UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

————————————

**No. 22-1129**

————————————

UNITED STATES OF AMERICA,

v.

GAMAL ABDELAZIZ,

*Defendant-Appellant.*

————————————

**No. 22-1138**

————————————

UNITED STATES OF AMERICA,

v.

JOHN WILSON,

*Defendant-Appellant.*

————————————

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 19-cr-10080
Hon. Nathaniel M. Gorton, U.S. District Judge

————————————

**JOINT APPENDIX, VOLUME I OF II (A1 to A4198)**

————————————

Brian T. Kelly
Joshua C. Sharp
Lauren A. Maynard
Nixon Peabody LLP
53 State Street
Boston, MA 02109
(617) 345-1000
jsharp@nixonpeabody.com

Noel J. Francisco
Yaakov M. Roth
Marco P. Basile
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Gamal Abdelaziz*

*Counsel for John Wilson*

(counsel continued on inside cover)

Michael Kendall
Lauren M. Papenhausen
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

*Counsel for John Wilson*

# TABLE OF CONTENTS

## <u>VOLUME I OF II</u>

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
|  | District Court Docket Sheet (No. 19-cr-10080) (through 4/17/2022) |  | A01 |
| 400 | Government's Motion for Hearing Regarding Conflicts of Interest (Excerpted) | 6/6/2019 | A214 |
| 732 | Fourth Superseding Indictment | 1/14/2020 | A217 |
| 906 | Transcript of Status Conference | 2/28/2020 | A289 |
| 972-9, 972-19, 972-33, 972-39, 972-47 | Exhibits I, S, GG, MM, and UU to Defendants' Memorandum of Law in Support of Motion to Dismiss Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing | 3/25/2020 | A313 |
| 1104, 1104-1, 1104-2, 1104-3 | Government's Sur-Reply in Opposition to Defendants' Motion to Dismiss Indictment or, In the Alternative, for Suppression of Evidence and for Discovery and an Evidentiary Hearing (with Exhibits A, B, and C) | 4/24/2020 | A369 |
| 1170 | Government's Response in Opposition to Defendants' Motions to Dismiss the Fourth Superseding Indictment | 5/8/2020 | A393 |
| 2015-1 | Defendants' Proposed Jury Instructions | 8/2/2021 | A455 |
| 2099-1 | Exhibit A (Declaration of Jamaal C. King) to Government's Notice and Motion Regarding Authentication | 8/17/2021 | A547 |

# TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| 2108 | Transcript of Pretrial Conference | 8/18/2021 | A550 |
| 2425 | Transcript of Trial Day 1 | 9/8/2021 | A615 |
| 2426 | Transcript of Trial Day 2 | 9/9/2021 | A657 |
| 2427 | Transcript of Trial Day 3 | 9/10/2021 | A868 |
| 2338 | Transcript of Trial Day 4 | 9/13/2021 | A967 |
| 2387 | Transcript of Trial Day 5 | 9/14/2021 | A1136 |
| 2388 | Transcript of Trial Day 6 | 9/15/2021 | A1278 |
| 2389 | Transcript of Trial Day 7 | 9/17/2021 | A1460 |
| 2390 | Transcript of Trial Day 8 | 9/20/2021 | A1658 |
| 2391 | Transcript of Trial Day 9 | 9/21/2021 | A1873 |
| 2392 | Transcript of Trial Day 10 | 9/23/2021 | A2083 |
| 2398 | Transcript of Trial Day 11 | 9/24/2021 | A2274 |
| 2399 | Transcript of Trial Day 12 | 9/27/2021 | A2490 |
| 2400 | Transcript of Trial Day 13 | 9/28/2021 | A2706 |
| 2401 | Transcript of Trial Day 14 | 9/29/2021 | A2935 |
| 2402 | Transcript of Trial Day 15 | 9/30/2021 | A3148 |
| 2403 | Transcript of Trial Day 16 | 10/1/2021 | A3199 |
| 2404 | Transcript of Trial Day 17 | 10/4/2021 | A3349 |
| 2405 | Transcript of Trial Day 18 | 10/5/2021 | A3554 |
| 2406 | Transcript of Trial Day 19 | 10/6/2021 | A3627 |

## TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| 2407 | Transcript of Trial Day 20 | 10/7/2021 | A3789 |
| 2413 | Transcript of Trial Day 21 | 10/8/2021 | A3878 |
| 2128-1, 2128-3 | Exhibits A and C to Motion to Suppress Thirteen "Consensual Wiretap" Calls | 8/31/2021 | A3897 |
| 2296 | Government's Response to Defendants' Offer of Proof for Evidence Excluded in the Examination of Rebecca Chassin and Opposition to Motion to Admit Extrinsic Evidence for Impeachment of Pat Haden, Alex Garfio, and Timothy Brunold | 9/28/2021 | A3903 |
| 2424 | Government's Opposition to Defendants' Motions for Judgment of Acquittal and New Trial | 11/5/2021 | A3912 |
| 2530 | Transcript of Gamal Abdelaziz Sentencing | 2/9/2022 | A3980 |
| 2554 | Transcript of John Wilson Sentencing | 2/16/2022 | A4009 |
| 2565-1, 2565-2. 2565-3 | Exhibits A, B, and C to John Wilson's Motion for Release Pending Appeal | 3/18/2022 | A4053 |
| 969-1 | Exhibits A-E to Government's Response to Defendant's Motion to Dismiss or Suppress, No 19-cr-10081 | | A4178 |
| 2540 | Gamal Abdelaziz Notice of Appeal | 2/23/2022 | A4195 |
| 2552 | John Wilson Notice of Appeal | 2/25/2022 | A4197 |

# TABLE OF CONTENTS
(continued)

## VOLUME II OF II

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---------|-------------|------|------|
|  | Exhibit 2 |  | A4199 |
|  | Exhibit 13 |  | A4208 |
|  | Exhibit 48 |  | A4209 |
|  | Exhibit 49 |  | A4212 |
|  | Exhibit 75 |  | A4215 |
|  | Exhibit 80 |  | A4217 |
|  | Exhibit 83 |  | A4280 |
|  | Exhibit 88 |  | A4284 |
|  | Exhibit 89 |  | A4286 |
|  | Exhibit 107 |  | A4288 |
|  | Exhibit 109 |  | A4296 |
|  | Exhibit 112 |  | A4297 |
|  | Exhibit 118 (Excluded) |  | A4299 |
|  | Exhibit 121 |  | A4300 |
|  | Exhibit 126 |  | A4303 |
|  | Exhibit 134 |  | A4305 |
|  | Exhibit 156 |  | A4440 |
|  | Exhibit 204 |  | A4441 |
|  | Exhibit 213 |  | A4443 |

## TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| | Exhibit 330 | | A4444 |
| | Exhibit 334 | | A4445 |
| | Exhibit 338 | | A4446 |
| | Exhibit 339 | | A4449 |
| | Exhibit 340 | | A4452 |
| | Exhibit 341 | | A4455 |
| | Exhibit 342 | | A4458 |
| | Exhibit 345 | | A4461 |
| | Exhibit 350 | | A4462 |
| | Exhibit 351 | | A4463 |
| | Exhibit 352 | | A4465 |
| | Exhibit 361 | | A4467 |
| | Exhibit 362 | | A4469 |
| | Exhibit 363 | | A4470 |
| | Exhibit 372 | | A4472 |
| | Exhibit 383 | | A4473 |
| | Exhibit 387 | | A4479 |
| | Exhibit 390 | | A4481 |
| | Exhibit 396 Transcript[*] | | A4483 |

[*] The transcripts of the audio and video files are not in evidence.

# TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| | Exhibit 396 Audio File | | A4484 |
| | Exhibit 415 | | A4485 |
| | Exhibit 427 | | A4487 |
| | Exhibit 439 Transcript* | | A4489 |
| | Exhibit 439 Audio File | | A4490 |
| | Exhibit 450 | | A4491 |
| | Exhibit 458 | | A4492 |
| | Exhibit 459 | | A4494 |
| | Exhibit 461 | | A4496 |
| | Exhibit 478 | | A4499 |
| | Exhibit 501A | | A4501 |
| | Exhibit 505 | | A4518 |
| | Exhibit 508 Transcript* | | A4521 |
| | Exhibit 508 Audio File | | A4523 |
| | Exhibit 511 | | A4524 |
| | Exhibit 513 | | A4527 |
| | Exhibit 525 Transcript* | | A4529 |
| | Exhibit 525 Audio File | | A4544 |
| | Exhibit 526 Transcript* | | A4545 |
| | Exhibit 526 Audio File | | A4555 |

# TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| | Exhibit 534 | | A4556 |
| | Exhibit 555 Transcript* | | A4557 |
| | Exhibit 555 Audio File | | A4592 |
| | Exhibit 561 Transcript* | | A4593 |
| | Exhibit 561 Audio File | | A4613 |
| | Exhibit 562 Transcript* | | A4614 |
| | Exhibit 562 Audio File | | A4624 |
| | Exhibit 563 Transcript* | | A4625 |
| | Exhibit 563 Audio File | | A4633 |
| | Exhibit 572 Transcript* | | A4634 |
| | Exhibit 572 Audio File | | A4637 |
| | Exhibit 574 Transcript* | | A4638 |
| | Exhibit 574 Audio File | | A4642 |
| | Exhibit 578 Transcript* | | A4643 |
| | Exhibit 578 Audio File | | A4660 |
| | Exhibit 587 Transcript* | | A4661 |
| | Exhibit 587 Audio File | | A4668 |
| | Exhibit 591 Transcript* | | A4669 |
| | Exhibit 591 Audio File | | A4676 |
| | Exhibit 592 | | A4677 |

# TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| | Exhibit 594 Transcript* | | A4683 |
| | Exhibit 594 Audio File | | A4696 |
| | Exhibit 596 | | A4697 |
| | Exhibit 602 Transcript* | | A4699 |
| | Exhibit 602 Audio File | | A4704 |
| | Exhibit 607 Transcript* | | A4705 |
| | Exhibit 607 Audio File | | A4799 |
| | Exhibit 620 Transcript* | | A4800 |
| | Exhibit 620 Audio File | | A4805 |
| | Exhibit 621 Transcript* | | A4806 |
| | Exhibit 621 Audio File | | A4812 |
| | Exhibit 624 | | A4813 |
| | Exhibit 625 Transcript* | | A4818 |
| | Exhibit 625 Audio File | | A4824 |
| | Exhibit 671 Transcript* | | A4825 |
| | Exhibit 671 Audio File | | A4833 |
| | Exhibit 711 | | A4834 |
| | Exhibit 712 | | A4835 |
| | Exhibit 714 | | A4837 |
| | Exhibit 716 | | A4839 |

## TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---|---|---|---|
| | Exhibit 718 | | A4840 |
| | Exhibit 719 | | A4841 |
| | Exhibit 720 | | A4842 |
| | Exhibit 721 | | A4843 |
| | Exhibit 722 | | A4844 |
| | Exhibit 1043 (Excluded) | | A4845 |
| | Exhibit 1049 (Excluded) | | A4848 |
| | Exhibit 1254 | | A4850 |
| | Exhibit 1255 | | A4853 |
| | Exhibit 1288 (Excluded) | | A4854 |
| | Exhibit 1364 | | A4856 |
| | Exhibit 1374 Video File (Source of 1374A and 1374B Excerpts) | | A4857 |
| | Exhibit 1374A Transcript[*] | | A4858 |
| | Exhibit 1374A Video File (Excluded) | | A4861 |
| | Exhibit 1374B Video File (Excluded) | | A4862 |
| | Exhibit 1422A (Excluded) | | A4863 |
| | Exhibit 1481A | | A4871 |
| | Exhibit 1482A | | A4874 |
| | Exhibit 1497A (Excluded) | | A4876 |

# TABLE OF CONTENTS
(continued)

| ECF NO. | DESCRIPTION | DATE | PAGE |
|---------|-------------|------|------|
| | Exhibit 1540 | | A4881 |
| | Exhibit 1563A | | A4882 |
| | Exhibit 7011 | | A4884 |
| | Exhibit 7785 | | A4918 |
| | Exhibit 7993 (Excluded) | | A4924 |
| | Exhibit 8116 (Excluded) | | A4925 |
| | Exhibit 8123 (Excluded) | | A4927 |
| | Exhibit 8192 (Excluded) | | A4928 |
| | Exhibit 8194 (Excluded) | | A4932 |
| | Exhibit 8243 (Excluded) | | A4934 |
| | Exhibit 8244 (Excluded) | | A4936 |
| | Exhibit 9024 | | A4938 |
| | Exhibit 9025 | | A4939 |
| | Exhibit 9564 (Excluded) | | A4945 |
| | Exhibit 9591A (Excluded) | | A4947 |
| | Exhibit 9619 (Excluded) | | A4951 |
| | Exhibit 9652 (Excluded) | | A4952 |
| | Exhibit 9848 (Excluded) | | A4953 |
| | Exhibit 1208 (Excluded) | | A4954 |
| | Exhibit 9682 (Excluded) | | A4956 |

APPEAL,CASREF,FirstStep,INTERP,VICTIM

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:19–cr–10080–NMG All Defendants

Case title: USA v. Colburn, et al

Magistrate judge case numbers:  1:19–mj–06087–MPK
1:19–mj–06087–MPK

Date Filed: 03/05/2019

Assigned to: Judge Nathaniel M. Gorton

**Defendant (1)**

| | |
|---|---|
| **David Sidoo** | represented by |
| *TERMINATED: 07/21/2020* | |

represented by **David Z. Chesnoff**
Chesnoff & Schonfeld
520 S. 4th Street
Las Vegas, NV 89101
702–384–5563
Email: dzchesnoff@cslawoffice.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Martin G. Weinberg**
Martin G. Weinberg, PC
20 Park Plaza
Suite 1000
Boston, MA 02116
617–227–3700
Fax: 617–338–9538
Email: owlmgw@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Richard A. Schonfeld**
Chesnoff & Schonfeld
520 South Fourth Street
Las Vegas, NV 89101
702–384–5563
Email: rschonfeld@cslawoffice.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:1349 – CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1ssss)

**Disposition**

Defendant sentenced to a term of 90 days
imprisonment to be followed by a term of 1 year
Supervised Release; $250,000.00 fine; $100
Special Assessment

**Highest Offense Level (Opening)**

Felony

A1

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD (1) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1sss) | |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2ss) | Dismissed on government motion |
| 18:1956(h)–MONEY LAUNDERING CONSPIRACY (3sss) | Dismissed on government motion |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ssss) | Dismissed on government motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: Judge Nathaniel M. Gorton
Referred to: Magistrate Judge M. Page Kelley

**Defendant (2)**

| **Gregory Colburn** | represented by | **David S. Schumacher** |
|---|---|---|

represented by **David S. Schumacher**
Hooper, Lundy & Bookman, P.C.
470 Atlantic Avenue
Suite 1201
Boston, MA 02210
617–532–2704
Email: DSchumacher@health–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jordan R.C. Kearney**
Hooper, Lundy Bookman, P.C.,
575 Market Street

Suite 2300
San Francisco, CA 94105
(415) 875–8500
Email: JKearney@health–law.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Patric Hooper**
Hooper, Lundy & Bookman, PC
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
310–551–8165
Email: phooper@health–law.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Angela J. Benoit**
Hooper, Lundy & Bookman, P.C.
470 Atlantic Avenue
Suite 1201
Boston, MA 02210
978–395–1731
Email: hlbdocket@health–law.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1sss) | Defendant sentenced to a term of 8 weeks imprisonment to be followed by a term of 1 year Supervised Release; $12,500.00 Fine; $100 Special Assessment. |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (2) | |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2s) | |

**A3**

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3ss)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3sss) | Dismissed on Government motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M. Page
Kelley

**Defendant (3)**

| **Amy Colburn** | represented by | **David S. Schumacher** |
| --- | --- | --- |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Jordan R.C. Kearney** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |
| | | |
| | | **Patric Hooper** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |
| | | |
| | | **Angela J. Benoit** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |

**A4**

18:1349––CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1s)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1ss)

18:1349 – CONSPIRACY TO                     Defendant sentenced to a term of 8 weeks
COMMIT MAIL AND WIRE                        imprisonment to be followed by a term of 1 year
FRAUD AND HONEST SERVICES                   Supervised Release; $12,500.00 Fine; $100
MAIL AND WIRE FRAUD                         Supervised Release
(1sss)

18:1956(h) – MONEY
LAUNDERING CONSPIRACY
(2)

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2s)

18:1956(h)–MONEY LAUNDERING
CONSPIRACY
(3ss)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3sss) | Dismissed on Government motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

Appeals court case number:
22–1129 USCA – First Circut

**Defendant (4)**

| **Gamal Abdelaziz** | represented by | **Brian T. Kelly** |
| --- | --- | --- |
| *TERMINATED: 02/16/2022* | | Nixon Peabody LLP |
| | | 100 Summer Street |
| | | Boston, MA 02110 |
| | | 617–345–1000 |
| | | Email: bkelly@nixonpeabody.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

*Designation: Retained*

**Donald J. Campbell**
Campbell & Williams
700 S 7th Street
Las Vegas, NV 89101
702–382–5222
Email: djc@cwlawlv.com
*TERMINATED: 03/26/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joshua C.H. Sharp**
Nixon Peabody LLP
Exchange Place
53 State Street
Boston, MA 02109–2835
617–345–1135
Email: jsharp@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Elliot M. Weinstein**
Elliot M. Weinstein
83 Atlantic Avenue
Boston, MA 02110
617–367–9334
Email: elliot@eweinsteinlaw.com
*TERMINATED: 08/20/2021*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Lauren Maynard**
Nixon Peabody LLP
Exchange Place
53 State Street
Boston, MA 02109–2835
617–345–1238
Email: lmaynard@nixonpeabody.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert L. Sheketoff**
One McKinley Square
Boston, MA 02109
617–367–3449
Fax: 617–723–1710
Email: sheketoffr@aol.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**                                     **Disposition**

18:1349–-CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST
SERVICES MAIL AND WIRE
FRAUD
(1)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST

**A6**

SERVICES MAIL AND WIRE
FRAUD
(1s)

18:1349 – CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST
SERVICES MAIL AND WIRE
FRAUD
(1ss)

Defendant sentenced to a term of imprisonment of
12 months and 1 day, which term consists of terms
of 12 months and 1 day on Counts 1ss and 2ss,
such terms to be served concurrently; 2 years
Supervised Release, which term consists of terms
of 2 years on Counts 1ss and 2ss, such terms to run
concurrently; $250,000 fine, which consists of
$125,000 on each count; $200 Special Assessment

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

18:371–CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2s)

18:371 – CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2ss)

Defendant sentenced to a term of imprisonment of
12 months and 1 day, which term consists of terms
of 12 months and 1 day on Counts 1ss and 2ss,
such terms to be served concurrently; 2 years
Supervised Release, which term consists of terms
of 2 years on Counts 1ss and 2ss, such terms to run
concurrently; $250,000 fine, which consists of
$125,000 on each count; $200 Special Assessment

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

**Defendant (5)**

| | | |
| --- | --- | --- |
| **Diane Blake**<br>*TERMINATED: 11/23/2020* | represented by | **Stephen H. Sutro**<br>Duane Morris LLP<br>Spear Tower |

**A7**

One Market Plaza
Suite 2200
San Francisco, CA 94105–1127
415–957–3000
Email: SHSutro@duanemorris.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Christian G. Kiely**
Todd & Weld
One Federal Street
27th Floor
Boston, MA 02110
617–624–4729
Email: ckiely@toddweld.com
*ATTORNEY TO BE NOTICED*

**David E. Meier**
Todd & Weld
One Federal Street
27th Floor
Boston, MA 02110
617–720–2626
Fax: 617–227–5777
Email: dmeier@toddweld.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Melinda L. Thompson**
Todd & Weld
One Federal Street
27th Floor
Boston, MA 02110
617–624–4754
Email: mthompson@toddweld.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:1349––CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1s)

18:1349 – CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1ss)

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

18:371–CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY

**Disposition**

Defendant sentenced to a term of 6 weeks
imprisonment, to be followed by a term of 2 years
Supervised Release; $125,000.00 Fine; $100
Special Assessment

(2s)

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government Motion |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government Motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

**Defendant (6)**

| **Todd Blake**<br>*TERMINATED: 11/23/2020* | represented by | **Stephen H. Sutro**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
|---|---|---|
| | | **Christian G. Kiely**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **David E. Meier**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| | | **Melinda L. Thompson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349–––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES | |

**A9**

MAIL AND WIRE FRAUD
(1)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1s)

18:1349 – CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1ss)

Defendant sentenced to a term of 4 months
imprisonment, which term consists of terms of 4
months on Counts 1ss and 3ss, such terms to be
served concurrently; 2 Years Supervised
Release, which term consists of terms of 2 years
on Counts 1ss and 3ss, such terms to run
concurrently; $125,000.00 Fine, which consists
of $75,000.00 on Count 1ss and $50,000.00 on
Count 3ss; $200 Special Assessment

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

18:371–CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2s)

18:1956(h)–MONEY LAUNDERING
CONSPIRACY
(3s)

18:1956(h) – MONEY
LAUNDERING CONSPIRACY
(3ss)

Defendant sentenced to a term of 4 months
imprisonment, which term consists of terms of 4
months on Counts 1ss and 3ss, such terms to be
served concurrently; 2 Years Supervised
Release, which term consists of terms of 2 years
on Counts 1ss and 3ss, such terms to run
concurrently; $125,000.00 Fine, which consists
of $75,000.00 on Count 1ss and $50,000.00 on
Count 3ss; $200 Special Assessment

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                     **Disposition**

18:371 – CONSPIRACY TO
COMMIT FEDERAL PROGRAMS        Dismissed on Government Motion
BRIBERY
(2ss)

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                              **Disposition**

18:1349 – Conspiracy to commit mail
fraud and honest services mail fraud.

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

**A10**

**Defendant (7)**

**I–Hsin Chen**
*also known as*
I–Hsin Joey Chen

represented by **Chase A. Scolnick**
KELLER/ANDERLE LLP
18300 Von Karman Avenue
Suite 930
92612
Irvine, CA 92612
949–476–8700
Email: cscolnick@kelleranderle.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jennifer L. Keller**
KELLER/ANDERLE LLP
18300 Von Karman Avenue
Suite 930
Irvine, CA 92612
949–476–8700
Email: jkeller@kelleranderle.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Reuben Camper Cahn**
KELLER/ANDERLE LLP
18300 Von Karman Avenue
Suite 930
Irvine, CA 92612
(949) 476–8700
Email: rcahn@kelleranderle.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:1349––CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST
SERVICES MAIL AND WIRE
FRAUD
(1)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST
SERVICES MAIL AND WIRE
FRAUD
(1s)

18:1349 – CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST
SERVICES MAIL AND WIRE
FRAUD
(1ss)

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

**Disposition**

**A11**

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

18:1341 AND 1346 AND 2– WIRE
FRAUD AND HONEST
SERVICES WIRE FRAUD;
AIDING AND ABETTING
(5s)

18:1341 and 1346 and 2 – WIRE
FRAUD AND HONEST
SERVICES WIRE FRAUD;
AIDING AND ABETTING
(5ss)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton

**Defendant (8)**

| **Mossimo Giannulli**<br>*TERMINATED: 09/09/2020* | represented by | **Mark E Beck**<br>Mark Beck Law<br>350 West Colorado, Suite 200<br>Pasadena, CA 91105<br>(213) 596–7828<br>Email: mbeck@markbecklaw.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| --- | --- | --- |
| | | **Perry J. Viscounty**<br>Latham & Watkins LLP<br>650 Town Center Drive<br>20th Floor<br>Costa Mesa, CA 92626<br>(714) 755–8288<br>Email: perry.viscounty@lw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| | | **Roman Martinez** |

**A12**

Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004–1304
(202) 637–3377
Email: roman.martinez@lw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Sean M. Berkowitz**
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 777–7016
Email: sean.berkowitz@lw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Allison S Blanco**
Latham & Watkins LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626
(714) 755–8293
Email: allison.blanco@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**George W. Vien**
Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street
Boston, MA 02110
617–720–2880
Fax: 617–720–3554
Email: gwv@dcglaw.com
*ATTORNEY TO BE NOTICED*

**Joshua N. Ruby**
Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street
Boston, MA 02110
617–720–2880
Email: jnr@dcglaw.com
*ATTORNEY TO BE NOTICED*

**William J. Trach**
Latham & Watkins LLP
John Hancock Tower, 27th Flr.
200 Clarendon Street
Boston, MA 02116
617–880–4514
Email: william.trach@lw.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |

**A13**

| | |
|---|---|
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Defendant sentenced to a term of 5 months imprisonment to be followed by a term of Supervised Release of 2 years; $250,000.00 Fine; $100 Special Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371–CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2s) | |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government Motion |
| 18:1956(h)–MONEY LAUNDERING CONSPIRACY (3s) | |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M. Gorton

**Defendant (9)**

| | | |
|---|---|---|
| **Elizabeth Henriquez**<br>*TERMINATED: 04/07/2020* | represented by | **Aaron M. Katz**<br>Ropes & Gray LLP – MA<br>Prudential Tower<br>800 Boylston St.<br>Boston, MA 02199–3600<br>617–951–7117<br>Email: aaron.katz@ropesgray.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**A14**

**Colleen A Conry**
Ropes & Gray LLP,
2099 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006–6807
(202) 508–4600
Email: colleen.conry@ropesgray.com *(Inactive)*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Laura Gaffney Hoey**
Ropes & Gray, LLP
111 South Wacker Drive
Chicago, IL 60606
312–845–1318
Email: laura.hoey@ropesgray.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | Defendant sentenced to a term of 7 months imprisonment, which term consists of terms of 7 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; a fine of $200,000.00, which consists of fines of $100,000.00 on each count; $200 Special Assessment. |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | Defendant sentenced to a term of 7 months imprisonment, which term consists of terms of 7 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; a fine of $200,000.00, which consists of fines of $100,000.00 on each count; $200 Special Assessment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M. Gorton

**Defendant (10)**

**Manuel Henriquez**
*TERMINATED: 08/04/2020*

represented by **Melinda Haag**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street
San Francisco, CA 94117
628–432–5110
Email: mhaag@paulweiss.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robin Linsenmayer**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street
Ste 24th Floor
San Francisco, CA 94105
628–432–5100
Email: robin.linsenmayer@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Walter Brown**
Orrick, Herrington & Sutcliffe LLP
405 Howard Street
San Francisco, CA 94105
(415) 773–5995
Email: wbrown@orrick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | Defendant is sentenced to a term of 6 months imprisonment, which term consists of terms of 6 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $200,000 fine, which consists of fines of $100,000 on each count; $200 Special Assessment |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | Defendant is sentenced to a term of 6 months imprisonment, which term consists of terms of 6 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $200,000 fine, which consists of fines of $100,000 on each count; $200 Special Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

A16

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

---

Assigned to: Judge Nathaniel M. Gorton

Appeals court case numbers: 20–1418 USCA – First Circuit, 20–1823 USCA – First Circuit

**Defendant (11)**

| **Douglas Hodge** *TERMINATED: 02/25/2020* | represented by | **Brien T. O'Connor** Ropes & Gray – MA Prudential Tower 800 Boylston Street Boston, MA 02199–3600 617–951–7385 Fax: 617–951–7050 Email: boconnor@ropesgray.com *ATTORNEY TO BE NOTICED* |
| --- | --- | --- |
| | | **Ezra D. Geggel** Ropes & Gray – MA Prudential Tower 800 Boylston Street Boston, MA 02199–3600 617–951–7438 Email: ezra.geggel@ropesgray.com *ATTORNEY TO BE NOTICED* |
| | | **Joan McPhee** Ropes & Gray LLP – MA Prudential Tower 800 Boylston St. Boston, MA 02199–3600 617–951–7535 Fax: 617–951–7050 Email: jmcphee@ropesgray.com *ATTORNEY TO BE NOTICED* |
| | | **Miranda Hooker** Troutman Pepper Hamilton Sanders LLP 125 High Street, 19th Floor Boston, MA 02110 617–204–5160 Email: Miranda.Hooker@Troutman.com *ATTORNEY TO BE NOTICED* *Designation: Retained* |

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE | Defendant sentenced to a term of 9 months imprisonment, which term consists of terms of 9 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which |

**A17**

| | |
|---|---|
| FRAUD<br>(1) | term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $750,000, which consists of fines of $250,000 on Count 1 and $500,000 on Count 2; $200 Special Assessment |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY<br>(2) | Defendant sentenced to a term of 9 months imprisonment, which term consists of terms of 9 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $750,000, which consists of fines of $250,000 on Count 1 and $500,000 on Count 2; $200 Special Assessment |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                               **Disposition**

18:1349 – Conspiracy to commit mail fraud and honest services mail fraud.

---

Assigned to: Judge Nathaniel M. Gorton

**Defendant (12)**

| | | |
|---|---|---|
| **Michelle Janavs**<br>*TERMINATED: 03/05/2020* | represented by | **John L. Littrell**<br>Bienert Katzman PLC<br>903 Calle Amanecer<br>Suite 350<br>San Clemente, CA 92673<br>(949) 369–3700<br>Email: jlittrell@bklwlaw.com *(Inactive)*<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| | | **Jonathan L. Kotlier**<br>Nutter, McClennen & Fish, LLP<br>Seaport West<br>155 Seaport Boulevard<br>Boston, MA 02210–2604<br>617–439–2000<br>Fax: 617–310–9683<br>Email: jkotlier@nutter.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Thomas H. Bienert** |

A18

Bienert Katzman PLC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
(949) 369–3700
Email: tbienert@bienertkatzman.com *(Inactive)*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**William D. Weinreb**
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue
Suite 520
Boston, MA 02199
617–712–7100
Email: billweinreb@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | Defendant sentenced to a term of 5 months imprisonment, which term consists of terms of 5 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $250,000; $200 Special Assessment |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | Defendant sentenced to a term of 5 months imprisonment, which term consists of terms of 5 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $250,000; $200 Special Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M. Gorton
Referred to: Magistrate Judge M. Page Kelley

**Defendant (13)**

**Elisabeth Kimmel**
*TERMINATED: 12/10/2021*

represented by **Eoin P. Beirne**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–348–1707
Fax: 617–542–2241
Email: ebeirne@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark E. Robinson**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–542–6000
Email: merobinson@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Robert Popeo**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–542–6000
Fax: 617–348–4745
Email: rrpopeo@mintz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cory S. Flashner**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–542–6000
Email: csflashner@mintz.com
*ATTORNEY TO BE NOTICED*

**Mathilda McGee–Tubb**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–348–4404
Email: msmcgee–tubb@mintz.com
*ATTORNEY TO BE NOTICED*

**Peter Charles Mulcahy**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–348–4733
Email: pcmulcahy@mintz.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:1349––CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES

**Disposition**

MAIL AND WIRE FRAUD
(1)

18:1349– CONSPIRACY TO
COMMIT MAIL AND WIRE
FRAUD AND HONEST SERVICES
MAIL AND WIRE FRAUD
(1s)

18:1349 – CONSPIRACY TO                    Defendant sentenced to a term of 6 weeks
COMMIT MAIL AND WIRE                       imprisonment, to be followed by a term of 2 years
FRAUD AND HONEST SERVICES                  Supervised Release (the first 12 months of which
MAIL AND WIRE FRAUD                        shall be on home detention); $250,000 Fine; $100
(1ss)                                      Special Assessment

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

18:371–CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2s)

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government Motion |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M. Gorton

**Defendant (14)**

| **Lori Loughlin**<br>*TERMINATED: 09/09/2020* | represented by | **David C. Scheper**<br>Winston & Strawn<br>333 South Grand Avenue, 38th Floor<br>Los Angeles, CA 90071<br>213.615.1700<br>Email: dscheper@winston.com<br>*TERMINATED: 02/26/2021*<br>*LEAD ATTORNEY* |
| --- | --- | --- |

**A21**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Perry J. Viscounty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Roman Martinez**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Sean M. Berkowitz**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Allison S Blanco**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**William J. Trach**
(See above for address)
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Defendant sentenced to a term of 2 months imprisonment to be followed by a term of 2 years of Supervised Release; $150,000.00 Fine; $100 Special Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371–CONSPIRACY TO COMMIT FEDERAL PROGRAMS | |

**A22**

BRIBERY
(2s)

| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government Motion |
|---|---|

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government Motion |
|---|---|

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

---

Assigned to: Judge Nathaniel M. Gorton

Appeals court case number: 21–1421
USCA – First Circuit

**Defendant (15)**

| **William McGlashan, Jr.**<br>*TERMINATED: 05/22/2021* | represented by | **Jack W. Pirozzolo**<br>Sidley Austin LLP<br>60 State Street<br>34th Floor<br>Boston, MA 02109<br>617–223–0304<br>Fax: 617–223–0301<br>Email: jpirozzolo@sidley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
| | | **Joan M. Loughnane**<br>Sidley Austin LLP<br>787 7th Avenue<br>New York, NY 10019<br>212–839–5567<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |
| | | **John C. Hueston**<br>Hueston Hennigan<br>620 Newport Center Drive<br>Suite 1300<br>Newport Beach, CA 90014<br>949–226–6740<br>Email: jhueston@hueston.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**A23**

*Designation: Retained*

**Marshall A. Camp**
Hueston Hennigan LLP
523 West 6th Street
Suite 400
Los Angeles, CA 90014
213–778–4340
Email: mcamp@hueston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Brittani A Jackson**
Hueston Hennigan LLP
523 West 6th Street
Suite 400
Los Angeles, CA 90014
(213) 788–4065
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Vicki Chou**
Hueston Hennigan LLP
523 West 6th Street
Suite 400
Los Angeles, CA
(213) 788– 4340
Email: vchou@hueston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371–CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2s) | |
| 18:1956(h)–MONEY LAUNDERING CONSPIRACY (3s) | |
| 18:1341 AND 1346 AND 2– WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; AIDING AND ABETTING (7s) | |

**A24**

18:1341 and 1346 and 2 – WIRE
FRAUD AND HONEST SERVICES
WIRE FRAUD; AIDING AND
ABETTING
(7ss)

Defendant sentenced to a term of 3 months
imprisonment, to be followed by a term of 2
years Supervised Release; $250,000 Fine; $100
Special Assessment

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Dismissed on Government motion |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government motion |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

**Defendant (16)**

**Marci Palatella**          represented by   **Allen J. Ruby**
*TERMINATED: 12/17/2021*                      Allen Ruby, Attorney at Law
                                              15559 Union Avneue, #138
                                              Los Gatos, CA 95032
                                              408–477–9690
                                              Email: allen@allenruby.com
                                              *LEAD ATTORNEY*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*
                                              *Designation: Retained*

                                              **Emily A. Reitmeier**
                                              Skadden, Arps, Slate, Meagher & Flom LLP
                                              525 University Ave
                                              Palo Alto, CA 94301
                                              (650) 470–4500
                                              Email: emily.reitmeier@skadden.com
                                              *LEAD ATTORNEY*
                                              *PRO HAC VICE*
                                              *ATTORNEY TO BE NOTICED*

*Designation: Retained*

**Jack P. DiCanio**
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
650–470–4500
Email: jack.dicanio@skadden.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael K. Loucks**
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street
Boston, MA 02116
617–573–4840
Email: michael.loucks@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Defendant to a term of 6 weeks imprisonment to be followed by a term of 2 years Supervised Release (the first 6 months of which shall be spent in home detention); $250,000 Fine; $100 Special Assessment |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371–CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2s) | |
| 18:1956(h)–MONEY LAUNDERING CONSPIRACY (3s) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY | Dismissed on Government Motion |

**A26**

(2ss)

18:1956(h) – MONEY
LAUNDERING CONSPIRACY                    Dismissed on Government motion
(3ss)

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                                **Disposition**

18:1349 – Conspiracy to commit
mail fraud and honest services mail
fraud.

---

Assigned to: Judge Nathaniel M.
Gorton
Referred to: Magistrate Judge M.
Page Kelley

Appeals court case number:
22–1138 USCA – First Circuit

**Defendant (17)**

**John Wilson**                  represented by  **Andrew E. Tomback**
*TERMINATED: 02/18/2022*                       McLaughlin & Stern, LLP
                                               260 Madison Avenue
                                               New York, NY 10016
                                               917–301–1285
                                               Email: atomback@mclaughlinstern.com
                                               *LEAD ATTORNEY*
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*
                                               *Designation: Retained*

                                               **Lauren M. Papenhausen**
                                               White & Case, LLP
                                               75 State Street
                                               Boston, MA 02109
                                               212–819–7077
                                               Email: lauren.papenhausen@whitecase.com
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Michael Kendall**
                                               White & Case, LLP
                                               75 State Street
                                               Boston, MA 02109
                                               617–939–9310
                                               Email: michael.kendall@whitecase.com
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Noel J. Francisco**
                                               Jones Day
                                               51 Louisiana Aveenue, NW
                                               Washington, DC 20001–2113
                                               202–879–5485
                                               Email: njfrancisco@jonesday.com
                                               *LEAD ATTORNEY*
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

**A27**

*Designation: Retained*

**Yakov Malkiel**
Division of Administrative Law Appeals
14 Summer Street
Malden, MA 02148
781–397–4700
Email: yakov.malkiel@mass.gov
*TERMINATED: 04/14/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349–––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; a fine of $200,000.00, which consists of $100,000.00 on Count 1ss and $100,000.00 on Count 2ss; $88,546.00 Restitution; $800 Special Assessment |
| 18:1956(h)– MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371–CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2s) | |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; a fine of $200,000.00, which consists of $100,000.00 on Count 1ss and $100,000.00 on Count 2ss; $88,546.00 Restitution; $800 Special Assessment |
| 18:1956(h)–MONEY LAUNDERING CONSPIRACY (3s) | |
| 18:1341 AND 1346 AND 2– WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; | |

**A28**

AIDING AND ABETTING
(6s)

18:1341 and 1346 and 2 – WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; AIDING AND ABETTING
(6ss)

Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; $88,546.00 Restitution; $800 Special Assessment

18:1341 AND 1346 AND 2– WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; AIDING AND ABETTING
(8s)

18:1341 and 1346 and 2 – WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; AIDING AND ABETTING
(8ss–9ss)

Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; $88,546.00 Restitution; $800 Special Assessment

18:1341 AND 1346 AND 2– WIRE FRAUD AND HONEST SERVICES WIRE FRAUD; AIDING AND ABETTING
(9s)

18:666(a)(2)and 2–FEDERAL PROGRAMS BRIBERY; AIDING AND ABETTING
(11s–12s)

18:666(a)(2) and (2) – FEDERAL PROGRAMS BRIBERY; AIDING AND ABETTING
(11ss–12ss)

Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; $88,546.00 Restitution; $800 Special Assessment

26:7206(1) – FILING A FALSE TAX RETURN
(13ss)

Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; a fine; $88,546.00 Restitution; $800 Special Assessment

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:1956(h) – MONEY LAUNDERING CONSPIRACY

**Disposition**

Dismissed on Government motion

(3ss)

**Highest Offense Level**
**(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M. Gorton

**Defendant (18)**

| | | |
|---|---|---|
| **Homayoun Zadeh** *TERMINATED: 11/16/2021* | represented by | **Megan A. Siddall** Miner Siddall LLP 101 Federal Street, Suite 650 Boston, MA 02110 617–202–5878 Fax: 617-202-5893 Email: msiddall@msdefenders.com *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Designation: Retained* |
| | | **Seth B. Orkand** Robinson & Cole LLP One Boston Place, 25th floor Boston, MA 02108 617–557–5915 Fax: 617-557-5999 Email: sorkand@rc.com *TERMINATED: 01/04/2021* *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Tracy A. Miner** Miner Siddall LLP 101 Federal Street Suite 650 Boston, MA 02110 617–202–5890 Fax: 617-202-5893 Email: tminer@msdefenders.com *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Designation: Retained* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349––CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349– CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |

**A30**

26:7206(1) – FILING A FALSE
TAX RETURN
(1sss)

18:1956(h)– MONEY
LAUNDERING CONSPIRACY
(2)

18:371–CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2s)

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

Defendant sentenced to a term of 6 weeks
imprisonment to be followed by a term of 1 year
Supervised Release; Restitution in the amount of
$8,414; fine in the amount of $20,000; $100
Special Assessment

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1349 – CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | Dismissed on Government motion |
| 18:371 – CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2ss) | Dismissed on Government Motion |
| 18:1956(h) – MONEY LAUNDERING CONSPIRACY (3ss) | Dismissed on Government Motion |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

Assigned to: Judge Nathaniel M.
Gorton

**Defendant (19)**

| **Robert Zangrillo**<br>*TERMINATED: 06/09/2021* | represented by | **Matthew L. Schwartz**<br>Boies Schiller Flexner<br>55 Hudson Yards<br>20th Floor<br>New York, NY 1001<br>212–303–3646<br>Email: mlschwartz@bsfllp.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| --- | --- | --- |

*Designation: Retained*

**Nicholas C. Theodorou**
Foley Hoag LLP
155 Seaport Boulevard
Seaport World Trade Center West
Boston, MA 02210
617−832−1163
Fax: 617−832−7000
Email: ntheodorou@foleyhoag.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin G. Weinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Pabian**
Michael Pabian Law Office, LLC
20 Park Plaza, Suite 1000
Boston, MA 02116
339−227−0642
Email: pabianlaw38@gmail.com
*ATTORNEY TO BE NOTICED*

**Sara K Winik**
Boies Schiller Flexner LLP
55 Hudson Yards
20th Floor
New York, NY 10001
(212) 446−2300
Email: swinik@bsfllp.com
*TERMINATED: 06/19/2020*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349−−CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1) | |
| 18:1349− CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1s) | |
| 18:1349 − CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD AND HONEST SERVICES MAIL AND WIRE FRAUD (1ss) | |
| 18:1956(h)− MONEY LAUNDERING CONSPIRACY (2) | |
| 18:371−CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (2s) | |

**A32**

18:371 – CONSPIRACY TO
COMMIT FEDERAL PROGRAMS
BRIBERY
(2ss)

18:1956(h)–MONEY
LAUNDERING CONSPIRACY
(3s)

18:1956(h) – MONEY
LAUNDERING CONSPIRACY
(3ss)

18:1341 AND 1346 AND 2– WIRE
FRAUD AND HONEST SERVICES
WIRE FRAUD; AIDING AND
ABETTING
(4s)

18:1341 and 1346 and 2 – WIRE
FRAUD AND HONEST SERVICES
WIRE FRAUD; AIDING AND
ABETTING
(4ss)

18:1341 AND 1346 AND 2– WIRE
FRAUD AND HONEST SERVICES
WIRE FRAUD; AIDING AND
ABETTING
(10s)

18:1341 and 1346 and 2 – WIRE
FRAUD AND HONEST SERVICES
WIRE FRAUD; AIDING AND
ABETTING
(10ss)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:1349 – Conspiracy to commit mail fraud and honest services mail fraud. | |

**Movant**

| **University of Southern California** | represented by | **Debra Wong Yang** |
| --- | --- | --- |
| | | Gibson Dunn |
| | | 333 South Grand Avenue |
| | | Los Angeles, CA 90071 |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

Douglas Fuchs
Gibson Dunn
333 South Grand Avenue
Los Angeles, CA 90071
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

Anthony E. Fuller
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617–371–1000
Fax: 617–371–1037
Email: anthony.fuller@hoganlovells.com
*ATTORNEY TO BE NOTICED*

Elizabeth Carr Pignatelli
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617–371–1031
Email: elizabeth.pignatelli@hoganlovells.com
*ATTORNEY TO BE NOTICED*

William H. Kettlewell
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617–371–1005
Fax: 617–371–1037
Email: bill.kettlewell@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**William Rick Singer**                     represented by **Andrew Neil Hartzell**
Freeman Mathis & Gary, LLP
60 State Street, 6th Flr.
Boston, MA 02109
617–963–5966
Email: nhartzell@fmglaw.com
*ATTORNEY TO BE NOTICED*

**Donald H. Heller**
Donal H. Heller, A Law Corporation
2638 American River Drive
Sacramento, CA 95825
916–974–3500
Fax: 916.927.2009
Email: dheller@donaldhellerlaw.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Williams & Olds, CPAs**                     represented by **Andrew Neil Hartzell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donald H. Heller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Interested Party**

| | | |
|---|---|---|
| **Georgetown University** | represented by | **Bruce M. Berman**<br>Wilmer, Cutler & Pickering Hale and Dorr LLP<br>2445 M Street, N.W.<br>Washington, DC 20037–1420<br>202–663–6000<br>Email: Bruce.Berman@wilmerhale.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

**George P. Varghese**
Wilmer Cutler Pickering Hale and Dorr LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6524
Email: George.Varghese@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Bruce B Berman**
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Timothy J. Perla**
Wilmer Cutler Pickering Hale and Dorr LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6696
Fax: 617–526–6000
Email: timothy.perla@wilmerhale.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Interested Party**

**Objecting Students**

**Objector**

| | | |
|---|---|---|
| **Educational Testing Service** | represented by | **James P. Loonam**<br>Jones Day<br>250 Vesey Street<br>New York, NY 10281<br>212–326–3808<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Objector**

Pat Haden                              represented by   **Brandon D. Fox**
                                                        Jenner & Block LLP
                                                        515 South Flower Street
                                                        Suite 3300
                                                        Los Angeles, CA 90071–2246
                                                        (213) 239–5100
                                                        Email: bfox@jenner.com
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

                                                        **William J. Lovett**
                                                        Lovett O'Brien LLP
                                                        125 High Street
                                                        Ste 26th Floor
                                                        Boston, MA 02110
                                                        617–371–1007
                                                        Fax: 617–314–0447
                                                        Email: wlovett@lovettobrien.com
                                                        *ATTORNEY TO BE NOTICED*

**Objector**

Alex Garfio                            represented by   **David P. Vaughn**
                                                        Law Offices of David Vaughn
                                                        350 S Grand Ave
                                                        Suite 3550
                                                        Los Angeles, CA 90071–3447
                                                        213–973–9175
                                                        Email: davidvaughn@vaughnlawoffices.com
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

                                                        **Glenn A. MacKinlay**
                                                        McCarter & English, LLP
                                                        265 Franklin Street
                                                        Boston, MA 02110
                                                        617–449–6548
                                                        Email: gmackinlay@mccarter.com
                                                        *ATTORNEY TO BE NOTICED*

**Objector**

Alexandra Reisman                      represented by   **David P. Vaughn**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

                                                        **Glenn A. MacKinlay**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Objector**

Scott Wandzilak            represented by   **David P. Vaughn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Glenn A. MacKinlay**
(See above for address)
*ATTORNEY TO BE NOTICED*

---

**Objector**

Objecting Parents

---

**Objector**

Ron Orr            represented by   **Marc Charles Laredo**
Laredo & Smith LLP
101 Federal Street
Suite 650
Boston, MA 02110
617–443–1100
Email: laredo@laredosmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D Smith**
Laredo & Smith, LLP
101 Federal Street, Suite 650
Boston, MA 02110
617–443–1100
Fax: 617–367–6475
Email: smith@laredosmith.com
*ATTORNEY TO BE NOTICED*

---

**Objector**

Steve Lopes            represented by   **Marc Charles Laredo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark D Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

---

**Objector**

Steven Masera            represented by   **David H. Thomas**
Taft Stettinius & Hollister LLP
65 E State St #1000
Columbus, OH 43215
614–334–6199
Fax: 614–221–2007
Email: dthomas@taftlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Kathryn S. Wallrabenstein**
Taft, Stettinius & Hollister LLP
65 East State Street
Suite 1000
Columbus, OH 43215
614–220–0238
Fax: 614–221–2007
Email: kwallrabenstein@taftlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Philip Yvan Kouyoumdjian**
Taft Stettinius & Hollister LLP
14 Penn Plaza
Ste 2102
New York, NY 10122
917–534–7180
Email: pkouyoumdjian@taftlaw.com
*ATTORNEY TO BE NOTICED*

**Intervenor**
**News Media**                          represented by  **Gordon P. Katz**
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116
617–573–5839
Email: gordon.katz@hklaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jeremy M. Sternberg**
Holland & Knight (B)
10 St. James Avenue
11th Flr.
Boston, MA 02116
617–854–1476
Email: jeremy.sternberg@hklaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Intervenor**
**Ron Crawford**                        represented by  **Laura Diss Gradel**
Jones Day (Bos)
100 High Street, 21st Flr.
Boston, MA 02110
617–960–3939
Email: lgradel@foleyhoag.com
*ATTORNEY TO BE NOTICED*

**Intervenor**
**Boston Globe Media Partners, LLC**    represented by  **Jennifer Miller**
Morgan Lewis & Bockius LLP
One Federal Street
Boston, MA 02110

617–951–8360
Fax: 617–951–8736
Email: jonathan.albano@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**

**USA**                                    represented by    **Eric S. Rosen**
Roche Freedman, LLP
101 Arch Street
8th Floor
Boston, MA 02110
617–977–4163
Email: erosen@rochefreedman.com
*TERMINATED: 10/26/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Eric S. Rosen**
Roche Freedman, LLP
470 Atlantic Avenue
4th Floor
Boston, MA 02210
617) 977–4163
Email: erosen@rochefreedman.com
*TERMINATED: 10/26/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Ian J. Stearns**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748–3208
Email: ian.stearns@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Kristen A. Kearney**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3204
Email: kristen.kearney@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Leslie Wright**
US Attorney's Office – MA
J. Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3367
Email: leslie.wright@usdoj.gov
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Stephen E. Frank**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3244
Email: stephen.frank@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Alexia R. De Vincentis**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3394
Fax: 617–748–3951
Email: alexia.devincentis@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Carol E. Head**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3100
Email: Carol.Head@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Donald C. Lockhart**
U.S. Attorney's Office
50 Kennedy Plaza, 8th Flr.
Providence, RI 02903
401–709–5030
Email: donald.lockhart2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Justin D. O'Connell**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3100
Email: justin.o'connell@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Karin Michelle Bell**
U.S. Attorney's Office – MA
595 Main Street
Suite 206
Worcester, MA 01608
508–368–0106
Email: karin.bell@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Raquelle L. Kaye**

United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617–748–3403
Email: raquelle.kaye@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2019 | 1 | SEALED INDICTMENT as to David Sidoo (1) count(s) 1. (Attachments: # 1 JS45)(DaSilva, Carolina) (Entered: 03/05/2019) |
| 03/05/2019 | 2 | MOTION to Seal Case as to David Sidoo by USA. (DaSilva, Carolina) (Entered: 03/05/2019) |
| 03/05/2019 | 3 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered ALLOWING 2 Motion to Seal Case as to David Sidoo (1) (DaSilva, Carolina) (Entered: 03/05/2019) |
| 03/05/2019 | 4 | Arrest Warrant Issued by Magistrate Judge M. Page Kelley as to David Sidoo. (DaSilva, Carolina) (Entered: 03/05/2019) |
| 03/05/2019 | 5 | ELECTRONIC NOTICE of Case Assignment as to David Sidoo; Judge Nathaniel M. Gorton assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Finn, Mary) (Entered: 03/05/2019) |
| 03/05/2019 | 6 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge M. Page Kelley. Reason for referral: Full Pretrial Proceedings as to David Sidoo (DaSilva, Carolina) (Entered: 03/05/2019) |
| 03/06/2019 | 7 | NOTICE OF ATTORNEY APPEARANCE Kristen A. Kearney appearing for USA. (Lima, Christine) (Entered: 03/07/2019) |
| 03/06/2019 | 8 | NOTICE OF ATTORNEY APPEARANCE Justin D. O'Connell appearing for USA. (Lima, Christine) (Entered: 03/07/2019) |
| 03/06/2019 | 9 | NOTICE OF ATTORNEY APPEARANCE Leslie Wright appearing for USA. (Lima, Christine) (Entered: 03/07/2019) |
| 03/11/2019 | 10 | MOTION to Unseal Case as to David Sidoo by USA. (Belmont, Kellyann) (Entered: 03/12/2019) |
| 03/11/2019 | 12 | Assented to MOTION for Bond as to David Sidoo by USA. (Belmont, Kellyann) (Entered: 03/12/2019) |
| 03/11/2019 | 1 | MOTION to Seal Case as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 2 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1 Motion to Seal Case as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus Jr. (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan Jr. (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32) (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |

A41

| 03/11/2019 | 3 | SEALED COMPLAINT as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus, Jr (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan, Jr (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32). (Attachments: # 1 JS45, # 2 Affidavit pgs 1–46, # 3 Affidavit pgs 47–121, # 4 Affidavit pgs 122–173, # 5 Affidavit 174–204)(Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 4 | Arrest Warrant Issued by Magistrate Judge M. Page Kelley as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 5 | ELECTRONIC NOTICE of Case Assignment as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo; Magistrate Judge M. Page Kelley assigned to case. (Finn, Mary) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 1 | MOTION to Seal Case as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 2 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1 Motion to Seal Case as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus Jr. (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan Jr. (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32) (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 3 | SEALED COMPLAINT as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus, Jr (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan, Jr (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32). (Attachments: # 1 JS45, # 2 Affidavit pgs 1–46, # 3 Affidavit pgs 47–121, # 4 Affidavit pgs 122–173, # 5 Affidavit 174–204)(Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 4 | Arrest Warrant Issued by Magistrate Judge M. Page Kelley as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, |

| | | |
|---|---|---|
| | | Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Alves–Baptista, Antonia) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/11/2019 | 5 | ELECTRONIC NOTICE of Case Assignment as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo; Magistrate Judge M. Page Kelley assigned to case. (Finn, Mary) [1:19–mj–06087–MPK] (Entered: 03/11/2019) |
| 03/12/2019 | 11 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 10 Motion to Unseal Case as to David Sidoo (1) (Belmont, Kellyann) (Entered: 03/12/2019) |
| 03/12/2019 | 13 | Magistrate Judge M. Page Kelley: ORDER entered granting 12 Motion for Bond as to David Sidoo (1) (Belmont, Kellyann) (Entered: 03/12/2019) |
| 03/12/2019 | 20 | Arrest Warrant Returned Executed on 3/11/2019 as to David Sidoo. (McDonagh, Christina) (Entered: 03/14/2019) |
| 03/12/2019 | 6 | MOTION to Unseal Case as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/12/2019) |
| 03/12/2019 | 7 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 6 Motion to Unseal Case as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus Jr. (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan, Jr. (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/12/2019) |
| 03/12/2019 | | Arrest of Diane Blake, Todd Blake, Amy Colburn, Gregory Colburn, Agustin Huneeus, Jr, Bruce Isackson, Marjorie Klapper, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio in California Northern District. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/15/2019) |
| 03/12/2019 | 6 | MOTION to Unseal Case as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/12/2019) |
| 03/12/2019 | 7 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 6 Motion to Unseal Case as to Gregory Abbott (1), Marcia Abbott (2), Gamal Abdelaziz (3), Diane Blake (4), Todd Blake (5), Jane Buckingham (6), Gordon Caplan (7), I–Hsin Chen (8), Amy Colburn (9), Gregory Colburn (10), Robert Flaxman (11), Mossimo Giannulli (12), Elizabeth Henriquez (13), Manuel Henriquez (14), Douglas Hodge (15), Felicity Huffman (16), Agustin Huneeus Jr. (17), Bruce Isackson (18), Davina Isackson (19), Michelle Janavs (20), Elisabeth Kimmel (21), Marjorie Klapper (22), Lori Loughlin (23), Toby MacFarlane (24), William McGlashan Jr. (25), Marci Palatella (26), Peter Jan Sartorio (27), Stephen |

A43

| | | |
|---|---|---|
| | | Semprevivo (28), Devin Sloane (29), John Wilson (30), Homayoun Zadeh (31), Robert Zangrillo (32) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/12/2019) |
| 03/12/2019 | | Arrest of Homayoun Zadeh in Central District of California (Western Division – Los Angeles). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/12/2019 | | Arrest of Diane Blake, Todd Blake, Amy Colburn, Gregory Colburn, Agustin Huneeus, Jr, Bruce Isackson, Marjorie Klapper, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio in California Northern District. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/15/2019) |
| 03/12/2019 | | Arrest of Gamal Abdelaziz in District of Nevada. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/12/2019) |
| 03/12/2019 | | Arrest of Mossimo Giannulli in Central District of California (Western Division – Los Angeles). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/12/2019 | | Arrest of I–Hsin Chen in Central District of California (Western Division – Los Angeles). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/12/2019 | | Arrest of Elizabeth Henriquez in Southern District of New York (Foley Square). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/12/2019 | | Arrest of Manuel Henriquez in Southern District of New York (Foley Square). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/12/2019 | | Arrest of John Wilson in Southern District of Texas. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/12/2019 | | Arrest of Jane Buckingham, Robert Flaxman, Michelle Janavs, Stephen Semprevivo in Central District of California (Western Division– Los Angeles). (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/15/2019) |
| 03/13/2019 | 14 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to David Sidoo. The Initial Appearance Hearing is set for March 15, 2019 at 2:30 p.m. in Courtroom 14 before Magistrate Judge Jennifer C. Boal. (York, Steve) (Entered: 03/13/2019) |
| 03/13/2019 | 15 | NOTICE OF ATTORNEY APPEARANCE: Martin G. Weinberg appearing for David Sidoo. Type of Appearance: Retained. (Weinberg, Martin) (Entered: 03/13/2019) |
| 03/13/2019 | 16 | RECEIPT: as to David Sidoo. Receipt # 1BST073396 for monies received on 03/13/2019 in amount of $1,000,000.00, re: 12 MOTION for Bond filed by USA 13 Order on Motion for Bond, (Coppola, Katelyn) (Entered: 03/13/2019) |
| 03/13/2019 | 17 | MOTION for Leave to Appear Pro Hac Vice by David Z. Chesnoff Filing fee $ 100, receipt number 0101−7582740. as to David Sidoo. (Attachments: # 1 Exhibit 1. Affirmation of David Z. Chesnoff, # 2 Exhibit 2. Certificate of Good Standing for David Z. Chesnoff)(Weinberg, Martin) (Entered: 03/13/2019) |
| 03/13/2019 | 18 | MOTION for Leave to Appear Pro Hac Vice by Richard A. Schonfeld Filing fee $ 100, receipt number 0101−7582765. as to David Sidoo. (Attachments: # 1 Exhibit 1. Affirmation of Richard A. Schonfeld, # 2 Exhibit 2. Certificate of Good Standing for Richard A. Schonfeld)(Weinberg, Martin) (Entered: 03/13/2019) |
| 03/13/2019 | 19 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added David Z. Chesnoff.; granting 18 Motion for Leave to Appear Pro Hac Vice Added Richard A. Schonfeld as to David Sidoo (1). Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Belmont, Kellyann) (Entered: 03/13/2019) |
| 03/13/2019 | 8 | NOTICE OF ATTORNEY APPEARANCE Justin D. O'Connell appearing for USA. (O'Connell, Justin) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 12 | NOTICE OF ATTORNEY APPEARANCE Kristen A. Kearney appearing for USA. (Kearney, Kristen) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |

| 03/13/2019 | 13 | NOTICE OF ATTORNEY APPEARANCE Leslie Wright appearing for USA. (Wright, Leslie) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
|---|---|---|
| 03/13/2019 | 8 | NOTICE OF ATTORNEY APPEARANCE Justin D. O'Connell appearing for USA. (O'Connell, Justin) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 12 | NOTICE OF ATTORNEY APPEARANCE Kristen A. Kearney appearing for USA. (Kearney, Kristen) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 13 | NOTICE OF ATTORNEY APPEARANCE Leslie Wright appearing for USA. (Wright, Leslie) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 9 | MOTION to Quash *Arrest Warrant* as to Douglas Hodge by USA. (O'Connell, Justin) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 10 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 9 Motion to Quash as to Douglas Hodge (15) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 11 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Douglas Hodge. Initial Appearance set for 3/13/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 14 | ELECTRONIC NOTICE OF HEARING as to Douglas Hodge Further Hearing re conditions set for 3/13/2019 04:20 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 15 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance as to Douglas Hodge held on 3/13/2019. Court goes over the proceedings and advises defendant of his rights. Court has colloquy with defendant about whether or not he understands his rights and if he understands the pending charges. Government states charges and maximum penalties and agrees to release of defendant on conditions of release. Court hears parties regarding travel conditions. Defendant will post secured bond in one week. Court goes over the conditions with the defendant and has a colloquy about whether or not he understands the conditions. Order to issue. (Attorneys present: Eric Rosen, Justin O'Connell for the government, Miranda Hooker for defendant and Susan Walls for Probation. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio−recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 16 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re release conditions as to Douglas Hodge held on 3/13/2019. Court clarifies release conditions related to travel. Court hears from parties. Order to issue. (Attorneys present: Justin O'Connell and Kristen A. Kearney for the government and Miranda Hooker for defendant. Susan Walls for Probation. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio−recordings . For a transcript of this proceeding, contact Debail at deborah_scalfani@mad.uscourts.gov. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 17 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Douglas Hodge. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 18 | Secured Appearance Bond Bond Entered as to Douglas Hodge in amount of $ 500,000. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/13/2019) |
| 03/13/2019 | 19 | NOTICE OF ATTORNEY APPEARANCE: Miranda Hooker appearing for Douglas Hodge. Type of Appearance: Retained. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/14/2019) |
| 03/14/2019 | 21 | ELECTRONIC NOTICE OF RESCHEDULING as to David Sidoo. Please be advised that the Initial Appearance Hearing set for March 15, 2019 at 2:30 p.m. before Magistrate Judge Jennifer C. Boal will now be held in  **Courtroom 1** (York, Steve) (Entered: 03/14/2019) |

| | | |
|---|---|---|
| 03/14/2019 | 20 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Gamal Abdelaziz. Initial Appearance in this District set for 3/29/2019 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/14/2019) |
| 03/15/2019 | | ELECTRONIC NOTICE of Duplicate Filing Fee and Credit for Refund, for $100.00 paid on 03/13/2019, receipt number 0101–7582676. (Tran, Henry) (Entered: 03/15/2019) |
| 03/15/2019 | 22 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Jennifer C. Boal: Initial Appearance and Arraignment as to David Sidoo re Count 1 held on 3/15/2019. The Court advised the defendant of his rights and the charges against him. The defendant retained counsel. The government stated the maximum penalties and did not seek detention but rather moved to release the defendant on conditions. The Court heard from the parties as to the proposed conditions of release. The Court advised the defendant of his Conditions of Release. A colloquy was conducted. The defendant waived the reading of the indictment out loud and entered a plea of not guilty as to count 1 of the Indictment. Defense counsel opted for automatic discovery. The parties agreed to exclude the time. The Court released the defendant on conditions and a secured bond. The Initial Status Conference is set for April 18, 2019 at 10:30 a.m. in Courtroom 24 before Magistrate Judge M. Page Kelley. (Attorneys present: Rosen, Wright & O'Connell for the government; Weinberg, Chesnoff, Schonfeld for defendant;. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (York, Steve) (Entered: 03/15/2019) |
| 03/15/2019 | 23 | Magistrate Judge Jennifer C. Boal: ORDER entered. ORDER Setting Conditions of Release as to David Sidoo. (York, Steve) (Entered: 03/15/2019) |
| 03/15/2019 | 24 | Secured Bond Entered as to David Sidoo in amount of $1,500,000.00, (York, Steve) (Entered: 03/15/2019) |
| 03/15/2019 | 26 | RECEIPT: as to David Sidoo. Receipt # 1BST073446 for monies received on 03/15/2019 in amount of $500,000.00, re: 24 Bond. (Coppola, Katelyn) (Entered: 03/19/2019) |
| 03/15/2019 | 21 | Arrest Warrant Returned as to Douglas Hodge. (Warrant Quashed) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/15/2019) |
| 03/17/2019 | 27 | NOTICE OF ATTORNEY APPEARANCE: David S. Schumacher appearing for Amy Colburn, Gregory Colburn. Type of Appearance: Retained. (Schumacher, David) [1:19–mj–06087–MPK] (Entered: 03/17/2019) |
| 03/18/2019 | 25 | Magistrate Judge Jennifer C. Boal: ORDER entered. ORDER ON EXCLUDABLE DELAY as to David Sidoo. Time excluded from 3/15/2019 until 4/18/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (York, Steve) (Entered: 03/18/2019) |
| 03/18/2019 | 34 | Arrest Warrant Returned Executed on 3/12/2019 as to Amy Colburn. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 68 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Diane Blake, Todd Blake, Amy Colburn, Gregory Colburn, Bruce Isackson, Marjorie Klapper, William McGlashan, Jr, Marci Palatella, Robert Zangrillo. **Initial Appearance in this District set for 3/29/2019 04:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley.** (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 80 | MOTION for Leave to Appear Pro Hac Vice by Patric Hooper, Jordan Kearney Filing fee $ 200, receipt number 0101–7589831. as to Amy Colburn, Gregory Colburn. (Attachments: # 1 Exhibit Declaration of Patric Hooper, # 2 Exhibit Declaration of Jordan Kearney)(Schumacher, David) [1:19–mj–06087–MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 35 | Arrest Warrant Returned Executed on 3/12/2019 as to Gregory Colburn. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 42 | Arrest Warrant Returned Executed on 3/12/2019 as to Homayoun Zadeh. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 67 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Elizabeth Henriquez, Manuel Henriquez, Agustin Huneeus, Jr, Michelle Janavs, Toby MacFarlane, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh. **Initial Appearance in this District set for 3/29/2019 02:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley.** (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: |

| | | 03/18/2019) |
|---|---|---|
| 03/18/2019 | 39 | Arrest Warrant Returned Executed on 3/12/2019 as to Marci Palatella. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 68 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Diane Blake, Todd Blake, Amy Colburn, Gregory Colburn, Bruce Isackson, Marjorie Klapper, William McGlashan, Jr, Marci Palatella, Robert Zangrillo. **Initial Appearance in this District set for 3/29/2019 04:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley.** (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 44 | Arrest Warrant Returned Executed on 3/12/2019 as to Gamal Abdelaziz. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 66 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Jane Buckingham, Gordon Caplan, I−Hsin Chen, Robert Flaxman, Mossimo Giannulli, Felicity Huffman, Lori Loughlin. **Initial Appearance in this District set for 3/29/2019 12:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley.** (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 32 | Arrest Warrant Returned Executed on 3/12/2019 as to Robert Zangrillo. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 48 | Arrest Warrant Returned Executed on 3/12/2019 as to Todd Blake. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 53 | NOTICE OF ATTORNEY APPEARANCE: William J. Trach appearing for Mossimo Giannulli, Lori Loughlin. Type of Appearance: Retained. (Trach, William) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 56 | MOTION for Leave to Appear Pro Hac Vice by Sean M. Berkowitz and Perry J. Viscounty Filing fee $ 200, receipt number 0101−7588701. as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Certification of Sean M. Berkowitz, # 2 Certification of Perry J. Viscounty)(Trach, William) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 58 | Arrest Warrant Returned Executed on 3/12/2019 as to Mossimo Giannulli. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 65 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 56 Motion for Leave to Appear Pro Hac Vice Added Sean M. Berkowitz and Perry J. Viscounty as to Mossimo Giannulli (12), Lori Loughlin (23). Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 60 | Arrest Warrant Returned Executed on 3/13/2019 as to Lori Loughlin. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 62 | Arrest Warrant Returned Executed on 3/12/2019 as to I−Hsin Chen. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 51 | Arrest Warrant Returned Executed on 3/12/2019 as to Elizabeth Henriquez. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 55 | Arrest Warrant Returned Executed on 3/12/2019 as to Manuel Henriquez. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 36 | Arrest Warrant Returned Executed on 3/11/2019 as to William McGlashan, Jr. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 38 | Arrest Warrant Returned Executed on 3/12/2019 as to William McGlashan, Jr. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 81 | NOTICE OF ATTORNEY APPEARANCE: Jack W. Pirozzolo appearing for William McGlashan, Jr. Type of Appearance: Retained. (Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |

| | | |
|---|---|---|
| 03/18/2019 | 43 | Arrest Warrant Returned Executed on 3/12/2019 as to John Wilson. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 71 | Rule 5(c)(3) Documents Received as to John Wilson (Attachments: # 1 Document 4 court only, # 2 Document 5 court only)(Belmont, Kellyann) (Main Document 71 replaced on 3/18/2019) (Belmont, Kellyann). [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 47 | Arrest Warrant Returned Executed on 3/12/2019 as to Diane Blake. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 63 | Arrest Warrant Returned Executed on 3/12/2019 as to Michelle Janavs. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/18/2019 | 78 | Rule 5(c)(3) Documents Received as to Michelle Janavs (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/18/2019) |
| 03/19/2019 | 85 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 80 Motion for Leave to Appear Pro Hac Vice Added Patric Hooper and Jordan Kearney as to Amy Colburn (9), Gregory Colburn (10). Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 96 | NOTICE OF ATTORNEY APPEARANCE: Tracy A. Miner appearing for Homayoun Zadeh. Type of Appearance: Retained. (Miner, Tracy) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 97 | NOTICE OF ATTORNEY APPEARANCE: Seth B. Orkand appearing for Homayoun Zadeh. Type of Appearance: Retained. (Orkand, Seth) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 98 | NOTICE OF ATTORNEY APPEARANCE: Megan A. Siddall appearing for Homayoun Zadeh. Type of Appearance: Retained. (Siddall, Megan) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 92 | Rule 5(c)(3) Documents Received as to Gamal Abdelaziz (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 91 | Rule 5(c)(3) Documents Received as to Lori Loughlin (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 93 | MOTION for Leave to Appear Pro Hac Vice by John C. Hueston Filing fee $ 100, receipt number 0101−7592136. as to William McGlashan, Jr. (Attachments: # 1 Certification of John C. Hueston)(Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/19/2019 | 95 | MOTION for Leave to Appear Pro Hac Vice by Marshall A. Camp Filing fee $ 100, receipt number 0101−7592159. as to William McGlashan, Jr. (Attachments: # 1 Certification of Marshall A. Camp)(Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/19/2019) |
| 03/20/2019 | 104 | Rule 5(c)(3) Documents Received as to Homayoun Zadeh (Danieli, Chris) (Additional attachment(s) added on 3/26/2019: # 1 Court Only Document) (Danieli, Chris). [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/20/2019 | 107 | MOTION to Continue *Initial Appearance* to April 5, 2019 as to Homayoun Zadeh. (Miner, Tracy) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/20/2019 | 108 | Rule 5(c)(3) Documents Received as to Elisabeth Kimmel (Danieli, Chris) (Additional attachment(s) added on 3/26/2019: # 1 Exhibit Court Only Document, # 2 Exhibit Court Only Document) (Danieli, Chris). [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/20/2019 | | Arrest of Elisabeth Kimmel in Southern District of California (San Diego). (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/20/2019 | 102 | Rule 5(c)(3) Documents Received as to Mossimo Giannulli (Danieli, Chris) (Additional attachment(s) added on 3/26/2019: # 1 Court Only Document) (Danieli, Chris). [1:19−mj−06087−MPK] (Entered: 03/20/2019) |
| 03/20/2019 | 99 | Rule 5(c)(3) Documents Received as to I–Hsin Chen (Danieli, Chris) [1:19−mj−06087−MPK] (Entered: 03/20/2019) |

| 03/21/2019 | 116 | Rule 5(c)(3) Documents Received as to Amy Colburn (Danieli, Chris) (Additional attachment(s) added on 3/21/2019: # 1 Exhibit Court Only Document) (Danieli, Chris). [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| --- | --- | --- |
| 03/21/2019 | 118 | Rule 5(c)(3) Documents Received as to Gregory Colburn (Danieli, Chris) (Additional attachment(s) added on 3/21/2019: # 1 Exhibit Court Only Document) (Danieli, Chris). [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 129 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting in part and denying in part 107 Motion to Continue as to Homayoun Zadeh (31). Initial Appearance in this District reset for 4/3/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 130 | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Miner, Tracy) [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 115 | Rule 5(c)(3) Documents Received as to Todd Blake (Danieli, Chris) (Additional attachment(s) added on 3/21/2019: # 1 Exhibit Court Only Document) (Danieli, Chris). [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 117 | MOTION to Continue *Initial Appearances* to April 15, 2019 as to Mossimo Giannulli, Lori Loughlin. (Trach, William) [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 125 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 123 Motion to Continue as to Gordon Caplan (7); granting in part and denying in part 117 Motion to Continue as to Mossimo Giannulli (12), Lori Loughlin (23) Initial Appearances in this District reset for 4/3/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 114 | RECEIPT: as to Douglas Hodge. Receipt/Voucher Number # 700006 for monies received on 03/21/2019 in amount of $500,000.00, re: 18 Bond. (Tran, Henry) [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/21/2019 | 113 | Rule 5(c)(3) Documents Received as to Diane Blake (Danieli, Chris) (Additional attachment(s) added on 3/21/2019: # 1 Exhibit Court Only Document) (Danieli2, Chris). [1:19–mj–06087–MPK] (Entered: 03/21/2019) |
| 03/22/2019 | 137 | NOTICE OF ATTORNEY APPEARANCE: Michael K. Loucks appearing for Marci Palatella. Type of Appearance: Retained. (Loucks, Michael) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/22/2019 | 138 | MOTION for Leave to Appear Pro Hac Vice by Jack P. DiCanio and Allen J. Ruby Filing fee $ 200, receipt number 0101–7599005. as to Marci Palatella. (Attachments: # 1 Certification of Jack P. DiCanio, # 2 Certification of Allen J. Ruby)(Loucks, Michael) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/22/2019 | 132 | NOTICE OF ATTORNEY APPEARANCE: Brian T. Kelly appearing for Gamal Abdelaziz. Type of Appearance: Retained. (Kelly, Brian) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/22/2019 | 133 | NOTICE OF ATTORNEY APPEARANCE: Joshua C.H. Sharp appearing for Gamal Abdelaziz. Type of Appearance: Retained. (Sharp, Joshua) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/22/2019 | 131 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Elisabeth Kimmel. Initial Appearance in this District set for 4/3/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/22/2019 | 136 | MOTION for Leave to Appear Pro Hac Vice by Reuben Camper Cahn, Jennifer L. Keller, Chase A. Scolnick Filing fee $ 300, receipt number 0101–7598793. as to I–Hsin Chen. (Attachments: # 1 Affidavit Declaration of Ruben Camper Cahn, # 2 Affidavit Declaration of Chase A. Scolnick, # 3 Affidavit Declaration of Jennifer L. Keller)(Bassil, Janice) [1:19–mj–06087–MPK] (Entered: 03/22/2019) |
| 03/25/2019 | 157 | ELECTRONIC NOTICE OF RESCHEDULING as to Elisabeth Kimmel: Initial Appearance reset for 3/29/2019 12:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |

| | | |
|---|---|---|
| 03/25/2019 | 147 | NOTICE OF ATTORNEY APPEARANCE: Joan McPhee appearing for Douglas Hodge. Type of Appearance: Retained. (McPhee, Joan) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 148 | NOTICE OF ATTORNEY APPEARANCE: Brien T. O'Connor appearing for Douglas Hodge. Type of Appearance: Retained. (O'Connor, Brien) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 151 | NOTICE OF ATTORNEY APPEARANCE: Aaron M. Katz appearing for Elizabeth Henriquez. Type of Appearance: Retained. (Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 152 | MOTION to Continue *any Rule 5 Hearing in the District of Massachusetts* as to Elizabeth Henriquez, Manuel Henriquez. (Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 149 | NOTICE OF ATTORNEY APPEARANCE: Michael Kendall appearing for John Wilson. Type of Appearance: Retained. (Kendall, Michael) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 150 | NOTICE OF ATTORNEY APPEARANCE: Yakov Malkiel appearing for John Wilson. Type of Appearance: Retained. (Malkiel, Yakov) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 155 | MOTION to Continue *Appearance in this District* to April 9, 2019 or April 10, 2019 as to John Wilson. (Kendall, Michael) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/25/2019 | 154 | NOTICE OF ATTORNEY APPEARANCE: Jonathan L. Kotlier appearing for Michelle Janavs. Type of Appearance: Retained. (Kotlier, Jonathan) [1:19–mj–06087–MPK] (Entered: 03/25/2019) |
| 03/26/2019 | 119 | SUPERSEDING INDICTMENT as to David Sidoo (1) count(s) 1s, Gregory Colburn (2) count(s) 1, 2, Amy Colburn (3) count(s) 1, 2. (Attachments: # 1 JS45)(Alves–Baptista, Antonia) (Entered: 03/26/2019) |
| 03/26/2019 | 120 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge M. Page Kelley Reason for referral: Full Pretrial Proceedings as to David Sidoo, Amy Colburn, Gregory Colburn (Alves–Baptista, Antonia) (Entered: 03/26/2019) |
| 03/26/2019 | 174 | Rule 5(c)(3) Documents Received as to Marci Palatella (Danieli, Chris) (Additional attachment(s) added on 3/26/2019: # 1 Exhibit Court Only Document) (Danieli, Chris). [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 170 | NOTICE OF ATTORNEY APPEARANCE: Martin G. Weinberg appearing for Robert Zangrillo. Type of Appearance: Retained. (Weinberg, Martin) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 172 | NOTICE OF ATTORNEY APPEARANCE: Nicholas C. Theodorou appearing for Robert Zangrillo. Type of Appearance: Retained. (Theodorou, Nicholas) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 173 | MOTION for Leave to Appear Pro Hac Vice by Matthew L. Schwartz Filing fee $ 100, receipt number 0101–7602698. as to Robert Zangrillo. (Attachments: # 1 Affirmation, # 2 Certificate of Good Standing)(Theodorou, Nicholas) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 197 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 173 Motion for Leave to Appear Pro Hac Vice Added Matthew L. Schwartz. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Robert Zangrillo (32) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 177 | NOTICE OF ATTORNEY APPEARANCE: R. Robert Popeo appearing for Elisabeth Kimmel. Type of Appearance: Retained. (Popeo, R.) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |

| 03/26/2019 | 178 | NOTICE OF ATTORNEY APPEARANCE: Eoin P. Beirne appearing for Elisabeth Kimmel. Type of Appearance: Retained. (Beirne, Eoin) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 179 | NOTICE OF ATTORNEY APPEARANCE: Mark E. Robinson appearing for Elisabeth Kimmel. Type of Appearance: Retained. (Robinson, Mark) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 191 | NOTICE OF ATTORNEY APPEARANCE: David E. Meier appearing for Diane Blake, Todd Blake. Type of Appearance: Retained. (Meier, David) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 192 | MOTION for Leave to Appear Pro Hac Vice by Stephen H. Sutro Filing fee $ 100, receipt number 0101–7604171. as to Diane Blake, Todd Blake. (Attachments: # 1 Exhibit A)(Meier, David) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 194 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 192 Motion for Leave to Appear Pro Hac Vice Added Stephen H. Sutro. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Diane Blake (4), Todd Blake (5) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 166 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 136 Motion for Leave to Appear Pro Hac Vice Added Reuben Camper Cahn, Jennifer L. Keller, Chase A. Scolnick. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to I–Hsin Chen (8) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 187 | Rule 5(c)(3) Documents Received as to Elizabeth Henriquez (Danieli, Chris) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 190 | MOTION for Leave to Appear Pro Hac Vice by Colleen Conry Filing fee $ 100, receipt number 0101–7603970. as to Elizabeth Henriquez. (Attachments: # 1 Affidavit)(Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 193 | NOTICE OF ATTORNEY APPEARANCE: Laura Gaffney Hoey appearing for Elizabeth Henriquez. Type of Appearance: Retained. (Hoey, Laura) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 195 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 190 Motion for Leave to Appear Pro Hac Vice Added Colleen Conry. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Elizabeth Henriquez (13) (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 182 | MOTION for Leave to Appear Pro Hac Vice by Melinda Haag Filing fee $ 100, receipt number 0101–7603731. as to Manuel Henriquez by Elizabeth Henriquez. (Attachments: # 1 Affidavit of Melinda Haag)(Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 183 | MOTION for Leave to Appear Pro Hac Vice by Walter Brown Filing fee $ 100, receipt number 0101–7603744. as to Manuel Henriquez by Elizabeth Henriquez. (Attachments: # 1 Affidavit of Walter Brown)(Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 186 | MOTION for Leave to Appear Pro Hac Vice by Robin Linsenmayer Filing fee $ 100, receipt number 0101–7603795. as to Manuel Henriquez by Elizabeth Henriquez. (Attachments: # 1 Affidavit of Robin Linsenmayer)(Katz, Aaron) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 188 | Rule 5(c)(3) Documents Received as to Manuel Henriquez (Danieli, Chris) [1:19–mj–06087–MPK] (Entered: 03/26/2019) |

| 03/26/2019 | 196 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 182 Motion for Leave to Appear Pro Hac Vice Added Melinda Haag as to Elizabeth Henriquez (13) and Manuel Henriquez (14); granting 183 Motion for Leave to Appear Pro Hac Vice Added Walter Brown as to Elizabeth Henriquez and Manuel Henriquez (14); granting 186 Motion for Leave to Appear Pro Hac Vice Added Robin Linsenmayer as to Elizabeth Henriquez and Manuel Henriquez (14). Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 175 | Rule 5(c)(3) Documents Received as to William McGlashan, Jr (Danieli, Chris) (Additional attachment(s) added on 3/26/2019: # 1 Exhibit Court Only Document) (Danieli, Chris). [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 198 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 93 Motion for Leave to Appear Pro Hac Vice Added John C. Hueston as to William McGlashan Jr. (25); granting 95 Motion for Leave to Appear Pro Hac Vice Added Marshall A. Camp. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to William McGlashan Jr. (25) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 189 | MOTION for Leave to Appear Pro Hac Vice by Andrew E. Tomback Filing fee $ 100, receipt number 0101−7603914. as to John Wilson. (Attachments: # 1 Affidavit / Certification)(Kendall, Michael) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/26/2019 | 199 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 189 Motion for Leave to Appear Pro Hac Vice Added Andrew E. Tomback. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to John Wilson (30) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/26/2019) |
| 03/27/2019 | 121 | ELECTRONIC NOTICE OF HEARING as to Amy Colburn, Gregory Colburn Initial Appearance in this District and Arraignment set for 4/3/2019 03:45 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 03/27/2019) |
| 03/27/2019 | 210 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 138 Motion for Leave to Appear Pro Hac Vice Added Jack P. DiCanio and Allen J. Ruby. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Marci Palatella (26) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 |  | ELECTRONIC NOTICE of Duplicate Filing Fee and Credit for Refund, for $100.00 paid on 03/26/2019, receipt number 0101−7603691. (Tran, Henry) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 | 208 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting in part and denying in part 152 Motion to Continue as to Elizabeth Henriquez (13), Manuel Henriquez (14. ) Initial Appearance set for 4/3/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 |  | ELECTRONIC NOTICE of Duplicate Filing Fee and Credit for Refund, for $100.00 paid on 03/26/2019, receipt number 0101−7603771. (Tran, Henry) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 | 201 | MOTION to Modify Conditions of Release *and Appearance* as to William McGlashan, Jr. (Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 | 202 | MEMORANDUM in Support by William McGlashan, Jr re 201 MOTION to Modify Conditions of Release *and Appearance* (Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |

| | | |
|---|---|---|
| 03/27/2019 | 204 | MOTION to Permit Limited International Travel in April 2019 as to William McGlashan, Jr. (Pirozzolo, Jack) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 | 200 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting in part and denying in part 155 Motion to Continue as to John Wilson (30) Initial Appearance set for 3/29/2019 04:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley. **Note: Change is time only!** (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/27/2019 | 203 | ELECTRONIC NOTICE OF RESCHEDULING as to John Wilson Initial Appearance set for 4/3/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/27/2019) |
| 03/28/2019 | 216 | MOTION to Modify Conditions of Release as to Gamal Abdelaziz. (Kelly, Brian) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 217 | MEMORANDUM in Support by Gamal Abdelaziz re 216 MOTION to Modify Conditions of Release (Kelly, Brian) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 212 | MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 219 | MOTION to Withdraw Document 212 MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 221 | ELECTRONIC NOTICE OF RESCHEDULING as to William McGlashan, Jr: Initial Appearance set for 3/29/2019 02:00 PM in Courtroom 1 before Magistrate Judge M. Page Kelley. **Note: change is to time only!**(Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 213 | Assented to MOTION for Leave to Appear Pro Hac Vice by Thomas H. Bienert, Jr. Filing fee $ 100, receipt number 0101−7607756. as to Michelle Janavs. (Attachments: # 1 Affidavit Affidavit of Thomas H. Bienert, Jr.)(Kotlier, Jonathan) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 214 | Assented to MOTION for Leave to Appear Pro Hac Vice by John L. Littrell Filing fee $ 100, receipt number 0101−7607771. as to Michelle Janavs. (Attachments: # 1 Affidavit Affidavit of John L. Littrell)(Kotlier, Jonathan) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/28/2019 | 215 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 213 Motion for Leave to Appear Pro Hac Vice Added Thomas H. Bienert, Jr as to Michelle Janavs (20); granting 214 Motion for Leave to Appear Pro Hac Vice Added John L. Littrell. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Michelle Janavs (20) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/28/2019) |
| 03/29/2019 | 227 | NOTICE *of Disclosure under 18 USC 2518* by USA as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, Diane Blake, Todd Blake, Jane Buckingham, Gordon Caplan, I–Hsin Chen, Amy Colburn, Gregory Colburn, Robert Flaxman, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Felicity Huffman, Agustin Huneeus, Jr, Bruce Isackson, Davina Isackson, Michelle Janavs, Elisabeth Kimmel, Marjorie Klapper, Lori Loughlin, Toby MacFarlane, William McGlashan, Jr, Marci Palatella, Peter Jan Sartorio, Stephen Semprevivo, Devin Sloane, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) [1:19−mj−06087−MPK] (Entered: 03/29/2019) |
| 03/29/2019 | 230 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance in this District as to Diane Blake, Todd Blake, Marjorie Klapper, Marci Palatella, Robert Zangrillo held on 3/29/2019. Court goes over the proceedings and advises the defendants of their rights. Court has colloquy with defendants about whether or not they understand their rights and if they understand the pending charges. Government states charges and maximum penalties for all defendants. All defendants waive the preliminary hearing. Court has colloquy with each defendant about waiving the hearing and finds that their waivers are knowing and voluntary. Government agrees to release on conditions. Court re−imposes bonds set in the arresting Districts. Court goes over the conditions with each defendant and has a colloquy with each defendant about whether or not they understand the conditions. Counsel for defendant Klapper clarify the bond set in Norther District of |

| | | |
|---|---|---|
| | | California was unsecured. Court hears counsel for defendant Zangrillo about removing condition regarding sale of real estate. No objection by government. Court orders that condition removed. Defendant Zangrillo should surrender passport to pretrial office in Southern District of Florida. Court is in recess Court goes back on record to address a question regarding release conditions for defendant Zangrillo. (Attorneys present: Eric Rosen, Justin O'Connell, Leslie Wright for the government, Stephen H. Sutro, David E. Meier,Jonathan M. McDougall, Daniel K. Gelb,Jack P. DiCanio, Michael K. Loucks, Matthew L. Schwartz, Nicholas C. Theodorou, Martin G. Weinberg for defendants. )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/29/2019) |
| 03/29/2019 | 244 | WAIVER of Preliminary Hearing by Marci Palatella (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 267 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Marci Palatella. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 228 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance in this District as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, I−Hsin Chen, Robert Flaxman, Agustin Huneeus, Jr, Elisabeth Kimmel held on 3/29/2019. Interpreter sworn. Court goes over the proceedings and advises the defendants of their rights. Court has colloquy with defendants about whether or not they understands their rights and if they understand the pending charges. Government states charges and maximum penalties for all defendants. All defendants waive the preliminary hearing. Court has colloquy with each defendant about waiving the hearing and finds that their waivers are knowing and voluntary. Court hears counsel on 216 Motion to Modify Conditions of Release as to Gamal Abdelaziz. After hearing argument the Court allows the motion as stated on the record. Government agrees to conditions of release for all defendants. The Court hears counsel on conditions. The Court goes over the conditions of release with each defendant and has a colloquy about whether or not they understand the conditions. The Court reimposes the bonds set in the arresting Districts. Court grants Marcia Abbott an additional month to post secured bond. (Attorneys present: Eric S. Rosen, Justin D. O'Connell, Leslie Wright for the government and Daniel L. Stein, Geoffrey E Hobart, Katherine P. Onyshko, Brian T. Kelly, Joshua C.H. Sharp, Reuben Camper Cahn, Janice Bassil, William D. Weinreb,Michael T. Packard, Jeremy M. Sternberg, William P. Keane, Eoin P. Beirne, R. Robert Popeo for defendants. )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. Interpreter name: Melissa Lo, Language: Mandarin. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/29/2019) |
| 03/29/2019 | 234 | WAIVER of Preliminary Hearing by Gamal Abdelaziz (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 251 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Gamal Abdelaziz. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 252 | Appearance Bond Entered as to Gamal Abdelaziz. (Originally entered in the District of Nevada and adopted by this Court) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 225 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 219 Motion to Withdraw Document as to Robert Zangrillo (32) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/29/2019) |
| 03/29/2019 | 246 | WAIVER of Preliminary Hearing by Robert Zangrillo (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 268 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Robert Zangrillo. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 269 | Appearance Bond Entered as to Robert Zangrillo in amount of $ 500,000. ( Originally entered in the Southern District of Florida and adopted by this Court) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 241 | WAIVER of Preliminary Hearing by Elisabeth Kimmel (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |

A54

| 03/29/2019 | 258 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Elisabeth Kimmel. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 236 | WAIVER of Preliminary Hearing by Todd Blake (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 265 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Todd Blake. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 237 | WAIVER of Preliminary Hearing by I−Hsin Chen (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 253 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to I−Hsin Chen. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 254 | Unsecured Appearance Bond Entered as to I−Hsin Chen in amount of $ 1,000,000. ( Originally entered in the Central District of California and adopted by this Court) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 229 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance in this District as to Michelle Janavs, William McGlashan, Jr, Stephen Semprevivo held on 3/29/2019. Court goes over the proceedings and advises the defendants of their rights. Court has colloquy with defendants about whether or not they understand their rights and if they understand the pending charges. Government states charges and maximum penalties for all defendants. All defendants waive the preliminary hearing. Court has colloquy with each defendant about waiving the hearing and finds that their waivers are knowing and voluntary. Government agrees to release on conditions. Court re−imposes bonds set in the arresting Districts. Court hears argument on Motions # 201 Motion to Modify Conditions of Release and # 204 Motion to Permit Limited International Travel by William McGlashan, Jr. After hearing argument the Court denies the motions as stated on the record. Court goes over the conditions of release with each defendant and has a colloquy with each defendant about whether or not they understand the conditions. Counsel for William McGlashan, Jr. request Wire Tap application. Government responds. Court takes it under advisement. Government to file the Order entered by Judge Burroughs and defense counsel may file a formal motion in this case. Court in recess. Court goes back on record to address a question regarding release condition for defendant William McGlashan Jr.(Attorneys present: Eric Rosen, Justin O'Connell, Leslie Wright for the government, John L. Littrell, Jonathan Kotlier, Jack W. Pirozzolo, John C. Hueston, Steven Boozang for defendants. )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 03/29/2019) |
| 03/29/2019 | 243 | WAIVER of Preliminary Hearing by William McGlashan, Jr (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 261 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to William McGlashan, Jr. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 235 | WAIVER of Preliminary Hearing by Diane Blake (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 264 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Diane Blake. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 240 | WAIVER of Preliminary Hearing by Michelle Janavs (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 259 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Michelle Janavs. (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 03/29/2019 | 260 | Unsecured Appearance Bond Entered as to Michelle Janavs in amount of $ 400,000. ( Originally entered in the Central District of California and adopted by this Court) (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 04/01/2019 | 270 | Transcript of Initial Appearance as to Gregory Abbott, Marcia Abbott, Gamal Abdelaziz, I−Hsin Chen, Robert Flaxman, Agustin Huneeus, Jr, Elisabeth Kimmel held on March 29, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased |

| | | |
|---|---|---|
| | | through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/22/2019. Redacted Transcript Deadline set for 5/2/2019. Release of Transcript Restriction set for 7/1/2019. (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 04/01/2019 | 271 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 04/01/2019 | 272 | Transcript of Initial Appearance as to Michelle Janavs, William McGlashan, Jr, Stephen Semprevivo held on March 29, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/22/2019. Redacted Transcript Deadline set for 5/2/2019. Release of Transcript Restriction set for 7/1/2019. (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 04/01/2019 | 273 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/01/2019) |
| 04/02/2019 | 122 | ELECTRONIC NOTICE OF RESCHEDULING as to Amy Colburn, Gregory Colburn Initial Appearance in this District and Arraignment reset for 4/3/2019 03:45 PM in Courtroom 18 before Magistrate Judge M. Page Kelley. **Note: change is to courtroom only!** (Belmont, Kellyann) (Entered: 04/02/2019) |
| 04/02/2019 | 281 | ELECTRONIC NOTICE OF RESCHEDULING as to Jane Buckingham, Gordon Caplan, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Felicity Huffman, Bruce Isackson, Lori Loughlin, Toby MacFarlane, Peter Jan Sartorio, Devin Sloane, John Wilson, Homayoun Zadeh: Initial Appearance in this District set for 4/3/2019 02:30 PM in Courtroom 18 before Magistrate Judge M. Page Kelley. **Note: The change is to the courtroom only!** (Belmont, Kellyann) [1:19−mj−06087−MPK] (Entered: 04/02/2019) |
| 04/02/2019 | 279 | Transcript of Initial Appearance as to Diane Blake, Todd Blake, Marjorie Klapper, Marci Palatella, Robert Zangrillo held on March 29, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/23/2019. Redacted Transcript Deadline set for 5/3/2019. Release of Transcript Restriction set for 7/1/2019. (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/02/2019) |
| 04/02/2019 | 280 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) [1:19−mj−06087−MPK] (Entered: 04/02/2019) |
| 04/03/2019 | 123 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance in this District and Arraignment as to Amy Colburn, Gregory Colburn held on 4/3/2019. Court goes over the proceedings and advises the defendants of their rights. Court has colloquy with each defendant about whether or not they understand their rights and the pending charges. Government states charges and maximum penalties. Defendants waive the formal reading of the indictment. Not Guilty Plea entered by Amy Colburn (3) as to Counts 1 and 2. Not Guilty Plea entered by Gregory Colburn (2) as to Counts 1 and 2. Parties opt for automatic discovery. Initial Status Conference set for 6/3/2019 11:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. Counsel agree to exclude the time under the Speedy Trial Act. Order to issue. Court goes over the conditions of release with each defendant and has a colloquy with them about whether or not they understand the conditions. Court orders the bonds entered in the Northern District of California to be imposed in this District. Court goes over its stance on international travel. All passports were surrendered to pretrial. (Attorneys present: Eric Rosen, Justin O'Connell and Leslie Wright for the government,David S. Schumacher for defendants. Doris Fitzpatrick for Probation. |

A56

| | | |
|---|---|---|
| | | )Court Reporter Name and Contact or digital recording information: James Gibbons at jamesgibbonsrpr@gmail.com. (Belmont, Kellyann) (Entered: 04/04/2019) |
| 04/03/2019 | 124 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Amy Colburn, Gregory Colburn. Time excluded from 4/3/2019 until 6/3/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 04/04/2019) |
| 04/03/2019 | 125 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Gregory Colburn. (Belmont, Kellyann) (Entered: 04/05/2019) |
| 04/03/2019 | 126 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Amy Colburn. (Belmont, Kellyann) (Entered: 04/05/2019) |
| 04/03/2019 | 289 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Appearance in this District as to Gordon Caplan, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Felicity Huffman, Bruce Isackson, Lori Loughlin, Toby MacFarlane, John Wilson, Homayoun Zadeh held on 4/3/2019.Court goes over the proceedings and advises the defendants of their rights. Court has colloquy with each defendant about whether or not they understand their rights and the pending charges. All defendants waive the preliminary hearing. Court has colloquy with each defendant about waiving the hearing and finds all the waivers knowing and voluntary. Court orders for appearance bonds in arresting districts to be imposed in this district. Any firearms should be removed from primary residences and verification should be given to pretrial. Court addresses the condition of release for defendants not to discuss the case with family members that may be a victim or witness in the case. Court hears from the government and defense counsel. Court orders for that condition not to apply to family members. Government states charges and maximum penalties for all defendants. Requests for international business travel should be made by motion and the Court is disinclined to allow personal international travel. Court goes over the conditions of release with each defendant and has colloquy with each defendant about whether or not they understand the conditions. Court hears from defense counsel on # 130 Motion to Modify conditions. No objections by the government. Motion is allowed. Court does not impose condition regarding transferring of assets that was originally imposed for John Wilson. All defendants have surrendered their passports to pretrial. (Attorneys present: Eric Rosen, Justin O'Connell and Leslie Wright for the government, Joshua Levy, Aaron Katz, Melinda Haag, Walter Brown, Martin Murphy, Michael Packard, Ted Cassman, Maksim Nemtsev, Michael Kendall, Yakov Malkiel, Tracy Miner, Perry J. Viscounty, Sean M. Berkowitz, William J. Trach for defendants. )Court Reporter Name and Contact or digital recording information: James Gibbons at jamesgibbonsrpr@gmail.com (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 290 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 130 Motion to Modify Conditions of Release as to Homayoun Zadeh (31). As stated in open court. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 300 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Homayoun Zadeh. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 310 | WAIVER of Preliminary Hearing by Homayoun Zadeh (Belmont, Kellyann) (Belmont, Kellyann). [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 292 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Mossimo Giannulli. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 302 | WAIVER of Preliminary Hearing by Mossimo Giannulli (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 283 | Transcript of Initial Appearance as to Douglas Hodge held on March 13, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Maryann Young. The Transcript may be purchased through Maryann Young at youngtrans2@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/24/2019. Redacted Transcript Deadline set for 5/6/2019. Release of Transcript Restriction set for 7/2/2019. (Scalfani, Deborah) [1:19–mj–06087–MPK] (Entered: 04/03/2019) |

| | | |
|---|---|---|
| 04/03/2019 | 284 | Transcript of Hearing as to Douglas Hodge held on March 13, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Maryann Young. The Transcript may be purchased through Maryann Young at youngtrans2@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/24/2019. Redacted Transcript Deadline set for 5/6/2019. Release of Transcript Restriction set for 7/2/2019. (Scalfani, Deborah) [1:19–mj–06087–MPK] (Entered: 04/03/2019) |
| 04/03/2019 | 285 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) [1:19–mj–06087–MPK] (Entered: 04/03/2019) |
| 04/03/2019 | 297 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Lori Loughlin. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 307 | WAIVER of Preliminary Hearing by Lori Loughlin (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 293 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Elizabeth Henriquez. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 303 | WAIVER of Preliminary Hearing by Elizabeth Henriquez (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 294 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to Manuel Henriquez. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 304 | WAIVER of Preliminary Hearing by Manuel Henriquez (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 299 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER Setting Conditions of Release as to John Wilson. (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/03/2019 | 309 | WAIVER of Preliminary Hearing by John Wilson (Belmont, Kellyann) [1:19–mj–06087–MPK] (Entered: 04/04/2019) |
| 04/08/2019 | 127 | ELECTRONIC NOTICE OF RESCHEDULING as to David Sidoo: With agreement of counsel Initial Status Conference reset for 6/3/2019 11:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 04/08/2019) |
| 04/09/2019 | 128 | Waiver of Appearance for arraignment and entry of plea of not guilty by David Sidoo. (Belmont, Kellyann) (Entered: 04/09/2019) |
| 04/09/2019 | 129 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER ON EXCLUDABLE DELAY as to David Sidoo. Time excluded from 4/18/2019 until 6/3/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 04/09/2019) |
| 04/09/2019 | 130 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered accepting 128 Waiver of indictment filed by David Sidoo (Belmont, Kellyann) (Entered: 04/09/2019) |
| 04/09/2019 | 313 | Notice of correction to docket made by Court staff. Docket #313 removed as it was filed in the wrong case by AUSA Rosen. (Garvin, Brendan) [1:19–mj–06087–MPK] (Entered: 04/09/2019) |
| 04/09/2019 | 314 | SECOND SUPERSEDING INDICTMENT as to David Sidoo (1) count(s) 1ss, 2ss, Gregory Colburn (2) count(s) 1s, 2s, Amy Colburn (3) count(s) 1s, 2s, Gamal Abdelaziz (4) count(s) 1, 2, Diane Blake (5) count(s) 1, 2, Todd Blake (6) count(s) 1, 2, I–Hsin Chen (7) count(s) 1, 2, Mossimo Giannulli (8) count(s) 1, 2, Elizabeth Henriquez (9) count(s) 1, 2, Manuel Henriquez (10) count(s) 1, 2, Douglas Hodge (11) count(s) 1, 2, Michelle Janavs (12) count(s) 1, 2, Elisabeth Kimmel (13) count(s) 1, 2, Lori Loughlin (14) count(s) 1, 2, William McGlashan, Jr (15) count(s) 1, 2, Marci Palatella (16) count(s) 1, 2, John Wilson (17) count(s) 1, 2, Homayoun Zadeh (18) count(s) 1, 2, Robert Zangrillo (19) count(s) 1, 2. (Attachments: # 1 JS45)(Geraldino–Karasek, Clarilde) (Entered: 04/09/2019) |

| 04/09/2019 | 315 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge M. Page Kelley Reason for referral: Full Pretrial Proceedings as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Geraldino–Karasek, Clarilde) (Entered: 04/09/2019) |
|---|---|---|
| 04/09/2019 | 316 | Letter (non–motion) regarding Response to Chief Judge Saris' Letter as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Lelling, Andrew) (Entered: 04/09/2019) |
| 04/09/2019 | 317 | MOTION for Protective Order *concerning discovery* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Attachments: # 1 Exhibit Protective Order)(Rosen, Eric) (Entered: 04/09/2019) |
| 04/10/2019 | 318 | Transcript of Initial Appearance as to Elizabeth Henriquez, Manuel Henriquez held on April 3, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/1/2019. Redacted Transcript Deadline set for 5/13/2019. Release of Transcript Restriction set for 7/9/2019. (Scalfani, Deborah) (Entered: 04/10/2019) |
| 04/10/2019 | 319 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/10/2019) |
| 04/10/2019 | 320 | EXCERPT Transcript of Initial Appearance for defs ELIZABETH HENRIQUEZ, MANUEL HENRIQUEZ, and FELICITY HUFFMAN as to Mossimo Giannulli, Lori Loughlin, John Wilson, Homayoun Zadeh held on April 3, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/1/2019. Redacted Transcript Deadline set for 5/13/2019. Release of Transcript Restriction set for 7/9/2019. (Scalfani, Deborah) (Entered: 04/10/2019) |
| 04/10/2019 | 321 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/10/2019) |
| 04/10/2019 | 322 | MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 04/10/2019) |
| 04/11/2019 | 323 | Assented to MOTION For An Addendum to Protective Order as to David Sidoo. (Attachments: # 1 Text of Proposed Order Addendum to Protective Order)(Weinberg, Martin) (Entered: 04/11/2019) |
| 04/12/2019 | 324 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 322 Motion to Travel for business as to Robert Zangrillo (19). Defendant must return passport to pretrial office after travel is completed. (Belmont, Kellyann) (Entered: 04/12/2019) |
| 04/12/2019 | 325 | NOTICE *Defendant David Sidoo's Entry of a Plea of NOT GUILTY and Waiver of Appearance for Arraignment as to the Second Superseding Indictment* by David Sidoo (Weinberg, Martin) (Entered: 04/12/2019) |
| 04/12/2019 | 326 | NOTICE *Defendant Robert Zangrillo's Entry of a Plea of NOT GUILTY and Waiver of Appearance for Arraignment as to the Second Superseding Indictment* by Robert Zangrillo (Weinberg, Martin) (Entered: 04/12/2019) |

| | | |
|---|---|---|
| 04/12/2019 | 327 | Assented to MOTION for Leave to Appear Pro Hac Vice by Joan M. Loughnane Filing fee $ 100, receipt number 0101−7634602. as to William McGlashan, Jr. (Attachments: # 1 Certification of Joan M. Loughnane)(Pirozzolo, Jack) (Entered: 04/12/2019) |
| 04/12/2019 | 328 | NOTICE *of Waiver of Appearance for Arraignment* by Homayoun Zadeh (Miner, Tracy) (Entered: 04/12/2019) |
| 04/12/2019 | 329 | NOTICE *Pursuant to Rule 10(b) of Waiver of Appearance at Arraignment and Entry of Plea of Not Guilty* by Elisabeth Kimmel (Beirne, Eoin) (Entered: 04/12/2019) |
| 04/12/2019 | 330 | NOTICE *Pursuant to Rule 10(b) of Waiver of Appearance at Arraignment and Entry of Plea of Not Guilty* by Michelle Janavs (Littrell, John) (Entered: 04/12/2019) |
| 04/12/2019 | 331 | MOTION to Permit Transfer of Passports to the Pretrial Services Office for the Northern District of California as to Elizabeth Henriquez, Manuel Henriquez. (Katz, Aaron) (Entered: 04/12/2019) |
| 04/12/2019 | 332 | NOTICE *of Waiver of Appearance at Arraignment* by John Wilson (Malkiel, Yakov) (Entered: 04/12/2019) |
| 04/12/2019 | 333 | NOTICE *Entry of Plea of Not Guilty and Waiver of Appearance for Arraignment* by I−Hsin Chen (Cahn, Reuben) (Entered: 04/12/2019) |
| 04/14/2019 | 334 | NOTICE *of Waiver of Appearance at Arraignment and Entry of Plea of Not Guilty* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 04/14/2019) |
| 04/15/2019 | 335 | NOTICE *(Waiver of Appearance for Arraignment)* by Douglas Hodge (O'Connor, Brien) (Entered: 04/15/2019) |
| 04/15/2019 | 336 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Lori Loughlin (Trach, William) (Entered: 04/15/2019) |
| 04/15/2019 | 337 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Mossimo Giannulli (Berkowitz, Sean) (Entered: 04/15/2019) |
| 04/15/2019 | 338 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 327 Motion for Leave to Appear Pro Hac Vice Added Joan M. Loughnan. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to William McGlashan Jr. (15) (Belmont, Kellyann) (Entered: 04/15/2019) |
| 04/15/2019 | 339 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts waivers # 325 , # 326 , # 328 , # 329 , # 330 , # 332 , # 333 , # 334 , # 335 , # 336 , # 337 as to David Sidoo, Gamal Abdelaziz, I−Hsin Chen, Mossimo Giannulli, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, John Wilson, Homayoun Zadeh, Robert Zangrillo (Belmont, Kellyann) (Entered: 04/15/2019) |
| 04/15/2019 | 340 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 331 Motion to Permit Transfer of Passports to the Pretrial Services Office for the Northern District of California as to Elizabeth Henriquez (9), Manuel Henriquez (10). "With the assent of probation, the motion is allowed, the probation office shall send the passports to California by certified mail." (Belmont, Kellyann) (Entered: 04/15/2019) |
| 04/15/2019 | 341 | MOTION to Dismiss *Second Superseding Indictment* as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 04/15/2019) |
| 04/15/2019 | 342 | ELECTRONIC NOTICE OF HEARING as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. **Initial Status Conference set for 6/3/2019 11:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley.** (Belmont, Kellyann) (Entered: 04/15/2019) |
| 04/15/2019 | 343 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Diane Blake (Meier, David) (Entered: 04/15/2019) |

| 04/15/2019 | 344 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Todd Blake (Meier, David) (Entered: 04/15/2019) |
| 04/15/2019 | 345 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by William McGlashan, Jr (Pirozzolo, Jack) (Entered: 04/15/2019) |
| 04/15/2019 | 346 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Marci Palatella (Loucks, Michael) (Entered: 04/15/2019) |
| 04/16/2019 | 347 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Elizabeth Henriquez (Katz, Aaron) (Entered: 04/16/2019) |
| 04/16/2019 | 348 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Manuel Henriquez (Katz, Aaron) (Entered: 04/16/2019) |
| 04/16/2019 | 349 | Opposition by Michelle Janavs as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, John Wilson, Homayoun Zadeh, Robert Zangrillo re 317 MOTION for Protective Order *concerning discovery* (Littrell, John) (Entered: 04/16/2019) |
| 04/17/2019 | 350 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10 (b), the court accepts waivers # 343 , 344 , 345 , 346 , 347 , 348 as to Diane Blake, Todd Blake, Elizabeth Henriquez, Manuel Henriquez, William McGlashan, Jr, Marci Palatella (Belmont, Kellyann) (Entered: 04/17/2019) |
| 04/17/2019 | 351 | Opposition by Douglas Hodge re 317 MOTION for Protective Order *concerning discovery , joining Defendants' Preliminary Opposition to Proposed Protective Order* (O'Connor, Brien) (Entered: 04/17/2019) |
| 04/17/2019 | 352 | ELECTRONIC NOTICE OF HEARING as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo : Arraignment set for 4/29/2019 10:30 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. Those defendants whose waivers have been accepted pursuant to Fed. R. Crim. P. 10(b) need not appear at arraignment. Counsel must appear in court. Counsel who cannot be at the arraignment may ask co–counsel to stand in for them. Counsel are ordered to confer with the government regarding the government's proposed protective order prior to April 29, and if the parties cannot reach agreement, the parties shall file a joint status report no later than Thursday, April 25 outlining any remaining issues. The court will hear argument on remaining issues concerning the protective order on April 29.(Belmont, Kellyann) (Entered: 04/17/2019) |
| 04/17/2019 | 353 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Amy Colburn (Schumacher, David) (Entered: 04/17/2019) |
| 04/17/2019 | 354 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Gregory Colburn (Schumacher, David) (Entered: 04/17/2019) |
| 04/17/2019 | 355 | Opposition by Marci Palatella re 317 MOTION for Protective Order *concerning discovery Joinder In Defendants Janavs, Abdelaziz, Chen, Colburn, Henriquez, Kimmel, Wilson, Zadeh, And Zangrillo's Preliminary Opposition To Plaintiff's Motion For A Protective Order* (Loucks, Michael) (Entered: 04/17/2019) |
| 04/18/2019 | 356 | Assented to MOTION to Modify Conditions of Release *to Travel within the United States* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 04/18/2019) |
| 04/19/2019 | 357 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts waivers ##353 and 354 as to Amy Colburn, Gregory Colburn. (Belmont, Kellyann) (Entered: 04/19/2019) |
| 04/19/2019 | 358 | NOTICE OF ATTORNEY APPEARANCE Alexia R. De Vincentis appearing for USA. (De Vincentis, Alexia) (Entered: 04/19/2019) |
| 04/22/2019 | 359 | MOTION to Suspend Motion Practice Until the Intial Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle |

| | | |
|---|---|---|
| | | Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by David Sidoo, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Kotlier, Jonathan) Modified text and event used on 4/22/2019 (Belmont, Kellyann). (Entered: 04/22/2019) |
| 04/22/2019 | 360 | Notice of correction to docket made by Court staff. Docket text and event was modified to reflect caption re # 359 Motion to Suspend Motion Practice as to David Sidoo, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Belmont, Kellyann) (Entered: 04/22/2019) |
| 04/23/2019 | 361 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 356 Motion to Modify Conditions of Release as to Elisabeth Kimmel (13) (Belmont, Kellyann) (Entered: 04/23/2019) |
| 04/23/2019 | 362 | ELECTRONIC NOTICE OF Courtroom change: Arraignment set for 4/29/2019 10:30 AM in **Courtroom 18** before Magistrate Judge M. Page Kelley. **Note: change is to courtroom only!** (Belmont, Kellyann) (Entered: 04/23/2019) |
| 04/24/2019 | 363 | MOTION to Travel *(Motion To Permit Specific And Limited International Business Travel To Japan)* as to Marci Palatella. (Loucks, Michael) (Entered: 04/24/2019) |
| 04/25/2019 | 364 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 363 Motion to Travel as to Marci Palatella (16) (Belmont, Kellyann) (Entered: 04/25/2019) |
| 04/25/2019 | 365 | STATUS REPORT *RE PROTECTIVE ORDER* by David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Attachments: # 1 Exhibit PROPOSED PROTECTIVE ORDER)(Beirne, Eoin) (Entered: 04/25/2019) |
| 04/26/2019 | 366 | MOTION for Protective Order as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Attachments: # 1 Exhibit Second Proposed Protective Order)(Beirne, Eoin) (Entered: 04/26/2019) |
| 04/28/2019 | 367 | MEMORANDUM in Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 366 MOTION for Protective Order (Rosen, Eric) (Entered: 04/28/2019) |
| 04/29/2019 | 368 | NOTICE OF ATTORNEY APPEARANCE: Melinda L. Thompson appearing for Diane Blake, Todd Blake. Type of Appearance: Retained. (Thompson, Melinda) (Entered: 04/29/2019) |
| 04/29/2019 | 369 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Arraignment as to David Sidoo (1) Count 1ss,2ss and Gregory Colburn (2) Count 1s,2s and Amy Colburn (3) Count 1s,2s and Gamal Abdelaziz (4) Count 1,2 and Diane Blake (5) Count 1,2 and Todd Blake (6) Count 1,2 and I–Hsin Chen (7) Count 1,2 and Mossimo Giannulli (8) Count 1,2 and Elizabeth Henriquez (9) Count 1,2 and Manuel Henriquez (10) Count 1,2 and Douglas Hodge (11) Count 1,2 and Michelle Janavs (12) Count 1,2 and Elisabeth Kimmel (13) Count 1,2 and Lori Loughlin (14) Count 1,2 and William McGlashan Jr. (15) Count 1,2 and Marci Palatella (16) Count 1,2 and John Wilson (17) Count 1,2 and Homayoun Zadeh (18) Count 1,2 and Robert Zangrillo (19) Count 1,2 held on 4/29/2019. Arraignment held for each defendant, counsel for each defendant present in court. Initial |

| | | |
|---|---|---|
| | | status conference scheduled for June 3, 2019 at 11:00 a.m. The court explains that at future status conferences, local counsel should appear in person, counsel may stand in for each other, and out–of–town counsel may appear by telephone if necessary.<br># 359 , Motion to suspend motion practice, is denied. With the agreement of Attorney Schumacher, the court allows the government to file its opposition to #341, defendants Amy Colburn and Greg Colburn's motion to dismiss second superceding indictment, by July 29, 2019.<br>## 317 and # 323 , government's motion for a protective order, and motion for an addendum to the government's proposed protective order, are denied as moot, given subsequent motions filed by the parties. The court hears argument on # 366 , defendants' motion for a protective order. The court asks the parties to confer further and file another proposed order.<br>The government shall provide automatic discovery by May 30, 2019.<br>(Attorneys present: Eric S. Rosen, Justin D. O'Connell and Leslie Wright for the government and Michael Pabin (standing in for Martin Weinberg), David S. Schumacher, Brian T. Kelly and Joshua C.H. Sharp, Melinda Thompson, John Littrell (also standing in for Reuben Camper Cahn), William J. Trach, Aaron Katz (also standing in for Manuel Henriquez), Brien T. O'Connor, Joan McPhee, Jonathan L. Kotlier, Eoin P. Beirne, Jack W. Pirozzolo, Michael K. Loucks, Michael Kendall, Tracy A. Miner, Nicholas C. Theodorou for defendants. )Court Reporter Name and Contact or digital recording information: Richard Romanow at bulldog@richromanow.com. (Belmont, Kellyann) (Entered: 04/29/2019) |
| 04/29/2019 | 370 | Magistrate Judge M. Page Kelley: ORDER entered. ORDER ON EXCLUDABLE DELAY as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. Time excluded from 4/9/2019 until 6/3/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 04/29/2019) |
| 05/01/2019 | 371 | Joint MOTION for Protective Order as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Attachments: # 1 Exhibit FINAL PROPOSED PROTECTIVE ORDER)(Beirne, Eoin) (Entered: 05/01/2019) |
| 05/01/2019 | 372 | Joint MOTION for Protective Order as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Attachments: # 1 Exhibit FINAL PROPOSED PROTECTIVE ORDER)(Beirne, Eoin) (Entered: 05/01/2019) |
| 05/01/2019 | 373 | Transcript of Arraignment as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on April 29, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/22/2019. Redacted Transcript Deadline set for 6/3/2019. Release of Transcript Restriction set for 7/30/2019. (Scalfani, Deborah) (Entered: 05/01/2019) |
| 05/01/2019 | 374 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/01/2019) |
| 05/01/2019 | 375 | MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 05/01/2019) |
| 05/01/2019 | 376 | Notice of correction to docket made by Court staff. The wrong document was filed in entry # 371 Joint Motion for protective order. The motion has been terminated and was refiled on the docket as entry # 372 as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal |

**A63**

| | | Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Belmont, Kellyann) (Entered: 05/01/2019) |
|---|---|---|
| 05/02/2019 | 377 | Magistrate Judge M. Page Kelley: PROTECTIVE ORDER entered granting 372 Motion for Protective Order as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 05/02/2019) |
| 05/02/2019 | 378 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered finding as moot 366 Motion for Protective Order as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 05/02/2019) |
| 05/02/2019 | 379 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 375 Motion to Travel as to Robert Zangrillo (19). The court does not require additional information to be filed under seal at this time. (Belmont, Kellyann) (Entered: 05/02/2019) |
| 05/09/2019 | 380 | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Miner, Tracy) (Entered: 05/09/2019) |
| 05/16/2019 | 381 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 380 Motion to Modify Conditions of Release as to Homayoun Zadeh (18) (Belmont, Kellyann) (Entered: 05/16/2019) |
| 05/24/2019 | 384 | MOTION for Leave to Appear Pro Hac Vice by Donald J. Campbell Filing fee $ 100, receipt number 0101–7702556. as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A)(Sharp, Joshua) (Entered: 05/24/2019) |
| 05/29/2019 | 385 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 384 Motion for Leave to Appear Pro Hac Vice Added Donald J. Campbell. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Gamal Abdelaziz (4) (Lima, Christine) (Entered: 05/29/2019) |
| 05/29/2019 | 386 | NOTICE OF ATTORNEY APPEARANCE: George W. Vien appearing for Mossimo Giannulli. Type of Appearance: Retained. (Vien, George) (Entered: 05/29/2019) |
| 05/29/2019 | 387 | NOTICE OF ATTORNEY APPEARANCE: Joshua N. Ruby appearing for Mossimo Giannulli. Type of Appearance: Retained. (Ruby, Joshua) (Entered: 05/29/2019) |
| 05/29/2019 | 388 | STATUS REPORT by David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Beirne, Eoin) (Entered: 05/29/2019) |
| 05/31/2019 | 390 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. In the parties' joint initial status report (# 388 ), defendants "suggest that out–of–state counsel be allowed to attend" the initial status conference by telephone. The court notes that there are nineteen defendants and that it is not workable to have numerous defense counsel appearing by telephone. If a defendant has local counsel, local counsel shall appear at the hearing, or have another local counsel cover for them. If a defendant does not have local counsel, out–of–state counsel may appear by telephone. Defendants are not required to attend the hearing. (Belmont, Kellyann) (Entered: 05/31/2019) |
| 06/03/2019 | 393 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Initial Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori |

A64

Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on 6/3/2019.

Automatic discovery has been produced and supplemented. Discovery is voluminous, in the millions of pages, and the government will continue to produce discovery on a rolling basis. The parties will confer regarding discovery requests. The parties will confer regarding the government's providing better indices for the discovery already produced. Prior to the interim status conference, the parties will confer and propose deadlines for discovery requests in their joint status report filed prior to the conference. The court will set deadlines for dispositive motions when appropriate.

Resolution of the motion to dismiss filed by Amy and Greg Colburn (# 341 ) is stayed and the government need not file an opposition at this time. When defendants have had sufficient time to review discovery, a schedule will be set for the filing of motions by other defendants and for the government's opposition to those motions and to # 341 .

Court hears argument from counsel regarding the production of exculpatory discovery. The court finds that the government does not need to certify that all Brady materials have been identified and provided, as requested in the initial status report (# 388 at 2). Regarding defense counsel's request for FBI reports concerning uncharged parents, the court defers any ruling on this issue. The parties will confer regarding this issue and if the matter cannot be resolved between the parties, defendants should file a motion to compel.

Court hears from government about whether government will call any experts at trial. The court will set deadlines for expert discovery at the next status conference.

The interim status conference is scheduled for 10/2/2019 at 2:15 p.m. in courtroom 24 before Magistrate Judge Kelley. Defendants are not required to attend. All parties agree to the exclusion of time under the Speedy Trial Act. Order to issue.

One of the defendants' conditions of release is that they not have contact with witnesses in the case. The government will provide defendants with a list of such witnesses by June 30, 2019. The list will be supplemented on a rolling basis.

Court addresses the government's motion, filed under seal, for a hearing regarding conflicts of interest (#383). The motion to file under seal is allowed. The motion for a hearing is allowed. Defendants that are the subject of the motion shall file responses under seal by June 27, 2019. After the defendants have filed their responses, counsel are to confer about what should be redacted and redacted copies of the motion and responses shall be filed on the public docket. The court will then hold hearings pursuant to *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c).

(Attorneys present: Eric Rosen, Justin O'Connell and Leslie Wright for the government,Martin G. Weinberg, David S. Schumacher, Brian T. Kelly, Joshua C.H. Sharp, Stephen H. Sutro, David E. Meier,Jennifer L. Keller, Reuben Camper Cahn, George W. Vien, Joshua N. Ruby, Aaron M. Katz, Walter Brown, Brien T. O'Connor, Miranda Hooker, Ezra Geggel, Jonathan L. Kotlier, John L. Littrell, Eoin P. Beirne, William J. Trach, Jack W. Pirozzolo, Michael K. Loucks, Michael Kendall,Megan A. Siddall, Matthew L. Schwartz, Nicholas C. Theodorou for defendants) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@madmont, Kellyann) (Entered: 06/04/2019)

| | | |
|---|---|---|
| 06/03/2019 | 394 | Magistrate Judge M. Page Kelley: ORDER entered. INITIAL STATUS REPORT AND ORDER ON EXCLUDABLE DELAY Time excluded from 6/3/2019 until 10/2/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Belmont, Kellyann) (Entered: 06/04/2019) |
| 06/06/2019 | 396 | Transcript of Initial Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on June 3, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/27/2019. Redacted Transcript Deadline set for 7/8/2019. Release of Transcript Restriction set for 9/4/2019. (Scalfani, Deborah) (Entered: 06/06/2019) |

| 06/06/2019 | 397 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 06/06/2019) |
| --- | --- | --- |
| 06/06/2019 | 398 | ELECTRONIC NOTICE OF HEARING as to Robert Zangrillo: Rule 44(c) Hearing set for 6/11/2019 01:15 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/06/2019) |
| 06/06/2019 | 399 | ELECTRONIC NOTICE OF HEARING as to David Sidoo: Rule 44(c) Hearing set for 6/26/2019 03:45 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/06/2019) |
| 06/06/2019 | 400 | MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Attachments: # 1 Exhibit Exhibit B, # 2 Exhibit C)(Rosen, Eric) (Entered: 06/06/2019) |
| 06/06/2019 | 401 | RESPONSE to Motion by Robert Zangrillo re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Weinberg, Martin) (Entered: 06/06/2019) |
| 06/07/2019 | 402 | ELECTRONIC NOTICE OF HEARING as to Elizabeth Henriquez: Rule 44(c) Hearing set for 6/17/2019 09:30 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/07/2019) |
| 06/10/2019 | 403 | MOTION to Unseal Document *Dkt. 400 and 401* as to David Sidoo, Amy Colburn, Gregory Colburn, Diane Blake, Todd Blake, Mossimo Giannulli, Elizabeth Henriquez, Douglas Hodge, Lori Loughlin, Homayoun Zadeh, Robert Zangrillo by USA. (Attachments: # 1 Exhibit)(Rosen, Eric) (Entered: 06/10/2019) |
| 06/10/2019 | 404 | NOTICE *Response to Government's MOTION to Unseal Document Dkt. 400 and 401* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 06/10/2019) |
| 06/10/2019 | 405 | Assented to MOTION for Leave to File *Document Under Seal and Ex Parte* as Elizabeth Henriquez, by Elizabeth Henriquez. (Attachments: # 1 Exhibit Redacted version of proposed response)(Katz, Aaron) Modified docket text to reflect motion pertains to defendant Elizabeth Henriquez on 6/12/2019 (Belmont, Kellyann). (Entered: 06/10/2019) |
| 06/11/2019 | 406 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Robert Zangrillo. "Regarding the hearing to be held today at 1:15PM, the parties may if they wish submit suggested questions for the court to ask at the hearing. Questions shall be submitted no later than 12:00PM and shall be filed on the docket" (Belmont, Kellyann) (Entered: 06/11/2019) |
| 06/11/2019 | 407 | NOTICE *Defendant's Proposed Foster Hearing Questions* by Robert Zangrillo re 406 Order, (Weinberg, Martin) (Entered: 06/11/2019) |
| 06/11/2019 | 408 | RESPONSE to Motion by Douglas Hodge re 403 MOTION to Unseal Document *Dkt. 400 and 401* (Attachments: # 1 Exhibit 1)(O'Connor, Brien) (Entered: 06/11/2019) |
| 06/11/2019 | 409 | ELECTRONIC NOTICE OF HEARING as to Amy Colburn, Gregory Colburn: Rule 44(c) Hearing set for 7/18/2019 01:15 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/11/2019) |
| 06/11/2019 | 410 | SEALED REPLY TO # 392 and # 401 RESPONSE to Motion by USA as to David Sidoo, Robert Zangrillo re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest, (Belmont, Kellyann) (Entered: 06/11/2019) |
| 06/11/2019 | 411 | NOTICE *Government's Proposed Foster Hearing Questions* by USA as to Robert Zangrillo re 406 Order, (Wright, Leslie) (Entered: 06/11/2019) |
| 06/11/2019 | 412 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. If any defendant has an objection to # 403 , the government's motion to unseal ## 400 and 401 , that defendant shall file his or her written objection no later than June 14, 2019. (Belmont, Kellyann) (Entered: 06/11/2019) |

| 06/11/2019 | 413 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Robert Zangrillo held on 6/11/2019. Court addresses issues relating to # 400 , Government's Motion for Hearing regarding Conflicts of Interest (redacted). It was filed on the public docket, but all counsel for defendants did not consent to the redacted version before it was filed. Court placed document # 400 and response, # 401 , under seal, and the government filed a motion to unseal it, # 403 . Court hears from the government and counsel for Mr. Zangrillo. Mr. Zangrillo does not object to the redacted version of the motion as it pertains to him. The Court will docket an order for other defendants to file objections to the motion to unseal. Government filed a motion regarding potential conflicts of interest regarding Mr. Zangrillo's legal representation, # 383 . The law firm of Boies Schiller Flexner LLP represents Mr. Zangrillo and also represents Davina Isackson, who is charged in a separate, related case, and who, according to the government, is a co−conspirator and is cooperating with the government. Attorney Martin Weinberg represents both defendants David Sidoo and Robert Zangrillo in this case. Court holds hearing for Mr. Zangrillo to explain actual and potential conflicts of interest and what effect they might have on his representation. Court informs Mr. Zangrillo of his right to retain an attorney of his own choosing and his right to retain an attorney who is free from conflicts of interest. Court also advises the defendant of his right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendant of the risks of being represented by counsel who also represent other defendants in a case. Court hears from Attorney Weinberg who informs the Court that any possible conflicts with his representation of Mr. Zangrillo may be at this time. If there was a joint trial, Mr. Zangrillo understands that Attorney Weinberg would withdraw from his case and continue to represent Mr. Sidoo. Court hears from Attorney Schwartz regarding the steps that Boies Schiller Flexner has taken to ensure there is no communication of confidential information between teams representing Mr. Zangrillo and Ms. Isackson. The firm has ensured that no one that works on Mr. Zangrillo's case is working on Ms. Isackson's case and that there have been no communications between the teams regarding the case, electronic case files are password protected, and only members who represent a particular defendant has access to the materials. All of these measures were communicated to everyone employed at the firm through a memorandum by general counsel. Staff working on Mr. Zangrillo's case are located in the firm's Florida and New York Offices and staff working on Ms. Iscakson's case are located in the Los Angeles office. Court hears from the government, which agrees the conflicts may be waived at this time. Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972). After hearing from defendant and counsel from both sides, the Court accepts the waiver of right to separate counsel. Defendant will submit written waiver to Court and an order will issue. (Attorneys present: Eric S. Rosen, Justin D. O'Connell,Leslie Wright for the government and Matthew L. Schwartz, Nicholas C. Theodorou, Martin G. Weinberg for defendant. )Court Reporter Name and Contact or digital recording information: Debra Joyce at joycedebra@gmail.com. (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/11/2019 | 414 | WAIVER of Right to Separate Counsel by Robert Zangrillo (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/11/2019 | 415 | WAIVER of Right to Separate Counsel by Robert Zangrillo (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/11/2019 | 416 | Magistrate Judge M. Page Kelley: ORDER re Conflict of Interest as to Robert Zangrillo (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/12/2019 | 417 | ELECTRONIC NOTICE OF RESCHEDULING as to Amy Colburn, Gregory Colburn: Rule 44(c) Hearing reset for 7/19/2019 10:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/12/2019 | 418 | ELECTRONIC NOTICE OF HEARING as to Diane Blake, Todd Blake: Rule 44(c) Hearing set for 7/24/2019 03:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/12/2019 | 419 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 405 Assented to MOTION for Leave to File Document Under Seal and Ex Parte. "Assented to MOTION for Leave to File Document Under Seal and Ex Parte is allowed. " (Belmont, Kellyann) |

| | | (Entered: 06/12/2019) |
|---|---|---|
| 06/12/2019 | 420 | Sealed Ex Parte Response to # 383 and # 400 Motion for Hearing regarding conflicts of interest filed by Elizabeth Henriquez. (Belmont, Kellyann) (Entered: 06/12/2019) |
| 06/14/2019 | 421 | Transcript of Rule 44(c) Hearing as to Robert Zangrillo held on June 11, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Debra Joyce at joycedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/5/2019. Redacted Transcript Deadline set for 7/15/2019. Release of Transcript Restriction set for 9/12/2019. (Scalfani, Deborah) (Entered: 06/14/2019) |
| 06/14/2019 | 422 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 06/14/2019) |
| 06/17/2019 | 423 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Elizabeth Henriquez held on 6/17/2019. Government filed a motion regarding potential conflicts of interest regarding Ms. Henriquez's legal representation, # 383. Defendant does not object to the unsealing of the redacted version of the Government's Motion for hearing regarding conflicts of interest, document # 400 . The law firm of Ropes and Gray represents Ms. Henriquez and also represents defendant Douglas Hodge in this case. Court explains actual and potential conflicts of interest to Ms. Henriquez and what effect they might have on her representation. Court informs Ms. Henriquez of her right to retain an attorney of her own choosing and her right to retain an attorney who is free from conflicts of interest. Court also advises defendant of her right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendant of the risks of being represented by counsel in a firm that also represents other defendants in the same case. The government outlines possible conflict and states it does not oppose the joint representation at this time. Defendant submitted ex parte and sealed response to the motion and Court hears from defense counsel. Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972). After hearing from defendant and counsel from both sides, the Court accepts the waiver of right to separate counsel. Defendant will submit written waiver to Court and an order will issue. (Attorneys present: Eric Rosen and Kristen Kearney for the government and Aaron Katz for the defendant. )Court Reporter Name and Contact or digital recording information: Lee Marzilli at leemarz@aol.com. (Belmont, Kellyann) (Entered: 06/17/2019) |
| 06/17/2019 | 424 | WAIVER of Right to Separate Counsel by Elizabeth Henriquez (Belmont, Kellyann) (Entered: 06/17/2019) |
| 06/17/2019 | 425 | Magistrate Judge M. Page Kelley: ORDER re Conflict of Interest as to Elizabeth Henriquez entered. (Belmont, Kellyann) (Entered: 06/18/2019) |
| 06/19/2019 | 426 | MOTION for Leave to File *Motion For Rule 17(c) Subpoena Under Seal* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 06/19/2019) |
| 06/19/2019 | 427 | MOTION For Leave to Partially Proceed Ex Parte on Motion for Rule 17(c) Subpoena as to Robert Zangrillo. (Weinberg, Martin) (Entered: 06/19/2019) |
| 06/19/2019 | 428 | NOTICE OF ATTORNEY APPEARANCE: Ezra D. Geggel appearing for Douglas Hodge. Type of Appearance: Retained. (Geggel, Ezra) (Entered: 06/19/2019) |
| 06/20/2019 | 429 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered regarding the Rule 44(c) hearing set for 6/26/19 at 3:45PM as to David Sidoo. If the parties wish to they may submit suggested questions for the court to ask at the hearing. Questions shall be submitted no later than 5:00PM on June 24, 2019 and shall be filed on the docket. (Belmont, Kellyann) (Belmont, Kellyann) (Entered: 06/20/2019) |
| 06/21/2019 | 430 | NOTICE *Defendant's Proposed Foster Hearing Questions* by David Sidoo re 429 Order, (Weinberg, Martin) (Entered: 06/21/2019) |

A68

| 06/21/2019 | 431 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 426 Motion for Leave to File Motion for Rule 17(c) Subpoena Under seal as to Robert Zangrillo (19); granting 427 Motion for Leave to Partially Proceed Ex Parte on Motion for Rule 17(c) Subpoena as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 06/21/2019) |
| --- | --- | --- |
| 06/21/2019 | 432 | SEALED MOTION for Rule 17(c) pre–trial subpoena as to Robert Zangrillo. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Redacted motion, # 8 Cover letter)(Belmont, Kellyann) (Entered: 06/24/2019) |
| 06/24/2019 | 433 | NOTICE *of Government's Proposed Foster Hearing Questions* by USA as to David Sidoo re 429 Order, (O'Connell, Justin) (Entered: 06/24/2019) |
| 06/25/2019 | 434 | ELECTRONIC NOTICE OF RESCHEDULING as to David Sidoo: The hearing set for tomorrow is converted to a status conference. Status Conference set for 6/26/2019 03:45 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/25/2019) |
| 06/25/2019 | 435 | MOTION for Leave to Appear Pro Hac Vice by Roman Martinez Filing fee $ 100, receipt number 0101–7750166. as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Certification of Roman Martinez)(Trach, William) (Entered: 06/25/2019) |
| 06/25/2019 | 436 | MOTION for Leave to Appear Pro Hac Vice by Mark E. Beck Filing fee $ 100, receipt number 0101–7750219. as to Mossimo Giannulli. (Attachments: # 1 Certification of Mark E. Beck)(Trach, William) (Entered: 06/25/2019) |
| 06/25/2019 | 437 | MOTION for Leave to Appear Pro Hac Vice by David C. Scheper Filing fee $ 100, receipt number 0101–7750286. as to Lori Loughlin. (Attachments: # 1 Certification of David C. Scheper)(Trach, William) (Entered: 06/25/2019) |
| 06/26/2019 | 438 | ELECTRONIC NOTICE CANCELLING HEARING as to David Sidoo. Due to a scheduling conflict the status hearing set for 6/26/19 at 3:45pm in front of Magistrate Judge Kelley is cancelled and a further hearing will be set. (Belmont, Kellyann) (Entered: 06/26/2019) |
| 06/26/2019 | 439 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 435 Motion for Leave to Appear Pro Hac Vice Added Roman Martinez. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Mossimo Giannulli (8), Lori Loughlin (14) (McDonagh, Christina) (Entered: 06/26/2019) |
| 06/26/2019 | 440 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 436 Motion for Leave to Appear Pro Hac Vice Added Mark E. Beck. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Mossimo Giannulli (8) (McDonagh, Christina) (Entered: 06/26/2019) |
| 06/26/2019 | 441 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 437 Motion for Leave to Appear Pro Hac Vice Added David C. Scheper. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Lori Loughlin (14) (McDonagh, Christina) (Entered: 06/26/2019) |
| 06/27/2019 | 442 | RESPONSE to 400 MOTION Foster hearing and other hearings regarding potential conflict of interest by Diane Blake, Todd Blake as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (McDonagh, Christina) (Entered: 06/27/2019) |
| 06/27/2019 | 443 | ELECTRONIC NOTICE OF HEARING as to David Sidoo : Rule 44(c) Hearing set for 7/16/2019 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 06/27/2019) |
| 06/27/2019 | 444 | RESPONSE to Motion by Gamal Abdelaziz re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Sharp, |

| | | |
|---|---|---|
| | | Joshua) (Entered: 06/27/2019) |
| 06/27/2019 | 445 | RESPONSE to Motion by Mossimo Giannulli, Lori Loughlin re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Attachments: # 1 Exhibit A – Viscounty declaration, # 2 Exhibit B – Giannulli declaration, # 3 Exhibit C – Loughlin declaration, # 4 Exhibit D – Vien declaration, # 5 Exhibit E – Semprevivo transcript excerpts)(Berkowitz, Sean) (Entered: 06/27/2019) |
| 06/27/2019 | 446 | Assented to MOTION to Seal *and Ex Parte (Response to Government's Motion for Hearing Regarding Conflicts of Interest and Declarations of Douglas Hodge and Brien T. O'Connor)* as to Douglas Hodge. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(O'Connor, Brien) (Entered: 06/27/2019) |
| 06/27/2019 | 447 | RESPONSE to Government's 400 MOTION Foster hearing and other hearings regarding potential conflict of interest by Homayoun Zadeh as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (McDonagh, Christina) (Entered: 06/28/2019) |
| 06/27/2019 | 448 | RESPONSE to 400 Government's MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* by Amy Colburn, Gregory Colburn (McDonagh, Christina) (Entered: 06/28/2019) |
| 06/28/2019 | 449 | Transcript of Rule 44(c) Hearing as to Elizabeth Henriquez held on June 17, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/19/2019. Redacted Transcript Deadline set for 7/29/2019. Release of Transcript Restriction set for 9/26/2019. (Scalfani, Deborah) (Entered: 06/28/2019) |
| 06/28/2019 | 450 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 06/28/2019) |
| 07/01/2019 | 451 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 446 Motion to file documents under Seal and Ex Parte as to Douglas Hodge (11) (Belmont, Kellyann) (Entered: 07/01/2019) |
| 07/01/2019 | 452 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Government to file any replies to responses to # 400 Motion for Hearing regarding conflicts of Interest by July 12, 2019. (Belmont, Kellyann) (Entered: 07/01/2019) |
| 07/02/2019 | 456 | ELECTRONIC NOTICE OF HEARING as to Douglas Hodge: Rule 44(c) Hearing set for 7/22/2019 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. If the parties wish to they may submit suggested questions for the court to ask at the hearing. Questions shall be submitted no later than 5:00PM on July 18, 2019 and shall be filed on the docket. (Belmont, Kellyann) (Entered: 07/02/2019) |
| 07/02/2019 | 457 | ELECTRONIC NOTICE OF HEARING as to Gamal Abdelaziz: Rule 44(c) Hearing set for 7/23/2019 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. If the parties wish to they may submit suggested questions for the court to ask at the hearing. Questions shall be submitted no later than 5:00PM on July 19, 2019 and shall be filed on the docket. (Belmont, Kellyann) Modified on 7/2/2019 (Entered: 07/02/2019) |
| 07/10/2019 | 458 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 432 SEALED MOTION for Rule 17(c) pre–trial subpoena as to Robert Zangrillo. (Subpoena issued). (Belmont, Kellyann) (Belmont, Kellyann). (Entered: 07/10/2019) |
| 07/11/2019 | 459 | SEALED REPLY TO 447 RESPONSE to Motion by USA as to Homayoun Zadeh re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest. (Belmont, Kellyann) (Entered: 07/12/2019) |
| 07/12/2019 | 460 | REPLY TO RESPONSE to Motion by USA as to Gamal Abdelaziz, Mossimo Giannulli, Douglas Hodge, Lori Loughlin re 446 Assented to MOTION to Seal *and Ex Parte (Response to Government's Motion for Hearing Regarding Conflicts of Interest and Declarations of* |

| | | |
|---|---|---|
| | | *Douglas Hodge and Brien T. O'Connor)*, 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (De Vincentis, Alexia) (Entered: 07/12/2019) |
| 07/15/2019 | 461 | NOTICE OF ATTORNEY APPEARANCE: Cory S. Flashner appearing for Elisabeth Kimmel. Type of Appearance: Retained. (Flashner, Cory) (Entered: 07/15/2019) |
| 07/16/2019 | 462 | RESPONSE to Motion by Amy Colburn, Gregory Colburn re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Schumacher, David) (Entered: 07/16/2019) |
| 07/16/2019 | 463 | ELECTRONIC NOTICE OF HEARING as to Homayoun Zadeh: Rule 44(c) Hearing set for 8/19/2019 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. Parties may submit suggested questions for the court to ask at the hearing. Questions shall be submitted no later than 5:00PM on August 15, 2019 and shall be filed on the docket. Modified on 7/16/2019 (Belmont, Kellyann). (Entered: 07/16/2019) |
| 07/16/2019 | 464 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing pursuant to *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to David Sidoo held on 7/16/2019. Defendant present by video.<br>Government filed a motion regarding potential conflicts of interest regarding Mr. Sidoos legal representation, # 383.<br>Attorney Martin Weinberg represents two defendants, David Sidoo and Robert Zangrillo, in this case. Court explains actual and potential conflicts of interest to Mr. Sidoo. Court informs Mr. Sidoo of his right to retain an attorney who is free from conflicts of interest. Court also advises him of his right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises Mr. Sidoo of some of the risks posed by being represented by an attorney who also represents another defendant in the case.<br>Court hears from defense counsel, who state that they have explained the issue of conflict of interest to Mr. Sidoo. If there were a joint trial, Mr. Weinberg would continue to represent Mr. Sidoo and would withdraw from representing Mr. Zangrillo. Court explains to Mr. Sidoo that if Mr. Weinberg were to withdraw from representing Mr. Zangrillo, his obligations toward Mr. Zangrillo as his former counsel would still be in effect. Attorneys Chesnoff and Schonfeld represent that they would handle any preparation and cross examination relating to Mr. Zangrillo if necessary.<br>Government informs the Court that it does not object to Mr. Sidoo's waiver of right to separate counsel.<br>Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972).<br>After hearing from defendant and counsel from both sides, the Court accepts the waiver of right to separate counsel. Defendant will submit written waiver to Court and an order will issue.<br>(Attorneys present: Eric S. Rosen and Justin D. O'Connell for the government and Martin G. Weinberg, David Z. Chesnoff (by video) and Richard A. Schonfeld (by video) for defendant. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Belmont, Kellyann) (Entered: 07/17/2019) |
| 07/17/2019 | 465 | ELECTRONIC NOTICE OF HEARING as to Mossimo Giannulli, Lori Loughlin: Rule 44(c) Hearing set for 8/27/2019 03:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 07/17/2019) |
| 07/17/2019 | 466 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Amy Colburn, Gregory Colburn. If the parties wish to they may submit suggested questions for the court to ask at the hearing on Friday. Questions shall be submitted no later than 2:00PM on July 18, 2019 and shall be filed on the docket. (Belmont, Kellyann) (Entered: 07/17/2019) |
| 07/17/2019 | 467 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Diane Blake, Todd Blake. If the parties wish to they may submit suggested questions for the court to ask at the hearing on 7/24. Questions shall be submitted no later than 5:00PM on July 22, 2019 and shall be filed on the docket. (Belmont, Kellyann) (Entered: 07/17/2019) |
| 07/17/2019 | 468 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Mossimo Giannulli, Lori Loughlin If the parties wish to they may submit suggested questions for the court to ask at the hearing on 8/27/19. Questions shall be submitted no later than 5:00PM on August 23, 2019 and shall be filed on the docket. (Belmont, Kellyann) (Entered: 07/17/2019) |

| | | |
|---|---|---|
| 07/18/2019 | 469 | NOTICE *Regarding Proposed Foster Hearing Questions* by Amy Colburn, Gregory Colburn re 466 Order, (Schumacher, David) (Entered: 07/18/2019) |
| 07/18/2019 | 470 | NOTICE *of the Government's Proposed Foster Hearing Questions* by USA as to Amy Colburn, Gregory Colburn re 466 Order, (O'Connell, Justin) (Entered: 07/18/2019) |
| 07/18/2019 | 471 | NOTICE *Defendant Douglas Hodge's Proposed Rule 44(c) Hearing Questions* by Douglas Hodge (O'Connor, Brien) (Entered: 07/18/2019) |
| 07/18/2019 | 472 | NOTICE *of Government's Proposed Forster Hearing Questions* by USA as to Douglas Hodge (O'Connell, Justin) (Entered: 07/18/2019) |
| 07/19/2019 | 475 | MOTION for Leave to File *3 Page Sur–Reply to Government's Conflicts Motion* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A [Proposed 3 Page Sur–Reply])(Sharp, Joshua) (Entered: 07/19/2019) |
| 07/19/2019 | 477 | WAIVER of Right to Separate Counsel by David Sidoo (Chesnoff, David) (Entered: 07/19/2019) |
| 07/19/2019 | 478 | NOTICE *Gamal Abdelaziz's Proposed Rule 44(c) Hearing Questions* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 07/19/2019) |
| 07/19/2019 | 479 | RESPONSE to Motion by Diane Blake, Todd Blake re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Meier, David) (Entered: 07/19/2019) |
| 07/19/2019 | 480 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing pursuant to *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Gregory Colburn and Amy Colburn held on 7/19/2019. Defendants present and sworn.<br>Government filed a motion regarding potential conflicts of interest regarding Gregory Colburns and Amy Colburns legal representation, # 383.<br>Attorneys David Schumacher, Jordan R.C. Kearney, Patric Hooper and the firm of Hooper, Lundy & Bookman, P.C. represent both Gregory and Amy Colburn. Court explains actual and potential conflicts of interest to the defendants. Court informs the defendants of their right to retain an attorney who is free from conflicts of interest. Court also advises the defendants of their right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendants of some of the risks posed by being represented by an attorney who also represents another defendant in the case.<br>Court hears from defense counsel, who states that he has explained the issue of conflicts of interest to the defendants.<br>Court hears from government regarding concerns relating to the defendants having the same counsel.<br>Court has a colloquy with each defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972).<br>After hearing from defendants and counsel from both sides, the Court accepts the waiver of right to separate counsel. Defendants will submit written waivers to Court and an order will issue.<br>(Attorneys present: Eric Rosen and Justin O'Connell for the Government and David Schumacher for the defendants. )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) (Entered: 07/19/2019) |
| 07/19/2019 | 481 | WAIVER of Right to Separate Counsel by Gregory Colburn (Belmont, Kellyann) (Entered: 07/19/2019) |
| 07/19/2019 | 482 | WAIVER of Right to Separate Counsel by Amy Colburn (Belmont, Kellyann) (Entered: 07/19/2019) |
| 07/19/2019 | 483 | NOTICE *of Government's Proposed Foster Hearing Questions* by USA as to Gamal Abdelaziz (O'Connell, Justin) (Entered: 07/19/2019) |
| 07/22/2019 | 484 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 475 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4) (Belmont, Kellyann) (Entered: 07/22/2019) |

| 07/22/2019 | 485 | SUR–REPLY to Motion by Gamal Abdelaziz re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Sharp, Joshua) (Entered: 07/22/2019) |
|---|---|---|
| 07/22/2019 | 486 | NOTICE *Government's Proposed Foster Hearing Questions* by USA as to Diane Blake, Todd Blake re 467 Order, (O'Connell, Justin) (Entered: 07/22/2019) |
| 07/22/2019 | 487 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Douglas Hodge held on 7/22/2019.<br>Government filed a motion regarding potential conflicts of interest regarding Mr. Hodges legal representation, # 383.<br>The law firm of Ropes and Gray represents Mr. Hodge, co–defendant Elizabeth Henriquez and victim and potential witness University of Southern California.<br>Defense counsel informs the Court what steps have been taken by Ropes and Gray to minimize the risks of dual representation.<br>Government responds. It is the government's position that U.S.C must provide written consent. Government suggests that independent counsel should evaluate the conflict issue.<br>Defendant responds.<br>Court explains actual and potential conflicts of interest to Mr. Hodge and what effect they might have on his representation. Court informs Mr. Hodge of his right to retain an attorney of his own choosing and his right to retain an attorney who is free from conflicts of interest. Court also advises defendant of his right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendant of some of the risks of being represented by counsel from a law firm that also represents other defendant and victim in the same case.<br>Court takes brief recess.<br>Court back on record.<br>Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972).<br>Defendant waives his right to separate counsel. Defendant to submit written waiver. Court takes the matter under advisement. Defendant will file a supplemental memorandum on the U.S.C. consent issue, and other issues raised at the hearing, under seal, and government may respond to it.<br>(Attorneys present: Eric Rosen, Kristen Kearney and Leslie Wright for the government and Brien O'Connor, Ezra Geggel, Joan McPhee and Miranda Hooker for the defendant. )Court Reporter Name and Contact or digital recording information: James Gibbons at jamesgibbonsrpr@gmail.com. (Belmont, Kellyann) (Entered: 07/23/2019) |
| 07/22/2019 | 488 | WAIVER of Right to Separate Counsel by Douglas Hodge (Belmont, Kellyann) (Entered: 07/23/2019) |
| 07/23/2019 | 491 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Gamal Adelaziz held on 7/23/2019.<br>Government filed a motion regarding potential conflicts of interest regarding Mr. Abdelazizs legal representation, # 383.<br>The law firm of Nixon Peabody represents Mr. Abdelaziz, potential witness John Vandemoer, and victim and potential witness University of Southern California (U.S.C.).<br>The court hears from the government regarding potential conflicts of interest. The government's position is that the potential conflict with dual representation with Mr. Abdelaziz and Mr. Vandemoer is waivable but does not believe the written waiver executed by U.S.C. is sufficient to waive that conflict. Defendant responds. Defendant's position is that the written waiver by U.S.C. is sufficient. Defendant informs the Court on the steps Nixon Peabody has taken to minimize the risks of dual representation.<br>Court addresses the parties regarding Massachusetts Rule of Professional Conduct 1.7 and whether U.S.C.'s written waiver, signed at the outset of Nixon Peabody's representation of U.S.C., is sufficient at this time. Defense counsel informs the Court that U.S.C. has informed Nixon Peabody that it does not consent to the dual representation.<br>Court explains actual and potential conflicts of interest to Mr. Abdelaziz and what effect they might have on his representation. Court informs Mr. Abdelaziz of his right to retain an attorney of his own choosing and his right to retain an attorney who is free from conflicts of interest. Court also advises defendant of his right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendant of some of the risks of being represented by counsel from a law firm that also represents a victim and potential witnesses in the same case. |

| | | |
|---|---|---|
| | | Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972).Defendant waives his right to separate counsel. Defendant to submit written waiver. Court takes the matter under advisement. (Attorneys present: Eric Rosen, Kristen Kearney and Leslie Wright for the government and Brian Kelly and Joshua Sharp for the defendant. )Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/23/2019 | 492 | WAIVER of Right to Separate Counsel by Gamal Abdelaziz (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/24/2019 | 490 | MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 07/24/2019) |
| 07/24/2019 | 493 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Gamal Abdelaziz. Concerning the hearing held on July 23, 2019, re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Gamal Adelaziz, the court orders as follows. The rules of professional conduct for attorneys appearing and practicing before this court are the Massachusetts Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court, as set forth as Rule 3:07 of that court, as of January 1, 2015. Rule 1.7, concerning conflicts of interest, provides that if the representation of one client will be directly adverse to another client, an attorney may still represent them both if, among other conditions, each affected client gives informed consent, confirmed in writing. At the hearing on July 23, 2019, for the first time, counsel informed the court that the alleged victim in this case, University of Southern California (U.S.C.), does not consent to the joint representation. On further reflection after the hearing, the court requires additional information from counsel concerning the informed consent of U.S.C. Counsel shall file, no later than **August 6, 2019**, a supplemental memorandum stating the position of U.S.C. and why counsel is not in violation of Rule 1.7 by continuing to represent both clients. If counsel cannot divulge to the court U.S.C.'s reasons for objecting to the representation without violating the attorney–client privilege, counsel may so state or may file the memorandum under seal and ex parte, if necessary. (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/24/2019 | 494 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 490 Motion to Travel as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/24/2019 | 495 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing pursuant to *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Diane Blake and Todd Blake held on 7/24/2019. Government filed a motion regarding potential conflicts of interest regarding Diane and Todd Blakes legal representation, # 383. Attorneys Stephen Sutro, David Meier, Melinda Thompson and the law firms of Duane Morris LLP and Todd & Weld LLP represent both Diane and Todd Blake. Court hears from government regarding concerns relating to the dual representation. The government believes that the conflict is waivable. Court hears from defense counsel, who state that they have explained the issue of conflicts of interest to the defendants. Defendants sworn. Court explains actual and potential conflicts of interest to the defendants. Court informs the defendants of their right to retain an attorney who is free from conflicts of interest. Court also advises the defendants of their right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendants of some of the risks posed by being represented by an attorney who also represents another defendant in the case. Court has a colloquy with each defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972). After hearing from defendants and counsel from both sides, the court accepts the waiver of right to separate counsel. Defendants will submit written waivers to court and an order will issue. (Attorneys present: Eric Rosen, Kristen Kearney and Leslie Wright for the government and Stephen Sutro and David Meier for defendants. )Court Reporter Name and Contact or digital recording information: Joan Daly at joanmdaly62@gmail.com. (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/24/2019 | 496 | WAIVER of Right to Separate Counsel by Diane Blake (Belmont, Kellyann) (Entered: 07/24/2019) |

| 07/24/2019 | [497](#) | WAIVER of Right to Separate Counsel by Todd Blake (Belmont, Kellyann) (Entered: 07/24/2019) |
| 07/24/2019 | [498](#) | Memorandum regarding (Supplemental) Conflicts of Interest as to Douglas Hodge (O'Connor, Brien) (Entered: 07/24/2019) |
| 07/25/2019 | [499](#) | Magistrate Judge M. Page Kelley: ORDER entered. Order Re Conflict of Interest as to David Sidoo. (Belmont, Kellyann) (Entered: 07/25/2019) |
| 07/25/2019 | [500](#) | Magistrate Judge M. Page Kelley: ORDER entered as to Diane Blake and Todd Blake. Order Re Conflict of Interest. (Belmont, Kellyann) (Entered: 07/25/2019) |
| 07/25/2019 | [501](#) | Magistrate Judge M. Page Kelley: ORDER entered as to Amy Colburn and Gregory Colburn. Order re Conflict of Interest. (Belmont, Kellyann) (Entered: 07/25/2019) |
| 07/25/2019 | [503](#) | Magistrate Judge M. Page Kelley: ORDER entered as to Robert Zangrillo. On motion of defendant Robert Zangrillo, #432−7, previously filed under seal, is unsealed. (Belmont, Kellyann) Modified on 7/25/2019 to correct document # (Belmont, Kellyann). (Entered: 07/25/2019) |
| 07/26/2019 | [504](#) | Response as to Gamal Abdelaziz, Mossimo Giannulli, Douglas Hodge, Lori Loughlin: 498 Memorandum (not related to a motion). (De Vincentis, Alexia) (Entered: 07/26/2019) |
| 07/26/2019 | [505](#) | Transcript of Rule 44(c) Hearing as to Amy Colburn, Gregory Colburn held on July 19, 2019, before Magistrate Judge M. Page Kelley. Court Reporter and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/16/2019. Redacted Transcript Deadline set for 8/26/2019. Release of Transcript Restriction set for 10/24/2019. (Scalfani, Deborah) (Entered: 07/26/2019) |
| 07/26/2019 | [506](#) | Transcript of Rule 44(c) Hearing as to Gamal Abdelaziz held on July 23, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/16/2019. Redacted Transcript Deadline set for 8/26/2019. Release of Transcript Restriction set for 10/24/2019. (Scalfani, Deborah) (Entered: 07/26/2019) |
| 07/26/2019 | 507 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 07/26/2019) |
| 07/29/2019 | [508](#) | Transcript of Rule 44(c) Hearing as to David Sidoo held on July 16, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/19/2019. Redacted Transcript Deadline set for 8/29/2019. Release of Transcript Restriction set for 10/28/2019. (Scalfani, Deborah) (Entered: 07/29/2019) |
| 07/29/2019 | 509 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 07/29/2019) |
| 07/29/2019 | [510](#) | NOTICE *Redacted Response to July 24, 2019 Order* by Gamal Abdelaziz re 493 Order,,,,,,, (Sharp, Joshua) (Additional attachment(s) added on 7/29/2019: # [1](#) Gamal Abdelaziz's Response (SEALED)) (Vieira, Leonardo). (Entered: 07/29/2019) |
| 07/30/2019 | [511](#) | MOTION for Leave to Appear Pro Hac Vice by Douglas Fuchs Filing fee $ 100, receipt number 0101−7806303 by University of Southern California. (Attachments: # [1](#) Exhibit A)(Pignatelli, Elizabeth) (Entered: 07/30/2019) |
| 07/30/2019 | 512 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 511 Motion for Leave to Appear Pro Hac Vice Added Douglas Fuchs. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case |

| | | Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Vieira, Leonardo) (Entered: 07/30/2019) |
|---|---|---|
| 07/30/2019 | 513 | Assented to MOTION for Leave to File *Response to the Government's Supplemental Memorandum Regarding Conflicts of Interest* as to Douglas Hodge. (Attachments: # 1 Exhibit A)(O'Connor, Brien) (Entered: 07/30/2019) |
| 08/05/2019 | 514 | Transcript of Rule 44(c) Hearing as to Douglas Hodge held on July 22, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/26/2019. Redacted Transcript Deadline set for 9/5/2019. Release of Transcript Restriction set for 11/4/2019. (Scalfani, Deborah) (Entered: 08/05/2019) |
| 08/05/2019 | 515 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 08/05/2019) |
| 08/07/2019 | 516 | MOTION to Travel *(Motion To Permit Specific And Limited International Business Travel To Japan)* as to Marci Palatella. (Loucks, Michael) (Entered: 08/07/2019) |
| 08/08/2019 | 517 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 516 Motion to Permit Specific and Limited International Business Travel to Japan as to Marci Palatella (16) (Belmont, Kellyann) (Entered: 08/08/2019) |
| 08/09/2019 | 518 | Supplemental RESPONSE to Motion by Mossimo Giannulli, Lori Loughlin re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Attachments: # 1 Exhibit A – Supplemental Declaration of Perry J. Viscounty)(Berkowitz, Sean) (Entered: 08/09/2019) |
| 08/14/2019 | 519 | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Siddall, Megan) (Entered: 08/14/2019) |
| 08/15/2019 | 520 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 519 Motion to Modify Conditions of Release as to Homayoun Zadeh (18) (Belmont, Kellyann) (Entered: 08/15/2019) |
| 08/15/2019 | 521 | NOTICE *Proposed Foster Hearing Questions* by Homayoun Zadeh (Miner, Tracy) (Entered: 08/15/2019) |
| 08/15/2019 | 522 | NOTICE *Government's Proposed Foster Hearing Questions* by USA as to Homayoun Zadeh re 463 Notice of Hearing, (O'Connell, Justin) (Entered: 08/15/2019) |
| 08/16/2019 | 523 | NOTICE *Objections to Proposed Foster Hearing Questions* by Homayoun Zadeh (Miner, Tracy) (Entered: 08/16/2019) |
| 08/19/2019 | 524 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Homayoun Zadeh held on 8/19/2019. Sealed sidebar held with counsel. Defendant sworn. Government filed a motion regarding potential conflicts of interest regarding Dr. Zadehs legal representation, # 383 . The law firm of Miner, Orkand, Siddall LLP represents Dr. Zadeh and also represents defendant Gordon Ernst in a related case. The court hears argument from the parties. The government does not believe that the conflict can be waived. Defense counsel argues that conflict can be waived and informs the court of the steps it has taken to mitigate any conflict. Defendant has consulted with outside counsel about this issue. Court explains actual and potential conflicts of interest to Dr. Zadeh and what effect they might have on his representation. Court informs Dr. Zadeh of his right to retain an attorney of his own choosing and his right to retain an attorney who is free from conflicts of interest. Court also advises defendant of his right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendant of the risks of being represented by counsel in a firm that also represents another defendant in a related case. Court has a colloquy with the defendant based on the requirements of *United States v.* |

| | | |
|---|---|---|
| | | *Foster*, 469 F.2d 1 (1972). Defendant waives right to separate counsel. Defendant will submit written waiver to the court and the court takes the matter under advisement. (Attorneys present: Eric Rosen, Justin O'Connell and Kristen Kearney for the government and Tracy Miner and Megan Siddall for the defendant. )Court Reporter Name and Contact or digital recording information: Richard Romanow at bulldog@richromanow.com. (Belmont, Kellyann) (Entered: 08/20/2019) |
| 08/19/2019 | 527 | WAIVER of Right to Separate Counsel by Homayoun Zadeh (Belmont, Kellyann) (Entered: 08/21/2019) |
| 08/20/2019 | 525 | Transcript of Rule 44(c) Hearing as to Diane Blake, Todd Blake held on July 24, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/10/2019. Redacted Transcript Deadline set for 9/20/2019. Release of Transcript Restriction set for 11/18/2019. (Scalfani, Deborah) (Entered: 08/20/2019) |
| 08/20/2019 | 526 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 08/20/2019) |
| 08/21/2019 | 528 | NOTICE OF ATTORNEY APPEARANCE: Anthony E. Fuller appearing for Movant University of Southern California (Fuller, Anthony) (Entered: 08/21/2019) |
| 08/21/2019 | 529 | NOTICE OF ATTORNEY APPEARANCE: Elizabeth Carr Pignatelli appearing for Movant University of Southern California (Pignatelli, Elizabeth) (Entered: 08/21/2019) |
| 08/22/2019 | 530 | MOTION for Leave to Appear Pro Hac Vice by Debra Wong Yang Filing fee $ 100, receipt number 0101–7844280. as to the University of Southern California. (Attachments: # 1 Exhibit A)(Pignatelli, Elizabeth) (Entered: 08/22/2019) |
| 08/22/2019 | 531 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 530 Motion for Leave to Appear Pro Hac Vice Added Debra Wong Yang. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Garvin, Brendan) (Entered: 08/22/2019) |
| 08/22/2019 | 532 | Third Party MOTION to Quash *Subpoena* as to Robert Zangrillo by University of Southern California. (Attachments: # 1 Memorandum in Support of Non–Party University of Southern California's Motion to Quash, # 2 Exhibit Subpoena to Produce Documents, Information, or Objects in a Criminal Case, # 3 Exhibit Declaration of Tim Brunold, # 4 Exhibit Declaration of Tracey Vranich)(Pignatelli, Elizabeth) (Entered: 08/22/2019) |
| 08/23/2019 | 533 | ELECTRONIC NOTICE OF COURTROOM CHANGE as to Mossimo Giannulli, Lori Loughlin: Rule 44(c) Hearing set for 8/27/2019 03:00 PM in **Courtroom 1** before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 08/23/2019) |
| 08/23/2019 | 534 | NOTICE *of Proposed Foster Hearing Questions* by Mossimo Giannulli, Lori Loughlin (Berkowitz, Sean) (Entered: 08/23/2019) |
| 08/23/2019 | 535 | NOTICE *of Government's Proposed Foster Hearing Questions* by USA as to Mossimo Giannulli, Lori Loughlin (Wright, Leslie) (Entered: 08/23/2019) |
| 08/23/2019 | 536 | Assented to MOTION for Hearing as to Robert Zangrillo. (Weinberg, Martin) (Entered: 08/23/2019) |
| 08/26/2019 | 537 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 536 Motion for Hearing as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 08/26/2019) |
| 08/26/2019 | 538 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Robert Zangrillo 532 Third Party MOTION to Quash *Subpoena* : Motion Hearing set for 9/18/2019 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 08/26/2019) |

| 08/27/2019 | 539 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Mossimo Giannulli and Lori Loughlin held on 8/27/2019. Government filed a motion regarding potential conflicts of interest relating to Mr. Giannullis and Ms. Loughlins legal representation, # 383 . <br> The law firm of Latham & Watkins LLP represents both Mr. Giannulli and Ms. Louglin. Latham & Watkins LLP formerly represented a victim in the case, the University of Southern California. Mr. Giannulli is also represented by the law firm of Donnelly, Conroy & Gelhaar, LLP which also represents defendants in related cases, Davina Isackson and Peter Jan Sartorio. <br> The court hears argument from the parties. The government does not believe that the conflict regarding dual representation of Mr. Giannulli and Ms. Isackson can be waived. Defense counsel argues that the conflict can be waived and informs the court of the steps it has taken to mitigate any conflict. Defendants have consulted with outside counsel about this issue. Defendants sworn. <br> Court explains actual and potential conflicts of interest to the defendants and what effect they might have on their representation. Court informs the defendants of their right to retain attorneys of their own choosing and their right to retain attorneys who are free from conflicts of interest. Court also advises the defendants of their right to have an ex parte hearing regarding any of the issues raised at this hearing today. Court advises the defendants of the risks of being represented by counsel in a firm that also represents another defendant in the same case, defendants in related cases and a firm who formerly represented a victim in the case. <br> Court has a colloquy with the defendants based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972). Defendants waive right to separate counsel. Defendants will submit written waivers to the court and the court takes the matter under advisement. Order to issue. <br> (Attorneys present: Eric Rosen, Justin O'Connell, Kristen Kearny, Leslie Wright for the government and George Vien, William Trach, Sean Berkowitz for defendants. )Court Reporter Name and Contact or digital recording information: Lee Marzilli at leemarz@aol.com. (Belmont, Kellyann) (Entered: 08/28/2019) |
| 08/27/2019 | 540 | WAIVER of Right to Separate Counsel by Mossimo Giannulli (Belmont, Kellyann) (Entered: 08/28/2019) |
| 08/27/2019 | 541 | WAIVER of Right to Separate Counsel by Lori Loughlin (Belmont, Kellyann) (Entered: 08/28/2019) |
| 08/30/2019 | 542 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 400 MOTION Foster hearing and other hearings regarding potential conflict of interest; granting # 403 Motion to Unseal Document 400 and 401; granting 513 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Belmont, Kellyann) (Entered: 08/30/2019) |
| 09/02/2019 | 543 | Transcript of Rule 44(c) Hearing as to Mossimo Giannulli, Lori Loughlin held on August 27, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/23/2019. Redacted Transcript Deadline set for 10/3/2019. Release of Transcript Restriction set for 12/2/2019. (Scalfani, Deborah) (Entered: 09/02/2019) |
| 09/02/2019 | 544 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 09/02/2019) |
| 09/03/2019 | 545 | Assented to MOTION for Leave to File *Extra Page Response* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 09/03/2019) |
| 09/03/2019 | 546 | Opposition by Robert Zangrillo re 532 Third Party MOTION to Quash *Subpoena* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Weinberg, Martin) (Entered: 09/03/2019) |

A78

| 09/03/2019 | 547 | Response as to Douglas Hodge: 504 Response (unrelated to a motion). (O'Connor, Brien) (Entered: 09/03/2019) |
|---|---|---|
| 09/03/2019 | 552 | Sealed Unredacted exhibits re 546 Opposition by Robert Zangrillo re[ 532] Third Party MOTION to Quash Subpoena (Main document is Exhibit 1) (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 15, # 15 Exhibit 16, # 16 Exhibit 17, # 17 Exhibit 18)(Belmont, Kellyann) (Entered: 09/09/2019) |
| 09/04/2019 | 548 | Transcript of Rule 44(c) Hearing (sealed portion removed) as to Homayoun Zadeh held on August 19, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/25/2019. Redacted Transcript Deadline set for 10/7/2019. Release of Transcript Restriction set for 12/3/2019. (Scalfani, Deborah) (Entered: 09/04/2019) |
| 09/04/2019 | 549 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 09/04/2019) |
| 09/04/2019 | 550 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Homayoun Zadeh : Miner Orkand Siddall LLP are ordered to file, under seal, the written waivers by defendants Gordon Ernst and Homayoun Zadeh, referred to in # 447 , Defendant Homayoun Zadeh's response to government's motion for hearing regarding conflicts of interest, by close of business September 4, 2019. (Belmont, Kellyann) (Entered: 09/04/2019) |
| 09/04/2019 | 551 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 545 Assented to MOTION for Leave to File Extra Page Response as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 09/04/2019) |
| 09/13/2019 | 553 | MOTION to Travel as to Robert Zangrillo. (Weinberg, Martin) (Entered: 09/13/2019) |
| 09/13/2019 | 554 | ADDENDUM by Robert Zangrillo re 553 MOTION to Travel (Weinberg, Martin) (Entered: 09/13/2019) |
| 09/13/2019 | 555 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 553 Motion to Permit specific and limited international business travel as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 09/13/2019) |
| 09/13/2019 | 556 | ELECTRONIC NOTICE of Courtroom change as to Robert Zangrillo: Motion Hearing set for 9/18/2019 02:30 PM in **Courtroom 22** before Magistrate Judge M. Page Kelley. **Note: change is to courtroom only! (Belmont, Kellyann) (Entered: 09/13/2019)** |
| 09/13/2019 | 557 | Assented to MOTION for Leave to File *Reply Brief* as to Robert Zangrillo by University of Southern California. (Attachments: # 1 Exhibit Nonparty University of Southern California's Proposed Reply to Response in Opposition to Motion to Quash, # 2 Exhibit Declaration of Timothy Brunold)(Pignatelli, Elizabeth) (Entered: 09/13/2019) |
| 09/16/2019 | 558 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 557 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 09/16/2019) |
| 09/16/2019 | 559 | REPLY TO RESPONSE to Motion by University of Southern California as to Robert Zangrillo re 532 Third Party MOTION to Quash *Subpoena* (Pignatelli, Elizabeth) (Entered: 09/16/2019) |
| 09/17/2019 | 560 | Assented to MOTION for Leave to File *Sur–Reply Regarding Nonparty University of Southern California's Motion to Quash* as to Robert Zangrillo. (Attachments: # 1 Exhibit 1. Sur–Reply Regarding Nonparty University of Southern California's Motion to Quash)(Weinberg, Martin) (Entered: 09/17/2019) |

| 09/17/2019 | 561 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>560</u> Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 09/17/2019) |
| --- | --- | --- |
| 09/17/2019 | <u>562</u> | SUR–REPLY to Motion by Robert Zangrillo re <u>532</u> Third Party MOTION to Quash *Subpoena ; Leave to File Granted on September 17, 2019* (Weinberg, Martin) (Entered: 09/17/2019) |
| 09/18/2019 | <u>563</u> | NOTICE OF ATTORNEY APPEARANCE: Michael Pabian appearing for Robert Zangrillo. Type of Appearance: Retained. (Pabian, Michael) (Entered: 09/18/2019) |
| 09/18/2019 | 564 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Motion Hearing as to Robert Zangrillo held on 9/18/2019 re <u>532</u> Third Party MOTION to Quash *Subpoena* filed by University of Southern California. Court hears argument on motion. Parties will confer to see if an agreement can be worked out and notify the Court of the status by September 30th. (Attorneys present: Douglas Fuchs and Anthony Fuller for University of Southern California, Martin Weinberg and Michael Pabian for defendant Zangrillo and Eric Rosen, Justin O'Connell and Kristen Kearney for government. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Belmont, Kellyann) (Entered: 09/18/2019) |
| 09/18/2019 | <u>565</u> | Sealed Submission by Robert Zangrillo made in open Court on 9/18/2019. (Belmont, Kellyann) (Entered: 09/18/2019) |
| 09/18/2019 | <u>566</u> | Sealed Ex parte submission by Robert Zangrillo made in open Court on 9/18/2019. (Belmont, Kellyann) (Entered: 09/18/2019) |
| 09/18/2019 | <u>567</u> | Sealed submission by Robert Zangrillo made in open Court on 9/18/2019. (Attachments: # <u>1</u> Submission with markings)(Belmont, Kellyann) (Entered: 09/18/2019) |
| 09/19/2019 | <u>568</u> | NOTICE by Robert Zangrillo re <u>553</u> MOTION to Travel (Weinberg, Martin) (Entered: 09/19/2019) |
| 09/20/2019 | <u>570</u> | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Siddall, Megan) (Entered: 09/20/2019) |
| 09/20/2019 | 571 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>570</u> Motion to Modify Conditions of Release as to Homayoun Zadeh (18) (Belmont, Kellyann) (Entered: 09/20/2019) |
| 09/24/2019 | <u>572</u> | Transcript of Motion Hearing as to Robert Zangrillo held on September 18, 2019, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/25/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/24/2019) |
| 09/24/2019 | 573 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 09/24/2019) |
| 09/25/2019 | <u>574</u> | STATUS REPORT *(Joint Interim)* by USA as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Kearney, Kristen) (Entered: 09/25/2019) |
| 09/30/2019 | 575 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered re # <u>532</u> Third Party MOTION to Quash Subpoena as to Robert Zangrillo. Parties continue to confer. Status Report due by 10/7/2019 (Belmont, Kellyann) (Entered: 09/30/2019) |

A80

| 10/02/2019 | 576 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Interim Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on 10/2/2019. <br> Discovery is voluminous and the government is still in the process of producing it. <br> Defendants are in the process of reviewing it. The government expects to complete discovery related to recent search warrants within two months. <br> Court hears from counsel regarding discovery issues. Counsel to confer and meet in person if possible to attempt to resolve issues. <br> The Court informs the parties that Judge Gorton expects to hold a trial or trials in this case in 2020. <br> Interim Status Conference set for 1/17/2020 11:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. At this date the Court will set deadlines for discovery motions and motions pertaining to the scope of the conspiracy. Parties agree to exclude the time under the Speedy Trial Act. Order to issue. <br> (Attorneys present: Eric Rosen and Kristen Kearney for the government, Martin Weinberg, David Schumacher, Brian Kelly, Joshua Sharp, David Meier, Reuben Cahn, George Vien, Aaron Katz, Brien O'Connor, Joan McPhee, John Littrell, Jonathan Kotlier, Eoin Beirne, Cory Flashner, William Trach, John Hueston, Jack Pirozzolo, Michael Loucks, Michael Kendall, Yakov Malkiel, Tracy Miner for defendants. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceedinScalfani by email at deborah_scalfani@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 10/02/2019) |
| 10/02/2019 | <u>577</u> | Magistrate Judge M. Page Kelley: ORDER entered. STATUS REPORT and ORDER ON EXCLUDABLE DELAY as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. Time excluded from 10/2/2019 until 1/17/2020. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 10/02/2019) |
| 10/07/2019 | <u>578</u> | Transcript of Interim Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on October 2, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/28/2019. Redacted Transcript Deadline set for 11/7/2019. Release of Transcript Restriction set for 1/6/2020. (Scalfani, Deborah) (Entered: 10/07/2019) |
| 10/07/2019 | 579 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 10/07/2019) |
| 10/07/2019 | 580 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered re # 532 Third Party MOTION to Quash Subpoena as to Robert Zangrillo. Parties continue to confer. Status Report due by 10/11/2019. (Belmont, Kellyann) (Entered: 10/07/2019) |
| 10/11/2019 | <u>582</u> | STATUS REPORT *Regarding Motion for Rule 17(c) Subpoena* by Robert Zangrillo (Weinberg, Martin) (Entered: 10/11/2019) |
| 10/15/2019 | 583 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. In light of #582, joint status report, Defendant Zangrillo and USC shall file a joint status report when they reach an agreement concerning Defendant Zangrillo's subpoena. (Belmont, Kellyann) (Entered: 10/15/2019) |

| 10/16/2019 | 584 | MOTION to Travel as to Robert Zangrillo. (Weinberg, Martin) (Entered: 10/16/2019) |
|---|---|---|
| 10/17/2019 | 585 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 584 Motion to Travel as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 10/17/2019) |
| 10/17/2019 | 586 | ELECTRONIC NOTICE OF HEARING as to Douglas Hodge Rule 11 Hearing set for 10/21/2019 10:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi−interview−schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 10/17/2019) |
| 10/18/2019 | 587 | Case as to Douglas Hodge no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 10/18/2019) |
| 10/18/2019 | 588 | ELECTRONIC NOTICE OF HEARING as to Manuel Henriquez Rule 11 Hearing set for 10/21/2019 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi−interview−schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 10/18/2019) |
| 10/18/2019 | 589 | Case as to Manuel Henriquez no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 10/18/2019) |
| 10/18/2019 | 590 | ELECTRONIC NOTICE OF HEARING as to Douglas Hodge:Further Foster Hearing set for 10/21/2019 09:00 AM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 10/18/2019) |
| 10/18/2019 | 591 | ELECTRONIC NOTICE OF HEARING as to Michelle Janavs Rule 11 Hearing set for 10/21/2019 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi−interview−schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 10/18/2019) |
| 10/21/2019 | 592 | ELECTRONIC NOTICE OF HEARING as to Elizabeth Henriquez Rule 11 Hearing set for 10/21/2019 04:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi−interview−schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 593 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Further Hearing re *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) as to Douglas Hodge held on 10/21/2019.<br>Parties inform the Court that since the previous hearing, no additional conflict issues have arisen. Both the government and defendant believe the conflicts between USC, Ms. Henriquez, and Mr. Hodge may be waived.<br>Court withheld the decision on accepting the waiver on potential conflicts to see if further developments would arise relating to the University of Southern California's motion to quash Defendant Zangrillo's recent 17(c) subpoena. Counsel for Mr. Hodge informs the court that Mr. Hodge's defense is not affected by that issue.<br>Court hears from parties regarding any possible issues between USC and Mr. Hodge that may arise regarding sentencing and restitution. The government informs the court that USC will not be seeking restitution.<br>Defendant sworn. Court has a colloquy with the defendant based on the requirements of *United States v. Foster*, 469 F.2d 1 (1972).<br>Court finds defendant's waiver is knowing and voluntary and accepts it. Order to issue. (Attorneys present: Eric Rosen and Justin O'Connell for the government, Brien O'Conner, John McPhee and Miranda Hooker for defendant. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio−recordings . For a proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 10/21/2019) |

| | | |
|---|---|---|
| 10/21/2019 | 594 | Magistrate Judge M. Page Kelley: ORDER entered. Order re Conflict of Interest as to Douglas Hodge. (Belmont, Kellyann) (Entered: 10/21/2019) |
| 10/21/2019 | 595 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Douglas Hodge held on 10/21/2019. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. No written plea agreement. Government informs Defendant of the maximum possible penalties. Government informs the Defendant and the Court of the facts it would prove if this matter were to go to trial. Plea entered by Douglas Hodge (11) Guilty Count 1,2. Sentencing set for 1/22/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant released on all previously imposed conditions of release. (Attorneys present: O'Connor, McPhee, Hooker, Rosen, O'Connell. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 596 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Douglas Hodge Sentencing set for 1/22/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 597 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Manuel Henriquez held on 10/21/2019. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. No written plea agreement. Government informs Defendant of the maximum possible penalties. Government informs the Defendant and the Court of the facts it would prove if this matter were to go to trial. Defendant addresses the Court. Plea entered by Manuel Henriquez (10) Guilty Count 1,2. Sentencing set for 3/5/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant released on all previously imposed conditions of release. (Attorneys present: Haag, Brown, Rosen, Kearney. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 598 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Manuel Henriquez Sentencing set for 3/5/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 599 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Michelle Janavs held on 10/21/2019. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. No written plea agreement. Government informs Defendant of the maximum possible penalties. Government informs the Defendant and the Court of the facts it would prove if this matter were to go to trial. Plea entered by Michelle Janavs (12) Guilty Count 1,2. Sentencing set for 2/25/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant released on all previously imposed conditions of release. (Attorneys present: Littrell, Kotlier, Rosen, Kearney. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 600 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Douglas Hodge Sentencing set for 2/25/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 601 | Notice of correction to docket made by Court staff. Correction: Docket No. 600 corrected because: it was filed as to the incorrect Defendant. Please note: the Sentencing Hearing for Defendant Douglas Hodge is set for 1/22/20, and the Sentencing for Defendant Michelle Janavs is set for 2/25/20. as to Douglas Hodge, Michelle Janavs (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 602 | ELECTRONIC NOTICE as to Douglas Hodge Sentencing set for 1/22/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 603 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Michelle Janavs Sentencing set for 2/25/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/21/2019) |
| 10/21/2019 | 604 | PROPOSED ORDER(S) submitted by University of Southern California as to Robert Zangrillo (Fuller, Anthony) (Entered: 10/21/2019) |
| 10/21/2019 | 608 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Elizabeth Henriquez held on 10/21/2019. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. No written |

| | | |
|---|---|---|
| | | plea agreement. Government informs the Defendant of the maximum possible penalties, and the facts it would must prove if this matter were to go to trial. Plea entered by Elizabeth Henriquez (9) Guilty Count 1,2. Sentencing set for 2/7/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant released on all previously imposed conditions of release. (Attorneys present: Katz, Hoey, Rosen. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 10/22/2019) |
| 10/22/2019 | 605 | Transcript of Foster Hearing as to Douglas Hodge held on October 21, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Debra Lajoie. The Transcript may be purchased through Debra Lajoie at lajoiedebra@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/12/2019. Redacted Transcript Deadline set for 11/22/2019. Release of Transcript Restriction set for 1/21/2020. (Scalfani, Deborah) (Entered: 10/22/2019) |
| 10/22/2019 | 606 | Transcript of Rule 11 Hearing as to Douglas Hodge held on October 21, 2019, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/12/2019. Redacted Transcript Deadline set for 11/22/2019. Release of Transcript Restriction set for 1/21/2020. (Scalfani, Deborah) (Entered: 10/22/2019) |
| 10/22/2019 | 607 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 10/22/2019) |
| 10/22/2019 | 609 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Elizabeth Henriquez Sentencing set for 2/7/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/22/2019) |
| 10/22/2019 | 610 | THIRD SUPERSEDING INDICTMENT as to David Sidoo (1) count(s) 1sss, 3sss, Gregory Colburn (2) count(s) 1ss, 3ss, Amy Colburn (3) count(s) 1ss, 3ss, Gamal Abdelaziz (4) count(s) 1s, 2s, 3s, Diane Blake (5) count(s) 1s, 2s, 3s, Todd Blake (6) count(s) 1s, 2s, 3s, I−Hsin Chen (7) count(s) 1s, 3s, 5s, Mossimo Giannulli (8) count(s) 1s, 2s, 3s, Elisabeth Kimmel (13) count(s) 1s, 2s, 3s, Lori Loughlin (14) count(s) 1s, 2s, 3s, William McGlashan, Jr (15) count(s) 1s, 2s, 3s, 7s, Marci Palatella (16) count(s) 1s, 2s, 3s, John Wilson (17) count(s) 1s, 2s, 3s, 6s, 8s−9s, 11s−12s, Homayoun Zadeh (18) count(s) 1s, 2s, 3s, Robert Zangrillo (19) count(s) 1s, 2s, 3s, 4s, 10s. (Attachments: # 1 JS45)(Geraldino−Karasek, Clarilde) (Entered: 10/22/2019) |
| 10/22/2019 | 611 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge M. Page Kelley Reason for referral: Full Pretrial Proceedings as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Geraldino−Karasek, Clarilde) (Entered: 10/22/2019) |
| 10/22/2019 | 612 | Case as to Elizabeth Henriquez, Manuel Henriquez, Michelle Janavs no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 10/22/2019) |
| 10/23/2019 | 613 | Transcript of Rule 11 Hearing as to Elizabeth Henriquez held on October 21, 2019, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/13/2019. Redacted Transcript Deadline set for 11/25/2019. Release of Transcript Restriction set for 1/21/2020. (Scalfani, Deborah) (Entered: 10/23/2019) |
| 10/23/2019 | 614 | Transcript of Rule 11 Hearing as to Manuel Henriquez held on October 21, 2019, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/13/2019. Redacted Transcript Deadline set for 11/25/2019. Release of Transcript Restriction set for 1/21/2020. (Scalfani, Deborah) (Entered: 10/23/2019) |

| 10/23/2019 | 615 | Transcript of Rule 11 Hearing as to Michelle Janavs held on October 21, 2019, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/13/2019. Redacted Transcript Deadline set for 11/25/2019. Release of Transcript Restriction set for 1/21/2020. (Scalfani, Deborah) (Entered: 10/23/2019) |
|---|---|---|
| 10/23/2019 | 616 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 10/23/2019) |
| 10/24/2019 | 617 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Robert Zangrillo. The Court adopts the parties' agreed–upon confidentiality order # 604 . (Belmont, Kellyann) (Entered: 10/24/2019) |
| 10/29/2019 | 618 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: Defendants may file written waivers of appearance at arraignment pursuant to Fed. R. Crim. P. 10(b) no later than November 13, 2019. The arraignment on the superseding indictment will be scheduled for November 20, 2019 at 2:30pm for any defendants who do not wish to file a waiver. (Belmont, Kellyann) (Entered: 10/29/2019) |
| 10/29/2019 | 619 | NOTICE *Defendant David Sidoo's Entry of a Plea of NOT GUILTY and Waiver of Appearance for Arraignment as to the Third Superseding Indictment* by David Sidoo (Weinberg, Martin) (Entered: 10/29/2019) |
| 10/29/2019 | 620 | **Filed in error. Please refer to entry 621 .** (Entered: 10/29/2019) |
| 10/29/2019 | 621 | NOTICE *Defendant Robert Zangrillo's Entry of a Plea of NOT GUILTY and Waiver of Appearance for Arraignment as to the Third Superseding Indictment* by Robert Zangrillo (Weinberg, Martin) (Entered: 10/29/2019) |
| 10/29/2019 | 622 | NOTICE *of Waiver of Appearance for Arraignment* by Homayoun Zadeh (Siddall, Megan) (Entered: 10/29/2019) |
| 10/29/2019 | 623 | NOTICE *of Entry of Plea of Not Guilty and Waiver of Appearance at Arraignment on Third Superseding Indictment* by Elisabeth Kimmel (Beirne, Eoin) (Entered: 10/29/2019) |
| 10/30/2019 | 624 | NOTICE */ Defendant John Wilson's Waiver of Appearance at Arraignment on the Third Superseding Indictment* by John Wilson (Kendall, Michael) (Entered: 10/30/2019) |
| 10/30/2019 | 625 | NOTICE *Entry of a Plea of Not Guilty and Waiver of Appearance for Arraignment as to the Third Superseding Indictment* by I–Hsin Chen (Cahn, Reuben) (Entered: 10/30/2019) |
| 10/31/2019 | 626 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of David Sidoo, # 619 . (Belmont, Kellyann) (Entered: 10/31/2019) |
| 10/31/2019 | 627 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Robert Zangrillo, # 621 . (Belmont, Kellyann) (Entered: 10/31/2019) |
| 10/31/2019 | 628 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Homayoun Zadeh, # 622 . (Belmont, Kellyann) (Entered: 10/31/2019) |
| 10/31/2019 | 629 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Elisabeth Kimmel, # 623 . (Belmont, Kellyann) (Entered: 10/31/2019) |
| 10/31/2019 | 630 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of John Wilson, # 624 . (Belmont, Kellyann) (Entered: 10/31/2019) |

| | | |
|---|---|---|
| 10/31/2019 | 631 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of I–Hsin Chen, # 625 . (Belmont, Kellyann) (Entered: 10/31/2019) |
| 11/01/2019 | 632 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 11/01/2019) |
| 11/01/2019 | 633 | NOTICE *of Waiver of Appearance for Arraignment* by Mossimo Giannulli (Trach, William) (Entered: 11/01/2019) |
| 11/01/2019 | 634 | NOTICE *of Waiver of Appearance for Arraignment* by Lori Loughlin (Trach, William) (Entered: 11/01/2019) |
| 11/01/2019 | 635 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Gregory Colburn (Schumacher, David) (Entered: 11/01/2019) |
| 11/01/2019 | 636 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Amy Colburn (Schumacher, David) (Entered: 11/01/2019) |
| 11/01/2019 | 637 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Marci Palatella (Loucks, Michael) (Entered: 11/01/2019) |
| 11/04/2019 | 638 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by William McGlashan, Jr (Pirozzolo, Jack) (Entered: 11/04/2019) |
| 11/05/2019 | 639 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Diane Blake, Todd Blake (Meier, David) (Entered: 11/05/2019) |
| 11/06/2019 | 640 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Gamal Abdelaziz, # 632 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 641 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Mossimo Giannulli, # 633 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 642 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Lori Loughlin, # 634 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 643 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Gregory Colburn, # 635 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 644 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Amy Colburn, # 636 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 645 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Marci Palatella, # 637 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 646 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of William McGlashan, Jr, 638 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/06/2019 | 647 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waivers of Diane Blake and Todd Blake, # 639 . (Belmont, Kellyann) (Entered: 11/06/2019) |
| 11/13/2019 | 648 | MOTION to Compel *Production of Brady Material* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A)(Sharp, Joshua) (Entered: 11/13/2019) |
| 11/13/2019 | 649 | MOTION to Travel *(Motion To Permit Specific And Limited International Business Travel To France)* as to Marci Palatella. (Loucks, Michael) (Entered: 11/13/2019) |
| 11/15/2019 | 650 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 649 Motion to Travel as to Marci Palatella (16) (Belmont, Kellyann) (Entered: 11/15/2019) |

| 11/18/2019 | 651 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Robert Zangrillo 532 Third Party MOTION to Quash *Subpoena* : At request of parties a further Motion Hearing is set for 11/26/2019 12:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 11/18/2019) |
|---|---|---|
| 11/19/2019 | 652 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. All defendants named in the third superseding indictment have filed waivers of appearance and entered not guilty pleas and the Court has accepted the waivers. Accordingly there will be no arraignments on 11/20/2019. (Belmont, Kellyann) (Entered: 11/19/2019) |
| 11/20/2019 | 653 | MOTION to Seal *and File a Portion of Brief Ex Parte* as to Robert Zangrillo by University of Southern California. (Fuller, Anthony) (Entered: 11/20/2019) |
| 11/20/2019 | 655 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 653 MOTION to Seal and File a Portion of Brief Ex Parte as to Robert Zangrillo by University of Southern California. (Belmont, Kellyann) (Entered: 11/20/2019) |
| 11/21/2019 | 658 | Assented to MOTION to Seal Document as to Robert Zangrillo. (Weinberg, Martin) (Entered: 11/21/2019) |
| 11/22/2019 | 659 | Magistrate Judge M. Page Kelley: ORDER entered granting 658 Motion to Seal Document as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 11/22/2019) |
| 11/22/2019 | 660 | Sealed Response by to #657 Sealed Exparte Nonparty University of Southern California's Brief Regarding Defendant Zangrillo's Request for Production of Documents filed by Robert Zangrillo. (Attachments: # 1 Exhibits)(Belmont, Kellyann) (Entered: 11/25/2019) |
| 11/25/2019 | 661 | MOTION to Seal as to Robert Zangrillo by University of Southern California. (Fuller, Anthony) (Entered: 11/25/2019) |
| 11/25/2019 | 662 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 661 Motion to Seal as to Robert Zangrillo by University of Southern California. (Belmont, Kellyann) (Entered: 11/25/2019) |
| 11/25/2019 | 663 | Assented to MOTION to Continue *Sentencing* to March 3, 2020 as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 11/25/2019) |
| 11/26/2019 | 665 | Assented to MOTION to Continue *(Defendant Douglas Hodge's Assented– to Motion to Continue his Sentencing to February 7, 2020)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 11/26/2019) |
| 11/26/2019 | 668 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Motion Hearing as to Robert Zangrillo held on 11/26/2019 re 532 Third Party MOTION to Quash *Subpoena* filed by University of Southern California (USC). After conferring regarding #532, the parties notified the court that they had resolved many of the issues, but sought a hearing concerning remaining issues. Counsel filed briefs under seal and filed some materials ex parte. The first part of the hearing was held with the public present, where the court heard Martin Weinberg, counsel for defendant, Robert Zangrillo, argue. The second part of the hearing was held under seal, with only Mr. Weinberg, counsel for USC, and the government present. The court excluded the public so that counsel could freely argue concerning the specific documents that had been filed ex parte with the court and documents that had been filed under seal and were subject to a protective order. Counsel for USC argued, and Mr. Weinberg was given the opportunity to respond. The court went back on the public record and announced its ruling. Considering whether the defendant's requests are "unreasonable and oppressive" under *United States v. Nixon*, 418 U.S. 683 (1974), the court finds that the names and personal information concerning prospective students are protected and will not be produced. The court notes that defendant is not asking for that information. Rather, defendant is complaining that the names of USC officials and others, such as influential persons who advocated for particular students to be admitted, are redacted from the materials provided by USC. The court finds that USC may redact the names of administrators and others from the materials provided, but must provide, as it has offered to, a description of each redacted person's role, which explains who they are in a general sense. USC will use as a template the |

sample redacted form that it handed up to the court during the hearing, which has been marked as an exhibit and placed under seal, ex parte, as it contains the names of the individuals in question.

If in the future the government objects to the admissibility of documents because they have been redacted, the court anticipates that the documents will be unredacted for use at trial. The court denies defendant's request for USC to run further names through its email system, as the court finds that this request is unreasonable and oppressive, given the information defendant has already received. The court also denies defendant's request to be given further information about donors, including those who may have donated over $100,000.00, as the information sought is only marginally relevant and is likewise unreasonable and oppressive for USC to compile. In addition, the further information sought tips defendant's requests into a "fishing expedition," which is not allowed under *Nixon*.

With regard to the twenty items that USC sought to not provide to defendant, attached to USC's brief ex parte, at the hearing the court stated that emails that involved Dean of Admission Tim Brunold should be provided to defendant with names redacted, but the persons involved described by role. On further examination, the court notes that all the emails involve Dean Brunold. USC asked if they might also redact proprietary information concerning their admissions process. The court asked USC to file an explanation of the terms relating to admission used in the emails.

The court now further orders USC, in addition to explaining what terms it would like to redact and why, to submit to the court all proposed redactions concerning these emails, by **December 10, 2019**.

(Attorneys present: Douglas Fuchs, Anthony Fuller, Debra Wong Yang for University of Southern California, Martin Weinberg for defendant Zangrillo, George Vien and Michael Kendall and Justin O'Connell for government. )Court Reporter Name and Contact or digital recording information: Digital Recording. (**SEALED 12:44:50–1:54:10**) To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.unt, Kellyann) (Entered: 11/27/2019)

| | | |
|---|---|---|
| 11/26/2019 | 669 | Sealed and Ex parte Documents submitted to Court by University of Southern California in open Court 11/26/2019. (Main document: Sealed. Attachments: # 1 Ex parte, # 2 Ex parte)(Belmont, Kellyann) (Entered: 11/27/2019) |
| 11/27/2019 | 670 | Opposition by USA as to Gamal Abdelaziz re 648 MOTION to Compel *Production of Brady Material* (Rosen, Eric) (Entered: 11/27/2019) |
| 11/27/2019 | 672 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 663 Motion to Continue as to Elizabeth Henriquez (9) Sentencing set for 3/3/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 12/02/2019) |
| 12/02/2019 | 671 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 665 Motion to Continue as to Douglas Hodge (11). Sentencing set for 2/7/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 12/02/2019) |
| 12/04/2019 | 673 | Transcript of Motion Hearing (Sealed Portion Removed) as to Robert Zangrillo held on November 26, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 12/26/2019. Redacted Transcript Deadline set for 1/6/2020. Release of Transcript Restriction set for 3/3/2020. (Scalfani, Deborah) (Entered: 12/04/2019) |
| 12/04/2019 | 674 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 12/04/2019) |
| 12/04/2019 | 675 | NOTICE OF ATTORNEY APPEARANCE: William D. Weinreb appearing for Michelle Janavs. Type of Appearance: Retained. (Weinreb, William) (Entered: 12/04/2019) |
| 12/05/2019 | 676 | Assented to MOTION for Leave to File *Reply in Support of Gamal Abdelaziz's Motion to Compel Production of Brady Material* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A – Proposed Reply)(Sharp, Joshua) (Entered: 12/05/2019) |

| | | |
|---|---|---|
| 12/06/2019 | 677 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>676</u> Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order) – in the caption of the document as to Gamal Abdelaziz (4) (Belmont, Kellyann) (Entered: 12/06/2019) |
| 12/06/2019 | <u>678</u> | REPLY TO RESPONSE to Motion by Gamal Abdelaziz re <u>648</u> MOTION to Compel *Production of Brady Material* (Sharp, Joshua) (Entered: 12/06/2019) |
| 12/09/2019 | <u>679</u> | SEALED Transcript of SEALED Motion Hearing as to Robert Zangrillo held on November 26, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Linda Walsh @ lwalshsteno@gmail.com (Scalfani, Deborah) (Entered: 12/09/2019) |
| 12/09/2019 | <u>680</u> | Assented to MOTION for Leave to File *Redacted Motion for Production of Exculpatory Evidence* as to David Sidoo, Gamal Abdelaziz, Diane Blake, Todd Blake, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by David Sidoo. (Weinberg, Martin) (Entered: 12/09/2019) |
| 12/09/2019 | <u>681</u> | MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings* as to David Sidoo, Gamal Abdelaziz, Diane Blake, Todd Blake, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by David Sidoo. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2)(Weinberg, Martin) (Entered: 12/09/2019) |
| 12/10/2019 | <u>682</u> | Assented to MOTION for Joinder *to Join Motion for Disclosure of Exculpatory Evidence* as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 12/10/2019) |
| 12/10/2019 | <u>683</u> | MOTION to Join Motion for Disclosure of Exculpatory Evidence [Dkt. No. 681] *(Unopposed)* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 12/10/2019) |
| 12/11/2019 | <u>684</u> | Assented to MOTION for Joinder *to Join Motion for Disclosure of Exculpatory Evidence as to Elisabeth Kimmel* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Elisabeth Kimmel. (Flashner, Cory) (Entered: 12/11/2019) |
| 12/11/2019 | <u>685</u> | Assented to MOTION for Leave to File *Sur–Reply in Opposition to Defendant's Motion to Compel* as to Gamal Abdelaziz by USA. (Attachments: # <u>1</u> Exhibit A – Government's Proposed Sur–Reply)(Rosen, Eric) (Entered: 12/11/2019) |
| 12/11/2019 | 686 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>680</u> Assented to MOTION for Leave to File Redacted Motion for Production of Exculpatory Evidence as to David Sidoo (1), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 12/11/2019) |
| 12/11/2019 | 687 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>682</u> Motion for Joinder as to Gregory Colburn (2), Amy Colburn (3); granting <u>684</u> Motion for Joinder as to Gregory Colburn (2), Amy Colburn (3), Elisabeth Kimmel (13), William McGlashan Jr. (15); granting 683 Motion to join Motion for Disclosure of Exculpatory Evidenceas to William McGlashan Jr. (15) (Belmont, Kellyann) (Entered: 12/11/2019) |
| 12/11/2019 | 688 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>685</u> Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order) – in the caption of the document as to Gamal Abdelaziz (4) (Belmont, Kellyann) (Entered: 12/11/2019) |
| 12/11/2019 | <u>689</u> | MOTION for Joinder *in Motion for Production of Exculpatory Evidence (ECF No. 681) (Unopposed)* as to Mossimo Giannulli, Lori Loughlin. (Berkowitz, Sean) (Entered: 12/11/2019) |
| 12/12/2019 | <u>690</u> | SUR–REPLY to Motion by USA as to Gamal Abdelaziz re <u>648</u> MOTION to Compel *Production of Brady Material* (Rosen, Eric) (Entered: 12/12/2019) |

| 12/12/2019 | 691 | SEALED # 681 MOTION for Exculpatory Evidence as to David Sidoo. (Attachments: # 1 Exhibit, # 2 Exhibit)(Vieira, Leonardo) Modified on 12/23/2019 (Belmont, Kellyann). (Entered: 12/12/2019) |
| 12/13/2019 | 692 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Gamal Abdelaziz. Order on # 648 , Defendant Abdelaziz's Motion to Compel Production of Brady Material. The government shall, within ten days of this order, provide the court, for in camera and ex parte inspection, materials not already provided to the defendant, including FBI reports or other evidence, regarding or supporting the second sentence of paragraph 187 of FBI Special Agent Smiths March 11, 2019 Affidavit in Support of the Criminal Complaint. The government shall also provide the court copies of documents that it has already disclosed to the defendant in support of the government's assertion that the "motion should be denied as moot because the government has already disclosed the information [Abdelaziz] seeks." (Belmont, Kellyann) (Entered: 12/13/2019) |
| 12/13/2019 | 693 | MOTION to Compel *Production of Material and Exculpatory Evidence* as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Berkowitz, Sean) (Entered: 12/13/2019) |
| 12/16/2019 | 694 | SEALED Non–party University of Southern California's Brief Regarding Production of Documents. (Vieira, Leonardo) Modified on 12/18/2019 (Belmont, Kellyann). (Entered: 12/17/2019) |
| 12/18/2019 | 695 | Set Hearings as to Robert Zangrillo: Status hearing set for 12/18/2019 03:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) Modified on 12/18/2019 (Belmont, Kellyann). (Entered: 12/18/2019) |
| 12/18/2019 | 696 | MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 12/18/2019) |
| 12/18/2019 | 697 | MEMORANDUM in Support by William McGlashan, Jr re 696 MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Pirozzolo, Jack) (Entered: 12/18/2019) |
| 12/18/2019 | 698 | MOTION for Leave to File Excess Pages *for Memorandum in Support of Motion to Compel (Unopposed)* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 12/18/2019) |
| 12/18/2019 | 699 | Supplemental MOTION to Compel *Production of Exculpatory Evidence "Joined by" Other Defendants* as to John Wilson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 (Redacted), # 3 Exhibit 3 (Redacted), # 4 Exhibit 4 (Redacted), # 5 Exhibit 5 (Redacted), # 6 Exhibit 6 (Redacted), # 7 Exhibit 7 (Redacted), # 8 Exhibit 8 (Redacted), # 9 Exhibit 9 (Redacted), # 10 Exhibit 10 (Redacted), # 11 Exhibit 11 (Redacted), # 12 Exhibit 12 (Redacted), # 13 Exhibit 13 (Redacted))(Kendall, Michael) (Entered: 12/18/2019) |
| 12/18/2019 | 700 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Further Hearing on # 532 Third Party Motion to Quash Subpoena as to Robert Zangrillo held on 12/18/2019. USC previously asked to withhold twenty emails from Mr. Zangrillo. At a previous hearing, on November 26, 2019, the court ordered USC to provide the emails to Mr. Zangrillo, but allowed USC to redact names from the emails and replace the names with a description of people by their role. On the docket entry from the hearing (# 668 ), the court ordered USC to submit to the court all proposed redactions concerning the twenty emails by December 10, 2019. Today, the court asked USC why it did not receive the redacted emails. USC stated that it misunderstood the court's order. The court further reminded USC that it previously ordered USC to provide the court, by December 10, 2019, with the definitions of the terms having to do with USC's admissions process from which USC wants to redact from the same batch of emails. *Id.* USC responded that it did not understand the court's order. Counsel for Mr. Zangrillo handed up in open court the redacted materials he received from USC yesterday. USC will file with the court a detailed explanation of the meaning of the terms having to do with UCS's admissions process no later than December 23, 2019. At the hearing on November 26, 2019, USC agreed to provide Mr. Zangrillo charts with names redacted, but the persons described by role. Mr. Zangrillo argued today that he has received the redacted materials, but the descriptions are so vague as to be meaningless, for example, someone is described only as a "university administrator." The court ordered the |

| | | |
|---|---|---|
| | | parties to confer about this issue, and ordered USC to provide Mr. Zangrillo with more precise descriptions. If the parties cannot reach agreement, the court will hear further arguments on this point.<br>(Attorneys present: Douglas Fuchs (by telephone), Anthony Fuller, for University of Southern California, Martin Weinberg for defendant Zangrillo )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani&#0. (Belmont, Kellyann) (Entered: 12/19/2019) |
| 12/19/2019 | 701 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 689 Motion for Joinder as to Mossimo Giannulli (8), Lori Loughlin (14); granting 698 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to William McGlashan Jr. (15) (Belmont, Kellyann) (Entered: 12/19/2019) |
| 12/19/2019 | 702 | Assented to MOTION to Continue *(Partial) response dates for defendants' discovery motions* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Rosen, Eric) (Entered: 12/19/2019) |
| 12/20/2019 | 703 | MEMORANDUM in Support by William McGlashan, Jr re 696 MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Pirozzolo, Jack) (Entered: 12/20/2019) |
| 12/20/2019 | 704 | PROPOSED ORDER(S) submitted by University of Southern California as to William McGlashan, Jr (Fuller, Anthony) (Entered: 12/20/2019) |
| 12/23/2019 | 705 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered.<br># 702 , Motion to Continue Dates for Responses, is allowed. The Government's responses to ## 681 , 693 , 696 , 697 , and 699 , are due January 14, 2020. Although the government did not mention # 691 in its motion, the government's response to that motion is also due on January 14, 2020. Any replies by defendants are due January 28, 2020 and any sur–replies by February 4, 2020. The court may hold a hearing on these motions on Tuesday, February 11. If hearings are to be held, the court will set the times of the hearings in mid–January. The parties are reminded that at the status conference on January 17, 2020, dates will be set for the filing of motions concerning the scope of the conspiracy.<br>By January 29, 2020, the government shall file a memorandum to assist Judge Gorton in setting trial dates, proposing how defendants may be grouped if it becomes necessary to have multiple trials in this matter. Defendants shall file any responses by February 12, 2020. (Belmont, Kellyann) (Entered: 12/23/2019) |
| 12/23/2019 | 706 | ELECTRONIC NOTICE OF HEARING as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo Status Conference set for 2/27/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Some counsel may be permitted to appear by phone so long as it does not become unwieldy. (Lima, Christine) (Entered: 12/23/2019) |
| 12/23/2019 | 707 | MOTION for Extension of Time to December 26, 2019 to File Supplemental Brief as to Robert Zangrillo by University of Southern California. (Fuller, Anthony) (Entered: 12/23/2019) |
| 12/23/2019 | 708 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 707 Motion for Extension of Time as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 12/23/2019) |
| 12/23/2019 | 709 | ELECTRONIC NOTICE OF RESCHEDULING as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo Status Conference set for 2/27/2020 11:00 AM in |

| | | |
|---|---|---|
| | | Courtroom 4 before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY.(Lima, Christine) (Entered: 12/23/2019) |
| 12/24/2019 | 710 | MOTION to Travel *(Motion To Permit Specific And Limited International Business Travel To Japan)* as to Marci Palatella. (Loucks, Michael) (Entered: 12/24/2019) |
| 12/26/2019 | 711 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 710 Motion to Travel as to Marci Palatella (16) (Belmont, Kellyann) (Entered: 12/26/2019) |
| 01/02/2020 | 718 | MOTION To Join Defendant John Wilson's 699 Supplemental Motion To Compel Production Of Exculpatory Evidence (UNOPPOSED) as to Marci Palatella. (Loucks, Michael) Modified event used on 1/3/2020 (Belmont, Kellyann). (Entered: 01/02/2020) |
| 01/03/2020 | 719 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 718 Motion to Join Docket # 699 to Marci Palatella (16) (Belmont, Kellyann) (Entered: 01/03/2020) |
| 01/03/2020 | 720 | MOTION to Travel *for Business* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 01/03/2020) |
| 01/04/2020 | 721 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 720 Motion to Travel as to Robert Zangrillo (19) (Kelley, M.) (Entered: 01/04/2020) |
| 01/10/2020 | 725 | PROPOSED ORDER(S) submitted by University of Southern California as to Lori Loughlin (Fuller, Anthony) (Entered: 01/10/2020) |
| 01/10/2020 | 726 | PROPOSED ORDER(S) submitted by University of Southern California as to Mossimo Giannulli (Fuller, Anthony) (Entered: 01/10/2020) |
| 01/10/2020 | 730 | STATUS REPORT *(Joint)* by USA as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 01/10/2020) |
| 01/14/2020 | 731 | MOTION for Leave to File *Motion for Subpoenas on Partial Ex Parte Basis* as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 01/14/2020) |
| 01/14/2020 | 732 | FOURTH SUPERSEDING INDICTMENT as to David Sidoo (1) count(s) 1ssss, 3ssss, Gregory Colburn (2) count(s) 1sss, 3sss, Amy Colburn (3) count(s) 1sss, 3sss, Gamal Abdelaziz (4) count(s) 1ss, 2ss, 3ss, Diane Blake (5) count(s) 1ss, 2ss, 3ss, Todd Blake (6) count(s) 1ss, 2ss, 3ss, I–Hsin Chen (7) count(s) 1ss, 3ss, 5ss, Mossimo Giannulli (8) count(s) 1ss, 2ss, 3ss, Elisabeth Kimmel (13) count(s) 1ss, 2ss, 3ss, Lori Loughlin (14) count(s) 1ss, 2ss, 3ss, William McGlashan, Jr (15) count(s) 1ss, 2ss, 3ss, 7ss, Marci Palatella (16) count(s) 1ss, 2ss, 3ss, John Wilson (17) count(s) 1ss, 2ss, 3ss, 6ss, 8ss–9ss, 11ss–12ss, 13ss, Homayoun Zadeh (18) count(s) 1ss, 2ss, 3ss, Robert Zangrillo (19) count(s) 1ss, 2ss, 3ss, 4ss, 10ss. (Attachments: # 1 JS45)(Alves–Baptista, Antonia) (Entered: 01/14/2020) |
| 01/14/2020 | 733 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge M. Page Kelley Reason for referral: Full Pretrial Proceedings as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Alves–Baptista, Antonia) (Entered: 01/14/2020) |
| 01/14/2020 | 734 | Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings* (Wright, Leslie) (Entered: 01/14/2020) |
| 01/14/2020 | 735 | MOTION for Leave to File Excess Pages *in response to motions to compel* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Rosen, Eric) (Entered: 01/14/2020) |

| 01/14/2020 | 736 | Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 693 MOTION to Compel *Production of Material and Exculpatory Evidence*, 699 Supplemental MOTION to Compel *Production of Exculpatory Evidence "Joined by" Other Defendants*, 698 MOTION for Leave to File Excess Pages *for Memorandum in Support of Motion to Compel (Unopposed)* (Attachments: # 1 Exhibit)(O'Connell, Justin) (Entered: 01/14/2020) |
| 01/14/2020 | 737 | Unredacted Version of# 734 Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 681 MOTION for Exculpatory Evidence Regarding Title III Interceptions and Consensual Recordings. (Belmont, Kellyann) Modified on 1/15/2020 (Belmont, Kellyann). (Entered: 01/15/2020) |
| 01/16/2020 | 738 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 735 Motion for Leave to File Excess Pages. (Belmont, Kellyann) (Entered: 01/16/2020) |
| 01/16/2020 | 739 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 731 Motion for Leave to File Motion for Subpoenas on Partial Ex Parte Basis as to Gregory Colburn (2), Amy Colburn (3) (Belmont, Kellyann) (Entered: 01/16/2020) |
| 01/17/2020 | 744 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Interim Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on 1/17/2020. Discovery is ongoing and consists of millions of pages of documents and audio files. The government is still providing discovery. Several defendants who are presently negotiating discovery requests with the government may file motions to compel. Court reminds the parties that by January 29, 2020, the government will file a memorandum to assist Judge Gorton in setting trial dates, and defendants shall file responses by February 12, 2020. Concerning the fourth superceding indictment, defendants should file waivers of appearance pursuant to Federal Rule of Criminal Procedure 10(b) by January 31, 2020. The court will not schedule hearings on the waivers. If any defendant wishes to have a hearing, they should contact Kellyann Belmont. The court addresses several Foster hearings which the court previously took under advisement. Concerning Mr. Abdelaziz's representation by Nixon Peabody, which also represents the University of Southern California, the court invites the parties to review their previous filings and file any supplemental pleadings by January 31, 2020. The court suggests that attorneys for Mr. Abdelaziz provide the government with a redacted version of #510–1 on the docket, and if they do not, they should file an ex parte explanation with the court as to why a redacted version cannot be provided to the government. The court may schedule a further hearing on this matter in February. The court will address the outstanding matter concerning the 17C subpoena in Mr. Zangrillo's case in the near future. The government requests reciprocal discovery. The court finds that it is premature to rule on this request at this time. The government may file a motion in the future if it wants to address this issue. The court discusses pending discovery requests. The parties in the Abdelaziz motion should contact the Courtroom Clerk, Ms. Belmont to schedule a hearing date on docket #. # 648 . There will not be hearings on the other motions on February 11, 2020, as the court previously suggested. Rather, after February 4, 2020, when the motions are ripe, the court will set hearings on them, preferably some time in February. The parties' dates for additional discovery motions as set out in the status report are adopted. The court encourages defense counsel to continue to file discovery motions on a rolling basis. The dates for pretrial motions under Rule 12(b) as set out in the status report are adopted. These dates are subject to Judge Gorton's approval. The Colburn's motion will be deemed to have been filed on April 1, 2020, when the other motions are due. If counsel for the Colburns want to file a revised or supplemental motion, in light of any developments since the motion was originally filed, that will be allowed. The parties' agreement regarding the timing of expert disclosures as set out in the status report is adopted. The court will revisit the issue of the government's giving the defendants |

| | | early notice, and the issue concerning the scope of the disclosures, at the next status conference. The court orders the parties to further confer about this matter prior to the next conference to see if they can reach agreement on this issue. A further interim status date is scheduled for May 5, 2020 at 11:00 a.m. in Courtroom 24 before Magistrate Judge M. Page Kelley. The time between today and May 5, 2020 will be excluded under the speedy trial act. (Attorneys present: Eric Rosen, Kristen Kearney, Justin O'Connell, Leslie Wright for the government and Martin Weinberg, David Schumacher, Brian Kelly, Joshua Sharp, David Meier, Stephen Sutro, Janice Bassil for Reuben Cahn, George Vien, Sean Berkowitz, Cory Flashner, Robert Popeo, Eoin Beirne, Mark Robinson, John Hueston, Jack Pirozzolo, Michael Loucks, Yakov Malkiel, Tracy Miner for defendants. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio–recordings . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Be (Entered: 01/17/2020) |
|---|---|---|
| 01/17/2020 | 745 | Magistrate Judge M. Page Kelley: ORDER entered. INTERIM STATUS REPORT AND ORDER ON EXCLUDABLE DELAY as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. Time excluded from 1/17/2020 until 5/5/2020. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 01/17/2020) |
| 01/17/2020 | 746 | NOTICE *of Waiver of Appearance for Arraignment on Fourth Superseding Indictment* by Homayoun Zadeh (Siddall, Megan) (Entered: 01/17/2020) |
| 01/21/2020 | 747 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Regarding # 725 , the court adopts the agreed–upon proposed order regarding confidentiality of materials produced by the University of Southern California to Defendant Lori Loughlin. (Belmont, Kellyann) (Entered: 01/21/2020) |
| 01/21/2020 | 748 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Regarding # 726 , the court adopts the agreed–upon proposed order regarding confidentiality of materials produced by the University of Southern California to Defendant Mossimo Giannulli. (Belmont, Kellyann) (Entered: 01/21/2020) |
| 01/21/2020 | 749 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered Pursuant to Fed. R. Crim.P. 10(b), the court accepts the waiver of Homayoun Zadeh, # 746 . (Belmont, Kellyann) (Entered: 01/21/2020) |
| 01/21/2020 | 750 | NOTICE *of Waiver of Appearance for Arraignment on Fourth Superseding Indictment* by David Sidoo (Weinberg, Martin) (Entered: 01/21/2020) |
| 01/21/2020 | 751 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Gamal Abdelaziz 648 MOTION to Compel *Production of Brady Material* : Motion Hearing set for 1/31/2020 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 01/21/2020) |
| 01/21/2020 | 752 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Diane Blake, Todd Blake (Meier, David) (Entered: 01/21/2020) |
| 01/21/2020 | 753 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Marci Palatella (Loucks, Michael) (Entered: 01/21/2020) |
| 01/21/2020 | 754 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 01/21/2020) |
| 01/22/2020 | 755 | MOTION for Leave to File *Subpoenas (Redacted)* as to Amy Colburn, Gregory Colburn by Amy Colburn. (Schumacher, David) (Entered: 01/22/2020) |
| 01/22/2020 | 756 | NOTICE *Waiver of Appearance at Arraignment and Entry of Plea of Not Guilty* by Elisabeth Kimmel (Beirne, Eoin) (Entered: 01/22/2020) |
| 01/22/2020 | 757 | NOTICE */ Defendant John Wilson's Waiver of Appearance at Arraignment on the Fourth Superseding Indictment* by John Wilson (Kendall, Michael) (Entered: 01/22/2020) |

| 01/22/2020 | 758 | Sealed Version of # 755 MOTION for Leave to File Subpoenas as to Amy Colburn, Gregory Colburn. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Belmont, Kellyann) (Entered: 01/23/2020) |
|---|---|---|
| 01/23/2020 | 759 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Regarding # 704 , the court adopts the agreed–upon proposed order regarding confidentiality of materials produced by the University of Southern California to Defendant William McGlashan, Jr. (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 760 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of David Sidoo, # 750 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 761 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Diane Blake and Todd Blake, # 752 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 762 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Marci Palatella, # 753 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 763 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Gamal Abdelaziz, # 754 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 764 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Elisabeth Kimmel, # 756 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 765 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of John Wilson, # 757 . (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 766 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 755 Motion for Leave to File to serve pretrial subpoenas as to Gregory Colburn (2), Amy Colburn (3) (Belmont, Kellyann) (Entered: 01/23/2020) |
| 01/23/2020 | 767 | Assented to MOTION for Leave to File Excess Pages *regarding Sentencing Memorandum* as to Douglas Hodge. (O'Connor, Brien) (Entered: 01/23/2020) |
| 01/23/2020 | 768 | Assented to MOTION to Seal Document *, re: portions of Sentencing Memorandum and certain letters in support* as to Douglas Hodge. (O'Connor, Brien) (Entered: 01/23/2020) |
| 01/23/2020 | 769 | NOTICE *Waiver of Appearance at Arraignment on Fourth Superseding Indictment* by Amy Colburn (Schumacher, David) (Entered: 01/23/2020) |
| 01/23/2020 | 770 | NOTICE *Waiver of Appearance at Arraignment on Fourth Superseding Indictment* by Gregory Colburn (Schumacher, David) (Entered: 01/23/2020) |
| 01/23/2020 | 771 | NOTICE *of Waiver of Appearance for Arraignment and Entry of Plea of Not Guilty* by William McGlashan, Jr (Pirozzolo, Jack) (Entered: 01/23/2020) |
| 01/23/2020 | 772 | Assented to MOTION for Leave to File *Exhibits Under Seal* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by David Sidoo. (Weinberg, Martin) (Entered: 01/23/2020) |
| 01/23/2020 | 773 | REPLY TO RESPONSE to Motion by David Sidoo as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings* (Weinberg, Martin) (Entered: 01/23/2020) |
| 01/24/2020 | 774 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 772 Assented to MOTION for Leave to File Exhibits Under Seal as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. |

| | | |
|---|---|---|
| | | (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 01/24/2020) |
| 01/24/2020 | 775 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Amy Colburn, # 769 . (Belmont, Kellyann) (Entered: 01/24/2020) |
| 01/24/2020 | 776 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Gregory Colburn, # 770 . (Belmont, Kellyann) (Entered: 01/24/2020) |
| 01/24/2020 | 777 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of William McGlashan, Jr, 771 . (Belmont, Kellyann) (Entered: 01/24/2020) |
| 01/24/2020 | 778 | Sealed Exhibits re # 773 REPLY TO RESPONSE to Motion by David Sidoo as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 681 MOTION for Exculpatory Evidence Regarding Title III Interceptions and Consensual Recordings. (Attachments: # 1 Exhibit 2)(Belmont, Kellyann) (Entered: 01/24/2020) |
| 01/24/2020 | 779 | NOTICE *Plea of Not Guilty and Waiver of Appearance for Arraignment as to Fourth Superseding Indictment* by I–Hsin Chen (Cahn, Reuben) (Entered: 01/24/2020) |
| 01/27/2020 | 780 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of I–Hsin Chen, # 779 . (Belmont, Kellyann) (Entered: 01/27/2020) |
| 01/27/2020 | 781 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 767 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Douglas Hodge (11); granting 768 Motion to Seal Document as to Douglas Hodge (11) (Lima, Christine) (Entered: 01/27/2020) |
| 01/27/2020 | 782 | NOTICE *of Waiver of Appearance for Arraignment on Fourth Superseding Indictment* by Mossimo Giannulli (Berkowitz, Sean) (Entered: 01/27/2020) |
| 01/27/2020 | 783 | NOTICE *of Waiver of Appearance for Arraignment on Fourth Superseding Indictment* by Lori Loughlin (Berkowitz, Sean) (Entered: 01/27/2020) |
| 01/27/2020 | 784 | Assented to MOTION for Order *Extending Briefing Schedule on Motions to Compel* as to Mossimo Giannulli, Lori Loughlin, William McGlashan, Jr, John Wilson by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 01/27/2020) |
| 01/27/2020 | 788 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Mossimo Giannuli, # 782 . (Belmont, Kellyann) (Entered: 01/27/2020) |
| 01/27/2020 | 789 | MOTION For Leave to Offer Character Statements at Sentencing Hearing as to Douglas Hodge. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(O'Connor, Brien) (Additional attachment(s) added on 1/28/2020: # 3 Exhibit A, # 4 Exhibit B) (Vieira, Leonardo). (Entered: 01/27/2020) |
| 01/27/2020 | 790 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Lori Loughlin, # 783 . (Belmont, Kellyann) (Entered: 01/27/2020) |
| 01/27/2020 | 791 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 784 Assented–to Motion to extend briefing schedule as to Mossimo Giannulli (8), Lori Loughlin (14), William McGlashan Jr. (15), John Wilson (17). Reply briefs in support of motions to compel are due by January 31, 2020 and the government's sur–replies are due by February 7, 2020. (Belmont, Kellyann) (Entered: 01/27/2020) |
| 01/28/2020 | 794 | NOTICE *of Waiver of Appearance for Arraignment on Fourth Superseding Indictment* by Robert Zangrillo (Weinberg, Martin) (Entered: 01/28/2020) |

| 01/28/2020 | 795 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Pursuant to Fed. R. Crim. P. 10(b), the court accepts the waiver of Robert Zangrillo, # 794 . (Belmont, Kellyann) (Entered: 01/28/2020) |
|---|---|---|
| 01/28/2020 | 796 | NOTICE *of Submission* by Douglas Hodge (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27)(O'Connor, Brien) (Entered: 01/28/2020) |
| 01/29/2020 | 798 | Judge Nathaniel M. Gorton: ORDER entered. **DENYING** 789 Motion as to Douglas Hodge (11). (Vieira, Leonardo) (Entered: 01/29/2020) |
| 01/29/2020 | 799 | Memorandum regarding trial dates and groupings as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 01/29/2020) |
| 01/30/2020 | 801 | MOTION for Exculpatory Evidence as to Robert Zangrillo. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Weinberg, Martin) (Entered: 01/30/2020) |
| 01/30/2020 | 804 | ELECTRONIC NOTICE CANCELLING HEARING as to Gamal Abdelaziz. The motion hearing set for 1/31/2020 at 2:30pm in front of Magistrate Judge Kelley is cancelled and will be rescheduled. (Belmont, Kellyann) (Entered: 01/30/2020) |
| 01/30/2020 | 805 | REPLY TO RESPONSE to Motion by John Wilson re 699 Supplemental MOTION to Compel *Production of Exculpatory Evidence "Joined by" Other Defendants* (Kendall, Michael) (Entered: 01/30/2020) |
| 01/31/2020 | 806 | REPLY TO RESPONSE to Motion by William McGlashan, Jr re 696 MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* (Attachments: # 1 Exhibit 1)(Pirozzolo, Jack) (Entered: 01/31/2020) |
| 01/31/2020 | 807 | REPLY TO RESPONSE to Motion by Mossimo Giannulli, Lori Loughlin re 693 MOTION to Compel *Production of Material and Exculpatory Evidence* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Berkowitz, Sean) (Entered: 01/31/2020) |
| 01/31/2020 | 809 | PROPOSED ORDER(S) submitted by University of Southern California as to John Wilson (Fuller, Anthony) (Entered: 01/31/2020) |
| 01/31/2020 | 810 | SENTENCING MEMORANDUM by Douglas Hodge (Attachments: # 1 Exhibit A, # 2 Exhibit B)(O'Connor, Brien) (Additional attachment(s) added on 2/3/2020: # 3 Sentencing Memo (SEALED), # 4 Exhibit A (SEALED), # 5 Exhibit B (SEALED)) (Vieira, Leonardo). (Entered: 01/31/2020) |
| 01/31/2020 | 811 | ADDENDUM by USA as to Gamal Abdelaziz re 400 MOTION Foster hearing and other hearings regarding potential conflict of interest *(previously redacted copy of brief)* (Wright, Leslie) (Entered: 01/31/2020) |
| 01/31/2020 | 812 | NOTICE *Supplemental Memorandum Regarding Foster Hearing* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 01/31/2020) |
| 02/03/2020 | 814 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. The court adopts the proposed order submitted by the University of Southern California as to John Wilson, # 809 . (Belmont, Kellyann) (Entered: 02/03/2020) |
| 02/03/2020 | 815 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered as to Homayoun Zadeh. The court previously held a hearing on August 19, 2019, on the government's motion pursuant to *United States v. Foster*, 469 F.2d 1 (1st Cir. 1972) and Federal Rule of Criminal Procedure 44(c) (docket no. 383 ), concerning a conflict of interest involving the law firm of Miner Orkand Siddall LLP, which represents defendant Homayoun Zadeh in this matter and defendant Gordon Ernst in a related case, United States v. Ernst, et al, No.19–cr–10081–IT. At the hearing, the court explained the conflict of interest in this matter to Mr. Zadeh, and engaged in a colloquy with him about his rights. (# 548 , transcript of hearing.) Mr. Zadeh waived the conflict issue, signed a written waiver, and then later submitted a further written waiver to the court. (## 527 , 569 .) That same day, the court engaged in a colloquy with Mr. Ernst, see 19–cr–10081–IT, # 213 . Because certain facts were not developed at that time |

**A97**

| | | |
|---|---|---|
| | | concerning counsel's representation of Mr. Ernst, the court took the matter of both Mr. Ernst and Mr. Zadeh's waivers under advisement.<br>On January 29, 2020, the court conducted a further hearing with Mr. Ernst, *see* 19–cr–10081–IT, # 376 . The court found that the representation of Mr. Ernst and Mr. Zadeh by present counsel is permissible under Massachusetts Rule of Professional Conduct 1.7 because there is not a concurrent conflict of interest. The government was in agreement. Therefore, the court now accepts the waiver of Mr. Zadeh.<br>Defense counsel for Mr. Ernst and Mr. Zadeh are ordered to inform the court immediately if a concurrent conflict of interest arises. (Belmont, Kellyann) (Entered: 02/03/2020) |
| 02/03/2020 | 816 | SENTENCING MEMORANDUM by USA as to Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs (Attachments: # 1 Appendix A (Victim Impact Statements), # 2 Appendix B (Government Briefing Regarding Guidelines))(O'Connell, Justin) (Attachment 1 replaced on 2/7/2020) (Vieira, Leonardo). (Entered: 02/03/2020) |
| 02/04/2020 | 817 | Transcript of Hearing as to Robert Zangrillo held on December 18, 2019, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/25/2020. Redacted Transcript Deadline set for 3/6/2020. Release of Transcript Restriction set for 5/4/2020. (Scalfani, Deborah) (Entered: 02/04/2020) |
| 02/04/2020 | 818 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 02/04/2020) |
| 02/04/2020 | 819 | MOTION to Seal *Appendix A to the Government's Sentencing Memorandum [Dkt 816]* as to Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs by USA. (O'Connell, Justin) (Entered: 02/04/2020) |
| 02/04/2020 | 820 | SUR–REPLY to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings* (Attachments: # 1 Exhibit A)(Wright, Leslie) (Entered: 02/04/2020) |
| 02/05/2020 | 821 | SENTENCING MEMORANDUM by Douglas Hodge (O'Connor, Brien) (Entered: 02/05/2020) |
| 02/06/2020 | 822 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 819 Motion to Seal as to Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12) (Lima, Christine) (Entered: 02/06/2020) |
| 02/06/2020 | 823 | PROPOSED ORDER(S) submitted by University of Southern California as to Diane Blake (Fuller, Anthony) (Entered: 02/06/2020) |
| 02/06/2020 | 824 | PROPOSED ORDER(S) submitted by University of Southern California as to Todd Blake (Fuller, Anthony) (Entered: 02/06/2020) |
| 02/06/2020 | 825 | PROPOSED ORDER(S) submitted by University of Southern California as to Elisabeth Kimmel (Fuller, Anthony) (Entered: 02/06/2020) |
| 02/06/2020 | 826 | MOTION for Leave to File *2–Page Sur–Sur–Reply* as to Robert Zangrillo. (Attachments: # 1 Exhibit 1)(Weinberg, Martin) (Entered: 02/06/2020) |
| 02/07/2020 | 828 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. The court adopts the proposed order submitted by the University of California as to Diane Blake, # 823 . (Belmont, Kellyann) (Entered: 02/07/2020) |
| 02/07/2020 | 829 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. The court adopts the proposed order submitted by the University of California as to Todd Blake, # 824 . (Belmont, Kellyann) (Entered: 02/07/2020) |
| 02/07/2020 | 830 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. The court adopts the proposed order submitted by the University of California as to Elisabeth Kimmel, # 825 . |

| | | | |
|---|---|---|---|
| | | | (Belmont, Kellyann) (Entered: 02/07/2020) |
| 02/07/2020 | 831 | | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 826 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 02/07/2020) |
| 02/07/2020 | 832 | | NOTICE *Sur−Sur−Reply* by Robert Zangrillo re 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings* (Weinberg, Martin) (Additional attachment(s) added on 2/7/2020: # 1 Unredacted copy) (Belmont, Kellyann). (Entered: 02/07/2020) |
| 02/07/2020 | 833 | | Magistrate Judge M. Page Kelley: ORDER entered re Conflict of Interest as to Lori Loughlin and Mossimo Giannulli. (Belmont, Kellyann) (Entered: 02/07/2020) |
| 02/07/2020 | 834 | | SUR−REPLY to Motion by USA as to Mossimo Giannulli, Lori Loughlin, William McGlashan, Jr, John Wilson re 699 Supplemental MOTION to Compel *Production of Exculpatory Evidence "Joined by" Other Defendants as well as Dkt. 693 (Giannulli/Loughlin) and Dkt. 696 (McGlashan)* (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D)(Rosen, Eric) (Entered: 02/07/2020) |
| 02/07/2020 | 835 | | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 2/7/2020 for Douglas Hodge (11), Count(s) 1, 2. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 9 months imprisonment, which term consists of terms of 9 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $750,000, which consists of fines of $250,000 on Count 1 and $500,000 on Count 2; $200 Special Assessment. Defendant informed of right to appeal. Defendant to self−surrender at the facility designated by the Bureau of Prisons by 2:00 PM on Friday, 3/20/2020. (Attorneys present: O'Connor, Geggel, McPhee, Hooker, Rosen, O'Connell, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 02/10/2020) |
| 02/10/2020 | 837 | | Magistrate Judge M. Page Kelley: ORDER entered. Order re Conflict of Interest as to Gamal Abdelaziz (Belmont, Kellyann) (Entered: 02/10/2020) |
| 02/11/2020 | 838 | | Transcript of Interim Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on January 17, 2020, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Karen Aveyard. The Transcript may be purchased through Karen Aveyard at k.aveyard@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/3/2020. Redacted Transcript Deadline set for 3/13/2020. Release of Transcript Restriction set for 5/11/2020. (Scalfani, Deborah) (Entered: 02/11/2020) |
| 02/11/2020 | 839 | | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 02/11/2020) |
| 02/11/2020 | 840 | | Transcript of Sentencing as to Douglas Hodge held on February 7, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/3/2020. Redacted Transcript Deadline set for 3/13/2020. Release of Transcript Restriction set for 5/11/2020. (Scalfani, Deborah) (Entered: 02/11/2020) |
| 02/11/2020 | 841 | | SEALED EXCERPT Transcript of Sentencing (Sealed Side Bar) as to Douglas Hodge held on February 7, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com (Scalfani, Deborah) (Entered: |

| | | 02/11/2020) |
|---|---|---|
| 02/11/2020 | 842 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 02/11/2020) |
| 02/12/2020 | 846 | Response as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Lori Loughlin, William McGlashan, Jr, John Wilson: 799 Memorandum (not related to a motion),. (Berkowitz, Sean) (Entered: 02/12/2020) |
| 02/12/2020 | 847 | Response as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: (Flashner, Cory) (Entered: 02/12/2020) |
| 02/12/2020 | 848 | Response as to Marci Palatella: (Loucks, Michael) (Entered: 02/12/2020) |
| 02/12/2020 | 849 | Response as to Homayoun Zadeh: (Siddall, Megan) (Entered: 02/12/2020) |
| 02/12/2020 | 850 | NOTICE *Memorandum Regarding Trial Groupings* by Robert Zangrillo (Weinberg, Martin) (Entered: 02/12/2020) |
| 02/13/2020 | 851 | Opposition by USA as to Robert Zangrillo re 801 MOTION for Exculpatory Evidence (Attachments: # 1 Exhibit A through U)(Kearney, Kristen) (Entered: 02/13/2020) |
| 02/13/2020 | 852 | Assented to MOTION for Leave to File Excess Pages *for Sentencing Memorandum* as to Michelle Janavs. (Littrell, John) (Entered: 02/13/2020) |
| 02/13/2020 | 853 | Assented to MOTION to Seal Document *re Portions of Sentencing Memorandum and Certain Letters in Support* as to Michelle Janavs. (Littrell, John) (Entered: 02/13/2020) |
| 02/14/2020 | 854 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 852 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Michelle Janavs (12); **ALLOWING** 853 Motion to Seal Document as to Michelle Janavs (12) (Vieira, Leonardo) (Entered: 02/14/2020) |
| 02/18/2020 | 855 | Assented to MOTION to Seal Document *re Portions of Sentencing Memorandum and Certain Exhibits* as to Manuel Henriquez. (Brown, Walter) (Entered: 02/18/2020) |
| 02/18/2020 | 856 | Assented to MOTION for Leave to File Excess Pages *for Sentencing Memorandum* as to Manuel Henriquez. (Brown, Walter) (Entered: 02/18/2020) |
| 02/19/2020 | 858 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 855 Motion to Seal Document as to Manuel Henriquez (10); **ALLOWING** 856 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Manuel Henriquez (10) (Vieira, Leonardo) (Entered: 02/19/2020) |
| 02/19/2020 | 859 | Assented to MOTION for Leave to File Excess Pages *for Sentencing Memorandum* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 02/19/2020) |
| 02/19/2020 | 860 | Assented to MOTION to Seal *Portions of the Sentencing Memorandum, Certain Letters in Support and Portions of the Defendants Letter to the Court* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 02/19/2020) |
| 02/20/2020 | 861 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 859 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Elizabeth Henriquez (9); **ALLOWING** 860 Motion to Seal as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 02/20/2020) |

| | | |
|---|---|---|
| 02/20/2020 | 862 | SENTENCING MEMORANDUM by Michelle Janavs (Attachments: # 1 Appendix of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Exhibit 44, # 46 Exhibit 45, # 47 Exhibit 46, # 48 Exhibit 47, # 49 Exhibit 48, # 50 Exhibit 49, # 51 Exhibit 50, # 52 Exhibit 51, # 53 Exhibit 52, # 54 Exhibit 53, # 55 Exhibit 54, # 56 Exhibit 55, # 57 Exhibit 56, # 58 Exhibit 57, # 59 Exhibit 58)(Littrell, John) (Additional attachment(s) added on 2/21/2020: # 60 Appendix) (Vieira, Leonardo). (Attachment 59 replaced on 2/24/2020) (Vieira, Leonardo). (Entered: 02/20/2020) |
| 02/21/2020 | 863 | NOTICE of Supplemental Authority by Mossimo Giannulli, Lori Loughlin re 693 MOTION to Compel Production of Material and Exculpatory Evidence (Attachments: # 1 Exhibit A)(Berkowitz, Sean) (Entered: 02/21/2020) |
| 02/24/2020 | 865 | MOTION to Compel Production of Tax−Related Exculpatory Evidence as to John Wilson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Malkiel, Yakov) (Entered: 02/24/2020) |
| 02/24/2020 | 866 | NOTICE Joining Docket No. 863 Notice of Supplemental Authority by William McGlashan, Jr (Pirozzolo, Jack) (Entered: 02/24/2020) |
| 02/25/2020 | 867 | NOTICE (Supplemental) by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 799 Memorandum (not related to a motion), (Rosen, Eric) (Entered: 02/25/2020) |
| 02/25/2020 | 868 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Douglas Hodge (11), Count(s) 1, 2, Defendant sentenced to a term of 9 months imprisonment, which term consists of terms of 9 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $750,000, which consists of fines of $250,000 on Count 1 and $500,000 on Count 2; $200 Special Assessment. (Lima, Christine) (Entered: 02/26/2020) |
| 02/25/2020 | 869 | Judge Nathaniel M. Gorton: ORDER entered. STATEMENT OF REASONS as to Douglas Hodge (Lima, Christine) (Entered: 02/26/2020) |
| 02/25/2020 | 871 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 2/25/2020 for Michelle Janavs (12), Count(s) 1, 2,. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 5 months imprisonment, which term consists of terms of 5 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $250,000; $200 Special Assessment. Defendant informed of right to appeal. Defendant to self−surrender to a facility designated by the Bureau of Prisons before 2:00 PM on 4/7/2020.(Attorneys present: Littrell, Bienert, Weinberg, Rosen, Kearney, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Debra Lajoie at lajoiedebra@gmail.com. (Lima, Christine) (Entered: 02/26/2020) |
| 02/26/2020 | 870 | Assented to MOTION for Leave to File Excess Pages for Sentencing Memorandum (Amended) as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 02/26/2020) |
| 02/26/2020 | 872 | Transcript of Sentencing as to Michelle Janavs held on February 25, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Debra Lajoie at lajoiedebra@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/18/2020. Redacted Transcript Deadline set for 3/30/2020. Release of Transcript Restriction set for 5/26/2020. (Scalfani, Deborah) (Entered: 02/26/2020) |
| 02/26/2020 | 873 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at |

| | | |
|---|---|---|
| | | http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 02/26/2020) |
| 02/26/2020 | 874 | NOTICE by Elisabeth Kimmel as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 867 Notice (Other), (Beirne, Eoin) (Entered: 02/26/2020) |
| 02/26/2020 | 875 | Memorandum regarding Trial Groupings (Supplemental) and Motion to Postpone Setting of Trial Date as to Mossimo Giannulli, Lori Loughlin (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Berkowitz, Sean) (Entered: 02/26/2020) |
| 02/26/2020 | 876 | Memorandum regarding Trial Groupings (Second Supplemental) as to Mossimo Giannulli, Lori Loughlin (Berkowitz, Sean) (Entered: 02/26/2020) |
| 02/27/2020 | 878 | MOTION for Leave to File *Supplemental Memorandum in Support of Motion to Compel* as to William McGlashan, Jr. (Attachments: # 1 Proposed Supplemental Memorandum in Support of Motion to Compel, # 2 Exhibit 1, # 3 Exhibit 2)(Pirozzolo, Jack) (Entered: 02/27/2020) |
| 02/27/2020 | 879 | MOTION for Leave to File *Supplemental Brief in Support of Motion to Compel Production of Material and Exculpatory Evidence* as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Exhibit 1 – proposed supplemental brief)(Berkowitz, Sean) (Entered: 02/27/2020) |
| 02/27/2020 | 880 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 879 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Mossimo Giannulli (8), Lori Loughlin (14); granting 878 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to William McGlashan Jr. (15) (Belmont, Kellyann) (Entered: 02/27/2020) |
| 02/27/2020 | 881 | Supplemental MEMORANDUM in Support by Mossimo Giannulli, Lori Loughlin re 693 MOTION to Compel *Production of Material and Exculpatory Evidence* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Berkowitz, Sean) (Entered: 02/27/2020) |
| 02/27/2020 | 882 | Supplemental MEMORANDUM in Support by William McGlashan, Jr re 696 MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Pirozzolo, Jack) (Entered: 02/27/2020) |
| 02/27/2020 | 883 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on 2/27/2020. Re: 875 Memorandum, Defendants may, by 3/13/20, file a joint motion to dismiss, to suppress, and/or for sanctions, along with supporting memorandum. Government may file it's opposition by 3/27/20. Court may set a hearing for early April. Defendants will be divided into tow groups for trials. The first group will include Defendants Abdelaziz, Diane Blake, Todd Blake, Giannulli, Loughlin, Wilson, Zadeh, and Zangrillo. Jury empanelment will begin on 9/28/20, with the trial to begin on 10/5/20. A Status Conference with regards to these defendants will be held on 7/28/20 at 3:00 PM. A Final Pretrial Conference will be held on 9/22/20 at 3:00 PM. The remaining Defendants will be tried in January, most likely beginning on 1/11/21. Any motions to sever or oppose these groupings are to be filed by 4/1/20. Dispositive Motions due by 4/1/20, oppositions due by 4/30/20, and replies due by 5/15/20. Court may hold a hearing on these motions in early June, 2020. Counsel to confer on proposed pretrial deadlines. Court hears brief arguments with regards to Document No. 875. (Attorneys present: Weinberg, Schumacher, Hooper, Kelly, Meier, Thompson, Cahn, Berkowitz (by phone), Vien, Trach, Beirne, Robinson, Popeo, Flashner, Pirozzolo, Camp, Loucks, Tomback, Kendall, Miner, Rosen, Kearney, Wright. )Court Reporter Name and Contact or digital recording information: Joan Daly at joanmdaly62@gmail.com. (Lima, Christine) Modified on 2/27/2020 (Lima, Christine). |

| | | |
|---|---|---|
| | | (Entered: 02/27/2020) |
| 02/27/2020 | 884 | ELECTRONIC NOTICE OF HEARING as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, John Wilson, Homayoun Zadeh, Robert Zangrillo Final Pretrial Conference set for 9/22/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Jury Selection set for 9/28/2020 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Jury Trial set for 10/5/2020 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Status Conference set for 7/28/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 02/27/2020) |
| 02/27/2020 | 885 | ELECTRONIC NOTICE OF HEARING as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella Jury Trial set for 1/11/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 02/27/2020) |
| 02/27/2020 | 886 | Supplemental MEMORANDUM in Support by Gamal Abdelaziz re 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings Or, Alternatively, Emergency Motion For Production of Exculpatory Consensual Recordings* (Attachments: # 1 Exhibit 1 (Abdelaziz Letter), # 2 Exhibit 2 (USAO Letter), # 3 Exhibit 3 (Consent Forms))(Sharp, Joshua) (Entered: 02/27/2020) |
| 02/27/2020 | 887 | Assented to MOTION to Continue *Sentencing Hearings* as to Elizabeth Henriquez, Manuel Henriquez. (Katz, Aaron) (Entered: 02/27/2020) |
| 02/28/2020 | 888 | ELECTRONIC NOTICE OF RESCHEDULING as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, John Wilson, Homayoun Zadeh, Robert Zangrillo In light of the Yom Kippur Holiday, Jury Selection is rescheduled to 9/29/2020 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 02/28/2020) |
| 02/28/2020 | 889 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Gamal Abdelaziz 648 MOTION to Compel *Production of Brady Material* : Motion Hearing set for 3/2/2020 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 890 | ELECTRONIC NOTICE as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, Marci Palatella, Homayoun Zadeh, Robert Zangrillo, Resetting Hearing on Motion 681 MOTION for Exculpatory Evidence *Regarding Title III Interceptions and Consensual Recordings*, 648 MOTION to Compel *Production of Brady Material*, 693 MOTION to Compel *Production of Material and Exculpatory Evidence* : Motion Hearing set for 3/2/2020 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 891 | ELECTRONIC NOTICE as to William McGlashan, Jr, Resetting Hearing on Motion 696 MOTION to Compel *the Production of Materials Pursuant to Brady v. Maryland and Federal Rule of Criminal Procedure 16* : Motion Hearing set for 3/2/2020 02:30 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 892 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered re Motion hearings set for Monday 3/2/2020.<br>The parties are ordered to confer prior to the hearing to determine if any issues can be narrowed, and to inform the court if they reach agreement on any issues prior to the hearing.<br>**At oral argument only one attorney will be permitted to argue regarding each motion.**<br>(Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 893 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 870 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Elizabeth Henriquez (9) (Lima, Christine) (Entered: 02/28/2020) |
| 02/28/2020 | 894 | ELECTRONIC NOTICE OF HEARING as to Gamal Abdelaziz, Robert Zangrillo Status Conference set for 2/28/2020 03:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 895 | Sealed Exhibit A re 881 Supplemental MEMORANDUM in Support by Mossimo Giannulli, Lori Loughlin re 693 MOTION to Compel Production of Material and Exculpatory Evidence |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A part 2, # 2 Exhibit A part 3)(Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 898 | ELECTRONIC NOTICE CANCELING HEARINGS as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, William McGlashan, Jr, Marci Palatella, Homayoun Zadeh, Robert Zangrillo. After Court had a status conference with defendants Abdelaziz and Zangrillo all motion hearings set for 3/2/2020 at 2:30pm in front of Magistrate Judge Kelley are cancelled. Parties are to confer and the government will update the Court by close of business Tuesday regarding status of the motions. Court will set motion hearings later in the week of if necessary. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 899 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Status Conference re 648 Motion to Compel as to Gamal Abdelaziz and 801 Motion for Production of Exculpatory Evidence as to Robert Zangrillo held on 2/28/2020. The Court discussed setting discovery motions for hearings on Monday March 2nd. The government requests additional time to produce remaining discovery to defendants. Court hears from Attorneys Brian Kelly and Martin Weinberg about outstanding Brady materials, 302s, IRS reports etc. Court discusses its view of government's Brady obligations, including that the "sum and substance" letters are insufficient to notify defendants of discovery, and that information throughout the 302 interview reports that the government has provided the court with ex parte is exculpatory and should be produced to defendants. Defendants discuss additional materials, including notes and drafts of 302 reports, and recordings of certain calls, that they argue should be produced. The government responds that it will consider releasing materials to defendants. After hearing from the parties, all of the motion hearings set for Monday March 2 at 2:30 p.m. are cancelled. All parties are to confer and by close of business Tuesday, March 3, the government is to provide an update to the Court of what is still in dispute. If necessary the Court will schedule motion hearings for later in the week. (Attorneys present: Leslie Wright and Kristen Kearney for the government and Brian Kelly, Joshua Sharp, Lauren Maynard for defendant Abdelaziz and Martin Weinberg (by telephone) for defendant Zangrillo. Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to https://www.mad.uscourts.gov/caseinfo/transcripts.htm#audio−recordings . For a transcript of this proceeding, cfani by email at deborah_scalfani@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 02/28/2020) |
| 02/28/2020 | 900 | Letter (non−motion) regarding Extrajudicial Statements as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, Homayoun Zadeh (Trach, William) (Entered: 02/28/2020) |
| 02/28/2020 | 903 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 887 Motion to Continue Sentencing Hearings as to Elizabeth Henriquez (9), Manuel Henriquez (10) (Lima, Christine) (Entered: 03/02/2020) |
| 03/02/2020 | 904 | ELECTRONIC NOTICE OF RESCHEDULING as to Elizabeth Henriquez Sentencing set for 3/31/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 03/02/2020) |
| 03/02/2020 | 905 | ELECTRONIC NOTICE OF RESCHEDULING as to Manuel Henriquez Sentencing set for 4/8/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 03/02/2020) |
| 03/02/2020 | 906 | Transcript of Status Conference as to Gamal Abdelaziz, Robert Zangrillo held on February 28, 2020, before Magistrate Judge M. Page Kelley. No Reporter Used. Digital Recording transcribed by Kelly Mortellite. The Transcript may be purchased through Kelly Mortellite at mortellite@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/23/2020. Redacted Transcript Deadline set for 4/2/2020. Release of Transcript Restriction set for 6/1/2020. (Scalfani, Deborah) (Entered: 03/02/2020) |
| 03/02/2020 | 907 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 03/02/2020) |
| 03/02/2020 | 909 | NOTICE: **Please see attached Notice.** (Vieira, Leonardo) (Entered: 03/02/2020) |

| 03/02/2020 | 910 | NOTICE OF ATTORNEY APPEARANCE: Lauren Maynard appearing for Gamal Abdelaziz. Type of Appearance: Retained. (Maynard, Lauren) (Entered: 03/02/2020) |
|---|---|---|
| 03/02/2020 | 911 | NOTICE OF ATTORNEY APPEARANCE Karin Michelle Bell appearing for USA. (Bell, Karin) (Entered: 03/02/2020) |
| 03/03/2020 | 913 | Magistrate Judge M. Page Kelley: ORDER entered. Order re: 17(c) Subpoena as to Robert Zangrillo (Belmont, Kellyann) (Entered: 03/03/2020) |
| 03/03/2020 | 914 | Transcript of Status Conference as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on February 27, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/24/2020. Redacted Transcript Deadline set for 4/3/2020. Release of Transcript Restriction set for 6/1/2020. (Scalfani, Deborah) (Entered: 03/03/2020) |
| 03/03/2020 | 915 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 03/03/2020) |
| 03/03/2020 | 918 | Letter (non–motion) regarding status report as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 03/03/2020) |
| 03/04/2020 | 919 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. In light of the government's release of discovery to the defendants, # 918 , defendants shall confer, and by March 20, 2020, file a consolidated status report to the court concerning what discovery issues remain outstanding. (Belmont, Kellyann) (Entered: 03/04/2020) |
| 03/05/2020 | 922 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Michelle Janavs (12), Count(s) 1, 2, Defendant sentenced to a term of 5 months imprisonment, which term consists of terms of 5 months on Counts 1 and 2, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1 and 2, such terms to run concurrently; a fine of $250,000; $200 Special Assessment (Lima, Christine) (Entered: 03/05/2020) |
| 03/05/2020 | 923 | Judge Nathaniel M. Gorton: ORDER entered. STATEMENT OF REASONS as to Michelle Janavs (Lima, Christine) (Entered: 03/05/2020) |
| 03/05/2020 | 924 | Assented to MOTION to Extend Notice of Appeal Deadline as to Douglas Hodge. (Attachments: # 1 Exhibit A)(O'Connor, Brien) (Entered: 03/05/2020) |
| 03/05/2020 | 925 | Assented to MOTION for Extension of Time to March 20, 2020 to File as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Gamal Abdelaziz. (Sharp, Joshua) (Entered: 03/05/2020) |
| 03/06/2020 | 926 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 924 Motion to Extend Notice of Appeal Deadline as to Douglas Hodge (11) (Lima, Christine) (Entered: 03/06/2020) |
| 03/06/2020 | 927 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 925 Motion for Extension of Time as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Lima, Christine) (Entered: 03/06/2020) |

A105

| 03/08/2020 | 928 | Assented to MOTION for Extension of Time to File Discovery Motions as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Elisabeth Kimmel. (Flashner, Cory) (Entered: 03/08/2020) |
|---|---|---|
| 03/09/2020 | 929 | STATUS REPORT *(Joint)* by Robert Zangrillo as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, John Wilson, Homayoun Zadeh, Robert Zangrillo (Weinberg, Martin) (Entered: 03/09/2020) |
| 03/09/2020 | 930 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. In light of defendants' assented–to motion to revise the schedule for the filing of discovery motions # 928 , the present deadline of March 13 is suspended, and the defendants may file a proposed schedule for the filing of discovery motions, should one be necessary, as part of the status report they are already required to file on March 20, 2020. (Belmont, Kellyann) (Entered: 03/09/2020) |
| 03/11/2020 | 932 | ELECTRONIC NOTICE OF HEARING as to David Sidoo Rule 11 Hearing set for 3/13/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 03/11/2020) |
| 03/11/2020 | 933 | PLEA AGREEMENT as to David Sidoo (Rosen, Eric) (Entered: 03/11/2020) |
| 03/12/2020 | 934 | NOTICE OF ATTORNEY APPEARANCE: William H. Kettlewell appearing for Movant University of Southern California (Kettlewell, William) (Entered: 03/12/2020) |
| 03/12/2020 | 935 | MOTION for Extension of Time to March 31, 2020 to File Object to Magistrate Judge Kelley's Ruling on Redactions of Student Information as to Robert Zangrillo by University of Southern California. (Fuller, Anthony) (Entered: 03/12/2020) |
| 03/13/2020 | 936 | RESPONSE to Motion by Robert Zangrillo re 935 MOTION for Extension of Time to March 31, 2020 to File Object to Magistrate Judge Kelley's Ruling on Redactions of Student Information (Weinberg, Martin) (Entered: 03/13/2020) |
| 03/13/2020 | 937 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to David Sidoo held on 3/13/2020. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for the Defendant and the Court. Government informs the Defendant of the maximum possible penalties; no mandatory minimums. Government informs the Defendant of the facts it would prove if this matter were to go to trial. Plea entered by David Sidoo (1) Guilty Count 1ssss. Court conditionally accepts the plea pending receipt of the PSR. Sentencing set for 7/15/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant released on all previously imposed conditions of release, with one modification: Defendant, with the assent of the Government, request that bond be reduced to $750,000.00. Court allows the oral motion. Order to issue. (Attorneys present: Weinberg, Rosen, Kearney, Wright. )Court Reporter Name and Contact or digital recording information: James Gibbons at jamesgibbonsrpr@gmail.com. (Lima, Christine) (Entered: 03/13/2020) |
| 03/13/2020 | 938 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to David Sidoo Sentencing set for 7/15/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 03/13/2020) |
| 03/13/2020 | 939 | Assented to MOTION to Continue *Self–Surrender Date* to May 4, 2020 as to Douglas Hodge. (O'Connor, Brien) (Entered: 03/13/2020) |
| 03/13/2020 | 940 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 939 Motion to Continue Self–Surrender Date to May 4, 2020 as to Douglas Hodge (11) (Lima, Christine) (Entered: 03/13/2020) |
| 03/13/2020 | 941 | Assented to MOTION for Extension of Time to April 20, 2020 to File Notice of Appeal *and for Extension of Time to May 7, 2020 to Surrender to BOP* as to Michelle Janavs. (Littrell, John) (Entered: 03/13/2020) |

| 03/16/2020 | 942 | Transcript of Plea Hearing as to David Sidoo held on March 13, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/6/2020. Redacted Transcript Deadline set for 4/16/2020. Release of Transcript Restriction set for 6/15/2020. (Scalfani, Deborah) (Entered: 03/16/2020) |
|---|---|---|
| 03/16/2020 | 943 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 03/16/2020) |
| 03/16/2020 | 944 | Judge Nathaniel M. Gorton: ORDER entered. ORDER OF DISBURSEMENT of Funds as to David Sidoo (Lima, Christine) (Entered: 03/16/2020) |
| 03/17/2020 | 945 | Judge Nathaniel M. Gorton: ORDER entered as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Lima, Christine) (Entered: 03/17/2020) |
| 03/17/2020 | 946 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 941 Motion for Extension of Time to File Notice of Appeal and to Surrender to BOP as to Michelle Janavs (12) (Lima, Christine) (Entered: 03/17/2020) |
| 03/17/2020 | 947 | Judge Nathaniel M. Gorton: ORDER entered granting in part and denying in part 935 Motion for Extension of Time as to Robert Zangrillo (19) (Lima, Christine) (Entered: 03/17/2020) |
| 03/18/2020 | 948 | NOTICE OF ATTORNEY APPEARANCE Stephen E. Frank appearing for USA. (Frank, Stephen) (Entered: 03/18/2020) |
| 03/18/2020 | 949 | MOTION for Extension of Time to March 25, 2020 to File Submission *(Unopposed)*, MOTION for Leave to File Excess Pages *(Unopposed)* ( Responses due by 4/1/2020) as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Mossimo Giannulli, Lori Loughlin. (Berkowitz, Sean) (Entered: 03/18/2020) |
| 03/18/2020 | 950 | MOTION Of Objection and Motion to Modify Order on Defendant Zangrillo's Rule 17(c) Subpoena as to Robert Zangrillo by University of Southern California. (Fuller, Anthony) (Entered: 03/18/2020) |
| 03/18/2020 | 951 | MEMORANDUM in Support by University of Southern California as to Robert Zangrillo re 950 MOTION Of Objection and Motion to Modify Order on Defendant Zangrillo's Rule 17(c) Subpoena (Attachments: # 1 Exhibits A–H)(Fuller, Anthony) (Entered: 03/18/2020) |
| 03/19/2020 | 953 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 949 Motion for Extension of Time to File and (19); **ALLOWING** 949 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. **The consolidated, over–long brief shall be limited to 35 pages.** As to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19). (Vieira, Leonardo) (Entered: 03/19/2020) |
| 03/20/2020 | 959 | STATUS REPORT *Re Discovery* by Elisabeth Kimmel as to Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Flashner, Cory) (Entered: 03/20/2020) |
| 03/22/2020 | 960 | NOTICE OF ATTORNEY APPEARANCE: Robert L. Sheketoff appearing for Gamal Abdelaziz. Type of Appearance: Retained. (Sheketoff, Robert) (Entered: 03/22/2020) |

| 03/23/2020 | 961 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. "Regarding # 959 , defendants' consolidated status report re discovery and assented–to request for two weeks' time to propose a briefing schedule for discovery motions, the court allows the motion and extends the time to April 3, 2020 for defendants to file a proposed discovery motion schedule. The court encourages the defendants to continue to work with the government to narrow any remaining discovery disputes." (Belmont, Kellyann) (Entered: 03/23/2020) |
|---|---|---|
| 03/23/2020 | 962 | Assented to MOTION for Leave to File *Extra−Long and Partially Sealed Response* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 03/23/2020) |
| 03/23/2020 | 963 | RESPONSE to Motion by Robert Zangrillo re 950 MOTION Of Objection and Motion to Modify Order on Defendant Zangrillo's Rule 17(c) Subpoena (Attachments: # 1 Exhibit)(Weinberg, Martin) (Additional attachment(s) added on 3/30/2020: # 2 Exhibit 2) (Lima, Christine). (Entered: 03/23/2020) |
| 03/23/2020 | 964 | MOTION to Withdraw as Attorney *Motion for Leave to Withdraw Appearance* by Donald J. Campbell as to Gamal Abdelaziz. (Campbell, Donald) (Entered: 03/23/2020) |
| 03/24/2020 | 966 | ELECTRONIC NOTICE OF HEARING as to Gamal Abdelaziz Telephone Conference set for 3/26/2020 02:00 PM before Magistrate Judge M. Page Kelley. Counsel provided call in information by email. (Belmont, Kellyann) (Entered: 03/24/2020) |
| 03/24/2020 | 967 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 962 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 03/24/2020) |
| 03/24/2020 | 968 | RESPONSE to Motion by Robert Zangrillo re 950 MOTION Of Objection and Motion to Modify Order on Defendant Zangrillo's Rule 17(c) Subpoena (Attachments: # 1 Exhibit)(Weinberg, Martin) (Entered: 03/24/2020) |
| 03/25/2020 | 969 | Assented to MOTION for Leave to File Excess Pages as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Elisabeth Kimmel. (Beirne, Eoin) (Entered: 03/25/2020) |
| 03/25/2020 | 970 | Assented to MOTION for Leave to File *(Assented−to Amended Motion for Leave to Exceed Page Limit for Sentencing Memorandum)* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 03/25/2020) |
| 03/25/2020 | 971 | MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 03/25/2020) |
| 03/25/2020 | 972 | MEMORANDUM in Support by Mossimo Giannulli, Lori Loughlin as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Exhibit OO, # 42 Exhibit PP, # 43 Exhibit QQ, # 44 Exhibit RR, # 45 Exhibit SS, # 46 Exhibit TT, # 47 Exhibit UU, # 48 Exhibit VV, # 49 Exhibit WW)(Trach, William) (Entered: 03/25/2020) |

| 03/26/2020 | 973 | ELECTRONIC NOTICE issued requesting courtesy copy for 972 Memorandum in Support, 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo Counsel who filed these documents are requested to submit a courtesy copy of them to the Clerk's Office. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Lima, Christine) (Entered: 03/26/2020) |
|---|---|---|
| 03/26/2020 | 974 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 970 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Lima, Christine) (Entered: 03/26/2020) |
| 03/26/2020 | 975 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 969 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 03/26/2020) |
| 03/26/2020 | 976 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Telephone Conference re possible conflict of interest as to Gamal Abdelaziz held on 3/26/2020.Attorney Robert Sheketoff recently entered his appearance in this case for Mr. Abdelaziz. Magistrate Judge Kelley explains that Attorney Robert Sheketoff is on her conflicts list because of a social relationship. Attorney Sheketoff responds that he will not be participating in any proceeding before Magistrate Judge Kelley, but has been retained in order to assist at trial. The government and Attorney Fuller for University of Southern California do not object. (Attorneys present: Eric Rosen and Stephen Frank for the government, Brian Kelly, Joshua Sharp, Lauren Maynard and Robert Sheketoff for defendant. Anthony Fuller for University of Southern California. )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) (Entered: 03/26/2020) |
| 03/26/2020 | 977 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 964 Motion to Withdraw as Attorney. Attorney Donald J. Campbell terminated as to Gamal Abdelaziz (4) (Belmont, Kellyann) (Entered: 03/26/2020) |
| 03/26/2020 | 978 | SENTENCING MEMORANDUM by Elizabeth Henriquez (Attachments: # 1 Appendix, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Katz, Aaron) (Entered: 03/26/2020) |
| 03/27/2020 | 979 | ELECTRONIC NOTICE OF RESCHEDULING as to Elizabeth Henriquez Sentencing set for 3/31/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY. HEARING WILL BE HELD BY VIDEOCONFERENCE.(Lima, Christine) (Entered: 03/27/2020) |
| 03/27/2020 | 981 | Assented to MOTION for Leave to File Excess Pages *Re Defendants' Memorandum in Support of Their Motion to Dismiss Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property* as to Mossimo Giannulli, Lori Loughlin. (Berkowitz, Sean) (Entered: 03/27/2020) |
| 03/27/2020 | 982 | Assented to MOTION for Leave to File *Reply Brief* as to Robert Zangrillo by University of Southern California. (Attachments: # 1 Exhibit A)(Fuller, Anthony) (Entered: 03/27/2020) |
| 03/27/2020 | 983 | SATISFACTION OF JUDGMENT as to Douglas Hodge (Head, Carol) (Entered: 03/27/2020) |
| 03/30/2020 | 984 | RESPONSE TO SENTENCING MEMORANDUM by USA as to Elizabeth Henriquez (Rosen, Eric) (Entered: 03/30/2020) |
| 03/30/2020 | 985 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 981 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Mossimo Giannulli (8), Lori Loughlin (14) (Vieira, |

| | | Leonardo) (Entered: 03/30/2020) |
|---|---|---|
| 03/30/2020 | 986 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 982 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 03/30/2020) |
| 03/30/2020 | 987 | REPLY TO RESPONSE to Motion by University of Southern California as to Robert Zangrillo re 950 MOTION Of Objection and Motion to Modify Order on Defendant Zangrillo's Rule 17(c) Subpoena (Fuller, Anthony) (Entered: 03/30/2020) |
| 03/30/2020 | 988 | RESPONSE TO SENTENCING MEMORANDUM by Elizabeth Henriquez *(Elizabeth Henriquez's Reply to Government's Supplemental Sentencing Memorandum)* (Attachments: # 1 Exhibit A)(Katz, Aaron) (Entered: 03/30/2020) |
| 03/30/2020 | 989 | MOTION for Leave to File */ Defendant John Wilson's Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record* as to John Wilson. (Kendall, Michael) (Entered: 03/30/2020) |
| 03/30/2020 | 990 | NOTICE OF ATTORNEY APPEARANCE: Christian G. Kiely appearing for Diane Blake, Todd Blake. Type of Appearance: Retained. (Kiely, Christian) (Entered: 03/30/2020) |
| 03/31/2020 | 991 | Assented to MOTION for Leave to File *Motion to Suppress Partially Under Seal* as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo by Robert Zangrillo. (Weinberg, Martin) (Entered: 03/31/2020) |
| 03/31/2020 | 992 | MOTION to Sever */ Defendant John Wilson's Motion to Sever* as to John Wilson. (Kendall, Michael) (Entered: 03/31/2020) |
| 03/31/2020 | 993 | MOTION to Dismiss */ Defendant John Wilson's Motion to Dismiss* as to John Wilson. (Kendall, Michael) (Entered: 03/31/2020) |
| 03/31/2020 | 994 | MOTION to Strike */ Defendant John Wilson's Motion to Strike re: 732* as to John Wilson. (Kendall, Michael) (Entered: 03/31/2020) |
| 03/31/2020 | 995 | MEMORANDUM in Support by John Wilson re 992 MOTION to Sever */ Defendant John Wilson's Motion to Sever*, 994 MOTION to Strike */ Defendant John Wilson's Motion to Strike re: 732* , 993 MOTION to Dismiss */ Defendant John Wilson's Motion to Dismiss* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Kendall, Michael) (Attachment 6 replaced on 4/1/2020) (Vieira, Leonardo). (Entered: 03/31/2020) |
| 03/31/2020 | 996 | Assented to MOTION to Seal *Portion of Memorandum in Support of Motion to Dismiss* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 03/31/2020) |
| 03/31/2020 | 997 | Assented to MOTION to Seal *Exhibit to Opposition to Defendant John Wilson's Motion for Leave to File Exhibit in the Public Record* as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 03/31/2020) |
| 03/31/2020 | 998 | Opposition by University of Southern California as to John Wilson re 989 MOTION for Leave to File */ Defendant John Wilson's Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Fuller, Anthony) (Attachment 3 replaced on 4/2/2020) (Vieira, Leonardo). (Entered: 03/31/2020) |
| 03/31/2020 | 999 | Assented to MOTION for Leave to File *Partially Sealed Motion to Suppress Evidence Derived from the Government's Four Wiretaps* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 03/31/2020) |
| 03/31/2020 | 1000 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 989 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Lima, Christine) (Entered: 03/31/2020) |

| | | |
|---|---|---|
| 03/31/2020 | 1001 | MOTION for Leave to File Excess Pages *(Unopposed) for Memorandum in Support of Defendants' Motion to Suppress Evidence Derived from the Government's Four Wiretaps* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 03/31/2020) |
| 03/31/2020 | 1002 | Assented to MOTION for Leave to File *Reply Brief in Support of Defendant John Wilson's Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record [ECF No. 989]* as to John Wilson. (Attachments: # 1 Proposed Reply Brief, # 2 Exhibit 1)(Kendall, Michael) (Entered: 03/31/2020) |
| 03/31/2020 | 1004 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held via video from courtroom on 3/31/2020 for Elizabeth Henriquez (9), Count(s) 1, 2. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 7 months imprisonment, which term consists of terms of 7 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; a fine of $200,000.00, which consists of fines of $100,000.00 on each count; $200 Special Assessment. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons by 2:00 PM on 6/30/2020, unless extended by written Order of this Court. (Attorneys present: Katz, Hoey, Rosen, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Lima, Christine) (Entered: 04/01/2020) |
| 04/01/2020 | 1003 | ELECTRONIC NOTICE issued requesting courtesy copy for 995 Memorandum in Support as to John Wilson Counsel who filed this document are requested to submit a courtesy copy of it to the Clerk's Office. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Lima, Christine) (Entered: 04/01/2020) |
| 04/01/2020 | 1005 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered as to John Wilson vacating 1000 Order on 989 Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record. Motion was granted in error by Court staff. (Lima, Christine) (Entered: 04/01/2020) |
| 04/01/2020 | | Reopen Document as to John Wilson 989 MOTION for Leave to File */ Defendant John Wilson's Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record* (Lima, Christine) (Entered: 04/01/2020) |
| 04/01/2020 | 1006 | Transcript of Video Telephone Conference as to Gamal Abdelaziz held on March 26, 2020, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/22/2020. Redacted Transcript Deadline set for 5/4/2020. Release of Transcript Restriction set for 6/30/2020. (Scalfani, Deborah) (Entered: 04/01/2020) |
| 04/01/2020 | 1007 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/01/2020) |
| 04/01/2020 | 1008 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 991 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Amy Colburn (3), I–Hsin Chen (7), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1009 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 996 Motion to Seal as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1010 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1001 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to William McGlashan Jr. (15) (Vieira, |

| | | Leonardo) (Entered: 04/01/2020) |
|---|---|---|
| 04/01/2020 | 1011 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 999 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to William McGlashan Jr. (15) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1012 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1002 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1013 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 997 Motion to Seal as to John Wilson (17) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1014 | REPLY TO RESPONSE to Motion by John Wilson re 989 MOTION for Leave to File / *Defendant John Wilson's Motion for Leave to File Exhibit Temporarily Under Seal and Thereafter in the Public Record* (Attachments: # 1 Exhibit)(Malkiel, Yakov) (Entered: 04/01/2020) |
| 04/01/2020 | 1015 | MOTION to Suppress *Title III Interceptions or Alternatively for a Franks Hearing* as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo by Robert Zangrillo. (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1016 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 991 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to William McGlashan Jr. (15) (Vieira, Leonardo) (Entered: 04/01/2020) |
| 04/01/2020 | 1017 | Assented to MOTION for Leave to File *Sur–Reply Regarding John Wilson's Motion for Leave to File Exhibit in the Public Record* as to John Wilson by University of Southern California. (Attachments: # 1 Exhibit A)(Fuller, Anthony) (Entered: 04/01/2020) |
| 04/01/2020 | 1019 | MOTION to Dismiss *For Lack of Venue* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Sharp, Joshua) (Entered: 04/01/2020) |
| 04/01/2020 | 1020 | MEMORANDUM in Support by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1019 MOTION to Dismiss *For Lack of Venue* (Sharp, Joshua) (Entered: 04/01/2020) |
| 04/01/2020 | 1021 | MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of Property and Honest Services* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 04/01/2020) |
| 04/01/2020 | 1022 | MEMORANDUM in Support by William McGlashan, Jr as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1021 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of Property and Honest Services* (Pirozzolo, Jack) (Entered: 04/01/2020) |
| 04/01/2020 | 1023 | MOTION to Dismiss *Count Seven of the Fourth Superseding Indictment* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 04/01/2020) |
| 04/01/2020 | 1024 | MOTION to Suppress *Evidence Derived from the Government's Four Wiretaps* as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John |

| | | Wilson, Robert Zangrillo by William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 04/01/2020) |
|---|---|---|
| 04/01/2020 | 1025 | MEMORANDUM in Support by William McGlashan, Jr as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo re 1024 MOTION to Suppress *Evidence Derived from the Government's Four Wiretaps* (Pirozzolo, Jack) (Entered: 04/01/2020) |
| 04/01/2020 | 1026 | MOTION to Dismiss *Count Five of the Fourth Superseding Indictment* as to I–Hsin Chen. (Cahn, Reuben) (Entered: 04/01/2020) |
| 04/01/2020 | 1027 | Assented to MOTION for Leave to File *Exhibits Under Seal* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1029 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/01/2020) |
| 04/01/2020 | | Notice of correction to docket made by Court staff. Correction: Transcript deleted because it was docketed to this defendant inadvertently as to Elisabeth Kimmel (Scalfani, Deborah) (Entered: 04/01/2020) |
| 04/01/2020 | 1030 | Transcript of Sentencing Hearing (Videoconference) as to Elizabeth Henriquez held on March 31, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/22/2020. Redacted Transcript Deadline set for 5/4/2020. Release of Transcript Restriction set for 6/30/2020. (Scalfani, Deborah) (Entered: 04/01/2020) |
| 04/01/2020 | 1031 | MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv) and (v)* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1032 | MEMORANDUM in Support by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1031 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv) and (v)* (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1033 | MOTION to Sever as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1034 | MEMORANDUM in Support by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1033 MOTION to Sever (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1035 | MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1036 | MEMORANDUM in Support by Elisabeth Kimmel re 1035 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)* (Beirne, Eoin) (Entered: 04/01/2020) |
| 04/01/2020 | 1037 | MOTION to Dismiss *(1) Count One Insofar as it Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and Georgetown University and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Diane Blake, Todd Blake. (Meier, David) (Entered: 04/01/2020) |

A113

| 04/01/2020 | 1038 | MEMORANDUM in Support by Diane Blake, Todd Blake as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1037 MOTION to Dismiss *(1) Count One Insofar as it Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and Georgetown University and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Meier, David) (Entered: 04/01/2020) |
| 04/01/2020 | 1039 | MOTION to Dismiss *Money Laundering Conspiracy (Count III)* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Flashner, Cory) (Entered: 04/01/2020) |
| 04/01/2020 | 1040 | MEMORANDUM in Support by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1039 MOTION to Dismiss *Money Laundering Conspiracy (Count III)* (Flashner, Cory) (Entered: 04/01/2020) |
| 04/01/2020 | 1041 | MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 04/01/2020) |
| 04/01/2020 | 1042 | MEMORANDUM in Support by Mossimo Giannulli, Lori Loughlin as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1041 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property* (Trach, William) (Entered: 04/01/2020) |
| 04/01/2020 | 1043 | MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1044 | MEMORANDUM in Support by Robert Zangrillo re 1043 MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses* (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1045 | MOTION to Strike *Class–Taking Allegations or, Alternatively, to Sever* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1046 | MEMORANDUM in Support by Robert Zangrillo re 1045 MOTION to Strike *Class–Taking Allegations or, Alternatively, to Sever* (Weinberg, Martin) (Entered: 04/01/2020) |
| 04/01/2020 | 1047 | MOTION for Leave to Appear Pro Hac Vice by Sara Winik Filing fee $ 100, receipt number 0101–8180104. as to Robert Zangrillo. (Attachments: # 1 Exhibit Affirmation, # 2 Exhibit Certificate of Good Standing)(Weinberg, Martin) (Entered: 04/01/2020) |
| 04/02/2020 | 1048 | ELECTRONIC NOTICE issued requesting courtesy copy for 1034 Memorandum in Support, 1019 MOTION to Dismiss *For Lack of Venue*, 1033 MOTION to Sever , 1042 Memorandum in Support, 1041 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property*, 1031 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv) and (v)*, 1022 Memorandum in Support, 1040 Memorandum in Support, 1038 Memorandum in Support, 1037 MOTION to Dismiss *(1) Count One Insofar as it Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and Georgetown University and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery*, 1020 Memorandum in Support, 1025 Memorandum in Support, 1021 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of Property and Honest Services*, 1015 MOTION to Suppress *Title III Interceptions or Alternatively for a Franks Hearing*, 1039 MOTION to Dismiss *Money Laundering Conspiracy (Count III)*, 1043 MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses*, 1024 MOTION to Suppress *Evidence Derived from the Government's Four Wiretaps*, 1032 Memorandum in Support, 1035 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)*, 1036 Memorandum in Support, 1026 MOTION to Dismiss *Count Five of the Fourth Superseding Indictment*, 1023 MOTION to Dismiss *Count Seven of the* |

| | | |
|---|---|---|
| | | *Fourth Superseding Indictment*, 1045 MOTION to Strike *Class−Taking Allegations or, Alternatively, to Sever*, 1027 Assented to MOTION for Leave to File *Exhibits Under Seal*, 1046 Memorandum in Support, 1044 Memorandum in Support as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo Counsel who filed these documents are requested to submit a courtesy copy of them to the Clerk's Office. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Lima, Christine) (Entered: 04/02/2020) |
| 04/02/2020 | 1049 | ELECTRONIC NOTICE OF RESCHEDULING as to Manuel Henriquez Sentencing set for 6/10/2020 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 04/02/2020) |
| 04/02/2020 | 1052 | NOTICE – For all future filings, counsel are to clearly indicate which Defendant number they are filing on behalf of, as well as which Docket Entry any filing relates to by David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Lima, Christine) (Entered: 04/02/2020) |
| 04/02/2020 | 1053 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1047 Motion for Leave to Appear Pro Hac Vice Added Sara K. Winik. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/02/2020) |
| 04/02/2020 | 1054 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** in part and **DENYING** in part 989 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 04/02/2020) |
| 04/02/2020 | 1055 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1027 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/02/2020) |
| 04/02/2020 | 1056 | MEMORANDUM in Support by Robert Zangrillo re 1043 MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses* (Weinberg, Martin) (Entered: 04/02/2020) |
| 04/03/2020 | 1058 | STATUS REPORT *Regarding Discovery and Request to Delay Filing of a Proposed Briefing Schedule for Discovery Motions* by Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Sharp, Joshua) (Entered: 04/03/2020) |
| 04/06/2020 | 1059 | ELECTRONIC NOTICE OF HEARING as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: Notice of hearing via video re discovery schedule on Thursday, April 9 at 3:00 p.m. Counsel shall appear by video if possible. The court will set a schedule for the government's production of discovery and the filing of discovery motions by defendants. Discovery motions practice shall be completed by June 2020. The interim status conference on May 5, 2020 will be a final status conference and the case will be referred to the District Court at that time. (Clerk will e−mail counsel with instructions for hearing) (Belmont, Kellyann) (Entered: 04/06/2020) |
| 04/07/2020 | 1060 | Assented to MOTION for Leave to File Excess Pages *for Memorandum in Opposition to Defendants' Motion to Dismiss* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth |

| | | |
|---|---|---|
| | | Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Frank, Stephen) (Entered: 04/07/2020) |
| 04/07/2020 | 1069 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Elizabeth Henriquez (9), Count(s) 1, 2, Defendant sentenced to a term of 7 months imprisonment, which term consists of terms of 7 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; a fine of $200,000.00, which consists of fines of $100,000.00 on each count; $200 Special Assessment. (Lima, Christine) (Entered: 04/09/2020) |
| 04/08/2020 | 1061 | NOTICE OF APPEAL by Douglas Hodge re 868 Judgment,, Filing fee: $ 505, receipt number 0101−8188201 (Fee Status: Filing Fee paid) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/28/2020. (O'Connor, Brien) (Entered: 04/08/2020)** |
| 04/08/2020 | 1062 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1060 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I−Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/08/2020) |
| 04/08/2020 | 1063 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Douglas Hodge to US Court of Appeals re 1061 Notice of Appeal − Final Judgment. (Paine, Matthew) (Entered: 04/08/2020) |
| 04/08/2020 | 1064 | NOTICE *of Submission of Chart Outlining Discovery Requests* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 04/08/2020) |
| 04/08/2020 | 1065 | MEMORANDUM in Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* (Frank, Stephen) (Entered: 04/08/2020) |
| 04/08/2020 | 1066 | MEMORANDUM in Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing ((CORRECTED TO INCLUDE EXHIBITS))* (Attachments: # 1 Exhibit A−NNN)(Frank, Stephen) (Entered: 04/08/2020) |
| 04/08/2020 | 1067 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: The non−party motion of USC to modify the order on defendant Zangrillo's Rule 17(c) subpoena (Docket No. 950 ) is **ALLOWED,** in part, and **DENIED**, in part. The Magistrate Judges Order regarding the Rule 17(c) subpoena (Docket No. 913 ) is modified to allow the replacement of all student applicant names with anonymous identifiers and the redaction of student applicants street addresses. USCs objection to that Order is otherwise **OVERRULED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 04/09/2020) |

| 04/09/2020 | 1068 | USCA Case Number as to Douglas Hodge 20–1418 for 1061 Notice of Appeal – Final Judgment filed by Douglas Hodge. (Paine, Matthew) (Entered: 04/09/2020) |
|---|---|---|
| 04/09/2020 | 1071 | STATUS REPORT *(Discovery Chart)* by USA as to Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 04/09/2020) |
| 04/09/2020 | 1072 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Hearing as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on 4/9/2020.<br>The court held a conference re scheduling which counsel attended by video. The court discussed the schedule of the case going forward.<br>The status conference on May 5 will be a final status conference and at that time the case will be sent to the district court.<br>The government shall complete its production of discovery to the defendants by May 5. The defendants shall file any remaining discovery motions by May 22. The government will have until June 5 to respond to any discovery motions.<br>The following motions are denied without prejudice: # 648 , # 681 , # 693 , # 696 , # 699 , # 801 , # 865 . The government and defendants should confer and by May 15 the defendants shall file motions to compel concerning any discovery requests that cannot be worked out between the parties.<br>By the close of business on Friday, May 1, the parties shall file a joint final status report that addresses:<br>Whether any defendants are asking for a R. 11 hearing rather than going to trial;<br>The probable length of trial;<br>Whether any defendant intends to raise a defense of insanity or public authority;<br>What timetable the parties have agreed to regarding expert disclosures.<br>Attorneys present: Eric Rosen, Kristen Kearney, Justin O'Connell for the government and Martin Weinberg, David Schumacher, Brian Kelly, Lauren Maynard, Joshua Sharp, David Meier,Stephen Sutro, Reuben Cahn, George Vien, Sean Berkowitz, Cory Flashner, Eoin Beirne, John Hueston, Jack Pirozzolo, Michael Loucks, Jack DiCanio, Andrew Tomback, Michael Kendall, Yakov Malkiel, Tracy Miner for defendants<br>Court Reporter Name and Contact or digital recording information: Lee Marzilli at leemarz@aol.com. (Belmont, Kellyann) (Entered: 04/09/2020) |
| 04/10/2020 | 1073 | SATISFACTION OF JUDGMENT as to Michelle Janavs (Head, Carol) (Entered: 04/10/2020) |
| 04/10/2020 | 1074 | MOTION for Leave to File *Reply in Support of Their Motion Regarding Governmental Misconduct (ECF No. 971)* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 04/10/2020) |
| 04/10/2020 | 1075 | RESPONSE to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1074 MOTION for Leave to File *Reply in Support of Their Motion Regarding Governmental Misconduct (ECF No. 971)* (Frank, Stephen) (Entered: 04/10/2020) |
| 04/13/2020 | 1076 | PROPOSED ORDER(S) submitted by University of Southern California as to Gamal Abdelaziz (Fuller, Anthony) (Entered: 04/13/2020) |
| 04/14/2020 | 1077 | Judge Nathaniel M. Gorton: ORDER entered: re: 1074 Motion for Leave to File. Motion **ALLOWED,** in part, and **DENIED,** in part; defendants may file, on or before April 17, 2020, a reply, not to exceed 10 pages, limited to the alleged misconduct which is the subject matter of the original motion (Docket No. 971 ). The government may submit a sur–reply, similarly limited, on or before April 24, 2020.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), |

| | | |
|---|---|---|
| | | William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/14/2020) |
| 04/14/2020 | 1078 | Judge Nathaniel M. Gorton: ORDER entered: re: 1074 Motion for Leave to File. Motion **ALLOWED**, in part, and **DENIED,** in part; defendants may file, on or before April 17, 2020, a reply, not to exceed 10 pages, limited to the alleged misconduct which is the subject matter of the original motion (Docket No. 971 ). The government may submit a sur–reply, similarly limited, on or before April 24, 2020.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to as to Gamal Abdelaziz (4) (Vieira, Leonardo) (Entered: 04/14/2020) |
| 04/14/2020 | 1079 | Set Deadlines re 971 MOTION to Dismiss. **Replies due by 4/17/2020. Sur–replies due by 4/24/2020.** (Vieira, Leonardo) (Entered: 04/14/2020) |
| 04/16/2020 | 1080 | MOTION for Leave to File *Motion to Quash and Memo is Support Under Seal* as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 04/16/2020) |
| 04/16/2020 | 1081 | Judge Nathaniel M. Gorton: ORDER entered: As to Gamal Abdelaziz re 1076 Proposed Order(s) submitted filed by University of Southern California. Treated as a stipulaton and request to enter proposed order and request **GRANTED.** (Counsel shall, in the future, refrain from referring to "this Court or the District Court" which are one and the same. (Vieira, Leonardo) (Entered: 04/16/2020) |
| 04/16/2020 | 1082 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1080 Motion for Leave to File Motion under seal as to Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), John Wilson (17) (Belmont, Kellyann) (Entered: 04/16/2020) |
| 04/16/2020 | 1083 | SEALED MOTION to Quash as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson by University of Southern California. (Belmont, Kellyann) (Entered: 04/16/2020) |
| 04/16/2020 | 1084 | SEALED MEMORANDUM in Support by University of Southern California as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson re 1083 SEALED MOTION to Quash. (Belmont, Kellyann) (Entered: 04/16/2020) |
| 04/17/2020 | 1085 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: Please see attached Memorandum and Order. (Vieira, Leonardo) (Entered: 04/17/2020) |
| 04/17/2020 | 1086 | REPLY TO RESPONSE to Motion by Mossimo Giannulli, Lori Loughlin as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* (Trach, William) (Entered: 04/17/2020) |
| 04/17/2020 | 1087 | MOTION to Compel *Production of Purportedly Privileged Materials* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O)(Sharp, Joshua) (Entered: 04/17/2020) |
| 04/20/2020 | 1088 | Assented to MOTION for Leave to File *Under Seal Portions of Motion to Modify Sentence and Certain Exhibits in Support* as to Michelle Janavs. (Littrell, John) (Entered: 04/20/2020) |
| 04/21/2020 | 1095 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1088 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Michelle Janavs (12) (Vieira, Leonardo) (Entered: 04/21/2020) |

| 04/22/2020 | 1096 | Transcript of Hearing (Courtroom and Remote by Video) as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on April 9, 2020, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/13/2020. Redacted Transcript Deadline set for 5/26/2020. Release of Transcript Restriction set for 7/21/2020. (Scalfani, Deborah) Modified on 4/22/2020 (Scalfani, Deborah). (Entered: 04/22/2020) |
| 04/22/2020 | 1097 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/22/2020) |
| 04/22/2020 | 1098 | MOTION to Reduce Sentence *Modify Sentence* as to Michelle Janavs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Littrell, John) (Entered: 04/22/2020) |
| 04/22/2020 | 1100 | MOTION to Modify Sentence as to Michelle Janavs, filed under seal. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Lima, Christine) (Entered: 04/23/2020) |
| 04/23/2020 | 1101 | Set/Reset Deadlines re Motion in case as to Michelle Janavs 1100 MOTION to Reduce Sentence, 1098 MOTION to Reduce Sentence *Modify Sentence*. Responses due by 4/29/2020 (Lima, Christine) (Entered: 04/23/2020) |
| 04/23/2020 | 1102 | MOTION To Modify Sentence to Impose Home Detention as to Douglas Hodge. (O'Connor, Brien) (Entered: 04/23/2020) |
| 04/24/2020 | 1103 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered as to Douglas Hodge, Michelle Janavs. "Because the requested relief may have precedential impact on all remaining cases, the government is directed to respond substantively and in writing to the pending Motions to Modify Sentence (Docket Nos. 1098 and 1102) on or before the close of business Tuesday April 28, 2020." (Lima, Christine) (Entered: 04/24/2020) |
| 04/24/2020 | 1104 | SUR–REPLY to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 971 MOTION to Dismiss *Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct and for Discovery and an Evidentiary Hearing* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Frank, Stephen) (Entered: 04/24/2020) |
| 04/27/2020 | 1105 | Assented to MOTION for Leave to File *Opposition to USC's Motion to Quash Under Seal* as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 04/27/2020) |
| 04/27/2020 | 1106 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1105 Assented to MOTION for Leave to File Opposition to USC's Motion to Quash Under Seal as to Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), John Wilson (17) (Belmont, Kellyann) (Entered: 04/27/2020) |
| 04/28/2020 | 1107 | Assented to MOTION to Seal *Portions of Government's Opposition to Motions to Modify Sentences* as to Douglas Hodge, Michelle Janavs by USA. (Kearney, Kristen) (Entered: 04/28/2020) |
| 04/28/2020 | 1111 | Assented to MOTION for Leave to File Excess Pages *for Memorandum in Support of Motion Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re–Sentencing on the Remaining Count of Conviction* as to Douglas Hodge. (O'Connor, Brien) (Entered: 04/28/2020) |
| 04/28/2020 | 1112 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1107 Motion to Seal as to Douglas Hodge (11), Michelle Janavs (12) (Lima, Christine) (Entered: 04/28/2020) |

A119

| 04/28/2020 | 1113 | Opposition by USA as to Douglas Hodge, Michelle Janavs re 1100 MOTION to Reduce Sentence, 1098 MOTION to Reduce Sentence /*Modify Sentence*, 1102 MOTION To Modify Sentence to Impose Home Detention *(Redacted)* (Kearney, Kristen) (Entered: 04/28/2020) |
| --- | --- | --- |
| 04/29/2020 | 1114 | Opposition by USA as to Douglas Hodge, Michelle Janavs re 1100 MOTION to Reduce Sentence, 1098 MOTION to Reduce Sentence /*Modify Sentence*, 1102 MOTION To Modify Sentence to Impose Home Detention *(CORRECTED BRIEF)* (Kearney, Kristen) (Entered: 04/29/2020) |
| 04/29/2020 | 1115 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting in part and denying in part 1111 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Douglas Hodge (11). "Motion allowed, in part, and denied in part; 30 pages maximum." (Lima, Christine) (Entered: 04/29/2020) |
| 04/29/2020 | 1116 | Opposition by USA as to Douglas Hodge, Michelle Janavs re 1100 MOTION to Reduce Sentence, 1098 MOTION to Reduce Sentence /*Modify Sentence*, 1102 MOTION To Modify Sentence to Impose Home Detention , filed under seal. (Lima, Christine) (Entered: 04/29/2020) |
| 04/29/2020 | 1117 | Case as to David Sidoo no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 04/29/2020) |
| 04/29/2020 | 1118 | MOTION for Leave to File *Reply to Motion to Modify Sentence (Unopposed)* as to Michelle Janavs. (Littrell, John) (Entered: 04/29/2020) |
| 04/29/2020 | 1119 | SEALED Opposition by Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson re 1083 SEALED MOTION to Quash (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Cover Letter)(Vieira, Leonardo) . (Entered: 04/29/2020) |
| 04/29/2020 | 1120 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1118 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Michelle Janavs (12). Reply memo, not to exceed 10 pages, to be filed by close of business today, 4/29/20. (Lima, Christine) (Entered: 04/29/2020) |
| 04/29/2020 | 1121 | NOTICE as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: **The May 5, 2020 11:00AM Status Hearing in front of Magistrate Judge Kelley will be by telephone. Clerk will e–mail counsel call in information.** Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Courts general orders and public notices available on www.mad.uscourts.gov or con tact media@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 04/29/2020) |
| 04/29/2020 | 1122 | MOTION for Extension of Time to May 8, 2020 to File Response/Reply *To Certain Of Defendants' Dispositive Motions, and to File an Oversized Brief* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Bell, Karin) (Entered: 04/29/2020) |
| 04/29/2020 | 1123 | Assented to MOTION to file response partly under seal and for an oversized brief *as related to Dkts. 1015 and 1024* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Rosen, Eric) (Entered: 04/29/2020) |

A120

| 04/29/2020 | 1124 | REPLY TO RESPONSE to Motion by Michelle Janavs re 1100 MOTION to Reduce Sentence, 1118 MOTION for Leave to File *Reply to Motion to Modify Sentence (Unopposed)* (Attachments: # 1 Affidavit of Gerloni Cotton)(Weinreb, William) (Entered: 04/29/2020) |
|---|---|---|
| 04/29/2020 | 1125 | Assented to MOTION for Leave to File *Reply in Support of His Motion to Modify His Sentence to Impose Home Detention* as to Douglas Hodge. (Attachments: # 1 Exhibit A – Proposed Reply)(O'Connor, Brien) (Entered: 04/29/2020) |
| 04/30/2020 | 1126 | MOTION for Leave to File Excess Pages *Regarding Response to Sur–reply in Opposition to Governmental Misconduct Motion (Unopposed)* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 04/30/2020) |
| 04/30/2020 | 1127 | Notice of correction to docket made by Court staff. Correction: Document Nos. 1098 and 1108 terminated corrected because: Please refer to Document No. 1100. Please note this is simply a docket clean–up as to Michelle Janavs (Lima, Christine) (Entered: 04/30/2020) |
| 04/30/2020 | 1128 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, the motion of defendant Douglas Hodge (Docket No. 1102 ) and defendant Michelle Janavs (Docket No. 1100 ) are **DENIED** without prejudice.<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 04/30/2020) |
| 04/30/2020 | 1129 | Judge Nathaniel M. Gorton: ORDER entered: Motion **ALLOWED**, in part, and **DENIED**, in part; the governments' omnibus brief will be limited to 65 pages re: 1122 Motion for Extension of Time to File Response/Reply as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Manuel Henriquez (9), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19). (Vieira, Leonardo) (Entered: 04/30/2020) |
| 04/30/2020 | 1130 | Judge Nathaniel M. Gorton: ORDER entered: Motion **ALLOWED**, in part, and **DENIED**, in part; the governments' consolidated response will be limited to 30 pages re: 1123 Motion as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/30/2020) |
| 04/30/2020 | 1131 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1125 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 04/30/2020) |
| 04/30/2020 | 1132 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1126 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 04/30/2020) |
| 04/30/2020 | 1133 | REPLY TO RESPONSE to Motion by Douglas Hodge re 1102 MOTION To Modify Sentence to Impose Home Detention (O'Connor, Brien) (Entered: 04/30/2020) |
| 04/30/2020 | 1134 | MOTION for Leave to File *Reply Brief Under Seal* as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 04/30/2020) |
| 04/30/2020 | 1135 | Opposition by USA as to John Wilson re 992 MOTION to Sever / *Defendant John Wilson's Motion to Sever*, 994 MOTION to Strike / *Defendant John Wilson's Motion to Strike re: 732* |

A121

| | | |
|---|---|---|
| | | , 993 MOTION to Dismiss / *Defendant John Wilson's Motion to Dismiss* (Kearney, Kristen) (Entered: 04/30/2020) |
| 04/30/2020 | 1136 | MEMORANDUM in Opposition by USA as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1033 MOTION to Sever (Wright, Leslie) (Entered: 04/30/2020) |
| 04/30/2020 | 1137 | Opposition by USA as to Robert Zangrillo re 1043 MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses*, 1045 MOTION to Strike *Class−Taking Allegations or, Alternatively, to Sever* (Attachments: # 1 Exhibit A (Chart of Federal Cases Alleging Cheating as a Means of Committing Mail or Wire Fraud))(O'Connell, Justin) (Entered: 04/30/2020) |
| 04/30/2020 | 1138 | Opposition by USA as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo re 1024 MOTION to Suppress *Evidence Derived from the Government's Four Wiretaps*, 1015 MOTION to Suppress *Title III Interceptions or Alternatively for a Franks Hearing* (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Rosen, Eric) (Additional attachment(s) added on 12/14/2021: # 4 Unredacted Response, # 5 Unredacted Exhibit A, # 6 Unredacted Exhibit B, # 7 Unredacted Exhibit C) (Lima, Christine). (Entered: 04/30/2020) |
| 05/01/2020 | 1139 | Letter (non−motion) regarding Motion for Leave to File Reply Brief Under Seal as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson (Fuller, Anthony) (Entered: 05/01/2020) |
| 05/01/2020 | 1140 | STATUS REPORT *(JOINT)* by USA as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 05/01/2020) |
| 05/01/2020 | 1141 | Response as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: 1104 Sur−reply to Motion,, filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Trach, William) (Entered: 05/01/2020) |
| 05/01/2020 | 1142 | RESPONSE to Motion by USA as to Gamal Abdelaziz re 1087 MOTION to Compel *Production of Purportedly Privileged Materials* (Bell, Karin) (Entered: 05/01/2020) |
| 05/01/2020 | 1143 | MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re−Sentencing on the Remaining Count of Conviction as to Douglas Hodge. (O'Connor, Brien) (Entered: 05/01/2020) |
| 05/01/2020 | 1144 | MEMORANDUM in Support by Douglas Hodge re 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re−Sentencing on the Remaining Count of Conviction (O'Connor, Brien) (Entered: 05/01/2020) |
| 05/01/2020 | 1145 | AFFIDAVIT in Support of Joan McPhee; by Douglas Hodge re 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re−Sentencing on the Remaining Count of Conviction *(Declaration)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(O'Connor, Brien) (Entered: 05/01/2020) |
| 05/01/2020 | 1146 | AFFIDAVIT in Support of Ezra D. Geggel; by Douglas Hodge re 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re−Sentencing on the Remaining Count of Conviction *(Declaration)* (O'Connor, Brien) (Entered: 05/01/2020) |
| 05/04/2020 | 1147 | ORDER of USCA as to Douglas Hodge re 1061 Notice of Appeal – Final Judgment. (Paine, Matthew) (Entered: 05/04/2020) |
| 05/05/2020 | 1151 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. Regarding # 1087 , defendant Abdelaziz's motion to compel, in light of the government's filing, # 1142 , the motion to compel is denied as moot. (Belmont, Kellyann) (Entered: 05/05/2020) |
| 05/05/2020 | 1152 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1134 MOTION for Leave to File Reply Brief Under Seal by University of Southern California as to Gamal |

| | | |
|---|---|---|
| | | Abdelaziz (4), Diane Blake (5), Todd Blake (6), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), John Wilson (17) (Belmont, Kellyann) (Entered: 05/05/2020) |
| 05/05/2020 | 1155 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Final Status Conference as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held via telephone on 5/5/2020: <br> The case is sent up to the District Court. <br> Court adopts the dates and deadlines set forth in the Joint Statement, # 1140 . <br> Counsel agree to the exclusion of time under the Speedy Trial Act. Order to issue. <br> (Attorneys present: Eric Rosen for the government, Martin Weinberg, David Schumacher,Patric Hooper, Brian Kelly, Joshua Sharp, David Meier,Stephen Sutro, Reuben Cahn, George Vien, Sean Berkowitz, William Trach, Cory Flashner, Eoin Beirne, John Hueston, Jack Pirozzolo, Michael Loucks, Yakov Malkiel, Andrew Tomback, Michael Kendall and Tracy Miner for defendants )Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) (Entered: 05/05/2020) |
| 05/05/2020 | 1156 | Magistrate Judge M. Page Kelley: ORDER entered. FINAL STATUS REPORT AND ORDER ON EXCLUDABLE DELAY as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. Time excluded from 5/5/2020 until 7/28/2020. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belmont, Kellyann) (Entered: 05/05/2020) |
| 05/05/2020 | 1161 | SEALED REPLY TO SEALED RESPONSE to Motion by University of Southern California as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson re 1083 SEALED MOTION to Quash (Belmont, Kellyann) (Entered: 05/06/2020) |
| 05/06/2020 | 1159 | Transcript of Status Conference via Teleconference as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo held on May 5, 2020, before Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/27/2020. Redacted Transcript Deadline set for 6/8/2020. Release of Transcript Restriction set for 8/4/2020. (Scalfani, Deborah) (Entered: 05/06/2020) |
| 05/06/2020 | 1160 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/06/2020) |
| 05/07/2020 | 1163 | NOTICE *(Supplemental Filing Addressing Circumstances Warranting Immediate Adjudication)* by Douglas Hodge re 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re–Sentencing on the Remaining Count of Conviction (O'Connor, Brien) (Entered: 05/07/2020) |
| 05/08/2020 | 1169 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, after consideration of defendant' memorandum in support of their motion to dismiss the indictment (Docket No. 972 ); the governments opposition to that motion (Docket No. 1066 ); defendants' reply in support of the motion (Docket No. 1086 ); the government's sur–reply in opposition (Docket No. 1104 ), supported by affidavits of agents and an Assistant United States Attorney; and the defendants' response to the governmen's sur–reply (Docket No. 1141 ), the defendants' motion to dismiss the indictment or in the alternative to suppress evidence and order an evidentiary hearing (Docket No. 971 ) is **DENIED**. <br><br> So ordered. (Vieira, Leonardo) (Entered: 05/08/2020) |

| 05/08/2020 | 1170 | Opposition by USA as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1041 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property*, 1037 MOTION to Dismiss *(1) Count One Insofar as it Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and Georgetown University and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery*, 1023 MOTION to Dismiss *Count Seven of the Fourth Superseding Indictment*, 1031 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv) and (v)*, 1026 MOTION to Dismiss *Count Five of the Fourth Superseding Indictment*, 1019 MOTION to Dismiss *For Lack of Venue*, 1021 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of Property and Honest Services*, 1039 MOTION to Dismiss *Money Laundering Conspiracy (Count III)*, 341 MOTION to Dismiss *Second Superseding Indictment*, 1035 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)* (Wright, Leslie) (Entered: 05/08/2020) |
| 05/11/2020 | 1171 | Assented to MOTION for Leave to File *Reply Partially Under Seal* as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo by Robert Zangrillo. (Weinberg, Martin) (Entered: 05/11/2020) |
| 05/11/2020 | 1172 | ELECTRONIC NOTICE OF HEARING ON MOTION as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Elisabeth Kimmel, Lori Loughlin, John Wilson 1083 SEALED MOTION to Quash : Motion Hearing set for 5/14/2020 02:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley.<br><br>This hearing will be conducted by video conference. **U.S.C. has requested that this hearing be sealed because the motion pertains to materials covered by a protective order, and defendants do not object. The court finds that it will be difficult, if not impossible, for the parties to argue the motion without specifically referring to these materials, therefore the hearing will be closed to the public and the transcript will be sealed.** (Belmont, Kellyann) (Entered: 05/11/2020) |
| 05/11/2020 | 1173 | Response as to Douglas Hodge: 1163 Notice (Other), filed by Douglas Hodge. (O'Connell, Justin) (Entered: 05/11/2020) |
| 05/11/2020 | 1175 | Assented to MOTION for Extension of Time to May 27, 2020 to File Response/Reply as to 1136 Memorandum in Opposition, *Regarding Severance* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elisabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Elisabeth Kimmel. (Beirne, Eoin) (Entered: 05/11/2020) |
| 05/12/2020 | 1177 | Judge Nathaniel M. Gorton: ORDER entered: Motion **ALLOWED, in part,** and **DENIED,** in part; defendants shall file their reply in support of their motion to sever on or before Wednesday, May 20, 2020 re: 1175 Motion for Extension of Time to File Response/Reply as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 05/12/2020) |
| 05/12/2020 | 1179 | Assented to MOTION for Leave to File *Partially Under Seal Reply to 1138 Government's Opposition to 1024 Defendants' Motion to Suppress Evidence Derived from the Government's Four Wiretaps* as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo by William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 05/12/2020) |
| 05/12/2020 | 1180 | STATUS REPORT *RE JOINT PROPOSED PRE–TRIAL DISCLOSURES FOR TRIAL COMMENCING ON JANUARY 11, 2021* by Elisabeth Kimmel as to Gregory Colburn, Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella (Flashner, Cory) (Entered: 05/12/2020) |
| 05/12/2020 | 1182 | Judge Nathaniel M. Gorton: ORDER entered: As to Douglas Hodge re 1147 USCA Order. Having considered the relevant pleadings, the Court determines that there exist extraordinary circumstances which warrant immediate adjudication of Defendant Douglas Hodge's habeas |

| | | |
|---|---|---|
| | | petition filed pursuant to 28 U.S.C § 2255 despite the pendency of his direct criminal appeal.<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 05/13/2020) |
| 05/13/2020 | 1181 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1171 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Amy Colburn (3), I–Hsin Chen (7), Elisabeth Kimmel (13), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 05/13/2020) |
| 05/13/2020 | 1183 | REPLY TO RESPONSE to Motion by Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo re 1015 MOTION to Suppress *Title III Interceptions or Alternatively for a Franks Hearing* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Weinberg, Martin) (Entered: 05/13/2020) |
| 05/13/2020 | 1184 | MOTION for Reconsideration re 1169 Memorandum & Order,,, as to John Wilson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Malkiel, Yakov) (Entered: 05/13/2020) |
| 05/13/2020 | 1185 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1179 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Amy Colburn (3), I–Hsin Chen (7), Elisabeth Kimmel (13), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 05/13/2020) |
| 05/13/2020 | 1187 | Assented to MOTION to Continue *His Sentencing to August 2020* as to Manuel Henriquez. (Haag, Melinda) (Entered: 05/13/2020) |
| 05/13/2020 | 1189 | MOTION for Extension of Time to May 22, 2020 to File Response/Reply as to 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re–Sentencing on the Remaining Count of Conviction as to Douglas Hodge by USA. (O'Connell, Justin) (Entered: 05/13/2020) |
| 05/14/2020 | 1191 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1189 Motion for Extension of Time to File Response/Reply as to Douglas Hodge (11). (Vieira, Leonardo) (Entered: 05/14/2020) |
| 05/14/2020 | 1192 | Reset Deadlines re: Motion or Report and Recommendation in case as to Douglas Hodge 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re–Sentencing on the Remaining Count of Conviction . **Response due by 5/22/2020.** (Vieira, Leonardo) (Entered: 05/14/2020) |
| 05/14/2020 | 1193 | Judge Nathaniel M. Gorton: ORDER entered: re: 1187 Motion to Continue as to Manuel Henriquez (10). Defendant's Assented–to Motion to Continue Sentencing (Docket no. 1187 ) is **ALLOWED,** in part, and **DENIED,** in part. The sentencing is rescheduled for Friday, July 10, 2020 at 11:00 a.m. If travel restrictions remain in force on that date and defendant continues not to consent to proceed by video, the sentencing will occur one week after the lifting of said restrictions with no further continuances.<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 05/14/2020) |
| 05/15/2020 | 1199 | REPLY TO RESPONSE to Motion by William McGlashan, Jr as to Amy Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Robert Zangrillo re 1024 MOTION to Suppress *Evidence Derived from the Government's Four Wiretaps* (Pirozzolo, Jack) (Entered: 05/15/2020) |
| 05/15/2020 | 1200 | REPLY TO RESPONSE to Motion by Robert Zangrillo re 1043 MOTION to Dismiss *Counts One and Four Insofar as They Allege Cheating in Online Courses* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Weinberg, Martin) (Entered: 05/15/2020) |
| 05/15/2020 | 1201 | REPLY TO RESPONSE to Motion by Robert Zangrillo re 1045 MOTION to Strike *Class–Taking Allegations or, Alternatively, to Sever* (Weinberg, Martin) (Entered: 05/15/2020) |

| | | |
|---|---|---|
| 05/15/2020 | 1202 | REPLY TO RESPONSE to Motion by John Wilson re 992 MOTION to Sever / *Defendant John Wilson's Motion to Sever*, 994 MOTION to Strike / *Defendant John Wilson's Motion to Strike re: 732* , 993 MOTION to Dismiss / *Defendant John Wilson's Motion to Dismiss* (Malkiel, Yakov) (Entered: 05/15/2020) |
| 05/18/2020 | 1207 | MOTION Intervene as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Motion for Permanent Injunction, # 2 Motion for Leave to File Oversized Brief, # 3 Memo in Support, # 4 Exhibit)(Vieira, Leonardo) (Entered: 05/18/2020) |
| 05/20/2020 | 1213 | MOTION to Seal *Portions of Douglas Hodge's Forthcoming Motion for Leave to Amend His Motion Pursuant To 28 U.S.C. § 2255 to Modify the Relief Sought* as to Douglas Hodge. (O'Connor, Brien) (Entered: 05/20/2020) |
| 05/20/2020 | 1215 | REPLY TO RESPONSE to Motion by Elisabeth Kimmel as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1033 MOTION to Sever (Beirne, Eoin) (Entered: 05/20/2020) |
| 05/21/2020 | 1217 | PLEA AGREEMENT as to Lori Loughlin (Frank, Stephen) (Entered: 05/21/2020) |
| 05/21/2020 | 1218 | PLEA AGREEMENT as to Mossimo Giannulli (Frank, Stephen) (Entered: 05/21/2020) |
| 05/21/2020 | 1219 | ELECTRONIC NOTICE OF HEARING as to Mossimo Giannulli, Lori Loughlin<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: www.forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices ava ilable on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Rule 11 Hearing set for 5/22/2020 11:30 AM in Courtroom 4 before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 05/21/2020) |
| 05/21/2020 | 1220 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1213 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 05/21/2020) |
| 05/21/2020 | 1221 | Joint MOTION for Extension of Time to May 29, 2020 to File Response to Defendant's Motion for Relief Pursuant to 28 U.S.C. § 2255 in Order for Parties to Meet and Confer as to Douglas Hodge by USA. (Frank, Stephen) (Entered: 05/21/2020) |
| 05/22/2020 | 1222 | ELECTRONIC NOTICE OF HEARING as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: www.public.mad.uscou rts.gov/seating–signup.html. |

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

**Hearing set for Friday, May 29,2020 12:00 p.m. concerning 17(c) subpoenas, including subpoenas directed to the University of Southern California (U.S.C.), to set dates for U.S.C.'s compliance with the subpoenas, dates for motions to quash or motions to enforce the subpoenas, and to discuss the filing of motions for subpoenas in the future. Defense counsel for all defendants listed above should be present, not just defendants with recent requests for subpoenas. The court will only discuss scheduling issues and will not hear arguments on the merits of any requests.(Belmont, Kellyann) (Entered: 05/22/2020)**

| | | |
|---|---|---|
| 05/22/2020 | 1226 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1221 Motion for Extension of Time as to Douglas Hodge (11). **Response due by 5/29/2020.** (Vieira, Leonardo) (Entered: 05/22/2020) |
| 05/22/2020 | 1227 | MOTION to Compel *(Renewed)* as to John Wilson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Malkiel, Yakov) (Entered: 05/22/2020) |
| 05/22/2020 | 1229 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Mossimo Giannulli, Lori Loughlin held on 5/22/2020 by video. Defendants each sworn. Court has colloquy with each Defendant re: name, age, educational background, state of mind, charges. Government informs the Defendants of the maximum possible penalties; no mandatory minimums. Government outlines the provisions of the written plea agreement for the Court and Defendants. Government informs the Defendants of the facts it would prove if this matter were to go to trial. Plea entered by Mossimo Giannulli (8) Guilty Count 1ss and Lori Loughlin (14) Guilty Count 1ss. Sentencing as to Defendant Mossimo Giannulli set for 8/21/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Sentencing as to Defendant Lori Loughline set for 8/21/2020 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendants remain released on all previously imposed conditions. (Attorneys present: Rosen, Trach, Berkowitz. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) Modified on 5/27/2020 (Lima, Christine). (Entered: 05/27/2020) |
| 05/27/2020 | 1228 | REPLY TO RESPONSE to Motion by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1041 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Universities of Property* (Weinberg, Martin) (Entered: 05/27/2020) |
| 05/27/2020 | 1230 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Mossimo Giannulli Sentencing set for 8/21/2020 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 05/27/2020) |
| 05/27/2020 | 1231 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Lori Loughlin Sentencing set for 8/21/2020 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 05/27/2020) |
| 05/27/2020 | 1232 | REPLY TO RESPONSE to Motion by William McGlashan, Jr as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1021 MOTION to Dismiss *Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of Property and Honest Services*, 341 MOTION to Dismiss *Second Superseding Indictment* (Pirozzolo, Jack) (Entered: 05/27/2020) |
| 05/27/2020 | 1233 | REPLY TO RESPONSE to Motion by Elisabeth Kimmel as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1031 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv) and (v)* (Beirne, Eoin) (Entered: 05/27/2020) |
| 05/27/2020 | 1234 | REPLY TO RESPONSE to Motion by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1019 MOTION to Dismiss |

| | | |
|---|---|---|
| | | *For Lack of Venue* (Sharp, Joshua) (Entered: 05/27/2020) |
| 05/27/2020 | 1235 | RESPONSE to Motion by Elisabeth Kimmel re 1035 MOTION to Dismiss *Pursuant to Federal Rules of Criminal Procedure 12(b)(1) and 12(b)(3)(B)* (Beirne, Eoin) (Entered: 05/27/2020) |
| 05/27/2020 | 1236 | Opposition by USA as to John Wilson re 1184 MOTION for Reconsideration re 1169 Memorandum & Order,,, (Attachments: # 1 Exhibit A through C)(Kearney, Kristen) (Entered: 05/27/2020) |
| 05/27/2020 | 1237 | REPLY TO RESPONSE to Motion by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1037 MOTION to Dismiss *(1) Count One Insofar as it Alleges Conspiracy to Commit Honest Services Fraud Against the University of Southern California and Georgetown University and (2) Count Two Alleging Conspiracy to Commit Federal Programs Bribery* (Meier, David) (Entered: 05/27/2020) |
| 05/27/2020 | 1238 | REPLY TO RESPONSE to Motion by Elisabeth Kimmel as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1039 MOTION to Dismiss *Money Laundering Conspiracy (Count III)* (Flashner, Cory) (Entered: 05/27/2020) |
| 05/27/2020 | 1239 | Supplemental REPLY TO RESPONSE to Motion by John Wilson re 1039 MOTION to Dismiss *Money Laundering Conspiracy (Count III)* (Malkiel, Yakov) (Entered: 05/27/2020) |
| 05/28/2020 | 1240 | Assented to MOTION for Leave to File Excess Pages *to Respond to Defendant's Motion for Relief Pursuant to Section 2255* as to Douglas Hodge by USA. (Frank, Stephen) (Entered: 05/28/2020) |
| 05/28/2020 | 1241 | Transcript of Rule 11 Hearing as to Mossimo Giannulli, Lori Loughlin held on May 22, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/18/2020. Redacted Transcript Deadline set for 6/29/2020. Release of Transcript Restriction set for 8/26/2020. (Scalfani, Deborah) (Entered: 05/28/2020) |
| 05/28/2020 | 1242 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 05/28/2020) |
| 05/29/2020 | 1243 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1240 Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 05/29/2020) |
| 05/29/2020 | 1244 | MOTION to Strike *the Second Sentence of Paragraph 119 and all of Paragraph 121 from the Fourth Superseding Indictment* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Sharp, Joshua) (Entered: 05/29/2020) |
| 05/29/2020 | 1245 | MEMORANDUM in Support by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1244 MOTION to Strike *the Second Sentence of Paragraph 119 and all of Paragraph 121 from the Fourth Superseding Indictment* (Sharp, Joshua) (Entered: 05/29/2020) |
| 05/29/2020 | 1246 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Video conference held in open court on 5/29/2020 with the University of Southern California, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Elizabeth Kimmel, William McGlashan Jr., Marci Palatella, John Wilson, Homayoun Zadeh and Robert Zangrillo.<br>The Court advises the parties that any newly−filed discovery motions will go to Judge |

|  |  |  |
|---|---|---|
|  |  | Gorton and may be referred back to Judge Kelley. <br> If defendants intend to file additional discovery motions they should do so as soon as possible. The Court intends to resolve discovery disputes well in advance of trial. If defendants file discovery motions close to the trial date they should be prepared to explain why they did so. <br> Court hears from U.S.C. regarding recently–issued subpoenas. Parties are working toward a resolution in the seven–defendant subpoena. Currently U.S.C. has the Palatella, Wilson, and Kimmel and Zadeh subpoenas outstanding. Court hears from Attorney Loucks about the possibility of consolidating the subpoenas. U.S.C. indicates that it is at different stages of negotiations with the defendants. <br> After hearing from the parties the Court sets the following deadlines. By June 12, 2020, U.S.C. will finish negotiating with defendants regarding the outstanding subpoenas, by July 3, 2020, U.S.C. will file any motions to quash, defendants will respond by July 17, 2020, and U.S.C. may file a reply by July 24, 2020. <br> If a defendant intends to join in another defendant's motion they should file a motion to join on the docket. The Court reminds all parties that if they are filing documents that refer to previously–docketed motions they should put the original document number in the caption. (Attorneys present: Douglas Fuchs, Anthony Fuller, Matthew Coe–Odess for University of Southern California, David Schumacher, Joshua Sharp, David Meier, Ruben Cahn, Cory Flashner, Jack Pirozzolo, Marshall Camp, Michael Loucks, Andrew Tomback, Michael Kendall, Yakov Malkiel, Tracy Miner and Martin Weinberg for the defendants )Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Belmont, Kellyann) (Entered: 05/29/2020) |
| 05/29/2020 | 1247 | Opposition by USA as to Douglas Hodge re 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re–Sentencing on the Remaining Count of Conviction (Attachments: # 1 Exhibit A to VV)(O'Connell, Justin) (Additional attachment(s) added on 6/8/2020: # 2 Sealed exhibits) (Lima, Christine). (Entered: 05/29/2020) |
| 05/29/2020 | 1248 | Non–Party MOTION for Extension of Time and Leave to File a Motion to Quash a Rule 17(c)(1) Subpoena, and Order Granting Access to CM/ECF as to John Wilson by Williams & Olds, CPAs, William Rick Singer. (Attachments: # 1 Notice of Appearance, # 2 Exhibit)(Vieira, Leonardo) (Entered: 06/01/2020) |
| 06/01/2020 | 1249 | NOTICE *Regarding Docket Numbers of Pending Motions and Related Filings* by Robert Zangrillo as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Weinberg, Martin) (Entered: 06/01/2020) |
| 06/01/2020 | 1250 | Judge Nathaniel M. Gorton: ORDER entered: Joint Proposed Schedule is hereby **adopted** as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella re 1180 Status Report filed by Elisabeth Kimmel (Vieira, Leonardo) (Entered: 06/01/2020) |
| 06/01/2020 | 1251 | Judge Nathaniel M. Gorton: ORDER entered: SCHEDULING ORDER as to Gamal Abdelaziz, Diane Blake, Todd Blake, John Wilson, Homayoun Zadeh, Robert Zangrillo. Please see attached order. Discovery to be completed by 7/27/2020. (Vieira, Leonardo) Modified on 6/2/2020 to fix docket text (Vieira, Leonardo). (Entered: 06/01/2020) |
| 06/01/2020 | 1252 | Set/Reset Deadlines as to Gamal Abdelaziz, Diane Blake, Todd Blake, John Wilson, Homayoun Zadeh, Robert Zangrillo: Discovery to be completed by 7/17/2020 Motions in Limine due by 9/9/2020 Exhibit List due by 8/26/2020. Expert Witness List due by 7/27/2020. (Vieira, Leonardo) Modified on 6/2/2020 to fix docket text (Vieira, Leonardo). (Entered: 06/01/2020) |
| 06/01/2020 | 1253 | RESPONSE to Motion by John Wilson re 1248 MOTION for Extension of Time to File Extension of Time and Leave to File a Motion to Quash a Rule 17(c)(1) Subpoena, and Order Granting Access to CM/ECF *(Opposing the Motion in Part)* (Malkiel, Yakov) (Entered: 06/01/2020) |
| 06/02/2020 | 1254 | Assented to MOTION for Leave to File *Reply in Support of His Motion for Relief Pursuant to 28 § U.S.C. 2255 (Dkt. 1143)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 06/02/2020) |
| 06/02/2020 | 1255 | Notice of correction to docket made by Court staff. Correction: documents 1251 and 1252 corrected because: To reflect correct defendants as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William |

| | | McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Vieira, Leonardo) (Entered: 06/02/2020) |
|---|---|---|
| 06/02/2020 | 1256 | Assented to MOTION to Seal *and for a Briefing Schedule* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 06/02/2020) |
| 06/02/2020 | 1257 | MOTION for Leave to Appear Pro Hac Vice by Allison S. Blanco Filing fee $ 100, receipt number 0101−8267028. as to Mossimo Giannulli, Lori Loughlin. (Attachments: # 1 Certification of Allison S. Blanco)(Trach, William) (Entered: 06/02/2020) |
| 06/02/2020 | 1258 | MOTION to Reduce Sentence pursuant to First Step Act as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 06/02/2020) |
| 06/03/2020 | 1260 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1257 Motion for Leave to Appear Pro Hac Vice Added Allison S. Blanco. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Mossimo Giannulli (8), Lori Loughlin (14) (Vieira, Leonardo) (Entered: 06/03/2020) |
| 06/03/2020 | 1261 | Second MOTION to Reduce Sentence */Modify Sentence* as to Michelle Janavs. (Attachments: # 1 Exhibit 1)(Littrell, John) (Entered: 06/03/2020) |
| 06/03/2020 | 1262 | Judge Nathaniel M. Gorton: ORDER entered: re: 1256 Motion to Seal. Motion **ALLOWED;** a hearing will be scheduled if the court determines it to be necessary. Counsel will receive an email within twenty−four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Vieira, Leonardo) Modified on 6/4/2020 to fix docket text (Vieira, Leonardo). (Entered: 06/04/2020) |
| 06/03/2020 | 1263 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1254 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 06/04/2020) |
| 06/04/2020 | 1264 | MEMORANDUM in Support by Elizabeth Henriquez re 1258 MOTION to Reduce Sentence pursuant to First Step Act (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Katz, Aaron) (Additional attachment(s) added on 6/4/2020: # 6 Memorandum In Support, # 8 Exhibit B (SEALED), # 9 Exhibit A (SEALED), # 10 Exhibit C (SEALED), # 11 Exhibit D (SEALED), # 12 Exhibit E (SEALED)) (Vieira, Leonardo). (Entered: 06/04/2020) |
| 06/04/2020 | 1265 | Assented to MOTION for Leave to File *Partially Sealed Assented−To Motion to Modify Her Conditions of Release* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 06/04/2020) |
| 06/05/2020 | 1267 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Homayoun Zadeh 1259 Sealed MOTION filed by Homayoun Zadeh (Lima, Christine) Motions referred to M. Page Kelley. (Entered: 06/05/2020) |
| 06/05/2020 | 1268 | NOTICE OF ATTORNEY APPEARANCE: Donald H. Heller appearing for Interested Party Williams & Olds, CPAs (Heller, Donald) (Entered: 06/05/2020) |
| 06/05/2020 | 1269 | NOTICE OF ATTORNEY APPEARANCE: Donald H. Heller appearing for Interested Party William Rick Singer (Heller, Donald) (Entered: 06/05/2020) |
| 06/05/2020 | 1270 | Opposition by USA as to John Wilson re 1227 MOTION to Compel *(Renewed)* (Attachments: # 1 Exhibit Exhibits)(Rosen, Eric) (Additional attachment(s) added on 6/8/2020: # 2 Sealed exhibits) (Lima, Christine). (Entered: 06/05/2020) |
| 06/05/2020 | 1271 | NOTICE OF ATTORNEY APPEARANCE: Andrew Neil Hartzell appearing for Interested Party Williams & Olds, CPAs (Hartzell, Andrew) (Entered: 06/05/2020) |
| 06/05/2020 | 1272 | NOTICE OF ATTORNEY APPEARANCE: Andrew Neil Hartzell appearing for Interested Party Williams & Olds, CPAs (Hartzell, Andrew) (Entered: 06/05/2020) |
| 06/05/2020 | 1273 | NOTICE OF ATTORNEY APPEARANCE: Andrew Neil Hartzell appearing for Interested Party William Rick Singer (Hartzell, Andrew) (Entered: 06/05/2020) |

**A130**

| 06/05/2020 | 1274 | NOTICE OF ATTORNEY APPEARANCE: Andrew Neil Hartzell appearing for Interested Party William Rick Singer (Hartzell, Andrew) (Entered: 06/05/2020) |
|---|---|---|
| 06/05/2020 | 1275 | MOTION for Leave to Appear Pro Hac Vice by Donald H Heller Filing fee $ 100, receipt number 0101−8273197. as to John Wilson by Williams & Olds, CPAs. (Hartzell, Andrew) (Entered: 06/05/2020) |
| 06/05/2020 | 1276 | MOTION for Leave to Appear Pro Hac Vice by Donald H Heller Filing fee $ 100, receipt number 0101−8273219. as to John Wilson by William Rick Singer. (Hartzell, Andrew) (Entered: 06/05/2020) |
| 06/05/2020 | 1277 | First MOTION to Quash *Rule 17(c)(1) Subpoena* as to John Wilson by Williams & Olds, CPAs. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Heller, Donald) (Entered: 06/05/2020) |
| 06/05/2020 | 1279 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1265 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 06/08/2020) |
| 06/08/2020 | 1278 | MOTION for Leave to File *13−Page Reply in Support of Motion for Relief Pursuant to 28 USC 2255 (Dkt. 1143) (Unopposed)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 06/08/2020) |
| 06/08/2020 | 1280 | Assented to MOTION for Leave to File Excess Pages *and to Partially Seal Government's Opposition and for Additional Time to Respond* as to Elizabeth Henriquez, Michelle Janavs by USA. (Kearney, Kristen) (Entered: 06/08/2020) |
| 06/08/2020 | 1281 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 1278 Motion for Leave to File 13−Page Reply in Support of Motion for Relief Pursuant to 28 USC 2255 (Dkt. 1143) (Unopposed); Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Lima, Christine) (Entered: 06/08/2020) |
| 06/08/2020 | 1283 | Assented to MOTION to Modify Conditions of Release *Filed Partially Under Seal* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 06/08/2020) |
| 06/08/2020 | 1284 | Assented to MOTION to Modify Conditions of Release *Filed Partially Under Seal (CORRECTED MOTION)* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 06/08/2020) |
| 06/08/2020 | 1285 | REPLY TO RESPONSE re: 1143 MOTION Pursuant to 28 U.S.C. § 2255 to Set Aside His Plea, in Part, and for Re−Sentencing on the Remaining Count of Conviction (Attachments: # 1 Exhibit A, Declaration of Douglas Hodge in Support, # 2 Exhibit B, Declaration of Brein T. O'Connor in Support)(O'Connor, Brien) Modified on 6/10/2020 to fix docket text (Vieira, Leonardo). Modified on 6/10/2020 to fix entry relationship (Vieira, Leonardo). (Entered: 06/08/2020) |
| 06/08/2020 | 1286 | Opposition by USA as to Elizabeth Henriquez, Michelle Janavs re 1258 MOTION to Reduce Sentence pursuant to First Step Act , 1261 Second MOTION to Reduce Sentence *Modify Sentence (Redacted)* (Kearney, Kristen) (Additional attachment(s) added on 6/9/2020: # 1 Sealed opposition) (Lima, Christine). (Entered: 06/08/2020) |
| 06/09/2020 | 1287 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 1280 Motion for Leave to File Under Seal as to Elizabeth Henriquez (9), Michelle Janavs (12). Please note: the request for extra pages and for an extension of time to 6/9/30 to file are moot (Lima, Christine) (Entered: 06/09/2020) |
| 06/09/2020 | 1288 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 1248 Motion for Extension of Time and Leave to File a Motion to Quash a Rule 17(c)(1) Subpoena, and Order Granting Access to CM/ECF as to John Wilson as to John Wilson (17) (Lima, Christine) (Entered: 06/09/2020) |
| 06/09/2020 | 1290 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 1283 Motion to Modify Conditions of Release as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 06/09/2020) |

| 06/09/2020 | 1291 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1284 Motion to Modify Conditions of Release as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 06/09/2020) |
| 06/09/2020 | 1292 | MOTION for Leave to File *Reply Brief in Support of Renewed Motion to Compel* as to John Wilson. (Attachments: # 1 Proposed Reply Brief)(Malkiel, Yakov) (Entered: 06/09/2020) |
| 06/09/2020 | 1293 | MOTION to Seal *Portions of His Forthcoming Motion to Modify His Sentence or for Immediate Self–Surrender (Unopposed)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 06/09/2020) |
| 06/10/2020 | 1294 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. **ALLOWING** 1293 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 06/10/2020) |
| 06/10/2020 | 1295 | Opposition by John Wilson re 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena* (Malkiel, Yakov) (Entered: 06/10/2020) |
| 06/10/2020 | 1296 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to John Wilson 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena* filed by Williams & Olds, CPAs (Lima, Christine) Motions referred to M. Page Kelley. (Entered: 06/10/2020) |
| 06/11/2020 | 1298 | Judge Nathaniel M. Gorton: ORDER entered: re: 1261 Motion to Reduce Sentence as to Michelle Janavs (12). Upon consideration of defendants' motion, the Court takes judicial notice that, although the current public health crisis is not ended, it has abated and will likely continue to abate over the next few months. If defendant, Janavs, prefers to postpone her report date until August 31, 2020, the Court will so order but will not convert the sentence imposed to home confinement. Counsel shall notify the Court on or before June 18, 2020 of defendants' preference. Motion **DENIED.** (Vieira, Leonardo) (Entered: 06/11/2020) |
| 06/11/2020 | 1299 | Judge Nathaniel M. Gorton: ORDER entered: **DENYING** 1258 Motion to Reduce Sentence as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 06/11/2020) |
| 06/11/2020 | 1301 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1292 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 06/12/2020) |
| 06/12/2020 | 1302 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 1275 Motion for Leave to Appear Pro Hac Vice Added Donald H. Heller. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to John Wilson (17) (Vieira, Leonardo) (Entered: 06/12/2020) |
| 06/12/2020 | 1303 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 1276 Motion for Leave to Appear Pro Hac Vice Added Donald H. Heller. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to John Wilson (17) (Vieira, Leonardo) (Entered: 06/12/2020) |
| 06/12/2020 | 1304 | Opposition by USA as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1244 MOTION to Strike *the Second Sentence of Paragraph 119 and all of Paragraph 121 from the Fourth Superseding Indictment* (Wright, Leslie) (Entered: 06/12/2020) |
| 06/15/2020 | 1306 | Notice of correction to docket made by Court staff. Correction: Document No. 1251 corrected because: To correct the date for the due date for filing of Government's Exhibit/Witness lists to Wednesday, July 29, 2020 as to Gamal Abdelaziz, Diane Blake, Todd Blake, John Wilson, Homayoun Zadeh, Robert Zangrillo (Lima, Christine) (Entered: 06/15/2020) |

| 06/16/2020 | 1309 | Assented to MOTION for Leave to File *Under Seal (Medical Information)* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 06/16/2020) |
|---|---|---|
| 06/16/2020 | 1310 | REPLY TO RESPONSE to Motion by John Wilson re 1227 MOTION to Compel *(Renewed) (Leave to file granted on June 12, 2020)* (Malkiel, Yakov) (Entered: 06/16/2020) |
| 06/17/2020 | 1316 | First MOTION for Leave to File *Reply Brief* as to John Wilson by William Rick Singer. (Attachments: # 1 Exhibit Proposed Reply Brief)(Heller, Donald) (Entered: 06/17/2020) |
| 06/17/2020 | 1317 | First MOTION for Leave to File *Reply Brief* as to John Wilson by Williams & Olds, CPAs. (Attachments: # 1 Exhibit Proposed Reply Brief)(Heller, Donald) (Entered: 06/17/2020) |
| 06/17/2020 | 1318 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1309 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 06/17/2020) |
| 06/17/2020 | 1319 | APPENDIX/EXHIBIT by William Rick Singer as to John Wilson (Heller, Donald) (Entered: 06/17/2020) |
| 06/17/2020 | 1320 | MOTION for Reconsideration re 1258 MOTION to Reduce Sentence pursuant to First Step Act filed by Elizabeth Henriquez, 1299 Order on Motion to Reduce Sentence as to Elizabeth Henriquez. (Attachments: # 1 Exhibit)(Katz, Aaron) (Additional attachment(s) added on 6/18/2020: # 2 Sealed Motion, # 3 Exhibit A (sealed), # 4 Exhibit B (sealed)) (Lima, Christine). (Entered: 06/17/2020) |
| 06/18/2020 | 1321 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1316 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17); granting 1317 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Belmont, Kellyann) (Entered: 06/18/2020) |
| 06/18/2020 | 1322 | First REPLY TO RESPONSE to Motion by Williams & Olds, CPAs, William Rick Singer as to John Wilson re 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena Leave to file granted on June 18, 2020* (Attachments: # 1 Exhibit Exhibit A)(Heller, Donald) (Entered: 06/18/2020) |
| 06/18/2020 | 1323 | Assented to MOTION to Conduct Sentencing by Video Conference as to David Sidoo. (Weinberg, Martin) (Entered: 06/18/2020) |
| 06/18/2020 | 1325 | MOTION to Withdraw as Attorney by Sara Winik as to Robert Zangrillo. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Weinberg, Martin) (Entered: 06/18/2020) |
| 06/19/2020 | 1326 | MOTION for Leave to File *Two−Page Reply In Support of Motion to Strike* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Attachments: # 1 Exhibit Proposed Two−Page Reply)(Sharp, Joshua) (Entered: 06/19/2020) |
| 06/19/2020 | 1328 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1325 Motion to Withdraw as Attorney Attorney Sara K Winik terminated as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 06/22/2020) |
| 06/19/2020 | 1329 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1323 Motion as to David Sidoo (1) (Vieira, Leonardo) (Entered: 06/22/2020) |
| 06/22/2020 | 1330 | Assented to MOTION to Seal *Portions of Government's Opposition to Motion for Reconsideration* as to Elizabeth Henriquez by USA. (Kearney, Kristen) (Entered: 06/22/2020) |
| 06/23/2020 | 1331 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1326 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF |

| | | |
|---|---|---|
| | | Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Elisabeth Kimmel (13), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 06/23/2020) |
| 06/23/2020 | 1333 | REPLY TO RESPONSE to Motion by Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1244 MOTION to Strike *the Second Sentence of Paragraph 119 and all of Paragraph 121 from the Fourth Superseding Indictment* (Sharp, Joshua) (Entered: 06/23/2020) |
| 06/23/2020 | 1334 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, the following motions of the defendants to dismiss the indictment (Docket Nos. 34 , 1021 , 1023 , 1026 , 1031 , 1035 , 1037 , 1039 and 1041 ) are **DENIED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 06/23/2020) |
| 06/23/2020 | 1335 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1330 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 06/23/2020) |
| 06/23/2020 | 1336 | Opposition by USA as to Elizabeth Henriquez re 1320 MOTION for Reconsideration re 1258 MOTION to Reduce Sentence pursuant to First Step Act filed by Elizabeth Henriquez, 1299 Order on Motion to Reduce Sentence *(Redacted)* (Kearney, Kristen) (Entered: 06/23/2020) |
| 06/24/2020 | 1338 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: In accordance with the foregoing, motions of the defendants (1) to Suppress Title III Interceptions (Docket No. 1015 ), (2) to Suppress Evidence Derived from Four Wiretaps (Docket No. 1024 ) and (3) for a Franks Hearing (Docket Nos. 1015 and 1024 ) are **DENIED.**<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 06/24/2020) |
| 06/24/2020 | 1339 | Assented to MOTION for Extension of Time to July 24, 2020 to File Notice of Appeal *of Order Denying Motion to Modify Sentence* as to Michelle Janavs. (Littrell, John) (Entered: 06/24/2020) |
| 06/24/2020 | 1340 | Assented to MOTION to Continue *Sentencing Date* as to Manuel Henriquez. (Linsenmayer, Robin) (Entered: 06/24/2020) |
| 06/25/2020 | 1342 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1339 Motion for Extension of Time to File as to Michelle Janavs (12) (Vieira, Leonardo) (Entered: 06/25/2020) |
| 06/25/2020 | 1343 | Judge Nathaniel M. Gorton: ORDER entered. re: 1340 Motion to Continue as to Manuel Henriquez (10). Motion **ALLOWED;** sentencing is rescheduled for Wednesday, July 29, 2020 at 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 06/25/2020) |
| 06/26/2020 | 1346 | MOTION to Compel *the Production of Documents by USC in Response to Rule 17(c) Subpoena* as to Gamal Abdelaziz, Diane Blake, Todd Blake, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Attachments: # 1 Exhibit A)(Wright, Leslie) (Entered: 06/26/2020) |
| 06/30/2020 | 1350 | ELECTRONIC NOTICE as to John Wilson, Resetting Hearing on Motion 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena* : Motion Hearing set for 7/10/2020 03:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley.<br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: www.forms.mad.uscourts.gov/courtlist.html. |

| | | |
|---|---|---|
| | | For questio ns regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. (Belmont, Kellyann) (Entered: 06/30/2020) |
| 07/01/2020 | 1353 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Elisabeth Kimmel 1346 MOTION to Compel *the Production of Documents by USC in Response to Rule 17(c) Subpoena* filed by USA (Lima, Christine) Motions referred to M. Page Kelley. (Entered: 07/01/2020) |
| 07/01/2020 | 1354 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: In accordance with the foregoing, petitioner's motion (1) for a resentencing, and (2) to vacate his plea to the money laundering charge pursuant to 28 U.S.C. § 2255 (Docket No. 1143 ) is **DENIED** and his petition is **DISMISSED.**<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 07/02/2020) |
| 07/02/2020 | 1355 | Assented to MOTION for Leave to File *Motion to Quash and Memorandum in Support Under Seal* as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 07/02/2020) |
| 07/02/2020 | 1356 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1355 Assented to MOTION for Leave to File Motion to Quash and Memorandum in Support Under Seal as to John Wilson by University of Southern California. (Belmont, Kellyann) (Entered: 07/02/2020) |
| 07/02/2020 | 1359 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: In accordance with the foregoing, defendant Wilson's Renewed Motion to Compel the Production of Exculpatory Evidence (Docket No. 1227 ) is **ALLOWED** to the extent that the government is directed to confirm that it has reviewed its records and has produced all Brady material with respect to the subject events but is otherwise **DENIED.** Defendant Wilson's Motion for Reconsideration Regarding the Applicability of The Court's May 8, 2020 Order to Defendant John Wilson (Docket No. 1184 ) is **DENIED.**<br><br>**So Ordered.** (Vieira, Leonardo) (Entered: 07/06/2020) |
| 07/03/2020 | 1357 | SEALED MOTION to Quash as to John Wilson by University of Southern California. (Belmont, Kellyann) (Entered: 07/06/2020) |
| 07/03/2020 | 1358 | SEALED MEMORANDUM in Support by University of Southern California as to John Wilson re 1357 SEALED MOTION to Quash (Belmont, Kellyann) (Entered: 07/06/2020) |
| 07/06/2020 | 1360 | Assented to MOTION for Return of Passport Upon Release as to Michelle Janavs. (Littrell, John) (Entered: 07/06/2020) |
| 07/06/2020 | 1361 | MOTION for Leave to File *Ex Parte and Under Seal Exhibits to Opposition to Government's Motion to Compel, ECF No. 1346 (Unopposed)* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/06/2020) |
| 07/07/2020 | 1362 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1361 MOTION for Leave to File Ex Parte and Under Seal Exhibits to Opposition to Government's Motion to Compel, ECF No. 1346 (Unopposed) as to Elisabeth Kimmel (Belmont, Kellyann) (Entered: 07/07/2020) |
| 07/07/2020 | 1363 | ELECTRONIC NOTICE as to John Wilson, Resetting Hearing on Motion 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena* : Motion Hearing by video reset for 7/21/2020 03:00 PM in Courtroom 24 before Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 07/07/2020) |
| 07/08/2020 | 1366 | MOTION for Extension of Time to August 17, 2020 to File Notice of Appeal *(Unopposed)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 07/08/2020) |
| 07/09/2020 | 1367 | Assented to MOTION for Leave to File *Sentencing Memorandum Partially Under Seal* as to David Sidoo. (Weinberg, Martin) (Entered: 07/09/2020) |
| 07/09/2020 | 1368 | Assented to MOTION to Seal *Opposition Brief (To USC's Motion To Quash)* as to John Wilson. (Kendall, Michael) (Entered: 07/09/2020) |

| | | |
|---|---|---|
| 07/09/2020 | 1369 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1366 Motion for Extension of Time to File as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 07/10/2020) |
| 07/10/2020 | 1370 | ELECTRONIC NOTICE OF RESCHEDULING (AS TO TIME ONLY) as to David Sidoo<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notic es available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Sentencing set for 7/15/2020 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. PLEASE NOTE – CHANGE IS A TO TIME ONLY. (Lima, Christine) (Entered: 07/10/2020) |
| 07/10/2020 | 1371 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1367 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to David Sidoo (1) (Vieira, Leonardo) (Entered: 07/10/2020) |
| 07/10/2020 | 1372 | SENTENCING MEMORANDUM by David Sidoo (Attachments: # 1 Exhibits to Sentencing Memorandum)(Weinberg, Martin) (Entered: 07/10/2020) |
| 07/10/2020 | 1373 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: The motions of Defendant Zangrillo to Dismiss Counts One and Four (Docket No. 1043 ) and to Strike the Class–Taking Allegations (Docket No. 1045 ) are **DENIED.** The alternative request of defendant Zangrillo to sever his trial is also **DENIED.**<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 07/10/2020) |
| 07/10/2020 | 1374 | Opposition by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh re 1346 MOTION to Compel *the Production of Documents by USC in Response to Rule 17(c) Subpoena* (Flashner, Cory) (Entered: 07/10/2020) |
| 07/10/2020 | 1375 | Sealed Ex parte declarations re 1374 Opposition by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh re 1346 MOTION to Compel the Production of Documents by USC in Response to Rule 17(c) Subpoena (Attachments: # 1 Declaration)(Belmont, Kellyann) (Entered: 07/10/2020) |
| 07/10/2020 | 1377 | SENTENCING MEMORANDUM by USA as to David Sidoo (O'Connell, Justin) (Entered: 07/10/2020) |
| 07/10/2020 | 1378 | PLEA AGREEMENT as to Diane Blake (Wright, Leslie) (Entered: 07/10/2020) |
| 07/10/2020 | 1379 | PLEA AGREEMENT as to Todd Blake (Wright, Leslie) (Entered: 07/10/2020) |
| 07/10/2020 | 1380 | ELECTRONIC NOTICE OF HEARING as to Diane Blake, Todd Blake<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices availabl e on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Rule 11 Hearing set for 7/14/2020 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. |

| | | Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi-interview-schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 07/10/2020) |
|---|---|---|
| 07/13/2020 | 1382 | APPENDIX/EXHIBIT by David Sidoo 1372 Sentencing Memorandum filed by David Sidoo (Attachments: # 1 Supplemental Exhibit 1 and 2)(Weinberg, Martin) (Entered: 07/13/2020) |
| 07/13/2020 | 1383 | Assented to MOTION to Modify Conditions of Release as to Mossimo Giannulli, Lori Loughlin. (Trach, William) (Entered: 07/13/2020) |
| 07/14/2020 | 1386 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1383 Motion to Modify Conditions of Release as to Mossimo Giannulli (8), Lori Loughlin (14) (Vieira, Leonardo) (Entered: 07/14/2020) |
| 07/14/2020 | 1387 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1360 Motion as to Michelle Janavs (12) (Vieira, Leonardo) (Entered: 07/14/2020) |
| 07/14/2020 | 1392 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Diane Blake, Todd Blake held by video on 7/14/2020. Defendants sworn. Court has colloquy with Defendant Todd Blake re: name, age, educational background, state of mind, charges. Court has colloquy with Defendant Diane Blake re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for Defendant Todd Blake. Government outlines the provisions of the written plea agreement for Defendant Diane Blake. Government informs Defendant Todd Blake of the maximum possible penalties; no mandatory minimums. Government informs Defendant Diane Blake of the maximum possible penalties; no mandatory minimums. Government informs the Defendants of the facts it would prove if this matter were to go to trial. Plea entered by Diane Blake (5) Guilty Count 1ss and Todd Blake (6) Guilty Count 1ss,3ss. Sentencing as to Defendant Diane Blake set for 11/17/2020 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Sentencing as to Defendant Todd Blake set for 11/17/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendants released on all previously imposed conditions as restated in Court. (Attorneys present: Sutro, Meir, Wright. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 07/16/2020) |
| 07/15/2020 | 1388 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1368 Assented to MOTION to Seal Opposition Brief (To USC's Motion To Quash) as to John Wilson. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Belmont, Kellyann) (Entered: 07/15/2020) |
| 07/15/2020 | 1401 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 7/15/2020 for David Sidoo (1). Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Count(s) 1ssss, Defendant sentenced to a term of 90 days imprisonment to be followed by a term of 1 year Supervised Release; $250,000.00 fine; $100 Special Assessment; Count(s) 2ss, 3sss, 3ssss, Dismissed on government motion. Defendant informed of any rights to appeal. Defendant to self–surrender at the institution designated by the Bureau of Prisons before 2:00 PM on 9/23/20. (Attorneys present: Chesnoff, Weinberg, Schonfeld, O'Connell, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 07/17/2020) |
| 07/16/2020 | 1393 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Diane Blake Sentencing set for 11/17/2020 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 07/16/2020) |
| 07/16/2020 | 1394 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Todd Blake Sentencing set for 11/17/2020 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 07/16/2020) |
| 07/16/2020 | 1395 | Assented to MOTION to Continue *October 2020 Trial* to late February 2021 as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, |

| | | |
|---|---|---|
| | | John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Bell, Karin) (Entered: 07/16/2020) |
| 07/16/2020 | 1396 | Transcript of Rule 11 Hearing via Zoom as to Diane Blake, Todd Blake held on July 14, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/6/2020. Redacted Transcript Deadline set for 8/17/2020. Release of Transcript Restriction set for 10/14/2020. (Scalfani, Deborah) (Entered: 07/16/2020) |
| 07/16/2020 | 1397 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Scalfani, Deborah) (Entered: 07/16/2020) |
| 07/16/2020 | 1398 | Letter (non−motion) regarding discovery as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Bell, Karin) (Entered: 07/16/2020) |
| 07/16/2020 | 1399 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, defendants motions to dismiss the indictment for improper venue (Docket No. 1019 ) is **DENIED.**<br><br>**So ordered.** (Vieira, Leonardo) (Entered: 07/16/2020) |
| 07/16/2020 | 1400 | SEALED Opposition by John Wilson re 1357 SEALED MOTION to Quash. (Vieira, Leonardo) (Entered: 07/17/2020) |
| 07/16/2020 | 1402 | Judge Nathaniel M. Gorton: ORDER entered. **CORRECTED** MEMORANDUM AND ORDER: For the foregoing reasons, defendant's motions to dismiss the indictment for improper venue (Docket No. 1019 ) is **DENIED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 07/17/2020) |
| 07/17/2020 | 1403 | Assented to MOTION for Leave to File *Reply in Support of Motion to Compel the Production of Documents by USC* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh by USA. (Attachments: # 1 Exhibit A − Government's Proposed Reply)(Wright, Leslie) (Entered: 07/17/2020) |
| 07/17/2020 | 1404 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1403 Assented to MOTION for Leave to File Reply in Support of Motion to Compel the Production of Documents by USC by USA as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18) ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (Belmont, Kellyann) (Entered: 07/17/2020) |
| 07/17/2020 | 1407 | REPLY TO RESPONSE to Motion by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh re 1346 MOTION to Compel *the Production of Documents by USC in Response to Rule 17(c) Subpoena* (Wright, Leslie) (Entered: 07/17/2020) |
| 07/21/2020 | 1409 | Electronic Clerk's Notes for proceedings held before Magistrate Judge M. Page Kelley: Motion Hearing as to John Wilson held via video on 7/21/2020 re 1277 First MOTION to Quash *Rule 17(c)(1) Subpoena* filed by Williams & Olds, CPAs. Hearing held in open Court. Court hears from the parties. The court finds that the subpoena is overbroad and the motion to quash is allowed in part and denied in part. The court goes over certain categories of documents that Mr. Wilson may subpoena from Williams and Olds. The parties agree to confer, and Williams and Olds will provide documents certified by employees of Williams and Olds. The documents provided shall not include documents that have already been provided to the government in connection with this case. If the parties cannot reach agreement the court will hold a further hearing. (Attorneys present: Michael Kendall, Andrew Tomback, Andrew Neil Hartell and Donald Heller. )Court Reporter Name and |

| | | Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Belmont, Kellyann) (Entered: 07/21/2020) |
|---|---|---|
| 07/21/2020 | 1410 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to David Sidoo (1), Count(s) 1ssss, Defendant sentenced to a term of 90 days imprisonment to be followed by a term of 1 year Supervised Release; $250,000.00 fine; $100 Special Assessment; Count(s) 2ss, 3sss, 3ssss, Dismissed on government motion (Lima, Christine) (Entered: 07/22/2020) |
| 07/22/2020 | 1412 | Transcript of Sentencing via Zoom as to David Sidoo held on July 15, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/12/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/20/2020. (Scalfani, Deborah) (Entered: 07/22/2020) |
| 07/22/2020 | 1413 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 07/22/2020) |
| 07/22/2020 | 1414 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, defendants' motion to sever (Docket No. 1033 ) is **DENIED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 07/22/2020) |
| 07/22/2020 | 1415 | MOTION for Leave to File *(Douglas Hodge's Unopposed Motion for Leave to File Under Seal Portions of His Forthcoming Motion Pursuant to 18 U.S.C. § 3582(c) for a Modification of His Sentence)* as to Douglas Hodge. (O'Connor, Brien) (Entered: 07/22/2020) |
| 07/22/2020 | 1416 | SENTENCING MEMORANDUM by Manuel Henriquez (Attachments: # 1 Appendix of Exhibits (Redacted Version))(Haag, Melinda) (Entered: 07/22/2020) |
| 07/22/2020 | 1418 | SENTENCING MEMORANDUM by USA as to Manuel Henriquez (Rosen, Eric) (Entered: 07/22/2020) |
| 07/23/2020 | 1419 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1415 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 07/23/2020) |
| 07/23/2020 | 1420 | Appearance Bond Entered as to Lori Loughlin in amount of $ $100,00.00, (Lima, Christine) (Entered: 07/23/2020) |
| 07/23/2020 | 1421 | Appearance Bond Entered as to Mossimo Giannulli in amount of $ $100,00.00, (Lima, Christine) (Entered: 07/23/2020) |
| 07/23/2020 | 1422 | NOTICE as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: This case has heretofore been captioned United States v. David Sidoo et. al because defendant David Sidoo was the first individual indicted and his name was listed first on the Superseding Indictments. Because Mr. Sidoo has pled guilty and been sentenced, henceforth this case will be captioned United States v. Gregory Colburn et. al because Mr. Colburn is listed as the second defendant on the Fourth Superseding Indictment. (Lima, Christine) (Entered: 07/23/2020) |
| 07/23/2020 | 1423 | ELECTRONIC NOTICE CANCELING HEARING OR OTHER DEADLINE as to Gamal Abdelaziz, Diane Blake, Todd Blake, Mossimo Giannulli, Lori Loughlin, John Wilson, Homayoun Zadeh, Robert Zangrillo. Hearing canceled: Status Conference scheduled for 7/28/20 (Lima, Christine) (Entered: 07/23/2020) |
| 07/23/2020 | 1426 | MOTION for Leave to Appear Pro Hac Vice by Brittani A. Jackson Filing fee $ 100, receipt number 0101–8342171. as to William McGlashan, Jr. (Attachments: # 1 Certification of |

| | | |
|---|---|---|
| | | Brittani A. Jackson)(Pirozzolo, Jack) (Entered: 07/23/2020) |
| 07/23/2020 | 1427 | Transcript of Motion Hearing via Zoom as to John Wilson held on July 21, 2020, before Chief Magistrate Judge M. Page Kelley. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/13/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/21/2020. (Scalfani, Deborah) (Entered: 07/23/2020) |
| 07/23/2020 | 1428 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 07/23/2020) |
| 07/24/2020 | 1429 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. **ALLOWING** 1426 Motion for Leave to Appear Pro Hac Vice Added Brittani A. Jackson. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to William McGlashan Jr. (15) (Vieira, Leonardo) (Entered: 07/24/2020) |
| 07/24/2020 | 1430 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, defendants' motion to strike the second sentence of paragraph 119 and all of paragraph 121 (Docket No. 1244 ) is **DENIED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 07/24/2020) |
| 07/24/2020 | 1431 | SEALED REPLY in support of Motion by University of Southern California as to John Wilson re 1357 SEALED MOTION to Quash (Belmont, Kellyann) (Entered: 07/27/2020) |
| 07/27/2020 | 1432 | ELECTRONIC NOTICE OF HEARING as to Manuel Henriquez<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Sentencing set for 7/29/2020 02:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. NOTE – DATE AND TIME REMAIN UNCHANGED. THIS NOTICE IS TO INDICATE THAT THE HEARING WILL BE HELD BY VIDEO. (Lima, Christine) (Entered: 07/27/2020) |
| 07/27/2020 | 1434 | MOTION Pursuant to 18 U.S.C. § 3582(c) for a Modification of His Sentence as to Douglas Hodge. (O'Connor, Brien) (Entered: 07/27/2020) |
| 07/27/2020 | 1435 | MEMORANDUM in Support by Douglas Hodge re 1434 MOTION Pursuant to 18 U.S.C. § 3582(c) for a Modification of His Sentence *(Redacted)* (Attachments: # 1 Exhibit A – Filed Under Seal, # 2 Exhibit B – Filed Under Seal, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(O'Connor, Brien) (Additional attachment(s) added on 7/28/2020: # 6 Sealed Memorandum, # 7 A (sealed), # 8 B (sealed)) (Lima, Christine). (Entered: 07/27/2020) |
| 07/28/2020 | 1437 | MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal as to John Wilson. (Malkiel, Yakov) (Entered: 07/28/2020) |
| 07/28/2020 | 1438 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: In accordance with the foregoing, the motions of defendant John Wilson (1) to sever Wilson's trial from those of his co–defendants (Docket No. 992 ), (2) to dismiss the Substantive Counts (Docket No. 993 ), and (3) to strike the allegations concerning the 2018 Conduct as described in the Indictment (Docket No. 994 ) are **DENIED.** |

| | | |
|---|---|---|
| | | **So ordered.** (Vieira, Leonardo) Modified on 7/29/2020 to fix docket text (Vieira, Leonardo). (Entered: 07/28/2020) |
| 07/29/2020 | 1439 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 7/29/2020 for Manuel Henriquez (10), Count(s) 1, 2. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant is sentenced to a term of 6 months imprisonment, which term consists of terms of 6 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $200,000 fine, which consists of fines of $100,000 on each count; $200 Special Assessment. Defendant informed of right to appeal. Defendant to self–surrender at the facility designated by the Bureau of Prisons before 2:00 PM on 2/24/21. (Attorneys present: Haag, Brown, Rosen, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 07/30/2020) |
| 07/30/2020 | 1441 | Assented to MOTION for Leave to File *Sealed Sur–Reply (to USC's Motion to Quash)* as to John Wilson. (Malkiel, Yakov) (Entered: 07/30/2020) |
| 08/03/2020 | 1443 | Assented to MOTION to Seal *Portions of the Governments Opposition to Defendant Douglas Hodges Motion for a Modification of His Sentence* as to Douglas Hodge by USA. (O'Connell, Justin) (Entered: 08/03/2020) |
| 08/03/2020 | 1444 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1443 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Lima, Christine) (Entered: 08/03/2020) |
| 08/03/2020 | 1446 | Opposition by USA as to Douglas Hodge re 1434 MOTION Pursuant to 18 U.S.C. § 3582(c) for a Modification of His Sentence (Attachments: # 1 Affidavit of Robert Schreffler)(Kearney, Kristen) (Additional attachment(s) added on 8/4/2020: # 2 Government's Opposition) (Vieira, Leonardo). (Entered: 08/03/2020) |
| 08/04/2020 | 1447 | MEMORANDUM in Opposition by USA as to John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Rosen, Eric) (Entered: 08/04/2020) |
| 08/04/2020 | 1448 | MOTION for Leave to File *Reply in Support of Motion Pursuant to 18 USC 3582(c) for a Modification of Sentence (Unopposed)* as to Douglas Hodge. (Attachments: # 1 Exhibit A, Proposed Reply Memorandum)(O'Connor, Brien) (Entered: 08/04/2020) |
| 08/04/2020 | 1449 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Manuel Henriquez (10), Count(s) 1, 2, Defendant is sentenced to a term of 6 months imprisonment, which term consists of terms of 6 months on Counts 1ss and 2ss, to be served concurrently; 2 years Supervised Release, which term consists of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $200,000 fine, which consists of fines of $100,000 on each count; $200 Special Assessment (Lima, Christine) (Entered: 08/05/2020) |
| 08/05/2020 | 1451 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1448 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 08/05/2020) |
| 08/05/2020 | 1452 | REPLY TO RESPONSE to Motion by Douglas Hodge re 1434 MOTION Pursuant to 18 U.S.C. § 3582(c) for a Modification of His Sentence (O'Connor, Brien) (Entered: 08/05/2020) |
| 08/06/2020 | 1454 | Judge Nathaniel M. Gorton: ORDER entered: re: 1395 Motion to Continue as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19). Motion **ALLOWED;** the trial in this case is re–scheduled to |

| | | |
|---|---|---|
| | | commence on Monday, February 22, 2021, at 9:00AM. |
| | | Jury Trial set for 2/22/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 08/06/2020) |
| 08/06/2020 | 1463 | Non–Party Educational Testing Service's Responses and Objections to Defendants' Subpoena to Produce Documents, Information, or Objections (Attachments: # 1 Cover Letter)(Vieira, Leonardo) (Entered: 08/18/2020) |
| 08/07/2020 | | Terminate Hearings as to Gamal Abdelaziz, John Wilson, Homayoun Zadeh, Robert Zangrillo: Final Pretrial Conference set for 9/22/20 and Jury selection set for 9/29/20. (Lima, Christine) (Entered: 08/07/2020) |
| 08/11/2020 | 1457 | MOTION for Leave to File *Reply in Support of Motion to File Ex Parte and Under Seal* as to John Wilson. (Attachments: # 1 Proposed Reply)(Malkiel, Yakov) (Entered: 08/11/2020) |
| 08/17/2020 | 1459 | NOTICE OF APPEAL by Douglas Hodge re 1354 Memorandum & Order,. Filing fee: $ 505, receipt number 0101–8376235 (Fee Status: Filing Fee paid). NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/8/2020. (O'Connor, Brien) **(Entered: 08/17/2020)** |
| 08/17/2020 | 1460 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Douglas Hodge to US Court of Appeals re 1459 Notice of Appeal. (Paine, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 1461 | SENTENCING MEMORANDUM by USA as to Mossimo Giannulli, Lori Loughlin (O'Connell, Justin) (Entered: 08/17/2020) |
| 08/17/2020 | 1462 | Case as to Mossimo Giannulli, Lori Loughlin no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 08/17/2020) |
| 08/18/2020 | 1464 | SATISFACTION OF JUDGMENT as to Elizabeth Henriquez (Head, Carol) (Entered: 08/18/2020) |
| 08/19/2020 | 1465 | SATISFACTION OF JUDGMENT as to Manuel Henriquez (Head, Carol) (Entered: 08/19/2020) |
| 08/21/2020 | 1466 | USCA Case Number as to Douglas Hodge 20–1823 for 1459 Notice of Appeal. (Paine, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 1467 | MOTION for Clarification *or, in the Alternative, Issuance of a Certificate of Appealability* as to Douglas Hodge. (Attachments: # 1 Text of Proposed Order)(O'Connor, Brien) (Entered: 08/21/2020) |
| 08/21/2020 | 1468 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 8/21/2020 for Mossimo Giannulli (8), Count(s) 1ss. Court accepts the C Plea. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 5 months imprisonment to be followed by a term of Supervised Release of 2 years; $250,000.00 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion; Count(s) 3ss, Dismissed on Government motion. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 11/19/2020. (Attorneys present: Kierney, Berkowitz, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 08/24/2020) |
| 08/21/2020 | 1469 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 8/21/2020 for Lori Loughlin (14), Count(s) 1ss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court accepts the C–plea. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 2 months imprisonment to be followed by a term of 2 years of Supervised Release; $150,000.00 Fine; $100 Special Assessment; Count(s) 2ss, 3ss, Dismissed on Government Motion. Defendant informed of |

| | | |
|---|---|---|
| | | right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 11/19/2020. (Attorneys present: Trach, O'Connell, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 08/24/2020) |
| 09/03/2020 | 1471 | MOTION to Reduce Sentence *ELIZABETH HENRIQUEZS MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 09/03/2020) |
| 09/03/2020 | 1472 | MEMORANDUM in Support by Elizabeth Henriquez re 1471 MOTION to Reduce Sentence *ELIZABETH HENRIQUEZS MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)* (Katz, Aaron) (Entered: 09/03/2020) |
| 09/04/2020 | 1475 | Opposition by USA as to Douglas Hodge re 1467 MOTION for Clarification *or, in the Alternative, Issuance of a Certificate of Appealability* (Kearney, Kristen) (Entered: 09/04/2020) |
| 09/04/2020 | 1476 | NOTICE OF ATTORNEY APPEARANCE: Mathilda McGee–Tubb appearing for Elisabeth Kimmel. Type of Appearance: Retained. (McGee–Tubb, Mathilda) (Entered: 09/04/2020) |
| 09/04/2020 | 1477 | NOTICE OF ATTORNEY APPEARANCE: Peter Charles Mulcahy appearing for Elisabeth Kimmel. Type of Appearance: Retained. (Mulcahy, Peter) (Entered: 09/04/2020) |
| 09/08/2020 | 1482 | Assented to MOTION to Seal *Portions of Government's Opposition and Exhibits to Motion to Modify Sentence* as to Elizabeth Henriquez by USA. (Kearney, Kristen) (Entered: 09/08/2020) |
| 09/08/2020 | 1483 | MOTION for Leave to File *a Reply in Support of Motion for Clarification or, in the Alternative, Issuance of a Certificate of Appealability (Dkt. 1467) (Unopposed)* as to Douglas Hodge. (Attachments: # 1 Exhibit A, Reply Memorandum in Support of Motion for Clarification or, in the Alternative, Issuance of a Certificate of Appealability)(O'Connor, Brien) (Entered: 09/08/2020) |
| 09/08/2020 | 1484 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1482 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Lima, Christine) (Entered: 09/08/2020) |
| 09/08/2020 | 1485 | Opposition by USA as to Elizabeth Henriquez re 1471 MOTION to Reduce Sentence *ELIZABETH HENRIQUEZS MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)* (Attachments: # 1 Exhibit A through F)(Kearney, Kristen) (Entered: 09/08/2020) |
| 09/08/2020 | 1486 | Opposition by USA as to Elizabeth Henriquez re 1471 MOTION to Reduce Sentence *ELIZABETH HENRIQUEZ MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)*, filed under seal. (Attachments: # 1 Exhibit)(Lima, Christine) (Entered: 09/08/2020) |
| 09/09/2020 | 1487 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 1483 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Douglas Hodge (11) (Vieira, Leonardo) (Entered: 09/09/2020) |
| 09/09/2020 | 1488 | REPLY TO RESPONSE to Motion by Douglas Hodge re 1467 MOTION for Clarification *or, in the Alternative, Issuance of a Certificate of Appealability* (O'Connor, Brien) (Entered: 09/09/2020) |
| 09/09/2020 | 1489 | MOTION for Leave to File *Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. (Flashner, Cory) (Entered: 09/09/2020) |
| 09/09/2020 | 1490 | Assented to MOTION for Leave to File *Reply Under Seal* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 09/09/2020) |

| 09/09/2020 | 1493 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Mossimo Giannulli (8), Count(s) 1ss, Defendant sentenced to a term of 5 months imprisonment to be followed by a term of Supervised Release of 2 years; $250,000.00 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion; Count(s) 3ss, Dismissed on Government motion (Lima, Christine) (Entered: 09/10/2020) |
|---|---|---|
| 09/09/2020 | 1495 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Lori Loughlin (14), Count(s) 1ss, Defendant sentenced to a term of 2 months imprisonment to be followed by a term of 2 years of Supervised Release; $150,000.00 Fine; $100 Special Assessment; Count(s) 2ss, 3ss, Dismissed on Government Motion (Lima, Christine) (Entered: 09/10/2020) |
| 09/10/2020 | 1491 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. **ALLOWING** 1490 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 09/10/2020) |
| 09/10/2020 | 1492 | REPLY TO RESPONSE to Motion by Elizabeth Henriquez re 1471 MOTION to Reduce Sentence */ ELIZABETH HENRIQUEZS MOTION TO MODIFY SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) /* (Katz, Aaron) (Additional attachment(s) added on 9/11/2020: # 1 Elizabeth Henriquez's Reply in Support) (Vieira, Leonardo). (Entered: 09/10/2020) |
| 09/15/2020 | 1498 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1457 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 09/16/2020) |
| 09/16/2020 | 1497 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1437 Motion as to John Wilson (17). (Vieira, Leonardo) (Entered: 09/16/2020) |
| 09/16/2020 | 1499 | REPLY TO RESPONSE to Motion by John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal *(Specifically Concerning the Motion for Leave to File Ex Parte and Under Seal) (Leave to File Granted on September 16, 2020)* (Malkiel, Yakov) (Entered: 09/16/2020) |
| 09/21/2020 | 1501 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, the motion of defendant Douglas Hodge to modify sentence (Docket No. 1434 ) is **DENIED** without prejudice. <br><br>**So ordered.** (Vieira, Leonardo) (Entered: 09/22/2020) |
| 09/21/2020 | 1502 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, the motion of defendant Elizabeth Henriquez to modify sentence (Docket No. 1471 ) is **DENIED** without prejudice. <br><br>**So ordered.** (Vieira, Leonardo) (Entered: 09/22/2020) |
| 09/23/2020 | 1505 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: In accordance with the foregoing, petitioner's motion for a Certificate of Appealability is **ALLOWED,** in part, and **DENIED,** in part. The Court will grant a Certificate of Appealability with respect to the issue of <br><br>whether the government violated Mr. Hodge's constitutional right to material, exculpatory evidence, and if so, whether that violation undermined the integrity of Mr. Hodges sentencing hearing such that Mr. Hodge is entitled to a re–sentencing, but not otherwise. <br><br>**So ordered.** (Vieira, Leonardo) (Entered: 09/24/2020) |
| 09/24/2020 | 1503 | Assented to MOTION for Release of Bail as to David Sidoo. (Weinberg, Martin) (Entered: 09/24/2020) |
| 09/24/2020 | 1504 | Assented to MOTION for Release of Bail (Substitute Motion) re 1503 Assented to MOTION for Release of Bail as to David Sidoo. (Weinberg, Martin) (Entered: 09/24/2020) |

| 09/24/2020 | 1506 | Transmitted Supplemental Record on Appeal as to Douglas Hodge re 1061 Notice of Appeal – Final Judgment 1459 Notice of Appeal Documents included: ECF Nos. 1501 and 1505 (Paine, Matthew) (Entered: 09/24/2020) |
|---|---|---|
| 09/25/2020 | 1507 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 1504 Motion as to David Sidoo (1). (Vieira, Leonardo) (Entered: 09/25/2020) |
| 09/25/2020 | 1508 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: Finding as moot 1503 Motion as to David Sidoo (1) (Vieira, Leonardo) (Entered: 09/25/2020) |
| 09/28/2020 | 1509 | MOTION for Leave to File *ex parte Motion* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 09/28/2020) |
| 09/30/2020 | 1510 | MEMORANDUM in Opposition by USA as to John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal (Attachments: # 1 Exhibit A through LL)(Rosen, Eric) (Additional attachment(s) added on 10/13/2020: # 2 Exhibit A–LL Unredacted) (Lima, Christine). (Entered: 09/30/2020) |
| 10/05/2020 | 1511 | MOTION for Order *PERMITTING MANUEL HENRIQUEZ AN EARLY SURRENDER TO THE BUREAU OF PRISONS AND RECOMMENDING THAT HE BE PERMITTED TO VISIT HIS WIFE* as to Manuel Henriquez. (Haag, Melinda) (Entered: 10/05/2020) |
| 10/06/2020 | 1512 | Assented to MOTION to Continue *January 2021 Trial* as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella. (Beirne, Eoin) (Entered: 10/06/2020) |
| 10/07/2020 | 1513 | Assented to MOTION for Leave to File *Declarations Ex Parte and Under Seal in Support of Motion to Continue January 2021 Trial (ECF No. 1512)* as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella. (Beirne, Eoin) (Entered: 10/07/2020) |
| 10/08/2020 | 1514 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1513 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7), Elisabeth Kimmel (13), William McGlashan Jr. (15), Marci Palatella (16) (Vieira, Leonardo) (Entered: 10/08/2020) |
| 10/08/2020 | 1515 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 1511 Motion for Order as to Manuel Henriquez (10) (Vieira, Leonardo) (Entered: 10/09/2020) |
| 10/09/2020 | 1520 | Judge Nathaniel M. Gorton: ORDER AND RECOMMENDATION entered re 1511 MOTION for Order *PERMITTING MANUEL HENRIQUEZ AN EARLY SURRENDER TO THE BUREAU OF PRISONS AND RECOMMENDING THAT HE BE PERMITTED TO VISIT HIS WIFE* filed by Manuel Henriquez (Lima, Christine) (Entered: 10/13/2020) |
| 10/09/2020 | 1521 | **Entry filed in error.** Please refer to 1520 (Vieira, Leonardo). (Entered: 10/13/2020) |
| 10/12/2020 | 1519 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Elisabeth Kimmel, Homayoun Zadeh. (Flashner, Cory) (Entered: 10/12/2020) |
| 10/13/2020 | 1523 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1489 Motion for Leave to File as to Elisabeth Kimmel (13); granting 1509 Motion for Leave to File as to Elisabeth Kimmel (13); granting 1519 Motion for Leave to File as to Elisabeth Kimmel (13), Homayoun Zadeh (18). Clerk will send out link to file documents. (Belmont, Kellyann) (Entered: 10/13/2020) |
| 10/13/2020 | 1525 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. (Flashner, Cory) (Entered: 10/13/2020) |
| 10/14/2020 | 1527 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1525 MOTION for Leave to File Motion Ex Parte and Under Seal as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), John Wilson (17) (Belmont, Kellyann) (Entered: 10/14/2020) |
| 10/15/2020 | 1533 | MOTION for Leave to File *Reply Brief in Support of ECF No. 1437 (Partly Assented–to)* as to John Wilson. (Attachments: # 1 Proposed Reply, # 2 Exhibits A–K to Proposed Reply)(Malkiel, Yakov) (Entered: 10/15/2020) |

| 10/16/2020 | 1534 | NOTICE. **Please see attached Notice.** (Vieira, Leonardo) (Entered: 10/16/2020) |
|---|---|---|
| 10/19/2020 | 1536 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER. **Please see attached Memorandum and Order.** (Vieira, Leonardo) (Entered: 10/20/2020) |
| 10/20/2020 | 1537 | Set/Reset Deadlines/Hearings as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, William McGlashan, Jr, Marci Palatella: Motions due by 3/19/2021 Final Pretrial Conference set for 4/13/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Jury Trial set for 4/20/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 10/20/2020) |
| 10/20/2020 | 1539 | MOTION to Reduce Sentence *(Elizabeth Henriquez's Renewed Motion to Reduce Sentence Under 8 U.S.C. § 3582)* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 10/20/2020) |
| 10/21/2020 | 1541 | MOTION for Leave to File *Two–Page Supplement Ex Parte and Under Seal* as to John Wilson. (Malkiel, Yakov) (Entered: 10/21/2020) |
| 10/22/2020 | 1543 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1441 Assented to MOTION for Leave to File Sealed Sur–Reply (to USC's Motion to Quash)as to John Wilson (17). Clerk to send out link to file sealed document. (Belmont, Kellyann) (Entered: 10/22/2020) |
| 10/22/2020 | 1544 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1489 MOTION for Leave to File Ex Parte and Under Seal as to as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), John Wilson (17). Clerk to send out link to file sealed document. (Belmont, Kellyann) (Entered: 10/22/2020) |
| 10/22/2020 | 1545 | SEALED Opposition by John Wilson re 1357 SEALED MOTION to Quash (Belmont, Kellyann) (Entered: 10/22/2020) |
| 10/25/2020 | 1546 | NOTICE of Withdrawal of Appearance by Government Attorney Eric S. Rosen as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Rosen, Eric) (Entered: 10/25/2020) |
| 10/26/2020 | 1548 | Attorney update in case as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo. Attorney Eric S. Rosen terminated. (Vieira, Leonardo) (Entered: 10/26/2020) |
| 10/26/2020 | 1549 | Opposition by USA as to Elizabeth Henriquez re 1539 MOTION to Reduce Sentence *(Elizabeth Henriquez's Renewed Motion to Reduce Sentence Under 8 U.S.C. § 3582)* (Attachments: # 1 Exhibit A through C)(Kearney, Kristen) (Entered: 10/26/2020) |
| 10/27/2020 | 1550 | MOTION to Travel *(Request to Permit Specific and Limited International Business Travel to Cancun, Playa Del Carmen, and Tulum Mexico)* as to Robert Zangrillo. (Weinberg, Martin) (Entered: 10/27/2020) |
| 10/27/2020 | 1551 | Assented to MOTION for Leave to File *Under Seal A Response to Defendant's Sealed Sur–Reply* as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 10/27/2020) |
| 10/28/2020 | 1552 | Assented to MOTION for Leave to File *Opposition to Defendants' Motion to Compel Under Seal* as to Elisabeth Kimmel, Homayoun Zadeh by University of Southern California. (Fuller, Anthony) (Entered: 10/28/2020) |
| 10/28/2020 | 1553 | MOTION for Leave to File *(Reply in Support of Elizabeth Henriquez's Renewed Motion to Reduce Sentence Under 8 U.S.C. § 3582)* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 10/28/2020) |
| 10/28/2020 | 1554 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 1553 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elizabeth Henriquez (9) (Vieira, Leonardo) (Entered: 10/28/2020) |

| | | |
|---|---|---|
| 10/28/2020 | 1556 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1541 MOTION for Leave to File Two–Page Supplement Ex Parte and Under Seal as to John Wilson. (17); granting 1551 Assented to MOTION for Leave to File Under Seal A Response to Defendant's Sealed Sur–Reply as to John Wilson by University of Southern California. Court will send link to counsel to file documents. (Belmont, Kellyann) (Entered: 10/28/2020) |
| 10/29/2020 | 1559 | Assented to MOTION for Leave to File *Opposition to Defendants' Motion to Compel USC's Response to February 7, 2020 Subpoena (ECF #716) Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 10/29/2020) |
| 10/29/2020 | 1560 | REPLY TO RESPONSE to Motion by Elizabeth Henriquez re 1539 MOTION to Reduce Sentence *(Elizabeth Henriquez's Renewed Motion to Reduce Sentence Under 8 U.S.C. § 3582)* (Katz, Aaron) (Entered: 10/29/2020) |
| 10/29/2020 | 1561 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1550 Motion to Travel as to Robert Zangrillo (19). (Vieira, Leonardo) (Entered: 10/29/2020) |
| 10/29/2020 | 1562 | Judge Nathaniel M. Gorton: ORDER entered: re: 1539 Motion to Reduce Sentence as to Elizabeth Henriquez (9). Because, for the third time, defendant has failed to demonstrate extraordinary and compelling reasons to reduce her sentence, motion **DENIED.** (Vieira, Leonardo) (Entered: 10/30/2020) |
| 11/03/2020 | 1563 | MOTION for Leave to File *Revised Reply* as to John Wilson. (Malkiel, Yakov) (Entered: 11/03/2020) |
| 11/03/2020 | 1565 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. (Flashner, Cory) (Entered: 11/03/2020) |
| 11/03/2020 | 1566 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1563 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 11/03/2020) |
| 11/05/2020 | 1568 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1565 MOTION for Leave to File Motion Ex Parte and Under Seal as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. Clerk to send link to counsel. (Belmont, Kellyann) (Entered: 11/05/2020) |
| 11/06/2020 | 1571 | Amended REPLY TO RESPONSE to Motion by John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Malkiel, Yakov) (Main Document 1571 replaced on 11/6/2020) (Lima, Christine). (Entered: 11/06/2020) |
| 11/09/2020 | 1573 | NOTICE *of Counsel's Change of Address* by Homayoun Zadeh (Miner, Tracy) (Entered: 11/09/2020) |
| 11/09/2020 | 1574 | Assented to MOTION for Return of Passport as to Manuel Henriquez. (Linsenmayer, Robin) Modified on 11/12/2020 to fix event type and docket text (Vieira, Leonardo). (Entered: 11/09/2020) |
| 11/09/2020 | 1575 | Magistrate Judge M. Page Kelley: ORDER RE: GOVERNMENT'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS BY THE UNIVERSITY OF SOUTHERN CALIFORNIA IN RESPONSE TO RULE 17(c ) SUBPOENAS (# 1346 ) as to Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Belmont, Kellyann) (Entered: 11/09/2020) |
| 11/10/2020 | 1576 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **DENYING as moot** 1533 Motion for Leave to File; as to John Wilson (17) (Vieira, Leonardo) (Entered: 11/10/2020) |
| 11/10/2020 | 1577 | MOTION for Leave to File *(Under Seal) An Opposition to Defendant John Wilson's Ex Parte Supplement to His Motion to Compel* as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 11/10/2020) |

| 11/10/2020 | 1578 | SENTENCING MEMORANDUM by USA as to Diane Blake, Todd Blake (Wright, Leslie) (Entered: 11/10/2020) |
|---|---|---|
| 11/10/2020 | 1579 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1552 Assented to MOTION for Leave to File Opposition to Defendants' Motion to Compel Under Seal as to Elisabeth Kimmel, Homayoun Zadeh by University of Southern California. (Belmont, Kellyann) (Entered: 11/10/2020) |
| 11/10/2020 | 1580 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1559 Assented to MOTION for Leave to File Opposition to Defendants' Motion to Compel USC's Response to February 7, 2020 Subpoena (ECF #716) Under Seal as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson by University of Southern California. (Belmont, Kellyann) (Entered: 11/10/2020) |
| 11/10/2020 | 1584 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 11/10/2020) |
| 11/10/2020 | 1585 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1574 Assented to MOTION for Return of Passport as to Manuel Henriquez. (10) (Vieira) (Vieira, Leonardo) Modified on 11/12/2020 to fix docket text (Vieira, Leonardo). (Entered: 11/12/2020) |
| 11/12/2020 | 1586 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1577 MOTION for Leave to File (Under Seal) An Opposition to Defendant John Wilson's Ex Parte Supplement to His Motion to Compel as to John Wilson by University of Southern California. Clerk to send link. (Belmont, Kellyann) (Entered: 11/12/2020) |
| 11/12/2020 | 1587 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1584 MOTION for Leave to File Motion Ex Parte and Under Seal as to Elisabeth Kimmel (13). Clerk to send link. (Belmont, Kellyann) (Entered: 11/12/2020) |
| 11/12/2020 | 1588 | MOTION for Leave to File *a Sur−Reply in Opposition to Defendant John Wilson's Amended Reply (Dkt. 1571)* as to John Wilson by USA. (O'Connell, Justin) (Entered: 11/12/2020) |
| 11/12/2020 | 1591 | SENTENCING MEMORANDUM by Diane Blake, Todd Blake (Attachments: # 1 Exhibit A)(Meier, David) (Entered: 11/12/2020) |
| 11/13/2020 | 1594 | Amended MOTION for Leave to File *a Sur−Reply in Opposition to Defendant John Wilson's Amended Reply (Dkt. 1571)* as to John Wilson by USA. (O'Connell, Justin) (Entered: 11/13/2020) |
| 11/13/2020 | 1595 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1594 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 11/13/2020) |
| 11/13/2020 | 1596 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **DENIED** as moot 1588 Motion for Leave to File; as to John Wilson (17) (Vieira, Leonardo) (Entered: 11/13/2020) |
| 11/16/2020 | 1614 | MOTION to Seal *Portions of the Government's Sur−reply in Opposition to Defendant John Wilson's Amended Reply (Dkt. 1571)* as to John Wilson by USA. (O'Connell, Justin) (Entered: 11/16/2020) |
| 11/17/2020 | 1615 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** 1614 Motion to Seal. Counsel will receive an email within twenty−four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include − Leave to file granted on (date of order)− in the caption of the document as to John Wilson (17) (Vieira, Leonardo) (Entered: 11/17/2020) |
| 11/17/2020 | 1616 | SUR−REPLY to Motion by USA as to John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal (O'Connell, Justin) (Entered: 11/17/2020) |
| 11/17/2020 | 1619 | SEALED SUR−REPLY to Motion by USA as to John Wilson re 1437 MOTION (1) for Relief Based on the Government's Improper Search and Seizure of Emails and (2) for Leave to File Ex Parte and Under Seal (Lima, Christine) (Entered: 11/18/2020) |

| | | |
|---|---|---|
| 11/17/2020 | 1620 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 11/17/2020 for Diane Blake (5), Count(s) 1ss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court formally accepts the binding plea agreement and will impose the agreed–upon sentence. Defendant sentenced to a term of 6 weeks imprisonment, to be followed by a term of 2 years Supervised Release; $125,000.00 Fine; $100 Special Assessment; Count(s) 2ss, 3ss, Dismissed on Government Motion. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 2/15/2021. (Attorneys present: Sutro, Meier, Wright, Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 11/18/2020) |
| 11/17/2020 | 1621 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 11/17/2020 for Todd Blake (6), Count(s) 1ss, 3ss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court formally accepts the binding plea agreement and will impose the agreed–upon sentence. Defendant sentenced to a term of 4 months imprisonment, which term consists of terms of 4 months on Counts 1ss and 3ss, such terms to be served concurrently; 2 Years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 3ss, such terms to run concurrently; $125,000.00 Fine, which consists of $75,000.00 on Count 1ss and $50,000.00 on Count 3ss; $200 Special Assessment; Count(s) 2ss, Dismissed on Government Motion. Defendant informed of right to appeal. Defendant to self–surrender at the facility designated by the Bureau of Prisons before 2:00 PM on 4/26/2021.(Attorneys present: Sutro, Meier, Wright, Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 11/18/2020) |
| 11/19/2020 | 1627 | MOTION for Leave to File *Document Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. (Flashner, Cory) (Entered: 11/19/2020) |
| 11/20/2020 | 1634 | Assented to MOTION to Continue *Februray 2021 Trial* as to Gamal Abdelaziz, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Sharp, Joshua) (Entered: 11/20/2020) |
| 11/23/2020 | 1642 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Diane Blake (5), Count(s) 1ss, Defendant sentenced to a term of 6 weeks imprisonment, to be followed by a term of 2 years Supervised Release; $125,000.00 Fine; $100 Special Assessment; Count(s) 2ss, 3ss, Dismissed on Government Motion (Lima, Christine) (Entered: 11/24/2020) |
| 11/23/2020 | 1644 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Todd Blake (6), Count(s) 1ss, 3ss, Defendant sentenced to a term of 4 months imprisonment, which term consists of terms of 4 months on Counts 1ss and 3ss, such terms to be served concurrently; 2 Years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 3ss, such terms to run concurrently; $125,000.00 Fine, which consists of $75,000.00 on Count 1ss and $50,000.00 on Count 3ss; $200 Special Assessment; Count(s) 2ss, Dismissed on Government Motion (Lima, Christine) (Entered: 11/24/2020) |
| 11/24/2020 | 1637 | NOTICE OF ATTORNEY APPEARANCE Carol E. Head appearing for USA. (Head, Carol) (Entered: 11/24/2020) |
| 11/24/2020 | 1638 | SATISFACTION OF JUDGMENT as to Lori Loughlin (Head, Carol) (Entered: 11/24/2020) |
| 11/24/2020 | 1639 | NOTICE OF ATTORNEY APPEARANCE Carol E. Head appearing for USA. (Head, Carol) (Entered: 11/24/2020) |
| 11/24/2020 | 1640 | SATISFACTION OF JUDGMENT as to Mossimo Giannulli (Head, Carol) (Entered: 11/24/2020) |
| 11/25/2020 | 1648 | Judge Nathaniel M. Gorton: NOTICE entered: Before ruling on the Assented–to Motion to Continue February 2021 Trial (Docket No. 1634 ), the Court poses a few questions and comments to counsel for response on or before Friday, December 4, 2020. (Vieira, Leonardo) (Entered: 11/25/2020) |
| 11/25/2020 | 1649 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, Wilsons motion for relief (part, but not all, of Docket No. 1437 ) is **DENIED.** |

**A149**

| | | |
|---|---|---|
| | | So ordered. (Vieira, Leonardo) (Entered: 11/25/2020) |
| 11/30/2020 | 1651 | MOTION / Defendant John Wilson's Motion for Leave to obtain Copy of Sealed November 20, 2020 Hearing Transcript as to John Wilson. (Kendall, Michael) (Entered: 11/30/2020) |
| 12/01/2020 | 1653 | MOTION for Leave to Obtain Sealed Transcript as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 12/01/2020) |
| 12/01/2020 | 1655 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1651 John Wilson's Motion for Leave to obtain Copy of Sealed November 20, 2020 Hearing Transcript as to John Wilson. (Belmont, Kellyann) (Entered: 12/01/2020) |
| 12/01/2020 | 1656 | Assented to MOTION for Leave to File *Ex Parte Sealed Declarations* as to Gamal Abdelaziz, John Wilson, Homayoun Zadeh, Robert Zangrillo. (Sharp, Joshua) (Entered: 12/01/2020) |
| 12/02/2020 | 1657 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 1656 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 12/02/2020) |
| 12/04/2020 | 1659 | NOTICE *OF JOINT RESPONSE TO COURT NOTICE (DKT. 1648)* by Gamal Abdelaziz, John Wilson, Homayoun Zadeh, Robert Zangrillo (Sharp, Joshua) (Entered: 12/04/2020) |
| 12/08/2020 | 1667 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1653 MOTION for Leave to Obtain Sealed Transcript as to Gamal Abdelaziz (4) (Belmont, Kellyann) (Entered: 12/08/2020) |
| 12/11/2020 | 1670 | Transcript of Sentencing as to Diane Blake held on November 17, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/4/2021. Redacted Transcript Deadline set for 1/11/2021. Release of Transcript Restriction set for 3/11/2021. (Coppola, Katelyn) (Entered: 12/15/2020) |
| 12/11/2020 | 1671 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 12/15/2020) |
| 12/11/2020 | 1672 | Transcript of Sentencing as to Todd Blake held on November 17, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/4/2021. Redacted Transcript Deadline set for 1/11/2021. Release of Transcript Restriction set for 3/11/2021. (Coppola, Katelyn) (Entered: 12/15/2020) |
| 12/11/2020 | 1673 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 12/15/2020) |
| 12/16/2020 | 1676 | PROPOSED ORDER(S) submitted by University of Southern California as to Homayoun Zadeh (Fuller, Anthony) (Entered: 12/16/2020) |
| 12/16/2020 | 1677 | PROPOSED ORDER(S) submitted by University of Southern California as to Marci Palatella (Fuller, Anthony) (Entered: 12/16/2020) |
| 12/17/2020 | 1683 | Transcript of Sentencing as to Mossimo Giannulli held on August 21, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/7/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/17/2021. (Coppola, Katelyn) (Entered: 12/25/2020) |

| | | |
|---|---|---|
| 12/17/2020 | 1684 | Transcript of Sentencing as to Lori Loughlin held on August 21, 2020, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/7/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/17/2021. (Coppola, Katelyn) (Entered: 12/25/2020) |
| 12/17/2020 | 1685 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 12/25/2020) |
| 12/17/2020 | 1686 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 12/25/2020) |
| 12/21/2020 | 1679 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1634 Motion to Continue as to Gamal Abdelaziz (4), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) Jury Trial set for 9/13/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Final Pretrial Conference set for 8/18/2021 11:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 12/21/2020) |
| 12/23/2020 | 1680 | Emergency MOTION for Compassionate Release 18 USC 3582 *Due to a COVID–19 Outbreak at FCI Dublin* as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 12/23/2020) |
| 12/23/2020 | 1681 | Opposition by USA as to Elizabeth Henriquez re 1680 Emergency MOTION for Compassionate Release 18 USC 3582 *Due to a COVID–19 Outbreak at FCI Dublin* (Attachments: # 1 Exhibit A)(Kearney, Kristen) (Entered: 12/23/2020) |
| 12/23/2020 | 1682 | Judge Nathaniel M. Gorton: ORDER entered: **DENYING** 1680 Order on Motion for Compassionate Release – 18:3582 as to Elizabeth Henriquez (9).<br><br>**Please see Attached Order.** (Vieira, Leonardo) (Entered: 12/23/2020) |
| 01/02/2021 | 1687 | NOTICE of Withdrawal of Appearance of Attorney Seth B. Orkand as to Homayoun Zadeh (Orkand, Seth) (Entered: 01/02/2021) |
| 01/04/2021 | | Attorney update in case as to Homayoun Zadeh. Attorney Seth B. Orkand terminated. (Vieira, Leonardo) (Entered: 01/04/2021) |
| 01/05/2021 | 1688 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. (Flashner, Cory) (Entered: 01/05/2021) |
| 01/14/2021 | 1689 | SATISFACTION OF JUDGMENT as to Todd Blake (Head, Carol) (Entered: 01/14/2021) |
| 01/14/2021 | 1690 | SATISFACTION OF JUDGMENT as to Diane Blake (Head, Carol) (Entered: 01/14/2021) |
| 01/14/2021 | 1691 | Emergency MOTION to Modify Sentence Pursuant to 18 U.S.C. Sec. 3582(c)(1) as to Mossimo Giannulli. (Trach, William) (Entered: 01/14/2021) |
| 01/14/2021 | 1692 | MEMORANDUM in Support by Mossimo Giannulli re 1691 Emergency MOTION to Modify Sentence Pursuant to 18 U.S.C. Sec. 3582(c)(1) (Trach, William) (Entered: 01/14/2021) |
| 01/14/2021 | 1693 | AFFIDAVIT in Support of William J. Trach; by Mossimo Giannulli re 1691 Emergency MOTION to Modify Sentence Pursuant to 18 U.S.C. Sec. 3582(c)(1) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Trach, William) (Entered: 01/14/2021) |
| 01/19/2021 | 1694 | Opposition by USA as to Mossimo Giannulli re 1691 Emergency MOTION to Modify Sentence Pursuant to 18 U.S.C. Sec. 3582(c)(1) (Kearney, Kristen) (Entered: 01/19/2021) |
| 01/25/2021 | 1695 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1688 MOTION for Leave to File Motion Ex Parte and Under Seal as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson. Clerk to send out link. (Belmont, Kellyann) (Entered: 01/25/2021) |

| 01/25/2021 | 1696 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered. ## 1676 and 1677 , proposed confidentiality orders by the University of Southern California pertaining to defendants Homayoun Zadeh and Marci Palatella, are hereby accepted by the Court. (Belmont, Kellyann) (Entered: 01/25/2021) |
| --- | --- | --- |
| 01/25/2021 | 1697 | MOTION to Continue April 2021 Trial as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella. (Loucks, Michael) (Entered: 01/25/2021) |
| 01/26/2021 | 1699 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, the motion of defendant Mossimo Giannulli to modify sentence (Docket No. 1691 ) is **DENIED without prejudice.** <br><br> So ordered. (Vieira, Leonardo) (Entered: 01/26/2021) |
| 01/27/2021 | 1700 | Assented to MOTION for Leave to File *Declaration Ex Parte and Under Seal* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 01/27/2021) |
| 01/28/2021 | 1703 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1700 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 01/28/2021) |
| 02/01/2021 | 1706 | MOTION for Leave to File *Rule 17(c) Motion Ex Parte and Under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh. (Siddall, Megan) (Entered: 02/01/2021) |
| 02/02/2021 | 1707 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1706 MOTION for Leave to File Rule 17(c) Motion Ex Parte and Under Seal as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh. Clerk to send link. (Belmont, Kellyann) (Entered: 02/02/2021) |
| 02/04/2021 | 1713 | Assented to MOTION *to Defer her Self–Surrender Date to Bureau of Prisons* as to Diane Blake. (Meier, David) (Entered: 02/04/2021) |
| 02/04/2021 | 1714 | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** 1713 Motion as to Diane Blake (5) (Vieira, Leonardo) (Entered: 02/04/2021) |
| 02/05/2021 | 1716 | PLEA AGREEMENT as to William McGlashan, Jr (Frank, Stephen) (Entered: 02/05/2021) |
| 02/05/2021 | 1717 | RESPONSE to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1697 MOTION to Continue April 2021 Trial (Frank, Stephen) (Entered: 02/05/2021) |
| 02/08/2021 | 1718 | ELECTRONIC NOTICE OF HEARING as to William McGlashan, Jr <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br> Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br> For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br> Rule 11 Hearing set for 2/10/2021 03:00 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. <br><br> Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 02/08/2021) |
| 02/08/2021 | 1719 | Case as to William McGlashan, Jr no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/08/2021) |

| 02/08/2021 | 1720 | MOTION for Leave to Appear Pro Hac Vice by Vicki Chou as to William McGlashan, Jr. (Attachments: # 1 Certification of Vicki Chou)(Pirozzolo, Jack) (Entered: 02/08/2021) |
| 02/09/2021 | 1722 | NOTICE OF ATTORNEY PAYMENT OF FEES as to 1720 MOTION for Leave to Appear Pro Hac Vice by Vicki Chou by Defendants William McGlashan, Jr, William McGlashan, Jr. Filing fee $ 100, receipt number 0101−8628640. Payment Type : PRO HAC VICE. (Pirozzolo, Jack) (Entered: 02/09/2021) |
| 02/09/2021 | 1723 | DISMISSAL as to Robert Zangrillo *from the Fourth Superseding Indictment* (Attachments: # 1 Exhibit A [Pardon Warrant], # 2 Exhibit B [Pardon Acceptance])(O'Connell, Justin) (Entered: 02/09/2021) |
| 02/10/2021 | 1725 | Judge Nathaniel M. Gorton: ORDER entered: as to Robert Zangrillo re 1723 Dismissal by Government filed by USA. **Please see attached Order.** (Vieira, Leonardo) (Entered: 02/10/2021) |
| 02/10/2021 | 1726 | Assented to MOTION for Release of Bail and Return of Passport as to Robert Zangrillo. (Weinberg, Martin) (Entered: 02/10/2021) |
| 02/10/2021 | 1729 | NOTICE *Response to Government Filing* by Gamal Abdelaziz, Homayoun Zadeh re 1717 Response to Motion, (Sharp, Joshua) (Entered: 02/10/2021) |
| 02/10/2021 | 1730 | Assented to MOTION for Return of Passport as to Lori Loughlin. (Trach, William) (Entered: 02/10/2021) |
| 02/10/2021 | 1733 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to William McGlashan, Jr held by video on 2/10/2021. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for the Court and the Defendant. Government informs the Defendant of the maximum possible penalties; no mandatory minimums. Government informs the Defendant of the facts it would prove if this matter were to go to trial. Plea entered by William McGlashan Jr. (15) Guilty Count 7ss. Sentencing set for 5/12/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant remains released on all previously imposed conditions of release. (Attorneys present: Pirozzolo, Hueston, O'Connell. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 02/11/2021) |
| 02/10/2021 | 1734 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to William McGlashan, Jr Sentencing set for 5/12/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 02/11/2021) |
| 02/11/2021 | 1731 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. **ALLOWING** 1720 Motion for Leave to Appear Pro Hac Vice Added Vicki Chou. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to William McGlashan Jr. (15) (Vieira, Leonardo) (Entered: 02/11/2021) |
| 02/11/2021 | 1732 | MOTION for Leave to File *Protective Order Ex Parte and Under Seal* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 02/11/2021) |
| 02/11/2021 |  | Terminate Hearings as to William McGlashan, Jr: Final Pretrial Conference scheduled for 4/13/21. (Lima, Christine) (Entered: 02/11/2021) |
| 02/11/2021 | 1735 | NOTICE *Response to Government's Cross−Motion to Re−Consolidate the Proceedings and to Adjourn Pre−Trial Deadlines [ECF# 1717]* by Elisabeth Kimmel (Beirne, Eoin) (Entered: 02/11/2021) |
| 02/12/2021 | 1736 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1730 Motion as to Lori Loughlin (14). (Vieira, Leonardo) (Entered: 02/12/2021) |
| 02/12/2021 | 1737 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1726 Motion as to Robert Zangrillo (19) (Vieira, Leonardo) (Entered: 02/12/2021) |
| 02/12/2021 | 1738 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz 1732 MOTION for Leave to File *Protective Order Ex Parte and Under Seal* filed by Gamal Abdelaziz (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 02/12/2021) |

| 02/12/2021 | 1739 | Case as to Robert Zangrillo no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 02/12/2021) |
| 02/12/2021 | 1740 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1732 MOTION for Leave to File Protective Order Ex Parte and Under Seal as to Gamal Abdelaziz (4). Clerk to send link. (Belmont, Kellyann) (Entered: 02/12/2021) |
| 02/12/2021 | 1743 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: finding as moot 1017 Motion for Leave to File; as to John Wilson (17) (Vieira, Leonardo) (Entered: 02/12/2021) |
| 02/15/2021 | 1744 | RESPONSE to Motion by I–Hsin Chen re 1697 MOTION to Continue April 2021 Trial *Defendant I–Hsin "Joey" Chen's Response to Government's Cross–Motion to Re–Consolidate the Proceedings and to Adjourn Pre–Trial Deadlines* (Cahn, Reuben) (Entered: 02/15/2021) |
| 02/16/2021 | 1745 | Judge Nathaniel M. Gorton: ORDER entered: **ALLOWING** 1697 Motion as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7), Elisabeth Kimmel (13), Marci Palatella (16)<br><br>The Court further schedules a status conference for Tuesday, June 15, 2021, at 3:00 P.M., at which pre–trial deadlines will be determined and further consideration of logistics and severance will be discussed, if necessary. So ordered. (Vieira, Leonardo) (Entered: 02/16/2021) |
| 02/16/2021 | 1746 | ELECTRONIC NOTICE CANCELING HEARING as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella. Hearing canceled: Jury Trial (Vieira, Leonardo) (Entered: 02/16/2021) |
| 02/16/2021 | 1747 | Set Hearing as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella: Status Conference set for 6/15/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Vieira, Leonardo) (Entered: 02/16/2021) |
| 02/17/2021 | 1748 | MOTION permission to file under seal as to Gamal Abdelaziz. (Sheketoff, Robert) (Entered: 02/17/2021) |
| 02/17/2021 | 1749 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1748 MOTION permission to file under seal as to Gamal Abdelaziz. Clerk to send link. (Belmont, Kellyann) (Entered: 02/17/2021) |
| 02/17/2021 | 1761 | Transcript of Rule 11 Hearing as to William McGlashan, Jr held on February 10, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/10/2021. Redacted Transcript Deadline set for 3/22/2021. Release of Transcript Restriction set for 5/18/2021. (Coppola, Katelyn) (Entered: 02/24/2021) |
| 02/17/2021 | 1762 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 02/24/2021) |
| 02/19/2021 | 1752 | MOTION to Modify Protective Order Governing Documents Received from USC as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh. (Attachments: # 1 Text of Proposed Order Proposed Order)(Miner, Tracy) (Entered: 02/19/2021) |
| 02/19/2021 | 1753 | MOTION for Leave to File *ex parte* as to Gamal Abdelaziz. (Sheketoff, Robert) (Entered: 02/19/2021) |
| 02/22/2021 | 1754 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz 1753 MOTION for Leave to File *ex parte* filed by Gamal Abdelaziz (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 02/22/2021) |
| 02/22/2021 | 1755 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh 1752 MOTION to Modify Protective Order Governing Documents Received from USC filed by Elisabeth Kimmel, Homayoun Zadeh, Gamal Abdelaziz (Lima, Christine) (Entered: 02/22/2021) |
| 02/22/2021 | 1756 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1753 MOTION for Leave to File ex parte as to Gamal Abdelaziz (4). Clerk to send link. (Belmont, Kellyann) |

| | | |
|---|---|---|
| | | (Entered: 02/22/2021) |
| 02/22/2021 | 1757 | Magistrate Judge M. Page Kelley: ORDER entered granting 1752 MOTION to Modify Protective Order Governing Documents Received from USC as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh. (Belmont, Kellyann) (Main Document 1757 replaced on 2/22/2021) (Belmont, Kellyann). (Entered: 02/22/2021) |
| 02/23/2021 | 1759 | MOTION for Leave to Obtain Copy of Sealed Hearing Transcript as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 02/23/2021) |
| 02/24/2021 | 1760 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Elisabeth Kimmel 1759 MOTION for Leave to Obtain Copy of Sealed Hearing Transcript filed by Elisabeth Kimmel (McDonagh, Christina) Motions referred to M. Page Kelley. (Entered: 02/24/2021) |
| 02/25/2021 | 1763 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1759 Motion for Leave to Obtain Copy of Sealed Hearing Transcript as to Elisabeth Kimmel (13) (Belmont, Kellyann) (Entered: 02/25/2021) |
| 02/25/2021 | 1766 | NOTICE of Withdrawal of Appearance of Attorney David C. Scheper as to Lori Loughlin (Scheper, David) (Entered: 02/25/2021) |
| 02/26/2021 | 1767 | Assented to MOTION Return of Passport as to Elizabeth Henriquez. (Katz, Aaron) (Entered: 02/26/2021) |
| 02/26/2021 | | Attorney update in case as to Lori Loughlin. Attorney David C. Scheper terminated. (McDonagh, Christina) (Entered: 02/26/2021) |
| 02/26/2021 | 1768 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 1767 Assented to MOTION Return of Passport as to Elizabeth Henriquez (9) (McDonagh, Christina) (Entered: 02/26/2021) |
| 03/07/2021 | 1773 | NOTICE OF ATTORNEY APPEARANCE: Elliot M. Weinstein appearing for Gamal Abdelaziz. Type of Appearance: Retained. (Weinstein, Elliot) (Entered: 03/07/2021) |
| 03/08/2021 | 1775 | MOTION to Seal as to Gamal Abdelaziz. (Weinstein, Elliot) (Entered: 03/08/2021) |
| 03/09/2021 | 1776 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz 1775 MOTION to Seal filed by Gamal Abdelaziz (Lima, Christine) Motions referred to M. Page Kelley. (Entered: 03/09/2021) |
| 03/09/2021 | 1778 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1775 Motion to Seal as to Gamal Abdelaziz (4). Clerk to send link to counsel. (Belmont, Kellyann) (Entered: 03/09/2021) |
| 03/15/2021 | 1781 | JUDGMENT of USCA as to Douglas Hodge re 1061 Notice of Appeal – Final Judgment,. (Paine, Matthew) (Entered: 03/16/2021) |
| 03/15/2021 | 1782 | MANDATE of USCA as to Douglas Hodge re Appeal number 1061 . Appeal number 1061 Terminated (Paine, Matthew) (Entered: 03/16/2021) |
| 03/15/2021 | 1783 | JUDGMENT of USCA as to Douglas Hodge re 1459 Notice of Appeal. (Paine, Matthew) (Entered: 03/16/2021) |
| 03/15/2021 | 1784 | MANDATE of USCA as to Douglas Hodge re Appeal number 1459 . Appeal number 1459 Terminated (Paine, Matthew) (Entered: 03/16/2021) |
| 03/22/2021 | 1786 | Probation Jurisdiction Transferred to Northern District of California as to Elizabeth Henriquez Transmitted Transfer of Jurisdiction form, with certified copies of indictment, judgment and docket sheet. (Attachments: # 1 Exhibit)(Vieira, Leonardo) (Entered: 03/23/2021) |
| 03/23/2021 | 1787 | Notice to Northern District of California of a Transfer of Jurisdiction as to Elizabeth Henriquez. Your case number is: 21–CR–00120. Docket sheet and documents attached. The finance office will transmit the bond and/or passport collected. If you require a copy of the financial ledger, please email your request to mad_findoc@mad.uscourts.gov (If you require certified copies of any documents, please send a request to mad_certcopy@mad.uscourts.gov. If you wish to designate a different email address for future transfers, send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov.) |

| | | (Vieira, Leonardo) (Entered: 03/23/2021) |
|---|---|---|
| 03/24/2021 | 1788 | MOTION for Protective Order as to Gamal Abdelaziz, Homayoun Zadeh by Homayoun Zadeh. (Weinstein, Elliot) (Entered: 03/24/2021) |
| 03/25/2021 | 1789 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Homayoun Zadeh 1788 MOTION for Protective Order filed by Homayoun Zadeh (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 03/25/2021) |
| 04/05/2021 | 1792 | ELECTRONIC NOTICE CANCELING HEARING OR OTHER DEADLINE as to Amy Colburn, Gregory Colburn, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella. Hearing canceled: Final Pretrial Conference previously scheduled for 4/13/21 (Lima, Christine) (Entered: 04/05/2021) |
| 04/07/2021 | 1793 | MOTION for Leave to File *Opposition (Partially) Under Seal* as to Gamal Abdelaziz, Homayoun Zadeh by University of Southern California. (Attachments: # 1 Exhibit A)(Fuller, Anthony) (Entered: 04/07/2021) |
| 04/08/2021 | 1794 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Homayoun Zadeh 1793 MOTION for Leave to File *Opposition (Partially) Under Seal* filed by University of Southern California (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 04/08/2021) |
| 04/09/2021 | 1795 | NOTICE OF ATTORNEY APPEARANCE: Lauren M. Papenhausen appearing for Defendant John Wilson (Papenhausen, Lauren) (Entered: 04/09/2021) |
| 04/12/2021 | 1796 | MOTION to Withdraw as Attorney by Yakov Malkiel as to John Wilson. (Malkiel, Yakov) (Entered: 04/12/2021) |
| 04/12/2021 | 1797 | Assented to MOTION *to Defer His Self–Surrender Date to Bureau of Prisons* as to Todd Blake. (Meier, David) (Entered: 04/12/2021) |
| 04/14/2021 | 1798 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 1796 Motion to Withdraw as Attorney. Attorney Yakov Malkiel terminated as to John Wilson (17) (Lima, Christine) (Entered: 04/14/2021) |
| 04/14/2021 | 1799 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 1797 Motion to Defer His Self–Surrender Date to Bureau of Prisons as to Todd Blake (6) (Lima, Christine) (Entered: 04/14/2021) |
| 04/14/2021 | 1800 | MOTION for Leave to File *Motion Ex Parte and Under Seal* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 04/14/2021) |
| 04/15/2021 | 1801 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1800 MOTION for Leave to File Motion Ex Parte and Under Seal as to Elisabeth Kimmel (13). Clerk to send link. (Belmont, Kellyann) (Entered: 04/15/2021) |
| 04/15/2021 | 1802 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1793 MOTION for Leave to File Opposition (Partially) Under Seal as to Gamal Abdelaziz, Homayoun Zadeh by University of Southern California. Clerk to send link. (Belmont, Kellyann) (Entered: 04/15/2021) |
| 04/15/2021 | 1803 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo 1800 MOTION for Leave to File *Motion Ex Parte and Under Seal* filed by Elisabeth Kimmel (Vieira, Leonardo) (Entered: 04/15/2021) |
| 04/15/2021 | 1804 | SEALED Opposition by University of Southern California as to Gamal Abdelaziz, Homayoun Zadeh re 1788 MOTION for Protective Order (Belmont, Kellyann) (Entered: 04/15/2021) |
| 04/16/2021 | 1806 | Assented to MOTION for Leave to File *reply* as to Gamal Abdelaziz, Homayoun Zadeh by Homayoun Zadeh. (Weinstein, Elliot) (Entered: 04/16/2021) |

| 04/20/2021 | 1807 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Homayoun Zadeh 1806 Assented to MOTION for Leave to File *reply* filed by Homayoun Zadeh (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 04/20/2021) |
|---|---|---|
| 04/20/2021 | 1808 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1806 Assented to MOTION for Leave to File reply as to Gamal Abdelaziz (4), Homayoun Zadeh (18). Clerk to send link. (Belmont, Kellyann) (Entered: 04/20/2021) |
| 04/20/2021 | 1809 | SEALED REPLY TO RESPONSE to Motion by Gamal Abdelaziz, Homayoun Zadeh re 1788 MOTION for Protective Order (Belmont, Kellyann) (Entered: 04/20/2021) |
| 04/28/2021 | 1810 | ELECTRONIC NOTICE OF RESCHEDULING as to William McGlashan, Jr

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

Sentencing set for 5/12/2021 11:00 AM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. CHANGE IS AS TO TIME ONLY. (Lima, Christine) (Entered: 04/28/2021) |
| 04/29/2021 | 1811 | MOTION To Modify Protective Order Governing Documents Received From USC as to John Wilson. (Attachments: # 1 Exhibit 1 – Text of Proposed Order)(Kendall, Michael) (Entered: 04/29/2021) |
| 04/29/2021 | 1812 | MOTION to Add Interested Party, as to Elisabeth Kimmel. (Lima, Christine) (Entered: 04/29/2021) |
| 04/29/2021 | 1813 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1812 MOTION to Add Interested Party, as to Elisabeth Kimmel. (13) (Belmont, Kellyann) (Entered: 04/29/2021) |
| 04/29/2021 | 1814 | NOTICE OF ATTORNEY APPEARANCE: Timothy J. Perla appearing for Interested Party Georgetown University (Lima, Christine) (Entered: 04/29/2021) |
| 04/29/2021 | 1815 | MOTION for Leave to File Under Seal as to Elisabeth Kimmel by Georgetown University. (Lima, Christine) (Entered: 04/29/2021) |
| 04/29/2021 | 1816 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1815 MOTION for Leave to File Under Seal as to Elisabeth Kimmel by Georgetown University. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Belmont, Kellyann) (Entered: 04/29/2021) |
| 04/29/2021 | 1817 | Assented to MOTION for Leave to Appear Pro Hac Vice by Bruce M. Berman Filing fee $ 100, receipt number 0101–8751457. as to Elisabeth Kimmel by Georgetown University. (Perla, Timothy) (Main Document 1817 replaced on 5/3/2021) (Vieira, Leonardo). (Additional attachment(s) added on 5/5/2021: # 1 Exhibit) (Vieira, Leonardo). (Entered: 04/29/2021) |
| 04/29/2021 | 1818 | Assented to MOTION for Leave to Appear Pro Hac Vice by George P. Varghese Filing fee $ 100, receipt number 0101–8751489. as to Elisabeth Kimmel by Georgetown University. (Perla, Timothy) (Additional attachment(s) added on 5/5/2021: # 1 Exhibit) (Vieira, Leonardo). (Entered: 04/29/2021) |
| 04/30/2021 | 1819 | Entered in error. Please see # 1820 (Entered: 04/30/2021) |

| 04/30/2021 | 1820 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered: **ALLOWING** <u>1817</u> Motion for Leave to Appear Pro Hac Vice Added Bruce B. Berman. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Elisabeth Kimmel (13); **ALLOWING** <u>1818</u> Motion for Leave to Appear Pro Hac Vice Added George P. Varghese. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 04/30/2021) |
| --- | --- | --- |
| 04/30/2021 | 1821 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to John Wilson <u>1811</u> MOTION To Modify Protective Order Governing Documents Received From USC filed by John Wilson (Lima, Christine) Motions referred to M. Page Kelley. (Entered: 04/30/2021) |
| 04/30/2021 | <u>1823</u> | MOTION to Travel *(Motion Seeking Permission of the Court to Travel Internationally)* as to I–Hsin Chen. (Cahn, Reuben) (Entered: 04/30/2021) |
| 04/30/2021 | <u>1824</u> | Magistrate Judge M. Page Kelley: ORDER entered granting 1811 MOTION To Modify Protective Order Governing Documents Received From USC as to John Wilson. (Belmont, Kellyann) (Entered: 05/03/2021) |
| 05/03/2021 | <u>1825</u> | Judge Nathaniel M. Gorton: ORDER entered. **ALLOWING** <u>1823</u> Motion to Travel as to I–Hsin Chen (7) (Vieira, Leonardo) (Entered: 05/03/2021) |
| 05/04/2021 | <u>1827</u> | MOTION for Leave to File *Ex Parte Motion Under Seal* as to Gamal Abdelaziz, Homayoun Zadeh. (Siddall, Megan) (Entered: 05/04/2021) |
| 05/05/2021 | 1828 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Homayoun Zadeh <u>1827</u> MOTION for Leave to File *Ex Parte Motion Under Seal* filed by Homayoun Zadeh, Gamal Abdelaziz (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 05/05/2021) |
| 05/05/2021 | 1829 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting <u>1827</u> MOTION for Leave to File Ex Parte Motion Under Seal as to Gamal Abdelaziz, Homayoun Zadeh. Clerk to provide link. (Belmont, Kellyann) (Entered: 05/05/2021) |
| 05/05/2021 | <u>1830</u> | MOTION to Seal Document */ portions of sentencing memorandum and certain letters in support of Mr. McGlashan.* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 05/05/2021) |
| 05/06/2021 | 1832 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. **ALLOWING** <u>1830</u> Motion to Seal Document as to William McGlashan Jr. (15). Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Vieira, Leonardo) (Entered: 05/06/2021) |
| 05/07/2021 | <u>1838</u> | SENTENCING MEMORANDUM by William McGlashan, Jr (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C)(Pirozzolo, Jack) (Entered: 05/07/2021) |
| 05/07/2021 | <u>1839</u> | SENTENCING MEMORANDUM by USA as to William McGlashan, Jr (O'Connell, Justin) (Entered: 05/07/2021) |
| 05/07/2021 | <u>1840</u> | SENTENCING MEMORANDUM by William McGlashan, Jr (Attachments: # <u>1</u> Exhibit B, # <u>2</u> Exhibit C)(Vieira, Leonardo) (Entered: 05/10/2021) |
| 05/12/2021 | 1843 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 5/12/2021 for William McGlashan, Jr. (15), Count(s) 1ss, 2ss, 3ss, Dismissed on Government motion; Count(s) 7ss: After consultation with counsel, Court rules that the Exhibit letters to the Defendant's sentencing memorandum are to be unsealed. Court goes over the objections to the PSR. Court calculations the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court formally accepts the C plea and imposes sentence: Defendant sentenced to a term of 3 months imprisonment, to be followed by a term of 2 years Supervised Release; $250,000 Fine; $100 Special Assessment. Defendant informed of right to appeal. Defendant |

| | | |
|---|---|---|
| | | to self–surrender to the facility designated by the Bureau of Prisons by 2:00 PM on 6/9/21. (Attorneys present: Pirozzolo, Hueston, O'Connell, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 05/12/2021) |
| 05/14/2021 | 1848 | Memorandum from Probation regarding Request for International Travel as to Lori Loughlin. Requested action: Approval by District Judge (McAnally, Sean) (Entered: 05/14/2021) |
| 05/14/2021 | 1849 | Memorandum from Probation regarding Request for International Travel as to Mossimo Giannulli. Requested action: Approval by District Judge (McAnally, Sean) (Entered: 05/14/2021) |
| 05/19/2021 | 1850 | Assented to MOTION for Protective Order *modification* as to Gamal Abdelaziz, Homayoun Zadeh, and Elisabeth Kimmel (Sheketoff, Robert) Modified on 5/20/2021 to fix parties (Vieira, Leonardo). (Entered: 05/19/2021) |
| 05/20/2021 | 1852 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh 1850 Assented to MOTION for Protective Order *modification* filed by Gamal Abdelaziz (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 05/20/2021) |
| 05/20/2021 | 1853 | Judge Denise J. Casper: ENDORSED ORDER entered as to Mossimo Giannulli approving 1849 Memorandum from Probation regarding Request for International Travel (Lima, Christine) (Entered: 05/20/2021) |
| 05/20/2021 | 1854 | Judge Denise J. Casper: ORDER entered as to Lori Loughlin approving 1848 Memorandum from Probation regarding Request for International Travel (Lima, Christine) (Entered: 05/20/2021) |
| 05/20/2021 | 1855 | Transcript of Sentencing as to William McGlashan, Jr held on May 12, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/10/2021. Redacted Transcript Deadline set for 6/21/2021. Release of Transcript Restriction set for 8/18/2021. (Coppola, Katelyn) (Entered: 05/21/2021) |
| 05/20/2021 | 1856 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 05/21/2021) |
| 05/22/2021 | 1857 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to William McGlashan, Jr. (15), Count(s) 1ss, 2ss, 3ss, Dismissed on Government motion; Count(s) 7ss, Defendant sentenced to a term of 3 months imprisonment, to be followed by a term of 2 years Supervised Release; $250,000 Fine; $100 Special Assessment (Lima, Christine) (Entered: 05/24/2021) |
| 05/25/2021 | 1861 | NOTICE OF APPEAL by William McGlashan, Jr re 1334 Memorandum & Order, 1857 Judgment, Filing fee: $ 505, receipt number 0101–8791418 (Fee Status: Filing Fee paid) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** US District Court Clerk to deliver official record to Court of Appeals by 6/14/2021. (Pirozzolo, Jack) (Entered: 05/25/2021) |
| 05/25/2021 | 1862 | MOTION for Leave to File *Ex Parte and Sealed Document* as to Gamal Abdelaziz, Elisabeth Kimmel, Homayoun Zadeh. (Siddall, Megan) (Entered: 05/25/2021) |
| 05/25/2021 | 1863 | MOTION for Leave to File Excess Pages *and Partially Under Seal a Memorandum in Support of Motion to Dismiss or for Other Relief* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 05/25/2021) |

| 05/26/2021 | 1865 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to William McGlashan, Jr to US Court of Appeals re 1861 Notice of Appeal – Final Judgment. (Paine, Matthew) (Entered: 05/26/2021) |
| 05/26/2021 | 1866 | USCA Case Number as to William McGlashan, Jr 21–1421 for 1861 Notice of Appeal – Final Judgment. (Paine, Matthew) (Entered: 05/26/2021) |
| 05/26/2021 | 1867 | MOTION to Transfer Case to Central District of California. as to Amy Colburn, Gregory Colburn, I–Hsin Chen by Amy Colburn. (Attachments: # 1 Exhibit)(Schumacher, David) (Entered: 05/26/2021) |
| 05/26/2021 | 1868 | MOTION to Seal Document *and submit declarations in support of Motion to Transfer Case Ex Parte* as to Amy Colburn, Gregory Colburn, I–Hsin Chen by Amy Colburn. (Schumacher, David) (Entered: 05/26/2021) |
| 05/26/2021 | 1869 | Judge Nathaniel M. Gorton: ORDER entered re 1863 Motion for Leave to File Excess Pages. Motion **ALLOWED,** in part, and **DENIED,** in part; sensitive information in the memorandum may be redacted from the publicly–filed document but the memorandum shall not exceed 30 pages in length.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Elisabeth Kimmel (13) (Vieira, Leonardo) (Entered: 05/26/2021) |
| 05/26/2021 | 1870 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 1862 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Homayoun Zadeh (18) (Vieira, Leonardo) (Entered: 05/26/2021) |
| 05/27/2021 | 1873 | MOTION for Leave to File *a Motion Ex Parte and Under Seal* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 05/27/2021) |
| 05/27/2021 | 1876 | Judge Nathaniel M. Gorton: ORDER entered: re 1868 Motion to Seal Document as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7). Motion **ALLOWED,** in part, and **DENIED,** in part; defendants may file declarations (Affidavit in Massachusetts) under seal but not ex parte. (Vieira, Leonardo) (Entered: 05/28/2021) |
| 05/28/2021 | 1874 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered. ORDER REFERRING MOTION as to Elisabeth Kimmel 1873 MOTION for Leave to File *a Motion Ex Parte and Under Seal* filed by Elisabeth Kimmel (Vieira, Leonardo) Motions referred to M. Page Kelley. (Entered: 05/28/2021) |
| 05/28/2021 | 1875 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1873 Motion Ex Parte and Under Seal as to Elisabeth Kimmel (13). Clerk to send link. (Belmont, Kellyann) (Entered: 05/28/2021) |
| 05/28/2021 | 1877 | MOTION to Dismiss *or for Other Relief Based on Constitutional Violations* as to Elisabeth Kimmel. (Popeo, R.) (Entered: 05/28/2021) |
| 05/28/2021 | 1878 | MEMORANDUM in Support by Elisabeth Kimmel re 1877 MOTION to Dismiss *or for Other Relief Based on Constitutional Violations* (Popeo, R.) (Additional attachment(s) added on 6/1/2021: # 1 Memorandum in Support of Defendant Elisabeth Kimmel's motion to Dismiss) (Vieira, Leonardo). (Entered: 05/28/2021) |
| 05/28/2021 | 1879 | AFFIDAVIT in Support by Elisabeth Kimmel re 1877 MOTION to Dismiss *or for Other Relief Based on Constitutional Violations (Declaration of Eoin Beirne)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30)(Popeo, R.) (Additional attachment(s) added on 6/1/2021: # 31 Declaration of Eoin Beirne, # 32 Exhibit 1 (SEALED), # 33 Exhibit 2 (SEALED), # 34 Exhibit 3 (SEALED), # 35 Exhibit 8 (SEALED)) (Vieira, Leonardo). (Entered: 05/28/2021) |

**A160**

| 06/07/2021 | 1886 | MOTION for Leave to File *Ex Parte and Sealed Document* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 06/07/2021) |
|---|---|---|
| 06/07/2021 | 1888 | MOTION for Leave to File *Document Ex Parte and Under Seal* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 06/07/2021) |
| 06/07/2021 | 1889 | Magistrate Judge M. Page Kelley: ELECTRONIC ORDER entered granting 1886 Motion for Leave to File as to Gamal Abdelaziz (4); granting 1888 Motion for Leave to File as to Elisabeth Kimmel (13). Clerk to send links. (Belmont, Kellyann) (Entered: 06/07/2021) |
| 06/09/2021 | | Terminated defendant Robert Zangrillo, pending deadlines, and motions. (Lima, Christine) (Entered: 06/09/2021) |
| 06/09/2021 | 1892 | Opposition by USA as to Amy Colburn, Gregory Colburn, I–Hsin Chen re 1867 MOTION to Transfer Case to Central District of California. (Wright, Leslie) (Entered: 06/09/2021) |
| 06/10/2021 | 1894 | STATUS REPORT by USA as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Frank, Stephen) (Entered: 06/10/2021) |
| 06/10/2021 | 1895 | NOTICE OF ATTORNEY APPEARANCE Ian J. Stearns appearing for USA. (Stearns, Ian) (Entered: 06/10/2021) |
| 06/11/2021 | 1896 | ELECTRONIC NOTICE OF RESCHEDULING as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.

Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

Status Conference set for 6/15/2021 03:30 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY. (Lima, Christine) (Entered: 06/11/2021) |
| 06/11/2021 | 1898 | Response as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo: (Maynard, Lauren) (Entered: 06/11/2021) |
| 06/11/2021 | 1899 | MOTION for Leave to File *Reply Brief* as to Amy Colburn, Gregory Colburn, I–Hsin Chen by Gregory Colburn, Amy Colburn. (Schumacher, David) (Entered: 06/11/2021) |
| 06/11/2021 | 1900 | Opposition by USA as to Elisabeth Kimmel re 1877 MOTION to Dismiss *or for Other Relief Based on Constitutional Violations* (Attachments: # 1 Exhibit A)(Stearns, Ian) (Entered: 06/11/2021) |
| 06/14/2021 | 1902 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1899 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7). Reply memo, not to exceed 5 pages, to be filed no later than 5:00 PM today (June 14, 2021). (Lima, Christine) (Entered: 06/14/2021) |
| 06/14/2021 | 1903 | REPLY TO RESPONSE to Motion by Gregory Colburn, Amy Colburn as to Amy Colburn, Gregory Colburn, I–Hsin Chen re 1867 MOTION to Transfer Case to Central District of California. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schumacher, David) (Entered: |

A161

| | | |
|---|---|---|
| | | 06/14/2021) |
| 06/15/2021 | 1904 | Judge Nathaniel M. Gorton: ORDER entered: For the foregoing reasons, defendants' motion to transfer (Docket No. 1867 ) is **DENIED.**<br><br>So ordered. (Vieira, Leonardo) (Entered: 06/15/2021) |
| 06/15/2021 | 1905 | MOTION To File A Further Response To The Government's June 10, 2021 Status Report On An Ex Parte Basis as to Marci Palatella. (Loucks, Michael) (Entered: 06/15/2021) |
| 06/15/2021 | 1906 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered denying 1905 Motion To File A Further Response To The Government's June 10, 2021 Status Report On An Ex Parte Basis as to Marci Palatella (16). Motion to file on an ex parte basis denied. (Lima, Christine) (Entered: 06/15/2021) |
| 06/15/2021 | 1908 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Status Conference as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh held by video on 6/15/2021. 8 Defendants currently remain in this case. Court informs counsel that it has denied Document No. 1867 and will be denying 1877 with a Memorandum and Order to follow. Defendant Kimmel may file reply, not to exceed 5 pages, by close of business on Friday (6/18). Court informs Defendants that it can fit a maximum of 6 Defendants in one courtroom at the Moakley Courthouse. If the total number of defendants is 6, Court will proceed with jury empanelment on 9/8/21 as scheduled. If there are still 8 defendants remaining, Court will sever the case. Defendants Abdelaziz, Kimmel, Palatell, Wilson, and Zadeh will proceed on 9/8/21, and Defendants Colburn, Colburn, and Chen will proceed on 1/11/22, with a Final Pretrial Conference to be held o 1/5/22. Court slightly modifies it's prior order issuing pretrial deadlines (Document No. 179). Government informs the Court that it will not be filing expert disclosures. Defendants have until 6/25/21 to file their reciprocal discovery. Exhibit/Witness list due by 6/25/21; objections by 7/3/21. All other deadlines remain in effect. Defendant Wilson may file a motion for reconsideration, not to exceed 10 pages, re: the issue of severance as soon as possible. Court goes over potential length of trial. Jury Trial set for 9/8/2021 09:00 AM in Courtroom 1 before Judge Nathaniel M. Gorton. (Attorneys present: Frank, Schumacher, Hooper, Kelly, Maynard, Beirne, Robinson, Popeo, Flashner, Dicanio, Loucks, Tomback, Kendall, Miner, Keller. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) Modified on 6/17/2021 (Lima, Christine). (Entered: 06/16/2021) |
| 06/17/2021 | 1909 | MOTION Trial Management And To Reconsider Severance as to John Wilson. (Kendall, Michael) (Entered: 06/17/2021) |
| 06/17/2021 | 1915 | Transcript of Status Conference as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, I–Hsin Chen, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh held on June 15, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/8/2021. Redacted Transcript Deadline set for 7/19/2021. Release of Transcript Restriction set for 9/15/2021. (Coppola, Katelyn) (Entered: 06/21/2021) |
| 06/17/2021 | 1918 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 06/21/2021) |
| 06/18/2021 | 1911 | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Siddall, Megan) (Entered: 06/18/2021) |
| 06/18/2021 | 1912 | Opposition by USA as to John Wilson re 1909 MOTION Trial Management And To Reconsider Severance (Stearns, Ian) (Entered: 06/18/2021) |
| 06/18/2021 | 1913 | REPLY TO RESPONSE to Motion by Elisabeth Kimmel re 1877 MOTION to Dismiss *or for Other Relief Based on Constitutional Violations* (Popeo, R.) (Entered: 06/18/2021) |
| 06/21/2021 | 1914 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 1911 Motion to Modify Conditions of Release as to Homayoun Zadeh (18) (Vieira, Leonardo) (Entered: 06/21/2021) |

**A162**

| 06/21/2021 | 1916 | Judge Nathaniel M. Gorton: ORDER entered **DENYING** 1909 Motion as to John Wilson (17). (Vieira, Leonardo) (Entered: 06/21/2021) |
|---|---|---|
| 06/21/2021 | 1917 | Judge Nathaniel M. Gorton: ORDER entered: as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh. **Please see attached Order.** (Vieira, Leonardo) (Entered: 06/21/2021) |
| 06/21/2021 | 1919 | Reset Hearings as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh. Reciprocal discovery from defendants: Friday, June 25, 2021; Government exhibit/witness lists: Friday, June 25, 2021; Defense expert disclosures: Friday, July 2, 2021; Defense exhibit/witness lists: Friday, July 16, 2021; Meet/confer on documents, etc.: Wednesday, July 21, 2021; Rebuttal expert disclosures: Wednesday, July 28, 2021; All parties motions in limine, voir dire, jury instructions: Friday, July 30, 2021; All responses to motions in limine, voir dire, jury instructions: Friday, August 6, 2021; Final Pretrial Conference set for 8/18/2021 11:00 AM Jury Empanelment set for 9/8/2021 09:00 AM Jury Trial set for 9/13/2021 09:00 AM (Vieira, Leonardo) (Vieira, Leonardo). (Entered: 06/21/2021) |
| 06/21/2021 | 1920 | Set/Reset Hearings as to Amy Colburn, Gregory Colburn, I–Hsin Chen. Final Pretrial Conference set for 1/5/2022 11:00 AM Jury Trial set for 1/13/2022 09:00 AM Reciprocal discovery from defendants: Monday, September 27, 2021; Government exhibit/witness lists: Friday, October 15, 2021; Defense expert disclosures: Monday, October 25, 2021; Defense exhibit/witness lists: Friday, November 12, 2021; Meet/confer on documents, etc.: Wednesday, November 17, 2021; Rebuttal expert disclosures: Wednesday, December 1, 2021; All parties motions in limine, voir dire, jury instructions: Friday, December 10, 2021; All responses to motions in limine, voir dire, jury instructions: Friday, December 17, 2021; (Vieira, Leonardo) (Vieira, Leonardo). (Entered: 06/21/2021) |
| 06/25/2021 | 1921 | Assented to MOTION to Seal *Government's Exhibit List* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh by USA. (Kearney, Kristen) (Entered: 06/25/2021) |
| 06/25/2021 | 1922 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1921 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to |

| | | |
|---|---|---|
| | | file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18) (Lima, Christine) (Entered: 06/25/2021) |
| 06/25/2021 | 1923 | Assented to MOTION for Leave to Appear Pro Hac Vice by Emily A. Reitmeier Filing fee $ 100, receipt number 0101–8835398. as to Marci Palatella. (Attachments: # 1 Exhibit 1 (Certification Of Emily A. Reitmeier))(Loucks, Michael) (Entered: 06/25/2021) |
| 06/25/2021 | 1924 | EXHIBIT/WITNESS LIST by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh (O'Connell, Justin) (Entered: 06/25/2021) |
| 06/25/2021 | 1925 | EXHIBIT/WITNESS LIST by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh (O'Connell, Justin) (Entered: 06/25/2021) |
| 06/25/2021 | 1926 | EXHIBIT re 1925 Exhibit/Witness List filed by USA by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh (O'Connell, Justin) (Entered: 06/25/2021) |
| 06/25/2021 | 1927 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: For the foregoing reasons, defendant Elisabeth Kimmel's motion to dismiss (Docket No. 1877 ) is **DENIED** without prejudice. So ordered. (Vieira, Leonardo) (Entered: 06/28/2021) |
| 06/25/2021 | 1928 | Exhibit List, filed under seal, as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, Homayoun Zadeh, filed by USA. (Lima, Christine) (Entered: 06/28/2021) |
| 07/01/2021 | 1929 | SUPERSEDING INFORMATION (Felony) as to Homayoun Zadeh (18) count(s) 1sss. (Attachments: # 1 JS45)(Alves–Baptista, Antonia) (Entered: 07/01/2021) |
| 07/01/2021 | 1930 | PLEA AGREEMENT as to Homayoun Zadeh (Frank, Stephen) (Entered: 07/01/2021) |
| 07/01/2021 | 1931 | MOTION for Rule 11 Hearing as to Homayoun Zadeh by USA. (Frank, Stephen) (Entered: 07/01/2021) |
| 07/01/2021 | 1932 | MOTION for Re–Consolidation as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Frank, Stephen) (Entered: 07/01/2021) |
| 07/02/2021 | 1933 | Opposition by Gamal Abdelaziz as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1932 MOTION for Re–Consolidation (Maynard, Lauren) (Entered: 07/02/2021) |
| 07/02/2021 | 1934 | ELECTRONIC NOTICE OF HEARING as to Homayoun Zadeh This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. Waiver of Indictment and Plea to Information hearing set for 7/9/2021 02:30 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 07/02/2021) |

| 07/06/2021 | 1935 | Opposition by Amy Colburn re 1932 MOTION for Re−Consolidation (Attachments: # 1 Exhibit 1)(Schumacher, David) (Entered: 07/06/2021) |
| 07/06/2021 | 1936 | Opposition by Gregory Colburn re 1932 MOTION for Re−Consolidation (Schumacher, David) (Entered: 07/06/2021) |
| 07/06/2021 | 1937 | Opposition by I−Hsin Chen as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1932 MOTION for Re−Consolidation *(I−Hsin "Joey" Chen's Opposition to Re−Consolidation)* (Cahn, Reuben) (Entered: 07/06/2021) |
| 07/06/2021 | 1938 | MOTION for Leave to File *Reply Brief in Support of Motion for Re−Consolidation* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by USA. (Attachments: # 1 Exhibit A (Proposed Reply Brief))(Frank, Stephen) (Entered: 07/06/2021) |
| 07/07/2021 | 1939 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1931 Motion for Rule 11 Hearing as to Homayoun Zadeh (18) (Lima, Christine) (Entered: 07/07/2021) |
| 07/07/2021 | 1940 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1938 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), I−Hsin Chen (7), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Lima, Christine) (Entered: 07/07/2021) |
| 07/07/2021 | 1941 | REPLY TO RESPONSE to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1932 MOTION for Re−Consolidation (Frank, Stephen) (Entered: 07/07/2021) |
| 07/09/2021 | 1942 | WAIVER OF INDICTMENT by Homayoun Zadeh (Lima, Christine) (Entered: 07/09/2021) |
| 07/09/2021 | 1943 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Waiver of Indictment and Plea to Information as to Homayoun Zadeh held by video on 7/9/2021. Defendant sworn. Court has colloquy with Defendant re: waiving of indictment. Waiver to be filed forthwith, and is accepted by the Court. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for the Court and Defendant. Government reminds Defendant of the maximum possible penalties. Government informs the Defendant of the facts it would prove if this matter were to go to trial. Plea entered by Homayoun Zadeh (18): Guilty Count 1sss. Sentencing set for 11/10/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant remains released on personal recognizance. (Attorneys present: Miner, Kearney. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Lima, Christine) (Entered: 07/12/2021) |
| 07/12/2021 | 1944 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Homayoun Zadeh Sentencing set for 11/10/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 07/12/2021) |
| 07/12/2021 | 1945 | Case as to Homayoun Zadeh no longer referred to Magistrate Judge M. Page Kelley. (Belmont, Kellyann) (Entered: 07/12/2021) |
| 07/12/2021 | 1946 | Transcript of Hearing as to Homayoun Zadeh held on July 9, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 8/2/2021. Redacted Transcript Deadline set for 8/12/2021. Release of Transcript Restriction set for 10/12/2021. (Coppola, Katelyn) (Entered: 07/14/2021) |

| 07/12/2021 | 1947 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 07/14/2021) |
|---|---|---|
| 07/15/2021 | 1948 | Judge Nathaniel M. Gorton: ORDER entered denying 1932 MOTION for Re−Consolidation as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), I–Hsin Chen (7), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18) (McDonagh, Christina) (Entered: 07/15/2021) |
| 07/15/2021 | 1949 | MOTION for Order *Requiring Appearance of Counsel* as to I–Hsin Chen. (Attachments: # 1 Proposed Order)(Cahn, Reuben) (Entered: 07/15/2021) |
| 07/16/2021 | 1950 | NOTICE OF ATTORNEY APPEARANCE Raquelle L. Kaye appearing for USA. (Kaye, Raquelle) (Entered: 07/16/2021) |
| 07/16/2021 | 1951 | SATISFACTION OF JUDGMENT as to William McGlashan, Jr (Kaye, Raquelle) (Entered: 07/16/2021) |
| 07/16/2021 | 1952 | EXHIBIT/WITNESS LIST by John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 07/16/2021) |
| 07/16/2021 | 1953 | EXHIBIT/WITNESS LIST by Marci Palatella (Loucks, Michael) (Entered: 07/16/2021) |
| 07/16/2021 | 1954 | EXHIBIT/WITNESS LIST by Elisabeth Kimmel (Attachments: # 1 Exhibit A)(Beirne, Eoin) (Entered: 07/16/2021) |
| 07/16/2021 | 1955 | EXHIBIT/WITNESS LIST by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson (Sharp, Joshua) (Entered: 07/16/2021) |
| 07/16/2021 | 1956 | EXHIBIT/WITNESS LIST by Gamal Abdelaziz (Sharp, Joshua) (Entered: 07/16/2021) |
| 07/19/2021 | 1957 | MOTION for Order *Requiring Appearance of Counsel* as to Amy Colburn, Gregory Colburn. (Attachments: # 1 Text of Proposed Order)(Hooper, Patric) (Entered: 07/19/2021) |
| 07/19/2021 | 1958 | EXHIBIT/WITNESS LIST by John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 07/19/2021) |
| 07/20/2021 | 1959 | Judge Nathaniel M. Gorton: ORDER entered. The Motion will be held in abeyance pending the results of the request re 1957 MOTION for Order *Requiring Appearance of Counsel* filed by Gregory Colburn, Amy Colburn (McDonagh, Christina) (Entered: 07/20/2021) |
| 07/20/2021 | 1960 | Judge Nathaniel M. Gorton: ORDER entered. The Motion will be held in abeyance pending the results of the request re 1949 MOTION for Order *Requiring Appearance of Counsel* filed by I–Hsin Chen (McDonagh, Christina) (Entered: 07/20/2021) |
| 07/22/2021 | 1962 | Judgment Returned Executed as to Todd Blake on 7/12/2021. (McDonagh, Christina) (Entered: 07/23/2021) |
| 07/23/2021 | 1961 | MOTION for Leave to File *Document Partially Under Seal and Partially Ex Parte* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 07/23/2021) |
| 07/26/2021 | 1965 | MOTION to Release Passport as to Homayoun Zadeh. (Siddall, Megan) (Entered: 07/26/2021) |
| 07/27/2021 | 1966 | Judge Nathaniel M. Gorton: ORDER entered. Motion allowed but defendant shall provide the government with an unredacted copy 1961 MOTION for Leave to File Document Partially Under Seal and Partially Ex Parte ; Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4) (McDonagh, Christina) (Entered: 07/27/2021) |
| 07/27/2021 | 1967 | MOTION Order of Witness Immunity *[REDACTED VERSION]* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Sharp, Joshua) (Main Document 1967 replaced on 7/29/2021) (Lima, Christine). (Entered: 07/27/2021) |
| 07/27/2021 | 1968 | MOTION for Order as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson, filed under seal. (Lima, Christine) (Entered: 07/27/2021) |

| 07/27/2021 | 1970 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 1965 Motion to Release Passport as to Homayoun Zadeh (18) (McDonagh, Christina) (Entered: 07/28/2021) |
|---|---|---|
| 07/28/2021 | 1969 | MOTION for Leave to File *Document Partially Under Seal* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/28/2021) |
| 07/28/2021 | 1972 | Judge Nathaniel M. Gorton: ORDER entered Motion allowed; defendant shall provide the government with an unredacted copy re 1969 MOTION for Leave to File Document Partially Under Seal; Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (McDonagh, Christina) (Entered: 07/28/2021) |
| 07/28/2021 | 1973 | NOTICE *of Withdrawal of Motion* by Amy Colburn, Gregory Colburn re 1957 MOTION for Order *Requiring Appearance of Counsel* (Hooper, Patric) (Entered: 07/28/2021) |
| 07/29/2021 | 1974 | Assented to MOTION for Leave to File *Motion in Limine Exceeding Page Limit and Exhibits under Seal* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 07/29/2021) |
| 07/29/2021 | 1975 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 1957 Motion for Order as to Gregory Colburn (2), Amy Colburn (3) (Lima, Christine) (Entered: 07/29/2021) |
| 07/29/2021 | 1976 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1974 Motion for Leave to File Motion in Limine Exceeding Page Limit and Exhibits under Seal as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (Lima, Christine) (Entered: 07/29/2021) |
| 07/29/2021 | 1977 | Assented to MOTION for Leave to File Excess Pages *and Partially Under Seal a Motion in Limine* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/29/2021) |
| 07/29/2021 | 1978 | Supplemental MOTION *to Release Passports* as to Homayoun Zadeh. (Attachments: # 1 Exhibit Proposed Order)(Miner, Tracy) (Entered: 07/29/2021) |
| 07/29/2021 | 1979 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1923 Motion for Leave to Appear Pro Hac Vice Added Emily A. Reitmeier. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Marci Palatella (16) (Lima, Christine) (Entered: 07/29/2021) |
| 07/29/2021 | 1980 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1977 Motion for Leave to File Excess Pages and to file under seal as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 07/29/2021) |
| 07/30/2021 | 1981 | Assented to MOTION for Leave to File *Under Seal Motions in Limine regarding Marital Communications and Uncharged Third Parties* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 07/30/2021) |
| 07/30/2021 | 1982 | Assented to MOTION for Leave to File *Motion in Limine Under Seal* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1983 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1981 Assented to MOTION for Leave to File Under Seal Motions in Limine regarding Marital Communications and Uncharged Third Parties; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 07/30/2021) |
| 07/30/2021 | 1984 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 1982 Assented to MOTION for Leave to File Motion in Limine Under Seal; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (McDonagh, Christina) (Entered: 07/30/2021) |
| 07/30/2021 | 1985 | Assented to MOTION for Extension of Time to File *Proposed Jury Instructions* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by John Wilson. (Kendall, |

| | | |
|---|---|---|
| | | Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 1986 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered ALLOWING 1985 Assented to MOTION for Extension of Time to File Proposed Jury Instructions as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 07/30/2021) |
| 07/30/2021 | 1987 | Judge Nathaniel M. Gorton: ORDER entered granting 1978 Supplemental MOTION to Release Passports as to Homayoun Zadeh (18) (McDonagh, Christina) (Entered: 07/30/2021) |
| 07/30/2021 | 1988 | MOTION in Limine *to Exclude Marital Privileged Communications and the Fruits of Marital Communications That the Government Improperly Seized* as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson by John Wilson. (Attachments: # 1 Memorandum in Support of John Wilsons Motion in Limine to Exclude Marital Privileged Communications and the Fruits of Marital Communications That the Government Improperly Seized)(Kendall, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 1989 | MOTION in Limine *to Preclude Argument or Evidence Contrary to Law Concerning Money Laundering* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by John Wilson. (Attachments: # 1 Memorandum in Support of Motion in Limine to Preclude Argument or Evidence Contrary to Law Concerning Money Laundering, # 2 Exhibit 1)(Kendall, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 1990 | MOTION in Limine *to Require the Government to Proffer its Corroborating Evidence of the Alleged Conspiracy Under Petrozziello* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1991 | MEMORANDUM in Support by Elisabeth Kimmel as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1990 MOTION in Limine *to Require the Government to Proffer its Corroborating Evidence of the Alleged Conspiracy Under Petrozziello* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Flashner, Cory) (Additional attachment(s) added on 8/2/2021: # 4 Unredacted Memo (FILED UNDER SEAL), # 5 Exhibit A (FILED UNDER SEAL), # 6 Exhibit B (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 07/30/2021) |
| 07/30/2021 | 1992 | MOTION in Limine *to Preclude Evidence of Defendants' Incomes, Wealth, Spending, or Lifestyles* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1993 | MOTION in Limine *to Exclude Evidence Concerning Internal Revenue Agent's Beliefs or Opinions as to State of Mind or Questions of Tax Law* as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Memorandum in Support of Motion in Limine to Exclude Evidence Concerning Internal Revenue Agent's Beliefs or Opinions as to Wilson's State of Mind or Questions of Tax Law)(Kendall, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 1994 | MEMORANDUM in Support by Elisabeth Kimmel as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1992 MOTION in Limine *to Preclude Evidence of Defendants' Incomes, Wealth, Spending, or Lifestyles* (Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1995 | MOTION in Limine *to Exclude Reference to Stephen Wynn* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 07/30/2021) |
| 07/30/2021 | 1996 | MOTION in Limine *to Exclude Evidence Pertaining to Defendants Who Pled Guilty* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by Elisabeth Kimmel. (Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1997 | MEMORANDUM in Support by Elisabeth Kimmel as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1996 MOTION in Limine *to Exclude Evidence Pertaining to Defendants Who Pled Guilty* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Flashner, Cory) (Entered: 07/30/2021) |
| 07/30/2021 | 1998 | MOTION in Limine *to Exclude Evidence of Private School Tuition Payments* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by John Wilson. (Attachments: # 1 Memorandum in Support of Motion in Limine to Exclude Evidence of Private School Tuition Payments)(Kendall, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 1999 | Joint MOTION *to Utilize Juror Questionnaire and Continue Deadline Regarding Voir Dire* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Wright, |

| | | Leslie) (Entered: 07/30/2021) |
|---|---|---|
| 07/30/2021 | 2000 | MOTION in Limine *to Limit Testimony of Nitya Velakachrla* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit A)(Sharp, Joshua) (Entered: 07/30/2021) |
| 07/30/2021 | 2001 | MOTION in Limine *to Preclude Irrelevant Evidence Concerning Uncharged Third Parties* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Additional attachment(s) added on 8/2/2021: # 1 SEALED Motion, # 2 Exhibit A–ZZ (filed under seal), # 3 Exhibit AAA – WWW (filed under seal)) (Lima, Christine). (Entered: 07/30/2021) |
| 07/30/2021 | 2002 | MOTION in Limine *To Exclude Evidence Regarding "Taking" An Admissions Spot* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Loucks, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 2003 | MOTION in Limine *to Preclude Entrapment Defense* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 07/30/2021) |
| 07/30/2021 | 2004 | MOTION in Limine *to Introduce Marital Communications* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Kearney, Kristen) (Additional attachment(s) added on 8/2/2021: # 1 SEALED Motion, # 2 Exhibit A–M (filed under seal)) (Lima, Christine). (Entered: 07/30/2021) |
| 07/30/2021 | 2005 | MEMORANDUM in Support by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2002 MOTION in Limine *To Exclude Evidence Regarding "Taking" An Admissions Spot* (Loucks, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 2006 | MOTION in Limine *to Preclude and Limit Defendants' Proposed Expert Testimony* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Stearns, Ian) (Entered: 07/30/2021) |
| 07/30/2021 | 2007 | MOTION in Limine *to Preclude the Introduction of Judicial Statements Regarding Credibility* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Wright, Leslie) (Entered: 07/30/2021) |
| 07/30/2021 | 2008 | MOTION in Limine *to Preclude Defendants' Use of Co–Conspirator Statements Other Than for Impeachment* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 07/30/2021) |
| 07/30/2021 | 2009 | MOTION in Limine *to Preclude Evidence and Argument Seeking Jury Nullification* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 07/30/2021) |
| 07/30/2021 | 2010 | MOTION in Limine *to Exclude Evidence or Reference to Donna Heinel Personally Receiving Any Money from Rick Singer* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Attachments: # 1 Exhibit A)(Sharp, Joshua) (Entered: 07/30/2021) |
| 07/30/2021 | 2011 | MOTION in Limine *Motion in Limine to Exclude Evidence Postdating Rick Singer's Cooperation with the Government* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by John Wilson. (Attachments: # 1 Memorandum in Support Motion in Limine to Exclude Evidence Postdating Rick Singers Cooperation with the Government)(Kendall, Michael) (Entered: 07/30/2021) |
| 07/30/2021 | 2012 | APPENDIX/EXHIBIT by John Wilson as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson 2011 MOTION in Limine *Motion in Limine to Exclude Evidence Postdating Rick Singer's Cooperation with the Government* filed by John Wilson (Kendall, Michael) (Entered: 07/30/2021) |
| 08/02/2021 | 2013 | MOTION in Limine to Exclude Evidence of Testing Accommodations as to Elisabeth Kimmel, joined by John Wilson. (McDonagh, Christina) (Entered: 08/02/2021) |
| 08/02/2021 | 2014 | Proposed Jury Instructions by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson (Stearns, Ian) (Entered: 08/02/2021) |
| 08/02/2021 | 2015 | Proposed Jury Instructions by John Wilson as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Additional attachment(s) added on 8/3/2021: # 2 Unredacted Jury Instructions (FILED UNDER SEAL), # 3 Ex. A (Filed Under Seal)) (McDonagh, Christina). (Entered: 08/02/2021) |

A169

| 08/04/2021 | 2016 | Judge Nathaniel M. Gorton: ORDER entered Motion ALLOWED but the parties shall submit their joint proposed Questionaire by the close of business on Thurs. Aug. 12, 2021 re 1999 Joint MOTION to Utilize Juror Questionnaire and Continue Deadline Regarding Voir Dire as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/04/2021) |
|---|---|---|
| 08/05/2021 | 2017 | Assented to MOTION to Seal *Two of Government's Oppositions to Defendants' Motions in Limine* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Stearns, Ian) (Entered: 08/05/2021) |
| 08/05/2021 | 2019 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2017 Assented to MOTION to Seal Two of Government's Oppositions to Defendants' Motions in Limine. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/05/2021) |
| 08/05/2021 | 2020 | Joint MOTION for Extension of Time to File *Responses to Proposed Jury Instructions* as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson by John Wilson. (Kendall, Michael) (Entered: 08/05/2021) |
| 08/05/2021 | 2021 | Assented to MOTION for Leave to File Excess Pages as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Flashner, Cory) (Entered: 08/05/2021) |
| 08/05/2021 | 2022 | MOTION for Protective Order as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Attachments: # 1 Exhibit EXHIBIT A PROPOSED ORDER)(Sharp, Joshua) (Entered: 08/05/2021) |
| 08/05/2021 | 2023 | NOTICE *of Withdrawal of Motion* by I–Hsin Chen re 1949 MOTION for Order *Requiring Appearance of Counsel* (Cahn, Reuben) (Entered: 08/05/2021) |
| 08/05/2021 | 2024 | MOTION / Defendants Assented–To Motion for Leave to File Briefs Opposing Government Motion in Limine Partially Under Seal, And to File Exhibits Under Seal, And to Exceed Page Limit as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson. (Kendall, Michael) (Entered: 08/05/2021) |
| 08/06/2021 | 2025 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2020 oint MOTION for Extension of Time to File Responses to Proposed Jury Instructions as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/06/2021) |
| 08/06/2021 | 2026 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2021 Assented to MOTION for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/06/2021) |
| 08/06/2021 | 2027 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2024 Defendants Assented–To Motion for Leave to File Briefs Opposing Government Motion in Limine Partially Under Seal, And to File Exhibits Under Seal, And to Exceed Page Limit as to Gamal Abdelaziz (4), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/06/2021) |
| 08/06/2021 | 2028 | Assented to MOTION for Leave to File *Response to Motion in Limine Partially Under Seal* as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 08/06/2021) |
| 08/06/2021 | 2029 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2028 Assented to MOTION for Leave to File Response to Motion in Limine Partially Under Seal; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (McDonagh, Christina) (Entered: 08/06/2021) |
| 08/06/2021 | 2031 | Opposition by John Wilson as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2004 MOTION in Limine *to Introduce Marital Communications (Redacted Public Version)* (Kendall, Michael) (Additional attachment(s) added on 8/9/2021: # 1 SEALED opposition) (Lima, Christine). (Entered: 08/06/2021) |

| 08/06/2021 | 2032 | Opposition by John Wilson as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2001 MOTION in Limine *to Preclude Irrelevant Evidence Concerning Uncharged Third Parties (Redacted Public Version)* (Kendall, Michael) (Additional attachment(s) added on 8/9/2021: # 1 SEALED opposition) (Lima, Christine). (Entered: 08/06/2021) |
|---|---|---|
| 08/06/2021 | 2033 | RESPONSE to Motion by Gamal Abdelaziz as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2003 MOTION in Limine *to Preclude Entrapment Defense* (Kelly, Brian) (Entered: 08/06/2021) |
| 08/06/2021 | 2034 | MEMORANDUM in Opposition by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2008 MOTION in Limine *to Preclude Defendants' Use of Co−Conspirator Statements Other Than for Impeachment* (Loucks, Michael) (Entered: 08/06/2021) |
| 08/06/2021 | 2035 | RESPONSE to Motion by Gamal Abdelaziz as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2007 MOTION in Limine *to Preclude the Introduction of Judicial Statements Regarding Credibility* (Kelly, Brian) (Entered: 08/06/2021) |
| 08/06/2021 | 2036 | MEMORANDUM in Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1990 MOTION in Limine *to Require the Government to Proffer its Corroborating Evidence of the Alleged Conspiracy Under Petrozziello* (Frank, Stephen) (Entered: 08/06/2021) |
| 08/06/2021 | 2037 | Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 1995 MOTION in Limine *to Exclude Reference to Stephen Wynn* (Frank, Stephen) (Entered: 08/06/2021) |
| 08/06/2021 | 2038 | Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 2002 MOTION in Limine *To Exclude Evidence Regarding "Taking" An Admissions Spot* (Frank, Stephen) (Entered: 08/06/2021) |
| 08/06/2021 | 2039 | RESPONSE to Motion by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2010 MOTION in Limine *to Exclude Evidence or Reference to Donna Heinel Personally Receiving Any Money from Rick Singer*, 1998 MOTION in Limine *to Exclude Evidence of Private School Tuition Payments* (O'Connell, Justin) (Entered: 08/06/2021) |
| 08/06/2021 | 2040 | RESPONSE to Motion by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2011 MOTION in Limine *Motion in Limine to Exclude Evidence Postdating Rick Singer's Cooperation with the Government* (O'Connell, Justin) (Entered: 08/06/2021) |
| 08/06/2021 | 2041 | RESPONSE to Motion by Elisabeth Kimmel as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2009 MOTION in Limine *to Preclude Evidence and Argument Seeking Jury Nullification* (Flashner, Cory) (Additional attachment(s) added on 8/9/2021: # 1 Unredacted Version (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 08/06/2021) |
| 08/06/2021 | 2042 | MOTION to Dismiss *Count Three of the Fourth Superseding Indictment* as to Amy Colburn, Gregory Colburn, Gamal Abdelaziz, I−Hsin Chen, Elisabeth Kimmel, Marci Palatella, John Wilson by USA. (Wright, Leslie) (Entered: 08/06/2021) |
| 08/06/2021 | 2043 | Opposition by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1989 MOTION in Limine *to Preclude Argument or Evidence Contrary to Law Concerning Money Laundering* (Wright, Leslie) (Entered: 08/06/2021) |
| 08/06/2021 | 2044 | Opposition by USA as to Gamal Abdelaziz re 2000 MOTION in Limine *to Limit Testimony of Nitya Velakachrla* (Wright, Leslie) (Entered: 08/06/2021) |
| 08/06/2021 | 2045 | Opposition by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1967 MOTION Order of Witness Immunity *[REDACTED VERSION]* (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A)(Stearns, Ian) (Entered: 08/06/2021) |
| 08/06/2021 | 2046 | Opposition by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1992 MOTION in Limine *to Preclude Evidence of Defendants' Incomes, Wealth, Spending, or Lifestyles* (Stearns, Ian) (Entered: 08/06/2021) |
| 08/06/2021 | 2047 | Opposition by Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 2006 MOTION in Limine *to Preclude and Limit Defendants' Proposed Expert Testimony* (Beirne, Eoin) (Entered: 08/06/2021) |
| 08/06/2021 | 2048 | Opposition by USA as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson re 1996 MOTION in Limine *to Exclude Evidence Pertaining to Defendants Who Pled Guilty* (Wright, Leslie) (Entered: 08/06/2021) |
| 08/06/2021 | 2049 | Opposition by USA as to Gamal Abdelaziz, Elisabeth Kimmel, John Wilson re 1988 MOTION in Limine *to Exclude Marital Privileged Communications and the Fruits of Marital Communications That the Government Improperly Seized [REDACTED VERSION]* (Kearney, Kristen) (Additional attachment(s) added on 8/9/2021: # 1 SEALED opposition) (Lima, Christine). (Attachment 1 replaced on 8/10/2021) (Lima, Christine). (Entered: 08/06/2021) |
| 08/06/2021 | 2050 | Opposition by USA as to John Wilson re 1993 MOTION in Limine *to Exclude Evidence Concerning Internal Revenue Agent's Beliefs or Opinions as to State of Mind or Questions of Tax Law* (Kearney, Kristen) (Entered: 08/06/2021) |
| 08/06/2021 | 2051 | MOTION to Sever *Pursuant To Federal Rules Of Criminal Procedure 12(B)(3)(D) And 14* as to Marci Palatella. (Loucks, Michael) (Entered: 08/06/2021) |
| 08/06/2021 | 2052 | MEMORANDUM in Support by Marci Palatella re 2051 MOTION to Sever *Pursuant To Federal Rules Of Criminal Procedure 12(B)(3)(D) And 14* (Loucks, Michael) (Entered: 08/06/2021) |
| 08/06/2021 | 2053 | AFFIDAVIT in Support of Emily Reitmeier; by Marci Palatella re 2051 MOTION to Sever *Pursuant To Federal Rules Of Criminal Procedure 12(B)(3)(D) And 14* (Loucks, Michael) (Entered: 08/06/2021) |
| 08/06/2021 | 2056 | Opposition by USA as to Elisabeth Kimmel, John Wilson re 2013 MOTION in Limine, filed under seal. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lima, Christine) (Entered: 08/09/2021) |
| 08/09/2021 | 2054 | Set Deadlines as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson: Objections to Exhibit/Witness Lists due by 8/12/2021. (Lima, Christine) (Entered: 08/09/2021) |
| 08/09/2021 | 2055 | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson 2022 MOTION for Protective Order . Responses due by 8/16/2021 (Lima, Christine) (Entered: 08/09/2021) |
| 08/09/2021 | 2057 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2042 Motion to Dismiss as to Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), I–Hsin Chen (7), Elisabeth Kimmel (13), Marci Palatella (16), John Wilson (17) (Lima, Christine) (Entered: 08/09/2021) |
| 08/12/2021 | 2064 | PLEA AGREEMENT as to Elisabeth Kimmel (O'Connell, Justin) (Entered: 08/12/2021) |
| 08/12/2021 | 2065 | MOTION for Rule 11 Hearing as to Elisabeth Kimmel by USA. (O'Connell, Justin) (Entered: 08/12/2021) |
| 08/12/2021 | 2066 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2065 Motion for Rule 11 Hearing as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 08/12/2021) |
| 08/12/2021 | 2067 | ELECTRONIC NOTICE OF HEARING as to Elisabeth Kimmel<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: |

| | | |
|---|---|---|
| | | https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Rule 11 Hearing set for 8/16/2021 02:30 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 08/12/2021) |
| 08/12/2021 | 2068 | Objection as to Gamal Abdelaziz, Elisabeth Kimmel, Marci Palatella, John Wilson: 1958 Exhibit/Witness List filed by John Wilson, 1954 Exhibit/Witness List filed by Elisabeth Kimmel, 1953 Exhibit/Witness List filed by Marci Palatella, 1956 Exhibit/Witness List filed by Gamal Abdelaziz. (Attachments: # 1 Attachment A)(Kearney, Kristen) (Entered: 08/12/2021) |
| 08/12/2021 | 2069 | Objection as to John Wilson: 1925 Exhibit/Witness List filed by USA. (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 08/12/2021) |
| 08/12/2021 | 2070 | Objection as to Marci Palatella: 1925 Exhibit/Witness List filed by USA. (Loucks, Michael) (Entered: 08/12/2021) |
| 08/12/2021 | 2071 | Objection as to Gamal Abdelaziz, Marci Palatella, John Wilson: 1924 Exhibit/Witness List filed by USA. (Loucks, Michael) (Entered: 08/12/2021) |
| 08/12/2021 | 2072 | Objection as to Gamal Abdelaziz: 1925 Exhibit/Witness List filed by USA. (Sharp, Joshua) (Main Document 2072 replaced on 8/13/2021) (Lima, Christine). (Entered: 08/12/2021) |
| 08/12/2021 | 2073 | NOTICE *JOINT PROPOSED JUROR QUESTIONNAIRE* by Gamal Abdelaziz, Marci Palatella, John Wilson re 2016 Order on Motion for Miscellaneous Relief, (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Sharp, Joshua) (Entered: 08/12/2021) |
| 08/12/2021 | 2074 | Objection as to Gamal Abdelaziz, Marci Palatella, John Wilson: 1958 Exhibit/Witness List filed by John Wilson, 1953 Exhibit/Witness List filed by Marci Palatella, 1956 Exhibit/Witness List filed by Gamal Abdelaziz. (Attachments: # 1 Exhibit Government's Objections to Defendants' Exhibit Lists)(Kearney, Kristen) (Entered: 08/12/2021) |
| 08/13/2021 | 2075 | MOTION for Leave to File Reply re 2039 Response to Motion, as to Gamal Abdelaziz, Marci Palatella, John Wilson by Gamal Abdelaziz. (Attachments: # 1 Exhibit A – Proposed Reply)(Kelly, Brian) (Entered: 08/13/2021) |
| 08/13/2021 | 2076 | Response as to Gamal Abdelaziz, Marci Palatella, John Wilson: 2014 Proposed Jury Instructions filed by USA. (Kendall, Michael) (Entered: 08/13/2021) |
| 08/13/2021 | 2077 | Memorandum regarding SUPPLEMENTAL OBJECTION TO GOVERNMENTS JURY INSTRUCTIONS REGARDING THE MEANING OF BRIBE as to Gamal Abdelaziz, Marci Palatella, John Wilson (Sharp, Joshua) (Entered: 08/13/2021) |
| 08/13/2021 | 2078 | Proposed Jury Instructions by Gamal Abdelaziz, Marci Palatella, John Wilson (Kendall, Michael) (Entered: 08/13/2021) |
| 08/13/2021 | 2079 | Response as to Gamal Abdelaziz, Marci Palatella, John Wilson: 2015 Proposed Jury Instructions, filed by John Wilson. (Wright, Leslie) (Entered: 08/13/2021) |
| 08/13/2021 | 2080 | MOTION to Sever *Defendant John Wilson's Motion to Sever Tax Count* as to John Wilson. (Kendall, Michael) (Entered: 08/13/2021) |
| 08/16/2021 | 2081 | Opposition by USA as to Marci Palatella re 2051 MOTION to Sever *Pursuant To Federal Rules Of Criminal Procedure 12(B)(3)(D) And 14* (Stearns, Ian) (Entered: 08/16/2021) |
| 08/16/2021 | | Terminate Deadlines and Hearings as to Homayoun Zadeh: Final Pretrial Conference scheduled for 8/18/21. (Lima, Christine) (Entered: 08/16/2021) |
| 08/16/2021 | 2082 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2075 Motion Leave to File Reply re 2039 Response to Motion, as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17) (Lima, Christine) (Entered: 08/16/2021) |

| 08/16/2021 | 2083 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz as to Gamal Abdelaziz, Marci Palatella, John Wilson re 2010 MOTION in Limine *to Exclude Evidence or Reference to Donna Heinel Personally Receiving Any Money from Rick Singer*, 1998 MOTION in Limine *to Exclude Evidence of Private School Tuition Payments* (Kelly, Brian) (Entered: 08/16/2021) |
|---|---|---|
| 08/16/2021 | 2084 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Elisabeth Kimmel held by video on 8/16/2021. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for the Court and Defendant. Government informs the Defendant of the maximum possible penalties; no mandatory minimums. Government informs the Defendant of the facts it would prove if this matter were to go to trial. Sentencing set for 12/9/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant remains released on all previously imposed conditions. (Attorneys present: Beirne, Flashner, Stearns. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 08/16/2021) |
| 08/16/2021 | | Terminate Deadlines and Hearings as to Elisabeth Kimmel: Final Pretrial Conference scheduled for 8/18/21 and Jury Trial scheduled to begin on 9/8/21. (Lima, Christine) (Entered: 08/16/2021) |
| 08/16/2021 | 2085 | NOTICE OF ATTORNEY APPEARANCE: William J. Lovett appearing for Objector Pat Haden (Lovett, William) (Entered: 08/16/2021) |
| 08/16/2021 | 2086 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Elisabeth Kimmel Sentencing set for 12/9/2021 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 08/16/2021) |
| 08/16/2021 | 2087 | Assented to MOTION for Leave to Appear Pro Hac Vice by Brandon D. Fox Filing fee $ 100, receipt number 0101–8905410. as to Gamal Abdelaziz, Marci Palatella, John Wilson by Pat Haden. (Attachments: # 1 Affidavit Affidavit of Brandon D. Fox In Support of Motion For Pro Hac Vice Admission)(Lovett, William) (Entered: 08/16/2021) |
| 08/16/2021 | 2088 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2087 Motion for Leave to Appear Pro Hac Vice Added Brandon D. Fox. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/16/2021) |
| 08/16/2021 | 2089 | Assented to MOTION to Seal *Motion To Intervene and Quash Trial Subpoena* as to Gamal Abdelaziz, Marci Palatella, John Wilson by Pat Haden. (Lovett, William) (Entered: 08/16/2021) |
| 08/16/2021 | 2090 | Opposition by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 2022 MOTION for Protective Order (Frank, Stephen) (Entered: 08/16/2021) |
| 08/17/2021 | 2091 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2089 Assented to MOTION to Seal Motion To Intervene and Quash Trial Subpoena. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/17/2021) |
| 08/17/2021 | 2092 | PRETRIAL MEMORANDUM by Gamal Abdelaziz, Marci Palatella, John Wilson (Kendall, Michael) (Entered: 08/17/2021) |
| 08/17/2021 | 2093 | PRETRIAL MEMORANDUM by USA as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Frank, Stephen) (Entered: 08/17/2021) |

| | | |
|---|---|---|
| 08/17/2021 | 2094 | MOTION to Quash *Motion To Intervene and Quash Trial Subpoena* as to Gamal Abdelaziz, Marci Palatella, John Wilson by Pat Haden. (Attachments: # 1 Exhibit Declaration)(Lovett, William) (Additional attachment(s) added on 8/17/2021: # 2 Unredacted Motion (FILED UNDER SEAL), # 3 Unredacted Declaration (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 08/17/2021) |
| 08/17/2021 | 2095 | NOTICE OF ATTORNEY APPEARANCE: Brandon D. Fox appearing for Objector Pat Haden (Fox, Brandon) (Entered: 08/17/2021) |
| 08/17/2021 | 2097 | Entry filed in error (McDonagh, Christina) (Entered: 08/17/2021) |
| 08/17/2021 | 2098 | MOTION to Continue *September 2021 Trial* as to Marci Palatella, John Wilson. (Loucks, Michael) (Entered: 08/17/2021) |
| 08/17/2021 | 2099 | NOTICE *and Motion Regarding Authentication* by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Attachments: # 1 Exhibit A (Declaration of Jamaal C. King), # 2 Exhibit B (Declaration of Claire Cole), # 3 Exhibit C (Declaration of Nick Temple), # 4 Exhibit D (Declaration of Karl Lewis), # 5 Exhibit E (Declaration of Samantha Abbott))(Frank, Stephen) (Entered: 08/17/2021) |
| 08/18/2021 | 2100 | NOTICE by Gamal Abdelaziz as to Gamal Abdelaziz, Marci Palatella, John Wilson (Kelly, Brian) (Entered: 08/18/2021) |
| 08/18/2021 | 2101 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Final Pretrial Conference as to Gamal Abdelaziz, Marci Palatella, John Wilson held on 8/18/2021. Court denies without prejudice 2098 Motion to Continue as to Marci Palatella (16), John Wilson (17). Court denies 2051 Motion to Sever as to Marci Palatella (16); and denies 2080 Motion to Sever as to John Wilson (17). Court issues the following orders on the pending Motions in limine: denying without prejudice 1988 Motion in Limine as to Gamal Abdelaziz (4), John Wilson (17); finding as moot 1989 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying 1990 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 1992 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); finding as moot 1993 Motion in Limine as to Gamal Abdelaziz (4), John Wilson (17); finding as moot 1995 Motion in Limine as to Gamal Abdelaziz (4); denying without prejudice 1996 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 1998 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 2000 Motion in Limine as to Gamal Abdelaziz (4); granting 2001 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying 2002 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); granting in part and denying in part 2003 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); granting in part and denying in part 2004 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); granting in part and denying in part 2006 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); granting in part and denying in part 2007 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 2008 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); finding as moot 2009 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 2010 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); denying without prejudice 2011 Motion in Limine as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17); finding as moot 2013 Motion in Limine as to John Wilson (17). Court hears arguments from counsel on the rulings. Court goes over objections to Exhibit and Witness lists. Court discusses length of trial, and trial schedule, with counsel. Court goes over empanelment procedures, length of openings, and logistics. Court will have zoom access for the trial. Court goes over questionnaire. Jury empanelment to begin at 9:00 AM on 9/8/21 in the Jury Assembly lounge. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Reitmeier (by video), DiCanio (by video), Loucks, Tomback (by video), Papenhausen, Kendall, Stearns, Frank. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 08/19/2021) |

| 08/19/2021 | 2102 | MOTION to Withdraw as Attorney by Elliot M. Weinstein as to Gamal Abdelaziz. (Weinstein, Elliot) (Entered: 08/19/2021) |
|---|---|---|
| 08/19/2021 | | Terminate Deadlines and Hearings as to Gamal Abdelaziz, Marci Palatella, John Wilson: Final Pretrial Conference held on 8/18/21. (Lima, Christine) (Entered: 08/19/2021) |
| 08/19/2021 | 2108 | Transcript of Pretrial Conference as to Gamal Abdelaziz, Marci Palatella, John Wilson held on August 18, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/9/2021. Redacted Transcript Deadline set for 9/20/2021. Release of Transcript Restriction set for 11/17/2021. (Coppola, Katelyn) (Entered: 08/24/2021) |
| 08/19/2021 | 2109 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Coppola, Katelyn) (Entered: 08/24/2021) |
| 08/20/2021 | 2103 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2102 Motion to Withdraw as Attorney. Attorney Elliot M. Weinstein terminated as to Gamal Abdelaziz (4) (Lima, Christine) (Entered: 08/20/2021) |
| 08/20/2021 | 2104 | Set/Reset Deadlines re Motion in case as to Gamal Abdelaziz, Marci Palatella, John Wilson 2099 MOTION Regarding Authentication, 2094 MOTION to Quash *Motion To Intervene and Quash Trial Subpoena*. Responses due by 8/27/2021 (Lima, Christine) (Entered: 08/20/2021) |
| 08/23/2021 | 2105 | PLEA AGREEMENT −− *Amended Language in Paragraph 4 per Court Order* as to Elisabeth Kimmel (Stearns, Ian) (Entered: 08/23/2021) |
| 08/24/2021 | 2106 | PLEA AGREEMENT as to Marci Palatella (Wright, Leslie) (Entered: 08/24/2021) |
| 08/24/2021 | 2107 | MOTION for Rule 11 Hearing as to Marci Palatella by USA. (Wright, Leslie) (Entered: 08/24/2021) |
| 08/24/2021 | 2115 | Transcript of Rule 11 Hearing as to Elisabeth Kimmel held on August 16, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/14/2021. Redacted Transcript Deadline set for 9/24/2021. Release of Transcript Restriction set for 11/22/2021. (Coppola, Katelyn) (Entered: 08/27/2021) |
| 08/24/2021 | 2116 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general−info.htm (Coppola, Katelyn) (Entered: 08/27/2021) |
| 08/25/2021 | 2110 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered granting 2107 Motion for Rule 11 Hearing as to Marci Palatella (16). (Simeone, Maria) (Entered: 08/25/2021) |
| 08/25/2021 | 2111 | ELECTRONIC NOTICE OF HEARING. The Rule 11 Hearing as to Marci Palatella has been set for 8/26/2021 04:15 PM in Remote Proceeding : Boston before District Judge Leo T. Sorokin. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |

| | | |
|---|---|---|
| | | Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violations of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, or denial of entry to future hearings, and such other sanctions, including for contempt of court, as may be deemed appropriate or necessary by the court.<br><br>Rule 11 Hearing set for 8/26/2021 04:15 PM in Remote Proceeding : Boston before District Judge Leo T. Sorokin.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the presentence interview. (Simeone, Maria) (Entered: 08/25/2021) |
| 08/26/2021 | 2112 | Assented to MOTION to Seal / *Defendants' Assented–To Motion for Leave to File Under Seal a Brief and Exhibits Opposing Pat Haden's Motion to Intervene and Quash Trial Subpoena* as to Gamal Abdelaziz, John Wilson. (Kendall, Michael) (Entered: 08/26/2021) |
| 08/26/2021 | 2114 | Electronic Clerk's Notes for proceedings held before District Judge Leo T. Sorokin.<br><br>Rule 11 Hearing as to Marci Palatella held on 8/26/2021. The court goes over the waiver of right to appear in person. The defendant waives her right on the record. The court finds the waiver knowing and voluntary, accepts the waiver and proceeds via Remote Proceeding. The court swears the defendant and holds a colloquy. The court reviews the maximum penalties, sentencing guidelines and summarizes the provisions in the plea agreement. The government states the elements of the offense and factual basis for the plea. The court takes the plea. A Plea is entered by Marci Palatella (16) of Guilty to Count 1 insofar as it charges conspiracy to commit honest services mail fraud. The court finds the defendant fully competent and capable of entering an informed plea, finds the plea knowing and voluntary, and DEFERS acceptance of the plea pending sentencing to be held by Judge Gorton. The Sentencing has been set for 12/16/2021 03:00 PM before Judge Nathaniel M. Gorton. The government objects to the confidential recommendation of Probation. The defendant is advised the conditions of release remain in full force and effect through the date of sentencing.<br><br>(Attorneys present: Atty Frank; Atty Loucks, Atty DiCanio, PO Martha Victoria. )Court Reporter Name and Contact or digital recording information: Rachel Lopez at raeufp@gmail.com. (Simeone, Maria) Modified on 8/27/2021 (Simeone, Maria). Modified on 8/27/2021 (Simeone, Maria). (Entered: 08/27/2021) |
| 08/27/2021 | 2113 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2112 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 08/27/2021) |
| 08/27/2021 | 2117 | Opposition by John Wilson as to Gamal Abdelaziz, John Wilson re 2094 MOTION to Quash *Motion To Intervene and Quash Trial Subpoena by Pat Haden* (Attachments: # 1 Exhibit A – E (Redacted), # 2 Exhibit F – K (Redacted))(Kendall, Michael) (Additional attachment(s) added on 9/2/2021: # 3 SEALED opposition, # 4 SEALED Exhibits) (Lima, Christine). (Entered: 08/27/2021) |
| 08/27/2021 | 2118 | Opposition by John Wilson as to Gamal Abdelaziz, John Wilson re 2099 MOTION Regarding Authentication *and Notice Regarding Authentication.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kendall, Michael) (Entered: 08/27/2021) |
| 08/30/2021 | 2119 | MOTION for Hearing *on Invocation of Fifth Amendment* as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 08/30/2021) |
| 08/30/2021 | 2120 | MOTION for Leave to File *Reply in Support of Government's Motion Regarding Authenticity* as to Gamal Abdelaziz, John Wilson by USA. (Attachments: # 1 Exhibit A –– Proposed Reply)(Stearns, Ian) (Entered: 08/30/2021) |
| 08/30/2021 | 2121 | MOTION to Preclude Access to Trial via Zoom as to Gamal Abdelaziz, John Wilson by Gamal Abdelaziz. (Kelly, Brian) (Entered: 08/30/2021) |

| 08/30/2021 | 2122 | Assented to MOTION to Seal *Reply to Defendant's Opposition Pat Haden's Motion to Intervene and Quash Trial Subpoena* as to Gamal Abdelaziz, Marci Palatella, John Wilson by Pat Haden. (Fox, Brandon) (Entered: 08/30/2021) |
| --- | --- | --- |
| 08/30/2021 | 2123 | EXHIBIT/WITNESS LIST by John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 08/30/2021) |
| 08/30/2021 | 2124 | EXHIBIT/WITNESS LIST by USA as to Gamal Abdelaziz, John Wilson (Stearns, Ian) (Entered: 08/30/2021) |
| 08/31/2021 | 2125 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2122 Assented to MOTION to Seal Reply to Defendant's Opposition Pat Haden's Motion to Intervene and Quash Trial Subpoena. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), Marci Palatella (16), John Wilson (17) (McDonagh, Christina) (Entered: 08/31/2021) |
| 08/31/2021 | 2126 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2120 MOTION for Leave to File Reply in Support of Government's Motion Regarding Authenticity; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 08/31/2021) |
| 08/31/2021 | 2127 | REPLY TO RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2099 MOTION Regarding Authentication (Stearns, Ian) (Entered: 08/31/2021) |
| 08/31/2021 | 2128 | MOTION to Suppress *THIRTEEN "CONSENSUAL WIRETAP" CALLS* as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Exhibit Exhibit A – Motion to Seal Submitted to Judge Burroughs, # 2 Exhibit Exhibit B– Misdated Letter to AT&T, # 3 Exhibit Exhibit C – Consent Form)(Sharp, Joshua) (Attachment 1 replaced on 8/31/2021) (McDonagh, Christina). (Entered: 08/31/2021) |
| 08/31/2021 | 2129 | NOTICE OF ATTORNEY APPEARANCE: Angela J. Benoit appearing for Amy Colburn, Gregory Colburn. Type of Appearance: Retained. (Benoit, Angela) (Entered: 08/31/2021) |
| 08/31/2021 | 2130 | Assented to MOTION to Seal */ Defendant John Wilson's Assented–To Motion to Seal His Motion to Exclude Known False Evidence Regarding Jovan Vavic* as to John Wilson. (Kendall, Michael) (Entered: 08/31/2021) |
| 08/31/2021 | 2131 | NOTICE *Revised Joint Proposed Juror Questionnaire* by USA as to Gamal Abdelaziz, John Wilson (Kearney, Kristen) (Entered: 08/31/2021) |
| 08/31/2021 | 2132 | REPLY TO RESPONSE to Motion by Pat Haden as to Gamal Abdelaziz, Marci Palatella, John Wilson re 2094 MOTION to Quash *Motion To Intervene and Quash Trial Subpoena* (Fox, Brandon) (Additional attachment(s) added on 8/31/2021: # 1 Unredacted Version (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 08/31/2021) |
| 08/31/2021 | 2133 | Assented to MOTION for Leave to File *Under Seal Government's Supplemental Exhibit List* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 08/31/2021) |
| 09/01/2021 | 2134 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2130 Assented to MOTION to Seal / Defendant John Wilson's Assented–To Motion to Seal His Motion to Exclude Known False Evidence Regarding Jovan Vavic. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (McDonagh, Christina) (Entered: 09/01/2021) |
| 09/01/2021 | 2135 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2133 Assented to MOTION for Leave to File Under Seal Government's Supplemental Exhibit List; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/01/2021) |
| 09/01/2021 | 2136 | MOTION to Exclude *Known False Evidence Regarding Jovan Vavic (Redacted)* as to John Wilson. (Attachments: # 1 Exhibit A – D (Redacted))(Kendall, Michael) (Additional attachment(s) added on 9/2/2021: # 2 Unredacted Motion (Filed Under Seal)) (McDonagh, Christina). (Entered: 09/01/2021) |

| 09/01/2021 | 2137 | EXHIBIT/WITNESS LIST by USA as to Gamal Abdelaziz, John Wilson (Stearns, Ian) (Additional attachment(s) added on 9/2/2021: # 1 Unredacted Exhibit List (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 09/01/2021) |
|---|---|---|
| 09/01/2021 | 2138 | MOTION to Travel *(Motion for Permission for Limited Travel)* as to William McGlashan, Jr. (Pirozzolo, Jack) (Entered: 09/01/2021) |
| 09/01/2021 | 2139 | MOTION for Leave to File *a Sur–Reply to the Government's Notice and Motion Regarding Authentication* 2099 as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Defendants' Proposed Sur–Reply Regarding Government's Notice and Motion to Authenticate)(Kendall, Michael) (Entered: 09/01/2021) |
| 09/01/2021 | 2140 | MOTION for Leave to File *Sealed Sur–Reply Brief Regarding Pat Haden's Motion to Intervene and Quash Trial Subpoena (Partially–Assented–To)* as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Defendants' Proposed Sur–Reply to Pat Haden's Reply in Support of Motion to Intervene and Quash Trial Subpoena (Redacted), # 2 Exhibit A & B (Filed Under Seal))(Kendall, Michael) (Entered: 09/01/2021) |
| 09/02/2021 | 2141 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2139 MOTION for Leave to File a Sur–Reply to the Government's Notice and Motion Regarding Authentication 2099 ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/02/2021) |
| 09/02/2021 | 2142 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2140 MOTION for Leave to File Sealed Sur–Reply Brief Regarding Pat Haden's Motion to Intervene and Quash Trial Subpoena (Partially–Assented–To); Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/02/2021) |
| 09/02/2021 | 2143 | Memorandum from Probation regarding Response to Request for International Travel as to William McGlashan, Jr. Requested action: Review (McAnally, Sean) (Entered: 09/02/2021) |
| 09/02/2021 | 2144 | District Judge Leo T. Sorokin.<br><br>ELECTRONIC ORDER entered. As the emergency judge and at the request of Judge Gorton \to resolve a Motion for Travel (#2138) because Judge Gorton is away, the Court ALLOWS the Motion to Travel.<br><br>re 2138 Motion to Travel as to William McGlashan Jr. (15) (Simeone, Maria) (Entered: 09/02/2021) |
| 09/02/2021 | 2145 | SUR–REPLY to Motion by Gamal Abdelaziz, John Wilson re 2094 MOTION to Quash *Motion To Intervene and Quash Trial Subpoena (Redacted Public Version)* (Attachments: # 1 Exhibit A and B (Filed Under Seal))(Kendall, Michael) (Additional attachment(s) added on 9/2/2021: # 2 SEALED sur–reply, # 3 SEALED Exhibit A, # 4 SEAlED Exhibit B) (Lima, Christine). (Entered: 09/02/2021) |
| 09/02/2021 | 2146 | SUR–REPLY to Motion by Gamal Abdelaziz, John Wilson re 2099 MOTION Regarding Authentication (Kendall, Michael) (Entered: 09/02/2021) |
| 09/03/2021 | 2147 | MOTION for Leave to File *One–Page Exhibit Under Seal* as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/03/2021) |
| 09/03/2021 | 2148 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2147 MOTION for Leave to File One–Page Exhibit Under Seal ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/03/2021) |
| 09/03/2021 | 2149 | Proposed Jury Instructions by John Wilson as to Gamal Abdelaziz, John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 09/03/2021) |

| | | |
|---|---|---|
| 09/05/2021 | 2150 | Opposition by USA as to John Wilson re 2136 MOTION to Exclude *Known False Evidence Regarding Jovan Vavic (Redacted)* (Kearney, Kristen) (Entered: 09/05/2021) |
| 09/05/2021 | 2151 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2128 MOTION to Suppress *THIRTEEN "CONSENSUAL WIRETAP" CALLS* (Stearns, Ian) (Entered: 09/05/2021) |
| 09/06/2021 | 2152 | MOTION for Leave to File *TWO AND A HALF PAGE REPLY IN SUPPORT OF MOTION TO SUPPRESS THIRTEEN WIRETAP RECORDINGS* as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Exhibit A (PROPOSED REPLY))(Sharp, Joshua) (Entered: 09/06/2021) |
| 09/06/2021 | 2153 | EXHIBIT/WITNESS LIST by Gamal Abdelaziz (Kelly, Brian) (Entered: 09/06/2021) |
| 09/07/2021 | 2154 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2152 MOTION for Leave to File TWO AND A HALF PAGE REPLY IN SUPPORT OF MOTION TO SUPPRESS THIRTEEN WIRETAP RECORDINGS; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/07/2021) |
| 09/07/2021 | 2155 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz as to Gamal Abdelaziz, John Wilson re 2128 MOTION to Suppress *THIRTEEN "CONSENSUAL WIRETAP" CALLS* (Kelly, Brian) (Entered: 09/07/2021) |
| 09/07/2021 | 2156 | MOTION for Reconsideration – *Redacted* as to Gamal Abdelaziz, John Wilson by Gamal Abdelaziz. (Kelly, Brian) (Additional attachment(s) added on 9/7/2021: # 1 Unredacted Motion (Filed Under Seal)) (McDonagh, Christina). (Entered: 09/07/2021) |
| 09/07/2021 | 2157 | Assented to MOTION for Leave to File *Under Seal Exhibits to Government's Response to Defendant's Motion for Reconsideration (Dkt. 2156)* as to Gamal Abdelaziz, John Wilson by USA. (Frank, Stephen) (Entered: 09/07/2021) |
| 09/07/2021 | 2158 | MOTION for Leave to File */ Defendant John Wilson's Motion for Leave to File Reply to Government's Opposition to Wilson's Motion to Exclude Known False Evidence Regarding Jovan Vavic* as to John Wilson. (Attachments: # 1 Exhibit A – [Proposed] Defendant John Wilson's Reply to Government's Opposition to Wilson's Motion to Exclude Known False Evidence Regarding Jovan Vavic)(Kendall, Michael) (Entered: 09/07/2021) |
| 09/07/2021 | 2159 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2157 Assented to MOTION for Leave to File Under Seal Exhibits to Government's Response to Defendant's Motion for Reconsideration (Dkt. 2156); Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/07/2021) |
| 09/07/2021 | 2160 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2158 MOTION for Leave to File / Defendant John Wilson's Motion for Leave to File Reply to Government's Opposition to Wilson's Motion to Exclude Known False Evidence Regarding Jovan Vavic; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (McDonagh, Christina) (Entered: 09/07/2021) |
| 09/07/2021 | 2161 | REPLY TO RESPONSE to Motion by John Wilson re 2136 MOTION to Exclude *Known False Evidence Regarding Jovan Vavic (Redacted)* (Kendall, Michael) (Entered: 09/07/2021) |
| 09/07/2021 | 2162 | RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2156 MOTION for Reconsideration – *Redacted* (Frank, Stephen) (Additional attachment(s) added on 9/7/2021: # 1 Ex A (Filed Under Seal), # 2 Ex. B (Filed Under Seal), # 3 Exhibit C (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 09/07/2021) |
| 09/07/2021 | 2163 | STIPULATION re Authenticity and Business Records by Gamal Abdelaziz as to Gamal Abdelaziz, John Wilson (Kelly, Brian) (Entered: 09/07/2021) |
| 09/07/2021 | 2164 | MOTION to Sequester *Witnesses* as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Text of Proposed Order)(Kendall, Michael) (Entered: 09/07/2021) |

| 09/07/2021 | 2165 | RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2164 MOTION to Sequester *Witnesses* (Stearns, Ian) (Entered: 09/07/2021) |
|---|---|---|
| 09/07/2021 | 2166 | EXHIBIT/WITNESS LIST by John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 09/07/2021) |
| 09/08/2021 | 2167 | Set/Reset Hearings as to Gamal Abdelaziz, John Wilson Jury Trial/Empanelment Day 1 set for 9/8/2021 09:00 AM in Courtroom 4/Jury Assembly Hall before Judge Nathaniel M. Gorton. Jury Trial/Empanelment Day 2 set for 9/9/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Jury Trial/Empanelment Day 3 set for 9/10/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. Jury Trial Day 4 set for 9/13/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 09/08/2021) |
| 09/08/2021 | 2168 | MOTION for Leave to File */ Defendants' Motion for Leave to File Reply Brief in Support of Defendants' Motion to Sequester Witnesses* as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Exhibit A – [Proposed] Defendants' Reply in Support of Defendants' Motion to Sequester Witnesses)(Kendall, Michael) (Entered: 09/08/2021) |
| 09/08/2021 | 2169 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Empanelment Day 1 as to Gamal Abdelaziz, John Wilson held on 9/8/2021. Court informs counsel of its rulings on seating availability in the Courtroom for the trial. Court gives initial remarks to first panel of jurors brought in. Panel of 117 sworn. Jurors given questionnaires to fill out and instructed to call back with further reporting instructions. Court gives initial remands to second panel of jurors. Panel of 104 sworn. Jurors given questionnaires to fill out and instructed to call back with further reporting instructions. Parties present list of jurors they agree to be stricken. Jury Empanelement Day 2 set for 9/9/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Wright, Frank, Kearney, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 09/09/2021) |
| 09/09/2021 | 2170 | NOTICE OF ATTORNEY APPEARANCE: Glenn A. MacKinlay appearing for Objectors Scott Wandzilak, Alexandra Reisman, Alex Garfio (MacKinlay, Glenn) (Entered: 09/09/2021) |
| 09/09/2021 | 2171 | MOTION to Quash as to Gamal Abdelaziz, John Wilson by Scott Wandzilak, Alexandra Reisman, Alex Garfio. (MacKinlay, Glenn) (Entered: 09/09/2021) |
| 09/09/2021 | 2173 | Assented to MOTION for Leave to File *A Motion to Quash (Partially) Under Seal* as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/09/2021) |
| 09/09/2021 | 2174 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2173 Motion for Leave to File A Motion to Quash (Partially) Under Seal as to John Wilson (17) (Lima, Christine) (Entered: 09/09/2021) |
| 09/09/2021 | 2176 | MOTION to Quash as to John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/09/2021) |
| 09/09/2021 | 2177 | MEMORANDUM in Support by University of Southern California as to John Wilson re 2176 MOTION to Quash (Attachments: # 1 Exhibit A–F)(Fuller, Anthony) (Main Document 2177 replaced on 9/10/2021) (Lima, Christine). (Attachment 1 replaced on 9/10/2021) (Lima, Christine). (Entered: 09/09/2021) |
| 09/09/2021 | 2178 | Assented to MOTION to Seal *Renewed Motion to Strike Potential Juror* as to Gamal Abdelaziz, John Wilson by USA. (Frank, Stephen) (Entered: 09/09/2021) |
| 09/09/2021 | 2183 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial/Empanelment Day 2 as to Gamal Abdelaziz, John Wilson held on 9/9/2021. Voir dire held. Jury Trial/Empanelment Day 3 set for 9/10/2021 09:00 AM in Courtroom 4 before Judge Nathaniel M. Gorton. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Wright, Frank, Kearney, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 09/10/2021) |
| 09/10/2021 | 2179 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2178 Motion to Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/10/2021) |

| 09/10/2021 | 2180 | MOTION to Strike Potential Juror as to Gamal Abdelaziz, John Wilson by USA, filed under seal. (Attachments: # 1 Exhibit A)(Lima, Christine) (Entered: 09/10/2021) |
|---|---|---|
| 09/10/2021 | 2184 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 2180 MOTION to Strike Potential Juror as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/10/2021) |
| 09/10/2021 | 2185 | Memorandum from Probation regarding Request for International Travel as to Lori Loughlin. Requested action: Decision and Signature (McAnally, Sean) (Entered: 09/10/2021) |
| 09/10/2021 | 2186 | Judge Nathaniel M. Gorton: ORDER entered. APPROVING 2185 Memorandum from Probation regarding Request for International Travel as to Lori Loughlin. (McDonagh, Christina) (Entered: 09/10/2021) |
| 09/10/2021 | 2187 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial/Empanelement as to Gamal Abdelaziz, John Wilson held on 9/10/2021. Voir dire continued. Jury of 16 selected at 12:25 PM. Court dismisses the potential jurors for the day. Court and counsel discuss trial logistics. Jury Trial Day 4 to resume at 9:00 AM on 9/13/21 with opening statements by the parties. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Wright, Frank, Kearney, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 09/10/2021) |
| 09/10/2021 | 2211 | Judge Nathaniel M. Gorton: ORDER entered denying 2094 Motion to Quash as to Gamal Abdelaziz (4), John Wilson (17); finding as moot, in part, and allowing, in part 2099 Motion Regarding Authentication as to Gamal Abdelaziz (4), John Wilson (17); denying without prejudice 2119 Motion for Hearing as to Gamal Abdelaziz (4), John Wilson (17); denying 2121 Motion to Preclude Access to the Trial via Zoom as to Gamal Abdelaziz (4), John Wilson (17); denying 2128 Motion to Suppress as to Gamal Abdelaziz (4), John Wilson (17); denying 2156 Motion for Reconsideration as to Gamal Abdelaziz (4), John Wilson (17); denying 2136 Motion to Exclude as to John Wilson (17) (Lima, Christine) (Entered: 09/14/2021) |
| 09/11/2021 | 2188 | EXHIBIT/WITNESS LIST by USA as to Gamal Abdelaziz, John Wilson (Stearns, Ian) (Entered: 09/11/2021) |
| 09/12/2021 | 2189 | MOTION for Continuing Objection as to Gamal Abdelaziz, John Wilson by Gamal Abdelaziz. (Kelly, Brian) (Entered: 09/12/2021) |
| 09/13/2021 | 2190 | MOTION to Exclude *Inadmissible Hearsay Evidence* as to Gamal Abdelaziz, John Wilson by John Wilson. (Kendall, Michael) (Entered: 09/13/2021) |
| 09/13/2021 | 2191 | RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2190 MOTION to Exclude *Inadmissible Hearsay Evidence* (Frank, Stephen) (Entered: 09/13/2021) |
| 09/13/2021 | 2199 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 4 as to Gamal Abdelaziz, John Wilson held on 9/13/2021. Juror No. 69 excused. Panel of 15 jurors sworn. Court gives preliminary instructions to the jury. Opening statements by the Government. Opening statements by Defendant Abdelaziz. Opening statements by Defendant Wilson. Government calls Bruce Isackson, sworn. Jury Trial Day 5 to resume at 9:00 AM on 9/14/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Wright, Frank, Kearney, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/13/2021) |
| 09/13/2021 | 2200 | MOTION MOTION FOR COURT INSTRUCTION ON OPENING STATEMENT as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 09/13/2021) |
| 09/13/2021 | 2207 | NOTICE OF ATTORNEY APPEARANCE: Jeremy M. Sternberg appearing for Intervenor News Media (McDonagh, Christina) (Entered: 09/14/2021) |
| 09/13/2021 | 2208 | NOTICE OF ATTORNEY APPEARANCE: Gordon P. Katz appearing for Intervenor News Media (McDonagh, Christina) (Entered: 09/14/2021) |
| 09/13/2021 | 2209 | MOTION of Non−Party News Media to Intervene and for Access to Proceedings by News Media. (Attachments: # 1 Exhibit A)(McDonagh, Christina) (Entered: 09/14/2021) |

| | | |
|---|---|---|
| 09/13/2021 | 2217 | EXCERPT Transcript of Jury Trial – Day 4 (Opening Statements) as to Gamal Abdelaziz held on September 13, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/4/2021. Redacted Transcript Deadline set for 10/14/2021. Release of Transcript Restriction set for 12/13/2021. (Coppola, Katelyn) (Entered: 09/15/2021) |
| 09/13/2021 | 2218 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 09/15/2021) |
| 09/14/2021 | 2201 | MOTION *AMENDED Motion for Court Instruction* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 09/14/2021) |
| 09/14/2021 | 2202 | EXHIBIT/WITNESS LIST by Gamal Abdelaziz, John Wilson (Sharp, Joshua) (Entered: 09/14/2021) |
| 09/14/2021 | 2203 | Assented to MOTION to Seal */ Defendant John Wilson's Assented–To Motion for Leave to File Under Seal a Motion and Exhibits to Exclude a Wiretapped Conversation Between Rick Singer and Marci Palatella* as to John Wilson. (Kendall, Michael) (Entered: 09/14/2021) |
| 09/14/2021 | 2204 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2203 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Lima, Christine) (Entered: 09/14/2021) |
| 09/14/2021 | 2210 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 5 as to Gamal Abdelaziz, John Wilson held on 9/14/2021. Continued direct examination of Bruce Isackson; cross by Defendant Abdelaziz; cross by Defendant Wilson; re–direct by Government; re–cross by Defendant Abdelaziz. Government calls Special Agent Keith Brown, sworn. Jury Trial Day 6 to resume at 9:00 AM on 9/15/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Reitmeier (by video), DiCanio (by video), Loucks, Tomback (by video), Papenhausen, Kendall, Stearns, Frank. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/14/2021) |
| 09/14/2021 | 2212 | MOTION to Exclude */ Defendant John Wilson's Motion to Exclude a Taped Conversation Between Rick Singer and Marci Palatella [Redacted Version]* as to John Wilson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C – (Filed Under Seal), # 4 Exhibit D, # 5 Exhibit E – (Filed Under Seal), # 6 Exhibit F – (Filed Under Seal), # 7 Exhibit G)(Kendall, Michael) (Additional attachment(s) added on 9/15/2021: # 8 SEALED Motion, # 9 SEALED Exhibit B, # 10 SEALED Exhibit C, # 11 SELAED Exhibit E, # 12 SEALED Exhibit F) (Lima, Christine). (Entered: 09/14/2021) |
| 09/14/2021 | 2213 | Assented to MOTION for Leave to File *Under Seal Government's Opposition to Defendant's Motion to Exclude Exhibit 563 (Dkt. 2212)* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 09/14/2021) |
| 09/15/2021 | 2214 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2213 Motion for Leave to File Under Seal as to John Wilson (17) (Lima, Christine) (Entered: 09/15/2021) |
| 09/15/2021 | 2215 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2212 MOTION to Exclude */ Defendant John Wilson's Motion to Exclude a Taped Conversation Between Rick Singer and Marci Palatella [Redacted Version]* (Attachments: # 1 Exhibit A –– Transcript of Ex. 563, # 2 Exhibit B –– Transcript of Ex. 561)(Stearns, Ian) (Additional attachment(s) added on 9/15/2021: # 3 SEALED Opposition, # 4 SEALED Exhibit A, # 5 SEALED Exhibit B) (Lima, Christine). (Entered: 09/15/2021) |
| 09/15/2021 | 2216 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2213 Motion for Leave to File under Seal as to Gamal Abdelaziz (4) (Lima, Christine) (Entered: 09/15/2021) |
| 09/15/2021 | 2219 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 6 as to Gamal Abdelaziz, John Wilson held on 9/15/2021. Court denies 2212 Motion to |

| | | |
|---|---|---|
| | | Exclude as to John Wilson (17). Continued direct examination of Special Agent Brown; cross by Defendant Wilson. Jury Trial Day 7 to resume at 9:00 AM on 9/17/21. There will be no session on 9/16/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Reitmeier (by video), DiCanio (by video), Loucks, Tomback (by video), Papenhausen, Kendall, Stearns, Frank. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/16/2021) |
| 09/16/2021 | 2220 | MOTION to Seal / *Defendant John Wilson's Motion for Leave to File Under Seal a Brief Opposing Non−Party University of Southern California's Motion to Quash* as to John Wilson. (Kendall, Michael) (Entered: 09/16/2021) |
| 09/16/2021 | 2221 | MOTION to Seal / *Defendants' Motion for Leave to File Under Seal a Brief Opposing Intervenors' Motion to Intervene and Quash Trial Subpoenas* as to Gamal Abdelaziz, John Wilson. (Kendall, Michael) (Entered: 09/16/2021) |
| 09/16/2021 | 2222 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2220 Motion to Seal. Counsel will receive an email within twenty−four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include − Leave to file granted on (date of order)− in the caption of the document as to John Wilson (17) (Lima, Christine) (Entered: 09/16/2021) |
| 09/16/2021 | 2223 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2221 Motion to Seal. Counsel will receive an email within twenty−four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include − Leave to file granted on (date of order)− in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/16/2021) |
| 09/16/2021 | 2224 | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Gamal Abdelaziz, John Wilson 2209 MOTION of Non−Party News Media to Intervene and for Access to Proceedings. Responses due by 5:00 PM 9/17/2021 (Lima, Christine) (Entered: 09/16/2021) |
| 09/16/2021 | 2225 | MOTION for Leave to Appear Pro Hac Vice by David Vaughn Filing fee $ 100, receipt number 0101−8951734. as to Gamal Abdelaziz, John Wilson by Scott Wandzilak, Alexandra Reisman, Alex Garfio. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(MacKinlay, Glenn) (Entered: 09/16/2021) |
| 09/16/2021 | 2226 | Opposition by John Wilson re 2176 MOTION to Quash *By Non−Party University of Southern California (Public Version)* (Attachments: # 1 Exhibit A − D (Under Seal))(Kendall, Michael) (Additional attachment(s) added on 9/17/2021: # 2 SEALED OPPOSITION, # 3 SEALED Exhibits) (Lima, Christine). (Entered: 09/16/2021) |
| 09/16/2021 | 2227 | Opposition by John Wilson as to Gamal Abdelaziz, John Wilson re 2171 MOTION to Quash *Trial Subpoenas by the Intervenors (Redacted Public Version)* (Attachments: # 1 Exhibit A − F (Under Seal))(Kendall, Michael) (Additional attachment(s) added on 9/17/2021: # 2 SEALED OPPOSITION, # 3 SEALED Exhibits) (Lima, Christine). (Entered: 09/16/2021) |
| 09/16/2021 | 2228 | MOTION Exclude Yearbooks *(Exhibits 702 to 705)* as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 09/16/2021) |
| 09/16/2021 | 2229 | EXHIBIT/WITNESS LIST by John Wilson (Attachments: # 1 Exhibit A)(Kendall, Michael) (Entered: 09/16/2021) |
| 09/17/2021 | 2230 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2228 MOTION Exclude Yearbooks *(Exhibits 702 to 705)* (Stearns, Ian) (Entered: 09/17/2021) |
| 09/17/2021 | 2231 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2225 Motion for Leave to Appear Pro Hac Vice Added David P. Vaughn. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/17/2021) |
| 09/17/2021 | 2232 | NOTICE OF ATTORNEY APPEARANCE Donald C. Lockhart appearing for USA. (Lockhart, Donald) (Entered: 09/17/2021) |

| | | |
|---|---|---|
| 09/17/2021 | 2233 | RESPONSE to Motion by USA as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 2209 MOTION of Non–Party News Media to Intervene and for Access to Proceedings (Lockhart, Donald) (Entered: 09/17/2021) |
| 09/17/2021 | 2236 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 7 as to Gamal Abdelaziz, John Wilson held on 9/17/2021. Court denies without prejudice 2228 Motion to Exclude Yearbooks (Exhibits 702 to 705) as to Gamal Abdelaziz (4). Continued cross of Special Agent Brown by Defendant Wilson; cross by Defendant Abdelaziz; re–direct by Government; re–cross by Defendant Wilson; re–cross by Defendant Abdelaziz. Government calls Rachel Sih, sworn; cross by Defendant Abdelaziz; re–direct by Government. Jury Trial Day 8 to resume at 9:00 AM on 9/20/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/20/2021) |
| 09/19/2021 | 2237 | MOTION for Curative Instruction as to Gamal Abdelaziz, John Wilson. (Lima, Christine) (Entered: 09/20/2021) |
| 09/19/2021 | 2238 | Supplemental EXHIBIT LIST by Gamal Abdelaziz (Lima, Christine) (Entered: 09/20/2021) |
| 09/19/2021 | 2239 | Response to Defendants' Confrontation Clause Objections and Proposed Limiting Instruction, as to Gamal Abdelaziz, John Wilson, filed by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lima, Christine) (Entered: 09/20/2021) |
| 09/19/2021 | 2240 | Opposition to Defendants' Request for Limiting Instructions Regarding Co–Conspirators as to Gamal Abdelaziz, John Wilson, filed by USA. (Lima, Christine) (Entered: 09/20/2021) |
| 09/20/2021 | 2234 | NOTICE OF ATTORNEY APPEARANCE: Laura Diss Gradel appearing for Intervenor Ron Crawford *and Kristyn Bunce DeFilipp appearing for Intervenor Ron Crawford* (Gradel, Laura) (Entered: 09/20/2021) |
| 09/20/2021 | 2235 | MOTION to Quash *Trial Subpoena and to Intervene* as to Gamal Abdelaziz, John Wilson by Ron Crawford. (Gradel, Laura) (Entered: 09/20/2021) |
| 09/20/2021 | 2241 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2237 MOTION for Curative Instruction (Lima, Christine) (Entered: 09/20/2021) |
| 09/20/2021 | 2242 | REPLY TO RESPONSE to Motion by Scott Wandzilak, Alexandra Reisman, Alex Garfio as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 2171 MOTION to Quash *Trial Subpoenas and Motion to Intervene – Reply to Defendant's Opposition* (MacKinlay, Glenn) (Entered: 09/20/2021) |
| 09/20/2021 | 2243 | Assented to MOTION for Leave to File *Five–Page Reply Memorandum in Support of Non–Party New Media's Motion to Intervene and for Access to Proceedings* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by News Media. (Sternberg, Jeremy) (Entered: 09/20/2021) |
| 09/20/2021 | 2244 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 8 as to Gamal Abdelaziz, John Wilson held on 9/20/2021. Government reads 2 Stipulations. Government calls Mikaela Sanford, sworn; cross by Defendant Wilson; cross by Defendant Abdelaziz; re–direct by Government; re–cross by Defendant Wilson; re–cross by Defendant Abdelaziz. Government calls Rebecca Chassin, sworn. Jury Trial Day 9 to resume at 9:00 AM on 9/20/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at joycedebra@gmail.com. (Lima, Christine) (Entered: 09/20/2021) |

| 09/20/2021 | 2245 | ELECTRONIC NOTICE CANCELING HEARING OR OTHER DEADLINE as to Gamal Abdelaziz, John Wilson. Hearing canceled: Jury Trial Scheduled for 9/22/21 (Lima, Christine) (Entered: 09/20/2021) |
|---|---|---|
| 09/20/2021 | 2246 | Opposition by Gamal Abdelaziz, John Wilson re 2235 MOTION to Quash *Trial Subpoena and to Intervene* (Sharp, Joshua) (Entered: 09/20/2021) |
| 09/20/2021 | 2250 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER granting in part, and denying, in part 2209 Non–Party News Media to Intervene and For Access to Proceedings by News Media. Upon consideration of the intervenors motion:1) Intervenors motion to intervene (Docket No. 2209) isALLOWED;2) with respect to the unsealing of the governments motion to strike a potential juror (Docket No. 2180) and the Courts order allowing the same (Docket No. 2184),intervenors motion for access to the proceedings is, subject to appropriate redactions, ALLOWED; but3) intervenors motion is otherwise, DENIED. (Lima, Christine) (Entered: 09/21/2021) |
| 09/20/2021 | 2253 | Judge Nathaniel M. Gorton: ORDER entered granting 2189 Motion as to Gamal Abdelaziz (4), John Wilson (17); finding as moot 2196 Motion to Intervene as to Gamal Abdelaziz (4), John Wilson (17); denying without prejudice 2200 Motion for Court Instruction on Opening Statement as to Gamal Abdelaziz (4); denying 2181 Motion to Quash as to John Wilson (17). See order for details. (Lima, Christine) (Entered: 09/21/2021) |
| 09/21/2021 | 2247 | MOTION ADMIT EXHIBITS as to Gamal Abdelaziz. (Attachments: # 1 Exhibit 1254, # 2 Exhibit 1255, # 3 Exhibit 1540, # 4 Exhibit 1541)(Sharp, Joshua) (Entered: 09/21/2021) |
| 09/21/2021 | 2248 | Response as to Gamal Abdelaziz, John Wilson: 2240 Response (unrelated to a motion). (Attachments: # 1 Exhibit)(Papenhausen, Lauren) (Entered: 09/21/2021) |
| 09/21/2021 | 2249 | MOTION for Leave to File *Reply in Opposition to Defendants' Motion for Limiting Instruction* as to Gamal Abdelaziz, John Wilson by USA. (Attachments: # 1 Exhibit Proposed Reply Brief)(Frank, Stephen) (Entered: 09/21/2021) |
| 09/21/2021 | 2251 | MOTION ADMIT EXHIBIT 1288 *AS NON HEARSAY* as to Gamal Abdelaziz. (Attachments: # 1 Exhibit 1288)(Sharp, Joshua) (Entered: 09/21/2021) |
| 09/21/2021 | 2252 | MOTION DEFENDANT GAMAL ABDELAZIZS MOTION FOR LIMITING INSTRUCTION as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 09/21/2021) |
| 09/21/2021 | 2254 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2252 MOTION DEFENDANT GAMAL ABDELAZIZS MOTION FOR LIMITING INSTRUCTION (Stearns, Ian) (Entered: 09/21/2021) |
| 09/21/2021 | 2256 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 9 as to Gamal Abdelaziz, John Wilson held on 9/21/2021. Cross by Defendant Abdelaziz; cross by Defendant Wilson; re–direct by Government; re–cross by Defendant Abdelaziz; re–cross by Defendant Wilson. Government calls Special Agent Elizabeth Keating, sworn. Jury Trial Day 10 to resume at 9:00 AM on 9/23/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Frank, Kearney, Wright, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at joycedebra@gmail.com. (Lima, Christine) (Entered: 09/22/2021) |
| 09/22/2021 | 2255 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2243 Motion for Leave to File; as to David Sidoo (1), Gregory Colburn (2), Amy Colburn (3), Gamal Abdelaziz (4), Diane Blake (5), Todd Blake (6), I–Hsin Chen (7), Mossimo Giannulli (8), Elizabeth Henriquez (9), Manuel Henriquez (10), Douglas Hodge (11), Michelle Janavs (12), Elisabeth Kimmel (13), Lori Loughlin (14), William McGlashan Jr. (15), Marci Palatella (16), John Wilson (17), Homayoun Zadeh (18), Robert Zangrillo (19) (Lima, Christine). "The Court has considered the argument raised in News Media Intervenors motion for leave to file a reply (Docket No. 2243). Because the Court finds further briefing unnecessary to resolve the issue raised in that motion, it is DENIED as moot." Modified on 9/23/2021 (Lima, Christine). (Entered: 09/22/2021) |
| 09/22/2021 | 2257 | Opposition by USA as to Gamal Abdelaziz re 2247 MOTION ADMIT EXHIBITS (Kearney, Kristen) (Entered: 09/22/2021) |
| 09/22/2021 | 2258 | Response as to Gamal Abdelaziz, John Wilson: 2239 Response (unrelated to a motion). (Kendall, Michael) (Entered: 09/22/2021) |

A186

| | | |
|---|---|---|
| 09/22/2021 | 2259 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz re 2247 MOTION ADMIT EXHIBITS (Sharp, Joshua) (Entered: 09/22/2021) |
| 09/23/2021 | 2260 | MOTION for Leave to File *Motion to Intervene and Quash Trial Subpoenas for Testimony (Partially) Under Seal* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/23/2021) |
| 09/23/2021 | 2261 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 10 as to Gamal Abdelaziz, John Wilson held on 9/23/2021. Continued direct of Special Agent Keating; cross by Defendant Abdelaziz; cross by Defendant Wilson. Jury Trial Day 11 to resume at 9:00 AM on 9/24/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/23/2021) |
| 09/23/2021 | 2262 | MOTION for Leave to File *Reply Brief* as to John Wilson by University of Southern California. (Attachments: # 1 Exhibit A – Reply)(Fuller, Anthony) (Entered: 09/23/2021) |
| 09/23/2021 | 2263 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2260 Motion for Leave to File Partially Under Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/23/2021) |
| 09/23/2021 | 2264 | MOTION to Quash *Trial Subpoenas and to Intervene* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fuller, Anthony) (Additional attachment(s) added on 9/24/2021: # 3 PARTIALL SEALED Motion, # 4 PARTIALLY SEALED EXHIBITS A & B) (Lima, Christine). (Entered: 09/23/2021) |
| 09/23/2021 | 2265 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: denying as moot, in part, and granting, in part 2181 Motion to Quash; granting in part, and denying, in part 2171 Motion to Intervene and Quash Trial Subpoenas; granting 2235 Motion to Intervene and Quash Trial Subpoenas; denying 2237 Motion for Curative Instruction; denying 2252 Motion for a Limiting Instruction; denying 2251 Motion to Introduce Exhibit. (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2266 | Assented to MOTION for Leave to File *Defendant John Wilson's Assented−To Motion For Leave To File Sur−Reply Brief Regarding Non−Party University Of Southern California's Reply In Support Of Motion To Quash* as to John Wilson. (Attachments: # 1 Exhibit A – Proposed Sur−Reply)(Kendall, Michael) (Entered: 09/24/2021) |
| 09/24/2021 | 2267 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 1988 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 1989 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 1990 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 1992 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 1996 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 1998 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2001 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2002 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2003 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2004 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2006 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2007 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2008 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2009 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2010 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2011 Motion in Limine as to Elisabeth Kimmel (13); finding as moot 2013 Motion in Limine as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2268 | MOTION to Intervene and for Order Allowing Public Access to Transcripts of Audio Recordings Provided to Jury as to Gamal Abdelaziz, John Wilson, filed by Boston Globe Media Partners, LLC.. (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2269 | MEMORANDUM in Support by Gamal Abdelaziz, John Wilson re 2268 MOTION to Intervene and for Order Allowing Public Access to Transcripts of Audio Recordings Provided to Jury (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2270 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER, denying 2247 Motion to Admit Exhibits as toGamal Abdelaziz. (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2271 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2268 Motion to Intervene and for Order Allowing Public Access to Transcripts of Audio Recordings |

| | | |
|---|---|---|
| | | Provided to Jury as to Gamal Abdelaziz (4), John Wilson (17). "Intervenor Boston Globe Media Partners, LLC.s Motion for Order Allowing Public Access to Transcripts of Audio Recordings Provided to Jury (Docket No. 2268) is ALLOWED. The transcripts for those recordings which are in evidence will be released to the public." (Lima, Christine) (Entered: 09/24/2021) |
| 09/24/2021 | 2281 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 11 as to Gamal Abdelaziz, John Wilson held on 9/24/2021. Continued cross examination of Special Agent Keating by Defendant Wilson; re−direct by the Government; re−cross by Defendant Abdelaziz; re−cross by Defendant Wilson. Government calls Aaricka Hughes, sworn; cross by Defendant Abdelaziz; re−direct by Government; re−cross by Defendant Abdelaziz. Proposed verdict forms to be filed by 5:00 PM on 9/27/21. Jury Trial Day 12 to resume at 9:00 AM on 9/27/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kathleen Silva kathysilva@verizon.net. (Lima, Christine) (Entered: 09/27/2021) |
| 09/26/2021 | 2272 | MOTION for Order *Concerning the Mode and Order of Witness Questioning in the Remainder of the Government's Case−In−Chief or, In the Alternative, for Witness Instruction* as to John Wilson. (Papenhausen, Lauren) (Entered: 09/26/2021) |
| 09/26/2021 | 2273 | MOTION for Reconsideration *MOTION TO RECONSIDER EVIDENTIARY RULING ON EXHIBIT 1374A AND ORDER ON MOTION TO QUASH SUBPOENA TO RON CRAWFORD* as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/26/2021) |
| 09/26/2021 | 2274 | MOTION DEFENDANTS MOTION FOR HEARING ON ASSERTION OF FIFTH AMENDMENT RIGHTS as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/26/2021) |
| 09/26/2021 | 2275 | MOTION for Reconsideration *ADMISSION OF EXHIBIT 1288* as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/26/2021) |
| 09/26/2021 | 2276 | MOTION DEFENDANTS MOTION TO INTRODUCE EXHIBITS 1563A, 1478, 9025, 1381A, AND 8182 as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Exhibit 1381A, # 2 Exhibit 8182, # 3 Exhibit 1478, # 4 Exhibit 1563, # 5 Exhibit 9025)(Sharp, Joshua) (Entered: 09/26/2021) |
| 09/26/2021 | 2277 | MOTION to Seal *Defendants' Offer of Proof and Motion to Admit* as to Gamal Abdelaziz, John Wilson by John Wilson. (Papenhausen, Lauren) (Entered: 09/27/2021) |
| 09/27/2021 | 2278 | MOTION for Leave to File *Its Motion to Quash Record−Keeper Subpoenas (Partially) Under Seal* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/27/2021) |
| 09/27/2021 | 2279 | Opposition by Gamal Abdelaziz, John Wilson re 2264 MOTION to Quash *Trial Subpoenas and to Intervene* (Kendall, Michael) (Entered: 09/27/2021) |
| 09/27/2021 | 2280 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2277 Motion to Seal. Counsel will receive an email within twenty−four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include − Leave to file granted on (date of order)− in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/27/2021) |
| 09/27/2021 | 2282 | Proposed Jury Verdict Form by John Wilson as to Gamal Abdelaziz, John Wilson (Attachments: # 1 Exhibit A − Proposed Verdict Form)(Kendall, Michael) (Entered: 09/27/2021) |
| 09/27/2021 | 2283 | Offer of Proof and MOTION to Admit Evidence, filed under seal as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Exhibit 1085, # 2 Exhibit 1116, # 3 Exhibit 1219, # 4 Exhibit 1249, # 5 Exhibit 1288, # 6 Exhibit 1297, # 7 Exhibit 1565, # 8 Exhibit 3628, # 9 Exhibit 7107, # 10 Exhibit 7207, # 11 Exhibit 7223, # 12 Exhibit 7235, # 13 Exhibit 7238, # 14 Exhibit 7242, # 15 Exhibit 7332, # 16 Exhibit 7341, # 17 Exhibit 7358, # 18 Exhibit 7387, # 19 Exhibit 7409, # 20 Exhibit 7527, # 21 Exhibit 7529, # 22 Exhibit 7807, # 23 Exhibit 7845, # 24 Exhibit 8045, # 25 Exhibit 9734, # 26 Exhibit 9748, # 27 Summary Chart)(Lima, Christine) (Entered: 09/27/2021) |

| 09/27/2021 | 2284 | Proposed Jury Verdict Form by USA as to Gamal Abdelaziz, John Wilson (Attachments: # 1 Exhibit A –– Proposed Verdict Form)(Stearns, Ian) (Entered: 09/27/2021) |
| 09/27/2021 | 2285 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2278 Motion for Leave to File Partially Under Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/27/2021) |
| 09/27/2021 | 2286 | MOTION to Compel as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kendall, Michael) (Entered: 09/27/2021) |
| 09/27/2021 | 2287 | MOTION to Quash *Defendants' Trial Subpoenas* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fuller, Anthony) (Additional attachment(s) added on 9/28/2021: # 3 SEALED Motion, # 4 SEALED Exhibit A, # 5 SEALED Exhibit B) (Lima, Christine) (Entered: 09/27/2021) |
| 09/27/2021 | 2288 | Opposition by Ron Crawford as to Gamal Abdelaziz, John Wilson re 2273 MOTION for Reconsideration *MOTION TO RECONSIDER EVIDENTIARY RULING ON EXHIBIT 1374A AND ORDER ON MOTION TO QUASH SUBPOENA TO RON CRAWFORD* (Gradel, Laura) (Entered: 09/27/2021) |
| 09/27/2021 | 2289 | MOTION for Reconsideration as to Gamal Abdelaziz, John Wilson by Gamal Abdelaziz. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Kelly, Brian) (Entered: 09/27/2021) |
| 09/27/2021 | 2290 | NOTICE OF ATTORNEY APPEARANCE: Payal Salsburg appearing for Objectors Steve Lopes, Ron Orr (Salsburg, Payal) (Entered: 09/27/2021) |
| 09/27/2021 | 2291 | MOTION for Leave to File *Under Seal Opposition to Defendants' Motion For Hearing on Assertion of Fifth Amendment Rights* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by Steve Lopes, Ron Orr. (Salsburg, Payal) (Entered: 09/27/2021) |
| 09/27/2021 | 2292 | Memorandum regarding Defendants' Offer of Proof for Evidence Excluded in the Examination of Rebecca Chassin as to Gamal Abdelaziz, John Wilson (Attachments: # 1 Exhibits (Filed Under Seal))(Kendall, Michael) (Entered: 09/27/2021) |
| 09/27/2021 | 2293 | MOTION to Admit Extrinsic Evidence for Impeachment of Pat Haden, Alex Garfio, and Timothy Brunold *(Public Redacted Version)*, as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Exhibits A – M (Filed Under Seal))(Kendall, Michael) (Additional attachment(s) added on 9/28/2021: # 2 SEALED Motion, # 3 SEALED Exhibit A, # 4 SEALED Exhibit B, # 5 SEALED Exhibit C, # 6 SEALED Exhibit D, # 7 SEALED Exhibit E, # 8 SEALED Exhibit F, # 9 SEALED Exhibit G, # 10 SEALED Exhibit H, # 11 SEALED Exhibit I, # 12 SEALED Exhibit J, # 13 SEALED Exhibit K, # 14 SEALED Exhibit L, # 15 SEALED Exhibit M) (Lima, Christine). (Entered: 09/27/2021) |
| 09/27/2021 | 2294 | MOTION DEFENDANTS MOTION FOR HEARING ON INVOCATION OF FIFTH AMENDMENT BY STEVEN MASERA as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/27/2021) |
| 09/27/2021 | 2295 | MOTION to Exclude */ Defendants' Motion to Exclude Evidence Concerning Internal Revenue Agent's Beliefs or Opinions as to Wilson's State of Mind or Questions of Law* as to John Wilson. (Kendall, Michael) (Entered: 09/27/2021) |
| 09/27/2021 | 2298 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER: "... defendants continuing objection based upon the Confrontation Clause, which have not been reduced to a formal motion, are OVERRULED." (Lima, Christine) (Entered: 09/28/2021) |
| 09/27/2021 | 2301 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 12 as to Gamal Abdelaziz, John Wilson held on 9/27/2021. Government calls Laura Janke, sworn; cross by Defendant Abdelaziz; cross by Defendant Wilson; re–direct by Government; re–cross by Defendant Abdelaziz. Government calls James Nahmens, sworn; cross by Defendant Wilson; re–direct by Government; re–cross by Defendant Wilson. Government calls Jeffrey DeMaio, sworn. Jury Trial Day 13 to resume at 9:00 AM on 9/28/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at |

| | | |
|---|---|---|
| | | joycedebra@gmail.com. (Lima, Christine) (Entered: 09/28/2021) |
| 09/28/2021 | 2296 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2293 MOTION to Admit Extrinsic Evidence for Impeachment of Pat Haden, Alex Garfio, and Timothy Brunold *(Public Redacted Version)*,, 2283 MOTION to Admit Evidence (Stearns, Ian) (Entered: 09/28/2021) |
| 09/28/2021 | 2297 | RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2289 MOTION for Reconsideration , 2275 MOTION for Reconsideration *ADMISSION OF EXHIBIT 1288*, 2273 MOTION for Reconsideration *MOTION TO RECONSIDER EVIDENTIARY RULING ON EXHIBIT 1374A AND ORDER ON MOTION TO QUASH SUBPOENA TO RON CRAWFORD* (Frank, Stephen) (Entered: 09/28/2021) |
| 09/28/2021 | 2299 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2291 Motion for Leave to File under Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/28/2021) |
| 09/28/2021 | 2300 | NOTICE OF ATTORNEY APPEARANCE: Mark D Smith appearing for Objectors Steve Lopes, Ron Orr (Smith, Mark) (Entered: 09/28/2021) |
| 09/28/2021 | 2302 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2276 MOTION DEFENDANTS MOTION TO INTRODUCE EXHIBITS 1563A, 1478, 9025, 1381A, AND 8182 (Stearns, Ian) (Entered: 09/28/2021) |
| 09/28/2021 | 2303 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz, John Wilson re 2275 MOTION for Reconsideration *ADMISSION OF EXHIBIT 1288*, 2273 MOTION for Reconsideration *MOTION TO RECONSIDER EVIDENTIARY RULING ON EXHIBIT 1374A AND ORDER ON MOTION TO QUASH SUBPOENA TO RON CRAWFORD* (Sharp, Joshua) (Entered: 09/28/2021) |
| 09/28/2021 | 2304 | Opposition by University of Southern California as to Gamal Abdelaziz, John Wilson re 2286 MOTION to Compel (Fuller, Anthony) (Entered: 09/28/2021) |
| 09/28/2021 | 2305 | Opposition by Steve Lopes, Ron Orr as to Gamal Abdelaziz, John Wilson re 2274 MOTION DEFENDANTS MOTION FOR HEARING ON ASSERTION OF FIFTH AMENDMENT RIGHTS , filed under seal. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Lima, Christine) (Entered: 09/28/2021) |
| 09/28/2021 | 2306 | Opposition by Gamal Abdelaziz, John Wilson re 2287 MOTION to Quash *Defendants' Trial Subpoenas / Defendants' Opposition to Non−Party University of Southern California's Motion to Quash Defendants' Trial Subpoenas for Record−Keeper Testimony* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kendall, Michael) (Attachment 1 replaced on 9/29/2021) (Lima, Christine). (Attachment 2 replaced on 9/29/2021) (Lima, Christine). (Attachment 1 replaced on 9/29/2021) (Lima, Christine). (Attachment 2 replaced on 9/29/2021) (Lima, Christine). (Entered: 09/28/2021) |
| 09/28/2021 | 2307 | MOTION for Leave to Appear Pro Hac Vice by Philip Y. Kouyoumdjian Filing fee $ 300, receipt number MADC−8980642. as to Gamal Abdelaziz, John Wilson. (Attachments: # 1 Motion for Leave to Appear Pro Hac Vice, # 2 Kathryn S. Wallrabenstein Certification, # 3 Motion for Leave to Appear Pro Hac Vice, # 4 David H. Thomas Certification)(Kouyoumdjian, Philip) (Entered: 09/28/2021) |
| 09/28/2021 | 2308 | REPLY TO RESPONSE to Motion by University of Southern California as to Gamal Abdelaziz, John Wilson re 2264 MOTION to Quash *Trial Subpoenas and to Intervene on Behalf of Non−Parties Ray Gonzales and Tracey Vranich* (Fuller, Anthony) (Entered: 09/28/2021) |
| 09/28/2021 | 2313 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 13 as to Gamal Abdelaziz, John Wilson held on 9/28/2021. Cross of J. Demaio by Defendant Wilson; cross by Defendant Abdelaziz; re−direct by Government; re−cross by Defendant Wilson. Government calls Casey Moon, sworn; cross by Defendant Wilson; cross by Defendant Abdelaziz; re−direct by Government; re−cross by Defendant Wilson; re−cross by Defendant Abdelaziz. Jury Trial Day 14 to resume at 9:00 AM on 9/29/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) (Entered: 09/29/2021) |

**A190**

| | | |
|---|---|---|
| 09/29/2021 | 2309 | MOTION DEFENDANTS MOTION TO ADMIT EXHIBIT 1219 AS STATE OF MIND EVIDENCE as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 09/29/2021) |
| 09/29/2021 | 2310 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2307 Motion for Leave to Appear Pro Hac Vice Added Kathryn S. Wallrabenstein and David H. Thomas<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>as to Gamal Abdelaziz (4), John Wilson (17) (McDonagh, Christina) (Entered: 09/29/2021) |
| 09/29/2021 | 2311 | MOTION to Quash *Trial Subpoena on Behalf of Gigi Shapiro and the University of Southern California's Custodian of Record* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/29/2021) |
| 09/29/2021 | 2312 | Opposition by Steven Masera as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I−Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo re 2294 MOTION DEFENDANTS MOTION FOR HEARING ON INVOCATION OF FIFTH AMENDMENT BY STEVEN MASERA (Attachments: # 1 Exhibit A)(Kouyoumdjian, Philip) (Entered: 09/29/2021) |
| 09/29/2021 | 2314 | MOTION for Leave to Appear Pro Hac Vice by Philip Kouyoumdjian Filing fee $ 100, receipt number MADC−8982452. as to Gamal Abdelaziz, John Wilson by Steven Masera. (Kouyoumdjian, Philip) (Entered: 09/29/2021) |
| 09/29/2021 | 2315 | MOTION for Leave to Appear Pro Hac Vice by Kathryn S. Wallrabenstein Filing fee $ 100, receipt number MADC−8982581. as to Gamal Abdelaziz, John Wilson by Steven Masera. (Attachments: # 1 Certification)(Kouyoumdjian, Philip) (Entered: 09/29/2021) |
| 09/29/2021 | 2316 | MOTION for Leave to Appear Pro Hac Vice by David H. Thomas Filing fee $ 100, receipt number MADC−8982604. as to Gamal Abdelaziz, John Wilson by Steven Masera. (Attachments: # 1 Certification)(Kouyoumdjian, Philip) (Entered: 09/29/2021) |
| 09/29/2021 | 2317 | NOTICE OF ATTORNEY APPEARANCE: Philip Yvan Kouyoumdjian appearing for Objector Steven Masera (Kouyoumdjian, Philip) (Entered: 09/29/2021) |
| 09/29/2021 | 2318 | NOTICE *of Change of Address* by Pat Haden as to Gamal Abdelaziz, Marci Palatella, John Wilson (Fox, Brandon) (Entered: 09/29/2021) |
| 09/29/2021 | 2319 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz as to Gamal Abdelaziz, John Wilson re 2293 MOTION to Admit Extrinsic Evidence for Impeachment of Pat Haden, Alex Garfio, and Timothy Brunold *(Public Redacted Version),* (Kelly, Brian) (Entered: 09/29/2021) |
| 09/29/2021 | 2320 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2309 MOTION DEFENDANTS MOTION TO ADMIT EXHIBIT 1219 AS STATE OF MIND EVIDENCE (Stearns, Ian) (Entered: 09/29/2021) |
| 09/29/2021 | 2321 | MOTION to Strike *Testimony of IRS Agent Concerning Tax Calculation* as to John Wilson. (Kendall, Michael) (Entered: 09/29/2021) |
| 09/29/2021 | 2322 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz, John Wilson re 2309 MOTION DEFENDANTS MOTION TO ADMIT EXHIBIT 1219 AS STATE OF MIND EVIDENCE (Sharp, Joshua) (Entered: 09/29/2021) |
| 09/29/2021 | 2323 | Judge Nathaniel M. Gorton: ORDER entered denying 2293 Motion to Admit Extrinsic Evidence for Impeachment of Pat Haden, Alex Garfio, and Timothy Brunold as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 09/30/2021) |
| 09/29/2021 | 2325 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 14 as to Gamal Abdelaziz, John Wilson held on 9/29/2021. Government calls Mark Deckett, sworn; cross by Defendant Wilson; cross by Defendant Abdelaziz; re−direct by Government; re−cross by Defendant Abdelaziz. Government calls Lauren George, sworn; |

| | | |
|---|---|---|
| | | cross by Defendant Abdelaziz; cross by Defendant Wilson. Government calls Agent Colleen Ranahan, sworn; cross by Defendant Wilson; re–direct by Government; re–cross by Defendant Wilson. Government rests. Court will hear arguments by counsel on pending matters at 3:30 PM in Courtroom 4. (Attorneys present: Kelley, Sheketoff, Maynard, Sharp, Kendall, Papenhausen, Tomback, Frank, Wright, Kearney, Stearns, Frank.)Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at joycedebra@gmail.com. (Lima, Christine) Modified on 9/30/2021 (Lima, Christine). (Entered: 09/30/2021) |
| 09/29/2021 | 2338 | Transcript of Jury Trial – Day 4 as to Gamal Abdelaziz, John Wilson held on September 13, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kelly Mortellite, Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/20/2021. Redacted Transcript Deadline set for 11/1/2021. Release of Transcript Restriction set for 12/28/2021. (Coppola, Katelyn) (Entered: 10/01/2021) |
| 09/29/2021 | 2339 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 10/01/2021) |
| 09/30/2021 | 2324 | MOTION to Exclude *Hearsay Wiretap Calls and E–mails* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 09/30/2021) |
| 09/30/2021 | 2326 | REPLY TO RESPONSE to Motion by University of Southern California as to Gamal Abdelaziz, John Wilson re 2287 MOTION to Quash *Defendants' Trial Subpoenas* (Attachments: # 1 Exhibit A)(Fuller, Anthony) (Entered: 09/30/2021) |
| 09/30/2021 | 2327 | Set/Reset Hearings as to Gamal Abdelaziz, John Wilson Status Conference/Motion Hearing set for 9/30/2021 03:30 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 09/30/2021) |
| 09/30/2021 | 2328 | Opposition by USA as to John Wilson re 2321 MOTION to Strike *Testimony of IRS Agent Concerning Tax Calculation* (Kearney, Kristen) (Entered: 09/30/2021) |
| 09/30/2021 | 2329 | Opposition by Gamal Abdelaziz, John Wilson re 2324 MOTION to Exclude *Hearsay Wiretap Calls and E–mails* (Sharp, Joshua) (Entered: 09/30/2021) |
| 09/30/2021 | 2330 | MOTION for Acquittal *Under Federal Rule of Criminal Procedure 29* as to Gamal Abdelaziz, John Wilson by John Wilson. (Kendall, Michael) (Entered: 09/30/2021) |
| 09/30/2021 | 2331 | Assented to MOTION for Leave to File *Its Motion to Amend Protective Order Under Seal* as to Gamal Abdelaziz, John Wilson by University of Southern California. (Fuller, Anthony) (Entered: 09/30/2021) |
| 09/30/2021 | 2335 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 15/Status Conference in relation to Jury Trial as to Gamal Abdelaziz, John Wilson held on 9/30/2021; with arguments given, the Court denied 2330 Motion for Acquittal as to John Wilson, without prejudice pending further briefing; 2324 Government's Motion to Preclude Defendants' Introduction of Wiretap Calls and E–mails to Establish Singer's "State of Mind" and 2273 Defendants' Motion to Reconsider Evidentiary Ruling on Exhibit 1374A and Order on Motion to Quash Subpoena to Ron Crawford, addressed; witness/evidence scheduling addressed. (Attorneys present: Kelley, Sheketoff, Maynard, Sharp, Kendall, Papenhausen, Tomback, Frank, Wright, Kearney, Stearns, Frank)Court Reporter Name and Contact information: Kristin Kelley at kmob929@gmail.com. (Lovett, Jarrett) Modified on 10/4/2021 (Lima, Christine). (Entered: 10/01/2021) |
| 10/01/2021 | 2332 | MOTION *for Ruling on Objections to Defendants' Exhibits* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 10/01/2021) |
| 10/01/2021 | 2333 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2331 Motion for Leave to File Under Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 10/01/2021) |
| 10/01/2021 | 2334 | EXHIBIT/WITNESS LIST by John Wilson (Kendall, Michael) (Entered: 10/01/2021) |

| 10/01/2021 | 2336 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER as to Gamal Abdelaziz, John Wilson: granting 2264 Intervenors' Motion to Quash Trial Subpoenas; denying 2273 Motion for Reconsideration; granting 2274 Motion for Hearing on Assertion of Fifth Amendment Rights; granting 2294 Motion for Hearing on Assertion of Fifth Amendment Rights; denying 2275 Motion for Reconsideration; granting, in part, and denying, in part 2276 Motion to Introduce Exhibits 1563A, 1478, 9025, 1381A and 8182; denying 2321 Motion to Strike Testimony of Agent Ranahan; denying 2309 Motion to Admit Exhibit 1219 and Exhibit 1249; denying 2283 Motion to Admit Evidence; denying 2286 Motion to Compel Testimony of Scott Simon; granting 2311 Motion to Intervene and Quash a Trial Subpoena; denying as moot and granting, in part 2287 Motion to Quash Trial Subpoenas; denying as moot 2289 Motion for Reconsideration of Evidentiary Rulings; denying as moot, in part, and denying, in part 2295 Motion to Exclude Evidence. (Lima, Christine) (Entered: 10/01/2021) |
| 10/01/2021 | 2337 | MOTION to Amend Protective Order as to Gamal Abdelaziz, John Wilson by University of Southern California, filed under seal. (Lima, Christine) (Entered: 10/01/2021) |
| 10/01/2021 | 2340 | EXHIBIT/WITNESS LIST by John Wilson as to David Sidoo, Gregory Colburn, Amy Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo (Kendall, Michael) (Entered: 10/01/2021) |
| 10/01/2021 | 2349 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 16 as to Gamal Abdelaziz, John Wilson held on 10/1/2021. Court hears arguments from counsel on 2332 MOTION for Ruling on Objections to Defendants' Exhibits. Defendant Wilson calls Andrew Mericle, sworn; cross by Government. Jury excused for the day at 12:10 PM. Defendant Abdelaziz calls Steven Lopes (appears by zoom), sworn. Lopes invokes his Fifth Amendment right not to testify. Defendant Abdelaziz calls Ronald Orr (appears by zoom), sworn. Orr invokes his Fifth Amendment right not to testify. Court has ex parte hearing by phone with Attorney Thomas and witness Steven Masera. Jury Trial Day 17 to resume at 9:00 AM on 10/4/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at joycedebra@gmail.com. (Lima, Christine) Modified on 10/4/2021 (Lima, Christine). (Entered: 10/04/2021) |
| 10/03/2021 | 2341 | Proposed Jury Instructions by Gamal Abdelaziz, John Wilson (Sharp, Joshua) (Entered: 10/03/2021) |
| 10/03/2021 | 2342 | NOTICE *DEFENDANTS SUPPLEMENTAL MEMORANDUM REGARDING FAILURE TO PROVE COUNT 2 VENUE* by Gamal Abdelaziz, John Wilson re 2330 MOTION for Acquittal *Under Federal Rule of Criminal Procedure 29* (Sharp, Joshua) (Entered: 10/03/2021) |
| 10/03/2021 | 2343 | Proposed Jury Instructions by John Wilson (Attachments: # 1 Exhibit Proposed Jury Instruction)(Kendall, Michael) (Entered: 10/03/2021) |
| 10/03/2021 | 2344 | MOTION for Reconsideration *Regarding Admission of Contextual Email, or in the Alternative, To Limit Misleading Argument* as to John Wilson. (Attachments: # 1 Exhibit Exhibits Offered Not Admitted)(Kendall, Michael) (Entered: 10/03/2021) |
| 10/04/2021 | 2345 | MOTION to Exclude *Irrelevant and Prejudicial Area of Questioning for Testimony of James Walters* as to John Wilson. (Attachments: # 1 Exhibit Transcript Excerpts)(Kendall, Michael) (Entered: 10/04/2021) |
| 10/04/2021 | 2346 | MOTION to Exclude *Exhibit 8131* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 10/04/2021) |
| 10/04/2021 | 2347 | MOTION to Exclude *Testimony of James Walters for Violations of Sequestration Order* as to Gamal Abdelaziz, John Wilson by USA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Stearns, Ian) (Entered: 10/04/2021) |
| 10/04/2021 | 2348 | Proposed Jury Instructions by John Wilson (Attachments: # 1 Exhibit Proposed Supplemental Jury Instructions)(Kendall, Michael) (Entered: 10/04/2021) |
| 10/04/2021 | 2350 | Proposed Jury Instructions by Gamal Abdelaziz, John Wilson (Sharp, Joshua) (Entered: 10/04/2021) |

| 10/04/2021 | 2351 | MOTION for Acquittal *DEFENDANTS RENEWED MOTION FOR JUDGMENT OF ACQUITTAL* as to Gamal Abdelaziz, John Wilson. (Sharp, Joshua) (Entered: 10/04/2021) |
|---|---|---|
| 10/04/2021 | 2352 | Electronic Clerk's Notes for proceedings before Judge Nathaniel M. Gorton: Jury Trial Day 17 as to Gamal Abdelaziz, John Wilson held on 10/5/2021 granting 2346 Motion to Exclude as to Gamal Abdelaziz (4), John Wilson (17); finding as moot 2347 Motion to Exclude as to Gamal Abdelaziz (4), John Wilson (17); granting 2344 Motion for Reconsideration re 2346 MOTION to Exclude *Exhibit 8131* filed by USA, 2347 MOTION to Exclude *Testimony of James Walters for Violations of Sequestration Order* filed by USA, 2344 MOTION for Reconsideration *Regarding Admission of Contextual Email, or in the Alternative, To Limit Misleading Argument* filed by John Wilson, 2345 MOTION to Exclude *Irrelevant and Prejudicial Area of Questioning for Testimony of James Walters* filed by John Wilson as to John Wilson (17); finding as moot 2345 Motion to Exclude as to John Wilson (17);. Defendant Wilson calls James Walters, sworn; cross by Government; re–direct by Defendant Wilson; re–cross by Government. Defendant Wilson calls John (Jack) Bowen, sworn; cross by Government; re–direct by Defendant Wilson; re–cross by Government. Defendant Wilson rests. Charge Conference set for 1:00 PM on 10/5/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite at mortellite@gmail.com. (Lima, Christine) Modified on 10/5/2021 (Lima, Christine). Modified on 10/5/2021 (Lima, Christine). (Entered: 10/05/2021) |
| 10/05/2021 | 2353 | MOTION DEFENDANTS MOTION TO EXCLUDE ARGUMENT REGARDING CONTROL OF FUNDS as to Gamal Abdelaziz. (Sharp, Joshua) (Entered: 10/05/2021) |
| 10/05/2021 | 2354 | MOTION for Leave to File *Under Seal Offer of Proof* as to David Sidoo, Amy Colburn, Gregory Colburn, Gamal Abdelaziz, Diane Blake, Todd Blake, I–Hsin Chen, Mossimo Giannulli, Elizabeth Henriquez, Manuel Henriquez, Douglas Hodge, Michelle Janavs, Elisabeth Kimmel, Lori Loughlin, William McGlashan, Jr, Marci Palatella, John Wilson, Homayoun Zadeh, Robert Zangrillo by John Wilson. (Papenhausen, Lauren) (Entered: 10/05/2021) |
| 10/05/2021 | 2355 | NOTICE *Proposed Curative Instruction* by Gamal Abdelaziz as to Gamal Abdelaziz, John Wilson (Kelly, Brian) (Entered: 10/05/2021) |
| 10/05/2021 | 2356 | MOTION Instruction on Inadmissible Evidence Introduced During Opening Statements as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 10/05/2021) |
| 10/05/2021 | 2357 | NOTICE *Government's Supplemental Notice Regarding Federal Programs Bribery and "Official Acts"* by USA as to Gamal Abdelaziz, John Wilson (Stearns, Ian) (Entered: 10/05/2021) |
| 10/05/2021 | 2358 | NOTICE *Government's Response to Defendants' Supplemental Proposed Jury Instruction Regarding Venue* by USA as to Gamal Abdelaziz, John Wilson re 2341 Proposed Jury Instructions (Stearns, Ian) (Entered: 10/05/2021) |
| 10/05/2021 | 2359 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2353 MOTION DEFENDANTS MOTION TO EXCLUDE ARGUMENT REGARDING CONTROL OF FUNDS (Stearns, Ian) (Entered: 10/05/2021) |
| 10/05/2021 | 2360 | REPLY TO RESPONSE to Motion by Gamal Abdelaziz re 2353 MOTION DEFENDANTS MOTION TO EXCLUDE ARGUMENT REGARDING CONTROL OF FUNDS (Sharp, Joshua) (Entered: 10/05/2021) |
| 10/05/2021 | 2361 | NOTICE *Objection to Proposed Jury Instructions* by Gamal Abdelaziz (Sharp, Joshua) (Entered: 10/05/2021) |
| 10/05/2021 | 2368 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Charge Conference/Jury Trial Day 18 as to Gamal Abdelaziz, John Wilson held on 10/5/2021. Charge Conference held. Closing arguments to begin at 9:00 AM on 10/6/21. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 10/06/2021) |
| 10/06/2021 | 2362 | NOTICE *DEFENDANTS OBJECTION TO PROPOSED VERDICT FORM* by Gamal Abdelaziz, John Wilson (Sharp, Joshua) (Entered: 10/06/2021) |

| 10/06/2021 | [2363](#) | Objection as to John Wilson: [2014](#) Proposed Jury Instructions filed by USA. (Kendall, Michael) (Entered: 10/06/2021) |
|---|---|---|
| 10/06/2021 | [2364](#) | NOTICE *Government's Response to Defendants' Objection to Proposed Verdict Form* by USA as to Gamal Abdelaziz, John Wilson (Stearns, Ian) (Entered: 10/06/2021) |
| 10/06/2021 | [2365](#) | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting [2354](#) Motion for Leave to File Under Seal as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 10/06/2021) |
| 10/06/2021 | [2366](#) | Response as to Gamal Abdelaziz, John Wilson: [2357](#) Notice (Other) filed by USA. (Kendall, Michael) (Entered: 10/06/2021) |
| 10/06/2021 | [2367](#) | Memorandum regarding Defendants' Offer of Proof for Evidence Excluded During Trial as to Gamal Abdelaziz, John Wilson (Attachments: # [1](#) Exhibit A (Filed Under Seal))(Papenhausen, Lauren) (Additional attachment(s) added on 10/7/2021: # [2](#) Exhibit 86, # [3](#) Exhibit 103, # [4](#) Exhibit 111, # [5](#) Exhibit 118, # [6](#) Exhibit 125) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [7](#) Exhibit 155, # [8](#) Exhibit 1043, # [9](#) Exhibit 1049, # [10](#) Exhibit 1085, # [11](#) Exhibit 1088, # [12](#) Exhibit 1104, # [13](#) Exhibit 1116) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [14](#) Exhibit 1219, # [15](#) Exhibit 1247, # [16](#) Exhibit 1249, # [17](#) Exhibit 1288, # [18](#) Exhibit 1297, # [19](#) Exhibit 1339, # [20](#) Exhibit 1350) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [21](#) Exhibit 1381A, # [22](#) Exhibit 1452A, # [23](#) Exhibit 1474B, # [24](#) Exhibit 1478, # [25](#) Exhibit 1494A, # [26](#) Exhibit 1541, # [27](#) Exhibit 1554, # [28](#) Exhibit 1560, # [29](#) Exhibit 1564) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [30](#) Exhibit 1565, # [31](#) Exhibit 7003, # [32](#) Exhibit 7004, # [33](#) Exhibit 7010, # [34](#) Exhibit 7012, # [35](#) Exhibit 7069, # [36](#) Exhibit 7070, # [37](#) Exhibit 7071) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [38](#) Exhibit 7072, # [39](#) Exhibit 7076, # [40](#) Exhibit 7077, # [41](#) Exhibit 7078, # [42](#) Exhibit 7080, # [43](#) Exhibit 7223, # [44](#) Exhibit 7238, # [45](#) Exhibit 7242, # [46](#) Exhibit 7255, # [47](#) Exhibit 7258, # [48](#) Exhibit 7289, # [49](#) Exhibit 7316, # [50](#) Exhibit 7358) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [51](#) Exhibit 7387, # [52](#) Exhibit 7492, # [53](#) Exhibit 7960, # [54](#) Exhibit 7968A, # [55](#) Exhibit 7972, # [56](#) Exhibit 7973, # [57](#) Exhibit 7974, # [58](#) Exhibit 7976, # [59](#) Exhibit 8003, # [60](#) Exhibit 8004, # [61](#) Exhibit 8008) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [62](#) Exhibit 8014, # [63](#) Exhibit 8030, # [64](#) Exhibit 8031, # [65](#) Exhibit 8092, # [66](#) Exhibit 8112, # [67](#) Exhibit 8130, # [68](#) Exhibit 8135, # [69](#) Exhibit 8142, # [70](#) Exhibit 8144, # [71](#) Exhibit 8157) (Lima, Christine). (Additional attachment(s) added on 10/7/2021: # [72](#) Exhibit 8163, # [73](#) Exhibit 8182A, # [74](#) Exhibit 8185, # [75](#) Exhibit 8189, # [76](#) Exhibit 8192, # [77](#) Exhibit 8193, # [78](#) Exhibit 8194, # [79](#) Exhibit 8195, # [80](#) Exhibit 8212, # [81](#) Exhibit 8230, # [82](#) Exhibit 8231, # [83](#) Exhibit 8232, # [84](#) Exhibit 8241, # [85](#) Exhibit 8255) (Lima, Christine). (Additional attachment(s) added on 2/16/2022: # [86](#) Exhibit 8264, # [87](#) Exhibit 8265, # [88](#) Exhibit 9014, # [89](#) Exhibit 9021, # [90](#) Exhibit 9025, # [91](#) Exhibit 9031) (Lima, Christine). (Entered: 10/06/2021) |
| 10/06/2021 | [2369](#) | MOTION for Supplemental Jury Instructions as to Gamal Abdelaziz, John Wilson by Gamal Abdelaziz. (Kelly, Brian) (Entered: 10/06/2021) |
| 10/06/2021 | [2370](#) | NOTICE *Proposed Verdict Form* by Gamal Abdelaziz as to Gamal Abdelaziz, John Wilson (Kelly, Brian) (Entered: 10/06/2021) |
| 10/06/2021 | 2371 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 19 as to Gamal Abdelaziz, John Wilson held on 10/6/2021. Closing arguments by the Government. Closing arguments by Defendant Abdelaziz. Closing arguments by Defendant Wilson. Rebuttal by Government. Jury Trial Day 20 to resume at 9:00 AM on 10/7/21 with the charge to the Jury. (Attorneys present: Kelly, Sharp, Sheketoff, Maynard, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com and Debra Joyce at joycedebra@gmail.com. (Lima, Christine) (Entered: 10/06/2021) |
| 10/07/2021 | [2372](#) | Opposition by USA as to Gamal Abdelaziz, John Wilson re [2369](#) MOTION for Supplemental Jury Instructions (Frank, Stephen) (Entered: 10/07/2021) |
| 10/07/2021 | 2374 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 20 as to Gamal Abdelaziz, John Wilson held on 10/7/2021. Jury Charge/Instructions given to the Jury by the Court. Jury begins deliberations at 11:27 AM. Jury recesses for the day at 5:00PM. Jury Trial Day 21 to resume at 9:00 AM on 10/8/21. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley |

| | | |
|---|---|---|
| | | at kmob929@gmail.com. (Lima, Christine) (Entered: 10/12/2021) |
| 10/08/2021 | 2373 | MOTION for Extension of Time to File *Post−Trial Motions* as to Gamal Abdelaziz, John Wilson by John Wilson. (Kendall, Michael) (Entered: 10/08/2021) |
| 10/08/2021 | 2375 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Jury Trial Day 21 as to Gamal Abdelaziz, John Wilson held on 10/8/2021. Jury resumes deliberations at 9:00 AM. Jury returns with a question at 9:15 AM. Jury returns with a verdict at 2:30 PM. See verdict form for details. Sentencing as to Defendant Abdelaziz set for 2/16/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton., Sentencing as to Defendant Wilson set for 2/17/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Attorneys present: Kelly, Sharp, Maynard, Sheketoff, Stearns, Kearney, Wright, Frank, Tomback, Papenhausen, Kendall. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 10/12/2021) |
| 10/08/2021 | 2376 | JURY VERDICT as to Gamal Abdelaziz (4) Guilty on Count 1ss,2ss and John Wilson (17) Guilty on Count 1ss,2ss,6ss,8s,9s,11ss−12ss,13ss. (Attachments: # 1 Notes from the Jury)(Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | | Terminate Deadlines and Hearings as to Gamal Abdelaziz, John Wilson: Jury Trial scheduled for 10/12/21 − 10/15/21. (Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | 2377 | JURY AND WITNESS LIST for Jury Trial held 9/8/21 − 10/8/21 as to Gamal Abdelaziz, John Wilson (Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | 2378 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Gamal Abdelaziz Sentencing set for 2/16/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | 2379 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to John Wilson Sentencing set for 2/17/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | 2380 | EXHIBIT LIST for Jury Trial held 9/8/21 − 10/8/21 as to Gamal Abdelaziz, John Wilson (Lima, Christine) (Entered: 10/12/2021) |
| 10/12/2021 | 2381 | RESPONSE to Motion by USA as to Gamal Abdelaziz, John Wilson re 2373 MOTION for Extension of Time to File *Post−Trial Motions* (Stearns, Ian) (Entered: 10/12/2021) |
| 10/12/2021 | 2386 | DUPLICATE TRANSCRIPT FILED (Original entry 2338 )of Jury Trial − Day 4 as to Gamal Abdelaziz, John Wilson held on September 13, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite. (Coppola, Katelyn) Modified on 10/14/2021 to reflect that this is a duplicate docket entry (Coppola, Katelyn). (Entered: 10/14/2021) |
| 10/12/2021 | 2387 | Transcript of Jury Trial − Day 5 as to Gamal Abdelaziz, John Wilson held on September 14, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2388 | Transcript of Jury Trial − Day 6 as to Gamal Abdelaziz, John Wilson held on September 15, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2389 | Transcript of Jury Trial − Day 7 as to Gamal Abdelaziz, John Wilson held on September 17, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |

| 10/12/2021 | 2390 | Transcript of Jury Trial – day 8 as to Gamal Abdelaziz, John Wilson held on September 20, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2391 | Transcript of Jury Trial – Day 9 as to Gamal Abdelaziz, John Wilson held on September 21, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2392 | Transcript of Jury Trial – Day 10 as to Gamal Abdelaziz, John Wilson held on September 23, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2393 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 10/14/2021) |
| 10/12/2021 | 2398 | Transcript of Jury Trial – Day 11 as to Gamal Abdelaziz, John Wilson held on September 24, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2399 | Transcript of Jury Trial – Day 12 as to Gamal Abdelaziz, John Wilson held on September 27, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2400 | Transcript of Jury Trial – Day 13 as to Gamal Abdelaziz, John Wilson held on September 28, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2401 | Transcript of Jury Trial – Day 14 as to Gamal Abdelaziz, John Wilson held on September 29, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2402 | Transcript of Jury Trial – Day 15 as to Gamal Abdelaziz, John Wilson held on September 30, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |

| | | |
|---|---|---|
| 10/12/2021 | 2403 | Transcript of Jury Trial – Day 16 as to Gamal Abdelaziz, John Wilson held on October 1, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2404 | Transcript of Jury Trial – Day 17 as to Gamal Abdelaziz, John Wilson held on October 4, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Kelly Mortellite The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2405 | Transcript of Jury Trial – Day 18 as to Gamal Abdelaziz, John Wilson held on October 5, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2406 | Transcript of Jury Trial – Day 19 as to Gamal Abdelaziz, John Wilson held on October 6, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com and Debra Joyce. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/12/2021 | 2407 | Transcript of Jury Trial – Day 20 as to Gamal Abdelaziz, John Wilson held on October 7, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Coppola, Katelyn) (Entered: 10/15/2021) |
| 10/13/2021 | 2382 | Assented to MOTION for Return of Passport as to Diane Blake. (Sutro, Stephen) (Entered: 10/13/2021) |
| 10/13/2021 | 2383 | Assented to MOTION for Return of Passport as to Todd Blake. (Sutro, Stephen) (Entered: 10/13/2021) |
| 10/13/2021 | 2384 | Assented to MOTION to Continue *Sentencing* as to Gamal Abdelaziz. (Kelly, Brian) (Entered: 10/13/2021) |
| 10/14/2021 | 2385 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2384 Motion to Continue as to Gamal Abdelaziz (4) Sentencing set for 2/9/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 10/14/2021) |
| 10/14/2021 | 2394 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 2382 Assented to MOTION for Return of Passport as to Diane Blake. (5) (McDonagh, Christina) (Entered: 10/14/2021) |
| 10/14/2021 | 2395 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 2383 Assented to MOTION for Return of Passport as to Todd Blake (6) (McDonagh, Christina) (Entered: 10/14/2021) |
| 10/14/2021 | 2396 | Assented to MOTION for Extension of Time to October 22, 2021 to File Witness and Exhibit Lists as to Amy Colburn, Gregory Colburn, I–Hsin Chen by USA. (Stearns, Ian) (Entered: 10/14/2021) |
| 10/15/2021 | 2397 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered ALLOWING 2396 Assented to MOTION for Extension of Time to October 22, 2021 to File Witness and Exhibit Lists as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7) (McDonagh, Christina) (Entered: 10/15/2021) |
| 10/18/2021 | 2413 | Transcript of Jury Trial – Day 21 as to Gamal Abdelaziz, John Wilson held on October 8, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: |

| | | |
|---|---|---|
| | | Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/8/2021. Redacted Transcript Deadline set for 11/18/2021. Release of Transcript Restriction set for 1/18/2022. (Coppola, Katelyn) (Entered: 10/22/2021) |
| 10/18/2021 | 2414 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 10/22/2021) |
| 10/20/2021 | 2408 | Memorandum from Probation regarding Request for International Travel as to Mossimo Giannulli. Requested action: Decision and Signature (McAnally, Sean) (Entered: 10/20/2021) |
| 10/20/2021 | 2409 | Memorandum from Probation regarding Request for International Travel as to Lori Loughlin. Requested action: Decision and Signature (McAnally, Sean) (Entered: 10/20/2021) |
| 10/21/2021 | 2410 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered as to Mossimo Giannulli re 2408 Memorandum from Probation regarding Request for International Travel. (Lima, Christine) (Entered: 10/22/2021) |
| 10/21/2021 | 2411 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered as to Lori Loughlin re 2409 Memorandum from Probation regarding Request for International Travel. (Lima, Christine) (Entered: 10/22/2021) |
| 10/22/2021 | 2412 | MOTION for Judgment of Acquittal and Motion for New Trial *(Renewed),* as to Gamal Abdelaziz, John Wilson by John Wilson. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kendall, Michael) (Entered: 10/22/2021) |
| 10/22/2021 | 2415 | EXHIBIT/WITNESS LIST by USA as to Gregory Colburn, Amy Colburn, I–Hsin Chen (Stearns, Ian) (Entered: 10/22/2021) |
| 10/22/2021 | 2416 | EXHIBIT/WITNESS LIST by USA as to Gregory Colburn, Amy Colburn, I–Hsin Chen (Stearns, Ian) (Entered: 10/22/2021) |
| 10/26/2021 | 2417 | Memorandum from Probation regarding Request for International Travel as to William McGlashan, Jr. Requested action: Decision and Signature (McAnally, Sean) (Entered: 10/26/2021) |
| 10/27/2021 | 2418 | Judge Nathaniel M. Gorton: ORDER entered. APPROVING 2417 Memorandum from Probation regarding Request for International Travel as to William McGlashan, Jr. (McDonagh, Christina) (Entered: 10/27/2021) |
| 11/02/2021 | 2419 | SENTENCING MEMORANDUM by Homayoun Zadeh (Miner, Tracy) (Entered: 11/02/2021) |
| 11/03/2021 | 2420 | NOTICE *of Offer of Proof Concerning Trial Evidence Obtained from Search Warrant* by John Wilson (Attachments: # 1 Exhibits)(Kendall, Michael) (Entered: 11/03/2021) |
| 11/03/2021 | 2425 | Transcript of Jury Trial – Day 1 as to Gamal Abdelaziz, John Wilson held on September 8, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/24/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/1/2022. (Coppola, Katelyn) (Entered: 11/08/2021) |
| 11/03/2021 | 2426 | Transcript of Jury Trial – Day 2 as to Gamal Abdelaziz, John Wilson held on September 9, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/24/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/1/2022. (Coppola, Katelyn) (Entered: 11/08/2021) |
| 11/03/2021 | 2427 | Transcript of Jury Trial – Day 3 as to Gamal Abdelaziz, John Wilson held on September 10, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. |

| | | Redaction Request due 11/24/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/1/2022. (Coppola, Katelyn) (Entered: 11/08/2021) |
|---|---|---|
| 11/03/2021 | 2428 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 11/08/2021) |
| 11/04/2021 | 2421 | MOTION for Leave to File *Omnibus Opposition to Defendants' Post–Trial Motions Exceeding Page Limit and Partially Under Seal* as to Gamal Abdelaziz, John Wilson by USA. (Stearns, Ian) (Entered: 11/04/2021) |
| 11/04/2021 | 2422 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2421 Motion for Leave to File Omnibus Opposition to Defendants' Post–Trial Motions Exceeding Page Limit and Partially Under Seal ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 11/04/2021) |
| 11/05/2021 | 2423 | SENTENCING MEMORANDUM by USA as to Homayoun Zadeh (Kearney, Kristen) (Entered: 11/05/2021) |
| 11/05/2021 | 2424 | Opposition by USA as to Gamal Abdelaziz, John Wilson re 2412 MOTION for Judgment of Acquittal and Motion for New Trial *(Renewed),*, 2351 MOTION for Acquittal *DEFENDANTS RENEWED MOTION FOR JUDGMENT OF ACQUITTAL*, 2330 MOTION for Acquittal *Under Federal Rule of Criminal Procedure 29* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Stearns, Ian) (Additional attachment(s) added on 11/8/2021: # 5 PARTIALLY SEALED OPPOSITION) (Lima, Christine). (Entered: 11/05/2021) |
| 11/10/2021 | 2429 | ELECTRONIC NOTICE OF RESCHEDULING as to Homayoun Zadeh Sentencing set for 11/10/2021 03:30 PM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY.(Lima, Christine) (Entered: 11/10/2021) |
| 11/10/2021 | 2430 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 11/10/2021 for Homayoun Zadeh (18),Count(s) 1sss: Court rejects the C–plea and takes a recess for the parties to confer. Court hears from Defendant and Government. Defendant withdraws his objection to the PSR. Court goes over the remaining objection to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court formally accepts the C–plea, having been satisfied that it's concerns have been met. Court imposes sentence: Defendant sentenced to a term of 6 weeks imprisonment to be followed by a term of 1 year Supervised Release; Restitution in the amount of $8,414; fine in the amount of $20,000; $100 Special Assessment; Count(s) 1ss, Dismissed on Government motion; Count(s) 2ss, 3ss, Dismissed on Government Motion. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 12/7/21. (Attorneys present: Miner, Kearney, Wright, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 11/12/2021) |
| 11/12/2021 | 2432 | Transcript of Sentencing as to Homayoun Zadeh held on November 10, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 12/3/2021. Redacted Transcript Deadline set for 12/13/2021. Release of Transcript Restriction set for 2/10/2022. (Coppola, Katelyn) (Entered: 11/16/2021) |
| 11/12/2021 | 2433 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 11/16/2021) |
| 11/15/2021 | 2431 | Assented to MOTION to Release Passport as to Gamal Abdelaziz. (Kelly, Brian) (Entered: 11/15/2021) |

| 11/16/2021 | 2434 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2431 Motion for Permission to Use Passport to Register for Medicare as to Gamal Abdelaziz (4) (Lima, Christine) (Entered: 11/18/2021) |
|---|---|---|
| 11/16/2021 | 2435 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Homayoun Zadeh (18), Count(s) 1ss, Dismissed on Government motion; Count(s) 1sss, Defendant sentenced to a term of 6 weeks imprisonment to be followed by a term of 1 year Supervised Release; Restitution in the amount of $8,414; fine in the amount of $20,000; $100 Special Assessment; Count(s) 2ss, 3ss, Dismissed on Government Motion (Lima, Christine) (Entered: 11/18/2021) |
| 11/19/2021 | 2437 | EXHIBIT/WITNESS LIST by I–Hsin Chen (Cahn, Reuben) (Entered: 11/19/2021) |
| 11/19/2021 | 2438 | EXHIBIT/WITNESS LIST by I–Hsin Chen (Cahn, Reuben) (Entered: 11/19/2021) |
| 11/19/2021 | 2439 | EXHIBIT/WITNESS LIST by Gregory Colburn, Amy Colburn (Schumacher, David) (Entered: 11/19/2021) |
| 11/19/2021 | 2440 | EXHIBIT/WITNESS LIST by Gregory Colburn, Amy Colburn (Schumacher, David) (Entered: 11/19/2021) |
| 11/23/2021 | 2441 | PLEA AGREEMENT *(as Amended)* as to Elisabeth Kimmel (Stearns, Ian) (Entered: 11/23/2021) |
| 11/24/2021 | 2442 | EXHIBIT/WITNESS LIST by Gregory Colburn, Amy Colburn (Schumacher, David) (Entered: 11/24/2021) |
| 12/01/2021 | 2443 | Assented to MOTION for Leave to File *Sentencing Memorandum Partially Under Seal* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 12/01/2021) |
| 12/01/2021 | 2444 | ELECTRONIC NOTICE OF RESCHEDULING as to Elisabeth Kimmel Sentencing set for 12/9/2021 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY.(Lima, Christine) (Entered: 12/01/2021) |
| 12/01/2021 | 2445 | Assented to MOTION to Extend Self–Report Date as to Homayoun Zadeh. (Miner, Tracy) (Entered: 12/01/2021) |
| 12/01/2021 | 2446 | MOTION for Rule 11 Hearing as to Amy Colburn, Gregory Colburn by USA. (Stearns, Ian) (Entered: 12/01/2021) |
| 12/01/2021 | 2447 | PLEA AGREEMENT as to Gregory Colburn (Stearns, Ian) (Entered: 12/01/2021) |
| 12/01/2021 | 2448 | PLEA AGREEMENT as to Amy Colburn (Stearns, Ian) (Entered: 12/01/2021) |
| 12/02/2021 | 2449 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2443 Assented to MOTION for Leave to File Sentencing Memorandum Partially Under Seal; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Elisabeth Kimmel (13) (McDonagh, Christina) (Entered: 12/02/2021) |
| 12/03/2021 | 2450 | ELECTRONIC NOTICE OF HEARING as to Amy Colburn, Gregory Colburn<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Rule 11 Hearing set for 12/7/2021 12:00 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton.<br><br>Counsel is to contact U.S. Probation and Pretrial Services as soon as possible http://www.map.uscourts.gov/psi–interview–schedule to determine scheduling of the |

| | | |
|---|---|---|
| | | presentence interview. (Lima, Christine) (Entered: 12/03/2021) |
| 12/03/2021 | 2451 | SENTENCING MEMORANDUM by Elisabeth Kimmel (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38)(Beirne, Eoin) (Additional attachment(s) added on 12/6/2021: # 39 Unredacted Sentencing Memo (Filed Under Seal), # 40 Ex. 1 (Filed Under Seal), # 41 Ex. 2 (Filed Under Seal), # 42 Ex. 3 (Filed Under Seal), # 43 Ex. 4 (Filed Under Seal), # 44 Ex. 6 (Filed Under Seal), # 45 Ex. 7 (Filed Under Seal), # 46 Ex. 8 (Filed Under Seal), # 47 Ex. 9 (Filed Under Seal), # 48 Ex. 10 (Filed Under Seal), # 49 Ex. 12 (Filed Under Seal), # 50 Ex. 13 (Filed Under Seal), # 51 Ex. 14 (Filed Under Seal), # 52 Ex. 15 (Filed Under Seal), # 53 Ex. 16 (Filed Under Seal), # 54 Ex. 17 (Filed Under Seal), # 55 Ex. 19 (Filed Under Seal), # 56 Ex. 20 (Filed Under Seal), # 57 Ex. 21 (Filed Under Seal), # 58 Ex. 22 (Filed Under Seal), # 59 Ex. 23 (Filed Under Seal), # 60 Ex. 24 (Filed Under Seal), # 61 Ex. 25 (Filed Under Seal), # 62 Ex. 26 (Filed Under Seal), # 63 Ex. 27 (Filed Under Seal), # 64 Ex. 28 (Filed Under Seal), # 65 Ex. 29 (Filed Under Seal), # 66 Ex. 31 (Filed Under Seal), # 67 Ex. 32 (Filed Under Seal), # 68 Ex. 33 (Filed Under Seal), # 69 Ex. 34 (Filed Under Seal), # 70 Ex. 36 (Filed Under Seal), # 71 Ex. 37 (Filed Under Seal), # 72 Ex. 38 (Filed Under Seal)) (McDonagh, Christina). (Entered: 12/03/2021) |
| 12/03/2021 | 2452 | SENTENCING MEMORANDUM by USA as to Elisabeth Kimmel (Attachments: # 1 Exhibit A)(Stearns, Ian) (Entered: 12/03/2021) |
| 12/06/2021 | 2453 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2446 Motion for Rule 11 Hearing as to Gregory Colburn (2), Amy Colburn (3) (Lima, Christine) (Entered: 12/06/2021) |
| 12/06/2021 | 2454 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2445 Motion to Extend Self–Report Date as to Homayoun Zadeh (18) (Lima, Christine) (Entered: 12/06/2021) |
| 12/07/2021 | 2455 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to Amy Colburn, Gregory Colburn held by video on 12/7/2021. Defendants sworn. Court has colloquy with each defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreements for the Court and Defendants. Parties to amend page 1 of the plea agreements as discussed. Government reminds the Defendants of the maximum possible penalties; no mandatory minimums. Government informs the Defendants of the facts it would prove if this matter were to go to trial. Plea entered by Amy Colburn (3) Guilty Count 1sss and Gregory Colburn (2) Guilty Count 1sss. Sentencing as to Gregory Colburn set for 4/14/2022 02:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Sentencing as to Amy Colburn set for 4/14/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendants remain released on all previously imposed conditions of release. (Attorneys present: Stearns, Schumacher, Kearney, Hooper. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 12/07/2021) |
| 12/07/2021 | 2456 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Gregory Colburn Sentencing set for 4/14/2022 02:00 PM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 12/07/2021) |
| 12/07/2021 | 2457 | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Amy Colburn Sentencing set for 4/14/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 12/07/2021) |
| 12/07/2021 | 2458 | ELECTRONIC NOTICE OF RESCHEDULING as to Marci Palatella Sentencing set for 12/16/2021 12:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY.(Lima, Christine) (Entered: 12/07/2021) |
| 12/07/2021 | 2459 | PLEA AGREEMENT *(Amended to reflect date of plea)* as to Amy Colburn (Stearns, Ian) (Entered: 12/07/2021) |
| 12/07/2021 | 2460 | PLEA AGREEMENT *(Amended to reflect date of plea)* as to Gregory Colburn (Stearns, Ian) (Entered: 12/07/2021) |

| 12/08/2021 | 2461 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2099 Motion Motion Regarding Authentication as to Gregory Colburn (2), Amy Colburn (3), I–Hsin Chen (7), Marci Palatella (16). Motion found as moot, in part, and allowed, in part, per Document No. 2211 on 9/10/21. (Lima, Christine) (Entered: 12/08/2021) |
|---|---|---|
| 12/08/2021 | 2462 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2164 Motion to Sequester as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2463 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2168 Motion for Leave to File; as to Gamal Abdelaziz (4), John Wilson (17) (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2465 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered denying 2201 Amended Motion for Court Instruction as to Gamal Abdelaziz (4), as ruled on in Document No. 2253. (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2466 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2249 Motion for Leave to File; as to Gamal Abdelaziz (4), John Wilson (17); finding as moot 2262 Motion for Leave to File; as to John Wilson (17); finding as moot 2266 Motion for Leave to File; as to John Wilson (17) (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2467 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 2272 Motion for Order as to John Wilson (17) (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2468 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered denying 2275 Motion for Reconsideration re 2275 MOTION for Reconsideration *ADMISSION OF EXHIBIT 1288* filed by John Wilson, Gamal Abdelaziz as to Gamal Abdelaziz (4), John Wilson (17). Denied in Document No. 2336 entered on 10/1/21. (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2469 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered denying 2324 Motion to Exclude as to Gamal Abdelaziz (4), John Wilson (17). Denied in clerk notes entered 9/30/21, docket entry No. 2335. (Lima, Christine) (Entered: 12/08/2021) |
| 12/08/2021 | 2470 | NOTICE *of Additional Exhibits* by Elisabeth Kimmel re 2451 Sentencing Memorandum,,,,,,,, (Attachments: # 1 Exhibit 39, # 2 Exhibit 40)(Beirne, Eoin) (Entered: 12/08/2021) |
| 12/08/2021 | 2471 | Assented to MOTION to Seal *(Partially) Sentencing Memorandum And Exhibits* as to Marci Palatella. (Loucks, Michael) (Entered: 12/08/2021) |
| 12/09/2021 | 2472 | MOTION for Rule 11 Hearing as to I–Hsin Chen by USA. (Kearney, Kristen) (Entered: 12/09/2021) |
| 12/09/2021 | 2473 | PLEA AGREEMENT as to I–Hsin Chen (Kearney, Kristen) (Entered: 12/09/2021) |
| 12/09/2021 | 2474 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 12/9/2021 for Elisabeth Kimmel (13), Count(s) 1ss: Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of 6 weeks imprisonment, to be followed by a term of 2 years Supervised Release (the first 12 months of which shall be on home detention); $250,000 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureaus of Prisons by 2:00 PM on 1/12/2022. (Attorneys present: Beirne, Popeo, Flashner, Stearns, Wright, Martha Victoria and Crystal Monteiro for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 12/09/2021) |
| 12/09/2021 | 2475 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting in part and denying in part 2471 Motion to Seal as to Marci Palatella (16). "Defendants Assented–To Motion to File Sentencing Memorandum and Exhibits Partially Under Seal (Docket No. 2471) is ALLOWED, in part, DENIED, in part. Defendant may redact confidential health information from her public filing, but may not redact personal information because that category is overbroad and because defendant has not specified what sort of personal information is at issue or why redaction is warranted." (Lima, Christine) (Entered: 12/09/2021) |
| 12/09/2021 | 2476 | SENTENCING MEMORANDUM by Marci Palatella (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 |

| | | |
|---|---|---|
| | | Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32)(Loucks, Michael) (Additional attachment(s) added on 12/10/2021: # <u>33</u> Partiall Sealed Sentencing Memorandum, # <u>34</u> Exhibit 1 (unredacted), # <u>35</u> Exhibit 7 (unredacted), # <u>36</u> Exhibit 8 (unredacted), # <u>37</u> Exhibit 9 (unredacted), # <u>38</u> Exhibit 11 (unredacted), # <u>39</u> Exhibit 16 (unredacted), # <u>40</u> Exhibit 19 (unredacted), # <u>41</u> Exhibit 20 (unredacted), # <u>42</u> Exhibit 21 (unredacted), # <u>43</u> Exhibit 22 (unredacted), # <u>44</u> Exhibit 23 (unredacted), # <u>45</u> Exhibit 25 (unredacted), # <u>46</u> Exhibit 27 (unredacted), # <u>47</u> Exhibit 28 (unredacted), # <u>48</u> Exhibit 31 (unredacted), # <u>49</u> Exhibit 32 (unredacted)) (Lima, Christine). (Entered: 12/09/2021) |
| 12/09/2021 | <u>2477</u> | SENTENCING MEMORANDUM by USA as to Marci Palatella (Wright, Leslie) (Entered: 12/09/2021) |
| 12/10/2021 | 2478 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting <u>2472</u> Motion for Rule 11 Hearing as to I–Hsin Chen (7) (Lima, Christine) (Entered: 12/10/2021) |
| 12/10/2021 | 2479 | ELECTRONIC NOTICE OF HEARING as to I–Hsin Chen <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br> Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: <u>https://forms.mad.uscourts.gov/courtlist.html</u>. <br><br> For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on <u>www.mad.uscourts.gov</u> or contact <u>media@mad.uscourts.gov</u>. <br><br> Rule 11 Hearing set for 12/15/2021 02:00 PM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. <br><br> Counsel is to contact U.S. Probation and Pretrial Services as soon as possible <u>http://www.map.uscourts.gov/psi–interview–schedule</u> to determine scheduling of the presentence interview. (Lima, Christine) (Entered: 12/10/2021) |
| 12/10/2021 | <u>2480</u> | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Elisabeth Kimmel (13), Count(s) 1ss, Defendant sentenced to a term of 6 weeks imprisonment, to be followed by a term of 2 years Supervised Release (the first 12 months of which shall be on home detention); $250,000 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion; Count(s) 3ss, Dismissed on Government motion (Lima, Christine) (Entered: 12/10/2021) |
| 12/13/2021 | <u>2482</u> | Memorandum from Pretrial regarding Release Status Letter as to I–Hsin Chen. Requested action: Acceptance Of Letter (Prophet, Justin) (Entered: 12/13/2021) |
| 12/15/2021 | 2483 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Rule 11 Hearing as to I–Hsin Chen held by video on 12/15/2021. Interpreter sworn. Defendant sworn. Court has colloquy with Defendant re: name, age, educational background, state of mind, charges. Government outlines the provisions of the written plea agreement for the Court and Defendant. Government informs the Defendant of the maximum possible penalties; no mandatory minimums. Government informs the Defendant of the facts it would prove if this matter were to go to trial. Plea entered by I–Hsin Chen (7) Guilty Count 5ss. Sentencing set for 4/20/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. Defendant remains released on all previously imposed conditions of release. (Attorneys present: Cahn, Kearney. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. Interpreter name: Lingling Martin – lingling@komartin.com, Language: Mandarin. (Lima, Christine) (Entered: 12/16/2021) |
| 12/16/2021 | <u>2484</u> | Judge Nathaniel M. Gorton: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to I–Hsin Chen Sentencing set for 4/20/2022 03:00 PM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 12/16/2021) |

| 12/16/2021 | 2485 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 12/16/2021 for Marci Palatella (16), Count(s) 1ss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court accepts the binding plea agreement and imposes sentence: Defendant sentenced to a term of 6 weeks imprisonment to be followed by a term of 2 years Supervised Release (the first 6 months of which shall be spent in home detention); $250,000 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion; Count(s) 3ss, Dismissed on Government motion. Defendant informed of right to appeal. Defendant to self−surrender to the facility designated by the Bureau of Prisons by 2:00 PM on 1/13/22.(Attorneys present: DiCanio, Loucks, Kearney, Wright, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 12/16/2021) |
|---|---|---|
| 12/17/2021 | <u>2487</u> | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Marci Palatella (16), Count(s) 1ss, Defendant to a term of 6 weeks imprisonment to be followed by a term of 2 years Supervised Release (the first 6 months of which shall be spent in home detention); $250,000 Fine; $100 Special Assessment; Count(s) 2ss, Dismissed on Government Motion; Count(s) 3ss, Dismissed on Government motion (Lima, Christine) (Entered: 12/20/2021) |
| 12/20/2021 | 2486 | ELECTRONIC NOTICE CANCELING HEARING OR OTHER DEADLINE as to Amy Colburn, Gregory Colburn, I−Hsin Chen. Hearing or Deadline canceled: Final Pretrial Conference set for 1/5/22 (Lima, Christine) (Entered: 12/20/2021) |
| 12/20/2021 | <u>2489</u> | Judge Nathaniel M. Gorton: MEMORANDUM AND ORDER entered.<br><br>For the foregoing reasons,<br><br>− defendants' motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 (Docket No. <u>2330</u> ) is **DENIED;**<br><br>− defendants' renewed motion for judgment of acquittal (Docket No. <u>2351</u> ) is **DENIED;** and<br><br>− defendants' renewed motion for judgment of acquittal and motion for new trial (Docket No. <u>2412</u> ) is **DENIED.**<br><br>**So ordered.** (Warnock, Douglas) (Entered: 12/21/2021) |
| 12/21/2021 | <u>2490</u> | Memorandum from Probation regarding Request for International Travel as to Lori Loughlin. Requested action: Approval/Disapproval (McAnally, Sean) (Entered: 12/21/2021) |
| 12/21/2021 | <u>2491</u> | Letter (non−motion) regarding Rule 1.12 of the Massachusetts Rules of Professional Conduct as to David Sidoo (Berman, Bruce) (Entered: 12/21/2021) |
| 12/21/2021 | <u>2492</u> | Judge Nathaniel M. Gorton: ENDORSED ORDER entered as to Lori Loughlin re <u>2490</u> Memorandum from Probation regarding Request for International Travel (Lima, Christine) (Entered: 12/22/2021) |
| 12/24/2021 | <u>2493</u> | MOTION to Continue *Sentencing Date* to March 2022 as to John Wilson. (Kendall, Michael) (Entered: 12/24/2021) |
| 12/26/2021 | <u>2494</u> | Opposition by USA as to John Wilson re <u>2493</u> MOTION to Continue *Sentencing Date* to March 2022 (Stearns, Ian) (Entered: 12/26/2021) |
| 12/30/2021 | <u>2495</u> | Judge Nathaniel M. Gorton: ORDER entered re <u>2493</u> Motion to Continue as to John Wilson (17). Motion **DENIED** but the court will entertain the re−scheduling of the sentencing to any date before Thursday February 17, 2022. (Warnock, Douglas) (Entered: 12/30/2021) |
| 12/30/2021 | <u>2498</u> | Transcript of Rule 11 Hearing as to I−Hsin Chen held on December 15, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/20/2022. Redacted Transcript Deadline set for 1/31/2022. Release of Transcript Restriction set for 3/30/2022. (Coppola, Katelyn) (Entered: 01/06/2022) |
| 12/30/2021 | 2499 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript |

| | | |
|---|---|---|
| | | Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 01/06/2022) |
| 01/04/2022 | 2496 | Second MOTION to Continue *Sentencing* to February 16, 2022 as to John Wilson. (Kendall, Michael) (Entered: 01/04/2022) |
| 01/06/2022 | 2497 | SATISFACTION OF JUDGMENT as to Homayoun Zadeh (Head, Carol) (Entered: 01/06/2022) |
| 01/06/2022 | 2500 | Assented to MOTION *To Extend Self–Report Date* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 01/06/2022) |
| 01/06/2022 | 2501 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2496 Motion to Continue as to John Wilson (17) Sentencing set for 2/16/2022 03:00 PM in Courtroom 4 before Judge Nathaniel M. Gorton. (Warnock, Douglas) (Entered: 01/06/2022) |
| 01/07/2022 | 2502 | MOTION to Withdraw Document 2500 Assented to MOTION *To Extend Self–Report Date* as to Elisabeth Kimmel. (Beirne, Eoin) (Entered: 01/07/2022) |
| 01/07/2022 | 2503 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered granting 2502 Motion to Withdraw Document as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 01/07/2022) |
| 01/07/2022 | 2504 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered withdrawing 2500 Motion To Extend Self–Report Date as to Elisabeth Kimmel (13) (Lima, Christine) (Entered: 01/07/2022) |
| 01/12/2022 | 2505 | Transcript of Sentencing as to Marci Palatella held on December 16, 2021, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/2/2022. Redacted Transcript Deadline set for 2/14/2022. Release of Transcript Restriction set for 4/12/2022. (Coppola, Katelyn) (Entered: 01/18/2022) |
| 01/12/2022 | 2506 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 01/18/2022) |
| 01/18/2022 | 2508 | Transcript of Rule 11 as to Marci Palatella held on August 26, 2021, before Judge Leo T. Sorokin. Court Reporter Name and Contact Information: Rachel Lopez at raeufp@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/8/2022. Redacted Transcript Deadline set for 2/18/2022. Release of Transcript Restriction set for 4/18/2022. (Coppola, Katelyn) (Entered: 01/24/2022) |
| 01/18/2022 | 2509 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 01/24/2022) |
| 01/19/2022 | 2507 | SATISFACTION OF JUDGMENT as to Elisabeth Kimmel (Head, Carol) (Entered: 01/19/2022) |
| 02/01/2022 | 2510 | SATISFACTION OF JUDGMENT as to Marci Palatella (Head, Carol) (Entered: 02/01/2022) |
| 02/02/2022 | 2511 | MOTION to Show Cause re Modification/Revocation of Supervised Release as to Michelle Janavs. (Attachments: # 1 Declaration of John Littrell in support thereof, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Littrell, John) (Entered: 02/02/2022) |
| 02/02/2022 | 2512 | Assented to MOTION for Leave to File *Partially Under Seal* as to Gamal Abdelaziz. (Kelly, Brian) (Entered: 02/02/2022) |
| 02/03/2022 | 2513 | Judge Nathaniel M. Gorton: MEMORANDUM AND ORDER entered. For the foregoing reasons, defendant's motion to file sentencing memorandum exhibits partially under seal (Docket No. 2512 ) is **ALLOWED.** |

| | | So ordered. (Warnock, Douglas) (Entered: 02/03/2022) |
|---|---|---|
| 02/03/2022 | 2514 | Judge Nathaniel M. Gorton: ORDER entered **DENYING** 2511 Motion to Show Cause re Revocation of Supervised Release as to Michelle Janavs (12). Because Supervised Release is an important part of any sentence imposed by this court and because there are no extenuating circumstances warranting a reduction of the particular sentence imposed in this case, motion denied. (Warnock, Douglas) (Entered: 02/04/2022) |
| 02/04/2022 | 2515 | SENTENCING MEMORANDUM by Gamal Abdelaziz (Attachments: # 1 Exhibit A)(Kelly, Brian) (Additional attachment(s) added on 2/7/2022: # 2 SEALED EXH A) (Lima, Christine). (Entered: 02/04/2022) |
| 02/04/2022 | 2516 | SENTENCING MEMORANDUM by USA as to Gamal Abdelaziz (Stearns, Ian) (Entered: 02/04/2022) |
| 02/07/2022 | 2517 | Joint MOTION for Order *Staying Surrender Dates and Entering Briefing Schedule Regarding Bail Pending Appeal* as to Gamal Abdelaziz, John Wilson by USA. (Attachments: # 1 Text of Proposed Order)(Stearns, Ian) (Entered: 02/07/2022) |
| 02/09/2022 | 2518 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2517 Joint MOTION for Order *Staying Surrender Dates and Entering Briefing Schedule Regarding Bail Pending Appeal* as to Gamal Abdelaziz, John Wilson. (Warnock, Douglas) (Entered: 02/09/2022) |
| 02/09/2022 | 2519 | Judge Nathaniel M. Gorton: ORDER entered re 2517 Joint MOTION for Order *Staying Surrender Dates and Entering Briefing Schedule Regarding Bail Pending Appeal* filed by USA (Warnock, Douglas) (Entered: 02/09/2022) |
| 02/09/2022 | 2520 | Assented to MOTION to Seal *(Partially) a Letter of Reference Related to His Sentencing* as to John Wilson. (Kendall, Michael) (Entered: 02/09/2022) |
| 02/09/2022 | 2522 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 2/9/2022 for Gamal Abdelaziz (4), Count(s) 1ss, 2ss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence: Defendant sentenced to a term of imprisonment of 12 months and 1 day, which term consists of terms of 12 months and 1 day on Counts 1ss and 2ss, such terms to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $250,000 fine, which consists of $125,000 on each count; $200 Special Assessment. Defendant informed of right to appeal. It is further ordered that pursuant to a motion filed on behalf of the Defendant and his co–defendant Mr. Wilson, which was allowed by the Court, the Defendant's self–surrender date is indefinitely postponed, but the Defendant nevertheless remain subject to the previous conditions imposed and under the same bond imposed pretrial, specifically relative to reporting to the Probation Officer and receiving permission to travel. (Attorneys present: Kelly, Sharp, Sheketoff, Wright, Stearns, Frank, Kearney, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 02/10/2022) |
| 02/10/2022 | 2521 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2520 Assented to MOTION to Seal *(Partially) a Letter of Reference Related to His Sentencing* as to John Wilson. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to John Wilson (17) (Warnock, Douglas) (Entered: 02/10/2022) |
| 02/11/2022 | 2523 | NOTICE of *Request for an Evidentiary Hearing* by John Wilson (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Kendall, Michael) (Entered: 02/11/2022) |
| 02/11/2022 | 2524 | SENTENCING MEMORANDUM by USA as to John Wilson (Stearns, Ian) (Entered: 02/11/2022) |
| 02/11/2022 | 2525 | SENTENCING MEMORANDUM by John Wilson (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Kendall, Michael) (Additional attachment(s) added on 2/14/2022: # 5 SEALED EXHIBIT A) (Lima, Christine). (Entered: 02/11/2022) |
| 02/11/2022 | 2530 | Transcript of Sentencing as to Gamal Abdelaziz held on February 9, 2022, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at |

| | | |
|---|---|---|
| | | kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/4/2022. Redacted Transcript Deadline set for 3/14/2022. Release of Transcript Restriction set for 5/12/2022. (Coppola, Katelyn) (Entered: 02/16/2022) |
| 02/11/2022 | 2531 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 02/16/2022) |
| 02/13/2022 | 2526 | NOTICE of Supplement to Request for an Evidentiary Hearing by John Wilson re 2523 Notice (Other) (Attachments: # 1 Exhibit)(Kendall, Michael) (Entered: 02/13/2022) |
| 02/14/2022 | 2527 | NOTICE of Government's Response in Opposition to Defendant's Request for an Evidentiary Hearing by USA as to John Wilson (Stearns, Ian) (Entered: 02/14/2022) |
| 02/14/2022 | 2528 | NOTICE of Reply to Government's Response in Opposition to Defendant's Request for an Evidentiary Hearing by John Wilson re 2527 Notice (Other) (Kendall, Michael) (Entered: 02/14/2022) |
| 02/16/2022 | 2529 | ELECTRONIC NOTICE OF RESCHEDULING as to John Wilson Sentencing set for 2/16/2022 03:30 PM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. NOTE – CHANGE IS AS TO TIME ONLY. (Lima, Christine) (Entered: 02/16/2022) |
| 02/16/2022 | 2532 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to Gamal Abdelaziz (4), Count(s) 1ss, 2ss, Defendant sentenced to a term of imprisonment of 12 months and 1 day, which term consists of terms of 12 months and 1 day on Counts 1ss and 2ss, such terms to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $250,000 fine, which consists of $125,000 on each count; $200 Special Assessment; Count(s) 3ss, Dismissed on Government motion (Lima, Christine) (Entered: 02/17/2022) |
| 02/16/2022 | 2535 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held on 2/16/2022 for John Wilson (17). Court denies 2523 Request for an Evidentiary Hearing. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court imposes sentence. Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; a fine of $200,000.00, which consists of $100,000.00 on Count 1ss and $100,000.00 on Count 2ss; $88,546.00 Restitution; $800 Special Assessment. Defendant informed of right to appeal. It is further ordered that pursuant to a motion filed on behalf of the Defendant and his co–defendant Mr. Abdelaziz, which was allowed by the Court, the Defendant's self–surrender date is indefinitely postponed, but the Defendant nevertheless remain subject to the previous conditions imposed and under the same bond imposed pretrial, specifically relative to reporting to the Probation Officer and receiving permission to travel. (Attorneys present: Tomback, Papenhausen, Kendall, Stearns, Frank, Kearney, Wright, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 02/17/2022) |
| 02/17/2022 | 2533 | MOTION for Judicial Recommendation as to Gamal Abdelaziz. (Kelly, Brian) (Entered: 02/17/2022) |
| 02/18/2022 | 2536 | Judge Nathaniel M. Gorton: ORDER entered. JUDGMENT as to John Wilson (17): Defendant sentenced to a term of 15 month imprisonment, which term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of 1 year on Count 13ss, such terms to run concurrently; $88,546.00 Restitution; $800 Special Assessment; Count(s) 3ss, Dismissed on Government motion (Lima, Christine) (Entered: 02/22/2022) |
| 02/18/2022 | 2538 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 2533 Motion for Judicial Recommendation to Bureau of Prisons as to Gamal Abdelaziz (4) (Warnock, Douglas) (Entered: 02/22/2022) |

| 02/18/2022 | 2554 | Transcript of Sentencing as to John Wilson held on February 16, 2022, before Judge Nathaniel M. Gorton. Court Reporter Name and Contact Information: Kristin Kelley at kmob929@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 3/11/2022. Redacted Transcript Deadline set for 3/21/2022. Release of Transcript Restriction set for 5/19/2022. (Coppola, Katelyn) Modified date of hearing on docket entry text, on 2/25/2022 (Coppola, Katelyn). (Main Document 2554 replaced on 3/1/2022 due to the wrong year typed on the cover page) (Coppola, Katelyn). (Entered: 02/25/2022) |
|---|---|---|
| 02/18/2022 | 2555 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Coppola, Katelyn) (Entered: 02/25/2022) |
| 02/23/2022 | 2539 | Judge Nathaniel M. Gorton: ORDER entered. AMENDED JUDGMENT as to Gamal Abdelaziz (4), Count(s) 1ss, 2ss, Defendant sentenced to a term of imprisonment of 12 months and 1 day, which term consists of terms of 12 months and 1 day on Counts 1ss and 2ss, such terms to be served concurrently; 2 years Supervised Release, which term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently; $250,000 fine, which consists of $125,000 on each count; $200 Special Assessment; Count(s) 3ss, Dismissed on Government motion. Amended to include judicial recommendation to the SPC at USP, Atwater, CA. (Lima, Christine) (Entered: 02/23/2022) |
| 02/23/2022 | 2540 | NOTICE OF APPEAL by Gamal Abdelaziz re: 2532 Judgment & 2539 Amended Judgment Filing fee: $ 505, receipt number AMADC–9196901 (Fee Status: Filing Fee paid). NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals.  **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 3/15/2022. (Kelly, Brian)<br><br>Modified on 3/3/2022 to correct docket entry relationships (DaSilva, Carolina). (Entered: 02/23/2022) |
| 02/23/2022 | 2541 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Gamal Abdelaziz to US Court of Appeals re 2540 Notice of Appeal. (Dore, Samantha) (Entered: 02/23/2022) |
| 02/24/2022 | 2542 | USCA Case Number as to Gamal Abdelaziz 22–1129 for 2540 Notice of Appeal, filed by Gamal Abdelaziz. (Dore, Samantha) (Entered: 02/24/2022) |
| 02/24/2022 | 2543 | Assented to MOTION for Return of Property/PostTrial as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 02/24/2022) |
| 02/25/2022 | 2544 | MOTION for Leave to Appear Pro Hac Vice by Marco P. Basile Filing fee $ 100, receipt number MADC–9199825. as to John Wilson (Attachments: # 1 Affidavit of Marco P. Basile, Esq.)(Kendall, Michael) Modified on 2/25/2022 to correct applicable defendants (Warnock, Douglas). (Entered: 02/25/2022) |
| 02/25/2022 | 2545 | MOTION for Leave to Appear Pro Hac Vice by Noel J. Francisco Filing fee $ 100, receipt number MADC–9199896. as to John Wilson (Attachments: # 1 Affidavit of Noel J. Francisco, Esq.)(Kendall, Michael) Modified on 2/25/2022 to correct applicable defendants (Warnock, Douglas). (Entered: 02/25/2022) |
| 02/25/2022 | 2546 | MOTION for Leave to Appear Pro Hac Vice by Harry S. Graver Filing fee $ 100, receipt number MADC–9199963. as to John Wilson (Attachments: # 1 Affidavit of Harry S. Graver, Esq.)(Kendall, Michael) Modified on 2/25/2022 to correct applicable defendants (Warnock, Douglas). (Entered: 02/25/2022) |
| 02/25/2022 | 2547 | MOTION for Leave to Appear Pro Hac Vice by Jacob M. Roth Filing fee $ 100, receipt number MADC–9200066. as to John Wilson (Attachments: # 1 Affidavit of Jacob M. Roth, Esq.)(Kendall, Michael) Modified on 2/25/2022 to correct applicable defendants (Warnock, Douglas). (Entered: 02/25/2022) |
| 02/25/2022 | 2548 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 2544 Motion for Leave to Appear Pro Hac Vice Added Marco P. Basile |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>as to John Wilson (17) (Warnock, Douglas) (Entered: 02/25/2022) |
| 02/25/2022 | 2549 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 2545 Motion for Leave to Appear Pro Hac Vice Added Noel J. Francisco<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>as to John Wilson (17) (Warnock, Douglas) (Entered: 02/25/2022) |
| 02/25/2022 | 2550 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 2546 Motion for Leave to Appear Pro Hac Vice Added Harry S. Graver<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>as to John Wilson (17) (Warnock, Douglas) (Entered: 02/25/2022) |
| 02/25/2022 | 2551 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 2547 Motion for Leave to Appear Pro Hac Vice Added Jacob M. Roth<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>as to John Wilson (17) (Warnock, Douglas) (Entered: 02/25/2022) |
| 02/25/2022 | 2552 | NOTICE OF APPEAL by John Wilson re 2536 Judgment,, Filing fee: $ 505, receipt number AMADC−9201409 (Fee Status: Filing Fee paid) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 3/17/2022. (Francisco, Noel) (Entered: 02/25/2022)** |
| 02/25/2022 | 2553 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2543 Motion for Return of Property/PostTrial as to Elisabeth Kimmel (13) (Warnock, Douglas) (Entered: 02/25/2022) |
| 02/28/2022 | 2556 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to John Wilson to US Court of Appeals re 2552 Notice of Appeal − Final Judgment. (Paine, Matthew) (Entered: 02/28/2022) |

| 02/28/2022 | 2557 | Letter of Support as to Amy Colburn (Attachments: # 1 Attachment) (Warnock, Douglas) (Entered: 02/28/2022) |
|---|---|---|
| 03/02/2022 | 2558 | USCA Case Number as to John Wilson 22–1138 for 2552 Notice of Appeal – Final Judgment, filed by John Wilson. (Paine, Matthew) (Entered: 03/02/2022) |
| 03/02/2022 | 2559 | MOTION to Modify Conditions of Release as to Homayoun Zadeh. (Siddall, Megan) (Entered: 03/02/2022) |
| 03/02/2022 | 2560 | Memorandum from Probation regarding Request for International Travel as to William McGlashan, Jr. Requested action: Decision and Signature (McAnally, Sean) (Entered: 03/02/2022) |
| 03/03/2022 | 2561 | Judge Nathaniel M. Gorton: ORDER entered **APPROVING** 2560 Memorandum from Probation regarding Request for International Travel as to William McGlashan, Jr. (Warnock, Douglas) (Entered: 03/03/2022) |
| 03/03/2022 | 2562 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2559 Motion to Modify Conditions of Release as to Homayoun Zadeh (18) (Warnock, Douglas) (Entered: 03/03/2022) |
| 03/07/2022 | 2563 | Letter in Support of Gregory Colburn Regarding Sentencing filed by Lewis Haut (Warnock, Douglas) (Entered: 03/07/2022) |
| 03/18/2022 | 2564 | Assented to MOTION for Leave to File *Partially Under Seal* as to Gamal Abdelaziz. (Kelly, Brian) (Entered: 03/18/2022) |
| 03/18/2022 | 2565 | MOTION for Release Pending Appeal as to John Wilson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Francisco, Noel) (Entered: 03/18/2022) |
| 03/18/2022 | 2566 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2564 Motion for Leave to File Partially Under Seal as to Gamal Abdelaziz (4) (Lima, Christine) (Entered: 03/18/2022) |
| 03/18/2022 | 2567 | MOTION for Release Pending Appeal (redacted) as to Gamal Abdelaziz. (Kelly, Brian) (Additional attachment(s) added on 3/21/2022: # 1 SEALED Motion) (Lima, Christine). (Entered: 03/18/2022) |
| 03/21/2022 | 2568 | Assented to MOTION for Return of Passport as to Marci Palatella. (Loucks, Michael) (Entered: 03/21/2022) |
| 03/22/2022 | 2569 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2568 Assented to MOTION for Return of Passport as to Marci Palatella. (Warnock, Douglas) (Entered: 03/22/2022) |
| 04/04/2022 | 2570 | Assented to MOTION to Seal *for Leave to File Declaration Under Seal* as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 04/04/2022) |
| 04/04/2022 | 2571 | MOTION to Appear at Sentencing Hearing by Videoconference as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 04/04/2022) |
| 04/05/2022 | 2572 | Judge Nathaniel M. Gorton: ORDER entered **ALLOWING** 2570 Motion to Seal. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to Gregory Colburn (2), Amy Colburn (3) (Warnock, Douglas) (Entered: 04/05/2022) |
| 04/07/2022 | 2573 | Assented to MOTION to Seal *for Leave to File Portions of Sentencing Memorandum and Letters in Support Under Seal* as to Amy Colburn, Gregory Colburn. (Schumacher, David) (Entered: 04/07/2022) |
| 04/07/2022 | 2574 | DECLARATION in Support re 257 MOTION to Appear at Sentencing Hearing by Videoconference , filed by Gregory Colburn, filed under seal. (Lima, Christine) (Entered: 04/07/2022) |
| 04/08/2022 | 2575 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2571 Motion to Appear at Sentencing Hearing by Videoconference as to Gregory Colburn (2), Amy Colburn (3). "To permit defendants to avoid the expense of attending their sentencings in person, motion allowed." (Lima, Christine) (Entered: 04/08/2022) |

| 04/08/2022 | 2576 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2573 Motion to Seal as to Gregory Colburn (2), Amy Colburn (3). "Motion allowed, provided, however, that defendants shall file appropriate redacted versions of their sentencing memorandum and letters in support." (Lima, Christine) (Entered: 04/08/2022) |
| --- | --- | --- |
| 04/08/2022 | 2577 | Joint MEMORANDUM in Support by Amy Colburn, Gregory Colburn re 2573 Assented to MOTION to Seal *for Leave to File Portions of Sentencing Memorandum and Letters in Support Under Seal* (Attachments: # 1 Exhibit A)(Schumacher, David) (Entered: 04/08/2022) |
| 04/08/2022 | 2579 | SENTENCING MEMORANDUM by Gregory Colburn, Amy Colburn, filed under seal. (Attachments: # 1 Exhibit)(Lima, Christine) (Entered: 04/11/2022) |
| 04/10/2022 | 2578 | SENTENCING MEMORANDUM by USA as to Gregory Colburn, Amy Colburn (Attachments: # 1 Exhibit A –– Email from Amy and Gregory Colburn)(Stearns, Ian) (Entered: 04/10/2022) |
| 04/12/2022 | 2580 | Assented to MOTION *for Leave to File Declaration Under Seal* as to I–Hsin Chen. (Cahn, Reuben) (Entered: 04/12/2022) |
| 04/12/2022 | 2581 | MOTION to Appear at Sentencing Hearing by Videoconference as to I–Hsin Chen. (Cahn, Reuben) (Entered: 04/12/2022) |
| 04/13/2022 | 2582 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 2580 Assented to MOTION *for Leave to File Declaration Under Seal*. Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to I–Hsin Chen (7) (Warnock, Douglas) (Entered: 04/13/2022) |
| 04/14/2022 | 2583 | Assented to MOTION to Seal *for Leave to File Portions of Sentencing Memorandum and Letters in Support Under Seal* as to I–Hsin Chen. (Cahn, Reuben) (Entered: 04/14/2022) |
| 04/14/2022 | 2584 | Declaration of R. Cahn in Support of 2581 MOTION to Appear at Sentencing Hearing by Videoconference , filed by I–Hsin Chen, filed under seal. (Lima, Christine) (Entered: 04/15/2022) |
| 04/14/2022 | 2585 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 4/14/2022 for Gregory Colburn (2), Count(s) 1sss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing from the parties. Defendant addresses the Court. Court formally accepts the C–plea agreement and imposes sentence: Defendant sentenced to a term of 8 weeks imprisonment to be followed by a term of 1 year Supervised Release; $12,500.00 Fine; $100 Special Assessment. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 5/26/22. (Attorneys present: Schumacher, Kearney, Stearns, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Lima, Christine) Modified on 4/15/2022 (Lima, Christine). (Entered: 04/15/2022) |
| 04/14/2022 | 2586 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Sentencing held by video on 4/14/2022 for Amy Colburn (3), Count(s) 1sss. Court goes over objections to the PSR. Court calculates the applicable guideline range. Court hears recommendations for sentencing. Defendant addresses the Court. Court formally accepts the C–plea agreement and imposes sentence: Defendant sentenced to a term of 8 weeks imprisonment to be followed by a term of 1 year Supervised Release; $12,500.00 Fine; $100 Supervised Release. Defendant informed of right to appeal. Defendant to self–surrender to the facility designated by the Bureau of Prisons before 2:00 PM on 8/21/22. (Attorneys present: Schumacher, Kearney, Stearns, Martha Victoria for US Probation. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Lima, Christine) (Entered: 04/15/2022) |
| 04/15/2022 | 2587 | Judge Nathaniel M. Gorton: ORDER entered re 2581 Motion to Appear at Sentencing Hearing by Videoconference as to I–Hsin Chen. To permit defendant to avoid the expense of travel for himself and his attorneys, motion **ALLOWED.** (Warnock, Douglas) (Entered: 04/15/2022) |

| 04/15/2022 | 2588 | Judge Nathaniel M. Gorton: ORDER entered re 2583 Assented to MOTION to Seal *for Leave to File Portions of Sentencing Memorandum and Letters in Support Under Seal*. Motion **ALLOWED,** provided however, that defendant shall file an appropriately redacted version of his sentencing memorandum and letter in support; Counsel will receive an email within twenty–four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include – Leave to file granted on (date of order)– in the caption of the document as to I–Hsin Chen (7) (Warnock, Douglas) (Entered: 04/15/2022) |
|---|---|---|
| 04/15/2022 | 2590 | SENTENCING MEMORANDUM by USA as to I–Hsin Chen (Kearney, Kristen) (Entered: 04/15/2022) |
| 04/15/2022 | 2591 | MEMORANDUM in Support by I–Hsin Chen re 2583 Assented to MOTION to Seal *for Leave to File Portions of Sentencing Memorandum and Letters in Support Under Seal* (Attachments: # 1 Exhibit A)(Cahn, Reuben) (Entered: 04/15/2022) |
| 04/17/2022 | 2592 | MOTION to Travel as to Elisabeth Kimmel. (Flashner, Cory) (Entered: 04/17/2022) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 19-10080-NMG |
| ) | |
| (1)    DAVID SIDOO, ) | |
| (2)    GREGORY COLBURN, ) | |
| (3)    AMY COLBURN, ) | **FILED UNDER SEAL**[1] |
| (4)    DIANE BLAKE, ) | |
| (5)    TODD BLAKE, ) | |
| (8)    MOSSIMO GIANNULLI, ) | |
| (9)    ELIZABETH HENRIQUEZ, ) | |
| (11)    DOUGLAS HODGE, ) | |
| (14)    LORI LOUGHLIN, ) | |
| (18)    HOMAYOUN ZADEH, and ) | |
| (19)    ROBERT ZANGRILLO, ) | |
| ) | |
| Defendants. ) | |
| | |

GOVERNMENT'S MOTION FOR HEARING REGARDING CONFLICTS OF INTEREST

The government respectfully moves for a hearing pursuant to *United States v. Foster*, 469

F.2d 1, 5 (1st Cir. 1972), and Federal Rule of Criminal Procedure 44(c), to address the following

conflicts of interest involving defense counsel in this case:

- 

- *Second,* the law firm of Boies Schiller Flexner LLP ("Boies Schiller") represents
  defendant Robert Zangrillo as well as his alleged co-conspirator, Davina Isackson,

---

[1] The government respectfully moves to file this brief under seal insofar as it references
the potential cooperation of a defendant in a related matter.  Attached to this filing as Exhibit A is
a proposed redacted version of the motion, which the government proposes to file on the public
docket with the Court's approval.

a person the lawyer represents in *some other matter*" even when the matters are unrelated) (emphasis added). Disqualification may yet be appropriate in such circumstances. *See Bryan Corp.*, 474 Mass. at 516; *see also Syncro Soft SRL*, 320 F. Supp. 3d at 321 ("Because Sunstein violated its duty of undivided loyalty to Syncro Soft in violation of Rule 1.7, the Court finds in its discretion that disqualification is appropriate in this litigation."); *Harrison v. Fisons Corp.*, 819 F. Supp. 1039, 1041 (M.D. Fla 1993) (large, multi-office law firm could not litigate against bank while also representing bank in "wholly unrelated" matters, despite the fact that matters involved different attorneys in different offices and attorneys did not have access to confidential information "which would in any way taint the representation"); *State ex rel. Neb. State Bar Ass'n v. Frank*, 631 N.W. 2d 485 (Neb. 2001) (lawyer could not represent client in workers' compensation claim against insurer while also representing insurer in unrelated litigation).

<u>Third</u>, the use of conflict counsel to handle particular cross-examinations or matters related to U.S.C. poses inherent problems on the facts of this case because of U.S.C.'s centrality to the allegations. The charges against the U.S.C. defendants focus on whether they conspired to defraud U.S.C. Among the likely legal and factual issues that will arise over the course of these proceedings is whether the university's coaches and athletic administrators owed it a fiduciary duty; whether the university was aware of or sanctioned its employees' actions; whether the university's admissions and athletic recruitment policies and procedures otherwise condoned those actions; whether the employees breached their duties to the university by accepting payments from the defendants, directly and indirectly, to themselves and to university accounts over which they exercised discretion, in exchange for facilitating the admission of the defendants' children; and whether the alleged misrepresentations by the defendants and their co-conspirators were material. Yet notwithstanding the centrality of U.S.C. to the charges against the U.S.C. defendants, Ropes

has taken the position that "it is premature to assume that any cross-examination of a U.S.C. representative would be on a critical issue," Exhibit C at 2, while Latham has indicated—even before receiving any discovery—that its defense of Loughlin and Giannulli "will focus on their knowledge and intent," and on "legal deficiencies in the government's mail fraud and honest services theories," and that the firm will "recuse itself entirely from . . . cross-examination [of any U.S.C. witnesses], as well as all underlying strategic advice . . . [and] any aspect of the case that concerns restitution to U.S.C." *See* Exhibit B at 2.

It is difficult to imagine that defendants could, at the outset of this litigation, intelligently disclaim such critical lines of potential defense, or agree to hand them off to conflict counsel without any involvement from the rest of the defense team or any plan for whether and, if so, how they fit into an overall defense strategy. Nor, indeed, is it plausible that a defense team could even develop a coherent strategy when part of the team is walled off from certain defenses—or, alternately, that conflict counsel could prepare and coordinate such defenses in isolation, without involving the entire defense team in a manner that is adverse to the interests of U.S.C. Moreover, Giannulli's conflict counsel—the 11-member law firm of Donnelly, Conroy & Gelhaar, LLP— also represents Davina Isackson, who, as noted, is a cooperating witness for the government. Accordingly, for all the reasons set forth above, that firm is itself conflicted, and cannot continue to represent both clients.

<u>Fourth</u>, the government respectfully submits that any inquiry into these issues should specifically address Nixon's contention that U.S.C. waived any conflicts by signing the firm's standard engagement letter, which Nixon has advised contains an advance waiver of any conflicts. Even if such an advance waiver were sufficient to constitute "informed consent, confirmed in writing" to address a conflict that arises subsequently, Rule 1.7 permits clients, at least in certain

24

A216

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No.: 19-10080-NMG |
| | ) |
| v. | ) Violations: |
| | ) |
| (1)  DAVID SIDOO, | ) Count One: Conspiracy to Commit |
| (2)  GREGORY COLBURN, | ) Mail and Wire Fraud and Honest |
| (3)  AMY COLBURN, | ) Services Mail and Wire Fraud |
| (4)  GAMAL ABDELAZIZ, | ) (18 U.S.C. § 1349) |
| (5)  DIANE BLAKE, | ) |
| (6)  TODD BLAKE, | ) Count Two: Conspiracy to Commit |
| (7)  I-HSIN "JOEY" CHEN, | ) Federal Programs Bribery |
| (8)  MOSSIMO GIANNULLI, | ) (18 U.S.C. § 371) |
| (13)  ELISABETH KIMMEL, | ) |
| (14)  LORI LOUGHLIN, | ) Count Three: Money Laundering Conspiracy |
| (15)  WILLIAM McGLASHAN, Jr., | ) (18 U.S.C. § 1956(h)) |
| (16)  MARCI PALATELLA, | ) |
| (17)  JOHN WILSON, | ) Counts Four to Ten: Wire Fraud and Honest |
| (18)  HOMAYOUN ZADEH, and | ) Services Wire Fraud; Aiding and Abetting |
| (19)  ROBERT ZANGRILLO | ) (18 U.S.C. §§ 1343, 1346 and 2) |
| | ) |
| Defendants | ) Counts Eleven and Twelve: Federal Programs |
| | ) Bribery; Aiding and Abetting |
| | ) (18 U.S.C. §§ 666(a)(2) and 2) |
| | ) |
| | ) Count Thirteen: Filing a False Tax Return |
| | ) (26 U.S.C. § 7206(1)) |
| | ) |
| | ) Forfeiture Allegations: |
| | ) (18 U.S.C. § 981(a)(1)(C) and |
| | ) 28 U.S.C. § 2461) |
| | ) |
| | ) Money Laundering Forfeiture Allegations: |
| | ) (18 U.S.C. § 982(a)(1)) |
| | ) |

FOURTH SUPERSEDING INDICTMENT

At all times relevant to this Fourth Superseding Indictment:

General Allegations

1.    Defendant DAVID SIDOO was a resident of Vancouver, Canada.

2.      Defendant GREGORY COLBURN was a resident of Palo Alto, California.

3.      Defendant AMY COLBURN was a resident of Palo Alto, California.

4.      GREGORY COLBURN and AMY COLBURN (together, "the COLBURNS") were a married couple.

5.      Defendant GAMAL ABDELAZIZ, also known as "Gamal Aziz," was a resident of Las Vegas, Nevada.

6.      Defendant DIANE BLAKE was a resident of Ross, California.

7.      Defendant TODD BLAKE was a resident of Ross, California.

8.      DIANE BLAKE and TODD BLAKE (together, "the BLAKES") were a married couple.

9.      Defendant I-HSIN "JOEY" CHEN was a resident of Newport Beach, California.

10.     Defendant MOSSIMO GIANNULLI was a resident of Los Angeles, California.

11.     Defendant LORI LOUGHLIN was a resident of Los Angeles, California.

12.     MOSSIMO GIANNULLI and LORI LOUGHLIN (together, "the GIANNULLIS") were a married couple.

13.     Defendant ELISABETH KIMMEL was a resident of Las Vegas, Nevada and La Jolla, California.

14.     Defendant WILLIAM McGLASHAN, Jr. was a resident of Mill Valley, California.

15.     Defendant MARCI PALATELLA was a resident of Hillsborough, California.

16.     Defendant JOHN WILSON was a resident of Lynnfield, Massachusetts. WILSON was the sole shareholder of Hyannis Port Capital, Inc. ("HPC"). HPC was an "S" Corporation for federal tax purposes.

17.     Defendant HOMAYOUN ZADEH was a resident of Calabasas, California.

18.    Defendant ROBERT ZANGRILLO was a resident of Miami, Florida.

<u>Other Relevant Persons and Entities</u>

19.    The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

20.    The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California.   In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

21.    ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

22.    The College Board was a non-profit organization headquartered in New York, New York.   Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States.   The College Board and ETS (together, the "College Board") also developed and administered SAT subject tests, which are also used as part of the college admissions process.

3

A219

23.    Georgetown University ("Georgetown") was a highly selective private university located in Washington, D.C.   Georgetown received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

24.    Stanford University ("Stanford") was a highly selective private university located in Palo Alto, California.   Stanford received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

25.    The University of California at Los Angeles ("UCLA") was a highly selective public university located in Los Angeles, California.   UCLA received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

26.    The University of Southern California ("USC") was a highly selective private university located in Los Angeles, California.   USC received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

27.    Harvard University ("Harvard") was a highly selective private university located in Cambridge, Massachusetts.   Harvard received benefits in excess of $10,000 annually under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

28.    The athletic teams of Georgetown, Stanford, UCLA, USC, and Harvard (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

29.    The Universities are commercial enterprises that, among other things, charge tuition for their services.

30.     William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California.   Singer founded and, together with others, operated The Key and KWF.

31.     Mark Riddell was a resident of Palmetto, Florida.   Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

32.     Igor Dvorskiy was a resident of Sherman Oaks, California.   Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the "West Hollywood Test Center").   Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

33.     Niki Williams was a resident of Houston, Texas. Williams was employed as an assistant teacher at a public high school in Houston (the "Houston Test Center").   Williams also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

34.     Gordon Ernst was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts.   Until January 2018, Ernst was employed as the head coach of men's and women's tennis at Georgetown.

35.     Martin Fox was a resident of Houston, Texas.   Fox was employed as the president of a private tennis academy and camp in Houston.

36.     Steven Masera was a resident of Folsom, California.   Until in or about December 2017, Masera was employed as an accountant and financial officer for The Key and KWF.

37.     Mikaela Sanford was a resident of Sacramento, California. Sanford was employed in various capacities for The Key and KWF.

38.     Donna Heinel was a resident of Long Beach, California.   Heinel was employed as the senior associate athletic director at USC.

39.     Ali Khosroshahin was a resident of Fountain Valley, California.   Until on or about November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC.

40.     Laura Janke was a resident of North Hollywood, California.   Until on or about January 10, 2014, Janke was employed as an assistant coach of women's soccer at USC.   Janke reported to Khosroshahin until his departure from the university.

41.     Jovan Vavic was a resident of Rancho Palos Verdes, California.   Vavic was employed as the head coach of men's and women's water polo at USC.

42.     Jorge Salcedo was a resident of Los Angeles, California.   Salcedo was employed as the head coach of men's soccer at UCLA.

43.     John Vandemoer was a resident of Palo Alto, California.   Vandemoer was employed as the head sailing coach at Stanford.

44.     The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing federal tax laws.

General Background on Standardized Testing and the College Admissions Process

45.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages.   When submitted, standardized test scores are a material part of the admissions process.

46.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36.

47.     The SAT includes sections on writing, critical reading, and mathematics.   Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400.   As of March 2016, the SAT has been scored on a scale of 400 to 1600.

48.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits.  In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time, and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

49.     ACT and SAT administrators are agents of ACT and the College Board, respectively, and owe a duty of honest services to those organizations.

50.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

51.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

52.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

53.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

54.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

55.     Many selective colleges and universities in the United States, including all of the Universities, recruit students with demonstrated athletic abilities, and typically apply different

criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Universities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

56.     Athletic coaches and administrators are employees and agents of the universities that employ them, and owe a duty of honest services to their employers.

57.     At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University, and tuition typically does not cover the cost of a student's attendance.

<div align="center">General Background on Federal Tax Law</div>

58.     Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the IRS. IRS Tax Form 1040X is the Amended U.S. Individual Income Tax Return ("Form 1040X"), which is designed for taxpayers who need to correct mistakes or make changes to a previously filed tax return.

59.     Domestic corporations are generally required to file an annual income tax return, whether or not they had any taxable income.

60.     S corporations are closely held companies that choose to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code. S corporations are required to report their annual gross receipts or sales, expenses, and resulting income or loss on a Form 1120-S (an "S-Return")

filed with the IRS, and to pass any income or loss through to their shareholders for federal tax purposes. The shareholders, in turn, are required to report that income or loss on their own individual tax returns using a "Schedule K-1," and to pay any tax due as a result.

61.     Section 501(c)(3) of the Internal Revenue Code permits organizations operated exclusively for charitable purposes to be exempt from taxation ("501(c)(3) entities"). Among other things, 501(c)(3) entities must not be organized or operated for the benefit of private interests, and none of the earnings of a 501(c)(3) entity may inure to the benefit of any private shareholder or individual.

62.     To encourage public support of charitable organizations, federal law permits individuals to deduct contributions to 501(c)(3) entities from their taxable income. Such deductions, which are subject to certain limitations, are typically reported to the IRS on a donor's income tax return, thereby reducing the donor's income tax obligation.

63.     Title 26, United States Code, Section 170 provides, among other things, that no deduction for a charitable contribution of $250 or more shall be allowed unless it is substantiated by a written acknowledgment from the recipient organization indicating whether any goods or services were provided in consideration for the contribution, and, if so, providing a description and good faith estimate of the value of the goods or services provided. Any deduction must be reduced by the value of goods or services provided in exchange.

<u>The Fraud Conspiracy</u>

64.     From in or about 2007 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to

facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

<div align="center">Objects and Purposes of the Fraud Conspiracy</div>

65.     The principal objects of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.   The principal purposes of the conspiracy included:   (1) securing the admission of the defendants' children to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes; (2) enriching Singer and the recipients of the bribes; (3) funding designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally; and (4) concealing the fraud scheme.

<div align="center">Manner and Means of the Fraud Conspiracy</div>

66.     Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

  a.  Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

  b.  Changing the location of the exams to one of two test centers: the Houston Test Center or the West Hollywood Test Center;

  c.  Bribing college entrance exam administrators at the Houston Test Center and the West Hollywood Test Center to permit cheating, in violation of the administrators' duty of honest services to ACT, Inc. and the College Board;

<div align="center">10</div>

d.  Paying Riddell or another third party to pose as an exam proctor or as a student taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or take the exam in place of the students;

e.  Having a third party take classes in place of the defendants' children, with the understanding that grades earned in those classes would be submitted as part of the students' college applications;

f.  Bribing athletic coaches and university administrators to designate students as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories, in violation of the coaches' and administrators' duties of honest services to their employers;

g.  Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams on which they purportedly played, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications;

h.  Submitting falsified applications for admission to colleges and universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained standardized test scores and class grades, fake awards, athletic activities, and fabricated essays;

11

A227

      i.    Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients; and

      j.    Concealing the fraud to prevent the scheme from being discovered, including by the Universities and standardized testing entities.

<u>Acts in Furtherance of the Fraud Conspiracy</u>

67.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

<u>DAVID SIDOO</u>

68.    In or about the fall of 2011, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's older son.

69.    On or about September 16, 2011, SIDOO e-mailed Singer copies of his older son's driver's license and student identification card for the purpose of creating a falsified identification card for Riddell.

70.    Singer used the documents to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's older son.

71.    On or about December 1, 2011, Singer sent the falsified identification bearing Riddell's likeness and the name of SIDOO's older son by UPS from California to a hotel in Vancouver, Canada.

72.    On or about December 2, 2011, Riddell flew from Tampa, Florida to Vancouver, Canada to take the SAT in place of SIDOO's older son.   After he arrived, Riddell collected the falsified identification in the name of SIDOO's older son that Singer had sent to the hotel.

73.     To minimize suspicion and reduce the chance of getting caught, Singer directed Riddell not to obtain too high a score, because SIDOO's older son had previously taken the exam himself and obtained a total score of 1460 out of a possible 2400.

74.     On or about December 3, 2011, Riddell used the falsified identification card to pose as SIDOO's older son in order to secretly take the SAT in his place.   Riddell earned a total score of 1670 out of a possible 2400.

75.     On or about December 7, 2011, Singer e-mailed Masera a number of receipts from Riddell's trip to Vancouver.   Singer told Masera that the receipts were "[e]xpenses to pay back mark riddell" and that he should "bill david sidoo" for the expenses as well as for Riddell's airfare from Tampa, Florida to Vancouver, Canada.

76.     On or about December 23, 2011, Singer e-mailed a copy of the SAT score Riddell secretly obtained to an administrator at Chapman University, a private university in Orange, California, on behalf of SIDOO's older son.

77.     SIDOO paid Singer $100,000, as agreed, for having Riddell take the SAT for SIDOO's older son.

78.     In or about 2012, SIDOO agreed to pay Singer to have Riddell secretly take a Canadian high school graduation exam in place of SIDOO's older son.

79.     On or about May 15, 2012, Singer purchased plane tickets for Riddell to fly from Tampa, Florida to Vancouver, Canada on June 8, 2012, and to return to Tampa shortly thereafter.

80.     On or about June 9, 2012, Riddell posed as SIDOO's older son in order to secretly take the Canadian high school graduation exam in his place.

81.     In or about the fall of 2012, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's younger son.

13

82.     On or about October 31, 2012, SIDOO e-mailed Singer a document listing his younger son's address and other biographical information for the purpose of creating a falsified identification card for Riddell.

83.     Singer used the information to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's younger son.

84.     On or about November 22, 2012, Singer purchased a plane ticket for Riddell to fly from Tampa, Florida to Los Angeles, California on November 29, 2012, in order to take the SAT for SIDOO's younger son.

85.     Singer directed Riddell to obtain a high score because SIDOO's younger son had not previously taken the SAT.

86.     On or about December 1, 2012, Riddell used a falsified identification card to pose as SIDOO's younger son in order to secretly take the SAT in his place at a high school in Orange County, California.   Riddell earned a total score of 2280 out of a possible 2400.

87.     On or about January 21, 2013, SIDOO e-mailed Singer asking for wire transfer instructions.

88.     On or about January 22, 2013, an employee of The Key provided SIDOO with wire instructions for a company bank account in California.

89.     On or about January 23, 2013, SIDOO wired $100,000 to the account, as agreed, for having Riddell take the SAT for SIDOO's younger son.

90.     In 2013 and 2014, the SAT scores Riddell secretly obtained on behalf of SIDOO's younger son were submitted as part of his applications to colleges and universities in the United States, including on or about March 12, 2014 to Georgetown in Washington, D.C.

91.　　Singer paid Riddell approximately $5,000 plus travel expenses for each of the three exams Riddell took in place of SIDOO's children.

92.　　In or about October 2013, Singer drafted a falsified application essay describing SIDOO's younger son's purported internship with an organization that worked to combat violence among Los Angeles-based gangs. The essay falsely claimed that SIDOO's younger son had been held up at gun point by gang members in Los Angeles. Singer e-mailed the essay to SIDOO. SIDOO wrote back with minor changes to the essay, and asked, "can we lessen the interaction with the gangs. Guns …? [T]hat's scary stuff. Your call you know what they look for." The essay, without the reference to guns, was later submitted as part of SIDOO's younger son's application for admission to multiple universities.

93.　　Beginning in approximately 2015, SIDOO asked Singer if he could have Riddell take either the Graduate Management Admission Test ("GMAT"), a standardized test that is widely used as part of the business school admissions process, or the Law School Admission Test ("LSAT") on behalf of his older son. In exchange for taking one of the exams, Sidoo agreed to pay Singer a sum of money, and Singer, in turn, agreed to pay Riddell approximately $100,000.

94.　　Singer and Riddell researched the security measures in place for both exams. On or about April 28, 2015, Singer told SIDOO that their plan to have Riddell take the LSAT in place of SIDOO's son was "[n]ot happening due to fingerprinting" requirements on the exam.

95.　　On or about December 15, 2016, Riddell used Western Union to wire $520 to China to pay for fraudulent drivers' licenses that he intended to use to pose as SIDOO's older son for the GMAT. Riddell had the identifications mailed to Singer. The false identifications were not of high quality, and Riddell ultimately decided not to take the exam on behalf of SIDOO's son.

96. On or about October 25, 2018, Singer called SIDOO from Boston, Massachusetts. During the call, SIDOO noted that his older son was applying to business school, adding, "I thought you were gonna call me and say I got a 2100 on my GMAT." In fact, the GMAT is scored on a scale of 200 to 800. Singer responded, "They don't have a 2100 for the GMAT. But I would do my best to get it for ya." SIDOO replied, "I know."

### GREGORY COLBURN and AMY COLBURN

97. In or about the fall of 2017, GREGORY COLBURN and AMY COLBURN agreed with Singer to pay $25,000 to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers.

98. On or about September 13, 2017, AMY COLBURN e-mailed her son's high school education specialist, at Singer's direction, to request accommodations for her son's SAT and ACT exams, including the ability to take the exams with extended time over multiple days.

99. On or about October 10, 2017, AMY COLBURN e-mailed Singer that she was waiting to hear back about whether her son would be granted the requested accommodations.

100. On or about November 17, 2017, AMY COLBURN e-mailed Singer to tell him that she "got the accommodations we wanted for SAT" for her son.

101. In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of approximately $24,452.55, to pay for the SAT cheating scheme.

102. GREGORY COLBURN subsequently issued an additional check in the amount of $547.45 to KWF and wrote "charitable contribution" in the memo line.

103. On or about December 31, 2017, Singer e-mailed AMY COLBURN an admission ticket for the COLBURNS' son for an SAT exam with extended time to be administered on or about March 10, 2018.

16

A232

104.   On or about December 31, 2017, AMY COLBURN reserved a hotel room for the night of March 9, 2018 in West Hollywood, California for two adults and one child.

105.   On or about March 9, 2018, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for the COLBURNS' son and another student who took the test at the West Hollywood Test Center the same day.

106.   Singer directed Riddell not to obtain too high a score on the COLBURNS' son's SAT, so that the score would not raise any red flags.

107.   On or about March 10, 2018, after the COLBURNS' son and another student had completed the exam, Riddell reviewed and corrected their answers.

108.   Riddell earned a total score of 1190 out of a possible 1600 for the COLBURNS' son.

109.   On or about March 12, 2018, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

110.   On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for facilitating Riddell's cheating on behalf of the COLBURNS' son and another student.

111.   On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the COLBURNS' son and another student.

112.   In or about 2018, the SAT score Riddell secretly obtained on behalf of the COLBURNS' son was submitted as part of his applications to various colleges and universities.

113.   During a call on or about October 24, 2018, Singer told AMY COLBURN that the IRS was auditing KWF and Singer was "not going to mention to the IRS that Mark [Riddell] took the test for [your son]," to which AMY COLBURN replied, "Mm-hmm."   Later in the same call, Singer told GREGORY COLBURN that he was not telling the IRS that "Mark Riddell took the

test for [your son] at [the West Hollywood Test Center]." GREGORY COLBURN replied, "No, I got that. Yes. No, I got that."

<div align="center">GAMAL ABDELAZIZ</div>

114.    Beginning in or about the summer of 2017, GAMAL ABDELAZIZ agreed with Singer to pay an amount, ultimately totaling $300,000, for facilitating his daughter's admission to USC as a purported basketball recruit.

115.    On or about July 16, 2017, in an e-mail bearing the subject line "For Me to complete USC athletic profile," Singer asked ABDELAZIZ to send biographical information about his daughter. The e-mail indicated that the profile would include falsified information related to basketball.

116.    On or about July 27, 2017, Singer requested that ABDELAZIZ provide an action photo of his daughter playing basketball to be used in the athletic profile. ABDELAZIZ e-mailed a photo that same day.

117.    On or about August 7, 2017, Janke e-mailed Singer a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors. In the cover e-mail, Janke wrote, "Profile for [ABDELAZIZ's daughter]. . . . Let me know if you want me to add any other awards to her profile or if you think that is enough." Singer forwarded Janke's e-mail and false profile to ABDELAZIZ.

118.    On or about October 5, 2017, Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a basketball recruit.

119.    On or about December 4, 2017, Heinel instructed Singer that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center,

<div align="center">18</div>

the arena for USC's basketball and volleyball programs. Subsequently, Heinel and Singer agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.

120. On or about March 26, 2018, after USC mailed ABDELAZIZ's daughter a formal acceptance letter, ABDELAZIZ wired $300,000 to KWF.

121. In or about July 2018, KWF began paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits. The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.

122. On or about January 3, 2019, Singer called ABDELAZIZ from Boston, Massachusetts. During the call, Singer told ABDELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not playing basketball for USC, had responded that she had suffered an injury. ADBELAZIZ confirmed that he would provide the same cover story if questioned.

<u>DIANE BLAKE and TODD BLAKE</u>

123. Beginning in or about 2017, DIANE BLAKE and TODD BLAKE agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate their daughter's admission to USC as a purported volleyball recruit.

124. On or about January 29, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE assumed the school was "in the reach stretch category." Singer responded: "There is a way to

garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present." DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

125. On or about June 28, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE: "We are fully committed to the USC plan."

126. On or about August 7, 2017, Janke e-mailed Singer a falsified volleyball profile for the BLAKES' daughter. Approximately one week later, Singer forwarded the profile to Heinel.

127. Heinel presented the BLAKES' daughter to the USC subcommittee for athletic admissions as a purported volleyball recruit on or about September 7, 2017.

128. On or about September 14, 2017, Heinel e-mailed Singer a letter, addressed to the BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. Singer forwarded the letter to the BLAKES that same day. TODD BLAKE responded by thanking Singer and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

129. On or about September 16, 2017, Singer instructed TODD BLAKE to send a check for $50,000 to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE mailed a $50,000 check to USC Women's Athletics that same day.

130. On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF.

131. On or about October 22, 2018, a USC Assistant Athletic Director e-mail TODD BLAKE, "I see you gave a gift to women's basketball last year. . . . Was that for a particular reason? Have you looked at annual scholarship support through the Trojan Athletic Fund[?]" TODD BLAKE falsely replied, "My financial gift was a one-time event, to commemorate a friend who was a former women's basketball coach. Given that USC Annenberg School of

Communications (my daughter's school) wants me to donate money to them, I expect to direct my contributions to that cause going forward."

132.    Three days later, in a call on or about October 25, 2018, TODD BLAKE told Singer, in sum and substance, that USC approached him "from a fund-raising perspective," because of his prior payment to USC.   TODD BLAKE told Singer that, in response to two requests from USC development personnel, he had been "very like evasive," adding, "I've effectively evaded both [requests], you know, answering anything there.   So we're good."

133.    In the same call, Singer told TODD BLAKE that he was not going to tell the IRS that the payment was for the BLAKES' daughter "getting in through Donna Heinel and women's volleyball."   TODD BLAKE replied, "Right."   TODD BLAKE later asked Singer, "And will I get contacted [by the IRS] and if so how would you like me to answer?"

134.    In a call on or about February 22, 2019, Singer told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years.   Singer said he wanted to let DIANE BLAKE know about the subpoena "since [the BLAKES' daughter] was accepted through volleyball, but wasn't really a volleyball player in reality at [the] USC level[.]"   DIANE BLAKE responded, "Yeah."

### I-HSIN "JOEY" CHEN

135.    In or about the spring of 2018, CHEN agreed with Singer to pay $75,000 to have Riddell pose as a proctor for his son's ACT exam and secretly correct his answers.

136.    On or about April 10, 2018, Singer caused KWF to pay Dvorskiy $20,000 for facilitating Riddell's cheating on behalf of CHEN's son and another student.

137.    On or about April 13, 2018, Riddell flew from Tampa, Florida to Los Angeles, California.

138.    The following day, on or about April 14, 2018, CHEN's son took the ACT at the West Hollywood Test Center.   Riddell purported to proctor the exam and, after CHEN's son had completed it, corrected his answers.

139.    On or about April 16, 2018, CHEN's company wired $75,000 to The Key in exchange for having Riddell cheat on CHEN's son's ACT.

140.    On or about April 17, 2018, Singer caused KWF to pay Riddell $20,000 for correcting the ACT answers for CHEN's son and another student.

141.    On or about April 18, 2018, Dvorskiy sent the completed exams, via Federal Express, to ACT, Inc. in Iowa City.

142.    In or about 2018, the ACT score Riddell secretly obtained on behalf of CHEN's son was submitted via interstate wire communication to various colleges and universities, including, on or about October 8, 2018, to Emerson College in Boston, Massachusetts.

143.    On or about February 21, 2019, Singer called CHEN and asked: "[W]e both agree that Mark took the test for [your son], right?" CHEN responded: "Yeah."

<u>MOSSIMO GIANNULLI and LORI LOUGHLIN</u>

144.    In or about 2016 and 2017, GIANNULLI and LOUGHLIN agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate the admission of their two daughters to USC as purported crew recruits.   GIANNULLI had previously been introduced to Singer by an unindicted co-conspirator.

145.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to Singer, noting, "I have some concerns and want to fully understand the game plan and make sure

we have a roadmap for success as it relates to [our older daughter] and getting her into a school other than ASU!"   Singer responded, "If you want [U]SC I have the game plan ready to go into motion. Call me to discuss."

146.    On or about August 18, 2016, Singer sent an e-mail to GIANNULLI and LOUGHLIN stating that he needed a copy of their older daughter's transcript and test scores "very soon while I create a coxswain portfolio for her.   It would probably help to get a picture of her on an ERG in workout clothes like a real athlete too."   GIANNULLI replied, the next day, "Fantastic. Will get all."

147.    On or about September 7, 2016, GIANNULLI sent Singer an e-mail attaching a photograph of his older daughter on an ergometer.

148.    On or about October 27, 2016, Heinel presented the GIANNULLIS' older daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials— obtained the subcommittee's approval to admit her to USC as a crew recruit.

149.    On or about October 29, 2016, Singer e-mailed GIANNULLI:   "Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

150.    On or about November 1, 2016, GIANNULLI replied to Singer: "I told biz mgr to Fed Ex [the payment] today."

151.    On or about March 30, 2017, Singer's bookkeeper e-mailed a $200,000 invoice to GIANNULLI and LOUGHLIN.   The invoice thanked GIANNULLI and LOUGHLIN for their pledge to KWF and further stated that their "private contribution" of $200,000 was now due.

152. On or about April 2, 2017, in response to an e-mail attaching a $200,000 invoice, GIANNULLI e-mailed Singer's bookkeeper and LOUGHLIN, "We are currently on holiday in the Bahamas but will gladly handle this when home next week."

153. On or about April 10, 2017, GIANNULLI forwarded the $200,000 invoice to his own financial advisor for payment, writing, "Good news my daughter . . . is in [U]SC . . . . bad is I had to work the system."

154. On or about the same day, after the GIANNULLIS' daughter received a formal acceptance letter from USC, GIANNULLI wired $200,000 to KWF.

155. On or about April 10, 2017, GIANNULLI e-mailed Singer, copying LOUGHLIN, "I wanted to thank you again for your great work with [our older daughter], she is very excited and both Lori and I are very appreciative of your efforts and end result!"   When Singer responded by asking if there was a "similar need anywhere so we do not lose a spot" for their younger daughter, LOUGHLIN replied, "Yes USC for [our younger daughter]!"

156. On or about July 14, 2017, Singer directed Janke to prepare a falsified crew profile for the GIANNULLIS' younger daughter.

157. On or about July 16, 2017, Singer e-mailed the GIANNULLIS requesting that they send an "action picture" for the crew profile.   Singer indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team.

158. On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed Singer a photograph of their younger daughter on an ergometer.

159. On or about November 2, 2017, Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

160.    On or about November 29, 2017, Singer directed GIANNULLI and LOUGHLIN to "send a 50K check to USC and the address is below.   Additionally the rest of the 200K will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."

161.    On or about December 5, 2017, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

162.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

163.    On or about October 25, 2018, Singer called GIANNULLI from Boston, Massachusetts.   During that call, Singer told GIANNULLI, "Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?'   So it's funny how-- I thought I was just makin' stuff up."   GIANNULLI replied, "Uh, right."

164.    On or about November 29, 2018, Singer called LOUGHLIN from Boston, Massachusetts.   During the call, Singer said, in sum and substance, that KWF was being audited by the IRS, which was asking about the two payments of $200,000 by the GIANNULLIS.   Singer added, "So I just want to make sure that you know that, one, that you're probably going to get a call and that I have not told them anything about the girls going through the side door, through crew, even though they didn't do crew to get into USC.   So I—that is—all I told them was that you guys made a donation to our foundation to help underserved kids."   LOUGHLIN replied, "Um-hmm."

25

A241

## ELISABETH KIMMEL

165.    Beginning in or about 2012, KIMMEL agreed to pay Singer an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit.

166.    In or about September 2012, KIMMEL asked Singer for Ernst's contact information.

167.    On or about November 26, 2012, a Georgetown admissions director e-mailed KIMMEL's daughter, copying Ernst, that, "[i]n order to send you your likely letter, your application needs to be complete.   Although Coach Ernst has shared with me your unofficial SAT score report, we have not received the scores officially from the College Board and this is a requirement for admission."   Ernst forwarded this e-mail to Singer, who forwarded it to KIMMEL.

168.    On or about November 27, 2012, KIMMEL e-mailed Singer, and asked whether her daughter should "avoid discussing field hockey"—a sport she actually played—in her Georgetown alumni interview because it might "raise red flags."

169.    On or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions ha[d] conducted an initial review of [her] application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach" and "ha[d] rated [her] admission as 'likely.'"

170.    On or about January 16, 2013, Singer e-mailed KIMMEL and her spouse that "we need to collect monies to put into an escrow account for [your daughter's] acceptance to Georgetown.   As agreed to once the Likely Letter comes we need to have a deposit of --- you have two distribution amounts based on your foundation?   Normally a family provides us no less than

half - 125 upon acceptances of the Likely and the other half within a week of the final acceptance." KIMMEL replied, "Please let me know the name of the payee and I will have the first check prepared today."

171.    On or about April 2, 2013, Masera e-mailed KIMMEL the following: "I understand that you have received a GU acceptance letter. Would you like me to revise the Foundation letter to reflect the full $200,000.00 payment?" KIMMEL replied that she would "need to make two payments, one before June and the other after June 1." KIMMEL added, "my memory was that the total amount was higher-- $200 would be great, but I think we agreed on $275K over the two payments."

172.    On or about April 4, 2013, KIMMEL caused the Meyer Charitable Foundation, a family foundation on which KIMMEL and her spouse served as officers, to issue a check to KWF in the amount of $100,000.

173.    On or about June 19, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a second check to KWF in the amount of $170,000.

174.    On or about July 2, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a third check to KWF in the amount of $5,000.

175.    Between on or about September 5, 2012 and on or about September 6, 2013, Singer caused The Key, and later KWF, to pay Ernst $244,000 in monthly installments.

176.    Beginning in or about 2017, KIMMEL agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate her son's admission to USC as a purported track and field recruit.

177.    On or about August 10, 2017, Singer directed Janke to create a falsified athletic profile for KIMMEL's son. The profile falsely described KIMMEL's son as an elite high school

pole vaulter and included a photograph purporting to be of KIMMEL's son pole vaulting but which, in fact, depicted another individual.

178.     On or about October 5, 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a track and field recruit.

179.     On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

180.     On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

181.     On or about July 26, 2018, KIMMEL and her spouse called Singer to explain that their son's advisor at USC had inquired about his status as a track athlete.   KIMMEL asked Singer: "[S]o we have to hope this advisor doesn't start poking around?"

### WILLIAM McGLASHAN, Jr.

182.     In or about the fall of 2017, McGLASHAN agreed to pay Singer $50,000 to arrange for Riddell to purport to proctor his son's ACT exam and secretly correct his son's answers.

183.     On or about October 21, 2017, McGLASHAN received an e-mail from his son's high school notifying McGLASHAN that his son had received an accommodation from the ACT to take the test with "double time."   The e-mail further stated that McGLASHAN's son would "be proctored at school," and directed him to contact the school at least four weeks prior to the exam so that a proctor could be scheduled.

184.     On or about November 13, 2017, McGLASHAN's wife e-mailed a learning services assistant at her son's high school and confirmed that her son would take the exam at his high school on December 20 and 21, 2017.

185.    On or about November 20, 2017, Singer, McGLASHAN and Dvorskiy completed an ACT "Request for Arranged Testing" form to move McGLASHAN's son's ACT exam from his high school to the West Hollywood Test Center in Los Angeles.  After the form was completed, Singer instructed McGLASHAN to send it to the ACT.

186.    On or about November 28, 2017, McGLASHAN e-mailed a counselor at his son's high school as follows:  "I am in LA with [my son] on Dec 9, and Rick ([my son's] college councilor [sic]) has arranged for [my son] to take the ACT test at a school while we are there over the weekend."  The school counselor asked if the school should cancel McGLASHAN's son's ACT exam that had been scheduled to be administered at his own high school on December 20 and 21, 2017.  McGLASHAN responded:  "That is correct. . . .  Just decided on this alternative strategy today."

187.    On or about November 30, 2017, Singer's accountant sent an e-mail to McGLASHAN attaching an "invoice and information [f]or payment regarding [the West Hollywood Test Center]."  The attached invoice was for $50,000, with the description on the invoice listed as: "Regarding [the West Hollywood Test Center]."

188.    On or about December 4, 2017, McGLASHAN sent an e-mail to his assistant directing her to confirm that a check had been "fedexed" to KWF.  McGLASHAN's assistant responded:  "I have the check taken care of, already confirmed it will be sent via Fed-Ex."  That same day, McGLASHAN directed his assistant to book him a flight to Los Angeles leaving on the evening of Friday, December 8, 2017, and returning in the early afternoon of the following day, December 9, 2017.

189.    On or about December 6, 2017, McGLASHAN made a purported donation of $50,000 to KWF from his personal charitable donation fund.

190.     On or about December 8, 2017, at approximately 6:09 p.m., McGLASHAN departed San Francisco by private jet and arrived in Los Angeles at approximately 7:05 p.m.    That same day, Riddell traveled from Tampa, Florida to Los Angeles to purport to proctor the ACT exam for McGLASHAN's son and two other students.

191.     On or about December 9, 2017, McGLASHAN's son took the ACT exam at the West Hollywood Test Center.   After McGLASHAN's son completed the exam, Riddell corrected his answers.

192.     McGLASHAN and his son departed Los Angeles by private jet at approximately 3:21 p.m. on December 9, 2017, and arrived in San Francisco at approximately 4:15 p.m.

193.     On or about December 10, 2017, Riddell returned to Tampa, Florida from Los Angeles.

194.     On or about December 13, 2017, Dvorskiy sent McGLASHAN's son's completed ACT exam, via Federal Express, to ACT, Inc. in Iowa City. The "ACT Administration and Payment Report" for the exam falsely stated that the exam had been administered over two days, December 9 and 10, 2017.

195.     On or about December 15, 2017, Singer caused KWF to pay Dvorskiy $40,000 for facilitating Riddell's cheating on behalf of McGLASHAN's son and other students.

196.     On or about December 16, 2017, Singer caused KWF to pay Riddell $35,000 for correcting the exam answers for McGLASHAN's son and other students.

197.     On or about January 10, 2018, which was the day that McGLASHAN's son's ACT score became available online, McGLASHAN sent Singer a text message stating:   "You have a very relieved and motivated young man!   Very grateful."   Singer replied:   "Thank you.   It takes a lot of pressure off[.]"   McGLASHAN responded:   "Yes!"

198.     On or about January 26, 2018, McGLASHAN's son's high school counselor e-mailed McGLASHAN and his son a list of colleges for McGLASHAN's son to consider.   The list included Boston University and Northeastern University, both of which are located in the District of Massachusetts.

199.     On or about April 27, 2018, McGLASHAN's son's high school counselor e-mailed McGLASHAN and his son a second list of colleges to consider.   The list again included Northeastern University.

200.     On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGLASHAN's son was submitted to various colleges and universities, including Northeastern University, in Boston, Massachusetts, via wire communication in interstate commerce.

201.     Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his son's admission to USC as a purported football recruit.

202.     In a call on or about July 30, 2018, Singer told McGLASHAN, in substance, that he had a "side door" at USC that would allow McGLASHAN's son to be admitted "through athletics."   Singer told McGLASHAN that the side door would cost $250,000, and that, in exchange for this payment, McGLASHAN's son would be accepted to USC.   Singer further explained that after McGLASHAN received an "unofficial" admission letter for his son, McGLASHAN would need to make a payment of $50,000 to "Women's Athletics."   Then, after McGLASHAN's son received his "official letter," McGLASHAN would owe the remaining $200,000.   Singer also discussed with McGLASHAN the need to create a falsified athletic profile for McGLASHAN's son, which Singer said he had done "a million times," and the need for McGLASHAN to keep the scheme quiet.

203.   On or about August 22, 2018, Singer left McGLASHAN a voicemail in which Singer said that he met with USC and that, because McGLASHAN's son's high school did not have a football team, Singer would "make him a kicker/punter" and create a football profile using "Photoshop," so that McGLASHAN's son could be "walk[ed] … through with football" at a USC "sub-committee meeting."

204.   In a follow-up call that same day, Singer told McGLASHAN that he needed pictures of McGLASHAN's son "playing multiple sports, or something where you can kind of see his face a little bit in action," so that he could "Photoshop him onto a kicker."   During the call, McGLASHAN confirmed his understanding that the "deal" required him to make an initial payment of $50,000, followed by a second payment of $200,000.

205.   On or about August 24, 2018, Singer sent an e-mail to McGLASHAN with the subject line "USC needs."   Singer wrote:   "Bill can you get me an unofficial transcript, pdf of test scores and an action sports photo of [your son]."

206.   On or about August 25, 2018, McGLASHAN sent a text message to his son, asking "Did you get the photos?"   McGLASHAN's son replied that his brother had taken the photos and was uploading them to his computer.

207.   On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, high school transcript, and photos that depicted his son running and posing. Singer forwarded the materials to Janke with instructions to create a falsified profile of McGLASHAN's son as a "kicker/punter."

208.   On or about September 8, 2018, Singer e-mailed Heinel a profile that falsely depicted McGLASHAN's son as a football place kicker and punter.

209.    On or about September 29, 2018, McGLASHAN sent a text message to Singer asking: "So when will we know definitively on USC?" Singer replied the next day: "They had their first Subco last week- football has a while before going through Subco- later in the fall as it is in season."

## MARCI PALATELLA

210.    Beginning in or about 2016, PALATELLA agreed to pay Singer $75,000 to arrange for Riddell to pose as a proctor for her son's SAT exam and secretly correct his answers. PALATELLA also agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate her son's admission to USC as a purported football recruit.

211.    On or about March 14, 2016, Singer e-mailed PALATELLA an assessment of which schools he believed her son could be admitted to "with the fudging of the scores."

212.    On or about February 27, 2017, after her son was granted extended time on the SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017."

213.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF.

214.    On or about March 7, 2017, Singer caused KWF to issue a payment of $25,000 to Dvorskiy for facilitating Riddell's cheating on behalf of PALATELLA's son.

215.    On or about March 10, 2017, Riddell flew from Tampa, Florida to Los Angeles, California to purport to proctor the SAT for PALATELLA's son at the West Hollywood Test Center.

216.    On or about March 11, 2017, after PALATELLA's son completed the SAT exam at the West Hollywood Test Center, Riddell reviewed and corrected his answers.

33

A249

217.     On or about March 11, 2017, Singer caused KWF to issue a payment of $10,000 to Riddell for correcting the SAT answers for PALATELLA's son.

218.     On or about March 13, 2017, Dvorskiy sent the completed SAT exam, via UPS, to the College Board in New Jersey.

219.     On or about July 27, 2017, PALATELLA e-mailed Singer a photo of her son in his football uniform and asked: "Will this work?"   Singer forwarded the photo to Janke, together with PALATELLA's son's grade point average and the fraudulently obtained SAT score.   Janke created an athletic profile for PALATELLA's son that included falsified football credentials.

220.     On or about November 16, 2017, Heinel presented PALATELLA's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a football recruit.

221.     On or about December 1, 2017, PALATELLA mailed Heinel a check in the amount of $100,000, made payable to USC Women's Athletic Board.

222.     On or about May 1, 2018—after PALATELLA's son received a formal acceptance letter from USC—PALATELLA's company wired $400,000 to KWF.

223.     On or about October 24, 2018, Singer called PALATELLA from Boston, Massachusetts.   During the call, PALATELLA agreed to mislead the IRS if anyone inquired about her payments to KWF.

224.     On or about January 9, 2019, PALATELLA exchanged text messages with a friend regarding the money PALATELLA paid to KWF for her son's admission to USC.   Her friend stated:   "I can only think the money was spent wisely for school or else wise," to which PALATELLA replied:   "I don't think most of it went to the school between us only.   Please never ever repeat anything."

### JOHN WILSON

225.    Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate his son's admission to USC as a purported water polo recruit. Beginning in or about 2018, WILSON agreed to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his twin daughters' admissions to Stanford and Harvard as purported athletic recruits.

226.    On or about February 10, 2013, WILSON e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown etc[.] this year" and to "confirm for which schools is side door option really viable." Singer responded that the deadline for USC and Boston College was "mid July."

227.    On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure his son's admission as a purported water polo recruit.   WILSON wrote:   "What does Jovan need by [S]ept 20?   Do u have what we need? Do I make the first payment to u then?"

228.    On or about October 4, 2013, Vavic advised Singer that he needed an athletic profile for WILSON's son and that it "needs to be a good resume."

229.    On or about October 12, 2013, WILSON e-mailed Singer requesting an update on the college application process.   Singer replied that Vavic had WILSON's son's information and "asked me to embellish his profile more, which I am doing."

230.    On or about October 13, 2013, WILSON e-mailed Singer asking:   "When is Jovan [Vavic] going to be able to give us decision on USC?   And when do I pay u?   Was it 50% in nov? 50% in feb when we get final official notice?"   Singer replied that "Jovan [Vavic] will provide [your son's] info to admission[s] when he does his other guys over the next month.   No payment

of money till he gets a verbal and written from admissions and then 50 percent to a savings account I set up. Then the remainder upon an acceptance letter in March with everyone else."

231. On or about October 19, 2013, Singer forwarded WILSON a water polo profile for WILSON's son that included fabricated awards.

232. Singer subsequently provided Vavic with the falsified profile, which included fabricated awards.

233. On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly."

234. On or about February 28, 2014, the USC subcommittee for athletic admissions approved the admission of WILSON's son as a water polo recruit based on the falsified athletic credentials.

235. On or about March 1, 2014, WILSON e-mailed Singer under the subject line "USC fees." WILSON wrote:

> Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?

Singer replied that he could make the invoice for business consulting fees, so that WILSON could "write [it] off as an expense."

236. On or about April 7, 2014, after USC mailed WILSON's son a formal acceptance letter, WILSON's company wired a total of $220,000 to Singer, including $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer directly.

237. On or about April 16, 2014, Singer withdrew a $100,000 cashier's check, made out to "USC Men's Water Polo," from The Key's account. The "Purpose/Remitter" identified on the check was "Wilson Family."

238. On or about September 29, 2018, WILSON asked Singer about "side door" opportunities for his twin daughters. Singer explained, in sum and substance, that "by the side door" he may be able to tell the sailing coach: "'Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit.'"

239. On or about October 15, 2018, Singer called WILSON to discuss various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play. They just-- that's the path I'm gonna get 'em in on." WILSON responded: "Gotcha."

240. On or about October 17, 2018, WILSON's executive assistant e-mailed him: "I just received a text with Bank info for The Key Worldwide Foundation, what is this for?" WILSON replied: "It's a $500k donation I am going to make this year. Tax write off and help getting into colleges."

241. On or about the same day, WILSON's company, HPC, wired $500,000 to an account in the name of KWF in the District of Massachusetts.

242. On or about October 27, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured a "side door" deal for one of WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford.

243. On or about November 29, 2018, Singer, who was located in the District of Massachusetts, told WILSON that he had secured an admissions spot at Harvard through a purported "senior women's administrator" at the university, and that, in exchange for an initial

$500,000 payment to her, as well as a subsequent payment, the administrator would designate one of WILSON's daughters as an athletic recruit.

244.    On or about December 11, 2018, WILSON's company, HPC, wired another $500,000 to the Massachusetts account in the name of KWF.

<div align="center">HOMAYOUN ZADEH</div>

245.    Beginning in or about 2016, Zadeh agreed with Singer to pay an amount, ultimately totaling $100,000, to facilitate his daughter's admission to USC as a purported lacrosse recruit.

246.    On or about December 16, 2016, ZADEH provided Singer with a photograph of his daughter cheerleading.   Singer forwarded the photograph to Janke and directed her to fabricate a lacrosse profile for ZADEH's daughter.

247.    On or about March 15, 2017, Heinel presented ZADEH's daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a lacrosse recruit.

248.    On or about March 17, 2017, KWF sent $50,000 to the USC Women's Athletics Board.

249.    In a text message on or about March 20, 2017, ZADEH told Singer that his daughter was concerned that "she did not get in on her own merits.   I have not shared anything about our arrangement but she somehow senses it."

250.    During the same text exchange, Singer told ZADEH that he could "make the 100k payment over the next 6 months starting April 1st.   You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense."

251.    Between on or about May 30, 2017 and on or about September 7, 2018, ZADEH made or caused the following payments to be made to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

252.    On or about October 25, 2018, Singer called ZADEH from Boston, Massachusetts. During the call, Singer told ZADEH, in sum and substance, that KWF was being audited by the IRS. Singer said: "I'm not going to tell the IRS that we got [your daughter] in through lacrosse." ZADEH responded: "Right." Singer continued: "And Donna Heinel at USC." ZADEH replied: "Right." Singer also said: "[Y]ou know, we created a profile that wasn't real." ZADEH responded: "Right."

## ROBERT ZANGRILLO

253.    Beginning in or about 2017, ZANGRILLO agreed with Singer to pay for a third party to complete online high school courses for his daughter, with the understanding that credits earned in those classes would be submitted to colleges on his daughter's behalf, either as part of her college applications or to serve as proof of her high school graduation. ZANGRILLO also agreed with Singer to pay for a third party to complete online college courses for his daughter, with the understanding that grades earned in those classes would be submitted as part of his daughter's college applications.

254. In or about March 2017, even though she ultimately did not attend the university, ZANGRILLO's daughter was admitted to Boston University for the fall of 2017. At the time, ZANGRILLO's daughter was enrolled in an online high school.

255. In or about the spring of 2017, ZANGRILLO's daughter was enrolled in five courses through her online high school, all of which, once completed, would fulfill credits she needed to graduate. ZANGRILLO's daughter had only partially completed each of these courses.

256. On or about June 14, 2017, Sanford sent an e-mail to another individual, Co-Conspirator 1 ("CC-1"), containing the log-in information for ZANGRILLO's daughter's online high school. Sanford and CC-1 used this log-in information to complete four of the outstanding courses for ZANGRILLO's daughter.

257. On or about July 18, 2017, Masera e-mailed an invoice to ZANGRILLO and his assistant, copying Singer. The e-mail stated, "Attached is a new invoice seeking reimbursement for course completion for [ZANGRILLO's daughter]." The invoice listed four courses and billed ZANGRILLO for the coursework that Sanford and CC-1 completed on behalf of ZANGRILLO's daughter.

258. On or about July 20, 2017, ZANGRILLO's assistant replied to Masera's e-mail: "Wire has been sent." On or about the same day, ZANGRILLO wired $3,109.50 to The Key.

259. On or about July 28, 2017, Sanford e-mailed ZANGRILLO's daughter's online high school and requested that her transcript be sent to Boston University.

260. On or about the same day, a member of the counseling department at ZANGRILLO's daughter's high school e-mailed her that she needed to complete a course, Fitness Fundamentals, to fulfill her graduation requirements.

261.  Sanford subsequently completed the "Fitness Fundamentals" course for ZANGRILLO's daughter.  Thereafter, on or about August 23, 2017, Sanford e-mailed ZANGRILLO's daughter's high school and again requested that her transcript "with proof of graduation" be e-mailed to Boston University.

262.  On or about August 24, 2017, ZANGRILLO's daughter's high school e-mailed her transcript to Boston University in the District of Massachusetts.  The transcript reflected credits earned by Sanford and CC-1 on behalf of ZANGRILLO's daughter.

263.  On or about January 19, 2018, ZANGRILLO's assistant e-mailed ZANGRILLO and his daughter an invoice from The Key, dated August 23, 2017, in the amount of $2,500.  The invoice was for "Course Completion by Mikaela Sanford – Fitness Fundamentals 2." ZANGRILLO's assistant asked him to "please approve and confirm this payment for $2500 that they show as outstanding."

264.  On or about January 22, 2018, ZANGRILLO wired $2,500 to The Key.  The reference on the wire was ZANGRILLO's daughter's name.

265.  Beginning in or about 2018, ZANGRILLO agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his daughter's transfer to USC as a purported crew recruit.

266.  On or about February 1, 2018, ZANGRILLO's daughter's transfer application was submitted to USC.  The application included falsified athletic credentials.

267.  In a call with ZANGRILLO, ZANGRILLO's daughter, and Sanford, on or about June 11, 2018, Singer explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been

41

A257

sculling and rowing," and that the crew coach had agreed to designate her as a purported crew recruit, provided that "you guys help us."

268.    During the same call, ZANGRILLO directed Sanford to take an online biology course and finish an online art history course for his daughter.  By that time, Sanford had already started the art history course and taken other online courses for ZANGRILLO's daughter through multiple colleges.

269.    During the spring of 2018, Singer's bookkeeper had sent several invoices to ZANGRILLO and his assistant for Sanford's completion of other courses on behalf of ZANGRILLO's daughter.  When these invoices went unpaid, Singer, in an e-mail on or about June 12, 2018, asked ZANGRILLO to "get this handled ASAP."  Singer added that, "Mikaela [Sanford] will suspend working on anything as of tomorrow if not taken care of."  In response, ZANGRILLO asked his assistant to "make sure this is taken care of this a[.]m[.]"  ZANGRILLO wired $10,800.26 on or about the same day.

270.    On or about August 15, 2018, Singer's bookkeeper e-mailed ZANGRILLO and his assistant an invoice for "course completion" for the biology course discussed in the June 11, 2018 call.  ZANGRILLO replied, "Approved."

271.    Transcripts reflecting the completion of these online courses were submitted to USC on behalf of ZANGRILLO's daughter.

272.    On or about September 20, 2018, after USC had mailed ZANGRILLO's daughter an acceptance letter, ZANGRILLO wired $200,000 to KWF.

273.    On or about that same day, ZANGRILLO caused a check in the amount of $50,000 to be issued to "USC Women's Athletics."

274. On or about October 25, 2018, Singer, who was located in the District of Massachusetts, called ZANGRILLO and told him that KWF was being audited. Singer told ZANGRILLO that he would not tell the IRS that the "monies went to go pay Donna Heinel for USC to get her [*i.e.*, ZANGRILLO's daughter] in." ZANGRILLO then asked what he should tell the IRS regarding the purpose of the payment "just so I know so we have the story straight." Singer responded that ZANGRILLO should say that all the money paid to KWF, including the money paid for Singer's assistant to take classes for ZANGRILLO's daughter, were for "our programs that handle underserved kids." ZANGRILLO replied: "Okay, great, perfect."

275. On or about January 3, 2019, Singer, who was located in the District of Massachusetts, called ZANGRILLO, who confirmed that his daughter would not say anything to her USC advisor about being admitted through athletics.

### Other Co-Conspirators

276. In addition to the exams Singer paid Riddell to take for the children of the defendants, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of other co-conspirators known and unknown to the Grand Jury and, in many of those instances, bribed exam administrators, including Dvorskiy and Williams, to permit Riddell to do so.

277. Singer likewise bribed athletic coaches and university administrators on behalf of other co-conspirators known and unknown to the Grand Jury to designate the children of those co-conspirators as athletic recruits.

278. Singer also agreed with other co-conspirators known and unknown to the Grand Jury to arrange for Sanford and others to take courses on behalf of the children of these other co-conspirators with the understanding that grades earned in those classes would be submitted as part of the students' college applications.

<u>The USC Federal Programs Bribery Conspiracy</u>

279.    From in or about 2007 through in or about February 2019, the defendants identified below conspired with others known and unknown to the Grand Jury to bribe agents of USC to secure their children's admission to that university.

<u>Objects and Purposes of the USC Federal Programs Bribery Conspiracy</u>

280.    The principal object of the USC federal programs bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666.    The principal purposes of the conspiracy included, among other things: (1) securing the admission of the defendants' children to USC; (2) enriching the recipients of the bribes; (3) funding designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally; and (4) concealing the bribery scheme.

<u>Manner and Means of the USC Federal Programs Bribery Conspiracy</u>

281.    Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the USC federal programs bribery conspiracy were the following:

> a.   Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams on which they purportedly played, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' applications to USC;

> b.   Paying bribes to USC athletic coaches and administrators in exchange for designating the defendants' children as purported athletic recruits—with little or no regard for their athletic abilities and, in some cases, even though

they did not play the sport they were purportedly recruited to play—and as members of other favored admissions categories; and

    c.   Explaining to clients and prospective clients of The Key that the bribes were a tried-and-true method of gaining admission to USC and other colleges and universities that had been successfully employed by many other clients.

<u>Overt Acts in Furtherance of the USC Federal Programs Bribery Conspiracy</u>

282.    On various dates from in or about 2007 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the USC federal programs bribery conspiracy:

<div align="center"><u>GAMAL ABDELAZIZ</u></div>

283.    On or about March 26, 2018, ABDELAZIZ wired $300,000 to KWF.

<div align="center"><u>TODD AND DIANE BLAKE</u></div>

284.    On or about September 16, 2017, TODD BLAKE mailed a $50,000 check made payable to USC Women's Athletics, an account controlled by Heinel.

285.    On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF.

<div align="center"><u>MOSSIMO GIANNULLI AND LORI LOUGHLIN</u></div>

286.    On or about November 1, 2016, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

287.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF.

288.    On or about December 5, 2017, GIANNULLI directed his business manager to send a $50,000 check, made payable to USC Women's Athletics, to Heinel.

289.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

## ELISABETH KIMMEL

290.     On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.   The check was signed by KIMMEL's spouse.

291.     On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

## WILLIAM McGLASHAN, Jr.

292.     Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to bribe one or more USC employees to facilitate his son's admission to USC as a purported football recruit.

293.     On or about August 24, 2018, Singer sent an e-mail to McGLASHAN with the subject line "USC needs."   Singer wrote in the e-mail, "Bill can you get me an unofficial transcript, pdf of test scores and an action sports photo of [your son]."

294.     On or about August 25, 2018, McGLASHAN sent a text message to his son, asking "Did you get the photos?"   McGLASHAN's son replied that his brother had taken the pictures and was uploading the photos to his computer.

295.     On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, high school transcript, and photos that depicted his son running and posing. Singer forwarded the materials to Janke with instructions to create a falsified profile of McGLASHAN's son as a "kicker/punter."

296.     Janke then created a football profile for McGLASHAN's son, which falsely depicted him as an elite football place kicker and punter.

297.     On or about September 8, 2018, Singer e-mailed the fraudulent profile to Heinel.

298.    On or about September 29, 2018, McGLASHAN sent a text message to Singer, asking, "So when will we know definitively on USC?"    Singer replied, "They had their first Subco last week- football has a while before going through Subco- late in the fall as it is in season."

## MARCI PALATELLA

299.    On or about December 1, 2017, PALATELLA mailed Heinel a $100,000 check, made payable to USC Women's Athletic Board.

300.    On or about May 1, 2018, PALATELLA caused her company to wire $400,000 to KWF.

## JOHN WILSON

301.    On or about April 7, 2014, WILSON caused his company to wire a total of $220,000 to Singer, comprised of $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

302.    On or about April 16, 2014, Singer caused KWF to issue a $100,000 cashier's check, made payable to "USC Men's Water Polo," to Vavic.

## HOMAYOUN ZADEH

303.    On or about March 17, 2017, Singer caused KWF to issue a $50,000 check, made payable to "USC Women's Athletics Board," to Heinel.

304.    Between on or about May 30, 2017 and on or about September 7, 2018, ZADEH made or caused the following payments to be made to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |

| Date Posted to KWF Account | Amount |
|---|---|
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

### ROBERT ZANGRILLO

305. On or about September 20, 2018, ZANGRILLO wired $200,000 to KWF.

306. On or about that same day, ZANGRILLO caused a check in the amount of $50,000 to be issued to "USC Women's Athletics."

### The Money Laundering Conspiracy

307. The defendants conspired with others known and unknown to the Grand Jury to conceal their fraud scheme by funneling bribe and other payments through The Key or KWF, including via payments to and from accounts in the District of Massachusetts, and to promote their fraud scheme via payments to The Key and KWF from outside the United States.

### Objects and Purposes of the Money Laundering Conspiracy

308. The principal objects and purposes of the money laundering conspiracy were: (a) to conceal and disguise the nature, location, source, ownership, and control of bribe and other payments in furtherance of the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and, (b) to transport, transmit, and transfer funds to a place in the United States from and through a place outside the United States, with the intent to promote the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

Manner and Means of the Money Laundering Conspiracy

309.    Among the manner and means by which the defendants and co-conspirators known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

    a.  Making purported charitable donations to KWF or payments to The Key to fund the bribe and other payments in furtherance of the fraud and bribery schemes;

    b.  Having KWF issue letters falsely attesting that the purported donations would help "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for the money;

    c.  Having The Key issue falsified "consulting" agreements and invoices stating that payments were for legitimate services, when in fact the payments were made in furtherance of the fraud and bribery schemes; and

    d.  Issuing bribe and other payments in furtherance of the fraud and bribery schemes from accounts in the name of The Key and KWF.

Acts in Furtherance of the Money Laundering Conspiracy

310.    On various dates from in or about 2011 through in or about February 2019, the defendants and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

DAVID SIDOO

311.    On or about January 23, 2013, SIDOO wired $100,000 from an account in Canada to an account in California in the name of The Key, to pay for the SAT cheating scheme for SIDOO's younger son.

## GREGORY COLBURN and AMY COLBURN

312.   In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of approximately $24,452.55, to pay for the SAT cheating scheme for the COLBURNS' son.

313.   GREGORY COLBURN subsequently issued an additional check in the amount of $547.45 to KWF, and wrote "charitable contribution" in the memo line.

314.   On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for the purported donation.

315.   In a call on or about October 24, 2018, Singer told AMY COLBURN, "So what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids." AMY COLBURN responded, "Okay."

316.   During the same call on or about October 24, 2018, Singer told GREGORY COLBURN, "I just wanted to make sure that we don't-- we're all on the same page."   GREGORY COLBURN replied, "Right.   It was to help underserved kids. . . . Got it.   No problem."

## GAMAL ABDELAZIZ

317.   On or about March 26, 2018, ABDELAZIZ wired a payment of $300,000 to KWF to pay for the scheme to admit his daughter to USC as a purported basketball recruit.

318.   On or about April 6, 2018, Singer's bookkeeper e-mailed ABDELAZIZ a letter from KWF falsely indicating that "no goods or services were exchanged" for the purported donation.

### DIANE BLAKE and TODD BLAKE

319. On or about September 16, 2017, TODD BLAKE mailed a $50,000 check to Heinel, payable to "USC Women's Athletics," to pay for the scheme to admit his daughter to USC as a purported volleyball recruit.

320. On or about February 5, 2018, TODD BLAKE wired $200,000 to KWF as a further payment for the recruitment scheme.

321. In call on or about October 25, 2018, TODD BLAKE asked Singer, "[W]ill I get contacted [by the IRS], and if so how would you like me to answer?" Singer responded, "[W]hat I want you to say is that your money went to our foundation, which it did." TODD BLAKE replied: "Yeah. Okay." Singer later said, "You made a donation to help underserved kids." TODD BLAKE responded, "Right. Okay, good."

322. In a call on or about February 22, 2019, Singer told DIANE BLAKE that her daughter "got in with you guys making a payment, you know, for [$]50,000 to USC Women's Athletics directly and then [$]200[,000] to my foundation." DIANE BLAKE responded "Right," and further agreed with Singer when he said that "that was the payment to get her in."

### I-HSIN "JOEY" CHEN

323. On or about April 10, 2018, Singer's accountant e-mailed CHEN a falsified invoice from The Key in the amount of $100,000 for purported "Consulting services."

324. On or about April 13, 2018, CHEN e-mailed Singer's accountant to ask for this invoice to be reduced to $75,000, which was the amount CHEN had agreed to pay Singer for participating in the ACT cheating scheme.

325. On or about April 16, 2018, CHEN caused his company to wire $75,000 to The Key.

## MOSSIMO GIANNULLI and LORI LOUGHLIN

326.     On or about April 10, 2017, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his older daughter to USC as a purported crew recruit.

327.     On or about April 11, 2017, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

328.     On or about February 6, 2018, GIANNULLI wired $200,000 to KWF to pay for the scheme to admit his younger daughter to USC as a purported crew recruit.

329.     On or about February 7, 2018, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

## ELISABETH KIMMEL

330.     On or about April 4, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $100,000 as partial payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

331.     Masera thereafter sent a letter to the Meyer Charitable Foundation, directed to KIMMEL and her spouse, falsely indicating that "no goods or services were exchanged" for the purported donation.

332.     On or about June 19, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $170,000 as further payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

333.    On or about July 2, 2013, KIMMEL caused the Meyer Charitable Foundation to issue an additional check to KWF in the amount of $5,000 as further payment for securing her daughter's admission to Georgetown as a purported tennis recruit.

334.    On or about February 1, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000 as payment for securing her son's admission to USC as a purported track and field recruit.

335.    On or about March 20, 2018, Singer's bookkeeper sent a letter to KIMMEL and her spouse falsely indicating that "no goods or services were exchanged" for the purported donation.

## WILLIAM McGLASHAN, Jr.

336.    On or about December 6, 2017, McGLASHAN sent $50,000 to KWF from his personal charitable donation fund to pay for the ACT cheating scheme for McGLASHAN's son.

337.    On or about December 16, 2017, Masera sent a letter to McGLASHAN falsely indicating that "no goods or services were exchanged" for the purported donation.

## MARCI PALATELLA

338.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF to pay for the SAT cheating scheme for PALATELLA's son.

339.    On or about May 1, 2018, PALATELLA's company wired $400,000 to KWF to pay for the scheme to admit her son to USC as a purported football recruit.

## JOHN WILSON

340.    On or about March 1, 2014, WILSON asked Singer, in substance, whether he could pay Singer from his corporate account for the scheme to admit WILSON's son's to USC as a

purported water polo recruit, so that the payment would be deductible as a purported consulting fee business expense.

341.    On or about April 2, 2014, Masera sent a letter to WILSON's employee dated April 7, 2014, falsely indicating that "no goods or services were exchanged" for a purported $100,000 donation to KWF.

342.    On or about April 7, 2014, WILSON caused his company to wire $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

343.    On or about April 16, 2014, Singer caused The Key to issue a $100,000 cashier's check, made payable to USC Men's Water Polo, to Vavic.    This check stated that the "purpose/remitter" was the "Wilson Family."

344.    On or about July 28, 2014, USC sent WILSON and his spouse a gift acknowledgment for their purported $100,000 charitable contribution to USC Men's Water Polo. USC issued this letter without knowing that WILSON's payment was made in exchange for facilitating his son's fraudulent admission to USC as a purported recruit.

<u>HOMAYOUN ZADEH</u>

345.    On or about March 17, 2017, Singer caused KWF to issue a $50,000 check, made payable to "USC Women's Athletics Board," to Heinel.

346.    On or about April 5, 2017, Masera e-mailed an invoice to ZADEH and his spouse for their purported "pledge" to KWF of $100,000, which was in fact a payment for facilitating ZADEH's daughter's fraudulent admission to USC as a purported lacrosse recruit.

347.    Between on or about May 30, 2017 and September 7, 2018, ZADEH and his spouse made eight payments totaling $55,000 to KWF.

348. On or about December 27, 2017, Singer's bookkeeper sent a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their purported $40,000 in donations made in 2017.

## ROBERT ZANGRILLO

349. On or about September 20, 2018, ZANGRILLO wired $200,000 to KWF to pay for the scheme to admit his daughter to USC as a purported crew recruit.

350. In a call from Boston, Massachusetts on or about October 25, 2018, Singer told ZANGRILLO, in sum and substance, that the IRS was auditing KWF. ZANGRILLO asked: "What was [my daughter's] payment for? Just so I know, so we have the story straight." Singer responded, in substance, that the payments would appear to be "for our programs that handle underserved kids." ZANGRILLO replied: "Okay, great, perfect."

### Other Co-Conspirators

351. Singer likewise funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of Massachusetts and elsewhere, on behalf of other co-conspirators known and unknown to the Grand Jury, in order to conceal and disguise the nature, location, source, ownership, and control of bribe money and other payments in furtherance of the bribery and fraud schemes.

352. Other co-conspirators known and unknown to the Grand Jury also transported, transmitted, and transferred monetary instruments and funds from a place outside the United States to and through KWF and The Key accounts inside the United States in furtherance of the bribery and fraud schemes.

<u>WILSON's False Tax Returns</u>

353.    Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate WILSON's son's admission to USC as a purported water polo recruit.

354.    On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure WILSON's son's admission as a purported water polo recruit. WILSON wrote: "What does Jovan need by [S]ept 20? Do u have what we need? Do I make the first payment to u then?" Singer replied, stating, "I believe I have everything. Transcript[,] test scores[,] and a [water polo] player profile so [Vavic] can add [your son] to his recruit list and present him to admissions in October." WILSON replied: "Great," and added that he wanted to know "when and where to wire the money."

355.    On or about January 21, 2014, Vavic e-mailed Singer, asking if WILSON's son was "still interested in USC." Singer replied, "Absolutely – family is ready to help."

356.    On or about February 28, 2014, WILSON's son was presented to the USC subcommittee on athletic admissions and admitted as a purported recruit to the water polo team.

357.    On or about March 1, 2014, WILSON sent Singer an e-mail with the subject line "USC fees," in which WILSON wrote: "Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" Singer responded, "Yes we can send you an invoice for business consulting fees and you may write off as an expense. What is the name address etc you want the invoice to be made out to?" WILSON replied with the name and address of his company, HPC.

358.  On or about March 29, 2014, WILSON sent an e-mail to his employee ("HPC Employee-1") with the subject line "Re: Wire to the key," and wrote that HPC Employee-1 would soon receive "an invoice and wiring instructions for $250k," which would be paid for by HPC. HPC Employee-1 responded:  "And what is the acct I'm charging this to?"  WILSON replied: "Business Consulting – the invoice will be for consulting – pls work with him to get invoice correct."  In an e-mail the next day, WILSON clarified that the amount to be paid was $200,000 and not $250,000.

359.  On or about March 31, 2014, Masera e-mailed HPC Employee-1 that he would prepare two invoices: an invoice for $100,000 that would be payable to KWF, and a "consulting invoice" for "our Business" for the "other $100k."  Masera added that an additional $20,000 would also be paid to Singer.

360.  On the same day, HPC Employee-1 e-mailed WILSON as follows:  "Per Steve [Masera] 100k will be to his foundation, 100k an invoice from the Key and 20k to Rick Singer. Since you said 200K, we're at 220k, is this a moving target?"  WILSON responded:  "Yes I added $20 k for his expenses."  HPC Employee-1 then asked whether WILSON wanted the additional $200,000 "invoiced to HPC as well," and WILSON replied, "Yes."

361.  HPC Employee-1 then e-mailed Singer and Masera, writing: "So basically the first 100k is going to be a donation to your foundation.  The second 100k will be an invoice from the Key. . . .  As for the 20k, I will also need an invoice from Rick [Singer] on this as well to Hyannis Port Capital . . . ."

362.  On or about April 2, 2014, Masera sent HPC Employee-1 an e-mail with the subject line "Modified Invoices," writing: "If you need any further alterations, just let me know . . . ." Attached to the e-mail was:  (a) an invoice to HPC in the amount of $20,000, payable to Rick

Singer, containing the description, "Special Consulting Income[.] Concept, design, and implementation of Professional Development program for Hyannis Port Capital associates;" (b) an invoice to HPC in the amount of $100,000, payable to "The Key," containing the description, "Business Consulting – August through June 2014;" and (c) a letter stating, "Thank you for your contribution of $100,000 to The Key Worldwide Foundation. . . . This letter shall serve as formal acknowledgement of your contribution or, for which no goods or services were exchanged."

363.   On or about April 7, 2014, HPC wired $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer.

364.   On or about April 16, 2014, The Key made a $100,000 payment to USC Men's Water Polo.

365.   WILSON caused his tax preparers to create a Form 1120S for HPC for the tax year 2014, in which the $100,000 payment to KWF was improperly included as a charitable donation, and the $120,000 in purported "consulting" fees to Singer and The Key were improperly included as business expenses.   These deductions were included on the Schedule K-1 issued for HPC.

366.   WILSON's Form 1040 for the 2014 tax year was received by the IRS on or about December 29, 2015, containing declarations by WILSON and his wife, under penalty of perjury, that the information contained therein was true, correct and complete.   That return claimed, amongst other false and fraudulent items: (1) contributions to charity based, in part, on a $100,000 payment made by HPC to KWF; and, (2) business losses from HPC based, in part, on $120,000 in payments to Singer and The Key deducted by HPC as purported business expenses.   As a result, WILSON and his spouse's taxable income for 2014 was underreported.

367.   On or about January 11, 2017, the IRS received a 2014 1040X amended tax return from WILSON and his wife, containing declarations by WILSON and his wife, under penalty of

58

A274

perjury, that the information contained therein was true, correct and complete. Like the original 2014 return, it improperly included the $100,000 payment to KWF as a purported charitable contribution, and claimed losses from HPC based, in part, on the $120,000 in payments to Singer and The Key that HPC deducted as purported business expenses.

368. On or about March 30, 2018, the IRS received a second 2014 1040X amended tax return from WILSON and his wife containing declarations by WILSON and his wife, under penalty of perjury, that the information contained therein was true, correct and complete. Like the prior 2014 returns, this return also included the $100,000 payment to KWF as a purported charitable contribution, and claimed losses from HPC based, in part, on the $120,000 in payments to Singer and The Key that HPC deducted as purported business expenses. The second 2014 1040X amended tax return was mailed to the IRS from Lynnfield, Massachusetts on or about March 26, 2018.

## COUNT ONE
### Conspiracy to Commit Mail and Wire Fraud
### and Honest Services Mail and Wire Fraud
### (18 U.S.C. § 1349)

The Grand Jury charges:

369.  The Grand Jury re-alleges and incorporates by reference paragraphs 1-278 of this Fourth Superseding Indictment.

370.  From in or about 2007 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did, for the

purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346; and,

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

371.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-306 of this

Fourth Superseding Indictment.

372.   From in or about 2007 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

    (4)    GAMAL ABDELAZIZ,
    (5)    DIANE BLAKE
    (6)    TODD BLAKE,
    (8)    MOSSIMO GIANNULLI,
    (13)   ELISABETH KIMMEL,
    (14)   LORI LOUGHLIN,
    (15)   WILLIAM McGLASHAN, Jr.,
    (16)   MARCI PALATELLA,
    (17)   JOHN WILSON,
    (18)   HOMAYOUN ZADEH, and
    (19)   ROBERT ZANGRILLO

conspired with others known and unknown to the Grand Jury to commit federal programs bribery,

that is, to corruptly give, offer and agree to give anything of value to any person, with intent to

influence and reward an agent of an organization, to wit, agents of USC, in connection with any

business, transaction and series of transactions of USC involving anything of value of $5,000 or

more, that is, in exchange for facilitating the admission to USC for the defendants' children, where

USC received benefits in excess of $10,000 under federal programs involving grants, contracts,

subsidies, loan guarantees, insurance and other forms of federal assistance in any one-year period,

in violation of Title 18, United States Code, Section 666(a)(2).

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE
### Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury further charges:

373.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-352 of this Fourth Superseding Indictment.

374.    From in or about 2011 through in or about February 2019, in the District of Massachusetts, and elsewhere, the defendants,

| | |
|---|---|
| (1) | DAVID SIDOO, |
| (2) | GREGORY COLBURN, |
| (3) | AMY COLBURN, |
| (4) | GAMAL ABDELAZIZ, |
| (5) | DIANE BLAKE, |
| (6) | TODD BLAKE, |
| (7) | I-HSIN "JOEY" CHEN, |
| (8) | MOSSIMO GIANNULLI, |
| (13) | ELISABETH KIMMEL, |
| (14) | LORI LOUGHLIN, |
| (15) | WILLIAM McGLASHAN, Jr., |
| (16) | MARCI PALATELLA, |
| (17) | JOHN WILSON, |
| (18) | HOMAYOUN ZADEH, and |
| (19) | ROBERT ZANGRILLO |

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  to conduct and attempt to conduct financial transactions, to wit, bribe payments and other payments funneled through a purported charitable organization and a for-profit corporation, knowing that that the property involved in such transactions represented the proceeds of some form of unlawful activity and which, in fact, involved the proceeds of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, and knowing that the transactions were designed, in whole and in part, to

conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b.  to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds, to wit, bribes and other payments, to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS FOUR THROUGH TEN
Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341 and 1346 and 2)

The Grand Jury further charges:

375.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-278 of this Fourth Superseding Indictment.

376.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants set forth below, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, ACT, SAT and other standardized tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud, as follows:

| COUNT | DEFENDANT(S) | APPROXIMATE DATE | WIRE |
|:---:|:---:|:---:|:---|
| 4 | ROBERT ZANGRILLO | August 24, 2017 | High school transcript sent to Boston University |
| 5 | JOEY CHEN | October 8, 2018 | ACT scores sent to Emerson College |
| 6 | JOHN WILSON | October 17, 2018 | $500,000 wire transfer to KWF |
| 7 | WILLIAM McGLASHAN JR. | October 24, 2018 | ACT scores sent to Northeastern University |
| 8 | JOHN WILSON | October 27, 2018 | Telephone call with Singer |
| 9 | JOHN WILSON | December 11, 2018 | $500,000 wire transfer to KWF |

| 10 | ROBERT ZANGRILLO | January 3, 2019 | Telephone call with Singer |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

COUNTS ELEVEN AND TWELVE
Federal Programs Bribery; Aiding and Abetting
(18 U.S.C. §§ 666(a)(2) and 2)

The Grand Jury further charges:

377.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-306 of this

Fourth Superseding Indictment.

378.    On or about the dates set forth below, in the District of Massachusetts and

elsewhere, the defendant,

(17)   JOHN WILSON

corruptly gave, offered and agreed to give anything of value to any person, with intent to influence

and reward an agent of an organization, as set forth below, in connection with any business,

transaction and series of transactions of such organization involving anything of value of $5,000

or more, where such organization received benefits in excess of $10,000 annually under federal

programs involving grants, contracts, subsidies, loan guarantees, insurance and other forms of

federal assistance in any one-year period, as follows:

| COUNT | AGENT AND ORGANIZATION | APPROXIMATE DATE | PAYMENT |
|---|---|---|---|
| 11 | Sailing coach of Stanford | October 17, 2018 | $500,000 wire transfer to KWF |
| 12 | Senior women's administrator of Harvard | December 11, 2018 | $500,000 wire transfer to KWF |

All in violation of Title 18, United States Code, Sections 666(a)(2) and (2).

COUNT THIRTEEN
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

379.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-368 of this Fourth Superseding Indictment.

380.   On or about March 26, 2018 in the District of Massachusetts and elsewhere, the defendant,

(17)   JOHN WILSON,

did willfully make and subscribe a joint Amended U.S. Individual Income Tax Return, Form 1040X, for the tax year 2014, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that, among other items, the lines for adjusted gross income and itemized deductions, and the attached Form 1040, included HPC losses and gifts to charity based on payments from HPC to KWF, Singer and The Key as purported charitable contributions or business expenses.

All in violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

381.    Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 371, 666, 1341, 1346, 1349 and 2, set forth in Counts One through Two and Four through

Twelve of this Fourth Superseding Indictment, the defendants,

(1)    DAVID SIDOO,
(2)    GREGORY COLBURN,
(3)    AMY COLBURN,
(4)    GAMAL ABDELAZIZ,
(5)    DIANE BLAKE,
(6)    TODD BLAKE,
(7)    I-HSIN "JOEY" CHEN,
(8)    MOSSIMO GIANNULLI,
(13)    ELISABETH KIMMEL,
(14)    LORI LOUGHLIN,
(15)    WILLIAM McGLASHAN, Jr.,
(16)    MARCI PALATELLA,
(17)    JOHN WILSON,
(18)    HOMAYOUN ZADEH, and
(19)    ROBERT ZANGRILLO

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.

382.    If any of the property described in Paragraph 381 above as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 381 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

383.　Upon conviction of the offense in violation of Title 18, United States Code, Section

1956(h), set forth in Count Three of this Fourth Superseding Indictment, the defendants,

　　　　(1)　DAVID SIDOO,
　　　　(2)　GREGORY COLBURN,
　　　　(3)　AMY COLBURN,
　　　　(4)　GAMAL ABDELAZIZ,
　　　　(5)　DIANE BLAKE,
　　　　(6)　TODD BLAKE,
　　　　(7)　I-HSIN "JOEY" CHEN,
　　　　(8)　MOSSIMO GIANNULLI,
　　　　(13)　ELISABETH KIMMEL,
　　　　(14)　LORI LOUGHLIN,
　　　　(15)　WILLIAM McGLASHAN, Jr.,
　　　　(16)　MARCI PALATELLA,
　　　　(17)　JOHN WILSON,
　　　　(18)　HOMAYOUN ZADEH, and
　　　　(19)　ROBERT ZANGRILLO

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

384.　If any of the property described in Paragraph 383 above as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

　　　　a.　cannot be located upon the exercise of due diligence;

　　　　b.　has been transferred or sold to, or deposited with, a third party;

　　　　c.　has been placed beyond the jurisdiction of the Court;

　　　　d.　has been substantially diminished in value; or

　　　　e.　has been commingled with other property which cannot be divided without
　　　　　　difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 383 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL,

_____
FOREPERSON

_____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys
District of Massachusetts

District of Massachusetts: January 14, 2020
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

72

**A288**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )          Criminal Action
         Plaintiff,           )          No. 19-10080-NMG
                              )
v.                            )
                              )
GAMAL ABDELAZIZ and           )
ROBERT ZANGRILLO,             )
                              )
         Defendants.          )
                              )
```

BEFORE THE HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

HEARING

February 28, 2020

John J. Moakley United States Courthouse
Courtroom No. 24
One Courthouse Way
Boston, Massachusetts  02210

Digitally recorded and
transcribed stenographically by:
Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1   APPEARANCES:

 2   On Behalf of the Government:
     Leslie Wright
 3   Kristen A. Kearney
     United States Attorney's Office MA
 4   1 Courthouse Way
     Suite 9200
 5   Boston, MA 02210
     617-748-3204
 6   leslie.wright@usdoj.gov
     kristen.kearney@usdoj.gov
 7
     On Behalf of the Defendant Gamal Abdelaziz:
 8   Brian T. Kelly
     Joshua C.H. Sharp
 9   Lauren Maynard
     Nixon Peabody LLP
10   Exchange Place
     53 State Street
11   Boston, MA 02109-2835
     617-345-1135
12   bkelly@nixonpeabody.com
     jsharp@nixonpeabody.com
13   lmaynard@nixonpeabody.com

14   On Behalf of the Defendant Robert Zangrillo:
     (Via teleconference)
15   Martin G. Weinberg
     Martin G. Weinberg, PC
16   20 Park Plaza
     Boston, MA 02116
17   617-227-3700
     owlmcb@att.net

18

19

20

21

22

23

24

25
```

**A290**

```
 1                      P R O C E E D I N G S
 2              COURTROOM CLERK:  Case Number 19-10080, United States
 3    v. Gamal Abdelaziz and Robert Zangrillo.  The Honorable M. Page
 4    Kelley presiding.  Would counsel please identify themselves for
 5    the record.
 6              MS. WRIGHT:  Good afternoon, Your Honor.  Leslie
 7    Wright and Kristen Kearney for the government.
 8              THE COURT:  Okay.  Good afternoon.
 9              MR. KELLY:  Sure, good afternoon.  Brian Kelly and
08:04 10    Josh Sharp and Lauren Maynard for Mr. Abdelaziz.
11              THE COURT:  Hi.  Good afternoon.
12              MR. WEINBERG:  And good afternoon.  Martin Weinberg by
13    phone.  Good afternoon, Your Honor.
14              THE COURT:  Okay.  Good afternoon.  So I'll just note
15    that this was a very impromptu hearing, and I really appreciate
16    everyone appearing on very short notice.
17              MR. KELLY:  Yes.  Just for the record, You Honor, I
18    note that, despite my foot boot, I was able to get here quicker
19    than Mr. Weinberg apparently.
08:04 20              THE COURT:  All right.  Okay.  So given Judge Gorton's
21    setting a schedule that is very truncated for the filing of
22    motions pertaining to the most recent iPhone notes of
23    Mr. Singer, I wanted to move quickly on the -- all of the
24    various motions for discovery, of which there are many, that
25    are outstanding in the case.
```

1           And I originally, just to be totally transparent, had

2       thought that I would take my time and write something on those

3       motions, but it does seem to me that if there are some

4       materials that could be produced quickly, it would be better

5       than having the defendants get those materials piecemeal and

6       file a succession of motions to dismiss based on <u>Brady</u>.

7           And in the interest of saving everyone a lot of time

8       and trouble, I thought I would have everyone in next Monday and

9       we would try to sort through what we could just as a measure --

08:06 10    just as a way of getting materials to the defendants that I was

11      going to order them to be provided with anyway prior to the

12      filing dates so that this doesn't end up being a long, long

13      process.

14          I know now also we have pretty short trial dates

15      looming, and I don't -- so I think some of this material is

16      going to go out anyway, and I don't really think it's to

17      anyone's advantage to spend all of their time fighting back and

18      forth about these motions about discovery when perhaps the

19      simplest thing is just to get the discovery.

08:06 20        So I think then we heard from the government Monday is

21      not a good day for various reasons, and so I'm concerned that

22      the longer we take for my decision, the shorter the time will

23      be for the government either to provide people with stuff or

24      for the defendants to absorb it.

25          And I will just tell you I certainly cannot speak for

1    Judge Gorton, but he is pretty firm on his dates.  So if, for

2    example, I were to order the government to produce 302s to the

3    defendants and it took you a while and they wanted more time

4    then to file those motions, I'm not sure they would get it.  So

5    I'd rather do this on -- I mean, I've certainly read all the

6    motions, although some of them are not ripe yet so I haven't

7    read all of them.  It's been kind of a nonstop thing.

8            So, Mr. Abdelaziz's motion is the first one that was

9    filed and has been pending the longest, and it's absolutely

08:08 10    ripe and it's actually pretty narrow.  So I just wondered if

11    the government had anything to say about this generally, and

12    then maybe we'd talk a little bit about their motion.

13            MS. WRIGHT:  Sure.  Your Honor, and we agree and we

14    understand your concerns.  Now that we have set trial dates,

15    our plan definitely was to sit down internally and figure out a

16    plan for production of all remaining discovery, including Jones

17    Act material, Rick Singer's 302 included.  We would just --

18    just the timing of setting something for Monday is a little

19    tricky on our end logistically because two of our team members

08:08 20    are currently out of town traveling, and one of our team

21    members had a death in his immediate family.  So we would just

22    ask for a little bit more time for us to sit down, tick through

23    all the remaining buckets of discovery and come up with a

24    sensible plan for getting that out as quickly as possible, and

25    hopefully that would then substantially narrow the issues that

1    Your Honor would have to decide with respect to the motions to

2    compel.

3        THE COURT:  Okay.  Yes.  Mr. Kelly is getting ready to

4    stand up.

5        MR. KELLY:  Yes, Your Honor.  Well, okay.  We're not

6    just concerned with <u>Jencks</u> here.  I mean, I know there's always

7    back and forth about when <u>Jencks</u> is producible, et cetera.

8        Our view is that <u>Brady</u> material has been withheld to

9    us contrary to the local rules, the Constitution, and the court

08:09 10   well knows all the case law.  And so our request is relatively

11   discrete from the outset.  And, you know, we're just looking

12   for -- actually, it's just not FBI 302, but I think it would

13   also be IRS reports as well, about the various representations

14   that were made about the so-called side deal that Singer had

15   with Heinel about the side door.  And that occurred well after

16   our client's daughter got into the school.  He knew nothing

17   about this side deal that Singer had.

18        We just want those reports because it's <u>Brady</u> with

19   respect to my client, as is any communication that Singer had

08:10 20   with my client about this being a donation to a school rather

21   than a bribe to an individual.  We view that as core <u>Brady</u>.

22   The government says not <u>Brady</u>.  So that's I think the

23   fundamental tension here, and we would want those materials

24   because we think we're required to get them.

25        Now, if somebody's family member has died and that

```
 1   impacts the process, I'm not crazy, I'm not going to say that
 2   shouldn't be considered by the court.  Nor am I, you know,
 3   suggesting we should get some unfair advantage with the
 4   government.  The fact is we've been asking for this for a long
 5   time.  The fact is the Brady rules apply to them in this case
 6   as it does in every case, and the fact is it hasn't been
 7   produced.  So we would respectfully suggest whatever plan they
 8   come up with with respect to Jencks, it should be expedited and
 9   that Brady should have been produced not just yesterday but
10   weeks ago.
11            MS. WRIGHT:  If I could just respond briefly.  And I
12   raised Rick Singer's 302s as an example.  We intend to, like I
13   said, tick through every remaining box of discovery, figure out
14   a plan for producing it all.  Clearly we have some disputes
15   about what constitutes Brady and what doesn't, but our plan is
16   that now we have a trial date to come up with a quick timeline
17   for getting all our remaining discovery out to all the
18   defendants.
19            THE COURT:  Great.  Okay.
20            MR. WEINBERG:  Excuse me, Your Honor.
21            THE COURT:  Yes.
22            MR. WEINBERG:  There are two other matters, you know,
23   and I exchanged a ten-paragraph request for information
24   specific to Mr. Zangrillo, including, you know, what did
25   Mr. Singer tell him about donations going to U.S.C. and did
```

        1    Mr. Singer in fact talk to a coach that Mr. Singer claimed he
        2    talked to on a tape.  The government answer, which, you know,
        3    preliminary satisfied me is, one, we may not agree with you as
        4    to whether all that you ask for is Brady, but you have
        5    everything, document, information, et cetera, that we have
        6    that's related to any of the ten paragraphs, and you will get
        7    it if any new information is developed.  So I can't quarrel,
        8    you know, with that kind of blanket representation that the
        9    government is no longer, as to Mr. Zangrillo, following with
08:13  10    where is the line between inculpatory/exculpatory.
       11         The government's got its view that even if a parent is
       12    told the money is going to the school for a worthwhile program
       13    and the parents think it's a donation that the government feels
       14    that it helps the kid or guarantees the kid gets in, the
       15    government's got its theory that's a crime.  We have our theory
       16    that that's the legitimate donation that's close to the
       17    heartland of what universities do.  But I was satisfied that
       18    representations made by the prosecution team satisfied me that,
       19    as of the date they were made, they gave me everything that
08:14  20    related to the ten paragraphs and would continue to supplement
       21    regardless of our differing views on where the line between
       22    exculpatory and inculpatory lies.
       23         Quite frankly, it's hard for me to -- you know, it's
       24    not plausible to me that Mr. Singer hadn't been asked about
       25    some of these subjects.  Did you talk to a rowing coach as you

1  claimed to Mr. Zangrillo?  Didn't you tell Mr. Zangrillo where

2  the monies that he paid to Key were destined to go?

3       But I also understand that it's not a perfect world

4  and the prosecution has lots of different cases, and when they

5  tell me, you know, point blank, unconditionally that I've got

6  everything, I expect that, and I have to believe that they are

7  going to give me everything that relates to the ten paragraphs

8  of the motion.

9       And I joined the other defendant's motions, and we

08:15 10  have a separate motion, and I know Mr. -- Mr. Kelly filed the

11  supplement to that dealing with consensual recordings.  And I

12  haven't heard, whether it's Ms. Wright or Ms. Kearney, address

13  whether in the government discussions about the subject --

14  productions, whether they intend to moot that motion which

15  asked for all of the non-produced consensual.  But I know we're

16  very interested in that in light of the Singer iPhone notes and

17  particularly interested in the consensual recordings because

18  they were being automatically recorded by Singer's phone when

19  he spoke to government agents, when he spoke to other parents,

08:16 20  the entire range of calls on his phone while he was working for

21  the government and while he at least subjectively believed that

22  the government was yelling at him, certainly making him

23  promises, and he was certainly highly motivated during this

24  entire time period to be as valuable a witness as he could.

25       So we believe that that motion, unless the government

1  is going to agree to produce all of the consensuals that began

2  when he began his cooperation and presumably ended upon the

3  disclosure of the indictment shortly after March 5, that motion

4  remains viable and remains very important to us and even more

5  important in light of the most recent production of exculpatory

6  evidence in Singer's notes.

7       MS. WRIGHT:  We do plan to produce all non-pertinent

8  consensual recordings.

9       MR. KELLY:  Okay.  And not to put too fine a point on

08:17 10  it, but we just filed this yesterday, so I'm sure the court has

11  had a blizzard of motions.  But we are -- we also are very

12  interested in the consensually recorded that may have been

13  designated not pertinent, the handwritten notes that were

14  released recently by Singer, where he talked about having a

15  loud, abrasive call with an agent.  And we think it's an IRS

16  agent.  We think that tape exists.  We don't have it.  We think

17  it's core Brady if this agent is telling him to lie about what

18  he actually believes, and that's the inference we're drawing.

19       Now, if that's one of the tapes that is -- they have

08:18 20  and they haven't produced it, we do in fact want it.  But we

21  get back to our original request, and when we asked for that,

22  we also asked, again, as yesterday's motion is probably

23  premature to reference the court, but there is a lot of

24  iMessages that have been deleted.  And we have asked for that,

25  and we attached that as an exhibit to our motion yesterday as

1    the type of things we're looking for from Singer's phone.  It

2    looks like all this stuff has been deleted.

3         So if they have it, we want it, and we think it is

4    Brady, and we would say that, at least with respect to our

5    motion, it's not moot because we haven't got the reports on the

6    two issues that we initially flagged, i.e., what do they have

7    about this side deal on the so-called side door between Singer

8    and Heinel.  Because it happened months after my client's kid

9    got into the school, so he could not have known about it.

08:19 10         And secondly, what do they have between communications

11    and our client about this being a donation to a school, not a

12    person, because that's where we think it affects his mental

13    intent, therefore it reflects his innocence, and it is Brady.

14    So whatever the logistical hurdles are, the rules are the

15    rules.  They get applied very stringently to our clients, and

16    they get applied stringently to the defense.  It should also be

17    applied to the government, that if it's Brady, we should have

18    had it months ago.

19         THE COURT:  Okay.  So --

08:19 20         MR. WEINBERG:  If I can -- if I can add just one

21    thing.

22         THE COURT:  Yes, go right ahead.

23         MR. WEINBERG:  We do, really do urge the government

24    to, you know, with a witness like Singer, get to the bottom of

25    what he remembers saying to our clients because much of what he

1  said was before the Title IIIs issued by Judge Burroughs.

2  Again, our clients take the position -- and I'd have to waive

3  the attorney-client privilege to say exactly why -- that they

4  understood that the funds that they were providing either

5  directly to the school or to the school through Singer were

6  going to programs that needed funds, programs approved by

7  U.S.C.

8        And the notes that were recently produced seem to

9  reinforce the view that Singer talked to them and bring his

08:20 10  financial request in terms of donations, goes to, you know, two

11  or three different essential elements in this case.  One is,

12  objectively was there a donation in good faith that's

13  non-fraudulent and not a bribe or was there not, and what did

14  the defendants believe.  Did they have intent?  What did

15  Singer, who they trusted, put in her heads as the justification

16  for seeking funds and seeking payments to the school?

17        These are primary issues and we really ought to, at

18  this point with a trial date and the case has now been indicted

19  for, you know, about 11 months, know exactly what Singer is

08:21 20  telling the government about what he told our clients about

21  what the purpose of the payments were.  And that's why we've

22  pushed these <u>Brady</u> motions so hard, Your Honor.

23        THE COURT:  Okay.  Yes.

24        MS. WRIGHT:  If I just may really briefly, Your Honor.

25  First of all, we agree that now we have a trial date, we are

**A300**

 1  going to produce the 302s.  But we have provided defense

 2  counsel with summaries of Singer's statements on the exact

 3  topics that defense counsel is now addressing.

 4      Just two brief things.  First, the phone, we're going

 5  to provide a full extract of Rick Singer's iPhone in very short

 6  order, so I hope that that would address the concerns raised by

 7  Mr. Kelly.  The only other thing I'll say is that with respect

 8  to the non-pertinent consensual recordings, my understanding,

 9  and I need to verify this, but that would not include

08:22 10  discussions between Rick Singer and government agents.

11      THE COURT:  Okay.

12      MR. KELLY:  Well --

13      THE COURT:  So let me just say a couple of things.

14  First of all, you know, I have read all the motions, at least

15  the ones that are ripe, of which there are many.  We had to do

16  a long -- a big chart of them recently.  But I don't think the

17  sum and substance summaries are sufficient.  And one of the

18  reasons it's taken me so long to work through these motions is

19  I've been looking through the ex parte materials I have to try

08:23 20  to pinpoint precisely where the sum and substance comments are

21  coming from.

22      But I will just say this by way of illustration.  With

23  regard to Mr. Abdelaziz, the 302s of Rick Singer, especially if

24  you look at FD-1023 -- and obviously the defendants don't have

25  this, but the government will know what I'm talking about --

1    page 1 of 5, it's dated 11/9/2018, on the second page there is

2    a paragraph that kind of talks -- well, it talks about when

3    Heinel specifically was corrupted by Rick Singer.  And if you

4    just look at the paragraph that begins with the sentence, "At

5    the beginning, Heinel was not personally taking her share of

6    the money," the suggestion there is that she wasn't being

7    bribed at first in her relationship with him.  If she's taking

8    money for an account over which she has control, which, I know

9    the government says that's a bribe, you still have to prove

08:24 10    that the school was not in on that.

11            And I know that the government -- I've also reviewed

12    the 302s with U.S.C., and I know that the higher-ups are

13    saying, "We never did that," and the lower-downs are saying,

14    "We might have."  So I think it's -- and I'll just tell you

15    from other material I've seen ex parte in the case, it is a

16    viable assertion that U.S.C. had a practice of its admissions,

17    of its athletics department admitting kids in exchange for

18    donations who were -- as athletic walk-ons.  And there's an

19    email that I think has been widely circulated where a parent

08:25 20    asks an administrator, "What about the preferred walk-on spot?

21    Could my daughter have that?"  So that's something that people

22    were being told was a possibility to get their kids in.

23            So if that is a viable line of defense, then when

24    precisely Heinel agreed with Singer to start taking money

25    personally is highly relevant because you're going to say, Oh,

**A302**

it's a bribe legally if she has money going into accounts she

controlled.  That's going to be something for the jury to

decide.  It's not de facto a bribe.  The school has to be

ignorant of that, and one might well ask, How could the school

have been ignorant of that?  Like, how did admissions work?

So I think it's going to be very important to

demonstrate or to -- excuse me -- to produce the 302s that

explain precisely when Heinel started taking money personally.

And the interesting thing here is, in this 302 I'm looking at,

08:28 there is -- actually, I think it's a typo, it says, "In late

fall or spring 2017."  I've never heard anyone use that phrase,

the late fall or spring of one year.  So I don't know if that

means late fall of 2016 or spring 2017, but it just seems like

a very blurry, odd way of pinning someone down on the time.

And frankly, the fact that in this 302 the government

isn't trying to pin him down on the time and ask him any

further questions about it I think is exculpatory.  Because if

you can't prove that Heinel was corrupted when she was just

taking money for the accounts at the school, then this would be

08:30 your fallback, and you're -- it's very, very vague here.  So I

think Abdelaziz should get what he's asking for in this motion.

I think it's relevant, and it's exculpatory.

I mean, you -- I just think the government is kind of

stuck on this theory that, if the money is going into an

account for the school in exchange for Heinel advocating for a

**A303**

1    student, then the defendants are guilty.

2         Number one, you do have to show they knew that was

3    happening; and, number two, you have to show the school wasn't

4    okay with that.  Right?

5         MS. WRIGHT:  Yeah, yes, Your Honor.  And we intend to

6    prove that.  I will just note, as Your Honor mentioned, clearly

7    our theory is that the payments to the programs that Heinel was

8    accepting without letting admissions know that she was doing

9    that in exchange for not only advocating but essentially

08:31 10   insuring these kids' admission to the university, that these

11   are bribes.

12        But I just also note with respect to the timing, when

13   she started to take money personally, what Mr. Singer had to

14   say about that is not the only source of evidence on that

15   point, and there are bank records that make it very clear when

16   she started to accept money personally, and the defendants have

17   all of that information.

18        THE COURT:  So you're showing -- you're saying that

19   when a bank -- when she starts getting the $20,000 a month,

08:31 20   that's exactly when her agreement with Singer was solidified.

21        MS. WRIGHT:  The agreement for her to start taking

22   money personally?

23        THE COURT:  So I think you're also overlooking the

24   possibility that Singer didn't understand the admissions

25   process at U.S.C.  So the fact that Singer thinks something's

1    amiss when he first starts working -- you know, when he first

2    starts working -- also you -- there's information here about

3    how Pat Haden is welcoming him as a fundraiser.  What does that

4    mean?

5         So there's just -- also, I just find -- I started

6    going through here.  I think there are other categories of

7    information, such as Singer's truthfulness, that are really

8    important because I think he was lying to a lot of the parents,

9    and I do think that's relevant.  Some of them may have figured

08:33 10   that out.  And whether he was telling someone the truth about

11   something or not I think, and whether he's a pathological liar,

12   is going to kind of permeate the whole case.  And I think the

13   defendants are entitled to know if he's truthful.

14        Yes, Mr. Kelly.

15        MR. KELLY:  We just had two things.  First of all,

16   just because -- we understand the government has a somewhat

17   novel theory of a guilty bribe, but that doesn't mean it's not

18   Brady for our client's purposes.  Like most people in America,

19   he's going to think a bribe is money going to a person, not a

08:33 20   donation to a school that he wants his kid to go to.

21        THE COURT:  Sure.  But if you look at Skilling and

22   they use that mayor example, you could take a bribe from

23   someone and actually enrich the school, and it could still be a

24   bribe.  It's kind of like why I think Mr. Vandemoer was guilty.

25   Because he's taking money and admitting students sort of on the

side, even though the money is going to the program, the school

doesn't have its imprimatur on his running his own mini

admissions program.

MR. KELLY:  Your Honor, my client has no idea who

Donna Heinel was.

THE COURT:  Sure.  No.  I get that.  So I think the

problem with the government's theories is -- it's not a

Vandemoer situation because you've got -- it's once removed

because you've got these parents paying Singer, who is paying

the coach or the administrator, and that makes things very

complicated as far as the parents' intent and what the parents

understand is going on.

MR. KELLY:  Right.  Money is given to schools all the

time, to the athletic department, particular school program.

And does it help kids get in?  Yes.  It's not a bribe.  People

don't like it, but it happens all the time that money is given

to a school.  Does that give people an advantage?  Yes, but

that's not --

THE COURT:  Sure.

MR. KELLY:  -- a bribe in this context.

THE COURT:  And I think, for example -- yeah --

MR. KELLY:  And I think in Skilling, the mayor there

was getting money for himself.  So the money for herself,

Heinel, doesn't occur until later, according to them, according

to the evidence.  That's further reason why Skilling doesn't

1   save them with their theory.

2        THE COURT:  Sure, but I think you can have a kind of

3   business or personal interest.  It doesn't have to be money in

4   your pocket.  It could be something less tangible that helps

5   your interests.  So I do think, if the school doesn't know

6   about it and the parent does know about it, Donna Heinel's

7   allegedly taking money for an account at the school that she

8   has control over and it somehow burnishes her prestige or she

9   gets to direct it somewhere or other to her professional

09:44 10  benefit would be a bribe, but the parent has to know she's

11  doing that, and the school cannot be condoning it.

12       MR. KELLY:  Okay.  One more point, Your Honor.  This

13  is a little off-topic, but it's a preview, and I want to give

14  the government a heads-up because we're going to ask for it and

15  maybe they can factor this into their ongoing or soon-to-be

16  productions, is that in light of Judge Sorokin's recent ruling

17  on his case involving 302s and how they've been changed with

18  interaction between the agent and the AUSAs, we're going to

19  seek any drafts of these 302s that may have been changed by

09:45 20  interactions with the agents and the AUSAs on the case.

21       So we think that based on Judge Sorokin -- I don't

22  know if that occurred here, but certainly Judge Sorokin's

23  opinion suggests that's what's going on.  So not only do we

24  want the 302s and/or IRS reports, we want to know if those

25  things were altered to fit the charges here.

1          THE COURT:  Okay.  So --

2          MR. WEINBERG:  Judge, if I heard the government

3     correctly, they're planning on producing the consensual call

4     tapes that had not previously been produced but are carving out

5     tapes between Singer and law enforcement.  And I would just say

6     that I think at least some of the calls between Singer and law

7     enforcement are exculpatory and non-privileged, particularly

8     the ones between the start of this cooperation and October 2

9     when he was saying, Just had a call with agents and they're

09:46 10    asking me to tell a fib and essentially saying to say that they

11    want it to be a payment when I'm telling them it was a donation

12    to a program.  And they say that one agent, at least, is urging

13    him to bend the truth, which is what they asked me not to do

14    when I was talking or working with other agents and Eric Rosen

15    and I assume the rest of the prosecutors.

16         And this is the cornerstone issue that goes to intent,

17    which is, Singer is saying it was a donation to programs, and

18    he says, Liz raised her voice.  They want me to tell that Liz

19    had raised her voice to me like she did in the hotel room about

09:47 20    agreeing with her that everyone bribed the school.

21         And today we just talked about the cornerstone issue,

22    which is the government is calling a bribe what the defense

23    calls a donation to a program.  And what the defense is saying,

24    Judge, they were told by Singer, We're going to give donations

25    to programs.  And it goes to both the subjective element and

1    the underlying reality of what the payment was for.

2         And Your Honor has seen through the 17C litigation

3    that, to put it mildly, U.S.C. welcomed donations, and

4    admissions did not bar itself or wall itself off from being

5    affected by development and wanting donations.  And it's -- you

6    know, I get the government's allegation that these payments are

7    not proper, but we should be receiving consensual calls during

8    this 9/21 or 9/22 to 10/2 period because, according to what

9    Singer wrote into the iPhone and what the government provided

09:49 10    to us, he is having a dispute with at least one of the agents

11    in being asked to adopt scripts in these consensual calls that

12    do not conform to what he, Singer, is saying to the government

13    he was telling the parents, which is these were donations to

14    programs and not bribes.

15         And so I get that the government does not want to

16    produce calls between their witness and government agents, but

17    I think, given Singer's notes that were produced the other day,

18    we can make a particularized showing that these consensual

19    calls with the government agents where they were discussing

09:50 20    these subjects are exculpatory and are producible.

21         THE COURT:  Okay.  So I think the takeaway here is,

22    from me, that sort of -- unfortunately, I know about

23    Mr. Frank's loss.  I'm very sorry about that.  But I do think

24    time is of the essence here.  And secondly, I would really just

25    urge the government in this very high-profile case with a very

1  difficult key player, I don't know if he's going to be the

2  government's witness or not, but regardless, the cat is out of

3  the bag, and he's -- this is a very complicated situation and

4  it's ugly.

5       So I just -- I would really urge the government to be

6  as transparent as possible.  This is not a time to hold your

7  cards close to your vest or hold back information or try to get

8  any kind of strategic advantage from the timing of discovery.

9  I would just disclose whatever you can bring yourself to at

09:51 10  this stage, but I would really be liberal about what I'm

11  disclosing because all that's going to happen is we're going to

12  have another very intense round of motions, whatever you don't

13  turn over.  And I can just tell you, I'm inclined to release

14  materials, just given the atmospherics here and what's

15  happening.

16       So I think what I'm going to do is just give everyone

17  some breathing space.  Why don't we take Monday, and I'll let

18  the government talk among themselves and talk to counsel, and

19  then maybe by the close of business Tuesday you can just give

09:52 20  Ms. Belmont an update, it doesn't have to be something formal,

21  but letting us know what is still in dispute.  And then I

22  really don't want another big batch of filings.  We don't

23  really have time for that.  We'll just try to schedule a

24  hearing for later in the week.  But I do think the government

25  should be geared up to get things out quickly because I think

```
 1   that's the only way to deal with Judge Gorton's schedule and
 2   then just let everyone get ready for trial.  Yes?
 3          MR. KELLY:  One final point, and I agree Judge
 4   Gorton's schedule is daunting so we do want these materials as
 5   soon as possible.  I think what I just heard, though, I agree
 6   with Mr. Weinberg that we need the tapes of Singer with the
 7   agent as the subject of these notes.  I think I heard the
 8   government say they don't exist, these tapes.  But if that's
 9   true, then he must have been using a different phone.  And if
10   he was using a different phone and it wasn't recorded, we'd
11   like to know that.  Because otherwise they should have the tape
12   of this so-called call where he was allegedly told to lie.
13          THE COURT:  Okay.  So this is something new, but I'm
14   going to let you talk to the government about that.  And I will
15   just say to the government I do find there's some exculpatory
16   information in the 302s pertaining to the U.S.C. witnesses as
17   well, so that should be checked and produced if you can at this
18   time.  Okay?
19          All right.  Anything else now?  Mr. Weinberg, thanks
20   for appearing.
21          MR. WEINBERG:  Thank you, Your Honor, for allowing me
22   to appear by phone.  Have a nice weekend.
23          THE COURT:  Sure.  Thanks, everyone, for assembling so
24   quickly.  So anything else?
25          MS. WRIGHT:  No.
```

09:53 (line 10)
09:53 (line 20)

1          MR. KELLY:  No, Your Honor.

2          THE COURT:  Okay.  Good luck, everyone.

3                    _ _ _ _ _

4

5              CERTIFICATE OF OFFICIAL REPORTER

6          I, Kelly Mortellite, Registered Merit Reporter

7     and Certified Realtime Reporter, in and for the United States

8     District Court for the District of Massachusetts, do hereby

9     certify that the foregoing transcript is a true and correct

10    transcript of the stenographically reported proceedings held in

11    the above-entitled matter to the best of my skill and ability.

12              Dated this 1st day of March, 2020.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

10:33 20

21

22

23

24

25

# EXHIBIT I



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

February 26, 2020

VIA E-MAIL
Counsel of Record

      Re:     College Admissions Cases

Dear Counsel:

     Enclosed at Bates numbers SINGER-PHONE-000495-000803 please find copies of the "Notes" from William "Rick" Singer's iPhone. These copies include numerous duplicates, because they were extracted from the phone over multiple dates during Singer's proactive cooperation, but we are producing them to you in their entirety.[1]

     During the investigation, members of the prosecution team learned that Singer had taken notes on his iPhone about his interactions with the government. Specifically, on or about October 28, 2018, members of the team saw all or part of the first four paragraphs under the entry for October 2, 2018, and the entry on October 6, 2018 (SINGER-PHONE-000536). At that time, the government believed the notes were privileged and did not review them further. In August 2019, the government initiated a privilege review process. This week, Singer's counsel agreed to waive privilege over the notes, and so we are now producing them.

     We intend to disclose the remaining iPhone content shortly, once the privilege review is complete.

---

[1] The extractions occurred on or about October 5, 2018, October 23, 2018, November 1, 2018, November 29, 2018, January 3, 2019, February 15, 2019, February 28, 2019, and March 11, 2019.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:    */s Eric S. Rosen*_____
       Eric S. Rosen
       Justin D. O'Connell
       Kirsten A. Kearney
       Leslie A. Wright
       Assistant U.S. Attorneys

cc:    The Hon. M. Page Kelley
      U.S. Magistrate Judge

# EXHIBIT S

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---------|-------------------------------------------------------------|---------------------|

| HEADER | |
|--------|--|
| **Source ID:** | ▇▇▇▇▇ |
| **Date:** | 11/08/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| SOURCE REPORTING | |
|------------------|--|

**Date of Contact:** 10/31/2018

**List all present including yourself (do not include the CHS):**
SA Laura Smith
SA Elizabeth Keating
SA Kaitlyn Cedrone
AUSA Eric Rosen
AUSA Justin O'Connell
Don Heller, Attny for CHS

**Type of Contact:**    In Person

     **Country:**    UNITED STATES

     **City:**    Boston

     **State:**    Massachusetts

**Date of Report:**    11/08/2018

**Substantive Case File Number**

▇▇▇▇▇▇▇▇

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed at the United States Attorney's Office in Santa Ana, California. Present during the interview were FBI Special Agents Laura Smith and Kaitlyn Cedrone, IRS Special Agent, Elizabeth Keating, and Assistant United States Attorneys Eric Rosen and Justin O'Connell. Also present during the interview was CHS's attorney, Don Heller. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:



| FD-1023 | Page 1 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|----------------------------------|

SINGER-REPORTS-000033

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|

ABDELAZIZ- CHS was unsure how s/he met GAMAL ABDELAZIZ (ABDELAZIZ) but recalled ABDELAZIZ called CHS regarding his son, ███████ ABDELAZIZ ███████. CHS flew to their house. ███████ was a phenomenal student but ███ played basketball at ███████ in Nevada. ███████ also played on the ███████ for one week. CHS worked with ███████ legitimately got into Columbia by himself. At the same time, ███████ sister, ABDELAZIZ ███████, was applying to schools. ABDELAZIZ had connections at USC. ███████ applied to USC but was denied. ███ ended up going to ███████. ABDELAZIZ called CHS because he should have done the side door at USC with ███. ABDELAZIZ knew it would have cost $250,000 for the side-door at USC. ABDELAZIZ worked for Steve Wynn and transferred to China to open a hotel. ███████ ABDELAZIZ ███ did poorly in school in China. ABDELAZIZ called CHS saying ███████ was doing summers at USC. ABDELAZIZ promised ███████ h/she'd get USC done for her because of the sacrifice she made in moving to China. ███████ played basketball but CHS made her a better basketball player. ███████ was not a Division 1 basketball player. CHS told ABDELAZIZ USC would be $300,000. CHS charged $300,000 for ███████ because CHS knew s/he had to give DONNA HEINEL (HEINEL) more money because ███████ would be a difficult (less strong) student for HEINEL to get through. HEINEL, or the program received approximately $200,000 of the $300,000. Someone at USC, who was from China, was a member of the sub-committee that reviewed student athletes presented by HEINEL. This Chinese person said ███████ went to a tough school in China. HEINEL had to explain ███████ profile to the sub-committee. ABDELAZIZ knew ███████ was not strong enough to be recruited by USC. ABDELAZIZ knew there was an exchange of money to someone/USC to get ███████ into USC. HEINEL diverted some of the money to a particular part of USC. ABDELAZIZ did not know about HEINEL specifically, but knew someone at USC was pulling strings. The money from ABDELAZIZ went to KWF and then went to USC program, which was directed to a specific area. The mom never talked with CHS. Both parents knew the money was going to the school, not KWF.

HEINEL- HEINEL knew the players CHS brought her were not recruitable athletes at USC. CHS had not told HEINEL they were not strong players. HEINEL knew CHS was producing profiles. There was an implicit understanding that they were not strong enough athletes to play for USC. HEINEL knew the profiles were created to look like the student athletes can play at USC. HEINEL told CHS not to send money to USC from KWF because the payments could be flagged.

███████ CHS did not recall how s/he met ███████ played lacrosse at ███████ and was not getting along with the kids at school and wanted to transfer. CHS recommended ███████ transfer to Georgetown and CHS made him a tennis and lacrosse player. ███████ was a good lacrosse player. CHS did not believe ███████ played tennis. The ███████ went to CHS' home because they bought a home nearby. ███████ and GORDIE ERNST (ERNST) have since become friends. ███████ did not know the money was going to ERNST; he believed it was going to the Georgetown tennis program. ███████ knew ███████ did not play tennis. ███████ knew he was getting into Georgetown through the tennis program.

| FD-1023 | Page 2 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000034

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---|---|---|
| | CHS REPORTING DOCUMENT | |

BIZZAK- JEFF BIZZAK (BIZZAK) was the father to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CHS met BIZZAK and through ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). ▮▮▮▮ was on BIZZAK's Board- Surf League. CHS met ▮▮▮ and his mother in California. CHS did not meet BIZZAK. ▮▮▮▮▮▮ was a great athlete; he was a surfer, volleyball player (both indoor and sand), and a water polo player. ▮▮▮▮ was a setter in volleyball. BIZZAK's big thing was to get ▮▮▮ to work harder. ▮▮▮ did do better in school. BIZZAK and CHS had a conversation regarding USC. USC called BIZZAK a lot because of the wave technology BIZZAK had developed. BIZZAK did not want ▮▮▮▮ to know that he got into USC through friends at USC. CHS suggested using water polo or volleyball to get ▮▮▮ into USC. CHS had both a water polo and volleyball profile created for ▮▮▮ which CHS sent to HEINEL. Most of the information on ▮▮▮ athletic profile was real. Even though ▮▮▮ was a good volleyball player, he was not good enough to be recruited by USC. CHS got ▮▮▮ into USC early. ▮▮▮ was not told he got into USC through the side door until he received his acceptance letter. The reason they did not tell ▮▮▮ about the side door was because his parents wanted him to continue working hard in school. ▮▮▮ did his own tests; they were not taken by RIDDELL. BIZZAK knew ▮▮▮ was getting into USC through athletics. ▮▮▮▮ parents did not review ▮▮▮ athletic profile, CHS just sent it to USC. The BIZZAK's discussed Georgetown as another option for ▮▮▮ but ▮▮▮ wanted to be near water. ▮▮▮ was involved in USC; he helped build surf technology at the school.

| FD-1023 | Page 3 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

A319

SINGER-REPORTS-000035

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** | OFFICIAL RECORD |
|---------|-------------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT               |                 |

| FD-1023 | Page 4 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

UNCLASSIFIED

A320

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|-------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT        |                 |

**Synopsis:**
CHS proffer- Day 4

| FD-1023 | Page 5 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

SINGER-REPORTS-000037

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| SIGNATURE | | |
|---|---|---|

Submitted By            **LCSMITH (undefined undefined)**                    **Mon, 31 Dec 2018 09:20:28 -0500**

First Level Approved By   **JPKEELAN (John Keelan)**                         **Wed, 2 Jan 2019 16:50:48 -0500**

| FD-1023 | Page 6 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

A322

SINGER-REPORTS-000038

# EXHIBIT GG



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 13, 2020

**SENT VIA E-MAIL AND FEDERAL EXPRESS**
Counsel of Record

   Re: *United States v. David Sidoo, et al.*
      Case No. 19-cr-10080-NMG[1]

Dear Counsel:

   Enclosed please find the following discovery materials, produced pursuant to the agreed-upon protective order:

1. A DVD containing a SecureZIP file titled VB-DISCOVERY016.zip. The password to access the zip file is ▮▮▮▮▮▮▮ Instructions regarding how to extract the contents of the zip file are contained on the DVD and are also set forth in our prior production letters. Also enclosed with this letter is an index listing the records contained in the zip file, which are Bates-stamped VB-RECORDS-00501313 – VB-RECORDS-00706147. These records are primarily e-mails obtained recently from Defendant Mikaela Sanford.

2. One thumb drive containing the following records:[2]

  • Pen register data for Singer's phones with phone numbers ending in 0584, 8802, and 5816. Additional information regarding these phones is set forth below;

  • Proffer agreements with Singer and others;

---

  [1] The government will provide the defendants in *United States v. Ernst, et al.*, No. 19-cr-10081- IT, with the same discovery as that being provided here.

  [2] Some of the records contained on this thumb drive have not yet been Bates-stamped. The government will soon Bates-stamp these documents, create indexes, and send replacement discovery.

- Title III and consensual recordings not previously produced, including a recorded call between Singer and government agents;

- Text messages from Mikaela Sanford's phone;

- Consent to search forms signed by Singer;

- Reports regarding agents' contacts with Singer during the investigation;

- The contents of Singer's Google Drive accounts;

- Handwritten notes created by Singer during the investigation, including written "scripts" that Singer used during calls with defendants and others;[3]

- Records related to expense reimbursement requests made by Singer during the investigation;

- Text message screenshots sent from Singer to agents during the investigation;

- A video and related documentation concerning Morrie Tobin and Rudy Meredith;

- FBI and IRS interview reports and associated agent notes;[4]

- Ping data for Singer's phone with phone number ending in 8802;

- QuickBooks files for The Key Worldwide Foundation and The Key. Please note that these files are being produced in native format and require QuickBooks 2019;[5] and,

- An image of Singer's flip phone with phone number ending in 5816.

3. A second thumb drive containing a native image of Singer's laptop, which was seized on or about November 23, 2018. The government is currently copying this laptop, and

---

[3] Investigators are working with Singer to determine whether he has any other handwritten notes.

[4] Any missing agent notes will be supplemented in later productions as the notes are obtained from the agents.

[5] The government was only recently able to access the QuickBooks files provided with this discovery.

2

**A325**

will produce the image as soon as the copying is complete.[6] Please note that we intend to produce a processed, Bates-stamped version of the laptop data at a later date.

In addition, as referenced in our March 3, 2020 discovery letter, below please find information regarding phones used by Singer during the investigation:

**iPhone 7+**
**Serial** 
**IMEI**
**Phone Number** ████████ 8802

This telephone was intercepted pursuant to a court-ordered wiretap between June 5, 2018 and September 29, 2018. Between September 27, 2018 and March 11, 2019, calls made to and from this telephone were consensually recorded. Additionally, there was a pen register on this phone for the period April 18, 2018 to October 7, 2018. Local extractions of this telephone were made on or about the following dates: October 5, 2018, October 29, 2018, November 1, 2018, November 29, 2018, November 30, 2018, January 16, 2019, February 15, 2019, February 28, 2019 and March 11, 2019. All of these extraction reports have already been produced.

This telephone remained in Singer's possession until May 2019. In May 2019, Singer exchanged the telephone for a new iPhone XR, Serial ████████████ IMEI ████████████ When the phone was replaced, data from the original phone was transferred to the new phone.

The new 8802 phone remained in Singer's possession until Friday, March 6, 2020. At this time, Singer sent the phone, via FedEx, to agents at the FBI's office in Chelsea, MA. Agents took possession of the phone on Monday, March 9, 2020. On or about March 9, 2020, the FBI requested the phone be extracted using "GreyKey," in an attempt to recover deleted text messages. In the event the text messages are recovered, the government will review and produce them as appropriate.

**Motorola ZTE Z233V Cymbal**
**Phone Number** ██████ 5816

Agents provided Singer with this flip phone on September 21, 2018. The purpose of the phone was for Singer to use it to call agents and his counsel. This phone was not recorded. Singer ceased using this phone in October 2018 and returned it to agents on or about October 23, 2018. Agents conducted an extraction of this phone on March 4, 2020, and this extraction report is being provided herewith.

---

[6] Certain potentially privileged documents have been excluded from the image subject to a privilege review.

**LG-M150**
**Android ID** 
**IMEI**
**Phone Number** 5704

At the inception of Singer's cooperation, Singer's attorney instructed Singer to purchase this telephone for communications with his attorney and Singer's family. Singer purchased this phone on or about September 24, 2018, and used it until on or about October 18, 2018. Singer never used this phone to communicate with agents. This phone was not recorded.

Agents in California seized this telephone from Singer between October 31, 2018 and November 1, 2018, and it has been in the government's possession since that time. Agents conducted a logical extraction of this telephone on or about November 7, 2018, and the government has previously produced the extraction.

**iPhone 8+**
**Serial #** 
**IMEI**
**Phone Number** 0584

After Singer turned in the 5816 and 5704 phones, he purchased this telephone in October 2018 for communications with agents and with his counsel. This phone was not recorded. There was a pen register on this phone for the period October 12, 2018 through April 11, 2019, and that pen register data is being provided herewith. This phone is currently in Singer's possession and he uses this as his personal phone.

**Landline**
**Phone number** 8802

There was a pen register for this phone for the period May 4, 2018 through July 3, 2018. The pen register data is being provided herewith.

\*        \*        \*

4

A327

The government recognizes its ongoing discovery obligations and will continue to produce additional discovery as required. If you have any questions regarding the materials enclosed, or those that are forthcoming, please contact us at your earliest convenience. **Finally, if you intend to attach agent reports to filings, please redact all personal identifiers on the reports.**

Sincerely,
ANDREW E. LELLING
United States Attorney

By:    */s/ Eric S. Rosen*
Eric S. Rosen
Justin D. O'Connell
Kristen A. Kearney
Leslie A. Wright
Karin M. Bell
Stephen E. Frank
Assistant U.S. Attorneys

5

**A328**

# EXHIBIT MM

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, _Fin_ _____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

_Iphone 7⁺ serial# ▓▓▓▓▓ HFYK_
CPU Make, Model & Serial Number (if available)

_IMEI ▓▓▓▓▓8088_
Storage or Retrieval Media, Computer Peripherals

_____

_____

and located at _____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _____.

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

_01/03/2019_
Date

_01/03/2019_
Date

_Fin_
Signature

_Kaitlyn Cedrone_
Signature of Witness

_Kaitlyn Cedrone_
Printed Full Name of Witness

_Boston, MA_
Location

SINGER-VOL002-000346

This is to certify that on ___01/03/2019___ at _Residence Inn,_
_Chelsea, MA_

Special Agents of the Federal Bureau of Investigation, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that ~~nothing~~ was removed from my custody by those Agents.

_only iphone_
_7+_

(Signed) _____

Witnessed: _____

Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

_Kaitlyn Cedrone_
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

**A331**

G2O U.S.GOVERNMENT PRINTING OFFICE: 2015-391-063

FD-597 (Rev. 4-13-2015)

Page __1__ of __1__

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date) _01/03/2019_

item (s) listed below were:
- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) __Fin__

(Street Address) _____

(City) _____

Description of Item (s): __Iphone 7 +__

serial # _____ HFYK

IMEI _____ 8088

01/03/19
KC

Received By: _Kaitlyn Cedrone_
(Signature)

Printed Name/Title: Kaitlyn Cedrone

Received From: _Fin_
(Signature)

Printed Name/Title: FiN

SINGER-VOL002-000348

G.P.O. U.S. GOVERNMENT PRINTING OFFICE: 2015-391-063

FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▇▇▇▇▇▇▇▇

On (date) 01/03/2019

item (s) listed below were:
- [ ] Collected/Seized
- [ ] Received From
- [✓] Returned To
- [ ] Released To

(Name) Firr

(Street Address)

(City)

Description of Item (s): Iphone 7+
serial # ▇▇▇▇▇ HFYK
IMEI ▇▇▇▇▇▇ 8088

01/03/2019
KC

Received By: _Fw_ (Signature)

Printed Name/Title: FiN

Received From: _Kaitlyn Cedrone_ (Signature)

Printed Name/Title: Kaitlyn Cedrone
Special Agent

A333

SINGER-VOL002-000349

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, _Fin_ _____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

_Iphone 7+ imei_ ▉▉▉▉▉▉ _8088_
CPU Make, Model & Serial Number (if available)

_serial #_ ▉▉▉▉▉ _HFYK_
Storage or Retrieval Media, Computer Peripherals

_____

and located at _Residence Inn, Chelsea, MA_ _____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _0918_ .

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

_2/15/19_
Date

_02/15/2019_
Date

_Fin_
Signature

_Kaitlyn Cedrone_
Signature of Witness

_Kaitlyn Cedrone_
Printed Full Name of Witness

_Chelsea, MA_
Location

A334

This is to certify that on 02/15/2019          at Residence Inn Chelsea, MA

Special Agents of the Federal Bureau of Investigation, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that ~~nothing~~ was removed from my custody by those Agents.

only iphone 7+

(Signed) _Jim_

_Kaitlyn Cedrone_
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Witnessed: "

_Laura Sittos_
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

**A335**

SINGER-VOL002-000351

**GPO** U.S. GOVERNMENT PRINTING OFFICE: 2015-391-063

FD-597 (Rev. 4-13-2015)                                                                Page ___1___ of ___1___

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

On (date) _02/15/2019_

item (s) listed below were:
- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) _Fin_

(Street Address) _____

(City) _____

Description of Item (s): _Iphone 7+_
_Imei ▓▓▓▓▓ 88088_
_Serial # ▓▓▓▓▓ HFYK_

KC
02/15/2019

Received By: _Kaitlyn Cedrone_        Received From: _Fin_
(Signature)                                      (Signature)

Printed Name/Title: _Kaitlyn Cedrone_   Printed Name/Title: _Fin_
_Special Agent_

**A336**

**SINGER-VOL002-000352**

G2O U.S.GOVERNMENT PRINTING OFFICE: 2015-391-063

FD-597 (Rev. 4-13-2015)

Page __1__ of __1__

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▇▇▇▇▇▇▇▇▇

On (date) __02/15/2019__

item (s) listed below were:
- ☐ Collected/Seized
- ☐ Received From
- ☑ Returned To
- ☐ Released To

(Name) __Fin__

(Street Address) _____

(City) _____

Description of Item (s): Iphone 7+
Imei ▇▇▇▇▇▇▇ 8088
Serial # ▇▇▇▇▇▇▇ HFYK

KC
02/15/2019

Received By: __Fin__ (Signature)

Printed Name/Title: __Fin__

Received From: __Kaitlyn Cedrone__ (Signature)

Printed Name/Title: __Kaitlyn Cedrone Special Agent__

SINGER-VOL002-000353

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, __Fin_____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

__Iphone 7+, Imei▮▮▮▮▮8088_____
CPU Make, Model & Serial Number (if available)

__Serial #▮▮▮▮ HFYK_____
Storage or Retrieval Media, Computer Peripherals

_____

_____

and located at __Residence Inn, Chelsea, MA_____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _____.

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

__2/28/2019__
Date

__02/28/2019__
Date

__Fin__
Signature

__Kaitlyn Cedrone__
Signature of Witness

__Kaitlyn Cedrone__
Printed Full Name of Witness

__Chelsea, MA__
Location

SINGER-VOL002-000354

This is to certify that on ___02/28/2019___ at __9:30 am__

Special Agents of the Federal Bureau of Investigation, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that nothing was removed from my custody by those Agents.

Iphone 7+

(Signed) _____Jim_____

Witnessed: ___

_____Kaitlyn Cedrone_____
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

_____Laurie Stubbs_____
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

**A339**

SINGER-VOL002-000355

U.S. GOVERNMENT PRINTING OFFICE: 2015-391-063

FD-597 (Rev. 4-13-2015)

Page __1__ of __1__

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date) __02/28/2019__

item (s) listed below were:
- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) __Fin__

(Street Address) _____

(City) _____

Description of Item (s): __Iphone 7+__

__Imei_____8088__

__Serial #_____HFYK__

KC
02/28/2019

**Received By:** _Kaitlyn Cedrone_
(Signature)

**Printed Name/Title:** _Kaitlyn Cedrone_
Special Agent

**Received From:** _Jim_
(Signature)

**Printed Name/Title:** _Fin_

SINGER-VOL002-000356

FD-597 (Rev. 4-13-2015)

Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

On (date) __02/28/2019__

item (s) listed below were:
☐ Collected/Seized
☐ Received From
☑ Returned To
☐ Released To

(Name) __Fin__

(Street Address) _____

(City) _____

Description of Item (s): __Iphone 7+__

__Imei__ ▉▉▉▉▉ __8088__

__Serial #__ ▉▉▉▉▉ __HFYK__

KC
02/28/2019

Received By: _Fin_ (Signature)

Printed Name/Title: __Fin__

Received From: _Kaitlyn Cedrone_ (Signature)

Printed Name/Title: __Kaitlyn Cedrone__
Special Agent

A341

SINGER-VOL002-000357

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, ___Fin_____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

___Iphone 7+; imei ███████████ 3088_____
CPU Make, Model & Serial Number (if available)

___serial# ███████████ +FYK_____
Storage or Retrieval Media, Computer Peripherals

_____

_____

and located at ___Residence Inn, chelsea, MA_____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _____.

　　　　I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

　　　　I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

_____　　　　_Fin_____
Date　　　　　　　　　　　　　　　　　Signature

_03/11/2019_____　　　　_Kaitlyn Cedrone_____
Date　　　　　　　　　　　　　　　　　Signature of Witness

　　　　　　　　　　　　　　　　　　　_Kaitlyn Cedrone_____
　　　　　　　　　　　　　　　　　　　Printed Full Name of Witness

　　　　　　　　　　　　　　　　　　　_Chelsea, MA_____
　　　　　　　　　　　　　　　　　　　Location

A342

SINGER-VOL002-000358

This is to certify that on  **03/11/2019**  at  **8:40 am**

Special Agents of the Federal Bureau of Investigation, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that nothing was removed from my custody by those Agents.

*I phone 7+*

(Signed) _____

Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Witnessed:

Special Agent  **IRS - CI**
Federal Bureau of Investigation
U.S. Department of Justice

**SINGER-VOL002-000359**

FD-597 (Rev. 4-13-2015)

Page ___1___ of ___1___

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ▉▉▉▉▉▉▉▉▉▉▉▉▉

On (date) ___03/11/2019___

item (s) listed below were:
- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) ___Fin___

(Street Address) _____

(City) _____

Description of Item (s): ___Iphone 7+, imei▉▉▉▉▉▉88088___
___serial #▉▉▉▉▉ HFYK___

K C
03/11/2019

Received By: ___Kaitlyn Cedrone___
(Signature)

Received From: ___Fin___
(Signature)

Printed Name/Title: ___Kaitlyn Cedrone___
___Special Agent___

Printed Name/Title: ___Fn___

SINGER-VOL002-000360

FD-597 (Rev. 4-13-2015)                                                                    Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### Receipt for Property

Case ID: ████████████████

On (date)  03/11/2019                    item (s) listed below were:
                                         ☐ Collected/Seized
                                         ☐ Received From
                                         ☑ Returned To
                                         ☐ Released To

(Name)  Fin

(Street Address) _____

(City) _____

Description of Item (s):  iphone 7+, imei ████████████ 8088

                         serial #  ████████  HFYK

                                    KC
                                   03/11/2019

Received By:  ___Fin___                          Received From:  ___Kaitlyn Cedrone___
              (Signature)                                        (Signature)

Printed Name/Title:  ___Fin___                   Printed Name/Title:  Kaitlyn Cedrone
                                                                      Special Agent

FD-26 (Rev. 7-20-94)

# DEPARTMENT OF JUSTICE

## FEDERAL BUREAU OF INVESTIGATION

### CONSENT TO SEARCH

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:

(Describe the person(s), place(s), or thing(s) to be searched.)



Iphone 7 plus
Serial number ████████ HFYK
IMEI ████████ 808 8
████████

KC
10/05/2018

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation.

Oct 5 2018
Date

Rich Singer
Signature

Witness

Kaitlyn Cedrone

SINGER-VOL002-000362

This is to certify that on _____ at _____
Special Agents of the Federal Bureau of Investigation, U. S. Department of Justice, conducted a
search of _____ .
I certify that nothing was removed from my custody by Special Agents of the Federal Bureau of
Investigation, U. S. Department of Justice.

(Signed) _____

**Witnessed:**

_____
Special Agent
Federal Bureau of Investigation
U. S. Department of Justice

_____
Special Agent
Federal Bureau of Investigation
U. S. Department of Justice

SINGER-VOL002-000363

FD-597 (Rev. 4-13-2015)                                                    Page 1 of 1

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: ▮▮▮▮▮▮▮▮▮▮▮▮

On (date) 10/5/2018 _____ item (s) listed below were:

- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) Rick Singer

(Street Address) _____

(City) _____

Description of Item (s): Iphone 7 plus
serial number ▮▮▮▮▮▮ HFYK
IMEI ▮▮▮▮▮▮ 808 8

KC
10/5/2018

**Received By:** *Kaitlyn Cedrone*
(Signature)

**Received From:** _____
(Signature)

**Printed Name/Title:** Kaitlyn Cedrone
Special Agent

**Printed Name/Title:** RICK SINGER

A348

SINGER-VOL002-000364



SINGER-VOL002-000365

FD-597 (Rev. 4-13-2015)

Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: ███████████████

On (date) _10/5/2018_

item (s) listed below were:
- ☐ Collected/Seized
- ☐ Received From
- ☑ Returned To
- ☐ Released To

(Name) _Rick Singer_

(Street Address) _____

(City) _____

Description of Item (s): I phone 7 plus
serial number ████████ HFYK
IMEI ████████████ 808 8

KC
10/5/2018

Received By: _[signature]_                Received From: _Kaitlyn Cedrone_
(Signature)                                        (Signature)

Printed Name/Title: _RICK SINGER_         Printed Name/Title: _Kaitlyn Cedrone_
                                                        Special Agent

SINGER-VOL002-000366



SINGER-VOL002-000367

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, _Fin_ , have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

_iphone 7 plus serial#_ ▬▬▬ _HFYK_
CPU Make, Model & Serial Number (if available)

_IMEI_ ▬▬▬ _8088_
Storage or Retrieval Media, Computer Peripherals

and located at _Marriott Residence Inn Chelsea_ , which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _0918_ .

I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

_11/1/2018_
Date

_[signature]_
Signature

_____
Date

_____
Signature of Witness

_____
Printed Full Name of Witness

_____
Location

SINGER-VOL002-000368

This is to certify that on _November 1, 2018_ at _8:17am_

Special Agents of the Federal Bureau of Investigation, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that ~~nothing~~ my iPhone 7 plus was removed from my custody by those Agents.

(Signed) _____

_____

Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Witnessed:

_____

Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

A353

SINGER-VOL002-000369

GPO U.S. GPO: 2016-395-373

FD-597 (Rev. 4-13-2015)

Page 1 of 1

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID:

On (date) 17 | 1 | 2018

item (s) listed below were:
- [ ] Collected/Seized
- [✓] Received From
- [ ] Returned To
- [ ] Released To

(Name) Fin

(Street Address) Marriott Residence Inn

(City) Chelsea, MA

Description of Item (s): iPhone 7 plus
Charger for phone
serial # [redacted] 7HFYK
IMEI [redacted] 8088

Nothing
Laura Futter Smith

Received By: Laura Smith (Signature)

Received From: Fin (Signature)

Printed Name/Title: Laura (Smith) Smith     Printed Name/Title: Fin

A354

G2O U.S. GPO: 2016-395-373

FD-597 (Rev. 4-13-2015)                                                    Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: ███████████████████

On (date) __11/1/2018__                    item (s) listed below were:
- [ ] Collected/Seized
- [ ] Received From
- [x] Returned To
- [ ] Released To

(Name) Fin

(Street Address) Marriott Residence Inn

(City) Chelsea, MA

Description of Item (s): iphone 7 plus
Charger for iphone
Serial # ███████████ 7HFYK
IMEI ███████████ 8088

Received By: _Fin_ (Signature)

Printed Name/Title: Fin

Received From: _(Signature)_

Printed Name/Title: Laura Smith

A355



FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, ___Fin_____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

___Iphone 7 plus, serial ▓▓▓▓▓ HFYK___
CPU Make, Model & Serial Number (if available)

___IMEI ▓▓▓▓▓ 8088___
Storage or Retrieval Media, Computer Peripherals

and located at ___Residence Inn, Chelsea, MA_____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins,

and/or specific directions for computer entry are as follows: _____.

   I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

   I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

___11/29/18___
Date

___11/29/2018___
Date

___Fin___
Signature

___Kaitlyn Cedrone___
Signature of Witness

___Kaitlyn Cedrone___
Printed Full Name of Witness

___Residence Inn, Chelsea, MA___
Location

SINGER-VOL002-000372

This is to certify that on _____11/29/2018_____ at Residence Inn, Chelsea, MA

Special Agents of the Federal Bureau of Investigations, U.S. Department of Justice, conducted a complete search of any

and all computers, any electronic and/or optical data storage and/or retrieval system, and any related computer peripherals.

I certify that ~~nothing~~ was removed from my custody by those Agents.

Iphone 7 plus

(Signed) _____

_Kaitlyn Cedrone_
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Witnessed: _

_____
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

**A357**

SINGER-VOL002-000373

G-2O U.S. GPO: 2016-395-373

FD-597 (Rev. 4-13-2015)                                    Page __1__ of __1__

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date) __11/29/18__                    item (s) listed below were:
                                          ☐ Collected/Seized
                                          ☑ Received From
                                          ☐ Returned To
                                          ☐ Released To

(Name) _____

(Street Address) _____

(City) _____

Description of Item (s):  Iphone 7 plus
                 Serial ▮▮▮▮▮▮  HFYK
                 IMEI ▮▮▮▮▮▮  8088

                              KC
                           11/29/18

Received By: _Kaitlyn Cedrone_          Received From: _Dan_
              (Signature)                               (Signature)
Printed Name/Title: Kaitlyn Cedrone     Printed Name/Title: Fin

**A358**                                  SINGER-VOL002-000374

G-P-O  U.S. GPO: 2016-395-373

FD-597 (Rev. 4-13-2015)

Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### Receipt for Property

Case ID: _____

On (date) ___11/29/18___

item (s) listed below were:
- [ ] Collected/Seized
- [ ] Received From
- [✓] Returned To
- [ ] Released To

(Name) _____

(Street Address) _____

(City) _____

Description of Item (s): Iphone 7 plus
Serial ▮▮▮▮▮▮ HFYK
IMEI ▮▮▮▮▮▮▮ 8088

KC
11/29/18

Received By: Fin Yw
(Signature)

Received From: Kaitlyn Cedrone
(Signature)
Kaitlyn Cedrone

SINGER-VOL002-000375

G2O U.S. GPO: 2016-395-373

FD-597 (Rev. 4-13-2015)

Page 1 of 1

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property**

Case ID: ▮▮▮▮▮▮▮▮▮▮▮

On (date) 10/31/2018

item (s) listed below were:
☑ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name) _____

(Street Address) _____

(City) _____

Description of Item (s):  LG Black cell phone
IMEI ▮▮▮▮▮▮▮ 6533
Model # LG-M150

KC
11/27/2018

Received By:  _Kaitlyn Cedrone_
(Signature)

Received From:  _Jim_
(Signature)

Printed Name/Title: Kaitlyn Cedrone

Printed Name/Title: Fin

**A360**

SINGER-VOL002-000376

September 20, 2018

Re:     Consensual Monitoring of Wireless Phone by Law Enforcement

Dear:

Kindly accept this correspondence as confirmation of representations made by the Department of Justice (DOJ) and the **Federal Bureau of Investigation (FBI)** regarding the consensual monitoring of mobile phones for law enforcement purposes pursuant to 18 U.S.C.§ 2511 (2)(c). The specific phone referenced in this letter for AT&T's assistance in conducting consensual monitoring is an AT&T cellular telephone assigned telephone number           8802

Pursuant to 18 U.S.C. § 2501 *et seq.*, the law enforcement agencies of the Department of Justice sometimes consensually monitor the wire and electronic communications of confidential informants and other parties in order to gather information for their criminal investigations. As you know, consent of one of the parties to a communication is sufficient under the law to permit monitoring without court order. Even though consensual monitoring does not require a judge's authorization, given the portability of cellular phones and possibility of civil liability arising from someone other than the consenting party using the phone, AT&T has been requiring prosecutors to obtain a court order before permitting consensual monitoring.

Since we are aware of your concerns regarding the portability, and correspondingly the common transfer of mobile phones to non-consenting third parties, the **DOJ/FBI** propose that with consensual monitoring under 18 U.S. C. § 2511, consenting parties will be required to sign a consent and acknowledgment form pledging that the target phone will not be used by anyone else, including the uses of cell phone photography and text messaging. A sample copy of this form is attached.

After a thorough review of current applicable law, it is the position of the **DOJ/FBI** that an order is not required when a party to a communication consents to the monitoring, even when that phone used is inherently mobile; however, since the **DOJ/FBI** also recognizes the rights of third parties should be protected, the consenting party will be required to read and sign a statement pledging that the phone shall not be used by any other party.

We hope that this information assuages AT&T's concerns. Should you have any additional questions, please do not hesitate to contact us. Thank you for your anticipated cooperation in this matter.

Sincerely yours,

AUSA Signature

*ERIC S. ROSEN*
**AUSA Printed Name**

**A361**

SINGER-VOL002-000377

## CONSENT AND ACKNOWLEDGEMENT

I, _RICK SINGER_, hereby state that:

1.      I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents.  My consent extends to all communications over any such phone, whether or not that communication relates to a criminal investigation, to any and all messages left on any voicemail feature of any such phone, photographs taken using the phone, and text messaging.  I further consent to the disclosure of any information or records regarding such communications to law enforcement agents.

2.      I acknowledge that I have been instructed that any cellular telephones provided to me in the course of my activities are to be used only by me, and that I am not authorized to allow any other person to make, receive or participate in telephone calls involving those telephones as defined above in which I am not a participant.

Date: _9/27/18_

Signature

Printed Name

Witness/Interpreter Signature

Witness/Interpreter Printed Name

**A362**

SINGER-VOL002-000378

December 17, 2018

Re:  Consensual Monitoring of Wireless Phone by Law Enforcement

Dear AT&T:

Kindly accept this correspondence as confirmation of representations made by the Department of Justice (DOJ) and the **Federal Bureau of Investigation (FBI)** regarding the consensual monitoring of mobile phones for law enforcement purposes pursuant to 18 U.S.C.§ 2511 (2)(c). The specific phone referenced in this letter for AT&T's assistance in conducting consensual monitoring is an AT&T cellular telephone assigned telephone number ▮▮▮▮ 8802

Pursuant to 18 U.S.C. § 2501 *et seq.*, the law enforcement agencies of the Department of Justice sometimes consensually monitor the wire and electronic communications of confidential informants and other parties in order to gather information for their criminal investigations. As you know, consent of one of the parties to a communication is sufficient under the law to permit monitoring without court order. Even though consensual monitoring does not require a judge's authorization, given the portability of cellular phones and possibility of civil liability arising from someone other than the consenting party using the phone, AT&T has been requiring prosecutors to obtain a court order before permitting consensual monitoring.

Since we are aware of your concerns regarding the portability, and correspondingly the common transfer of mobile phones to non-consenting third parties, the **DOJ/FBI** propose that with consensual monitoring under 18 U.S. C. § 2511, consenting parties will be required to sign a consent and acknowledgment form pledging that the target phone will not be used by anyone else, including the uses of cell phone photography and text messaging. A sample copy of this form is attached.

After a thorough review of current applicable law, it is the position of the **DOJ/FBI** that an order is not required when a party to a communication consents to the monitoring, even when that phone used is inherently mobile; however, since the **DOJ/FBI** also recognizes the rights of third parties should be protected, the consenting party will be required to read and sign a statement pledging that the phone shall not be used by any other party.

We hope that this information assuages AT&T's concerns. Should you have any additional questions, please do not hesitate to contact us. Thank you for your anticipated cooperation in this matter.

Sincerely Yours

*Eric S. Rosen*

**AUSA Signature**          **Eric S. Rosen**

**AUSA Printed Name**

SINGER-VOL002-000379

## CONSENT AND ACKNOWLEDGEMENT

I, _Rick Singer_ hereby state that:

1.     I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents. My consent extends to all communications over any such phone, whether or not that communication relates to a criminal investigation, to any and all messages left on any voicemail feature of any such phone, photographs taken using the phone, and text messaging. I further consent to the disclosure of any information or records regarding such communications to law enforcement agents.

2.     I acknowledge that I have been instructed that any cellular telephones provided to me in the course of my activities are to be used only by me, and that I am not authorized to allow any other person to make, receive or participate in telephone calls involving those telephones as defined above in which I am not a participant.

Date: _12/29/2018_

Signature

Printed Name _Rick Singer_

Witness

Witness/Interpreter

SINGER-VOL002-000380

# EXHIBIT UU

FD-340c (4-11-03)

File Number  S-00091023

Field Office Acquiring Evidence  BS

Serial # of Originating Document  S-00091023-A-31

Date Received  10\31\2018

From _____

(Name of Contributor/Interviewee)

_____

(Address)

_____

(City and State)

By  SA Laura Smith

To Be Returned  ☐ Yes    ☑ No
Receipt Given  ☐ Yes    ☑ No
Grand Jury Material - Disseminate Only Pursuant to Rule 6 (e)
Federal Rules of Criminal Procedure
☐ Yes    ☑ No
Federal Taxpayer Information (FTI)
☐ Yes    ☑ No

Title:  CHS proffer - Day 4

Reference:  CHS proffer - Day 4

(Communication Enclosing Material)

Description:  ☐ Original notes re interview of

318A - BS - 2885343

_____

_____

_____

1A-19

Rick does not have anyone on the inside of SAT or ACT.

Abdelaziz ÷ RS unsure how they met. Called ~~Dad~~ RS for ███ . RS flew to house, ███ phenominal student but didn't get ███ Played Bask. B. at ███ in Nevada. RS mixed up ███ (legit) got into Colombia. At same time sister, ███ , was applying to schools. Dad had connections at USC. ███ denied from USC, went to GW. Dad called b/c should have done side door w/ ███ Dad knew it would have been $250K for ~~SD~~ to USC. ███ got into Colombia ~~him~~ ~~b/c~~ ███ played on students for 1 week. ~~Dad~~ ~~Abbani~~ works for Steve Wynn + then ttr to China to open hotel. ███ did poorly at school ~~them~~ in China. Dad Called saying ███ was doing summer at USC. Dad promised ███ he'd get USC done for her b/c sacrifice to go to China. RS made her a

A367

DI bask-ball plare

Donna knows players aren't ~~bad~~ ~~one~~ RS has not told Donna they are not recruitable to USC. ~~Donna knows to~~ ~~profile created to~~ ~~look like mid pacific, producing~~ strong players. Donna knows RS is trying ~~proxies~~ proxies. Implicit understanding ~~are~~ not strong enough to play for RS told dad $300k → RS knew he had USC

to give Donna more b/c this would be difficult (less strong student). Donna/prog. received ± $200k ~~us~~ Person Ann Chinea was in subco meeting. Donna had to explain ███████ profile. USC china contact said ██████ went to tough school in China. Gamal knew ~~he~~ was not strong enough to be ~~being~~ recruited. Gamal knew there was an ~~exchange~~ exchange

of money to someone / USC to get ██████ in. Donna directed some of the money. Gamal didn't know about Donna; he knew someone at USC pulling strings. $ → foundation → USC program which was directed by someone to a specific ~~coach~~ area. Mom never talked to RS. Parents knew $ going to school, not the foundation.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et. al*., | ) | **Leave to File Sur-Reply** |
| | ) | **Granted on April 14, 2020** |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS INDICTMENT OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF
EVIDENCE AND FOR DISCOVERY AND AN EVIDENTIARY HEARING (DKT. 971)**

## **INTRODUCTION**

The government did not commit misconduct in this case.  It did not violate *Brady*.  It did not fabricate evidence.  It did not entrap any defendant.  And it did not suborn the commission of a crime.

Attached are declarations from three members of the government's investigative and prosecution team:  Elizabeth Keating, a special agent with the Internal Revenue Service – Criminal Investigation; Laura Smith, a special agent with the Federal Bureau of Investigation; and Assistant United States Attorney Eric S. Rosen.  *See* Exs. A-C.  Also attached is an FBI-302 report of an interview with cooperating witness Rick Singer.[1]  *See* Ex. D.  The declarations and the 302 report explain the context of Singer's October 2 note and what prompted him to write it.  The declarations also affirm, under penalty of perjury, that the government did not fabricate evidence, seek to entrap any defendant, or suborn the commission of a crime.  The evidence described in the government's opening brief corroborates the declarations, illustrating the defendants' intent to commit fraud *and* bribery based on their statements and conduct *before* Singer began cooperating.  The consensual calls Singer made three weeks *after* his October 2 note are consistent with that earlier evidence.

The government did not use Singer to suborn the commission of a crime.  The government used him to gather additional evidence of a crime the defendants had *already* committed when they agreed to pay money in exchange for their children's admission to college as fake athletic recruits.  For this reason, and the reasons set forth below and in the government's opening brief, the defendants' motion should be denied without a hearing.

---

[1] Unless otherwise noted, the factual assertions in this brief are supported by the attached declarations and 302.

## ADDITIONAL FACTUAL BACKGROUND

Singer was approached by federal agents in a Boston hotel room on September 21, 2018. The approach followed a six-month investigation into his college admissions fraud scheme. Over the course of that investigation, the government gathered extensive evidence that Singer had turned his college counseling business, and an associated charity, into a front for fraud. For parents who sought an illicit edge for their children, Singer offered an array of services. He could guarantee high scores on college entrance exams by cheating. He could guarantee good grades in classes by having his employees pose as the students and take the classes in their names. And he could guarantee admission to certain colleges by using falsified athletic resumes and "donations" to university athletic programs to induce coaches to recruit unqualified applicants to their teams.

By the time of the approach, the government had developed evidence against complicit coaches, university athletics administrators, test proctors, test administrators, and parents who had participated in the scheme. Those parents – including the defendants in this case – had *already committed* fraud, or they were in the midst of the crime. In addition, new clients were continuing to contact Singer about enlisting his services.

On September 21, Singer agreed to cooperate with the government's investigation. He was, initially, a reluctant cooperator. He did not fully accept responsibility for his crimes.[2] He continued to use the word "donation" to describe payments to university athletic programs in exchange for the coaches' agreement to recruit unqualified students based on fabricated credentials. During Singer's first meeting with agents on September 21, Special Agent Keating told him that it doesn't matter if a payment is called "donation," or is directed to an athletic

---

[2] Weeks later, Singer acknowledged that he obstructed the government's investigation during this time, tipping off several parents that he was "wired."

program instead of a coach's pocket: exchanging money for a guaranteed admissions spot for an unqualified student based on fabricated athletic credentials is a crime. Special Agent Keating does not recall raising her voice at Singer during this meeting, but believes she was more "animated" than usual due to Singer's refusal to accept responsibility for his crimes.[3]

Despite his reluctance, Singer engaged in a series of consensually recorded calls in the first days after the approach, including with several parents. Those parents were either actively engaged in the fraud scheme at the time of the calls, or learning its details for the first time. Only one of the calls was with a remaining defendant in this case.[4]

In those calls, the government directed Singer to be explicit that the scheme involved paying money, as a *quid pro quo*, to induce one or more university employees to facilitate the admission of the parents' children as purported athletic recruits. In calls with parents to whom Singer had already said that their money would go to an athletic "program," Singer generally continued using that language. But in calls with new clients, he generally said that the money went "to the coach." This was not because there is a legal distinction between a "donation" to a "program" and a "payment" to a "coach." There isn't, provided that the money is intended as a *quid pro quo*. But the government wanted to make sure that anyone who decided to pursue the scheme at that point – when it was, effectively, a government sting operation – understood that

---

[3] Special Agent Smith recalls that Special Agent Keating raised her voice "somewhat." Singer recalls that the meeting was "boisterous" on both sides.

[4] That call, on September 29, 2018, was with defendant John Wilson, who had previously agreed with Singer to secure his son's admission to USC as a purported water polo recruit, and who contacted Singer again around the time of the government's approach about pursuing the "side door" a second time for his daughters. The call, which focused on future illegal conduct, is described in the government's opening brief. *See* Dkt. 1066 at 12-13. Singer also had a brief, non-substantive call with Wilson on September 23, 2018, to cancel a scheduled meeting.

their money would be used to induce a university insider to commit fraud, and could not later claim they had been duped or entrapped.

For example, on October 2, 2018, Singer received a call from Parent A, who had been referred to him by another client, Gordon Caplan.[5]  Because Singer had not previously discussed the scheme with Parent A, the government instructed him to say that the fraud involved sending money "to the coach."  He told Parent A:  "[Y]ou'd make a donation to, um, to the coach, um -- I mean, to the  program and the coach, essentially, because they need help."  Ex. E at 7-8.  He added: "[T]hey would flag her as a student athlete, which she is, uh, but she may not be at the level in which, um, she'd be a recruitable student athlete.  They would help her and support her, 'cause you're giving some support, um, to the pro-- to, to the coach."  *Id*. at 8.  Later in the call, Singer said:  "[T]here will be a donation to the coach . . . who is gonna provide the help of getting her in." *Id*. at 10.  Parent A asked:  "When you say a donation to the coach, you're talkin' about a donation in connection with playing sort of the, the athletic card?"  *Id*. at 11.  Singer replied:  "Yeah, that's correct."  *Id*.[6]

---

[5] Caplan had agreed with Singer to pursue the test-cheating fraud for his daughter and also discussed the "side door" with him, but ultimately chose not to pursue it.  Caplan pled guilty to conspiracy to commit mail fraud and honest services mail fraud and was sentenced by Judge Talwani to one month in prison.  *See United States v. Caplan*, 19-cr-10117, Dkts. 380 & 517.

[6] Singer had a subsequent call with Parent A in which, at the government's instruction, he advised Parent A that he had secured a commitment from the Yale University soccer coach to admit Parent A's daughter as a soccer player in exchange for $1 million.  Ex. F.  This was a ruse. As noted in the government's opening brief, by that point the Yale coach was cooperating with the government's investigation.  Singer said:  "[A]ll the payments will be made to the coach and then the coach will figure out what he does with his money.  And at the end of the day, your daughter shows up first day of school, she's just a regular student and everything goes on like it normally goes on."  *Id*. at 5.  Parent A asked:  "[Y]ou said I make the payment to the coach.  Exactly who am I making a check out to, Rick?"  *Id*.  Singer responded:  "[T]o my foundation."  *Id*.  Parent A later chose not to proceed with the scheme and was not charged.

*That same day, Singer wrote his October 2 note* concerning a "[l]oud and abrasive call with agents." In the note, Singer wrote that the agents "continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment." And he wrote that "Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them."

The agents do not specifically recall a "loud and abrasive" call on that day, but they do remember tense calls with Singer during this period. The agents were *not* telling Singer to entrap parents who had *already* engaged in the scheme by asking them to "agree to a lie." They were telling him to be more explicit in describing the scheme to parents who still had the opportunity to back out – to make it obvious that the money would be a *quid pro quo* for fraud. Singer was particularly resistant to using blunt language with parents who were in the midst of the fraud – as opposed to those who were just finding out about it, like Parent A – because he had already told them that their money would go to an athletic program, not a coach. But in all of those late September and early October calls, Singer was discussing *future* or *ongoing* conduct, *not* something that had happened in the past.

What Singer's note does *not* reflect is the agents' instructions concerning interactions with the defendants before this Court, who had *already* engaged in his scheme *before* the government's approach. The government did not direct Singer to call these defendants until *three weeks after the October 2 note was written*. It is *those* calls, all of which concern *historical* conduct, that the defendants seek to suppress. But Singer's note has nothing to do with them.

For those late October calls, the government instructed Singer to engage the parents in a discussion about their prior conduct using a ruse: that the IRS was auditing his foundation, and –

5

for parents whose children had been admitted to USC – that he would not tell the IRS that the money they had sent to "Donna" at USC was in exchange for having their children recruited as fake athletes. At that time, the government had a good faith belief, based on the evidence in the case, that each parent knew and understood this. While not every parent might have known that the complicit USC insider's name was "Donna," most did; and the evidence showed that they all understood that their "donations" to USC and to Singer's charity were a *quid pro quo* to secure their children's admission as recruited athletes based on false credentials. The purpose of the "audit" calls was to give any parent who claimed not to have that understanding the opportunity to say so – and to elicit additional evidence of what their understanding was.

For example, as set forth in the government's opening brief, in 2016, Singer instructed Giannulli to "*send 50K payment* to the person below . . . Donna Heinel[,] Senior Womens Associate Athletic Director[,] c/o of USC Athletics[,] . . . Check should be made out to USC Athletics[.]" Dkt. 1066 at 5 (emphasis added). Singer then forwarded an email *from Heinel* to Giannulli and Loughlin, attaching a letter indicating that their daughter had been admitted to USC as a recruited athlete. *Id.*, Ex. R. The email had Heinel's name and title on it. The following year, Singer instructed Giannulli and Loughlin to send another check, payable to a USC fund, to Heinel, in connection with their younger daughter's admission as a fake recruit. *Id.* at 6. Thereafter, in the "audit" call on October 25, 2018, Singer told Giannulli: "I'm not gonna say anything [to the IRS] about your payments going to Donna Heinel at USC to get the girls into USC, through crew." *Id.* at 11. And in a call with Loughlin, Singer said: "[N]othing has been said about the girls, your donations helping the girls get into USC to do crew even though they didn't do crew." *Id.*

Likewise, in 2018, Singer forwarded an email *from Heinel* to Zangrillo confirming that Zangrillo's daughter had been accepted to USC "through athletics" even though, as Zangrillo

knew, she was not an athlete. *Id.* at 8. At Singer's direction, Zangrillo mailed Heinel a $50,000 check, payable to "USC Women's Athletics," and sent a second check to Singer's charity, KWF. *Id.* On the "audit" call, Singer said: "I won't say that the, uh, the moneys went to go pay Donna Heinel for USC to get [your daughter] in." *Id.* at 10.

Singer's statements on the "audit" calls were thus consistent with what the defendants already understood, and the defendants' responses corroborate that evidence. The government was not attempting to build a case that the parents understood Heinel to be personally pocketing money, and the government has never alleged that. The government *has* alleged – and the calls, checks and emails prove – that the defendants knew that one or more complicit insiders at USC were facilitating the admission of their children as recruited athletes in exchange for payments to a USC athletic program. Accordingly, while the government *did* direct Singer to use ruses as part of its investigation, it did *not* fabricate evidence, and it did *not* suborn the commission of a crime.

## ARGUMENT

## I.    THE GOVERNMENT DID NOT COMMIT MISCONDUCT

The government did not commit misconduct in this case. As the attached declarations affirm, under penalty of perjury, the investigative team did not instruct Singer to fabricate evidence, to entrap parents, or to elicit false admissions from anyone. Singer's 302 corroborates these declarations.

The reality is that Singer was a reluctant cooperator who wrote the October 2 note at a time when he had not fully accepted responsibility for his crime, and while he was obstructing the government's investigation. In his first interview with government agents, he used the word "donation" to describe the money he and his clients sent to athletic programs, even as he acknowledged that the payments were in exchange for recruiting unqualified students to athletic teams based on fabricated credentials. Special Agent Keating firmly reminded Singer that a

donation is a gift:  money in exchange for nothing.  Paying money in exchange for guaranteed admissions spots for unqualified athletes based on fabricated credentials is illegal.  The issue is not *where* the money was sent, or what the payments were called, but *why* it was sent and what the parents received in exchange.  Here, they received their children's guaranteed admission to elite universities as recruited athletes in sports they did not play (or did not play at that level).  Singer later acknowledged as much when he pled guilty.  But like many white collar defendants, he was slow to accept the full extent of his culpability – as he now admits.

Agents and prosecutors told Singer to be more explicit with parents who had not yet completed the fraud, and to tell parents who had not yet agreed to the scheme that it involved paying off coaches.  Like many white collar criminals, Singer was not typically so blunt.  He did not use words like "bribe" or "payoff," even though that is what the payments were.  Singer's note makes plain his frustration.  He was particularly resistant to telling parents who were in the middle of the fraud at the time of the government's approach that the money was a payment to a coach, because that was not what he had told them previously.  In Singer's language, it was a "fib."  But because this portion of the investigation was a sting – targeting ongoing and future conduct – the government wanted to ensure that the crime would be obvious to anyone involved in it.

Despite the defendants' attempts to make it so, Singer's note has *nothing to do* with the consensual calls he made weeks later to parents who had *already* engaged in the scheme before the government's approach.  The purpose of those calls was to corroborate what the evidence indicated those parents knew and understood about the fraud and bribery.  The script Singer used during those calls was consistent with that evidence.  Put another way, during the late-October "audit" calls, Singer repeated back to the defendants a summary of the crime they had committed and asked them if they agreed they had done it.  The calls were the equivalent of a wired-up

cooperator asking a drug dealer, to whom the cooperator has previously sold drugs: "Do you remember when I sold you those drugs?" That is not suborning the commission of a crime. It is corroborating evidence of it. So too, here. If the defendants in this case did *not* agree with Singer's summary of their crimes, the government anticipated that they would say so – instead of readily agreeing to mislead the IRS about the reason for their payments, as they all did.

In sum, the government did *not* suborn the commission of a crime. The defendants in this case had *already* agreed to commit fraud and bribery. The government used Singer to gather *additional* evidence of the crime they had already committed – and to ensure that individuals who had not yet crossed the line knew what they were getting into.[7]

Finally, the government did not investigate Singer's October 2 note after first learning of it on October 28 for several reasons. <u>First</u>, the AUSAs responsible for the investigation were aware that Singer was a reluctant cooperator who was slow to accept responsibility for his crimes and initially refused to make consensual calls. <u>Second</u>, they knew that, at the time Singer wrote the note, he was obstructing the government's investigation by tipping off potential targets. <u>Third</u>, the AUSAs were either present when Singer made the consensual calls, or reviewed them afterwards, and they were familiar with the other evidence in the case. They knew that the purpose of the calls in late September and early October was to be *more* explicit with individuals who still had the opportunity to back out of the fraud. And they knew that the note had nothing to do with the "audit" calls Singer placed in late October, weeks after the note was written. They also knew that what Singer said on those calls was consistent with what other evidence showed: that the defendants understood they were making *quid pro quo* payments to a USC fund to induce a

---

[7] As set forth in the government's opening brief, the defendants' remaining claims of misconduct are meritless and do not warrant relief.

university insider to facilitate the fraudulent recruitment of their children. <u>Finally</u>, the AUSAs knew that the purpose of the consensual calls was to make sure that the government *only* charged individuals who acted with knowledge and intent and who were, in fact, guilty.

## II. THERE IS NO BASIS FOR AN EVIDENTIARY HEARING

There is no basis for an evidentiary hearing. The government has unequivocally denied committing misconduct, and has provided declarations from two experienced federal agents and an AUSA, under penalty of perjury, addressing the contentions in Singer's October 2 note. The government has also interviewed Singer about his note and produced an FBI 302 report of that interview. The declarations are detailed, credible, and corroborated by the 302 report and other evidence, including the consensual calls Singer made and evidence of the defendants' criminal intent prior to Singer's cooperation. The defendants have, accordingly, failed to meet their burden of establishing a disputed issue of material fact that would warrant a hearing. *See United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996).

## <u>CONCLUSION</u>

The government, like the Court, views the allegations of misconduct in this case as serious and disturbing. The defendants' contention that the government "has engaged in a sustained, orchestrated effort to cheat the justice system" is repugnant and untrue. For all of the reasons set forth above, and in its opening brief, the government respectfully submits that the defendants' motion should be denied without a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  */s/ Stephen E. Frank*
Karin M. Bell
Stephen E. Frank
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Stephen E. Frank
Stephen E. Frank
Assistant United States Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ELIZABETH KEATING**

I, Elizabeth Keating, state the following:

1.    I am a special agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI"). I have been a special agent with IRS-CI since September of 2008. Prior to becoming a special agent with IRS-CI, I worked as a revenue agent for the Internal Revenue Service for approximately three years. As a special agent my responsibilities include the investigation of criminal violations of the Internal Revenue laws, the Bank Secrecy Act, the Money Laundering Control Act, and related offenses.

2.    I have been assigned to "Operation Varsity Blues," an investigation of fraud and bribery in the college admissions process, since approximately March 2018.

3.    On September 21, 2018, I participated in the approach of William "Rick" Singer, who was a target of the investigation. On that day, I was accompanied by Special Agents Laura Smith and Kaitlyn Cedrone of the Federal Bureau of Investigation ("FBI"). For part of the time that we met with Singer, we were accompanied by Supervisory Special Agent John Keelan of the FBI. We approached Singer in a hotel room at the Marriott Long Wharf in Boston.

4.      When we approached Singer, he agreed to cooperate with the investigation and to be interviewed. During the interview, it was my impression that Singer was not being completely truthful and was minimizing his conduct.

5.      For example, Singer described the payments he and his clients made to athletic programs, and that his clients made to his non-profit foundation, as "donations." I told Singer that a donation was money provided as a gift, with no expectation of anything in return. I further explained, in substance, that payments in exchange for an agreement to recruit a student as a fake athlete are illegal. I do not recall if I used the word bribe, but I may have.

6.      I do not recall raising my voice during this initial interview, but I was more animated than usual because of Singer's reluctance to accept responsibility for his crime.

7.      The next day, after consulting with his attorney, Singer agreed to consensually record phone calls with other individuals involved in his scheme.

8.      Singer was initially a reluctant cooperator. He wanted to make only a few calls, and resisted our direction to make more. We later learned that Singer was also obstructing our investigation during this early period.

9.      The consensually recorded calls Singer made to parents in late September and early October involved parents who had begun, but not completed the fraud and bribery scheme. Singer also spoke with brand new clients who had contacted him. For these early calls, we instructed Singer, in substance, to tell clients that the scheme involved paying coaches to admit students as recruited athletes. We wanted him to be explicit that the scheme involved bribes. The purpose was to ensure that, for clients who had not yet committed a crime or were still in the middle of it, there would be no possible confusion about their intent. Singer, however, was resistant. He told us that this was not what he typically told his clients. He said that he usually told his clients that

the money was a donation to an athletic program. While I do not recall a specific "loud and abrasive" call on October 2, I do recall having stern conversations with Singer during this period, about this issue and about his cooperation generally.

10.    With new clients, Singer generally followed our direction and told them the money was going to the coach. As to clients to whom Singer had already spoken, but who were still in the middle of the fraud, he resisted and remained consistent with his prior conversations. We asked Singer to be more explicit on the calls so that there would be no confusion about the parents' intent if they continued to go forward.

11.    Several weeks later, in late October, we instructed Singer to place a series of calls to parents who had completed the fraud and bribery scheme before we approached him. For these calls, we instructed Singer to tell the parents that the IRS was auditing his foundation. For parents who had sent their children to the University of Southern California ("USC"), we typically instructed him to say that he would not tell the IRS that their donations were payments to "Donna" at USC in exchange for having their children recruited as athletes. This description was consistent with our understanding of what those parents understood based on the evidence we had gathered. Singer willingly made these calls.

12.    I never directed Singer to fabricate evidence against anyone, and to my knowledge he did not fabricate evidence against anyone.

13.    As part of the investigation, we used the proactive techniques I have described. But I did not direct Singer "to ask questions and retrieve responses that are not accurate" about the parents' actions or intent, or to ask parents "to agree to a lie [he] was telling" about their actions or intent, and to my knowledge Singer did not do that.

14.    I did not tell Singer that we wanted to "nail" or entrap any defendant, and I did not want to do so.

15.    I did not ask Singer to bend the truth, other than by using the proactive investigative techniques I have described. I repeatedly told Singer that he needed to be truthful with us.

16.    I first saw Singer's October 2 note on October 28, 2018. I did not address the note with Singer because I knew that it referred to our instructions, in late September and early October 2018, to be more explicit with parents who had not completed the fraud. I also knew that he had resisted that direction and I believed that he had not fully accepted responsibility for his own conduct at that time. That is what I understood the note to reflect. I also knew that the October 2 note did not relate to the historical "audit" calls that occurred weeks later.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 04/24/2020

Elizabeth Keating
Special Agent
Internal Revenue Service – Criminal Investigation

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF LAURA SMITH**

I, Laura Smith, state the following:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  I joined the FBI in 2010 as a forensic accountant conducting complex financial investigations.  I am currently a special agent on a squad that investigates economic crimes, including various forms of corporate fraud, securities fraud and bribery.  I hold a Bachelor's degree in Criminal Justice-Economic Crimes Investigation and a Master's degree in Accounting.

2.      Since approximately March 2018, I have been one of the case agents for "Operation Varsity Blues," an investigation of fraud and bribery in the college admissions process.

3.      On September 21, 2018, I participated in the approach of William "Rick" Singer, who was a target of the Varsity Blues investigation.  On that day, I was accompanied by Special Agent Kaitlyn Cedrone of the FBI and Special Agent Elizabeth Keating of the Internal Revenue Service – Criminal Investigation division ("IRS-CI") who are both assigned to the Varsity Blues investigation.  My supervisor, FBI Supervisory Special Agent John Keelan, was also present for part of the approach.  The goal of the approach was to determine whether Singer wanted to cooperate with the government's investigation.

**A385**

4.    We approached Singer in a hotel room at the Marriott Long Wharf in Boston where he had been meeting with Rudolph Meredith, the women's soccer coach at Yale University and a cooperating witness in our investigation.

5.    When we first approached Singer, he agreed to cooperate with our investigation and to be interviewed. However, Singer was not fully forthcoming regarding parts of his scheme, and it was my impression that he was not taking full responsibility for his conduct. In my training and experience, this reaction is typical of white collar defendants, who often rationalize their actions and have trouble acknowledging that what they have done is criminal. This is particularly true in the early days and weeks after they have been caught.

6.    For example, Singer told us that the payments he and his clients made to university athletics programs were "donations." Special Agent Keating told Singer, in substance, that a payment in exchange for recruiting a fake student athlete to an athletic team is illegal.

7.    Based on my experience working with Special Agent Keating, she is typically soft-spoken. I recall her raising her voice somewhat during this portion of the interview with Singer.

8.    The next day, September 22, 2018, after consulting with his attorney, Singer agreed to consensually record phone calls with other individuals involved in his scheme, including several coaches. Over the next few days, Singer also had calls with new clients and parents who were in the middle of the scheme. For these calls, we instructed Singer to be more explicit about the bribery aspect of the scheme. We told him to tell the parents that in exchange for a payment to a coach, their child would be recruited as an athlete based on falsified credentials.

9.    Singer resisted our direction to be more explicit, explaining that he typically told clients that the payments were "donations" to an athletic "program," not payments to the coach. I

do not remember a specific "loud and abrasive" call on October 2, but I do remember having tense conversations with Singer during this period about this issue.

10.    Singer ultimately followed our direction with respect to new clients. But in calls to clients who were already engaged in the scheme but had not yet completed it, Singer told us that he needed to remain consistent with what he had said in the past, and that is generally what he did on those calls.

11.    Weeks later, toward the end of October 2018, we turned our attention to the parents who had already completed the fraud and bribery scheme before Singer began cooperating. At that time, we asked Singer to make calls to those parents, including the parents charged in this case. For those calls, we instructed Singer to engage in a ruse: to tell the parents that the IRS was auditing their donations to his foundation, and that he would not tell the IRS the truth about those payments.

12.    At the time of the audit calls, I believed, based on the evidence developed in the investigation thus far, that the parents knew and understood that their "donations" were made in exchange for having an employee at the University of Southern California ("USC") recruit their children as fake athletes. The purpose of the "audit" calls was to corroborate each parent's knowledge and intent before charging them with a crime. We directed Singer to confirm that the parents understood that they had made payments to induce an individual at USC to recruit their children as fake athletes. Singer did not resist making these calls, or question the substance of them.

13.    At no time did I instruct Singer to fabricate evidence against anyone and, to my knowledge, he did not fabricate evidence against anyone.

14.     I did not instruct Singer to ask parents to "agree to a lie [he] was telling" about their actions or intent, and to my knowledge Singer did not do that.

15.     I did not instruct Singer "to ask questions and retrieve responses that are not accurate" about the parents' actions and intent, and to my knowledge he did not do that.

16.     I did not tell Singer that we wanted to "nail" or entrap any defendant, and I did not want to do that.

17.     I did not ask Singer to bend the truth, other than by using the proactive investigative techniques described above. I did, however, repeatedly tell Singer that he needed to be truthful with us about his actions and those of his co-conspirators.

18.     I first saw Singer's October 2 note on October 28, 2018. I did not address the note with Singer because I knew that it referred to our instructions, in early October 2018, that he be more explicit on calls with clients who had not yet completed the fraud. And I knew that he had resisted that direction. I also knew that the October 2 note did not relate to the historical "audit" calls that occurred weeks later.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 4/24/2020

Laura Smith
Special Agent
Federal Bureau of Investigation

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ERIC S. ROSEN**

I, Eric S. Rosen, state the following:

1.     I am an Assistant United States Attorney ("AUSA") in the United States Attorney's
Office for the District of Massachusetts.  I have served as an AUSA for approximately eight years,
including nearly five years in the District of Massachusetts and, before that, more than three years
in the Western District of Pennsylvania.  In that capacity, I have investigated and prosecuted a
variety of crimes including drug trafficking, money laundering, securities and financial fraud, and
bribery.  Prior to that I worked as an Assistant District Attorney in the New York County District
Attorney's Office for three years, and as an associate at Richards, Kibbe & Orbe LLP, a law firm
in New York, New York that specializes in white collar defense and complex civil litigation.  I
also clerked for The Hon. Robert P. Patterson, Jr., of the United States District Court for the
Southern District of New York.

2.     I have been assigned to "Operation Varsity Blues," an investigation of fraud and
bribery in the college admissions process, since approximately March 2018.

3.     I am aware that, on September 21, 2018, agents from the Federal Bureau of
Investigation ("FBI") and the Internal Revenue Service ("IRS") approached William "Rick"
Singer, a target of the investigation, to see if he wanted to cooperate.

4.      Thereafter, the agents and I met with Singer and his attorney on multiple occasions to interview Singer and to discuss his cooperation.  During those meetings, we repeatedly told Singer that he needed to be completely truthful with us.

5.      Singer was initially a reluctant cooperator.  He was not fully forthcoming, tried to protect certain of his co-conspirators, and resisted making consensually recorded calls.

6.      In late September and early October 2018, Singer made a series of consensually recorded phone calls with parents and coaches at our direction.  The calls with parents involved parents who had begun, but not completed the fraud and bribery scheme.  Singer also spoke with brand new clients who had contacted him.  For these calls, the agents and I generally instructed Singer to be more explicit – for instance, to say that the money was going to be paid to a coach in exchange for their children's admission as fake athletic recruits.  I understood that Singer was not usually this explicit with his clients, typically telling them that the money was a "donation" to an athletic "program."  But it was important to me that Singer be clear and direct, so that, among other reasons, clients who were still actively involved in the scheme, or considering it for the first time, could not later claim they were confused or entrapped.

7.      Singer resisted our instruction because this wasn't what he usually told his clients.  He explained that he could not suddenly be more explicit with clients to whom he had already explained the fraud.  For those clients, who were in the middle of the fraud, Singer generally remained consistent with his previous conversations.  For new clients, we instructed him to be more explicit, and he followed that direction.

8.      Several weeks later, toward the end of October 2018, the agents and I turned our attention to the parents who had already completed the scheme before Singer began cooperating.  That includes most of the defendants in this case.  By that time, I had a good faith basis to believe,

based on the evidence developed to that point, that each of these parents had engaged in the scheme with the requisite knowledge and criminal intent. In order to corroborate that evidence, the agents and I instructed Singer to call these parents using a ruse that the IRS was auditing his foundation. For parents whose children had been admitted to the University of Southern California ("USC"), we instructed him to say, in substance, that he would not tell the IRS that they had paid "Donna" at USC to have their children recruited as fake athletes. At that time, the evidence demonstrated that most of the parents knew who Donna was, because they had sent their money directly to her attention, and Singer had forwarded emails from her to a few of the parents. And even if they did not know her name, I believed, based on the evidence, that they knew that someone at USC was complicit in the scheme in exchange for the money. Likewise, for parents who had engaged in the test cheating, we instructed Singer to say, in substance, that he would not tell the IRS that their money had been used to pay the participants in that fraud. At that time, the evidence demonstrated that these parents knew that they had paid Singer to have an individual correct their children's exams, with the complicity of the test site coordinator. The purpose of these calls was to give any parent who did not have this understanding the opportunity to say so, and to explain what their understanding was. We frequently told Singer to pause during the conversations to allow the parents an opportunity to respond to what he was saying.

9.    I first saw a portion of Singer's October 2 note on October 28, 2018. I did not "investigate" the allegations in the note because, as described above, I knew what the agents and I had instructed Singer to say on the consensual calls, and I was either present when he made those calls or reviewed them afterwards. Singer's contention that the agents asked him "to tell a fib and not restate what I told my clients as to where the money was going" did not surprise me because the agents and I *had* instructed Singer to tell new and ongoing clients that, if they moved forward,

they would be paying a coach to recruit their children. I knew that Singer had pushed back on this at the time because it was not the way he typically described his scheme. I also knew that, as described above, Singer's October 2 note had nothing to do with the audit calls in late October to the defendants in this case.

10.    I do not recall seeing the portion of the October 2 note concerning Gordon Caplan on October 28. But I had no intention of entrapping anyone and would never do so. Indeed, although Caplan had already agreed to pursue the testing fraud by the time we approached Singer, and had committed overt acts in furtherance of that fraud, I specifically instructed Singer to tell Caplan that the choice to proceed with the fraud was Caplan's, that he was under no pressure to do so, and that he could back out at any time. Singer followed those instructions in a call on November 8, 2018.

11.    I did not direct Singer to fabricate evidence against anyone. I did not direct Singer "to ask questions and retrieve responses that are not accurate" about the parents' understanding of the scheme. I did not direct Singer to ask parents "to agree to a lie [he] was telling them" about their actions and intent. I did not tell Singer that I wanted to "nail" or entrap any defendant. I did not ask Singer to bend the truth, other than by using the proactive investigative techniques I described above.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Apr. 24, 2020_

_Eric S. Rosen_

Eric S. Rosen
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 19-10080-NMG |
| | ) | |
| GREGORY COLBURN, | ) | *Leave to File 65-Page Response* |
| AMY COLBURN, | ) | *Granted on 4/30/20 [ECF No. 1129]* |
| GAMAL ABDELAZIZ, | ) | |
| DIANE BLAKE, | ) | |
| TODD BLAKE, | ) | |
| I-HSIN "JOEY" CHEN, | ) | |
| MOSSIMO GIANNULLI, | ) | |
| ELIZABETH KIMMEL, | ) | |
| LORI LOUGHLIN, | ) | |
| WILLIAM McGLASHAN, Jr., | ) | |
| MARCI PALATELLA, | ) | |
| JOHN WILSON, | ) | |
| HOMAYOUN ZADEH, and | ) | |
| ROBERT ZANGRILLO, | ) | |
| | ) | |
| Defendants | ) | |

_____

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DIMISS THE FOURTH SUPERSEDING INDICTMENT
[ECF NOS. 341, 1019, 1021, 1023, 1026, 1031, 1035, 1037, 1039, 1041]**

**A393**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................... 1

BACKGROUND ......................................................................................... 2

ARGUMENT ............................................................................................... 3

I.    THE INDICTMENT ADEQUATELY ALLEGES SINGLE CONSPIRACIES AND
      THE DEFENDANT CO-CONSPIRATORS ARE PROPERLY JOINED........................3

      A.   Whether there were single or multiple conspiracies is a question of fact for the
           jury. ................................................................................................... 4

      B.   The defendants are properly joined in a single Indictment........................................ 13

II.   VENUE IS PROPER IN THE DISTRICT OF MASSACHUSETTS............................. 17

      A.   Applicable law.................................................................................... 17

      B.   The allegations of the Indictment establish venue for the charged conspiracies
           in the District of Massachusetts. ................................................................. 19

III.  THE DEFENDANTS' CHALLENGES TO THE FRAUD ALLEGATIONS FAIL...... 25

      A.   The Indictment adequately alleges mail and wire fraud.......................................... 25

      B.   The Indictment adequately alleges honest services mail and wire fraud. ............... 39

IV.   THE DEFENDANTS' CHALLENGES TO THE FEDERAL PROGRAMS
      BRIBERY CONSPIRACY AND SUBSTANTIVE COUNTS ARE EQUALLY
      MERITLESS....................................................................................... 52

V.    THE DEFENDANTS' CHALLENGE TO THE MONEY LAUNDERING
      CONSPIRACY COUNT IS WITHOUT MERIT........................................... 53

      A.   Applicable law.................................................................................... 53

      B.   The Indictment properly alleges conspiracy to commit money laundering. ........... 54

CONCLUSION.......................................................................................... 60

## **INTRODUCTION**

In a series of motions, the defendants seek the dismissal of all counts of the Fourth Superseding Indictment ("FSI" or "Indictment") based on a variety of purported factual and legal infirmities.

*First*, they argue that the factual allegations do not support joining them together in the charged conspiracies, or even in a single indictment—and that as a result, venue for this case does not properly lie in the District of Massachusetts.

*Second*, they argue that the mail and wire fraud charges (and the related conspiracy) are invalid to the extent they rely on a property theory, because the victim universities and testing companies were not deprived of cognizable property interests.

*Third*, they argue that those counts are also invalid to the extent they rely on an honest services fraud theory, because test administrators do not owe a fiduciary duty to testing companies, and because the monies the defendants allegedly paid as a *quid pro quo* to secure their children's admission to college as purported athletic recruits were not bribes. They seek dismissal of the federal programs bribery counts for the same reasons.

*Fourth*, they contend that the charged money laundering conspiracy is not viable because the funds they allegedly conspired to launder were not "proceeds" of a specified unlawful activity.

The defendants' motions are without merit. Their challenges to the conspiracy counts, joinder and venue boil down to a dispute over the sufficiency of the government's evidence. But that is a matter for the jury, not the Court on a motion to dismiss. Their property and honest-services fraud arguments contravene black-letter law. And their contention that the money-laundering charge is invalid because the Indictment does not sufficiently allege "proceeds" of crime is equally meritless.

For all these reasons, and the reasons set forth below, the defendants' motions should be denied.[1]

## **BACKGROUND**

The Indictment charges the defendants with conspiring with one another, and with other co-conspirators, to secure the admission of their children to selective colleges and universities in the District of Massachusetts and elsewhere using fraud and bribery. [FSI ¶ 64.] The manner and means of the conspiracy included paying off standardized test proctors and administrators to engage in cheating on college entrance exams, falsifying the children's academic transcripts by paying third parties to take classes in their names, falsifying the children's college applications in order to portray them as elite athletes, and bribing college athletic coaches and administrators, including through purported donations to their programs, to designate the children as athletic recruits based on those phony credentials. [FSI ¶¶ 66(a)-(h).] The Indictment alleges that all of the defendants worked with the architect of the conspiracy, William "Rick" Singer, who explained to them that these fraudulent methods were "tried-and-true," and had been successfully employed by many other clients. [*See, e.g.*, FSI ¶ 66(i).] And it alleges that the conspirators sought to conceal their scheme from, among others, the universities and standardized testing agencies they were defrauding. [FSI ¶ 66(j).]

In particular, Count One of the Indictment charges the 14 remaining defendants with conspiring to commit two crimes—wire fraud and mail fraud—by depriving the victim testing companies and universities of property (tests and test scores, and admissions slots to their entering

---

[1] This brief responds to the following defense motions, several of which raise substantially similar and overlapping arguments: ECF Nos. 341, 1019, 1021, 1023, 1026, 1031, 1035, 1037, 1039, and 1041. The corresponding defense memoranda are located at ECF Nos. 1020, 1022, 1025, 1026, 1032, 1036, 1038, 1040, 1042. Hereinafter, reference to these memoranda will be [D.XXX at XX.].

classes, respectively) and of their right to the honest and faithful services of their test administrators, athletic coaches, and university administrators. [FSI ¶¶ 369-70.] Each of the defendants is charged with conspiring to commit both of those object crimes as part of a single overarching scheme to secure the admission of their children to elite colleges through bribery and deception. Count Two charges 11 of the defendants with conspiring to commit federal programs bribery by bribing agents of the University of Southern California ("USC") to facilitate the admission of their children to USC. [FSI ¶¶ 371-72.] Count Three charges all of the defendants with conspiring to commit money laundering by funneling bribe and other payments in furtherance of the scheme through Singer's sham charitable foundation, The Key Worldwide Foundation ("KWF"), and his for-profit college counseling business, The Key, in an effort to conceal the nature, source, ownership and control of that money. [FSI ¶¶ 373-74.] Counts Four through Twelve are substantive fraud and bribery charges [FSI ¶¶ 375-78], while Count Thirteen charges defendant Wilson with tax fraud based on his alleged deduction of bribe payments from his taxes as purported charitable donations and business expenses. [FSI ¶¶ 379-80.]

## **ARGUMENT**

## I.    **THE INDICTMENT ADEQUATELY ALLEGES SINGLE CONSPIRACIES AND THE DEFENDANT CO-CONSPIRATORS ARE PROPERLY JOINED**

The defendants seek dismissal of Counts One through Three of the Indictment, contending that the allegations are duplicitous because they make out multiple conspiracies, not the single conspiracies charged in each of those counts. [D.1032 at 7–17; *see also* D.314.] Based on similar logic, they also challenge their joinder in a single indictment. [D.1032 at 17–24.] The defendants' arguments are contrary to black-letter law and the facts as pled. Whether the government can ultimately prove the allegations in the Indictment is a question of fact for the jury, *not* a basis for dismissal on the pleadings. The defendants' motions should, accordingly, be denied.

3

### A.    Whether there were single or multiple conspiracies is a question of fact for the jury.

In support of their duplicity argument, the defendants rely primarily on *Kotteakos v. United States*, 328 U.S. 750 (1946) [*see* D.1032 at 8–15], in which the Supreme Court reversed the convictions of defendants convicted of a single conspiracy because the evidence at trial "proved not one conspiracy but some eight or more different ones of the same sort executed through a common key figure, Simon Brown." 328 U.S. at 752. Brown, who acted as a loan broker, was charged with conspiring with borrowers to make fraudulent loan applications. But the Court found that the evidence proved "no connection" among the borrower-defendants "other than that Brown had been the instrument in each instance for obtaining the loans." *Id.* at 754. And the government *conceded* that there was no evidence at trial of a connection among the defendants—a "rim of the wheel to enclose" various "spokes" who separately agreed with a common "hub"—and that the proof therefore "made out a case, not of a single conspiracy, but of several." *Id.* at 755.

*Kotteakos* is not this case. In citing it, the defendants conflate what the government must *prove* at trial with what it must *plead* in an indictment. *Kotteakos* did not concern the latter. The only question presented was whether the variance between the single conspiracy charged in the indictment and the multiple conspiracies later proved at trial was harmless. *Id.* at 758 (noting that "[t]he question we have to determine is whether the same [harmlessness] ruling [of *Berger v. United States*, 295 U.S. 78 (1935)] may be extended to a situation in which one conspiracy only is charged and at least eight having separate, though similar objects, are made out by the evidence, if believed"); *see also id.* at 775 (stating explicitly that the decision did not address the validity of the indictment).[2] While the underlying court of appeals decision opined that the trial judge

---

[2] The defendants also overstate the Supreme Court's answer to the question presented. The Court did *not* find that the prejudice from a variance between a single conspiracy and multiple

"'should have dismissed the indictment,'" [D.1032 at 12 (quoting *United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945)], that statement was *dicta*, and was written in 1945—*before* the modern notice pleading standard was implemented.  *See* FED. R. CRIM. P. 7(c)(1) (effective March 21, 1946).  "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1), which provides that an indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (internal citation and quotations omitted)).

The defendants do not, because they cannot, point to any appellate authority holding that an indictment should be dismissed for failure to allege a "rim."  And Rule 7(c)(1) does not require such specificity.  To the contrary, the law is clear that "[w]hether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury."  *United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir. 1999); *accord, e.g.*, *United States v. Bedini*, 861 F.3d 10, 14 (1st Cir. 2017); *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009); *United States v. Villarman-Oviedo*, 325 F.3d 1, 12 (1st Cir. 2003); *United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1190–91 (1st Cir. 1993); *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (1st Cir. 1993); *United States v. David*, 940 F.2d 722, 732 (1st Cir. 1991); *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984).

---

conspiracies is "virtually presumptive," and that is not the law.  [D.1032 at 27.]  *See, e.g.*, *United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998) ("When the proof at trial reveals the existence of more than one conspiracy, the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood that confusion or prejudice resulted from transference of guilt from one conspiracy to another.") (internal quotations omitted).  If the evidence at trial warrants, the Court can instruct the jury on how to distinguish a single conspiracy from multiple conspiracies.  *See, e.g., United States v. Soto-Beniquez*, 356 F.3d 1, 22 (1st Cir. 2003).

The defendants contend that "several" federal courts have taken the path they urge, but cite a total of three district court cases in support of that contention. [D.1032 at 28.] None is persuasive. The first is a case from the Middle District of North Carolina, in which the court dismissed a conspiracy count as duplicitous where one defendant was alleged to have engaged in four objects, but the remaining defendants were alleged to have engaged in only one, and the court found that the allegations made out two separate schemes. *See United States v. Eury*, No. 1:14CR39-1, 2015 WL 1861807, at *6-7 (M.D.N.C. Apr. 23, 2015). Here, however, *all* of the defendants are alleged to have agreed to the charged object(s) of the conspiracies. And despite the defendants' efforts to reframe the allegations as involving three entirely separate schemes, the Indictment alleges otherwise: that they conspired in *a single overarching scheme* to gain admission to college through various means.

The defendants next cite the Eastern District of North Carolina's decision in *United States v. Jackson*, 926 F. Supp. 2d 691 (E.D.N.C. 2013). [D.1032 at 28.] In that case, the district court dismissed a conspiracy charge against two of five defendants where the government *conceded* that they had no involvement in a scheme "to circumvent federal gun laws for the purpose of enriching corporate profits," but simply helped to cover it up. *Id*. at 703-04. Again, not this case.

Finally, in *United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), the District of Puerto Rico dismissed conspiracy counts where "the description of the overt acts [was] neatly divided between two distinct sets of co-conspirators" and "the only element of commonality" between the alleged schemes was that they "were to defraud one same bank and both include[d] the same bank officers." 986 F. Supp. at 71-72. In so doing, the court failed to acknowledge that the question whether there is a single conspiracy or multiple conspiracies is generally one for the jury, or cite any authority in support of its view that the question could be decided on the basis of

6

**A400**

the pleadings alone.  The case has never been relied upon by another court to dismiss a conspiracy alleged to be unitary, and has been criticized as inconsistent with "the strong preference for juries to determine the question of whether multiple or single conspiracies exist and how this preference affects the pleading requirements."  *See United States v. Ohle*, 678 F. Supp. 2d 215, 222 & n.5 (S.D.N.Y. 2010).

In fact, courts routinely *decline* to dismiss conspiracy counts based on pre-trial claims of duplicity, even in extreme cases.  In *United States v. Gabriel*, for example, Judge Rakoff declined to dismiss an indictment that, "on any but a superficial reading," appeared to allege "two distinct conspiracies," with overt acts that were divisible into two sets, each "different in impetus, duration, personnel and purpose."  920 F. Supp. 498, 503-04 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997).  Noting that, "if it were within the power of the Court to do, [it] would dismiss . . . for duplicity," Judge Rakoff found that, given "boilerplate allegations of a single conspiracy," he could *not* conclude "on the basis of the pleadings alone that there [was] *no* set of facts . . . that could warrant a reasonable jury in finding a single conspiracy."  *Id.* at 505 (emphasis in original); *accord, e.g.*, *United States v. Molina*, No. 11 Cr. 528(JFK), 2013 WL 2455922 (S.D.N.Y. June 5, 2013) (agreeing that "a district court should ordinarily not grant a motion to dismiss for duplicity where the indictment sufficiently alleges a single conspiracy . . . even where the indictment 'appears to actually allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count'") (quoting *Gabriel*, 920 F. Supp. at 504–05); *see also United States v. Berlin*, 707 F. Supp. 832, 837 (E.D. Va. 1989) ("[I]f the indictment as drawn would permit the government to prove a set of facts that would support a

finding of one conspiracy, then the indictment is proper and the decision as to how many conspiracies existed is for the jury.") (citation omitted).[3]

The Indictment in this case is facially valid, and each of the first three counts properly alleges a single conspiracy. *First*, the Indictment alleges that the defendants shared the common conspiratorial goal of using bribery and fraud for the purpose of securing the admission of the their children to selective colleges and universities. It alleges a similar purpose with respect to the federal programs bribery conspiracy. And it alleges that the money laundering conspiracy sought to conceal the above-described fraud scheme by funneling bribe payments through Singer's foundation and his for-profit company. More is not required. *See United States v. Ortiz-Islas*, 829 F.3d 19, 25 (1st Cir. 2016) (existence of a common goal "is broadly drawn"); *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("The common goal requirement has generally been broadly drawn by the Courts of Appeals: Given these broad common goals the common objective test may have become a mere matter of semantics.") (citation and internal quotation marks omitted); *cf. Soto-Beniquez*, 356 F.3d at 18–19 (noting that a "common purpose" can include "selling drugs for a profit").[4]

Nor does the fact that the defendants accomplished their common goal by various means— such as paying bribes, cheating on tests or in online courses, and falsifying credentials—turn one

---

[3] As the defendants concede [D.332 at 15-16], dismissal would in any event be without prejudice to re-indicting them on what they refer to as "little conspiracies" comprised of individual defendants (or married couple-defendants) and Singer. Their suggestion that such charges would fail because they were merely Singer's clients is frivolous. A "mere buyer-seller relationship, without more," may not establish a conspiracy [D.1032 at 16 n.4 (internal quotations omitted)], but a buyer and seller joining forces to defraud a third party does.

[4] While the defendants may have had individual motives for joining the conspiracy—such as a desire for their children to gain admission to the colleges of their choice—that does not mean they did not also share in the conspiracy-wide goal of using fraud and bribery to gain admission for their children to elite colleges and universities.

8

conspiracy into multiple conspiracies. The First Circuit's decision in *United States v. Prieto* is instructive. *See* 812 F.3d 6 (1st Cir. 2016). In that case, which involved a charge of mail fraud, rather than conspiracy, the court *rejected* the defendant's duplicity claim where the government alleged that the defendant ran a multi-faceted scheme that defrauded some 30 mortgage lenders and involved "deceit of homeowners, straws, and lenders" alike. *Prieto*, 812 F.3d at 10. Noting that the indictment "packaged all averments under a single mail fraud count," the court concluded that the indictment properly "made clear that the government undertook the burden of proving a single, overarching scheme." *Id.* at 10-11. It reasoned:

> Schemes to defraud are often, by their nature, complex. The accomplishment of a scheme's fraudulent goal and the simultaneous evasion of detection by its victims of the authorities often necessitate multi-faceted patterns of criminal activity that may harm different groups of victims at different times. . . . . Having put together such a multi-faceted scheme, [the defendant] can hardly protest that the government was willing to charge and bear the burden of proving such a scheme.

*Id.* at 12. Likewise here, the mere fact that the defendants accomplished the goals of their conspiracy in a multi-faceted way does not morph a single agreement into multiple conspiracies. *Cf., e.g.*, *United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[I]t is often possible . . . to divide a single [ ] conspiracy into subagreements," but "this does not necessarily mean that more than one conspiracy exists."); *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more than one conspiracy. As long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy."); *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986) ("[A] finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies").

*Second*, the Indictment sufficiently alleges overlap among the participants in the charged conspiracies. Not only does it allege "the pervasive involvement of a *single* core conspirator," *Portela*, 167 F.3d at 695 (emphasis added and internal quotations and citation omitted)—e.g., Singer—but it also alleges that *all* of the defendants agreed to the object(s) of the conspiracies with which they are charged. The defendants' contention that such overlap was not "meaningful," [D.1032 at 13], is, in fact, meaningless. The Indictment alleges otherwise, and that factual question is properly reserved for the jury at trial. Similarly, the fact that some defendants were involved in some aspects of the scheme but not others is of little moment. Even if "every defendant did not participate in every transaction necessary to fulfill the aim of their agreement [that] does not transform a continuing plan into multiple conspiracies." *Drougas*, 748 F.2d at 17; *see also United States v. Berroa*, 85 F.3d 131, 154 (1st Cir. 2017) (each defendant need not know "all of the details of the conspiracy or participate in every act in furtherance of the conspiracy").

*Third*, while the government is not required to allege interdependence, the Indictment does just that, insofar as it alleges that the manner and means of the conspiracy included explaining to clients and prospective clients that the scheme's methods were "tried-and-true," and "had been successfully employed by many other clients." [FSI ¶ 66(i).] The defendants concede as much, but dismiss these allegations as insufficient because they "at most suggest that some parents knew Singer had other customers."[5] [D.1032 at 15.] But the question of what the evidence "suggests" is reserved for the jury. And, in any event, the Indictment makes plain that a critical aspect of the scheme was re-assuring the defendants that others had pursued it successfully. The evidence at

---

[5] The defendants' concession is directly at odds with their assertion that the Indictment "does not allege or support an inference that any of the defendants knew, or knew of, any of their co-defendants when the events at issue occurred, or that they knew or knew of any participants in Singer's schemes, other than those with whom they directly interacted." [D.1032 at 5.]

10

trial will prove that the defendants sought such assurances as a pre-requisite to joining, and were keenly interested in the scheme's overall success.[6]  This case is, accordingly, unlike those the defendants cite in which the "hub" sought to keep his customers "separate from and ignorant of the existence of the others," *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004), or in which the customers were indifferent to "[w]hether the operation included 3000 additional [customers] or none," *People v. Luciano*, 35 Misc. 3d 1217(A), 2012 WL 1473438, at *15 (N.Y. Cty. Sup. Ct. Apr. 27, 2012).  Here, the defendants were aware that their activities were part of a larger enterprise.  *See, e.g.*, *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (awareness that co-conspirators "were purchasing [jewelry] from [a central hub] for the same purpose [of money laundering], and . . . even encouraged others to do likewise," constituted "substantial evidence that [they] were aware of the nature and scope of [the central hub's] scheme, thereby distinguishing [the] situation from the rimless wheel discussed in . . . *Kotteakos*"); *United States v. Nerlinger*, 862 F.2d 967, 972-73 (2d Cir. 1988) (evidence from which jury could "infer that the [defendants] knew their activities were parts of a larger enterprise operated by [the central hub]" was sufficient to take the case out of the *Kotteakos* rule).  Indeed, the very nature of the alleged scheme depended on having numerous parents willing to engage in bribery and fraud, and a network of corrupt coaches, class takers, test takers, exam administrators, and others willing to facilitate those crimes.  No parent thought Singer was doing this just for them—and the scheme as structured would not have worked had he done so.  *See Portela*, 167 F.3d at 695 n.2 ("The analysis we use to determine 'interdependence' is often characterized in the caselaw as an analysis of 'the nature of the scheme,' but there is no conceptual difference between the tests.") (citation omitted).

---

[6] Indeed, the evidence will show, among other things, that parents inquired about what Singer was doing for other parents, complained when they thought other parents were being loose-lipped, and referred friends.

11

*Cf. id.* at 697-98 (affirming conviction of drug supplier for conspiring with other suppliers, among others, where "the work of other suppliers was essential to the health of [the intermediary's] network, and thus also to the ultimate success of [the supplier's] transaction" with that intermediary). The defendants' conclusory assertion that Singer's activities "on behalf of any one of his clients . . . weren't 'necessary' to the success of his efforts on behalf of any other," [D.1032 at 14], is thus untrue—and premature in the context of a motion to dismiss.

At bottom, the defendants' motion is little more than a challenge to the sufficiency of the government's evidence. But as the First Circuit has repeatedly made clear, including as recently as last week, that is not proper on a motion to dismiss. *See United States v. Alexander*, -- F.3d --, 2020 WL 2079163 (1st Cir. Apr. 30, 2020); *see also, e.g.*, *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("The problem with [defendant's] argument is that it fails to attack the facial validity of the indictment and instead challenges the government's substantive case."); *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) (noting that "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations"). The issue on a motion to dismiss is not the government's proof, but "solely whether the allegations in the indictment are sufficient to apprise the defendant[s] of the charged offense[s]." *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir.2012). The Indictment indisputably does that, and the defendants' "attempt to sink a facially valid indictment with a motion to dismiss that targets the strength of the government's *evidence* misfires."[7]  *Guerrier*, 669 F.3d at 3 (emphasis in original).

---

[7] The conclusion that the Indictment properly alleges single conspiracies disposes of Kimmel's separate motion to dismiss the charges against her or, alternatively, to limit the allegations to those concerning her efforts to secure her son's admission to USC. [D.1036.] Kimmel contends that her conduct comprised "two wholly-disconnected alleged conspiracies," one involving her daughter's admission to Georgetown, the other involving her son's admission

### B.     The defendants are properly joined in a single Indictment.

Building on their *Kotteakos* argument, the defendants contend that they have been improperly joined under Federal Rule of Criminal Procedure 8(b), and that the acts each defendant allegedly took in furtherance of the conspiracies are not sufficiently related to be joined under that rule. [D.1032 at 17-24.] But the defendants' misjoinder argument simply rehashes their *Kotteakos* arguments, and they also misstate the remedy for improper joinder, which is severance, not dismissal. Because the defendants have been properly joined, their motion should be denied.

### 1.     Applicable law.

Rule 8(b) provides that an indictment:

> may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

To be properly joined, "the offenses in question must constitute a series of acts or transactions," and there must be "a showing that joining the defendants is a benefit to the government." *United States v. Prange*, 922 F. Supp. 2d 127, 129 (D. Mass. 2013) (Gorton, J.) (citing *United States v. Santiago Barbosa*, 666 F.2d 704, 707-08 (1st Cir. 1981)). "'In the ordinary case, a rational basis

---

to USC. [D.1036 at 7.] But Kimmel's involvement in the single conspiracy the government charged did not terminate with her daughter's admission, and then resume when it was her son's turn. "[I]n order to withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy. . . . [M]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal from a conspiracy." *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002) (citation and internal quotation marks omitted). Moreover, Kimmel's suggestion that the Court should strike the allegations concerning her efforts to secure her daughter's admission to Georgetown fails because Kimmel cannot satisfy the "exacting" standard for striking surplusage, *United States v. Sawyer*, 878 F. Supp. 279, 294 (D. Mass. 1995) (Gorton, J.), *aff'd*, 85. F.3d 713 (1st Cir. 1996), particularly where evidence of the allegations would be admissible in a trial of her later actions to show knowledge, intent, and absence of mistake, *see United States v. Anzalone*, 783 F.3d 10, 12 (1st Cir. 1986) (actions outside the statute of limitations period are not barred from admission under Rule 404(b)).

for joinder of multiple counts should be discernible from the face of the indictment.'" *United States v. Azor*, 881 F.3d 1, 10 (1st Cir. 2017) (quoting *United States v. Natanel*, 938 F.2d 302, 306 (1st Cir. 1991)). Put differently, "the propriety of joinder under Rule 8(b) is to be judged according to the language of the indictment, not according to the government's proof at trial." *United States v. Sutherland*, 656 F.2d 1181, 1190 (5th Cir. 1981) (citing *Schaffer v. United States*, 362 U.S. 511 (1960)). "[I]t is settled that a conspiracy count can forge the needed linkage" for proper joinder, absent a showing that the charge was included in bad faith. *Natanel*, 938 F.2d at 307 (citations omitted); *United States v. Luna*, 585 F.2d 1, 4 (1st Cir. 1978). Further, "[j]oinder is proper . . . even when the objecting defendant is only connected to one part of [the] scheme." *Azor*, 881 F.3d at 11 (citation omitted); *see also Santiago Barbosa*, 666 F.2d at 708 ("lack of total identity is the whole purport of" Rule 8(b)). Defendants bear the burden of showing misjoinder, and the remedy for misjoinder is severance. *Natanel*, 938 F.2d at 306.

> **2.     The offenses charged in the Indictment are part of the same series of acts or transactions and joinder benefits the government.**

"The government can indict jointly based on 'what it reasonably anticipates being able to prove against the defendants' at the time of indictment." *Azor*, 881 F.3d at 10 (quoting *Natanel*, 938 F.2d at 306). Here, as set forth above, the Indictment alleges, and the government anticipates proving at trial, that the defendants conspired together to commit mail and wire fraud and honest services mail and wire fraud, as well as to commit money laundering, and that 11 of the 14 defendants also conspired together to commit federal programs bribery. The government also anticipates proving related substantive offenses, each of which is part of the same series of acts or transactions that give rise to the conspiracies.

The principal purposes of the federal programs bribery conspiracy are largely the same as those of the fraud conspiracy, and the acts underlying the conspiracies are also the same. [*Compare*

14

FSI ¶ 280 (allegations concerning federal programs bribery conspiracy) *with* FSI ¶ 65 (allegations concerning fraud conspiracy).]  The money laundering conspiracy is likewise part of the same series of acts or transactions because it was designed to conceal the fraud scheme.  [FSI ¶ 307-08.] Each of the substantive wire fraud and federal programs bribery charges constitutes an act in furtherance of the conspiracies.  [*Compare* FSI ¶¶ 376, 378 (substantive wire fraud and federal programs bribery charges) *with* FSI ¶¶ 142, 200, 241-42, 244, 262, 275 (acts in furtherance of fraud conspiracy).]  Finally, the tax charge against Wilson concerns fraud arising from his deduction of bribe and other payments in furtherance of the conspiracies from his taxes, and is thus part of the same series of acts or transactions as the other charges.  The conspiracy charges thus "forge the needed linkage" for joinder.[8]

Courts have found proper joinder on much less.  In *Santiago Barbosa*, for example, the indictment charged distribution of heroin against one defendant and distribution of cocaine against the same defendant and two others.  666 F.2d at 706.  Even in the absence of a conspiracy charge linking the two counts, the First Circuit affirmed the denial of severance because one defendant was charged in both counts, "the place of sale was the same, and the second sale began five minutes after the first was completed."  *Id.* at 707.  Relying on *Santiago Barbosa*, this Court found three conspiracies alleged in *Prange* were part of the same series of acts or transactions, notwithstanding the fact that only one of the defendants was alleged to have participated in all three.  922 F. Supp. 2d at 129.  In reaching that conclusion, the Court considered that (1) the alleged transactions underlying all three took place in the same office in Massachusetts, (2) Prange and an undercover

---

[8] The defendants do not contend that the government included the conspiracy charges in bad faith—and it did not.  *See Luna*, 585 F.2d at 4  (rejecting appeal of denial of severance motion where conspiracy charge was sufficient link under Rule 8 and "appellants have not pointed to any evidence that the prosecutor had an impermissible motive in joining the three counts of the indictment").

agent took part in each transaction, (3) Prange was the initial link between the other defendants and the sting operation, and (4) Prange benefited from each conspiracy.  *Id.* at 129.

Here, as noted, *all* the defendants are charged in two of the three conspiracies, 11 of the 14 are charged in the third, and the substantive charges are alleged to be acts in furtherance of those conspiracies.  Moreover, even under the defendants' erroneous view of this case as alleging multiple "little conspiracies," joinder would still be proper, where Singer played a role analogous to Prange.  *See also Schaffer*, 362 U.S. at 515-16 (affirming convictions on substantive offenses even where conspiracy charge that "originally justified joinder" was dismissed at close of government's case, and noting that trial judge's limiting instructions were sufficient to protect defendants against potential prejudice).

Singer, of course, is not the only link, and the defendants' argument that there is no identity of participants is based on their effort to break the charged conspiracy down into three "distinct" schemes:  test cheating, class-taking, and athletic recruitment.  [D.1032 at 20, 22.]  But Rule 8(b) is governed by the Indictment, *Schaffer*, 362 U.S. at 513, which alleges not just single conspiracies but a single overarching scheme.  That scheme was conducted through Singer's charitable and for-profit entities, and involved common victims and common participants, including Singer's employees and associates and the defendants themselves, several of whom participated in multiple aspects of the scheme.  And there is complete identity of participants in Counts One and Three, and almost complete identity in Count Two.

Joinder also provides significant benefits to the government.  As set forth in the government's opposition to the defendants' motion to sever [D.1136], conducting no fewer than 11 separate trials (assuming married couples are tried together) would be a massive waste of judicial and prosecutorial resources.  Contrary to the defendants' conclusory arguments [D.1032

at 23-24], separate trials would feature much of the same evidence to prove the existence, nature, and scope of the charged conspiracies, including evidence relating to Singer and his operation, and intercepted and consensually recorded calls among Singer and his co-conspirators (including other parents who are alleged to have participated in the conspiracy), as well as testimony from victims, law enforcement and summary witnesses, and extensive documentary evidence. And evidence that is relevant to proving each individual defendant's guilt as to the substantive charges is also relevant to proving the conspiracies with which all the defendants are charged. *See Prange*, 922 F. Supp. 2d at 129.

Because the offenses alleged here are part of the same acts or transactions and joinder benefits the government, the defendants cannot meet their burden of establishing misjoinder.

## II.    VENUE IS PROPER IN THE DISTRICT OF MASSACHUSETTS

The defendants separately seek to dismiss the conspiracy counts for lack of venue pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)(i), asserting that their alleged crimes have no connection to Massachusetts. [D.1020.] Because the Indictment adequately alleges conduct occurring in this District in furtherance of the charged conspiracies, that motion, too, should be denied.

### A.    Applicable law.

A defendant is entitled to be tried in a venue where the alleged crime was committed. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"); FED. R. CRIM. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). "To deal with continuing offenses such as conspiracy, Congress enacted 18 U.S.C. § 3237(a) (1982),

17

establishing that 'any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.'" *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989).

It is black-letter law that in a conspiracy case, venue is proper so long as any act in furtherance of the conspiracy was committed in the district, even if the defendant was not physically present there. *See id.*; *United States v. Josleyn*, 99 F.3d 1182, 1191 (1st Cir. 1996) ("As a general rule, venue in a conspiracy case depends upon whether an overt act in furtherance of the alleged conspiracy occurred in the trial district . . . . The defendant need not have been physically present in the trial district during the conspiracy.") (internal citations omitted)*; see also United States v. Georgiadis*, 819 F.3d 4, 10-11 (1st Cir. 2016) (noting that if the defendant or any of his co-conspirators took an overt act in furtherance of the conspiracy to commit money laundering in Massachusetts, then venue in the District of Massachusetts was proper, and citing 18 U.S.C. § 1956(i)(2)[9] and *Whitfield v. United States,* 543 U.S. 209, 218 (2005) for the proposition that § 1956(i)(2) "functions as a confirmation of the 'longstanding rule' that 'venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense'").

A motion to dismiss for lack of venue will be granted only if the indictment does not sufficiently allege conduct occurring in the trial district in furtherance of the alleged conspiracy. *See United States v. Acherman*, 140 F. Supp. 3d 113, 117–18 (D. Mass. 2015) (Sorokin, J.) (citing

---

[9] Under 18 U.S.C. § 1956(i)(2), a prosecution for an attempt or conspiracy offense under Section 1956 or Section 1957 "may be brought in the district where venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."

*United States v. Condo*, No. 11–cr–30017–NMG, 2014 WL 1400817, at *1 (D. Mass. Apr. 7, 2014) (Gorton, J.)).    At the motion to dismiss stage, "the allegations of the indictment and the unchallenged statement of proof of the prosecutor must be accepted as true."  *Id.* at 118 (quoting *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986)).    "The government's ability to prove th[ose] allegation[s] is a question for trial."  *Id.* (citations omitted).  *See also United States v. Razo*, No. 1:11-CR-00184-JAW, 2012 WL 5874667, at *6 (D. Me. Nov. 20, 2012) ("For now, the allegations in the superseding indictment assert that the criminal conduct occurred in part in the District of Maine, and are thus facially sufficient to support venue in the District of Maine.  [The defendant] remains free to challenge those allegations at trial.").

### B.  The allegations of the Indictment establish venue for the charged conspiracies in the District of Massachusetts.

The Indictment alleges that the defendants conspired to use bribery and other forms of fraud to facilitate their children's admission to selective colleges in the District of Massachusetts and elsewhere.  [FSI ¶ 64.]  The Indictment further alleges that the manner and means by which the defendants and their co-conspirators carried out the fraud conspiracy included submitting falsified applications to colleges in the District of Massachusetts and elsewhere.  [FSI ¶ 66(h).]  The Indictment also alleges numerous acts occurring in this District in furtherance of the fraud conspiracy, including the following:

- In or about July 2018, Singer's sham charitable foundation, KWF, began paying USC athletics administrator Donna Heinel $20,000 per month in exchange for facilitating the admission of Abdelaziz's daughter, and the children of other Singer clients, to USC as purported athletic recruits.  The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.  [FSI ¶ 121.]

- In or about 2018, the ACT score Singer's corrupt proctor, Mark Riddell, secretly obtained on behalf of Chen's son was submitted via interstate wire communication to various colleges and universities, including, on or about October 8, 2018, to Emerson College in Boston, Massachusetts.  [FSI ¶ 142.]

19

- On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGlashan's son was submitted to various colleges and universities, including Northeastern University, in Boston, Massachusetts, via wire communication in interstate commerce. [FSI ¶ 200.]

- On or about October 17, 2018, Wilson's company, HPC, wired $500,000 to an account in the name of KWF in the District of Massachusetts in connection with Wilson's agreement to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his twin daughters' admission to Stanford and Harvard as purported athletic recruits. [FSI ¶ 241.]

- On or about December 11, 2018, Wilson's company, HPC, wired another $500,000 to the Massachusetts account in the name of KWF. [FSI ¶ 244.][10]

- On or about August 24, 2017, Zangrillo's daughter's high school emailed her transcript to Boston University in the District of Massachusetts. The transcript reflected credits earned by Sanford and another co-conspirator on behalf of Zangrillo's daughter. [FSI ¶ 262.]

- Consensually recorded calls between Singer and certain of the defendants occurred when Singer was located in the District of Massachusetts. [FSI ¶¶ 122, 163, 164, 223, 242, 243, 252, 274, 275, 350.]

Each of these allegations is re-alleged and incorporated by reference in Counts One, Two, and Three. [*See* FSI ¶¶ 369, 371, 373.]

In addition, with respect to the money laundering conspiracy charged in Count Three, the Indictment alleges that the defendants conspired to conceal their fraud scheme by funneling bribe and other payments through The Key or KWF, including via payments to and from accounts in the District of Massachusetts. [FSI ¶ 307.] The Indictment further alleges that Singer funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of

---

[10] The defendants note that the allegations regarding payments made by Wilson in 2018 are the subject of a separate motion to strike. For the reasons set forth in the government's consolidated opposition to Wilson's motions to sever, dismiss, and strike, there is no basis to strike those allegations. [*See* D.1135.] In any event, contrary to defendants' assertion, the Wilson allegations are among many that establish venue in this District.

Massachusetts and elsewhere, on behalf of other co-conspirators, in order to conceal and disguise the nature, location, source, ownership, and control of bribe money and other payments in furtherance of the bribery and fraud schemes.  [FSI ¶ 351.]

In short, the Indictment alleges multiple overt acts occurring in Massachusetts in furtherance of each of the charged conspiracies, and these allegations are easily sufficient to support venue in this District.  The defendants' contrary arguments are without merit.  As to Count One, their primary contention is, once again, that the government has improperly joined them together in a single conspiracy.  For all of the reasons set forth above, that is not true.  And because the defendants are properly charged together in a single conspiracy, a single act by any co-conspirator in furtherance of the conspiracy occurring in this District is all that is required to give rise to venue here.  The Indictment far surpasses that requirement.  There is, accordingly, no need to analyze each defendant's ties to the District separately, and the defendants' remaining arguments in support of dismissing Count One for lack of venue are therefore moot.

With respect to Count Two, the defendants contend that the Indictment does not allege a single overt act tied to Massachusetts.  That is incorrect.  *All* of the alleged overt acts in furtherance of Count One are re-alleged and incorporated by reference in Count Two, including the allegation that, on or about January 3, 2019, Singer mailed a check from Massachusetts to Heinel in California, in exchange for Heinel facilitating the admission of Abdelaziz's daughter and the children of other Singer clients to USC as purported athletic recruits.

The defendants contend that this mailing does not support venue in Massachusetts because Singer's arrangement to pay Heinel $20,000 per month was a separate agreement formed after his agreements with the defendants.  It wasn't.  The defendants are charged with engaging in a single conspiracy with Singer, Heinel, and others, and steps taken by Singer and Heinel in furtherance of

21

A415

that conspiracy—such as deciding how to allocate the bribes the defendants had previously agreed to pay—support venue as to all of them. The fact that the $20,000 per month payments began later in the conspiracy is irrelevant. The conspiracy was ongoing, and none of the defendants withdrew from it. Indeed, a number of the defendants were actively working with Singer at the time—including McGlashan, who was pursuing the USC side door on behalf of his son at the time Singer was approached by law enforcement. Nor does it matter whether the defendants were aware of this specific arrangement between Singer and Heinel. The law is clear that each conspirator need not know all of the details of the conspiracy or participate in every act in furtherance of it. *See Berroa*, 85 F.3d at 154.

Likewise, that Singer was cooperating at the time he mailed the check to Heinel is irrelevant, because the conspiracy did not end with his cooperation. The defendants quote the First Circuit's decision in *Portela* for the proposition that "[G]overnment agents do not count as coconspirators." [*See* D.1020 at 3 (quoting *Portela*, 167 F.3d at 700 n.8).] But their edits to that quote are telling. The full quote says something quite different: "'The rule that government agents do not count as co-conspirators has relevance *only in situations where the conspiracy involves only one defendant and a government informer.*'" *Portela*, 167 F.3d at 700 n.8 (quoting *United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987)); *see also Giry*, 818 F.2d at 126 (plurality requirement for conspiracy satisfied by participation of two true conspirators, so participation of government agents did not negate existence of conspiracy charge); *United States v. Cordero*, 668 F.2d 32, 43 (1st Cir. 1981) ("The participation of a government agent in a conspiracy does not negate the existence of that conspiracy nor make it any the less a violation of the law."). Here, all of the defendants, and all of the other co-conspirators—including Heinel—remained a part of the conspiracy even after Singer began cooperating. Accordingly, the payment to Heinel was in

22

A416

furtherance of the conspiracy, and the mailing thus sufficient to support venue in this District. And that is true regardless of whether the mailing was at the direction of law enforcement. The First Circuit has explicitly rejected the concept of "manufactured venue" or "venue entrapment" and has held that government agents may influence where a crime occurs, and thus where venue lies. *See United States v. Valenzuela*, 849 F.3d 477, 489 (1st Cir. 2017). For all of these reasons, this allegation alone is sufficient to establish venue for Count Two, even without all the other allegations in the Indictment.

It is also sufficient to establish venue for Count Three. The defendants assert that the Indictment does not does not allege a single payment to or from an account in Massachusetts in support of the money laundering conspiracy. They once again ignore that the allegations in support of the fraud and bribery conspiracies—including the mailing to Heinel and the payments by Wilson—are re-alleged and incorporated by reference in Count Three. Those payments, made to and from accounts in this District, were in furtherance of the money laundering conspiracy and establish venue. Likewise, the defendants cite no support for their contention that the more general allegation that Singer funneled bribes through KWF and The Key to coaches and university administrators in Massachusetts does not suffice to establish venue. It does. At trial, the government will prove that Singer paid bribes to Ernst, the Georgetown tennis coach, out of The Key and KWF accounts, including in June 2018—prior to Singer's cooperation—when he caused a $100,000 check to be mailed to Ernst's residence in Falmouth, Massachusetts. At this stage, the general allegation in the Indictment and this statement of proof must be accepted as true. *See*

23

*Acherman*, 140 F. Supp. 3d at 118. Therefore, this too—even if it were standing alone—is sufficient to establish venue for Count Three (as well as Count One).

Finally, the defendants argue that even if the Court concludes that the government has properly alleged a single conspiracy and therefore that the act of any co-conspirator can support venue, it should adopt the Second Circuit's foreseeability test, which requires that an overt act must be foreseeable to each defendant to establish venue. But neither the First Circuit, nor any other circuit, has adopted this test. *See United States v. Renteria*, 903 F.3d 326, 329-30 (3d Cir. 2018) (declining to adopt a reasonable foreseeability test); *United States v. Johnson*, 510 F.3d 521, 527 (4th Cir. 2007) (finding no foreseeability requirement under 15 U.S.C. § 78aa, which governs venue for securities offenses); *United States v. Castaneda*, 315 F. App'x 564, 569-70 (6th Cir. 2009) (unpublished) (declining to adopt foreseeability as an element of venue); *United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012) ("Simply put, section 3237(a) does not require foreseeability to establish venue for a continuous offense.").

Neither the text of the Constitution nor of 18 U.S.C. § 3237(a) requires reasonable foreseeability, and such a test should not be implied given that venue is a jurisdictional element to which *mens rea* requirements do not apply. *See Renteria*, 903 F.3d at 330. As the Fourth Circuit reasoned in *Johnson*:

> If Congress [in enacting 15 U.S.C. § 78aa] had wanted to limit venue to those districts where the defendant could have reasonably foreseen his criminal conduct taking place, it could have easily done so. Instead, it enacted a broad venue provision, one that lacked any reference to a defendant's mental state or predictive calculus. . . . We are especially reluctant to imply a foreseeability requirement in light of the fact that it is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime . . . This is because venue is similar in nature to a

24

A418

> jurisdictional element . . . and typically lacks any sort of explicit
> knowledge or foreseeability prerequisite[.]

510 F.3d at 527 (internal citations and quotation marks omitted). The defendants offer no sound basis for the Court to depart from these principles. Accordingly, the Court should reject the defendants' request to adopt a foreseeability requirement that the First Circuit has not imposed, and the defendants' motion to dismiss for lack of venue should be denied.

## III. THE DEFENDANTS' CHALLENGES TO THE FRAUD ALLEGATIONS FAIL.

As noted, Count One charges the defendants with conspiracy to commit mail and wire fraud on both a property and honest services theory, while Counts Four through Ten charge defendants Chen, McGlashan, Wilson, and Zangrillo with substantive counts of mail and wire fraud. The defendants attack all of these counts, arguing that this case lacks both "property" and "bribes." Both claims lack merit.

### A. The Indictment adequately alleges mail and wire fraud.

The defendants argue that the Indictment does not allege that the universities or the testing companies were deprived of "property" cognizable under the mail or wire fraud statutes. [D.1022; D.1042.] That is wrong. The "property" described in the Indictment—admissions slots at the universities and SAT/ACT tests and the scores on those tests—qualifies as such under settled precedent and the defendants cite no persuasive legal authority to the contrary.

#### 1. The mail and wire fraud statutes are not limited to the protection of "traditional" forms of property.

The mail and wire fraud statutes prohibit the use of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. In *McNally v. United States*, 483 U.S. 350, 358 (1987), the

Supreme Court held that the mail fraud statute[11] did not reach deprivations of "intangible rights unrelated to money or property." *Cleveland v. United States*, 531 U.S. 12, 18 (2000) (discussing *McNally*). But *Carpenter v. United States* soon clarified that *McNally* had not "limit[ed] the scope of § 1341 to tangible as distinguished from intangible property rights," 404 U.S. 19, 25 (1987), and subsequent First Circuit cases construed the term "property" broadly. *See United States v. Ochs*, 842 F.2d 515, 522 (1st Cir. 1988) ("[T]he *Carpenter* Court gave a broad reading to protected property interests . . . ."); *United States v. Dray*, 901 F.2d 1132, 1142 (1st Cir. 1990) (noting that "the concept of property 'is to be interpreted broadly'") (quoting *McNally*, 483 U.S. at 356); *see also United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (explaining that the mail fraud statute protects "a wide variety of tangible and intangible property interests"). In *Pasquantino*, the Supreme Court affirmed this view, holding that "property" in the wire fraud statute is used "as that term is ordinarily employed[,] . . . 'extend[ing] to every species of valuable right and interest.'" 544 U.S. at 356 (quoting Black's Law Dictionary 1382 (4th ed. 1951)).

The defendants ask the Court to read into this precedent a rule that the mail and wire fraud statutes only reach forms of property with a "historical pedigree," such as those that appear in Blackstone's *Commentaries* or were recognized at common law. [D.1042 at 5-9.] This argument is without merit. Although the Supreme Court referred to "traditional concepts of property" in *Carpenter* and *Cleveland*, it did not suggest that the statutory definition was *limited* to such property. *See Carpenter*, 484 U.S. at 25-26; *Cleveland*, 531 U.S. at 24. And while *Pasquantino* consulted common law sources in deciding whether a foreign country's right to unpaid taxes was

---

[11] Although *McNally* was a mail fraud case, the Supreme Court "construe[s] identical language in the wire and mail fraud statutes in *pari materia*," *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005), and the government therefore discusses cases under both statutes interchangeably.

property, 544 U.S. at 356, the case did not *require* such an analysis. Indeed, it expressly embraced a definition of "property" that contained no such limitation.

That other appellate courts, including the Second, Third, and Sixth Circuits, construed *Carpenter* to encourage consideration of traditional property concepts is equally unavailing. *See United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994); *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988*); United States v. Baldinger*, 838 F.2d 176, 179 (6th Cir. 1988). The force of those precedents is doubtful following *Pasquantino*, *see United States v. Blaszczak*, 947 F.3d 19, 31-32 (2d Cir. 2019) (applying *Pasquantino*'s definition in determining whether a novel interest was cognizable), and in any event, this Court is bound by the precedent of the First Circuit, which has not so held. *See Ochs*, 842 F.2d at 522; *Dray*, 901 F.2d at 1142; *Rosen*, 130 F.3d at 9.[12]

### 2. Admissions slots are cognizable property interests.

Universities have a cognizable property interest in the composition of their undergraduate degree programs. *See Frost,* 125 F.3d 346. In *Frost*, the defendants were professors and graduate students convicted of mail fraud for their roles in a scheme to award masters and doctoral degrees from the University of Tennessee Space Institute ("UTSI"), using, among other things, plagiarized theses and dissertations, with the intent that the students—primarily military and government personnel—would later steer contracts to the professors. *Id.* at 352-53. In upholding the convictions of the professors, the Sixth Circuit held that by falsely certifying that the students had satisfied degree requirements, the professors infringed a cognizable property right of UTSI in its unissued masters and doctoral degrees. *Id*. at 367. The court noted that, "[i]n general, the concept

---

[12] Even if this were not the case, it is not clear that the property alleged in the Indictment does not fall within "traditional" notions of property. Indeed, the two cases most on-point, *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), and *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004), arose in circuits that *do* consider traditional property interests.

of property refers to a bundle of rights which includes the rights to possess, use, exclude, profit, and dispose." *Id.* (internal quotation marks and citation omitted). It further explained:

> Ultimately, a university is a business: in return for tuition money and scholarly effort, it agrees to provide an education and a degree. The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students . . . will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money. [USTI] therefore has a property right in its unissued degrees. . . .

*Id.*

The defendants argue that *Frost* is distinguishable because it addressed unissued degrees rather than admissions slots [D.1042 at 10], but this is a distinction without a difference. Students gain admission to a college or university for the purpose of and with the expectation that they will obtain a degree. Thus, "admissions slots" and "unissued degrees" are little more than alternate ways of describing the same thing. *Frost*'s rationale, moreover, applies equally whether one focuses on the process of gaining admission to a selective university or its awarding of degrees. The number of admissions slots, like the number of degrees, is limited, and an institution of higher education that awards coveted admissions slots to those "who have not earned them" will decrease their value, damaging the institution's reputation and its ability to continue to attract tuition-paying students. *Frost*, 125 F.3d at 367.[13]

The defendants also dispute that admissions slots have "economic value," [D.1042 at 9], but it is self-evident that undermining the integrity of the academic process imposes real costs, ranging from the prospect of a decline in applications and reduced donations in the future to the

---

[13] The defendants also suggest that *Frost* may be distinguished because it was a prosecution for honest services fraud [D.1042 at 11 n.6], but the court's analysis of UTSI's property rights drew no such distinction, *see* 125 F.3d at 367, and defendants fail to show why this should matter.

immediate loss of an opportunity to field a competitive sports team. *Cf. United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996) (noting, in a mail and wire fraud case involving a fraudulent scheme to retain ineligible basketball players, that the scheme harmed the university not only because it "did not get the quality student it expected" but because, absent the fraud, it "might have been able to recruit other qualified, eligible students to play basketball").[14]

Nor is *Frost* alone in its reasoning. In *United States v. Barrington*, the Eleventh Circuit found that a wire fraud scheme—pursuant to which students accessed a university's grading system and changed grades to benefit themselves and friends—implicated the university's "intangible property interest in the integrity of its grading system." 648 F.3d 1178, 1191 n.11 (11th Cir. 2011). And in *Hedaithy*, , the Third Circuit applied *Frost*'s rationale expressly to find that the property interests of a testing business were violated by a fraudulent scheme in which imposters were hired to take the Test of English as a Foreign Language ("TOEFL") exam on behalf of others. 392 F.3d at 585. The court concluded that this scheme implicated the same property interests as the approval of fraudulent academic accomplishments in *Frost*, undermining the "integrity of the TOEFL testing process" and its "credibility, and thus the value of [the testing company's] entire investment in the process." *Id.* at 600 (internal quotation marks omitted). The same logic applies to those who gain access to a university under fraudulent pretenses, as the defendants here did for their children. *See id.* at 601 (finding "no principled distinction" between the fraud perpetrated in *Frost* and its impact on degrees and the fraud perpetrated on the testing company and its impact on score reports).

---

[14] Contrary to the defendants' suggestion [D.1042 at 9], the government need not show pecuniary harm, but only that the defendant "contemplated either some articulable harm befalling the fraud victim or some gainful use of the object of the fraudulent scheme by the perpetrator." *Rosen*, 130 F.3d at 9 (internal quotation marks omitted). The latter is certainly true here.

29

The conclusion that the universities have a cognizable interest in their admissions slots also follows from the well-established principle that "the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets." *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 1998); *accord United States v. Gray*, 406 F.3d 227, 234 (4th Cir. 2005) (agreeing that a property owner's "intangible right to control the disposition of its assets" is an interest protected by the mail and wire fraud statutes and citing cases).[15] This right is infringed, and a violation of the statutes occurs, when, as a result of the defendant's fraudulent scheme, the victim is "depriv[ed] . . . of information necessary to make discretionary economic decisions." *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998); *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991) ("[W]ithholding or inaccurate reporting of information that could impact an economic decision can provide the basis for a mail fraud prosecution.").

Universities, of course, have an interest in controlling which potential students have access to their vast array of valuable assets including dormitory rooms, classrooms and laboratories, and the labor of an extensive, highly trained workforce. Where an applicant obtains admission—and thus access to such assets—based on fraudulent "misrepresentation of an essential element of the bargain," that conduct infringes a cognizable property interest under the mail and wire fraud statutes. *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). That is precisely what happened here: the defendants obtained admissions slots intended for skilled athletes by, among other things, representing that they were sufficiently qualified for those slots when they were not.

---

[15] *See also United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003) ("[W]e have recognized the intangible right to control one's property is a property interest within the purview of the mail and wire fraud statutes."); *United States v. Bucuvalas*, 970 F.2d 937, 945 (1st Cir. 1992) (applying right to control theory in holding that the City of Boston had a cognizable interest in municipal licenses), *abrogated by Cleveland*, 531 U.S. 12.

In doing so, they deprived the universities of their right to control access to their valuable assets—a property interest that the mail and wire fraud statutes protect.

### 3.    The defendants' arguments to the contrary are without merit.

The defendants' remaining arguments provide no basis for concluding that admissions slots are not "property."

#### a.    *Plyler et al*. did not resolve the issue before this Court.

The defendants first argue that *United States Plyler*, 222 U.S. 15 (1911), and other ancient civil service fraud cases show that an admissions slot is not "property." [D.1042 at 11–15.] That is incorrect. *Plyler* did not hold that a civil service job—which the defendants analogize to an admissions slot [D.1042 at 11]—is not "property." Indeed, such a reading of the case is belied by the Court's reliance on *Curley v. United States*, 130 F. 1 (1st Cir. 1904), which held that a defendant's use of "fraud and deception to avoid the requirement of the law in respect to qualifications, and to secure. . . an office for the duties of which the person was not qualified," *would* constitute a fraud implicating "property and property rights." 130 F. 1, 12–13 (1st Cir. 1904). At most, this one-paragraph opinion suggests that forging civil service documents could be a "fraud[] against the United States" even if "an actual financial or property loss" did not result. *See* 222 U.S. at 15. It is inapposite here.[16]

#### b.    The Indictment properly alleges conspiracy to obtain admission, not offers.

The defendants next contend that the Indictment alleges a scheme to deprive the universities of admissions *offers*, not *slots*, and that the former is not "property." [D.1042 at 15–

---

[16] Moreover, whatever propositions *Plyler* and its progeny established for the statutes they construed, they cannot form a basis to ignore the Supreme Court's and First Circuit's binding constructions of the term "property" in the mail fraud and wire fraud statutes, as described above.

18.]  This argument targets a straw man, and even a cursory reading of the Indictment debunks the claim.  The phrase "admissions slot" refers to a place in the admitted student body—such as the places "allot[ted] . . . to [a] head coach of a sport for that coach's admitted athletes."  [FSI ¶55.] The Indictment expressly alleges that the defendants sought by their fraudulent scheme to obtain "admission to the Universities."  [FSI ¶¶ 370(a) (mail fraud) & 370(b) (wire fraud).]  This language establishes that the object of the conspiracy was to obtain these reserved positions—a commodity that, by its nature, is inherently limited.  [*Accord* FSI ¶ 65 (identifying as a "principal purpose[] of the conspiracy" the goal of "securing the admission of the defendants' children to selective colleges").]

Even if the Indictment had not been so clear, the defendants' reliance on *Skilling v. United States*, 561 U.S. 358 (2010), *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) and *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) [D.1042 at 15–19], does not advance their cause. None of those cases addresses the question whether an "offer" is property.  Indeed, neither *Skilling* nor *Takhalov* addresses the meaning of "property" at all.  *Skilling*, 561 U.S. at 400; *Takhalov*, 827 F.3d at 1312–15.  The cases are also plainly distinguishable, for reasons *Takhalov* makes apparent. Contrary to the defendants' suggestion [D.1042 at 18], *Takhalov*'s holding does not turn on the temporal relationship between a defendant's deceptive conduct and the resulting harm, but on the need for the deception to be material.  In construing the term "scheme to defraud," *Takhalov* distinguished between schemes that "do no more than cause their victims to enter into transactions they would otherwise avoid," from those "where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."  827 F.3d at 1314 (citations and internal quotation marks omitted).

The deception alleged here—falsified athletic and academic credentials—did more than cause the universities "to enter into transactions they would otherwise avoid." *Id.* (internal quotation marks omitted). Indeed, it is difficult to imagine a clearer example of a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered," *id*. (internal quotation marks omitted), than admitting an individual as a recruited athlete when the person does not have such skills, or based on a transcript or test scores that do not represent the applicant's academic abilities. This is, accordingly, not a case where the deceived party ended up with a bargain whose "terms were the same as any that could have been negotiated at arm's length," without such deception. *Skilling*, 561 U.S. at 400.

### c.    The defendants' argument that the Indictment improperly alleges a deprivation of services is without merit.

The defendants next claim that if admissions slots are not offers, they must be "services," which they contend are also not property. [D.1042 at 19-22]. But that is plainly not true. As noted above, institutions of higher education possess numerous assets deployed to the benefit of admitted students. While some may be thought of as "services"—*i.e*., instruction, administration—others, including dorm rooms, furniture, food, and access to institutional facilities, are not.

Nor does the distinction matter. As *Frost* made clear, the relationship between a university and an admitted student is ultimately a contractual one: "in return for tuition money and scholarly effort, [the university] agrees to provide an education and a degree." 125 F.3d at 367. And "fraudulently obtained contracts are property," notwithstanding that they are "promise[s] to pay for services rendered." *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008). Moreover, the Supreme Court's decision this week in *Kelly v. United States* affirms that an employer's "right to its employees' time and labor . . . can undergird a property fraud prosecution," including a prosecution for wire fraud, so long as deprivation of those services is the "object of the fraud."

--- S.Ct.---, 2020 WL 220083, at *6 (May 7, 2020) (internal quotation marks omitted). While the Court found that principle inapplicable in that case, because the redirection of government labor was merely "incidental" to the scheme that centered on an exercise of the government's regulatory function, *id.* at *7, the opposite is true here. The object of the fraud was to obtain admission, which entailed access to the services of the universities' employees no less than to the universities' real property. Given these precedents, the Indictment properly charges a deprivation of property whether or not some of what the defendants obtained as a result of their fraud may be described as educational "services."[17]

> ### d.    The defendants' policy arguments provide no basis for dismissal.

Finally, the defendants argue that the government's theory of property sweeps too broadly, placing college applicants "at the mercy of federal prosecutors" for any misstatement. [D.1042 at 30-32.] The defendants point to no case supporting the dubious proposition that this Court may dismiss a facially valid indictment based on concerns about application of its theory to other fact patterns.[18] On that ground alone, this claim should be rejected. But even assuming such authority existed, this case hardly represents a novel application of the mail and wire fraud statutes. *See Barrington*, 648 F.3d at 1190-92 (upholding application of wire fraud statute to grade-changing scheme). [*See also* D.1137, Exhibit A (chart identifying other cases in which academic cheating

---

[17] In light of *Kelly*'s confirmation that employee services are cognizable property, the defendants' argument that *McNally* supports the opposite view [D.1042 at 28], is untenable. Likewise, the defendants' citations to cases distinguishing "property" from "services" in far different contexts, including *De Lima v. Sessions*, which addressed the meaning of "generic theft" for purposes of sentencing, 867 F.3d 260, 266–67 (1st Cir. 2017), add nothing to their argument.

[18] The defendants' vagueness claim plainly fails for this reason, as dismissal for lack of notice prior to trial can only occur where the "facts surrounding the commission of the alleged offense" are entirely uncontested, which is not true here. *See United States v. Stepanets*, 879 F.3d 367, 375 (1st Cir. 2018) (internal quotation marks omitted).

formed the basis mail and/or wire fraud convictions).][19]  To be sure, close cases may arise in which courts must draw a line between forms of academic cheating that can satisfy the elements of mail and wire fraud and those that cannot.  But courts have no authority to do so by adopting a definition of "property" contrary to binding authority, as the defendants would have this Court do.  The Indictment alleges that the defendants engaged in a scheme to defraud the universities out of valuable admissions slots by falsely portraying their children as recruited athletes.  Wherever the line may ultimately be drawn, it is not here.

### 4.    The Indictment properly charges that the testing companies were deprived of property.

In a separate but related motion the defendants argue that the Indictment fails to allege that ACT, Inc. or the College Board was deprived of a cognizable property interest.  [*See generally* D.1022.]  Apart from the repetition of arguments already addressed above—*e.g.*, that the mail and wire fraud statutes only reach "traditional" forms of property and should be construed narrowly, and that educational "services" cannot be property [D.1022 at 2-3, 6-7]—this challenge reduces to two claims:  (1) that *Hedaithy*, the sole on-point appellate precedent, was wrongly decided, and (2) that *Hedaithy* does not apply to the allegations against them [D.1022 at 7-12].  Neither argument withstands scrutiny.

---

[19] Nor can the defendants plausibly claim that the garden-variety misstatements and fibs they describe—such as misleading a store to reserve a Christmas present [D.1042 at 24]—would become mail or wire fraud under the government's theory.  These circumstances fail to describe a crime for reasons unrelated to the property interest, including the lack of any knowing and willing participation in a "scheme or artifice to defraud using false or fraudulent pretenses" or a material misstatement.  *See United States v. Pena*, 910 F.3d 591, 596 (1st Cir. 2018) (internal quotation marks omitted); *United States v. Appolon*, 715 F.3d 362, 367-68 (1st Cir. 2013).

### a. *Hedaithy* was correctly decided.

The defendants in *Hedaithy* were convicted of mail fraud for their roles in a scheme in which hired imposters took the TOEFL, a test administered by Educational Testing Services, Inc. ("ETS"), to generate passing scores so that the defendants or others could remain in the United States on student visas. 392 F.3d at 582. On appeal from their convictions, the defendants argued that the indictment did not identify a cognizable deprivation of property. The Third Circuit disagreed. Following a review of Supreme Court and circuit precedent, the court held that the scheme implicated two property interests:[20] ETS's right to exclusive use of confidential business information contained in the tests, which was violated when the imposters "gained access to ETS's TOEFL exam on terms other than those prescribed by ETS," *id.* at 595; and ETS's interest in the score reports and its "right to convey these items only to those individuals who [met] its prescribed conditions," *id.* at 597.[21]

The defendants make no meaningful attempt to counter *Hedaithy*'s reasoning other than to suggest that its holding that ETS had a property interest in unissued score reports contravenes *Cleveland*. [D.1022 at 12.] As the Third Circuit explained, this argument "misunderstands the fundamental basis of the Supreme Court's reasoning in that case":

> *Cleveland* was based upon the conclusion that the issuance of a government's licenses is an exercise of a state's police powers to regulate. Because the issuance of such a license is a component of the state's regulatory scheme, the license was held not to be "property" in the hands of the regulator. Such reasoning is wholly inapplicable in this case. Here, ETS is a private business that

---

[20] The Third Circuit reviewed *McNally, Cleveland* and *Carpenter. Pasquantino* had not yet been decided. *Id.* at 590-93.

[21] The court found it unnecessary to address two other property interests advanced by the government, including ETS's interest in customer goodwill and in its test administration and scoring services. 392 F.3d at 594 n.15.

36

> provides a service and reports test results in pursuit of a profit-seeking endeavor. Unlike a state, ETS has no sovereign power to regulate.

*Id.* at 600. *Hedaithy* also noted that, in *Cleveland*, the Supreme Court distinguished analogous circumstances involving private parties, such as "'a franchisor's right to select its franchisee,'" which "'derive[] from its ownership of a trademark, brand name, business, strategy or other product that it may trade or sell in the open market'"—circumstances that applied to ETS, which owned the rights to its trademark and copyrights and could sell or license those assets to others. *Id.* (quoting *Cleveland*, 531 U.S. at 24). *Hedaithy*'s reasoning accords with that of the First Circuit. *See Berroa*, 856 F.3d at 149 (noting that *Cleveland* rested on the proposition that "any interest the state had in the licenses was 'regulatory' as opposed to proprietary").[22]

### b. *Hedaithy* applies to this case.

The defendants' attempts to distinguish *Hedaithy* are also without merit. The defendants first argue that *Hedaithy* does not apply because the Indictment alleges a property interest in test "scores," [FSI ¶¶ 54, 370(a, b)], while *Hedaithy* addressed score reports. 392 F.3d at 597. [*See*

---

[22] As an alternative, the defendants argue that this Court should follow *United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988), an easily distinguishable district court case. *Ferrara*'s holding—that a non-profit entity had no property interest in English language and medical knowledge certificates issued to graduates of foreign medical schools—was based on the court's inability "to discern any meaningful difference between [that] certificate" and the state's medical license. *See id* at 42–43. The court noted that the non-profit lacked any "commercial interest in the certificate" and declined to find that an injury to the non-profit's reputation was sufficient to create a property interest. *Id.* at 42-43 & nn.2-3. Unlike the non-profit in *Ferrara,* there can be no argument that ACT, Inc. or the College Board acted as adjuncts of a state licensing authority, nor does the government's allegation of a property interest rely solely on customer goodwill. [FSI ¶ 54.] Moreover, *Ferrara*'s rationale—equating a private entity to a government regulatory authority—is untenable after *Cleveland*. *See Hedaithy*, 392 F.3d at 600. And Second Circuit precedent undermines *Ferrara*'s backhanded refusal to consider goodwill as a cognizable property interest. *See United States v. Finazzo*, 850 F.3d 94, 111 & n.18 (2d Cir. 2017) (holding that deceits that cost a victim "good will" or result in "reputational harm" may support a prosecution for mail and wire fraud if they "could lead . . . to economic losses").

37

A431

*also* D.1022 at 9.] That distinction is meaningless. Test scores do not exist in a vacuum, and the Indictment's allegation that that the "scores" were the "intellectual and physical property" of the testing companies is broad enough to encompass an interest in the reports in which the scores were transmitted. [FSI ¶ 54.]

Nor would it matter if this were not so. While *Hedaithy* noted that the score reports at issue were "tangible items, held in the physical possession of [ETS]," its rationale for ascribing them value lay in ETS's interest in protecting the "goodwill" it had "developed . . . due to the integrity of the testing process." 392 F.3d at 600; *accord United States v. Alsgusair*, 256 F.Supp.2d 306, 316 (D.N.J. 2003). The harm to this interest from fraudulently obtained scores does not depend on their presence in a report. Rather, it results because the scores convey an implicit representation that they were produced in accordance with proper procedures, in the same way the unissued degrees in *Frost* were "property" because they carried an implicit representation that degree requirements were properly fulfilled, 125 F.3d at 367, and the altered grades in *Barrington* implicated the university's "intangible interest in the integrity of its grading system," 648 F.3d at 1191 n.11.[23]

Finally, the defendants argue that the allegation that Riddell corrected their children's tests after they were completed does not allege a scheme to defraud the testing companies of "standardized tests." [D.1022 at 10-12]. That is nonsense. A scheme to fraudulently take possession of tests after they are completed and "correct" them is no less a scheme to "fraudulently obtain" the tests than one in which the tests are taken by an imposter at the outset (which the

---

[23] The defendants also note that the ACT, Inc. website states that "students own their test scores" and may delete them [D.1022 at 9 (emphasis omitted)], but the ability to own a validly obtained test score simply confirms that test scores are property, and the ability to delete a score does not disprove the Indictment's allegation that the intellectual property that goes into the score is the property of ACT, Inc. [FSI ¶ 54.]

Indictment alleges was also among the manner and means by which the scheme was executed, and which it alleges Riddell actually did in the case of defendant Sidoo, who has pled guilty and is awaiting sentencing).  [FSI ¶¶ 66d, 68-91.]  In either case, the schemer has "gain[ed] access to [the] test on terms other than prescribed by" a party possessing the right to control such access. *Hedaithy*, 392 F.3d at 595.  This is true, moreover, whether or not the children knew their answers were being corrected, because the focus is on whether the victim was deprived by the defendants' scheme of the "right to decide how to use" the information contained in the test, not on how that deprivation occurred.  *Id.* (internal quotation marks omitted).

In sum, the Indictment alleges a scheme to defraud the universities of admissions slots and the testing companies of their tests and test scores—each of which constitutes a cognizable property right.  Accordingly, the defendants' motion to dismiss Counts One and Four through Ten on this ground must be denied.

### B.    The Indictment adequately alleges honest services mail and wire fraud.

The honest services fraud statute defines a "scheme or artifice to defraud" as including a "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court held that § 1346 applies to "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 407.

The defendants contend that Count One should be dismissed insofar as it alleges honest services fraud because the Indictment does not adequately allege that Dvorskiy owed a fiduciary duty to the testing companies [D.1022 at 12-16], or that Heinel, Vavic, and Ernst accepted bribes in violation of the fiduciary duty they owed to the universities [D.1038].  These arguments are without merit.

### 1.    The Indictment adequately alleges fiduciary duties.

The defendants do not dispute that the coaches they are charged with bribing owed a fiduciary duty to their university employers.  *See Skilling*, 561 U.S. at 407 n.41 (describing the "existence of a fiduciary relationship" between an employee and employer as "beyond dispute"). They also do not meaningfully dispute that fiduciary duties may arise in independent contractor relationships.  In fact, the law is clear that § 1346 applies equally to "an officer or employee of a private entity . . . or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers." *United States v. Rybicki*, 354 F.3d 124, 127, 141–42 & n.17 (2d Cir. 2003) (en banc).  The existence of the fiduciary relationship turns not on labels but on whether the relationship is a "trusting [one] in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *United States v. Milovanovic*, 678 F.3d 713, 724 (9th Cir. 2012) (en banc) (reversing dismissal of indictment charging independent contractor with bribery-based scheme to help unqualified, non-resident applicants obtain commercial drivers' licenses by, among other things, cheating on exams).  Whether a given relationship qualifies is a question of fact for the jury. *Id.*; *United States v. Halloran*, 821 F.3d 321, 340 (2d Cir. 2016).

The defendants do not address this authority.  Instead, they argue that an independent contractor "typically" does not owe a fiduciary duty under Massachusetts law, and that the allegation that Dvorskiy "served as a compensated test administrator" [FSI ¶32], is therefore insufficient to "establish" a fiduciary relationship.  [D.1022 at 13-16.]  That is incorrect, for two reasons.  *First*, while compensation alone does not *establish* the existence of a fiduciary relationship, a criminal indictment is not required to "establish" anything.  It must only *allege* those "facts and circumstances as will inform the accused of the specific offence, coming under

the general description, with which he is charged." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)). *Second*, the Indictment does just that. It specifically alleges that ACT and SAT administrators like Dvorskiy "are agents of ACT and the College Board, respectively, and owe a duty of honest services to those organizations." [FSI ¶49; *see also* FSI ¶¶50–51 (alleging that test administrators must typically certify that they will administer the test in accordance with the ACT or SAT administration manual and ensure that the materials are used for the examinee only).] More is not required—and the defendants' argument concerning what the evidence shows about the nature of Dvorskiy's relationship with ACT and the College Board demonstrates that they understand precisely the nature of the charge. Their argument for dismissal of the honest services fraud allegations on this basis therefore fails.

## 2. The Indictment adequately alleges bribes.

The defendants next argue that the honest services fraud allegations should be dismissed because the Indictment fails to allege the "type" of *quid pro quo* necessary to support conviction for that offense. [D.1037 at 2.] The defendants thus concede that the Indictment alleges that they paid money as a *quid pro quo* for having university insiders recruit their children as purported athletes based on fabricated credentials. They nevertheless claim that the Indictment is deficient because neither payments made to university accounts designated by those insiders, nor payments directly to the insiders, constitute "bribes"—despite the fact that those payments were contingent on the defendants' receiving the benefit of their bargain, and were made only when they actually received it.

41

a.    **Payments to university accounts designated by corrupt coaches constitute bribes.**

The Indictment alleges that *quid pro quo* payments to corrupt university insiders took two forms:  (1) payments by the defendants and Singer to designated university accounts over which the corrupt insiders exercised discretion or that otherwise benefited them professionally [FSI ¶65, 129, 149-150, 160-61, 179, 221, 237,[24] 248, 273; *see also* FSI ¶202[25]], and (2) payments by Singer's entities to the corrupt coaches personally [FSI ¶¶119, 121, 175.]  The defendants argue that the former were not "bribes," but rather the product of "an unauthorized form of fundraising" [D.1038 at 10], while the latter were simply gratuities.  Those arguments are incorrect as a matter of law, and misapprehend the very purpose of the honest services fraud doctrine.

A bribe is simply "a payment (or other benefit) given in exchange for an employee's provision of influence or favorable treatment from his employer."  *United States v. DeMizio*, 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012) (Gleeson, J.), *aff'd* 741 F.3d 373 (2d Cir. 2014); *see also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999) ("Bribery

---

[24] Wilson's contention that Singer "stole $100,000" of what he intended to be a $200,000 "donation" to the USC men's water polo team for which his son went on to play [D.1038 at 19], relies on a highly sanitized rendition of the facts devoid of mention that he is alleged to have agreed with Singer to embellish his son's athletic profile.  [FSI ¶¶229, 231, 233.]  In any event, to the extent Wilson wishes to argue that he acted in good faith because he believed the entirety of this payment would go to the designated USC fund (despite being routed through Singer) and constituted a legitimate donation (despite being accompanied by an embellished athletic profile), the place to do so is at trial.

[25] McGlashan notes the absence of any allegation that he actually paid the alleged bribe, claiming that this was because "he chose not to pursue the alleged side door scheme." [D.1023 at 1-2; *see also* D.1038 at 4 n.6.]  That is untrue.  In fact, the evidence will show that he was tipped off by Singer before the scheme could be completed.  In any event, the Indictment adequately alleges that he conspired with Singer to engage in the charged conspiracy, including *both* the testing and side door aspects of the scheme. [FSI ¶¶201-209.]  Any withdrawal defense is a question of fact for the jury.  *United States v. Leoner-Aguirre*, 939 F.3d 310, 318 (1st Cir. 2019), *cert. denied*, 140 S. Ct. 820, 205 L. Ed. 2d 499 (2020).

requires intent 'to influence' an official act or 'to be influenced' in an official act . . . .  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.") (emphasis in original).  The law is clear that payments to third parties, including even charities, may qualify as bribes or kickbacks.  *See, e.g.*, *DeMizio*, 741 F.3d at 381–82 (rejecting argument that "private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff" and further noting that a scheme is "no less a kickback scheme when the employee directs the third party to share its profits with an entity designated by the employee in which the employee has an interest"); *United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003) (kickback arrangement required payments to "individuals who had provided miscellaneous personal services to [the defendant] or his relatives . . . and . . . charities that [the defendant] supported").  Accordingly, whether the defendants' payments were sent, at Heinel's direction, to a USC fund over which she exercised discretion, or to her own personal account, is irrelevant.  So long as the money was paid with corrupt intent—as a *quid pro quo* for recruiting students as athletes based on false credentials—it was a bribe.

In arguing that their *quid pro quo* payments could not have been bribes because the money went to USC, the defendants emphasize that neither they nor the government has identified a case in which a payment to the alleged victim of honest services fraud has been held to constitute a bribe.  [D.1038 at 1, 14.]  But that fact is unremarkable.  *Skilling* did not limit honest services fraud to "conduct that fit the *traditional mold* of a bribe or kickback," as the defendants claim.  [D.1038 at 12 (emphasis added).]  It merely limited the doctrine to bribes or kickbacks.  *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011) ("*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks."); *DeMizio*, 2012 WL 1020045, at

*6 ("[T]he "core" preserved by Skilling is [not] limited to particular fact patterns involving bribes or kickbacks that were recognized by pre-*McNally* case law."); *United States v. Scanlon*, 753 F. Supp. 2d 23, 26 (D.D.C. 2010) ("[*Skilling*] used the term 'core' not . . . to distinguish 'core bribe-and-kickback' cases from 'non-core bribe-and-kickback cases,' but rather to distinguish bribery and kickback cases (which themselves constitute the 'core' of pre-*McNally* case law) from cases involving mere undisclosed self-dealing."). The defendants' argument "would effectively freeze honest services fraud," by placing "[n]ovel bribery and kickback schemes . . . beyond the reach of the federal antifraud statutes. Nothing in *Skilling* or its reasoning supports this result." *DeMizio*, 2012 WL 1020045, at *7.

The defendants rely on *Wilkie v. Robbins*, 551 U.S. 537 (2007), for the proposition that a payment to an alleged victim cannot constitute a bribe. But that is not what *Wilkie* said. *Wilkie* was a civil case against government employees for allegedly committing Hobbs Act extortion by coercing a landowner to grant the government an easement over his land. 551 U.S. at 563. The Supreme Court held that extortion under color of official right requires "the sale of public favors for private gain" and "does not apply when the National Government is the intended beneficiary of allegedly extortionate acts." *Id.* at 563-64. The defendants analogize the universities to the government, and contend that payments to the universities cannot constitute bribes as a matter of law. But that analogy is as inapt as it sounds.

In *Wilkie*, the Court simply found that claims of Hobbs Act extortion under color of official right cannot be premised on "efforts of Government employees to get property for the exclusive benefit of the Government." 551 U.S. at 564–65 (citations omitted). The Court's concern was that "the fear of criminal charges or civil claims for treble damages . . . could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the

Government and the public." *Id.* at 567; *see also id.* at 566 (regulators "'do not become racketeers by acting like aggressive regulators'") (quoting *Sinclair v. Hawke*, 314 F.3d 934, 944 (8th Cir. 2003)). It was on the basis of this concern that the Court rejected the landowner's reliance on its prior statement, made in the context of a union official's extortion to the benefit of the union, that "'extortion as defined in the Hobbs Act in no way depends upon having a direct benefit conferred on the person who obtains the property.'" *Id.* at 566 (quoting *United States v. Green*, 350 U.S. 415, 420 (1956)) (alteration omitted). It concluded that Congress "could very well have meant" "to prohibit extortionate acts in the interest of private entities like unions, but ignore them when the intended beneficiary is the Government," because "drawing a line between private and public beneficiaries prevents suits . . . against public officers whose jobs are to obtain property owed to the Government." *Id. Wilkie* thus does not support the proposition that a *quid pro quo* cannot be a "bribe" when payment is made to the employer, no matter who that employer may be.

Moreover, even if some form of personal benefit to the coaches were required, the Indictment alleges it: the payments went to university accounts over which the coaches had discretion or that otherwise benefitted them professionally. [FSI ¶ 65.] The Indictment thus alleges, explicitly, that the payments were a "thing of value" to the university insiders. And that proposition is supported by longstanding authority holding that the term "'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'" *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir.1986)). "[A]ny payment that the defendant subjectively believes has value . . . constitutes a thing 'of value.'" *United States v. Crozier*, 987 F.2d 893, 901 (2d Cir. 1993).

Thus, for example, it is well-established that campaign contributions can constitute bribes—even in the absence of evidence that the money was directed to the candidate's pocket—because they can be used for "all manner of self-promotion" to secure the candidate's professional position. *United States v. McGregor*, No. 2:10CR186-MHT, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011); *see also United States v. Terry*, No. 1:10CR390, 2011 WL 5008415, at *5 (N.D. Ohio Oct. 19, 2011) ("The jury could most certainly have concluded that the defendant personally benefited from this assistance [in the form of campaign contributions and other benefits] as it was arguably instrumental in the defendant's bid to retain his seat as a common pleas judge."); *United States v. Vila*, No. CRIM 3:08CR297-PJB, 2009 WL 79189, at *4 (D.P.R. Jan. 9, 2009) ("It hardly seems plausible to suggest that the viability of a wire fraud prosecution should turn on a distinction as meaningless as whether a candidate personally receives a gift of two thousand dollars or whether that gift is instead made out to the candidate's political committee. Either way, the candidate reaps 'personal gain.'"). Notably, the candidate need not embezzle or misappropriate the funds to reap that benefit. *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 257-59 (1992) (affirming Hobbs Act conviction of public official who attempted to claim the payment he received was a campaign contribution.); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (same, for honest services fraud conviction); *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (same, for federal programs bribery). As the Sixth Circuit explained in *Terry*,

> That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. But the

> prosecution may rebut that alternative explanation, and context may
> show that an otherwise legitimate contribution is a bribe.

707 F.3d at 613 (citation omitted).[26]

The defendants do not address this authority, much less explain how the "unauthorized form[s] of fundraising" found to be criminal in these cases is any different from the "unauthorized form of fundraising" they contend happened here. Instead, they cite a series of Seventh Circuit cases applying a "private gain" requirement the Seventh Circuit adopted pre-*Skilling* to limit the reach of honest services fraud. *See United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998). But even the Seventh Circuit has acknowledged that its test "has come in for its share of criticism," *Sorich*, 523 F.3d at 708, and has explained that "[b]y 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not. . . . Robin Hood may be a noble criminal, but he is still a criminal," *id*. at 709-10.

In any event, the cases the defendants cite are also inapt for other reasons. In *United States v. Thompson*, for example, in which the court reversed the honest services fraud conviction of a

---

[26] The defendants rely on a passing statement by Judge Woodlock at the sentencing hearing in *United States v. Bizzack*, No. 19-cr-10222-DPW-1 (Oct. 30, 2019), to argue that payments to university accounts cannot constitute bribes absent foreseeable embezzlement or misappropriation of the funds by the university insiders. [D.1038 at 9-10.] But Judge Woodlock's comment, like a similar discussion that occurred at the sentencing in *United States v. Vandemoer*, No. 19-cr-10079-RWZ (June 12, 2019) [D.1038 at 9 n.10], concerned how to *monetize* bribes for purposes of calculating loss, *not* whether the defendants had engaged in honest services fraud. [D.1038 Ex. D at 99 ("I've spent some time trying to figure out how do you monetize this case?"); D.1038 Ex. E at 23 ("I don't think rather Probation or the Defendant or I suggested that there was not fraud, both regular fraud and honest services fraud.").] Indeed, Judge Woodlock *accepted* the defendant's plea to conspiracy to commit mail fraud *and* honest-services mail fraud, and analogized the case to paying off a maître d' to "get in the side door." [D.1038 Ex. D at 89 ("[Y]ou have identified the fishbone in my throat on this case. That is the other people who think that life is a series of encounters with maitre d's who, you give them a little bit of money and you get in the side door. . . . That's the way of I think of this case, crudely stated.").] In any event, the defendants have not cited a single case supporting an embezzle-or-misappropriate requirement, and the government has found none.

state procurement officer who steered a state contract to a company her boss favored, the defendant was not accused of taking a bribe or receiving a kickback from a third party. 484 F.3d 877, 879 (7th Cir. 2007) ("[N]o *quid pro quo* was entailed."); *id.* at 881 ("Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback."); *id.* at 883 (distinguishing cases involving "payoffs outside proper channels"). Nor did she act in exchange for political contributions by the contract recipient. *Id.* (observing that "[t]his would be a hard case" if she had). Rather, she merely "pursue[d] the public interest as [she] understood it," apparently in the hope that it would result in improved job security and a salary increase. *Id.* at 882, 884. In the absence of a *quid pro quo*, the court concluded that neither "peace of mind" from added job security nor "a raise approved through normal civil-service means" qualified as private gain under the Seventh Circuit standard. *Id.* at 882–84. The court affirmed this holding in *Sorich*, which was similarly devoid of a bribe or kickback. *See* 523 F.3d at 708-09. These cases, in other words, have nothing to do with whether professional benefits obtained by an employee as a result of a secret *quid pro quo* violate her duty of honest services.

The sole case the defendants cite in which the Seventh Circuit applied *Thompson* to a fact pattern involving a bribe or kickback is *United States v. Blagojevich*, involving efforts by the former governor of Illinois to exchange a Senate seat for a job in the President's Cabinet, or a private-sector job, or a donation to a fund Blagojevich would control. 794 F.3d 729, 734 (7th Cir. 2015) (Easterbrook, J.). But that case also does not help the defendants. Blagojevich's convictions were reversed because the jury instructions did not distinguish exchanging the official act for a private-sector job or donation to a fund Blagojevich would control—which the Seventh Circuit found *would have* qualified as "private benefit"—from exchanging it for a public post, which the

court found was simply a "political logroll . . . the swap of one official act for another." *Id.* at 734. *Blagojevich* thus has no bearing here.[27]

Ultimately, the defendants' argument is that their scheme could not have constituted honest services fraud because the universities benefited from it financially. But that is not true. There is no requirement that an employer be harmed *financially* by an honest-services fraud scheme, and neither is there a bar to liability in the event it financially benefitted.[28] As the name implies, honest services fraud deprives an employer of the "intangible right to [the] honest services" of its employees. 18 U.S.C. § 1346. Thus, as the Supreme Court noted in *Skilling*, in describing the development of the "honest services" doctrine: "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry." 561 U.S. at 400. "*Even if the scheme occasioned a money or property gain for the betrayed party*, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'" *Id*. (emphasis added). Likewise, "after *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback, but whether such actions benefited or harmed the employer who enjoyed a right to the honest services of its employee, is irrelevant." *United States v. Tanner*, No. 17 CR. 61 (LAP),

---

[27] The defendants' fallback argument—that even if the payments constituted a personal benefit to the university insiders, the Indictment is deficient because it contains no allegation that the defendants knew the corrupt coaches would personally benefit, merits little discussion. It is nothing more than a good-faith defense in motion-to-dismiss disguise.

[28] Nor does such a limitation make sense. By the defendants' logic, it would have been criminal if they had paid Heinel *personally* for secretly recruiting their unqualified children, even if she had turned around and paid all the money directly into the USC Women's Athletics Fund. But, they contend, it was *not* criminal for her to engage in the exact same secret *quid pro quo*, as long as she steered their payments directly into the fund, without a pit-stop in her bank account. Such a distinction is silly, and the law does not demand such formalism. Both instances involve using the same payment to secretly induce an employee to breach of her duty of honest services.

49

2018 WL 1737235, at *6 (S.D.N.Y. Feb. 23, 2018), *aff'd*, 942 F.3d 60, 65 (2d Cir. 2019); *see also United States v. Black*, 530 F.3d 596, 600 (7th Cir. 2008) (rejecting proposition that gain must "be at the expense of the persons (or other entities) to whom the defendants owed their honest services" as "a no harm-no foul argument"), *vacated and remanded on other grounds*, 561 U.S. 465 (2010); *Sorich*, 523 F.3d at 709–10 ("In the case of a successful scheme, the [entity to whom the duty of honest services is owed] is deprived of its servants' . . . honest services *no matter who receives the proceeds*.") (internal quotation omitted; emphasis added).   What matters is whether, notwithstanding any financial gain, the employer viewed the scheme as material—and that is a question of fact for the jury.  *Rybicki*, 354 F.3d at 145-46  (noting that "actual or intended economic or pecuniary harm to the victim need not be established.  The only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services.") (citation, internal quotation marks and alteration omitted).  The defendants' argument for dismissal of the honest services fraud allegations on this basis therefore also fails.

      b.      **Payments made directly to corrupt coaches were not mere gratuities.**

     The defendants further contend that even the payments made to the corrupt coaches personally were at most gratuities, because Singer arranged with Heinel to direct payments to her personally *after* she fulfilled her end of the bargain.[29]  [D.1038 at 16-19.]  In advancing this

---

[29] The defendants contend that their argument applies equally to the allegations concerning Kimmel's efforts to facilitate her daughter's admission to Georgetown [D.1038 at 19 n.14], but it is unclear how.  The Indictment alleges that Kimmel agreed with Singer "in or about 2012 . . . to pay an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit," and that "[b]etween on or about September 5, 2012 and on or about September 6, 2013, Singer caused the Key, and later KWF, to pay Ernst $244,000 in monthly installments." [FSI ¶¶ 165, 175.]  Kimmel's daughter was admitted to Georgetown on the basis of falsified athletic credentials while this agreement was in effect [FSI ¶¶ 169-171], so any argument concerning the timing of the payments relative to Ernst's actions is inapplicable.  Any argument concerning Kimmel's *knowledge* of the arrangement fails for the reasons set forth below.

argument, the defendants acknowledge that payment need not precede the performance of the paid-for act in order to constitute a bribe. [D.1038 at 16-17.] "The core difference between a bribe and a gratuity," after all, "is not the time the illegal payment is made, but the *quid pro quo*. . . ." *United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013) (quoting *United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998)); *id.* at 23 ("[A] bribe can be promised before, but paid after, the official's action on the payor's behalf.") (quoting *United States v. Jennings*, 160 F.3d 1006, 1015 n.3 (4th Cir. 1998)). The defendants nevertheless argue that the payments do not constitute bribes because Singer and Heinel did not agree that he would pay her personally, in monthly $20,000 installments, until after she had presented the defendants' children to the USC subcommittee for athletic admissions. They contend that although "the *timing* of payments is not necessarily dispositive," "the timing of the *agreement* is." [D.1038 at 16-17.] They add that there is no allegation that they had knowledge of that agreement. [D.1038 at 18-19.]

The defendants' argument focuses on the wrong agreement. What matters is *not* when *Singer agreed with Heinel* to allocate the money to her personally, but when the defendants *agreed with Singer* to make payments to designated athletic programs and/or to Singer's purported charity with the understanding that those payments were a *quid pro quo* in exchange for having their children recruited as athletes based on falsified credentials.[30] In every case, the Indictment alleges that the parents' agreements pre-dated the bogus recruitment—although their arrangement with Singer was that they would pay for the fraud only *after* their children had been at least conditionally

---

[30] Indeed, this would remain true even if Singer never paid Heinel at all, but simply pocketed the money and hid that fact. *See United States v. Potter*, 463 F.3d 9, 16-17 (1st Cir. 2006) (wire fraud punishes devising a scheme to defraud, and conspiracy punishes an agreement to do the same). The defendants' focus on whether (and when) their payments actually made their way to Heinel's pockets is therefore misplaced. [D.1038 at 4 n.5 & 18.] So, too, is Wilson's suggestion that the allegations against him fail to state a claim "[b]ecause his donation is not even alleged to have enriched any individual." [D.1038 at 20.]

admitted. The fact that Singer later arranged with Heinel to re-allocate those payments to her personally, instead of to the fund she had designated at USC, is irrelevant. By that point, the parents had already agreed to the illicit *quid pro quo*. Moreover, an honest services fraud defendant need "not know the precise way in which the money would reach [the intended recipient]"—he only has to expect that it would. *Potter*, 463 F.3d at 15 (affirming honest services and conspiracy to commit honest services fraud convictions over an argument to the contrary).[31] Here, the government alleges that the defendants knew their children would be recruited by a corrupt university insider as fake athletes in exchange for money. How that money was allocated—whether to a university fund, to the insider personally, or to both (as it ultimately was here)—is irrelevant, as is whether the allocation changed over the course of the conspiracy. The crime is the same.

## IV.    THE DEFENDANTS' CHALLENGES TO THE FEDERAL PROGRAMS BRIBERY CONSPIRACY AND SUBSTANTIVE COUNTS ARE EQUALLY MERITLESS.

As noted, Count Two of the Indictment charges 11 of the defendants with conspiracy to commit federal programs bribery, and Counts Eleven and Twelve charge Wilson with substantive federal programs bribery. The defendants' arguments for dismissal of these counts mirror their arguments for dismissal of the honest services fraud charges [D.1038], and fail for the same reasons. As set forth above, payments to third-parties—here, the university accounts that the corrupt insiders designated—may constitute a "thing of value."[32] The defendants' motion to dismiss these counts should therefore be denied.

---

[31] And, as noted, each conspirator need not know all the details of the conspiracy. *Berroa*, 85 F.3d at 154.

[32] It is likewise irrelevant for purposes of federal programs bribery whether the money actually ended up in the coaches' pockets. *See* 18 U.S.C. § 666(a)(2) (criminalizing a mere "offer"

## V.    THE DEFENDANTS' CHALLENGE TO THE MONEY LAUNDERING CONSPIRACY COUNT IS WITHOUT MERIT.

The defendants separately move to dismiss Count Three, charging money laundering conspiracy, on the basis that it does not properly allege a transaction involving proceeds of a specified unlawful activity. [D.1040.] That is not true. The Indictment alleges that the defendants agreed to conduct money laundering transactions involving proceeds of the charged fraud scheme. For that reason, their motion should be denied.

### A.    Applicable law.

Because "the money laundering statute is meant to punish a separate offense from the underlying 'specified unlawful activity'. . . it criminalizes separate financial transactions involving the funds derived from such illegal activity." *United States v. Castellini*, 392 F.3d 35, 45 (1st Cir. 2004). In short, "'money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds.'" *Id.* at 48 (quoting *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998)); *see also United States v. Richard*, 234 F.3d 763, 769 (1st Cir. 2000) ("'[T]he laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime.'") (quoting *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000)); *Mankarious*, 151 F.3d at 704 ("A money launderer must obtain proceeds *before* laundering can take place.").

It is not a requirement, however, "that the underlying crime must be fully completed before any money laundering can begin," or that "the two crimes involved . . . be entirely separate in time." *Castellini*, 392 F.3d at 48. Rather, "[o]nce the basic elements of the underlying crime are

---

of something of value); *see also United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013) ("That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe.").

sufficiently far along to create proceeds . . . the money becomes proceeds of illegal activities and it can be laundered." *Id.* Accordingly, a number of circuits, including the First Circuit, have held that proceeds are derived from a completed offense *or* a completed phase of an ongoing offense. *See Richard*, 234 F.3d at 770 (sustaining conspiracy and substantive money laundering convictions under 18 U.S.C. § 1957 where the government introduced sufficient evidence that the defendant's acceptance of checks constituted a completed phase in the ongoing bankruptcy fraud and that the defendant committed separate acts to launder the proceeds after he took them into his possession); *see also United States v. Nunez*, 419 F. Supp. 2d 1258, 1267 (S.D. Cal. 2005) ("The Ninth Circuit has said that 'proceeds' must be from a previous and completed criminal activity. . . . The First, Second, Third, Fourth, and Seventh Circuits have applied broader language, to include an already completed offense, *or completed phase of an ongoing offense.*") (citations and internal quotation marks omitted) (emphasis in original).

### B.    The Indictment properly alleges conspiracy to commit money laundering.

The defendants are all charged with conspiracy to commit money laundering by agreeing to conduct financial transactions involving the proceeds of specified unlawful activity—here, mail and wire fraud and honest services mail and wire fraud—knowing that the transactions were designed, at least in part, to conceal the nature and source of the proceeds. The defendants correctly note that, to properly charge a money laundering conspiracy under Section 1956, an indictment must allege that the financial transactions the defendants conspired to conduct involved proceeds of a specified unlawful activity. *See United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007). But the defendants' contention that the Indictment fails to do so in this case is plainly incorrect under First Circuit law.

The fraud scheme in which the defendants engaged created proceeds that the defendants agreed would be laundered through one of two entities:  KWF, Singer's purported charity, or The Key, his for-profit company.  The Indictment alleges that the defendants agreed with Singer to pay various amounts to engage in the scheme to secure their children's admission to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes.  It alleges that each defendant paid at least a portion of the agreed-upon amount to KWF or The Key.  And it alleges that the defendants funneled the payments through Singer's entities to conceal the scheme.

In other words, the defendants made payments to Singer's entities with the intention that all or a portion of the money they paid would thereafter be used to further their bribery and fraud scheme.  And the defendants agreed with Singer to structure the transactions in this manner to conceal their illegal activity, so that the bribe and other payments would not be traced back to them.  This is precisely the type of conduct that the money laundering statute is intended to penalize.  *See Castellini*, 392 F.3d at 49 ("The money laundering of the proceeds of an underlying illegal activity may make the underlying crime more difficult to detect or to prove.  And Congress wanted to curtail the separate market of criminal activity which money laundering represents.").

The defendants' payments to KWF and The Key constituted completed wires or mailings in furtherance of the underlying scheme—rendering them guilty of wire or mail fraud at that moment, even without more.  But the scheme continued, and the payments thus also constituted a completed phase of that ongoing scheme.  Accordingly, the moment the defendants made those payments to Singer's entities, their clean funds became "tainted by crime," *Richard*, 234 F.3d at 769, and became proceeds of the specified unlawful activity.

Once this *first* phase of the scheme was complete, Singer used those proceeds to make the payments necessary to complete the *next* phase of the scheme. These second-level transactions—the purported donations to athletic programs, payments to Dvorskiy, Ernst, Heinel, and others personally, and payments to Riddell and others to facilitate the scheme—were money laundering transactions, separate and distinct from the transactions that created the proceeds in the first place.

The First Circuit has upheld money laundering convictions on similar facts. In *Richard*, for example, a defendant appealed his conviction for money laundering on the basis of his contention that the predicate offense of bankruptcy fraud was not complete because the funds he received from investors had not yet been deposited into the account of a co-conspirator's dummy corporation to conceal them from the bankruptcy court. 234 F.3d at 769. On that basis, he argued, the money did not yet constitute proceeds of the bankruptcy fraud, and was therefore not "criminally derived," as required by Section 1957. *Id.* The First Circuit *rejected* that argument, finding that there was sufficient evidence from which a jury could conclude that, having commenced a bankruptcy fraud scheme, the defendant's acceptance of investor checks constituted a completed phase of that scheme—and the money therefore constituted proceeds of the scheme even before it was transferred into the dummy account. *Id.* at 770. That is, "the defendants' fraudulent scheme generated proceeds, and then [the defendant] committed separate acts to launder the proceeds after he took them into his possession." *Id.*

The defendants attempt to distinguish *Richards*, and a similar bankruptcy fraud and money laundering case from the Ninth Circuit, *United States v. Nunez*, 419 F. Supp. 2d 1258 (S.D. Cal. 2005), on the basis that, unlike the defendants in those cases, they were not engaged in an ongoing crime. [D.1040 at 13.] But that is not true. Indeed, the Indictment alleges, and the evidence at trial will show that the defendants' scheme worked in phases, with certain payments made at the

time their children were conditionally admitted, for example, and other payments made upon formal admission. As in *Richards*, the defendants here completed a phase of their scheme (and an independent crime) as soon as they made their payments to KWF or The Key, and those payments thus constituted proceeds of that scheme. And as in *Richards*, the laundering of those funds occurred in the next phase of the scheme, when Singer transferred those proceeds to other co-conspirators.

Moreover, because the defendants are charged with money laundering *conspiracy*, they are liable for the acts of their co-conspirators. Those acts include the payments those co-conspirators made to Singer's entities—all of which created proceeds that were commingled in the accounts of KWF and The Key—and Singer's subsequent laundering of those proceeds through the bribe and other payments he made from those accounts. As the First Circuit explained in *Misla-Aldarondo*:

> [W]e should not forget that here [the defendant] was charged with *conspiracy* to commit both money laundering and extortion, and therefore is liable for the acts of his co-conspirators. Indeed, the indictment specifically references the facts of Count 1 (the conspiracy to extort) to describe the source of the unlawful funds applicable to both Counts 3 and 4 [the money laundering conspiracy counts]. Since [the defendant] is liable for the acts of his co-conspirators . . . a reasonable jury could have found that the act of extortion was sufficiently complete upon [his co-conspirator] taking control of the funds from [the hospital]. Any of the concealing transactions that follow thus would clearly involve proceeds of unlawful activity.

478 F.3d at 68–69 (emphasis in original). As in *Misla-Aldarondo*, once Singer took control of the funds from the defendants, the underlying offense was sufficiently complete that the concealing transactions that followed—the bribe and other payments out of Singer's accounts—involved proceeds of specified unlawful activity.

Instead of grappling with First Circuit law, the defendants rely on a readily distinguishable case from the Western District of Missouri, *United States v. LaBrunerie*, in which the defendants

57

A451

were charged with conspiracy to commit bribery and money laundering for paying a city councilman to take various actions beneficial to them. 914 F. Supp. 340, 342 (W.D. Mo. 1995). [D.1040 at 13.] The specified unlawful activity was federal programs bribery. *See id.* at 344. The government's theory was that the predicate offense was complete as soon as the defendants *offered* to pay bribes, and money laundering occurred when they prepared to pay those bribes by purchasing a check from the bank. *See id.* at 344-45. The court, adopting the report and recommendation of the magistrate judge, rejected that theory, finding that money "set aside" as a result of a mere agreement to pay bribes did not represent "proceeds" of the bribery scheme because "[t]he money [the defendants] earmarked to pay [the councilman] was in their control before they allegedly entered the [bribery] agreement; it was not money that came into their hands because of the agreement." *Id.* at 342.

This case is different. Here, the proceeds of the fraud scheme did not result from the conspirators' mere "agreement" to pay bribes. Rather, the money became proceeds only after it was paid by the parent defendants to Singer's charitable foundation or for-profit corporation, thereby completing the first phase of the scheme (and giving rise to an independently chargeable crime). The purpose of funneling the money through Singer's entities, disguised as either a charitable "donation" or a payment for college counseling services, and then commingling it with other co-conspirators' money, before distributing it to still other co-conspirators in the second phase of the scheme—either as a direct payment or as another purported "donation"—was to conceal its nature, location, source, ownership, and control. Unlike *LaBrunerie*, there were thus *two separate* sets of transactions: the payments the defendants made to KWF and The Key, followed by the bribe and other payments Singer made using those proceeds. This two-step process served no legitimate purpose. And in contrast to *LaBrunerie*, Singer did *not* use untainted

58

A452

funds already in his possession to make the bribe payments.  He used the *defendants'* money, which was not under his control before the completion of the first phase of the scheme, and which came into his hands only because of that scheme.  *Cf. LaBrunerie*, 914 F. Supp. at 347 (magistrate judge recommending that the money laundering counts be dismissed because "neither §1956 nor § 1957 criminalize monetary transactions conducted with money *which has not yet been received* by the person committing the predicate offense) (emphasis added).[33]  This is quintessential money laundering:  the use of a "clean" entity, and the guise of a legitimate transaction, to "wash" money by masking where it came from, who it belonged to, and what it was for.

Finally, the defendants assert that the Indictment fails to allege specific monetary transactions, when those transactions occurred relative to the specified unlawful activity, and who participated in them.  [D.1040 at 13-15.]  But the defendants are charged with *conspiracy*, not substantive money laundering, and such detailed allegations are not required.  The Indictment plainly alleges that the defendants *agreed* with Singer to conduct financial transactions—the bribe and other payments Singer made from accounts in the name of KWF and The Key—knowing that the funds involved in those transactions were the proceeds of their fraud scheme, and that the transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of those proceeds.  That is all that is required.  *See United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (government need only prove that defendant "agreed with another person to

---

[33] Other cases the defendants cite are similarly distinguishable.  In *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997), for example, the court found that the withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds.  *See also United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999) (noting that, in *Christo*, "the bank-fraud charge and the money-laundering charges were predicated on the same transaction, writing checks on accounts with insufficient funds and causing the bank to pay those checks through the check-kiting scheme").  Here, by contrast, there are two separate sets of transactions.

violate the substantive provisions of the money-laundering statute during the period alleged in the indictment"). The defendants cite no support for their contention that, to properly allege conspiracy, the money laundering transactions must be specifically identified, and fully traced back to the transactions that created the proceeds.

Accordingly, the defendants' motion to dismiss Count Three should be denied.

## **CONCLUSION**

For all the reasons set forth above, the defendants' motions should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Leslie A. Wright*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
KARIN M. BELL
STEPHEN E. FRANK
ALEXIA DEVINCENTIS
RANDALL KROMM
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: May 8, 2020                              */s/ Leslie A. Wright*
Assistant United States Attorney

60

A454

# EXHIBIT A

### Instructions Requested by Defendants Abdelaziz, Kimmel, Palatella, and Wilson

Except as otherwise noted, Defendants Abdelaziz, Kimmel, Palatella, and Wilson request that the Court instruct the jury as follows:

### I.　Preliminary and Final Introductory Instructions

### 1.　Duty of the Jury

You have been chosen to be the judges of the facts in this case. It is your duty to decide from the evidence what the facts are. Your responsibility in that role is to listen carefully to the evidence so that you can properly judge the facts. You must decide this case only on what you hear in this Courtroom and only upon the information which is presented to you as evidence. That evidence will be in the form of the sworn witnesses' testimony, documentary evidence such as tape-recordings and other things received as exhibits. You are not to judge the facts based upon what you hear or may have heard outside of this Courtroom. You are not to base your decision on any bias, prejudice or sympathy that you may have. You should not take anything I may say or do during the trial as indicating what I think of the believability or significance of the evidence or what your verdict should be.[1]

It is your duty to find the facts from all the evidence admitted in this case. To those facts you must apply the law as I give it to you. The determination of the law is my duty as the presiding judge in this court. It is your duty to apply the law exactly as I give it to you, whether you agree with it or not. You must not be influenced by any personal likes or dislikes, prejudices or sympathy. That means that you must decide the case solely on the evidence before you and according to the law.[2]

You will recall that you took an oath promising to do so at the beginning of the case. In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. You must not read into these instructions, or into anything I may have said or done, any suggestions by me as to what verdict you should return—that is a matter entirely for you to decide.[3]

---

[1]　Adapted from First Circuit Pattern Criminal Jury Instruction 3.01.
[2]　Adapted from First Circuit Pattern Criminal Jury Instruction 3.01.
[3]　Adapted from First Circuit Pattern Criminal Jury Instruction 3.01.

1

### 2.    Pretrial Publicity

In the past, there may have been news stories that discussed some of the defendants in this case. You cannot consider or rely upon those news stories in determining your verdict in this case, because you can have no confidence that those news stories are accurate, either with respect to the facts or the law.  The only evidence in this case is the evidence that comes from the witness stand, and from documents that are admitted into evidence.  And I will instruct you on the law.[4]

---

[4]    Adapted from O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions* § 10.02 (6th ed. 2015).

2

### 3.    Conduct of the Jury

With respect to your conduct as jurors, first, please do not discuss this case with anyone.  Until you retire to the jury room at the end of the case to deliberate to your verdict, you simply are not to talk about this case with anyone, including your family members, your friends or your fellow jurors.  Do not let anyone talk to you about the case or about anyone who has anything to do with it.  If someone should try to talk to you, please report it to me immediately.

I know that many of you use cell phones, smart phones, the internet and other tools of technology.  However, during this jury trial, you may not communicate with anyone about this case using your cell phone, e-mail, smart phone, text messaging, Twitter, blogs or websites, internet chat rooms or social networking websites such as Facebook, Instagram, MySpace, LinkedIn, YouTube, TikTok, or Snapchat.  If you did so, it would be a violation of your oath as jurors and might even cause a mistrial at great expense to the parties and to this Court.  I instruct you, therefore, that as long as you are a juror on this case, you are not to use these tools of technology in connection with this case.

If you encounter the lawyers, the witnesses, or the parties involved in this case in the hallways, cafeteria, or anywhere else, please do not say anything to them.  Your talking with them while the trial is ongoing would not only have the appearance of being inappropriate; it would also be inappropriate.  In addition, do not read or watch or listen to anything in the media which may in any way relate to this case.  And do not try to do any independent research or make any investigation about the case on your own.  Again, internet research about the case is prohibited.  This includes looking up any of the participants in this case on social media or posting or searching on social media about this case.

Finally, keep your mind open and do not form any opinion until all of the evidence has been presented.  Keep an open mind until you start your deliberations at the end of the case.[5]

---

[5]    Adapted from First Circuit Pattern Criminal Jury Instruction 1.07; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, Jury Trial Transcript Vol. II, at 2-29 – 2-30 (D. Mass. Apr. 12, 2016).

3

### 4.      The Nature of the Indictment

This is a criminal case that has been brought by the United States government.  The Defendants have been charged by the government with violations of federal law.  The charges against the defendants are contained in the Indictment.  The indictment is simply the description of the charges against the Defendants; it is not evidence of anything.  The Defendants pleaded not guilty to the charges and deny committing the crimes.[6]

The number of charges against each Defendant is no evidence of guilt and should not influence your decision in this case in any way.  It is your duty to separately consider the evidence that relates to each charge for each defendant and to return a separate verdict for each one.  For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge.  Your decision on one charge should not influence your decision on any of the other charges.[7]

The Indictment in this case contains three conspiracy counts.

Count I charges that all of the Defendants, along with Rick Singer and other people, conspired to commit mail and wire fraud, as well as honest services mail and wire fraud, in violation of Title 18 of the United States Code, Section 1349.

Count II charges that all of the Defendants tried here, along with Rick Singer and other people, conspired to commit federal programs bribery, in violation of Title 18 of the United States Code, Section 371.

Count III charges that all of the Defendants, along with Rick Singer and other people, conspired to commit money laundering, in violation of Title 18 of the United States Code, Section 1956(h).

The Indictment in this case also contains three counts against Defendant John Wilson for wire fraud and honest services wire fraud in violation of Title 18 of the United States Code, Sections 1341 and 1346, and aiding and abetting wire fraud and honest services wire fraud in violation of Title 18 of the United States Code, Section 2.

Count VI charges Mr. Wilson with committing wire fraud and honest services wire fraud, or aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with the wiring of certain funds from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on October 17, 2018.

Count VIII charges Mr. Wilson with committing wire fraud and honest services wire fraud, or aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with a telephone call between Mr. Wilson and Rick Singer on October 27, 2018.

---

[6]      Adapted from First Circuit Pattern Criminal Jury Instruction 1.02.
[7]      *Thomas v. United States*, 849 F.3d 669, 676 (6th Cir. 2017).

4

Count IX charges Mr. Wilson with committing wire fraud and honest services wire fraud, or aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with the wiring of certain funds from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on December 11, 2018.

The Indictment in this case also charges Defendant John Wilson with two counts of federal programs bribery in violation of Title 18 of the United States Code, Section 666(a)(2), and aiding and abetting federal programs bribery in violation of Title 18 of the United States Code, Section 2.

Count XI charges that Mr. Wilson committed federal programs bribery, or aided and abetted Rick Singer in committing federal programs bribery, in connection with the wiring of certain funds from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on October 17, 2018.

Count XII charges that Mr. Wilson committed federal programs bribery, or aided and abetted Rick Singer in committing federal programs bribery, in connection with the wiring of certain funds from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on December 11, 2018.

Lastly, Count XIII charges Defendant John Wilson with willfully filing a false federal tax return in violation of Title 26 of the United States Code, Section 7206(1).

The Defendants have pled not guilty to these charges, and the government, therefore, must prove beyond a reasonable doubt all of the elements of a given offense charged in the indictment against each Defendant before you can find that Defendant guilty of that particular offense.[8]

---

[8]     Adapted from First Circuit Pattern Criminal Jury Instruction 3.01.

## 5.    Presumption of Innocence; Proof Beyond a Reasonable Doubt

This is a criminal case, and there are three basic rules for you to keep in mind.  First, the Defendants are presumed innocent until proven guilty.  The presumption is not a mere formality. It is a matter of the most important substance.[9]  All of the Defendants start this case as innocent. You cannot draw any conclusions against them because they happen to be here in Court with us and the government has made some charges against them.  The Indictment makes only accusations, nothing more.  The Defendants, therefore, start out with a clean slate.[10]  You are not to convict any of the Defendants of a particular charge unless you are persuaded of that Defendant's guilt of that charge beyond a reasonable doubt.[11]

Second, the burden of proof is on the government throughout the case.  The Government must prove each and every element of the offenses charged against each Defendant, and must satisfy you that a particular Defendant is guilty of the particular crime with which he or she is charged beyond a reasonable doubt.  The Defendants do not have any burden to prove their innocence or to present any evidence or even to testify.  Each of the Defendants has the right to remain silent, and the law prohibits you from considering the fact that any of the Defendants may not have testified when arriving at your verdict.[12]

Third, the Government must prove its case against the Defendants, including each of the elements of the crimes charged, beyond a reasonable doubt.  This is a strict and heavy burden. Indeed, the presumption of innocence alone may be sufficient to raise a reasonable doubt and to require the acquittal of a defendant. This standard requires that the evidence leaves no reasonable doubt concerning each of the Defendant's guilt.  You may not find any Defendant guilty unless all of you unanimously find that the government has proven his or her guilt beyond a reasonable doubt.[13]

A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence.  Reasonable doubt exists when, after weighing and considering all the evidence using reason and common sense, jurors cannot say that they have a settled conviction of the truth of the charge.  Of course a Defendant is never convicted on suspicion or conjecture.  If, for example, you view the evidence in the case as reasonably permitting either of two conclusions, one, that the Defendant is guilty as charged; the other, that the Defendant is not guilty, you must find the Defendant not guilty.

It is not sufficient for the Government to establish a probability, even if a strong one, that a fact charged is more likely true than not true.  That is not enough to meet the burden of proof beyond a reasonable doubt.  On the other hand, there are very few things in this world that we know with

---

[9]    First Circuit Pattern Criminal Jury Instruction 3.02.

[10]    Adapted from First Circuit Pattern Criminal Jury Instructions 1.02, 3.02; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, Jury Trial Transcript Vol. II, at 2-28-2-29 (D. Mass. Apr. 12, 2016).

[11]    First Circuit Pattern Criminal Jury Instruction 3.02.

[12]    Adapted from First Circuit Pattern Criminal Jury Instructions 1.02, 3.02; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, Jury Trial Transcript Vol. II, at 2-28-2-29 (D. Mass. Apr. 12, 2016).

[13]    Adapted from First Circuit Pattern Criminal Jury Instructions 1.02, 3.02; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, Jury Trial Transcript Vol. II, at 2-28-2-29 (D. Mass. Apr. 12, 2016).

absolute certainty, and in criminal cases, the law does not require proof that overcomes every conceivable doubt.

The Defendants have the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential element of a crime charged against them. If, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to any of the Defendants' guilt of a particular crime, it is your duty to find him or her not guilty of that crime. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of a particular Defendant's guilt of a particular crime, you should find him or her guilty of that crime.[14]

---

[14]    Adapted from First Circuit Pattern Criminal Jury Instruction 3.02; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-146 – 13-147 (D. Mass. Apr. 28, 2016).

### 6.    Defendants Tried Together

The Defendants are being tried together because the Government has charged that they acted together in committing the crimes of which they are accused. Remember, however, that each separate offense and the evidence pertaining to it should be considered separately with respect to each Defendant. You must not treat the Defendants as a group. In some instances, for example, evidence that is admitted against one defendant may not be admissible against the other three defendants, in which event you should not give any consideration to that evidence with respect to the other three defendants.  Each Defendant is constitutionally entitled to have his or her guilt or innocence determined on an individual basis. Thus, with respect to each charge, you must assess each Defendant and the evidence that was admitted against him or her individually.  In doing so, you must analyze what the evidence in the case shows with respect to each Defendant, leaving out of consideration any evidence admitted solely against some other Defendant or Defendants. Each Defendant is entitled to have his or her case decided on the evidence and the law applicable to him or her.[15]

---

[15]    Adapted from First Circuit Pattern Criminal Jury Instructions 1.02, 3.07; *see also Blumenthal v. United States*, 332 U.S. 539, 560 (1947) (endorsing instruction that "the guilt or innocence of each defendant must be determined by the jury separately," and "[e]ach defendant has the same right to that kind of consideration on your part as if he were being tried alone"); *United States v. Natanel*, 938 F.2d 302, 308 (1st Cir. 1991) ("the court below minimized any possible prejudice by repeatedly instructing the jury to treat the defendants as individuals and to consider each charge separately"). The additional language is utilized in the Seventh Circuit to instruct juries where multiple defendants have been charged.  *See, e.g.*, *United States v. Rodriguez*, 53 F.3d 1439, 1451 (7th Cir. 1995).

### 7.        Jurors as Fact-Finders; Judge Instructs on Law

You are the judges of the facts.  Although the law allows a Trial Judge in this Court to comment on evidence, I deliberately do not do so and, instead, leave the fact-finding entirely in your hands.  You are the sole and exclusive judges of the facts.  Fortunately, you do not have to resolve every dispute of fact raised by the evidence.  In order to know which fact disputes are important, you need to know what rules of law to apply.  I've explained some of those rules to you during the course of the trial, and I'll explain others to you now.

Under your oath as jurors, you cannot allow consideration of the punishment which may be imposed upon the Defendants if convicted to influence your verdict or to enter into your deliberations in any way.  In addition, you cannot allow considerations of sympathy for the Defendants, for the Government or for any victims to influence your verdict or to enter into your deliberations any way.

It would be improper for you to allow any feelings you might have about the nature of the alleged crimes to interfere with your decision-making process.  You are not to be swayed by bias, prejudice, sympathy or antagonism.  Rather, your function is to find the facts fairly and impartially on the basis of the evidence.[16]

---

[16]        Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-133 – 13-134 (D. Mass. Apr. 28, 2016).

9

### 8.    What Is Evidence; What Is Not Evidence; Inferences

The evidence in this case consists of all exhibits received into evidence, all facts that may have been admitted or stipulated to and all of the sworn testimony of the witnesses.

As I told you at the beginning of the trial, statements and arguments of counsel are not evidence in the case.  Questions and objections by lawyers are not evidence.  Any evidence ordered stricken by the Court must also be disregarded.  Anything that you have seen or heard outside of this courtroom is not evidence, and you must disregard it entirely.  Again, the Indictment is not evidence.  Your verdict must be based solely on the evidence presented in this Courtroom and in accordance with these instructions.[17]

Also, from the facts proved, you may draw reasonable inferences about additional facts.  An inference is a deduction or a conclusion.  An inference is an additional finding that your experience, reason and common sense lead you to draw from the facts that you find are proved by the evidence.  Any inference that you draw from the facts must be a reasonable one and not merely conjecture or guesswork.

It is for you, as judges of the facts, to decide whether the evidence before you is or is not sufficient for you to draw an inference.  Ultimately, in drawing inferences, you should use your common sense.[18]

Charts or summaries have been prepared and shown to you during the trial for the purpose of explaining facts that are allegedly contained in records and other documents, which are also in evidence in the case.  You've also heard mention of chalks, which are exhibits not in evidence, used to demonstrate a particular point.  While chalks are not evidence, you may use them to aid your understanding of the evidence in the case.  Some exhibits have been redacted in accordance with Court rules or orders.  You are not to speculate about what has been redacted.  You are not to draw any inferences from those redactions.[19]

---

[17]    First Circuit Pattern Criminal Jury Instruction 3.08.
[18]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-134 – 13-135 (D. Mass. Apr. 28, 2016); *see* First Circuit Pattern Criminal Jury Instructions 3.04, 3.08.
[19]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-139 – 13-140 (D. Mass. Apr. 28, 2016).

### 9.    Kinds of Evidence: Direct and Circumstantial

There are two kinds of evidence: direct and circumstantial.  Testimony of a witness showing first-hand observation of a fact by that witness is direct evidence.  For example, the testimony of an eyewitness just about what he or she saw is direct evidence.  If the witness is permitted to go beyond what he or she saw and is permitted to state a conclusion or an inference or an opinion, that part of the answer is not direct evidence.  Instead, it's a kind of circumstantial evidence.

Circumstantial evidence is proof of some facts, including events and circumstances, on the basis of which the jury may infer the existence or nonexistence of additional facts.  It is indirect evidence, that is proof of a fact or facts from which you could draw the inference, by reason and common sense, that another fact exists, even though it has not been proven directly.

Direct and circumstantial evidence have equal standing in the law; that is, with respect to what weight shall be given to evidence before you, the law makes no distinction between direct and circumstantial evidence.  No greater degree of certainty is required of circumstantial evidence than of direct evidence.  You are to consider all of the evidence in the case and give each item of evidence the weight you believe it deserves.[20]

---

[20]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-135 – 13-136 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instruction 3.05.

### 10.    Spoliation

If you find that a party or a witness destroyed, obliterated or failed to preserve documents or records, including text messages, emails or recordings that the party or witness knew would be relevant to a contested issue in this case and knew at the time there was a potential for prosecution, then you may infer—but are not required to infer—that the contents of the destroyed evidence were unfavorable to the party or the witness.[21]

---

[21]    Adapted from First Circuit Pattern Criminal Jury Instruction 2.13.

### 11. Failure to Collect Evidence

You have heard evidence that the government erred by failing to preserve Rick Singer's texts and documents as soon as possible, which led Rick Singer to delete text messages and other documents before he became a cooperating witness and while he was acting as a cooperating witness. You may infer (but you are not required to infer) that the contents of the destroyed evidence were unfavorable to the government.[22]

---

[22] *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 20 (9th Cir. 2009) ("[A]n adverse inference instruction may be allowed when a party fails to produce a document that exists *or should exist* and is within its control." (emphasis added)).

### 12. Use of Tapes and Transcripts

During the course of the trial, you heard numerous conversations that were recorded. This is proper evidence for you to consider, and you may give the audio recordings the same weight that you would give any other evidence. Transcripts were provided to you as you listened to some of the recorded conversations to help you understand what was said on the tapes. Those transcripts are not exhibits, and you will not have them in the jury room. Based on the evidence before you, if you believe at any point that the transcript reported something different from what you heard on the recording, you should be guided by what you heard and not by what you recall from the transcript.[23]

---

[23]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-136 – 13-137 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instruction 2.09.

### 13.    Stipulations

The evidence in this case may include facts to which the lawyers have agreed or stipulated.  A stipulation means simply that the parties accept the truth of a particular proposition or fact.  Absent disagreement, there is no need for evidence on that fact apart from the stipulation.[24]

---

[24]    *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-134 (D. Mass. Apr. 28, 2016).

## 14.    Credibility of Witnesses

An important part of your job as jurors is to decide whether and to what extent you believe what each witness had to say and how important that testimony was.  You are the sole judges of the credibility of the witnesses. You do not have to accept the testimony of any witness if you find the witness not credible.  In deciding whether to believe a witness or how much weight to give to that witness's testimony, you may consider anything that reasonably helps you assess a witness's testimony.

The following are the kinds of questions you may want to consider in evaluating a witness's credibility:  Did the person seem honest?  Did he or she have some reason not to tell the truth?  Did the witness have an interest in the outcome of this case, meaning would the witness stand to gain something of value from a particular result in this case?  Did he or she gain any personal advantage by testifying?  Did the witness seem to have a good memory?  Did the witness's testimony differ from his or her earlier testimony or from the testimony of other witnesses?  Was the witness's testimony on cross-examination different from his or her testimony on direct examination?  What was the witness's manner while testifying?  These are some but of course not all of the kinds of things that will help you decide how much weight to give to what each witness had to say.

You may also consider any demonstrated bias, prejudice or hostility of a witness in deciding what weight to give to the testimony of that witness.  The mere number of witnesses or exhibits or the length of the testimony has no bearing on what weight you give to evidence or on whether you find that the burden of proof has been met.  Weight does not mean amount of evidence; weight means your judgment about the credibility and importance of evidence.[25]

---

[25]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-140 – 13-141 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instructions 1.06, 3.06.

### 15.    Missing Witness

If it is peculiarly within the power of the government to produce a witness who could give material testimony, or if a witness, because of his or her relationship to the government, would normally be expected to support the government's version of events, the failure to call that witness may justify an inference that his or her testimony would in this instance be unfavorable to the government.  You are not required to draw that inference, but you may do so.  No such inference is justified if the witness is equally available to both the government and the Defendants, if the witness would normally not be expected to support the government's version of events, or if the testimony would merely repeat other evidence. [26]

---

[26]    Adapted from First Circuit Pattern Criminal Jury Instruction 2.12.

### 16.    Testimony of Law Enforcement Agents and Government Employees

You've heard testimony of law enforcement officers and witnesses who are employed by the federal government. The fact that a witness may be employed as a law enforcement officer or otherwise for the government does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is also appropriate to consider whether, in his or her investigation, the particular law enforcement witness acted in accordance with the standards of his department or agency. If you find any omissions in the investigation were significant and not adequately explained, you may consider whether the omissions tend to affect the quality, reliability or credibility of the evidence presented by the government. In addition, in assessing the credibility of a witness who is employed by the government, you may consider whether the witness has a personal or professional interest in the outcome of the case. It is your decision, after reviewing all of the evidence, whether to accept the testimony of a law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.[27]

---

[27]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-143 (D. Mass. Apr. 28, 2016). *See United States v. Torres-Galindo*, 206 F.3d 136, 142 (1st Cir. 2000) (appeals to "believe the police or FBI because of their history, integrity, or public service [are] inappropriate"); *see also United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999) (improper for prosecutor to state in closing argument that employees of the government wouldn't lie); *United States v. Martin*, 507 F.2d 428, 432 (7th Cir. 1974) ("[I]t was particularly important for the defendant to know of any prejudices the jurors may have had about the Government or about the credibility of government agents.").

### 17.      Testimony of Witnesses with Immunity

You've heard testimony of witnesses who have testified under a grant of immunity.  Immunity means that a witness's testimony may not be used against him in any subsequent criminal proceeding.  However, if he testified untruthfully, he can be prosecuted for perjury or making a false statement even though he testified under a grant of immunity.  Some people in this position are entirely truthful while testifying.  Still, you should consider the testimony of immunized witnesses with greater care and caution than the testimony of an ordinary witness.  They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves.  You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice for or against the Defendant or by any of the benefits he or she has received from the Government as a result of being immunized from prosecution.[28]

---

[28]      Adapted from *United States v. Ponzo*, Case No. 97-cr-40009-NMG, Jury Trial Transcript Day Twenty-Two, at 22-139 – 22-141 (D. Mass. Feb. 3, 2014); *United States v. DeCicco*, Case No. 17-cr-10092-NMG, ECF No. 376, Jury Trial Transcript Day 7, at 81-82 (D. Mass. June 12, 2018); First Circuit Pattern Criminal Jury Instruction 2.08.

### 18.     Testimony of Cooperating Witnesses

You've heard testimony of witnesses who provided evidence under agreements with the government.  As with witnesses who have been granted immunity, some people in this position are entirely truthful while testifying.  Still, you should consider the testimony of cooperating witnesses with particular caution.  They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves.  A witness who realizes that he may be able to obtain his own freedom, receive a lighter sentence or obtain other benefits from the government by giving testimony favorable to the prosecution has a motive to testify falsely.  You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice for or against the Defendant or by any of the benefits he has received from the government as a result of having an agreement with the government.[29]

---

[29]     Adapted from *United States v. Ponzo*, Case No. 97-cr-40009-NMG, Jury Trial Transcript Day Twenty-Two, at 22-139 – 22-141 (D. Mass. Feb. 3, 2014); First Circuit Pattern Criminal Jury Instruction 2.08.

20

### 19.    Inconsistencies in Witness Testimony

You should remember that the law does not impose on the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.  You may consider inconsistencies or differences as you weigh evidence, but you do not have to discredit testimony merely because an inconsistency or difference exists.  In weighing the effect of any inconsistency or difference, consider whether it concerns a matter of importance or an unimportant detail and whether it results from innocent error or intentional falsehood.

On the other hand, you're not required to accept testimony merely because it is uncontradicted.  You may decide, because of a witness's bearing and demeanor or because of inherent improbability or for whatever reason, that a witness's testimony is not worthy of belief.  You may accept all of a witness's testimony or reject all of it, or you may accept part and reject another part.[30]

---

[30]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-142 – 13-143 (D. Mass. Apr. 28, 2016); *see also Hardware Mut. Ins. Co. v. Jacob Hieb, Inc.*, 146 F.2d 447, 451 (8th Cir. 1945); *Dillon v. Evansville Refining Co.,* 127 F.2d 13, 17 (7th Cir. 1942).

### 20.    Defendants' Right Not to Testify (If Applicable)

A Defendant has a constitutional right not to testify and a right not to produce any evidence at all.  No inference of guilt or of anything else may be drawn from the fact that a Defendant did not testify.  In this case, the Defendants have chosen to exercise their right not to testify.  It would be improper and unfair for you to speculate as to the reason or reasons why the Defendants have so chosen.  You must not infer anything whatsoever from the Defendants' decisions not to testify, and I specifically instruct you that, during your deliberations, you may not discuss this fact in any manner whatsoever.[31]

---

[31]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-146 – 13-147 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instruction 3.03.

### 21.    Character Evidence

Some of the Defendants chose to present evidence showing that they enjoy a reputation for honesty, truthfulness, and integrity in their communities.  Such evidence may indicate to you that it is improbable that a person of such character would commit the crimes charged and therefore cause you to have reasonable doubt as to their guilt.  You should consider any evidence of each of the Defendant's good character along with all the other evidence in the case and give it such weight as you believe it deserves.[32]  If, when considered with all the other evidence presented during this trial, the evidence of any Defendant's good character creates a reasonable doubt in your mind as to his or her guilt, you should find that Defendant not guilty.[33]

---

[32]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-137 (D. Mass. Apr. 28, 2016).
[33]    First Circuit Pattern Criminal Jury Instruction 2.19.

23

## 22.    Defense of Good Faith

Evidence has been presented of each Defendant's good faith.

Good faith is an absolute defense to each of the charges in this case.  If the defendant you are considering believed in good faith that he or she was acting properly, even if he or she was mistaken in that belief, and even if others were injured by his or her conduct, then it is your duty to acquit that Defendant.

The burden of proving good faith does not rest with the Defendants because the Defendants do not have an obligation to prove anything in this case.  It is the government's burden to prove beyond a reasonable doubt that the Defendants are guilty and did not act with good faith.[34]

---

[34]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-159 – 13-160 (D. Mass. Apr. 28, 2016); *United States v. Soto*, 799 F.3d 68, 94-95 (1st Cir. 2015); *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 27-28 (D.P.R. May 26, 2017); Sand et al., *Modern Federal Jury Instructions*, Instruction 8-1 (2014). Good faith is an "absolute defense" to a specific-intent crime. *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991).  A criminal defendant is generally "entitled to an instruction on his theory of the defense so long as the theory is a valid one and there is evidence in the record to support it." *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998); *see also United States v. Gorski*, 880 F.3d 27, 32 n.3 (1st Cir. 2018); *see also United States v. Henry*, 136 F.3d 12, 17 n.3 (1st Cir. 1998).

### 23. Collective Knowledge Doctrine

The government has charged each Defendant with participation in three conspiracies—namely, the conspiracy charged in Count One, the conspiracy charged in Count Two, and the conspiracy charged in Count Three. The government alleges that the Defendants participated in the charged conspiracies with several objects, including corruptly paying money to bribe university employees and test proctors, and corruptly paying money to the Key Worldwide Foundation for the same purpose, as a part of the alleged bribe paid to the university employees or test proctors.[35]

Entities such as corporations and universities compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. Thus, the knowledge of an entity, such as a corporation or a university, is the totality of what all of the employees know within the scope of their employment.[36]

The University of Southern California and Georgetown University, as private not for profit corporations, are not individuals, and they act collectively through all of their employees, not just those in one department or on one committee such as an Admissions Committee. Therefore, the knowledge of all employees of the University of Southern California, while acting within the scope of their employment, is imputed to the University of Southern California, and you must consider the actions and knowledge of all of the University of Southern California's employees in evaluating whether any defendant acted with intent to defraud the University of Southern California, or with intent to bribe an employee of the University. Likewise, the knowledge of all employees of Georgetown University, while acting within the scope of their employment, is imputed to Georgetown University, and you must consider the actions and knowledge of all of Georgetown University's employees in evaluating whether any defendant acted with intent to defraud Georgetown University, or with intent to bribe one of its employees.

In general, whether some USC employees or certain USC committees, such as the Admissions Committee, did not know about certain aspects of the defendants' children's admission is not dispositive as to whether USC had that knowledge. Nor is any lack of knowledge on USC's part dispositive as to whether the defendants acted corruptly.

All of each defendant's interactions with employees of USC are relevant to and must be considered by you in evaluating their intent and whether there is proof beyond a reasonable doubt that any defendant had the intent to defraud USC of the honest services of its employees. In determining the defendants' intent, you may consider evidence regarding: fundraising efforts

---

[35]    *See* Memorandum in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v), ECF 1032 at 6, n.2 (acknowledging that the Indictment technically alleges that each remaining Defendant participated in three conspiracies—a "fraud conspiracy," a "federal program bribery conspiracy," and a "money laundering conspiracy" —but that the Indictment makes clear that all three conspiracies are cut from the same cloth); Government's Response in Opposition to Defendants' Motions to Dismiss [sic] the Fourth Superseding Indictment, ECF No. 1170, at 6 (arguing that the Indictment alleges that the Defendants "conspired in a *single overarching scheme* to gain admission to college through various means"), 16 (arguing that the Indictment "alleges not just single conspiracies but a single overarching scheme").

[36]    *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987).

by USC, any team or athletic program within USC, and any individual employee of USC; knowledge of any USC employee within the scope of their employment relating to fundraising efforts by USC and admissions decisions by USC; all conversations and other interactions the defendant had with any USC employee; and thank you notes or gift receipts provided by USC for donations.

I also instruct you that just because an employee engaged in conduct in violation of the policies of his or her employer, or in conduct that is illegal, does not mean that the employee was not acting within the scope of her employment.[37]  Corporations, like the University of Southern California and Georgetown University, have a duty to police the conduct of all of their employees and are bound by the criminal conduct of their employees, when that conduct falls within the scope of their employment.[38]

---

[37]       *See, e.g.*, *United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982) (stating an agent is acting in the scope of employment when performing acts of the kind he is acting with an intent to benefit the corporation, even when the act is criminal).

[38]       *See, e.g.*, *United States v. Potter*, 463 F.3d 9, 25 (1st Cir. 2006) (stating that corporations are liable for criminal acts of its agents when the agents are acting within the scope of employment).

### 24.　　Other Individuals Not Defendants in This Trial

You are here to decide whether the Government has proven beyond a reasonable doubt that each of the Defendants is guilty of the crime or crimes charged in the indictment. The Defendants are not charged with committing any other crimes besides the offenses charged in the indictment. Moreover, you are not to be concerned with the guilt of any other person or persons not on trial as a defendant in this case. Other individuals who have been mentioned during the course of this trial are not on trial, and you are not being asked to reach a verdict as to them. You are not to speculate about the reasons why they are not part of this trial, and that fact should not affect or influence your verdict with respect to any of the Defendants who are on trial. You must base your verdict solely on the evidence, or lack of evidence, against the Defendant then under consideration in this case. It is not unusual for criminal cases to proceed separately against different individuals, even if they are allegedly involved in the same offenses or charged in the same indictment with other alleged crimes. It would be improper for you to speculate as to the status of the proceedings against other individuals who have not testified. For this reason, you must also not draw any inferences regarding any counts of the Indictment upon which I do not instruct you or ask you render a verdict.[39]

---

[39]　　Adapted from *United States v. Ponzo*, ECF No. 1974, Case No. 97-cr-40009-NMG, Jury Trial Transcript Day Twenty-Two, at 22-144 (D. Mass. Nov. 14, 2013); *United States v. DeCicco*, ECF No. 376, Case No. 17-cr-10092-NMG, Jury Trial Transcript Day 7, at 85 (D. Mass. June 12, 2018).

## II.    *Conspiracy Generally*

### 25.    **Basic Elements: Conspiracy**

A "conspiracy" is an agreement among two or more persons to achieve an unlawful purpose or purposes. For you to find a Defendant guilty of conspiracy, you must be convinced that the government has proven beyond a reasonable doubt each of the following three elements of the offense for each particular count with respect to that Defendant:[40]

*First*, that the agreement specified in the Indictment, and not some other agreement or agreements, existed between those people as alleged in the Indictment to commit a crime, and that the Defendant specifically intended and agreed that a member of the conspiracy would commit conduct that actually constituted the underlying crimes alleged, such as mail or wire fraud, bribery, or money laundering;

*Second*, that the Defendant joined in that agreement willfully, as I will define that term; and

*Third*, that one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy. I will also define for you the term "overt act."

---

[40]    *See United States v. Tum*, 707 F.3d 68, 72, 74-75 (1st Cir. 2013); First Circuit Pattern Criminal Jury Instruction 4.18.1349.

28

**A483**

## 26.    Conspiracy – First Element: An Agreement

With respect to the first element, a conspiracy is an agreement to commit a crime or series of crimes.  The conspiracy does not have to be a formal agreement or plan, but the government must prove that those who were involved agreed together to commit a crime or group of crimes. Mere similarity of conduct among various people, or the fact that they may have associated with each other or discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.[41]  A conspiracy generally ends after the central criminal purpose has been accomplished.[42]

For there to be a conspiracy, there must be an agreement between at least two conspirators. Thus, there can be no conspiracy if the defendant conspired only with government agents, informants, or cooperators.[43]  You are hereby instructed that after the government approached Rick Singer on September 21, 2018, he became the government's agent, informant, and cooperator, and thereafter could not be a co-conspirator with anyone because one who acts as a government agent and enters into a purported conspiracy in the secret role of an informant cannot be a co-conspirator.[44]

---

[41]        Adapted from *United States v. Morrow*, 39 F.3d 1228, 1234-35 (1st Cir. 1994); *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-153 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instruction 4.18.371(1).

[42]        *SEC v. Papa*, 555 F.3d 31, 36 n.3 (1st Cir. 2009).

[43]        *United States v. Castellini*, 392 F.3d 35, 51 n.11 (1st Cir. 2004) ("[T]here can be no conspiracy as a matter of law solely between a defendant and a government agent."); First Circuit Pattern Instruction, 4.18.371(1) cmt. 10; *United States v. McClain*, 934 F.2d 822, 828 (1st Cir. 1991) ("Burnett could not, as an informant, conspire with anyone").

[44]        *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986) (reversing conviction for failure to instruct that after cooperator's arrest "he became the Government's agent and informer and thereafter could not be a co-conspirator with [defendant] because one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator").

29

### 27. Conspiracy – First Element: The Conspiracies Alleged In The Indictment

The government has the burden of proving the conspiracies alleged in the Indictment. You must decide whether each of the conspiracies existed, and, if it did, who at least some of its members were. If you find that the conspiracies charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find that any Defendant was not a member of the charged conspiracies, then you must find that Defendant not guilty, even though that Defendant may have been a member of some other conspiracy.[45]

The Indictment alleges that all of the Defendants took part in three conspiracies with Rick Singer and other parents, university employees, and others affiliated with Rick Singer.[46] First, in Count One, the Indictment charges that all of these people took part in a single conspiracy to commit mail and wire fraud and honest service mail and wire fraud. Second, in Count Two, the Indictment charges that all of these people took part in a single conspiracy to commit federal programs bribery. Lastly, in Count Three, the Indictment charges that all of these people took part in a single conspiracy to commit money laundering. As charged in the Indictment, all three conspiracies began in or about 2007 and continued until February 2019.

You must determine whether each of these three conspiracies existed as charged, and, if it did, whether each Defendant was a member of them. In this respect, the law recognizes that a Defendant may agree to take part in a single conspiracy where multiple crimes will be committed. For instance, a Defendant may agree to take part in an open-ended conspiracy (e.g., a conspiracy to rob banks) where the specifics of the future crimes (e.g., which banks will be robbed) is undetermined or at least unknown to the Defendant. But if a Defendant agrees with others simply to commit a single crime (e.g., to rob one bank) and has no knowledge or foresight of the conspiracy's broader scope, that Defendant is a member only of the narrower, one-crime conspiracy.[47]

Here, each of the Counts alleges that all of the Defendants agreed to take part in an open-ended conspiracy, as opposed to a narrow conspiracy. If you determine that any of the Defendants intended to take part in a narrower conspiracy as opposed to the open-ended conspiracy charged in the Count at issue, you must find that Defendant not guilty with respect to that Count.[48]

---

[45] Ninth Circuit Model Criminal Jury Instruction 8.22; *see United States v. Bedini*, 861 F.3d 10, 16-17 (1st Cir. 2017).

[46] Despite charging the Defendants with three separate conspiracies, the government contends that the Defendants participated in a single, overarching conspiracy through a variety of means. *See* Memorandum in Support of Defendants' Motion to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and 12(b)(3)(B)(i), (iv), and (v), ECF 1032 at 6, n.2 (acknowledging that the Indictment technically alleges that each remaining Defendant participated in three conspiracies—a "fraud conspiracy," a "federal program bribery conspiracy," and a "money laundering conspiracy"—but that the Indictment makes clear that all three conspiracies are cut from the same cloth); Government's Response in Opposition to Defendants' Motions to Dimiss [sic] the Fourth Superseding Indictment, ECF No. 1170, at 6 (arguing that the Indictment alleges that the Defendants "conspired in a *single overarching scheme* to gain admission to college through various means"), 16 (arguing that the Indictment "alleges not just single conspiracies but a single overarching scheme").

[47] First Circuit Pattern Criminal Jury Instruction 4.18.371(1), cmt. 5; Fifth Circuit Criminal Pattern Jury Instruction 2.16. This principle is reiterated in this in *United States v. Franco-Santiago*, 681 F.3d 1, 7-9 (1st Cir. 2012), and *United States v. Monserrate-Valentin*, 729 F.3d 31, 43 (1st Cir. 2013).

[48] *See* Fifth Circuit Criminal Pattern Jury Instruction 2.16; First Circuit Pattern Criminal Jury Instruction 4.18.371(1), cmt. 5.

### 28. Conspiracy – First Element: Multiple Conspiracies[49]

As I have previously instructed, Count One of the Indictment charges that all of the Defendants and others took part in a single, overarching conspiracy to commit mail and wire fraud and honest service mail and wire fraud. Count Two charges that all of the Defendants and others took part in a single, overarching conspiracy to commit federal programs bribery. Count Three charges that each of the Defendants took part in a single, overarching conspiracy to commit money laundering. Each of the three Counts alleges the existence of a single, overarching conspiracy of which all of the Defendants were members. The Indictment does not allege multiple, separate conspiracies within each Count.

As I instructed you earlier, a single conspiracy exists when two or more people join together to further one common unlawful design, purpose, or overall plan. Conversely, multiple conspiracies exist when there are separate unlawful agreements.

With respect to each of the conspiracy Counts, if you find that there was not one conspiracy as alleged by the government, but instead that there were multiple separate conspiracies, then you must find the Defendants not guilty of the conspiracy Count at issue.[50]

Whether there was one conspiracy or multiple conspiracies or, indeed, no conspiracy at all, is a question of fact for you, the jury, to determine in accordance with these instructions.

In determining whether there was a single conspiracy or multiple conspiracies with respect to each conspiracy count, you may consider a number of factors. These include:

Whether the alleged members of the conspiracy shared a common goal or purpose;

Whether the various activities of the conspiracy involved overlapping participants; and

---

[49] "[A] court should instruct on the issue [of multiple conspiracies] 'if, on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged.'" *United States v. Balthazard*, 360 F.3d 309, 315 (1st Cir. 2004) (quoting *United States v. Brandon*, 17 F.3d 409, 449 (1st Cir. 1994) (further internal quotation marks and citations omitted)).

[50] The First Circuit has used variance analysis to review convictions where the evidence supports only a conspiracy narrower than the factual allegations of the Indictment charge, and, if there is no harmful prejudice from the variance, has allowed a guilty verdict to stand. *Compare, e.g., Monserrate-Valentine*, 729 F.3d at 43*; Franco-Santiago*, 681 F.3d at 7-9 (conviction reversed, although based not on variance but on statute of limitations); *United States v. Mubayyid*, 658 F.3d 35, 41 (1st Cir. 2011); *with United States v. Glenn*, 828 F.2d 855, 858-60 (1st Cir. 1987) (finding harmful prejudice as to one defendant and not as to another defendant). Therefore, confronted with a Rule 29 motion at the close of the government's case, if the trial judge concludes that the evidence is not sufficient to sustain the multiple-object conspiracy as charged, the trial judge must decide whether there is sufficient evidence of a narrower conspiracy and, if so, whether the resulting variance between the charge and the evidence is prejudicial. If the judge concludes that the variance is not prejudicial, the question remains how to charge the jury concerning the object of the conspiracy. In a multiple-object conspiracy case, the Supreme Court suggested going farther: "if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration." *Griffin v. United States*, 502 U.S. 46, 60 (1991).

Whether the alleged conspirators believed that their activities were "interdependent."[51]

To determine whether "interdependence" exists, you should ask whether the evidence shows, or fails to show, that the activities of one aspect of the scheme were necessary or advantageous to the success of another aspect of the scheme.[52] Interdependence does not exist when one alleged conspirator is indifferent to the purposes of the others.[53] Thus, to determine interdependence you must consider the alleged conspirators' states of mind: Each individual must think the aspects of the venture interdependent, and each defendant's subjective understanding, and not his or her mere participation in some branch of the venture, is key.[54]

Again, as I instructed you earlier, if you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even if you find that some other conspiracy existed. If you find that a Defendant was not a member of the conspiracy charged in the Indictment, then you must find that Defendant not guilty, even though that Defendant may have been a member of some other conspiracy.[55]

---

[51]    Adapted from O'Malley et al., *Federal Jury Practice and Instructions* § 31:09 (6th ed. 2020); Sand et al., *Modern Federal Jury Instructions (Crim.)*, Inst. 19-5 (Multiple Conspiracies) (2020); First Circuit Pattern Criminal Jury Instruction No. 4.18.37(1), cmt. 5; *United States v. Trainor*, 477 F.3d 24, 34, n.20 (1st Cir. 2007) (describing a "wide range of factors"); *United States v. Dellosantos*, 649 F.3d 109, 117 (1st Cir. 2011) (describing the "three factors this court has found particularly helpful in evaluating the evidence" of single vs. multiple conspiracies).

[52]    Adapted from *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999), quoting *United States v. Wilson*, 116 F.3d 1066, 1076 (5th Cir. 1997).

[53]    *United States v. Glenn*, 828 F.2d 855, 858-59 (1st Cir. 1987).

[54]    *Portela*, 167 F.3d at 695.

[55]    Ninth Circuit Model Criminal Jury Instruction 8.22; *see United States v. Bedini*, 861 F.3d 10, 17 (1st Cir. 2017).

32

### 29. Conspiracy – Second Element: Willfulness

With respect to the second element of the crime of conspiracy, the government must prove beyond a reasonable doubt that the Defendant then under consideration acted willfully.

Willfulness is a form of intent. Intent and motive are separate concepts. Motive is what prompts a person to act or fail to act. Intent refers to the state of mind with which the act is done. The government need not prove the Defendant's motive, but it must prove his or her intent.[56]

The word "willfully" means to act voluntarily and intelligently, and with specific intent to commit the underlying crime, such as mail fraud or bribery. In other words, it means to act with a bad purpose, either to disobey or disregard the law. To act by ignorance, accident, or mistake is not to act willfully.[57]

Mere knowledge of or acquiescence in the conspiracy is not sufficient to prove that a defendant knowingly and willfully joined a conspiracy, nor is it sufficient that he or she did something that happened to further or assist the purposes or objects of the conspiracy. Rather, to prove membership in the conspiracy, the evidence must establish that the defendant participated with the intention of aiding in the accomplishment of the conspiracy's principal purpose.[58]

---

[56]     *United States v. DeCicco*, Case No. 17-cr-10092-NMG, ECF No. 376, Jury Trial Transcript Day 7, at 92 (D. Mass. June 12, 2018).
[57]     Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-150 (D. Mass. Apr. 28, 2016); *see also United States v. DeCicco*, Case No. 17-cr-10092-NMG, ECF No. 376, Jury Trial Transcript Day 7, at 93 (D. Mass. June 12, 2018).
[58]     Adapted from *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016).

### 30.    Conspiracy – Second Element: Good Faith

If the Defendant under consideration acted in good faith, he or she cannot be guilty of the crime of conspiracy.  If the Defendant had a good faith belief that he or she was not violating the law, even if that belief was mistaken, he or she did not have the necessary intent to commit the crime.[59] In other words, the Defendant's good faith is a complete defense to the conspiracy charges because good faith is simply inconsistent with the element of willfulness.

While the term "good faith" has no precise definition, it means, among other things, an honest belief, a lack of malice, and lacking an intent to violate the law. A person who acts on an honestly-held belief is not punishable merely because that honest belief turns out to be incorrect or wrong. The law of conspiracy subjects to punishment only those people who act willfully, and with an intent to violate the law.

The burden is on the government to prove the required intent and consequent lack of good faith, as I will define for you next, beyond a reasonable doubt. The Defendant is under no obligation to prove good faith.[60]

---

[59]    *See United States v. Gorski*, 880 F.3d 27, 32  n.3 (1st Cir. 2018); *see also United States v. Henry*, 136 F.3d 12, 17 n.3 (1st Cir. 1998) ("If the defendant had a good faith belief that Beede was authorized to transport the waste to its facility, he is not guilty of the crime of conspiracy even if it turns out that that belief was wrong.  The burden of proving good faith does not rest with the defendant because the defendant does not have to prove anything in this case.  It is the government's burden to prove beyond a reasonable doubt that the defendant is guilty of conspiracy."); Eighth Circuit Model Criminal Jury Instruction 9.08A (2020); *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991) (a good-faith belief "is an absolute defense to a charge of mail or wire fraud").
[60]    *United States v. Goodchild*, 25 F.3d 55, 59 (1st Cir. 1994).

### 31.    Conspiracy – Second Element: Intent

The government must prove two types of intent to convict a Defendant of conspiracy: an intent to agree (that is, an intent to join the conspiracy), and an intent that the underlying crime be committed.[61]

To show the first type of intent, the government must prove that the defendant voluntarily and intelligently agreed to join the conspiracy specified in the count at issue.  If the conspiracy charged in the count at issue involved more than one crime, the defendant must, at a minimum, have had knowledge or foresight of the multiple crimes before he can be convicted of agreeing to join that conspiracy. On the other hand, if a defendant agrees with others simply to commit a single crime, and has no knowledge or foresight of his accomplices' intentions and agreement to commit multiple crimes, that defendant had intent to join only a narrower, one-crime conspiracy, and is not guilty of the other broader conspiracy charged in the count at issue.[62]

A conspiracy requires more than just a buyer-seller relationship between the Defendant and another person. Such a transactional relationship, standing alone, cannot a support a conviction for conspiracy. Even if the purchase or sale itself was illegal, a conviction for conspiracy requires proof of an agreement to commit a crime beyond that of the mere sale. In other words, the government must prove that the buyer and seller had a joint criminal objective beyond the transaction between them.[63]

To show the second type of intent, the government must prove that the Defendant joined the conspiracy specified in the count at issue with the intent to commit the underlying crimes alleged in that count.  The object of the conspiracy at issue must be the crimes alleged in the count at issue.  An agreement that does not have the commission of a crime as its object is not a conspiracy. [64]

---

[61]      *See* First Circuit Pattern Criminal Jury Instruction 4.18.1341; *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Volume XIII, at 13-154 (D. Mass. Apr. 28, 2016).

[62]      *United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir. 1994) ("But if a defendant agrees with others simply to commit a single crime (e.g., to rob one bank) and has no knowledge or foresight of the conspiracy's broader scope, that defendant is a member only of the narrower, one-crime conspiracy.").

[63]      *See United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993) (citing "substantial law," in both First Circuit and others, "that a single drug sale does not automatically make buyer and seller co-conspirators"); *United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000) ("because the line between a conspiracy and a mere buyer-seller relationship is difficult to discern, district judges should instruct juries in appropriate situations on the distinction"); *United States v. Walker*, 746 F.3d 300, 308 (7th Cir. 2014) ("a mere buyer-seller relationship provides a defense to a conspiracy charge because it negates an essential element, the agreement to commit a crime, of a conspiracy").

[64]      *See United States v. Bravo-Fernandez*, 722 F.3d 1, 32 (1st Cir. 2013) ("since the conduct allegedly underlying the conspiracy was not a crime, no... conspiracy to commit that conduct can exist either").

### 32.  Conspiracy – Third Element: Overt Act

The third element of the crime of conspiracy is the commission of an overt act. The government must prove beyond a reasonable doubt that one of the conspirators knowingly and willfully committed at least one overt act to accomplish some purpose of the conspiracy at some time during the period of the conspiracy.  An "overt act" is any action intended to accomplish some object of the conspiracy.  The government is not required to prove that the Defendant personally committed or knew about the overt act. It is sufficient if one conspirator committed one overt act at some time during the period of the conspiracy.[65]

---

[65]  Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-155 (D. Mass. Apr. 28, 2016); First Circuit Pattern Criminal Jury Instruction 4.18.371(1); *Modern Federal Jury Instructions (Crim.)*, Inst. 19-3S (Multiple Conspiracies) (2021); *see also* Eleventh Circuit Pattern Criminal Jury Instructions, Offense Instruction 13.1; Federal Judicial Center Pattern Criminal Jury Instruction No. 4.

### III.    Count One: Conspiracy to Commit Mail and Wire Fraud

### 33.    Count One: Conspiracy to Commit Mail and Wire Fraud: Introduction

Count One of the Indictment charges that the Defendants conspired with Rick Singer and others to commit mail and wire fraud, and honest services mail and wire fraud. As I will explain to you in a moment, mail and wire fraud on the one hand, and honest services mail and wire fraud on the other hand, are different crimes. Title 18, Section 1349 of the United States Code makes it a crime to conspire to commit both mail and wire fraud, and honest services mail and wire fraud.

Here, Count One alleges that all of the Defendants took part in one single conspiracy with Rick Singer and other parents, university employees, and others affiliated with Rick Singer. As charged in the Indictment, this conspiracy began in or about 2007 and continued until February 2019. One alleged objective of the conspiracy was to use materially false statements to obtain property, in the form of standardized test scores and admission to universities.  Another alleged objective of the conspiracy was to use bribes and kickbacks to deprive the testing services and universities of the honest and faithful services of test proctors, athletic coaches, and university administrators.

It is not necessary for the government to prove that the Defendants intended the alleged scheme to defraud to achieve both of the objects.  Rather, it is sufficient if the government proves beyond a reasonable doubt that the Defendants intended the scheme to achieve one of the charged objects.  But in that event, in order to return a verdict of guilty, you must unanimously agree as to which of the two objects the Defendants intended to achieve.[66]  In other words, you need to unanimously agree on whether the Defendant was guilty of wire fraud because he or she engaged in a scheme to obtain money or property or because he or she engaged in a scheme to deprive of honest services.

Mail and wire fraud, and honest services mail and wire fraud, are the underlying crimes alleged to have been the purpose of the conspiracy charged in Count One. I am providing you with the elements of these crimes so that you may evaluate whether each Defendant specifically intended that they be committed in furtherance of the alleged conspiracy.

---

[66]    *United States v. Woodard*, 459 F.3d 1078, 1084 n.2 (11th Cir. 2006); *United States v. Ballard*, 663 F.2d 534, 544 (5th Cir. 1981) (conviction reversed where it was impossible to tell if jurors agreed that defendant committed same act which could properly support conviction for mail fraud and conspiracy).

## 34.     Mail and Wire Fraud – Elements

The first theory of Count One is that the Defendants conspired to commit mail and wire fraud in order to obtain property in the form of standardized test scores and admission to universities.  I am explaining mail and wire fraud together because they are similar, but I will note where they are different. The crime of mail or wire fraud has three elements:

First, a scheme to obtain money or property by means of materially false or fraudulent pretenses.

Second, that the Defendant knowingly and willfully participated in the scheme, with intent to defraud.

And third, with respect to mail fraud, that the Defendant caused the United States mail, or a private or commercial interstate carrier, to be used for the purpose of executing the scheme or in furtherance of the scheme. It is also sufficient if it was reasonably foreseeable that the United States mail, or a private or commercial interstate carrier, would be used for the purpose of executing the scheme or in furtherance of the scheme.[67]

Wire fraud is slightly different. With respect to wire fraud, the third element is that the Defendant caused an interstate wire communication to be used for the purpose of executing the scheme, or in furtherance of the scheme, or that it was reasonably foreseeable that an interstate wire communication would be used.[68]

---

[67]     Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-157 – 13-158 (D. Mass. Apr. 28, 2016), and First Circuit Pattern Criminal Jury Instructions 4.18.1341, 4.18.1343, to conform to three-element model articulated in *United States v. DiRosa*, 761 F.3d 144, 150-151 (1st Cir. 2014), and *United States v. Appolon*, 715 F.3d 362, 367-368 (1st Cir. 2013).
[68]     First Circuit Pattern Criminal Jury Instruction 4.18.1343.

### 35.        Mail and Wire Fraud – Definitions: "Scheme"

I will now define some of these terms. For purposes of the mail and wire fraud statute, a "scheme" includes any plan, pattern, or course of action.[69]

---

[69]        *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-158 (D. Mass. Apr. 28, 2016).

### 36.　　Mail and Wire Fraud – Definitions: "Materially False or Fraudulent Pretenses"

"Materially false or fraudulent pretenses" means any materially false statements or assertions that were either known to be untrue when made or were made with reckless indifference to their truth, and that were made with the intent to defraud.[70]

---

[70]　　Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-158 – 13-159 (D. Mass. Apr. 28, 2016), First Circuit Pattern Criminal Jury Instructions 4.18.1341, 4.18.1343.

### 37.    Mail and Wire Fraud – Definitions: "Material" or "Materially"

A fact or matter is "material" if it has a natural tendency to influence or be capable of influencing the decision of the decision-maker to whom it was addressed.[71]  If the alleged victim would have made the same decision if it knew the true facts, the misstatement at issue cannot be material.[72]

If the alleged victim makes a particular decision despite its actual knowledge that certain false statements were made to it, that is very strong evidence that those statements were not material.[73]

Likewise, if the alleged victim regularly makes similar decisions despite actual knowledge that certain false statements were made to it, that is strong evidence that the statements are not material.[74]

---

[71]    Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-159 (D. Mass. Apr. 28, 2016), First Circuit Pattern Criminal Jury Instructions 4.18.1341, 4.18.1343; *see also United States v. Blastos*, 258 F.3d 25, 29 (1st Cir. 2001).

[72]    *See United States v. Williams*, 12 F.3d 452, 457 (5th Cir. 1994) ("[O]ne way of determining whether the statements were capable of influencing a bank's decision is to extrapolate from the facts and ask, 'If the bank had relied on the defendant's statements, would it have made any difference?'"); *see also id.* at 458 (framing the relevant question as whether "a bank or federal institution, armed with the truth, would have arrived at a different decision on a pending application").

[73]    *Universal Health Services v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2003-04 (2016).

[74]    *Universal Health Services*, 136 S.Ct. at 2004.

A496

### 38.     Mail and Wire Fraud – Definitions: "Knowingly" and "Willfully"

A Defendant acts "knowingly" if he or she was conscious and aware of his or her actions, realized what he or she was doing or what was happening around him or her, and did not act because of ignorance, mistake, or accident.[75]

A Defendant acts "willfully" if he or she acted knowingly and purposely, with an intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.[76]

For mail and wire fraud, the government must prove both knowing and willful conduct.

---

[75]     *See United States v. Pagan-Romero*, 894 F.3d 441, 444 (1st Cir. 2018); *United States v. Mueffelman*, 470 F.3d 33, 41 (1st Cir. 2006); *see also United States v. DeNunzio,* Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-149 – 13-150 (D. Mass. Apr. 28, 2016).
[76]     Sand et al., *Modern Federal Jury Instructions-Criminal*, P 44.01 (2021); *see* First Circuit Pattern Criminal Jury Instruction 2.17.

### 39. Mail and Wire Fraud – Definitions: "Intent to Defraud"

To act with "intent to defraud" means to act willfully and with the specific intent to do something the law forbids; that is to say, with bad purpose, either to disobey or disregard the law.[77]

Good faith on the part of the Defendant negates intent and is a complete defense to mail or wire fraud. If, for example, you find that the Defendant had a good faith belief that the alleged victims knew of and condoned—in other words provided tacit approval for—the activities in question, then the Defendant did not have an intent to defraud.[78] Evidence of the alleged victim's actions or omissions, or evidence of deficiencies in the manner in which it implemented or enforced its policies and procedures, may also be considered by you to the extent that such evidence bears on the element of intent.[79]

---

[77] Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-159 (D. Mass. Apr. 28, 2016).

[78] *United States v. Soto*, 799 F.3d 68, 94-95 (1st Cir. 2015); *see also United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996); *United States v. Klock*, 210 F.2d 217, 22-23 (2nd Cir. 1954).

[79] Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-159 – 13-160 (D. Mass. Apr. 28, 2016); *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996). Good faith is an "absolute defense" to a specific-intent crime. *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991). A criminal defendant is generally "entitled to an instruction on his theory of the defense so long as the theory is a valid one and there is evidence in the record to support it." *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998). Magistrate Judge Kelley has spoken extensively on the relevance of the parents' "good faith" to the crimes alleged in the Indictment. *See also* Sealed Transcript of May 14, 2020 Hearing at 21:12-24; 23:6 to 24:9, 45:13-24 (Kelley, M.J.):



A defendant has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.[80]



*See also* Sealed Transcript of February 10, 2021 Hearing at 27:15-24 (Kelley, M.J.):



With respect to the honest services piece, at least, the Court has also held that whether the parents acted in good faith or not would be an issue for the jury to decide at trial. *See United States v. Sidoo*, 468 F. Supp. 3d 428, 445 (D. Mass. 2020) (Gorton, J.) ("Again, to the extent the defendants maintain that they were unaware that their payments were going to corrupt insiders or of the extent to which those insiders deprived the universities of their honest services is a factual question to be resolved at trial.").

[80]     *United States v. Joselyn*, 99 F.3d 1182, 1194 (1st Cir. 1996).

44

### 40.    Mail and Wire Fraud – Definitions: "Property": Admission to the Universities

*Instruction Requested by Defendant Wilson:*

Mail and wire fraud also require proof that a purpose of the scheme was to obtain money or "property." It is not enough that the scheme involved, or may have caused, an incidental loss of money or property by the alleged victim. The evidence must show, rather, that obtaining money or property was an object of the scheme.[81] The government's allegation is that by submitting false information in connection with their children's applications to the universities, the defendants committed the federal crime of mail or wire fraud because they intended to deprive the universities of their "property" in the form of an admissions slot.

Here, I instruct you that the admission of a student to a university, or an admissions slot, does not constitute "property" of the university and thus cannot serve as a basis for a finding of mail or wire fraud, or a conspiracy to commit mail or wire fraud.[82]

Moreover, if the only actions taken by the university employees who allegedly were part of the scheme was to do exactly the sorts of things the university normally expected or wanted those employees to do, i.e., to recommend students for admission based on various criteria, including fundraising considerations, then their actions cannot count as the taking of property from the university, and hence there can be no scheme to commit mail or wire fraud.[83]

*Instruction Requested by Defendants Abdelaziz, Kimmel, and Palatella:*

*Prefatory Explanation for the Court:*

For the reasons set forth in the Defendants' Memorandum of Law in Support of Their Motion to Dismiss Count One Insofar as It Alleges Conspiracy to Defraud Universities of Property (ECF No. 1042), which the Defendants hereby incorporate by reference, and in *United States v. Ernst*, 502 F. Supp. 3d 637 (D. Mass. 2020), it is the Defendants' position that admission to a university does not constitute "property" as a matter of law for purposes of the mail and wire fraud statutes. Accordingly, the Defendants respectfully request that the Court instruct the jury that admissions to universities do not constitute "property" for purposes of these statutes. Nonetheless, the Defendants recognize that this Court has previously held that "application slots to universities are property interests owned by the university cognizable under the mail and wire fraud statutes." *Sidoo*, 468 F. Supp. 3d at 441. To the extent the Court is unwilling to give the Defendants' requested instruction in light of its prior holding, the Defendants respectfully submit an alternative requested instruction, set forth below, to allow the jury to determine whether the admissions slots at issue in this case constitute "property." *See Hana Fin., Inc. v. Hana Bank*,

---

[81]    *See Kelly v. United States*, 140 S.Ct. 1565, 1573-74 (2020).

[82]    *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss Count One Insofar as It Alleges Conspiracy to Defraud Universities of Property (ECF No. 1042), which the Defendants incorporate herein by reference; *United States v. Ernst*, 502 F. Supp. 3d 637 (D. Mass. 2020). As noted above, the Defendants expressly maintain, and do not waive, all arguments in their prior briefing, including that the admissions slots at issue under the government's theory cannot constitute "property" within the meaning of the mail or wire fraud statutes.

[83]    *See Kelly*, 140 S.Ct. at 1571-73.

574 U.S. 418, 423-24 (2015) ("'[T]he application-of-legal-standard-to-fact sort of question . . . , commonly called a 'mixed question of law and fact' has typically been resolved by juries.'" (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)). The Defendants reserve all rights to argue that the question of what constitutes "property" under these statutes is a question of law that was incorrectly decided at the motion to dismiss stage, or a mixed question of law and fact.

*Alternative Requested Instruction:*

Mail and wire fraud also require proof that a purpose of the scheme was to obtain money or "property." It is not enough that the scheme involved, or may have caused, an incidental loss of money or property by the alleged victim. The evidence must show, rather, that obtaining money or property was an object of the scheme.[84] The government's allegation is that by submitting false information in connection with their children's applications to the universities, the defendants committed the federal crime of mail or wire fraud because they intended to deprive the universities of their "property" in the form of an admissions slot.

You must determine whether the admissions slots at issue in this case are in fact property of the universities.

"Property" may include tangible money or property and, in some circumstances, intangible interests such as the right to control the use of one's assets. With respect to intangible interests, such as the right to control, to allocate, or to exclude, interference with those interests, standing alone, does not rise to the level of a scheme to obtain property for purposes of the mail and wire fraud statutes.[85] Not every non-disclosure or misrepresentation that could affect one's decision of how to use assets is sufficient to support a mail or wire fraud conviction. A property interest in the intangible right to control the use of one's assets may be injured *only* when the alleged scheme is intended to impact an *economic* decision or, in other words, to cause *tangible economic harm*.[86] Thus, in order to prove that a defendant agreed and intended to defraud the universities here, the government must prove beyond a reasonable doubt that the misrepresentation or non-disclosure of information caused, or was intended to cause, tangible

---

[84]     *See Kelly v. United States*, 140 S.Ct. 1565, 1573-74 (2020).
[85]     *See Kelly*, 140 S. Ct. at 1572 ("The State's 'intangible rights of allocation, exclusion, and control'—its prerogatives over who should get a benefit and who should not—do 'not create a property interest.'") (citing *Cleveland v. United States*, 531 U.S. 12, 23 (2000)).
[86]     *United States v. Finazzo*, 850 F.3d 94, 111-12 (2d Cir. 2017); *Ernst*, 502 F. Supp. 3d at 651 (quoting *Finazzo*, 850 F.3d at 111-12).

economic harm to the university.[87]  If the university received the full economic benefit of its bargain, there is no property fraud for purposes of the mail and wire fraud statutes.[88]

Moreover, if the only actions taken by the university employees who allegedly were part of the scheme was to do exactly the sorts of things the university normally expected or wanted those employees to do, i.e., to recommend students for admission based on various criteria, including fundraising considerations, then their actions cannot count as the taking of property from the university, and hence there can be no scheme to commit mail or wire fraud.[89]

---

[87]        Adapted from *Finazzo*, 850 F.3d at 109-12; *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015); and *United States v. Mittelstaedt*, 31 F.3d 1208, 1210 (2d Cir. 1994); *see also Kelly*, 140 S. Ct. at 1572 (a non-property right cannot be transformed into property by the mere allegation that the victim was deprived of control); *Binday*, 804 F.3d at 570 (2d Cir. 2015) ("we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."); *United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003) (under a right to control theory, property fraud sufficient if the defendant "knowingly provides or withholds materially false information which imposes a substantial risk of loss on another . . . even if that risk does not materialize"); *United States v. Wallach*, 935 F.2d 445, 462-63 (2d Cir. 1991) ("the right to control . . . theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information"); *United States v. Shyres*, 898 F.2d 647, 653 (8th Cir. 1990) (upholding conviction because jury could have found defendant deprived victim of the right to control the spending of its funds under several different theories, all of which would have resulted in actual or potential economic harm); *United States v. Fagan*, 821 F.2d 1002, 1010, n.6 (5th Cir. 1987) (upholding conviction in part because evidence demonstrated that defendant deprived victim of its right to control its money which resulted in or could have resulted in tangible economic harm – i.e., paying less to the defendant for his services, among others).

[88]        *Binday*, 804 F.3d at 570.

[89]        *See Kelly*, 140 S.Ct. at 1571-73.

### 41. Mail and Wire Fraud – Definitions: "Property": Standardized Test Scores

*Instruction Requested by Defendant Palatella:*

The government has also alleged that the money and property at issue is: "ACT, SAT and other standardized tests and test scores." In this case you have heard evidence only regarding the SAT score for the child of one defendant, Marci Palatella. The government has alleged, among other things, that Ms. Palatella participated in a scheme to defraud the College Board through acts of deceit to obtain the property of the College Board, in particular the SAT test score of her child. To find her guilty of this offense, you must decide beyond a reasonable doubt that Ms. Palatella willfully engaged in this aspect of the conspiracy with the intent, through the alleged deceit or fraud, to take or obtain property of the College Board.[90]

As a first step, you must determine, beyond a reasonable doubt, that Ms. Palatella knew that the object of this aspect of the scheme to defraud was to obtain property of the College Board. You must, accordingly, decide beyond a reasonable doubt that the SAT test score of her son was property of the College Board.

In deciding whether the SAT test score for defendant Marci Palatella's child is property of the College Board and that she intended to obtain that property through a scheme to defraud the College Board, you may consider the following. In determining whether a test score is property, you may consider those factors that make something one's own property, including their ability to buy and sell it, to control or enjoy its use and keep others from controlling or enjoying its use.

*First*, you may consider the control, if any, that could be asserted over the test score by the College Board once the score was provided to defendant Palatella.

*Second*, you may consider whether there is a marketplace for the SAT test score of her child in which defendant Palatella could buy or sell that score. You may consider in this regard whether the score of her child could be transferred or sold to another parent or student who could then use that score in some manner.

*Third*, you may consider whether the College Board had a property interest in any particular score that might have been achieved by defendant Palatella's son during the test, and whether a lower score or a higher score by her son changed the value of the SAT test score as property of the College Board.

*Fourth*, you may consider whether there is a market price that can be paid for an SAT test score.

If you find that the SAT test score of Ms. Palatella's son is not property of the College Board at the time it made that score available to Ms. Palatella and her son, then you may not convict her of participating in the scheme to defraud for that purpose.

The government has not charged in its indictment that the process by which the test was administered by the College Board to Ms. Palatella's son was property of the College Board or

---

[90] *See Kelly v. United States*, 140 S.Ct. 1565, 1572 (2020).

that Ms. Palatella schemed with another person to obtain with deceit that process as property from the College Board.  Accordingly, I instruct you that you are not to consider, in your deliberations, whether the process of taking the test was property of the College Board.

### IV.   Count One: Conspiracy to Commit Honest Services Mail and Wire Fraud

### 42.   Count One: Conspiracy to Commit Honest Services Mail and Wire Fraud: Introduction

The second theory of Count One is that the Defendants conspired to commit honest services mail and wire fraud, meaning that honest services mail and wire fraud is the underlying crime alleged to have been the purpose of the conspiracy in Count One.[91]  Count One alleges that each Defendant took part in a single conspiracy, with Rick Singer, other parents, university employees, test proctors, and others affiliated with Rick Singer, from in or about 2007 through in or about February 2019, to deprive the testing services and the universities of their right to the honest and faithful services of their test proctors, athletic coaches, and university administrators, through bribes and kickbacks.

Again, I am providing you with the elements for honest services mail and wire fraud so that you may evaluate whether each Defendant specifically intended and agreed that a member of the conspiracy would engage in honest services mail and wire fraud.  If the government does not prove beyond a reasonable doubt that the Defendant specifically intended and agreed that some member of the conspiracy would commit honest services mail and wire fraud, then the government has failed to prove that the Defendant engaged in a conspiracy to commit honest services mail and wire fraud.

The crime of honest services mail and wire fraud has six elements.

The first element is that an employee or contractor owed a fiduciary duty to an entity.

The second element is that the Defendant agreed and specifically intended that the fiduciary would perform an official act that violated his or her fiduciary duty, and deprive the entity to which he or she owed a fiduciary duty of his or her honest services, in exchange for a bribe or kickback.[92]

The third element is that there was in fact a bribe or kickback.[93]

The fourth element is that the Defendant agreed and specifically intended that the fiduciary would deceive the entity to which he or she owed a fiduciary duty through a material misrepresentation, false statement, false pretense, or a deliberately misleading statement.

---

[91]    Adapted from *United States v. Gurry, et al.*, Case No. 16-cr-10343-ADB, ECF No, 930, Jury Trial Transcript Day 49, at 49-54 (D. Mass. April 4, 2019); Eleventh Circuit Pattern Criminal Jury Instructions O50.2, O50.3; Ninth Circuit Model Criminal Jury Instruction 8.123; *United States v. Sawyer*, 85 F.3d 713, 732 n.16 (1st Cir. 1996); *United States v. Reichel*, Case No. 1:15-cr-10324-DPW, ECF No. 244, Substantive Jury Instructions at 5-6 (D. Mass. June 17, 2016).

[92]    *See United States v. Napout*, 332 F. Supp. 3d 533, 549, 565-66 (E.D.N.Y. 2018).

[93]    *Skilling v. United States*, 561 U.S. 358, 368 (2010).

The fifth element is that it was foreseeable to the Defendant that the entity to which the employee or contractor owed a fiduciary duty might suffer an economic harm as a result of the breach of fiduciary duty.

The sixth and final element concerns the use of the mail or wires.  In a moment, I will further describe this element and the other five elements of honest services mail and wire fraud.

### 43.     Honest Services Mail and Wire Fraud – First Element (Fiduciary Duty): University Employees

As I instructed you earlier, the alleged objective of this conspiracy was to use bribes and kickbacks to deprive the testing services and universities of the honest and faithful services of their test proctors, athletic coaches, and university administrators.

With respect to university employees, the first element is that a university employee, such as an athletic coach or administrator, owed a fiduciary duty to his or her employer.  Thus, the government must prove beyond a reasonable doubt that the university employees at issue here owed a fiduciary duty to their employer.

A fiduciary is a person having a duty, created by his or her work or activities, to act primarily for the benefit of another in matters connected with his or her work or activities.[94]  A fiduciary relationship is a relationship created by law, such as that of guardian and ward, trustee and beneficiary, principal and agent, or attorney and client.[95]  The essence of a fiduciary relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.[96]  The fact that one party is compensated by another does not establish a fiduciary relationship.[97]  In general, employment-type relationships are not fiduciary relationships.[98]

In determining whether a particular person owed a fiduciary duty to another, you may consider: the relationship of the parties with respect to the alleged criminal conduct; the parties' respective capacities and experience; the degree to which control and decision-making power over important and valuable assets and staff was delegated to the person; the degree to which there

---

[94]     *See Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 966 (S.D. Cal. 2007) (quoting *Tyler v. Children's Home Society*, 29 Cal. App.4th 511, 548-49 (1994)); *see also United States v. Meredith*, Case No. 19-cr-10075-MLW, ECF No. 41, Transcript of Rule 11 Hearing at 33:16-20 (D. Mass. Mar. 28, 2019) ("I expect, if I were trying this case, this could be a contested issue because there is some jurisprudence that says you look to state law to see if there's a fiduciary relationship, duty[.]").

[95]     *See Korodi*, 504 F. Supp. 2d at 966 (citing *PersSon v. Smart Inventions, Inc.*, 125 Cal.App.4th 1141, 1160 (2005)).

[96]     *See Korodi*, 504 F. Supp. 2d at 966 (citing *PersSon*, 125 Cal.App.4th at 1160, and quoting *Barbara A. v. John G.*, 145 Cal.App.3d 369, 383 (1983)).

[97]     *Skilling v. United States*, 561 U.S. 358, 408 n. 41 (2010).

[98]     This is well established under California law, which governs the analysis as to Donna Heinel's and Jovan Vavic's relationships with the University of Southern California. *See O'Byrne v. Santa Monica-UCLA Medical Center*, 94 Cal. App. 4th 797, 811-12 (2001) (under California law, "[i]n general, employment-type relationships are not fiduciary relationships").  Under District of Columbia law, which governs the analysis as to Gordon Ernst's relationship with Georgetown University, fiduciary principles are generally applicable to employees, but the existence of an agency relationship giving rise to fiduciary duties depends on a fact-intensive analysis of whether the employer has "the right to control and direct the employee's work performance, the manner in which they conducted their work, and whether their work was part of the regular business of [the employer]."  *Amtrak v. Veolia Transp. Servs.*, 592 F. Supp. 2d 86, 94 (D.D.C. 2009).

was special trust, confidence, and reliance in the person; and the degree to which the person knowingly accepted that special trust and confidence.[99]

---

[99]    *See* Ninth Circuit Model Criminal Jury Instruction 8.123; *Judah v. Reiner*, 744 A.2d 1037 (D.C. Ct. App. 2000) (listing factors to be considered in determining whether a person owes a fiduciary duty to another under District of Columbia law).

### 44.    Honest Services Mail and Wire Fraud – First Element (Fiduciary Duty): Test Proctor

*Instruction Requested by Defendant Palatella:*

With respect to the test proctors, the government must prove, beyond a reasonable doubt, that the standardized test proctor owed a fiduciary duty to the College Board.[100]

I have already instructed you on a fiduciary and the factors to consider when determining whether a particular person owed a fiduciary duty to another.

In the ordinary or typical business relationship, an independent contractor does not owe a fiduciary duty for the services that independent contractor performs.[101]  The government asserts here that Dvorskiy owed a fiduciary duty to the College Board.  The government bears the burden of proving beyond a reasonable doubt that an independent contractor owed the testing company a fiduciary duty.  Proof that the College Board compensated Dvorskiy for his services is by itself not proof that Dvorskiy owed the College Board a fiduciary duty.[102]

---

[100]    *See United States v. Sidoo*, 468 F. Supp. 3d 428, 443 (D. Mass. 2020) ("[w]hether or not Dvorskiy indeed maintained the requisite fiduciary duty is another issue to be explored at trial and determined by the jury").
[101]    *Spring Inv'r Services, Inc. v. Carrington Capital Mgmt., LLC*, CIV.A. 10-10166-FDS, 2013 WL 1703890, at *7 (D. Mass. Apr. 18, 2013)

### 45. Honest Services Mail and Wire Fraud – Second Element (Intent)

The second element of honest services mail and wire fraud is that the Defendant agreed and specifically intended that the fiduciary would perform an official act that violated his or her fiduciary duty, and deprive the entity to which he or she owed a fiduciary duty of his or her honest services, in exchange for a bribe or kickback.[103]

Proving intent to deceive alone, without the intent to cause loss of honest services, is not sufficient to prove intent to defraud. If you find that the Defendant intended his or her actions to advance the interests of the fiduciary's employer, as such interests were communicated to the fiduciary, then the Defendant did not intend to cause loss of honest services.[104]

As I have already instructed you, good faith on the part of the Defendant negates intent and is a complete defense to mail or wire fraud. If, for example, you find that the Defendant was unaware that his or her payments were going to corrupt university officials and instead had a good faith belief, even a mistaken one, that the payments were going to the university itself or to university officials for non-corrupt purposes, then the Defendant did not have an intent to defraud.[105] Similarly, if you find that the Defendant had a good faith belief, even if mistaken, that the alleged victim welcomed, knew of, condoned, or provided tacit approval for, the activities in question, then the Defendant did not have an intent to defraud. In addition, if you find that that

---

[103]     *See United States v. Napout*, 332 F. Supp. 3d 533, 549, 565-66 (E.D.N.Y. 2018).

[104]     *See* Eleventh Circuit Pattern Criminal Jury Instruction O50.3; *United States v. Brown*, 459 F.3d 509, 521-22 (5th Cir. 2006) (holding that Enron scheme alleged in indictment, pursuant to which employees of large energy company and of financial institution, to ensure that company met its earning goals as well as to secure personal bonuses for themselves based on company's performance, participated in conspiracy to inflate company's earnings, was not scheme in which employees' interests sufficiently diverged from perceived interest of their corporate employer to support charge of honest services wire fraud); *see also Brown*, 459 F.3d at 522 ("[W]here an employer intentionally aligns the interests of the employee with a specified corporate goal, where the employee perceives his pursuit of that goal as mutually benefitting him and his employer, and where the employee's conduct is consistent with that perception of the mutual interest, such conduct is beyond the reach of the honest-services theory of fraud as it has hitherto been applied.").

[105]     *See supra*, notes accompanying Proposed Instructions 21 and 29 (discussing good faith); *United States v. Sidoo*, 468 F. Supp. 3d 428, 445 (D. Mass. 2020) (Gorton, J.) ("Again, to the extent the defendants maintain that they were unaware that their payments were going to corrupt insiders or of the extent to which those insiders deprived the universities of their honest services is a factual question to be resolved at trial."); *see also* ECF No. 906, Transcript of February 28, 2020 Hearing, at 15:23-19:11 (Kelley, M.J.):

> I mean, you -- I just think the government is kind of stuck on this theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty. Number one, you do have to show they [the Defendant parents] knew that was happening; and, number two, you have to show the school wasn't okay with that..... So I think the problem with the government's theories is—it's not a Vandemoer situation because you've got – it's once removed because you've got these parents paying Singer, who is paying the coach or the administrator, and that makes things very complicated as far as the parents' intent and what the parents understand is going on....Donna Heinel's allegedly taking money for an account at the school that she has control over and it somehow burnishes her prestige or she gets to direct it somewhere or other to her professional benefit, would be a bribe, but the parent has to know she's doing that, and the school cannot be condoning it.

the Defendant had a good faith belief that no fiduciary duty would be breached, then the Defendant did not have an intent to defraud.[106]

Evidence of the alleged victim's actions or omissions, or evidence of deficiencies in the manner in which it implemented and enforced its policies and procedures, may be considered by you to the extent that such evidence bears on the issue of whether or not the defendant formed the required intent to commit the crimes with which he is charged.[107]

A defendant has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.[108]

---

[106]    Adapted from *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996).
[107]    Adapted from *Josleyn*, 99 F.3d at 1194.
[108]    Adapted from *Josleyn*, 99 F.3d at 1194.

### 46.    Honest Services Mail and Wire Fraud – Third Element (Bribes and Kickbacks)

The third element of honest services mail and wire fraud is that there was in fact a bribe or kickback.  Without a bribe or a kickback, there cannot be an honest services fraud.[109]

In this context, a bribe or kickback is money or anything of value which is provided, directly or indirectly, personally to an employee or contractor with the specific intent of inducing the employee or contractor to perform an official act that violates her fiduciary duty.[110]

There are four caveats to the definition of bribe and kickback.

First, a payment *to the entity* allegedly being defrauded of the employee's or contractor's honest services, to be used for the benefit of that entity, is not a bribe or kickback. For example, a payment directed by an employee to his or her university employer, to be used for the benefit of the university, does not constitute a bribe or kickback.[111]  This is true regardless of the employee exercised some measure of control over the university's accounts. If the payment was made to the university, and used or intended for use for the benefit of the university, then the payment is

---

[109]    *Skilling v. United States*, 561 U.S. 358, 368 (2010).

[110]    *See United States v. Napout*, 332 F. Supp. 3d 533, 549, 565-66 (E.D.N.Y. 2018).

[111]    *See Skilling*, 561 U.S. at 409-11 (holding that "honest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks" and in particular does not cover "undisclosed self-dealing" or "conflicts of interest").  The *Skilling* Court was clear that the honest services scheme need not occasion a pecuniary loss (and might, in fact, occasion a pecuniary gain) to the entity being defrauded. *Id.* at 399. However, nothing in *Skilling* suggests that the actual bribe – the *sine qua non* of the offense – could be a payment *to the victim*. Indeed, even in the *Skilling* example of the corrupt mayor, the *sine qua non* of the offense—a payment *to the mayor* rather than the city— (i.e., a bribe) was present and therefore the city was deprived of the mayor's honest services. *Id.*  **Undersigned counsel has not located a single case—anywhere— where a payment to the entity being defrauded constitutes a bribe or kickback. To permit the government to prove a "bribe" through a payment to the entity being defrauded would create a new category of "bribe" that has never been recognized and is certainly not a "core" or "paradigmatic" bribe as required by *Skilling*, even if the underlying conduct might constitute a breach of fiduciary duty.**  That a payment *to the defrauded entity* cannot be a bribe or kickback is supported by case law requiring a "private gain" for an honest services conviction. *See United States v. Nayak*, 769 F.3d 978, 981 (7th Cir. 2014) (clarifying that "private gain" is no longer an explicit element of honest services fraud only because *Skilling* narrowed the statute to criminalize only a subset of actions—namely bribes and kickbacks—that generate private gains by definition: "Now, only bribery or kickbacks, rather than any private gain whatsoever, can be used to show honest-services fraud."). The term "private gain" was never broad enough to encompass a payment *to the victim of the fraud*. *See United States v. Sorich*, 523 F.3d 702, 710 (7th Cir. 2008) (holding that the "spoils" could go to "third parties" but the "purpose of the private gain requirement—and one that does not depend on who gets the spoils—is to prevent the conviction of individuals who have breached a fiduciary duty to an employer or the public, but have not done so for illegitimate gain.").

not a bribe or a kickback.[112]  Rather, the bribe or kickback must involve a private payment or private gain for the employee or some other third party.[113]

Second, a bribe cannot be bona fide salary, wages, fees or other compensation paid to an employee or contractor in the usual course of business.   Nor can it be some sort of psychic or indirect financial benefit derived from enriching the alleged victim of the alleged fraud.  Thus, neither an increase in salary for doing what one's superiors deem a good job, nor an addition to one's peace of mind from thinking one's job more secure, nor basking in a superior's approval, praise, or admiration can prove a bribe or a kickback.[114]

Third, a payment made to reward someone for prior action, such as a gratuity, is not a bribe or a kickback.  The payment or receipt of a mere gratuity does not constitute honest services fraud.  If the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity.  If the agreement to exchange a thing of value for an act is made after that act has been performed, then that agreement cannot properly be viewed as an agreement to offer or accept a bribe.[115]

Fourth, if the alleged victim condoned—or provided tacit approval for— the payment that the government contends was a bribe or kickback, then such payment was not a bribe or kickback.[116]

---

[112]    Nor does the fact that the defendant might somehow be *rewarded by the victim* or gain some psychic or other indirect benefit from enriching *the victim* have any bearing on whether the payment at issue is a bribe.  As the Seventh Circuit concluded when faced with a similar argument to the government's here: "The United States has not cited, and we have not found, any appellate decision holding that an increase in official salary, or a psychic benefit such as basking in a superior's approbation (and thinking one's job more secure), is the sort of 'private gain' that makes an act criminal under § 1341 and § 1346. . . . .  We now hold that neither an increase in salary for doing what one's superiors deem a good job, nor an addition to one's peace of mind, is a 'private benefit' for the purpose of § 1346."  *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007) (Easterbrook, J.).  *See also United States v. Blagojevich*, 794 F.3d 729, 737 (7th Cir. 2015) (stating that neither an employee's "interest in keeping her job" nor "interest in receiving a salary" is "a form of private benefit for the purpose of federal criminal statutes.") (citing *Thompson*).  *Cf. United States v. Brown*, 459 F.3d 509, 522 (5th Cir. 2006) (noting a factual situation where "the only personal benefit or incentive originated with [victim employer] itself—*not from a third party as in the case of bribes or kickbacks*.") (emphasis added); *United States v. Bizzack*, Case No. 19:cr-10222-DPW, ECF No. 34, Sentencing Tr. at 15:23-16:11 (D. Mass. Oct. 30, 2019) ("THE COURT: That's not a bribe, is it?  It's received by USC.  Then we've got a faithless employee.  That's a different issue from bribery, right?  GOVERNMENT: Your Honor, because in light of Skilling, there has to be a bribe or a kickback.  THE COURT: Yes, there does, I agree.  And this is a case in search of a bribe or a kickback …. So now we're back to this question of what was the bribe that [Heinel] received?  **Because it has to be to her, not some account that she controlled, unless you say it was reasonably foreseeable to [Bizzack] that she was going to toy with that account." (emphasis added)).**

[113]    *See United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015); *McNally v. United States*, 483 U.S. 350, 355 (1987).

[114]    *See supra*, note 112.

[115]    *See Skilling v. United States*, 561 U.S. 358, 407 (2010); *United States v. Bravo-Fernandez*, 722 F.3d 1, 19, 20 (1st Cir. 2013); *see also United States v. Friedman*, 854 F.2d 535, 556-57 (2d Cir. 1988) (gratuity is a defense to bribery); *United States v. Jennings*, 160 F.3d 1006, 1018-19 (4th Cir. 1998) (requiring a "mere gratuity" instruction where there is a factual basis for the instruction).

[116]    *See* ECF No. 906, Transcript of February 28, 2020 Hearing, at 14:7-16:6 (Kelley, M.J.):

THE COURT: If she's taking money for an account over which she has control, which, I know the government says that's a bribe, **you still have to prove that the school was not in on that**….. [The government is] going to say, oh, it's a bribe legally if she has money going into accounts she controlled.

And, more generally, conduct by an agent that would otherwise constitute a breach of a fiduciary duty does not constitute a breach if the principal consents to the conduct.[117]

---

**That's going to be something for the jury to decide. It's not de facto a bribe. The school has to be ignorant of that, and one might well ask, how could the school have been ignorant of that?...** I just think the government stuck on this theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty. Number one you do have to show that they knew that was happening; and, **number two, you have to show the school wasn't in on it, Right?**

AUSA WRIGHT: Yeah, yes Your Honor. And we intend to prove that. (Emphasis added.)

*See also* Sealed Transcript of May 14, 2020 Hearing at 47:2-11 (Kelley, M.J.):



*See also United States v. Josleyn*, 99 F.3d 1182, 1194-95 (1st Cir. 1996); *United States v. Klock*, 210 F.2d 217, 22-23 (2nd Cir. 1954); *United States v. Brown*, 459 F.3d 509, 524-25 (5th Cir. 2006).

[117]    *See Lauffs v. Carr*, No. 04-cv-809-WGH (WMc), 2005 U.S. Dist. LEXIS 66238, at *52 (S.D. Cal. Nov. 10, 2005); *Lamelza v. Lindsay*, No. G045402, 2012 Cal. App. Unpub. LEXIS 8597, at *20 (Cal. Ct. App. Nov. 27, 2012).

### 47.     Honest Services Fraud – Definition: "Official Act"

I have used the term "official act" in these instructions.

An official act is a decision or action on a question or matter which may at any time be pending before any fiduciary in the fiduciary's capacity or in the fiduciary's place of trust.  The question or matter must be specific and focused and involve a formal exercise of the organization's power akin to awarding a contract or instituting a lawsuit.[118]  In general, to qualify as an official act, the fiduciary must make a decision or take an action on that question or matter, or agree to do so.[119]

Whether or not a fiduciary took an official act or agreed to do so is a question of fact for you to determine like any other fact question.[120]

---

[118]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017); *United States v. Napout*, 332 F. Supp. 3d 533, 565 (E.D.N.Y. 2018).

[119]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017).

[120]    *Napout*, 332 F. Supp. 3d at 565-66.

48.                    **Honest Services Mail and Wire Fraud – Fourth Element (Misrepresentation)**

The fourth element of honest services mail and wire fraud is that the Defendant then under consideration agreed and specifically intended that the fiduciary would deceive the entity to which he or she owed a fiduciary duty through a material misrepresentation, false statement, false pretense, or a deliberately misleading statement.[121]

Again, a fact or matter is "material" if it has a natural tendency to influence or be capable of influencing the decision of the decision-maker to whom it was addressed.[122]  If the alleged victim would have made the same decision if it knew the true facts, the misstatement at issue cannot be material.[123]

---

[121]        Adapted from *United States v. Gurry, et al.*, Case No. 16-cr-10343-ADB, ECF No, 930, Jury Trial Transcript Day 49, at 49-54 (D. Mass. April 4, 2019); Eleventh Circuit Pattern Criminal Jury Instructions O50.2, O50.3; Ninth Circuit Model Criminal Jury Instruction 8.123; *United States v. Sawyer*, 85 F.3d 713, 732 n.16 (1st Cir. 1996); *United States v. Reichel*, Case No. 1:15-cr-10324-DPW, ECF No. 244, Substantive Jury Instructions at 5-6 (D. Mass. June 17, 2016).

[122]        Adapted from *United States v. DeNunzio*, Case No. 14-cr-10284-NMG, ECF No. 513, Jury Trial Transcript Vol. XIII, at 13-159 (D. Mass. Apr. 28, 2016), First Circuit Pattern Criminal Jury Instructions 4.18.1341, 4.18.1343; *see also United States v. Blastos*, 258 F.3d 25, 29 (1st Cir. 2001).

[123]        *See United States v. Williams*, 12 F.3d 452, 457 (5th Cir. 1994) ("[O]ne way of determining whether the statements were capable of influencing a bank's decision is to extrapolate from the facts and ask, 'If the bank had relied on the defendant's statements, would it have made any difference?'"); *see also id.* at 458 (framing the relevant question as whether "a bank or federal institution, armed with the truth, would have arrived at a different decision on a pending application").

### 49.      Honest Services Mail and Wire Fraud – Fifth Element (Foreseeable Harm)

***Instruction Requested by Defendants Abdelazi, Kimmel, and Palatella:***

The fifth element of honest services mail and wire fraud is that it was foreseeable to the Defendant that the entity to which an employee or contractor owed a fiduciary duty might suffer an economic harm as a result of the breach of fiduciary duty.[124]  To meet this requirement, the government must show that the Defendant could foresee that the scheme potentially might cause concrete, economic business harm to the university or testing service.[125]  The government also must show that the Defendant contemplated some actual economic harm or injury to the entity to which a fiduciary owed a fiduciary duty.[126]  Mere embarrassment or publicity or criticism is not economic harm.

***Instruction Requested by Defendant Wilson:***

The fifth element of honest services mail and wire fraud is that it was foreseeable to the Defendant that the entity to which an employee or contractor owed a fiduciary duty might suffer an economic harm as a result of the breach of fiduciary duty.[127]  To meet this requirement, the government must show that the Defendant could foresee that the scheme potentially might cause concrete, economic business harm to the university or testing service.[128]  Thus, if, for example, you find that the Defendant understood that the result of the conduct would be economically beneficial to the university, then you must find the Defendant not guilty.  The government also must show that the Defendant contemplated some actual economic harm or injury to the entity to which a fiduciary owed a fiduciary duty.[129]  Mere embarrassment or publicity or criticism is not economic harm.

---

[124]      *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000); *see United States v. Lusk*, Case No. 15-cr-00124, 2017 U.S. Dist. LEXIS 17028, at *39-43 (S.D.W. Va. Feb. 7, 2017); *Triplett v. United States*, Case No. 02-cr-718-CAP-AJB-1, 2012 U.S. Dist. LEXIS 135355, at *40-41 (N.D. Ga. Aug. 29, 2012), *aff'd*, 551 Fed. Appx. 472 (11th Cir. 2013); *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C. Cir. 1983).

[125]      *United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001).

[126]      *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).

[127]      *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000); *see United States v. Lusk*, Case No. 15-cr-00124, 2017 U.S. Dist. LEXIS 17028, at *39-43 (S.D.W. Va. Feb. 7, 2017); *Triplett v. United States*, Case No. 02-cr-718-CAP-AJB-1, 2012 U.S. Dist. LEXIS 135355, at *40-41 (N.D. Ga. Aug. 29, 2012), *aff'd*, 551 Fed. Appx. 472 (11th Cir. 2013); *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C. Cir. 1983).

[128]      *United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001).

[129]      *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).

50.    **Honest Services Mail and Wire Fraud – Sixth Element (Use of Mail or Wires)**

The sixth and final element of honest services fraud concerns the use of the mail or wires. With respect to honest services mail fraud, the final element is that, for the purpose of executing the scheme or in furtherance of the scheme, the Defendant then under consideration agreed and specifically intended to cause the United States mail or a private or commercial interstate carrier to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, the United States mail or a private or commercial interstate carrier would be used.[130]

With respect to honest services wire fraud, the final element is that, for the purpose of executing the scheme or in furtherance of the scheme, the Defendant then under consideration agreed and specifically intended to cause an interstate wire communication to be used, or it was reasonably foreseeable that an interstate wire communication would be used on or about the date alleged.[131]

---

[130]    Adapted from *United States v. Gurry, et al.*, Case No. 16-cr-10343-ADB, ECF No, 930, Jury Trial Transcript Day 49, at 49-54 (D. Mass. April 4, 2019); Eleventh Circuit Pattern Criminal Jury Instructions O50.2, O50.3; Ninth Circuit Model Criminal Jury Instruction 8.123; *United States v. Sawyer*, 85 F.3d 713, 732 n.16 (1st Cir. 1996); *United States v. Reichel*, Case No. 1:15-cr-10324-DPW, ECF No. 244, Substantive Jury Instructions at 5-6 (D. Mass. June 17, 2016).

[131]    Adapted from *United States v. Gurry, et al.*, Case No. 16-cr-10343-ADB, ECF No, 930, Jury Trial Transcript Day 49, at 49-54 (D. Mass. April 4, 2019); Eleventh Circuit Pattern Criminal Jury Instructions O50.2, O50.3; Ninth Circuit Model Criminal Jury Instruction 8.123; *United States v. Sawyer*, 85 F.3d 713, 732 n.16 (1st Cir. 1996); *United States v. Reichel*, Case No. 1:15-cr-10324-DPW, ECF No. 244, Substantive Jury Instructions at 5-6 (D. Mass. June 17, 2016).

### V. *Count Two: Conspiracy to Commit Federal Programs Bribery*

**51.  Count Two: Conspiracy to Commit Federal Programs Bribery: Introduction**

Count Two of the Indictment accuses the four Defendants—Mr. Abdelaziz, Mrs. Kimmel, Mrs. Palatella, and Mr. Wilson—of conspiring with Rick Singer, other parents, university employees, and others affiliated with Rick Singer to commit a different federal crime—the crime of committing what is called "federal programs bribery." Count Two alleges the Defendants were part of a conspiracy that lasted from 2007 to February 2019. Count Two charges these four Defendants with conspiring to corruptly give things of value, i.e., bribes, in exchange for facilitating the admission to the University of Southern California of the Defendants' children. This charge does not apply to the admission of Mrs. Kimmel's child to Georgetown University. Similarly, Count Two does not apply to the potential admission of Mr. Wilson's daughters to Stanford University and Harvard University.

It is against federal law to conspire with someone to commit federal programs bribery.  To convict a Defendant on Count Two you must find that the government has proven, beyond a reasonable doubt, the three elements of the crime of conspiracy that I have already described to you: that the conspiracy described in Count Two of the Indictment existed; that the Defendant under consideration willfully agreed to join that conspiracy (and not some other conspiracy); and that one of the members of the charged conspiracy committed an overt act in furtherance of that conspiracy.

Since Count Two requires you to prove that each Defendant agreed to the commission of conduct that actually constituted the underlying crime of federal programs bribery, I am providing you with the elements of that crime, so that you may evaluate whether any of the Defendants specifically intended that such acts be committed in furtherance of the alleged conspiracy.

 To find federal programs bribery, the government must prove each of the following elements beyond a reasonable doubt:[132]

First, the person acts with corrupt intent.

Second, the person gives, offers, or agrees to give a thing of value to another person that constitutes a bribe.

Third, the above is done to corruptly influence or reward an agent of an organization in connection with some business, transaction, or series of transactions of that organization.

---

[132]     *See* 18 U.S.C. § 666(a).  Adapted from *United States v. Bravo-Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013); Eighth Circuit Model Criminal Jury Instruction 6.18.666A; *see also* Eleventh Circuit Pattern Criminal Jury Instruction O24.2; *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017).

Fourth, that this business, transaction, or series of transactions involved a thing with a value of $5,000 or more.

Fifth, that the organization, in a one-year period preceding or following the bribe, received benefits of more than $10,000 under any federal program involving a grant, contract subsidy, loan, guarantee, insurance, or other assistance.[133]

There are a few caveats to these instructions.

The statute requires that the Government prove beyond a reasonable doubt the existence of a quid pro quo or, in plain English, an agreement that the thing of value that is given to the agent is in exchange for that agent promising to perform official acts for the giver.[134]  This means the giver must have the specific intent to give something of value in exchange for official action.[135] It is not sufficient that the thing of value is given to curry favor, to cultivate a friendship, or to express gratitude, or that there is merely some connection in time or place with an official act that is promised to the giver; rather, there must be an agreement that the thing of value was offered by the giver and accepted by the agent in exchange for a promise to perform an official act.[136]

---

[133]    Adapted from Seventh Circuit Pattern Criminal Jury Instructions, 18 U.S.C. §666(a)(2) ("Paying a Bribe").

[134]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21, 24 (D.P.R. May 26, 2017).

[135]    *United States v. Sidoo*, 468 F. Supp. 3d 428, 444 (D. Mass. 2020) ("For a payment to constitute a bribe, there must be 'a quid pro quo — a specific intent to give or receive something of value in exchange for an official act.'" (quoting *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999)).

[136]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21, 24 (D.P.R. May 26, 2017).

65

### 52.    Federal Programs Bribery – Definitions: "Corrupt Intent"

I have used the term "corrupt intent" in these instructions.  The government must prove beyond a reasonable doubt that the Defendants acted with "corrupt intent" to offer or give a bribe.

A *quid pro quo* is not a crime if it is not performed with "corrupt intent."

An act is done "corruptly" if it is performed voluntarily, deliberately, and dishonestly for the purpose of either accomplishing an unlawful end or result, or of accomplishing some otherwise lawful end or lawful result, by any unlawful method or means.[137]

In other words, corruptly means that the Defendant understood that he or she was engaging in unlawful bribery.[138]

Good faith on the part of a defendant as to the legality of his or her conduct is a complete defense to federal programs bribery.[139]

If, for example, you find that the Defendant was unaware that his or her payments were going to corrupt university officials and instead had a good faith belief, even a mistaken one, that the payments were going to the university itself or to university officials for non-corrupt purposes, then the Defendant did not have an intent to defraud.  Similarly, if you find that the Defendant had a good faith belief that USC knew of and condoned, or provided tacit approval for, the activities in question, then the Defendant did not have corrupt intent because they did not think they were engaging in bribery.

Evidence of USC's actions or omissions, or evidence of deficiencies in the manner in which it implemented and enforced its policies and procedures, may be considered by you to the extent that such evidence bears on the issue of whether or not the defendant formed the required corrupt intent.[140]

A defendant has no burden to establish a defense of good faith. The burden is on the government to prove corrupt intent and the consequent lack of good faith beyond a reasonable doubt.[141]

---

[137]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017).

[138]    *See also United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) ("'Corruptly' refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity."); *cf. United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) ("To be guilty of soliciting or accepting a bribe in violation of section 666(a)(1)(B) requires knowing that the money or other thing of value received was indeed a bribe, which is to say an inducement to do a corrupt act.").

[139]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 27 (D.P.R. May 26, 2017).  *Cf. United States v. Sidoo*, 468 F. Supp. 3d 428, 445 (D. Mass. 2020) (Gorton, J.) ("Again, to the extent the defendants maintain that they were unaware that their payments were going to corrupt insiders or of the extent to which those insiders deprived the universities of their honest services is a factual question to be resolved at trial.").

[140]    Adapted from *United States v. Joslyn*, 99 F.3d 1182, 1194 (1st Cir. 1996).

[141]    *Joselyn*, 99 F.3d at 1194.

### 53. Federal Programs Bribery – Definitions: "Bribe"

I have used the word "bribe" in these instructions. I have defined "bribe" for you earlier, and repeat that instruction here. The government must prove beyond a reasonable doubt the presence of a bribe.

There are four caveats to the definition of a bribe.

First, a payment *to the victim*, to be used for the benefit of that entity, is not a bribe. For example, a payment directed by an employee to his or her university employer, to be used for the benefit of the university, does not constitute a bribe.[142] This is true regardless of whether the employee exercised some measure of control over the university's accounts. If the payment was made to or for the benefit of the university, and used or intended for use for the benefit of the university, then the payment is not a bribe.[143] Rather, the bribe or kickback must involve a private payment or private gain for the personal benefit of the employee or some other third party.[144]

Second, a bribe cannot be bona fide salary, wages, fees or other compensation paid to an employee or contractor in the usual course of business. Nor can it be some sort of psychic or indirect financial benefit derived from enriching the alleged victim of the alleged fraud. Thus, neither an increase in salary for doing what one's superiors deem a good job, nor an addition to one's peace of mind from thinking one's job more secure, nor basking in a superior's approval can prove a bribe.[145]

Third, a payment made to reward someone for prior action, such as a gratuity, is not a bribe. The payment or receipt of a mere gratuity does not constitute a bribe. If the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity. If the agreement to exchange a thing of value for an act is made after that act has been performed, then that agreement cannot properly be viewed as an agreement to offer or accept a bribe.[146]

---

[142]      *See supra*, note 111. The honest services cases defining bribe are helpful because both honest services fraud and federal programs bribery require the presence of a bribe. *See United States v. Bravo-Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013) ("the true targets of § 666 are bribes").

[143]      *See supra*, note 111.

[144]      *See United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015); *see McNally v. United States*, 483 U.S. 350, 355 (1987).

[145]      *See supra*, note 112; *see also United States v. Blagojevich*, 794 F.3d 729, 737 (7th Cir. 2015) ("*Thompson* reversed convictions under § 666 and § 1346 that had been obtained on a theory that a public employee's interest in keeping her job meant that she violated federal law if she performed any aspect of her job in ways that she knew she shouldn't….Thompson holds, among other things, that the interest in receiving a salary from a public job is not a form of private benefit for the purpose of federal criminal statutes.").

[146]      *See Skilling v. United States*, 561 U.S. 358, 407 (2010); *United States v. Bravo-Fernandez*, 722 F.3d 1, 19, 20 (1st Cir. 2013); *see also United States v. Friedman*, 854 F.2d 535, 556-57 (2d Cir. 1988) (gratuity is a defense to bribery); *United States v. Jennings*, 160 F.3d 1006, 1018-19 (4th Cir. 1998) (requiring a "mere gratuity" instruction where there is a factual basis for the instruction).

Fourth, if the alleged victim condoned—or provided tacit approval for— the payment that the government contends was a bribe, then such payment was not a bribe.[147]

---

[147]     *See* ECF No. 906, Transcript of February 28, 2020 Hearing, at 14:7-16:6 (Kelley, M.J.):

THE COURT: If she's taking money for an account over which she has control, which, I know the government says that's a bribe, **you still have to prove that the school was not in on that**….. [The government is] going to say, oh, it's a bribe legally if she has money going into accounts she controlled. **That's going to be something for the jury to decide. It's not de facto a bribe. The school has to be ignorant of that**, and one might well ask, **how could the school have been ignorant of that?...** I just think the government stuck on this theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty.  Number one you do have to show that they knew that was happening; and, **number two, you have to show the school wasn't in on it, Right?**

AUSA WRIGHT: Yeah, yes Your Honor.  And we intend to prove that. (Emphasis added.)

*See also* Sealed Transcript of May 14, 2020 Hearing at 47:2-11 (Kelley, M.J.): 47:2-11:



*See also United States v. Josleyn*, 99 F.3d 1182, 1194-95 (1st Cir. 1996); *United States v. Brown*, 459 F.3d 509, 521-22 (5th Cir. 2006).

68

### 54. Federal Programs Bribery – Definitions: "Official Act"

I have used the term "official act" in these instructions.

For purposes of federal programs bribery, an official act is a decision or action on a question or matter which may at any time be pending before any agent in the agent's capacity or in the agent's place of trust. The question or matter must be specific and focused and involve a formal exercise of the organization's power akin to awarding a contract or instituting a lawsuit.[148] In general, to qualify as an official act, the agent must make a decision or take an action on that question or matter, or agree to do so.[149]

Whether or not an agent took an official act or agreed to do so is a question of fact for you to determine like any other fact question.[150]

---

[148]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017); *United States v. Napout*, 332 F. Supp. 3d 533, 565 (E.D.N.Y. 2018).

[149]    *United States v. Bravo-Fernandez*, Case No. 10-cr-00232-FAB-1, ECF No. 997, Jury Trial Transcript, Jury Instructions, at 21 (D.P.R. May 26, 2017).

[150]    *Napout*, 332 F. Supp. 3d at 565-66.

## VI.    Count Three: Money Laundering Conspiracy

### 55.    Count Three: Money Laundering: Introduction

Count Three of the Indictment accuses the four Defendants of conspiring with Rick Singer, other parents, university employees, and others affiliated with Rick Singer to commit the federal crime of money laundering.

It is against federal law to conspire with someone to commit the crime of money laundering. To convict a Defendant on Count Three you must find that the government has proven, beyond a reasonable doubt, the three elements of the crime of conspiracy that I have already described to you: that the conspiracy described in Count Three of the Indictment existed; that the Defendant under consideration willfully agreed to join that conspiracy (and not some other conspiracy); and that one of the members of the charged conspiracy committed an overt act in furtherance of that conspiracy.

More specifically, to prove conspiracy to commit money laundering, the government is required to show beyond a reasonable doubt, with respect to each Defendant, that he or she willfully agreed with one or more co-conspirators (1) to knowingly conduct a financial transaction, (2) involving funds that the Defendant knew to be the proceeds of some form of unlawful activity, and (3) that were in fact the proceeds of the specified unlawful activity of mail and wire fraud, and (4) that the Defendant knew the transactions to be designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.[151]

---

[151]    First Circuit Pattern Criminal Jury Instruction 4.18.1956(h) (quoting *United States v. Misla-Aldarondo*, 478 F.3d 52, 68 (1st Cir. 2007)); *see United States v. Romero-Lopez*, 695 F.3d 17, 24 n.5 (1st Cir. 2012); *United States v. Martinez-Medina*, 279 F.3d 105, 115 (1st Cir. 2002).

70

## 56.    Money Laundering – Definitions: "Proceeds"

"Proceeds" means any profits that someone acquires or retains as a result of the commission of the unlawful activity.[152]  The "proceeds" used for money laundering must be proceeds from a different illegal activity than the illegal activity of money laundering itself.[153] This element requires both that the specified unlawful activity is sufficiently distinct from the money laundering transaction, and that the specified unlawful activity, i.e., a specific crime, occurred and generated proceeds before the money laundering transaction.[154] Money that persons supply to be used to commit a crime are not proceeds.  In order to be proceeds, the funds must have been received by someone who considered the funds to be the receipts or profits of the specified unlawful activity.

---

[152]    18 U.S.C. § 1956(c)(9) ("[T]he term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."); First Circuit Pattern Criminal Jury Instructions 4.18.1956(a)(1)(A), 4.18.1956(a)(1)(B)(i).

[153]    *United States v. Castellini*, 392 F.3d 35, 38 (1st Cir. 2004); *see* First Circuit Pattern Criminal Jury Instruction 4.18.1956(a)(1)(B)(i) , cmt. 2.

[154]    *United States v. Conley*, 37 F.3d 970, 980 (3d Cir. 1994); *see also United States v. Richard*, 234 F.3d 763, 769 (1st Cir. 2000) ("[M]oney laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds . . . [t]hus the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime[.]" (internal citations and quotation marks omitted)).

71

### 57.     Money Laundering – Definitions: "Specified Unlawful Activity"

In order to find that the crime of money laundering has occurred, you must first find that there was a separate criminal offense, which I refer to as the specified unlawful activity. The alleged specified unlawful activity here is the mail and wire fraud and honest services mail and wire fraud conspiracies alleged in Count One.[155]

---

[155]     *See United States v. Castellini*, 392 F.3d 35, 38 (1st Cir. 2004).

### 58.    Money Laundering – Elements: Intent

I have previously instructed you on the definition of the element of intent to prove conspiracy to commit mail and wire fraud, and to commit federal programs bribery.

To convict on a money laundering offense, the Government must prove beyond a reasonable doubt that the Defendant, with specific intent, had the purpose to conceal money or other property with full knowledge that the money or other property involved in the transaction represented proceeds from an illegal activity.[156]  Subjective good faith is a complete defense to a money laundering offense.[157]  If a Defendant believes in good faith that the activity underlying the proceeds in question is legitimate, then you cannot find that the Defendant possessed the required intent to satisfy the statute.[158]

---

[156]    *United States v. Carucci*, 22 F.Supp.2d 117, 124 (D. Mass. 2002), *rev'd on other grounds* 364 F.3d 339, 344 (1st. Cir. 2004); *see Cuellar v. United States*, 553 U.S. 550, 563 (stating that the term "design" means "purpose or plan" in the context of the money laundering statute and, therefore, mere concealment of proceeds without purpose to conceal does not do not constitute money laundering).

[157]    *See United States v. Davis*, 10 Fed. Appx. 107, 110 (4th Cir. 2001); *United States v. Castronuovo*, 649 Fed. Appx. 904, 924-25 (11th Cir. 2016). *Cf. Conley*, 859 F. Supp. at 928.

[158]    *See Castronuovo*, 649 Fed. Appx. at 924-25; *Conley*, 859 F. Supp. at 928.

73

A528

### 59.    Money Laundering – Elements: Designed to "Conceal"

To find that the fourth element is satisfied, you must find that the purpose of the financial transaction was to conceal the nature, location, source, ownership, or control of the transacted proceeds.[159] "Conceal" means to hide, withhold information about, or prevent disclosure or recognition of something.[160]  If you find that the transactions merely involved spending or investing illegally obtained assets, then the Defendant cannot be found guilty of conspiracy to commit money laundering.  Instead, at least one purpose for the expenditure must be to conceal or disguise the nature, location, source, ownership or control of the funds.[161]

---

[159]    *United States v. Cedeño-Pérez*, 579 F.3d 54, 60-61 (1st Cir. 2009); *see* First Circuit Pattern Jury Instruction 4.18.1956(a)(1)(B)(i), cmt. 1; *see also United States v. Frigerio-Migiano*, 254 F.3d 30, 33 (1st Cir. 2001).
[160]    First Circuit Pattern Criminal Jury Instruction 4.18.152(1).
[161]    *United States v. Hall*, 434 F.3d 42, 50 (1st Cir. 2006) ("It is true about that the money laundering statute does not criminalize the mere spending or investing of illegally obtained assets. Instead, at least one purpose for the expenditure must be to conceal or disguise the assets." (citation omitted)).

**Instructions Requested by Defendant Wilson**

**VII.** *Counts Six, Eight, and Nine: Wire Fraud and Honest Services Wire Fraud and Aiding and Abetting*

    **60.** **Counts Six, Eight, and Nine: Wire Fraud and Honest Services Wire Fraud and Aiding and Abetting: Introduction**

The Indictment in this case contains three counts against Defendant John Wilson for wire fraud and honest services wire fraud in violation of Title 18 of the United States Code, Sections 1341 and 1346, and aiding and abetting wire fraud and honest services wire fraud in violation of Title 18 of the United States Code, Section 2.

Count Six charges Mr. Wilson with committing wire fraud and honest services wire fraud, and aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with the wiring of $500,000 from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on October 17, 2018.

Count Eight charges Mr. Wilson with committing wire fraud and honest services wire fraud, and aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with a telephone call between Mr. Wilson and Rick Singer on October 27, 2018.

Count Nine charges Mr. Wilson with committing wire fraud and honest services wire fraud, and aiding and abetting Rick Singer in committing wire fraud and honest services wire fraud, in connection with the wiring of $500,000 from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on December 11, 2018.

### 61.    Counts Six, Eight, and Nine: Wire Fraud and Honest Services Wire Fraud: Elements

To convict Defendant John Wilson of wire fraud and honest services wire fraud under Counts Six, Eight, or Nine, you must find that the Government has proven, beyond a reasonable doubt, each of the elements of these crimes that I have already described to you.

As I have previously instructed, the three elements of wire fraud are as follows:

First, a scheme to obtain money or property by means of materially false or fraudulent pretenses.

Second, that the Defendant knowingly and willfully participated in the scheme, with intent to defraud.

Third, that the Defendant caused an interstate wire communication to be used for the purpose of executing the scheme, or in furtherance of the scheme, or that it was reasonably foreseeable that an interstate wire communication would be used.

The six elements of honest services wire fraud are as follows:

The first element is that an employee or contractor owed a fiduciary duty to an entity.

The second element is that the Defendant agreed and specifically intended that the fiduciary would perform an official act that violated his or her fiduciary duty, and deprive the entity to which he or she owed a fiduciary duty of his or her honest services, in exchange for a bribe or kickback.

The third element is that there was in fact a bribe or kickback.

The fourth element is that the Defendant agreed and specifically intended that the fiduciary would deceive the entity to which he or she owed a fiduciary duty through a material misrepresentation, false statement, false pretense, or a deliberately misleading statement.

The fifth element is that it was foreseeable to the Defendant that the entity to which the employee or contractor owed a fiduciary duty might suffer an economic harm as a result of the breach of fiduciary duty.

The sixth and final element is that, for the purpose of executing the scheme or in furtherance of the scheme, the Defendant then under consideration agreed and specifically intended to cause an interstate wire communication to be used, or it was reasonably foreseeable that an interstate wire communication would be used on or about the date alleged.

A531

Again, good faith is a complete defense to wire fraud and honest services wire fraud. Mr. Wilson has no burden to establish a defense of good faith. The burden is on the government to prove the required intent and the consequent lack of good faith beyond a reasonable doubt.[162]

You should rely on the more detailed descriptions I have previously given you of the elements of wire fraud and honest services wire fraud in determining whether the government has met its burden of proving each element of these crimes as to Mr. Wilson, beyond a reasonable doubt.

In a moment, I will instruct you about the elements of aiding and abetting, and what you must find in order to convict Mr. Wilson of aiding and abetting wire fraud and honest services wire fraud. I will also instruct you on the defense of factual impossibility, which is a defense Mr. Wilson has raised with respect to Counts Six, Eight, and Nine, among others.

---

[162]     *See* Instructions 39, 45, *supra.*

### 62. Counts Six, Eight, and Nine: Aiding and Abetting[163]

As I have explained, Counts Six, Eight, and Nine charge Defendant John Wilson with aiding and abetting wire fraud and honest services wire fraud in violation of Title 18 of the United States Code, Section 2.

Under the aiding and abetting statute, it is not necessary for the government to show that Mr. Wilson himself committed the crimes with which he is charged in order for the government to sustain its burden of proof. A person who aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you only may find Mr. Wilson guilty of the offenses charged if you find that the government has proved beyond a reasonable doubt that Rick Singer actually committed the offenses with which Mr. Wilson is charged, and that Mr. Wilson aided or abetted Rick Singer in the commission of those offenses.

As you can see, the first requirement is that you find that the government has proved beyond a reasonable doubt that another person has committed the crime charged. Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place. Thus, if you find that Rick Singer did not commit wire fraud and honest services wire fraud with respect to the count at issue, then Mr. Wilson cannot be found guilty of aiding and abetting with respect to that count. But if you do find that Rick Singer committed a crime with respect to the count at issue, then you must consider whether Mr. Wilson aided or abetted the commission of that crime.

Relatedly, as I explained previously, after the Government approached Rick Singer on September 21, 2018, he became the Government's agent, informant, and cooperator. As of that date, he was acting in the secret role of an informant and you may find that he was not acting in any criminal capacity. Rick Singer's cooperation also relates to Mr. Wilson's defense of factual impossibility, which I will instruct you on shortly.

In order to aid or abet another to commit a crime, it is necessary that a defendant knowingly and willfully associate himself in some way with the crime, and that he knowingly and willfully participate in the crime by doing some act to help make the crime succeed.

To establish that Mr. Wilson knowingly and willfully associated himself with the crime, the government must establish that Mr. Wilson intended that wire fraud and honest services wire fraud be committed.

To establish that Mr. Wilson participated in the commission of the crime, the government must prove that Mr. Wilson engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.

---

[163] Adapted from Sand et al., *Modern Federal Jury Instructions (Crim.)*, Inst. 11-2 (Aiding and Abetting) (2021).

78

Participation in a crime is willful if done voluntarily and intentionally, and with the specific intent to do something which the law forbids or with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law. Thus, good faith is a complete defense to the crime of aiding and abetting.

Merely associating with others who were committing a crime is not sufficient to establish aiding and abetting, even if the defendant knew that a crime was being committed. In addition, one who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor. An aider and abettor must know that the crime be committed and act in a way that is intended to bring about the success of the criminal venture.

To determine whether Mr. Wilson aided or abetted the commission of wire fraud and honest services wire fraud, ask yourself these questions:

Has the Government proven beyond a reasonable doubt that Rick Singer committed the crime of wire fraud and honest services wire fraud with respect to the count at issue?

Did it prove beyond a reasonable doubt that Mr. Wilson knowingly and willfully participated in the crime charged?

Did the government prove beyond a reasonable doubt that he knowingly and willfully associated himself with the criminal venture?

Did it prove beyond a reasonable doubt that he sought by his actions to make the criminal venture succeed?

If the answer to each of these questions with respect to the count at issue is "yes," then Mr. Wilson is an aider and abettor, and therefore guilty of the offense. If, on the other hand, your answer to any one of these questions is "no," then Mr. Wilson is not an aider and abettor, and you must find him not guilty.

## VIII.   *Counts Eleven and Twelve: Federal Programs Bribery and Aiding and Abetting*

### 63.      **Counts Eleven and Twelve: Federal Programs Bribery and Aiding and Abetting: Introduction**

Counts Eleven and Twelve of the Indictment charge Mr. Wilson with federal programs bribery in violation of Title 18 of the United States Code, Section 666(a)(2), or aiding and abetting Rick Singer in committing federal programs bribery in violation of Title 18 of the United States Code, Section 2.

Count Eleven charges that Mr. Wilson committed federal programs bribery, and aided and abetted Rick Singer in committing federal programs bribery, in connection with the wiring of $500,000 from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on October 17, 2018.  The Indictment alleges that these funds were wired in connection with the potential admission of Mr. Wilson's daughter to Stanford University.

Count Twelve charges that Mr. Wilson committed federal programs bribery, and aided and abetted Rick Singer in committing federal programs bribery, in connection with the wiring of $500,000 from Hyannis Port Capital, Inc. to the Key Worldwide Foundation on December 11, 2018.  The Indictment alleges that these funds were wired in connection with the potential admission of Mr. Wilson's daughter to Harvard University.

### 64.     Counts Eleven and Twelve: Federal Programs Bribery: Elements

To convict Mr. Wilson of federal programs bribery under Count Eleven or Count Twelve, you must find that the Government has proven, beyond a reasonable doubt, each of the five elements of federal programs bribery that I have already described to you.  Those elements are as follows:

First, the person acts with corrupt intent.

Second, the person gives, offers, or agrees to give a thing of value to another person that constitutes a bribe.

Third, the above is done to corruptly influence or reward an agent of an organization in connection with some business, transaction, or series of transactions of that organization.

Fourth, that this business, transaction, or series of transactions involved a thing with a value of $5,000 or more.

Fifth, that the organization, in a one-year period preceding or following the bribe, received benefits of more than $10,000 under any federal program involving a grant, contract subsidy, loan, guarantee, insurance, or other assistance.

You should rely on the more detailed descriptions I have previously given you of the elements of federal programs bribery in determining whether the government has met its burden of proving each element of that crime as to Mr. Wilson, beyond a reasonable doubt.

In a moment, I will instruct you on the defense of factual impossibility, which is a defense Mr. Wilson has raised with respect to Counts Eleven and Twelve, among others.

### 65. Counts Eleven and Twelve: Aiding and Abetting[164]

To convict Mr. Wilson of aiding and abetting Rick Singer in committing federal programs bribery under Count Eleven or Count Twelve, you must find that the Government has proven, beyond a reasonable doubt, each of the two requirements of aiding and abetting that I have already described to you:

The first requirement is that you find that another person has committed the crime charged. Again, obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place. Thus, if you find that Rick Singer did not commit federal programs bribery with respect to the count at issue, then Mr. Wilson cannot be found guilty of aiding and abetting with respect to that count.

Relatedly, as I explained previously, after the Government approached Rick Singer on September 21, 2018, he became the Government's agent, informant, and cooperator. As of that date, he was acting in the secret role of an informant and you may find that he was not acting in any criminal capacity. Rick Singer's cooperation also relates to Mr. Wilson's defense of factual impossibility, which I will instruct you on shortly.

The second requirement is that the defendant knowingly and willfully associate himself in some way with the crime, and that he knowingly and willfully participate in the crime by doing some act to help make the crime succeed.

To determine whether Mr. Wilson aided or abetted the commission of federal programs bribery, ask yourself these questions:

Has the Government proven beyond a reasonable doubt that Rick Singer committed the crime of federal programs bribery with respect to the count at issue?

Did it prove beyond a reasonable doubt that Mr. Wilson knowingly and willfully participated in the crime charged?

Did it prove beyond a reasonable doubt that he knowingly and willfully associated himself with the criminal venture?

Did the government prove beyond a reasonable doubt that he sought by his actions to make the criminal venture succeed?

If the answer to each of these questions with respect to the count at issue is "yes," then Mr. Wilson is an aider and abettor, and therefore guilty of the offense. If, on the other hand, your answer to any one of these questions is "no," then Mr. Wilson is not an aider and abettor, and you must find him not guilty.

---

[164] Adapted from Sand et al., *Modern Federal Jury Instructions (Crim.)*, Inst. 11-2 (Aiding and Abetting) (2021).

### IX. Count Thirteen: Filing a False Tax Return

### 66. Count Thirteen: Filing a False Tax Return: Introduction[165]

In Count Thirteen, the Indictment charges Mr. Wilson with willfully filing a false federal tax return in violation of 26 U.S.C. § 7206(1).

For you to find Mr. Wilson guilty of willfully filing a false federal tax return, you must be convinced that the government has proven each of the following elements beyond a reasonable doubt:

First, that Mr. Wilson made, or caused to be made, a federal income tax return for the year in question that he verified to be true;

Second, that the tax return was false as to a material matter;

Third, that Mr. Wilson signed the return willfully and knowing it was false; and

Fourth, that the return contained a written declaration that it was made under the penalty of perjury.

The evidence need not establish beyond a reasonable doubt that the deductions totaled the exact amount alleged in the indictment, or that the deductions were overstated in the exact amount alleged, but only that the accused willfully overstated or caused to be overstated in some substantial amount the deductions as charged in the indictment.[166]

In a moment, I will further instruct you on the second and third elements of this offense.

---

[165]  First Circuit Pattern Criminal Jury Instruction 4.26.7206.
[166]  *United States v. Warden*, 545 F.2d 32, 37 (7th Cir. 1976).

### 67. Count Thirteen: Filing a False Tax Return: Second Element – "False as to a Material Matter"[167]

The second element of willfully filing a false tax return requires the government to prove beyond a reasonable doubt that the tax return was false as to a material matter.

A "material" matter is one that is likely to affect the calculation of tax due and payable, or to affect or influence the IRS in carrying out the functions committed to it by law, such as monitoring and verifying tax liability. A return that omits material items necessary to the computation of taxable income is not true and correct.

---

[167]     First Circuit Pattern Criminal Jury Instruction 4.26.7206.

### 68. Count Thirteen: Filing a False Tax Return: Third Element – "Willfully and Knowing It Was False"

The third element that the government must prove beyond a reasonable doubt is that Mr. Wilson signed the tax return willfully and knowing it was false.

"Willfully" means a voluntary, intentional violation of a known legal duty.[168] An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.[169]

Accordingly, if you find Mr. Wilson made an error but did not know he did, or otherwise that he was merely negligent, sloppy, or careless, you must find him not guilty.[170] In other words, no one can be convicted of filing a false tax return because they made a mistake or because they were careless or because they had a good-faith, but mistaken, belief as to the requirements of the tax laws.[171] A good-faith belief is one that is honestly held.[172] Even if you find that Mr. Wilson was negligent in that he should have noticed the error, that is not a basis to find him guilty.[173]

In this case, therefore, it isn't enough for the government to show that the losses or deductions on Mr. Wilson's tax returns were improper. The government also has to prove that Mr. Wilson knew and intended that they were improper, or, rather that Mr. Wilson knew and intended that the statements made about them in the tax returns were not true and correct.[174] In addition, the government has to prove that Mr. Wilson acted willfully; that is to say, with bad purpose either to disobey or to disregard the law.

In determining whether Mr. Wilson intended to misstate anything on his tax return, you may find that if he could have reduced his tax payments by claiming lawful deductions but did not do so, he was less likely to have a motive to reduce his tax payments by making a false statement because he could have reduced them through lawful means. As I have previously instructed,

---

[168]    First Circuit Pattern Criminal Jury Instruction 4.26.7206.

[169]    *United States v. Monteiro*, 871 F.2d 204, 208 (1st Cir. 1989) ("An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." (internal quotation marks omitted)).

[170]    *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir. 1986) (affirming order granting new trial where the trial court "was persuaded that the Rothrocks had given the necessary information to the preparer, and had innocently overlooked the errors in the returns"); *United States v. Anshen*, No. 91-10440, No. 91-10441, 1993 U.S. App. LEXIS 12451, at *13-14 (9th Cir. May 17, 1993) ("[N]either a careless disregard whether one's actions violate the law nor gross negligence in signing a tax return will suffice" to prove 'willfulness' under § 7206(1)" (quoting *United States v. Claiborne*, 765 F.2d 784, 797-98 (9th Cir. 1985)).

[171]    *United States v. Griffin*, 524 F.3d 71, 78 (1st Cir. 2008) ("No one can be convicted of filing a false tax return because they made a mistake or because they were careless or because they had a genuine, but mistaken, belief in the requirements of the tax code." (internal quotation marks omitted)).

[172]    *United States v. Adams*, 740 F.3d 40, 45 n.4 (1st Cir. 2014).

[173]    *United States v. Griffin*, 524 F.3d 71, 80 (1st Cir. 2008); *United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993).

[174]    *United States v. Mikutowicz*, 365 F.3d 65, 71 (1st Cir. 2004) ("It isn't enough for the government to show that the deductions were improper. The government also has to prove that the defendant knew that they were improper, or, rather that the defendant did not believe that the statements he made about the deductions in these returns were true and correct." (brackets and internal quotation marks omitted)).

motive is not the same thing as intent, and the government does not need to prove motive in order to convict. But if a person lacks a motive to do something, they are less likely to do it intentionally, so motive is relevant and you may consider it in determining whether the government has proved intent beyond a reasonable doubt.[175]

Mr. Wilson's intent must be determined by a subjective standard. This means you must decide what Mr. Wilson actually knew and believed, not what a reasonable person in his position should have known or believed.[176]

However, in determining what Mr. Wilson actually knew and believed, you may consider whether his alleged beliefs were unreasonable. This is because to the extent a belief is unreasonable, and particularly where it is highly unreasonable, that may be probative of whether it is actually held in good faith. For instance, a belief that the moon is made of green cheese might be considered unreasonable and therefore probative of the belief-holder's insincerity. Of course, that is an extreme example that has nothing to do with this case.[177] On the other hand, to the extent a belief is reasonable, or reflects a reasonable misunderstanding, that may be probative of the belief holder's sincerity.[178]

---

[175]    *United States v. Wilson*, 887 F.2d 69, 74-76 (1st Cir. 1989) (approving of an instruction in a case involving alleged tax misstatements explaining the relationship between motive and intent).

[176]    *United States v. Adams*, 740 F.3d 40, 45 (1st Cir. 2014) ("[D]efendant's intent must be determined by a subjective standard. A good-faith but mistaken belief as to what the tax laws require is not enough to have the required knowledge and intent." (ellipsis and internal quotation marks omitted)); *id.* at 45 n.4 ("[T]he court [properly] instructed the jurors that they 'must decide what a particular defendant actually knew and believed, not what a reasonable person in his position should have known or believed' . . . .").

[177]    *United States v. Mikutowicz*, 365 F.3d 65, 71 (1st Cir. 2004).

[178]    *United States v. Adams*, 740 F.3d 40, 46 n.5 (1st Cir. 2014).

### 69. Count Thirteen: Filing a False Tax Return: Proper Deductions

It is not a violation of the tax laws to claim a deduction for giving money to a for-profit business if the taxpayer intends that the for-profit business will then pass the money on to a charitable organization.[179] Thus, if you find that Mr. Wilson gave the money at issue to Rick Singer or to Mr. Singer's company intending that Rick Singer would give it to a charitable organization, you must return a not guilty verdict.

In addition, a charitable organization supporting a university athletic team can be an exempt organization under the federal tax laws. Therefore, it is not illegal in and of itself to claim a tax deduction for donating to such an organization.[180]

---

[179]  26 U.S.C. § 170(c) (defining charitable contribution as contribution "to or for the use of" charitable entity); *Kluss v. Commissioner*, 46 T.C. 572, 575 (1966) (where taxpayer gave $5,000 to for-profit foundation so foundation could send free subscriptions of its publication to members of Texas State Legislature, noting that "[t]he answer seems to turn principally on one critical factor, i.e., the donor's intent . . . . In other words, who did the petitioner actually intend to benefit when she made her contribution? This is the ready touchstone."); *Brinley v. Comm'r*, 782 F.2d 1326, 1332 (5th Cir. 1986) (rejecting government's argument that deductions for expenses incurred in providing services to charities can only be taken if the taxpayer himself or herself performed the services) ("[W]e find nothing on the face of § 1.170A-1(g) that expressly limits deductions for expenditures incurred in the rendition of charitable work to the person who actually performs the service.").

[180]  *See* Amateur Athletic Organizations, IRS Exempt Organizations Continuing Professional Education ("EO CPE") § H, at 4 (I.R.S. 1982), https://www.irs.gov/pub/irs-tege/eotopich82.pdf ("[O]rganizations that promote sports competition in conjunction with educational organizations are recognized as being described in IRC 501(c)(3). Rev. Rul. 67-291 states that the athletic program of a university is an integral part of its overall educational activities and that an organization that provides necessary services to student athletes and coaches is described in IRC 501(c)(3)."); EO CPE § E, at 1 (I.R.S. 1987), https://www.irs.gov/pub/irs-tege/eotopice87.pdf ("[A]n amateur athletic organization may be classified as 'educational' under IRC 501(c)(3) on the grounds that it . . . is affiliated with an exempt educational organization."); *see also* Rev. Rul. 67-291, 1967-2 C.B. 184 (1967) (concluding an organization that "subsidiz[ed] a training table for coaches and members of a university's athletic teams" was tax exempt); *cf.* I.R.S. G.C.M. 37048 (Mar. 18, 1977) (concluding an organization that put on a college football bowl game was tax exempt); I.R.S. G.C.M. 37522 (May 2, 1978) (concluding that an organization that built a football stadium to lease to a public high school was tax exempt); I.R.S. G.C.M. 38339 (Apr. 8, 1980) (same with respect to hockey rink); *Clippers Found., Inc.*, 1994 WL 508911, at *1, *2 (I.R.S. Jan. 5, 1994) (exemption ruling in favor of organization with the "stated purpose . . . to foster national or international amateur sports competition by affording the opportunity for young elite athletes in track and field events to train to be representatives of the United States on the U.S. Olympic Team," including the guidance that "[d]onors may deduct contributions to you as provided in Code section 170.").

70.    **Count Thirteen: Filing a False Tax Return: Tax Professionals**[181]

Taxpayers are allowed to use tax preparers and to delegate tax preparation responsibilities to tax professionals.  In this trial, you have heard evidence that Mr. Wilson delegated some of his tax preparation responsibilities to his tax preparers and bookkeepers.  You may consider such evidence in determining whether Mr. Wilson's allegedly false statements are willful.

---

[181]     *Belcher v. United States*, Civil Action No. 598., 1960 U.S. Dist. LEXIS 5094, at *10 (W.D. Va. Sep. 21, 1960) ("I am satisfied that to discharge these duties plaintiffs relied upon their bookkeeper . . . . [P]laintiffs' failure to pay, collect, or truthfully account for and pay over, the taxes here in controversy, was not willful."); *Wiggins v. United States*, 188 F. Supp. 374, 376-77 (E.D. Tenn. 1960);  *Moody v. United States*, 275 F. Supp. 917, 926 (E.D. Mich. 1967); Treasury Department Circular No. 230, 31 C.F.R. §§ 10.2(4), 10.3 (various categories of people, including registered tax return preparers, may practice before the Internal Revenue Service for matters related to a taxpayer).

71.    **Count Thirteen: Filing a False Tax Return – Defense of Administrative Consistency**[182]

The government must treat similarly situated persons equally when collecting taxes and deciding tax issues.  If one taxpayer is treated differently from another similarly situated taxpayer, the government must state the reason for the inconsistency.  The government cannot tax one party and not tax another party without some rational basis for the difference.

In this trial, you have heard evidence that universities give preferential treatment to donors and potential donors with respect to the admission of their family members.  In addition, you have heard evidence that the IRS has a longstanding practice of allowing taxpayers to take charitable deductions for donations to universities, notwithstanding this preferential treatment.  If, upon considering this evidence, you find that the government is treating Mr. Wilson differently than other similarly situated parties, and that the government did not offer a rational basis for the inconsistency, you must acquit Mr. Wilson of the tax charge.

---

[182]    *See Hernandez v. Comm'r*, 490 U.S. 680, 703 (1989) (recognizing in a section 170 case that upon a proper factual record, a taxpayer may prevail on an "administrative consistency argument"); *United States v. Kaiser,* 363 U.S. 299, 308, 4 L. Ed. 2d 1233, 80 S. Ct. 1204 (1960) (Frankfurter, J., concurring) ("The Commissioner cannot tax one and not tax another without some rational basis for the difference."); *Int'l Business Machines Corp. v. United States*, 343 F.2d 914, 923 (Ct. Cl. 1965) ("[F]or all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis"); *Sirbo Holdings, Inc. v. Commissioner,* 476 F.2d 981, 987 (2d Cir. 1973) ("Commissioner has a duty of consistency toward similarly situated taxpayers."); *Gateway Equip. Corp. v. United States*, 247 F. Supp. 2d 299, 321 (W.D.N.Y. 2003) (granting summary judgment for Gateway "[b]ecause the IRS has offered no explanation for its position, and because Gateway has clearly been treated differently from other similarly situated taxpayers").

## X.    *Miscellaneous Instructions*

### 72.    **Factual Impossibility**

Mr. Wilson has raised the defense of factual impossibility with respect to the charges of wire fraud, honest services wire fraud, federal programs bribery, and aiding and abetting set forth in Counts Six, Eight, Nine, Eleven, and Twelve.

Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible.[183]  The defense applies where (1) a factual circumstance prevented the defendant from committing the crime with which he is charged; and (2) the defendant did not know about that particular factual circumstance.[184]

Here, you have heard evidence that Rick Singer became a government cooperator on September 21, 2018, and that this made it impossible for Mr. Wilson to bribe or defraud anyone via Rick Singer as of that date, or to aid and abet Rick Singer in bribing or defrauding anyone as of that date..[185]  In addition, you have heard evidence that Mr. Wilson was unaware that Rick Singer was a government cooperator.

The government may overcome the defense of factual impossibility in this case by proving either of the following beyond a reasonable doubt: (1) that Rick Singer was not a government cooperator during the events at issue; or (2) that Mr. Wilson knew that Rick Singer was a government cooperator during the events at issue.  But unless the government has proven either of these things beyond a reasonable doubt, you must acquit Mr. Wilson of the charges of wire fraud, honest services wire fraud, federal programs bribery, and aiding and abetting set forth in Counts Six, Eight, Nine, Eleven, and Twelve.[186]

---

[183]    *See United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989).

[184]    *See* Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina, § 4.h 600 (Miller W. Shealy, Jr., ed., 2020 online ed.).

[185]    As explained in Section IV.B of Defendant John Wilson's Consolidated Memorandum of Law in Support of his Motions to Sever, to Dismiss, and to Strike, ECF No. 995, which is hereby incorporated by reference, Rick Singer's cooperation made it impossible for John Wilson to commit the crimes set forth in in Counts Six, Eight, Nine, Eleven, and Twelve.

[186]    *See United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996) ("Although a double jeopardy claim of the successive prosecution type is admittedly in the nature of an affirmative defense to an indictment, there is nothing unorthodox about requiring the government to bear the ultimate burden of proof vis-a-vis the existence of an alleged constitutional violation once sufficient evidence is adduced to put the question legitimately into issue."); *United States v. Rodriguez*, 858 F.2d 809, 813-15 (1st Cir. 1988) (holding that if a defendant identifies record evidence from which a jury could conclude that the defendant was entrapped, the government must bear the burden of proving that no entrapment occurred, and concluding that "there was sufficient evidence of both inducement and lack of predisposition from which a rational juror could derive a reasonable doubt as to whether or not the appellant was entrapped").

### 73.    Adverse Inference Concerning the Events of September 2018

You have heard evidence that shortly after Rick Singer agreed to cooperate with the Government, the Government instructed him to cancel a meeting with Mr. Wilson scheduled for September 23, 2018.  You have also heard evidence that the Government did not record or monitor a virtual meeting between Rick Singer and Mr. Wilson on September 28, 2018 when Rick Singer was at the FBI's offices in Sacramento.

Defense Counsel for Mr. Wilson has argued that, based on this evidence and other evidence, you should draw the adverse inferences that: (1) the Government instructed Rick Singer to cancel the September 23, 2018 meeting because it knew that Mr. Singer's discussions with Mr. Wilson would be exculpatory with respect to Mr. Wilson; and (2) the Government chose not to record or monitor the September 28, 2018 virtual meeting between Rick Singer and Mr. Wilson because it knew that their discussion would be exculpatory with respect to Mr. Wilson.  You are permitted to draw these adverse inferences, but you are not required to do so.[187]  You also may infer but are not required to infer based upon the Government's failure to record or monitor the September 28, 2018 virtual meeting that in fact the content of that meeting was unfavorable to the Government and favorable to Mr. Wilson.[188]

---

[187]    Memorandum & Order, July 7, 2020, ECF No. 1359, at 2 ("Wilson will be permitted to inquire at trial of government witnesses about events that occurred in September, 2018, and to petition the Court that it should instruct the jury about adverse inferences regarding those events."); *see also Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 20 (9th Cir. 2009) ("[A]n adverse inference instruction may be allowed when a party fails to produce a document that exists *or should exist* and is within its control." (emphasis added)).

[188]    *See* Instruction 10, *supra*.

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | NO. 19-CR-10080-NMG |
| Plaintiff, | |
| vs. | CERTIFICATION IN SUPPORT OF AUTHENTICITY OF BUSINESS RECORDS AND OTHER EVIDENCE |
| Abdelaziz, et al. | |
| Defendant. | |

Jamaal C. King, being duly sworn, based on information and belief, deposes and states:

1.    I am a Supervisory Special Agent (SSA) with the Federal Bureau of Investigation (FBI), currently serving within the Telecommunications Intercept & Collection Technology Unit (TICTU), Operational Technology Division (OTD) in Quantico, Virginia.  The TICTU is responsible for the development, deployment, and support of lawfully authorized wireline and wireless electronic surveillance capabilities.  I hold a Master of Science in Information Systems and a Bachelor of Science in Computer Science, both from the University of Maryland Baltimore County.

2.    I am filing this certification to satisfy Federal Rules of Evidence 902(11)[1] and 902(14).

3.    The authorized surveillance in this case includes those collections performed through the assistance of a wireless telecommunications service provider (Provider) pursuant to the Communications Assistance for Law Enforcement Act (CALEA)[2].  CALEA requires providers to have the ability to perform electronic surveillance pursuant to a court order or other lawful authorization.  Under the CALEA model, the provider performs the authorized intercept while

---

[1] "The reference to the 'certification requirements of Rule 902(11) or (12)' is only to the procedural requirements for a valid certification.  There is no intent to require, or permit, a certification under this Rule to prove the requirements of Rule 803(6)."  Fed. R. Evid. 902(14) Advisory Committee's note to 2017 amendment.
[2] 47 U.S.C. §§1001-1010 (1994).

providing the communication to law enforcement for collection.

4.      The FBI receives the authorized intercept from the provider over two separate channels. The Call Content Channel (CCC) delivers the audio related to an authorized phone call. The Call Data Channel (CDC) delivers the Pen Register and Trap and Trace (PRTT) data related to the authorized calls as well as other forms of data, such as Short Message Service (SMS) communications. The CCC and CDC are both received within the FBI's telephony collection system which is run and managed by the TICTU. The collection systems are physically located in areas within FBI field offices known as Central Monitoring Plants (CMPs). Access to CMPs is restricted to technical personnel who locally maintain the collection systems. Users of the collection system (also known as monitors) are granted access to review information in the collection system by technical personnel at the direction of the responsible Case Agent and do not have the ability to alter or manipulate the collected data.

5.      At the termination of a phone call and upon the receipt of an SMS text message, the collected data is hashed and proprietary software is utilized to assign a unique digital signature to each call and text message. A hash is a mathematical function that provides a unique value for a given piece of data. The digital signature is an additional step employed by the telephony collection system to maintain the authenticity and integrity of the collected data. Altering any element of the CCC and CDC associated with a call would change the hash value associated with the call and the unique digital signature would not remain intact. A hash value is a number that is often represented as a sequence of characters and is produced by an algorithm based upon the digital contents of a drive, medium, or file. Similarly, altering any element of the CDC associated with a text message would change the hash value associated with the text and the unique digital signature would also not remain intact.

6.    I have been requested to verify the authenticity of wireless communications to be presented within the above captioned case.  The TICTU's collection system was working as designed during the dates of collection in this case.

7.    The sessions present in the collection system span the date range of 06/05/2018 – 03/14/2019. There are a small subset of sessions in which the collection system received PRTT data, but did not receive audio. In my experience this can be attributed to unanswered calls which never produce audio as well as instances in which the service provider sent PRTT data but did not deliver audio to the collection system.

8.    I have reviewed the data associated with all of the calls and text messages in this case.  All of the digital signatures and hash values have been verified as being intact for the following telephone number: 916-348-8802.

9.    Therefore, the original sessions and the exhibits to be introduced are an exact match because the hash values match and the digital signatures are intact.


        Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: August 13, 2021.




Jamaal C. King
Supervisory Special Agent, FBI

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA,          )
4                    Plaintiff      )
                                    )
5      vs.                          )  No. 1-19-CR-10080
                                    )
6    GAMAL ABDELAZIZ, MARCI         )
     PALATELLA, and JOHN WILSON,    )
7                    Defendants.    )
                                    )
8                                   )

9

10

                BEFORE THE HONORABLE NATHANIEL M. GORTON
11                   UNITED STATES DISTRICT JUDGE
                        PRETRIAL CONFERENCE
12

13

14

15        John Joseph Moakley United States Courthouse
                        Courtroom No. 4
16                     One Courthouse Way
                   Boston, Massachusetts 02210
17

18                     August 18, 2021
                        11:00 a.m.
19

20

21             Kristin M. Kelley, RPR, CRR
                   Official Court Reporter
22        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
23                Boston, Massachusetts 02210
                   E-mail: kmob929@gmail.com
24

             Mechanical Steno - Computer-Aided Transcript
25

```
 1   APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          United States Attorney's Office

 6          1 Courthouse Way

 7          Suite 9200

 8          Boston, MA 02210

 9          617-748-3208

10          stephen.frank@usdoj.gov

11          ian.stearns@usdoj.gov

12          for the Plaintiff.

13

14

15          Brian T. Kelly

16          Joshua C. Sharp

17          Lauren Maynard

18          Nixon Peabody LLP

19          100 Summer Street

20          Boston, MA 02110

21          617-345-1000

22          bkelly@nixonpeabody.com

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10            Jack P. DiCanio

11            Michael K. Loucks

12            Emily A. Reitmeier

13            Skadden, Arps, Slate, Meagher & Flom LLP

14            525 University Avenue

15            Palo Alto, CA 94301

16            650-470-4500

17            jack.dicanio@skadden.com

18            for Marci Palatella.

19

20

21

22

23

24

25
```



```
 1    APPEARANCES:

 2

 3          Michael Kendall

 4          Lauren M. Papenhausen

 5          White & Case, LLP

 6          75 State Street

 7          Boston, MA 02109

 8          617-939-9310

 9          michael.kendall@whitecase.com

10          for John Wilson.

11

12          Andrew E. Tomback

13          McLaughlin & Stern, LLP

14          260 Madison Avenue

15          New York, NY 10016

16          917-301-1285

17          atomback@mclaughlinstern.com

18          for John Wilson.

19

20

21

22

23

24

25
```

1                       P R O C E E D I N G S

2              THE CLERK:  This is Criminal Action No. 19-10080, the

3    United States of America versus Gamal Abdelaziz, et al.

4              Would counsel please introduce themselves for the

5    record.

6              MR. FRANK:  Good morning, your Honor.  Stephen Frank

7    and Ian Stearns for the United States.

8              THE COURT:  Mr. Frank and Mr. Stearns, good morning.

9              MR. KELLY:  Good morning.  Brian Kelly, Josh Sharp and

11:04 10   Bob Sheketoff on behalf of Mr. Aziz is what he goes by.  It's a

11   lot simpler.

12             THE COURT:  Mr. Aziz is how he goes by?

13             MR. KELLY:  Yes.

14             THE COURT:  Good morning.

15             MR. KENDALL:  Good morning, your Honor.  Michael

16   Kendall and Lauren Papenhausen and, by Zoom, Mr. Tomback is

17   participating from Connecticut.

18             THE COURT:  Good morning to him.

19             MR. LOUCKS:  Good morning, your Honor.  Mike Loucks,

11:04 20   Jack DiCanio, and Emily Reitmeier on behalf of defendant

21   Palatella.

22             THE COURT:  Good morning to you, Mr. Loucks, and

23   Mr. DiCanio and Miss Reitmeier.

24             All right.  Before we start, I can just give you the

25   protocol for this.  You can wear a mask or not.  I'd prefer you

1   don't wear a mask when addressing the Court, but it's

2   completely within your choice.

3        We're going to start now with this final pretrial

4   conference with respect to the September trial in the so-called

5   "Varsity Blues" case.  Before we begin, I'm going to state my

6   general attitude with this case, after which I will render my

7   rulings on the pending motions in limine, hear the parties in

8   response, and then discuss the empanelment process and the

9   trial procedures.

11:05 10      As a preliminary matter, counsel should understand

11  that this trial is not going to be about the general admissions

12  policy of the University of California or the method it uses to

13  admit students.  USC is not on trial here, and I will not have

14  this case devolve into multiple side trials.  Unless there's

15  evidence that a defendant was misinformed with respect to the

16  admission policy of the subject university and/or knew that USC

17  admitted a specific unqualified student whose parent made a

18  large donation to the school before that defendant entered into

19  the alleged conspiracy with Singer, evidence of what other

11:06 20  unrelated students and parents did has no bearing on the

21  defendants' state of mind and, thus, is irrelevant to the

22  requisite scienter that the government must prove in this case.

23        Second, this case is almost two and a half years old,

24  and we are now on the eve of trial.  Just yesterday, two of the

25  three defendants moved to continue the trial for COVID-19

related reasons.  The government has not had a chance to
respond, but I presume it opposes the motion.  Even if it does
not, I will deny that motion without prejudice because, as of
now, jury trials are proceeding in federal courts and this case
needs to be resolved.  I fully intend to begin jury empanelment
on September 8, 2021, and submit this case to the jury before
the end of October.

          In the meantime, this Court will give short shift to
motions addressing the same issues that have already been
decided over the past 2 years and will not consider severances
of any kind.  In that regard, the motions to sever recently
filed by defendants Palatella and Wilson, dockets No. 2051 and
2080, are denied.

          I will turn now to the 20 or so pending motions in
limine.  I will, for the most part, address those motions in
chronological order of the filings, and I will hear from the
parties once in the middle and once at the end.

          Starting with Wilson's motion to exclude marital
privileged communications and the fruits of such communication,
that's docket No. 1988, it is denied without prejudice because,
first, the marital communications in government Exhibit 48 are
subject to the joint participant exception of that privilege.
Second, Wilson's objection to the admission of any undisclosed
exhibits containing marital communications is too broad and,
third, this Court has previously ruled that the fruit of the

    1    poisonous tree doctrine does not apply to marital

    2    communications.

    3         Now, a little bit out of order, but with respect to

    4    the government's mirror image motion, docket 2004, that is to

    5    be permitted to introduce marital communications, that motion

    6    is denied as to the government's Exhibit 131, but otherwise

    7    allowed to the extent it seeks a finding from this Court that

    8    the other government exhibits attached thereto fall outside of

    9    the marital communications privilege.

11:09 10         The government has attached a 129 page exhibit under

   11    seal, which includes several e-mails that communicate with

   12    third parties, and thus fall outside of the scope of the

   13    marital communications privilege.

   14         With respect to the e-mail communications solely

   15    between spouses, other than Exhibit 131, those spousal

   16    communications appear to be in furtherance of the alleged

   17    conspiracy.  Indeed, the e-mails discuss arrangements with

   18    Singer and show that the spouses engaged in activities to

   19    support that arrangement, including selecting photographs for

11:10 20    the fraudulent athletic profiles used to secure admission as

   21    purported athletic recruits.

   22         Although this goes beyond the scope of the in limine

   23    motion, for the same reasons, the defendant Abdelaziz's

   24    objection to government Exhibits 273, 315, and 330, on the

   25    basis of marital privilege, is overruled.

1          As to Exhibit 131, the subject e-mail contains a

2     medical evaluation and other medical information about

3     Mr. Wilson's son following a concussion.  Nothing in the e-mail

4     indicates that the medical information was used to further the

5     conspiracy, but rather seemed to disclose, quote, nothing more

6     than the mundane incidents of the Wilson's marital

7     relationship, unquote, that is the health of their child and,

8     therefore, it will not be admitted.

9          Third, defendants' motion to preclude argument or

11:11 10   evidence contrary to black letter law concerning money

11    laundering, docket 1989, is denied as moot.  The money

12    laundering count has been dismissed from the Fourth Superseding

13    Indictment.  To the extent the defendants' motion also seeks to

14    preclude the government from arguing that the payments by

15    defendant to Singer's entities were intended to further an

16    elicit quid pro quo scheme and to conceal that scheme, the

17    request is denied.  The subject evidence, that is that

18    defendants wired money to or through Singer's organizations

19    rather than directly to the coaches and administrators, as the

11:12 20   government contends, is relevant to defendants' intent with

21    respect to the conspiracy, which is a central issue in this

22    case.

23          Fourth, defendants' motion to require the government

24    to proffer corroborating evidence of the alleged conspiracy

25    under United States versus Petrozziello before statements of

purported coconspirators are admitted, docket No. 1990, is

denied.  The Court finds no reason to depart from the procedure

outlined by the First Circuit Court of Appeals which prevents a

Court to admit provisional the statements of alleged

coconspirators under Federal Rule of Evidence 801(d)(2)(E),

subject to a determination at the close of the evidence as to

whether the proponent of the statement established by a

preponderance of the evidence, quote, that a conspiracy

embracing both the declarant and the defendant existed and that

the declarant uttered the statement during and in furtherance

of the conspiracy.

        The Court, nonetheless, cautions the government as it

surely knows that it does not provide intrinsic evidence

establishing all of the required elements of any applicable

hearsay exception under 801(d)(2).  It risks the declaration of

a mistrial.

        Fifth, defendants' motion to preclude evidence of

their income, wealth, spending or lifestyle, docket 1992, is

denied without prejudice.  The Court will not exclude all

evidence pertaining to defendants' financial wherewithal

because such evidence may be relevant to show, among other

things, motive, that is that the defendants were motivated to

have their children admitted into elite universities so that

they could maintain or improve their status in the community.

        That said, the government will not be allowed to dwell

A559

1    on this issue or to beat this horse or make inflammatory

2    statements regarding defendants' wealth or lifestyle, and the

3    Court will entertain proposed limiting instruction from the

4    defendants in that regard.

5         Sixth, defendant Wilson's motion to exclude evidence

6    concerning Internal Revenue Service agents' beliefs and/or

7    opinions as to Wilson's state of mind or question of tax law,

8    docket 1993, is denied as moot.  The government has stated that

9    it does not intend to elicit testimony from the IRS agent on

11:14 10   either topic, but rather testimony from the agent regarding her

11   qualifications, tax terminology helpful to understanding her

12   testimony, a summary of Wilson's relevant tax returns and

13   deductions claimed, and a summary of how the IRS determined

14   that various deductions claimed on Mr. Wilson's tax returns

15   were improper, et cetera, all of which are permissible.

16         The government will not be permitted to elicit any

17   testimony directly, addressing the ultimate question of whether

18   Mr. Wilson intended to evade federal income taxes, which is

19   inadmissible under Federal Rule of Evidence 704(b).

11:15 20        Seven, defendant Gamal Abdelaziz's motion to exclude

21   reference to Steven Wynn, docket 1995, is denied as moot

22   because the government has agreed it will not refer to Mr. Wynn

23   at the trial.

24         Eight, defendants' motion to exclude evidence

25   pertaining to other defendants who pled guilty, docket 1996, is

1  denied without prejudice.  The government has agreed that it

2  will not introduce evidence concerning the guilty pleas of

3  other defendants other than those who will testify at trial as

4  cooperating witnesses.

5        With respect to the other relief sought by defendants'

6  motion, namely the exclusion of all out-of-court statements and

7  related evidence pertaining to individuals who pled guilty in

8  this or a related "Varsity Blues" prosecution, there is no

9  basis for such a sweeping prohibition.  Furthermore, to the

11:16 10  extent defendants are concerned about the jury's exposure to

11  news stories pertaining to defendants who pled guilty, for

12  example, Miss Loughlin, that is a matter more properly

13  addressed at jury empanelment and through appropriate limiting

14  instructions about not being influenced by the guilty pleas of

15  others, which this Court intends to give during the trial

16  and/or in its charge.

17        In any event, should it become apparent at trial that

18  certain out-of-court statements are unduly prejudicial under

19  Federal Rule of Evidence 403, the defendants can renew their

11:17 20  motion to exclude such evidence.

21        Nine, defendants' motion to exclude evidence of

22  Mr. Singer's signed deals with Donna Heinel and Jovan Vavic,

23  docket No. 1998 and docket 2010, on the ground that the

24  defendants did not know and did not agree to those side deals

25  are denied without prejudice, although the Court will entertain

1    a limiting instruction composed by the defendants at the time

2    the government seeks to introduce such evidence, explaining

3    that the evidence is admitted de bene esse pending the

4    Petrozziello ruling at the end of the case.

5         It is well settled that each conspirator need not know

6    the details of the conspiracy or participate in every act in

7    furtherance thereof.  Thus, to the extent the government can

8    establish a single conspiracy, evidence as to how Heinel and

9    Vavic were paid is relevant to how the conspiracy operated and

11:18 10   need not be excluded on the basis that some of the defendants

11   were unaware of the arrangements.  Moreover, that Mr. Singer

12   was cooperating at the time he agreed to pay tuitions or the

13   children of Vavic, likewise, does not justify the exclusion of

14   evidence of the side deals.

15        As this Court has explained in docket No. 1399, the

16   Fourth Superseding Indictment properly alleges a single

17   overarching conspiracy that continued after Mr. Singer began

18   cooperating with the government.  Of course, in the event the

19   government fails to establish a single overarching conspiracy,

11:19 20   the Court will be compelled to give appropriate limiting

21   instructions to the jury or, perhaps more likely, declare a

22   mistrial.

23        At this stage, I will stop and hear counsel with

24   respect to any of my rulings on the first nine matters.

25             Yes.  Mr. Frank.

1          MR. FRANK:  One question.  We understand your Honor's

2     ruling on the first issue, our motion to exclude irrelevant

3     evidence.  Your Honor, it's stated that this case will not be

4     about the general admissions policies of USC.  We understand

5     that ruling also embraces VIP lists and evidence concerning

6     individual students who are not at issue in this case who may

7     have appeared on VIP lists, and we just wanted to clarify that.

8          THE COURT:  I'm not sure I understand what you're

9     asking me.

11:20 10        MR. FRANK:  The defense has, as part of its motion,

11    sought to introduce evidence about students who were not

12    recruited but who appeared on VIP lists for various reasons

13    that were forwarded to the admissions office.  My understanding

14    of the ruling is that unless the defendants themselves were

15    aware of those students and why they were considered for

16    admission, it would not come in.

17          MR. KELLY:  Your Honor, we would object to that.  I

18    think the government here is urging the Court to commit what

19    would be reversible error here.  We're not looking for a

11:20 20   hundred mini trials in all these other matters.  There is

21    certainly a discrete amount of documents that we need to get

22    into evidence to defend ourselves, which we obviously have a

23    constitutional right to do.  They keep urging the Court to

24    prevent us from putting on a defense here.

25          Now, it's black letter law that in a case like this if

1    the defendant has a good faith belief that what he is doing is

2    appropriate, that's a defense on the fraud charge.  Now, the

3    reasonableness of his good faith is at issue.  For instance, if

4    he says he's got a good faith belief that the moon is made of

5    green cheese, well, objectively, it's not, but if he has a good

6    faith belief that, in fact, USC wants money to help facilitate

7    these kids get into school and designates them as walk-on

8    athletes, we need to be able to present that so the jury can

9    see he, in fact, has a good faith belief that's critical to his

11:21 10    defense.

11        They keep trying to cut it out because they know it's

12    part of the defense.  They've got USC policies on their exhibit

13    list.  So it bears the Court to keep an open mind on that on

14    how we present these at trial.  We're not looking to put on a

15    hundred of exhibits.  We'll narrow it down and put on what we

16    need to defend ourselves here and show he had a reasonable good

17    faith belief.

18        THE COURT:  We'll see what happens in the context of

19    the trial in that regard.

11:22 20        Mr. Kendall.

21        MR. KENDALL:  Your Honor, if I may add two things.

22    First, we believe, to follow what Mr. Kelly is saying, this

23    evidence goes to whether or not USC is a victim or not.  What's

24    important is there are recordings and other documents that show

25    Singer explicitly telling the exposed members of the conspiracy

1    USC has a VIP list, USC does this, I'm getting you into an

2    existing USC program.  So to the extent that he has represented

3    that to the supposed conspirators, I think they have a right to

4    show that he's telling the truth.  And it sort of rebuts any

5    thought that this is a fraud on USC.  It's actually a policy

6    that USC is endorsing, particularly for the honest services

7    charge.  If an employee is doing something to fulfill the

8    employer's goals or positions, that's not a theft of honor

9    services.  That's a provision of good services, and we need it

11:23 10   for that.

11         There's a second issue, your Honor, which is Wilson is

12    charged with a tax count.  We cited the Bowear case to the

13    Court in our pleadings.  They want to say that Wilson had no

14    right to deduct the amount of the donation on his tax return

15    and it's not a deduction under any scenario.  The case law is

16    clear that we have a right to put on an alternative tax

17    calculation to show that our tax calculation was correct.

18         Under the IRS code, whether or not Wilson's deduction

19    should be set aside depends upon how USC valued similar help to

11:23 20   other donors.  Let me give you an example.

21         THE COURT:  This is going into too much detail for

22    this case.

23         MR. KENDALL:  So I need to put that in for the tax

24    case.  As Mr. Kelly said, we're not going to put in thousands

25    of documents.  We have a few examples and we've got some

summary charts that can be done very efficiently, but we need
to show if this was a provision of honest services to USC, not
a theft of honest services, and how to value the benefit for
the tax charge.  Thank you, your Honor.

THE COURT:  Mr. Frank --

MR. DICANIO:  This is Jack DiCanio.

THE COURT:  I can't see you.

MR. DICANIO:  I'm on the Webex.  I should be visible.
I see you all.

11:24 THE COURT:  Who is it speaking now again?

MR. DICANIO:  Good morning, your Honor.  This is Jack
DiCanio.  First of all, your Honor, thank you very much for
allowing us to participate by Zoom.  I agree with the arguments
of co-counsel on this.  I'd like to adjust a few.

My client actually dealt directly with Donna Heinel,
who was an associate athletic director at USC, a very senior
person at USC.  We have evidence, and evidence will be
introduced at trial, that will talk about those communications
and will deal with what the USC athletic department was
11:25 communicating to my client, but I think one of the things I'd
like to reiterate, Judge, is what the government's going to do
is say USC had no knowledge of this and they are going to
portray them as the victim, when, in fact, the real evidence is
that USC very much understood what was going on.  The entire
athletic department very much understood what was going on.

1          In fairness to us, we should be able to produce enough

2    evidence to illustrate that to the jury.  Now, I agree with

3    co-counsel.  We'll be judicious about it.  We'll be limiting

4    about it, but this concept of USC not understanding what was

5    happening is just not true, and we should have the ability to

6    demonstrate that.  It's particularly important to my client

7    because my client dealt directly with people within the

8    athletic department.

9          Thank you, your Honor.

11:26 10          THE COURT:  Mr. Frank?

11          MR. FRANK:  Your Honor, I didn't mean to open up a can

12    of worms here.  All I wanted to clarify was your Honor's ruling

13    was that information, evidence about specific students who are

14    not on trial here should not come in unless the defendants can

15    prove that they were aware of it and it had an effect on their

16    good faith and their intent.  I just wanted to clarify.  Your

17    Honor had mentioned students recruited as athletes, that that

18    also encompassed other students regardless of how they got it.

19          THE COURT:  That's what my ruling on the subject in

11:26 20    limine motion is intended to convey.  I'm not going to resolve

21    all of the other issues at this time.

22          Anything else with respect to my first nine rulings

23    with respect to in limine motions?  If not, I will proceed with

24    number 10.

25          Defendant Abdelaziz's motion to limit the testimony of

 1    a Ms. Velakachrla, I'm not sure how you pronounce that name,

 2    but it's docket 2000, is denied without prejudice.  The

 3    government has agreed that the only testimony it will list from

 4    the subject person, Miss Velakachrla, is that which is

 5    nonhearsay and of which the witness has personal knowledge.

 6    Furthermore, the Court agrees with the government that the

 7    opinion of a classmate as to how Miss Abdelaziz's basketball

 8    skills compare to those of her teammates constitutes lay,

 9    rather than expert, opinion, which Velakachrla can offer, so

11:28 10    long as her opinion is based upon her personal observations and

 11    knowledge.  Although this again goes beyond the scope of the in

 12    limine motion for the same reasons, defendants' objections to

 13    the government's calling Miss Velakachrla as a witness is

 14    overruled.

 15          11, to the extent that there is evidence that the

 16    University of Southern California admitted unqualified students

 17    whose parents made large donations to the school before such

 18    admissions and that the defendants knew about such admissions,

 19    it would be relevant to the defendants' state of mind, that is

11:28 20    scienter and thus admissible, but if such alleged conduct was

 21    not known to the subject defendant, it is irrelevant and thus

 22    inadmissible.

 23          Therefore, the government's motion to preclude

 24    irrelevant evidence, docket 2001, will be allowed, but that

 25    will not preclude defendants from proffering evidence of

1    University of Southern California's alleged corrupt admission

2    policy if it was known to the proffering defendant and somehow

3    impacted his or her state of mind, nor will it foreclose

4    defendants from introducing evidence of Southern Cal's alleged

5    special interest and VIP policy if the government first

6    proffers evidence of Southern Cal's admission policy in its

7    case-in-chief.

8          12, defendants' motion to exclude evidence regarding

9    taking an admission slot, docket 2002, is denied.  This Court

11:29 10   has already concluded that admission slots at competitive

11   universities are both limited and highly coveted, are valuable

12   because they are limited and, in fact, may constitute the

13   object of the alleged conspiracy.  Furthermore, evidence and

14   argument that any of the defendants took an admissions spot

15   from another student is directly relevant to the instant

16   charges in that it is probative of the fact that the University

17   of Southern California has a vested interest in admitting only

18   those students who are qualified.

19          13, because the term, quote, entrapment, unquote, is a

11:30 20   term of art, this Court will allow the government's motion to

21   preclude entrapment defense, docket 2003, to the extent it

22   seeks to prevent defendants from using that term in front of

23   the jury when challenging the recorded conversations with

24   Singer other than when quoting Singer.  To the extent the

25   motion seeks not to prevent defendants from attacking the

credibility -- I'm sorry.  I'll say that again.  To the extent

the motion seeks to prevent defendants from attacking the

credibility of the phone calls with Singer, however, that

motion will be denied.

Indeed, as this Court has stated in a prior memorandum

and order, to the extent the defendants are dissatisfied with

Singer's purported denials of any wrongdoing in connection with

his rehearsed telephone calls, they will have ample opportunity

to cross-examine him if and when he testifies at trial.

Whether Singer's calls in October of 2018 were consistent with

his prior representation of his program and whether they

demonstrate that defendants believed their payments to be

legitimate donations rather than bribes is an issue squarely

for the jury after a trial on the merits.

14, the Court will resolve the government's motion to

preclude and limit defendants' proposed expert testimony,

docket No. 2006, as follows:  With the government's motion to

exclude the testimony of Kent Kiehl, Ph.D., that motion is

allowed subject to reconsideration.  The Court does not

comprehend how expert testimony analyzing a witness's

psychological condition has any relevance to a defendants'

state of mind or the element of scienter.  If defendants choose

to pursue that argument, they may file a brief supplement to

this motion within a week to which the government may reply

within a week, limited to five pages each.

1          B, the government's motion to exclude the testimony of

2    Kent John Chabotar, Ph.D. and William Tierney, Ph.D. is denied

3    without prejudice.  How higher education in the United States,

4    a multi-billion dollar industry, operates is information not

5    necessarily obvious to a layperson and may help the jury assess

6    the defendants' state of mind in this case.  That said, the

7    Court will not permit a sideshow on this subject and will

8    sustain the government's objection if it goes too far.

9          Finally, regarding the government's motion to limit

11:33 10    but not foreclose the testimony of Richard Speier, that motion

11    is allowed.  While defendants may utilize expert testimony to

12    establish the proper investigative procedures that apply to the

13    work of federal agents, the Court will not permit an expert who

14    is not present during the investigation to offer an opinion

15    that agents attempted to influence Mr. Singer to provide

16    untruthful testimony.

17          15, the government's motion to preclude the

18    introduction of judicial statements regarding credibility,

19    docket 2007, is allowed, in part, and denied, in part.

11:34 20    Although defendants' cannot introduce extrinsic evidence of any

21    judicial statements regarding the credibility of Timothy

22    Brunold, Dean of the University of Southern California

23    Admissions, they will be permitted to inquire on

24    cross-examination whether the witness's credibility has been

25    questioned by a judicial officer without being allowed any

follow-up.  See Federal Rule of Evidence 608(b).

16, the government's motion to preclude defendants' use of a coconspirator's statements other than for impeachment, docket 2008, is denied without prejudice.  The government requests an overbroad exclusion of evidence and makes the request completely out of context, so the issue will be dealt with at and within the context of the trial.

17, the government's motion to preclude evidence and argument seeking jury nullification, docket 2009, is denied as moot.  Its requested relief is sweeping and out of context and the defendants concede they will not raise a jury nullification defense.  Nevertheless, defendants are forewarned that this Court will not allow any evidence or argument pertaining to the health, details of arrest, or the collateral consequences of a conviction of any defendant because none of that evidence is admissible under Federal Rules of Evidence 401, 402, and 403.

Furthermore, while defendants may under certain circumstances present evidence showing the general admissions practice of the subject university, the Court will permit neither, one, a collection of mini trials, nor, two, any mention of selective prosecution, which, like entrapment, is a term of art and should not be used arbitrarily.

18, defendants' motion to exclude evidence post-dating Rick Singer's cooperation with the government, docket 2011, is denied without prejudice.  The question whether the alleged

1    conspiracy ended when Mr. Singer began cooperating with the

2    government is a question of fact for the jury.  As I have said

3    before, the government has charged a conspiracy that continues

4    after Mr. Singer began cooperating.  If they prove it,

5    post-cooperation evidence is admissible.  If they can't, the

6    jury or the Court will tell you.

7         Finally, 19, defendant Wilson's motion to exclude

8    evidence of testing accommodations, docket 2013, is denied as

9    moot.  The government agrees that it will not introduce

11:37 10   evidence in its case-in-chief regarding such accommodations

11    because Mr. Wilson is not charged with participating in that

12    portion of the charged scheme.

13         To the extent the government seeks to reserve the

14    right to introduce such evidence, one, to respond if defendants

15    open the door by putting certain accommodations at issue

16    and/or, two, to show on cross-examination of the defendants

17    their knowledge of and involvement in their children's

18    education and college application process, the Court will hold

19    the motion in abeyance until it is in a better position to rule

11:38 20   on the admissibility of such evidence in the context of the

21    trial.

22         I will now hear from counsel on those latter rulings,

23    if any.

24         MR. KELLY:  Your Honor, two things.

25         THE COURT:  Mr. Kelly.

1      MR. KELLY:  Yes.  First of all, as the Court said from

2  the outset here, this case has been pending for two and a half

3  years.  The government had a court order to give us a witness

4  list in the middle of July.  Now they're telling the Court and

5  us they don't know if they're calling Rick Singer, their key

6  witness, their star witness, who they predicated this whole

7  investigation on.  They dropped a footnote.  It's going to

8  cause a lot of wheels spinning and a waste of time if we have

9  to prepare or and present evidence, and they won't tell us

11:38 10  whether they're calling their main witness.

11      So, I think, in fairness to the process and to

12  expedite matters, the Court should instruct them to make a

13  decision.  They've had two and a half years whether to call

14  this guy.  He's their key guy.  We should know.  I think, as

15  the Court just indicated, some of its rulings here today is

16  predicated upon the notion that we're going to have ample

17  opportunity to cross-examine him at trial.  That may well

18  inform the Court's rulings on some of these evidentiary matters

19  as we go forward.  So that's number one.

11:39 20      Number two, I understand the Court's ruling on

21  Brunold.  608(b) is a clear rule.  We're not going to try to

22  present extrinsic evidence of the magistrate's ruling on

23  credibility.  Just so I'm clear, we can certainly inquire

24  whether or not he's aware that a court has made an adverse

25  finding about his credibility before this trial.  Is that the

```
 1   Court's ruling?
 2          THE COURT:  Is that the way you interpret my ruling?
 3          MR. KELLY:  I think I would clean up those questions,
 4   Judge.  It's clear that they did.  So if he denies it, we'll
 5   make a different motion.
 6          THE COURT:  Okay.
 7          MR. KELLY:  Thank you.
 8          THE COURT:  Mr. Frank.
 9          MR. FRANK:  Your Honor, as we indicated in our
11:40 10  pretrial memorandum, we have agreed, effectively, with the
11   defense's proposal that we give them 2 days heads up on who our
12   witnesses are going to be.  They want it by 4:00 p.m. of the
13   close of business 2 days before.  We suggested 6:00 p.m. to
14   give us a little time to get back from court and figure things
15   out.  We have not made a final decision about any particular
16   witness.  We have a witness list.  It's been prepared in good
17   faith.  We intend to call witnesses off that list, just like
18   they have a witness list that we assume they've prepared in
19   good faith and intend to call witnesses off that list.
11:40 20         As to any witness, we don't view one witness as
21   particularly different from another witness.  We will make a
22   game-time decision of who we're calling depending on how the
23   evidence is coming in.
24          MR. KENDALL:  Your Honor, if I could be heard briefly
25   on the topic.  When the government first gave us their witness
```

list, they said it was going to be a 6-week trial for their
case.  They now have told the Court that they think it's
somewhere in the range of 3 weeks.  They've clearly cut out a
lot of witnesses from their witness list or they couldn't in
good faith tell you 6 weeks and then move it to 3 weeks.  They
have a right to make game-time decisions and to have their
options open.  On the other hand, they clearly have eliminated
some witnesses.  If they could just give us what's their
present good faith witness list to comport with their change in
estimates of time, that would be very helpful, your Honor.

THE COURT:  All right.  Let Mr. Frank respond to that.

MR. FRANK:  Your Honor, two defendants have pled
guilty since we prepared that witness list, so obviously we're
not going to be calling witnesses relevant to those defendants.
We're also hoping that there will be some agreement as to the
authentication of documents so we don't have to call a half
dozen keeper of records to get those documents in, as to which
there's really no dispute as to authenticity.  Many of those
same type of records are on the defense exhibit list.  So we're
happy to provide an updated witness list.  We're happy to
provide an updated exhibit list.

We hope, in light of the Court's rulings, the defense
will also provide an updated and useful exhibit list given that
their exhibit list as is has 2,500 exhibits and serves no
practical value to anyone looking at it.

            1          THE COURT:  That's the purpose of a final pretrial

            2    conference, to focus the issues.  I expect that counsel will

            3    act in good faith and will make a serious effort to limit the

            4    amount of documents that are going to be introduced and to

            5    inform opposing counsel as to the current understanding as to

            6    witnesses without prejudice to being able to change in

            7    midstream because something has come up or some witnesses

            8    testified in a certain direction.  Nobody has to make an

            9    absolute final declaration of who they're going to call as

    11:42  10    witnesses before trial.  We all know that.

           11          On the other hand, it is necessary for opposing

           12    counsel to prepare cross-examination, and you ought to act as

           13    officers of this Court in good faith to see that this case is

           14    tried properly and correctly under the Federal Rules of

           15    Evidence.  Okay?

           16          Mr. Kendall?

           17          MR. KENDALL:  This is more of a courtroom etiquette in

           18    light of your rulings.  You've made certain rulings that allows

           19    the government to make arguments that, I assume, they'll raise

    11:43  20    in their opening.

           21          THE COURT:  Openings are not arguments.  I'm not going

           22    to allow openings to be arguments.  I'm going to get to this at

           23    a later point when we talk about how long you're going to have

           24    to open.  If you can't say I expect the evidence will show, et

           25    cetera, et cetera, then you shouldn't be saying it in an

1     opening.  An opening is not a second argument.  I tell the jury

2     that very clearly in my opening instructions to them.  Just in

3     response to, argument is not going to happen at an opening.

4          MR. KENDALL:  I misspoke.  I apologize, your Honor,

5     for sloppy language.  I expect they'll give a preview of the

6     evidence consistent with your rulings, some of which we have

7     opposed and objected to.  I just want to know how do we

8     properly preserve our objections without being discourteous.

9     Do you want us to object after the opening is all done?  I

11:44 10    don't want to stand up in an opening and object.

11         THE COURT:  First of all, you ought not be saying

12    things in your opening that are objectionable.  You ought to be

13    able to talk to one another about what it is that you're going

14    to say in your openings.  And if there is a problem, bring it

15    to my attention before the opening happens.

16         MR. KENDALL:  Your Honor, I'm asking something

17    slightly different.  I expect Mr. Frank will act consistent

18    with your rulings on the motions in limine.  We need to

19    preserve appellate rights.  We accept your ruling with respect,

11:44 20    but we just need to reserve our appellate rights.  I don't want

21    to interrupt his opening to preserve an appellate right.  I

22    want to know if I do it at side bar.

23         THE COURT:  You can do it at side bar after the end of

24    the opening or can object to my rulings on the in limine

25    motions.

```
 1              MR. KENDALL:  You mean to object today to the Court's
 2        rulings?
 3              THE COURT:  If you want to.
 4              MR. KENDALL:  To put it succinctly, we'd object to
 5        everything you've ruled against us to preserve our rights.  I
 6        don't want to be too clever about it.  We would object.  If
 7        you'd like, we can file something in writing to preserve that.
 8              THE COURT:  You can do that.
 9              MR. KENDALL:  I don't want to take up your time with
10        it today, your Honor.  You've ruled and we respect that.  We
11        need to protect ourselves.
12              THE COURT:  Any way you think you need to preserve the
13        appellate record, you should.
14              MR. KENDALL:  We may ask to see you after.
15              MR. KELLY:  Respectfully, your Honor.  I'm not
16        agreeing to that, with my co-defense counsel here.  If there's
17        something in opening, which I don't anticipate, if the
18        government says something that's inappropriate, I'm going to
19        object then and there.  I'm not going to be discourteous.  I'll
20        try not to be discourteous, but I'm not going to go along with
21        we're not going to object if they do something improper in
22        opening.  I don't suspect they will.
23              THE COURT:  I don't think anybody is anticipating
24        improper conduct by either the prosecution or defense counsel.
25        That's the way I operate.  I don't expect it and I don't want
```

11:45  (line 10)
11:46  (line 20)

           1   it to happen.  Okay?  Anything else with respect to the rulings

           2   on the in limine motions?

           3          MR. DICANIO:  Your Honor, this is Jack DiCanio.  I'd

           4   like to just go back to the ruling on 202, the admissions slot

           5   motion.

           6          THE COURT:  Wait, Mr. DiCanio.  You mean 2002?

           7          MR. DICANIO:  Yes.  My apologies.  It's the motion on

           8   the admission slots.

           9          THE COURT:  All right.  Yes.  Go ahead.

   11:47 10          MR. DICANIO:  Your Honor, I just want to make sure

          11   that we're all clear and, in particular, the government is all

          12   clear, as to what you're allowing and what you're not allowing.

          13   Based upon their proffer and their motion, I would expect that

          14   the admission spots that they're talking about are not general

          15   admission spots, meaning the applications that nonathletes

          16   submit to USC.  These would be admission slots relating to

          17   athletes, point number one.  Point number two, it would be

          18   limited to admission spots on the teams that are relevant in

          19   the case.  So, in this instance, it would be the football,

   11:48 20   water polo and women's basketball team.  Your Honor, that's

          21   what's at issue in the case.  If there is a limitation for

          22   spots, it's certainly not the general admission pool.  I think

          23   the government should be so limited.

          24          Lastly, your Honor, you made a comment that USC has a

          25   vested interest in admitting only qualified students.  I think

that's the point that we're trying to make here, that USC is a

private institution.  They made choices for admissions based on

a number of different factors.  The generosity of parents was

one.  That's what all of those athletic department documents

that we're trying to get in show.  That's what the testimony

we're trying to get in show.  It wasn't only interested in a

certain type of qualification for the government, the academic

or athletic qualifications, it was also with respect to

donations.  That's going to be an issue for the jury to decide.

11:48 10    And we think the evidence we're trying to get in proves that in

spades.  Thank you for your consideration.

THE COURT:  Mr. Frank, do you wish to respond?

MR. FRANK:  Just briefly, your Honor.  We understand

your Honor's ruling to be that this case is about the

defendants' intent and their knowledge and that you are going

to constrain the evidence to evidence that is relevant to that

point.  If they didn't know something that was going on beyond

the scenes with respect to other people who were not at issue,

then it cannot have influenced their intent.

11:49 20    With respect to the admission spots, the evidence will

show that this was a scheme to obtain spots that were reserved

at the discretion of coaches for recruited athletes.  That's

what the evidence is going to show and that's what we're going

to argue.

THE COURT:  Mr. Kelly?

1    MR. KELLY:  I think he's urging the Court to go places

2    it shouldn't go.  It will be reversible error if we're not

3    allowed to defend ourselves on the good faith process our

4    clients had.  The fact is, the reasonableness of that good

5    faith needs to be tested.  If, in fact, they thought A was

6    happening and A was happening, that's a defense.  So we're not

7    looking to put in thousands of documents to show that A was

8    happening, i.e. USC was funneling kids to school through this

9    process, rich kids.  We just need some examples to show the

11:50  10  good faith reasonableness of their beliefs.  I'd urge the Court

11    to consider that when we present the exhibits that we

12    ultimately present.

13    MR. KENDALL:  Your Honor, if I may add but not repeat.

14    There's a second line that's equally important, the defense

15    alluded to a little bit earlier, that has nothing to do with

16    our intent and good faith, which is an important consideration.

17    It's if we're stealing the honest services of USC, it means

18    we're getting the employees to do something that the university

19    does not want them to do.  We, therefore, have a right to show

11:50  20  that the university does want them to do this, that this is the

21    official policy of the athletic department, and it's been

22    approved by various people who work with it to show that these

23    people are not stealing their honest services.  They're doing

24    their job in a way that they're being commended and respected

25    for.  And that's directly relevant, your Honor.

```
 1              THE COURT:  Mr. Frank.
 2              MR. FRANK:  It's a conspiracy that's alleged, your
 3     Honor.  It's a conspiracy to steal.  So the relevant question
 4     is did the defendants have a knowledge and intent to join a
 5     conspiracy to steal honest services from somebody else, not
 6     even did it actually happen, but whether they inspired to make
 7     it happen.
 8              MR. KENDALL:  Your Honor, the documents we're looking
 9     to show in this conspiracy, supposed conspiracy, include
11:51 10     something I think you're going to be dealing with later, Pat
11     Haden, the director of athletics.  They do not allege in their
12     filings he is a member of the conspiracy.  He is not identified
13     as an unidentified conspirator.  He is a person who is on the
14     board of trustees and on the athletic department and in charge
15     of the athletic department fundraising.  We will prove that
16     before he ever met Singer he was doing a side door type
17     operation where people could donate to get their kids in, both
18     on the VIP and the SUBCO list, and after he met Singer and knew
19     what Singer was doing, he had people to continue to work with
11:52 20     Singer as part of this overall fundraising scheme.
21              I actually have a couple of documents that are on
22     point.  May I hand them to the clerk?
23              THE COURT:  To what end?
24              MR. KENDALL:  It shows his role in fundraising and
25     having his people work with Singer.
```

1          THE COURT:  Relevant to any of the in limine motions

2     we've been discussing?

3          MR. KENDALL:  Yes, your Honor.  It shows this was

4     the providing of honest services by doing the fundraising, so

5     it's separate from the state of mind of the defendants.  The

6     same evidence also shows he was fulfilling the honest services

7     of the university by doing the fundraising with Singer and

8     other people.  It was a widespread practice of which Singer was

9     only a small part of.  So we can't steal the honest services if

11:53 10     we're actually part of the fulfillment of the honest services

11     of the fundraising from parents of applicants.

12          THE COURT:  Mr. Frank?

13          MR. KENDALL:  May I hand them up to the clerk?

14          THE COURT:  Mr. Frank, do you object?

15          MR. FRANK:  I don't think your Honor has ruled on Pat

16     Haden.

17          THE COURT:  This is not before the Court today so I'm

18     not going to take those documents.  Mr. Frank?

19          MR. FRANK:  The other point is it's a conspiracy to

11:53 20     steal honest services.  Whether or not they could be stolen is

21     a different question.  It was a conspiracy to do so that's

22     alleged.  The defendants' intent is what's at issue.  If they

23     had a good faith basis for believing that Pat Haden did

24     something, then they'll be permitted, as I understand it, to

25     introduce evidence of what they knew with respect to what

1    somebody else was doing.  If they didn't know it, it can't be

2    relevant to their good faith.

3         MR. KENDALL:  Your Honor, if I may add one thing.  If

4    they put in evidence that they knew this was going on and they

5    thought it was going on, then they're certainly entitled to

6    show that they're not making it up but, in fact, their good

7    faith belief is an accurate belief and it is consistent with

8    what the university is doing.

9         THE COURT:  So this is something I rule on after

11:54 10   they've testified or there's been evidence introduced that they

11    knew about Mr. Haden's activities, right?

12         MR. KENDALL:  They knew about the university athletic

13    department activities.

14         THE COURT:  That's a question that's going to come up

15    at a point in trial and it will be in context, right?

16         MR. KENDALL:  Hopefully, your Honor.

17         THE COURT:  That's when I'll deal with it.

18         MR. KELLY:  One more point.  The Joselyn case in the

19    First Circuit case that we cited in our jury instructions, it

11:54 20   talks about the condonation defense is permitted in the First

21    Circuit.  I think a lot of exhibits we introduced goes to that,

22    so we would ask the Court to consider that as well.

23         MR. DICANIO:  If I could make one more point.  I know

24    we're harping on this issue because, as Mr. Kelly said, it is

25    critically important to our defense.  What the government's

trying to do is they're trying to show a process, an admissions
process at USC, but not the complete process, not a certain
element of the process.  What we're trying to do is show the
complete process, which includes consideration of donations.

Also, your Honor, we also have the ability and a right
to argue immateriality.  If the athletic department was
proceeding with full knowledge of who these students were and
whatever limitations they might have and still proceeded to
move for their admission, that certainly goes to the
materiality of whatever statements the government is trying to
prove is false.  So, your Honor, I think that also needs to be
considered.

THE COURT:  Wish to respond to that, Mr. Frank?

MR. FRANK:  We're not trying to show a process, your
Honor.  We're not putting on a case about USC's admission
policies.  We're putting on a case about these defendants'
knowledge and intent to secure their children's admission using
payments to facilitate their admission as something they were
not, which is recruited athletes.  It's about these defendants,
what they were trying to do, and not a process at USC.

THE COURT:  You've heard my comments and my rulings
and we're going to let it stand at that.  We'll now proceed to
some other issues.  I have reviewed the numerous objections
filed by each party to the other's witness and exhibit lists.

The defendants' objections to government's witnesses

```
 1   who are associated solely with two individuals who were

 2   defendants in this case at the time the witness lists were

 3   filed but have since pled guilty is sustained.

 4        The Court will also sustain defendant Abdelaziz's

 5   objection to government's Exhibit 518, an e-mail attaching his

 6   12 page Wells Fargo bank statement from March of 2018, unless

 7   the government redacts all nonrelevant information.

 8        All remaining objections are overruled because they

 9   are conclusory and fail to provide the Court with adequate
```
11:57 10   context on which I can base any ruling.
```
11        We need to proceed to other scheduling matters.

12        MR. KENDALL:  May I address something you just ruled

13   on?

14        THE COURT:  Yes, Mr. Kendall.

15        MR. KENDALL:  Your Honor, as my notes have it, maybe I

16   got it wrong, I believe you ruled that for the two defendants

17   who have pled and left the case you're going to sustain the

18   objections to their exhibits?

19        THE COURT:  That's what I said.
```
11:57 20        MR. FRANK:  I thought you said witnesses.  They're
```
21   coconspirators in the case, so exhibits relevant to them may be

22   relevant.  We're going to evaluate that.

23        THE COURT:  You want me to read it again?

24        MR. KENDALL:  My notes were not good, your Honor.  It

25   would be very helpful to me.
```

```
 1              THE COURT:  Defendants' objection to government's
 2    witnesses who are associated solely with two individuals who
 3    were defendants in the case at the time the witness lists were
 4    filed but have since pled guilty is sustained.
 5              MR. KENDALL:  I should be quiet and sit down.  Thank
 6    you.
 7              THE COURT:  Mr. Frank, you have recently changed your
 8    estimate of time to two to 3 weeks, and that is with respect to
 9    these three defendants, right?
11:58 10             MR. FRANK:  Yes, your Honor.
11             THE COURT:  Then it seems to me that I ought to be
12    able to tell prospective jurors that this is more in the nature
13    of a 4-week trial than a 6-week trial, correct?
14             MR. FRANK:  Correct.
15             THE COURT:  Do defendants agree with that?
16             MR. KELLY:  Your Honor, I hate to keep beating the
17    drum.  Singer is the key witness.  He could be on
18    cross-examination for a week and a half or 2 weeks if they call
19    him.  If they keep equivocating as to whether -- to make their
11:59 20    decision to call a witness, that affects the length of trial.
21             THE COURT:  They told me it's a two to 3-week case for
22    the government's case-in-chief.  I don't ask them what
23    witnesses it's going to be they think they need to call.  I'm
24    going to take that as a good faith estimate of what the
25    government thinks they need to put on their case-in-chief.
```

1          MR. DICANIO:  Your Honor, this is Jack DiCanio.  I'm a

2    little concerned with that estimate only because I know from

3    Mrs. Palatella's perspective, we have several witnesses that we

4    are likely to call from California.  I would ask maybe that the

5    estimate be more like 5 weeks than four, your Honor.

6          THE COURT:  I'll consider that.  I think parties

7    understand the way this session works is that we start at about

8    9:00 a.m. every morning.  We have a morning break somewhere

9    around 11, not exactly at 11, but at an appropriate time.  We

12:00 10    go to 1 o'clock, break for lunch until two.  Then usually we go

11    until three or 3:30, but never after. 3:30.  That is the

12    standard procedure.

13          We don't do that every day.  Sometimes the Court has

14    afternoon business I need to attend to so we don't have an

15    afternoon session.  And there will be days in September on

16    which we will not be in session.  One is the Jewish High Holy

17    Day of Yom Kippur, which I'm not sure the exact date, but it's

18    in the second week of this trial.  We will not be on trial that

19    day.  Then, at the very end of the month, the Court has duties

12:00 20    as a panelist on the judicial panel of multidistrict

21    litigation.  I will be out of the state on Thursday,

22    September 30th and Friday, October 1st.  There may be other

23    dates that I will advise counsel of, but the procedure will be

24    nine to three each day.  So you can kind of understand that.

25          Now we need to discuss the empanelment procedure,

 1    including the anticipated length of opening statements.  I do

 2    need to inquire one last time because, as we have determined

 3    before, Wednesday, September 8th is the second day of Rosh

 4    Hashanah.  I understand that everybody agrees that we are going

 5    to start the process that day.  If there are any prospective

 6    jurors that observe the second day, they will be postponed

 7    until the third day because we're going to have 2 days where

 8    we're going to be calling in jurors.  That is my understanding.

 9    Is there any reason for me to not go forward in that regard?

12:02 10          MR. KENDALL:  Fine, your Honor.

11          MR. FRANK:  Same, your Honor.

12          THE COURT:  So we are going to submit a questionnaire.

13    You have a prepared questionnaire.  Before we adjourn today,

14    I'm going to try to get to those questions that you haven't

15    agreed upon.  You've agreed on most of the question.  I think

16    there are 45.  There about five each that you've proposed.

17    We'll talk about those.

18          I have the jury clerk.  I'm not going to put him on

19    right at the minute.  He is going to help explain how we are

12:02 20    going to do the process.  We are going to summons in roughly

21    two groups of 100 on that first Wednesday, September 8, one

22    group in the morning and one group in the afternoon.  Once the

23    morning group arrives, I will give the prospective jurors a

24    brief summary of the case and hand out the questionnaire.  Of

25    course counsel may be present, and probably should be present.

1    We're going to do that in the jury assembly lounge down on the

2    second floor.

3        The clerk's office will then copy the completed

4    questionnaires and give the answers to the parties somewhere

5    around noon.  The parties will have until about 4:00 p.m. to

6    review the questionnaire to determine whether they agreed to

7    strike any jurors for cause, at which point they will inform

8    the Court of their decisions.  Then the Court will inform the

9    clerk's office which jurors to call in the following day.

12:04 10        To interrupt for a moment, what that means is you're

11    not going to get a list four or 5 days in advance.  That is not

12    the way our system works.  You will get all of their

13    questionnaires in time to review them and over night to

14    determine whether or not you have some reason to object to

15    their continuing to sit as jurors.

16        As to the second group, they will arrive at around

17    1:00 p.m. on that first day.  The Court will provide them the

18    same sort of an opening, give them the questionnaire, give them

19    a chance to answer the questions, and then we will get their

12:04 20    answers somewhere in the late afternoon.  The parties will have

21    until the following morning to review those answers.

22        Then, the following day, that is Thursday,

23    September 9th, the parties and the Court will convene in one of

24    the large courtrooms, it won't be this courtroom, and conduct

25    an individual voir dire of the prospective jurors that remain

1    from the first group.  Empanelment -- we're hoping but we don't

2    know out of the 100 that we get 60 back out of each group of

3    100.  Empanelment will continue until roughly 40 prospective

4    jurors are so-called cleared.  Then the Court will bring the 40

5    cleared jurors back and give the parties an opportunity to use

6    their peremptory strikes until 16 jurors are selected, four of

7    whom will be alternates.  I've decided that we will go with 16

8    rather than 18, just simply because I think that number is

9    sufficient.

12:05 10        Under the rules, the defendants will have 12

11    peremptory challenges.  The government will have eight.  With

12    respect to the selection of alternates, I have empanelled for

13    many, many years in a way that's slightly different than called

14    for by Federal Rule of Criminal Procedure 24.  In other words,

15    I empanel all 16 under one system and I don't require counsel

16    to exercise their peremptory challenges the first 12 and then

17    have a separate empanelment of the four alternates.  I do that

18    because I like to have the 16 jurors participate as equals

19    during the course of the trial.  We know who the alternates are

12:06 20    but they don't.  The four alternates are the ones who are

21    seated last, that is the 13, 14, 15, and 16th jurors will be

22    respectively the first, second, third and fourth alternates.

23        So when we get to the point where we have 40 cleared

24    jurors, we come back into this courtroom and my deputy clerk

25    chooses the jurors at random out of a hat, if you will, and

they are seated in the jury.  Then, if peremptory challenges

are exercised against any of those 16, of course they are

replaced.  As they are replaced, we keep track of who is there

first.  The four last persons are the four alternates.  They

are not designated as alternates from day one, but you and I

know who they are and know their order of all the alternation,

if you will, alternatees.

That is a system slightly different than that called

for in Rule 24.  It does allow counsel to exercise any of their

peremptory throughout the process rather than ten and six for

the jurors and two whatever it is that go with the alternates.

Is that acceptable to counsel?  Mr. Frank?

MR. FRANK:  It is, your Honor.  Quick question.  My

understanding is we'll get the questionnaires back in the late

afternoon and then have over night to review them?

THE COURT:  You'll get them in two separate tranches,

if you will.  We're going to give the first questionnaire out

at about 9 o'clock in the morning.  We expect to get it back at

12.  You'll have that first at 12.  You'll have until 4 o'clock

to agree amongst yourselves as to who we'll excuse just on the

basis of written questions and who we will invite back the next

day.

Then the second group comes in and their

questionnaires won't be available until about 4 o'clock.

You'll have those questionnaires overnight.  Then you'll be

1    able to tell us as to which ones you will agree to call in.  At

2    this point, I think maybe Mr. McAlear better be put on so he

3    can correct me where I've made a mistake, if I've made some.

4         Mr. McAlear.

5         MR. MCALEAR:  Hello, your Honor.  Everything sounds

6    exactly as we had discussed it earlier.

7         THE COURT:  So the second group of questionnaires

8    counsel will get at about 4:00 in the afternoon on Wednesday

9    afternoon, is that right?

12:09 10        MR. MCALEAR:  That's been how the process has worked

11    in the past.  We're always subject to the few straggling jurors

12    that want to write more than others, but we should have them by

13    4 o'clock.

14         THE COURT:  Counsel will have them overnight and be

15    able to determine which ones they agree should be excused and

16    which ones should not.  How is that second group notified as to

17    coming in on Friday?  Oh, that's right.  That's Thursday.  They

18    would be summonsed to come in on Thursday.

19         MR. MCALEAR:  That's right.

12:10 20        THE COURT:  We're working with 3 days, not two,

21    Wednesday, Thursday and Friday of that first week.

22         MR. FRANK:  Would your Honor like us to be here first

23    thing Wednesday morning or?

24         THE COURT:  I'm going to be greeting jurors, so I

25    think it would be appropriate for you to be here.

1        MR. FRANK:  I didn't understand if they were being

2   handed questionnaires.

3        THE COURT:  I'll make brief remarks.  Mr. McAlear may

4   supplement what I say as to how to do the questionnaires and

5   how to turn them in.  Then they will be set free to write their

6   answers and we will be excused.  Then we'll do the same thing

7   at 1 o'clock.

8        MR. FRANK:  Thank you, your Honor.  The other question

9   I have is whether the government would be permitted to run

12:10 10 criminal history checks on those jurors, provided we share

11  results.

12       THE COURT:  I would think both sides may want to do

13  that.  I think that's the concern of all counsel.  They'd like

14  to have a little time to run that information.  Is that

15  correct?

16       MR. KELLY:  Yes, your Honor.  Once they're seated in

17  the box, if I change my mind, can I go back and strike one?

18       THE COURT:  We have a rule that after the first round

19  of strikes, you can't strike somebody.  In other words, there

12:11 20 are no back strikes.  In the first round, let's say, for

21  instance, we put 16 in the box and we exercise the challenges

22  outside the hearing of the jury.  I don't know exactly how

23  we're going to do that in these circumstances, but they're

24  exercised outside the hearing of the jurors.  I allow

25  peremptory to be exercised one at a time.  If the government

1    has a peremptory challenge, they'll exercise it.  Then we'll go

2    to the defendants.  They'll exercise one.  We go back and forth

3    until both sides are satisfied that first round.

4         For instance, maybe the government has challenged

5    three and the defendants have challenged five.  We've gotten

6    rid of eight of the 16.  Those eight cannot be challenged in a

7    later round.  They're there.  But you can exercise your

8    peremptories at any point in the process.  You can use those

9    five challenges with that 16 or you can use eight or ten with

12:12 10   that first 16, understanding that you only have so many for the

11   second round.  It's only the newly replaced eight that have

12   replaced the eight stricken before as to which you can use your

13   subsequent strikes.

14         MR. KELLY:  Thank you, your Honor.

15         THE COURT:  Everybody understand that?  Is that

16   agreeable to defense counsel?  I didn't get the agreement of

17   Mr. Kendall.

18         MR. KENDALL:  Yes.  Agreeable, your Honor.

19         THE COURT:  Mr. Loucks?

12:12 20   MR. LOUCKS:  Yes.

21         THE COURT:  Mr. Kelly?

22         MR. KELLY:  Yes, your Honor.

23         THE COURT:  As you know, the alternates may end up in

24   seats 3, 11, 9 and 14.  You will know who they are.  At the end

25   of the trial, if we had to replace one of the jurors, those

1    four alternates are excused but allowed to stay in a separate

2    room in case we need to utilize their attendance later.

3            Openings.  I see no reason why we can't go with a

4    45-minute opening with the government and each defendant having

5    30 minutes.  As I said before, openings are not alternate

6    arguments and they're not to be used as such.  They should

7    respond to that preamble I said, the evidence will show.  If

8    you have anything beyond that, you shouldn't say that.  So

9    45 minutes for the government and 30 for each defendant for

12:14 10  openings.

11            The Court intends to try this case in this courtroom,

12   that is Courtroom 4, with two overflow courtrooms likely,

13   Courtrooms 6 and 7.  The trial will also be streamed via Zoom

14   and we have yet to hear back from our folks as to extra space

15   for attorneys.  I expect that we will have roughly 50 people in

16   this courtroom.  The way I get there is 16 jurors, roughly

17   seven court personnel.  That's me, my courtroom deputy, the

18   courtroom reporter, about three of my clerks.  With the

19   parties, it will be three prosecutors, two counsel at table

12:15 20  with the defendants.  If I'm right, that's 12 people in the

21   well.  12 and 16, 23.  Am I right?  Maybe I'm missing something

22   here.  Anyway, it -- that's not correct.  16, 7 is 23.  12 is

23   35.  That will leave roughly 15, well, a witness, 36, will

24   leave roughly 14 people for the gallery.  That can be --

25            We're going to have to have some availability for the

 1    public to be in the courtroom, but there will be satellite

 2    courtrooms both for extra counsel, paralegals, family members,

 3    whatever.  Counsel can make proposals to me about that if they

 4    wish.  I think that's where we're headed, roughly 50 people in

 5    the courtroom.  Any comments on that?

 6              MR. FRANK:  Your Honor, I think your Honor said three

 7    prosecutors at the table.  There are actually four on the case.

 8    We can either squeeze or perhaps somebody can sit in the back.

 9              THE COURT:  I think somebody would be able to sit in

12:16 10    the back.  Prosecutors have three.  Each defendant has two

11    counsel plus the defendant.  So there are going to be three

12    people at each of the tables.  That's 12.

13              MR. FRANK:  And paralegals.

14              THE COURT:  Paralegals may have to be in the satellite

15    courtroom.  You make a proposal to me as to how you feel the

16    gallery ought to be handled and I'll consider it.

17              MR. FRANK:  Typically, there's a paralegal operating

18    the trial director.

19              THE COURT:  Consult with one another.  If you can

12:16 20    unanimously come to me with a proposal, I will give it serious

21    consideration.  Mr. Kelly?

22              MR. KELLY:  We'll do that.  We'll talk to the

23    government and see if we can't get an agreeable proposal.

24              MR. KENDALL:  Your Honor, the one thing I think is

25    related to this, the government listed a large number of agents

1    that it wanted to have present in the courtroom.  We move to

2    sequester all of the witnesses.  I believe it's standard

3    practice for the summary IRS revenue agent to be able to be in

4    the courtroom because he's got to summarize the testimony.  I,

5    myself, may have a summary fact witness that's comparable.

6    They can be in the satellite courtroom, otherwise we would move

7    to have everybody sequestered.

8              THE COURT:  The government has filed a motion to

9    unsequester the case agents.  Enlighten me again, Mr. Frank, as

12:17 10   to who you have asked to not be sequestered.

11             MR. FRANK:  Case agent, revenue agent, summary

12   witnesses.

13             THE COURT:  How many people is that?

14             MR. FRANK:  Five people.

15             MR. KENDALL:  We object.  Particularly the case agent,

16   Miss Keeting, is a particular witness, particularly if

17   Mr. Singer is not testifying.

18             THE COURT:  Are they going to be witnesses?

19             MR. FRANK:  One case agent may be a witness, your

12:18 20   Honor, yes.

21             THE COURT:  Usually, prior to the testimony, the case

22   agent is sequestered, but after the testimony they are not.

23   Why don't you see if you can work out an agreement with counsel

24   on that one.

25             MR. KENDALL:  It sounds unlikely, but we will try.

1          MR. KELLY:  For the record, we join the sequestration

2    request.

3          MR. DICANIO:  Your Honor, may I be heard on the

4    opening statements?

5          THE COURT:  Yes.  This is Mr. DiCanio.

6          MR. DICANIO:  Yes.  We have requested for

7    Miss Palatella 45 minutes for the opening, so an additional

8    15 minutes.  I ask the Court to consider that. I understand

9    it's not a time for argument.  This is going to be the first

12:19 10   time that the defendants have told their story and what the

11   trial is going to look like.  There's an awful lot of media

12   coverage, a lot of statements by the government about what this

13   case is about.  Even a former prosecutor appeared in a

14   documentary talking about what this case is about.  This will

15   be the first time they hear it from us.  We shouldn't be unduly

16   limited in telling them what they're going to hear in this

17   trail.  We're only asking for an additional 15 minutes.  My

18   client has two different types of conspiracy we have to deal

19   with.  I think it's important we get our message early so the

12:19 20   jury can understand where we're coming from.

21          THE COURT:  Mr. DiCanio, in jury trials, stories are

22   told by witnesses, not by counsel.  30 minutes is enough for

23   counsel to summarize what he or she thinks the evidence will

24   show.  30 minutes is enough for each defendant.  That means the

25   defendants actually get twice as long as the government to make

1   their openings.  30 times three is 90.  That's twice 40.  The

2   government will get 45 minutes.  Each defendant will get 30.

3   If the defendants want to trade time with one another, they can

4   do that, but the total amount of time from the defendant side

5   will be no more than 90 minutes.

6          MR. DICANIO:  Your Honor, with all due respect, this

7   is a case where the government doesn't need much time at all.

8   The talking has been done by the media, who has a perspective

9   on this case.  I understand what you're saying.  It's time for

12:20 10  telling what the jury is going to hear, but it is a story, a

11  story of what happened.  We should have an opportunity to

12  outline that in sufficient detail so when the case starts, the

13  jury understands where the government is going and they

14  understand where we are going.  An additional 15 minutes is not

15  going to put us so far behind it will jeopardize the overall

16  timing the Court would like for the case.  So I ask that you

17  reconsider.

18          THE COURT:  The motion is denied.  You'll get

19  30 minutes.

12:21 20         Turning to your pretrial memoranda, the defendant has

21  asked about document admissibility issues.  They contend that

22  they have made several attempts to reach agreement with the

23  government regarding document admissibility issues, including

24  proposing a stipulation to the government that certain broad

25  categories of documents be deemed as authentic and/or business

```
 1   records.  Has there been any progress on this admissibility
 2   issue?  Mr. Frank?
 3            MR. FRANK:  It's not entirely clear, your Honor.  We
 4   responded to the defense proposal.  We agreed to the
 5   authenticity, to stipulate to the authenticity of some records,
 6   in particular, records we haven't seen.  The defense has
 7   indicated to us that they will only stipulate to the
 8   authenticity of certain records if we call Mr. Singer and if we
 9   commit to that now.  It's not clear to us, since there's no
10   serious dispute, that the calls on the wire are the calls on
11   the wire, that the e-mails that we obtained by searches are the
12   e-mails that we obtained by searches, that the voicemails from
13   Mr. Singer's phone are the voicemails on his phone, why a
14   stipulation to authenticity but not admissibility would be
15   conditioned on which witnesses we call, but that's the
16   situation we're in right now.  That's why we've moved to
17   preauthenticate all of those records based on certificates of
18   authenticity submitted by the keepers of those records.
19            THE COURT:  Is the defense going to oppose that
20   motion?
21            MR. KENDALL:  Yes, your Honor.  With respect to the
22   issue of the authentication of the tapes, we have filed motions
23   and affidavits at the time of the motions to dismiss where we
24   raised two issues: First, Singer did not record all of the
25   conversations that he had with my client, possibly others, and
```

**A602**

other people the government told him to tape record.  So the

tape recording was selective.

Second, Singer's notes indicate that he was told to

lie and say false things on the tapes.  We maintain that's

quite true, that a lot of the things he's saying are false

representations of prior events that the agents told him to do.

We don't think these tapes can be validated without having

Singer there to validate them because it's not just a question

of whose voice it is.  It's a question of whether or not the

tape, all the tapes have been kept and made or were some things

not recorded for certain purposes, and did Singer purposely put

in false, misleading information as he recorded in the written

notes that you said we'd have ample time to cross-examine

about.

So we think, your Honor, either the government tells

us they're going to call Singer to validate the tapes at trial

or there should be a hearing outside of trial to validate the

tapes, and we'll call Singer then as part of the evidentiary

hearing to decide whether or not the tapes are accurate and

reliable.

MR. FRANK:  All of those arguments go to weight, not

authenticity, of the recordings that were made.  There's no

serious dispute that those recordings are those recordings.

That's the only issue.

THE COURT:  Get your oppositions in sooner rather than

**A603**

1    later, Mr. Kendall.  I'll decide the motion on the papers.

2         MR. KENDALL:  We got their papers late yesterday.  If

3    we could have until next Friday to get to you, would that be

4    convenient with the court?

5         THE COURT:  Yes.

6         We've talked about jury selection, which was another

7    subject matter of the defendants' pretrial memorandum.  We've

8    talked about lengths of openings.  We haven't talked about the

9    protocol as to parties providing each other with their

12:25 10   witnesses on a particular day.  I think the only difference is

11   4:00 p.m. and 6:00 p.m.  I'll split the difference and say by

12   5:00 p.m., two business days in advance, each side will provide

13   to the other side the list of witnesses they intend to call.

14        Mr. Frank?

15        MR. FRANK:  Just briefly, your Honor.  There was a

16   slightly bigger difference.  The defense proposed business

17   days.  We proposed days.  Business days would require we tell

18   them on Thursday.  We were calling on Monday.

19        MR. KENDALL:  Your Honor, we want some semblance of a

12:25 20   decent weekend.  If they could tell us Friday 12 o'clock who we

21   have on Monday, he wanted to tell us Saturday night at

22   6:00 p.m., which I didn't think was that convenient. Friday at

23   12.

24        THE COURT:  What about that, Mr. Frank?  I think you

25   ought to be able to do that.

**A604**

1          MR. FRANK:  12 is the middle of the court day, your

2     Honor.  We'd like to assess what happens on trial, if we could

3     tell them after court at five.

4          THE COURT:  3 o'clock, close of the session, you tell

5     them.

6          MR. FRANK:  Thank you, your Honor.

7          MR. KENDALL:  Thank you, your Honor.  That's very

8     gracious.

9          THE COURT:  All right.  Summary charts, I think you

12:26 10   had a difference on summary charts.  The government was going

11    to say 5 days.  The defendants said 2 days.  Has that been

12    resolved?

13          MR. FRANK:  It has not.

14          MR. KENDALL:  The issue we have, your Honor, is we

15    don't know if we're going to put on a defense until they're

16    resting or close to resting.  So to say that we do it 5 days

17    before they rest, it just raises a Fifth Amendment issue that

18    we just can't deal with.  They need to have charts in

19    sufficient time so they can review them and understand them and

12:26 20   they can deal with them competently.  We thought 2 days would

21    give us enough play time to decide are we putting on a defense,

22    what are we putting on in that defense, and to get them the

23    chart.

24          THE COURT:  Mr. Frank?

25          MR. FRANK:  They're drafts, your Honor, that we're

1    requesting.  We're going to provide them.  We think they should

2    provide them as well.  I understand Mr. Kendall to say earlier

3    he already has summary charts.  I don't understand the issue

4    with drafts.

5         THE COURT:  This is something I shouldn't have to

6    resolve.  I'm going to say 3 days both ways provide charts

7    going to be used, 3 days hence.

8         Logistics, we're going to be, as I said before, in

9    this courtroom.  We're trying to provide other backup space for

12:27 10   attorneys.  The Wi-Fi information, that's all got to come from

11   the folks in the clerk's office that we will give you

12   information as soon as we have it.  Those are matters that I'm

13   not going to resolve here.  The government's pretrial

14   memorandum, we've already talked about their change in the

15   length of the case-in-chief, the two to 3 weeks.

16        I think we've covered all the other matters that are

17   mentioned in this one.  The government expects to provide jury

18   binders.  We've talked about case agents and the sequestration

19   order and Power Point presentations and overflow courtrooms.  I

12:28 20   think we have discussed each of those matters.

21        That leaves us then with the jury proposed

22   questionnaire.  You have agreed on 45 questions, some of which,

23   if you had not been in agreement, I would think is beyond what

24   you need to inquire of prospective jurors.  Like, for instance,

25   what magazines or newspapers they read, I would never authorize

**A606**

```
 1    that unless you both agree to ask that question.

 2           Question No. 20, that this trial is expected to last

 3    approximately 4 weeks, I'm not going to say four to 6 weeks.

 4    I'm going to do everything I can to make it happen.

 5           I normally do not ask jurors whether they have

 6    problems with the law, as you have in question No. 22.

 7    Prosecution has the burden of proving the defendant is guilty

 8    beyond a reasonable doubt.  A defendant does not have to prove

 9    that he is innocent.  Do you disagree in any way with that

10    principle?

11           I wouldn't ask that question because I instruct the

12    jury on what the law is.  I don't ask them whether they agree

13    or not with the law.  If you want to do that question and you

14    both agree to it, I will let it be asked.

15           On question 35, this is something that may have been

16    resolved already where you say, "Attached to this questionnaire

17    is attachment A, is a list of people who may testify at this

18    trial".  Then you ask the question, "Do you personally know any

19    of those people", answer yes or no.  They haven't told you

20    which ones they know.  So the question has got to be, if yes,

21    please describe who it is that you know and how you know them,

22    right, otherwise they can check the box yes and we wouldn't

23    know which of the 50 people they know?

24           MR. KELLY:  I think that was Mr. Frank's question.

25    We'll fix that up.
```

**A607**

1          THE COURT:  38, which refers to the case itself,

2    nobody, at least in this questionnaire, has identified this

3    case as the so-called "College Admission" or "Varsity Blues"

4    case.  I had suggested, have you ever commented on this case,

5    sometimes referred to as the "Varsity Blues" case or the

6    "College Admissions" case, in a blog, et cetera, et cetera.  I

7    think that ought to be added, although I will in my initial

8    remarks to the jury explain that.  So maybe it's not necessary.

9    They will have heard this an hour before I commented, so I

12:31 10    think it ought to be included in the written.

11          MR. FRANK:  Our concern was only "Varsity Blues" is an

12    FBI operational name.  The press has latched on to that name.

13    We understand your Honor would be describing the case to them,

14    so regardless of whatever name is in the media, it's whether

15    they've heard about this case.  We don't think they need to

16    hear the names "Varsity Blues".

17          MR. KENDALL:  For once, Mr. Frank and I both agree.

18    I'm afraid people will start Googling things.

19          THE COURT:  Fair enough.  Do the other defendants

12:32 20    agree?  Mr. Kelly?

21          MR. KELLY:  The documentary that we're concerned about

22    is called "Varsity Blues".  I'll discuss with my colleagues and

23    we'll submit something quickly to the Court on this issue.

24          THE COURT:  All right.  If you are in agreement at not

25    using certain terminology, then the Court will give it very

```
 1   serious consideration.  It's where you're in disagreement that
 2   I have to make a call.  If you're in agreement, let me know and
 3   we'll address it that way.
 4         Turning to the exhibits, the differences of opinion.
 5   Question one on both of yours refer just exactly to this
 6   subject matter, the publicity of this case.  The question
 7   offered to me by the defendants, you do use the term "Varsity
 8   Blues" and "College Admissions", whereas the government does
 9   not.  In the defendants' question, you ask for a more nuanced
10   amount of information that the prospective juror has, that is
11   whether it's none, a little, a moderate amount, or every TV
12   mentioned.
13         I think it might be appropriate to find out from each
14   potential juror how much of an involvement with this case
15   they've had.  So I would be leaning toward the defendants'
16   proposal, but I certainly won't use the term "Varsity Blues"
17   and "College Admissions" if that is agreed.
18         Any comments on that first question?
19         MR. KENDALL:  I need to discuss with Mr. Kelly.  As we
20   said, we'll get back to you.
21         THE COURT:  Fair enough.  Do it sooner rather than
22   later.
23         MR. KENDALL:  Much sooner, your Honor.  Thank you.
24         THE COURT:  With respect to the second question of the
25   defendants' supplemental, I'm not going to ask people what
```

```
 1   organizations.  I think that's too invasive of their right to
 2   privacy.  I am not going to allow question number two.
 3        Question No. 3 is whether or not they've been in the
 4   military.  What does that add?  Why do we need to ask them
 5   whether they or somebody in their family is in the military?
 6   Mr. Kendall?
 7        MR. KENDALL:  I'm not the one handling the
 8   questionnaire.
 9        THE COURT:  Mr. Kelly or whoever it was that proposed
10   that question?
11        MR. KELLY:  Yes, your Honor.  This one came from a
12   defendant who is no longer in the case.  I won't blame
13   Mr. Frank, but.
14        THE COURT:  I'm not going to ask that one, nor am I
15   going to ask do you believe that if the government indicts a
16   corporation of committing a crime that corporation probably did
17   something illegal.  I'm not going to ask them that.
18        I will ask the equivalent of the question about
19   wealthy, whether they have something against rich people,
20   because I'm going to give defendants that one, and I'm going to
21   give the government number four of their requests that some
22   witnesses in the case cooperated with the government in hope of
23   receiving a more lenient sentence.  The trade off is, if I ask
24   the rich guy question, I'm going to ask the cooperated question
25   too.
```

**A610**

1      So that covers the supplemental questions of the

2  defendants.  The plaintiff's, rather the government's, I will

3  ask a particular question about knowledge of this case.

4      With respect to the second and third questions, I

5  think I will ask a combined question of have you ever had

6  management or supervisory responsibility on your job or started

7  or owned your own business in one question.  So I would ask the

8  fourth question.  I don't think I need to ask about the

9  Internal Revenue Service, so I'm not going to ask them to file.

12:36 10      Those are my rulings on the supplemental questions

11  offered by the defendants and the government.

12      Any comments?  Mr. Frank?

13      MR. FRANK:  Briefly, your Honor, the last question on

14  the Internal Revenue Service because there's a tax fraud issue

15  in this case.  We believe it's relevant whether a juror has had

16  an issue and has a beef with the IRS.

17      MR. KENDALL:  Your Honor, it's way too broad.  People

18  have all sorts of civil audits, interactions, whatever else.  I

19  think you're going to ask quite thoroughly whether people have

12:37 20  any antipathy towards law enforcement or antipathy towards the

21  government.  I think that covers it.  The IRS has so many

22  interactions with so many people.

23      THE COURT:  I agree with defendant on that one.

24      I believe we have covered all of the matters that I

25  had anticipated covering.  Of course, each time we get together

1    I would be derelict in my obligation of not asking at this 11th

2    hour whether there is any prospect of further changes of plea

3    or resolutions of the remaining cases.  Is there any chance of

4    that happening?  Mr. Frank?

5           MR. FRANK:  We are hopeful, your Honor, but I can't

6    say that there's a guarantee of that.

7           MR. KENDALL:  Not at all, your Honor.

8           THE COURT:  Mr. Kelly?

9           MR. KELLY:  The Court should prepare for trial.

12:38 10           THE COURT:  The Court is prepared for trial.

11           Mr. Loucks?

12           MR. LOUCKS:  I'll defer to Mr. DiCanio.

13           MR. DICANIO:  I think we're ready to go forward.

14           THE COURT:  So are we.

15           Are there any other matters that need to come to the

16    Court's attention before we adjourn for the day.  Mr. Loucks?

17           MR. LOUCKS:  Nothing, your Honor.

18           THE COURT:  Mr. Kendall?

19           MR. KENDALL:  One small matter.  To keep things moving

12:38 20    quickly in the courtroom, if we're limited in the people we can

21    have in the main court, we're obviously going to have to be

22    communicating with the paralegals and attorneys to come back

23    and forth bringing things, getting copies of exhibits so

24    there's no slow down in the movement.  Could the Court issue an

25    order allowing our nonattorney paralegals to bring their cell

1    phones into the courthouse?  That's the only way we can e-mail

2    them, please bring Exhibit 42, we need it right away.  We can't

3    lean over the rails to speak to them.  We've got to e-mail

4    them.

5            THE COURT:  You have a form to fill out.  You can

6    contact my deputy.  We'll accomplish that.

7            MR. KENDALL:  That's great, your Honor.  Thank you

8    very much.

9            THE COURT:  Anything else?

12:39 10         MR. FRANK:  Nothing for the government.

11           THE COURT:  Thank you, counsel.  If we don't

12   communicate between now and then, we'll see you all on the

13   morning of Wednesday, September 8th to empanel a jury and

14   resolve this case.  We're adjourned.

15           (Whereupon, the proceedings adjourned at 12:43 p.m.)

16

17

18

19

20

21

22

23

24

25

**A613**

```
 1               C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    August 18, 2021 in the above-entitled matter to the best of my

11    skill and ability.

12

13

14        /s/ Kristin M. Kelley            August 18, 2021

15        Kristin M. Kelley, RPR, CRR            Date
          Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

**A614**

1                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA,          )
4                        Plaintiff          )
                                    )
5     vs.                           )  No. 1-19-CR-10080
                                    )
6     GAMAL ABDELAZIZ and JOHN      )
      WILSON,                       )
7                        Defendants.        )
                                    )
8                                   )

9

10

            BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 1
12

13

         John Joseph Moakley United States Courthouse
14                    Courtroom No. 4
                   One Courthouse Way
15               Boston, Massachusetts 02210

16

17                    September 8, 2021
                         9:20 a.m.
18

19

20

                   Kristin M. Kelley, RPR, CRR
21                   Official Court Reporter
         John Joseph Moakley United States Courthouse
22               One Courthouse Way, Room 3209
                   Boston, Massachusetts 02210
23                E-mail: kmob929@gmail.com

24         Mechanical Steno - Computer-Aided Transcript

25

**A615**

```
 1     APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```



```
 1   APPEARANCES:

 2

 3          Robert L. Sheketoff

 4          One McKinley Square

 5          Boston, MA 02109

 6          617-367-3449

 7          sheketoffr@aol.com

 8          for Gamal Abdelaziz.

 9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  This is Criminal Action No. 19-10080, the
 3   United States of America versus Gamal Abdelaziz and John
 4   Wilson.
 5          Would counsel please introduce themselves for the
 6   record.
 7          MR. FRANK:  Good morning, your Honor.  Steven Frank,
 8   Kristen Kearney, Leslie Wright and Ian Stearns for the United
 9   States.
10          THE COURT:  Good morning, counsel.
11          MR. KELLY:  Good morning, your Honor.  Brian Kelly,
12   Joshua Sharp, Bob Sheketoff, and Lauren Maynard on behalf of
13   defendant Gamal Abdelaziz.  We would ask -- we pronounce it
14   Aziz.
15          THE COURT:  I'm not going to do that.  I'm going to
16   pronounce the name the way it's indicted.  Abdelaziz has gotten
17   into my head, so I'm going to call him Aziz.
18          MR. KELLY:  Sounds good.
19          MR. KENDALL:  Good morning, your Honor.  Mike Kendall,
20   Andy Tomback, Lauren Papenhausen, with our client John Wilson,
21   and his wife Leslie Wilson is right behind us.
22          THE COURT:  Good morning to you all.  I would just
23   say, as far as I'm concerned in this courtroom, you're free to
24   remove your masks if you want to.  You certainly don't have to
25   but you're free to do that.  We're going to be going down to
```

1    the jury lounge where we have in excess of 100 potential

2    jurors.  As you know, we are going to greet them, say good

3    morning, and basically ask them to fill out the questionnaire

4    we've all agreed upon.  So that will take ten or 15 minutes, at

5    most.

6              Before we start, I need for the record to note in a we

7    are proceeding today with this trial in person and by Zoom

8    technology pursuant to a General Order of this Court, the

9    National Emergency Act and the CARES Act.  These regulations

09:22 10   relate to the coronavirus pandemic and authorize under certain

11   circumstances, such as these, the conduct of criminal

12   proceedings in person, as well as by means of

13   videoconferencing.  Thus, we are going to go forward using this

14   Zoom technology, as well as proceeding in person.

15             This is a public hearing and these proceedings are

16   being made available to members of the public, the press, and

17   interested parties via Zoom technology.  Those attendees are

18   not, of course, permitted to participate in any other way in

19   these proceedings.

09:23 20             I also remind all of you who are attending this

21   videoconference by Zoom technology that federal rule of

22   criminal proceeding 53 and local Rule 83.3 prohibit

23   photographing, recording, and broadcasting this proceeding, and

24   any violation of these rules will subject the wrongdoer to

25   sanctions and/or loss of press privileges.

1            The only other matter that I want to discuss outside

2     the hearing of the jury panel is the parties' proposed

3     allocations of seats in the courtroom.  I've gone over that

4     carefully, counsel and, unfortunately, you're not going to be

5     allocated 29 of the 50 seats.  I am going to reserve eight

6     seats for the public in the courtroom.  That will be subject to

7     change day-to-day, but that will mean that members of the

8     family and/or press will be allowed to be in the courtroom.  If

9     counsel can agree on who that's going to be, that's fine, but

09:24 10     there will be, thus, 42 allocated to the parties and to the

11     Court.

12            Since we're going to have 16 jurors and we have 8

13     court personnel, when I count myself, my deputy, the Court

14     reporter, and four clerks and interns, I'm going to reserve

15     8 -- actually, the 8th would be the Court Security Officer.

16     With 16 jurors and personnel, that's 24.  With 8 people from

17     the public, that comes to 32.  That means the parties are

18     allocated 18 seats, not 29, 18.  I'm going to leave it up to

19     you to work out how you allocate those 18 seats, but it's not

09:25 20     going to be as many as you have asked me for.

21            Any comments with respect to that?

22            MR. KELLY:  No, your Honor.

23            THE COURT:  The government?

24            MR. FRANK:  No, your Honor.

25            THE COURT:  Mr. Kendall?

1          MR. KENDALL:  No, your Honor.

2          THE COURT:  Is there anything else then that needs to

3     come to my attention before we adjourn down to the jury

4     assembly lounge?

5          MR. KELLY:  A small matter, your Honor.  So the Court

6     doesn't think we're being rude here, my handwriting's terrible.

7     My handwriting's terrible.  We're going to text back to each

8     other.  Is that okay?

9          THE COURT:  Fine with me.

09:25 10          MR. KELLY:  That's what we're doing on the phone.

11     We're not playing games.  I can actually read it that way.

12          THE COURT:  That's fine.  Anything else, counsel?  All

13     right.  Then I'm going to go through the back of the house.  My

14     deputy will go down with you to outside of the jury assembly

15     lounge.  We will go in as a unit.  I will make a few comments.

16     I'll ask counsel to introduce themselves.  I'll start with the

17     government with Mr. Frank.  You'll introduce yourself or have

18     your colleagues introduce themselves.  Then I'll go to

19     Mr. Kelly, and you can do the same.  Mr. Kendall will do the

09:26 20     same.

21          At that stage, I think I have a few more comments to

22     the jury.  We then swear in the jury panel because they are

23     under oath when they're answering all of these questions.  I'm

24     going to emphasize that.  Hopefully, they will be able to

25     complete this questionnaire in an hour or two, after which we

**A622**

1    will have the benefit of being able to look at them.

2         Then, as you all know, we're going to do it all over

3    again at approximately 1 o'clock.  I guess we're a little bit

4    flexible on the time because we're summonsing in another full

5    load of potential jurors for the afternoon session.

6         Everybody on the same page?

7         MR. KELLY:  Yes, your Honor.

8         THE COURT:  Okay.  Then we're adjourned.  I'll see you

9    downstairs in about 5 minutes.

09:27 10         THE CLERK:  All rise.

11         (The Court exited at 9:27 a.m.)

12         (Recess.)

13         (The Court entered at 9:35 a.m.)

14         THE CLERK:  This is Criminal Action 19-10080, the

15    United States of America versus Gamal Abdelaziz and John

16    Wilson, the Honorable Nathaniel M. Gorton presiding.  Court is

17    in session.  You may be seated.

18         THE COURT:  Good morning, ladies and gentlemen.  My

19    name is Nathaniel Gorton, and I'm the United States District

09:35 20    Judge assigned to preside over this session of the United

21    States District Court for the District of Massachusetts.

22         This case on which you have been called to sit on as

23    jurors is a criminal case which involves alleged fraudulent

24    conduct with respect to college admissions.

25         Now, in order to pick a fair and impartial jury,

1    first, we need you all to fill out an extensive questionnaire.

2    Please take your time and be careful when you answer the nearly

3    50 questions in that questionnaire.  It is very important that

4    you answer all the questions truthfully and to the best of your

5    ability.  And please understand that you are under oath when

6    you answer these questions, but you are not being judged here

7    today.  When you are asked about your opinions or your

8    feelings, you are entitled to them.  It is just when those

9    opinions might become relevant to this case that the parties

09:37 10    are entitled to know them as well.  It is very important that

11    we pick a fair and impartial jury for this case.

12           Now, before you get to the questionnaire, however, let

13    me say a few words about public health and safety.  As a juror

14    in this courthouse, you will be asked to wear a mask regardless

15    of whether you have been vaccinated.  Once we begin the trial,

16    counsel, the defendants, witnesses and I will often not be

17    wearing masks.  As you sit here in the jury assembly lounge,

18    you will notice that we are at least partially socially

19    distanced and we will stay that way until, when and if, you are

09:37 20    chosen to sit on this jury.  During the trial, however, the

21    jurors will be in the courtroom and seated in a jury box.

22           If any of these rules or the protocol I have outlined

23    makes you uncomfortable or is objectionable, you will be able

24    to make your concerns known on this questionnaire.  The health

25    and safety of jurors is of primary importance to all of us.  So

**A624**

```
 1    that is enough said on that subject for the time being.

 2            To further assist you, when you fill out the

 3    questionnaire, I'm going to ask counsel to introduce themselves

 4    and their clients if they are in the assembly lounge.  I would

 5    also like counsel to state the name and location of the law

 6    firm or law office with which they are associated.  We're going

 7    to start with the United States, Assistant United States

 8    Attorney Mr. Frank.

 9            MR. FRANK:  Thank you, your Honor.  Good morning,

09:38 10    ladies and gentlemen.  My name is Stephen Frank.  I'm an

11    Assistant United States Attorney in the District of

12    Massachusetts.  Can't hear me back there.  Can you hear me

13    better now?

14            Good morning, my name is Stephen Frank.  I'm an

15    Assistant United States Attorney in the District of

16    Massachusetts.  Can you hear me now?

17            My name is Stephen Frank.  I'm an Assistant United

18    States Attorney here in the District of Massachusetts.  With me

19    at the table are three other United States Attorneys.  To my

09:39 20    right, Leslie Wright, to her right, Kristen Kearney, and to her

21    right, Ian Stearns.  Together, we represent the United States.

22    Good morning.

23            THE COURT:  All right.  For the defendants.

24    Mr. Kelly.

25            MR. KELLY:  My name is Brian Kelly.  Good morning,
```

1    everyone.  I'm with a law firm called Nixon Peabody, here in

2    Boston.  To my left is my client, Gamal Abdelaziz.  He's one of

3    the defendants in this case.  To his left is Joshua Sharp, also

4    representing him, as well as two others here, Bob Sheketoff

5    there and Lauren Maynard to my left.  Good morning.

6             THE COURT:  Mr. Abdelaziz, please remove his mask for

7    a moment.

8             MR. KELLY:  Good morning.  That's it.  Thanks.

9             THE COURT:  Mr. Kendall?

09:40 10         MR. KENDALL:  Hello.  Can you hear me now?  Hi.  I'm

11   Mike Kendall.  I'm a lawyer here in Boston at a law firm called

12   White & Case.  This is my partner, Lauren Papenhausen, from

13   White & Case.  Also representing our client John Wilson is Andy

14   Tomback from McLaughlin & Stern in New York.

15            John, if you could stand up.  This is our client John

16   Wilson.

17            Thank you, very much.

18            THE COURT:  All right.  Thank you, counsel.  Now with

19   respect to the empanelment itself, the first thing I need to do

09:41 20   is to swear you in as the jury panel.  The reason that we swear

21   you in is that this is a very important part of the case where

22   we select jurors who will hear a specific case.  The parties in

23   this case have a constitutional right to a jury that as fair

24   and impartial as humanly possible, therefore, we go through

25   this process of picking a jury.  I would now ask my deputy

```
 1   clerk to please swear in the jury panel.

 2           THE CLERK:  Would the panel please stand and raise

 3   their right hands.

 4           Do you and each of you solemnly swear that the

 5   statements you are about to make before this Court shall be the

 6   truth, the whole truth and nothing but the truth, so help you

 7   God?

 8           (Jury affirms.)

 9           THE CLERK:  Thank you.  You may be seated.

10           THE COURT:  Now the jury coordinator, Mr. McAlear,

11   will now distribute this questionnaire, which is rather

12   lengthy.  Please take your time and answer every question

13   completely and honestly.  After you complete the questionnaire,

14   you will be excused for the day.  Some of you will be notified

15   to report back tomorrow morning, that is Thursday morning, for

16   further empanelment procedure, but I want to thank you all now

17   for your participation up to this point.  So now we are going

18   to adjourn.  The parties that came in are going to leave.  You

19   have some work to do with filling out this questionnaire.

20   Thank you.

21           THE CLERK:  All rise.

22           (The Court exited at 9:43 a.m.)

23           (The Court entered at 1:06 p.m.)

24           THE CLERK:  Court is now in session.

25           THE COURT:  Good afternoon, counsel.  Before we go
```

09:42 (line 10)
09:43 (line 20)

1    down for the afternoon group that we have in the jury assembly

2    lounge, I wanted to talk an about a couple of logistics

3    matters.  As I believe everybody understands, this afternoon as

4    soon as counsel have had a chance to review the questionnaires

5    of the morning group, we expect that you will be able to agree

6    on who we will excuse and who we will summons in tomorrow

7    morning.

8          As to those who there is no agreement, we will have a

9    session later this afternoon.  Then the Court will decide as to

01:07 10   the final numbers as to who to summons and who to excuse.  We

11   need to do that, of course, before 5 o'clock because that's

12   when the jury coordinator needs to inform those who are to be

13   summonsed back as opposed to those who will not be.  Is there

14   anything that you would like to comment in that regard?

15         We'll start with the government, Mr. Frank.

16         MR. FRANK:  No, your Honor.  Thank you.

17         THE COURT:  Mr. Kelly?

18         MR. KELLY:  I understand.  We'll try to do that.  I

19   would just ask that we each get a hard copy of these questions.

01:07 20   We only got one for the defense side.  As much as I enjoy

21   sharing with Mr. Kendall.

22         THE COURT:  You should have both gotten a copy.  We

23   will work on that, Mr. Kelly, as quickly as we can.  I agree.

24   You both should have copies.

25         MR. KELLY:  Is 4:30 workable?

```
 1              THE COURT:  I'm looking to do it earlier than that.
 2    We need to make our decisions.  Of course if you agree on
 3    everything, we can wait until 4:30.  If you don't, I think
 4    we've got to schedule some sort of a conference say quarter of
 5    four, 3:45, no later than 3:45, so we can get the final numbers
 6    to the jury coordinator by 5 o'clock.
 7              MR. KELLY:  Sounds good, your Honor.
 8              THE COURT:  Mr. Kendall?
 9              MR. KENDALL:  Mr. Kelly's often excellent to represent
10    my needs, but I want to clarify one thing.  We've been looking
11    through the questionnaires.  It's been great.  We got them very
12    promptly.  In terms of reaching a consensus of who should not
13    be called back, I want to raise something.  It may break a log
14    jamb and help us do it a lot more quickly and get the Court
15    information it needs quickly.
16              There's a few folks on the questionnaire that
17    specifically say they don't like the Varsity Blues case, rich
18    people get advantages, they don't like rich people, people
19    shouldn't take the Fifth Amendment, they should come and
20    explain what they did.  I'm hoping those will be ones we can
21    have a consensus on that they have predetermined views that
22    they are not likely to listen to the Court's instructions and
23    follow them faithfully.
24              THE COURT:  I'm not going to get into the middle of
25    negotiations between you and the government between who should
```

(01:08 at line 10, 01:09 at line 20)

```
 1    be summonsed and who shouldn't.

 2            MR. KENDALL:  I'm previewing that.  I'm not asking you

 3    to step in at this point.  I think that's what the issue will

 4    be, at least from my perspective.

 5            THE COURT:  Fair enough.

 6            With respect to tomorrow, assuming that we come to an

 7    agreement as to who should be summonsed back and who should

 8    not, we are going to engage in what is known as individual voir

 9    dire.  What we're going to do is have those who have been

10    summonsed back will be in the jury assembly lounge.  The jury

11    coordinator and his helpers will come to this courtroom with

12    eight or ten potential jurors, all but one of whom will remain

13    outside.

14            This courtroom will become the side bar.  In other

15    words, rather than try to gather around a side bar, we will

16    simply invite the potential juror to come in to sit at the

17    witness stand and respond to my questions about the affirmative

18    responses, and as I have notified counsel, I will allow counsel

19    to ask questions as long as I believe the questions are aimed

20    at deciding whether this person is qualified to be a juror and

21    not whether this person is going to vote for my client or the

22    government.  If a question is posed that I think is

23    inappropriate, I'll tell the potential juror not to answer.  We

24    can have an argument about that, as long as you understand that

25    I'm going to allow counsel to inquire.
```

```
 1              That is one counsel per side.  The government will
 2      designate who is questioning for the government.  Each of the
 3      defendants will designate a particular inquisitor.  If that
 4      person is excused for cause, they go home.  If they are not
 5      excused for cause and retained, I am not going to send them
 6      back to the jury lounge, but rather put them into a separate
 7      courtroom or separate place.  We haven't decided exactly where.
 8              If we are able tomorrow to accumulate what would be
 9      considered 36, or I'm probably going to err on the side of
01:12 10  going above 36, understanding there's a total of 20 peremptory
11      challenges and need 16 jurors and 16 and 20 is 36, I'm going to
12      go to about 40.  When I get about 40 cleared jurors, we will be
13      able at that stage to go to the random selection of the jurors.
14      What I will do is bring those 36 or 40 potential jurors back to
15      this courtroom.  They will sit in the back of the courtroom.
16      My deputy clerk will choose at random, as we always have
17      before, out of a hat, if you will, 16 jurors to sit in the jury
18      box.  They're all cleared jurors.
19              At that stage, I will not need to inquire of them as I
01:13 20  normally do in my standard procedure of asking what they do for
21      a living and, if they're married, what their spouse does,
22      because we will already have that information and we will have
23      already individually voir dired that person.
24              So if they're cleared, we get 16 in the box, we will
25      proceed to side bar, actually proceed to side bar.  It would be
```

1   helpful if not all the attorneys have to come.  I'll leave that

2   up to you.  The defendants are entitled to be at side bar, if

3   they wish, unless they waive their right to be here.  We have

4   white noise.  We will employ the white noise so the

5   conversation at side bar is relatively private, at which point

6   parties will exercise peremptory challenges.

7         As you know, the government has 8.  The defendants

8   have 12.  We will proceed seriatim, as they say.  In the first

9   round, the government will exercise a peremptory challenge if

01:14 10   they have one.  The defense will exercise one, back and forth

11   until both sides are satisfied, understanding that there are no

12   back strikes.  If we strike eight people out of the first 16,

13   the 8 that remain in the jury box cannot be stricken in the

14   later round.  The 8 new ones, of course, can be stricken, and

15   you can use your peremptory challenges as you wish.

16         Again, as we have previously determined, the last four

17   jurors in the jury box, no matter what seats they're in, are

18   the alternates.  The 13th juror is alternate No. 1 and so

19   forth.

01:14 20         Is it understood how we're going to do that?

21         MR. KELLY:  One question, your Honor.  My question is

22   at the stage where there's 40 here and they're being chosen at

23   random, are the juror numbers going to be used consistent with

24   these questionnaires so we know?

25         THE COURT:  Yes.  You'll know.  Absolutely.  You'll

A632

know after we've had the individual voir dire which ones are

retained and which ones aren't.  Once we get to 40, at that

stage -- now, this may occur tomorrow.  It may not occur

tomorrow.  If we are able to do it tomorrow by mid to late

afternoon, we will go forward with the peremptories to be

exercised so we can have a jury assembled by 5 o'clock before

we adjourn for the day.

           If I determine in the middle of the day or at some

point that we're not going to make it and we're going to need

01:15  to summons in the second tranche for Friday morning, then I

will excuse those who have been retained up to that point and

ask them to come back in the morning and we will complete the

process on Friday.

           MR. KELLY:  Either way, openings are Monday.

           THE COURT:  Either way, openings are Monday.

           Any questions or comments as to -- there is one other

thing.  Because we are treating this courtroom as side bar

during the individual voir dire, I am not going to allow

anybody else to be in the back of the courtroom.  In other

01:16  words, it's going to be a closed courtroom for that portion

because it is the equivalent of what would be occurring at side

bar.  I think that's appropriate because I respect the privacy

of potential jurors.  And I think they have a right to privacy.

Obviously, they're not going to be private from any of the

people here or the parties that are represented.  This is not a

```
 1    public hearing when we get to the point of asking individuals

 2    about their responses to this questionnaire.

 3         Any problem with that from the government?

 4         MR. FRANK:  No, your Honor.  Thank you.

 5         THE COURT:  Mr. Kelly?

 6         MR. KELLY:  No, your Honor.

 7         THE COURT:  Mr. Kendall?

 8         MR. KENDALL:  No, your Honor.

 9         THE COURT:  That's the way we're going to proceed with

01:17 10    the individual voir dire tomorrow.

11         Now we're going to go back down and do a second

12    version of what we did this morning welcoming the jurors and

13    tell them about the questionnaire and so forth.  Any questions

14    about that?  If not, I'll see you downstairs in five minutes.

15         (The Court exited at 1:18 p.m.)

16         (The Court entered at 1:24 p.m.)

17         THE CLERK:  This is Criminal Action No. 19-10080, the

18    United States of America versus Gamal Abdelaziz and John

19    Wilson.  The Honorable Nathaniel M. Gorton presiding.  Court is

01:24 20    now in session.  Thank you.

21         THE COURT:  Good afternoon.  My name is Nathaniel

22    Gorton, and I am a United States District Judge assigned to

23    preside over this session of the United States District Court

24    for the District of Massachusetts.  The case on which you have

25    been called to sit as jurors is a criminal case which involves
```

**A634**

1    alleged fraudulent conduct with respect to college admissions.

2         In order to pick a fair and impartial jury, first, we

3    need you all to fill out an extensive questionnaire.  Please

4    take your time and be careful when you answer the nearly 50

5    questions in that questionnaire.  It is very important that you

6    answer all of the questions truthfully and to the best of your

7    ability, and please remember that you are under oath when you

8    answer these questions, but you are not being judged here.

9         When you are asked about your opinions or feelings,

01:25 10    you are entitled to them.  It is just that when those opinions

11    might become relevant to this case, the parties are entitled to

12    know them as well.  It is very important that we select a fair

13    and impartial jury.

14         Now, before you get to the questionnaire, let me say a

15    few words about public health and safety.  As a juror in this

16    courthouse, you will be asked to wear a mask regardless of

17    whether you have been vaccinated.  Once we begin the trial,

18    counsel, the defendants, witnesses, and I will often not be

19    wearing masks.

01:26 20         As you sit here in the jury assembly hall, you will

21    notice that you are at least somewhat socially distanced and we

22    will stay that way until when and if you are chosen to sit as a

23    juror on this trial.  During the trial, however, the jurors

24    will be in a courtroom and seated in a jury box.

25         If any of these rules or the protocol I have outlined

makes you uncomfortable or is objectionable, you will have an

opportunity to express your concerns in that questionnaire.

The health and safety of jurors is of primary importance to us.

Enough said for the time being on the question of

health and so forth.

Now, to further assist you, when you fill out your

questionnaire, I'm going to ask counsel to introduce themselves

and their clients, if they are in the assembly hall.  I would

also like counsel to state the name and location of their law

firms or the law offices with which they are associated, and we

will start with Mr. Frank from the United States Attorney's

office.

MR. FRANK:  Thank you, your Honor.  Can everyone hear

me?  Good afternoon.  My name is Stephen Frank.  I'm an

Assistant United States Attorney here in the District of

Massachusetts.  With me at the table are three of my fellow

Assistant United States Attorneys.  To my right is Kristen

Kearney.  To her right is Leslie Wright.  And to her right is

Ian Stearns.  Together, we represent the United States.  Good

afternoon.

THE COURT:  Mr. Kelly.

MR. KELLY:  Good afternoon.  My name is Brian Kelly.

I'm here.  I'm a member of the law firm Nixon Peabody in

Boston.  I'm here with my client to my left, Gamal Abdelaziz,

and to his left is another attorney from my firm, Joshua Sharp.

1    Behind Joshua are Bob Sheketoff and Lauren Maynard.  We

2    represent Mr. Aziz.  Good afternoon.

3            THE COURT:  Mr. Kendall.

4            MR. KENDALL:  Thank you, your Honor.  Hi.  Good

5    afternoon.  I'm Mike Kendall.  I practice at the Boston office

6    of the law firm called White & Case, along with me is my

7    partner Lauren Papenhausen.  Standing next to me over here to

8    my right is John Wilson, our client.  Behind me is our

9    co-counsel Andrew Tomback of a firm called McLaughlin & Stern

01:28 10   in New York.  Thank you very much.

11            THE COURT:  All right.  Thank you, counsel.  Now, with

12   respect to the empanelment itself, the first thing I need to do

13   is to swear you in as the jury panel in this case.  The reason

14   we swear you in is this is a very important part of the case

15   where we select the jurors who will hear a specific case.  The

16   parties in this case have a constitutional right to a jury that

17   is as fair and impartial as humanly possible, therefore we go

18   through this process of picking a jury.

19            I would now ask my deputy clerk to please swear you in

01:29 20   as the jury pool.

21            THE CLERK:  Would the panel please stand and raise

22   your right hands.  Do you and each of you solemnly swear that

23   the statements you are about to make before this Court shall be

24   the truth, the whole truth and nothing but the truth, so help

25   you God?

**A637**

```
 1              (Jury affirms. )

 2         THE CLERK:  Thank you.  You may be seated.

 3         THE COURT:  All right.  Now the jury coordinator will

 4    now distribute this questionnaire to you.  Please take your

 5    time and answer every question completely --

 6         I'll start again.  Thank you for pointing that out.

 7    The jury coordinator will now distribute the questionnaire.

 8    Please take your time and answer every question completely and

 9    honestly.  After you complete the questionnaire, you will be

01:30 10    excused for the day.  Some of you will be notified to report

11    back on Friday morning for further empanelment procedure, but I

12    want to thank you all for your participation up to this point.

13    We are adjourned.

14              (The Court exited at 1:31 p.m.)

15              (The Court entered at 3:52 p.m.)

16         THE COURT:  Good afternoon, counsel.  Perhaps I will

17    start by asking counsel whether you've come to any sort of an

18    agreement and what the situation looks like.

19         Mr. Frank.

03:53 20         MR. FRANK:  Your Honor, we've agreed that there are 20

21    potential jurors who should be struck for cause.  There's about

22    the same number that we do not agree on.  We can give you the

23    first 20.

24         THE COURT:  Out of 117, that would leave us with 97.

25    Are you suggesting the government would like me to call back in
```

1    97?

2         MR. FRANK:  There are probably about a dozen

3    additional jurors that the government believes should be

4    struck.  I'm not quite sure, but I'm guessing about an equal

5    number from the defense that we just haven't reached an

6    agreement on.  We didn't have time to discuss those.

7         THE COURT:  So approximately 24 others that would be

8    struck if I accepted one side or the other's request to strike.

9         MR. FRANK:  That's roughly right.

03:54 10        THE COURT:  So that would be 44 from the 117.

11        MR. FRANK:  I think that's approximate.

12        THE COURT:  I'm in the giving you an exact number.

13   That would mean we're calling in somewhere around 80 of the 117

14   or 75, something like that.

15        MR. FRANK:  I think that's right.

16        THE COURT:  Mr. Kelly, what do you think?

17        MR. KELLY:  Okay.  We've been trying to process all

18   the paper here.  I was unable to look at jurors 75 and 90, but

19   we'll get to it.  We did reach agreement on 20 of the 117.  I

03:54 20   do agree that they have some they wish to be stricken.  Perhaps

21   we'll agree or won't have the time, and perhaps they'll agree

22   to our dozen or so.  I can't give you exact numbers.  We've got

23   agreement on the 20.  We can give you the 20.  We'll keep

24   working on it and alert the Court.

25        THE COURT:  Mr. Kendall?

1          MR. KENDALL:  We've been working together.  I think I

2     may have a little bit more of a count on the numbers than what

3     Mr. Frank offered the Court.  We think there's probably about

4     42, 43 that we would want to strike that the government has not

5     agreed to strike.  Those 42 or 43 I can just tell the Court

6     what the categories are so you understand what our concerns

7     are.

8          Many of these people strongly do in the believe in the

9     Fifth Amendment, a group of them work for one of the victims,

03:55 10   which is Harvard, Stanford or USC.  There was a group of

11     teachers and some healthcare workers that said there was a

12     hardship.  That may require further court inquiry.  I didn't

13     want to be too strong on that.  A lot of people said schools

14     start this week, we missed a COVID year, it difficult for the

15     students.  That's in the group.  And there's a group that

16     expressed very strong biases against the defendants, against

17     rich people having special privileges, thinking that they were

18     guilty based upon the media.

19          THE COURT:  So this would be in addition to the 20

03:56 20   that you've all agreed should be stricken?

21          MR. KENDALL:  Correct.

22          THE COURT:  You want me to strike 43 now.  So we're

23     talking roughly half of the 117.

24          MR. KENDALL:  Give or take one or two numbers, yes,

25     your Honor.

**A640**

1    THE COURT:  Do those include the ones that Mr. Kelly?

2    MR. KENDALL:  Yes.

3    THE COURT:  That would be a grand total of the

4 defendants request for striking.

5    MR. KENDALL:  20 we've agreed on, and about 43.  I

6 need to double count to give you a precise number.  It's

7 roughly 42, 44, in that range.

8    THE COURT:  Mr. Frank, have you seen the 43 that the

9 defendants are requesting to strike?

03:56 10    MR. FRANK:  We have not discussed those 43.

11    MR. KENDALL:  Mr. Kelly hasn't had a chance to see it.

12 We wrote it all up.

13    MR. KELLY:  We went through the numbers we definitely

14 agreed upon and knocked them out.  We think the government has

15 more they think should be stricken.  We have more.

16    THE COURT:  I have no problem if you have agreed

17 amongst yourselves it strike 20, we'll strike those 20 right

18 now.

19    What I want to see is the 43 that the defendants want

03:57 20 stricken and the government may or may not want stricken.  Are

21 there some that the government wants stricken that the

22 defendants don't?

23    MR. KENDALL:  It's not that we necessarily don't, your

24 Honor.  The government has some preliminary data on convictions

25 but it wasn't confirmed.  If it turns out to be the person and

         1    a felony conviction, that's one thing N.  Good faith, they gave

         2    us the best information they have, but it's not yet confirmed.

         3    We thought that may be dealt with better tomorrow when we can

         4    have the information confirmed as opposed to doing something if

         5    we dent know it's reliable or complete.

         6             THE COURT:  I'd like you to do, and you can do it as

         7    quickly as possible, the 20 that are agreed to are stricken.

         8    We're down to 97.  I want to see a list that has the 43 that

         9    the defendants want me to strike and the several, 12 or so,

03:58   10    that the government wants me to strike, with different

        11    notations so I can tell the difference.  How long do you need

        12    to get me such a piece of paper?

        13             MR. KENDALL:  Is handwriting okay?

        14             THE COURT:  Handwriting is fine.

        15             MR. KENDALL:  Probably 10 minutes.

        16             THE COURT:  I'll give you 15, but I want to see that

        17    list first.  Then I'll make a determination as to what we do

        18    from there on whether we come back and have a discussion about

        19    them or whether we just go with your requests.

03:59   20             MR. KENDALL:  To help the Court, we're just working

        21    here off of cryptic notes.  Do you want that list of 43 broken

        22    down to Fifth Amendment?

        23             THE COURT:  Sure, if you can do it.

        24             THE COURT:  Hardship, work for a victim.

        25             THE COURT:  Yes.

```
 1          MR. KENDALL:  We'll try to do that.  We may need a

 2    smidgen more than 15.

 3          THE COURT:  Understand Mr. McAlear can correct me if

 4    I'm wrong.  What is the time that you have to use to summons

 5    these folks for tomorrow morning?

 6          MR. MCALEAR:  They're calling in at five.  It's going

 7    to take at least 15 minutes, if not 20, to set the message for

 8    the jurors that we want.  4:45 is when I absolutely need the

 9    list.
```

04:00 10          MR. KELLY:  Does it help to give you the 20 now?

```
11          MR. MCALEAR:  Absolutely.

12          THE COURT:  Get me the other 43 or 50 names as quickly

13    as possible.  We're going to have it turn it around in a hurry.

14    We're in recess for 15 or 20 minutes.

15          (Recess taken 4:00 p.m. to 4:36 p.m.)

16          THE COURT:  Mr. Frank, what has the government come up

17    with?

18          MR. FRANK:  We have our list for the Court.  I believe

19    that the defense is agreeing with us on one of those jurors
```

04:36 20    being stricken.  That is Juror No. 35.  Withdrawn, your Honor.

```
21    I apologize.  We agree with the defense on No. 88.

22          THE COURT:  More to the point, you were going to give

23    me a list of all of the ones that the government agreed would

24    be stricken, then a list from all of the ones the defendants

25    agreed would be stricken.  Is there no overlap at all?
```

```
 1          MR. FRANK:  There is no overlap, but we have agreed to

 2    one of the individuals on their list being stricken.  We have

 3    our list that we can hand up.

 4          THE COURT:  This is an addition to the 20 we've

 5    already agreed?

 6          MR. FRANK:  That is the government's additional list.

 7          MR. KENDALL:  Not agreed upon.

 8          MR. KELLY:  We do not agree to those.  The only one

 9    we've agreed to in this time frame is 88 in addition to the

10    other 20 we told Mr. McAlear about at the break.  We're still

11    working to try to come to agreement on more.  Those are just,

12    as I understand it, what they hope we will agree to, but we

13    have not agreed to it yet.  We have a list of our own that we

14    need to give the Court to say this guy doesn't agree to Fifth

15    Amendment privilege, whatever the excuse is.  We believe we

16    have cause as well that we want the government to agree with.

17          THE COURT:  Counsel, here's where I'm coming at it

18    from.  I'm coming at it from a different direction.  We started

19    with 117 today.  I want to know who we're going to call back

20    tomorrow to individually voir dire.  I'm not as interested in

21    who we're going to agree may be ultimately and finally stricken

22    as I am in who we're going to call back tomorrow to

23    individually voir dire.  Nobody is going to give up their right

24    to challenge any of the people that appear tomorrow for cause,

25    nor are you exercising your peremptory challenges at this
```

stage.  I want to have tomorrow a working number of potential

jurors.  I don't want to call anybody in tomorrow who is

completely unacceptable to both sides.  I want to call in

roughly half of the people that showed up today.  I'd like to

get 60 people here tomorrow to individually voir dire and

maybe, out of those 60, we do find 20 that would be acceptable

to both sides.

MR. KELLY:  I would submit, I think 21 can be

dismissed.  That gets us down to --

THE COURT:  96.

MR. KELLY:  I think they have to be brought in.  Maybe

we can agree overnight that some of these people can be

released, but I don't see any way around it today to come to an

agreement and tell them within the time frame we have.  I think

we call back the 96 and work through those.  Maybe tomorrow

morning we'll have another 15 that we've agreed upon and now

we're down to 80 and we can work through in terms of striking

them.

MR. KENDALL:  If I may raise one thing, your Honor.

THE COURT:  Yes.

MR. KENDALL:  I understand the Court's desire to have

a workable number tomorrow and not inconvenience all these

people.  Would it be helpful for the Court if we just discussed

the four or five categories of topics Mr. Frank doesn't agree

with us?  If the Court thinks any of those topics is a valid

```
 1    one, we can do a ten, 15 wholesale.  There's a whole group that

 2    October to the Fifth Amendment.

 3              THE COURT:  I can talk to you about that right now, I

 4    think, Mr. Kendall.  I think the fact that somebody's answered

 5    a question that they or somebody in their family or somebody

 6    that they know, is employed by Harvard or Stanford is not a

 7    grounds to exclude them.  I would bring them in and ask them

 8    whether the fact that they have somebody around the corner

 9    that's a friend that works for Harvard would prejudice them in
04:41 10    this case.

11              MR. KENDALL:  I'd agree with you on that.  We're not

12    going at that level.

13              THE COURT:  That was one of the categories I thought

14    you listed.

15              MR. FRANK:  I think it's more if they're working

16    there.  If they personally are substantively involved at

17    Harvard.

18              THE COURT:  Why is somebody who's employed at Harvard

19    University automatically excluded from this trial as a juror?
04:41 20              MR. KENDALL:  The government has put people like that

21    on its list as well.  I think the idea is they're closely tied

22    to a victim and likely have strong views.

23              THE COURT:  We can inquire about that.

24              MR. KENDALL:  That's why I wanted to give you the

25    categories.
```

1          THE COURT:  The other one is the rich people.  Lots of

2     these people have said they don't like rich people if they've

3     gotten their money in untowered ways.  That doesn't mean

4     everybody that's rich they'd be prejudiced against.  I think

5     that is a category that is not worthy of excluding somebody

6     because they've checked a box that they somehow have something

7     against some rich people.

8          MR. KENDALL:  Some expressed a far more aggressive

9     attitude.

04:42 10          THE COURT:  Those could be excluded.

11          MR. KENDALL:  The ones that I think are quite strong

12    is people just flat out reject the Fifth Amendment.  In my

13    experience in drawing juries in this courthouse, people have

14    such respect for a judge that if a judge questions them about

15    the Fifth Amendment, they'll back off out of respect for you,

16    but then they'll go right out of here with the same view they

17    have and they're just being polite to the authority they

18    respect.

19          THE COURT:  I don't think I agree with you,

04:43 20    Mr. Kendall.  I think maybe I should have had more input on

21    that question.  I think a lot of people, lay people, will say

22    somebody ought to get up and defend themselves, but when

23    they're confronted with what the law is and a judge instructs

24    them that notwithstanding their suspicion the law entitles

25    somebody to remain silent and is the requirement of the

1    government to prove its case beyond a reasonable doubt, et

2    cetera, et cetera, I think people honor those instructions not

3    withstanding their feelings of some sort of the guy ought to

4    have got up and defended himself.

5         MR. KENDALL:  I wish what you were saying was true,

6    your Honor.

7         THE COURT:  I've been doing it for 29 years.  I have

8    seen that happen on occasion.  I wouldn't automatically dismiss

9    somebody who checked that he might be concerned about the fact

04:44 10  that somebody didn't take the stand, automatically.  If you can

11   agree some of those applications where the people goes on and

12   on and those persons should be excused, but not automatically

13   because they checked yes to that question it presents a

14   problem.

15        MR. TOMBACK:  Does it make sense to tackle a few of

16   those?  We made some notes.

17        THE COURT:  What I want you to do, and I'm going to

18   extend this.  I know the coordinator said he needed this by

19   now.  I'm going to give you another half hour to try to come up

04:44 20  with 60, 70 names, not 96, that we should call in that have a

21   realistic chance of being seated as jurors in this case.  That

22   gives you -- we can strike up to half of the people that have

23   answered these questionnaires perhaps for good reason,

24   especially people who have scheduling problems, people who have

25   said they're teachers and they're brand new at their job and

COVID-19 and they want to get back to school.  I would exclude

those folks.  They're important people that need to be in the

school teaching kids.  I would be in favor of excusing anybody

that's asked for a scheduling conflict having to serve 4 weeks

on this sort of trial.

MR. KENDALL:  I think your guidance is helpful, your

Honor.

THE COURT:  I want by 5:15 a list that shows at least

60 people that we can call in tomorrow.  Mr. Kelliy?

04:46  MR. KELLY:  Okay.  Obviously.

THE COURT:  What's your concern?

MR. KELLY:  I was just thinking procedure.  We'll see

what we can do.  It might be easier to tell you what we need to

strike.

MR. KENDALL:  We need another 30 to strike.

THE COURT:  That would be a number to work with.

MR. KENDALL:  We'll look for another 30 to 40.

THE COURT:  I need it by 5:15.

MR. KENDALL:  We're not leaving.  I'll sit right here.

04:46  THE COURT:  We're in recess until 5:15.

(Recess taken 4:47 p.m. 5:18 p.m.)

THE COURT:  Good afternoon, counsel.  Have you been

able to work our list in the last half hour?

MR. FRANK:  Mr. Frank?

MR. FRANK:  We have 15 additional names from the

```
 1    defense list that we can agree to.

 2              THE COURT:  Mr. Kendall?

 3              MR. KENDALL:  We went through the list and put anybody

 4    who checked hardship.  Some of those were teachers.  Some had

 5    significant family health issues, a child or elderly person or

 6    small business.  We didn't screen it all.  If we do anybody

 7    that does hardship, that's 20.  They accepted 15 of the 20.  If

 8    the Court is looking to have a truly manageable number, that

 9    would be the other five, and that would be everybody who

05:18 10    claimed hardship.

11              THE COURT:  That would come off the 95?

12              MR. KENDALL:  That would give us 20 we agreed on and

13    another 20 hardships, of which they accept 15 of the 20.

14              MR. FRANK:  There were some errors on hardship list.

15    One of the individuals did not check hardship.  One works for a

16    municipality and said he wasn't sure he'd get paid after 3 days

17    for jury service, but I believe because he works for a

18    municipality he would.  And there were a couple that claimed

19    hardship that were not dubious.  They were not teachers.  One

05:19 20    was a consultant who travels.  We looked in good faith at the

21    list of 20.  We agreed to 15 names.

22              THE COURT:  Those 15 are in addition to the 20 or 21?

23              MR. FRANK:  These are in addition to the names we

24    previously gave the Court, which was 21.

25              MR. KENDALL:  So it's 36.  You're down to 80.
```

1          MR. FRANK:  I don't know if the defense has agreed to

2     any of the dozen names, many on our list who had convictions

3     and arrests who did not report it.

4          THE COURT:  You'll look into it tonight.

5          MR. KENDALL:  With the arrest, the government, to

6     their credit, said it was preliminary data and they're not

7     sure.  If, in fact, these people have felony convictions, we're

8     not going to dispute that.  Nothing is certain on that data.

9     It's up in the air.  I don't know what we can do with it until

05:20 10    it's confirmed.

11         MR. FRANK:  Some of the arrests were not disclosed and

12    there was a specific question about that.  There were also four

13    jurors on our list who cited hardship and I don't know if the

14    defense is agreeing to those.

15         THE COURT:  What about those four?

16         MR. FRANK:  I'm sorry.  Five.

17         THE COURT:  Five.  I think it would be helpful to

18    excuse all those with hardship because we're going to do it

19    when we get them here tomorrow anyway.

05:20 20         MR. KENDALL:  Your Honor, of their group of hardship,

21    it says hardship and other categories.  We see 1 person, I

22    don't view these as hardships.  One of them has some autism

23    issues, your Honor.  That's discrimination against somebody's

24    disability.  If the person says they're on the autism spectrum,

25    without further inquiry, we cannot discriminate them because of

1    some issue like that.

2          One juror expressed unacceptable racist views, but we

3    don't think that affects the deliberation of this case, but we

4    agree the views expressed are repugnant, at least as we would

5    read the response, maybe we're not doing him justice.  That was

6    not a hardship person.

7          1 person said they were suspicious about cooperate

8    ors.  That's in the same category as the Fifth Amendment, will

9    they follow your instructions.  So these aren't teachers who

05:21 10    have a first grade class starting tomorrow.  These are what

11    they call other categories.

12          MR. FRANK:  That's not accurate, your Honor.  All of

13    them indicated specifically that they had a hardship that would

14    make it difficult for them to serve.  In addition, there were

15    other categories they felt into.

16          For example, one of them said they had a personal or

17    family responsibility that would interfere with their service

18    as a juror because they were on call for their elderly father.

19          One of them said that she's interviewing for a new job

05:22 20    and could miss opportunities since she cannot schedule

21    follow-up interviews and also is responsible for a 5-year-old

22    child.

23          One of them said that she cares weekly for her father

24    and grandmother and therefore has a hardship.

25          One of them said she cannot read or understand

```
 1   English.
 2          MR. KENDALL:  We'll agree to two of those, your Honor,
 3   Juror 3 and Juror 95.
 4          THE COURT:  If these folks had come to side bar in the
 5   normal course of empanelment and had expressed those hardships,
 6   I would have had you hear but I would not have asked for your
 7   opinion.  I would have excused them for the hardship.  I'm
 8   relatively lenient when somebody tells me they have young
 9   children at home that they can't care for and it's a 4-week
10   trial.  I would be inclined to grant hardship excuses under
11   these circumstances if I heard them orally as opposed to seeing
12   them in writing.  I would have excused them on the spot.  I
13   suppose you would have been entitled to object to my excusing
14   them on the spot, but that's what I would have done.
15          What I hear is we can get down to roughly 75 and 80
16   that we call in.  I will do that.  I want you to give those
17   numbers immediately to the jury coordinator so that he can put
18   this on the call and we can have 75 to 80 jurors show up
19   tomorrow.
20          In the meantime, I would ask counsel to diligently try
21   to pair that list down if there are people that you haven't had
22   a chance to vet sufficiently.  For instance, if you find out
23   that one of these is a convicted fell on and ineligible, we can
24   either excuse that person when they arrive or excuse them
25   between now and then.
```

A653

1          MR. KENDALL:  Your Honor, the convicted felons, as

2     soon as it's confirmed that it's certain and the government is

3     comfortable, that's an easy one.  I'll go check the other

4     hardships Mr. Frank is raising and if we can add a few more to

5     the list, we'll do it right now.

6          THE COURT:  Right now what I need you to do is give

7     Mr. McAlear the 78 or whatever it is names that are not to be

8     excused and that will be called in tomorrow for individual voir

9     dire.  Hopefully, maybe even before he make that's call, you

05:25 10     can add three or four to that list, and between now and

11     tomorrow morning, perhaps three or four more so we have roughly

12     70 people to talk to tomorrow.

13          MR. KENDALL:  Yes, your Honor.  We'll do that.

14          MR. FRANK:  Your Honor, with respect to the additional

15     100 names from this afternoon --

16          THE COURT:  Second tranche.

17          MR. FRANK:  Which none of us have really looked at.

18     What does your Honor expect that have?

19          THE COURT:  Over nature going to have to review those.

05:25 20     We'll go forward with calling them in on Friday if we are

21     unable to empanel the jury tomorrow, which it frankly looks

22     like we're not going to be able to complete.  If we get 70

23     names in, I rather doubt we're going to end up with 36-year

24     jurors out of those 78.  So we'll have to go to the second day

25     and do exactly the same thing with the second tranche.  You're

1    expected to get together and agree who will be dismissed and

2    make a more concerted effort to maybe increase that number from

3    20 to 30 or 40 and we call another 70 in on Friday morning and

4    do the process again, unless somebody can think of a different

5    way to do it.

6         It is likely that tomorrow, as we go through the voir

7    dire process and I excuse some for cause and not others, that I

8    will let the not others go home rather than sit around all day

9    in the unlikely event that we'll end up with 36 or 40 cleared

05:26 10    jurors and be able to exercise peremptory before four or

11    5 o'clock.  That is unlikely to happen.

12         I will, of course, need to thoroughly instruct anybody

13    who has held that they are not to talk to anybody about this

14    case, not to do any research on the internet, so on and so

15    forth, that instruction I give at the outset of the trial.  I

16    am open to suggestions on how I do that.  I can't do it each

17    and every time, but perhaps we could write-up an instruction

18    that we hand to the people that are reserved but on their way

19    home to read as to what they cannot do before the further

05:27 20    empanelment procedure.  I would invite a joint statement or

21    statement to give to anybody who is reserved to excused

22    tomorrow.

23         Can you do that?

24         MR. KELLY:  Yes, your Honor.

25         MR. FRANK:  Yes, your Honor.

1          THE COURT:  I'll ask Mr. McAlear.  Is there anything

2     else we need to do at this point?

3          MR. MCALEAR:  No, your Honor.

4          THE COURT:  You'll give him within the next 15 minutes

5     a list that will have between 70 and 80 names on it and he will

6     summons those people to be here tomorrow morning at nine.

7     Everybody on the same page?

8          MR. FRANK:  Yes, your Honor.

9          MR. KENDALL:  Yes, your Honor.

05:28 10          THE COURT:  Thank you, counsel.  We're adjourned.

11     We'll get together tomorrow morning at 9 a.m.

12          (Whereupon, the proceedings adjourned at 5:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        UNITED STATES DISTRICT COURT
                            DISTRICT OF MASSACHUSETTS
2


3
    UNITED STATES OF AMERICA,          )
4                        Plaintiff     )
                                       )
5   vs.                                )   No. 1-19-CR-10080
                                       )
6   GAMAL ABDELAZIZ and JOHN           )
    WILSON,                            )
7                        Defendants.   )
                                       )
8                                      )

9


10

                    BEFORE THE HONORABLE NATHANIEL M. GORTON
11                       UNITED STATES DISTRICT JUDGE
                             JURY TRIAL - DAY 2
12


13

                John Joseph Moakley United States Courthouse
14                          Courtroom No. 4
                            One Courthouse Way
15                      Boston, Massachusetts 02210

16


17                          September 9, 2021
                                9:12 a.m.
18


19


20

                        Kristin M. Kelley, RPR, CRR
21                        Official Court Reporter
                John Joseph Moakley United States Courthouse
22                     One Courthouse Way, Room 3209
                        Boston, Massachusetts 02210
23                      E-mail: kmob929@gmail.com

24          Mechanical Steno - Computer-Aided Transcript

25

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```



```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
1    APPEARANCES:

2

3            Andrew E. Tomback

4            McLaughlin & Stern, LLP

5            260 Madison Avenue

6            New York, NY 10016

7            917-301-1285

8            atomback@mclaughlinstern.com

9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         THE COURT:  Good morning, counsel.  We're ready to

 3    proceed with the second day.  This is going to be primarily

 4    individual voir dire of what I'm calling the first tranche of

 5    prospective jurors.  Over the evening, did counsel eliminate

 6    anymore of this first tranche?  Mr. Frank?

 7         MR. FRANK:  Yes, your Honor.  The government has

 8    agreed to strike three of the for cause jurors suggested by the

 9    defense, numbers 88, 104 and 117.  The defense has agreed to

10    strike one of the jurors that the government thought should be

11    struck for cause, number 1, for a total of four.

12         THE COURT:  So those are four additional overnight who

13    have already been stricken.

14         MR. FRANK:  Correct.  I think that takes us to 75.

15         THE COURT:  Fair enough.  I can instruct the jury

16    coordinator that those four, numbers 1, 88, 104 and 117 do not

17    need to be in the list.

18         THE COURT:  Apparently, 88 was already excused

19    yesterday.

20         MR. FRANK:  Well, we renew our agreement on that.

21         THE COURT:  It will be 1, 104 and 117 for Mr. McAlear.

22         All right.  With regard to the second tranche, we need

23    your agreements.  Obviously we can't be working on that

24    simultaneously, but we need that as soon as you can resolve it.

25    What is the status of the work on the second group?
```

1      MR. FRANK:  So we have not conferred about that, your

2  Honor.  I can't speak for the defense.  The government has

3  identified 40 jurors, potential jurors, from that group that we

4  would strike for cause.  31 of them for hardship and another 9

5  for other reasons, including prior arrests or convictions.  I

6  would note, your Honor, that with respect to the group one

7  jurors who are coming in today, there are four jurors,

8  potential jurors, we've identified who failed to disclose in

9  3 cases, completely failed to disclose prior criminal charges

09:15 10  that resulted in felony quaffs, continued without finding, but

11  for sensing guideline purposes is a felony conviction.  One

12  disclosed a misdemeanor but did not disclose the quaff.  Then

13  there were additional four that identified hardship that's we

14  believe should be struck for cause.

15      THE COURT:  What do counsel request that I do for

16  them?  Do you want me to bring them in here and confront them

17  that they didn't tell me about a felony?

18      MR. KELLY:  Respectfully, your Honor, no.  I would

19  like to confer the government when we're done with this process

09:15 20  here.  I would only note that quaffs in the state system are

21  not conviction, so when the federal government files an 851

22  enhancement on prior convictions, they can't rely on the quaff.

23  So I have to look at the questionnaire to see if, as he

24  suggests, they lied to the Court.

25      THE COURT:  In the meantime, we won't bring them up

```
 1    and put them in the witness chair.
 2              MR. KELLY:  It's the second tranche.
 3              MR. KELLY:  In the first tranche, I suggest we ask
 4    them.
 5              MR. KENDALL:  Your Honor, it's a continuance without a
 6    finding that gets dismissed.  They may have a different
 7    understanding of the question than Mr. Frank did.  I think we
 8    should give the potential juror the chance to explain their
 9    answer and we can all evaluate it.
09:16 10              THE COURT:  I don't want to create unnecessary
11    embarrassment.
12              MR. KENDALL:  I understand, your Honor.
13              MR. FRANK:  The question asks whether they have been
14    charged with an offense other than a traffic violation.  In
15    2 cases, it was assault and battery.  In one case, it was
16    possession of a class C substance, and one case it was
17    malicious destruction of property.  I don't think there's
18    anything ambiguous about it.
19              THE COURT:  We don't need to belabor this one at that
09:17 20    point.  When we get to those folks, we'll address the issue
21    then.  I want to know who from each party will be questioning
22    each juror.  If it changes midstream, let me know.
23              Mr. Frank, will it be you?
24              MR. FRANK:  No.  It will be Miss Kearney.
25              THE COURT:  For Mr. Abdelaziz?
```

1          MR. KELLY:  Myself.

2          THE COURT:  For Mr. Wilson?

3          MR. KENDALL:  It will be me, your Honor.

4          A few other guidelines before we begin.  I don't

5     expect to inquire of every potential juror about all of the

6     affirmative responses.  I will inquire about one or more and

7     then I will allow counsel to inquire.  I caution you once again

8     that potential jurors have rights of privacy.  If I think the

9     question is too invasive of the potential juror's right to

09:18 10    privacy, I'm going to instruct him or her not to answer.  So

11    keep in mind that, yes, you're entitled to know information

12    about these affirmative responses, but, at the same time, these

13    jurors are citizens who have been summonsed against their will

14    to serve as jurors and they do have rights of privacy.  They

15    ought to be respected.  Keep that in mind.

16          The other matter that I was thinking about is I expect

17    to remind each of the potential jurors when they take a seat

18    that they remain under oath.  Yesterday they took an oath.

19    Usually, when I have witnesses who return after an overnight

09:19 20    hiatus from testifying, the first thing I do is to remind a

21    witness that he or she remains under oath.  I'm going to do

22    that with respect to the jurors as they take their seats unless

23    counsel can think of some other way to accomplish this.  Of

24    course, it will be very repetitive.

25          Is there anything counsel wishes to say about that?

```
 1              MR. FRANK:  No, your Honor.

 2              MR. KELLY:  No, your Honor.

 3              MR. KENDALL:  No, your Honor.

 4              THE COURT:  Any other questions about how we expect to

 5    proceed with this voir dire?  Mr. McAlear anything from the

 6    jury coordinator's perspective I should be reminded of?

 7              MR. MCALEAR:  No, your Honor.

 8              THE COURT:  If I reserve somebody, I need to instruct

 9    that person who is going to be released to home not to do any

09:20 10   research, et cetera.  Did counsel have a chance to draft a

11    proposed written instruction that would be acceptable to all

12    sides?

13              MR. FRANK:  We did not.  We're working on it right

14    now.

15              THE COURT:  We don't have anybody yet to reserve.  It

16    does seem to me that we ought to not only tell them that they

17    can't do any independent research about the case overnight, but

18    a nice one paragraph synopsis of their obligations as a

19    reserved juror would be helpful.  Work on that.

09:21 20              MR. KELLY:  We will, your Honor.  Perhaps the Court

21    could just inquire if they had done any research last night to

22    make sure nothing has come up between last night and today.

23              THE COURT:  If I do that times 70, it's going to

24    lengthen the time.  If you want to remind me from time to time

25    on a particular juror, I certainly will do that.
```

**A665**

```
 1          Mr. McAlear.

 2          THE COURT:  Mr. McAlear reminds me, if we reserve a

 3   juror, we'll hold them in the back of the house in case after I

 4   have reserved there are questions that counsel have before we

 5   send them home.  We'll have a short period of time after we

 6   reserve the jurors for counsel to bring anything to my

 7   attention that they need to do outside the hearing of the

 8   juror.  Okay?  All right.  Let's call the first potential

 9   juror.  .

09:28 10          MR. FRANK:  Your Honor, we have our proposed

11   instruction.  We could e-mail it to the deputy.

12          THE COURT:  Has defense counsel looked at it?

13          MR. FRANK:  No.

14          MR. FRANK:  Would it be possible to print it out here

15   and circulate it?

16          THE COURT:  I think perhaps we could do that.

17          MR. MCALEAR:  Juror No. 2, Keith Caito.

18          THE COURT:  Good morning, Mr. Caito.  You may remove

19   your mask if you want, but you don't have to.

09:30 20          PROSPECTIVE JUROR:  I think I will, your Honor.  Thank

21   you, sir.

22          THE COURT:  Mr. Caito, you're reminded that you remain

23   under oath.

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  I just notice one thing from your
```

**A666**

```
 1    questionnaire, that you take a medication called sertraline.

 2    What is that for?

 3            PROSPECTIVE JUROR:  It's more mental health.  I deal

 4    with depression and anxiety.  It's like a Zoloft type, generic,

 5    that my doctor assigned me.

 6            THE COURT:  Does it have any effect on your ability on

 7    what's being said in a courtroom, for instance?

 8            PROSPECTIVE JUROR:  Not that I can think of, sir.

 9    It's basically a mood balancer.

10            THE COURT:  You take it every day?

11            PROSPECTIVE JUROR:  Yes.  I take 150 milligrams every

12    day.

13            THE COURT:  Would that cause any problems being a

14    juror in this case?

15            PROSPECTIVE JUROR:  No.  I don't think so.

16            THE COURT:  Generally, Mr. Caito, can you decide this

17    case solely on the basis of the evidence that comes into this

18    courtroom and not on the basis of anything else?

19            PROSPECTIVE JUROR:  Yes.  Basically, anything that

20    would be said or shown or testimony, if I were here, I would

21    base my decision just on that.

22            THE COURT:  Any questions, counsel?  We'll start with

23    defendant Abdelaziz, Mr. Kelly.

24            MR. KELLY:  Good morning.  Thanks for being here.

25            PROSPECTIVE JUROR:  You're welcome.
```

```
 1          MR. KELLY:  Is there anything about this case you've
 2   seen in this questionnaire that suggests you couldn't be fair
 3   to both sides?
 4          PROSPECTIVE JUROR:  No, nothing I haven't seen.
 5   Obviously I haven't heard anything about it and I'm not going
 6   to do any research on it, no news cycle.  I never heard of this
 7   particular case.  I heard of more prominent ones out in
 8   California.  I never heard of these, even though I know they're
 9   similar.  Never heard of them.
10          MR. KELLY:  Thank you very much.  Thank you for coming
11   in.
12          THE COURT:  Mr. Kendall?
13          MR. KENDALL:  Good morning.  No questions, your Honor.
14          THE COURT:  Miss Kearney?
15          MS. KEARNEY:  Good morning, sir.  I noticed on your
16   questionnaire that you work in food service.
17          PROSPECTIVE JUROR:  Yes.
18          MS. KEARNEY:  I wanted to make sure I understand.
19   Would it be any hardship for you to serve on a jury potentially
20   up to 4 weeks.
21          MS. KEARNEY:  I don't work during the day.  I work in
22   the afternoon slash evening.  I usually work from about four to
23   5:00 p.m.  Usually until about 1:00 a.m. and spend some time at
24   home to get to sleep.  Sometimes I have problems with sleeping
25   and I deal with a lot of just -- I don't have a disease or
```

something.  I have trouble sleeping.  I literally the night
before -- yesterday I worked and managed to get home and get an
hour and a half or 2 hours so I was very tired with this.  Work
has been busy and tiring lately.  The last couple Saturdays I
worked 12-hour shifts.  We're getting to a busy part of the
year with football season here.  Dealing with that, as I told
the Honorable Judge Gorton, I deal with mental health, such as
depression and anxiety.  I've been dealing with a lot of
depression lately and deal with usual anxiety on a regular
basis.  That's why I take sertraline.  A lot of times how it
effects me is being physically and mentally tired a lot.  I
deal with that a lot.  I'm obviously still awake-ish right now,
of course, but I don't get a lot of good sleep.  I don't work a
day job.  It's different.  It's a different mentality working
late at night as opposed to during the day.  Normally right
now, I was scheduled to work today at 12, normally right now
I'd still be trying to get ready for work at this time.
Obviously I'm up here now, so of course I made the obligation
to come up here, of course.  It's important.  If I were to work
during that time, I obviously don't know exactly.  I obviously
told my manager about this and he understood that I had to come
up here and all that.  If I were to come up here during the
day, say 5 days a week, I would have to do that and my manager
wouldn't give me the time off at night.  It would probably be
come up here, do this, and then go back to work and then work

1 | and come back.  It would probably be a bit difficult on my end
2 | to be awake and sharp.  I don't think it would really help me
3 | or help anybody else to be clear.  If I were to go to school
4 | right now, I probably couldn't handle something like that.  It
5 | would definitely effect me a lot physically and mentally.
6 | MS. KEARNEY:  Thank you.
7 | THE COURT:  I'm hearing that you believe this would
8 | cause you a hardship to serve on this jury.
9 | PROSPECTIVE JUROR:  Probably not to the extent of
09:35 10 | like -- it would definitely be tiring, affect me physically and
11 | mentally.  Even with work, I work 40 plus hours a week.  Even
12 | with that, it would be a little bit tire some.  When I am tired
13 | a lot, it does -- not my thoughts.  It effects me a lot.
14 | People can tell I'm tired.  I see a therapist once a week.
15 | She's noticed a couple weeks I've been really tired and been
16 | depressed a lot lately.
17 | THE COURT:  Mr. Caito, it does seem to me that this is
18 | going to cause you a hardship serving on this jury for roughly
19 | 4 weeks, and that's what I believe it takes.  It's a full-time
09:36 20 | job.  You need to be aware and not tired and able to
21 | concentrate on evidence and able to get a good night's sleep so
22 | you can continue to do that the next day.  It doesn't sound to
23 | me like your schedule is going to allow that.
24 | PROSPECTIVE JUROR:  No.  Unfortunately not, if I had a
25 | day job and slept at night, I would be very honored to serve.

```
 1              THE COURT:  Thank you, Mr. Allocate owe.  I'm going to
 2    excuse you from this jury.
 3              PROSPECTIVE JUROR:  Thank you, sir.
 4              THE COURT:  Good morning, Miss Morris.  You may take a
 5    seat.  You may take your mask off if you choose to but you
 6    don't have to.
 7              PROSPECTIVE JUROR:  Okey-doke.
 8              THE COURT:  Miss Morris, you're reminded that you
 9    remain under oath.  I have looked at your questionnaire and I
10    understand that you live with compromised elderly parents.
11              PROSPECTIVE JUROR:  Correct.
12              THE COURT:  Would service on this jury cause you
13    hardship to as a result of that?
14              PROSPECTIVE JUROR:  It would cause me hardship because
15    I would have to isolate myself from being around so many
16    people.  I'm a full-time care giver to my dad.
17              THE COURT:  I take it you feel that service on this
18    jury would be a hardship to you.
19              PROSPECTIVE JUROR:  Yes.  Being around so many people.
20              THE COURT:  I'm going to excuse you from this jury.
21    Thank you, Miss Morris.
22              PROSPECTIVE JUROR:  Thank you very much, your Honor.
23              THE COURT:  Good morning, Miss Lightbody.
24              PROSPECTIVE JUROR:  Good morning.
25              THE COURT:  Please be seated.  You're reminded that
```

(09:38 at line 10, 09:39 at line 20)

```
 1    you remain under oath.  You make take your mask off if you want

 2    to but you don't have to.  It's up to you.

 3            PROSPECTIVE JUROR:  Thank you.

 4            THE COURT:  If you'd pull that microphone a little

 5    close so we can hear.  Miss Lightbody, I understand that your

 6    cousin's husband was a Boston detective, is that right?

 7            PROSPECTIVE JUROR:  Yes.

 8            THE COURT:  Would the fact that you have a distant

 9    relationship to a law enforcement officer in any way affect

10    your ability to be fair and impartial in this case?

11            PROSPECTIVE JUROR:  No.

12            THE COURT:  You could decide this case solely on the

13    basis of evidence that comes into this courtroom and not on the

14    basis to any prior relationship to a law enforcement officer?

15            PROSPECTIVE JUROR:  Correct.

16            THE COURT:  You apparently work with a college coach

17    with respect to your son.  I'm not sure I understand that.

18            PROSPECTIVE JUROR:  Correct.  So I have a senior in

19    high school who is going to be a freshman in college come the

20    fall of 2022.

21            THE COURT:  Would the fact that he's involved in

22    sports and about ready to go to college in any way affect your

23    ability to be fair and impartial in this case, which of course

24    involves allegations of fraudulent college admissions?

25            PROSPECTIVE JUROR:  No.
```

```
 1              THE COURT:  Let me see if I can understand.  You think

 2       you can be fair and impartial and decide this case based solely

 3       on the evidence that comes into this courtroom and not on

 4       anything else, is that right?

 5              PROSPECTIVE JUROR:  Correct.

 6              THE COURT:  Any questions for this potential juror?

 7       Mr. Kelly?

 8              MR. KELLY:  Good morning.  I represent Mr. Abdelaziz.

 9       My name's Brian Kelly.  Thank you for coming in.  Simple

09:41 10       question is, in reviewing this questionnaire, is there anything

11       in there that suggests to you that you couldn't be fair to all

12       sides?

13              PROSPECTIVE JUROR:  No.  There's nothing.  All voices

14       need to be heard.  You're innocent until proven guilty.

15              MR. KELLY:  Thank you very much.

16              THE COURT:  Mr. Kendall?

17              MR. KENDALL:  Good morning.  I'm Mike Kendall.  I

18       represent John Wilson.  No questions, your Honor.

19              THE COURT:  Miss Kearney?

09:41 20       MS. KEARNEY:  Good morning, Miss Lightbody.  With

21       respect to the college coach you're working with for your son,

22       how often does he meet with your son or what kind of work is he

23       doing?  If you could elaborate a little bit more.

24              PROSPECTIVE JUROR:  Sure.  It's a she.  He's only had

25       one meeting.  It's really just to keep him organized and just
```

1    giving him milestones through the college process, like saying,

2    hey, August 1st, the common app process is open.  You should

3    have you are he is a done by this time, teacher recommendations

4    on this time.  So it's really just keeping him organized.  It's

5    really my husband and I forming that spreadsheet and kind of

6    having the columns and checklists and things of that nature,

7    but having someone other than his parents harping on him to

8    make sure that he's following each step in the process.

9         MS. KEARNEY:  Thank you.

09:42 10        THE COURT:  Thank you, Miss Lightbody.  I am going to

11    have you reserved.  We're not going to go forward with any

12    further procedure today.  The jury coordinator will tell you

13    what room you are to go.  You're going to be asked to come back

14    perhaps at a later time.  I caution you not it try to do any

15    independent research on this case.  Don't refer to the internet

16    or any of those electronic tools that help us in daily life.

17    You can't do this about this case because you're going to

18    decide eventually, if you're chosen as a juror, solely on the

19    basis of the evidence that comes into this courtroom and not on

09:43 20    the basis of any independent research.  Okay?

21         PROSPECTIVE JUROR:  That's correct.  Yes.

22         THE COURT:  The jury coordinator will tell you where

23    you need to go.

24         Good morning, miss late on.  You may be seated.  You

25    are reminded you're under oath.  You may take your mask off if

1    you choose, but you don't have to.  If you'd pull that

2    microphone a little closer to you so we can hear your answers.

3         Miss late on, I understand at least one of the

4    questions you answered affirmatively is that someone you know

5    or in your family was convicted of possession and theft and

6    served some time in jail.

7         PROSPECTIVE JUROR:  That's correct.

8         THE COURT:  Were you involved in the prosecution of

9    this person?  Was it a relative or someone in your family?

09:45 10         PROSPECTIVE JUROR:  It was my cousin, but I was not

11    involved.

12         THE COURT:  Have you talked to your cousin about

13    having served in prison?

14         PROSPECTIVE JUROR:  Not lately.

15         THE COURT:  Would the fact that somebody in your

16    family was involved in the criminal justice system in any way

17    affect your ability to be fair and impartial in this case,

18    which of course involves charges of completely different kind

19    of criminal conduct?

09:45 20         PROSPECTIVE JUROR:  No.  I don't believe so.

21         THE COURT:  You could decide this case solely on the

22    basis of the evidence that comes into this courtroom and not on

23    the basis of anything has happened elsewhere?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  I understand that you played soccer or

```
 1    somebody in your family played soccer in college?

 2              PROSPECTIVE JUROR:  Yes, I did.

 3              THE COURT:  Would the fact that these charges involve

 4    allegations of falsifying records of sports prowess in any way

 5    affect your ability to be fair and impartial in this case

 6    having been a college athlete in your case?

 7              PROSPECTIVE JUROR:  I don't say for sure one way or no

 8    in what way way, but it would definitely play a factor.

 9              THE COURT:  By play a factor, what do you mean?

10              PROSPECTIVE JUROR:  I think it would depend on the

11    situation how it was falsified, did that person take someone

12    else's spot completely.

13              THE COURT:  So it would depend on the evidence that

14    comes before you and not on the basis of the fact that you're a

15    college athlete?

16              PROSPECTIVE JUROR:  I suppose so.

17              THE COURT:  That right?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Any questions for this potential juror?

20              MR. KELLY:  Yes.  Good morning.  I represent Mr. Aziz.

21    You just said you suppose so.  Is there some hesitation that

22    your prior playing status might affect your decision here?

23              PROSPECTIVE JUROR:  I think it's a big thing that I

24    was a student athlete.  I went through the process.  I was

25    fully involved.  If someone had to take someone else's spot or
```

         1   someone was removed, just the kind of integrity of the student

         2   athlete circumstance was questioned, I think I would have a

         3   different mind-set than someone who wasn't involved at all.

         4            MR. KELLY:  It was D 3 you played?  Process yes.

         5            MR. KELLY:  What position?

         6            PROSPECTIVE JUROR:  Defense.

         7            MR. KELLY:  Is anything about going through this

         8   questionnaire suggest anything to you that would make you feel

         9   like you couldn't be fair to the defense and the government?

09:47   10            PROSPECTIVE JUROR:  No.

        11            THE COURT:  Mr. Kendall.

        12            MR. KENDALL:  Hi.  I'm Mike Kendall.  I represent John

        13   Wilson.  Thank you for coming in this morning.  We appreciate

        14   your frankness of your answers.  I just wanted to ask a couple

        15   of points.  You expressed concern if somebody's spot was taken.

        16   Is this based upon -- I take it this is obviously based upon

        17   your own experience as an athlete and your own process of going

        18   through the college athletic system?

        19            PROSPECTIVE JUROR:  Yes.

09:47   20            MR. KENDALL:  How many years did you play at Anna

        21   Maria?

        22            PROSPECTIVE JUROR 4.

        23            MR. KENDALL:  I take it that prior knowledge and

        24   experience is something you would make as part of your thinking

        25   or analysis of the evidence.

1          PROSPECTIVE JUROR:  Absolutely.

2          MR. KENDALL:  It would be hard to separate?

3          PROSPECTIVE JUROR:  Probably, yes.

4          MR. KENDALL:  Appreciate your candor.

5          THE COURT:  Thank you.

6          MS. KEARNEY:  Do you feel your cousin was treated

7     fairly in the criminal justice system?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Thank you, miss lay ton.  I'm going to ask

09:48  10     you to be reserved with the jury coordinator.  You're reminded

11     that if you are to be called back, please do not do any

12     independent research on this case.  That would be totally

13     inappropriate because you're going to decide this case, if you

14     are chosen as a juror, solely on the basis of the evidence that

15     comes into this courtroom and not on the basis of anything that

16     you found out about the case.  Okay?

17          PROSPECTIVE JUROR:  All right.

18          MR. KELLY:  Procedurally is now the time?

19          THE COURT:  Hold the next potential juror, please.

09:49  20          MR. KELLY:  We would move to excuse that juror for

21     cause.  We think her statements about her playing history

22     suggests to us that she cannot be fair in this case to our

23     client.  She seemed to have very firm beliefs about this case

24     involving taking a spot from somebody else.  We think her

25     answers reflected hostility to the defense side that we believe

1   justify a strike for cause, your Honor.

2        THE COURT:  Mr. Kendall?

3        MR. KENDALL:  I might add one point.  In some ways she

4   was a very responsible, honest person.  That's to be commended.

5   It shows a responsible person.  I think I would agree I had a

6   very light touch and she admitted freely she cannot separate

7   her prior experience and her out of court experience as a

8   college athlete in deciding this case.  She was very upfront

9   about that. I didn't push very hard.  I let her answer a fairly

09:50 10   open question.  I think that's the essential issue that

11   disqualifies somebody, if they're going to bring out of court

12   experience and things outside the evidence that they cannot

13   separate from their decision-making in this case that has

14   personal experience with the same facts in this case.  I think

15   it's a very strong basis to challenge her, your Honor.

16        THE COURT:  Miss Kearney or Mr. Frank.

17        MR. FRANK:  Your Honor, every juror brings life

18   experience to the case.  We can't just disqualify any juror

19   because they were a college athlete.  She said she could keep

09:50 20   an open mind and be impartial.  As Mr. Kendall said, there was

21   nothing about her answer that suggested a lack of integrity.

22   We don't think simply because she was a college athlete that

23   that's a disqualifier.

24        THE COURT:  I'm not going to exclude her for cause.  I

25   think she answered the questions that I asked about being able

**A679**

        to decide this case based on the solely on the evidence that
        comes before this court.  I take her answers as truthful.  She
        will not be stricken for cause.

                Call the next potential juror.

                Good morning, Mr. Ross.  You're reminded you're under
        oath.  You may remove your mask, if you choose.  If you will
        pull the microphone closer to you, so we can hear your answers.

                Mr. Ross, I understand that you were once before on
        jury duty, is that right?

                PROSPECTIVE JUROR:  Yes, sir.

                THE COURT:  Would you tell me about that.

                PROSPECTIVE JUROR:  It was a trial based on --

                THE COURT:  Civil trial.

                PROSPECTIVE JUROR:  Civil trial using other people's
        money.

                THE COURT:  Do you remember what court it was?

                PROSPECTIVE JUROR:  Yes, the one down by State Street.

                THE COURT:  The state court, Suffolk Superior Court.

                PROSPECTIVE JUROR:  Yes, sir.  It was almost 15 years
        ago.  It's been a while.  The trial was about the infomercial
        where you say you use other people's money to make money.

                THE COURT:  Do you remember how the case came out?

                PROSPECTIVE JUROR:  Yes, sir.  They were found guilty.

                THE COURT:  Liable.

                PROSPECTIVE JUROR:  Liable, yes, sir.  They couldn't

1   come up with anybody that said, okay, use my money and I

2   benefitted from what you said.  In fact, it was the opposite.

3          THE COURT:  Would that experience, Mr. Ross, in any

4   way affect your ability to be fair and impartial in this case?

5          PROSPECTIVE JUROR:  I'd be fair.

6          THE COURT:  You could be fair in this case?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  You also mentioned that someone in your

9   family at one point was a mail man for Harvard University.

09:53 10          PROSPECTIVE JUROR:  I am.

11          THE COURT:  Currently.

12          PROSPECTIVE JUROR 1 aspect.  Harvard has offices in

13   Brighton on guest street.  I'm the mail man for them.

14          THE COURT:  You understand that universities are

15   involved in this case.  Would the fact that you worked for

16   Harvard affect your ability to be fair and impartial in this

17   case?

18          PROSPECTIVE JUROR:  I don't work for Harvard.  I work

19   for the United States post office.  I deliver mail to one of

09:53 20   their offices.

21          THE COURT:  Would that connection in Harvard in any

22   way affect your ability?

23          PROSPECTIVE JUROR:  No.  It wouldn't affect my

24   ability.  I wanted to mention that because they said any kind

25   of ties.

```
 1              THE COURT:  Absolutely correct to mention it.
 2              Is there anything else that would prevent you from
 3       being fair and impartial in this case that you can think of?
 4              PROSPECTIVE JUROR:  No.
 5              THE COURT:  Any questions, Mr. Kelly, for this
 6       potential juror?
 7              MR. KELLY:  Sure.  Thank you.  Good morning.  Thank
 8       you for coming in.  I represent Mr. Aziz here.  Couple quick
 9       questions.
10              You referenced the experience you had in that civil
11       case.
12              PROSPECTIVE JUROR:  Yes, sir.
13              THE COURT:  Would you be comfortable understanding
14       that this case is criminal and the burden of proof is beyond a
15       reasonable doubt, whereas in a civil case that you sat on it's
16       just more likely than not is the burden of proof.  Would you
17       feel comfortable distinguishing between your prior service in a
18       civil case and this one being criminal?  In a criminal case,
19       the government has to prove things beyond a reasonable date.
20       In a civil case, two people are suing each other over money.
21       It's a different standard.  Are you comfortable with that?
22              PROSPECTIVE JUROR:  Yes, sir.
23              MR. KELLY:  This case will involve a lot of
24       discussions about college sports.  Do you follow any college
25       sports in general?
```

```
 1          PROSPECTIVE JUROR:  I more follow the pro sports, not
 2    really much on college sports, except for college basketball
 3    where you do the bracket.  Just the N-C-A-A-bracket.  That's
 4    all for my college sports following.  Then I just pick teams.
 5    It isn't like I follow teams.
 6          MR. KELLY:  The March madness stuff?  There's not much
 7    around here.  We don't have good college teams here.
 8          Anything about the questionnaire that would make you
 9    not fair to all sides?
10          PROSPECTIVE JUROR:  No.  I think I would be able to
11    give a fair and honest effort.  Whatever happens, happens.
12          MR. KELLY:  Thank you.
13          THE COURT:  Mr. Kendall.
14          MR. KENDALL:  Good morning.  I'm Mike Kendall.  I
15    represent John Wilson.  I have no questions.
16          THE COURT:  Miss Kearney?
17          MS. KEARNEY:  No questions.
18          THE COURT:  Thank you, Mr. Ross.  I'll ask you to be
19    reserved on this case.  That means Mr. McAlear will tell you
20    where to go.  If you are called back, please do not do any
21    research, independent research, on this case.  Don't try to
22    find out what's going on because you're going to decide this
23    case, if you're chosen as a juror, solely on the basis of
24    evidence that comes in this courtroom and not outside research.
25    Okay?
```

```
 1              PROSPECTIVE JUROR:  Yes, sir.

 2              THE COURT:  Thank you, Mr. Ross.

 3              Good morning, Mr. Ayles.  Please take a seat.  You're

 4    reminded you're still under oath.  You may remove your mask if

 5    you want to, but you don't have to.  Would you speak right into

 6    the meek phone, please.

 7              Mr. Ayles, I understand you have a job that requires

 8    daily attention and guidance.  Would service on this jury

 9    impose a hardship on you with respect to your job?

09:57 10              PROSPECTIVE JUROR:  More so on the city that I'm

11    employed with.

12              THE COURT:  You're employed by a municipality?

13              PROSPECTIVE JUROR:  Correct.

14              THE COURT:  What do you do for them?

15              PROSPECTIVE JUROR:  I'm their chief financial officer,

16    director of municipal finance.

17              THE COURT:  So you could serve on this jury.

18    Understand that you probably have to take a leave.  How many

19    other employees in your department?

09:58 20              PROSPECTIVE JUROR:  I have about 25 that report within

21    the finance department.

22              THE COURT:  So the municipality wouldn't go bankrupt

23    without you for 4 weeks?

24              PROSPECTIVE JUROR:  No, sir.

25              THE COURT:  Could you be fair and impartial in this
```

1  case and decide this case solely on the basis of the evidence

2  that comes into this courtroom and not on the basis of any

3  outside influence?

4         PROSPECTIVE JUROR:  I feel I could.

5         THE COURT:  Is there anything in the questionnaire

6  that caused you concern about your ability to be fair and

7  impartial in this case?

8         PROSPECTIVE JUROR:  No, your Honor.

9         THE COURT:  Mr. Kelly, any questions for this

09:58 10  potential juror?

11         MR. KELLY:  Just quickly, your Honor.  Good morning.

12  Thanks for coming in.  I represent defendant Abdelaziz.

13         One of the questions on the questionnaire referenced

14  you saw an article recently in the Boston Globe.

15         PROSPECTIVE JUROR:  Yes.

16         MR. KELLY:  Anything about that stick in your memory?

17         PROSPECTIVE JUROR:  No.  I perused through the article

18  so I'd have a general understanding of what the case was about.

19  Didn't really focus on any of the details.

09:59 20         MR. KELLY:  Anything about that that you think would

21  make you favor one side over the other?

22         PROSPECTIVE JUROR:  No, sir.

23         MR. KELLY:  Would that article or anything else in

24  this questionnaire make you feel like you couldn't be fair to

25  defense and the government?

```
 1              PROSPECTIVE JUROR:  No, sir.

 2              MR. KELLY:  Nothing further.

 3              THE COURT:  Mr. Kendall?

 4              MR. KENDALL:  Good morning.  No questions, your Honor.

 5              THE COURT:  Miss Kearney?

 6              MS. KEARNEY:  Good morning, sir.  In your

 7    questionnaire you referenced an incident where you were a

 8    teenager.  I just wanted to ask you if there was anything about

 9    that experience that might affect your ability to be fair and

10    impartial in this criminal trial?

11              PROSPECTIVE JUROR:  No.  Not about those, no.

12              THE COURT:  Did you feel you were treated fairly in

13    that experience?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  I also notice that in a prior position you

16    had some fundraising responsibility.  Can you elaborate on that

17    a little bit?

18              PROSPECTIVE JUROR:  Yes.  Prior it my role with the

19    municipality now, I was director of operations for a quasi-y

20    state quasi-y nonprofit that did fundraising and implemented

21    child abuse programs throughout the state, did some legislative

22    work.  So we raised money to help further those efforts.

23              MS. KEARNEY:  Did you personally have any fundraising

24    goals you had to meet?

25              PROSPECTIVE JUROR:  Not me personally.  The director
```

**A686**

         1  of development reported to me.  They were in charge of all the

         2  fundraising activities.

         3          MS. KEARNEY:  Thank you, sir.

         4          THE COURT:  Thank you, Mr. Ayles.  I'll ask you to be

         5  reserved and go with Mr. McAlear.  You are, of course,

         6  instructed not to do any independent research in this case if

         7  you were to be called back to sit as a juror.  You're going to

         8  decide this case solely on the basis of the evidence that comes

         9  into this courtroom.  Don't do any research in the meantime.

10:01  10          PROSPECTIVE JUROR:  Understood, your Honor.  Thank

        11  you.

        12          THE COURT:  Good morning, Miss Miville.  Is that how

        13  you pronounce it?

        14          PROSPECTIVE JUROR:  Close enough.

        15          THE COURT:  Miss Miville.  You're reminded you're

        16  under oath, Miss Miville.  You may remove your mask if you want

        17  to, but you don't have to.  Would you pull that microphone

        18  close so we can hear you.

        19          PROSPECTIVE JUROR:  Good morning.

10:02  20          THE COURT:  Good morning.  You mentioned you just

        21  started a new job.  If you were chosen as a juror, you'd be out

        22  of that job for probably 4 weeks.  Would that cause you a

        23  hardship?

        24          PROSPECTIVE JUROR:  Very much so.  I have a disabled

        25  husband at home.  I'm the only income right now.

```
 1          THE COURT:  I'm going to excuse you from this jury.

 2    It's important for you to get off to a good start at your job.

 3    It sounds to me --

 4          PROSPECTIVE JUROR:  At my age, brand new.

 5          THE COURT:  Your age is pretty young from my vantage

 6    point so don't worry about that.  I understand how this could

 7    cause you a hardship.  I'm not going to require you to serve.

 8    Thank you.  You're excused.

 9          Good morning.  Is it Mr. Keohan.

10:03 10          PROSPECTIVE JUROR:  Keohan.

11          THE COURT:  Mr. Keohan, you're reminded that you

12    remain under oath.  You may remove your mask if you want to,

13    but you don't have to.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  Would you pull that microphone close so we

16    can all hear when you answer my questions.

17          Mr. Keohan, I understand that back in college you

18    played basketball and football.

19          PROSPECTIVE JUROR:  No.  My sons did.

10:03 20          THE COURT:  You had relations that played college

21    athletics, right?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  This case, of course, involves allegations

24    of falsely claiming to be athletes and getting into college

25    under false pretenses.  Would the fact that you have
```

```
 1   connections with people that were actually athletes in college
 2   in any way affect your ability to be fair and impartial in this
 3   case?
 4           PROSPECTIVE JUROR:  No.
 5           THE COURT:  You could decide this case solely on the
 6   basis of the evidence that comes into this courtroom and not on
 7   the basis of any prior knowledge of sports?
 8           PROSPECTIVE JUROR:  No.  Absolutely could.
 9           THE COURT:  Apparently, somebody in your family was
10   convicted of operating under the influence sometime ago.
11           PROSPECTIVE JUROR:  Correct.
12           THE COURT:  Was that person involved in a criminal
13   proceeding?
14           PROSPECTIVE JUROR:  Yes.
15           THE COURT:  Were you present?  Did you participate in
16   that?
17           PROSPECTIVE JUROR:  No.
18           THE COURT:  So would that involvement with the
19   criminal justice system, even as indirect as that was, in any
20   way affect your ability to be fair and impartial in this case?
21           PROSPECTIVE JUROR:  No.
22           THE COURT:  Apparently, your first cousin worked for
23   the FBI.
24           PROSPECTIVE JUROR:  Correct.
25           THE COURT:  Would the fact that you have connections
```

         1    with law enforcement in any way affect your ability to be fair

         2    and impartial in this case, which may involve the testimony of

         3    law enforcement officers?

         4              PROSPECTIVE JUROR:  Not at all.

         5              THE COURT:  Any questions for this potential juror,

         6    Mr. Kelly?

         7              MR. KELLY:  Sure.  Good morning.  Thanks for coming

         8    in.  I represent Mr. Aziz here.  What is your cousin's name?

         9              PROSPECTIVE JUROR:  Robert oxly, O-X- L-E-Y-.

10:05   10              THE COURT:  How long did he work for the bureau in

        11    Boston?

        12              PROSPECTIVE JUROR:  I think he actually was in

        13    Virginia first.  I think he's retired now.  He retired, is

        14    working security somewhere in Manchester.

        15              MR. KELLY:  Do you get along with your cousin?

        16              PROSPECTIVE JUROR:  Yes.  I don't see him often.

        17              MR. KELLY:  Anything about that, the fact he worked

        18    for the FBI, if there are FBI agents in this case, would tend

        19    to make you more or less receptive to the FBI agents testimony?

10:06   20              PROSPECTIVE JUROR:  No.  Not at all.

        21              MR. KELLY:  Nothing in this questionnaire or

        22    proceedings today suggest to you you can't be fair in this

        23    case?

        24              PROSPECTIVE JUROR:  No.

        25              MR. KELLY:  You referenced sports questions there.

**A690**

```
 1   Are there any college sports in particular you follow?
 2              PROSPECTIVE JUROR:  I'm a sports fan.
 3              MR. KELLY:  Thanks.  Nothing more.
 4              PROSPECTIVE JUROR:  You're welcome.
 5              THE COURT:  Mr. Kendall?
 6              MR. KENDALL:  Good morning, Mr. Kendallal.  I
 7   represent John Wilson.  Thank you for coming in.  I have no
 8   questions.
 9              THE COURT:  Miss Kearney?
10:06 10        MS. KEARNEY:  Good morning, Mr. Keohan.
11              PROSPECTIVE JUROR:  Good morning.
12              MS. KEARNEY:  I want to ask you about your experience
13   with the criminal justice system.  Is there anything about your
14   history that might affect your ability to be fair and impartial
15   in terms of a criminal case?
16              PROSPECTIVE JUROR:  No.
17              MS. KEARNEY:  If you had any experience with the
18   criminal justice system yourself, do you feel you were treated
19   fairly?
10:07 20        PROSPECTIVE JUROR:  Sorry?
21              MS. KEARNEY:  If you had any experience with the
22   criminal justice system yourself, do you feel you were treated
23   fairly?
24              PROSPECTIVE JUROR:  Yes.
25              MS. KEARNEY:  Thank you.
```

**A691**

1          THE COURT:  Thank you, Mr. Keohan.  I'm going to ask

2     you to be what we call reserved.  Mr. McAlear will show you the

3     room you're called to.  If you're called back on other

4     occasion, please don't try to do any research between now and

5     then on the internet.  That would be entirely inappropriate

6     because if you're chosen as a juror in this case, you're going

7     to decide the case solely on the basis of evidence that comes

8     into this courtroom and not on the basis of any independent

9     research.  Okay?

10:07 10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Thank you, Mr. Keohan.

12          PROSPECTIVE JUROR:  Thank you.

13          MS. KEARNEY:  Your Honor, before the next juror comes

14     in, we wanted to address something.

15          THE COURT:  Yes.

16          MS. KEARNEY:  The government wants to strike Juror 18

17     for cause.  He has a conviction for larceny more than $250,

18     which would be a felony conviction.  He also has several drunk

19     driving arrests that he was not fully forthcoming about.  He

10:08 20     said it was with somebody else in his family, not him.

21          MR. KELLY:  That's news to us.  This morning they

22     didn't note that to us about Juror 18.  They noted others about

23     quaffs.  This is the first we're hearing that.  We would oppose

24     that.

25          MS. KEARNEY:  I'm happy to share his criminal record.

1    I just noticed it myself.

2              MR. KENDALL:  I'd ask to bring the witness in and ask

3    him why he didn't mention it.

4              MR. KELLY:  It's a pretty common name.  Keohan in

5    Boston is pretty common.  Let's see if it's really him.

6              THE COURT:  Let's call Mr. Keohan back.  You may

7    inquire of those.

8              MS. KEARNEY:  Yes, your Honor.  I didn't want to

9    embarrass him.

10:09 10              THE COURT:  I understand.

11              Thank you for coming in, Mr. Keohan.  There are a few

12    other questions that one of the attorneys would like to ask

13    you.

14              PROSPECTIVE JUROR:  Okay.

15              THE COURT:  You may continue, Miss Kearney.

16              MS. KEARNEY:  Good morning again.  I wanted to

17    follow-up.  Were you recently charged in 2019 with leaving a

18    scene for property damage?

19              PROSPECTIVE JUROR:  With OUI.

10:10 20              MS. KEARNEY:  Did you plead guilty to that offense?

21              PROSPECTIVE JUROR:  I did.

22              MS. KEARNEY:  How many OUIs have you been charged

23    with?

24              PROSPECTIVE JUROR:  Two.

25              MS. KEARNEY:  In 1992, were you convicted of larceny?

1          PROSPECTIVE JUROR:  No.  I don't know where that came

2     from.

3          THE COURT:  Do you have any idea what that?

4          PROSPECTIVE JUROR:  I've never been charged with

5     larceny.

6          MS. KEARNEY:  With theft of any kind?

7          PROSPECTIVE JUROR:  Nothing.

8          MR. KELLY:  Thank you, sir.

9          THE COURT:  Do defendants counsel wish to ask any

10:10 10     questions?

11          MR. KELLY:  No.  Not at all.  Thank you.

12          THE COURT:  Mr. Kendall?

13          MR. KENDALL:  Thank you.

14          PROSPECTIVE JUROR:  Could I ask about the larceny?

15          THE COURT:  Yes, of course.

16          PROSPECTIVE JUROR:  I've never been charged with

17     larceny.  I don't know where that came from.

18          THE COURT:  It was a misidentification as far as

19     you're concerned?

10:10 20          PROSPECTIVE JUROR:  Yes.  Absolutely.  How do I look

21     into that?

22          THE COURT:  That's a separate matter, Mr. Keohan.

23     That doesn't involve this case.  You're certainly entitled to

24     look into it if you want to.  Thank you, Mr. Keohan.

25          THE COURT:  Miss Kearney?

**A694**

1          MS. KEARNEY:  The government still moves to strike
2     Mr. Keohan for cause given that he was not forthcoming with the
3     Court initially regarding his OUIs, and it also does appear he
4     has a larceny conviction on the rap sheet as the OUIs he
5     described, understanding he doesn't believe that that's him,
6     the rest of the convictions appear to match up.

7          THE COURT:  Mr. Kelly.

8          MR. KELLY:  Opt questionnaire, he said OUI.  He didn't
9     lie about it.  He put it on the questionnaire.  If you look at
10:11 10     31.  He's not lying about that.  The larceny's not him.
11     Sometimes people get misidentified on rap sheets with people
12     with common names.  The Court can assess for itself his
13     credibility.  I respectfully admit there's nothing wrong with
14     that juror.

15          THE COURT:  Mr. Kendall?

16          MR. KENDALL:  I want to reaffirm what he said.  It
17     says 2-year Probation OUI class, misdemeanor, OUI.  If they
18     thought there was something about his response that wasn't
19     appropriate, they should have asked him.  As soon as it was
10:12 20     raised, he immediately said it.  He said there was a second.
21     He said there was property damage.  He was not looking to hide
22     anything from this Court.  Thank you.

23          THE COURT:  Miss Kearney?

24          MS. KEARNEY:  I believe the Court specifically asked
25     if it was him or someone else who was involved with the prior

```
 1   OUI that he disclosed and he said it was someone else.

 2          THE COURT:  I'm not going to excuse him for cause.  I

 3   think he might have misunderstood my question.  He was under

 4   oath.  He said he could decide this case solely on the basis of

 5   the evidence that comes into this courtroom.  I understood him

 6   to be an honest person.  I'm not going to strike him for cause.

 7          We'll call the next potential juror.

 8          Good morning, miss Williams.  Please be seated.

 9   You're reminded that you remain under oath.  You may remove

10   your mask if you want to, but you don't have to.  If you'll

11   pull that microphone close in so we can hear what you have to

12   say.

13          Miss Williams, I understand you're a school teacher

14   and you've just started with your new year.  Where do you teach

15   school?

16          PROSPECTIVE JUROR:  Needham, Massachusetts.

17          THE COURT:  What level?

18          PROSPECTIVE JUROR:  Ninth graders and 12th graders.

19          THE COURT:  In the high school?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  What courses do you teach?

22          PROSPECTIVE JUROR:  Senior wellness will be yoga,

23   games, nutrition, and C P R.

24          THE COURT:  Would the fact that this is going to be

25   about a 4-week trial cause you hardship?  It may cause your
```

Line timestamps: 10:13 at line 10, 10:14 at line 20.

1   students hardship, I'm sure, but would it cause you a hardship?

2          PROSPECTIVE JUROR:  Just in terms of -- relationship

3   building because right now I'm establishing.  We would be

4   probably one rotation, one full rotation that I would miss

5   them.

6          THE COURT:  We ask jurors to undergo inconvenience

7   because all jury duty causes people inconvenience, but we don't

8   require them to undergo hardship.  Sometimes the difference

9   between inconvenience and hardship is very hard to draw.

10:15 10  There's a thin line.  I don't like to cause people hardship in

11  their employment, but it's a civic duty to serve on juries, so

12  it's very important that we have citizens willing to undergo

13  inconvenience.  I'm going to leave it up to you to tell me

14  whether this is going to be more in the nature of an

15  inconvenience for everybody or a real educational hardship for

16  you and/or for the Needham students that you won't be able to

17  teach.  You tell me.

18         PROSPECTIVE JUROR:  I think it's going to be if

19  elected an inconvenience, but I don't think it would be an

10:15 20  absolute hardship.

21         THE COURT:  So you would be willing to do it even

22  though you're going to be out of your job for 4 weeks or so, is

23  that right?

24         PROSPECTIVE JUROR:  Uh-hum.

25         THE COURT:  It wouldn't cause you to be concerned

```
 1   while you're sitting here as a juror sitting about, oh, I
 2   should be teaching my students?  Would it be too much to
 3   concentrate on this case?
 4           PROSPECTIVE JUROR:  To be honest, I would probably be
 5   thinking a little bit about that.
 6           THE COURT:  You think they could survive?
 7           PROSPECTIVE JUROR:  Yes.
 8           THE COURT:  Do you have any assistants that will take
 9   over your teaching duties for those 4 weeks?
10           PROSPECTIVE JUROR:  Yes.
11           THE COURT:  Are you confident they can do a good job?
12           PROSPECTIVE JUROR:  We have a really great staff at
13   Needham.
14           THE COURT:  You're confident they would do a good job
15   in your absence?
16           PROSPECTIVE JUROR:  Yes.
17           THE COURT:  You can decide this case on the evidence
18   brought into the courtroom and not on any influence from the
19   outside?
20           PROSPECTIVE JUROR:  Right.
21           THE COURT:  Is there anything in that questionnaire
22   that caused you concern when you were answering these questions
23   that you might not be able to be fair and impartial?
24           PROSPECTIVE JUROR:  No.  I don't think so.
25           THE COURT:  Mr. Kelly, any questions for this
```

1    potential juror?

2         MR. KELLY:  Sure.  Thank you for coming in.  I

3    represent Mr. Aziz here.  How many students do you teach?

4         PROSPECTIVE JUROR:  120.  Right now we're doing

5    seniors.  I would be teaching seniors.

6         MR. KELLY:  So your class just started?

7         PROSPECTIVE JUROR:  Yes.  This would be our third day.

8         MR. KELLY:  If we have a 4-week trial, that's going to

9    pose a major inconvenience, correct?

10:17 10       PROSPECTIVE JUROR:  It's going to be inconvenient.  I

11   will not tell you any other way.

12        MR. KELLY:  You say you'd be thinking about your

13   students.

14        PROSPECTIVE JUROR:  At way back there, yeah, but I

15   think I'm competent to focus on what's in front of me.

16        MR. KELLY:  Is there any issues with the school system

17   with you taking off a month at the start of the school year?

18        PROSPECTIVE JUROR:  I've never done this before so

19   I've never checked in.  I just check in with my department

10:18 20   head.  She said she would follow-up on what happens.

21        MR. KELLY:  So you never served on a jury before?

22        PROSPECTIVE JUROR:  I've never served on a jury that

23   lasted more than just 1 day.

24        MR. KELLY:  You served on 1 day juries?

25        PROSPECTIVE JUROR:  Yes.

1          MR. KELLY:  Was it criminal or civil?

2          PROSPECTIVE JUROR:  I'm thinking it was criminal.

3          MR. KELLY:  This case is a criminal case where the

4    burden is on the government to prove beyond a reasonable doubt.

5    A civil case is they're arguing about money and they have to

6    prove things more lakely than not.  Are you okay with that

7    distinction?

8          PROSPECTIVE JUROR:  Yes.

9          MR. KELLY:  Okay.  Nothing further.

10:18 10          THE COURT:  Mr. Kendall?

11          MR. KENDALL:  Good morning.  No questions.

12          THE COURT:  Miss Kearney?

13          MS. KEARNEY:  Good morning.  No questions, your Honor.

14          THE COURT:  Thank you, miss Williams.  I'm going to

15    ask you to be reserved.  That means you're going to go with

16    Mr. McAlear to another room.  You may be called back to be

17    selected as a juror on this case.  I remind you not to try to

18    do any independent research.  Don't go on the internet and try

19    to discover facts that relate to this case.  If you are chosen

10:19 20    to be a juror, you're going to decide the case solely on the

21    basis of the evidence that comes into this courtroom and not on

22    the basis of anything you could find on the internet.  Okay?

23          PROSPECTIVE JUROR:  So just referring back to your

24    question, can I ask one?

25          THE COURT:  Yes.

**A700**

 1          PROSPECTIVE JUROR:  Should I contact my school system

 2   to see their feelings?

 3          THE COURT:  Mr. McAlear will tell you about that.  You

 4   haven't been selected as a juror, but you haven't been excused

 5   either.  You're in limbo at this stage, along with a bunch of

 6   oath people.  We'll certainly let you know as soon as we can.

 7   Thank you, miss Williams.

 8          MR. KELLY:  Your Honor, with respect to that juror,

 9   defendant as would move to strike for cause given her teaching

10:20 10   120 students and her hesitation I observed on whether her full

11   attention could be on this trial and this case.  We would move

12   to strike her for cause.

13          THE COURT:  Miss Kearney?

14          MS. KEARNEY:  Your Honor, she was clear responding to

15   your questions that while it would be an inconvenience, it

16   would not be a hardship and would be able to focus on the

17   evidence.  Given that, we would not.

18          THE COURT:  I'm not going to strike her for cause.

19   Bring in the next potential juror.

10:21 20          Good morning.  Is it Miss Heyl?

21          PROSPECTIVE JUROR:  Heyl.

22          THE COURT:  Miss Heyl, please be seated.  You may take

23   your mask off, but you don't have to.  Miss Heyl, I understand

24   you teach at a community toddler center, is that right?

25          PROSPECTIVE JUROR:  Yes, through a community action

1  agency.  I'm in one of their daycare centers, for lack of a

2  better.

3         THE COURT:  Service on this jury would be for about

4  4 weeks.  Would that be a hardship?

5         PROSPECTIVE JUROR:  It's kind of difficult.  We're

6  doing home visits now and staffing has been tight with the way

7  COVID's been.  We've currently at our small site we have one

8  teacher with symptoms and two others with other stuff.  We are

9  a big agency.  They have been able to find people to cover.  It

10  all depends.  COVID's been really tough.

11         THE COURT:  It sounds to me like it would be a real

12  potential for a hardship.

13         PROSPECTIVE JUROR:  It could be, yes.

14         THE COURT:  I'm going to excuse you from this jury.

15  You have an important job.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  Even though jury service is very important

18  and I hope you will do it another time because it's one of the

19  most important civic duties we have.  I think this sounds like

20  this is not the appropriate time for you to be sitting on a

21  jury for 4 weeks.  Thank you, Miss Heyl.

22         Is it Miss LaQuerre?

23         PROSPECTIVE JUROR:  No.  It's a bad English lesson.

24  Q-U is a qua, but in French, it's a K.  It's LaQuerre.

25         THE COURT:  Thank you for helping me out.

```
 1   Miss LaQuerre, you're reminded you're under oath.  You may
 2   remove the mask if you want.  You can if you don't have to.
 3            PROSPECTIVE JUROR:  I'll remove it to make it easier.
 4            THE COURT:  Miss LaQuerre, you mentioned that your job
 5   is supervising children in a classroom.
 6            PROSPECTIVE JUROR:  Yes.
 7            THE COURT:  If you are chosen as a juror in this case,
 8   you wouldn't be able to do that for about 4 weeks.  Will that
 9   cause you and/or your class a hardship?
10   PROSPECTIVE JUROR:  Yeah.  I was hasty with answering
11   the questionnaire.  It would be a hardship because of COVID
12   where we're back in the building.  There's no more remote.  The
13   kids have a lapse in learning.  We're trying so hard to get
14   everyone up to par.  Let's face it.  People are still nervous
15   about being in a building and close quarters.  We're not 6 feet
16   away.  We're 3 feet away.  You can't.
17            THE COURT:  With kids.  Yes.
18            PROSPECTIVE JUROR:  So that will be very difficult.
19            THE COURT:  You are an important could go in this
20   whole school.  It comes through on the paper.
21            PROSPECTIVE JUROR:  No.  I wouldn't say that.
22   Everyone's role's important.  I'm not way up there by no means.
23   I'm in the special ed department.  I support children on
24   Individual Education Plans, so they need you in the classroom.
25   I'm legit in the classroom supporting probably eight students
```

1    in each class I go through the whole day.  I have a schedule.

2    They need your help.  Some have issues with attention-deficit.

3    Got to keep them on task.  They need that consistency.  I role

4    model for them to be.

5            THE COURT:  If you were not there for 4 weeks, who

6    would do your job?

7            PROSPECTIVE JUROR:  That's the problem.  I'm not sure.

8    Subs right now are nowhere to be found.

9            THE COURT:  I'm going to excuse you from this jury

10:26 10    because I think you have a very important job.

11            PROSPECTIVE JUROR:  Thank you so much.  That's nice of

12    you to say that.

13            THE COURT:  The fact that we lost a year of education

14    and you're trained in this and these kids need you as opposed

15    to a substitute, it's very important for you to do your civic

16    duty and serve on juries, but I think your job now is more

17    important.  I'm going to excuse you from this jury.

18            PROSPECTIVE JUROR:  Thank you so much.

19            THE COURT:  I'll try to remember that in the future.

10:27 20            Good morning, Mr. Gately.  You may be seated.  You are

21    reminded you're under oath.  You may take your mask off if you

22    want to, but you don't have to.

23            PROSPECTIVE JUROR:  Thank you.

24            THE COURT:  Mr. Gately, I understand you're retired.

25    What are you retired from?

**A704**

```
 1              PROSPECTIVE JUROR:  I was working at Trader Joe's.

 2              THE COURT:  At one point, you had a management or

 3       supervisory experience or started your own business.

 4              PROSPECTIVE JUROR:  I did.

 5              THE COURT:  Tell me about that.

 6              PROSPECTIVE JUROR:  I had a vending business for about

 7       20 years.

 8              THE COURT:  What kind of business?

 9              PROSPECTIVE JUROR:  Vending machines.  My brother and

10:28 10  I sold out.

11              THE COURT:  You understand how it is to run a

12       business.

13              PROSPECTIVE JUROR:  Oh, yeah.

14              THE COURT:  Would any of your experiences in any way

15       that you told us about in this questionnaire affect your

16       ability to be fair and impartial in this case?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  So you could decide this case solely based

19       on the evidence that comes into this courtroom and not on the

10:28 20  basis of anything you've heard outside of it; is that fair to

21       say?

22              PROSPECTIVE JUROR:  Yes, your Honor.

23              THE COURT:  Any questions for this potential juror,

24       Mr. Kelly?

25              MR. KELLY:  Sure.  Quickly.  Good morning, sir.
```

1    Thanks for coming in today.  I represent Mr. Aziz here.  I

2    noticed one of the things in the questionnaire indicated you

3    had served on a civil trial before, right?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  This case is, of course, a criminal trial

6    where the proof of standard is beyond a reasonable doubt and

7    you're comfortable with the distinction between the criminal

8    and civil trial?

9            PROSPECTIVE JUROR:  Yes, I am.

10:29 10            MR. KELLY:  Thanks.

11            THE COURT:  Mr. Kendall?

12            MR. KENDALL:  No questions.

13            THE COURT:  Miss Kearney?

14            MS. KEARNEY:  Good morning, sir.  I wanted to

15    follow-up on one question in the questionnaire.  Have you or

16    anyone you're close to had any experience with the criminal

17    justice system before?

18            PROSPECTIVE JUROR:  No.

19            MS. KEARNEY:  You personally have never been arrested

10:29 20    or charged with a crime?

21            PROSPECTIVE JUROR:  I had a couple of D-U-Is when I

22    was young.

23            THE COURT:  Have you had any recent arrests?

24            PROSPECTIVE JUROR:  No.

25            MS. KEARNEY:  Were you ever charged with assault and

**A706**

```
 1   battery on a family member?

 2               PROSPECTIVE JUROR:  Yes, I was.

 3               MS. KEARNEY:  When was that?

 4               PROSPECTIVE JUROR:  I would say six or 7 years ago.

 5               MS. KEARNEY:  Anything about that prior experience

 6   that you felt were you treated unflair at all?

 7               PROSPECTIVE JUROR:  No.

 8               MS. KEARNEY:  Anything about that experience that

 9   would affect your ability to be fair and impartial in this

10   trial?

11               PROSPECTIVE JUROR:  Not at all.

12               MS. KEARNEY:  Thank you.

13               THE COURT:  Any further questions from counsel?

14               MR. KELLY:  No, your Honor.

15               THE COURT:  I'll reserve you for the jury.  I'll have

16   you go with Mr. McAlear.  If you're called back on another day,

17   please do not do any independent research on this case, looking

18   at the internet.  You understand that would be totally

19   inappropriate because you have to decide this case, if you're

20   chosen to be a juror, solely on the basis of the evidence that

21   comes into this courtroom and not on the basis of anything that

22   you learn outside.  You understand that?

23               PROSPECTIVE JUROR:  I saw it on the news last night

24   and I shut it off.

25               THE COURT:  Thank you.  Thank you, Mr. Gately.
```

```
 1          THE COURT:  Miss Kearney?

 2          MS. KEARNEY:  Your Honor, the government moves to

 3     strike Juror No. 22 for cause.  While he did disclose today

 4     some of his prior criminal history, he did not disclose it in

 5     the questionnaire, even though that was under oath, and then he

 6     also failed to disclose he was arrested as recently as 2018 for

 7     assault and battery.  So given that, the government moves to

 8     strike him.

 9          MR. KELLY:  We would oppose that, your Honor.  First

10     of all, when they're filling out these questionnaires, not all

11     of them have Harvard Ph.D. degrees.  It's a lot of time

12     pressure to fill them out.  He was very candid when asked about

13     the question.  These quaffs are not convictions.  He seemed

14     open and acknowledged it.  He seemed like a fair juror.  I

15     don't think it rises to the level of excuse for cause.  They

16     may not like this juror and may strike him later, but this is

17     not cause.

18          THE COURT:  Mr. Kendall?

19          MR. KENDALL:  I agree with Mr. Kelly.  People come

20     from all walks of life.  People don't work with paper and

21     respond to this paper as what others might do.  What I saw most

22     important is he admitted all the questions she asked him,

23     acknowledged it, and then said he didn't think he was treated

24     unfairly.  I thought that had a real sense of responsibility

25     and sort of candor about it.  He didn't say it was this or
```

 1    that.  He wasn't looking to make excuses.  He said the

 2    system -- he said he was not treated unfairly.  I think that's

 3    probably the single most important point we need to do when

 4    evaluating him.

 5         MS. KEARNEY:  Your Honor, two follow-up points.  I

 6    began by asking the juror whether he or anyone he knew had ever

 7    been arrested or involved in the criminal justice system and he

 8    said no.  It was only when I prompted him with specific past

 9    arrests that he became candid with the Court.

10:32 10        On top of that, he does have a continuance without a

11    finding, which for assault and battery, which is a felony, as

12    recently as 2008, under the sensing guidelines those are

13    treated as convictions with the Probation Office.  I'm also

14    familiar with the Sam son case Judge Sorokin was dismissing

15    jurors consistent with the jury office's policy that quaffs

16    were treated as felony convictions.

17         MR. KELLY:  Just briefly, when the government goes and

18    files those 851 enhancements based on prior convictions for

19    drugs, they can't use quaffs.  It's not the law.  These quaffs

10:33 20   under the state system, as I've learned from my esteemed

21    counsel, Mr. She can to have, they're not convictions.  He was

22    candid.  Courtrooms can make people nervous.  He was very

23    up-front.  We don't think this rises to the level of cause,

24    your Honor.

25         THE COURT:  I agree with defendants.  I'm not going to

**A709**

1    excuse him for cause.

2          Call the next potential juror.

3          Good morning, miss Nelson.  You're reminded you're

4    still under oath.  You may remove your mask if you want to.

5    Please pull the microphone so we can hear you.

6          PROSPECTIVE JUROR:  Absolutely.

7          THE COURT:  I understand that you are a caretaker for

8    your mother who is ill.  Would 4 weeks on a jury cause you

9    hardship to serve on this jury?

10:34 10          PROSPECTIVE JUROR:  Yes.  She was diagnosed with

11    A-L-S-.

12          THE COURT:  A very, very serious disease.

13          PROSPECTIVE JUROR:  It's awful.  Her husband is

14    15 years older than she is.  He turns 83 tomorrow.

15          THE COURT:  Sort of a young guy.

16          PROSPECTIVE JUROR:  I just moved them from South

17    Carolina to Quincy.  She live in Marina Bay, which is amazing.

18    I live in Southie here.  It's only 10 minutes.  I've just been

19    there every day.  We're getting them some home healthcare but

10:35 20    literally the first person is coming today for hours.  I was

21    hoping to be there to meet and help.

22          THE COURT:  It sounds to me like this would be a

23    hardship for you to serve on this jury.

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  I'm going to excuse you.  You have very

1    serious and important duties.  I wish you good luck.  I hope at

2    a later time you will be willing to serve on a jury because

3    it's a very important job.

4        PROSPECTIVE JUROR:  I'm very interested in it, to be

5    honest.  It's my mom.

6        THE COURT:  I think you have more pressing duties at

7    this point.  Thank you, miss Nelson.

8        MS. KEARNEY:  Your Honor, before we begin with the

9    next juror, I just wanted to tell the Court that he has a prior

10   criminal history that he did not disclose in his questionnaire.

11       THE COURT:  This is Mr. De as?

12       MS. KEARNEY:  Yes, Juror 27.  He was charged in 2003

13   for use without authority.  That was a quaff.  And destruction

14   of property, from the same date, that was also a quaff.  He did

15   not disclose it on his questionnaire.  If it would be possible

16   for the Court to inquire about it, because I think it's awkward

17   for me to do so.

18       THE COURT:  Fair enough.  Mr. Kelly.

19       MR. KELLY:  2 points, A, the quaff is not a

20   conviction.  B, he referenced something more serious about a

21   felony.  I assume that's a family member because it would have

22   been on a rap sheet.  It's not like he was hiding his

23   connection to law enforcement.  Attempted murder, a relative or

24   friend of the family or someone was arrested for.

25       THE COURT:  So what is it that counsel is asking of

the Court?  Miss Kearney would like me to inquire about the

someone convicted of attempted murder matter, is that right?

MS. KEARNEY:  In his own personal record, your Honor,

that he did not disclose in the questionnaire.

THE COURT:  What was that record again?

MS. KEARNEY:  He has two convictions, both related to

the same incident in 2003, one for use without authority and

one for malicious destruction of property.

THE COURT:  What was the first one?

MS. KEARNEY:  Use without authority, using someone's

car.

THE COURT:  A vehicle?

MS. KEARNEY:  Yes.

MR. KELLY:  These are quaffs.  If they want to ask

difficult questions, they should ask the questions.  These are

quaffs, not convictions.

MS. KEARNEY:  If this juror ends up on the jury, it's

awkward to have the government question him about his criminal

history when he has not already disclosed on his questionnaire.

THE COURT:  Mr. Kendall?

MR. KENDALL:  You won't know it by his name but my

client is Hispanic.  I don't want people being thrown off and

have an unrepresentative jury unless there's really good

grounds.

THE COURT:  Call the potential juror.

1          Good morning, Mr. Diaz.  Please have a seat.  You're

2     reminded that you remain under oath.  You may remove the mask

3     if you wish, but you don't have to.  Please pull that

4     microphone close enough so we can hear.

5          Mr. Diaz, I understand in response to one of the

6     questions you mentioned that someone you know was convicted of

7     attempted murder or assault about 10 years ago.

8          PROSPECTIVE JUROR:  Correct.

9          THE COURT:  Can you tell me about that.

10:39 10          PROSPECTIVE JUROR:  It's a cousin of mine.  I don't

11     remember what the actual charge is because it was so long ago.

12     That's what it was, one or the other.

13          THE COURT:  Were you in any way involved in that

14     prosecution?

15          PROSPECTIVE JUROR:  No.  He's just a relative.  It had

16     nothing to do with me.

17          THE COURT:  However, apparently, there is a record

18     that you were charged back in 2003, which was continued without

19     a finding, but involved a conviction involving use without

10:40 20     authority of a vehicle?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Would you tell me about that and why

23     didn't you bring that up on your questionnaire?

24          PROSPECTIVE JUROR:  Honestly, I completely forgot

25     about that.  That happened when I was a teenager.  I forgot.

**A713**

1          THE COURT:  Would you tell me about what it was.

2          PROSPECTIVE JUROR:  I was just in a stolen car.  We

3     were pulled over.

4          THE COURT:  Was there another charge in addition to

5     the use without authority?

6          PROSPECTIVE JUROR:  Not that I recall.  Honestly, I

7     don't remember.

8          THE COURT:  What was the ultimate result of that case?

9          PROSPECTIVE JUROR:  Community service.

10:40 10          THE COURT:  How much community service, if you

11     remember?

12          PROSPECTIVE JUROR:  It was 1 day, I believe.

13          THE COURT:  You were not imprisoned at all?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Is there anything on that questionnaire

16     that would affect your ability to be fair and impartial in this

17     case?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Do you believe that you could be fair and

10:41 20     impartial and determine this case solely on the basis of the

21     evidence that comes into this courtroom and not on the basis of

22     anything that's happened outside of the courtroom?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Any questions for this potential juror?

25     Mr. Kelly?

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | MR. KELLY:  Just briefly.  Thanks for coming in.  I                  |
| 2  | represent Mr. Aziz here.  A lot of the case will involve tempt       |
| 3  | about sports.  Do you follow college sports at all?                  |
| 4  | PROSPECTIVE JUROR:  Not really, no.                                  |
| 5  | MR. KELLY:  Thanks.  Nothing further.                               |
| 6  | THE COURT:  Mr. Kendall?                                            |
| 7  | MR. KENDALL:  Thank you for coming in.  No questions,               |
| 8  | your Honor.                                                         |
| 9  | THE COURT:  Miss Kearney?                                           |
| 10 | MS. KEARNEY:  Good morning, Mr. Diaz.  I wanted to                  |
| 11 | follow-up on some of the questions the judge asked you.  Was        |
| 12 | there anything about your experience in the criminal justice        |
| 13 | system or your cousin's experience that you felt you or your        |
| 14 | cousin were treated unfairly?                                        |
| 15 | PROSPECTIVE JUROR:  No.                                              |
| 16 | THE COURT:  Thank you, Mr. Diaz.  You may go with                   |
| 17 | Mr. McAlear to the so-called reserve room.  If you are called       |
| 18 | back, you are reminded, please do not try to do any independent      |
| 19 | research on this case.  That would be inappropriate.  If and        |
| 20 | when you are chosen as a juror in the case, you're going to         |
| 21 | decide the case based solely on the basis of the evidence that      |
| 22 | comes into this courtroom and not on the basis of anything          |
| 23 | outside.  So don't do any independent research.  Okay?             |
| 24 | PROSPECTIVE JUROR:  Sure.                                            |
| 25 | THE COURT:  Thank you, Mr. Diaz.                                    |

10:41 (line 10)
10:42 (line 20)

**A715**

```
 1              Good morning, Mr. Williams.  Please be seated.  You're
 2    reminded that you remain under oath.  You may remove the mask
 3    if you want to, but you don't have to.
 4              PROSPECTIVE JUROR:  Sure.
 5              THE COURT:  Mr. Williams, I understand that you
 6    actually look after your children.  Your wife works full-time,
 7    is that correct?
 8              PROSPECTIVE JUROR:  Yes.  She works Monday through
 9    Thursday and Saturdays.  She usually work in the evenings or
10:43 10    afternoon/evenings.  She'll handle morning stuff.  I get to
11    work from home Monday through Thursday and go to the office on
12    Fridays.  I get to either pick them up from the bus stop or if
13    she's busy, I can drive them to school.
14              THE COURT:  So it's a dual effort?
15              PROSPECTIVE JUROR:  It is.  It's all hands on deck at
16    all times.
17              THE COURT:  Was there anything in the questionnaire
18    that gave you pause as to your ability to be fair and impartial
19    in this case?
10:44 20              PROSPECTIVE JUROR:  No.  Honestly, I don't even know
21    what this case is about.  I know you said fraud.
22              THE COURT:  You've heard about the case generally but
23    not this particular part of it?
24              PROSPECTIVE JUROR:  No.  I've not heard about the case
25    at all.
```

**A716**

```
 1            THE COURT:  Is there any reason that you would not be
 2    able to be fair and impartial in this case?
 3            PROSPECTIVE JUROR:  No.
 4            THE COURT:  Any questions for this potential juror?
 5    Mr. Kelly?
 6            MR. KELLY:  Good morning.  I'm Mr. Kelly.  I represent
 7    Mr. Aziz in this matter.  Thank you for coming in today.  I
 8    guess the question is about the schedule really.  This is a --
 9    we're estimating it's a 4-week trial.  Sometimes things go
10    shorter, hopefully.  Would a 4-week commitment in this federal
11    court on this matter be problematic to your home situation to
12    your children?
13            PROSPECTIVE JUROR:  Somewhat.  I don't have a lot of
14    people to help.  My mom lives nearby but she works also.  She's
15    covering for me today.  She's going to work from my house.
16    She's going to get my daughter off to the bus today while I'm
17    here.  It's not impossible but it would be hard to do.
18            THE COURT:  Mr. Kendall?
19            MR. KENDALL:  Good morning.  No questions.
20            THE COURT:  Miss Kearney?
21            MS. KEARNEY:  No questions.
22            THE COURT:  Maybe I should follow-up on that,
23    Mr. Williams.  We don't want to cause you hardship.  We know
24    that jury duty does cause inconvenience, sometimes serious
25    inconvenience, but there's a difference between inconvenience
```

1    and hardship.  Sometimes it's a very close call.  I can't make

2    that call, only you can.  I don't want to cause hardship in

3    your family or your employment.  You tell me.  Is it going to

4    be a serious inconvenience for three or 4 weeks or a real

5    hardship?

6         PROSPECTIVE JUROR:  I think it would be a hardship.

7    I'd have to get someone to essentially make sure they were at

8    my house to get my daughter off the bus, and I don't know if --

9    depending on when the trial started, to hair someone to be a

10:46 10   nanny for a month.

11        THE COURT:  It's going to be a hardship.  I'm going to

12   excuse you from this jury.  I hope you will come at some time

13   when it's less invent for you and serve as a juror.  I think

14   this is not the right case.

15        PROSPECTIVE JUROR:  Okay.  Thank you.

16        THE COURT:  Thank you, Mr. Williams.  You're excused.

17        Good morning, Miss Elwell.  Please be seated.  You're

18   reminded that you remain under oath.  You may remove your mask

19   if you want to, but you don't have to.

10:47 20        PROSPECTIVE JUROR:  Okay.

21        THE COURT:  Miss Elwell, you mentioned that you need

22   to work full-time and if you are chosen for this jury, it will

23   be about a 4-week trial.  Is that going to cause you financial

24   hardship?

25        PROSPECTIVE JUROR:  Yes, it will, unfortunately.

```
 1              THE COURT:  I'm not going to cause you financial
 2     hardship.  I'm going to use you from this jury.  Jury duty is a
 3     very important civic duty.  I hope at some stage you'll be
 4     willing to do so.  I think this case being as long as it's
 5     going to be would cause you financial hardship and I don't
 6     think we ought to do it.
 7              PROSPECTIVE JUROR:  I agree.  I wish it was a
 8     different time.
 9              THE COURT:  Thank you, Miss Elwell.  You're excused.
10     Counsel, we're going to take a break in about
11     10 minutes.  We'll go to about 11 and then take a 15-minute
12     recess.
13              Good morning, Miss Hyde.
14              PROSPECTIVE JUROR:  Good morning.
15              THE COURT:  You may be seated.  You are reminded
16     you're under oath.  You may remove your mask if you want to,
17     but you don't have to.
18              Miss Hyde, you planned a 2-week vacation in October,
19     is that right?
20              PROSPECTIVE JUROR:  Correct.  My brother is getting
21     married.
22              THE COURT:  This case is going to go beyond that.  I
23     don't want to interfere in an important family event.  I will
24     excuse you from this trial.  That doesn't excuse you from all
25     trials.  I hope at a less inconvenient time you will serve as a
```

10:48 at line 10
10:49 at line 20

juror.  It's a very important civic duty.  I think this case is
going to go beyond the time when you have a commitment.  You're
excused.

PROSPECTIVE JUROR:  Great.  Thank you.

THE COURT:  Good morning, Mr. Eddy.  Please be seated.
You are reminded that you remain under oath.  You may remove
the mask if you want to, but you don't have to.  Mr. Eddy,
would 4 weeks on this trial cause you a hardship financially or
otherwise?

10:50 PROSPECTIVE JUROR:  I don't believe so.

THE COURT:  You mentioned that you or someone that you
are close to is employed by a police department.  Would the
fact that you have a connection with law enforcement in any way
affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Can you decide this case solely on the
basis of the evidence that comes into this courtroom and not on
the basis of any outside influence or anything else that's
happened in your life?

10:51 PROSPECTIVE JUROR:  I believe so.  I do think one of
the questions I answered on the questionnaire was about a
general perception of people who may have certain advantages in
aspects of life in terms of college admission.  That is
something that's based on life experience in my mind, but I'll
certainly do my best.

1          THE COURT:  The point is that you haven't heard any

2     evidence about these two particular defendants.

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  They start out absolutely innocent.  The

5     government is required to prove beyond a reasonable doubt the

6     charges that they've made against them.  Whatever your general

7     concept of people of wealth or whatever doesn't count in this

8     case because these individuals are entitled to be judged on the

9     facts pertaining to them.  Can you tell me that you can decide

10:52 10  this case solely on the basis of the evidence that comes into

11    this courtroom and not on any preconceived ideas about college

12    admission?

13         PROSPECTIVE JUROR:  I believe that I could.

14         THE COURT:  Mr. Kelly, any questions?

15         MR. KELLY:  Sure.  Good morning, Brian Kelly,

16    representing Mr. Aziz here.  A follow-up from the Court's

17    question there.  You understand this is a criminal case with

18    specific charges and deciding if the wealthy people have more

19    advantages than others.  That's not the issue, whether that's

10:52 20  fair or not.  You're comfortable serving in a case like this?

21         PROSPECTIVE JUROR:  Yes.  I would be.

22         THE COURT:  I noticed you -- I got confused about the

23    Georgetown football question there.  There's a lot of sports

24    issue.  I didn't even know Georgetown had a football team.

25         PROSPECTIVE JUROR:  They do.  I was there, it was

```
 1   Division 3.  Now it's one double A.  I was a walk-on.
 2             MR. KELLY:  What did you play?
 3             PROSPECTIVE JUROR:  I played guard.
 4             MR. KELLY:  I assume you follow Georgetown basketball
 5   team, a little more prominent?
 6             PROSPECTIVE JUROR:  Yes.  They would be the dominant
 7   sport.
 8             MR. KELLY:  Are you a college basketball fan in
 9   general?
10   PROSPECTIVE JUROR:  Other than following what they do
11   by and large, I would say no.
12             MR. KELLY:  Nothing about that would prevent you from
13   being fair to all sides in this case?
14             PROSPECTIVE JUROR:  I don't believe so, no.  It would
15   not.
16             MR. KELLY:  I notice you had watched the netflex.  Is
17   that what you referenced in here?
18             PROSPECTIVE JUROR:  Yes.  I believe they called it a
19   documentary.  I'm not sure why they did because I believe they
20   were actors playing some of the roles in that.  It was probably
21   more of a film than documentary.
22             MR. KELLY:  Anything about that that would affect your
23   ability to be fair here?
24             PROSPECTIVE JUROR:  I mean, it's the media.  You've
25   got to take it with a grain of salt.  The performance created
```

         1   by that particular show was that something unusual was going

         2   on, I would say.

         3             MR. KELLY:  Understanding the media's not always

         4   accurate, you're fine looking at this in a fair and even handed

         5   fashion?

         6             PROSPECTIVE JUROR:  I believe I could do that.

         7             MR. KELLY:  Thanks.

         8             THE COURT:  Mr. Kendall?

         9             MR. KENDALL:  Yes.  Good morning.  I'm Mike Kendall.

10:54   10   I represent John Wilson.

        11             I wanted to ask a couple of questions about the

        12   Netflix documentary.  I appreciate you noting that it was not a

        13   real documentary and was with actors.  What did you think when

        14   you saw it though?  What was your reaction?

        15             PROSPECTIVE JUROR:  I think certainly the person at

        16   the center of it in terms of the person who was organizing

        17   whatever was happening, he was on the list on the

        18   questionnaire, I'm trying to think of the right word to use.

        19             MR. KENDALL:  Mr. Singer?

10:55   20             PROSPECTIVE JUROR:  Yes.  Mr. Singer was not

        21   completely above board in what he was doing.  Again, it's a

        22   movie more than a documentary.  I have to take that into

        23   consideration.

        24             MR. KENDALL:  If you saw evidence in this case that

        25   showed that Netflix documentary simply was made up Hollywood

```
 1   stuff, is that something you could separate in your mind?

 2          PROSPECTIVE JUROR:  I believe yes.  The evidence is

 3   certainly more important than what was portrayed in a movie.

 4          MR. KENDALL:  So it hasn't left you with any

 5   particular feeling or predisposition about the defendants in

 6   this case?

 7          PROSPECTIVE JUROR:  Walking away from the movie

 8   certainly one particular feeling, as we just discussed, but you

 9   obviously have to look at the evidence and consider that.

10:56 10        MR. KENDALL:  You understand that the issue here is

11   whether the defendants have broken a law and that the judge

12   will instruct you on the law.

13          PROSPECTIVE JUROR:  Yes.

14          MR. KENDALL:  And you have to follow the judge's

15   instructions.  So even if you have a personal view that

16   something's not right or not fair or not good, he's the boss.

17   He sets the law, even if you have views of fairness that may be

18   different.  It may be a different issue than what you're being

19   instructed on.

10:56 20        PROSPECTIVE JUROR:  I agree with that.

21          THE COURT:  Miss Kearney?

22          MS. KEARNEY:  Good morning.  No questions, your Honor.

23          THE COURT:  Thank you, Mr. Eddy.  You're going to be

24   in reserve.  Mr. McAlear will tell where you to go.  If you're

25   called back to serve as a juror, then you will decide this case
```

A724

|  | 1 | solely on the basis of evidence that comes into this courtroom. |
|--|---|---|
|  | 2 | Do not do any independent research. Any exploring on the |
|  | 3 | internet would be inappropriate. You understand that? |
|  | 4 | PROSPECTIVE JUROR: Understood. |
|  | 5 | THE COURT: Thank you, Mr. Eddy. |
|  | 6 |  |
|  | 7 | MR. KENDALL: Your Honor, before we bring somebody in? |
|  | 8 | THE COURT: Yes. Hold the juror. |
|  | 9 | MR. KENDALL: He is a responsible gentleman and was |
| 10:57 | 10 | trying to be helpful as he could be. I appreciate that. It's |

solely on the basis of evidence that comes into this courtroom.

Do not do any independent research. Any exploring on the

internet would be inappropriate. You understand that?

PROSPECTIVE JUROR: Understood.

THE COURT: Thank you, Mr. Eddy.


MR. KENDALL: Your Honor, before we bring somebody in?

THE COURT: Yes. Hold the juror.

MR. KENDALL: He is a responsible gentleman and was

trying to be helpful as he could be. I appreciate that. It's

the Netflix documentary. The issue with the Netflix

documentary is it didn't talk about this case but Mr. Wilson

was one of the main people portrayed in that. I think if the

government is forced to give an answer, they'll even agree

there were false statements made about Mr. Wilson. For

example, they took the actions of a man named Sloane whose son

was a false water polo player and attributed them to

Mr. Wilson. It wasn't even that it was pretrial publicity. It

was false pretrial publicity and he was a major character in

that documentary. It's one thing to say I saw a newspaper

article. It's another thing to say I saw a movie with false

accusations. As you may know, Mr. Wilson filed a case about

that. It's now in state court. It was a false representation

of the evidence in this case, indisputably. The accusation was

his son did play water polo and falsified a profile with

1    documents and stuff.  That is not the case.  His son was a real

2    water polo player.  The pictures were of his son.  They took

3    the facts of Mr. Sloane and they put them under the name Wilson

4    in the documentary.  So we are very concerned about anybody

5    who's seen that documentary sitting on the jury.  We'd ask that

6    he be struck for cause.

7              THE COURT:  Miss Kearney?

8              MS. KEARNEY:  The prospective juror was forthcoming

9    and said he had seen the Netflix documentary.  He also said you

10:59 10  have to take it with a grain of salt.  He volunteered it was

11   more of a film than documentary.  It sounded like he was going

12   to base on the evidence.

13             THE COURT:  I'm not going to dismiss this juror for

14   cause.  I believe the public is becoming more sophisticated

15   with respect to media reports.  The media is being questioned

16   more and more for their truthfulness.  I think he comes across

17   as an intelligent person that can differentiate between what is

18   fact and what is fiction.  The facts will come out in this

19   case.  He has answered the questions, I believe, forthrightly.

11:00 20  I'm not going to excuse him for cause.

21             Good morning, Miss Arsenault.  Is that how you

22   pronounce it?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Miss Arsenault, please be seated.  You're

25   reminded you are under oath.  You may remove the mask if you

```
 1   want to, but you don't have to.
 2          PROSPECTIVE JUROR:  Relief.
 3          THE COURT:  Miss Arsenault, is there any reason why
 4   you can't sit on this juror and be fair and impartial?
 5          PROSPECTIVE JUROR:  I don't think so.
 6          THE COURT:  You're a medical technologist.
 7          PROSPECTIVE JUROR:  Yes.
 8          THE COURT:  Will 4 weeks absent from that job cause
 9   you financial hardship?
11:01 10          PROSPECTIVE JUROR:  No, because I think they make up
11   the difference.
12          THE COURT:  They're supposed to.  Sometimes you have a
13   hard time having them do that.  You're not concerned about
14   that.  Is that fair to say?
15          PROSPECTIVE JUROR:  Yeah.  Not at this present time,
16   no.
17          THE COURT:  Were there any questions in the
18   questionnaire that would cause you to not be fair and impartial
19   in this case?
11:01 20          PROSPECTIVE JUROR:  No.
21          THE COURT:  Mr. Kelly, any questions for this
22   potential juror?
23          MR. KELLY:  No.  I represent Mr. Aziz.  Thanks for
24   coming in.
25          THE COURT:  Mr. Kendall?
```

1          MR. KENDALL:  Yes.  Good morning.  My name's Mike

2     Kendall.  I represent John Wilson.  Thank you for coming in.

3     Paragraph 39, you answered yes for if you'd seen some of the

4     press coverage of this general matter called the Varsity Blues.

5          PROSPECTIVE JUROR:  Yes.

6          MR. KENDALL:  Can you describe in your own words.

7          MS. KEARNEY:  It was one of those questions I put no

8     first and then scratched out.  First I thought, no, I don't

9     know anything about this.  Then I thought, is this part of the

11:02 10   ongoing thing that started off with those two actresses and the

11    husband that paid for their daughters to go to school?

12         MR. KENDALL:  And what was your thought when you had

13    that idea?

14         PROSPECTIVE JUROR:  I thought maybe I do know a little

15    about this but all I know is what I saw on the news briefly.

16         MR. KENDALL:  Did you have any views about what you

17    saw?  Did it bother you?

18         PROSPECTIVE JUROR:  I first of all thought these

19    parents are stupid to pay for their kids to go to college.  I

11:02 20   told my kids they needed to pay.

21         MR. KENDALL:  Did it bother you that they did it?  Did

22    you think it was unfair or wrong?

23         PROSPECTIVE JUROR:  It bothered me a little because

24    I'm thinking I would never have the money if I wanted to do it

25    for my kids.  I didn't have the money to pay for their college

1    to begin with.  I paid a little.  I only had one out of three

2    that went to college.  She went to UMass Lowell.  I told them

3    if you went to an inexpensive school if I had some extra money,

4    I'd help you.  I did pay half of each semester while she worked

5    part-time and took out student loans.  It did make me a little

6    agitated.

7         MR. KENDALL:  Does that give you any particular

8    thoughts about people who have a lot of money, a lot of

9    substantial resources, and if they spend it in a way that seems

11:03 10  different or sort of even wasteful?  Do you have any thoughts

11    about that?

12         PROSPECTIVE JUROR:  I would think the more money you

13    have, the more you want.  I think they just tend to waste it

14    and just do whatever.

15         MR. KENDALL:  Thank you for coming in.  I appreciate

16    your candor.

17         THE COURT:  Miss Kearney?

18         MS. KEARNEY:  Good morning, Miss Arsenault.  Is there

19    anything about the information you've seen about the news

11:04 20  reports that would cause you to be not impartial and fair in

21    evaluating the evidence?

22         PROSPECTIVE JUROR:  I don't think so.  I'd like to

23    think I look at each person as a separate entity, just like you

24    look at any child as a separate thing too.

25         MS. KEARNEY:  Thank you very much.

1          THE COURT:  The question, Miss Arsenault, is whether

2     you can be fair and impartial in this case and decide it solely

3     on the basis of the evidence that comes into this courtroom and

4     not on the basis of anything you've read or heard before the

5     case.

6          PROSPECTIVE JUROR:  I think I could.

7          THE COURT:  Thank you.  I'm going to have you go with

8     Mr. McAlear to the reserve room.  You may or may into the be

9     called back to sit as a juror.  In the meantime, please do not

11:04 10     do any independent research or go on to the internet.  That

11     would be inappropriate.  The case is going to be determined on

12     the basis of evidence.  Thank you.

13          Counsel, we're going to be in recess for 15 minutes.

14     I think we've made progress.  We'll continue at about 11:20.

15          MR. KENDALL:  Out of curiosity, your Honor, how many

16     have we accepted so far?

17          THE COURT:  I was going to count that up myself.

18          MR. FRANK:  I think it's ten, your Honor.

19          THE COURT:  Ten.  I agree with the government's

11:05 20     number.

21          MR. KENDALL:  We're looking for 36?

22          THE COURT:  More like 40.  I want to err on the side

23     of too many.

24          (Recess taken 11:05 a.m. to 11:25 a.m.)

25          THE COURT:  Good morning again, counsel.  I have now

```
 1    had a chance to read the proposed instruction that I'm going to

 2    ask Mr. McAlear to give to all reserved.  If has a strange

 3    likeness.  I think it comes right out of one of my charges,

 4    which, of course, is very appealing.  I think it is

 5    appropriate.  I don't think there's anybody who has an

 6    objection, is that correct, Mr. Kelly?

 7              MR. KELLY:  No.  We found it very appealing as well,

 8    your Honor.

 9              THE COURT:  Mr. Kendall?

10    MR. KENDALL:  Equally so.

11              THE COURT:  I'm going to ask Mr. McAlear to give each

12    person in the reserve list this instruction.  I'll tell each

13    one that they will get a written request.

14              Is there anything else that needs to come to my

15    attention before we call the next potential juror?  All right.

16    We'll call the next one.

17              Good morning, Mr. Connaughton.  Is that how you

18    pronounce it?

19              PROSPECTIVE JUROR:  That's correct.

20              THE COURT:  Mr. Connaughton, please be seated.  You're

21    reminded that you remain under oath.  You may remove the mask

22    if you want to, but you don't have to.

23              Mr. Connaughton, you are interviewing for a new job

24    opportunity, is that correct?

25              PROSPECTIVE JUROR:  Yes.
```

**A731**

```
 1              THE COURT:  I take it then jury duty at this point for
 2     4 weeks would cause you a hardship?
 3              PROSPECTIVE JUROR:  I would think so.
 4              THE COURT:  I don't want to cause you, especially a
 5     financial hardship, if you're looking for a new job or you're
 6     just about to have a new job.  I think that it would not be
 7     appropriate for you to sit on this jury unless I'm missing
 8     something.  Do you have any feelings about it one way or the
 9     other?
11:28 10            PROSPECTIVE JUROR:  That would be very helpful.
11              THE COURT:  So I'm going to excuse you,
12     Mr. Connaughton.  That doesn't excuse you from all jury duty.
13     It's a very important civic responsibility that you have to
14     serve on juries.  I hope once you get settled and get that new
15     job, you will be able to serve as a juror.  Good luck to you in
16     your efforts.  Thank you.  You're excused.
17              Good morning, Mr. Rodriguez.
18              PROSPECTIVE JUROR:  Good morning, your Honor.
19              THE COURT:  Please be seated.  You're reminded that
11:29 20    you remain under oath.  You may remove your mask if you want
21     to, but you don't have to.
22              PROSPECTIVE JUROR:  Thank you.
23              THE COURT:  Mr. Rodriguez, I understand that you are
24     the sole provider for an elderly person is that, right?
25              PROSPECTIVE JUROR:  That is correct.  That would be my
```

```
 1    wife.
 2              THE COURT:  I take it that 4 weeks on a jury would
 3    cause you some severe hardship, is that fair?
 4              PROSPECTIVE JUROR:  It would, economically as well as
 5    just basic day-to-day housekeeping care and chores.
 6              THE COURT:  I'm not going to do that.  I'm not going
 7    to cause you that economic hardship.  I think you have an
 8    important job taking care of somebody, therefore I'm going to
 9    excuse you from this jury.  That does not excuse you from all
10    jury duty.  I hope at one point you will be able to exercise
11    your civic duty and serve on a jury.  Okay?
12              PROSPECTIVE JUROR:  Thank you, your Honor.
13              THE COURT:  Good morning, Miss Lacorazza.  Please be
14    seated.  Understand that you remain under oath.  You may remove
15    the mask if you want to, but you don't have to.
16              Miss Lacorazza, was there anything on the
17    questionnaire that gave you pause as to whether you could be
18    fair and impartial in this case?
19              PROSPECTIVE JUROR:  No.
20              THE COURT:  Do you think you can decide this case
21    solely based on the evidence that comes into this courtroom and
22    not on the basis of anything you've heard outside the Court
23    room?
24              PROSPECTIVE JUROR:  Yes, I do.
25              THE COURT:  I understand you have a relation to some
```

1    swat, police.

2        PROSPECTIVE JUROR:  On my cousin's side through

3    marriage.

4        THE COURT:  Would that relationship with law

5    enforcement cause you to be impartial or unfair in this case?

6        PROSPECTIVE JUROR:  I don't think so.

7        THE COURT:  Mr. Kelly?

8        MR. KELLY:  Good morning, whatever it is.  I represent

9    Mr. Aziz.  Thank you for coming in.  With respect to that

11:32 10    question about the FBI, what's the name of your cousin or the

11    agent who is in your family?

12        PROSPECTIVE JUROR:  Bryce Montoya.

13        MR. KELLY:  Nothing with respect to that would affect

14    your ability to be unfair in this case?

15        PROSPECTIVE JUROR:  No.

16        MR. KELLY:  Thank you very much.

17        THE COURT:  Mr. Kendall?

18        MR. KENDALL:  One moment, your Honor.  No questions.

19        THE COURT:  Miss Kearney?

11:32 20        MS. KEARNEY:  Good morning, Miss Lacorazza.  No

21    questions.

22        THE COURT:  Thank you, Miss Lacorazza.  I'm going to

23    ask you to go into the reserve room.  That means you may or may

24    not be called back.  I want to caution you not to do any

25    independent research on this case because if you are called to

```
  1   sit as a juror, you will decide this case solely on the basis
  2   of the evidence that comes into this courtroom and not any
  3   independent research.  You're going to have a little paragraph
  4   of instructions to follow while you wait to be called.  Okay?
  5            PROSPECTIVE JUROR:  Thank you.
  6            THE COURT:  Good morning, Mr. Wakelin.  Is that how
  7   you pronounce your name?
  8            PROSPECTIVE JUROR:  It is, sir.  Thank you.
  9            THE COURT:  Good morning, Mr. Wakelin.  You may be
 10   seated.  You are reminded you're under oath.  You may remove
 11   the mask if you wish.
 12            Mr. Wakelin, the only question from your questionnaire
 13   is I note you were a college athlete at Dennison University, is
 14   that right?
 15            PROSPECTIVE JUROR:  That is correct.
 16            THE COURT:  This case involves allegations that allege
 17   that some of the defendants falsely identified as athletes.
 18   Will that in any way affect your ability to be fair and
 19   impartial in this case?
 20            PROSPECTIVE JUROR:  No, it will not.
 21            THE COURT:  You could decide this say case solely
 22   based on the evidence that's going to come into this courtroom
 23   and not on the basis of anything outside or what you've heard
 24   about?
 25            PROSPECTIVE JUROR:  So what I would say to you, sir,
```

```
 1    is that for the last 30 years I've followed the media and
 2    entertainment business for an investment management firm here
 3    in Boston.  I'm very familiar with Laurie law enforcement Lynn
 4    and felicity huff man.  I know that there's a fixer in
 5    California that was involved in an admissions scandal of some
 6    variety.  I have not read anything on that.  Given the fact
 7    that I followed the industry for a long period of time, I am
 8    familiar with some of the things that have happened with
 9    respect to not only the University of Southern California but
10    also Harvard.  I have a son who just graduated from Georgetown
11    University, who was a freshman, I believe, when there was an
12    individual at the school who was impacted by that as well.  I
13    have tangential information with respect to what might be
14    raised here.
15         THE COURT:  Fair enough.  The question is, however,
16    can you decide this case based solely on the evidence that
17    comes into this courtroom and not on the basis of what you've
18    heard tangentially about other defendants in this case.
19         PROSPECTIVE JUROR:  Yes.
20         THE COURT:  Any questions, Mr. Kelly.
21         MR. KELLY:  Sure.  Briefly.  Good morning, Brian Kelly
22    for Mr. Aziz here.  A few follow-up questions.  Have you
23    watched any TV shows or films about anything related to this?
24         PROSPECTIVE JUROR:  I have not.
25         MR. KELLY:  Putting aside the actresses in California
```

11:35 (line 10)
11:36 (line 20)

```
 1   may or may not have done, can you treat my client here

 2   separately from them in your mind?

 3           PROSPECTIVE JUROR:  Yes, I could.

 4           MR. KELLY:  Nothing about your sporting experience at

 5   Dennison would affect your outlook on this case?

 6           PROSPECTIVE JUROR:  I -- no.  I don't feel that

 7   because athletic endeavors were used in order to gain admission

 8   into college would be impacted by my being a collegiate

 9   athlete.

10           MR. KELLY:  D3, Dennison?

11           PROSPECTIVE JUROR:  Dennison is D3 yes.

12           MR. KELLY:  What was your position there?

13           PROSPECTIVE JUROR:  I played third base.

14           MR. KELLY:  Are you a college sports fan at all?

15           PROSPECTIVE JUROR:  I am a college sports fan, yes.

16           MR. KELLY:  Which sports do you follow?

17           PROSPECTIVE JUROR:  I follow all the large ones.  In

18   addition to my son who was at Georgetown, my other son, who is

19   his twin brother, was at Notre Dame.  We are active collegiate

20   athletic followers, I would say.

21           MR. KELLY:  Nothing further.  Thanks again coming in.

22           THE COURT:  Mr. Kendall.

23           MR. KENDALL:  Good afternoon.  Still morning.  Good

24   morning.  I'm Mike Kendall.  I represent John Wilson.  Couple

25   things I wanted to follow-up on.  You mentioned when your son
```

A737

1    was a freshman at Georgetown, one of the kids was effected.

2    Can you tell us your impression of what happened and your

3    memory about it and your thoughts about it.

4         PROSPECTIVE JUROR:  I don't know specifics of how this

5    particular child was admitted into Georgetown.  I just know

6    that they were accused of being admitted on a preferential

7    basis.  I can't recall whether or not it was the sailing coach

8    or the way that this particular person ended up at Georgetown,

9    but there was some question as to their viability,

11:38 10    qualifications, with respect to gaining admittance there.

11         My son actually did not know the person intimately but

12    knew of the person.  I know they had some challenges once the

13    public information came out.

14         MR. KENDALL:  Thanks.  Appreciate that.

15         The other thing I wanted to raise is one issue in this

16    case will be that people make donations to schools and the

17    schools will give preferential treatment to their relative for

18    a donation, not for a fraud or criminal act.  Does that

19    practice bother you?  Do you have any views on that practice?

11:39 20         PROSPECTIVE JUROR:  My brother-in-law went to Harvard

21    University.  His four children also went to Harvard University.

22    My children did not go to Harvard University.  I don't find the

23    practice of large donations to be untoured, if you would,

24    however, what I would suggest is that there is a certain level

25    of privilege with respect to a person's ability to purchase

1    their way into a situation that they might not be academically

2    qualified for that I think gets to the entire basis of

3    privilege in this country.

4         MR. KENDALL:  I appreciate your candor.  I wanted to

5    ask you a couple more questions on that.

6         PROSPECTIVE JUROR:  Certainly.

7         MR. KENDALL:  How much does that bother you?

8         PROSPECTIVE JUROR:  As I mentioned, it just is a

9    reflection of privilege.  I don't hold it against people for

11:40 10  taking advantage in every way that they can on a legal basis.

11    It still is a privilege problem with the fabric of I would say

12    the United States.

13         MR. KENDALL:  If the issue is that people did take

14    advantage of that, making a donation could get their child a

15    boast to get into college, a significant boast, and they did it

16    purposefully and intentionally but not fraudulently, is that

17    something you realize is legal and it's fine to be done and you

18    can't judge a person for that?

19         PROSPECTIVE JUROR:  Like I said, if it's legal and it

11:41 20  appears to be legal, then there's nothing wrong other than

21    people using their privilege to their advantage.  I wouldn't

22    necessarily say that I would hold it against someone for

23    pursuing any avenues for their children's education.

24         MR. KENDALL:  I appreciate your candor.  Thanks.

25         THE COURT:  Miss Kearney?

MS. KEARNEY:  Good morning, sir.  The judge is going

to instruct you on what the law is and whether something is or

is not illegal.  Are you going to be able to follow his

instructions?

PROSPECTIVE JUROR:  Yes.

MS. KEARNEY:  Your feelings on privilege, is there

anything about that that would make you unable to judge the

evidence fairly and impartially?

PROSPECTIVE JUROR:  No.  I don't believe there is.

MS. KEARNEY:  Thank you, sir.

THE COURT:  Thank you, Mr. Wakelin.  You will be held

in reserve and go with Mr. McAlear at this point.  Please do

not try to do any independent research on this case.  That

would be entirely inappropriate, as I'm sure you know, because

you're going to decide this case, if you are selected to be a

jury, solely on the basis of the evidence that comes into this

courtroom.  Thank you.

MR. KENDALL:  Your Honor, if we may have a moment?

THE COURT:  Yes, Mr. Kendall.

MR. KENDALL:  Again, we have a very fine person,

intelligent, straightforward, honest person, someone to be

respected.  The fact -- and he knows what he's supposed to say

and he knows what is the appropriate thing to do.  I think he's

a person who believes in doing the appropriate thing right

away.  The fact that he says his brother-in-law got four kids

into Harvard and his didn't get in, I think this is something

that bothers him.  While jurors try to be dispassionate, this

is clearly something that's ingrained in him and it was a

family issue.  I was sort of shocked at the answer.  It boths

him.  I think it will affect the way he looks at this case.  We

like to think we can always be dispassionate and analytical,

but some baggages you can't get rid of.  I think this is an

example of that.

MR. KELLY:  I would enjoin in that motion to excuse

for cause.  I think the way he kept bringing up privilege,

privilege, privilege, suggests he is going to be biassed in

this case.  His answers, the Harvard situation, although he

didn't go to Harvard, maybe he didn't go to Dartmouth, I can

see why he's troubled, but those answers suggest he probably

cannot be fair in this case.  We would enjoin in that motion to

excuse him.

THE COURT:  Miss Kearney?

MS. KEARNEY:  Your Honor, the prospective juror said

he could listen to the evidence fairly and impartially and

could follow your instructions.  Given that, we do not agree.

THE COURT:  He will not be excused.

MR. FRANK:  Your Honor, briefly, some of the

questioning there --

THE COURT:  It got close to the line, I agree,

Mr. Frank.  I'm not going to allow questions that basically are

1    an opening argument, Mr. Kendall.  That almost got to the point

2    where I told the potential juror not to answer.  Be careful

3    from now on.

4         MR. KENDALL:  I apologize, your Honor.  I did not

5    intend to do that.  That's the only person I really probed with

6    the whole day.  I understand your point.

7         THE COURT:  Good morning, miss golden.  Please be

8    seated.  You're reminded you are still under oath.  You may

9    remove the mask if you want to, but you don't have to.

11:46 10        In response to some of the questions or one particular

11    question on the questionnaire you said you had strong feelings

12    about wealthy people who don't pay workers well or make the

13    world a better place.

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  The question in this case, which involves

16    two at least potentially wealthy defendants, is can you decide

17    this case based solely on the evidence that comes into this

18    courtroom and not on your concern about wealthy people in

19    general.

11:46 20        PROSPECTIVE JUROR:  Yes.

21         THE COURT:  In other words, this response to 43, and

22    you were being honest, is a general feeling you have, but you

23    could put it behind you and decide this case without reference

24    to that concern?

25         PROSPECTIVE JUROR:  Yes, I could.

1          THE COURT:  Is there anything about any of the

2     questions on the questionnaire or your answers to them that

3     gave you pause as to your ability to be fair and impartial in

4     this case?

5          PROSPECTIVE JUROR:  Not to be fair and impartial, but

6     I was concerned about the one to stay off social media, since

7     that is the only way I communicate --

8          THE COURT:  Say that again.

9          PROSPECTIVE JUROR:  I was concerned about the one that

11:47 10   asked me to stay off social media for the duration.  I'm a

11    small business owner.  That's how I communicate with my

12    customers.

13         THE COURT:  It certainly doesn't mean you can't use

14    that for your profession.  The concern is that people, it's so

15    easy to get information on the internet, that you go on and

16    start to do independent research.  That can't be done.  I can't

17    allow that to be done during the trial because this case is

18    going to be decided solely on the basis of the evidence that

19    comes into this courtroom and not on the basis of any

11:48 20   independent research that you or any other juror might do.  So

21    that's going to be an instruction that I give at the very

22    beginning of the case that you cannot use social media or any

23    other electronic means to do anything to do with this case.

24    That doesn't mean you can't do your own job by using it.

25         PROSPECTIVE JUROR:  Got it.

         1              THE COURT:  With that qualification, can you follow

         2       that instruction?

         3              PROSPECTIVE JUROR:  Yes.  That's not a problem.  I

         4       actually have no idea what the case is even about, so I've

         5       already done no research.

         6              THE COURT:  Fair enough.  Any questions, Mr. Kelly?

         7              MR. KELLY:  Yes.  Good morning.  Brian Kelly.  I

         8       represent Mr. Aziz here.  Thank you for coming in.  Just a

         9       couple quick follow-up questions.

11:48   10              The Court's question about social media and your

        11       answer, I assume that includes Facebook?

        12              PROSPECTIVE JUROR:  Yes.

        13              MR. KELLY:  Isn't it a thing or Facebook where news

        14       flashes pop up?

        15              PROSPECTIVE JUROR:  Not through the business page.

        16       There's no news feed.  It's just my ability to communicate with

        17       my customers.

        18              MR. KELLY:  You say you use it for your business and

        19       could not function without it?

11:49   20              PROSPECTIVE JUROR:  Correct.  I wouldn't be able to

        21       contact my customers or run my business for the month or

        22       however long it takes.

        23              MR. KELLY:  What other forms of social media do you

        24       use?

        25              PROSPECTIVE JUROR:  Also Instagram.

```
 1          MR. KELLY:  Do they sometimes send you messages about

 2   current events?

 3          PROSPECTIVE JUROR:  No.  I'm a makeup artist.  No one

 4   tells me anything about what's going on in the world.

 5          MR. KELLY:  Are you a college sports fan in any way?

 6          PROSPECTIVE JUROR:  No.

 7          MR. KELLY:  There was an answer to one of these

 8   questions that you have strong feelings about wealthy people.

 9   Can you just share with us what those strong feelings may be.

10          PROSPECTIVE JUROR:  It's not about all wealthy people.

11   When I see something like that Wal-Mart has more people who are

12   on government assistance and employed, what?  If you're

13   employed, you should be able to make enough to not be on

14   government assistance.  I don't understand.  It's just in

15   situations like that where I tend to judge whoever's at the top

16   of the hierarchy.

17          MR. KELLY:  If there were people in this case who had

18   done well in their lives and had good jobs, you wouldn't resent

19   them for that?

20          PROSPECTIVE JUROR:  I don't have anything against ones

21   who are wealthy in general, just ones who take advantage of

22   people to get there.

23          THE COURT:  Mr. Kendall.

24          MR. KENDALL:  A couple things.  You run your own

25   business.
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MR. KENDALL:  Do you have employees?

 3              PROSPECTIVE JUROR:  Just me.

 4              MR. KENDALL:  If we tie you up most of the day with

 5      the trial, will you be able to manage things?

 6              PROSPECTIVE JUROR:  Yes.

 7              THE COURT:  Miss Kearney.

 8              MS. KEARNEY:  Good morning.  One of the questions in

 9      your questionnaire you mentioned related to prior experience

11:51 10     being a victim of a crime.  I wanted to ask, do you feel you

11      were treated fairly in that experience in terms of the criminal

12      justice system?

13              PROSPECTIVE JUROR:  I did not move it over to the

14      criminal justice system, what happened there.

15              MS. KEARNEY:  Was there anything about your feelings

16      about the criminal justice system there that caused you to not

17      move forward?

18              PROSPECTIVE JUROR:  No.  The person who assaulted me

19      was not an American so it wasn't really relevant.

11:51 20             MS. KEARNEY:  Thank you.

21              THE COURT:  Thank you, miss golden.  I'm going to ask

22      you to go into what we're calling reserve, which means you're

23      going with Mr. McAlear.  If you are called back to serve on

24      this jury, please don't do any research in the meantime.  It

25      would be inappropriate, as we've just talked about.  You can't
```

```
 1   go do some independent research because the case is going to be
 2   decided on the basis of the evidence that comes here and not on
 3   any outside information.
 4         PROSPECTIVE JUROR:  I will continue not paying
 5   attention to the world.
 6         THE COURT:  Thank you, miss golden.
 7         Good morning, Mr. Walsh.  You may be seated.  You are
 8   reminded you are still under oath.  You may remove the mask if
 9   you want to, but you don't have to.
10         I understand, Mr. Walsh, that you are a dentist.
11         PROSPECTIVE JUROR:  Yes, sir.
12         THE COURT:  And if you were to be called to serve on
13   this case, that it would perhaps cause you some financial
14   hardship, is that fair to say?
15         PROSPECTIVE JUROR:  It would be difficult because I
16   have 11 employees.  I think it would be difficult for them,
17   because if I'm not there, they can't work.
18         THE COURT:  In other words, you're the top of the
19   pyramid and what goes on underneath needs you to guide?
20         PROSPECTIVE JUROR:  Yes, your Honor.
21         THE COURT:  We call people to serve on juries and we
22   expect that they're going to undergo inconvenience, sometimes
23   serious inconvenience, but not hardship.  The difference
24   between inconvenience and hardship sometimes is hard to
25   discern, but I don't want to cause you financial hardship or
```

1    your practice financial hardship.  If that's going to occur,

2    then I'm going to excuse you from this jury, but you have to

3    tell me.

4         PROSPECTIVE JUROR:  Yes.  It would be a hardship.

5    I've actually just -- I haven't been in my office for the past

6    2 weeks because I'm just recovering from a pinched sciatic

7    nerve, so that's another 2 weeks that I've been out of my

8    offices.

9         THE COURT:  This would be kind of exacerbating an

11:54 10    already occurring problem?

11         PROSPECTIVE JUROR:  Yes, sir.  It would be.

12         THE COURT:  I'm going to excuse you from this jury.

13    That doesn't excuse you for all jury duty.  I hope sometime

14    when you get a little break in your practice that you'll be

15    willing to serve because it's a very important civic

16    responsibility.

17         PROSPECTIVE JUROR:  I've served before in a trial.  I

18    would be happy to do that at some other point in time.

19         THE COURT:  Thank you, Mr. Walsh.  You're excused.

11:55 20         Good morning, miss Burke.

21         PROSPECTIVE JUROR:  Good morning.

22         THE COURT:  Please be seated.  You're reminded that

23    you remain under oath.  You may remove the mask if you want to,

24    but you don't have to.

25         Miss Burke, you mentioned that two of your cousins

```
 1    attended Harvard.

 2              PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  As you know, this case involves

 4    allegations that involve other universities, Harvard and other

 5    universities.  Would the fact that you have some even remote

 6    connection with Harvard affect your ability to be fair and

 7    impartial in this case?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  You can base the this case on the evidence

11:56 10   that comes into the Court room and not any other matters that

11    come into your head?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  Is there anything in the questionnaire

14    that gave you pause as to your ability to be fair in this case?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Mr. Kelly, any questions for this juror?

17              MR. KELLY:  Briefly.  Good morning, Brian Kelly.  I

18    represent Mr. Aziz.  I notice you're a Bruins fan.  Do you

19    follow college sports at all?

11:56 20             PROSPECTIVE JUROR:  Not at all.

21              MR. KELLY:  Thanks.  That's it.

22              THE COURT:  Mr. Kendall?

23              MR. KENDALL:  Nothing, your Honor.

24              THE COURT:  Miss Kearney?

25              MS. KEARNEY:  Good morning, ma'am.  No questions.
```

```
 1              THE COURT:  Thank you, miss Burke.  I'd like you to go

 2    in reserve, which is what we're calling we're holding for

 3    potential future service on this jury.  Mr. McAlear will show

 4    you where to go.  You're, of course, forewarned not to do any

 5    independent research on this case.  That would be

 6    inappropriate, as I'm sure you understand.  Don't try to do any

 7    looking up on the internet as to what this case might involve.

 8    Okay?

 9              PROSPECTIVE JUROR:  Okay.

11:58 10        Good morning, Miss DiCastro.  Please take a seat.

11    You're reminded you remain under oath.  You may remove the mask

12    if you want to, but you don't have to.

13              Miss DiCastro, you mentioned that your job in a small

14    office would make it difficult for you to find coverage if you

15    had to serve for 4 weeks on a jury.

16              PROSPECTIVE JUROR:  That's correct.

17              THE COURT:  I take it that means that would cause you

18    a financial hardship or your business a financial hardship.  Is

19    that fair to say?

11:58 20            PROSPECTIVE JUROR:  Yes.  I work in a very small

21    office.  We have four people.  It would be hard for coverage.

22              THE COURT:  So this would cause you a hardship to

23    serve on the jury?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  I'm going to excuse you from this jury.
```

         1    That doesn't excuse you from all juries.  I hope at a different

         2    time, maybe not so stressful in your business, you will serve

         3    as a juror because it's a very important civic responsibility.

         4    Okay?

         5              PROSPECTIVE JUROR:  Okay.

         6              THE COURT:  You're excused from this jury.  Thank you

         7    for coming in today.

         8              Good morning, Mr. Sullivan.

         9              PROSPECTIVE JUROR:  Good morning.

11:59   10              THE COURT:  Would you please remove your hat.  Thank

        11    you.  You can remove your mask if you want, but you don't have

        12    to do that.

        13              PROSPECTIVE JUROR:  Thank you.

        14              THE COURT:  You're reminded that you remain under

        15    oath.  I understand that you work at a distant place.

        16              PROSPECTIVE JUROR:  That's correct.

        17              THE COURT:  Would service on this jury cause you a

        18    financial hardship?

        19              PROSPECTIVE JUROR:  It may.

12:00   20              THE COURT:  By may.

        21              PROSPECTIVE JUROR:  Well, it will, yes.

        22              THE COURT:  I don't want to cause you financial

        23    hardship.  We do ask you to endure inconvenience, but we don't

        24    ask you to give up your job or give up your where with all that

        25    you need to live on.  I'm going to excuse you from this jury.

        1    That doesn't excuse you from all jury duty.  I hope you'll find
        2    a time when you can perform your civic responsibility of
        3    serving on a jury, but this one's going to be 4 weeks and it
        4    will cause you, presumably, to have some financial hardship.
        5    I'm not going to do that.  You're excused.
        6            PROSPECTIVE JUROR:  Thank you.
        7            THE COURT:  Good afternoon, Mr. Glassman.
        8            PROSPECTIVE JUROR:  Good afternoon.
        9            THE COURT:  Please be seated.  You're reminded that
12:01  10    you remain under oath.  You may remove the mask if you want to,
       11    but you don't have to.
       12            Mr. Glassman, I understand from the answers that you
       13    gave on your questionnaire that you played college sports back
       14    in your day, is that right?
       15            PROSPECTIVE JUROR:  No, one of my sons.
       16            THE COURT:  I misunderstood that.  Would the fact that
       17    your son was involved in college athletics and that this case
       18    involves alleged fraudulent claims of athletic prowess in any
       19    way affect your ability to be fair and impartial?
12:02  20            PROSPECTIVE JUROR:  No.
       21            THE COURT:  In other words, you can decide this case
       22    solely on the evidence that comes into this courtroom and not
       23    on the basis of anything you've heard outside of it?
       24            PROSPECTIVE JUROR:  Yes.
       25            THE COURT:  Any questions for this potential juror,

```
 1   Mr. Kelly?

 2           MR. KELLY:  Briefly.  Good morning, Brian Kelly.  I

 3   represent Mr. Aziz here.  Putting aside the Bridgewater state

 4   football, do you follow college sports in general?

 5           PROSPECTIVE JUROR:  No, I don't.

 6           MR. KELLY:  Thanks.

 7           THE COURT:  Mr. Kendall?

 8           PROSPECTIVE JUROR:  Thank you for coming in.  No

 9   questions, your Honor.

12:02 10         THE COURT:  Miss Kearney?

11           MS. KEARNEY:  Good afternoon, Mr. Glassman.  I wanted

12   to follow-up on one of the questions about your prior juror

13   service.  You said the jury did not come to a verdict.  Can you

14   elaborate.

15           PROSPECTIVE JUROR:  It was a mistrial.  There were six

16   of us and we didn't agree on a verdict.

17           MS. KEARNEY:  Was it fairly guided or was there one

18   hold out?

19           PROSPECTIVE JUROR:  It was two to four.

12:03 20         MS. KEARNEY:  Thank you, sir.

21           THE COURT:  Do you remember what kind of case it was?

22           PROSPECTIVE JUROR:  It was a marijuana case.

23           THE COURT:  Whereabouts?

24           PROSPECTIVE JUROR:  I think it was Fall River or New

25   Bedford that it was in.
```

```
 1              THE COURT:  Thank you.  Thank you, Mr. Glassman.  I'm

 2    going to ask you to go into reserve, which Mr. McAlear will

 3    explain to you.  It means you may or may not be called back.

 4    In the meantime, please do not do any independent research on

 5    this case.  That would be inappropriate.  Thank you for your

 6    attendance.

 7              Good morning, Mr. Marshall.  Please be seated.  You're

 8    reminded that you remain under oath.  You may remove the mask

 9    if you want to, but you don't have to.

12:04 10              Was there anything in the questionnaire that gave you

11    pause as to whether you could be fair and impartial in this

12    case?

13              PROSPECTIVE JUROR:  No.

14              THE COURT:  You can decide this case solely on the

15    evidence that comes into this courtroom and not on any evidence

16    from outside the courtroom?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  You said you may have a hearing problem.

19    Are you having a hard time hearing what I'm saying?

12:05 20              PROSPECTIVE JUROR:  No.  I can hear you.

21              THE COURT:  We do have assistance for those who have

22    hearing difficulties.  If and when you are chosen as a juror

23    and you want to have a headset or something, we have that.

24              PROSPECTIVE JUROR:  Okay.

25              THE COURT:  The other thing is, of course, if there's
```

A754

```
 1   any time when you can't hear a witness, you raise your hand and
 2   we have the witness repeat his or her answer.
 3           PROSPECTIVE JUROR:  Okay.
 4           THE COURT:  So we do have the ability to assist people
 5   who have that sort of a hardship.  Is there any reason you can
 6   see why you can't be fair and impartial in this case?
 7           PROSPECTIVE JUROR:  No.
 8           THE COURT:  Mr. Kelly, any questions?
 9           MR. KELLY:  Just briefly.  Good afternoon.  My name's
10   Brian Kelly.  I represent Mr. Aziz here.  Are you a college
11   sports fan at all?
12           PROSPECTIVE JUROR:  Not really.
13           MR. KELLY:  There's one question on the questionnaire,
14   actually a lot of questions.  One of them asked whether or
15   not -- it says the prosecution had the burden of proving the
16   defendant is guilty beyond a reasonable doubt.  The defendant
17   does not have to prove that he's innocent.  Then it asked the
18   question do you disagree in any way with this principle.  You
19   answered yes.  I'm trying to get an understanding of what you
20   meant.
21           PROSPECTIVE JUROR:  I didn't understand the question
22   that well I guess.
23           MR. KELLY:  If the judge, who's the boss on the law
24   and many other things, if he tells you it's the government's
25   burden of proving that the defendant is guilty beyond a
```

```
 1    reasonable doubt, will you follow the judge's instruction?

 2                 PROSPECTIVE JUROR:  Yes.

 3                 MR. KELLY:  If he tells you the defendant, like my

 4    client, does not have to prove that he's innocent, will you

 5    follow that instruction?

 6                 PROSPECTIVE JUROR:  Yes.

 7                 MR. KELLY:  Is there anything about what you've seen

 8    in this questionnaire or heard to date in this process that

 9    would prevent you from being fair to all sides?

10                 PROSPECTIVE JUROR:  No.

11                 THE COURT:  Mr. Kendall?

12                 MR. KENDALL:  Good day.  No questions.

13                 THE COURT:  Miss Kearney?

14                 MS. KEARNEY:  Good afternoon.  In your response to one

15    of the questions about whether you, relative, close friend had

16    any prior experience being arrested or charged with a crime,

17    was there anything about experience that you felt the people

18    involved were not treated fairly?

19                 PROSPECTIVE JUROR:  No.  They were treated right.

20                 MS. KEARNEY:  Was there anything about that experience

21    that would affect your ability to be fair and impartial in this

22    trial?

23                 PROSPECTIVE JUROR:  No.

24                 MS. KEARNEY:  Thank you, sir.

25                 THE COURT:  Thank you, Mr. Marshall.  I'll have you go
```

12:07 — line 10
12:08 — line 20

1    into reserve, which is what we're calling those who may be

2    called back for further jury duty.  You will go with

3    Mr. McAlear.  Please understand that you're not to do any

4    independent research about this case on the internet that.

5    Would be inappropriate because you're going to decide this

6    case, if and when you're chosen as a juror, solely based on the

7    evidence that comes into this courtroom.

8        Good afternoon, Mr. Bowker.  You may be seated.  You

9    may remove your mask if you want to.  You are reminded you are

12:09 10    under oath.

11        Mr. Bowker, you are self employed?

12        PROSPECTIVE JUROR:  That's correct.

13        THE COURT:  Service on this jury, which would take

14    about 4 weeks, would cost you serious hardship?

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  I'm not going to cause you hardship.  You

17    need to be employed.  You need to make a living.  This is going

18    to take 4 weeks.  I take it this is the time of year when

19    chartering a boat is able to be done as opposed to November or

12:09 20    December or January, right?

21        PROSPECTIVE JUROR:  Yes.  That's correct, sir.

22        THE COURT:  Maybe in the wintertime when you're not

23    working you can serve on another jury because it's a very

24    important civic responsibility that you have to serve on

25    juries, but I'm not going to make you serve on this one and

```
 1    endure financial hardship.  You're excused, Mr. Bowker.

 2              PROSPECTIVE JUROR:  Thank you, your Honor.

 3              THE COURT:  Good afternoon, Mr. Ratliff.  It's

 4    Ratliff.  Ratliff.  Please be seated.  You're reminded that you

 5    remain under oath.  You may remove the mask if you want to, but

 6    you don't have to.

 7              Was there anything on that questionnaire that gave you

 8    pause as to whether or not you could be fair and impartial in

 9    this case?

12:11 10              PROSPECTIVE JUROR:  No, your Honor.

11              THE COURT:  You're convinced you could decide this

12    case solely based on the evident that comes into this courtroom

13    and not on any outside influences?

14              PROSPECTIVE JUROR:  Yes, sir.

15              THE COURT:  Your wife was employed by Salem State?

16              PROSPECTIVE JUROR:  That's correct.

17              THE COURT:  Does the fact that this case involves

18    other universities in any way affect your ability to be fair

19    and impartial?

12:11 20              PROSPECTIVE JUROR:  No, your Honor.

21              THE COURT:  Mr. Kelly, any questions?

22              MR. KELLY:  Briefly.  Good afternoon, Brian Kelly.  I

23    represent Mr. Aziz here.  A lot of the case will have some

24    discussion about sports, college sports.  Are you a college

25    sports fan at all?
```

```
 1            PROSPECTIVE JUROR:  No, not at all.

 2            MR. KELLY:  Thanks.  That's it.

 3            THE COURT:  Mr. Kendall?

 4            MR. KENDALL:  Nothing, your Honor.  Thank you.

 5            THE COURT:  Miss Kearney?

 6            MS. KEARNEY:  Good afternoon, Mr. Ratliff.  You

 7      disclosed in your questionnaire that you were previously a

 8      witness in a criminal trial.  Was there anything about that

 9      experience that made you feel that you were treated unfairly?

12:12 10            PROSPECTIVE JUROR:  My apologies if that's what I

11      indicated.  My mother was.  It asked if a family member was.  I

12      wasn't involved in that.  I don't believe so, no.

13            MS. KEARNEY:  Was there anything about the way your

14      mother was treated that makes you feel she was treated

15      unfairly?

16            PROSPECTIVE JUROR:  No.

17            MS. KEARNEY:  Anything about your mother's experience

18      and what she's told you about it make you think you can't be

19      unfair or impartial?

12:12 20            PROSPECTIVE JUROR:  No.  I was a child.

21            THE COURT:  Thank you, Mr. Ratliff.  I'm going to ask

22      you to go into reserve, which means you may be called back for

23      further jury duty.  In the meantime, please do not do any

24      internet research about this case.  That would be inappropriate

25      because you're going to judge this case on the basis of
```

1    evidence that comes into the Court room and not online.

2             MR. KENDALL:  Your Honor, I overlooked something.

3             THE COURT:  Of course.

4             MR. KENDALL:  Number nine where you listed your

5    employment background, you listed that you did tax return prep

6    for about 4 years.  Can you just tell us about the job, what

7    you did, what you thought about it.

8             PROSPECTIVE JUROR:  Of course.  I worked at Jackson

9    huity, started as just a preparer, seasonal work.  I'm in

12:13 10   finance now.  It was in preparation, I thought, for my coming

11   career.  My last year with them I was an office manager.  That

12   was for about three and a half months.

13            MR. KENDALL:  Do you have any training or formal

14   education in how to do tax return work?

15            PROSPECTIVE JUROR:  Jackson Hewitt provides training.

16   My formal training would come later when I was getting my

17   bachelor's degree in accounting and finance.

18            MR. KENDALL:  Thank you, your Honor.

19            THE COURT:  Thank you, Mr. Ratliff.  You may step

12:14 20   down.

21            Good afternoon, Mr. Yee.  Please be seated.  You are

22   reminded that you remain under oath.  You may remove your mask

23   if you want to, but you don't have to.

24            Mr. Yee, you indicate you are a self employed music

25   educator.  Will service on this jury, which is going to last

**A760**

 1   about 4 weeks, cause you a financial hardship or will you be

 2   able to continue your teaching?

 3         PROSPECTIVE JUROR:  I should be fine.

 4         THE COURT:  In other words, we normally go from nine

 5   to three or 3:30 Monday through Friday, not every day.  We will

 6   have some days when we won't be in session and, of course,

 7   we're not in session on the weekends.  I don't want to cause

 8   you financial hardship to be a juror on this case.  I don't

 9   know.  You'll have to tell me if that's a problem.

12:15 10    PROSPECTIVE JUROR:  I will be missing quite a bit of

11   work days if I were to serve as a juror.

12         THE COURT:  It would not cost you a financial

13   hardship?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Was there anything else on the long

16   questionnaire you had to fill out yesterday that gave you pause

17   as to whether or not you could be fair and impartial in this

18   case?

19         PROSPECTIVE JUROR:  No.

12:16 20    THE COURT:  You're convinced you can decide this case

21   solely on the evidence that comes into this courtroom and not

22   on anything else you believe you may have heard about it?

23         PROSPECTIVE JUROR:  I think so.

24         THE COURT:  Mr. Kelly.

25         MR. KELLY:  Briefly.  Good afternoon.  Brian Kelly.  I

     1    represent Mr. Aziz here.  I didn't understand or maybe I didn't

     2    hear it correctly.  The answer about being self employed.  You

     3    said if you have to be in a 4-week trial you'll miss a lot of

     4    work days.

     5         PROSPECTIVE JUROR:  I would miss a few work days but I

     6    would be okay.

     7         MR. KELLY:  Would it concern you having to miss those

     8    work days for the next month?  If the trial goes 4 weeks, is

     9    that going to cause you problems?

12:16 10         PROSPECTIVE JUROR:  Yes, but I think I would be okay

    11    even then.

    12         MR. KELLY:  There's a question on this questionnaire

    13    that asks you about if you've done jury service before.

    14         PROSPECTIVE JUROR:  I have, state jury.

    15         THE COURT:  You thought it was targeting state jury

    16    because you said you weren't sure.

    17         PROSPECTIVE JUROR:  I served twice in state court.

    18         MR. KELLY:  Were they a criminal case like this where

    19    the burden is --

12:17 20         PROSPECTIVE JUROR:  That's what I don't really

    21    remember.

    22         MR. KELLY:  You don't remember if it was a civil

    23    dispute over money?  When was it?  Do you know?

    24         PROSPECTIVE JUROR:  Four and then 7 years ago.

    25         MR. KELLY:  So it was two different trials?

1           PROSPECTIVE JUROR:  (Witness nods head.)

2           THE COURT:  You have to answer orally.

3           PROSPECTIVE JUROR:  Yes.

4           MR. KELLY:  You don't know if it was civil or

5      criminal.

6           PROSPECTIVE JUROR:  I think it might have been civil.

7           MR. KELLY:  Did the jury reach a verdict?

8           PROSPECTIVE JUROR:  Yes.

9           MR. KELLY:  In both of them?

12:18 10          PROSPECTIVE JUROR:  Yes.

11          MR. KELLY:  Do you remember the verdict?

12          PROSPECTIVE JUROR:  Not guilty.

13          MR. KELLY:  If it was civil, it would be not liable.

14          PROSPECTIVE JUROR:  It's 4 years ago.

15          MR. KELLY:  That's quite a while.  That's all right.

16          Are you a college sports fan?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Mr. Kendall?

19          MR. KENDALL:  In question 39 -- first of all, good

12:18 20     afternoon.  Mike Kendall.  I represent Mr. Wilson.  Question 39

21     asked "this case has been referred to the media as the varsity

22     blues and college admissions case.  Have you read any articles,

23     read any books, watched any news or any information about it? "

24     You've never heard of this case before?

25          PROSPECTIVE JUROR:  No.

```
 1              MR. KENDALL:  Then that's it.  Thanks.

 2              THE COURT:  Miss Kearney?

 3              MS. KEARNEY:  Good afternoon, sir.  No questions.

 4              THE COURT:  Thank you, Mr. Yee.  I'm going to ask you

 5     to go into reserve.  That's where we ask you to wait to see if

 6     you'll be asked to do any further jury duty.  In the meantime,

 7     please do not do any independent research.  That would be

 8     inappropriate, as I'm sure you understand.  This case is going

 9     to be decided solely on the basis of the evidence that comes
12:19
10     into this courtroom and not on anything outside of it.  Okay?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  Good afternoon, Mr. Megna.  You may be

13     seated.  You're reminded that you're under oath.  You may

14     remove your mask but you don't have to.  Mr. Megna, you

15     apparently care weekly for your father and your grandfather.

16     Would the fact that you had to serve on a jury for 4 weeks

17     affect that ability to take care of them?

18              PROSPECTIVE JUROR:  Yes, sir.  It's my grandmother

19     actually.
12:20
20              THE COURT:  I take it you feel that having to serve on

21     this jury is a hardship?

22              PROSPECTIVE JUROR:  Yes, sir.

23              THE COURT:  We ask you to endure inconvenience, but we

24     don't require hardship.  I'm going to excuse you.  That doesn't

25     excuse you from all jury duty.  You have a civic obligation to
```

1   serve on duties when and if you're able to do so, so I hope at

2   some point in the future you're able to do that.  Thank you,

3   Mr. Megna.  You're excused.

4        Good afternoon, Miss Marini.  Please be seated.

5   You're reminded that you remain under oath.  You may remove the

6   mask if you want to, but you don't have to.

7        PROSPECTIVE JUROR:  Thank you.

8        THE COURT:  Miss Marini, will serving on this jury

9   cause you a financial hardship?

12:21 10      PROSPECTIVE JUROR:  No.

11       THE COURT:  Because it's going to last about 4 weeks

12  and we don't want to cause you financial hardship.  The other

13  question is, was there anything in that questionnaire that gave

14  you pause as to whether or not you can be fair and impartial in

15  this case.

16       PROSPECTIVE JUROR:  No.

17       THE COURT:  You could decide this case solely on the

18  evidence that comes into this courtroom and not on something

19  you've heard outside the courtroom?

12:22 20      PROSPECTIVE JUROR:  Yes.

21       THE COURT:  You have a couple of children who were

22  college athletes.  Is that true?

23       PROSPECTIVE JUROR:  Yes.  One is still in college

24  plague hockey.  The other just graduated BU.

25       THE COURT:  Where does he play hockey?

**A765**

1          PROSPECTIVE JUROR:  University of Southern Maine.

2          THE COURT:  Would the fact that you have college

3   athletes as children in any way affect your ability to be fair

4   and impartial in this case, which involves allegations of

5   misstatements about athletic ability in order to get into

6   college?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Mr. Kelly, any questions?

9          MR. KELLY:  Just briefly.  Good afternoon.  Thanks for

12:23 10   coming in.  I represent Mr. Aziz here.  To follow-up briefly on

11   that, your daughter or son who plays hockey.

12          MR. KENDALL:  My daughter was a rower.  My son plays

13   hockey.

14          MR. KELLY:  Nothing about that would affect your

15   judgment in this case?

16          PROSPECTIVE JUROR:  No.

17          MR. KELLY:  Do you follow college sports?

18          PROSPECTIVE JUROR:  I do.  We're more of a college

19   athletic family.  We watch football, hockey, basketball.

12:23 20          MR. KELLY:  Anything about that would prevent you to

21   being fair on all sides of this case?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Mr. Kendall?

24          MR. KENDALL:  Thank you, your Honor.  Mike Kendall.  I

25   represent John Wilson.  I just have a question about 25.  You

```
 1   disclose your employment at the executive office of the trial

 2   court for the Commonwealth.  Can you just tell us what you do.

 3        PROSPECTIVE JUROR:  I work for the executive office in

 4   the department of research and planning, like a repository for

 5   all of the trial courts statis I guess you'd say.  We collect

 6   data on all cases.  No names are attached to the data.  I

 7   basically run the office, H R, payroll, procuring supplies and

 8   things like that.

 9        MR. KENDALL:  I take it you're not in courtrooms.

10   PROSPECTIVE JUROR:  No.

11        MR. KENDALL:  And you have nothing to do with court

12   cases?

13        PROSPECTIVE JUROR:  No.

14        THE COURT:  Miss Kearney.

15        MS. KEARNEY:  Good afternoon.  You also answered a

16   question about other jury service.  Is there anything about

17   that that would affect your ability to be fair and impartial in

18   this trial?

19        PROSPECTIVE JUROR:  No.

20        MS. KEARNEY:  You also noted someone you knew had

21   prior involvement in the criminal justice system.  Is there

22   anything about that that would affect your ability to be fair

23   and impartial?

24        PROSPECTIVE JUROR:  No.  I think I was messengering

25   myself and maybe my brother.  He's a clerk within the civil
```

**A767**

```
 1   department.
 2            MS. KEARNEY:  I think you put down here you or someone
 3   you know had been either arrested or charged with a crime.  Did
 4   you feel that the person who was arrested or charged was
 5   treated fairly?
 6            PROSPECTIVE JUROR:  Oh, yeah.
 7            MS. KEARNEY:  Thank you.
 8            THE COURT:  Thank you, Miss Marini.  I'm going to ask
 9   you to go into reserve, which means that I'm going to hold you
10   for the potential of calling back.  In the meantime, please
11   don't do any independent research.  That would be
12   inappropriate, of course, for you to go online and scope out
13   what this case is all about.  That would be inappropriate
14   because you're going to decide this case, if and when you are
15   selected as a juror, solely based on the evidence that comes
16   into the Court room and not on any outside sources.
17            PROSPECTIVE JUROR:  Absolutely.
18            Good afternoon, Mr. Scannell.  Is it Scannell or
19   Scannell?
20            PROSPECTIVE JUROR:  Either is fine.  Scannell is
21   preferred.
22            THE COURT:  Good afternoon.  You may be seated.  You
23   may remove your mask, if you want.  You are under oath.
24            Mr. Scan, you're in auto sales?
25            PROSPECTIVE JUROR:  I am.
```

1          THE COURT:  Would the fact you would have to serve on

2   a jury for 4 weeks cause you financial hardship?

3          PROSPECTIVE JUROR:  It would.  I just finished up

4   6 years of college for two students.  That's kind of drained a

5   lot of the extra, and I have one with medical issues we're

6   trying to help with.

7          THE COURT:  You can see the light at the end of the

8   tunnel for that.

9          PROSPECTIVE JUROR:  I hope so.

12:27 10          THE COURT:  We don't mean to cause financial hardship.

11   We understand jury duty causes inconvenience, but we don't want

12   to cause financial hardship.  I'm going to excuse you from

13   this.  That doesn't excuse you from all jury duty, I hope you

14   understand.  I hope you'll be willing to serve on a jury

15   further in the future.

16          PROSPECTIVE JUROR:  Hopefully, it's somewhere down the

17   road.  Thank you.  Enjoy the day.

18          Good afternoon, Miss Frithsen.  Frithsen?

19          PROSPECTIVE JUROR:  Frithsen.

12:28 20          THE COURT:  Miss Frithsen, please understand you're

21   still under oath.  You may remove your mask, but you don't have

22   to.  You have answered some of the questions about the fact

23   that you're uncomfortable if people don't go through the proper

24   process when getting degrees and there's sort of an entitlement

25   from the wealthy.  Having that opinion, would that affect your

1  ability to be fair and impartial in this case which involves

2  people who allegedly have used their wealth to help them get

3  kids into college?  We have to know a little bit more as to how

4  your feeling affects your ability to be fair and impartial.

5  PROSPECTIVE JUROR:  I think I could see both sides,

6  but I think I do -- that entitlement, I've seen it.  It doesn't

7  sit easy with me.

8  THE COURT:  The issue is whether you can decide the

9  case based upon the evidence that comes into this courtroom and

12:29 10  not on the basis of your prior understanding and dislike of

11  people that abuse (v) the system.

12  PROSPECTIVE JUROR:  I think I could see the evidence

13  and make a fair judgment.

14  THE COURT:  We can't get inside your head.  Only you

15  can tell us.  If you can't be, you're under oath, you have to

16  be truthful.  You have to tell us that, no, I couldn't, I

17  couldn't put that out of my head, or, yes, notwithstanding the

18  fact that I have an uncomfortable feeling, I could be fair and

19  impartial and listen to the evidence and decide the case solely

12:30 20  based on the evidence.  Only you can tell me that.

21  PROSPECTIVE JUROR:  Yes.  I think that despite feeling

22  uncomfortable I could listen to the evidence and make a.

23  THE COURT:  You've answered yet another question,

24  number 49, which asks you about any potential bias.  You said

25  sense of entitlement and wealthy schools is a reason you left

1    your past job.  Tell me a little bit about that.

2             PROSPECTIVE JUROR:  Sure.  The pressure from the

3    parents on the students and that sense of if they weren't

4    performing and getting into the schools they wanted, it fell

5    back on the school district where I worked.

6             THE COURT:  Would you mind telling me what school

7    district that was.

8             PROSPECTIVE JUROR:  Manchester Essex Regional School

9    District.

12:31 10          THE COURT:  That led you to?

11            PROSPECTIVE JUROR:  That was one reason.  There were

12   multiple reasons.  It was one thing that I wanted a different

13   population to work with.

14            THE COURT:  Would that in any way affect your ability

15   to be fair and impartial in this case?

16            PROSPECTIVE JUROR:  I think I could be fair and

17   impartial.  I think I'd be uncomfortable.

18            THE COURT:  Uncomfortable meaning that you would

19   hesitate to find for the defendants if the government couldn't

12:31 20   prove its case beyond a reasonable doubt?

21            PROSPECTIVE JUROR:  Sorry.  Can you repeat the

22   question.

23            THE COURT:  The government has an obligation to prove

24   the allegations beyond a reasonable doubt, which is a very

25   strict standard.  If you felt that the government hadn't done

A771

```
  1  that, would you feel uncomfortable in returning a verdict of
  2  not guilty for these defendants?
  3          PROSPECTIVE JUROR:  Possibly.  I think it could -- I
  4  think this would be difficult for me.
  5          THE COURT:  I'm going to excuse you from this jury.  I
  6  thank you for your honesty.  That's what we need.  You're
  7  entitled to your opinions.  That doesn't excuse you from all
  8  jury duty.  I hope you will be willing to serve on another jury
  9  because it is one of the most important civic obligations we
 10  have as citizens.  I'll excuse you from this one.  Maybe
 11  another time you will serve.  Okay?
 12          PROSPECTIVE JUROR:  Right.
 13          THE COURT:  Thank you.
 14          Good afternoon, Miss Rodrigues.
 15          PROSPECTIVE JUROR:  Good afternoon.
 16          THE COURT:  Please be seated.  You're reminded that
 17  you remain under oath.  You may remove the mask if you want to,
 18  but you don't have to.
 19          PROSPECTIVE JUROR:  Thank you.
 20          THE COURT:  You are employed on the north shore.
 21  Would service on this jury for 4 weeks cause you financial
 22  hardship?
 23          PROSPECTIVE JUROR:  No, it would not.
 24          THE COURT:  So that's not a problem.
 25          PROSPECTIVE JUROR:  Correct.
```

12:32 (line 10)
12:33 (line 20)

1          THE COURT:  Was there anything else on that

2     questionnaire that gave you pause as to whether or not you

3     could be fair and impartial in this case?

4          PROSPECTIVE JUROR:  Yes.  My son actually is a current

5     athlete at UMass Amherst.  I don't know much about the case

6     itself, but when you mentioned varsity blues, that brought

7     pause for thought because when he was going through that

8     process of admissions, I'd like to think I would be fair, but

9     quite honestly, I think I'd get a little angry as well.  He

12:34 10    worked hard both as an athlete and academically.  That does

11    give me some concern, quite honestly.  I'd like to think I

12    could be fair and impartial, however, I had that personal

13    reaction.

14         THE COURT:  The question isn't what your general

15    concept of the philosophy here is, but whether or not you could

16    decide this case solely on the basis of the evidence that comes

17    into this courtroom and not on any preconceived notions about

18    what the case is about.

19         PROSPECTIVE JUROR:  It's not preconceived notions.  I

12:34 20    think hearing the evidence would cause me to get frustrated and

21    angry given that I went through something personally.  I don't

22    know what the evidence is, but if it has anything to do with

23    college admissions and athletics and anything that's happened

24    that was unfair or not truthful, that would cause me to be

25    concerned, yes.

1          THE COURT:  So I guess I'm hearing that you don't

2    think you could be fair and impartial in this case.

3          PROSPECTIVE JUROR:  Correct.  I'd like to think I

4    could be, but I'm concerned.

5          THE COURT:  I'm going to excuse you from this case.

6    Thank you for your candor.  I hope you will serve on another

7    jury some day.

8          PROSPECTIVE JUROR:  Thank you so much.  I appreciate

9    it.

12:35  10          THE COURT:  Good afternoon, Mr. Torrice.  Will you

11    please take your hat off.  Thank you.  You may be seated.

12    Please understand you remain under oath.  You may remove the

13    mask if you want to, but you don't have to.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  Mr. Torrice, I understand serving on a

16    jury for 4 weeks would cause you financial hardship?

17          PROSPECTIVE JUROR:  Yes.  This is the busiest time for

18    our industry.

19          THE COURT:  I'm not going to cause you financial

12:36  20    hardship.  I'm going to excuse you from this jury.  I hope at

21    another lime, maybe a less inconvenient time, maybe in the

22    winter, you'd be willing to serve as a juror.  It's an

23    important civic duty.

24          PROSPECTIVE JUROR:  I have and I would.

25          THE COURT:  I'll excuse you from this jury.  Thank

1    you, Mr. Torrice.

2        Good afternoon, Mr. Kennie.  Please be seated.  You're

3    reminded you're still under oath.  You may remove your mask if

4    you want to.

5        The questionnaire that you answered, most of the

6    questions were answered no, right?

7        PROSPECTIVE JUROR:  Correct.

8        THE COURT:  You did answer you had prior jury service.

9    Would you tell me about that.

12:37 10        PROSPECTIVE JUROR:  In Barnstable county, small claims

11    court.

12        THE COURT:  Was that a case that you brought?

13        PROSPECTIVE JUROR:  No, although I have had that

14    position also.

15        THE COURT:  So you've brought a case in small claims

16    court and had a case brought against you in small claims court?

17        PROSPECTIVE JUROR:  No.  I served on a jury and also I

18    had brought a case.

19        THE COURT:  This was a jury in a small claims court?

12:38 20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Whereabouts was that?

22        PROSPECTIVE JUROR:  It was in Barnstable.

23        THE COURT:  What was the case about?

24        PROSPECTIVE JUROR:  It had something to do with some

25    kind of a vehicle, maybe a mobile home or something like that.

```
 1    There was some issue with transfer of title or some craziness.
 2            THE COURT:  All of the other questions you answered no
 3    to, is that correct?
 4            PROSPECTIVE JUROR:  I think so.
 5            THE COURT:  Is there anything in the questionnaire
 6    that gave you pause as to whether or not you can be fair and
 7    impartial if you were empanelled on the jury in this case?
 8            PROSPECTIVE JUROR:  No.
 9            THE COURT:  Any questions, Mr. Kelly?
12:39 10         MR. KELLY:  Briefly.  Good afternoon.  My name is
11    Brian Kelly.  I represent Mr. Aziz here.  A lot of this case
12    will center around college sports.  You a college sports fan at
13    all?
14            PROSPECTIVE JUROR:  No.
15            MR. KELLY:  Okay.  There's that.  Thanks.
16            THE COURT:  Mr. Kendall?
17            MR. KENDALL:  Good afternoon.  Thank you.  No
18    questions, your Honor.
19            THE COURT:  Miss Kearney?
12:39 20         MS. KEARNEY:  No questions, your Honor.
21            THE COURT:  Mr. Kennie, I'll ask you to go into
22    reserve, which means you'll go with Mr. McAlear.  You are not
23    to do any research on this case.  In the meantime, you may be
24    called back for further jury duty, but please don't do any
25    independent research.  Do you understand that?
```

```
 1                PROSPECTIVE JUROR:  I do.

 2                THE COURT:  Thank you.

 3                Good afternoon, miss Foley.

 4                PROSPECTIVE JUROR:  Good afternoon.

 5                THE COURT:  Please be seated.  You're reminded that

 6      you remain under oath.  You may remove the mask if you want to,

 7      but you don't have to.

 8                Miss Foley, I understand you're not employed --

 9                PROSPECTIVE JUROR:  I am.

12:40 10                THE COURT:  You baby-sit for a couple grandchildren a

11      few days a week?

12                PROSPECTIVE JUROR:  I do.

13                THE COURT:  Will service on this jury cause you

14      financial hardship?

15                PROSPECTIVE JUROR:  My husband just retired 2 weeks

16      ago.  The plan is to not do anything until January.

17                THE COURT:  So you're okay.

18                PROSPECTIVE JUROR:  Yeah.  We're okay.  We're working

19      on my huge salary right now.

12:41 20                THE COURT:  I don't want to cause you financial

21      hardship.  This will be about a 4-week trial.

22                PROSPECTIVE JUROR:  It won't be great, but it won't be

23      hardship.  I don't know what you call financial hardship.

24                THE COURT:  That's the thing.  We ask all jurors to

25      undergo inconvenience, sometimes serious inconvenience, but
```

```
 1   there's a difference between inconvenience and hardship.  I

 2   don't want to put somebody out of business to serve on a 4-week

 3   trial.

 4           PROSPECTIVE JUROR:  I see.  No.  My daughter is self

 5   employed.  She just opened her own business.  I baby-sit for

 6   her children.  My husband's retired.  It's scary.  He's with

 7   them today.  It is what it is.

 8           THE COURT:  As far as the employment side goes, you're

 9   free to serve on this jury?

12:42 10         PROSPECTIVE JUROR:  Besides it being a small family

11   business I work for and a small place, yes.  I'm not going to

12   lie.  Yeah.  I guess I could.

13           THE COURT:  Again, I don't want to cause you financial

14   hardship.  If you tell me it will, I won't make you serve.  If

15   it's going to be an inconvenience or serious inconvenience, I'd

16   ask you to undergo that.

17           PROSPECTIVE JUROR:  I see.  I think I'm on the fence

18   with it.  I really am.  I don't even know what to say.  It

19   would not be the greatest thing.

12:42 20         THE COURT:  Is there anything else in the

21   questionnaire that gave you pause as to whether or not you

22   could be fair and impartial in this case if you were a juror?

23           PROSPECTIVE JUROR:  No, I don't think so, in any case

24   to be honest with you.

25           THE COURT:  I guess I then have to pursue my earlier
```

|  | line.  If you feel that this would cause you or your family |
|---|---|
| 1 |  |
| 2 | financial distress or hardship, I'm not going to make you serve |
| 3 | on this jury.  If, on the other hand, you can do it, and |
| 4 | 4 weeks is not going to cause you any real problem, then I |
| 5 | would ask you to be a candidate to serve on this jury.  You |
| 6 | have to tell me. |

1    line.  If you feel that this would cause you or your family

2    financial distress or hardship, I'm not going to make you serve

3    on this jury.  If, on the other hand, you can do it, and

4    4 weeks is not going to cause you any real problem, then I

5    would ask you to be a candidate to serve on this jury.  You

6    have to tell me.

7         PROSPECTIVE JUROR:  I have to tell you in an honest

8    way.  Right?

9         THE COURT:  I think that would be appropriate.

12:43 10         PROSPECTIVE JUROR:  Then I'm going to have to say I

11    can do it, but driving for 4 weeks and the stress of the

12    driving and all that -- I can do it.  I can do it.

13         THE COURT:  I will take that as a yes.  It's not going

14    to be a serious hardship.

15         PROSPECTIVE JUROR:  Not a serious hardship.  I can't

16    say that.

17         MR. KELLY:  Mr. Kelly, any questions for this juror?

18         MR. KELLY:  Briefly.  Brian Kelly.  I represent

19    Mr. Aziz here.  One of the questions in the questionnaire

12:43 20    mentioned you have a son-in-law in?

21         PROSPECTIVE JUROR:  My son-in-law is an A-T- F- agent.

22    Kevin Connolly.  He's a fire inspector for the state of Maine.

23         MR. KELLY:  How about college sports?  Are you a

24    college sports fan in any way?

25         PROSPECTIVE JUROR:  Is he?

```
 1              MR. KELLY:  You.

 2              PROSPECTIVE JUROR:  Yeah.  Sports is always on in my

 3     house.  It's rule of the remote.

 4              MR. KELLY:  Thank you.

 5              THE COURT:  Mr. Kendall?

 6              MR. KENDALL:  Good afternoon.  Thank you for coming.

 7     No questions.

 8              THE COURT:  Miss Kearney.

 9              MS. KEARNEY:  Good afternoon, miss Foley.  You had
```
12:44 10     responded to one of the questions in the questionnaire that
```
11     your husband was a witness to a crime.

12              PROSPECTIVE JUROR:  Yes.

13              MS. KEARNEY:  Did he have any involvement with that

14     after the fact in terms of --

15              PROSPECTIVE JUROR:  What happened was he was on lunch

16     break and he was in a park have gone his lunch.  He looked

17     over.  He thought some kids were playing around.  It was actual

18     knives.  They were having a knife fight.  He stopped at the

19     local police before going back and said I saw something.  The
```
12:45 20     kids were horsing around.  I think it's knives or something.  I
```
21     couldn't tell for sure.  It was so scary because he -- they

22     didn't ask anything.  They saw his badge.  They went to his

23     work and got him.  2 years later or 3 years later he had to go

24     into court, but he didn't recognize anybody, but he had to go

25     into court.
```

**A780**

1          MS. KEARNEY:  Was anything about that experience cause
2     you to think he wasn't treated fairly by the criminal justice
3     system?

4          PROSPECTIVE JUROR:  No.  I don't think so.  It just
5     took a couple of years for him to go in.

6          MS. KEARNEY:  Anything about that experience cause you
7     to think it would affect your ability to be fair and impartial?

8          PROSPECTIVE JUROR:  No.  I don't know -- no.

9          MS. KEARNEY:  Thank you.

12:45 10          THE COURT:  Thank you, miss Foley.  I'll ask you to be
11     in reserve, which means you are going to be perhaps called back
12     for further jury duty.  In the meantime, please do not talk to
13     anyone about this case or try to do any independent research.
14     That would be inappropriate.

15          PROSPECTIVE JUROR:  I definitely won't.  Trust me.  I
16     know someone will try to get something out of me.  Have a nice
17     day.

18          THE COURT:  Thank you.

19          Good afternoon, Mr. Porter.

12:46 20          PROSPECTIVE JUROR:  Afternoon.

21          THE COURT:  Please be seated.  You're reminded that
22     you remain under oath.  You may take the mask off if you want
23     to but you don't have to.

24          PROSPECTIVE JUROR:  I'll leave it on if you can hear
25     me.

```
 1              THE COURT:  Mr. Porter, would serving on this jury
 2      cause you a financial hardship?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  You said someone, it's unclear whether
 5      it's you or someone you know, was robbed multiple times as a
 6      bank teller.  Would you tell me about that.
 7              PROSPECTIVE JUROR:  I worked for Citizens Bank as a
 8      part-time teller for about a year.  Over that year I was robbed
 9      three times, funny enough.
12:47 10        THE COURT:  Where was the bank?
11              PROSPECTIVE JUROR:  South Weymouth.
12              THE COURT:  South Weymouth?
13              PROSPECTIVE JUROR:  Next to a Johnny's food master.  I
14      was incorporated into a Johnny's food master.
15              THE COURT:  You worked for them 1 year?
16              PROSPECTIVE JUROR 1 year.
17              THE COURT:  You were robbed three times?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  At gun point?
12:47 20        PROSPECTIVE JUROR:  Just notes or verbal threats, no
21      guns.
22              THE COURT:  Did you ever have to appear in court or
23      get involved in the criminal justice system in any way?
24              PROSPECTIVE JUROR:  Not in that case.  I did have to
25      appear as a witness when I worked as a security officer for
```

1    Hanover mall.  It was a drug deal.

2         THE COURT:  Would that experience with the criminal

3    justice system in any way affect your ability to be fair and

4    impartial in this case?

5         PROSPECTIVE JUROR:  Not that I'm aware of.

6         THE COURT:  Is there anything in the questionnaire

7    that gave you pause as to whether you can be fair and impartial

8    in this case?

9         PROSPECTIVE JUROR:  No.  I think I'm a very impartial

12:48 10    person.

11         THE COURT:  Mr. Kelly?

12         MR. KELLY:  Briefly, your Honor.  Good afternoon.

13    Brian Kelly.  I represent Mr. Aziz here.  You follow college

14    sports at all?

15         PROSPECTIVE JUROR:  College sports?  No, not really.

16    I'm more of a musician.

17         THE COURT:  Mr. Kendall?

18         MR. KENDALL:  Good day.  No questions.  That you.

19         THE COURT:  Miss Kearney?

12:48 20         MS. KEARNEY:  Good afternoon, Mr. Porter.  You also

21    said that you had previously served on a jury.  Was there

22    anything about that experience that you think would affect your

23    ability to be fair and impartial in this trial?

24         PROSPECTIVE JUROR:  No.  I think it went all smoothly.

25    It went very well.

1        MS. KEARNEY:  In the case where you were a witness for

2   the drug deal, do you know how that case turned out?

3        PROSPECTIVE JUROR:  I believe the defendant ended up

4   doing some time.  I'm not a hundred percent.  I went to the

5   courtroom that day but never actually appeared as a witness on

6   the stand.  They had me in the back room waiting.  I think they

7   resolved everything before they needed to call me up.

8        MS. KEARNEY:  Thank you.

9        THE COURT:  Thank you, Mr. Porter.  You are in

12:49 10   reserve, as we're saying.  You'll go with Mr. McAlear.  You may

11   be called back for further jury duty.  In the meantime, please

12   do not do any independent research on this case or try to look

13   it up on the internet.  That would be inappropriate.

14        Good afternoon, Mr. Schilmeister.  You remain under

15   oath.  You may remove the mask if you want but you don't have

16   to.

17        Mr. Schilmeister, would serving on this jury cause you

18   financial hardship?

19        PROSPECTIVE JUROR:  No.

12:50 20        THE COURT:  Is there anything in the questionnaire

21   that you had to answer yesterday that gave you cause as to

22   whether you can be fair and impartial in this case?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  In other words, you could decide this case

25   based solely upon the evidence that comes into this courtroom

| | |
|---|---|
| 1 | and not on the basis of anything else you may have heard about |
| 2 | this case, is that true? |
| 3 | PROSPECTIVE JUROR:  Yes. |
| 4 | THE COURT:  I understand your father was a lawyer. |
| 5 | PROSPECTIVE JUROR:  I think so. |
| 6 | THE COURT:  Do you know what kind of law he practiced? |
| 7 | PROSPECTIVE JUROR:  No.  I'm sorry. |
| 8 | THE COURT:  Is there anything else that you feel would |
| 9 | be an impairment to your being a juror in this case? |

12:51 10        PROSPECTIVE JUROR:  No.

11        THE COURT:  Any questions, Mr. Kelly?

12        MR. KELLY:  Quickly, my name is Brian Kelly.  I

13  represent Mr. Aziz.  Thank you for coming in today.  Do you

14  follow college sports at all?

15        PROSPECTIVE JUROR:  No.

16        MR. KELLY:  Thanks.

17        THE COURT:  Mr. Kendall?

18        MR. KENDALL:  No questions, your Honor.

19        THE COURT:  Miss Kearney?

12:52 20        MS. KEARNEY:  Good afternoon, sir.  In your

21  questionnaire, you mentioned that your parents and brother --

22  you might have some concerns about COVID in relation to them.

23        PROSPECTIVE JUROR:  Yes, but they've all been fully

24  vaccinated.

25        PROSPECTIVE JUROR:  You also mentioned you might have

```
 1   trouble with crowds.  Would you have trouble being in a
 2   courtroom with approximately 50 people in it?
 3              PROSPECTIVE JUROR:  Would it be spread out like this
 4   or?  Would you feel comfortable sitting in a jury box with 15
 5   other people?
 6              PROSPECTIVE JUROR:  Yes.
 7              MS. KEARNEY:  And with additional people in the back
 8   of the courtroom and all the lawyers?
 9              PROSPECTIVE JUROR:  Uh-hum.
10              MS. KEARNEY:  Thank you, sir.
11              THE COURT:  Thank you, Mr. Schilmeister.  I will have
12   you in reserve.  You will go with Mr. McAlear.  If you are
13   called for further jury duty, please do not in the meantime do
14   any independent research about the case.  You understand that
15   would be inappropriate, right?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  Thank you, Mr. Schilmeister.
18              THE COURT:  Yes, Miss Kearney?
19              MS. KEARNEY:  Your Honor, I just wanted to flag that
20   it seems that the prospective juror had a little trouble
21   understanding your questions when you were asking about what
22   his dad did.  So I just wanted to -- we would move to strike.
23   We don't know he'd be able to follow along with the evidence if
24   he was having trouble understanding basic questions like that.
25              THE COURT:  Mr. Kelly?
```

12:52 (line 10)
12:53 (line 20)

```
 1              MR. KELLY:  I would oppose.  He said he could be fair

 2    and sit through a trial.  I saw no reason to strike for cause.

 3              THE COURT:  Mr. Kendall?

 4              MR. KENDALL:  I thought he was a particularly

 5    conscientious person.  He noted he didn't have a problem with

 6    crowds.  She went through this room, that box, the particulars

 7    of it.  He was fine.  I think he was a very responsible

 8    gentleman.  He should not be struck for cause.

 9              THE COURT:  I'm not going to strike him for cause.

12:54 10          THE COURT:  Good afternoon, Mr. Brennan.  You may be

11    seated.  You may remove your mask if you want to.  You are

12    reminded you're under oath.  You are self employed.  Would

13    4 weeks on a trial like this cause you a financial hardship?

14              PROSPECTIVE JUROR:  It would be very difficult.  I

15    have two customers houses that are opened up right now.  I have

16    to have them buttoned up for the wintertime before I start

17    another project in the wintertime.  I'm the individual doing

18    the work.  I don't have a crew of people to do the work.

19              THE COURT:  I'm not going to cause you financial

12:55 20   hardship.  I'll excuse you from this jury.  That doesn't excuse

21    you from all jury duty.  I hope you will at some point accept

22    your civic obligation of serving on a jury, but I'm not going

23    to require you to sit on this one.  You're excused.

24              PROSPECTIVE JUROR:  I appreciate that.  I have done

25    grand jury service.  It was a lot of fun to do.
```

1          THE COURT:  I hope you'll do it again.  Thank you,

2     Mr. Brennan.

3          Good afternoon, Miss Wilcox.  Please be seated.

4     You're reminded that you remain under oath.  You may take your

5     mask off if you'd like to.

6          PROSPECTIVE JUROR:  Thank you.

7          THE COURT:  Miss Wilcox, you're retired so I take it

8     service on this jury would not cause you financial hardship; is

9     that fair to say?

12:56 10          PROSPECTIVE JUROR:  That's correct.

11          THE COURT:  Is there anything in the long

12     questionnaire that you had to fill out yesterday that gives you

13     pause as to whether or not you could be fair and impartial in

14     this case.

15          PROSPECTIVE JUROR:  No.  I do believe that I can be.

16          THE COURT:  I see that question 18 you did have prior

17     jury service, right?

18          PROSPECTIVE JUROR:  Yes, in juvenile court.

19          THE COURT:  How long ago was that?

12:57 20          PROSPECTIVE JUROR:  Just about 3 years.

21          THE COURT:  3 years ago.  Did you sit on a jury for

22     that case?

23          PROSPECTIVE JUROR:  I did, but after the testimony the

24     police dismissed the case.

25          THE COURT:  So you never had to deliberate on that?

```
 1              PROSPECTIVE JUROR:  Correct.

 2              THE COURT:  Would that involvement with the criminal

 3    justice system impact your ability to be fair and impartial in

 4    this case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  Is there anything on this questionnaire

 7    cause you concern that you could not be fair and impartial?

 8              PROSPECTIVE JUROR:  No.  I was one of the last ones

 9    filling out that questionnaire yesterday.  I believe county do

12:58 10   it.

11              THE COURT:  Mr. Kelly.

12              MR. KELLY:  Good afternoon.  Brian Kelly.  I represent

13    Mr. Aziz here.  A few follow-up questions.  On your prior case,

14    the judge dismissed the case and the jury didn't deliberate.

15    Do you understand that not all judges dismiss cases and juries

16    do deliberate?

17              PROSPECTIVE JUROR:  Absolutely.

18              MR. KELLY:  That would not affect your analysis in

19    this situation?

12:58 20         PROSPECTIVE JUROR:  Not at all.  I will say I think at

21    that point in that case I had already come to that conclusion

22    myself before we had talked.

23              MR. KELLY:  There were some answers about the media.

24    I don't know if that means a lot of media or not that you've

25    seen about this case.  Have you seen a lot of reports about
```

```
 1    this case or how much have you seen?

 2            PROSPECTIVE JUROR:  As I wrote, mostly just early on

 3    when it was unavoidable on media because of the Hollywood

 4    people in it, but other than that, I don't know anything about

 5    it.  I did not follow it.  As I wrote, the only thing that I

 6    noticed about it is what a coincidence when the Boston Globe

 7    article about this trial was going to start next week and I

 8    said, oh, my, I have jury selection this week and it's possible

 9    that that's what it's for.  That's my only connection with it.

12:59 10   So I haven't studied it or anything.

11            MR. KELLY:  Nothing about what you've seen to date

12    would affect your ability to be fair to the defense and the

13    government in this case?

14            PROSPECTIVE JUROR:  Absolutely not.

15            MR. KELLY:  Whatever the media reported, that's the

16    media?

17            PROSPECTIVE JUROR:  It's gone.  Media, I don't -- I

18    don't trust all the media anyway.

19            MR. KELLY:  Fair point.  Are you the retired math

01:00 20   professor or your husband?

21            PROSPECTIVE JUROR:  My husband is the math professor.

22            MR. KELLY:  Where was he a professor at?

23            PROSPECTIVE JUROR:  Wellesley college.

24            MR. KELLY:  Sport college sports fan at all?

25            PROSPECTIVE JUROR:  No.  Red Sox and Patriots.  I
```

```
 1  don't watch college sports.

 2          MR. KELLY:  Thank you.

 3          THE COURT:  Mr. Kendall?

 4          MR. KENDALL:  Thank you, your Honor.  Good afternoon.

 5  I'm Mike Kendall.  I represent John Wilson.  I just wanted to

 6  ask you questions on one topic.  You have extensive career

 7  experience in higher education, as does your husband.  Did you

 8  have a particular observations about fundraising at schools and

 9  what you thought of it and if it's left any impression on you?

10  PROSPECTIVE JUROR:  I wasn't involved in the

11  fundraising.  I was involved in giving away the money from the

12  gifts and the stewardship and the endowments.  I know that the

13  fundraisers work hard to make connections with the donors,

14  potential donors.  Can you repeat your question, please.

15          MR. KENDALL:  Yes.  It was maybe a little bit vague.

16  I'm sorry.  Based upon your career experience, do you have any

17  opinions or observations about university fundraising that are

18  in your mind that sort of shape how you view the situation?

19          PROSPECTIVE JUROR:  I think it's a necessary part of

20  higher education in this country because the colleges need the

21  money fund raised in order to provide both academic and social

22  things for all the students, as well as funds for students who

23  can't afford to pay it themselves, and also for attracting

24  smart kids and talented kids in whatever they're talented in.

25  Could be sports.  Could be they're a good obo player and they
```

```
 1    need an obo player in the orchestra or whatever.  There are

 2    some kids who are smart and talented and don't have the money

 3    background so funds contributed go to everybody, people who can

 4    pay their way, people that can't.  That all is part of why

 5    colleges seek donations.

 6           MR. KENDALL:  Thank you very much.  Thank you, your

 7    Honor.

 8           THE COURT:  Miss Kearney.

 9           MS. KEARNEY:  Good afternoon, Miss Wilcox.  Your role

01:03 10   in the financial aid office, what was it?

11           PROSPECTIVE JUROR:  It was to analyze family financial

12    strength, using a formula that is both the federal formula for

13    financial aid eligibility and the college's formula for

14    determining eligibility and analyzing families.  The words we

15    would tell the families ourselves would be your financial

16    strength, basically your ability to contribute to your child's

17    education here.  We would determine a number.  If there was a

18    difference between that number and what the cost of the year at

19    the college, we would make that up.  Where I worked, we were a

01:04 20   full lead institution.  We would offer a package of loans and

21    work and scholarship grants.  So it was need based.

22           I want to point out it was after the admissions

23    decision was already done.  We had nothing to do with who is

24    admitted.  It was when the admissions office gave us a name and

25    then we would start to develop an aid package.
```

1          MS. KEARNEY:  In your position, did you do any work

2     with Pell grants?

3          PROSPECTIVE JUROR:  We would determine it's just a

4     push of the button on the computer and it would tell us if the

5     student was eligible for a Pell grant.  Then we would put it in

6     their aid package.

7          MS. KEARNEY:  Would you have any difficulty in

8     listening to evidence regarding Pell grants here and separating

9     that from your previous experience with Pell grants?

01:05 10        PROSPECTIVE JUROR:  Oh, I'd have no difficulty, no.  I

11    think since I understand what it is, I would probably

12    understand it well.

13         MS. KEARNEY:  But do you understand that you would be

14    limited to the evidence that's presented to you regarding Pell

15    grants and not bring in your prior, I don't want to say

16    experience, but your prior understanding of how they work?

17         PROSPECTIVE JUROR:  Yes.  I'd be fine.

18         MS. KEARNEY:  You mentioned in your prior jury service

19    that you had already come to a conclusion even before the case

01:06 20   was dismissed.

21         PROSPECTIVE JUROR:  After all the testimony I remember

22    thinking I don't think that testimony is enough to do anything

23    against this defendant, and that was just my response.  Then

24    the next thing I knew, that's what the judge said.  I think

25    that's why I remember it so well.  I said, well, I guess I did

A793

okay because that's what the judge said afterwards.

MS. KEARNEY:  Do you understand here the evidence will come in over the course of several weeks and that at the end of the trial, the judge will be instructing you on what the law is?  Are you prepared to follow those instructions and not form an opinion in advance?

PROSPECTIVE JUROR:  Absolutely.

MS. KEARNEY:  Then you also disclosed a Facebook post you made.  Can you tell us a little bit more about that Facebook post.

PROSPECTIVE JUROR:  I was candid because it says you're under oath and did you post anything.  I said there's a Boston Globe article and it's about a trial coming to federal court and I'm coming to federal court for jury selection.  Then I said maybe, and that was it.

MS. KEARNEY:  Did anyone comment in response to your post?

PROSPECTIVE JUROR:  They might have put an emoji with a wow sign or something, but no comments.

MS. KEARNEY:  Thank you.

THE COURT:  Thank you, Miss Wilcox.  I'm going to ask you to go into reserve, which means that you will go with Mr. McAlear.  You may or may not be called back for further jury duty.  In the meantime, please do not do any independent research.  You understand how important that is.  Thank you.

```
 1           THE COURT:  Counsel, I'm going to come back at five

 2   past two.  My man is to go through the process like we're going

 3   until three or 3:30, depending on how many more reserves we

 4   get.  I don't think we're going to be able to get all of them

 5   today.  We'll plan to do this once again tomorrow morning.  I

 6   am now confident that we're going to be able to have a

 7   sufficient number sometime by mid morning tomorrow.  Later on

 8   that day we're going to go to that next phase, that is we will

 9   invite all of those who have not been stricken and are

10   so-called clear jurors back into the courtroom.  It will be at

11   least 40 individuals.  You will be able to exercise your

12   peremptory challenges as previously mentioned.  I think we will

13   end up with a jury before the close of business tomorrow.

14           Anything else that needs to come to my attention

15   before we recess for lunch?  Mr. Kelly?

16           MR. KELLY:  No, your Honor.

17           THE COURT:  Mr. Kendall?

18           MR. KENDALL:  No, your Honor.

19           THE COURT:  Miss Kearney?

20           MS. KEARNEY:  No, your Honor.

21           THE COURT:  We are in recess until --

22           MR. MCALEAR:  Jurors are downstairs at lunch.  If

23   counsel goes downstairs, just keep in mind there are jurors all

24   over the place.

25           THE COURT:  Please do not have any conversations with
```

1    those jurors.  It would not only appear to be inappropriate, it

2    would be inappropriate.  It's best to keep your distance from

3    any potential jurors during this next hour.

4         MR. MCALEAR:  As well as conversations.

5         THE COURT:  Conversations among yourselves should be

6    restricted.  Those in reserve are still here?

7         MR. MCALEAR:  No.

8         THE COURT:  They've been given the little blurb

9    devised.

01:10 10         And we're in recess until five past two.

11         (Recess taken 1:11 p.m. to 2:07 p.m.)

12         THE COURT:  Counsel, we do need to plan on the second

13    tranche.  I don't think we're going to need as many people

14    tomorrow as we called in today.  What progress, if any, has

15    counsel made with respect to this second group of 104?

16         MR. KELLY:  Not much, your Honor.  I think we're going

17    to confer after this group.  The government has a list of ones

18    they think should be stricken for scheduling reasons.  We'll

19    see if we can match that up, at least with respect to maybe the

02:08 20    first 50.

21         THE COURT:  There is some concern by the jury

22    coordinator holding the ones that we have.  We have 31 left.

23    If we only go through 20 and leave 10, we have 10 very

24    disgruntled folks that sat around all day and have not been

25    heard.  We could press on.  I had planned on recessing at 3:30.

            1    If we only have five or eight left, it may make sense to go

            2    through and complete all that are here today.  Any thoughts

            3    about that?

            4         MR. KENDALL:  We like that, your Honor.  Are you

            5    speaking for Mr. Kelly?

            6         MR. KELLY:  I'll let him say.  If it's only a handful,

            7    we can quickly look through the questions as well.  He could

            8    press on.  Of the remaining 31, we only need 16.  That would

            9    get us to 40.

    02:09  10         THE COURT:  It will be close.  Let's go forward.

           11    We'll perhaps revisit this issue halfway through the session at

           12    3 o'clock.

           13         Good afternoon, Miss Uriot.  You're reminded that you

           14    remain under oath.  You may remove your mask if you want to,

           15    but you don't have to.

           16         Miss you're I can't tell, you're employed by a fire

           17    department?

           18         PROSPECTIVE JUROR:  Yes.

           19         THE COURT:  If you were to be called as a juror for

    02:10  20    4 weeks, would that cause you financial hardship?

           21         PROSPECTIVE JUROR:  Not financial hardship.  It would

           22    be hard on the department to fill my position.

           23         THE COURT:  They don't have anyone who can act as a

           24    dispatcher in the meantime?

           25         PROSPECTIVE JUROR:  They would have to hire someone

```
 1    overtime.
 2          THE COURT:  As I've said many times before today, I
 3    don't want to cause hardship to the potential juror.  We do, of
 4    course, ask you to undergo inconvenience.  We ask the town of
 5    Attleboro to undergo inconvenience with the prospect of one of
 6    their employees serving on a jury.  I'm not too concerned about
 7    that so long as it's not going to be to your detriment.  I
 8    don't want to jeopardize your employment or anything else.
 9          You mentioned in response to the question about the
10    government's having to prove guilt beyond a reasonable doubt
11    that you thought the defendant should be able to prove
12    themselves innocent if innocent.  In other words, you think you
13    ought to take the stand?
14          PROSPECTIVE JUROR:  I the question kind of confused
15    me.  I just meant if they're innocent, they should be able --
16          THE COURT:  I'm sorry.  I can't hear you.
17          PROSPECTIVE JUROR:  I was confused by that question.
18    I meant if they are innocent, they should be able to prove that
19    their innocent.
20          THE COURT:  You understand that under our system of
21    justice, a defendant has no obligation to testify and has an
22    absolute constitutional right to remain silent and that it is
23    the burden of the government to prove its case beyond a
24    reasonable doubt?  Do you have any problem with following that
25    rule of law?
```

```
 1          PROSPECTIVE JUROR:  No could you base your decision on
 2   this case only on evidence that comes into this courtroom and
 3   not on any outside feelings you may have?
 4          PROSPECTIVE JUROR:  Yes.
 5          THE COURT:  Mr. Kelly.
 6          MR. KELLY:  Just to follow-up briefly.  Good
 7   afternoon.  I'm Brian Kelly.  I represent Mr. Aziz.  On that
 8   question there, you disagree that the government should have
 9   the burden of proof.  You said the defendant should be able to
02:13 10  prove themselves innocent?
11          PROSPECTIVE JUROR:  Prove themselves innocent.
12          MR. KELLY:  What do you mean by that?
13          PROSPECTIVE JUROR:  If they are innocent, they should
14   be able to prove themselves innocent.
15          MR. KELLY:  If they're innocent, they should be able
16   to prove it when you have a trial.
17          PROSPECTIVE JUROR:  Correct.
18          MR. KELLY:  Even if the presumption of innocence is
19   there, you think they have some duty at least to prove
02:13 20  themselves innocent if they're really innocent.
21          PROSPECTIVE JUROR:  Yes, sir.
22          MR. KELLY:  Are you a college basketball fan?
23          PROSPECTIVE JUROR:  No.
24          THE COURT:  Mr. Kendall.
25          MR. KENDALL:  Good afternoon.  I'm Mike Kendall.  I
```

**A799**

1    represent John Wilson.  I wanted to follow-up a little bit on

2    question 24.  You work at the Attleboro police.  New that

3    you've moved over to fire you're still friends with the folks

4    at the Attleboro police.  With your work experience, have you

5    developed any view about criminal trials or the criminal trial

6    process?

7          PROSPECTIVE JUROR:  Not so much, just kind of, as long

8    as it's a fair trial, then that's all that matters.

9          MR. KENDALL:  Do you have any view about how the

02:14 10    system works or people's roles or how things happen there?

11          PROSPECTIVE JUROR:  No.

12          MR. KENDALL:  Thank you.

13          THE COURT:  Miss Kearney.

14          MS. KEARNEY:  Good afternoon.  I just wanted to

15    follow-up.  Will you have any problem following the judge's

16    instructions in the case?

17          PROSPECTIVE JUROR:  No.

18          MS. KEARNEY:  So if he instructs you the government

19    has the burden of proof, you'll be able to follow that

02:14 20    instruction?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Thank you, Miss Uriot.  I'm going to ask

23    you to be in reserve, which means you're going to go with

24    Mr. McAlear.  You may be subject to recall to become a juror in

25    this case.  In the meantime, please do not do any independent

**A800**

 1    research.  That would be inappropriate.  You're going to decide

 2    this case, if you are chosen to be a juror, solely on the

 3    evidence that comes into this courtroom.  Okay?

 4         PROSPECTIVE JUROR:  Yes.

 5         MR. KELLY:  Your Honor, on this juror, we'd move to

 6    strike for cause.  I think it's clear she has predisposition to

 7    think the defendant has to prove he's innocent.  The Court gave

 8    a pretty clear instruction to her and within 15 seconds she's

 9    telling me, I do think if he's innocent, he should prove

02:16 10    himself innocent.  That's obviously at odds with the

11    fundamental presumption of innocence in our system and we have

12    no burden.  I think someone who's worked in the police

13    department, who is on the stand here in federal court and is

14    repeating again what she said in her questionnaire it's pretty

15    clear that shell not be able to set aside her view, her validly

16    held view that if someone's innocent, they should prove it.

17    That's a problem.  We move to excuse for cause, your Honor.

18         MS. KEARNEY:  Your Honor, she confirmed both to you

19    and to my follow-up questions that she would not have a problem

02:16 20    following your instructions, including that instruction that

21    the government has the burden of proof.  Regarding her

22    connections to law enforcement, she did work at a police

23    department but she's not in law enforcement herself and in

24    response to questions on that topic, she said she just wanted a

25    fair trial.

**A801**

1          THE COURT:  I'm not going to excuse her for cause.

2    The objection is overruled.  Call our next potential juror.

3          Good afternoon, Miss Montes.  Is that how you

4    pronounce your name?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  You're reminded you are under oath.  You

7    may remove your mask, if you want to.  Miss Montes, do I

8    understand that you will not have a financial hardship if you

9    serve on this jury for about 4 weeks?

02:18 10          PROSPECTIVE JUROR:  That is correct.

11          THE COURT:  But you've also mentioned you commented on

12    Facebook about this case at one stage.

13          PROSPECTIVE JUROR:  I did.

14          THE COURT:  Tell me about that.

15          PROSPECTIVE JUROR:  It was something on the news.

16    Someone had just gotten community service.  Somebody else had

17    posted about an African-American woman who served jail time.  I

18    was a little taken aback by the disparity.

19          THE COURT:  Do any of those answers you gave on your

02:18 20    questionnaire give you pause as to whether or not you could be

21    fair and impartial in this case and decide this case solely on

22    the evidence that comes into the courtroom?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  So you believe you can do that?

25          PROSPECTIVE JUROR:  Yes.

```
 1              THE COURT:  And you mentioned a connection to law
 2     enforcement.
 3              PROSPECTIVE JUROR:  A family friend.
 4              THE COURT:  Would being friendly with a law
 5     enforcement officer affect your ability to be fair and
 6     impartial in this case?
 7              PROSPECTIVE JUROR:  No.
 8              THE COURT:  Somebody was arrested or charged with a
 9     crime in your family.
10              PROSPECTIVE JUROR:  On my father's side of the family,
11     we're not very close, but I understand there are people who
12     have gone to jail, yes.
13              THE COURT:  You don't know them well?
14              PROSPECTIVE JUROR:  I don't know them well.  They're
15     people in our community.  It happens.
16              THE COURT:  Were you involved in any of the criminal
17     process that was taken against them?
18              PROSPECTIVE JUROR:  No.
19              THE COURT:  Would that involvement with the criminal
20     justice system affect your ability to be fair and impartial in
21     this case?
22              PROSPECTIVE JUROR:  I don't believe so.
23              THE COURT:  Mr. Kelly, any questions for this
24     potential juror?
25              MR. KELLY:  Sure.  Good afternoon.  My name's Brian
```

02:19 10

02:20 20

```
 1    Kelly.  I represent Mr. Aziz.  Quick follow-up, please.
 2          With respect to the media coverage you saw about this
 3    case, what exactly do you recall seeing?
 4          PROSPECTIVE JUROR:  I don't recall it right now off
 5    the top of my head.  I think this was when the news first
 6    broke.  I can't even tell you how long ago that was.  I try to
 7    stay away from social media when I can.  It's something we try
 8    to teach our children.
 9          MR. KELLY:  You did comment publicly on Facebook about
10    this case?
11          PROSPECTIVE JUROR:  It was whatever was on the news
12    about it, yes.  I think it was when I was briefly going through
13    it -- what I remember, I haven't gone back, but what I remember
14    was there was some news coverage about someone receiving
15    community service, but there was another person who had gotten
16    actual jail time.  What my concern was was the disparity.
17          MR. KELLY:  Right.  And so you usually try to avoid
18    social media but in this case in this instance you felt
19    strongly enough about it to comment on this case, right?
20          PROSPECTIVE JUROR:  That situation, yes.
21          MR. KELLY:  On Facebook for all to see, right?
22          PROSPECTIVE JUROR:  Yes.
23          MR. KELLY:  You gave an answer about how wealth should
24    not change fairness.  What did you mean by that?
25          PROSPECTIVE JUROR:  I think the question that was
```

**A804**

1    posed was -- if you could repeat the question.

2              MR. KELLY:  Sure.  There's a lot of questions on here.

3              PROSPECTIVE JUROR:  I want to be accurate.

4              MR. KELLY:  It says "do you have any opinion about

5    wealth" this is question 43 -- "do you have any opinions about

6    wealthy and/or successful people that would impact your ability

7    to decide this case impartially on the evidence presented and

8    the law as stated by the Court? " You said no.  Then you wrote

9    a comment that said "wealth should not change fairness."

02:22 10              PROSPECTIVE JUROR:  The comment is directed as

11    everyone should be judged at the same level.  So the question

12    almost states like because someone is wealthy you should look

13    at them differently, whether favorably or negatively.  That

14    shouldn't enter into -- that shouldn't be part of the process

15    is the way that I read that question.

16              MR. KELLY:  So someone's economic status should be

17    irrelevant.

18              PROSPECTIVE JUROR:  Exactly.

19              MR. KELLY:  That's it, your Honor.

02:22 20              THE COURT:  Mr. Kendall.

21              MR. KENDALL:  Yes, please, your Honor.  Good

22    afternoon.  My name's Mike Kendall.  I represent Mr. Wilson.  I

23    have a question about your answer to question nine.  You

24    described your job as being an executive assistant, looks like

25    some healthcare.

**A805**

 1          PROSPECTIVE JUROR:  I'm what you call a

 2   jack-of-all-trades.  I worked at the C level sweet.  To go back

 3   to the gentleman's comment earlier about I work with very

 4   wealthy people, these things don't have one to do with the

 5   other.

 6          MR. KENDALL:  You're getting right to my point.  Thank

 7   you.  What type of work do you do there?

 8          PROSPECTIVE JUROR:  Presently I work for a C M O,

 9   chief medical officer, for a pharmaceutical company.

02:23 10          MR. KENDALL:  In the past, what type of executives

11   have you worked with?

12          PROSPECTIVE JUROR:  I worked for a technology firm

13   where I supported a whole C level sweet, everything from the

14   CEO to the CFO.  I worked at another technology firm.  I've

15   worked for a company that dealt in bit coin where I supported

16   the CEO and the chief marketing officer.

17          MR. KENDALL:  Who did you work with at steward?

18          PROSPECTIVE JUROR:  The head of urology there.  I

19   helped run his office and fellowship program.

02:24 20          MR. KENDALL:  What type of schedule?

21          PROSPECTIVE JUROR:  Everything from patient.  You see

22   people from all different walks of life.  So everything from

23   working with the patients to working with the fellows and their

24   programs, all things.

25          MR. KENDALL:  Moving more to the C sweets and not the

**A806**

1  steward job.  Was that helping the executives manage everything

2  that came in?

3        PROSPECTIVE JUROR:  I would do anything.  The way I

4  describe it is I'm your office wife.  I make sure you do what

5  you need to get done and I make sure it looks seamlessly from

6  the outside.

7        THE COURT:  Miss Kearney.

8        MS. KEARNEY:  No questions, your Honor.

9        THE COURT:  Thank you, Miss Montes.  I'm going to ask

02:24 10  you to be in reserve.  You may be called back.  In the

11  meantime, please do not any outside research on the this case,

12  which would be inappropriate.  If you're ultimately selected as

13  a juror, you're going to decide the case based on evidence that

14  comes into this courtroom and not anything from the outside.

15  Thank you.

16        Counsel, I've just been notified that Miss Uriot, who

17  was just the one we previously examined has gone back down and

18  found out that there's been a death in her family and that

19  there will be a funeral next week.  It doesn't sound like a

02:26 20  close family member, but shell have to attend a funeral next

21  week.  Do you want me to call her back and get anymore detail

22  on that?  What is the position of counsel?

23        MR. KELLY:  I think she should be excused.  I don't

24  want to question her.

25        THE COURT:  Mr. Kendall?

1          MR. KENDALL:  He's speaking for the loyal we.

2          THE COURT:  Miss Kearney?

3          MS. KEARNEY:  Your Honor, if it would be possible to

4     call her back and get some more details.

5          MR. KELLY:  On the last one, Judge, 77, she's probably

6     commented on this very case so Aziz would move to strike her.

7     She's on Facebook publically commenting on this case.  I'm

8     concerned this case is going to generate some publicity and I'm

9     concerned that she's already weighed in publicly on social

02:27 10    media.

11          THE COURT:  Miss Kearney?

12          MS. KEARNEY:  Your Honor, she said everyone should be

13    judged at the same level and said she could be impartial.

14          THE COURT:  I don't see that the comment renders her

15    ineligible to be a juror.  Lots of people make lots of comments

16    on Facebook.  I don't find this one to be indicative of have

17    gone made up her mind on the case.  I examined her under oath.

18    I find her to be credible.  I'm not going to excuse her for

19    cause.

02:28 20         Good afternoon, Mr. Hicks.  You may be seated.  You're

21    reminded you're under oath.  You can remove your mask if you

22    want to.

23          I understand one of the questions, I guess the last

24    question that you answered, you expressed a suggestion that you

25    were not sure whether you could give the defendants a fair

1    trial.

2    PROSPECTIVE JUROR:  Well, I know quite a bit about the

3    case, the scandal in general.  I just know that a lot of the

4    people seem to be pleading guilty right at the beginning,

5    meaning to me that means the evidence is overwhelming, at least

6    for one of them.  I believe this is the first one that's gone

7    to trial.

8    THE COURT:  Excuse me?

9    PROSPECTIVE JUROR:  I believe this is the first one

02:29 10    that's gone to trial that I have read about.  In my mind, I'm

11    thinking.

12    THE COURT:  You understand every defendant has an

13    independent right.

14    PROSPECTIVE JUROR:  I know.  I know.  I tell myself

15    that.  Until this trial, I just assumed, not having a vested

16    interest.

17    THE COURT:  You believe you probably made up your

18    mind?

19    PROSPECTIVE JUROR:  I think it's going to be hard to

02:29 20    overcome it with a preexisting notion.

21    THE COURT:  I'm going to excuse you from this jury.

22    Thank you.  I hope you will serve on a jury at a future time in

23    another case because it's an important civic duty.  I'll excuse

24    you from this jury.

25    Bring the juror back in.  This is number 76.

**A809**

```
 1              Miss Uriot, I understand you heard some bad news in
 2      your family, is that right?
 3              PROSPECTIVE JUROR:  It's my sister-in-law's mother.
 4      She passed away on Tuesday.
 5              THE COURT:  Sister-in-law's mother.
 6              PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  Were you close to her?
 8              PROSPECTIVE JUROR:  I'm close to my sister-in-law.
 9              THE COURT:  So you feel obligated that you have to
02:31 10      attend the funeral?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Or that you would want to attend the
13      funeral.
14              PROSPECTIVE JUROR:  Yes, sir.
15              THE COURT:  You don't happen to know when that's going
16      to be?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  I expect you would request to be excused?
19              PROSPECTIVE JUROR:  I guess so, if that's.
02:31 20              THE COURT:  Not knowing the day, we are scheduled to
21      start the trial next week.  We're going to not have a session
22      next Thursday.  If it happened to be on Thursday, that would
23      not conflict, but without knowing, it would be difficult.  I
24      don't want to excuse you unless you want to be excused.
25              PROSPECTIVE JUROR:  It's just something that I feel is
```

```
 1    important.  I didn't want to use it as an excuse either.
 2            THE COURT:  I understand.  You feel without knowing
 3    what day it is that you need to be excused.
 4            PROSPECTIVE JUROR:  Yes.
 5            THE COURT:  You're excused, Miss Uriot.  Thank you
 6    very much.
 7            Call the next.
 8            Good afternoon, Miss Dodd.
 9            PROSPECTIVE JUROR:  Good afternoon.
10            THE COURT:  Please be seated.  You are reminded that
11    you remain under oath.  You may remove your mask if you want to
12    but you don't have to.  Miss Dodd, the only question I believe
13    that you answered affirmatively or at least I have noted here
14    is that you have a moderate knowledge about the case and its
15    coverage.  Would any of that knowledge affect your ability to
16    be fair and impartial in this case?
17            PROSPECTIVE JUROR:  No.
18            THE COURT:  In other words, you are convinced that you
19    can decide this case based solely on the evidence that comes
20    into this courtroom and not on the basis of any news you've
21    heard about it?
22            PROSPECTIVE JUROR:  Yes.
23            THE COURT:  Was there anything else in the
24    questionnaire that gave you pause that you would not be able to
25    render a verdict fairly and without bias?
```

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Thank you.  Mr. Kelly, any questions?

 3              MR. KELLY:  Briefly.  Good afternoon.  Brian Kelly.  I

 4       represent Mr. Aziz.  Some of this case will involve testimony

 5       about college sports.  Do you follow college sports at all?

 6              PROSPECTIVE JUROR:  No.

 7              MR. KELLY:  That's it.

 8              THE COURT:  Mr. Kendall.

 9              MR. KENDALL:  Good afternoon.  Mike Kendall.  I

02:34 10       represent John Wilson.  Just wanted to ask you about question

11       9, where you describe your employment as associate product

12       management at J.P. Morgan.  Can you tell us what you do.

13              PROSPECTIVE JUROR:  Sure.  I work at J.P. Morgan for

14       5 years now, ever since I graduated school in the defense

15       services space.  My current role is in product management.  We

16       work with new clients, RFPs, client reprices, basically, the

17       pricing strategy.

18              MR. KENDALL:  What type of clients?

19              PROSPECTIVE JUROR:  End management/////.

02:34 20       MR. KENDALL:  You don't work with retail end?

21              PROSPECTIVE JUROR:  I don't.

22              THE COURT:  Miss Kearney?

23              MS. KEARNEY:  No questions.

24              THE COURT:  You may step down.  I'm going to have you

25       in reserve, which means you may be called back at some time.
```

```
 1   Please understand you're not to do any research about this case

 2   or go online or learn anything about it.  That would be

 3   inappropriate.  You're going to decide this case, if you are

 4   selected as a juror, based on the testimony that comes into

 5   this courtroom.  Okay?

 6            PROSPECTIVE JUROR:  Thank you.

 7            THE COURT:  Good afternoon, Miss Bettencourt.

 8            PROSPECTIVE JUROR:  Good afternoon.

 9            THE COURT:  Please be seated.  You're reminded that

10   you remain under oath.  You may remove your mask if you want,

11   but you don't have to.  I understand you have answered some

12   questions on the questionnaire that will need to be clarified.

13            Number 43, which asks you about wealthy people and

14   what you think of them, you said you think that money can buy

15   an advantage in many aspects of life.  Is that in any way going

16   to affect your ability to be fair and impartial in this case

17   which involves allegations against people who are of some

18   wealth?

19            PROSPECTIVE JUROR:  No.  I don't think so.  It's a

20   fact.  I, myself, have advantages that others don't have based

21   on just wealth and jobs and things.  So to say that -- I just

22   couldn't say that there's not a difference.  There is.

23            THE COURT:  Can you tell me that you will decide this

24   case solely based on the evidence that comes into this

25   courtroom and not on any preconceived notions you have of
```

```
 1   people of wealth?

 2          PROSPECTIVE JUROR:  Yes.

 3          THE COURT:  Also, with respect to that next question

 4   regarding prejudice against a defendant who may choose not to

 5   testify, you say you understand that that's a right and that

 6   there are strategic aspects, but you're not sure how you would

 7   feel if you heard the case.  You understand that all defendants

 8   have a constitutional right not to testify, that it is the

 9   government's burden to prove a case beyond a reasonable doubt

02:38 10  and the defendants do not have to present any evidence or

11   testify and that that is the law?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  If I were to instruct you on that, will

14   you follow my instruction?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  So this matter that you are concerned

17   about, whether or not a defendant testifies, you understand

18   when you're deliberating that, you can't consider that when you

19   deliberate the case?

02:38 20         PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Is there anything else in that

22   questionnaire that gives you pause that you might not be able

23   to be fair and impartial in this case?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Mr. Kelly, any questions?
```

1    MR. KELLY:  Yes.  Good afternoon.  My name's Brian

2    Kelly.  I'm here with my client Mr. Aziz.  Let me follow-up on

3    that question.  In response to that question, 44, there's a

4    whole bunch of questions, when it said the defendant in a

5    criminal case had an absolute right not to testify, would you

6    hold it against the defendants if they did not testify in this

7    case, and you say "I don't know.  I understand it is a right

8    and there are strategies, but I don't know how I feel until I

9    heard the entire case."

02:39 10    PROSPECTIVE JUROR:  Right.

11    MR. KELLY:  Can you tell me what you're thinking with

12    that response.

13    PROSPECTIVE JUROR:  I guess I was filling out the

14    questionnaire I was feeling that I should try to answer as

15    honestly as possible.  When I was reading the question, I was

16    thinking about how would I feel.  I guess I was saying that

17    it's hard to predict the future because I wouldn't know until I

18    actually heard a case.  I guess that's why I was trying to say

19    that I understand that that's -- I understand that they don't

02:40 20    have to testify.  It doesn't mean anything per se.  I don't

21    they have means innocent, not testifying means guilty.  I know

22    that's not what it means.  It's more like hearing the full

23    story.

24    MR. KELLY:  So you're not trained in the law

25    obviously?

**A815**

```
 1              PROSPECTIVE JUROR:  No.  You can tell by my response?
 2              MR. KELLY:  If the judge were to instruct you, look,
 3      this is the law that defendants are presumed innocent and the
 4      burden of proof is on the government and the defendant doesn't
 5      have to prove anything, you could follow that instruction?
 6              PROSPECTIVE JUROR:  Sure.
 7              MR. KELLY:  If he were to instruct you that nothing
 8      can be inferred or understood from a defendants' not
 9      testifying, you could follow that instruction?
02:40 10              PROSPECTIVE JUROR:  Yes.
11              MR. KELLY:  Your first thought or your first reaction
12      to that questionnaire, you could put that aside?
13              PROSPECTIVE JUROR:  Yes.  Yeah: I would be able to
14      follow the instructions.
15              MR. KELLY:  That's it.  Thanks.
16              THE COURT:  Mr. Kendall.
17              MR. KENDALL:  I'm fine.  Thank you.
18              THE COURT:  Miss Kearney?
19              MS. KEARNEY:  Good afternoon, Miss Bettencourt.  In
02:41 20      your questionnaire, you said you previously served on a
21      criminal jury but they were unable to reach a verdict.  Can you
22      elaborate a little bit on that?
23              PROSPECTIVE JUROR:  No.  I ended up being the
24      alternate.
25              MS. KEARNEY:  Thank you.
```

**A816**

|   |   |
|---|---|
| 1 | THE COURT:  Thank you, Miss Bettencourt.  I'm going to |
| 2 | ask you to be in reserve, which means you may or may not be |
| 3 | called back for further duty.  In the meantime, I instruct you |
| 4 | not to do any independent research on this case.  That would be |
| 5 | not appropriate because if you are ultimately chosen as a juror |
| 6 | in this case, you're going to decide on the evidence that comes |
| 7 | into this courtroom and nothing else, right? |
| 8 | PROSPECTIVE JUROR:  Yes. |
| 9 | THE COURT:  Thank you, Miss Bettencourt. |
| 02:42 10 | Good afternoon, Miss Schroth? |
| 11 | PROSPECTIVE JUROR:  Schroth. |
| 12 | THE COURT:  Please be seated.  Understand you remain |
| 13 | under oath.  You may remove your mask, but you don't have to. |
| 14 | Miss Schroth, do I understand you believe it might be a |
| 15 | hardship to serve on this jury for 4 weeks? |
| 16 | PROSPECTIVE JUROR:  Yes. |
| 17 | THE COURT:  That's because you have young children at |
| 18 | home without an ability to see that they're taken care of? |
| 19 | PROSPECTIVE JUROR:  My husband has travel planned so |
| 02:43 20 | it would be difficult with him away. |
| 21 | THE COURT:  I don't want to cause you hardship.  If |
| 22 | it's going to be a hardship to you, I'm going to excuse you |
| 23 | from this jury.  I wanted to understand that's what you're |
| 24 | asking me to do. |
| 25 | PROSPECTIVE JUROR:  Yes. |

**A817**

1          THE COURT:  Then you are excused, Miss Schroth.  Thank

2    you very much.

3          Good afternoon, miss Roberts.  Please be seated.

4    Understand that you remain under oath.  You may remove your

5    mask if you want to, but you don't have to.

6          Miss Roberts, would serving on this jury cause you a

7    financial hardship?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  You did answer a question, number 42, with

02:44 10    respect to cooperators, that you were unsure whether you could

11    fairly and impartially consider a cooperator's testimony.

12    Would you explain that or embellish on that a little bit.

13          PROSPECTIVE JUROR:  I was unsure of what the question

14    meant when I read it.

15          THE COURT:  You understand that some people cooperate

16    with the government and they get a break on what they're

17    charged with or the sentence they have to serve, but they are

18    required to testify truthfully under oath and if they don't do

19    that, it can be subject to prosecution for perjury.  Do you

02:45 20    understand the government has a right to use people who

21    cooperate, and would you be able, notwithstanding your answer,

22    to be fair and impartial in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Are you sure about that.

25          PROSPECTIVE JUROR:  Yes.

```
 1            THE COURT:  Mr. Kelly, do you have any questions for
 2    miss Roberts?
 3            MR. KELLY:  Yes.  Good afternoon.  Name's Brian Kelly.
 4    I represent Mr. Aziz here.  Quick question for you.  There's
 5    one question in this pretty lengthy questionnaire where you
 6    indicated you've seen some local news media about the case.
 7    Can you just tell me about this.
 8            PROSPECTIVE JUROR:  Not about this case.  I usually
 9    only watch the Channel 5 news.
10            MR. KELLY:  That's simplifies my question.  Thank you.
11            Do you follow college sports at all?
12            PROSPECTIVE JUROR:  No.
13            MR. KELLY:  Nothing further.
14            THE COURT:  Mr. Kendall.
15            MR. KENDALL:  Good afternoon.  Thank you.  No.  I
16    don't have any questions.
17            THE COURT:  Miss Kearney?
18            MS. KEARNEY:  Good afternoon, miss Roberts.  One
19    question for you.  On your questionnaire, you said you
20    previously served on a jury.  Is there anything about that
21    experience that would affect your ability to be fair and
22    impartial?
23            PROSPECTIVE JUROR:  No.
24            THE COURT:  Thank you, miss Roberts.  I will ask you
25    to be in reserve.  That means you may be called back to serve
```

1    on this jury.  In the meantime, you're not to do any

2    independent research.  That would be entirely inappropriate.  I

3    think you understand why.  You're going to decide this case, if

4    chosen as a juror, solely on the basis of the evidence that

5    comes into this courtroom.  Okay?  Thank you.

6            Good afternoon, miss Murphy.  You may be seated.

7    You're reminded that you remain under oath.  You may remove the

8    mask if you want to, but you don't have to.

9            Miss Murphy, would serving on this jury cause you any

02:47 10    financial hardship?

11            PROSPECTIVE JUROR:  It may if I'm out of work for a

12    long time.

13            THE COURT:  Well, we expect that the case will last

14    about 4 weeks.  I'm confidence it will be over by the middle of

15    October.  Would that cause you such financial problems that you

16    would feel that you couldn't serve?

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  Then I will excuse you because I don't

19    want to cause you financial hardship.

02:48 20            PROSPECTIVE JUROR:  Thank you.

21            THE COURT:  If that would cause that, then you're

22    excused.

23            PROSPECTIVE JUROR:  Thank you.

24            THE COURT:  You're welcome.

25            Good afternoon, Mr. Costa.  You may be seated.  You're

1    reminded you are still under oath.  You may remove your mask if

2    you want to, but you don't have to.

3           Mr. Costa, would serving on this jury cause you

4    financial hardship?

5           PROSPECTIVE JUROR:  No, sir.

6           THE COURT:  You answered some other questions on the

7    questionnaire that I need to inquire about.  You've said in

8    response to a potential prejudice that people will seek

9    advancement over ethics, and also you said that cooperators get

02:49 10    out of being held accountable for bad decisions.

11    Notwithstanding those answers, if the Court were to instruct

12    you that the government is entitled to call people who

13    cooperate with them, would you be able to be fair and impartial

14    in this case or would that impact your ability?

15           PROSPECTIVE JUROR:  I don't think it would impact.

16    It's just my point of view from a wealth perspective.

17           THE COURT:  Do you have a prejudice against people of

18    wealth?

19           PROSPECTIVE JUROR:  It would be based on category.  I

02:50 20    think there's an advantage, a higher advantage of that.  It

21    just makes my opinion in a sense that with more money you get

22    advantage period.

23           THE COURT:  If the evidence were that the defendants

24    in this case were people of some wealth, would that

25    automatically prejudice you against their case notwithstanding

 1   the facts that come into this courtroom?

 2           PROSPECTIVE JUROR:  No.

 3           THE COURT:  So could you be fair and impartial and

 4   judge this case based solely on the evidence that comes into

 5   this court regardless of the status of wealth of the

 6   defendants?

 7           PROSPECTIVE JUROR:  I would hope so that I could do

 8   that.

 9           THE COURT:  You hope so.  Only you can be inside your

02:51 10  head.  I need to know whether you can or you can't.

11           PROSPECTIVE JUROR:  Well, I can.  Again, I look at

12   things based on how it's said to me, what's presented.

13           THE COURT:  On the evidence that comes into the Court

14   room?

15           PROSPECTIVE JUROR:  Well, yeah.  I look at it from

16   that perspective, if I can comprehend it and understand it and

17   know what's going on, then hopefully you I can make the right

18   decision based on what I hear.

19           THE COURT:  Do you have any doubt for any of the

02:51 20  questions that were asked of you in the questionnaire and the

21   answers that you gave, do you have any doubt that you can be

22   fair and impartial in this case?

23           PROSPECTIVE JUROR:  I don't know.

24           THE COURT:  I appreciate your answer.  I'm going to

25   excuse you from this jury.  Thank you, Mr. Costa.

```
 1          Good afternoon, Mr. Callahan.  Please be seated.  You
 2   understand you remain under oath.  If you want to remove the
 3   mask, you can.  You don't have to.
 4          Mr. Callahan, would serving on this jury for 4 weeks
 5   cause you any financial hardship?
 6          PROSPECTIVE JUROR:  No.
 7          THE COURT:  Would any of the questions or your answers
 8   in the questionnaire that you filled out yesterday, a very
 9   lengthy questionnaire, give you pause as to whether you could
10   be fair and impartial in this case?
11          PROSPECTIVE JUROR:  I can be impartial.  I didn't have
12   any questions about that.
13          THE COURT:  So you could decide this case based solely
14   on the evidence that comes into this courtroom and not on
15   anything that's happened outside of the courtroom or what
16   you've heard about the case?
17          PROSPECTIVE JUROR:  That's correct.
18          THE COURT:  Any questions, Mr. Kelly?
19          MR. KELLY:  Yes.  Good afternoon.  Brian Kelly.  I
20   represent Mr. Aziz.  Quick question for you on this
21   questionnaire.  There's an answer to one of the questions about
22   publicity.  Have you seen a lot of publicity about this matter?
23          PROSPECTIVE JUROR:  I've seen it on the news, not
24   necessarily this particular matter but other folks who have
25   been involved in this matter, yeah.
```

```
 1              MR. KELLY:  Has what you've seen cause you to come to

 2     any conclusions about the people who are in this trial?

 3              PROSPECTIVE JUROR:  No.

 4              MR. KELLY:  So you can approach this from a

 5     perspective that you could be fair to both sides, the defense

 6     and the government?

 7              PROSPECTIVE JUROR:  That's correct.

 8              MR. KELLY:  Do you follow college sports at all?

 9              PROSPECTIVE JUROR:  Not really.

10              MR. KELLY:  That's it.  Thanks.

11              THE COURT:  Mr. Kendall.

12              MR. KENDALL:  If I may have one moment, your Honor.

13              THE COURT:  Yes.

14              MR. KENDALL:  Hi.  I'm Mike Kendall.  I represent John

15     Wilson.  Good afternoon.

16              PROSPECTIVE JUROR:  Good afternoon.

17              MR. KENDALL:  I want to follow-up on the question

18     Mr. Kelly was asking you, 39.  Tell us in your own words what

19     did you think of the news media you read, any sort of reaction.

20              PROSPECTIVE JUROR:  I honestly didn't give it a whole

21     lot of thought.  I know there were a couple of high profile

22     folks, felicity huff man and aunt Becky that I was familiar

23     with.  That was really the extent of it.  I moved on to the

24     next story.  Didn't pay too much attention beyond that.

25              MR. KENDALL:  You didn't really care.
```

A824

```
 1              PROSPECTIVE JUROR:  Right.

 2              THE COURT:  Miss Kearney.

 3              MS. KEARNEY:  Good afternoon.  One question for you.

 4      You indicated on your questionnaire that you previously served

 5      on a jury.  Is there anything about that experience that would

 6      affect your ability to be fair and impartial in this trial?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Thank you, Mr. Callahan.  I'm going to

 9      leave you in reserve, which means you may or may not be called

02:55 10      back for further jury.  In the meantime, do not do any

11      independent research on this case.  You can't consult the

12      internet or anything like that.  It would be inappropriate.

13              PROSPECTIVE JUROR:  Understood.

14              THE COURT:  Good afternoon, Miss Buttrick.  Please be

15      seated.  You're reminded that you remain under oath.  You may

16      remove the mask if you want to, but you don't have to.

17              PROSPECTIVE JUROR:  Thank you.

18              THE COURT:  Miss Buttrick, I noticed that you said

19      that you might have a scheduling conflict during the week of

02:56 20      October 7th.  Is that something that you could not postpone or

21      avoid or is that something you feel you have to do.

22              PROSPECTIVE JUROR:  It's a trip with my husband.

23      We've already paid for it.

24              THE COURT:  So it's a prepaid vacation.

25              PROSPECTIVE JUROR:  It's a bowling tournament.  We're
```

            1   on a bowling team together.

            2           THE COURT:  You don't want to postpone that.

            3           PROSPECTIVE JUROR:  I can't postpone it because it's

            4   in Columbus, Ohio.  I could miss it, however, my husband would

            5   be very upset because we bowl together.  We're a team.

            6           THE COURT:  I don't want to get in the middle of a

            7   vacation that's prepaid.

            8           PROSPECTIVE JUROR:  Or married, right?

            9           THE COURT:  You want to be excused from this jury,

02:57  10   right?

           11           PROSPECTIVE JUROR:  If it would go.

           12           THE COURT:  It's going to be that long.

           13           PROSPECTIVE JUROR:  Then yes.

           14           THE COURT:  You're excused.  Thank you.

           15           You good afternoon, Mr. Wallace.

           16           PROSPECTIVE JUROR:  Hello.  Thank you for having me.

           17           THE COURT:  Have a seat.  You're reminded that you

           18   remain under oath.  You may remove the mask if you want to, but

           19   you don't have to.  Would service on this jury, Mr. Wallace,

02:58  20   cause you financial hardship?

           21           PROSPECTIVE JUROR:  Not that I'm aware of.

           22           THE COURT:  I will take that answer as you feel you

           23   could serve for roughly 4 weeks.

           24           PROSPECTIVE JUROR:  I'd have to talk to my boss.  The

           25   answer is yes.

```
 1              THE COURT:  That you could serve.

 2              PROSPECTIVE JUROR:  I can serve.

 3              THE COURT:  There have been some other questions that

 4     you answered on the questionnaire that I think we need to have

 5     you embellish a little bit.

 6              With respect to the question about ante government or

 7     defense prejudices, you said that admissions should be based on

 8     hard work and achievement, that is admissions to college.

 9              PROSPECTIVE JUROR:  Inspect.

10              THE COURT:  Also, you cite time in sports media.  What

11     did you mean by that?

12              PROSPECTIVE JUROR:  Could you repeat the yes.

13              THE COURT:  The question had to do with whether you

14     had any prejudices against the government or the defense that

15     you knew of, and you mentioned that college admissions should

16     be based on hard work and achievement.

17              PROSPECTIVE JUROR:  I might have misunderstood the

18     question and might have been referring to things that I've read

19     about scandal with admissions.

20              THE COURT:  Would what you've read affect your ability

21     to be fair and impartial in this case, that is could you decide

22     this case solely based upon the evidence that comes into this

23     courtroom and not on the basis of anything that you've read?

24              PROSPECTIVE JUROR:  I could do that.

25              THE COURT:  With respect to the defendants testifying
```

02:59 (line 10)
03:00 (line 20)

or not testifying, you said you think the defendants should

have nothing to hide, which I understand you think they ought

to testify.

PROSPECTIVE JUROR:  Yes.

THE COURT:  But you understand that the law is a

defendant does not have to testify.

PROSPECTIVE JUROR:  I understand.

THE COURT:  He has a constitutional right not to

testify and you cannot consider in your deliberations in this

03:00 case whether or not he testified.  Do you understand that?

PROSPECTIVE JUROR:  I understand that.

THE COURT:  Would you follow that instruction if

given?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Those are the questions that I would ask.

Mr. Kelly, do you have any?

MR. KELLY:  Yes, your Honor.  Good afternoon.  Brian

Kelly.  I represent Mr. Aziz.  Let me follow-up quickly if I

could.

03:01 PROSPECTIVE JUROR:  Sure.

MR. KELLY:  With respect to this questionnaire, you

said you would have concerns or reservations about your ability

or willingness to abide by the rule that you be barred from the

media review.  You say you use it for your sports business

news.  That's why you checked that you'd be concerned.  So

```
 1    that's still accurate?  You'd have a concern?

 2              PROSPECTIVE JUROR:  Yes.

 3              MR. KELLY:  You came to court before you were just

 4    instructed with the thought that defendants in a criminal case

 5    like this should have nothing to hide and should testify,

 6    right?

 7              PROSPECTIVE JUROR:  My opinion.

 8              MR. KELLY:  You have a friend or relative retired FBI?

 9              PROSPECTIVE JUROR:  That's correct.

10    MR. KELLY:  Here in Boston?

11              PROSPECTIVE JUROR:  What's his or her name?

12              PROSPECTIVE JUROR:  Kris did he core.

13              MR. KELLY:  How down agent did he cower?

14              PROSPECTIVE JUROR:  I've known her for 20 years

15    through my wife.

16              MR. KELLY:  You also indicated on question 21 you are

17    responsible for the operation of over 20 employees, is that

18    right?

19              PROSPECTIVE JUROR:  That's right.

20    MR. KELLY:  That part of your concern with serving on

21    a 4-week jury?

22              PROSPECTIVE JUROR:  My day-to-day business requires me

23    to be with my employees working because we produce a lot of

24    live sports content, so being on site is crucial for me.

25              MR. KELLY:  So it would be a hardship.
```

1    PROSPECTIVE JUROR:  Yes.  Financially, no, because my

2  company would take care of me, but for my work, yes.

3    MR. KELLY:  From a work perspective it's a hardship.

4  I guess it would be a hardship for your fellow employees if

5  you're in the there.

6    PROSPECTIVE JUROR:  That's right.

7    THE COURT:  Let me stop you there.  Are you asking to

8  be excused for that hardship?

9    PROSPECTIVE JUROR:  I will do what the Court thinks is

03:03 10  best.  I would like to be excused for that for my employees and

11  for my work, but I don't think that the way this government and

12  the law has been built that that necessarily puts me in a place

13  that I have an option in saying yes or no.

14    THE COURT:  I don't want to cause your business or

15  your employees a hardship.  If it's going to cause a hardship,

16  I will excuse you.  I didn't understand that you were asking to

17  be excused for that hardship.

18    PROSPECTIVE JUROR:  I'm a decision-maker on a daily

19  basis.

03:03 20    THE COURT:  You're excused, Mr. Wallace.  Thank you.

21    PROSPECTIVE JUROR:  Thank you.

22    THE COURT:  Good afternoon, miss pierce.

23    PROSPECTIVE JUROR:  Good afternoon.

24    THE COURT:  Please be seated.  You're reminded that

25  you remain under oath.  You may remove your mask if you want,

```
 1    but you don't have to.  Par miss pierce, would serving on this
 2    jury cause you a financial hardship?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  You mentioned that you saw that
 5    documentary on Netflix.
 6              PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  What effect did that have on you and would
 8    it affect your ability to be fair and impartial on this case?
 9              PROSPECTIVE JUROR:  I don't remember too much about
10    it.  I don't think it would affect me.
11              THE COURT:  Do you understand that at least the
12    defendant believes that there were falsities in that and that
13    that's not fact, that the facts in this case are going to come
14    out in the evidence in this courtroom?  Could you decide this
15    case based solely on the evidence that comes out in this
16    courtroom and not on the basis of anything you saw in that
17    Netflix documentary?
18              PROSPECTIVE JUROR:  Definitely.  Yes.
19              THE COURT:  Was there anything else on the
20    questionnaire that gave you pause that you would be able --
21    that you would not be able to decide this case fairly and
22    impartially?
23              PROSPECTIVE JUROR:  No.
24              THE COURT:  So you think you could do that?  You could
25    be fair and impartial?
```

03:04 (line 10)
03:05 (line 20)

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Any questions, Mr. Kelly?

 3              MR. KELLY:  Just briefly.  Good afternoon.  Brian

 4     Kelly.  I represent Mr. Aziz here.

 5              Nothing you may have seen in the media gives you any

 6     strong feelings either way about this case?

 7              PROSPECTIVE JUROR:  No.

 8              MR. KELLY:  I think I read this correctly, but

 9     40 years a teacher?

03:06 10         PROSPECTIVE JUROR:  Yes.  I taught for over 30 years.

11              MR. KELLY:  Nothing about that experience would have

12     any effect on you in a case where college admissions stuff is

13     being discussed?

14              PROSPECTIVE JUROR:  No.

15              MR. KELLY:  How about college sports?  Do you follow

16     college sports at all?

17              PROSPECTIVE JUROR:  Basketball a little bit.

18              MR. KELLY:  Which team?

19              PROSPECTIVE JUROR:  I think the -- I can't think of

03:06 20    it.  I'm sorry.

21              MR. KELLY:  It's okay.  Men's basketball?  Women's

22     basketball?

23              PROSPECTIVE JUROR:  Yes.  In March.

24              MR. KELLY:  The March madness stuff.

25              PROSPECTIVE JUROR:  Yes.
```

A832

```
 1            THE COURT:  Mr. Kendall.

 2            MR. KENDALL:  Yes, your Honor.  Thank you.  Good

 3    afternoon.  I represent John Wilson.  My name's Mike Kendall.

 4    Just a couple small things.  You were honest enough and frank

 5    enough to discuss some very painful things about your family

 6    being a victim in some criminal actions.  I'm sorry to read

 7    that and have to raise it.  Has it left you with any views of

 8    the criminal justice system?

 9            PROSPECTIVE JUROR:  No.

03:07 10            MR. KENDALL:  No particular thoughts in favor of or

11    against the police or anything about court procedures or

12    anything else?

13            PROSPECTIVE JUROR:  I see the importance of getting --

14    of getting a lawyer, your own personal lawyer.  I don't want to

15    get into it so much about my sister.

16            MR. KENDALL:  I don't want to at all.

17            PROSPECTIVE JUROR:  We didn't have our own lawyer.  I

18    think it's much easier and would have been better than.

19            MR. KENDALL:  I don't want to ask about your family

03:08 20    issues, just your view of the system.

21            PROSPECTIVE JUROR:  No.  I have a son who's an

22    attorney and a daughter-in-law who's an attorney.  I'm very

23    proud of the fact that they are.  I applaud you all.  Yes.

24            MR. KENDALL:  Where do they practice and where do they

25    work?
```

1          PROSPECTIVE JUROR:  My son is in Maine and my

2    daughter-in-law is in Minnesota.

3          MR. KENDALL:  What type of work do they do as lawyers?

4          PROSPECTIVE JUROR:  My son does real estate and my

5    daughter-in-law works for the county.

6          MR. KENDALL:  Great.  I saw your husband's retired.

7    What did he do before retirement?

8          PROSPECTIVE JUROR:  He was a paralegal before

9    retirement.

03:08 10          MR. KENDALL:  Where did he work?

11          PROSPECTIVE JUROR:  He had a couple of different

12    places.  I can't recall.

13          MR. KENDALL:  Do you know what type of legal work he

14    did as a paralegal?

15          PROSPECTIVE JUROR:  He had three careers.  That was

16    his last 5 years.  I'm not sure.

17          MR. KENDALL:  Did he work for a government agency?

18          PROSPECTIVE JUROR:  No.

19          MR. KENDALL:  Private lawyer?

03:09 20          PROSPECTIVE JUROR:  Private.

21          MR. KENDALL:  Thank you.

22          THE COURT:  Miss Kearney?

23          MS. KEARNEY:  No questions.

24          THE COURT:  Thank you, miss pierce.  I'm going to ask

25    you to be in reserve.  You will go with Mr. McAlear.  That

        means you may be called back for further jury duty.  Please do

        not try to do any independent research on this case.  You

        understand that would be inappropriate, correct?

                PROSPECTIVE JUROR:  Yes.

                THE COURT:  Thank you, miss pierce.

                Good afternoon, Mr. Liu.  You may be seated.  You're

        reminded that you remain under oath.  You may remove the mask

        if you want, but you don't have to.

                Mr. Liu, would serving on this jury for 4 weeks cause

        you any financial hardship?

                PROSPECTIVE JUROR:  Not a financial hardship.

                THE COURT:  So you are willing to serve and it

        wouldn't affect your job status?

                PROSPECTIVE JUROR:  I need to find out 4 weeks.  I

        need to check with H-R-.  Doing civic duty is part of our

        company policy, but 4 weeks is something that I don't have any

        back information on that.  I can check with -- I will probably

        give you a better answer how that would affect me.

                THE COURT:  We don't want to cause you financial

        hardship.  Employers, especially large ones like you work for,

        I understand it's Bristol Meyers, is that right?

                PROSPECTIVE JUROR:  Yes.

                THE COURT:  They have an obligation as citizens to

        support their employees who are called for jury duty.  Whether

        or not that means they will pay you full salary for the whole

1    4 weeks, I don't know.  They have certain obligations that the

2    Court, in fact, can help support you, in other words, my deputy

3    could call up your superior and say.

4        PROSPECTIVE JUROR:  I would probably be safe then.

5        THE COURT:  I think you would be but I can't guarantee

6    it.  I don't want to be understood as guaranteeing it.  At

7    least putting that aside for the moment, there were some other

8    matters that you responded to on the questionnaire that I would

9    like to ask you about.

03:12 10        One was a question about prejudice against the

11   defendant who did not testify.  You said you don't see a strong

12   reason for a defendant not to testify in a case like this.

13       Do you understand that all defendants in criminal

14   cases have a constitutional right not to testify?

15       PROSPECTIVE JUROR:  No.  I wasn't aware of that.

16       THE COURT:  Would you be able to follow an instruction

17   to that effect if I gave it to you in the trial?

18       PROSPECTIVE JUROR:  Yes.  If it's the right reading of

19   the law, I will follow.

03:12 20        THE COURT:  In fact, if you were a juror, I will

21   instruct you that you can't even consider that fact in the

22   deliberation room that a defendant did not testify because

23   defendants have a constitutional right not to testify.  So you

24   could follow my instructions if I instructed you in that

25   manner?

1           PROSPECTIVE JUROR:  Oh, yeah.  You give me the

2     instruction, I would definitely follow it.

3           THE COURT:  Is there any reason at all that you think

4     you would not be able to be fair and impartial in this case?

5           PROSPECTIVE JUROR:  I read a little bit in the news

6     about this whole thing they call Varsity Blues.  It's this

7     whole college admissions scandal.  I do have some emotional

8     component in this.  I don't think it's fair.  I was reading the

9     news.  There are already, how do I say, some people who have

03:13 10    already served their term as well.  In general, I think it's a

11    bad practice.

12          THE COURT:  You've heard that other people have been

13    convicted and went to jail, is that what you're saying?

14          PROSPECTIVE JUROR:  I think so, yeah.  I see something

15    like that.

16          THE COURT:  That's not these two defendants.  These

17    two defendants have independent rights to defend themselves and

18    to present cases.  What some other defendant did has no impact

19    whatsoever on these defendants.  Do you understand that?

03:14 20          PROSPECTIVE JUROR:  After hearing your explanation, I

21    think I understand it now.

22          THE COURT:  The question is, could you decide this

23    case solely on the basis of the evidence that comes into this

24    courtroom and not on the basis of what you read about other

25    varsity blues cases?

1      PROSPECTIVE JUROR:  I think I can.  I feel I'm an

2  objective person and I can confine my judgment based on the

3  facts and what I hear and follow your instructions.

4      THE COURT:  That's important.  Only you can tell me

5  that.  Only you can tell me whether you believe you can be fair

6  and impartial.  I can't get inside your head.  Can you be fair

7  and impartial?

8      PROSPECTIVE JUROR:  I think I can, yes.

9      THE COURT:  Any questions, Mr. Kelly?

03:15 10      MR. KELLY:  Yes.  Good afternoon.  Brian Kelly for

11  Mr. Aziz.  On that last question, you said you think you can be

12  fair but you're not sure.

13      PROSPECTIVE JUROR:  That's true.  I think I can.

14      MR. KELLY:  Given your beliefs coming in, are you

15  certain you can be fair or you just hope you can be fair?

16      PROSPECTIVE JUROR:  That's a double question.  I think

17  that's an unfair question.  Put another one.

18      MR. KELLY:  In the questionnaire, you said "in a case

19  like this I don't see a strong reason for the defendant not to

03:15 20  testify."  That's your opinion?

21      PROSPECTIVE JUROR:  That was my opinion prior to

22  knowing the defendant had a constitutional right that they do

23  not have to testify.  With the judge's explanation, I think I

24  would take that out, definitely take back that.

25      MR. KELLY:  You could take that completely out of your

```
 1   mind and banish it?
 2           PROSPECTIVE JUROR:  I think so.
 3           MR. KELLY:  You indicated some of these other parents
 4   were convicted.  Did you comment you thought the prison
 5   sentences were too short?
 6           PROSPECTIVE JUROR:  I did not.  I never commented
 7   anything.
 8           MR. KELLY:  Your work responsibilities, what are they?
 9           PROSPECTIVE JUROR:  My work responsibility?  I work in
10   a pharmaceutical company.  I work in early research and do
11   discovery, research and discovery for it.  I'm leading a couple
12   projects.  I'm critical and have pretty high workloads.
13   Basically, from those considerations, if I'm away for like
14   4 weeks, that would be a significant impact to the progress of
15   that.
16           MR. KELLY:  If you're away for 4 weeks, it will be a
17   significant impact on what?
18           PROSPECTIVE JUROR:  On the progress of those projects.
19           MR. KELLY:  On the progress of the projects?
20           PROSPECTIVE JUROR:  Yes.
21           MR. KELLY:  Would that be a burden to your
22   professional life?
23           PROSPECTIVE JUROR:  A burden to my professional life?
24   It would slow down my professional growth for 4 weeks.  Let me
25   put it that way.
```

1        MR. KELLY:  Your professional growth?

2        PROSPECTIVE JUROR:  Professional growth for 4 weeks.

3        MR. KELLY:  Has anything that you've seen in the media

4   given you strong feelings against the defense or against the

5   government or anything like that?

6        PROSPECTIVE JUROR:  Nothing against the government.  I

7   think in general I have an unfavorable opinion on the

8   defendants.

9        MR. KELLY:  What?

03:18 10       PROSPECTIVE JUROR:  Unfavorable.  I feel the whole

11   practice was wrong.

12        MR. KELLY:  So you come to court with that unfavorable

13   impression.

14        PROSPECTIVE JUROR:  Yes.  Everything that I know to

15   myself at this moment, but I don't think -- I come to the Court

16   with this impression about the whole case, about my personal

17   opinion of the defendants, but at same time, I do think I can

18   follow the judge's instructions, as I mentioned earlier.  I

19   feel confidence I can follow the instructions and make my

03:19 20   decision based on the facts and the instructions.

21        MR. KELLY:  If the judge told you it was the

22   government's burden of proof, you could follow that

23   instruction?

24        PROSPECTIVE JUROR:  Could you explain a little bit

25   more about the government's burden of proof.

**A840**

1          MR. KELLY:  I would, but they would object.  That's

2     the judge's job.  Bottom line is you will follow what this

3     judge tells you is the law.

4          PROSPECTIVE JUROR:  Yes, I will.

5          MR. KELLY:  And you feel you can be fair to all sides

6     here?

7          PROSPECTIVE JUROR:  I feel I can, yes.

8          MR. KELLY:  Okay.

9          THE COURT:  Mr. Kendall.

03:19 10          MR. KENDALL:  Yes, your Honor.  In your answer, you

11     were kind enough to be very frank with us and mentioned

12     something about the emotional component of your reaction to

13     this case.  Is that what you've discussed already or is there

14     something else that fits within that description of what you

15     said with an emotional component.

16          PROSPECTIVE JUROR:  The emotional component I just

17     mentioned, right.

18          MR. KENDALL:  So you've discussed it.

19          PROSPECTIVE JUROR:  I don't think we discussed it.

03:20 20     It's just like an unfavorable.  I don't think that we discussed

21     it.  I do not like the whole admission fraud practice actions,

22     whatever.

23          MR. KENDALL:  If we were to start this trial, would

24     you start this trial presuming that they're innocent and

25     they've done nothing wrong and you're just having an open mind

**A841**

1    to the evidence?

2         PROSPECTIVE JUROR:  I think I would be able to adjust

3    my mind to that if I have opportunity to sit on a jury, yeah.

4         MR. KENDALL:  So you feel strongly that you would

5    start this trial thinking they've done nothing wrong and

6    they're presumed innocent?

7         PROSPECTIVE JUROR:  I think I would be able to do

8    that.

9         MR. KENDALL:  Thank you.  The last question I wanted

03:21 10   to ask is you said in your questionnaire about an issue of

11   responsibilities, injure job responsibilities would have an

12   impact on.  Does it impact the team you manage or other people

13   or is it just your own person being effected by this?  Is it a

14   whole group of researchers or team members slowed down or just

15   you?

16        PROSPECTIVE JUROR:  60 percent on me and 40 percent on

17   the team.

18        THE COURT:  Miss Kearney?

19        MS. KEARNEY:  No questions, your Honor.  Thank you.

03:21 20   THE COURT:  Mr. Liu, I'm going to reserve you.  That

21   means that you will go with Mr. McAlear.  You may be called

22   back for further jury duty.  You are instructed not to make any

23   kind of investigation.  You're not to go online.  You

24   understand that would be inappropriate because if you are

25   selected to be a juror, you will decide this case solely based

1    on the evidence that comes into this courtroom and not on

2    anything that comes in from outside.  You understand?

3         PROSPECTIVE JUROR:  I understand.

4         THE COURT:  Thank you, Mr. Liu.  P.

5         Mr. Kelly?

6         MR. KELLY:  I'd move to strike this juror he said on

7    his questionnaire when he had time to reflect, and he's got a

8    Ph.D., he wrote "in a case like this I don't see any strong

9    reason for the defendant not to testify."  That's his mind-set

03:22 10   coming in.  I think some of the other things he said suggests

11   to me that he'd have a difficult time, although he would try

12   mightily, he would say he'd try to follow instructions.

13        THE COURT:  He didn't say try.  He said he would.

14        MR. KELLY:  He said that, Judge.  My concern is that

15   he might not be able to continue that.  That's the request for

16   the record.

17        THE COURT:  Mr. Kendall.

18        MR. KENDALL:  I feel the same way, your Honor.  He's a

19   remarkably brilliant accomplished man.  He's very responsible.

03:23 20   He's very respectful of the legal system, but I think it was

21   clear he's overcoming emotional and predispositions because

22   he's trying to do what's correct.  I respect him for that.  He

23   kept on saying "I think, I think".  Your Honor, given the

24   emotions of this case and a much more elevated case with high

25   emotions and social issues, I think someone who's that frank

about wanting to do the right thing but being emotionally

disclosed to being compromised and human, I do think he should

be excused.

THE COURT:  Miss Kearney.

MS. KEARNEY:  Your Honor, the prospective juror

acknowledged he was not aware defendants did not have to

testify.  As soon as you alerted him to that, he said he would

follow your instructions.  I wrote down he said he was

confident he could follow your instructions.

THE COURT:  I'm not going to excuse him for cause.

We'll go on to the next one.

MR. FRANK:  Your Honor, just briefly, the questioning

there was bordering on cross-examination.  It was repetitive,

over and over on topics your Honor had already explored.  Both

defendants explored it in exquisite detail.

THE COURT:  For instance what?

MR. FRANK:  For instance, on whether the juror could

be fair and impartial.  There must have been 15 questions on

that topic.  He answered them again and again and again.  I

think it was excessive.

MR. KELLY:  Just for the record, your Honor,

Miss Kearney did not object and, to date, we've been very --

THE COURT:  Before you speak, Mr. Kelly, I'm going to

defend you.

MR. KENDALL:  Me too I hope, your Honor.

1          THE COURT:  I don't think that was uncalled for on

2     this particular juror.  I agree that under normal circumstances

3     that would have been excessive, but this juror did have some

4     doubts that I think were clarified by the questions that I

5     asked and that later defense counsel asked.  I'm not going to

6     criticize them for that examination.  I agree they don't need

7     to go that far with most potential jurors.

8          MR. FRANK:  Thank you, your Honor.  In particular on

9     the hardship issue, he said there was no hardship and then they

03:25 10    started exploring what the impact would be on people at Bristol

11    Meyers Squibb, it's a lot.

12         THE COURT:  Your objection is noted.  Bring the next

13    one in.

14         Good afternoon, Mr. Day.  You're reminded you remain

15    under oath.  If you'd like to, you can take your mask off, but

16    you don't have to.

17         Would service on this jury cause you any financial

18    hardship, Mr. Day?

19         PROSPECTIVE JUROR:  No.

03:26 20    THE COURT:  You say in response to one question that

21    you were somewhat uncomfortable on passing judgment on

22    somebody.  Would you explain that a little bit.

23         PROSPECTIVE JUROR:  Just the feeling.

24         THE COURT:  It's not a religious side.

25         PROSPECTIVE JUROR:  No.

**A845**

1          THE COURT:  Just a feeling of passing judgment on a

2     fellow human being.

3          PROSPECTIVE JUROR:  Right.

4          THE COURT:  Notwithstanding that feeling, if the

5     government proves its case beyond a reasonable doubt, would you

6     have any trouble in finding the defendants guilty?

7          PROSPECTIVE JUROR:  I don't think -- no.

8          THE COURT:  If the government does not prove its case

9     beyond a reasonable doubt, would you have any problem in

03:27 10   finding them not guilty?

11          PROSPECTIVE JUROR:  No.  Despite my feelings, I think

12     it would be my duty to do that.

13          THE COURT:  Fair enough.  You would understand that

14     you'd have to follow the instructions of the Court whether you

15     believe in them or not, is that right?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Could you decide this case solely based on

18     the evidence that comes into this courtroom and not on the

19     basis of any prior conception about this case or anything that

03:27 20   you've heard about it?

21          PROSPECTIVE JUROR:  I think so.  I don't know much

22     about the case at all.

23          THE COURT:  So the answer to that question is yes?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Those are my questions.  Mr. Kelly, do you

```
 1   have any?
 2          MR. KELLY:  Just briefly.  Good afternoon.  Brian
 3   Kelly.  I represent Mr. Aziz here.  This case will involve a
 4   lot of discussion about college sports teams.  Do you follow
 5   college sports at all?
 6          PROSPECTIVE JUROR:  Some.
 7          MR. KELLY:  Which sports?
 8          PROSPECTIVE JUROR:  Basketball, track and field.  I
 9   ran track and field in college.
10          MR. KELLY:  Men's basketball, women's?
11          PROSPECTIVE JUROR:  Men's.
12          THE COURT:  Mr. Kendall.
13          MR. KENDALL:  Yes.  I'm Mike Kendall.  I represent
14   John Wilson.
15          What did you run in track?
16          MR. KENDALL:  2 miles, 3 miles.  It was the 70s.
17          THE COURT:  Miss Kearney.
18          MS. KEARNEY:  Good afternoon, Mr. Day.  The judge
19   asked you some questions regarding your answer about being
20   uncomfortable passing judgment.  I just had one follow-up
21   question about if the judge is instructing you the government
22   has to prove its case beyond a reasonable doubt but is not
23   beyond all doubt, would you be comfortable following that
24   instruction?
25          PROSPECTIVE JUROR:  I think I understand the
```

03:28 at line 10
03:28 at line 20

```
 1   reasonable doubt rule, so I think I can, yeah.
 2          MS. KEARNEY:  Would you be able to follow the judge's
 3   instructions?
 4          PROSPECTIVE JUROR:  Yes.
 5          THE COURT:  Thank you, Mr. Day.  You are in reserve,
 6   which means that you'll go with Mr. McAlear here.  You may be
 7   called back for further jury duty.  Please do not do any
 8   research on the case or anything on the internet.  You
 9   understand the reasons why you shouldn't do that?
10          PROSPECTIVE JUROR:  Yes.
11          THE COURT:  Thank you.
12          Good afternoon, Mr. Miller.  Please be seated.  You
13   understand you remain under oath.  If you'd like to remove your
14   mask, you may, but you don't have to.
15          Mr. Miller, would serving on this jury cause you a
16   financial hardship?
17          PROSPECTIVE JUROR:  I don't think so, no.
18          THE COURT:  Is there anything in the questionnaire of
19   those 49 questions you were asked to answer in writing
20   yesterday that gives you pause that you would be able to decide
21   this case fairly and impartially?  Could you do that?
22          PROSPECTIVE JUROR:  Yes, I could.
23          THE COURT:  You could decide this case solely based on
24   the evidence that comes into this courtroom and not on the
25   basis of anything else you've heard about the case outside this
```

```
 1   courtroom?
 2           PROSPECTIVE JUROR:  Yes, sir.
 3           THE COURT:  Any questions, Mr. Kelly?
 4           MR. KELLY:  Briefly.  Good afternoon, sir.  My name is
 5   Brian Kelly.  I represent Mr. Aziz.  Do you follow college
 6   sports at all?
 7           PROSPECTIVE JUROR:  Yes.
 8           MR. KELLY:  Which sports?
 9           PROSPECTIVE JUROR:  Everything.
10           MR. KELLY:  All of them?
11           PROSPECTIVE JUROR:  Yes.
12           MR. KELLY:  Thanks.
13           THE COURT:  Mr. Kendall?
14           MR. KENDALL:  Good afternoon.  No questions.  Thank
15   you.
16           THE COURT:  Miss Kearney.
17           MS. KEARNEY:  Good afternoon.  You indicated you
18   served on a jury before.
19           PROSPECTIVE JUROR:  Yes.
20           MS. KEARNEY:  Was there anything about that experience
21   that would affect your ability to be fair and impartial in this
22   trial?
23           PROSPECTIVE JUROR:  No.
24           THE COURT:  Thank you, Mr. Miller.  That means you're
25   in reserve.  You'll go with Mr. McAlear and you may be called
```

```
 1    for further jury duty.  Please understand that you're not to do
 2    any research about this case or go on the internet.  That would
 3    be totally inappropriate because you're going to decide this
 4    case, if you're ultimately chosen as a juror, based upon the
 5    evidence that comes into this courtroom only.  All right?
 6              PROSPECTIVE JUROR:  Yes, sir.  Thank you.
 7              THE COURT:  Good afternoon, miss Brickley.  You
 8    understand you're still under oath.  You may remove your mask
 9    if you want to, but you don't have to.  Would serving on this
10    jury cause you a financial hardship?
11              PROSPECTIVE JUROR:  No.
12              THE COURT:  You mentioned as a former student
13    athlete -- maybe I should inquire.  What was your sport?
14              PROSPECTIVE JUROR:  Soccer.
15              THE COURT:  Where did you play?
16              PROSPECTIVE JUROR:  N-Y-U-
17              THE COURT:  Division 1?
18              PROSPECTIVE JUROR:  Division 3.
19              THE COURT:  But you find it offensive that people took
20    spots from active players.  Would that effect your ability to
21    be fair and impartial understanding that these two defendants
22    have not had their day in court and that they're entitled to it
23    and whatever any other defendant has done in this case is
24    totally irrelevant to their defense?  Could you abide by that
25    instruction from this Court?
```

**A850**

1    PROSPECTIVE JUROR:  So I've served on a jury before.

2  Going in it was a state case.  Going in, completely understand

3  innocent until proven guilty.  The only thing about this case

4  is tricky because I've had conversations about it with family,

5  with teammates, with coaches.  I think it would be hard

6  personally for me going into it just have gone had all these

7  conversations before to take on that viewpoint of innocent

8  until proven guilty.

9    THE COURT:  In other words, you couldn't put all those

03:35 10  conversations behind you and decide this case solely based on

11  the evidence that comes into this courtroom?

12    PROSPECTIVE JUROR:  I think it would be hard.

13    THE COURT:  We can't get in your hard.  Only you can

14  told me if you can be fair and IEP partial.  If you can't,

15  that's the honest thing to tell me.  I ask you one final time.

16  Could you be fair and impartial in this case with the, quote,

17  baggage that you're bringing with you?

18    PROSPECTIVE JUROR:  I think others could be more fair

19  and impartial.

03:36 20    THE COURT:  Fair enough.  I'm going to excuse you,

21  miss Brickley.  Thank you for your candor.  You're excused.

22    Counsel, we're going to do about three more and then

23  we'll caucus.  Sorry.  We're going to do four more.

24    Good afternoon, Mr. Pandey.  Is that how you pronounce

25  the name?

1    PROSPECTIVE JUROR:  Yes.  That's fine.

2    THE COURT:  Please be seated.  You are reminded that

3    you are under oath.  You can take your mask off, but you don't

4    have to.

5    You mentioned you might have to travel because of an

6    ill mother overseas.

7    PROSPECTIVE JUROR:  Yes.  My he mother lives in

8    Mumbai, India.  She's not ill right now but she's 80 plus and

9    with all the things going on, potentially, I could have to go

03:37 10   back.  I'm not sure.  If she's sick, then I have to go.

11    THE COURT:  There's nobody there to care for her?

12    PROSPECTIVE JUROR:  Yeah.  They're not in Mumbai.  My

13    sister is not in the state right now.  If she's ill, I'll have

14    to travel.

15    THE COURT:  I take it you would be uncomfortable in

16    having to serve on this jury for 4 weeks?

17    PROSPECTIVE JUROR:  Yes.

18    THE COURT:  I'm going to excuse you, Mr. Pandey.  I

19    hope at another time you'll be willing to serve on a jury

03:37 20   because it's a very important civic duty that you have.  It

21    sounds to me like this is an inconvenient, inappropriate time

22    for you to have to serve.  You're excused.

23    PROSPECTIVE JUROR:  Thank you.

24    THE COURT:  Good afternoon, Miss Withem.  Please be

25    seated.  You're reminded that you remain under oath.  If you

**A852**

1    would like to remove the mask, you may, but you don't have to.

2        Miss Withem, would serving on this jury for 4 weeks

3    cause you a financial hardship?

4        PROSPECTIVE JUROR:  Yes, it would.

5        THE COURT:  I don't want to cause you financial

6    hardship, therefore I'm not going to require you to sit on this

7    jury.  I do want you to serve on a jury sometime because it's a

8    very important civic responsibility, but this one seems like

9    it's going to be inconvenient for you and going to cause you

03:39 10    some hardship, and I don't want to do that.  You're excused,

11    Miss Withem.  Thank you.

12        Good afternoon, Mr. McDavitt.  Please be seated.

13    Please understand that you are still under oath.  Also, if you

14    want to remove the mask, you may, but you don't have to.

15        Mr. McDavitt, would serving on this jury for 4 weeks

16    cause you any financial hardship?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Was any of the questions on that long

19    questionnaire that you had to fill out yesterday give you pause

03:40 20    as to whether you could fairly and impartially decide this

21    case?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  You think you could do that.

24        PROSPECTIVE JUROR:  I do.

25        THE COURT:  Decide this case solely on the basis of

|  | |
|---|---|
| 1 | evidence that comes into this courtroom and not anything you've |
| 2 | heard outside the courtroom? |
| 3 | PROSPECTIVE JUROR:  Yes. |
| 4 | THE COURT:  Those are my questions.  Mr. Kelly? |
| 5 | MR. KELLY:  Briefly.  My name is Brian Kelly.  I |
| 6 | represent Mr. Aziz. |
| 7 | There will be a lot of discussion about college sports |
| 8 | in this case.  Are you a college sports fan? |
| 9 | PROSPECTIVE JUROR:  Not so much. |

1   evidence that comes into this courtroom and not anything you've

2   heard outside the courtroom?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Those are my questions.  Mr. Kelly?

5        MR. KELLY:  Briefly.  My name is Brian Kelly.  I

6   represent Mr. Aziz.

7        There will be a lot of discussion about college sports

8   in this case.  Are you a college sports fan?

9        PROSPECTIVE JUROR:  Not so much.

03:40 10        MR. KELLY:  More professional?

11        PROSPECTIVE JUROR:  More professional.

12        THE COURT:  Mr. Kendall?

13        MR. KENDALL:  Good afternoon.  I'm Mike Kendall.  I

14   represent John Wilson.  Just two things.  You responded to

15   question 39 that you've heard about this in passing on the

16   local news.

17        PROSPECTIVE JUROR:  Correct.

18        MR. KENDALL:  Any reaction to it?

19        PROSPECTIVE JUROR:  Not so much at the time.  Didn't

03:41 20   really.

21        MR. KENDALL:  You worked at med tech for 11 years.

22   Can you tell us what you do, what your job involves.

23        PROSPECTIVE JUROR:  Sure.  We do medical sales so for

24   office and hospital facilities.

25        MR. KENDALL:  You write code or?

```
 1              PROSPECTIVE JUROR:  I have in the past.  People who
 2      work for me write code.
 3              THE COURT:  Miss Kearney?
 4              MS. KEARNEY:  Good afternoon.  You indicated you
 5      previously served on a jury.  Is there anything about that
 6      experience that would affect your ability to be fair and
 7      impartial in this case?
 8              PROSPECTIVE JUROR:  No.
 9              MS. KEARNEY:  You also mentioned your mother-in-law
10      was a victim of a crime.  Do you feel she was treated fairly by
11      the criminal justice system?
12              PROSPECTIVE JUROR:  I do.
13              MS. KEARNEY:  Is there anything about that experience
14      that would affect your ability to be fair and impartial?
15              PROSPECTIVE JUROR:  No.
16              THE COURT:  Thank you, Mr. Did he have.  I'm going to
17      reserve your attendance, which means you may get called back
18      for further jury duty.  In the meantime, however, you're not to
19      do any research or go on to the internet and find out more
20      about this case.  That would be inappropriate because if you
21      are selected to be a juror, you're going to decide the case
22      solely on the basis of the evidence that comes into this
23      courtroom.  You understand that?
24              PROSPECTIVE JUROR:  Yes.
25              THE COURT:  Thank you.
```

1      Good afternoon, Mr. Hughes.

2      PROSPECTIVE JUROR:  Good afternoon.

3      THE COURT:  Please be seated.  Understand that you

4  remain under oath.  If you would like to take the mask off, you

5  may, but you don't have to.

6      Mr. Hughes, would serving on this jury for 4 weeks

7  cause you financial hardship?

8      PROSPECTIVE JUROR:  Not really.

9      THE COURT:  So you would be willing to serve and it's

03:44 10  not going to effect your ability to make a living?

11      PROSPECTIVE JUROR:  No.

12      THE COURT:  There were some other questions you

13  answered in the questionnaire that you said I think in response

14  to the ante cooperate or question that you do not believe in

15  plea bargaining and think that if you do a crime, you should

16  have to face full consequences.

17      PROSPECTIVE JUROR:  I understand the reason for plea

18  bargaining.  You get a small fish to give up to get a bigger

19  fish.  I would have a hard time trusting that person that are

03:44 20  going to sell their persons out.  Why should I believe anything

21  that they say?  I would have a problem with that.

22      THE COURT:  You don't think, no matter what a

23  cooperate or said, that you could believe him or her.

24      PROSPECTIVE JUROR:  I'd have a hard time believing

25  them, yeah.  Just back of my mind I'd be thinking this guy's

```
 1  going to say anything he can say to save himself.
 2          THE COURT:  Is there anything else in the
 3  questionnaire, any other questions that you were asked, that
 4  give you pause as to whether or not you could be fair and
 5  impartial in this case?
 6          PROSPECTIVE JUROR:  No.
 7          THE COURT:  So I ask you, do you think you could be
 8  fair and impartial and decide this case based on the evidence
 9  that comes into the courtroom for this case?
10          PROSPECTIVE JUROR:  I could.
11          THE COURT:  Mr. Kelly.
12          MR. KELLY:  Just briefly.  My name is Brian Kelly.  I
13  represent Mr. Aziz here.  If the judge instructs you on what is
14  the law, you'd follow what the judge told you.
15          PROSPECTIVE JUROR:  Absolutely.
16          MR. KELLY:  You played hockey?
17          PROSPECTIVE JUROR:  Yes.
18          MR. KELLY:  Would that affect your judgment if we're
19  talking a lot about sports?
20          PROSPECTIVE JUROR:  No.
21          MR. KELLY:  Are you a college sports fan besides
22  college hockey?
23          PROSPECTIVE JUROR:  I'm a sports fan in general.
24          MR. KELLY:  Nothing further.
25          THE COURT:  Mr. Kendall?
```

03:45 (line 10)
03:45 (line 20)

1          MR. KENDALL:  No further questions.

2          THE COURT:  Miss Kearney.

3          MS. KEARNEY:  Good afternoon, Mr. Hughes.  You had

4    indicated that you understood that plea bargaining happens and

5    there's a small fish used to get a bigger fish.  Does your

6    opinion change if it was a big fish used to get other big fish?

7          PROSPECTIVE JUROR:  For me, it's just if somebody's

8    making a deal, if somebody's been involved in nefarious

9    activity and they're making a deal to better themselves, I have

03:46 10    a hard time believing that person.  It seems somebody like that

11    would just say whatever they needed to say.  I would have a

12    hard time believing somebody like that.

13          MS. KEARNEY:  So when the judge asked if you could be

14    fair and impartial, does that factor in that you would have a

15    hard time listening to the testimony of potential cooperators?

16          PROSPECTIVE JUROR:  When all the facts come out, I'll

17    look at all the facts and make a decision.  Regardless of what

18    anybody says, I'll listen to the facts and make a decision.

19          MS. KEARNEY:  Have you ever been involved in the

03:47 20    criminal justice system yourself?

21          PROSPECTIVE JUROR:  No.  As far as what?

22          MS. KEARNEY:  Have you ever been arrested or charged

23    with a crime?

24          PROSPECTIVE JUROR:  I've been arrested before.

25          MS. KEARNEY:  When was that?

1    PROSPECTIVE JUROR:  I don't know.  It was a long time

2    ago.  90s.  All the charges were dropped.

3    MS. KEARNEY:  Thank you, sir.

4    THE COURT:  Thank you, Mr. Hughes.  I will hold you in

5    reserve.  That means you will go with McAlear.  You may be

6    called back for further jury duty.  In the meantime, please do

7    not do any research or go into the internet about this case.

8    That would be entirely inappropriate because if you are

9    selected to be a juror, you be asked to decide this case on the

03:48 10   basis of evidence that comes into this courtroom and not

11   anything outside.  Do you understand that?

12   PROSPECTIVE JUROR:  I do.

13   THE COURT:  Thank you, Mr. Hughes.

14   PROSPECTIVE JUROR:  I don't have to call tonight?

15   THE COURT:  Mr. McAlear will tell you.  You may well.

16   Miss Kearney?

17   MS. KEARNEY:  Yes, your Honor.  The government moves

18   to strike Juror No. 110 for cause.  He indicated both in his

19   questionnaire as well as here that he would have difficulty

03:48 20   listening to the testimony of cooperators.  While he did

21   indicate on questioning that he could be fair and impartial,

22   I'm concerned with his candidness because also in his

23   questionnaire he did not disclose that he had ever been

24   arrested and it was only when pressed here that he acknowledged

25   it.  So if he's not being candid been that, I'm also concerned

1    about whether he can put aside his feelings about people who

2    cooperate with the government.

3         MR. KELLY:  Your Honor, I do not think this rises to

4    the level of striking for cause.  He was candid.  The charges

5    were dismissed in the 90s.  It's almost 30 years now.  He

6    didn't hide his conviction.  He was arrested and charges were

7    dismissed.  He said he'd listen to the evidence and make a

8    decision then, which is what I hope most jurors will do.  From

9    our perspective, he's not subject to challenge for cause.

03:49 10         THE COURT:  Mr. Kendall?

11         MR. KENDALL:  The only thing I would add in, your

12    Honor, is his candid response for a person with no exposure to

13    the legal system wasn't so far from the First Circuit patent

14    jury instruction.  He'd be skeptical.  People who make deals, I

15    don't know exactly your instruction on the topic, but I think

16    there's a sense they're allowed to be skeptical.  What he said

17    is he'll listen to the judge.  This guy was a cop for 6 years

18    in the military.  He understands the role of a judge and the

19    deference to a judge.

03:50 20         Second, he said he'll base this decision on all of the

21    evidence, which means corroboration, other people coming in,

22    the type of things the government tries to do with his

23    informants is what he's looking to see.

24         THE COURT:  Miss Kearney?

25         MS. KEARNEY:  Your Honor, he didn't just say he would

**A860**

1  follow along with the First Circuit patent instructions on

2  cooperators.  He actually said he would have a problem with

3  people who sell their friends out.

4       Also, this wasn't an arrest where charges were

5  dismissed.  It resulted in a continuation without a finding.

6  According to his record, there was actually a jury trial before

7  he pled.  That was one of two incidents he had.  He had a

8  separate one in 2007 for operating after a suspended

9  registration.  Given that, the government wishes to strike for

03:51 10  cause.

11       THE COURT:  I'm going to deny the government's motion.

12  I will not strike him for cause.  That was a close call, but I

13  think he did answer my questions sufficiently to allow him with

14  my instructions to follow them and to be fair and impartial.

15  I'm not going to strike him for cause.

16       Counsel, it's now ten of four.  We're not going to

17  make it to the magic number of 40.  The way I count it, and

18  maybe Mr. McAlear will correct me, but I think we have 33 or

19  maybe 34 cleared jurors.

03:51 20       MR. MCALEAR:  I have 35, your Honor.

21       THE COURT:  That is short of what I want to have.  We

22  need to have counsel advise us on the second tranche.  We are

23  certainly not going to need to call in as many as we called in

24  today.  In fact, I think we would be safe in calling no more

25  than 30 jurors tomorrow.  I would like cooperation from counsel

**A861**

     1    to agree on the 30 that we can call from the second tranche.

     2    You've got an hour to do that, Mr. McAlear?

     3         MR. MCALEAR:  I would say so.

     4         THE COURT:  Let's reconvene here at quarter of five,

     5    4:45, at which point I am hopeful that counsel will be able to

     6    give me a list of 30 names from second tranche to call for

     7    tomorrow.  I don't know how you're going to get there.  We

     8    don't need a hundred.  We don't need everybody who's not

     9    subject to a hardship excuse.  I think we'll be able to reach

03:53 10    the number of 40 cleared jurors by sometime mid to late morning

    11    tomorrow.  We will then go to the following phase of picking a

    12    jury after the exercise of peremptory challenges.  Any

    13    comments?

    14         MR. KELLY:  Quick question, your Honor, a suggestion

    15    perhaps.  Can we give you 20 names?  It will make it quicker.

    16    We have ten left.  There's ten people left in the first

    17    tranche.

    18         THE COURT:  Is that right, we have ten left?

    19         MR. MCALEAR:  Yes.

03:53 20         THE COURT:  You were saying 30 from the new group or

    21    30 total?

    22         MR. MCALEAR:  I was saying 30 from the new group, but

    23    I didn't know how quickly they could go through.  I don't think

    24    we need 40 jurors.  If it's going to include people they have

    25    agreed upon and get rid of jurors that are not going to be

```
 1   needed, then that number would then come down.

 2              THE COURT:  Mr. Kelly.

 3              MR. KELLY:  How about we do 25?  We have 45 minutes.

 4   I'm mindful of the deadline.

 5              MR. FRANK:  20 or 25 is fine with us, Judge.  I wanted

 6   to clarify.  We skipped a bunch.

 7              THE COURT:  We skipped only because we needed to

 8   address this particular one.  We're going to go back to number

 9   104, I believe, we were up to.

10              MR. MCALEAR:  He was struck.

11              THE COURT:  We'll start with 105.  We have about ten

12   more on that list.

13              I want to end up with 25 total, in other words, 15 new

14   ones.

15              MR. FRANK:  Okay.

16              MR. KENDALL:  Ten from tranche one, 15 from tranche

17   two.

18              THE COURT:  Yes.  We're in recess until 4:45, unless

19   you come it a decision before then.  Let my deputy know if you

20   have.

21              (Recess taken from 3:55 to 4:57 p.m.)

22              THE COURT:  Good afternoon, counsel.  I understand

23   you're having a bit of a problem.  I've got a suggestion that I

24   think might resolve it.  We only need a few numbers to be able

25   to get the final five or six.  The tranche number two includes
```

**A863**

```
  1   104 names.  The first number is 118, I believe.  I am going to

  2   propose that we randomly call numbers 118 through 137, no

  3   matter who they are or what their responses are.  Out of those

  4   20, in addition to the ten that we have already coming back

  5   tomorrow, we should be able to fill the remaining five seats of

  6   cleared jurors.  Why doesn't that work?

  7             MR. FRANK:  I think that works, Judge.

  8             MR. KELLY:  That works very well.

  9             THE COURT:  Mr. Kendall?

 10             MR. KENDALL:  Your Honor, while we have disagreements,

 11   there were a bunch in the first 20 that we both agreed had

 12   hardship issues or other issues.

 13             THE COURT:  If you can agree what numbers those are,

 14   we can avoid them.

 15             MR. KENDALL:  We can give you those numbers.

 16             THE COURT:  That's fine.  How many of the first 20?

 17             MR. KENDALL:  We believe nine of the first 20 are

 18   hardship.

 19             THE COURT:  We'll take those nine out.  Having sort of

 20   prearranged this, we don't need nine more.  We'll take five

 21   more.  We'll take 138 through 142, if that's five more.

 22             MR. KENDALL:  May we check to see if we agreed on

 23   those two?

 24             THE COURT:  Of course.

 25             MR. FRANK:  Judge.
```

**A864**

1          THE COURT:  Wait a minute.  There's a lack of

2     agreement here.

3          MR. FRANK:  We gave them a list of people who

4     literally said we have a hardship.  We gave them that list

5     which we stayed up late last night compiling.  They went

6     through from that starting point and decided who they wanted.

7     Now they're giving the Court that list.  That's not fair.

8          MR. KENDALL:  Your Honor, I think it's a little bit

9     different than that.  We have a list here of about 23 people

04:59 10     that they said was fine to bring back that we agreed is fine to

11     bring back.  We took out hardships.  They took out and we went

12     along with most people that had arrests that didn't lead to

13     convictions, which you had let on today.  There was maybe one

14     we disagreed with.  Then there was some people who said they

15     hated the rich or things like that that we didn't agree with

16     them on that.  We have 23 people that both sides put on their

17     list.

18          MR. FRANK:  We don't have a list.  That's not true,

19     Judge.  We don't have a list.  We put a list of people who

05:00 20     claimed hardship.

21          MR. KELLY:  I think it gets back to the Court's

22     original proposal.  Why don't we take that number.  If there's

23     one we agree on striking, the first 20 in the next tranche.

24          THE COURT:  Do you agree, Mr. Frank, about any of

25     those 20 between 118 and 137 that should be stricken for

```
 1   hardship?

 2          MR. FRANK:  We have a list of eight people in that

 3   group that are hardships.

 4          THE COURT:  Do those coincide with the defendants'

 5   list?

 6          MR. FRANK:  I don't know because I haven't seen the

 7   defendants' list.

 8          MR. KENDALL:  We counted more hardships in that group,

 9   your Honor.

05:00 10        THE COURT:  I'm going to take the eight that you agree

11   on.  We are going to call enough so we will have 20 jurors show

12   up tomorrow.  If my arithmetic is right, we're going to go 118

13   through 145.  Is that about right?  We're going to eliminate

14   the eight names that you both agree are hardships.  We're going

15   to end up with 20 people from tranche No. 2.

16          MR. KENDALL:  I believe there were nine hardships.

17          MR. FRANK:  If you go that high, there's one

18   additional number.  If we go 118 to 146, that will exclude nine

19   numbers.

05:01 20        THE COURT:  118 to 146.  We will exclude nine of those

21   numbers who the parties have agreed are hardships.

22          MR. KENDALL:  Okay.

23          THE COURT:  All right?  Everybody on the same page?

24          MR. FRANK:  Thank you, Judge.

25          THE COURT:  Mr. Kelly?
```

```
 1              MR. KELLY:  Absolutely.

 2              THE COURT:  Mr. Kendall?

 3              MR. KENDALL:  We're all on your page, yes, your Honor.

 4              THE COURT:  All right.  Mr. Frank.

 5              MR. FRANK:  Yes, your Honor.

 6              THE COURT:  We're going to call 118 through 146 with

 7      nine names agreed upon by counsel that will be eliminated from

 8      those.  We will, hopefully, end up with about 25 people.

 9              Anything else that needs to come to my attention

10      before we adjourn for the day?  We will reconvene tomorrow

11      morning at 9:00 a.m.

12              MR. FRANK:  Thank you, your Honor.

13              MR. KENDALL:  Thank you, your Honor.

14              MR. KELLY:  Thank you, your Honor.

15              THE COURT:  We're in recess.

16              (Whereupon, the proceedings adjourned at 5:02 p.m.)

17

18

19

20

21

22

23

24

25
```

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3
     UNITED STATES OF AMERICA,          )
4                        Plaintiff      )
                                        )
5    vs.                                )  No. 1-19-CR-10080
                                        )
6    GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
7                        Defendants.    )
                                        )
8                                       )

9

10

                    BEFORE THE HONORABLE NATHANIEL M. GORTON
11                     UNITED STATES DISTRICT JUDGE
                          JURY TRIAL - DAY 3
12

13
                John Joseph Moakley United States Courthouse
14                          Courtroom No. 4
                           One Courthouse Way
15                    Boston, Massachusetts 02210

16

17                         September 10, 2021
                              9:** a.m.
18

19

20
                        Kristin M. Kelley, RPR, CRR
21                        Official Court Reporter
                John Joseph Moakley United States Courthouse
22                     One Courthouse Way, Room 3209
                        Boston, Massachusetts 02210
23                     E-mail: kmob929@gmail.com

24          Mechanical Steno - Computer-Aided Transcript

25

**A868**

```
 1     APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```



```
 1   APPEARANCES:

 2

 3          Robert L. Sheketoff

 4          One McKinley Square

 5          Boston, MA 02109

 6          617-367-3449

 7          sheketoffr@aol.com

 8          for Gamal Abdelaziz.

 9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         THE CLERK:  Court is now in session.

 3         THE COURT:  Good morning, counsel.  Before we continue

 4    the process of individual voir dire, I would like to deal with

 5    the government's motion to strike Juror No. 18 for cause.  They

 6    filed a motion overnight.  I assume counsel for defendants have

 7    had a chance to review that, Mr. Kelly, Mr. Kendall.

 8         MR. KELLY:  I've reviewed it now, your Honor.

 9         THE COURT:  Do you wish to be heard in opposition?

09:19  10         MR. KELLY:  Well, your Honor, here's the issue as I

10    see it.  I think the government's right about the fact that if

11    it's a crime punishable by more than a year, it's a felony,

12    even though the state calls them misdemeanors up until two and

13    a half years.

14         THE COURT:  Isn't it two OUIs, misdemeanors, and the

15    third a felony?

16         MR. KELLY:  I think if it's over a year, if he's

17    convicted of a crime over a year in the federal system, it

18    counts however the state qualifies it.  The second part of the

09:19  20    analysis is has his civil rights been restored.  I haven't

20    thought about that issue in a long time.  There's really only

21    three civil rights at issue.  In Massachusetts, you never lose

22    your right to vote.  The second right is you can't run for

23    public office.  That only applies when you're in jail.  The

24    third civil right is, as I recall, is the right to serve on a
```

```
 1   jury.  Then your rights are restored after 7 years.  The
 2   conviction they're bringing to everyone's attention is less
 3   than 7 years.  What I don't recall is whether or not the
 4   restoration of rights, which is a complicated process, has to
 5   be individual or general application for this rule.  I don't
 6   have a final thought on whether his rights have been restored.
 7   He was certainly very candid about it when asked.  She was
 8   certainly on the jury pool process, so I assume when they
 9   screen these people, they've gone through this analysis and put
10   them on the pool.  He was on the pool.  He was, by all
11   accounts, very honest and he did not appear to be hiding
12   anything when questioned.  I would say based upon that, I would
13   not agree to him being kicked off.  Again, I don't know the
14   full restoration process.
15           THE COURT:  Mr. Kendall.
16           MR. KENDALL:  Your Honor, I know very little about
17   this topic, this issue of eligibility and whatever.  We've
18   asked somebody to research it in the office.  I'd ask if we can
19   get to you back at the break or in an hour's time.  I want to
20   look at it and understand how it works.  I'm sure you know
21   better than I do.
22           THE COURT:  I don't.  Mr. Frank.
23           MR. FRANK:  Your Honor, both statutes, we think, are
24   quite clear.  They don't refer to the term "felony".  They
25   refer to crimes punishtial under state or federal law by
```

1    imprisonment for more than 1 year.  The statute under which the

2    potential juror was convicted in August of 2019 on its face is

3    punishable by imprisonment for up to two and a half years.

4    Those are the terms that the statute uses.  With respect to the

5    restoration of civil rights, I agree with Mr. Kelly that it is

6    under Judge Gertner's decision 7 years in the standard period.

7    This potential juror was convicted in August of 2019.  His

8    Probation ran until August of just August of 2021.  So there's

9    no possibility that his civil rights have been restored.

09:22 10        THE COURT:  He was convicted of larceny, contrary to

11   his comments on the stand?

12        MR. FRANK:  His rap sheet shows that he lied on the

13   stand and he was convicted of larceny.  That conviction is in

14   the same rap sheet with all the convictions that he

15   acknowledged.

16        THE COURT:  I'm going to allow the motion.  I'm going

17   to strike this Juror No. 18 for cause, which means that we're

18   down to 34, rather than 35.  We need to get six more out of the

19   process that we're going to proceed with right now.

09:22 20        Anything else that needs to come to my attention

21   before we proceed with the process of individual voir dire?

22        MR. KELLY:  No, your Honor.

23        MR. KENDALL:  No, your Honor.

24        THE COURT:  Let us call starting with No. 105, I

25   believe it is.

1          Good morning, Mr. Xanthopoulos.  Is that how you
2    pronounce your name?
3          PROSPECTIVE JUROR:  Yes, sir.
4          THE COURT:  Mr. Xanthopoulos, you're reminded that you
5    remain under oath.  You may remove your mask if want to, but
6    you don't have to.
7          In response to question 23 on the questionnaire, you
8    made a comment that you thought that if a defendant is guilty,
9    they must prove they're innocent, especially if there is
09:24 10   evidence.  Of course, that's not the law.  Do you know that the
11   law is different than what you said?
12         PROSPECTIVE JUROR:  Could you repeat the question?  I
13   may have misread it then if that's the case.
14         THE COURT:  The answer to question No. 23 that you
15   gave, you said that if a defendant is guilty, they must prove
16   that they're innocent, especially if there's evidence.
17         PROSPECTIVE JUROR:  Then I definitely misread it.  I
18   thought it said if they are not guilty.  The question is if
19   they are guilty?
09:24 20   THE COURT:  No.  The question is the burden of proof
21   is always on the government to prove beyond a reasonable doubt
22   that the defendant charged is guilty.  The defendant has no
23   obligation to prove anything.  That's contrary to the law.
24   Would you be able to accept that instruction from the Court,
25   not withstanding your opinion?

```
 1          PROSPECTIVE JUROR:  I'm a little confused now.  Can
 2   you please repeat the question.
 3          THE COURT:  Let's see if I can give you the exact
 4   question that was asked.  "The prosecution has the burden of
 5   proving the defendant is guilty beyond a reasonable doubt.  A
 6   defendant does not have to prove that he is innocent.  Do you
 7   disagree in any way with this principal?  I believe your answer
 8   was "Yes.  If a defendant is guilty, they must prove that they
 9   are innocent, especially if there is evidence."
 10          PROSPECTIVE JUROR:  I must have misread it.  I guess
 11   my answer should be changed to no then.
 12          THE COURT:  That's a crucial issue, of course, in any
 13   criminal case, notwithstanding the answer, and having answered
 14   all the questions of the questionnaire, do you have any doubt
 15   that if you are chosen to sits a juror on this case, you could
 16   be fair and impartial?
 17          PROSPECTIVE JUROR:  I would definitely be fair and
 18   impartial.
 19          THE COURT:  Can you decide this case based solely on
 20   the evidence that is presented in this courtroom and not based
 21   upon any other information that you have from elsewhere?
 22          PROSPECTIVE JUROR:  Yes.
 23          THE COURT:  What about your comments to 43 that
 24   "wealthy people sometimes believe that money can be their way
 25   out when the evidence proves guilt"?  I'm not sure I understand
```

1  that.  What do you mean by that?

2  PROSPECTIVE JUROR:  I kind of meant most likely if

3  there are wealthy people involved in the case they'd be able to

4  most likely get good lawyers or better lawyers than say someone

5  who doesn't have enough money.

6  THE COURT:  Do you have a bias against wealthy people?

7  PROSPECTIVE JUROR:  I guess in that regard maybe a

8  slight bias, yes.

9  THE COURT:  To be a fair and impartial juror you've

09:27 10  got to enter this case without any bias toward anybody.  Can

11  you do that?

12  PROSPECTIVE JUROR:  It would have to depend on the

13  evidence in the case.

14  THE COURT:  Let's see if counsel have any questions

15  for you.  Mr. Kelly.

16  MR. KELLY:  Good morning.  I represent Mr. Aziz here.

17  If the evidence in the case were that the defendants were

18  wealthy and they did have good lawyers, you would hold that

19  against them?

09:27 20  PROSPECTIVE JUROR:  If the evidence proves that the

21  defendant is guilty, then I would have to vote in saying that

22  he was guilty.

23  MR. KELLY:  What I'm getting at is your concern is

24  generally in society wealthy people have advantages that other

25  people don't.

```
 1           PROSPECTIVE JUROR:  Correct.  Most of the time, yes.
 2           MR. KELLY:  That's your firmly held belief?
 3           PROSPECTIVE JUROR:  Yes.
 4           MR. KELLY:  In fact, where you came here today, your
 5      view was that if a defendant is guilty, they must prove they're
 6      innocent.  You wrote that, right?
 7           PROSPECTIVE JUROR:  Correct.  But like I stated
 8      earlier, I misread the question.
 9           MR. KELLY:  What you wrote is "if the defendant is
09:28 10      guilty, they must prove they're innocent, especially if there's
11      evidence."  What do you mean by that, if the government puts on
12      some evidence, the defense should put some on too?
13           PROSPECTIVE JUROR:  Can you repeat that.
14           MR. KELLY:  You wrote, "If the defendants' guilty,
15      they must prove they're innocent, especially if there is
16      evidence." Do you mean if the government puts on evidence that
17      they're guilty, the defense should put on evidence that they're
18      not guilty?
19           PROSPECTIVE JUROR:  Correct.
09:28 20           MR. KELLY:  That's it.
21           THE COURT:  Mr. Kendall.
22           MR. KENDALL:  Good morning.  My name's Mike Kendall.
23      I represent John Wilson.  I'm sorry to go back to the same
24      question.  I hope you appreciate that's what we're supposed to
25      do.  That question toward the end, you were concerned about
```

1    wealthy people having certain advantages.  I think you

2    referenced they get better lawyers than average.

3              PROSPECTIVE JUROR:  Correct.

4              MR. KENDALL:  Do you think that gives them a bit of an

5    edge or bit of advantage in a case like this?

6              PROSPECTIVE JUROR:  Generally, the way I viewed it,

7    more expensive lawyers tend to be better lawyers.  That may not

8    be the case but that's what I was exposed to.

9              MR. KENDALL:  I'm glad to hear that.  Do you think

09:29 10   that gives them some type of edge in the courtroom, sort of an

11   advantage that other people don't have?  It's not the same

12   trial for all people because of that.

13             PROSPECTIVE JUROR:  I guess most of the time, yes.  It

14   depends on which lawyer they hire.

15             MR. KENDALL:  What do you mean by that?

16             PROSPECTIVE JUROR:  Like I said, it depends on the

17   lawyer.  You could get a really expensive lawyer but they could

18   be poor at their job.

19             MR. KENDALL:  If they get a good lawyer that's good at

09:30 20   their job, they have an edge that others don't have in the

21   legal system.

22             PROSPECTIVE JUROR:  Yes.

23             MR. KENDALL:  I appreciate your candor.

24             THE COURT:  Miss Kearney.

25             MS. KEARNEY:  Good morning.  Following up on some of

1    the questions you've been asked, notwithstanding your views on

2    the types of lawyers that a defendant could afford, would you

3    be able to put aside those views and just judge based on the

4    evidence that's presented to you in court?

5            PROSPECTIVE JUROR:  Yes.

6            MS. KEARNEY:  If the judge instructed you that it's

7    the government's burden of proof in this case, would you be

8    able to follow that instruction?

9            PROSPECTIVE JUROR:  Yes.

09:30 10         MS. KEARNEY:  Thank you.

11           THE COURT:  Thank you, Mr. Xanthopoulos.  You may be

12   put in reserve.  That is you will go with the jury coordinator

13   for the time being.  You may be called back for further

14   empanelment information.  In the meantime, of course, you're

15   not to do any research about this case on the internet or

16   anything like that.  You understand why.

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Thank you.

19           Mr. Kelly?

09:31 20         MR. KELLY:  We're going to move to strike this juror

21   for cause.  He just testified under oath in court that he has a

22   bias against wealthy people.  That's his firmly held belief.

23   He's certainly entitled to that belief, but given the facts of

24   this case, he will be biased against our client.  He doesn't

25   like them hiring lawyers that, in his view, give him an undue

```
 1   edge.  He had difficulty even responding to the Court's
 2   questions initially.  I think that's another basis that
 3   concerns me that he can't even follow the instructions of what
 4   it's going to be.  After you instructed him, he still answered
 5   wrong.  He can't follow instructions.  More important for my
 6   client is he can be biased against him based upon his answers,
 7   based upon his written answers too that he had time to prepare
 8   when he was filling out the questionnaire.  When he came here,
 9   he repeat it had under oath.  We respectfully suggest,
10   unfortunately, he's biased against my client and he should be
11   struck for cause.
12              THE COURT:  Mr. Kendall.
13              MR. KENDALL:  To add slightly to that, I obviously
14   adopt his position, he's a respectful young man.  He clearly
15   respects the Court and what the Court says to him.  He clearly
16   said that he has an ingrained bias.  As much as he has respect
17   for the Court's instructions, I don't think you're going to
18   take it into the jury room.  He said rich people has an edge in
19   the courtroom because they get better lawyers.  I suggest, your
20   Honor, given how fraught this case is with those issues, I
21   think we have to just acknowledge that this juror's not the
22   appropriate person for this case.
23              THE COURT:  Miss Kearney.
24              MS. KEARNEY:  The prospective juror acknowledged he
25   misunderstood the question.  When it was explained to him, he
```

The times in the left margin read: 09:32 at line 10, 09:33 at line 20.

 1    did say that he could put his views aside on both whether

 2    wealthy people can afford better lawyers, although he

 3    acknowledged sometimes that's not all the case.  He also said

 4    he'd be able to follow your instructions.  Given that, we

 5    oppose.

 6         MR. KELLY:  Your Honor, I think I miss the most

 7    important point, he said under oath he thinks the defendant has

 8    to put on evidence.  If the government puts on evidence of

 9    guilt, the defendant has to put on evidence of innocence.

09:33 10    That's obviously not the law.

 11         THE COURT:  I've heard enough.  I'm going to excuse

 12    this juror, contrary to my earlier rulings yesterday, and

 13    sustain the defendants' objection as to Mr. Xanthopoulos, who

 14    will be used.

 15         Good morning, Miss Reyes.  Please be seated.  You're

 16    reminded you are still under oath.  You may remove your mask,

 17    but you don't have to.

 18         Miss Reyes, would serving on this jury for 4 weeks

 19    cause you financial hardship?

09:34 20         (Witness nods head.)

 21         THE COURT:  You're going to have to answer audibly so

 22    the Court reporter can take down your answers.

 23         PROSPECTIVE JUROR:  No.

 24         THE COURT:  With respect to the answers you gave, I

 25    would just ask a general question.  Having answered all of the

**A882**

```
 1  questions on the questionnaire, do you have any doubt that if

 2  you are chosen to be a juror on this case, you could be fair

 3  and impartial.

 4            PROSPECTIVE JUROR:  Sorry.  What was the question?

 5            THE COURT:  Do you have any doubt as to whether you

 6  can be fair and impartial?

 7            PROSPECTIVE JUROR:  No doubt.

 8            THE COURT:  Can you decide this case based solely on

 9  the evidence that comes in a this courtroom and not based upon

10  any other information that you may have about the case?

11            PROSPECTIVE JUROR:  Yes.

12            THE COURT:  Mr. Kelly, any questions?

13            MR. KELLY:  Briefly.  Good morning.  I'm Brian Kelly.

14  I represent Mr. Aziz here.  With respect to this case, there

15  might be some evidence about college sports.  Are you a college

16  sports fan at all?

17            PROSPECTIVE JUROR:  No.

18            MR. KELLY:  That's it.

19            THE COURT:  Mr. Kendall.

20            MR. KENDALL:  Thank you for coming in, but no

21  questions.

22            THE COURT:  Miss Kearney.

23            MS. KEARNEY:  Good morning, miss Reyes.  I see from

24  your questionnaire you previously served on a jury.  Is there

25  anything about that experience that would affect your ability
```

 1   to be fair and impartial in this case?

 2           PROSPECTIVE JUROR:  No.

 3           THE COURT:  Thank you, miss Reyes.  We will reserve

 4   you.  Putting you into reserve is what we call it.  You'll

 5   report to Mr. McAlear here.  You may be called for further

 6   investigation as to whether or not you're going to serve as a

 7   juror in this case.  In the meantime, please do not do any

 8   research on that subject.  Of course, that would be

 9   inappropriate because you're going to decide this case, if you

09:36 10   are chosen to be a juror, solely on the evidence that comes

11   into this courtroom.  Okay?  Thank you.

12           PROSPECTIVE JUROR:  Thank you.

13           THE COURT:  Good morning miss Dorazio.  Please have a

14   seat.  You're reminded that you remain under oath.  You may

15   remove your mask if you want to, but you don't have to.

16           PROSPECTIVE JUROR:  I want to.

17           THE COURT:  Miss Dorazio, you informed us that you are

18   not available after October 13th, which I believe is a

19   Wednesday.

09:37 20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  This trial is probably going to be over by

22   then, but I can't guarantee it.

23           PROSPECTIVE JUROR:  I have a family -- excuse me.  I

24   have a family reunion with my siblings flying in to visit my

25   mother at a nursing home.  She's 90.  She just went in there.

```
 1                I have to add another something to the questionnaire
 2       that I forgot that might be relevant besides that.
 3                THE COURT:  Yes.
 4                PROSPECTIVE JUROR:  A friend of mine was recently
 5       convicted of tax fraud.  I completely forgot about that.  I
 6       just blocked it out completely.  It might have even been a
 7       federal case.
 8                THE COURT:  Would that in any way affect your ability
 9       to be fair and impartial in this case --
09:38 10                PROSPECTIVE JUROR:  No.
11                THE COURT:  Wait a minute.  I have to ask the
12       question.  Would that affect your ability to be fair and
13       impartial in this case where one particular incident involves
14       allegations of tax fraud?
15                PROSPECTIVE JUROR:  No, no.  He broke the law.  He has
16       to pay the price.
17                THE COURT:  That would not impact your being a juror
18       in this case?
19                PROSPECTIVE JUROR:  No.  The only reason I'm
09:38 20       mentioning it is because I wrote a letter of reference for him
21       as a personal reference for the case.  The lawyers asked me to
22       do that.  So it is on record that I supported this individual
23       as a friend of mine, but it will not affect, no.
24                THE COURT:  My question is whether it would affect
25       your ability to be fair and impartial in this case.
```

**A885**

```
 1              PROSPECTIVE JUROR:  No.
 2              THE COURT:  We've got to go back to that October 13th
 3      date.  I can't guarantee this case will be over.
 4              PROSPECTIVE JUROR:  I know.  That's what concerns me.
 5              THE COURT:  If you have an absolute commitment to not
 6      being anywhere else other than at this reunion on the 13, 14
 7      and 15, I'm pretty sure I can guarantee this case is going to
 8      be done by the 15th, but not by the 13th.
 9              PROSPECTIVE JUROR:  People are flying in.
09:39 10        THE COURT:  If you have a commitment that you cannot
11      break, I'm going to excuse you from this jury.
12              PROSPECTIVE JUROR:  Okay.
13              THE COURT:  You're excused.  Thank you.
14              Good morning, miss Bradford.  You may be seated.
15      You're reminded you are still under oath.  You may remove the
16      mask, but you don't have to.
17              Miss Bradford, would serving on this jury for
18      approximately 4 weeks cause you financial hardship.
19              PROSPECTIVE JUROR:  Not financial.  I am a director of
09:40 20  an aquarium where I work so it would be tricky why W-staffing,
21      but it's possible.
22              THE COURT:  Do you have other people that could
23      substitute for you for that length of time?
24              PROSPECTIVE JUROR:  We could make it work if needed.
25              THE COURT:  Fair enough.  With respect to your answers
```

**A886**

1    on the questionnaire, just generally, have gone answered all

2    those questions, do you have any doubt that if you are chosen

3    to be a juror on this case, you could be fair and impartial?

4              PROSPECTIVE JUROR:  I do not have a doubt, no.

5              THE COURT:  Can you decide this case based solely on

6    the evidence that comes into this courtroom and not based upon

7    any other information that you may have about the case?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Mr. Kelly, any questions?

09:41 10              MR. KELLY:  Briefly.  Good morning.  I'm Brian Kelly.

11    I represent Mr. Aziz here.  Thanks for coming in.

12              Just a quick follow-up on some of the questionnaire

13    questions.  This case may involve some discussions of college

14    sports.  Are you a college sports fan at all?

15              PROSPECTIVE JUROR:  No.

16              MR. KELLY:  There's one question indicating that you

17    played in college.

18              PROSPECTIVE JUROR:  My brother did.

19              MR. KELLY:  He played baseball?

09:41 20              PROSPECTIVE JUROR:  He did.

21              MR. KELLY:  Anything about that experience of any

22    significance to you?

23              PROSPECTIVE JUROR:  No, not in particular.

24              MR. KELLY:  Do you follow N-C-A-A-basketball or

25    anything like that?

```
 1          PROSPECTIVE JUROR:  No.

 2          MR. KELLY:  Thanks a lot.

 3          THE COURT:  Mr. Kendall.

 4          MR. KENDALL:  Yes, your Honor.  A couple.  Good

 5   morning.  I'm Mike Kendall.  I represent John Wilson.  I just

 6   have a question about No. 39 in the questionnaire.  It asks if

 7   you've ever heard of any of the press coverage for what's

 8   called the Varsity Blues case, and you said no.  You've never

 9   heard of this case?

10          PROSPECTIVE JUROR:  So I did want to clarify that

11   question.  So I had heard about it I think a couple years ago

12   when it was like the big celebrity thing, but I thought that

13   question was about this specific case, which I have not heard

14   about.  I hadn't heard about the varsity blues buzzword or

15   anything, just the college admissions scandal in general I

16   heard about, but haven't followed closely.

17          MR. KENDALL:  I appreciate you clarifying that.  Did

18   you have any reaction whenever you saw any of the publicity

19   that you did see?

20          PROSPECTIVE JUROR:  Just regarding the fairness of it

21   all.  I went to college myself too, so for people to think that

22   they can maybe get in without a fair way in and just kind of

23   pay their way through wasn't necessarily my favorite thing to

24   hear.

25          MR. KENDALL:  Do you have any strong views on that
```

1    topic?

2            PROSPECTIVE JUROR:  Just -- I don't know.  Not in

3    particular, just that I don't think bribing your way into

4    anything is really fair for the rest of the people who have to

5    kind of work their way in.  That's all I really know about the

6    case.

7            MR. KENDALL:  Thank you.

8            THE COURT:  Miss Kearney.

9            MS. KEARNEY:  Good morning, miss Bradford.  Would you

09:43 10  be able to put aside your views on what you've heard about the

11   Varsity Blues case previously and just judge this case on the

12   evidence presented at the trial?

13           PROSPECTIVE JUROR:  Yes.

14           MS. KEARNEY:  Would you be able to follow the judge's

15   instruction on the law?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Thank you, miss Bradford.  I'm going to

18   put you in reserve, which means you will be held for perhaps

19   further involvement in this case.  In the meantime, of course,

09:44 20  please do not do any independent research or go online.  It

21   would be totally inappropriate.  You understand that, right?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Thank you, miss Bradford.

24           Good morning, Mr. Pitts.  You may be seated.  You may

25   remove your mask if you want to, but you don't have to.

```
 1              Mr. Pitts, would serving on this jury for 4 weeks
 2      cause you financial hardship?
 3              PROSPECTIVE JUROR:  No.
 4              THE COURT:  Just generally having answered all of the
 5      questions on the questionnaire, do you have any doubt if you
 6      were chosen to sit as a juror in this case you could be fair
 7      and impartial?
 8              PROSPECTIVE JUROR:  Do I have any doubt?  No.
 9              THE COURT:  Can you decide this case based solely on
09:45 10    the evidence that comes into this courtroom and not based upon
11      any information you have from elsewhere?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  Mr. Kelly, any questions?
14              MR. KELLY:  Just briefly.  Good morning.  Thanks for
15      coming in.  My name is Brian Kelly.  I represent Mr. Aziz.
16      This case may involve some discussion about college sports.
17      Are you a college sports fan at all?
18              PROSPECTIVE JUROR:  No.
19              MR. KELLY:  Only question.  Thanks.
09:45 20        THE COURT:  Mr. Kendall.
21              MR. KENDALL:  Yes.  Thank you, your Honor.
22              Good morning.  My name's Mike Kendall.  I represent
23      John Wilson.  I just had a couple of simple questions.
24              On question 9, you described your employment.  I think
25      it's a development office engineer.  Can you tell us what you
```

**A890**

```
 1    do?

 2            PROSPECTIVE JUROR:  Yes.  So there's an online

 3    advertising website.  So I do dem-ups for them, which means I

 4    basically take care of maintaining the infrastructure and

 5    developer tools to help the developers work on features for

 6    that website.

 7            MR. KENDALL:  In question 39, you were asked if you

 8    ever heard of the case the Varsity Blues college admissions

 9    case and any of the media or anything else.  You said no.

09:46 10    You've never heard of it?

11            PROSPECTIVE JUROR:  I have not.

12            MR. KENDALL:  The last question I wanted to ask you,

13    which was 45, you said you could abide by the rules of not

14    looking at any news corage or media stuff about this, but you

15    prefer to not be barred from Facebook.

16            PROSPECTIVE JUROR:  Yeah.  I'd like to correct that.

17    Apparently, someone mentioned -- I heard it might be a high

18    profile case.  I didn't understand it at the time.  It makes

19    sense to not go on Facebook for this.

09:47 20            MR. KENDALL:  Your mom and dad are lawyers?

21            PROSPECTIVE JUROR:  Yes.

22            MR. KENDALL:  What type of law practice do they have?

23            PROSPECTIVE JUROR:  My dad does bankruptcy and I think

24    divorce law, and my mom is a, I don't know exactly what, but

25    she works at a mental health advocate's office but she's a
```

**A891**

  1   lawyer for them.

  2         MR. KENDALL:  I take it their work and growing up with

  3   them as lawyers, that will have no impact on you in this case?

  4   Is that fair to say?

  5         PROSPECTIVE JUROR:  Yeah.

  6         MR. KENDALL:  Thank you very much.

  7         THE COURT:  Miss Kearney.

  8         MS. KEARNEY:  Good morning, Mr. Pitts.  I wanted to

  9   follow-up on one of your questions.  You said you didn't know

09:48 10   if you had a relative, close friend or anyone who worked for a

 11   criminal defense attorney or public defender.  I wanted to just

 12   clarify.  Is there someone that you think might but you're not

 13   sure?

 14         PROSPECTIVE JUROR:  I don't actually know exactly -- I

 15   should know what my mom does.  I'm fairly certain she does not,

 16   but I actually don't know.

 17         MS. KEARNEY:  Thank you.

 18         THE COURT:  Thank you, Mr. Pitts.  I'm going to put

 19   you in reserve, which means that you may be subject to further

09:48 20   involvement in this case.  In the meantime, do not try to do

 21   any independent research.  That would be inappropriate, as I'm

 22   sure you understand.

 23         PROSPECTIVE JUROR:  Okay.

 24         THE COURT:  Thank you, Mr. Pitts.

 25         Good morning, miss Seger.  You may be seated.  You're

1  reminded you're still under oath.  You may remove the mask if

2  you want to, but you don't have to.

3       Miss Seger, would serving on this jury for 4 weeks or

4  so cause you financial hardship?

5       PROSPECTIVE JUROR:  No.

6       THE COURT:  With respect to the answers that you gave

7  to the questions on the questionnaire, do you have any doubt

8  that if you were chosen to sit as a juror on this case you

9  could be fair and impartial?

09:50 10      PROSPECTIVE JUROR:  I don't have any concerns.

11      THE COURT:  You have no doubt?

12      PROSPECTIVE JUROR:  None.

13      THE COURT:  Can you decide this case based solely on

14 the evidence that comes into this courtroom and not based upon

15 any information you have from other sources?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  Thank you.  Mr. Kelly, any questions?

18      MR. KELLY:  Yes.  Just briefly.  Good morning.  Brian

19 Kelly.  I represent Mr. Aziz.  Thank you for coming in.

09:50 20      Just to follow-up on a couple questions here, there's

21 an answer you had about the media reports.  You've seen some

22 media reports in this matter.

23      PROSPECTIVE JUROR:  I remember the two celebrities

24 that had similar cases.  I know about the college admissions

25 scandal.  I remember Lori something and the other celebrity,

```
 1   but it was just in the news.
 2           MR. KELLY:  Did your review of that news cause you to
 3   get any opinions about this matter?
 4           PROSPECTIVE JUROR:  I thought what they did was wrong.
 5           MR. KELLY:  Could you put that out of your mind and
 6   treat this as a separate case, separate matter?
 7           PROSPECTIVE JUROR:  Sure.
 8           MR. KELLY:  Nothing you've seen in the media to date
 9   would make you be unfair to the defense at all?
10           PROSPECTIVE JUROR:  No.  I don't remember hearing
11   about them.
12           MR. KELLY:  How about sports?  A lot of this case will
13   be about college sports.  Are you a college sports fan at all?
14           PROSPECTIVE JUROR:  UConn basketball.
15           MR. KELLY:  Men's, women's?  The women's is the famous
16   program.
17           PROSPECTIVE JUROR:  Both.
18           MR. KELLY:  Anything about that that you think would
19   affect your approach to this case?
20           PROSPECTIVE JUROR:  No.
21           MR. KELLY:  Did you play basketball growing up?
22           PROSPECTIVE JUROR:  No.
23           MR. KELLY:  Thank you.
24           THE COURT:  Mr. Kendall.
25           MR. KENDALL:  Thank you, your Honor.
```

```
 1              MR. KELLY:  Oh, I have one.

 2              THE COURT:  Go ahead, Mr. Kelly.

 3              MR. KELLY:  There's another answer you had about your

 4      daughter-in-law works at the courthouse.

 5              PROSPECTIVE JUROR:  She's a clerkship with a judge.  I

 6      forget his name.  He's here.

 7              MR. KELLY:  It's not Judge Gorton.

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  Mr. Kendall.

09:52 10         MR. KENDALL:  Yes.  Good morning.  My name's Mike

11      Kendall.  I represent John Wilson.  I wanted to follow-up on a

12      couple of things Mr. Kelly asked.  Your daughter-in-law is a

13      clerk for one of the judges in the courthouse.

14              PROSPECTIVE JUROR:  Yes.

15              MR. KENDALL:  You don't remember the judge's name?

16              PROSPECTIVE JUROR:  I don't.  Sorry.

17              MR. KENDALL:  Could you tell us your daughter-in-law's

18      name.

19              PROSPECTIVE JUROR:  Gal, G-A-L, Seger Binenbaum.

09:52 20         MR. KENDALL:  Do you know anything about the

21      particular judge she works with?  Is it a district court judge,

22      bankruptcy judge, appellate judge?  Do you have any idea what

23      type of judge it is?

24              PROSPECTIVE JUROR:  I don't.

25              MR. KENDALL:  Other than a good judge.
```

```
 1              PROSPECTIVE JUROR:  I'm sure he is.
 2              MR. KENDALL:  The second thing is you mentioned you
 3     had seen some of the news coverage.  To be honest, I couldn't
 4     hear all of the answer.  If I repeat, I apologize.  When you
 5     saw the early coverage about the celebrities, did you have any
 6     reaction to it, just your thoughts or your views of, gee, this
 7     is A, or B or C.
 8              PROSPECTIVE JUROR:  It was wrong what they did.
 9              MR. KENDALL:  Why did you think it was wrong?
09:53 10         PROSPECTIVE JUROR:  They paid money to get their kids
11     into a school.
12              MR. KENDALL:  You think that was wrong?
13              PROSPECTIVE JUROR:  From the reports it sounded like
14     they did things.  There was a rowing.  I don't even remember
15     the name of the person getting on to a rowing team or
16     something.  They paid to get their kids in.
17              MR. KENDALL:  What is it that you think that's wrong
18     about that or what's wrong about what you read?
19              THE COURT:  I don't think -- that's asking her to give
09:54 20    a legal conclusion.  She doesn't have to answer that.
21              MR. KENDALL:  Thank you, your Honor.  Thank you very
22     much.
23              THE COURT:  Miss Kearney.
24              MS. KEARNEY:  Good morning, miss Seger.  Your son is
25     also a lawyer.  What kind of law does he practice?
```

**A896**

1          PROSPECTIVE JUROR:  Corporate.

2          MS. KEARNEY:  I also saw on your questionnaire that

3   you previously served on a jury.  Was there anything about that

4   experience that might affect your ability to be fair and

5   impartial in this case?

6          PROSPECTIVE JUROR:  No.

7          MS. KEARNEY:  Your sister, you wrote, was a victim of

8   a crime.

9          PROSPECTIVE JUROR:  Her house was broken into years

09:54 10   and years ago.

11          MS. KEARNEY:  Do you feel she was treated fairly in

12   connection with the criminal justice system in that instance?

13          PROSPECTIVE JUROR:  Yes.

14          MS. KEARNEY:  Anything about that experience that

15   might affect your ability to be fair and impartial?

16          PROSPECTIVE JUROR:  No.

17          MS. KEARNEY:  Do you understand that the judge is

18   going to instruct you on what the law is and are you going to

19   be able to follow the judge's instructions?

09:55 20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Thank you, miss Seger.  I'm going to hold

22   you in reserve, which means that you may have further

23   involvement in this case.  You will go -- I'm sorry, Mr. Kelly.

24          MR. KELLY:  Apologies.

25          THE COURT:  Go ahead.

**A897**

```
 1            MR. KELLY:  One last question.  Does your son work at
 2    mechanic carter and English?
 3            PROSPECTIVE JUROR:  Yes.
 4            THE COURT:  As I was saying, I'm going to have you in
 5    the reserve pool, which means that you may have further
 6    involvement, but please do not try to do any independent
 7    research on this case.  You understand why that would be
 8    inappropriate, right?
 9            PROSPECTIVE JUROR:  Yes.
09:55 10        THE COURT:  Thank you.
11            MR. KELLY:  Your Honor?
12            THE COURT:  Yes.
13            MR. KELLY:  I think the only issue that I could
14    suggest she'd be excused for cause for her is mechanic carter
15    and English represent a witness in the case.  I think they just
16    recently filed a motion to quash on some subpoena matter.  Her
17    son works at the firm.  That firm is local counsel on a
18    witness.  They just filed a motion, apparently.  Haven't even
19    read the motion.  Her son works for the firm.  I think that's
09:56 20    probably a problem.
21            THE COURT:  Miss Kearney.
22            MS. KEARNEY:  Her son works for the corporate
23    practice.  Mechanic carter English is local counsel.  It's
24    former AUSA Glenn mechanic kinly who only joined the office a
25    week ago.  I doubt they know each other or would come across
```

1  each other.

2      MR. KELLY:  I'm suggesting they know each other.  I'm

3  just suggesting her son works for mechanic carter English and

4  they represent a witness in this case.  I think that's grounds

5  to move for cause.

6      MR. KENDALL:  Your Honor, I have a separate issue.

7  Her daughter-in-law clerks for one of the judges in this

8  courthouse.  This case has been broken up and spread out

9  through multiple judges in this court.  I was trying to get

09:57 10  some data just so we can figure out is she works for another

11  chambers that has got one of the defendants or one of the cases

12  here.  That would cause me concern if she was clerking -- she's

13  obviously not clerking for Judge Talwani because she said it

14  was a male judge, but Judge Woodlock.

15      MR. KENDALL:  Did you get the last name of the clerk?

16      MR. KENDALL:  She said it.  I hope he have it in the

17  transcript.  If not, maybe Mr. Sharp here heard better than I

18  did.

19      MR. SHARP:  It was Gal, G-A-L, Seger, S-E-G-E-R,

09:57 20  B-I-N-E-N-B-A-U-M.

21      THE COURT:  Could you spell that again.

22      MR. SHARP:  B-I-N-E-N-B-A-U-M.  Your Honor, throughout

23  the proceedings I'm going to keep my mask on.  I have a newborn

24  daughter.

25      THE COURT:  That's fine.  Binenbaum, can we check

```
 1   that?

 2          The clerk:  I'll ask HR.

 3          THE COURT:  Does the government have a position on

 4   this?

 5          MS. KEARNEY:  Your Honor, she indicated that it was a

 6   he.  We know it's not Judge Talwani who has one of the other

 7   trials in this case.  The fact she didn't even know the judge's

 8   name, it doesn't sound like she's discussing things with her

 9   daughter-in-law.

09:58 10          THE COURT:  I think this is a close call, but not an

11   absolute necessary to excuse her because her daughter-in-law --

12          MS. KEARNEY:  Her daughter-in-law is clerking and her

13   son is at mechanic carter English opt corporate side.

14          THE COURT:  I don't think it's necessary to excuse her

15   for that reason.  If we can find out what judge it is that she

16   is clerking for, it may change.  For now, I'm not going to

17   excuse her for cause.  If there's more information gained in

18   the next few hours, I will listen to any renewed motion in that

19   regard.

09:59 20          Let's go on with the next one.

21          Good morning, Miss DaSilva.  Is that how you pronounce

22   your name?

23          PROSPECTIVE JUROR:  Correct.

24          THE COURT:  You may be seated.  You are reminded that

25   you remain under oath.  You may remove your mask if you want
```

1  to, but you don't have to.

2        Miss DaSilva, would serving on this jury for about a

3  4-week period cause you financial hardship?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  You answered one question that had to do

6  with the requirement that the government prove guilt beyond a

7  reasonable doubt by saying that "the defendant is there for a

8  reason."  What do you mean by that?

9        PROSPECTIVE JUROR:  I mean obviously somebody found

10:00 10  something for him or her to be in the situation they're in.  I

11  believe everybody should have to prove if they are innocent.

12        THE COURT:  Do you understand that that's contrary to

13  the law?  The law requires the government to prove its case

14  against anyone it charges with a crime beyond a reasonable

15  doubt and the defendant has no obligation to prove anything.

16  In fact, the defendant can remain entirely silent and not

17  testify and that is the law.  He has a right.  He or she has a

18  right to do that.  So if I were to instruct you about the law,

19  could you follow that instruction notwithstanding your opinion?

10:00 20        PROSPECTIVE JUROR:  Sure.

21        THE COURT:  With respect generally it all of the

22  questions on the questionnaire, do you have any doubt at all

23  that if you were chosen to sit as a juror on this case you

24  could be fair and impartial?

25        PROSPECTIVE JUROR:  Yes.

**A901**

1          THE COURT:  Do you have doubt?  Yes, you do have doubt

2     or you don't have any doubt?

3          PROSPECTIVE JUROR:  I don't have any doubt.

4          THE COURT:  Can you decide this case solely based on

5     the evidence that comes into this courtroom and not based on

6     anything else you may have heard about the case?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Mr. Kelly, any questions for this witness?

9          MR. KELLY:  Yes, your Honor.  Good morning.  Brian

10:01 10   Kelly.  I represent Mr. Aziz.

11          I want to follow-up on a couple questions here.

12     You're 40 years old?

13          PROSPECTIVE JUROR:  Yes.

14          MR. KELLY:  You filled this out.  You did it honestly?

15          PROSPECTIVE JUROR:  Yes.  Honestly.

16          MR. KELLY:  Best of your ability?

17          PROSPECTIVE JUROR:  Yes.

18          MR. KELLY:  Your view was, in fact, that the defendant

19     is there for a reason.

10:01 20          PROSPECTIVE JUROR:  Yes.

21          MR. KELLY:  And the reason would be he's probably

22     guilty?  That's why he's there?

23          PROSPECTIVE JUROR:  No.  I'm not saying he's guilty.

24     I'm just saying obviously there was some kind of investigation

25     or something as to why he would be in the position he's in.

**A902**

1       MR. KELLY:  Innocent people aren't just plucked off

2  the street?  Is that your thought?

3       PROSPECTIVE JUROR:  No.  There's innocent people that

4  get in trouble all the time.  That's why I said that they

5  should defend themselves, but then the judge explained it

6  shouldn't be that way.  I get that.

7       MR. KELLY:  You think they should defend themselves if

8  there's evidence against them?

9       PROSPECTIVE JUROR:  Prior to when the judge explained

10:02 10  to me, yes, I thought that.

11       MR. KELLY:  Just now when the judge gave you that

12  instruction, that took away your viewpoint?

13       PROSPECTIVE JUROR:  Correct.

14       MR. KELLY:  That you developed over 40 years.

15       PROSPECTIVE JUROR:  Correct.

16       MR. KELLY:  You saw some media coverage in this.

17  Netflix?

18       PROSPECTIVE JUROR:  I didn't see it.  I heard that

19  it's there, but yes.

10:03 20       MR. KELLY:  You didn't watch it?

21       PROSPECTIVE JUROR:  I didn't watch it.

22       MR. KELLY:  How much media coverage, if any, have you

23  seen of this matter?

24       PROSPECTIVE JUROR:  The only thing I really know about

25  it is Netflix or something is suing Netflix or something like

1    that.  That's all I really know about it.  And then prior to

2    this I know of that full house lady or whatever it is.  That's

3    all I really know.

4              MR. KELLY:  No other media coverage comes to your

5    mind?

6              PROSPECTIVE JUROR:  Nothing.

7              MR. KELLY:  Nothing about Mr. Abdelaziz in this case?

8              PROSPECTIVE JUROR:  Didn't even know who he was.

9              MR. KELLY:  How about college sports?  You college

10:03 10   sports fan at all?

11             PROSPECTIVE JUROR:  No.

12             MR. KELLY:  Sports fan in general?

13             PROSPECTIVE JUROR:  I like football, N-F- L.

14             MR. KELLY:  But other than that, no college sports?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Mr. Kendall.

17             MR. KENDALL:  Thank you.  Good morning.  My name's

18   Mike Kendall.  I represent John Wilson.

19             PROSPECTIVE JUROR:  Good morning.

10:03 20        MR. KENDALL:  I just wanted to focus on this issue of

21   the Netflix in the media coverage.  Netflix was the only thing

22   you wrote down by name in your questionnaire.

23             PROSPECTIVE JUROR:  Yes.

24             MR. KENDALL:  What was it about Netflix that was so

25   memorable to you?

         1              PROSPECTIVE JUROR:  I have a Netflix account.  When I

         2    saw some kind of scrolling through social media, I saw

         3    something about either Netflix is getting sued or somebody is

         4    suing Netflix, something like that, about that.  That's all I

         5    saw.

         6              MR. KENDALL:  What did you read about that lawsuit?

         7              PROSPECTIVE JUROR:  Not much, just like the head line.

         8              MR. KENDALL:  What did you think about it when you saw

         9    it?

10:04   10              PROSPECTIVE JUROR:  Nothing.

        11              MR. KENDALL:  You haven't seen any part of the Netflix

        12    documentary itself?

        13              PROSPECTIVE JUROR:  Nothing.

        14              MR. KENDALL:  Have you seen the general media coverage

        15    about this case?

        16              PROSPECTIVE JUROR:  No.  I'm not really -- I don't

        17    watch the news.  My news, I get it through social media,

        18    whatever I scroll.

        19              MR. KENDALL:  Did you see anything about some of the

10:05   20    other people, cell rememberities or well known people when

        21    might have been part of this case?

        22              PROSPECTIVE JUROR:  I don't know if it's the same.

        23    Like I said, that full house lady or whatever.

        24              MR. KENDALL:  Did you have any thoughts about that?

        25              PROSPECTIVE JUROR:  No.

1          MR. KENDALL:  Thank you very much.  Appreciate your

2     candor.

3          THE COURT:  Miss Kearney?

4          MS. KEARNEY:  Good morning, Miss DaSilva.  I have no

5     questions.

6          THE COURT:  Miss DaSilva, I'm going to hold you in

7     reserve.  That means that you may be called back at a later

8     time.  In the meanwhile, please do not do any independent

9     research on this case.  That would be entirely inappropriate.

10:05 10     I'm sure you understand why.  Thank you.

11          THE COURT:  With respect to the prior -- are you

12     rising on this?

13          MR. KENDALL:  Yes.  For this person.

14          MR. KENDALL:  If the Court wanted to say something, I

15     didn't mean to pop up too quickly.

16          THE COURT:  I was going to go back to the prior one

17     for information we have with respect to miss seeing's

18     daughter-in-law.  Apparently, she is an intern for Judge Young.

19     He describes his interns as volunteer law clerks, but she is,

10:06 20     in fact, not a paid law clerk, but rather a 3-month intern.

21          MR. KENDALL:  I don't know if Judge Young is involved

22     in this.

23          MS. KEARNEY:  He does not have any of the related

24     cases.

25          MR. KELLY:  From defendant Aziz's perspective, that is

**A906**

1  not a ground for cause.

2  　　　THE COURT:  So miss Seger is still in the reserve

3  pool.

4  　　　Did somebody rise with respect to Miss DaSilva?

5  　　　MR. KELLY:  I did.

6  　　　THE COURT:  Yes, Mr. Kelly.

7  　　　MR. KELLY:  I think she's quite candid in her response

8  on 23, which goes answer bedrock principal, in the justice

9  system.  The Court instructed her quite firmly.  I submit not

10:07 10  many people are going to deny a general judge when it's said to

11  them like this.  She came to this courthouse with 40 years of

12  experience.  This is her viewpoint.  The defendant is there for

13  a reason.  When someone says that, they mean the defendants'

14  there because he's probably guilty.  That's a valid viewpoint

15  some people may have, but it's not part of the criminal justice

16  process.  I think she would be biased against my client.  On

17  that basis, I move to strike her for cause, your Honor.

18  　　　THE COURT:  Mr. Kendall.

19  　　　MR. KENDALL:  Your Honor, in addition to what

10:07 20  Mr. Kelly said, I'm particularly concerned about her reference

21  to the Netflix documentary lawsuit.  We've had a few people

22  come in who have seen the documentary and have had full

23  discussion of their issues.  She's the first person that shows

24  John Wilson is suing Netflix based on the documentary.  I think

25  she's got too much information in the courtroom: To be honest,

**A907**

1    I don't know if I view her as a candid witness.  I think she
2    was trying to retreat from some of her answers because I think
3    she may be a person who wants to get on the jury.  The fact
4    that she has more knowledge about the Netflix issue than
5    anybody else we've had come through this juror pool causes me
6    concern.  That Netflix lawsuit is going to keep on going.  It's
7    been in the newspapers.  It's been reported.  It will probably
8    continue to be.  I'd ask the Court.  Everyone's been here
9    through this.  If I had a question that I was concerned about
10:09 10    the answer, I still had great respect for the integrity of the
11    person and their answers and their forthrightness.  This person
12    I'm a little bit concerned about, unlike any of the others.

13            THE COURT:  Miss Kearney.

14            MS. KEARNEY:  Your Honor, starting with the Netflix
15    concern, unlike some of the other jurors who are in our pool,
16    she hasn't even seen the Netflix documentary.  She saw a head
17    line but didn't know who was suing or being sued.  She doesn't
18    really have any information on the Netflix documentary.

19            Regarding her views on the burdens of proof, as soon
10:09 20    as you explained it to her, she did not hesitate to say she'd
21    be able to follow the Court's instructions.  She also
22    acknowledged that innocent people get in trouble all the time
23    and that she just did not understand what the law was prior to
24    coming in, but she would not hesitate to follow your
25    instructions.

1       Regarding her forthrightness, she was extremely candid

2   and acknowledged that she had a different opinion but would be

3   able to follow your instructions.

4       THE COURT:  I am not going to excuse her for the

5   Netflix comment.  As I've said before, that is not an automatic

6   out because somebody has heard about the Netflix lawsuit, but I

7   am going to sustain the objection of attorney Kelly because,

8   notwithstanding the fact that she did acknowledge that she

9   would follow my instructions, I think that her opinion was a

10:10 10  little bit too ingrained and, therefore, I'm going to sustain

11  the objection of the defendant Aziz.  So Miss DaSilva is

12  stricken.

13      Call the next one.  Good morning, miss Wilson.

14      PROSPECTIVE JUROR:  Good morning.

15      THE COURT:  Please be seated.  You're reminded you

16  remain under oath.  You may remove your mask if you want to,

17  but you don't have to.

18      Miss Wilson, the first question is are you related to

19  the defendant Wilson in this case?

10:11 20  PROSPECTIVE JUROR:  No, I am not.

21      THE COURT:  Have you ever heard of him before?

22      PROSPECTIVE JUROR:  No, at least I don't think so.

23  I've never heard of him, no.

24      THE COURT:  The general question I guess for you is,

25  having answered all of the questions in the questionnaire

1    yesterday, and that was -- maybe it was the day before

2    yesterday, that was a very extensive questionnaire.  Do you

3    have any doubt that if you're chosen to sit as a juror on this

4    case you could be fair and impartial?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  In other words, do you have doubt or do

7    you have no doubt?

8              PROSPECTIVE JUROR:  I think -- no.  I don't think I

9    have any doubt.  I have a lot of opinions but I don't have any

10:12 10   doubts.

11             THE COURT:  You could be fair and impartial in this

12   case?  Is that the bottom line?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Can you decide this case solely based upon

15   the evidence that comes in a this courtroom and not based upon

16   any other information that you have about the case?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Your daughter is a college athlete and it

19   bothers you that people are able to circumvent hard work and

10:12 20   take away a spot on the team.  Would that overcome your ability

21   to be fair and impartial in this case or could you put that

22   opinion aside and decide this case based upon the evidence

23   against these defendants and not your general concept that

24   bribing people into college to let their child in is somehow,

25   is wrong?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Could you do that?

 3              PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  Mr. Kelly, any questions?

 5              MR. KELLY:  Sure.  Just briefly.  Good morning.

 6     Thanks for coming in.  I represent Mr. Aziz over here.

 7              To follow-up quickly on a couple questions from the

 8     judge, your daughter is a basketball player?

 9              PROSPECTIVE JUROR:  Yes.  That's correct.

10              MR. KELLY:  Anything about that process give you any

11     strong views?  You said you had a lot of opinions.

12              PROSPECTIVE JUROR:  Sure.  I have feelings.

13              MR. KELLY:  What would those feelings or opinions be

14     about this case?

15              PROSPECTIVE JUROR:  My thought -- my feeling is

16     that -- I know based on experience how hard she worked getting

17     herself there, even just number of years and hours that she put

18     into that, and also the hours that she spent dedicated to her

19     academics.  I think the conjunction of those two -- what am I

20     trying to say?  I just know all the hard work this she put into

21     it and the time, all the tournaments, all the coaching that

22     she's gone to or has had in the past and will continue to have.

23     I know how much time and effort she's put into it.

24              MR. KELLY:  Obviously she did a great job to get where

25     she's at.  Given your observations of her and the hard work she
```

**A911**

```
 1   did, does that cause you to resent people who are accused of

 2   taking a shortcut?

 3           PROSPECTIVE JUROR:  It wouldn't make me very happy if

 4   I knew that, sure.

 5           MR. KELLY:  If that was the allegation, would you have

 6   a hard time being fair in the case?

 7           PROSPECTIVE JUROR:  I'd like to hear all the evidence.

 8   Oh, no.  Yeah.  I would not have a hard time being fair after

 9   hearing all the evidence, sure.

10           MR. KELLY:  So you'd keep an open mind that she's are

11   just allegations?

12           PROSPECTIVE JUROR:  Yes.

13           MR. KELLY:  On the defense and the defense is presumed

14   innocent.  You'd be okay with that?

15           PROSPECTIVE JUROR:  Yes.

16           MR. KELLY:  I guess you are a college sports fan

17   because your daughter is there.  Do you follow any sports in

18   particular?

19           PROSPECTIVE JUROR:  Well, I have to sit there all the

20   time with my husband watching sports these days because we're

21   the only two in the house.  Always basketball, football.  Those

22   are the two, baseball as well.  I'm not a fanatic about it.

23           MR. KELLY:  Lastly, on media coverage of this matter,

24   have you seen much media coverage about this?

25           PROSPECTIVE JUROR:  I know it's out there.  I know
```

10:15 on line 10
10:15 on line 20

 1 | it's happening.  I haven't really followed very much of it.
 2 |         MR. KELLY:  The little bit that you saw, would it
 3 | affect your opinion as to this particular case?
 4 |         PROSPECTIVE JUROR:  No.
 5 |         MR. KELLY:  Thanks a lot.
 6 |         THE COURT:  Mr. Kendall.
 7 |         MR. KENDALL:  Yes.  Thank you, your Honor.
 8 |         Good morning.
 9 |         PROSPECTIVE JUROR:  Good morning.
10:16 10 |         MR. KENDALL:  I'm Mike Kendall.  I represent John
11 | Wilson.  Thank you for coming in.  I just wanted to follow-up
12 | again on the same issue that's Mr. Kelly and the judge had
13 | raised.
14 |         I appreciate your thoughts that you can be fair and
15 | you can be respectful of the judge's instructions.  I'm just
16 | curious, on the first day of the trial, what would you be
17 | thinking about the defendants?
18 |         PROSPECTIVE JUROR:  I don't know.  I think I would
19 | just wait to hear how this is being presented.
10:17 20 |         MR. KENDALL:  I've got no further questions.
21 |         THE COURT:  Miss Kearney.
22 |         MS. KEARNEY:  Good morning, miss Wilson.  You
23 | indicated in your questionnaire that you previously served on a
24 | jury.  Is there anything about that experience that would
25 | affect your ability to be fair and impartial in this case?

```
 1              PROSPECTIVE JUROR:  No.

 2              MS. KEARNEY:  It looks like you may have had

 3    involvement in the criminal justice system or know someone who

 4    was involved.  Do you think whoever that was was treated

 5    fairly?

 6              PROSPECTIVE JUROR:  By whom?

 7              MS. KEARNEY:  By the criminal justice system

 8    generally.

 9              PROSPECTIVE JUROR:  Oh, sure.  Yeah.

10:18 10         MS. KEARNEY:  Is there anything about that experience

11    that would affect your ability to be fair and impartial?

12              PROSPECTIVE JUROR:  No.

13              MS. KEARNEY:  To follow-up on some of the questions

14    that Mr. Kelly and Mr. Kendall asked you, would you have any

15    problem putting your opinions aside and listening to the

16    evidence as it comes in during the trial?

17              PROSPECTIVE JUROR:  I don't think so.

18              MS. KEARNEY:  Thank you.

19              THE COURT:  Thank you, miss Wilson.  You will be held

10:18 20   in reserve, which means you may be subject to call back.  In

21    the meantime, please don't do any independent research on the

22    case.  You understand that would be entirely inappropriate,

23    right?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Thank you, miss Wilson.
```

**A914**

```
 1            Good morning, Mr. Stanton.

 2            PROSPECTIVE JUROR:  Good morning.

 3            THE COURT:  Please be seated.  You're reminded that

 4     you remain under oath.  You may remove the mask if you want to,

 5     but you don't have to.

 6            Mr. Stanon, would serving on a jury for 4 weeks, which

 7     is about what this case would take, cause you any financial

 8     hardship?

 9            PROSPECTIVE JUROR:  Well, sure, because Uber is about

10:19 10    30 to $35 each way.

11            THE COURT:  You're gainfully employed?

12            PROSPECTIVE JUROR:  Yes.

13            THE COURT:  What would you do if you couldn't go to

14     your job for 4 weeks?

15            PROSPECTIVE JUROR:  Call out sick I guess.

16            THE COURT:  I'm concerned that it may cause you

17     financial hardship.  I don't want to cause you financial

18     hardship if serving on this jury would.  I just don't know.

19     Would it?

10:20 20            PROSPECTIVE JUROR:  Yes.

21            THE COURT:  It would.  I don't think we want to cause

22     you financial hardship.  I will excuse you from this jury.

23     That doesn't excuse you from all jury duty.  I hope that you

24     will be willing to serve on another jury because it's a very

25     important civic obligation that all of us have, but I think
```

**A915**

```
 1    having to serve for 4 weeks and go without a salary is too much

 2    to ask.  I'm going to excuse you.

 3            PROSPECTIVE JUROR:  Appreciate it.

 4            THE COURT:  Thank you.

 5            MR. KENDALL:  Your Honor, may I ask one or two

 6    questions?

 7            PROSPECTIVE JUROR:  Yes.

 8            MR. KENDALL:  I noticed you worked at F- W-web in the

 9    warehouse.  Is that a big company?

10    10         PROSPECTIVE JUROR:  Yes.

11            MR. KENDALL:  Like likely to cover your salary while

12    you're on jury duty.

13            PROSPECTIVE JUROR:  I'm still within the 90-day

14    period.

15            MR. KENDALL:  You just started there?

16            PROSPECTIVE JUROR:  Yes.

17            MR. KENDALL:  They won't cover it for the 90 days?

18            PROSPECTIVE JUROR:  I don't think so.

19            MR. KENDALL:  You could check.

20    20         PROSPECTIVE JUROR:  Yes.

21            MR. KENDALL:  You started February 1st.

22            PROSPECTIVE JUROR:  Through a temp agency.

23            MR. KENDALL:  Then they took you on full-time?

24            PROSPECTIVE JUROR:  About a month ago.

25            THE COURT:  You're excused, Mr. Stanton.  Thank you.
```

**A916**

```
 1              Good morning, Mr. Bobek.  Bobek?
 2              PROSPECTIVE JUROR:  Bobek.
 3              THE COURT:  Good morning.  You may be seated.  You may
 4    remove your mask if you want to, but you don't have to.  You
 5    are reminded you're under oath.
 6              Mr. Bobek, would serving on this jury for 4 weeks
 7    cause you a financial hardship?
 8              PROSPECTIVE JUROR:  I don't think so.  I'm salary.
 9    I'd have to check.
10:22 10          THE COURT:  So that's not a problem?
11              PROSPECTIVE JUROR:  No.
12              THE COURT:  With respect to all of the questions you
13    were asked on that questionnaire, which was a very extensive
14    questionnaire, do you have any doubt at all that if you're
15    selected to be a juror on this case that you would be able to
16    be fair and impartial?
17              PROSPECTIVE JUROR:  No doubt.
18              THE COURT:  Can you decide this case based solely on
19    the evidence that comes into this courtroom and not based on
10:23 20    any information you may have from outside sources?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  Mr. Kelly, any questions?
23              MR. KELLY:  Good morning.  Thanks for coming in.  My
24    name's Brian Kelly.  I represent Mr. Aziz.
25              How about in terms of media coverage?  Have you seen
```

```
 1   any media coverage of this matter?

 2            PROSPECTIVE JUROR:  I've heard of this but a year or

 3   more ago.  I think I might have marked that I saw media

 4   coverage, but I can't really remember anything about it, names

 5   or people.

 6            MR. KELLY:  Nothing about what you did see over a year

 7   ago would affect your approach to this case?

 8            PROSPECTIVE JUROR:  No.

 9            MR. KELLY:  How about college sports?  There will be a

10   lot of discussion about college sports in this case.  Are you a

11   college sports fan?

12            PROSPECTIVE JUROR:  Not really, no.

13            MR. KELLY:  That's it.

14            THE COURT:  Mr. Kendall.

15            MR. KENDALL:  No questions, your Honor.

16            THE COURT:  Miss concern?

17            MS. KEARNEY:  Good morning.  I saw on your

18   questionnaire that you or someone you know was a victim to a

19   crime and a witness to a crime.  Did you feel that whoever was

20   involved was treated fairly by the criminal justice system?

21            PROSPECTIVE JUROR:  Yeah.  I honestly answered that

22   because it's the only thing that really came to mind.  It was a

23   minor incident, a break in at my sister's.  I don't know if

24   they ever caught who did it.  That was the best I could answer

25   that question.
```

**A918**

```
 1              MS. KEARNEY:  Is there anything about that experience
 2      that would affect your ability to be fair and impartial in this
 3      case?
 4              PROSPECTIVE JUROR:  No.
 5              THE COURT:  Thank you, Mr. Bobek.  I'm going to hold
 6      you in reserve, which means you may be called back for further
 7      involvement in the case.  In the meantime, please do not do any
 8      independent research or go on the internet to look up about
 9      this case.  That would be entirely inappropriate about this
10      case.  Thank you.
11              MR. SHEKETOFF:  Your Honor, my youngest daughter works
12      at the same company as he does.
13              THE COURT:  The same company as Mr. Bobek?
14              MR. SHEKETOFF:  Yes.  It's a company called Buildium.
15      It's not a giant company.  It's not tiny.  It's a unique last
16      name.
17              THE COURT:  Do you want me to call him back and ask
18      him if he knows -- is it your daughter?
19              MR. SHEKETOFF:  Yes.
20              THE COURT:  Does counsel have a position in that?
21              MS. KEARNEY:  Your Honor, I'm not opposed to calling
22      him back to see if he shows Mr. Sheketoff's daughter.  I know,
23      according to Google, Buildium has over 300 employees.
24              THE COURT:  Your daughter is named Rachel?
25              MR. SHEKETOFF:  Sheketoff.
```

1          THE COURT:  That you for coming back, Mr. Bobek.  In

2     the interim, somebody has mentioned that they know somebody

3     that works at the same company that you do, Buildium.

4     Approximately, how many employees are at your company, if you

5     know?

6          PROSPECTIVE JUROR:  I think it's close to 250 or 300

7     or so.  It was acquired by Real Page, a much larger company

8     with thousands of employees, and most recently acquired by

9     tomorrow awe bravo, which is a large investment firm.

10:26 10          THE COURT:  Where is it located where you work?

11          PROSPECTIVE JUROR:  That is right across from

12     government center.

13          THE COURT:  Here in Boston?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  One of the persons involved in this case

16     has a daughter who works there named Rachel she can to have.

17     Do you know Rachel she can to have?

18          PROSPECTIVE JUROR:  I do know.

19          THE COURT:  How?

10:27 20          PROSPECTIVE JUROR:  Professional acquaintance.  I

21     think she's on the product team.  My position involves data

22     analytics.  I interface with a lot of individuals around with

23     data so they can do their jobs.

24          THE COURT:  If it were to turn out that one of

25     Rachel's relatives was involved in this case in any way, would

1    that affect your ability to be fair and impartial?

2         PROSPECTIVE JUROR:  No.  I don't think so, no.

3         THE COURT:  You know her only professionally, not

4    socially?

5         PROSPECTIVE JUROR:  That's correct.

6         THE COURT:  Thank you.  I'll hold you in reserve.  You

7    may go back with the jury coordinator.

8         Counsel?

9         MR. KELLY:  We don't have any objection.  Passing

10:28 10   familiarity with her, doesn't seem like they deal with each

11   other on a direct basis.  We're not going to move to strike.

12        MS. KEARNEY:  The government agrees.

13        THE COURT:  Thank you.  We will move on.

14        MR. KELLY:  Your Honor, we've reached the 40 mark.

15   Can we take a quick break?

16        THE COURT:  We're going to see two more folks.  Then

17   we'll take a break.

18        Good morning, Mr. Heffernan.  Please be seated.  You

19   are reminded you're under oath.  You may remove your mask, but

10:29 20   you don't have to.

21        Mr. Heffernan, would serving on this jury for

22   approximately 4 weeks cause you financial hardship?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  Generally, having answered all of the

25   questions on that questionnaire a day before yesterday, and it

1    was a very extensive questionnaire, do you have any doubt at

2    all that if you were chosen to sit as a juror in this case that

3    you could be fair and impartial?

4         PROSPECTIVE JUROR:  Do I have any doubt?  No.

5         THE COURT:  Can you decide this case based solely on

6    the evidence that comes into this courtroom and not based upon

7    any information you have from other sources?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Mr. Kelly, any questions?

10:30 10   MR. KELLY:  Just briefly.  Good morning.  Brian Kelly.

11   I represent Mr. Aziz.  Thanks for coming in.

12        This case will involve a lot of discussion of college

13   sports.  Do you follow college sports at all?

14        PROSPECTIVE JUROR:  Not really.

15        MR. KELLY:  You haven't heard anything in the media

16   that gives you any opinion about this case one way or another?

17        PROSPECTIVE JUROR:  That gives me an opinion?  I read

18   in the case perhaps six or 8 months ago, but did it form an

19   opinion?  I'm open, I think.

10:31 20   MR. KELLY:  So you're open to both sides.

21        MR. KELLY:  Thank you.

22        THE COURT:  Mr. Kendall.

23        MR. KENDALL:  Briefly, your Honor.  Par good morning.

24   My name's Mike Kendall.  I represent John Wilson.

25        You described your job as a solution executive at Tech

```
 1  Systems.  What do you do?
 2          PROSPECTIVE JUROR:  It's a consultant.  We go in and
 3  work with larger companies to get an understanding of their I T
 4  infrastructure and we make recommendations on how to improve
 5  it.
 6          MR. KENDALL:  What's your role in all of that?
 7          PROSPECTIVE JUROR:  I'm basically a solution exec
 8  helps plan and figure out what's needed for a particular
 9  situation.  If someone needs I T or something like that, I help
10  plan and I might run an engagement team.
11          MR. KENDALL:  Fair to say your expertise is more on
12  the I T- side of things than business?
13          PROSPECTIVE JUROR:  I T and business.  Years ago,
14  6 years ago I was in IBM and it was business side of it, so I
15  did a lot of business strategy.
16          MR. KENDALL:  Thank you.
17          THE COURT:  Miss Kearney.
18          MS. KEARNEY:  Good morning.  I see from your
19  questionnaire you previously served on a jury.  Is there
20  anything about that experience that would affect your ability
21  to be fair and impartial in this case?
22          PROSPECTIVE JUROR:  No.
23          THE COURT:  Thank you, Mr. Heffernan.  I'm going to
24  hold you in reserve.  That means that you may be called back
25  for further involvement in this case, but in the meantime,
```

**A923**

```
 1   please do not do any independent research or go online to try

 2   to find about this case.  That would, of course, be

 3   inappropriate, as you understand, right?

 4            PROSPECTIVE JUROR:  I understand, yes.

 5            THE COURT:  Thank you.  Par good morning, miss Willis.

 6   Please be seated.  You may remove the mask if you want to, but

 7   you don't have to.

 8            PROSPECTIVE JUROR:  Happily.  Thank you.

 9            THE COURT:  Miss Willis, would serving on this jury

10   for approximately 4 weeks cause you financial hardship?

11            PROSPECTIVE JUROR:  Probably not financial hardship.

12            THE COURT:  So that's not a problem for this service

13   or is it?

14            PROSPECTIVE JUROR:  No, no, it's not.

15            THE COURT:  With respect generally to the questions

16   that you were asked on that questionnaire, which I know is very

17   extensive, do you have any doubt at all that if you were

18   selected to serve on this jury that you could be fair and

19   impartial?

20            PROSPECTIVE JUROR:  I don't have any doubt I could be

21   fair and impartial.

22            THE COURT:  Can you decide this case solely based on

23   the evidence that comes into this courtroom and not on any

24   information you may have acquired outside this courtroom?

25            PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  Mr. Kelly, any questions?
 2              MR. KELLY:  Just briefly.  Good morning.  Brian Kelly
 3     on behalf of Mr. Aziz.  Thanks for coming in.
 4              This case may involve a lot of testimony about the
 5     college sports scene.  Are you a college sports fan at all?
 6              PROSPECTIVE JUROR:  Not really.  My sons are.
 7              MR. KELLY:  Thanks.  That's it.
 8              THE COURT:  Mr. Kendall.
 9              MR. KENDALL:  Briefly, your Honor.
10:35 10              Good morning.  I'm Mike Kendall.  I represent John
11     Wilson.  Just a couple questions on your answers.  You said in
12     nine that you are an owner of the rock well restaurant group.
13     Could you describe what that is and what you do.
14              PROSPECTIVE JUROR:  I own three restaurants.  Rock
15     well restaurant group, I'm technically not an owner.  I'm a
16     member.  It's an LLC.  But I have two other businesses that are
17     separate entities.  There wasn't a lot of room there to
18     elaborate.
19              MR. KENDALL:  What the are the other businesses?
10:35 20              PROSPECTIVE JUROR:  ONe is the prospect hill partners
21     and the d/b/a is The Independent.  The other one is Union
22     Square Group, and the d/b/a is Vieras.  All are restaurants in
23     Somerville.
24              MR. KENDALL:  Is that that area that's sort of open
25     and there's restaurants all around?
```

```
 1              PROSPECTIVE JUROR:  One of them is in davis square,

 2     Somerville, two of them are in union square, Somerville.

 3              MR. KENDALL:  In number 39, you said you had not heard

 4     any news coverage about the case known as Varsity Blues or the

 5     college admissions case.  You've heard nothing about it?

 6              PROSPECTIVE JUROR:  No.  I've seen when I'm watching

 7     about a year ago when I was watching the evening news I would

 8     occasionally see a celebrity outside of this courthouse.  Then

 9     I did a couple of days ago, I was skimming the Globe, and I saw

10:36 10   a head line.  I started to read it and read the first paragraph

11     and said jury selection begins on Wednesday at this courthouse.

12     I thought, oh, that's probably what I'm going for and I

13     stopped.

14              MR. KENDALL:  Do you have any thoughts about the case

15     or any articles you've seen?

16              PROSPECTIVE JUROR:  No.

17              MR. KENDALL:  Thank you for coming in.

18              THE COURT:  Miss Kearney.

19              MS. KEARNEY:  I have no questions.

10:37 20         THE COURT:  Thank you, miss Willis.  I'm going to hold

21     you in reserve.  You may get called for further service on this

22     jury.  In the meantime, do not do any independent research

23     about this case that. Would be inappropriate, of course.  Thank

24     you, miss Willis.

25              PROSPECTIVE JUROR:  Thank you.
```

1          THE COURT:  By my count, we have 41 cleared jurors.  I

2    think we are able now to go to the next process.  Let me speak

3    to Mr. McAlear and make sure my count is correct.

4          We started with 35, lost one to 24, and I think we've

5    had seven since we started.

6          MR. KENDALL:  We have eight, your Honor.

7          THE COURT:  I might have missed one.  So that means we

8    have 42?

9          MR. KENDALL:  Yes, your Honor.

10:38 10          THE COURT:  All right.

11          Counsel, I've just consulted with the jury coordinator

12    to make sure I have the information correct.  As you all know,

13    we have from the second tranche about 25 potential jurors in

14    the jury room.  I'm not going to dismiss them now.  During this

15    next phase, that is when I call in these 42 cleared jurors and

16    we go through the process of putting them in the jury box and

17    allowing counsel to exercise peremptory challenges, after that

18    process is done and, presumably, we have a jury of 16, I would

19    dismiss the people in the second tranche, but I will not

10:40 20    unconditionally dismiss those who are left over from the 42

21    that I'm going to call back, the reason being is that sometimes

22    over the weekend things happen and I want to have the

23    availability of six or so potential jurors in case somebody for

24    some unforeseen reason needs to be replaced on Monday morning.

25    I will not swear the jury today, so jeopardy will not attach

     1  until Monday when we come back and begin the trial, at which

     2  point I will swear the jury, of course.

     3          Any problem with that?

     4          MR. KELLY:  Not from defendant Aziz's perspective.

     5          THE COURT:  Mr. Kendall?

     6          MR. KENDALL:  Not from Mr. Wilson's perspective.

     7          THE COURT:  The government?

     8          MS. KEARNEY:  No, your Honor.

     9          THE COURT:  What I propose to do now is take a short

10:41 10  break, maybe 15 minutes, so Mr. McAlear can get the 42 people

    11  who will be assembled in the back of this courtroom.  After we

    12  come back, my deputy clerk will, as she always has for all of

    13  my prior trials, go through and randomly select numbers to sit

    14  in the box.  Of course shell announce the number of the juror

    15  and the name.  They will be seated sequentially in the jury

    16  box, up to 16.  I hope we have 16 seats in the jury now.  We'll

    17  remove the back chair in the back row there so we'll have 8 in

    18  each row.

    19          We will keep track of all the names.  After we have

10:42 20  all the 16, my former procedure was to ask each of them what

    21  they do for a living and, if they're married, what their spouse

    22  does.  We all know that now so we're not going to do that.

    23  We're going to go immediately to sidebar where counsel will be

    24  invited to exercise peremptory challenges one at a time.  The

    25  government will go first.  The defendants will go second until

1    everyone is satisfied.  Understanding there is no back strike.

2    After the first round, that juror is permit.

3         Finally, again, after we replace jurors and get,

4    whether it's two or three rounds, the last four jurors in the

5    jury box, no matter which seats they're seated in, will be the

6    alternates.  The 13th juror seated will be alternate number

7    one, the 14th, number two, et cetera, et cetera.  Any problems

8    with the procedure we're going to follow?

9         MR. KELLY:  For defendant Aziz, this is not under

10:43 10    seal?  This is going to be public?

11         THE COURT:  No.  We are going to be public now.  We're

12    through selecting individual jurors by voir dire.  The reason

13    we did that outside the public's hearing is because it's a

14    sidebar situation.  I wanted to respect the privacy of the

15    jurors.  From this point forward, it's a public hearing and we

16    will be on Zoom and people will be eligible to come into the

17    courtroom, although -- we're going to tell people that we'll

18    have a few seats reserved for the public in addition to the 42

19    potential jurors.  The Zoom will be turned on and there's an

10:44 20    overflow courtroom available.

21         Any questions, Mr. Kendall?

22         MR. KENDALL:  No, your Honor.  One small thing.  We

23    may need to step aside to confer between us to respond to you.

24    That's all.

25         THE COURT:  By step aside, we'll be at sidebar.  You

**A929**

1    can stem back or go back to counsel table, if you want.

2         MR. KENDALL:  That's all I need.  Thank you.

3         THE COURT:  Will all counsel be coming to sidebar or

4    will you reduce yourselves to two a piece?  If you want to

5    come, you can.  I don't have a problem with it.  It will be

6    crowded.

7         MR. KENDALL:  If we need that, we will not crowd.

8         THE COURT:  One will be designated from each side to

9    exercise peremptory challenges.  You'll have to tell me that.

10:45 10   It will be Mr. Kelly, Mr. Kendall, and for the government?

11        MR. FRANK:  Me, your Honor.

12        THE COURT:  Mr. Frank.

13        MR. KENDALL:  Can I clarify one thing?

14        THE COURT:  Yes.

15        MR. KENDALL:  We're obviously working in a

16   collaborative way.  When we exercise our challenge, is it one

17   government, one defense, or one government, one Aziz, one

18   Wilson?

19        THE COURT:  That's up to you.  If you want to split

10:45 20   them down the middle.

21        MR. KENDALL:  We don't.  We want to do it as 1 block.

22        THE COURT:  Obviously, the defendants have slightly

23   more challenges.  They have 12, as opposed to eight by the

24   government.  I used to say one more the government, two for

25   defendants.  I haven't been doing that lately.  You are

1    certainly free to go back and forth until you're satisfied in

2    that first round.

3              In other words, the government will exercise its per

4    peremptory in the first round.  If we get to a second round,

5    defendants will go first.  A third round, government will go

6    first.  I'm not going to say this is Mr. Kelly's challenge or

7    Mr. Kendall's challenge.  You can agree to that amongst

8    yourselves, but you will both have the opportunity during that

9    first round to make challenges.

10:46 10            MR. KENDALL:  Okay.  If we want to go one, one, one,

11    one, one all the way through, that's acceptable for the Court?

12            THE COURT:  Is there a problem with that from the

13    government's side?

14            MR. FRANK:  Your Honor, my understanding is the

15    customary way of doing it is one two, is that right?

16            THE COURT:  Well, it was.  I haven't followed that

17    procedure in a couple of years because, as a matter of fact,

18    both sides can exercise as many peremptories as they want

19    during any round.  So whether it's now or later doesn't seem to

10:47 20    make a big difference.  It will be one for the government.  One

21    for the defendant.  One for the government.  One for the

22    defendant and so forth.

23            MR. FRANK:  Within each round.

24            THE COURT:  All the way through, yes.  In the second

25    round, it will be one for the defendant, one for the

1    government, one for the defendant, one for the government.

2        MR. FRANK:  That makes perfect sense.  Thank you.

3        MR. KENDALL:  Thank you, your Honor.

4        THE COURT:  Anything else that needs to come to my

5    attention before we recess for about 15 minutes?

6        MR. KELLY:  That would be my request.  Could we start

7    at 11:15?  I think I have to talk to Mr. Kendall about a couple

8    matters.

9        THE COURT:  We'll make it 11:10.  Okay?

10:48 10        MR. KENDALL:  Thank you.

11        THE COURT:  I want to move this thing along.  We're in

12    recess.

13        (Recess taken 10:48 a.m. to 11:28 a.m.)

14        THE CLERK:  This is Criminal Action No. 19-10080, the

15    United States of America versus Gamal Abdelaziz and John

16    Wilson.

17        Would counsel please introduce themselves for the

18    record.

19        MR. FRANK:  Good morning, your Honor.  Stephen Frank,

11:29 20    Kristen Kearney, Leslie Wright and Ian Stearns for the United

21    States.

22        THE COURT:  Good morning, counsel.

23        MR. KELLY:  Good morning, your Honor.  Brian Kelly and

24    Joshua Sharp on behalf of the defendant Gamal Abdelaziz.

25        THE COURT:  Good morning, counsel.

1          MR. KENDALL:  Good morning, Mike Kendall, Andy Tom

2     back and Lauren Papenhausen on behalf of Mr. Wilson.

3          THE COURT:  Good morning, counsel.

4          Good morning, jurors.  Of course, we've seen each

5     other before.  You are the pool that have been reserved,

6     meaning that you are going to participate in the further

7     selection of a jury.  What we do now is that my deputy clerk in

8     a few minutes will at random call 16 of you to sit in the jury

9     box, and shell instruct you which seat to sit in.

11:29 10         Then, counsel and I will withdraw to sidebar.  What

11    you will hear is what we call white noise.  It's basically

12    static to more or less preserve the privacy of the

13    conversations that are here.  It's not that we're tryinf to

14    keep secrets from you.  It's that we are going matters that you

15    need not be concerned about, but they are important to the

16    selection of this jury.

17         Then you will see how we proceed from that point

18    forward.  Some of you may get stricken from the jury.  It

19    doesn't mean you're not qualified to be a juror.  It's that we

11:30 20   have what we call peremptory challenges where counsel can

21    challenge jurors that they feel they would prefer to have

22    somebody else on the jury.  That's the way the system works.

23         With that, I'm going to turn it over to my deputy

24    clerk who is going to call the numbers.  You will be identify

25    by name and number.  We will know which seat it is that you are

```
 1    seated in.

 2            THE CLERK:  Juror No. 116, Christopher Bobek.  Please

 3    come forward and take Seat No. 1 in the jury box.  Seat No. 1

 4    in the seat closest to me in the front row.

 5            PROSPECTIVE JUROR:  What was the name?

 6            THE CLERK:  Christopher Bobek.

 7            Would Juror No. 37, Marina Lacorazza, please come

 8    forward and take Seat No. 2.

 9            Juror No. 120, Jessica Willis, please come forward and

10    take Seat No. 3.

11            Juror No. 11, Julie Lightbody, please come forward and

12    take Seat No. 4.

13            Juror No. 32, Patrick Eddy, please come forward and

14    take Seat No. 5.

15            Juror No. 27, Hector Diaz, please come forward and

16    take Seat No. 6.

17            Juror No. 94, Robert Day, please come forward and take

18    Seat No. 7.

19            Juror No. 84, Dorothy Roberts, please come forward and

20    take Seat No. 8.

21            Juror No. 60, Anthony Yee, please come forward and

22    take Seat No. 9.  Mr. Yee, Seat No. 9 is the first seat in the

23    second row.

24            Juror No. 55, Lucas Ratliff, please come forward and

25    take Seat No. 10.
```

11:32 at line 10

11:34 at line 20

1          Juror No. 14, Roger Ross, please come forward and take

2     Seat No. 11.

3          Juror No. 91, Veronica Pierce, please come forward and

4     take Seat No. 12.

5          Juror No. 44, Allison Burke, please come forward and

6     take Seat No. 13.

7          Juror No. 69, Steven Kennie, please come forward and

8     take Seat No. 14.

9          Juror No. 77, Zatcha Montes,  please come forward and

11:38 10    take Seat No. 15.

11          Juror No. 38, Jeffrey Wakelin, please come forward and

12    take Seat No. 16.

13          THE COURT:  All right.  As I said before, jurors, we

14    will have a sidebar conference now.  You will hear this white

15    noise, which is basically the static, to preserve the privacy

16    of our conversation.  I will see counsel at sidebar.

17               *** Start of sidebar ***.

18          THE COURT:  As I've said before, in the first round,

19    the government goes first.  Do you have any peremptory

11:40 20    challenges, Mr. Frank?

21          MR. FRANK:  So I'm clear, your Honor, are we going by

22    seat No. Or juror number?

23          THE COURT:  I want you to give me the seat number

24    first and then the number of the juror, if you have it.

25          MR. FRANK:  Yes, your Honor.  We move to strike Seat

```
 1  No. 4, Juror No. 11, Miss Lightbody.

 2          THE COURT:  All right.  That would be Seat No. 4,

 3  Miss Lightbody.

 4          MR. FRANK:  Yes, your Honor.

 5          THE COURT:  Now we'll go to the defendants.  Actually,

 6  give me the number of the juror first and then the seat number.

 7          MR. KELLY:  60.

 8          THE COURT:  And seat number?

 9          MR. KELLY:  Nine.  That would be Mr. Yee, number 60.

10          THE COURT:  In seat nine.  Okay.  Back to the

11  government.

12          MR. FRANK:  Seat No. 7, Juror No. 94, Mr. Day.

13          THE COURT:  94, Mr. Day.  Okay.

14          MR. KELLY:  77.

15          THE COURT:  77 in seat 15?

16          MR. KELLY:  Yes, Judge.

17          THE COURT:  Government?

18          MR. FRANK:  Can we have a moment, your Honor?

19          THE COURT:  Yes, you may.

20          MR. FRANK:  Seat No. 16, Juror No. 38.

21          THE COURT:  That is No. 38 in seat 16.  That is

22  Mr. Wakelin, correct?

23          MR. FRANK:  Yes, your Honor.

24          THE COURT:  Back to the defendants.

25          MR. KELLY:  Juror 32.  I think it's seat --
```

11:41  (line 10)
11:43  (line 20)

**A936**

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | THE COURT:  Five?                                            |
| 2     | MR. KELLY:  Yes.                                            |
| 3     | THE COURT:  That would be Mr. Eddy.                        |
| 4     | MR. FRANK:  We need one more moment.                       |
| 5     | THE COURT:  Yes, of course.                                |
| 6     | MR. FRANK:  That's it from us, Judge.                      |
| 7     | THE COURT:  Defendants?                                    |
| 8     | MR. KELLY:  Can we now consult?                            |
| 9     | THE COURT:  Yes, you may.                                  |
| 11:45 10 | MR. KELLY:  Have they rested?                           |
| 11    | THE COURT:  They said they have no more challenges,       |
| 12    | but after you make another challenge, I will offer them the |
| 13    | opportunity to make another challenge.                      |
| 14    | MR. KELLY:  Thank you.                                     |
| 15    | THE COURT:  Yes?                                           |
| 16    | MR. KELLY:  From this group, we don't have anymore.       |
| 17    | THE COURT:  I'll go back to the government one more       |
| 18    | time.  Do you have anymore?                                |
| 19    | MR. FRANK:  No, your Honor.                                |
| 11:46 20 | THE COURT:  Come in, counsel.  I want to make sure I    |
| 21    | got it correct.  Those jurors currently seated in seats 4, 5, |
| 22    | 7, 9, 15, and 16 have been challenged.  Am I correct?      |
| 23    | MR. KELLY:  Do we have the juror numbers, your Honor?     |
| 24    | THE COURT:  Yes, Juror No. 11 in seat four; Juror 32      |
| 25    | in seat five; Juror No. 94 in seat 7; Juror No. 60 in seat 9; |

A937

Juror No. 77 in seat 15; and Juror No. 38 in seat 16.  Those

are the only six challenges that I've heard, correct?

MR. FRANK:  Yes.

THE COURT:  All right.  Understood that the ten

remaining jurors cannot be stricken in a later round.  Counsel

understand that's?

MR. FRANK:  Yes.

THE COURT:  We will fill those six seats.  You may

return to counsel table.  We'll go through the process.

11:48   MR. KENDALL:  Thank you, your Honor.

*** End of sidebar ***.

THE CLERK:  The following jurors have been excused and

may report down to Jim McAlear in the back there.

Juror No. 11, Julie Lightbody; Juror No. 32, Patrick

Eddy; Juror No. 44, Robert Day; Juror No. 60, Anthony Yee;

Juror No. 77, Zatcha Montes; and Juror No. 38, Jeffrey Wakelin.

THE CLERK:  Filling Seat No. 4 in the front row, Juror

No. 13, Paige Leighton please come forward.

Filling Seat No. 5, Juror No. 109, Kelsey Bradford

11:50   please come forward.

Filling Seat No. 7, Juror No. 33, Therese Arsenault

please come forward.

Filling Seat No. 9, Juror No. 16, Bryant Ayles please

come forward.

Filling Seat No. 15, Juror No. 1212, Susan Seger

```
 1   please come forward.
 2           Filling Seat No. 16, Juror No. 111, Steven Pitts
 3   please come forward.
 4           THE COURT:  I will see counsel at sidebar.
 5                   *** Beginning of sidebar ***.
 6           THE COURT:  Before we start, counsel, I need to
 7   inquire of the defendants since it is a constitutional right
 8   for your client to be at sidebar, do your clients waive that
 9   right?
10           MR. KELLY:  On behalf of defendant Aziz, we waive that
11   right.
12           MR. KENDALL:  On behalf of defendant Wilson, we do.
13           THE COURT:  In this round, the defendants go first.
14   Any challenges, Mr. Kelly?
15           MR. KELLY:  In seat 4, Juror No. 13.  That would be
16   miss Leighton.
17           THE COURT:  Turning to the government.
18           MR. FRANK:  Seat 16, Juror 111.
19           THE COURT:  That would be Mr. Pitts.
20           MR. FRANK:  Yes.
21           THE COURT:  Back to the defendants.
22           MR. KELLY:  Seat 5, Juror 109.
23           THE COURT:  109 in seat 5, that would be miss
24   Bradford, correct?
25           MR. KELLY:  Yes.
```

```
 1              THE COURT:  Government?

 2              MR. FRANK:  Nothing further, Judge.

 3              THE COURT:  Defendants?

 4              MR. KELLY:  Yes.  We strike Juror No. 33 in seat 7.

 5              THE COURT:  That would be Miss Arsenault?

 6              MR. KELLY:  Yes.

 7              THE COURT:  I'll go back to the government and

 8      inquire.  Do you have any further strikes?

 9              MR. FRANK:  No, your Honor.

11:56 10              THE COURT:  Again, for the defendants, any further

11      strikes?

12              MR. KELLY:  Yes, your Honor.  Juror 112 in seat 15.

13              THE COURT:  That is miss Seger?

14              MR. KELLY:  Yes, your Honor.

15              THE COURT:  Once again defendants?

16              MR. KELLY:  Nothing further from the defendants.  I

17      have those in seats 4, 5, 7, 15 and 16 being stricken, is that

18      correct?

19              MR. KELLY:  Yes, your Honor.

11:56 20              THE COURT:  Understand now, if there were no further

21      strikes, the first person seated this time around would be the

22      12th juror and all of the remainders would be alternates.  Do

23      you understand that?

24              MR. KELLY:  That's a good point.  Can I discuss that?

25              THE COURT:  Yes.
```

```
 1              MR. KELLY:  Thank you, your Honor.  We're fine.

 2              THE COURT:  I just want to make sure I have it, 4, 5,

 3         7, 15 and 16.  Those seats will be filled.  Return to counsel

 4         table.

 5                        *** End of sidebar ***.

 6              THE CLERK:  The following jurors have been excused and

 7         may report down to Mr. McAlear to your right.

 8              Juror No. 13, Paige Leighton; Juror No. 109, Kelsey

 9         Bradford; Juror No. 33, Therese Arsenault; Juror 112, Susan

11:58 10    Seger; and Juror No. 111, Steven Pitts.

11              Filling Seat No. 4, Juror No. 118, Robert Heffernan

12         please come forward.

13              Filling Seat No. 5, Juror No. 64, Elizabeth Marini

14         please come forward.

15              Filling Seat No. 7 is Juror No. 79, Megan Dodd, please

16         come forward.

17              Filling Seat No. 15, Juror No. 49, Wayne Glassman

18         please come forward.

19              Filling Seat No. 16, Juror No. 114, Maria Elena Wilson

12:00 20    please come forward.

21              THE COURT:  Once again, I will see counsel at sidebar.

22                     *** Beginning of sidebar ***.

23              THE COURT:  In the third round, government goes first.

24         Mr. Frank.

25              MR. FRANK:  Seat No. 15, Juror No. 49.
```

```
 1              THE COURT:  That would be Mr. Glassman, is that
 2     correct?
 3              MR. FRANK:  Yes.
 4              THE COURT:  Defendants?
 5              MR. KELLY:  In seat 16, Juror No. 14.
 6              THE COURT:  That would be miss Wilson, correct?
 7              MR. KELLY:  Yes.
 8              THE COURT:  Back to the government?
 9              MR. FRANK:  Nothing further.
10              THE COURT:  Back to defendants.
11              MR. KELLY:  In seat five, No. 64.
12              THE COURT:  That would be Miss Marini, correct?
13              MR. KELLY:  Yes, your Honor.
14              THE COURT:  Once again to the government if they've
15     changed their mind?
16              MR. FRANK:  No, your Honor.
17              THE COURT:  Again to the defendants?
18              MR. KELLY:  No, your Honor.
19              THE COURT:  So those in seats 5, 15, and 16 have been
20     stricken.  You understand that those are the second, third and
21     fourth alternates.  The first alternate was the last one
22     seated.  I will have to calculate that, if somebody could come
23     up with it.  These last three will all be alternates.
24              MR. FRANK:  Your Honor, who is the 12th juror?  I'm
25     confused.
```

1        THE COURT:  Who is the first alternate?  Okay.  The
2   first alternate is Megan Dodd.  All the rest that are going to
3   be seated are alternates.  Other than miss Dodd, they're all
4   jurors.

5        MR. FRANK:  Thank you.

6        THE COURT:  We're going to fill the seats 5, 15 and
7   16.

8        MR. KENDALL:  Thank you, your Honor.

9            *** End of sidebar. ***

12:04 10       THE CLERK:  The following jurors have been excused and
11   may see Mr. McAlear at the doors.

12        Juror No. 64, Elizabeth Marini; Juror No. 49, Wayne
13   Glassman; Juror No. 114, Maria Elena Wilson.

14        Filling Seat No. 5, Juror No. 52, John Marshall please
15   come forward.

16        Filling Seat No. 15, juror No. 93, Haibo Liu please
17   come forward.

18        Filling Seat No. 16, Juror No. 74, Karen Wilcox please
19   come forward.

12:06 20       THE COURT:  We'll see counsel.

21            *** Beginning of sidebar ***

22        THE COURT:  All right.  This round the defendants go
23   first.  Any challenges?

24        MR. KELLY:  Yes, your Honor.  Seat 15, No. 93.

25        THE COURT:  That would be Mr. Liu, right?

```
 1              MR. KELLY:  Correct.

 2              MR. FRANK:  In seat 16, No. 74.

 3              THE COURT:  That would be miss Wilcox, correct?

 4              MR. FRANK:  Yes, your Honor.

 5              THE COURT:  Defendants?

 6              MR. KELLY:  Nothing further.

 7              THE COURT:  Government?

 8              MR. FRANK:  Nothing further.

 9              THE COURT:  So those in seats 15 and 16 will be

12:07 10   excused.  We will fill those seats once again.

11              MR. KENDALL:  May I just confirm one thing, your

12   Honor, in terms of the strikes that are left?  We have two

13   left.

14              THE COURT:  You have two left.

15              MR. KENDALL:  The government?

16              THE COURT:  The government has two left as well.

17              MR. KENDALL:  Thank you.

18                      *** End of sidebar ***.

19              THE CLERK:  The following jurors have been excused and

12:08 20   may see Mr. McAlear at the doors:  Juror No. 94, Haibo Liu, and

21   Juror No. 74, Karen Wilcox.

22              Filling Seat No. 15 is juror No. 42, Zarabeth Golden.

23              Filling Seat No. 16, Juror No. 72, Samuel Schilmeister

24   please come forward.

25              THE COURT:  Once more, counsel.
```

**A944**

```
 1              *** Beginning of sidebar ***.
 2         THE COURT:  Fifth round government goes first.
 3         MR. FRANK:  Juror No. 16 -- Seat No. 16, Juror No. 72.
 4         THE COURT:  So that would be 72 in seat 16.  That
 5    would be Mr. /SHEUL, correct?
 6         MR. KENDALL:  Your Honor, we want to raise an
 7    objection to that strike.  Mr. /SHEUL is the person that
 8    reportedly had some issues with being on the autism spectrum.
 9    Mr. Frank expressed to us that he should be automatically
12:11 10   excluded and not even called back because of the disability.
11    I'd like to know if the government has a reason to strike him
12    other than he has a disability.  He expressed very strong
13    screws about the disability that aren't appropriate.  He may
14    have autism, but he was very responsive and very articulate
15    understanding your questions.  We think that's not a proper
16    strike, your Honor.
17         THE COURT:  Mr. Frank?
18         MR. FRANK:  Mr. Kendall always manages to personalize
19    it, which I resent, but we expressed views based on his
12:12 20   questionnaire in which he said that he is uncomfortable in
21    crowded places.  He also was unable to answer the question of
22    what his parents did professionally, he wasn't sure what kind
23    of lawyers they were.  It seemed to us that he was not
24    following the Court's questions, was confused.  For those
25    reasons, we move to strike him.
```

1          MR. KENDALL:  If I may, your Honor, we specifically

2     asked him if he had any problems sitting in the box with the

3     jury.  He said no, the courtroom was fine, the juror was fine.

4     The transcript, I believe, will show his response.

5          THE COURT:  I don't see that the government has

6     demonstrated that they're striking him because of his

7     disability and their peremptory challenge to strike him, I'm

8     going to allow them to strike him.

9          MR. KENDALL:  Thank you for your patience, your Honor.

12:12 10          THE COURT:  Are there any other strikes?

11          MR. KELLY:  In seat 15, Juror 22.

12          THE COURT:  That will be Miss Golden, correct?

13          MR. KELLY:  Yes, your Honor.

14          THE COURT:  Then both of the seats 15 and 16, the hot

15     seats, will be filled one last time or maybe not.  Each side

16     has one more peremptory challenge.

17          Let me say this, counsel while we're here.  After we

18     have a neutral jury, I am going to dismiss those in the back of

19     the courtroom for today.  As I think I'd said later, I'm not

12:13 20     going to dismiss this jury in case we have some problems over

21     the weekend.  If we were to have a problem and on Monday

22     morning had to call one more of the jurors back, we would call

23     the five or six or eight or however many there are and the

24     deputy would, just as she's done up to this point, at random

25     pick a juror or two or however many we would have.  Understand

```
 1   at that stage if you use your last peremptory now, you would
 2   have no peremptories on Monday.  So just stand forewarned that
 3   the possibility of replacement might mean you wouldn't have any
 4   peremptories.
 5          Now, I would hear counsel if you wanted to argue
 6   jointly that you ought to have one more peremptory, if that
 7   happens, but as of now, both sides have used all but one of
 8   their peremptories.  Under the rules that we have going now, if
 9   you use that today, you wouldn't have it available in the
10   unlikely event that we have to go and pick some new juries on
11   Monday.
12          MR. KENDALL:  Can we have one moment?
13          THE COURT:  Yes, you may.
14          MR. FRANK:  We would agree to one additional in the
15   event that happens.
16          MR. KENDALL:  We would agree as well.
17          THE COURT:  So you have one left today.  If this
18   unlikely occurrence happens on Monday, each side will have one
19   additional.
20          MR. KENDALL:  Yes.  Thank you, your Honor.  We
21   appreciate it.
22          THE COURT:  So we need to replace the people in 15 and
23   16 one more time.
24          MR. KENDALL:  Yes.  Thank you.
25                      *** End of sidebar ***.
```

**A947**

```
 1              THE CLERK:  The following jurors have been excused and

 2   may see Mr. McAlear at the door: Juror No. 42, Zarabeth Golden,

 3   and Juror No. 72, Samuel Schilmeister.

 4              Filling Seat No. 15, Juror No. 106, Monica Reyes

 5   please come forward.

 6              Filling Seat No. 16, Juror No. 82, Melanie Bettencourt

 7   please come forward.

 8                    *** Beginning of sidebar ***.

 9              THE COURT:  This round defendants first.

10              MR. KELLY:  Using the last one, seat 16, Juror 82.

11              THE COURT:  That would be miss Bettencourt, right?

12              MR. KELLY:  Yes.

13              THE COURT:  Government?

14              MR. FRANK:  Nothing further.

15              THE COURT:  So we will replace the last seat.  The

16   defendants are out of challenges.  The government has one left

17   as of now.

18              Counsel, what I'm going to do I'm going to declare

19   that we have a jury indifferent and then dismiss the folks in

20   the back of the courtroom, but tell them that they need to

21   remain available on Monday.  I'm going to read out that charge

22   that we gave them yesterday just to remind them that they're

23   not to do any text messaging, they're not to talk to anybody

24   about the case because they still are eligible to be on this

25   jury, notwithstanding the fact that it's unlikely that they
```

(12:18 at line 10, 12:19 at line 20)

1    will be called.  All right?

2              MR. FRANK:  Yes, your Honor.

3              MR. KENDALL:  Thank you, your Honor.

4                        *** End of sidebar ***

5              THE CLERK:  Juror No. 82, Melanie Bettencourt, you

6    have been excused.

7              Filling Seat No. 16, Juror No. 87, Mark Callahan

8    please come forward.

9              THE COURT:  Counsel.

12:21 10                    *** Beginning of sidebar ***.

11             THE COURT:  Government?

12             MR. FRANK:  We're satisfied with the jury.

13             THE COURT:  Then, counsel, this is the jury.

14             I will declare that we have a jury indifferent.  I'm

15   going to dismiss them, the remainder of the jurors, with the

16   instructions that they are to remain available to be called

17   Monday.

18             I'm going to say a few other things.  I'm going to

19   tell them about when the trial is going to start, what the

12:22 20   general procedure's going to be day-to-day, that is we go

21   mornings and most afternoons.  I'm also going to tell them

22   there's a few days that they will have off, namely next

23   Thursday, Yom Kippur, and the Thursday at the end of the month

24   when I'm detained on M D L business.

25             Also, I understand, Mr. Kendall, you wanted to have no

1    afternoon session on Wednesday.

2            MR. KENDALL:  I'll do whatever is respectful to the

3    court.  The Yom Kippur holiday starts midday Wednesday.  If we

4    didn't have a midday session, that would be wonderful.  If the

5    Court thinks we need it for the schedule, we can keep it.

6            THE COURT:  We will shorten it.  Realistically, what

7    do you need?  I'll give you what you need.

8            MR. KENDALL:  I can work with whatever's good for the

9    Court.  It just means a little more rushing.

12:23 10        THE COURT:  Can we leave it we'll see how we're going

11   and we won't go after three for sure?

12           MR. KENDALL:  I appreciate that.  Thank you, your

13   Honor.

14           THE COURT:  The previous day the Court has their

15   monthly meeting in the afternoon, so we may not have an

16   afternoon session on Tuesday.  We'll go to 1 o'clock for sure.

17   Maybe we can go over to maybe about 1:30 on that day, but we

18   will not have an afternoon session on Tuesday, the second day

19   of trial.

12:23 20        MR. KENDALL:  Great, your Honor.

21           THE COURT:  Those 2 days we'll have abbreviated

22   afternoon sessions.

23           Anything else?

24           MR. KENDALL:  No, your Honor.

25           THE COURT:  All right.  That's what I'm going to do,

1   give a short little blurb to the jurors and then we'll have

2   another session this afternoon outside the hearing of the jury.

3                        *** End of sidebar ***

4           THE COURT:  All right.  I declare that we have a juror

5   indifferent.  That means that you are the jury in this case.

6   I'm going to dismiss you shortly with a few instructions, and

7   also those of you in the back of the room who are still

8   reserved in this case.  I'm going to ask you and give you some

9   instructions, to remain reserved over the weekend.  We don't

12:25 10  know what might happen between now and Monday morning.  I'm not

11  going to swear in jury in.  The case is not going to start

12  until Monday.  There is an outside possibility we may need to

13  avail ourselves of your attendance.  So those of you who are in

14  the back of the room and not been seated in the jury thus far

15  are instructed to remain available.  I'm going to now give some

16  instructions to both the sitting jury and those who remain.  I

17  want you to listen to it carefully.  I'm going to sit down to

18  do that, if you don't mind.

19          Ladies and gentlemen, you have been chosen to be the

12:25 20  judges of the facts in this case.  We will begin this trial

21  next Monday, that is on Monday, September 13th at 9:00 a.m. in

22  this courtroom, at which time I will instruct you on your duty

23  and conduct as jurors and the role of the judge, the jury, and

24  the lawyers.

25          Now, for the duration of this trial, we will start

each morning at about 9:00 a.m.  We will start about 9:00 a.m.

We'll talk a short morning recess, break for lunch at about

1 o'clock, reconvene at about 2 o'clock, and then proceed with

the trial until approximately 3:30 each day, not after 3:30.

On days on which you are deliberating to a verdict, we

will continue until about 5:00 p.m.  As I said, the trial will

begin on Monday morning and will proceed day-to-day.  I expect

it will be completed by Friday, October 8th, or at least during

the week of October 11th.  In other words, it's going to be

done by the middle of October.  I'm giving that an outside --

there's a possibility it may be before that.  In any event,

it's going to be concluded by the middle of October.

Now, during the course of the trial, there are going

to be certain days that we will not have sessions.  I already

know that next Tuesday afternoon, that's the 14th, I have prior

business so we're only going to go until about one or 1:30 on

Tuesday.  Also, on Wednesday, in anticipation of the Jewish

high holiday, which is Yom Kippur on Thursday, we're going to

break a little earlier than 3:00 p.m. Wednesday.  We will have

no session on Thursday.  That's the high Jewish holiday.  Then

on Thursday, September 30th, the Court has prior judicial

business that I must attend to, so we will not have a session

on Thursday, September 30th.  Now, this schedule may change as

we go along.  There may be a day we don't need a full afternoon

schedule, and I will let you know about that.

```
 1              You are now going to be excused for the weekend.  I
 2     will remind you that you are not, under any circumstances,
 3     discuss this case with anyone or conduct any independent
 4     research.  If you did so, it would be in violation of your oath
 5     as jurors and it might even cause a mistrial at great expense
 6     to the parties and the Court.
 7              Then you may recall that yesterday I gave you a
 8     written instruction.  I'm going to read that again to put it in
 9     your heads.
12:28 10          Please do not discuss this case with anyone, including
11     your family members, your co-workers, your friends O your
12     fellow potential jurors.  Please do not communicate with anyone
13     about this case using your cell phone, e-mail, smart phone,
14     text messaging, Twitter, blogs or websites, internet chat
15     rooms, or social networking websites, such as Facebook,
16     MySpace, LinkedIn or YouTube.  As long as you are a potential
17     juror in this case, you are not to use any of these tools of
18     technology in connection with this case.
19              If you encounter the lawyers, witnesses or parties
12:29 20     involved in this case, please do not say anything to them.
21     Please do not read or listen to anything which in any way
22     relates to this case and do not try to do any independent
23     research or make any investigation about the case on your own.
24     The reason for all of this is that the case is going to be
25     decided based on the evidence that comes into this courtroom
```

1   and not on the basis of anything else that you may read or

2   anybody else's comments.

3        The first thing that's going to happen when you go

4   home and say I've been put on a juror or I'm potentially going

5   to be on the jury is somebody's going to say let me tell you

6   about a case that I heard about.  They're going to be since in

7   that.  There's nothing wrong with it.  You use me as the foil.

8   Say there's this ornery judge in Boston that doesn't want to

9   let us talk about the case, and that's true.  I will be ornery

12:30 10  if you do that because it does jeopardize the whole concept of

11   our judicial system.  You are not to be influenced by anything

12   outside the evidence that will come before you in this trial.

13   That's going to happen in this courtroom and not at home or

14   talk to go friends or looking at anybody on the internet.

15        So please honor my instructions.  I'm going to ask the

16   16 of you on Monday morning before we start the trial whether

17   you've been able to honor my instructions.  I hope to have a

18   unanimous showing of 16 hands.  If in the unlikely event we

19   need to call upon any of those that are alternates at this

12:30 20  stage, I will be in touch with you.  In fact, we will be in

21   touch with you on Monday to let you know that you are no longer

22   obligated to honor my instructions.  Until Monday, until you're

23   notified, I ask those in the back of the room to honor those

24   instructions.

25        Mr. McAlear will show you where to go.  My deputy is

1     going to show them the jury room right now.  You're going to go

2     through this door.  You'll see where you're going to be

3     assembling on Monday morning in the jury room.  My deputy will

4     show you that.

5          Other than that, I wish you a pleasant weekend.  You

6     can think about everything else except this case.  Don't worry

7     about this case.  Monday morning you'll go to work and that's

8     when you'll be concerned about the case.  Have a pleasant

9     weekend.  I'll see you Monday morning.

12:31 10          THE CLERK:  All rise for the jury.

11          (Jury exits.)

12          THE COURT:  We need to go over some matters but I'm

13     not prepared to have a final final pretrial conference until

14     2 o'clock.  At 2 o'clock, I'll ask you to come back.  Anything

15     we have then we'll go over the logistics of what we're going to

16     be doing on Monday morning and any other questions that counsel

17     have.  I think we all need a break right now.  I'll be back at

18     2 o'clock, unless there's something that can't wait until then.

19          MR. KELLY:  It can wait.

12:32 20          THE COURT:  We'll see you back here at 2 o'clock.

21          (Recess taken 12:33 to 2:02 p.m.)

22          THE COURT:  Good afternoon, counsel.  As we start, I

23     have issued an order ruling on all of the outstanding motions

24     with the exception of the motions that were filed by nonparties

25     yesterday.  I've not dealt with them, nor do I intend to deal

1    with them immediately.  I think they're not as time sensitive

2    as some of these others.  I don't expect to hear your reaction

3    to the entry of my order with perhaps the one exception being

4    the motion for sequestration, which is the last motion, No. 8,

5    starting on page 5.

6        I think you've stipulated, at least somewhat, as to

7    who is going to be sequestered and who isn't.  I'm not going to

8    sequester witnesses during the opening.  To the extent that the

9    Wilson's are going to be in the courtroom at that time, I am

02:03 10   not going to allow counsel to, quote, introduce them.  You can

11   refer to them during your opening if you want to, but I'm not

12   going to have you have them stand up or say anything.  That is

13   is inappropriate.

14       MR. KENDALL:  Your Honor, am I even allowed just to

15   point to them?

16       THE COURT:  You can point to them.

17       MR. KENDALL:  That's all I'll ask.  I'm just going to

18   say this is my client John Wilson.  That's his wife Leslie

19   Wright and their three children.  That's it.

02:04 20       THE COURT:  That's fine.

21       If they are going to be witnesses, they're going to be

22   sequestered after the opening.

23       MR. KENDALL:  Understood.

24       THE COURT:  The exceptions I've stated at the bottom

25   of five and going on to page 6.  The government is allowed to

       1    have a single designated agent that can be in the courtroom

       2    even though he or she may testify, but not all three.  If the

       3    other two are going to testify, they can't be in the courtroom

       4    until after they've testified.

       5         MR. FRANK:  So only one of them is on our witness

       6    list.  All three have been subpoenaed.  That's the issue,

       7    Judge.

       8         THE COURT:  In other words, the defendants are

       9    intending to call them.

02:04 10         MR. KENDALL:  Yes, your Honor.  It's very likely,

      11    particularly how we see how Singer plays out, whether he's

      12    called or not.  They've been subpoenaed in good faith.  There's

      13    a high likelihood we will call them, but it depends on what

      14    comes out at trial.

      15         THE COURT:  That may be a difference.  Why does the

      16    government feel they need to have the three agents in the

      17    courtroom during the entire trial?

      18         MR. FRANK:  We do not, your Honor.  One of the agents

      19    we've agreed should be sequestered until she testifies.  She's

02:05 20    the agent on our witness list.  The other two agents are

      21    assisting us.  They've been at witness prep sessions throughout

      22    our preparation for the trial.  They've been the case agents on

      23    the case.  I've never had a situation before where merely

      24    because the defendant has subpoenaed the case agents, which is

      25    pretty standard, that they are therefore excluded from the

```
 1   proceedings.  They're assisting us throughout.
 2           THE COURT:  My ruling is more aimed toward where the
 3   government plans to offer the testimony of an agent and I have
 4   not allowed them, especially not allowed them to sit at counsel
 5   table until after.  If it's just that they've been subpoenaed
 6   by the defendants, I'm going to allow the agents to be in the
 7   courtroom but not at counsel table.
 8           MR. FRANK:  Thank you, your Honor.
 9           THE COURT:  Is there anything else with respect to the
10   sequestration that needs to be dealt with?
11           MR. KENDALL:  One small courtesy, your Honor.  We've
12   worked out amongst ourselves how to deal with the 18 slots
13   forever the three teams.  We're going to be six, six, six.
14   Only for the openings we were wondering if we could have two of
15   the eight public seats for members of the Wilson family during
16   the opening, otherwise within the configuration there isn't
17   enough for the family.  They'll be gone after the opening.
18           THE COURT:  So two of the eight would be Wilson
19   family?
20           MR. KENDALL:  In the Court allows, yes, your Honor.
21           THE COURT:  Any objection to that?
22           MR. FRANK:  Two of the eight will be present at
23   opening and they will be members of the Wilson family.
24           MR. KENDALL:  Of the eight public seats, two of those
25   would be used by the Wilson family for opening only.
```

```
 1              MR. FRANK:  We don't have a position on that, Judge.

 2              THE COURT:  I will allow that.

 3              MR. FRANK:  Your Honor, if I could clarify.  The third

 4     agent may be present for openings but then has to be

 5     sequestered.

 6              THE COURT:  Yes.

 7              MR. FRANK:  Thank you, your Honor.

 8              THE COURT:  How we handle the public seating of the

 9     eight during the course of the trial is something I don't want

10     to get into the details of.  Either my deputy or somebody in

11     the Clerk's Office will be handling that.

12              MR. FRANK:  Your Honor, for witnesses who have

13     attorneys representing them while they testify, may those

14     attorneys be in the courtroom?

15              THE COURT:  I would think that would be an exception

16     that should be allowed.

17              We need to turn to the openings just to remind

18     counsel.  As I understand it, the government will have up to

19     45 minutes.  The defendants will have up to 30 minutes.  Who

20     will be starting?

21              MR. KELLY:  Your Honor, if I could ask the Court this:

22     Initially, the defense was given 90 minutes because there was

23     three of us left.  Third one is gone.  We're not asking for the

24     full 30 minutes.  I'd respectfully ask for five more minutes so

25     I don't violate the 30-minute deadline.  35 minutes, maybe
```

won't use it.  I don't want to go blind.  I'm asking for

35 minutes for myself, Mr. Kendall.  That would be 70 instead

of the original 90, so we'd save 20 minutes.

   THE COURT:  Does the government have any position?

   MR. FRANK:  Government has no position on that, Judge.

   THE COURT:  All right.  35.

   MR. KELLY:  Thank you, your Honor.

   THE COURT:  Each of the defendants.

   MR. KENDALL:  Thank you, your Honor.

02:09     MR. FRANK:  As a logistical matter, Judge, we expect

to have a Power Point for opening.  I believe this monitor we

discussed with the deputy could be here.

   THE COURT:  It could be.  The deputy will show you

how.  Understand again about how pet peeve of not wandering

during openings.  That doesn't mean you can't go retrieve a

document if you need to.  I don't like you wandering back and

forth.  You can't approach the jury box within 10 feet.

There's an added reason for that with the COVID.  I've never

allowed counsel to approach closer than 10 feet.  If you want

02:09  to use this portable lectern here, that's fine.  Don't go

closer than 10 feet to the box and don't wanter around while

making your opening.  If you have to go point something out,

that's okay.  The process of wandering back and forth is what

bothers me.

   MR. FRANK:  Yes, your Honor.  So we may point to

1     something on the Power Point.

2            THE COURT:  Yes.

3            MR. FRANK:  Thank you, your Honor.

4            THE COURT:  Who is going to be going first -- the

5     government opens.  Who goes first for the defense?  It will be

6     you, Mr. Kelly?

7            MR. KELLY:  Yes.

8            THE COURT:  Then Mr. Kendall to follow.

9            MR. KENDALL:  Yes, your Honor.

02:10 10            THE COURT:  Again, I caution counsel that this is not

11     a second closing argument that you're making at opening.  If

12     you can't say I expect the evidence to show before everything

13     that you say, you shouldn't be saying it.  That's what I'm

14     going to tell the jury in my opening instructions, that

15     openings are not arguments.  You will be violating what I've

16     said if you go beyond that.  All right?  Everybody understand

17     that?

18            MR. KELLY:  Yes, your Honor.

19            THE COURT:  Monday we will get through the openings

02:11 20     and therefore the government's case will start.  Who will be

21     the witnesses for the government on Monday and Tuesday?

22            MR. FRANK:  Your Honor, I expect our first witness

23     will be Bruce Isackson.

24            THE COURT:  He is who?

25            MR. FRANK:  He's a cooperating witness.  He's one of

```
 1    the parent participants in the scheme.
 2              THE COURT:  How long approximately will his direct
 3    scam be?
 4              MR. FRANK:  Between two and 3 hours.  Could be about
 5    3 hours.
 6              THE COURT:  Approximate cross?
 7              MR. KELLY:  We're just getting the notice.  I'm not
 8    faulting them.  This is the time.  We have to determine how
 9    much cross is needed for him.  I can't imagine it would be more
02:11 10   than the direct.
11              THE COURT:  But it may be as much as two or 3 hours?
12              MR. KELLY:  Doubtful.
13              THE COURT:  That is likely to be the witness that will
14    complete Monday.
15              MR. KELLY:  Yes.
16              THE COURT:  If we get beyond that, who will be the
17    government's next witness on Tuesday?
18              MR. FRANK:  It is likely to be special agent Keith
19    Brown.  It is possible that we would call Davina Isackson,
02:12 20   Mr. Isackson's wife.
21              THE COURT:  Keith Brown, how long would his direct be
22    approximately?
23              MR. FRANK:  His direct is also in the two to 3-hour
24    range Miss Isackson, if she were to testify, her direct is in
25    the 90-minute range.
```

1          MR. KELLY:  I would only say this, you're supposed to
2     tell us the witnesses, not potential.
3          MR. FRANK:  It is likely we will go to special agent
4     brown but we're now on Friday talking about Tuesday.  I
5     understood the instruction previously to be that we were to
6     tell you on Friday who is coming on Monday.
7          THE COURT:  Let's not have an argument here.  I
8     understand if the government feels the testimony of
9     Mr. Isackson isn't complete that they may need Mrs. Isackson.
02:13 10     I can't imagine why you would need 90 minutes when you've had
11     two to 3 hours for.  I understand the reasons for that.  We
12     accept the conditional statement you may or may not call her
13     in.  Mr. Brown will be the next witness after the Isackson's?
14          MR. FRANK:  Yes, your Honor.
15          THE COURT:  His direct will be two to 3 hours?
16          MR. FRANK:  Yes, your Honor.
17          THE COURT:  That looks like it takes us well into the
18     second day, if not through the second day.
19          MR. FRANK:  Yes, your Honor.  I should note it is not
02:13 20     our present intention to call Mr. Singer it testify.  He
21     remains on our list in case we change our mind, but that is not
22     our presentation.
23          MR. KELLY:  And we reserve our right to call him, your
24     Honor.
25          THE COURT:  Of course.

1          MR. KENDALL:  I didn't hear what Mr. Frank said, your

2     Honor.

3          THE COURT:  He said it is the intention right now of

4     the government not to call Mr. Singer.

5          MR. KENDALL:  That's their intention.

6          THE COURT:  That's their intention, present intention

7     without prejudice to changing their mind, which, of course, you

8     have a right to do too.

9          MR. KENDALL:  May I ask one thing, your Honor?

02:14 10          MR. KENDALL:  Of course.

11          MR. KENDALL:  With respect to Keith Brown, we don't

12     know what he's going to testify to at all.  We don't see his

13     name showing up on any 1023 reports.  I don't believe he was

14     part of an investigation that we've appreciated.  We don't know

15     if he's a summary witness, if he's going to put in tapes.

16     Could the government tell us the general topic of Mr. Brown's

17     testimony?

18          THE COURT:  Mr. Frank?

19          MR. KENDALL:  I may have missed something.

02:15 20          MR. FRANK:  His name does appear on several 1023

21     reports.  He's going to provide a brief background of the

22     investigation and principally is there to introduce e-mails and

23     phone calls.

24          MR. KENDALL:  Thank you.

25          MR. TOMBACK:  One last thing.  I'm Andy Tomback.  I

thought that the sequence was Isackson, brown, Isackson?

MR. FRANK:  It would be Isackson, possibly Isackson, brown.

MR. TOMBACK:  Thank you.

THE COURT:  Is there anything else that needs to come to the Court's attention before we adjourn for the weekend?

MR. FRANK:  Your Honor, we weren't clear based on your Honor's comments to the jury.  Is October 1st still a day when the Court is planning?

02:15 THE COURT:  The MDL has decided to go remote, so I will be working all day Thursday on MDL stuff, but I won't be out of town on Friday.  We will have a session on October 1st, Friday, October 1st.

MR. FRANK:  Thank you, your Honor.

THE COURT:  I should have mentioned that to you.  I'm sorry I didn't.  Things seem to be getting cancelled rather than scheduled more frequently.

Anything else from the defendants' side?

MR. KELLY:  For defendant Aziz, nothing further, your

02:16 Honor.

THE COURT:  Mr. Kendall?

MR. KENDALL:  One second to check my notes.

THE COURT:  You may do so.  This is likely to be the lineup on the tables as we go forward?  Is that fair to say?

MR. KELLY:  Yes, your Honor.  Just logistically, we

1   confirmed with the government, they're fine having their

2   parallel here and IT people here and we're going to sit there

3   as defendants.

4          THE COURT:  In other words, the government's going to

5   have the front left table here.

6          MR. KELLY:  That one, one-third of this, and the

7   individual yes people and tape people are sitting here.  Then

8   the defendants are in this back row.

9          THE COURT:  I see.  Mr. Kelly, you'll be on that

02:17 10  table.

11         MR. KELLY:  I will.

12         THE COURT:  With your other co-counsel.

13         MR. KELLY:  Yes.  This group here.

14         THE COURT:  And Mr. Kendall will be where he is.

15         MR. KENDALL:  We'll tuck Mr. Wilson over here.

16         THE COURT:  So it will be four per table basically.

17         MR. KELLY:  Quick math check, yes, your Honor.

18         MR. KENDALL:  Nothing further in my notes.

19         THE COURT:  Thank you, counsel.  We will go forward

02:17 20  with the trial starting at 9:00 a.m. on Monday morning.  Have a

21  good weekend.

22         (Whereupon, the proceedings concluded at 2:18 p.m.)

23

24

25

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3
     UNITED STATES OF AMERICA,          )
4                        Plaintiff      )
                                        )
5    vs.                                )  No. 1-19-CR-10080
                                        )
6    GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
7                        Defendants.    )
                                        )
8                                       )

9

10

                 BEFORE THE HONORABLE NATHANIEL M. GORTON
11                   UNITED STATES DISTRICT JUDGE
                       JURY TRIAL - DAY 4
12

13
               John Joseph Moakley United States Courthouse
14                       Courtroom No. 4
                         One Courthouse Way
15                   Boston, Massachusetts 02210

16

17                      September 13, 2021
                            9:25 a.m.
18

19

20
                     Kristin M. Kelley, RPR, CRR
21                   Kelly Mortellite, CRR, RMR
                        Official Court Reporter
22         John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
23                   Boston, Massachusetts 02210
                      E-mail: kmob929@gmail.com
24
               Mechanical Steno - Computer-Aided Transcript
25

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```



```
 1   APPEARANCES:

 2

 3          Robert L. Sheketoff

 4          One McKinley Square

 5          Boston, MA 02109

 6          617-367-3449

 7          sheketoffr@aol.com

 8          for Gamal Abdelaziz.

 9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  You may be seated.  Court is now if |
| 3 | session. |
| 4 | THE COURT:  I need to see counsel at sidebar about an |
| 5 | issue with a juror. |
| 6 | *** Beginning of sidebar *** |
| 7 | THE COURT:  Good morning, counsel.  Juror No. 69, |
| 8 | Mr. Kennie, in Seat No. 14, has informed the deputy clerk that |
| 9 | he cannot possibly serve.  He lives in Harwich.  It's a |
| 09:25 10 | terrible commute.  When asked why he didn't bring this up to us |
| 11 | in the prior three days under oath that he's been here, he said |
| 12 | nobody ever asked him specifically.  It's pretty clear he |
| 13 | doesn't want to sit on this jury.  So we have two alternatives: |
| 14 | We can excuse him and go with 15 jurors or we can cancel all of |
| 15 | today's scheduled events, call the six people back that we have |
| 16 | in reserve and go through the process of picking a fourth |
| 17 | alternate. |
| 18 | MR. KELLY:  Can you give us a moment to confer? |
| 19 | THE COURT:  Yes. |
| 09:26 20 | MR. KELLY:  Thank you, your Honor. |
| 21 | THE COURT:  Wait.  Do we have everyone represented? |
| 22 | Okay.  Go ahead. |
| 23 | MR. KELLY:  With respect to the defense's view, we'd |
| 24 | ask the Court to inquire if he insists and if, in the Court's |
| 25 | view, it is valid insistence and it's in the Court's view he |

| | |
|---|---|
| 1 | can't serve, we would like to proceed today with 15, but we |
| 2 | would ask there be some inquiry to make sure it's not just the |
| 3 | morning with the rain and he's annoyed about traveling from the |
| 4 | Cape.  It's only a 3-week trial now.  It's obviously -- he |
| 5 | agreed under oath that he could serve. |
| 6 | THE COURT:  We've also offered to put him up at a |
| 7 | hotel.  He's refused that.  He said he'd have to eat all his |
| 8 | meals out.  He answered all of the questions on the |
| 9 | questionnaire, as you may remember.  Now, he even refused to |
| 09:28 10 | tell us what his parents did for a living.  The guy was clearly |
| 11 | evasive in his response to questions. |
| 12 | MR. KELLY:  We're prepared to have him. |
| 13 | MR. KENDALL:  We'd like to keep him as a juror. |
| 14 | THE COURT:  Okay.  Do you want to be present when I |
| 15 | question him? |
| 16 | MR. KENDALL:  Whatever the Court feels is appropriate. |
| 17 | THE COURT:  I don't want to overwhelm him.  So what I |
| 18 | would do is I would invite one each to my lobby where we'll |
| 19 | have a court reporter and I will inquire of him as to whether |
| 09:28 20 | he is adamant.  Is that what you want me do? |
| 21 | MR. KENDALL:  That would be fine, your Honor. |
| 22 | MR. FRANK:  Your Honor, we think at this point he |
| 23 | needs to be stricken for cause.  He clearly doesn't want to |
| 24 | serve.  Your Honor has been clear that you basically agree with |
| 25 | that.  He's going to be disruptive.  He's going to not show up. |

```
 1   This is not somebody who is qualified to serve as a juror based
 2   on his conduct.  It's the first day of trial.
 3            MR. KELLY:  It may be first day butterflies, and if
 4   the Court talks to him, he may decide otherwise.  He said he
 5   could serve under oath.  He filled out a questionnaire.
 6            THE COURT:  I'm going to invite one counsel, one
 7   prosecutor, Mr. Kendall and Mr. Kelly to my lobby with my court
 8   reporter.  We will inquire of him briefly.
 9            Are you asking permission to question him yourselves
10   or do you want me to do the questioning?
11            MR. KELLY:  I'll defer to the Court.
12            MR. KENDALL:  I'll defer to you, your Honor.
13            THE COURT:  All right.  Then we're in recess for
14   five minutes.  We'll convene in my lobby.
15            MR. KENDALL:  Thank you, your Honor.
16                      *** End of sidebar ***
17        (Beginning of in camera conference in chambers.)
18            THE COURT:  Have a seat, Mr. Kennie, right there.
19   Good morning, sir.
20            JUROR NO. 69:  Good morning.
21            THE COURT:  I understand you have expressed concern
22   about serving on this jury.
23            JUROR NO. 69:  Surviving it, yes, the service.
24            THE COURT:  What is the problem?
25            JUROR NO. 69:  It takes me about three hours to get me
```

09:29 at line 10
09:43 at line 20

1    here in the morning.  It will probably take me at least three

2    and a half to get home.  I also drive an electric car, so I

3    have to stop for half an hour to get a charge on the way home

4    in Plymouth.  Originally, I thought you said the trial was

5    going to be five to seven days.

6            THE COURT:  When did I say that?

7            JUROR NO. 69:  When we first met you.  I figured I

8    could survive that.  With a 30-day, I could definitely not

9    survive it.

09:43 10         THE COURT:  You understand that the Court could, in an

11    extreme need, and we have in the past, put you up here at a

12    hotel during the course of the trial?

13            JUROR NO. 69:  Uh-hum.  Then I would have to go out

14    for every meal too.

15            THE COURT:  Are you asking to be excused from this

16    jury?

17            JUROR NO. 69:  I would like to be excused.

18            THE COURT:  Why didn't you bring this to our attention

19    during the three days of empanelment?

09:43 20         JUROR NO. 69:  Nobody asked me if I had any hardship,

21    and I did not think it was going to be a 30-day.

22            THE COURT:  Well, I said in this questionnaire it was

23    going to be four weeks and I asked specifically whether you had

24    any personal or business affairs that would make it difficult

25    for you to serve.  You said no.  Do you have any personal or

A974

family responsibilities, et cetera?  You said no.  Then the

last question, is there any other matter or information you

feel that the judge and attorneys should know about not covered

in the questions?  You said no.

JUROR NO. 69:  There again, I was under the impression

it was going to be a much shorter period of time.

THE COURT:  You don't remember me saying it was going

to be four weeks in this?

JUROR NO. 69:  I thought you said four to five days.

THE COURT:  Anything else you'd like to tell us as to

why you should be excused?

JUROR NO. 69:  I also have some other issues, but I'm

in the middle of a really contentious divorce.  There are some

items scheduled for later in the month, possible settlement.

THE COURT:  You mean in the divorce matter?

JUROR NO. 69:  Yes.

THE COURT:  All right.  Thank you, Mr. Kennie.  I'm

going to ask you to withdraw for a minute.  I'm going to

consult with counsel.  I'll call you back.  Thank you.

*** Juror No. 69 exits ***

THE COURT:  Counsel?  Mr. Kendall?

MR. KENDALL:  It appears that the divorce is probably

more of the issue than the commute.  With an electric car where

I park across the street, they have the electric thing right

there.  You can charge them up every morning.  I don't think

**A975**

1    that's the issue.  We like him as a juror.  We'd like to keep

2    him.  I don't know how much -- Abraham Lincoln said, "You can

3    take a horse to water."  I don't know how much we can make him

4    drink, but we'd like to keep him if we can and not waste a day.

5          MR. KELLY:  First of all, I didn't know Lincoln said

6    that, but thank you.

7          Secondly, we are on the same page.  We'd prefer to

8    have him as a juror.  He gave answers to the Court under oath.

9    The reality is the reality.  If the Court concludes it's not

09:44 10   appropriate, the scheduling hardship is too much, we'll go with

11    15 and start today.

12          THE COURT:  Mr. Frank?

13          MR. FRANK:  We think the hardship issues are genuine.

14    Six hours round trip is really inappropriate and uncalled for.

15    Staying in a hotel is a hardship in and of itself for the

16    duration of the trial.  We also now think there are genuine

17    credibility issues now with this juror.  What he just said

18    about what the Court said is false.  The Court never suggested

19    it was going to be a four or five-day trial.  Given all of

09:44 20   those issues, given his clear desire not to be here, we think

21    he should be excused for cause, and we're prepared to go

22    forward today.

23          MR. KELLY:  The other point is it doesn't take

24    three hours from Harwich.  It takes less than two.  I don't

25    think the travel consideration is there.

1          THE COURT:  I want to ask specifically, the government

2     is prepared to go ahead with 15 rather than cancel today's

3     procedures?

4          MR. FRANK:  We're a little uneasy about it, but we're

5     prepared to go ahead.

6          THE COURT:  I'm going to excuse him.  We'll go forward

7     with 15 jurors and hope we can be successful.

8          I might add that in my last major big trial, which was

9     20 something years ago, a mafia trial, the same thing happened

09:44 10    on the first day.  We had 18 jurors before excluding that one.

11    We went with 17.  Maybe I'm going to jinx something, but we

12    never had anybody miss a day during a four-month trial.

13    Seventeen jurors showed up every single day.  I'm hopeful

14    things haven't changed that much in 20 plus years and we will

15    be fine going forward with 15 jurors.

16          I'm going to call him back in, while you remain here,

17    and excuse him.  I don't know whether I'm going to thank him

18    for his service, but I'm going to excuse him because of

19    hardship reasons and leave it at that.

09:44 20               *** Juror No. 69 entered ***

21          THE COURT:  Good morning again, Mr. Kennie.  I have

22    decided after consultation with counsel to excuse you for

23    hardship.  Your service is excused for this jury.

24          JUROR NO. 69:  Thank you.

25          THE COURT:  You're excused.

1          *** Juror No. 69 excused ***

2          THE COURT:  All right, counsel.  We will go forward

3     with my opening remarks and swearing in of the jury in a couple

4     of minutes.  Thank you.

5          MR. KENDALL:  Your Honor, couple quick things.  We had

6     just wanted to clarify your preferred way for us to preserve

7     our objections.

8          THE COURT:  You have a written motion that I've read.

9     The government hasn't responded to it.

09:44 10          Does the government have a position?

11          MR. FRANK:  We think it's an appropriate way for them

12     to proceed preserving their objection.

13          MR. KENDALL:  When the first Isackson gets up, one of

14     us will say objection, your Honor, as we discussed earlier.  We

15     don't have to pop up each time that it's hearsay, that it's a

16     coconspirator?

17          THE COURT:  Yes.  The only subdivision of your motion

18     that I believe has not quite been dealt with by my earlier

19     rulings is with respect to Petrozziello and the conspiracy

09:44 20     issue.  I think it's the fifth bullet point where the

21     defendants object to the introduction of wiretaps without the

22     testimony of Mr. Singer, as the introduction of such evidence

23     violates the confrontation clause.  I'm going to reserve on

24     that one.  If that issue comes up today, you don't have a

25     standing objection.

1          MR. KENDALL:  Okay.

2          THE COURT:  I'd like to know the government's position

3     in response to that one at some future date, or if you want to

4     put it on the record now.

5          MR. FRANK:  To the extent it was a court authorized

6     wiretap, we don't see what the confrontation clause issue is.

7     It's not testimony of hearsay, in any event.  It's a

8     coconspirator statement.  To the extent the objection was the

9     one they previously made about the consensual calls, we believe

09:44 10     the Court has already addressed that.  Those statements of

11     Mr. Singer come in for context and not for the truth.

12          THE COURT:  That's not likely something that's going

13     to be addressed in the next few days, right?

14          MR. FRANK:  Maybe in the next few days, but it will

15     not be today.  We also think we would not object to a limiting

16     instruction as to Mr. Singer's statements on those.

17          THE COURT:  I will entertain a limiting instruction by

18     the defendants if they want to give me one.  I will consider

19     it.  Other than that bullet point, the motion for the

09:44 20     continuing objection is allowed.

21          MR. KENDALL:  Thank you, your Honor.  Is it going to

22     come up with Mr. Brown?

23          MR. FRANK:  There are no consensuals that are going to

24     be introduced with Mr. Brown, only wiretaps.

25          MR. KENDALL:  One last thing, your Honor.  We forgot

```
 1   to put in the motion, I think it is pretty standard, an

 2   objection for one will be an objection for both, so we don't

 3   have to both pop up each time?

 4           THE COURT:  Any problem with that?

 5           MR. FRANK:  No, your Honor.

 6           THE COURT:  That will be allowed.

 7           MR. KENDALL:  Thank you.

 8           THE COURT:  Thank you, counsel.  We'll see you in a

 9   few minutes.

10           (End of in camera conference.)

11           (Recess taken 9:44 a.m. to 9:49 a.m.)

12           (Jury enters.)

13           THE CLERK:  You may be seated.  Court is now in

14   session.

15           THE COURT:  Good morning, jurors.  Welcome back.  I

16   hope you had a pleasant weekend and are ready to go to work.

17           There's two things I need to do before we start.

18   Actually, there's three.  Was everybody able to honor my

19   instructions about not talking about or doing any independent

20   research on this case?  Please raise your hand if you have

21   abided by my instructions.

22           Thank you.  That's a unanimous showing of hands, and I

23   appreciate it.

24           The second thing I need to do is to have you stand up

25   once more and be sworn in as the jury in this case.
```

Line timestamps: 09:44 (line 10), 09:50 (line 20)

1          (Jury sworn.)

2          THE COURT:  Next thing I'm going to do is appoint

3    Mr. Ayles to be the foreman of this jury.  I need to take a

4    short recess to find my documents before we continue.

5          As you may have noticed, jurors, we did excuse one of

6    your colleagues for personal reasons so that we are going to go

7    forward with 15 jurors rather than 16.  In the process of that

8    hearing, I have misplaced remarks that I need to make to you

9    right now.  Actually, I think I've now located them.

09:52 10          Ladies and gentlemen, you've been chosen to be the

11   judges of the facts in this case.  Your responsibility in that

12   role is to listen carefully to the evidence so that you can

13   properly judge the facts.  You must decide this case only on

14   what you hear in this courtroom and only upon that information

15   which is presented to you as evidence.  That evidence will be

16   in the form of witnesses' sworn testimony, documentary

17   evidence, such as e-mails, tape recordings and other things

18   received as exhibits.  You are not to judge the facts based

19   upon what you have heard outside of this courtroom.  You're not

09:53 20   to base your decision on any bias, prejudice, or sympathy that

21   you may have.

22          With respect to your fellow jurors, feel free to get

23   to know one another, but please do not talk about the specifics

24   of this case with each other before you are asked to deliberate

25   at the end of the case.  What you say to each other based only

on some of the evidence could put a slant on this case that would be unfair. You must not form any opinion until all of the evidence has been admitted. Keep an open mind until you start your deliberations at the end of the case.

Now, during the course of the trial if at any time there's something that could assist you in understanding the case or anything that detracts from your understanding, please raise your hand. We will stop the proceedings and try to take care of the problem.

For instance, if a lawyer steps between you and a witness and you cannot see the witness, raise your hand, and we'll have the lawyer move. If you cannot hear a witness, raise your hand and we'll have that witness repeat his or her answer. If you'd like a glass of water, let us know. We'll have one brought to you. If you need a short break for any reason, we will take a short break.

Now, at the end of the trial, you will make your decision based on what you remember about the evidence. You will not have a written transcript of the testimony to read, so I urge you to pay attention to the testimony as it is presented to you at trial.

To that end, however, I am going to permit you to take notes during the course of the trial to aid your recollection. My deputy clerk will provide each of you with a notebook and a pen. The number on the cover of the notebook, if there is one,

1 should be your own jury seat number.  If there isn't one, I'd

2 like you to put your own jury seat number on that notebook when

3 you get it.  Just to remind you about the numbers of the seats,

4 Mr. Boebeck is in Seat No. 1, down through Miss Roberts, who is

5 in Seat No. 8.  Then Mr. Ayles is in Seat No. 9, down through

6 No. 15, which is Mr. Callahan's seat.  So put the number of

7 your seat on that notebook that you're going to keep and that

8 should identify it as yours.

9   You, of course, are not obliged to take any notes at

09:56 10 all.  If you do not take notes, you should not be influenced by

11 the notes of another juror, but rely only upon your own

12 recollection of the evidence.  You must not allow note taking

13 to interfere with the ongoing nature of the trial or to

14 distract you from what happens here in the courtroom.  One of

15 your most important jobs, of course, is to observe the

16 witnesses.  You can't do that while you're taking notes.  Notes

17 taken by any juror, moreover, are not evidence in the case and

18 must not take precedence over your or someone else's

19 independent recollection of the evidence received in the case.

09:56 20 Notes are only an aid to recollection and are not entitled to

21 any greater weight than actual recollection or the impression

22 of each juror as to what is the evidence.

23   You cannot take your notes outside of this courtroom

24 and the jury room.  You will leave your notebooks in the jury

25 room at the end of each session and retrieve them on the

**A983**

following morning.  So, again, I ask you to put your own seat
number on each of those notebooks.  They are for your use only.

Now, I'm the judge of the law of the case.  It's my
job to provide you with the law, and you must take the law from
me as I define it for you.  You must follow the law whether you
agree with it or not.  Occasionally, I will confer with the
lawyers in this case at sidebar where we will be discussing a
matter of law in the case.  It's not evidence and it's not
relevant to your deliberations.  We're not trying to keep
secrets from you.  We're talking about a matter of law about
which you need not be concerned.

The lawyers in this case are presenting to you the
views of things as their clients see it.  Let me caution you
that what a lawyer says here is not evidence of anything.
Statements, arguments and questions by lawyers are not
evidence.  The evidence comes from the witnesses, writings,
exhibits and any facts that the lawyers agree to or stipulate
to or that the Court may instruct you to find.

Now, with respect to the witnesses, you have broad
power.  You can believe everything a witness tells, you can
believe some of what a witness tells you, or you can
disbelieve what a witness tells you.

Certain things are not evidence and must not be
considered by you.  Again, statements, arguments and questions
by the lawyers are not evidence.

1          Objections to questions are not evidence.  You should

2    not be influenced by an objection or the Court's ruling on it.

3    If the objection is sustained, ignore the question.  If it is

4    overruled, treat the answer like any other answer.

5          Testimony that the Court has excluded or told you to

6    disregard is not evidence and must not be considered.

7          Anything you have seen or heard outside of this

8    courtroom is not evidence and must be disregarded.  You are to

9    decide this case solely on the basis of the evidence presented

09:59 10   to you in this courtroom.

11          Now, this is a criminal case and there are three basic

12   rules for you to keep in mind: First, the defendants are

13   presumed innocent until proven guilty.  The defendants start

14   this case as innocent.  You cannot draw any conclusions against

15   the defendants because they happen to be here in the Court with

16   us and the government has made some charges against them.  The

17   indictment only makes accusations, nothing more.  The

18   defendants, therefore, start out with a clean slate.

19          Second, the burden of proof is on the government

09:59 20   throughout the case.  The government must prove each and every

21   element of the offenses charged against the defendant then

22   under consideration.  The defendants do not have any burden to

23   prove their innocence or to present any evidence or to testify.

24   The defendants have the right to remain silent and the law

25   prohibits you from considering the fact that the defendants may

1    not have testified when arriving at your verdict.

2        Third, the government must prove its case against the

3    defendant then under consideration beyond a reasonable doubt.

4    This is a strict and heavy burden.  This standard requires the

5    evidence leaves no reasonable doubt concerning the defendants'

6    guilt.

7        Now, with respect to your conduct as jurors, first,

8    please do not discuss this case with anyone.  Until you're

9    retired to the jury room at the end of the case to deliberate

10:00 10    to your verdict, you simply are not to talk about this case

11    with anyone, including your family, your friends, or your

12    fellow jurors.

13        I know that many of you use cell phones, smartphones,

14    the internet, and other tools technology.  However, during this

15    jury trial you may not communicate with anyone about this case

16    using your cell phone, e-mail, smart phone, text messaging,

17    Twitter, blogs or websites, internet, chat rooms or social

18    networking websites, such as Facebook, Instagram, Twitter,

19    LinkedIn and YouTube.  If you did so, it would be a violation

10:01 20    of your oath as jurors, and might even cause a mistrial at

21    great expense to the parties and to the Court.  So I instruct

22    you, therefore, that as long as you are a juror on this case,

23    you are not to use these tools of technology in connection with

24    this case.

25        If you encounter the lawyers, witnesses or parties

```
 1    involved in this case in the hallways, cafeteria or anywhere
 2    else, please do not say anything to them.  Your talking with
 3    them while the trial is ongoing would not only have the
 4    appearance of being inappropriate, it would also be
 5    inappropriate.
 6         In addition, do not read or listen to anything in the
 7    media which in any way relates to this case and do not try to
 8    do any independent research or make any investigation about the
 9    case on your own.
10:02 10       Finally, keep your mind open and do not form any
11    opinion until all of the evidence has been presented.  Keep an
12    open mind until you start your deliberations at the end of the
13    case.
14         Now, the trial will begin with opening statements of
15    the attorneys for the parties.  An opening statement is neither
16    evidence nor argument.  It is an outline of what that party
17    intends to prove and is offered to help you follow the
18    evidence.
19         Next, the government will present its witnesses and
10:02 20    the defendants may cross-examine them.  Then the defendants
21    will present their witnesses and the government may
22    cross-examine them.  After all the evidence is in, the
23    attorneys will present their closing arguments to summarize and
24    interpret the evidence for you, and then the Court will
25    instruct you on the law.  You will then retire to deliberate to
```

1    your verdict.

2            With that, I will invite the government to make its

3    opening.  Mr. Frank.

4            MR. FRANK:  Your Honor, Miss Wright will be opening

5    for the government.  May we have a moment to set up the

6    monitor?

7            THE COURT:  Yes, you may.

8            MR. FRANK:  Thank you, your Honor.  Your Honor, the

9    jurors can also follow along on their own screens.

10:04  10            THE COURT:  Jurors, in the back row in between each

11    seat, there is a little box.  If you open that box up, you can

12    pull out a screen.  Technology is not always what it's set out

13    to be.

14            We're ready to proceed.

15            MS. WRIGHT:  It was the fall of 2018 and defendant

16    John Wilson was worried.  His twin daughters were juniors in

17    high school getting ready to apply to college.  They were good

18    students, but Wilson wanted them to go to top schools, like

19    Harvard or Stanford, and he did not want to take any chances.

10:10  20    He wanted to make sure they got in.  He wanted a guarantee.

21            The evidence in this case will show that he knew just

22    how to get one.  He called up a man named Rick Singer, a

23    college counselor who had arranged for Wilson's older son to

24    get into his top choice school just a few years earlier.

25    Together, Wilson and Singer agreed on a plan.  They would pose

**A988**

Wilson's daughters as elite athletes, even though neither one

of them was.  Singer suggested that they pose them as sailors

because Wilson had a home in Hyannisport near the water.  Then,

in exchange for what he called donations totalling

$1.5 million, Singer would arrange for insiders at Harvard and

Stanford to recruit Wilson's daughters on to their teams, and

that would effectively guarantee their admission to the

universities.  As Singer told Wilson, "It's a done deal."

      Defendant Gamal Abdelaziz, the same thing.  The

evidence will show that, in exchange for $300,000, Mr. Aziz,

that's what he goes by, agreed to have Singer get his daughter

admitted to the University of Southern California, USC, as a

phony basketball recruit.  They used a fake athletic profile to

pose her as a top ranked basketball player.  In reality, she

did not even make her high school's varsity team.

      What these two defendants did was criminal.  They

participated in a scheme to have their children admitted to

college as fake athletic recruits in exchange for money.

That's fraud.  It is also a form of bribery.  Those two crimes

are what this case is all about.

      Good morning.  My name is Leslie Wright.  I'm an

Assistant United States Attorney for the District of

Massachusetts.  With me at counsel table over here are several

of my colleagues from the U.S. Attorney's office.  Together, we

represent the United States.  Our job is to present to you the

evidence that shows beyond a reasonable doubt that these two

defendants did exactly what they're charged with doing:  Lying

to get their children into college, using money to get corrupt

insiders to make it happen and violating the federal fraud,

bribery and conspiracy laws in the process.

Now, here is what defendant John Wilson did not know

when he called Rick Singer on that September day back in 2018.

The FBI was listening to that call.  They had been on to

Singer's fraud for months and had gotten court authorization

for a wiretap on his phone.

Later, Singer agreed to make recorded calls at the

FBI's direction.  You will learn that this is a lawful and

common investigative technique.  It's designed to catch a

person committing a crime and to gather evidence of crimes that

have already been committed.  You are going to hear those

recorded calls over the course of this trial.

You will hear defendant John Wilson in his own words

tell Singer that his daughters were not very good athletes, but

that maybe they could be the water girl or the mascot for the

Harvard and Stanford teams.

You will hear Singer tell Wilson that he could not get

both of his daughters into Stanford because the sailing coach,

he had to recruit some real sailors, some real sailors, so that

Stanford would not catch on.  When you listen to that call, pay

close attention.  You will hear defendant John Wilson actually

1    laugh in response to that.

2          You will also hear recordings that Singer made with

3    defendant Gamal Abdelaziz.  Now, you will learn by the time of

4    the FBI's wiretap on Singer's phone, Aziz's daughter had

5    already been admitted to USC, so the FBI directed Singer to

6    call Aziz with a ruse.  They directed him to tell Aziz that the

7    IRS was conducting an audit of Singer and asked about the

8    payment Aziz made to get his daughter into USC.

9          In another call, the FBI directed Singer to tell Aziz

10:14 10    that USC's admission officials were wondering why his daughter

11    had not shown up for basketball practice.  Neither of those two

12    things is true.  Both were made up by the FBI.  But defendant

13    Gamal Abdelaziz did not know that.  In those calls, you will

14    hear Aziz admit exactly what he had done, the fraud he had

15    committed, the bribes he had paid as part of the scheme, and

16    you will hear him agree to lie to cover it up.

17          So how did the scheme start?  The evidence will show

18    that it started with Rick Singer, who ran a college counseling

19    business out of California called The Key.  You will learn that

10:15 20    Singer offered his clients a whole suite of services.  Some

21    were totally legitimate, like tutoring, standardized test

22    preparation, and assistance with college applications.  But

23    some were not legitimate, like arranging for test proctors to

24    cheat on the SAT and ACT on behalf of students and bribing test

25    administrators to let that cheating happen, like having

1    Singer's employees pose as students and take online classes in

2    their names to improve their GPA and by fabricating athletic

3    credentials and getting college coaches and athletic department

4    insiders to pretend to recruit those students in exchange for

5    money.

6              Singer called that last part "the side door".  You

7    will learn it was a sprawling conspiracy that extended from

8    coast to coast.  It included coaches and athletic department

9    administrators who agreed to facilitate the admission of these

10:16 10    students as phony athletic recruits in exchange for money.  It

11    included employees and associates of Singer's organization who

12    created fake athletic profiles for these students and falsified

13    their college applications, who handled the money and issued

14    fake invoices and charitable deduction letters that allowed the

15    parents to write their payments off as business expenses or

16    donations, and it included the parents themselves, like these

17    two defendants and dozens of others who agreed to the lies and

18    the payoffs that made it all possible.

19              The parents did not come up with the scheme.  That was

10:17 20    Rick Singer, but without them it never would have happened.

21              Here is how the side door scheme typically worked:

22    First, Singer pitched the parents on the scheme, telling them

23    that he could get their kids into college as athletic recruits

24    in exchange for payments.  Singer typically called the payments

25    donations and said that they would go to the university

insider's program.  In the case of the coach, that usually
meant the team that that coach coached.  In the case of an
athletic department administrator, that typically meant a
university athletic fund under that administrator's control.

Second, once the parents had agreed to the scheme,
Singer had them send him an action photo of their kid playing a
sport.  In some cases, the kids actually played the sport.  In
others, they did not.  But make no mistake.  Whether they
played or not, none of these kids were getting recruited to
play collegiate sports without the money or the fake
credentials.  That was the third step in the scheme.

With the action photo in hand, Singer had his
associates create a fake athletic profile.  Sometimes it was
totally invented.  Other times, when the kids actually played
the sport, Singer would embellish the profile, add in fake
awards, improving times, making these kids look like legitimate
athletic recruits.

Fourth, Singer sent these fake athletic profiles to
his university insiders.  You will learn that there was a whole
network of corrupt coaches and athletic department
administrators at different schools who were part of the scheme
at USC, at UCLA, at Stanford, at Yale, and at Georgetown.

Step 5.  These insiders would use those fake profiles
to get the students admitted as recruited walk-on athletes.
You will learn that's a term for a recruit who does not receive

an athletic scholarship.  As recruited walk-ons, these students bypassed the regular admission process and were typically admitted before they even applied.

Here's what the admissions department at these schools did not know, what the insiders did not tell them: These were not real recruits.  They were never going to play.  Their credentials were fabricated.  They were being recruited in exchange for money.

Step 6 was the payment.  Once the students were advised that they had been admitted, Singer's bookkeeper invoiced the parents for the agreed-upon amount.  Typically, that was around $250,000, sometimes more depending on the student, depending on the school.  The evidence will show that there were several ways in which the parents made their payments.  Let's walk through them.

In some cases, the parents paid part of the money directly to the insider's program or fund as a purported donation, and they sent the rest to Singer, usually to a sham charity that Singer set up called the Key Worldwide Foundation, or KWF, which allowed the parents to write those payments off as charitable contributions.  In a few cases, parents sent this part of the money to Singer's for-profit business, The Key, and wrote those payments off as business expenses.  In other cases, when the parents didn't split their payments like this, they would send all of the money to Singer and he took care of the

1   insiders.

2        Typically, Singer told the parents that this money

3   that they paid to KWF, or The Key, would go to support the

4   insider's program.  Sometimes some of it did.  Singer would

5   make contributions to the coach's team or to the

6   administrator's fund.  In other cases, Singer paid the coaches

7   and administrators personally, money to their own pockets or to

8   sports camps or companies they controlled, or he would pay

9   expenses for them, like the private school tuition for a

10:21 10   coach's children.

11        The evidence will show that Singer was not honest with

12   the parents.  He did not tell them about these payments to the

13   insiders' pockets, and he did not tell them that he kept a

14   large chunk of their money for himself.  Over the course of

15   this trial you will learn that those are not the only things

16   Singer was not honest about.  He was dishonest with the parents

17   in all sorts of things, about his background, his business, his

18   connections, and other things as well.

19        Now, whichever way the money flowed, Singer made clear

10:22 20   to the parents that, in exchange for their payments, the coach

21   or athletic department insider would secure an athletic

22   recruitment slot for their children, which would effectively

23   guarantee their admission.

24        The evidence will show that Singer gave the parents a

25   money back guarantee: No admission, no payment.  He told them

1    he had done it successfully for other parents many, many times

2    before.

3            Now, over the course of this trial, you will hear

4    about the admissions process for recruited athletes,

5    particularly at USC.  The key point is this: Elite

6    universities, like USC, give their athletic coaches the power

7    to recruit high school athletes they think will help their

8    teams win.  At USC, which is an athletic powerhouse, those

9    athletes, they include olympic champions and superstars who go

10:23 10   on to play professional sports.

11            You will learn that, at USC, coaches provide

12    information on their recruits to an athletic department

13    administrator who acts as a liaison between athletics and

14    admissions.  That liaison presents the coach's recruits to a

15    special athletic admissions subcommittee, called SUBCO for

16    short.  That committee is composed of admissions officers from

17    the admissions office, not the athletic department, who review

18    and approve the coach's recruits.  You will learn that the

19    overwhelming majority are recruits.

10:23 20           The upshot?  If you are talented and lucky enough to

21    be recruited by a USC coach, you are practically guaranteed

22    admission to the university, and that is even true even if your

23    grades aren't that high because the academic requirements for

24    recruited athletes are typically lower than for other

25    applicants.

1          You will learn that the athletic department's liaison

2    to the SUBCO used to be a senior administrator named Donna

3    Heinel.  The evidence will show that Heinel was one of Singer's

4    corrupt insiders.  She was not a coach.  Her job was not to

5    recruit athletes.  Her job was to just present to SUBCO the

6    athletes that coaches had recruited, but Heinel abused her

7    position and misled the committee by presenting phony recruits

8    that coaches had not actually recruited and denied knowing

9    anything about it.

10:24 10          You will learn that in her role as liaison to the

11    SUBCO, Heinel presented to the committee with recruitment

12    packets which contained basic information on each recruit, like

13    their GPA and their test scores.  That packet also included an

14    athletic profile that contained information on the recruit's

15    athletic ability, championships they had won, awards they had

16    received, and it described how they were expected to contribute

17    to USC athletics.  For the children of Singer's clients, that

18    information was fabricated.

19          You will see several of the phony recruitment packets

10:25 20    that Heinel presented to the SUBCO, like this one for defendant

21    Gamal Abdelaziz's daughter.  On the left-hand side, this is the

22    cover page of that recruitment packet.  You can see how it

23    lists the high school, her GPA, her SAT scores here.  Up above

24    under "Sport", it says "WBSK."  You will learn that's an an

25    abbreviation for women's basketball.  And here under

1   "Percentage Scholarship", "WO" for walk-on.

2         And this, this is the athletic profile that Heinel

3   presented to the SUBCO for Aziz's daughter.  You will learn

4   that Heinel took the falsified athletic profile that Singer

5   sent to her, embellished it even more, and presented Sabrina

6   Abdelaziz to the SUBCO as a basketball recruit, even though

7   USC's basketball coach had never even heard of her.

8         Here, it says Sabrina Abdelaziz is a starting point

9   guard and team captain on her high school's team.  You will

10:26 10   learn that she was not even on the team at the time.  She

11  stopped playing after her sophomore year.  You will also learn

12  that this photo that Donna Heinel presented to the SUBCO,

13  that's not even Sabrina Abdelaziz.  And here, it says "Sabrina

14  will be a great addition to our USC program."  Of course, the

15  real Sabrina did not go on to play basketball at USC.

16        Now, we expect that this document and others that I'm

17  about to show to you will be presented as exhibits during this

18  trial, so you'll see them again, and you will have them in the

19  jury room with you when you go to deliberate on a verdict.

10:27 20        One other thing to quickly note: Like here, you are

21  going to see and hear the names of the defendants' children

22  over the course of this trial.  You're going to see photos of

23  them, but this case is about what their parents did, the crimes

24  their parents committed.

25        Another of Singer's corrupt insiders was Jovan Vavic,

USC's head water polo coach.  The evidence will show that Vavic

agreed to recruit defendant John Wilson's son on to the water

polo team.  Wilson's son was a good water polo player, but he

was not good enough to play at USC.  That's not what Vavic told

the SUBCO though.

Here is what he told them in the recruitment packet he

submitted for John Wilson's son Johnny.  Now, this is a photo

of Johnny Wilson, and some of these accolades and credentials

are even his, but not all of them.  Some of them are

embellished.  For example, here Vavic told the SUBCO that

Johnny Wilson would have an immediate impact on USC's

championship water polo team.  That was false.  The reality,

Johnny never played in a single game.

Now, you will learn that the members of the SUBCO,

they were completely in the dark about all of this.  They had

no idea that Donna Heinel and Jovan Vavic were pulling the wool

over their eyes.  They believed them.  They trusted them.  They

had no reason not to.  Why did Heinel and Vavic do it?  Money,

money that these defendants and their coconspirators funneled

to Heinel and Vavic's programs through Singer, money that

helped bolster their careers at USC, and ultimately, money that

Singer funneled to Heinel and Vavic personally in the form of

^  fees and private school tuition payments.

You will learn that Singer did not share that last

part with defendants.  As I said earlier, he typically told the

1    parents the money was going to the insider's program.  In

2    Vavic's case, that was the water polo team he coached.  In

3    Heinel's case, that was usually an athletic fund that she

4    oversaw called the Women's Athletic Board.  That is where some

5    of the money went.

6         For example, here is a cashier's check that Singer

7    sent to the USC men's water polo team after Vavic agreed to

8    recruit defendant John Wilson's son, $100,000 from the Wilson

9    family.  Of course, Vavic did not tell the SUBCO that he had

10:29 10   recruited John Wilson in exchange for this money or that he had

11   done so based on embellished athletic credentials.

12        The evidence will also show that later, Singer made

13   tens of thousands of dollars in private school tuition payments

14   for Vavic's two sons.

15        Similarly, the evidence will show that in 2018 Singer

16   began sending $20,000 per month to Heinel in the form of fake

17   consulting fees.  That money, it ended up right in her pocket.

18        Here is a fake invoice that Heinel sent to disguise

19   the true nature of those monthly payments.  You will learn

10:30 20   that, at the direction of FBI agents, Singer asked Heinel to

21   add some detail to this invoice, but he did not tell her what

22   to write.

23        Here is what she came up with on her own: Consulting

24   services, interview, evaluation and assessments for prospective

25   students.  And look who she listed, Abdelaziz.  Again, Singer

1    did not let the parents in on this part of the scheme, but

2    whether the money went to the insider's pocket or to their

3    program, the important point is what the money was for, what it

4    was intended to do.  The evidence will show that here the money

5    was intended to get these university insiders to facilitate the

6    fraudulent admission of these students by deceiving the

7    admissions department into approving them as athletic recruits.

8    And that's exactly what happened.  Because of those payments,

9    Heinel and Vavic misled their USC colleagues and recruited the

10:31 10   defendants' children using falsified credentials.

11           The evidence will show that these parents knew that.

12    They knew that this scheme required them to pretend that their

13    children were recruitable athletes to falsify their

14    credentials.  That is fraud.  And wherever they thought the

15    money was going, the evidence will show that they knew it was

16    being used to get an insider to give up a recruitment slot

17    based on those phony credentials, and to mislead others to pull

18    it off.  That is a form of bribery, money to get corrupt

19    insiders to stage bogus recruitments using phony credentials.

10:32 20   That was the scheme and that is why we are here today.

21           For their actions, the defendants are charged with

22    several crimes.  At the conclusion of the trial Judge Gorton

23    will describe the charges to you and instruct you on the law.

24    For now I will give you a brief overview, but, of course, it is

25    the judge's instructions you should follow.

**A1001**

1        Both defendants are charged with conspiracy.

2   Conspiracy is simply a legal word for an agreement between two

3   or more people to commit a crime.  The agreement in this case

4   was among the defendants, Rick Singer, and all the other

5   participants in Singer's scheme, other parents, corrupt

6   insiders, like Donna Heinel and Jovan Vavic, and people who

7   worked for Singer to help make the scheme happen.

8        Now, the law does not require that all the members of

9   the conspiracy know one another or know all the details of the

10:33 10   conspiracy.  The evidence in this case will show that while the

11   defendants did not know all of the other participants, they did

12   know they were joining a larger scheme, a network, a network

13   that Singer created, and without that network, the scheme never

14   would have worked.

15        Both defendants are charged with conspiracy to commit

16   mail and wire fraud and honest services mail and wire fraud.

17   They are also charged with conspiracy to commit federal

18   programs bribery.

19        Mail and wire fraud are forms of fraud that involve

10:33 20   the use of the mail or the use of a wire communication, like a

21   phone call or an e-mail or a wire payment or transfer.  Honest

22   services fraud is another form of fraud that involves depriving

23   someone, typically an employer, of the honest services of its

24   employee.  Federal programs bribery is a form of bribery that

25   involves entities that receive federal benefits, which many

1    universities, including USC, do.

2         The defendants are charged with conspiring to commit

3    mail and wire fraud by making misrepresentations to get their

4    kids into college as something they were not, recruited

5    athletes.

6         They are charged with conspiring to commit honest

7    services fraud by getting those corrupt insiders to agree to

8    falsely present their children as athletic recruits and to lie

9    to university admission officials in exchange for money.

10:34 10        They are charged with conspiring to commit federal

11   programs bribery by giving something of value to those corrupt

12   insiders in exchange for facilitating the admission of their

13   children.

14        Defendant John Wilson is also charged with specific

15   instances of those crimes: Wire fraud, honest services wire

16   fraud, and federal programs bribery, and he is charged with

17   filing a false tax return for improperly writing off his

18   payments to Singer as business expenses and charitable

19   contributions in order to try to reduce the taxes he owed.

10:35 20        We will prove these crimes to you using several

21   different kinds of evidence.  As I noted before, the defendants

22   are two of many parents who participated in Singer's side door

23   scheme.  You will hear Singer describe the scheme to other

24   participants in his own words when the FBI had a wiretap on his

25   phone and he did not know anyone else was listening.

1      For example, you will hear a call between Singer and a

2   parent named Gordon Caplan.  During that call, Singer

3   introduced the side door scheme.  This is a transcript of that

4   call.  During trial you will have binders with copies of these

5   transcripts so that you can follow along as you listen to the

6   recordings.  Here, Singer tells Caplan, "There is a front door,

7   which means you get in on our own, based on merit."  Singer

8   says, "The back door is through institutional advancement,

9   fundraising, which is ten times as much money."  Singer says he

10:36 10  has created this side door in because the back door, there's no

11   guarantee.  They're just going to give you a second look.  And

12   Singer says his families, they want a guarantee.  In other

13   words, Singer presented his side door as a cheaper alternative

14   that provided parents with something they could not get

15   anywhere else, a guarantee of admission.

16      You will also hear a call in which Singer described

17   the scheme to Agustin Huneeus, another parent who participated

18   in the scheme, whose daughter was admitted to USC as a fake

19   water polo recruit.

10:36 20      This is a transcript of that call.  You will hear

21   Singer explain to Huneeus that Donna Heinel was going to

22   present his daughter to the SUBCO as a water polo recruit, and

23   that when she does, Singer says, "You will write a check for

24   $50,000.  It will go to Donna Heinel, senior women's athletic

25   director."  He says the check will be made out to USC Women's

Athletics.  Singer tells Huneeus, "That check, it goes right to her."  Then you will hear Huneeus ask Singer, "So there's no chance I give that $50,000 and she's not admitted?"  Singer assures Huneeus that will not happen because he won't have to send him money until he gets the admission letter.  That's that money back guarantee.

These calls will take you behind the curtain of this conspiracy and give you realtime insight into how it worked.

You will also hear directly from another parent who participated in a scheme, a man named Bruce Isackson.  You will learn that Mr. Isackson and his wife worked with Singer to get their two daughters admitted to college as state athletic recruits, their older daughter as a soccer player, even though she wasn't great at soccer, and their younger daughter as a crew recruit, even though she had never rowed crew in her life.

Mr. Isackson will explain how the fraud works and all the steps along the way, the action photos, the fake athletic profiles, the payments, and those phony charitable deduction letters.

You will hear from other participants in the scheme as well, including people who worked for Singer and helped facilitate the fraud.  One of those witnesses is Laura Janke, a former USC assistant soccer coach, who accepted bribes from Singer when she coached at USC and later went to work with him making fake athletic profiles, including this profile for

defendant Gamal Abdelaziz's daughter.  You will learn that this

profile was invented, made up from information Janke found on

the internet.  Janke will explain how she would Google

students' high schools and try to find club teams in the area

as well as tournaments and championships, things she could put

on these profiles to make them look plausible.  You will learn

that this photo on this profile, that's not Sabrina Abdelaziz

either.

Janke will also explain how Donna Heinel first got

involved in this scheme.  You will learn that once Heinel

figured out what Singer was up to with Vavic and the other

complicit USC coaches, she stepped in to facilitate the

fraudulent recruitment for herself in exchange for payments to

that fund that she oversees, oversaw.

Both Mr. Isackson and Ms. Janke pled guilty to

participating in this scheme.  They will be testifying about

their roles in it in the hopes of getting lighter sentences for

their crimes.  You will have the opportunity to evaluate their

testimony for yourselves and you will see how it is backed up

by other evidence presented to you.

For instance, you will be able to see Singer's

interactions with the defendants for yourselves because many of

their communications were by e-mail.  We are going to present

those e-mails to you in chronological order so you can see the

key milestones in the defendants' relationship with Singer.

1    Fair warning, there are a lot of e-mails.  Going through them

2    like that, it might be a bit of a slog, but we are going to ask

3    you to pay close, careful attention because those e-mails are

4    really important evidence of the scheme and of the defendants'

5    knowing participation in it.

6              For example, you will see this e-mail from March of

7    2013.  This is right around the time Singer first started

8    discussing the side door scheme with defendant John Wilson,

9    five years before those calls about Wilson's daughter.  About

10:40 10    his son, Wilson wrote "obviously his skill level may be below

11    the other freshmen".  He asks Singer, "In your view, will he be

12    so weak as to be a clear misfit at practice?"

13              That was followed a few months later by this e-mail in

14    which Singer told Wilson that Coach Jovan Vavic needed a player

15    profile so he could add Johnny to his recruit list and present

16    him to admissions in October.

17              And this one, two months after that, where Singer told

18    Wilson, "Jovan has Johnny's stuff and asked me to embellish

19    Johnny's profile more, which I am doing."  Singer also says,

10:41 20    "Jovan will provide Johnny's info to admission when he does

21    this other guy's over the next month.  No payment of money

22    until he gets a verbal and written from admissions."  Again,

23    that money back guarantee.

24              Here is the profile Singer promised, which he e-mailed

25    Wilson six days later.  You will learn that his profile, it

1   was, in fact, embellished, just like Singer said it would be.

2          Days later when Wilson asked, "What are the

3   expectations if Johnny gets into USC through this water polo

4   approach?"  Here's what Singer tells him, "Just be ready for

5   practice in the fall as a player on the roster or just a member

6   of the squad but not get in the pool."  Here, Singer is

7   assuring Wilson that his son would never need to get into the

8   pool.  He would not have to play.

9          And when his son did get admitted to USC as a water

10:42 10  polo recruit, Wilson asked Singer to send him the bill.  Here's

11  what he said:  "Thanks again for making this happen.  Please

12  give me the invoice."  He asks, "What are the options for

13  payment?  Can we make it for consulting or whatever so I can

14  pay it from the corporate account?"

15         You will learn that that's what Wilson did.  As shown

16  here, Wilson paid $100,000 from his company's account to The

17  Key.  He paid another $20,000 directly to Singer for his time.

18  The evidence will show that Wilson wrote these two payments off

19  as business expenses, and then he paid another $100,000 to

10:43 20  Singer's foundation, the Key Worldwide Foundation, and he

21  deducted that payment from his taxes as charity.

22         This is how they papered over it, with fake consulting

23  invoices and a fake donation letter saying that no goods or

24  services have been exchanged.  None of that was true.  None of

25  it.  The evidence will show that there were no consulting

A1008

services.  Of course, Wilson did receive something in exchange
for his purported donation, an athletic recruitment slot for
his son.

You are also going to hear from John Wilson's tax
preparers who will tell you about how they unwittingly prepared
the false tax returns that Wilson submitted based on these
bogus documents.

You will see a similar pattern for defendant Gamal
Abdelaziz.  First, an e-mail from Aziz to Singer with an action
photo for his daughter's athletic profile, a photo not of his
daughter, but of a different player on her high school's junior
varsity basketball team.  And then an e-mail from Singer to
Aziz attaching the fake profile that Laura Janke had created
using that same photo.  Here is what Singer asked the defendant
when he sent the profile: "Let me know if you want me to add
any other awards to her profile or if you think that is
enough."

Here is the admission approval letter that Singer sent
to Aziz after Donna Heinel presented his daughter to the SUBCO
and got her admitted to USC as a basketball recruit.  Note what
it says here, "Your records indicate that you have the
potential to make a significant contribution to the
intercollegiate athletic program, as well as to the academic
life of the university, and it requires her to register with
the NCAA.

```
 1              After his daughter was admitted to USC, Aziz received
 2     this invoice from Singer's bookkeeper for what the invoice
 3     refers to as his private contribution to the Key Worldwide
 4     Foundation.  And, finally, that same fake donation letter
 5     falsely attesting that no goods or services had been exchanged
 6     for Aziz's $300,000 payment.
 7              In addition to this evidence, you will hear from a
 8     representative of the USC admissions department, a member of
 9     the SUBCO, which was the target of the defendants' fraud, the
10:46 10 people to whom those fake athletic profiles were presented, the
11     people who were deceived.  The admissions official will tell
12     you about the trust that SUBCO placed in Donna Heinel and Jovan
13     Vavic and how Heinel and Vavic took advantage of that and
14     breached that trust.
15              As I have mentioned I think a few times now, we will
16     also present to you recordings of the defendants' calls with
17     Singer.  You will hear calls between Wilson and Singer when the
18     FBI put a wiretap on Singer's phone over four years after
19     Wilson got his son into USC through the side door, this time
10:46 20 discussing his twin daughters.
21              You will also hear calls with both defendants that
22     Singer later made at the FBI's direction.
23              You will learn that, initially, Singer was difficult
24     for the FBI agents to work with.  He agreed to make those
25     recorded calls but then he pushed back, and did he not follow
```

**A1010**

1    the agents' instructions in lots of ways, including by deleting

2    text messages.  He even accused the agents of all sorts of

3    wrongdoing.

4         The government does not intend to call Singer as a

5    witness at this trial, but you will hear his voice in recording

6    after recording.  You will see his words in e-mail after

7    e-mail.

8         You will also hear the defendants' voices and you will

9    see their words.  This trial is about them, John Wilson and

10:47 10   Gamal Abdelaziz, what they knew, what they intended and what

11   they agreed to do.  That you will hear from the defendants

12   themselves in their own words on tape when they did not know

13   anyone was listening.

14         On those calls you will hear Singer describe in detail

15   to Wilson telling him that he could pay up-front to have two

16   spots locked in for his daughters.  You will hear Singer tell

17   Wilson that it did not matter what sport they used because they

18   would not have to play.  Singer tells Wilson, "That's just the

19   path I'm going to get them in on."  Defendant John Wilson's

10:48 20   response?  "Gotcha."

21         Ultimately, you will hear Singer tell Wilson that he

22   had struck a deal with the sailing coach at Stanford and with

23   an athletic administrator at Harvard to admit Wilson's

24   daughters as athletic recruits in exchange for money.  In

25   reality, that was not true.  There was no Harvard

**A1011**

administrator.  That was a ruse concocted by the FBI, but
defendant John Wilson did not know that.  You will hear him
agree to pay over a million dollars to secure those recruitment
slots for his daughters at Harvard and Stanford, money he later
sent to an account Singer set up at the FBI's direction.
Wilson's worry, what to do if one of his daughters decided she
wanted to go to Harvard and he had already bought her a slot at
Stanford instead.  In Wilson's own words, "that would be a high
class problem."

10:49    You will also hear recordings of calls Singer made to
defendant Gamal Abdelaziz.  In those calls, you will hear Aziz
admit what he had done and agree with Singer to cover it up.

For example, here are excerpts of the calls where
Singer told Aziz that USC admissions officials were asking why
his daughter had not shown up for basketball.  Here, Singer
tells Aziz that Donna Heinel was asked by admissions as to why
Sabrina did not show up for women's basketball in the fall.
Singer says Donna told them that it was because Sabrina had
plantar fasciitis.  This too was a ruse devised by the FBI,
10:49    but, again, defendant Gamal Abdelaziz did not know that.  Here,
he agrees to give the same cover story.  "I will answer the
same should they call me."

He did not hesitate when presented with the choice to
lie.  That's what this case is about, lies, lies to obtain
athletic admissions slots that were bought and paid for.

```
 1              This case is not about wealthy people donating money

 2      to universities in the hope that their children get

 3      preferential treatment in the admissions process.  The

 4      defendants are not charged with crimes for having donated money

 5      to USC.  If that was all they had done, we would not be here

 6      today.  We are here today because these defendants made a

 7      different choice to get their children admitted to elite

 8      universities as state athletic recruits based upon falsified

 9      credentials to corrupt university insiders to mislead their own

10:51 10      colleagues in order to exchange the recruitment slots for

11      money.

12              After you have seen and heard all of the evidence, the

13      government will have the opportunity to speak with you again.

14      When we do, we will ask you to return the only verdict

15      consistent with that evidence, that the defendants, John Wilson

16      and Gamal Abdelaziz, are guilty beyond a reasonable doubt as

17      charged.  Thank you.

18              THE COURT:  For the defendant, Abdelaziz, Mr. Kelly

19      may make his opening.

10:52 20              MR. KELLY:  All set?

21              THE COURT:  You may begin.

22              MR. KELLY:  Good morning.  My client is Gamal

23      Abdelaziz.  He is not only presumed innocent under the law, he

24      actually is innocent in this case.  There are only two charges

25      against Gamal.  The evidence in this case will show he didn't
```

**A1013**

1    do either one of them.

2         Let me try this again.

3         There are two charges against him.  He didn't do

4    either one of them.  The two charges are what's called

5    conspiracy counts, basically, as the prosecutor says, an

6    agreement to do something illegal.  He never agreed to do

7    anything illegal with Rick Singer.  Rick Singer is the center

8    of this case.  The case revolves around Rick Singer, the whole

9    investigation.  It's why we're here.  And now, in opening

10:53 10    statement, the government says, never mind, we're not calling

11    him.  Think about that when you eventually deliberate.  You're

12    allowed to consider what evidence is presented and what

13    evidence is not.

14         Before I move further, if I may introduce my client.

15    He's over at the client table with me.  He has three children,

16    Sarah, Adam, and Sabrina.  Much of the evidence you will hear

17    in this case is about his third daughter, Sabrina.  His wife is

18    sitting behind him today in the courtroom.  Sabrina is back in

19    California finishing her senior year at USC.

10:54 20         For Gamal, this case came about because of a

21    conversation he had with this Rick Singer, the government's

22    star cooperating witness, who apparently they're not going to

23    call.  He knew Singer for many years before his third daughter

24    Sabrina was going to school.  He knew him from his first two

25    kids, Sarah and Adam.  Adam actually hit it off really well

**A1014**

1    with Singer.  He was sort of a mentor to Adam.

2         So by the time his third child, Sabrina, was going off

3    to college, he knew Singer and he trusted him.  He had paid

4    Singer a little over $5,000 to help with the college consulting

5    application process for his kid Adam.  Adam eventually got into

6    Columbia University in New York City.  For Gamal, his

7    impression, his mind-set, which is what matters in a conspiracy

8    case, what was he thinking, he thought Singer was legit.  He

9    had no inkling that Singer was a skilled con man.  And make no

10:55 10  mistake, that's what Singer is, an extremely skilled con man.

11        He went to Gamal's home.  Gamal trusted him, thought

12   he was a very good friend.  So that's his mind-set when he has

13   this conversation with Singer in the spring of 2017.

14        At the time he was going back and forth, Gamal was, to

15   China for business.  His third daughter, Sabrina, was heading

16   to school, to college, and he had a conversation with Singer.

17   His daughter wanted to go to college in LA.  USC, of course, is

18   in LA.  It was Singer -- so the call starts, as it usually did,

19   with chatter about Adam because Singer and Adam were very good

10:56 20  friends.  When they got through speaking about Adam, the

21   subject of Sabrina comes up.

22        Singer asked him, Gamal, "Has she played any sports in

23   high school?"  He says, "Yeah, she's played basketball."  Now,

24   Singer -- excuse me -- Gamal, he thinks it's a legitimate

25   extracurricular activity when you apply to college.  He didn't

        1    say she was a superstar.  He knew she wasn't a superstar.  She

        2    only played two years in high school.  She went to school

        3    because of his job.  It was a tremendous sacrifice.  He had to

        4    go over to Macau, China.  His wife and daughter lived in Hong

        5    Kong.  So she went to Hong Kong International School.  It's an

        6    academic school.  It's not a big sports school.  USC's probably

        7    never ever had a Division 1 recruit from this Hong Kong

        8    International School, nor was Gamal thinking that was the

        9    situation.

10:57  10          Singer tells him that USC has these walk-on spots, and

       11    if your kid wants to be a practice player or a manager and you

       12    make a big donation, it's an enormous boost to the application

       13    process, it really helps your kid get in.  Again, that's what

       14    Singer tells him.  If your kid has played a sport, which she

       15    had, basketball, she can be a practice player, team manager,

       16    and you write a big check, that helps your kid get in.

       17          So Gamal was fortunate enough at that time to have the

       18    finances to do that.  In fact, you'll hear from most people,

       19    the amount of money, $200,000, which is what was requested,

10:58  20    $200,000, not $300,000.  Singer changed it later so he could

       21    pocket a hundred, but he originally asked for $200,000.  And

       22    Gamal had it.  In fact, he had donated in the past.  In fact,

       23    after, after his son Adam was at Columbia University, the

       24    Columbia people, the development people, approached him and

       25    asked him for a donation.

1    That's what these private schools do.  USC is a

2    private school.  It's not illegal to fundraise and it's not

3    illegal to give money to a school with the hope that it helps

4    your kid get in.  And that's Gamal's mind-set.  He thought it

5    would help his kid get in.  No one ever said bribery to him.

6    No one ever said it at all.  Singer certainly didn't say it to

7    him.

8    So that's his mind-set, because that's what matters in

9    a conspiracy count.  He had already given a lot of money to

10:59 10    Columbia, $200,000, coincidentally, and Singer asked him for

11    $200,000 for USC.  So he said okay.  In fact, he ultimately

12    told Gamal that it was for a specific place at USC, the Galen

13    Center.

14    Let me show you that photo.  It's a real place.  I

15    think that is slide 8.  There it is.  So it's a real place.  In

16    Gamal's mind, it was a real donation.  These private schools

17    can use donations for many reasons, build buildings, maintain

18    operations, give scholarships to children who do not have the

19    access that his child was blessed to have.  So that's part of

10:59 20    the reason he did this.

21    Now, the government has just spoken a lot about this

22    fake athletic profile.  Yeah, it was a fake athletic profile.

23    There were all these awards on her athletic profile that he

24    didn't put on there.  What the evidence is going to show in

25    this case, that e-mail, that e-mail that they sent on

**A1017**

August 8th, that's to an e-mail address he wasn't even using, cox.net. He never replies to this e-mail. They have no evidence that he opened the attachment with the fake profile. There will be zero evidence that he looked at that fake profile because he didn't. He didn't.

That e-mail with the picture that was sent to Singer by Gamal? Yeah. He sent that picture. Singer asked him earlier on, send me pictures of Sabrina's team. Sabrina had been the MVP of her team her sophomore year. So Gamal got pictures from his wife, sent five photos, her whole team playing a game. They're not really professional pictures. Singer picks the one that's not even his kid. Gamal knows what his kid looks like, Sabrina. Singer chooses that picture. He never sees which one he picks.

In fact, later, as the government just told you, this woman Laura Janke, who's part of Singer's consulting crew, she changed the profile again without his knowledge, without his involvement, and put a second kid on there from the website of the Hong Kong school. He had no involvement in this athletic profile. The athletic profile did have fake awards. He had nothing to do with that. He gave Singer photos that his wife took. His wife took all the photos. As I said, for a period of time, he was working over in China. His daughter was in Hong Kong at this school. It's an American school. It's a better school than anything that was available to Macao, China.

So he couldn't go to any of the games.  The games were on the
weekend.  I'm sorry, during the week.  And he would travel a
couple hours from Macao to Hong Kong to see his wife and
daughter on weekends.  But he didn't make any games.  He knew
she played basketball and he was proud of her.  He was proud of
her.

The government can make fun of the fact she only
played JV, but he was a proud father.  When Singer asked if she
played any sports, he honestly said yes.

Slide 3.

In his mind, his daughter had played basketball.  She
had been the MVP.  When Singer says this school will take kids
as practice players or team managers because of these walk-on
slots that they set aside to raise money, Gamal said okay,
because USC, it was a fundraising machine.  Like other private
schools, it's permitted to fundraise.

In fact, at one point, they had a $6 billion
fundraising goal and the athletic department did its part,
raised a lot of money.  So it's not unusual that something like
that occurs.  People make donations to schools.  Sometimes it's
in gratitude because you went to the school.  Sometimes when
the money's big enough, like here, you hope it helps your kid.
That's what he did.  He was never told he was bribing a single
person.

You're going to hear all this stuff about Donna

Heinel.  Donna Heinel, he's never met her once.  The first time

he hears about her is in that set-up call after the fact.  The

calls that the government referred to are in late October of

2018.  The first one was two calls, two calls where Singer

calls out of the blue.  He hasn't talked to Singer in months.

Singer calls him.  He's driving his car.  He's in LA.  How you

doing?  They talk about Adam, like they always do.  That's when

this phony IRS is auditing me discussion comes up.  That's when

Singer tries to inject this name, Donna Heinel, into the

process.

        He's never heard of her.  At the time he was dealing

with Singer for Sabrina's application, there was no mention of

Donna Heinel.  Singer makes, the government's cooperating

witness, at the behest of the FBI, throws in Donna Heinel is

taking the money.  He's never heard of her.

        And this little invoice that they put up, this invoice

is created after his daughter had gotten into the school.  He

doesn't know about it.  It's between Singer and this person

Heinel.  It's not his doing.  It's not in his mind.

        Again, he's charged with two things, two conspiracies,

agreements to do something illegal, and he never agrees with

Singer or anyone else to bribe anyone or to defraud USC.  Those

are the crux of the two charges on him, bribery and fraud.  He

didn't do either.

        Now, you'll see -- in fact, when I say to you that he

1    had no knowledge that -- if Heinel was pocketing money, he

2    didn't know.  He didn't know that.  In fact, don't take my word

3    for it.  In this very case, there's evidence that there's no

4    evidence he thought Heinel was pocketing money.

5          A filing in this case, in this court, the government

6    was not attempting to build a case that the parents understood

7    Heinel to be personally pocketing money, and the government has

8    never alleged that.  We agree on that.  Gamal doesn't know

9    Heinel's pocketing money.  He didn't know anyone was pocketing

11:05 10    money at USC.  That's not the way it was explained to him by

11    Singer, the government's cooperating witness, because in a

12    conspiracy case, it's what Gamal was thinking and what Singer

13    would do.

14          As I said, giving money to a school with the hope it

15    helps your child get in is not a crime.  In fact, here, as I

16    said, Gamal had zero contact with the other parents, none.

17    This massive nationwide conspiracy that the government suggests

18    he's part of, it doesn't exist in his mind.  He's talking to

19    Singer.  He doesn't even know Mr. Wilson, never met him, never

11:06 20    talked to him, never seen him.  Nothing Wilson did or he did

21    affected each other.  Doesn't know the guy.  Wilson's from

22    Massachusetts.  Gamal's from Nevada.  Doesn't know him.

23          Yes, Gamal was fortunate enough to be able to make

24    this big donation, no doubt about it, but he's not a guy who

25    grew up with a lot of money.  He grew up in Egypt, one of eight

**A1021**

kids.  Like many people, he came to this country in his early

twenties.  He was dirt poor in Egypt.  He came here for more

opportunity.  When he came here legally, he became a United

States citizen.  He's been a U.S. citizen for over 35 years.

He started working in New York in the hospitality industry.  He

worked 14, 15 hours a day.  He made his money the old-fashioned

way.  He worked for it.  Then he was fortunate enough to go out

to Las Vegas, Nevada and got a high ranking job in the

hospitality industry.  So he made a lot of money, he did, but

that's not a crime, especially when a man like him worked hard

for it and he wanted to donate it where he thought it was

appropriate.

In fact, he had donated some to Columbia in the past.

So these big schools, these private schools, who are allowed to

fundraise, they want money, and it helps your child get in.

Now, this Rick Singer, cold con man, very smooth

talker -- the government has talked about how the side door was

almost, per se, illegal.  That's not the way Singer presented

it to the outside world, not at all.  He would be in public

talking about his fundraising ideas and the side door, other

donors can give money and it helps them get in.  He was a very

smooth talker.  It wasn't just Gamal who got sucked in by it.

Major corporations would listen to him.

Let me show you a tape of him talking to the Starbucks

company.

```
 1              (Audio played.)

 2              So that's Singer in action, the guy the government has

 3    built this whole case upon.  The government has suggested he

 4    has a sham charity.  Maybe he did.  In Gamal's mind, Gamal's

 5    mind, it was a legit charity.  Remember, Gamal had three kids.

 6    The second kid, Adam, had a great experience with Singer, ended

 7    up at Columbia.  He paid Singer $5,000 for his services.  It

 8    was test correcting, that sort of thing.  But part of it was

 9    Gamal trusted Singer and thought it was a legitimate charity.

10    It wasn't a sham charity.

11              His kid Adam went on a trip to Atlanta to help

12    underprivileged children.  It was a mentoring trip for

13    underprivileged kids in Atlanta.  Gamal's son traveled from

14    Nevada to Atlanta with this guy, Singer, and a few other kids.

15    That's a picture of Rick Singer in the middle here at this

16    trip.  Gamal's son is in the black shirt.  Singer's with the

17    Bruins shirt, not Boston Bruins, that's a UCLA Bruins shirt.

18    So it's a legitimate trip in Gamal's mind.  His son

19    participated.

20              So when it's referred to as a sham charity, I'm not

21    here to debate whether the charity is a proper 501(c)(3)

22    foundation.  It's registered as such when you look at the

23    website.  His son had gone on a trip, thought it was

24    legitimate.  So that's his mind-set.

25              As the government says, there's two charges in this
```

case against him, conspiracy charges.  A conspiracy charge,
they have to prove specific intent, what's in Gamal's mind, not
what's in someone else's mind.  There's no guilt by association
in federal court.  All these other parents, he doesn't know
them, doesn't know Wilson, doesn't know the rest of them.  It's
what's in his mind that matters and what Singer told him.

When Singer told him if you make a donation to USC and
they have walk-on spots for practice players and team managers,
it sounded legit.  It did not sound like he was bribing anyone.
In fact, the government's first witness who will be called,
Bruce Isackson, Singer told him some of that too.  So this is
not just jargon that Singer threw around specific to Aziz.  He
threw around a lot, practice players and team managers.

For Gamal, he's not a college sports enthusiast.  All
he knows is that his daughter played basketball in high school
and it's a good extracurricular activity, and this guy Singer,
who helped his two older kids, was telling him it would really
help get into USC is she was a practice player.  So that's all
the bribery stuff.

As I talked to you about that athletic profile, no
evidence he replied to the e-mail, no evidence he forwarded the
e-mail, no evidence he opened the attachment with all these
phony awards.  He did not agree to send a picture that wasn't
even his daughter.  This woman, Laura Janke, who's part of
Singer's stable, who will testify, she did all the awards

1    without his input.

2         As a matter of fact, at a certain point, Singer got

3    fed up with the whole situation himself.  Even Singer, the con

4    man, got disgusted with what he was doing.  Now, when he became

5    a cooperating witness, you're supposed to abide by the law at

6    that point.  He didn't, of course.  He was charged and

7    convicted of obstruction of justice, but he also wrote a note

8    to himself.  He didn't like what was happening, what he was

9    being asked to do, like fill out that invoice months afterwards

11:18 10    that had nothing to do with Gamal.  He wrote a note to himself.

11         So this is his note to his iPhone.  He's talking about

12    a loud and abrasive call with agents.  "They continued to ask

13    me to tell a fib and not restate what I told my clients where

14    the money was going -- their money was going, to the programs,

15    not the coach.  And that it was a donation.  And they wanted it

16    to be a payment.  I asked for a script, if they want me to ask

17    questions and retrieve responses that are not accurate to the

18    way I should be asking questions.  Essentially, they are asking

19    me to bend the truth.  Liz raised her voice to me like she did

11:18 20    in the hotel room about agreeing with her that everyone bribed

21    the schools, this time about asking each person to agree to a

22    lie I was telling."

23         So there's the con man himself writing a little diary

24    note.  Even he is sick of the lying.  And these tapes that you

25    will hear contain lies.  In that first call that you'll hear

1    when he says something about this Donna Heinel person, bear in

2    mind, you will hear evidence, that a week later after Singer

3    pretends that Gamal's and his daughter hang out, he tells the

4    FBI a week later he doesn't know Donna Heinel.  He thought the

5    money was going to the school.

6            Think about that.  If you think somebody is going to

7    the school to help you, that's not bribery.  Okay?

8            I'm running out of time here, so I have to be careful.

9    Let me get to a suggestion here.

11:19 10            Actually, before I get to suggestion here, the

11    original request was 200,000 from Singer.  This gets switched

12    to 300,000 because Singer wants another hundred grand for his

13    foundation.  He tells Gamal, "I'm doing great thing overseas.

14    I have all these students overseas.  I need more money for the

15    foundation."  This was Gamal's last kid, no more college after

16    this.  Gamal acquiesced, "Okay.  300,000 to your foundation."

17    Singer says, "It enhances me as a counselor if the money comes

18    from me."  At all times, he thought 200,000 was going to USC,

19    but, as it turns out, Singer took all of it.  None of it went

11:20 20    to USC, none of it.

21            As you'll hear, these athletic departments, the money

22    was not stolen by someone at USC.  So listen to that evidence

23    carefully when you hear it.

24            Couple final points.  USC, they weren't duped by what

25    happened with Sabrina Abdelaziz, not at all.  The people in the

1   athletics department and that so-called SUBCO, they have their

2   feeder schools, feeder schools like -- some high schools are

3   good at football.  So a lot of kids go to play football at the

4   school.  Around here, St. Sebastian's, boys hockey, a lot of

5   boys go for hockey, or girls lacrosse, Westwood High School.  A

6   lot of girl lacrosse players go to Westwood.  But the Hong Kong

7   International School was not a feeder school for sports.  It

8   was a feeder school for academics.  Anyone reviewing her

9   application is going to know she's not a superstar.

11:21 10          In fact, you'll hear evidence that a member of that

11   SUBCO visited her school.  They know her school.  No one ever

12   said anything to USC about a superstar in basketball named

13   Sabrina.  In fact, you'll hear a little -- you'll see a little

14   text exchange between two admissions officers regarding

15   Sabrina, Gamal's daughter.  Let me see that one.

16          So this is --

17          MR. FRANK:  Your Honor, I apologize.  I have to

18   object.

19          MR. KELLY:  It's about his daughter, your Honor.

11:22 20          MR. FRANK:  I apologize, your Honor, but this is --

21   he's misstating what this is.

22          MR. KELLY:  This is a chat between two admissions

23   people at USC pertaining directly to Sabrina Abdelaziz.

24          MR. FRANK:  It is not, your Honor.

25          THE COURT:  I'm not going to exclude it now, but I

```
 1   will hear counsel after the opening.
 2              MR. KELLY:  Sure.  So the -- it's from a man named
 3   Alexander at USC, USC.edu, to Kelsey Bradshaw, another USC
 4   person.  What's it about?  Sabrina Abdelaziz.
 5              Let me read that.  So the name, Sabrina Abdelaziz.
 6              Kelsey, "Athlete."
 7              Alexander, "Yes.  What's her deal?"
 8              Kelsey, "She's admitted."
 9              Alexander, "Do you have any background?"
10              Kelsey, "Haha."
11              Alexander, "LOL.  Is she actually a B ball player?"
12              Kelsey, "She's supposedly the best B ball player in
13   the Asian International School League."
14              Alexander, "Ha.  Good to know."
15              Kelsey, "LOL."
16              Alexander, "Thanks."
17              Kelsey, "But yes, it appears she actually plays the
18   sport."
19              Alexander, "Ha."
20              Kelsey, "That's been a problem this year."
21              Alexander, "Good to know.  The counselor reached out
22   and was like, what's up with this admit."
23              Kelsey, "LOL."
24              Alexander, "This school sends us like 60, and she's
25   near the bottom.  This is a top feeder for us abroad, so I was
```

like, umm, athlete?  I hope this isn't a surprise."

Kelsey, "LOL.  Oh, athletes."

Alexander, "Right?  Keep doing the lord's work, Kelsey."

Kelsey, "head bang."

So that's his daughter's application being discussed about the fact she already got in and she's in the athlete camp.  LOL, which means laugh out loud, of course.  Here's what's not funny.  What's not funny is we have a man, Gamal Abdelaziz, who is innocent of these two charges and yet here he is in federal court.  He will defend himself.  He's being charged with crimes he did not commit.

Apparently, the man behind it all, Rick Singer, is not coming to court.  So, please, bear in mind who's got the burden of proof here.  It's always the government who bears the burden of proof.  I can sit down and say just prove it, wouldn't have to do anything.

At the end of this case, after you hear all the evidence, please keep an open mind, and I'll come back and I will ask you if, in fact, you will return a verdict of not guilty on the two charges he's facing.

Thank you very much for your attention.

THE COURT:  Now Mr. Kendall will make an opening for the defendant Wilson.

MR. KENDALL:  Your Honor, can we take a one or

```
 1    two-minute break for technical issues?

 2            THE COURT:  Yes.  We can take a short break at this

 3    time.  We'll take a break and let's be back at 11:35.

 4            (Jury exits.)

 5            THE COURT:  Counsel, be seated for a minute.  Does the

 6    government wish to elaborate on its objection?

 7            MR. FRANK:  Your Honor, we have a number of objections

 8    to the opening.  We don't believe that video is coming into

 9    evidence.  Neither of these defendants ever saw that video.  We

10    believe it's objectionable on those grounds.

11            We believe that the reference to somebody who has been

12    identified as a non-testifying cooperating witness, the

13    reference to his guilty plea was inappropriate and contrary to

14    the Court's order.

15            With respect to that last exhibit, your Honor,

16    Mr. Kelly specifically represented to the jury repeatedly that

17    that was an exchange between two admissions department

18    officials.  That is not true.  Neither of those individuals

19    works in the admissions department.  They are low ranking

20    assistants in the athletics department.  They have nothing to

21    do with admissions.  That was simply a false statement that was

22    planted in the jury's mind.  We think it's entirely

23    inappropriate.

24            We think Mr. Kelly should instruct the jury himself

25    that what he said was untrue, that they don't work in the
```

1  admissions department.

2      We also think the jury should be instructed that the

3  opening statements and the exhibits put in front of the jury

4  during opening statements are not evidence in this case.

5      THE COURT:  Mr. Kelly, do you wish to respond?

6      MR. KELLY:  Yes, your Honor.  I think perhaps the jury

7  should be instructed that his objection is not true because

8  Kelsey Bradshaw's on their website at USC as an Associate

9  Director as an admissions counselor.  So she does work in the

11:27 10  admissions office.  I don't know what that's about.

11      We didn't object to their opening where they talked

12  about all these other parents who have nothing to do with him.

13  We let it go.  The video references the side door that they

14  talked about in their opening.  They brought it up, the side

15  door, and how he's always talking about.

16      We do have Mr. Crawford under subpoena.  If we can't

17  get in through the agent, if we can't get in through Crawford,

18  we reserve the right to call Singer ourselves.  It's relevant

19  evidence.  It goes to the heart of the scheme that they say my

11:28 20  client is part of.

21      THE COURT:  I've heard enough.  Let me say this:  If

22  counsel introduced matters in their opening which turns out is

23  not admissible, I am going to make an instruction to the jurors

24  to disregard what that particular counsel said at opening.  I

25  will entertain a short proposed instruction from the government

1    as to what it wants me to say to the jury about Mr. Kelly's

2    opening, and I'll reserve as to whether or not I will do it

3    primarily on the basis of whether it turns out what he talked

4    about was admissible or not admissible.

5        I strongly urge counsel to avoid introducing anything

6    in their openings that later turn out to be inadmissible.  If

7    that occurs, I will instruct the jury.  I think it is worse

8    than if you hadn't said it in the first place if it turns out

9    to be inadmissible evidence.

11:29  10    We're in recess for 10 minutes.

11        (Recess taken 11:29 a.m. to 11:45 a.m.)

12        (Jury enters.)

13        THE COURT:  Good morning again, jurors.  We're about

14    to hear opening for defendant, Wilson.

15        Mr. Kendall, you may proceed.

16        MR. KENDALL:  May it please the Court.

17        Good morning.  I'm Mike Kendall.  Lauren Papenhausen,

18    Andrew Tomback and I represent John Wilson.  On behalf of John,

19    we thank you for your jury service.

11:46  20    I'm going to put aside my prepared comments for a

21    minute because I want to respond to two things that Ms. Wright

22    said in her opening.  The first thing she said was, "None were

23    getting recruited without the money."  I want to show you two

24    e-mails that the government has and they knew about before they

25    made that statement.

1    Could we first have Exhibit 7255.  This is from Jack

2  Bowen, Johnny's high school water polo coach.  You don't know

3  the world of water polo.  Jack Bowen is royalty in that world.

4  Two-time MVP at the NCAA championship, he led his team to

5  victories both times, an alternate on the Olympic team.

6  Unbelievably successful high school water polo coach.  This is

7  what he wrote to the Wilsons.  "The Air Force Academy coach has

8  expressed a real interest in Johnny."

9    Can we have the next e-mail, please.  Then he's

11:47 10  reporting back to the Wilsons about Johnny.  "He continues to

11  be excited about both USC and BC and swimming at BC, and I

12  offered to write a non-academic recommendation for him if he

13  needs it, as I feel I would write a strong one on his behalf."

14  In fact, Coach Bowen did speak to the USC coaching staff and

15  told him they should recruit Johnny.

16    The next thing Ms. Wright said, "They were never going

17  to play," as if Johnny was never going to be on the team,

18  wasn't going to be at practice, wasn't going to be a part of

19  the team.

11:47 20    Could we have the photograph, please.  This is the

21  2014 USC water polo team, the official team picture.  If you

22  look in the last row on the left, the blond kid with the smile

23  is Johnny Wilson.  He was on the team.  He was what they call a

24  red shirt.  Yes, he didn't get to play in games.  There were 13

25  freshmen red shirts that year that didn't play in any games.

1   He was one of the 13, which is the backbone of the team's

2   recruiting, the red shirts, but there he is on the team.  He

3   was on the team.  He had to withdraw in January after the

4   season was over because he had a third concussion, and that was

5   enough, he thought.

6          So the other thing we have is, we agree with the

7   government.  They said John didn't know about any bribery.

8   We've just eliminated a huge part of this trial.  They

9   acknowledge that Singer never told John that whatever he was

11:48 10   doing, there was no bribery in any discussion with John.  John

11   thought he was making legal, legitimate donations, as you heard

12   Singer say in that tape, to IRS-approved charities.  Nothing

13   about improper -- why do you think we heard all this talk, Mr.

14   Huneeus, Mr. Kaplan, all these are people that have never met

15   John Wilson because he can't say anything about John Wilson

16   having any connection or knowledge that there was any bribery.

17   He made a donation to the USC water polo team that his son was

18   on.

19          Their whole case is going to boil down to can they

11:49 20   prove that a profile drafted by Mr. Singer and sent to USC is

21   somehow something John is responsible for and that it has

22   materially false statements.  No witness will say they ever

23   discussed it with John, that he ever read it or acknowledged

24   it.  No witness will support them on that.

25          There is no e-mail to show John ever commented on it

1    or discussed it with anybody.  And most importantly -- and I'm

2    not going to tell you all the evidence you're going to see --

3    you will see evidence at trial that shows why John never saw

4    that and why you can conclude he never saw that.  That's their

5    whole case.  They can't prove that he saw that profile and

6    understood what was on it.  They have nothing.

7         And so what John did know was that his children had

8    real accomplishments.  Johnny was a star high school water polo

9    player and swimmer who was qualified for USC.  He was on the

11:50 10   USC water polo team his freshman season and left because he had

11   a third concussion.  The twin girls scored really well on their

12   ACT tests for college entrance.  One got a perfect score.  The

13   other one got almost a perfect score.  He never talked about

14   misrepresenting their athletic abilities.  He said they weren't

15   as good an athlete as the boy.  They could be a team manager or

16   something like that because that's what Singer told him.

17        So let me introduce you to the Wilson family.  There's

18   John sitting there, his son Johnny, his wife Leslie, and his

19   daughters Maimi and Courtney.

11:51 20   So why is John on trial?  Because the evidence will

21   show Rick Singer is one of the great con men of our time.  He

22   specialized in stealing from rich people, and he stole over

23   half of John's donation to USC.  How could he defraud John and

24   such smart people for so many years?  Because he did what all

25   the good con men do, he mixed the truth with lies.

```
 1              Mr. Singer was one of the most successful college
 2    counselors in California.  Who did he advise?  Steve Jobs, the
 3    founder of Apple computer, the CEOs of major Hollywood studios,
 4    the CEOs of major corporations, the investment bankers.  The
 5    very most successful people in California, many of them came to
 6    him for advice.  And he was a family adviser to the Wilsons for
 7    many years before he stole from them.  He exploited the
 8    children's success and hard work to steal from their parents.
 9              Why was John a perfect mark for Mr. Singer?  The
11:52 10   evidence will show John is book smart and engineering smart,
11    but Singer is a different kind of smart.  He's a master of
12    manipulation.  All of us in this court have the benefit of
13    hindsight.  We know the end of this story before you hear the
14    first piece of evidence.  But let's look at what John knew as
15    things unfolded, as things happened.
16              If we could have the timeline, please.  The relevant
17    time starts in 1998.  John became a client of Goldman Sachs,
18    one of the world's most respected investment banks.  This part
19    of Goldman specializes in the supporting senior executives who
11:52 20   are overscheduled.  CEOs and managers need people to give them
21    support.  They need teams and they delegate authority to
22    trusted advisers.
23              John asked Goldman for advice on how to make gifts to
24    support education.  The conversations he had with Goldman show
25    John's state of mind about his gift-giving and his donations
```

and taxes.  John told Goldman that education was his priority

for what turned out to be very generous donations over the

20-year period.  Goldman provided him with advisers and

referred him to lawyers to create trusts and make educational

gifts.

I'll now tell you about John's background so you'll

John told Goldman he was focused on education because

of the role education played in changing John's life.  John

later told Mr. Singer the similar background details about

John's life, how he was born, how he grew up, what education

had done for John and John's donations for education.  Singer

used this information to manipulate and cheat John.

I'll now tell you about John's background so you'll

understand how Singer sized him up and realized he could

manipulate him.  John was born in absolute poverty.  In the

late 1950s his mother got pregnant at 15.  Her father was from

a conservative family from Puerto Rico, and he threw her out of

the house.  She became a single mother with several children

and a ninth-grade education.

John started life in a public housing project in

Hartford, Connecticut.  He told Mr. Singer that the name

"Wilson" came from the father who adopted him.  To this day,

John has no idea who is his biological father.  He has a

23andMe test, that's it.  But John explained to Singer he had

been more book smart than street smart.  He was the kid who did

well in math and science, and he got a scholarship to an

1  engineering college called Rensselaer Polytech Institute.  Then

2  he went to Harvard Business School.

3       Goldman started giving John legal and tax advice on

4  educational gifts.  He got advice on trusts to pay for

5  education for five nieces and nephews.  Then he got tax advice

6  on making donations to a university.  Years before he ever met

7  Singer, he set up a will and a trust to leave $2 million to

8  Harvard and the engineering school to fund scholarships for

9  students whose parents did not go to college, to strangers,

11:55 10  like him.  They donated to other schools, too.  That's how Rick

11  Singer entered the picture.

12       Could I have the timeline, please.  John's adviser at

13  Goldman Sachs knew how John valued education.  In 2010, the

14  adviser recommended that John retain Rick Singer as Johnny's

15  college counselor.  The Goldman adviser had been recommending

16  Rick Singer to other Goldman clients for about three years.  At

17  the time it seemed like a great recommendation.  As I said

18  earlier, Mr. Singer was one of the most successful college

19  counselors in California.

11:55 20       Can we have the websites, please.  He had very slick

21  websites.  He eventually wrote two books on college counseling.

22  These are reprints from a later time.  And he got glowing

23  references.  When Goldman referred Mr. Singer to another

24  financial adviser, this was the biography that was presented.

25  "Read it, please.  Best-selling author Rick Singer is the CEO

and master coach.  The Key's offerings are delivered one-on-one

in the client's home or office."  Then look at the third

paragraph.  "A sampling of The Key corporate clients include

Morgan Stanley, Smith Barney, Wells Fargo, the Pacific

Institute, Disney Records," and various other respected

corporations.

Why did Singer drop these names and cite these things

to John and other people?  So they'd trust him, so that he'd

defer to their advice.  Mr. Singer's client list from the

company, there's well over a thousand, I think over 1500 names

on it.  A lot of these people are like John.  They hired

Mr. Singer for standard college advising.  They did not pay

anyone to cheat on tests, and they did not pay bribes.

In 2010, Mr. Singer started to advise Johnny Wilson.

Johnny was a star high school swimmer and water polo player.

That's him winning the championship in the butterfly, the

toughest stroke in swimming competition at the league

championship in high school.

Next one, please.  That's him taking a shot in a game

in high school.  His high school team I think won 14 league

championships out of 17 years, something like that.

Johnny was on multiple club and school teams.  Singer

was a sports fanatic and a good adviser for high school

athletes.  For three years he regularly came to the Wilson

house, once every three weeks, once every four weeks, whatever

was the schedule, and then he'd call Johnny during the
in-betweens of the meetings.  He gave advice on tutors and
writing coaches, sports and academics.  John wanted him to keep
track of the boy, so he'd focused on school and not all on
sports.  And they trusted him so much.  They let Singer meet
and talk alone with their son for three years.  John's not the
type of father who would leave his son alone to someone he
thought corrupt.

Then in 2012, the office supply retailer called
Staples hired John to be president of its European operations.
John had to move to Holland for the next four years.  It was a
great career opportunity for John, and John's internet sales
were crushing Staples, and Staples wanted a president to see if
they could fight Amazon and save the 12,000 jobs of the Staples
employees in Europe.  It was so stressful, John gained 40
pounds those years.

Johnny stayed in California to finish high school.
You can see that brings us up to about 2012, 2013.  And the
Wilsons asked Mr. Singer to help Johnny manage his college
applications.  The mom and girls were in Europe, too, with
their father.

While John was working in Holland, Mr. Singer
implemented the scheme to steal from John.  First he told John
several true facts.  He said water polo could help Johnny get
into college.  He said if Johnny worked hard with Mr. Singer's

1    tutor, he could get a strong result on his college boards.

2    Johnny did.  He also said that for students like Johnny who are

3    qualified to meet USC standards, making a donation could give

4    them a boost.  Mr. Singer said colleges give a preference to

5    the children of donors and that the coaches at USC could

6    support an applicant whose family would donate to the team.

7         Mr. Singer called the strategy and giving a donation

8    to a specific a team or university program a side door.  When

9    he explained it to John, he described the side door as a

11:59 10   completely legal fundraising strategy approved by USC and other

11   schools to raise funds for specific teams and programs.

12   Mr. Singer never told John that a side door included bribery or

13   fraudulent credentials.

14        USC recruited a few top water polo players and gave

15   them scholarships, but the team took a lot of freshmen and made

16   most of them red shirts.  Under NCAA rules in college sports, a

17   red shirt can only practice.  They are not allowed to play in

18   games.  There were 13 red shirts on the team Johnny's year.  He

19   was one of 13 kids that fit the e-mail that they showed you

12:00 20   that said he's not going to get into the pool for a game.  13

21   of them didn't get into the pool for a game that season.  And

22   that was John's concern.  He was going from being a high school

23   star on the team, all-league, the star of the high school team,

24   and he's going to be a red shirt.  But he was and he was there

25   for the season.

1          Mr. Singer said because Johnny was qualified for USC,

2     if John agreed to donate to the USC team, the coach would

3     support Johnny's application as a walk-on red shirt, and he

4     confirmed the donations would be tax deductible.

5          Now, of course the lie was he told them the donation

6     was $220,000.  $100,000 went to USC, and Singer stole the other

7     $120,000 for himself.  How could Singer steal this money so

8     easily and bamboozle John and other stuff?  We're going to show

9     you Singer tell this in his own words.  Watch this tape.  It's

12:01 10    made by the IRS and FBI agents of Mr. Singer with another

11    informant just before they confronted Singer and made him their

12    informant.  Listen to him brag, what a great con man he is.

13          (Video played.)

14    MR. KENDALL:  The evidence will show for three years

15    Mr. Singer went into John's home and smiled at his wife and

16    complimented his children.  He listened when John told him

17    about his early background in poverty and his later donations

18    for education and autism groups.  Mr. Singer knew the kid from

19    the projects would be generous and would trust Mr. Singer's

12:04 20    advice.  That's how he stole John's donation.  And once he

21    became an informant, that is how he manipulated John for the

22    IRS agents running the investigation.

23          The evidence will show that before and after he

24    started working for the government, Mr. Singer repeatedly told

25    John the side door was perfectly legitimate and exactly what

the schools wanted.  Here is a part of the tape the government

did not play.  In it Mr. Singer tells John that he negotiated

four side-door donations to Harvard.  Listen to how he

describes it, please.

          (Video played.)

          MR. KENDALL:  Mr. Singer convinced John the side-door

donations were so legitimate that Mr. Singer would negotiate

them with the President of Harvard University.  That's

obviously not true.  Mr. Singer doesn't know the President of

Harvard University.  In his eight years advising the Wilson

family, Mr. Singer never said the donation was a bribe.  He

said exactly the opposite, that it was an accepted fundraising

program.

          We will present evidence of Mr. Singer's state of mind

to show when Mr. Singer proposed side-door donations to John,

he intended to propose to offer donations to school programs.

In a conspiracy, both sides' state of mind matters.  So it's

not just evidence of John's state of mind.  It's evidence of

Mr. Singer's state of mind that we will show you.

          Earlier you heard Mr. Singer talking at Starbucks

about side-door donations.  Could we have the next exhibit,

please.  This is a proposal for a book.  You've heard him refer

to that in the Starbucks presentation.  It's an outline for a

book he was putting together.  "Getting Your Child Into College

- The Untold Story."  What was Chapter 14?  "Front, back and

 1    side-door relationships.  Who you know does matter."  Then

 2    there's an e-mail he sent to a parent that is exactly the same

 3    information he told John.  "Okay, side door is not improper,

 4    nor is back door.  Both are how all schools fund their special

 5    programs or needs."

 6         Mr. Singer repeatedly combined truth with lies.  He

 7    was completely truthful when he explained that schools like USC

 8    had a different admissions process for athletes than for

 9    non-athletes.  He was lying when he talked about meeting with

12:06  10    the President of Harvard, but he was truthful in saying that

 11    USC gave favorable admissions consideration to donors'

 12    children.

 13         The evidence will show this was part of the services

 14    that the USC Athletics Department expected of its employees.

 15    The employees would identify donors who would help the school

 16    meet its fundraising needs, and then the employees would help

 17    those donors' children get admitted.

 18         Here are two e-mails from USC Athletic Department

 19    discussing Mr. Singer.  The first comes from Pat Haden.  He is

12:07  20    the top of the athletics department.  He is the boss.  This is

 21    what he does in May 2015.  What's interesting is he meets

 22    Singer after Johnny has been admitted.  It's about a year and

 23    change after the admission of Johnny.  And one of his

 24    fundraising contacts, a lawyer named Chuck Kenworthy, is

 25    setting up a relationship.  "I would like to introduce you to

1    my friend Rick Singer.  He has asked to meet you both."  Then

2    he gives the examples of all the fundraising people he's

3    brought to USC.  Rick has worked closely with the following

4    families."  There's about eight or nine there.  John Wilson of

5    Staples is one of them.

6         Could we have the next one, please.  Then Donna Heinel

7    sends an e-mail out to Ron Orr.  Mr. Orr is the head of

8    fundraising in the athletic department.  The athletic

9    department was so focused on fundraising, they had 14

12:08 10   fundraisers just in athletics reporting up to Mr. Haden.  14

11    people full-time raising money led by Mr. Orr.  What did he

12    write?  What did Ms. Heinel tell the head of fundraising?  "I

13    also will be receiving in the next two weeks a check for

14    $50,000 from the family.  The family came to me from Rick

15    Singer who was introduced to me from Pat Haden, the head of the

16    athletics department."

17         The evidence will show the schools created this system

18    of giving an admission boost to donors.  We're not defending

19    it.  The judge will instruct you.  And that is the most

12:08 20   important part of this case, that you follow the judge's

21    instructions.  He'll instruct you on which issues are relevant

22    to your verdict and what is the applicable law.  We're not here

23    to decide whether the college fundraising system could be

24    better.  It is what it is.  And you must follow the judge's

25    instructions on the law that you are sworn to do.

```
 1          These were lawful donations John made to USC and the
 2   foundation.  The IRS has a website that listed Mr. Singer's
 3   foundation as an approved charity, so the IRS told anybody who
 4   looked it up, including John's tax advisers, that it's okay to
 5   take a deduction to The Key Foundation as well as to USC.
 6          If we could have the thank-you notes, please.  These
 7   are the thank-you notes that the school sent John, the
 8   $100,000, and the other from The Key Foundation.  John had no
 9   idea The Key Foundation was a fraud or a sham as the government
10   claims.  In fact, he used to drive his son Johnny to tutoring
11   programs in the inner city schools of Sacramento for programs
12   sponsored by The Key Foundation.  That was John's frame of
13   reference.
14          The government showed you some invoices that it said
15   were part of the tax case.  Nobody ever sent those invoices to
16   John.  They went to a bookkeeper who didn't understand how to
17   process them correctly and who missed the trojan fund letter.
18          What's the tax -- created?  John had a sub S
19   corporation, and you'll hear about tax advice that the sub S
20   corporation is called a passthrough entity.  It doesn't pay
21   taxes.  It's just a passthrough to the individual's own tax
22   return.  They mistakenly put it down as a deduction on business
23   expenses as opposed to a Schedule A deduction of a charitable
24   deduction.  Either way, it was a deduction.  It had no real
25   impact in any tax calculation.  They're just putting it in
```

12:09 (line 10)

12:10 (line 20)

**A1046**

1    there to try to dirty him up.  The same way Mr. Huneeus and Mr.

2    Kaplan and all these people he's never had contact with are

3    thrown into the case.

4         You'll see John's tax return.  In 2014 he had a

5    fabulous income.  2.5 million in adjusted gross income, 2.5.

6    He paid 953,000 in taxes.  That's about 39 percent at that

7    income rate.  He made over $300,000 in charitable

8    contributions.  So taxes and charity were about 49 percent of

9    the money he earned of two and a half million dollars.

12:11 10         He's not someone who is looking to cheat the system.

11    To say that this minor thing, the bookkeeper putting it in one

12    place as one kind of deduction instead of another place as

13    another kind of deduction as a motivation of tax evasion I

14    suggest to you is absurd.

15         I now want to move to when John hires Singer in 2018

16    to advise his daughters.  In 2018, John still did not know what

17    we know today, that Mr. Singer was a con man.  He had known and

18    trusted Mr. Singer for eight years.  Mr. Singer met John's

19    daughters at the home when they were nine years old.  They were

12:11 20    now juniors in high school, and John called Mr. Singer to hire

21    him to be an adviser to the girls.  This is where Mr. Singer

22    told him he was working with the President of Harvard on

23    side-door donations, and he was dealing with the presidents of

24    Brown and Tufts as well.  What more do you want for him to sort

25    of tell him this is an official university program than to be

1  citing all the presidents that are discussing it with him?

2  By 2018, Mr. Singer upgraded his pitch.  He told

3  Mr. Wilson that he was doing side-door donations for more than

4  50 schools.  He said the side door was so common you could use

5  it with non-athletes as well.  The daughters could be a team

6  manager or help the team in some other way.  Mr. Wilson trusted

7  Mr. Singer and believed he was telling the truth.

8  Mr. Singer had told John in 2014 that he never got

9  paid for the USC donation.  He just did it as part of the

12:12 10  friendship with John.  Of course he didn't tell him he stole

11  $120,000.  John repeated this in 2018 and said, "It's so great.

12  Why are you doing this for free?  Don't you think you should

13  get paid for helping somebody facilitate a donation?"  It shows

14  you how much he believed and trusted Singer.

15  Next slide, please.  At the same time John hired

16  Singer, the FBI recruited him to be their informant.

17  Mr. Singer told the government that sometimes he worked with a

18  cheater to pay bribes, but he told the government other parents

19  did not do these things.  They intended to make legitimate

12:13 20  donations to schools.  Mr. Singer told the government that

21  Mr. Wilson's son was a real water polo player, and they had

22  never discussed paying a bribe.  The government told Singer

23  that wasn't good enough, and they insisted he try and trick

24  Mr. Wilson.

25  This is Mr. Singer's note he wrote to himself about

John Wilson when the government was pressuring him.  "John
Wilson 20,000, nothing to do with USC, plus donation to USC
program for real polo player."  Right after Mr. Singer spoke to
John about his daughters, the government was so aggressive to
Mr. Singer, he wrote that note that Mr. Kelly showed you and I
want to show you again.

This is written on October 2.  On October 1 is when
these events happened, and they happen in part because of a
conversation he had on September 29 with John Wilson.  And
what's interesting to note is the agents are supposed to write
reports any time they have an important event in an
investigation.  They wrote nothing down about this October 1
call.  The only reason we have it is because Mr. Singer was so
distrustful and frightened and surprised at the way they wanted
him to lie about John Wilson, he secretly wrote his own note.
I suggest to you most people, even Rick Singer, don't lie in
their diary.  That's what this was, a private note he'd have so
if it ever blew up on him and the agents made him lie and
falsify evidence, he can say, "I objected and they forced me to
do it."

It's in there.  Take a moment to read it if you'd
like.  "They want me to tell a fib and not restate what I told
my clients as to where their money was going, to the program,
not the coach, and that it was a donation and they want it to
be a payment."  You'll see on the tapes they made of John how

1    they played cat and mouse with John.  "Oh, you got to make a

2    payment to the coach and to the school."  And John would say,

3    "Why would I have to make a payment to the school," not

4    realizing they had slipped in "coach" to make it sound like he

5    paid a bribe when Singer told him he never had, it had never

6    been discussed.

7            Think about that.  One of the world's greatest con men

8    wrote that even he was upset with the way the IRS wanted to

9    manipulate John Wilson.  Plus, Mr. Singer is not going to be

12:15 10    here to testify, but we don't need him.  We have his note.  We

11    know his version of events.

12           The government is supposed to follow rules in

13    investigation.  One of these is to avoid bringing -- one reason

14    for this is to avoid bringing an innocent person to trial.

15    Here you'll see the government ignored its rules in the

16    investigation.  They didn't write down all the negative things

17    Singer told them.  They didn't write down that October 1

18    meeting that caused all of these notes.  And they told Singer

19    that you had to talk to Wilson differently than the other

12:16 20    parents.  You can't be blunt.  You can't be explicit.  You

21    can't be direct because we know Wilson will not go for any of

22    it.

23           So I want to show you the type of conversation they

24    had with a parent when they had no reservations.  Could we have

25    the next exhibit, please.

```
 1              (Video played.)
 2              MR. KENDALL:  That's not how they told Singer to ever
 3      talk to John Wilson.  Never use the word "bribe."  They called
 4      up all the parents of kids who got into USC and asked them
 5      questions about it.  They have never asked John a single
 6      question about USC.  "Oh, John, did you think we bribed Coach
 7      Vavic?  John, do you remember that profile that was sent to
 8      you?  You knew it was a false profile."  They made no
 9      reference.  Three months they had undercover work with Singer
12:17 10    on John Wilson, three months, multiple phone calls, text
11      messages, e-mails.  Not once did they ever say, "Hey, John, do
12      you know that profile to USC, do you know that was a false
13      profile?"  They wouldn't go near it because they knew what
14      John's answer would be.
15              In sum, the evidence will show John Wilson did nothing
16      illegal.  He trusted a con man who stole his money.  That con
17      man knows how to play people better than anybody in this
18      courtroom.  He knows how to play an engineering nerd like John
19      Wilson.  He knows how to play some of the corrupt parents like
12:18 20    the Isacksons who may come in.  He even knows how to play FBI
21      and IRS agents.  That's what he did his whole life, played
22      people as easily as one would play a piano.
23              John Wilson did not break the law.  The government
24      concedes he had nothing to do with bribery.  They have no
25      evidence they can show you that he ever discussed and
```

1    acknowledged or did anything of a false thing to USC, and

2    there's a series of tapes that even Singer was uncomfortable

3    about.  So you'll have to hear his notes and not his testimony,

4    but the notes are all you need to understand what happened, and

5    that is why at the close of this case we will ask you to find

6    John Wilson not guilty of all of the charges.  Thank you.

7            THE COURT:  All right.  We will now proceed with the

8    evidence.  My deputy will move that screen so we --

9            MR. KELLY:  Your Honor, may I come to sidebar, please.

12:19 10         THE COURT:  Yes.

11                 *** Beginning of sidebar ***

12           MR. FRANK:  Your Honor.

13           THE COURT:  We're not all here yet.

14           MR. KELLY:  Two things, your Honor.  First, I think we

15   preserved this, but under First Circuit law, apparently I'm

16   supposed to specifically note it on the record.  Object to

17   hearsay, relevancy and prejudice with the next witness, the

18   Isacksons.  I'm supposed to be specific, I guess, so that's

19   what I'm doing for the record.  We object to them calling him.

12:20 20         MR. KENDALL:  It's just a continuing objection we

21   discussed.  We can either stand up in court or just say it now

22   as the Court would like.

23           THE COURT:  Does the government have a position?

24           MR. FRANK:  No.

25           THE COURT:  You can do either one.

```
 1            MR. KELLY:  I just think, I think we're required to,
 2     so that's why --
 3            THE COURT:  All right.
 4            MR. KELLY:  Second, more important.  Mr. Frank has
 5     told this Court these two people weren't at USC admissions.  I
 6     want to mark these for identification purposes.  They're
 7     admissions counselors.  He can't stand up to the Court and
 8     accuse me of something we didn't do.  These people work in the
 9     admissions office at USC.  He said they didn't.  I'm going to
12:20 10   object to the government doing that.  That's not appropriate.
11            THE COURT:  This was something that was done outside
12     of the hearing of the jury, and this will be taken care of
13     outside of the hearing of the jury when we don't have a jury
14     sitting here.  Okay?
15            MR. KELLY:  I just want to object on the record that
16     they are in fact admissions counselors.  When he stands up and
17     says something is not true, he shouldn't do that in front of
18     the jury.
19            THE COURT:  He didn't do it in front of the jury.
12:21 20           MR. KELLY:  He said something is not true and that --
21            THE COURT:  You're talking about what he said after I
22     dismissed the jury, so we'll talk about that when the jury is
23     not being held.  I'm not going to allow sidebars when the jury
24     is here about something that doesn't have to do with the jury.
25     So stay forewarned, this is the last time I'm going to do that.
```

```
 1              MR. FRANK:  Your Honor, he was right, I was wrong

 2     about that.  I withdraw the objection to that exhibit.  I made

 3     a mistake.  But I will preserve my objection to any other

 4     issues I raised.

 5              THE COURT:  Okay.  Fair enough.

 6                   * * * End of sidebar * * *

 7              THE COURT:  If the government would call its first

 8     witness.

 9              MR. FRANK:  Thank you, Your Honor.  The government

12:22 10   calls Bruce Isackson.

11              BRUCE ISACKSON, Sworn

12              THE CLERK:  Would you please state your name for the

13     record, spelling your last.

14              THE WITNESS:  Bruce Isackson, I-s-a-c-k-s-o-n.

15              THE COURT:  You may proceed.

16              MR. FRANK:  May I inquire of the witness, your Honor?

17              THE COURT:  Yes.  Mr. Isackson, will you pull the

18     microphone, the whole bottom moves so you can move it closer to

19     you.

12:23 20             THE WITNESS:  Got it.

21              THE COURT:  Thank you.

22                   DIRECT EXAMINATION OF BRUCE ISACKSON

23     BY MR. FRANK:

24     Q.   Good afternoon, Mr. Isackson.

25     A.   Good afternoon.
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 1     | Q. | Can you tell us where you live.                            |
| 2     | A. | Hillsborough, California.                                  |
| 3     | Q. | Is that in the Bay area?                                   |
| 4     | A. | Yes, San Francisco Bay area.                               |
| 5     | Q. | Are you currently employed?                                |
| 6     | A. | I am.                                                      |
| 7     | Q. | What do you do?                                            |
| 8     | A. | I'm a commercial real estate investor.                    |
| 9     | Q. | Do you work for yourself or are you employed by someone    |
| 12:23 10 |    | else?                                                   |
| 11    | A. | I'm employed by W.P. Investments.                         |
| 12    | Q. | Was that previously your own company?                     |
| 13    | A. | I was a partner there, yeah.                              |
| 14    | Q. | Are you married?                                          |
| 15    | A. | I am.                                                      |
| 16    | Q. | How long have you been married?                           |
| 17    | A. | 29 years.                                                 |
| 18    | Q. | And to whom are you married?                              |
| 19    | A. | Davina Isackson.                                          |
| 12:23 20 | Q. | Do you have children?                                   |
| 21    | A. | I do.                                                     |
| 22    | Q. | How many children do you have?                            |
| 23    | A. | Four.                                                     |
| 24    | Q. | Can you tell us their names and their ages, please.       |
| 25    | A. | Yes.  Evan, 25; Lauren, 23; Audrey, 21; and Ryan, 19.     |

|  |  |
|---|---|
| 1 | Q.   Mr. Isackson, have you ever pled guilty to a crime? |
| 2 | A.   Yes. |
| 3 | Q.   What crime have you pled guilty to? |
| 4 |      MR. KENDALL:  Objection, your Honor, just for the |
| 5 | matter we discussed. |
| 6 |      THE COURT:  Overruled. |
| 7 | A.   Conspiracy to commit money laundering, mail fraud and tax |
| 8 | evasion. |
| 9 | Q.   When did you plead guilty to those crimes? |
| 12:24 10 | A.   Approximately two and a half years ago. |
| 11 | Q.   Mr. Isackson, could you tell the jury in your own words |
| 12 | what you did that led you to plead guilty to those crimes? |
| 13 | A.   Yes.  I participated in a scheme to get my children |
| 14 | admitted to colleges, two of my children admitted to colleges |
| 15 | as fake athletic recruits, and I also paid to have one of my |
| 16 | daughter's test scores altered. |
| 17 | Q.   Who did you enter into that scheme with? |
| 18 | A.   Rick Singer.  And I mean, there's a lot of people that, |
| 19 | you know -- so let me give you my complete answer, I guess. |
| 12:25 20 | Rick Singer who was the mastermind, the ring leader of it, his |
| 21 | organization, The Key Foundation, his contacts at colleges in |
| 22 | the athletic department, among others, and parents like myself |
| 23 | and my wife Davina. |
| 24 | Q.   I want to return to that, but I want to take a step back |
| 25 | for a moment, sir.  Can you tell this jury where you were born? |

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Where were you born? |
| 3 | A. | San Francisco, California. |
| 4 | Q. | And how far did you go in school? |
| 5 | A. | Four years at UCLA. |
| 6 | Q. | And did you graduate? |
| 7 | A. | I did. |
| 8 | Q. | What did you graduate with? |
| 9 | A. | A degree in political science. |
| 12:26 10 | Q. | What did you do after you graduated from college? |
| 11 | A. | I became a commercial real estate broker. |
| 12 | Q. | Where was that? |
| 13 | A. | At Cushman & Wakefield. |
| 14 | Q. | That's a brokerage firm? |
| 15 | A. | It is. |
| 16 | Q. | And where did you work, what area? |
| 17 | A. | Oakland, California. |
| 18 | Q. | So back in the Bay area? |
| 19 | A. | I did. |
| 12:26 20 | Q. | You mentioned someone named Rick Singer.  Who is Rick Singer? |
| 22 | A. | Rick Singer was someone we hired to be a college counselor for two of my daughters. |
| 24 | Q. | How did you meet him? |
| 25 | A. | We met him, my wife was introduced -- my wife, my |

**A1057**

```
 1    daughters -- my daughter horseback rides, as does a woman named
 2    Elizabeth Henriquez, and her daughters were at the same
 3    competition as my wife, and Lauren was riding.  Lauren had a
 4    bad fall, ultimately had a concussion.  And they spent a couple
 5    hours hanging out together.  The talk of colleges came up, and
 6    she talked highly of Rick Singer and said it was someone my
 7    wife -- we should consider.
 8    Q.   So this was at a horseback riding competition?
 9    A.   It was.
10    Q.   And what stage was your daughter -- your daughter Lauren?
11    A.   Mm-hmm.
12    Q.   What stage was she in in high school at that point?
13    A.   I believe it was in her senior year, close to her senior
14    year.
15    Q.   And what kind of student was Lauren in high school?
16    A.   She was above average but not a superior student.  Mostly
17    B's, some A's.
18    Q.   Did there come a time after Liz Henriquez recommended Rick
19    Singer to your wife that you hired him?
20    A.   Yes.
21    Q.   What do you recall about your initial interactions with
22    Rick Singer?
23    A.   Rick had a very strong personality.  I would say he was
24    almost intimidating.  He made it clear there was one way to get
25    into schools, and that was his way.  He made us feel that we
```

A1058

```
 1   needed him more than he needed us, even though we were paying
 2   him for his services.
 3   Q.   What do you recall him telling you about your daughter
 4   Lauren's college prospect?
 5   A.   He made it clear that most of the difficult schools to get
 6   into or all of the difficult schools she would consider, with
 7   her grades and test scores, wouldn't be an option for her.
 8   Q.   Would be an option or would not?
 9   A.   Would not, would not.
10   Q.   And what schools were those that she was interested in?
11   A.   Oh, there's a list of schools, but her top choice was USC
12   at the time.
13   Q.   USC, University of Southern California?
14   A.   Correct.
15   Q.   What if anything did Rick Singer tell you he could do for
16   you to help Lauren get in?
17   A.   He basically said he had a way to get her in, and he had
18   done it countless times, and it was pretty much bulletproof.
19   Q.   What do you recall Rick Singer telling you about how it
20   would work?
21   A.   He told us that she would come into the school basically
22   as a fake soccer player, and she could gain entry through that
23   way, as a recruit, and the admissions department would be
24   fooled and take her in that way.
25   Q.   Was he that explicit?
```

12:28 (line 10)
12:29 (line 20)

```
 1    A.    Well, he basically told us that she was going to come in

 2    as a soccer player, yes.  And she was not a college-level

 3    soccer player.

 4    Q.    Did she play soccer?

 5    A.    She played high school soccer somewhat.

 6    Q.    How long did she play soccer?

 7    A.    She didn't even play her senior year in high school.

 8    Q.    Did she play soccer competitively --

 9    A.    No.

12:30 10    Q.    -- when she played?

11    A.    No.  I mean, she was an average player, a little above

12    average player.

13    Q.    But she was on her high school's team until senior year?

14    A.    Yes.  Again, she did not play senior year.

15    Q.    Did she play outside of school?

16    A.    Yeah -- no.  She played when she was younger a little bit

17    of soccer.

18    Q.    Did Rick Singer say anything to you about money?

19    A.    Yes.

12:30 20    Q.    What did he tell you?

21    A.    He basically said there was a smorgasbord of money that

22    was given to different schools based on kind of the difficulty

23    and how hard the process was.

24    Q.    What did he tell you it would cost to get Lauren into USC?

25    A.    Initially he said it was between $250,000 and $300,000.
```

**A1060**

```
 1   Q.   Did he tell you what the money was for?

 2   A.   Yeah.

 3   Q.   What did he tell you?

 4   A.   Well, he just said that we'd be making a payment to his

 5   foundation and his foundation would funnel it through to the

 6   athletic departments of those schools -- that school.

 7   Q.   To the athletic department?

 8   A.   Correct.

 9   Q.   What did you think would happen if you didn't pay the

10   money?

11   A.   There's no way Lauren could have gained entry to the

12   school on her grades or test scores.

13   Q.   Did you think your daughter Lauren was qualified to play

14   soccer at the University of Southern California?

15   A.   Not even close, no.

16   Q.   Did she intend to play soccer in college?

17   A.   No.

18   Q.   Other than making that payment to Mr. Singer's foundation

19   that you said you understood would go to the athletic program

20   at USC, what if anything did Rick Singer tell you you needed to

21   do to make this scheme work?

22   A.   Well, she was going to be posed as a soccer recruit, so we

23   needed to get a picture of her playing soccer.

24   Q.   Did he tell you how that photograph of your daughter

25   playing soccer would be used?
```

A.    Yeah.  He said he'd put together, you know, the necessary

resume that would make her out to be, you know, a superior

prospect for a college team.

Q.    Did you have an understanding of why there needed to be a

resume of your daughter's soccer skills?

A.    Yeah.  I mean, she was not a college-level soccer player.

She wasn't even an elite high school player, so he would

obviously have to embellish her record quite a bit to convince

the program that she was capable of being a Division I soccer

player.

Q.    Did he ever show you the resume?  Did you ever see it?

A.    No.

Q.    So how do you know that it was falsified?

A.    Well, she got in as a soccer player to a school she had no

ability to get in at, so it had to work.

Q.    You testified that Rick Singer told you he had done this

before?

A.    Yes.

Q.    What did he tell you about that?

A.    He told us he had done this countless times and it was

basically bulletproof.

Q.    Was it that important to you?

A.    Very important.

Q.    Why?

A.    We did not want to be guinea pigs and have this thing blow

```
 1    up and have my daughter exposed.
 2    Q.   You testified that he told you it was bulletproof.  What
 3    do you understand that to mean?
 4    A.   He said he had done it countless times.  Made it seem to
 5    us that it had been dozens of students and many at USC.
 6    Q.   Did he tell you which students or which families he worked
 7    with?
 8    A.   Not in particular, no.
 9    Q.   Did you know of any families that he worked with?
10    A.   Yes.
11    Q.   What did you know about that?
12    A.   I knew that they were, a majority of them were from
13    wealthy families and they had kids, some of them that were
14    average students and were getting into good schools.
15    Q.   Did you believe this process to be legitimate?
16    A.   No.
17    Q.   Why not?
18    A.   Well, because my daughter was getting admitted as a fake
19    soccer player, and she had no athletic ability to be going to
20    college and be admitted as a recruit.
21    Q.   Did you ultimately pursue the process for your daughter
22    Lauren at USC?
23    A.   Yes, we did.
24    Q.   Did Lauren get accepted to USC?
25    A.   No, she did not.
```

1  Q.    What happened?

2  A.    According to Rick, he said that it came out that the

3  athletic department found out she had a concussion, and because

4  of that, she would be ruled out as eligible to play on the

5  team.

6  Q.    Did you believe him when he told you that?

7  A.    She did have a concussion, but we weren't convinced that

8  was the reason, but we went with it.

9  Q.    What happened next?

12:35 10  A.    So he went over his list of schools and he came up --

11  among them was University of Santa Barbara, UC Santa Barbara,

12  and that was the school she was excited about.

13  Q.    Did there come a time when Lauren visited UC Santa

14  Barbara?

15  A.    Yes.

16  Q.    Tell us about that.

17  A.    My wife took her down to visit the campus.  They went

18  around the school.  She actually had some friends there.  And

19  she came back and was pretty excited about it and decided

12:35 20  that's where she wanted to go next.

21  Q.    What happened next?

22  A.    We got a voicemail from Rick that he left on our machine

23  that was pretty disturbing.

24        MR. FRANK:  Your Honor, at this time if we may

25  distribute to the witness and jurors binders of transcripts?

```
 1              THE COURT:  Yes.

 2              MR. FRANK:  Thank you.

 3              MR. KENDALL:  Objection, your Honor, hearsay.  And

 4   this is not a continuing but a particular objection.

 5              THE COURT:  As to what, a particular document?

 6              MR. KENDALL:  The tape he wants to play now, your

 7   Honor.  We don't think it's in furtherance of anything.

 8              THE COURT:  Mr. Frank?

 9              MR. FRANK:  Your Honor, it's admissible pursuant to
```
12:36 10   *Petrozziello*, it comes in de bene.
```
11              THE COURT:  I will allow it subject to a *Petrozziello*

12   ruling.

13              MR. FRANK:  Thank you, your Honor.

14              THE COURT:  Do you have copies for my clerks?

15              MR. FRANK:  May I proceed?

16              THE COURT:  Yes, you may.

17   BY MR. FRANK:

18   Q.   Mr. Isackson, if you could turn to the tab in your binder

19   marked 190.  If the jurors could turn to that tab as well.
```
12:38 20              THE COURT:  Before we go on, are you offering this as
```
21   an exhibit?

22              MR. FRANK:  I'm about to offer the audio as an

23   exhibit, your Honor.

24              THE COURT:  Okay.  Go ahead.

25   Q.   Prior to testifying today, did you have an opportunity to
```

```
  1  review the disc marked as Government Exhibit 190?

  2  A.   I did.

  3       MR. FRANK:  And Ms. Lewis, do you have that disc and

  4  could you show it to Mr. Isackson, please.

  5  Q.   Do you recognize that disc?

  6  A.   I do.

  7  Q.   How do you recognize it?

  8  A.   I've listened to it, and I've initialled it on the disc.

  9  It's a recording of a voicemail that Rick left for us.

 10       MR. FRANK:  The government offers 190.

 11       THE COURT:  It will be admitted.

 12       (Exhibit 190 admitted into evidence.)

 13  Q.   And turning to the transcript in your binder marked 190,

 14  prior to coming here today, did you have an opportunity to

 15  review that transcript?

 16  A.   I have.

 17  Q.   And is it a fair and accurate transcript of the recording

 18  that is Exhibit 190?

 19  A.   It is.

 20  Q.   And are those your initials and a date at the bottom of

 21  the transcript?

 22  A.   They are.

 23  Q.   So Mr. Isackson, when was this recording -- first of all,

 24  you testified this was a voicemail recording.

 25  A.   Correct.
```

12:39 (line 10)
12:40 (line 20)

|    |    |
|----|----|
| 1 | Q. Whose voicemail was this recording left on? |
| 2 | A. It was left on my wife Davina's phone. |
| 3 | Q. And did you have an opportunity to hear it? |
| 4 | A. I did. |
| 5 | Q. How did you hear it? |
| 6 | A. She played it for me. |
| 7 | Q. And that was in or about April of 2016? |
| 8 | A. That's correct. |
| 9 | Q. And the circumstances were, I believe you testified, |
| 12:40 10 | following your daughter's visit to UC Santa Barbara? |
| 11 | A. Correct. |
| 12 | MR. FRANK: Could we play Exhibit 190, please. |
| 13 | (Audio recording played.) |
| 14 | Q. Whose voice was that on that voicemail? |
| 15 | A. Rick Singer. |
| 16 | Q. Mr. Isackson, what was your reaction to receiving that |
| 17 | voicemail? |
| 18 | A. Both my wife and I were in shock. |
| 19 | Q. Did you have any idea what Rick Singer was talking about? |
| 12:42 20 | A. We had absolutely no idea. |
| 21 | Q. What do you understand him to be telling you? |
| 22 | A. He somehow was implying that we had gone behind his back |
| 23 | and talked to the coach and maybe mentioned something about |
| 24 | Rick. And we did nothing, we had no conversations with anyone. |
| 25 | Q. What did you do after you received that message? |

1    A.    Well, we picked up the phone and called Rick.

2    Q.    What did you tell him?

3    A.    We basically said we have absolutely no idea why you would

4    say something like that.  We've never talked to the soccer

5    coach.  And I said, "I don't even know the guy's name."  And

6    all of a sudden, when I said "the guy's name," he goes, "The

7    guy's name?  It's a woman there."  I said, "I don't know,

8    Rick."  And then the game was back on.  He believed -- he

9    understood we had no conversations with anyone at the school.

12:43 10    He was back working with us.

11    Q.    And even after receiving that voicemail from Rick Singer

12    you continued to work with him?

13    A.    We did.

14    Q.    Why?

15    A.    Well, we were far into the process, and to start things

16    out with someone else would have been pretty difficult at that

17    point in time.

18    Q.    Did your daughter Lauren apply to UC Santa Barbara?

19    A.    No.

12:43 20    Q.    Why not?

21    A.    Rick never told us, but basically it was too late at that

22    school, we felt, with what had transpired, but he never really

23    gave us an exact real reason.

24    Q.    Did there come a time when Singer suggested another school

25    for your daughter?

```
 1   A.    Yes.

 2   Q.    Which school?

 3   A.    UCLA.

 4   Q.    University of California at Los Angeles?

 5   A.    Correct.

 6   Q.    Did Singer tell you how the process would work with

 7   respect to UCLA?

 8   A.    Yes.

 9   Q.    What did he tell you?

10   A.    She would be admitted as a soccer player to the school.

11   Q.    Was there going to be a payment?

12   A.    Yes.

13   Q.    Do you recall the amount?

14   A.    I do.

15   Q.    How much?

16   A.    $250,000.

17   Q.    Did you believe that your daughter was qualified to be

18   recruited to play soccer at UCLA?

19   A.    No, not even close.

20   Q.    Did you believe that your daughter would be admitted to

21   UCLA without being posed as a soccer recruit?

22   A.    No.  She did not have the grades or the test scores to do

23   that.

24   Q.    Did you have an understanding of what would happen if you

25   didn't agree to pay the money?
```

```
 1    A.    Yeah.  She wouldn't have got into UCLA.

 2    Q.    Did you have an understanding of how the process would

 3    work at UCLA?

 4    A.    Yes.

 5    Q.    What was your understanding?

 6    A.    He would create a resume posing her as a fake soccer

 7    player.  He would walk through the athletics department, his

 8    contact there would walk it through the admissions, and she

 9    would be accepted as a recruit.

12:45 10         MR. FRANK:  Could we show the witness only, please,

11    200.

12    Q.    And before we look at this exhibit, Mr. Isackson, did you

13    agree to pursue the scheme with respect to UCLA?

14    A.    We did.

15    Q.    Do you recognize 200?

16    A.    Yes.

17    Q.    What is it?

18    A.    It's an e-mail.

19    Q.    Who is the e-mail from?

12:45 20    A.    Rick Singer.

21    Q.    Who is it to?

22    A.    It's to my wife, Davina, cc'ing myself and my daughter

23    Lauren.

24    Q.    What's the date?

25    A.    June 29, 2016.
```

```
 1              MR. FRANK:  The government offers 200.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 200 admitted into evidence.)

 4              MR. FRANK:  Can the members of the jury see that on

 5      their screen?

 6              THE COURT:  It's on the screen.  Not in the book.

 7              MR. FRANK:  Yes, on the screen.  If we could direct

 8      Mr. Isackson to the bottom e-mail in the chain, the first

 9      e-mail in the chain.

12:46 10 Q.   Do you see there's an e-mail there from Amy King,

11      Aking@athletics.UCLA.edu to Josh Walters,

12      jwalters@athletics.UCLA.edu, dated June 29, 2016?

13 A.   I do.

14 Q.   What is the subject?

15 A.   Lauren Isackson.

16 Q.   She writes, "Hi Josh.  Gavin, Petrina and Christina

17      reviewed all the info and are fine moving forward with Lauren.

18      The admissions committee approved her at the meeting yesterday

19      so you can let her know."  Do you know who Amy King is?

12:46 20 A.   No.  I see that she's involved in athletics, though.

21 Q.   Do you know who Josh Walters is?

22 A.   I do.

23 Q.   Who is Josh Walters?

24 A.   He was the assistant women's soccer coach.

25 Q.   Ms. King wrote, "The admissions committee approved her at
```

the meeting yesterday so you can let her know."  Do you have an

understanding of what that refers to?

A.    Yeah, that the athletic department had walked her

athletic -- you know -- application through and admissions

bought off on it.

MR. FRANK:  If we could look at the next e-mail up in

the chain.

Q.    Do you see that Mr. Walters forwarded that e-mail to

somebody named Jorge Salcedo, jsalcedo@athletics.UCLA.edu?

A.    Yes.

Q.    Do you know who Jorge Salcedo is?

A.    I do.

Q.    Who is Jorge Salcedo?

A.    He was the men's soccer coach at UCLA.

Q.    Did there come a time when you had an opportunity to meet

Jorge Salcedo?

A.    Yes.

Q.    Who introduced you to Jorge Salcedo?

A.    Rick Singer did.

Q.    Do you have an understanding of the relationship between

Mr. Salcedo and Mr. Singer?

A.    Yes.

Q.    What is your understanding?

A.    He was Mr. Singer -- he was Rick's, you know, inside track

with the athletic department at the UCLA men's soccer team.

```
  1              MR. FRANK:  If we could look at the next e-mail up in

  2   the chain.

  3   Q.   You see that Mr. Salcedo forwarded this e-mail to Rick

  4   Singer.

  5   A.   Mm-hmm.

  6   Q.   And then it's cc'd to alikhosro13@gmail.com.  Do you have

  7   any idea who that is?

  8   A.   I do not.

  9   Q.   If we could look at the next e-mail up in the chain.  Do

12:48 10   you see that Mr. Singer forwarded this on and wrote "Congrats.

 11   Finally"?

 12   A.   Mm-hmm, I do.

 13              MR. FRANK:  If we could look at the next e-mail up in

 14   the chain.

 15   Q.   Do you see that your wife Davina Isackson responded,

 16   "Rick, I know it's been a rough ride but I thank you from the

 17   bottom of my heart and soul for your persistence, creativity

 18   and commitment toward helping Lauren.  She is a great kid with

 19   a wonderful potential.  I am so excited for her to enter her

12:49 20   next phase.  Now let the adventure begin."

 21              Did you have an understanding of why your wife was

 22   thanking Rick Singer?

 23   A.   Yes.

 24   Q.   What was your understanding?

 25   A.   It was clear through his process, getting her in as an
```

1    athlete, that she was accepted to UCLA.

2    Q.    She writes.  "PS - Audrey would like to meet with you

3    soon.  When are you around?"  Can you remind us who Audrey is?

4    A.    That's my younger daughter.

5    Q.    Did you have an understanding of why your wife was

6    referencing your daughter Audrey in this e-mail?

7    A.    Yes.

8    Q.    Why?

9    A.    She wanted to do the process, you know, the college

12:49 10    process with Rick again with my daughter.

11           MR. FRANK:  Could we show the witness only Exhibit

12    203, please.

13    Q.    Mr. Isackson, do you recognize Exhibit 203?

14    A.    Yes.

15    Q.    What is it?

16    A.    It's an e-mail.

17    Q.    And who is it from?

18    A.    It's from myself to Rick Singer.

19    Q.    And what's the date?

12:50 20    A.    July 16, 2016.

21    Q.    July 16?

22    A.    July 11.  Excuse me.

23           MR. FRANK:  The government offers 203.

24           THE COURT:  It will be admitted.

25           (Exhibit 203 admitted into evidence.)

|    |    |                                                                          |
|----|----|--------------------------------------------------------------------------|
| 1  | Q. | If we could, do you see the subject line of the e-mail?                 |
| 2  | A. | Yes.                                                                     |
| 3  | Q. | It says "Invoice 1107 from The Key Worldwide Foundation."               |
| 4  | A. | Yes.                                                                     |
| 5  |    | MR. FRANK:  Ms. Lewis, could we look at the                              |
| 6  |    | attachment, please.                                                      |
| 7  | Q. | What is this attachment?                                                 |
| 8  | A. | It's an invoice for Rick's services.                                     |
| 9  | Q. | It says "Private contribution, letter of receipt will be                |

12:50 10   provided upon payment."

| 11 | A. | Yes. |
| 12 | Q. | It provides some wiring instructions below that. |
| 13 | A. | Mm-hmm. |
| 14 | Q. | And there's an amount of $250,000. |
| 15 | A. | Yes. |
| 16 | Q. | Prior to receiving this invoice, what did you know about |
| 17 |    | The Key Worldwide Foundation? |
| 18 | A. | Not a lot.  I mean, Rick had told us that it was an |
| 19 |    | accredited 501(3)(C) corporation and that he provided |

12:51 20   charitable stuff to underprivileged kids as well as helped out

| 21 |    | at programs at universities that needed funding. |
| 22 | Q. | Did you believe him? |
| 23 | A. | I knew that -- I shouldn't say "I knew."  I mean, I |
| 24 |    | thought that a small portion of what he was doing would go to |
| 25 |    | these legitimate charitable causes to cover up his scheme. |

**A1075**

1    Q.    Did you have an understanding of why you were being sent

2    this invoice?

3    A.    Yes.

4    Q.    What was your understanding?

5    A.    It was the payment that he had told us from the beginning

6    was the amount it took to get Lauren in as a fake athlete to

7    UCLA.

8            MR. FRANK:  Ms. Lewis, if we could look again at the

9    cover e-mail, and if we could look at the second e-mail in the

12:52 10    chain.

11    Q.    You wrote, "Hi Rick.  I'm in motion getting the payment

12    processed and in that regard had a question for you.  Can you

13    please give me a call today to discuss."

14            Do you recall what you wanted to discuss?

15    A.    Yes.

16    Q.    What was that?

17    A.    I wanted to make sure that if Lauren actually didn't get

18    into the school finally, that we would potentially -- we would

19    get our money back.

12:52 20    Q.    Why were you concerned about getting your money back if

21    her admission was not finalized?

22    A.    Well, I didn't want to pay $250,000, to make a $250,000

23    gift to his charity for no reason.

24    Q.    You called it a gift?

25    A.    Excuse me.  I wouldn't want to spend $250,000, make a

1    payment of $250,000 to his organization.

2    Q.    Why did you call it a gift?

3    A.    That was a Freudian slip.  It's not a gift.  It was a

4    payment.

5    Q.    Did Mr. Singer tell you it was a donation?

6    A.    Oh, yeah.  He said it was a donation to his charity,

7    correct.

8              MR. FRANK:  If we could look at the next e-mail up in

9    the chain.

12:53 10    Q.    You wrote, "Rick, thanks for the follow-up call regarding

11    the attached Key Worldwide Foundation invoice.  Per our

12    discussion, can you please send me an e-mail confirming that if

13    Lauren is not admitted to UCLA as a freshman for the fall 2016

14    class that The Key Worldwide Foundation will refund our

15    $250,000 gift."  And again, you refer to it as a gift there.

16    A.    Mm-hmm.

17    Q.    Had you previously made charitable donations, sir?

18    A.    Yes.

19    Q.    Have you ever asked for one of them back if you didn't get

12:53 20    something in exchange?

21    A.    Never.

22              MR. FRANK:  Could we show the witness only Exhibit

23    204, please.

24    Q.    Do you recognize Exhibit 204?

25    A.    I do.

```
 1    Q.    What is it?

 2    A.    It's an e-mail.

 3    Q.    Who is it from?

 4    A.    Rick Singer.

 5    Q.    Who is it to?

 6    A.    Myself, Steve Masera and Steve Masera cc'ing my wife

 7    Davina.

 8    Q.    What's the date?

 9    A.    July 11, 2016.

12:54 10              MR. FRANK:  Government offers 204.

11              THE COURT:  It will be admitted.

12              (Exhibit 204 admitted into evidence.)

13    Q.    Mr. Singer wrote to you -- first of all, before I get to

14    the text, it's sent to you, your wife and Steve Masera.  Did

15    you have an understanding of who Steve Masera was?

16    A.    Yes.

17    Q.    Who was Steve Masera?

18    A.    He was in the accounting department at The Key Foundation.

19    Q.    And did you ever have interactions with him?

12:54 20    A.    E-mails.

21    Q.    Mr. Singer wrote, "Bruce, this is to confirm that your

22    donation of $250,000 to The Key Worldwide Foundation supporting

23    educational initiatives we have created to help those who need

24    it most will be returned if Lauren's admission to UCLA is

25    reversed from the e-mail acceptance she has already received."
```

```
 1              Did you believe that your money was going to support
 2    educational initiatives to help those who need it most?
 3    A.   Absolutely not.
 4    Q.   Did you pay this invoice?
 5    A.   I did.
 6    Q.   Why did you pay it?
 7    A.   Well, I knew that if I didn't pay it, Rick would find a
 8    way to have Lauren's admission revoked.
 9              MR. FRANK:  Could we show the witness only Exhibit
10    208, please.
11    Q.   Do you recognize this document?
12    A.   Yes, I do.
13    Q.   What is it?
14    A.   It's basically, they say there's a receipt of the donation
15    to The Key Worldwide Foundation coming.  They're going to send
16    me a hard copy of it.
17              MR. FRANK:  The government offers 208.
18              THE COURT:  It will be admitted.
19              (Exhibit 208 admitted into evidence.)
20    Q.   Do you see that it's an e-mail from Steve Masera to you
21    and your wife copied to Rick Singer dated July 21, 2016,
22    Subject:  Receipt Letter?
23    A.   I do.
24    Q.   He writes, "Hello Bruce and Davina.  I have attached a
25    copy of your receipt letter for the donation made to The Key
```

1    Worldwide Foundation.  Hard copy will be mailed today also.

2    Thank you for your generosity.  Steve Masera, Director of

3    Finance at The Key."

4         MR. FRANK:  And Ms. Lewis, if we could look at the

5    receipt letter that's attached.

6    Q.   It says, "Dear Bruce and Davina.  Thank you for your

7    contribution of $251,159.51 to The Key Worldwide Foundation."

8         Sir, why is the amount different from the $250,000

9    that you were invoiced?

12:56 10    A.   Because we made this gift with stock, and selling shares

11    you couldn't equate it to an even $250,000.

12    Q.   The next sentence reads, "Your generosity will allow us to

13    move forward with our plans to provide educational and

14    self-enrichment programs to disadvantaged youth.  We are very

15    excited about the impact these programs will have in the

16    communities in which we will engage."

17         Did you believe that to be true or untrue?

18    A.   I believed that to be untrue.

19    Q.   The next sentence says, "This letter shall serve as formal

12:57 20    acknowledgment of your contribution for which no goods or

21    services were exchanged."

22         Did you believe that statement to be true or untrue?

23    A.   Totally untrue.

24    Q.   Why did you believe it to be totally untrue?

25    A.   Because the payment got our daughter admitted into UCLA,

**A1080**

```
 1   so we totally had something we received.
 2   Q.   Did you believe you were entitled to take a tax deduction
 3   for that payment of $251,000?
 4   A.   No.
 5   Q.   Why not?
 6   A.   Because it was an illicit gift that didn't end up going to
 7   a charity, and the cost was completely illegal and we did it to
 8   participate in the scheme.
 9   Q.   Did you take the tax deduction?
10   A.   I did.
11   Q.   Why did you do that?
12   A.   I wanted to get the write-off.
13   Q.   Prior to this time had you previously made payments either
14   to The Key Worldwide Foundation or to Mr. Singer's for-profit
15   entity, The Key?
16   A.   I believe we had made some tutoring -- he billed us I
17   think approximately $7,000 for college counseling services
18   before this.
19   Q.   And again, that $7,000 was for what?
20   A.   For helping her with the application process, guiding her
21   through the schools and those kind of things.
22   Q.   Did you deduct those payments?
23   A.   No.
24   Q.   What happened after Lauren was admitted to UCLA?
25   A.   Approximately two and a half months after she was
```

**A1081**

admitted, the soccer program found out that she wasn't out on

the field, and it ultimately led to them to finding out that

she had had a prior concussion which happened during horseback

riding.  And, you know, they wanted -- they said that basically

now she couldn't be on the team.  You can't play with a

concussion.

Q.   What did that mean for her admission?

A.   It would have been revoked.  She would have to leave the

school.

Q.   When you said they were concerned, did you have an

understanding who was concerned that she wasn't on the field?

A.   Yeah.  It was the --

MR. KENDALL:  Objection, your Honor, hearsay.

THE COURT:  Sustained.

Q.   What happened as a result of this discovery?

A.   She basically was told that, you know, she had a

concussion, she couldn't be on the team, and she would have to

leave the school.

Q.   Did you meet with anybody as a result of that?

A.   We did.

Q.   Who did you meet with?

A.   We met with quite a few people at the school.  We met with

Gavin Crew, Christina Rivera.  We met with the head of

admissions, I believe his name is Gary Clark.

Q.   What happened at those meetings?

A.   Basically we explained to them that Lauren did have a

concussion but that we had met with doctors and that she could

go through rehab and could be a participating soccer player in

a relatively short time, probably 60 days.

Q.   During the time that you were meeting with those

officials, were you being counseled by anyone about how to

engage in those meetings?

A.   Yes.

Q.   Who was counseling you?

A.   Jorge Salcedo.

Q.   What do you recall about what he told you?

A.   He basically knew all the inner workings of what was going

on behind the scheme -- behind the scenes.  And he told us, you

know, what to expect and what was the best way to approach it.

Q.   Did you have an understanding of why he was giving you

that advice?

A.   Sure.

Q.   What was your understanding?

A.   He was involved in the scheme, and I think if Lauren left

the school, there's a good chance Rick would have taken his

money back.

Q.   You testified that at the meeting -- was there one meeting

or more than one meeting?

A.   There was only one meeting at the school.

Q.   You testified that the director of admissions was there?

```
 1    A.    Yes.
 2    Q.    Did you have an understanding from that meeting of whether
 3    the director of admissions was aware that your daughter never
 4    intended to play soccer at UCLA?
 5    A.    He clearly didn't have any idea.
 6    Q.    Did you have an understanding of whether he was aware that
 7    your daughter was not qualified to play soccer at UCLA?
 8    A.    No, he had no idea.
 9    Q.    Did you have an understanding of why the people at that
10    meeting were so concerned that your daughter had had a
11    concussion and wasn't able to play soccer?
12    A.    Yeah, because she couldn't be a player at that point.
13    Q.    Was Lauren ultimately permitted to stay at UCLA?
14    A.    Yes.
15    Q.    How did that happen?
16    A.    They agreed to do a protocol with UCLA doctors that would
17    actually -- you know, she would have to go through and pass,
18    and it took approximately 60 days, and she was able to get
19    approvals that her concussion was subsided and she would be
20    okay to play.
21    Q.    Did she end up playing soccer at UCLA?
22    A.    No.
23    Q.    What happened?
24    A.    She actually became a team manager on the team.
25          MR. FRANK:  Your Honor, we're going to switch gears at
```

**A1084**

```
 1    this point.  Would it be an appropriate time to take a break?
 2              THE COURT:  Yes, we'll take the lunch break.  You may
 3    step down for the time being, Mr. Isackson.  We'll be in recess
 4    for one hour, jurors.  Normally lunchtime is 1:00 to 2:00.
 5    Sometimes we'll go over a few minutes, sometimes maybe a few
 6    minutes short, but I'll ask you to be back at 2:00.  We will
 7    not go after 3:30 today, and we may end a little bit before,
 8    somewhere around 2:30.  So I'll see you back here at 2:00.  You
 9    can leave those notebooks on your chairs.  You can take your
10    own notebooks if you want to.
11              (Jury exits the courtroom.)
12              THE COURT:  Be seated, counsel.  Mr. Frank,
13    approximately how much longer on direct for this witness?
14              MR. FRANK:  I was just discussing that with Mr.
15    Kendall, your Honor.  I believe he's going to take us the rest
16    of the day and possibly into tomorrow.
17              THE COURT:  All right.  Fair enough.
18              MR. TOMBACK:  Your Honor, when they opened, they
19    mentioned one witness pretty clearly, one Isackson.  Can we
20    have some clarity as to whether Davina is going to testify or
21    not, or is that still up in the air?
22              MR. FRANK:  We're waiting to conclude Mr. Isackson's
23    testimony.  We mentioned one because we didn't want to promise
24    a second if we weren't --
25              THE COURT:  I'll allow him to make that choice after
```

```
 1    the conclusion of the examination of Mr. Isackson.

 2            We're in recess until 2:00 p.m.

 3            (Recess taken 1:04 p.m. to 2:03 p.m.)

 4            THE CLERK:  You may be seated.  Court is now in

 5    session

 6            THE COURT:  Good afternoon, jurors.  We're ready to

 7    resume.

 8            Mr. Isackson, you're reminded you're still under oath.

 9            You may continue with direct examination, Mr. Frank.

02:04 10       MR. FRANK:  Thank you, your Honor.

11            EXAMINATION OF BRUCE ISACKSON (Continued)

12    BY MR. FRANK:

13    Q.   Good afternoon again, Mr. Isackson.

14    A.   Good afternoon.

15    Q.   When we left off, we had been talking about your daughter

16    Lauren and her admission to UCLA.  Do you recall that

17    testimony?

18    A.   Yes, I do.

19    Q.   I want you to switch gears now and talk about your younger

02:04 20  daughter Audrey.

21    A.   Okay.

22    Q.   Did there come a time where you engaged Rick Singer to

23    pursue this scheme for a second time with your daughter Audrey?

24    A.   Yes.

25    Q.   What kind of student is your daughter Audrey?  Let me
```

```
 1   rephrase that question.  What kind of student was she in high
 2   school?
 3   A.   She was a good student, above average, mostly Bs and As.
 4   Q.   Mr. Isackson, if you could bring the microphone closer to
 5   you.  I think we may be having trouble hearing you.  If you can
 6   speak directly into the microphone, maybe even closer if you
 7   can.
 8   A.   Yes.  Is that better?
 9   Q.   Could you answer that question again?  What kind of high
10   school student was your daughter Audrey?
11   A.   Yeah.  She was slightly above average, mostly Bs, some As.
12   Q.   Was she an athlete in high school?
13   A.   Not at all.
14   Q.   Did you ultimately decide with Mr. Singer -- well,
15   withdrawn.
16        What college did you ultimately decide with
17   Mr. Singer to pursue admission to for her?
18   A.   To USC.
19   Q.   What, if anything, did Mr. Singer tell you about how she
20   would be admitted to USC?
21   A.   At USC, he said she would come in as a crew recruit.
22   Q.   Crew?
23   A.   Crew.
24   Q.   Did your daughter row crew?
25   A.   No.
```

02:05 (line 10)
02:06 (line 20)

```
 1  Q.   Had she ever rowed crew?

 2  A.   No.

 3  Q.   What, if anything, did he tell you about how much that

 4  would cost?

 5  A.   It was $250,000.

 6  Q.   What was your understanding of whether Audrey would have

 7  been admitted to USC on her own merit?

 8  A.   She didn't have the grades or the test scores to get in.

 9  Q.   Other than paying the $250,000, what, if anything, did

10  Rick Singer tell you you had to do in order to get her admitted

11  to USC as a crew recruit?

12  A.   He asked us for a head shot of her.

13  Q.   A head shot?  A photograph?

14  A.   Correct.

15  Q.   Did he tell you how the photograph would be used?

16  A.   He told us that he would be putting together information,

17  a resume, making her out to be a high level high school recruit

18  for colleges as a crew person.

19  Q.   Was he that specific or was that something you understood

20  from what he told you?

21  A.   Yeah.  That's -- yes.  That's what I understood from him.

22  He said he would put together everything that was needed to

23  handle the application.

24  Q.   What was your understanding of what the athletic profile

25  would say about your daughter?
```

```
 1    A.    Well, make her out to be an athlete, Division 1 athlete,

 2    for a sport she'd never entered in her life and never been in a

 3    crew boat or anything.

 4    Q.    What, if anything, did Mr. Singer tell you Audrey would

 5    have to do at USC once admitted pursuant to the scheme?

 6    A.    He was pretty clear.  He said she didn't have to do

 7    anything, she didn't even have to go to -- around the crew area

 8    at all.

 9    Q.    What did he tell you about the money?

10    A.    That we'd make a payment to his foundation, and it would

11    be funneled to the athletic program at USC.

12    Q.    What was your understanding of what would happen if you

13    didn't pay the money?

14    A.    She wouldn't have gotten into the school on her grades or

15    her test scores.

16    Q.    Could we show the witness -- well, before I do that, did

17    you agree to pursue this scheme with respect to your daughter

18    Audrey?

19    A.    Yes, we did.

20    Q.    Could we show the witness only Exhibit 447.  As that's

21    being pulled up on your screen, Mr. Isackson, did you, in fact,

22    send a photograph of your daughter to Mr. Singer for use in an

23    athletic profile?

24    A.    We did.

25    Q.    Do you recognize Exhibit 447?
```

02:08 (line 10)
02:08 (line 20)

```
 1    A.    Yes.

 2    Q.    What is it?

 3    A.    It's an e-mail.

 4    Q.    Who's it from?

 5    A.    From Rick Singer.

 6    Q.    Who is it to?

 7    A.    To my daughter Audrey, my wife, Davina, and myself.

 8          THE COURT:  Mr. Isackson, I'm going to ask you to

 9    please move the microphone so that the microphone can come

10    closer to your mouth, please.

11          THE WITNESS:  Is this better?  Sorry about that.

12    Q.    What is the date of this e-mail?

13    A.    It's December 15, 2017.

14          MR. FRANK:  The government offers Exhibit 447.

15          THE COURT:  It will be admitted.

16          (Exhibit 447 admitted into evidence.)

17    Q.    Do you see that the e-mail appears to be forwarding an

18    attachment?

19    A.    Yes.

20    Q.    And the name of the attachment, it says "Aubrey"?

21    A.    Yes.

22    Q.    Is that a typo?

23    A.    I assume so, yes.

24    Q.    What's your daughter's name?

25    A.    Audrey, A-U-D-R-E-Y.
```

```
 1  Q.   It says, "Please attached letter.  Please keep this hush

 2  hush till late March."

 3            Can we look at the attachment, please.  Do you

 4  recognize the attachment?

 5  A.   Yes.

 6  Q.   What is it?

 7  A.   The acceptance from the Dean of Admissions at USC.

 8  Q.   It reads in the first paragraph, "Dear Audrey,

 9  Congratulations!  I am pleased to inform you that the Admission

 10 Committee, after careful review of your credentials, has

 11 approved your admission to the University of Southern

 12 California for the fall 2018 semester.  Your records indicate

 13 that you have the potential to make a significant contribution

 14 to the intercollegiate athletic program, as well as to the

 15 academic life of the university.  I can assure you that the

 16 faculty and staff will do all that we can to support you in

 17 achieving your goals as a student athlete at USC."

 18            Mr. Isackson, did you believe that your daughter

 19 Audrey had the potential to make a significant contribution to

 20 the intercollegiate athletic program at the University of

 21 Southern California?

 22 A.   No.

 23 Q.   Did you believe she would be a student athlete at USC?

 24 A.   No.

 25 Q.   If we look at the second paragraph, it reads, "Please be
```

02:10  (line 10)
02:11  (line 20)

1   advised that this letter of acceptance is based upon a

2   preliminary review of your academic records.  In order to

3   validate this acceptance you must: One, complete in full an

4   undergraduate application by January 15, 2018."

5         The date of this letter is December 14, 2017.  As of

6   the date of this letter, had your daughter even applied to USC?

7   A.   No.

8   Q.   If we look at point three, it says "Register with the NCAA

9   Eligibility Center."  Did you have an understanding as to why

02:11 10   your daughter needed to register with the NCAA Eligibility

11   Center?

12   A.   Yeah.  That's where the athletes went to go to sign up.

13   Q.   Below the numbered points, it says, "If these conditions

14   are not met, your approval will be revoked.  On behalf of the

15   university, I would like to express our pleasure with your

16   commitment to USC.  We are delighted to welcome you to our

17   community of scholars and to our athletic program."

18         Who is it signed by?

19   A.   The Dean of Admissions, Timothy Brunold.

02:12 20   Q.   Could we look at the cover e-mail, please.  Now, you see

21   that this e-mail was forwarded to Mr. Singer before he sent it

22   to you.  If we could just enlarge that.  Who was it forwarded

23   from?

24   A.   Rick Singer.

25   Q.   Who was it sent to Mr. Singer by?

```
 1    A.    Donna Heinel.
 2    Q.    Can you read into the record Ms. Heinel's signature block,
 3    please?
 4    A.    Sure.  Donna C. Heinel, Ed, Senior Athletic Director/SWA,
 5    Associate Professor-Rossier School of Education, University of
 6    Southern California.
 7    Q.    I believe that's a senior associate director?
 8    A.    Senior associate director, yes.
 9    Q.    Did you have an understanding of why Donna Heinel was
02:13 10    sending this letter of preliminary acceptance to Mr. Singer?
11    A.    Yes.
12    Q.    What was your understanding?
13    A.    That was Rick's contact at USC that he had a relationship
14    with.  She was letting him know that Audrey had been accepted
15    early.
16    Q.    Prior to receiving this e-mail, had you heard the name
17    Donna Heinel?
18    A.    Yes.
19    Q.    Who had you heard it from?
02:13 20    A.    Rick Singer.
21    Q.    Again, what was your understanding from Mr. Singer of who
22    she was?
23    A.    He had mentioned her several times as his contact in the
24    athletic department at USC.
25    Q.    Mr. Singer wrote to you at top, "Please attached letter.
```

```
 1    Please keep this hush hush till late March."
 2              Did you have an understanding of why you needed to
 3    keep your daughter's admission to USC hush hush until late
 4    March?
 5    A.   Yes.
 6    Q.   What was your understanding?
 7    A.   She hadn't applied to the school.  Her high school -- you
 8    know, college people that helped her out at her high school
 9    would have no idea that she had an application that had not
02:14 10   been submitted and now she's already accepted.  It would have
11    been awfully strange.
12    Q.   What was your understanding of what would have happened if
13    you told people she had been admitted?
14    A.   They would have figured out that something was awry.
15              MR. FRANK:  Could we show the witness only, please,
16    Exhibit 450.
17    Q.   Do you recognize Exhibit 450?
18    A.   Yes.
19    Q.   What is it?
02:14 20   A.   It's an e-mail.
21    Q.   Who is it from?
22    A.   My wife Davina.
23    Q.   Who is it to?
24    A.   Rick Singer, cc'ing my daughter Audrey, myself, and then
25    Steve Masera at the Key Worldwide Foundation.
```

```
 1              MR. FRANK:  Government offers 450.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 450 admitted into evidence.)

 4              MR. FRANK:  Ms. Lewis, if you can just enlarge a

 5      little more so we can see what Mr. Isackson is responding to.

 6      Thank you.

 7      Q.   Mr. Isackson, do you see that your wife is responding to

 8      Mr. Singer's forwarding that acceptance letter?

 9      A.   I do.

10      Q.   She says "Rick, thank you for your e-mail.  Very exciting

11      news.  We will definitely lay low until March, satisfy the

12      requirements in the letter, as well as continue through the

13      regular application process and deadlines on Audrey's other

14      colleges."

15              Why was Audrey continuing to apply through the

16      regular process to other colleges if she'd already been granted

17      preliminary approval to go to USC?

18      A.   I think I mentioned before, her high school, as most do,

19      helped her with the application process.  She had to keep the

20      ruse going.  We had to keep the ruse going that she was doing

21      it the traditional way to get into schools.

22      Q.   What did you think would happen if you told Audrey's high

23      school that she was not continuing with the regular application

24      process to other colleges?

25      A.   They wouldn't understand any reason for that.
```

```
 1              MR. FRANK:  Could we show the witness only, please,

 2    Exhibit 506.

 3              Mr. Isackson, do you recognize Exhibit 506?

 4    A.   Yes.

 5    Q.   What is it?

 6    A.   It's an e-mail.

 7    Q.   Who is it from?

 8    A.   It's from Melissa Rail from The Key Worldwide Foundation.

 9    Q.   You see she forwards it to you and your wife?

02:16 10    A.   Correct.

11    Q.   What's the date?

12    A.   April 9, 2019 -- 2018, excuse me.

13              MR. FRANK:  The government offers Exhibit 506.

14              THE COURT:  It will be admitted.

15              (Exhibit 506 admitted into evidence.)

16    Q.   Do you see at the top it says "Forward invoice 1167 from

17    the Key Worldwide Foundation"?

18    A.   Yes.

19    Q.   At the bottom, it's from Melissa Rail.  Do you know who

02:17 20    Melissa Rail was?

21    A.   No.

22    Q.   It says "Dear Davina, thank you for your generous donation

23    to the Key Worldwide Foundation.  Attached is a courtesy

24    invoice which includes our wire instructions," and then it goes

25    on from there.
```

**A1096**

| | |
|---|---|
| 1 | Can we take a look at the attachment, please. |
| 2 | What is the attachment? |
| 3 | A.   It's an invoice. |
| 4 | Q.   Who's the invoice from? |
| 5 | A.   The Key Worldwide Foundation. |
| 6 | MR. FRANK:  Ms. Lewis, if you could highlight the |
| 7 | description and the amount. |
| 8 | Q.   It says "Private Contribution - letter of receipt will be |
| 9 | provided upon payment," "Amount," "$250,000".  Did you know, |
| 02:18 10 | sir, why you were receiving this invoice? |
| 11 | A.   Yes. |
| 12 | Q.   Why? |
| 13 | A.   It was our payment to get Audrey admitted as a fake |
| 14 | athlete to USC. |
| 15 | Q.   Did you know where that money would go? |
| 16 | A.   Yes. |
| 17 | Q.   What did Rick Singer tell you about where that money would |
| 18 | go? |
| 19 | A.   Rick said it would be funneled to the USC athletic |
| 02:18 20 | program. |
| 21 | Q.   Did you know, sir, who would ultimately decide on your |
| 22 | daughter's admission to USC? |
| 23 | A.   Yes. |
| 24 | Q.   Who would decide on her admission? |
| 25 | A.   The admissions department. |

```
 1   Q.   Did you know why you needed to lie on Audrey's application
 2   about her athletic abilities?
 3   A.   Yeah.
 4   Q.   Why?
 5   A.   She would not have gotten into school on her grades or her
 6   test scores.
 7   Q.   Did you know if the admission department -- did you have
 8   an understanding about whether the admission department knew
 9   that?
10   A.   No.  There would be no reason to lie if the admissions
11   department knew about it.
12        MR. FRANK:  We can take that down.
13   Q.   As a part of Audrey's application process, did there come
14   a time when you also engaged Mr. Singer in connection with her
15   standardized college admission tests?
16   A.   Yes.
17   Q.   Tell us about that.
18   A.   He said he had a controlled environment in LA where he
19   would have a proctor administer the test with her one-on-one
20   and had the ability to change the score after she took the
21   test.
22   Q.   Let's break that down a little bit.  First of all, you
23   said he told you he had a controlled environment in LA.  What
24   did you understand him to mean by "a controlled environment in
25   LA"?
```

```
 1    A.   That it was something that he oversaw and he was
 2    responsible for and he knew exactly the process of the test
 3    taking and how it started from beginning to end.
 4    Q.   What, if anything, did he tell you you would need to do to
 5    have Audrey take the test in the controlled environment?
 6    A.   That she would have to have testing shown that she needed
 7    additional time to do the test.
 8    Q.   How would she get additional time?
 9    A.   Well, basically, if you have -- if it's determined that
10    you have, I would say, below standard -- you just need more
11    time to process the questions than the average student, then
12    they'd allow you to have more time.
13    Q.   And once she got more time, what did you understand would
14    happen?
15    A.   She was able to go to Rick's testing center with the
16    proctor that he had placed in there.
17    Q.   What did you understand would happen there?
18    A.   Audrey would take the test, and when she was finished, the
19    proctor would review it and change the scores to get the score
20    that Rick felt was needed to get her into the school.
21    Q.   Was there a cost associated with that?
22    A.   Yes.
23    Q.   How much?
24    A.   Two hundred -- oh, for that.  Excuse me.  That was
25    $100,000.
```

```
 1   Q.   Did you agree to participate in that part of the scheme?

 2   A.   We did.

 3   Q.   Did Audrey ultimately -- did there come a time when Audrey

 4   ultimately went to Los Angeles to take the test at Mr. Singer's

 5   controlled facility?

 6   A.   Yes.

 7   Q.   Where do you live?

 8   A.   We live in Hillsborough, California.

 9   Q.   How far is Los Angeles from Hillsborough?

10   A.   It's about a six- or seven-hour car ride.

11   Q.   Where would Audrey have taken the test if she had not --

12   if you had not pursued the scheme?

13   A.   Most likely at her high school.

14   Q.   How far is that from your house?

15   A.   15 or 20 minutes.

16   Q.   What happened when Audrey took the test in LA?

17   A.   She finished the test and told us that she thought she did

18   really well.  When she came home --

19   Q.   Sorry?

20   A.   When she came home, she told us she thought she did really

21   well.

22   Q.   What happened after that?

23   A.   We called Rick to see how the test went.  I remember his

24   words exactly.  He said, excuse my language, "She did shit."

25   Q.   What was your reaction when he told you that?
```

A.   We were surprised because Audrey studied pretty hard for
the test and thought she had done well on her own.

Q.   So what happened?

A.   Rick said that they had to change the score.

Q.   Did he tell you what he thought they should change the
score to?

A.   Yes.

Q.   What did he tell you?

A.   It was a 31 on the ACT test.

Q.   Did you agree?

A.   We did.

Q.   What score did Audrey ultimately receive on the ACT?

A.   She got a 31.

Q.   Did you make a payment in connection with that scheme?

A.   We did.

Q.   How much?

A.   $100,000.

Q.   Where did you make that payment to?

A.   To the Key Worldwide Foundation.

Q.   Did you believe that that payment was going to charity?

A.   No.

Q.   How did you think the money was being used?

A.   Only one way it could go.  It would be to Rick and to his
proctor that administered the test.

Q.   Did there come a time when you took a tax deduction in

```
 1   connection with that purported donation?

 2   A.   Yes.

 3   Q.   Did you think it was a legitimate deduction to which you

 4   were entitled?

 5   A.   No.  I knew it wasn't.

 6   Q.   Why did you take the deduction?

 7   A.   I wanted to get the write-off.

 8   Q.   Mr. Isackson, did there come a time when you engaged with

 9   Rick Singer again with respect -- actually, withdrawn.

10          Do you know whether that test score you obtained

11   through this scheme was used in connection with your daughter's

12   college applications?

13   A.   Yes.

14   Q.   How it was used?

15   A.   It was part of her application process that was sent into

16   her -- sent into the school.

17   Q.   Was it sent into one school or more than one school?

18   A.   I know I sent it to USC.  I don't recall where else it was

19   sent to.  That was the score that was used for testing.

20   Q.   Did there come a time when you engaged Mr. Singer again

21   with respect to your son Ryan?

22   A.   Yes.

23   Q.   How so?

24   A.   We started the process of talking with him about working

25   with Ryan.
```

|    |    |
|----|----|
| 1  | Q.   What did you intend to do with Rick Singer with respect to |
| 2  | your son Ryan? |
| 3  | A.   Used him in the same process for college as we used for |
| 4  | our two daughters. |
| 5  | Q.   I want to direct your attention now to October of 2018. |
| 6  | Do you have that time in mind? |
| 7  | A.   Okay. |
| 8  |      MR. KELLY:  I'm sorry.  What time? |
| 9  |      MR. FRANK:  October of 2018. |

02:24 10   Q.   Mr. Isackson, do you recall receiving a telephone call
11   from Mr. Singer in October of 2018?
12   A.   I do.
13   Q.   What did he tell you in that call?
14   A.   He said his foundation was being audited by the IRS.
15   Q.   Prior to coming here today -- well, on your -- on the desk
16   in front of you, there's a disc labeled Exhibit 671.  Do you
17   see that disk?
18   A.   I do.
19   Q.   Do you recognize it?
02:25 20   A.   I do.
21   Q.   How do you recognize it?
22   A.   I've listened to it and I've initialed it as well.
23   Q.   Prior to coming here today, you had an opportunity to
24   listen to it you said?
25   A.   I have.

```
 1    Q.    What is it?

 2    A.    It's a recording of conversation, a telephone call between

 3    Rick and me and his foundation being audited.

 4          MR. FRANK:  The government offers 671.

 5          THE COURT:  It will be admitted.

 6          (Exhibit 671 admitted into evidence.)

 7          MR. FRANK:  If the jurors could turn in their binders

 8    to the tab labeled 671.

 9    Q.    Mr. Isackson, if you could do the same.  Prior to coming

10    here today, have you had an opportunity to review that

11    transcript?

12    A.    I have.

13    Q.    Is it a fair and accurate transcript of the recording?

14    A.    Yes, it is.

15    Q.    And are those your initials at the bottom of the page?

16    A.    Yes.

17          MR. FRANK:  Ms. Lewis, if we could start at the

18    beginning.

19          (Audio recording played.)

20    Q.    Mr. Isackson, I just want to ask you a few questions.

21    First of all, do you recognize Mr. Singer's voice on that call?

22    A.    I do.

23    Q.    If I could direct your attention to page 2 of the

24    transcript at line 6, Mr. Singer said, "So they asked about

25    your payments."  Did you have an understanding of who "they"
```

```
 1    was?

 2    A.   Yes.

 3    Q.   What was your understanding?

 4    A.   It was the IRS.

 5    Q.   He said one of them was for when Mark took the test for

 6    Audrey.  Had you heard the name Mark before this phone call?

 7    A.   No.

 8    Q.   Did you have an understanding of who that referred to?

 9    A.   Yes.

02:28 10    Q.   Who did it refer to in your understanding?

11    A.   Would have been the proctor in the test who changed the

12    results.

13    Q.   You responded, "Okay."  Was that because you knew what he

14    was talking about?

15    A.    It was just shorthand for the process that took place.

16    Q.   Did you have an understanding of what he was talking

17    about?

18    A.   Yes.

19    Q.   At line 9, he says "The payment that we made to Jorge to

02:29 20    help Lauren get into UCLA through soccer."  You again responded

21    "Okay."  Did you have an understanding of who he was referring

22    to there?

23    A.   Yes.

24    Q.   Who?

25    A.   The payment that we made to get Audrey admitted as a fake
```

```
 1   athlete at UCLA.

 2   Q.   Who was Jorge?

 3   A.   Jorge was the men's soccer coach.

 4   Q.   Then he says, at line 12, "and then the payment that we

 5   made to Donna Heinel at USC to help Audrey get in through

 6   crew."

 7            Did you have an understanding of what he was

 8   referring to there?

 9   A.   Yes.

10   Q.   What did you understand him to be referring to?

11   A.   Again, Donna Heinel helped Audrey in her admissions

12   process at USC.

13   Q.   When he said to you "The payment that we made to Donna

14   Heinel," did you understand him to be suggesting to you that

15   the payment had gone to Donna Heinel personally?

16            MR. KELLY:  Objection.  Leading.

17            THE COURT:  Sustained.

18   Q.   What was your understanding of what he was telling you

19   about where the payment was going when he said "Payment that we

20   made to Donna Heinel"?

21   A.   He was just talking about the process of how he did it

22   through the athletic department.

23   Q.   Did you have an understanding of where that money -- what

24   did he tell you about where that money was going?

25   A.   He told us the money was going to the USC athletic
```

1    program.

2    Q.   Did you have an understanding of whether or not he was

3    telling you anything different in this call?

4    A.   It was just the process, shorthand, so to speak, how it

5    took place, how he sent the money in.

6    Q.   At line 15, he says, "Of course, I'm not going to tell the

7    IRS this is where the money went, how the money was.  So I

8    just -- I just want to make sure that what I've told them so

9    far is that that 600K plus has actually gone to pay to our

02:31 10   foundation for underserved kids," and you responded, "Uh-huh."

11            Why did you respond "uh-huh"?

12   A.   Because I wanted to be on board with him in that program

13   keeping it disguised.

14   Q.   Was it true, in your understanding, that the money was

15   going to pay for underserved kids?

16   A.   Absolutely not.

17   Q.   Could we pick up at line 24, please.

18            (Audio recording played.)

19   Q.   You heard yourself say "Sure, sure"?

02:32 20   A.   Yes.

21   Q.   If we could go back to page 3, at the top of the page,

22   line 1, Mr. Singer asks you, "Did you take a write-off for

23   those," and you responded, "I did take a write-off for those,

24   yes."  What did you mean by that?

25   A.   I took a tax deduction for all those checks that I wrote.

```
 1   Q.   At line 12, you said, "You know, if we do get audited or
 2   something, we would need a letter or something like that."
 3            What were you talking about?
 4   A.   If we did get audited, we'd have to have some proof saying
 5   we made a gift to a charitable 501(c)(3), so we'd asked for
 6   that letter.  We had only gotten it for the first one, not the
 7   last two.
 8   Q.   You had not gotten it for your daughter?
 9   A.   Yeah.  We didn't get it for Audrey for USC, nor for the
10   test taking.
11   Q.   Why did you want the letter?
12   A.   To keep the ruse going with the IRS that we had made a
13   charitable gift.
14   Q.   At line 17, Mr. Singer says, "so I just wanted to make
15   sure our stories are aligned," and you responded, "Yeah".
16            Why did you respond "yeah"?
17   A.   Because I wanted to be on the same page as him.  I did not
18   want to have the scheme blown up in our face.
19   Q.   At page 4, at line 3, Mr. Singer says, "I'm just saying
20   that everything went to our foundation to help underserved
21   kids, right?"  And you respond at line 6, "But how -- what do
22   they -- do they track that, Rick, though or how do they? Will
23   they?"
24            Who is the "they" you're referring to?
25   A.   The IRS.
```

02:33 on line 10

02:34 on line 20

**A1108**

```
 1    Q.   When you said "do they track that", what were you
 2    concerned about the IRS tracking?
 3    A.   The flow of money and where it went.
 4    Q.   Why were you concerned about that?
 5    A.   Because it would be fairly hard for him to hide all that
 6    money going into the foundation and going from there to USC
 7    when I knew a good portion of that money was going into his
 8    pockets and the people who helped him.
 9    Q.   When you said you knew a good portion of that money was
10    going into his pocket and the people that helped him, was that
11    anything that he ever told you?
12    A.   No.
13    Q.   So why did you have that belief?
14    A.   Well, I did not think that Rick was in the business of
15    working full-time for charitable causes.
16    Q.   If we could pick up line 17, please.
17         (Audio recording played.)
18    Q.   You said at line 4 on page 5, "I'm assuming that we're not
19    the only people they're asking about."
20              What other people were you referring to?
21    A.   Well, Rick had told me that tons and tons of parents, and
22    I would think there would be a lot of people that would be
23    going through their returns.
24    Q.   At line 8, Mr. Singer says, "Tons, tons of people".  And
25    you respond at line 9, "Okay.  Okay.  Good".  Why was that good
```

02:35 (line 10)
02:36 (line 20)

```
 1    in your view that there were tons of people involved?
 2    A.    If there was a lot of people, there would be a lot of
 3    returns to go through.  Most of these people have very
 4    complicated returns.  It would be pretty hard to figure things
 5    out.
 6    Q.    Who would it be hard -- who would have a hard time
 7    figuring things out?
 8    A.    The IRS.
 9          MR. FRANK:  Could we pick up at line 9, please.
10          (Audio recording played.)
11    Q.    Mr. Isackson, if I could direct your attention to the
12    bottom of page 5 at line 23, you said at line 23, "But you
13    don't think that they would look at the paper trail on it and
14    try to dig deeper or what's your feeling on it?"
15          What paper trail were you referring to?
16    A.    The flow of money from this foundation out.
17    Q.    What was your concern?
18    A.    It was pretty obvious that Rick wasn't doing this all for
19    charitable causes and was helping people --
20          THE COURT:  I'm having a hard time hearing you.  Pull
21    it over closer to you, please.
22    A.    It was pretty clear that Rick had a lot of people helping
23    him with this scheme, and they would have to be compensated, as
24    well as himself.
25    Q.    At the top of page 7, Mr. Singer says, "He was asking if I
```

```
 1    had a boy candidate that wanted to get in through UCLA soccer,

 2    make the payments, and I didn't know if, you know, potentially

 3    Ryan would be one of those".

 4              Again, sir, were you considering the scheme at this

 5    point for your son Ryan?

 6    A.    Yes.

 7    Q.    Did he play soccer?

 8    A.    He did play soccer.

 9    Q.    Did he play at a level that, in your view, was sufficient

02:40 10   to be recruited at the collegiate level?

11    A.    No, not even close.

12    Q.    At line 14 on page 7, you said, "Well, I'm wishing you the

13    best in this thing for both of us here".

14              Why were you wishing Mr. Singer the best for both of

15    you?

16    A.    I was just trying to be nice, but my goal was that we

17    would both be okay in this, so I would be okay in this.

18    Q.    Were you concerned that he wouldn't be?

19    A.    Absolutely.

02:40 20   Q.    At the time of this phone call, sir, did you have any idea

21    that you were being recorded?

22    A.    No.

23    Q.    What was your reaction to receiving this phone call?

24    A.    I was in shock.

25    Q.    I want to direct your attention now to a few months late
```

| | |
|---|---|
| 1 | in December of 2018.  Do you recall a time in or about December |
| 2 | of 2018 when Rick Singer visited you at your home? |
| 3 | A.   I do. |
| 4 | Q.   What were the circumstances of that visit? |
| 5 | A.   He came to meet with Ryan and started the process, |
| 6 | interview colleges. |
| 7 | Q.   Could you bring the mic even close? |
| 8 | A.   I'm really sorry. |
| 9 |         He was beginning the process of college with Ryan. |
| 02:41 10 | Q.   Was he going to meet with you or was he going to meet with |
| 11 | Ryan? |
| 12 | A.   Both of us.  He met with me and Ryan. |
| 13 | Q.   Did he meet with you independently? |
| 14 | A.   We talked first, yes. |
| 15 | Q.   Did there come a time when you learned that Rick Singer |
| 16 | was wearing a wire during that visit? |
| 17 | A.   Yes. |
| 18 | Q.   When did you learn that? |
| 19 | A.   After the fact. |
| 02:41 20 | Q.   At the time you were not aware of it? |
| 21 | A.   No. |
| 22 | Q.   On your desk in front of you is a disk marked Exhibit 607. |
| 23 | Have you had an opportunity to review Exhibit 607? |
| 24 | A.   Yes, I have. |
| 25 | Q.   Do you see your initials and the date on there? |

```
 1    A.    I do.

 2    Q.    What is that?

 3    A.    It's a recording of the visit between Rick and myself.

 4              MR. FRANK:  Government offers 607.

 5              THE COURT:  It will be admitted.

 6              (Exhibit 607 admitted into evidence.)

 7    Q.    If I could direct you and the jury to Tab 607 in your

 8    transcript binders.  Do you have that in front of you, sir?

 9    A.    I do.

02:42 10   Q.    Mr. Isackson, the jury's going to have the entire audio

11    recording in evidence, but I'm only going to refer you to

12    certain parts right now.

13    A.    All right.

14    Q.    I'm going to start on page 1 at line 20.

15              MR. FRANK:  Miss Lewis, if we can start at 1 minute,

16    37 seconds.

17              (Audio recording played.)

18    Q.    What happened in the next few pages of this recording?

19    A.    Rick wanted me to go throughout our remodel, and that's

02:43 20   what I did.

21    Q.    You showed him around the house?

22    A.    Yes.

23    Q.    During the conversation with Mr. Singer, did there come a

24    time when you discussed investments in business ventures?

25    A.    Yes.
```

**A1113**

```
 1   Q.   Tell us about that.

 2   A.   Rick told me he was involved in a development in Tahoe and

 3   he had homes and he wanted my advice and the best way to market

 4   it because he was trying to get out of his investment.

 5   Q.   Did he tell you about what other investments he had?

 6   A.   Yes.

 7   Q.   What, if anything, did he tell you about a gym in Oakland?

 8   A.   He said that he invested in a gym in Oakland, and they

 9   were putting on basketball games, and he was running that, and

02:44 10   it was pretty profitable.

11   Q.   What, if anything, did he tell you about Sacramento Kings?

12   A.   He told me he was a part owner in the Sacramento Kings.

13   Q.   Did you believe him when he told you those things?

14   A.   No.

15   Q.   Why not?

16   A.   Well, to be a part owner of the Sacramento Kings would be

17   a multimillion dollar investment.  I didn't think Rick had

18   anywhere near those kind of resources.

19   Q.   I want to direct you now to page 25 of the transcript at

02:45 20   line 24.

21        MR. FRANK:  Miss Lewis, could you start the audio at

22   18 minutes and four seconds.

23        (Audio recording played.)

24        MR. FRANK:  We can stop there.

25   Q.   Mr. Isackson, if you'll turn to page 26.  At line 10, you
```

1    said, "I'm so paranoid about this F'ing thing you were talking

2    about.  I don't even like talking about it on the phone".

3             What thing were you referring to?

4    A.    The IRS auditing his foundation.

5    Q.    Why were you paranoid and why did you not want to talk

6    about it on the phone?

7    A.    I thought there was a chance they could be taping his

8    phones, and if they hear our conversation about it, I was

9    talking clearly that I knew about the scheme.

02:47 10  Q.    If we could turn to page 28, at line 15, Mr. Singer says,

11   "Money's going to Georgetown over here.  It's going to USC over

12   here."

13             At line 18, "It's going, and then it's going to the

14   we have the place in Oakland.  It's going to fund that."

15             At line 22, "It's taking kids to camp."

16             At line 24, "it's doing this.  It's doing that."

17             Did you believe Mr. Singer's money from his

18   foundation was going to all those different places?

19   A.    I knew he was filtering a little bit of his money to cover

02:48 20  up his scheme.  I knew that the majority of it was not going to

21   anything other than his pockets and people who were involved

22   with him.

23   Q.    If we can pick up at page 29, line 10.

24             (Audio recording played.)

25             MR. FRANK:  We can stop it there.

**A1115**

1  Q.  Mr. Isackson, if you can turn back to page 29 of the

2  transcript, at line 22.  You said, "For example, when we did

3  the testing thing."  What were you referring to?

4  A.  That was a test that Rick had his proctor administer for

5  Audrey.

6  Q.  At the top of page 33, you asked, "That was as a gift,

7  right?"  What did you mean by that?

8  A.  I wanted to confirm he put that down as a gift.

9  Q.  What do you mean by a gift?

02:53 10  A.  Well, it was a payment for the testing, but I wanted to

11  make sure that he had shown it as a charitable gift to his

12  foundation.

13  Q.  At line 3, you said, "And they're not -- there's no way

14  they could correlate and say that wasn't for a gift.  That

15  would only be if they would talk to you about that and say,

16  where did that go, right?  You know what I'm saying?"

17          What did you mean by that, there was no way they

18  could correlate and say that wasn't for a gift?

19  A.  Unless he said something, I was hoping they would not be

02:53 20  able to figure it out.

21  Q.  If you could turn to page 34 at line 2, Mr. Singer said,

22  "It's part of a lot of other, right?"  And at line 5, "Well,

23  because a lot of other money is in the pot."  And you said,

24  "Coming in the pot, right?"

25          What pot were you referring to?

1    A.    All the other parents had given money.  There was a lot of

2    money coming in and going through the foundation, so it would

3    be difficult to figure things out.

4    Q.    What parents did you have an understanding had put money

5    into the foundation?

6    A.    I thought it could be hundreds of them.

7    Q.    What was your understanding of why parents were putting in

8    the foundation?

9    A.    They were doing the same thing I was.

02:54 10    Q.    Did you know which specific parents?

11    A.    Not exactly.

12    Q.    Why did it matter to you that other parents were putting

13    money in the same pot as you?

14    A.    Well, if there was a lot of parents doing that, that would

15    make the whole scheme a lot more complicated.  Those would be

16    very difficult returns to go through, pretty thick process with

17    tens and tens of people.  It would be a tough thing to figure

18    out.

19    Q.    At line 23, Mr. Singer said, "Put it this way:  There's

02:54 20    lots of people that have done it."  At page 35, line 1, you

21    said, "Oh, no.  I know.  Oh, oh, Goddamn it.  I know that".

22         What did you know?

23    A.    I knew that a lot of other parents had done the same thing

24    I had done.

25    Q.    If we could turn back to page 36 and pick up again at line

1    2.

2              (Audio recording played.)

3    Q.   At the bottom of page 37, line 22, you said, "I don't know

4    where, how your money goes.  Obviously people are getting, you

5    know, so you're -- they'll be only be able to track maybe, you

6    know, a third of it going out to, so to speak, charity stuff.

7    Will they -- does that sound like something that's going to be

8    a big red flag or what do you think?"

9              What did you mean when you said they'd only be able

02:57 10   to track maybe, you know, a third of it going out to charity?

11   A.   I was giving a rough percentage of the amount I thought he

12   was trying to hide by giving it to charitable entities at the

13   colleges and whatnot, and two-thirds of it or more would be

14   going to himself and his people involved in this scheme.

15   Q.   When you say to himself and people involved in this

16   scheme, what did you mean by that?

17   A.   Again, Rick wouldn't do this with tons and tons of parents

18   just to try and get charity -- to sort of --

19              MR. KENDALL:  Objection, your Honor.

02:58 20            THE COURT:  Sustained.

21   Q.   What was your understanding of why a third of the money

22   would be going to charity?

23   A.   It was just commonsense.

24   Q.   At line 9, Mr. Singer said, "There's stuff going to

25   universities".

**A1118**

1          At line 18, he said, "You could see -- you'd have to

2    understand college to understand the correlation that money

3    went to the school to help the kid get in?"

4          At line 23, he said, "You'd have to know dates.

5    You'd have to be able to figure out."

6          Did you have any idea what he was talking about

7    there?

8    A.    Yes.

9    Q.    What did you think he was talking about?

02:59 10   A.    He was saying if they dug really deep, they could see the

11   year they wrote a large check, their child got into a large

12   university, and they would put those two and two together and

13   it would be pretty peculiar.

14   Q.    Can we pick up at page 39 at the top.

15         (Audio recording played.)

16   Q.    Mr. Isackson, at page 41 -- first of all, line 8, there's

17   a quiet moment on the recording.  There's a barely audible

18   voice that says "Why don't you send a PDF."  Do you have an

19   understanding of what was happening there?

03:02 20   A.    Yeah.  I think Rick was just typing on his phone while we

21   were having our meeting for some reason.  That was him talking

22   as he was doing it.

23   Q.    At line 13, you said, "I don't even take the write-offs,

24   you know, for taking people out to lunch and those kind of

25   things because, to me, just as I said to my accountant, for me

|  |  |
|---|---|
| 1 | the ten or 15 grand off my statement and have them come back |
| 2 | and say show me those receipts or do this or that, I'd just |
| 3 | rather do it, so I really -- everything I do is clean." |
| 4 | Was it really true that everything you did was clean? |
| 5 | A.    No. |
| 6 | Q.    What wasn't clean? |
| 7 | A.    This process with my children and the process of the test |
| 8 | taking and that taking that deduction as well too, the college |
| 9 | payments. |
| 03:03 10 | Q.    Was it true when you said "I don't take write-offs for |
| 11 | taking people out to lunch and those kind of things"? |
| 12 | A.    Yes. |
| 13 | Q.    Do you think you would actually be entitled to those kind |
| 14 | of deductions for actual business expenses? |
| 15 | A.    Yeah. |
| 16 | Q.    I'm sorry? |
| 17 | A.    Yes.  You take people out to lunch, you can write that off |
| 18 | if it's business related. |
| 19 | Q.    Did you think that because you didn't take those |
| 03:03 20 | deductions you were entitled to take these deductions? |
| 21 | A.    No.  Not at all.  It had nothing to do with it. |
| 22 | Q.    At page 42, you said, at line 3, "That's all in your, in |
| 23 | your, in your 10 years, 50.  Okay." |
| 24 | Then, at line 6, you said, "Okay, but so -- and |
| 25 | there's some big people." |

**A1120**

```
 1              He said, "Huge people, right?  Big, big people."
 2              What was your reaction when Mr. Singer told you he
 3      had done this for about 50 people?
 4      A.   I was surprised.
 5      Q.   Why were you surprised?
 6      A.   I figured he'd average five people a year, the way he
 7      described this scheme.  I thought there was a lot more have
 8      gone their kids take the test that way.
 9      Q.   Did you want there to be more people involved?
03:04 10    A.   Absolutely.
11      Q.   Why?
12      A.   Again, the more people involved, the more returns the IRS
13      would go through, the much more complicated it would be to
14      figure this out.
15              MR. FRANK:  Can we pick up at page 42, line 11.
16              (Audio recording played.)
17              MR. FRANK:  We can stop there, please.
18      Q.   Mr. Isackson, if you can turn back to page 24 of the
19      transcript.  At line 17, you said, "you know, if they get into
03:07 20    the meat and potatoes, this could be the -- the front page
21      story with everyone from Kleiner Perkins through whatever
22      getting these kids into school".
23              First of all, who's Kleiner Perkins?
24      A.   It's a large venture capital firm in Silicon Valley.
25      Q.   A large venture capital firm?
```

```
 1   A.   Correct.
 2   Q.   What was your understanding about Kleiner Perkins?
 3        MR. KENDALL:  Objection, your Honor.
 4        THE COURT:  We can have what his understanding of it
 5   was.  Overruled.
 6   A.   Rick had told me he had done college counseling for some
 7   of the partners there.
 8   Q.   And you said, "If they get into the meat and potatoes,
 9   this could be the -- the front page story."
10        What would be a front page story?
11   A.   The whole scheme of his.
12   Q.   And then he said "well, the person who would be the front
13   page", and he didn't finish that sentence.  Who did you think
14   he was going to --
15        MR. KENDALL:  Objection, your Honor.
16        THE COURT:  Sustained.
17   Q.   At page 45, line 2, you said "meat and potatoes guy they
18   would love to have is -- it's so hard for these kids to get
19   into college and here's -- look what's going on behind the
20   schemes."
21        Why did you use the word "schemes"?
22   A.   Because that's what it was.
23   Q.   What were you concerned about?
24   A.   The fact that it would be a front page news story.
25   Q.   At page 46, line 8, you said "I'm so paranoid about
```

```
 1    Davina.  I go, I really don't want you talking on the phone to

 2    Rick about this.  I'm thinking, you know, are they -- I can't

 3    imagine they'd go to the trouble of tapping my phone, but I

 4    don't -- would they tap someone like your phone?".

 5              Who are you referring to?

 6    A.   Tapping Rick Singer's phone.

 7    Q.   Who?

 8    A.   Sorry?

 9    Q.   Who were you concerned would be tapping Rick Singer's

10    phone?

11    A.   I'm sorry.  The IRS.

12              MR. FRANK:  Can we pick it up at page 46, line 18.

13              (Audio recording played.)

14              MR. FRANK:  If we could stop it there, please.

15    Q.   If you could turn back to page 48.  At line 7, you said,

16    "Like with Ryan, the question is, should we be taking the

17    write-off on that thing, you know, when we do it with Ryan.

18    You know, I don't know."

19              What were you referring to there?

20    A.   Because he had been audited, it seemed like the IRS was on

21    top of this, I should not be taking deductions on it.

22    Q.   On what?

23    A.   On these payments I was making if we used Rick to do the

24    process.

25    Q.   With Ryan?
```

03:09 (line 10)
03:13 (line 20)

```
 1   A.   Correct.

 2   Q.   At page 49, at the bottom, line 21, you say -- actually,

 3   line 20, you say, "How did that -- how does that work?  When

 4   you say I'm making a gift to the school, is that a legitimate

 5   gift or is there actually people that are at school that get

 6   some dough out of the thing?"

 7        What were you asking Mr. Singer there?

 8   A.   I wanted him to admit to me that good portions of the

 9   money were going to himself and others.

10   Q.   When you say "others," who do you mean by that?

11   A.   The other people that are involved in the scheme.

12   Q.   Why did you think money was going to individuals involved

13   in the scheme?

14        MR. KELLY:  Objection.  Leading.

15        THE COURT:  He can have that question.  Overruled.

16   A.   It's complete commonsense.

17   Q.   You also said, "when you say I'm making a gift to the

18   school, is that a legitimate gift."

19        Did you think that a gift to the school under these

20   circumstances would be a legitimate gift?

21   A.   Absolutely not.

22   Q.   Why not?

23   A.   Because we're making payments to get our children in as

24   fake athletes and having their test score altered.  It wouldn't

25   have been a legitimate.
```

1    Q.    Why would it matter to you whether the money went to the

2    school or the individual?

3    A.    Because if it went to -- if portions of it went to the

4    school, it would hide the scheme.  It would be going to a,

5    quote unquote, charitable entity.

6    Q.    And if it went to an individual?

7    A.    It would be black and white, payment to someone that

8    received money from him or his foundation.

9    Q.    At page 50, line 6, Mr. Singer said, "So some people, I'll

03:15 10    say to them, so it's your program".  At line 9, "How do you

11    want the money?"  At line 11, "They'll send it to -- line 13,

12    "USC women's soccer."  Line 15, "Others will say send it to me

13    and I have to create a discretionary fund to raise extra money.

14    So what I do is just say you're helping me out.  I'll send it

15    to you."

16         Is that scenario he was describing there in your

17    understanding a legitimate scenario?

18    A.    No.

19    Q.    Why not?

03:15 20    A.    Because, again, it was this payment we made getting our

21    kids into the school.

22    Q.    At page 51, line 8, Mr. Singer says, "So let's say --

23    let's say -- let's use an example.  Let's say I'm going to --

24    we're using women's soccer.  So the women's soccer coach may

25    say to me, hey, send it to my camp fund, SC football, right?"

```
 1              And you respond at line 13, "That's cool.  That's
 2    school."
 3              Why was that cool?
 4    A.   Because that money was being funneled to the school's
 5    thing, which would have been a charitable thing.  It would have
 6    been difficult to figure out.
 7    Q.   Then, at line 20, you said, "Oh, really, because I was
 8    thinking that some type of -- there has to be a little bit of
 9    play or some of", and then you trailed off.  What were you
10    talking about there?
11    A.   I wanted Rick to just admit to me on the phone and in
12    black and white that he was lining his pockets and paying
13    people but he was beating around the bush again on this phone
14    call too.
15    Q.   This was a phone call?
16    A.   Sorry.  I'm sorry.  In our meeting that took place at our
17    house.
18    Q.   After this point in the conversation, did there come a
19    time when your son joined the conversation?
20    A.   Yes.
21    Q.   Did you discuss the scheme in his presence?
22    A.   No, I did not.
23    Q.   Why not?
24    A.   Well, we didn't want him to know about the process.
25    Q.   I want to direct your attention to page 80, if you could
```

**A1126**

```
 1   just jump ahead to page 80 in the transcript at line 11.
 2           MR. FRANK:  Is everyone at page 80, line 11?
 3   Miss Lewis, if you could pick up at 54 minutes even.
 4           (Audio recording played.)
 5   Q.  Mr. Isackson, if I could direct your attention back to
 6   page 80.  At line 11 on page 80, Mr. Singer says "I've got to
 7   go see the -- I've got to go see the Demerline's.  At line 15,
 8   he says, "right across the street from the Palatella's.  They
 9   live on Lincoln."
10           Did you know the Palatella's?
11   A.  Yes.
12   Q.  Who are the Palatella's?
13   A.  They had some children that were the age of our kids, so
14   we knew them socially.
15   Q.  Did you know they were working with Mr. Singer?
16           MR. KENDALL:  Objection, your Honor.
17           THE COURT:  Overruled.
18   A.  Yes, I did know that.
19   Q.  How did you know that?
20   A.  Rick told us.
21   Q.  In what context?
22   A.  He said he was counseling their son.
23   Q.  At page 81 -- let me ask you this.  Did he ever tell you
24   they were involved in the scheme with him?
25   A.  No, he did not.
```

Q.   At page 81, line 8, you said, "we'll just -- we'll just

kind of deal with this as it comes.  If we have to have you do

the testing, I think we'll definitely pay cash this time."  And

at line 13, "and not, not rush through the other way.  You

know, just kind of take -- I just do get uptight about talking

on the phone."

        Why did you want to pay cash this time if you did the

testing?

A.   I was saying cash, but what I was referring to is I

03:22 wouldn't be taking the write-off on it.

Q.   Why not?

A.   Because he was being audited and, to me, clearly the test

taking portion would be impossible to hide.

Q.   Then, at line 13, you said, "not run it through the other

way".

        What would you have to run it through in order to

take the deduction?

A.   Well, you'd have to take a -- you'd have to claim it as a

charitable deduction for something he didn't receive anything

03:22 for.

Q.   Who would you have to make the check out to in order to

make a deduction?

A.   In his case, I'd have to write it to the Key Foundation.

Q.   Bottom of the page, you said, "it's got to be so over --

it's got to be so overly fair.  The only reason I said to

|  |  |
|---|---|
| 1 | Davina, this is almost like a TV drama, you know, when you look |
| 2 | at the who's who of people there".  What were you referring to |
| 3 | by the who's who? |
| 4 | A.   Well, Rick had dropped some pretty heavy names, and I knew |
| 5 | that a majority of his clients were wealthy individuals and big |
| 6 | people in the business community, so it would be a very |
| 7 | interesting story. |
| 8 | Q.   Was it comforting to you to know those people were his |
| 9 | clients? |
| 03:23 10 | A.   Absolutely. |
| 11 | Q.   Why? |
| 12 | A.   Well, those people would have really, really thick returns |
| 13 | and most of them would be giving a lot of money to chatter, so |
| 14 | it would be much more difficult to figure things out. |
| 15 | Q.   At page 83, line 7, you said, "Yeah, yeah, I'm sure with a |
| 16 | lot of these charities too, you know -- and it probably helps. |
| 17 | It's tougher too with the returns of the people if they look at |
| 18 | that and they say, well, he's never given, and now he's giving. |
| 19 | I mean, with me, I have done it aside from you.  I've done some |
| 03:23 20 | big gifts in some big years". |
| 21 | What did you mean by that? |
| 22 | A.   I was concerned that there were some people that just |
| 23 | didn't give to charity and in the years their children got |
| 24 | admitted, they wrote a large check to Rick Singer's foundation, |
| 25 | and if the IRS looked at that the same year their child got in, |

1    that would be a pretty big flag.

2    Q.   If we could move ahead --

3         THE COURT:  We're going to break at this stage in the

4    day.  Mr. Isackson, you may step down.  We're a few minutes

5    earlier than normal.  I have some other afternoon business.

6    I'm going to let you go a few minutes early.

7         Jurors, this is the first night that you have been a

8    constituted jury.  You will be going home to get questions from

9    all of your friends and members of your family.  Please

03:24 10   remember my instructions.  Do not talk about this case or about

11   any of the evidence you've heard.  You've only heard just the

12   beginning.  You have lots more evidence to hear.  It would be

13   inappropriate for you to talk about this case with anyone or do

14   any independent research.  I think you understand the reasons

15   for that.  What somebody else says to you about some similar

16   case they know about has absolutely nothing to do with this

17   case and you're not to discuss it or talk about it.  So get

18   into the habit of deflecting questions that will be in your

19   direction.

03:25 20        I'll see you back tomorrow morning.  Tomorrow will be

21   a little bit different.  We'll be recessing at one, and may go

22   a few minutes later than one, maybe as late as 1:30.  We will

23   not have an afternoon session.  I'll see you at 9:00 a.m.

24   tomorrow morning.

25        MR. FRANK:  Your Honor, if the jurors could leave

```
 1    their transcript binder.
 2          THE COURT:  Yes.  If you could leave your transcript
 3    binders.  You may take your notebooks back with you into the
 4    jury room.
 5          (Jury exits.)
 6          THE COURT:  Please be seated, counsel.
 7          Approximately how much longer on this direct
 8    examination?
 9          MR. FRANK:  Very little.
03:26 10          THE COURT:  Half an hour?
11          MR. FRANK:  Less.
12          THE COURT:  Any idea now as to a rough estimate of
13    cross-examination from defendants?  Mr. Kelly.
14          MR. KELLY:  Roughly, 2 hours.
15          THE COURT:  Mr. Kendall?
16          MR. TOMBACK:  Your Honor, it's Andy Tomback.  I
17    believe it will be roughly the same.  I know you want me to say
18    less, but it will be roughly that.
19          THE COURT:  If we complete the testimony of
03:27 20    Mr. Isackson tomorrow, who will be the next witness?
21          MR. FRANK:  Your Honor, depending on what happens on
22    cross-examination, it could be Davina Isackson.  If it's not
23    Davina Isackson, it will be Special Agent Keith Brown.
24          THE COURT:  And you told me the examination of
25    Mr. Brown is in the several hours category?
```

```
 1              MR. FRANK:  Yes.

 2              THE COURT:  What about Wednesday now?  The government

 3       is required to inform the defendants who you will be calling

 4       Wednesday if you are through with Agent Brown.

 5              MR. FRANK:  Given what we just heard, it seems

 6       unlikely that will be the case.

 7              THE COURT:  What if?

 8              MR. KENDALL:  Then it would likely be Special Agent

 9       Liz Keating.

03:27 10        THE COURT:  Her direct examination will be

11       approximately how long?

12              MR. FRANK:  Also in the several hour duration.

13              THE COURT:  Anything else that needs to come to my

14       attention before we adjourn for the day?

15              MR. KELLY:  No, your Honor.

16              MR. KENDALL:  If I can clarify.  Are the consensual

17       tapes going to be played with Miss Keating?

18              MR. FRANK:  Yes.

19              MR. KENDALL:  Thank you, your Honor.

03:28 20        THE COURT:  We're in recess until tomorrow morning at

21       nine.  I have other business.  If counsel could exit the

22       courtroom, it would be appreciated.

23              (Whereupon, the proceedings concluded at 3:29 p.m.)

24

25
```



```
1                        I N D E X

2    Witness                          Page

3    BRUCE ISACKSON

4    Direct Examination by Mr. Frank

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         E X H I B I T S

 2    NO.                          ADMIT

 3    190   ...................    100

 4    200   ...................    105

 5    203   ...................    108

 6    204   ...................    112

 7    208   ...................    113

 8    447   ...................    124

 9    450   ...................    129

10    506   ...................    130

11    607   ...................    138

12    671   ...................    147

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 13, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14   /s/ Kristin M. Kelley              September 13, 2021

15   Kristin M. Kelley, RPR, CRR             Date
     Official Court Reporter
16

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

UNITED STATES OF AMERICA,          )
4                      Plaintiff     )
                                     )
5    vs.                            )  No. 1-19-CR-10080
                                     )
6    GAMAL ABDELAZIZ and JOHN       )
     WILSON,                        )
7                      Defendants.   )
                                     )
8                                    )

9

10

              BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 5
12

13

           John Joseph Moakley United States Courthouse
14                      Courtroom No. 4
                      One Courthouse Way
15              Boston, Massachusetts 02210

16

17                     September 14, 2021
                          9:12 a.m.
18

19

20

                    Kristin M. Kelley, RPR, CRR
21                   Kelly Mortellite, CRR, RMR
                       Official Court Reporter
22        John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
23                 Boston, Massachusetts 02210
                    E-mail: kmob929@gmail.com
24

           Mechanical Steno - Computer-Aided Transcript
25

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3        Robert L. Sheketoff

 4        One McKinley Square

 5        Boston, MA 02109

 6        617-367-3449

 7        sheketoffr@aol.com

 8        for Gamal Abdelaziz.

 9

10

11        Michael Kendall

12        Lauren M. Papenhausen

13        White & Case, LLP

14        75 State Street

15        Boston, MA 02109

16        617-939-9310

17        michael.kendall@whitecase.com

18        for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2                        (Jury enters.)

 3              THE CLERK:  You may be seated.  Court is now in

 4       session.

 5              THE COURT:  Good morning, jurors.  Welcome back.

 6       We're ready to resume.

 7              Mr. Isackson, you're reminded that you remain under

 8       oath.

 9              And, Mr. Frank, you may continue with direct

09:12 10       examination.

11              MR. FRANK:  Thank you, your Honor.

12              DIRECT EXAMINATION OF BRUCE ISACKSON (Continued)

13       BY MR. FRANK:

14       Q.   Good morning again, Mr. Isackson.

15       A.   Good morning.

16       Q.   If you could turn back to Tab 607 in your transcript

17       binder, we had been reviewing the recording that Mr. Singer

18       made of the meeting in your home.  Do you recall that from

19       yesterday?

09:13 20       A.   Yes.

21       Q.   In or about December of 2018?

22       A.   Yes.

23       Q.   If I could direct you to page 88 of the transcript.  We

24       will resume listening to the recording on page 14 at line 8.

25              MR. FRANK:  Miss Lewis, if you could pick up at
```

```
 1   59 minutes and 8 seconds.
 2            (Audio recording played.)
 3   Q.   Mr. Isackson, at page 88, line 14, you said, "when I got
 4   that fucking phone call my wife doesn't even know my heart just
 5   fucking stopped, it was just like, you know, I'm thinking worse
 6   case, if it comes through it just means you're gonna pay fines.
 7   I think."
 8            What was the phone call that you were referring to?
 9   A.   The phone call that he had referred to from the IRS.
09:15 10   Q.   Could you please bring the microphone --
11   A.   I'm sorry.
12            THE COURT:  If you'd pull the microphone way over in
13   front of you and push the tab away.
14            THE WITNESS:  Is this better?
15            THE COURT:  Thank you.
16            THE WITNESS:  Okay.
17   Q.   What was the phone call you were referring to?
18   A.   The phone call that he received from the IRS.
19   Q.   That you received from the IRS?
09:15 20   A.   That he received from the IRS.
21   Q.   Okay.  And why did your heart stop?
22   A.   Well, there was a good chance that we'd be audited and the
23   whole scheme could be exposed.
24   Q.   And then you said at line 17, "I'm thinking worse case if
25   it comes through just means you're gonna pay fines.  I think."
```

**A1141**

|       |                                                                        |
|-------|------------------------------------------------------------------------|
| 1     | What were you referring to there?                                       |
| 2     | A.   The actual punishment, the end result of it.                       |
| 3     | Q.   Why did you say "I think"?                                         |
| 4     | A.   I had no idea of how serious an offense it was.                    |
| 5     | Q.   At page 89, line 2, you said, "or worse case the *Wall*           |
| 6     | *Street Journal* gets ahold of it and it's some story or              |
| 7     | something like that, which would be much worse."                       |
| 8     |      Why would you think it would be much worse if the                 |
| 9     | *Wall Street Journal* got ahold of the story?                         |
| 09:16 10 | A.   Because then it would be front page news.  It would be a        |
| 11    | big story.                                                             |
| 12    | Q.   What would be front page news?                                    |
| 13    | A.   The whole scheme, the whole process, my involvement, my           |
| 14    | children, you know, having to leave school, everything.                |
| 15    | Q.   You can put that aside.                                           |
| 16    |      Mr. Isackson, you testified yesterday that there came             |
| 17    | a time when you were charged with a crime in connection with           |
| 18    | your involvement in this scheme.  When was that?                       |
| 19    | A.   It was approximately two and a half years ago.                    |
| 09:17 20 | Q.   And after you were charged, did there come a time when you      |
| 21    | pled guilty in connection with your involvement to securing            |
| 22    | admission for your daughters to college and cheating on                |
| 23    | standardized tests?                                                    |
| 24    | A.   Yes.                                                              |
| 25    | Q.   When was that?                                                    |

```
 1   A.   It was 2 months after -- it was 2 months after -- excuse
 2   me.  It was -- the timing --
 3   Q.   When did you plead guilty?
 4   A.   When did I plead guilty?  I pled guilty pretty much after
 5   we were arrested.
 6             MR. FRANK:  Could we show the witness only Exhibit
 7   674, please.
 8   Q.   Mr. Isackson, do you recognize that document?
 9   A.   Yes.
10   Q.   What is it?
11   A.   It's a Plea Agreement.
12             MR. FRANK:  Government offers 674.
13             THE COURT:  It will be admitted.
14             (Exhibit 674 admitted into evidence.)
15   Q.   Whose Plea Agreement is this?
16   A.   It's mine.
17   Q.   Could we look at page 7, please.  Do you recognize the
18   signature on the Plea Agreement?
19   A.   Yes.
20   Q.   Whose is it?
21   A.   It's mine.
22   Q.   And the date?
23   A.   April 7, 2019.
24   Q.   Have you been sentenced in connection with your
25   involvement in this scheme?
```

**A1143**

```
 1   A.   No.

 2   Q.   Have you spent any time in jail since pleading guilty?

 3   A.   No.

 4        MR. FRANK:  Could we look -- for the witness only,

 5   could we look at Exhibit 675, please.

 6   Q.   Do you recognize this document?

 7   A.   Yes.

 8   Q.   What is it?

 9   A.   It's a Cooperation Agreement.

09:19 10      MR. FRANK:  The Government offers 675.

10

11        THE COURT:  The date of it, please?

12        MR. FRANK:  The date is April 3, 2019.

13        THE COURT:  It will be admitted.

14        (Exhibit 675 admitted into evidence.)

15   Q.   Mr. Isackson, whose Cooperation Agreement is this?

16   A.   It's mine.

17        MR. FRANK:  Could be look at page 5, please.

18   Q.   Do you recognize that signature?

19   A.   Yes.

09:19 20   Q.   Whose is it?

21   A.   It's mine.

22   Q.   What is the date?

23   A.   April 7, 2019.

24   Q.   What is your understanding of what you have agreed to do

25   under the terms of this Cooperation Agreement?
```

**A1144**

1    A.    Tell the truth about exactly what happened.

2    Q.    What is your understanding of what will happen if you tell

3    the truth about exactly what happened?

4    A.    There's a chance that my sentence could be reduced.

5    Q.    What is your understanding of what will happen if you do

6    not tell the truth?

7    A.    It would be much worse.  I would get the most harsh

8    treatment there could be.

9    Q.    Is the judge who sentences you required to give you a

09:20  10    lower sentence if you testify truthfully?

11    A.    No.

12    Q.    Are you hoping to get a lower sentence as a result of your

13    cooperation?

14    A.    Yes, absolutely.

15    Q.    Who will decide your sentence?

16    A.    The judge.

17            MR. FRANK:  No further questions.

18            THE COURT:  Cross-examination, Mr. Kelly.

19                CROSS-EXAMINATION OF BRUCE ISACKSON

09:21  20    BY MR. KELLY:

21    Q.    Good morning, Mr. Isackson.

22    A.    Good morning.

23    Q.    So you just told us that, facing the prospect of paying

24    fines and a *Wall Street Journal* article, your heart stopped.

25    A.    Correct.

**A1145**

|     |     |
| --- | --- |
| 1 | Q.   So you were panicking about the idea of paying fines, |
| 2 | right? |
| 3 | A.   I was panicking about the whole situation. |
| 4 | Q.   And I suspect you might be panicking even more once you |
| 5 | learned you could actually go to prison, right? |
| 6 | A.   That was a good thought, yes.  Correct. |
| 7 | Q.   And you'd pretty much do anything to stay out of prison, |
| 8 | wouldn't you? |
| 9 | A.   I don't know what you mean. |
| 09:21 10 | Q.   You don't know what that means?  You'd pretty much do |
| 11 | anything to stay out of prison, wouldn't you? |
| 12 | A.   I don't know what -- where are you going with that |
| 13 | question? |
| 14 | Q.   Well, you'd lie to stay out of prison, wouldn't you? |
| 15 | A.   I would not do that. |
| 16 | Q.   You wouldn't do that? |
| 17 | A.   No.  I understand that -- |
| 18 | Q.   I'm asking the questions here.  Would you lie to keep your |
| 19 | wife out of prison? |
| 09:22 20 | A.   No. |
| 21 | Q.   Would you lie to get your daughter into college? |
| 22 | A.   I did. |
| 23 | Q.   So you would lie to get your daughter into college, right? |
| 24 | A.   I did. |
| 25 | Q.   So you would lie to get your daughter into college, |

```
 1    wouldn't you?

 2    A.    I'll repeat, I did.

 3    Q.    Okay.  But you wouldn't lie to keep your wife out of

 4    prison; is that your testimony?

 5    A.    That's my testimony, yes.

 6    Q.    Okay.  And prior to your testimony today, how many times

 7    did you meet with either the prosecutors or the federal agents

 8    on this case?

 9    A.    I'm not sure the exact amount of times.

10    Q.    Did you meet with them last night?

11    A.    No.

12    Q.    How about over the weekend?

13    A.    Yes.

14    Q.    How many hours did you spend with the federal agents or

15    the prosecutors on this case over this past weekend?

16    A.    I'm not exactly sure.

17    Q.    More than one?

18    A.    Yes.

19    Q.    More than two?

20    A.    Yes.

21    Q.    More than three?

22    A.    I'd say approximately.

23    Q.    And where did you meet with the federal officers?

24    A.    At their office.

25    Q.    All right.  And this meeting over the weekend, was that
```

**A1147**

```
 1   the first time you'd ever met with the federal agents or
 2   prosecutors on this matter?
 3   A.   No.
 4   Q.   How many times before this weekend had you met with them?
 5   A.   I don't recall the exact amount of times.  I would say
 6   approximately three or four.
 7   Q.   And for each of those meetings, was it approximately a
 8   couple hours?
 9   A.   Yes, approximately.
10   Q.   During any of those meetings did you ever tell the
11   government that you knew Gamal Abdelaziz?
12   A.   No.
13   Q.   Because you don't know Gamal Abdelaziz, do you?
14   A.   No, I don't.
15   Q.   You'VE never spoken to him before, have you?
16   A.   I have not.
17   Q.   You've never agreed with him about anything, have you?
18   A.   Have I agreed directly with him?  No.
19   Q.   You had some indirect agreement with a man you don't know?
20   A.   I believe everyone that was involved, all the parents
21   involved in this.
22   Q.   And he's a man you never met before, right?
23   A.   That's absolutely correct.
24   Q.   You never spoke to him before?
25   A.   No.
```

```
 1   Q.    It's kind of an unusual name.  Do you know anyone else
 2   named Gamal Abdelaziz in California?
 3   A.    No, I do not.
 4   Q.    Let me ask you this.  How many times did you speak to Rick
 5   Singer over the years?
 6   A.    I'm not exactly sure how many times I've spoken with him
 7   to be exact.
 8   Q.    More than ten?
 9   A.    I don't think I've spoken with him more than ten times,
10   no.
11   Q.    How many times did you meet with him at your home?
12   A.    I believe only once.  Oh, excuse me.  Two times.  Two
13   times.
14   Q.    You met with him at your home, by the way, after he left
15   that threatening message to you and your wife, right?
16   A.    Yes.
17   Q.    So despite that threatening message, you still welcomed
18   him into your home, correct?
19   A.    We were engaging him.  We were working with him.
20   Q.    Right.  You were already knee deep in criminal activity
21   with him, weren't you?
22   A.    I don't understand your question.
23   Q.    Okay.  He threatened you and yet you still invited him to
24   your home, correct?
25   A.    That's correct.
```

```
 1    Q.   Because you were so eager to do this fraud scheme with
 2    your wife, correct?
 3    A.   I don't like those words, but yes, we wanted to continue
 4    with him.  We thought about it.
 5    Q.   You don't like those words, but those words reflect the
 6    truth, don't they?
 7    A.   I don't know the exact answer to tell you there.
 8    Q.   All right.  So in all these conversations and meetings
 9    with Rick Singer, did he ever say the name Gamal Abdelaziz?
10    A.   No, he did not.
11    Q.   That might be a name you'd remember, correct?
12    A.   Could be.
13    Q.   In all your meetings with Singer, how many lies do you
14    think he told you?  Can you estimate that?
15    A.   I would have no idea.
16    Q.   More than a dozen?
17    A.   I'd be guessing.
18    Q.   Can you estimate more than 20?
19              MR. FRANK:  Objection.
20              THE COURT:  Sustained.
21    Q.   In your view, Singer was a skilled liar, wasn't he?
22    A.   He definitely told some lies.
23    Q.   And he could change his tune on a dime, couldn't he?  He
24    could threaten you and then he could be nice, right?
25    A.   He kind of just -- his behavior, he was -- as I said, I
```

**A1150**

think initially he had an intimidating personality.  He's a
very strong-willed guy.  It was kind of his way to do business
or you're not going to get your program with him.

Q.   Well, that's the way he treated you, right?

A.   I believe that's what he -- I don't think he changed his
routine for anyone.

Q.   Really?

A.   Yeah.

Q.   How would you know that?

09:28 A.   I wouldn't know that, but I'm saying that was how it was
with me.

Q.   Sorry.  You would not know that, right?

A.   That's correct.  I would not --

Q.   You only know how he treated you, right?

A.   Yes.

Q.   And are you aware that he ever threatened other people?

A.   No.

Q.   Because he could, in fact, talk about legitimate things as
well, right?

09:28 A.   That's correct.

Q.   For instance, in front of your son, he could talk about
legitimate things?

A.   That's correct.

Q.   And you took great pains to keep your son out of this
scheme in dealing with Singer, correct?

```
 1   A.   I don't understand your question.

 2   Q.   Well, I think yesterday you said with respect to your son

 3   Ryan you tried to keep him out of discussions about the scheme

 4   with Singer, right?

 5   A.   We did not discuss the scheme in front of him, no.

 6   Q.   You didn't?

 7   A.   No.

 8   Q.   Because -- obviously, you're his father and you want to

 9   keep him out of it, right?

10   A.   Yeah.  I didn't want to involve my child in that part of

11   the discussions.

12   Q.   I'd like to play a portion of tape 607.  It is on page --

13   there's a section that I believe the prosecutor skipped over

14   yesterday.  It starts on page 65.

15            (Audio recording played.)

16   Q.   So that's all legitimate banter back and forth with just

17   you, your son, Singer, and your wife, right?

18   A.   Yes.

19   Q.   I'm sorry?

20   A.   Yes, yes.

21   Q.   There's no threatening -- he's not -- he's not using his

22   threatening tone there, is he?

23   A.   No, he's not.

24   Q.   Okay.  Proceed, please.

25            (Audio recording played.)
```

09:29 (line 10)
09:33 (line 20)

**A1152**

```
 1   Q.    Now, when he said you could be a practice player, you

 2   didn't think Singer was sucking your son into a crime right in

 3   front of you, did you?

 4   A.    He was talking about being a practice player.

 5   Q.    You thought that was legit, right?

 6   A.    I'm sorry?

 7   Q.    You thought that was legitimate, right?

 8   A.    I don't understand what you mean by your question.

 9   Q.    You don't know what the world "legitimate" means?
```
09:34
```
10   A.    I absolutely know what that means.  I don't understand

11   your question.

12   Q.    When Singer said in front of you and your wife to your son

13   that he could be a practice player, you didn't understand that

14   to mean your son was about to get involved in a crime in your

15   presence, did you?

16   A.    He asked that question to him.

17   Q.    Sir, you have to answer the question if you understand it.

18   A.    I will.

19   Q.    You just testified moments ago and yesterday that you
```
09:34
```
20   never brought your son into anything legitimate -- illegal with

21   Singer, right?

22   A.    I think I -- pretty sure we said we didn't discuss the

23   scheme in front of him, yeah.

24   Q.    Okay.  So right here when he's talking to your son about

25   being a practice player, you didn't see that as part of the
```

| | |
|---|---|
| 1 | scheme, did you? |
| 2 | A.   He asked that question to him. |
| 3 | Q.   I know he asked the question.  And when he asked the |
| 4 | question, you didn't view it as part of the scheme, did you? |
| 5 | A.   Again, he asked that question to him. |
| 6 | Q.   I know, but you have to answer my question.  You didn't |
| 7 | view it as part of the scheme when he said that to your son |
| 8 | about being a practice player, did you? |
| 9 | A.   I'm still -- when you're saying "part of the scheme," he |
| 09:35 10 | asked him if he wanted to be a practice player.  He didn't get |
| 11 | into any kind of scheme discussions with him at all.  He asked |
| 12 | him if he wanted to be a practice player.  That was the |
| 13 | question he asked him. |
| 14 | Q.   Right.  And that seemed legitimate at the time to you, |
| 15 | correct? |
| 16 | A.   When you say it seemed legitimate, he asked him if he |
| 17 | wanted to be a practice player. |
| 18 | Q.   Did that sound like a crime he was trying to get your son |
| 19 | involved in? |
| 09:35 20 | A.   My son wouldn't know about that crime. |
| 21 | Q.   So it did not sound like a crime to your son, right? |
| 22 |      MR. FRANK:  I'm going to object at this point.  It's |
| 23 | been asked and answered. |
| 24 |      THE COURT:  Overruled. |
| 25 | Q.   When he said to your son you can be a practice player -- |

```
 1   A.   Yes.

 2   Q.   -- you didn't jump up and say, stop, this is a fraud, get

 3   my son out of here, did you?

 4   A.   No, I didn't.

 5   Q.   Because it sounded legitimate, reasonable that he could be

 6   a practice player if he had some experience with soccer, right?

 7   A.   Rick threw that out to him.

 8   Q.   Well, you're a sports fan, aren't you?

 9   A.   I enjoy sports.

10   Q.   Okay.  Some of these teams use practice players, don't

11   they?

12   A.   Yes.

13   Q.   Okay.  And when Singer said to your son you could be a

14   practice player, that did not strike you at the time as a

15   crime, right?

16   A.   He was discussing with him he wanted to be a practice

17   player.  He just was discussing soccer, yes.

18   Q.   Let's keep going, please.

19            (Audio recording played.)

20   Q.   So, again, in your mind, is this part of the scheme at

21   all?

22   A.    In my mind, I understood, yes, this was part of -- I don't

23   want to say the word "scheme," but I want to say in my mind I

24   understood what Rick was talking about.  I don't think my son

25   had any idea.
```

09:36 (line 10)
09:37 (line 20)

**A1155**

```
 1   Q.   Well, you don't want to say the word "scheme," but you
 2   used it about a dozen times in direct questioning, didn't you?
 3   A.   I don't know the exact amount.
 4   Q.   Did you ever use the word "scheme" when you were meeting
 5   with the agents those many hours?
 6   A.   Sure.
 7   Q.   You did?
 8   A.   Uh-hum.
 9   Q.   You think that's reflected in anything that the agents
10   took down, that you used the word "scheme," or is this a word
11   now you decided to use at this trial?
12   A.   No.
13   Q.   But when Singer again talked about being a practice player
14   in front of you and your son, you didn't view that as involving
15   your son in any illegal scheme, did you?
16   A.   Again, my son had no idea about it.
17   Q.   Because it sounds reasonable.  You can be a practice
18   player if you played the sport, right?
19   A.   I guess.
20   Q.   You guess?
21   A.   Yes.  I guess.
22            MR. KELLY:  Keep playing.
23            THE COURT:  Excuse me.  Where are we in the
24   transcript?
25            MR. KELLY:  We are -- your Honor, I think we stopped
```

|    |    |
|----|----|
| 1 | at page 70. |
| 2 | Q.   Actually, before we begin, why don't we just stop. |
| 3 | There's a reference to a Jorge. |
| 4 | A.   Um-hmm. |
| 5 | Q.   He's a soccer coach over at UCLA, right? |
| 6 | A.   Correct. |
| 7 | Q.   Did you know anything about him taking bribes at the time? |
| 8 | A.   When you say did I know about him taking bribes, I assumed |
| 9 | he was involved in it.  Absolutely. |
| 09:39 10 | Q.   But you let Singer go ahead and talk about this man you |
| 11 | knew to be taking bribes? |
| 12 | A.   Again, my son knew nothing about Jorge. |
| 13 | Q.   Well, did you? |
| 14 | A.   Yes. |
| 15 | Q.   And you didn't stop it, did you? |
| 16 | A.   Rick was doing his rap.  I let him talk. |
| 17 | Q.   Yeah.  And so you didn't keep your son out of any of this, |
| 18 | did you?  You just let it go? |
| 19 | A.   It was a short -- relatively short conversation.  They |
| 09:40 20 | just went through Rick asking him his questions. |
| 21 | MR. KELLY:  All right.  Please keep going. |
| 22 | THE COURT:  I want to know where you are, Mr. Kelly. |
| 23 | MR. KELLY:  Yes.  We had stopped at page 70, line 16 I |
| 24 | believe is where we left off. |
| 25 | THE COURT:  Thank you. |

|     |                                                                    |
|-----|--------------------------------------------------------------------|
| 1   | (Audio recording played.)                                          |
| 2   | Q.   Now, yesterday there was a discussion of your daughter        |
| 3   | Audrey.  Do you recall those questions?                            |
| 4   | A.   Yes.                                                           |
| 5   | Q.   You paid a test proctor to take -- to increase her ACT        |
| 6   | score, right?                                                      |
| 7   | A.   That's correct.                                               |
| 8   | Q.   And when you did that in your mind, obviously, you knew       |
| 9   | that was fraud, right?                                             |
| 09:42 10 | A.   Correct.                                                 |
| 11  | Q.   There was no question in your mind that was not only          |
| 12  | inappropriate but illegal, right?                                  |
| 13  | A.   Correct.                                                      |
| 14  | Q.   Okay.  Now, with respect to her, she went to USC, right?      |
| 15  | She got into USC?                                                  |
| 16  | A.   Correct.                                                      |
| 17  | Q.   And there was an athletic profile of her created, right?      |
| 18  | A.   Correct.                                                      |
| 19  | Q.   And she had never rowed crew, had she?                        |
| 09:43 20 | A.   No.                                                      |
| 21  | Q.   She had no interest in crewing or rowing, whatever the        |
| 22  | term is, right, zero?                                              |
| 23  | A.   Correct.                                                      |
| 24  | Q.   She had no interest in that sport at all?                     |
| 25  | A.   Correct.                                                      |

```
 1   Q.   That's why you had to give just a headshot, because there
 2   was no instances of her ever participating in crew, right?
 3   A.   I don't know that.
 4   Q.   What do you mean?  You don't know if she ever participated
 5   in crew?
 6   A.   No.  You asked the question that's why you gave a
 7   headshot, because she had no interest in the sport and she had
 8   never done it, so I said I don't know why.  We just gave him a
 9   headshot.
10   Q.   You were asked to give a picture?
11   A.   That's correct.
12   Q.   And that's what you provided, right?
13   A.   That's what we gave him.
14   Q.   You didn't create the athletic profile of Audrey, did you?
15   A.   We did not.
16   Q.   Singer had people do that, right?
17   A.   I assume.
18   Q.   Well, do you know?
19   A.   We gave him a headshot.  He took care of everything from
20   there.
21   Q.   And Singer had other people working with him, like Laura
22   Janke.  Did you ever hear that name?
23   A.   I believe so.
24   Q.   So Singer had people create these athletic profiles,
25   right?
```

|  |  |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    And you never even saw it, did you? |
| 3 | A.    No, we did not. |
| 4 | Q.    Are you aware that my client's daughter, Sabrina |
| 5 | Abdelaziz, also got into USC? |
| 6 | A.    Only because I read the paper. |
| 7 | Q.    Are you aware she's about to graduate from USC this |
| 8 | spring? |
| 9 | A.    I'm not, no. |
| 09:45 10 | Q.    You have no idea? |
| 11 | A.    I have no idea. |
| 12 | Q.    Is your daughter about to graduate from USC? |
| 13 | A.    No. |
| 14 | Q.    How did things work out for her at USC? |
| 15 | A.    What is your exact question there? |
| 16 | Q.    Was she expelled from USC? |
| 17 |        MR. FRANK:  Your Honor, I object to this line of |
| 18 | questioning. |
| 19 |        THE COURT:  Sustained. |
| 09:45 20 | Q.    Is your daughter scheduled to graduate from USC? |
| 21 |        MR. FRANK:  Your Honor, I object. |
| 22 |        THE COURT:  Sustained. |
| 23 | Q.    Your wife's name is Davina, right? |
| 24 | A.    Yes. |
| 25 | Q.    Did I pronounce that correctly? |

```
 1   A.   You did.

 2   Q.   She has a friend named Lauren Whittam, correct?

 3   A.   I don't know if I'd call her a friend.

 4   Q.   Okay.  Would you -- does she know a woman named Lauren

 5   Whittam?

 6   A.   Yes, she does.

 7   Q.   And has she known Lauren Whittam for a long time?

 8   A.   When you say "a long time," what do you mean by that?

 9   Q.   More than a year.

10   A.   Yes, more than a year.

11   Q.   More than two years?

12   A.   I believe more than two years, yes.

13   Q.   More than three years?

14   A.   That I don't know.

15   Q.   And Lauren Whittam is a development person at USC,

16   correct?

17   A.   Yes, my understanding.

18   Q.   She's a fundraiser, right?

19   A.   She's in the development department, yes.  She raises

20   funds.

21   Q.   She raises money for USC, correct?

22   A.   That's correct.

23   Q.   And your wife is, if not friendly with her, certainly has

24   known her for a while?

25   A.   Like I said, I believe she's known her for two or
```

| | |
|---|---|
| 1 | three years.  I'm not sure. |
| 2 | Q.   Are you aware Ms. Whittam offered to flag your daughter |
| 3 | Lauren at USC if you donated money to help her with the |
| 4 | admission process? |
| 5 | A.   I do remember some conversation about that. |
| 6 | Q.   Okay.  So it was no secret that USC was heavy on |
| 7 | fundraising, right? |
| 8 | A.   I don't know exactly what you want from that question. |
| 9 | Q.   Well, it's just a question.  You don't have to figure out |
| 09:47 10 | where I'm going.  You just have to answer it truthfully, if you |
| 11 | can. |
| 12 | A.   I will. |
| 13 | Q.   It was not unknown to you that USC did a lot of |
| 14 | fundraising, correct? |
| 15 | A.   Yes.  USC did a lot of fundraising. |
| 16 | Q.   It's a private school, right? |
| 17 | A.   Yes, it is. |
| 18 | Q.   And it raises funds all the time, right? |
| 19 | A.   Yes. |
| 09:47 20 | Q.   In fact, Lauren Whittam, an acquaintance of your wife, |
| 21 | told you and her if you donated to USC, she could flag Lauren's |
| 22 | application and it might help? |
| 23 | A.   I had no conversations with Lauren Whittam. |
| 24 | Q.   Well, did your wife ever tell you that? |
| 25 | A.   She briefly mentioned it to me, yes. |

```
 1    Q.   Okay.  So you learned about that from your wife?

 2    A.   That's correct.

 3    Q.   Okay.  And did you learn that Ms. Whittam said it might

 4    help, but there was no guarantee?

 5    A.   That was my understanding.

 6    Q.   That was your understanding?

 7    A.   Correct, but when you say it would help -- it would

 8    help --

 9    Q.   Hold on now.

09:48 10        MR. FRANK:  Can the witness answer the question?

11              THE COURT:  He's answered the question.

12    Q.   Now, you -- well, let's stick with Ms. Whittam.  Have you

13    seen any document in this case, a message from Ms. Whittam to

14    your wife?

15    A.   I do not recall.

16    Q.   What documents have you looked at before you came here

17    today to testify?

18    A.   I looked at all the recorded tapes that we've looked at.

19    Q.   Have you looked at anything besides the tapes and the

09:49 20    transcripts?  Any e-mails?

21    A.   I don't believe we looked at any e-mails with the

22    Government.

23    Q.   I'm not asking you about you and your wife.  I'm asking

24    about you and the Government only.  Okay?  Understand that?

25    I'm not asking about anything you may have done with your wife.
```

```
 1    I'm asking about you and the Government.  Okay?
 2    A.   Yeah.
 3    Q.   All right.  Well, did you listen to the tape between your
 4    wife and Singer about Ms. Whittam?
 5    A.   I don't believe that we did.
 6    Q.   Would you recognize your wife's voice?
 7    A.   I think I might.
 8    Q.   And how about Mr. Singer?  You'd recognize his voice, too,
 9    right?
10    A.   Yes.
11    Q.   I'm going to start Exhibit 1444.
12         MR. FRANK:  Objection, your Honor.  This is not a
13    recording that this defendant is on, that this witness is on.
14         MR. KELLY:  Well, they've stipulated to the
15    authenticity of the tapes and he can identify the speakers and
16    supposedly, according to the Government, his wife is a
17    coconspirator and so is Singer.
18         MR. FRANK:  That does not make it admissible or
19    impeachment.
20         MR. KELLY:  It's relevant and it's pertinent to a
21    cross-examination topic about Ms. Whittam and his understanding
22    about donating.
23         THE COURT:  Let me see counsel at sidebar.
24              *** Beginning of sidebar ***
25         THE COURT:  What is it that you're --
```

**A1164**

1          MR. KELLY:  It's a two-page transcript, very brief, a

2     tape excerpt.

3          THE COURT:  Of what?

4          MR. KELLY:  Of his wife and Rick Singer talking about

5     her donation to USC.

6          THE COURT:  What date?

7          MR. KELLY:  It's dated October 8, 2018, right smack in

8     the middle of the conspiracy.  It's his wife trying to credit

9     her making a donation to USC, what she believes is legitimate.

09:51 10          THE COURT:  And the purpose for playing it for this

11     witness is what?

12          MR. KELLY:  To show the jury that, in fact, a lot of

13     things that they did was legitimate, not illegitimate.  That's

14     what they said when they make donations for their kids at

15     college.

16          MR. FRANK:  Well, he's not his wife.  It's his wife

17     testifying.

18          THE COURT:  You mean Mr. Isackson is not

19     Mrs. Isackson.

09:52 20          MR. FRANK:  Correct.  They're seeking to cross-examine

21     Mr. Isackson with statements that he's never heard that

22     Mrs. Isackson made on consensual recordings he says now is

23     smack in the middle of the conspiracy.  I understand the

24     defendants to be disputing that there is a conspiracy.  It's

25     not a coconspirator statement as to them, because they deny

there's a conspiracy.  It's not proper impeachment of this
witness.  He didn't say it.  It's his wife talking to the
Government's cooperating witness.  These are consensual
recordings that --

THE COURT:  Yeah.  And I don't see the relevance to
this witness, or to impeaching this witness.

MR. KENDALL:  Your Honor --

MR. KELLY:  The government is suggesting this is some
big massive conspiracy.  The government is suggesting that his
wife is a coconspirator.  He just testified that he -- that
Ms. Whittam was raising money for USC.  And this will show that
not only was she raising money, but the family's -- part of the
gift was legitimate.

MR. FRANK:  The family doesn't think.  Each witness
thinks for himself.

MR. KELLY:  Well, let me ask this.  Is Mr. Frank
calling the wife to the stand?

MR. FRANK:  We're going to decide at the conclusion of
this cross-examination.

THE COURT:  All right.  We'll reserve until that
point.  If they don't call and you want to bring this back up
before we dismiss Mr. Isackson, we'll talk about it then.

*** End of sidebar ***

Q.   How many times have you spoken with Ms. Whittam?

A.   Maybe one time.

A1166

```
 1    Q.    When?

 2    A.    I'm not exactly sure where -- when it was.

 3    Q.    Was it at a USC event?

 4    A.    I'm pretty certain -- no.  I don't think it was at a USC

 5    event.

 6    Q.    You're not suggesting in any way that Ms. Whittam at USC

 7    was involved in any criminal activity, are you?

 8    A.    No, I'm not.

 9    Q.    You have to speak up.  No one can hear you.

 10   A.    Sorry.  Sorry.

 11             No, I'm not.

 12   Q.    She's just a legitimate fundraiser at USC, right?

 13   A.    She's a fundraiser at USC.

 14   Q.    Is she legitimate or no?

 15             MR. FRANK:  Objection.

 16             THE COURT:  Overruled.

 17   Q.    When the judge says overruled, you have to answer the

 18   question.

 19   A.    I understand.  Yes.  That -- yes, she's legitimate.  Yes.

 20   Q.    At one point -- did your wife tell you at one point that

 21   she called Singer and said, hey, we want to get credit for our

 22   donation to get benefits at USC?  Did she tell you about that?

 23   A.    No.

 24   Q.    Where is your wife now?

 25   A.    She's in Boston.
```

```
 1    Q.    Where?

 2            MR. FRANK:  Objection.  Relevance.

 3            THE COURT:  Sustained.

 4    Q.    Well, how far from the courthouse is she?

 5            MR. FRANK:  Objection.

 6            THE COURT:  Sustained.

 7    Q.    Have any promises been made to you that she doesn't have

 8    to testify if you do well for the government here today?

 9    A.    Absolutely not.

09:56 10    Q.    So your testimony is totally irrelevant to her status as a

11    witness in this case?

12            MR. FRANK:  Objection.  Foundation.

13            THE COURT:  Sustained.

14    Q.    So her status of testifying today is a complete mystery to

15    you?

16    A.    Repeat your question.  I don't understand it.

17    Q.    Has anyone told you whether your wife is testifying here

18    today?

19    A.    No.

09:56 20    Q.    And you haven't discussed it with her?

21    A.    Absolutely not.

22    Q.    You haven't discussed with your wife anything about

23    testifying?

24    A.    We were told we can't talk anything about the case with my

25    wife.
```

```
     1   Q.   All right.  Now, we heard that tape earlier where Singer
     2   referenced the phrase "practice player" in front of your son
     3   Ryan, correct?  You remember that?
     4   A.   I do.
     5   Q.   He also used a term "team manager" about your daughter
     6   Lauren, didn't he?
     7   A.   Yes.
     8   Q.   In fact, he told the FBI back in April of 2019 that you
     9   thought your daughter Lauren was going to be a manager of the
09:57 10   UCLA soccer team.  Didn't you tell the FBI that?
    11   A.   I could have.  I mean, that's what she ended up doing.
    12   Q.   Well, my question is didn't you tell the FBI that in April
    13   of 2019 you thought your daughter Lauren was going to be a
    14   manager of the soccer team?
    15   A.   I do not recall that conversation.
    16   Q.   Well, do you -- do you think if the FBI wrote that down in
    17   a report they would be mistaken?
    18   A.   What was your question?
    19   Q.   Do you think the FBI wrote that down wrong?
09:58 20        MR. FRANK:  Objection.
    21        THE COURT:  Overruled.
    22   A.   It's a fact when you read it like that if it's from a
    23   report, absolutely.
    24   Q.   So you did tell the FBI that your mindset, in your mind,
    25   you thought Lauren was going to be a manager on the soccer team
```

**A1169**

         1   because that's what Singer told you, right?

         2   A.   That's correct.

         3   Q.   So your basis of knowledge in your mind came largely from

         4   Rick Singer's statements to you, right?

         5   A.   You need to repeat that question.

         6   Q.   All right.  Your mind is what matters in terms of whether

         7   you're guilty or not, right?

         8   A.   Yes.

         9   Q.   You knew you were bribing someone to take a test or -- I'm

09:58   10   sorry -- to increase the test score for your daughter, right?

        11   A.   That's correct.

        12   Q.   So, in your mind, you knew you were guilty of that, right?

        13   A.   Correct.

        14   Q.   And you have no idea what's in other people's minds, do

        15   you?

        16   A.   Not exactly sure what your question is there either.

        17   Q.   Well, you're not a mind reader, are you, sir?

        18   A.   No.

        19   Q.   And you don't know a man in Nevada who you don't even know

09:59   20   what was he thinking when he spoke to Rick Singer, do you?

        21   A.   A man in Nevada?

        22   Q.   Yes.  A man in Nevada named Gamal Abdelaziz.  You have no

        23   idea what was in his head when he was speaking to Singer,

        24   correct?

        25   A.   I had no idea he lived in Nevada.

```
 1    Q.   If Singer was talking to him about practice players and
 2    team managers, you don't know what that meant to him, do you?
 3    A.   No, I wouldn't.
 4    Q.   How about this USC person named Donna Heinel?  I think you
 5    testified yesterday that you heard about her a few times from
 6    Rick Singer, right?
 7    A.   That's correct.
 8    Q.   And you heard about her well before you got arrested,
 9    right?
10    A.   That is correct.
11    Q.   Okay.  Did he ever say to you I'm bribing this woman named
12    Donna Heinel at USC?
13    A.   Not outwardly.
14    Q.   Well, did he say it inwardly and you heard it?
15    A.   No.  He did not say it inwardly, obviously.  No, he did
16    not.
17    Q.   Okay.  So at least with respect to you, he did reference a
18    USC contact he had named Donna Heinel, right?
19    A.   He referenced her for sure.
20    Q.   And he referenced her well before you got arrested, right?
21    A.   That is correct.
22    Q.   Okay.  And even though he referenced her with you, he
23    never said to you she was being bribed, right?
24    A.   Again, not directly, no.  He did not.  Obviously not, no.
25    Q.   Now, I think you twice said yesterday that there was, in
```

```
 1    your mind, some part of Singer's charity that was legitimate,
 2    right?
 3    A.   I assumed there would be.
 4    Q.   You assumed there would be or you thought there was a
 5    legitimate part of his charity?
 6    A.   When you say "a legitimate part of his charity," his
 7    charity was a fraud, but I assume he funneled some money to
 8    charitable causes, places that, you know, did work.
 9    Q.   Now that word "funnel", you never used that word "funnel"
10:01 10   with the FBI, did you?
11    A.   I don't recall.
12    Q.   It's not in any of their reports when they met with you,
13    that word "funnel", is it?
14         MR. FRANK:  Objection.
15         THE COURT:  Overruled.  If he knows.
16    A.   I do not recall.
17    Q.   Did anyone suggest to you that that word "funnel" would be
18    a good word to inject into a federal trial?
19    A.   Absolutely not.
10:02 20   Q.   All right.  But with respect to Singer's charitable works,
21    did you know or didn't you know that some of it was legitimate?
22    A.   You keep using the word "legitimate".  I assume some of
23    the money he took from -- he set out to his charity went to
24    organizations that were 501(c)(3) charitable entities, whether
25    it was schools or camps or whatever he did with it.
```

```
 1   Q.   Well, didn't you know -- didn't you know there was a
 2   basketball camp in Oakland connected with a very prominent AU
 3   team named the Oakland Soldiers?  Did you know that?
 4   A.   I know he had some involvement with a -- with a basketball
 5   thing, yes.
 6   Q.   In Oakland?
 7   A.   Correct.
 8   Q.   You know Oakland pretty well, don't you?
 9   A.   I lived there 30 years ago for a couple years, for several
10   years.
11   Q.   All right.  You're in the Bay Area and you're a sports
12   fan.  You know Oakland pretty well, right?
13   A.   Yeah, generally I know it, but not specifically too well.
14   Q.   All right.  And you knew Singer had some sort of
15   charitable sports camp going in Oakland, right?
16   A.   He had referenced that with me, yes.
17   Q.   And that seemed legitimate to you, that part at least?
18   A.   Yeah.  It seemed like he was doing something there,
19   correct.
20   Q.   Now, we've heard a lot from this tape where Singer visited
21   your home on December 3rd of 2018.  At the time, Singer was
22   working for the Government, right?
23   A.   I found that out afterwards, yes.
24   Q.   Well, you now know at least he was wired up, as they say,
25   right?
```

Line timestamps: 10:03 (line 10), 10:03 (line 20)

```
 1   A.   I do.

 2   Q.   And he ended up taping, obviously, both you and himself

 3   during that meeting, right?

 4   A.   Correct.

 5   Q.   And didn't he end up telling you that he didn't think any

 6   money went to individuals at USC?

 7   A.   I don't believe we talked about USC.

 8   Q.   Okay.  Let's play a portion of 607.

 9        MR. KELLY:  For the record, it's transcript 49,

10   line 20.

11        (Audio recording played.)

12   Q.   You're talking about USC, right?

13   A.   That's correct.

14   Q.   It looks like you do use the word "funnel" sometimes,

15   don't you?

16   A.   Correct.

17        MR. KELLY:  Okay.  Keep going.

18        (Audio recording played.)

19   Q.   All right.  So Singer right there said to you, at least on

20   that occasion, he didn't think any money was going to USC

21   people, right?

22   A.   Uh-hum.

23   Q.   Is that a yes, sir?

24   A.   Can you repeat the question one more time?  Tell me

25   exactly where we are.
```

10:05 (line 10)
10:07 (line 20)

```
 1   Q.   Sure.  If you're looking at page 51 of the transcript at
 2   line 15, you say to him, and this is right after there's a
 3   reference to SC football, "but none of it you're saying really
 4   went to, really went to individuals."
 5          Singer, "I don't think so."
 6          You say, "Ah-hah."
 7          And Singer says, "I don't think so."  Then you keep
 8   talking a little bit.  That's what I'm referencing.
 9          He says, "could have been."
10   10:07      But he's certainly not saying to you on tape, yeah,
11   we were bribing people at USC.  He didn't say that, did he?
12   A.   At that point he did not, no.
13   Q.   Pretty clear he tells you "I don't think so," right?
14   A.   Yes.
15   Q.   Okay.  And it's quite possible he was telling other
16   parents that as well, right, no one's being bribed?
17          MR. FRANK:  Objection to what's possible.
18          THE COURT:  Sustained.
19   Q.   Now, yesterday you tried to explain that little blurb by
20   10:08  suggesting what you were doing was really investigating where
21   the money went.  Is that what you were trying to suggest
22   yesterday?
23   A.   No.
24   Q.   You weren't playing Sherlock Holmes here.  You were just
25   asking the question, right?
```

```
 1   A.   No.  I was trying to get him to admit to me that he had

 2   bribed people.

 3   Q.   Oh.  So you turned into the investigator at that moment;

 4   is that what you're telling this jury?

 5   A.   Not at all.

 6   Q.   Okay.  You were trying to nail him down on an admission;

 7   is that your testimony?

 8   A.   No.  I wanted him to tell me, you know, admit on -- you

 9   know, when he's talking to me that he actually gave money to

10   people.

11   Q.   This was a man --

12   A.   He was pretty clever about not doing that.

13   Q.   This was a man who both threatened you and your wife

14   before he came to your house, right?

15   A.   You're talking about what would happen on the tape that he

16   left on --

17   Q.   Yes.

18   A.   Yes.  He left a threatening message.

19   Q.   Despite that, you're saying you decided to ferret out what

20   was going on yourself?  Is that your suggestion here?

21   A.   I don't understand what the threatening message has to do

22   with ferreting.  No.  Can you explain that to me?

23   Q.   Well, if he was so intimidating, does it really make any

24   sense that now suddenly you were going to question him about

25   where this money was going?
```

```
 1   A.   I don't even see the relevance of that.  I wanted him to

 2   admit to me what he had done.  He was still cagey about it.

 3   Q.   Right.  Right.  Even when you pressed him, he said I don't

 4   think so.  Even when you pressed him, he didn't tell you anyone

 5   was being bribed, right?

 6   A.   I believe he said he could have.  That was his admittance.

 7   Could have.

 8   Q.   Hold on.  Let me see if I'm reading this correctly.

 9   A.   Sure.

10   Q.   Don't you, on page 51, say, "but none of it you're really

11   saying went to -- really went to individuals?"

12             Singer, "No, I don't think so."

13             Then --

14   A.   I believe if you read through this transcript -- can I

15   finish my statement?

16   Q.   I'll continue my question.  Okay?  You're the witness.

17   A.   You asked me a question and I'm telling you an answer.

18   You're giving me a specific location and taking a one off.  I'm

19   telling you I believe somewhere in this document I do recall he

20   said "could have", the word "could have".

21   Q.   We'll get to that in a second, sir.  You're not disputing

22   he told you at that junction there he didn't think any money

23   was going to individuals.  He told that you on tape in this

24   transcript, didn't he?

25   A.   To me, when someone says "I don't think so", that's not a
```

10:10 (line 10)
10:10 (line 20)

```
 1   very definitive answer.
 2   Q.   So when someone says "no, I don't think so", that could
 3   mean, yes, people are getting bribed?
 4   A.   No.  It doesn't mean that.
 5   Q.   Of course it doesn't mean that.  It's ridiculous.
 6            MR. FRANK:  Objection.
 7            THE COURT:  Sustained.
 8   Q.   If someone said, "no, I don't think so", they're
 9   indicating to you the answer is no, they don't think so,
10   correct?
11   A.   Technically, yes.
12   Q.   Then it goes on to the next page where Singer says "but in
13   this time."
14            You say, "Yeah."
15            "There could have been."
16            "Yeah."
17            "Folks like that, right?"
18            "Right."
19            "Okay."
20            "Okay."
21            So he tells you, I don't think so, there could have
22   been, but certainly no definitive discussion with you about
23   anyone being bribed at that point, correct?
24   A.   No.  No.  I'm telling you that if someone says "could have
25   been," that, to me, implies he could have bribed some people.
```

```
 1    Q.   I see.  And at that point he had no -- you were knee deep

 2    in fraudulent activity with Singer, right?

 3    A.   We had committed crimes.  That's for sure.

 4    Q.   All right.  So he did let down his guard with you.  You're

 5    not a new prospect client, right?

 6              MR. FRANK:  Objection.

 7              THE COURT:  Overruled.

 8    Q.   When the judge says overruled, you have to answer it.

 9    A.   No.  I understand that.  You're going to have to repeat

10    the question.

11    Q.   All right.  So at that time, by this point, at this tape,

12    in this chronology, you were in cahoots with Singer, right?

13    A.   We had committed crimes for sure.

14    Q.   All right.  And so he could let down his guard and speak

15    freely with you, couldn't he?

16    A.   That's an assumption.  I don't know.

17    Q.   Okay.  And even though you've been committing crimes with

18    him, he was still cagey about whether anyone was getting money,

19    correct?

20    A.   That's for sure.

21    Q.   And you were not some new client of his.  You were an

22    individual client and different from anyone else, right?

23    A.   I was an individual client and what?

24    Q.   Yeah.  Your situation was unique to you, correct?

25              MR. FRANK:  Objection.
```

```
 1              THE COURT:  Give me the question again.
 2   Q.   Your situation was unique to you, correct?
 3   A.   In my discussion --
 4              MR. FRANK:  Calls for speculation.
 5              THE COURT:  No.  I don't think so.  You can answer
 6   that question.
 7   A.   So you're saying my discussions that I was having were
 8   just related to me; is that what you're saying?
 9   Q.   Your situation was unique to you, right?
10   A.   I've asked you a question.  I'll ask it again.  Are you
11   saying that my discussions with him were unique to me?  Is that
12   what you were talking about?
13   Q.   You know what the word "unique" means, right?
14   A.   Of course I do.
15   Q.   Okay.  You don't know what he was saying to other parents,
16   do you?
17   A.   I do not.
18   Q.   You know what he was saying to you?
19   A.   That's correct.
20   Q.   And you know what your mindset was, right?
21   A.   Yes.
22   Q.   And you don't know what these other parents' mindset were
23   when you weren't even present for the discussions with someone
24   like Mr. Abdelaziz, right?
25   A.   No, I would not know that.
```

```
 1    Q.    Now, you pled guilty back in May of 2019, correct?
 2    A.    Correct.
 3    Q.    And you were supposed to be sentenced for your crimes in
 4    July of this year, right?
 5    A.    I believe so.
 6    Q.    But that sentencing hearing got delayed, right?
 7    A.    Yes.
 8    Q.    It got moved until January of 2022, correct?
 9    A.    That's correct.
10:15 10   Q.    And that's so you can get credit for your testimony here
11    today, right?
12    A.    That's because I'm a cooperating witness.  Until I'm
13    finished, I won't be sentenced.
14    Q.    Right.  So you can get credit for your testimony, right?
15    A.    Yes.
16    Q.    I mean, you're obviously getting a reduction in your
17    sentence when you cooperate, right?
18    A.    That's -- it's not obvious that I'll get that.  I'm
19    hopeful of that.
10:15 20   Q.    That's why you're here, to get a credit, correct?  That's
21    the point.
22    A.    I'm here to do what I promised to do, tell the truth and
23    be present.
24    Q.    And the truth is you have no idea who Gamal Abdelaziz is;
25    isn't that the truth?
```

```
 1   A.    I think I've told you that three or four times.

 2   Q.    So it's the truth, right?

 3   A.    I know nothing about Gamal Abdelaziz -- I've forgotten his

 4   first name.  Gamal.  Gamal.

 5   Q.    And the truth is, you hope if you help the government

 6   convict Abdelaziz, you'll get a break on your sentence, right?

 7   A.    No.

 8   Q.    Well, isn't that why you're here today, to try to get a

 9   break?

10   A.    I'm here to tell the truth.  I'm here to be present and do

11   the best of my memory and tell you everything I know about the

12   case.

13   Q.    Right.  And the truth is, you're facing some serious

14   prison time, aren't you?

15   A.    When you say the word "serious" --

16   Q.    Well, would 37 months in prison be serious to you?

17   A.    Yes, but that's not what I'm anticipating.

18   Q.    It's not what you're anticipating?

19   A.    No, it's not.

20   Q.    Okay.  When you pled guilty before a different judge in a

21   different federal courtroom, isn't that what the prosecutor

22   said the government would recommend before you cooperated?

23   A.    Yes, is it.

24   Q.    So without cooperation, the Government is going to

25   recommend 37 years -- 37 months.  That's bad enough.  37 months
```

1    in prison, right?

2         MR. FRANK:  Objection to what the Government's going

3    to do.

4         THE COURT:  Overruled.

5    Q.   Right?  Didn't the Government say that on the record when

6    you pled guilty, that they would recommend the low end of the

7    guideline range, and your low end is 37 months, right?

8    A.   Yes.  I believe that is correct.

9    Q.   Okay.  So it's a serious sentence hanging out there for

10:17 10  you?

11   A.   If that was the case, it would have been, yes.

12   Q.   Well, you haven't been -- you haven't spent a day in jail

13   yet, have you?

14   A.   I have not.

15   Q.   And you're hoping not to spend a day in jail, right?

16   A.   Of course I would not like to go to jail.

17   Q.   And you don't want your wife to go to jail either, right?

18   A.   I would hope she wouldn't go to jail either, yes.

19   Q.   And her low end that the government will recommend without

10:18 20  cooperation is 27 months in jail, right?

21   A.   I don't remember the exact amount, but yes.

22   Q.   All right.  She was there pleading guilty with you in

23   front of the same judge when the government said this on the

24   record in front of you, right?

25   A.   I'm trying to remember if she was there with me when we

|  |  |
|---|---|
| 1 | both pleaded guilty.  I believe so. |
| 2 | Q.   Do you want me to show you the transcript of the hearing? |
| 3 | A.   No, no, no.  Yeah.  It was quite a while ago, yeah. |
| 4 | Q.   So she was there with you, right? |
| 5 | A.   I believe so. |
| 6 | Q.   And the low end for her was 27 months.  Do you recall that |
| 7 | being said? |
| 8 | A.   I do not remember the exact amount of time that she was |
| 9 | facing. |
| 10:19 10 | Q.   All right.  Let me show you -- |
| 11 | A.   I'm sure if that's what it is in the record, that's what |
| 12 | it is, but I don't recall the exact number of months. |
| 13 | Q.   All right.  But does that sound in the ballpark of what |
| 14 | you think she's facing as well? |
| 15 | A.   Yes. |
| 16 | Q.   Okay.  So the crime that you've admitted to, those are |
| 17 | some serious sentences, right? |
| 18 | A.   Those are lengthy terms, yes. |
| 19 | Q.   But you said moments ago you don't expect to get that? |
| 10:19 20 | A.   I did. |
| 21 | Q.   And has someone promised you already that you're going to |
| 22 | get a sentence below the guideline range? |
| 23 | A.   No. |
| 24 | Q.   Then why don't you expect to get that? |
| 25 | A.   Because no one in this -- none of the other parents |

```
 1    involved got anywhere near that kind of sentence.
 2    Q.   Okay, but your guideline ranges is 37 months, right?  Has
 3    anyone said to you --
 4    A.   I've told you, no one has said anything to me.  And,
 5    again, I know what other parents have received.  It's quite
 6    a -- substantially less.
 7    Q.   I want to know what you think you're receiving.  Do you
 8    think you're getting any time in jail after you testify here
 9    today?
10:20 10  A.   I have no idea.
11    Q.   And the information you pled guilty to, three different
12    charges, right?
13    A.   Correct.
14    Q.   There was a money laundering conspiracy?
15    A.   Correct.
16    Q.   By the way, are you aware that Mr. Abdelaziz is not facing
17    any money laundering charges?
18    A.   I am not.
19    Q.   You don't know what he's charged with, do you?
10:20 20  A.   Not exactly.
21    Q.   Okay.  And you pled guilty to a conspiracy related to
22    taxes?
23    A.   That is correct.
24    Q.   Are you aware he's not facing any conspiracy related to
25    taxes?
```

```
 1    A.    I'm not.

 2    Q.    How about your honest services conspiracy that you pled

 3    guilty?  Do you recall that charge?

 4    A.    Yes.

 5    Q.    In that charge, about ten different people are referenced:

 6    Rick Singer, Mark Riddell, Igor Dvorskiy, Niki Williams.  They

 7    all pertain to the test scheme, test fraud scheme you engaged

 8    in, right?

 9    A.    I don't know all those individuals' names.

10:21 10    Q.    Do you know who Mark Riddell is?

11    A.    I do now, yes.

12    Q.    All right.  So some of these names you don't -- you've

13    never heard of Igor Dvorskiy?

14    A.    I've heard that name.  I've never heard of Niki.

15    Q.    Was she employed at this test center in Houston?

16    A.    I don't know anything about the Houston test center.

17    Q.    All right.  Steven Masera, Donna Heinel, Ali Khosroshahin?

18    A.    I don't know that name.

19    Q.    Jorge Salcedo, Laura Janke and Gordon Ernst.  There's no

10:22 20    mention of Gamal Abdelaziz in the charges you pled guilty to,

21    is there?

22          MR. FRANK:  Your Honor, I object.

23          THE COURT:  Sustained.

24    Q.    Well, let me ask you this, sir.  Your testimony here

25    today, it's the Government who controls whether or not a motion
```

```
 1    is made to get you credit; isn't that true?

 2    A.   Yes.

 3    Q.   So if they're not happy with your performance here,

 4    there's no motion for you to get credit, right?

 5    A.   I don't believe that's the case.

 6    Q.   Well, isn't the determination of whether defendant has

 7    provided substantial assistance rest solely in the discretion

 8    of the U.S. Attorney and is not subject to appeal or review?

 9    Do you remember that line in your Cooperation Agreement?

10    A.   Yes, vaguely.

11    Q.   Let's bring that one up, Cooperation Agreement.  It's

12    Exhibit 675.  Let's go to Section 2, please.  Let's highlight

13    the first paragraph under Section 2 and the first sentence

14    there.  "Should the Defendant provide substantial assistance in

15    the investigation or prosecution of another person who has

16    committed a criminal offense, the U.S. Attorney agrees that, at

17    or before sentencing, the U.S. Attorney will file a motion

18    under the guideline section 5K1.1 to recommend that the Court

19    impose a sentence below the advisory Guidelines sentencing

20    range", which, in your case, was beginning at 37 months, right?

21    A.   Correct.

22    Q.   And the first sentence of the next paragraph, "The

23    determination whether Defendant has provided substantial

24    assistance rests solely in the discretion of the U.S. Attorney

25    and is not subject to appeal or review".
```

**A1187**

```
 1              Did I read correctly?
 2    A.   You did.
 3    Q.   All right.  So you had indicated earlier you thought it
 4    was up to the judge to sentence you, right?
 5    A.   Correct.
 6    Q.   And again, it's not this particular federal judge.  It's a
 7    different particular federal judge, correct?
 8    A.   Correct.
 9    Q.   But that judge in your case can't file this motion without
10:24 10  a Government request, right?  It's up to the government to
11    determine whether or not this Substantial Assistance Motion
12    gets filed, right?
13    A.   Correct.
14              MR. KELLY:  Nothing further at this time, your Honor.
15              THE COURT:  Cross-examination, Mr. Kendall.
16              MR. KENDALL:  It will be Mr. Tomback, your Honor.
17              THE COURT:  I'm sorry?
18              MR. KENDALL:  It will be Mr. Tomback.
19              THE COURT:  Mr. Tomback.
10:25 20            CROSS-EXAMINATION OF BRUCE ISACKSON
21    BY MR. TOMBACK:
22    Q.   Good morning, Mr. Isackson.  My name's Andy Tomback.  I
23    represent John Wilson.
24              You've never met my client Mr. Wilson, John Wilson.
25    I'm pointing to him.  He's sitting there next to
```

```
  1    Ms. Papenhausen.
  2    A.    I have met him before.
  3    Q.    When did you meet him?
  4    A.    I met him several times.  I've been to his home.
  5    Q.    You've been in his home for an Autism Speaks fundraiser,
  6    right, that he held?
  7    A.    That's correct.
  8    Q.    And you were there?
  9    A.    It was a school event, or -- yeah.  A public school event.
10:26 10    Q.    But he also had an Autism Speaks event that you attended,
 11    correct?
 12    A.    I don't remember the topic.
 13    Q.    It was a fundraiser for a nonprofit, correct, that he
 14    hosted?
 15    A.    No, no.  I met him for a Hillsborough school function.
 16    Q.    Okay.  And let me ask -- have you met their oldest son at
 17    that event, Johnny Wilson, a graduate of USC?
 18    A.    No.
 19    Q.    Have you met either of their twin daughters, Mimi or
10:26 20    Courtney Wilson?
 21    A.    No.
 22    Q.    You haven't talked to any of the Wilsons in substantive
 23    conversation or on the phone or e-mailed them, have you?
 24    A.    No.
 25    Q.    Somebody else made the arrangements for you to show up at
```

|       |                                                                       |
|-------|-----------------------------------------------------------------------|
| 1     | the fundraiser, not Mr. Wilson himself directly with you?             |
| 2     | A.    It was a school event.                                          |
| 3     | Q.    That's not responsive.  Can you answer my question?            |
| 4     | MR. FRANK:  Objection.                                                 |
| 5     | THE COURT:  Sustained.                                                 |
| 6     | Q.    Did Mr. Wilson invite you into his home or did you attend      |
| 7     | a function at his home that was organized by somebody else?          |
| 8     | A.    Yes.  I attended a school function that was organized by       |
| 9     | someone else.                                                         |
| 10:27 10 | Q.    And you've spoken a fair amount about people that you       |
| 11    | know.  You remember the conversation that was recorded where         |
| 12    | you mentioned various people in the Hillsborough area?  How big      |
| 13    | a town is Hillsborough?                                               |
| 14    | A.    I believe the population's 10 or 11,000.                        |
| 15    | Q.    And you're -- you made a point that -- a point of pointing     |
| 16    | out the people that you knew in Hillsborough.  You pointed out       |
| 17    | you went to a fundraiser and tangentially, quote/unquote, know       |
| 18    | Mr. Wilson, is that correct?  In your direct testimony,              |
| 19    | Mr. Frank asked you questions and you answered them where you        |
| 10:28 20 | indicated that you knew people in the Hillsborough area,         |
| 21    | correct?                                                              |
| 22    | A.    I'm sorry.  Are you saying that I said I knew people, just     |
| 23    | people in the Hillsborough area?  What is your question?             |
| 24    | Q.    Correct.  Correct.                                              |
| 25    | A.    Yes.  Of course.                                                |

**A1190**

```
  1   Q.    Okay.  You're an admitted test cheater, right, or you
  2   arranged test cheating to the benefit of your children; is that
  3   fair?
  4            MR. FRANK:  I'm objecting to the question.
  5            THE COURT:  I did not hear the question.
  6   Q.    You're an admitted test cheater; is that fair to say?
  7   A.    I paid to have scores altered for my daughter.
  8   Q.    You're a tax evader?
  9   A.    I took a write-off that was not appropriate, yes.
10:29 10   Q.    Yes, you're a tax evader?
 11   A.    I committed tax evasion, correct.
 12   Q.    And you're someone who readily agreed on two occasions to
 13   submit a fake bio to a college, both of those -- actually, you
 14   deceived for Lauren three colleges and you deceived for Audrey
 15   one college; is that fair to say?
 16   A.    We did not have three for Lauren.
 17   Q.    I didn't hear the answer, Mr. Isackson.
 18   A.    I said we did not do three for Lauren.
 19   Q.    You're not counting UCSB?
10:29 20   A.    We didn't apply to UCSB.
 21   Q.    Mr. Singer didn't create a profile for your daughter as a
 22   basketball player?
 23   A.    He did not, no.
 24   Q.    You don't recall that?
 25   A.    I know for a fact he did not create a file as a basketball
```

1  player for UC Santa Barbara.

2  Q.   And in terms of Hillsborough, it's made up of how many

3  people, 11,000 people?

4  A.   Like I said, 10 or 11,000 people.

5  Q.   And they're rich, poor and middle class people in

6  Hillsborough?

7          MR. FRANK:  Objection.  Relevance.

8          THE COURT:  Sustained.

9  Q.   There's honest and dishonest people in Hillsborough?

10:30 10          MR. FRANK:  Objection.  Relevance.

11          THE COURT:  Sustained.

12  Q.   You would agree that your daughter Lauren is an honest

13  person?

14  A.   Yes.

15  Q.   She wasn't involved in your and your wife's supplying a

16  photo to Singer to use to make her a fake athlete?

17  A.   I don't believe she was.

18  Q.   When she was at UCLA, she was involved in event

19  management, no?

10:30 20  A.   What do you mean by event management?

21  Q.   Did she participate or -- on her own or during her time in

22  college participate in event management?

23  A.   I don't believe she did.  I don't know exactly what that

24  term means.  What is event management?

25  Q.   Do you recall the fact that she had an interest in event

```
 1   management, specifically in connection with the Gamma Phi Beta

 2   sisterhood?

 3   A.   I have no idea.

 4   Q.   Have you heard of anything called The Wall Group?

 5   A.   Yes.

 6   Q.   What's The Wall Group?

 7   A.   It's where she worked.

 8   Q.   Do you understand her to have been involved or do you keep

 9   track of what she did at that place?  What did she do at The

10   Wall Group, if you know?

11            MR. FRANK:  Objection.  Compound and relevance.

12            THE COURT:  Sustained.

13   Q.   Do you know if she was involved in event management at The

14   Wall Group?

15            MR. FRANK:  Objection.

16            THE COURT:  Overruled.  If he knows.

17   A.   I don't know her exact duties over there, no.

18   Q.   Do you know if she prepared a resume at some point in time

19   when she was at UCLA?

20   A.   A resume for what purpose?

21   Q.   Let me direct your attention -- let's put up on the

22   monitor VB-RECORDS-00535.

23            MR. FRANK:  Objection to this appearing in front of

24   the jury.

25            THE COURT:  Don't show it to the jury unless it's
```

```
 1    admitted into evidence.
 2            MR. TOMBACK:  Can we show to the witness
 3    VVB-RECORDS-00535 and 086.
 4            MR. FRANK:  Can we see a copy?
 5            THE COURT:  Show a copy to counsel, please.
 6            MR. TOMBACK:  For the record, that's Exhibit DX-9621.
 7            THE COURT:  Okay.  We just have exhibits.  We don't
 8    have letters in front of them.  What is it?
 9            MR. TOMBACK:  Trial Exhibit 9621.
10            THE COURT:  9621?
11            MR. TOMBACK:  Correct, Your Honor.
12            MR. FRANK:  I object to this document.  This
13    document -- this witness has never seen this document.
14            THE COURT:  He can show it to the witness to refresh
15    his memory, if that's what the purpose is.
16            MR. TOMBACK:  Your Honor, the purpose is just to
17    review the document to define the use of the word "embellish",
18    which is a word that the government used in its opening six
19    times and it --
20            THE COURT:  Show him the document, have him read it
21    and then we'll take the document down and see if it refreshes
22    his memory.
23            MR. TOMBACK:  Sure.  On the screen, or do you want me
24    to hand it to him?
25            THE COURT:  No, no, no.  He's got it on the screen, I
```

```
 1   presume.
 2           THE WITNESS:  I don't have it here.
 3   Q.   We'll scroll it from the bottom up here, and let him know
 4   if you need it to go slower.
 5   A.   Okay.
 6           MR. FRANK:  Your Honor, I believe Mr. Tomback's screen
 7   is visible to the jury.
 8   Q.   Are you done?
 9   A.   I've read a little bit of it.  It's going fast.
10   Q.   Let me make it easier for you.  Let me have Randall hand
11   you a copy of the document.
12   A.   Sure.
13   Q.   Here's a copy of Trial Exhibit 9621.  Directing your
14   attention to the top of the document, Mr. Isackson --
15   A.   Can I read through it?
16   Q.   Sure.  Take your time.  I thought you were done.
17   A.   Okay.
18   Q.   Going from the bottom up, Mr. Isackson, do you understand
19   this to be in substance and summary --
20           MR. FRANK:  Objection.
21           THE COURT:  You're not going to summarize the
22   document.  He's looked at it.  You can take the document away.
23   You can now ask whether it refreshes his memory about the line
24   of questioning.  If you're -- but you can't take him through
25   the document.  It's not in evidence.
```

```
 1   Q.   Do you recall now that your daughter was involved in event

 2   planning and sought to get a summer job?

 3   A.   Absolutely not.  I don't recall that.  I had nothing to do

 4   with this.  My wife had conversations with Mikaela.  I never

 5   spoke to the woman once.

 6   Q.   And with respect to your daughter Lauren -- you read the

 7   document, right, right, Mr. Isackson?

 8   A.   Yes.

 9   Q.   Do you recall on direct exam that you testified and you

10   used the word "embellished"?

11   A.   I don't recall the exact -- whether I said that exactly,

12   no, I don't recall that.  If you said I did, I'm sure I did.  I

13   don't recall.

14   Q.   Let's direct your attention to the transcript from

15   yesterday, page 96, line 1.

16            THE COURT:  This is in 607?

17            MR. TOMBACK:  Yes.

18            THE COURT:  Where is the page again?

19            MR. TOMBACK:  It's page 96, Your Honor, line 6.

20            MR. FRANK:  This is a trial transcript.

21            MR. TOMBACK:  It's 96 in the transcript, your Honor.

22   Sorry.  Trial transcript from yesterday, your Honor.

23            THE COURT:  I don't have it.

24            MR. FRANK:  Is this being shown to the witness only?

25            THE COURT:  Yes, just to the witness.
```

1          MR. TOMBACK:  It's yesterday's testimony, Mr. Frank.

2          MR. FRANK:  It's not in evidence.  It's a document.

3          THE COURT:  Mr. Tomback, you can show him a copy of

4    the transcript from yesterday, but it's not --

5          MR. TOMBACK:  I understand.

6    Q.   Does that refresh your recollection, line 6, specifically

7    line 8 in the middle, that you used the word "embellish" when

8    you testified yesterday in response to Mr. Frank's questions?

9    A.   I do see that, yes.

10:38 10   Q.   Now, that was early in your testimony, correct?

11   A.   Yes.

12   Q.   And the word "embellish" doesn't really describe what

13   happened with respect to your daughter or her bio, correct?

14         MR. FRANK:  Objection.  Actually, withdrawn.  Sorry.

15   A.   I think we're talking about Lauren, aren't we?

16   Q.   No.  I'm switching over to Audrey.  Audrey is the -- let's

17   be clear, Audrey is your daughter where all you submitted was a

18   headshot, correct?

19   A.   I know, but I thought I saw college here, so go ahead.  It

10:39 20   said soccer player and there was nothing about Audrey for

21   soccer.

22   Q.   Mr. Isackson, the transcript -- the important thing is the

23   appearance of the word "embellish", that Singer would embellish

24   her record, right, to convince the program she was capable of

25   being a Division 1 soccer player?  That's with respect to

```
 1   Lauren.  I'm now switching to Audrey.
 2   A.   Okay.  You confused me.  I believe this has to do with
 3   Lauren and you're talking about Audrey and this has nothing to
 4   do with Audrey.
 5   Q.   Okay.  With Audrey's bio, if I could just stay with Audrey
 6   for a moment, Mr. Isackson.  With Audrey's bio, you only
 7   submitted to Mr. Singer a headshot, correct?
 8   A.   That is correct.
 9   Q.   He made her into an oarswoman.  Did you even know he was
10   making her into an oarswoman?  Did you know what sport he was
11   making her?
12   A.   He was taking her through the crew department, so I assume
13   it obviously had something to do with crew.
14   Q.   An oarswoman, a woman who rows, who uses an oar to row a
15   boat.
16   A.   Yeah.  I assume.
17   Q.   But you don't know anything else about Audrey's profile
18   and how it was created?
19   A.   No.
20   Q.   And he made them up entirely?  He, Singer, or one of
21   Singer's people, made up your daughter's credentials entirely,
22   correct?
23   A.   We provided him a headshot and his organization took it
24   from there.
25   Q.   That bio, in appearance, was a fiction?
```

```
 1    A.    Absolutely.  She was not a crewsman, whatever you call
 2    them, oarsman.
 3    Q.    When you testified before, you were trying to -- well, in
 4    fairness, Mr. Singer didn't embellish Audrey's skills as an
 5    oarswoman, he just made them up, correct?
 6    A.    Yes.  I guess the way you're phrasing it, I guess that's
 7    correct.
 8    Q.    Well, you need something to start with.  You need a
 9    foundation to embellish, correct?
10    A.    Yeah, but he exaggerated immensely, I'm sure, to make her
11    profile -- if she had to be a Division 1 crew person or
12    whatever you call it.  It would have to be, in my opinion,
13    blown up huge to be that kind of elite athlete.
14    Q.    So let me direct your attention back to the document.
15    Does it refresh your recollection that when she wanted to
16    get -- when Lauren wanted to get help when she was at college,
17    wanted to get help from Ms. Sanford --
18          MR. FRANK:  Objection, your Honor.
19    Q.    -- she asked her to embellish her resume?
20          MR. FRANK:  Objection, your Honor.  He has no
21    testimony of this.
22          THE COURT:  He can answer that question, if he
23    understands it.
24          MR. FRANK:  Can we take the document down?  It's back
25    up.
```

```
 1              THE COURT:  Yes.  Take the document down.
 2    A.   Can you repeat the question?
 3              MR. TOMBACK:  Can I have it read back.
 4              (Reporter reads back as requested.)
 5    A.   Yes.  That's what it says.
 6    Q.   Did you think she was being dishonest when she asked
 7    Mikaela Sanford to embellish her resume?
 8              MR. FRANK:  I don't believe the witness was answering
 9    the prior question.
10:42 10         THE COURT:  I don't know what the witness was
11    answering, but ask the next question, Mr. Tomback.
12    Q.   Do you think your daughter was being dishonest when she
13    asked Ms. Sanford to embellish her resume?
14              MR. FRANK:  Objection to facts not in evidence.
15              THE COURT:  Overruled.
16    A.   The way this is written, the text of this thing, it
17    doesn't appear --
18              MR. FRANK:  Objection.
19              THE COURT:  I don't know the nature of the objection.
10:43 20         MR. FRANK:  There's a document in front of him that
21    he's reading from.
22              THE COURT:  Take the document down.  Ask him whether
23    it refreshes his memory, and we'll go from there.  He can't
24    testify from the document itself.
25    Q.   Does it refresh your memory that your daughter, when
```

```
 1   asked -- when she asked to improve her resume, she asked to
 2   have it embellished?
 3   A.   That's what is there.
 4        MR. FRANK:  Can we take the document away from the
 5   witness?
 6        THE COURT:  It's apparently off the screen.
 7        MR. FRANK:  He's got a copy up there in front of him.
 8   May I?
 9        THE COURT:  Somebody can retrieve the document.
10   Q.   Mr. Isackson, the word "embellish" can mean a person said
11   truthful and positive things, correct?
12   A.   Repeat that question again.
13   Q.   The word "embellish" can be used in a manner where the
14   person wants something -- wants -- the person wants something
15   truthful and positive to happen to, say, a resume?
16        MR. FRANK:  Objection to what a person wants.
17   A.   It's very confusing.
18        THE COURT:  If he understands the question, he can
19   answer it.
20   A.   I don't.  It's very confusing to me.
21   Q.   The word "embellish" can be used in a truthful and
22   positive fashion?
23   A.   You can embellish, you can enlarge something that's
24   truthful, yes.
25   Q.   You can also embellish it without enlarging it, can't you?
```

10:44 (line 10)
10:44 (line 20)

```
 1    You can just make it look better, as your daughter asked
 2    Mikaela Sanford for her resume, right?
 3              MR. FRANK:  Objection to facts not in evidence.
 4              THE COURT:  Overruled.
 5    A.    Okay.  Repeat the question again.
 6    Q.    I'll have it read back.
 7    A.    Sure.
 8              (Reporter reads back as requested.)
 9    A.    I believe in the context there she was making it to look
10:45 10   larger, yes.
11    Q.    In the context there, she wanted all of her
12    accomplishments to be included in her resume, correct?
13    A.    Yes.
14    Q.    She wanted her experience in the sisterhood planning
15    events to be included in her resume, correct?
16              MR. FRANK:  Objection to what someone else wanted.
17              THE COURT:  Sustained.
18    Q.    Again, your daughter used the word "embellish" in an
19    honest and truthful way, correct?
10:45 20          MR. FRANK:  I object to this, your Honor.
21              THE COURT:  Sustained.
22              MR. FRANK:  He's reading from a document again.
23    Q.    If Lauren were to use the word "embellish" to describe her
24    credentials, she would be using the word to describe a positive
25    description that was honest and truthful?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  He can answer that, it's a hypothetical

 3       question, if he agrees with it.

 4       A.   I don't.  I don't really understand the question.  To me,

 5       it's enlarging.

 6              MR. TOMBACK:  Can I have a moment, your Honor?

 7              THE COURT:  Yes.

 8       Q.   With respect to your daughter, when you say embellish

 9       means to enlarge things, are you testifying that when your

10:47 10  daughter used the word "embellish," she wanted to enlarge, in a

11       misleading way, her resume?

12              MR. FRANK:  Objection to what his daughter wanted.

13              THE COURT:  Sustained.

14       Q.   You know the Government's seen your and your wife's

15       e-mails, correct?

16       A.   Correct.

17       Q.   They have your tax returns and related correspondence,

18       correct?

19       A.   Correct.

10:47 20  Q.   And from both you and Mr. Singer they have your and your

21       wife's e-mails, correct?

22       A.   Correct.

23       Q.   And they have a large number of tape recordings of Singer

24       and you and your children and your wife, correct?

25       A.   I don't know about a large recording.  I know they have
```

```
 1    several.

 2    Q.   They have the December 3rd recording.  They have the

 3    October 24th recording from 2018.  They have a few from

 4    September.  They have a few from August.  They have a bunch,

 5    right?

 6    A.   I only think there's two or three, but I don't know.  You

 7    tell me how many there are.

 8    Q.   I'll represent to you that there's more than two or three,

 9    if you accept my representation.

10    A.   How many are there?

11         MR. FRANK:  Objection to counsel testifying.

12         THE COURT:  I did not hear the answer of the witness.

13         THE WITNESS:  I'm sorry?

14         THE COURT:  I did not hear the witness' answer.

15    A.   I don't know the exact amount.  I didn't think there was

16    many.

17    Q.   Will you accept my representation that in all those

18    recordings, all those documents and e-mails, that the

19    government produced to the defense in this case that you never

20    once used the word "embellish"?

21         MR. FRANK:  I object, your Honor.

22         THE COURT:  Overruled.

23    A.   I have no idea.

24    Q.   Will you accept my representation that it never occurred,

25    that we put the word "embellish" into the database with respect
```

|  |  |
|---|---|
| 1 | to the Isackson documents? |
| 2 | MR. FRANK:  I object. |
| 3 | THE COURT:  This is going too far.  Sustained. |
| 4 | Q.   Do you accept my representation that the only documents |
| 5 | that turned up -- |
| 6 | MR. FRANK:  I object to the acceptance -- |
| 7 | THE COURT:  He doesn't have to accept your |
| 8 | representation.  So move forward, Mr. Tomback. |
| 9 | Q.   Your lawyer, David Weinraub, is Mr. Frank's former boss, |
| 10:49 10 | correct? |
| 11 | MR. FRANK:  Objection. |
| 12 | THE COURT:  Sustained. |
| 13 | A.   Repeat that question? |
| 14 | THE COURT:  There's no question before you. |
| 15 | THE WITNESS:  Oh.  I'm sorry. |
| 16 | Q.   In your preparation sessions, Mr. Kelly went over with you |
| 17 | the number of times that you prepared your testimony and met |
| 18 | with the government, correct? |
| 19 | A.   I'm sorry.  Repeat that again. |
| 10:49 20 | Q.   Mr. Kelly went over with you the number of times that you |
| 21 | prepared your testimony and met with the government? |
| 22 | A.   We went through a bunch of documents. |
| 23 | Q.   Right.  How many times did you meet with the government |
| 24 | before you testified -- before your testimony here today? |
| 25 | A.   I'm not sure of the exact amount of times. |

```
 1   Q.   Okay.  And you went over -- he covered -- I'd like to move

 2   through it, but he covered it.  There were meetings that were

 3   several hours long, correct?

 4   A.   Correct.

 5   Q.   And your counsel was in the room for those meetings,

 6   correct?

 7   A.   That's correct.

 8   Q.   How many of your counsel?

 9        MR. FRANK:  Objection.  Relevance.

10   THE COURT:  I didn't hear the question.

11   Q.   How many of your counsel were present?

12        THE COURT:  Overruled.

13   A.   Two, both my attorneys.

14   Q.   And how many government prosecutors and agents were

15   present, on average?

16   A.   I think it was maybe three.

17   Q.   In those meetings, did the word -- in those sessions when

18   you did your dry runs, do you recall whether you used the

19   word --

20        MR. FRANK:  Objection.

21        THE COURT:  Overruled.

22   Q.   Did you use the word "embellished" in your testimony in

23   the practices?

24        MR. FRANK:  Objection to --

25        THE COURT:  I didn't hear the question and I didn't
```

```
 1   hear the objection because there were over each other.  So say
 2   the question.  After the question, if you have an objection,
 3   object.
 4          MR. FRANK:  Yes, your Honor.
 5   Q.   When you rehearsed your testimony, did you use the word
 6   "embellish" in the dry runs?
 7          MR. FRANK:  Objection to rehearsed, Your Honor.
 8          THE COURT:  Overruled.
 9   A.   I don't recall.
10   MR. TOMBACK:  Your Honor, we have a stipulation for
11   authenticity for all documents from The Key.  Government
12   exhibit -- sorry -- trial Exhibit 9621, the document that I put
13   in front of Mr. Isackson, is from The Key.  I offer it into
14   evidence.
15          MR. FRANK:  I object, your Honor.  The stipulation to
16   authenticity does not make it admissible.
17          THE COURT:  Sustained.
18   Q.   So to recap what was covered in your direct, you testified
19   that, quote, there's no way Lauren could have gained entry to
20   the school, USC, on her grades or test scores, correct?
21   A.   That is correct.
22   Q.   And you admitted she wasn't even close to being qualified
23   to play soccer at USC?
24   A.   That is correct.
25   Q.   She did not even intend to play the sport in college?
```

1    A.    That is correct.

2    Q.    Same goes for Audrey?

3    A.    She wasn't going to play soccer.  She was not going to

4    play a sport.

5    Q.    Right.  She certainly wasn't going to row?

6    A.    That's correct.

7    Q.    Without Singer's help, your state of mind is clear, your

8    daughters could not get into colleges that you and Singer

9    focused on, correct?

10:53 10    A.    Can you repeat that question?

11    Q.    Without Singer's help, your state of mind at the time was

12    clear, your daughters could not get into the colleges that they

13    were applying?

14    A.    That is correct.  Well, those specific schools, correct.

15    Q.    Those specific schools.  Those specific schools were not

16    where they began their focus.  Lauren was focused on Miami,

17    right, University of Miami, where Davina went?

18    A.    She applied there and she was accepted.

19    Q.    That's not my question, Mr. Isackson.  Her focus to begin

10:54 20    with for colleges was the University of Miami -- withdrawn.

21          Her focus with colleges before Mr. Singer entered the

22    picture was not USC?

23    A.    That was one of the schools she wanted to go to.

24    Q.    But she wasn't eligible to go there.  Neither her grades

25    nor her test scores --

```
 1    A.    You're talking about Miami.  Miami is what you were
 2    talking about.  You said her focus was Miami.  I said that's
 3    where she wanted to go.
 4    Q.    I got that.
 5    A.    Okay.
 6    Q.    When Mr. Singer entered the picture, she wanted to go to
 7    USC when he was done with you and her, correct?
 8    A.    He mentioned that was a school that he had influence and
 9    she liked it.
10:55 10  Q.    Okay.  And she couldn't get in there without help?
11    A.    Absolutely.  On her test scores or grades, that's correct.
12    Q.    You've committed crimes with Mr. Singer?
13    A.    Did I what?
14    Q.    You committed crimes with Mr. Singer?
15    A.    Yes.
16    Q.    You didn't voluntarily turn yourself in?  You were
17    arrested?
18    A.    That's correct.
19    Q.    After you were caught, you quickly -- you testified, you
10:56 20  very quickly admitted that you were guilty of a crime.
21    April 3rd you signed your Plea Agreement, right?
22    A.    Correct.
23    Q.    You were very quick to become a cooperator, correct?
24    A.    We were very quick to admit our guilt and we agreed to
25    cooperate.
```

```
 1   Q.   You didn't have much choice because you had helped -- you
 2   had helped one of your child become a test cheater, correct?
 3   A.   Yes.
 4   Q.   And you were on tape arranging to have a second child
 5   become a test cheater?
 6   A.   We were discussing it.
 7   Q.   And Mr. Kelly covered a fair amount of the Plea Agreement
 8   and the Cooperation Agreement.  Your minimum sentencing
 9   guideline is 37 months.  You understand that much, right?
10:57 10   A.   Yes.
11            MR. FRANK:  Objection to the characterization of it.
12            THE COURT:  I'm not sure I understand it.
13            MR. FRANK:  I'll withdraw it, your Honor.
14   Q.   Unless the government makes a motion to your sentencing
15   judge, the Sentencing Guideline for you is 37 to 46 months,
16   correct?
17   A.   Technically that's correct, yes.
18   Q.   Right.  I don't want to get into technically.  You do
19   understand when you signed the Cooperation Agreement that the
10:57 20   Sentencing Guidelines that were agreed upon were 37 to
21   46 months?
22   A.   Yes.  That is correct.
23   Q.   And I heard your testimony.  You think you're going to get
24   less, right?
25   A.   Definitely hopeful of that, yes.
```

```
 1   Q.   But the judge can't depart from that 37 to 46-month range

 2   unless the Government makes the motion.  Do you understand

 3   that?

 4          MR. FRANK:  Objection to what the judge --

 5          THE COURT:  Sustained.

 6   Q.   You're hoping the government makes that motion, aren't

 7   you, Mr. Isackson?

 8   A.   Absolutely.

 9   Q.   You really want it?

10   A.   Of course I don't want to go to jail for a long time.

11   Q.   Okay.  And you testified on direct about your Cooperation

12   Agreement and your Plea Agreement and you emphasized a number

13   of times that it requires you to testify truthfully?

14   A.   Absolutely.

15   Q.   You're just here to testify truthfully, correct?

16   A.   Absolutely.

17   Q.   I won't repeat what Mr. Kelly covered with you about

18   whether you'll lie to save your wife jail time or lie to save

19   yourself jail time because you're going to testify truthfully

20   and you'll never lie, right?

21   A.   Yes.

22   Q.   You're here to tell the truth?

23   A.   I'm absolutely here to tell the truth.

24   Q.   Solemnly swear you're here to tell the truth?

25          MR. FRANK:  Objection.
```

**A1211**

```
 1   A.    Absolutely.

 2   Q.    I just want to understand.  As we sit here today, at the

 3   end of the day, who decides whether you've told the truth or

 4   not?

 5   A.    I'm not sure what your question is.

 6   Q.    Well, I'm not referring to a higher power.  I'm referring

 7   to whoever is in charge, responsible, to make the motion to

 8   allow the judge to depart from the Sentencing Guidelines down

 9   from 37 months for you, down from 27 months for Davina.  Who

10   makes that decision?

11   A.    The judge makes that decision.

12   Q.    Did you ever read a Cooperation Agreement?

13   A.    Yes.

14   Q.    Mr. Kelly put up on the screen for you the part in the

15   Cooperation Agreement that makes it clear that the Government

16   has to recommend --

17   A.    Yes.  The Government -- I thought you said who makes the

18   decision on that.  The judge makes the decision.

19   Q.    Fair enough, Mr. Isackson.  The judge makes the decision,

20   but the judge doesn't get to make that decision until the

21   Government recommends it, right?

22   A.    That's correct.

23   Q.    You've got to go through that toll to get to the judge?

24   A.    Yes.

25   Q.    Again, who -- as far as you're concerned, whether it's a
```

1    greater power or the press or whatever, the party that you want

2    to satisfy that you've told the truth is the Government, isn't

3    it, Mr. Frank and the other people sitting at the table?

4    A.    I'm here to tell the truth and that's what I'm doing, so

5    they know that.

6    Q.    I know that, Mr. Isackson.  I'm asking another question.

7    Who decides whether you're telling the truth for purposes of

8    your sentencing?

9    A.    I don't think the Government decides whether I'm making

11:00 10    the truth, telling the truth.  I don't think it's for them to

11    decide.  I'm sworn to tell the truth, so I don't know what your

12    questioning is here.

13    Q.    Well, in terms of evaluating whether you have indeed told

14    the truth?

15    A.    They made it clear to me that if I don't tell the truth,

16    my punishment would be much worse, so I don't know where you're

17    going with these questions.

18    Q.    Well, at the end of this session, at the end of your

19    testimony, you're not going to get a report card from Judge

11:01 20    Gorton or from counsel.

21            MR. FRANK:  I object.  We've been over this.

22            THE COURT:  He hasn't asked a question yet.

23    Q.    Are you?

24            MR. FRANK:  Now I object.

25            THE COURT:  Overruled.

```
 1   A.    So I'm sorry.  I got lost in that back and forth.  Repeat

 2   the question, please.  You shouldn't be laughing.  It's really

 3   hard to hear a lot of this stuff.  Really.  I don't find it

 4   funny.

 5   Q.    The reporter will read it back.  It will be better.

 6   A.    Sure.  That's fine.

 7   Q.    You keep asking me to repeat the question.  If you just

 8   said you couldn't hear me, I would, but it's the seventh time

 9   you asked.  I'll try to speak better into the microphone.

10               MR. TOMBACK:  Read it back.

11               THE COURT:  She'll read it back if I instruct her to

12   read it back.  She may read it back.

13               (Reporter reads back as requested.)

14   A.    No.

15   Q.    The determination for your sentencing for the

16   recommendation to the judge of whether you're telling the truth

17   belongs to the Government, yes or no?

18   A.    I still don't believe it's their decision to decide

19   whether I'm telling the truth.

20   Q.    If the Government determines that you're not being

21   truthful, they won't make the motion, will they?

22   A.    If I'm not telling the truth and they determine that, I

23   think I'll be in a lot of trouble.

24   Q.    And they determine that, right?  They, the Government,

25   determines that?
```

11:01 (line 10)

11:02 (line 20)

```
 1   A.   Yes.

 2            MR. TOMBACK:  One moment, your Honor.

 3            THE COURT:  Yes.

 4            MR. TOMBACK:  Can we take a break, your Honor?

 5            THE COURT:  How much more do you have?

 6            MR. TOMBACK:  A fair amount.

 7            THE COURT:  All right.  We'll take the morning recess

 8   at this point, jurors.  We'll be in recess for 15 minutes.

 9   I'll see you back here.

10            (Jury exits.)

11            THE COURT:  Be seated, counsel.  How much longer on

12   cross, Mr. Tomback?

13            MR. TOMBACK:  I believe I could go until the 1 o'clock

14   break, but I'll try to trim it down.

15            THE COURT:  Okay.  I am not going to allow you to ask

16   for the Court reporter to re-read questions unless I'm

17   convinced there's real evasiveness going on here.  You can

18   rephrase the question.  You can be clearer.  In some cases, you

19   can't be heard, because I couldn't hear you some of the time.

20   I don't like you instructing the court reporter to re-read

21   questions that you've asked when the witness can't understand

22   it.  You either rephrase the question or you ask it more

23   clearer.  All right?

24            MR. TOMBACK:  I understand, your Honor.  I understood

25   that when you told me that during the questioning.
```

```
 1              THE COURT:  Okay.

 2              If we get through the cross-examination, there will be

 3    redirect, I presume?

 4              MR. FRANK:  Yes, your Honor.

 5              THE COURT:  All right.  Okay.  Is there anything else

 6    that needs to come to my attention before we recess?

 7              MR. FRANK:  No, your Honor.

 8              MR. KELLY:  No, your Honor.

 9              THE COURT:  We're in recess.

11:05 10         (Recess taken 11:05 to 11:24 a.m.)

11              (Jury enters.)

12              THE COURT:  Ready to resume?  Again, Mr. Isackson,

13    you'll be reminded you remain under oath.  We will continue

14    with cross-examination.

15              MR. TOMBACK:  Thank you, your Honor.

16    BY MR. TOMBACK:

17    Q.   Mr. Isackson, you first met Mr. Singer in August or

18    September of 2015?

19    A.   I did not meet him then, no.

11:24 20    Q.   When did you first meet him?

21    A.   In person, sometime in 2016.

22    Q.   And you met him at the Four Season's Hotel?

23    A.   I was not at that meeting.

24    Q.   Who was in that meeting?

25    A.   That was my wife.
```

```
 1    Q.    And who was in the second meeting with Mr. Singer?

 2    A.    I believe my wife was.

 3    Q.    And who was in the third meeting?

 4    A.    I don't know the order of the meetings.

 5    Q.    Okay.  In substance in those meetings Mr. Singer explained

 6    to you that he could help your daughter get into colleges?

 7    A.    Are you talking about when I was with him?

 8    Q.    Your first meeting, whenever it was, wherever it was, in

 9    substance, he said that he could help your daughter get into

10    colleges?

11    A.    Yes.

12    Q.    And he didn't say to you or to your wife that the primary

13    way he could help Lauren get into college was by tutoring her

14    at that time?

15    A.    No.

16    Q.    And he didn't say that he could help her train in order to

17    be a recruitable athlete, did he?

18    A.    No, he did not.

19    Q.    And it was kind of late for Lauren to do better on her

20    tests through Mr. Singer's tutoring services as well, leaving

21    aside the grades?

22    A.    That, I don't know.

23    Q.    In substance did you explain to Mr. Singer that you had a

24    short-term problem with Lauren in terms of her getting into

25    colleges?
```

```
 1   A.   I don't understand where your question is going.

 2   Q.   You weren't looking for a long-term solution to make

 3   Lauren a better candidate as an applicant to colleges, were

 4   you?

 5   A.   I still don't understand your question.

 6   Q.   You weren't looking for a long -- you weren't looking,

 7   when you met with Mr. Singer, for a long-term solution to help

 8   Lauren become a better candidate for colleges?

 9   A.   I still don't understand, what are you saying about long

11:26 10  term?  What are you implying there?

11   Q.   When was Lauren applying to college relative to when you

12   met with Singer?

13   A.   When he got involved with her, it was relatively late in

14   the process, correct.  Yeah.

15   Q.   Okay.  That's what I mean.  Excuse me.  So in terms of

16   what you were looking for from Mr. Singer, you were looking for

17   a short-term fix to Lauren's situation?

18   A.   You're putting words in my mouth.

19   Q.   I'm asking you a question.  Were you looking for a

11:27 20  short-term way to improve her chances to be admitted to

21   college?

22   A.   We were looking to have his assistance, help her get into

23   the schools of her choice.

24   Q.   Were you present in the meeting when Mr. Singer said he

25   needed a photo of Lauren with her foot touching a soccer ball?
```

A.    Yes.  I don't think that's the way he put it, but he said
a picture of her playing soccer.

Q.    You testified that you understood he was going to take
that and make her into a much better soccer player than she
was, correct?

A.    That's correct.

Q.    She didn't play soccer her senior year at all, correct?

A.    That is correct.

Q.    She was mainly interested in equestrian; is that correct?

11:28 A.    That's correct.  That was her sport of choice.

Q.    Okay.  He didn't try to hide from you in any way that he
was going to use the photo of your daughter with a soccer ball
to build a fictional fake resume for her, did he?

A.    No.

Q.    He wasn't uncomfortable sharing that with either you or
your wife?

A.    You need to explain exactly what your question is, as far
as, what are you talking about, the resume?

Q.    Leaving aside whether it's the second, the third or the
11:28 fourth meeting, whatever the meeting was when you were present
with your wife, Mr. Singer said, in substance, "I need a
picture of your daughter with her foot touching a soccer ball.
I can help her get into college if you give me that."

A.    That was part of his process.

Q.    And you understood what that process was early on for Mr.

1    Singer, two, three, four meetings in?

2    A.    I don't recall exactly how many meetings in, but I do

3    recall the conversation for sure.

4    Q.    It didn't take months, it took days or weeks, right, in

5    terms of your meetings with Mr. Singer?

6    A.    Again, my wife had the initial meetings with Mr. Singer.

7    Q.    Well, she updated you, didn't she?

8    A.    Yeah.

9    Q.    Do you have any recollection?  I mean, through this

11:29 10    process, do you have a recollection of how the quote-unquote

11    "process" --

12    A.    Yeah, I mean --

13    Q.    -- proceeded?

14    A.    -- the initial meetings with him, I wasn't part of it.

15    Q.    Did he provide tutoring services to Lauren?

16    A.    I don't think so.

17    Q.    No.  He didn't provide testing tutoring services or

18    coursework tutoring services, did he?

19    A.    She took her own tutoring services.

11:30 20    Q.    And he didn't have somebody start working with her to

21    become a better soccer player, did he?

22    A.    No.

23    Q.    It didn't take long to get to the fake bio agreement with

24    Mr. Singer, did it?

25    A.    Again, I don't recall what meeting that was, how far in

        the process it was, so I don't recall exactly.

  Q.    Well, it sounds like most of the meetings were with your
        wife, correct?

  A.    Yes, the early meetings were, yeah.

  Q.    Okay.  Leaving aside the precise timing when you made the
        agreement with Singer to submit the fake bio, he had never seen
        your daughter play soccer, correct?

  A.    That is correct.

  Q.    He had never tutored her?

  A.    I believe not, correct.

  Q.    Either in courses or in tests, correct?

  A.    I believe so, yes, correct.

  Q.    It wasn't a long romance between you and Mr. Singer, was
        it?

  A.    Exact period of time, I don't know.  It was several
        months, many months.

  Q.    You were asked by Mr. Frank about whether you ever made a
        refundable donation, do you recall, with respect to a $250,000
        payment from Lauren?

  A.    I do.

  Q.    That was the payment when you weren't positive she was
        going to get into UCLA.  She had an e-mail acceptance, and you
        were hoping that somehow the deal would be sealed, so to speak,
        right?

  A.    Yes, we were hoping she would get in.

```
 1   Q.   And eventually, by the way, that deal was sealed; she got
 2   in?
 3   A.   That's correct.
 4   Q.   And Mr. Frank played or showed you your wife Davina's
 5   enthusiastic e-mail thanking Rich in a heartfelt way and
 6   saying, in substance, we were a team and we got this done.  Do
 7   you recall that?
 8   A.   I do.
 9   Q.   You were a team with Mr. Singer, right?
10   A.   That's my wife -- what my wife wrote.
11   Q.   In the two to three years leading up to your dealings with
12   Mr. Singer, had you and your wife focused your charitable
13   giving on educational giving, educational institutions?
14           MR. FRANK:  Objection, relevance.
15           THE COURT:  How is this relevant?
16           MR. TOMBACK:  Your Honor, it's relevant to
17   Mr. Wilson's defense because Mr. Wilson's defense focuses on
18   his generosity to educational institutions.
19           THE COURT:  You can have that question.
20   A.   No, that's not true what you are saying.  We were giving
21   to educational institutions for a long time.  We gave quite
22   extensively to the Hillsborough School System.  We've given to
23   most all the schools in my -- the public school system,
24   Hillsborough, all the schools fairly substantially that my
25   children have gone to.
```

A1222

```
 1    Q.   And you referred to those donations in your testimony with
 2    Mr. Frank, correct?
 3    A.   Yes, I spoke about some of them.
 4    Q.   You spoke about something called the Federation, as I
 5    recall?
 6    A.   Jewish Federation, correct.
 7    Q.   Jewish Federation.  What is that exactly?
 8    A.   What do you mean, "What is that exactly"?
 9    Q.   Well, is the Federation a nonprofit that provides services
10    to people, or is it a clearinghouse for contributions that are
11    then passed along to other nonprofits to perform the actual
12    services, if you know?
13    A.   I believe it's an institution that is involved in doing a
14    lot of charitable work.  Does that answer your question?
15    Q.   Do you understand the Federation, the United Federation
16    itself does the work, or does it fundraise --
17    A.   You said "the indicted Federation"?
18    Q.   Excuse me.  I'm not -- I'm familiar with the United Jewish
19    Appeal, but I'm not familiar with the Federation, so just
20    forgive me.  The Federation, does itself do the good works?
21    A.   It's -- it sends out money to all sorts of charitable
22    causes that do the work, correct.
23    Q.   It's a clearinghouse, if you will?
24    A.   No, it's not a clearinghouse.
25    Q.   It receives money and then it turns around and distributes
```

1  that money to other nonprofits that do good works, correct?

2  A.    It does a lot of work on its own.

3  Q.    Correct, but it also sends money to other nonprofits,

4  correct?

5  A.    Yes.

6  Q.    You're a major supporter, right?

7  A.    We give to them, yes.

8  Q.    So you have some knowledge of what it does?  I'm just

9  asking you.  Correct?

11:34 10  A.    No, but the way you're phrasing those questions, you're

11  flipping it around so it's confusing to me.

12  Q.    Okay.  Are you familiar with the United Way?

13  A.    I've heard the name, yes.  I've never given to them.

14  Q.    Is the Federation to your knowledge similar to the United

15  Way?

16  A.    I don't know how the United Way operates.

17  Q.    How about Catholic Charities?

18  A.    I've never given to Catholic Charities.  I don't know

19  anything about Catholic Charities.

11:35 20        MR. TOMBACK:  I'm going to direct your attention to

21  your tax return for the year 2016, DX9543, which I'd like to

22  put up, your Honor, with your permission for the witness to

23  see.

24        THE COURT:  Just for the witness?

25        MR. TOMBACK:  Yes, your Honor.

|       |                                                                        |
|-------|------------------------------------------------------------------------|
| 1     | THE COURT:  Yes.                                                        |
| 2     | MR. FRANK:  Is there a copy for the government?                         |
| 3     | THE COURT:  Do you have a copy for counsel?                             |
| 4     | Q.   Are you familiar with the tax return, 954523?                      |
| 5     | A.   I don't have it on my screen.                                      |
| 6     | Q.   000302463.  It should be on your screen now, Mr. Isackson.         |
| 7     | A.   Yes, it is.                                                        |
| 8     | Q.   Do you recognize that tax return?                                  |
| 9     | A.   Yes.                                                               |

11:37 10    Q.   It's your tax return that you filed jointly with your wife
11    Davina for the year 2014, correct?
12    A.   Correct.
13    Q.   Directing your attention to the "Gifts to Charity" line,
14    in 2014, on page 00302469 --
15         MR. FRANK:  Your Honor, is this document being used to
16    refresh the witness's recollection?
17         THE COURT:  Is it in evidence?
18         MR. TOMBACK:  Your Honor, I didn't offer it into
19    evidence.  It's Mr. Isackson's tax return.  It goes to his
11:38 20    credibility.
21         MR. FRANK:  It does not go to his credibility, your
22    Honor.  There's no impeachment on this issue.  It's his tax
23    return.
24         THE COURT:  What question -- are you going to ask him
25    a specific question about charitable donations?

```
 1            MR. TOMBACK:  I'm going to ask him two questions about
 2     charitable donations, how much he gave generally and how much
 3     he gave to educational institutions.
 4            MR. FRANK:  I have no objection to those questions,
 5     your Honor.  The document is full of personal identifying
 6     information.
 7            THE COURT:  Yeah, I don't think we need to enter the
 8     entire document, but I will allow you to question him about
 9     that.
11:39 10        MR. TOMBACK:  Absolutely, your Honor.  Thank you.
11     We'll just redact out everything but the parts I'm focused on.
12            MR. FRANK:  I don't believe it's an admissible
13     document that's being used for impeachment.
14            MR. TOMBACK:  I can work without the document, your
15     Honor.
16            THE COURT:  Go ahead.
17            MR. TOMBACK:  I'd like to leave the document up for
18     the witness, though, if that's okay.
19            THE COURT:  It can be used to refresh his memory.
11:39 20   That can be done.
21            MR. FRANK:  He hasn't denied a memory yet.
22     BY MR. TOMBACK:
23     Q.   Sir, in 2014, do you recall that your overall gifts to
24     charity were $4,252?
25     A.   That's what it says here, but that is not how it works.
```

|   |   |
|---|---|
| | 1 | Q.   This is your tax return, isn't it? |
| | 2 | A.   Absolutely it is. |
| | 3 | Q.   What's your -- |
| | 4 | A.   I think I know where you're going but -- |
| | 5 | Q.   I'm not interested in what you think, Mr. Isackson.  I |
| | 6 | just want to ask you questions if that's okay.  Okay? |
| | 7 |        My next question, my next question for you is what's |
| | 8 | your overall income? |
| | 9 | A.   Is that -- |
| 11:40 | 10 |        MR. FRANK:  Objection, relevance. |
| | 11 | Q.   What was your overall income for 2014? |
| | 12 | A.   I want to back up.  I want to make something very clear. |
| | 13 | When I made charitable gifts, in any one year I will give to |
| | 14 | the Federation, and they have a -- I don't know what the entity |
| | 15 | of it is.  It's the same thing you can do with all sorts of |
| | 16 | companies, Charles Schwab, they set up a charitable fund.  So I |
| | 17 | may give a half million dollars, $400,000 in one year, and from |
| | 18 | that I can distribute out gifts.  So that one year that I give, |
| | 19 | it will not show up on my return here. |
| 11:40 | 20 |        Do you understand that?  Does that make sense to you? |
| | 21 | Q.   That wasn't the question pending, Mr. Isackson.  We can go |
| | 22 | through more than one year. |
| | 23 | A.   We don't need to do that.  My point is -- |
| | 24 | Q.   We can go through 2014, 2015 and 2017.  You subtract out |
| | 25 | the money that you gave to KWF, you don't get very far.  You |

```
 1   get to ten grand total for those three years.  Is that true,

 2   Mr. Isackson?  That's the total for those three years that I'm

 3   looking at, 2014, '15 and '17?

 4   A.   But then the year before I probably gave 400 grand,

 5   $400,000, and I took that as a charitable gift, which it was.

 6   And it goes into a fund that can grow, and you can distribute

 7   it.  Do you understand that?

 8   Q.   I'm asking the questions.  I just note, we don't have to

 9   review each year, but if we ran the percentages for any one of

11:41 10   these given years, it would be less than .001 percent giving?

11   A.   You're forgetting the fact that in two or three years

12   prior to that I might have given a gift of $400,000.  Does that

13   make sense?

14   Q.   I want to direct your attention back to the $250,000

15   payment you made to Mr. Singer, KWF, for Lauren, your daughter

16   Lauren.  Do you recall that?

17   A.   Yes.

18   Q.   I want to direct your attention to tab 16.  Withdrawn.

19            Do you recall that you used Facebook stock to make

11:42 20   that gift?

21   A.   Yes, I do.

22   Q.   You understand -- well, with the Facebook stock, it had

23   appreciated a substantial amount, correct?

24   A.   Yes.

25   Q.   The stock that you used to fund Lauren's entrance into
```

```
 1    UCLA, you paid roughly $60,000 for it, and it had appreciated
 2    to a point where you were able to pay Mr. Singer $251,000 and
 3    change.  Do you recall that?
 4    A.   That's correct.
 5    Q.   And if you had sold that stock on the open market, you
 6    would have had to take a capital gains tax, correct?
 7    A.   That's correct.
 8    Q.   Because you used the stock to pay Mr. Singer to get your
 9    daughter into UCLA, you were able to get -- you were able to
11:43 10    avoid that capital gains tax entirely, correct?
11    A.   Yes, that's correct.
12    Q.   And that normally would be perfectly legal if you really
13    were making a charitable donation, right?
14    A.   That's correct.
15    Q.   You understand that.  You seem to be well-versed in the
16    charities, right?
17    A.   When you say I'm "well-versed in the charities" --
18    Q.   You understand that you took advantage of this opportunity
19    to take appreciated stock and avoid a capital gains tax?
11:43 20    A.   Yes, yes, I did.
21    Q.   And that tax would have been substantial, correct?
22    A.   That is correct.
23    Q.   Somewhere in excess of 20 percent federal in addition to
24    state tax, correct?
25    A.   Yes.
```

```
 1    Q.    Which aren't low in California.  You avoided all of that?

 2    A.    That is correct.

 3    Q.    And that would have been legal, but it wasn't legal here,

 4    was it?

 5    A.    No, it was not.

 6    Q.    It wasn't legal because, as you testified, you understood

 7    -- I want to combine them all because I'm mindful of the time,

 8    so I'm going to combine all of your daughters.

 9           You understood with respect to Lauren and with

11:44 10    respect to Audrey, some of the money that went in -- went out

11    of KWF to in your mind help your child get into those schools,

12    correct?

13    A.    You're going to have to ask that question again.

14    Q.    It wasn't -- withdrawn.  I'll come back to that.

15           Let me move on to the $75,000 payment that you owed

16    Mr. Singer for the test-cheating.  Do you recall that amount?

17    A.    Yes.

18    Q.    I want to put up diagram number -- I want to put up

19    diagram number 2?

11:45 20           MR. FRANK:  We don't have any diagrams, your Honor.

21           THE COURT:  Where are the diagrams?

22           MR. TOMBACK:  Let me hand the diagram to Mr. Frank.

23           MR. FRANK:  Is this being used as a chalk or a summary

24    chart?

25           MR. TOMBACK:  It's a summary chart.
```

```
     1              MR. FRANK:  We were supposed to receive summary charts
     2    in advance, your Honor.
     3              MR. KENDALL:  He doesn't know the local language, your
     4    Honor.
     5              MR. TOMBACK:  It's a chalk.
     6              THE COURT:  All right.  Give a copy to Mr. Frank.
     7              MR. TOMBACK:  To help Mr. Frank review, I've given him
     8    all four of the ones I may use.
     9              THE COURT:  I can't hear you when you both talk.
11:46 10    Mr. Frank?
    11              MR. FRANK:  May I have a moment to review these?
    12              THE COURT:  Yes, you may.
    13              MR. TOMBACK:  I just want to tell him the one I want
    14    to use now is the second one.
    15              MR. FRANK:  Your Honor, these look like closing
    16    argument slides to me.  They don't look like they're
    17    appropriate for cross-examination.  I can hand them to the
    18    Court.
    19              MR. TOMBACK:  Your Honor, I can get it done without
11:46 20    the diagrams.
    21              THE COURT:  Let's go forward.
    22              MR. TOMBACK:  Okay.
    23    Q.   With respect to the 75,000 that you owed Mr. Singer for
    24    the test-cheating for Audrey, do you recall that?
    25    A.   Yes.
```

```
 1   Q.   There came a time when you also wanted to save taxes on
 2   that 75 grand, right?
 3   A.   Correct.
 4   Q.   Your idea which you gave to Mr. Singer was, if you gave
 5   that money for the test-cheating arrangements for controlling
 6   the room to KWF, then you could take a tax deduction, right?
 7   A.   Actually, it was his idea.
 8   Q.   I apologize.  But the two of you came to a pretty quick
 9   understanding, right, that he would allow you to contribute the
10   75,000 to KWF, correct, and he would back that up with a gift
11   letter if the IRS came and audited you, right?
12   A.   That is correct.
13   Q.   And what was his demand in return for letting you do that
14   in backing up your deduction?
15   A.   When you say "what was his demand" --
16   Q.   Didn't you then pay $100,000 to KWF, not just 75?
17   A.   Yes, yes, that is correct.
18   Q.   He raised you 25, right?
19   A.   That is correct.
20   Q.   You didn't testify about that on direct, right?  Did you
21   forget that?
22   A.   I don't think I was asked that question.
23   Q.   No, I know you weren't asked that question.  I just asked
24   you, did you forget it?  Did you cover it with the government?
25   A.   I'm trying to think.  We probably did discuss that.
```

```
 1   Q.   There can be no doubt in your mind if you go to somebody
 2   and say, "I owe you 75 grand for test-cheating, I want to avoid
 3   the taxes on that, so I'll pay it to a nonprofit" -- and it's
 4   his idea, so I apologize.  But he says that, "You got to pay me
 5   25 grand extra and then you can get the tax savings, I'll take
 6   the 25."  Is that what happened in substance?
 7   A.   He charged more for that service, correct, he did.
 8   Q.   No, he didn't charge more for the service, Mr. Isackson,
 9   did he?  He charged to --
10   A.   I --
11   Q.   -- your tax --
12   A.   For me to take a write-off that was not appropriate, which
13   I admitted to, he asked for an additional $25,000.
14   Q.   And did you think that $25,000 was going to help
15   underprivileged youth or contributing to a college?
16   A.   No.
17   Q.   It was going to go into his pocket, right?
18   A.   I assumed so.
19   Q.   Just like the 100 grand that was paid to Mr. Salcedo to
20   help your daughter Lauren get into -- can't keep track -- to
21   get into UCLA, the second or third school that you tried for
22   her, correct?
23   A.   I didn't know the exact amount until later that we paid
24   him.
25   Q.   As you sit here today, you know he got 100 grand, right?
```

11:48 at line 10

11:49 at line 20

```
 1    A.    I believe that's the amount.

 2    Q.    You interacted with him in your daughter's admission.  You

 3    didn't know the number, but you knew he was with Singer in

 4    helping her get in, right?

 5    A.    As I said before, I knew it was obvious that he was paying

 6    people that were helping with the scheme.

 7    Q.    He was open with you about that?

 8    A.    He was open with me about what?

 9    Q.    What you just said.

11:50 10    A.    No, he wasn't open.  Until the very last tape he was still

11    covering it up to give to people directly.

12    Q.    But it was clear to you --

13    A.    I've told you the whole time that I believe you'd have to

14    be a fool to think that money was not going to people that were

15    helping with this scheme.  That's what I have to say on it.

16          MR. TOMBACK:  One moment, your Honor.  I'm close to

17    done.

18          THE COURT:  Yes.

19    Q.    You didn't introduce Mr. Singer to any of your business

11:51 20    associates, did you?

21    A.    I did not.

22    Q.    You didn't introduce him to any of your friends, did you?

23    A.    I did not.

24    Q.    That wouldn't be smart because then Mr. Singer might stray

25    into tax evasion or test-cheating or getting them -- getting
```

**A1234**

```
 1  their children in through fake bios, correct?
 2  A.   That really wasn't the purpose of why I didn't introduce
 3  him, no.
 4  Q.   Well, you didn't want your friends to know that your
 5  children had gotten into schools based on fake credentials?
 6  A.   I didn't -- I made the decision not to talk about it to
 7  anybody else.  That's clear.  The reasons you're giving aren't
 8  really the reasons.
 9          MR. TOMBACK:  Hold on one second, your Honor.  May I
10  have just a moment, your Honor?
11          THE COURT:  Yes.
12  Q.   Mr. Isackson, did the government at any point in time
13  threaten to indict any of your children?
14  A.   I don't believe so.
15  Q.   Your daughter Lauren was aware that she was being
16  submitted -- she was -- her application was being submitted to
17  USC as a fake oarswoman, correct?
18  A.   Did you say Lauren or Audrey?
19  Q.   If I misspoke, I apologize.  I meant your second child,
20  Audrey.
21  A.   Yes.
22  Q.   Your second daughter, Audrey.
23  A.   That's okay.
24  Q.   Did she know that her application was being submitted with
25  her being characterized as a fake oarswoman?
```

```
 1   A.   She knew she was getting in through the athletic
 2   department.  There is a sort of correlation with the athletic
 3   department.  She didn't know the inner workings of it.
 4   Q.   Did Singer ever tell you that he was working with the
 5   Harvard president to do side doors?
 6   A.   No.
 7   Q.   Did Singer ever tell you that he knew the Brown president?
 8   A.   We never discussed Brown or Harvard as a school that our
 9   daughters were ever interested in.
11:54  10   Q.   Did he tell you that he was reading applications for
11   multiple ivy league schools?
12   A.   I'm sorry, he was doing what for multiple of schools?
13   Q.   He never told you he was reading applications for
14   admissions departments in multiple ivy league schools, did he?
15   A.   I don't believe so.  That he was reading applications?
16   Q.   Correct.
17   A.   I don't believe so.
18   Q.   He never used the term "side door" with you, did he?
19   A.   I don't believe he did.
11:55  20        MR. TOMBACK:  That's all I have, your Honor.
21        THE COURT:  Redirect, Mr. Frank?
22        MR. FRANK:  Thank you, your Honor.
23            REDIRECT EXAMINATION OF BRUCE ISACKSON
24   BY MR. FRANK:
25   Q.   Mr. Isackson, you were asked a number of questions about
```

```
 1    your meetings with the government.
 2    A.    Yes.
 3    Q.    Did you memorialize lines when you were meeting with the
 4    government?
 5    A.    No.
 6    Q.    Did you rehearse or practice testimony when you were
 7    meeting with the government?
 8    A.    No.
 9    Q.    Did you review documents and listen to audio recordings
10    when you were meeting with the government?
11    A.    I did.
12    Q.    What did the government tell you in each and every one of
13    those meetings was your number one obligation?
14    A.    To tell the truth and relay things as accurately as I can
15    remember them.
16    Q.    You were asked some questions by Mr. Kelly about a
17    conversation your wife had about flagging your daughter, her
18    application at USC.
19    A.    Yes, yes.
20    Q.    Other than the scheme that you've talked about here today,
21    did anyone from USC offer to have your daughter admitted as a
22    fake athlete in exchange for a contribution?
23    A.    Repeat that one more time.
24    Q.    Other than the scheme we've talked about here today --
25    A.    Yes.
```

**A1237**

Q.   Did Lauren Whittam or any development official at USC

offer to have your daughter recruited as a fake athlete in

exchange for money?

A.   No.

Q.   Did Lauren Whittam or any other USC official offer you a

guaranty of admission in exchange for money?

A.   No.

Q.   You were asked some questions about the mindset of other

parents.  You don't know the mindset of any other parents, do

you, sir?

A.   No.

Q.   What was your mindset when you sent Rick Singer a

photograph of your daughter Lauren playing soccer?

A.   It was pretty clear that he was putting together some sort

of resume that would make her out to be an incredible athlete

for a high school-level player.

Q.   What was your mindset when you sent Rick Singer a

photograph of your daughter Audrey?

A.   He would put together something similar with her in the

crew department that her abilities would be superior as well.

Q.   What was your mindset when you paid those invoices to The

Key Worldwide Foundation after your two daughters were admitted

as fake athletic recruits to college?

A.   I'm not sure what you mean by what was my mindset.

Q.   What was your mindset?  What did you feel about that?

```
 1    A.   Obviously didn't feel great.  I knew I was doing something

 2    wrong.

 3    Q.   You were asked a whole long series of questions about what

 4    your teenage daughter meant when she used the worked

 5    "embellish" in an e-mail to someone.

 6    A.   Mm-hmm.

 7    Q.   Do you have any idea what your teenage daughter meant when

 8    she used the word "embellish"?

 9    A.   I don't, no.

11:58 10    Q.   You testified that you would have to -- you understood you

11    would have to embellish Lauren's record quite a bit to convince

12    USC she was a legitimate soccer player.  When you, sir, used

13    the word "embellish" --

14    A.   Mm-hmm.

15    Q.   -- what was that a fancy word for?

16    A.   Disguise, make something that's not accurate, enlarge

17    something beyond reasonable proportions.

18    Q.   Lie?

19    A.   Yes.

11:59 20    Q.   You were asked some questions about that audio recording,

21    that wire recording that Mr. Singer made of you when he visited

22    you in your home in December of 2018.  You were asked about a

23    discussion in your son's presence of whether he wanted to be a

24    practice player when he went to college.  Do you recall those

25    questions?
```

```
 1   A.    Mm-hmm, I do.

 2   Q.    Was there any discussion in front of your son on that

 3   occasion about creating a fake athletic profile?

 4   A.    No.

 5   Q.    Was there any discussion in front of your son on that

 6   occasion about using money to induce a university insider to

 7   lie to their colleagues about your son's athletic

 8   qualifications?

 9   A.    No.

11:59 10   Q.    Was there any discussion at all in that conversation in

11   front of your son about fake recruitment?

12   A.    No.

13   Q.    Did you understand, sir, when Mr. Singer was asking about

14   whether your son wanted to be a practice player, where he was

15   going with that?

16   A.    Well, I knew he was asking questions that would be, you

17   know, something that he wanted to see if he could pull the same

18   thing off for Ryan.

19   Q.    Did you know what would happen if he went down that road?

12:00 20   A.    Absolutely.

21   Q.    You were asked a series of questions about whether Singer

22   admitted to you in that recording that he was bribing

23   individuals personally.  Do you recall those questions?

24   A.    I do.

25   Q.    Wherever the money went, Mr. Isackson, whether to an
```

```
 1    athletic program or to an individual's pocket, did you believe
 2    that what you were doing in this scheme was legitimate?
 3    A.   No.
 4    Q.   Why?
 5    A.   Because the payments we were -- the payments we made were
 6    for services to get our kids into schools or to have a test
 7    score altered.
 8    Q.   Why were you more concerned in the context of what you
 9    believed was an IRS audit about payments to individuals than
10    payments to programs?
11    A.   If you're referring to the fact that I thought there was a
12    lot of people involved and that made me feel better about it,
13    is that --
14    Q.   I'm asking you a different question.
15    A.   Okay.
16    Q.   You believed Mr. Singer's foundation was being audited,
17    correct?
18    A.   Correct.
19    Q.   Why were you more concerned in that context about payments
20    he made to individuals than to programs?
21    A.   Oh, because I knew that the testing score was clearly
22    something that would be harder to disguise.  It was a payment
23    for services unrelated to any university or anything like that.
24    Q.   What about payments to universities?
25    A.   Payments to universities would be harder to dig up.
```

|     |     |
| --- | --- |
| 1 | Q.    You were asked a series of questions about your |
| 2 | obligations under the terms of your cooperation agreement.  Do |
| 3 | you recall that line of questioning? |
| 4 | A.    Yes. |
| 5 |        MR. FRANK:  Could we call up Exhibit 675 in evidence, |
| 6 | please.  Can we look at -- does the jury have that?  Could we |
| 7 | look at page 2, please. |
| 8 | Q.    Do you see the section under "Substantial Assistance"? |
| 9 | A.    Yes. |

12:02
|      |     |
| --- | --- |
| 10 | Q.    If you look at the second paragraph -- Ms. Lewis, could |
| 11 | you highlight the second sentence beginning with, "The U.S. |
| 12 | Attorney will make this determination." |
| 13 |        Do you see that says, "The U.S. Attorney will make |
| 14 | this determination based on the truthfulness and value of the |
| 15 | defendant's assistance regardless the outcome or result of |
| 16 | any proceeding or trial."  Do you see that? |
| 17 | A.    I do. |
| 18 | Q.    Mr. Kelly didn't ask you about that sentence, did he? |
| 19 | A.    No. |

12:03
|      |     |
| --- | --- |
| 20 | Q.    Do you have a dog in this fight, Mr. Isackson?  Do you |
| 21 | have any vested interest in the outcome of this proceeding? |
| 22 | A.    I'm here to tell the truth, and my sentence hopefully will |
| 23 | be reflective of that and get it lower. |
| 24 | Q.    You were asked a series of questions about the deductions |
| 25 | you took from your taxes for the payments you made to Mr. |

| | |
|---|---|
| 1 | Singer's charity.  Do you recall those questions? |
| 2 | A.   Yes. |
| 3 | Q.   Why did you take those deductions? |
| 4 | A.   Because it benefited me from a tax standpoint. |
| 5 | Q.   Did you believe they were legitimate deductions? |
| 6 | A.   No. |
| 7 | Q.   Did you believe that, instead of taking them as charitable |
| 8 | deductions, it would have been okay to take them as business |
| 9 | expenses? |
| 12:03 10 | A.   No. |
| 11 | Q.   Did you believe that it would have been okay to call them |
| 12 | business consulting? |
| 13 | A.   No. |
| 14 | Q.   Why not? |
| 15 | A.   Because they were not such. |
| 16 | Q.   I'm sorry? |
| 17 | A.   Because they weren't business consulting. |
| 18 | Q.   You were asked a series of questions about how much |
| 19 | charitable giving you engaged in as reflected on your personal |
| 12:04 20 | income tax returns.  Do you recall those questions? |
| 21 | A.   Yes. |
| 22 | MR. FRANK:  I'd like to direct your attention, if we |
| 23 | could just use the transcript rather than the audio at this |
| 24 | point, to Exhibit 607 and to page 85 of that exhibit, of that |
| 25 | transcript.  I'm sorry, I have the wrong date. |

1      Could I have one moment, your Honor, to get the right
2  page number?
3          THE COURT:  Yes.
4          MR. FRANK:  Sorry.  It's 83.
5          THE COURT:  Okay.
6  Q.   Do you see on page 83, Mr. Isackson, at line 13, you said,
7  "I had done it aside from --
8  A.   Yes.
9  Q.   -- "I've done some big gifts in some big years."  Do you
10 see that?
11 A.   I do.
12 Q.   And then you said on line 16, "We do the Jewish stuff, and
13 yeah, I give, actually, I give to the Jewish Federation."  Do
14 you see that?
15 A.   I do.
16 Q.   And then you said at line 22 -- line 21, "Besides you, but
17 I'm trying to think in time, I've definitely, like, when my mom
18 had cancer and stuff like that, in a bunch of years we gave
19 hundreds of thousands of dollars."  Correct?
20 A.   Correct.
21 Q.   Was that true?
22 A.   Yes.
23 Q.   And you did that through a charitable remainder trust?
24 A.   That's what it is called, yes.
25 Q.   And that wouldn't appear on your personal tax returns,

```
 1    would it?
 2    A.   That's correct.
 3    Q.   And you've also, I believe you testified, given to
 4    educational institutions for a long time.
 5    A.   Correct.
 6    Q.   Did you get anything in return for those gifts?
 7    A.   Nothing, no.
 8    Q.   What educational institutions have you given to, sir?
 9    A.   We've given substantial amounts every year to the public
12:06 10  school system, Hillsborough Public Schools.  We've given to
11    really every private school my kids attended.
12    Q.   And in fact, your name was at one point inscribed in a
13    wall at your children's school, isn't that true?
14    A.   That's correct.
15    Q.   Is your name still on that wall, Mr. Isackson?
16    A.   I don't know.  I told them they could take it down
17    actually.
18    Q.   Why did you tell them to take your name down from the
19    wall?
12:07 20  A.   Because I was embarrassed.
21         MR. FRANK:  No further questions.
22         THE COURT:  Any further questions, Mr. Kelly or --
23         MR. KELLY:  Briefly.
24         THE COURT:  Mr. Kelly, recross.
25              RECROSS-EXAMINATION OF BRUCE ISACKSON
```

```
 1   BY MR. KELLY:
 2   Q.   You were embarrassed because you were caught red-handed
 3   committing a crime, right?
 4   A.   I was embarrassed because I didn't want to have my name on
 5   the wall because of the affiliation that came out after the
 6   fact that I was involved in this scheme, and I didn't want it
 7   to appear that the school, which they clearly had no
 8   involvement, would be part of it.  I didn't want to soil their
 9   wall.
12:07 10  Q.   Mr. Frank said to you, your mindset was a guilty mindset,
11   wasn't it?  He asked you about your mindset, right?
12   A.   My mindset when?
13   Q.   He said to you, you don't know the mindset of other
14   parents, correct?
15   A.   Yes, he asked me that question.
16   Q.   That's a true question and a true answer, right?  You
17   don't know the mindset of these other parents, do you?
18   A.   I don't.  I could only guess.  No, I don't know.
19   Q.   Right.  You could guess and you don't even know what your
12:08 20  own daughter meant when she said "embellish" versus what you
21   meant, right?
22   A.   I was not familiar with that document at all.  I had never
23   seen it before.
24   Q.   The point is, people use words differently, right?  Your
25   daughter who was a teenager might use the word "embellish"
```

**A1246**

```
 1   differently than you, correct?
 2   A.   Could be.
 3   Q.   And Singer took a different approach with your son around
 4   than he did with you, correct?
 5   A.   Yes.
 6   Q.   All right.  So Singer could sing different tunes depending
 7   upon who he was dealing with, right?
 8   A.   Yeah.  I don't know exactly what you're trying to say
 9   here.
10   Q.   Well, did he ever tell you he was reading applications or
11   helping in the admissions offices of all these schools?
12   A.   No, he did not.  I told you that before.
13   Q.   Okay.  So he may have taken a different approach with
14   other parents, correct?
15   A.   I have no idea.
16   Q.   And you testified that he never referenced the side door
17   in front of you, right?
18            MR. FRANK:  Beyond the scope, your Honor.
19            THE COURT:  Overruled.
20   Q.   Right?  He never referenced this side door term with you,
21   right?
22   A.   I said I don't believe he did.
23   Q.   All right.  So he had a different approach once he sized
24   up who he was dealing with, right?
25   A.   I have no idea what he did with other parents.
```

```
 1    Q.   Okay.  And he sized you up as somebody who would in fact
 2    commit fraud with him, right?
 3    A.   I don't know what his mindset was as far as sizing me up.
 4    Q.   Well, okay.  And you were also asked, Did you practice
 5    your testimony with the government.  You said no.
 6    A.   That's correct.
 7    Q.   Well, how much time did you spend with the prosecutor,
 8    Mr. Frank?
 9    A.   I thought we went through all of these questions before.
12:10 10  Q.   Yeah, I'm going to ask you again.  How much time did you
11    spend with him?
12    A.   I don't know the exact amount of time.
13    Q.   More than an hour or two?
14    A.   These same questions were asked from before, and we went
15    through this, and I gave all the answers before.
16    Q.   This is called recross-examination.  Did you spend more
17    than an hour or two with Mr. Frank?
18    A.   Yes, I did.
19    Q.   Did he ask you questions about your situation?
12:10 20  A.   Yes.
21    Q.   And it's your testimony to this jury that that's not
22    practicing in any way?
23    A.   No.  A lot of it had to do with clarification.  We went
24    over tapes to listen to the words several times to make sure
25    everything I signed for was accurate.  It took a lot of time.
```

**A1248**

```
 1    Q.   So preparing but not practicing, correct?

 2    A.   Wasn't preparing.  It was to make sure my answers were

 3    clear.

 4    Q.   All right.  Mr. Frank went back to Exhibit 675 and read

 5    the -- if we could put that up briefly, please.  He read

 6    paragraph 2, the second sentence.  Whereas I had read the first

 7    sentence, "The determination whether the defendant has provided

 8    substantial assistance rests solely in the discretion of the

 9    U.S. Attorney," then he read the second sentence, correct?

12:11 10   A.   That is correct.

11    Q.   And who's making the determination in that second

12    sentence, the defense attorney, the Court, who?  What does that

13    say?  The U.S. Attorney would make that determination, correct?

14    A.   That's correct.

15    Q.   They would decide if you were truthful, right?

16    A.   That's correct.

17    Q.   And you don't think it matters one bit what happens in

18    this case as to whether they determine whether you've been

19    truthful or not?

12:12 20   A.   Yeah.  If they determine I haven't been truthful, I would

21    be in a lot of jeopardy.

22    Q.   And you wouldn't lie to stay out of prison, would you?

23    A.   I wouldn't lie on anything that has to do with this, my

24    defense here.

25    Q.   But you did lie repeatedly about trying to get your kid
```

**A1249**

1   into school, right?

2   A.   I did.

3          MR. KELLY:  Nothing further.

4          THE COURT:  Recross, Mr. Tomback?

5          MR. TOMBACK:  Nothing further, your Honor.

6          THE COURT:  All right.  Thank you.  You may step down,

7   Mr. Isackson.  Government's next witness?

8          MR. FRANK:  The government calls Special Agent Keith

9   Brown.

12:13 10          KEITH BROWN, Sworn

11          THE CLERK:  Would you please state your name for the

12   record, spelling your last.

13          THE WITNESS:  It's Keith Brown, B-r-o-w-n.

14          THE COURT:  You may remove your mask, Mr. Brown.

15          THE WITNESS:  Thank you, your Honor.

16          MR. FRANK:  Ms. Lewis, could you show the witness

17   Exhibits 525, 526 and 555, please.

18                  DIRECT EXAMINATION OF KEITH BROWN

19   BY MR. FRANK:

12:14 20   Q.   Good afternoon, Special Agent Brown.

21   A.   Good afternoon.

22   Q.   Would you please tell us where you work.

23   A.   I'm a special agent with the FBI in Boston.

24   Q.   How long have you worked at the FBI?

25   A.   I started with the FBI in July of 2014.

```
 1   Q.   And are you assigned to a particular squad at the FBI in
 2   Boston?
 3   A.   Yes.  I'm assigned to the Corporate and Securities Fraud
 4   squad in Boston.
 5   Q.   How long have you been with the Corporate and Securities
 6   Fraud squad?
 7   A.   Since I arrived in the Boston office, which was in
 8   December of 2014.
 9   Q.   Can you tell us a little bit about your educational
10   background.
11   A.   Sure.  I'm a graduate of Hamilton College in New York,
12   class of 2000.
13   Q.   And you have a degree from Hamilton?
14   A.   Yes, in world politics and international relations.
15   Q.   After graduating from Hamilton, did you have a job?
16   A.   Yes.  I spent most of my time before the FBI with a
17   company called Marsh McLennan.  I worked for various divisions
18   of Marsh.  And when I left Marsh to join the FBI, I left as a
19   vice president.
20   Q.   What kind of company is Marsh McLennan?
21   A.   It's a global insurance services and professional services
22   firm.  The core business is insurance brokering.  Most of my
23   time at Marsh was spent within client facing software division.
24   Q.   What kind of training did you receive upon joining the FBI
25   in 2014?
```

12:15 at lines 10, 20

```
 1    A.   Trained in a variety of matters, firearms, defensive
 2    tactics, tactical training, legal training, investigative
 3    training.  It covers quite a bit in a short amount of time.
 4    Q.   Since being assigned to the Corporate and Securities Fraud
 5    squad, what kind of cases have you worked on?
 6    A.   Most of my time has been devoted to market manipulation
 7    cases, more commonly known as pump and dump schemes.  In
 8    addition to that I've worked on investment adviser frauds.
 9    I've assisted with insider trading cases and Ponzi schemes.
12:17 10    Q.   Did there come a time, special agent, when you were
11    assigned to a securities fraud investigation that involved a
12    search of a residence in the Los Angeles area?
13    A.   Yes.
14    Q.   When was that?
15    A.   The search occurred on February 14, 2018.
16    Q.   Following that search did there come a time when you
17    interviewed the individual whose home you searched?
18    A.   Yes.  We interviewed the individual that day.  The
19    individual shortly thereafter came to Boston and participated
12:17 20    in proffer interviews with the government.
21    Q.   What are proffer interviews?
22    A.   Proffer interviews are essentially where the subject of an
23    investigation, along with their attorneys, agrees to be
24    interviewed, and they're provided some protection by the
25    government, mainly that their statements won't be used directly
```

**A1252**

```
 1    against them.
 2    Q.   Without telling me what you were told during any of those
 3    interviews, did there come a time after the interviews that you
 4    began to investigate someone else?
 5    A.   Yes.
 6    Q.   Who did you begin to investigate?
 7    A.   We began to investigate the head coach of a prestigious
 8    university's soccer team.
 9    Q.   Who was that?
10    A.   Rudolph Meredith.
11    Q.   And where was Rudolph Meredith a soccer coach?
12    A.   At Yale University.
13    Q.   In broad strokes tell me some of the investigative steps
14    you took when you investigated Rudolph Meredith.
15    A.   Sure.  We obtained business records related to
16    Mr. Meredith.  Consensual recordings were made with
17    Mr. Meredith, including recordings with an undercover FBI
18    employee.  Financial -- at least one financial transaction
19    occurred with Mr. Meredith, and he was again recorded, both
20    audio and video.
21    Q.   You referred to something called "consensual recordings."
22    What are consensual recordings?
23    A.   Consensual recording is basically what people commonly
24    think of as wiring somebody up against a target of an
25    investigation.  It typically entails one -- well, it does
```

1    entail one party to that conversation consenting to the

2    government recording.  We do that both with body recorders,

3    with the phone, using video as appropriate.

4    Q.   As a result of that investigation did there come a time

5    when you began to investigate yet another individual?

6    A.   Yes.

7    Q.   Who was that?

8    A.   The additional individual was Rick Singer.

9    Q.   At that point did you handle the investigation of Rick

12:19 10   Singer, or was it assigned to someone else?

11   A.   I was involved in some of the initial steps related to

12   Rick Singer, but myself and my partner on the securities fraud

13   investigation were both due to be out of the division for quite

14   a period of time.  I was scheduled to leave for initial SWAT

15   certification in Quantico, which was a three-week course.

16        My partner on the investigation was scheduled to go

17   on a three-month temporary assignment in Europe.  Both of us

18   were not going to be able to devote the time that was apparent

19   would be needed to kick off the investigation of Mr. Singer,

12:20 20   and other agents on my squad were brought in to basically take

21   the lead.

22   Q.   Did you assist?

23   A.   In the initial stages, yes, and I did stay in touch with

24   members of the case team while I was at Quantico, but again, I

25   had very limited time when I was there to do that.  And then

```
 1    after that, my participation was fairly limited.  I assisted
 2    with monitoring the wire and assisted with some operational
 3    actions related to a meeting in September.
 4    Q.    You testified that you assisted in monitoring a wire.
 5    What are you referring to?
 6    A.    We had a Title III up for the summer of 2018 for Mr.
 7    Singer's phone.
 8    Q.    What is a Title III?
 9    A.    A Title III is authorization granted to the government by
10    a U.S. District Court judge basically to monitor all
11    communications with a target telephone.
12    Q.    It's a wiretap?
13    A.    Yes.
14    Q.    And whose phone was wiretapped?
15    A.    Mr. Singer's phone was wiretapped.
16    Q.    And that was in the summer of 2018?
17    A.    Yes.
18    Q.    Are you familiar with what an e-mail search warrant is?
19    A.    Yes.
20    Q.    What is an e-mail search warrant?
21    A.    An e-mail search warrant is permission granted to the
22    government by a U.S. magistrate judge for the government to
23    seize and review e-mail communications for a target e-mail
24    address.
25    Q.    And are you aware of whether e-mail searches were used as
```

12:21 at lines 10, 20

**A1255**

1    part of this investigation?

2    A.    Yes.

3    Q.    Have you had an opportunity to review some of the results

4    of those searches?

5    A.    Yes.

6    Q.    Which e-mail accounts are you aware of being searched as

7    part of the investigation?

8    A.    I've personally reviewed e-mail search warrants related to

9    Rick Singer's e-mail, Gamal Aziz's e-mail, John Wilson's e-mail

12:22 10    and e-mails including Donna Heinel from USC.

11    Q.    I want to talk about the wiretap for just a moment.

12    A.    Sure.

13    Q.    Before coming here today did you have an opportunity to

14    review the discs in front of you that have been marked as

15    Exhibits 525, 526 and 555?

16    A.    Yes.

17    Q.    What are those?

18    A.    525 is a three-way call between Rick and an individual

19    named Scott Treibly and Gordon Caplan.  526 is a follow-up call

12:22 20    to 525 between Mr. Caplan and Mr. Singer, and 555 is a call

21    between Rick Singer and Agustin Huneeus.

22    Q.    How do you know those are the other individuals on those

23    calls?

24    A.    I've confirmed it with a variety of steps.  The U.S.

25    Attorney's Office obtained subscriber records for the numbers.

```
 1    The numbers matched those in the case of Mr. Treibly and

 2    Mr. Huneeus.  I've also reviewed an extraction of Mr. Singer's

 3    phone that was taken on October 5, 2018.  And the phone numbers

 4    for the individuals are stored.

 5            MR. KENDALL:  Objection, your Honor.  I think this is

 6    a lot of hearsay.  These are out-of-court documents.

 7            MR. FRANK:  He's testifying for his basis for

 8    authenticating.

 9            THE COURT:  Let him answer the question.

10    A.   So reviewing the extraction report from the October

11    extraction, I was able to identify the contact information for

12    these individuals, and all the contact information included the

13    phone number for the calls.

14            MR. FRANK:  The government offers 525, 526 and 555.

15            MR. KELLY:  We renew our Petrozziello objection to

16    these.

17            MR. KENDALL:  And we have a continuing objection, your

18    Honor.

19            THE COURT:  Petrozziello objection is noted and

20    overruled for the time being.  525, 526, 555 will be

21    conditionally admitted.

22            (Exhibits 525, 526, 555 admitted into evidence.)

23            MR. KELLY:  Just for the record, we renew the

24    confrontation clause objection as well.

25            THE COURT:  Yes.
```

```
  1              MR. KENDALL:  Your Honor, I gave an expansive one.  As

  2     long as it's picked up by the court reporter, I don't mean to

  3     disrupt you.

  4              THE COURT:  Yes.

  5     BY MR. FRANK:

  6     Q.   If we could look in your transcript binder to the marked

  7     525.

  8     A.   Yes.

  9     Q.   Have you had an opportunity to review this transcript?

12:24 10     A.   I have.

 11     Q.   Is it a fair and accurate transcription of the recording?

 12     A.   It is.

 13     Q.   Are the voices identified accurately to the best of your

 14     ability?

 15     A.   Yes, they are.

 16     Q.   What is the date of this call?

 17     A.   The date of the call is June 15, 2018.

 18     Q.   And who are the participants in the call?

 19     A.   Rick Singer, Scott Treibly, and Gordon Caplan.

12:25 20              MR. FRANK:  Could we play the call from the start,

 21     please.

 22              (Audio recording played.)

 23              MR. FRANK:  Can we stop right there, please.

 24     Q.   And again, special agent, there's indications that there's

 25     Mr. Singer's voice, Mr. Treibly's voice and Mr. Caplan's voice?
```

```
 1    A.    Yes.

 2    Q.    And have you verified that with other recordings as well?

 3    A.    I have.

 4          MR. FRANK:   If we could pick it up at that point.

 5          (Audio recording played.)

 6    Q.    Special agent, did there come a time when there was a

 7    follow-up call between Mr. Singer and Mr. Caplan?

 8    A.    Yes.

 9          MR. FRANK:   Could you turn to the tab marked 526 in

12:41 10    your transcript binder.   Ms. Lewis, can we start it again.

11          (Audio recording played.)

12          MR. FRANK:   Can we pause it there for just a moment.

13    Q.    Special agent, what was the date of this call?

14    A.    It was the same day, on June 15, 2018.

15          MR. FRANK:   Thank you, you may resume.

16          (Audio recording played.)

17    Q.    Special agent, I'd like to ask you now to turn to the

18    transcript marked 555 in your binder.

19    A.    Yes.

12:51 20    Q.    What is the date of the call at transcript 555?

21    A.    It's August 30, 2018.

22    Q.    And who was this call with?

23    A.    Rick Singer and Agustin Huneeus.

24    Q.    And this was also intercepted over the Court-authorized

25    wiretap?
```

```
 1   A.   It was.

 2           MR. FRANK:  Can we begin.

 3           (Audio recording played.)

 4           MR. FRANK:  Okay.  Let's just stop it right there.

 5   The jury will have the rest of the exhibit in evidence, but I

 6   just want to fast-forward for a moment to page 23 of the

 7   transcript, at line 3.

 8           (Audio recording played.)

 9           MR. FRANK:  Let's stop it right there.  Your Honor,

10   I'm about to switch gears to another topic.

11           THE COURT:  Switch gears, we'll go about 15 more

12   minutes.

13           MR. FRANK:  Yes, your Honor.

14   Q.   Special agent, I want to now take you through a series of

15   e-mails that were obtained as part of this investigation, and

16   I'm going to begin by asking you to read into evidence a series

17   of e-mails relating to defendant Gamal Aziz.

18           MR. KELLY:  Can we have copies, your Honor, please?

19           THE COURT:  Do you have copies?

20           MR. FRANK:  We've marked all of these as exhibits and

21   provided copies previously.  We don't have a hard copy of the

22   entire set.

23           THE COURT:  Well, why don't you tell him the numbers

24   you're going to be using.

25           MR. FRANK:  I'm happy to do that, your Honor.  I was
```

(line markers: 01:00 at line 10, 01:01 at line 20)

```
 1    actually going to offer them in bulk.
 2              MR. KELLY:  Maybe I'll object.  I just want to see
 3    them and see what they are.  Maybe I won't.
 4              THE COURT:  Go ahead and make the offer.
 5              MR. FRANK:  It's Exhibit 9, Exhibit 315, Exhibit 323,
 6    Exhibit 330, Exhibit 334, Exhibits 338 through 342, Exhibit
 7    345, Exhibit 352, Exhibit 363, Exhibit 362, Exhibit 361,
 8    Exhibit 371, Exhibit 372, 376, 381, 387, 390, 427, 467, 478 and
 9    505.
10              MR. KELLY:  Your Honor, I don't have these memorized.
11    If I could have a moment to look at them.
12              MR. FRANK:  We can go one by one, your Honor.
13              THE COURT:  We'll go one by one.
14              MR. KELLY:  9, 315 -- what was the next?
15              MR. FRANK:  You want me to read the list again?
16              MR. KELLY:  No.  Your colleague just helpfully handed
17    it to me.  Hold on.  We'll pull them up electronically, your
18    Honor.
19              THE COURT:  All right.  Let's go one at a time.
20    BY MR. FRANK:
21    Q.  Special agent, those exhibits that I just listed, what are
22    they?
23    A.  They're a series of e-mails between primarily Rick Singer
24    and Gamal Aziz.
25    Q.  And are there others on those e-mails as well?
```

```
 1   A.   Yes.  Amal Felaya, who I believe is Gamal's wife is also

 2   in this chains, and I believe there's an e-mail from Donna

 3   Heinel as well.

 4   Q.   And who selected these e-mails for you to read into the

 5   record today?

 6   A.   U.S. Attorney's Office did.

 7            THE COURT:  I'm sorry, I didn't hear.

 8            THE WITNESS:  The United States Attorney's Office did.

 9            MR. FRANK:  If we could show the witness only Exhibit

10   9, please.

11   Q.   Special agent, what is Exhibit 9?

12   A.   It's an e-mail dated December 12, 2011 from William Powers

13   to Rick Singer and Gamal Aziz.

14   Q.   What's the subject?

15   A.   Adam Aziz.

16            MR. FRANK:  The government offers Exhibit 9.

17            THE COURT:  It will be admitted.

18            MR. KELLY:  No objection, your Honor.

19            MR. KENDALL:  Your Honor, notwithstanding our

20   continuing objection.  Thank you.

21            THE COURT:  Yes.

22            (Exhibit 9 admitted into evidence.)

23            MR. FRANK:  Ms. Lewis, could we start on page 2 with

24   the e-mail from Gamal Aziz to William Powers.  Not that e-mail.

25   On page 2.  There we go, thank you.
```

Lines 10 and 20 are marked with timestamps: `01:03` at line 10 and `01:04` at line 20.

|   |   |
|---|---|
| 1 | Q.   You see this is an e-mail from Mr. Aziz to William Powers? |
| 2 | A.   Yes. |
| 3 | Q.   Could you read for the record Mr. Aziz's signature block. |
| 4 | A.   "Gamal Aziz President Chief Executive Officer MGM |
| 5 | Hospitality." |
| 6 | Q.   And could you read the e-mail for the record, please? |
| 7 | A.   "Hi Bill, I hope you're well and able to manage this |
| 8 | market's volatility in good spirit.  I need your advice.  My |
| 9 | son Adam, junior high, has set his eyes on going to Stanford |
| 01:05 10 | and will be applying next year.  He's got the grades, the SAT, |
| 11 | athletics, basketball, trilingual and above all a really good |
| 12 | kid.  I wanted to know if you can advise me with your |
| 13 | experience with Stanford, if there's anyone that can guide Adam |
| 14 | or anything that Adam can do to increase his odds at being |
| 15 | accepted.  Sorry for imposing, and my very best to you and your |
| 16 | family for the holidays." |
| 17 | Q.   And how does Mr. Powers respond in the e-mail right above |
| 18 | it? |
| 19 | A.   "Gamal, I am happy to help and suggest that you retain |
| 01:05 20 | Rick Singer, best private college advisor for Adam, and hence |
| 21 | you.  Rick is a friend and I have relied on him successfully |
| 22 | for our four children who have gone through this process." |
| 23 | Q.   You can stop right there.  And if we could just go to the |
| 24 | e-mail above it.  You see there's an e-mail from Mr. Singer? |
| 25 | A.   Yes. |

```
  1   Q.   And how does he respond?

  2   A.   "Bill, thank you for the introduction and kind words.

  3   Gamal, please feel free to call me anytime."

  4   Q.   You don't have to read that into the record.  That's his

  5   phone number.

  6   A.   "I will be in LV," which I understand to be Las Vegas,

  7   "next week visiting Joan and Jim Hammer, two very philanthropic

  8   people in LV to work with their second child, Taylor."

  9   Q.   And what does Mr. Powers say at the top?

 10   A.   He writes, "Gamal, prioritize meeting Rick.  You will

 11   thank me, WCP."

 12   Q.   And again, the date of this e-mail?

 13   A.   Is December 12, 2011.

 14        MR. FRANK:  2011.  Thank you.  Could we show the

 15   witness only Exhibit 315, please.

 16   Q.   Do you recognize this document?

 17   A.   Yes.

 18   Q.   What is it?

 19   A.   It's an e-mail between Gamal Aziz and Amal Felaya.

 20   Q.   What's the subject line?

 21   A.   "Senior retainer for Sabrina from Dr. Bedor."

 22   Q.   What's the date?

 23   A.   The date of May 21, 2017.

 24        MR. FRANK:  The government offers 315.

 25        THE COURT:  It will be admitted.
```

```
 1              (Exhibit 315 admitted into evidence.)

 2    Q.   And this is about six years after the e-mail we just

 3    looked at?

 4    A.   Approximately, yes.

 5              MR. FRANK:  Could we start at the bottom of the first

 6    page, please.  And Ms. Lewis, if you could highlight the

 7    signature block there at the bottom.

 8    Q.   Who is the bottom e-mail from?

 9    A.   Victor Urbach, CTO College Admission Central, LLC in New

01:07 10   York, New York.

11              MR. FRANK:  If we could go to that e-mail, the

12    introductory part there.  Thank you.

13    Q.   Do you see that that's an e-mail from Victor Urbach to

14    Amal Felaya?

15    A.   Yes.

16    Q.   Based on your review of these e-mails, who is Amal Felaya?

17    A.   I understand Amal to be Gamal Aziz's wife.

18    Q.   What is the date of this e-mail?

19    A.   May 31, 2017.

01:08 20   Q.   "Subject"?

21    A.   "Senior retainer for Sabrina."

22    Q.   Could you read just the introductory paragraph, please.

23    A.   "Sabrina's junior year retainer ends tomorrow, May 31, and

24    Dr. Bedor has set aside a senior retainer slot for her

25    beginning June 1."
```

```
 1   Q.   And can we go up to the top, you see it's been forwarded
 2   by Amal Felaya to Gamal Aziz?
 3   A.   Yes.
 4   Q.   What is Gamal Aziz's e-mail address in this e-mail?
 5   A.   Gamalaziz797@gmail.com.
 6   Q.   And in fact did you review other e-mails that were seized
 7   pursuant to a search warrant from that account?
 8   A.   I did, yes.
 9   Q.   And could you read that response of Mr. Aziz for the
10   record, please.
11   A.   "Don't you think it would be better to hire Rick at this
12   point?"
13        MR. FRANK:  Can we show the witness only Exhibit 323,
14   please.
15   Q.   So that was May 31 we just looked at?
16   A.   Yes.
17   Q.   Do you recognize this e-mail?
18   A.   Yes.
19   Q.   What does the "From" line say?
20   A.   "From Rickwsinger@gmail.com.
21   Q.   And what is the date?
22   A.   July 2, 2017.
23   Q.   And does it appear to have been sent to anyone?
24   A.   There's no "To" recipient.
25   Q.   Where did you find this e-mail?
```

01:09  (line 10)
01:09  (line 20)

1    A.   This e-mail was found in the e-mail search warrant returns

2    for Mr. Singer's e-mail.

3            MR. FRANK:   The government offers 323.

4            MR. KELLY:   We object to this.   There's no evidence

5    this went to Mr. Aziz.

6            MR. FRANK:   We're not suggesting it did, your Honor.

7            MR. KELLY:   You are suggesting it did.

8            THE COURT:   How is it relevant?

9            MR. FRANK:   It's directly relevant.   Mr. Aziz's

01:10 10   daughter is mentioned in it.   It's an email that was saved in

11    Rick Singer's e-mail account and note to himself.

12            MR. KELLY:   So this is another out-of-court statement.

13            THE COURT:   Well, I will take this de bene subject to

14    an argument out of the hearing of the jury.

15            MR. FRANK:   Can it be shown to the jurors, your Honor?

16            THE COURT:   Yes, it can, for the time being.

17    Q.   What is the -- the prior e-mail is May 31, 2017?

18    A.   Yes.

19    Q.   What is the date of this e-mail?

01:10 20   A.   July 2, 2017.

21    Q.   So a little over a month later?

22    A.   Yes.

23    Q.   What is the "Subject" line?

24    A.   "U.S.C. with Donna."

25    Q.   And do you see that there's a list of names and numbers?

```
 1   A.   Yes.

 2   Q.   Could you read the first four names, please, and numbers?

 3   A.   Matteo 300, Jordan Tuchan 250, Gino Palatella 500, Olivia

 4   Giannulli 250.

 5   Q.   And at the very bottom do you see a name?

 6   A.   I do.

 7   Q.   Could you read that for the record, please?

 8   A.   "Sabrina Aziz, Gamal daughter, Trojan transfer."

 9        MR. FRANK:  Could we show the witness only Exhibit

01:11 10   330, please.

11   Q.   Do you recognize this e-mail?

12   A.   Yes.

13   Q.   What is it?

14   A.   It's an e-mail from Gamal Aziz to Amal Felaya.

15   Q.   What's the date?

16   A.   July 17, 2017.

17   Q.   About two weeks later?

18   A.   Approximately, yes.

19        MR. FRANK:  The government offers 330.

01:11 20        THE COURT:  It will be admitted.

21        (Exhibit 330 admitted into evidence.)

22   Q.   And what is the -- if we go to the bottom e-mail in the

23   chain, who is that from?

24   A.   It's from Rick Singer.

25   Q.   And who is it to?
```

**A1268**

```
 1    A.    It's to Gamal Aziz.

 2    Q.    What is the subject?

 3    A.    "For me to complete U.S. athletic profile."

 4    Q.    Can you just read the categories that are listed?

 5    A.    "High school, cumulative unweighted and weighted GPA and

 6    test score, home address, e-mail, phone number, parents,

 7    birthdate, if they play the sport, position, club, accolades if

 8    they have them and action picture."

 9    Q.    What does it say next to "if they played a sport"?

01:12 10    A.    "Basketball."

11    Q.    And what does it say next to "club"?

12    A.    "Beijing Junior National Team."

13          MR. FRANK:  If we could just back out of the close-up.

14    Q.    Who is this e-mail forwarded by and who is it forwarded

15    to?

16    A.    It was forwarded from Gamal Aziz to Amal Felaya.

17    Q.    And which e-mail address was it forwarded from?

18    A.    The Gamalaziz797@gmail.com address.

19          MR. FRANK:  Can we show the witness only Exhibit 334,

01:13 20    please.

21    Q.    Do you recognize this document?

22    A.    Yes.

23    Q.    What is it?

24    A.    An e-mail from Gamal Aziz to Rick Singer.

25    Q.    What's the date?
```

```
 1   A.    July 27, 2017.

 2          MR. FRANK:  Government offers Exhibit 334.

 3          THE COURT:  It will be admitted.

 4          (Exhibit 334 admitted into evidence.)

 5   Q.    What's the subject?

 6   A.    "Sabrina."

 7   Q.    And if you could look at the first e-mail in the chain at

 8   the bottom, what does Mr. Singer write?

 9   A.    "Gamal, I need an action photo or two of Sabrina playing
01:14 10   basketball, transcript 9-11, senior classes, and PDF of test

11   scores ASAP."

12   Q.    And how does Mr. Aziz respond?

13   A.    "Got it."

14          MR. FRANK:  Could we look at Exhibit 338, please.

15   Q.    Who is that from?

16          MR. FRANK:  I'm sorry, this is for the witness only.

17   Your Honor, if we could just show the witness, we can flip

18   through Exhibits 338 --

19          THE COURT:  No.  We're going to need to break at this
01:14 20   point.  So you may step down for the time being, Mr. Brown.

21          As I said yesterday, you are not going to have an

22   afternoon session.  We went a little bit over time on our late

23   morning sessions, but we're going to have a session tomorrow

24   which will be also slightly abbreviated.  I'm not sure exactly

25   whether we'll be breaking at this time but we will be breaking
```

```
 1    at or before 3:00 tomorrow, so it will be a little bit of a
 2    shortened day.
 3            Again, you're reminded don't talk about the case to
 4    anybody.  It's going to sound like a broken record when I say
 5    this so many times, but it is important that you honor my
 6    instructions and not try to do any independent research, not
 7    try to talk anybody or allow them to talk to you, more
 8    importantly.
 9            So have a pleasant rest of the day.  I'll see you
01:15 10   tomorrow morning at 9:00 a.m.
11            (Jury exits the courtroom.)
12            THE COURT:  All right.  Be seated, counsel.
13    Approximately how much longer on direct of Mr. Brown?
14            MR. FRANK:  I would estimate a couple of hours, your
15    Honor.
16            THE COURT:  Couple of hours?
17            MR. FRANK:  I would estimate that, yes.
18            THE COURT:  And the cross, about the same?
19            MR. KENDALL:  Your Honor, I'll be doing -- excuse me.
01:16 20   I'll be doing the cross.  If a couple hours means two --
21            THE COURT:  Not Mr. Kelly at all?
22            MR. KELLY:  No.  I'll be doing my own, your Honor.
23            MR. KENDALL:  I'll be doing the first cross.  If he
24    thinks a couple of hours, that will be the minimum of what I'll
25    need perhaps.
```

```
 1              THE COURT:  Mr. Kelly?

 2              MR. KELLY:  Maybe an hour.

 3              THE COURT:  So he's likely to take all of tomorrow.

 4              MR. KELLY:  Yes, in my view.

 5              THE COURT:  And since we're talking about it, actually

 6    there will be no session Thursday, but we will have a session

 7    on Friday.  Who is likely to be the following witness?

 8              MR. FRANK:  Special Agent Keating, your Honor.

 9              THE COURT:  Keating.  And the approximate length of

01:17 10    direct?

11              MR. FRANK:  Close to three hours I would estimate.

12              THE COURT:  So it looks like the rest of the week is

13    taken up.  We know what's going to happen, right?

14              MR. KENDALL:  Will Friday be a full afternoon, your

15    Honor?

16              THE COURT:  I'm sorry?

17              MR. KENDALL:  Will Friday go to 3:30?

18              THE COURT:  We may be able to break a little early.

19    Why?  Do you have a problem?

01:17 20              MR. KENDALL:  No.  I just want to --

21              THE COURT:  We're going to have an afternoon session,

22    but we might end a little earlier on Friday.

23              MR. KENDALL:  At the Court's pleasure.

24              THE COURT:  All right.  Anything else that needs to

25    come to my attention before we adjourn for the end of the day?
```

```
 1              MR. FRANK:  There's one housekeeping matter.  We can

 2     bring it up now or tomorrow morning.  It concerns the timing of

 3     the deposition that your Honor --

 4              THE COURT:  What deposition is that?

 5              MR. FRANK:  Defense deposition of Mr. Haden.

 6              THE COURT:  I don't have a preference as to when it's

 7     taken.  It's up to counsel to take it at a time when it's

 8     appropriate.  And if it's going to be offered at the trial,

 9     certainly you're going to have to have daily copy so that

01:18 10     everybody will have copies of the transcript sooner rather than

11     later, but that's not an issue that I'm going to get involved

12     in.

13              MR. FRANK:  Yes, your Honor.  And he's in California,

14     so should I assume we're going to be doing this by Zoom?

15              MR. KENDALL:  Your Honor, I've discussed it with

16     Mr. Haden's attorney as recently as last night.  We would like

17     to do it by Zoom.  Mr. Haden may make some sort of arrangement.

18     It will probably be at his attorney's office.  I'm trying to

19     schedule with the government and Mr. Haden's counsel.  I'm

01:18 20     thinking maybe this Sunday.  If not this Sunday, it will be

21     sometime next week.  It was my hope to record the deposition

22     and then edit it to a shortened version and play that shorter

23     version to the jury.

24              THE COURT:  And obviously going over the redactions

25     with counsel.
```

        1           MR. KENDALL:  Of course.  I assume it will go both

        2    ways.  We'll work it out.

        3           THE COURT:  That's fine with the Court.

        4           MR. FRANK:  The issue for us is timing.  It's in the

        5    middle of our direct case, so we prefer to do the deposition

        6    later in the week or weekend.

        7           MR. KENDALL:  The problem is we need time to do just

        8    what you said, redact it, cut it down and edit it, get it

        9    physically prepared.

01:19  10           THE COURT:  Well, counsel, try to work that out

       11    overnight.  You've been working together now for two years.

       12    You should be able to resolve this issue.  If you can't, I'll

       13    resolve it, but I want you to work at it overnight, and we'll

       14    talk about it tomorrow.

       15           MR. KENDALL:  What may help us, your Honor, is there

       16    any afternoon next week you think we will not be sitting, if we

       17    break at 1:00?

       18           THE COURT:  That's a good question.  I'm hoping to,

       19    since we've sort of got a tradition here running four-day

01:20  20    weeks, our first week was four days, this week is four days,

       21    the week after next is four days already scheduled.  So I am

       22    hoping maybe to not have a session on a week from Friday, so

       23    that might be an appropriate time, a week from whatever the

       24    date is.

       25           THE CLERK:  24th.

1          THE COURT:  24th I would not have a session.

2          MR. KENDALL:  Okay.  We'll e-mail all of this, your

3     Honor.

4          THE COURT:  Okay.  I think that might be the best

5     time.  We're in recess until tomorrow morning at 9:00 a.m.

6          (Whereupon, the proceedings adjourned at 1:20 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Witness                              Page

BRUCE ISACKSON

Direct Examination by Mr. Frank        5

Cross-Examination by Mr. Kelly        10

Cross-Examination by Mr. Tomback      53

Redirect Examination by Mr. Frank    101

Recross Examination by Mr. Kelly     110


KEITH BROWN

Direct Examination by Mr. Frank      115

```
1                      E X H I B I T S

2

3    No.                          ADMIT

4    674    ....................      8

5    675    ....................      9

6    525    ....................    122

7    526    ....................    122

8    555    ....................    122

9    9      ....................    127

10   315    ....................    130

11   330    ....................    133

12   334    ....................    135

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**A1277**

```
 1

 2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 3


 4
     UNITED STATES OF AMERICA,        )
 5                      Plaintiff     )
                                      )
 6   vs.                              )  No. 1-19-CR-10080
                                      )
 7   GAMAL ABDELAZIZ and JOHN         )
     WILSON,                          )
 8                      Defendants.   )
                                      )
 9                                    )


10


11
                   BEFORE THE HONORABLE NATHANIEL M. GORTON
12                    UNITED STATES DISTRICT JUDGE
                         JURY TRIAL - DAY 6
13


14
                 John Joseph Moakley United States Courthouse
15                         Courtroom No. 4
                          One Courthouse Way
16                 Boston, Massachusetts 02210


17


18                        September 15, 2021
                             9:15 a.m.
19


20


21
                        Kristin M. Kelley, RPR, CRR
22                      Kelly Mortellite, RMR, CRR
                           Official Court Reporter
23             John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
24                    Boston, Massachusetts 02210
                       E-mail: kmob929@gmail.com
25
                 Mechanical Steno - Computer-Aided Transcript
```

```
 1   APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
1   APPEARANCES:

2

3           Andrew E. Tomback

4           McLaughlin & Stern, LLP

5           260 Madison Avenue

6           New York, NY 10016

7           917-301-1285

8           atomback@mclaughlinstern.com

9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  You may be seated.  Court is now in
 3    session.
 4            THE COURT:  Good morning, counsel.  Before we begin,
 5    overnight we had a motion filed by the defendants to exclude a
 6    taped conversation between Rick Singer and Marci Palatella.
 7    The government filed an opposition this morning.  I haven't had
 8    a chance to read it carefully.  I've skimmed it, but my
 9    question for both counsel is, isn't the issue whether or not
10    Mrs. Wilson is an unindicted coconspirator?
11            Mr. Frank.
12            MR. FRANK:  Yes, your Honor.  And she is an unindicted
13    coconspirator.
14            THE COURT:  And is that the grounds on which you
15    contend this tape is admissible?
16            MR. FRANK:  We do.  Marci Palatella is an indicted
17    coconspirator.  She'd pled guilty.  She's speaking with another
18    coconspirator, Rick Singer, about a third individual, an
19    unindicted coconspirator, Leslie Wilson.  So it is a classic
20    coconspirator statement relaying conversations among
21    coconspirators.
22            THE COURT:  Why doesn't this come in, Mr. Kendall,
23    subject to *Petruzziello*?
24            MR. KENDALL:  Your Honor, two things.  First, I
25    don't -- if we ask the government for what its proffer is to
```

1    prove, which is typically what you do in *Petruzziello*, or what

2    you can do in *Petruzziello* --

3        THE COURT:  Say that again.  I'm sorry.

4        MR. KENDALL:  If the government has made a proffer of

5    what they think shows her being a coconspirator -- so I think

6    the Court has enough information before it today to make that

7    decision with her in particular.  They say she forwarded some

8    photos, she did a couple things.  Nothing -- but to make her a

9    coconspirator, they have to show she has knowledge that

10   fraudulent information is being submitted to the school.  The

11   only thing they have in that that they claim is fraudulent

12   information is that sports profile of the son, you know, with

13   the water polo picture.  There's nothing, absolutely nothing,

14   to connect her to that sports profile.  Everything else she

15   does is just a mother supporting her kid's application.

16       THE COURT:  Wasn't this the subject of the in limine

17   motion when we were talking about the marital exclusion?

18       MR. KENDALL:  Yes, your Honor.  We did discuss it

19   earlier, and you did rule against us on that.  I think it's

20   more ripe now that we're in court.  And the government made a

21   huge concession in their opening.  They don't tie us to any

22   bribery.  They don't claim we knew about bribes to any people.

23   So they certainly are not claiming she knows about a bribe to

24   anybody.  So the whole thing hangs on this one issue, can they

25   tie her to the false USC sports profile.  I've not heard

1    Mr. Frank or the government make any allegations she knew about

2    that profile or that they have any evidence to tie her to that

3    profile.

4              THE COURT:  Mr. Frank.

5              MR. FRANK:  Your Honor, the Court has already found

6    that she's an unindicted coconspirator.  For purposes of the

7    marital privilege, we did make a proffer that she's on e-mails

8    specifically discussing the side door in those words.  She's

9    referring to it as "the side door."  She's referring to the

10   purchase of a spot.

11             THE COURT:  I'm sorry.  She's referring to?

12             MR. FRANK:  She's explicitly referring to the purchase

13   of a spot on the water polo team from Jovan Vavic.  She sends

14   the photos that are used on the profile, which ultimately was

15   falsified.  And what Mr. Kendall says about the government

16   having conceded that there was no bribery or that his client

17   was not aware of bribery is simply not true, your Honor.  Our

18   whole case is built on the fact that there was a false profile

19   and a bribe, and a payment to the program is a bribe.

20             THE COURT:  All right.  I'm going to deny the

21   defendants' motion and admit it subject to *Petruzziello*, of

22   course, as all the other coconspirator statements are subject

23   to.  So if there is not anything else, I will call the jury.

24             Call the jury.

25             MR. FRANK:  Your Honor, would it be helpful to the

**A1284**

1    Court to have a hard copy of the exhibits being introduced?

2          THE COURT:  Yes.  In other words, they're not in this

3    book?

4          MR. FRANK:  I don't know which book that is.  That's

5    our transcripts.  We also have hard copies of the exhibits.

6          THE COURT:  Yes.  It would be helpful.

7          (Jury enters.)

8          THE CLERK:  Thank you.  You may be seated.

9          THE COURT:  Good morning, jurors.  I just want to say

10   that we're starting a little late today, but when we start

11   late, it's not because we're idle.  We need to resolve issues

12   outside of your hearing and, actually, we're saving time.  So

13   some days or sometimes in the middle of testimony when we ask

14   you to recess so we can discuss matters of law it's so that we

15   can save time.  We're not wasting time.  Okay?

16         So we're ready to start again.

17         Mr. Brown, you're reminded that you remain under oath.

18         Mr. Frank, you may continue with direct examination.

19          MR. FRANK:  Thank you, Your Honor.

20          DIRECT EXAMINATION OF KEITH BROWN (Continued)

21   BY MR. FRANK:

22   Q.   Good morning again, Special Agent.

23   A.   Good morning.

24   Q.   Just give me one second to squeeze in here.

25          MR. FRANK:  Miss Lewis, if we could call up Exhibit

1    330 in evidence.  Unfortunately, it is now my monitor that is

2    not working.

3    Q.   Okay, Special Agent.  We took a look at Exhibit 330.  Just

4    to orient ourselves as to where we left off, Exhibit 330 was

5    the e-mail from Mr. Singer to Mr. Aziz, subject, "for me to

6    complete USC athletic profile".

7         Do you see that?

8    A.   Yes.

9    Q.   And who did Mr. Aziz forward Mr. Singer's e-mail to?

10   A.   He forwarded the message to Amal Felaya.

11   Q.   And, again, who is that?

12   A.   I believe that's his wife.

13   Q.   If you look at Exhibit 334 in evidence, and this is

14   updated July 17, 2017, and Exhibit 334 in evidence, what's the

15   date on this exhibit?

16   A.   July 27, 2017.

17   Q.   And this is where Mr. Singer says "Gamal, I need an action

18   photo or two of Sabrina playing basketball".

19         Do you see that?

20   A.   Yes.

21   Q.   And how does Mr. Aziz respond?

22   A.   "Got it".

23         MR. FRANK:  Okay.  Could we now look at exhibit -- for

24   the witness only, Exhibits 338 through 342, if we could just

25   scroll through those for the witness only.

```
 1              Do you recognize 338, Special Agent?

 2    A.    Yes.

 3    Q.    What is it?

 4    A.    An e-mail from Gamal Aziz to Rick Singer.

 5    Q.    Subject?

 6    A.    "Sabrina's action pictures on my iPhone".

 7    Q.    And if we could look at Exhibit 339, please?  Do you

 8    recognize this document?

 9    A.    Yes.

10    Q.    What is it?

11    A.    An e-mail from Gamal Aziz to Rick Singer.

12    Q.    Subject?

13    A.    "Sabrina".

14    Q.    E-mail 340, please.  What's this?

15    A.    An e-mail from Gamal Aziz to Rick Singer.

16    Q.    Subject?

17    A.    "Sabrina".

18    Q.    Thank you.  341, please.  What is this?

19    A.    Also an e-mail from Gamal Aziz to Rick Singer.

20    Q.    Subject?

21    A.    "Sabrina".

22    Q.    Thank you.  And 342, please.  What is this?

23    A.    Also an e-mail from Gamal Aziz to Rick Singer.

24    Q.    Subject?

25    A.    Also "Sabrina".
```

1   Q.   Thank you.

2        MR. FRANK:  The government offers Exhibits 338

3   through 342.

4        MR. KENDALL:  No objection.

5        THE COURT:  All of those exhibits are -- or all of

6   those e-mails are dated July 27, 2017?  Is that correct?

7        MR. FRANK:  Yes, your Honor.

8        THE COURT:  They'll be admitted.

9        (Exhibit 338, 339, 340, 341, 342 admitted into

10  evidence.)

11  Q.   Can we start with 338 in evidence, please.  Okay.  Special

12  Agent, again, refresh us what this is.

13  A.   An e-mail from Gamal Aziz to Rick Singer.

14  Q.   And it says "Sabrina's action pictures on my iPhone"?

15  A.   Yes.

16  Q.   Can we look at the attachment, please.

17       MR. FRANK:  Miss Lewis, if you could next to that

18  bring up 339 in evidence.

19  Q.   What is 339?

20  A.   An e-mail from Gamal Aziz to Rick Singer.

21  Q.   It also says "Subject: Sabrina"?

22  A.   Yes.

23  Q.   Can we look at the attachment on 339, please.

24       MR. FRANK:  And Miss Lewis, if you could take those

25  down and put up 340 and 341.

A1288

```
 1   Q.   If you could just take a look at the attachments.  What do
 2   those appear to be, Special Agent?
 3   A.   The image on the left appears to be a team photo of a
 4   women's basketball team and the photo on the right is a photo
 5   of young women playing basketball.
 6        MR. FRANK:  And if we could take those down and look
 7   at 342, please.
 8   Q.   You see again the subject is "Sabrina"?
 9   A.   Yes.
10   Q.   Can we look at the attachment?  What is this?
11   A.   A team photo of a women's basketball team.
12        MR. FRANK:  Can we show the witness only Exhibit 345,
13   please.
14   Q.   Do you recognize this document?
15   A.   Yes.
16   Q.   What is it?
17   A.   It is an e-mail from Rick Singer to Gamal Aziz.
18   Q.   What is the date?
19   A.   July 27, 2017.
20        MR. FRANK:  Government offers 345.
21        THE COURT:  It will be admitted.
22        (Exhibit 345 admitted into evidence.)
23   Q.   And what does Mr. Singer say to Mr. Aziz in this e-mail?
24        MR. FRANK:  Do the jurors have it on the screen?
25   Q.   Hold on just one second.
```

1           What does Mr. Singer say to Mr. Aziz in this e-mail?

2    A.    He writes, "we will use this one".

3    Q.    Okay.  And is there an indication on this e-mail of which

4    one he's referring to?

5    A.    Yes.

6    Q.    What is the number of the attachment to the prior e-mail?

7    A.    The attachment is DSC_0123.JPG

8           MR. FRANK:  Miss Lewis, if you could put this on the

9    right -- or on the left of the screen and call up Exhibit 340

10   on the right.

11   Q.    What is the attachment number for Exhibit 340?

12   A.    DSC_ 0123.JPG

13   Q.    And how do those attachment numbers compare?

14   A.    They're the same.

15          MR. FRANK:  Miss Lewis, if you could, on the right,

16   put up the attachment to Exhibit 340.

17   Q.    Again, what is that photograph on the right?

18   A.    It's an image of young women playing basketball.

19          MR. FRANK:  Could we show the witness only

20   Exhibit 352, please.

21   Q.    What is this, Special Agent?

22   A.    An e-mail from Rick Singer to Gamal Aziz.

23   Q.    What's the subject?

24   A.    "Sabrina".

25   Q.    What's the date?

1    A.    August 8, 2017.

2            MR. FRANK:  The government offers 352.

3            THE COURT:  It will be admitted.

4            (Exhibit 352 admitted into evidence.)

5    Q.    Special Agent --

6            MR. FRANK:  Miss Lewis, if you could just enlarge that

7    once more, please.

8    Q.    Could you read the e-mail into -- the top e-mail into the

9    record, please.

10   A.    "Gamal please answer below, profile for Sabrina... her

11   e-mail, phone, and parents' names need to be added in as I did

12   not have that.  Let me know if you want me to add any other

13   awards to her profile or if you think that is enough".

14   Q.    And if we could look at the e-mail that's being forwarded

15   below this one, do you see that there is that same text below

16   that you just read into the record?

17   A.    Yes.

18   Q.    And who is this forwarded message from?

19   A.    It's from Laura Janke.

20   Q.    Okay.  And can we take a look at the attachment to the

21   e-mail, please.  And Special Agent --

22           MR. FRANK:  If we could just Zoom in on the -- Miss

23   Lewis, on the top left.

24   Q.    What is the name on this profile?

25   A.    "Sabrina Abdelaziz".

1    Q.    What does it say below that?

2    A.    "Point guard".

3    Q.    And what does it list as her height?

4    A.    5 foot 8 inches.

5    Q.    Okay.  And if we could look at the resume portion below in

6    the box, could you read us the first couple entries under "Hong

7    Kong International School Basketball"?

8    A.    "Starting Point Guard, Team Captain, 48th Holiday

9    Basketball Tournament Champions, 2016 China Cup Champions, APAC

10   Basketball Finals".

11   Q.    Okay.  Thank you.  If we could look at the photograph,

12   please.

13        MR. FRANK:  And if you could, Miss Lewis, put that on

14   the right and put up the attachment to Exhibit 3 -- I believe

15   it's 340.

16   Q.    Special Agent, how do the photographs on the profile and

17   the photographs that Mr. Aziz sent Mr. Singer compare?

18   A.    The photograph on the profile appears to be a cropped

19   version of the image that Mr. Aziz sent.

20        MR. FRANK:  And in -- on the left, in Exhibit 340, the

21   e-mail that Mr. Aziz sent to Mr. Singer, could you just go to

22   the cover e-mail, please.

23   Q.    Special Agent, what is the subject of that e-mail?

24   A.    "Sabrina".

25   Q.    Okay.  Thank you.

1          MR. FRANK:  Miss Lewis, you can take down 340, and

2     just put up 352, please.  If we can go back to the cover

3     e-mail.

4     Q.   You see -- if we can just go to the heading, what is the

5     e-mail address to which Mr. Singer sent this e-mail?

6     A.   GamalAziz@cox.net.

7     Q.   And where did you obtain this e-mail?

8     A.   I received this e-mail in the gamalaziz797@gmail.com

9     e-mail returns.

10    Q.   So can you explain that?

11    A.   I cannot.

12    Q.   The e-mail was found in the search warrant returns for

13    GamalAziz797@gmail.com?

14    A.   It was.

15    Q.   Even though it was sent to gamalaziz@cox.net?

16    A.   Yes.

17    Q.   And are you familiar with auto-forwarding?

18    A.   Generally, yes.

19    Q.   And, generally speaking, what is auto-forwarding?

20         MR. KELLY:  Objection.  There's no evidence it was

21    auto-forwarded.

22         THE COURT:  He can explain what it is and, presumably,

23    you intend to tie this in, Mr. Frank?

24         MR. FRANK:  Your Honor, I can withdraw the question.

25    Q.   You found the e-mail in the Gmail search warrant returns?

```
 1   A.   Yes.

 2   Q.   Thank you.

 3        MR. FRANK:  Can we look at, for the witness only,

 4   Exhibit 363, please.

 5   Q.   Do you recognize this document?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.   An e-mail from Rick Singer to Donna Heinel.

 9   Q.   And what's the date?

10   A.   August 15, 2017.

11   Q.   What's the subject?

12   A.   "American but in China basketball player".

13        MR. FRANK:  Government offers 363.

14        THE COURT:  It will be admitted.

15        (Exhibit 363 admitted into evidence.)

16   Q.   What is the attachment?

17   A.   Sabrina Abdelaziz's profile.doc.

18   Q.   And can we take a look at the attachment, please.  Special

19   Agent, do you recognize this attachment?

20   A.   Yes.

21   Q.   How does it compare with the attachment to the e-mail to

22   Mr. Aziz that we just looked at?

23   A.   It appears to be the same with the exception of e-mail,

24   phone and parents' information added in the top left corner.

25   Q.   Could we look -- and what is the date on the cover e-mail,
```

```
 1   if we could look at that, please?

 2   A.   August 15, 2017.

 3        MR. FRANK:  Can we show the witness only Exhibit 362,

 4   please.

 5   Q.   Do you recognize this document?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.   An e-mail from Donna Heinel to Rick Singer.

 9   Q.   And what is the subject?

10   A.   "American but in China basketball player".

11        MR. FRANK:  Government offers 362.

12        THE COURT:  It will be admitted.

13        (Exhibit 362 admitted into evidence.)

14   Q.   Does this appear to be a response to Mr. Singer's e-mail

15   to Miss Heinel?

16   A.   It does.

17   Q.   And how does Miss Heinel respond?

18   A.   She wrote, "We will need a better picture".

19        MR. FRANK:  Can we show the witness only Exhibit 361,

20   please.

21   Q.   Do you recognize 361?

22   A.   Yes.

23   Q.   What is it?

24   A.   An e-mail from Laura Janke to Rick Singer.

25   Q.   And what is the date?
```

1    A.    August 16, 2017.

2              MR. FRANK:  Government offers 361.

3              THE COURT:  It will be admitted.

4              (Exhibit 361 admitted into evidence.)

5              MR. FRANK:  Miss Lewis, if you could just zoom out a

6    little bit and go down to the forwarded e-mail -- I'm sorry.

7    Go up a little bit and we're just going to zoom in on sort of

8    the top third of the page.  Perfect.  Thank you.

9    Q.    Special Agent, if you could just read for the record the

10   e-mail, the initial e-mail, on the bottom from Rick Singer on

11   August 15, 2017?

12   A.    "Donna sent back.  She needs a different picture for

13   Olivia and Sabrina.  I need to get an action photo for Gino

14   from mom".

15   Q.    And how does Miss Janke respond?

16   A.    "What kind of pictures does she want from them?"

17   Q.    And how does Mr. Singer respond?

18   A.    "For Sabrina clearer and Olivia different look than the

19   one we used".

20   Q.    And how does Miss Janke respond?

21   A.    "Yikes... you gave me the picture for Sabrina.  Do you

22   have a different one?"

23              MR. FRANK:  If we could put this on the right side of

24   the screen, Miss Lewis, please.  And if you could call up

25   Exhibit 323 in evidence on the left.  And can you -- exactly.

1    Thank you.

2    Q.    Exhibit 323 on the left, Special Agent, you introduced

3    that yesterday.  That was the Singer note "USC with Donna".  Do

4    you recall that?

5    A.    Yes.

6    Q.    Okay.  On the right --

7         MR. FRANK:  Miss Lewis, could you highlight the

8    reference to Olivia?  Could you highlight that e-mail actually?

9    Q.    Do you see there are three names in that e-mail?

10   A.    Yes.

11   Q.    What are the three names?

12   A.    Olivia, Sabrina, and Gino.

13   Q.    And do you see those three same names in the e-mail "USC

14   with Donna"?

15   A.    Yes.

16        MR. FRANK:  Miss Lewis, can you highlight those.  Can

17   you read those names from the USC with Donna e-mail for the

18   record, please.

19   A.    Gino Palatella, Olivia Giannulli, and Sabrina Aziz.

20   Q.    Thank you.

21        MR. FRANK:  Miss Lewis, you can take down 323 on the

22   left.  And if you can put Exhibit 361 back up.  Thank you.  And

23   if we could look at the bottom half of the chain now -- no.

24   Starting -- exactly, at the bottom half of that page.

25   Q.    And in the middle of the page, you see there is a

1    forwarded -- Mr. Singer has forwarded a message to Miss Janke?

2    A.    Yes.

3    Q.    And can you read that message, please?

4          MR. FRANK:  Miss Lewis, if you could highlight that.

5    Thank you.

6    A.    He wrote, "Did you do Matteo Sloane, Italian water polo

7    player that attends Buckley?"

8    Q.    And how did Miss Janke respond?

9    A.    "No.  I didn't have anything on him.  I will get it done".

10   Q.    And do you see that he has forwarded a message to

11   Miss Janke from another individual?

12   A.    Yes.

13   Q.    And who is that individual?

14   A.    Devin Sloane.

15   Q.    And what is the subject line of the e-mail that came

16   forwarded from Devin Sloane?

17   A.    "For me to complete USC athletic profile".

18         MR. FRANK:  And if we could go to the next page of

19   this exhibit, please.  Can you start -- thank you.

20   Q.    What is -- can you just read for the record the e-mail

21   that Mr. Singer sent Mr. Sloane?

22   A.    "High school - The Buckley School, cumulative unweighted

23   and weighted GPA and test score, (SAT or ACT and subject tests

24   if available), home address, e-mail, phone number, parents,

25   birthday, if they play the sport - water polo, position -

```
 1    perimeter player, Club LA Water Polo, Italian Junior National
 2    Team, accolades if they have them, action picture".
 3            MR. FRANK:  And if we can put that on the right and
 4    put Exhibit 330 in evidence on the left, please.
 5    Q.   You see Exhibit 330 on the left in evidence is an e-mail
 6    that Mr. Singer sent to Mr. Aziz?
 7    A.   Yes.
 8    Q.   And it's Exhibit 361 on the right is the e-mail he sent to
 9    Mr. Sloane?
10    A.   Yes.
11    Q.   How did the two lists of items to complete the USC
12    athletic profile compare?
13    A.   The information requested appears to be the same.
14    Q.   And what is the date of the e-mail to Mr. Aziz?
15    A.   July 16, 2017.
16    Q.   And what is the date of the e-mail to Mr. Sloane?
17    A.   Also July 16, 2017.
18            MR. FRANK:  Thank you.  You can take that down.
19    Miss Lewis, can we put 371 for the witness only, please.
20    Q.   What is 371?
21    A.   An e-mail from Rick Singer to Donna Heinel.
22    Q.   What's the date?
23    A.   August 18, 2017.
24            MR. FRANK:  Government offers 371.
25            THE COURT:  It will be admitted.
```

```
 1              (Exhibit 371 admitted into evidence.)

 2   Q.   And if we could start on the bottom e-mail, what does

 3   Miss Heinel write to Mr. Singer on August 18, 2017?

 4   A.   "Matteo Sloane bio".

 5   Q.   And do you recognize the name Matteo Sloane from the last

 6   e-mail?

 7   A.   I do, yes.

 8   Q.   And can we look at the response from Mr. Singer.  What

 9   does Mr. Singer say in response?

10   A.   "Will forward this weekend.  Sabrina's pictures I got from

11   school and dad in Hong Kong are not closer than what I provided

12   already.  What should I do?  Also have a pole vaulter real good

13   grades and scores forwarding today - Tommy Kimmel from Bishops

14   in SD", San Diego.

15   Q.   Thank you.

16           MR. FRANK:  Can we look at Exhibit 372 for the witness

17   only, please.

18   Q.   Do you recognize this document?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's an e-mail from Rick Singer to Donna Heinel.

22   Q.   What's the date?

23   A.   August 28, 2017.

24           MR. FRANK:  The government offers --

25           MR. KELLY:  Your Honor, to the extent we haven't
```

1  already with our continued objection, we continue to object on

2  confrontation clause grounds and 403 grounds.

3            THE COURT:  All right.  That's noted.

4            MR. FRANK:  Government offers 372.  Is that admitted,

5  your Honor?

6            THE COURT:  Yes.  372 is admitted.

7            MR. FRANK:  Thank you.

8            (Exhibit 372 admitted into evidence.)

9  Q.    Special Agent --

10           MR. FRANK:  Miss Lewis, if we could enlarge the bottom

11 e-mail.

12 Q.    Who is this e-mail from?

13 A.    Donna Heinel.

14 Q.    And I'm sorry, before we look at the e-mail, can we look

15 at the caption of the e-mail.  What is the subject of the

16 e-mail exchange?

17 A.    "These are the athletes I have from you".

18 Q.    Thank you.  And what does -- can we now look back at

19 Miss Heinel's e-mail.  Special Agent, what is the list on the

20 left?

21 A.    It's a list of names.

22 Q.    And then if you could look at the third column, what is

23 that a list of?

24 A.    A list of college sports.

25 Q.    Okay.

```
 1            MR. FRANK:  And if we could put that up on the right
 2   and put Exhibit 323 in evidence on the left.
 3   Q.    Do you see the name "Olivia Giannulli" on the right?
 4   A.    Yes.
 5   Q.    What is the sport?
 6   A.    "Rowing".
 7   Q.    Do you see the name "Olivia Giannulli" on the left?
 8   A.    Yes.
 9   Q.    What's the amount listed next to it?
10   A.    250.
11   Q.    And if we could go down, do you see the name "Matteo
12   Sloane" on the right?
13   A.    Yes.
14   Q.    What is the sport?
15   A.    "MWP", which I believe refers to men's water polo.
16   Q.    And do you see the name "Matteo" on the left?
17   A.    Yes.
18   Q.    Do you see the name "Gino Palatella" on the list
19   Miss Heinel sent Mr. Singer?
20   A.    Yes.
21   Q.    What is the sport?
22   A.    "MFB", which I believe refers to men's football.
23   Q.    And do you see the name "Gino Palatella" on the left?
24   A.    Yes.
25   Q.    And what's the number Mr. Singer has next to it?
```

```
 1    A.    500.

 2    Q.    And do you see the name "Sabrina Abdelaziz" on the right?

 3    A.    Yes.

 4    Q.    And what is the sport next to it?

 5    A.    "WBSK", which I believe is an abbreviation for women's

 6    basketball.

 7    Q.    And do you see the name "Sabrina Abdelaziz" on the left?

 8    A.    Yes.

 9    Q.    What does it say next to it?

10    A.    "Sabrina Aziz - Gamal daughter - Trojan transfer".

11    Q.    Thank you.

12          MR. FRANK:  Could we look at 376 for the witness only,

13    please.

14    Q.    Do you recognize this document?

15    A.    Yes.

16    Q.    What is it?

17    A.    An e-mail from Gamal Aziz to Rick Singer.

18    Q.    What is the date?

19    A.    August 31, 2017.

20          MR. FRANK:  Government offers 376.

21          THE COURT:  It will be admitted.

22          (Exhibit 376 admitted into evidence.)

23    Q.    If you could look at the bottom e-mail in the chain, what

24    does Mr. Aziz write to Mr. Singer?

25    A.    "Rick, any update?  Sabrina is getting a recommendation
```

```
 1   letter from the director of the summer program at USC where she

 2   went for the last two summers and I want to make sure that any

 3   contact with USC is through you.  Please call when you can".

 4   Q.   How does Mr. Singer respond to the inquiry about the

 5   letter of reference from someone at USC?

 6   A.   "It has zero impact for me and my process.  We can add

 7   that person to her other recommenders on the common app if she

 8   wants".

 9   Q.   And how does Mr. Aziz respond?

10   A.   "Ok".

11        MR. FRANK:  Can we look at 381 for the witness only,

12   please.

13   Q.   Do you recognize this document?

14   A.   Yes.

15   Q.   What is it?

16   A.   An e-mail from Donna Heinel to Katie Fuller.

17   Q.   And what is the date?

18   A.   October 3, 2017.

19        MR. KELLY:  Same objection as before, your Honor.

20        THE COURT:  Who is Miss Fuller?

21   Q.   Special Agent, have you seen the name Katie Fuller before?

22   A.   Yes.

23   Q.   And where did you see that name?

24   A.   In a USC e-mail production.

25   Q.   And who is Miss Fuller?
```

1    A.    Based on a limited review, she appears to be an employee

2    of USC.

3    Q.    Does she have a USC e-mail address?

4    A.    She does.

5          MR. FRANK:  Government offers 381.

6          MR. KELLY:  We still object on confrontation grounds.

7    We understand they're not offering them as witnesses either.

8          THE COURT:  It will be admitted.

9          (Exhibit 381 admitted into evidence.)

10   Q.    What is the e-mail that Miss Heinel sends to her colleague

11   Miss Fuller on October 3, 2017?  What does the attachment say?

12   A.    "Sabrina Abdelaziz profile.doc".

13   Q.    And while we're on this e-mail, what is Miss Heinel's

14   title?

15   A.    "Senior Athletic Director, SWA" --

16   Q.    Senior Associate Athletic Director?

17   A.    Yeah.  "Senior Associate Athletic Director, SWA,

18   University of Southern California".

19   Q.    And again, the date is October 3, 2017?

20   A.    Yes.

21   Q.    Okay.  Can we look at the attachment Miss Heinel sent to

22   Miss Fuller.

23         MR. FRANK:  Now, Miss Lewis, if you could put this

24   attachment on the right of the screen, please, and put

25   Exhibit 363 in evidence on the left.  If we could just go to

1    the e-mail first.

2    Q.    Just to refresh us, Special Agent, the e-mail on the left

3    from Rick Singer to Donna Heinel, what's the date on that?

4    A.    August 15, 2017.

5    Q.    What is the attachment?

6    A.    "SabrinaAbdelazizprofile.doc".

7         MR. FRANK:  And now could we look at the attachment.

8    And Miss Lewis, if you could zoom in.

9    Q.    Do they appear generally the same, Special Agent?

10   A.    With a few exceptions, yes.

11   Q.    And if we could look at the top left, what is the height

12   listed for Sabrina Abdelaziz on the profile Mr. Singer sent to

13   Miss Heinel?

14   A.    5 foot, 8 inches.

15   Q.    What is the height listed for Miss Abdelaziz on the

16   profile Miss Heinel sent to her colleague?

17   A.    5 foot, 10 inches.

18   Q.    If we could zoom out, do you see there's a photograph on

19   the left in the profile Mr. Singer sent to Miss Heinel?

20   A.    Yes.

21   Q.    Can we zoom in on the photo on the right, please.  Is that

22   the same photo that's on the Sabrina Abdelaziz profile that

23   Miss Heinel sent to her colleague at USC?

24   A.    No.

25   Q.    Do those appear to be even the same individual?

```
 1   A.   No.

 2        MR. FRANK:  If we can zoom out, please.  You can take

 3   out 363 on the left.  Thank you.  And just to refresh on 381 --

 4   Miss Lewis, I'm sorry.  If you could just go back to the cover

 5   e-mail.

 6   Q.   What is the date that Miss Heinel sent this to her

 7   colleague?

 8   A.   October 3, 2017.

 9        MR. FRANK:  Could we show the witness only 387,

10   please.

11   Q.   Do you recognize this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   An e-mail from Donna Heinel to Rick Singer.

15   Q.   And what is the date?

16   A.   October 10, 2017.

17   Q.   And how long is October 10th after October 3rd?

18   A.   Approximately a week.

19        MR. FRANK:  Government offers 387.

20        MR. KELLY:  Same objection, confrontation clause.

21        THE COURT:  It will be admitted.

22        (Exhibit 387 admitted into evidence.)

23   Q.   And what is the attachment name of the attachment that

24   Miss Heinel sends to Mr. Singer on October 10, 2017?

25   A.   "SAbdelaziz.PDF".
```

**A1307**

1   Q.   Can we look at the attachment, please.  What is the date

2   of this letter?

3   A.   October 9, 2017.

4   Q.   Could you read the introduction, please.

5   A.   "Dear Sabrina, congratulations!  I am pleased to inform

6   you that the Admission Committee, after careful review of your

7   credentials, has approved your admission to the University of

8   Southern California for the Fall 2018 semester.  Your records

9   indicate that you have the potential to make a significant

10   contribution to the intercollegiate athletic program, as well

11   as to the academic life of the university.  I can assure you

12   that the faculty and staff will do all that we can to support

13   you in achieving your goals as a student athlete at USC".

14   Q.   And could you read the next two sentences, please.

15   A.   "Please be advised that this letter of acceptance is based

16   upon a preliminary review of your academic records.  In order

17   to validate this acceptance, you must."

18   Q.   And could you read Item 1, please.

19   A.   "Complete in full an Undergraduate Application by

20   January 15, 2018".

21   Q.   Could you read Item 3, please.

22   A.   "Register with the NCAA Eligibility Center".

23   Q.   Okay.  And then what does it say below those items?

24   A.   "If these conditions are not met, your approval will be

25   revoked".

1    Q.    And the final paragraph, please.

2    A.    "On behalf of the University, I would like to express our

3    pleasure with your commitment to USC.  We are delighted to

4    welcome you to our community of scholars and to our athletic

5    program.  We look forward to seeing you on campus next year".

6    Q.    And who is it signed by?

7    A.    Timothy Brunold, the Dean of Admission.

8    Q.    And again, the date of this letter, Special Agent?

9    A.    Dated October 9, 2017.

10          MR. FRANK:  Could we look for the witness only

11   Exhibit 427, please.  I'm sorry.  Before we look at 427, can we

12   look at 390.  I skipped one on accident.

13   Q.    Do you recognize 390?

14   A.    Yes.

15   Q.    What is 390?

16   A.    An e-mail from Rick Singer to Gamal Abdelaziz.

17   Q.    And what's the date?

18   A.    October 10, 2017.

19   Q.    What's the subject?

20   A.    "S Abdelaziz copy.PDF".  Oh, I'm sorry.  "FWD: USC

21   letter".

22   Q.    The attachment is "S Abdelaziz copy.PDF"?

23   A.    Yes.

24          MR. FRANK:  Government offers 390.

25          THE COURT:  It will be admitted.

1          MR. FRANK:  And can we look at the attachment, please.

2          (Exhibit 390 admitted into evidence.)

3   Q.    How does the attachment Mr. Singer sent to Mr. Abdelaziz

4   on October 10th compare to the attachment you just read in the

5   e-mail from Miss Heinel to Mr. Singer?

6   A.    It appears to be the same letter.

7   Q.    And if we could look back at the cover e-mail, what is the

8   e-mail address that Mr. Singer sent this to?

9   A.    GamalAziz797@gmail.com.

10  Q.    And how does that e-mail address compare to the e-mail

11  account where you found Sabrina Abdelaziz's profile that

12  Mr. Singer sent?

13  A.    I'm sorry.  I don't understand the question.

14  Q.    Mr. Singer -- you introduced into evidence an exhibit in

15  which Mr. Singer sent Mr. Aziz a profile of Sabrina?

16  A.    Yes.

17  Q.    How does this e-mail address compare to the account where

18  you found that profile?

19  A.    This is the same account where I found the profile.

20  Q.    Thank you.

21          MR. FRANK:  Could we now look, for the witness only,

22  at Exhibit 427, please.

23  Q.    Do you recognize this document?

24  A.    Yes.

25  Q.    What is it?

1   A.    An e-mail from Gamal Aziz to Gary Keung.

2   Q.    And again, what is the e-mail address from which Mr. Aziz

3   sent this e-mail?

4   A.    GamalAziz797@gmail.com.

5   Q.    What is the date of this e-mail?

6   A.    November 29, 2017.

7         MR. FRANK:  Government offers 427.

8         THE COURT:  It will be admitted.

9         (Exhibit 427 admitted into evidence.)

10        MR. FRANK:  And if we could look at the e-mail, the

11  second half of the page, Miss Lewis, "Dear Mr. and

12  Mrs. Abdelaziz."

13  Q.    Could you read the first half of that e-mail, please.

14  A.    "Dear Mr. and Mrs. Abdelaziz, I just want to bring to your

15  attention of the application deadlines for USC and the pros and

16  cons that I have discussed with Sabrina.  As those who are

17  applying to the school may know, USC has a December 1st

18  deadline that is said to be for merit scholarship consideration

19  and programs in cinematic arts and architecture, as well as a

20  regular deadline on January 15th.  With that said, while the

21  December 1st deadline is not stated to give any edge/priority

22  in admissions, I have discussed with other counselors and would

23  like to list out the potential pros and cons to submitting the

24  application earlier."

25        MR. FRANK:  And Miss Lewis, if you could take us down

1    to the second page and the signature block.

2    Q.    How does Mr. Keung identify himself?

3    A.    His title is Admissions Consultant for The Edge Learning

4    Center in Causeway Bay, Hong Kong.

5         MR. FRANK:  Miss Lewis, if you could take us to the

6    top of the e-mail chain to Mr. Aziz's response.

7    Q.    How does Mr. Aziz respond to Mr. Keung's e-mail concerning

8    the application deadlines for USC?

9    A.    "Dear Gary, thank you so much for your extraordinary help

10   and support for Sabrina, we're going to pass on applying in

11   December.  Very best, Gamal".

12        MR. FRANK:  Can we show the witness only Exhibit 467,

13   please.

14   Q.    Do you recognize this document?

15   A.    Yes.

16   Q.    What is it?

17   A.    An e-mail from Rick Singer to Melissa Rail.

18   Q.    What's the date?

19   A.    January 26, 2018.

20   Q.    And Melissa Rail, what is her e-mail address?

21   A.    Melissa.Rail@TheKeyWorldwide.com.

22   Q.    And what's the subject?

23   A.    "Foundation billing".

24        MR. FRANK:  Government offers 467.

25        THE COURT:  It will be admitted.

1          (Exhibit 467 admitted into evidence.)

2    Q.    Special Agent, if we could look at the e-mail on the

3    bottom half from Miss Rail to Mr. Singer.  Could you read the

4    introduction, please.

5    A.    "Hi Rick, I have drafted all of the Foundation billing.

6    Could you please review the list below and let me know of any

7    changes prior to me sending them out?"

8    Q.    And do you see an entry for Tommy Kimmel?

9    A.    Yes.

10   Q.    What's the amount next to it?

11   A.    $200,000.

12   Q.    Do you see an entry for Olivia Giannulli?

13   A.    Yes.

14   Q.    What's the amount next to it?

15   A.    $200,000.

16   Q.    And then there's a note?

17   A.    "Please note that we billed them $200,000 in April 2017

18   and they paid it".

19   Q.    You see Gino Palatella?

20   A.    Yes.

21   Q.    Is there an amount?

22   A.    $400,000.

23   Q.    Is there a note?

24   A.    "We previously billed them for $75,000 in March 2017 and

25   they paid it".

1   Q.   And do you see an entry for Matteo Sloane?

2   A.   Yes.

3   Q.   And is there an amount?

4   A.   $200,000.

5   Q.   And do you see there's a heading "other billing you said

6   to hold"?

7   A.   Yes.

8   Q.   And what's the first name under that?

9   A.   Sabrina Aziz.

10  Q.   And what's it say?

11  A.   "Got acceptance.  Waiting for next steps from USC".

12  Q.   If we could go to the top e-mail.  Do you see Mr. Singer's

13  response?

14  A.   Yes.

15  Q.   I want to direct your attention to the second sentence.

16  There's an entry for Olivia?

17  A.   Yes.

18  Q.   What does it say?

19  A.   "Olivia.  They paid 50 to USC already, bill 200 last year

20  was for the first daughter Bella".

21  Q.   There's an entry for Gino?

22  A.   Yes.

23  Q.   What does that say?

24  A.   "Gino's 75 was for testing - bill 400 as 100 of 500

25  already paid to USC".

**A1314**

```
 1    Q.    And do you see there's an entry for someone named Audrey
 2    Isackson?
 3    A.    Yes.
 4    Q.    And what does it say next to that?
 5    A.    "Bill 250 for USC".
 6          MR. FRANK:  Could we show the witness only
 7    Exhibit 478, please.
 8    Q.    Do you recognize this document?
 9    A.    Yes.
10    Q.    What is it?
11    A.    An e-mail from Melissa Rail to Gamal Aziz.
12    Q.    And what's the e-mail address to which she sends this
13    e-mail?
14    A.    GamalAziz797@gmail.com.
15    Q.    And what's the date?
16    A.    March 16, 2018.
17    Q.    And what is the subject?
18    A.    "Invoice 1174 from The Key Worldwide Foundation".
19          MR. FRANK:  Government offers 478.
20          THE COURT:  It will be admitted.
21          (Exhibit 478 admitted into evidence.)
22    Q.    Could you read the e-mail for the record, please.
23    A.    "Dear Gamal, thank you for your generous donation.  Our
24    courtesy invoice is attached hereto and contains wire
25    information".
```

1  Q.  And if we would look at the attachment, who is the invoice

2  from?

3  A.  The Key Worldwide Foundation.

4  Q.  Who is it sent to?

5  A.  Gamal Aziz.

6      MR. FRANK:  And Miss Lewis, if you could highlight the

7  description and the amount.  Thank you.

8  Q.  What does it say under "description"?

9  A.  "Private contribution - letter of receipt will be provided

10 upon payment, $300,000."

11 Q.  I'm sorry?

12 A.  The amount is $300,000.

13     MR. FRANK:  If we could show the witness only

14 Exhibit 505, please.

15 Q.  Do you recognize this document?

16 A.  Yes.

17 Q.  What is it?

18 A.  An e-mail from Melissa Rail to Gamal Aziz.

19 Q.  And what is the e-mail address?

20 A.  GamalAziz797@gmail.com.

21 Q.  What's the subject?

22 A.  "Receipt letter".

23 Q.  And what is the date?

24 A.  April 6, 2018.

25     MR. FRANK:  Government offers 505.

1          THE COURT:  It will be admitted.

2          (Exhibit 505 admitted into evidence.)

3          MR. FRANK:  If we could just expand that out just for

4   a moment.

5   Q.   Do you see at the bottom there's that e-mail you just read

6   a moment ago from Miss Rail to Mr. Aziz, "thank you for your

7   generous donation"?

8   A.   Yes.

9   Q.   And just up above that do you see that Mr. Aziz has

10  responded?

11  A.   Yes.

12  Q.   What did he say?

13  A.   "Wire sent today, thank you Melissa".

14  Q.   What e-mail address did he send that from?

15  A.   The GamalAziz797@gmail.com address.

16  Q.   And how does that compare with the account where you found

17  the Sabrina Abdelaziz profile that Mr. Singer sent Mr. Aziz?

18  A.   It's the same.

19          MR. FRANK:  Could we look at the attachment, please.

20  Q.   What's the letterhead say?

21  A.   "The Key Worldwide Foundation".

22  Q.   And can you read the introductory paragraph, please?

23  A.   "Thank you for your contribution of $300,000 to the Key

24  Worldwide Foundation.  Your generosity will allow us to move

25  forward with our plans to provide educational and

1    self-enrichment programs to disadvantaged youth.  We are very

2    excited about the impact that these programs will have in the

3    communities in which we will engage".

4    Q.    And what does the second paragraph say?

5    A.    "This letter shall serve as formal acknowledgment of your

6    contributions for which no goods or services were exchanged".

7    Q.    And who is the letter signed by?

8    A.    Rick Singer.

9          MR. FRANK:  Thank you.  Miss Lewis, you can take that

10   down.  Special -- give me one second.

11          If I could just have one minute, your Honor.

12          THE COURT:  Yes.

13          MR. FRANK:  Can we take a look at Exhibit 352 in

14   evidence, please.

15   Q.    And again, Special Agent, what is 352?

16   A.    An e-mail from Rick Singer to Gamal Aziz.

17   Q.    And this was sent to which e-mail address?

18   A.    The cox.net e-mail address.

19          MR. FRANK:  Could we show the witness only 415,

20   please.

21   Q.    And do you recognize this to be an e-mail from Mr. Aziz?

22   A.    Yes.

23   Q.    And who is it to?

24   A.    Mikaela Sanford.

25   Q.    And what is the date?

**A1318**

1   A.   November 3, 2017.

2   Q.   What is the subject?

3   A.   "USC letter".

4   Q.   And what is the attachment?

5   A.   "S Abdelaziz copy.PDF".

6        MR. FRANK:  The government offers 415.

7        THE COURT:  It will be admitted.

8        (Exhibit 415 admitted into evidence.)

9        MR. FRANK:  And if we can just look at the attachment,

10  please.

11  Q.   Do you recognize this attachment?

12  A.   Yes.

13  Q.   What is it?

14  A.   It appears to be the same October 9th letter of acceptance

15  from USC.

16  Q.   Okay.  And if we could look at the e-mail, do you see

17  there is a forwarded message?

18  A.   Yes.

19  Q.   And who is that forwarded message from?

20  A.   The forwarded message is from Rick Singer.

21  Q.   And who is it to?

22  A.   It's to Gamal Aziz.

23  Q.   And what address is it sent to?

24  A.   The GamalAziz@cox.net e-mail address.

25  Q.   Do you recall a moment ago I asked you and then withdrew a

1    question about auto-forwarding?

2    A.    Yes.

3    Q.    Can we look at the response from Mr. Aziz.  What e-mail

4    address does Mr. Aziz respond from?

5    A.    The GamalalAziz797@Gmail account.

6    Q.    Okay.  And if you could read the e-mail for the record,

7    please.

8    A.    "Mikaela, my name is Gamal Aziz, I've been working with

9    Rick on my daughter Sabrina's college admission.  Rick asked

10   that we work with you to complete USC's application to make

11   sure it meets the exact requirements below.  We currently live

12   in Hong Kong so there's a time difference of 16 hours, please

13   let me know your availability and your preferred method of

14   communication.  Sabrina and I can be available for a call on

15   your Monday 5:00 PM if that works for you.  Very best, Gamal".

16          MR. FRANK:  If we could take that down, please.

17   Q.    Special Agent, as part of your preparation for testifying

18   today, did you have an opportunity to review an extraction of

19   an image of a cellular phone?

20   A.    Yes.

21   Q.    What is an extraction?

22   A.    An extraction is basically an export of the contents of a

23   phone that's copied by law enforcement that's what's referred

24   to as the image.

25   Q.    And whose phone did you review?

1    A.    I reviewed an extraction of Rick Singer's phone.

2    Q.    And what was the date of the extraction?

3    A.    The extraction was conducted on October 5, 2018.

4    Q.    In front of you there are several discs labeled Exhibit

5    396, 439, and 508.  Do you see those?

6    A.    Yes.

7    Q.    Have you previously had an opportunity to review those

8    exhibits?

9    A.    Yes.

10   Q.    What are they?

11   A.    They are voicemails that were obtained through the

12   extraction of Mr. Singer's phone on October 5.  They're

13   voicemails from Donna Heinel to Rick Singer.

14         MR. FRANK:  Government offers 396, 439, and 508.

15         MR. KELLY:  Same objection as before.

16         MR. KENDALL:  Same as before, your Honor.

17         THE COURT:  All right.  They will be admitted over the

18   defendants' objections.

19         (Exhibits 369, 439, 508 admitted into evidence.)

20         MR. FRANK:  Could we look at Exhibit 387 in evidence,

21   please.

22   Q.    And again, Special Agent, this is the e-mail we introduced

23   a few moments ago from Donna Heinel to Rick Singer, forwarding

24   that -- attaching that letter of acceptance.

25   A.    Yes.

1  Q.   Do you recall that?  And what is the date of this letter?

2  A.   October 10, 2017.

3  Q.   And if we could now turn to the tab marked 396 in your

4  binder.

5       MR. FRANK:  And the jurors have this in their

6  transcript binders as well, 396.

7       Miss Lewis, can you leave 387 up on the screen, or is

8  that not possible?

9       (Discussion off the record.)

10 Q.   Okay.  Special Agent, again, what is the date of

11 Exhibit 387, the e-mail from Donna Heinel to Rick Singer?

12 A.   October 10, 2017.

13 Q.   And what is the date of this voicemail in Exhibit 396?

14 A.   The voicemail is October 19, 2017.

15 Q.   So it's nine days later?

16 A.   Yes.

17 Q.   Can we play Exhibit 396, please.

18       (Audio recording played.)

19 Q.   Special Agent, if I could direct your attention to line 11

20 of the transcript.  Who does Miss Heinel tell Mr. Singer to

21 have the clients make the checks out to?

22 A.   She instructs him to make the checks out to Women's

23 Athletic Board.

24 Q.   And who does she instruct him to have the checks sent to,

25 at the end of line 12?

1    A.    And send those to her.

2    Q.    And if I could direct your attention to line 15.  At

3    line 14, she says "Then we'll talk about Sabrina since that's a

4    larger amount of money and how we can structure that one".

5    A.    Yes.

6    Q.    Special Agent, you are assigned to which squad at the FBI?

7    A.    Corporate and Securities Fraud Squad.

8    Q.    And in your experience investigating corporate and

9    securities fraud, are you familiar with the term "structure"?

10   A.    Yes.

11        MR. KELLY:  Objection, your Honor.  Objection.  He's

12   not charged with any obstruction count or money laundering

13   count.  He's not charged with that.

14        THE COURT:  I don't know what the question is.

15   Q.    Are you familiar with the context of a financial

16   transaction, what it means, the structure of a transaction?

17        MR. KELLY:  Objection.  Grounds.  He's not charged

18   with any.

19        THE COURT:  Mr. Frank, what's the relevance?

20        MR. FRANK:  I'm not suggesting the term in a legal

21   term of art.  I'm suggesting the --

22        THE COURT:  He can have it.

23   Q.    What does it mean to "structure" a financial transaction?

24   A.    Structuring generally means to break a larger transaction

25   up into smaller transactions for the purpose of evading

1    compliance, scrutiny, law enforcement scrutiny.

2    Q.   So it's breaking the larger transactions into smaller

3    transactions?

4    A.   Yes.

5         MR. FRANK:  Could we look at Exhibit 439 in evidence,

6    please.  That's at Tab 439 in the transcript binder.

7    Q.   Special Agent, what is the date of this voicemail?

8    A.   December 4, 2017.

9    Q.   And who is this voicemail from?

10   A.   It's also from Donna Heinel.

11   Q.   And this was also on Rick Singer's phone?

12   A.   Yes.

13        MR. FRANK:  Could we play 439, please.

14        (Audio recording played.)

15   Q.   Special Agent, if I could now direct your attention to

16   Exhibit 508 in the transcript -- 508 in the transcript binder.

17   Does everyone have 508?  Special Agent, what is the date of the

18   voicemail at 508?

19   A.   It's dated April 12, 2018.

20   Q.   So that's about 5 months after the last voicemail?

21   A.   Yes, approximately.

22   Q.   And who is this voicemail from?

23   A.   It's also from Donna Heinel.

24        MR. FRANK:  Could we play 508, please.

25        (Audio recording played.)

1          MR. FRANK:  Could we show the witness only

2     Exhibit 701, please.

3     Q.   Do you recognize this document?

4     A.   Yes.

5     Q.   What is it?

6     A.   An e-mail from Rick Singer to Devin Sloane.

7     Q.   What's the date?

8     A.   April 1, 2018.

9     Q.   What's the subject?

10    A.   "Hope all's well".

11         MR. FRANK:  Government offers 701.

12         MR. KELLY:  Same objection, your Honor.

13         THE COURT:  It will be admitted.

14         (Exhibit 701 admitted into evidence.)

15    Q.   If we could start with the bottom e-mail, you see there is

16    a forwarded message from someone named Julie Taylor-Vaz to

17    Devin Sloane?

18    A.   Yes.

19    Q.   And do you recognize the name Devin Sloane from the

20    earlier e-mails that we looked at?

21    A.   Yes.

22    Q.   And do you recognize below the name Matteo Sloane from the

23    e-mails that we looked at?

24    A.   Yes.

25    Q.   It says "reply to Julie Taylor-Vaz".  Do you see that?

1    A.    Yes.

2    Q.    And what is the e-mail domain name that she's writing

3    from?

4    A.    The e-mail domain is Buckley.org.

5    Q.    Okay.  And Matteo Sloane's domain name?

6    A.    It's Crossflo -- oh.  I'm sorry.

7    Q.    Matteo Sloane?

8    A.    Buckley.org, as well.

9    Q.    And can you read the e-mail at the bottom.

10   A.    "Hi, Matteo!  I hope you're enjoying spring break and that

11   you're recovering well from your surgery.  You've been on my

12   mind a great deal these past few weeks.

13           Please update Navience Family Connection with your

14   admission results when you get a chance.  I'd like to know how

15   everything has turned out for you".

16   Q.    And it's signed Miss Taylor-Vaz?

17   A.    Yes.

18   Q.    And do you see that up above that Devin Sloane has

19   forwarded that e-mail to someone else?

20           MR. FRANK:  Miss Lewis, if you could just zoom out for

21   just a moment.

22   Q.    Who has Mr. Sloane forwarded that e-mail from

23   Miss Taylor-Vaz to?

24   A.    It appears he's forwarded it to Rick Singer.

25   Q.    And what does Mr. Sloane write?

1   A.   "What do you think we should do?  Either we can list all

2   the non-USC acceptances and not include USC, or include

3   everything, or do nothing."

4   Q.   And what does Mr. Singer respond?

5   A.   "They know about USC.  One of the counselors questioned

6   Matteo getting in as a water polo player this week.  My folks

7   at SC called me so we could restate Matteo's playing in Italy,

8   as Buckley does not have a team".

9   Q.   And how does Mr. Sloane respond up above?

10   A.   "Any concerns?"

11   Q.   And how does Mr. Singer respond?

12   A.   "I believe all is covered.  The question was asked last

13   week and internally it was documented by our person and nothing

14   has been brought up since".

15   Q.   And what is the date?

16   A.   April 1, 2018.

17          MR. FRANK:  If we can have the witness only look at

18   Exhibit 509.

19          MR. KELLY:  Excuse me.  What was that exhibit number?

20          MR. FRANK:  That exhibit was 701.

21          If we can look at Exhibit 509 for the witness only.

22   Q.   Do you recognize Exhibit 509?

23   A.   Yes.

24   Q.   What is it?

25   A.   An e-mail from Mossimo Giannulli to Rick Singer, copying

1    Mark Hauser.

2    Q.    And what is the date?

3    A.    It's dated April 12, 2018.

4    Q.    And what is the subject?

5    A.    "Olivia and USC".

6          MR. FRANK:    The government offers 509.

7          THE COURT:    It will be admitted, 509.

8          (Exhibit 509 admitted into evidence.)

9    Q.    Could we look at the e-mail at the bottom of the chain,

10   please.    Who is that from?

11   A.    Philip Petrone.

12   Q.    Who is that to?

13   A.    Mossimo Giannulli, copying Jacqueline Landry.

14   Q.    And what is the subject?

15   A.    "Olivia and USC".

16   Q.    And before we read the e-mail, I'd like to go to the

17   signature block.    Who is Mr. Petrone described as in the

18   signature block?

19   A.    The Co-Director of College Counseling at Marymount High

20   School.

21   Q.    Can we look at the e-mail, please.    Would you read that

22   for the record, please.

23   A.    "Mr. Giannulli, I wanted to provide you with an update on

24   the status of Olivia's admission offer to USC.    First and

25   foremost, they have no intention of rescinding Olivia's

1    admission and were surprised to hear that was even a concern

2    for you and your family.  You can verify that with Clay Busia,

3    Senior Assistant Director of Admission and the Marymount

4    representative for the last 5 years: Busia@USC.edu or

5    213-740-6635, if you would like.

6            I also shared with Clay that you had visited this

7    morning and affirmed for me that Olivia is truly a coxswain.

8    Again, I think so highly of all that Olivia has done as a

9    student and entrepreneur.  I know USC will only add to her

10   success and she to the Trojan family.  Best, PJ Petrone".

11   Q.   And who does Mr. Giannulli forward this e-mail to?

12   A.   He appears to have forwarded it to Mossimo Giannulli.

13   Q.   I'm sorry.  Who does Mr. Giannulli forward it to?

14   A.   To Rick Singer.

15   Q.   And what is the date again?

16   A.   April 12, 2018.

17   Q.   And referring back to the transcript of Exhibit 508 in

18   evidence, what was the date of that voicemail from Miss Heinel?

19   A.   Also on April 12, 2018.

20   Q.   Same date?

21   A.   Yes.

22   Q.   And directing your attention to the transcript of 508 at

23   line 12, what are the two schools that Miss Heinel references

24   she doesn't want anybody going in and yelling at counselors

25   because that will shut everything down?

```
1   A.    It's line 22.  She says "anybody going into Buckley or

2   Marymount".

3   Q.    Special Agent, I'm now going to ask you to read into

4   evidence a series of e-mails relating to defendant John Wilson.

5   Have you previously had an opportunity to review these

6   exhibits?

7   A.    I have.

8         MR. FRANK:  Your Honor, I've provided a binder of

9   these exhibits to the defense.  I would suggest that we could

10  perhaps speed things along by offering them in bulk.

11        MR. KENDALL:  Your Honor, we just got them a moment

12  before he got on the stand this morning.  So I can't do bulk.

13  I have to read them before we put them in.  I'll try to be

14  quick, but we can't do bulk.

15        MR. FRANK:  Okay.

16        THE COURT:  All right.

17        MR. FRANK:  Beginning with Exhibit 48 for the witness

18  only, please.

19        THE COURT:  Do you have a copy of the binder for the

20  Court?  Is that this binder here?

21        MR. FRANK:  I believe it is, Your Honor.

22  Q.    Special Agent, do you recognize Exhibit 48?

23  A.    Yes.

24  Q.    What is it?

25  A.    It's an e-mail from Leslie Wilson to John Wilson.
```

1    Q.    And what's the date?

2    A.    March 2, 2013.

3    Q.    And what is the subject?

4    A.    "Potential trip - meet coaches if possible".

5            MR. FRANK:   Government offers 48.

6            MR. KENDALL:   Objection, your Honor.  We have a prior

7    objection on marital issues, but subject to that.

8            THE COURT:   Subject to the ruling that was made by the

9    Court earlier, it will be admitted.

10            (Exhibit 48 admitted into evidence.)

11    Q.   We can start at the very bottom of the chain, please.  Do

12    you see there's an e-mail on February 10th from Mr. Singer

13    "spring break trip"?

14    A.    Yes.

15    Q.    And if we can go up to the next e-mail in the chain, could

16    you read Mr. Wilson's response?

17    A.    "Rick, what is the deadline to decide on side door for USC

18    or BC or Georgetown, et cetera this year?  (Also please confirm

19    for which schools is side door option really viable).

20            Also, if Johnny went to AMS school for 2 years and

21    played club water polo there what is probability side door at

22    USC or other locations would be a realistic option then?"

23    Q.    Thank you.  And how does Mr. Singer respond?

24    A.    "USC and BC by mid July.  USC 95 percent chance - BC 50

25    until I have a face-to-face and his test scores are in,

1    Georgetown need very good grades and no more than one B this

2    semester and 1950+ by mid June then, depending on commitment,

3    90 percent if all in".

4        MR. FRANK:  If we can move up two e-mails to the

5    February 12th e-mail from Rick Singer, you've got it right

6    there.  Thank you.

7    Q.   Special Agent, could you read the second sentence of that

8    e-mail, beginning with "Jovan"?

9    A.   "Jovan is giving me one boys slot and as of yet no one has

10   stepped up to commit, that is why it is later".

11   Q.   Can we turn to the first page of the exhibit, please.  Do

12   you see at the bottom there's an e-mail from Leslie Wilson to

13   Mr. Singer?

14   A.   Yes.

15   Q.   Could you read that for the record, please?

16   A.   "Hi Rick, is this spot still available for USC?  Should we

17   decide before our Easter trip?  It would be such a shame to

18   lose it because we didn't decide fast enough.  Thanks,

19   Leslie.".

20   Q.   And how does Mr. Singer respond?

21   A.   "It is still available".

22   Q.   And how does Miss Wilson respond?

23   A.   "Okay - is another candidate looking at USC also?  So we

24   should be pushing Johnny to decide if that's his number 1

25   choice?  As I mentioned hate to lose this due to us taking too

1   long to decide (Johnny is unaware of this arrangement)".

2   Q.   And how does Mr. Singer respond?

3   A.   There are five plus wanting in that are boys - 2 polo, 3

4   others".

5   Q.   And if we could look at the top e-mail in the chain, you

6   see that this is an exchange between Leslie Wilson and John

7   Wilson?

8   A.   Yes.

9   Q.   And could you read the last sentence of the e-mail,

10   please.

11   A.   "Maybe we can call Rick about the one spot he has at USC -

12   hate to lose it if we want to go down this path.  Rick is

13   meeting Johnny next Saturday".

14   Q.   Thank you.

15        MR. FRANK:  Could we look at Exhibit 49 for the

16   witness only, please.

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   What is it?

20   A.   An e-mail between John Wilson and Rick Singer, copying

21   Leslie Wilson.

22   Q.   What's the date?

23   A.   March 27, 2013.

24   Q.   What is the subject?

25   A.   John Wilson.

```
 1            MR. FRANK:  Government offers 49.

 2            THE COURT:  It will be admitted.

 3            (Exhibit 49 admitted into evidence.)

 4   Q.   Could we -- this is a very long chain.  If we could look

 5   at the bottom of the chain, do you see there's an e-mail from

 6   Mikaela Sanford to Rick Singer, "Subject: John Wilson"?

 7   A.   Yes.

 8   Q.   And what is the heading?

 9   A.   The heading is "itinerary for John Wilson".

10   Q.   And then there's a date, "Tuesday, April 2nd"?

11   A.   Yes.

12   Q.   Then there are two campus tours listed?

13   A.   Yes.

14   Q.   What are the two schools at which the campus tours are

15   listed?

16   A.   USC and LMU.

17   Q.   And if we could look at the next e-mail up, the response

18   from Mr. Singer, what does he say?

19   A.   "All intact.  I sent an e-mail to Jovan to see if he is on

20   campus to meet".

21   Q.   And then there's a response next up in the chain from John

22   Wilson.  Do you see that?

23   A.   Yes.

24   Q.   What does he say?

25   A.   "Rick, these are generic tours?  I thought we might be
```

**A1334**

1    meeting with assistant water polo coaches et cetera".

2    Q.   And how does Mr. Singer respond?

3    A.   "There are no offices on campus at USC.  I asked Jovan to

4    come to campus to meet.  At LMU they are not very interested in

5    Johnny - more get in and then we can speak same for others.  I

6    can ask again but be prepared for their outlook".

7    Q.   And how does Mr. Wilson respond?

8    A.   "R, so, none of the teams really even LMU want to even

9    meet with him on their campus?"

10   Q.   And how does Mr. Singer respond after Mr. Wilson says none

11   of them, even LMU, want to meet with him?

12   A.   "They're in the top 8 in the country.  They want totally

13   dedicated polo players - Johnny has to put in more time and

14   decide he really wants to play or when they meet him they will

15   be disappointed and make my relationship sour.

16        Please let me know if Johnny is going to be totally

17   on board.  LMU may be delayed if Jovan comes to campus to meet

18   at noon on Tuesday as well".

19   Q.   Okay.  If we could look at the first page of the -- of

20   Exhibit 49, there's an e-mail from Mr. Wilson near the bottom

21   of the page on March 26, 2013.  Could you read that for the

22   record, please?

23   A.   "If water polo and swimming are not realistic for Johnny,

24   then what are the schools that he has a realistic shot at

25   (without help) in SoCal area, southwest, and east coast?"

1   Q.   In response to Mr. Wilson's e-mail about water polo and

2   swimming not being realistic for Johnny, do you see that

3   Mr. Singer provides a list of schools?

4   A.   Yes.

5   Q.   And if we could then go up to the next e-mail on the

6   chain, it's another e-mail from Mr. Wilson.  Could you read

7   that, please.

8   A.   "Johnny also was wondering if he did the side door at USC

9   is it year round commitment?  For 2 years minimum?  Or one?

10   Will he be traveling with team or stay home for road meets et

11   cetera?

12        What would a bench warmer position mean?  Would the

13   other kids know he was a bench warmer side door person?"

14   Q.   And how does Mr. Singer respond to Mr. Wilson's inquiry

15   about whether the other kids would know he was a bench warmer

16   side door person?

17   A.   "Travel is only if he is playing so no -- the commitment

18   is to be on the roster not attend all practices, but he will

19   have to attend drug tests and other mandatory functions for

20   one year then walk away/frankly after the first semester he can

21   move on ".

22   Q.   If we could go to the next e-mail up in the chain,

23   Mr. Wilson's response, could you read that for the record?

24   A.   "I would love him to actually be committed and give it his

25   best.  I don't want to taint his meeting with USC coach.  I

1  know he was worried about his grades and practice time

2  commitment and travel year round.

3          So it sounds like even if he practices all the time,

4  et cetera, it will be known that he is a bench warming

5  candidate?  Obviously his skill level may be below the other

6  freshmen.  In your view, will he be so weak as to be a clear

7  misfit at practice et cetera?"

8  Q.   And how does Mr. Singer respond?

9  A.   "They have 42 guys - 20 plus do not travel but practice.

10  He will be fine.  Bench warming on the four time in a row

11  national champion is not bad as a freshman".

12  Q.   And how does Mr. Wilson respond?

13  A.   "Thanks.  Just want to be sure he is not a leper".

14          MR. FRANK:  Could we show the witness only Exhibit 63,

15  please.

16  Q.   Do you recognize this document?

17  A.   Yes.

18  Q.   What is it?

19  A.   An e-mail from Rick Singer to John Wilson, copying Leslie

20  Wilson.

21  Q.   What's the subject?

22  A.   "Photos of Johnny".

23  Q.   What is the date?

24  A.   June 3, 2013.

25          MR. FRANK:  The government offers 63.

1           THE COURT:  It will be admitted.

2           (Exhibit 63 admitted into evidence.)

3    Q.   Could you read the second e-mail in the chain on June 3rd

4    from John Wilson?

5    A.   "Do any of these shots of Johnny look good enough or

6    should we get a specific one this week?"

7    Q.   And how does Mr. Singer respond?

8    A.   "They will work.  If you can get a close up in action

9    would be better, but not totally necessary".

10          MR. FRANK:  Could we show the witness only Exhibit 65,

11   please.

12   Q.   Do you recognize this document?

13   A.   Yes.

14   Q.   What is it?

15   A.   An e-mail from Leslie Wilson to Rick Singer, copying John

16   Wilson.

17   Q.   And what e-mail address is Leslie Wilson writing from?

18   A.   Leslie@leslieqwilson.com.

19   Q.   What's the date?

20   A.   June 11, 2013.

21   Q.   What's the subject?

22   A.   "H20 polo shots of Johnny Wilson".

23          MR. FRANK:  Government offers 65.

24          THE COURT:  It will be admitted.

25          (Exhibit 65 admitted into evidence.)

1    Q.    Could you read the e-mail, please.

2    A.    "Hi Rick, here are some shots of Johnny playing water

3    polo.  My favorite is 7908, but please review and pass along to

4    USC the one you like the best.  Thank you, Leslie".

5           MR. FRANK:  Miss Lewis, if you could please flip us

6    slowly through the attachments.

7    Q.    Special Agent, what do these appear to be?

8    A.    A man playing water polo.

9           MR. FRANK:  I'd now like to show the witness only

10   Exhibit 64, please.

11   Q.    Do you recognize this document?

12   A.    Yes.

13   Q.    What is it?

14   A.    An e-mail from Rick Singer to Leslie Wilson.

15   Q.    What's the date?

16   A.    June 4, 2013.

17   Q.    Subject?

18   A.    "Johnny".

19          MR. FRANK:  Government offers 64.

20          THE COURT:  It will be admitted.

21          (Exhibit 64 admitted into evidence.)

22   Q.    Can we look at the e-mail at the bottom of the chain from

23   Leslie Wilson.  Again, what e-mail address is that from?

24   A.    Leslie@leslieqwilson.com.

25   Q.    And could you read the e-mail, please?

1    A.    "Johnny would like to sign up for UCLA

2    workshop/internship.  It's such a great experience you have

3    lined up - fabulous opportunity.  Johnny's two friends Wyatt

4    Driscoll (Johnny's friend who was severely hurt by football

5    injury) and another close friend of Johnny's, Elijah Glenn.

6          The 2 families would love to have their sons join

7    Johnny and are interested in making whatever financial

8    obligation... is necessary for the week plus your college

9    counseling.  They would not be looking at schools with a sports

10   angle, but would love your counseling for their essays...

11         They do not know about our financial discussions

12   regarding Johnny and USC and we'd like to keep this

13   confidential between you and I.  Please let me know if we can

14   make some type of arrangement for the three boys to attend your

15   internship and what dates they would fly into LA and what day

16   they would return.  Thanks so much, Leslie".

17   Q.    And how does Mr. Singer respond?  Can you just read the

18   first couple of sentences, please.

19   A.    "Leslie thank you.  Our business together is only between

20   us.  We can have all three" --

21   Q.    You can stop right there.

22         MR. FRANK:  And if we can look at 74 for the witness

23   only, please.

24   Q.    Do you recognize this document?

25   A.    Yes.

**A1340**

1   Q.   What is it?

2   A.   An e-mail from Rick Singer to John Wilson.

3   Q.   What's the date?

4   A.   August 11, 2013.

5   Q.   What's the subject?

6   A.   "Applications".

7        MR. FRANK:   Government offers 74.

8        THE COURT:   It will be admitted.

9        (Exhibit 74 admitted into evidence.)

10  Q.   You see at the bottom there's an e-mail from Mr. Wilson to

11  Mr. Singer?

12  A.   Yes.

13  Q.   Could you read the last line of the e-mail, please.

14  A.   "When do we make our first payment to USC?"

15  Q.   And if we look at Mr. Singer's response to the inquiry,

16  "When do we make our first payment to USC?"  Could you read the

17  second paragraph, please.

18  A.   "US - Jovan and I meet in two weeks and at that time he

19  will give me his timeline for Johnny's stuff".

20       MR. FRANK:   Could we show the witness only Exhibit 75,

21  please.

22  Q.   Do you recognize this document?

23  A.   Yes.

24  Q.   What is it?

25  A.   An e-mail from John Wilson to Rick Singer.

```
 1   Q.   What's the date?

 2   A.   August 24, 2013.

 3   Q.   What's the subject?

 4   A.   "Update on applications".

 5            MR. FRANK:  Government offers 75.

 6            THE COURT:  It will be admitted.

 7            (Exhibit 75 admitted into evidence.)

 8   Q.   If we can start at the bottom of the chain, you see

 9   there's an e-mail from John Wilson to Rick Singer?

10   A.   Yes.

11   Q.   And if we can just look at the very bottom, could you read

12   that e-mail?

13   A.   "Where do we stand on applications?  I assume they are all

14   out and can you please send me electric copies.  What progress

15   is Johnny making on the essays, et cetera?  Back up schools and

16   USC?

17            "When do I make first donation?"

18   Q.   And if we could look at Mr. Singer's response, if you

19   could just read the last couple of sentences, beginning with

20   "UC."

21   A.   "UC app not out until October 1st.  As they become

22   available we will input but need to see Johnny for info and a

23   final list of schools.  Jovan is in Greece.  He texted me

24   yesterday that he wants Johnny's material, not app, around

25   September 20th".
```

1    Q.    If we could look at Mr. Wilson's response, could you read

2    the last line, please?

3    A.    "What does Jovan need by September 20th?  Do you have what

4    we need?  Do I make the first payment to you then?"

5    Q.    And after Mr. Wilson inquires "Do I make the first payment

6    to you then," could you read Mr. Singer's response?

7    A.    "I believe I have everything.  Transcript, test scores,

8    and a player profile so he can add Johnny to his recruit list

9    and present him to admissions in October".

10   Q.    And after Mr. Singer says that he will add Johnny to his

11   recruitment and present him to admissions in October, how does

12   Mr. Wilson respond in the first line?

13   A.    "Great.  Let me know when you have verified you have it

14   all completed and into Jovan.  Also when and where to wire

15   money".

16   Q.    And how does Mr. Singer respond?

17   A.    "Will do".

18          MR. FRANK:  Could we look at Exhibit 81 for the

19   witness only, please.

20   Q.    Do you recognize this document?

21   A.    Yes.

22   Q.    What is it?

23   A.    An e-mail from Jovan Vavic to Rick Singer.

24   Q.    What's the date?

25   A.    October 4, 2013.

```
 1            MR. FRANK:  Government offers 81.

 2            THE COURT:  It will be admitted.

 3            (Exhibit 81 admitted into evidence.)

 4   Q.   You see there's an e-mail from Mr. Singer to Mr. Vavic at

 5   the bottom, subject "Johnny Wilson - water polo Menlo School -

 6   Stanford club polo" --

 7   A.   Yes.

 8   Q.   -- "per our conversation"?

 9   A.   Yes.

10   Q.   And how does Mr. Vavic respond?

11   A.   "Rick, I need his resume, needs to be a good resume.

12   Thanks, Jovan".

13            MR. FRANK:  Could we look at 83, please, for the

14   witness only.

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   An e-mail from John Wilson to Rick Singer, copying Leslie

19   Wilson.

20   Q.   What is the date?

21   A.   October 13, 2013.

22   Q.   This is another long chain.  I'm sorry.  What is the

23   subject line?

24   A.   "Johnny apps and USC et cetera".

25            MR. FRANK:  Government offers 83.
```

```
 1              THE COURT:  Admitted.

 2              (Exhibit 83 admitted into evidence.)

 3   Q.   This is a long chain.  I'm going to start at the bottom.

 4   There's an e-mail from John Wilson to Rick Singer on Saturday,

 5   October 12th.  Do you see that?

 6   A.   Yes.

 7   Q.   Could you read that into the record, please.

 8   A.   "Hope all is well.  I wanted to catch up on where the

 9   college app process stands (personal statement, USC, other

10   essays, the total application status, when J is taking the new

11   SAT and ACTs, et cetera.)  Is there a time we can chat today or

12   tomorrow?"

13   Q.   How does Mr. Singer respond?

14   A.   "Common application will be submitted between

15   December 1st-15th after next test dates and apps done.  Jovan

16   has Johnny's stuff and asked me to embellish his profile more,

17   which I am doing.  ACT signed up for October 26th, SAT

18   November 2nd".

19   Q.   After Mr. Singer tells Mr. Wilson that Jovan has Johnny's

20   stuff and asked me to embellish his profile more, which I am

21   doing, how does Mr. Wilson respond?  If you could look at line

22   2 of his response and read that for the record.

23   A.   "Also when is Jovan going to be able to give us decision

24   on USC?  And when do I pay you?  Was it 50 percent in November?

25   50 percent in February when we get final official notice?"
```

1  Q.   And if we can just look at Mr. Singer's response in the

2  second paragraph, can you read that for the record, please.

3  A.   "Jovan will provide Johnny's info to admission and when he

4  does his other guys over the next month.  No payment of money

5  till he gets a verbal and written from admission and then

6  50 percent to a savings account I set up.  Then the remainder

7  upon an acceptance letter in March with everyone else".

8           MR. KENDALL:  Your Honor, for the sake of

9  completeness, could we have the preceding paragraph read, as

10  well?

11          MR. FRANK:  The preceding paragraph is in evidence.

12          THE COURT:  You can have him read it while we're here.

13          MR. FRANK:  Okay.

14  Q.   Could you read it, please.

15  A.   "First is to finalize the Personal Statement - this is all

16  about Johnny putting in time not me - my work is done quickly

17  or is done.  The profile I am assuming you are speaking about

18  Navience?  I have attached the Common to Navience, filled in

19  schools et cetera - all done.  The teacher rec part he will do

20  this week".

21  Q.   And after Mr. Singer told Mr. Wilson that Jovan will

22  provide Johnny's info to admission and no payment money until

23  he gets a verbal and written response from admissions, how did

24  Mr. Wilson respond?

25  A.   "Do you have his latest personal statement draft?  Can you

1    forward it and I will talk with him about it.  Does he have all

2    your feedback and clear on what additional improvements you

3    suggest?"

4    Q.   If we could look further up in the chain, do you see

5    there's a long essay there?

6    A.   Yes.

7    Q.   I'm not going to ask you to read that.  The jury will have

8    it.  But if you could just read the first couple of sentences

9    under Mr. Singer's e-mail.

10    A.   "I took the liberty of completing the essay.

11          Life lessons from the water!!"

12    Q.   And if we could look at Mr. Wilson's response, could you

13    read that for the record, please.

14    A.   "Rick, thanks so much.  Looks great.  Several quick

15    suggestions to wrap this up.  That I edited below.

16          "One, add a title like 'life lessons from the water!'

17    Maybe split the second to last paragraph so it ends with the

18    lesson (like the previous paragraphs).  Three, add a closing

19    sentence about the future with hints at playing in college".

20          MR. FRANK:  Can we show the witness only Exhibit 84,

21    please.

22    Q.   Special Agent, do you recognize Exhibit 84?

23    A.   Yes.

24    Q.   What is it?

25    A.   An e-mail from Rick Singer to Joel Margulies.

1   Q.   What's the date?

2   A.   October 14, 2013.

3   Q.   What is the subject?

4   A.   "Johnny Wilson profile - need ASAP".

5        MR. FRANK:   Government offers 84.

6        THE COURT:   It will be admitted.

7        (Exhibit 84 admitted into evidence.)

8   Q.   Special Agent, if you could read the first two lines of

9   this e-mail.

10  A.   "Johnny Wilson 6"1' 180 pounds position - driver - No. 6

11  swimming times - 50 freestyle 22.49 short course - 100

12  freestyle 49.45 short course".

13  Q.   And then under "Awards & Honors", can you read the first

14  two entries, please?

15  A.   "2010, 2011, 2012, 2013 - Varsity Letterman, 2011, 2012,

16  2013 - Cocaptain."

17  Q.   You see there's an ongoing list of awards after that?

18  A.   Yes.

19  Q.   And what is the last one on the list?

20  A.   "Asics National Sports Youth Leadership Council - 2012,

21  2013".

22       MR. FRANK:   Miss Lewis, if you could just put this up

23  on the right, please.   And put 83 in evidence on the left.   And

24  if we could go to page 3 of 83.   And if you could just enlarge

25  that e-mail at the bottom there on October 13th.

**A1348**

1    Q.    What is the date of when Mr. Singer advised Mr. Wilson

2    "Jovan has Johnny's stuff and asked me to embellish his profile

3    more, which I am doing"?

4    A.    That e-mail was sent on October 13, 2013.

5    Q.    What is the date of Mr. Singer's e-mail to Mr. Margulies,

6    Subject line, "Johnny Wilson profile"?

7    A.    The next day, October 14, 2013.

8    Q.    Thank you.

9         MR. FRANK:  If we could take down Exhibit 83 on the

10   left.  And if we could show the witness only Exhibit 85,

11   please.

12   Q.    Who is this from?

13   A.    It's from Rick Singer to Joel Margulies.

14   Q.    What is the date?

15   A.    October 14, 2013.

16   Q.    What is the time -- or the subject?

17   A.    "Johnny Wilson".

18        MR. FRANK:  Government offers 85.

19        THE COURT:  Admitted.

20        (Exhibit 85 admitted into evidence.)

21        MR. FRANK:  Miss Lewis, if you could put 85 on the

22   right, please, and 84 on the left.  And if you could enlarge

23   the top of 84, please, just the first couple of lines.  Thank

24   you.

25   Q.    What is the date and time of Exhibit 84?

1   A.    84 is October 14, 2013, at 11:43 a.m.

2   Q.    What is the date and time of Exhibit 85?

3   A.    October 14, 2013, at 12:27 p.m.

4   Q.    So about 45 minutes later?

5   A.    Yes.

6         MR. FRANK:  Miss Lewis, if you could take down that

7   enlargement.  Thank you.

8   Q.    What are the swimming times listed for Johnny Wilson at

9   11:43 a.m.?

10  A.    At 11:43, they're listed as 50 freestyle 22.49 seconds

11  short course, 100 freestyle 49.45 short course.

12  Q.    What are the swim times listed for Johnny Wilson at

13  12:27 p.m., approximately 45 minutes later?

14  A.    20.12 short course, 50 freestyle, and 43.98 100 freestyle.

15  Q.    Which ones are better?

16        MR. KENDALL:  Objection, your Honor.

17        THE COURT:  Sustained.

18  Q.    How do the swim times in Exhibit 85 compare to the swim

19  times in 84?  Are they longer or shorter?

20  A.    They are shorter.

21        MR. FRANK:  Can we look at, for the witness only,

22  Exhibit 88, please.

23  Q.    Do you recognize this document?

24  A.    Yes.

25  Q.    What is it?

1   A.   It's an e-mail from Rick Singer to John Wilson.

2   Q.   What is the date?

3   A.   October 19, 2013.

4   Q.   What's the subject?

5   A.   "Wilson."

6        MR. FRANK:  Government offers Exhibit 88.

7        THE COURT:  Admitted.

8        (Exhibit 88 admitted into evidence.)

9   Q.   Do you see that Mr. Singer is forwarding Mr. Wilson an

10  attachment?

11  A.   Yes.

12  Q.   And who is the forwarded message from?

13  A.   Joel Margulies.

14  Q.   And could we look at the attachment, please.  What does

15  that appear to be?

16  A.   A profile for John B. Wilson.

17       MR. FRANK:  Okay.  And could we put that on the right,

18  please.  And could we put Exhibit 84 on the left.  This is the

19  earlier e-mail to Mr. Margulies.  And then could we

20  put exhibit -- substitute Exhibit 85 for Exhibit 84.  And if

21  you could just enlarge those times and enlarge, please,

22  Miss Lewis, the swim times on the left under the photograph.

23  Q.   Special Agent, the swim times on the profile that

24  Mr. Singer sent to Mr. Wilson, how do they compare with the

25  swim times in Exhibit 85?

```
 1   A.   They're the same.

 2   Q.   And if we could just look back at Exhibit 88, the cover

 3   e-mail, what e-mail address does Mr. Singer send that to?

 4   A.   He sent it to John@Hyannisportcapital.com.

 5        MR. FRANK:  Can we look at Exhibit 87, please, just

 6   for the witness only.

 7   Q.   Do you recognize this document?

 8   A.   Yes.

 9   Q.   What is it?

10   A.   It's an e-mail from Debbie Rogers to Rick Singer.

11   Q.   What's the date?

12   A.   October 18, 2013.

13   Q.   What's the subject?

14   A.   "Menlo letter".

15        MR. FRANK:  Government offers 87.

16        THE COURT:  Admitted.

17        (Exhibit 87 admitted into evidence.)

18   Q.   What does the logo above Debbie Rogers' signature block

19   say?

20   A.   Hyannis Port Capital.

21   Q.   And there appears to be an image in the logo?

22   A.   Yes.

23   Q.   Do you see that?  What is the image?

24   A.   Appears to be the illustration of a sailboat, a sail from

25   a sailboat.
```

```
 1   Q.   You see that she's forwarding the e-mail to Mr. Singer?

 2   A.   Yes.

 3   Q.   There's another e-mail lower in the chain?

 4   A.   Yes.

 5        MR. FRANK:  And who -- Miss Lewis, if you could just

 6   zoom out.  Yeah.  Thank you.

 7   Q.   Who is the e-mail lower in the chain with?

 8   A.   It's from Debbie Rogers to John Wilson and Leslie Wilson.

 9   Q.   Okay.  And if we could just look at the attachment,

10   please.  What is the heading of the attachment?

11   A.   It's from Mark Clevenger, the Director of College

12   Counseling at Menlo School.

13   Q.   Can you read the first paragraph, please.

14        MR. KENDALL:  Again, your Honor, for completeness, can

15   we have the first two?

16        THE COURT:  Let him do his thing.  And then we'll see

17   if we can shortcut it.

18        MR. FRANK:  He can read the first two.  That's fine.

19   A.   "In an effort to provide maximum clarity and support for

20   Menlo seniors, our team has met and reviewed each senior's

21   college list.  Our goal is to ensure that the lists are, in our

22   view, balanced and appropriate.  You will find your senior's

23   list enclosed, along with our assessment of the likelihood of

24   admission at each school.  At the bottom of the list you will

25   see a brief summary statement about the list.
```

1          The ultimate goal is to make sure that every senior

2    is striving appropriately while remaining safe in this process.

3    We are fully aware that in many cases, students have

4    extenuating circumstances at certain colleges and universities

5    - alumni ties, athletic recruitment, et cetera.  Our analysis

6    does not factor in these circumstances and is based strictly on

7    students' academic records, test scores, and extracurricular

8    profiles".

9    Q.   And if we could look at the next page, please, what's the

10   heading?

11   A.   "John B. 'Johnny' Wilson (class of 2014) Active College

12   Applications".

13   Q.   And do you see there is a list of colleges below that?

14   A.   Yes.

15   Q.   And there's a Menlo assessment on the right?

16   A.   Yes.

17   Q.   What is the second to last college on the list?

18   A.   It's the University of Southern California.

19   Q.   What is the Menlo assessment in the absence of factors

20   like athletic recruitment and alumni ties?

21   A.   They note it as an "RR", which in the table below is a

22   "Double Reach".

23          MR. FRANK:  Can we look at Exhibit 89 for the witness

24   only, please.

25   Q.   Do you recognize this document?

1  A.   Yes.

2  Q.   What is it?

3  A.   It's an e-mail from John Wilson to Rick Singer, copying

4  Leslie Wilson.

5  Q.   What's the date?

6  A.   October 23, 2013.

7  Q.   What's the subject?

8  A.   "Quick question on Johnny spring/summer".

9       MR. FRANK:  And the government offers 89.

10      THE COURT:  Admitted.

11      (Exhibit 89 admitted into evidence.)

12 Q.   If we could look at the bottom e-mail in the chain from

13 Mr. Wilson to Mr. Singer, could you read the first line,

14 please.

15 A.   "What are the expectations if Johnny gets into USC through

16 this WP water polo approach?"

17 Q.   And how does Mr. Singer respond?

18 A.   "Just be ready for practice in the fall as a player on the

19 roster or just a member of the squad, but not get in the pool.

20 He has to be on the roster for a year one way or another".

21 Q.   And how does Mr. Wilson respond after Mr. Singer says that

22 Johnny does not have to get in the pool?

23 A.   "Thanks.  We are encouraging Johnny to focus on water polo

24 this spring and he will do Sopen and Stanford club.  (Not

25 varsity swimming - as that requires him to skip all senior

1    trips - off).

2              "That way he can take senior trip to Spain for a week

3    and also spend 2 weeks in the spring coming to Europe to visit

4    with us.

5              "I strongly prefer he plays as hard as he can and at

6    least suits up and scrimmages with the team.  Would it also

7    make sense for him to try a week of camp at USC?

8              When would he need to start this, August or

9    September?"

10             MR. FRANK:  Can we show the witness --

11             THE COURT:  No.  We're going to take the morning

12   recess at this stage.  You can step down, Mr. Brown.  We'll be

13   in recess for 15 minutes, jurors.

14             (Jury exits.)

15             THE COURT:  Be seated, counsel.  Approximately how

16   much longer on direct of Mr. Brown?

17             MR. FRANK:  I would estimate an hour, perhaps a little

18   longer.

19             THE COURT:  And the estimated cross-examinations?

20             MR. KENDALL:  We'll get started today obviously, but

21   we'll go into Friday.

22             MR. KELLY:  Your Honor, I'll cross a bit as well, your

23   Honor.

24             I also without -- we may submit a request for a

25   limiting instruction because there's been a lot of evidence

1    about other parents and other coconspirators.  I think the

2    Court said in last year's ruling that whether such evidence

3    should be admitted in conjunction with a limiting instruction

4    to the jury is a question for another day.

5         I think that day is here.  So with the Court's

6    permission, we will submit a request for a limiting instruction

7    to the effect that, you know, evidence regarding other parents

8    should be considered only to the extent it bears on the nature

9    and scope of the conspiracy and that proof that the defendants

10   willfully joined must be based upon evidence in their own words

11   and actions.

12        I'll spell it out.  That's consistent with First

13   Circuit law.  There's been a lot of evidence coming in

14   regarding other parents.  I understand the context.  I

15   understand it's based upon the alleged conspiracy.  I think the

16   jury's got to be told.  They may not understand that, so we're

17   going to request that, please.

18        THE COURT:  All right.

19        Does the government have a position on that?

20        MR. FRANK:  Your Honor, typically those -- my

21   understanding is those limiting instructions are given at the

22   conclusion of the evidence when the case is submitted to the

23   jury.  I'm not sure that we object to a limiting instruction

24   now.  My only concern is, I don't know this for certain, but we

25   received a transcript from the defense last night concerning an

1    exhibit that relates to an uncharged parent who -- and my fear

2    is given the length of cross-examination that they're

3    estimating for Mr. Brown, who is really just reading records

4    into evidence, that they may be planning to seek to introduce

5    evidence regarding other uncharged parents.  And my concern

6    about that is, if we give a limiting instruction regarding

7    coconspirator parents, I don't want there to be confusion about

8    parents who are not part of the conspiracy, which I don't think

9    that evidence should come in at all.

10              THE COURT:  Mr. Kelly?

11              MR. KELLY:  I believe it's a voicemail that Singer

12    left for somebody, somebody who is referenced, I believe, in

13    the exhibit.  It's a separate issue.  I think the transcript

14    he's talking about is simply a voice message Singer left to

15    another parent who he's already referenced in this case.

16              I think that's a separate issue.  I'm more focused

17    upon all this other evidence coming in for all these other

18    parents who are alleged to be conspirators.  I understand the

19    Court's ruling.  I'm not so sure the jury does.  I just don't

20    want them to misunderstand that.

21              THE COURT:  Give a copy of your proposal to the

22    government, and we'll consider it when it's submitted.

23              MR. KELLY:  Thank you.

24              THE COURT:  Do counsel have a preference as to whether

25    we have an afternoon session today?

```
 1          MR. KENDALL:  I'd be happy to have it, your Honor, not

 2    too late.

 3          THE COURT:  We won't go after three.  We've said that

 4    before.

 5          MR. KENDALL:  Given how much he needs to cover, I

 6    think it would be great, your Honor.

 7          THE COURT:  We'll go to three.  Thank you.  We're in

 8    recess.

 9          (Recess taken 11:09 a.m. through 11:28 a.m.)

10          (Jury enters.)

11          THE COURT:  Good morning again, jurors.  And

12    Mr. Brown, you're reminded that you remain under oath.

13    Mr. Frank, you may continue your examination.

14          MR. FRANK:  If we could look at Exhibit 101 for the

15    witness only, please.

16    Q.    Do you recognize that document, Special Agent?

17    A.    Yes.

18    Q.    What is it?

19    A.    It's an e-mail from Rick Singer to Jovan Vavic.

20    Q.    And what is the date?

21    A.    January 21, 2014.

22    Q.    What is the subject?

23    A.    "Johnny Wilson, Water Polo Menlo School Stanford Club

24    Polo."

25          MR. FRANK:  The government offers 101.
```

```
 1              THE COURT:  It will be admitted.

 2              (Exhibit 101 admitted into evidence.)

 3              MR. FRANK:  If we could just start at the bottom of

 4    the chain.  Actually, one e-mail up.

 5    Q.   Do you see that there's an e-mail on January 21, from

 6    Jovan Vavic?

 7    A.   Yes.

 8    Q.   Could you read that for the record, please.

 9    A.   "Rick, is Johnny still interested in USC?  If so, we need

10    his fall grades, unofficial is fine, thanks, Jovan."

11    Q.   How does Mr. Singer respond?

12    A.   "Absolutely - family is ready to help.  I will forward

13    ASAP.  Thank you."

14    Q.   And after Mr. Singer responds "Family is ready to help,"

15    how does Mr. Vavic respond?

16    A.   "This will be a big class, we already have 12 verbal and

17    16 very interested, I cannot guaranty anything, he will go to

18    SUBCO after my top recruits, most likely in February/March.

19    But I will present him with my top walkons."

20    Q.   And how does Mr. Singer respond?

21    A.   "I really appreciate it.  The family is fully on board.

22    All your help is always very much appreciated.  Thank you."

23    Q.   What is the date of this e-mail?

24    A.   January 21, 2014.

25    Q.   And directing your attention to the second e-mail in the
```

1   chain, what is the date that Mr. Vavic says he will go to

2   SUBCO?

3   A.   Most likely in February or March.

4        MR. FRANK:  Could we show the witness only Exhibit

5   710, please.

6   Q.   Do you recognize that document?

7   A.   Yes.

8   Q.   What is it?

9   A.   An e-mail from John Wilson to Rick Singer copying Debbie

10  Rogers.

11  Q.   Subject?

12  A.   "USC fees."

13  Q.   What is the date?

14  A.   March 1, 2014.

15       MR. FRANK:  The government offers 710.

16       THE COURT:  Admitted.

17       (Exhibit 710 admitted into evidence.)

18  Q.   Special Agent, again, what was the date that Mr. Vavic

19  said he would go to SUBCO?

20  A.   In February or March.

21       MR. FRANK:  Could we look at the bottom e-mail on this

22  chain, please.

23  Q.   What is the date?

24  A.   March 1, 2014.

25  Q.   What does Mr. Wilson write?

1    A.    "Rick, thanks again for making this happen.  Please give

2    me the invoice.  What are the options for payment?  Can we make

3    it for consulting or whatever from the key so that I can pay it

4    from the corporate account?  J."

5    Q.    After Mr. Wilson asks, "What are the options for payment?

6    Can we make it for consulting or whatever from the key so that

7    I can pay it from the corporate account," how does Mr. Singer

8    respond?

9    A.    "Yes, we can send you an invoice for business consulting

10   fees and you may write off as an expense.  What is the name,

11   address, et cetera, you want the invoice to be made out to?"

12   Q.    And again, what is the subject line of this e-mail?

13   A.    "USC fees."

14   Q.    And what was the response from Mr. Wilson?

15   A.    "R.  Awesome.  Hyannis Port Capital, Inc.  2 Fleur Place,

16   Atherton, California  94027, Care of Debbie Rogers.  John."

17   Q.    And who is copied on this e-mail?

18   A.    Debbie Rogers.

19   Q.    And what e-mail address does Mr. Wilson send this e-mail

20   from?

21   A.    The john@hyannisportcapital.com e-mail address.

22            MR. FRANK:  Can we show the witness only Exhibit 109,

23   please.

24   Q.    Do you recognize this document?

25   A.    Yes.

```
 1   Q.   What is it?

 2   A.   It's an e-mail from John Wilson to Debbie Rogers.

 3   Q.   What is the date?

 4   A.   March 29, 2014.

 5   Q.   What is the subject?

 6   A.   "Wire to The Key."

 7            MR. FRANK:  The government offers 109.

 8            THE COURT:  Admitted.

 9            (Exhibit 109 admitted into evidence.)

10   Q.   Could you read the first e-mail at the bottom of the

11   chain, please.

12   A.   "D.  Monday we will get an invoice and wiring instructions

13   for $250,000 to be paid by HPC Inc.  Thanks.  J."

14   Q.   How does Ms. Rogers respond?

15   A.   "And what is the account I'm charging this to?"

16   Q.   And how does Mr. Wilson respond?

17   A.   "Business consulting - the invoice will be for consulting

18   - please work with him to get an invoice correct."

19            MR. FRANK:  Can we show the witness only 110, please.

20   Q.   Do you recognize this?

21            MR. KENDALL:  Excuse me, we can't see the screen.

22            THE COURT:  Do we have electronic problems here?

23            MR. KENDALL:  We're getting snow, your Honor.

24            THE COURT:  Okay.  Let's see if we can help it.

25            (Pause.)
```

```
 1              THE COURT:  Well, we have IT on the way.  What do
 2   counsel propose?
 3              MR. FRANK:  Can the jurors see the exhibits?
 4              THE COURT:  Is the jury -- that's right.  This is only
 5   for the witness.
 6              MR. FRANK:  Could we look at 710 in evidence just to
 7   see if it shows up on the jurors' screens?
 8              It does, your Honor.  I think the jurors' screens are
 9   working.  If counsel are willing, they have hard copies, if we
10   could move ahead.
11              THE COURT:  Counsel, do you have hard copies?
12              MR. KENDALL:  We do but we'd have to locate things
13   given the volume as we go through each one.
14              MR. FRANK:  I think you have a binder of these
15   exhibits in order.
16              MR. TOMBACK:  Can you give us the exhibits so that we
17   can track just off of those instead of the binders?
18              MR. KENDALL:  They're not in numerical order, so
19   locating them --
20              MR. FRANK:  We just finished with 710.
21              MR. KENDALL:  What's the next one?
22              MR. FRANK:  109.  I'm sorry.
23              THE COURT:  110.
24              MR. FRANK:  You're right, your Honor, 110.  May I
25   proceed, your Honor?
```

```
 1              THE COURT:  Do you have it?

 2              MR. KENDALL:  Yes, I'm ready.  Yes, thank you.

 3              THE COURT:  110.

 4              MR. FRANK:  For the witness only, 110.

 5   Q.   Do you recognize that e-mail?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.   An e-mail from John Wilson to Debbie Rogers.

 9   Q.   And what is the subject?

10   A.   "Wire to The Key."

11   Q.   The date?

12   A.   March 30, 2014.

13              MR. FRANK:  The government offers 110.

14              THE COURT:  It will be admitted.

15              (Exhibit 110 admitted into evidence.)

16   Q.   And do you see at the bottom there of the enlarged section

17   there's Ms. Rogers' e-mail from March 29, "What is the account

18   I'm charging this to?"

19   A.   Yes.

20   Q.   That was the e-mail we previously saw?

21   A.   Yes.

22   Q.   And how does Mr. Wilson respond the next day?

23   A.   "By the way the amount is $200,000 not 250,000."

24              MR. FRANK:  Could we show the witness only Exhibit

25   112, please.
```

```
 1   Q.   Do you recognize this document?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   An e-mail from John Wilson to Debbie Rogers.

 5   Q.   What is the date?

 6   A.   March 31, 2014.

 7   Q.   What is the subject?

 8   A.   "The Key."

 9        MR. FRANK:  The government offers 112.

10        THE COURT:  It will be admitted.

11        (Exhibit 112 admitted into evidence.)

12        THE COURT:  We're going to stop just for a second and

13   see if we can get some technological help.  Come forward.  It's

14   counsel's screens.

15        INFORMATION TECHNOLOGIST:  Thank you, Judge.  I'm

16   going to go up through, I just need to visually verify first.

17   I will go up there first and come back to verify with you all.

18        COURTROOM CLERK:  Thank you.

19        MR. FRANK:  Should I proceed, your Honor?

20        THE COURT:  Do you have a copy of 112, Mr. Kendall?

21        MR. KENDALL:  Yes, Your Honor.

22        THE COURT:  All right.  We'll proceed.

23        MR. FRANK:  You can start at the bottom of the chain.

24   Q.   Do you see the e-mail from Debbie Rogers to Mr. Wilson?

25   A.   Yes.
```

1   Q.   What does she write?

2   A.   "You realize if they are not incorporated, they will

3   receive a 1099 if this is ran through the business...  They

4   will also need to provide HPC a completed W-9 for tax reporting

5   purposes. "

6   Q.   How does Mr. Wilson respond?

7   A.   He writes, "Yes, they are a legit business.  Please work

8   with them on the right paperwork.  Thanks.  J."

9   Q.   How does Ms. Rogers respond?

10  A.   "Who do I work with, Steve?"

11  Q.   How does Mr. Wilson respond?

12  A.   "Start with Rick Singer.  Thanks."

13  Q.   And then Ms. Rogers' response again?

14  A.   "I contacted Rick and he directed me to Steve.  Per Steve,

15  100,000 will be to his foundation, 100,000 an invoice from The

16  Key and 20,000 to Rick Singer.  Since you said 200,000, we're

17  at 220,000.  Is this a moving target?"

18  Q.   And how does Mr. Wilson respond?

19  A.   "Yes.  I added $20,000 for his expenses."

20  Q.   And Ms. Rogers' response to that?

21  A.   "And you want this invoiced to HPC as well?"

22  Q.   And how does Mr. Wilson respond?

23  A.   "Yes."

24       MR. FRANK:  Could we show the witness only Exhibit

25  120, please.

```
 1   Q.   Do you recognize 120?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   It's an e-mail from Rick Singer to Steve Masera.

 5   Q.   And what is the date?

 6   A.   April 15, 2014.

 7   Q.   And what's the subject?

 8   A.   "USC."

 9        MR. FRANK:  The government offers Exhibit 120.

10        THE COURT:  Admitted.

11        (Exhibit 120 admitted into evidence.)

12        MR. FRANK:  Can we start at the bottom of the chain.

13   Q.   What is Mr. Masera's e-mail at the bottom of the chain?

14   A.   "When do you want to pay USC water polo for John Wilson

15   and USC baseball for Rudy Driscoll?"

16   Q.   And how does Mr. Singer respond?

17   A.   "ASAP if we can afford it."

18   Q.   And how does Mr. Masera respond?

19   A.   "Yes, we can send now.  Do you have names and addresses

20   for each?"

21   Q.   And how does Mr. Singer respond?

22   A.   "I would like to deliver a cashier check to both this

23   week."

24        MR. FRANK:  Could we show the witness only Exhibit

25   122, please.  And we -- exactly.  Thank you, Ms. Lewis.
```

```
 1   Q.   Special Agent, do you recognize 122?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   It's a redacted e-mail between John Wilson and Debbie

 5   Rogers.

 6   Q.   What is the date?

 7   A.   July 14, 2014.

 8   Q.   And what's the subject?

 9   A.   "Rough thoughts on cash."

10        MR. FRANK:   The government offers 122.

11        THE COURT:   In its redacted form?

12        MR. FRANK:   In its redacted form, your Honor, by

13   stipulation of counsel.

14        THE COURT:   It will be admitted as redacted.

15        (Exhibit 122 admitted into evidence.)

16        MR. FRANK:   And I represent to you, sir, that the

17   redactions are numbers and dollar amounts.

18   Q.   Do you see it says "Rough thoughts on cash" at the top?

19   A.   Yes.

20   Q.   If you could look at the top, he says, "D.  Sale of

21   house," and there's a redacted number, "net."

22   A.   Yes.

23   Q.   Then it says, "Paid down," and there's a redacted number,

24   "in HP."

25   A.   Yes.
```

1   Q.   Do you know what "HP" refers to?

2   A.   I understand it to be a reference to Hyannis Port.

3   Q.   And below that it says "net," and there's a redacted

4   number, "cash."  Then it says, "Refinanced HP," and then

5   there's a redacted number, "mortgage."  Do you see that?

6   A.   Yes.

7   Q.   And then below that there's a section "Big uses."  Do you

8   see that?

9   A.   Yes.

10  Q.   And there's one item that is not redacted.  Can you read

11  the big use that is not redacted for the record.

12  A.   "Rick for USC $250,000."

13          MR. FRANK:  Could we show the witness only 124,

14  please.

15  Q.   Do you recognize this document?

16  A.   Yes.

17  Q.   What is it?

18  A.   An e-mail from Leslie Wilson to John Wilson.

19  Q.   What is the date?

20  A.   July 22, 2014.

21  Q.   What is the subject?

22  A.   "Johnny start at USC water polo."

23          MR. FRANK:  The government offers 124.

24          THE COURT:  Admitted.

25          (Exhibit 124 admitted into evidence.)

1          MR. FRANK:  Could we start at the bottom of the chain,

2     please.

3     Q.   Do you see there's an e-mail from Mr. Wilson to

4     Mr. Singer?

5     A.   Yes.

6     Q.   Could you read that for the record, please.

7     A.   "Hope all is well.  Trying to book flights to California

8     to get Johnny moved in, et cetera.  What is the start date for

9     him for water polo?  I thought you mentioned August 14 or so.

10    USC policy says he cannot arrive before August 20 without a

11    written letter from a coach or teacher.  Johnny sent an e-mail

12    to Jovan but didn't hear back."

13    Q.   And how does Mr. Singer respond?

14    A.   "First practice is August 19.  He needs to call Jovan and

15    get what he needs.  He must create a relationship if wants to

16    be on the team.  Jovan is a great guy - rough at practice but

17    responds when called on."

18    Q.   And you see that there's an exchange at the top between

19    Leslie Wilson and John Wilson?

20    A.   Yes.

21    Q.   Could you read that, please.

22    A.   "Thank you honey.  I'll keep after Johnny to see Jovan

23    while he's there."

24         MR. FRANK:  Okay.  If we could show the witness only

25    126, please.

1   Q.   Do you recognize this document?

2   A.   Yes.

3   Q.   Who is it from?

4   A.   It's from Debbie Rogers.

5   Q.   Who is it to?

6   A.   John Wilson and Leslie Wilson.

7   Q.   And what is the e-mail address for Leslie Wilson?

8   A.   Leslie@leslieqwilson.com.

9   Q.   And for John Wilson?

10  A.   John@hyannisportcapital.com.

11  Q.   What is the subject?

12  A.   "USC gift ACK," acknowledgment.

13  Q.   And what is the attachment called?

14  A.   "SC Trojan Athletic Fund, 7-28-2014.pdf."

15       MR. FRANK:   Government offers 126.

16       THE COURT:   Admitted.

17       (Exhibit 126 admitted into evidence.)

18       MR. FRANK:   You can enlarge that, Ms. Lewis, thank

19  you, for the jurors to see, and we will move to the attachment.

20  Q.   What is the heading of the attachment?

21  A.   "The Trojan Athletic Fund, USC Department of Athletics,

22  Los Angeles, California."

23  Q.   Okay.  Can you read the letter, please.

24  A.   "Dear John and Leslie, thank you for your generous gift to

25  USC athletics men's water polo in the amount of $100,000.

1    Maintaining state-of-the-art facilities is an essential part of

2    USC's commitment to excellence.  Through your contribution, you

3    are helping the university achieve this important goal.  On

4    behalf of the young student-athletes that will benefit from

5    your anonymous gift, thank you.  Fight on.  Ron Orr."

6              MR. FRANK:  I just want to quickly go back to Exhibit

7    124, Special Agent.  And Ms. Lewis, if you could enlarge the

8    e-mail, the second e-mail up from the bottom.

9    Q.   When does Mr. Singer tell Mr. Wilson first practice is?

10   A.   August 19.

11   Q.   And what's the year?

12   A.   2014.

13             MR. FRANK:  Okay.  Could we show the witness only

14   Exhibit 137, please.

15   Q.   Who is this from?

16   A.   It's from John Wilson.

17   Q.   What is the e-mail address?

18   A.   Johnbwilson@usc.edu.

19   Q.   And who is it to?

20   A.   Jovan Vavic.

21   Q.   What is the date?

22   A.   January 12, 2015.

23   Q.   How long is January 2015 after August of 2014?

24   A.   Approximately four months later.

25             MR. FRANK:  Government offers 137.

```
 1            THE COURT:  Admitted.
 2            (Exhibit 137 admitted into evidence.)
 3   Q.   Could you read the e-mail for the record, please.
 4   A.   "I hope you had a great break and wonderful holiday
 5   season.  I wanted to thank you and illustrate how profoundly
 6   appreciative I am for the incredible opportunity you have given
 7   me here at USC as an individual member on the team as well as a
 8   student at this school.  Unfortunately this was a much bigger
 9   commitment than I had planned on making, and despite my best
10   efforts, my grades reflected my inability to balance my
11   academic and athletic life.  Along with my academic struggles,
12   I am also still very conscientious about my situation regarding
13   my head.  While water polo has gotten me very far in my life
14   and has always played a major role, I must start considering
15   being more careful with my head.  I already have three
16   diagnosed concussions, and with a very likely fourth concussion
17   looming in the near future I must start considering my future.
18   Because my body is already starting to burn out from water
19   polo, I need to make sure the same doesn't happen with my head.
20   I will need to use my brain for the next 70 years, and for this
21   reason, I need to be focusing more on my academic life and my
22   future over water polo.  For these reasons, I will not be
23   playing water polo this semester and will be focusing on my
24   academic life and my future career in the business world."
25            MR. FRANK:  Special Agent, I'd now like to
```

1    fast-forward a few months.  If we could show the witness only

2    Exhibit 154, please.

3             MR. KENDALL:  Objection, Your Honor.

4             THE COURT:  Grounds?

5             MR. KENDALL:  I hate to say this, this may be

6    something that would warrant a sidebar.  I don't want to speak

7    in front of the jury.

8             THE COURT:  All right.

9                 *** Beginning of Sidebar ***

10            THE COURT:  Mr. Kendall.

11            MR. KENDALL:  This is the e-mail about Singer paying

12   the tuitions for Vavic's children 18 months after my client's

13   son was admitted to USC.  And if you may remember --

14            THE COURT:  Try to keep your voice down.  Speak right

15   down into here.

16            MR. KENDALL:  If you may remember, the government,

17   when they raised this and we litigated it before you, said they

18   make no representation my client knew about this or it was his

19   money.  And in fact, the debriefings from Singer say the

20   purpose of this payment was if he needed future favors from

21   Vavic, not from a prior obligation.

22            When Mr. Frank went to these e-mails, he said we're

23   now going to do a bunch of Johnny Wilson e-mails.  And he's

24   juxtaposed this to give it the appearance that the Vavic e-mail

25   relates to Wilson.

**A1375**

1          I think we need some type of clarification that the

2     government makes no representation that my client knew about

3     this, that it was his money or it relates to his son's

4     admission.  It's just to show a separate Vavic/Singer

5     relationship.  That's why I didn't want to say it in front of

6     the jury.

7          THE COURT:  Yes, fair enough.

8          MR. FRANK:  We absolutely intend to make clear the

9     timeline, that this is long after Mr. Wilson -- that was going

10    to be my next question, actually.  This is long after Mr.

11    Wilson paid his funds and indeed after his son quit the team.

12         And we opened on the fact that these personal payments

13    were something that Mr. Singer did not tell the parents about.

14    That's in our opening statement.  We said it repeatedly.

15         THE COURT:  Okay.

16         MR. KENDALL:  If we could have that clarified when it

17    comes in.  Otherwise the juxtaposition is unfair.

18         THE COURT:  Well, put it in the prefix of your

19    question.  And if it isn't satisfactory to you, Mr. Kendall,

20    you can give me a draft instruction to the jury if you want,

21    but that will take some time.  We'll do it at the break.

22         MR. FRANK:  The only other issue, your Honor, with the

23    prefix is this witness is a reader.  He doesn't have all of the

24    information about Mr. Singer's statements, so we're going to

25    make clear the timeline, crystal clear.

```
 1          THE COURT:  All right.
 2          MR. FRANK:  And there will be no argument at any point
 3   that Mr. Singer told Mr. Wilson about these payments.
 4          MR. KENDALL:  Maybe it could just be, the witness
 5   could be led by the government, and I wouldn't object to this
 6   leading.
 7          MR. FRANK:  He's not going to know what I'm talking
 8   about.
 9          MR. KENDALL:  If I may finish.  If he could just say,
10   "Agent, you make no representation that there's a connection
11   between these payments and Mr. Wilson in any way" --
12          MR. FRANK:  Well, that's not true.  There is a
13   connection.  It's part of the scheme.  It's part of the
14   conspiracy.
15          THE COURT:  Go forward.  And Mr. Kendall, after this
16   colloquy back and forth, if you feel you need some special
17   instruction, you draft one, and I'll consider it at the break.
18          MR. KENDALL:  Excellent.  Thank you your Honor.
19          THE COURT:  Okay.
20              *** End of sidebar ***
21          MR. FRANK:  Ms. Lewis, if we could once again show the
22   witness only Exhibit 154, please.
23   Q.   Do you see that document, Special Agent?
24   A.   Yes.
25   Q.   What is it?
```

**A1377**

1    A.    An e-mail from Rick Singer to Steve Masera.

2    Q.    What is the date -- excuse me -- the date?

3    A.    August 27, 2015.

4    Q.    What is the subject?

5    A.    "Loyola High School Tuition."

6         MR. FRANK:  The government offers 154.

7         THE COURT:  It will be admitted.

8         (Exhibit 154 admitted into evidence.)

9    Q.    Now, Special Agent, before we look at Exhibit 154, I'd

10   like to look back at Exhibit 112 in evidence, please.  Do you

11   recall Exhibit 112 was an e-mail exchange between Mr. Wilson

12   and Debbie Rogers discussing payments to The Key following the

13   admission of Johnny Wilson to USC?

14   A.    Yes.

15   Q.    Can you tell us what is the date of the e-mail exchange

16   between Mr. Wilson and Mr. Rogers discussing those payments?

17   A.    March 31, 2014.

18        MR. FRANK:  Thank you.  If we could look at 126 in

19   evidence.

20   Q.    That's the gift acknowledgment that Ms. Rogers sent Mr.

21   Wilson?

22   A.    Yes.

23   Q.    If we could look at the attachment.  What's the date on

24   the attachment, please, what is that date?

25   A.    July 28, 2014.

```
 1    Q.   And how long is July 28, 2014 before August 27, 2015?

 2    A.   Little over a year.

 3         MR. FRANK:  Okay.  And if we could look at Exhibit

 4    137, please.

 5    Q.   Do you recall this is the e-mail where Johnny Wilson quits

 6    the water polo team?

 7    A.   Yes.

 8    Q.   And what is the date on that e-mail?

 9    A.   January 12, 2015.

10    Q.   And how long is January 12, 2015 before August 27, 2015?

11    A.   Little over eight months.

12         MR. FRANK:  Okay.  Could we now look at Exhibit 154,

13    please.

14    Q.   Do you see at the bottom there's an e-mail at the very

15    bottom from Lisa Vavic to Jovan Vavic?

16    A.   Yes.

17    Q.   And could you read the first paragraph, please.

18    A.   "Loyola High School does not have a system that generates

19    statements for the students.  If tuition has not been paid by

20    January, then they send out a statement.  For right now this is

21    what they have given me."

22    Q.   You see there are two names there below that?

23    A.   Yes.

24    Q.   What are the two names?

25    A.   Marko and Stefan.
```

1    Q.    And what are the tuition amounts?

2    A.    Junior tuition is $19,140.  Freshman tuition is $18,830.

3    Q.    You see that Mr. Vavic forwards that e-mail?

4    A.    Yes.

5    Q.    Who does he forward it to?

6    A.    He forwards it to Rick Singer.

7    Q.    And what does he say?

8    A.    "Rick, here are the amounts for Marko and Stefan and their

9    ID numbers.  Thanks.  Jovan."

10    Q.    And Mr. Singer forwards that again?

11    A.    Yes.

12    Q.    Who does he forward it to?

13    A.    He forwards it to Steve Masera.

14    Q.    And what does he say?

15    A.    "Please pay these from our foundation as scholarships - in

16    a separate note.  Please make sure to put names and ID

17    numbers."

18    Q.    Now, you said "separate."  It actually says "deprecate,"

19    but you substituted the word "separate"?

20    A.    Correct.

21         MR. FRANK:  Could we look, for the witness only, at

22    Exhibit 212, please.

23    Q.    What is this document?

24    A.    An e-mail from Jovan Vavic to Rick Singer.

25    Q.    And what is the date?

```
 1   A.   August 4, 2016.

 2   Q.   So this is a year later?

 3   A.   Yes.

 4   Q.   And what is the subject?

 5   A.   "Loyola tuition."

 6             MR. FRANK:  The government offers 212.

 7             THE COURT:  Admitted.

 8             (Exhibit 212 admitted into evidence.)

 9             MR. FRANK:  Again, if we could start at the bottom of

10   the e-mail from Lisa Vavic to Jovan Vavic.

11   Q.   What is the date of that e-mail?

12   A.   July 28, 2016.

13   Q.   And what is the subject?

14   A.   "Loyola tuition."

15   Q.   And what are the amounts that are listed?

16   A.   $19,875 and $20,025.

17   Q.   And the total?

18   A.   $39,9000.

19   Q.   Who does Mr. Vavic send that to?

20   A.   He sends that to Rick Singer.

21   Q.   And what does he say?

22   A.   "Hello Rick, here is the information you requested.

23   Thanks, Jovan."

24   Q.   And how does Mr. Singer respond?

25   A.   "I will ask my office to send by the end of this week.
```

1    Thanks."

2    Q.    And again, the date of this exchange?

3    A.    August 3, 2016.

4          MR. FRANK:  I'd now like to show the witness only

5    Exhibit 238, please.

6    Q.    Do you recognize this document?

7    A.    Yes.

8    Q.    What is it?

9    A.    It's an e-mail from John Wilson to Rick Singer.

10   Q.    What is the subject?

11   A.    "Connecting on my daughters."

12   Q.    What is the date?

13   A.    December 9, 2016.

14         MR. FRANK:  The government offers 238.

15         THE COURT:  Admitted.

16         (Exhibit 238 admitted into evidence.)

17   Q.    Could you read the e-mail for the record, please.

18   A.    "Rick, I hope you are well.  Long time since we worked

19   together on Johnny.  Love to chat regarding my daughters and

20   high school et cetera.  We are still in Europe."

21   Q.    And signed "John B. Wilson"?

22   A.    Yes.

23         MR. FRANK:  Can we show the witness only Exhibit 409,

24   please.

25   Q.    Do you recognize this document?

```
 1   A.   Yes.

 2   Q.   What is it?

 3   A.   It's an e-mail from Marci Palatella to Leslie Wilson.

 4   Q.   What is the date?

 5   A.   October 27, 2017.

 6        MR. FRANK:  The government offers 409.

 7        MR. KENDALL:  Objection, your Honor, as we previously

 8   addressed.

 9        THE COURT:  It's admitted over the objection by the

10   defendant Wilson.

11        (Exhibit 409 admitted into evidence.)

12        MR. FRANK:  This is a long chain, somewhat long chain

13   the jury will have in evidence.

14   Q.   I just want to direct your attention to the second e-mail

15   in the chain to start from Leslie Wilson on October 27, 2017.

16        MR. FRANK:  It's the second from the top, Ms. Lewis.

17   Q.   Do you see she writes, "Marci, it was fabulous seeing you.

18   I love our visits together.  Thank you for lunch.  My treat

19   next time."

20   A.   Yes.

21   Q.   Could you read the last paragraph?

22   A.   "I had a few thoughts about Rick and USC.  Easier to talk

23   on the phone.  I'm boarding my plane now, so let's connect in

24   the next few days."

25   Q.   And how does Ms. Palatella respond to Ms. Wilson?
```

1   A.   "Leslie, absolutely loved seeing you.  Only sorry to have

2   our time cut so short.  You look fabulous.  Would love to talk,

3   advice is always invaluable, likely on your flight but if you

4   have a moment later today please call.  Love you, Marci."

5   Q.   Do you recognize the name Marci -- the name Palatella?

6   A.   Yes.

7   Q.   How do you recognize it?

8   A.   In prior exhibits there was a reference to Gino Palatella.

9        MR. FRANK:  Could we just quickly call up Exhibit 372,

10  please.

11  Q.   Do you see the date here is August 28, 2017?

12  A.   Yes.

13  Q.   And this is the e-mail headed "Here are the students I

14  have from you so far."

15       MR. FRANK:  Could we just show the subject line.

16  Q.   "These are the athletes I have from you."  Do you see

17  that?

18  A.   Yes.

19  Q.   Do you see on Ms. Heinel's e-mail the name Gino Palatella?

20  A.   Yes.

21  Q.   There's a sport next to it?

22  A.   Yes.

23  Q.   What is the sport?

24  A.   It's listed as "MFB," which I understand to be men's

25  football.

1   Q.   So the date of this is what?

2   A.   August 28, 2017.

3   Q.   If we could go back to 409, the e-mail exchange between

4   Ms. Palatella and Leslie Wilson, what is the date there?

5   A.   October 27, 2017.

6   Q.   Thank you.  Special Agent, on the desk in front of you

7   there should be a disc labeled 563.

8   A.   Yes.

9   Q.   Have you had an opportunity to review that disc?

10   A.   Yes.

11   Q.   What is it?

12   A.   It's a call between Marci Palatella and Rick Singer.

13   Q.   And those are your initials on the disc?

14   A.   They are.

15        MR. FRANK:  The government offers 563.

16        THE COURT:  It will be admitted.

17        MR. KENDALL:  Same objection, your Honor.

18        THE COURT:  Over objection of defendant Wilson.

19        MR. KELLY:  And Aziz as well, your Honor.

20        THE COURT:  And the defendant Aziz.

21        (Exhibit 563 admitted into evidence.)

22        MR. FRANK:  If the jurors could turn to 563 in their

23   binders.

24   Q.   What is the date of this call, Special Agent?

25   A.   It's dated September 15, 2018.

1    Q.    So this is about a year later after that last e-mail?

2    October 2017 is the last e-mail?

3    A.    Yeah, approximately a year later.

4          (Audio recording played.)

5          MR. FRANK:  Can we have one moment, please, just so

6    the jurors can get there, please.  Thank you.

7          THE COURT:  It's at the very end of the first binder.

8          MR. FRANK:  Okay.  You can start from the top.  Thank

9    you, Ms. Lewis.

10          (Audio recording played.)

11          MR. FRANK:  Stop it right there.

12    Q.    Special Agent, I neglected to ask you, have you had an

13    opportunity to review this transcript?

14    A.    Yes.

15    Q.    And is it a fair and accurate transcription of the

16    recording?

17    A.    It is.

18    Q.    And are those your initials at the bottom?

19    A.    Yes.

20          MR. FRANK:  Can we turn to page 6 of the transcript.

21    We're going to jump ahead.  We're going to move to page 6, line

22    13.  And once the jurors get there, page 6 line 13, Ms. Lewis,

23    if you could pick up, Ms. Lewis, at 4 minutes and 28 seconds.

24          (Audio recording played.)

25          MR. FRANK:  We're going to stop it right there.

1    Q.   Special Agent, the date of this call was September 15,

2    2018?

3    A.   Yes.

4    Q.   Were there calls intercepted on that same date on Mr.

5    Singer's -- on the wiretap on Mr. Singer's phone with John

6    Wilson?

7    A.   Yes, there were.

8    Q.   On the desk in front of you are two discs labeled 561 and

9    552.  Do you recognize those discs?

10   A.   Yes, I do.

11   Q.   What are they?

12   A.   They're calls between John Wilson and Rick Singer on

13   September 15, 2018.

14   Q.   The same date as the call we just listened to?

15   A.   Yes.

16        MR. FRANK:  The government offers 561 and 562.

17        THE COURT:  It will be admitted.

18        (Exhibits 561 and 562 admitted into evidence.)

19        MR. FRANK:  If the jurors could turn to 561 in their

20   binders, please.

21   Q.   And while they do that, Special Agent, have you had an

22   opportunity to review this transcript?

23   A.   Yes, I have.

24   Q.   And is it a fair and accurate transcript of the recording?

25   A.   Yes, it is.

1   Q.   Are those your initials at the bottom?

2   A.   They are.

3   Q.   Is the same true for the transcript of Exhibit 562; you

4   reviewed that and it's fair and accurate?

5   A.   Yes.

6        MR. FRANK:   If we could start, Ms. Lewis, at the

7   beginning of the recording at 561.

8        (Audio recording played.)

9        MR. FRANK:   We're going to stop it right there just

10  for a moment.

11  Q.   Special Agent, if you could turn to page 8 of the

12  transcript.  At line 9 on page 8 Mr. Singer says, "And, you

13  know this, that if you said you wanted to go somewhere like

14  Stanford or Harvard or Yale and go through a different door,

15  you can do that, but to go in directly, you got to be -- just

16  to play, you got to be 35, 36 plus essentially perfect grades."

17       Do you see that?

18  A.   Yes.

19  Q.   Then at line 17, Mr. Wilson responds, "On the other doors

20  that you have, certainly things like crew, can they try that?"

21       Who is the first person in that phone call to mention

22  athletics?

23  A.   Mr. Wilson.

24  Q.   And then on the next page at line 11 on page 9, Mr. Wilson

25  says, "So what kind of deals is it there?  Is it like, you

1    know, water polo and a donation?  Or what is it, like, you

2    know, if you get into that," who is the first person to mention

3    athletics and money in the same sentence?

4    A.    Mr. Wilson.

5    Q.    Then at line 18, Mr. Singer says, "Harvard is -- Harvard

6    is, it's usually about 1.2."  And how does Mr. Wilson respond?

7    A.    "Jesus."

8    Q.    Then Mr. Singer says, "Stanford is 1.2, but, you know, the

9    back door is -- Harvard is asking for 45 million."  And how

10   does Mr. Wilson respond?

11   A.    "Good God."

12          MR. FRANK:  If we could resume at page 11, I think

13   we're at line 5 or 6.

14          (Audio recording played.)

15          MR. FRANK:  Stop it right there, Ms. Lewis.

16   Q.    Special Agent, at page 16, line 3, they're talking about

17   Stanford, and Mr. Wilson says, "You're saying that's a minimum

18   of 1.2 on the side door?"  And Mr. Singer responds, "Yeah."

19          Do you see that?

20   A.    Yes.

21   Q.    And then Mr. Wilson says, "What sports would be best for

22   them?  Is crew the best, even you're talking about the ivies

23   and stuff like that, or is that not going to even matter?"

24   Mr. Singer responds, "They -- for me, it doesn't matter.  I'll

25   make them a sailor or something because of where you live."

1          Special Agent, what is the name of Mr. Wilson's

2    company?

3    A.   Hyannis Port Capital.

4    Q.   And do you recall we looked at the logo earlier?

5    A.   Yes.

6    Q.   What was the logo of Hyannis Port Capital?

7    A.   Illustration of a sail from a sailboat.

8    Q.   This call was made from a cell phone for Mr. Wilson?

9    A.   Yes.

10   Q.   Have you reviewed the billing records for that phone?

11   A.   Yes.

12   Q.   And where does the billing statement come back to?

13   A.   To Hyannis Port, Massachusetts.

14        MR. FRANK:  Thank you.  Could we pick up at line 16,

15   please.

16        (Audio recording played.)

17   Q.   Special Agent, the call terminated there.  Do you know

18   what happened?

19   A.   I don't.  The call was disconnected for some reason.

20        MR. FRANK:  If we could turn to page 18 of the

21   transcript.

22   Q.   At line 13, Mr. Singer said, "Well, if you just try the

23   athlete side and you were using the side door with the athlete,

24   it's a done deal, just like with John."

25          What is the name of Mr. Wilson's son?

1    A.    John.

2    Q.    And then Mr. Wilson says, "Right, but you're saying

3    athlete side even as an alumni is essentially 1.2."  Mr. Singer

4    says, "Absolutely.  We got --"  Wilson says, "But if you're --"

5    And then how does Mr. Singer respond at line 20?

6    A.    "Guy is giving up their spot.  He's -- they're not a good

7    enough athlete to compete with."

8    Q.    And if we turn to page 19, at line 13, in the middle of

9    the line, Mr. Wilson says, "Are those numbers -- are there any

10   way to make those like tax deductible as like donations to the

11   school and stuff?  How does that work?"

12          And Mr. Singer responds, "They're all tax -- it's all

13   tax deductible.  It's going into a nonprofit 501(c)(3).  It's

14   all tax deductible, every one, every piece of it."

15          Who is the first person to ask about making these

16   payments tax deductible in this call?

17   A.    Mr. Wilson.

18   Q.    Did the call resume?

19   A.    It did.

20          MR. FRANK:  Could we turn to Exhibit Transcript 562,

21   please.  Ms. Lewis, if you could start at the top.

22          (Audio recording played.)

23          MR. FRANK:  If we could turn to page 6 of the

24   transcript.

25   Q.    At line 17, Mr. Wilson says, "I mean, their scores are

1    already good enough to get into anyplace a side door, I assume

2    with the athletes, right?"

3              And how does Mr. Singer respond?

4    A.   He says, "Uh, not really.  They're okay.  I still got to

5    fight for it because we don't have --"

6    Q.   And if I could turn your attention to page 4.  Mr. Singer

7    refers at line 10 to a meeting at 10:00 and at something called

8    the Marriott Wharf, and Mr. Wilson responds "Marriott Long

9    Wharf, that's downtown Boston."  Do you see that?

10   A.   Yes.

11   Q.   The following Friday was September 21?

12   A.   Yes.

13   Q.   That was six days after this call?

14   A.   Yes.

15   Q.   Are you aware of what happened on September 21 in the

16   FBI's investigation of Mr. Singer?

17   A.   Yes, I am generally aware because I assisted in obtaining

18   rooms for the meeting in the Marriott Long Wharf.

19   Q.   What happened?

20   A.   My understanding is that there was a consensually recorded

21   meeting with Mr. Singer after which Mr. Singer was approached.

22   Q.   Approached by?

23   A.   FBI agents.

24   Q.   And what is an approach?

25   A.   An approach is basically when we attempt to interview

1   typically a subject of an investigation by confronting them

2   with evidence and seeking to obtain a statement from them

3   typically in the hope of soliciting their cooperation.

4   Q.   Did you have any involvement in the approach of Mr. Singer

5   on September 21, 2018 at the Marriott Long Wharf in Boston?

6   A.   I did not, beyond helping them obtain the hotel rooms.

7        MR. FRANK:  Thank you, Special Agent.  I have no

8   further questions.

9        THE COURT:  Cross-examination, Mr. Kendall?

10       MR. KENDALL:  Yes, Your Honor.  I just need a minute

11  to get my papers organized.

12       THE COURT:  Yes, of course.

13            CROSS-EXAMINATION OF KEITH BROWN

14  BY MR. KENDALL:

15  Q.   Good afternoon, Agent Brown.

16  A.   Good afternoon.

17  Q.   Other than passing you in the hallway yesterday, we've

18  never met before, correct?

19  A.   I don't believe so, no.

20  Q.   Okay.  And you've been an agent for seven years?

21  A.   Yes, approximately.

22  Q.   I take it you take pride in your FBI service?

23  A.   Absolutely.

24  Q.   And you believe that the FBI provides thorough training to

25  its agents, correct?

```
 1   A.   Yes.

 2   Q.   Okay.  You agree it sets high standards for how to conduct

 3   investigations, correct?

 4   A.   Yes.

 5   Q.   And one of the purposes of those high standards that the

 6   FBI puts in is to make sure they can be effective in finding

 7   out who committed a crime, correct?

 8   A.   Sure.

 9   Q.   And another purpose of those standards is to protect false

10   -- to protect innocent people from false accusations, correct?

11   A.   Sure.

12   Q.   And you agree with me with the job as an agent doing a

13   thorough investigation to protect people from false accusations

14   is as important as catching the bad guys, correct?

15   A.   Yes.  Certainly in my experience I strive to do as

16   thorough an investigation as I can.

17   Q.   And you take great pride in that, that that's what the

18   Bureau wants you to do, correct?

19   A.   I take pride in my work, yes.

20   Q.   Yes.  And part of the pride in your work is that you take

21   pride in making sure that innocent people are protected from

22   false accusations, correct?

23   A.   For sure.

24   Q.   And that's why you think people have to follow many of the

25   standard rules the FBI sets for investigations, correct?
```

 1   A.   Sure.

 2   Q.   That's why it's important for agents to gather all of the

 3   evidence, whether it's good or bad, for the prosecutors,

 4   correct?

 5   A.   Absolutely.

 6   Q.   And that's why agents want to make sure that everybody can

 7   see the full story and see all of the evidence and not just one

 8   sliver of it, correct?

 9   A.   Sure.

10   Q.   Okay.  You didn't pick all the e-mails that were presented

11   with you this morning, did you?

12   A.   No.

13   Q.   Mr. Frank picked every one.

14   A.   Yes.

15   Q.   Okay.  And you can't sit here today and tell us that's a

16   complete picture of the story, correct?

17   A.   That's not what I was asked to do, no.

18   Q.   Right.  You were not asked to use your training and your

19   experience and your sense of fair play in picking the evidence,

20   correct?

21   A.   That was not my role here today, no.

22   Q.   The government cherry-picked it?

23   A.   They presented evidence that they think is relevant to

24   their case.

25   Q.   Okay.  And you from your own perspective as an agent want

 1  to make sure that the jury sees all the relevant evidence,

 2  correct?

 3  A.   I understand that's your position, your job.

 4  Q.   Isn't it your position, too, that you want the jury to see

 5  all the relevant evidence?

 6  A.   That's the purpose of the trial, sir.

 7  Q.   Yeah.  And that's the FBI, too; they want everybody to see

 8  a complete story of all the relevant evidence.  They don't want

 9  to cherry-pick, correct?

10          MR. FRANK:  Objection.  He's not testifying as to the

11  FBI's view.

12          THE COURT:  Yes, sustained.

13          MR. KENDALL:  I'd like to have you take a look at two

14  exhibits.  If we could start with Exhibit 8126.

15          MR. FRANK:  Your Honor, I object.  This is not in

16  evidence.

17          MR. KENDALL:  You're right.  If we could show the

18  witness, please.  This is documents the government gave me,

19  your Honor.

20          MR. FRANK:  That doesn't make them admissible.

21          THE COURT:  What's the purpose?  Do you want to

22  refresh his memory about something?

23          MR. KENDALL:  No.  I want to ask him if he can

24  identify these two e-mails as he's done with all the e-mails

25  with Mr. Frank.  These are more of the same stream of

1    communication.  And then I want to put them in to impeach some

2    of the documents that have been put in.

3              MR. FRANK:  There's been no impeachment, your Honor.

4              MR. KENDALL:  May I show him the documents, your

5    Honor?

6              THE COURT:  Yes, show him the document.

7              MR. KENDALL:  If you could take a look at Exhibit

8    8126, just for the witness, please.

9              MR. FRANK:  Could we have a copy of these exhibits?

10             THE COURT:  How about copies for counsel?

11             MR. KENDALL:  Sure.

12   Q.   I'm going to show you a document dated July 29, 2013.  Do

13   you see there it has the --

14             MR. FRANK:  Your Honor, I'm going to object to this

15   line of cross.

16             THE COURT:  Before the document is admitted --

17             MR. KENDALL:  I'm trying to lay the foundation for it

18   now, your Honor.

19             THE COURT:  Go ahead.

20             MR. FRANK:  May I approach?

21             THE COURT:  Approach?

22             MR. FRANK:  I have an objection to what's about to

23   happen.

24             THE COURT:  All right.  I'll see counsel.

25                   *** Beginning of sidebar ***

```
 1              MR. FRANK:  Your Honor.

 2              MR. KENDALL:  These are the two documents.  If you

 3    notice, they both have the U.S. Attorney's Office Bates number

 4    on them.  They are having some of the same e-mail addresses

 5    that he's just identified and testified for.

 6              MR. FRANK:  I'm not disputing their authenticity, your

 7    Honor.

 8              MR. KENDALL:  Your Honor, the issue is, he's put in

 9    part of a dialogue between my client.

10              THE COURT:  Try to keep your voice down, please.

11              MR. KENDALL:  He's put in part of a dialogue between

12    my client and Mr. Singer.  For both completeness and for state

13    of mind, I want to have the complete e-mail exchange that was

14    going on at the relevant time and not just cherry-picked ones.

15              MR. FRANK:  Your Honor, he's entitled to put on a case

16    when he puts on a case, but he's only entitled right now to

17    impeach this witness, not to use him as his own summary witness

18    to put in evidence that he wants to put in.  That's in the

19    defense case.  This witness is here to read evidence into the

20    record.  That's what he did.

21              MR. KENDALL:  Your Honor, they had this witness put in

22    the profile which they're trying to create an impression that

23    my client saw the profile.  This directly impeaches what

24    they're trying to communicate to the jury, and I think I have a

25    right to do it in a timely and effective way.
```

A1398

1          MR. FRANK:  I don't see how this impeaches --

2          THE COURT:  Tell me about what this document is that

3    you're -- that's document 7785A.  What is it?

4          MR. KENDALL:  These are e-mails that my client sent to

5    Mr. Singer about the ACT scores that his son got.  They just

6    put in a sports profile that they claim my client saw that has

7    the wrong ACT scores.  These are much higher scores.  So if my

8    client saw the sports profile they're trying to tell the jury

9    he saw, he clearly would have corrected that you put in the

10   wrong scores because I already told you what the right scores

11   are and you didn't put them in.

12         It directly impeaches the single most important piece

13   of evidence they have in this case, which is the sports profile

14   that they say my client saw, which this proves he didn't.

15         MR. FRANK:  The e-mail we put in, first of all, the

16   special agent didn't testify that anyone saw anything.  He

17   simply testified that it was to an e-mail address that the

18   defendant later responded from.  That was the sum total of his

19   testimony.  He can't be impeached on something he didn't

20   testify about.  If they want to put this in in their direct

21   case and argue from it, they're welcome to do that.

22         MR. KENDALL:  Your Honor --

23         THE COURT:  Wait, wait, wait.

24         MR. KENDALL:  Your Honor, they put up this witness to

25   create the impression that my client received a false profile.

1    I have a right to rebut that impression with the witness they

2    did it with.  This case is being sanitized.  They're putting up

3    witnesses who don't know any of the facts and saying we can't

4    put in documents to rebut their documents.

5        MR. FRANK:  If I may briefly respond.  The government

6    intends to call a case agent as well as one of its next

7    witnesses.  This agent was here to read certain evidence into

8    the record and that's all.  I'm concerned because Mr. Kendall

9    has said that he wants to spend several hours with this agent,

10   that he wants to use him as his own summary witness, and that's

11   inappropriate.

12       He has a summary witness on his witness list.  He's

13   entitled to put in whatever evidence is appropriate to put in

14   at that time, but he's not entitled to use the government's

15   case in chief to put in his defense case unless he's impeaching

16   the witness, which he's not doing.  He's just putting in

17   evidence.

18       MR. KENDALL:  I'm further -- the witness puts in half

19   the dialogue, your Honor.  We're entitled to put in the rest of

20   the dialogue.

21       MR. FRANK:  This is not part of the same document.

22       THE COURT:  I'm going to allow you to cross-examine

23   this witness on what he testified to on direct examination.

24   I'm not going to let you put on your defense with this witness.

25       Now, go forward with your cross-examination.  If you

1    want to argue about this further at the break, which is very

2    shortly about to come, we'll do it, but I'm not going to let

3    you put your case in against this witness.  You can

4    cross-examine him on what he testified to on his direct but not

5    beyond that.

6              * * * End of sidebar * * *

7    BY MR. KENDALL:

8    Q.   Agent Brown, I think you testified you played no real role

9    in the investigation of Rick Singer and the people he was

10   involved with, correct?

11   A.   For the most part I monitored the wire and was involved in

12   some of the very early stages of the Singer investigation.  But

13   yes, that's generally correct.

14   Q.   So Mr. Frank selected you to be a person to read a bunch

15   of e-mails, but you didn't participate in the investigation of

16   those e-mails, correct?

17   A.   Correct.

18   Q.   You didn't investigate any witnesses, correct?

19   A.   No.

20   Q.   You didn't interview witnesses?

21   A.   I did not.

22   Q.   There have been hundreds of interviews in this case.

23   Would it be fair to say you didn't really participate in any

24   one or any significant one?

25   A.   Yes.

1  Q.   Okay.  And you're reading e-mails that you don't even

2  understand, correct?

3  A.   I don't know all the context of the e-mails, that's

4  correct.

5  Q.   To be -- no disrespect to you, Agent --

6  A.   None taken.

7  Q.   -- because I have great respect for you, but we could have

8  pulled somebody in off the street to read the e-mails the same

9  way you did.

10  A.   Sure.  I'm sure you can appreciate, when asked to testify,

11  that my response would be yes.

12  Q.   Okay.  And there are other agents in this case that have a

13  lot more information about it than you do, correct?

14  A.   Correct.

15  Q.   You were selected because you didn't have this

16  information, correct?

17         MR. FRANK:  Objection.

18         THE COURT:  Sustained.

19  Q.   Well, you agree with me, you don't any information where

20  many others could have testified and they do have the

21  information, right?

22  A.   My understanding is others with that information will be

23  testifying.

24  Q.   Okay.  But for you to sit here and read e-mails, you're

25  the person who doesn't know anything about the context of the

```
 1   interviews, correct?

 2   A.   Sure.

 3   Q.   And for example, that sports profile that you put in on an

 4   e-mail, that is the sports profile of Johnny Wilson --

 5   A.   Yes.

 6   Q.   You have no idea what the entries are on that, if they're

 7   accurate or not accurate?

 8   A.   I don't, no.

 9   Q.   You have no idea if there's entries on there that hurt his

10   chances of admission, correct?

11   A.   That's true.

12   Q.   But you do know John Wilson never responded to that

13   e-mail, correct?

14   A.   Without refreshing and looking at the document, I'm not

15   sure I can answer that question.

16   Q.   Mr. Frank never found a document to show you and read that

17   showed John Wilson ever acknowledged that e-mail, correct?

18            MR. FRANK:  Objection --

19            THE COURT:  Sustained.

20   Q.   Nobody from the prosecution ever selected an e-mail for

21   you to look at that showed Mr. Wilson ever responded to that

22   e-mail, correct, the October 19 one?

23   A.   Again, without seeing the document, I couldn't tell you if

24   there was a reply to it or not.  I did not --

25   Q.   As you sit here today, you cannot identify a single reply
```

1    to that e-mail, correct?

2    A.   I haven't looked for one, and I haven't been provided one.

3    Q.   So you cannot represent to this jury that such an e-mail

4    exists, correct?

5    A.   I'm not sure I follow your question.  It was entered into

6    evidence as an exhibit.

7    Q.   The October 19 e-mail was entered into evidence.  You

8    agree with me you cannot cite any e-mail to show that John

9    Wilson ever acknowledged receiving it.

10   A.   I don't believe so, no.

11   Q.   And you can't cite to this jury any e-mail that indicates

12   John Wilson ever read it or discussed it with anybody, correct?

13   A.   No.

14   Q.   "Correct," meaning you agree with me?

15   A.   Yes, yes.

16   Q.   Yes.  There was no evidence that you're aware of to show

17   that John Wilson ever read that e-mail or responded to it,

18   correct?

19   A.   That I'm aware of, no.

20   Q.   Okay.  And whatever wiretaps you've looked for in this

21   case, you've never seen anything where John Wilson was ever

22   asked about that profile by any government agent or by

23   Mr. Singer, correct?

24   A.   I personally did not do the search of all calls related to

25   Mr. Wilson.  I reviewed the calls that we discussed today.

```
 1   Q.   But the calls you reviewed, you had no memory of there
 2   being any reference to that profile in any of the calls you
 3   reviewed, correct?
 4   A.   No.
 5   Q.   Okay.  We've only got a few minutes before the break.  I'd
 6   like to go a little bit into the training you've had as an
 7   agent.
 8   A.   Sure.
 9   Q.   What training have you had on investigating white-collar
10   crime?
11   A.   We received limited training in white-collar crime during
12   the academy.  The bulk of it happens through a training agent
13   process where, during our probationary period as a new agent,
14   we're assigned a senior agent to work with, and you learn
15   primarily by working closely with them and other senior agents
16   on the squad.
17   Q.   And as part of the training or work you've had over the
18   last seven years, have you dealt with con men?
19   A.   Sure.
20   Q.   And fraudsters?
21   A.   Absolutely.
22   Q.   That's sort of one of your specialties, correct?
23   A.   Absolutely.
24   Q.   And would you agree with me some of these con men that you
25   dealt with are extremely skilled?
```

1  A.   Yes.

2  Q.   They have wonderful stories and abilities to deliver them,

3  correct?

4  A.   For sure.

5  Q.   They're almost like a musician, the way they can spin

6  their story and present it so effectively to the audience,

7  correct?

8       MR. FRANK:  I object, your Honor.  This is not

9  impeachment.

10      THE COURT:  Sustained.

11 Q.   And you would agree with me that one of the things that

12 con men do is they lull their victims into believing a false

13 story.

14      MR. FRANK:  Objection.

15      THE COURT:  He can answer that if he understands it.

16 A.   Yes, lulling is often present in fraud cases, yes.

17 Q.   And your experience has been that these con men often

18 develop their lulling stories over time until they perfect

19 them.

20 A.   I don't know if I would agree with that, but yes, they are

21 skilled at lulling their victims, yes.

22 Q.   And they sometimes develop a certain type of story or

23 presentation to carry out the fraud that they use with more

24 than one victim, correct?

25 A.   Yes.

1   Q.   Okay.  In your securities fraud work that led to this case
2   did you find that that's what that group was doing?
3   A.   Not exactly.  I think that type of approach is more common
4   at least in my experience in investment adviser-type frauds,
5   Ponzi schemes, things of that nature.
6   Q.   Okay.  Where people have sort of a fraudulent presentation
7   they use to cheat innocent victims, correct?
8   A.   In the context of lulling, it's usually because they've
9   run out of their ability to pay back victims who are asking for
10  redemption, so they'll come up with stories as to why they
11  can't provide requested wires.
12  Q.   And what types of training have you had in handling
13  informants?
14  A.   Again, primarily through limited experience at the academy
15  and then mainly through working with more senior agents.
16  Q.   Okay.  And it would be fair to say one of the things
17  you've learned about in dealing with informants is that it's
18  important to memorialize every substantive event with the
19  informant in a written report.
20       MR. FRANK:  Your Honor, this is not impeachment of his
21  testimony.
22       THE COURT:  I'm not sure he has the foundation for
23  this, but in any event, we are going to break for lunch at this
24  point.  You may step down for the time being, Mr. Brown.
25            Court will be in recess until 2:00.  We're going to

**A1407**

1   have a short afternoon session.  We are going to recess at 3:00

2   or maybe a few minutes before 3:00, so it will be just one

3   hour.  I'll see you back here at 2:00.

4        (Jury exits.)

5        THE COURT:  All right.  Be seated, counsel.

6   Approximately how long on cross-examination of this witness,

7   Mr. Kendall?

8        MR. KENDALL:  We'll finish the day, your Honor, and go

9   into Friday for sure.

10        THE COURT:  All right.

11        MR. KELLY:  I'll follow him afterwards, your Honor.

12        THE COURT:  All right.  Anything else that needs to

13   come to the Court's attention before we recess?

14        MR. KENDALL:  If I may get some guidance from the

15   Court, I want to be on track and not be wasting the jury's

16   time.  My view, Your Honor, is under Rule 106, related

17   writings, remainder of related writings, there's an issue of

18   completeness here.  There's a dialogue that's going on between

19   my client and Mr. Singer by e-mail.  My client is in Europe

20   most of this time.  And they put in some of the parts of that

21   e-mail dialogue but not all of it.

22        I'd like to put in some of the other e-mails that I

23   think fill in the holes of what's there.  And I think if he can

24   read them for the government, he can read the rest of them for

25   us, your Honor.  And I think it's important for the jury to

1    hear it together as one package as opposed to they hear half

2    the dialogue here and then a week later they hear the other

3    half of the dialogue.

4            So my request to the Court is can I put in the e-mails

5    that fill in the holes of what the government has left in the

6    dialogue that it's presented?

7            MR. KELLY:  We would join in that request, your Honor,

8    under both the rule of completeness and the ability to impeach

9    him on what he's just put into evidence.  So it's just totally

10   inefficient to have to recall him to read in some others while

11   he's here.  It makes no sense.  So we would like the

12   opportunity to do that as well.

13           THE COURT:  Mr. Frank.

14           MR. FRANK:  Your Honor, the rule of completeness

15   doesn't allow him to put in months and months of conversations

16   in the hopes of recreating an entire relationship over a period

17   of time.

18           We put in complete e-mail chains.  If there's a part

19   of a chain that they believe is missing, then they can put that

20   in under the rule of completeness, arguably.  But not a

21   relationship that spans months and years, which is what they're

22   trying to do.  They have a summary witness on the record.  It's

23   entirely efficient for them to put on their case when they put

24   on their case.  But so far, nothing that's happening here

25   has --

```
 1            THE COURT:  Yes, that's the ruling of the Court.  If
 2   there's something in a chain that was introduced on direct
 3   examination that you want to fill in, I will allow you to do
 4   that.  I'm not going to allow you to put on the defense's case
 5   in the government's case-in-chief.  We're in recess until 2:00.
 6            (Recess taken 1:05 p.m. to 2:08 p.m.)
 7            (Jury enters.)
 8            THE CLERK:  Thank you.  You may be seated.  Court is
 9   now in session.
10            THE COURT:  Good afternoon, jurors.  We're ready to
11   resume.
12            Mr. Brown, again, you're reminded that you remain
13   under oath.
14            Mr. Kendall, you may continue with cross-examination.
15            MR. KENDALL:  Thank you very much, your Honor.
16            Mr. Carter, could we go to Exhibit 525 that is in
17   evidence.  Yes, please.
18   BY MR. KENDALL:
19   Q.   Mr. Brown, I'm going to replay just a portion of the tape
20   with Rick Singer, Gordon Caplan, and Scott Treibly that you
21   were kind enough to introduce to us yesterday.  Do you remember
22   that tape?
23   A.   Yes, sir.
24            MR. KENDALL:  Randall, if we can start at the
25   beginning, and I'd like to stop at line 14 on page 2.  Include
```

1    line 14, not 15.  Actually, I may tell you to stop earlier than
2    that.  I'll probably stop after -- at the end of page 1.  Play
3    from the beginning to line 24 on page 1.
4        (Audio recording played.)
5        MR. KENDALL:  Stop it now.
6    Q.   Okay.  I want to go through this first page of the
7    transcript.  We see here that Mr. Treibly is introducing
8    Mr. Caplan to Mr. Singer for the first time, correct?
9    A.   Yes.
10   Q.   And Mr. Singer tries a joke that falls flat, correct?
11   A.   It does.
12   Q.   You agree with me?
13   A.   Yes.
14   Q.   Okay.  And then he pivots very quickly, correct?
15   A.   Yes.
16   Q.   Okay.  And what Mr. Caplan states is his wife has told him
17   something about Mr. Singer, but they've never really met or had
18   a conversation directly, correct?
19   A.   That's my understanding, yes.
20       MR. KENDALL:  If we can then start picking up where
21   you stopped, Mr. Carter, and then we'll go for about another
22   12, 15 lines.  I'll note where we should stop.
23       (Audio recording played.)
24       MR. KENDALL:  Stop, please.
25   Q.   Okay.  Now you recall later on in this tape Mr. Caplan

1    introduces himself as a corporate M&A lawyer from New York

2    City?

3    A.   I believe that might be on the next call, about 26.

4    Q.   Fair enough.  Whatever it is.

5    A.   Yes.

6    Q.   The point is Mr. Caplan introduces who he is?

7    A.   Correct.

8    Q.   He's the chairman -- I think he said co-chairman of an

9    international law firm based in New York City?

10   A.   Correct.

11   Q.   And he's a deal maker, M&A work, things of that nature?

12   A.   Correct.

13   Q.   Fair to say he's a very sophisticated, accomplished person

14   with that type of background?

15        MR. FRANK:  Objection, your Honor.

16        MR. KENDALL:  It's right on the tape, Your Honor.

17        THE COURT:  Overruled.

18        MR. KENDALL:  Thank you.

19   Q.   And here we have Mr. Singer's introduction of himself that

20   he has a $290 million company with a thousand employees,

21   correct?

22   A.   Yes.  That's what he says.

23   Q.   And 280 internationally.  "And what we do is help the

24   wealthiest families in the U.S. get their kids into school, so

25   we have the Gates', the Jobs'.  We have every NBA owner, every

    1    NFL  owner.  We get everybody".

    2            Now, you're not saying those statements are true,

    3    correct?

    4    A.   I have no basis to say those statements are true.

    5    Q.   Okay.  You don't know what part of that statement may be

    6    true and what part may be false, correct?

    7    A.   Correct.

    8    Q.   Okay.  In your experience, though, in investigating

    9    fraudsters, you know they often combine truth and lies

   10    together, correct?

   11    A.   They can, yes.

   12    Q.   It wouldn't surprise you if that were the case here,

   13    correct, if some was true and some was untrue?

   14    A.   It wouldn't surprise me, no.

   15    Q.   Okay.  And we see from these two tapes that Mr. Caplan

   16    proceeds within three, four pages to do fraudulent acts with

   17    Mr. Singer, correct?

   18    A.   Correct.

   19    Q.   After three, four pages of transcript, he's happy to

   20    falsify medical tests to get his daughter extended time,

   21    correct?

   22    A.   Correct.

   23    Q.   He agrees to do some sort of arrangement with a controlled

   24    room or controlled test so he can get a false score on his

   25    daughter's test?

1    A.    Yes.

2    Q.    And you agree with me these are discussed -- the

3    dishonesty is discussed with exquisite frankness, correct?

4    A.    Yes.

5    Q.    No beating around the bush?

6    A.    No.

7    Q.    Okay.  It is explicit to anybody here to see what the

8    state of mind is of the two participants, correct?

9    A.    I'd agree, yes.

10   Q.    Okay.  And you'd agree with me nowhere here does

11   Mr. Caplan say I want you to be an advisor to my family,

12   correct?

13   A.    Without reviewing the transcript again, I can't tell you

14   where it pivots, but I'll take your assertion that it's page 4

15   where it pivots.

16   Q.    Okay.  But nowhere does he say that I want to have a

17   multi-year relationship of you advising my children?

18   A.    They seem to get down to business pretty quick.

19   Q.    Right.  And the business does not include a multi-year

20   relationship to be advising the children, correct?

21   A.    That seems to be the case.

22   Q.    No place in this tape do they schedule visits for

23   Mr. Singer to meet every two to three, four weeks with the

24   children, correct?

25   A.    That seems to be the case, yes.

1    Q.    Nowhere do they discuss that they trust Mr. Singer so much

2    that they're going to let him meet with the children alone?

3          MR. FRANK:  Objection.

4          THE COURT:  Well, if he recalls, he can answer that.

5    A.    Again, I don't -- without expanded context in the

6    relationship between Mr. Singer and Mr. Caplan, my only basis

7    would be these two calls.

8    Q.    Right, and that's all I'm asking you about is what's in

9    these two calls.  I'm --

10   A.    In these two calls --

11   Q.    -- only focusing on what's in these two calls right now.

12   A.    By my recollection, they don't discuss that in the calls.

13   Q.    Okay.  And they certainly don't discuss getting a tutor,

14   correct, for SAT or ACT scores?

15   A.    If my memory's correct, they do discuss a woman named

16   Tatiana, I believe, in the second call.

17   Q.    Tatiana works in the office.  She's not a tutor, correct?

18         MR. FRANK:  Objection.

19         THE COURT:  Sustained.

20   Q.    What page is Tatiana on?

21   A.    Page 8 of the second exhibit, 526.

22   Q.    Of 526?

23   A.    Actually, if you look at line 19.

24   Q.    What page?

25   A.    Page 8.

1    Q.    Yeah.

2    A.    They actually do talk about --

3    Q.    Wait.  What exhibit are you on?

4    A.    526, the second call.

5    Q.    Give me just one second.  I want to organize my papers.

6    And what page are you talking about?

7    A.    Page 8, line 19.  They're talking about meeting on a

8    weekly basis with Tatiana.

9    Q.    You don't know what Tatiana's role is, do you?

10   A.    I have no idea who Tatiana is.

11   Q.    You don't know her last name?

12   A.    No.

13   Q.    Tatiana Duende means nothing to you, correct?

14   A.    It does not.

15   Q.    You have no idea what her role in this -- is in the Key,

16   correct?

17   A.    Correct.

18   Q.    There's no discussion here that Tatiana is going to be

19   tutoring, correct?

20   A.    There's not, but in terms of meeting with them on a

21   regular basis, they're clearly discussing that.

22   Q.    Not Mr. Singer, Tatiana?

23   A.    Correct, who I presume is an employee of Mr. Singer.

24   Q.    Yes.  And it doesn't -- Tatiana's going to meet.  You

25   don't even know where Tatiana is located, correct?

1    A.   I believe they say she's in New York up above on the same

2    page.

3    Q.   Where?

4    A.   Line 10.

5    Q.   Line 10.  Correct.  Thank you very much.  "Talk to my

6    person who lives in New York, Tatiana, and she'll start working

7    with Tatiana on a weekly basis."

8         It doesn't say what the work is for?

9    A.   I have no basis to say what the work is for.

10   Q.   And you don't know what Tatiana's skillset is?

11   A.   No.

12   Q.   You know what the point of this call is, correct, that

13   they're going to cheat on this test, correct?

14   A.   That seems to be the gist of it.

15   Q.   It doesn't make much sense to have a tutor for a young

16   woman who doesn't do well on tests if you're going to cheat on

17   a test, correct?

18        MR. FRANK:  Objection to what makes sense.

19        THE COURT:  I'm sorry.  The objection is based on

20   what?

21        MR. FRANK:  Speculation.

22        THE COURT:  Sustained.

23   Q.   And certainly there's no discussion of having Mr. Singer

24   meet with the children face-to-face in the house, correct?

25   A.   Again, it didn't come up in this call, but I don't know

1  the relationship between them.

2  Q.  We're just talking about these two calls.  That's all.

3  A.  Yeah.  It didn't come up in their initial conversation.

4  Q.  Mr. Caplan, you'd agree with me, is very transactional?

5  A.  He seemed to be direct.  I think he says he's a direct

6  person.

7  Q.  Yeah.  And he's been prepped by his wife, correct?

8  A.  I believe he mentioned that at the beginning.  Yes.

9  Q.  It appears he's been prepped by Mr. Treibly, as well?

10  A.  Mr. Treibly, yes.  It sounds like there was some prior

11  discussion.

12  Q.  Okay.  And at no point did Mr. Singer talk about meeting

13  and working with the President of Harvard University, correct?

14  A.  In this call, he did not.

15  Q.  No place did he talk about working with the President of

16  Tufts?

17  A.  Not in this call.  No, he did not.

18  Q.  And in no place did he talk about meeting and working with

19  the President of Brown, correct?

20  A.  Not on this call, no.

21  Q.  At no place did he talk about reading admission files at

22  two of the major universities in the United States every year?

23  A.  I don't recall him saying that in these calls, no.

24  Q.  And specifically saying that he's reading admission files

25  at Harvard, correct?

1    A.    Harvard did not come up in this call.

2    Q.    So you agree with me there is nothing in the calls with

3    Gordon Caplan where Mr. Singer's trying to establish himself as

4    a person authorized by the universities to provide the service

5    he's trying to sell to Mr. Caplan, correct?

6    A.    I don't recall, but that sounds correct.

7    Q.    Okay.  Nowhere does he say Harvard says I can have people

8    cheat on the test and they'll take the scores.  Doesn't say

9    anything like that, correct?

10    A.    No.

11    Q.    He's not trying to establish credibility for himself that

12    he's authorized to do something on behalf of a major

13    university, correct?

14    A.    Correct.

15    Q.    And at the -- and that's for both of the calls with

16    Mr. Caplan?

17    A.    Yes.

18    Q.    And he certainly didn't talk about looking for a rigorous

19    engineering school to have his children take tough math and

20    science classes, correct?

21    A.    That did not come up in those calls, no.

22    Q.    He wanted a shortcut?  Is that a yes?

23    A.    A degree, yes.

24    Q.    And he wanted to cheat?

25    A.    He wanted to improve his daughter's grades by cheating,

1    yes, her scores rather.

2    Q.   And you agree you have no basis to connect anything

3    Mr. Caplan did with anything of Mr. Wilson, correct?

4         MR. FRANK:  I object, your Honor.

5         MR. KENDALL:  I'll rephrase, your Honor.

6    Q.   There's nothing in this tape to say that Mr. Wilson is

7    involved with Mr. Caplan's test cheating, correct?

8    A.   Correct.

9    Q.   And there's nothing in the tape that was played of

10   Mr. Wilson where he talks about test cheating, correct?

11   A.   Correct.

12        MR. KENDALL:  Next I'd like to go next to Exhibit 49,

13   which is in evidence.

14   Q.   First, before we go into the exhibit itself, you testified

15   about a bunch of e-mails that were selected by the prosecutors

16   for you to read, correct?

17   A.   Yes.

18   Q.   Did you read every e-mail they showed you, or did you only

19   read some of the ones that you've seen?

20   A.   I read at least once every single e-mail that I've read

21   today.

22   Q.   No.  I'm asking a different question.  I'm sorry if I

23   wasn't clear.  Did the prosecutors in the selection of e-mails

24   they gave you to look over, are some of the ones you looked

25   over not -- you didn't read today?

1   A.    Yes.  The exhibit list was refined with time, yes.

2   Q.    Okay.  So how many total e-mails did they give you to

3   read?

4   A.    I don't recall.

5   Q.    Rough estimate percentage wise, you read half of what they

6   gave you?  You read a quarter?  You read a third?

7   A.    The -- I didn't read the prefinalized exhibit list.  I

8   didn't read every e-mail that was provided to me by the U.S.

9   Attorney's Office, if that's your question.

10  Q.    Let me see if I can ask it a better way and be more

11  helpful.

12          Do you have an estimate of the number of e-mails they

13  gave you to start with?

14  A.    I don't recall.

15  Q.    Can you tell us by how many inches of paper, rough

16  estimate of the number, 50 to 60, whatever in your good faith

17  you think?

18  A.    I don't recall.  It was broadly similar to the final list

19  of exhibits.  I don't know for certain how many were removed.

20  Q.    Okay.  Who decided to remove certain exhibits?

21  A.    The prosecutors.

22  Q.    Okay.  And if we start with that total set you started

23  with, was it -- I want to focus on just the things that deal

24  with John Wilson.  Were there John Wilson e-mails that was in

25  the starting set with you and they took them out at some point

1    so you were given a subset of the John Wilson e-mails shown to

2    you?

3    A.    Yes.  There were some that were removed.

4    Q.    Do you know how many were removed?

5    A.    I don't.  I believe it was a handful.

6    Q.    Okay.  And does a handful mean -- handful can mean

7    different things.  Can a handful mean five, a handful mean 10,

8    15?

9    A.    Again, I don't recall with certainly, but I would estimate

10    no more than five to ten.

11    Q.    Okay.  And were they e-mails in that time frame of 2013

12    and 2014?

13    A.    I don't recall.

14    Q.    Okay.  But they were e-mails between John Wilson and

15    Mr. Singer?

16    A.    I believe the e-mails that were primarily removed were

17    related to concussions is my recollection.

18    Q.    Okay.  Were there other e-mails there that were removed?

19    A.    I don't recall.

20    Q.    Were there e-mails with the high school coach Jack Bowen

21    that were removed?

22    A.    I don't remember seeing e-mails with Jack Bowen.

23    Q.    So it's fair to say your best memory is when the

24    government made a selection of e-mails to show you, they didn't

25    include any of the Jack Bowen ones, correct?

1    A.    I don't know who Jack Bowen is.

2    Q.    Okay.  And so you've certainly not seen any of his

3    e-mails, correct?

4    A.    Not that I recall.

5    Q.    Okay.  And so you'd agree with me that the e-mails you

6    read from even your exposure and limited understanding is not

7    the complete dialogue between John Wilson and Rick Singer in

8    the 2013 and 2014 time period?

9    A.    Without a doubt.

10    Q.    Okay.  And you don't know if there were important e-mails

11    kept out or unimportant ones, correct?

12    A.    Correct.

13    Q.    And you don't know if there are e-mails about test scores

14    that were kept out, correct?

15    A.    Correct.

16    Q.    You don't know if there are e-mails that are relevant to

17    the sports profile of that October 19th e-mail, correct?

18    A.    Correct.

19    Q.    Okay.  And so it would be fair to say you did not

20    represent to this jury that what you've shown is a complete and

21    accurate picture of what was discussed in 2013 and '14?

22           MR. FRANK:  I object, your Honor.

23           THE COURT:  Grounds?

24           MR. FRANK:  He's not representing anything to the

25    jury.  He's here to read documents.

 1          THE COURT:  All right.  He can answer that question,

 2   if he understands it.

 3   A.   Again, entering a limited number of exhibits in, my

 4   understanding is that my testimony is not the government's

 5   entire case.

 6   Q.   Excuse me.  I'm not asking for the government's entire

 7   case.  I'm asking for your -- what you're representing to this

 8   jury.  You're not representing that this is the entire picture

 9   of the correspondence John had with Mr. Singer, correct?

10   A.   I have no basis to say one way or another.

11   Q.   Okay.  Well, you know some of the stuff wasn't there.  You

12   just don't know how much existed that was presented?

13   A.   Yes.  Certain exhibits were not presented.  Yes.

14   Q.   But you don't know the volume that were not presented?

15   A.   I don't.

16   Q.   Okay.  I'd like to go then to Exhibit 49, which we've put

17   up.

18          MR. KENDALL:  Is this shown to everybody, Mr. Carter?

19   Thank you.

20   Q.   Why don't we go to the back of it to the bottom of page 2.

21   We see where you started.  It says "Forwarded:

22   MikaelaSanford@thekeyworldwide.com."

23          And from -- the work you've done preparing for

24   today's testimony, you know Mikaela Sanford is an employee of

25   Mr. Singer, correct?

1    A.    I know that generally.  Beyond that, I have no

2    recollection of what her role was at The Key.

3    Q.    But you see from that e-mail address it's a Key e-mail

4    address?

5    A.    Yes.

6    Q.    And you participated in the search warrants and the things

7    related to The Key e-mails?

8    A.    My participation with the search warrants was limited to

9    confirming the exhibits that I presented today were present

10   within the search warrants.  I didn't do any investigative

11   search beyond that.

12   Q.    But you know the e-mail address?  That you recognize.  You

13   recognize Mikaela's is a Key?

14   A.    The Key Worldwide, I believe, is one of the e-mail search

15   warrants.  I don't even know if that was a chain.  I reviewed

16   Rick Singer's Gmail account.

17   Q.    Okay.  And do you know if there's an involvement of Rick

18   Singer with The Key Worldwide?

19   A.    I understand that to be his company, his organization.

20   Q.    Okay.  Is it his foundation or his business?  Do you know?

21   A.    I don't know.

22   Q.    Okay.  And then it says "itinerary for John Wilson",

23   correct?

24   A.    Yes.

25   Q.    And it lists four separate schools all in the Los Angeles,

1    Southern California area, correct?  USC?

2    A.   Yes.  Southern California, yes.  I would say that's

3    correct.

4    Q.   LMU, UCSB, University of California Santa Barbara, and

5    USD,  University of San Diego, correct?

6    A.   Correct.

7    Q.   So they're going to look at a bunch of schools, correct?

8    A.   Yes.

9    Q.   Okay.  Now, if we go back to page 2.

10        MR. KENDALL:  Mr. Carter, if you'll look at the middle

11   where it states for Mr. Singer "there are no offices".

12   Q.   Mr. Singer informs Mr. Wilson, "There are no offices on

13   campus at USC.  I asked Jovan to come to campus to meet.  At

14   LMU they are not very interested in Johnny - more get in and

15   then we can speak same for others.  I can ask again but be

16   prepared for their outlook".

17        So it's clear here that Mr. Wilson and his son are

18   going to meet the water polo coach, Jovan, correct?  That's the

19   plan at least?

20   A.   He requested that Jovan meet them there.  That doesn't

21   that there was a meeting set up.

22   Q.   If we look at the top of page 2 at the third line, it

23   states "Jovan just texted me" --

24        MR. KENDALL:  Third line from the top, please,

25   Mr. Carter.

1    Q.    "Jovan just texted me.  He will meet you all at 3:30 p.m.

2    on Tuesday on the pool deck.  You will have to leave LMU

3    early", correct?

4    A.    Yes.

5    Q.    So there certainly is an intention to meet Jovan from this

6    e-mail.  You obviously can't say whether or not they did meet

7    him?

8    A.    Correct.

9    Q.    Okay.  Now, in the e-mails that you looked at but didn't

10   testify about, were there any e-mails -- did you see the

11   e-mails that described the meeting with Jovan?

12   A.    I don't recall.

13   Q.    Okay.  And then I'd like to read again something that

14   Mr. Frank covered with you, but I'd like to add a little bit

15   more to what's being read.  If in the middle of page 2,

16   Mr. Carter, if we could go about a quarter of the way down the

17   page.

18   Q.    "R", which obviously is Rick Singer, "if water polo and

19   swimming are not realistic for Johnny, then what other schools

20   that he has a realistic shot at (without help) in Southern

21   California area, southwest, and east coast".

22           You see that?  So this --

23   A.    It's not up on the screen, so could you repeat your

24   question?

25   Q.    Sure.  You see there where Mr. Wilson's message on

1    March 26, 2013, is "If water polo and swimming are not

2    realistic for Johnny, then what are the schools that he has a

3    realistic shot at (without help) in the SoCal area, southwest,

4    and east coast."

5            You see that?

6    A.   Yes.

7    Q.   You see there's a parenthetical, "a realistic shot

8    (without help)".

9    A.   Yup.

10   Q.   You understand that to be a reference to a side-door

11   donation?

12   A.   That's my interpretation of it, yes.

13   Q.   Okay.  And we hear Mr. Singer's response right above it,

14   "SMU, TCU" -- that's Texas Christian, to your understanding?

15   A.   Sounds correct.

16   Q.   "LMU, SDSU", San Diego, "UCSC, Cal Poly, SLO, CU",

17   Colorado University Bolder, Indiana, Oregon, Arizona, Rollins".

18           And then he writes in response to the question

19   "harder" -- "University of Miami, Santa Clara, USC,

20   Northeastern, BU, George Washington, Wisconsin, Tulane, and

21   USC".

22   A.   Yes.

23   Q.   So Mr. Singer describes USC as a realistic but harder

24   school for Johnny, correct?

25   A.   That seems to be the case.  Yes.

 1   Q.   And that's in March of 2013, correct?

 2   A.   Yes.

 3   Q.   And you understand Johnny's a junior in high school at

 4   that point?

 5   A.   That's correct, based on the timeline, yes.

 6   Q.   I take it the time you went to college is a lot more

 7   recent than the time I went to college?

 8   A.   I'm not sure it's that different.

 9   Q.   It is a good bit.  I assure you.

10        And you would accept that people's academic records

11   are not set in stone in their junior year?  They still have

12   more college exams to take, correct?

13   A.   Sure.

14   Q.   And so if they get a really good score on a college exam

15   after March of 2013, that can increase their likelihood of

16   getting in, correct?

17   A.   Sure.

18   Q.   If their grades are good and hold up and do well, that can

19   also change things?

20   A.   I'm not an expert on the admissions process, but sure.

21   Q.   This is an answer in a snapshot in time, correct?

22   A.   Yes.

23   Q.   Okay.  Then if we look just above that, John -- clearly

24   John is -- he's the kind of person who asks a lot of questions,

25   looks like from this e-mail.  You agree with me?

 1   A.   He asks questions, yes.

 2   Q.   He's looking to Mr. Singer to be the expert to answer

 3   questions, correct?

 4   A.   Yes.  He's asking questions of him.

 5   Q.   About the college admissions process?

 6   A.   Yes.

 7   Q.   Okay.  It's not like Mr. Caplan, how do you cheat and can

 8   you guarantee a result?  It's like how does this process work,

 9   how do these things happen, correct?

10   A.   Actually, taking a step back, what you put on the screen,

11   he's not asking about the college admissions process in

12   general.  He's asking specifically about the side door and what

13   commitment Johnny would have.

14   Q.   Yes.  And that is part of the college admissions process.

15   A.   Wasn't part of my college admissions process.

16   Q.   It may not have been.  And you shouldn't be making

17   expressions on your face to the jury.

18        MR. FRANK:  I object to that.

19        THE COURT:  No comments like that.

20   Q.   Okay.  You're just here to read documents, correct?

21   A.   Answering your questions.

22   Q.   Thank you.

23        And he says, "Traveling is only if he is playing so

24   no".  Do you know what a bench warmer is, somebody who doesn't

25   play in a game, correct?

 1   A.    Correct.

 2   Q.    Do you know what a "red shirt" is?

 3   A.    I don't.

 4   Q.    Okay.  So you have no idea what a red shirt is in college

 5   sports?

 6   A.    I know it's a term in college sports.  I don't really have

 7   time to watch college sports.

 8   Q.    Okay.  So if any of this e-mail in Exhibit 49 is talking

 9   about the role a red shirt has on an NCAA Division 1 team,

10   you're clueless on that.  And that's not being disrespectful.

11   It's just not something you're know.

12   A.    Correct.

13   Q.    Okay.  So to understand and interpret what Mr. Singer says

14   in this e-mail, it may be necessary to have someone who

15   understands the red shirt process, correct?

16   A.    Sure.

17   Q.    Okay.  You'll see there at the top, the one, two, three,

18   fourth line from the top, Mr. Singer states "They have 42

19   guys".  Do you know anything about water polo?

20   A.    Not much.

21   Q.    Okay.  You don't know if that's an exceptionally large

22   collegiate team or not, correct?

23   A.    No.

24   Q.    Do you know at least that it's a very rough sport?

25   A.    From watching it in the Olympics many years ago, yes.  It

1   seems like a fairly contact intensive sport.

2   Q.   It's like ice hockey in a swimming pool, correct?

3   A.   I don't know.

4   Q.   It's a very --

5        MR. FRANK:  Your Honor, I object to the testifying

6   that's happening here.

7        THE COURT:  Well, yes.  Ask him questions.

8   Q.   Okay.  It states "they have 42 guys and 20 plus do not

9   travel but practice," correct?

10  A.   That's what it says, yes.

11  Q.   So we know at least 20 out of the 42 are bench warmers,

12  correct?

13  A.   I don't know if bench warmers is the correct term, but

14  maybe reserve players, players who don't travel.  I don't know

15  what the correct term is.

16  Q.   It says twenty plus.  So more than 20 of the 42 do not

17  travel, which you understand means travel to a game?

18  A.   Yes.

19  Q.   I mean, they don't travel for tourism.  They travel to go

20  to games.

21  A.   Sure.

22  Q.   Okay.  So close to half or more than half do not travel

23  but practice, correct?

24  A.   Based on what Mr. Singer's saying, yes.  That seems to be

25  the case.

 1   Q.   Okay.  Does that indicate 20 plus are bench warmers?

 2   A.   Again, I don't know if they're bench warmers or younger

 3   players that don't travel with the team.  I don't have a basis

 4   to say one way or the other.

 5   Q.   Or maybe both?

 6   A.   I don't know.

 7   Q.   Okay.  "But he will be fine".  And then Mr. Singer says,

 8   "bench warming on the four-time in a row national champion is

 9   not bad as a freshman", correct?

10   A.   Correct.

11   Q.   So he's, apparently, equating bench warming with being

12   part of the 20 plus that do not travel, but practice, correct?

13   A.   That seems to be the case, yes.

14        MR. FRANK:  Your Honor, I object to asking the witness

15   to interpret e-mails he read into the record.

16        THE COURT:  Let's go forward.

17   Q.   Okay.  I'd now like to next to go to Exhibit 75, please.

18   If we could go to the last line of Exhibit 75, please,

19   Mr. Wilson asks Mr. Singer "When do I make first donation?",

20   correct?

21   A.   Correct.

22   Q.   He uses the word "donation"?

23   A.   Yes.

24   Q.   And he modifies it with "first"?

25   A.   Correct.

1  Q.   So you agree with me that implies there's going to be at

2  least a second donation?

3  A.   Yes.

4  Q.   Okay.  This e-mail is dated August 2013.  Are you aware

5  where Mr. Wilson is living at this time?

6  A.   I'm not.

7  Q.   Okay.  If you take a look at the top of page, that second

8  page we're at, he states "Where do we stand on applications?  I

9  assume they are all out and can you please send me electronic

10 copies.  What progress is Johnny making on the essays et

11 cetera?  Back up schools and USC?"

12      You agree with me Mr. Wilson is asking Mr. Singer to

13 update him on what his son Johnny is doing?

14 A.   Yes.  I agree.

15 Q.   "What progress is Johnny making on the essays et cetera?

16 Back up schools and USC?".  You see what I'm referring to?

17 A.   Yes.

18 Q.   Okay.  And if we take a look at the last line on page 75,

19 we see Mr. Wilson is e-mailing from John.Wilson@staples.eu.

20 You understand enough about the internet to agree that "eu"

21 indicates it's an e-mail account in Europe?

22 A.   Again, I don't have the basis to say that but that seems

23 to make sense.

24 Q.   You've never seen "eu" on a European e-mail account.

25 A.   .eu?  I don't think so.  I've seen country specific

1   domains, but not .eu.

2   Q.   Okay.  And then, if we could go to the middle of that

3   page, you see where it says "I believe", if we could highlight

4   that line?  He writes -- so Mr. Singer writes to John, who's at

5   Staples.eu, "I believe I have everything.  Transcript, test

6   scores, and a player profile so he can add Johnny to his

7   recruit list and present him to admissions in October".

8        You see there's a reference to player profile,

9   correct?

10  A.   Yes.

11  Q.   And Mr. Singer says he has everything.  So that includes a

12  player profile?

13  A.   That seems to be the implication.

14  Q.   Okay.  And then if we could then put that aside and go to

15  Exhibit 83.  And if we could go to the third page, please, at

16  the bottom, we see there at the second line from the bottom

17  Mr. Wilson is -- bottom of the second -- of the third page,

18  please, starting on October 12th.  Okay.

19        On October 12, 2013, Mr. Wilson sends an e-mail to

20  Mr. Singer.  And this time he's sending it from a Hyannis Port

21  Capital e-mail account, not the Staples one, correct?

22  A.   Right.

23  Q.   And he writes "Hope all is well.  I wanted to catch up on

24  where the college app process stands," and then we go to the

25  next page, "the total application status and when J is taking

1    the new SAT and ACTs et cetera.  Is there a time we can chat

2    today or tomorrow?  John".

3              Again, he's asking Mr. Singer to update him on what

4    his son is doing, correct?

5    A.   Yes.

6    Q.   Okay.  And he's referring to retaking the SAT and ACTs

7    again, correct?

8    A.   Yes.

9    Q.   Okay.  Let's go back to the third page, the response

10   that's just above this e-mail exchange.  It starts with "common

11   application".  He wrote, "common application will be submitted

12   between December 1st and 15th after the next test dates and

13   apps done.  Jovan has Johnny's stuff and asked me to embellish

14   his profile more, which I am doing".

15             Okay.  So he's referring to embellishing a profile,

16   correct?

17   A.   Yes.

18   Q.   If we look up a couple lines above that where it says "R,

19   thanks", John then writes to Mr. Singer, "When is Johnny going

20   to have his profile and teacher recs done?  What about other

21   essays?  Also, when is Jovan going to be able to give us a

22   decision on USC?  And when do I pay you?"

23             Okay.  Now, if we take a look just above that to

24   Mr. Singer's response, "First is to finalize the Personal

25   Statement - this is all about Johnny putting in time not me -

1  my work is done quickly or is done".  Then he responds, "The

2  profile I am assuming you are speaking about Navience".

3        So we have Mr. Singer refers to a profile.  John asks

4  when's the profile going to be done.  Then Singer says, I

5  assume you're referring to a Navience profile, correct?

6  A.  Yes.

7  Q.  Do you know what a Navience profile is?

8  A.  No idea.

9  Q.  From the days when you applied to college, they didn't

10  have Navience as the --

11  A.  No.

12  Q.  -- system?  You're not here testifying that Navience is

13  referring to a sports profile for USC, are you?

14  A.  I don't know what a Navience profile is.

15  Q.  Okay.  All we know is, when John Wilson is, from wherever

16  he is, is trying to connect with Mr. Singer and say what about

17  this profile you've just mentioned, Mr. Singer focuses him on a

18  Navience profile, correct?

19        MR. FRANK:  I object to "all we know".

20        THE COURT:  Sustained.

21  Q.  Excuse me.  Excuse me.

22        You see in the e-mail when Mr. Wilson asks about

23  when's the profile going to get done, Mr. Singer tells him, I

24  assume you're talking about a Navience profile?

25  A.  That's what the e-mail says, yes.

1   Q.   Nowhere does Mr. Singer say, I assume you're talking about

2   a USC sports profile, correct?

3   A.   That's not what he says, no.

4   Q.   Okay.  And you have no idea what's the difference between

5   the two, correct?

6   A.   No.

7   Q.   Okay.  If we could take a look at the very bottom of

8   page 2, he writes "Do you have his latest" -- it starts October

9   13, 5:20 a.m.  John Wilson at Hyannis Port Capital writes to

10  Mr. Singer.

11       Then we go to the top of page 3.  "Do you have his

12  latest personal statement draft?  Can you forward it and I will

13  talk with him about it.  Does he have all your feedback and

14  clear on what additional improvements you suggest?"

15       Here he's focusing on the son's essay, correct?

16  A.   Yes.  That appears to be.

17  Q.   And then Mr. Singer responds, "I sent it to you and Leslie

18  last week".  You see that at the bottom of page 2?

19  A.   Yes.

20  Q.   And then John says, "ok that's still the latest"?

21  A.   Yes.

22  Q.   Okay.  And if we go to page -- top of page 1, about a

23  third of the way down, on October 13, 2013, e-mail from Rick

24  Singer, who writes "I took the liberty of completing the

25  essay".  And we see the title is "Life Lessons From The Water".

1    Do you see that?

2    A.    Yes.

3    Q.    So if we look at the top e-mail in this chain, we see

4    Mr. Wilson's response is "Rick, thanks so much.  Looks great.

5    Several quick suggestions to wrap this up.  That I edited

6    below".  And then he proposes a title.  He wants to split the

7    second to last paragraph.  He proposes some edits, correct?

8    A.    Yes.

9    Q.    So, in this one chain, we have Mr. Wilson doing multiple

10   e-mails with Mr. Singer just about the essay, correct?

11   A.    Yes.  They mentioned it many times.

12   Q.    Okay.  If we can go to the Exhibit 89, which we discussed.

13   Okay.  If we could go to the bottom third of Exhibit 89,

14   please.  It's Wednesday, October 23, 2013,

15   JohnWilson@Hyannisportcapital.com.  "R, what are the

16   expectations if Johnny gets into USC through this water polo

17   approach?"  Do you see that?

18   A.    Yes.

19   Q.    "Does he have to play Stanford club in addition to Sopen

20   club and/or varsity swim team?"

21            Do you know what the Stanford club team is?

22   A.    No.

23   Q.    Do you know what the Sopen club team is?

24   A.    No.

25   Q.    You certainly know what a varsity swim team is, high

1   school varsity swim team, correct?

2   A.   Yes.

3   Q.   So you don't know how many even club teams and school

4   teams Johnny is on, do you?

5   A.   No.

6   Q.   But this, apparently, is referring to two club teams and a

7   varsity swim team on top of the school water polo team.

8   A.   Not sure where it mentions the school water polo team, but

9   it definitely mentions those three.

10  Q.   Okay.  So it's those three, not counting a school water

11  polo team, correct?

12  A.   Yeah.  There doesn't appear to be a mention of a school

13  water polo team.

14  Q.   And then Mr. Singer responds, "Just be ready for practice

15  in the fall as a player on the roster or just a member of the

16  squad, but not get in the pool."

17          Now, you don't know what the phrase "not get in the

18  pool" means?

19  A.   No, not necessarily.  I assume it means not to get in the

20  pool.

21  Q.   But you don't know what it means not to get in the pool

22  for what?

23  A.   I assume for water polo, but I don't know.

24  Q.   You don't know did what -- do you know if red shirts get

25  in the pool for games and matches?

1          MR. FRANK:  Your Honor, the witness is not here to

2     interpret documents.

3          THE COURT:  Sustained.

4     Q.   Okay.  You don't know what that phrase refers to, correct?

5     A.   No.

6     Q.   You don't know if there's any special language relating to

7     water polo that relates to it?

8          MR. FRANK:  Objection.  Asked and answered.

9          THE COURT:  Sustained.

10    Q.   Okay.  Then we see the response is "Thanks we are

11    encouraging Johnny to focus on water polo this spring and he

12    will do Sopen and Stanford club", correct?

13    A.   Yes.

14    Q.   "Not varsity swimming - as that requires him to skip all

15    senior trips".  Then it says, "That way he can take senior trip

16    to Spain for a week and also spend two weeks in the spring

17    coming to Europe to visit with us".  Do you see that?

18    A.   Yes.

19    Q.   So Mr. Wilson is saying that when his son goes to Europe

20    he can visit with John?

21    A.   Yes.

22    Q.   That appears to indicate John is in Europe and the boy is

23    in California?

24    A.   Yes.

25    Q.   And then he says, "I strongly prefer he plays as hard as

**A1441**

1    he can and at least suits up and scrimmages with the team.

2    Would it also make sense for him to try a week of camp at USC",

3    correct?

4    A.   Yes.

5    Q.   And do you understand that if somebody suits up and

6    scrimmages, they'll be in a swimming pool?

7    A.   If that's for water polo, yes.

8         MR. KENDALL:   Next, if we could have Exhibit 101,

9    please.   Okay.

10   Q.   This is an e-mail between Mr. Singer and Mr. Vavic in

11   January 2014.   We see in the middle of the line "Rick, is

12   Johnny still interested in USC, if so we need his fall grades

13   (unofficial is fine)".   You see that?

14   A.   Yes.

15   Q.   Okay.   So these -- we're talking about grades that are in

16   the fall, really in the middle of his senior year of high

17   school, correct?

18   A.   Yes.   That sounds correct.

19   Q.   Okay.   And then Singer's response is "absolutely, family's

20   ready to help.   I will forward ASAP.   Thank you".

21        And then Mr. Vavic writes "this will be a big class".

22   You see that?

23   A.   Yes.

24   Q.   "We already have 12 verbals and 16 very interested".   You

25   don't know what verbals or very interested mean, I take it?

1   A.   I assume a verbal is someone who has given --

2   Q.   Please don't assume.  If you know specifically --

3        MR. FRANK:  Your Honor, this entire testimony he's

4   asking him to assume.

5        THE COURT:  He is assuming.  He can answer that.

6   A.   I assume verbal -- verbals refer to verbal commitments to

7   attend and 16 would be potentially people interested in the

8   program.

9   Q.   Okay.  And it states -- and Vavic wrote, "I cannot

10  guarantee anything", correct?

11  A.   Yes.

12  Q.   Okay.  Then I'd like to go to Exhibit 126, please.  Okay.

13  If we could -- we see this is an e-mail from

14  DebbieRogers@hyannisportcapital.com?

15  A.   Yes.

16  Q.   Fair to say that indicates she has some employment or

17  other affiliation?  She's using Hyannis Port Capital as her

18  e-mail address?

19  A.   Yes.

20  Q.   And it's to John Wilson and to Leslie Wilson both,

21  correct?

22  A.   Yes.

23  Q.   And it's dated July 31st, and it says "USC gift

24  acknowledgment", correct?

25  A.   Yes.

1    Q.    And it's from the "SC Trojan Athletic Fund", correct?

2    A.    Yes.

3    Q.    Okay.  So we turn to page 2.  It's John and Leslie Wilson

4    at 2 Fleur Place, Atherton.  And they get a letter that says

5    "Thank you for your generous gift to USC athletic men's water

6    polo in the amount of $100,000", correct?

7    A.    Correct.

8    Q.    "Maintaining state-of-the-art facilities is an essential

9    part of USC's commitment to excellence.  Through your

10   contributions, you are helping the University achieve this

11   important goal."  It says, "On behalf of the young athletes

12   that will benefit from your anonymous gift, thank you.  Ron

13   Orr".  It says it's anonymous, but they know it's from the

14   Wilson's, correct?

15   A.    The school seems to know, yes.

16   Q.    And it's from a man named Ron Orr, correct?

17   A.    Yes.

18   Q.    And his title is Associate Athletic Director?

19   A.    Yes.

20   Q.    So he's obviously an employee of USC?

21   A.    Appears to be, yes.

22   Q.    Okay.  And he has some sort of management role if he's got

23   the title of Associate Athletic Director, correct?

24   A.    That would be the assumption, yes.

25   Q.    Okay.  And there's a cc: to Jovan Vavic?

1   A.   Yes.

2   Q.   Okay.  Then we have Exhibit 137.  That's dated January 12,

3   2015, correct?

4   A.   Yes.

5   Q.   And if you take a look at the e-mail address, it's

6   JohnBWil@USC.edu.  I take it as part of your preparation you've

7   determined that's Johnny Wilson's e-mail account at USC,

8   correct?

9   A.   It appears to be, yes.  I don't believe I independently

10  verified that's his e-mail address.

11  Q.   Well, "edu" indicates a school, correct?

12  A.   It does.

13  Q.   USC is the school he was attending, correct?

14  A.   Yes.

15  Q.   Okay.  And this father and son are similar names, but this

16  is JohnBWil@USC, correct?

17  A.   Correct.

18  Q.   You have no reason to believe that my client Mr. Wilson

19  was at USC, do you?

20  A.   No.

21  Q.   Okay.  So -- and it's addressed to Jovan Vavic with an

22  e-mail address there.  And he writes, "Hello Jovan, I hope that

23  you had a great break and wonderful holiday season.  I wanted

24  to thank you and illustrate how profoundly appreciative I am

25  for the incredible opportunity you have given me here at USC as

1   an individual member on the team as well as a student at this

2   school".

3           So he writes he's a member of the team, correct?

4   A.   Yes.

5   Q.   Okay.  And then he says, "it's a bigger commitment than I

6   had planned", and his grades reflected his inability to balance

7   sports and athletic life?

8   A.   Yes.

9   Q.   Okay.  And he also notes he had a third concussion,

10  correct?

11  A.   Yes.

12  Q.   Obviously, based upon the e-mails you've read, it hasn't

13  shown where that third concussion took place, correct?

14  A.   No.  I don't know the details of that.

15  Q.   Okay.  And so he states he's going to resign from the

16  water polo team as a result of these issues, correct?

17  A.   Yes.

18          MR. KENDALL:  Your Honor, there's a couple of

19  scheduling things we need to discuss.  This might be a good

20  time, and I can tighten up.

21          THE COURT:  You may step down for the time being,

22  Mr. Brown.

23          We are going to be in recess, jurors, as I said.

24  Tomorrow we do not have a session, so you're off until Friday

25  morning.  Friday morning at ten of 9:00 a.m. we'll return.

1    You'll have a full day on Friday.

2         Next week I'm hopeful that one of the days we're going

3    to be able to not have a session.  We're going to talk about

4    that a little bit today, but I'll let you know on Monday.

5         So it is important now.  You're going to have a full

6    day where you don't have to think about this case and where

7    people will no doubt ask you about the case.  Again, honor my

8    instructions about not talking about this case with anyone else

9    or doing any independent research.  That would be

10   inappropriate.

11        Have a pleasant rest of this day and a pleasant day

12   tomorrow off.  I'll see you on Friday morning at 9:00 a.m.

13        (Jury exits.)

14        THE COURT:  On Friday morning, how much longer on the

15   cross, Mr. Kendall?

16        MR. KENDALL:  Not sure.  I think it could be a half

17   hour to an hour, but I've got to go through things and

18   reorganize and tighten up.

19        THE COURT:  And Mr. Kelly?

20        MR. KELLY:  I'd say the same thing.

21        THE COURT:  Half an hour to an hour.

22        MR. KELLY:  Half an hour to an hour, and I've got to

23   reorganize as well.

24        THE COURT:  Okay.  And then after Mr. Brown?

25        MR. FRANK:  Your Honor, given the way things are

**A1447**

```
 1    going, I think we're going to change our witness order for
 2    Friday.  We have two witnesses -- I'm sorry.  We have one
 3    witness who's flying in from out of town, so we'd like to get
 4    her on and off.  So our current intention is to call Mikaela
 5    Sanford after Special Agent Brown, and then two short
 6    witnesses, Rachel Sih and Mark Deckett, and then Special Agent
 7    Keating.
 8              THE COURT:  Rachel, how do you spell her last name?
 9              MR. FRANK:  S-i-h.
10              THE COURT:  I'm sorry?
11              MR. FRANK:  S-i-h.
12              THE COURT:  And then who was after her?
13              MR. FRANK:  Mark Deckett.
14              THE COURT:  And those are short direct exams?
15              MR. FRANK:  Yes, your Honor.
16              THE COURT:  And then after that?
17              MR. FRANK:  Special Agent Keating.
18              THE COURT:  The one who was going to go forward.
19              MR. FRANK:  Yes, your Honor.
20              THE COURT:  All right.
21              MR. KELLY:  I'm not sure I heard correctly.  They're
22    taking those three out of order, or we're going to complete
23    Agent Brown?  Did I mishear that?
24              THE COURT:  We're going to complete Agent Brown first.
25              All right.  Counsel, with respect to next week, it
```

1    would be better for the Court to have the day that we're not

2    going to have a session on Wednesday rather than Friday.  Does

3    that create any problems for anybody?

4            MR. KENDALL:  Your Honor, that may help solve some,

5    because Mr. Haden's lawyer told me he was not available for the

6    deposition on Friday.  I can go back and check with him on

7    Wednesday.

8            THE COURT:  Wednesday will be the day that we will not

9    have a session next week.  We will have a session on Friday.

10            MR. KENDALL:  May I ask another scheduling issue, your

11    Honor?

12            THE COURT:  Yes.

13            MR. KENDALL:  My instincts tell me that the

14    government's case may be going more quickly than we

15    anticipated, but it also indicates to me that to follow the

16    Court's preferences, we're going to probably have to put more

17    people in our case for things that we can't do in the

18    government's case.

19            Could we get an estimate from the government when they

20    realistically think they're going to rest, because I don't want

21    to be cut short and I need things to be lined up and ready to

22    go?

23            THE COURT:  Can you estimate that at this stage,

24    Mr. Frank?

25            MR. FRANK:  Well, I will tell you that this

1    cross-examination is far longer than I anticipated for a

2    reader.  I guesstimate that we will fill the week next week,

3    and  whether we bleed over into the following week is not clear

4    to me.

5              MR. KENDALL:  Thank you.

6              THE COURT:  Fair enough.

7              All right.  There were two matters that the defendants

8    asked me with respect to limiting instructions to the jury.

9    Has the government had a chance to review those?

10             MR. FRANK:  Yes, we have, your Honor.

11             THE COURT:  And do you have a position on either or

12   both?

13             MR. FRANK:  We oppose both of them and we don't

14   believe either one is -- in fact, we don't feel a limiting

15   instruction is necessary in either event, but we certainly

16   oppose these limiting instructions.

17             We -- with respect to the Jovan Vavic limiting

18   instruction, I made crystal clear the timing in my direct

19   examination.  I was very, very careful about it.  We were

20   explicit repeatedly in opening argument, in opening statements

21   about it, and we will continue to be explicit about it.  So

22   there's really no need for the Court to give a characterization

23   of the facts, which is what the defense is essentially asking

24   for here.

25             With respect to the original instruction, we believe

1    that will be covered with the closing instructions.  Those

2    recordings that we introduced are essentially it in terms of

3    recordings of conversations involving other parents.  So there

4    will be other additional scheme evidence of a limited nature,

5    but nothing that I think would warrant this kind of

6    instruction.  I think the First Circuit case law is clear that

7    this kind of instruction is not necessary.

8              THE COURT:  All right.  Mr. Kelly.

9              MR. KELLY:  With respect to that last point, yes, I

10    think it's very necessary.  It's hard to unring the bell, as

11    the Court well knows, when something like that is being put

12    into the record.  And the jury's sitting there listening to all

13    this testimony about other parents.  I understand the Court's

14    ruling, it goes to the context of the conspiracy, but as a lay

15    jury hearing it, I think they need to be informed that proof

16    that the defendants willfully joining the conspiracy must be

17    based upon the evidence of their own words or actions, not all

18    these other parents that they don't know.  And that's the

19    suggestion he's trying to get into the jury box now well before

20    the Court instructs the jury.  And it's clear First Circuit law

21    that willful joinder must be based upon evidence of the

22    defendant's own words.

23              It's dry in here.  I'm not getting emotional.  I

24    apologize.  It's very stuffy.

25              So I think an instruction now is appropriate, your

 1    Honor, and we would request it.

 2         THE COURT:  All right.  I will take the matter under

 3    advisement.  We'll see you all --

 4         MR. KENDALL:  One last?

 5         THE COURT:  Yes.

 6         MR. KENDALL:  Miss Sanford, who they're calling on

 7    Friday, we subpoenaed her for our case as well.  She's a

 8    witness that we will present testimony we want to do, and I

 9    just need the Court's guidance.  If you want me to have a tight

10    limited cross with her just to everything he touches and

11    nothing more, then we're going to have this woman fly back

12    across the country in another week.  If the Court would have --

13         THE COURT:  What will the nature of your direct part

14    of the exam be --

15         MR KENDALL:  We would --

16         THE COURT:  -- and how long?

17         MR. KENDALL:  How long?  I can get it done in, soup to

18    nuts, 60 to 90 minutes.

19         THE COURT:  Mr. Frank, what's the government's

20    position?

21         MR. FRANK:  Well, this is the first I'm hearing of it,

22    your Honor.  I think we should take it as it goes.  I can't --

23    first of all, she's not flying from across the country.  She's

24    in Atlanta.  We hope to get here out of here Friday.  I don't

25    want to be unreasonable about it, but it's also awkward and

1    disruptive to have the defendants' case in the middle of the

2    government's case.

3    THE COURT:  Yeah.  I think if it was going to be

4    something limited, 60 to 90 minutes doesn't sound like it's

5    very limited, that counsel should be able to agree on this, but

6    if push comes to shove, I'm not going to force the government

7    to allow the defendants to put in -- their case in the middle

8    of the government's case if it's just a matter of relatively

9    unimportant material.

10    MR. KENDALL:  It's not, your Honor.

11    THE COURT:  Then, you know, I'd like to save her a

12    trip.

13    MR. KENDALL:  Then I just wanted to be clear, your

14    Honor, we're going to do whatever the Court tells us.  We're

15    going to have to call her back and put her on the defense case.

16    And so it may take more time from the jury overall if we split

17    it up.  If that's the Court's order, we'll certainly follow it.

18    THE COURT:  I commend counsel to try to work something

19    out, but if they can't, I'm not going to force the government

20    to allow a defendant -- a witness that the defendant is going

21    to call in their case-in-chief in the middle of the

22    government's case.

23    MR. FRANK:  It would certainly be helpful if we had a

24    proffer of the expected testimony.

25    THE COURT:  Yeah.  If you want to talk to Mr. Frank

 1   about the proffer of what is expected to be said, perhaps you

 2   can work it out.

 3           MR. KENDALL:  It's all in the 302s, your Honor.  It's

 4   pretty much all in the 302s.

 5           THE COURT:  It's time to start the journey homeward,

 6   and I don't know whether it's polite to say, but have a good

 7   Yom Kippur.

 8           MR. KENDALL:  You've been very gracious, your Honor.

 9   Thank you.  They say have a gentle fast.

10           THE COURT:  Have a gentle fast.

11           (Whereupon, the proceedings adjourned at 3:09 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       I N D E X

 2   Witness                             Page

 3   KEITH BROWN

 4   Direct Examination by Mr. Frank        8

 5   Cross-Examination by Mr. Kendall     116

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2    NO.                        ADMIT

 3    338    ....................    11

 4    339    ....................    11

 5    340    ....................    11

 6    341    ....................    11

 7    342    ....................    11

 8    345    ....................    12

 9    352    ....................    14

10    363    ....................    17

11    362    ....................    18

12    361    ....................    19

13    371    ....................    23

14    376    ....................    26

15    381    ....................    28

16    387    ....................    30

17    390    ....................    33

18    467    ....................    36

19    478    ....................    38

20    505    ....................    40

21    415    ....................    42

22    369    ....................    44

23    439    ....................    44

24    508    ....................    44

25    701    ....................    48
```

```
 1                        E X H I B I T S

 2   No.                        ADMIT

 3   48    ....................   54

 4   49    ....................   57

 5   63    ....................   61

 6   65    ....................   61

 7   64    ....................   62

 8   74    ....................   64

 9   75    ....................   65

10   81    ....................   67

11   84    ....................   71

12   85    ....................   72

13   88    ....................   74

14   87    ....................   75

15   89    ....................   78

16   101   ....................   83

17   710   ....................   84

18   109   ....................   86

19   110   ....................   88

20   112   ....................   89

21   120   ....................   91

22   122   ....................   92

23   124   ....................   93

24   126   ....................   95

25
```

**A1457**

```
 1                        E X H I B I T S

 2     No.                        ADMIT

 3     137   ....................   97

 4     154   ....................  101

 5     212   ....................  104

 6     238   ....................  105

 7     409   ....................  106

 8     563   ....................  561

 9     561   ....................  110

10     562   ....................  110

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            We, Kristin M. Kelley and Kelly Mortellite, certify

 9    that the foregoing is a correct transcript from the record of

10    proceedings taken September 15, 2021 in the above-entitled

11    matter to the best of our skill and ability.

12

13

14    /s/ Kristin M. Kelley            September 15, 2021

15    /s/ Kelly Mortellite             September 15, 2021

16    Kristin M. Kelley, RPR, CRR              Date
      Kelly Mortellite, RMR, CRR
17    Official Court Reporter

18

19

20

21

22

23

24

25
```

**A1459**

```
 1

 2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 3


 4
      UNITED STATES OF AMERICA,          )
 5                         Plaintiff     )
                                         )
 6    vs.                                )  No. 1-19-CR-10080
                                         )
 7    GAMAL ABDELAZIZ and JOHN           )
      WILSON,                            )
 8                         Defendants.   )
                                         )
 9                                       )


10

11
                  BEFORE THE HONORABLE NATHANIEL M. GORTON
12                     UNITED STATES DISTRICT JUDGE
                          JURY TRIAL - DAY 7
13


14
              John Joseph Moakley United States Courthouse
15                         Courtroom No. 4
                          One Courthouse Way
16                   Boston, Massachusetts 02210

17


18                       September 17, 2021
                            9:13 a.m.
19

20

21
                       Kristin M. Kelley, RPR, CRR
22                     Kelly Mortellite, RMR, CRR
                          Official Court Reporter
23            John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
24                   Boston, Massachusetts 02210
                       E-mail: kmob929@gmail.com
25
               Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

3

```
 1    APPEARANCES:

 2

 3          Robert L. Sheketoff

 4          One McKinley Square

 5          Boston, MA 02109

 6          617-367-3449

 7          sheketoffr@aol.com

 8          for Gamal Abdelaziz.

 9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3         Andrew E. Tomback

 4         McLaughlin & Stern, LLP

 5         260 Madison Avenue

 6         New York, NY 10016

 7         917-301-1285

 8         atomback@mclaughlinstern.com

 9         for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2       THE COURT:  May I see counsel at sidebar.

3       Good morning, counsel.  We have had another juror

4  problem.  Mr. Diaz in Seat No. 6 has informed my deputy and the

5  people in the Clerk's Office, not other jurors, that he is

6  distraught, that he cannot continue to serve as a juror.  He is

7  very nervous.  He doesn't like being in the courtroom and that

8  he wants off this jury.  And when my deputy said, well, you're

9  going to probably have to talk to the judge about it, he said,

09:13 10  not in there I'm not.  He doesn't want to come back into the

11  courtroom at all.

12       So I think what I have to do is have a meeting with

13  him, as we did with the other juror that we dismissed, with

14  counsel, if you choose to be there, and I'm certainly inviting

15  you to be there, to ask him what the problem is, but I need to

16  be very careful, as I'm sure counsel are aware, about not

17  talking about the facts of this case.  It's only what is in his

18  mind that has upset him, what is the cause of his deciding that

19  he doesn't want to be a juror.

09:14 20       Any comments or suggestions from counsel?

21       MR. KELLY:  Seems like a reasonable approach.  And

22  we'll just listen and then confer with counsel.

23       THE COURT:  I take it you agree that I have to caution

24  him not to say anything to me or to you about his opinion of

25  the facts of the case?

```
 1              MR. KELLY:  Yes, one hundred percent.
 2              THE COURT:  We cannot -- we cannot get into that. We
 3    can only ask him what it is that's caused this problem without
 4    talking about the facts of this case.
 5              MR. KENDALL:  Yes, your Honor.
 6              MR. KELLY:  Could we confer for a moment?
 7              THE COURT:  Yes, you may.
 8              Yes, counsel?
 9              MR. KENDALL:  We would like to be present, your Honor.
09:16 10    We ask that after the gentleman speaks, before the Court makes
11    a decision, if counsel can talk with the Court before deciding.
12              THE COURT:  Of course.  What I'll do is just what I
13    did the last time: I'll hear him, I'll excuse him, I'll hear
14    comments from counsel, and then I'll call him back.
15              MR. KELLY:  And I'm concerned -- obviously, if this is
16    just a concern about work matters, rather -- he's concerned
17    more about work matters and missing work than he is about being
18    nervous in the courtroom.
19              THE COURT:  You think that's what it is?
09:17 20              MR. KELLY:  Yes.  I believe he noticed how long this
21    is going to go and he's probably trying to get off.  He works
22    on commission I think.
23              MR. KENDALL:  My past experience has been, including
24    our most recent juror, that often people think of their
25    convenience more than their obligations.
```

```
 1              THE COURT:  Okay.  Any insight from the government?
 2              MR. FRANK:  No, your Honor.  Thank you.
 3              THE COURT:  All right.  So we're going to have one
 4       counsel from each.  It will be Mr. Kelly and Mr. Kendall and
 5       Mr. Frank.  Right?  All right.  We'll adjourn to my lobby.
 6                   (In camera conference in chambers.)
 7              THE COURT:  Let the record reflect that we are in the
 8       lobby with counsel, my law clerks, my deputy.  I'm going to now
 9       invite Mr. Diaz, who is in Seat No. 6.  My deputy will bring
09:42 10    him in.
11              THE COURT:  Good morning, Mr. Diaz.  Have a seat.  I
12       understand you've spoken to my deputy clerk and to somebody in
13       the jury clerk's office that you are concerned about continuing
14       as a juror in this case.
15              JUROR NO. 6:  Correct.
16              THE COURT:  Without talking about the facts of this
17       case, which of course you cannot do, what is the problem that
18       you're facing?
19              JUROR NO. 6:  Being a part of the trial it's more than
09:42 20    I thought I could handle, like mentally.  I'm not sleeping
21       well.  I'm eating only one time a day because I'm thinking
22       about this.  I feel that if I can be removed or excused, I
23       would like that to happen because I don't want to, like -- I
24       don't want to feel like this.  I don't think I can be fair in
25       there or pay attention the way I need to be because it's too
```

much for me in my head to deal with this.  I didn't realize,
like, how much it would weigh on me like this.  I just -- I
just answered the summons to come.  I was truthful and I just
wanted to do the right thing, but I don't think I can do this.

THE COURT:  If it has anything to do with your
employment, I understand it's a big chunk of time away from
your job.

JUROR NO. 6:  Yeah.

THE COURT:  If it was something like your employer was
putting pressure on you because they need you back at work, the
Court would be willing to intervene and talk to your employer
and say how important this job is and that they can't hold this
against you in any way, because serving on a jury is a civic
duty, a very important civic duty, and, of course, now that
you've been constituted as a juror, it would be disruptive to
excuse you unless there is a real good reason to.  So I don't
know.  Is that part of the factor?

JUROR NO. 6:  No.  It's not my job.  It's just -- it's
me.  It's in my mind.  It's how it's making me feel.  I'm sorry
that I made it that far and I sat there for 3 days.  I just --
I don't want to be a part of it.

THE COURT:  It's an emotional thing?

JUROR NO. 6:  Yeah.  It's an emotional thing.  It's in
my mind.  I can't get it out.  It's controlling me, if that
makes sense.

         1              THE COURT:  You've been working at a professional job

         2    for some -- how long have you been at your current job?

         3              JUROR NO. 6:  Since December 2016.

         4              THE COURT:  So you've had about four, five years in

         5    the commercial world.

         6              JUROR NO. 6:  Yes.

         7              THE COURT:  I'm sure you've had some pressure in the

         8    commercial world.

         9              JUROR NO. 6:  Yeah.

09:43   10              THE COURT:  Having to make sales and all that stuff.

        11    Has that bothered you mentally to the point where you couldn't

        12    do your job?

        13              JUROR NO. 6:  No.  This is just different because,

        14    like, I'm asked to judge someone's life.  They may go to prison

        15    and something like that.  I just -- I realized now sitting

        16    there I can't do that.

        17              THE COURT:  So you're asking the Court to be excused

        18    from further jury duty, and you don't think that there's any

        19    way we could accommodate you such that we would be able to

09:43   20    alleviate your problem?

        21              JUROR NO. 6:  Exactly.  The best thing, I just would

        22    like to be removed, if that's the option.

        23              THE COURT:  Okay.  What I'd like you to do is withdraw

        24    for a few minutes and not go back into the jury room.  Just go

        25    down -- my deputy will show you a place, an alcove, where you

can have a seat.  I'll discuss the matter with the attorneys

and then I'll invite you back.  Okay?

JUROR NO. 6:  Thank you.

THE COURT:  Thank you, Mr. Diaz.

The record will reflect that Mr. Diaz has withdrawn.

Comments from counsel?  Mr. Kelly?

MR. KELLY:  We can't reward people when they get

hypersensitive and under stress.  The juror needs to toughen

up.  He can sit through the process he agreed to be part of.

It's his civic duty.  If we're going to let people out every

time they get nervous or stressed because it's a federal case,

we'll never get any jurors.  Respectfully, I'd admit while it's

a stressful process for everyone and everyone loses sleep and

doesn't eat as much, it's not as though he doesn't understand

what's happening.  It's not as though his job is in jeopardy.

He's stressed.  I'd suggest, as difficult as it may be, he

should sit there and fulfill his duty.

MR. KENDALL:  Your Honor, I'm glad Mr. Kelly didn't

coach my daughters.  I would have put it a little differently.

I have come to the same conclusion.  I think he's a pretty

straightforward, reasonable guy.  I think he wants to get out

of jury duty.  The way he put it, he didn't say -- if it could

be.  The court reporter will have the words better than I'll

remember him.  The last bit was he'd like to be excused if he

could be.  He's not seeking medical care.  He's not on

medication. Maybe it is stressful. Sitting on a jury could be

stressful to a lot of people. I don't dispute that.

We've already lost one. We lose two the first week,

that's not good, your Honor. To be honest, Mr. Frank and I

have had this in a prior trial. We're entitled to 12 jurors.

I don't want to be at the end that we have 10 or 11 jurors and

we're being asked after investing four weeks to let a jury

deliberate. That's always bad for a defendant to have less

than 12.

I think we keep him. If he comes back next week and

say he's got medical treatment or he's under issues, we can

revisit it. I'd hate to lose two the first week.

THE COURT: Mr. Frank.

MR. FRANK: I think if he wanted to get out of jury

duty for hardship, he would have said it. He's not just trying

to get out of jury duty in my view. In my view, he's

distraught. He said he's not sleeping, he's not eating. My

concern is that he's not going to be able to deliberate in good

faith with the other jurors. He effectively said as much.

We're only three days into the trial and he's having that

reaction. I can't see how he can continue for the next couple

of weeks and then deliberate if he's already under this much

stress from the first couple of witnesses. In my view, he is

being genuine and he should be excused.

I do share Mr. Kendall's concern because I don't want

1    to relive that experience.  My suggestion would be we consider

2    ways to expedite the proceedings so we can get through this.

3    If that means putting days back on the schedule, if that works

4    for the Court, or having longer days, if that works for the

5    Court, then we would be amenable to that so we can speed that

6    up.

7          MR. KELLY:  I'd speak to that.

8          THE COURT:  I'll let you speak in a minute.  What do I

9    realistically tell him he's facing as a remainder of the trial?

09:43 10    3 weeks?

11          MR. FRANK:  I think the government's case is plus or

12    minus another week.  I don't know what the defense case looks

13    like.

14          MR. KENDALL:  Your Honor, it's the issue we dealt with

15    yesterday.  If we can get rid of these witnesses by having a

16    full examination in the government's case, we'll save three,

17    four days.  Right now, if I'm limited on Mikaela Sanford, we've

18    already subpoenaed her.  She's coming back.  The same thing

19    will be with every witness basically that testifies.  We'll

09:43 20    save three or four days if we can have the full examination one

21    time with each witness, as opposed to how Mr. Frank has been

22    insisting and truncating it.

23         We're putting on a case.  We're putting on a case with

24    a bunch of witnesses.  A lot of time defendants say that.  We

25    are.  We've given a list of experts who we've retained to

1    testify.  We have fact witnesses that he knows we're preparing.

2    I haven't counted it up to give you a reliable answer.  I guess

3    the defense case is a week or so, and I say "or so" because I

4    don't know if it's four days or seven days.  If we could do a

5    full examination when the witness is on the stand for the first

6    time, we'll save time.

7            MR. KELLY:  Two things: First of all, I think perhaps

8    the Court could keep him for now.  He gets more acclimated

9    after another day, and next week, if he's still having this

09:43 10    problem, the Court can inquire and take some action then.  I'm

11    concerned if we lose another juror this quickly.  Secondly, I

12    don't think his convenience should inconvenience the rest of

13    the jurors and us so the whole schedule gets changed.  The

14    schedule is the schedule.  The Court has set the schedule.  I

15    think having the day off on Wednesday and the following week as

16    well, that's fine.

17            MR. KENDALL:  This trial will be three plus for

18    evidence is my estimate, plus deliberations.  So it's basically

19    a four-week trial is my guess, your Honor, and that's just a

09:43 20    guess.  Lose two in the first week is not a good thing.

21            THE COURT:  Anything else, Mr. Frank?

22            MR. FRANK:  No, just that if he's this distraught,

23    your Honor, he's going to be disruptive to the other jurors and

24    a negative force on the rest of the jury.  That, to me, is a

25    bigger concern than losing one when we have two more left who

```
 1    are spares.

 2          THE COURT:  What if I say you're going to have to, you

 3    know, live it out today?  This is Friday.  We're going to have

 4    a full day.  I want you to think about it over the weekend.

 5    We'll have another discussion on Monday.  Suck it up today.

 6    You're going to stay here today and be a juror.  You'll have

 7    the weekend to, hopefully, rest.  I'll talk to you Monday

 8    morning.

 9          MR. KENDALL:  If I may make one suggestion, your

10    Honor?

11          THE COURT:  Yes.

12          MR. KENDALL:  Give a little more dose of Mr. Kelly.  I

13    wouldn't want to encourage him that if you just come back a

14    second time you're gone.  Maybe just ask him to do his best

15    effort, and if he feels the need, he can raise this again, but

16    not tell him Monday's your day to come back with another story

17    on Monday and you're out.  I don't want to give him too much

18    encouragement.

19          As I said, your Honor, it's not as if he received

20    medical treatment or medication or things like that.  He

21    doesn't want to be a juror for whatever reason, whether it's

22    the emotional issue or other issues he doesn't want to tell us

23    about.

24          Remember the first guy that came in?  He talked all

25    about the commute and then he told us the divorce at the end.
```

```
 1    The Court said he'd give him a hotel and everything and it was

 2    the divorce.

 3           THE COURT:  I am concerned about Mr. Frank's comment

 4    about the effect on the other jurors.  If he's a negative

 5    force, that's bad.  Hopefully, he's keeping this to himself.  I

 6    don't know.  I'm hopeful that he is.

 7           MR. KENDALL:  He seems to be a very respectful person,

 8    your Honor.  He dresses very neatly and respectfully for court

 9    every day.  He's speaking in the most low key, not emotional

10    table pounding manner.  I think he's -- I think he appreciates

11    the process.

12           THE COURT:  Having considered your comments, what I'm

13    going to do is call him back in and tell him I want him to stay

14    today and do the best he can, and that if he feels the

15    necessity to talk to me again on Monday morning, I will hear

16    him, otherwise we'll go forward.

17           MR. KELLY:  Thank you, your Honor.

18           MR. KENDALL:  Thank you, your Honor.

19           THE COURT:  Let's call him back.

20           Good morning again, Mr. Diaz.  Have a seat.  Thank you

21    for being patient.  After talking over the matter and thinking

22    about it, what I'm going to ask you to do is this: This is

23    Friday.  I want you to, as they say in the vernacular, suck it

24    up today, sit as a juror today, and if you feel after today and

25    after the weekend when you've had a chance to rest up a little
```

1    bit that you need to talk to me again on Monday, I will hear

2    you.  I want you to understand how important your civic duty as

3    a juror is.  It's perhaps the most important civic duty that

4    citizens have is to serve on juries.  I do understand that lots

5    of people are under stress, lots of people have problems,

6    especially early on in jury trials, but they sometimes get

7    acclimated and get over that first hump.  I'm going to ask you

8    to work as hard as you can today.  We're going to go until

9    about 3 o'clock this afternoon.  Then we're going to be off

09:43 10    Saturday and Sunday.  You'll have a chance to rest up.

11        If you feel you need to talk to me about this problem

12    on Monday, I will hear you, otherwise I'm hoping that you will

13    get over that problem and that you'll be able to do your civic

14    duty.  Okay?

15        JUROR NO. 6:  I mean, am I allowed to refuse?  I

16    really don't -- my mind is made up and my heart is made up.  I

17    don't want to be a part of this.  I don't think sitting today

18    and having the weekend is going to change that, so I don't

19    know -- can I say no?  Am I allowed to?

09:43 20        THE COURT:  You know, I'm not going to put you in

21    shackles and force you to go back into the courtroom.  I'm

22    asking you as a federal judge to do your civic duty for one

23    more day to see if we can't get over this problem.  You know,

24    it's very, very important and very disruptive if we were to

25    excuse so many jurors that we wouldn't have a quorum to hear

          1    this case at the end.  That would cause all kinds of trouble,

          2    not only to the litigants who have spent lots and lots of

          3    energy and time and money to get this case prepared, but to the

          4    Court itself.  The whole system depends upon jurors that are

          5    willing to serve, and none of them feel that it's a

          6    convenience.  It's an inconvenience for every one of your

          7    colleagues.  Every one of those jurors in that jury room is

          8    inconvenienced and some are certainly feeling stress because

          9    it's not an easy job.  Everybody knows that.  So I'm appealing

09:43    10    to you but I'm not going to physically force you to go into

         11    that courtroom.

         12              JUROR NO. 6:  I understand.  I don't mean to be

         13    disruptive.  I know that this is causing an issue.  If you want

         14    me to sit today, I will, but I know that Monday I'm going to

         15    feel the same way so.

         16              THE COURT:  All right.  Thank you.  I'm going to ask

         17    you to withdraw one more time, talk this over with counsel, and

         18    then we'll go from there.  Okay?

         19              JUROR NO. 6:  Thank you.

09:43    20              THE COURT:  Thank you, Mr. Diaz.

         21              Counsel?

         22              MR. FRANK:  Your Honor, I think he said his mind is

         23    made up.  He asked if he could refuse.  I personally think

         24    there is a greater danger to the rest of the jurors from having

         25    him sit than there is from excusing him at this point, but I do

think we should contemplate alternatives, like longer days.

I'm not going to concede to Mr. Kendall's request that he put

his case in during our case.  We just can't do that in good

faith.  I do think there are other alternatives.

THE COURT:  Let me hear from defense counsel.

MR. KELLY:  I think I've made my position perhaps more

clearer than I should have as to my thoughts on this juror.  I

think if he stays for the day what is the harm for one more

day.  If he really feels that way after getting a good night's

sleep over the weekend, he's going to, but I don't want his

concerns to inconvenience everyone else or require a change in

the schedule.  I think the schedule --

THE COURT:  I'm not going to change the schedule, at

least as of now.  I think we're making good progress.  I think

you, in good faith, tried to honor my instructions to move the

case along.  I'm not going to, at least at this point, change

the days that we've scheduled to have off, and that is one day

next week, one day the following week.  I haven't decided on

the first week in October.  We'll see how we're going at that

stage.  I'm convinced that the case is going to be completed by

the end of the first week in October at the latest.  I think it

might be completed before that.

In any event, I'm not going to deliberately alter the

schedule or make you try the case for eight hours a day because

of this.

1          Mr. Kendall, I haven't heard you comment.

2          MR. KENDALL:  I agree with Mr. Kelly's view.  I think

3     we should try to keep him.  I'm just loathe to lose jurors.

4          THE COURT:  Of course, I am too.  As you know, most of

5     the time on criminal cases, we generally go at 14.  Knock on

6     wood, we've been successful in avoiding mistrials because of

7     lost jurors.  Three more weeks with only two extras will be

8     problematic, although it has been my experience the more jurors

9     get invested in a case, the less likely they are to ask to be

09:43 10    excused.  This is unusual after three days in a very

11    interesting case that is high profile that somebody asks to be

12    out.  It's unusual.  You don't have jurors coming to me like

13    this.  This is not with precedence.

14         MR. KENDALL:  I understand.  In our prior case this

15    happened.  Our juror's wife had a brain tumor and had to have

16    surgery.  It was heartbreaking.  To lose two in the first week

17    makes me nervous.

18         THE COURT:  I don't want to take any more time out of

19    this day.  I am going to ask him to stay today.  I am going to

09:43 20    give him the option to see me again on Monday morning.  We'll

21    see what happens.

22         Any problem with that?

23         MR. KENDALL:  No, your Honor.

24         MR. KELLY:  No, your Honor.

25         MR. FRANK:  No, your Honor.

```
 1          THE COURT:  Call him in.  I'm going to ask him to stay
 2    today.  We'll excuse him at 3 o'clock.  We'll see what happens
 3    on Monday morning.
 4          Good morning once again, Mr. Diaz.  What I have
 5    decided to do, Mr. Diaz, is ask you to stay today for this day.
 6    If you have further problems that you want to talk to me after
 7    you've had a chance to rest up over the weekend on Monday
 8    morning if you want to see me, I will see you.  Okay?
 9          JUROR NO. 6:  Okay.  Thank you.
10          THE COURT:  I thank you for doing your civic duty.  I
11    want you to pay as close attention today as you can and do the
12    best you can and do your civic duty.  Okay?
13          JUROR NO. 6:  I will.
14          THE COURT:  Thank you very much.  Return to the jury
15    room.  Thank you.
16          Counsel, I do want to deal with the motion that was
17    filed over the evening.  I am now sensitive to what I deal with
18    outside the hearing of the general public and so I'm going to
19    adjourn this session, but when we go back, I'm going to go back
20    in, and we'll talk about the motion that was filed over the
21    night in open court.
22          MR. KENDALL:  Your Honor, there's been so many motions
23    filed.  I don't keep track of every.  I'm sure it's mine.
24          THE COURT:  It's your motion to exclude yearbooks.
25          MR. KENDALL:  That's his.
```

09:43 (line 10)
09:43 (line 20)

```
 1              THE COURT:  I'm sorry.  It's Mr. Kelly's motion.  I'm

 2    not going to do it here because this was in chambers and in

 3    private and, as you know, I have been criticized for that.

 4              MR. KENDALL:  Not by us.

 5              MR. KELLY:  I haven't had a chance to read the paper

 6    lately, but will do over the weekend.

 7              THE COURT:  Okay.  We'll see you back in open court.

 8              MR. KENDALL:  Thank you, your Honor.

 9              (End of in camera conference in chambers.)

09:43 10                        (Recess.)

11              THE CLERK:  You may be seated.  Court is now in

12    session.

13              THE COURT:  Good morning, counsel.  Before I call the

14    jury, I did want to address the motion that was filed overnight

15    by defendant Abdelaziz to exclude yearbooks.  The government

16    opposes that motion.  Apparently, there's going to be a witness

17    that is familiar with this issue, and I don't see there's a

18    hearsay problem, especially if a witness testifies and then is

19    shown a photograph that she can identify.  So I am going to

09:46 20    deny this motion without prejudice and revisit it if necessary

21    in context.

22              MR. KELLY:  Your Honor, I would only respectfully

23    request that the photos themselves go into the record and we

24    can exempt the yearbook and the rest be redacted.  These high

25    school yearbooks are usually filled with nonsense and I don't
```

**A1480**

```
 1   know what relevance it has to these --
 2           THE COURT:  You understand it's the whole yearbook
 3   that's being offered?
 4           MR. KELLY:  That's my impression.
 5           THE COURT:  Is there any reason why it can't just be
 6   the photograph?
 7           MR. STEARNS:  I don't think so, your Honor.  If we
 8   can, we'd like to use the yearbook with the witness, and then
 9   we can enter in evidence copies of the pages of photos.
09:47 10         THE COURT:  As long as the yearbook doesn't go in as
11   an exhibit.  There's no need for that.
12           MR. STEARNS:  We'll provide copies of the photographs
13   from the yearbook.
14           THE COURT:  All right.  Fair enough.  All right.  Call
15   the jury.
16           (Jury enters.)
17           THE COURT:  Good morning, jurors.  Welcome back.  We
18   needed to resolve some issue outside of your hearing, but those
19   have been resolved and we will now proceed.
09:49 20         Mr. Brown, you're reminded you're under oath.
21           And Mr. Kendall, you may continue with
22   cross-examination.
23             CROSS-EXAMINATION OF KEITH BROWN (Continued)
24   BY MR. KENDALL:
25   Q.   Good morning.
```

1    A.    Good morning.

2    Q.    Thank you for joining us again.  I'd like to bring us

3    through some of the exhibits you read and just ask you to read

4    some additional parts and get your observations on a couple of

5    parts.

6    A.    Sure.

7    Q.    If we can start with Exhibit 38, please.

8          MR. KENDALL:  Mr. Carter, if we can highlight the top

9    e-mail that starts with "HB" and ends with with "BB".

09:50 10    Q.    So this is an e-mail from March 2013, correct?

11    A.    Yes, March 2, 2013.

12    Q.    The subject is "Potential trip - meet coaches if

13    possible", Correct?

14    A.    Yes.

15    Q.    Could you tell us -- well first, the prior e-mail that you

16    read from this chain at the very end, John Wilson refers to

17    AMS.  Do you understand AMS to be the designation for the

18    Amsterdam airport?

19    A.    I don't know that from the context of this e-mail, but I'm

09:50 20    familiar with Schiphol Airport.  I think AMS is the airport

21    code.

22    Q.    Great.  Thank you.  Could you just read to us this --

23          MR. KENDALL:  Can we highlight the HB to BB,

24    Mr. Carter?

25    Q.    If you can just read that to us this morning.

1    A.    "Can't wait to see you at the airport!"

2    Q.    If we could highlight the whole e-mail and then you can

3    read it all at once, please.

4    A.    Sure.

5    Q.    Okay.  If you could read it to the jury, please.

6    A.    "Can't wait to see you at the airport!  This morning I'll

7    be racing from Johnny's swim meet to girls swim meet - if they

8    finish on time, they will come with me to the airport.  Maybe

9    we can call Rick about the one spot he has at USC - hate to

09:51 10    lose it if we want to go down this path.  Rick is meeting

11    Johnny next Saturday.  XOXOXOXO".

12    Q.    Okay.  So it's clear that the family is coming to see

13    Mr. Wilson at an airport, correct?

14    A.    It seems that Leslie is coming to the airport.  I'm not

15    sure about the family.

16    Q.    Okay.  Well, if they finish on time?

17    A.    Yes.

18    Q.    Okay.  And it's also a reference to the very last sentence

19    there is "Rick is meeting Johnny next Saturday", correct?

09:52 20    A.    Yes.

21    Q.    So looking at the date of this e-mail, that would assume

22    the first week of March he's meeting with Johnny, correct?

23    A.    Around first week of March, yes.

24          MR. KENDALL:  Okay.  Can we go to Exhibit 64, please.

25    Q.    You read part of this.  This is a June 4, 2013, e-mail

```
 1   from Rick Singer to Leslie Wilson.

 2           MR. KENDALL:  Could we go to the top paragraph,

 3   Mr. Carter, the three lines.  Highlight that.

 4   Q.   And if you could just read that to us, please.

 5   A.   "Leslie thank you.  Our business together is only between

 6   us.  We can have all three kids come and room together.  If you

 7   want to have the families or yourself call my office Mikaela

 8   can sign all three up 916489-8802.  If you want me to reach out

 9   to the families and provide college counseling help I will or

10   they can call me directly".

11   Q.   And do you recall that on Wednesday you read the bottom of

12   this e-mail that referred to an UCLA workshop/internship?

13   A.   Yes.

14   Q.   Okay.  Great.

15           MR. KENDALL:  If we could now go to Exhibit 63,

16   please.

17   Q.   And here I have to correct something.  It's really my

18   fault.  On Wednesday, I asked you a question and said that you

19   hadn't seen any e-mails from Jack Bowen, and I think you

20   agreed.

21   A.   I did not recall Jack Bowen, no.

22   Q.   Okay.  I want to correct.  The question I meant to ask was

23   you didn't see any e-mails between Jack Bowen and -- strike

24   that.

25           Let's just -- the mistake was mine, not yours.  I'd
```

```
 1    like you to start in on Exhibit 63 from the middle of the first

 2    page where we see it goes from Jack Bowen.  Could you read that

 3    all the way to the end of this e-mail chain.  And first, if you

 4    can just tell me, you know that Jack Bowen has two e-mail

 5    addresses?  One is at Menlo School and the other one is at

 6    Yahoo.com, correct?

 7    A.   Yes.  I see that.

 8    Q.   And what is the subject of this?

 9    A.   "Photos of Johnny".

09:54 10   Q.   And it's June 3, 2013?

11    A.   Yes.

12    Q.   Copies to John and Leslie Wilson?

13    A.   If you can start reading where it says "here's about" and

14    read to the end, please.

15    A.   Sure.  "Here's about 15 photos.  There's one where he's

16    out pretty high, too!" - with the dropbox URL -- "let me know

17    if any of these work or if we should have Leslie (or me) take

18    photos this week".

19    Q.   Signed "Best Jack", correct?

09:54 20   A.   Yes.

21    Q.   And that's indicating that this person by the name of Jack

22    Bowen is sending photos of Johnny, correct?

23    A.   Yes.  It appears so.

24    Q.   Okay.  You know, why don't we turn to the second page of

25    this, all the way at the end, please.
```

**A1485**

```
 1              And why don't we read the e-mails from the earliest
 2       on up so we can see the sequence.
 3       A.    Okay.
 4       Q.    And just go up to where we read the Jack Bowen e-mail,
 5       please.
 6       A.    "I think Leslie already asked already but wanted to be
 7       sure (if we could) to get a couple of good photos of Johnny
 8       playing water polo.  I would love anything you have of him way
 9       out of the water with the ball passing or shooting.  I want it
09:55 10      for one of his apps, as well as my office in AMS as soon as
11       practical.  All we have are older shots from a couple of years
12       back.  I don't know if you are doing team action shots or if
13       Leslie or someone else like Joe could take some so he won't be
14       too embarrassed.  Let me know.  Have a great summer.  Let us
15       know about another giants game as well.  Thanks John".
16       Q.    And that's addressed to somebody named Jack?
17       A.    Yes.
18       Q.    Okay.  Now, the next e-mail actually starts at the bottom
19       of page 1.  Could you read that to us, on Sunday, June 2nd?
09:56 20      A.    Sure.  "Hi John, I've e-mailed Joseph Rozenfeld to see if
21       he has any of Johnny from last year.  Also, I don't think it
22       would be a problem at all for Leslie to come to workout
23       tomorrow or Wednesday and I announced that she's taking photos
24       for the Menlo athletics photo bank.  I could also take some
25       with my iPhone.  Not sure if that's good enough quality.  Best
```

```
 1   Jack".
 2   Q.   Okay.  And that's Jack Bowen at Menlo School?
 3   A.   Yes.
 4   Q.   Okay.  And then if you can read the e-mail above that on
 5   Sunday, June 2 at 9:13 p.m.?
 6   A.   He writes, "Here's one I found in my e-mail from Joseph
 7   Rozenfeld from last year.  Will keep them coming if I find
 8   more".
 9   Q.   Okay.  And we know the prior -- the e-mail that -- the
10   first one you read that comes after that one in time shows he
11   sent a total of 15 photos, correct?
12   A.   That's what he said, yes.
13   Q.   Okay.  Now, I'd like us now to go to 65.  Well, one
14   second, please.  We're on 63 -- I'd like to go to 65.  Now,
15   Exhibit 65 is an e-mail from Leslie Wilson to John -- cc'd to
16   John Wilson at Staples.eu and to Rick Singer as the main
17   addressee, correct?
18   A.   Yes.
19   Q.   But, in the attachments, I noticed you used black and
20   white photocopies, not the original color photos.  Did you
21   select the pictures?
22   A.   I did not, no.
23   Q.   So you didn't even know that there was original color
24   photos in the original document, correct?
25   A.   I believe this is the only version I viewed.
```

```
 1    Q.   Okay.  I'd like to show you something we've marked as 65A.
 2    And do you agree with me that 65A is the same e-mail as in 65,
 3    correct?
 4    A.   I haven't done a side to side comparison, but I'll take
 5    your word for it.
 6    Q.   Okay.  I appreciate that.  And then if we could go to the
 7    first photos of 65A, you see it's a beautiful color photo,
 8    correct?
 9    A.   Yes.
09:58 10   Q.   Okay. If I were to suggest to you it's the same photo
11    that's the first photo in 65 that's black and white, would you
12    accept my representation?
13    A.   Again, not comparing them to side to side, yes, I accept
14    your representation.
15    Q.   And if we go to the third photo in 65 -- actually, if we
16    go to the second photo in 65A, you see -- you identified in the
17    black and white it's a man.  You see it's Johnny Wilson,
18    correct?
19    A.   I don't know what Johnny Wilson looks like.
09:59 20        MR. FRANK:  Your Honor, has this exhibit been offered
21    into evidence?
22        MR. KENDALL:  We'd like to offer it into evidence,
23    your Honor.
24        MR. FRANK:  I have no objection.
25        THE COURT:  It will be admitted.
```

```
 1              (Exhibit 65A admitted into evidence.)
 2    Q.    And you don't know who Johnny Wilson is?
 3    A.    I know from him from the context of the e-mails.  I
 4    couldn't tell you what he looks like.
 5    Q.    You said a man.  It's actually a boy, isn't it?
 6    A.    It's a male.
 7    Q.    All right.  Thank you.  And if you take a look at the
 8    photo, you see that the hand holding the ball, he's palming it
 9    right hand up?
09:59 10   A.    Yes.
 11   Q.    And his thumb is over the blue stripe, and you can see the
 12   little red dot where you fill the ball with air, correct?
 13   A.    It's a black stripe and looks like a white dot, but
 14   otherwise.
 15   Q.    Yeah, white dot -- well, if it's black, I'll agree with
 16   you.  Your eyesight is probably better than mine.  Okay.  So
 17   you see that is 65A.  I'd now like you to just keep that in
 18   mind.
 19              And let's go to Exhibit 88.  You agree it's the same
10:00 20   photo?
 21   A.    I don't see a photo.
 22   Q.    Exhibit 88, second page?
 23   A.    Yes.  Appears to be the same.
 24   Q.    You see the thumb where that white dot is?
 25   A.    I do.
```

| | |
|---|---|
| 1 | Q.   Over the dark stripe? |
| 2 | A.   Yes. |
| 3 | Q.   So it looks like the photo we have here is something that |
| 4 | a man by the name of Jack Bowen sent from the 15 in the |
| 5 | Dropbox, correct? |
| 6 | A.   I'm not sure I can say that.  I believe it's one of the |
| 7 | pictures that Ms. Wilson sent to Mr. Wilson.  I don't know if |
| 8 | it came from the Dropbox filed from Jack Bowen.  I can't say |
| 9 | that. |
| 10:01 10 | Q.   Okay.  Fair enough.  I'd now like to ask you, looking at |
| 11 | Exhibit 88, do you see the address up in the top corner, |
| 12 | 2 Fleur Street, Atherton, California? |
| 13 | A.   Yes. |
| 14 | Q.   When you were reviewing the exhibits, did you notice any |
| 15 | discrepancy about that address? |
| 16 | A.   No.  I believe that -- I did not review that address in |
| 17 | the document, but that address sounds familiar from another |
| 18 | exhibit. |
| 19 | Q.   Okay.  Let's go to those other two exhibits. |
| 10:01 20 | MR. KENDALL:  If we can go to Exhibit, first, 126, |
| 21 | please, Mr. Carter.  That's going to be the thank you letter |
| 22 | from the Trojan Fund.  If we go to the second page. |
| 23 | Q.   We see here July 28, 2014, Ron Orr of the Trojan Fund is |
| 24 | writing a thank you note to John and Leslie Wilson, correct? |
| 25 | A.   Yes. |

```
 1   Q.   But the address there is listed 2 Fleur Place, not 2 Fleur

 2   Street.

 3   A.   Okay.

 4   Q.   Did you notice that before?

 5   A.   I did not.

 6   Q.   I take it you know your own address, don't you?

 7   A.   I do.

 8   Q.   Okay.  And you don't know which is the correct address in

 9   Atherton, California, do you?

10   A.   I don't.

11   Q.   If we could go to Exhibit 710, please, and bring it in

12   next to the same address, please.  We see here Exhibit 710 is

13   from John Wilson to Rick Singer with a cc to Debbie Rogers and

14   it says "R awesome!  Hyannis Port Capital, Inc".  And what's

15   the address for Hyannis Port Capital, Inc.?

16   A.   He listed it as 2 Fleur Place.

17   Q.   Okay.  So you agree with me that we have two documents

18   here that show a different name for the Wilson address than

19   what appears on this document, correct, that appears on

20   Exhibit 88, the profile?

21   A.   Yes.

22   Q.   Okay.  If we could go back to the second page of

23   Exhibit 88, the profile, please.  If we go below the

24   photograph, we're going to see it says "Menlo School Water

25   Polo", correct?
```

```
 1   A.   Yes.

 2   Q.   And we saw in that earlier e-mail with the Dropbox that

 3   Jack Bowen has a Menlo School e-mail address, correct?

 4   A.   Yes.

 5   Q.   But with respect to Stanford water polo club, you have not

 6   seen anything that shows Jack Bowen is the coach of Stanford

 7   water polo club, correct?

 8   A.   I don't believe I have, no.

 9   Q.   Okay.  So there's no document here that tells us whether

10   Bowen is part of Stanford or not, correct?

11   A.   I don't believe so, no.

12   Q.   Do you remember when we spoke on Wednesday we went through

13   Exhibit 89 that referred to some of the teams that Johnny was

14   on?

15   A.   I'd have to refresh.  I don't recall.

16   Q.   Sure.  Let's go to 89 then.  We'll pull that over.  Well,

17   we don't have to pull -- let's just look at 89, and then we'll

18   go back.  You see on 89 at the bottom where John Wilson asks,

19   and you read to the jury, "Does he have to play Stanford club

20   in addition to Sopen club and varsity swim team"?

21   A.   Yes.

22   Q.   Okay.  So there's a reference to two clubs here, Stanford

23   and Sopen, correct?

24   A.   Yes.

25   Q.   If we can go back to that second page of Exhibit 88, we
```

```
 1    see a reference to Menlo School water polo?

 2              MR. KENDALL:  No.  To Exhibit 88, please, to the --

 3    oh, yeah.  Thank you.  Thank you.

 4    Q.   We see a reference to the Menlo School water polo?

 5    A.   Yes.

 6    Q.   We see a reference to the Stanford water polo?

 7    A.   Yes.

 8    Q.   But we see no reference to the Sopen club, correct?

 9    A.   I don't see a reference to the Sopen club, no.

10:05 10    Q.   And finally, if we could go to the left side column in the

11    middle, do you see where the SATs are listed?

12    A.   Yes.

13    Q.   You've not seen any e-mails that describe his SAT or ACT

14    scores, have you?

15    A.   I don't believe so, no.

16    Q.   Okay.  So you don't know if that's accurate or his best

17    scores or anything else?

18    A.   No.

19    Q.   Okay.  And you'd agree with me you have not seen any

10:05 20    e-mail that shows John Wilson, the father, supplied any of the

21    information on Exhibit 88 to anybody, correct?

22    A.   I don't believe so, no.

23    Q.   Okay.  And you've not seen any e-mail in which he

24    acknowledges receipt of Exhibit 88?

25    A.   I don't recall, but I don't believe so, no.
```

```
 1    Q.   And you have not seen any e-mail that indicates anybody
 2    from the Wilson family correcting the address on Exhibit 88,
 3    correct?
 4    A.   No.  I have not seen that.
 5    Q.   Or correcting the Stanford water polo coach's name,
 6    correct?
 7    A.   I have not seen that.  No.
 8    Q.   Or asking for insertion of Sopen water polo, correct?
 9    A.   Correct.
10    Q.   Or commenting on putting these particular SAT scores in
11    the document, correct?
12    A.   Correct.
13         MR. KENDALL:  I'm going to move off of that document.
14    I'd like to now go to Document 74, please.
15    Q.   And if we take a look, you read part of this e-mail, but I
16    want to read -- have you read the other part.  In the middle of
17    it, it says on August 11, 2013, at 2:20 p.m., it's John Wilson
18    sending an e-mail to somebody called R, which I suggest is Rick
19    Singer.  Do you see that?
20    A.   Yes.
21    Q.   Can you read the first two lines of that e-mail?  You
22    didn't have that when you read the other stuff.
23    A.   "I hope you are well.  Johnny now says that you are
24    filling out his applications except for the essays.  Is this
25    true?"
```

```
 1    Q.    Okay.  And now if we could go see the response from Rick

 2    Singer to Mr. Wilson.  If you could start with "we have

 3    started" and read the three paragraphs of the entire e-mail.

 4    A.    "We have started the common application.  I am waiting for

 5    supposed work he did with his tutor this summer and the

 6    assignments I provided.  All the apps will be done by me and

 7    the editing of all the essays and short answers, too.  He just

 8    has to get them to me and started.

 9         Us -- Jovan and I meet in 2 weeks and at that time he

10:08 10    will give me his timeline for Johnny's stuff.

11         I am to see Johnny on the 24th afternoon".

12    Q.    Okay.  So he's saying he's going to meet with Johnny on

13    August 24th.  Is that correct?

14    A.    It doesn't say August, but that sounds correct.

15    Q.    Okay.  It's August 11th when he sends the e-mail and he

16    says on the 24th?

17    A.    That's a safe assumption.

18    Q.    Okay.  I appreciate that.

19         MR. KENDALL:  If we could turn to Exhibit 111, please.

10:08 20    Q.    Do you recall reading part of this e-mail to the jury that

21    refers to invoices?

22    A.    I do.

23    Q.    Okay.  You -- just one quick question.  You see the top

24    e-mail is between Debbie Rogers, Steve Masera, and Rick Singer,

25    correct?
```

1        MR. FRANK:  Is this exhibit in evidence?

2        MR. KENDALL:  I thought it was.  Did you not put it

3   in?

4        THE COURT:  Apparently, it's not in.

5        MR. KENDALL:  This is not in?  This is in the binder I

6   have from the government.  Then let's take it down then if it

7   isn't.  I thought it was.

8        Excuse me.  I may have the numbers mixed up.  Okay.

9   Never mind then.  I'd like to now go to Exhibit 122.

10:10 10       And, your Honor, Mr. Frank was kind enough to use a

11   redacted version when he put this in.  I'd like to unredact a

12   few of the numbers.  Just some of it is going to be relevant.

13        MR. FRANK:  I would just like the record to reflect

14   that the government redacted the exhibit at the request of the

15   defense and we've now assented to having the entire exhibit

16   unredacted, provided that it is unredacted in its entirety.

17        MR. KENDALL:  Your Honor, the only part that's

18   relevant is about the bottom five lines that deal with income

19   and below that and that's all I'm looking for.  It relates to

10:10 20   the tax issue.

21        MR. FRANK:  Your Honor, under 106, it's either

22   redacted or not.

23        THE COURT:  It's either all or none.

24        MR. KENDALL:  Okay.  So we'll put it all in.

25        THE COURT:  122 is admitted unredacted.

```
 1              (Exhibit 122 admitted into evidence.)
 2     Q.   Okay.  I'd like to take you down to the bottom of it where
 3     it says "big incomes", and there are three listed.  Do you see
 4     that?
 5     A.   Yes.
 6     Q.   If we could just show it.  It says "DGS net sales two
 7     million", correct?
 8     A.   Yes.
 9     Q.   "Franklin 450k", correct?
10     A.   Yes.
11     Q.   "Staples 800k", correct?
12     A.   "With bonuses", yes.
13     Q.   Okay.  And then if you look at the line just below that,
14     it says "total about 2.3 million income".  Not quite sure how
15     they did the math, but I want you to look at the three inputs
16     there, DGS net sales 2, Franklin 450, and Staples 800.  If we
17     just add those up together, those three, we get 3.25 million,
18     correct?
19     A.   Not 2.5, but --
20     Q.   3.25.
21     A.   Yes.  Yes.
22     Q.   Those three, DGS, Franklin, and Staples, together,
23     combined 3.25.  It's just -- DGS makes up almost, but not quite
24     two-thirds of that amount.  Would you agree with me?
25     A.   Yes.
```

Q.   So the big income that year is DGS net sales, or at least

the projection at that time is about two-thirds of the income

that's listed in those three items?

A.   Okay.

Q.   Do you know anything about what DGS net sales is?

A.   I have no idea.

Q.   Do you know if DGS net sales has any relationship to HPC

Capital?

         MR. FRANK:  Objection.  Foundation.

10:12          THE COURT:  Sustained.

Q.   I now would like to go to the tape that you played

yesterday of John Wilson on September 15th.  And what I've done

is -- if you remember, the call is broken up.  We have two

transcripts because they dropped the call in the middle.

A.   Yes.

Q.   Okay.  And I believe your transcripts were 561 and 562?

A.   Yes.

Q.   Okay.  I have transcripts I marked as 561A and 562A.

They've got a couple of small corrections in red.

10:13 A.   Okay.

Q.   I'd like to go through them with you.  If you agree with

the corrections, that's fine.  If not, say you don't, but I'd

like you to consider them.

         MR. FRANK:  They are copies we haven't seen, your

Honor.

```
 1              MR. KENDALL:  Sure.  We're pulling them up right now,
 2       your Honor.
 3              Mr. Carter, could you first go to 561A, page 1.  And
 4       I'd like to play -- you can play it from the start at line 23.
 5              (Audio recording played.)
 6       Q.   Okay.  So you agree with me that's the opening of the
 7       conversation, correct?
 8       A.   Yes.
 9       Q.   And the first thing Mr. Wilson is asking for is to have
10:14 10  some type of advisory, a structured relationship for Mr. Singer
11       to be talking to his daughters, correct?
12       A.   Yes.
13              MR. KENDALL:  Okay.  If we can go to page 2 and play
14       lines 3 to 6, please.
15              (Audio recording played.)
16       Q.   And Mr. Singer responds and he sets up an arrangement.
17       He's going to speak with his daughters monthly and more often,
18       if necessary, correct?
19       A.   Yes.
10:15 20  Q.   Okay.  And if we could continue playing down to line 19 on
21       that page.
22              (Audio recording played.)
23              MR. KENDALL:  Could we hold one second, please.  I
24       think I have an issue with the transcript.  May I confer for
25       one moment, your Honor?
```

1          THE COURT:  Yes.

2          MR. KENDALL:  Excuse me, your Honor, we have got a few

3   corrections on the transcript.  We're not going to play the

4   voice.  We're just going to show you --

5          Can you play the voice with the lines of transcript?

6   No?  Okay.

7   Q.   If we can go to 561A, page 2, lines 9 to 19.  Okay.  So

8   you see here the first thing Mr. Singer raises with Mr. Wilson

9   is test prep, correct?

10:17 10  A.   Yes.

11  Q.   Okay.  And what Mr. Wilson tells them is they've done a

12  lot of test prep already.  They've been working on these exams

13  since they were freshman and now they're juniors, correct?

14         MR. FRANK:  Objection.  The witness has not had a

15  opportunity to compare the transcript with the audio.

16         THE COURT:  That's a fair -- an observation.

17         MR. KENDALL:  Your Honor, this is the transcript the

18  government gave us and is in evidence other than the red marks

19  that are just some changes.

10:18 20         MR. FRANK:  There's no transcript in evidence.

21         THE COURT:  The transcript is not.

22         MR. KENDALL:  Okay.  We'll go back to the other one if

23  that's what I should do, your Honor.

24         Can we go back to the other version, and we'll just

25  play the lines.

```
 1              THE COURT:  Okay.  We're now in 561?

 2              MR. KENDALL:  We'll go back to 561.  Yes, your Honor.

 3              THE COURT:  Page 2?

 4              MR. KENDALL:  Yes.

 5              (Audio recording played.)

 6    Q.   So we see here what the discussion is at the beginning of

 7    this conversation is Mr. Singer proposing test prep.  He wants

 8    to have a tutor meet with them every week.  He'll see them

 9    every fourth week and they'll have homework, correct?

10    A.   Yes, that's correct.

11              MR. KENDALL:  Okay.  If we can keep going, Mr. Carter.

12              (Audio recording played.)

13    Q.   You heard Mr. Wilson was the first one to bring up

14    engineering and science schools for his daughter, correct?

15    A.   Yes.  I believe that's correct.

16    Q.   And then Mr. Singer starts talking about how high the

17    scores is and how high the grades must be, correct?

18    A.   Yes.

19    Q.   You don't know whether what Mr. Singer is saying is true

20    or not?

21    A.   I have no basis.  No.

22    Q.   You don't know if that's what he's saying that to lull

23    someone into something or he's speaking the truth, correct?

24    A.   I have no basis to say.  No.

25              MR. KENDALL:  Okay.  Why don't we pick up at the next
```

10:20 (line 10)
10:23 (line 20)

```
 1    segment, please, Mr. Carter.
 2              (Audio recording played.)
 3              MR. KENDALL:  We'll stop there.
 4    Q.   You saw with a reference to a 35 or 36, Mr. Singer says,
 5    "That's what it's going to take to even play in the game on
 6    their own," right?
 7    A.   That's what it says, yes.
 8    Q.   You don't know what the daughters scored on their ACTs or
 9    SATs, do you?
10:25 10    A.   Mr. Wilson seems to imply they have a 32, but beyond that,
11    I don't know.
12    Q.   32 as a freshman.  You don't know what they've done as a
13    junior, do you?
14    A.   I don't.
15              MR. KENDALL:  Let's keep going here.  Please,
16    Mr. Carter, please keep playing.
17              (Audio recording played.)
18              MR. KENDALL:  If we can stop right there.
19    Q.   Now, you see that Mr. Singer is the first person to raise
10:26 20    Harvard and Yale in the conversation, correct?
21    A.   Yes.  That sounds correct.
22    Q.   Okay.  If we can keep going on.
23              (Audio recording played.)
24              MR. KENDALL:  If we can stop right there.
25    Q.   You see Mr. Wilson raises the issue of crew, correct?
```

```
 1    A.   Yes.

 2    Q.   But he talks about what time they can get, correct?

 3    A.   There's an unintelligible portion so it's not clear

 4    exactly what he's saying before that, but he's saying a really

 5    good time.

 6    Q.   "If they had a really good time, they could work on that

 7    and get a time of X," correct?

 8    A.   He says, "I can work on that and get a time of X", yes.

 9         MR. KENDALL:  Can we replay that, please.

10:27 10       (Audio recording played.)

11         MR. KENDALL:  Stop right there.

12    Q.   You see Mr. Singer is the first one to raise the issues of

13    doors, correct?

14    A.   Yes.

15         MR. KENDALL:  Okay.  If we could keep going, please.

16         (Audio recording played.)

17         MR. KENDALL:  Stop that, please.

18    Q.   Do you agree with me he says "if they had a really good

19    time, they could work on that"?

10:29 20   A.   I couldn't make out exactly what he says.  Whether it was

21    an "I" or something else.

22         MR. KENDALL:  Can you just play that one line earlier?

23         I'm sorry, your Honor.  We'll just leave it for the

24    jury's memory.  Just keep playing.

25         (Audio recording played.)
```

**A1503**

```
  1              MR. KENDALL:  If we could stop right there.

  2    Q.   Mr. Wilson, the first time he's talking about a money

  3    issue refers to it as a contribution, correct?

  4    A.   I'm not sure.  What's your question?

  5    Q.   He uses the word "contribution"?

  6    A.   Yes.

  7    Q.   He doesn't use "bribe" or "cash" or anything else?  He

  8    says "contribution"?

  9    A.   He does.

 10              MR. KENDALL:  Okay.  If we can keep playing, please.

 11              (Audio recording played.)

 12    Q.   You agree with me this is now the second time Mr. Singer

 13    has raised Harvard, correct?

 14    A.   Yes.

 15    Q.   Okay.  And here he's talking about he's going to Harvard

 16    next Friday because the President wants to do a deal with me.

 17    In fact, it was Rudy Meredith who wanted to do a deal with him,

 18    correct?

 19    A.   I understand he was meeting with Mr. Meredith on the

 20    15th -- on the 21st, yes.

 21    Q.   Yes.  And so Mr. Singer is coming to Boston to meet Rudy

 22    Meredith on September 21st, correct?

 23    A.   Yes.

 24    Q.   And 6 days prior to that on September 15th, he's telling

 25    John Wilson he's coming to Harvard next Friday, the 21st,
```

**A1504**

1    because the President of Harvard wants to do a deal with him,

2    correct?

3    A.    That's what he says, yes.

4    Q.    And, in fact, the people who wanted to do a deal with him

5    were the FBI, correct?

6    A.    We were definitely part of his itinerary.

7    Q.    Okay.  And the President of Harvard was not?

8    A.    I don't know that.

9    Q.    Well, do you have any reason to believe that the President

10:32 10    of Harvard was meeting with him to do a deal with four

11    side-door --

12    A.    No.

13    Q.    -- donations?  Okay.  You're not meaning to imply that

14    that was even a remote possibility, are you?

15    A.    I am not.

16    Q.    Okay.  So -- and he's describing it that the President

17    actually is reaching out, wants to work with him.  "Why would

18    you go to somebody else if you could come to me?"  Correct?

19    A.    Yes.

10:32 20    Q.    What you testified earlier on Wednesday about con-men

21    using lulling stories to get their victims to believe them.

22    Would you agree with me that's an example of that?

23    A.    I don't know if "lulling" is the correct term for that.  I

24    would say that's maybe an exaggeration or a boast or a lie to

25    embellish his credentials.

```
 1   Q.   Well, you'd agree with me there's a big difference between
 2   an exaggeration and a flat out lie, correct?
 3   A.   Yes, but again, I don't know if "lull" is the correct term
 4   for that.
 5   Q.   It's a flat out lie.  That you'll agree, correct?
 6   A.   I have no basis to think that that's true.
 7        MR. KENDALL:  Okay.  If we can keep on playing,
 8   please.
 9        (Audio recording played.)
10:33 10      MR. KENDALL:  If we can stop there.
11   Q.   So it's after Mr. Singer tells the exaggeration, the
12   embellishment of meeting the President of Harvard University to
13   discuss four side-door deals, that Mr. Wilson then asks would
14   it be something like water polo and a donation, correct?
15   A.   Yes.
16        MR. KENDALL:  Mr. -- so please keep on playing,
17   Mr. Carter.
18        (Audio recording played.)
19        MR. KENDALL:  You can stop right there.
10:35 20   Q.   So at this point in the call Mr. Singer has identified
21   Harvard, Stanford, Georgetown, BC, UCLA, and USC as all schools
22   that could do this door with a contribution, correct?
23   A.   Yes.
24   Q.   Six of the most respected and wonderful schools in the
25   country.  Would you agree?
```

```
 1   A.   Yes, however, he also noted --

 2   Q.   If you could just answer my question, please.

 3        MR. FRANK:  Your Honor, could the witness be allowed

 4   to answer the question?

 5        THE COURT:  Let him finish that question, the answer.

 6   A.   The part that gives me pause is he's noting the public

 7   schools can't do them because of scrutiny because everybody's

 8   watching them.

 9   Q.   Public schools are subject to legislatures and newspapers

10   and people with political agendas, correct?

11   A.   They're -- potentially they receive higher scrutiny, yes.

12   Q.   Okay.  And Mr. Singer has told him that the President of

13   Harvard University has decided to do this, correct?

14   A.   Which I think we both agree is probably a false.

15   Q.   No.  I'm asking you, correct, that's what Singer said?

16   A.   That is what Singer said.

17   Q.   Okay.  If you can just respond to my questions, please.

18   Okay.

19        So Mr. Singer has told him the President of Harvard

20   University, a private school, has formally approved this

21   program, correct?

22        MR. FRANK:  Objection.

23        THE COURT:  Sustained.

24   Q.   Has approved this program?

25        MR. FRANK:  Objection.
```

10:35 10

10:36 20

```
 1              THE COURT:  Sustained.
 2   Q.   Has approved these donations?
 3              MR. FRANK:  Objection.
 4              THE COURT:  Sustained.
 5   Q.   Okay.  And he's listed five other private schools that
 6   have participated in this situation, correct?
 7   A.   He's listed other private schools, yes.
 8              MR. KENDALL:  Okay.  If we could keep on playing,
 9   please.
10:36 10          (Audio recording played.)
11              MR. KENDALL:  We can stop right there.
12   Q.   So now we hear that Mr. Singer's telling Mr. Wilson that
13   he's doing over 700 of these side-door contributions in this
14   year, correct, at 50 or 60 different schools?
15   A.   That's what he says, yes.
16   Q.   Okay.  And you said you expressed some concern about
17   public schools, correct?
18   A.   I didn't express concern about public schools, but --
19   Q.   You noted the comment there about public schools, correct?
10:37 20   A.   I did, yes.
21   Q.   Are you aware that UCLA is the number one rated public
22   university in the United States?
23   A.   I am not.
24   Q.   Are you aware that UCLA is a public university?
25   A.   I am not.
```

**A1508**

```
 1              MR. KENDALL:  Okay.  If we could keep on playing,
 2      please.
 3              (Audio recording played.)
 4              MR. KENDALL:  Okay.  If we can then play the next
 5      section, please.
 6              (Audio recording played.)
 7      A.   I'm sorry.  Where did you skip to?
 8      Q.   Page 13, please.  Are you following it on the screen?
 9      A.   It seemed to jump ahead.
10:39 10 Q.   It did.  There are some excerpts.
11              MR. KENDALL:  Page 13, line 12, please.
12              (Audio recording played.)
13              MR. KENDALL:  If we can then go to page 15, start at
14      line 7.
15              (Audio recording played.)
16              MR. KENDALL:  If you could stop there.
17      Q.   You see where Mr. Singer says, "I'll make them a sale or
18      something, because of where you live"?
19      A.   Yes.
10:41 20 Q.   And then Mr. Wilson has a laugh, and then he says, "That's
21      probably more than we'll want to go".  He's referring up to
22      line 3 whether or not to to donate $1.2 million, correct?
23              MR. FRANK:  Objection to what he's referring to.
24              THE COURT:  Sustained.
25              MR. KENDALL:  I'll rephrase, Your Honor.
```

```
 1   Q.    He says, "That's probably more than we'll want to go",
 2   correct?
 3   A.    He does, yes.
 4   Q.    And if you look at line 3 and 4, he says "You're saying
 5   that's the minimum of 1.2 on the side-door", correct?
 6   A.    Yes.
 7           MR. KENDALL:  Okay.  If we could keep on going.
 8           (Audio recording played.)
 9           MR. KENDALL:  If you could stop right there.
10   Q.    So when Mr. Wilson's asking him for schools where the
11   contribution is half or three hundred, you agree with me
12   Mr. Singer gives him a whole list of schools, correct?
13   A.    Yes.
14   Q.    Let's count them: Georgetown, Boston College, Georgia
15   Tech, USC, UCLA, Berkeley, Duke.  It's about seven schools?
16   A.    I wasn't counting, but that sounds correct.
17   Q.    And would you agree with me both Berkeley and UCLA are
18   public schools in California?
19   A.    I believe Berkeley is a public school.  Based on the name,
20   UCLA sounding like a public school, but again, I don't know for
21   sure.
22           MR. KENDALL:  Okay.  Why don't we keep on playing,
23   please.
24           (Audio recording played.)
25           MR. KENDALL:  Can you stop right there.
```

**A1510**

|  |  |
|---|---|
| 1 | Q.   Mr. Wilson asks, "What would it have to be in terms of |
| 2 | crew I guess.  You'd have to be a good enough athlete?"  Is |
| 3 | that his question? |
| 4 | A.   Yes. |
| 5 | MR. KENDALL:  Okay.  We can keep on playing. |
| 6 | (Audio recording played.) |
| 7 | MR. KENDALL:  If we can stop right there. |
| 8 | Q.   And so you agree with me Mr. Wilson asks if it's tax |
| 9 | deductible, and Mr. Singer assures him that it is, correct? |
| 10:46 10 | A.   Yes. |
| 11 | Q.   And he refers to a nonprofit 501(3)(c).  Do you know what |
| 12 | a 501(c)(3) organization is? |
| 13 | A.   I believe it's a reference to the IRS code for a -- |
| 14 | Q.   For a nonprofit charity? |
| 15 | A.   Yes. |
| 16 | Q.   Thank you. |
| 17 | MR. KENDALL:  Okay.  If we can keep on playing. |
| 18 | (Audio recording played.) |
| 19 | Q.   If we can go back to this little section.  You've done a |
| 10:47 20 | lot of work with financial institutions, correct? |
| 21 | A.   I've done some work for financial institutions, yes. |
| 22 | Q.   And you deal with securities? |
| 23 | A.   I do. |
| 24 | Q.   You know what Goldman Sachs is, don't you? |
| 25 | A.   Yes. |

1    Q.    Why don't you describe what Goldman Sachs is.

2    A.    It's a large publicly traded investment bank.

3    Q.    Generally considered one of the most successful and

4    respected, based upon your expertise?

5    A.    They're certainly one of the largest, yes.

6    Q.    Okay.  One of the most successful?

7    A.    I don't have a basis to say that, but yes.

8    Q.    Okay.  And do you know of any association or relationship

9    that Mr. Wilson has with Goldman Sachs?

10:48 10    A.    I don't have a basis to say either way.  I don't know of

11    one.

12    Q.    Do you know of any relationship or association that

13    Mr. Singer has with Goldman Sachs?

14    A.    I'm not aware of one.

15    Q.    And he refers to "The guys from Goldman called me.

16    They've got four families that have seniors right now."  Do you

17    see that?

18    A.    Yes.

19    Q.    And then he refers to "They're being quoted by the

10:48 20    development office".  Do you know what a development office is

21    at a university, don't you?

22    A.    Yes.

23    Q.    Okay.  And you know that development offices raise money

24    for universities, correct?

25    A.    Yes.

```
 1   Q.   And based upon your investigation of Mr. Meredith, you
 2   know that development offices get involved in admissions in
 3   return for donations?
 4           MR. FRANK:  Objection.  Foundation.
 5           THE COURT:  Sustained.
 6   Q.   Okay.  Did you do a debriefing of Rudy Meredith?
 7   A.   I did.
 8   Q.   And, in that debriefing, did Mr. Meredith say things that
 9   were against his interest and admit things that were contrary
10   to his interest?
11           MR. FRANK:  Objection.  Beyond the scope.
12           THE COURT:  Sustained.
13           MR. KENDALL:  Okay.  Could we go back to the next tape
14   where the -- after the break.  Randall, let's start at page 1,
15   line 10, please.
16           (Audio recording played.)
17           MR. KENDALL:  If we could stop right there.
18   Q.   You hear Mr. Wilson say "Unless they can really get some
19   national times in", correct?  Referring to his daughters
20   getting national times in, correct?
21   A.   Yes.
22   Q.   He doesn't say anything about falsifying or faking times,
23   correct?
24   A.   My understanding of this is he's referring to --
25   Q.   I'm not asking your understanding.  I'm asking what the
```

```
 1    tape says in the transcript, please.

 2    A.    Well, I think the context is important, but yes.

 3    Q.    It says "they can" -- "unless they can really get some

 4    national times in crew you're saying it doesn't really matter".

 5    Is that what the tape says?

 6    A.    Again, I think that's out of context.

 7    Q.    Fine.  Thank you.  I'm just asking what the tape says.

 8    A.    That's what the tape says.

 9    Q.    Thanks.

10    MR. KENDALL:  If we can then keep going.

11    (Audio recording played.)

12    MR. KENDALL:  Stop right there.

13    Q.    He says that for heavyweight versus lightweight crew for

14    women that a heavyweight is 150 pounds.  Do you know if that's

15    true or not?

16    A.    I don't.

17    Q.    Okay.  As far as your position is, it could be completely

18    made up, correct?

19    A.    Yes.

20    MR. KENDALL:  Okay.  Let's keep going.

21    (Audio recording played.)

22    MR. KENDALL:  Let's stop there.

23    Q.    And Singer says "So that's what they gotta be and then

24    they got to crush it and they gotta go to nationals and they

25    gotta really engage in the sport".
```

```
 1                  That's what he said, correct?
 2    A.    That's what he said.
 3    Q.    And you know the expression "crush it" means when you do
 4    something really great in sports or some other activity?
 5    A.    Yes.
 6    Q.    There's no discussion here about fabricating times, is
 7    there?
 8    A.    Again, I think the context --
 9    Q.    I'm not asking for your context judgment.  I'm asking of
10    you what the tape says, please.  It talks about crushing it.
11    A.    The tape says it in context with the rest of the
12    conversation.
13    Q.    Okay.  He says you've got to crush it, correct?
14    A.    He does, yes.
15    Q.    "They got to crush it and they gotta go to nationals",
16    correct?  And "they gotta really engage in the sport".  That's
17    what he says, correct?
18    A.    Yes, which I think makes sense in the context of the
19    broader conversation.
20    Q.    Can I ask you, for the rest of my questions, to please
21    answer my questions and not give context?
22              MR. FRANK:  The witness is --
23              MR. KENDALL:  Your Honor, I've not asked for context
24    at all.
25              THE COURT:  Just go forward.
```

A1515

```
 1              MR. KENDALL:  Okay.  Keep playing, please.

 2              (Audio recording played.)

 3              MR. KENDALL:  Why don't we stop.

 4              And then if we could go --

 5              I'm almost at the end, your Honor.

 6   Q.   Would you agree with me this tape is September 15th?

 7   A.   Yes.

 8   Q.   And that's the week before Mr. Singer was arrested,

 9   correct?

10   A.   I don't know that he was arrested.  I know he was

11   approached.

12   Q.   Excuse me.  I appreciate that.  Let me take back that

13   question.

14   A.   Sure.

15   Q.   Mr. Singer had an interaction with the FBI on

16   September 21st?

17   A.   That's my understanding, yes.

18   Q.   I don't mean to imply there's an arrest at all.  I'm sorry

19   I even said that.

20   A.   It's fine.

21   Q.   And you agree with me, in all of the tapes you looked at,

22   there never once was a statement about cheating on tests or

23   SATs for the Wilson children, correct?

24   A.   I don't recall ever hearing that.

25              MR. KENDALL:  If I may have one moment, your Honor.
```

```
 1              THE COURT:  Yes.
 2              MR. KENDALL:  No further questions, your Honor.
 3                   CROSS-EXAMINATION OF KEITH BROWN
 4    BY MR. KELLY:
 5    Q.   Good morning, Agent Brown.
 6    A.   Good morning.
 7    Q.   I think you -- I represent Gamal Abdelaziz in this matter.
 8    A.   Yes, sir.
 9    Q.   I think you indicated a couple times already that your
10    involvement in this case wasn't very extensive, right?
11    A.   Correct.
12    Q.   And you weren't the FBI case agent on this matter, were
13    you?
14    A.   I was not.
15    Q.   An FBI case agent generally has the most knowledge about a
16    particular case, right?
17    A.   The case team, yes.  I think equally, yes.
18    Q.   Well, the case agent is in charge of the case.  That's why
19    he or she is called the case agent, right?
20    A.   Yes.  We typically have one agent as the primary, but in
21    these types of large investigations, it's not as if the other
22    parties don't equally participate.  It's usually a team effort
23    with one person listed at the top.
24    Q.   Sure.  And who was the FBI case agent on this matter?
25    A.   Special Agent Laura Smith.
```

```
 1    Q.   And is she anywhere in the courtroom today?

 2    A.   Yes, she is.

 3    Q.   And where is she?

 4    A.   Agent Smith is right there (indicating).

 5    Q.   Okay.  Now, would it be fair to say she knows a lot more

 6    about this case than you do?

 7              MR. FRANK:  Objection.  Foundation.

 8              THE COURT:  He can answer the question.

 9    A.   Yes.

10:59 10    Q.   And it's not you, but it's the prosecution team who

11    decides whether to call her as a witness, right?

12    A.   Sure.

13    Q.   But you testified that you, of course, did do some work on

14    this case, right?

15    A.   Yes.

16    Q.   For instance, you -- I think you testified that you

17    monitored the wiretap in the summer of 2018 and then you did

18    some more work in September of 2018, correct?

19    A.   Very limited in September, but yes.

10:59 20    Q.   Okay.  Then you got busy on other FBI matters, right?

21    A.   I was busy throughout, yes.

22    Q.   All right.  You got busy on a matter that didn't pertain

23    to this case after September 2018?

24    A.   And prior to that, yes.

25    Q.   All right.  Well, so you personally did not do any
```

**A1518**

1    investigation of Gamal Abdelaziz, right?

2    A.    I did not, no.

3    Q.    And the wiretap that's been of some discussion here, he

4    wasn't intercepted on that wiretap, was he?

5    A.    The Court authorized wiretap, I don't believe so, no.

6    Q.    Right.  The Title III that the Court authorized the summer

7    of 2018 Mr. Abdelaziz was never intercepted on, correct?

8    A.    That's my understanding, but I haven't reviewed all the

9    calls.

11:00 10    Q.    Okay.  Fair enough.  And is it your understanding that

11    there are only two calls involving Mr. Abdelaziz in this case?

12    A.    I don't know that.

13    Q.    Okay.  And do you -- is it your understanding that the two

14    calls occurred after his daughter was accepted at the school?

15         MR. FRANK:  Objection.  Beyond the scope.

16         THE COURT:  Sustained.

17    Q.    So you have no idea if there's one call involving him,

18    two?  You just don't know?

19         MR. FRANK:  Objection.

11:00 20         THE COURT:  Sustained.

21    Q.    All right.  Well, as one of the monitoring agents on the

22    wiretap, you have to do certain things like minimize calls,

23    right?

24    A.    Sure.

25    Q.    And minimization in the context of a wiretap is very

1    important, right?

2    A.    Absolutely.

3    Q.    You don't want to be intercepting conversations that are

4    irrelevant or private nature that don't pertain to the

5    investigation, right?

6    A.    Yes.

7    Q.    That's the general idea behind minimization, right?

8    A.    Yes.

9    Q.    And so before you participate as one of the monitors on

11:01 10    the wiretap, you look at the court order to see who you're --

11    what phone you're tapping, right?

12    A.    I believe I read the affidavit, yes.

13    Q.    Okay, because that gets you prepared to do the

14    minimization, right?

15    A.    The minimization instructions are part of that.

16    Q.    All right.  And do you recall on that affidavit that you

17    read that the federal court was told that up until the summer

18    of 2018 all the money Rick Singer gave to Donna Heinel went to

19    USC's athletic programs?

11:02 20          MR. FRANK:  I object to this as beyond the scope, your

21    Honor.

22          MR. KELLY:  He testified he read the affidavit.

23          THE COURT:  I think it is beyond the scope.

24    Sustained.

25    Q.    Well, in your discussions with your fellow agents in this

```
 1  case, did you ever learn that it was the FBI's position that up

 2  until the summer of 2018 all the money --

 3          MR. FRANK:  Objection.  Hearsay.

 4          THE COURT:  This is inappropriate.  If it's beyond the

 5  scope, you shouldn't be asking the question in which you put

 6  all the information that you want on the record.

 7          MR. KELLY:  All right.  Could I show the witness, just

 8  the witness, Exhibit 9025, please.

 9  Q.   Do you see that, sir?

10  A.   I do.

11  Q.   Is that an affidavit in support of the wiretap?

12          MR. FRANK:  This remains beyond the scope and it is

13  also hearsay.

14          MR. KELLY:  Judge, he just said he was a monitoring

15  agent and he read the affidavit.  I'm trying to refresh his

16  recollection as to what he saw.

17          THE COURT:  You can show him the document to refresh

18  his memory about something that he testified to earlier.

19  Q.   Now looking at the -- if you'll keep scrolling, please, on

20  this document --

21          MR. FRANK:  Your Honor, he was asked no questions

22  about this document.

23          MR. KELLY:  I'm seeing if it refreshes his

24  recollection as to what he read in that affidavit before he

25  became a monitor for the wiretap.
```

**A1521**

```
 1          MR. FRANK:  He's not been asked the questions and he
 2    does not remember.
 3          THE COURT:  Ask him to read the affidavit, take the
 4    affidavit down, and then ask him a question.
 5    Q.   Sure.  Can you read this excerpt slowly to yourself?
 6    A.   I'm sorry.  Which excerpt?
 7    Q.   We'll begin at the top.  It's only 5 pages.
 8    A.   One point that might be relevant.  This appears to be a
 9    version of the affidavit from later in the summer.  I don't
10    know if I monitored the wire after that point.  I believe I
11    monitored it prior to this affidavit.
12    Q.   Why don't we scroll to the bottom and we'll see the date,
13    please.  And if we can keep going to the very end.
14    A.   It's referencing August 2018.
15    Q.   Is that the summer of 2018?
16    A.   It is, but I don't believe I monitored the wire in August.
17    Q.   So this is the one you recall not seeing?  Is that your
18    testimony?
19    A.   I can't say either way.  Based on this, it appears there
20    were multiple versions of the affidavit.  I would have reviewed
21    it prior to my first shift.
22    Q.   Well, let's see if you can read the part just above this
23    signature line, please.
24    A.   "I, Laura Smith" --
25    Q.   No.  I'm sorry.  To yourself, please.
```

11:05  (lines 10, 20)

1    MR. KELLY:  Mr. Carter, above that, please.  Keep

2    going.  Keep going.  Keep going.  Keep going.  Right there.

3    Q.   Read paragraph C to yourself and see if it refreshes your

4    recollection as to whether you ever read this or not.

5         Have you had a chance to look at that, sir?

6    A.   Down to the end of the page.

7    Q.   Does that refresh your memory as to whether or not you

8    read this particular affidavit that was submitted to the Court?

9    A.   It doesn't.  It was in the summer of 2018.  I can't recall

11:07 10   what was in the affidavit at the time.  But again, I'm not sure

11   if I even reviewed this version of the affidavit based on the

12   sessions -- the wire dates that I did monitor.

13   Q.   Okay.  So the wire --

14        MR. KELLY:  We'll put this down, please.

15   Q.   The wire, as you testified, occurred in the summer of

16   2018, right?

17   A.   Yes.

18   Q.   And before you became a monitor, you did, in fact, read

19   the Court order and the affidavit to the application so you'd

11:07 20   have some sense of what was going on, right?

21   A.   Yes.

22   Q.   And you just don't recall as you sit there whether you

23   read that particular affidavit; is that fair?

24   A.   Yes.

25   Q.   Now -- and do you recall that Mr. Abdelaziz's donation was

1  in March of '18, not the summer?

2  A.    I don't recall.

3  Q.    Well, okay.  You do obviously know that Rick Singer was a

4  cooperating witness for the FBI in this case, right?

5  A.    I'm not authorized to confirm or deny who cooperated with

6  the government unless ordered to do so by the Court.

7  Q.    Well, okay.  We're in a trial here, and I'm asking you,

8  did Rick Singer make tapes for the government?

9  A.    I believe he did, but I wasn't involved in that.

11:08 10  Q.    Would that be considered a form of cooperation, if you

11  make tapes for the government?

12  A.    Yes.

13  Q.    And if you sat down with the government and allowed

14  yourself to be interviewed, would that be considered a form of

15  cooperation?

16        MR. FRANK:  This is well beyond the scope, your Honor.

17        THE COURT:  Well, he can have that question.

18  A.    Submitting to an interview doesn't necessarily indicate

19  whether someone's cooperating or not.

11:08 20  Q.    What if you repeatedly submit to interviews, does that

21  mean -- does that suggest you're cooperating?

22  A.    It can.

23  Q.    But you're not authorized to tell us now today whether he

24  was a cooperating witness for the FBI?

25  A.    Unless ordered by the Court, I cannot.

```
 1   Q.   And that's because of some FBI protocols?

 2   A.   That's what I was instructed, yes.

 3   Q.   And who instructed you on that?

 4   A.   The FBI Boston office.

 5   Q.   So it's the Boston FBI's position that if a federal agent

 6   testifies in court in a federal case, he can't confirm or deny

 7   whether someone is a cooperating witness?

 8   A.   Unless ordered by the Court, I can't confirm or deny if

 9   somebody is.

10   Q.   There's a difference between informants and cooperating

11   witnesses, right?

12   A.   Yes.  Mr. Singer cooperated with the government, yes.

13   Q.   Okay.  And handling cooperating witnesses and handling

14   informants is tricky business, right?

15   A.   It can be.

16   Q.   I mean, the FBI can locate Mr. Singer if the prosecution

17   team asked the FBI to do it, can't they?

18        MR. FRANK:  Your Honor.

19        THE COURT:  This is going beyond, I think, the scope

20   of this witness' testimony.

21   Q.   Well, are you aware of whether Mr. Singer is alive or not?

22        MR. FRANK:  I object.

23        THE COURT:  He can answer that question.

24   A.   I have no reason to think he's not.

25   Q.   And wasn't he recently here in Boston a month ago?
```

11:09 — line 10
11:10 — line 20

**A1525**

```
 1    A.    I understand that he was, but again, I wasn't involved in

 2    that.

 3    Q.    Okay.  Did you understand he was interviewed here in

 4    Boston about a month ago --

 5          THE COURT:  Sustained.

 6    Q.    And are you aware he's not being called as a witness in

 7    this case?

 8          THE COURT:  Sustained.

 9    Q.    Let me ask this.  It's not you but it's the prosecution

10    team who decides who the witnesses are for the government,

11    correct?

12    A.    Of course.

13    Q.    All right.  And are you aware that when Mr. Singer was

14    cooperating with the government he deleted hundreds of texts on

15    his phone?

16          MR. FRANK:  Objection.

17          THE COURT:  Sustained.

18          And we're going to take the morning recess at this

19    point.  Mr. Brown, you may step down, please.

20          (Jury exits.)

21          THE COURT:  Please be seated, counsel.

22          How much longer on your cross, Mr. Kelly?

23          MR. KELLY:  I suspect 45 minutes if I go -- it's hard

24    to judge on some of these questions.  But the way it's going,

25    it will probably be quicker than I thought.  So I would
```

```
 1    respectfully suggest --
 2              THE COURT:  Contrary to Mr. Kendall's half hour that
 3    was over an hour.
 4              MR. KELLY:  All right.  Well, I don't want to fall
 5    into that trap.  I'll say 45 minutes.
 6              MR. KENDALL:  We had tape issues.  It didn't go as
 7    smoothly as I hoped, and you are quite right.
 8              THE COURT:  So you think about a half hour?
 9              MR. KELLY:  I think it might go 45 minutes, your
11:12 10   Honor.
11              THE COURT:  All right.  And then if we get beyond
12    that, there will be redirect, I presume?
13              MR. FRANK:  It will be brief.
14              THE COURT:  All right.  And then we still have your
15    out of town witness, Mr. Frank?
16              MR. FRANK:  Yes, your Honor.
17              THE COURT:  All right.  We're going to go until --
18    we'll have a lunch break and then go to about three this
19    afternoon.  The Court has other afternoon business that I need
11:13 20   to attend to, but we will go to about three.
21              Is there anything else that needs to come to my
22    attention before we recess?
23              MR. KELLY:  No, your Honor.
24              MR. KENDALL:  No, your Honor.
25              THE COURT:  We're in recess for 15 minutes.
```

```
 1              (Recess taken 11:13 a.m. to 11:32 a.m.)
 2     THE COURT:  Good morning, jurors.  We're ready to resume.
 3          Mr. Brown, you remain under oath.  You're reminded.
 4          Mr. Kelly, you may continue with cross-examination.
 5          MR. KELLY:  Yes.  Thank you, your Honor.
 6     BY MR. KELLY:
 7     Q.   Good morning again, Agent Brown.
 8                    On direct, you were asked about an e-mail that
 9     Mr. Singer sent with a fake profile regarding Sabrina
11:32 10   Abdelaziz.  Do you recall those questions?
11     A.   Yes.
12     Q.   I'd like to show you that e-mail again and ask you a few
13     questions.  It's Exhibit 352 in evidence.
14     A.   Yes.
15     Q.   Now, this is a critical e-mail in this case regarding
16     Mr. Abdelaziz, isn't it?
17              MR. FRANK:  I object.
18              THE COURT:  Sustained.
19     Q.   Well, based upon your experience in this case, do you
11:32 20   think this is an important e-mail?
21              MR. FRANK:  I object.
22              THE COURT:  Sustained.
23     Q.   All right.  Well, let's talk about this e-mail, okay?
24              Look in the middle of the e-mail, please.  Originally
25     this was a message from Laura Janke to Rick Singer, correct?
```

```
 1   A.    Yes, correct.

 2   Q.    And she's attaching a profile for Sabrina, asking for

 3   various things, including telling Singer, "Let me know if you

 4   want me to add any other awards to her profile or if you think

 5   that's enough."

 6   A.    The only clarification, I don't know if there's an

 7   attached file to this.  It doesn't appear that there is.

 8   Q.    Well, I'll get to that in a second.  In fact, I'll get to

 9   it right now.  There's a second page to this, right, Mr. Brown?

10   A.    Okay.

11   Q.    Okay.  So let's go back to the other page, please.

12               So Laura Janke worked for Rick Singer, right?

13   A.    Again, I don't know what her relationship was with

14   Mr. Singer specifically.  I generally know that she had some

15   sort of business relationship with him, yes.

16   Q.    Are you aware she's the one who added awards to profiles?

17               MR. FRANK:  Objection.  Foundation.

18               THE COURT:  He can ask whether he's aware of it.

19   A.    Not specifically, no.

20   Q.    You don't know?

21   A.    No, I don't know what her relationship was.

22   Q.    So let's look carefully now at this e-mail.  Look at

23   the -- it's from Rick Singer, okay, right?

24   A.    Yes.

25   Q.    It shows to gamalaziz@cox.net?
```

**A1529**

```
 1    A.   Yes.

 2    Q.   It's going to him on August 8 at 1:20 and 47 seconds,

 3    right?

 4    A.   Yes.

 5    Q.   Sir, you have no evidence that my client ever replied to

 6    this, do you?

 7    A.   Not that I have seen personally, no.

 8    Q.   Do you think the prosecutor might have shown that to you

 9    before you testified if it existed?

11:35 10    A.   I think that's a safe assumption, yes.

11    Q.   If he had replied, "Looks great, add some more fake

12    awards," you might have seen that e-mail, right?

13    A.   Yes.

14    Q.   Okay.  So you've seen and know of no evidence that my

15    client ever replied to this e-mail, right?

16    A.   I have not seen that, no.

17    Q.   And you've seen and know of no evidence that he forwarded

18    this e-mail?

19    A.   I have not, no.

11:35 20    Q.   In fact, you have seen and know of no evidence that he

21    opened the attachment to this e-mail, right?

22    A.   No.

23    Q.   Not aware of any, right?

24    A.   Not that I've seen, no.

25    Q.   Okay.  And do you think that evidence would have been
```

1    brought to your attention before you testified in Federal Court

2    if such evidence existed?

3    A.    Yes.

4    Q.    Okay.  In fact, you know when Singer sent this to the

5    cox.net e-mail address, you know that 13 seconds later he got a

6    bounceback that says, "I'm not using this anymore.  Here is my

7    new gmail address."  You know that, right?

8    A.    I don't know that.  I haven't seen that e-mail.

9    Q.    Are you testifying that you were never shown an e-mail

11:36 10    reflecting that this thing bounced back to Singer within 13

11    seconds --

12              MR. FRANK:  Objection.  Misstates.

13    Q.    -- and said --

14              THE COURT:  Well, you can ask the question.  Go ahead.

15    Q.    As part of this chain you weren't shown that, "Please be

16    advised I've change my e-mail address to gamalaziz797@gmail?

17    A.    I don't recall seeing that, no.

18    Q.    And do you recall seeing what Singer did next?  He tried

19    to forward this chain to the gmail address but he made a typo,

11:36 20    right?

21    A.    I don't recall seeing that.

22    Q.    That was never shown to you?

23    A.    I don't recall, no.

24              MR. KELLY:  Let's see if I can show you the rest of

25    the chain here.  Let me show you Exhibit 9024 here.  Just the

| | |
|---|---|
| 1 | witness.  Just the witness. |
| 2 | Q.   Okay.  Do you recognize that e-mail bounceback away |
| 3 | message 13 seconds later on your screen? |
| 4 | A.   I haven't seen it -- I don't recall seeing it before, if |
| 5 | that's your question. |
| 6 | Q.   Can you tell me what it is? |
| 7 | A.   It appears to be an auto reply from gamalaziz@cox.net to |
| 8 | rwsinger@gmail.com. |
| 9 | Q.   What does the message say? |
| 11:37 10 | A.   "Please be advised that I've changed my e-mail address to |
| 11 | gamalaziz797@gmail.com." |
| 12 | Q.   What's it dated? |
| 13 | A.   Dated August 8, 2017, and the time is 1:21 a.m. |
| 14 |         MR. KELLY:  I offer this exhibit. |
| 15 |         MR. FRANK:  No objection. |
| 16 |         THE COURT:  It will be admitted, 9024. |
| 17 |         (Exhibit 9024 admitted into evidence.) |
| 18 | Q.   Okay.  So this is the second of the three e-mails in the |
| 19 | chain where it says, "Please be advised I've changed my e-mail |
| 11:38 20 | address to gamalaziz797@gmail.com, right? |
| 21 | A.   That what it says, yes. |
| 22 | Q.   And you weren't shown this before you came to court today |
| 23 | by the prosecutor? |
| 24 | A.   Not that I recall. |
| 25 | Q.   Okay.  And did you see the third and final part of the |

```
 1   chain where Mr. Singer tries to send it to this e-mail address?
 2   Do you see that?
 3              MR. FRANK:  I object to the characterization of it as
 4   a chain.
 5              THE COURT:  I can't --
 6              MR. FRANK:  I object to the characterization as a
 7   chain.
 8              THE COURT:  It's sustained.
 9   Q.   Let me show you Exhibit 351.
11:38 10             MR. KELLY:  Just the witness.  Blow up the top,
11   please.
12   Q.   That's two minutes later, right?
13   A.   Yes.
14   Q.   What's the date?
15   A.   Same date, August 8, 2017.
16   Q.   And who is it from?
17   A.   Rick Singer.
18   Q.   All right.  And who is it to?
19   A.   It's gamalaziz797@gmail.com.
11:39 20  Q.   It's missing a letter, isn't it?
21   A.   Yes.
22             MR. KELLY:  I move to have Exhibit 351 admitted,
23   please.
24             MR. FRANK:  No objection.
25             THE COURT:  It will be admitted.
```

```
 1              (Exhibit 351 admitted into evidence.)
 2              MR. KELLY:  Mr. Carter, can you put these three up on
 3    the screen so I can ask question about them side by side.
 4              Let's put up 9024 and 351, please.
 5    Q.   On the right is Exhibit 9024 now in evidence and, Agent
 6    Brown, that's in response to the original e-mail from Singer to
 7    Gamal at his cox.net address, right?
 8    A.   I don't know for sure but that seems to make sense, yes.
 9    Q.   Okay.  And is the message telling Mr. Singer that the
11:40 10   e-mail address has been changed?
11    A.   Yes.
12    Q.   All right.  And then if you go to the one on the left,
13    which is Exhibit 351, look at the "To" line where Singer sends
14    this e-mail.  He forgets the letter "G," right?
15    A.   Yes, it appears so.
16    Q.   It's off in cyberspace, right?
17    A.   Yes.
18    Q.   And could that perhaps explain the mystery here as to why
19    there's never a reply to Exhibit 352?
11:40 20   A.   That is certainly an explanation.
21    Q.   All right.  So at least in August of 2017, when Singer
22    sent this e-mail, let me show you Exhibit 352, please, take
23    away -- just -- yeah, 352, please.
24              So that is the e-mail with the profile with all these
25    nonsense awards that weren't accurate, right?
```

```
 1   A.   Yes.
 2   Q.   And there's no reply to that e-mail by Mr. Abdelaziz at
 3   all, is there?
 4   A.   I haven't seen one.
 5   Q.   And again, you were prepared by the government to come in
 6   to this courtroom and talk about the relevant e-mails, right?
 7   A.   Yes.
 8   Q.   And they didn't show you the bounceback e-mail, did they?
 9   A.   I don't recall seeing that e-mail, no.
10   Q.   And they didn't show you the e-mail to the wrong address
11   either, did they?
12   A.   I don't recall that e-mail either, no.
13   Q.   Okay.  But it's clear that August 8, Mr. Singer's e-mail
14   never got to Gamal Abdelaziz, did it?
15        MR. FRANK:  Objection.
16        THE COURT:  Sustained.
17   Q.   All right.  Let me move to another e-mail situation.
18        On direct you were shown a series of e-mails with
19   photos attached to them.  Do you recall that?
20   A.   Yes.
21   Q.   The first one was Exhibit 334.  I'd like to put it up on
22   the screen.  It's in evidence.
23        Let's look first at the "From" line.  That appears to
24   be yet another e-mail address that Gamal Abdelaziz has used in
25   the past, correct?
```

**A1535**

1    A.    Yes.

2    Q.    All right.  And this one is dated July 27, right?  And

3    Singer below is asking Mr. Aziz, "Gamal, I need an action photo

4    or two of Sabrina playing basketball."

5    A.    Yes.

6    Q.    That's what it says, right?

7    A.    Yes.

8    Q.    It doesn't say, "I need an action photo of someone

9    else playing basketball," right?  And he says, "Got it," right?

11:44  10   In fact, are you aware that about an hour and a half later he

11    gave a quick update to Mr. Singer and said, "In progress"?

12    A.    I have not seen that e-mail, no.

13    Q.    You haven't seen that one?

14    A.    No.

15    Q.    All right.  Let's go through the five e-mails with photos

16    that are in evidence that my client did send.  They are -- I'll

17    go through one by one.  Just for the record, 338, 339, 340, 341

18    and 342.  Those are -- I'm sure you don't have those numbers

19    memorized, right?

11:44  20   A.    No.

21    Q.    All right.  It's hard to memorize numbers, right?

22    A.    It's a lot of numbers.

23    Q.    All right.  So I'm going to represent to you that those

24    are five e-mails in evidence that I'll ask you about that

25    Mr. Abdelaziz sent in the span of two minutes.  So let's go

```
 1    over the time to show that's accurate.  Let's look at 338

 2    first.  So this one, the cover page doesn't have a picture,

 3    does it?

 4    A.    It appears to be an attachment to the e-mail.

 5    Q.    Okay.  So this cover page just has that so-called jpeg

 6    number there that you were asked about before, right?

 7    A.    Yes.

 8    Q.    And let's look at the time here.  3:44.  And let's see

 9    what this picture was of.  All right.  Now, obviously a girls'

11:45 10    basketball game.  Can you tell who is the young girl with the

11    arm in her face obscuring her view?  Do you know who that is?

12    A.    I don't.

13    Q.    All right.  That was sent at 3:44.  Then let's move to

14    3:39.  Again, face page has nothing but jpegs and blank and the

15    attachment is a photo.  Can we see the photo?

16            A girl taking a free throw, yeah, looks like a free

17    throw, right?

18    A.    Yes.

19    Q.    Do you know who that girl shooting is?

11:46 20    A.    I don't.

21    Q.    Okay.  Let's go back to the face page.  Would you dispute

22    if I represent that was Mr. Abdelaziz's daughter?

23    A.    No.  The first letter on the jersey appears to be an A.

24    Q.    Okay.  Right.  And on the cover page, again this is a

25    second of the five photos that are sent from Gamal to Rick
```

| | |
|---|---|
| 1 | Singer, right? |
| 2 | A.   I'm sorry.  The first -- |
| 3 | Q.   Exhibit 339 is the second e-mail Gamal sent to Singer with |
| 4 | a photo, a basketball photo attached, right?  It has another |
| 5 | jpeg number? |
| 6 | A.   Yeah.  I don't know the sequence in which they were sent, |
| 7 | but -- |
| 8 | Q.   Fair enough.  It's the second e-mail with another |
| 9 | basketball photo, right? |
| 11:47 10 | A.   Yeah.  Again, I don't know the order.  I can't confirm it |
| 11 | is the second, but it was one of the e-mails that were sent. |
| 12 | Q.   Yeah, there were a lot of e-mails.  This was the second |
| 13 | one I've just shown you. |
| 14 | Let me show you the third one, Exhibit 340.  Again, |
| 15 | let's look at the top first.  Gamal is sending it to Singer. |
| 16 | There's some jpeg number on it, and then attached to the |
| 17 | face -- sorry, at 3:45, a minute later, and let's see the |
| 18 | attachment.  This is of a girl dribbling a basketball.  If I |
| 19 | represent it's not his daughter, do you have any reason to |
| 11:48 20 | believe it's not his daughter? |
| 21 | A.   No. |
| 22 | Q.   In fact, she's wearing glasses, right? |
| 23 | A.   Yes. |
| 24 | Q.   Are you aware whether or not his daughter wears glasses? |
| 25 | A.   I'm not. |

**A1538**

| | |
|---|---|
| 1 | Q.   All right.  But it's the same game, right?  It looks to be |
| 2 | a picture, like the other two, from a game? |
| 3 | A.   It appears similar to the others.  I don't know whether |
| 4 | it's the same game or not. |
| 5 | Q.   All right.  So then let's go to Exhibit 340. |
| 6 | 340, please.  Sorry.  We were just looking at 340? |
| 7 | A.   Yes. |
| 8 | Q.   Okay.  We're going to move off 340.  We're going to go to |
| 9 | 341. |
| 11:49 10 | 341, again, another e-mail from Gamal to Singer on |
| 11 | July 27 at 3:45.  This is the fourth of the pictures I've shown |
| 12 | you now, right? |
| 13 | A.   Yes. |
| 14 | Q.   Another jpeg number, right, on the face page that's it, |
| 15 | correct? |
| 16 | A.   Yes. |
| 17 | Q.   And then you've got a picture attached to this one as |
| 18 | well.  Looking at this picture, sir, looking at what's |
| 19 | obviously the coach, to his left, our right, do you recognize |
| 11:50 20 | that girl as being in the other photos we've just seen? |
| 21 | A.   It appears to be the woman who was taking the free throw |
| 22 | shot. |
| 23 | Q.   Okay.  And then let me show you 342 in evidence, please. |
| 24 | MR. FRANK:  It appears our monitors just went out, |
| 25 | Judge. |

```
 1                 THE COURT:  I'm sorry?
 2                 MR. FRANK:  Our monitors just seem to have --
 3                 THE COURT:  We have monitor problems?
 4                 MR. FRANK:  Yes.
 5                 MR. KELLY:  I think it's just at counsel table.  I
 6       think the jury can see it.  Can the witness see it?
 7                 THE WITNESS:  Yes.
 8                 MR. KELLY:  These are in evidence.  I think we have
 9       copies, your Honor.
11:50 10                 THE COURT:  Do you need copies, Mr. Frank?
11                 MR. FRANK:  No, not of this.
12                 THE COURT:  All right.  Do you have problems?  The
13       jurors can see the picture?  Good.  Okay.
14                 MR. FRANK:  It just came back.
15                 MR. KELLY:  May I proceed, your Honor?
16                 THE COURT:  Yes.
17       Q.   I believe we're on 342, right?
18       A.   Yes.
19       Q.   And again, that's from Gamal to Rick Singer, and there's a
11:51 20       jpeg number, and if you look above, that's at 3:46, right?
21       A.   Yes.
22       Q.   And sir, is there a photo attached to this one as well?
23       A.   Yes.
24       Q.   Okay.  And if you're looking at the back row at number 1,
25       does she appear to be the same girl in some of the previous
```

 1    photos?

 2    A.    Yes.

 3    Q.    And do you know whether or not that's Sabrina Abdelaziz?

 4    A.    I don't know for sure.  Based on your representation, I'll

 5    take your word for it that it is.

 6    Q.    Okay.  And these are five e-mails with photos attached

 7    that are sent in the span of two minutes, correct?

 8    A.    Yes.

 9    Q.    All right.  And do you recall, what's the jpeg number of

11:52 10    the girl dribbling the ball?

 11    A.    The -- with the profile?

 12    Q.    The girl dribbling the ball with glasses.  Didn't you

 13    memorize the --

 14    A.    Yes, it's DSC_0123.

 15    Q.    And you've had a long time to look at that, haven't you?

 16    A.    Not a long time, but I looked at it.

 17    Q.    You prepared for your testimony today, right?

 18    A.    Yes, sir.

 19    Q.    Do you think if someone looked at this, in two minutes

11:52 20    they could remember jpeg numbers?

 21    A.    No.

 22    Q.    It's not reasonable to think that at all, is it?

 23    A.    No.

 24    Q.    All right.  So showing you Exhibit 345 that's in evidence,

 25    when Singer says to Gamal about an hour later -- well, no, I'm

```
 1    sorry -- nine minutes later, nine minutes later, do you see the
 2    time 3:54?  The last of the five photos had been at 3:46.  So
 3    if my math is right, that's nine minutes later.  Singer says,
 4    "We'll use this one."  Right?
 5    A.   Yes.
 6    Q.   And you don't have any evidence that Gamal replied to this
 7    e-mail, do you?
 8    A.   I haven't seen it personally, no.
 9    Q.   All right.  And you're the agent who was prepared to
10    testify about this, right?
11    A.   About this e-mail, yes.
12    Q.   Yeah.  And on this one there's no attachment, right?
13    A.   There doesn't appear to be, no.
14    Q.   So unless someone was a modern-day rain man, they wouldn't
15    remember the numbers and how they go to the photos, right?
16    A.   Well, personally you could go back to your "sent" and very
17    quickly identify which photo he's referring to.
18    Q.   And do you have any evidence that Gamal Abdelaziz did
19    that --
20    A.   Of course not.
21    Q.   -- back in July of 2017?
22    A.   Personally, no.
23    Q.   In fact, that photo of the girl dribbling the ball, that's
24    not even the photo that was submitted to USC's SUBCO committee,
25    was it?
```

A.    I have a vague recollection based on the exhibits.    I

understand that the photo was changed.    I can't recall what it

was changed to.

Q.    Okay.  Well, let me show you Exhibit 381.  First of all,

on the cover page, were both Donna Heinel and Katie Fuller USC

employees at the time?

A.    That's my understanding, yes.

Q.    And it's dated October 3, 2017, correct?

A.    Yes.

Q.    Do you know whether Sabrina's application was submitted

two days later on October 5 to the SUBCO?

A.    I don't recall.

Q.    All right.  And how about, let's see the attachment to

this, please.

        Take a look at that picture that was attached to what

was submitted to USC.  Now we got an entirely different girl,

don't we?

A.    It appears so, yes.

Q.    And she's not dribbling the ball and she doesn't have

glasses, right?

A.    Definitely not, no.

Q.    In fact, when Singer followed the bounceback instructions

properly, he sent it to Gamal, right?

A.    Sorry, I don't understand the question.

Q.    Sure.  Let me show you Exhibit 390 in evidence.  First of

```
 1   all, this is not the athletic profile, right?  This is the USC

 2   letter?

 3   A.   Correct.

 4   Q.   And below it appears with Rick Singer the subject is "USC

 5   letter."  He sent it to Gamal again at the cox.net address?

 6   A.   Okay.

 7   Q.   All right.  And then if you look above it, Singer is

 8   sending it to the correct Gamal gmail address, right?

 9   A.   Yes.

10   Q.   Are you aware that, as with the last trilogy I discussed

11   with you, there was an intervening bounceback message from

12   cox.net telling Singer that Gamal's e-mail address had changed?

13   A.   I haven't seen that, no.

14   Q.   No one showed that to you?

15   A.   No.

16        MR. KELLY:  Just for the witness, I'd like to put up

17   Exhibit 9027, please.

18   Q.   So this is also -- let's put the two of them back to back,

19   please.  Well, first of all, let me ask you about 9027 before

20   we put them back.  What is this?

21   A.   It appears to be a similar auto reply from

22   gamalaziz@cox.net to Rick Singer's email account.

23        MR. KELLY:  I offer it, your Honor.

24        MR. FRANK:  No objection.

25        THE COURT:  It will be admitted.
```

11:56 (line 10)
11:57 (line 20)

**A1544**

1              (Exhibit 9027 admitted into evidence.)

2              MR. KELLY:  So let's now put these two side by side.

3      390 and what we just admitted as 9027, please.

4      Q.   So does it appear to you anyway here when Singer sends it

5      to cox.net on the left of 390, Mr. Carter -- I'm sorry.

6      Speaking too quickly.

7              On the left on the bottom, Singer sends it to

8      cox.net, right?

9      A.   Yes.

11:58 10  Q.   If you go to the right, the bounceback kicks in?

11     A.   It appears so, yes.

12     Q.   It says, "Please be advised that I have changed my e-mail

13     address to gamalaziz797@gmail.com, right?

14     A.   Yes.

15     Q.   Then back to the other one, when you look at the top on

16     390 there, Singer actually gets it correct this time when he

17     sends it to Gamal.  He doesn't forget to drop the G, right?

18     A.   Correct.

19     Q.   So that one goes through during the USC letter, right?

11:59 20  A.   I believe so, yes.

21     Q.   On the prior one we just discussed, all you know on the

22     trilogy we just discussed, all you know when you served or the

23     FBI served a search warrant in July of 2019, 11 months later,

24     that's when Exhibit 352 was in the gmail, not in August, you

25     didn't serve the search warrant until 11 months later, right?

```
 1    A.    I don't know exactly when the search warrant was served.

 2    I didn't serve it.

 3    Q.    All right.  That's the only thing you can say from the

 4    search warrant is Exhibit 352 we were discussing was in the

 5    gmail then, right?

 6    A.    Just to confirm, if you could put 352 on the screen.

 7    We've talked about many exhibits.

 8          MR. FRANK:  Sure.

 9    A.    Yes.  So --

10    Q.    So this one here I'm talking about, this was found in the

11    search warrant that the FBI did in July of 2019, right?

12    A.    Yes, I personally saw that e-mail in the search warrant

13    return, yes.

14    Q.    And the only thing that search warrant tells you is that's

15    when they find it, right, July of 2019?  It doesn't tell you

16    how it migrated into the gmail, does it?

17    A.    Actually, in the metadata it does show when it was sent

18    and when it was received.

19    Q.    Yeah, but does it show how it got into the gmail?

20    A.    I'm not an expert in how e-mail headers work.  I can't say

21    with certainty how it did get into the gmail account.  All I

22    can tell you is that it was there and there's metadata

23    reflecting that it was sent at a prior date.

24    Q.    Yeah.  And you testified on direct that you can't explain

25    it, right?
```

```
 1   A.   There are possible explanations for how it got there, but
 2   I can't say with certainty how it did.
 3   Q.   Right.  There's a lot of possible explanations, right?
 4   A.   For sure.
 5   Q.   We'd be guessing though, wouldn't we?
 6   A.   I can't say with certainty how it got there.
 7   Q.   You'd be speculating right?
 8   A.   I would, yes.
 9   Q.   And, of course, you're aware that it's the government's
10   burden of proof in this case beyond a reasonable doubt?
11          MR. FRANK:  I object to the argument, your Honor.
12          THE COURT:  Sustained.
13   Q.   Well, do you build criminal prosecutions on speculation,
14   sir?
15          MR. FRANK:  I object, your Honor.
16          THE COURT:  Sustained.
17   Q.   Let's go to Exhibit 505, please.  Let's look at the
18   attachment that was discussed here in the middle, please.  This
19   is a letter to Gamal Aziz.  Let's look at the third paragraph.
20   There you go.  Okay.  I'll read it.  It's already in evidence.
21          "The Key Worldwide Foundation was incorporated in the
22   State of California on December 14, 2012 as a nonprofit, public
23   benefit charitable organization and tax-exemption applications
24   for recognition as 501(c)(3) charitable status were approved as
25   of December 14, 2012."  That was sent to Gamal in March of
```

```
 1   2018, right?
 2   A.   Yes.
 3   Q.   In fact, are you aware that it was a registered charity?
 4   A.   I'm not.
 5   Q.   You're not aware.  Are you aware that Gamal's son had gone
 6   on a trip with this charity?
 7   A.   No.
 8   Q.   You're not aware of that?
 9   A.   No.  I know there was some prior relationship with
10   Abdelaziz.  I don't know the details of it.
11   Q.   In this case there's no tax charges against Gamal
12   Abdelaziz, right?
13   A.   I don't know.
14   Q.   You don't know whether he's charged with a tax violation?
15          MR. FRANK:  Your Honor, this is argument.
16          THE COURT:  Sustained.
17   Q.   All right.  Let me ask you about Exhibit 427, please.  Do
18   you see the date of this one, November 29?
19   A.   Yes.
20   Q.   Okay.  You were asked about this on direct as well?
21   A.   Yes.
22   Q.   And you see where Gamal says, "We're going to pass on
23   applying in December."
24   A.   Yes.
25   Q.   Are you aware that his daughter took the SAT three days
```

**A1548**

1  after this letter?

2  A.    I am not.

3  Q.    How about Exhibit 330?  This is a -- if we start at the

4  top, this is an e-mail from Gamal to his wife, and it's on

5  7-17, and he's forwarding Singer's below.  Look at Singer's

6  below, please.  Go all the way to the bottom.  There's nothing

7  at the bottom, right?  And let's go further up, please.

8        And so Gamal is forwarding this Singer request to his

9  wife apparently?

12:04 10  A.    It appears so, yes.

11  Q.    All right.  And certain examples are given as to what is

12  needed, right?

13  A.    I don't know if they're examples or information Singer

14  already knows, I don't know.

15  Q.    Well, okay.  If you look at home address, China is a

16  pretty broad address, right?  He's obviously looking for

17  whatever the address is, right?

18  A.    Right.  I don't know the context of why that information

19  is there or how it got there.

12:05 20  Q.    Right.  But let's look at position three or four.  You

21  can't play both, right?

22  A.    I don't even know what position three or four is in

23  reference to.

24  Q.    Well, in basketball, if you have a three, that's a small

25  forward, and a four is a power forward.  Do you know that?

```
 1              MR. FRANK:  Objection to the testimony.

 2              THE COURT:  Sustained.

 3    Q.   Are you a basketball fan at all?

 4    A.   No.  Sorry.

 5    Q.   All right.  Point taken.  Not everyone's a basketball fan,

 6    right?

 7    A.   Sure.

 8    Q.   A lot of grown men don't know anything about basketball,

 9    right?

12:05 10              MR. FRANK:  Objection.

11              THE COURT:  Sustained.

12    Q.   With respect to this e-mail, if we can go to the top,

13    please.  Do you see the e-mail that preceded this from Laura

14    Janke to Rick Singer?

15    A.   I don't recall the e-mail that preceded this.

16    Q.   All right.

17              MR. KELLY:  Just for the witness only, put up Exhibit

18    329, please.

19    Q.   Have you seen this e-mail before?  Let me start with, what

12:06 20    is it?

21    A.   It's an e-mail from Laura Janke to Rick Singer.

22    Q.   What's it dated?

23              MR. FRANK:  Your Honor, this is not in evidence.

24              THE COURT:  It's apparently not in evidence.  What's

25    the number again?
```

```
 1              MR. KELLY:  It's 329.

 2   Q.   I'm not going to read it until it's in evidence, but what

 3   is it, just looking at the top?

 4   A.   It's an e-mail from Laura Janke to Rick Singer asking for

 5   similar information to the prior e-mail.

 6              MR. KELLY:  I offer this exhibit.

 7              MR. FRANK:  No objection.

 8              THE COURT:  It will be admitted, 329.

 9              (Exhibit 329 admitted into evidence.)

12:07 10   Q.   Let's look at what Laura Janke said in the middle there to

11   Singer.  This is Janke to Singer, right?

12   A.   Yes.

13   Q.   Let's see what she says.  "If they don't have the items

14   pertaining to the sport, let me know and I will create."  Do

15   you see where she says that?

16   A.   Yes.

17              MR. KELLY:  Now, let's put up 330 next to that, if we

18   could, please.

19   Q.   Okay.  So when Singer is sending his e-mail on the same

12:08 20   date to Gamal, he's taken out the little line at the bottom

21   where Janke says, "If they don't have the items pertaining to

22   the sport, let me know and I will create."  That's not there

23   anymore, is it?

24   A.   No.

25   Q.   And with respect to this e-mail, 329, have you seen it
```

```
 1   before in preparing for your testimony, sir?
 2           MR. FRANK:  Your Honor, it's not the same document.
 3           MR. KELLY:  Well, he's got redirect.
 4           THE COURT:  Are you objecting?
 5           MR. FRANK:  I am objecting.
 6           THE COURT:  It's sustained.
 7           MR. KELLY:  Okay.
 8   Q.   So with respect to this document that's in evidence, 329,
 9   was it shown to you before you testified here today?
12:09 10  A.   Are you referring to the document on the left?
11   Q.   Yes, sir.
12   A.   I don't recall seeing that before, no.
13           MR. KELLY:  Take that down, please.  The prosecutor on
14   direct referred to a Singer note to self, Exhibit 323.  Can we
15   see that one again, please?  It's in evidence.
16   Q.   Do you see Aziz's daughter's name down below?
17   A.   Yes.
18   Q.   And up top it's Singer to himself, right?
19   A.   Yes.
12:09 20  Q.   All right.  Besides this particular note to self --
21           MR. FRANK:  This is also not in evidence, your Honor.
22           MR. KELLY:  Pardon me?
23           MR. FRANK:  This version of this document is not in
24   evidence.
25           MR. KELLY:  I'm sorry.  This is --
```

```
 1              THE WITNESS:  It appears to be a redacted version.
 2              MR. KELLY:  Well, okay.  Do you want the name of the
 3      person connected to the business school?
 4              MR. FRANK:  I think we should put the version --
 5              MR. KELLY:  Okay.  Let's do it.  Do we have it?
 6              THE COURT:  You're offering 323 in its redacted form?
 7              MR. KELLY:  Yes.  There's a name to the left of
 8      "Business School" deleted.  It's not Aziz.  It's not a
 9      defendant.  It's irrelevant to this matter.  If they want the
12:10 10     full version, I'll put it in at the break.
11              MR. FRANK:  I have no objection to a different version
12      coming in, your Honor, but it shouldn't be represented to be
13      the version that's in evidence.
14              THE COURT:  Yeah, it's a different version.  Do you
15      want to call it 323A?
16              MR. KELLY:  Yes.
17              THE COURT:  It will be admitted as 323A.
18              (Exhibit 323A admitted into evidence.)
19              MR. KELLY:  Let's look at what is not in evidence,
12:10 20     just the witness, please, 448.
21      Q.   What is this, just looking at the heading?
22      A.   It appears to be a similar e-mail as the prior e-mail.
23      Q.   So another note to self by Singer?
24      A.   Yes.
25              MR. KELLY:  I offer it.
```

```
 1                 MR. FRANK:  No objection.

 2                 THE COURT:  It will be admitted as a redacted version.

 3                 MR. FRANK:  Actually, your Honor, I withdraw that,

 4       Your Honor.  I object to the redactions.  There is a version of

 5       this that's unredacted, and that should come in.

 6                 THE COURT:  This is a redacted version.  Do you have

 7       the unredacted one?

 8                 MR. KELLY:  I believe we provided it already to the

 9       government.  The Bates number on the bottom right is the

12:11 10  government's Bates number.  They have it.

11                 MR. FRANK:  We do have the document.

12                 THE COURT:  Wait, wait.

13                 MR. KELLY:  Sure.

14                 THE COURT:  Just offer the unredacted document.  Is it

15       448?

16                 MR. KELLY:  Yes.  Let me just -- may I confer with

17       counsel, your Honor?

18                 THE COURT:  Yes.

19                 (Pause.)

12:12 20           THE COURT:  So you're offering 448 in the unredacted

21       form, and it is an e-mail.  Do we have a date for it?

22                 MR. KELLY:  December 15, your Honor.

23                 THE COURT:  Of?

24                 MR. KELLY:  2017, yes.

25                 THE COURT:  It will be admitted.
```

```
 1            (Exhibit 448 admitted into evidence.)
 2   Q.   Okay.  On this one, note to Singer to himself on December
 3   15, again, "Subject:  USC with Donna."  Right?
 4   A.   Yes.
 5   Q.   It doesn't say "USC with Donna and Gamal," just "USC with
 6   Donna," right?
 7   A.   It says "USC with Donna."
 8   Q.   And in the middle, I think it's the middle, it says,
 9   "Sabrina Aziz 300-200."
10   A.   Yes.
11   Q.   Are you aware of the significance of that split, 300-200,
12   in this case?
13   A.   Not specifically, no.
14            MR. KELLY:  Okay.  You can take that down, please.
15   Q.   Now, I'm just going to refer to some of these tapes that
16   were played already on your direct.  Okay?  So we heard several
17   tapes involving some New York lawyer named Caplan, right?
18   A.   Yes.
19   Q.   And the gist of those tapes was that he was willing and
20   eager to pay for someone to take a test for his kid, right?
21   A.   Generally, yes.
22   Q.   All right.  And are you aware that there's no allegations
23   of any test-cheating issues against Mr. Abdelaziz?
24   A.   I'm not aware of any, no.
25   Q.   Okay.  And similarly, the call with Agustin Huneeus that
```

1    was played?

2    A.    Yes.

3    Q.    Another test-cheater, right?

4    A.    Yes.

5    Q.    And you don't have any evidence that Mr. Abdelaziz knows

6    either Mr. Caplan or Mr. Huneeus, do you?

7    A.    Not that I'm aware of, no.

8    Q.    Now, are you aware that Singer told Gamal 200,000 should

9    go to the Galen Center?

12:15 10    A.    I don't believe so, no.

11    Q.    You're not aware of that?

12    A.    Was that in one of the e-mails?  I don't recall seeing

13    that.

14    Q.    Well, if you don't recall, you don't recall, sir, but you

15    are unaware that Singer told Aziz that 200,000 should go to the

16    Galen Center?

17    A.    I don't recall hearing that.

18    Q.    Are you aware of what the Galen Center is?

19    A.    Based on the exhibits, it's something connected to USC.  I

12:15 20    don't know the relationship.

21    Q.    You don't know if it's a basketball stadium or not?

22    A.    I don't know.

23    Q.    There was a tape played where Heinel told Singer that the

24    money should go to the Galen Center.  Do you recall that tape?

25    A.    The voicemail, yes.

```
 1              MR. KELLY:  Exhibit 439, so I can play that again.
 2              (Audio recording played.)
 3    Q.   Now, this was dated December 4 of 2017, which is, of
 4    course, well before July 2018, correct?
 5    A.   Correct.
 6    Q.   And you don't -- you don't have any evidence to suggest
 7    that any of the monies that went to the Galen Center gift
 8    account went to any USC employee personally for any purpose
 9    unrelated to their employment at USC, do you?
12:17 10              MR. FRANK:  Objection, foundation.
11              THE COURT:  Sustained.
12    Q.   Do you know anything about the Galen Center gift account?
13    A.   No.
14              MR. KELLY:  One moment, your Honor.
15              THE COURT:  Yes.
16    Q.   I think you testified on direct that at some point you saw
17    the FBI extraction report in this case?
18    A.   Yes.
19    Q.   And let me show you the face page of 1481A, please.
12:18 20              MR. FRANK:  This is not in evidence, your Honor.
21              MR. KELLY:  Just the witness.  Just the witness, I'm
22    sorry.
23    Q.   Is this the -- I'll give you a moment to look at the top,
24    please.
25    A.   Yes.
```

```
 1   Q.   Is this the FBI extraction report that you were referring

 2   to that you've seen in the past?

 3   A.   It appears to be the same, the page is the same, yes.

 4   Q.   Okay.

 5        MR. KELLY:  Can you scroll down a little, please,

 6   Mr. Carter.

 7   Q.   Do see the date on the second line, 10-5-2018, correct?

 8   A.   Yes.

 9   Q.   Approximately two weeks earlier Mr. Singer had started to

10   cooperate with the government, right?

11   A.   I know he was approached on the 21st.  I don't know the

12   timeline beyond that.

13   Q.   Okay.  But shortly before this?

14   A.   Yes.

15   Q.   If you look at page 3 of this exhibit --

16        MR. KELLY:  Actually, I'd like to offer this, your

17   Honor.

18        MR. FRANK:  No objection.

19        THE COURT:  It will be admitted, 1481A.

20        (Exhibit 1481A admitted into evidence.)

21   Q.   So let me go back to the face page.  And so the jury can

22   see, it's dated 10-5-2018 in the second row, right?

23   A.   Yes.

24   Q.   An extraction report by the FBI is basically the FBI

25   taking all of the data out of the iPhone that a person has,
```

1    right?

2    A.   I can't say that.  An image is a copy of the iPhone.  An

3    extraction, I believe certain aspects of it are chosen by the

4    person doing the extraction, and that's what's removed as the

5    extraction.

6    Q.   Fair enough.

7    A.   I don't know if it's a complete copy of everything on the

8    iPhone.

9    Q.   All right.  It certainly gets a lot of data, right?

12:20 10   A.   Depending on what you select, yes.

11    Q.   If you go to the third page of this FBI extraction report,

12    if you look in the middle under the contents where it says

13    "iMessages," it says -- I'm sorry, it says "Chats."  Then it

14    says "Facebook message," "iMessages."

15    A.   As part of my review of the extraction, I didn't review

16    any chats.

17    Q.   Okay.  I'm just going to ask you about the document in

18    evidence, not any particular review.

19    A.   Sure.

12:21 20   Q.   You see where it says "iMessages," right?

21    A.   Yes.

22    Q.   That's one of those blue texts, right?  The iMessages are

23    blue ones, whereas the SMS texts are the green ones, right?

24    A.   I didn't review anything in this extraction report beyond

25    contacts and voicemails, so I can't say with any certainty.

```
 1   Q.   Sure.  But in general you know iMessages are the blue

 2   ones?

 3            MR. FRANK:  This is well beyond the scope of the

 4   direct.

 5            THE COURT:  I'll let him have this if we're not going

 6   to get too bogged down.

 7            MR. KELLY:  I'll keep moving.

 8   Q.   The iMessages are the blue ones, correct, do you know?

 9   A.   I don't know.  I review extraction reports.  I don't pay

12:22 10   close attention to which color is which.

11   Q.   But the blue ones are the ones that can't be captured on a

12   wiretap, right?

13   A.   I have no idea.

14   Q.   Okay.  How about then, it does show, of these iMessages

15   1,342 deleted, right?

16   A.   It appears to, yes.

17   Q.   All right.  And that's in October of 2018, shortly after

18   Mr. Singer began to cooperate with the United States, right?

19   A.   Shortly after he was approached.  Again, I don't know

12:22 20   details beyond that.

21   Q.   Okay.  Did you see the extraction report --

22            MR. KELLY:  You can put this one down, please.

23   Q.   Did you see this extraction report in March of 2019?

24   A.   No.

25   Q.   So that's the only one you did see?  I'm sorry.
```

|   |   |
|---|---|
| 1 | So the one that I just showed you that's in evidence |
| 2 | as 1481A from October is the one you saw? |
| 3 | A.   Yes, for the limited purpose of preparing for today, yes. |
| 4 | Q.   Fair enough.  And you never saw anything in March of 2019? |
| 5 | A.   I don't believe so, no. |
| 6 | MR. KELLY:  All right.  Your Honor, I should probably |
| 7 | take this to the sidebar.  I have several remaining e-mails |
| 8 | I'll speak to here.  I don't think I can represent that they |
| 9 | are part of a chain but they are in the same time period.  I |
| 12:24 10 | can question the witness about them now or later subject to the |
| 11 | Court's ruling. |
| 12 | THE COURT:  Why don't we discuss this at the break.  I |
| 13 | take it the witness, Mr. Brown, will be still available at the |
| 14 | break.  So let's do it that way.  Let's move along. |
| 15 | MR. KELLY:  With that, your Honor, I have no further |
| 16 | questions of Agent Brown. |
| 17 | THE COURT:  Redirect, Mr. Frank. |
| 18 | MR. FRANK:  Thank you, your Honor. |
| 19 | REDIRECT EXAMINATION OF KEITH BROWN |
| 12:25 20 | BY MR. FRANK: |
| 21 | Q.   Special Agent, you were just asked a series of questions |
| 22 | about deleting iMessages. |
| 23 | A.   Yes. |
| 24 | Q.   Have you ever deleted a message on your phone? |
| 25 | A.   Sure. |

```
 1    Q.   When you did that --
 2            MR. KELLY:  Objection, relevance.
 3            THE COURT:  Overruled.
 4    Q.   When you did that, did it also delete off the phone of the
 5    person who received the message?
 6            MR. KENDALL:  Objection, your Honor.
 7            THE COURT:  Overruled.
 8            MR. KENDALL:  This may be a sidebar, your Honor.
 9            THE COURT:  No.  I will let him have the question.
12:25 10   A.   No.  My understanding is that when you delete it on one
11    device, it does not delete it on the other.
12    Q.   You were asked a series of questions about payments to the
13    Galen Center?
14    A.   Yes.
15    Q.   Do you recall to whom Gamal Aziz wrote his check?
16    A.   I don't.
17    Q.   Could you look at Exhibit 505, please.  At the top it
18    says, "Attached is your official receipt of your contribution
19    to the Foundation."  Do you see that?
12:26 20   A.   Correct.
21    Q.   Could we look at the attachment.  "Thank you for your
22    contribution of $300,000 to the Key Worldwide Foundation."
23    A.   Yes.
24    Q.   Now, you can write a check to the Galen Center, right,
25    that's possible to do?
```

```
 1   A.   I assume so, yes.

 2   Q.   But that's not what Mr. Aziz did?

 3   A.   It appears not, no.

 4   Q.   Could we look at Exhibit 330, please.  You were asked some

 5   questions about this document that was sent to Mr. Aziz at the

 6   gamalaziz797@gmail.com address?

 7   A.   Yes.

 8   Q.   Do you see that Mr. Aziz forwarded it to his wife?

 9   A.   Yes.

12:27 10   Q.   And the headline, the subject of this e-mail is "For me to

11   complete USC athletic profile."

12   A.   Yes.

13   Q.   Is it fair to say that anyone receiving this would know

14   that a USC athletic profile was being created?

15        MR. KELLY:  Objection.

16        THE COURT:  Overruled.

17   A.   I think that's a safe assumption, yes.

18   Q.   Can you create an athletic profile if you don't play a

19   sport?

12:27 20   A.   Not a true one.

21        MR. KENDALL:  Objection, your Honor.

22        THE COURT:  Overruled.

23        MR. FRANK:  Can we look at Exhibit 427, please.

24   Q.   You were shown this document to a college counselor --

25   from Gamal Aziz to a college counselor in Hong Kong.  Do you
```

**A1563**

```
 1   recall that?

 2   A.    I do.

 3   Q.    "Dear Gary, Thank you so much for your extraordinary help

 4   and support for Sabrina.  We're going to pass on applying in

 5   December.  Very best, Gamal."

 6   A.    Yes.

 7   Q.    It doesn't say anything in this e-mail to the college

 8   counselor about the fact that Sabrina has already been approved

 9   for admission to USC, does it?

10   A.    It doesn't.

11              MR. FRANK:  Can we look at Exhibit 340.

12   Q.    You were asked some questions about these photos that

13   Mr. Aziz e-mailed to Rick Singer.

14   A.    Yes.

15   Q.    The subject line on this e-mail that Mr. Aziz sent to Rick

16   Singer is "Sabrina," right?

17   A.    It is.

18   Q.    It doesn't say "other players on Sabrina's team," does it?

19   A.    It does not.

20   Q.    It doesn't say "not Sabrina"?

21   A.    No.

22              MR. FRANK:  Can we look at the attachment.

23   Q.    Would you agree with me, sir, that if one of those people

24   were your daughter, you'd recognize her?

25   A.    For sure.
```

```
 1    Q.   In any of those e-mails that counsel showed you of

 2    photographs of Sabrina in 2017, did you see Mr. Aziz telling

 3    Mr. Singer that Sabrina didn't actually play basketball in

 4    2017?

 5    A.   No.

 6    Q.   And counsel asked you questions about whether someone

 7    could remember the jpeg number, right?

 8    A.   Yes.

 9    Q.   Who sent this photo to Mr. Singer with the subject line

10    "Sabrina"?

11    A.   Mr. Aziz.

12    Q.   You'd remember if you did that, right?

13    A.   Yes.

14         MR. FRANK:   Could we look at 352, please.

15    Q.   You were asked some questions about the cox.net e-mail

16    account.

17    A.   Yes.

18    Q.   Did you search the cox.net e-mail account?

19    A.   Personally, no.

20    Q.   Where did you find this e-mail?

21    A.   In Mr. Aziz's gmail account.

22    Q.   And you were asked some questions about whether this

23    e-mail could have metaphysically transported itself into that

24    e-mail account months after it was sent.

25         MR. KELLY:   Objection, your Honor.  I believe I said
```

```
 1   "migrate."  I didn't say "metaphysically."
 2            MR. FRANK:  Withdrawn.
 3   Q.   You were asked some questions about whether this e-mail
 4   could have migrated to that e-mail account months and months
 5   after it was sent.  Do you recall those questions?
 6   A.   Generally, yes.
 7   Q.   Are you familiar with time travel, Special Agent?
 8            MR. KELLY:  Objection, argumentative.
 9            THE COURT:  What was the question?
10            MR. KELLY:  Is he familiar with time travel.
11            THE COURT:  What was the question?
12   Q.   Are you familiar with time travel?
13            MR. KELLY:  I think that's objectionable, your Honor.
14            THE COURT:  Overruled.
15   Q.   Are you familiar with time travel?
16   A.   As a concept, yes.
17   Q.   Do you know if it's possible in this day and age?
18   A.   As far as I'm aware, it is not.
19   Q.   But you found this e-mail in Mr. Aziz's gamalaziz797 gmail
20   account?
21   A.   I did.
22   Q.   And that wasn't speculation.  That's where you found it,
23   right?
24   A.   Yes.
25            MR. FRANK:  Could we look at Exhibit 415, please.
```

**A1566**

```
 1    Q.   Do you see you were asked some questions about this
 2    exhibit as well?
 3    A.   Yes.
 4    Q.   You see at the bottom this is another e-mail that
 5    Mr. Singer sent in October of 2017 also to the
 6    gamalaziz@cox.net e-mail account?
 7    A.   I do.
 8    Q.   And you see that Mr. Aziz forwarded the e-mail to Mikayla
 9    Sanford.  Do you see that?
10    A.   I do.
11    Q.   There's no intervening e-mail there, is there?
12    A.   There doesn't to appear to be, no.
13    Q.   So the e-mail that Mr. Singer sent to the cox.net e-mail
14    account in 2017 was forwarded thereafter by Mr. Aziz from the
15    gamalaziz797 email account?
16    A.   It was.
17    Q.   And if we could take -- if you look at the e-mail, the
18    second sentence says, "Rick asked that we work with you to
19    complete USC's application to make sure it meets the exact
20    requirements below."  Did I read that accurately?
21    A.   Yes, you did.
22         MR. FRANK:  Could we look at what the exact
23    requirements in the attachment are?
24    Q.   Could you read item 3, please.
25    A.   "Register with the NCAA eligibility center."
```

```
 1   Q.   Okay.  And could you read the sentence in the first

 2   paragraph that begins, "Your records indicate."

 3   A.   "Your records indicate that you have the potential to make

 4   a significant contribution to the intercollegiate athletic

 5   program, as well as to the academic life of the university."

 6   Q.   What does your common sense tell you, Special Agent, about

 7   whether you can make a significant contribution to the

 8   intercollegiate athletic program at a Division 1 school when

 9   you fail to make your high school's varsity basketball team?

10   A.   You cannot.

11        MR. FRANK:  Okay.  We can take that down.  Can we look

12   at Exhibit 49, please.

13   Q.   You were asked some questions about this e-mail chain

14   involving John Wilson, Rick Singer and Leslie Wilson.  Do you

15   recall those questions?

16   A.   Yes.

17        MR. FRANK:  My eyesight is not sufficient to read

18   that, so I'm going to refer to my hard copy.

19   Q.   Now, if we look at the e-mail --

20        MR. FRANK:  If you could just move, Ms. Lewis, a

21   little further down.  Thank you.  If you could enlarge the

22   bottom two e-mails there.  Bottom two, sorry.  Thank you, yes.

23   Q.   Mr. Kendall asked you some questions about this exchange

24   where Mr. Wilson says, "If water polo and swimming are not

25   realistic for Johnny, what are the schools he has a realistic
```

A1568

|    |    |
|----|----|
| 1 | shot at without help?"  Do you recall that? |
| 2 | A.   Yes. |
| 3 | Q.   And then there's a list of schools.  Do you recall that |
| 4 | Mr. Kendall asked you about USC in the harder category? |
| 5 | A.   Yes. |
| 6 | Q.   And do you recall that he suggested that this e-mail was |
| 7 | sent Johnny's junior year, but that people's academic records |
| 8 | are not set in stone, they can improve? |
| 9 | A.   Yes. |
| 12:35 10 | Q.   Do you recall that? |
| 11 | A.   I do. |
| 12 | Q.   And this was in March of 2013? |
| 13 | A.   Yes. |
| 14 | Q.   Could we look at Exhibit 87, please.  This is now October |
| 15 | of 2013, right? |
| 16 | A.   Yes. |
| 17 | Q.   So if you're a junior in March of 2013, then what are you |
| 18 | in October of 2013? |
| 19 | A.   A senior. |
| 12:35 20 |       MR. FRANK:  If we could look at page 3 of the |
| 21 | attachment. |
| 22 | Q.   How many months is October after March? |
| 23 | A.   Approximately five. |
| 24 | Q.   It's actually seven, right? |
| 25 | A.   I'm sorry, seven. |

1    Q.   And if we look at the Menlo School assessment of Johnny

2    Wilson and his chances at the University of Southern California

3    without help, it's listed as a double reach, correct?

4    A.   Yes.

5    Q.   And that's seven months later during his senior year?

6    A.   Yes.

7         MR. FRANK:  Could we look at Exhibit 101, please.

8    Q.   You were asked some questions about this document and in

9    particular the sentence in the second e-mail from the top in

12:36 10   which Mr. Vavic tells Mr. Singer, "I cannot guaranty anything."

11   Do you see that?

12   A.   Yes.

13   Q.   Although you weren't asked about the last sentence, "I

14   will present him with my top walk-ons," correct?

15   A.   Yes.

16   Q.   Now, this statement, "I cannot guaranty anything," this

17   was sent by Jovan Vavic to Rick Singer, correct?

18   A.   Yes.

19   Q.   Mr. Wilson is not on this exchange, is he?

12:36 20   A.   No.

21        MR. FRANK:  Could we look at Exhibit 83, please, and

22   at page 3.  If we could just enlarge the second e-mail in the

23   chain from the top.  Ms. Lewis, if you could highlight the

24   second sentence in the -- actually, if you could just highlight

25   the second paragraph.

```
 1   Q.   Could you read that for the record, Special Agent.

 2   A.   "Jovan will provide Johnny's info to admission when he

 3   does his other guys over the next month.  No payment of money

 4   until he gets a verbal and written from admissions and then 50

 5   percent to a savings account I set up.  Then the remainder upon

 6   an acceptance letter in March with everyone else."

 7   Q.   Sounds like no payment until you get in, right?

 8   A.   That's what it sounds like.

 9   Q.   That's a guaranty, isn't it?

10        MR. KENDALL:  Objection, your Honor.

11        THE COURT:  Sustained.

12        MR. FRANK:  Could we look at the transcript.  If you

13   could flip in your binders to Exhibit 561, the transcript.

14   Q.   If I could draw your attention, Special Agent, to Exhibit

15   561 to page 18, line 13.  Mr. Singer says, "Well, yeah, if you

16   just try the athlete side, and you were using the side door

17   with the athlete, it's a done deal.  Just like with John."  Do

18   you see that?

19   A.   I do.

20   Q.   What does "a done deal" sound like to you?

21        MR. KENDALL:  Objection, your Honor.

22        THE COURT:  Sustained.

23        MR. FRANK:  Could we look at Exhibit 75, please.

24   Sorry, now I need to find my page again.  If we zoom into the

25   very bottom e-mail on the second page, the very last line.
```

| | |
|---|---|
| 1 | Q.   Mr. Kendall asked you about this statement -- this |
| 2 | question, "When do I make my first donation?" |
| 3 | A.   Yes. |
| 4 | Q.   You recall that he asked you about the fact that |
| 5 | Mr. Wilson used the word "Donation" and also the word "First," |
| 6 | implying there would be a second? |
| 7 | A.   Yes. |
| 8 | MR. FRANK:  Could we look two e-mails up, please. |
| 9 | Q.   Could you read the last sentence of that e-mail, the last |
| 12:40 10 | sentence? |
| 11 | A.   "Do I make the first payment to you then?" |
| 12 | Q.   He's not using the word "donation" there, right? |
| 13 | A.   No. |
| 14 | Q.   If we go two e-mails up from that, could you read the |
| 15 | first sentence of that e-mail? |
| 16 | A.   "Great.  Let me know when you have verified you have it |
| 17 | all completed and into Jovan." |
| 18 | Q.   And the next sentence? |
| 19 | A.   "Also when and where to wire money." |
| 12:40 20 | Q.   He's not using the word "Donation" there, is he? |
| 21 | A.   He is not. |
| 22 | MR. FRANK:  Could we look at Exhibit 83, please, if |
| 23 | you go to page 3, could you, Ms. Lewis, highlight the e-mail to |
| 24 | the right of where your cursor is right now. |
| 25 | Q.   Could you read the second paragraph there. |

```
 1  A.   "Also, when is Jovan going to be able to give us decision

 2  on USC?  And when do I pay you?  Was it 50 percent in November?

 3  50 percent in February when we get the final official notice?"

 4  Q.   Any reference to a donation?

 5  A.   None.

 6  Q.   And then Mr. Singer's response, one e-mail up.  Could you

 7  read the second paragraph there.

 8  A.   "Jovan will provide Johnny's info to admission when he

 9  does his other guys over the next month.  No payment of money

10  until he gets a verbal and written from admissions and then 50

11  percent to a savings account I set up.  The remainder on

12  acceptance letter in March with everyone else."

13  Q.   Any mention of a charitable donation in that e-mail?

14  A.   None.

15  Q.   What does Mr. Singer mention?

16  A.   That no payment until he gets a written -- a verbal and a

17  written from admissions.

18  Q.   And then where will the money go?

19  A.   Into a savings account he sets up.

20  Q.   Does that sound like a donation?

21  A.   Not to me.

22       MR. FRANK:  Could we look at Exhibit 710, please.

23  Q.   What is the subject line of this -- do you see this is

24  from Mr. Wilson to Mr. Singer and Ms. Rogers?

25  A.   Yes.
```

12:41 appears at line 10. 12:42 appears at line 20.

```
 1    Q.   What is the subject line that Mr. Wilson put on this
 2    e-mail?
 3    A.   "USC fees."
 4    Q.   Do "fees" sound like a donation to you?
 5              MR. KENDALL:  Objection, your Honor.
 6              THE COURT:  Sustained.
 7    Q.   Is there any mention of "donation" in the subject line?
 8    A.   There is not.
 9    Q.   What word did Mr. Wilson choose?
12:42 10   A.   "Fees."
11    Q.   And if we look at the bottom e-mail, the first e-mail in
12    the chain, do you see any reference to a donation in
13    Mr. Wilson's e-mail?
14    A.   None.
15    Q.   What words does he use to describe it?
16    A.   Invoice for the payment, and to make it a consulting
17    invoice or whatever.
18    Q.   Does that sound like a donation?
19    A.   No.
12:43 20          MR. FRANK:  Could we look at Exhibit 109, please.
21    Q.   Another e-mail from Mr. Wilson?
22    A.   Yes.
23    Q.   What is the subject line that Mr. Wilson put on his
24    e-mail?
25    A.   "Wire to the key."
```

| | |
|---|---|
| 1 | Q.   And do you see that Ms. Rogers asks in the second e-mail, |
| 2 | "What is the account I'm charging this to?" |
| 3 | A.   Yes. |
| 4 | Q.   And how does Mr. Wilson respond? |
| 5 | A.   "Business consulting.  The invoice will be for consulting. |
| 6 | Please work with him to get the invoice correct." |
| 7 | Q.   Does that sound like a donation to you? |
| 8 | MR. KENDALL:  Objection, your Honor. |
| 9 | THE COURT:  Sustained. |
| 12:44 10 | Q.   Does Mr. Wilson say anything here about his wire to The |
| 11 | Key being a donation? |
| 12 | A.   No. |
| 13 | MR. FRANK:  Could we look at Exhibit 89, please.  If |
| 14 | you could zoom in on the second e-mail.  Go a little lower. |
| 15 | That was my fault.  If you could just -- no, no.  Sorry.  If |
| 16 | you could zoom in on the second e-mail and the first line of |
| 17 | the e-mail below it, from October 23.  Exactly, thank you. |
| 18 | Q.   Do you see that Mr. Wilson asks, "What are the |
| 19 | expectations if Johnny gets into USC through this water polo |
| 12:44 20 | approach?" |
| 21 | A.   Yes. |
| 22 | Q.   And you were asked about Mr. Singer's response, "Just be |
| 23 | ready for practice in the fall as a player on the roster or |
| 24 | just a member of the squad but not get in the pool."  And |
| 25 | Mr. Kendall asked you whether or not "Get in the pool" means |

```
 1   only for games and matches.  Do you recall that?
 2   A.   Yes.
 3   Q.   What Mr. Singer says here is, "Just be ready for practice
 4   as a player on the roster."  Correct?
 5   A.   Yes.
 6   Q.   Does he say anything in this e-mail about being a practice
 7   player?
 8   A.   Not specifically, no.
 9   Q.   Does he say anything about being a red shirt?
10   A.   No.
11   Q.   What does he say?
12   A.   "Just be ready for practice in the fall as a player on the
13   roster or just a member of the squad but not get in the pool."
14   Q.   Is it possible to be a water polo practice player if
15   you're not in the water?
16        MR. KENDALL:  Objection, your Honor.
17        THE COURT:  Sustained.
18   Q.   Can you play water polo outside of the water?
19        MR. KENDALL:  Objection, your Honor.
20        THE COURT:  He can answer that question.
21   A.   My understanding is you cannot.
22   Q.   It's in a pool, right?
23   A.   Yes.
24        MR. FRANK:  Could we look at Exhibit 137, please.
25   Q.   Mr. Kendall asked you a series of questions about this
```

|  |  |
|---|---|
| 1 | e-mail from Johnny Wilson to Jovan Vavic in January of 2015. |
| 2 | Do you recall those questions? |
| 3 | A.   I do. |
| 4 | Q.   I want to direct your attention to the second sentence. |
| 5 | "I wanted to thank you and illustrate how profoundly |
| 6 | appreciative I am for the incredible opportunity you've given |
| 7 | me here at USC as an individual member on the team as well as a |
| 8 | student at this school."  Do you see that? |
| 9 | A.   Yes. |
| 12:46 10 | Q.   What is Mr. Wilson, Johnny Wilson, thanking Mr. Vavic for |
| 11 | giving him the opportunity to do? |
| 12 | MR. KENDALL:  Objection, your Honor. |
| 13 | THE COURT:  Sustained. |
| 14 | Q.   I want to direct your attention to the last sentence. |
| 15 | What does Johnny Wilson say? |
| 16 | A.   "For these reasons, I will not be playing water polo this |
| 17 | semester and will be focusing on my academic life and my future |
| 18 | career in the business world." |
| 19 | Q.   This was sent in January 2015? |
| 12:47 20 | A.   Yes. |
| 21 | MR. FRANK:  Ms. Lewis, if you could put this on the |
| 22 | right and put Exhibit 49 on the left.  Thank you.  And if we |
| 23 | could zoom in on that second email again from March 27 -- I'm |
| 24 | sorry, the third -- nope, a little lower down. |
| 25 | Q.   Could you read the part of it that says -- beginning with |

```
 1   "The commitment."

 2   A.   "The commitment is to be on the roster, not attend all

 3   practices, but he will have to attend drug tests and other

 4   mandatory functions for one year.  Then walk away.  Frankly,

 5   after the first semester he can move on."

 6   Q.   The e-mail on the right in which Johnny Wilson resigned

 7   from the water polo team, that was sent after the first

 8   semester, right?

 9   A.   I believe so, yes.

10   Q.   That's when he moved on?

11   A.   Yes.

12        MR. KENDALL:  Objection, your Honor.

13        THE COURT:  Well, the latter part, yes, it's

14   sustained.

15        MR. FRANK:  Could we look at Exhibit 83, please.  And

16   if we could look at the third page again.  If we look at the

17   second to last e-mail on page 3.

18   Q.   You were asked some questions about this e-mail in which

19   Mr. Wilson wrote, "Jovan has Johnny's stuff and asked me to

20   embellish his profile more, which I am doing."

21        MR. KENDALL:  Objection, your Honor.

22        THE COURT:  Overruled.

23        MR. KENDALL:  I think he misstated.

24        THE COURT:  Well, quote it again.

25   Q.   "Jovan has Johnny's stuff and asked me to embellish his
```

```
 1   profile more, which I am doing," that's what Mr. Singer said on
 2   October 13, correct?
 3   A.   Yes.
 4   Q.   And you were asked some questions about whether there was
 5   any confusion about which profile Mr. Singer was referring to.
 6   Do you recall those questions?
 7   A.   About Naviance, yes.
 8   Q.   Yes.   There was a suggestion that maybe he was referring
 9   to some other -- maybe Mr. Wilson misunderstood which profile
10   he was referring to.
11   A.   Yes.
12           MR. KENDALL:   Objection, your Honor.
13           THE COURT:   Overruled.   If that's what his
14   understanding is.
15           MR. FRANK:   Could we look at Exhibit 75, please.   If
16   we look at the e-mail in the middle to the right -- just the
17   one below that on August 24.
18   Q.   Could you read the second sentence, please.
19   A.   "Transcript, test scores and a player profile so he can
20   add Johnny to his recruit list and present him to admissions in
21   October."
22   Q.   What kind of profile does Mr. Wilson tell Mr. Singer --
23   I'm sorry.   Withdrawn.
24           What kind of profile does Mr. Singer tell Mr. Wilson
25   he is going to provide to Jovan Vavic in August of 2014?
```

A1579

```
 1    A.    He refers to it as a player profile.

 2    Q.    And what does Mr. Singer tell Mr. Wilson Mr. Vavic is

 3    going to do with that player profile in October?

 4    A.    He's going to add him to his recruit list and present him

 5    to admissions.

 6    Q.    Now, the e-mail that we looked at, Exhibit 83, in which

 7    Mr. Singer referred to embellishing the profile, that was in

 8    October of 2013, October 13.  Do you see that?

 9    A.    Yes.

10    Q.    That's Exhibit 83, October 13, 2013?

11    A.    Yes.

12          MR. FRANK:  Could we look at Exhibit 88.

13    Q.    How many days is October 19 after October 13?

14    A.    Six days later.

15          MR. FRANK:  And can we look at the attachment.

16    Q.    What kind of profile is attached to Exhibit 88?

17    A.    It appears to be a player profile.

18    Q.    Now, you were asked some questions about this profile and

19    whether you have any idea whether those swim times on the right

20    there --

21          MR. KENDALL:  Objection, your Honor.

22          THE COURT:  He hasn't finished the question.

23          MR. KENDALL:  I didn't ask about that.

24    Q.    You were asked some questions about whether you had any

25    idea whether any entries are accurate or inaccurate on this
```

```
 1  profile.
 2  A.   Yes.
 3  Q.   Do you recall those questions?
 4  A.   Generally, yes.
 5  Q.   And if we look at the swim times on the right, you see
 6  that there's a time of 20 seconds, 20.12 seconds listed for the
 7  short course and 43.98 listed for the 100 freestyle short
 8  course?
 9  A.   Yes.
10       MR. FRANK:  Could we look at Exhibit 84 side by side
11  with Exhibit 85, please.
12  Q.   Do you see that in Exhibit 84, sent at 11:43 p.m. there's
13  a time of 22.49 listed for the 50 freestyle and 49.45 listed
14  for the 100 freestyle?
15  A.   Yes.
16  Q.   And then in Exhibit 85 sent approximately 45 minutes
17  later, the times are changed to 20.12 for the 50 and 43.98 for
18  the 100?
19  A.   Yes.
20  Q.   Is it possible to improve your swimming time that much in
21  45 minutes?
22       MR. KENDALL:  Objection, your Honor.
23       THE COURT:  Sustained.
24  Q.   Do you have a reason to believe that the swim times on the
25  profile Exhibit 88 were falsified?
```

12:51 (line 10)
12:52 (line 20)

```
 1              MR. KENDALL:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3              MR. FRANK:  If we could go back to 88, please.

 4    Q.   Mr. Kendall asked you whether there was any evidence that

 5    Mr. -- if we could go back to the cover e-mail -- that

 6    Mr. Wilson read this e-mail.  Do you recall those questions?

 7    A.   I do, yes.

 8    Q.   And he asked you a series of questions that suggested that

 9    Mr. Wilson was in Europe?

12:53 10    A.   I recall those questions, yes.

11              MR. KENDALL:  Objection, your Honor.  Misstating the

12    record quite a bit.

13              THE COURT:  Well, I'm not aware of that.  The

14    objection is overruled.

15              MR. FRANK:  Your Honor, if I could grab some

16    documents.

17              THE COURT:  Yes.

18              MR. FRANK:  Thank you.

19              MR. KENDALL:  Your Honor, this is beyond the scope and

12:54 20    I would ask to be heard, your Honor.

21              THE COURT:  No, I'm not going to let you be heard now.

22    We're almost at the lunch break.  You can be heard then.

23              MR. FRANK:  Could we show the witness only Exhibit

24    711, please.

25    Q.   Now, Exhibit 88 --
```

```
 1              MR. KENDALL:  Your Honor, I don't even think -- I'm

 2    not sure this is even on the government's exhibit list.

 3              MR. FRANK:  We just added it, your Honor.  These are

 4    two exhibits.

 5              THE COURT:  All right.  Proceed.

 6    Q.   Exhibit 88 was sent on October 19, 2013, correct?

 7    A.   Yes.

 8    Q.   And Mr. Kendall asked you a series of questions suggesting

 9    that Mr. Wilson didn't see that e-mail.  Do you recall those

12:55 10  questions?

11    A.   Generally, yes.

12    Q.   What is the date of the e-mail at Exhibit 711?

13    A.   October 19, 2013.

14    Q.   Who is it from?

15    A.   John Wilson to Rick Singer, copying Leslie Wilson.

16    Q.   What's the subject?

17    A.   "Connecting in person."

18              MR. FRANK:  Government offers 711.

19              MR. KENDALL:  No objection, your Honor.

12:55 20             THE COURT:  It will be admitted.

21              (Exhibit 711 admitted into evidence.)

22    Q.   Do you see the bottom e-mail in the chain, Mr. Wilson

23    writes at 9:45 p.m. on October 18, "R.  Leslie and I are in

24    California this week.  Can we meet this weekend or next

25    Saturday?  John."
```

1   A.   Yes.

2   Q.   And how does Mr. Singer respond on October 19?

3   A.   He writes "Coming over at 3:30 tomorrow."

4   Q.   And how does Mr. Wilson respond?

5   A.   "Fantastic."

6   Q.   And what's the date?

7   A.   October 19, 2013.

8   Q.   And how does that compare with the date on Exhibit 88?

9   A.   I'd have to see 88 to refresh, I'm sorry.

12:56 10        MR. FRANK:  Could we put Exhibit 711 on the right and

11   Exhibit 88 on the left.

12   A.   It's the same date.

13   Q.   So based on Exhibit 711, it appears that Mr. Wilson was

14   not in Europe on October 19, 2013, was he?

15   A.   It appears not, no.

16   Q.   Who does it appear he was meeting with on October 19?

17   A.   Rick Singer.

18   Q.   And he was also in his e-mail, the

19   john@hyannisportcapital.com account, on October 19, correct?

12:56 20   A.   Yes.

21        MR. FRANK:  Could we show the witness Exhibit 712,

22   please.

23   Q.   What is this?

24   A.   An e-mail from John Wilson to Leslie Wilson.

25   Q.   What's the date?

```
 1    A.    The same day, October 19, 2013.

 2    Q.    What's the time?

 3    A.    8:53 and 47 seconds p.m.

 4    Q.    What is the subject?

 5    A.    Water polo shot.

 6          MR. FRANK:  The government offers 712.

 7          THE COURT:  It will be admitted.

 8          MR. KENDALL:  No objection, your Honor.

 9          (Exhibit 712 admitted into evidence.)

12:57 10          MR. FRANK:  Could we put Exhibit 712 on the right and

11    88 on the left.

12    Q.    Special Agent, what is the time that Exhibit 88, the water

13    polo profile, was sent by Rick Singer to John Wilson?

14    A.    It was sent at 7:30 p.m.

15    Q.    What is the time that Mr. Wilson accessed that same

16    john@hyannisportcapital.com e-mail account to send a water polo

17    shot to his wife?

18    A.    Same day at 8:53 p.m.

19    Q.    Approximately one hour and 23 minutes later?

12:57 20    A.    Yes.

21          MR. FRANK:  Could we look at the attachments to both

22    e-mails.

23    Q.    Special Agent, do you see any similarity between those

24    photos?

25    A.    The photo on the left appears to be a cropped image of the
```

```
 1    same photo on the right.
 2    Q.   In fact, Special Agent, we've looked at many, many e-mails
 3    together in which John Wilson is using the
 4    john@hyannisportcapital.com account, have we not?
 5    A.   Yes, we have.
 6    Q.   If we can just quickly look at some of those e-mails.
 7    Exhibit 83, which we just looked at a moment ago in which
 8    Mr. Singer told Mr. Wilson that he would be embellishing the
 9    profile just like Jovan Vavic wanted --
12:58 10           MR. KENDALL:  Objection, your Honor.
11           THE COURT:  Grounds?
12           MR. KENDALL:  He's characterizing the document.  He's
13    supposed to read documents, not --
14           THE COURT:  Yeah, all right.  Sustained.
15    Q.   What does Mr. Singer tell Mr. Wilson he was doing to the
16    profile in Exhibit 83?
17    A.   He writes --
18           MR. FRANK:  If we look at the bottom, page 3, and if
19    you zoom in on that e-mail, thank you Ms. Lewis.
12:59 20    Q.   What does Mr. Singer tell Mr. Wilson he's doing to the
21    profile?
22    A.   He writes that "Jovan has Johnny's stuff and asked him" --
23    "me to embellish his profile more."
24    Q.   And what does he say after that?
25    A.   "Which I am doing."
```

```
 1          MR. FRANK:  Okay.  If we go back to the cover.
 2    Q.   What e-mail account does Mr. Wilson respond from?
 3    A.   The john@hyannisportcapital.com e-mail address.
 4          MR. FRANK:  Could we look at Exhibit 48, please.
 5    Q.   What account is Mr. Wilson using in Exhibit 48?
 6    A.   The same john@hyannisportcapital.com account.
 7          MR. FRANK:  Could we look at Exhibit 49.
 8    Q.   What account is Mr. Wilson using in Exhibit 49?
 9    A.   The same account.
10          MR. FRANK:  Could we look at Exhibit 63.
11    Q.   What account is Mr. Wilson using in Exhibit 63?
12    A.   The same account.
13          MR. FRANK:  Could we look at Exhibit 65.
14    Q.   What account is Mr. Wilson using in Exhibit 65?
15    A.   Both the Hyannis Port Capital account and the staples.eu
16    account.
17          MR. FRANK:  Could we look at Exhibit 74.
18    Q.   What account is Mr. Wilson using in Exhibit 74?
19    A.   The hyannisportcapital account.
20          MR. FRANK:  Could we look at Exhibit 89.
21    Q.   What account is Mr. Wilson using in Exhibit 89?
22    A.   The hyannisportcapital account.
23          MR. FRANK:  Could we look at Exhibit 710.
24    Q.   What account is Mr. Wilson using in Exhibit 710?
25    A.   The same hyannisportcapital account.
```

01:00 (line 10)
01:00 (line 20)

```
 1              MR. FRANK:  Could we look at Exhibit 109.
 2   Q.    What account is Mr. Wilson using in Exhibit 109?
 3   A.    The same.
 4              MR. FRANK:  Thank you.  Should I continue, your Honor?
 5              THE COURT:  How much longer do you have?
 6              MR. FRANK:  Ten minutes.
 7              THE COURT:  All right.  We're going to take the lunch
 8   break at this stage, jurors, for an hour.  We'll be back at
 9   2:00.  We're going to go to 3:00 today, not to 3:30.  So we'll
10   have a relatively short afternoon session.  I'll see you back
11   here at 2:00.
12              (Jury exits the courtroom.)
13              THE COURT:  All right.  Please be seated, counsel.
14              Again, approximately how much longer on redirect,
15   Mr. Frank?
16              MR. FRANK:  Ten minutes or less, your Honor.
17              THE COURT:  And recross?
18              MR. KENDALL:  Probably 15, 20 minutes, your Honor.
19              MR. KELLY:  Ten minutes, your Honor.
20              THE COURT:  So we may get to another witness this
21   afternoon.
22              MR. KELLY:  Yes.  And may I just put something on the
23   record.  I was walking over.  I failed to object in a timely
24   fashion.  Mr. Kendall objected in a timely fashion.  I believe
25   I would like to join in the objection as to this:  When the
```

1   prosecutor asked the witness about "aren't texts on both

2   people's phones," in my view that's objectionable,

3   burden-shifting, and we ask you to instruct the jury that the

4   burden is on the prosecution, not the defense.  We don't have

5   to produce anything.  So when he asked the witness, the FBI

6   agent, who they're all listening to, doesn't these texts exist

7   on other people's phones, that's classic burden-shifting.  So

8   we object and ask for an instruction.

9           MR. FRANK:  There was no discussion of whose texts.

01:03 10  He asked him questions about 1,300 texts on the phone that were

11  deleted, and I simply asked whether those texts would exist on

12  the phones -- whatever phones -- they were deleted from, the

13  other phones.

14          MR. KENDALL:  Your Honor, I would like to amplify

15  this.  I think it's directly raising a Fifth Amendment issue.

16  It's not our relevance or our issue if there are texts on other

17  people's phones or somewhere out of this courtroom that they

18  have phones.  1,300 texts were deleted.

19          THE COURT:  This is something that doesn't need to be

01:03 20  resolved at this moment.  We're about to enter into a weekend,

21  at which time I expect there will be several motions filed.

22  One of them can be this and I will consider it.

23          MR. KENDALL:  Thank you, your Honor.

24          THE COURT:  We're in recess until 2:00.

25          THE CLERK:  All rise.

```
 1                    (Recess taken 1:04 p.m. to 2:06 p.m.)
 2              THE COURT:  Good afternoon, jurors.  We're ready to
 3    continue.
 4              Mr. Brown, again, you remain under oath.  You're
 5    reminded.
 6              And, Mr. Frank, you may continue with redirect
 7    examination.
 8              MR. FRANK:  Thank you, your Honor.
 9    BY MR. FRANK:
02:06 10   Q.   Mr. Brown, if I could direct your attention to the
11    transcript for Exhibit 561, please.
12    A.   Yes.
13    Q.   Special Agent Brown.  Sorry.  You recall that Mr. Kendall
14    asked you with respect to Exhibit 561 whether it was Mr. Singer
15    who first mentioned Harvard as a possibility for Mr. Wilson's
16    daughters?  Do you recall that -- those questions?
17    A.   I do.
18    Q.   If you look at page 5 of the transcript, at line 5 on
19    page 5, Mr. Singer asks which schools the girls are going to be
02:07 20   looking at.  Do you see that?
21    A.   Yes.
22    Q.   And how does Mr. Wilson respond at line 9?
23    A.   "You know, they'd love to go to, you know, some top
24    schools."
25    Q.   Top schools, right?  And then at line 18, he says "I think
```

```
 1   Courtney's looking at, you know, the top schools whether it's
 2   ivy or whether that's, you know, they're kind of, you know, the
 3   Cornells or the Princetons".  Do you see that?
 4   A.   I do.
 5   Q.   And then at page 7, if I could direct your attention to
 6   line 20, who's the first person in this call to mention going
 7   to Stanford?
 8   A.   It appears to be Mr. Wilson.
 9   Q.   And then, at page 8, Mr. Kendall asks you some questions
10   about Mr. Wilson's statement at line 20 concerning getting a
11   really good time.  You see that?  Mr. Wilson says, at line 17,
12   "On the other doors you have certain things like crew they can
13   try.  They can try that.  Is that still your number one, your
14   [unintelligible] a really good time?  I can work on that and
15   get a time of X".  Do you see that?
16   A.   Yes.
17   Q.   But at page 9, at line 11, Mr. Wilson says what at
18   line 11?
19   A.   "So what kind of deals is it there?  Is it like, you know,
20   [unintelligible,] water polo and donation or what is it like,
21   you know, if you get into that".
22   Q.   Had Mr. Singer previously defined the side door in this
23   conversation to your recollection?
24   A.   Not to my recollection, no.
25   Q.   Mr. Wilson's defining the side door:  Water polo and a
```

02:08 (line 10)
02:09 (line 20)

```
 1    donation, correct?

 2    A.   Yes.

 3    Q.   He's the first person to mention athletics and money in

 4    the same sentence in this call?

 5    A.   Yes.  I believe that's the first reference.

 6    Q.   And if I could direct your attention to page 16,

 7    Mr. Wilson says, at line 3, "You're saying that's a minimum of

 8    1.2 on the side door".  Do you see that?

 9    A.   I do.

10    Q.   And then what does he say in the paragraph beginning at

11    line 6?

12    A.   "What sports would be best for them?  Is crew the best

13    even if you are talking about the ivies and stuff like that or

14    is that not gonna even matter?"

15    Q.   Who's the first person in this call which suggests that

16    what sport for Mr. Wilson's daughter is not even going to

17    matter in the context of the side door?

18    A.   Mr. Wilson.

19    Q.   And if we could take a look at page 18, what does

20    Mr. Singer say at line 20?

21    A.   "Guy's giving up his spot.  He's -- they're not a good

22    enough athlete to compete with".

23    Q.   There's no mention there of getting a better time, is

24    there?

25    A.   No.
```

```
 1   Q.   And Mr. Kendall also --

 2           MR. KENDALL:  Your Honor, I object to using the

 3   transcript which is not in evidence.  I'd rather go with the

 4   tape if he's going to be asking questions, because we have

 5   differences on the tape.

 6           MR. FRANK:  I don't think there's differences of

 7   significance that have been identified on the transcript.  Your

 8   Honor, it's ten after 2:00.  I'm trying to expedite.

 9           THE COURT:  I'm going to let him proceed.  But if you

10   have a place, Mr. Kendall, where you believe the tape is

11   different than the transcript, you can bring it up on recross.

12           MR. KENDALL:  Thank you.

13   Q.   You were asked about page 8, line 23, Mr. Wilson's

14   reference to a contribution.

15   A.   Yes.

16   Q.   If I could direct your attention to page 19, what does

17   Mr. Wilson say at the beginning in the middle of line 13?

18   A.   "My God.  And is that a -- are those numbers -- are there

19   any way to make those like tax deductible as like donations to

20   the school and stuff?  How does that work?"

21   Q.   "Are there any way to make those like tax deductible as

22   like donations?"  Is that what he says?

23   A.   Yes.

24   Q.   Special Agent, have you ever made any charitable

25   contribution?
```

The line-time markers in the left margin are: 02:11 at line 10, 02:12 at line 20.

```
 1              MR. KENDALL:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3     Q.   You were asked some questions about Exhibit 525.  Remember

 4     the call involving Mr. Caplan?

 5     A.   Yes.

 6     Q.   And whether there was any beating around the bush about

 7     fraud in those conversations?

 8     A.   Yes.

 9     Q.   Do you recall those questions?

10     A.   I do.

11     Q.   Mr. Wilson -- Mr. Singer asks you whether in that

12     conversation Mr. Caplan and Mr. Singer were discussing fraud

13     with, I believe his words were "exquisite frankness"?

14     A.   I don't recall that term, but yes.

15     Q.   Okay.  I'd like to direct your attention to page 10 of the

16     transcript of 561, the one we're in.

17     A.   Sorry.  One more time.  Page 10?

18     Q.   Transcript of 561, page 10, line 12.  Mr. Singer says,

19     "USC hasn't changed.  UCLA can be done for about three.  You

20     know, public schools are really hard in California because

21     everybody's watching them".

22     A.   Yes.

23     Q.   Any beating around the bush there?

24              MR. KENDALL:  Objection, your Honor.

25              THE COURT:  He can answer that.
```

```
 1   A.    No.  The intention of that statement seems clear to me.
 2              MR. KENDALL:  Objection, your Honor.
 3              THE COURT:  Overruled.
 4   Q.    Page 16.  Would you take a look at page 16, Special Agent.
 5   At page 16, line 10, Mr. Singer says, in response to
 6   Mr. Wilson's question about whether it's not going to even
 7   matter, he says, "For me, it doesn't matter.  I'll make them a
 8   sale or or something because of where you live."  Any beating
 9   around the bush there?
02:15 10  A.    No.
11   Q.    And how does Mr. Wilson respond when Mr. Singer says he'll
12   make them a sale or or something because of where you live?
13   A.    He laughs and says, "That's probably more than I want to
14   go for.  Is there a two for one special if you've got twins?"
15   Q.    He appears to think it's funny?
16   A.    Yes.
17              MR. KENDALL:  Objection, your Honor.
18              THE COURT:  Sustained.
19   Q.    Can I direct your attention to page 18.  At line 13,
02:15 20  Mr. Singer says, "If you just try the athlete's side and you
21   were using the side door with the athlete, it's a done deal,
22   just like with John".  Mr. Wilson responds, "right, but you're
23   saying at the side, even as an alumni, is essentially 1.2."
24              Mr. Singer says at line 18, "Absolutely."  And then
25   at line 20, "Guy's giving up his spot.  He's -- they're not a
```

```
 1   good enough athlete to compete with."
 2              Any beating around the bush there?
 3   A.   No.
 4              MR. KENDALL:  Objection, your Honor.
 5              THE COURT:  Overruled.
 6   Q.   And at page 19 once again, Mr. Singer -- Mr. Wilson says,
 7   at line 10, "And they only get so many spots you get to fill."
 8   And at line 12, "yeah, yeah, that is a big issue".  And then he
 9   laughs and says, "oh, my God, and is that -- are those numbers,
10   are there any way to make those like tax deductible as like
11   donations to the school and stuff?  How does that work?"
12              Any beating around the bush there?
13   A.   No.
14   Q.   Special Agent, you were asked a series of questions about
15   Exhibit 525.  That was the call with Gordon Caplan?
16   A.   Yes.
17   Q.   And do you recall when Mr. Kendall asked you whether there
18   was anything in that call with Mr. Caplan about establishing a
19   multi-year relationship to advise Mr. Caplan's daughter?  Do
20   you recall that question?
21   A.   Generally, yes.
22              MR. KELLY:  I continue to object to the admission of
23   this against my client, your Honor.
24              THE COURT:  All right.  The objection is noted.
25   Q.   Was there anything in the call between Mr. Singer and
```

```
 1   Mr. Caplan about posing Mr. Caplan's daughter as a sailor
 2   because she lived near the water?
 3   A.    I don't recall that, no.
 4   Q.    Was there anything in the call with Mr. Caplan about
 5   getting a two for one special on buying an athletic recruitment
 6   spot?
 7   A.    No.
 8              MR. KENDALL:  Objection, your Honor.
 9              THE COURT:  Overruled.
10   Q.    Was there anything in the call with Mr. Caplan about
11   deducting payments for an athletic recruitment spot as like a
12   donation?
13   A.    No.
14   Q.    Or as a business expense?
15   A.    No.
16   Q.    How many of those things do you recall coming up in
17   Mr. Wilson's calls and Mr. Wilson's e-mails with Mr. Singer?
18              MR. KENDALL:  Objection, your Honor.
19              THE COURT:  Sustained.
20              MR. FRANK:  No further questions, your Honor.
21              THE COURT:  Recross, Mr. Kendall?
22              MR. KENDALL:  Yes, your Honor.
23                   RECROSS-EXAMINATION OF KEITH BROWN
24   BY MR. KENDALL:
25   Q.    I'd like to start with one of the e-mails that was brought
```

```
 1   up on -- excuse me.  I'd like to start with one of the e-mails
 2   that was brought up on redirect for the first time.
 3            MR. KENDALL:  If we could -- Randall, could you pick
 4   up Exhibit 711, please.  Yeah.  Oh, excuse me.  Okay.  If I
 5   could ask the government, since we just got it, could you put
 6   up 711, please?
 7   Q.   Now, if we take a look at this, we see this is from -- did
 8   you pick this e-mail?
 9   A.   Did I pick it?  No, I did not.
02:19 10   Q.   I'm going to get to the point.  There's two versions of
11   this e-mail in the government's possession.  You've got one
12   here right now, and it starts with a chain from John Wilson.
13   If we look at it from the bottom, we see John saying on
14   October 18, 2013, at 9:45 p.m. that he and Leslie are coming to
15   California.  Do you see that?
16            MR. FRANK:  Objection.  That's not what it says.
17   A.   That's not what it says.
18   Q.   "Leslie and I are in California this week."  Thank you
19   very much.  "Leslie and I are in California this week.  Can we
02:19 20   meet this weekend or next Saturday?"  Correct?
21   A.   Yes.
22   Q.   And so do you have a pen and paper there?
23   A.   No.
24   Q.   I can't put these up next to each other because they're
25   going to be in different systems.  So if you can just remember
```

1    that.

2           October 18 at 9:45 p.m. Mr. Singer responds on

3    October 19, 2013, at 6:49, "coming over at 3:30 tomorrow".

4           And is it your point that this is implying that he's

5    coming over on 3:30 on the 20th?

6           MR. FRANK:  Objection.  He's not making a point.

7           THE COURT:  Yeah.  He's not making a point.  You can

8    ask him about what he sees in the e-mail.

9    Q.   You see it says "coming over at 3:30 tomorrow," correct?

02:20 10    A.   Yes.

11    Q.   And the date of that is October 19th at 6:49?

12    A.   Yes.

13    Q.   Correct?  And Mr. Wilson's response is "Fantastic," and

14    his response is at October 19, 2013, at 12:58 a.m.?

15    A.   Okay.

16    Q.   Well, my first question is if Mr. Singer sends a message

17    at 6:49 on October 19th, how does Mr. Wilson respond at 12:58

18    a.m. on the same day?

19    A.   I can't say it with certainty, but my suspicion is that

02:21 20    given Mr. Wilson, as you said, resided in Europe, there might

21    be an issue with the time code for each e-mail.  That could be

22    a possible explanation.

23    Q.   Okay.  So were you aware of that before my question?

24    A.   No.  You just pointed out the times to me.

25    Q.   Okay.  So in your preparation with the government, nobody

1    pointed out this time issue.  Is that fair to say?

2    A.   I don't recall reviewing this e-mail in preparation for

3    today.

4    Q.   Okay.  So you're just reading it blind, correct?

5    A.   Yes.

6    Q.   I mean, you're just reading it without prep?

7    A.   Yes.

8    Q.   Okay.

9         MR. KENDALL:  Can we then have Exhibit 96 and 98,

02:21 10   Randall.

11   Q.   Okay.  This is something the government hasn't shown you,

12   correct?

13   A.   I don't see it.

14        MR. KENDALL:  Your Honor, I'd like to offer

15   Exhibit 96, 98.  It's the same --

16        THE COURT:  It's not on the screen.

17        MR. KENDALL:  Okay.

18   Q.   Can you see it now for the witness only?

19   A.   Yes.

02:22 20   Q.   It's the same e-mail chain, correct, but this is

21   Mr. Singer's version of it, or it appears to be, correct?

22   A.   I can't say that.  I'm just seeing this now.  I don't know

23   what it is.

24   Q.   Okay.  It's the same chain with one additional message,

25   correct?

```
 1              MR. KENDALL:  Your Honor, I can't put them --
 2    A.   Yes.  It appears to be.
 3    Q.   Okay.  And if you notice, if we go down to the second
 4    page, at the top of the second page, you'll see there's a bates
 5    number there to show it was produced by the government,
 6    correct?  USAO-VB.
 7    A.   I'll take your word that that's what that means.
 8              MR. KENDALL:  Your Honor, I'd like to offer this in
 9    for completeness of the chain.
10              MR. FRANK:  No objection.
11              THE COURT:  It will be admitted.
12              (Exhibit 96, 98 admitted into evidence.)
13    Q.   Now, let's start from the bottom up and read this.  Again,
14    we see on October 18th at 9:45 p.m. John Wilson saying "R,
15    Leslie and I are in California this week.  Can we meet this
16    weekend or next Saturday?" Correct?
17    A.   Yes.
18    Q.   And then the response is October 19, 2013, at 6:49.  Rick
19    Singer writes, "Coming over at 3:30 tomorrow", correct?
20    A.   Yes.
21    Q.   He doesn't say what 3:30 is tomorrow, whether it's a
22    Saturday or Sunday, correct?
23    A.   Correct.
24    Q.   And then we see on October 18, 2013, Mr. Wilson responds,
25    correct?
```

**A1601**

```
 1   A.    Yes.

 2   Q.    So if we're just going by the days, he's sending a

 3   response the day before the e-mail was sent, correct?

 4   A.    Yes.  Again --

 5   Q.    And if you could just let me lead the questions.

 6          MR. FRANK:  Your Honor, I object, if the witness

 7   hasn't answered.

 8          THE COURT:  He needs to be able to answer the

 9   question.

02:23 10        MR. KENDALL:  I've just asked if you could see that

11   the date was a day earlier, correct?

12          MR. FRANK:  That's not what he asked actually.

13          MR. KENDALL:  I'll rephrase it, your Honor.

14   Q.    You see October 18th is the day of the response, correct?

15   Just yes or no.

16   A.    Yes.

17   Q.    And you agree with me, just yes or no, that's a day

18   earlier than October 19th?

19   A.    Yes.

02:24 20   Q.    Correct?  And then he says, "See you tomorrow".  That's

21   Mr. Singer, correct?

22   A.    Yes.

23   Q.    You agree with me that it appears to be that we have times

24   from different continents, correct?

25   A.    That's a likely explanation, yes, but I can't confirm
```

1   that.

2   Q.   And if I suggested to you that Mr. Wilson flew from

3   Amsterdam that morning on the 19th to San Francisco, that would

4   be a logical explanation, correct?

5   A.   He did what?

6   Q.   If he flew from Amsterdam on the morning of October 19th

7   from AMS to San Francisco, that could be a logical explanation,

8   correct?

9   A.   Meaning his phone was in Europe during part of the e-mail

02:25 10   chain?  I don't understand.

11   Q.   No.  His phone was on an airplane not getting messages for

12   nine or ten hours of flight.

13   A.   I'm not sure what that's an explanation for but.

14   Q.   You agree there has to be some explanation how somebody

15   can respond on the 18th to a message on the 19th?

16   A.   And I'm sure it's present in metadata, an explanation as

17   to why it's there and the header information.

18   Q.   I'm just asking you there has to be an explanation.  I'm

19   not asking you to speculate, correct?

02:25 20   A.   Well, you are asking me to speculate.

21   Q.   I'm not asking you to speculate.

22   A.   I don't know why the dates.

23   Q.   Okay, but that's not what I'm asking you.  You don't know

24   why?

25   A.   I personally don't.

```
 1   Q.   And you don't know if 3:30 tomorrow refers to Saturday or
 2   Sunday, correct?
 3   A.   No.
 4   Q.   Okay.  The next document I'd like to go to is Exhibit 711
 5   and 712.  Well, first of all, when Mr. Frank started his
 6   direct, he stated that I had said Mr. Wilson was in Europe on
 7   October 19th in his question.  And I believe you agreed with
 8   it.
 9        MR. FRANK:  I don't believe that's what I said, your
10   Honor.
11        MR. KENDALL:  As long as we have an agreement that I'm
12   not being accused of saying that, then we're fine.
13        MR. FRANK:  No.  What you said --
14        May I, your Honor?
15        THE COURT:  Yes.
16        MR. FRANK:  What you said was you asked a series of
17   questions suggesting that Mr. Wilson works in Europe.
18        MR. KENDALL:  Yeah.  He works in Europe.  He lives in
19   Europe.  I'm not disputing that.
20        MR. FRANK:  Yes.  That's what I said.
21   Q.   Okay.  So let's take a look at exhibit -- actually, let's
22   start first at Exhibit 65.
23        MR. KENDALL:  Can we have that up on the screen,
24   please.
25   Q.   You've looked at this before, correct?
```

```
 1    A.    Yes.

 2    Q.    It's dated June 11, 2013, from Leslie Wilson to Rick

 3    Singer and John Wilson, correct?

 4    A.    Yes.

 5    Q.    And it says "water polo shots of Johnny Wilson"?

 6    A.    Yes.

 7    Q.    And do you see that one of the JPGs there is the second

 8    one in and ends in the numbers 7905?

 9    A.    I do.

02:27 10   Q.    So we know that Leslie Wilson has sent Rick Singer a JPG

11    7905 on June 11, 2013, correct?

12    A.    Correct.

13              MR. KENDALL:  If we take a look and go through the

14    pictures and get that same one we had before, Mr. Carter, with

15    the thumb by the little white spot.  65A.  I'm sorry.  Yes.

16    65A.

17    Q.    So you see that picture there with the thumb and the white

18    spot?

19    A.    Yes.

02:28 20         MR. KENDALL:  Can we now go to Exhibit 88, please.

21    Q.    You see it's the same picture, correct?

22    A.    Yes.

23    Q.    If we can go to the first page of the e-mail, we see Rick

24    Singer forwards it to John Wilson at 7:30 p.m. on October 19th,

25    correct?
```

```
 1   A.    Forwards the profile.  Yeah.

 2   Q.    Yeah.  The profile that had the picture he got on

 3   June 11th, correct?

 4   A.    Correct.

 5   Q.    Okay.  And we see Mr. Margulies sent it to Mr. Singer at

 6   4:26 p.m., correct?

 7   A.    Yes.

 8   Q.    So it's not forwarded for at least 3 hours if the times

 9   are aligned and we don't even know that, correct?

02:29 10   A.    Correct.

11         MR. KENDALL:  Okay.  Now, could we go to Exhibit 712.

12   And I'd ask the government if you'd be kind enough to put it up

13   because we don't have it in our system yet.

14   Q.    We see John Wilson sends to Leslie a water polo shot that

15   has the JPG 7905?

16   A.    Correct.

17         MR. KENDALL:  Okay.  If we could look at the next

18   picture, please.

19   Q.    It's the same photo, correct?

02:29 20   A.    Yes.

21   Q.    Okay.  And so Leslie Wilson is the person that had those

22   photos.  It's already in the profile before Mr. Wilson sends

23   it, correct?

24   A.    Yes, based on a review of the prior exhibits, yes.

25   Q.    So there's no assumption that he's sending anything to
```

```
 1   Mr. Singer, correct?
 2           MR. FRANK:  Objection about what there's an assumption
 3   about.
 4           THE COURT:  Sustained.
 5   Q.   Next I'd like to go to -- you were asked some questions
 6   about some of the exhibits and whether there was an issue about
 7   an academic situation getting better.  Do you recall that?
 8   A.   Asked by whom?
 9   Q.   Mr. Frank, in his redirect.
10   A.   I'm not sure exactly what you're referring to.
11           MR. KENDALL:  Okay.  Let me just call up -- if we
12   could go to Exhibit 87.
13   Q.   Remember he showed you a document from March of 2013,
14   Johnny's junior year, and then showed you this document
15   October 18, 2013, and asked you to count the months and if
16   anything had gotten better?
17   A.   Is -- could you show me --
18   Q.   Do you want -- we can look at the third page if that will
19   refresh you.
20   A.   Yes.
21   Q.   Do you remember he asked you about this, and about
22   5 months had passed and did any academic things get better?
23   A.   Yes.
24           MR. KENDALL:  Okay.  I'd like to -- if you could just
25   show the witness, please, Exhibit 7785A and 7785.  It's an
```

```
 1    e-mail and an attachment.

 2    Q.   Do you agree with me that this appears to be another

 3    e-mail between Mr. Wilson and Mr. Singer, correct?

 4    A.   Yes.

 5    Q.   And it's July 29th, which is in between the date of the

 6    two exhibits that Mr. Frank showed you when asking about a

 7    change in academic situation, correct?

 8    A.   Yes.  I don't recall that he was asking about a change in

 9    academic.  I think he was asking what year of school Johnny was

10    in.

11    Q.   No, he asked you from the junior year to the senior year

12    if things got better.  And then he showed you that letter and

13    you said, well, he got a statement from the school that showed

14    things didn't get better.

15    A.   I don't recall the discussion of things getting better.

16         MR. KENDALL:  Your Honor, I'd like to offer this into

17    evidence as direct impeachment, if I may.

18         MR. FRANK:  We have no objection to that coming in.

19         THE COURT:  Which one?  7785?

20         MR. KENDALL:  7785A and the attachment, which is 7785.

21         THE COURT:  It will be admitted.

22         MR. KENDALL:  If we could show that to the jury,

23    please.

24         (Exhibit 7785, 7785A admitted into evidence.)

25    Q.   It's John Wilson at Hyannis Port Capital July 29, 2013, to
```

1    Johnny's coach, Rick Singer.  And it says "Fwd: ACT".  You see

2    that?

3    A.   Yes.

4    Q.   And then John says, "R how do we view or percent rank

5    Johnny on his score?"  And if we turn to the first page of

6    7785, we see it's an ACT Plus Writing Student Report.

7             MR. KENDALL:  And, Randall, can you just highlight the

8    composite score and then the percentiles to the right of that.

9    Q.   He gets a 29.  You see that?

02:33 10   A.   Yes.

11   Q.   It puts him in the 93rd percentile of the United States,

12   correct?

13   A.   Yes.

14   Q.   That means for every 100 people who take the test, he did

15   better than 92 and seven did better than him, correct?

16   A.   Not an expert on percentiles, but that sounds correct.

17   Q.   Okay.  And then, if we could take that off and I'd like to

18   show you 8126, which is part of this e-mail chain that comes

19   about 27, 28 minutes later.

02:34 20            Could you just tell me if you recognize that.  Again,

21   it's an e-mail from John Wilson to Mr. Singer.

22   A.   Yes.

23   Q.   And remember from the first e-mail he asked, "How do we

24   view a percent range on Johnny's score"?  And then here he

25   follows up "ACT - I saw the percentiles - no need to reply".

```
 1  A.   Okay.

 2  Q.   If we could go to Exhibit --

 3       MR. KENDALL:  I'd like to offer that into evidence,

 4  your Honor.

 5       MR. FRANK:  No objection.

 6       THE COURT:  It will be admitted.

 7       (Exhibit 8126 admitted into evidence)

 8       MR. KENDALL:  If we could -- oh.  We haven't shown the

 9  jury.  I'm sorry.  Can we show the jury, please.

02:34 10  Q.   You can see there, "I saw the percentiles - no need to

11  reply".  So he's seen that his son hit the 93rd percentile on

12  the ACT, correct?

13  A.   Yes.

14       MR. KENDALL:  Okay.  If we can go back to Exhibit 88,

15  please.

16  Q.   This, of course, is the cover e-mail on the profile,

17  correct?

18  A.   Yes.

19  Q.   Let's go to page 2.  What we know on this profile is it's

02:35 20  got the wrong street, correct, 2 Fleur Street?

21  A.   Correction, with a typo.  Yes.

22  Q.   Not a typo.  It's 2 Fleur Street instead of 2 Fleur Place.

23       MR. FRANK:  I object.

24       THE COURT:  Sustained.

25  Q.   It's got the wrong name for the street, correct?
```

```
 1   A.    It's got the correct name for the street.  It describes

 2   the street as a street instead of a place.

 3   Q.    Do you know if you live on a street or an avenue or a

 4   place?

 5             MR. FRANK:  Objection.

 6             THE COURT:  Sustained.

 7   Q.    Okay.  It says 2 Fleur Street, when the correct name is 2

 8   Fleur Place, correct?

 9   A.    Correct.

10   Q.    Okay.  And then it lists Jack Bowen as the Stanford water

11   polo club, correct?

12   A.    Correct.

13   Q.    And it lists the SAT scores, but it doesn't list the ACT

14   score?

15   A.    That appears to be correct, yes.

16   Q.    If I were to suggest to you the ACT scores are a much

17   higher percentile, would you accept that representation?

18             MR. FRANK:   Objection, unless Mr. Kendall wants to

19   testify.

20             THE COURT:  Sustained.

21   Q.    And you agree with me there is no e-mail you're aware of

22   where John Wilson told Mr. Singer it's 2 Fleur Place, not 2

23   Fleur Street, correct?

24   A.    Cna you repeat the question?

25   Q.    There is no e-mail that the government picked to show you
```

**A1611**

| | |
|---|---|
| 1 | that has John Wilson telling Mr. Singer it's 2 Fleur Place not |
| 2 | 2 Fleur Street, correct? |
| 3 | A.   No. |
| 4 | Q.   And there's no e-mails from Mr. Wilson to Mr. Singer |
| 5 | saying Jack Bowen is not the coach of Stanford water polo. |
| 6 | Nobody showed you that e-mail, did they? |
| 7 | A.   They did not. |
| 8 | Q.   And nobody showed you the e-mail that said -- an e-mail |
| 9 | that said, you know, you forgot the Sopen water polo club.  You |
| 02:37 10 | never saw an e-mail like that, did you? |
| 11 | A.   I did not. |
| 12 | Q.   And you never saw an e-mail that said after all the money |
| 13 | I spent in tutoring, you didn't even put down the ACT scores? |
| 14 | You never saw anything like that either, did you? |
| 15 | A.   I did not, no. |
| 16 | MR. KENDALL:  Can I have one moment, your Honor? |
| 17 | THE COURT:  Yes. |
| 18 | MR. KENDALL:  I would now like to go to the tape.  And |
| 19 | Randall, if we can play the excerpt on Exhibit 561A on page 8. |
| 02:38 20 | I'm trying to get us down to about line 16 to line 22. |
| 21 | (Audio recording played.) |
| 22 | MR. KENDALL:  Stop there. |
| 23 | Q.   The tape says, "If they had a really good time, they could |
| 24 | work on that", correct? |
| 25 | A.   I'd have to hear it again.  It's hard to differentiate |

```
 1   that word.
 2   Q.   Okay.  You testified earlier for a transcript that says,
 3   "I can work on that".  My question is, it really says
 4   "differentiator.  If they had a really good time, they could
 5   work on that".
 6             MR. KENDALL:  Can we play that line over again?
 7             (Audio recording played.)
 8             MR. KENDALL: Stop.
 9   Q.   They could work on that.  Is that it?
10   A.   Play it one more time.
11             MR. KENDALL:  Sure.
12             (Audio recording played.)
13   A.   He steps over the word "fast".  It's hard to tell.
14   Q.   It sounds like "they".  It doesn't sound like "I",
15   correct?
16   A.   I can't say that.
17   Q.   Would you like it a third time?
18   A.   Sure.
19   Q.   Okay.
20             (Audio recording played.)
21   A.   Again, it's very -- it's a stepped on sentence.  It's hard
22   to differentiate the word.
23   Q.   Do you agree he didn't say "I can"?  Is it your testimony
24   after hearing it three times that he said "I can"?
25   A.   Can I hear it one more time?
```

02:39 (line 10)
02:40 (line 20)

```
 1   Q.    Sure.

 2              (Audio recording played.)

 3   A.    Again "they" is a possibility, but I can't say with

 4   certainty.

 5   Q.    It's a better possibility than "I," isn't it?

 6   A.    I think it's possible.

 7   Q.    Well, let me play it one last time, let the jury hear it,

 8   and then we'll leave it be.

 9   A.    Sure.

10              (Audio recording played.)

11   Q.    Okay.  Does that change your testimony at all?

12   A.    I can see how "they" can be a possibility for that, yes.

13              MR. KENDALL:  Okay.  Next if we could go to page 19.

14   I'd like to get as close as we can to line 12.

15   Q.    You testified that John Wilson said, "Is there anyway to

16   make those like tax deductible as like donations".  My question

17   to you, didn't he say "Is there anyway to make those like tax

18   deductible?  Are they donations to the school?"  I want you to

19   listen to the tape and see if you'd go with the first or the

20   second version.

21              (Audio recording played.)

22   A.    I can hear a pause for the question mark there.

23   Q.    Do you hear, "Are they donations to the school"?

24   A.    I certainly don't hear a pause at the question.  That

25   sounds like a continued statement.  I'd have to hear it again,
```

```
 1    if we're differentiating between "are" and "as".
 2    Q.   Yeah.  Sure.
 3             MR. KENDALL:  Why don't we play it again, please,
 4    Randall.
 5             (Audio recording played.)
 6    Q.   "Are they donations to the school and stuff"
 7    A.   No disrespect.  That sounds like "as" to me.  Maybe my
 8    hearing's not as good as yours.  It sounds like --
 9    Q.   My hearing doesn't matter.  We'll let the jury's hearing
10    decide.
11    A.   It sounds like "as" to me.
12             MR. KENDALL:  No further questions.  Thank you, your
13    Honor.
14             THE COURT:  Recross, Mr. Kelly.
15             MR. KELLY:  Yes.
16                 RECROSS-EXAMINATION OF KEITH BROWN
17    BY MR. KELLY:
18    Q.   Okay.  Good afternoon again.
19    A.   Good afternoon.
20    Q.   All right.  Now, on redirect, the prosecutor asked you a
21    few times about Exhibit 352.  Can I have that put back up,
22    please.  See the top part here?  This is the e-mail, the
23    critical e-mail with the attachment that had the fake profile,
24    right?
25    A.   Yes.
```

```
 1   Q.   And you have no idea how that ended up in his Gmail, do

 2   you?

 3   A.   We have thoughts on how it could have, but I do not know

 4   with certainty how it did, no.

 5   Q.   Right.  A lot of different thoughts or ideas, but no

 6   certainty, correct?

 7   A.   Discussed two possibilities with our forensics team, but

 8   they're just possibilities.  I don't know for sure.

 9   Q.   Right.  No conclusions have been drawn, right?

10   A.   Correct.

11   Q.   There's no evidence that he ever replied to this, right?

12   A.   No.

13   Q.   And there's no evidence that he ever forwarded this,

14   right?

15   A.   Not that I've seen, no.

16   Q.   Okay.  There's no evidence that he ever opened the

17   attachment to this, is there?

18   A.   No.

19   Q.   And, in fact, when Mr. Singer sent it along on 8/8/2017,

20   it bounced back.  Let's see the bounceback again, please.

21        MR. FRANK:  Your Honor, are we just retreading the

22   same ground?

23        MR. KELLY:  No.  I'm addressing his redirect.

24        So please put up 1924.

25   Q.   This is the one you didn't see before coming to court
```

02:44  (line 10)
02:45  (line 20)

```
 1   today, right?

 2   A.   Yes.  And the only correction I'd make to your statement

 3   is it's not necessarily a bounceback.  It's an advisement that

 4   he's changed his e-mail.  It's not that it wasn't delivered.

 5   Q.   Fair enough.  But it says, "I have changed my e-mail

 6   address to GamalAziz797@gmail," right?

 7   A.   Correct.

 8   Q.   And then we saw Exhibit 351.  Please show that.  And

 9   that's the one with the typo.  Singer sent it to the wrong

02:46 10   address, right?

11   A.   Yes.

12   Q.   Off in cyberspace time traveling somewhere, right?

13   A.   All through cyberspace, yes.

14   Q.   And this is also one you didn't get a chance to review

15   before you testified, right?

16   A.   I don't recall seeing this e-mail, no.

17   Q.   Okay.  So that's also one the government did not show you

18   before you came to court, right?

19        MR. FRANK:  Objection, your Honor.

02:46 20        THE COURT:  Sustained.

21   Q.   The only thing you know is that on July 1st of 2019 the

22   FBI served a search warrant and Google reported that, as of

23   July 1, 2019, there was this e-mail in Gmail, but you don't

24   know how it got there, right?

25   A.   That's a fair statement, yes.
```

```
 1    Q.   All right.  And the prosecutor asked you about the concept
 2    of time traveling.
 3    A.   Yes.
 4    Q.   Are you familiar with the concept of a defendant reading
 5    his old e-mails when he's indicted?
 6    A.   I'm sorry.  Doing what?
 7    Q.   Would it surprise you that after a man is indicted in
 8    March of 2019 he might go back and look at all his old e-mails
 9    on all his different devices, sir?
10    MR. FRANK:  Objection to the testifying and
11    speculation.
12    THE COURT:  I'll let him answer that question.
13    A.   Yes, with the caveat that I don't know either way if that
14    e-mail was read or not.
15    Q.   Right.  You have no idea?
16    A.   No idea.
17    Q.   Fair enough.  And you were asked whether Sabrina Abdelaziz
18    could make a significant contribution to a college basketball
19    program, right?
20    A.   Yes.
21    Q.   Do you think team managers make significant contributions
22    to basketball teams?
23    A.   I assume so.  I guess.
24    Q.   How about practice players?  Do you think they make
25    significant contributions to a team?
```

```
 1   A.   Relative to a starting player?  No.

 2   Q.   Well, are you aware that some of the best women's

 3   basketball programs in the country use practice players?

 4   A.   No.

 5   Q.   You're not aware of that?

 6   A.   I'd have no basis either way.

 7   Q.   Are you aware that Rick Singer told Mr. Abdelaziz that his

 8   daughter could be a team manager or a practice player?

 9        MR. FRANK:  Objection.

10        THE COURT:  Sustained.

11   Q.   You have no idea what Rick Singer told Mr. Abdelaziz, do

12   you?

13   A.   No.

14        MR. KELLY:  Your Honor, I have seven discrete e-mails.

15   I'd like to offer quickly with this witness.  I've given the

16   numbers to the government.  If I can put them in now, I will.

17   If they won't agree, I'll have to recall the witness.

18        MR. FRANK:  He can have his own reader and chance to

19   put the exhibits in during his examination.

20        MR. KELLY:  Well, under the rule of completeness,

21   under 106, I would suggest they're admissible.  And under

22   Rule 102 in the ascertainment of truth, which the rules are

23   supposed to be interpreted as, I suggest these --

24        THE COURT:  All right.  We've discussed this at

25   sidebar before.  You can introduce them in your case-in-chief,
```

```
 1   but not at this point.

 2           MR. KELLY:  Thank you, your Honor.  That would be it

 3   then.

 4           THE COURT:  All right.  Thank you.  You may step down,

 5   Mr. Brown.

 6           THE WITNESS:  Thank you, your Honor.

 7           THE COURT:  Call your next witness.

 8           MR. STEARNS:  The United States calls Rachel Sih.

 9           THE COURT:  Is it Mr. O'Connell?

02:49 10         MR. STEARNS:  Stearns, your Honor.

11           THE COURT:  Mr. Stearns.  Excuse me.  Mr. Stearns.

12           Rachel Sih, sworn.

13           MR. KENDALL:  Your Honor, just a continuing objection.

14           THE COURT:  Yes.

15           MR. KENDALL:  Thank you.

16           THE CLERK:  And would you just please state your name

17   for the record, spelling your last.

18           THE WITNESS:  Yes, Rachel, middle name Q-i, last name

19   S-i-h.

02:50 20         THE COURT:  And you pronounce that Sih?

21           THE WITNESS:  Yes.

22           THE COURT:  Sih.  If you'd pull the chair closer in so

23   that you can speak right into the microphone without having to

24   lean.  Thank you.

25           THE WITNESS:  Okay.
```

```
 1              THE COURT:  Mr. Stearns.
 2                 DIRECT EXAMINATION OF RACHEL SIH
 3      BY MR. STEARNS:
 4      Q.   Good afternoon, Miss Sih.
 5      A.   Good afternoon.
 6      Q.   How old are you?
 7      A.   I'm 21 years old.
 8      Q.   Where do you live?
 9      A.   I live -- currently live at Wellesley College.
10      Q.   You go to school at Wellesley College?
11      A.   Yes.
12      Q.   What year are you?
13      A.   I'm a senior.
14      Q.   What are you studying?
15      A.   I'm double majoring in economics and music.
16      Q.   Do you know Sabrina Abdelaziz?
17      A.   Yes.
18      Q.   How did you know Miss Abdelaziz?
19      A.   We were classmates in high school together in the same
20      grade.
21      Q.   How else do you know Sabrina Abdelaziz?
22      A.   We played together in my freshman year on the JV
23      basketball team.
24      Q.   Okay.  And after your freshman year, what team did you
25      play on?
```

**A1621**

```
 1    A.    I played on the varsity basketball team through my
 2    sophomore and senior year, through my sophomore to my senior
 3    year.
 4    Q.    And did Sabrina Abdelaziz ever play on the varsity
 5    basketball team with you?
 6    A.    No.
 7    Q.    We'll come back to that.  Where did you grow up, Miss Sih?
 8    A.    I grew up in Hong Kong.
 9    Q.    And how long did you live in Hong Kong?
02:52 10    A.    For around 18 years.
11    Q.    And where did you go to school?
12    A.    I went to Hong Kong International School.
13    Q.    What is the Hong Kong International School?
14    A.    It's a private American educated school.
15    Q.    And how long did -- does Hong Kong International School
16    also go by another name sometimes?
17    A.    Yes.  We go by HKIS.
18    Q.    And how long did you attend HKIS?
19    A.    I attended HKIS for 14 years.
02:52 20    Q.    From what grade to what grade?
21    A.    From pre-k to 12th grade.
22    Q.    Okay.  And what year did you graduate from HKIS?
23    A.    2018.
24    Q.    The spring of 2018?
25    A.    Yes.
```

```
 1    Q.    Okay.  When did you begin playing basketball

 2    competitively?

 3    A.    I began playing basketball competitively around sixth

 4    grade.

 5    Q.    Okay.  And did you play basketball at HKIS?

 6    A.    Yes.

 7    Q.    What teams, if you could just remind us, what teams you

 8    played on at HKIS in high school and what years?

 9    A.    In high school, I played on the JV women's basketball team

02:53 10   in my freshman year, and then through my sophomore to senior

11    years I played on the varsity team.

12    Q.    Okay.  Can you explain how trying out for the varsity

13    women's basketball team at HKIS worked?

14    A.    Yeah.  So it's usually three days of tryouts in October.

15    On the first day, we'll have like combined tryouts.  So all the

16    girls trying out for varsity and JV play together.  And then on

17    the second and third day, we'll split off into who's trying out

18    for varsity and who's trying out for JV.

19    Q.    Okay.  Then if you were a junior and you were cut from the

02:53 20   varsity team, can you play junior varsity at HKIS?

21    A.    If you are a junior, no, you can not.

22    Q.    Okay.  If you're a freshman or sophomore and you're cut

23    from varsity, can you play JV?

24    A.    Yes.

25    Q.    Now, when you were on the JV team your freshman year with
```

1    Sabrina Abdelaziz, were you aware of who was on the varsity

2    team at HKIS?

3    A.    Yes.

4    Q.    Can you just tell us how you're aware of that?

5    A.    Yeah.  Sure.  So we -- the varsity and JV teams practice

6    on the same court, but we split the court so we can also just

7    look over and see who is on the team.  We'd share locker rooms

8    and we'd travel to away games together.

9    Q.    And, conversely, when you made varsity your sophomore year

02:54 10    through your senior year, were you aware of who was on the

11    junior varsity team?

12    A.    Yes.

13    Q.    Okay.  Did you also play basketball competitively in high

14    school outside of HKIS?

15    A.    Yes.

16    Q.    Where did you play?

17    A.    I played for a club basketball team called Flight, and

18    later it was called Impact.

19    Q.    It's a club team?

02:54 20    A.    Yes.

21    Q.    Now I want to go back to your freshman year at HKIS.  How

22    did you meet Sabrina Abdelaziz?

23    A.    I met Sabrina Abdelaziz through the JV basketball team my

24    freshman year.

25    Q.    Okay.  And on the JV team, what position did you play?

```
 1   A.    I played point guard and shooting guard.

 2   Q.    And for those of us who are less basketball inclined, can

 3   you just explain to us what a point guard is?

 4   A.    Yeah.  So a point guard is usually sort of the shortest

 5   person on the team because I guess the closer to the ground,

 6   they can dribble better, and they're faster so they can weave

 7   through sort of the bigger players.

 8   Q.    And what position did Sabrina Abdelaziz play on the JV

 9   basketball team?

10   A.    Sabrina played center.

11   Q.    Okay.  Similar to a point guard, what's a center?

12   A.    A center is usually the tallest person on the team because

13   we need people to get our rebounds when we miss our shots and

14   so the center's job is mainly to do that.

15   Q.    Okay.  You mentioned that you played club basketball

16   outside of HKIS.  Did you know whether your teammates at HKIS

17   also played club basketball outside of school?

18   A.    Yes.

19   Q.    And how did you know that?

20   A.    In Hong Kong --

21         MR. KELLY:  Objection.  Relevance.

22         THE COURT:  Overruled.

23   Q.    You may answer.  How did you know whether your teammates

24   at HKIS also played basketball outside of school?

25   A.    So, in Hong Kong, there weren't a lot of opportunities for
```

**A1625**

playing basketball outside of school for women specifically, so

when Flight opened up, most of the people -- actually, the

majority of us went over to Flight.

Q.   Okay.  And based on your observations and interactions,

did Sabrina Abdelaziz play club basketball outside of HKIS?

A.   Based on my observations, no.

Q.   Okay.  Now I'd like to turn to show you a few books,

Miss Sih.

        MR. STEARNS:  If I could use the Elmo for this.  Just

for the witness at this point.

        MR. KELLY:  I'm sorry.  I didn't hear that.

        MR. STEARNS:  I'm going to use the Elmo.

        MR. KELLY:  Yes.  And I'm going to object to

anything -- the photos, fine.  Anything else, writings, we

object to.

Q.   Do you recognize this book, Miss Sih?  Exhibit -- it has a

sticker on it, Exhibit 702?  You see that?

A.   Yes.

Q.   What is Exhibit 702?

A.   It's my freshman year yearbook from high school.

Q.   And how do you know that?

A.   Because there's writings inside that are addressed to me.

Q.   Okay.  Turning to page 233 of Exhibit 702.  Do you see the

photograph there?

A.   Yes.

```
 1   Q.   What is that a picture of?

 2   A.   It's a picture of the women's JV basketball team from my

 3   freshman year.

 4        MR. STEARNS:  The government offers page 233 of

 5   Exhibit 702, your Honor, into evidence.

 6        MR. KELLY:  Again, we don't object to the photos, but

 7   not the roster and the hearsay in it.

 8        MR. STEARNS:  Your Honor, there's a quote that's been

 9   redacted from the bottom.  There's a picture.  None of the

10   words on the page are being offered.

11        THE COURT:  And it just shows names.  I will allow it

12   to be admitted, that page, without any other material.  What's

13   the page number again?

14        MR. STEARNS:  Page 233 of 702.

15        THE COURT:  It will be admitted.

16        (Exhibit 702 admitted into evidence.)

17   Q.   I apologize, Miss Sih.  It's a little bit bright.  There's

18   like a sun spot in the middle here that we will try to work out

19   as we continue.

20            What is this a picture of?

21   A.   A picture of the women's JV basketball team from my

22   freshman year.

23   Q.   Okay.  And do you see yourself in that picture?

24   A.   Yes.

25   Q.   Where are you?
```

|  |  |
|---|---|
| 1 | A.    In the front most row sitting down on the left side. |
| 2 | Q.    Okay.  And do you see Sabrina Abdelaziz in the picture of |
| 3 | the women's JV basketball team your freshman year? |
| 4 | A.    Yes. |
| 5 | Q.    Where is she? |
| 6 | A.    In back most row on the very left. |
| 7 | Q.    What number is she wearing? |
| 8 | A.    Number one. |
| 9 | Q.    Okay.  Now, turning -- do you see a picture in the bottom |
| 02:59 10 | row in the center with a woman or a girl dribbling a basketball |
| 11 | wearing glasses? |
| 12 | A.    I don't think we can see the photo. |
| 13 | Q.    Well, my apologies, let's see.  Do you see the picture in |
| 14 | the bottom row in the middle with the girl dribbling the |
| 15 | basketball? |
| 16 | A.    Yes.  Yes. |
| 17 | Q.    Is that Sabrina Abdelaziz? |
| 18 | A.    No. |
| 19 | Q.    Who is it? |
| 02:59 20 | A.    Cheryl Sandoval. |
| 21 | Q.    Who was Miss Sandoval? |
| 22 | A.    Miss Sandoval was a point guard on our team who was in the |
| 23 | year above both Sabrina and I. |
| 24 | Q.    And if you just turn back to the team picture at the top |
| 25 | of page 233, can you point out where Miss Sandoval is in the |

**A1628**

```
 1   team picture?
 2   A.   Yeah.  She's in the middle row, the third from the left.
 3   Q.   Wearing number 16 in glasses?
 4   A.   Yes.
 5   Q.   Turning to your sophomore year, Miss Sih, did you try out
 6   for the varsity team at HKIS?
 7   A.   Yes.
 8   Q.   Did you make it?
 9   A.   Yes.
10   Q.   Did Sabrina Abdelaziz try out for the varsity team at HKIS
11   during her sophomore year?
12   A.   No.
13   Q.   Okay.  What team did she play on her sophomore year?
14   A.   She played on the JV team.
15   Q.   Okay.  I'm going to turn to Exhibit 703.  Do you recognize
16   this?
17        MR. STEARNS:  Just for the witness at the moment.
18   A.   Yes.
19   Q.   What is Exhibit 703?
20   A.   It's my sophomore year yearbook.
21   Q.   Okay.  If we turn to page 231, what is that a picture of?
22   A.   It's a picture of the women's varsity basketball team from
23   my sophomore year.
24   Q.   And page 233?
25   A.   A picture of the women's JV basketball team from my
```

(03:00 appears beside lines 10 and 20)

**A1629**

```
 1    sophomore year.
 2              MR. STEARNS:  The government offers pages 231 and 233
 3    as Exhibit 703, your Honor.
 4              THE COURT:  They will be admitted without any written
 5    material other than the names.
 6              (Exhibit 703 admitted into evidence.)
 7    Q.   So just looking at the picture of the varsity team on
 8    page 231, Miss Sih, if we could -- if the jurors can see that,
 9    again, this is a picture of the varsity team your sophomore
03:01 10   year?
11    A.   Yes.
12    Q.   Okay.  Are you in this picture?
13    A.   Yes.
14    Q.   Where are you?
15    A.   In the front row on the very right.
16    Q.   Wearing number seven?
17    A.   Yes.
18    Q.   Okay.  Is Sabrina Abdelaziz in this picture?
19    A.   No.
03:01 20   Q.   Why not?
21    A.   Because she --
22              MR. KELLY:  Objection.  Relevance.
23              THE COURT:  Sustained.
24    Q.   Turning to page 233, what is that a picture of?
25    A.   It's a picture of the women's JV basketball team from my
```

**A1630**

1    sophomore year.

2    Q.    Okay.  And is Sabrina Abdelaziz in that picture?

3    A.    Yes.

4    Q.    Where is she?

5    A.    She's in the back row, third from the left.

6    Q.    Okay.  Wearing number one?

7    A.    Yes.

8    Q.    Okay.  Who was the captain of the JV team at HKIS your

9    freshman year, Miss Sih?

03:02 10    A.    My freshman year it was Miss Jody Chong and Miss Shawna

11    Keller.

12    Q.    And who were the captains of the JV team at HKIS your

13    sophomore year?

14    A.    My sophomore year it was Eileen Kim.

15    Q.    Okay.  Turning to your junior year, Miss Sih, did Sabrina

16    Abdelaziz try out for the varsity team?

17    A.    Yes.

18    Q.    Did she make the team?

19    A.    No.

03:02 20    Q.    What happened?

21    A.    She got cut from the team.

22    Q.    Okay.  And what happened after that?

23    A.    Because you get cut on the team at HKIS we don't allow

24    juniors to play -- or juniors or seniors to play on the JV

25    team, so she wasn't allowed to play basketball for HKIS.

1    Q.    Let's move to Exhibit 704, just for the witness at this

2    point.  Do you recognize the book marked as Exhibit 704,

3    Miss Sih?

4    A.    Yes.

5    Q.    What is it?

6    A.    It's my junior year yearbook.

7    Q.    Okay.  We're going to turn to page 215.

8            MR. STEARNS:  The government is going to offer pages

9    215 and 217, consistent with the previous exhibits.

03:03 10           THE COURT:  It will be admitted, again without any

11    written material other than the names.

12            (Exhibit 704 admitted into evidence.)

13    Q.    What is on page 215 of Exhibit 704, Miss Sih?

14    A.    It's a picture of the women's varsity basketball team from

15    my junior year.

16    Q.    Are you in this picture?

17    A.    Yes.

18    Q.    Where are you?

19    A.    I am in the front row on my knee on second from the right.

03:03 20    Q.    With the number seven on your arm?

21    A.    Yes.

22    Q.    Okay.  Do you know a girl named Nichia Velakacharia?

23    A.    Yes.

24    Q.    Who was Nichia Velakacharia?

25    A.    She was our captain during my junior year on the women's

```
 1   varsity basketball team, and she was in the year above me.
 2   Q.    Okay.  And is Miss Velakacharia in the picture in
 3   Exhibit 704?
 4   A.    Yes.
 5   Q.    Where is she located?
 6   A.    She is fourth from the left in the back row.
 7   Q.    Okay.  The tallest girl with the long brown hair?
 8   A.    Yes.
 9   Q.    Okay.  Is Sabrina Abdelaziz in the picture in Exhibit 704?
10   A.    No.
11   Q.    Okay.  Turning to page 217, which is in evidence, of
12   Exhibit 704, what is that a picture of?
13   A.    Of the women's JV basketball team from my junior year.
14   Q.    Is Sabrina Abdelaziz in that picture?
15   A.    No.
16   Q.    Finally, turning to your senior year, Miss Sih, did
17   Sabrina Abdelaziz try out for the varsity basketball team
18   during her senior year?
19   A.    No.
20   Q.    Do you recognize the book that's been marked as
21   Exhibit 705?
22   A.    Yes.
23   Q.    What is it?
24   A.    It is my yearbook from senior year in high school.
25   Q.    Okay.  Again, just for the witness, we'll turn to
```

          1  page 207.  Can you see that, Miss Sih?

          2  A.   Yes.

          3  Q.   What is on page 207 in Exhibit 705?

          4  A.   It's a picture of the women's varsity basketball team from

          5  my senior year.

          6  Q.   And what is on page 209 of Exhibit 705?

          7  A.   It's a picture of the women's JV basketball team from my

          8  senior year.

          9       MR. STEARNS:  The government offers pages 207, 209 of

03:05  10  Exhibit 705, your Honor.

         11       THE COURT:  Again they will be admitted without

         12  written material.

         13       MR. STEARNS:  Thank you.

         14       (Exhibit 705 admitted into evidence.)

         15  Q.   Turning back to page 207 of Exhibit 705, Miss Sih, you

         16  testified this is a picture of the women's varsity team your

         17  senior year?

         18  A.   Yes.

         19  Q.   Are you in this picture?

03:05  20  A.   Yes.

         21  Q.   Where are you located?

         22  A.   I'm in the front row, third from the right.

         23  Q.   Okay.  Is Sabrina Abdelaziz in this picture?

         24  A.   No.

         25  Q.   Okay.  Turning to page 209, again, you testified this is a

```
 1   picture of the women's JV team your senior year at HKIS.
 2   A.    Right.
 3   Q.    Is Sabrina Abdelaziz in this picture?
 4   A.    No.
 5   Q.    So Miss Sih, when is the last time that Sabrina Abdelaziz
 6   played basketball at HKIS?
 7   A.    At the end of the sophomore season, so it was late
 8   January, early February 2016.
 9   Q.    Okay.  If we could switch back over to the computer
10   system, we're going to look at a few documents that are already
11   in evidence.
12          THE COURT:  Counsel, do you expect to finish shortly,
13   because if not, we're going to have to recess and call her back
14   on Monday?
15          MR. STEARNS:  I anticipate being done with direct,
16   Your Honor, in -- I think I can do it in 5 minutes.
17          THE COURT:  All right.  Then we'll have to call her
18   back for cross-examination.
19          MR. KELLY:  I can be quick.  I don't know if I can be
20   that quick.  I can go 10 minutes maybe, but I'll do whatever.
21          THE COURT:  Mr. Kendall?
22          MR. KENDALL:  Oh.  I have nothing, your Honor.  Thank
23   you.
24          THE COURT:  All right.  Jurors, I'm going to violate
25   my promise to let you go by three, but in order to save having
```

A1635

|   |   |
|---|---|
| 1 | to call this witness back, I hope you'll bear with us and |
| 2 | we'll try to finish this up in ten or 15 minutes. |
| 3 | So go forward. |
| 4 | MR. STEARNS:  Thank you, your Honor.  We'll go forward |
| 5 | quickly. |
| 6 | Q.   Can we please look at Exhibit 340, which is in evidence. |
| 7 | Do you see that this is an e-mail from Gamal Aziz to an |
| 8 | individual named Rick Singer? |
| 9 | A.   Yes. |
| 03:07 10 | Q.   Okay.  And do you see that the subject is "Sabrina"? |
| 11 | A.   Yes. |
| 12 | Q.   What's the date of this e-mail, Miss Sih? |
| 13 | A.   July 27, 2017. |
| 14 | Q.   Approximately how long after Sabrina Abdelaziz stopped |
| 15 | playing basketball at HKIS is the date of this e-mail? |
| 16 | A.   Around 1.5 years. |
| 17 | MR STEARNS:  Okay.  Can we just click out of that, |
| 18 | Miss Lewis, and turn to the attachment. |
| 19 | Q.   Do you see the photograph, Miss Sih? |
| 03:08 20 | A.   Yes. |
| 21 | Q.   Who is that a picture of? |
| 22 | A.   The person dribbling the ball is Cheryl Sandoval. |
| 23 | Q.   And are you in that picture? |
| 24 | A.   Yes. |
| 25 | Q.   Where are you? |

```
 1    A.    I'm in the back, my head is cut off, wearing number seven.

 2    Q.    Okay.  Is Sabrina Abdelaziz in this picture anywhere?

 3    A.    No.

 4    Q.    Okay.  This is the same picture as the photograph we

 5    looked at in Exhibit 702, your freshman yearbook, correct?

 6    A.    Yes.

 7          Mr. Stearns:  All right.  Can we pull up Exhibit 352,

 8    Miss Lewis.

 9    Q.    Do you see this is an e-mail from someone named Rick

03:08 10   Singer to Gamal Abdelaziz with the subject "Fwd: Sabrina"?

11    A.    Yes.

12    Q.    Okay.  What's the date?

13    A.    August 8, 2017.

14    Q.    Okay.  Again, that's about a year and a half after Sabrina

15    stopped playing basketball at HKIS?

16    A.    Yes.

17    Q.    It says, "Gamal please answer below profile for Sabrina...

18    her e-mail, phone and parents' names needed to be added in as I

19    did not have that.  Let me know if you want me to add any other

03:09 20   awards to her profile or if you think that is enough".

21          And do you see that there's an attachment?

22    A.    Yes.

23    Q.    What is the name of the attachment?

24    A.    SabrinaA.doc.

25          MR. STEARNS:  And can we turn to the attachment of the
```

Exhibit, Miss Lewis.

Q.    In the top left, you'll see under Sabrina Abdelaziz's name, do you see where it says "Point Guard"?

A.    Yes.

Q.    Was it true or untrue that Sabrina Abdelaziz was the point guard?

A.    It was untrue.

Q.    Okay.  Do you know the height?  What's the height?

A.    5'8".

03:09    MR. STEARNS:  Okay.  And we can click out of that, Miss Lewis, and turn to the picture in the top right.

Q.    Is that Sabrina Abdelaziz?

A.    No.

Q.    Okay.  Who is that a picture of?

A.    Cheryl Sandoval.

        MR. STEARNS:  Okay.  Can we click out of that, Miss Lewis, and go to the bottom, Exhibit 352, the attachment, the bottom square, bottom box.

Q.    Do you see under "Hong Kong International School

03:10 Basketball" a number of items listed?

A.    Yes.

Q.    We'll just quickly walk through these.  Was it true or untrue that Sabrina Abdelaziz was a starting point guard for HKIS?

A.    Untrue.

```
 1    Q.    Was it true or untrue that Sabrina Abdelaziz was a team
 2    captain of the women's basketball team at HKIS?
 3    A.    Untrue.
 4    Q.    Do you see where it says "48th Holiday Basketball
 5    Tournament Champions"?
 6    A.    Yes.
 7    Q.    Are you familiar with that tournament?
 8    A.    Yes.
 9    Q.    Did Sabrina Abdelaziz ever play in that tournament?
10    A.    No.
11    Q.    How do you know that?
12    A.    Because the tournament was a varsity only tournament and
13    Sabrina didn't play on varsity.
14    Q.    Okay.  Do you see two lines down where it says "APAC
15    Basketball Finals"?
16    A.    Yes.
17    Q.    What is that?
18    A.    That is -- APAC is our like final varsity tournament at
19    the end of the season.
20    Q.    Did Sabrina Abdelaziz ever play in the APAC basketball
21    finals?
22    A.    No.
23    Q.    Okay.  Do you see two lines down it says "ISSFHK runner
24    up"?
25    A.    Yes.
```

```
 1   Q.    What does ISSFHK stand for?

 2   A.    It stands for the International School Sports Federation

 3   of Hong Kong.

 4   Q.    Okay.  And was it true or untrue that Sabrina Abdelaziz

 5   was a runner up in the ISSFHK?

 6   A.    Untrue.

 7   Q.    How do you know that?

 8   A.    Because in my freshman year we got third place together

 9   and then in the sophomore year where Sabrina played, they got

10   fifth place.

11   Q.    Going up one item, do you see where it says "International

12   School Sports Federation of Hong Kong Select Team"?

13   A.    Yes.

14   Q.    Have you ever heard of that?

15   A.    No.

16   Q.    Was Sabrina Abdelaziz on that select team?

17   A.    No.

18   Q.    Do you see where it says "Asia Pacific Activities

19   Conference All Star Team"?

20   A.    Yes.

21   Q.    Was it true or untrue that Sabrina Abdelaziz made that all

22   star team?

23   A.    Untrue.

24   Q.    How do you know that?

25   A.    Because APAC is a varsity only tournament so she wouldn't
```

**A1640**

```
 1    have been able to play or make the all star team.
 2    Q.   Okay.  And then the bottom box, we'll go more quickly
 3    through that.  Do you see that says "Hong Kong Basketball
 4    Academy"?
 5    A.   Yes.
 6    Q.   What is Hong Kong Basketball Academy?
 7    A.   It's a club basketball team.
 8    Q.   Okay.  And did Sabrina Abdelaziz ever play for the Hong
 9    Kong Basketball Academy?
10    A.   No.
11    Q.   How do you know that?
12    A.   Because when I was in high school, HKBA didn't have
13    opportunity for girls to play basketball, so it was only for
14    men's basketball.
15         MR. STEARNS:  If we can look at Exhibit 381,
16    Miss Lewis, which is already in evidence.
17    Q.   Miss Sih, do you see that this is an e-mail from someone
18    named Donna Heinel to Katie Fuller?
19    A.   Yes.
20    Q.   And the date is October 3, 2017?
21    A.   Yes.
22    Q.   And there's an attachment?
23    A.   Yes.
24    Q.   What's the name of the attachment?
25    A.   Sabrina Abdelaziz profile.doc.
```

1    MR. STEARNS:  And if we could turn to the attachment,

2  Miss Lewis.

3  Q.   Do you see under the height, Miss Sih, what does it say

4  now?

5  A.   5'10".

6  Q.   If we go to the picture in the top right, Miss Lewis,

7  Exhibit 381, who is that a picture of, Miss Sih?

8  A.   It's a picture of Nichia Velakacharia.

9  Q.   And remind us who she was again?

03:13 10  A.   She was our captain from my junior year.

11  Q.   Are you familiar with that picture?

12  A.   Yes.

13  Q.   How are you familiar with that picture?

14  A.   Because if you uncrop the picture, I'm in it.

15  Q.   Okay.  Where have you seen that picture?

16  A.   It was in the *South China Morning Post*, which was a Hong

17  Kong based newspaper, as well as our school newspaper online.

18  Q.   Okay.  And where was that picture taken?

19  A.   At the holiday basketball tournament in November 2016.

03:14 20  Q.   Your junior year?

21  A.   Yes.

22  Q.   Was Sabrina Abdelaziz playing basketball for HKIS then?

23  A.   No.

24  Q.   Okay.  Just a few more questions, Miss Sih.  How many

25  years did you play varsity basketball at HKIS

```
 1   A.   I played varsity basketball for 3 years.

 2   Q.   How many Division 1 U.S. college basketball programs were

 3   you recruited by?

 4   A.   None.

 5   Q.   How many Division 2 U.S. basketball programs were you

 6   recruited by?

 7   A.   None.

 8   Q.   How many Division 3 U.S. basketball programs were you

 9   recruited by?

10   A.   None.

11   Q.   And did Sabrina Abdelaziz ever practice with the varsity

12   team at HKIS?

13   A.   No.

14   Q.   Was she ever a practice player on the varsity team at

15   HKIS?

16   A.   No.

17             MR. STEARNS:  Nothing further, your Honor.

18             THE COURT:  Cross-examination, Mr. Kelly.

19             MR. KELLY:  Yes, your Honor.

20                  CROSS-EXAMINATION OF RACHEL SIH

21   BY MR. KELLY:

22   Q.   Good afternoon, Miss Sih.

23   A.   Good afternoon.

24   Q.   Hope school's going well so far.

25   A.   Yeah.  Thank you.
```

**A1643**

```
 1    Q.   Have you ever met Mr. Abdelaziz?

 2    A.   No.

 3    Q.   Never spoken to him, right?

 4    A.   No.

 5    Q.   All these documents you were just shown with the profile

 6    and the awards, you don't know who put them together, do you?

 7    A.   No.

 8    Q.   This high school yearbook that the prosecutor asked you so

 9    many questions about, did you have it with you at college?

10    A.   No.

11    Q.   Okay.  So did the government, the federal government, have

12    you go look and search for this high school yearbook to bring

13    to federal court?

14    A.   Yes.  My parents.

15    Q.   All right.  Now you don't know Mr. Abdelaziz, but you know

16    his daughter, right?

17    A.   Yes.

18    Q.   I'd like to show you, just the witness only, Exhibit 1335.

19    Do you recognize the people in that photo?

20    A.   Yes.

21         MR. KELLY:  I'd offer it.

22         MR. FRANK:  No objection.

23         THE COURT:  It will be admitted.

24         (Exhibit 1335 admitted into evidence.)

25    Q.   And who's the player in the middle there with the number
```

**A1644**

```
 1    one on?

 2    A.    That's Sabrina.

 3    Q.    Okay.  And that's obviously a basketball team, right?

 4    A.    Correct.

 5    Q.    How about Exhibit 1168?  Do you recognize that?

 6    A.    I've never seen this photo.

 7    Q.    Do you know who it is in the photo?

 8    A.    Yes.

 9          MR. KELLY:  Okay.  I'd offer it.

10          THE COURT:  It will be admitted.

11          (Exhibit 1168 admitted into evidence.)

12    Q.    And who's that in the photo?

13    A.    Sabrina.

14    Q.    That would be the daughter of Gamal Abdelaziz, right?

15    A.    I wouldn't know that.

16    Q.    All right.  Well, all right.  So let's talk briefly,

17    quickly, about your high school, HKIS.  It's pretty much an

18    academic based school, right?

19    A.    I wouldn't say that.

20    Q.    Well, would you say it's a basketball powerhouse?

21    A.    Oh, no.

22    Q.    No.  So it's not a school -- I mean, on direct you kind of

23    laughed at the idea that people were getting recruited for

24    basketball from HKIS, right?

25    A.    Yes.
```

1   Q.   Now anybody who knows anything about HKIS would know it's

2   not a basketball powerhouse, right?

3         MR. STEARNS:  Objection.

4         THE COURT:  Overruled.

5         THE WITNESS:  So do I answer the question?

6         THE COURT:  Yes.  You can answer.

7   A.   Okay.  Well, we were pretty good in Asia but we're not a

8   basketball powerhouse.

9   Q.   All right.  So anyone from a Division 1 school here in

03:17 10   America would know you're not going to get a lot of great

11   Division 1 women's players from HKIS, correct?

12         MR. STEARNS:  Objection as to what a lot of people

13   know.

14         THE COURT:  Sustained.

15   Q.   Well, are you aware of anyone from HKIS ever playing

16   Division 1 women's basketball?

17   A.   No.

18   Q.   And HKIS, a lot of kids who go there are from wealthy

19   backgrounds?

03:18 20   A.   Yes, the majority.

21   Q.   The majority.  And they send a lot of kids every year to

22   USC, right?

23   A.   It's one of the more popular schools, yes.

24   Q.   All right.  And USC, like many other schools, send

25   representatives to campus on occasion, right?

```
 1   A.   Yes.

 2   Q.   And in fact, USC goes to HKIS on occasion, right?

 3   A.   Sorry.  Can you repeat the question?

 4   Q.   Yeah.  That was a terrible question.  Sorry.

 5          You said USC, like other colleges, sometimes visit

 6   your old high school, right?

 7   A.   Yes.  They send, like, college admission representatives.

 8   Q.   All right.  And for USC, would you happen to recall a man

 9   named Kirk Brennan?

10   A.   No.

11   Q.   Would you happen to recall the name of anyone from USC who

12   went to your old high school?

13   A.   Like the administration, or are you talking about like

14   student wise?

15   Q.   I'm sorry.  People from USC who go to your school to, you

16   know, recruit students, that sort of thing, representatives of

17   USC, would you remember now years later any of their names?

18   A.   No.

19   Q.   All right.  But if a USC representative went to HKIS and a

20   lot of kids were going to USC, they might also know it's not a

21   basketball powerhouse, right?

22          MR. STEARNS:  Objection to what might other people

23   knew.

24          THE COURT:  Sustained.

25   Q.   Was it certainly well known to you that your high school
```

```
 1   was not a basketball powerhouse, right?

 2   A.   I wouldn't know.

 3   Q.   Okay.  But like you said, you never had anybody get

 4   recruited from your old high school for Division 1 women's

 5   basketball, right?

 6   A.   No.

 7   Q.   And if you were back in high school and someone said to

 8   you has Sabrina Abdelaziz ever played sports with you, what

 9   would your answer be?

10        MR. STEARNS:  Objection to the hypothetical.

11        THE COURT:  Sustained.

12   Q.   You played sports with Sabrina, didn't you?

13   A.   Yes.  I played JV basketball with her my freshman year.

14   Q.   Right.  And basketball's a sport, isn't it?

15   A.   Yes.

16        MR. KELLY:  Okay.  All right.  Thank you.  That's it.

17        THE COURT:  Any cross from Mr. Kendall?

18        MR. KENDALL:  No, your Honor.

19        THE COURT:  Any redirect?

20        MR. STEARNS:  Thank you.  Just a couple questions.

21              REDIRECT EXAMINATION OF RACHEL SIH

22   BY MR. STEARNS:

23   Q.   Can we pull up Exhibit 1168, I believe.  Miss Sih, did you

24   attend a banquet for HKIS at the end of your sophomore year for

25   athletics?
```

```
 1   A.    Yes.

 2   Q.    Okay.  And was Miss Abdelaziz at that banquet as well?

 3   A.    Yes.

 4   Q.    And did she win an award?

 5   A.    Yes.

 6   Q.    And what did she win?

 7   A.    The MVP of the JV basketball team.

 8   Q.    And based on your observations of interactions with

 9   Miss Abdelaziz over the years, what was your evaluation of her

03:21 10  as a basketball player?

11             MR. KELLY:  Objection.

12             THE COURT:  Sustained.

13             MR. STEARNS:  No further questions, your Honor.

14             THE COURT:  Redirect -- or recross?

15             MR. KELLY:  No, your Honor.

16             THE COURT:  Thank you, Miss Sih.  You may step down.

17             THE WITNESS:  Thank you, your Honor.

18             THE COURT:  We're going to now break for the week.

19   Jurors, we will be in recess today.  We're going to have a full

03:22 20  week next week, but I am able to tell you that we're not going

21   to have a session on Wednesday.  We're going to have Monday,

22   Tuesday.  We're going to have Wednesday off.  Then we'll have

23   Thursday and Friday next week.  I'm trying to allow us to have

24   a day off once a week.  It's important not only for you but for

25   the Court and for all of the rest of the business we have to
```

1    conduct.

2         It is especially important now that you're going to be

3    in recess for a weekend, that's two days you're not going to

4    have to worry about this case or think about it even if you

5    don't want to, but very important for you to honor my

6    instructions about not talking about the case with anybody

7    else.

8         Again, as I told you, I sound like a broken record,

9    but the reason for that is not what's going on here is a

03:22 10   secret.  Anybody who wants to come in can.  And in this case,

11   there's an overflow courtroom where people can watch our

12   proceedings, but the people you talk to have not seen this

13   case, have not seen all the evidence.  And what they say to you

14   about a case or about something they think is similar to this

15   case would be entirely inappropriate for you to consider

16   because you're going to decide this case solely on the basis of

17   the evidence that comes into this courtroom and not on the

18   basis of anything else, what anybody else says about a case or

19   that they think is similar, and so on and so forth.  You can

03:23 20   understand that.

21         So again, you can use me as the foil.  Say I'll talk

22   to you about this case all you want after the end of the case,

23   but I cannot talk to you about the case during -- while the

24   evidence is still going on.  Because you shouldn't be making up

25   your mind until you've heard all the evidence and you've heard

```
 1    closing arguments at the end of the case and you've heard my
 2    instructions on the law.  Then you're going to go deliberate
 3    and that's when you're going to decide this case.
 4             So have a pleasant weekend.  I'll see you at 9:00 a.m.
 5    Monday morning and that's -- what's the date of that?
 6             THE CLERK:  20th, I believe.
 7             THE COURT:  The 20th of September.  I'll see you then.
 8    Have a nice weekend.
 9             (Jury exits.)
10             THE COURT:  Please be seated, counsel.
11             Monday's lineup?
12             MR. FRANK:  Our current intention, your Honor, is to
13    pick up with Mikaela Sanford, followed by Special Agent
14    Keating.
15             THE COURT:  Sanford will be a relatively short direct
16    and Keating be long.
17             MR. FRANK:  That's correct.
18             THE COURT:  How many hours did you think?
19             MR. FRANK:  Hopefully, under three.
20             THE COURT:  All right, but in any event, there won't
21    be another witness after her on Monday.
22             MR. FRANK:  No.
23             THE COURT:  If -- right now what are your plans for
24    Tuesday?
25             MR. FRANK:  Our current intention is Laura Janke.
```

(03:24 markers appear at lines 10 and 20)

1    THE COURT:  And her direct would be?

2    MR. FRANK:  Maybe an hour.

3    THE COURT:  And if we get beyond her, the next one?

4    MR. FRANK:  We're not expecting to get beyond her on

5    Tuesday, your Honor, given the length of cross-examination.  We

6    have witnesses flying in but they're not going to be flying in

7    at such time.

8    THE COURT:  All right.  Any business that needs to

9    come to my attention before we adjourn for the week?

03:25 10    MR. KELLY:  Does this mean the Department of Ed.

11    witness is off the list?  I thought that was for today.

12    MR. FRANK:  He's local and he's short, so we're going

13    to save him for later.

14    MR. KENDALL:  Okay.  Your Honor, if we're having full

15    days Monday and Tuesday, it might be good to know who would go

16    Tuesday late in the day if we get there.

17    THE COURT:  Can you give us an idea of if we get

18    beyond Miss Janke who would be the next witness?

19    MR. FRANK:  Your Honor, I'm reluctant to fly in a

03:26 20    witness from out of town given we're not having court on

21    Wednesday.  It's highly unlikely that we're going to get

22    through anybody additional on Tuesday.

23    THE COURT:  Well, okay, but I don't want to go silent

24    when I've told this jury we're going to have a full session

25    Monday and Tuesday.  I don't want to get to Tuesday at noon and

1    you tell me you don't have a witness.

2         MR. FRANK:  We can always call Special Agent Deckett

3    who's local, but otherwise we would be flying in a witness who

4    would just be sitting here.

5         THE COURT:  Well, then plan to have another somebody

6    local and tell the defendants who it will be if, in the unusual

7    event, if we get through with Miss Janke midday Tuesday.  I do

8    not want to recess before 3 o'clock or 3:30 on Tuesday.  Okay?

9         MR. FRANK:  Yes, your Honor.

03:26 10         THE COURT:  Anything further from counsel?

11         MR. KENDALL:  Your Honor, we had raised you were going

12    to take under advisement the suggested instruction, the

13    limiting instruction with respect to Mr. Vavic.  I don't know

14    if that's ripe for the Court to consider.

15         THE COURT:  I'm going to try to consider that over the

16    weekend.

17         MR. KENDALL:  Great.

18         MR. FRANK:  Your Honor, if there's any motion practice

19    over the weekend given that ECF is down, should we just be

03:27 20    e-mailing those?

21         THE COURT:  That's not my union.  I think it would be

22    e-mailing my deputy clerk would be the best way to do it.

23         MR. KENDALL:  Very good.

24         THE COURT:  And I'm not sure, it's supposed to be down

25    the whole weekend, I believe.

```
1              MR. FRANK:  I believe so.
2              THE COURT:  All right.  I do have other business that
3   I need to conduct from the courtroom, so if you could depart
4   fairly quickly, thank you.
5              THE CLERK:  Court is in recess.
6              (Whereupon, the proceedings adjourned at 3:28 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                            I N D E X

2     Witness                                 Page

3     KEITH BROWN

4     Cross-Examination by Mr. Kendall          22

5     Cross-Examination by Mr. Kelly            58

6     Redirect Examination by Mr. Frank        102

7     Recross-Examination by Mr. Kendall       138

8     Recross-Examination by Mr. Kelly         156

9

10

11    RACHEL SIH

12    Direct Examination by Mr. Stearns        162

13    Cross-Examination by Mr. Kelly           184

14    Redirect Examination by Mr. Stearns      189

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2    NO.                        ADMIT

 3    65A    ....................    30

 4    122    ....................    38

 5    9024   ....................    73

 6    351    ....................    75

 7    9027   ....................    86

 8    329    ....................    92

 9    323A   ....................    94

10    448    ....................    96

11    1481A  ....................    99

12    711    ....................   124

13    712    ....................   126

14    96     ....................   142

15    98     ....................   142

16    7785   ....................   149

17    7785A  ....................   149

18    8126   ....................   151

19    702    ....................   168

20    703    ....................   171

21    704    ....................   173

22    705    ....................   175

23    1335   ....................   185

24    1168   ....................   186

25
```

```
 1   C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          We, Kristin M. Kelley and Kelly Mortellite, certify

 9   that the foregoing is a correct transcript from the record of

10   proceedings taken September 15, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley             September 17, 2021

15       /s/ Kelly Mortellite              September 17, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

```
 1
 2                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 3

 4
     UNITED STATES OF AMERICA,        )
 5                    Plaintiff       )
                                      )
 6   vs.                              ) No. 1-19-CR-10080
                                      )
 7   GAMAL ABDELAZIZ and JOHN         )
     WILSON,                          )
 8                    Defendants.     )
                                      )
 9                                    )

10

11
                 BEFORE THE HONORABLE NATHANIEL M. GORTON
12                   UNITED STATES DISTRICT JUDGE
                        JURY TRIAL - DAY 8
13

14
                John Joseph Moakley United States Courthouse
15                        Courtroom No. 4
                         One Courthouse Way
16                    Boston, Massachusetts 02210

17

18                       September 20, 2021
                              9:15 a.m.
19

20

21
                      Kristin M. Kelley, RPR, CRR
22                      Debra Joyce, RMR, CRR
                        Official Court Reporter
23           John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
24                 Boston, Massachusetts 02210
                     E-mail: kmob929@gmail.com
25
                Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         THE CLERK:  You may be seated.  Court is now in
 3    session.
 4         THE COURT:  Good morning, jurors.  Welcome back.  I
 5    hope you had a pleasant weekend and you're ready to go back to
 6    work.
 7         The government will call its next witness.
 8         MS. KEARNEY:  Your Honor, before we call the next
 9    witness, we wanted to read two stipulations into the record?
10         THE COURT:  Yes.
11         MS. KEARNEY:  The first is a stipulation regarding the
12    testimony of Don Hurley.
13         "The parties hereby stipulate and agree that, if
14    called to testify, Dawn Hurley, an Officer, Court Appearance
15    Analyst at Bank of America, would testify that:
16         On or about October 17, 2018, Bank of America received
17    a $500,000 wire transfer on behalf of its customer, The Key
18    Worldwide Foundation.  The wire was initiated from a First
19    Republic Bank account ending in 2343 in the name of Hyannis
20    Port Capital Inc. to a Bank of America account ending in 0486
21    in the name of the Key Worldwide Foundation.  The wire traveled
22    from First Republic Bank, through a clearinghouse in New York,
23    to the Key Worldwide Foundation's account in Massachusetts.
24    Exhibit 707 is Bank of America's record of this wire.
25         On or about December 11, 2018, Bank of America
```

1    received a $500,000 wire transfer on behalf of its customer,

2    The Key Worldwide Foundation.  The wire was initiated from a

3    First Republic Bank account ending in 2343 in the name of

4    Hyannis Port Capital Inc. to a Bank of America account ending

5    in 0486 in the name of The Key Worldwide Foundation.  The wire

6    traveled from First Republic Bank, through a clearinghouse in

7    New York, to the Key Worldwide Foundation's account in

8    Massachusetts.  Exhibit 708 is Bank of America's record of this

9    wire.

09:22 10         Bank of America employees who work in Bank of

11   America's wire department make records of wire transfers at or

12   near the time the Bank sends or receives wires.  It is the

13   regular practice of Bank of America to make records of wire

14   transfers it sends or receives.  Exhibits 707 and 708 were kept

15   in the course of Bank of America's regularly conducted business

16   activity.

17         The parties further agree that Exhibits 707 and 708

18   shall be deemed records of regularly conducted activity in

19   accordance with Federal Rule of Evidence 803(6)."

09:23 20         And this is signed by the government, as well as

21   counsel for Mr. Wilson.

22         THE COURT:  All right, then.  Exhibit 707 and 708 are

23   admitted.

24         (Exhibits 707, 708 admitted into evidence.)

25         MS. KEARNEY:  The second stipulation is regarding the

testimony of IRS revenue agent Roman Hernandez.

"The parties hereby stipulate and agree that, if called to testify, Roman Hernandez, a Revenue Agent with the Internal Revenue Service, would testify that:

Exhibit 157A is a certified official record of the U.S. Income Tax Return for an S Corporation for Hyannis Port Capital, Inc., including the Form 1120S and accompanying schedules and statements, for the tax period ending December 31, 2014.  This return was electronically filed with the Internal Revenue Service, or IRS, on or about September 2, 2015.

Exhibit 174A is a certified official record of the U.S. Individual Tax Return, including Form 1040 and accompanying schedules and statements, for defendant John Wilson and his wife Leslie Wilson for the tax period ending December 31, 2014.  This return was filed by mail and received by the IRS in Fresno, California, on or about December 29, 2015.

Exhibit 258A is a certified official record of the Amended U.S. Individual Income Tax Return, including the Form 1040X and accompanying schedules and statements, for defendant John Wilson and his wife Leslie Wilson for the tax period ending December 31, 2014.  This return was filed by mail and received by the IRS in Fresno, California on or about January 11, 2017.

1          Exhibit 501A is a certified official record of the
2     Amended U.S. Individual Income Tax Return, including the
3     Form 1040X and accompanying schedules and statements, for
4     defendant John Wilson and his wife Leslie Wilson for the tax
5     period ending December 31, 2014.  This return was filed by mail
6     and received by the IRS in Kansas City, Missouri on or about
7     March 30, 2018.
8          It is the regular practice of the IRS to keep copies
9     of tax returns, such as those in Exhibits 157A, 174A, 258A, and
09:25 10     501A, for a period of seven years.  Exhibits 157A, 174A, 258A,
11     and 501A were kept in the course of regularly conducted
12     activity of the IRS."
13          And the government moves to admit 157A, 174A, 258A,
14     and 501A.
15          THE COURT:  They are admitted.
16          (Exhibits 157A 174A, 258A, 501A admitted into
17     evidence.)
18          MS. KEARNEY:  And your Honor, would you like us to
19     mark these stipulations for identification?
09:26 20          THE COURT:  Yes.  They should be marked for
21     identification, I believe, perhaps A and B if we haven't used
22     those before.
23          (Exhibits A and B marked for identification.)
24          MS. KEARNEY:  At this time, the government calls
25     Mikaela Sanford.

|   |   |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | (Mikaela Sanford, sworn.) |
| 3 | THE CLERK:  Would you please state your name for the |
| 4 | record, spelling your last. |
| 5 | THE WITNESS:  Mikaela Sanford, S-a-n-f-o-r-d. |
| 6 | THE COURT:  And Miss Sanford, if you'd move your chair |
| 7 | closer to the bench and then the microphone closer to you so |
| 8 | that we can all hear.  It moves -- the whole stand moves. |
| 9 | Thank you. |
| 09:27 10 | Miss Kearney, you may examine. |
| 11 | DIRECT EXAMINATION OF MIKAELA SANFORD |
| 12 | BY MS. KEARNEY: |
| 13 | Q.   Good morning, Miss Sanford. |
| 14 | A.   Good morning. |
| 15 | Q.   Where do you live? |
| 16 | A.   In Georgia. |
| 17 | Q.   Are you currently employed? |
| 18 | A.   Yes. |
| 19 | Q.   Where? |
| 09:27 20 | A.   I work for a nonprofit organization. |
| 21 | Q.   Where were you employed during the period of 2013 to 2019? |
| 22 | A.   At The Key Worldwide. |
| 23 | Q.   What was your title at The Key? |
| 24 | A.   Project manager and administrative assistant. |
| 25 | Q.   Let's take a step back for a moment.  Where were you born? |

|   |   |   |
|---|---|---|
| 1 | A. | In Monterey Peninsula, in California. |
| 2 | Q. | How far did you go in school? |
| 3 | A. | A master's degree. |
| 4 | Q. | In what? |
| 5 | A. | In public administration with an emphasis in public |
| 6 | | management. |
| 7 | Q. | Where did you go to school? |
| 8 | A. | For undergrad, I went to Arizona State University and, for |
| 9 | | my master's, I went to California State University, East Bay. |

09:28 10   Q.   And after you graduated, what kind of work did you do?

11   A.   I went to work for a nonprofit association.

12   Q.   How did you come to work for The Key?

13   A.   I responded to an online ad seeking a project manager and

14        administrative assistant.

15   Q.   When did you start working for The Key?

16   A.   In March of 2013.

17   Q.   What were your initial job responsibilities?

18   A.   Initially, I was hired because Rick was working on a

19        number of projects and the managers that he put in place for

09:29 20   those projects, I was supposed to serve as somewhat of like a

21        liaison between Rick and the people that were in charge of

22        those projects.  I was supposed to keep them posted with any

23        updates or kind of serve as a point of contact and then also

24        keep Rick updated with anything that was coming up or anything

25        that -- or with any updates.

| | |
|---|---|
| 1 | Q.   When you say "Rick," are you referring to Rick Singer? |
| 2 | A.   Yes.  Rick Singer. |
| 3 | Q.   And what were the projects you were hired for? |
| 4 | A.   So at that time I was hired to -- at that time the |
| 5 | projects that he was working on included a reality show, a |
| 6 | Sirius Satellite radio show, a book, an athletic and academic |
| 7 | academy for student athletes, a series of summer camps, as well |
| 8 | as he also had a partnership with a bank where his services |
| 9 | would be offered to the kind of top tier clientele at that |
| 09:30 10 | bank. |
| 11 | Q.   And what became of the reality show? |
| 12 | A.   To my knowledge, that never happened. |
| 13 | Q.   How about the radio program? |
| 14 | A.   To my knowledge, that never happened. |
| 15 | Q.   What about his book? |
| 16 | A.   The book was self-published, but I don't think it really |
| 17 | sold much. |
| 18 | Q.   What became of the athletic academic academy? |
| 19 | A.   Never happened, to my knowledge. |
| 09:30 20 | Q.   What about the summer camps? |
| 21 | A.   The summer camps actually occurred in 2013 and 2014, and |
| 22 | the summer camps were actually offered before I came into the |
| 23 | picture and started working for Rick. |
| 24 | Q.   And you mentioned a partnership with a bank.  What became |
| 25 | of that? |

**A1668**

1  A.    I believe a handful of clients actually came out of that

2  and started working with Rick.

3  Q.    Did your job responsibilities evolve over time?

4  A.    Yes.

5  Q.    And how so?

6  A.    Eventually, my duties or my day-to-day duties included

7  really working on the college application process for Rick's

8  clients.

9  Q.    And who was your boss?

09:31 10  A.    Rick.

11  Q.    How closely did you work with Mr. Singer?

12  A.    I would say if you're comparing it to like the traditional

13  idea of a personal assistant, I didn't really fit that mold.  I

14  didn't really interact with Rick face-to-face very much or

15  often at all.  Like, I think in the early years he was in the

16  office maybe twice a month and later on, for example, I didn't

17  see him at all between December 2017 and January of 2019.  And

18  I didn't really speak to him that frequently or really at

19  length very often.  And I didn't, like, manage his calendar.  I

09:32 20  didn't field his phone calls.  I wasn't present during

21  meetings, I wasn't taking notes, those kind of traditional

22  duties and functions that I think most people see as a personal

23  assistant is fulfilling.  Those weren't things that I did.

24  Q.    What was Mr. Singer like as a boss?

25  A.    He was pretty difficult, very demanding.  I would describe

    1    it as very much of a hurry up and wait, so everything was now,

    2    now, now, now, now, and then things just kind of -- or tasks

    3    just sat there.  Like nothing really happened.  So, yeah, just

    4    difficult overall.

    5    Q.    You mentioned an office.  Where was your office located?

    6    A.    Our office was located in Sacramento.

    7    Q.    Who else worked in that office?

    8    A.    Steve Masera, the accountant.  And then when he left, his

    9    replacement or the replacement accountant came and then worked

09:32 10    in the office.

   11    Q.    Where did Mr. Singer work?

   12    A.    Rick worked everywhere.  So he was always on a plane and

   13    he worked -- or met with students in their homes.  I think

   14    maybe a couple of students he worked with via Skype.

   15    Q.    Did The Key have other employees?

   16    A.    Yes.

   17    Q.    How many?

   18    A.    We had six academic advisors that we called master

   19    coaches.  I would say about a dozen ACT and SAT tutors that

09:33 20    were independent contractors, and then we also had a series

   21    of -- or included in that number we had a number of writing

   22    coaches and essay coaches and then also subject test tutors.

   23    Q.    And where did these other employees work?

   24    A.    They worked either out of their homes or they met with

   25    students around the country.

```
 1   Q.   Are you familiar with someone named Tatiana Forero?

 2   A.   Yes.

 3   Q.   Who is she?

 4   A.   She was a former master coach for The Key Worldwide.

 5   Q.   Where did she work?

 6   A.   She worked out of her home in the New York area.

 7   Q.   Who were The Key's clients?

 8   A.   Our clients were pretty high net worth clientele around

 9   the country and around the world.

09:34 10  Q.   Approximately how many clients did The Key have per year?

11   A.   I can't really say a whole number, but I know that I

12   worked with roughly 100 seniors each academic year.

13   Q.   What services did The Key provide to those seniors?

14   A.   Traditional college counseling services, so assistance

15   with navigating the application process, assistance with

16   completing the actual application and guidance as to which

17   schools the students should apply to.

18   Q.   What did The Key charge for those services?

19   A.   In -- during my first year the rate fluctuated based on

09:34 20  where a student was located.  So, during the early years, the

21   rate hovered around $5,000 per academic year and the academic

22   year went from August to June.  And then, by my last year, the

23   rate was $8,000 per student for academic year.

24   Q.   How did The Key advertise its business?

25   A.   Word of mouth.
```

```
 1    Q.   To what extent were you involved in the finances of the
 2    business?
 3    A.   Not at all.
 4    Q.   Did there come a time when Mr. Masera discussed payments
 5    to The Key with you?
 6    A.   Yes.  There was one specific incident --
 7              MR. KENDALL:  Objection, your Honor.
 8              THE COURT:  Sustained.  She can describe what she did,
 9    not what he said.
09:35 10    Q.   All right.  Did there come a time when Rick Singer asked
11    you to take classes for students?
12    A.   Yes.
13    Q.   When was that?
14    A.   Several months after I started working for him.
15    Q.   How did you respond to his request?
16    A.   My -- the words that came out of my mouth were "I don't
17    think I can get an A."  And he said that was fine.
18    Q.   What did you do when you took a class for a student?
19    A.   I secured the course information from the student,
09:36 20    including the log-in credentials, and I logged in and took over
21    the course for that student.
22    Q.   Where were the courses held?
23    A.   They were held online at various high schools or at
24    colleges around the country.
25    Q.   Approximately, how many students did you take classes for?
```

|  |  |
|---|---|
| 1 | A.   Between 10 to 15 over the course of my time at The Key. |
| 2 | Q.   What was your understanding of why Mr. Singer asked you to |
| 3 | take classes for the student? |
| 4 | A.   Because the student was either incapable or just not |
| 5 | interested in completing the work themselves. |
| 6 | Q.   What was your understanding of how the grades from the |
| 7 | classes that you took for students were used? |
| 8 | A.   They would be used for -- they would be used on the |
| 9 | student's transcript. |
| 09:37 10 | Q.   Did you have an understanding of whether the parents knew |
| 11 | you were taking classes for their children? |
| 12 | A.   From my understanding, they were aware. |
| 13 | Q.   And what was that understanding based on? |
| 14 | A.   They were part of the conversation in regards to me |
| 15 | initiating the coursework or I secured information from the |
| 16 | parents.  And, from my understanding, they also paid the fee |
| 17 | for the course. |
| 18 | Q.   Did you take any classes for any of John Wilson's |
| 19 | children? |
| 09:37 20 | A.   No. |
| 21 | Q.   Did you take classes for any of Gamal Abdelaziz's |
| 22 | children? |
| 23 | A.   No. |
| 24 | Q.   Did there come a time when you heard the term "side door"? |
| 25 | A.   Yes. |

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | Q.   Where did you hear that?                                         |
| 2   | A.   That was a term that Rick used.                                 |
| 3   | Q.   Did Mr. Singer ever sit you down and explain the side door      |
| 4   | to you?                                                               |
| 5   | A.   No.                                                              |
| 6   | Q.   Did you come to your own understanding on what you thought       |
| 7   | the term "side door" meant?                                          |
| 8   | A.   Yes.                                                             |
| 9   | Q.   How did you come to that understanding?                         |

09:38 10   A.   It was through bits and pieces of information that I would
11   gather during the application process over the years working
12   with our students.
13   Q.   What did you think it meant?
14   A.   Initially, it was -- the side door was used to mean any
15   time a family was using connections to facilitate their
16   student's admission to college.  And over time that grew to
17   include athletics, at times the financial component, and at
18   times athletic recruitment.
19   Q.   And what was your understanding of the athletic piece of
09:38 20   it?
21   A.   That the student had to show participation in a sport.
22   Q.   Did you have an understanding as to whether the students
23   were, in fact, recruitable athletes?
24        MR. KENDALL:  Objection, your Honor.
25        THE COURT:  She can state whether she had an

          1   understanding.  Overruled.

          2   Q.    You can answer, Miss Sanford.

          3   A.    Can you repeat the question?

          4   Q.    Sure.  Did you have an understanding as to whether the

          5   students were, in fact, recruitable athletes?

          6   A.    On one specific -- or one specific occasion I did not

          7   believe that the student was a recruitable athlete.

          8   Q.    What about in other instances?

          9   A.    In the other instances I was not knowledgeable of that.

09:39    10   Q.    What was your understanding of the financial component of

         11   the side door?

         12   A.    That it was a donation.

         13   Q.    And what was that understanding based on?

         14   A.    The term "donation" was used.

         15   Q.    And again, what was your role in the finances of the

         16   company?

         17   A.    I didn't have a role in the finances for the company.

         18   Q.    Let's turn to John Wilson.  Did you have direct

         19   interaction with Mr. Wilson?

09:39    20   A.    No.

         21   Q.    I'm going to show you what's been marked as Exhibit 644.

         22         MS. KEARNEY:  For the witness only, please.

         23   Q.    Miss Sanford, do you recognize the exhibit that's up on

         24   your screen?

         25   A.    Yes.

```
 1   Q.    What is it?
 2   A.    It's an e-mail exchange between myself, Rick, and Joel
 3   Margulies is cc'd on the e-mail.
 4   Q.    Who was Joel Margulies?
 5   A.    He was a business associate of Rick's.
 6   Q.    What's the date of this e-mail?
 7   A.    Friday, September 20, 2013.
 8              MS. KEARNEY:  Government offers Exhibit 644.
 9              THE COURT:  It will be admitted.
10              (Exhibit 644 admitted into evidence.)
11   Q.    Let's look at the first e-mail in this chain,
12   Miss Sanford.  It's dated September 19, 2013.  How long had you
13   been with The Key at this time?
14   A.    6 months.
15   Q.    You wrote to Mr. Margulies, "Rick would like to have you
16   put together an athletic profile for the following students
17   utilizing their SAT scores, photos, and transcript".  Why were
18   you asking Mr. Margulies to put together athletic profiles?
19   A.    That would have come at the request of Rick.
20   Q.    You continued, "I am going to assume that you have
21   completed this for Rick before".  Why did you write that?
22   A.    Because Rick hadn't given much direction, so when I was
23   asking Joel to complete this task, I just assumed that he had
24   the knowledge and information to complete it.
25   Q.    One of the names listed is John Wilson.  Who is that?
```

09:41  10
09:41  20

```
 1    A.    That's Johnny Wilson.

 2    Q.    Mr. Wilson's son?

 3    A.    Yes, Mr. Wilson's son.

 4    Q.    Let's look at the next two e-mails in the chain.  In that

 5    first response from Mr. Margulies, he writes, "Is this to be a

 6    document or a web page or ????? I have not done this for him

 7    before".

 8          In your response, you wrote, "This will need to be a

 9    document.  I found a template online that I think can give you

09:42 10    an idea as to how the profile should look".  How did you know

11    what the profile should look like?

12    A.    I Googled it.

13    Q.    You also wrote "Rick, do you have any insight as to what

14    you would like to see"?  And if we look at the response from

15    Mr. Singer, he wrote "I will provide to Joel".  What did you

16    understand Mr. Singer to mean?

17    A.    That Rick would provide the additional details needed to

18    complete the task to Joel.

19          MS. KEARNY:  I would like to show the witness only

09:43 20    Exhibit 80.

21    Q.    Miss Sanford, do you recognize this document?

22    A.    Yes.

23    Q.    What is it?

24    A.    It is an e-mail exchange between myself and Rick.

25    Q.    What's the date?
```

```
 1   A.    Monday, September 30, 2013.

 2            MS. KEARNEY:  I offer Exhibit 80 into evidence.

 3            THE COURT:  It will be admitted.

 4            (Exhibit 80 admitted into evidence.)

 5   Q.    Miss Sanford, in the cover e-mail of this exhibit, you

 6   sent Mr. Singer information for the athletic profiles for Rio,

 7   Johnny, and Amanda.  Who is the Johnny referenced?

 8   A.    Johnny Wilson.

 9   Q.    And attached to this e-mail, at page 2, is Johnny Wilson's

09:43 10   high school transcript.  And, at pages 4 and 14, are copies of

11   unofficial SAT score reports for Johnny Wilson.  Why did you

12   send these to Mr. Singer?

13   A.    Rick had requested those documents.

14   Q.    Do you recall doing anything else in connection with

15   Johnny Wilson's college applications aside from the e-mails

16   we've gone over this morning?

17   A.    No.

18   Q.    Did you do anything for Mr. Singer with respect to

19   Mr. Wilson's twin daughters?

09:44 20   A.    I believe I mailed test prep books to them in preparation

21   for SAT or ACT prep sessions.

22   Q.    Let's turn next to Gamal Abdelaziz.  Did you interact with

23   Mr. Abdelaziz about his daughter Sabrina?

24   A.    Yes.

25   Q.    How much did you interact with him?
```

```
 1   A.   A few times via e-mail.
 2        MS. KEARNY:  Look at, for the witness only,
 3   Exhibit 441.
 4   Q.   Miss Sanford, do you recognize this document?
 5   A.   Yes.
 6   Q.   What is it?
 7   A.   It's an e-mail exchange between Rick, Andrew, Gamal,
 8   myself, and Sabrina.
 9   Q.   Who is Andrew?
10   A.   Andrew was a -- he was an essay coach for The Key.
11   Q.   What's the date of this e-mail?
12   A.   December 7, 2017.
13        MS. KEARNEY:  Government offers Exhibit 441.
14        THE COURT:  It will be admitted.
15        (Exhibit 441 admitted into evidence.)
16   Q.   So let's go to the December 5, 2017, e-mail for Mr. Singer
17   at the bottom of this chain.  Mr. Singer wrote, "Andrew now
18   time to work on short answer questions for USC.  One question
19   has to be answered using playing basketball as a passion".
20        What did you understand Mr. Singer to mean?
21   A.   Rick was providing guidance as to the topic for Sabrina's
22   USC supplemental essays.
23   Q.   Let's go to the next e-mail up.  On December 7, 2017,
24   Mr. Abdelaziz wrote to Andrew, "Sabrina shared with me that you
25   were done with the USC essays but there was no discussion of
```

09:45 (line 10)
09:45 (line 20)

basketball, I've asked her to reach out to you as per Rick's note below".

        Did you have an understanding as to what note Mr. Abdelaziz was referring to?

A.   He was referring to the previous e-mail where Rick was providing guidance as to the -- what the topic of the essay should be.

Q.   Let's look at the next two e-mails up in this chain. First, Mr. Singer replies "basketball will go in her activities", to which Andrew responded, "Hi Mr. Aziz, for USC there are two short essays and then a number of short answer questions.  I interpreted Rick's note to mean that Sabrina needed to mention basketball in one or more of the short answer questions.  Looking back, he may have meant that one of the essays should be about basketball, but Sabrina had the three cities idea, so we went ahead with that".

        What did you understand him to mean by the "three cities idea"?

A.   That was the essay topic that Sabrina went with.

Q.   Let's look at the top e-mail in this chain.  Mr. Singer replies, "One can speak about her involvement in basketball and her desire to continue to play.  The lessons she has learned by playing in both the U.S. and China have helped her become a stronger communicator both on and off the court".

        What did you understand Mr. Singer to be suggesting?

1    A.    He was giving additional guidance as to how to approach

2    the essay.

3           MS. KEARNY:  Let's look at Exhibit 442 for the witness

4    only, please.

5    Q.    Miss Sanford, do you recognize the document up on your

6    screen?

7    A.    Yes.

8    Q.    What is it?

9    A.    It's an e-mail exchange between Andrew, Gamal, Sabrina,

09:48 10    myself, and Rick.

11    Q.    What's the date?

12    A.    December 7, 2017.

13           MS. KEARNEY:  The government offers Exhibit 442.

14           THE COURT:  The date again?

15           THE WITNESS:  December 7, 2017.

16           THE COURT:  It will be admitted.

17           (Exhibit 442 admitted into evidence.)

18    Q.    Let's start with the e-mail from Andrew in the middle of

19    this page.  Do you see there, Miss Sanford, that this chain

09:48 20    picks up from the last chain we looked at where Andrew was

21    writing about the three cities idea?

22    A.    Yes.

23    Q.    And then Mr. Aziz responded, "Thank you Andrew, we'll go

24    with what Rick says.  So resolved".  What did you understand

25    him to mean?

```
 1   A.   That he wanted to go ahead with Rick's guidance in terms

 2   of the essay topic.

 3           MS. KEARNY:  Let's show for the witness only

 4   Exhibit 459.

 5   Q.   Miss Sanford, do you recognize this document?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.    It is an e-mail exchange between Gamal, myself, Andrew,

 9   and Sabrina.

09:49 10  Q.   What's the date?

11   A.   January 5th of 2018.

12           MS. KEARNEY:  The government offers Exhibit 459.

13           THE COURT:  It will be admitted.

14           (Exhibit 459 admitted into evidence.)

15   Q.   And Miss Sanford, let's look at the top two e-mails in

16   this chain.  We see that the bottom e-mail in the screen is the

17   e-mail from Rick Singer suggesting how to incorporate

18   basketball into her essay that we looked at previously.

19   A.   Yes.

09:49 20  Q.   And what was the date of that e-mail?

21   A.   December 8, 2017.

22   Q.   And looking at the top e-mail in the chain on January 5,

23   2018, Mr. Aziz writes, "Please see below, just as reminder of

24   Rick's direction was on the essays to compare with what Sabrina

25   just sent".
```

1          What did you understand Mr. Aziz to mean?

2    A.   He was reiterating that Rick had provided guidance as to

3    how to approach the essay.

4          MS. KEARNEY:  Can we show, for the witness only,

5    Exhibit 461.

6    Q.   Miss Sanford, do you recognize this document?

7    A.   Yes.

8    Q.   What is it?

9    A.   It's an e-mail exchange between Sabrina, myself, and then

09:50 10   cc'd on it is Gamal and Andrew.

11   Q.   What's the date?

12   A.   January 5th of 2018.

13         MS. KEARNEY:  The government offers Exhibit 461.

14         THE COURT:  Admitted.

15         (Exhibit 461 admitted into evidence.)

16   Q.   Let's start with the e-mail at the bottom of the first

17   page of this exhibit.  On January 4, 2018, Mr. Abdelaziz wrote

18   to you "Mikaela, Happy New Year!  I haven't been copied on your

19   correspondence with Sabrina lately but wanted to make sure you

09:51 20   have everything you need to submit the USC application soon.

21   Please let me know if there's anything you need me to assist

22   with".

23         What did you understand Mr. Abdelaziz to mean?

24   A.   He was asking for an update on the status of the USC

25   application, and he was letting me know that if there was

1   anything I needed in order to submit the application to let him

2   know.

3   Q.   Let's look at the next two e-mails.  You responded to

4   Mr. Abdelaziz by asking about the status of Sabrina's essays,

5   to which Sabrina responded on January 5, 2018, "attached below

6   is the basketball essay supplement Rick asked for as well as

7   the academic pursuit supplemental essay".

8            And let's look at the first attachment on page 2 of

9   this exhibit.  What did Sabrina attach to the e-mail?

09:51 10  A.   The supplemental essay.

11  Q.   Can you please read the first sentence of the essay.

12  A.   "The basketball court is like my art studio".

13            MS. KEARNEY:  Can we show, for the witness only,

14  Exhibit 458.

15  Q.   Miss Sanford, do you recognize this document?

16  A.   Yes.

17  Q.   What is it?

18  A.   It's an e-mail exchange between Gamal, myself, Sabrina and

19  Andrew.

09:52 20  Q.   What's the date?

21  A.   January 5th of 2018.

22            MS. KEARNEY:  The government offers Exhibit 458.

23            THE COURT:  It will be admitted.

24            (Exhibit 458 admitted into evidence.)

25  Q.   Let's start with the middle of the first page with the

```
 1    e-mail from Sabrina.  Miss Sanford, is that the e-mail we just
 2    looked at where Sabrina sent her basketball essay supplement
 3    Rick asked for as well as the academic pursuit supplemental
 4    essay?
 5    A.   Yes.
 6    Q.   And let's look at the response in the next e-mail.  You
 7    wrote, "I have to confirm a few things with Rick before I can
 8    submit.  I will confirm when USC is in".  What were you
 9    confirming?
 10   A.   That I don't remember.
 11   Q.   Let's look at the top e-mail in the chain.  Mr. Abdelaziz
 12   responded, "Thank you Mikaela, I read Sabrina's essays.  I
 13   noticed some minor grammar and spelling mistakes, but overall
 14   they're both good".  What essays did you understand
 15   Mr. Abdelaziz to be referring to?
 16        MR. KELLY:  Objection as to her understanding what
 17   someone else is thinking.
 18        THE COURT:  She can -- I'll let her answer the
 19   question.  Overruled.
 20   A.   Can you repeat the question?
 21   Q.   Sure.  What did you understand Mr. Abdelaziz to be
 22   referring to?  What essays did you understand him to be
 23   referring to?
 24   A.   The essays that had been attached to the previous message.
 25   Q.   And he continued, "I will leave it to you and Andrew to
```

```
 1    correct.  Please keep me in the loop until we submit".  What
 2    did you understand Mr. Abdelaziz to be directing you to do?
 3              MR. KELLY:  Same objection.
 4              THE COURT:  Overruled.
 5    A.   To -- sorry.  Can you repeat the question?
 6    Q.   Sure.  What did you understand Mr. Abdelaziz to be
 7    directing you to do?
 8    A.   To correct any of the grammatical errors that were present
 9    in the essay and then to let him know when the application was
10    submitted.
11              MS. KEARNEY:  Can we show, for the witness only,
12    Exhibit 463.
13    Q.   Do you recognize the document on your screen,
14    Miss Sanford?
15    A.   Yes.
16    Q.   What is it?
17    A.   That is Sabrina's USC application.
18              MS. KEARNEY:  The government offers Exhibit 463.
19              THE COURT:  It will be admitted.
20              (Exhibit 463 admitted into evidence.)
21    Q.   Miss Sanford, who submitted this application to USC for
22    Sabrina Abdelaziz?
23    A.   I admitted her application.
24    Q.   Now, I want to direct your attention to page 12.  At the
25    top of the page is a USC essay.  Can you please read the first
```

```
 1  sentence?

 2  A.   "The basketball court is like my art studio".

 3  Q.   Miss Sanford, did there come a time when you became aware

 4  that Rick Singer was being investigated?

 5  A.   Yes.

 6  Q.   How did you become aware of the investigation?

 7  A.   I came across an e-mail with a series of notes in his

 8  inbox.

 9  Q.   Why did you have access to Mr. Singer's e-mail?

10  A.   Rick actually gave me access to his e-mail my first day on

11  the job.

12  Q.   What did you find in the e-mail regarding the

13  investigation?

14       MR. KENDALL:  Objection, your Honor.  Hearsay.

15       THE COURT:  Sustained.

16  Q.   Miss Sanford, did you have an understanding of what was

17  being investigated?

18       MR. KENDALL:  Objection, your Honor.

19       THE COURT:  She can state whether she has an

20  understanding.

21  A.   No.

22  Q.   Did you talk to Mr. Singer about what you saw in his

23  e-mail?

24  A.   No.

25  Q.   Why not?
```

**A1687**

```
 1   A.   Because when things like wires and recorded phone calls

 2   are being noted in a document, I don't think that's something

 3   that I was supposed to know or be aware of.

 4   Q.   Did there come a time when you were charged with a crime

 5   in connection with the conduct you described today?

 6   A.   Yes.

 7   Q.   What crime?

 8   A.   Conspiracy to commit racketeering.

 9   Q.   What was your initial reaction to the charges against you?

10   A.   I was surprised.

11   Q.   Why?

12   A.   Because I didn't know or didn't realize that I had ever

13   done anything that could be constituted as a crime, let alone a

14   federal crime.

15   Q.   Did you plead guilty to the charge against you?

16   A.   Yes.

17   Q.   When was that?

18   A.   In October of 2020.

19   Q.   Why did you plead guilty?

20            MR. KENDALL:  Objection, your Honor.

21            MR. KELLY:  Objection.

22            THE COURT:  Overruled.

23   A.   Based on the crime and my understanding of the crime, I'm

24   guilty of the crime.

25            MS. KEARNEY:  I'd like to show, for the witness only,
```

```
 1   Exhibit 680.

 2   Q.   Miss Sanford, do you recognize the document on the screen?

 3   A.   Yes.

 4   Q.   What is it?

 5   A.   It is my Plea Agreement.

 6   Q.   And what's the date on it?

 7   A.   August 3, 2020.

 8        MS. KEARNEY:   The government offers Exhibit 680.

 9        THE COURT:   It will be admitted.

10        (Exhibit 680 admitted into evidence.)

11   Q.   And I'd like to look at page 7 of this exhibit.

12   Miss Sanford, do you recognize the signature on this Plea

13   Agreement?

14   A.   Yes.

15   Q.   Whose signature is it?

16   A.   That's mine.

17   Q.   What date did you sign this Plea Agreement?

18   A.   August 6, 2020.

19   Q.   Miss Sanford, have you been sentenced?

20   A.   No.

21   Q.   Have you spent any time in jail since pleading guilty?

22   A.   No.

23   Q.   In connection with your plea, did you enter into a

24   Cooperation Agreement with the government?

25   A.   Yes.
```

```
 1              MS. KEARNEY:  Can I show the witness only Exhibit 681,
 2    please.
 3    Q.   Do you recognize the document on your screen,
 4    Miss Sanford?
 5    A.   Yes.
 6    Q.   What is that?
 7    A.   That is my Cooperation Agreement.
 8    Q.   And what's the date?
 9    A.   August 3rd of 2020.
10              MS. KEARNEY:  The government offers 681.
11              THE COURT:  It will be admitted.
12              (Exhibit 681 admitted into evidence.)
13    Q.   Miss Sanford, looking at page 5 of this exhibit, do you
14    recognize the signature on that page?
15    A.   Yes.
16    Q.   Whose signature is it?
17    A.   It's my signature.
18    Q.   And when did you sign this Cooperation Agreement?
19    A.   August 6th of 2020.
20    Q.   What is your understanding of what the Cooperation
21    Agreement requires you to do?
22    A.   To provide assistance to the government in their
23    investigation and to tell the truth.
24    Q.   What is your understanding of what will happen if you do
25    those things?
```

|  |  |
|---|---|
| 1 | A.    That I will receive a favorable recommendation when it |
| 2 | comes to my sentencing. |
| 3 | Q.    What is your understanding of what happens if you don't |
| 4 | tell the truth? |
| 5 | A.    I could receive an unfavorable recommendation and I could |
| 6 | also be charged with perjury or obstruction. |
| 7 | Q.    Is the judge required to give you a lower sentence based |
| 8 | on a favorable recommendation from the government? |
| 9 | A.    No. |

09:59 10    Q.    Are you hoping for a lower sentence based on your
11    cooperation?
12    A.    Yes.
13    Q.    Who will decide your sentence?
14    A.    The judge.
15            MS. KEARNEY:  I have no further questions.
16            THE COURT:  Cross-examination.  Mr. Kelly?
17            MR. KENDALL:  Yes, your Honor.
18            THE COURT:  Or Mr. Kendall.
19            MR. KENDALL:  If I may have a moment to get organized.
09:59 20            THE COURT:  Yes, you may.
21                CROSS-EXAMINATION OF MIKAELA SANFORD
22    BY MR. KENDALL:
23    Q.    Good morning, Miss Sanford.
24    A.    Good morning.
25    Q.    Thank you for coming to Boston.  I want to start off with

```
 1    what you were discussing -- oh, by the way, my name's Mike

 2    Kendall.  I represent John Wilson.

 3              Fair to say you've never spoken to Mr. Wilson?

 4    A.   No.

 5    Q.   You never spoke to his son, correct?

 6    A.   No.

 7    Q.   I want to start off with what you described as your Plea

 8    Agreement with the government.  The government is charging you

 9    with you racketeering, a RICO enterprise, correct?

10    A.   Well, conspiracy to commit racketeering.

11    Q.   Right.  And that has a 20-year maximum sentence?

12    A.   Yes.

13    Q.   And they also charge you with two counts of theft of

14    honest services, wire fraud counts -- Count 2 and Count 9 of

15    the indictment I think?

16              MR. KELLY:  I object to that.  That's not what she's

17    charged.

18    Q.   I think those were dismissed as part of your Plea

19    Agreement.  Weren't two fraud counts dismissed?  You pled

20    guilty to the Count 1, the RICO racketeering conspiracy, but

21    they dismissed a -- I think it was fraud conspiracy and a fraud

22    substantive count?

23    A.   There were a series of charges that were part of a

24    superseding indictment that came about in the fall of 2019.

25    Those charges were dismissed, yes.
```

**A1692**

```
 1   Q.   Right.  And the two charges that were dismissed were fraud

 2   charges, theft of honest services, and other things, correct?

 3   A.   Honestly, there are so many I don't even remember how --

 4   like the exact charges at that time.

 5   Q.   Okay.  And you understand that the racketeering charge is

 6   a charge against you for participating in an organization or a

 7   group, correct?

 8   A.   Yes.

 9   Q.   But would it be fair to say the only fraudulent activity

10   you were involved in was the -- taking the classes for about a

11   dozen people, correct?

12   A.   Yes.

13   Q.   You didn't know anything improper about the side door,

14   correct?

15   A.   No.

16   Q.   You worked for Mr. Singer for 6 years, and for that entire

17   6-year period you were actually involved in helping him with

18   the side door, correct?

19   A.   I had a very limited knowledge of the side door and I had

20   a very limited knowledge of Rick's activities outside of my

21   interactions with him and what I was tasked with doing.

22   Q.   But you would e-mail various parents about their

23   participation in the side door, correct?

24   A.   I don't believe so.

25        MR. KENDALL:  Okay.  If we could, Randall -- excuse
```

**A1693**

1    me, Mr. Carter, I'd like to put up on the screen just for the

2    witness, please, our first exhibit will be Exhibit 9716.

3    Q.    Do you see 9716?

4    A.    Yes.

5    Q.    And that's an e-mail that Mr. Singer sent to you?  It's

6    the top e-mail in the chain, correct?

7    A.    Yes.

8    Q.    And if we take a look --

9          MR. KENDALL:  If we could go to page 4, Mr. Carter, of

10:04 10   this e-mail chain, and if we look there in the middle, it

11   says -- the Georgetown -- we can highlight that.

12         The Georgetown -- I'd like to offer this into

13   evidence, your Honor.

14         THE COURT:  It will be admitted.

15         (Exhibit 9716 admitted into evidence.)

16   Q.    Mr. Singer wrote to this family, "The Georgetown, GW,

17   Fordham and NYU we are going to need to call on favors and may

18   have to use a side door so visiting is critical so I can work

19   on getting done early on".  Did I read that correctly?

10:04 20  A.    Yes.

21   Q.    In the course of your work with Mr. Singer, you would see

22   him frequently e-mailing and discussing the side door with

23   parents, correct?

24   A.    I don't know if I'd use the word "frequently", but I know

25   that the term "side door" was used.

```
 1              MR. KENDALL:  Okay.  If we could go to Exhibit 9691,
 2    please.
 3    Q.   And if you could tell us, is that another e-mail that you
 4    had with Mr. Singer and others?  Do you see that, June 13,
 5    2016?
 6    A.   Yes.
 7              MR. KENDALL:  I'd like to offer Exhibit 9691.
 8              MR. FRANK:  Hold on.  Our monitor is not working.
 9    Hold on.
10:05 10          THE COURT:  We have some electronic problems.
11              MS. KEARNEY:  Your Honor, I don't believe the witness
12    has been impeached yet on this document.
13              THE COURT:  What's the purpose of this?
14              MR. KENDALL:  Your Honor, I asked the witness if she
15    was involved in numerous e-mails with clients about the side
16    door, and she said she didn't have a memory or she didn't think
17    so.  I'm now going to show her this, which says otherwise.
18              MS. KEARNEY:  Is he going to be refreshing her
19    recollection?
10:06 20          THE COURT:  This is not in evidence, right?
21              MR. KENDALL:  Not yet.  I was going to ask if she can
22    identify it and recognize it.
23              THE COURT:  All right.
24    Q.   Do you recognize Exhibit 9691?
25    A.   Yes.
```

```
 1   Q.   Is that an e-mail Mr. Singer sent to you, parents, and
 2   other people concerning a side door?
 3   A.   Yes.
 4        MR. KENDALL:  Okay.  I'd like to offer that into
 5   evidence, your Honor.
 6        THE COURT:  It will be admitted, 9691.
 7        (Exhibit 9691 admitted into evidence.)
 8        MR. KENDALL:  Now, Mr. Carter, if we can go to the
 9   second paragraph in that -- well, actually, the first two
10   paragraphs, if you could highlight.
11   Q.   What Mr. Singer wrote was, in an e-mail that was addressed
12   to multiple people, "I will have Mikaela begin the process of
13   creating a Google doc and common application with the essays
14   needed to start the process of applying to college".
15        "Tenley Hardin" -- that's another employee of The
16   Key?
17   A.   Yes.  She was a master coach for The Key.
18   Q.   "Will connect to begin Skyping and going over school
19   choices and editing essays, et cetera.  If we are going to use
20   a side door then I will need to know before the summer is over
21   so I can try to connect the dots".  Did I read that correctly?
22   A.   Yes.
23        MR. KENDALL:  Okay.  I'd like to next go to Exhibit
24   9690, please.
25   Q.   And if you could tell us, do you recognize this as an
```

```
 1   e-mail between you and Tatiana Forero De Morais?  Do you
 2   recognize it?
 3   A.   Oh.  Yes.
 4        MR. KENDALL:  I'd like to offer 9690 into evidence,
 5   your Honor.
 6        MS. KEARNEY:  Your Honor, I object to this line of
 7   questioning with these exhibits.  He -- Mr. Kendall is trying
 8   to impeach this witness, but he can refresh her recollection
 9   with these, but they shouldn't be admitted.
10   MR. KENDALL:  Your Honor, I think I am allowed to
11   impeach the way I think most appropriate.
12        THE COURT:  You're asking her as to whether or not she
13   has had contact with the so-called side door.  Is that what
14   this line is about?
15        MR. KENDALL:  She had multiple -- I've asked her
16   whether she's had multiple e-mails discussing the side door
17   with families, and she said no or she didn't think so,
18   something along those lines.  So the issue is multiple, Your
19   Honor.
20        THE COURT:  Yeah, but that doesn't make the document
21   admissible.
22        MR. KENDALL:  She's identified it as an authentic
23   document that she used.
24        THE COURT:  Okay.  But that still doesn't make it
25   admissible just because she recognizes it.
```

10:08 (line 10)
10:09 (line 20)

```
 1              MR. KENDALL:  I believe it's admissible for

 2      impeachment, your Honor.

 3              MS. KEARNEY:  Your Honor, the witness hasn't said

 4      anything that's different than what's in this document.  If he

 5      wants to refresh the witness' recollection about how frequently

 6      she was involved in e-mails.

 7              THE COURT:  I'm not going to have this one admitted,

 8      but you can use it to refresh her memory.

 9              MR. KENDALL:  Okay.

10:09 10 Q.   Does this document refresh your recollection that you were

11      discussing side doors about families with other employees even

12      without Mr. Singer being on the e-mail?  If you take a look at

13      the bottom there.

14      A.   Yes, however, I'd like to clarify that the term "side

15      door" is used.  There isn't necessarily a discussion or what I

16      would classify as a discussion of the side door.

17      Q.   Just a reference to a family using the side door?

18      A.   Correct.  There is a reference to the side door in each of

19      these e-mails that you've shown me.

10:10 20 Q.   And would it be -- and I think you testified that you had

21      access to Mr. Singer's e-mail box or inbox, correct?

22      A.   Yes.

23      Q.   How often would you review his inbox?

24      A.   It was really -- well, I wouldn't -- what do you mean by

25      "review"?
```

```
 1   Q.    How much would -- and I'm not suggesting you were doing
 2   anything improper or unauthorized, just how many times in the
 3   course of a month would you be needing to look at his inbox?
 4   A.    It was really on an as-needed basis.  Like if I needed to
 5   get a student's address, I would go in there to retrieve that
 6   information.  Or it was very rare when Rick would have me
 7   respond to an e-mail on his behalf, but it happened.  Not
 8   often, but it happened.
 9   Q.    Okay.  So you would be looking at his inbox and he would
10   direct you to a specific topic, or would you sometimes just
11   have to go there to find information to do your job, or both?
12   A.    Both.
13   Q.    Okay.  So you -- and that was fine with Mr. Singer that
14   you had access to the inbox and you could look up things to do
15   your job?
16   A.    I believe so.
17   Q.    Okay.  And would it be fair to say in the entire six years
18   you were working for him you never saw anything in that inbox
19   that made you think the side door was a fraud, correct?
20   A.    When I was going into -- or when I was accessing his
21   e-mail, I wasn't looking for any information about the side
22   door.
23   Q.    I'm just asking what you saw.  Okay.  You never saw
24   anything in there.  Whatever you were looking for, you never
25   saw anything that made you think that the side door was
```

1   improper, correct?

2   A.   I never saw any discussion of the side door in his inbox.

3   Q.   Fair to say in the entire six years you worked with him

4   you never heard any discussion, information, document, whatever

5   that suggested to you that a side door involved improper

6   bribery, correct?

7   A.   Well, I didn't have -- or I wasn't privy to conversations

8   that Rick was having with others outside of my presence in

9   regards to the side door.

10:12 10   Q.   Correct, but all the conversations in your presence, there

11   was never a reference to the side door involving anything

12   improper, correct?

13   A.   There weren't conversations in my presence about the side

14   door with parents.

15   Q.   There was certainly a bunch of e-mails, far more than I've

16   shown you so far, correct?

17   A.   I can't say how many additional e-mails there were, but in

18   these e-mails he's referencing the word "side door", but there

19   isn't a discussion about the side door.

10:13 20   Q.   Right.  And nobody ever had any discussion in front of you

21   that said the side door was improper, correct?

22   A.   There wasn't any conversation in my presence about the

23   side door other than the term "side door".

24   Q.   And facilitating -- and you're suggesting it to parents

25   and discussing it with parents, correct?

```
 1   A.   Do you -- sorry.  Can you clarify that question?

 2   Q.   Weren't there times when you would talk to a new family

 3   and be told that they're probably going to be doing a side

 4   door?

 5   A.   Yes.

 6   Q.   And you were informing other employees, Rick said this

 7   one's going to be a side door, correct?

 8   A.   Yes.

 9   Q.   Okay.  And fair to say you didn't have any knowledge in

10   the six years you worked there about any cheating on the ACTs

11   or SATs, correct?

12   A.   No.  I didn't have any knowledge about that.

13   Q.   So the only activity that got you into this problem with

14   the racketeering charge is taking classes for about a dozen

15   people, correct?

16   A.   Correct.

17   Q.   And that was a full-time job for the six years, correct?

18   A.   Yes.

19   Q.   Now -- and were you aware that sometimes side doors were

20   done for people who could be managers of a team and not

21   participate on the team?

22   A.   I recall one instance where a student was going to be a

23   manager, but I didn't equate that with the side door.  That was

24   very early on in my time working at The Key.

25   Q.   Okay.  Now, you also -- I'm going to switch topics.  You
```

```
 1    were also involved in working with The Key Foundation, correct?
 2    A.    No.  Well, define work for the Foundation.
 3    Q.    Did you help set up some of the summer camps in 2013 and
 4    2014 for The Key Foundation?
 5    A.    Yes.
 6    Q.    There was an environmental camp?
 7    A.    I don't believe that was the topic of either of the camps.
 8    Q.    What were the topics you remember of the camps?
 9    A.    The first year there was a writing camp that was over a
10    series of days, and then the first week was -- the theme
11    changed at the last minute, but I know it was a combination or
12    the attendees were a combination of Rick's students, as well as
13    students from the Family Crisis Shelter in the Orange County
14    area.
15    Q.    That was called 1736?
16    A.    Yes, 1736 Family Crisis Center.
17    Q.    Why don't you explain what the 1736 Family Crisis Center
18    is, please.
19    A.    It's a domestic violence shelter that's located in Orange
20    County, California.
21    Q.    The purpose of the summer camp was to get some of Rick's
22    students who were regular college coaching kids to be
23    participating in a program that would benefit 1736?  Weren't
24    they supposed to run some sort of fundraising run or a race or
25    something?
```

```
 1   A.    Yes.  The plan was for the students who participated to --
 2   they would focus on specific, like, roles.  I think one of them
 3   might have been marketing, logistics.  And then they would come
 4   together to put on a 5K run or walk or run, I think, in the LA
 5   area.
 6   Q.    Do you remember Johnny Wilson participated in that camp?
 7   A.    Yes.  He did participate in that camp.
 8   Q.    And you know, since this situation has become public with
 9   the court cases being brought, you've realized that there was a
10   lot of fraudulent activity going on at both the Foundation and
11   The Key that Mr. Singer never told you about, correct?
12             MS. KEARNEY:  Objection.
13             THE COURT:  Grounds?
14             MS. KEARNEY:  It's hearsay.
15             THE COURT:  Sustained.
16   Q.    Did you know of any improper activities going on at The
17   Key, at The Key Foundation at the time that you worked there?
18   A.    No, but also to clarify, I wasn't an actual employee of
19   The Key Worldwide Foundation.
20   Q.    But you'd help out with tasks there?
21   A.    Correct.
22   Q.    Okay.  It would be fair to say Mr. Singer was pretty good
23   at controlling information?
24   A.    I don't know if I would use the term "control
25   information".
```

```
 1    Q.    He never told you about the test cheating, correct?
 2    A.    That's correct.
 3    Q.    He never told you about any bribes to coaches at
 4    Georgetown or other schools, correct?
 5    A.    Correct.
 6    Q.    Now, he never told you about the tax evasion, correct?
 7    A.    Correct.
 8    Q.    And you were running the office for six years, correct?
 9    A.    I was in the office.  I don't know if I would say that I
10    ran the office.
11    Q.    Were you the closest person to being an office manager
12    that he had working for either the Foundation or the company?
13    A.    I can't speak on roles at the Foundation, but in terms of
14    the actual physical office when it was open from 2013 to 2018,
15    there were two people that were in that office, myself -- I was
16    one of those people.  And I would say that we both, you know,
17    were in there handling office affairs.
18    Q.    You and Mr. Masera?
19    A.    Mr. Masera and then, once Mr. Masera left, Melissa Rail.
20    Q.    Okay.  But Mr. Masera and Miss Rail, they dealt with the
21    checkbook and the monies, correct?
22    A.    From my understanding, yes.
23    Q.    Okay.  So putting aside the finances, you pretty much
24    managed everything else that went on in the office, correct?
25    A.    I answered phone calls.  I took out the trash from time to
```

10:18 (line 10)
10:19 (line 20)

```
 1   time.

 2   Q.   You supported Rick on his projects?

 3   A.   Which projects in particular?

 4   Q.   I think you said there was a book people were working on?

 5   A.   The book was actually -- the book was essentially in the

 6   process of being published when I started working for him.  So

 7   one of the first tasks that occurred when I started working for

 8   him was to read a manuscript of the book.

 9        MR. KENDALL:  Okay.  Could we show the witness Exhibit

10   8092 and 9695.  Oh.  Excuse me.  969 -- okay.  8092 and I

11   believe the other one is 9695.

12        MS. KEARNEY:  Do you have a copy for us?

13        MR. KENDALL:  I have one copy of the book I was going

14   to ask the witness to look at, and then I was going to offer

15   the book into evidence.

16        MS. KEARNEY:  What's the basis for admission of the

17   book?

18        MR. KENDALL:  Excuse me?

19        MS. KEARNEY:  What's the basis for admission of the

20   book?

21        MR. KENDALL:  If I can ask a question, your Honor,

22   then we can deal with the objection.

23        THE COURT:  All right.  Go forward.

24   Q.   Okay.  Do you recognize 8092?

25        MR. KENDALL:  And can we also put up 9695, Mr. Carter?
```

10:20 (line 10)
10:21 (line 20)

1    Q.    Do you recognize these two as the book that he

2    self-published?

3    A.    Yes.

4    Q.    Okay.  And he used these books to promote himself,

5    correct, to give himself credibility?

6    A.    I honestly don't know.  Most of the copies I had just

7    collected dust in my closet.

8    Q.    Okay, but didn't he always describe himself as an author

9    or a best-selling author in his promotional materials?

10:22 10    A.    In the promotional material, there's one specific flyer

11    that I've seen that he used when he was going to give talks or

12    things like that, and I don't recall him saying that he was a

13    best-selling author in that.

14    Q.    But this is the book he published, correct?

15    A.    Yes.

16          MR. KENDALL:  Okay.  I'd like to offer this into

17    evidence.

18          MS. KEARNEY:  Objection, your Honor.  It's hearsay.

19          THE COURT:  Sustained.

10:22 20          MR. KENDALL:  It's not for the truth of the matter,

21    your Honor.  It's just that they exist.

22          MS. KEARNEY:  Your Honor, it is irrelevant.  First of

23    all, this witness --

24          THE COURT:  Yeah.  Sustained.

25    Q.    You talked about the number of clients that you dealt

```
 1   with.  You said it was about a hundred a year, seniors?
 2   A.   Correct, yeah.  Roughly 100 seniors each year.
 3          MR. KENDALL:  If we can just show the witness
 4   Exhibit 8189, please.
 5   Q.   Do you recognize this document, please?
 6          MS. KEARNEY:  Do you have a copy?
 7          MR. KENDALL:  I believe this comes from the
 8   government, but if you want us to see if we have a copy to give
 9   you, yes.
10   Q.   Do you recognize Exhibit 8189, Miss Sanford?
11   A.   I've never seen this document before.
12   Q.   Do you know who would have kept a customer list at The
13   Key, if not you?
14   A.   I didn't keep the customer list and I believe that was
15   actually something the accountant handled, or had on record.
16   Q.   Jamie Manold?
17   A.   I don't know who that is.
18   Q.   William Manold, the accountant, his CPA firm?
19   A.   Oh.  I don't know who that is.
20   Q.   Okay.  So you never saw the actual customer list for the
21   company, correct?
22   A.   No.
23   Q.   Okay.  But you had 100 -- approximately, on average, 100
24   seniors per year to deal with, correct?
25   A.   Correct.
```

```
     1   Q.   So for the 6 years you were there, that would be roughly
     2   600 people, correct?
     3   A.   Correct, at minimum.
     4   Q.   At minimum.  So it could be a bit more than that?
     5   A.   Well, because I'm only including my list of seniors, and
     6   that was the only real tangible list of people I had of people
     7   that I worked with, but I also worked with underclassmen as
     8   well.  So that could have been freshman, sophomore, juniors,
     9   and even as young as eighth graders.
10:24 10   Q.   Okay.  And how many total did you work with with all
    11   grades in a typical year?
    12   A.   That I don't know, or that I never calculated.
    13   Q.   Did you have more underclassmen than you had seniors?
    14   A.   In terms of my direct interactions, I mean, it was for the
    15   most part the seniors so -- and that's the only, like, actual
    16   list that I had on hand.
    17   Q.   Okay.  Did you help Mr. Singer at all -- when you applied
    18   for the job, you actually looked at the website, didn't you?
    19   A.   Yes.
10:25 20   Q.   Okay.  And then afterwards did you ever look back at the
    21   website for any purpose?
    22   A.   Yes.
    23   Q.   Okay.  And, obviously, the website was part of the
    24   marketing effort that Mr. Singer did, correct?
    25   A.   I can't really speak on the intent that -- in which the
```

**A1708**

```
  1   website was used for Rick because the website existed before I
  2   came into the picture.
  3   Q.   Okay.  But as soon as you had an interview to go meet with
  4   folks, you actually went in and looked at the website, correct?
  5   A.   Correct.
  6   Q.   And it was something that was there for anybody else to
  7   refer to if they needed it, correct?
  8   A.   Yes, that's correct.
  9         MR. KENDALL:  Could we show the witness Exhibit 7012
10:26 10  and 7010.
 11         MS. KEARNEY:  Do you have a copy?
 12         MR. KENDALL:  Yes.
 13   Q.   Can you tell us, are these copies of the web pages that
 14   Mr. Singer had for his business?  7012 and 7010.
 15   A.   The one on the left, yes.  I have more of a memory of the
 16   one on the left, 7012.
 17   Q.   Okay.
 18   A.   But 7010 isn't as familiar to me.
 19         MR. KENDALL:  I'd like to offer 7012 into evidence,
10:26 20  please.
 21         MS. KEARNEY:  Objection, your Honor.
 22         THE COURT:  Grounds?
 23         MS. KEARNEY:  Hearsay and relevance.
 24         MR. KENDALL:  I'll ask a couple more questions to lay
 25   a better foundation, your Honor.
```

```
 1    Q.   When you went for a job interview, you looked at the
 2    website, correct?
 3    A.   Yes.
 4    Q.   And it informed your state of mind about what kind of
 5    business it was and what Mr. Singer did, correct?
 6    A.   Yes.
 7         MR. KENDALL:  Okay.  I'd like to offer it into
 8    evidence, your Honor.
 9         MS. KEARNEY:  Objection, your Honor.  We haven't
10    established that this is the website that she looked at.
11         MR. KENDALL:  I think she just identified.
12         THE COURT:  Let's clarify that.  Is this the one that
13    she looked at?
14    Q.   After you got employed there, do you recall doing anything
15    to change the website for the business?
16    A.   In 2018, we did a website redesign.
17    Q.   Okay.  Did it still have this look and appearance?
18    A.   No.  It was a lot cleaner, in my opinion.
19    Q.   Okay.  So this is the website that was up there at the
20    time that you got the job and were working there for several
21    years, correct?
22    A.   Yes.
23    Q.   Okay.  I want to show you another version today.
24         MR. KENDALL:  Exhibit 7011, please.
25    Q.   Do you see this version of the website?
```

```
 1   A.    Yes.

 2   Q.    It also -- it looks familiar to like the one you've seen

 3   before, correct?

 4   A.    Yes.

 5   Q.    And you'll notice it has his book there, his latest book.

 6   So this would obviously have been sometime after 2014?

 7              MS. KEARNEY:  Objection, your Honor.  This is not in

 8   evidence yet.

 9              THE COURT:  Sorry?

10:28 10         MS. KEARNEY:  This is not in evidence yet and

11   Mr. Kendall is pointing out things.

12              THE COURT:  Yes.

13              MR. KENDALL:  Okay.  I'd like to offer Exhibit 7011

14   into evidence, your Honor.

15              MS. KEARNEY:  Same objection, your Honor.  It's

16   hearsay.  It's not relevant to this witness.  We don't know

17   when this website was created, and it's also beyond the scope

18   of the direct.

19              MR. KENDALL:  Your Honor, it informs the witness'

10:29 20    state of mind, and I think it impeaches other parts of the --

21              THE COURT:  I'm going to allow it to be admitted,

22   7011.

23              MR. KENDALL:  Thank you, your Honor.

24              (Exhibit 7011 admitted into evidence.)

25   Q.    If we can now show that to everybody.
```

```
 1              MR. KENDALL:  I'd like to go to, I believe it's
 2      page 7.
 3      Q.   If you could look at page 7.
 4              MR. KENDALL:  And highlight that bottom paragraph.
 5      Q.   Okay.  I want to read this to you.  Do you remember
 6      they're -- this is a testimonial by one of the former customers
 7      or one of the clients.  Do you remember Evan Webb?
 8      A.   I remember the name, but I don't remember much about the
 9      student.
10:30 10 Q.   Okay.  "Dear Rick, I'm writing this e-mail today to simply
11      say thank you.  I leave for SMU" -- what is SMU?
12      A.   Southern Memphis University in Texas.
13      Q.   "In 30 days, and I could not be more excited about moving
14      to Dallas.  I'm positive that I would have never found such a
15      perfect school for me if it wasn't for your guidance.  Not only
16      did you help me through the college search and the application
17      processes, you were also able to help me obtain a manager
18      position on the basketball team.  I have already met some of
19      the players and other managers and I am very excited to begin
10:30 20 working with all of them.  I'm looking forward to staying in
21      touch as I go through my years as a mustang.  Thank you, Evan
22      Webb".
23              Do you remember anything further about Mr. Webb?
24      A.   No, and I actually wasn't aware as to where he went to
25      school or any of these other details mentioned in this
```

1    testimonial.

2    Q.    Okay.  And if we take a look at 711 on the first page, we

3    see here advertising the two books, Mr. Singer's latest book.

4    He does it singular, but it's the one you previously

5    identified, right, *Getting In*?

6    A.    Yes.

7          MR. KENDALL:  Your Honor, I'd like to admit 7012,

8    which is the other version of the website that the witness

9    identified.

10:31 10        MS. KEARNEY:  Same objection, your Honor.

11          THE COURT:  That one the objection is sustained.

12    Q.    Now, part of your tasks, I think you identified, were that

13    you would help them with the applications, correct?

14    A.    Yes.

15    Q.    I want to go back to the time period when you first

16    started in 2013 and 2014.  Okay?

17    A.    Uh-hum.

18    Q.    You started in March of '13?

19    A.    Yes.

10:32 20    Q.    In the early years, that first couple of years, you would

21    load the information into the internet link for the common

22    application, correct?

23    A.    Can you elaborate more on exactly what you're asking.

24    Q.    Yes.  Thank you.  I should do it a little bit better.

25          Back in 2013 and 2014 when your clients or customers

```
 1   were applying to colleges, they typically would have to fill

 2   out an application form that would be used for most of the

 3   schools, correct?  It was called a common app or common

 4   application?

 5   A.   Correct.  The common app was used as the baseline for the

 6   other application or the other application forms that any of

 7   our students were going to apply to.

 8   Q.   So the common app would have the core information that all

 9   schools would get, correct?

10   A.   That's correct.  And then, if by chance a student applied

11   to a school that wasn't a common app school and it required

12   additional pieces of information that wouldn't be found in the

13   common app, then we would reach out to the student or the

14   parent in order to get that information.

15   Q.   And you handled the data entry for the college

16   applications at this time period, correct?

17   A.   Correct, with a team of people.

18   Q.   Okay.  And you did not, as a practice, have the families

19   read the application before it was submitted, correct, in 2013

20   and '14?

21   A.   At that time I did not have a personal practice in place

22   where I would have the families review the applications prior

23   to submission.

24   Q.   Okay.  So you submitted Johnny Wilson's application or

25   oversaw the submission of Johnny Wilson's application without
```

```
 1    ever asking him or his family to read it, correct?
 2    A.   I actually can't even confirm that I even oversaw Johnny
 3    Wilson's application at all.
 4              MR. KENDALL:  Okay.  If we can just have a moment,
 5    please.
 6              I'd like to show you -- if we can show the witness
 7    only Exhibit 9683.
 8    Q.   If you could take a look at 9683.  Tell us if that is, in
 9    fact, an e-mail that Mr. Singer sent to you in 2013.
10:34  10    A.   Yes.  That is an e-mail that Mr. Singer sent to me in
11    2013.
12              MR. KENDALL:  Your Honor, I'd like to offer this into
13    evidence, please.
14              THE COURT:  It will be admitted.
15              MS. KEARNEY:  Objection, your Honor.  He can use it to
16    refresh the witness' memory, but I don't know that it needs to
17    be admitted into evidence.
18              THE COURT:  What are your grounds for objecting?
19              MS. KEARNEY:  It's hearsay.
10:35  20              THE COURT:  Sustained.
21              MR. KENDALL:  Excuse me.  What was the basis of the
22    objection, your Honor?
23              MS. KEARNEY:  Hearsay.
24    Q.   This was a --
25              MR. KENDALL:  Your Honor, it's not offered for the
```

truth of the matter.  It's offered for the obstruction, not for

the -- a statement of the content.

       MS. KEARNEY:  Your Honor, he can refresh the witness'

recollection.

       THE COURT:  Yeah.  I'm not going to admit it.

Q.   Okay.  Does this refresh your memory that you submitted

Johnny Wilson's applications in 2013 late in the year?

A.   No.

Q.   Does this refresh your recollection that Mr. Singer asked

you to submit his applications?

A.   Yes.

Q.   Okay.  But you just don't have a memory if you carried it

out or not, correct?

A.   Correct.  As I mentioned, I had a team of people that I

worked with at that point.  It was -- there were four of us and

so I don't know if -- what happened after this point.

Q.   Okay.  So it would be fair to say your best memory is that

your custom and practice was you oversaw a team filling out the

applications, correct?

A.   In 2013, yes.

Q.   Okay.  You didn't ask the families to review them,

correct?

A.   Correct.

Q.   And Mr. Singer asked you to submit Johnny Wilson's

application in November of 2013, correct?

```
 1   A.   Yes.  Rick asked me to submit Johnny Wilson's application.

 2   Q.   And then you were also involved in getting tutors for

 3   Mr. Wilson's daughters, correct?

 4   A.   That part I don't recall.

 5   Q.   I thought you testified --

 6   A.   I said that I sent test prep materials.

 7   Q.   Okay.  Do you remember Mr. Singer had a tutor by the name

 8   of Lily Ahn, A-h-n?

 9   A.   Yes.

10   Q.   A very capable young woman from Stanford?

11   A.   I don't actually recall where she went to school, but I do

12   remember Lily, yes.

13   Q.   She was a very good tutor, correct?

14   A.   I liked her on a personal basis, but I can't attest to her

15   abilities as a tutor.

16   Q.   Okay.  Do you recall that she was the tutor that was

17   assigned to the Wilson daughters?

18   A.   Yes.  I do recall that.

19   Q.   And she worked remotely, is that correct?

20   A.   Yes.

21   Q.   Okay.  So it would be fair to say that she would manage

22   her students and conduct her part of Mr. Singer's business by

23   remote communications, correct?

24        MS. KEARNEY:  Objection, your Honor.  This is beyond

25   the scope of direct.
```

```
 1              THE COURT:  Sustained.
 2     Q.   Now, we put into evidence Exhibit 80.  Do you remember we
 3     looked at that just a few moments ago?
 4              MR. KENDALL:  If we can get Exhibit 80 up on the
 5     screen, please.
 6     Q.   Do you remember taking a look at Exhibit 80?
 7     A.   Yes.
 8     Q.   Okay.  It's here that -- it's from you to Mr. Singer
 9     providing various information that was in the files or in the
10:38 10     sort of resources of The Key to put together the profiles for
11     people, correct?
12     A.   Can you clarify what you mean by "resources" and "files".
13     Q.   That's a good question.  Let's look at what is attached to
14     this e-mail.  It says "Wilson_transcript.dat", correct?
15     A.   Yes.
16     Q.   "Wilson_SAT", correct, pdf?
17     A.   Yes.
18     Q.   Wilson_SATMarch.pdf", correct?
19     A.   Correct.
10:39 20     Q.   So you had Mr. Wilson's SAT scores that you forwarded, but
21     no ACT scores, correct?
22     A.   Correct.
23     Q.   Okay.  If we can take a look at Exhibit 80, I'd like to go
24     to page 4.  And this, you recognize, as a College Board SAT
25     report of scores, correct?
```

```
 1    A.    Correct.

 2    Q.    And see the scores are on the left column.  If we could go

 3    down there.  "Critical reading national percentile, 78

 4    percent," correct?

 5    A.    Correct.

 6    Q.    And we see "mathematics national percentile, 83 percent"?

 7    A.    Correct.

 8    Q.    And then we see "writing national percentile, 90 percent"?

 9    A.    Correct.

10    Q.    And then the student gets an overall percentage of where

11    all of their scores combined put them, correct?

12    A.    Correct.

13    Q.    But it would be fair to say this student's percentile is

14    going to be under 90 percent, correct?  He's got a 83 and a 78

15    and a 90 that need to be worked out or averaged, correct?

16          MS. KEARNEY:  Objection.

17          THE COURT:  Sustained.

18    Q.    You've worked with SAT scores for many years at The Key,

19    correct?

20    A.    I was privy to students' SAT scores, but I'm not sure I

21    get what you mean by "worked with SAT scores."

22    Q.    Well, you're aware that they get a percentile ranking for

23    their overall score on the test?

24    A.    Yes.

25    Q.    Okay.  And the percentile ranking will be some sort of
```

average of the percentile for each individual component of the

test?

        MS. KEARNEY:  Objection.

        THE COURT:  Sustained.

        MR. KENDALL:  If we can then turn to the Bates ending

in 9333 of the same exhibit.

Q.   This is a second test score for Mr. Wilson, correct?

A.   Yes.

Q.   And if we look at the percentiles there, we see a

73 percent, correct?

A.   Correct.

Q.   An 85 percent, is that correct?

A.   Correct.

Q.   And then if we look at the bottom one, 78 percent?

A.   Correct.

Q.   Now, you would agree with me that when one submits --

based upon your experience of filling out all these

application, a person only has to submit one score to these

colleges?  They don't have to submit every test they take,

correct?

A.   Well, I think it depends on the kind of exam that you're

taking.  In this case, more than likely one score would have

been submitted, but it would -- the super score would have been

used and only if the school that he was submitting scores to

accepted the super score.

Q.   And why don't you explain to the jury what a super score

is.

A.   So the super score is the highest combined score amongst

all of the tests, or all of the exams that a student has taken.

So, in this case, if Johnny had scored higher on math in March

versus his math score in September, then more than likely the

math score from March would have been -- or deemed the highest

score, and that's what the university would have seen.

Q.   That's done for all the tests taken from the specific

company that administers the test, correct?  You can super

score an SAT result because they're all from the College Board?

         MS. KEARNEY:  Objection, your Honor.  This witness is

not an expert.

         THE COURT:  If she knows, she can answer.

A.   Can you ask the question again?  I'm sorry.

Q.   Sure.  It's -- I'll give a little more background to make

it less confusing.  I'm sorry for that.

         There's two type of college entrance exams.  There's

the SAT and ACT, correct?

A.   Correct.

Q.   And they're given by two different companies, correct?

A.   Correct.

Q.   Okay.  So you can submit your SAT scores and get a super

score for the SAT exams, correct?

A.   Correct, but again, only certain colleges and universities

1    accept super scores.

2    Q.   Right.   Thank you.

3         But also, if your ACT score was much better than your

4    SAT score, you could just submit the ACT and not worry about

5    super scoring or anything else, correct?

6    A.   That is correct, and that's, I guess, a personal

7    preference, but the ACT can also be super scored.

8    Q.   Okay.  Are you aware that Mr. Singer would send -- I think

9    you said earlier that Mr. Singer would use -- he had some type

10:44 10   of a relationship with a bank?

11   A.   Yes.

12   Q.   Okay.  What was the bank that he had the relationship

13   with?

14   A.   I don't -- I don't recall the name.

15   Q.   And he provided services to their senior executives?

16   A.   I don't believe that it was the senior executives.  From

17   my understanding it was -- his services were provided to the --

18   a small percentage of elite clientele at that bank.

19   Q.   Okay.  And was it an investment bank?

10:45 20   A.   I don't know.

21   Q.   Do you know if it was Morgan Stanley?  Does that ring a

22   bell?

23   A.   I mean, I know the name Morgan Stanley, but I don't know

24   if that was the bank in this case.

25   Q.   And so it was a bank where some of their elite clients

```
 1   would get the services, but you can't identify the bank by

 2   name?

 3   A.   I can't recall, no.

 4        MR. KENDALL:  If we could show the witness only

 5   Exhibit 9621.

 6   Q.   Do you recall working with a student named Lauren

 7   Isackson?

 8        MS. KEARNEY:  Your Honor, can we have a moment?  We

 9   don't have a copy of this.

10   THE COURT:  Yes.

11        MR. KENDALL:  I'm happy to give you my copy.

12   Q.   Did you work with Lauren Isackson?

13        MS. KEARNEY:  Objection, your Honor.  This is beyond

14   the scope.

15        THE COURT:  Overruled.

16   Q.   Did you work with Lauren Isackson?

17   A.   Yes.

18   Q.   Okay.  Is this an e-mail chain that you and she exchanged

19   at the time you were advising her?

20   A.   No.  This was actually after I had worked with her.

21   Davina -- in this situation, Davina, her mother, had reached

22   out to me, for instance, with creating a resume and CV for

23   Lauren so that she could apply for internships.

24   Q.   Was this when she was in high school or college?

25   A.   This was when she was in college.
```

```
 1   Q.   Okay, but they came back to you because of your advisory

 2   relationship at The Key, correct?

 3   A.   Well, I had actually maintained a relationship with Davina

 4   and we just got along, so she liked me and came to me for

 5   assistance.

 6            MR. KENDALL:  I'd like to offer 9621 into evidence,

 7   your Honor.

 8            MS. KEARNEY:  Objection, your Honor.  Hearsay.

 9   Relevance.

10            THE COURT:  In this case, I will allow it to be

11   admitted.

12            (Exhibit 9621 admitted into evidence.)

13            MR. KENDALL:  Thank you, your Honor.

14   Q.   I'd like to go to the second page where we see -- I think

15   we're on the third page.  Second page on April 4th, it says --

16   actually, let me get the order.

17            MR. KENDALL:  If you could highlight the whole two

18   paragraphs there, Mr. Carter.  All the way to the bottom and if

19   you could highlight the salutation "Hi Mikaela".  Do

20   everything.  Leave it just like that.

21   Q.   And this is the message she sent to you on April 4, 2019.

22   "Hi Mikaela, this is an e-mail from my internship counselor and

23   she wants me to change my resume and cover letter to embellish

24   upon my interest in event planning.  I copied some of her

25   e-mail below.  Please let me know your thoughts/changes".
```

10:47 (line 10)
10:48 (line 20)

1          Do you see that there?

2    A.    Yes.

3    Q.    Okay.  And then if we look below, and her advisor is

4    asking for an updated -- we see underlined, "We will need an

5    updated cover letter and resume that has focus on your

6    interests and experience in Event Management.  I believe you

7    are currently working at The Wall Group".

8          What do you remember about her internship and her

9    work in this area?

10:49 10   A.    I'm actually not familiar with her work in that area.

11   Q.    Okay.  But she was calling you for advice.  You didn't

12   think you were committing any fraud, did you?

13   A.    Well, this was actually facilitated by Davina.

14   Q.    Okay.  But Lauren is the one that sent you the e-mail?

15   A.    Correct, but it was at the urging of Davina.

16   Q.    Yeah, but Lauren wrote the e-mail, correct?

17   A.    Yes.

18   Q.    I'd like to show you next Exhibit 913, please.  Actually,

19   wait a minute.

10:50 20         If we could -- okay.  Actually, can we go back to

21   9621.

22         MR. KENDALL:  I apologize, your Honor.

23   Q.    If we can go to the area just above this section and a

24   little bit before that, why don't we start at the top of the

25   e-mail.  Actually, that might be more organized.

1          MR. KENDALL:  I apologize for the delay, your Honor.

2    Q.   We can see here what Lauren writes to you, after the

3    advice you gave her, "yes, this is great.  Can you just add on

4    to gamma phi beta sisterhood chair that I am also external

5    social chair and for sisterhood you can add that I coordinate

6    trips to locations and plan itineraries for 300 plus girls and

7    for the social chair I create relations among different

8    sororities and fraternities to work with them to plan social

9    events and philanthropy/charity events".

10:51 10          Does that sound like event management to you?

11   A.   Yes.

12   Q.   Okay.  And then below that we see she's responding to an

13   e-mail from you.  "Hey Lauren - your updated Cover Letter and

14   CV are attached.  Let me know what you think".

15          So you actually helped her write all of this,

16   correct?

17   A.   Davina and I actually worked on her resume I think it was

18   sometime before this, so I had an original copy on hand.

19   Q.   Now if we can switch over to a different document, Exhibit

10:52 20   916, please.  I mean 913.  I'm sorry.  913.

21          MS. KEARNEY:  Do you have a copy?

22          MR. KENDALL:  Let's see if I do.

23   Q.   Do you recognize 913 as an e-mail that Mr. Singer sent?

24   A.   Yes.

25   Q.   Do you remember who Nicholaus Johnson is?

```
 1   A.   No, I don't.

 2   Q.   Okay.

 3   A.   And I'm also not on this e-mail I don't think.

 4   Q.   Okay, but it's at a time you were working there, correct?

 5   A.   Correct.  I had been there for 3 months.

 6        MR. KENDALL:  Okay.  I'd like to offer this into

 7   evidence, your Honor.

 8        MS. KEARNEY:  Objection, your Honor.  As the witness

 9   noted, she's not even on this e-mail.

10        THE COURT:  Sustained.

11   Q.   Okay.  If we could -- okay.  Were you involved at all with

12   Mr. Singer doing a presentation at Starbucks in 2018?

13   A.   No.  I was aware he was giving the presentation and I

14   have -- there's a recording of that presentation which I have

15   seen since, probably 2019 or 2020.

16   Q.   Okay.  And did you discuss with him -- without getting

17   into what he said, did you discuss with him the details of him

18   making that presentation?  You knew he was doing it.  That's my

19   point.

20   A.   Correct.

21   Q.   At the time that he did it, did you know he was doing it?

22   A.   Correct.

23   Q.   Okay.  Did you have any role in helping him book his plane

24   tickets or put together any of the logistics?

25   A.   No.  As I mentioned, when it comes to my role as an
```

```
 1   assistant, I think those are things that are more so common

 2   with traditional personal assistants, and I didn't do things

 3   like book his travel or, to my knowledge, prepare -- help him

 4   prepare for that.

 5   Q.   But you reviewed that speech, correct?

 6        MS. KEARNEY:  Objection, your Honor.

 7   Q.   You reviewed the video?

 8        MR. KENDALL:  She just testified to it.

 9        MS. KEARNEY:  She just reviewed the video in 2019 or

10   2020.

11        THE COURT:  That's not what she said.  Ask another

12   question.

13   Q.   Okay.  When did you review the video?

14   A.   At some point after March 12th of 2019.

15        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

16   Exhibit 8115, a very short excerpt from the video.

17        MS. KEARNEY:  Objection, your Honor.  Hearsay, beyond

18   the scope and relevance.

19        THE COURT:  Sustained.

20        MR. KENDALL:  If I may have one moment to check my

21   notes, your Honor.

22        THE COURT:  Yes.

23        MR. KENDALL:  I just need to clean up one thing with

24   one document, your Honor, and then I'm done, a document that's

25   already in evidence.
```

1    9621, if we could have that back up on the screen,

2    please.  If we can go back to the second page of 9621, please,

3    under the April 4, 2018, date.  Yeah.  Right there.  And if we

4    can just highlight again that "Hi Mikaela" paragraph.

5    Q.   We have here Mikaela saying that her counselor wants her

6    to change her resume and cover letter to "embellish upon my

7    interest in event planning", correct?

8    A.   That was actually Lauren talking to me.

9    Q.   Yes.  That's what Lauren said to do.

10:56 10   A.   Well, no.  You said that it was Mikaela telling her.

11   Q.   Oh, she says "Hi Mikaela".  I'm sorry if I misspoke.  I

12   apologize.  "Hi Mikaela".  And then she tells you that's what

13   her intern counselor wants to do is to embellish upon her

14   interest in event planning, correct?

15   A.   That's what Lauren says, correct.

16   Q.   And then there's a back and forth series of e-mails that

17   end with that scripture we just went into about all the

18   specific things she was doing for the phi beta sisterhood and

19   the social chair and the 300 girls with the itineraries,

10:57 20   correct?

21   A.   Correct.

22          MR. KENDALL:  Thank you.  No further questions.

23          THE COURT:  Mr. Kelly.

24              CROSS-EXAMINATION OF MIKAELA SANFORD

25   BY MR. KELLY:

```
 1   Q.   Good morning, Miss Sanford.

 2   A.   Good morning.

 3   Q.   My name is Brian Kelly.  I represent Gamal Abdelaziz.

 4             You've never spoken to me before, have you?

 5   A.   No.

 6   Q.   You've never spoken to Mr. Gamal Abdelaziz before, have

 7   you?

 8   A.   No, well, outside of those e-mails, but we've never spoken

 9   on the phone or exchanged text messages.

10   Q.   Right.  You e-mailed him, but never actually spoke with

11   him, correct?

12   A.   Correct.

13   Q.   Same thing with his daughter Sabrina, correct?  You never

14   spoke with her, just e-mails, right?

15   A.   Correct.

16   Q.   Now the government asked you several questions about a

17   high school girl's college essay, right?

18   A.   Yes.

19   Q.   Was it your experience that teenagers sometimes exaggerate

20   in their college essays, ma'am?

21   A.   I can't actually say either way if they did exaggerate in

22   their essays.

23   Q.   So you worked in college counseling for a long time at The

24   Key, didn't you?

25   A.   For six years.  I actually wasn't hired to be a college
```

```
 1   counselor.  That really wasn't my main role.
 2   Q.   Did you see a lot of essays over the years?
 3   A.   I did, but --
 4   Q.   Don't you think -- did you see any exaggerations in these
 5   college essays, ma'am?
 6   A.   Well, I actually really didn't have any relationships with
 7   the students prior to, you know -- it was rare I had any
 8   interactions with students prior to their senior year and the
 9   application process, so I don't really know much about the
10   students other than what was presented to me, so I can't say if
11   they were exaggerating or not.
12   Q.   Okay.  Now, in this situation, it was Rick Singer, as you
13   saw in those series of e-mails, that was pushing the basketball
14   essay, right?
15   A.   Rick was making suggestions about the content of the
16   essays, correct.
17   Q.   And by the way, do you know when Mr. Abdelaziz finally
18   found out that his daughter was not on a high school basketball
19   team?
20        MS. KEARNEY:  Objection.
21        THE COURT:  Sustained.
22   Q.   Well, do you have any idea of Mr. Abdelaziz's
23   communications with his family members?
24   A.   No.  Outside of those e-mails, no.
25   Q.   And you worked for Rick Singer over 6 years, right?
```

```
 1   A.    Six years and two weeks.
 2   Q.    And he lied a lot to you, didn't he?
 3   A.    I don't know if I can really say what was a lie or what
 4   wasn't.
 5   Q.    Right.  It was very difficult to tell with him, wasn't it?
 6   A.    I wasn't really in Rick's physical space very often so --
 7   Q.    Well, were you occasionally in his physical space speaking
 8   with him?
 9   A.    From time to time, yes.
10   Q.    And he hid a lot of things from you, right?
11   A.    Well, we didn't actually go into -- during the times I was
12   actually around him, we weren't really like having much
13   conversations.  Especially in the later years, I describe it as
14   he blew into the office and I didn't know he was actually
15   around.  He would say, you're good, you got everything you
16   need, yeah, you're the best, bye, see you later, and he was
17   gone.
18   Q.    He was a smooth talker, right?  He was a smooth talker?
19   A.    I wouldn't describe him as that personally.
20   Q.    No?
21   A.    Not from my --
22   Q.    He would say, hi, how are you doing.  That's not being a
23   smooth talker?
24   A.    That's being cordial, in my opinion.
25   Q.    Okay.  Did he hide from you the fact that there was a
```

```
 1    bribery scheme going on, or were you in on that from the

 2    beginning?

 3    A.    Rick never shared with me there was any type of bribery

 4    that was occurring.

 5    Q.    Okay.  So he hid that from you, didn't he?

 6    A.    Yes.

 7    Q.    All right.  And then did he hide from you the fact that

 8    there was all sorts of test cheating going on with some of his

 9    clients?

 10   A.    Rick never disclosed that there was any sort of test

 11   cheating going on.  No, he did not.

 12   Q.    He hid that from you, right?

 13   A.    Yes.

 14   Q.    Are you aware there's no test cheating allegations against

 15   Mr. Abdelaziz?

 16            MS. KEARNEY:  Objection.

 17            THE COURT:  Sustained.

 18   Q.    When you first began working with Mr. Singer, you thought

 19   it was a legitimate job, right?

 20   A.    Yes.

 21   Q.    He hid the fact that it wasn't, correct?

 22   A.    Correct.

 23   Q.    There were, of course, some legitimate college counseling

 24   activities going on, correct?

 25   A.    Yes, there were.
```

**A1733**

```
 1   Q.   And when you first started with him, you didn't think you
 2   were joining some racketeering enterprise, did you?
 3   A.   Absolutely not.
 4   Q.   Your understanding of the situation changed over time,
 5   didn't it?
 6   A.   Can you elaborate?  What do you mean?  Understanding of
 7   what situation?
 8   Q.   The situation with Rick Singer, that's what I'm getting
 9   to.  Your understanding of what he was up to changed over time,
10   didn't it?
11   A.   Specifically what part of the situation?
12   Q.   Well, the more you learned, the less legitimate it seemed
13   to be, right?
14   A.   Well, I described -- I was never aware of anything that
15   was illegal that was happening, nor -- but when I talk about,
16   or when you say legitimate, I think things like lying on a
17   college application or having somebody take classes for
18   somebody else, or -- I mean, those things aren't legitimate.
19   Q.   And you took classes for people, didn't you?
20   A.   Correct.
21   Q.   And you added fake awards to people's common application,
22   didn't you?
23   A.   At the direction of Rick.
24   Q.   At the direction of Mr. Singer, correct?
25   A.   And/or a parent.
```

```
 1    Q.    Okay.  At the direction of Mr. Singer, right?  He told you

 2    to put some of these fake awards on all these applications,

 3    right?

 4    A.    Can you be more -- when you say "all of these."

 5    Q.    Well, actually, how about this?  Didn't you teach other

 6    people how to put fake awards on to these applications?

 7    A.    I wouldn't say that I taught anybody that.

 8    Q.    No?  Do you know a woman named Tatiana Puerta that was

 9    referenced earlier?

11:05 10    A.    Yes, I do.

11    Q.    Didn't you teach her how to put fake awards onto these

12    common applications?

13    A.    I wouldn't say that I taught her how to do that.

14          MR. KELLY:  Okay.  Let me show the witness only

15    Exhibit 132, please.

16    Q.    What's that at the bottom, please?  And then we'll read

17    all the way up.  Okay?  Do you see what it says there?  I'm not

18    asking you to read it out loud.  It's not in evidence yet.

19    A.    Yes.  I see it's an e-mail.

11:06 20    Q.    Okay.  Now let's scroll up.  And then you say something,

21    right?

22    A.    Correct.

23    Q.    And then Tatiana Puerta says something to you, if you

24    could read that, please.

25    A.    "Hi Mikaela" --
```

```
 1              MS. KEARNEY:  Objection.

 2    Q.    No, I'm sorry.  To yourself.  It's not in evidence.  I

 3    have to show it to you before it's in evidence, just

 4    procedurally.  Okay?

 5    A.    Oh.  Okay.

 6    Q.    So just please read that to yourself.

 7    A.    Okay.

 8    Q.    And then slide up, please.  Where you say on November 7th

 9    2014 at 1:03 p.m., can you read that to yourself, please.  And

11:07 10   then read Tatiana's response there.

11              Okay.  Then let's slide up and then read your

12    instructions there on November 10th.

13    A.    Okay.

14    Q.    And read Tatiana's response, please, to yourself.

15    A.    Okay.

16    Q.    Then keep going and you can see the top part and see what

17    you're telling Tatiana, please, in the middle of November 10,

18    2014, at 1:30 p.m.

19    A.    Okay.

11:07 20   Q.    And this whole e-mail is a November 10, 2014, e-mail

21    exchange between you and Tatiana, correct?

22    A.    Correct.

23              MR. KELLY:  I offer it, your Honor.

24              THE COURT:  It will be admitted.

25              (Exhibit 132 admitted into evidence.)
```

**A1736**

```
 1              MR. KELLY:  Now let's put this up for the jury and
 2     start at the bottom, please.
 3     Q.   A person named Nanette Tod is writing to you, "Hi Mikaela,
 4     could you use some awards/honors, do you have anything for
 5     him?"
 6              So she's asking you for some awards/honors for some
 7     male candidate obviously, right?
 8     A.   Correct.
 9     Q.   Slide up, please.  And then you say, "I think this is
11:08 10    something Tatiana will actually be taking care of".
11              And then Tatiana, who had just started recently,
12     right, said to you, "Hi Mikaela, I was hoping to get your help
13     with this.  I wasn't sure what Nanette meant by asking if you
14     had awards/honors for blank.  He doesn't have any... how might
15     you "have" awards for him?  Sorry, feeling a little lost".
16              Please scroll up.
17              Then you write back, "oooohhhhh.... I didn't catch
18     that in the message.  So sometimes Rick has a tendency to
19     embellish the awards and activities for the students utilizing
11:09 20    various programs and titles that The Key has put on in the
21     past.  If you need some ideas or examples as to what Rick has
22     done for his kids let me know".
23              Tatiana responds with "I've never done that or was
24     ever told to do that so I have zero experience about this.
25     Please enlighten me!"
```

```
 1          And then you enlighten her, don't you?  You say,
 2    "Sorry for the delay on this one... must have slipped through
 3    the cracks...", so you say, "so some of the honors/awards that
 4    Rick will enter are", and then you list a series of awards,
 5    right?
 6          You say, "These are all awards and organizations that
 7    fall under The Key and The Key Foundation umbrella.  Let me
 8    know if this helps".
 9          So you're giving her some ideas of fake awards to add
11:10 10   to the student's application, correct?
11    A.   I'm letting her know that -- or I'm giving her some
12    guidance to what Rick had done in the previous year.
13    Q.   Right.  Guidance on how Rick likes to add these fake
14    awards, right?
15    A.   Well --
16    A.   It's a simple question, ma'am.
17    A.   One of the awards is not a fake award.  And then,
18    actually, a few of them were given at the camp in 2013.
19    Q.   Okay.  Let me refine my question.  The award might be
11:10 20   real, but this kid did not earn it, right?
21    A.   That's correct.
22    Q.   So it might be a real award that somebody could earn, but
23    you are adding them to some kid's application even though the
24    kid didn't earn it, right?
25    A.   In this situation, that's true.
```

```
 1    Q.   Then Tatiana says, "ohhh ok.  Got it.  So "blank" is the

 2    son of the CEO of some bank -- how many can I put in there?"

 3    What do you tell her?

 4              You say "I think 3 or 4 honors/awards would suffice".

 5              So this exhibit shows you, in fact, taught Tatiana

 6    how to do it, right?

 7    A.   In this specific instance, correct.

 8    Q.   Before you came here today you never met me, right?

 9    A.   No.

10    Q.   You met with the government team, right?

11    A.   Yes.

12    Q.   Did they show you this exhibit?

13    A.   Yes.

14    Q.   They didn't ask you about this one on their direct, did

15    they?

16    A.   No.

17    Q.   Okay.  And how long did you spend with the government

18    preparing for this testimony?

19    A.   I believe five or six meetings.

20    Q.   Okay.  And how long typically were the meetings?

21    A.   Several hours.

22    Q.   Five, six meetings, several hours, right?

23    A.   Correct.

24    Q.   Did they show you a lot more e-mails than they've asked

25    you about here today?
```

```
 1    A.   Not as they pertain to -- not as it pertains to any

 2    individuals in the room.

 3    Q.   Okay.  Well, let's look at --

 4         THE COURT:  We're going to take the morning recess at

 5    this stage.

 6         You may step down for the time being, Miss Sanford.

 7         We're going to be in recess for 15 minutes, jurors.

 8         (Jury exits.)

 9         THE COURT:  Be seated, counsel.  How much more on

11:13 10    cross, Mr. Kelly?

11         MR. KELLY:  I can keep it under an hour, your Honor.

12         THE COURT:  Okay.  And then if we get beyond this

13    witness, who will be the next witness?

14         MR. FRANK:  Rebecca Chassin, your Honor.

15         THE COURT:  All right.  Anything that needs to come to

16    the Court's attention before we recess this morning?

17         MR. KENDALL:  One small thing, your Honor.  As you

18    know, we may -- we're planning to recall this witness in our

19    case.  When she's finished, can you just remind her that she's

11:14 20    still in the subpoena and she may need to return?

21         THE COURT:  Yes.

22         MR. KENDALL:  Okay.  Thank you.  We've served her with

23    our own subpoena.

24         THE COURT:  You may need to remind me again at that

25    stage.
```

```
 1            MR. KENDALL:  I'll pop up like a Jack in the box, your

 2      Honor.

 3            THE COURT:  We're in recess.

 4            (Recess taken 11:14 a.m. to 11:34 a.m.)

 5            THE CLERK:  All rise for the jury.

 6            (Jury enters.)

 7            THE CLERK:  Thank you.  You may be seated.

 8            THE COURT:  Good morning, jurors, we're ready to

 9      continue.

10            Ms. Sanford, you're reminded that you remain under

11      oath.

12            And, Mr. Kelly, you may continue with

13      cross-examination.

14            MR. KELLY:  Yes.  Thank you, your Honor.

15      BY MR. KELLY:

16      Q.   Good afternoon.  Good morning again, Ms. Sanford.

17            I think at the break I had asked you some questions

18      pertaining to e-mails that you've seen and haven't seen.  Do

19      you remember those questions?

20      A.   Yes.

21      Q.   All right.  And you had indicated that you met with the

22      government team five or six times to prepare for your

23      testimony, correct?

24      A.   Correct.

25      Q.   And your meetings lasted, did you say three hours or two
```

```
 1  hours?  I honestly don't recall what you said.

 2  A.   I said "several."

 3  Q.   All right.  So let's take the low end of several and call

 4  it three, and let's take the low end of meetings and call it

 5  five.  So that would be 15 hours you spent with the government

 6  to prepare for your testimony today, correct?

 7  A.   Correct.

 8  Q.   All right.  And you were shown lots of e-mails by them in

 9  the course of that preparation, correct?

11:36 10  A.   Well, it depends on what you mean by "lots."  Like --

11  Q.   How about this:  You were shown more e-mails by them than

12  they put into evidence here today, correct?

13  A.   I don't know, I guess, exactly what was put into evidence

14  today or what classifies as what's been put into evidence

15  today.

16  Q.   Were you shown more e-mails than the ones you were shown

17  today by the government?

18  A.   Yes.

19  Q.   Okay.  And let me bring up Exhibit 458 in evidence,

11:36 20  please.

21       Let's start at the bottom where Mr. Gamal Abdelaziz

22  says, "I haven't been copied on your correspondence with

23  Sabrina lately."

24       Do you see that?

25  A.   Yes.
```

```
 1    Q.   You, of course, have no idea about his work schedule,
 2    right?
 3    A.   No.
 4    Q.   Let's scroll up a bit, and where -- you were asked about
 5    your statement on January 6th.
 6              MR. KELLY:  I think you have to keep going up,
 7    Mr. Carter.  Okay.
 8    Q.   You were asked, "I have to confirm a few things with Rick
 9    before I can submit."
10              Do you remember the prosecutor asked you what that
11    meant?
12    A.   Yes.
13    Q.   And you remember you said, "That I don't remember."
14    A.   Correct.
15    Q.   And you remembered a lot more about these e-mails, but
16    that you don't remember, correct?
17    A.   Correct.
18    Q.   And prior to coming here today in your 15 hours or so of
19    preparation with the government, did you tell them, I don't
20    remember what I meant when I said, "I have to confirm a few
21    things with Rick before I can submit"?  Did you tell that to
22    the government?
23    A.   I believe -- I'm not sure if I used those exact words, but
24    I'm pretty sure that I've maintained the same stance on that
25    specific piece of information this entire time.
```

```
 1    Q.   Okay.  And when you indicated that to the government at

 2    some point in these 15 hours, did they show you any documents

 3    to refresh your recollection as to what that possibly could

 4    mean?

 5              MS. KEARNEY:  Objection.

 6              THE COURT:  I don't understand the question.

 7              Sustained.

 8    BY MR. KELLY:

 9    Q.   Well, when you indicated to the government that you

11:39 10    couldn't remember this, did they show you any more e-mails to

11    perhaps refresh your memory as to what this meant?

12              MS. KEARNEY:  Objection.

13              THE COURT:  Grounds?

14              MS. KEARNEY:  Relevance.

15              THE COURT:  Sorry?

16              MS. KEARNEY:  Relevance.

17              MR. KELLY:  It's cross-examination, impeachment,

18    Judge.

19              THE COURT:  He can have that question if she

11:39 20    understands it.

21              THE WITNESS:  Can you repeat the question?

22    BY MR. KELLY:

23    Q.   Sure.  You've testified that you don't remember what that

24    meant, "I have to confirm a few things with Rick before I can

25    submit."  I think you just testified that you indicated to the
```

1    government in your prep sessions that you maintained the same

2    position with them, that you didn't remember what that meant.

3    A.    Correct.

4    Q.    Okay.  And when you indicated to the government in these

5    prep sessions that you don't remember what this means, did they

6    show you anything to try to refresh your memory?

7    A.    No.

8    Q.    Okay.  So if there were four or five e-mails directly on

9    point to this, those weren't shown to you before you came here

11:40 10    today, correct?

11          MS. KEARNEY:  Objection.

12          THE COURT:  Overruled, if she understands the

13    question.

14    A.    I don't even know if those four or five e-mails actually

15    exist.

16    Q.    Right.  You weren't shown them, were you?

17    A.    I don't know if they exist.

18    Q.    Okay.  Well, let me show you one of them.

19          Well, but before I do, note where it says, "I have to

11:40 20    confirm a few things with Rick before I can submit."

21          And that -- okay.

22          Let's go to 1540 just for the witness, please.

23          Didn't you ask Rick Singer for an athletic profile for

24    Sabrina?

25    A.    I don't know if it's what profile is being referred to in

```
 1   this e-mail.  There's no -- it just says "profile."  There's no
 2   elaboration.
 3   Q.   And is it from you to Rick Singer on January 5th?
 4   A.   Yes.
 5        MR. KELLY:  We'd offer this, your Honor.
 6        MS. KEARNEY:  Objection, your Honor.  It can be used
 7   to refresh the witness' recollection, otherwise it's hearsay.
 8        THE COURT:  Yeah, I don't see how this is admissible,
 9   but it certainly can be used to refresh her memory.
10   BY MR. KELLY:
11   Q.   Okay.  Well, did you on many occasions ask for an athletic
12   profile from Rick Singer?
13   A.   No, I never asked for a profile -- or an athletic profile
14   from Rick Singer.
15   Q.   No?  Well, after this e-mail, let me show you 1541,
16   please.
17        Is this from Mr. Singer to you?
18   A.   Yes.
19   Q.   This is also on January 5th and it says -- well, you can
20   read what it says.
21   A.   Yes.
22   Q.   Does this refresh your memory as to whether he sent you
23   anything regarding a profile for Sabrina?
24   A.   No.
25   Q.   You've never seen this before?
```

**A1746**

```
 1   A.   Well, I don't -- I mean, it's an e-mail that's clearly
 2   sent -- or it was an e-mail that was clearly sent to me, but I
 3   don't have any recollection of this e-mail.
 4   Q.   All right.  Do you think you were never shown this before
 5   by the government before you got here today?
 6   A.   I have not seen this before -- I mean, since, I guess,
 7   January 5th of 2018.
 8   Q.   Okay.  How about -- let me show you Exhibit 1254.
 9        That's another e-mail from Singer to you, correct?
10   A.   Yes.
11   Q.   And you know who Laura Janke is, right?
12   A.   I have heard of her, yes.
13   Q.   And does this refresh your recollection as to whether
14   Singer sent you an athletic profile regarding Sabrina?
15        (Pause.)
16   A.   Yes.
17   Q.   Okay.  So it does refresh your recollection?
18        MR. KELLY:  I offer this one, your Honor.
19        MS. KEARNEY:  Objection, hearsay.
20        THE COURT:  Just because it refreshes her memory
21   doesn't make it admissible.  It's not going to be admitted.
22   BY MR. KELLY:
23   Q.   Well, on this particular document it refreshes your memory
24   that Singer sent you something pertaining to Sabrina Abdelziz
25   at your request, right?
```

```
 1   A.    That's what the e-mail said but I don't recall, like

 2   any -- I don't recall any of these things actually happening at

 3   the time.

 4   Q.    Okay.  Do you see where it says, "Let me know" -- the

 5   message is from Janke talking about awards to her profile?  Do

 6   you see that?

 7   A.    That -- that was correct, that was an e-mail that Laura

 8   Janke sent to Rick.

 9   Q.    So you don't remember whether or not this had to do with

10   Sabrina's Common App application with awards that were added?

11   A.    No, because I'm not seeing that mentioned in detail in the

12   actual e-mail exchange.

13   Q.    Okay.  Let's show you Exhibit 1255.

14         Do you see this e-mail?

15   A.    Yes.

16   Q.    After receiving an e-mail from Singer, are you advising

17   him that you intend to update Sabrina's app and thanking him?

18         MS. KEARNEY:  Objection.  Is this being used to --

19         THE COURT:  Sustained.

20   BY MR. KELLY:

21   Q.    Well, do you see that e-mail?

22         Is it from you to Singer?

23   A.    Yes.

24   Q.    Does it refresh your memory as to whether or not you

25   ever -- you ever updated Sabrina's application and then
```

1  submitted it with information provided by Singer?

2  A.   In the e-mail I responded and said that.

3  Q.   All right.  So you did add information to Sabrina's Common

4  Application, correct?

5  A.   According to the e-mail string, that's what that says.

6  Q.   And the information you added to Sabrina's application

7  pertained to sports, right?

8  A.   I'm not a hundred percent sure what I even added from --

9  or added to her application.

11:46 10  Q.   But whatever you added, you got it from Singer, right?

11  A.   It would have come from -- or -- I can't say -- I can't

12  say what I added to her actual application.

13  Q.   I'm not asking you what you actually added.  The basis of

14  your information, based on things I've just shown you, was you

15  got information from Singer and you added to people's

16  applications like Sabrina, right?

17  A.   I can't say in this instance what I added or if I actually

18  added the information to the application.

19  Q.   Okay.  Well, let's look at what I'll call 463A.

11:46 20       Now, this is a subset excerpt of a document that's

21  already in evidence.

22       You see how this is the USC application for Sabrina

23  Abdelaziz?

24       MS. KEARNEY:  Your Honor, I object to using this

25  version of the document.  There's a lot of --

```
 1              MR. KELLY:  The document's in evidence.
 2              MS. KEARNEY:  463 is the unredacted document that's in
 3       evidence.  This is a redacted excerpt.
 4              THE COURT:  What's your purpose here, Mr. Kelly?
 5              MR. KELLY:  I'm going to move to the second page very
 6       quickly.  It's an excerpt of a document that's already in
 7       evidence.
 8              THE COURT:  Why don't you use the document that's in
 9       evidence?
11:47 10        MR. KELLY:  Because it's about 75 pages and this is
11       two, so I just want to ask about one page.
12              THE COURT:  All right, go ahead.
13              MR. KELLY:  And I offer it.
14              THE COURT:  In its redacted version?
15              MR. KELLY:  Yes, your Honor.
16              THE COURT:  It will be admitted, 463A.  It is a
17       redacted version of 463 reduced to two pages, right?
18              MR. KELLY:  Yes, your Honor.
19              THE COURT:  All right.
11:47 20        (Exhibit 463A received into evidence.)
21       BY MR. KELLY:
22       Q.   So I think you said a moment ago you don't remember what
23       it is you may have added to Sabrina's application, correct?
24       A.   Correct, or if I added anything to the application at all.
25       Q.   You think somebody else did besides you?
```

**A1750**

```
     1   A.   I can't say either way.

     2   Q.   All right.  But that's one of the things you often did as

     3   part of your job with Singer's group, correct?

     4   A.   Can you clarify your question, please?

     5   Q.   Yes.  You often added not fake awards but awards that

     6   people didn't earn to your applications, correct?

     7   A.   No.

     8   Q.   Well, you did --

     9   A.   I'm sorry.

11:48 10  Q.   Did you ever add awards to people's Common Application?

    11   A.   I did at times, but that wasn't, like, the default.

    12   Q.   Okay.  Fair enough.  I'm not saying you did it every day.

    13   But I'm just saying you did it at times and you did it at the

    14   direction of Rick Singer, correct?

    15   A.   Correct.

    16   Q.   All right.  And on this particular exhibit, I want to

    17   direct your attention to a couple of these awards.  Where it

    18   says under "activities" and it lists 11 and 12, starting point

    19   guard up top.

11:49 20       You put that in, didn't you?

    21   A.   I don't know if I put that in there.  I can't say either

    22   way if I did or if I didn't.

    23   Q.   How about down below where it says "awarded academy MVP"?

    24       You put that into Sabrina's application, didn't you?

    25   A.   I can't say what I -- what or if I entered anything into
```

1  Sabrina's application, or, I'm sorry, her application.

2  Q.   But until a few moments ago you hadn't had a time review

3  those four e-mails I just showed you that you couldn't

4  remember, right?

5  A.   Correct.

6  Q.   Okay.  So in the 15 hours that you had to prepare with the

7  government, those weren't shown to you, were they?

8  A.   I had not seen -- or I hadn't seen those since, I guess,

9  January of 2018.

11:50 10  Q.   Right.  And for someone like yourself coming to federal

11  court, it might be helpful to see things in advance so it could

12  jog your memory, correct?

13        MS. KEARNEY:  Objection.

14        THE COURT:  Overruled.

15        THE WITNESS:  Can you repeat the question, please?

16  BY MR. KELLY:

17  Q.   Sure.  For someone like yourself who is coming to federal

18  court to testify, it might be helpful to show you documents in

19  advance so your memory can be refreshed, correct?

11:50 20  A.   It would be nice to be fully prepared for today.

21  Q.   Yes, yes.

22        And in the 150 hours of your preparation, you don't

23  recall seeing these communications between you and Singer, do

24  you recall?

25  A.   No, I don't recall.

```
 1   Q.   Okay.
 2           MR. KELLY:  Just one moment.
 3           (Pause.)
 4   Q.   And you've never testified in federal court before, have
 5   you?
 6   A.   No, I've never testified in court ever.
 7   Q.   All right.  I'm going to move to a new topic here, all
 8   right?
 9           Let's talk about this:  It's the government who chose
11:51 10  to charge you with a racketeering conspiracy, right?
11   A.   Correct, the government charged me with conspiracy to
12   commit racketeering.
13   Q.   Right.  And are you aware that's not a charge in this
14   case?
15   A.   Yes, I'm aware.
16   Q.   Okay.  And when you pled guilty, it was in front of a
17   different judge, correct?
18   A.   Correct.
19   Q.   Not Judge Gorton, a different judge.
11:52 20  A.   Right.
21   Q.   And it gets explained to you what the maximum penalties
22   for being a racketeer in a conspiracy that violates the RICO
23   statute, it's a 20-year maximum, right?
24   A.   Correct, that's my understanding of the maximum sentence.
25   Q.   And then there are what's called sentencing guidelines
```

1    that are calculated using all sorts of data and a range is the

2    end result that advises the court as to what the guideline

3    range is, correct?

4    A.    Yes, I have seen those guidelines.

5    Q.    Okay.  And in your situation, the guideline range is

6    approximately 15 to 21 months in prison, right?

7    A.    Correct.

8    Q.    And was it part of your plea agreement that the government

9    would recommend the low end, 15 months of prison, if you did

11:53 10    not cooperate with them?

11    A.    I can't -- can you ask the question again?

12    Q.    Sure.

13         Did the government in its plea agreement say they

14    would recommend incarceration at the low end of the guideline

15    sentencing range?

16         Let me just -- I'll put it up real quickly, okay?

17    A.    Okay.

18    Q.    Let's put up Exhibit 680, please.  And go to page 2.

19         And I'd just like to direct your attention, ma'am,

11:54 20    where it says in section 4(a), "The U.S. Attorney agrees to

21    recommend the following sending to the court: incarceration at

22    the low end of the guideline sentencing range."

23         Do you see that there in 4(a)?

24    A.    Yes.

25    Q.    And it was your understanding that the guidelines were

     1    approximately 15 to 21 months, right?

     2    A.   Correct.

     3    Q.   And the federal judge involved can do whatever he or she

     4    wants, these are advisory?

     5    A.   Correct, the judge ultimately decides the sentence.

     6    Q.   Right.  And whether or not -- there's -- are you aware

     7    that a motion can be filed with your judge saying that you have

     8    provided substantial assistance to the government, and,

     9    therefore, your sentence should be as low as zero?  Are you

11:55 10   aware of that?

    11    A.   I've never heard it described in I guess -- in relation to

    12    a motion, but I know -- or I've been told -- or the terms that

    13    have been used have been a recommendation.

    14    Q.   Okay.  So let me show you Exhibit 681, page 2, section 2,

    15    please.

    16         Could I direct your attention to the first --

    17    actually, this first paragraph.

    18         Now, this is your cooperation agreement separate from

    19    your plea agreement.  Do you follow me with that?

11:55 20   A.   Yes.

    21    Q.   Okay.  So under the plea agreement, you're looking at the

    22    low end of the guidelines unless you cooperate, correct?

    23         Here we're talking about a substantial assistance

    24    motion that can be made by the government, right?

    25    A.   Correct.

```
 1   Q.   And do you see the beginning of the second paragraph where

 2   it says, "The determination whether defendant has provided

 3   substantial assistance rests solely in the discretion of the

 4   U.S. Attorney and is not subject to appeal or review."  Isn't

 5   that what it says?

 6   A.   Yes, that's what it says.

 7   Q.   So whether to file the motion is solely dependent upon the

 8   government's discretion that's not subject to appeal or review,

 9   correct?

11:56 10  A.   Correct.

11   Q.   The judge, of course, can do whatever he or she wants at

12   the time of the sentencing, correct?

13   A.   Yes, that's my understanding.

14   Q.   Let's move to Mr. Singer, briefly.

15        Now, Mr. Singer had a fairly impressive bio, didn't

16   he?

17   A.   Is there a specific -- or are you referring -- can you

18   clarify what you mean?

19   Q.   Do you recall that on occasion you would send his

11:57 20  so-called bio around to different companies?

21   A.   I don't believe I ever sent it to a company.

22   Q.   Okay.  Let me show you -- let me ask you this.  Back in

23   December of 2015, would Singer claim that he had all these

24   impressive clients, like Steve Jobs, the CEO of Apple, or Joe

25   Montana, the hall of fame quarterback?  Do you recall Singer
```

| | |
|---|---|
| 1 | making claims like that? |
| 2 | A.   That's not something that Rick ever said or stated to me. |
| 3 | Q.   Okay.  Let me show you, if I could, please, Exhibit 1555, |
| 4 | just the witness. |
| 5 | I'd like to -- well, why don't you just take a look at |
| 6 | the first part, see you're forwarding something here, correct? |
| 7 | A.   Correct. |
| 8 | Q.   Okay.  And then let's move to the second page. |
| 9 | Okay.  Now let's move to the third page. |

11:59
10   And let's go, if we can, this is just for the witness,

11   see if I can refresh your recollection --

12   MS. KEARNEY:  I just want to clarify, I don't know

13   that the witness received the third page.

14   BY MR. KELLY:

15   Q.   Is the third page in front you, ma'am?

16   A.   Well, I guess what's on the third page -- or can you tell

17   me --

18   Q.   Does it say "with best selling author"?

19   A.   Yes.

11:59 20   Q.   So you've received it, right, it's right there?

21   MS. KEARNEY:  Objection.  The witness is not on the

22   top e-mail of this chain where that was attached.

23   THE COURT:  Show her the address.

24   MR. KELLY:  Okay.  It's from you to some fellow named

25   Joe Margolis.

```
 1          MS. KEARNEY:  The very top of the chain where the
 2    attachments are, this witness is not on it.
 3    MR. KELLY:
 4    Q.   Well, hold on now, what does that attachment say?  Doesn't
 5    it say Rick's newest bio.docx?  Isn't that what that says?
 6    A.   Yes but --
 7    Q.   Okay, let me slide down.
 8          MS. KEARNEY:  Can the witness finish the answer?
 9          MR. KELLY:  I asked her:  "Doesn't it say Rick's new
12:00 10    bio?"  She said, "Yes."  She answered the question.
11          MS. KEARNEY:  It sounded like she was going to say
12    more, Judge.
13          MR. KELLY:  They can redirect, Judge.
14          THE COURT:  Yes.
15          MR. KELLY:  Keep sliding down, please.
16          MS. KEARNEY:  Your Honor, I don't think Mr. Kelly has
17    established that this witness is on the top e-mail of the chain
18    which has the attachments.
19          MR. KELLY:  I object to the continuing objections
12:00 20    while I'm doing cross.  They get a chance to do cross.
21          THE COURT:  The objection is that she didn't receive
22    this at all, and now you're implying that she did.
23          MR. KELLY:  Well, I'm using it to refresh her
24    recollection, which I believe I can use to refresh her
25    recollection as to anything, and I'm going to get to the
```

```
 1   question quickly.
 2          THE COURT:  You can refresh her memory but that
 3   doesn't -- go ahead.
 4          MR. KELLY:  Yes.
 5   BY MR. KELLY:
 6   Q.   Let's go to the middle of this document with a series of
 7   names.  The second one down.  Do you see that name?
 8   A.   Yes.
 9   Q.   Okay.  And then within that list of names, let's look at
12:01 10   the second from the bottom.  All right.
11          Now, having seen that, does that refresh your
12   recollection as to whether or not Mr. Singer would sometimes
13   tell people that he had all these fancy clients like Joe
14   Montana and Steve Jobs?
15   A.   He's included that information in his bio.
16   Q.   Okay.  But is that something you would have seen on
17   occasion when you saw his bio?
18          MS. KEARNEY:  Can we take the exhibit down?
19          THE COURT:  Take the exhibit down.
12:01 20   BY MR. KELLY:
21   Q.   Do you recall in his bio he had all this -- these
22   important clients that he would list?
23   A.   Well, specifically this e-mail was from 2015, so I don't
24   actually even recall seeing this document -- or, you know, in
25   the flesh.
```

```
 1   Q.   Okay.  Did you on occasion see some bios that Mr. Singer
 2   would send around?
 3   A.   He had a -- there was a flier that he would use when he
 4   had a speaking engagement.
 5   Q.   Okay.  And --
 6   A.   But --
 7   Q.   And would those sometimes list his credentials?
 8   A.   I actually don't recall, like, what details were in that.
 9   Q.   Okay.  Let me show you, please -- let me ask you this:
10   Getting off the bio issue for a moment, he sometimes made
11   presentations to big, important companies right?
12   A.   I know he made presentations, but I can't really speak on
13   if they were big, important companies.
14   Q.   Okay.  How about -- have you heard of a company called --
15   a financial company called Oppenheimer funds?
16   A.   I've heard the name, but I'm not familiar with, like, what
17   they do or anything beyond that.
18   Q.   Okay.  Do you remember that he gave a -- Rick Singer gave
19   a presentation to them while were you working there?
20   A.   No, I don't recall that.
21   Q.   All right.  Let me show you Exhibit 1560.
22        And do you see at the top the various names on this
23   e-mail trail?
24   A.   Yes.
25   Q.   And do you see what it's about?
```

12:02 (lines 10)
12:03 (line 20)

```
 1              Just read it to yourself.
 2    A.   Yes.
 3    Q.   Okay.  Now having seen that, does it refresh your
 4    recollection as to whether or not Singer ever made a
 5    presentation to Oppenheimer company?
 6    A.   Well, I mean, based on the e-mail --
 7              MS. KEARNEY:  Objection, your Honor.
 8    BY MR. KELLY:
 9    Q.   I'm asking for your independent memory having seen this
10    document.  Does this document refresh your memory at all?
11    A.   No.  I wasn't privy or present -- I was never present when
12    Rick gave a speech or gave a talk or anything along those
13    lines.
14    Q.   Fair enough.  But you're on this e-mail and it doesn't
15    refresh your recollection as to what it was about; is that your
16    testimony?
17              MS. KEARNEY:  Can we take the exhibit down, your
18    Honor?
19              THE COURT:  Take the document down.
20    BY MR. KELLY:
21    Q.   How about this, let me ask you this.  You never saw that
22    document before?
23    A.   I was on the e-mail, so I saw it, I've seen it before.
24    Q.   Good point.  So you saw it at some point but you have no
25    memory of it now?
```

```
 1    A.    Correct.

 2    Q.    And in your 15 hours of preparation with the government,

 3    you don't recall them showing you that one, do you?

 4    A.    I have not seen that e-mail since, I guess, January of

 5    2014.

 6    Q.    Okay.  Do you remember sending a bio of Rick Singer to

 7    Starbucks in April of 2018?

 8    A.    No.

 9    Q.    Let me show you Exhibit 1554, just the witness, please.

12:05 10          Please just take a look at who's it from, who's it

11    sent to, and what the companies that it's sent to and who's

12    being cc'd and what the subject is and what the attachment is

13    all about.

14          Okay.  Now, taking a moment to having just reviewed

15    that, does it refresh your memory at all as to whether or not

16    Mr. Singer made a big presentation to Starbucks at some point?

17    A.    Oh, I've never doubted or I don't think I've ever

18    testified that I wasn't aware that he made --

19    Q.    Okay.

12:06 20    A.    -- or made -- or had a speech at Starbucks.  I was aware

21    of that.

22    Q.    And you are aware that beforehand you sent his bio to

23    Starbucks?

24    A.    I couldn't recall that before a few seconds ago.

25    Q.    But having seen that now you remember you sent a bio of
```

```
 1   Mr. Singer to Starbucks, correct?

 2   A.   Correct, but I don't know what the untitled attachment is

 3   that's also there.

 4   Q.   Let's show that, too.  Please put 1554 back up.

 5         So you do remember sending this to Starbucks regarding

 6   Mr. Singer's bio, correct?

 7   A.   Well, I mean -- I don't remember from 2018, but I can see

 8   in front of my face that I e-mailed Starbucks and cc'd Rick and

 9   included his bio in there.

10   Q.   So let's go to page 2 of this.  And the third line about

11   how many U.S. cities and how many foreign countries he's

12   working in.  Does that refresh your recollection of what the

13   sort of things he would say on his bio?

14   A.   That he would say in his bio?

15   Q.   Yes.

16   A.   Yes.

17         MR. KELLY:  All right.  I offer this one, your Honor.

18         MS. KEARNEY:  Objection.

19         THE COURT:  Just because it refreshes her memory

20   doesn't make it admissible.  She's testified to it, the

21   document is not admissible.  The objection is sustained.

22   BY MR. KELLY:

23   Q.   Is this consistent with how Singer would present himself

24   to the world?

25   A.   I can't say speak on how Rick presented himself to the
```

```
  1   world because I wasn't present when Rick had conversations with

  2   other people.

  3   Q.   Okay.  Is this consistent from your experience in what

  4   Singer would say in front of you about his expertise?

  5   A.   Rick didn't say things in front of me about his expertise.

  6   Q.   All right.  Do you recall that the Starbuck presentation

  7   actually occurred?

  8   A.   Yes.

  9   Q.   Okay.  And do you recall that you were sent a video link

12:08 10   to the presentation?

 11   A.   Yes.

 12   Q.   And did you watch it?

 13   A.   Yes, I actually testified earlier that I watched it at

 14   some point in, like, 2019 or 2020, after March 12th of 2019.

 15   Q.   Okay.  I'm going to show you -- well, actually, I need to

 16   give the witness some -- just the witness only, some earphones

 17   so she can both see and hear this exhibit before I move for its

 18   admission.

 19           MR. KELLY:  Don't play it out loud, its to be played

12:09 20   to her with her headphones before I move for admission of it.

 21           THE COURT:  I don't understand the purpose.

 22           MR. KELLY:  She just testified, your Honor, that she

 23   saw this exhibit.

 24           THE COURT:  Let me see counsel at sidebar.

 25           *** Beginning of sidebar on the record.  ***
```

```
 1              THE COURT:  Mr. Kelly.

 2              MR. KELLY:  Yes, your Honor.  So she has reviewed this

 3    video.  The video can be used in multiple ways that make it

 4    admissible in the federal rules of evidence.  For instance,

 5    806.

 6              I'm entitled to attack the character of Rick Singer.

 7    Identities ray video of Singer, she's seen it, I'm entitled to

 8    put it in in my defense.  I'm entitled to make a defense.  And

 9    there's no question she's seen it, she saw it.

12:10 10          It's relevant to this case because it goes to Singer's

11    state of mind.  This is how Singer presents himself to the

12    world.  He's a skilled con man, and a jury is entitled to hear

13    it.  With respect, I seek its admission.

14              MR. KENDALL:  If I may add, your Honor, I think the

15    most compelling issue is 803.  They're going to put on numerous

16    statements of Mr. Singer on the tape, his co-conspirator

17    hearsay, his e-mails.  We get to impeach Mr. Singer on 806 for

18    all the statements they have put in and they're going to put in

19    for the rest of the government case.  Thank you.

12:10 20          MS. KEARNEY:  Your Honor, the witness has testified

21    that she saw the video after her arrest in this case.

22              In terms of related 803, there's not a specific

23    statement that they're trying to impeach Mr. Singer on.

24    They're trying to just introduce evidence that's beyond the

25    scope of her direct, and that is not going to be suitable for
```

1    impeachment of this witness.

2        MR. FRANK:  If I could just amplify now, Judge, under

3    806 there has to be a specific statement that they're trying to

4    impeach.  There is no specific statement.  They're just using

5    general character evidence on a different occasion before a

6    general audience that no witness in this case has seen during

7    the pendency of the conspiracy.

8        The only time this witness ever saw this video was

9    after she was arrested and indicted.  We have no evidence that

12:11 10   their clients ever saw the video or ever had any impact on

11   their state of mind.

12       And also, Mr. Singer's statements to an audience at

13   Starbucks doesn't say anything about his state of mind, just

14   what he said on a different occasion.

15       MR. KENDALL:  Your Honor, if I may address

16   specifically the issues they raised.  They're going to put in

17   all the tape recordings made of Mr. Singer at the direction of

18   the government.  This directly impeaches those recordings,

19   including, I think it's the October 5th or 15th and the whole

12:12 20   series.  So it's impeaching directly statements of Mr. Singer.

21       Second, your Honor, it is also relevant to, as

22   Mr. Kelly said, it shows Singer's state of mind that the side

23   door by itself is not illegal.

24       Remember all of the impeachment that Mr. Frank was

25   trying to offer, it's a contribution, it's a payment, a payment

```
 1    is a bribe, trying to put in all these things that Mr. Singer

 2    said.

 3              This directly refutes that.  It shows that Singer's

 4    state of mind was that he wasn't entering into a conspiracy

 5    when he wanted to do a side door with my client.

 6              They're trying to say a side door is a conspiracy.

 7    This shows it's not.

 8              THE COURT:  One last statement from you and one last

 9    statement --

10    MR. KELLY:  One last statement.  Under 806, you're

11    allowed to attack and 806(b) goes to the truthfulness of the

12    side door, so we get to, respectfully, submit it.

13              MR. FRANK:  They still haven't offered a single

14    specific statement that they're trying to impeach more than

15    generically what he said when he was a cooperating witness

16    acting at the direction of the government, and his state of

17    mind there is completely irrelevant.

18              THE COURT:  I'm not going to let you play this before

19    this witness at this time.  This is a major argument that we

20    can have outside the hearing of the jury, but you're not going

21    to play it before this witness or ask her about that particular

22    Starbucks presentation.

23              MR. KENDALL:  We're not looking to challenge the

24    ruling.  She specifically authenticated, so not only relevance,

25    authenticity.
```

```
 1              THE COURT:  I'm not talking about authenticity.
 2              MR. KENDALL:  So if we raise it again with you, it's
 3    not based on authenticity, it's related to relevance.
 4              THE COURT:  You can come back later and we can talk
 5    about it, but you're not going to put it before this witness
 6    and ask her about this Starbucks presentation.  So the
 7    objection is sustained.
 8              MR. KENDALL:  Thank you, your Honor.
 9              *** End of discussion at sidebar. ***
12:14 10         MR. KELLY:  May I proceed, your Honor?
11              THE COURT:  Yes, you may.
12    BY MR. KELLY:
13    Q.   Ms. Sanford, so you do recall there was, in fact, a
14    videotape presentation by Mr. Rick Singer in front of
15    Starbucks, correct?
16    A.   At the Starbucks corporate headquarters, yes.
17    Q.   And you've watched that video yourself, correct?
18    A.   Yes.
19    Q.   Are you aware that Mr. Abdelaziz paid $7,000 to Rick
12:15 20    Singer for college consulting services for Sabrina?
21    A.   No, I'm not aware of that.
22    Q.   Does that sound, based on your experience, like a number
23    that could be likely?
24    A.   That fits within the range of prices that occurred during
25    my time at The Key.
```

```
 1              MR. KELLY:  Let me show just the witness 1558, please.
 2              And let's go to the second page, have the witness read
 3       it to herself, please.
 4       Q.   And look in the middle there, right after it says, "Good
 5       morning."
 6       A.   Okay.
 7       Q.   Does that refresh your memory as to whether Mr. Abdelaziz
 8       paid $7,000 for college consulting services?
 9       A.   I didn't have anything to do with the finances of the
12:16 10       company, so I wouldn't have, like, processed payments --
11       Q.   Sure?
12       A.   -- processed a check or anything like that.
13       Q.   Well, would an individual named Steve Masera have
14       responsibilities for stuff like that?
15       A.   In this e-mail it's Melissa Rail.
16       Q.   If you know, do you know a man named Steve Masera?
17       A.   Yes.
18       Q.   Did he have at some point financial responsibilities for
19       Mr. Singer's operation?
12:16 20       A.   He was the accountant for the office, correct.
21       Q.   Right.  That's not something you did.
22       A.   No.
23       Q.   Do you recall that you are the one who got the receipt for
24       submitting Sabrina Abdelaziz's Common App to USC?
25       A.   Yes.
```

```
 1              MR. KELLY:  Let me show the witness 1256, please.
 2    Q.   And you see -- well, take a second to take a look at it.
 3    A.   Yeah, I see it.
 4    Q.   Okay.  And is this, in fact, the receipt that you received
 5    for submitting her application?
 6    A.   Yes, it is.
 7    Q.   Okay.
 8              MR. KELLY:  I offer Exhibit 1256.
 9              MS. KEARNEY:  No objection.
10              THE COURT:  It will be admitted, 1256.
11              (Exhibit 1256 received into evidence.)
12    BY MR. KELLY:
13    Q.   Now, is this a document you had seen before coming here
14    today?
15    A.   Yes.
16    Q.   All right.  So this is one you were actually shown,
17    correct?
18    A.   Yes.
19    Q.   So, because you were shown it, you could remember it,
20    right?
21    A.   My memory was refreshed and this was confirmed that I had,
22    in fact, submitted the application.
23    Q.   Right.
24              MR. KELLY:  Just a moment, your Honor.
25              THE COURT:  Yes.
```

12:17 appears at line 10. 12:18 appears at line 20.

1          (Pause.)

2     BY MR. KELLY:

3     Q.   You got Sabrina's log in -- excuse me.  You received

4     Sabrina Abdelaziz's Common App login information in November of

5     2017, correct?

6     A.   I had her login information, but I can't confirm when I

7     received it.

8          MR. KELLY:  All right.  Let's show the witness Exhibit

9     1247, please.

12:19 10   Q.   Did you get a moment to read it?

11    A.   Yes.

12    Q.   Having reviewed this, does it refresh your memory that you

13    received Sabrina's Common App login information in November of

14    2017?

15    A.   I'm not actually seeing that reflected in the e-mail that

16    I'm seeing in front of me.

17    Q.   Well, how about where it says --

18         MS. KEARNEY:  Objection.

19    BY MR. KELLY:

12:19 20   Q.   And the second thing I'm asking you to read it to yourself

21    there, in the middle here, when it says, "can I," let's

22    highlight that, please.

23         If you could read that to yourself.

24    A.   Yes, I see that.

25    Q.   So does that refresh your memory that back in November of

|  | |
|---|---|
| 1 | 2017, you received Sabrina's login information for her Common |
| 2 | App account? |
| 3 | A.   No, because I'm not actually seeing that reflected in the |
| 4 | e-mail. |
| 5 | Q.   Well, let's look up above. |
| 6 |         What did you respond? |
| 7 |         MS. KEARNEY:  Objection. |
| 8 |         MR. KELLY:  I'm asking her to read it to herself, I'm |
| 9 | not asking her to read it out loud, see how you refresh your |
| 12:20 10 | memory here. |
| 11 | A.   Correct, I see what's in the e-mail. |
| 12 | Q.   Okay.  Now having seen that, does that refresh your memory |
| 13 | that you asked for Sabrina's login information on the Common |
| 14 | App? |
| 15 | A.   I don't think that's what you asked before, but, yes, I |
| 16 | did ask her to send that information to me. |
| 17 | Q.   Okay.  And you got that login information, didn't you? |
| 18 | A.   That's not reflected in this e-mail. |
| 19 | Q.   Well, I'm not asking you about the e-mail.  You got the |
| 12:21 20 | login information from Sabrina, didn't you? |
| 21 | A.   I got the login information at some point. |
| 22 | Q.   Right.  Because there's a receipt in your name for her |
| 23 | application, correct? |
| 24 | A.   Correct. |
| 25 | Q.   And you submitted her application after getting false |

```
 1  awards for her from Rick Singer, correct?
 2  A.   I don't know what I got from Rick or if I got anything
 3  from Rick that was actually added to her application.
 4  Q.   Because I showed you a series of e-mails that you've never
 5  seen before, right?  You haven't had time to reflect upon that?
 6  A.   I hadn't seen those e-mails since, I guess, 2018.
 7  Q.   Right.  And obviously, you've met with the government
 8  since 2018.  You met with them very recently, haven't you?
 9  A.   Yes.
10  Q.   And you never had a conversation with Mr. Abdelaziz where
11  you told him, I'm putting fake awards on Sabrina's application,
12  did you?
13  A.   If you're, like, referring to a phone call or a text
14  message exchange, I've never had that communication with him.
15  Q.   Well, you've never had an e-mail telling him that either?
16  A.   Not that I'm aware of.
17  Q.   And the government didn't show you such a piece of
18  evidence before you testified, right?
19  A.   I have not seen that.
20  Q.   Right.  So if there was an e-mail from you to him saying,
21  Hey, I'm putting a bunch of fake awards on Sabrina's
22  application, they probably would have shown that to you, right?
23  A.   I can't say either way.
24  Q.   Right.  Now, you don't have any idea, do you, ma'am, about
25  what Rick Singer told Abdelaziz about the college admissions
```

12:22 on lines 10 and 20.

```
  1  process, do you?

  2  A.   No, I was never present during any conversations that he

  3  would have had with Mr. Abdelaziz.

  4  Q.   All right.  And you have no idea whether Mr. Abdelaziz

  5  ever agreed to bribe anyone, do you?

  6  A.   I am not privy to any of that information or any of the

  7  conversations or anything along those lines.

  8  Q.   Okay.  One second, please.

  9       (Pause.)

12:24 10  Q.   You've heard of an organization called YPO, correct?

 11  A.   That doesn't sound familiar to me.

 12  Q.   All right.  Did you ever discuss a presentation by

 13  Mr. Singer to an organization called YPO?

 14  A.   Not that I can recall.

 15       MR. KELLY:  Let me show just the witness Exhibit 9682.

 16  Q.   Just take a moment to look at it yourself, please.

 17  A.   I --

 18  Q.   Well, have you had a chance to look at it?

 19  A.   Yes --

12:25 20  Q.   Let me ask you -- I don't want to elicit testimony --

 21       THE COURT:  Take the document down, please.

 22  BY MR. KELLY:

 23  Q.   Is there anything about that document that refreshes your

 24  memory at all about a YPO presentation by Rick Singer?

 25  A.   Well, no, because I didn't actually see where I was on
```

```
 1    that e-mail.
 2    Q.   But nothing about it refreshes your memory about that
 3    situation, correct?
 4    A.   No.  That appeared to be an e-mail exchange between Rick
 5    and his former business associate.  I don't think I was on that
 6    at all.
 7    Q.   And did Singer ever talk to you about it?
 8    A.   No.
 9         MR. KELLY:  At this time, your Honor, I have nothing
10    further.
11         THE COURT:  Redirect examination, Ms. Kearney.
12                    REDIRECT EXAMINATION
13    BY MS. KEARNEY:
14    Q.   Ms. Sanford, on cross-examination, Mr. Kendall asked you
15    questions about whether you knew there was anything improper
16    about the side door.  Do you recall those questions?
17    A.   Yes.
18    Q.   And he showed you several e-mails where Mr. Singer was
19    using the term "side door"?
20    A.   Correct.
21    Q.   Is there anywhere in those e-mails that Mr. Singer
22    mentioned that he was presenting students as fake athletic
23    recruits through the side door?
24    A.   That's not -- I didn't see that reflected in those e-mails
25    that were presented to me.
```

12:25 (line 10)
12:26 (line 20)

```
 1  Q.   And was there anywhere in those e-mails that Mr. Singer
 2  said a parent had to make a payment for their children's
 3  admission in order to go through the side door?
 4  A.   No, I didn't see any e-mails where that was presented.
 5  Q.   You testified on direct there was at least one instance
 6  where you knew a 's athletic credentials were fake?
 7  A.   Yes.
 8  Q.   As to the other students, what was your relationship with
 9  them in terms of whether you would know if their athletic
10  credentials were real or not?
11  A.   I didn't have the relationship with students prior to
12  the -- or I rarely had any sort of interaction or relationship
13  with students prior to the application process, so I didn't
14  have any knowledge as to kind of what they did in their free
15  time or what their activities were.  So if something was
16  presented to me, I would have believed or assumed it was, in
17  fact, accurate and true.
18  Q.   Did you have any understanding about whether Johnny
19  Wilson's athletic credentials were fabricated?
20  A.   I actually don't recall ever seeing anything about his
21  athletic credentials.
22  Q.   And how about Sabrina Abdelaziz, did you know whether she
23  even played basketball?
24  A.   No, I didn't know if she did or didn't.
25  Q.   At some point after you began working with Mr. Singer, you
```

12:27

12:28

```
 1   figured out that he was doing some things improperly?
 2   A.   Correct.
 3   Q.   He asked you to take classes for students?
 4   A.   Yes.
 5   Q.   He asked you to put fake awards on their applications?
 6   A.   Yes.
 7   Q.   What was your understanding at the time as to whether what
 8   he was doing was illegal?
 9   A.   I didn't believe or even think that there was anything
10   that Rick was doing or that I was being asked to do that was
11   illegal.
12   Q.   Why did you stay with him after you realized what he was
13   doing was improper?
14   A.   Well, that's kind of -- so I think I was in more of a
15   unique situation than some other people I think in the
16   workforce, and in the fall of 2016 I had learned that I had
17   defaulted on my student loans, so in order to get current, I
18   borrowed $11,000 from Rick in order to pay that back or I was
19   told that the company was going to pursue legal action against
20   me.  And due to the terms of that loan or the repayment plan
21   that was -- that was agreed upon, I would essentially have to
22   pay back that loan in full or if I was -- if I was fired or if
23   I quit, then I would -- whatever amount was due on that final
24   day I would have to pay that back to Rick on that day.
25   Q.   Mr. Kendall also asked you questions about the camps that
```

1   the foundation ran.

2   A.   Yes.

3   Q.   And how many camps were there?

4   A.   There were a total of three over a two-year period that I

5   actually was present for.

6   Q.   How long were the camps?

7   A.   The first camp was a week long; the second camp, which

8   actually occurred in that first year, was maybe like two or

9   three days; and then the second year, in 2014, that camp, it

12:30 10   was less than a week but more than, like, three days.

11   Q.   And you mentioned that for at least one of those camps it

12   was attended by Mr. Singer's students as well as students from

13   a local domestic violence shelter?

14   A.   Correct.

15   Q.   Who paid for Mr. Singer's students to attend the camp?

16   A.   The parents -- the parents paid for their own -- the

17   parents paid for their student's own expenses.

18   Q.   And what was your understanding of Mr. Singer's

19   relationship with that domestic violence shelter following the

12:31 20   conclusion of the camp?

21   A.   That the relationship deteriorated and it was

22   non-existent.

23   Q.   You were asked on your cross-examination whether

24   Mr. Singer ever told you about tax evasion.  Do you recall

25   that?

```
 1    A.    Yes.

 2    Q.    And I believe you said that Mr. Singer never said that to

 3    you?

 4    A.    No.  Rick didn't discuss his finances with me or his

 5    taxes.

 6    Q.    Did Mr. Masera ever complain to you about the way things

 7    were billed at The Key?

 8    A.    About -- can you repeat that?

 9    Q.    Did Mr. Masera ever complain to you about the way parents

10    were billed at The Key?

11          MR. KENDALL:  Objection, hearsay.

12          MS. KEARNEY:  Your Honor, I think under Petrozziello

13    this would come in.

14          MR. KENDALL:  I don't think it's in furtherance --

15          THE COURT:  Ask the question again.

16    BY MS. KEARNEY:

17    Q.    Whether from Mr. Masera ever complained to you how things

18    were billed at The Key?

19          MR. KENDALL:  Objection, your Honor.

20          THE COURT:  Overruled.

21    A.    In one instance he did express frustration.

22    Q.    What did he say?

23    A.    He was frustrated that Rick had -- or that Rick's clients

24    or this particular client had been advised to -- or had been

25    told that he could actually charge Rick's services for college
```

**A1779**

1  counseling services to the business as a business expense.

2  Q.   You were also shown copies of Mr. Singer's book as well as

3  The Key's website.  Do you recall that?

4  A.   Yes.

5  Q.   Do you know if Mr. Wilson ever reviewed either of those

6  items?

7  A.   No, I couldn't say either way if he did or didn't.

8  Q.   Do you know if Mr. Abdelaziz ever reviewed either of those

9  items?

12:32 10  A.   The same, I can't say if they did or if they didn't.

11  Q.   Is there anywhere on The Key's website or in Mr. Singer's

12  book where he mentions posing students as fake athletic

13  recruits?

14  A.   I can't say either way.

15  Q.   Is there anywhere in The Key's website or in Mr. Singer's

16  book where he describes having --

17        MR. KELLY:  Objection to leading the witness.

18        THE COURT:  Well, ask the question and then we'll see

19  whether it's leading.

12:33 20        MS. KEARNEY:  I'll rephrase.

21  BY MS. KEARNEY:

22  Q.   Ms. Sanford, where in Mr. Singer's book or on his website

23  does he describe that parents had to pay hundreds of thousands

24  of dollars in exchange for admissions slots at schools?

25  A.   I have never seen that described anywhere on the website

```
 1    or in the book.
 2    Q.   And you were pointed to a review from Evan Webb on the
 3    website?
 4    A.   Yes.
 5    Q.   Do you know if he was a side door student?
 6    A.   No, I don't know.
 7    Q.   Do you know if he was ever presented as a fake athletic
 8    recruit?
 9    A.   I don't know that.
10    Q.   Do you know if his parents ever made a payment to get
11    their child into school?
12    A.   I don't know that.
13         MS. KEARNEY:  Can we show for the witness only Exhibit
14    9683, which I don't think the government has a copy of, if
15    defense --
16         THE COURT:  What's the exhibit number?
17         MS. KEARNEY:  9683.
18    BY MS. KEARNEY:
19    Q.   Ms. Sanford, I believe on cross-examination you were shown
20    this e-mail?
21    A.   Yes.
22    Q.   And you were asked questions about whether Mr. Singer
23    instructed you -- whether you had a memory of whether
24    Mr. Singer instructed you to submit the applications for Johnny
25    Wilson?
```

```
 1   A.   Yes.
 2   Q.   And looking at the third sentence in that e-mail, does it
 3   refresh your recollection as to whether --
 4            MR. KENDALL:  Objection, your Honor, leading.
 5            THE COURT:  Sustained.
 6   BY MS. KEARNEY:
 7   Q.   Ms. Sanford, what is your memory as to whether Mr. Singer
 8   instructed you to submit Johnny Wilson's applications for all
 9   schools but USC?
12:35 10  A.   That is reflected in the e-mail.
11   Q.   Do you have a memory?
12   A.   No, I don't.
13   Q.   Does the e-mail refresh your recollection?
14   A.   No, it doesn't.
15   Q.   Ms. Sanford, what do you know about conversations that
16   Mr. Singer had with Mr. Wilson about his son's application?
17   A.   I don't know of any conversations he had or could have had
18   or would have had with Mr. Wilson.
19   Q.   What is your understanding of conversations that
12:35 20  Mr. Singer had with Mr. Abdelaziz about his daughter's
21   application?
22   A.   I'm not aware of any conversations that he could have,
23   would have -- could have or would have had with him.
24            MS. KEARNEY:  Can we look at Exhibit 415 -- excuse
25   me -- 442, which I believe is in evidence.
```

1          And can we blow up the December 7, 2017 e-mail from

2    Mr. Singer towards the bottom of the page.

3          Thank you.

4    Q.   Ms. Sanford, who instructed that basketball would go on

5    Sabrina Abdelaziz's activities?

6    A.   Rick did.

7    Q.   And if we can pull out of the blowup there.

8          Who was on this e-mail where Mr. Singer directed that

9    basketball would go into her activities?

12:36 10   A.   Andrew Gamal, Sabrina, myself, and Rick.

11   Q.   And you are aware of whether Mr. Abdelaziz directed you to

12   remove basketball from Sabrina Abdelaziz's activities?

13          MR. KELLY:  Objection.

14          THE COURT:  Overruled.

15   A.   That's not something I can recall him ever advising me to

16   do.

17   Q.   And if we go to the e-mail from Mr. Abdelaziz, what does

18   Mr. Abdelaziz say there?

19   A.   "Thank you, Andrew, we'll go with what Rick says.

12:37 20   So-resolved."

21          MS. KEARNEY:  Can we look at Exhibit 458 in evidence.

22          And if we can blow up the top e-mail there from

23   Mr. Abdelaziz.

24   Q.   And, Ms. Sanford, who instructed you to submit the

25   application with basketball essays for Sabrina Abdelaziz?

```
 1    A.   Gamal did.

 2         MS. KEARNEY:  And if we can go to Exhibit 459 in

 3    evidence.

 4         Blow up the top message there, please.

 5    Q.   Ms. Sanford, who reminded you as to Rick's direction about

 6    the essays, that it needed to include basketball?

 7    A.   Gamal did.

 8         MS. KEARNEY:  Can we pull up Exhibit 681 in evidence,

 9    please.

10    Can we go to page 2.

11         And that section on substantial assistance motion.

12    Q.   You were asked some questions on cross-examination about

13    the favorable recommendation from the government?

14    A.   Yes.

15    Q.   And I think Mr. Kelly pointed out to you that the first

16    sentence of that second paragraph, "the determination whether

17    defendant has provided substantial assistance rests solely in

18    the discretion of the U.S. Attorney."

19    A.   Yes.

20    Q.   Can you read the second sentence, please?

21    A.   "The U.S. Attorney will make this determination based on

22    the truthfulness and value of the defendant's assistance,

23    regardless of the outcome or result of any proceeding or

24    trial."

25    Q.   You were asked some questions about whether Mr. Singer
```

**A1784**

```
 1   told people that he had a list of prestigious clients.  Do you
 2   recall that?
 3   A.   Yes.
 4   Q.   What are you aware of -- excuse me.  Are you aware whether
 5   Mr. Singer ever shared those names with Mr. Wilson?
 6   A.   No, I'm not aware of that, if he did or if he didn't.
 7   Q.   And are you aware whether he shared that information with
 8   Mr. Abdelaziz?
 9   A.   No, I'm not aware if he did or didn't share that
10   information.
11   Q.   And finally, Ms. Sanford, you were shown Exhibit 9621,
12   which was admitted into evidence.
13            I don't believe the government has it, though.
14            And in the second page of this e-mail, Lauren
15   Isaacson -- how old was she at the time, approximately?
16   A.   She would have been in college already, but I don't know
17   an approximate age.
18   Q.   And in the e-mail on April 4th, she asked you -- excuse
19   me, she told that you her internship counselor wanted her to
20   change her resumé and cover letter to embellish upon her
21   interests in event planning.
22   A.   Correct.
23   Q.   With respect to your work for Mr. Singer, what did you
24   mean when you said the word "embellish"?
25            MR. KENDALL:  Objection, your Honor.
```

A1785

```
 1                   THE COURT:  Overruled.
 2       A.   When I used the word "embellish," that was essentially a
 3       nicer, friendlier way of saying lie.
 4                   MS. KEARNEY:  Nothing further.
 5                   THE COURT:  Recross, Mr. Kendall.
 6                         RECROSS-EXAMINATION
 7       BY MR. KENDALL:
 8       Q.   Ms. Sanford, you'll agree with me the word "embellish" has
 9       more than one definition, correct?
12:41 10 A.   I know my definition of the word.
11       Q.   Do you know the dictionary definition?
12       A.   I have not looked that up.
13       Q.   If I would to suggest to you "embellish" can also mean
14       just to add detail to make something look attractive, more
15       interesting, would you agree that's also the definition of
16       "embellish"?
17       A.   That's not the definition I use when I say the word.
18       Q.   Fair enough, but my question was are you aware of the
19       dictionary definition?
12:41 20 A.   Prior to you sharing it a few moments ago, no, I wasn't
21       aware.
22       Q.   So just because you have one intention when you use that
23       word, that doesn't mean the person who's reading it or hearing
24       it from you has the same understanding you do, correct?
25                   MS. KEARNEY:  Objection.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. KENDALL:
 3   Q.   Well, you agree "embellish" likely has more than one
 4   definition, correct?
 5   A.   Well, that's what you said, but I haven't seen that
 6   definition in the dictionary.
 7   Q.   Okay.  So you don't know the dictionary definition,
 8   correct?
 9   A.   No.
12:42 10   Q.   When you use the word "embellish," do you always say I
11   want you to hear the Ms. Sanford definition and I don't know if
12   that's the accurate definition in the dictionary?
13              MS. KEARNEY:  Objection.
14              THE COURT:  She can answer it.
15   A.   Can you repeat the question?
16   Q.   When you use the word "embellish," you don't tell people
17   you're using your own definition of it, do you?
18   A.   No, but if it's coming from my mouth or it's -- I'm typing
19   it out, then it's my interpretation and use of the word.
12:43 20   Q.   So when you use it, you use it to imply you're going to
21   mislead or be false about something, correct?
22   A.   Correct.
23   Q.   And you don't know what people who know the dictionary
24   definition are expecting that word to mean, do you?
25              MS. KEARNEY:  Objection.
```

```
 1            THE COURT:  Overruled.
 2    A.   I think it -- well, I think it's dependent on context.
 3    Q.   And in the context you saw with Lauren Isaacson, she was
 4    looking to use true details about her activities to give more
 5    context to what she's accomplished for her internship
 6    application, right?
 7    A.   That's what I took from the e-mail, correct.
 8    Q.   I'd now like to move to the discussion that the government
 9    had with you in their redirect about the side door.
12:43 10            Do you remember you were just asked:  "Did Mr. Singer
11    say that there were large payments for the side door on the
12    website?"  And you said, "No, there weren't"?
13    A.   I said that that's -- I don't recall seeing that.
14    Q.   You don't recall seeing it on the website you were asked,
15    correct?
16    A.   Correct.
17    Q.   And were you asked -- I forget what it was, you were asked
18    in some other context that you recall the side door involved
19    large payments, and you said, No, you didn't remember it in
12:44 20    that other context either?
21    A.   I was asked if I saw that in Rick's book, and I responded
22    I did not recall seeing that information in his book.
23    Q.   But you heard it in the Starbucks video, didn't you?
24            MS. KEARNEY:  Objection.
25            MR. KENDALL:  Your Honor, they opened the door.
```

```
 1            THE COURT:  Sustained.

 2            MR. KENDALL:  Your Honor, if I may be heard, they've

 3      opened the door by raising this issue.

 4            THE COURT:  I don't think they opened the door for

 5      that question.

 6            The objection is sustained.

 7      BY MR. KENDALL:

 8      Q.   Do you recall him saying it in any other context that the

 9      side door donation -- that the side door involved donations?

12:44 10     A.   In -- I'm sorry, in -- can you clarify what you mean by

11      "context" or --

12      Q.   In any other place other than the two things she asked

13      you, do you recall Mr. Singer saying the side door involved

14      donations?

15      A.   Rick had used the term "donation" with me, yes.

16      Q.   With respect to the side door, correct?

17      A.   Correct.

18      Q.   He never used the word "bribe," he used "donation,"

19      correct?

12:45 20     A.   Well, he used the term "bribe" on one occasion.

21      Q.   Did you ever tell that to the FBI in any of your

22      interviews prior to today?

23      A.   Yes.

24      Q.   And they were writing things down and taking things down,

25      do you remember that?
```

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 1     | A. | That's my understanding of what was happening.                       |
| 2     | Q. | Do you remember on January 28, 2020, you were interviewed            |
| 3     |    | by the FBI and they took notes?                                      |
| 4     | A. | Correct.                                                             |
| 5     | Q. | Your lawyer was present?                                             |
| 6     | A. | Yes.                                                                 |
| 7     | Q. | Mr. Rosen was present?                                               |
| 8     | A. | Yes.                                                                 |
| 9     | Q. | Ms. Kearney was present?                                             |

12:45 10   A.   Yes.

11   Q.   Leslie Wright was present?

12   A.   That I don't recall.

13   Q.   And you remember telling them -- did you remember telling

14   them you knew at the time that the side door was a donation,

15   you thought everything went to the school or through the

16   foundation to the school.  You did not know that Singer took

17   some of the money.  Do you remember telling the FBI that at

18   that time?

19   A.   Yes, from my limited understanding of the side door and

12:46 20   the things that I saw over the years, that's what I believed to

21   be true.

22   Q.   And in that debriefing you never once said that you

23   thought the money was being used as a bribe, correct?

24   A.   No, but that's also not what I said previously, a few

25   moments ago.

```
 1    Q.   Did you ever tell the FBI at your January 28, 2020

 2    debriefing that you knew at the time you worked for Mr. Singer

 3    that bribery was part of the side door?

 4    A.   I did not know that or -- nor did I think that, nor was I

 5    aware of that, so that's not information that I would have

 6    shared or stated.

 7    Q.   And did you also tell the FBI at that January 28, 2020

 8    debriefing you did not think that students got in as fake

 9    athletes?

12:47  10    A.   I don't recall saying that specific statement.

11    Q.   Is it consistent with what your understanding was at the

12    time that you did not think that students got in as fake

13    athletes?

14    A.   That's correct.

15         MR. KENDALL:  If I may have one moment, your Honor.

16         THE COURT:  Yes.

17         MR. KENDALL:  I think I'm done, your Honor.

18         THE COURT:  Recross, Mr. Kelly.

19         MR. KELLY:  Briefly, your Honor.

12:48  20                     RECROSS-EXAMINATION

21    BY MR. KELLY:

22    Q.   The prosecutor just showed you a series of e-mails again,

23    right?

24    A.   Yes.

25    Q.   And there's a reference to activities on one of the
```

1    e-mails, right?

2    A.    Is there a specific e-mail you're referring to?

3    Q.    There was an e-mail that the prosecutor put up and said,

4    Isn't Gamal on an e-mail that references activities?

5    A.    Yes.

6    Q.    You've never seen any e-mail which says, Gamal, we're

7    going to put some fake awards on your daughter's Common App.

8    You never saw an e-mail like that, right?

9    A.    No.

12:49 10    Q.    And in fact, you hid the fake awards that you were adding

11    to his daughter's Common App, didn't you?  You hid that from

12    him.

13    A.    I haven't even been able to state -- or I can't even state

14    what I added to the application, if I added anything to the

15    application or anything along those lines.

16    Q.    Ms. Sanford, you know you hid activities from him, don't

17    you?

18    A.    No, I don't know that.

19    Q.    Okay.  Let's look at 458, please.

12:49 20          In the middle where you say -- by the way, this is a

21    big, long chain of e-mails.  You're going back and forth with

22    them, and you're going back and forth with Singer, too, right?

23          You've seen multiple e-mails today involving this

24    subject matter, right?

25    A.    Correct.

```
 1    Q.    Okay.  So that's commonly referred to as a chain of
 2    e-mails, right?
 3    A.    Yes.
 4    Q.    And here you say, "I have to confirm a few things with
 5    Rick before I can submit."
 6              Right?
 7    A.    Yes --
 8    Q.    That is something you are telling Sabrina and Gamal,
 9    right?
10    A.    Yes.
11    Q.    And you don't tell them, I'm going to check with Rick and
12    get some fake awards to add to her application.  You didn't say
13    that, did you?
14    A.    No, that's not what I said in any e-mail exchange.
15    Q.    Right.  But that is what did you, correct?
16    A.    As I've said previously, I don't know if I added anything,
17    what I added, if I added anything, or anything beyond what's
18    expressed in these e-mail exchanges.
19    Q.    Okay.  Let me show you 1540, witness only again.
20              Didn't you immediately ask Singer for a profile on
21    Sabrina without copying Gamal?
22    A.    Correct.  I asked Rick for a profile without copying
23    Gamal.
24              MR. KELLY:  I offer 1540.
25              MS. KEARNEY:  Objection.
```

```
 1              THE COURT:  Sustained.

 2              MR. KELLY:  It's part of the chain.  It's

 3  independently admissible.  It's not hearsay and it's direct

 4  impeachment of the credibility of the witness, your Honor.

 5              MS. KEARNEY:  Your Honor, it is hearsay.  He's putting

 6  it in for the truth of whether or not a profile was requested.

 7              THE COURT:  Yes, the objection is sustained.

 8              MR. KELLY:  That was Exhibit 1540, for the record.

 9  BY MR. KELLY:

12:51 10  Q.   Let me show you 1541 for the record.

11       Didn't you request a profile from Singer about Sabrina

12  and didn't he send it to you?

13  A.   Yes.  I requested a profile from Rick in regards to

14  Sabrina, and according to this e-mail --

15              MS. KEARNEY:  Objection.

16              THE COURT:  Sustained.

17  BY MR. KELLY:

18  Q.   You didn't copy Gamal, did you?

19  A.   He's not copied on this e-mail.

12:52 20              MR. KELLY:  I offer 1541.

21              MS. KEARNEY:  Objection.

22              THE COURT:  The objection is sustained.

23  BY MR. KELLY:

24  Q.   Take a look at Exhibit 1255.

25       Didn't after -- didn't you thank Rick and indicate
```

1    that you would update Sabrina's application?

2    A.   That is what is said in this --

3         MS. KEARNEY:  Objection, your Honor.  I think the

4    witness has testified --

5         THE COURT:  Yes, not what was said -- what's the

6    number of this again?

7         MR. KELLY:  1255, and I again would respectfully

8    submit it's not hearsay.  The declarant is in court right

9    there.  I'm impeaching the witness.

12:52 10         MS. KEARNEY:  Your Honor, I think she's testifying

11    from the document, not from her memory, so if we want to take

12    the document down and he wants to ask it.

13         MR. KELLY:  Well, that's a separate point, your Honor.

14    I'm offering this as non-hearsay, direct impeachment, Rule 106

15    completeness, that's why it's being offered.  It's part of the

16    whole chain going back and forth.

17         THE COURT:  We can talk about this later out of the

18    hearing of the jury.  For the time being the objection is

19    sustained.

12:53 20         MR. KELLY:  All right.

21    BY MR. KELLY:

22    Q.   And isn't the subject matter of your discussions with

23    Singer on the side without Gamal, doesn't it have to do with

24    the phony athletic profile?

25    A.   I can't even say or could I have said back then if the

```
 1    profile was even phony.
 2    Q.   Okay.  Let me show you Exhibit 1254 for the record.  Just
 3    the witness.
 4         MR. KELLY:  Slide on down.  Mr. Carter, slide on down,
 5    please.  Keep sliding.  Okay.
 6         Keep going back up, I'm sorry.
 7    Q.   Isn't it true you got athletic awards for Sabrina from
 8    Rick Singer?
 9    A.   I can't say if I did.
12:54 10   Q.   And isn't it true that when you communicated with Singer
11    via e-mail about Gamal, you didn't copy Gamal, did you?
12    A.   In those previous e-mails that I saw, he was not copied on
13    those e-mails.
14    Q.   Right.  So when you were getting information about Sabrina
15    from Singer, he's cut out, right?
16    A.   In those specific e-mails, Gamal was not cc'd on those
17    e-mails.
18    Q.   And that's -- go back to 458, please, in the middle,
19    because you had to confirm a few things with Rick before I can
12:54 20   submit, correct?
21    A.   That is what I said in this e-mail, correct.
22         MR. KELLY:  Thank you.
23         Nothing further, your Honor.
24         THE COURT:  Thank you.
25         You may step down, Ms. Sanford.
```

```
 1              MR. KENDALL:  Your Honor, you had asked me to remind

 2     you about --

 3              MR. FRANK:  Any reminder, your Honor, we would ask be

 4     at sidebar.

 5              MR. KENDALL:  Fine with me, your Honor.

 6              THE COURT:  All right.  Then we'll do it at sidebar.

 7              *** Beginning of sidebar on the record. ***

 8              THE COURT:  Mr. Kendall, come in first over here, and

 9     you're over here.

12:55 10         Mr. Kendall, what is it that you want to remind me?

11              MR. KENDALL:  Just that she is under subpoena, she may

12     be recalled in the defense case, and she still has to be

13     sequestered from any publicity about it.  She may need to come

14     back under the subpoena.

15              THE COURT:  Ms. Sanford, do you understand?

16              THE WITNESS:  Yes, I understand.

17              THE COURT:  Anything else?

18              MR. KENDALL:  No, thank you.

19              THE COURT:  Anything from the government?

12:56 20         MR. FRANK:  No.

21              THE COURT:  Ms. Sanford, you may step down.

22              THE WITNESS:  Thank you.

23              *** End of discussion at sidebar. ***

24              THE COURT:  All right, jurors, we're a few minutes

25     early, but we're going to break for lunch.  I'll ask you that
```

```
 1    be back at 2:00.  We will go until 3:00 or a little bit after

 2    3:00, hopefully we'll be breaking before 3:30 today.  So I'll

 3    see you back here at 2:00.

 4              THE CLERK:  All rise for the jury.

 5              (Jury exits.)

 6              THE COURT:  All right.  Be seated, counsel.

 7              The government's next witness will be?

 8              MR. FRANK:  Rebecca Chassin.

 9              THE COURT:  Who is Rebecca Chase?

10              MR. FRANK:  Chassin, Chassin.  She is an Admissions

11    Officer at the University of Southern California.

12              THE COURT:  And how long will her direct be?

13              MR. FRANK:  I estimate about 45 minutes, maybe a

14    little less.

15              THE COURT:  And the cross-examination?

16              MR. KENDALL:  Longer, your Honor, longer than the 45

17    minutes.

18              MR. FRANK:  Your Honor --

19              MR. KELLY:  Same, much longer.

20              MR. KENDALL:  For impeachment, your Honor.

21              MR. FRANK:  There's been a lot of cross-examination

22    that we submit is not being for impeachment purposes.  This

23    witness was on for over two hours of cross-examination based on

24    a half hour of direct examination.

25              It's making it very complicated for us to schedule
```

12:57 (line 10)

12:57 (line 20)

```
 1    witnesses coming in from out of state because the

 2    cross-examinations are far, far longer than the direct

 3    examinations, and a lot of it is retreading the same ground, a

 4    lot of it is trying to get evidence in through the government's

 5    witnesses that is not for impeachment purposes.

 6          MR. KELLY:  Your Honor, the defense, of course, is

 7    allowed to present a defense and vigorously cross-examine the

 8    government witnesses.  Mr. Frank might not like that but those

 9    are the rules, and we've been complying with the rules.

10          To the extent he wants to limit how much we can

11    cross-examine the witness, we would respectfully ask the Court

12    not to take that suggestion.  We'll be reasonable, we haven't

13    gone on all day, but there are issues that have come up --

14          MR. KENDALL:  Your Honor, if I may add, Chassin is the

15    critical witness on the honor services theory, and she didn't

16    even work for the athletic department where the honor services

17    arose.  So, yes, we have to impeach her testimony.  They're

18    trying to put the whole honor services case through her.  She

19    didn't work, she wasn't their supervisor, she doesn't have

20    knowledge.  So there will be extensive impeachment of her, your

21    Honor, not putting in our case, but impeaching her.

22          THE COURT:  Finally, Mr. Frank.

23          MR. FRANK:  The Admissions Department was the victim

24    of the fraud, to say she doesn't have knowledge of the honor

25    services fraud is absurd.
```

```
 1              What I'm simply saying, I've just said that her

 2      testimony is going to be 45 minutes or less, and before they've

 3      seen heard a word of that testimony, the defense has already

 4      announced they're going to go on for hours and hours of

 5      cross-examination.

 6              THE COURT:  All right.  To the extent it is for

 7      impeachment, it will be allowed.  To the extent it goes beyond

 8      that and tries to get into the defendants' case in chief, the

 9      objections will be sustained.  So we're in recess --

12:59 10              MR. KELLY:  One procedural matter, your Honor.

11              THE COURT:  Yes.

12              MR. KELLY:  Just for the appellate record, I need to

13      mark these four exhibits for identification purposes:  1540,

14      1541, 1255, and 1254.  We can argue the admissibility later,

15      but at a minimum, I don't want to forget to mark those four.

16              THE COURT:  And they will be marked C, D, E, and F

17      because I believe we've already used A and B, right?

18              (Exhibits C, D, E and F marked for identification.)

19              MR. KENDALL:  Your Honor, we may have a number to the

01:00 20      Starbucks video, we can use that with a number or you can make

21      that the next letter, whatever is your custom.

22              THE COURT:  We'll make that the next letter, which

23      would be what?

24              MR. KENDALL:  G.

25              THE COURT:  G, all right, that's G.
```

**A1800**

```
 1              (Exhibit G marked for identification.)

 2              MR. KENDALL:  Thank you, your Honor.

 3              THE COURT:  All right.  We're in recess until 2:00.

 4              THE CLERK:  All rise.

 5              (Recess taken 1:00 p.m. to 2:07 p.m.)

 6              THE CLERK:  You may be seated.  Court is now in

 7   session.

 8              THE COURT:  Good afternoon, jurors.  We're ready to

 9   resume.

02:07 10        The government will call its next witness.

11              MR. FRANK:  Thank you, your Honor.  The government

12   calls Rebecca Chassin.

13              (Rebecca Chassin, sworn.)

14              THE CLERK:  Would you please state your name for the

15   record, spelling your last.

16              THE WITNESS:  My name is Rebecca Chassin,

17   C-h-a-s-s-i-n.

18              MR. FRANK:  May I inquire, your Honor?

19              THE COURT:  You may.

02:08 20        MR. FRANK:  Thank you.

21                   DIRECT EXAMINATION OF REBECCA CHASSIN

22   BY MR. FRANK:

23   Q.   Good afternoon, Miss Chassin.

24   A.   Good afternoon.

25   Q.   Can you tell us where you live?
```

```
 1   A.   I live in Los Angeles, California.

 2   Q.   And are you currently employed?

 3   A.   Yes.

 4   Q.   What do you do?

 5   A.   I'm an admissions officer at University of Southern

 6   California.

 7   Q.   What's your title?

 8   A.   I'm the assistant dean of undergraduate admissions.

 9   Q.   How long have you worked in admissions at the University

10   of Southern California?

11   A.   20 years.

12   Q.   What are your responsibilities as the assistant dean of

13   undergraduate admissions?

14   A.   I do a lot of same things that most officers do in terms

15   of talk with students and reading applications, but my own area

16   of responsibility is in processing applications and helping

17   with the evaluation process for undergraduate applications.

18        Mr.  Frank:  Just slow down slightly.  It might help

19   the court reporter.

20   Q.   Could you tell us a little bit about your educational

21   background and where you worked prior to joining USC.

22   A.   Sure.  I have a bachelor's degree from Pamona College in

23   sociology and I have a master's degree in communication

24   management from USC.  Before starting at USC, I was working at

25   a nonprofit for a couple of years and then came to USC in 2001.
```

02:09 appears at lines 10 and 20.

```
 1    Q.   How many students attend as undergraduates at USC?

 2    A.   Currently, it's around 19,000 undergraduate students.

 3    Q.   How many apply to the college each year?

 4    A.   It can vary a little bit.  It we're going back a few years

 5    to kind of the time frame, these kind of applications, if I

 6    take 2018, we had about 56,000 applications in that year.

 7    Q.   Okay.  And it's gone up since then?

 8    A.   Yes.  It continues to grow each year.

 9    Q.   And directing your attention to the -- that sort of 2013

02:10 10    to 2018 time frame, about how many of those applicants were

11    admitted?

12    A.   So, again, in 2018 it was about 8,600 students who we

13    offered admission to.

14    Q.   Okay.  So somewhere in the neighborhood of 15 percent?

15    A.   15, 16 percent, correct.

16    Q.   How are those admission decisions communicated to

17    students?

18    A.   So we mail students an admission packet that has a letter

19    of admission and other information about enrolling at the

02:11 20    institution, and we also will release information

21    electronically through an online portal.

22    Q.   You also send it out by U.S. mail?

23    A.   We do send it out by mail, yes.

24    Q.   Okay.  And when do you do that?

25    A.   We typically do it at the end of March.
```

1    Q.    Of the roughly 8,600 that you said who were admitted in

2    that time period annually, how many actually attend?

3    A.    So, typically, the first year class will be around 32 or

4    3,300 incoming first year students.

5    Q.    If a student wants to apply to USC, what do they do?

6    A.    We use the common application, which is an online

7    application maintained by a nonprofit organization.  It's used

8    by 80 or 90 colleges for students to fill out information about

9    themselves and then apply to college.

02:12 10    Q.    What's involved with the common application?

11    A.    The common application includes a variety of different

12    materials, some demographic information, where the student goes

13    to school, but would also include a college essay, a chance for

14    students to tell us about activities that they've been involved

15    with, letters of recommendation from teachers or counselors at

16    their school, high school transcripts, test scores, if they

17    want to include information about that.

18    Q.    And when is the application typically submitted?

19    A.    So our first year application deadline is December 1st for

02:12 20    scholarship consideration for merit based scholarships and

21    January 15th is the final first year deadline.

22    Q.    Who reviews all those tens of thousands of applications?

23    A.    Really hardworking staff of admission officers in our

24    office.

25    Q.    And is every application reviewed?

```
 1    A.    Yes, all completed applications.
 2    Q.    Directing your attention to the 2013 to 2018 time period,
 3    if you know, what was the average GPA of an admitted student?
 4    A.    So we use an unweighted average, so on a four-point scale,
 5    not giving any extra weight to grades earned in advanced
 6    coursework.  The average GPA is typically a 3.8 on a four point
 7    scale.
 8    Q.    What about the average standardized test score?
 9    A.    It's typically about 1450, 1460, in that range.
10    Q.    That's an SAT score?
11    A.    SAT score out of a possible 1600.  If students have
12    submitted ACT scores, we use an accordance table to concord
13    those to the SAT score.
14    Q.    Okay.  And what was the average ACT score?
15    A.    If we look at students' ACT scores, it's about a 33.
16    Q.    Okay.  And you said 1450?
17    A.    Around that.  It changes from year to year a little bit,
18    but yes.
19    Q.    That's on a 1600 point scale.  Was there a time when the
20    SAT was on a 2400 point scale?
21    A.    Yes.  So several years ago there were three parts to the
22    SAT, each scored out of 800, so the total score was out of
23    2400.
24    Q.    And what was the average score out of a 2400 score?
25    A.    In the mid 2100s.
```

```
 1   Q.   Are you familiar with the process for the admission of

 2   recruited athletes at USC?

 3   A.   Yes.

 4   Q.   Taking a step back, to what extent, if at all, are

 5   athletics an important component of life at the University of

 6   Southern California?

 7   A.   It's an important part.  A hallmark of a student's

 8   experience is the athletic tradition at USC.  We're proud of

 9   our athletes.  We have a number of national championship teams.

10   We compete at the very highest level.  We're really excited

11   that this year we're going to see so many USC athletes

12   competing at the Olympics this year.

13   Q.   In addition to the Olympics, do USC athletes also go on to

14   careers at the professional level?

15   A.   Yes, some do continue on at the professional level.

16   Q.   Where does USC typically rank nationally in terms of

17   athletics?

18   A.   Depends on the sport.  We won four national championships

19   last years in women's sports.  And we typically are competitive

20   in nearly all of our sports most years.

21   Q.   Are you familiar with the term "Division 1"?

22   A.   Yes.

23   Q.   What is Division 1?

24   A.   Division 1 is sort of the highest level of competition in

25   the NCAA conference and has to do with both the size of the
```

1    school, but also the level of competition, which would be sort

2    of the most competitive level.

3    Q.    And is USC a Division 1 school?

4    A.    Yes.

5    Q.    How is the athletic admissions process at a general level

6    different from the general admission process at USC?

7    A.    So we do have an athletic subcommittee for admission.

8    This is a group that meets throughout the year.  Most of the --

9    some of the reasons around why the athletic process is a little

02:16 10    bit different has to do with timing.  So coaches are recruiting

11    students.  They are -- there are nationally defined signing

12    dates by which student will commit to sports that happen well

13    before our usual admission process timeline, and so because of

14    that we meet kind of yearlong on athletic recruits that the

15    coaches are interested in in order to render decisions.

16    Q.    So do I understand you correctly that students can be

17    recruited to USC before the typical regular admissions process?

18    A.    That's correct.  In some cases, they may have been talking

19    to a coach even prior to their senior year and a coach may have

02:16 20    expressed an interest on having a student on a team for a long

21    time.

22    Q.    And when do recruited athletes actually submit an

23    application?

24    A.    Again, it depends a little bit on the student and then

25    where we are in the cycle, but it is possible that we would

**A1807**

1    have reviewed a student in the athletic subcommittee prior to a

2    student submitting an application.  Sometimes they've already

3    submitted an application.

4    Q.   When you say it's possible you've reviewed them prior to

5    them submitting an application, what do you mean by that?

6    A.   So the athletic subcommittee meets typically on a biweekly

7    basis.  It's made up of admissions officers, myself included,

8    as well as liaisons from the athletic offices who present the

9    students.  And so they will bring information to us in order to

02:17 10    make an admission decision that may come prior to a student

11    actually submitting their formal common application.

12    Q.   So are there instances where you approve an applicant for

13    admission through the athletics admission subcommittee prior to

14    their actually submitting an application to USC?

15    A.   Yes, but it would be based on materials that were reviewed

16    as part of the SUBCO process.

17    Q.   But you can be admitted before you apply?

18    A.   You can be approved for admission prior to actually

19    submitting the common application.

02:18 20    Q.   And how many students are presented to that subcommittee

21    typically?

22    A.   I would get 200 to 250 students in a cycle.

23    Q.   And how many of those are approved for admission

24    typically?

25    A.   Probably 85 to 90 percent of those students approved.

**A1808**

```
 1   Q.    So 85 to 90 percent of recruits who are presented to the
 2   subcommittee are approved for admission compared to 15 percent
 3   or so of the applicants in the general pool, is that correct?
 4   A.    Correct.
 5   Q.    And are there limits to how many students can be admitted
 6   through the subcommittee?
 7   A.    There's some limits, but you know, it's fairly constant
 8   from year to year.  So coaches are looking to replenish
 9   students who graduated on their teams, so it's not like they're
10   looking for an unlimited number of athletes.
11   Q.    So that number of 200 to 250 is pretty constant?
12   A.    It is.
13   Q.    And is that in any way linked to athletic rosters?
14   A.    It does have to do, again, with space available on a given
15   team.
16   Q.    You mentioned that the Athletic Admissions Subcommittee is
17   composed of admissions officers.  Does anyone vote on admission
18   other than admissions officers?
19   A.    No.  So the only voting members of the SUBCO are the folks
20   in the Office of Admission.
21   Q.    And how many of those folks vote?
22   A.    So there's typically five or six members from the Office
23   of Admission who are the voting members, and then the liaisons
24   who are there from Athletics are merely presenting the cases,
25   bringing us information, but not voting on members.
```

Q.   So the athletic liaisons do not vote on admissions?

A.   They do not.

Q.   And the subcommittee, that's often called SUBCO; is that right?

A.   It is.

Q.   Are the academic standards for student athletes different than for students submitted through the general application process?

A.   We consider every student's academic preparation and we are weighing any special talents or contributions that they'll make to the campus and the community, and so certainly their athletic talent is also weighted, as well as their academic preparation.

Q.   How do their test and grade scores compare to those in the general process?

A.   Generally, I would say their grades and test scores are far below our general students we admit.

Q.   Who decides which student athletes get recruited and presented to the subcommittee for admission?

A.   So the coaches will decide who they want to recruit, who they're either going to offer athletic scholarship to or who they want to recruit as a recruited walk-on if they don't have any more athletic scholarships available, and then those are the cases that are presented to us.

Q.   Which coaches?

```
 1    A.    The USC Athletics coaches for the various teams.

 2    Q.    And then you mentioned that there's a liaison from the

 3    Athletics Department who presents to the subcommittee?

 4    A.    Yes.

 5    Q.    Directing your attention to the 2013 to 2018 time frame,

 6    who was the lead primary liaison from the Athletics Department?

 7    A.    Donna Heinel.

 8    Q.    And what was her role?

 9    A.    She was a Senior Administrator in the Athletics Department

10    and one of her responsibilities was to present the cases at

11    SUBCO.

12    Q.    Was she a coach?

13    A.    No.

14    Q.    Was -- to your knowledge, was she responsible for

15    recruiting student athletes?

16    A.    Not to my knowledge.

17    Q.    So, again, what did she do exactly?

18    A.    She was the liaison to the SUBCO.  She would bring the

19    cases that coaches wanted to recruit in order to see if they

20    would be admitted or not.

21    Q.    Do coaches themselves ever present candidates to the

22    subcommittee?

23    A.    No.

24    Q.    Why not?

25    A.    They have lots of other things that they're responsible
```

**A1811**

1  for, and we don't want to confine them to our process, so they

2  typically will have a write-up, some information that they've

3  shared about the student and their interest in the student, and

4  we use that to make our decisions.

5  Q.   So there's a set of materials that you review?

6  A.   That's correct.

7  Q.   And tell us about that.  What's included in that?

8  A.   So a SUBCO packet will typically have the sort of athletic

9  resume of the student, the athletic accomplishments, things

02:22  10  that they've been involved with, any information that helps us

11  to understand the strength of their athletic accomplishments,

12  and then also will include a high school transcript and any

13  test scores that are being presented.

14  Q.   Do members of the subcommittee from the Admissions

15  Department verify the accuracy of those materials?

16  A.   Not independently.

17  Q.   Why not?

18  A.   We believe that, you know, that all of this information is

19  accurate from the coaches and that the transcripts and test

02:22  20  score information is accurate as well.

21  Q.   Do you have an understanding of how coaches identify the

22  student athletes that they recruit and present, submit to

23  SUBCO?

24       MR. KENDALL:  Objection, your Honor.  Hearsay.  Her

25  understanding of what other people do.

```
 1              THE COURT:  That question is objectionable and it's
 2     sustained.
 3     Q.   Do you work with the athletic department on the admission
 4     of student athletes on a regular basis?
 5     A.   Yes.
 6     Q.   And based on your work, is it important for you to know
 7     how students are identified for presentation to the
 8     subcommittee?
 9     A.   Yes.  I would want to know, you know, how a coach has come
02:23 10    to learn about a student's athletic talent.
11     Q.   And over the 20 years that you've worked in admissions at
12     USC, have you developed an understanding of how student
13     athletes are identified?
14     A.   Yes.
15              MR. KENDALL:  Objection, your Honor.  Still no
16     foundation.  It's hearsay.
17              THE COURT:  Well, no.  She can have that question.  He
18     can have that question.  She can answer it.
19              MR. FRANK:  Thank you, your Honor.
02:24 20    A.   Yes.  I understand it.
21     Q.   And what's your understanding?
22     A.   That coaches may have identified students from following
23     high school athletics and knowing about stand-out athletes from
24     various teams or sports.  They may have met students through
25     the recruiting process.  There's camps and competitions and
```

1 different things that they might scout at and learn about

2 students.  And students themselves can fill out questionnaires

3 for coaches to get their attention, so they have online

4 questionnaires for students to share their athletic

5 accomplishments to see if coaches would be interested in

6 recruiting them.

7 Q.   Now you mentioned a moment ago that some student athletes

8 are offered scholarships?

9 A.   Yes.  That's correct.

02:24 10 Q.   Are all student athletes offered scholarships?

11 A.   Not all recruited athletes are offered scholarships.

12 Q.   Which recruited athletes are offered scholarships?

13 A.   It's up to the coach to determine how they will use their

14 scholarship allocation.  The NCAA has guidelines about how many

15 scholarships each team or sport will have.  Some of those

16 sports required that the scholarships remain whole with a head

17 count, so you either have 100 percent scholarship or nothing.

18 Other sports it will be proportional, so you can break up

19 scholarships over different members of the team.  Really it's

02:25 20 at the discretion of the coaches how they want to do that.

21 Q.   Have you heard the term "recruited walk-on?"

22 A.   Yes.

23 Q.   What is a recruited walk-on?

24 A.   A recruited walk-on is a student who's being recruited for

25 their athletic talent, but who is not being awarded an athletic

         1    scholarship.

         2    Q.    So they go through the subcommittee process?

         3    A.    That's correct.

         4    Q.    Just like a scholarship athlete?

         5    A.    Yes.

         6    Q.    What criteria do you on the admissions subcommittee look

         7    for in recruited walk-on athletes?

         8    A.    Really it's not any different.  We're still trying to

         9    understand the student's athletic talent, what they will bring

02:25   10    to the team athletically, you know, and, again, look at their

        11    academic preparation.

        12    Q.    What are expectations for recruited walk-on athletes once

        13    they are admitted to USC?

        14    A.    That they will contribute to -- contribute athletically to

        15    the teams for which they've been recruited.

        16    Q.    What do you mean by that?

        17    A.    I mean, I guess I expect that the coach recruited them so

        18    that they could play.

        19    Q.    Are you familiar with the term "admission approval

02:26   20    letter"?

        21    A.    Yes.

        22    Q.    What is an admission approval letter?

        23    A.    Because the timeline of athletic recruiting can be out of

        24    sync with our general admission timeline, we may approve a

        25    student for admission, meaning they have conditions of

admission, things that we want to see from a student during

their senior year of high school.  And we want to let the

student know about these conditions or that they've approved

for admission at the time of the initial decision, even if

we're not ready to mail them an official packet.

Q.   If you receive an admission approval letter -- those are

also sent through the mail?

A.   That's correct.

Q.   If you receive an admission approval letter, what are the

02:27   odds that you'll be admitted to USC?

A.   100 percent.

Q.   In the binder in front of you, there are a number of

documents.  If you could just take a look at those documents,

which I'm about to offer.  They are Exhibits 107, 383, 384,

413, 414, 420, 592, 661, 662, 663, and I neglected to mention

229.  Do you see those documents in front of you?

A.   I do.

Q.   And what are they?

A.   These are athletic SUBCO packets.

02:28       MR. FRANK:  The government offers those exhibits.

       MR. KENDALL:  Objection, your Honor.  We don't object

to 107, which relates to my client's son, but we object to all

of the others.

       MR. KELLY:  Join the objection.

       MR. FRANK:  Your Honor, this is all admissible as

```
 1   evidence of the charged conspiracy.
 2              THE COURT:  Grounds for the objection?  Mr. Kendall
 3   first.
 4              MR. KENDALL:  Relevance, your Honor.  We don't think
 5   there's been a sufficient showing of Petrozziello to get all
 6   these in as relevant to my client.
 7              MR. FRANK:  Your Honor, there's been evidence
 8   concerning each and every one of these students that's already
 9   been submitted.  There's been evidence in the form of e-mails
10   between Rick Singer and Donna Heinel about these students.
11   There have been phone calls that have been submitted.  It's all
12   part of the evidence of the scheme.
13              MR. KENDALL:  Donna Heinel had nothing to do with my
14   client.
15              THE COURT:  Mr. Sheketoff?
16              MR. SHEKETOFF:  401 and 403, your Honor.
17              THE COURT:  I'm going to admit them de bene subject to
18   the Petrozziello ruling at the end of the case.  For the
19   record, I need to go over the numbers.  107, 383, 384, 413,
20   414, 420, 592, 661, 662, and 663.  Is that all?
21              MR. FRANK:  229. I think.
22              THE COURT:  229.  All right.  They are all admitted
23   per my earlier comment.
24              (Exhibit 107, 229, 383, 384, 413, 414, 420, 492, 661,
25   662, 663 admitted into evidence.)
```

|   |   |
|---|---|
| 1 | Q.    So tell us again, Miss Chassin, what is a SUBCO packet? |
| 2 | A.    A SUBCO packet is information that is presented at the |
| 3 | SUBCO meeting.  It will include an athletic resume, information |
| 4 | about the student's athletic talent, as well as the student's |
| 5 | high school transcript and test scores. |
| 6 | Q.    And that's a standardized set of materials that you look |
| 7 | at when you're evaluating student athletes? |
| 8 | A.    Yes.  That's correct. |
| 9 | Q.    Okay.  Can we take a look at Exhibit 107, please.  So this |
| 02:30 10 | is the cover page of a SUBCO packet? |
| 11 | A.    Yes. |
| 12 | Q.    Okay.  And if we look at the top, there's a date, 2/28/14. |
| 13 | Do you see that? |
| 14 | A.    Yes. |
| 15 | Q.    What does that represent? |
| 16 | A.    The date that the student was presented to the SUBCO, so |
| 17 | the date of the SUBCO meeting. |
| 18 | Q.    Okay.  And then there's a name? |
| 19 | A.    Yes. |
| 02:30 20 | Q.    John Wilson, do you see that? |
| 21 | A.    John Wilson.  Yes. |
| 22 | Q.    And there's an X where it says "fresh"? |
| 23 | A.    Indicating the student is a first year applicant, not a |
| 24 | transfer. |
| 25 | Q.    Then is says "Sport: MH2O".  What is that? |

A.    Men's water polo.

Q.    Then it says "Percent scholarship: WO".  What does that mean?

A.    Walk-on.

Q.    So that means they're not getting a scholarship, but they're being recruited?

A.    They're a recruited walk-on.

Q.    And then down below, it says "Course Curriculum Factor: 1, Institutional Factor: 4".  What does that mean?

A.    So we use unweighted GPAs and we just calculate the academic coursework a student has done.  We do adjust their GPA using the curriculum factor, which goes from zero to three, to account for advanced coursework that a student may have taken on, additional rigor at their school.

       And then there's an institutional factor that's also -- it's based on research that we've done about how students from individual high schools fair when they come to USC.  And a student at an institutional factor 4 school is a school that the baseline curriculum is preparing students very well when they come to USC.  So those also range from zero to four.

Q.    So academically rigorous curriculum, pretty light coursework; is that fair to say?

A.    The high school's preparing the student well, lighter curriculum than, yes, many other students from the school.

Q.    And then there's a "High School Core GPA" below that.  Is

 1   that a weighted or unweighted GPA?

 2   A.   It's what we call an adjusted GPA.  So again, we've

 3   calculated the unweighted GPA based on their academic

 4   coursework and then we've adjusted it with the curriculum

 5   factor and the institutional factor, each representing tenths

 6   of GPA points.  So this student has a 3.3 unadjusted GPA and a

 7   3.8 adjusted GPA.

 8   Q.   So you say 3.8 adjusted GPA.  Earlier, you testified that

 9   the average GPA of a student admitted to USC is 3.8.  Is that

02:32 10  the same 3.8?

 11  A.   No.  That would be an unweighted GPA.  This student's 3.3

 12  would be the unweighted GPA.

 13  Q.   Okay.  And then there's an SAT score below there, 590 on

 14  the left and then 650 and then 650 again.  Do you see that?

 15  A.   Yes.

 16  Q.   And so that's a total of about 1900?

 17  A.   1890, yeah.

 18  Q.   1890.  Okay.  Your math is better than mine, probably your

 19  SAT score.  How did those numbers, the 3.87 adjusted GPA and

02:32 20  the 1890 SAT, compare with applicants who were typically

 21  accepted to USC outside of the subcommittee process?

 22  A.   They're well below the averages, and this is a less

 23  competitive student academically.

 24  Q.   If you saw an ACT score for this student instead of the

 25  SAT score of 1890, if you saw an ACT score of 29, would that

```
 1   change your analysis?

 2   A.   Not really.  That's still well below our average.

 3   Q.   Do you correlate the ACT with the SAT?

 4   A.   We do.

 5   Q.   And how would an ACT score of 29 compare with an 1890 SAT

 6   score at this time?

 7   A.   ACT comports to about a 1940 on the three-part SAT.  An

 8   1890 and 1940 are not actually statistically significant in

 9   terms of a difference in scores.

10   Q.   Do you look at percentiles?

11   A.   Percentiles?

12   Q.   Percentile like how they -- percentile -- the ACT or SAT

13   percentile score.

14   A.   We don't.  We look at the actual score.

15   Q.   So percentiles, why do you not look at percentiles?

16   A.   Percentiles are comparing students -- they're national

17   percentile ranks, so they're comparing students to the whole

18   population of test takers of that test for that given year.

19   And so it would include anyone in the United States who had

20   taken that test during the year.

21        We're concerned with how students compare to our

22   applicant pool, which is really much stronger than the national

23   pool of test takers.

24   Q.   And are there different populations that typically take

25   the SAT or ACT that may factor into those percentiles?
```

02:33 at line 10
02:34 at line 20

**A1821**

```
 1   A.    There can be.  The ACT, especially during this time, was
 2   doing a lot of statewide testing, so they would be -- a state
 3   would contract with the ACT to offer it to all public high
 4   school students in the state as their statewide testing in high
 5   school.  So that would have a lot more students who maybe
 6   weren't college bound who were still taking the ACT as part of
 7   statewide testing.
 8   Q.    And what might that mean for the ACT score and SAT?
 9   A.    It means the overall pool of test takers is probably lower
02:35 10 and so a student's score relative to the overall pool might
11   look like they're a higher percentile rank, but the group of
12   students is not all college bound.
13   Q.    And then on the left there at the bottom, there's a series
14   of initials and dates.  What does that reflect?
15   A.    So those are sort of the record of our votes.  So we had
16   voted to admit the student, and then that's a record of the
17   folks who were present who voted to admit the student.
18   Q.    And how many Admissions Department members are required to
19   admit a student?
02:35 20 A.    We only require three members to hold a meeting, to hold a
21   SUBCO meeting, and it's majority rules, but in -- I would say
22   in the vast majority of cases, we're in consensus to admit or
23   deny a SUBCO applicant.
24   Q.    And whose initials are those at the top there?
25   A.    Those are mine, RJC.
```

| | |
|---|---|
| 1 | Q.   And again, Donna Heinel, would she have had a vote here? |
| 2 | A.   No.  This is -- the only folks who have voting rights are |
| 3 | admissions officers. |
| 4 | Q.   Can we look at the next page, please.  What are we looking |
| 5 | at here? |
| 6 | A.   So this is the athletic resume or information about the |
| 7 | student's athletic talent. |
| 8 | Q.   And looking at this particular athletic resume, what is |
| 9 | your understanding of who prepared this document? |
| 02:36 10 | A.   Given that it has information on the bottom that's |
| 11 | consistent with a lot of the profiles that would come from the |
| 12 | water polo coach, this was prepared by the coaching staff of |
| 13 | the water polo team. |
| 14 | Q.   And that's because at the bottom it says "assets to our |
| 15 | Men's Team"? |
| 16 | A.   Yes. |
| 17 | Q.   So at the top under "Athletic Bio", there's a list of |
| 18 | accolades.  It says, "Four-year varsity starter; three-year |
| 19 | Varsity Team Captain, in 2013, 2012 and 2011; 2013 California |
| 02:36 20 | Scholar Athlete Award; 2013 Asics National Sports Youth |
| 21 | Leadership Council," and it goes on from there. |
| 22 | To what extent is that significant to you on the |
| 23 | subcommittee in your evaluation of a candidate? |
| 24 | A.   It's helpful to us to see, you know, that a student is |
| 25 | competing at a high level, that they're competing and doing |

A1823

1  well, that they're -- you know, things like being first team or

2  selected all division and things like that that are signs that

3  the student is a strong athlete in the pool of high school

4  athletes for the sport.

5  Q.    At the bottom, under "assets to our Men's Team", it says

6  "top 10 attacker in grad class".  Then it says "extremely

7  fast/quick player, will be the fastest player on our team now".

8  What is your understanding of where that information was coming

9  from?

02:37 10  A.    That was coming from the coaching staff and evaluating the

11  student relative to the current members of the USC water polo

12  team.

13  Q.    And in 2014, who was the water polo coach at USC?

14  A.    Jovan Vavic.

15  Q.    So you thought that was coming from him?

16  A.    Him or one of his coaching staff, yes.

17  Q.    What did you understand "will be the fastest player on our

18  team now" to mean?

19  A.    That he swam faster than anyone on the current USC water

02:38 20  polo team.

21  Q.    Is that significant?

22  A.    It seems significant.  They're typically a contender for

23  national championships.

24  Q.    At the bottom there, it says "exceptional leader".  And

25  then it says "immediate impact player, due to his speed".  What

1    is your understanding of what it means to be an immediate

2    impact player on USC's championship team?

3    A.    This would be a student who would be playing in games

4    right away.

5    Q.    If we look at page 7 of the packet, please, who is

6    Alejandro Garfio?

7    A.    He was an associate in the USC Athletic Department who

8    would help Donna with the liaisonship to the athletics

9    subcommittee.

02:38 10    Q.    So he worked for Donna Heinel?

11    A.    I believe so.

12    Q.    It says -- this is an e-mail to him from Jovan Vavic.  I

13    believe you testified that he was the head water polo coach?

14    A.    Correct.

15    Q.    And Vavic writes, "Alex, this kid would be the fastest

16    player on our team, he swims 50 yards in 20 seconds, my fastest

17    players are around 22 seconds, this kid can fly, he was the

18    captain of his high school team as a sophomore, great work

19    ethic, was all CCS, he's a legit walk on who could end up

02:39 20    playing for us very soon".

21          That kind of a write-up from Coach Vavic, what do you

22    understand it to mean?

23    A.    The student is very fast compared to current members of

24    the USC water polo team and that he expected to have him

25    playing in games right away.

1    Q.   And would that be important to you in evaluating this

2    recruit?

3    A.   It would help if a student had a very strong level of

4    athletic talent.

5         MR. FRANK:  Can we look at Exhibit 383, please.  And

6    actually, I'm sorry, Miss Lewis.  I skipped one thing.  If we

7    can just go back to 107 for one moment, the very last page,

8    page 8.

9    Q.   Earlier, you had testified that the athletic profile we

02:40 10   looked at you understood to be prepared by the coach or his

11   staff.  What about this athletic profile?

12   A.   This looks like something that the student --

13        MR. KENDALL:  Objection, your Honor.  Speculation.

14        MR. FRANK:  She's testifying as to her understanding.

15        THE COURT:  I'll let her continue to answer.

16   Overruled.

17   A.   My understanding is this is a document that a student

18   would give to a coach to let the coach know about their

19   athletic talent and obviously wanted to share information about

02:40 20   his academic work as well.

21        MR. FRANK:  If we could look at Exhibit 383, please.

22   Q.   This is a SUBCO packet for Sabrina Abdelaziz?

23   A.   Yes.

24   Q.   What was the date of this subcommittee meeting?

25   A.   October 5, 2017.

A1826

```
 1   Q.   And do you see the initials at the bottom?
 2   A.   Yes.
 3   Q.   Whose initials are those in the second set of initials
 4   there?
 5   A.   Those are mine, RJC.
 6   Q.   Why did you sign this?
 7   A.   I voted to admit Sabrina.
 8   Q.   Okay.  And if we look at the top, it says "Sport: WBSK".
 9   What does that mean?
10   A.   Women's basketball.
11   Q.   And then below that, it says "High School: Hong Kong
12   International School".  Are you familiar with the Hong Kong
13   International School?
14   A.   Yes.
15   Q.   How are you familiar with it?
16   A.   Through my work as an admissions officer, it is one of the
17   many schools that -- you know, where students apply to USC, so
18   I'm familiar with the school.
19   Q.   What do you know about HKIS?
20   A.   It's an international school.  They have a strong
21   curriculum for students, and we typically get a good group of
22   applicants from that school each year.
23   Q.   And do you send admissions officers there?
24   A.   Yes.  We travel all over the country and all over the
25   world, going to high schools, talking to students, letting them
```

1   know about USC and answering those questions.  And Hong Kong

2   International is one of the schools that we regularly visit.

3   Q.    What's the purpose of those visits?

4   A.    To let students know about USC, to help them, you know,

5   through the application process, make sure they know they can

6   ask us questions, to educate them about USC and, hopefully,

7   they will apply.

8   Q.    What, if anything, did you know about athletics at HKIS?

9   A.    I don't really know too much about athletics at the high

02:42 10   school level or really at any level in general.

11   Q.    You're not a sports fan?

12   A.    Not so much.

13   Q.    Looking down at the "Course Curriculum Factor",

14   "Institutional Factor", and "High School Core GPA", what can

15   you tell us about what those indicate?

16   A.    So this is a student who doesn't really have much in the

17   way of advanced or rigorous coursework.  She is attending a

18   high school that prepares students generally well when they

19   come to USC, so her adjusted GPA is a 3.2.  Her unweighted GPA

02:43 20   would be a 2.8.

21   Q.    And what about her test score?

22   A.    And she has a 640 and a 520.  This was moving back from a

23   three-part score to a two-part score.  So on a scale of 1600,

24   she has an 1160.

25   Q.    Would this student have been a competitive applicant for

```
  1   USC outside of the athletic recruitment process?
  2   A.   She does not appear to be a competitive applicant
  3   academically.
  4        MR. FRANK:  Could we take a look at page 2.
  5   Q.   What is this document?
  6   A.   So this is an athletic resume telling us about a student's
  7   athletic talent.
  8   Q.   And you see at the top it says "SC Women's Basketball"?
  9   A.   Yes.
 10   Q.   What is your understanding of who would have prepared this
 11   document?
 12   A.   This would have been prepared by the women's basketball
 13   coaching staff.
 14   Q.   And there's a photograph there.  What is your
 15   understanding of who is in that photograph?
 16   A.   This could be a photograph of Sabrina.
 17   Q.   And then below there's a write-up.  It says, "Sabrina
 18   Abdelaziz is a starting point guard and team captain at the
 19   Hong Kong International School basketball team.  They were the
 20   48th Holiday Basketball Tournament Champions and 2016 China Cup
 21   Champions.  She made it to the APAC basketball finals and was
 22   part of the International School Sports Federation of Hong Kong
 23   Select Team.  For club, Sabrina played for Hong Kong Basketball
 24   Academy and was named 15U and 16U champions back to back
 25   years".
```

```
 1              What is your understanding of the significance, if at
 2     all, of that information?
 3     A.   I think it's evidence of her athletic talent, that she is
 4     playing at a competitive level, both in school and with a club
 5     team, and is doing very well.
 6     Q.   And what is your understanding of what it means that she's
 7     the starting point guard and team captain at HKIS?
 8     A.   That she's one of their best players.
 9     Q.   At the very bottom, it says "As part of the Asia Pacific
02:45 10    Conference All Star Team matched with her rigorous academic
11     curriculum, Sabrina will be a great addition to our USC
12     program".
13              What is your understanding of what the coach is
14     telling you there?
15     A.   They're very excited to have Sabrina playing on their
16     team.
17     Q.   If we can go back to page 1 of this document, the date of
18     this subcommittee meeting again?
19     A.   October 5, 2017.
02:45 20    Q.   Can we look at Exhibit 384, please.  What is the date of
21     this subcommittee meeting for this applicant?
22     A.   Also October 5, 2017.
23     Q.   So you would have considered Thomas Kimmel at the same
24     meeting that you considered Sabrina Abdelaziz?
25     A.   That's correct.
```

|   | |
|---|---|
| 1 | Q.   And taking a look under "Sport", it says "MTRA".  What |
| 2 | does that mean? |
| 3 | A.   Men's track and field. |
| 4 | Q.   Under "High School", it says "Bishop's School".  What do |
| 5 | you know about the Bishop's School? |
| 6 | A.   It's an independent school in San Diego.  Again, prepares |
| 7 | students well.  We typically will get a number of applicants |
| 8 | from Bishop's. |
| 9 | Q.   The course curriculum factor and institutional factor is |
| 02:46 10 | 2.  And the adjusted GPA is 4.0.  What does that mean? |
| 11 | A.   So he has some rigor in his curriculum.  He goes to a |
| 12 | school that's preparing students well relative to coming to |
| 13 | USC.  His unweighted GPA would be a 3.6 and an adjusted of 4.0. |
| 14 | Q.   What about his SAT scores? |
| 15 | A.   It looks like he has a 1370 on the SAT. |
| 16 | Q.   So would this student, Thomas Kimmel, have been |
| 17 | competitive academically with other applicants at USC outside |
| 18 | of the athletic recruitment process? |
| 19 | A.   He would not have been terribly competitive academically. |
| 02:47 20 | We see much stronger applicants from his high school every |
| 21 | year. |
| 22 | Q.   At the bottom, are those your initials? |
| 23 | A.   Yes, RJC. |
| 24 | Q.   Why did you vote to approve this applicant for admission |
| 25 | to USC? |

**A1831**

```
  1   A.   Based on the information that had been presented, we

  2   believe that he would contribute athletically to the

  3   university.

  4   Q.   Who did you understand that to be coming from?

  5   A.   I don't remember what his --

  6   Q.   It says "WCRA" at the top -- or "MTRA", sorry.

  7   A.   Oh, that he was being recruited by the men's track and

  8   field team.

  9        MR. FRANK:  Can we look at page 2, please.

 10   Q.   And again, your understanding of who prepared this?

 11   A.   This was prepared by the coaching staff of the track and

 12   field team.

 13   Q.   What's your understanding of who's depicted in that

 14   photograph?

 15   A.   That's a picture of Tommy Kimmel.

 16   Q.   If we look at Exhibit 661, please, what is the date of

 17   this subcommittee meeting?

 18   A.   October 5, 2017.

 19   Q.   So the same date as which you voted on Sabrina Abdelaziz

 20   and Thomas Kimmel?

 21   A.   Yes.

 22   Q.   Okay.  And the sport here is listed as "MBAS".  What do

 23   you understand that to be?

 24   A.   Men's baseball.

 25   Q.   Okay.  And then the school is Harvard-Westlake.  What do
```

1    you know about Harvard-Westlake?

2    A.    Harvard-Westlake is an independent school in Los Angeles

3    that sends us very strong applicants every year and is

4    academically rigorous.

5    Q.    Under course curriculum factor and institutional factor,

6    there's a two and four.  Under core GPA, there's a 4.04.  Under

7    SAT, there's a 760 and 760.  How do those numbers stack up?

8    A.    So this is a student who's taking some rigor in his

9    coursework, although we'll regularly see students from his

02:48 10    high school taking more rigor.  Again, it's a school that

11    prepares students well when they come to USC.  His unweighted

12    GPA would be 3.4 GPA and his SAT score is a 1520.

13    Q.    So would this student be competitive outside of the

14    athletic recruitment process?

15    A.    He's not a very competitive applicant based on the grades

16    that he's received and the coursework that he's taken.

17    Q.    You voted for this student as well?

18    A.    Yes.

19    Q.    Why?

02:49 20    A.    I voted to approve the student based on his -- the

21    strength of his athletic talent and that he'd contribute

22    athletically to USC.

23            MR. FRANK:  Can we look at Exhibit 413, please.

24    Q.    What's the date of this subcommittee meeting?

25    A.    November 2, 2017.

| | | |
|---|---|---|
| 1 | Q. | And the candidate here is Audrey Isackson? |
| 2 | A. | Yes. |
| 3 | Q. | And the sport is WROW? |
| 4 | A. | Yes. |
| 5 | Q. | What does that mean? |
| 6 | A. | Women's rowing, or crew. |
| 7 | Q. | Crew? |
| 8 | A. | Women's crew or women's rowing, yes. |
| 9 | Q. | And the high school is Woodside Priory? |

02:49 10   A.   Yes.

11   Q.   What do you know about that school?

12   A.   It's a parochial school in Northern California.  Again,

13   rigorous academic school that prepares students well and,

14   typically, will send many applicants to USC.

15   Q.   Looking at the course curriculum factor of one and the

16   institutional factor of three and the high school core GPA of

17   3.43, what is your assessment of how this student would fair in

18   the general admissions pool?

19   A.   This student's unlikely to be competitive academically

02:50 20   with an unweighted GPA of 3.0, hasn't taken as much rigor as

21   we'll see as many of her classmates and hasn't earned very

22   strong grades compared to classmates.

23   Q.   What about the ACT score of 31?

24   A.   It's fine.  It's below our averages.

25   Q.   What's your understanding of, based on looking at this,

1    who took the ACT?

2    A.    That it was taken by Audrey Isackson.

3    Q.    If we look at page 2, the very bottom, it says "Audrey is

4    a high caliber walk on that could vie for a seat in our varsity

5    4 boat within a year.  She has been rowing four years at a

6    smaller club program but has huge potential once given the

7    training and resources of a Division 1 program".

8            What is your understanding of what that means?

9    A.    That although she was presented without athletic

02:51 10    scholarship that she would be a -- you know, a strong

11    contributor with very little training from USC, that she's been

12    involved with rowing for a long time, and that they're excited

13    to have her as part of their program.

14    Q.    What, if at all, is the significance of the fact that

15    she's been involved with rowing before?

16    A.    There aren't that many students who have rowing

17    experience, so to see that a student has had experience with

18    that, is bringing that experience to our team, is valuable.

19            MR. FRANK:  Could we look at Exhibit 414, please.

02:51 20    Q.    What's the date of this subcommittee meeting?

21    A.    November 2, 2017.

22    Q.    So that's the same date as the subcommittee meeting for

23    Audrey Isackson that we just looked at?

24    A.    Yes.

25    Q.    This one is for Matteo Sloane?

**A1835**

A.    Yes.

Q.    The sport is listed as MWP?

A.    This is men's water polo.

Q.    And the school again is the Buckley School?

A.    Yes.

Q.    And then course curriculum factor of 2, institutional factor of 4, GPA of 3.82, and ACT score of 25.  Would this student have been competitive outside of the athletic admission recruitment process?

A.    The student is not competitive academically.

Q.    And taking a look at page 2 --

       MR. FRANK:  Miss Lewis, if you could highlight the paragraph at the bottom, "asset to our Men's Team".

Q.    It says, "Matteo brings the knowledge of international experience which makes him extremely valuable to the team along with experience in the playing style and plays that Coach Vavic teaches.  He has superior moves as a perimeter/attack player and has the ability to get free for shots and to draw foul that create 6 on 5 opportunities for his team.  He participates on LA Water Polo Red Team coached by Stephan Pillion and Dustin Litvak during the school year and travels to Italy during the summers.  Both coaches talk about his tremendous talent, smarts, and work ethic.  His high school does not have a water polo team so he stays in shape by participating on their co-ed swimming team".

```
 1              What is your understanding of the significance, if
 2     any, of the international experience that's referenced in this
 3     profile?
 4     A.   Many of our full athletic scholarship water polo players
 5     are students from abroad, from Eastern Europe, and so, you
 6     know, they compete at a very high level.  If there was a
 7     student who was competing among that group of students, we
 8     would believe that student is also very talented athletically.
 9              MR. FRANK:  Can we look at Exhibit 662, please.
10     Q.   Again, the date of this subcommittee meeting?
11     A.   November 2, 2017.
12     Q.   So, again, the same date as Audrey Isackson and Matteo
13     Sloane?
14     A.   Yes.
15     Q.   This student is also from the Harvard-Westlake School?
16     A.   Yes.
17     Q.   And the sport is "MTEN".  What does that stand for?
18     A.   Men's tennis.
19     Q.   Okay.  And looking at the academic credentials, how do you
20     assess those relative to the general admission population?
21     A.   The student would not be academically competitive in our
22     pool of applicants.
23              MR. FRANK:  Could we look at Exhibit 663, please.
24     Q.   What's the date here?
25     A.   November 2, 2017.
```

Q.   So the same subcommittee meeting as Audrey Isackson,

Matteo Sloane and  Jordan Tuchin?

A.   Yes.

Q.   And this student is Olivia Giannulli?  Do you see that?

A.   Yes.

Q.   And the sport is "WROW".  Again what does that stand for?

A.   Women's rowing or women's crew.

Q.   The school is Marymount High School.  What can you tell us

about Marymount High School?

A.   Marymount High School is an all girls Catholic high school

in Los Angeles.  Again, it prepares their students well.  We

typically have a great group of women that will apply from that

school each year.

Q.   The course curriculum factor is zero and the institutional

factor is 2.  What do those mean?

A.   So she wasn't taking much in the way of advanced or

rigorous coursework.  She's at a school that prepares its

students fairly well for USC.  Her unweighted GPA would be a

3.6.

Q.   And her SAT score is 560 and 510.  Again, how does that,

all of that academically stack up with students admitted to USC

outside of the athletic recruitment process?

A.   She would not be competitive academically in our process.

Q.   If we look at page 2, it says "Olivia Giannulli coxswain"

at the top?

A.   Yes.

Q.   And at the very bottom, it says "USC has four boats which require 4 coxswains along with 2 backups.  Olivia would fill the position of our number 3 boat.  Her sister is currently on our roster and fills the position of our number 4 boat. Division 1 rowing programs use scholarships for the oarsmen but rarely with scholarship a coxswain.  Although Olivia is nonscholarship she is highly talented and has been successful in both men's and women's boats".

What is your understanding of that discussion about scholarship versus nonscholarship?

A.   This is the coach letting us know why a student may not be receiving athletic scholarship, but is still a valuable and talented contributor to the team.

Q.   What is your understanding of what it means where it says that "she has been successful in both men's and women's boats"?

A.   That she has experience being a coxswain for both men and women's crew teams during high school.

Q.   There's also a reference to her sister who is currently on your roster or on the USC roster.  What, if any, is the significance of that?

A.   I'm not sure there's any specific significance other than letting us know that, you know, this student, who has been a coxswain, her sister has been a coxswain.  She knows what it means to come to the USC team and is interested in coming and

```
 1  participating on the team.
 2          MR. FRANK:  If we look at Exhibit 229, please.
 3  Q.   You see that this is a recruitment SUBCO packet for
 4  Isabella Giannulli?
 5  A.   Yes.
 6  Q.   And the date is approximately one year earlier, 10/27/16?
 7  A.   Yes.
 8  Q.   Who do you understand Isabella Giannulli to be in relation
 9  to Olivia Giannulli?
10  A.   Her older sister.
11  Q.   Okay.  And the sport here is listed "WROW".  Is that
12  women's rowing again?
13  A.   Yes.
14  Q.   And again, if you could take a look at the course
15  curriculum factor, the institutional factor, the GPA, and the
16  test scores, how do those compare competitively with other
17  students who are admitted to USC outside of the athletic
18  recruitment process?
19  A.   This student would not be competitive academically in our
20  process.
21  Q.   Okay.  Let's look at page 2.  It says "Bella is an
22  earnest, outspoken, incredibly positive minded coxswain" in the
23  first line.
24  A.   Yes.
25  Q.   And then, at the bottom, it says, "It is essential that we
```

1    have athletes like Bella join our team to give us more depth in

2    the coxswain department without costing us a scholarship at

3    this time, since there are so few scholarships becoming

4    available next year".

5           What is your understanding of what that discussion

6    means?

7    A.   Again, the coach explaining that though the student is not

8    receiving athletic scholarship, they're very talented in the

9    coxswain position that they fill.

02:58 10  Q.   If we could look at Exhibit 420, please.  The date of this

11   subcommittee meeting?

12   A.   November 16, 2017.

13   Q.   The applicant is Gino Palatella?

14   A.   Yes.

15   Q.   The sport is "MFOO".  What does that mean?

16   A.   Men's football.

17   Q.   The school is Sacred Heart Atherton?  What do you know

18   about that school?

19   A.   Catholic school up in Northern California.  Looks like

02:59 20  they prepare students fairly well for USC.  We would definitely

21   have applicants each year from Sacred Heart.

22   Q.   Here the course curriculum factor is zero.  The GPA is

23   2.85, and the SAT score is 1410.  How does that stack up?

24   A.   The student has an unweighted GPA of 2.6 with not really

25   rigor to speak of, which is far below what most of our

```
 1    applicants are doing.  So he would not be academically

 2    competitive at USC.

 3    Q.   Would this student have been admitted outside the SUBCO

 4    process?

 5    A.   No.

 6            MR. FRANK:  Could we look at Exhibit 592, please.

 7    Q.   What is the date of this SUBCO meeting?

 8    A.   August 1, 2018.

 9    Q.   And who is the candidate?

10    A.   Agustina Huneeus.

11    Q.   What is the sport?

12    A.   Women's water polo.

13    Q.   The school?

14    A.   Marin Academy.

15    Q.   Do you know anything about Marin academy?

16    A.   An independent school up in Northern California, good

17    rigor, and prepares students well for USC.

18    Q.   And what is your assessment of this student's academic

19    qualification outside of the athletic recruitment process?

20    A.   This student has an unweighted 3.1 GPA, and really not

21    much rigor.  We would not -- this student would not be

22    competitive academically in the USC process.

23    Q.   If we look at page 2, it says in the first line, "Agustina

24    is a high caliber walk on in a much needed goalie position".

25    Do you see that?
```

03:00 (lines 10, 20)

1    A.    Yes.

2    Q.    And I just want to direct you about three lines down from

3    there in the middle of the line.  It says, "She is a brick wall

4    when it comes to penalty shots.  No one can get the ball by

5    her.  She is a leader in the pool and controls her defense, she

6    is a constant communicator which is a valuable skill".

7          Then at the end there, it says, "She has the ability

8    to pay on her own and comes from a good school.  She has

9    verbally committed to us and will be a great Trojan!"

03:01 10         What's your understanding of all of that?

11    A.    Sounds like she's a very talented goalie and someone who

12    will be very valuable to the team.  They're not awarding

13    athletic scholarship for this student.  I mean, most of the

14    teams do not have enough scholarships for all the students on

15    the team to receive scholarships, so they would have to decide

16    where they'll use their scholarship most effectively.  The

17    coach will have to decide.

18    Q.    Okay.  You just looked at 11 subcommittee packets for 11

19    different students.  Would any of these students have been

03:01 20    competitive applicants to USC outside of the athletic

21    recruitment process?

22    A.    No.  None of them are academically competitive students.

23    Q.    Did you follow-up with the coaches of any of these sports

24    about their interest in any of these applicants?

25    A.    No.

```
 1    Q.    Why not?

 2    A.    We believe we had the information that we need from the

 3    coach.  If we thought we didn't have enough information, we

 4    would ask our Athletic liaison to get us more specific

 5    information, but in these cases, it looks like we had all the

 6    information that we needed to make an admissions decision.

 7    Q.    Based on your experience in USC admissions, what's the

 8    likelihood that these applicants would have been committed if

 9    they weren't walk-on athletes?

10         MR. SHEKETOFF:  Objection.

11         THE COURT:  Overruled.

12    A.    It's highly unlikely.  I don't think any of them would be

13    admitted without their athletic talent.

14    Q.    Did Donna Heinel tell you that the parents of these

15    students were making payments in connection with their

16    admission?

17    A.    No.

18    Q.    Did you know that payments were contingent on their

19    admission?

20    A.    Absolutely not.

21    Q.    Would that information have mattered to you in evaluating

22    these students?

23    A.    Absolutely.  That would have been a huge problem.

24    Q.    Why?

25    A.    Because we don't offer admission in exchange for money.
```

1  Q.   What would you have done if you had known that Donna

2  Heinel or anyone in the Athletic Department was taking money in

3  exchange for their program or for themselves in exchange for

4  the admission of these students?

5  A.   We would have, you know, definitely gone to our vice

6  president.  We would have elevated this to look into what was

7  going on and really done a review of students who were being

8  represented to us.  That would have been totally unacceptable.

9  Q.   At the time of their admission, did you know that any of

03:03 10  these students were working with an outside college counselor?

11  A.   No.

12  Q.   Miss Chassin, I want to direct your attention to 2018.

13  Did there come a time when you began to have concerns that some

14  student athletic recruits to USC were not legitimate athletic

15  recruits?

16  A.   Yes.

17  Q.   What happened?

18  A.   In the spring of 2018 --

19       MR. KELLY:  What's the time frame?

03:04 20       MR. FRANK:  She said spring of 2018.

21       MR. KELLY:  I didn't hear.

22       MR. FRANK:  Spring of 2018.

23  A.   So, in the spring of 2018, we began to hear from some high

24  school counselors who were surprised that students were being

25  admitted to USC based on their athletic talent, based on

```
 1    playing, you know, these sports.  And we heard from various

 2    high school counselors.  It wasn't all coming from one school,

 3    and that started to raise red flags.

 4    Q.   What did you do?

 5    A.   I spoke to Donna Heinel about it because I believed

 6    that --

 7         MR. SHEKETOFF:  Objection.  She spoke to Donna Heinel

 8    about it.

 9         THE COURT:  You can say what you said to her.

03:04 10         MR. FRANK:  Your Honor, the response is directly

11    relevant.  It's a coconspirator statement in furtherance.

12         THE COURT:  This is an 801?

13         MR. FRANK:  (d)(2)(e), yes, your Honor.

14         MR. SHEKETOFF:  She started to say what was on her

15    mind.  The reason why she spoke with Donna Heinel, that's

16    irrelevant.

17         THE COURT:  Sustained to that extent.

18    Q.   What did you do?

19    A.   I wrote an e-mail to Donna Heinel asking her about

03:05 20    specific students and telling her that we heard that they may

21    not be athletic recruits.

22         MR. FRANK:  For the witness only, if we could look at

23    Exhibit 511, please.

24    Q.   What is Exhibit 511?

25    A.   An e-mail.
```

```
 1   Q.   Whose it from?

 2   A.   From Kirk Brennan.

 3   Q.   Whose Kirk Brennan?

 4   A.   He's the Director of Undergraduate Admission.

 5   Q.   He's your boss?

 6   A.   Yes.

 7   Q.   It's sent to whom?

 8   A.   Tim Brunold and myself.

 9   Q.   Who's Tim Brunold?

10   A.   Tim Brunold is the Dean of Admission.

11   Q.   He's Kirk Brennan's boss?

12   A.   That's correct.

13   Q.   The date?

14   A.   April 13, 2018.

15   Q.   The subject?

16   A.   "Regarding independent counseling concerns".

17            MR. FRANK:  Government offers 511.

18            THE COURT:  It will be admitted.

19            (Exhibit 511 admitted into evidence.)

20   Q.   If you look at the bottom of the chain --

21            MR. KENDALL:  Your Honor, just a continuing objection

22   to 511.

23            THE COURT:  Yes.

24   Q.   You see there's an e-mail from Clay Busia to you, copied

25   to others at USC?
```

```
 1   A.    Yes.

 2   Q.    Who's Clay Busia?

 3   A.    He is one of our -- at the time, he was one of our

 4   admission officers.

 5   Q.    And it's to you and then copied to Aaron Brown and Kelsey

 6   Bradshaw.  Who are they?

 7   A.    Aaron Brown and Kelsey Bradshaw were two admission

 8   officers who also sat on the Athletic Subcommittee at that

 9   time.

10   Q.    Where did they rank in the hierarchy of USC admissions?

11   A.    Aaron Brown was an Associate Director and Kelsey Bradshaw

12   was a junior member of our office.

13   Q.    And Clay Busia writes on April 11th, "Hi, everyone!  I

14   just shared this information with Aaron.  Have you heard of

15   this group before?"  And then there's a link to

16   Thekeyworldwide.com.

17         Had you heard of The Key Worldwide before?

18   A.    No.

19   Q.    And it says, "I had a conversation with a counselor at

20   Woodside Priory in Northern California that was too similar to

21   the conversation I had with Marymount High School a few weeks

22   ago about one of their students of interest to women's crew.  I

23   was able to get this group's information from the counselor at

24   Priory.  I just called Marymount and they confirmed this is the

25   same group and counselor they have had concerns about
```

(03:06 at line 10, 03:07 at line 20)

1   (Georgetown called them out on a similar case).

2        "He allegedly charges over $80,000 per client and has

3   worked some magic on tennis, baseball, crew, and several other

4   athletic teams across the country.  I am concerned".

5        What was your understanding of what Clay Busia was

6   telling you?

7   A.   That he was hearing from counselors that some students

8   were using an independent counselor who seemed to be doing

9   illegitimate things in the admission process.

03:08 10  Q.   There's a specific reference in the e-mail to a

11  conversation with Marymount High School about one of their

12  students of interest to women's crew.  Did you have an

13  understanding of which student Clay Busia was talking about?

14  A.   He was talking about Olivia Giannulli.

15  Q.   If we look up in the chain, you forwarded this e-mail with

16  an "FYI" to your two bosses, Tim Brunold and Kirk Brennan.  Why

17  did you do that?

18  A.   I wanted to let them know that this is what we were

19  hearing from counselors and the additional information that

03:08 20  Clay had received.

21  Q.   Tim Brunold responds to you and Mr. Brennan, "Wow, the

22  plot thickens.  Have we heard back from Donna on the cases

23  where we expressed concern?"

24        And what did you understand Mr. Brunold to be

25  referring to?

A.    So I had written the e-mail to Donna asking her questions

about student athletes who had been approved and who we had

received questions about from the high school counselors.

Q.    Mr. Brennan writes, "I heard back on one I gave her,

Sloane, the Italian player Buckley said was a small guy.  She

says he really plays internationally, met Jovan at a tournament

in Serbia, and that he's a solid talent".

        Who's Jovan?

A.    Jovan Vavic, the men's water polo coach at the time.

Q.    And what was the -- what was your understanding of what

Mr. Brennan was relaying to you there?

A.    That he had spoken to Donna about the concern and that she

had given him information that helped him to know that he was a

legitimate recruit.

Q.    Then he writes, "Becky heard about a couple others; I'll

let her answer.  The tall coxswain seems like BS to me".

        Who's Becky?

A.    That's me.

Q.    And what did you understand him to be referring to about

the "tall coxswain"?

A.    Coxswains are generally very small and very light.  That

is valuable to their position in the boat.

Q.    He writes, "I'm beginning to think we need to reconcile

the rosters to the SUBCO docket.  Fred used to provide this and

it was a good way to see who was contributing.  Or maybe we

```
 1  need statements from high schools about athletic talent for
 2  walk-ons.  I dunno.  This service seems nuts".
 3          What did you understand Mr. Brennan to be saying?
 4  A.  That he wanted to begin to go back and look at the
 5  students enrolled in the university to see that they continued
 6  to play the sport for which they were recruited and presented
 7  to SUBCO.  I think that "this service seems nuts" is referring
 8  to The Key Worldwide.
 9  Q.  He said in his e-mail that you had heard about a couple of
10  others.  By the time of this e-mail on April 13th, had you
11  reached out to Miss Heinel?
12  A.  Yes.  I reached out to her before that.
13          MR. FRANK:  If we can show the witness only
14  Exhibit 513, please.
15  Q.  Do you recognize this document?
16  A.  Yes.
17  Q.  What is it?
18  A.  An e-mail.
19  Q.  Who is it from?
20  A.  Kirk Brennan.
21  Q.  Who is it to?
22  A.  Me and Tim Brunold.
23  Q.  And what is the date?
24  A.  April 13, 2018.
25  Q.  What is the subject?
```

```
 1    A.    "Regarding walk-ons".

 2              MR. FRANK:  Government offers 513.

 3              THE COURT:  It will be admitted.

 4              MR. KENDALL:  Objection, your Honor.

 5              MR. KELLY:  Objection.  Hearsay.

 6              MR. KENDALL:  Your Honor, my issue is my client's son

 7    was admitted 4 years before this.

 8              MR. FRANK:  Your Honor, I object to the speaking

 9    objection.

03:11 10          MR. KENDALL:  Your Honor, objection to time.

11              THE COURT:  Well, I'm going to admit it but I'll hear

12    you.  It will be admitted de bene depending on a discussion

13    outside the hearing of the jury.

14              (Exhibit 513 admitted into evidence.)

15    Q.    If we look at the first e-mail in the chain, you wrote an

16    e-mail to Donna Heinel with a copy to Tim Brunold.  Do you see

17    that?

18    A.    Yes.

19    Q.    "Subject: Walk-ons".  Do you see that?

03:11 20   A.    Yes.

21    Q.    And you wrote, "Hi Donna, here are a couple students whose

22    high schools were quite surprised to hear they were being

23    admitted as athletic recruits.  Thanks for looking into it.

24    Thanks, Becky".

25              And then you listed three students, Olivia Giannulli,
```

1    Tyler Kornguth, and Jordan Tuchin.  We just looked at their

2    athletic profiles?

3    A.   Yes.  That's correct.

4    Q.   And why did you list those three students in your e-mail

5    to Donna Heinel?

6    A.   They were three students that we had heard from high

7    school counselors that they were surprised that they were being

8    admitted as athletic recruits.  They didn't believe that their

9    athletic talent warranted admission to a Division 1 program.

03:12 10   Q.   Next to Olivia Giannulli, it says "Marymount High School

11   Women's crew".  And then it says, "sister was also recruited

12   for women's crew last year".  Who is that?

13   A.   Bella Giannulli.

14   Q.   Then it says, "school doesn't think either of the students

15   are serious crew participants.  Sister Isabella is not on the

16   online crew roster for this year.  They are daughters of the

17   actress Lori Loughlin".

18        Under "Tyler Kornguth", it says "school reports that

19   he is not a starter on their baseball team.  Seems to be second

03:12 20   tier player".

21        And under "Jordan Tuchin", you wrote "school reports

22   that he does not play for their school team which is very

23   competitive.  His packet indicated USTA play, but not tons that

24   would preclude his participation on the school team".

25        Why did you provide that information to Miss Heinel?

A.   I wanted to let her know the things that were raised that

brought doubt to whether or not these students were

athletically talented, whether they were strong enough athletes

to contribute to our Division 1 teams.

Q.   If we look up at the next e-mail in the chain, it's dated

March 29, 2018.

A.   Yes.

Q.   She writes, "Becky, Isabella was on crew in the fall of

last year but did not continue in spring due to the coach

(Zenon).  At the end of the year we fired Zenon and hired Josh

Adams.  Olivia was on the list of novice prospects that Josh

inherited.  He was seen her cox for the men's team during the

fall and thinks she has talent.  Her MAC club is competitive on

both the men's and women's side.  He honored the invitation

that was extended to Olivia from the past staff and is

welcoming her to be a walk on and to earn a spot.

          "Tyler Kornguth does not start for Harvard-Westlake

but is a highly talented baseball player.  Harvard-Westlake is

very political and Tyler is behind the son of a donor that gave

$1 million to the baseball program.  Tyler plays with Pacific

Baseball Academy during the summer which is where USC saw his

talent.  He can play multiple positions 2B, INF, have a good

bat, has great baseball IQ, smart in the classroom, and offered

to come to USC.  These were all the factors that baseball

looked at.

```
 1              "This is the feedback thus far."
 2              What was your understanding of Ms. Heinel's response?
 3    A.   That she had explanations for why the school might not be
 4    familiar with the student's athletic talent but that the
 5    athletic talent was, in fact, legitimate.
 6    Q.   Did you believe her?
 7    A.   I did believe her.
 8    Q.   Why?
 9    A.   I found her to be a very trustworthy colleague, somebody
10    that I trusted and somebody I knew would want to follow the
11    rules, would want to follow-up on these things if anything was
12    not as it should be.
13    Q.   If we look at the next e-mail up in the chain, you
14    forwarded this to Mr. Brunold and Mr. Brennan.  Do you see
15    that?
16    A.   Yes.
17    Q.   You said, "Haven't heard anything about Tuchin"?
18    A.   Yes.
19    Q.   And then Mr. Brennan responded, "On my water polo student,
20    Buckley confirmed that the water polo player I gave Donna is
21    also a client of this new Worldwide consultancy.  They also now
22    know more about his talent, so they are less concerned about
23    it".
24              What was your understanding of what Mr. Brennan was
25    telling you?
```

03:15 (line 10)

03:15 (line 20)

A.    That he had relayed Donna's information about the student

to the high school and the high school conceded that there may

be information about the student's water polo that they weren't

aware of.

Q.    And did you have an understanding of why Mr. Brennan was

telling you this?

A.    That he was closing the loop, letting us know that we

shouldn't be concerned about Matteo Sloane.

Q.    He writes, "Julie at Buckley mentioned that a D1 school

recently put their tennis coach on leave for pushing a

talentless kid (who didn't play tennis) who came from this

shady outfit.  I will listen for news articles on this".

    What shady outfit did you understand this to be

referring to?

A.    The Key Worldwide.

Q.    He wrote, "Something's real fishy on this program.  It's

starting to catch on at high schools."

    He wrote, "FWIW, Donna also told the water polo coach

the high school pushed back".

    Who's the water polo coach?

A.    Jovan Vavic.

Q.    "Which wasn't the case; they were surprised, though, which

got back to the dad, who hollered at the counselors.  That also

sounds like the story Becky heard about PJ at Marymount.  This

kind of intimidation is not cool".

```
 1            What did you understand him to be referring to there?
 2     A.   That the fathers of these students had heard that we were
 3     asking about their athletic talent, doubting their athletic
 4     talent, and they had gone to the high school to holler at the
 5     high school counselor for interfering in the process.
 6     Q.   He writes, "it sounds like the story Becky heard about PJ
 7     at Marymount".  What student did that relate to?
 8     A.   Olivia Giannulli's father also had gone in and yelled at
 9     the high school counselor.
03:17 10            MR. KENDALL:  Objection, your Honor.  Hearsay.
11            THE COURT:  Sustained.
12     Q.   What did you do as a result of receiving this e-mail?
13     A.   We wanted to look further into -- we looked further into
14     the legitimacy of the student's athletic talent.  We did
15     compare rosters with students who had been presented.
16     Q.   And did you confer with Donna Heinel?
17     A.   And we talked to Donna Heinel about our concerns with the
18     parents yelling at the counselors for us asking questions and
19     trying to verify information about the student's athletic
03:17 20     talent.
21     Q.   And what happened as a result of Heinel's response to you?
22     A.   I'm not sure I understand your question.
23     Q.   Did you do anything further after Heinel responded to you?
24     A.   No.  She gave us, you know, really helped us feel at ease
25     that these were legitimate recruits, the student's athletic
```

```
 1   talent was as presented, and there was nothing further to do.
 2   Q.   Did there come a time when you withdrew offers of
 3   admission for any student admitted through the Subcommittee on
 4   Athletic Admission during the 2019 admission process?
 5            MR. KENDALL:  Objection, your Honor.  It's beyond the
 6   scope of the alleged conspiracy.  It's hearsay.
 7            THE COURT:  What's the relevance?
 8            MR. FRANK:  It's actually been directly addressed by
 9   counsel for Mr. Abdelaziz with regard to his client's daughter
10   and the fact that she remains enrolled in university.  It's
11   directly responsive to that.
12            MR. KELLY:  She does remain enrolled.
13            THE COURT:  All right.  You can have the question.
14   Objection is overruled.
15   Q.   Did there come a time when you withdrew offers of
16   admission for any student admitted to the Subcommittee on
17   Athletics Admission cycle in 2019?
18   A.   Yes.
19   Q.   Why did you do that?
20            MR. SHEKETOFF:  Objection.
21            THE COURT:  Overruled.
22   A.   When we learned that there were students who had been
23   presented with fake athletic resumes and were not legitimate
24   athletes but had been approved through the SUBCO process, we
25   did not want to let their admission stand, and so we rescinded
```

**A1858**

1    our admission.

2    Q.   Which students were those?

3    A.   Agustina Huneeus, Claire Altman.  I don't remember the

4    last student.  There were three.

5    Q.   As a result of that process that you undertook, did there

6    come a time when you learned that Donna Heinel had misled you?

7           MR. KENDALL:  Objection, your Honor.

8           THE COURT:  Grounds?

9           MR. KENDALL:  Again, it's a hearsay statement.  What

03:19 10   Donna was thinking or what she did is different than

11   information that was conveyed to her.

12          THE COURT:  She can state if she -- if she learned

13   that Heinel was disciplined.

14          MR. KENDALL:  Objection, your Honor.  I think that

15   raises a true hearsay issue.

16          MR. FRANK:  She's testifying, your Honor --

17          THE COURT:  Objection's noted.

18          MR. FRANK:  Thank you.

19   Q.   Did you learn that Donna Heinel had misled you?

03:20 20   A.   Yes.

21   Q.   How did you learn that?

22          MR. KENDALL:  Objection.

23          THE COURT:  Overruled.

24   A.   First --

25   Q.   Based on what you did, did there come a time when you

```
 1  learned that she had misled you?
 2  A.   Yes.  I was asked questions by our --
 3  Q.   Without telling me what anyone asked you and what you
 4  spoke about.  You just testified that you learned -- that you
 5  ultimately withdrew offers of admission for some students?
 6  A.   Yes.
 7  Q.   And based on your -- based on that, did you learn that
 8  Miss Heinel had misled you?
 9           MR. KENDALL:  Objection.
10           THE COURT:  Overruled.
11  A.   I learned that Donna Heinel had misled us and that the
12  information in the athletic resumes that had been presented was
13  false.  We talked to the coaches --
14           MR. SHEKETOFF:  Objection, your Honor.
15           MR. KENDALL:  Objection, your Honor.
16           THE COURT:  Not what the coaches told you.
17  Q.   Without telling us what the coaches told you, did that
18  inform your opinion?
19  A.   Yes.
20  Q.   What was your reaction to learning that?
21           MR. SHEKETOFF:  Objection.
22           MR. KENDALL:  Objection, your Honor.
23           THE COURT:  Well, she can state her reaction.
24  A.   I felt truly betrayed by a colleague, somebody that I had
25  trusted.  I came to find out she had been lying to me and, when
```

**A1860**

```
 1   confronted, continued lying to me.
 2           MR. KENDALL:  Objection, your Honor.  Move to strike.
 3   It's full of hearsay.
 4           THE COURT:  Overruled.
 5   Q.   Are you aware of whether Donna Heinel remains employed at
 6   USC?
 7           MR. KENDALL:  Objection.
 8           THE COURT:  Overruled.
 9   A.   She's no longer employed.
10   Q.   Since when?
11   A.   March of 2019.
12   Q.   Are you aware of whether Jovan Vavic remains employed by
13   USC?
14           MR. KENDALL:  Objection.
15           THE COURT:  Overruled.
16   A.   He's no longer employed.
17   Q.   Since when?
18   A.   March of 2019.
19   Q.   Are you aware of whether the university investigated any
20   of the students who were admitted through the subcommittee
21   process that you were involved in?
22           MR. KENDALL:  Objection, your Honor.  That's truly
23   hearsay.
24           THE COURT:  How do you --
25           MR. FRANK:  I'm just asking if she's aware of the
```

**A1861**

```
 1   investigation.
 2           THE COURT:  She can state whether she's aware of the
 3   investigation.
 4   A.   I'm aware that current students were referred to the
 5   student Judicial Academic Committee.
 6   Q.   Did there come a time when Sabrina Abdelaziz came to your
 7   office?
 8   A.   Yes.
 9   Q.   When was that?
10   A.   June of 2019.
11   Q.   And why did she come to your office?
12           MR. SHEKETOFF:  Objection, your Honor.
13           THE COURT:  Sustained.
14   Q.   What happened?
15   A.   I showed her her admission record, her admission file,
16   which contained her application and her SUBCO packet and she
17   reviewed it in my office.
18   Q.   What -- you showed her the SUBCO packet?
19   A.   As part of her admission record.
20   Q.   And what was included in that packet?  All of the things
21   that we just looked at?
22   A.   Correct.
23   Q.   And did you observe -- did she say anything to you about
24   it?
25   A.   She didn't really say much.  She mostly looked at the
```

```
 1   documents.  She looked a little surprised to see the SUBCO
 2   packet.
 3   Q.   Do you know if Sabrina Abdelaziz remains enrolled at USC?
 4   A.   She does.
 5   Q.   Miss Chassin, has the Admissions Department made changes
 6   to the subcommittee process in the wake of Donna Heinel's
 7   departure?
 8           MR. KENDALL:  Objection, your Honor.  Relevance.
 9           THE COURT:  What's the relevance?
10           MR. FRANK:  The relevance is that, in response to all
11   the things that the witness just testified about there's been a
12   series of reforms to prevent it from happening again.
13           THE COURT:  The objection is sustained.
14           MR. FRANK:  No further questions.
15           THE COURT:  All right.  Before cross-examination,
16   we're going to break for the day.  You may step down for the
17   time being, Miss Chassin.
18           We're going to be in recess until tomorrow morning.
19   We have a full day tomorrow, as you've previously been told,
20   but Wednesday we have no session.  So we're going Monday,
21   Tuesday, Thursday, Friday this week.
22           It's important to maintain your -- follow my
23   instructions about not talking about this case or about the
24   evidence with anybody.  The reasons are clear to you by now,
25   I'm sure.  I will see you tomorrow morning at 9:00 a.m.  Have a
```

03:23 (line 10)
03:24 (line 20)

```
 1   pleasant rest of the day.

 2            (Jury exits.)

 3            THE COURT:  Please be seated, counsel.

 4            Approximately, how long for the cross-examination of

 5   Miss Chassin?  Is it going to be Mr. Sheketoff?

 6            MR. SHEKETOFF:  Yes, your Honor.  I'll take the same

 7   45 minutes that the prosecutor took, and it will take me about

 8   an hour and 20 minutes to take that 45 minutes.

 9            THE COURT:  I'm not sure I understand that answer.

10            MR. FRANK:  I think he's making fun of me, your Honor.

11            MR. SHEKETOFF:  I'm saying if I say 45 minutes, do I

12   get an hour and 20 minutes?

13            THE COURT:  Okay.  I see.  All right.  Mr. Kendall?

14            MR. KENDALL:  I'll be in the same range, an hour and

15   20, plus or minus that.

16            THE COURT:  All right.  Anything else that needs to

17   come to my attention?

18            MR. KELLY:  Yes, your Honor.

19            MR. KENDALL:  If we can know the schedule for tomorrow

20   and Thursday.

21            THE COURT:  Fair enough.  What is the schedule after

22   Miss Chassin?

23            MR. FRANK:  Special Agent Keating and then Laura

24   Janke, if we get through that.

25            THE COURT:  Keating again, the direct?  I've forgotten
```

```
 1   what you told me.
 2          MR. FRANK:  Somewhere in the two and a half to three
 3   hour range.
 4          THE COURT:  Janke?
 5          MR. FRANK:  An hour.
 6          THE COURT:  And are we looking toward the government
 7   resting at that stage?
 8          MR. FRANK:  Not quite, your Honor.
 9          MR. KENDALL:  Can we get an estimate, your Honor, of
10   when they will rest because we've got to line our people up and
11   get travel organized?
12          THE COURT:  Assuming cross of equal length of direct,
13   approximately when does the government expect?
14          MR. FRANK:  Can I have a moment, your Honor?
15          THE COURT:  Yes.
16          MR. KENDALL:  Thank you, your Honor.
17          MR. FRANK:  Your Honor, given the pace of
18   cross-examination, I would say mid to late next week.  If the
19   cross-examination -- the directs are not long after
20   Miss Keating.  So if the cross-examination were quicker, we
21   could finish earlier.
22          THE COURT:  All right.  Anything else?  Yes,
23   Mr. Kelly?
24          MR. KELLY:  Quickly, your Honor.  We would renew again
25   a request that we made earlier.  The government continues to
```

```
 1    put in a lot of evidence about other parents, ostensibly

 2    because the nature, scope, and operation of conspiracy, but a

 3    central issue in this case is the intent of this defendant,

 4    Mr. Abdelaziz.  And the jury -- we respectfully request that

 5    the jury be told now while it's all piling in, all these other

 6    parents' activities, that such evidence is not evidence of the

 7    defendant's intent, and proof that the defendant joined a

 8    conspiracy must be based upon evidence of his words and

 9    actions, not these other parents.
```

03:28 10         It's coming flying into the record.  Again,

```
11    ostensibly, for the nature, scope and operation of the

12    conspiracy, but as it's coming in now, it's unduly prejudicial

13    and forgery and we believe and we request that they should be

14    warned that this other parent evidence is for the nature and

15    scope of the conspiracy, not the intent of him.

16              THE COURT:  Mr. Frank?

17              MR. FRANK:  We briefed this issue, your Honor.  The

18    First Circuit law is clear that there's no limiting instruction

19    required in this situation.  I'd direct the Court to *US v.*
```

03:28 20    *Campbell* 268 F 3rd 1, a 2001 First Circuit case.  We are

```
21    proving the existence and the nature of the conspiracy.  We are

22    doing that in a limited way by putting in evidence about who

23    Rick Singer's other clients were that were engaged in the side

24    door scheme and what happened with their subcommittee

25    applications at or around the exact same time as these
```

1    individuals.  It's in limited evidence, but it is directly

2    relevant to our burden.

3            The First Circuit said there's no instruction required

4    in those circumstances, certainly not the kind of instruction

5    that the defense has requested, which brings up this issue of

6    intent.  We've not suggested anything -- that this evidence

7    suggests anything about intent.

8            If the Court were to give a mid trial instruction,

9    which we submit would be highly unusual in these circumstances,

03:29 10   we submit it should be a complete instruction on conspiracy,

11   such as the one that the Court will likely give at the end of

12   the case.  We think the kind of sort of excerpted instruction

13   with a couple of add-ons about intent that the defense has

14   requested would not be appropriate.

15           MR. KELLY:  I did not suggest it was required.  We're

16   requesting it out of fairness to the defendants because they

17   are shoveling in all this other evidence that has nothing to do

18   with his intent, so the jury, as they hear it, should have the

19   proper context, and it's not reflective of the defendants'

03:30 20   intent.  The reason it's a discrete instruction is because I'm

21   not asking for a long conspiracy instruction in the middle of

22   trial.  It's discrete, and that's an important issue in the

23   case.

24           THE COURT:  I will take the matter under advisement.

25   In fact, it's been under advisement for a couple of days now.

1    We'll see you tomorrow morning at 9:00 a.m.

2              (Whereupon, the proceedings concluded at 3:34 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       I N D E X

 2   Witness                            Page

 3   MIKAELA SANFORD

 4   Direct Examination by Ms. Kearney        9

 5   Cross-Examination by Mr. Kendall        34

 6   Cross-Examination by Mr. Kelly          72

 7   Redirect Examination by Ms. Kearney    118

 8   Recross-Examination by Mr. Kendall     129

 9   Recross-Examination by Mr. Kelly       134

10

11   REBECCA CHASSIN

12   Direct Examination by Mr. Frank        144

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           E X H I B I T S

 2    NO.                         ADMIT

 3    707    ....................    6

 4    708    ....................    6

 5    157A   ....................    8

 6    174A   ....................    8

 7    258A   ....................    8

 8    501A   ....................    8

 9    644    ....................    19

10    80     ....................    21

11    441    ....................    22

12    442    ....................    24

13    461    ....................    26

14    458    ....................    27

15    463    ....................    29

16    680    ....................    32

17    681    ....................    33

18    9716   ....................    37

19    9691   ....................    39

20    7011   ....................    54

21    9621   ....................    67

22    132    ....................    79

23    107    ....................    160

24    229    ....................    160

25
```

**A1870**

```
 1                          E X H I B I T S

 2     NO.                              ADMIT

 3     383     ....................    160

 4     384     ....................    160

 5     413     ....................    160

 6     414     ....................    160

 7     420     ....................    160

 8     492     ....................    160

 9     661     ....................    160

10     662     ....................    160

11     663     ....................    160

12     511     ....................    190

13     513     ....................    195

14

15                          E X H I B I T S

16     NO.                              For Identification

17     A       ....................      8

18     B       ....................      8

19     C       ....................    143

20     D       ....................    143

21     E       ....................    143

22     F       ....................    143

23     G       ....................    144

24

25
```

**A1871**

```
 1    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9    the foregoing is a correct transcript from the record of

10    proceedings taken September 15, 2021 in the above-entitled

11    matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley          September 20, 2021

15       /s/ Debra Joyce                September 20, 2021

16       Kristin M. Kelley, RPR, CRR          Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

1

2                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
3

4
UNITED STATES OF AMERICA,          )
5                       Plaintiff  )
                                   )
6  vs.                             ) No. 1-19-CR-10080
                                   )
7  GAMAL ABDELAZIZ and JOHN        )
   WILSON,                         )
8                  Defendants.     )
                                   )
9                                  )

10

11
             BEFORE THE HONORABLE NATHANIEL M. GORTON
12                  UNITED STATES DISTRICT JUDGE
                      JURY TRIAL - DAY 9
13

14
           John Joseph Moakley United States Courthouse
15                      Courtroom No. 4
                      One Courthouse Way
16               Boston, Massachusetts 02210

17

18                     September 21, 2021
                          9:10 a.m.
19

20

21
                   Kristin M. Kelley, RPR, CRR
22                    Debra Joyce, RMR, CRR
                      Official Court Reporter
23        John Joseph Moakley United States Courthouse
             One Courthouse Way, Room 3209
24               Boston, Massachusetts 02210
                 E-mail: kmob929@gmail.com
25
           Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

APPEARANCES:


      Robert L. Sheketoff

      One McKinley Square

      Boston, MA 02109

      617-367-3449

      sheketoffr@aol.com

      for Gamal Abdelaziz.



      Michael Kendall

      Lauren M. Papenhausen

      White & Case, LLP

      75 State Street

      Boston, MA 02109

      617-939-9310

      michael.kendall@whitecase.com

      for John Wilson.

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

      1                      P R O C E E D I N G S

      2              (Jury enters.)

      3              THE CLERK:  Thank you.  You may be seated.  Court is

      4      now in session.

      5              THE COURT:  Good morning, jurors.  We're ready to

      6      resume.

      7              Miss Chassin, you're reminded that you remain under

      8      oath.

      9              Mr. Sheketoff, you may conduct cross-examination.

09:10 10             MR. SHEKETOFF:  Thank you.  I may have to wander a bit

     11      to get over.

     12                   CROSS-EXAMINATION OF REBECCA CHASSIN

     13      BY MR. SHEKETOFF:

     14      Q.   Good morning, Miss Chassin.

     15      A.   Good morning.

     16      Q.   My name is Robert Sheketoff and I represent, along with

     17      others, Mr. Abdelaziz.  You've never met him, correct?

     18      A.   Correct.

     19      Q.   You've never had a conversation with him?

09:11 20     A.   That's correct.

     21      Q.   And you met his daughter on one occasion?

     22      A.   Yes.  That's correct.

     23      Q.   That was after people were indicted in connection with

     24      this case?

     25      A.   That's when she came to my office.

**A1877**

```
 1    Q.   All right.  And you had some interaction with her and she
 2    appeared to be surprised to you, correct?
 3    A.   Yes.
 4    Q.   When she looked at her file?
 5    A.   Yes.
 6    Q.   You weren't present when Mr. Abdelaziz saw that file for
 7    the first time, were you?
 8    A.   No.
 9    Q.   You don't know what his reaction was when he saw it for
10    the first time, do you?
11    A.   I do not.
12    Q.   And you don't know when you saw it for the first time,
13    correct?
14    A.   That's correct.
15    Q.   And you certainly don't know what Mr. Singer told
16    Mr. Abdelaziz over the period of time that they knew each
17    other?
18    A.   I've never met Mr. Abdelaziz.
19    Q.   And you never met Mr. Singer either?
20    A.   I've never met Mr. Singer.
21    Q.   Okay.  Now, you were chosen by the prosecution to be the
22    representative for USC yesterday, correct?
23    A.   Yes.  They asked me to come testify.
24    Q.   Is there anyone else from USC that has been subpoenaed by
25    the prosecution?
```

```
 1                  MR. FRANK:  Objection.
 2       Q.   To your knowledge?
 3                  MR. FRANK:  Objection.
 4                  THE COURT:  Grounds?  She can say what she knows.
 5                  MR. FRANK:  Relevance.
 6                  THE COURT:  Overruled.
 7       A.   I'm aware that some other folks in the Office of Admission
 8       have been subpoenaed.
 9       Q.   By the government or by the defense?
09:12 10      A.   Both.
11       Q.   Who else has been subpoenaed by the government?
12       A.   Tim Brunold and Kirk Brennan.
13       Q.   All right.  So you told us yesterday something about both
14       of those individuals, correct, Tim Brunold and Kirk Brennan?
15       A.   I think I told you their roles in our office.
16       Q.   Right.  So tell us again.  Who is Tim Brunold?
17       A.   Tim Brunold is the Dean of Admission.
18       Q.   So he's your boss, correct?
19       A.   He's one of my bosses, yes.
09:13 20      Q.   And Kirk Brennan is his right-hand person?
21       A.   The Director of Undergraduate Admission.
22       Q.   All right.  So he's your boss, also, correct?
23       A.   He's my direct supervisor, correct.
24       Q.   And did they come from California to Boston with you?
25       A.   They did not travel with me.
```

```
 1    Q.    Have you talked to them about this case?
 2    A.    After the indictment came out, I certainly discussed
 3    something that had happened to our office.
 4    Q.    Right.  So it would be natural to talk about it with your
 5    co-workers, correct?
 6    A.    Yes.
 7    Q.    All right.  And you did, did you not?
 8    A.    Again, this was something that concerned our office and so
 9    when the indictment came out, we certainly discussed it.
09:14 10    Q.    Right.  I'm not suggesting there's anything wrong with
11    that.  I'm just asking you if you did it.
12          MR. FRANK:  Objection.
13          THE COURT:  I'm sorry.  Give me the question again.
14    Q.    I'm not suggesting that you did anything wrong by doing
15    that.  I'm just asking you if you did it.
16          MR. FRANK:  Objection.
17          THE COURT:  On what grounds?
18          MR. FRANK:  It's a statement of counsel.
19          THE COURT:  All right.  Overruled.
09:14 20    A.    As I said, we discussed the case after the indictment came
21    out.
22    Q.    All right.  And as Dean of Admissions, Tim Brunold is in
23    charge of the VIP program for admissions, correct?
24    A.    I wouldn't describe the VIP process as a program, but yes.
25    He is somebody who will certainly consider all of the students
```

1    that are special interest to constituents across campus.

2    Q.    Right.  So there is a VIP program at USC, correct?

3            MR. FRANK:  Objection.  Relevance.  Beyond the scope.

4            THE COURT:  Overruled.

5    A.    There is a process by which students that are of special

6    interest to constituents around campus will receive a look

7    before their decision is finalized and they'll be reviewed by

8    the Dean of Admission.

9    Q.    Thank you.  Because you made it sound yesterday like money

09:15 10    has nothing to do with the admissions process at USC, correct?

11    A.    I stated that we don't make offers of admission in

12    exchange for money.

13    Q.    Right.  Well, what's the VIP list about?

14            MR. FRANK:  Objection.  Beyond the scope and contrary

15    to the Court's Order.

16            THE COURT:  I'm going to let him have that question,

17    but I am mindful of the prior Court Order.

18    Q.    What is VIP about?

19    A.    So there's several constituents across the campus, the

09:15 20    President, the Provost, different deans around the office or

21    around campus, as well as the University Advancement Office,

22    the folks who do fundraising for the University who may know

23    about students who are in our applicant pool.  They might know

24    about them through their work.  They might know about them

25    because they live in their neighborhood, but they're tracking

```
 1    and they're interested in the, you know, final decision on

 2    those students' applications.

 3    Q.   They might know about them because they've given money to

 4    the school and the school is interested in collecting money,

 5    correct?

 6              MR. FRANK:  Objection.  Relevance.

 7              THE COURT:  Overruled.

 8    A.   One of the reasons they may be tracking an applicant may

 9    be due to fundraising efforts that the University Advancement

09:16 10   Office is doing, or other offices.

11    Q.   Right.  Would you agree or disagree with this statement?

12    The Admissions Department has no involvement with respect to

13    donations or potential donations.  The Admissions Department

14    does not track donations by an applicant's family.  Information

15    concerning donations by an applicant's family is not included

16    in the applicant's file.  If you had known that a prospective

17    student's family had donated 50 grand or a 100 grand to USC, it

18    would not have affected the Admissions Department decision

19    whether to admit that student or not.

09:17 20         Do you agree or disagree with that?

21    A.   We don't make admissions decisions with respect to --

22    Q.   Do you agree or disagree with that?

23              MR. FRANK:  I object and ask that the witness be

24    allowed to answer the question.

25              THE COURT:  Overruled.
```

```
 1   Q.   Do you agree or disagree with that?
 2   A.   I don't agree with all of those statements, so I guess I
 3   disagree with all of those statements as a group.
 4   Q.   Because you understand, do you not, that money makes a
 5   difference at USC in many, many ways, correct?
 6   A.   Like all nonprofit organizations, USC does fundraising.
 7   Q.   Yeah.  Well, when Sabrina Abdelaziz was applying for
 8   admission to USC, was USC in the middle of a $6 billion
 9   fundraising effort?
10   A.   I'm not sure of the exact dates of the campaign.
11   Q.   Okay.  Do you know that USC had a $6 billion fundraising
12   effort at some point while you were working there?
13   A.   Yes.  I'm aware there was a large capital campaign.
14   Q.   And $6 billion is a lot of money, correct?
15   A.   Yes.
16   Q.   And one of the ways USC -- by the way, giving donations to
17   private institutions is completely legitimate, correct?
18   A.   I believe so, but I'm not a lawyer.
19   Q.   Okay.  Would you agree or disagree with this?  Wealthy
20   people donating money to universities in the hope that their
21   children get preferential treatment in the admissions process
22   is not illegal.
23        MR. FRANK:  Objection.  Calls for a legal conclusion.
24        THE COURT:  Sustained.
25   Q.   Wealthy people donate money to your university all the
```

|     |                                                                            |
| --- | -------------------------------------------------------------------------- |
| 1   | time, don't they?                                                          |
| 2   | A.    Yes.  As I said, like all nonprofits, we have an active              |
| 3   | fundraising arm of the University.                                        |
| 4   | Q.   And you are fully aware that many of these donors believe            |
| 5   | that it will help them get their children into school?                   |
| 6   | MR. FRANK:  Objection to what others believe.                            |
| 7   | THE COURT:  Sustained.                                                    |
| 8   | Q.   Well, you believe that, don't you?                                   |
| 9   | A.   I'm sorry.  Can you repeat the question?                             |
| 09:19 10 | Q.   You believe that donations by wealthy donors help their        |
| 11  | children get into USC?                                                    |
| 12  | A.   Not necessarily.                                                     |
| 13  | Q.   What do you mean by "not necessarily"?  What percentage of          |
| 14  | the people on the VIP list get rejected?                                 |
| 15  | A.   I'm not familiar.  I haven't done a data analysis of that.          |
| 16  | Q.   Do you know if a data analysis has been done by USC?                |
| 17  | A.   I'm not aware of that.                                               |
| 18  | MR. SHEKETOFF:  For the witness only, your Honor.                        |
| 19  | Exhibit 1339, Mr. Carter.                                                 |
| 09:20 20 | Q.   You've never seen this before?                                 |
| 21  | A.   No.                                                                  |
| 22  | Q.   You don't know who prepared it?                                     |
| 23  | A.   I'm not familiar with this document.  I don't know who              |
| 24  | prepared it.                                                              |
| 25  | Q.   You're third in line at the Admissions Department and you           |

|  |  |
|---|---|
| 1 | have no idea what number of VIP students get -- what the |
| 2 | percentage of VIP students that get tagged as VIP get in? |
| 3 | MR. FRANK:  Can we take the document down? |
| 4 | THE COURT:  The objection is sustained.  I don't |
| 5 | understand the question.  Let's take the document down. |
| 6 | MR. SHEKETOFF:  Can I repeat the document number? |
| 7 | 1339? |
| 8 | Can I have it up again, your Honor, just for the |
| 9 | witness? |
| 09:20 10 | THE COURT:  Yes. |
| 11 | Q.   So there's a category, "athletic VIP".  Are you aware of |
| 12 | that category? |
| 13 | A.   I'm just not familiar with this document. |
| 14 | Q.   No, I'm not asking about this document now.  I'm asking |
| 15 | about a category on this document.  Are you aware of "athletic |
| 16 | VIP"? |
| 17 | MR. FRANK:  I object to counsel's characterization of |
| 18 | what's on the document.  I object to having a document in front |
| 19 | of the witness. |
| 09:21 20 | THE COURT:  She can look at the document.  Then take |
| 21 | it down and ask if it refreshes her memory. |
| 22 | Q.   Yeah.  Are you aware of something called "athletic VIP"? |
| 23 | A.   I'm not aware of anything that's called that. |
| 24 | Q.   So how many hours did you sit with the government? |
| 25 | A.   I met with them several times. |

```
 1   Q.   Yeah.  I'm asking for your estimate of the number of
 2   hours.
 3   A.   Maybe 15 hours since January of 2019.
 4   Q.   Okay.  Was January of 2019 the first time you sat with the
 5   government?
 6   A.   Yes.  I gave an interview to the government at that time.
 7   Q.   And by the way, you have a lawyer in the courtroom,
 8   correct?
 9   A.   Yes, I do.
10   Q.   And he's paid for by USC, correct?
11   A.   I'm here on behalf of my university.
12   Q.   Right.  So I'm not suggesting that there's anything wrong
13   with that, but he's paid for by USC, correct?
14   A.   That's correct.
15   Q.   And at your first interview, how many lawyers from USC
16   were there?
17   A.   I believe there was one or two.
18   Q.   Or four?
19   A.   I don't remember.
20   Q.   Was the general counsel for USC there?
21   A.   No.
22   Q.   You sure about that?
23   A.   I don't recall the general counsel being present.
24   Q.   Do you know who the general counsel is?
25   A.   No.
```

```
 1   Q.   Okay.  And all your legal bills are paid by USC, correct?

 2   A.   Again, I'm here on behalf of my university.

 3   Q.   Right.  I'm not suggesting there's anything wrong with

 4   that.  I'm just asking you.

 5        MR. FRANK:  Your Honor, I object to the continued

 6   statements.

 7        THE COURT:  Overruled.

 8   A.   Yes.

 9   Q.   Okay.  And USC has an official position that they

10   published on the Worldwide Web about this quote/unquote

11   scandal, correct?

12   A.   I'm not sure exactly what you're talking about.

13   Q.   Well, have you read any press releases or releases from

14   USC about their position on this case?

15   A.   I believe there was a press release when the indictment

16   came in March 2019.  I don't recall the contents exactly.

17   Q.   Did you read it?

18   A.   I read it at the time in 2019.

19   Q.   Did you think you were selected because -- from the

20   Admissions Department because your personal views are closely

21   aligned to USC's stated position?

22        MR. FRANK:  Objection.

23        THE COURT:  Sustained.

24   Q.   You still work at USC, correct?

25   A.   That's correct.
```

```
 1   Q.   So what are the categories of VIP that you know without

 2   looking at that document?

 3   A.   As I mentioned before, the President might have an

 4   interest in applicants, the Provost, deans at the University,

 5   the University Advancement Office, trustees of the University,

 6   as well as the Athletic Advancement Office.

 7   Q.   All right.  And by the way, that document that I just

 8   showed you, you were never shown that document by the

 9   government?

10   A.   No.

11   Q.   They never asked you to explain the difference between the

12   admissions rate on the VIP list and the admissions rate for

13   general applicants?

14   A.   No.

15   Q.   And you don't know the difference?  You don't know as you

16   sit here today what that difference is?  Is that what you're

17   telling us?

18   A.   As I mentioned before, students who were on the VIP are

19   given extra consideration.  They're given a sort of second

20   review by the Dean of Admission before final decision is made.

21   Q.   Okay.  But you don't know the difference in the rate.  Is

22   it three times more likely that you'll get admitted if you're

23   on the VIP list?

24   A.   Again, I haven't done the data analysis.

25   Q.   Well, what is your -- you've been with Admissions for how
```

```
 1    long?
 2    A.   20 years.
 3    Q.   That's a chunk of change, even for an old man like me.
 4    And you don't have an impression as to whether being on the VIP
 5    list makes a huge difference in admissions to USC?
 6              MR. FRANK:  Objection.  Relevance, and calls for
 7    speculation.
 8              THE COURT:  Sustained.
 9    Q.   Do you believe, you, that for your children, if you gave a
10    donation to USC, you would be more likely to be -- have them
11    admitted?
12              MR. FRANK:  Objection.
13              THE COURT:  Sustained.
14    Q.   Do you believe that the wealthy have advantages in the
15    college admissions process that others don't?
16              MR. FRANK:  Objection.
17              THE COURT:  Sustained.
18    Q.   Now, you told us yesterday that part of your job is
19    overseeing staff, correct?
20    A.   Yes.
21    Q.   And you mentioned Kelsey Bradshaw yesterday as part of the
22    staff you oversee, correct?
23    A.   Yes.  She's an Associate Director and she's my direct
24    supervisee.
25    Q.   So you're directly responsible -- she reports directly to
```

1    you?

2    A.    She does now, yes.

3    Q.    Well, how about in 2017 when Sabrina Abdelaziz was

4    applying for admission to USC?  Did Kelsey Bradshaw report

5    directly to you?

6    A.    She was not my direct report at that time.  She was a

7    junior member of our staff.

8    Q.    So who did she report to?

9    A.    I don't -- we have a very large staff, 45, 50 people.  I

09:27 10    don't remember her direct supervisor.

11    Q.    Well, since then she's been promoted?

12    A.    Correct.

13    Q.    And you were still then one of her bosses, correct?

14    A.    Yes.  As I mentioned, I oversee the application review

15    process.

16    Q.    If something was going on with her, she had certain

17    suspicions, she would share them with you, correct?

18          MR. FRANK:  Objection to what Kelsey would do.

19          THE COURT:  Sustained.

09:27 20    Q.    Well, she was on SUBCO, wasn't she?

21    A.    Yes.  Again, she was one of the admission officers, a

22    junior member, who did a lot of administrative things,

23    paperwork and things regarding SUBCO.

24    Q.    Well, was she a voting member of SUBCO or not?

25    A.    Yes, she was.

         1    Q.   So if three of you were there that day, her, you, and

         2    somebody else, and she voted with the somebody else, the

         3    student would be admitted, correct?

         4    A.   That's correct.

         5    Q.   All right.  So she wasn't that junior in 2017, correct?

         6    A.   She was -- her -- her title was part of our junior staff

         7    but she was a full voting member of the SUBCO.

         8    Q.   Okay.  And SUBCO is just an abbreviation of what?

         9    A.   The Athletic Admission Subcommittee.

09:28   10    Q.   Subcommittee.  SUBCO.  Subcommittee.

        11    A.   Yes.

        12    Q.   Okay.  Subcommittee is too long so you shorten it to

        13    SUBCO?

        14    A.   That's just what we've always called it.

        15    Q.   Okay.  And I don't know if you mentioned him yesterday,

        16    but was there someone named Alexander Alvendia on your staff?

        17    A.   Yes.  He's also an admission officer.

        18    Q.   And what was his title back in 2017?  Do you recall?

        19    A.   He's had a couple of titles in our office.  I can't

09:29   20    remember if he was a Senior Assistant Director of Admission at

        21    the time or an International Admission Officer.

        22    Q.   Okay.  But he was clearly in the Admissions Department,

        23    and anyone that suggested otherwise would be wrong, correct?

        24    A.   Yes.  He's a member of our Admission Office.

        25    Q.   Now, yesterday toward the end of your testimony the

 1   prosecutor went over a number of e-mails between you and

 2   Brunold and others, Brennan and others, and even ones that you

 3   weren't on about the suspicions that had grown up around some

 4   of these recruited walk-ons, correct?

 5          MR. FRANK:  Objection.  Misstates.

 6          THE COURT:  Well, she can answer if she recalls.

 7   Overruled.

 8   A.   I looked at some e-mails yesterday during my testimony,

 9   that the government showed me, yeah, that were between Kirk and

09:30 10   Tim and myself.

11   Q.   Did you see any that weren't -- that didn't involve you

12   yesterday?

13   A.   I believe, in the chains, I was involved.

14   Q.   You mean at some point you got it?  It started somewhere

15   else and at some point you got it?

16   A.   I believe in the e-mails we looked at yesterday, yes.

17   Q.   Okay.  And they were about people not on trial in this

18   case, correct?

19   A.   That's correct.

09:30 20   Q.   And about suspicions that had been raised by guidance

21   counselors at various high schools, correct?

22   A.   The high school counselors had asked questions about those

23   applicants being admitted as athletic recruits.

24   Q.   Correct.  And you know that there was such a raising of

25   concern with Sabrina Abdelaziz's guidance counselor, correct?

 1    You know that, don't you?

 2    A.    I'm not aware of that.

 3          MR. SHEKETOFF:  Can I have Exhibit 1288 just for the

 4    witness.

 5    Q.    This is an e-mail sent --

 6          MR. FRANK:  I object to the characterization.

 7          THE COURT:  Yeah.  It's not in, right?

 8          MR. SHEKETOFF:  Right, your Honor.  Well, I'm going to

 9    offer it, but it's not in yet.  I'm not going to talk about the

09:31 10    substance of it.  I'm just going to ask her if this is an

11    e-mail between Alexander Alvendia --

12          THE COURT:  You can ask her what it is and see if she

13    can tell us.

14    Q.    Okay.  Do you know what it is?

15    A.    It doesn't look like an e-mail.  It looks like an IM

16    transcript, like an IM exchange.

17    Q.    Okay.  Do you recognize the names of the two people that

18    have this IM exchange?

19    A.    Yes.

09:32 20    Q.    And they're both in the Admissions Department?

21    A.    That's correct.

22    Q.    And this exchange was on March 27th of 2018?

23    A.    That's what it says.

24    Q.    Okay.  You've never seen this before?

25    A.    No.

```
 1   Q.    The government never showed you this before?

 2   A.    No.

 3   Q.    Is it about Sabrina Abdelaziz?

 4         MR. FRANK:  I object, your Honor.  It's not in

 5   evidence.  She's never seen it before.

 6         THE COURT:  It's not in.  You can't question her about

 7   the document.

 8         MR. SHEKETOFF:  Well, I offer it.

 9         MR. FRANK:  I object.

10         THE COURT:  Grounds?

11         MR. FRANK:  It's hearsay, your Honor.

12         THE COURT:  Sustained.

13         MR. SHEKETOFF:  I'm not offering it for the truth,

14   your Honor.  I'm offering it for the fact that it took place

15   and that it was never shown to her.  And I would like to ask

16   her to explain why her underlings never talked about it with

17   her.

18         MR. FRANK:  She can't explain why somebody else did

19   something.  It remains hearsay.

20         THE COURT:  Yeah.  The objection is sustained,

21   Mr. Sheketoff.

22         MR. KENDALL:  All right.  I'm not offering it for the

23   truth of the matter, just for the fact that it happened.

24         THE COURT:  You want to respond?

25         MR. FRANK:  He is offering it for the truth of the
```

```
 1   matter.  She's never seen the document before.  She can't

 2   explain a document she's never seen before.

 3           THE COURT:  The objection is sustained.

 4   Q.   Do you know why the government would hide this document

 5   from you?

 6           THE COURT:  Sustained.

 7           MR. FRANK:  Objection, your Honor, and move to strike.

 8   Q.   If your less senior members of your staff were discussing

 9   Sabrina Abdelaziz and issues that they might have, would you

10   expect them to bring that to your attention?

11   A.   Not if they were able to resolve those issues themselves.

12   Q.   Well, what if they weren't able to resolve those issues

13   themselves?

14   A.   If they needed my guidance, they would bring it to me.

15   Q.   Your position yesterday was that you were shocked to find

16   out that walk-on spots at USC were being exchanged for

17   donations of any kind, correct?  You were shocked?

18   A.   I was shocked to learn that the athletic profiles were not

19   accurate and were lies and I was shocked that, yes, that people

20   at USC in the Athletics Department had accepted money in

21   exchange for presenting candidates who were not true athletes.

22   Q.   Well, do you know if Donna Hein el had accepted any money

23   from Mr. Singer at the time that Sabrina applied and was

24   granted admission?

25   A.   I don't know all the details of the money that was
```

       1   exchanged.

       2   Q.   You don't know that the government has conceded that she

       3   did not take any money personally until after this period of

       4   time?

       5          MR. FRANK:  I object, your Honor.

       6          THE COURT:  Sustained.

       7   Q.   You have no knowledge about that?

       8   A.   About what?

       9   Q.   About when it was that it's alleged that Donna Heinel

09:35 10   started to take money personally.

      11   A.   I don't know the exact timeline of all of it.

      12   Q.   Did Donna Heinel have control over the Galen Center funds?

      13          MR. FRANK:  Objection.  Foundation.

      14          THE COURT:  Sustained.

      15   Q.   Well, do you know about the Galen Center?

      16   A.   I know it's our basketball and volleyball arena.

      17   Q.   Okay.

      18          THE COURT:  I'm going to ask to stop here.  I have an

      19   equipment problem that maybe we can solve.

09:37 20          You may proceed.

      21          MR. SHEKETOFF:  Can I have, just for the witness,

      22   1567.

      23   Q.   Do you recognize that?

      24   A.   That's the Galen Center, the basketball and volleyball

      25   arena.

|   |    |                                                                        |
|---|----|------------------------------------------------------------------------|
| 1 |    | MR. SHEKETOFF:  All right.  I'd offer it, your Honor.                   |
| 2 |    | THE COURT:  It will be admitted.                                       |
| 3 |    | (Exhibit 1567 admitted into evidence.)                                 |
| 4 |    | MR. SHEKETOFF:  And could I have 1566.                                  |
| 5 | Q. | Do you recognize what's depicted in 1566?                              |
| 6 | A. | Yes.                                                                   |
| 7 | Q. | Is that the inside of the Galen Center?                                |
| 8 | A. | Yes.                                                                   |
| 9 | Q. | A pretty impressive arena, yes?                                        |

09:37 10   A.   I don't go to that many arenas, so yes.  It looks like a
11   basketball arena.
12   Q.   Well, have you ever been inside the Galen Center?
13   A.   Yes.
14        MR. SHEKETOFF:  I'd offer 1566.
15        THE COURT:  It will be admitted.
16        (Exhibit 1566 admitted into evidence.)
17   Q.   Is it a 10,000 seat arena?
18   A.   Oh, I don't know the capacity of the arena.
19   Q.   It's big time basketball, correct?
09:38 20   A.   We're a Division 1 basketball team.  We do okay.
21   Q.   Do okay?  Yesterday you were so proud of the USC athletes.
22   You told us that you had four national championships last year.
23   A.   We did in our women's teams.
24   Q.   Well, the women play here, too, correct?
25   A.   Yes.

|    | |
|----|--|
| 1  | Q.   The first time this arena was ever sold out it was for a |
| 2  | women's basketball game against UCLA, correct? |
| 3  | A.   I don't know. |
| 4  | Q.   You don't know much about women's basketball? |
| 5  | A.   I don't follow many sports or any sports very closely. |
| 6  | Q.   Okay.  You're on the Subcommittee for admission of student |
| 7  | athletes and you don't know anything about sports? |
| 8  | A.   I know a lot about admission. |
| 9  |      MR. SHEKETOFF:  Okay.  We can take that down. |
| 09:39 10 | Q.   Let's talk about SUBCO for a minute.  Is there anyone on |
| 11 | that committee that knows anything about sports? |
| 12 | A.   Some of our members participated in high school sports, |
| 13 | but it's not a prerequisite to serving on the committee. |
| 14 | Q.   All right.  You told us yesterday 85 to 90 percent of the |
| 15 | people that are presented to SUBCO are granted admission? |
| 16 | A.   Yes.  These are highly talented athletes that the coaches |
| 17 | are very interested in recruiting. |
| 18 | Q.   Okay.  That's your view of it, they're highly talented |
| 19 | athletes that the coaches are interested in recruiting, |
| 09:40 20 | correct?  That's your view of it? |
| 21 | A.   Yes. |
| 22 | Q.   You've just -- you volunteered that in response to a |
| 23 | question that asks for a yes or no answer. |
| 24 |      MR. FRANK:  Objection to the argumentative nature. |
| 25 |      THE COURT:  Sustained. |

```
 1    Q.   Do you know how many -- and SUBCO has two types of student
 2    athletes that go through it, correct?  There are the recruited
 3    scholarship athletes and there are the recruited walk-ons,
 4    correct?
 5    A.   Yes.  That's correct.
 6    Q.   There is a huge difference between these two categories,
 7    isn't there?
 8    A.   Not necessarily.
 9    Q.   Not necessarily?  What does -- does "not necessarily" mean
10    sometimes there isn't?
11    A.   The coaches may have a limited number of scholarships to
12    award, a limited amount of scholarship to award, so they may be
13    bringing a student that they'd love to give a scholarship to
14    but they don't have any athletic scholarship available, so
15    they're bringing them as a recruited walk-on.
16    Q.   All right.  So that's your view of how sometimes it's
17    works and sometimes it doesn't.  Do you know that the NCAA has
18    scholarship requirements for sports like women's basketball and
19    football?
20    A.   They regulate the number of athletic scholarships for each
21    type of sport or team.
22    Q.   Do you know that they regulate the roster size, too?
23    A.   I'm not sure of the details of that.
24    Q.   Do you know that the football coach -- do you know why the
25    football coach might have a much stronger interest in walk-ons
```

```
 1   than the basketball coach would?
 2              MR. FRANK:  Objection.
 3              THE COURT:  Overruled.
 4   A.   Again, different coaches are managing their athletic
 5   scholarship in different ways.
 6   Q.   Well, could it be that the NCAA football roster allows 111
 7   participants on the team roster and the football scholarships
 8   are limited to 88 so that the football coach actually has to
 9   have walk-ons that can play?  You don't know about that?
10              MR. FRANK:  Objection.  Calls for speculation.
11              THE COURT:  Overruled.
12   A.   Like I said, all the teams have limits on the number of
13   scholarships and so some -- you know, most teams will have some
14   recruited walk-ons as part of their team as well.
15   Q.   Well, so you don't know those numbers for football?
16   A.   Again, I'm not that familiar with all the NCAA
17   regulations.
18   Q.   Do you know what the numbers are for women's basketball?
19   A.   Again, I'm not familiar with the regulations with the
20   NCAA.
21   Q.   Do you know what the roster size is for women's
22   basketball?
23   A.   No.
24   Q.   Do you know that the NCAA limits women's basketball
25   rosters to 15?
```

```
 1   A.   I'm not familiar.
 2   Q.   Do you know how many -- do you know that the NCAA allows
 3   the basketball coach for women's basketball to have 15
 4   scholarship athletes?
 5   A.   I'm not familiar with the details.
 6   Q.   So if that was correct, what I just said, if it was, do
 7   you see that the women's basketball coach might not care a darn
 8   about walk-ons and the football coach would?
 9            MR. FRANK:   Objection.   Hypothetical.
10            THE COURT:   Overruled.
11   A.   I'm just not familiar with how the coaches manage their
12   rosters.
13   Q.   All right.   Do you know who the coach of the women's
14   basketball team is today?
15   A.   I don't.
16   Q.   Do you know what -- do you know that when women basketball
17   players are recruited to a school like USC and competitors of
18   USC that organizations like ESPN and other sport organizations
19   sort of judge their recruiting class and give them a ranking?
20   A.   I'm not too familiar with that.
21   Q.   Do you know that USC's women's basketball recruiting class
22   for this year received a 7th best recruiting class in the
23   country ranking by ESPN?
24   A.   I'm not familiar with that ranking.
25   Q.   Well, if I were to suggest to you that the women's
```

09:43 appears at line 10
09:44 appears at line 20

```
 1   basketball coach at the time Sabrina Abdelaziz applied for
 2   admission to USC was Mark Trakh, does that name ring any bells
 3   at all?
 4   A.   I don't pay close attention to all the coaches.  I'm
 5   sorry.  I'm not familiar.
 6   Q.   All right.  Well, how many walk-on recruits did Mark Trakh
 7   ask for the year that Sabrina Abdelaziz applied for admission?
 8   A.   I don't have those data.
 9   Q.   You don't know if she was the only one that he asked for?
10   A.   I don't know.
11   Q.   Do you know if he ever asked for a walk-on recruit the
12   year before Sabrina Abdelaziz applied?
13   A.   I can't remember.
14   Q.   How about the year after?
15   A.   I can't remember.
16   Q.   Did the USC's women's basketball's team have a full
17   complement of players freshman year for Miss Abdelaziz?  In
18   other words, were you down a spot?
19   A.   I don't know.
20   Q.   When you looked at her application, did you have any
21   reason to believe that a player, given that resume that was
22   presented to you, could walk on to the USC women's basketball
23   team?
24   A.   I believe the coach was interested in recruiting the
25   student as a walk on, not offering them an athletic
```

scholarship, but that they were talented and would contribute

to the team as the profile stated.

Q.    Okay.  So the 10 or 15 percent of the applicants that go

through SUBCO that get rejected, what are your grounds for

rejecting them?

A.    There are students we feel are too academically risky to

support.  That's primarily it.

Q.    Okay.  So the only reason somebody who gets to SUBCO would

be rejected is if their scores are pathetic?

09:47 A.    Not necessarily their scores, but the overall academic

preparation being very risky and, again, if we don't believe we

can support a student academically, we don't want to bring them

to the University.

Q.    So, basically, you think they have absolutely no chance of

succeeding academically at USC and that's why you reject them?

A.    Again, the student's very academically risky.  We don't

want to bring them to the University if we don't feel that they

can be supported by our academic support.

Q.    Even though they're great athletes?

09:47 A.    Even if they're exceptional athletes.

Q.    So basically -- by the way, USC has abandoned the SAT and

ACT scores as a requirement, correct?

A.    We are test optional, like many universities in the

country at this time.

Q.    And most universities have at least, if not completely,

```
 1   abandoned those scores and gone to test optional?
 2            MR. FRANK:  Objection, your Honor.  This is beyond the
 3   scope of the conspiracy.
 4            THE COURT:  Overruled.
 5            MR. FRANK:  If he could establish a time frame.
 6            THE COURT:  Her general knowledge as an admissions
 7   officer.
 8            MR. FRANK:  If he could establish a time frame, your
 9   Honor.
10            THE COURT:  Time frame, yes.
11   Q.   So when did you go test optional?
12   A.   So beginning with students who entered the University in
13   fall '21, we were test optional.  Many students were not able
14   to even sit for an SAT or an ACT due to the pandemic, and we
15   felt that it was most equitable to give students the option if
16   they have scores.  If they wanted to include those scores, they
17   could choose to do so.
18   Q.   All right.  So you're saying that the reason to go to test
19   optional was the pandemic and that all the other universities
20   in the country that went to test optional was because of the
21   pandemic.  Is that your suggestion?
22            MR. FRANK:  Objection.
23            THE COURT:  Sustained.
24   Q.   Well, what about this year?  Is USC still test optional?
25            MR. FRANK:  Objection.  Relevance.
```

```
 1              THE COURT:  He can have that question.
 2    A.    Yes.  We've extended the test optional policy.
 3    Q.    Okay.  And that's because most college admissions officers
 4    have concluded that these tests are nonsense?
 5              MR. FRANK:  Objection.
 6              THE COURT:  Sustained.
 7    Q.    That these tests discriminate, correct?
 8              MR. FRANK:  Objection.
 9              THE COURT:  Sustained.
10    Q.    By the way, you weren't suggesting yesterday that Sabrina
11    Abdelaziz wasn't investigated by USC, were you, when you said
12    certain students were thrown out?
13    A.    I'm not sure what you're referring to.
14    Q.    Yeah.  You remember the prosecutor asking you whether or
15    not certain students were thrown out?
16    A.    Right.  After -- in -- after March 2019 when the
17    indictment was made public, there were students who were going
18    to be entering -- had been approved for admission for fall 2019
19    who were -- had their admission revoked.
20    Q.    Right.  And did the University investigate the other
21    students?
22    A.    I believe current students were -- went through a process
23    with the Student Judicial Affairs Committee.
24    Q.    All right.  And Sabrina Abdelaziz is still enrolled at
25    USC, isn't she?
```

09:49 (line 10)
09:50 (line 20)

1    A.    I believe so.

2    Q.    There are significant differences between recruited

3    scholarship athletes and walk-on athletes in terms of money,

4    correct?

5    A.    Students who were receiving athletic scholarship have

6    athletic scholarship and the recruited walk-ons are not

7    receiving athletic scholarship.

8    Q.    And if you're a recruited scholarship athlete and you

9    don't show up for the team, you just blow it off for whatever

09:51 10    reason, injury, illness, lack of desire, too much partying,

11    whatever the reason, what happens?

12    A.    I don't know.  That's really beyond the scope of the

13    admission process.

14    Q.    You don't know that the scholarship is taken away?

15    A.    It's handled by Athletics and Athletics compliance.

16    Q.    So Athletics and Admissions are two completely different

17    departments?

18    A.    That's correct.

19    Q.    Who was the head of the Athletics Department when Sabrina

09:51 20    Abdelaziz was applying for admission to USC?

21    A.    I don't know the exact date.  It was either Pat Haden or

22    Lynn Swann.

23    Q.    And did Pat Haden have his own VIP list?

24    A.    No.  There were folks who were of interest to the Athletic

25    Advancement Office, but he didn't have a separate list.

```
 1   Q.   So you don't call the Athletic Advancement list from USC's
 2   Athletic Department Pat Haden's list, correct?
 3   A.   I don't follow Pat.
 4   Q.   Okay.  Do you know what Tim Brunold might call it?
 5             MR. FRANK:  Objection.
 6             THE COURT:  Sustained.
 7   Q.   Well, has he talked about it with you?
 8   A.   I've never heard anybody talk about Pat Haden's list.
 9   Q.   No.  Has he talked about the VIP list from the Athletic
10   Department with you?
11   A.   Not specifically.  I mean, I'm aware that the Athletic
12   Advancement Office is tracking applicants and are interested in
13   their outcome of the admission decision.
14   Q.   Okay.  Now, "advancement" is a fancy term at USC for
15   raising money, correct?
16   A.   Yes.
17   Q.   So the Athletic Department has its own Advancement Office,
18   fundraising office?
19   A.   Most of our schools and departments have Advancement
20   Officers who work within the school.
21   Q.   So the Athletic Department has its own Advancement Office?
22   A.   Athletics, like many of the schools across the University,
23   so the School of Art and Design, or the College of Letters,
24   Arts and Sciences would have Advancement Officers, folks doing
25   fundraising with -- as employees of that school, the same way
```

```
 1   that folks are doing fundraising as part of the Athletics

 2   Office.

 3   Q.   Okay.  So they have an athletic -- the Athletic Department

 4   has a fundraising office?

 5   A.   Yes.

 6   Q.   Do you know who the head of that is?

 7   A.   I do not.

 8   Q.   Do you know how many -- whether they have 12 employees or

 9   20 employees or 2 employees?

10   A.   I'm not familiar with their setup.

11   Q.   And you don't know what they pay their employees?

12   A.   I do not.

13   Q.   Are employees in fundraising -- does Admissions have a

14   fundraising?

15   A.   No.

16   Q.   So walk-on athletes, do you know what happens to them if

17   they don't show up, they blow off their, quote unquote, team?

18   A.   Again, I'm not familiar with what happens after the

19   students matriculate and how they participate on their teams.

20   That's really the purview of the Athletics folks.

21   Q.   As you sit here today, you are telling us that you do not

22   know that there is no repercussion of any kind for a walk-on

23   student to not walk on?

24   A.   I guess it would really be up to Athletics and the coach.

25   Q.   Well, you can't take away his or her scholarship, correct?
```

1    A.    That's correct.  They're not receiving athletic

2    scholarship.

3    Q.    And you can't revoke their admissions at the University,

4    correct?

5    A.    The Athletics Office can't revoke anybody's admission to

6    the University.

7    Q.    Well, who can revoke someone's admission to the

8    University?

9    A.    The Admission Office and if it's an already matriculated

09:55 10    student, that may be a sanction of the Student Judicial Affairs

11    Committee.

12    Q.    All right.  Do you know if the Student Affairs Judicial

13    Committee has ever, in the history of USC, ever revoked the

14    admission of a walk-on, a recruited walk-on who doesn't show up

15    for the team?

16    A.    I'm not privy to the proceedings of SJACs.

17    Q.    Do you know how many walk-on slots Coach Trakh had for

18    Sabrina's matriculating class?

19    A.    As I said, I'm not familiar with the rosters and how the

09:56 20    coaches manage them.

21    Q.    So you can't say that she took a spot from anybody on the

22    team or on the walk-on list, can you?

23    A.    I don't know what you mean by "walk on list".

24    Q.    From Coach Trakh, if there even was one, the women's

25    basketball coach.  In other words, you can't tell us, can you,

that there were five walk-ons that Coach Trakh wanted and
because you took Sabrina Abdelaziz, the sixth one, who should
have been the fifth one, didn't get in.  You can't tell us
that, can you?

A.   Again, I'm not familiar with how the coaches manage their
rosters.

Q.   But you're familiar with admissions.  You've been there
for 20 years.  And you don't know how many walk-on recruits
Coach Trakh asked for in 2017?

A.   I don't review those data on a regular basis.

Q.   And the government never asked you to figure that out for
them?

A.   No.

Q.   Okay.  You gave us some numbers yesterday about the
classes at USC.  And you told us yesterday, I believe, that the
first year class is typically 32 to 3,300 students?

A.   Yes.

Q.   And you also told us that there were 19,000 undergraduates
at USC?

A.   Yes.  We admit a transfer class every year, as well.

Q.   Okay.  And is there a VIP list for transfers?

A.   In the same way that folks across campus might be
interested in freshman applicants, they may also be interested
in transfer applicants.

Q.   And is there a ranking on the VIP list, in other words,

|       |                                                                       |
|-------|-----------------------------------------------------------------------|
| 1     | are you first tier or second tier?                                    |
| 2     | A.    Those were created by some of the offices.  I believe           |
| 3     | Advancement wanted to let us know of folks who they were more         |
| 4     | interested or less interested in.  That wasn't really                 |
| 5     | information that we used, but information that they, you know,        |
| 6     | used in their internal process.                                       |
| 7     | Q.    Well, would there be an e-mail with you about changing          |
| 8     | someone from first tier to second tier?                               |
| 9     | A.    There might be.  This was more recordkeeping.  It wasn't        |
| 09:58 10 | really something that was important to the Admissions Office.      |
| 11    | We didn't ask for that information.                                   |
| 12    | Q.    So why would you have been included on that e-mail?            |
| 13    | A.    To maintain a spreadsheet.                                       |
| 14    | Q.    Because you maintained a spreadsheet?                           |
| 15    | A.    I'm one of the people that can, you know, add and change        |
| 16    | things in the spreadsheet.  We've since changed to tracking all      |
| 17    | this information, rather than just on a spreadsheet, to a             |
| 18    | database.  So depending on when that request was made, I maybe       |
| 19    | was changing it in the database.                                      |
| 09:59 20 | MR. SHEKETOFF:  Can I have Exhibit 1297 just for the           |
| 21    | witness.                                                               |
| 22    | Q.    Do you recognize this e-mail?                                    |
| 23    | A.    I don't remember it, but I can see that it's an e-mail and      |
| 24    | I can see that --                                                      |
| 25    | Q.    All right.  Are you cc'd on this e-mail?                        |

```
 1   A.   Can I see the rest of the e-mail, please?

 2   Q.   Yes.

 3            MR. KENDALL:  Mr. Carter.

 4   A.   Is that the end?  Thank you.

 5   Q.   All right.  Were you cc'd on this e-mail?

 6   A.   Yes.

 7   Q.   And why do you think you were cc'd on this e-mail?

 8            MR. FRANK:  Objection.  It's not in evidence.

 9            THE COURT:  Sustained.

10            MR. SHEKETOFF:  All right.  I offer it.

11            MR. FRANK:  I object.  It's irrelevant, beyond the

12   scope, hearsay.

13            THE COURT:  Sustained.

14   Q.   Well, you certainly know the difference between first tier

15   and second tier, correct?

16   A.   Again, this was something that the Advancement Office

17   wanted to separate their own list.  It wasn't something that

18   was significant to the Admission Office.

19            MR. SHEKETOFF:  Okay.  Can I have Wilson Exhibit 7358,

20   just for the witness.

21   Q.   Do you recognize this e-mail?

22   A.   Can I see the rest of the e-mail, please?

23   Q.   Sure.  All set?

24   A.   Is that the whole thing?

25   Q.   Yes.
```

```
 1   A.    Thank you.

 2   Q.    Do you recognize it?

 3   A.    Yes.

 4         MR. SHEKETOFF:  I'll offer it.

 5         MR. FRANK:  Objection, your honor.  He needed to

 6   refresh her recollection.

 7         THE COURT:  The objection is sustained, but it can be

 8   used to refresh her recollection.

 9   Q.    Okay.  What's a s-c-i-o-n?  How do you pronounce that?

10   MR. FRANK:  Can we take the document down?

11         THE COURT:  I can't hear you.

12         MR. FRANK:  I was asking if we could remove the

13   document.

14         THE COURT:  Yes.

15   A.    So, at USC, we like a lot of words that start with SC, so

16   our legacy applicants are called scions.

17   Q.    So why would you care whether someone was a legacy

18   applicant or not?

19   A.    So something that we'll consider in the admission process

20   is students who have had grandparents, parents, or siblings

21   who've attended the University.

22   Q.    And who forwarded this particular e-mail to you?

23         MR. FRANK:  Objection.

24         THE COURT:  Grounds?

25         MR. FRANK:  It's not in evidence.
```

**A1913**

```
 1              THE COURT:  Yeah.  Sustained.
 2    Q.   Well, does this e-mail involve just the Admissions
 3    Department?
 4              MR. FRANK:  Objection to the e-mail.
 5              THE COURT:  Sustained.
 6    Q.   Do you believe that there are advantages for the wealthy
 7    at the University of Southern California?
 8              MR. FRANK:  Objection.  Relevance.
 9              THE COURT:  He can have that question.
10:05 10   A.   Advantages by attending USC?
11    Q.   No.
12    A.   I'm sorry.  I don't understand your question.
13    Q.   Well, do you use Twitter?
14    A.   Yes.
15    Q.   Do you ever retweet people's posts?
16    A.   Sometimes.  I'm not a very active user.
17    Q.   Do you ever retweet -- well, strike that.
18              Do you recall a retweet of a post concerning the
19    advantages of the wealthy?
10:05 20   A.   I don't remember all of the tweets.
21              MR. SHEKETOFF:  Could I have, just for the witness,
22    Mr. Carter, Exhibit 9038.
23    Q.   Do you recall this retweet?
24    A.   Yes.
25    Q.   And by re tweeting it, you were telling the world, or at
```

```
 1   least people that have access to Twitter, that "everything

 2   (save perhaps one thing) in the admissions process" --

 3              MR. FRANK:  Your Honor, I object.

 4              THE COURT:  It hasn't been admitted.  You can't read

 5   from it.

 6              MR. SHEKETOFF:  Okay.  Then I offer it.

 7              MR. FRANK:  I object.  It can be used to refresh her

 8   if she doesn't remember it, but it's not in evidence.

 9              THE COURT:  Yeah.  What are you offering it for,

10   Mr. Sheketoff?

11              MR. SHEKETOFF:  For her bias.

12              MR. FRANK:  He can ask her about her bias, your Honor.

13              MR. SHEKETOFF:  I can also prove her bias.

14              THE COURT:  I'm going to allow him to offer this, and

15   I will admit it, 9038.

16              (Exhibit 9038 admitted into evidence.)

17   Q.   At least for this tweet, you didn't need statistical

18   evidence to agree with this, correct?  Anyone in Admissions

19   would know this?

20   A.   I think we're familiar with many ways in which affluent

21   students are advantaged in the admissions process, through the

22   schools they attend, the preparation that they get, the classes

23   they have access to, the test prep that they do.  There's a lot

24   of ways that affluent students are advantaged in the admissions

25   process.
```

1    Q.    But not by giving donations to universities?

2    A.    I wasn't specifically referring to that.

3    Q.    I apologize.  I'm not suggesting you were specifically

4    referring to that.  But you're taking this thing that was --

5    that you retweeted and you're limiting it to certain things.

6    And I'm asking you, did you also have in mind that their

7    parents can make donations to universities and that advantages

8    them?

9    A.    I don't remember what I thought while I was Tweeting.

10:08 10    Q.    Have you done anything at USC to stop this feeder school

11    concept where you just told us these kids are advantaged

12    because they go to these, you know, basically special private

13    schools?

14    A.    I think that we do really broad outreach.  We visit 2,000

15    high schools.  We try to be in all the places that we might

16    find students who might be a good fit for USC.  So I think we

17    actively work to make sure we're including as many students as

18    we can.

19    Q.    But you have close relationships with certain feeder

10:09 20    schools, correct?

21    A.    We've built relationships over the years with counselors

22    from all kinds of schools, including independent schools.

23    Q.    By the way, do you send -- USC admissions, do you send

24    recruiters to the Hong Kong International School every year?

25    A.    As I mentioned last year, we do have admission officers

**A1916**

who visit schools all over the country, all over the world, and

we do visit Hong Kong International School.  There's a lot of

students who are interested in hearing about USC.

Q.   Okay.  So the answer is yes, you send recruiters every

year to Hong Kong International School?

A.   We haven't gone the past couple years due to COVID, but

yes.  It is generally a school that we will visit.

Q.   Do you know that Kirk Brennan, the second in charge of

Admission, actually met Sabrina Abdelaziz at the Hong Kong

International School on one of these recruiting trips?

A.   I'm not aware of that.

Q.   He never discussed that with you?

A.   No.

Q.   When you guys talked about it right after the indictment

and you saw the name Abdelaziz, he didn't say to you, I met her

when I was at Hong Kong International School?

A.   I'm not aware of that.

Q.   So he never mentioned it to you?

     MR. FRANK:  Objection.  Asked and answered three

times.

     THE COURT:  Overruled.

A.   No.

Q.   So it's fair to say that your Admissions Department had a

very clear view of Hong Kong International School?

     MR. FRANK:  Objection to clear view.

```
 1              THE COURT:  I don't understand it.  Sustained.
 2    Q.   You knew that it was an academic institution and not a
 3    sports institution, correct?
 4    A.   Like I said, I'm not familiar with what's happening in
 5    high school sports at all of the many high schools that we
 6    visit or don't visit and we receive applications from.  We
 7    certainly knew the academic profile and that they prepare
 8    students well.
 9    Q.   Did -- well, you've already told us Kirk Brennan never
10    talked to you about Sabrina Abdelaziz, correct?
11    A.   Correct.
12    Q.   Okay.  How does the Athletic Department go about its
13    fundraising?
14              MR. FRANK:  Objection.  Foundation.
15              THE COURT:  Sustained.
16    Q.   Well, do you know what direction Donna Heinel was given in
17    2016 and 2015 and 2017 about her obligations vis-a-vis
18    fundraising?
19              MR. FRANK:  Objection.  Foundation.
20              THE COURT:  Sustained.
21              MR. SHEKETOFF:  I'm just asking her if she knows, your
22    Honor.
23              THE COURT:  Well, she can have that if she knows.
24    A.   I don't know.
25    Q.   You don't know.  You don't know what directions, if any,
```

```
 1   she was operating under?
 2            MR. FRANK:  Objection.  Asked and answered.
 3            THE COURT:  Sustained.
 4   Q.   Do you know if she had control of any funds that were
 5   donated to USC sports?
 6            MR. FRANK:  Objection.  Foundation.
 7            THE COURT:  Sustained.
 8            MR. SHEKETOFF:  I'm just asking her if she knows.
 9            THE COURT:  Well, we've been over this, I think,
10   enough.
11   Q.   Okay.  Do you have any idea how many people were on the
12   VIP list in Sabrina Abdelaziz's matriculating class?
13   A.   I don't have those data.
14   Q.   So as you sit here today, you don't know if it was a
15   thousand or one?
16   A.   It was more than one.
17   Q.   Was it more than 500?
18            MR. FRANK:  Objection.
19            THE COURT:  If she knows.  Overruled.
20   A.   I just don't have those data.
21   Q.   Was it a thousand?
22   A.   I just don't have those data.
23   Q.   You know the government does.
24            MR. FRANK:  Objection.
25            THE COURT:  Sustained.
```

```
 1              MR. SHEKETOFF:  Thank you, Judge.

 2              THE COURT:  Mr. Kendall, cross-examination.

 3              MR. KENDALL:  Thank you, your Honor.  Please, if I may

 4    just have a moment to set up.

 5              THE COURT:  Yes.

 6                  CROSS-EXAMINATION OF REBECCA CHASSIN

 7    BY MR. KENDALL:

 8    Q.   Good morning, Miss Chassin.

 9    A.   Good morning.

10    Q.   My name's Mike Kendall.  I represent John Wilson, along

11    with some other folks.  Thank you for coming up from California

12    and staying over for us.

13                Would you agree with me USC kept a $100,000 donation

14    from Mr. Wilson and has never returned it, correct?

15              MR. FRANK:  Objection.  Foundation.

16              THE COURT:  Sustained.

17    Q.   Okay.  Do you have any -- as you sit here today, do you

18    have any reason to believe that USC has returned that donation

19    to Mr. Wilson?

20              MR. FRANK:  Objection.  Foundation.  Beyond the scope.

21              THE COURT:  Sustained.  Not for beyond the scope, but

22    for lack of foundation.

23    Q.   You've testified yesterday about a bunch of SUBCO files

24    that were all submitted on the same day by Donna Heinel and

25    supposedly associated with Mr. Singer.  Do you remember that?
```

```
 1    A.    Yes.  I saw those SUBCOs that were on several different

 2    dates and that had been presented by Donna.

 3    Q.    Those were years after Johnny Wilson was admitted,

 4    correct?

 5    A.    Yes.

 6    Q.    He was admitted in March of 2014, correct?

 7    A.    I believe so.

 8    Q.    And as you sit here today, you have no basis to say that

 9    Mr. Wilson had any contact or association with those later

10:16 10  Donna Heinel submissions, correct?

11            MR. FRANK:  Objection.  Foundation.

12            MR. KENDALL:  I'm just asking her knowledge.

13            THE COURT:  She can answer that question.  Overruled.

14    A.    I'm sorry.  Can you repeat that question?

15    Q.    You have no knowledge to think that Mr. Wilson was

16    involved at all with these submissions that came in in 2016 and

17    '17 with Donna Heinel?

18    A.    They were not presented at the same time.

19    Q.    Right.  And you don't know of Mr. Wilson having any

10:16 20  involvement with those applications, correct?

21    A.    I don't think any of those --

22    Q.    It's a yes or no.  Do you have any knowledge that

23    Mr. Wilson was a participant in submitting applications for

24    Giannulli or anybody else?

25    A.    That Mr. Wilson was participating in other students'
```

**A1921**

1    admissions?

2    Q.    Yes.

3    A.    I don't know.

4    Q.    Of course not.  You have no knowledge of that, correct?

5    A.    Correct.

6    Q.    Okay.  And fair to say you have no knowledge of Donna

7    Heinel being involved with his son's submission?  It went

8    through with Coach Vavic's support, correct?

9    A.    I know that Donna presented his case and Jovan supported

10:17 10    his case.

11    Q.    Do you remember Donna saying anything about his case?

12    A.    I don't remember the discussion at the SUBCO from 2014.

13    Q.    As a matter of fact, you have no basis to claim that Donna

14    even knew Rick Singer back in early 2014, correct?

15    A.    I don't know when she met Singer.

16    Q.    Okay.  Now the SUBCO, did you say it met biweekly, every

17    2 weeks?

18    A.    Generally speaking, yes.

19    Q.    Did you physically gather in a place?

10:17 20    A.    Usually, yes.

21    Q.    Okay.  What if somebody couldn't make the meeting?

22    A.    So, as I mentioned, we only required three voting members

23    to be present.

24    Q.    Okay.  And how long did the meetings last?

25    A.    Couple of hours usually.

```
 1  Q.   How would people communicate about SUBCO activities

 2  outside of those meetings?

 3  A.   What kind of activities?

 4  Q.   If there was, you know, discussion about candidates coming

 5  up, or if they needed further work on a candidate, you know, if

 6  you needed to discuss actions with respect to SUBCO?

 7  A.   Sometimes we would hold and we would bring back the

 8  information to a future SUBCO meeting and sometimes we would

 9  discuss it via e-mail or phone.
```

10:18
```
10  Q.   Okay.  Would it be fair to say using e-mail was a fairly

11  regular practice for members of SUBCO, correct?

12  A.   We use e-mail every day in our work.

13  Q.   And the Admissions staff, correct?

14  A.   Yes.

15  Q.   And with the folks at the Athletics Department that you

16  dealt with, such as Donna Heinel or Alex Garfield, correct?

17  A.   We would sometimes e-mail them and we could sometimes call

18  them, and they us.

19  Q.   Okay.  That was part of your regularly conducted business
```
10:18
```
20  on the SUBCO, correct?

21  A.   I think that's part of my every day at the University, to

22  talk to folks around the University.

23  Q.   And who was Katie Fuller?

24  A.   Alex -- after Alex was no longer in the role helping Donna

25  as a liaison to the Athletics Subcommittee, Katie Fuller was in
```

that role.

Q.   Could you explain what Katie's role was and what Alex's

role was.

A.   They were just associates of Donna's who also would

present cases to SUBCO.

Q.   Would they also help manage the paperwork?

A.   Yes.  I believe so.

Q.   Keep track of the decisions?

A.   I don't know what they did on their end.  We would keep

track of the decisions in the Admission Office.

Q.   Okay.  Obviously, the Athletics Department has to keep

track of decisions as well, don't they?

A.   I presume they would want to let coaches know about the

decisions coming out of SUBCO.

Q.   And to manage rosters and scholarships?

A.   I don't know how that's handled in the -- in Athletics.

Q.   Okay.  You said earlier, "We don't make offers of

admission in exchange for money."  Do you recall saying that

earlier today?

A.   Yes.

Q.   Who is the "we" you're referring to?

A.   The Office of Undergraduate Admission.

Q.   So -- and you're referring to yourself, correct?

A.   I'm referring to the authority that the Office of

Undergraduate Admission has in making admission decisions.

1   Q.   Okay.  So that would include Tim Brunold, correct?

2   A.   Yes.

3   Q.   Okay.  So let's break that down a little bit.  You're not

4   including the Athletics Department in that statement, correct?

5   A.   We're the only ones authorized to make undergraduate

6   admission decisions.  So all undergraduate admission decisions

7   are made in our office.

8   Q.   But the Athletics Department can recruit walk-ons to

9   submit to SUBCO, correct?

10:20 10   A.   Yes.

11   Q.   And they can apply whatever criteria they want to submit

12   for a walk-on, correct?

13         MR. FRANK:  Objection.  Foundation.

14         THE COURT:  Sustained.

15         MR. KENDALL:  She's on the SUBCO, your Honor.  I'll

16   rephrase it.

17   Q.   Are you aware of any rules that restrict what a coach can

18   consider when submitting a walk-on candidate to SUBCO back in

19   2014?

10:21 20   A.   There are not rules.

21   Q.   Okay.  There was nothing in writing that said you can't

22   consider a financial contribution, correct?

23   A.   I don't know what's in writing in the Athletics Office.

24   Q.   You're not aware of anything in writing anywhere that

25   restricted the coach's discretion and what to consider for a

walk-on recruit, correct?  Just asking what you're aware of.

A.    The Athletics Subcommittee is for athletic talent only, so that's the only thing that would be considered in that process.

Q.    Is there a written document that says that?

A.    I don't know.

Q.    You said earlier, several times, "I'm just not familiar with how the coaches manage their rosters."  That's a correct statement?

A.    Yes.

Q.    You have no idea back in 2014 how Coach Vavic managed his roster, correct?

A.    That's correct.

Q.    You have no idea if he considered athletic contributions as a valid contribution to the team's benefit, correct?

A.    Again, cases that he was presenting to SUBCO would have been based on the athletic talent alone.

Q.    What?  Did Coach Vavic tell you that?

A.    That was the expectation of SUBCO.  It was very clear.

Q.    Well, you say that expectation of SUBCO was very clear.  Did they give a written statement to Coach Vavic about that?

A.    I don't know.

Q.    Okay.  You're not aware of any written guidance given by SUBCO in 2014 to Coach Vavic saying you cannot consider a donation when looking at a walk-on candidate, correct?

A.    If we believe that was the basis for a coach recruiting a

1    student, it would not have been appropriate for it to be in

2    SUBCO.

3    Q.    Okay.  You said, "we."  Are you including Tim Brunold in

4    the "we" that you're talking about?

5    A.    The Office of Admissions, yes, including Tim Brunold.

6    Q.    Okay.  If I were to suggest to you that Pat Haden and the

7    people that ran the Athletic Department often considered a

8    donor's willingness to give when evaluating a SUBCO candidate

9    that was related to that donor and they kept Mr. Brunold

10:23 10    informed about that, would your statement be, gee, they didn't

11    tell me?

12         MR. FRANK:  I object to the testifying by counsel and

13    the hypothetical.

14         THE COURT:  Sustained.

15    Q.    Well, you testified earlier you never saw a copy of Pat

16    Haden's special interest list, correct?

17    A.    Again, we received a list about athletic advancement

18    interests.  I never saw something that was specific to Pat

19    Haden.

10:23 20    Q.    Okay.  You never saw a list that was entitled Pat Haden's

21    special interest list or Pat Haden's VIP list.  You never saw

22    that?

23    A.    No.

24    Q.    Did Mr. Brunold ever tell you he got it?

25    A.    Not that I'm aware of.

```
 1    Q.    Okay.  Would you agree with me, if Mr. Brunold got that
 2    list, he might have different information about fundraising at
 3    SUBCO than you do?
 4    A.    I don't know.
 5    Q.    Well, he might have information that would be such that
 6    you shouldn't be speaking for him, correct?
 7              MR. FRANK:  Objection.  Foundation.
 8              THE COURT:  Sustained.
 9    Q.    Fair to say you have no idea what Tim Brunold and Pat
10:25 10    Haden discussed by e-mail and telephone calls about fundraising
11    and SUBCO, correct?
12    A.    Correct.  I don't know why I would.
13    Q.    They never included you in their e-mail traffic, correct?
14    A.    No.
15    Q.    They never invited you to their phone calls, correct?
16    A.    Correct.
17    Q.    They never -- when the sports department would invite
18    Mr. Brunold to go fly on the football team's private jet to
19    games, they didn't invite you on those trips, correct?
10:25 20              MR. FRANK:  Objection.  Facts not in evidence.
21              THE COURT:  Sustained.
22    Q.    Were you ever invited to be on the private jet of the
23    football team to go to a game?
24    A.    No.
25    Q.    Do you know if Mr. Brunold was?
```

```
 1    A.    I don't know.
 2          MR. KENDALL:  Okay.  Could I have Exhibit 1085 on
 3    the -- just for the witness, please.
 4    Q.    You recognize this as an e-mail --
 5          MR. FRANK:  Objection to counsel describing the
 6    document.
 7          THE COURT:  If it's not in evidence, you can't
 8    describe it.
 9    Q.    You testified earlier that it was a routine practice of
10:26 10   the Admissions Department to use e-mail to conduct its
11    business, correct?
12    A.    Yes.
13    Q.    And part of that was to conduct SUBCO business, correct?
14    A.    Yes.
15    Q.    And who do you recognize this e-mail, the "to" and "from"?
16          MR. FRANK:  Objection.  There's not even a "from".
17          THE COURT:  Sustained.
18    Q.    Okay.  Is this an e-mail that's being sent in the regular
19    course of the admissions and SUBCO process?
10:26 20         MR. FRANK:  Objection.
21          THE COURT:  Sustained.
22          MR. KENDALL:  Your Honor, I'd like to offer it,
23    please.  There's no -- there's a stipulation as to its
24    authenticity, and I believe she's laid the foundation for a
25    business record.
```

```
 1              MR. FRANK:  She has not, your Honor.
 2              THE COURT:  No.  It's not going to be admitted.  The
 3    objection is sustained.
 4              MR. KENDALL:  May I approach sidebar, your Honor?
 5              THE COURT:  No.
 6              MR. KENDALL:  Your Honor, it's not for the truth of
 7    the matter asserted.  It's just for notice.
 8              MR. FRANK:  Not notice to this witness.
 9              MR. KENDALL:  To state of mind.
10:27 10          THE COURT:  Yeah.  The objection's sustained.
11    Q.   If it turned out -- if I were to suggest to you that
12    Miss Heinel would e-mail Mr. Brunold Pat's VIP list every
13    couple of weeks during the recruiting season, you would tell us
14    you're completely unaware of that, correct?
15              MR. FRANK:  Objection to facts not in evidence, and
16    he's testifying.
17              THE COURT:  Sustained.
18    Q.   Okay.  Do you know how often the Athletics Department send
19    Pat's VIP list to Mr. Brunold?
10:27 20          MR. FRANK:  I object to this entire continuing line.
21              THE COURT:  He can have that question.
22    A.   I'm sorry.  Can you repeat the question?
23    Q.   Do you know how often the Athletics Department would send
24    Pat's VIP list to Mr. Brunold?
25    A.   I wouldn't know anything about it.
```

```
 1   Q.   And you've never seen the list, correct?

 2   A.   That's correct.

 3   Q.   Nobody's ever shown it to you and Mr. Brunold never

 4   discussed it with you?

 5   A.   No.

 6   Q.   Okay.  But you're stating -- when you say we would never

 7   take finances or donations in consideration, you're including

 8   Mr. Brunold in that as well, correct?

 9   A.   I didn't state that we wouldn't take them into
10:28 10  consideration.  I said that we don't make offers of admission

11   in exchange for money.

12   Q.   Well, what's the difference between taking it into

13   consideration and making an exchange for money?

14   A.   I think there's a big difference.

15   Q.   Well, if the student does not qualify to be in a SUBCO

16   team but the parent gives a donation and you voted to approve

17   them, is that an exchange for money, or is that just part of

18   the consideration?

19            MR. FRANK:  Objection.  Compound.
10:29 20            THE COURT:  All right.  It is a compound question.

21            MR. KENDALL:  Okay.  I'll rephrase it.

22   Q.   Do you remember voting to admit a SUBCO candidate walk-on

23   for the golf team whose father gave $3 million to the Athletics

24   Department at the same time?

25            MR. FRANK:  Objection.  This is contrary to the
```

1    Court's Order.

2         THE COURT:  Sustained.

3         MR. KENDALL:  Your Honor, I'm trying to impeach the

4    witness.

5         THE COURT:  That's beyond.  Sustained.

6    Q.   Okay.  Did you ever vote in favor of accepting SUBCO

7    candidates who were not good enough to be on a USC team, but

8    whose parents were making contributions?

9    A.   If I voted to approve a student in the SUBCO, it was

10:29 10   because I was convinced that their athletic talent would

11   contribute athletically to the University.

12   Q.   Meaning you thought they could actually be an athlete that

13   would perform on the team and be someone who is playing in

14   matches and games?

15   A.   That's what was presented to us.

16   Q.   Okay.  And are you aware of that one time of someone whose

17   father gave $3 million?

18         MR. FRANK:  I object.

19         THE COURT:  She can say whether she's aware of it.

10:30 20   A.   We were not -- no. I was not aware of it and the Athletics

21   Subcommittee were focused only on the student's athletic

22   talent.

23   Q.   When I refer to a golf walk-on whose father gave

24   $3 million, do you know who I'm talking about?  Just yes or no.

25   A.   No.  No.

```
 1   Q.   So if you voted on a golf walk-on and the father had
 2   already agreed to give $3 million and Mr. Brunold knew that, he
 3   didn't tell you that?
 4        MR. FRANK:  I object, your Honor.
 5        THE COURT:  Sustained.
 6   Q.   Okay.  So would it be fair to say every time you voted on
 7   a SUBCO candidate at meetings, you were unaware of any deals
 8   being made about donations, correct?
 9   A.   The focus of the athletic SUBCO is on the athletic talent
10   of the student, and that's the only thing that is under
11   consideration of whether or not they're approved as a student
12   athlete.
13   Q.   If you can answer my question, please.  I want to know
14   what you were aware of.  If at any time that you voted on a
15   SUBCO candidate, were you aware that there had been a
16   discussion about a donation with the parent?
17   A.   If we were aware of that, that was set aside for us to
18   focus on the athletic talent.
19   Q.   You didn't answer my question.  Were you aware of that?
20   A.   There have been cases where we have also known that a
21   student is of interest to the Advancement Office or of interest
22   to Athletic Advancement, but in the Subcommittee, we're focused
23   on the student's athletic talent alone.
24   Q.   Are you aware of anybody who was a SUBCO candidate for
25   golf that you were told the father was going to make a
```

10:30 (line 10)
10:31 (line 20)

A1933

1  donation?

2  A.   No.

3  Q.   Okay.  What about for tennis?  Were you ever told about

4  anybody who was going to make a donation for tennis and that

5  had been negotiated at the same time as their SUBCO application

6  was being submitted?

7  A.   I don't remember ever single student who's been presented

8  to me in SUBCO over, you know, many, many years, so I can't

9  recall every single instant of every single student and what

10:32  10  was told to me.  I can tell you that in the Athletics

11  Subcommittee we were solely focused on the athletic talent of

12  the student.

13  Q.   Were you aware of any tennis SUBCO candidate from the East

14  Coast whose father committed to give $500,000 at the time?

15          MR. FRANK:  Objection to him testifying.

16          MR. KENDALL:  Your Honor, I have a good faith basis

17  based upon documents I've been given.

18          THE COURT:  He can ask the question if she is aware of

19  that.

10:32  20  A.   I refer back to my previous response.  I don't remember

21  every single student from hundreds of SUBCO meetings that we

22  had and what information was, you know, available at the time

23  that we met.  In the Athletic Subcommittee, we're focused

24  solely on the student's athletic talent.

25  Q.   Do you remember a single candidate where Mr. Brunold told

```
 1   you that there had been a donation being discussed with the

 2   Athletics Department?  Can you recall a single time he gave you

 3   that information?

 4   A.   Not specifically, no.

 5   Q.   Generally?

 6   A.   Again, we were sometimes aware that there were students

 7   who were also of interest to other folks around the University,

 8   of interest to the Advancement Office, but in the Athletic

 9   Subcommittee, we were focused solely on the student's athletic

10   talent.

11             MR. KENDALL:  Mr. Carter, if you could do me a favor,

12   I'd like to put up, just for the witness, please, could you put

13   up Exhibit 7238, page 9.

14             MR. FRANK:  Can we have a copy, Mr. Kendall?

15             MR. KENDALL:  I think we're going to get you one right

16   now.  Yeah.  Tab 36.

17   Q.   Do you recognize this document?

18             MR. FRANK:  Your Honor, if he's going to impeach her

19   for it --

20             THE COURT:  I'm sorry?

21             MR. FRANK:  This document is not in evidence.

22             MR. KENDALL:  You're right.  It's for impeachment.  I

23   want to see if she'll identify it first.

24             THE COURT:  Okay.

25   A.   Yes.  This is a SUBCO document.
```

```
 1   Q.   And are those your initials there in the approval?

 2              MR. FRANK:  Objection, your Honor.

 3              THE COURT:  It's not in evidence, so you can't start

 4   examining her about the document.

 5              MR. KENDALL:  I just want to get her initials and then

 6   I was going to offer it, your Honor.

 7   Q.   Are those your initials on the document?

 8   A.   Yes, RJC.

 9              MR. KENDALL:  Okay.  I'd like to offer page 9 of 7238

10   into evidence.

11              MR. FRANK:  Objection.  Relevance.  Directly contrary

12   to the Court's Order.

13              MR. KENDALL:  It's direct impeachment, your Honor.

14   They've opened the door.

15              MR. FRANK:  And no impeachment --

16              THE COURT:  The objection is sustained.

17   Q.   Do you remember this candidate?

18              MR. FRANK:  Your Honor, could we wait until I have a

19   copy of the document?

20              THE COURT:  Yes.

21              MR. KENDALL:  We refer to this candidate as 843, so I

22   want to use the 843, not their actual name.

23   Q.   By looking at --

24   A.   I don't have anything on my screen.  Am I supposed to be

25   looking at something?
```

**A1936**

```
 1   Q.   When you looked at it before, did it refresh your
 2   recollection as to who the candidate was?
 3   A.   A document with no student's name on it?
 4   Q.   Okay.  We're working with a protective order.
 5        MR. KENDALL:  Your Honor, may I tell her who the name
 6   is, show her a document that will refresh the rest of the name?
 7        THE COURT:  You can show her anything to refresh her
 8   memory.  Then you take the document down and ask if it does.
 9        MR. KENDALL:  I have it here, your Honor.  May I walk
10   it over?
11   Q.   I'm going to show you a document that has a name on it.
12   Then I'm going to ask you if you recall being involved in that
13   SUBCO decision.  And if so -- this is 843.
14   A.   I don't recall that name.
15        MR. FRANK:  Okay.  May I see what the witness is being
16   shown?
17        THE COURT:  Yes.  Show counsel.
18        MR. KENDALL:  Sure.  I need to show it to her.
19   Q.   With that, do you recall who that is?
20   A.   I don't.
21   Q.   Okay.  So you have no memory of a golf walk-on in 2015
22   with what I've just refreshed your recollection?
23   A.   I don't have a -- I don't recall that student.
24   Q.   To assess the athletic talent in a golfer, do you know how
25   many strokes they should be hitting above par?
```

```
 1   A.   I rely on the information that's presented by the coach
 2   about how the student ranks among other high school golfers or
 3   among other members of the USC golf team.
 4   Q.   Do you remember in 2015 having a golf walk-on candidate
 5   whose scores were sometimes 20 strokes above par?
 6           MR. FRANK:  I object, your Honor.  This is beyond the
 7   scope, and it's directly contrary to the Court's Order.
 8           THE COURT:  He can have whether she remembers that
 9   specific case.
10   A.   I don't remember this specific student.
11   Q.   Okay.  And it'd be fair to say you don't evaluate whether
12   20 strokes or not is good, 20 strokes above par is good, for a
13   Division 1 golf team, because it's the coach's decision that
14   you defer to, correct?
15   A.   Yes.  We're looking to understand the student's athletic
16   talent in this -- you know, among other high school golfers in
17   this case or -- and/or among the USC golf team.
18   Q.   But you told us, I think earlier, that really the only
19   reason somebody gets rejected at SUBCO is for academics, not
20   for athletics, correct?
21   A.   That's primarily the reason, yes.
22   Q.   You refer to the coach's judgment?
23   A.   Yes.  We expect that the coaches are bringing athletically
24   talented students who will contribute to their team, contribute
25   athletically.
```

|  |  |
|---|---|
| 1 | Q.   Contribute to the team in a way that the coach has |
| 2 | decided? |
| 3 | A.   Athletically. |
| 4 | Q.   Have you -- did you ever put that in writing, coaches, it |
| 5 | has to be athletic only that you consider when you do a |
| 6 | submission to SUBCO?  You never told them that, did you? |
| 7 | A.   That was our clear expectation. |
| 8 | Q.   That was your clear expectation, but you didn't make it |
| 9 | clear to the Athletics Department now, did you? |
| 10:39 10 | A.   I believe coaches wanted to have students who would |
| 11 | contribute to their teams athletically. |
| 12 | Q.   Yes.  And if they include a financial contribution as part |
| 13 | of that consideration, it did not violate any rule that applied |
| 14 | to the Athletics Department, correct? |
| 15 | MR. FRANK:  Objection.  Foundation. |
| 16 | THE COURT:  Sustained. |
| 17 | Q.   Any rule that you're aware of and -- that you're aware of |
| 18 | at the Athletics Department, correct? |
| 19 | MR. FRANK:  Objection.  Foundation. |
| 10:39 20 | THE COURT:  He can have what she was aware of. |
| 21 | A.   I'm sorry.  Can you repeat the question? |
| 22 | Q.   And if they included contributions as part of their |
| 23 | assessment of what would be the contribution to the team, that |
| 24 | did not violate any rule that you're aware of that applied to |
| 25 | coaches in the Athletic Department? |

```
 1    A.    I'm not aware of the rules in the Athletic Department.

 2    Q.    Okay.  You worked with Coach Vavic, didn't you?  Excuse

 3    me.  You didn't work with Coach Vavic.  You worked with SUBCO

 4    applications to the water polo team, correct?

 5    A.    Yes.

 6    Q.    Okay.  And do you recall that Vavic only had about four

 7    and a half scholarships a year to give out?

 8    A.    I don't remember the exact scholarship allocation to the

 9    water polo team.

10    Q.    Okay.  He had a small number of scholarships, fair to say?

11    A.    I don't know the exact number of scholarship to his

12    specific team.

13    Q.    Does four or five for water polo sound in the ball park?

14    A.    I just couldn't say.

15    Q.    Okay.  You never discussed with Jovan Vavic his recruiting

16    philosophy, correct?

17    A.    We wouldn't speak with coaches directly, no.

18    Q.    Or his coaching philosophy, correct?

19    A.    We didn't speak with coaches directly.

20    Q.    Do you know how many water polo players are in the pool in

21    a game at any one time?

22    A.    I'm not sure off the top of my head.

23    Q.    Do you know how many athletes play during a game?

24    A.    I'm not sure off the top of my head.

25    Q.    Do you know how many athletes he recruited in 2014, the
```

**A1940**

```
 1   year that Johnny Wilson was recruited?

 2   A.   I don't have those data.

 3   Q.   Do you -- were you aware that there had been a tragedy in

 4   2013 and a lot of the team members had left the team in the

 5   prior year?

 6   A.   I'm not aware of that.

 7   Q.   You're not aware of one of the athletes having a tragic

 8   death and a bunch of team members then leaving the team because

 9   of it?

10   A.   I'm not aware of that.

11   Q.   So you don't know if Vavic needed a particularly large

12   class of recruits in 2014 or not, correct?

13   A.   I don't have any recollection of that time frame

14   specifically and his needs.

15   Q.   Do you know how many players were recruited in 2014?

16   A.   I don't have those data.

17   Q.   If I were to suggest 17, would that refresh your

18   recollection?

19   A.   You know, again, we look at the SUBCO athletes that are

20   presented at each meeting.  I haven't gone back to reconcile

21   the entire group of students for the whole year, and not every

22   student who is presented will ultimately enroll.

23   Q.   And would you agree with me there's a lot of reasons why a

24   water polo coach might want to have a large team?

25   A.   I don't know the details of -- I don't know how he decides
```

**A1941**

```
 1   how many students to have on the team.

 2   Q.    Players get injured, correct?

 3   A.    I assume players get injured doing most sports.

 4   Q.    And they need to be replaced when they're injured?

 5         MR. FRANK:  Objection.  Foundation.

 6         THE COURT:  Sustained.

 7   Q.    And, also, with the quality of USC's coaching and

 8   resources, they can often develop a player in to being a much

 9   better athlete, correct?

10   A.    I believe most students, as they continue to play, will

11   develop and become stronger athletes while they're at USC.

12   Q.    But USC's got great coaches, correct?

13   A.    I believe so.

14   Q.    They know how to develop talent, correct?

15   A.    Sure.

16   Q.    And do you also know that a lot of the athletes recruited

17   for water polo were red shirts?

18   A.    I'm not aware of, you know, the decisions that are made

19   about red shirting.

20   Q.    So you don't know how many of the entering class in 2014

21   were red shirts and how many were not?

22   A.    I do not.

23   Q.    And do you know how Vavic runs practices and drills for

24   the team?

25   A.    I've never been to a water polo practice.
```

```
 1   Q.   So you don't know if it's beneficial to him to have a

 2   larger team to run practices and drills, correct?

 3   A.   I don't know.

 4   Q.   Okay.  Now -- and there's also attrition on the teams.

 5   People quit over time, correct?

 6   A.   I don't have the details of that.

 7   Q.   So you don't really know much at all about how the

 8   Athletics Department operates, do you?

 9   A.   I don't work in the Athletics Department.

10   Q.   And you don't talk to them about your SUBCO work at all,

11   correct?

12   A.   I speak to the liaisons to the SUBCO and get information

13   when we need more information.

14   Q.   And when Tim Brunold speaks to Pat Haden about his VIP

15   list, they don't tell you about that at all, correct?

16        MR. FRANK:  Objection.  Asked and answered.

17        THE COURT:  Sustained.

18        MR. KENDALL:  I'd like to put up on the screen, for

19   the witness only, Exhibit 7950.

20   Q.   Do you recognize that?

21   A.   Yes.

22   Q.   Okay.  You were talking earlier yesterday about grades and

23   scores and the number of people being admitted at USC, correct?

24   A.   Yes.  I referred to data from 2018.

25   Q.   Okay.  And what do you recognize Exhibit 7950 to be?
```

A.   Our freshman profile from the class that entered in fall
2013.

Q.   Is that something put together by the Admissions Office?

A.   Yes.

Q.   Okay.  And you put it on your website so people who were
applying would have a sense of where they fit in for the
applicant pool?

A.   Yeah, and letting folks know about, you know, how proud we
are of our class and what our class -- what the makeup of our
class looks like.

Q.   And this is on the internet for everybody to see, correct?

A.   Correct.

Q.   And what are the intended audiences of potential
applicants, correct?

A.   Potential applicants, their families, counselors, anybody
who's interested in sort of what's happening with the entering
class at USC.

          MR. KENDALL:  Okay.  Your Honor, I'd like to offer
Exhibit 7950 into evidence.

          THE COURT:  It will be admitted.

          (Exhibit 7950 admitted into evidence.)

          MR. KENDALL:  Okay.  If we can show the jury, please.

Q.   So if we look at the top, it says "University of Southern
California Freshman Profile and Admission Information",
correct?

1  A.   Yes.

2  Q.   And if we look into that gray box, we see that 47,000

3  people applied, about 9,400 were admitted, and about 2,922

4  enrolled, correct?

5  A.   Yes.  I see those numbers.

6  Q.   Okay.  And the SUBCO people are done in a category

7  separate from the nonathletes, correct?

8  A.   The admission process is different, but they're included

9  in these numbers.  They're a part of the freshman class.

10:46 10  Q.   Yes, but it's a different consideration and a different

11  bucket of people being decided on?

12  A.   Just a different process, not really a different bucket.

13  Q.   Okay.  And if we take a look further down where it says

14  the "The Middle 50 percent SAT composite" for those who are

15  enrolled, it's 29 to 33, correct?

16  A.   That's for the enrolled class.  The admits are usually a

17  little bit higher.

18  Q.   The applicants are a bit lower, correct?

19  A.   Correct.

10:47 20  Q.   Okay.  So for the people who actually show up and want to

21  go to USC, if you've got a 29 on your SAT, you're in that

22  middle 50 percent of the class, correct?

23  A.   Right, meaning 25 percent of our enrollees have above 33

24  and 25 percent of our enrollees have below a 29.

25  Q.   Right.  And the 25 percent above the 33, a lot of them get

1  merit scholarships for academics, correct?

2  A.   Some of them do.

3  Q.   Trustee Scholars, Presidential Scholars?

4  A.   Some of them do.

5  Q.   It's a way to attract really gifted academic people to

6  come to USC and not another school?

7  A.   Sure.  That's part of our merit scholarship program.

8  Q.   You could say, you know, I can either get a free ride to

9  USC, or I can pay to go to UCLA.  I'll take the free ride.

10:47 10  Correct?

11  A.   It's just for tuition, but sure.

12  Q.   Okay.  And then those who fall in the bottom 25 percent

13  that are below the 29, that could be athletes, correct?

14  A.   It could be.

15  Q.   It could be the children of VIP donors?

16  A.   It could be any student who chooses to enroll who was

17  admitted.

18  Q.   But anybody who's got a 29, that's the middle of the

19  class, the middle 50 percent.  That's why you segregate out

10:48 20  that number, let people know what's the sort of middle of the

21  class score, correct?

22  A.   It's a fairly typical data point for colleges to present

23  and let folks know about.

24  Q.   Okay.  And then you have the "mean GPA (un-weighted)",

25  3.73, correct?

```
 1   A.   That's for the enrolled class, correct.
 2   Q.   Yes.  And that means -- that's not adjusting or giving
 3   people a benefit for taking a lot of AP classes, correct?
 4   A.   Right.  That's just the unweighted GPA based on their
 5   academic coursework.
 6   Q.   And a lot of people don't take AP classes and challenging
 7   classes, correct?
 8   A.   Many of our applicants will take more advanced coursework.
 9   That's pretty typical for us to see that students have chosen
10   to challenge themselves in high school as they prepare for
11   college.
12   Q.   Many will, but many will not, correct?
13   A.   I would say the vast majority have taken advanced
14   coursework.
15   Q.   Okay.  But a lot of the athletes may not have, correct?
16   A.   Some of them have and some of them haven't.
17   Q.   Okay.  Well, you testified yesterday that one of the
18   things about the SUBCO process is the athletes usually have
19   lower academic numbers than the nonathletes, correct?
20   A.   As a group.
21   Q.   Yeah.  And also, the VIP, many of the VIP donor candidates
22   may not have the most challenging coursework, correct?
23   A.   Again, some of them may and some of them may not.
24   Q.   Okay.  And so with Johnny Wilson, the SUBCO added .5 to
25   his GPA because of the AP courses he took and the curriculum he
```

```
 1    took, correct?
 2    A.    Part of it was based on the preparation he was getting
 3    from the high school that he attended and part of it was based
 4    on the rigor of the coursework that he chose.
 5           MR. KENDALL:  Okay.  I'd like to put up on the screen
 6    Exhibit 1116, please.
 7           MR. FRANK:  For the witness only?
 8           MR. KENDALL:  For the witness only, of course, yes.
 9    Q.    Do you see Exhibit 1116?
10    A.    Yes.
11    Q.    Okay.  And you recognize the e-mails to and from?
12    A.    I know who those people are.
13    Q.    Yeah.  And without going into details, it concerns SUBCO?
14    A.    Yes.
15    Q.    Okay.  And if you take a look --
16           MR. KENDALL:  Your Honor, I'd like to offer it,
17    please.
18           MR. FRANK:  Objection.
19           MR. KENDALL:  It's a SUBCO document.
20           MR. FRANK:  Objection.
21           THE COURT:  Sustained.
22    Q.    Take a look at page 2.  Have you ever seen this type of
23    list before without the redactions?
24           MR. FRANK:  Objection, your Honor.  He can ask her
25    impeachment questions about it.
```

```
 1          MR. KENDALL:  Your Honor, I'm looking to use this for

 2   impeachment.  I'm trying to lay a foundation.  That's all.

 3          MR. FRANK:  He doesn't need to lay a foundation for

 4   impeachment.

 5          THE COURT:  Show her the document.  Take it down.  Ask

 6   her whether it refreshes her memory.

 7   Q.   Okay.  If we could --

 8          MR. KENDALL:  May I just ask her if she's seen this

 9   before, your Honor, this type of document before?

10:51 10          THE COURT:  You can ask that.

11   Q.   Have you seen this type of chart before without

12   redactions?

13   A.   No.

14          MR. KENDALL:  Okay.  If we could turn to, Mr. Carter,

15   where it says "spring".  I'm going to count pages.  1, 2, 3, 4,

16   5, 6, 7, 8, 9, 10, 11, 12, to 13, where it says "M. Water

17   Polo".

18   Q.   Does this document refresh you as to the --

19   A.   I don't have anything on my screen.

10:52 20   Q.   Oh.  I'm sorry.  I'm a little ahead of things.  Okay.  Do

21   you see the list there?

22   A.   No.

23   Q.   Do you see it now?

24   A.   Yes.

25   Q.   Does that refresh you as to the large size of the class?
```

|       |                                                                              |
|-------|------------------------------------------------------------------------------|
| 1     | MR. FRANK:  Take the document down, please.                                  |
| 2     | THE COURT:  Take the document down.                                          |
| 3     | MR. KENDALL:  Okay.  Take the document down.                                 |
| 4     | Q.  Does that refresh you as to the size of the class that was               |
| 5     | admitted in 2014 with Mr. Wilson?                                            |
| 6     | A.  No.                                                                       |
| 7     | Q.  Okay.  Mr. Wilson's suggested GPA was 3.87.  Would you                    |
| 8     | agree with me that's high for a water polo walk-on?                          |
| 9     | A.  I don't know off the top of my head.                                     |
| 10    | Q.  Well, you've been doing SUBCO admissions for how many                    |
| 11    | years?                                                                        |
| 12    | A.  Many.                                                                     |
| 13    | Q.  How many?                                                                 |
| 14    | A.  Probably 14 or 15.                                                        |
| 15    | Q.  And in your -- based upon your 14 or 15 years experience                 |
| 16    | reviewing SUBCO applicants for water polo candidates, would you              |
| 17    | agree with me that 3.87 is a pretty high grade point average                 |
| 18    | for a water polo candidate?                                                  |
| 19    | A.  I wouldn't be able to speak to a specific sport, but yes.                |
| 20    | 3.87 would be a strong GPA among our student athletes.  It's                 |
| 21    | not a very competitive GPA among our overall applicant pool and              |
| 22    | our students that we admit.                                                  |
| 23    | Q.  But for student athletes, put him up in maybe the top                    |
| 24    | 20 percent or so for GPA's, rough numbers?                                   |
| 25    | A.  I just haven't looked at those data.                                     |

10:53 appears at lines 10, 20.

1  Q.   Okay.  And if they had a 29 on the ACT, would you agree

2  with me that would be a high score as well for water polo

3  walk-on candidates, correct?

4  A.   Among all student athletes, that would appear to be a

5  stronger score, but, again, among our overall applicant pool,

6  it's not --

7  Q.   I'm asking you about the athletes.  Please limit your

8  answer to my question.

9        My question was for water polo walk-on candidates.  A

10:54 10  29 is a high -- is a relatively high ACT score, correct?  Yes

11  or no?

12  A.   I can't answer that question.

13  Q.   So after 15 years of looking at water polo walk-on files,

14  you have no memory of what's a good score or a not so good

15  score on the ACT for a water polo candidate?

16  A.   You asked me specifically about water polo walk-ons, and

17  that's very specific.  I don't feel comfortable, you know,

18  asserting something that I can't be sure of.  I haven't

19  reviewed those data specifically.

10:55 20  Q.   Okay.  So for general athletic walk-ons, is 29 a pretty

21  good score?

22  A.   I think it's fine.  I think we see, you know, again,

23  students with above and below that among our recruited

24  walk-ons.

25  Q.   But that's certainly in the top half, isn't it?

```
 1    A.    I wouldn't be able to say.

 2    Q.    After 15 years, you can't say?

 3    A.    I wouldn't feel comfortable, you know, saying that without

 4    looking at the data.

 5          MR. KENDALL:   If we could go to Exhibit 107, please.

 6    That was put into evidence yesterday.

 7    Q.    Do you remember testifying about this profile yesterday?

 8    A.    Yes.

 9    Q.    Do you agree with me you want the information to be

10    accurate, correct?

11    A.    Yes.

12    Q.    So if somebody put down SAT scores that were not the

13    student's best numbers, you'd want to see the best numbers for

14    their college boards, wouldn't you?

15    A.    We'd be happy to see new scores if there were new scores

16    presented.

17    Q.    Or old scores that were just left off that were better

18    scores, correct?

19    A.    Sure.

20    Q.    And if somebody -- if these SAT scores are like the

21    86th percentile or lower and the ACT scores are in the

22    93rd percentile, it would be helpful for the SUBCO to see the

23    best scores, correct?

24    A.    We don't really look at the percentile range.  We mostly

25    are going to be focused on the individual scores, and we would
```

compare the SAT to the concorded ACT, concorded to an ACT score and look at those two scores. There can be differences in scores that are not statistically significant.

Q.   You'd want to see the 29 if the person got a 29, wouldn't you?

A.   We're happy to see any scores that the student wants presented on their behalf.

Q.   Right. And most students would want to give you their best scores, correct?

A.   Sure.

Q.   Okay. I'd next like to go to in Exhibit 107, the bates ending in 9805, which is the Alejandro Garfio e-mail. You testified yesterday that you thought speed was an important factor for water polo candidates. Do you remember that?

A.   Based on the coach's assertion that that was something he was very interested in.

Q.   Okay. And let's take a look at this assertion. "The kid would be the fastest player on our team, he swims 50 yards in 20 seconds". Okay. That's a statement that the coaches made, correct?

A.   Yes.

Q.   You don't know where he got that information from?

A.   I don't.

Q.   Okay. You don't know if my client knew anything about that representation, do you?

```
 1   A.   There's no way for me to know where Jovan got that

 2   information.

 3   Q.   And then he says, "My fastest players are around

 4   22 seconds".  Do you see that?

 5   A.   Yes.

 6   Q.   Do you agree with me somebody who is a high school

 7   sophomore could swim around 22, as the fastest player on the

 8   best water polo team in the country, would be a pretty good

 9   candidate, wouldn't you?

10   A.   I'm sorry.  Can you repeat the question?

11   Q.   Yes.  If, in fact, this said he swims as fast as my

12   fastest players, they're all around 22 seconds, that would be a

13   very impressive credential, wouldn't it?

14   A.   Again, I was trusting the coach in asserting that the

15   student swam very fast, that that was important to this

16   student's athletic talent and contribution to the team.

17   Q.   Yes.  And if he expressed it as he swims very fast

18   because, as a sophomore in high school, he can swim as fast as

19   the fastest people on the USC water polo team, that would be an

20   impressive credential to the SUBCO, wouldn't it?

21   A.   Yes, based on the coach's assertion that the swimming fast

22   is important to him.

23   Q.   Yes.  So whether he's the fastest on the team or just one

24   of the fastest on the teams, either way it's a good athletic

25   credential, correct?
```

```
 1   A.    Yes.

 2   Q.    And you're not here to dispute any of his athletic

 3   credentials, are you?

 4   A.    No.  I have now learned that the athletic credentials that

 5   were presented to us --

 6   Q.    Excuse me.  That's hearsay.  You don't have personal

 7   knowledge of anything, do you, correct?

 8   A.    I know that students who were recruited did not -- were

 9   not recruited by coaches.

11:00 10   Q.    Excuse me.  You don't know anything about Johnny Wilson's

11   recruitment process and Coach Vavic's involvement.  You only

12   know hearsay that somebody told you, correct?

13   A.    I know what was presented to me.

14   Q.    Okay.  You know somebody told you a story, correct?

15   A.    I'm sorry?

16         MR. FRANK:  Objection.

17   Q.    You did not observe a witness, any of the interactions

18   with the coach and the involvement of Johnny Wilson's

19   recruitment?

11:00 20   A.    I did not observe that coach recruiting Johnny Wilson.

21   Q.    Do you know that the USC coaches called his high school

22   coach?

23         MR. FRANK:  Objection.  Foundation.  Background.

24         THE COURT:  Sustained.

25   Q.    You'd agree with me, if USC called a highly respected high
```

1  school coach and the coach gave a strong recommendation, that

2  would be an important consideration, wouldn't it?

3          MR. FRANK:  Objection.  Hypothetical.

4          THE COURT:  Sustained.

5  Q.   In the SUBCO process, is one of the factors you look at

6  recommendations from high school coaches?

7  A.   They're sometimes included, but very rarely.

8  Q.   Okay.  Well, if there's a very strong, highly successful,

9  top high school coach of his very successful teams, is that

11:01 10  something that the coaches are often talked to before they

11  submit their SUBCO request?

12  A.   I'm sorry.  Can you repeat your question?

13  Q.   Sure.  I probably should rephrase it and not repeat it.

14          Coaches have different ways to evaluate the talent

15  they're recommending for SUBCO, correct?

16  A.   Yes.

17  Q.   One of those ways they evaluate is to talk to the person's

18  high school coach, correct?

19  A.   I'm aware that's one of the ways that they might find out

11:01 20  about a student.

21  Q.   And would you agree with me there are certain high school

22  programs that are known for producing high quality athletes

23  year after year?

24  A.   I'm sure there's strong teams at certain high schools.  I

25  don't know the details of that.

1  Q.  Right, and I'm just asking the general proposition.  There

2  were some high schools that have great coaches and great

3  traditions, just like USC does?

4  A.  Sure.

5  Q.  And year after year they produce high quality teams?

6  A.  Sure.

7  Q.  And it's -- and based upon your 15 years at SUBCO, you

8  know one of the ways that a coach may evaluate a high school

9  athlete is to talk to a highly regarded high school coach?

11:02 10  A.  Yes.

11  Q.  Okay.  And if the highly regarded high school coach were

12  to give the person a strong recommendation, that, too, would be

13  an important factor to be considered in their admissions,

14  correct?

15  A.  It's not really considered by the Admission Office, but I

16  could see that that would be a basis by which a coach would

17  want to recruit a student.

18  Q.  Okay.  Would you agree that when you're discussing what

19  you think was the expectation of what SUBCO had with respect to

11:04 20  donations, the only person whose e-mails you're familiar with

21  to make that statement are your own, correct?

22  A.  I'm not sure what you're referring to.

23  Q.  Well, you testified earlier you did not see Mr. Brunold's

24  e-mails with Pat Haden, correct?

25  A.  Correct.

```
 1    Q.   And you didn't see Mr. Brunold's e-mails with Donna

 2    Heinel, correct?

 3            MR. FRANK:  Objection, your Honor.  We've been over

 4    this.

 5            THE COURT:  Overruled.

 6    Q.   And you didn't see Kirk Brennan's e-mails on the topic

 7    either, did you?

 8    A.   No.  My understanding of that being the expectation has to

 9    do with it being stated --

11:04  10    Q.   Excuse me.  I asked you what e-mails you saw.

11    A.   Okay.

12    Q.   If you can just limit your answer to my question, please.

13    I'd appreciate it.  Mr. Frank can ask you what he thinks

14    appropriate.

15            MR. KENDALL:  Your Honor, now might be a good time for

16    the break, if it's convenient.

17            THE COURT:  How much more do you have?

18            MR. KENDALL:  I have a bit more, but I want to cut out

19    some things.  So if I have 10 minutes, it will be shorter.

11:05  20            THE COURT:  All right.  We'll take the morning recess

21    here for 15 minutes.  Jurors, we'll be in recess for 15

22    minutes.

23            (Jury exits.)

24            THE COURT:  Please be seated, counsel.

25            You may step down, Miss Chassin.
```

**A1958**

```
 1              Approximately, how much longer on cross?

 2              MR. KENDALL:  That's what I want to look at and cut

 3    down, your Honor.  My original plan would have been another

 4    45 minutes to an hour.  I'm going to try to shorten that.

 5              May I ask the Court for a little bit of guidance,

 6    because I don't want to flounder and do things that are not

 7    going to lead to productive testimony?  I'm trying to

 8    understand what's going to be the acceptable form of

 9    impeachment of this witness, your Honor.

11:06 10             I have a large number of documents that I think

11    directly contradict her testimony about "we didn't take money

12    into consideration at SUBCO."  Her boss did.  Her boss was

13    fully informed and was discussing it with Pat Haden and

14    coordinating admissions decisions based upon donations.

15             I have it all in the documents, your Honor.  I thought

16    that was appropriate impeachment because she's testified these

17    are business records.  She said the e-mails were of regularly

18    conducted activity for both the SUBCO and the Athletic

19    Department people that participated in SUBCO.  I would like to

11:07 20   use those documents with her to impeach that exact statement

21    that she made yesterday and today and I want to know if I'm

22    allowed to do that with the documents she's validated as

23    business records.

24             MR. FRANK:  She's done the furthest thing from

25    validating business records, your Honor.  She said that they
```

1    use e-mail in the course of their business, just like they use

2    the phone, just like they use an in-person meeting.  That

3    doesn't make something a business record.  That's number one.

4         Number two, she can't be impeached on something she's

5    never seen.  It's completely irrelevant to her.  It's a

6    communication between two other people.  She can be shown the

7    document.  She can be asked if it refreshes her recollection,

8    but it's not impeachment.

9         MR. KENDALL:  If I may respond, your Honor?

11:07 10         THE COURT:  Yes.

11         MR. KENDALL:  She's testified what "we" did.  And "we"

12    included Tim Brunold.  I think I have a right to impeach her

13    that she's testifying about things that she's factually wrong

14    on.  Whether it's good faith or bad faith, she should be

15    impeached if she's making a false statement to the jury.

16         THE COURT:  Well, you can show her a document and ask

17    if it refreshes her memory, but I'm not going to allow the

18    admission of these documents that she hasn't seen and that

19    she's not involved with, but -- so you can take what I've ruled

11:08 20    so far during your first 45 minutes of cross as guidance as to

21    what I'm going to let in and what I'm not.  I'm not going to

22    let in the documents, such as those you've offered thus far.

23    You can show documents to her and ask her if it refreshes her

24    memory about something that she has told you she doesn't

25    remember.

```
 1              MR. KENDALL:  Your Honor, I'm not trying to impeach
 2    her --
 3              THE COURT:  I'm not going to have a further argument
 4    on this now.  We're going to be in recess for 15 minutes.
 5              MR. KENDALL:  May we speak when we come back, your
 6    Honor?
 7              MR. SHEKETOFF:  Can I show you the document we filed
 8    this morning, which I'm not sure you've had a chance to see
 9    yet, on this exhibit that I wanted in, and we can talk?
10              THE COURT:  Have you filed this?
11              MR. SHEKETOFF:  Yes.  We filed it.
12              THE COURT:  Then we have it, presumably.  So this is a
13    second copy.
14              MR. KENDALL:  Your Honor, at the end of the break, may
15    I have 5 minutes to just get some guidance from the Court?
16              THE COURT:  You can have 2 minutes.
17              We're in recess.
18              (Recess taken 11:09 a.m. to 11:31 a.m.)
19              THE CLERK:  All rise.
20              (The Court entered the courtroom.)
21              THE CLERK:  Thank you.  You may be seated.
22              THE COURT:  You may step down for the time being,
23    Ms. Chassin, since we need to consider some matters before you
24    resume your testimony.
25              Just at the break the defendants submitted a motion to
```

1    introduce an exhibit, 1288.  Has the government had a chance to

2    review that motion?

3              MR. FRANK:  We just read it, your Honor.

4              One concern I have about the motion is that it appends

5    as an exhibit the text exchange -- on the public record the

6    text exchange that the defendant is seeking to introduce into

7    evidence.

8              I haven't had a chance to look back at the protective

9    order, but I believe it violates the protective order to have

11:32 10    that document on the public record; and, in any event, it's not

11    in evidence, it should not be on the public record.  We ask

12    that the document be taken off of ECF.

13              MR. KELLY:  That's incorrect, it doesn't violate the

14    protective order.  The student being named is his kid.

15    Everyone knows his kid is a subject of this public trial, so

16    there's no violation of a protective order.

17              It's an attachment to a very brief motion about that

18    particular exhibit on the issue of its admissibility.  It's

19    Mr. Sheketoff's witness, he's going to argue that, but there's

11:32 20    no violation of any protective order here.

21              THE COURT:  All right.

22              You state at the bottom of the first page that it is

23    offered for the state of mind of the University of Southern

24    Cal's Department of Admission.

25              The state of mind of the USC's Department of Admission

```
 1   is a policy, is it not?
 2            MR. SHEKETOFF:  So, this witness repeatedly says "we,"
 3   and she states the policy for the SUBCO.  And we have two
 4   admissions officers discussing this very applicant.
 5            THE COURT:  And you're offering this as what the
 6   policy of the Southern Cal's Department of Admissions is.  If
 7   that isn't for the truth of the matter, I don't know what is.
 8            MR. SHEKETOFF:  So more often --
 9            THE COURT:  This is not offered not for the truth.
10   It's offered for the defendants' case that the admissions
11   department at the University of Southern Cal wanted to take
12   money for spots.
13            MR. SHEKETOFF:  No, it's offered to show, because she
14   denies it, that admissions officers knew at the time in their
15   mind, other admissions officers, one of whom was actually on
16   SUBCO --
17            THE COURT:  Just because these are two admissions
18   officers doesn't mean that she endorses everything they say
19   just because they work for her.
20            MR. SHEKETOFF:  I agree, your Honor.  In fact, she's
21   testified that she didn't even know about it.  But this --
22            THE COURT:  So how can you impeach her on the basis of
23   what two of her fellow employees said that she didn't know
24   about?
25            MR. SHEKETOFF:  Because they knew, and if they knew,
```

| | |
|---|---|
| 1 | how could she not know?  That's what I'm going to say to her. |
| 2 | If you're underling understood that she did not have athletic |
| 3 | credentials -- |
| 4 | THE COURT:  Call the underlings and you might have |
| 5 | some impeachment, but I'm not going to allow this to be |
| 6 | introduced to impeach the witness on the stand, Ms. Chassin. |
| 7 | MR. SHEKETOFF:  So, your Honor, also, I think it's |
| 8 | independently admissible.  I think I could just read it, |
| 9 | whether she was here or not, because it shows what -- it's a |
| 11:35 10 | business record, and it shows what -- |
| 11 | THE COURT:  How is it a business record? |
| 12 | MR. SHEKETOFF:  Because it's kept in the regular |
| 13 | course of business by USC; it's what they do. |
| 14 | The government already stipulated that it's authentic. |
| 15 | They had a reader read e-mails earlier in the trial.  And so, |
| 16 | in my view, this is independent evidence by itself of what the |
| 17 | admissions officers knew. |
| 18 | THE COURT:  Mr. Frank. |
| 19 | MR. FRANK:  It's not a business record.  Just because |
| 11:35 20 | two people in a business use a particular means of |
| 21 | communication to talk to each other about lunch, about what |
| 22 | they're doing after work, about business, that doesn't make it |
| 23 | a business record. |
| 24 | Business records are things like subcommittee packets |
| 25 | which are standardized in format, which are compiled in the |

ordinary course of business which are maintained in a file.

        The fact that there is clear black letter law, the fact that e-mail is used in business all throughout the world doesn't make every e-mail a business record.

        By the way, these are not even e-mails, these are texts.  It's the furthest thing from a business record and we have not stipulated to that.

        MR. SHEKETOFF:  Okay.  So it shows the state of mind of the people that admitted Sabrina Abdelaziz, that's independently admissible.

        THE COURT:  Not through impeachment of this witness.

        So there may be ways that you can get this in, but it's not through Ms. Chassin.

        MR. KENDALL:  Your Honor, if I may be heard briefly.

        THE COURT:  Yes, briefly.

        MR. KENDALL:  I cut my request down to a single document, I want to impeach her for the truth of the matter she stated.  I'm not looking to impeach her memory or refresh her memory.  She said something on the stand that I maintain is factually untrue and I have a document that will impeach the truth of her representation.

        It is a list, what she referred to as Pat's VIP list or the VIP list that Mr. Haden had sent to Mr. Brunold.  She said she was speaking for what Brunold knew and did and understood, "we," "we don't do this," "my boss does not take

```
 1    money or accept money for admissions decisions."

 2          This directly impeaches -- she didn't have to speak

 3    for Mr. Brunold.  The government prepared her to speak for

 4    beyond her own knowledge.  Once they opened the door to

 5    Mr. Brunold's knowledge, I suggest it's fair impeachment.

 6          THE COURT:  What document is it, and have you shown

 7    the document --

 8          MR. KENDALL:  It's Exhibit 1085.  It's something the

 9    government produced to us.  It originally came from them.  USC

11:37 10  produced it to the government and then they gave it to us.

11          THE COURT:  Have you seen the document?

12          MR. FRANK:  I have, your Honor.  We produced 2.7

13    million documents to them, so that doesn't make it admissible.

14          The issue here is whether the witness can be impeached

15    on it.  He can try to put it front of her and impeach her on

16    it, but that doesn't make it admissible.  In fact, it's

17    extrinsic evidence of a collateral matter.  It's not admissible

18    pursuant to 608(b), it is not a business record.  There's no

19    reason that the document comes in.

11:38 20         He can refresh her on it.  He can try to impeach her

21    on it.  If she denies knowledge of it, that ends the inquiry.

22    It's not her e-mail.

23          MR. KENDALL:  Your Honor, it's not a collateral

24    matter.  It's directly what she testified to which is a central

25    issue what are the honorer services owed by the athletic
```

```
 1   department.
 2          THE COURT:  You can present it to her and ask her --
 3   the preliminary question is:  Did you testify X, Y, and Z, and
 4   put that in front of her and say, Does that refresh your memory
 5   that that is not true.
 6          MR. KENDALL:  Your Honor, I'm not -- she never had a
 7   memory on this.  She just testified about something she knows
 8   nothing about.
 9          MR. FRANK:  I was objecting to her testifying about
10   anything about Mr. Brunold.  Counsel kept asking her questions
11   about it.  She was not speaking for Mr. Brunold, and if they
12   want to call Mr. Brunold, they're welcome to do so.
13          MR. KENDALL:  Your Honor, the transcript will reflect
14   she said, "We do not accept money for admissions."
15          I said, "Who does we refer to?"
16          She said, "SUBCO, Mr. Brunold, the admissions
17   department."
18          She put it into evidence, your Honor.
19          It's only one document, your Honor.  I can be quick
20   with it, I'll make my point, and I'll be finished quickly.
21          Your Honor, she's testified these things are kept in
22   the ordinary course.  It's a list.  It's something they're
23   relying on.  That's the whole point of it.
24          I'll be done with it in 10 minutes.
25          MR. FRANK:  There's not a brevity or one document
```

11:38 (line 10)
11:39 (line 20)

```
 1    exception to the Rules of Evidence, your Honor.

 2           It's one document that's not admissible.  They can

 3    impeach her on it, they can ask her about it.  It doesn't come

 4    in.

 5           THE COURT:  You can impeach her, you can put it in

 6    front of her if it becomes appropriate to refresh her memory,

 7    but I'm not letting it in.

 8           Call the jury.

 9           (Pause.)

10           THE CLERK:  All rise for the jury.

11           (Jury entered the courtroom.)

12           THE CLERK:  Thank you.  You may be seated.

13           THE COURT:  Good morning again, jurors.

14           Our break was longer than we had anticipated, but it

15    was not because we were having an extended coffee hour.  We

16    needed to resolve certain legal matters outside of your

17    hearing, and, in essence, that saves time.  We're not wasting

18    time; it saves time for us to do that from time to time.

19    That's what we were doing.  We're now ready to resume.

20           Ms. Chassin, you're reminded that you remain under

21    oath.

22           And Mr. Kendall may continue with cross-examination.

23    BY MR. KENDALL:

24    Q.   Ms. Chassin, before we took the break, I asked you a

25    series of questions about some SUBCO candidates and asked if
```

(line timestamps: line 10 — 11:40, line 20 — 11:41)

1  you could recall that there was a fund-raising component to the

2  SUBCO application.  Do you remember that?

3  A.    Yes.

4  Q.    You said you had no memory of any such conversations or

5  discussions.  Do you remember that?

6  A.    I couldn't remember specific candidates.

7          MR. KENDALL:  I'd like to put on just for the witness,

8  your Honor, to see if we can refresh her recollection, Exhibit

9  1085.

11:42 10          And if we could go to page 2.

11  Q.    And I'm going to ask you to look -- it's a long list

12  there -- but I'm going to ask you to look at some specific

13  highlighted entries and tell us if that refreshes your

14  recollection.

15  A.    I've never seen this document.

16  Q.    I know that, I'm not suggesting you have.  I'm asking if

17  some of the information there refreshes your recollection about

18  SUBCO votes you made at an earlier time.

19          Do you see the one that's highlighted in yellow?

11:43 20          MR. FRANK:  Can we take the document down?

21          THE COURT:  Highlight everything you want to

22  highlight, have her look at it, and then take the document

23  down.

24  BY MR. KENDALL:

25  Q.    Do you notice that I've highlighted four entries there?

```
 1   A.    I can see those highlights.

 2   Q.    Could you look at them carefully, see if it relates to

 3   anything you remember from your SUBCO or admissions work, and

 4   after you've had the chance to study all four of those entries,

 5   let us know, and then we'll take the document down.

 6   A.    I don't recall any of this information.

 7         MR. KENDALL:   Okay, if we could take that down.

 8   Q.    So fair to say you were never told anything about

 9   fund-raising being a part of SUBCO decisions, correct?

11:44 10  A.    As I mentioned before, rarely, but time to time there

11   would be information that a student, again, was also of

12   interest to the advancement office, something like that, and we

13   would set that aside as we considered the athletic talent.

14         But those specific things you showed me, I have no

15   recollection of knowing that information or being told that

16   type of information.

17   Q.    That type of information Mr. Brunold never told you,

18   correct?

19   A.    I don't have any -- I've never seen that information.

11:44 20  Q.    You've never seen it, you've never heard it, correct?

21   A.    Correct.

22   Q.    In fact, if Mr. Brunold would tell you that information,

23   would it surprise you?

24   A.    Again, it's possible for someone to have athletic talent

25   and also to be of interest to the advancement office of the
```

1    University, so they're just two separate things.

2    Q.   What if they have no athletic talent?

3    A.   I'm sorry, can you repeat your question?

4    Q.   What if they have no athletic talent and they're making

5    donations?

6    A.   Like I said, there was a list for the athletic advancement

7    office, folks that they were interested in, that was separate

8    from the SUBCO process.  Only students who were being

9    considered for their athletic talent were brought to SUBCO.

11:45 10   Q.   So your understanding based on your knowledge was all of

11   the SUBCO candidates were brought for issues unrelated to

12   finance, right?

13   A.   They were brought based on your athletic talent.

14   Q.   If they were brought based on financial contribution, that

15   was something hidden from you, correct?

16   A.   Again, it came up from time to time, but we would set that

17   aside and be focused on the student's athletic talent in our

18   consideration in the SUBCO process.

19   Q.   If they didn't have athletic talent but were making a big

11:45 20   contribution at the time that the admission was being decided,

21   that was something that was never disclosed to you, correct?

22   A.   If they were in SUBCO, it was because they had athletic

23   talent that they were demonstrating to us.

24        I don't know if that was accurate or not, but that was

25   the point of them being brought to SUBCO.

```
 1    Q.   And if Mr. Brunold -- Mr. Brunold never told you these

 2    kids don't have any talent, we're just bringing them in for the

 3    money.

 4    A.   No.

 5    Q.   He never said that to you?

 6    A.   No.

 7    Q.   So if that was going on, it was hidden from you, correct?

 8    A.   I had no knowledge of that.

 9    Q.   I had a different question.

11:46 10         If that was going on, it was hidden from you, correct?

11         MR. FRANK:   Your Honor, I object.   She had no

12    knowledge.

13         THE COURT:   Sustained.

14    BY MR. KENDALL:

15    Q.   If that was going on, then you would not include

16    Mr. Brunold when you said, "We do not take donations for

17    admissions."

18         MR. FRANK:   Objection to the hypothetical.

19         THE COURT:   He can ask that question.

11:46 20    A.   The work of the SUBCO was to consider students for

21    athletic talent alone.

22    Q.   That's your opinion.

23         MR. FRANK:   Objection.

24         THE COURT:   Sustained.

25    BY MR. KENDALL:
```

```
 1  Q.   Do you have a written rule that says that?
 2  A.   No, that is the expectations that all of the members of
 3  the office of admission have around what happens at SUBCO.
 4  Q.   Well, when you say that's the expectation of all the
 5  admissions officers, was there a vote taken of the admissions
 6  officers and what their expectations were?
 7  A.   There were --
 8  Q.   Just a yes or no, was there a vote?
 9  A.   There was not a vote.
10  Q.   Is there a written rule that everybody was given and said
11  this is compliance department, sign it, this is how you're
12  going to do your job, you can never consider donations as part
13  of a SUBCO admissions?
14  A.   There is not a written rule.
15  Q.   Okay.  You agree with me this whole sort of college
16  admissions scandal has been a tremendous embarrassment to USC,
17  correct?
18  A.   I was very unhappy to learn about it.
19  Q.   I'm not asking your opinion.  It's an embarrassment to all
20  of USC, correct?
21  A.   Yes, I think that's fair to say.
22  Q.   And you'd agree with me the last thing the USC admissions
23  department wants the world to think is that it was willing to
24  sell slots to people for money, correct?
25  A.   The admission office was not willing to do that.
```

Q.   I didn't ask you if you did it or not, I'm asking that's

one of the last things the admissions office and your bosses

want people to think, that they were selling slots, correct?

A.   Correct.  I can't imagine an admission office that wants

people to think they're selling slots.  That's not what we do.

Q.   They didn't want people to think that they were working

closely with the athletics department to bring in donors'

children through SUBCO, correct?

        MR. FRANK:  Objection.  I can't follow that question.

        THE COURT:  She can answer it.

        Overruled.

        THE WITNESS:  Can you repeat the question?

        MR. KENDALL:  I don't know if I remember it myself.

        May we ask the reporter court to --

        THE COURT:  Yes, the court reporter will please repeat

it.

        (Record read.)

        MR. FRANK:  Use of the "they," objection, your Honor.

        THE COURT:  Sustained.

        MR. KENDALL:  I'll refine it.

BY MR. KENDALL:

Q.   Your bosses, meaning Mr. Brunold and Mr. Kirk (sic.), they

don't want the public to think that they were working with the

athletic department to bring in donors' children through SUBCO?

        MR. FRANK:  Objection what other people want.

**A1974**

```
 1              THE COURT:  She can answer it.
 2              Overruled.
 3    A.   We don't want anyone to have the impression that we're
 4    selling slots in the admission process.  I --
 5    Q.   It would be fair to say if your donors were embarrassed
 6    that they were buying slots, it would make the success of the
 7    $7 billion fund-raising campaign tarnished, correct?
 8    A.   I'm sorry, if the donor -- can you --
 9    Q.   If it became public that many of the donors got admissions
11:49 10   slots in return for giving money, it would tarnish the success
11    for USC of its $7 billion fund-raising campaign?
12              MR. FRANK:  Objection, hypothetical.
13              THE COURT:  First of all, it's $6 billion, but who's
14    arguing about $1 billion.
15              MR. KENDALL:  I think it went up to 6.8 or 6.9 by the
16    time they finished.
17              THE COURT:  The objection is sustained by the way.
18    BY MR. KENDALL:
19    Q.   The goal of the fund-raising exceeded $6 billion, didn't
11:50 20   it?
21    A.   I believe so.  I don't have an exact figure.
22    Q.   I didn't ask for an exact figure.
23    A.   I believe it exceeded the $6 billion goal.
24    Q.   Exceeded substantially?
25    A.   I don't know.
```

```
 1    Q.    6.7, 6.8, in that range?

 2    A.    I don't know.

 3    Q.    Well over 6 billion, that you know.

 4    A.    I know they exceeded their goal.

 5    Q.    Now, you talked earlier about the type of talent that

 6    SUBCO thought it was admitting.  Would you agree with me SUBCO

 7    admitted some people to be managers?

 8    A.    Absolutely not.

 9    Q.    Are you saying they never admitted someone to be a

11:50 10    manager?

11    A.    That was never known to us.  We were admitting students

12    based on their athletic talent with the expectation that they

13    were contributing athletically to our teams.

14    Q.    Go back to 2013, the same admissions cycle that Johnny

15    Wilson was a part of.

16          USC had a new basketball coach, Andy Enfield, was that

17    his name?

18    A.    I believe that was one of the basketball coaches.

19    Q.    Do you recall in that year there were five scholarship

11:51 20    athletes admitted and one walk-on with no scholarship through

21    SUBCO?

22    A.    I don't recall the specifics of a cycle.

23    Q.    Do you recall that there was somebody admitted and he was

24    the basketball manager because he was nowhere near the level of

25    talent to be on the USC men's basketball team?
```

```
 1  A.   I can't recall.

 2        MR. KENDALL:  Your Honor, I would like to try to

 3  refresh her recollection, your Honor.

 4        If we could show the witness only Exhibit 9734.

 5        Again, the name has been redacted.  If she needs the

 6  name, I can show her and show the government.

 7  Q.   Take a look at this and see where -- I take it you have

 8  not seen 9734 before, have you?

 9  A.   No.

11:52 10  Q.   But if you could take a look at the list of six names

11  there, the top one blacked out.

12        Do you see that one of the candidates did not get a

13  scholarship and the others either did or their scholarship was

14  pending?

15  A.   Actually, the decision was pending; but, yes, I can see --

16  I can see that.

17  Q.   And do you see that the person who didn't get a

18  scholarship had the highest academics of any of the basketball

19  recruits?

11:52 20        MR. FRANK:  Objection, the document is not properly --

21        THE COURT:  Sustained.

22  BY MR. KENDALL:

23  Q.   Does that refresh your recollection, that there's somebody

24  who came through that SUBCO year who did not meet anywhere near

25  the criteria of your typical basketball player?
```

```
 1    A.    I can't see that from that document.

 2    Q.    Does it refresh your recollection of that?

 3    A.    It does not.

 4    Q.    That his father was a businessman from Florida --

 5               MR. FRANK:  Objection, your Honor.

 6               THE COURT:  Yes, sustained.

 7    BY MR. KENDALL:

 8    Q.    So if USC admitted someone to be a manager through SUBCO,

 9    that's, again, something they didn't tell you about, correct?

11:53 10   A.    They would have been presented for their athletic talent

11    and we would approved them based on the athletic talent and

12    academic preparation that we saw in the SUBCO meeting.

13    Q.    Did USC admit practice players?

14    A.    Not through the SUBCO process.

15    Q.    So it's -- to your knowledge nobody was ever put forward

16    before SUBCO as a practice player?

17    A.    Not expressly as a practice player.  We would have wanted

18    to see the athletic talent and expected they were going to

19    contribute athletically to our teams.

11:53 20   Q.    So, again, if the athletic department and Mr. Brunold and

21    Mr. Kirk were talking about admitting somebody as a practice

22    player, that would be totally kept from you, correct?

23               MR. FRANK:  Objection.

24               THE COURT:  She can answer the question.

25               If, it's a hypothetical question.
```

```
 1    A.    I don't recall any students being presented in SUBCO as

 2    practice players.

 3    Q.    What about a male tennis player?

 4    A.    What is the question?

 5    Q.    Do you recall male tennis players being proposed as a

 6    practice player?

 7    A.    Not through the SUBCO process.

 8              MR. KENDALL:  If I may have a moment, your Honor.

 9              THE COURT:  Yes.

10              (Pause.)

11    BY MR. KENDALL:

12    Q.    Do you recall donors' children being admitted as practice

13    players but not through SUBCO?

14    A.    I don't recall.

15              MR. KENDALL:  Your Honor, I'd like to show the witness

16    only Exhibit 1249 to see if it refreshes her memory.

17              MR. FRANK:  Your Honor, if we're talking about

18    somebody who is admitted not through SUBCO, I object on

19    relevance grounds.

20              MR. KENDALL:  She just testified she's not aware of

21    practice players.

22              THE COURT:  Let him show the witness the document.

23              MR. KENDALL:  Exhibit 1249.

24              (Pause.)

25              MR. KENDALL:  If you could read it, take time to see
```

The timestamps in the left margin: 11:54 at line 10, 11:55 at line 20.

```
 1    if it refreshes your recollection, and then, when you're done,

 2    please put it down.

 3            And if you could look at the highlighted in yellow

 4    section.

 5            (Pause.)

 6    A.   I've never seen this document.

 7    Q.   I didn't ask you if you've seen it.

 8            If you could put it down and just tell us, does that

 9    refresh your recollection that USC was admitting donors'

11:56 10   children to be practice players on the golf and tennis teams?

11    A.   I don't recall any student being put through SUBCO as a

12    practice player.

13    Q.   My question was different.  Do you recall them being

14    admitted under any circumstances as practice players?

15    A.   The athletic piece of it isn't really relevant if they're

16    not in the SUBCO process.  We have lots of students who have

17    competed in athletics in high school.

18    Q.   My question, though, is you said that you didn't admit

19    practice players under any process.

11:57 20   A.   No, I said in the SUBCO process.

21    Q.   Were practice players admitted through the VIP process?

22    A.   Again, the practice player piece of it is irrelevant.

23    There are students who may have gone on to be practice players

24    who may have been admitted through the regular admission

25    process, through the VIP process, I don't know.
```

```
 1              MR. KENDALL:  Your Honor, I would like to show her one

 2    more document to refresh her recollection, and I'm going to

 3    have to walk it over to her because I don't have it

 4    electronically.

 5              THE COURT:  For the record, the number of the exhibit.

 6              MR. KENDALL:  I'm going to show her what I've

 7    previously shown her was Exhibit 9734, and then there's a

 8    document that doesn't have an exhibit number, but I'll show

 9    Mr. Frank, it's dated January 30, 2015.

11:58 10           (Pause.)

11              (Discussion off the record.)

12    BY MR. KENDALL:

13    Q.   I'd like to show you to refresh your recollection Exhibit

14    9734 and this document dated January 30, 2015.

15              And I represent to you the blacked-out person is the

16    same as the name highlighted in yellow.

17              Does that refresh your recollection that you saw

18    coming through the SUBCO the year same as Mr. Wilson someone

19    that was going to be a manager of a team and not a player?

11:59 20   A.   No.  If someone was represented as a manager, we would not

21    have considered them in SUBCO.

22    Q.   Okay.

23              Now, would you agree with me you're not an officer of

24    USC; is that correct?

25    A.   I don't know that specific definition.
```

```
 1   Q.   Well, it would be fair to say if you were a

 2   university-wide officer of USC, you would know it, correct?

 3   A.   I would know what?

 4   Q.   You don't know whether or not you're an officer or

 5   director of USC at large?

 6   A.   I don't know.

 7   Q.   Do you think you signed an affidavit in 2014 in a lawsuit

 8   where you said under oath, "I am not an officer or director of

 9   USC at large.  I also do not have responsibility for drafting

10   or establishing corporate policies for USC at large."

11        Do you remember signing that affidavit?

12   A.   I don't remember that specific affidavit.  I have -- I

13   have been called to deposition before.

14        MR. KENDALL:  Your Honor, I'd like to show the witness

15   only Exhibit 9705.

16   Q.   Do you recognize this document?

17   A.   Yes.  This was a deposition that I was called to.

18   Q.   Not a deposition.  It's an affidavit.

19        MR. FRANK:  I object to characterizing of the document

20   on the record, it's not in evidence.

21        THE COURT:  Yeah, you can't talk about it until it's

22   admitted.

23        MR. KENDALL:  Your Honor, I'd like to offer it into

24   evidence then.

25        MR. FRANK:  Objection, your Honor.  Entirely
```

```
 1    collateral, it's not produced for impeachment.
 2              MR. KENDALL:  It's used for impeachment, your Honor.
 3              MR. FRANK:  It hasn't been used.  It's 608(b), your
 4    Honor.
 5              THE COURT:  Well, this is a declaration in another
 6    case?
 7              MR. KENDALL:  Yes, but stating what the limitation of
 8    her authority which she says she doesn't remember and she
 9    doesn't remember ever having said.
12:01 10         THE COURT:  I'll allow it to be admitted, 9705.
11              (Exhibit 9705 received into evidence.)
12              MR. KENDALL:  Thank you, your Honor.
13              If we could go to paragraph 10, and if we could look
14    at the first two sentences.
15              THE WITNESS:  Is the rest of the document relevant?
16              MR. KENDALL:  I'm just going to ask you about the
17    first two sentences.  I can't testify about what's relevant.
18    I'm just asking --
19              THE WITNESS:  Well, then can I review the document.
12:01 20         THE COURT:  Let her look at the entire document and
21    give a copy of counsel.
22              MR. KENDALL:  I can give you mine if you'll give it
23    back to me.
24              THE WITNESS:  Can I review the document, please?
25              (Pause.)
```

```
 1            MR. KENDALL:  I have a second one I'll give the

 2    witness.

 3            THE WITNESS:  Thank you.

 4            (Pause.)

 5            MR. KENDALL:  You can keep it, I've got an extra one.

 6            (Pause.)

 7    BY MR. KENDALL:

 8    Q.    Have you finished reading it?

 9    A.    Yes.

12:04 10   Q.    Okay.

11            So in paragraph -- well, first of all, if you look at

12    the bottom there, you signed this on September 22, 2014 in Los

13    Angeles, correct?

14    A.    Yes.

15    Q.    That's the same calendar year Johnny Wilson was admitted

16    by SUBCO, correct?

17    A.    I --

18    Q.    I suggest Exhibit 107 shows admission was done around

19    March of 2014.

12:05 20   A.    Yes, so he would have been a new student.

21    Q.    And you stated, "I am not an officer or director of USC at

22    large."  Correct?

23    A.    Yes.

24    Q.    You said that under oath?

25    A.    Yes.
```

```
 1   Q.   Same oath you swore today.

 2   A.   Yes.

 3   Q.   And that's a true statement.

 4   A.   Yes.

 5   Q.   Okay.  You also wrote, "I also do not have responsibility

 6   for drafting or establishing corporate policies for USC at

 7   large."  Correct?

 8   A.   Yes.

 9   Q.   And that would also apply for the USC athletics

12:05 10   department, correct?

11   A.   I'm not responsible for establishing policies for the USC

12   athletics department, that's correct.

13   Q.   And back in 2014, Mr. Brunold, Mr. Brennan, and even

14   Ms. Harrington all would have had more responsibility for

15   establishing corporate policies for the admissions office than

16   you did, correct?

17   A.   Yes.

18   Q.   Next I'd like to go to page 2 of that document.  If we can

19   look at paragraphs 2 and 3.

12:06 20        "In my position as a senior associate director, I

21   oversee the evaluation process for all applicants."

22        And then the next paragraph, "In my position, I am

23   familiar with the recordkeeping procedures of USC's office of

24   admissions."  Do I have that there correct?

25   A.   Yes.
```

**A1985**

1   Q.   And then in the next paragraph -- and then you actually

2   further you have down there, "I am the person most qualified in

3   the office of admissions to testify regarding the admissions

4   process."

5       You were not talking about SUBCO, you were talking

6   about the general admissions process, correct?

7   A.   Yes.

8   Q.   And then you said in paragraph 3, The books and records

9   maintained by USC are made at or around the time of said acts,

12:07 10   conditions, proceedings, events and transactions, or from the

11   information transmitted by persons who are responsible for

12   making and maintaining said books and records."

13       You stated that under oath to show that the e-mails

14   and documents that you work with in the admissions office were

15   made in the ordinary course of regularly conducted admissions

16   activity, correct?

17       MR. FRANK:  Objection, your Honor.  It doesn't refer

18   to e-mails or other documents.

19       THE COURT:  Sustained.

12:07 20   BY MR. KENDALL:

21   Q.   The books and records.  Do records include e-mails?

22   A.   I don't know.

23   Q.   Well, when you stated here, did you mean to exclude

24   e-mails when you said that?

25   A.   I believe this refers to things like our course catalog

1    that has academic policies in it, as well as the actual

2    application records.

3    Q.   You didn't limit it that way, did you?

4    A.   I did not.

5    Q.   You said "the books and records," correct?

6    A.   Yes.

7    Q.   Okay.  And you said "by persons who are responsible for

8    making and maintaining such books and records."

9            E-mails that convey decisions on application -- strike

12:08 10   that.

11           E-mails that convey questions or discussions about

12   candidates, that's part of the books and records of USC, isn't

13   it?

14           MR. FRANK:  Your Honor, I object to this line.

15           THE COURT:  Well, that question is objectionable.

16           Objection is sustained.

17           MR. KENDALL:  Okay.

18   BY MR. KENDALL:

19   Q.   The USC SUBCO uses e-mail to carry on its regularly

12:08 20   conducted activity, correct?

21   A.   From time to time we may talk about things over that, but

22   the official record of the SUBCO decision is in those SUBCO

23   packets.

24   Q.   I didn't ask for the official record.

25           You used e-mail to carry on the SUBCO business,

```
 1   correct?

 2   A.   We sometimes would use e-mail to discuss SUBCO candidates,

 3   yes.

 4   Q.   And people who send these mails would have knowledge of

 5   the information they're sending to each other, correct?

 6   A.   I'm not sure I understand your question.

 7   Q.   I read X, Y, Z, could you tell me what this means?  And

 8   the person responds -- they're talking about things that's

 9   within the scope of their jobs and they have knowledge of in
```
12:09 10   general.
```
11             MR. FRANK:  Objection to what other people would know.

12             THE COURT:  Sustained.

13             MR. KENDALL:  Your Honor, this person said she's

14   qualified to be a record keeper; I think I'm qualified to ask

15   record keeper questions.

16   BY MR. KENDALL:

17   Q.   You certainly communicated with the athletics department

18   on SUBCO issues by e-mail, correct?

19   A.   From time to time we might ask questions or communicate
```
12:09 20   about decisions.
```
21   Q.   Or they might provide additional information about

22   candidates?

23   A.   They could.

24   Q.   And they could do that to any one of the five SUBCO

25   members, correct?
```

```
 1   A.    Yes.

 2   Q.    Okay.  And Donna Heinel would be one of the people doing

 3   that?

 4   A.    She could be.

 5   Q.    And Alexander Garfio would be?

 6   A.    She could be.

 7   Q.    And they would be often attaching spreadsheets and other

 8   documents of information to provide the SUBCO with additional

 9   data.

10            MR. FRANK:  Objection to what others would be doing.

11            THE COURT:  Sustained.

12   BY MR. KENDALL:

13   Q.    Do you have any knowledge -- do you have knowledge of

14   whether Mr. Haden ever met Rick Singer?

15            MR. FRANK:  Objection, foundation.

16            MR. KENDALL:  That's why I'm asking her, your Honor.

17            THE COURT:  That's overruled.

18            She can answer it.

19   A.    I don't know.

20   Q.    Did the government show you any e-mails that show

21   Mr. Singer and Mr. Haden corresponding?

22   A.    No.

23   Q.    Okay.  Do you have any reason -- do you have any knowledge

24   of whether or not Mr. Singer was authorized to do fund-raising

25   for the athletic department?
```

12:10 (line 10)
12:11 (line 20)

```
 1    A.   I don't know.

 2    Q.   And the government's never shown you any e-mails on that

 3    area?

 4              MR. FRANK:  Your Honor, this is well beyond the scope.

 5              THE COURT:  Overruled.

 6    A.   I don't know.

 7              MR. KENDALL:  If I may have one moment, your Honor.

 8              THE COURT:  Yes.

 9              (Discussion off the record.)

10              MR. KENDALL:  Thank you, your Honor.

11              THE COURT:  Redirect, Mr. Frank.

12              MR. FRANK:  Thank you, your Honor.

13                REDIRECT EXAMINATION OF REBECCA CHASSIN

14    BY MR. FRANK:

15    Q.   Ms. Chassin, you were asked a bunch of questions about an

16    affidavit you submitted in a civil lawsuit filed in 2014.  Do

17    you recall those questions?

18    A.   Yes.

19    Q.   And that affidavit, that lawsuit has absolutely zero to do

20    with this case; isn't that true?

21    A.   Yes.

22    Q.   And in fact, that lawsuit was filed by a student who

23    claimed that he was denied reasonable accommodation for a

24    disability, correct?

25    A.   Yes.
```

12:11 (line 10)
12:12 (line 20)

```
  1   Q.   And it was dismissed on summary judgment.

  2   A.   Yes.

  3   Q.   I'll ask questions from here.

  4        You were asked questions about a portion of that

  5   affidavit where you attested that you were not an officer or

  6   director of USC at large.  Do you recall those questions?

  7   A.   That's correct, yes.

  8   Q.   USC comprises an undergraduate institution --

  9   A.   Yes.

 10   Q.   -- and numerous professional schools, correct?

 11   A.   As well as a healthcare enterprise.

 12   Q.   Like a medical school?

 13   A.   Like hospitals.

 14   Q.   And you don't have anything to do with those other parts

 15   of USC?

 16   A.   No.

 17   Q.   But you do know a lot about undergraduate admission?

 18   A.   Yes.

 19   Q.   And as you attested in that affidavit, you oversee the

 20   evaluation process for all applicants for undergraduate

 21   admission into USC.

 22   A.   Correct.

 23   Q.   And you swore that under oath.

 24   A.   Yes.

 25   Q.   And that's true or untrue?
```

12:12 (line 10)
12:13 (line 20)

**A1991**

```
 1   A.   True.
 2   Q.   You were asked questions about retweeting a tweet about
 3   advantages that wealthy people have in applying to college.  Do
 4   you recall those questions?
 5   A.   Yes.
 6   Q.   Do you believe that wealthy people have advantages in
 7   applying to college in many other things?
 8   A.   Yes.
 9   Q.   What kinds of advantages?
10   MR. KENDALL:  Objection, your Honor.
11   THE COURT:  Overruled.
12   A.   The schools they attend, the type of curriculum they might
13   have access to, perhaps having parents who may be more
14   educated, having the ability to hire tutors for school or for
15   test prep for things like the SAT or the ACT, a lot of help in
16   the application process, a lot of help just understanding how
17   the application works, the kinds of things that we in the
18   admissions office might be interested in in a student's
19   application.  There are a number of different things.
20   Q.   Is there anything wrong with having those kinds of
21   advantages?
22   A.   No.
23   Q.   What about misusing advantages, can that happen?
24   MR. KENDALL:  Objection.
25   THE COURT:  Overruled.
```

12:13 (line 10)
12:14 (line 20)

**A1992**

```
 1   A.   We certainly don't believe that most affluent students are

 2   misusing their advantages, but it's a problem if students are

 3   misusing their advantages.

 4   Q.   What about wealthy people paying money to get an insider

 5   to lie to a subcommittee that you were a member of about

 6   recruiting athletes based on falsified credentials?

 7            MR. SHEKETOFF:  Objection.

 8            THE COURT:  Overruled.

 9   BY MR. FRANK:

12:14 10   Q.   Would that be a problem?

11   A.   Yes, that's a huge problem.

12   Q.   But that's not what you were talking about in the tweet.

13   A.   No, I was talking about the many, many students who apply

14   with no donations, no special treatment; they just have a lot

15   of advantages with a great upbringing with great education that

16   makes them look really outstanding to admission officers like

17   ours.

18   Q.   You were asked a whole series of questions about special

19   interest lists and -- sometimes called VIP lists.  Do you

12:15 20   recall those questions?

21   A.   Yes.

22   Q.   Are those the subcommittee?

23   A.   No.

24   Q.   Is that a wholly separate process?

25   A.   Yes.
```

```
 1    Q.   What does being on that list afford someone?

 2    A.   Extra consideration in the admission process that the dean

 3    of admission will review the final -- the decision before it is

 4    finalized.

 5    Q.   Does it mean you're going to get in?

 6    A.   No.

 7    Q.   If we could look at Exhibits 107 and 383 side by side.

 8         These are the subcommittee packets for Johnny Wilson

 9    and Sabrina Abdelaziz?

10    A.   Yes.

11              MR. SHEKETOFF:  Objection, your Honor.

12              THE COURT:  I'm sorry?

13              MR. SHEKETOFF:  Beyond the scope for me.  I did not

14    ask a single question about that.

15              MR. FRANK:  It's directly relevant, your Honor.

16              THE COURT:  The objection is overruled for the time

17    being.

18    BY MR. FRANK:

19    Q.   Do these documents have anything to do with the VIP

20    process?

21    A.   No.

22    Q.   Were these students admitted through any VIP

23    consideration?

24    A.   No.

25    Q.   And special interest, what counsel has referred to as the
```

**A1994**

|    | VIP list, there can be special interest given to candidates for |
|  1 | VIP list, there can be special interest given to candidates for |
|  2 | all sorts of reasons, right? |
|  3 | A.   Yes. |
|  4 | Q.   What are some of the reasons unrelated to philanthropy |
|  5 | that someone might get a second look? |
|  6 | A.   It could be that they know a candidate directly and they |
|  7 | feel that student would be a good fit of USC and take advantage |
|  8 | of have we have to offer. |
|  9 | It could be that they just want a heads-up that the |
| 10 | student has been denied so when they run across that student or |
| 11 | their family, they're aware that they had a disappointing |
| 12 | decision.  So, in some cases, it's merely for tracking purposes |
| 13 | and reporting back to the interested party. |
| 14 | Q.   Somebody's neighbor? |
| 15 | A.   Somebody's neighbor. |
| 16 | MR. SHEKETOFF:  Objection. |
| 17 | A.   Somebody they know. |
| 18 | THE COURT:  Sustained for leading. |
| 19 | BY MR. FRANK: |
| 20 | Q.   What about things like coming from an underprivileged |
| 21 | background, could that be a consideration that would get |
| 22 | somebody on a special interest list? |
| 23 | MR. SHEKETOFF:  Objection. |
| 24 | THE COURT:  Sustained. |
| 25 | BY MR. FRANK: |

12:16 (line 10)
12:17 (line 20)

1    Q.    Are there factors unrelated to wealth or potential status

2    as a donor that could get somebody on a special interest list?

3    A.    Absolutely.  A special interest list just has to do with

4    constituents across campus who are expressing a special

5    interest in a candidate.  The reason that they're interested in

6    a candidate doesn't necessarily have to do with money; it could

7    be, again, that they know the student, that they've met the

8    student, that they're interested in bringing more students from

9    an underrepresented background or from a lower socioeconomic

12:17 10    status and they're interested in promoting that at the

11    university.

12    Q.    You were asked some questions about your personal

13    knowledge of athletics.  When you're sitting on the

14    subcommittee and evaluating candidates like Johnny Wilson or

15    Sabrina Abdelaziz, whose judgment about their athletic talent

16    do you rely on?

17    A.    I'm trusting the athletic resumé that's been included in

18    the SUBCO packet which I believe has information from the coach

19    about their athletic talent and about the role they'll play on

12:18 20    the team when they come to USC.

21    Q.    You were asked a question about whether USC can revoke the

22    admission of somebody who doesn't -- who's admitted as a

23    recruited walk-on who doesn't show up.  Can USC revoke the

24    admission of somebody who lies in the application process?

25    A.    Yes.

```
 1   Q.   You were asked a series of questions about USC's official

 2   position on this case.  Do you recall those questions?

 3   A.   Yes.

 4   Q.   You were asked if you read a public statement that USC

 5   issued about this case.  Do you recall those questions?

 6   A.   Yes.

 7   Q.   Do you recall each and everything that was -- that USC

 8   announced in that statement?

 9   A.   No, it was a while ago.

10   Q.   Would it be helpful to you to see a copy of that statement

11   to refresh your recollection about what it contained?

12        MR. KENDALL:  Objection, your Honor.

13   A.   Sure.

14        MR. FRANK:  Can we show the witness only 1350, please.

15   Q.   And I just want to direct your attention in the first

16   place --

17        MR. FRANK:  Ms. Lewis, if you could just highlight for

18   the witness the second paragraph there.

19        Sorry, no, no.  If you go up just a little bit, the

20   second paragraph on the page.

21        There you go, "The university."

22   Q.   Ms. Chassin, if you could just read that paragraph.

23        MR. SHEKETOFF:  To herself?

24        MR. FRANK:  To herself.

25   BY MR. FRANK:
```

```
 1   Q.   And if you could read the next paragraph.

 2            MR. FRANK:  I'm sorry, "We first became aware."

 3            Lower down.

 4            (Pause.)

 5   Q.   And if you could read the next paragraph.

 6            (Pause.)

 7   Q.   Have you familiarized yourself with that document?

 8   A.   Yes.

 9            MR. FRANK:  Could we take it down, please.

12:20 10  Q.   Does that refresh your recollection that the university

11   completed an individual review of students who are alleged to

12   be involved in admissions deceit?

13            MR. KENDALL:  Objection, your Honor.  It's all

14   hearsay.  If that she read something else that she remembers

15   what she read, she didn't participate.

16            MR. FRANK:  She was asked about this on cross.

17            THE COURT:  He can ask her if it refreshes her memory

18   and inquire from there.

19            Overruled.

12:20 20  BY MR. FRANK:

21   Q.   Does it refresh your recollection that the

22   university completed an individual review of students --

23            MR. KENDALL:  Objection, leading your Honor.

24            THE COURT:  That part is sustained.

25   A.   I'm aware that the University investigated students --
```

```
 1              THE COURT:  There's no question before you at this
 2      point.
 3              THE WITNESS:  I'm sorry?
 4      BY MR. FRANK:
 5      Q.   Do you know whether the University conducted an individual
 6      review of students alleged to have been involved in admissions
 7      deceit?
 8              MR. KENDALL:  Objection, hearsay.
 9              THE COURT:  Overruled.
10      A.   Yes.
11      Q.   Do you know whether some students were found not to have
12      knowingly participated and others were found to have
13      participated?
14      A.   Yes.
15      Q.   And some students were disciplined and others were not.
16      A.   Yes.
17              MR. SHEKETOFF:  Objection.
18              THE COURT:  Overruled.
19      BY MR. FRANK:
20      Q.   Are you aware that some students were expelled?
21      A.   Yes.
22      Q.   Do you recall that USC, upon announcement of the Varsity
23      blues investigation promptly fired two individuals?
24              MR. KENDALL:  Objection, your Honor.
25              THE COURT:  Overruled.
```

```
 1    A.    Yes.

 2    Q.    Which individuals?

 3    A.    Donna Heinel and Johan Vavic.

 4    Q.    Are you aware that the University concluded that those

 5    individuals misled --

 6            MR. KENDALL:  Objection, your Honor.  That's truly

 7    hearsay, what the University concluded.

 8            THE COURT:  Yes, sustained.

 9    BY MR. FRANK:

10    Q.    Are you aware that those individuals misled the

11    subcommittee on athletic admissions?

12            MR. KENDALL:  Objection, your Honor.

13            THE COURT:  Sustained.

14    BY MR. FRANK:

15    Q.    You were asked some questions about whether you can say

16    that a recruitment slot given to one particular student took

17    away a spot from another particular student?

18    A.    Yes.

19    Q.    Are admissions slots unlimited?

20    A.    No.

21    Q.    What happens when you admit a student through the

22    subcommittee process who's unqualified?

23            MR. KENDALL:  Objection, your Honor.

24            THE COURT:  Overruled.

25    A.    It's part of the overall number of admissions that we're
```

```
 1  going to make for that year's class, so it means other students

 2  are not able to be admitted.

 3  Q.   You were asked some questions about Johnny Wilson's

 4  qualifications.  Do you remember those questions?

 5  A.   Yes.

 6            MR. FRANK:  Ms. Lewis, if we could just call up 107

 7  again, please.

 8  Q.   You were asked whether that grade point average as

 9  adjusted, 3.87, was high for a water polo walk-on?

10  A.   Yes.

11  Q.   Did your answer assume that the water polo walk-on was

12  legitimately recruited for athletic talent?

13  A.   Absolutely.

14  Q.   And that the credentials reflected on the subcommittee

15  packet are legitimate?

16  A.   Yes.

17  Q.   If you knew that this -- that -- withdrawn.

18            You were asked some questions about having an ACT

19  score of 29.

20  A.   Yes.

21  Q.   How many students who apply to USC get rejected with an

22  ACT score of 29?

23  A.   I have to imagine it's thousands and thousands.

24  Q.   Does an ACT score of 29 guarantee you admission to USC?

25  A.   No.
```

```
 1    Q.    What about going through the subcommittee as a recruited
 2    athlete?
 3    A.    No.
 4    Q.    What are your odds if you're recruited as an athlete and
 5    put through subcommittee?
 6              MR. KENDALL:  Objection.
 7              THE COURT:  Overruled.
 8    A.    As I mentioned before, the admit rate for students who are
 9    presented is high, probably 85 or 90 percent of those students
10    are admitted.
11    Q.    You were asked whether students can develop into stronger
12    players.  Do you recall those questions?
13    A.    Yes.
14    Q.    Do you know what it means to be an immediate impact
15    player?
16    A.    That a student would come and be contributing to the team,
17    maybe even starting on the team right away.
18    Q.    Were you asked some questions about whether somebody's
19    speed, whether it was 20 seconds versus 22 seconds, would have
20    mattered to you.  Do you recall those questions?
21    A.    Yes.
22    Q.    Would lies matter to you?
23    A.    Yes.
24    Q.    If you knew that Jovan Vavic was lying to you about a
25    student's qualifications, would that have mattered in the
```

```
 1   subcommittee's process?

 2   A.   Absolutely.

 3        MR. FRANK:  If we can call up 107 again, please.

 4   Q.   Is there anything in Johnny Wilson's profile -- and we can

 5   look at it if you'd like -- that talks about financial

 6   contributions?

 7   A.   I'll take a last look at it, please.

 8        MR. FRANK:  Ms. Lewis, if you could flip to the next

 9   page.

12:25 10   Q.   Anything on that page talking about financial

11   contributions?

12   A.   No.

13   Q.   Next page.

14        Anything on that page?

15   A.   No.

16   Q.   Next page.

17        That page?

18   A.   No.

19   Q.   Next page.

12:25 20        Anything on his report card?

21   A.   No.

22   Q.   Anything on this part of his report card?

23   A.   No.

24   Q.   Next page.

25        Anything there?
```

```
 1   A.   No.

 2   Q.   Next page.

 3            Anything in Coach Vavic's e-mail talking about

 4   financial contributions?

 5   A.   No.

 6   Q.   If Johnny Wilson was admitted based on financial

 7   contributions and not based on his athletic talent, would that

 8   have been hidden from you?

 9   A.   Yes.  By virtue of going through SUBCO, we believe he had

10   the athletic talent that was presented.

11   Q.   You were asked some questions about written guidance.

12   A.   Yes.

13   Q.   Are you aware of any written guidance not to lie at USC?

14   A.   No.

15   Q.   Are you aware of any written guidance not to submit

16   falsified athletic profiles to the subcommittee?

17   A.   No.

18   Q.   Are you aware of any written guidance not to add fake

19   awards to athletic profiles?

20   A.   No.

21   Q.   You are aware of any written guidance directing coaches

22   not to call somebody an immediate impact player when they're

23   not?

24   A.   No.

25   Q.   Are you aware of what common sense tells you about those
```

```
 1    things?

 2              MR. KENDALL:  Objection.

 3              THE COURT:  Sustained.

 4    BY MR. FRANK:

 5    Q.   Were are you aware of whether those things are right or

 6    wrong?

 7              MR. KENDALL:  Objection.

 8              THE COURT:  Sustained.

 9    BY MR. FRANK:

12:26 10   Q.   Are you aware of whether doing any of those things would

11    violate USC's written or unwritten policies?

12              MR. KENDALL:  Objection, compound.

13              THE COURT:  She can answer that one.

14    A.   Yes, I believe they would violate the expectations about

15    what SUBCO was for.

16              MR. FRANK:  No further questions.

17              THE COURT:  Any recross, Mr. Sheketoff?

18              MR. SHEKETOFF:  Yes.

19                RECROSS-EXAMINATION OF REBECCA CHASSIN

12:27 20   BY MR. SHEKETOFF:

21    Q.   At this time, good afternoon.

22              The prosecutor just asked you about slots, and you

23    said something along the lines of if Sabrina Abdelaziz was

24    admitted, somebody else would not have been admitted.

25              Did you say that?
```

```
 1   A.   Right, so the --

 2   Q.   No, the question was:  Did you say that?

 3   A.   It wasn't specific to Sabrina.

 4   Q.   So how many people were admitted by USC on the year that

 5   she applied?

 6   A.   I believe it was about 8,500.

 7   Q.   About 8,500.  You mean it might have been 8,516 or 8,600?

 8   A.   That number I don't have at the ready.

 9   Q.   You knew Sabrina Abdelaziz had already been admitted,

10   correct, when you decided to give admission letters to over

11   8,000 students, correct?

12   A.   Yes.  By being approved, she had already taken one of the

13   admission spaces that we had for that year.

14   Q.   Yeah, that's what you told us yesterday.  Once you get

15   that letter, it's not a maybe, you're in.

16   A.   Right.  She had already been reviewed and approved for

17   admission.

18   Q.   So is there somebody that you wanted to give an admissions

19   letter to from USC, number 8,212, that you didn't do that

20   because Sabrina Abdelaziz had taken a slot already?

21   A.   There's always students that we'd like to admit if we had

22   more space.

23   Q.   Well, who limited the amount of students you could give

24   letters of admission to?

25   A.   So it's based on --
```

A2006

```
 1    Q.   No, who did that?  Who?  You?
 2    A.   Our admit targets are created by our dean of admissions,
 3    Tim Brunold.
 4    Q.   So you don't have a clue whether or not he was going to
 5    admit 8,000 that year or 8,200 or 8,300.  It was totally up to
 6    him?
 7    A.   No, I had a specific number that was given that was
 8    calculated based on the yield expectation that we had for the
 9    number of students we expected to enroll.
12:29 10    Q.   All right.  So what was that number that you had that you
11    magically --
12    A.   I just don't have the exact number at the ready, I
13    apologize.
14    Q.   Well, when the prosecutor asked you on direct yesterday,
15    didn't you say something like 82 to 83 hundred?
16    A.   I believe I said 8,500, that was rounded.  I didn't give
17    you the exact number; I just don't have it at the ready.  It's
18    available.
19    Q.   Really?  Is it also available what the percentage of
12:30 20    students who make it onto the VIP list are admitted versus the
21    number of students who are just regular applicants?  Is that
22    ready -- readily available, too?
23    A.   That's not published information.
24    Q.   But it's readily available to you?
25    A.   No, it's not any information I've ever put together.
```

```
 1   Q.   You know that if you get out to the VIP list, you're four

 2   times more likely to be admitted than you are if you're a

 3   regular applicant, don't you?

 4   A.   I haven't looked at those data.

 5   Q.   You haven't looked at those data.

 6        Does anyone on the outside of USC know the difference

 7   between the VIP list and SUBCO?

 8        MR. FRANK:  Objection, foundation.

 9        THE COURT:  Sustained.

10   BY MR. SHEKETOFF:

11   Q.   Is that published USC information, the difference between

12   the VIP list and SUBCO?

13   A.   No, that's our internal process.

14   Q.   Do you think my client, Mr. Abdelaziz --

15        MR. FRANK:  I object, your Honor.

16        THE COURT:  Wait.  He hasn't asked the question.

17   BY MR. SHEKETOFF:

18   Q.   -- had any way of knowing whether his daughter was going

19   go through SUBCO or the VIP list?

20        MR. FRANK:  Objection, foundation.

21        THE COURT:  Sustained.

22   BY MR. SHEKETOFF:

23   Q.   You don't have a clue what Mr. Singer told him, do you?

24   A.   I've never met Mr. Singer.

25   Q.   So the answer is, correct, you don't have a clue.
```

12:30  (line 10)
12:31  (line 20)

```
 1   A.   Correct.

 2   Q.   And you don't have a clue about how he could learn the

 3   difference between SUBCO and VIP as an outsider to USC?

 4   A.   I object to the closing argument, your Honor.

 5        THE COURT:   Sustained.

 6   BY MR. SHEKETOFF:

 7   Q.   Well, there's nothing he could read online that tells the

 8   difference between SUBCO and VIP, is there?

 9   A.   It is not published online.

10   Q.   It's an internal policy, correct?

11   A.   Yes.

12   Q.   I mean, you know about it, Donna Heinel knows about it,

13   correct?

14   A.   Yes.

15   Q.   Because you work with it.

16        Now, you -- were you suggesting to the prosecutor that

17   most or many of the people that made it onto the VIP list were

18   not on there because of donor possibilities?

19   A.   I didn't suggest the ratio.

20   Q.   Well, what do you think the ratio is, about 90 percent of

21   them?

22        MR. FRANK:   Objection, foundation.

23        THE COURT:   If she knows, she can answer.

24        Overruled.

25   A.   Many of the students are on there because of the hope that
```

```
  1   they will, you know, contribute to the University financially,
  2   some of the students are not on there for that reason.  We
  3   don't really separate that out in the admissions office, we
  4   just know that someone around campus is interested in the
  5   student.
  6   Q.   When you say, We don't sort that out in the admissions
  7   process, you mean you don't know that information.  You don't
  8   know what Tim Brunold knows, correct?
  9   A.   I don't have that information.
12:33 10   Q.   And you don't know why Tim Brunold has not been called by
 11   the government and instead has picked you.
 12           MR. FRANK:  Objection, your Honor.
 13           THE COURT:  Sustained.
 14   BY MR. SHEKETOFF:
 15   Q.   There is no ceiling on the number of slots that USC can
 16   send admissions letters to, correct?
 17   A.   No, there definitely is.
 18   Q.   What is that ceiling?
 19   A.   Depending on the number of students that we expect to
12:33 20   enroll and the yield expectations we have, we calculate an
 21   admit target for each cycle.
 22   Q.   A target, you can add 10, 20 or 50 or 80 on that target
 23   and still be off who comes there, correct?
 24   A.   That's not our practice.
 25   Q.   Well, you don't have a clue how many of the 8,500 you
```

```
 1   accept are actually going to come there, do you?

 2   A.   We have good data that helps us to understand the

 3   likelihood that a student will enroll.

 4   Q.   Is that one of the factors you use in deciding whether to

 5   give an admission letter, whether a student is likely to

 6   enroll?

 7   A.   It's not part of our admission decision process, no.

 8   Q.   So how many enrolled in Sabrina Abdelaziz's class?

 9   A.   I believe it was about 3,300 students.  I don't have the

12:34 10  exact number.

11   Q.   Well, was it -- did it hit right on target or was it 15 or

12   20 more or less or in between?

13   A.   I don't recall.  I don't have those data in front of me.

14        MR. SHEKETOFF:  Could I have 1565 just for the

15   witness.

16   Q.   Do you recognize this document?

17   A.   Yes.

18   Q.   Did you receive a copy of this document?

19   A.   Yes.

12:35 20       MR. SHEKETOFF:  Offer it.

21        MR. FRANK:  Objection, it's hearsay, your Honor; it's

22   also beyond the scope.

23        THE COURT:  Sustained.

24   BY MR. SHEKETOFF:

25   Q.   Well, did you tell Mr. Kendall when he was cross-examining
```

```
 1   you that you had not seen a VIP list?
 2          MR. FRANK:  Objection, beyond the scope of the
 3   redirect.
 4          MR. SHEKETOFF:  Your Honor, when I go first in cross,
 5   I think I have the right to address things.
 6          THE COURT:  Yes, you do.  So overruled.
 7   A.   He was referring to Pat Haden's VIP list, which I was not
 8   familiar with.  In the Office of Admission, we have a list of
 9   all the students who are of interest to all the various
10   constituents that are being tracked so that we can do our work.
11   Q.   What do you mean "so you can do your work"?  Why would you
12   need that list?
13   A.   So we can make recommendations for the dean of admission
14   to review.
15   Q.   Why would you need a list of who other people in the
16   University consider to be VIPs when you're just making an
17   admissions decision?
18   A.   Again, this was just to expedite the work so he'd have
19   time to review them before our decision-making process ended.
20   Q.   Wasn't it because you could factor in whether or not
21   somebody was a donor in deciding to give a letter of admission?
22   A.   No.  We specifically instruct our staff to just simply
23   make a recommendation based on the application file and not to
24   consider the special interest.  That's already being considered
25   by the dean of admission in his review.
```

12:36 (line 10)

12:36 (line 20)

A2012

```
 1   Q.   Okay.  So whatever your staff recommends, the dean of

 2   admissions decides whether there's going to be a letter of

 3   admit or not.

 4   A.   He has the authority to admit students to the University,

 5   yes.

 6   Q.   So you just want your staff to know about the students

 7   that the dean of admit will have to consider who are on the VIP

 8   list.

 9   A.   We just need to get the work done so we need them to put

10   in the recommendations in enough time for him to do his review.

11   Q.   It doesn't reflect in any way, shape or form that your

12   institution is interested in raising money.

13   A.   That's not the work of the office of admission.

14   Q.   Is it the work of Mr. Brunold?

15   A.   No.

16   Q.   Then why does he need this list?

17             MR. FRANK:  Objection.

18             THE COURT:  Sustained.

19   BY MR. SHEKETOFF:

20   Q.   Everyone saw your retweet about rich people having

21   advantages, and the prosecutor asked you about those

22   advantages.  You had volunteered many of them to me, too.  Do

23   you remember that?

24   A.   Yes.

25   Q.   They go to good schools, they get counselors, they get
```

1    help with tests, et cetera, et cetera, correct?

2    A.    Yes.

3    Q.    All right.  And one of the advantages that they have and

4    one of the advantages that you recognized when you made that

5    retweet was they can give donations to schools and that changes

6    the school's mind about whether or not they're decent

7    candidates.

8    A.    I think that happens very rarely with most wealthy

9    students who are applying to college.  I think most of the

12:38 10    other advantages are a much bigger overall boost in the

11    application process to selective colleges.

12    Q.    So -- but you recognize that as something that you tweeted

13    about, their ability to give donations, correct?

14    A.    I wasn't specifically targeting that.

15    Q.    Nothing is specific in that, but you had a specific memory

16    with the prosecutor about all those things.  I'm asking was

17    this in the general background of your mind when you retweeted

18    that?

19    A.    I don't recall.

12:39 20    Q.    Do you know how much money the athletic department raised

21    in the year that Sabrina Abdelaziz was admitted?

22    A.    No.

23    Q.    Do you know how they raised it?

24    A.    Not specifically.

25    Q.    Do you know what direction they gave to their coaches

```
 1    about raising money?
 2            MR. FRANK:  Objection, beyond the scope of the
 3    redirect.
 4            THE COURT:  Overruled.
 5    A.   No, I don't work in the office of athletics.
 6            MR. SHEKETOFF:  Thank you.
 7            THE COURT:  Mr. Kendall, recross.
 8            MR. KENDALL:  A few minutes, your Honor, thank you.
 9              RECROSS-EXAMINATION OF REBECCA CHASSIN
12:40 10   BY MR. KENDALL:
11    Q.   Mr. Frank asked you about people -- students who were
12    expelled from USC.  Johnny Wilson wasn't expelled, was he?
13    A.   I believe he had already graduated.
14    Q.   And he graduated with a degree, correct?
15    A.   I don't know the specifics.
16    Q.   Okay.  You said the dean of admissions reviews the --
17    personally the VIP list, that's Mr. Brunold?
18    A.   Yes.
19    Q.   He's been doing it for years.
12:40 20   A.   Since he's been the dean of admission, yes.
21    Q.   And that goes back before 2014, correct?
22    A.   I don't remember the exact date when he became dean.
23    Q.   And you also spoke with Mr. Frank that Ms. Heinel and
24    Mr. Vavic left USC in 2019.  Do you remember that?
25    A.   Yes.
```

```
 1    Q.   Katherine Harrington, the head of all admissions, had to

 2    resign as well that year, didn't she?

 3    A.   No, she left the University in 2020.

 4    Q.   She left in 2020, but she left after all this became

 5    public as well?

 6    A.   She left the University, yes.

 7    Q.   And finally, you said at the very beginning in answering

 8    questions for Mr. Frank that VIP lists are not part of the

 9    SUBCO process.  Didn't you testify that to that earlier today?

12:41 10    A.   Yes.

11    Q.   You know that's not a true statement, don't you?

12    A.   It is a true statement.

13         MR. KENDALL:  I'd ask if we could show the witness

14    again Exhibit 1085 and see if that refreshes her recollection.

15         If we could start with just page 2 of Exhibit 1085.

16    Q.   If you could take a look at it and take a look at the

17    column that says status, just go down there and look at the

18    thoughts next to "status" and tell us if that refreshes your

19    recollection that the VIP lists do have some part in the SUBCO

12:42 20    process.

21    A.   Nope.

22    Q.   And if you could -- you see the yellow highlight, if you

23    could look above the yellow highlighted.

24    A.   I don't know about this document.  I don't know what it

25    is.  I've never seen it.  I don't know who made it.
```

1    Q.   Well, you just made a statement about VIP lists where you

2    thought you had some authority to say what they're involved in,

3    and you've never seen a VIP list --

4    A.   This is not a VIP list that is made in the office of

5    admission.  I don't know --

6    Q.   I agree with you -- well, if you take a look at the front

7    page of it, you can identify the e-mail, can't you?  In the

8    signature block.

9    A.   I can see that she sent it.  I don't know who made the

12:42 10    list.  It's just not an admission list.

11    Q.   Well, you see what it's entitled and what it's called,

12    correct?

13    A.   Yes.

14         MR. KENDALL:  Your Honor, I'd again offer Exhibit 1085

15    as impeachment from her redirect testimony that she just gave.

16         MR. FRANK:  I object, your Honor, on the same grounds.

17    And also, it's an unsent e-mail.

18         THE COURT:  The objection is sustained.

19         MR. KENDALL:  Thank you, your Honor.  No further

12:43 20    questions.

21         THE COURT:  Thank you, Ms. Chassin, you may step down.

22         THE WITNESS:  Thank you.

23         THE COURT:  The government may call its next witness.

24         MR. FRANK:  Thank you, your Honor.  The government

25    calls Special Agent Elizabeth Keating.

```
 1              (Pause.)
 2              MR. FRANK:  Your Honor, we have transcript binders.
 3              THE COURT:  Yes.
 4              (Discussion off the record.)
 5              (Pause.)
 6              MR. FRANK:  Just to expedite things, all we need for
 7       right now is the transcript 665, and then I think we can fix
 8       the binders.
 9              MR. KELLY:  Your Honor, perhaps we can use this time
10       to giving our objection, and that would be to the playing of
11       these contentions on the grounds that it violates the
12       confrontation clause of my client, Mr. Abdelaziz, if I don't
13       get the opportunity to cross-examine Mr. Singer.
14              MR. KENDALL:  I join in as well, your Honor.
15              THE COURT:  All right.  For the reasons stated in
16       other -- on other occasions, the objection is overruled.
17              MR. FRANK:  Your Honor, we have submitted a proposed
18       limiting instruction.  We've actually proposed it for these
19       purposes.
20              THE COURT:  Bring that to my attention later because
21       I'm not aware of it.
22              MR. FRANK:  Yes, your Honor.
23              (Elizabeth Keating, sworn.)
24              THE CLERK:  Thank you.  You may be seated.
25              And would you please state your name for the record,
```

1    spelling your last.

2            THE WITNESS:  Elizabeth Keating, K-e-a-t-i-n-g.

3            DIRECT EXAMINATION OF ELIZABETH KEATING

4    BY MR. FRANK:

5    Q.    Good afternoon, Special Agent Keating.

6    A.    Good afternoon.

7    Q.    Can you tell us where you work.

8    A.    I work at the Internal Revenue Service.

9    Q.    How long have you worked at the IRS?

12:48 10    A.    For approximately 18 years.

11    Q.    And what have you done -- what roles have you had over the

12    course of your 18 years at the IRS?

13    A.    I was a customer service representative, a revenue agent,

14    and I am currently a special agent.

15    Q.    How long were you a customer service representative?

16    A.    Approximately a year and a half.

17    Q.    What did you do in that role?

18    A.    I provided customer service.  People would call me with

19    questions and I would answer those questions.

12:48 20    Q.    And then how long were you a revenue agent?

21    A.    Approximately three years.

22    Q.    What did you do as a revenue agent?

23    A.    As a revenue agent I audited small businesses and

24    self-employed individuals.

25    Q.    And how long have you been a special agent?

```
 1   A.   Approximately 13 years.

 2   Q.   What is the difference between a revenue agent and a

 3   special agent?

 4   A.   A revenue agent audits individuals.  A special agent

 5   investigates individuals for violating criminal violations of

 6   the Internal Revenue Code.

 7   Q.   Can you tell us a little bit about your educational

 8   background.

 9   A.   I received a bachelor's degree in accounting from Bentley

10   College.

11   Q.   And where did you work after graduating Bentley and before

12   joining the IRS?

13   A.   I was a bank teller and then I was hired -- while I was in

14   college I was hired as an intern at the IRS.

15   Q.   So you basically worked for the IRS virtually since

16   graduating college?

17   A.   Yes.

18   Q.   What kind of training did you receive upon becoming a

19   special agent?

20   A.   I received six months of training in Georgia at the

21   federal law enforcement training academy.

22   Q.   What kind of training was that?

23   A.   It consisted of training in law enforcement techniques,

24   such as search warrants, writing search warrants, making

25   arrests, also firearms training, and I also had additional
```

1    training in tax law.

2    Q.    Did there come a time after becoming a special agent when

3    you were assigned to work with the FBI?

4    A.    Yes.

5    Q.    And when I say "assigned to work with the FBI," did you

6    work for the FBI or were you assigned to work with the FBI?

7    A.    I'm assigned to work with the FBI.

8    Q.    And when was that?

9    A.    Approximately 2015.

12:50 10    Q.    What does it mean to be assigned to work with the FBI as

11    an IRS special agent?

12    A.    I assist the FBI on -- with their investigation of their

13    cases.

14    Q.    Are you currently assigned to work with any particular

15    squads at the FBI?

16    A.    Yes, I'm assigned to the healthcare fraud squad and the

17    securities fraud squad.

18    Q.    And how long have you been assigned to each of those

19    squads?

12:51 20    A.    Healthcare fraud since 2015, securities fraud since 2017.

21    Q.    Did there come a time after you were assigned to work with

22    the securities fraud squad when you were assigned to an

23    investigation involving Rick Singer?

24    A.    Yes.

25    Q.    Approximately when was that?

```
 1    A.    March 2018.

 2    Q.    So about how long had you been with the securities fraud

 3    squad before you were assigned to assist with that

 4    investigation?

 5    A.    Less than a year.

 6    Q.    Were you the lead agent on the case?

 7    A.    No, I was not.

 8    Q.    What were your responsibilities?

 9    A.    I was assigned to the case as the IRS case agent.  My

12:51 10   focus was to investigate the financial aspects of the case.

11    Q.    Who was the lead case agent?

12    A.    FBI Special Agent Laura Smith.

13    Q.    As part of the investigation did there come a time when

14    you participated in an approach of Rick Singer?

15    A.    Yes.

16    Q.    What was the date of that approach?

17    A.    September 21, 2018.

18    Q.    Where did the approach occur?

19    A.    At the Long Wharf Marriott Hotel in Boston.

12:52 20   Q.    Is that right down here on the harbor?

21    A.    Yes.

22    Q.    I'm pointing, but I actually have no idea which direction

23    that is.

24          What happened at the Long Wharf Marriott?

25    A.    Mr. Singer came to meet with the Yale soccer coach,
```

```
 1   Mr. Meredith, for a meeting.
 2   Q.   How did that meeting get set up?
 3   A.   The FBI directed the -- Mr. Meredith to set up that
 4   meeting.
 5   Q.   What happened at that meeting?
 6   A.   At some point in the middle of the meeting, IRS and FBI
 7   agents went into the room and, as a rouse, we arrested
 8   Mr. Meredith and then we approached Mr. Singer.
 9   Q.   As a rouse you arrested Mr. Meredith?
10   A.   Yes.
11   Q.   Why did you stage an arrest of Mr. Meredith?
12   A.   We did not want Mr. Singer to know that Mr. Meredith set
13   up the meeting.
14   Q.   At the direction of agents?
15   A.   Yes, at the direction of the FBI.
16   Q.   What happened after you approached Mr. Singer?
17   A.   We explained to the -- the special agents explained to
18   Mr. Singer that he was under investigation and asked if he
19   would like to speak with us.
20   Q.   And did he agree to speak with you?
21   A.   Yes, he did.
22   Q.   How long approximately did you speak with him on that day?
23   A.   Spoke to Mr. Singer for a couple of hours.
24   Q.   And that day, September 21st, that was a Friday?
25   A.   Yes.
```

**A2023**

```
 1  Q.   Who led the interview of Mr. Singer?

 2  A.   Agent Laura Smith led that interview.

 3  Q.   And did you participate in it?

 4  A.   Yes, I did.

 5  Q.   Without telling me what Mr. Singer said, what was his

 6  demeanor during that interview?

 7  A.   Mr. Singer appeared nervous.  He was sitting in his chair

 8  and he was shriveled up in his chair, he had this look, a very

 9  scared look in his eye.

12:53 10  Q.   You said that went on for a few hours?

11  A.   Yes.

12  Q.   What happened when the interview ended?

13  A.   Agents left and Mr. Singer contacted his attorney.

14  Q.   How long was Mr. Singer in Boston on that occasion?

15  A.   He was in Boston for a couple of days.  He went home that

16  Monday.

17  Q.   So the meeting was on Friday and he went home on Monday?

18  A.   Correct.

19  Q.   Did you meet with him again during this time?

12:54 20  A.   Yes.

21  Q.   When?

22  A.   Agents met with him the next day on Saturday.

23  Q.   Okay.  And what was the purpose of that?

24  A.   Agents wanted to talk to Mr. Singer.  So we interviewed

25  Mr. Singer, and he made a few phone calls for us.
```

**A2024**

```
 1    Q.   At your direction?

 2    A.   Yes.

 3    Q.   And did you meet with him again after that?

 4    A.   Yes.

 5    Q.   And similar purpose?

 6    A.   Yes.

 7    Q.   And what happened on Monday?

 8    A.   On Monday, I and Special Agent Cedrone escorted Mr. Singer

 9    to the bank to open up a bank account.

12:54 10  Q.   And the bank account was in the name of what entity?

11    A.   The Key Worldwide Foundation.

12    Q.   And did the FBI have access to that bank account?

13    A.   Yes.

14    Q.   Prior to -- and then what happened after that?  Did

15    Mr. Singer leave Boston?

16    A.   Yes, Mr. Singer went home.

17    Q.   To where?

18    A.   California.

19    Q.   Prior to approaching Mr. Singer on September 21st, did you

12:55 20  intercept -- well, withdrawn.

21         Are you aware that there was a Title III wiretap of

22    Mr. Singer's phone?

23    A.   Yes.

24    Q.   Prior to approaching Mr. Singer on September 21st, did you

25    intercept any calls in which he set up a meeting in Boston?
```

```
 1    A.    Yes.

 2    Q.    Who did he set up a meeting with?

 3    A.    Mr. Wilson.

 4    Q.    Did Mr. Singer meet with Mr. Wilson while he was in

 5    Boston?

 6    A.    No, he did not.

 7    Q.    Why not?

 8    A.    Agents directed Mr. Singer not to meet with Mr. Wilson.

 9    Q.    And how did Mr. Singer cancel that meeting?

12:55 10   A.    We directed Mr. Singer to call Mr. Wilson to cancel the

11    meeting.

12    Q.    Did he do that?

13    A.    Yes, he did.

14          MR. FRANK:   Could we -- Ms. Lewis, could you show the

15    witness Exhibit 665?

16          Thank you.

17    Q.    Prior to coming here today, special agent, did you have an

18    opportunity to review the disk marked as 665?

19    A.    Yes.

12:56 20   Q.    And are those your initials on the disk?

21    A.    There's no initials on the disk.

22    Q.    Are you familiar with Exhibit 665?

23    A.    Yes.

24    Q.    What is it?

25    A.    It is a call between Mr. Singer and Mr. Wilson.
```

```
 1  Q.   If you could turn toward --

 2           MR. KELLY:  Objection.  She hasn't reviewed this one.

 3  There's no foundation for this one.

 4           MR. FRANK:  She's reviewed Exhibit 665, and she's

 5  familiar with it, your Honor.

 6           MR. KELLY:  She hasn't initialled it.  Maybe she saw

 7  something else.

 8           MR. FRANK:  If counsel would like to have me take a

 9  break, it's a --

10           THE COURT:  Do you have something else to do for five

11  minutes?

12  BY MR. FRANK:

13  Q.   Could you look at the tab in your binder that's marked as

14  665?

15  A.   Yes, I see that.

16  Q.   And have you had an opportunity to review that transcript?

17  A.   Yes.

18  Q.   And did you compare that transcript with a disk that was

19  marked as 665?

20  A.   Yes.

21  Q.   And is that a fair and accurate transcript of the

22  recording that you listened to that was marked as Exhibit 665?

23  A.   Yes.

24  Q.   And are those your initials and date at the bottom of that

25  transcript?
```

```
 1    A.    Yes, it is.

 2              MR. FRANK:   The government offers 665.

 3              THE COURT:   It will be admitted.

 4              MR. KENDALL:   Objection as we've previously disclosed,

 5    your Honor.

 6              THE COURT:   Yes, subject to the defendants' prior

 7    objection.

 8              (Exhibit 665 received into evidence.)

 9              MR. FRANK:   Ms. Lewis, could you play 665, please.

12:57 10        (Played recording.)

11    BY MR. FRANK:

12    Q.    Do you recognizes the voices on that call, special agent?

13    A.    Yes.

14    Q.    Whose voices are they?

15    A.    Mr. Singer and Mr. Wilson.

16    Q.    And the date of this call was September 23, 2018?

17    A.    Yes.

18    Q.    So that was the Sunday?

19    A.    Yes.

12:58 20    Q.    And I believe you testified that Mr. Singer made that call

21    at the direction of law enforcement agents?

22    A.    Correct.

23    Q.    Did Mr. Singer also agree to make other recorded phone

24    calls at the government's direction?

25    A.    Yes, he did.
```

```
 1    Q.    During the calls that Mr. Singer -- and are those calls
 2    known as consensuals, consensual calls?
 3    A.    Yes.
 4    Q.    During the consensual calls that Mr. Singer made at the
 5    direction of agents, was there a plan for those calls or a
 6    script?
 7    A.    There was no written script, but we did direct Mr. Singer
 8    on what to say.
 9    Q.    And who came up with that plan?
10    A.    Agents and prosecutors.
11    Q.    Were any of the phone calls -- other than the one we just
12    listened to in the days immediately after the approach of
13    Mr. Singer, were any of those calls with either Mr. Wilson or
14    Mr. Abdelaziz, again, with the exception of the one we just
15    listened to?
16    A.    Sorry, can you repeat that?
17    Q.    Sorry, it was a long question.
18          With the exception of the call we just listened to,
19    were any of the calls that Mr. Singer was directed to make in
20    the days immediately after the approach with either Mr. Wilson
21    or Mr. Abdelaziz?
22    A.    No.
23          MR. KENDALL:  Your Honor, minor objection.  Just days
24    immediately after, can we get a precise time period.
25          THE COURT:  Yes.
```

A2029

```
 1   BY MR. FRANK:
 2   Q.   Between September 21st and September 28th, 2018, other
 3   than the call we have just listened to, did agents direct
 4   Mr. Singer to make any phone calls to Mr. Wilson?
 5   A.   No.
 6   Q.   Between September 21, 2018 and the end of October 2018,
 7   did agents direct Mr. Singer to make any calls to
 8   Mr. Abdelaziz?
 9   A.   No.
10   Q.   And are you aware of any calls during that period with
11   Mr. Abdelaziz?
12   A.   No.
13            THE COURT:  All right.  We're going to stop here for
14   the lunch break.
15            Ms. Keating you may step down.
16            We're going to recess for one hour, jurors.  We're
17   going to have an afternoon session today, between 3:00 and 3:30
18   we will recess, so we'll see you back here at 2:00.
19            THE CLERK:  All rise for the jury.
20            (Jury left the courtroom.)
21            THE COURT:  All right.  Be seated, counsel.
22            So I take it the direct of Ms. Keating will take the
23   rest of the day.
24            MR. FRANK:  I believe it will continue into Thursday,
25   your Honor.
```

```
 1              THE COURT:  Into Thursday, okay.
 2              Anything else that needs to come to my attention
 3     before we recess --
 4              MR. FRANK:  We have submitted, I believe by ECF, a
 5     proposed limiting instruction for the consensual recordings.
 6              And we could -- I believe the deputy has it as well,
 7     so perhaps --
 8              THE COURT:  All right.  I will -- and you expect that
 9     both sides would like me to give that now.
01:02 10         MR. FRANK:  It was our proposed limiting instruction.
11              MR. KENDALL:  We need to look at it.
12              THE COURT:  Of course, I thought you had.
13              MR. KENDALL:  I don't believe what he's filed we've
14     looked at.
15              THE COURT:  All right.  You can let me know after the
16     break as to, A, whether you agree to it; and two, when it is
17     you would like me to give it.
18              MR. KENDALL:  The one other thing we could get, could
19     we find out what the schedule is for the rest of the week and
01:02 20   the expected stop date?  We've got to line our people up.
21              THE COURT:  Yes.  Today it will be Keating on direct.
22     We will not have a session tomorrow.
23              Thursday, Mr. Frank.
24              MR. FRANK:  I believe Keating will take the balance of
25     Thursday.  I hope we will get to the next witness and be able
```

    1   to complete the next witness by the end of the week, that's

    2   Lauren Janke.

    3           THE COURT:  But Ms. Keating's direct will be finished

    4   sometime Thursday.

    5           MR. FRANK:  Yes.

    6           MR. KENDALL:  When do you expect the government to

    7   rest next week?

    8           MR. FRANK:  Again, that depends on the pace of

    9   cross-examination.  If the pace of cross-examination is

01:03 10   consistent with our original expectations, perhaps by midweek,

   11   but if it drags longer, it will be longer.

   12           MR. KENDALL:  Thank you.

   13           THE COURT:  We're in recess until 2:00.

   14           THE CLERK:  All rise.

   15           (Recess taken.)

   16           THE CLERK:  You may be seated.  Court is now in

   17   session.

   18           THE COURT:  Good afternoon, counsel.  I have

   19   considered the defendant -- or the government's response to the

02:10 20   defendants' confrontation clause objections in which they have

   21   suggested a limiting instruction for me to give to the juror --

   22   jury and the defendants' proposed amendment to that

   23   instruction, and I've come up with what I believe is a hybrid

   24   of the two, and I will tell what I intend to instruct the jury

   25   on right now when they come in.

```
 1              You have heard and will hear evidence of certain phone
 2    calls between Rick Singer and the defendants and others after
 3    September 21, 2018, which Mr. Singer made at the direction of
 4    law enforcement.  While you must not consider Singer's
 5    statements during those calls for the truth of anything they
 6    assert, you may consider them for the context that they provide
 7    in evaluating the defendants' statements on the phone calls.
 8    By context I mean what Singer's statements may provide -- by
 9    context I mean that Singer's statements may provide meaning to
10    the defendants' responses, if any.
11              Counsel?
12              MR. FRANK:  No objection from the government, your
13    Honor.
14              THE COURT:  Mr. Kelly?
15              MR. KELLY:  Yes, your Honor.  Again, just for the
16    record, we don't think a limiting instruction would cure the
17    confrontation clause issue, but understanding the Court's rule,
18    understanding that's the instruction, could you just read the
19    part back again where you say, "while you".
20              THE COURT:  Yes.  While you must not consider Singer's
21    statements during those calls for the truth of anything they
22    assert, you may consider them for the context that they provide
23    in evaluating the defendants' statements on the phone calls.
24              MR. KELLY:  Again, keeping in mind my objection,
25    that -- if the Court's going to give an instruction, it sounds
```

A2033

```
 1   like something that's accurate for us.

 2          THE COURT:  Mr. Kendall had something else he wanted

 3   to bring to my attention.

 4          MR. KENDALL:  Do you want to just add to the

 5   instruction -- we think that instruction is better than what

 6   the government offered.  We're not waiving any rights obviously

 7   in our objections.  Two things -- by making those suggestions,

 8   we're not waiving any rights on the issue, but two things we

 9   wanted to raise.

02:13  10      The Court had said that you thought you had ruled on

11   the confrontation clause issue with respect to the tapes.  It's

12   our memory that you reserved on that issue and you have not

13   actually ruled on the confrontation clause issue on the tapes.

14          THE COURT:  Well, I'll review that, but I'm not going

15   to stop the testimony this afternoon to do that.  I'll do it

16   after we recess.

17          And where is it that you think I said that, at the in

18   limine motion stage?

19          MR. KENDALL:  At the part when you ruled on the

02:14  20   motion, so it was the authentication motion, not the in limine

21   motion.

22          THE COURT:  In the authentication motion?

23          MR. KENDALL:  Yeah.  The long list of issues for

24   authentication.  I think.

25          THE COURT:  Is that the government's memory?
```

```
 1              MR. FRANK:  That is the government's memory, your
 2    Honor.
 3              THE COURT:  Then I reserved.
 4              MR. FRANK:  You reserved.
 5              THE COURT:  All right.  I will review that overnight
 6    over the break and we'll discuss it later.
 7              MR. KENDALL:  Okay.  Your Honor, the last issue, and I
 8    appreciate the courtesy of raising this, Exhibit 578 is a tape
 9    the government's going to play this afternoon with my client
10    and Mr. Singer.  In it, there's an aside.  My client mentions
11    that he's planning to have a birthday party in France.  The
12    Versailles Museum is a function hall and you can rent out rooms
13    there.  So he's renting out a room there.
14              THE COURT:  This is Versailles?
15              MR. KENDALL:  Versailles.  You can check it on the
16    website.  Any room there in Versailles is available to rent as
17    a function hall, rooms for 20 to rooms for 200, all at
18    different prices.  He tells Mr. Singer, I'm going to invite you
19    to my party, and it has nothing to do with this case.  It's
20    only a salacious detail to make the jury think how wealthy my
21    client is and how he spends money.  I've asked the government
22    to just not play that little section.  They insist on playing
23    it.  I think it's unnecessary, your Honor.  I think it's
24    actually prejudicial under 401 and 403, both prejudicial and
25    not relevant.
```

```
 1              THE COURT:  Mr. Frank.
 2              MR. FRANK:  First of all, your Honor, to raise this
 3     now when we're about to play a recording that has been marked
 4     as an exhibit for literally months is, in our view, belated.
 5              Second of all, we think it's directly probative of the
 6     nature of the relationship between the defendant and his
 7     coconspirator.  It is highly unusual, we would submit, to
 8     invite your child's college counselor to a black tie party in
 9     France, so it is probative of the nature and closeness of the
02:16 10     relationship between the defendant and his alleged
11     coconspirator.
12              And finally, the notion that it's prejudicial when the
13     defense has put in evidence that the defendant paid over
14     $2 million a year in taxes we think doesn't hold any water.  So
15     it's certainly not more prejudicial than that fact.
16              MR. KELLY:  For the record, we object as well, your
17     Honor.
18              MR. KENDALL:  Your Honor, the tax issue, they're
19     putting the tax return into evidence.  Those numbers are before
02:16 20     the jury.  I do think the amount of tax that a reasonable
21     person would claim was evaded or missed versus the overall
22     amount of tax paid goes to --
23              THE COURT:  Well, I'm going to overrule the objection
24     but I wouldn't be averse at some point to allowing you to tell
25     the jury that he didn't rent all of Versailles, only a room.
```

1          MR. FRANK:  That's actually not what he says, but.

2          MR. KENDALL:  Thank you, your Honor.

3          THE COURT:  Okay.  Let's go.  Call the jury.

4          (Jury enters.)

5          THE CLERK:  Thank you.  You may be seated.

6          THE COURT:  Good afternoon, jurors.  Before we begin,

7   I have a limited instruction, what we call a limited

8   instruction, that I'm going to give you with respect to what

9   you're about to hear.

02:19 10          You have heard, and will hear, evidence of certain

11   phone calls between Rick Singer and the defendants and others

12   after September 21, 2018, which Mr. Singer made at the

13   direction of law enforcement.  While you must not consider

14   Singer's statements during those calls for the truth of

15   anything they assert, you may consider them for the context

16   that they provide in evaluating the defendants' statements on

17   the phone calls.  And by context I mean that Singer's

18   statements may provide meaning to the defendants' responses, if

19   any.  So keep that in mind.

02:19 20          Now, Miss Keating, you're reminded that you remain

21   under oath.

22          Mr. Frank, you may continue with direct examination.

23          MR. FRANK:  Thank you, your Honor.

24   BY MR. FRANK:

25   Q.   Good afternoon again, Miss Keating, Special Agent Keating.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | A.    Good afternoon.                                         |
| 2   | Q.    At the time that law enforcement agents approached Rick |
| 3   | Singer on September 21, 2018, did you give Mr. Singer any     |
| 4   | instructions with respect to the continued operation of his  |
| 5   | college counseling business?                                 |
| 6   | A.    Yes.                                                    |
| 7   | Q.    What instructions did you give him?                     |
| 8   | A.    We told Mr. Singer to continue with his college counseling |
| 9   | business.                                                     |
| 02:20 10 | Q.    Why?                                              |
| 11  | A.    We wanted Mr. Singer to continue with his business to make |
| 12  | things appear that everything was fine and that there was no -- |
| 13  | he wasn't working with the FBI.                              |
| 14  | Q.    Now, you testified a moment ago, or a little while ago  |
| 15  | that Mr. Singer returned home to California on the Monday of  |
| 16  | that weekend.  So that was September 24th?                    |
| 17  | A.    Yes.                                                    |
| 18  | Q.    Did there come a time when you met with him again after |
| 19  | that first weekend in Boston?                                 |
| 02:21 20 | A.    Yes.                                              |
| 21  | Q.    When was that?                                          |
| 22  | A.    The -- September 26th, a few days later.                |
| 23  | Q.    So that was the Wednesday of the following week?        |
| 24  | A.    Yes.                                                    |
| 25  | Q.    And where did you meet with him?                        |

```
 1   A.   In California.

 2   Q.   Where in California?

 3   A.   Santa Anna, California.

 4   Q.   And what was the purpose of that meeting?

 5   A.   To interview Mr. Singer.

 6   Q.   How long were you with him on that occasion?

 7   A.   For three days.

 8   Q.   And were all of those three days in Santa Anna,

 9        California?

10   A.   No.  We went to Sacramento for two days.

11   Q.   Why did you move to Sacramento?

12   A.   Mr. Singer's attorney had another commitment, so we went

13        to Sacramento.

14   Q.   I want to direct your attention to the meeting that you

15        had with him on the third day of that meeting, September 28th.

16   A.   Yes.

17   Q.   Did there come a time when you took a break during that

18        meeting?

19   A.   Yes, we did.

20   Q.   What happened during that break?

21   A.   Mr. Singer had a Facetime call with Mr. Wilson's

22        daughters.

23   Q.   Did you or your colleagues record that call?

24   A.   No, we did not.

25   Q.   Why not?
```

**A2039**

A.   We had no reason to believe, based on the evidence, that

Mr. Wilson's daughters were aware of the side door.

Q.   After the call, were you able to confirm that the Facetime

call was, in fact, with Mr. Wilson's daughters?

A.   Yes.

Q.   How?

A.   Mr. Singer's --

MR. KENDALL:  Objection, your Honor.  Hearsay and move

to strike the prior answer based --

THE COURT:  Overruled.  She can't say what she learned

as a result of conversations with those daughters.

Q.   Without telling us what Mr. Singer or anyone else told

you, were you able to confirm that the call, the Facetime call,

was, in fact, with Mr. Wilson's daughters?

MR. KENDALL:  Objection, your Honor.  It's hearsay.

She didn't participate.

THE COURT:  Overruled.

A.   There was a prior call where Mr. Singer and Mr. Wilson

discussed Mr. Singer meeting with Mr. Wilson's daughters and

there was a conversation the next day to confirm that call.

There was also a -- on Mr. Singer's phone, there was a listing

that said that he had a Facetime call with Mamie Wilson for 33

minutes.

Q.   Did there come a time after that Facetime call when

Mr. Wilson and Mr. Singer spoke again?

|     |    |                                                              |
|-----|----|--------------------------------------------------------------|
| 1   | A. | Yes.                                                         |
| 2   | Q. | When was that?                                               |
| 3   | A. | The next day.                                                |
| 4   | Q. | And did you record that conversation?                        |
| 5   | A. | Yes.                                                         |
| 6   | Q. | Were you present for the conversation?                       |
| 7   | A. | No.                                                          |
| 8   | Q. | Why not?                                                     |
| 9   | A. | I was flying home from California to -- back to Boston.      |

02:23 10   Q.   So the call was intercepted on the wire?

11   A.   On the consensual wire, yes.

12   Q.   If I could ask you to turn to the transcript marked 571 in

13   your binder.  On the desk in front of you, Special Agent, there

14   is a disk labeled 571.  Could you also take a look at that

15   disk.

16        Do you have the disk marked 571?

17   A.   Yes, I do.

18   Q.   Does this one have your initials on it?

19   A.   Yes, it does.

02:24 20        MR. FRANK:  Thank God.

21        MR. KELLY:  No objection.

22        MR. FRANK:  Withdrawn, your Honor.

23   Q.   Do you recognize that disk?

24   A.   Yes.

25   Q.   What is it?

```
 1    A.    It is a call between Mr. Wilson and Mr. Singer.

 2    Q.    And is the date of that call September 29, 2018?

 3    A.    Yes.

 4          MR. FRANK:  Government offers 571.

 5          THE COURT:  It will be admitted.

 6          (Exhibit 571 admitted into evidence.)

 7          MR. FRANK:  And if everyone could turn to the tab

 8    marked 571 in their binders, we'll begin at the beginning of

 9    that call.

10          (Audio recording played.)

11    Q.    So this was how long after the Facetime call with

12    Mr. Wilson's daughters?

13    A.    The next day.

14    Q.    And at line 20 on page 1, at line 17, Mr. Wilson says he's

15    been out of town, been traveling.  Then, at line 20, Mr. Singer

16    says, "ok, cool.  So the girls".  And then at line 22, "were

17    great".

18          How many daughters does Mr. Wilson have?

19    A.    Mr. Wilson has two daughters.

20    Q.    What are their names?

21    A.    Mamie and Courtney.

22    Q.    And then, at line 23, Mr. Wilson says, "I still didn't get

23    a full debrief from them, but talked to Leslie".  Who is

24    Leslie?

25    A.    Mr. Wilson's wife.
```

```
 1   Q.   Okay.  If we can pick up on page 2 where we left off.
 2        (Audio recording played.)
 3   Q.   Special Agent, I'd like to direct you back to page 4 of
 4   the transcript.  At line 14 on page 4, Mr. Wilson says, "And
 5   what were the schools in that, if you did the side door?  And
 6   I'm interested about the side door and that stuff".
 7        Do you see that?
 8   A.   Yes.
 9   Q.   Who was the first person on this phone call to mention the
10   side door?
11   A.   Mr. Wilson.
12   Q.   And Mr. Singer goes on to say, at line 24, "because all of
13   the coaches have... you know, they have guaranteed spots".  And
14   at line 4, "potentially there's a sailing option, potentially
15   there's a crew option.  I mean, I don't know how good of
16   athletes they are."  And then at line 13, he says -- I'm sorry.
17   At line 12, Mr. Wilson responds, "What if they're not really
18   that good?  I mean, they can do some crew, but I don't know
19   they're gonna be good.  Courtney's not even that good
20   competitively at sailing.  She just taught sailing and did
21   sailing in, you know" -- and then at line 18, "yacht club".
22        Who again is Courtney?
23   A.   Courtney is Mr. Wilson's daughter.
24   Q.   And then Mr. Singer responds, "but at the end of the day,
25   by the side door, I may be able to go to the sailing coach and
```

02:30  10
02:31  20

```
 1    say, 'hey, this family's willing to make the contributions.

 2    She could be on your team.  She is a sailor.  She may not be up

 3    to the level you are, but she can come -- you know, you're

 4    gonna get a benefit, and the family's gonna get benefit.  So

 5    are you -- are you interested in doing that?'"

 6           And how does Mr. Wilson respond at line 3?

 7    A.   "Yeah.  Okay".

 8    Q.   And back on page 5, Mr. Singer, at line 20, mentions going

 9    to the sailing coach.  And prior to this call, had you been

10    investigating any sailing coaches?

11    A.   Yes.

12           MR. KENDALL:  Objection, your Honor.

13           THE COURT:  Grounds?

14           MR. KENDALL:  This is Mr. Singer's words.  Whatever

15    they've been doing separately is not a part of Mr. Singer's

16    conversation.

17           MR. FRANK:  It's relevant to the investigation, your

18    Honor.

19           MR. KENDALL:  It's not relevant to my client's

20    conversation.

21           THE COURT:  Overruled.  He can have that question.

22    Q.   Prior to this conversation had you been investigating any

23    sailing coaches?

24    A.   Yes.

25    Q.   Who?
```

02:31 appears at line 10
02:32 appears at line 20

```
 1    A.    John Vandemoer, the Stanford sailing coach.
 2    Q.    Okay.  And Mr. Wilson says, at line 14, "I remember the
 3    last time I did this, you didn't really make any money on
 4    this -- the side -- on this -- on the side, this stuff.  You
 5    just charge and then you make a donation to the school, and
 6    that's it"?
 7    A.    I'm sorry.  What page are you on?
 8    Q.    I'm sorry.  It's page 6, line 14.
 9          THE COURT:  We haven't heard this, right?
10          MR. FRANK:  Oh.  I apologize, Judge.  I got ahead of
11    myself.
12          If we can continue where we left off.
13          (Audio recording played.)
14          MR. FRANK:  Let's stop it right there, please.
15    Q.    All right.  Going back to page 6, at line 14, Mr. Wilson
16    says -- Special Agent, are you with me, page 6, line 14?
17    A.    Yes.  I see that.
18    Q.    Mr. Wilson says, "I remember last time I did this, you
19    didn't really make any money on this, on the side, this stuff.
20    You just charge, and then you make a donation to the school and
21    that's it".
22          Who's the first person on this call to mention "the
23    last time"?
24    A.    Mr. Wilson.
25    Q.    And was it true that when Mr. Wilson previously engaged in
```

02:32 (line 10)
02:35 (line 20)

A2045

```
 1   the side door with Mr. Singer that Mr. Singer didn't make any
 2   money on this?
 3   A.   That is not true.
 4   Q.   What happened in that instance?
 5   A.   Mr. Singer kept some of the money for himself.
 6   Q.   And then, at line 20, Mr. Singer says, "when, you know, we
 7   did Johnny, that was essentially now the money goes into my
 8   foundation as a donation".
 9            What is the name of Mr. Wilson's son?
10   A.   Johnny Wilson.
11   Q.   Okay.  And then, if we look at page 7 at line 6,
12   Mr. Singer says, "And then what I can -- what I'll do is I'll
13   split the money potentially to the coach or other parties that
14   are at that school that need the money, right".  And then at
15   line 11, "so -- or it may go right to the coach that's helping
16   us.  It just depends on the school".
17            And how does Mr. Wilson respond to that at line 13?
18   A.   "Right".
19   Q.   And then Mr. Wilson continues, "okay, so you don't
20   actually get credit for a donation to the school, or get
21   hounded for that.  You get a".  And at line 17, "your donation
22   to you, or your foundation, The Key or whatever ".
23            And then how does Mr. Singer respond?
24   A.   "Right, and you get your write-off, and then you do your
25   thing".
```

```
 1   Q.   And what is a write-off, Special Agent?

 2   A.   A tax deduction.

 3   Q.   And how does Mr. Wilson respond at line 22?

 4   A.   "Ok".

 5            MR. FRANK:  Can we pick up at page 8 at

 6   approximately -- where we left off, at approximately line 20.

 7            (Audio recording played.)

 8            MR. FRANK:  Let's stop there.

 9   Q.   And Special Agent, if we can turn back to page 8,

02:42 10   Mr. Wilson says, at line 20, on page 8, "I have this close

11   friend of mine here who works at McKinsey with me, and he's

12   very well off.  He's the head of one of these big areas in

13   McKinsey for a lot of years".

14            What is McKinsey?

15   A.   McKinsey is a consulting company.

16   Q.   And if we turn to page 10 -- I'm sorry.  The bottom of

17   page 9, Mr. Singer says, "what I would" -- at line 18, "What I

18   would suggest is that he calls up her office, they have a

19   scheduling person for the president -- and he sets up a meeting

02:42 20   for he and his daughter to go meet, and she kinda meets with

21   them, and then she'll give an indication and he'll get an idea

22   of what it's gonna need -- what's going to need to be done to

23   have her go to Brown.  That's".  And then Mr. Wilson interrupts

24   and says, "the front door," and then at line 4, "like, like,

25   $10 million kind of thing".
```

1      Had Mr. Wilson use the term "front door" in this

2  conversation?

3  A.   No.

4  Q.   And then, at line 15, Mr. Wilson says "He wanted to do it,

5  so the other thing that he had a concern was he wanted to do it

6  in a way his daughter wouldn't know.  His daughter's already

7  said, 'dad, don't help me with this, don't help me with that'.

8  She's very kind of".  And then Mr. Singer interrupts at line 20

9  with "well, then that's a different path, and then -- then I

02:43 10  may have to get involved in that".

11      And how does Mr. Wilson respond?

12  A.   "Right".

13  Q.   And then at page 11, line 11, Mr. Singer says, "because

14  them going to meet the president isn't -- doesn't mean that

15  she's gonna help him, but that's a good starting point".

16      And how does Mr. Wilson respond at line 14?

17  A.   "Mm-hum".

18  Q.   We can pick up at page 15 where we left off, approximately

19  line 8.

02:45 20      (Audio recording played.)

21  Q.   Special Agent, if I could direct your attention back to

22  page 14.  Page 14, line 18, Mr. Wilson says, in the middle of

23  the line, "They would love to go to Stanford or Harvard".  And

24  then if you turn to page 15, Mr. Wilson says, at line 20, "so

25  those are the two that are on the top.  It's, it's the strategy

|  |  |
|---|---|
| 1 | to kind of get into those two". And then he says, "is Harvard |
| 2 | easier cause I'm a", at line 24, "legacy". |
| 3 | What does the term "legacy" refer to? |
| 4 | A. Alumni. |
| 5 | Q. And then at page 16 at line 15, Mr. Singer says "like |
| 6 | what's your -- like how much do you give to Harvard". How does |
| 7 | Mr. Wilson respond? |
| 8 | A. "Nothing. Like a couple hundred grand over the years". |
| 9 | Q. What does a couple hundred grand refer to? |
| 02:48 10 | A. A couple hundred thousand dollars. |
| 11 | Q. And then at page 17, line 22, Mr. Singer says, "No, she -- |
| 12 | they -- they may end up getting in without even a donation, |
| 13 | but, but you'll know at least this route, we got an", and |
| 14 | Mr. Wilson interrupts." You see that? |
| 15 | A. Yes. |
| 16 | Q. And what does he say at page 18, line 1? |
| 17 | A. "They gotta get erg scores". |
| 18 | Q. And what does he say at line 3? |
| 19 | A. "First, though, right?" |
| 02:48 20 | Q. And then Mr. Singer interrupts and says, "We got the side |
| 21 | door route, too". At line 4. "Yeah, yeah." |
| 22 | And then how does Mr. Wilson respond at line 5? |
| 23 | A. "But they're not really playing crew much. They're not |
| 24 | doing crew, rowing crew". |
| 25 | Q. At line 23 on that page, Mr. Singer says, "I'm gonna be |

| | |
|---|---|
| 1 | spending some time in Boston, because I'm gonna be reading in |
| 2 | Harvard this year, so I'll be able to get together with you". |
| 3 | Do you see that? |
| 4 | A.   Yes. |
| 5 | Q.   Was it true Mr. Singer was going to be reading at Harvard? |
| 6 | A.   No.  It was not true. |
| 7 | Q.   Was it true that he was going to be spending some time in |
| 8 | Boston? |
| 9 | A.   Yes. |
| 02:49 10 | Q.   Why? |
| 11 | A.   Meeting with agents and making phone calls. |
| 12 | Q.   This call was on September 29, 2018? |
| 13 | A.   Yes. |
| 14 | Q.   Moving ahead a few days, did there come a time in early |
| 15 | October when you met with Mr. Singer again in Boston? |
| 16 | A.   Yes. |
| 17 | Q.   When was that? |
| 18 | A.   October -- I'm sorry. |
| 19 | Q.   Was it in the first few days of October? |
| 02:49 20 | A.   Yeah, the first week of October. |
| 21 | Q.   And on that occasion, did there come a time when |
| 22 | Mr. Singer gave you his cell phone? |
| 23 | A.   Yes. |
| 24 | Q.   Why? |
| 25 | A.   To image his phone. |

|  |  |
|---|---|
| 1 | Q.   What does it mean to image somebody's phone? |
| 2 | A.   To make a copy of someone's telephone. |
| 3 | Q.   And is that what happened? |
| 4 | A.   Yes. |
| 5 | Q.   Was that the only time agents imaged Mr. Singer's phone? |
| 6 | A.   No. |
| 7 | Q.   Between October 2018 and March of 2019 how many times did |
| 8 | agents image Mr. Singer's phone? |
| 9 | A.   Eight times. |
| 02:50 10 | Q.   And after imaging the phone the first time on October 5, |
| 11 | what did you do with the image? |
| 12 | A.   Made a copy of the image on a DVD and gave it to the |
| 13 | AUSAs. |
| 14 | Q.   And what was your understanding of what they were doing |
| 15 | with it? |
| 16 | A.   My understanding was they were going to review the images. |
| 17 | Q.   And did there come a time when you were contacted about |
| 18 | what was on the phone? |
| 19 | A.   Yes. |
| 02:50 20 | Q.   When was that? |
| 21 | A.   October 28. |
| 22 | Q.   And what happened on October 28? |
| 23 | A.   I received an e-mail from an AUSA stating that Mr. Singer |
| 24 | wrote notes on his phone. |
| 25 | Q.   Wrote what on his phone? |

**A2051**

```
 1   A.    Notes on his phone.

 2   Q.    And did you see any of those notes?

 3   A.    I saw a portion of those notes.

 4         MR. FRANK:  I want to show now, the agent only,

 5   Exhibit 13.

 6   Q.    Special Agent, do you recognize Exhibit 13?

 7   A.    Yes.

 8   Q.    What is it?

 9   A.    The notes from Mr. Singer's phone.

02:51 10   Q.    And I'll note that this is a very large exhibit, several

11   hundred pages.  Are there multiple copies of the notes from

12   different extractions?

13   A.    Yes.

14         MR. FRANK:  Okay.  And I want to direct --

15         The government offers Exhibit 13.

16         MR. KENDALL:  Your Honor, objection.  I don't object

17   to the first few pages, but it's about, I don't know how to

18   estimate it, maybe four or 500 pages.  Most of that is not --

19   he's out of the conspiracy at this point, so there's no

02:51 20   coconspiracy --

21         MR. FRANK:  I object to the speaking objection.

22         MR. KENDALL:  Okay.  Your Honor, I object.  I don't

23   think it's a *Petriezzello* issue at this point.  I think that

24   issue has passed.  I'm happy to work with Mr. Frank for the few

25   things that are relevant to my client, but the hundreds of
```

```
 1    pages that are not --

 2         MR. FRANK:  We have no objection to that, your Honor.

 3    I'm happy to work with Mr. Kendall on that.

 4         THE COURT:  All right.  That's fine.  Thank you.

 5    Q.   If we look at the first page of Exhibit 13, if we can zoom

 6    in on the note there at the top, do you see that this was

 7    created on October 1, 2018?

 8    A.   Yes, I see that.

 9    Q.   And then it says, "modified on October 4, 2018"?

10    A.   Yes.  I see that.

11    Q.   At the top of the note, it says "September 29"?  Do you

12    see that?

13    A.   Yes.  I see that.

14    Q.   And it says, "Summary: Call with John Wilson about the

15    side door plus intro to his friend about helping at Brown for

16    2019"?

17    A.   I see that, yes.

18    Q.   And it says that again just below in the body of the note?

19    A.   Yes.

20    Q.   Do you know what that refers to?

21    A.   The call we just heard between Mr. Wilson and Mr. Singer.

22    Q.   And then it says, under October 1, "called Laura -- update

23    on weekend text and call with John Wilson on side door".

24         Who's Laura?

25    A.   Special Agent Laura Smith.
```

         1    Q.   And then it says, "Called Michelle Janavs, confirmed

         2    Isabel going through SUBCO and 50K payment made once she gets

         3    her initial letter of acceptance and the rest of the process".

         4         Who is Michelle Janavs?

         5    A.   She's a parent.

         6    Q.   Okay.  And then I want to jump down to where it says

         7    October 2nd.  And it says, "loud and abrasive call with agents.

         8    They continue to ask me to tell a fib and not restate what I

         9    told my clients as to where the" -- I believe that should be

02:53   10    their money -- "was going -- to the program not the coach and

        11    that it was a donation and they want it to be a payment.

        12         "I asked for a script if they want me to ask

        13    questions and retrieve responses that are not accurate to the

        14    way I should be asking the questions.  Essentially they are

        15    asking me to bend the truth which is what they asked me not to

        16    do when working with the agents and Eric Rosen.

        17         "Liz raised her voice to me like she did in the hotel

        18    room about agreeing with her that everyone bribed the schools.

        19    This time about asking each person to agree to a lie I was

02:54   20    telling them".

        21         I'm going to ask you a series of questions about

        22    this, Special Agent.  First of all, there's a reference to

        23    someone named Eric Rosen.  Who is that?

        24    A.   Is it --

        25    Q.   Oh.  I'm sorry.  I did not realize this was not up on the

```
 1    juror's screen.  This should be up on the juror's screen.

 2              MR. FRANK:  It's in evidence, correct?

 3              THE COURT:  It was admitted.

 4              MR. KELLY:  I would ask him to re-read it so the jury

 5    can see it.

 6              MR. FRANK:  I'm happy to re-read it, your Honor.

 7    Q.    Okay.  So you testified it says, "call with John Wilson

 8    about the side door plus intro to his friend about helping at

 9    Brown for 2019"?

02:54 10    A.    Yes.  I see that.

11    Q.    And again, who does that -- what does that refer to?

12    A.    The call with Mr. Wilson.

13    Q.    And then, under October 1, it says "called Laura -- update

14    on weekend text and call with John Wilson on the side door".

15    Who is Laura?

16    A.    Special Agent Laura Smith.

17    Q.    And then it says, "called Michelle Janavs confirmed Isabel

18    going through SUBCO and 50K payment made once she gets her

19    initial letter of acceptance and the rest of the process".

02:55 20              Who is Michelle Janavs?

21    A.    She is a parent.

22    Q.    And then I want to jump down to October 2nd.  It says,

23    "loud and abrasive call with agents.  They continue to ask me

24    to tell a fib and not restate what I told my clients as to

25    where their money was going -- to the program not the coach and
```

1    that it was a donation and they want it to be a payment.

2         "I asked for a script if they want me to ask

3    questions and retrieve responses that are not accurate to the

4    way I should be asking the questions.  Essentially they are

5    asking me to bend the truth which is what they asked me not to

6    do wither working with the agents and Eric Rosen.

7         "Liz raised her voice to me like she did in the hotel

8    room about agreeing with her that everyone bribed the schools.

9    This time about asking each person to agree to a lie I was

02:56 10   telling them".

11        First of all, who is Eric Rosen?

12   A.   He was an AUSA assigned to the case.

13   Q.   And there's a reference to Liz.  Do you know who that

14   refers to?

15   A.   It's referring to me.

16   Q.   And just starting at the top under October 2nd, it says

17   "loud and abrasive call with the agents".  Do you recall having

18   a loud and abrasive call with Mr. Singer on October 2, 2018?

19   A.   No, I do not.

02:56 20   Q.   Do you recall ever having a loud and abrasive call with

21   Mr. Singer?

22   A.   No, I do not.

23   Q.   And do you typically get loud and abrasive?

24        MR. KENDALL:  Objection, your Honor.

25        THE COURT:  Overruled.

**A2056**

```
 1    A.    No, I do not.
 2    Q.    Did you document your calls or did you or your fellow
 3    agents document your calls with Mr. Singer during this time
 4    frame?
 5    A.    Yes.  Special Agent Katie Cedrone documented, periodically
 6    documented, communications we had with Mr. Singer.
 7    Q.    And when you say "periodically documented communications
 8    with Mr. Singer", what do you mean by that?
 9    A.    We didn't -- she didn't document every single call we had
10    with Mr. Singer, but in every few weeks she documented that we
11    had communications with Mr. Singer.
12    Q.    If Mr. Singer made substantive communications to you, if
13    he told you about things that had happened that were --
14          MR. KELLY:  Objection to leading.
15          THE COURT:  Sustained to that extent.
16    Q.    What, if at all, did you do when Mr. Singer told you
17    something substantive?
18    A.    When we had communications that had substance, we
19    documented that in the report.
20    Q.    What about when you told him operational things or he told
21    you operational things he had done, like make a phone call?
22    A.    Specific operational things we did not document for each
23    call, but we summarized it periodically.
24    Q.    And were -- to what extent were his calls on the phone
25    recorded on the phone that he was using?
```

```
 1   A.   All the calls that Mr. Singer made on his phone were
 2   recorded.
 3   Q.   It says, "Liz raised her voice to me like she did in the
 4   hotel room about agreeing with her that everyone bribed the
 5   schools.  This time about asking each person to agree to a lie
 6   I was telling them".
 7          Do you recall meeting with Mr. Singer in a hotel
 8   room?
 9   A.   Yes, I do.
10   Q.   When was that?
11   A.   Met with Singer, Mr. Singer, the first day when we
12   approached him and then periodically that weekend.
13   Q.   And do you recall raising your voice at him on those
14   occasions?
15   A.   No.  I did not raise my voice.
16   Q.   I'm sorry?
17   A.   No.  I did not raise my voice to Mr. Singer.
18   Q.   What did you do?
19   A.   I explained to Mr. Singer what a donation was.
20          MR. KENDALL:  Objection, your Honor.  It's hearsay.
21          THE COURT:  She can say what she said.
22          MR. KENDALL:  What she tells Singer is not relevant.
23   It's just hearsay.
24          THE COURT:  It's not hearsay.  She can say what she
25   said to him.  Overruled.
```

A.   I explained to Mr. Singer that a donation is a gift and

you don't get anything else in return for it, and I also

explained to Mr. Singer that a payment in exchange for someone

being recruited as a fake athlete is not a donation.

Q.   Do you recall if you used the word "bribe"?

A.   I don't recall if I used the word "bribe".

Q.   You might have?

A.   I may have, yes.

      MR. KELLY:  Object to the leading.  She said she

didn't recall.  She said she may have.

      THE COURT:  Overruled from that point, but don't lead

the witness.

      MR. FRANK:  Yes, your Honor.

Q.   He says, under October 2nd, "after loud and abrasive call

with agents, they continue to ask me to tell a fib and not

restate what I told my clients as to where their money was

going -- to the program not the coach and that it was a

donation and they want it to be a payment".

      Did you instruct Mr. Singer to tell a fib?

A.   No, I did not.

Q.   What did you instruct him?

A.   I instructed Mr. Singer to tell the parents that it would

be a payment to a coach in exchange for their child to be

recruited as a false athlete.

Q.   Did you tell him not to use the words "donation" or

```
 1    "program"?
 2    A.    Yes.  We told Mr. Singer to use the "payment to a coach,"
 3    not "donation to a program."
 4    Q.   What was your understanding of what he had previously said
 5    to parents before he had been approached?
 6              MR. KELLY:  Objection.
 7              THE COURT:  Overruled.
 8    A.    Mr. Singer's general pitch was that it was a donation to a
 9    program.
10    Q.   Why did you tell him to use the word "payment" instead of
11    "donation"?
12    A.   We wanted to, as we were gathering evidence, make sure
13    that the parents understood that -- understood what was
14    happening with the side door and there would be no confusion if
15    they continued with the side door and they had the intent to do
16    so.
17    Q.   What were you -- what was the reason not to use the word
18    "donation"?
19    A.   We wanted to make sure that Mr. Singer was explicit so the
20    parents could not use that it was a donation as a cover story.
21    Q.    What about to the coach and not the program?
22    A.    Excuse me?
23    Q.    Why tell him to say to the coach and not the program?
24    A.    That -- because we want to make sure that the parents
25    could not use the excuse that it was going to -- that it was a
```

(03:00 at line 10, 03:01 at line 20)

**A2060**

1    legitimate donation, when it was a bribe.

2         MR. KELLY:  Object to her giving legal advice.

3         THE COURT:  Overruled.

4    Q.   At this time at the beginning of October, these notes are

5    from the first few days in October, who were the parents that

6    you were instructing Mr. Singer to call?

7    A.   At this period of time, it was parents that were in the

8    middle of the side-door scheme.

9    Q.   When you say in the middle of the side-door scheme, what

03:01 10   do you mean by that?

11         MR. KENDALL:  Objection, your Honor, to "scheme".  I

12   think she's supposed to be an objective witness.

13         THE COURT:  I didn't hear the first part of the

14   objection.

15         MR. KENDALL:  I object to her saying "side-door

16   scheme".  She can say a "side-door conversation".  Using

17   pejorative language is arguing to the jury, your Honor.

18         THE COURT:  She can use whatever she believes is

19   appropriate.  Your objection is overruled.

03:02 20   Q.   Which parents were you having him call?

21   A.   The parents that were in the middle of discussing the side

22   door with Mr. Singer.

23   Q.   And how did you determine which parents those were?

24   A.   From the wiretap.

25   Q.   It says, "Essentially they are asking me to bend the truth

**A2061**

```
 1  which is what they asked me not to do when working with the
 2  agents and Eric Rosen".
 3          Had you -- what, if anything, had you said to
 4  Mr. Singer in your prior meetings about bending the truth?
 5  A.   We told Mr. Singer not to lie.
 6  Q.   Did you tell him that once or more than once?
 7  A.   More than once.
 8  Q.   Below the highlighted section, it says, "Spoke to Scott
 9  Lawler which is a referral from Gordon Caplan.  They want to
10  nail Gordon at all costs".  Did you -- first of all, who is
11  Gordon Caplan?
12  A.   Gordon Caplan is a parent.
13  Q.   Okay.  And had Mr. Caplan been intercepted by this point
14  on the wiretap?
15  A.   Yes.
16  Q.   Okay.  And did you want to nail Gordon Caplan?
17  A.   I did not want to nail Gordon Caplan.
18  Q.   What did you want to do?
19  A.   Gather evidence and see if he would do the side-door
20  scheme or the SAT scheme.
21  Q.   Now, had Mr. Caplan called Mr. Singer prior to the
22  approach on September 21, 2018?
23  A.   Yes.
24  Q.   What about John Wilson?  Had he called Mr. Singer prior to
25  the approach on September 21?
```

```
  1   A.    Yes, he did.

  2   Q.    These notes, it says, "created on October 1, 2018," and

  3   "modified on October 4, 2018."  How long was this after the

  4   approach of Mr. Singer?

  5   A.    10 days.

  6   Q.    What was Mr. Singer's demeanor at this time in your

  7   interactions with him?

  8   A.    Mr. Singer was minimizing his conduct.  He wasn't fully

  9   accepting responsibility.

 10         MR. KENDALL:  Objection, your Honor.  She's

 11   characterizing as opposed to saying what happened.

 12         THE COURT:  Sustained.

 13         MR. KENDALL:  And move to strike that bit of the

 14   answer, your Honor.

 15   Q.    What was his demeanor, Special Agent?  I'm sorry.  Yes.

 16   What was his demeanor?

 17   A.    He was not following direction.

 18   Q.    Other than what we see in the notes, how else was he not

 19   following directions?

 20   A.    There was a few ways, including getting an unauthorized

 21   telephone, deleting text messages, and telling parents about

 22   the investigation.

 23   Q.    When you say getting an unauthorized telephone, what do

 24   you mean by that?

 25   A.    Mr. Singer purchased a phone that agents didn't know
```

```
 1    about.
 2    Q.   When you say, "Telling parents about the investigation,"
 3    what do you mean by that?
 4    A.   Mr. Singer told six people, most of whom were parents,
 5    that the FBI was monitoring his telephone.
 6    Q.   Were either of the defendants in this room among those
 7    six?
 8    A.   No.
 9    Q.   You mentioned deleting text messages.  Had you instructed
10    Mr. Singer not to delete text messages?
11    A.   Yes.
12    Q.   And you learned that he had?
13    A.   Yes.
14    Q.   Did you attempt to determine whether he -- and when did
15    you determine that?
16    A.   Approximately February 2020.
17    Q.   Okay.  So that was sometime after he gave you the phones?
18    A.   Yes.
19    Q.   Did you attempt to determine whether he deleted text
20    messages with either of these defendants after the time he
21    began taking direction from agents in late September?
22    A.   I determined that he did not delete text message -- well,
23    I determined -- what I looked at, he did not delete text
24    messages at that point.
25    Q.   And what did you look at to make that determination?
```

```
 1    A.    I went through Mr. Singer's image between the period of
 2    10/5/2018 to March 11, 2019.  And on the phone images, there's
 3    a column that says "deleted".  And if it said "yes", I looked
 4    at the number to determine who the contact was, the name of the
 5    contact.
 6    Q.    And when you did that, what did you see with respect to
 7    these two defendants?
 8    A.    I did not see their names on the deleted text messages.
 9    Q.    Did you determine -- at some point did you learn that he
10    had deleted text messages with either of these defendants from
11    the period before he was approached by federal agents?
12    A.    Yes.
13    Q.    What did you determine?
14    A.    I determined that he deleted text messages with
15    Mr. Abdelaziz in -- the text message was dated June 2017.
16    Q.    And do you know when he deleted those messages with
17    Mr. Abdelaziz?
18    A.    I do not.
19    Q.    Did there subsequently come a time when you learned more
20    recently that he had, in fact, deleted text messages with
21    Mr. Wilson during the period that he was taking directions from
22    federal agents?
23    A.    Yes.
24    Q.    How did you make that determination?
25    A.    While I was preparing for trial I was reviewing the phone
```

1    images and I saw -- I looked at the last phone image on -- at

2    the iMessages and compared them to the other images that we

3    took and there were iMessages that were missing.

4    Q.   So just so I understand, you compared messages that were

5    on a later extraction of the phone with messages that were on

6    earlier extractions?

7    A.   Yes.

8    Q.   And what did you see?

9    A.   There were some missing.  There were text messages in

03:07 10    certain extractions that were not on the last extraction.

11    Q.   So there were messages that were preserved on earlier

12    extractions that didn't show up on later extractions?

13    A.   Yes.

14    Q.   Had you done that analysis initially?

15    A.   No.

16    Q.   At the time of these notes in early October 2018, had

17    Mr. Singer had any -- made any consensually recorded calls to

18    Mr. Abdelaziz at the direction of law enforcement?

19    A.   No.

03:08 20    Q.   Other than the calls we've just listened to on

21    September 3rd -- I'm sorry -- September 23rd and

22    September 29th, had he had any consensually recorded calls with

23    Mr. Wilson?

24    A.   No.

25    Q.   Do you know if there are other references in these notes

```
 1  to Mr. Wilson?

 2  A.    Yes.

 3              MR. FRANK:  Could we show the witness page -- and the

 4  jury, page 218, please.

 5              MR. KENDALL:  Page 218?

 6              MR. FRANK:  Page 218 is the document.  It's got the

 7  Bates number Singer phone 712 at the bottom and it's also got

 8  the number 4950 on it.

 9              And Miss Lewis, if you can go to the top of the page.

10  Thank you.  And if you could highlight in the middle of that

11  box the reference to John Wilson.

12              MR. KENDALL:  Excuse me.  Can you tell me from the

13  Singer phone bates number?

14              MR. FRANK:  Yes.  The bates number on this exhibit are

15  4950.  It's also Singer phone 712 and it's also on the screen

16  in front of you.

17  Q.    Can you read what is highlighted in yellow, Special Agent.

18  A.    "John Wilson 20 thousand nothing to do with USC plus dona

19  to USC program for real polo player".

20  Q.    Does that say "plus donation"?  Is there a T missing

21  there?

22  A.    Oh, yes.  "Plus donation".

23  Q.    And what is the date of this note?

24  A.    January 30, 2019.

25  Q.    And how much had Mr. Wilson paid to Mr. Singer for the
```

```
 1   side door with Johnny Wilson?

 2   A.    Total 220,000.

 3   Q.    And of that 220,000, who did 20,000 go to?

 4   A.    20,000 went directly to Mr. Singer.

 5   Q.    And it says, "nothing to do with USC plus donation to USC

 6   program for real polo player".  Was Johnny Wilson, to your

 7   knowledge, a real polo player?

 8   A.    Yes, he was.

 9   Q.    Did there come a time when there was another consensually

10   recorded call after these notes were taken between Mr. Singer

11   and Mr. Wilson?

12   A.    Yes.

13   Q.    Could you take a look at Exhibit 578 on the table in front

14   of you.  And if you could turn to the transcript for call 578.

15         Special Agent, do you see your initials on the disk

16   marked 578?

17   A.    Yes, I do.

18   Q.    What is Exhibit 578?

19   A.    It's a recording of a call between Mr. Wilson and

20   Mr. Singer.

21   Q.    And if you look at the transcript in your binder, do you

22   see your initials on that transcript?

23   A.    Yes.

24   Q.    Is that a fair and accurate transcription of the call

25   between Mr. Singer and Mr. Wilson, that is Exhibit 578?
```

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And what is the date of the call? |
| 3 | A.   October 15, 2018. |
| 4 | Q.   How long is that after the notes we just read on |
| 5 | October 4th? |
| 6 | A.   Approximately 15 days. |
| 7 | MR. FRANK:  Okay.  And the government offers 578. |
| 8 | THE COURT:  It will be admitted. |
| 9 | (Exhibit 578 admitted into evidence.) |

03:11 10    Q.   Who called who?

11    A.   Mr. Wilson called Mr. Singer.

12         MR. FRANK:  Okay.  Can we begin at the beginning?

13         (Audio recording played.)

14         MR. FRANK:  We could stop it right there, Ms. Lewis.

15    Q.   Special Agent, who placed this phone call to whom?

16    A.   Mr. Wilson to Mr. Singer.

17    Q.   Mr. Wilson called Mr. Singer?

18    A.   Yes.

19    Q.   And if I could direct your attention to page 2, Mr. Wilson

03:16 20  says at the very top, line 1, in the middle of the line "So,

21    hey, there were a couple topics.  One was, you know, my

22    daughters, and I'm making some donations now, whatever -- how

23    that can work".

24         Who is the first person on this call to mention money

25    in connection with admission?

```
 1   A.    Mr. Wilson.

 2   Q.    And then at the bottom of that page -- well, actually, at

 3   line 15, Mr. Singer says, "so like I have opportunity with

 4   Stanford in sailing and I can do other Stanford sports

 5   potentially too.  And we have Yale and we have Harvard".

 6         And then, at the bottom of the page, line 24.  He

 7   says, "Stanford sailing, got Yale soccer, Harvard".

 8         Who was the Yale soccer coach at this time?

 9   A.    Rudy Meredith.

10   Q.    And who was the Stanford sailing coach?

11   A.    John Vandemoer.

12   Q.    And if you could move ahead to page 4, at line 2, at the

13   end of the line -- well, at the beginning of the line,

14   Mr. Singer says, "we can, you know, always do women's lacrosse.

15   And again, you know, they don't have to play.  They just -- I

16   just -- that's the path I'm gonna get them in on".

17         And how does Mr. Wilson respond at line 5?

18   A.    "Gotcha".

19   Q.    Excuse me.  At line 7, Mr. Singer says sail -- in response

20   to the question "anything else?"  Mr. Singer says "sailing,

21   crew, sometimes tennis.  The key to her is that, if I were to

22   get a deposit, you know, like, half a million dollars in the

23   bank, then it's -- you know, we can figure out where they want

24   to go".

25         Why did Mr. Singer ask Mr. Wilson if he wanted to
```

03:16 at line 10
03:17 at line 20

```
 1   make a deposit?
 2           MR. KELLY:  Objection.
 3           THE COURT:  Sustained.
 4   Q.   What, if any, instructions did agents give Mr. Singer
 5   about asking Mr. Wilson for a deposit?
 6   A.   Agents instructed Mr. Singer to ask Mr. Wilson for a
 7   deposit.
 8   Q.   Why?
 9           MR. KENDALL:  Objection.  Your Honor, the thinking of
10   why is not relevant.
11           THE COURT:  Objection is sustained.
12           MR. KENDALL:  Thank you, your Honor.
13           MR. FRANK:  Your Honor, I believe it is relevant in
14   light of the defense.
15           THE COURT:  Well, you're asking her why the agents
16   instructed Mr. Singer?
17           MR. FRANK:  To offer --
18           THE COURT:  I'll let her have that question.
19   A.   To see if Mr. Wilson would make the down payment.
20   Q.   At page 5, line 15, Mr. Wilson says, "and they don't
21   actually have to do that sport, you're saying.  They could go
22   in and" -- at line 18, "be like the score keeper or" -- and at
23   line 20, "water boy, water girl".
24           And how does Mr. Singer respond at line 20?
25   A.   Line 21?
```

```
 1   Q.   I'm sorry.  Line 17.

 2   A.   "Correct".

 3   Q.   And what does he say at line 21?

 4   A.   "Manager or whatever you want to call 'em.  Yeah."

 5        MR. FRANK:  And then if we can pick up at line 22.

 6        (Audio recording played.)

 7        MR. FRANK:  Stop it right there, Miss Lewis.

 8   Q.   At page 6, Special Agent, line 12, Mr. Singer says, "and

 9   let's say we're doing two girls in one place.  Then they're

10   gonna say to me, we're gonna give up a spot for you.  Are you

11   are you guaranteeing me that's she's coming?  And is the family

12   guaranteeing me that they're gonna ante up and they're gonna

13   make a payment, because they don't want to give up a spot.  And

14   the earlier I do it, the better".

15        And how does Mr. Wilson respond at line 20?

16   A.   "Gotcha".

17   Q.   And at page 7, Mr. Wilson says, at line 22, "and same

18   kinda deal, any sport?  You don't have to really play the

19   sport?"

20        And what does Mr. Singer respond?

21   A.   "That's correct."

22   Q.   And then at line 11, Mr. Singer says, "with your girls,

23   because they're athletic and they're big and all of that, I can

24   sell to anybody that they're athletic enough to be able to take

25   'em and there'll be no question".
```

```
  1              And how does Mr. Wilson respond at line 15?

  2     A.    "Yeah".

  3     Q.    And then what does he say at line 18?

  4     A.    "Even though they wouldn't play.  Ok".

  5              MR. FRANK:  Can we pick it up at line 20, please.

  6              (Audio recording played.)

  7     Q.    Special Agent, if I could direct your attention to page 9.

  8     At page 9, line 15, Mr. Wilson says, "Now, um, uh, how does

  9     that actually work?  What if they don't actually get in?"

03:28 10     Mr. Singer says, "oh, no, no, no.  You don't have to worry

 11     about it.  They're -- it's a done deal.  And I'll know

 12     beforehand if it's gonna be done or not".

 13              And how does Mr. Wilson respond?

 14     A.    "M-hum".

 15     Q.    Special Agent, did there come a time after this call that

 16     Mr. Wilson sent $500,000 to the Key Worldwide Foundation?

 17     A.    Yes.

 18              MR. FRANK:  If we could show the witness only

 19     Exhibit 581.

03:28 20     Q.    Do you recognize this document?

 21     A.    Yes.

 22     Q.    What is it?

 23     A.    It is an e-mail between Mr. Wilson and Debbie Rogers.

 24              MR. FRANK:  Government offers 581.

 25              THE COURT:  It will be admitted.
```

A2073

```
  1              (Exhibit 581 admitted into evidence.)

  2   Q.   An if we look at the bottom of the exhibit, first e-mail

  3   in the chain, Ms. Rogers, from the e-mail address

  4   debbie@Hyannisportcapital, writes "I just received a text with

  5   bank info for The Key Worldwide Foundation.  What is this for?"

  6              And if you could look at Mr. Wilson's response, he

  7   writes, "It's a 500,000 donation I am going to make this year,

  8   tax writeoff, and help getting into colleges".

  9              And Ms. Rogers responds, "Okay, so I'm assuming you

 10   will let me know when this is to be wired, so I'll wait for

 11   further direction".

 12              And how does Mr. Wilson respond?

 13   A.   "Yes".

 14   Q.   And how many days is October 17th after the October 15th

 15   call?

 16   A.   Two days.

 17              MR. FRANK:  And if we could show the witness only

 18   Exhibit 582.

 19              MR. KELLY:  I'm sorry.  What number?

 20              MR. FRANK:  582.

 21   Q.   Do you recognize this document?

 22   A.   Yes.

 23   Q.   What is it?

 24   A.   It is an e-mail from Mr. Wilson to Debbie Rogers and cc'd

 25   burlingame@firstrepublic.com.
```

```
 1                  MR. FRANK:  Government offers 582.

 2                  THE COURT:  It will be admitted.

 3                  (Exhibit 582 admitted into evidence.)

 4   Q.    And what is First Republic?

 5   A.    It is a bank.

 6   Q.    And Debbie Rogers writes at the bottom, "please wire

 7   $500,000 from Hyannis Port Capital Inc.'s account ending 2343

 8   to The Key Worldwide Foundation Bank of America".  Do you see

 9   that?

03:30 10   A.    Yes, I see that.

11   Q.    And what does she write under reason?

12   A.    "Donation".

13   Q.    And how does Mr. Wilson respond?

14   A.    "Yes.  Thanks".

15                  MR. FRANK:  Your Honor, this might be a good point.

16                  THE COURT:  Yes.  We have to break here.

17                  You can step down, Ms. Keating, for the time being.

18   We will be in recess tomorrow.  We will be back here Thursday

19   morning at 9:00 a.m.  Have a pleasant day off.

03:31 20                  Please honor my instructions on not doing any

21   independent research and talking to anybody about this case,

22   over this little hiatus in this case.  It's very important that

23   you not do that because you're going to decide this case solely

24   on the basis of the evidence that comes into this courtroom and

25   not under anything else.  See you day after tomorrow, that is
```

```
 1    Thursday, the 23rd of September at 9:00 a.m.  Have a pleasant

 2    day.

 3              THE CLERK:  All rise for the jury.

 4              (Jury exits.)

 5              THE COURT:  Please be seated, counsel.  Again,

 6    Mr. Frank, approximately how much longer on direct?

 7              MR. FRANK:  I'd estimate an hour, maybe a bit longer.

 8              THE COURT:  Sorry?

 9              MR. FRANK:  An hour to an hour and 15 minutes, I would

03:32 10    estimate.

11              THE COURT:  All right.

12              And then defendants expect the cross-examination to

13    take the rest of Thursday?

14              MR. KENDALL:  It's hard to predict.  There might be

15    some time left over Thursday afternoon.  We don't know when

16    he's really finishing or what he's covering.

17              THE COURT:  All right.  And if we get through this

18    witness, the next witness will be?

19              MR. FRANK:  Laura Janke.

03:32 20              THE COURT:  Janke.  And she's a long witness on

21    direct?

22              MR. FRANK:  Her testimony -- well, it definitely

23    wouldn't be completed on Thursday.  It's not a terribly long

24    direct.

25              MR. KENDALL:  Could we have Friday's witnesses, your
```

```
 1   Honor?

 2              THE COURT:  Yes.  Friday's witnesses.

 3              MR. FRANK:  At this point, your Honor, it would be

 4   Special Agent Mark Deckett.

 5              THE COURT:  And who is he?

 6              MR. FRANK:  He's with the Department of Education.

 7              THE COURT:  How do you spell the last name?

 8              MR. FRANK:  D-e-c-k-e-t-t.  And we need to assess,

 9   your Honor.  I'm skeptical if we're going to get that far, but

10   we'll --

11              THE COURT:  And his direct would be how long?

12              MR. FRANK:  Brief, your Honor.  It's about 15,

13   20 minutes.

14              THE COURT:  And if we get beyond him, who would the

15   next be?

16              MR. FRANK:  We're trying to figure that out, your

17   Honor.  We did not expect to get there.

18              THE COURT:  Well, figure it out by 5 o'clock and let

19   opposing counsel know.

20              MR. FRANK:  Yes, your Honor.

21              MR. KENDALL:  Thank you, your Honor.

22              THE COURT:  Okay.  Anything else?

23              MR. SHARP:  Your Honor, we filed a motion this

24   morning.  There were about four exhibits marked for ID

25   yesterday.
```

```
 1            THE COURT:  About?

 2            MR. SHARP:  Four exhibits marked for ID yesterday.

 3    There was a hearsay objection and it was sustained, but we

 4    provided the Court with some law on these.  We would like to

 5    use them perhaps with Special Agent Keating.  So you know, I

 6    think these are fairly black letter issues without writing a

 7    memorandum.  If we could get a ruling on that prior to her

 8    testimony so that we would know whether we can use them with

 9    her.

03:34 10            THE COURT:  You'll get a --

11            Go ahead, Mr. Frank.

12            MR. FRANK:  Your Honor, we intend to respond.  We got

13    that at 7 o'clock this morning.  We didn't have a chance to

14    respond yet.  I would note that, with respect to Special Agent

15    Keating, it's beyond the scope of her direct.

16            THE COURT:  You respond by noon tomorrow.

17            MR. FRANK:  Yes, your Honor.

18            MR. SHARP:  Your Honor, these issues are fairly black

19    letter about somebody's intent of what they're going to do not

03:34 20    being hearsay.  It's not an assertion.  I'm going to file the

21    application is not an assertion.  That is hearsay.

22            THE COURT:  All right.  I will review the motion and

23    the opposition tomorrow and let you know before the end of the

24    day tomorrow.

25            MR. SHARP:  Thank you.
```

```
 1            MR. KENDALL:  Just to let you know what else is

 2    coming, your Honor, I believe the government filed -- I haven't

 3    read any of this, but I'm being told this.  I believe the

 4    government filed a brief yesterday in the confrontation clause

 5    issue.  If we may have until tomorrow 2 o'clock or so to get

 6    our response to you on that.

 7            THE COURT:  Noon.

 8            MR. KENDALL:  Noon it will be.  Thank you.

 9            THE COURT:  All right.  We're in recess until Thursday

03:35 10    morning at 9 a.m.

11            (Whereupon, the proceedings adjourned at 3:35 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X
 2    Witness                        Page
 3    REBECCA CHASSIN
 4    Cross-Examination by Mr. Sheketoff        5
 5    Cross-Examination by Mr. Kendall         48
 6    Redirect Examination by Mr. Frank       118
 7    Recross-Examination by Mr. Sheketoff    133
 8    Recross-Examination by Mr. Kendall      143
 9
10
11    ELIZABETH KEATING
12    Direct Examination by Mr. Frank         147
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    E X H I B I T S

 2    NO.                      ADMIT

 3    1567  ....................     25

 4    1566  ....................     25

 5    9038  ....................     43

 6    7950  ....................     72

 7    571   ....................    170

 8    578   ....................    197

 9    581   ....................    202

10    582   ....................    203

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS     )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9   the foregoing is a correct transcript from the record of

10   proceedings taken September 21, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley           September 21, 2021

15       /s/ Debra Joyce                 September 21, 2021

16       Kristin M. Kelley, RPR, CRR          Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

1

2                        UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
3

4
     UNITED STATES OF AMERICA,           )
5                        Plaintiff       )
                                         )
6    vs.                                 )  No. 1-19-CR-10080
                                         )
7    GAMAL ABDELAZIZ and JOHN            )
     WILSON,                             )
8                        Defendants.     )
                                         )
9                                        )

10

11
                   BEFORE THE HONORABLE NATHANIEL M. GORTON
12                      UNITED STATES DISTRICT JUDGE
                          JURY TRIAL - DAY 10
13

14
                 John Joseph Moakley United States Courthouse
15                         Courtroom No. 4
                          One Courthouse Way
16                     Boston, Massachusetts 02210

17

18                       September 23, 2021
                            9:08 a.m.
19

20

21
                      Kristin M. Kelley, RPR, CRR
22                    Kelly Mortellite, RMR, CRR
                        Official Court Reporter
23          John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
24                    Boston, Massachusetts 02210
                      E-mail: kmob929@gmail.com
25
                 Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

3

```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Jury enters.)
 3              THE CLERK:  You may be seated.  Court is now in
 4    session.
 5              THE COURT:  Welcome back, jurors.  We're ready to go
 6    back to work.
 7              Miss Keating, you're reminded you're under oath.
 8    Mr. Frank, you may continue with direct examination.
 9              MR. FRANK:  Thank you, your Honor.
09:09 10   BY MR. FRANK:
11    Q.   Good morning, Special Agent Keating.
12    A.   Good morning.
13    Q.   How are you?
14              MR. FRANK:  Miss Lewis, can we pick up with
15    Exhibit 582 in evidence, please.
16              THE COURT:  582?
17              MR. FRANK:  Yes, your Honor.
18              THE COURT:  Is it in the binder?
19              MR. FRANK:  I believe it is, your Honor.  It's not in
09:10 20   the transcript binder.  This was an exhibit that was the last
21    exhibit we had in evidence.  Are the monitors not -- thank you.
22    Q.   Special Agent Keating, you recall that this was the last
23    exhibit we looked at, the wire from Hyannis Port Capital from
24    the account ending in 2343 to the Key Worldwide Foundation in
25    the amount of $500,000?
```

```
 1    A.    Yes.

 2    Q.    And the reason that is given at the bottom of the exhibit

 3    for the wire?

 4    A.    "Donation."

 5    Q.    Okay.  And what is the date of this e-mail?

 6    A.    October 17, 2018.

 7    Q.    Okay.  And that was two days after the last phone call

 8    that we listened to on October 15?

 9    A.    Correct.

09:11 10   Q.    Okay.  If we could proceed to Exhibit 591, I believe

11    there's a disk on the desk in front of you labeled Exhibit 591.

12    Do you see that?

13    A.    Yes.

14    Q.    And do you see your initials on that disk?

15    A.    Yes, I do.

16    Q.    And what is Exhibit 591?

17    A.    It's a recording of a call between Mr. Wilson and

18    Mr. Singer.

19          MR. FRANK:  Okay.  And if everyone could turn to the

09:12 20   tab in their binders for 591.

21    Q.    Special Agent Keating, if you could turn to the tab in

22    your transcript binder for 591 and let me know when you're

23    there.

24    A.    Yes.

25    Q.    Is this a fair and accurate transcription of the
```

```
 1   recording?

 2   A.   Yes, it is.

 3   Q.   And are those your initials at the bottom?

 4   A.   Yes.

 5   Q.   And the date of this call?

 6   A.   October 27, 2018.

 7   Q.   Okay.  So that's about 10 days after that wire transfer?

 8   A.   Yes.

 9        MR. FRANK:  The government offers 591.

10        THE COURT:  It will be admitted.

11        (Exhibit 591 admitted into evidence.)

12   Q.   Special Agent, who called whom?

13   A.   Mr. Wilson called Mr. Singer.

14   Q.   And where was Mr. Singer on October 27, 2018?

15   A.   Mr. Singer was in Boston.

16        MR. FRANK:  Okay.  Could we start with the beginning

17   of the call.

18        (Audio recording played.)

19   Q.   Special Agent, I'd like to direct you to the bottom of

20   page 1 of the transcript.

21   A.   Okay.

22   Q.   At line 23, Mr. Singer says, "So I had a conversation with

23   the Stanford sailing coach and so I just gave the Stanford

24   sailing coach 160,000 for his program and while we were having

25   that conversation I said, 'Hey, I'm hoping that this 160 that
```

09:12 (line 10)

09:18 (line 20)

|   | |
|---|---|
| 1 | I'm helping you with helps secure a spot for next year.  Can I |
| 2 | be guaranteed a spot for next year?'  And said, um, 'yes.'" |
| 3 | And then Mr. Singer picks up, in sum and substance, |
| 4 | at line 14 and says, "So essentially if you're -- I wanted you |
| 5 | to have first dibs, like I told you.  So if you want I can |
| 6 | provide John Vandemoer, which I'm essentially -- I'm gonna |
| 7 | essential send John directly the check to the coach.  I can |
| 8 | send him your 500,000 that you wired into my account to secure |
| 9 | the spot for one of your girls." |
| 09:19 10 | Remind us again who is John Vandemoer? |
| 11 | A.   He is the Stanford sailing coach. |
| 12 | Q.   And Mr. Singer continues at line 20, "I asked him for a |
| 13 | second spot in sailing and he said he can't do that because he |
| 14 | has to actually recruit some real sailors so that Stanford |
| 15 | doesn't", and then at page 3 he continues, "catch on." |
| 16 | Do you see that? |
| 17 | A.   Yes. |
| 18 | Q.   And how does Mr. Wilson respond when Mr. Singer says, at |
| 19 | line 21, "he can't do that because he actually has to recruit |
| 09:20 20 | some real sailors?"  How does Mr. Wilson respond at line 24? |
| 21 | A.   "(Laughter)". |
| 22 | Q.   And then he continues, "So that Stanford doesn't catch |
| 23 | on."  And how does Mr. Wilson respond at page 3, line 2? |
| 24 | A.   "Right." |
| 25 | Q.   And then what does Mr. Wilson say at lines 4 and 6? |

```
 1   A.   "Yeah, no.  He's got to actually have some sailors.

 2   Yeah."

 3   Q.   And Mr. Singer says at line 3, "So", and then at line 5

 4   "Stanford", and then at line 7, "yeah.  So that Stanford

 5   doesn't catch on to what he's doing."

 6            And how does Mr. Wilson respond when Mr. Singer says

 7   that the sailor -- the sailing coach needs to recruit some real

 8   sailors so that Stanford doesn't catch on to what he's doing?

 9   A.   "Right."

10   Q.   And then at line 12, Mr. Singer says, "It doesn't matter

11   if it's one of the girls who's not a sailor.  I can still put

12   her as a sailor."  Who were the girls again?

13   A.   His daughters, Maime Wilson and Courtney Wilson.

14   Q.   And then Mr. Singer continues, "or obviously the one that

15   is, I'll mark that she's a sailor cause he is, but not at the

16   level in which she can sail at Stanford."

17            And how does Mr. Wilson respond to that at line 18?

18   A.   "Right, right."

19   Q.   You testified that Mr. Singer was in Boston at the time of

20   this call?

21   A.   Yes, he was.

22   Q.   Was there a subsequent consensual call between Mr. Singer

23   and Mr. Wilson?

24   A.   Yes.

25   Q.   If you could look at the disk on your desk marked 594 and
```

```
 1    tell me if you see your initials.

 2    A.   Yes, I do.

 3    Q.   And what is 594?

 4    A.   It's a recording of a call between Mr. Singer and

 5    Mr. Wilson.

 6    Q.   And if you could look at the tab in your transcript binder

 7    marked 594, what is the date of that call?

 8    A.   November 5, 2018.

 9         MR. FRANK:  The government offers 594.

09:22 10       THE COURT:  It will be admitted.

11         (Exhibit 594 admitted into evidence.)

12    Q.   And is this transcript a fair and accurate transcript of

13    the recording?

14    A.   Yes, it is.

15    Q.   And are those your initials at the bottom?

16    A.   Yes.

17    Q.   Okay.  There's some introductory conversation, small talk

18    I'd like to pick up at page 2, line 20.  I'm sorry, line 24.

19    We'll begin at page 2, line 24.  That's 1 minute and 20 seconds

09:22 20    into the recording.

21         (Audio recording played.)

22         MR. FRANK:  Just stop it right there briefly.

23    Q.   Special Agent, if you could turn to page 3 of the

24    transcript.  At page 3, line 12, Mr. Singer says, "So the

25    sailing spot that we have, that we'll pay the coach, he doesn't
```

```
 1    care if it's a sailor or not."
 2            Who's the "he" in that sentence?
 3            MR. KENDALL:  Objection, your Honor.  I don't think
 4    she's --
 5            MR. FRANK:  I'll withdraw the question, your Honor,
 6    and rephrase.
 7    Q.   Who was the sailing coach at Stanford?
 8    A.   John Vandemoer.
 9    Q.   Okay.  And how does Mr. Wilson respond when Mr. Singer
10    says, "The sailing spot that we have, that we'll pay the coach,
11    he doesn't care if it's a sailor or not"?
12    A.   "Okay."
13    Q.   And then Mr. Singer says, "He doesn't care one bit.
14    One bit."  Do you see that?
15    A.   Yes.
16    Q.   And then if we could turn again to page 6, Mr. Singer says
17    at line 12, "Because if -- here's my point to him.  Help me get
18    another spot at Stanford and then I can give the second coach
19    less and give you the million.  Cause I'd like to stay around 1
20    and a half million to 1.7 million overall at Stanford."
21            Mr. Wilson responds, "For 2 slots you're saying", and
22    Mr. Singer responds, "correct."
23            And can you tell us how Mr. Wilson responds beginning
24    at line 4?
25    A.   "Is it some other coach?  How does that work for him?
```

```
 1    Does he -- is he screwing his colleagues?  Or (laughter) I
 2    don't know how that works.  He gets the lion's share and
 3    someone else gets less?"
 4         MR. FRANK:  Okay.  If we can pick up at line 18,
 5    please.
 6         (Audio recording played.)
 7    Q.   Special Agent, if you could turn to page 10 of the
 8    transcript, Mr. Singer says at line 10, on page 10, "if you
 9    want a guarantee and you want the first slot, you gotta -- you
10    gotta decide early."  Do you see that?
11    A.   Yes.
12    Q.   And how does Mr. Wilson respond at line 12 when Mr. Singer
13    says if you want the guarantee, you gotta decide early?
14    A.   "Right."
15    Q.   If I can direct your attention to page 11, line 16,
16    Mr. Wilson says on page 11 at line 16, "I know.  But if they
17    say, 'Oh, I really want to go to Harvard,' then oh, shit, you
18    know, I put all this money into Stanford."
19         Mr. Singer responds, "I get you.  I gotcha."
20         Mr. Wilson says at line 20, "That would be my luck,
21    right?"
22         Mr. Singer says at line 21, "I gotcha."
23         And what does Mr. Wilson says at line 22?
24    A.   "All right.  But still a high class problem, right?"
25    Q.   And then if I could direct your attention to page 12.  At
```

09:32 (line 10)
09:33 (line 20)

```
  1   line 7, Mr. Singer says, "I mean, you weren't going to get into
  2   either one let's just say based on the numbers that it takes to
  3   get in" -- and then there's a garbled reference and he says, at
  4   line 11, "admissions rate and they don't even play the sports,
  5   right?"
  6          And how does Mr. Wilson respond at line 13?
  7   A.   "Yeah.  They had a two percent shot or whatever taking the
  8   test, or whatever it comes out at."
  9   Q.   Special Agent, was there a subsequent consensual call
 10   between Mr. Singer and Mr. Wilson later in November?
 11   A.   Yes.
 12   Q.   If you could look at the disk on your desk labeled 602.
 13   Do you recognize your initials on that disk?
 14   A.   Yes, I do.
 15   Q.   What is it?
 16   A.   It is a recording of a conversation between Mr. Singer and
 17   Mr. Wilson.
 18   Q.   And if you could look at the tab in your binder marked 602
 19   and tell us what the date of that recording is.
 20   A.   November 29, 2018.
 21   Q.   And have you reviewed this transcript?
 22   A.   Yes, I have.
 23   Q.   Are those your initials at the bottom?
 24   A.   Yes.
 25   Q.   And is it a fair and accurate transcription of the
```

09:34 at line 10
09:35 at line 20

```
 1    recording?

 2    A.   Yes, it is.

 3              MR. FRANK:   The government offers 602.

 4              THE COURT:   It will be admitted.

 5              (Exhibit 602 admitted into evidence.)

 6              MR. FRANK:   And Miss Lewis, if you can start at the

 7    beginning, please.

 8              (Audio recording played.)

 9    Q.   Special Agent, if I could direct your attention to page 2

10    of the transcript.  If you look at page 2 at line 12,

11    Mr. Singer says, "So I got the senior women's administrator at

12    Harvard is going to give us a spot.  What we have to do is

13    we'll have to give her $500,000.  That money, obviously, like

14    the others, will go through my foundation and then I will fund

15    the senior women's administrator at Harvard."

16              Was there an actual senior women's administrator at

17    Harvard?

18    A.   No, there was not.

19    Q.   Why did Mr. Singer tell Mr. Wilson that there was a senior

20    women's administrator?

21              MR. KENDALL:   Objection, you your Honor.

22    Q.   At whose direction did Mr. Singer tell Mr. Wilson that

23    there was a senior women's administrator at Harvard?

24    A.   The government's.

25    Q.   Why?
```

09:39 appears at line 10; 09:40 appears at line 20.

```
 1          MR. KENDALL:  Objection, your Honor.
 2          THE COURT:  Overruled.
 3   A.   It was a ruse to see if Mr. Wilson would make payment.
 4   Q.   And then at line 20, Mr. Wilson says, "Your total's going
 5   to be 1.5.  250 will come in the spring for Stanford and 250
 6   for Harvard in the spring and then we'll -- we'll be solid.
 7   We'll be done.  We'll apply like a normal student, but we'll
 8   know that we're getting in in the late fall of next year."
 9          And how did Mr. Wilson respond when Mr. Singer says
10   "we'll apply like a normal student, but we'll know that we're
11   getting in"?
12   A.   "Okay, great."
13   Q.   And then at page 3, line 9, Mr. Singer says, "Maybe she
14   won't have to sail, but we're going to put her through sailing
15   and John Vandemoer.  This is actually a better play at Harvard
16   because she will just get her in through athletics in one of
17   the sports but it won't matter.  It won't matter."
18          How does Mr. Wilson respond, beginning at line 15?
19   A.   "Yeah, but she is a -- she sailor actually -- so sailing
20   is actually a logical thing.  She could be even the mascot,
21   whatever, but she knows sailing."
22   Q.   And you see where Mr. Wilson says, you just read this,
23   "She could be the mascot, but she knows sailing"?
24   A.   Yes.
25   Q.   And earlier, on the prior page, he referenced the daughter
```

09:40 (line 10)
09:41 (line 20)

```
 1   who wanted to go to Harvard.  And which daughter was that, at
 2   page 2, line 9?
 3   A.    Courtney.
 4   Q.    And he says at line 17 on page 3, "She knows sailing."  Do
 5   you see that?
 6   A.    Yes.
 7   Q.    I'd like to direct your attention to the earlier
 8   transcript we looked at for -- called 571, if you could look
 9   back at 571.  And if you turn to page 5 of the transcript at
10   571, tell us what Mr. Wilson says about Courtney's sailing
11   ability beginning at line 14.
12   A.    "Courtney is not even that good competitively at sailing.
13   She just did sailing and did sailing in, you know, yacht club."
14   Q.    Thank you.  Did there come a time, Special Agent, after
15   the call on November 29th that we just listened to when
16   Mr. Wilson sent a second payment for $500,000 to the Key
17   Worldwide Foundation?
18   A.    Yes.
19         MR. FRANK:  If we could look at Exhibit 613 for the
20   witness only, please.
21   Q.    Special Agent, do you recognize Exhibit 613?
22   A.    Yes.
23   Q.    What is it?
24   A.    It is an e-mail between Mr. Singer and Mr. Wilson.
25   Q.    What is the date?
```

A2098

```
 1   A.     December 11, 2018.

 2          MR. FRANK:  Government offers Exhibit 613.

 3          THE COURT:  It will be admitted.

 4          (Exhibit 613 admitted into evidence.)

 5   Q.   And if we look at the bottom of the chain to start, do you

 6   see that there's an e-mail from Debbie Rogers to

 7   burlingame@firstrepublic.com on December 11, 2018?

 8   A.   Yes.  I see that.

 9   Q.   And it copies John Wilson?

09:43 10   A.   Yes.

11   Q.   And what is the subject?

12   A.   "Wire from HPC Account ending 2343."

13   Q.   And what is First Republic?

14   A.   It is a bank.

15   Q.   And can you read us what it says below in the text?

16   A.   "Please wire $500,000 from Hyannis Port Capital Inc.'s

17   account ending 2343 to: The Key Worldwide Foundation."

18   Q.   And what does it give as the reason for the wire?

19   A.   "Donation."

09:44 20   Q.   And if we look up above, do you see that Mr. Wilson

21   forwards this text -- this e-mail to Mr. Singer?  Special

22   Agent, do you see that he forwards it to Mr. Singer?

23   A.   Yes.

24   Q.   And how does Mr. Singer respond?

25   A.   "Thank you."
```

```
 1    Q.   Did there come a time when there was a subsequent call

 2    between Mr. Singer and Mr. Wilson at the beginning of

 3    January 2019?

 4    A.   Yes.

 5    Q.   Is there a disk on your desk labeled 623?

 6    A.   Yes.

 7    Q.   What is it?

 8    A.   It's a recording of a call between Mr. Singer and

 9    Mr. Wilson.

09:45 10    Q.   And if I could direct you to the tab marked 623 in your

11    binder, can you tell us what the date of this call is?

12    A.   January 3, 2019.

13         MR. FRANK:  Government offers 623.

14         THE COURT:  It will be admitted.

15         (Exhibit 623 admitted into evidence.)

16         MR. FRANK:  Miss Lewis, if we can just start at the

17    top, please.

18         (Audio recording played.)

19    Q.   Special Agent, over the next few minutes of this phone

09:46 20    conversation, did Mr. Wilson and Mr. Singer discuss

21    Mr. Wilson's trip to Cuba?

22    A.   Yes.

23    Q.   We'll just skip over that for now.  It will be in

24    evidence, but if we could pick up at page 6 of the transcript,

25    line 10.
```

```
 1              MR. FRANK:  And Miss Lewis, page 6, line 10 is 4
 2      minutes and 5 seconds.
 3                  (Audio recording played.)
 4              MR. FRANK:  Can you just stop it right there for a
 5      moment, Miss Lewis.  Thank you very much.
 6      Q.   If we can take a look at page 8, Special Agent.  Beginning
 7      at the end of line 7, Mr. Singer says at page 8, line 7, "We'll
 8      go through, kind of like what we did with Johnny.  We went --
 9      John went, you know, right to water polo.  And for the girls,
10      I'll probably just go to two sports, sailing and crew, and just
11      walk 'em right through as recruited walk-ons."
12                  Do you see that?
13      A.   Yes.
14      Q.   And how does Mr. Wilson respond at line 13?
15      A.   "Okay."
16      Q.   And what is the name of Mr. Wilson's son?
17      A.   Johnny Wilson.
18      Q.   Okay.  And then at line 15, Mr. Singer says "My only thing
19      to you was I just want to make sure -- because, you know,
20      you're a known entity, a known family, and people know that
21      you're interested, and they're gonna say, "Hey, I can help
22      you," or people may call you and I just want to say -- you just
23      say, 'Hey, listen, we got -- we -- we're taking care of things
24      ourself.  We have it all.  Girls are great students.  We're
25      just gonna apply on our own'".
```

```
 1              And how does Mr. Wilson respond at line 24?

 2    A.   "Okay."

 3    Q.   And how does he continue?

 4    A.   "So just kind of -- just saying we're applying on our own,

 5    nothing?"

 6    Q.   And Mr. Singer responds at line 2, on page 9, "correct,

 7    nothing, nothing -- no side doors.  We're not doing anything."

 8              And how does Mr. Wilson respond at line 4?

 9    A.   "Yeah, don't mention about that, right."

09:51 10    Q.   And Mr. Singer responds, "Where -- yeah -- where you're

11    making a payment to help the kids get into school."

12              And how does Mr. Wilson respond at line 7?

13    A.   "Right, okay.  That sounds good."

14              MR. FRANK:  If we can just conclude the call.

15              (Audio recording played.)

16    Q.   Special Agent, did there come a time when there was a call

17    after this January 3rd call between Mr. Singer and Mr. Wilson?

18    A.   Yes.

19    Q.   And if you could look at the disk marked 625 in front of

09:52 20    you.

21    A.   Yes.

22    Q.   What is 625?

23    A.   It is a recording of a phone call between Mr. Singer and

24    Mr. Wilson.

25    Q.   And if you could look at the tab in your binder marked 625
```

```
 1    and tell us what is the date of the call.
 2    A.    January 10, 2019.
 3    Q.    And is that transcript a fair and accurate transcript of
 4    the recording?
 5    A.    Yes, it is.
 6    Q.    Are those your initials at the bottom?
 7    A.    Yes.
 8              MR. FRANK:  The government offers 625.
 9              THE COURT:  It will be admitted.
10              (Exhibit 625 admitted into evidence.)
11              MR. FRANK:  And Miss Lewis, if we could start at the
12    beginning, please.
13              (Audio recording played.)
14    Q.    Special Agent, if I could direct your attention to page 2
15    of the transcript -- actually, I'll pick up at the bottom of
16    page 1.  Mr. Singer says at line 22, "So you know, it's a done
17    deal.  I'm gonna get you a spot and it will get done.  As far
18    as for you, as the family, you can tell your girls whatever.
19    If you flip 'em or swap 'em or whatever you can do, you can --"
20              And how does Mr. Wilson respond at line 3?
21    A.    "Put 'em on their heads."
22    Q.    And Mr. Singer picks up, "you can tell 'em, you know, if
23    one of 'em is a sailor and the other one's the crewer -- tell
24    'em whatever you want.  But we're getting the spot.  And it
25    won't matter to them that they won't know any difference."
```

The line numbers 10 and 20 are preceded by timestamps 09:53 and 09:57 respectively.

```
  1              And how does Mr. Wilson respond at line 9?
  2    A.   "Okay.  Great."
  3    Q.   And then he says, "So they're indifferent that way."  Do
  4    you see that?
  5    A.   Yes.
  6    Q.   And then at page 3, Mr. Wilson says at line 9, "but is the
  7    sport determined?  That's all I'm asking -- is one of my
  8    daughters" -- at line 12, "the one who wants to go to Stanford
  9    has nothing do with sailing, hates sailing, like -- oh shit."
10              And how does Mr. Singer respond?
11    A.   "No, no, no.  It has nothing to do -- we're getting the
12    spot."
13    Q.   And what does Mr. Wilson say at line 16?
14    A.   "Okay."
15    Q.   And then Mr. Singer says at line 17, "and so.. and I know
16    they may not be athletes in that spot.  But we know that -- and
17    we know both not athletes at that level.  So it doesn't really
18    matter.  They're gonna take care of it with a spot in each
19    place, but it will go through athletics."
20              And how does Mr. Wilson respond at line 23?
21    A.   "Okay.  And the team specifically is still open."
22    Q.   And then page 4 at the top, Mr. Wilson says, "We'd like to
23    have something, if we had any influence on that, that actually
24    fits with their, at least, interests, so you don't have this,
25    kind of" -- and then at line 6, "God, I'm a failure -- I'm
```

09:58 (line 10)
09:58 (line 20)

```
 1   no -- I'm an idiot in sailing.  I know nothing about sailing.

 2   I'll look really stupid, even trying to be the, you know, bag

 3   carrier of sailing."  And Mr. Singer responds, "I totally get

 4   ya.  I totally get ya."

 5          And how does Mr. Wilson respond at line 11?

 6   A.   "Okay.  That's good news then.  Okay.  Great."

 7   Q.   And then at line 12, Mr. Singer says, "and then the only

 8   other thing I just want to remind you of is just staying away

 9   from the people in admissions and the foundation" -- and at

10   line 17, "If anybody wants to reach you.  Because again, this

11   is not going through admissions, or it's going through the

12   foundation.  So I just want to make sure that we keep this

13   clean."

14          And how does Mr. Wilson respond when Mr. Singer says,

15   "I just want to make sure that we keep this clean."

16   A.   "Was there anything with -- with respect to any -- talking

17   to anybody there?  But they should still go ahead and meet on

18   campus and interview."

19   Q.   Thank you.

20          Special Agent, in addition to the calls with Mr.

21   Wilson, did there also come a time when you directed Mr. Singer

22   to call parents who had previously participated in the

23   side-door scheme?

24          MR. KELLY:  Objection to the characterization.

25          THE COURT:  All right.  The objection is sustained.
```

1   Q.   In addition to the calls with Mr. Wilson, did there also

2   come a time when you directed Mr. Singer to call parents who

3   had previously engaged with him in the side door?

4         MR. KELLY:  Same objection.

5         THE COURT:  No.  He can have that.  Overruled.

6   A.   Yes.

7   Q.   When was that relative to the notes that we saw from early

8   October?

9   A.   3 weeks later at the end of October.

10:00  10   Q.   For the purpose of those calls, did you give Mr. Singer

11   any instructions about what to say?

12   A.   Yes.

13   Q.   What were those instructions?

14   A.   To tell the parents that The Key Worldwide Foundation was

15   being audited and that he was not going to tell the IRS that

16   the payments made to his insider was to get their child in as

17   recruited athletes.

18   Q.   Why did you tell him to say that?

19   A.   To confirm a parent's understanding that there was a

10:01  20   payment made in exchange for their child being a recruited

21   athlete.

22   Q.   And to the extent that the parents were involved with USC,

23   did you tell him -- did you typically use a name in connection

24   with the insider?

25   A.   Yes.

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | Q.   And what was the name?                                   |
| 2    | A.   Donna Heinel.                                            |
| 3    | Q.   Why?                                                     |
| 4    | A.   To let the parent to have -- just to confirm that the   |
| 5    | parents knew there was an insider at the school.             |
| 6    | Q.   Okay.  And if we could take a look at Exhibit 587 in front |
| 7    | of you, do you see the disk marked 587?                      |
| 8    | A.   Yes.                                                     |
| 9    | Q.   What is it?                                              |
| 10:02 10 | A.   It is a recording of a call between Mr. Singer and   |
| 11   | Mr. Abdelaziz.                                                |
| 12   | Q.   Okay.  And what is the date of the call?                |
| 13   | A.   October 25, 2018.                                        |
| 14   | Q.   And if you look at the tab in front of you, is that a fair |
| 15   | and accurate transcription of the recording at 587?          |
| 16   | A.   Yes.                                                     |
| 17   | Q.   And are those your initials at the bottom of the        |
| 18   | transcript?                                                   |
| 19   | A.   Yes.                                                     |
| 10:02 20 | Q.   And how did you confirm that this was Mr. Abdelaziz on |
| 21   | this call?                                                    |
| 22   | A.   Mr. Singer called Mr. Abdelaziz from his phone.  I went -- |
| 23   | during one of the extractions as the phone number linked to  |
| 24   | Mr. Abdelaziz.  I compared it to phone records we received for |
| 25   | Mr. Singer's telephone and did public records checks for that |

```
 1   phone number and it came back to Mr. Abdelaziz.  And then

 2   during this phone call Mr. Singer uses Mr. Abdelaziz's first

 3   name and they talk about his children.

 4        MR. FRANK:  Government offers exhibit 587.

 5        THE COURT:  It will be admitted.

 6        (Exhibit 587 admitted into evidence.)

 7   Q.   And the date of this call again?

 8   A.   October 25, 2018.

 9        MR. FRANK:  And Miss Lewis, if we could start at the

10   top, please.

11        (Audio recording played.)

12   Q.   Special Agent, if I could direct you to page 4, line 13,

13   Mr. Singer says, "And so I just want you to know from the IRS,

14   you know, I'm not going to tell the IRS anything about the fact

15   that your $300,000 was paid to Donna -- Donna Heinel at USC to

16   get Sabrina into school even though she wasn't a legitimate

17   basketball player at that level.  So I'm not gonna -- I'm not

18   going to say that to the IRS obviously."

19        And how does Mr. Abdelaziz respond at line 21?

20   A.   "Okay."

21   Q.   And at line 22, Mr. Singer says, "You're okay with that,

22   right?"

23        And how does Mr. Abdelaziz respond?

24   A.   "Of course."

25   Q.   If I could direct your attention to page 6 of the
```

```
 1    transcript.  At line 6, Mr. Singer says, "I'll tell you a funny
 2    story.  Is that Donna Heinel, who is the senior women's
 3    administrator, she actually called me and said" -- and then
 4    he's interrupted by a fire alarm and picks up at line 12.  "She
 5    called me and says, hey Rick, that profile that you did for
 6    Sabrina, I loved it.  It was really well done and going
 7    forward, anybody who isn't a real basketball player that's a
 8    female, I want you to use that profile going forward."
 9         And how does Mr. Abdelaziz respond?
10:11 10    A.   "I love it."
11    Q.   Was it true that Donna Heinel had said that she wanted to
12    use Sabrina Abdelaziz's profile for anybody who isn't a real
13    basketball player that's a female?
14    A.   No.  That is not true.
15    Q.   Who instructed Mr. Singer to say that?
16    A.   The government.
17    Q.   Why?
18    A.   To see what -- how Mr. Abdelaziz would respond.
19    Q.   Did there come a time when you directed Mr. Singer to make
10:11 20    another phone call to Mr. Abdelaziz?
21    A.   Yes.
22    Q.   Directing your attention to the disk in front of you
23    marked 621, do you recognize that disk?
24    A.   Yes, I do.
25    Q.   What is it?
```

```
 1   A.    It is a recording of a call between Mr. Singer and

 2   Mr. Abdelaziz.

 3   Q.    And if you could look at the tab marked 621 in your

 4   binder, do you recognize that transcript?

 5   A.    Yes.

 6   Q.    Is it a fair and accurate transcript of the recording?

 7   A.    Yes, it is.

 8   Q.    What is the date of the call?

 9   A.    January 3, 2019.

10         MR. FRANK:  The government offers 621.

11         THE COURT:  It will be admitted.

12         (Exhibit 621 admitted into evidence.)

13         (Audio recording played.)

14   Q.    Agent Keating, I'd like to direct your attention to page 3

15   of the transcript.  At page 3, line 5, Mr. Singer says "Donna,

16   Donna Heinel, who's the Senior Women's Administrator at USC,

17   she called me" -- and at line 8 he continues, "to give me a

18   heads up, and asked -- she was asked by Admissions as to why

19   Sabrina did not show up for Women's Basketball in the fall."

20         And then he continues at line 12, "So she told them

21   that Sabrina had an injury" -- and at line 14, "and that it

22   happened over the summer" -- and then at line 16, "and that she

23   would be out for 6 to 8 months?"

24         Did Sabrina Abdelaziz actually have an injury?

25   A.    No, she did not.
```

```
 1   Q.   Who instructed Mr. Singer to say that?

 2   A.   The government.

 3   Q.   Why?

 4   A.   To gather evidence of Mr. Abdelaziz's response.

 5   Q.   And how did Mr. Abdelaziz respond when Mr. Singer said

 6   that Donna Heinel had told Admissions that Sabrina had an

 7   injury and would be out for 6 to 8 months at line 17?

 8   A.   "Okay."

 9   Q.   And then at line -- page 4 -- turn to page 4, line 5.

10   Mr. Singer says, "but they may ask you, is she okay, whatever.

11   So I think that Donna told them that she had plantar

12   fasciitis."

13            Was it true that Sabrina had plantar fasciitis?

14   A.   No.

15   Q.   Who made that up?

16   A.   Mr. Singer.

17   Q.   And what does Mr. Abdelaziz respond at line 8?

18   A.   "Okay."

19   Q.   And then at the bottom of page 4, Mr. Singer says at

20   line 23 -- actually, before we get to the bottom of the page,

21   in the middle of the page at line 14, do you see that

22   Mr. Abdelaziz says "Would they ask her, Rick?"

23            Mr. Singer responds, "No, they won't ask Sabrina."

24            And what does Mr. Abdelaziz say at line 16?

25   A.   "Do I have to prepare her?"
```

|    |    |
|---|---|
| 1 | Q.   And then at the bottom of the page, Mr. Singer says at |
| 2 | line 23, "So I just -- but I have no idea if they're gonna call |
| 3 | or not.  I just wanted to give you a heads up.  They asked |
| 4 | about it and Donna replied" -- and at line 3, Mr. Singer says, |
| 5 | at line 3, "and I wanted you to know what her reply was." |
| 6 | And how does Mr. Abdelaziz respond? |
| 7 | A.   "That's fine.  I will answer the same, should they call |
| 8 | me." |
| 9 | Q.   And then at line 8, Mr. Abdelaziz says, "Great.  No |
| 10:20  10 | problem.  I appreciate it, Rick.  You know, this whole tax |
| 11 | issue, you called a few months ago, I got worried.  When I do |
| 12 | my taxes, should I mark this as a, you know -- as a charity, or |
| 13 | not, or use the 501(c)(3), or not, because you got me" -- and |
| 14 | then he continues at line 15, "concerned when you called the |
| 15 | last time." |
| 16 | Who was the first person to brings up taxes in this |
| 17 | phone call? |
| 18 | A.   Mr. Abdelaziz. |
| 19 | Q.   And do you see that he asks "When I do my taxes, should I |
| 10:20  20 | mark this as a charity?"  at line 10 through 12? |
| 21 | A.   Yes. |
| 22 | Q.   If I could direct your attention back to the prior call, |
| 23 | the transcript of 587 at page 5.  At page 5 of 587, lines 4 |
| 24 | through 6, what does Mr. Abdelaziz say? |
| 25 | A.   "My intention was to donate the money to the foundation |

1    and uh -- what -- you know, and then from there obviously -- I

2    don't think -- do they have the intention of reaching out to

3    the people that sent those payments?  Is that what you're

4    saying?"

5    Q.   And if I can direct you back to the transcript of 621 that

6    we were just listening to, Mr. Singer responds to

7    Mr. Abdelaziz's question at page 5, "When I do my taxes should

8    I mark this, you know, as a charity or not or use a 501(c)(3)

9    or not because you got me concerned when you called last time."

10:21 10        Mr. Singer responds at line 16, "Yeah, no, I mean,

11    your money went to our foundation" -- and at line 19, "So we're

12    a 501(c)(3), so I don't see where there should be any issue.

13    Because" -- at line 22, "that's what we are."

14        And what does Mr. Abdelaziz say at lines 23 and 24?

15    A.   "Okay.  Yeah, no, I just wanted to make sure that we're on

16    the same page."

17    Q.   Agent Keating, In addition to the calls with parents,

18    during this time that Mr. Singer was making calls at your

19    direction, did you also direct him to make calls to other

10:22 20    targets of the investigation?

21    A.   Yes.

22    Q.   Directing your attention to January 2019, did there come a

23    time when you had him call Jovan Vavic?

24    A.   Yes.

25    Q.   I'd like to direct your attention to the disk in front of

```
 1    you marked 620.  Do you see that?

 2    A.   Yes, I do.

 3    Q.   What is 620?

 4    A.   It's a recording of a call between Mr. Singer and

 5    Mr. Vavic.

 6              MR. KENDALL:  Your Honor, if you could just note the

 7    continuing objection.

 8              THE COURT:  Yes.

 9    Q.   And if you turn to the transcript of that call in your

10    binder, what is the date of the call?

11    A.   January 2, 2019.

12              MR. FRANK:  The government offers 620.

13              THE COURT:  620 will be admitted.

14              (Exhibit 620 admitted into evidence.)

15              MR. FRANK:  If we can start at the beginning, please.

16    I'm sorry.  Withdrawn.

17    Q.   Is this a fair and accurate transcript of the recording?

18    A.   Yes.

19    Q.   Are those your initials at the bottom?

20    A.   Yes.

21              MR. FRANK:  If we could just pick up at the beginning,

22    please, Miss Lewis.

23              (Audio recording played.)

24    Q.   Agent Keating, this call was in January of 2019?

25    A.   Yes.
```

```
 1    Q.   Approximately, how long was that after the admission of

 2    Johnny Wilson to USC?

 3    A.   Four years.

 4    Q.   And actually, a little longer than that, right?

 5    A.   2014.

 6    Q.   Okay.  And at the bottom of page 2, Mr. Singer says at

 7    line 23, "Obviously I've been able to go through Donna to help

 8    us with getting some kids in, but if I come across somebody

 9    that's a water polo player because I know that's what you --

10    they have to be a water polo player for you, then it -- it's

11    still okay for me to holler at you because essentially what

12    we've done in the past with the scholarships for your boys",

13    correct?

14         And how does Mr. Vavic respond?

15    A.   "Absolutely, absolutely."

16    Q.   Now, Special Agent, earlier the jury heard evidence

17    concerning Matteo Sloane and Agustina Huneeus.  Have you seen

18    any evidence that Mr. Vavic was involved in the admission of

19    Matteo Sloane or Agustina Huneeus?

20    A.   No, I have not.

21    Q.   Have you seen any evidence that he was paid in connection

22    with those admissions?

23    A.   No.

24    Q.   If I could direct your attention to page 3, line 10, he

25    says -- Mr. Vavic says at the end of the line, "The way SC is
```

now doing everything, Rick, is, um, um, when you get a walk-on,

I used to be able to get 'em in much easier, now the walk-on is

required to have decent grades and he has to have some kind of

a resume.  He can't just be a total nobody."  Do you see that?

A.    Yes.

Q.    And at line 11, he's referring to SC.  What does SC stand

for?

A.    University of Southern California.

Q.    Did you also direct Mr. Singer during this time period to

10:30 call Donna Heinel?

A.    Yes.

Q.    And at the time that Mr. Singer was approached by federal

agents, are you aware whether he was making payments to Donna

Heinel?

A.    Yes, he was.

Q.    How much was he paying Donna Heinel?

A.    $20,000 a month.

Q.    When did those payments begin?

A.    July 2018.

10:30 Q.    And after the approach did you direct him to continue with

those payments?

A.    Yes.

Q.    Why?

A.    To continue the payments so Miss Heinel did not think

there was anything unusual going on.

```
 1              MR. KENDALL:  Objection, your Honor.

 2              THE COURT:  Grounds?

 3              MR. KENDALL:  It's all hearsay what things are going

 4    on that he had participated, payments and the like.

 5              THE COURT:  Overruled.

 6    Q.   Sorry.  Did you finish your answer, Special Agent?

 7    A.   To continue Mr. Singer's payment arrangement with

 8    Miss Heinel so she would not know that there was something

 9    going on and Rick's working with the FBI.

10:31 10    Q.   If you could look at the disk in front of you marked 574,

11    do you see the disk marked 574?

12    A.   Yes.

13    Q.   What is it?

14    A.   It is a recording of a call between Mr. Singer and

15    Miss Heinel.

16    Q.   Okay.  And if you look at the transcript marked 574 in

17    front of you?

18    A.   Yes.

19    Q.   I'm sorry.  I directed you to the wrong call.  If we look

10:31 20    at 572 first.  Do you see the disk marked 572?

21    A.   Yes.

22    Q.   What is it?

23    A.   It is a recording of a phone call between Miss Heinel and

24    Mr. Singer.

25    Q.   And if you look at the transcript marked 572, what is the
```

```
 1   date of that call?
 2   A.   October 2, 2018.
 3          MR. FRANK:  The government offers 572.
 4          MR. KENDALL:  Your Honor, please note our continuing
 5   objection.
 6          MR. KELLY:  Same.
 7          THE COURT:  I note your objection.
 8          572 will be admitted.
 9          (Exhibit 572 admitted into evidence.)
10   Q.   And again, the date, Special Agent?
11   A.   October 2, 2018.
12          MR. FRANK:  Miss Lewis, if you can start at the
13   beginning of 572.
14          (Audio recording played.)
15   Q.   At page 2 of the transcript, line 5 -- well, actually, at
16   page 1, I'm sorry, line 21, Miss Heinel says, "I mean really by
17   the second week of November, you know, we're going to be
18   probably hopefully getting almost all your people through."
19          And then at line 5 on page 2, she says, "Is there
20   anybody else?  And the water polo player, right?"  Do you see
21   that?
22   A.   Yes.
23   Q.   Who was the water polo player that was going through the
24   process at this point?
25   A.   Agustina Huneeus.
```

```
 1    Q.   If I could direct your attention to the bottom of that

 2    page, Mr. Singer says, "The other thing I -- I could, I could

 3    use from you.  The next time you submit an invoice for the

 4    20,000" -- at line 22, "Can put some detail into the invoice?"

 5         And how does Miss Heinel respond at line 22, line 24?

 6    A.   "Sure.  No problem."

 7    Q.   Why did you ask Mr. -- why did you direct Mr. Singer to

 8    ask Miss Heinel for more detail on the invoice?

 9    A.   To gather evidence of Miss Heinel's understanding of the

10:35 10    $20,000 payment.

11    Q.   And did there come a time after this when -- this

12    October 2nd call that Mr. Singer and Miss Heinel had another

13    call?

14    A.   Yes.

15    Q.   And you previously identified the disk marked 574 as a

16    call between Mr. Singer and Miss Heinel, is that correct?

17    A.   Yes.

18         MR. FRANK:  The government offers 574.

19         THE COURT:  It will be admitted.

10:36 20    (Exhibit 574 admitted into evidence.)

21    Q.   And if we can look at the transcript for the call 574 in

22    your binder, are those your initials at the bottom of the

23    transcript?

24    A.   Yes.

25    Q.   And is that a fair and accurate transcription of this call
```

```
  1   between Mr. Singer and Miss Heinel?

  2   A.    Yes.

  3   Q.    What's the date of the call?

  4   A.    October 5, 2018.

  5   Q.    So that's approximately three days after the call we just

  6   listened to?

  7   A.    Yes.

  8            MR. FRANK:  If we can start at the top, please.

  9            (Audio recording played.)

 10   Q.    Special Agent, if I could direct you to page 1 of this

 11   call.  At line 20, Miss Heinel refers to two students.  What

 12   are their names?

 13   A.    Isabelle and Claire.

 14   Q.    And then at line -- and do you know what their last names

 15   are?

 16   A.    Isabelle Janavs and Claire Altman.

 17   Q.    If I could direct you to line -- page 2, at line 18

 18   Miss Heinel says, "Are you going to tell the family?  Or I just

 19   want to make sure --"

 20            Mr. Singer says "I can hold" and Miss Heinel says,

 21   "yeah, I just want to make sure that, you know, that doesn't

 22   get out."  And then at line 24, she says, "You know, I'm always

 23   worried about those counselors, you know --" and Mr. Singer

 24   says, "No.  Absolutely."  And he then says at line 4, "We

 25   already -- we already dealt with that."
```

```
 1              Are you familiar with the voicemail that Miss Heinel
 2    left for Mr. Singer about parents yelling at counselors?
 3    A.   Yes.
 4    Q.   And how long was that voicemail, approximately, before
 5    this call in October of 2018?
 6    A.   6 months.
 7    Q.   And then at line 20 on page 3, Mr. Singer says, "And what
 8    do you want -- do you want -- are you going to send me the
 9    letter or and do you want me to then -- then I'll get them to
10    forward the 50K."
11              Do you see that?
12    A.   Yes.
13    Q.   And how does Miss Heinel respond at line 24 and continuing
14    on to the next page?
15    A.   "Yeah, just -- let's hold on that right now.  I don't like
16    to do it so close."
17    Q.   And based on the context, do you have an understanding of
18    what "it" is?
19    A.   Receive the payment.
20    Q.   Did there come a time after this call when Miss Heinel
21    sent an invoice for the monthly $20,000 payment to Mr. Singer's
22    organization?
23    A.   Yes.
24              MR. FRANK:  Could we show the witness only Exhibit
25    596, please.
```

A2121

```
 1              MR. KELLY:  Your Honor, on this exhibit I'm going to
 2     object if it's being offered for the truth of the matter
 3     asserted on the invoice.  If it's just to provide context to
 4     the Heinel situation, I'm not going to object, but I just want
 5     to be clear.  If he's offering this for truth of the matter,
 6     I'll object on hearsay grounds.
 7              MR. FRANK:  It's a fraud case, your Honor.  We're not
 8     offering it for the truth of the matter asserted.
 9              MR. KENDALL:  I have a continuing objection, your
10:41 10    Honor.
11              THE COURT:  Your objection is overruled.
12     Q.    Special Agent, do you recognize 596?
13     A.    Yes.
14     Q.    What is it?
15     A.    It is an e-mail from Donna Heinel to
16     Danea@creatinganswers.com.
17     Q.    And do you understand that Creating Answers worked for
18     Mr. Singer's organization?
19     A.    Yes.
10:41 20    Q.    And what's the attachment label?
21     A.    "Counting Stars Invoice."
22     Q.    And the government -- what's the date, please?
23     A.    November 5, 2018.
24              MR. FRANK:  The government offers 596.
25              THE COURT:  It will be admitted.
```

```
 1                (Exhibit 596 admitted into evidence.)

 2    Q.   What does Miss Heinel write?  I'm sorry.  Can you just

 3    wait a minute until it's up on the -- there we go.  What does

 4    Miss Heinel write?

 5    A.   "Danea, here is my November invoice.  Thank you."

 6                MR. FRANK:  And Miss Lewis, if you could show us the

 7    attachment.  Miss Lewis, do we have a clearer copy of this

 8    attachment?  Is that 596A?

 9                Your Honor, the government offers 596A.

10:42 10         THE COURT:  596A is the attachment?

11                MR. FRANK:  It's the same e-mail with the attachment.

12    It's just a clearer copy.

13                THE COURT:  It will be admitted.

14                (Exhibit 596A admitted into evidence.)

15                MR. KELLY:  And again, Judge, for the record, 403

16    objection as well.

17                THE COURT:  Overruled.

18    Q.   What is this document, Special Agent?

19    A.   It is an invoice from Clear the Clearinghouse.

10:43 20    Q.   And can you tell us what it says under "Description"?

21    A.   "Consulting Services, interview, evaluation and

22    assessments for prospective students from 1. Hong Kong

23    International School, Abdelaziz; 2. The Bay School, Blake;

24    3. Cathedral Catholic, Bizak."

25    Q.   And what's the price?
```

```
 1    A.   $20,000.

 2    Q.   And what is the balance due?

 3    A.   $20,000.

 4    Q.   And if we look at the bottom, it says "Please make Checks

 5    payable to: Clear the Clearinghouse."  Do you see that?

 6    A.   Yes.

 7    Q.   And at the bottom, it says, "Checks can be mailed to the

 8    above address"?

 9    A.   I see that.  Yes.

10    Q.   And what is the address?

11    A.   64 Savona Walk, Long Beach, California.

12    Q.   Who lived at that address at this time?

13    A.   Donna Heinel.

14    Q.   Thank you.

15              MR. FRANK:  No further questions, your Honor.

16              THE COURT:  Cross-examination.  Mr. Kelly?

17              MR. KELLY:  Yes, your Honor.

18                 CROSS-EXAMINATION OF ELIZABETH KEATING

19    BY MR. KELLY:

20    Q.   Good morning, Agent Keating.

21    A.   Good morning.

22    Q.   Agent Keating, you spent hundreds of hours working on this

23    case, right?

24    A.   Yes.

25    Q.   And you've worked closely with the FBI on this matter as
```

| | |
|---|---|
| 1 | well, right? |
| 2 | A.    Correct. |
| 3 | Q.    You've talked to your fellow agents about this case many a |
| 4 | time, right? |
| 5 | A.    Yes. |
| 6 | Q.    Talked to the prosecution team probably more times than |
| 7 | you wanted to, right? |
| 8 | A.    Yes. |
| 9 | Q.    All right.  So it's fair to say you're a critical member |
| 10:46 10 | of this prosecution team, right? |
| 11 | MR. FRANK:  Objection. |
| 12 | THE COURT:  Sustained. |
| 13 | Q.    Do you view yourself as a critical member of this |
| 14 | prosecution team? |
| 15 | MR. FRANK:  Objection. |
| 16 | THE COURT:  Sustained. |
| 17 | Q.    Well, how long have you been working on it? |
| 18 | A.    Since 2018. |
| 19 | Q.    All right.  And you've spent a lot of time on this case, |
| 10:46 20 | right? |
| 21 | A.    Yes. |
| 22 | Q.    Now, did you work on the court ordered wiretap in the |
| 23 | summer of 2018? |
| 24 | A.    Yes. |
| 25 | Q.    And did you monitor some of the calls? |

```
 1    A.    Yes.
 2          MR. FRANK:  This is beyond the scope of the direct,
 3    your Honor.
 4          THE COURT:  Overruled.
 5    Q.    And -- well, are you the lead IRS agent on this matter,
 6    ma'am?
 7    A.    Yes.
 8    Q.    And so when you monitored the wiretap, did you ever hear
 9    Gamal Abdelaziz intercepted?
10:46 10    A.    No.
11    Q.    And over the many hours of your work in this case, you're
12    not aware of any allegations that he or his daughter were
13    involved in any test cheating scams?
14    A.    Correct.
15    Q.    And you're not aware of any evidence that anybody ever
16    took classes for his daughter, right?
17    A.    Correct.
18    Q.    So you're aware there are basically two charges against
19    him, right?  One involving an allegation of bribery and one
10:47 20    involving an allegation of fraud based upon this athletic
21    profile, right?
22    A.    Yes.
23    Q.    Let me ask you, how many times have you met with Rick
24    Singer?
25    A.    I don't recall the exact number, but it's maybe 50 times.
```

```
 1  Q.   Okay.  Approximately 50 -- a lot, right?

 2  A.   A lot, yes.

 3  Q.   Okay.  And, approximately, those 50 meetings totaled how

 4  many hours?  I'm not looking for certainty here.  I'm looking

 5  for an estimate.

 6  A.   A hundred hours.

 7  Q.   So maybe 50 meetings over a hundred hours?

 8  A.   That's an estimate.  I can't.  I don't know how long or

 9  how often I met with Mr. Singer, but I met with Mr. Singer

10  often.

11  Q.   All right.  And how many times have you spoken by phone

12  with Mr. Singer?

13  A.   Majority, I would say maybe 30 times out of the 50,

14  where -- again, it's an estimate.  I'm not sure.  We

15  communicated with Mr. Singer a lot over the telephone because

16  he was in California and we were in Boston.

17  Q.   And how many hours in total do you think you spoke to him

18  over the phone?

19       MR. FRANK:  Your Honor, can I ask for clarification?

20  I think we're talking about in-person and by phone call.

21       THE COURT:  I believe these are meant to be part of

22  the 50 times, but 30 by phone?

23       MR. KELLY:  Yes.

24  Q.   Apologies if I confused that.  Would you estimate 50 times

25  you met with him, or 50 times you interacted with him either by
```

```
 1   phone or in person?

 2   A.   Both phone and in person.

 3   Q.   Okay.  So, collectively, between meeting with him and

 4   talking to him over the phone you had at least 50 interactions

 5   with him, right?

 6   A.   At least.

 7   Q.   Maybe more, right?

 8   A.   Yes.

 9   Q.   And when is the last time you saw Rick Singer?

10   MR. FRANK:  Objection.  Relevance.

11   THE COURT:  Sustained.

12   Q.   Are you aware Rick Singer was recently in Boston?

13   MR. FRANK:  Objection.  Relevance.

14   THE COURT:  He can have that question.

15   A.   I'm aware Mr. Singer was in Boston a couple weeks ago.

16   Q.   Okay.  And was he interviewed?

17   MR. FRANK:  Objection.

18   THE COURT:  Sustained.

19   Q.   Where in Boston was he?

20   MR. FRANK:  Objection.

21   THE COURT:  Yeah.  You can have that he was in Boston,

22   but you can't pursue it.

23   Q.   Would you recognize a photo of Mr. Singer if I showed it

24   to you?

25   A.   Yes.
```

A2128

```
 1              MR. KELLY:  Let me show the witness only Exhibit 9021.
 2    A.    That's Mr. Singer.
 3              MR. FRANK:  Your Honor, I'm going to object on 403
 4    grounds.
 5              THE COURT:  Well, he hasn't offered it yet.
 6              MR. KELLY:  I offer it now, your Honor.  It's
 7    relevant.  It's an ID of the cooperating witness we've been
 8    discussing.
 9              MR. FRANK:  We're not disputing identity.  This is
10:50 10    objectionable on 403 grounds.
11              THE COURT:  I'm going to reserve on this.  We can talk
12    about it later.  It's not admissible now.
13    Q.    Okay.  Agent, Mr. Singer, he became a cooperating witness
14    for the government on September 21, 2018, right?
15    A.    He began cooperating with the FBI investigation on
16    September 21, 2018.
17    Q.    Okay.  So that's a yes, right?  He began cooperating with
18    the government on September 21, 2018, right?
19    A.    Yes.
10:51 20    Q.    And less than two weeks later he wrote a note to himself
21    saying that you were asking him to bend the truth.  Didn't he
22    do that?
23    A.    He wrote a note, yes.
24    Q.    And that was on October 2, 2018, correct?
25    A.    Yes.
```

```
 1    Q.   And is it your experience that people lie to their own
 2    diaries?
 3    A.   I don't have experience with people lying in their
 4    diaries.  People don't lie in their diaries.  They're usually
 5    truthful, but I can't opine on what Mr. Singer was thinking at
 6    the time.
 7    Q.   Okay.  And if the government were to call Mr. Singer as a
 8    witness in this trial, we could question him about that,
 9    couldn't we?
10    MR. FRANK:  I object, your Honor.
11    THE COURT:  Sustained.
12    Q.   Well, back in April of 2020 you signed a four page
13    declaration to the Court about this Singer note, didn't you?
14    A.   Yes.
15    Q.   Was it accurate and truthful?
16    A.   Yes.
17    Q.   Do you recall it?
18    A.   Yes.
19    Q.   And among other things, did you indicate that when first
20    dealing with Singer you wanted him to be explicit that the
21    scheme involved bribes, right?
22    A.   Wanted Singer to be explicit, yes.
23    Q.   And that was to avoid possible confusion about the intent
24    of the targets of this investigation, right?
25    A.   Possible confusion of the intent for anybody on the
```

```
 1   outside looking in.  There would be no confusion for them what
 2   was happening.
 3   Q.   No.  I'm not talking about people on the outside looking
 4   in.  I'm talking about people who were talking to Singer about
 5   the scheme.  You wanted Singer to be explicit so there would be
 6   no possible confusion about the intent of those people talking
 7   to Singer, right?
 8   A.   No.
 9   Q.   Well, didn't you say the purpose was to ensure for clients
10   who had not yet committed a crime or were still in the middle
11   of it, there would be no possible confusion about their intent?
12   A.   The point of that call was so it would be -- it was
13   explicit so the parents could not make the excuse that it
14   was --
15   Q.   I'm asking you a question about what you wrote in your
16   declaration to the Court.  Didn't you say, "The purpose was to
17   ensure that for clients who had not yet committed a crime or
18   were still in the middle of it, there would be no possible
19   confusion about their intent?"  Didn't you say that?
20   A.   No confusion about their --
21   Q.   Intent?
22   A.   -- intent and the --
23   Q.   I'm just asking, is that a sentence you wrote, or did
24   somebody else write that?
25   A.   Somebody else wrote that, but I signed it.
```

1   Q.   Okay.  So who wrote this declaration of yours?

2   A.   I don't know.  One of the prosecutors.  I'm not sure which

3   one.

4   Q.   Okay.  So this is a declaration you signed, but it was

5   written by the prosecutors?

6   A.   After -- yes.  After I reviewed it, I signed it.

7   Q.   Do you recall which one?

8   A.   No, I don't.

9   Q.   When you signed it, did you review it?

10:54 10   A.   Yes.

11   Q.   Okay.  And did you agree with its contents before it was

12   submitted to the Court?

13   A.   Yes.

14   Q.   And do you recall that it says, "We wanted him to be

15   explicit that the scheme involved bribes.  The purpose was to

16   ensure that, for clients who had not yet committed a crime or

17   were still in the middle of it there would be no possible

18   confusion about their intent."

19   A.   That is what's written there, yes.

10:55 20   Q.   And you signed it.  And do you still think that's true?

21   A.   The purpose of the call was to be explicit so there could

22   be no cover story.

23   Q.   Okay, but do you still think that sentence in that

24   declaration is true?

25   A.   I don't think there was any confusion about parents'

1   intent.

2   Q.   Okay.  But again, I understand you didn't write it, but

3   you signed this declaration.  So is this sentence true that the

4   purpose was to ensure that for clients who had not yet

5   committed a crime, or were still in the middle of it, there

6   would be no possible confusion about their intent?  That

7   sentence is in there, right?

8   A.   Yes.  That's in there.

9   Q.   Okay.  Because you wanted him to be explicit that the

10:56 10   scheme involved bribes, right?

11   A.   Correct.

12   Q.   Because he told you that previously when he was dealing

13   with parents, he wasn't so explicit, was he?

14   A.   Correct.

15   Q.   In fact, to quote your declaration, he said that he

16   usually told his clients that the money was a donation to an

17   athletic program, right?

18   A.   Correct.  That was his general pitch, yes.

19   Q.   And that doesn't sound so bad, does it?

10:56 20   A.   A donation to a program does not sound bad.

21   Q.   And so if someone was told that their money would be a

22   donation to a program, or a building like the Galen Center at

23   USC, that doesn't sound illegitimate or illegal, does it?

24        MR. FRANK:  Objection to how it sounds to third

25   parties.

```
 1              THE COURT:  Sustained.
 2    Q.   Well, if someone donates money to USC Women's Athletic
 3    Fund, that's not illegal, is it?
 4    A.   No.
 5    Q.   And if someone donates money to maintain or build the
 6    Galen Center at USC, that's not illegal, is it?
 7    A.   No.
 8    Q.   And you're aware, or are you aware that's what Mr. Singer
 9    told Gamal Abdelaziz Delaware in February of 2017?  Are you
10    aware they had that conversation?
11    A.   I'm not aware of a conversation he had with Mr. Abdelaziz
12    at that time.
13    Q.   You're not aware that they spoke about USC and his
14    daughter Sabrina in February of 2017?
15    A.   I'm not aware of a conversation that Mr. Singer had with
16    Mr. Abdelaziz in 2017.
17    Q.   Are you aware of an e-mail between Singer and Abdelaziz in
18    February of 2017?
19    A.   I'm aware of numerous e-mails between Mr. Singer and
20    Mr. Abdelaziz regarding Sabrina's fake profile.
21    Q.   I'd like to show you exhibit --
22              MR. KELLY:  Just the witness.
23    Q.   -- Exhibit 272.  Do you see the date of that?
24    A.   Yes.
25    Q.   And is this one of the e-mails you're aware of in this
```

```
 1   case?
 2   A.   I have not seen this e-mail, but it is from Mr. Singer's
 3   e-mail account.
 4   Q.   And it is to Mr. Aziz, isn't it?
 5   A.   Yes.
 6   Q.   Is it your testimony that you were never shown this e-mail
 7   before you came to court today?
 8   A.   I have not seen it -- I haven't seen this e-mail.
 9        MR. KELLY:  Okay.  Then take it down, please.
10   Q.   How many e-mails did you review before you came to court
11   today?
12   A.   I don't know exactly how many.  I reviewed e-mails
13   throughout this case and then reviewed e-mails in preparation
14   of trial.
15   Q.   Okay.  And who chose which e-mails for you to review
16   before you testified here today?
17   A.   For preparation of trial, the prosecutors.
18   Q.   All right.  And you're aware generally of the rules of
19   evidence, that if you don't see something, that maybe the jury
20   doesn't see it either, right?
21        MR. FRANK:  I object, your Honor.  Argumentative.
22        THE COURT:  Sustained.
23   Q.   Well, you're aware of the so-called Jencks Act, right?
24   A.   Yes.
25   Q.   Okay.  So you have to produce reports --
```

```
 1              MR. FRANK:  I object, your Honor, to the legal
 2    argument.
 3              THE COURT:  Yeah.  Sustained.
 4    Q.   Are you aware generally that Mr. Aziz back in February of
 5    2017 sent photos to Mr. Singer as they had discussed and noted
 6    that she had been the MVP and you can use ones you find
 7    suitable?  Do you know that, in general, that's what he said?
 8    A.   I know that Mr. Abdelaziz sent pictures to Mr. Singer.
 9    Q.   All right.  And do you know in -- way back in February of
11:00 10   2017 he told Singer here's some photos, she won MVP, use what
11    you find suitable?
12    A.   I don't recall that being said in e-mails.  I just recall
13    seeing e-mails sent to Mr. Singer with photos.
14              MR. KELLY:  I'm going to offer 272 as independently
15    admissible on the 8033 state of mind evidence of --
16              MR. FRANK:  No need for argument.  We don't object to
17    it.
18              THE COURT:  It will be admitted, 272.
19              (Exhibit 272 admitted into evidence.)
11:01 20             MR. KELLY:  Okay then.  Exhibit 272, let's go to that.
21    Let's look at the date on this.  I'm sorry.  Up top.
22    Q.   February 28, 2017, it's from Gamal Abdelaziz to Singer,
23    correct?
24    A.   Yes.
25    Q.   Let's go into the middle there on Tuesday, February 28,
```

```
 1   2017.  See what it says?  "I've attached Sabrina's basketball
 2   photos as discussed.  I'm sorry these are not professional
 3   pictures, but you'll recognize Sabrina from her MVP picture and
 4   you can use ones you find suitable.  I'm in the U.S. till
 5   March 10th if you have any questions.  My cell number's" --
 6   blah, blah, blah.
 7           And then it goes above that.  Singer tells him "the
 8   file is too large.  It won't open."
 9           And he says, "okay, will send a smaller version."
10   And way below this at the bottom, he's getting the
11   pictures from his wife, right?
12   A.   Yes.
13   Q.   So this is the first evidence you have of the discussions
14   between Singer and Aziz about Sabrina, right?
15           MR. FRANK:  Objection to the characterization.
16           THE COURT:  Characterization of what?
17           MR. FRANK:  This is the first evidence you have.
18           MR. KELLY:  I'll rephrase, Judge.
19           THE COURT:  Rephrase.
20   Q.   Do you have any other e-mails evidencing discussions
21   between Singer and Aziz about basketball and Sabrina besides
22   this?
23   A.   I've reviewed e-mails between Mr. Singer and Mr. Abdelaziz
24   discussing basketball and Sabrina.  I don't recall the dates on
25   those.
```

11:02  (line 10)

11:02  (line 20)

```
 1    Q.   All right.  But you're not aware as you sit there today
 2    that there's any e-mails prior to this, right?
 3    A.   I can't say for certain, but -- because I don't recall the
 4    dates.
 5    Q.   And you haven't seen this before today, right?
 6    A.   Correct.
 7    Q.   Now let's get back to this declaration again.  Didn't you
 8    also say in this declaration that "We asked Singer to be more
 9    explicit on the calls so there would be no confusion about the
10    parents' intent if they continued to go forward", right?  You
11    said that?
12    A.   Right.  It's in there, yes.
13    Q.   Okay.  And, again, I take it your concern because you
14    wanted to bring a conspiracy case, you know the intent --
15         MR. FRANK:  Objection.
16    Q.   Was your concern that some day you might have to prove in
17    a courtroom the intent of the people you could charge?
18         MR. FRANK:  Objection to her concern.
19         THE COURT:  Sustained.
20    Q.   Well, you were very focused on making sure it was explicit
21    so there was no confusion about the parents' intent.  You wrote
22    that, right?
23    A.   That's what -- we wanted Mr. Singer to be explicit so a
24    parent couldn't use the cover story that it was a donation
25    because it was a payment in exchange for an athlete being
```

A2138

1    recruited as a fake athlete.

2    Q.    Okay.  Do you have any evidence he paid off any coaches?

3    A.    I have evidence that the payment went to the coach.

4    Q.    Just answer the question, please.  Do you have any

5    evidence that Mr. Abdelaziz ever agreed to pay off a coach?

6                MR. FRANK:  Objection to "pay off a coach."

7                THE COURT:  Yes.  Sustained.

8    Q.    Okay.  Do you have any evidence that Mr. Abdelaziz ever

9    agreed to offer money to a person employed as a coach by USC?

11:05 10    A.    Mr. Abdelaziz offered money to a program directed by an

11    individual.

12    Q.    That's right.  He thought the money was going to a

13    program --

14                MR. FRANK:  I object to the speaking objections.

15                THE COURT:  We're going to take the morning recess

16    here.

17                You may step down for the time being, Miss Keating.

18                We're going to be in recess for 15 minutes, jurors.

19                (Jury exits.)

11:06 20                THE COURT:  Please be seated, counsel.  Approximately

21    how long do you think you're going to be on cross, Mr. Kelly?

22                MR. KELLY:  I think for sure an hour, Judge.  I'll try

23    to keep it to that.

24                THE COURT:  All right.  And Mr. Kendall?

25                MR. KENDALL:  Much longer, your Honor.  Mr. Frank, I

think, took about 2 hours and 40 minutes.  I don't know if I'll

be above that, but I'm in the range plus or minus.

THE COURT:  Okay.  Anything else that needs to come to

the Court's attention before we recess?

MR. KELLY:  No, your Honor.

MR. FRANK:  Not for the government.

THE COURT:  We are in recess for 15 minutes.

(Recess taken 11:06 a.m. to 11:23 a.m.)

THE COURT:  Good morning, counsel.  Two things before

we call the jury back.  Over the break, the Court was

petitioned by the press to release copies of the phone call

transcripts.  I see no reason why they ought not to be

provided.  Do counsel have any reason to object?

MR. KELLY:  Defer to the Court, your Honor.

MR. KENDALL:  Your Honor, given the nature of the

publicity that we have with the Zoom access call, I am very

concerned about sequestration.  I have no problem with them

being released at the end of the trial, but while we're trying

to sequester witnesses scattered all over the country with this

sort of obsessive publicity on the case, I think it creates a

risk.

MR. KELLY:  I actually defer to Mr. Kendall, your

Honor.  I withdraw that.

MR. KENDALL:  As I said your Honor, I don't have a

problem with public access when this trial is over.  The rules

```
 1    are the rules and we respect them, but we've got a lot more

 2    witnesses coming forward.

 3              THE COURT:  This is just the transcripts that we've

 4    been reading from and obviously have been quoted from

 5    extensively to this point.

 6              MR. KENDALL:  I understand, your Honor.

 7              THE COURT:  The reasons given were so that if they

 8    were going to quote anything, they would quote it accurately

 9    and not misquote anybody.

11:28 10          MR. KENDALL:  Somehow I'm never enthused with the

11    quoting that they do, your Honor.  I'm just trying to be

12    practical.  I'm not citing a rule or pounding the table.  I'm

13    just a cautious person.

14              THE COURT:  I hear you.

15              Mr. Frank, what's the government's position?

16              MR. FRANK:  We don't have a position, your Honor,

17    other than to note that the exhibits themselves, the audio is

18    public record at this point once it's introduced, and so it's

19    not clear if the transcripts really do much more in terms of

11:28 20    publicity other than, as your Honor pointed out, making sure

21    that any quotations from the audio is accurate.

22              MR. KENDALL:  Your Honor, that's the point

23    Ms. Papenhausen was kind of enough to remind me.  We challenge

24    the accuracy of some of these transcripts.  You've heard us do

25    it already with Agent Brown.  We're going to continue it with
```

**A2141**

```
 1    her.  I don't think -- the transcripts are not accurate.

 2         Are they generally accurate?  Yes.  But there are some

 3    key statements in there that we contest and that we think are

 4    very important to the defense that they be done with the

 5    appropriate corrections.  So given that they are not the real

 6    evidence and they are not -- there are issues of inaccuracy

 7    that in good faith we've already shown with the red line

 8    transcripts that we used last week, I'd ask that we hold off,

 9    your Honor.

11:29 10        MR. FRANK:  Your Honor, if Mr. Kendall disputed the

11    accuracy of the transcripts, all of them were provided to him

12    well in advance of trial.  He didn't dispute them at that

13    point.  He reserved until now so that he could do it in open

14    court.  We believe the transcripts are sufficiently accurate

15    and that they should be released.

16        MR. KENDALL:  They're not admit -- your Honor, you

17    know our position.

18        THE COURT:  I will take the matter under advisement,

19    but I did want to get the opinion of counsel before I did.

11:29 20        MR. KENDALL:  Thank you.

21        THE COURT:  The other issue, apparently you wanted to

22    talk to me about the photograph of Mr. Singer that was

23    proffered just before the break with his paddle board.

24        MR. KELLY:  Just to the extent, if I go back to it, I

25    don't want to go to sidebar for sure.  I wanted to just ask the
```

```
 1    Court at some point I might go back to it because we do think
 2    it's relevant to be identifying the cooperator in the case.
 3                THE COURT:  What's the reason for the objection?
 4                MR. FRANK:  Your Honor, it's deliberately -- it's a
 5    photo of him at the beach.  It's a photo that is deliberately
 6    designed to be prejudicial given the nature of the photo.  If
 7    they want a photo of Rick Singer, there are many photos out
 8    there.  We can give them a photo.  There's no dispute about who
 9    he is or what he looks like.  But a photo of him in a wet suit
10    at the beach from the side, from the back, going
11    paddle-boarding is deliberately designed to be prejudicial.
12    There's no other explanation.
13                MR. KENDALL:  Your Honor, I'd say it's no less
14    prejudicial or no more than the palace at Versailles.  They're
15    putting in stuff about my client that way.  This is far less
16    prejudicial.
17                MR. FRANK:  We didn't put anything in about
18    Versailles.  He said it on a tape.  We played the entire tape,
19    your Honor.
20                THE COURT:  Yeah, I'm going to sustain the objection
21    but certainly that does not prevent the defendants from
22    proffering another photograph of Mr. Singer just to put a face
23    with the name that we have heard lots about.  But that
24    particular photograph is not going to go in.
25                So call the jury.
```

```
 1              (Jury enters.)

 2              THE COURT:  Good morning again, jurors.  We're ready

 3       to resume.

 4              Ms. Keating, again you're reminded you remain under

 5       oath.  Mr. Kelly, you may continue with cross-examination.

 6              MR. KELLY:  Yes, Your Honor.  Thank you.

 7       BY MR. KELLY:

 8       Q.   So before the break I was asking you a series of questions

 9       regarding what Singer generally told his clients and, in fact,

11:33 10  you testified two days ago, you were asked, "What was your

11       understanding of what he had previously said to parents before

12       he had been approached?"  And then your answer was, "Mr.

13       Singer's general pitch was that it was a donation to a

14       program."  That was your testimony, right?

15       A.   In exchange for a recruitment spot.

16       Q.   Really?  You think that was your testimony?  Let's look at

17       that transcript, please.  Page 188, line 4.  Question: "What

18       was your understanding of what he had previously said to

19       parents before he had been approached?"

11:34 20             And there's a baseless objection there.  "Overruled."

21             Answer:  "Mr. Singer's general pitch was that it was

22       a donation to a program."

23             That's what you said, right?

24             MR. FRANK:  Taken out of context, your Honor.

25             THE COURT:  Overruled.
```

```
 1   Q.   Well, it was in the context of a question from Mr. Frank,
 2   right?
 3   A.   That is part of his general pitch.
 4   Q.   Okay.  And, in fact, Gamal Abdelaziz had his discussions
 5   with Singer months before you approached Singer, correct?
 6   A.   Sabrina's application and side door was done months
 7   before.
 8   Q.   Well, you keep throwing in the words "side door."  The
 9   only evidence you had that "side door" was ever uttered to him
10   was on those two tapes, right?
11   A.   We had evidence of false profiles being submitted to --
12   Q.   Let's stick with "side door" that you keep injecting into
13   this.  Do you have any evidence that the phrase "side door" was
14   ever used to him before those two tapes?
15   A.   Not the specific words "side door."
16   Q.   Okay.  Okay.  So every time you keep using it with respect
17   to him, all you have are those two tapes, correct?
18   A.   For the specific words "side door," yes.
19   Q.   And as to those specific words, who is the one who spoke
20   those specific words, Abdelaziz or Singer?
21   A.   In the transcripts?
22   Q.   Yes.
23   A.   I'd have to go back and look at the transcripts.
24   Q.   Okay.  We'll get there in a moment.
25   A.   Okay.
```

```
 1   Q.   But isn't it your recollection that "side door" was used

 2   by Singer, not Gamal?

 3   A.   I'd have to double-check the transcripts.

 4   Q.   In fact, didn't you tell Singer to use this phrase "side

 5   door" as much as he could?

 6   A.   I don't recall saying to use the words "side door."  We

 7   wanted Mr. Singer to be explicit and say it was a payment to a

 8   coach in exchange for a recruitment spot.

 9   Q.   Right.  And there's zero evidence that he ever agreed to

10   bribe a coach, right, zero?

11   A.   There's evidence that there was a false application

12   submitted to get Sabrina in as a fake recruit in exchange for a

13   payment to a program that was directed by an insider.

14   Q.   Right.  I know that's your theory of the case, but that

15   wasn't the question, was it?

16        MR. FRANK:  I object.

17        THE COURT:  Overruled.

18   Q.   Can you please just answer the question.  Do you have any

19   evidence that he ever agreed with Rick Singer or anyone to

20   bribe a USC coach, yes or no?

21   A.   The payment went to a program.  Specifically to a coach,

22   no.  But it went to a program.

23   Q.   So the answer is no, you have no evidence he ever agreed

24   to bribe a coach, right?

25   A.   A specific coach, no.
```

|   | |
|---|---|
| 1 | Q.   All right.  How about Donna Heinel, you have no evidence |
| 2 | that he ever knew of Heinel before those two calls either, do |
| 3 | you? |
| 4 | A.   Mr. Singer told us at some point that Mr. Abdelaziz did |
| 5 | not know the name Donna Heinel. |
| 6 | Q.   Correct.  Singer himself said he didn't know who Heinel |
| 7 | was until he injects the name into those two tapes, right? |
| 8 | A.   Correct. |
| 9 | Q.   In fact, that's why he had to list her title when he said |
| 11:38 10 | her name, right?  She's Donna Heinel, senior women's |
| 11 | administrator, USC, blah, blah, blah, right? |
| 12 | A.   He explained what her title was, he stated her title. |
| 13 | Q.   Right.  So when he called up Bruce Isackson and referenced |
| 14 | the corrupt coach Jorge Salcedo, he just said Jorge. |
| 15 | Mr. Isackson knew who he was talking about, right? |
| 16 | A.   I don't know what Mr. Isackson knew. |
| 17 | Q.   Well, did you listen to the tapes between Singer and |
| 18 | Isackson? |
| 19 | A.   I've heard those tapes. |
| 11:38 20 | Q.   All right.  And do you recall that Singer referenced |
| 21 | Jorge? |
| 22 | A.   I don't recall specifically.  I haven't listened to that |
| 23 | call in a while. |
| 24 | Q.   All right.  Let's see if we can pull that one up.  I don't |
| 25 | know the exhibit number off the top of my head on that one. |

```
 1 │  We'll come back to that, okay?
 2 │          Now, your declaration that you signed, albeit someone
 3 │  else wrote it, right?
 4 │  A.   Correct.
 5 │  Q.   In your declaration you indicated that you wanted Singer
 6 │  to be explicit going forward about bribes because you were
 7 │  concerned about being able to show his client had criminal
 8 │  intent, right?
 9 │  A.   I don't recall saying the words "criminal intent."
10 │  Q.   Okay.  Well, that's what we're talking about, right, a
11 │  criminal investigation, right?
12 │  A.   This is a criminal investigation, yes.
13 │  Q.   Right.  And Singer, however, was resistant.  He told us
14 │  this was not what he typically told his clients.  He said that
15 │  he usually told his clients that the money was a donation to an
16 │  athletic program.  Did you sign that declaration under oath?
17 │  A.   Yes.
18 │  Q.   Now, there were two recorded calls you've played here
19 │  today involving Singer and Abdelaziz, right?
20 │  A.   Correct.
21 │  Q.   Now, the first one was on October 25 of 2018, correct?
22 │  A.   Correct.
23 │  Q.   Who called whom?
24 │  A.   Mr. Singer called Mr. Abdelaziz.
25 │  Q.   Okay.  So his role at that point was to set up
```

```
 1   Mr. Abdelaziz and see if he could get him to say stuff that you
 2   could use, right?
 3            MR. FRANK:  Objection to "set up."
 4            THE COURT:  Sustained.
 5   Q.   Was this part of an undercover operation designed to get
 6   evidence of somebody committing a crime?
 7   A.   This call was made to gather evidence of Mr. Abdelaziz's
 8   understanding --
 9   Q.   Okay.
10   A.   -- of the agreement between him and Mr. Singer.
11   Q.   Right.  The agreement that they had discussed 18 months
12   previously, right?
13   A.   Related to Sabrina's application in 2017.
14   Q.   Now, you've seen that Exhibit 272.  They had a discussion
15   in February of 2017, right?
16   A.   Yes.
17   Q.   That's 18 months prior to this first call, correct?
18   A.   Correct.
19   Q.   You have -- he was never on some wiretap where you heard
20   him talking to Singer, correct?
21   A.   Correct.
22   Q.   So there's a difference.  There was a wiretap that's
23   authorized by a court, and then these are what you refer to as
24   consensual recordings because you have Singer basically doing
25   it on behalf of the government, correct?
```

```
 1    A.    Correct.
 2    Q.    And with respect to the wiretaps that's authorized by a
 3    judge after the judge finds probable cause, there's zero
 4    wiretaps of his phone, correct?
 5    A.    Correct.
 6    Q.    Now, this first call from Singer to Abdelaziz was about a
 7    month after Singer began cooperating, right?
 8    A.    Correct.
 9    Q.    And you do know that at that time, October 2018, Sabrina
11:42 10  Abdelaziz was already enrolled at USC, right?
11    A.    Yes.
12    Q.    And you do know that when Singer called Abdelaziz in
13    October 2018, they hadn't spoken with each other in months,
14    right?
15    A.    I know based on the wire they hadn't spoken to each other
16    since at least before then.
17    Q.    Several months, correct?
18    A.    Yes.
19    Q.    And when Singer called Gamal, do you know where Gamal was?
11:43 20  A.    I do not.
21    Q.    Do you know he was in his car in L.A.?
22    A.    I was not aware of that.
23    Q.    That was never part of the investigation, to determine
24    where Gamal was at the time he took this call?
25    A.    No, it was not.
```

```
 1   Q.   Did you know when Singer placed this call that Singer had
 2   been a college counselor for his first two kids?
 3   A.   I know he was a college counselor for his son.  I'm not
 4   sure about his daughter.
 5   Q.   But you knew that his -- you knew that his son Adam, Adam
 6   Abdelaziz, had had a great relationship with Singer, correct?
 7   A.   I knew they had a relationship, yes.
 8   Q.   Okay.  And did you know that Adam attended Columbia
 9   University?
 10  A.   Yes, I did.
 11  Q.   An ivy league school, correct?
 12  A.   I'm sorry?
 13  Q.   An ivy league school in New York?
 14  A.   Yes, yes.
 15  Q.   And did you know that Abdelaziz, after Adam was already
 16  there, was solicited for donations by Columbia?
 17  A.   Yes, I was aware of that.
 18  Q.   And did you know that after his son Adam was at Columbia,
 19  he actually made donations totaling $200,000 ultimately?
 20  A.   I was aware of that.
 21  Q.   Did you know about his background?  Did you know he was
 22  from Egypt?
 23  A.   I don't know if I knew he was from Egypt.
 24  Q.   Abdelaziz is not an Irish name, right?  Had you done any
 25  background on his coming to this country?
```

11:44 (lines 10, 20)

**A2151**

```
  1   A.   I know he worked in Asia.
  2   Q.   All right.  Did you know he was legally here, correct?
  3            MR. FRANK:  Objection, relevance.
  4            THE COURT:  Overruled.
  5   A.   I don't know Mr. Abdelaziz's immigration status.
  6   Q.   You don't know he's been a U.S. citizen for over 35 years?
  7   A.   I'm not aware of his immigration status.
  8   Q.   You didn't check his immigration status before charges
  9   were brought in this case?
11:45 10  A.   No, I did not.
 11   Q.   You don't have any information to suggest he's not a U.S.
 12   citizen, do you?
 13            MR. FRANK:  Objection.
 14            THE COURT:  Sustained.
 15   Q.   Are you suggesting in any way he's not legally here?
 16            MR. FRANK:  Objection.
 17            THE COURT:  Sustained.
 18   Q.   You said you knew he worked for a time in Macau, China,
 19   right?
11:45 20  A.   Yes.
 21   Q.   He was helping open and operate an American-based casino,
 22   correct?
 23   A.   Correct.
 24   Q.   And while he was doing that, his wife and daughter Sabrina
 25   were in Hong Kong, correct?
```

```
 1   A.   Correct.

 2   Q.   And his daughter was attending a school called the Hong

 3   Kong International School, correct?

 4   A.   Correct.

 5   Q.   In fact, at one of your first meetings with Singer on

 6   October 31 of 2018, didn't Singer tell you that Gamal and his

 7   wife thought their money was going to the school?

 8           MR. FRANK:  Object to the hearsay, your Honor.

 9           THE COURT:  No.  She can answer that question if she

11:46 10  remembers.

11   A.   Can you repeat that question, please.

12   Q.   Yeah.  Isn't there a report of one of your first meetings

13   with Singer where Singer said Gamal and his wife thought their

14   money with respect to Sabrina was going to the school?

15   A.   I don't remember if it was one of the first reports, but I

16   remember Mr. Singer saying that the payment was going to USC.

17   Q.   The school, correct?

18   A.   Yes.

19   Q.   But then when -- and you also remember Singer had told you

11:47 20  Gamal didn't know who Donna Heinel was, correct?

21   A.   Correct.

22           MR. FRANK:  Objection.

23   Q.   But when you did the recorded call --

24           MR. FRANK:  Objection.  Can we have the date, for

25   clarification?
```

```
 1              THE COURT:  Yeah, the date, please.
 2    Q.  Well, prior to the first call in October of 2018, you knew
 3    Gamal had no idea who Heinel was, right?
 4              MR. FRANK:  Objection, misstates.
 5              THE COURT:  The objection is overruled.  If she knows.
 6    A.  Mr. Singer told agents that --
 7    Q.  This is the question:  Before the first call in October of
 8    2018, you knew he didn't know who Donna Heinel was; that's why
 9    the title had to be put in the recording, right?
11:48 10  A.  No, that's incorrect.
11    Q.  Well, you didn't -- he didn't know who Donna Heinel was,
12    that's correct, right?
13    A.  We didn't find out until after the call.
14    Q.  Okay.  When you made that call, you knew for sure he had
15    never heard of Donna Heinel, right?
16    A.  No.  Mr. Singer didn't tell us until after the call.
17    Q.  Okay.  Okay.  After the call, like six days later he tells
18    you he doesn't know who Donna Heinel was, correct?
19    A.  Correct.
11:48 20  Q.  Okay.  So when Singer is in that call referring to a
21    payment to Donna Heinel, that's bending the truth, isn't it?
22    A.  Mr. Singer used Donna Heinel's name as the insider USC
23    that got Mr. Abdelaziz's child in as a basketball player.
24    Q.  He didn't say "insider."  He said "Donna Heinel," right?
25    A.  He used Donna's name.  She was the insider.
```

```
 1   Q.   Right.  I know that "insider" is your theory here.  But
 2   Donna Heinel has never been mentioned to him before this call,
 3   correct?
 4   A.   Correct.
 5   Q.   And let's be clear on Donna Heinel.  You would agree that
 6   she did not start personally taking money until the summer of
 7   2018, right?
 8   A.   July 2018, correct.
 9   Q.   Correct.  Okay.  In fact, the wiretap affidavit in this
10   case says that up until the summer of 2018, all the money
11   Singer provided to Heinel for her assistance went to the USC
12   athletic program, right?
13   A.   I don't exactly know what it says in the affidavit.  I
14   don't recall.  But the money went -- she started receiving
15   payments personally in July 2018.
16   Q.   Right.  And you know Gamal's payment was in March of '18,
17   right?
18   A.   Yes.
19   Q.   Let me show you Exhibit 9025.
20           MR. KELLY:  Just the witness, please.
21   Q.   I'll ask you to read that to yourself and I'll ask you if
22   you recognize it in a moment.
23           MR. FRANK:  Your Honor, if he wants to refresh her
24   recollection, I believe she --
25           MR. KELLY:  I believe she said a moment ago she
```

```
 1    doesn't recall exactly what it says.  So I'm showing it to her.

 2    I jumped to a question in between, but I'm getting back to it.

 3            Please keep scrolling.  Keep scrolling, keep

 4    scrolling, yeah.  Keep scrolling, please.  Keep scrolling.

 5    Q.   Okay.  Have you had a chance to take a quick look at what

 6    this excerpt is?

 7    A.   Yes.

 8    Q.   Do you recognize what it is?

 9    A.   It's an affidavit.

11:52 10        MR. FRANK:  Objection.

11            THE COURT:  Yeah, it's not in evidence.  She shouldn't

12    be testifying about the document.

13            MR. KELLY:  Okay.

14    Q.   Do you recognize what the document is, Agent?

15    A.   It's an affidavit.

16            THE COURT:  Just do you recognize it, yes or no?

17    A.   Oh.  I read this document before, but I do not -- it's not

18    my signature.

19    Q.   Right.  But you read it before you came here today as part

11:52 20   of your investigative duties, right?

21    A.   Yes.

22            MR. KELLY:  Okay.  I offer this, your Honor.

23            MR. FRANK:  Just a moment, your Honor.  It's hearsay,

24    your Honor.  So we're going to object.

25            THE COURT:  Sustained.
```

```
 1   Q.   Well, is it your memory that a federal judge was, in fact,

 2   told that up until the summer of 2018 all the money Singer

 3   provided to Heinel for her assistance went to the USC athletic

 4   program?  Is that your memory?

 5   A.   I don't specifically remember that sentence, but I know

 6   Donna Heinel started receiving money personally in the summer

 7   of 2018.

 8   Q.   Okay.  And you also know that's several months after Aziz

 9   made any donation, right?

11:53 10   A.   That's after he made payment, yes.

11   Q.   Okay.  And the payment was in March of 2018, and Heinel

12   was not personally pocketing any money at that time, right?

13   A.   Correct.

14   Q.   In fact, let me show you, just for the witness, 1563A.

15        MR. FRANK:  Is this being offered to refresh her

16   recollection?

17        MR. KELLY:  No.  This is being offered as an admission

18   of a party, the United States of America.

19        MR. FRANK:  We object to this, your Honor.

11:53 20        MR. KELLY:  It's First Circuit law, Qatar.

21        THE COURT:  Are you showing this to the witness?

22        MR. KELLY:  I was responding to the objection, but

23   I'll show it to the witness now.

24   Q.   Please take a look at 1563A, please.

25        Have you had a chance to take a quick review of this?
```

```
 1   A.   Yes.

 2   Q.   If you look at the top of the document, the very top,

 3   direct your attention to the very top.

 4        MR. KELLY:  Could you yellow the top part, please,

 5   Mr. Carter.  Yes, right there.

 6   Q.   You see that, right?

 7   A.   Yes.

 8        MR. FRANK:  Your Honor, I object.

 9   Q.   This is an independently admissible admission of the

11:54 10   United States --

11        THE COURT:  It's not going to be admitted.  It's a

12   pleading in this case.  It's clearly not admissible.  The

13   objection is sustained.

14        MR. KELLY:  Just for the record, I respectfully

15   disagree.  I think this is all the First Circuit --

16        THE COURT:  All right.  Your objection is noted.  Move

17   on.

18   Q.   Has it been indicated previously that you have no evidence

19   that Donna Heinel was personally pocketing money before the

11:55 20   summer of 2018?

21        MR. FRANK:  She's answered this question about four

22   times, your Honor.

23        THE COURT:  She can answer it one last time.

24   A.   I have evidence that shows Donna Heinel received payments

25   personally in the summer of 2018.
```

```
  1    Q.    And nothing before that, right?

  2    A.    Correct.

  3    Q.    In fact, you're aware that in May of 2018, Singer was

  4    recorded telling the Yale soccer coach, Meredith, that Heinel

  5    does not take any of the money for herself personally but maybe

  6    down the road she may.  You're aware that Singer was recorded

  7    saying that, right?

  8    A.    I was aware Mr. Singer was recorded on a conversation with

  9    Mr. Meredith.  I don't recall exactly that being said.

11:56 10  Q.    Let me show you Exhibit -- well, let me ask you this:

 11    Does the IRS -- IRS has a lot of forms, right?

 12    A.    Yes.

 13    Q.    And a lot of the forms of the IRS having to do with a

 14    criminal investigation is reported up to their superiors within

 15    the department, correct?

 16    A.    Some forms, yes.

 17    Q.    Sure.  And do you recall whether on any of the forms in

 18    this case where it was reported up the chain there was an

 19    indication that Singer had been recorded by the Yale soccer

11:57 20  coach talking about Heinel not taking any of the money for

 21    herself personally but maybe down the road?

 22    A.    I recall submitting documents in this investigation to my

 23    management.  I don't recall that specific statement.

 24    Q.    Okay.  Let me just direct the witness's attention to

 25    Exhibit 9014.  I'll show you the first page.  Let's show you
```

```
 1   the last page.  Let's highlight the names.  Do you see the
 2   first name there?  And then let's go to page 8.
 3              MR. FRANK:  Your Honor, could we have --
 4              MR. KELLY:  These are Bates numbers that I got from
 5   the government, your Honor.  It's 1719862 through 1719877.
 6   Again, this is just for the witness.  We go to where it talks
 7   in the middle -- second paragraph where it starts on the one,
 8   two, three, four -- the fifth line down, all the way to the
 9   right where it starts with that sentence, yes.
11:58 10  Q.  Could you review that to yourself.
11              MR. KELLY:  Mr. Carter, please highlight the date
12   there.  Just the date, yes.  All right.  Now please take it
13   down.
14   Q.  Has that document refreshed your recollection as to any
15   communication within the IRS about Singer's conversation that
16   was recorded by Coach Meredith?
17   A.  Yes, it does.
18   Q.  So is it, in fact, accurate to say that at some point,
19   actually June 11 of 2018, it was reported that Heinel,
11:59 20  according to Singer, does not take any of the money for herself
21   personally but Singer believed that down the road she may
22   because she has been involved with Singer for four years and
23   she's kind of getting this whole thing.  That was reported up
24   the chain, right?
25   A.   Yes.
```

1    Q.    And that's in May of 2018?

2    A.    The call was in May 2018.

3    Q.    Right.  Okay.  Now, before we get to these calls, I think

4    you testified two days ago that there was no written script for

5    Singer on these calls.  Is that still your testimony?

6    A.    There was written scripts by one of the AUSAs at some

7    point during this investigation.  I'm not sure of the date, but

8    generally we just gave Mr. Singer verbal instructions.

9    Q.    Okay.  But there was a very explicit written script at one

12:00 10    point called the McGlashan script, right?

11    A.    I don't recall that specific script, but there were

12    scripts written by an AUSA.

13         MR. KELLY:  Please show just the witness Exhibit 1478,

14    please.

15    Q.    Do you recognize this document?

16    A.    I know what this document is.  I don't -- I didn't write

17    it.

18    Q.    All right.

19    A.    And I don't recall the specifics.

12:01 20    Q.    All right.  But it is, in fact, consistent with your

21    memory that there were on occasion written scripts?

22    A.    Correct.

23    Q.    Okay.  And in this particular instance, this was a script

24    written by an AUSA not at this table, right?

25         MR. FRANK:  Objection to what this is.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | MR. KELLY:  Well, I offer it, your Honor, Exhibit |
| 2   | 1478. |
| 3   | MR. FRANK:  Hearsay, your Honor. |
| 4   | THE COURT:  Objection sustained. |
| 5   | MR. KELLY:  Judge, I'm not offering it for the truth |
| 6   | of the matter asserted.  I'm just offering it that it exists. |
| 7   | I don't care what's said in here.  It's not for the truth. |
| 8   | It's not hearsay.  Just because he objects on hearsay doesn't |
| 9   | mean it's hearsay.  It's not being offered for the truth, Your |
| 12:02 10 | Honor. |
| 11  | MR. FRANK:  It's not proper impeachment, your Honor. |
| 12  | MR. KELLY:  It's evidence in the case, your Honor. |
| 13  | THE COURT:  We can talk about it at a break at a later |
| 14  | time, but for the time being, the objection is sustained. |
| 15  | Q.   Well, let me show you what is an exhibit in the case, |
| 16  | Exhibit 13A, please. |
| 17  | MR. FRANK:  I don't believe 13A is in evidence.  13 is |
| 18  | in evidence. |
| 19  | MR. KELLY:  Okay.  Let's go to Exhibit 13 then and |
| 12:02 20 | let's please go to that -- actually, no.  Let's offer 13A. |
| 21  | It's a subset of a document already in evidence. |
| 22  | MR. KENDALL:  Your Honor, I hate to disagree with |
| 23  | Mr. Kelly, but if you remember, yesterday I raised an issue |
| 24  | that we needed to go through 13 and redact out some parts |
| 25  | because it was I think over 500 pages. |

```
 1            The government gave us 13A late last night.  I haven't
 2    had a chance to review it.  I don't object to anybody using it,
 3    but I don't want it to be said that we've agreed that it all
 4    goes in just as it's been prepared.  We need to have a couple
 5    of days.
 6            MR. KELLY:  Just for the record, that 13A is mine.  I
 7    prepared that.
 8            MR. KENDALL:  Whatever it is, I haven't looked at
 9    anything.  I'll be happy to get this resolved and not slow down
10    the process.
11            MR. KELLY:  I'll defer and go back to 13, Judge.  I'll
12    keep it moving.
13            THE COURT:  What is before the witness now?
14            MR. KELLY:  Let's put up Exhibit 13, please.
15            THE COURT:  Exhibit 13, which is in evidence?
16            MR. KELLY:  Yes, your Honor.
17            THE COURT:  All right.
18            MR. KELLY:  Let's see if we can't find where I had
19    that.  Yes.  Thank you.
20            Okay.  Can you highlight October 2 and that whole
21    first two paragraphs, please, and then the second paragraph as
22    well.  All right.
23    Q.  So this was on October 2 of 2018, correct?
24    A.  Correct.
25    Q.  Okay.  So this was about 26 days before the first of the
```

1    two calls to Abdelaziz, correct?

2    A.    Correct.

3    Q.    And this was Mr. Singer's mindset when he called

4    Abdelaziz, right?

5         MR. FRANK:  Objection to what was his state of mind.

6         THE COURT:  Sustained.

7    Q.    Well, as of October 2, 26 days beforehand, he wrote a note

8    to himself, right?  He said he had a loud and abrasive call

9    with agents.  "They continue to ask me to tell a fib and not

12:04 10   restate what I told my clients as to where the money" -- "where

11   here money was going to, to the program, not the coach, and

12   that it was a donation and they want it to be a payment."

13         Then it says, "I asked for a script if they want me

14   to ask questions and retrieve responses that are not accurate

15   to the way I should be asking the questions.  Essentially they

16   are asking me to bend the truth, which is what they asked me

17   not to do when working with the agents and Eric Rosen.

18         "Liz raised her voice to me like she did in the hotel

19   room about agreeing with her that everyone bribed the schools.

12:05 20   This time about asking each person to agree to a lie I was

21   telling them."

22         That's what it reads, correct?

23   A.    That's what Mr. Singer wrote.

24   Q.    And that was his perspective, right?

25         MR. FRANK:  Objection.

```
 1              THE COURT:  Sustained.
 2    Q.   Well, that wasn't your perspective, right?  You testified
 3    that you did no such thing.  You didn't yell at him?
 4    A.   That's what he wrote.
 5    Q.   Okay.  Well, did you yell at him?
 6    A.   No, I did not.
 7    Q.   Did you use a stern voice?
 8    A.   I was animated.  I repeated myself numerous times, but I
 9    did not raise my voice or yell at Mr. Singer in that hotel
12:06 10   room.
11    Q.   So how can you be animated without raising your voice?
12    A.   I'm generally a very quiet person.  So I was repeating
13    myself and using my hands because I usually talk with my hands
14    and I was not angry with Mr. Singer and I did not raise my
15    voice in the hotel room.
16    Q.   Okay.  Now --
17              MR. KELLY:  Let's go the transcript for Exhibit 587.
18    Q.   Now, again, Singer calls Aziz, right?
19    A.   Correct.
12:07 20   Q.   And they hadn't spoken in several months, right?
21    A.   They had not spoken since the wire.
22    Q.   And his daughter -- I'm sorry, Aziz was never intercepted
23    on a wire, was he?
24    A.   Correct.
25    Q.   So Aziz's daughter was already at USC, correct?
```

```
 1    A.   Correct.

 2    Q.   Any discussions he had with Singer had been months

 3    earlier, right?

 4    A.   Prior, correct.

 5    Q.   Okay.  Earlier, prior.  Sorry.  But it was definitely

 6    prior.  They hadn't spoken in months, correct?

 7    A.   Correct.

 8    Q.   So any discussions they had would have been months prior

 9    or earlier, correct?

10    A.   Correct.

11    Q.   And there's no wiretap of those discussions, right?

12    A.   Correct.

13    Q.   There's no recordings of any kind of those discussions,

14    right?

15    A.   Correct.

16    Q.   Now, when he says -- let's go to, look at lines 20 to 22.

17    Actually, make it 20 to 24.

18         When Singer asks him, "Did you guys go to parents

19    weekend last week or two weekends ago," do you understand that

20    to be a reference to USC parents weekend?

21         MR. FRANK:  Objection, your Honor.  Her understanding

22    is irrelevant.

23    Q.   Well, did you investigate --

24         THE COURT:  She can state what her understanding is.

25    Q.   You were one of the investigators in this case, right?
```

```
 1   A.   Yes.

 2   Q.   And you worked hundreds of hours on this case, right?

 3   A.   Yes.

 4   Q.   You listened to wiretaps, you looked at e-mails, right?

 5   A.   Yes.

 6   Q.   Okay.  So I'm sure you've looked at this transcript

 7   before, right?

 8   A.   Yes.

 9   Q.   Okay.  And when Singer said to him, "Did you guys go to
```
12:09 10   parents weekend last weekend or two weekends ago," did you
```
11   understand him to be referring to USC's parents weekend that

12   all of these colleges have?

13   A.   Yes.

14   Q.   Okay.  And when Aziz said, "Yes, we did.  We loved it.  We

15   absolutely loved it.  Got to meet a lot of people."  Do you see

16   that?

17   A.   Yes.

18   Q.   Do you know which people he was referring to?

19   A.   No, I do not.
```
12:09 20   Q.   Did you investigate that at all, which people he met with
```
21   at USC during parents weekend?

22   A.   No, I did not.

23   Q.   Do you have any knowledge that he went to like a VIP event

24   where a USC president warmly welcomed him?

25   A.   I was not aware of that.
```

|    |    |
|----|----|
| 1 | Q.   And do you think that might affect what was going on in |
| 2 | Aziz's mind at the time he was having this conversation? |
| 3 | MR. FRANK:   Objection. |
| 4 | THE COURT:   Sustained. |
| 5 | Q.   You don't know what was going on in Aziz's mind, do you? |
| 6 | A.   Correct. |
| 7 | Q.   Go to the second page, please, at the top.   The first |
| 8 | line, "Has Adam been on campus yet to see Sabrina?"   Do you |
| 9 | understand that to be a reference to his son Adam Abdelaziz? |
| 12:10 10 | A.   Yes. |
| 11 | Q.   I think you confirmed earlier that it was your |
| 12 | understanding, or it's your understanding now, that Adam had a |
| 13 | very good relationship with Singer. |
| 14 | A.   That Mr. -- that Adam Abdelaziz worked with Mr. Singer, |
| 15 | yes. |
| 16 | Q.   That his son Adam had been counseled by Singer previously, |
| 17 | right? |
| 18 | A.   Yes, yes. |
| 19 | Q.   And on line 8, the reference to Columbia by Aziz, that's |
| 12:10 20 | Columbia University where his son was going, correct? |
| 21 | A.   Yes. |
| 22 | Q.   And again, you're aware that over time he donated 200,000 |
| 23 | to Columbia, right? |
| 24 | A.   Yes. |
| 25 | Q.   And you see where on line 13 Aziz starts talking about how |

```
 1   he was too busy in China?

 2   A.   I see that, yes.

 3   Q.   And is that consistent with your understanding that in

 4   2017 he was spending a lot of time working in China?

 5   A.   Yes.

 6   Q.   All right.  And then below, lines 21 to 22, he again

 7   referenced that he had just landed in China.  He didn't have

 8   time to discuss it with his own son, right?

 9   A.   Yes, he says that.

12:11 10   Q.   Well, do you have any basis to think that was inaccurate,

11   he was working hard in China, didn't have time to discuss these

12   things with his son?

13   A.   He stated he just landed in China.  "We didn't have time

14   to discuss it."

15   Q.   Okay.  Then there's further discussions.  Singer tells him

16   he's in Boston.  They were watching the game last night.

17   That's a Red Sox game reference, right?

18   A.   Yes.

19   Q.   Playoffs, right?

12:12 20   A.   Yes, World Series.

21   Q.   All right.  So then Singer tells him a lie, right?

22        MR. FRANK:  Objection to the characterization.

23        THE COURT:  Sustained.

24   Q.   Well, okay.  Singer tells him his foundation was being

25   audited.  Was that a lie?
```

| | |
|---|---|
| 1 | A.   Mr. Singer's foundation was not being audited. |
| 2 | Q.   Okay.  So it's not true, right? |
| 3 | A.   Correct. |
| 4 | Q.   And typically things that aren't true are lies, right? |
| 5 | A.   We -- there was a ruse.  We told Mr. Singer to say that |
| 6 | his foundation was being audited and it wasn't.  So it was not |
| 7 | true. |
| 8 | Q.   I'm not saying you can't use a ruse, but that particular |
| 9 | statement was a lie designed to further your investigation, |
| 12:13 10 | right? |
| 11 | A.   Yes. |
| 12 | Q.   And at that point, starting at the bottom there, line 21, |
| 13 | is it fair to say that Gamal kind of yeses him to death for a |
| 14 | bit? |
| 15 | MR. FRANK:  Objection. |
| 16 | Q.   Do you know what the phrase "yeses him to death" means? |
| 17 | A.   According to -- on the call Mr. Abdelaziz says "yes" when |
| 18 | he answers. |
| 19 | Q.   I'm asking now in general.  Do you know what the phrase |
| 12:13 20 | "yesing someone to death" means? |
| 21 | A.   No. |
| 22 | Q.   When someone says "Yes, yes, yes, yes."  You never heard |
| 23 | that phrase? |
| 24 | A.   No. |
| 25 | Q.   Okay.  Well, does he, in fact, say "Yes, yes, yes, yes," |

```
 1   four different times?

 2   A.   He does respond "Yes."

 3   Q.   Okay.  So Singer tells him the Foundation -- let's look at

 4   the top of page 4.  I'm sorry, I'm jumping around here.  "We're

 5   getting audited right now."  He says "Yes."

 6          Then he says, "Looking at all my payments."  "Yes."

 7   "That have come into our Foundation, so they asked me, you

 8   know, about the $300,000 payment."  "Yes."  And then "that was

 9   made."  "Yes."

10          Now, there's no -- in this call, when he's talking

11   about the IRS audit, there's no panic by Abdelaziz, is there?

12          MR. FRANK:  Objection.

13          THE COURT:  Sustained.

14   Q.   Well, you heard that part of the tape, right?  He says,

15   "Yes, yes, yes"?

16   A.   I heard that, yes.

17   Q.   Doesn't sound like his heart is dropping, does it?

18          MR. FRANK:  Objection.

19          THE COURT:  If she can answer it.

20   A.   It sounds like he's listening to Mr. Singer and saying

21   "Yes."

22   Q.   Okay.  You know who Mr. Isackson is, right?

23   A.   Yes.

24   Q.   When he was told about the audit, his heart dropped and he

25   got all panicky, right?
```

```
 1    A.   I'm not exactly sure if that's his exact terms, but I know
 2    he was nervous.
 3             MR. KELLY:  Okay.  Let's see if we can pull that
 4    exhibit up, Mr. Carter.  I think it's 607 at page 88.  607 is
 5    in evidence.
 6             MR. FRANK:  Is that a transcript?
 7             MR. KELLY:  A transcript.
 8             MR. FRANK:  Okay.
 9    Q.   Let's look at line 14 where Isackson reports to Singer
10    what happened when he got that phone call.  "My wife doesn't
11    even know, my heart just f-ing stopped.  It was just like, you
12    know, I'm thinking worst case."
13             So Isackson knew he had done something wrong and
14    panicked, right?
15             MR. FRANK:  Objection.
16             THE COURT:  Sustained.
17             MR. KELLY:  Take that down, please, and go back to
18    587.
19    Q.   Now, okay.  Let's talk about that $300,000 payment.  You
20    know it was originally supposed to be 200,000, right?
21    A.   I was not aware of that.
22    Q.   During the course of your investigation you never learned
23    that the original discussion was about 200,000 from Aziz to
24    USC?
25    A.   No.  I was familiar with 250,000, not 200,000.
```

|    |    |
|----|----|
| 1  | Q.   And you never heard that the 200,000 got bumped up to |
| 2  | 300,000 at the end and the money then was supposed to go to The |
| 3  | Key Foundation.  You never learned that? |
| 4  | A.   I learned of the $300,000 payment. |
| 5  | Q.   But you're not familiar with that switch from 200 to 300? |
| 6  | A.   No, I am not. |
| 7  | Q.   And you spent hundreds of hours on this case, right? |
| 8  | A.   Yes. |
| 9  | Q.   Now, on lines 13 through 23, Singer tells him this tale |
| 12:18 10 | about Donna Heinel, right? |
| 11 | A.   Yes, he mentions Donna Heinel, yes. |
| 12 | Q.   And at the end of all that spiel, Abdelaziz is asked |
| 13 | "You're okay with that, right?"  "Of course."  Because it makes |
| 14 | no sense, right?  This whole fact pattern that gets thrown at |
| 15 | him while he's driving in his car in L.A. makes no sense, does |
| 16 | it? |
| 17 |           MR. FRANK:  I object, your Honor. |
| 18 |           THE COURT:  Sustained. |
| 19 | Q.   Well, you would agree he has no idea who Donna Heinel at |
| 12:18 20 | USC is at that point in time, right? |
| 21 | A.   Mr. Singer stated that Mr. Abdelaziz did not know Donna |
| 22 | Heinel. |
| 23 | Q.   Are you familiar with a place called the Galen Center? |
| 24 | A.   Yes. |
| 25 | Q.   That's a basketball arena on the USC campus, right? |

```
  1   A.   Yes.
  2   Q.   And at a certain point in time Aziz was told some of his
  3   money would be going to the Galen Center, right?
  4   A.   I don't specifically recall him being told it would be
  5   going to the Galen Center.  I know he was told it was going to
  6   a USC program.
  7   Q.   Right.  Initially he's told it would go into a program and
  8   then Singer tells him later it's going to the Galen Center,
  9   right?
12:19 10   A.   I don't recall specifically that it was going to the Galen
 11   Center.
 12          MR. KELLY:  All right.  If we could play Exhibit 439
 13   in evidence.
 14          (Audio recording played.)
 15   Q.   Now, that call which is in evidence is in December of
 16   2017, correct?
 17   A.   Correct.
 18   Q.   And so that is prior to when Aziz actually makes the
 19   payment in March of 2018, right?
12:21 20   A.   Correct.
 21   Q.   So does that call refresh your memory that at some point
 22   Aziz is told 200,000 is going to the Galen Center?
 23   A.   No.  That call just -- I remember that voicemail.  That's
 24   going to Mr. Singer stating that Ms. Heinel wants the money
 25   going to the Galen Center.  I don't know that Mr. Singer told
```

```
        1    Mr. Abdelaziz the payment was going to the Galen Center.

        2    Q.   You have no idea?

        3    A.   No.

        4    Q.   All right.  How about -- I'm going to show you Exhibit 448

        5    which is in evidence.  I'd like to direct your attention down

        6    most of the way until it references -- well, actually, before I

        7    do that.

        8          This is a note Singer wrote to himself on December

        9    15, right?

12:22  10    A.   Yes.

       11    Q.   And the subject is "USC with Donna."  Right?

       12    A.   Correct.

       13    Q.   And if you go further on down, you see "Sabrina Aziz,

       14    300-200."

       15    A.   Yes, I see that.

       16    Q.   And were you aware that 200 was supposed to go to the

       17    Galen Center and 100 was supposed to go to Singer's foundation?

       18    A.   I was aware that there was -- Mr. Abdelaziz's payment was

       19    going to a program at USC.

12:22  20    Q.   But you're just not sure which one?

       21    A.   I'm not aware if he told Mr. Singer 300,000 or 200,000.

       22          MR. KELLY:  All right.  Well, let me show just the

       23    witness, please, Exhibit 1564.  Let's go down to the middle of

       24    that document.  Mr. Carter, obviously the name I want is right

       25    there and the amounts are to the right.
```

```
 1   Q.   All right.  You recognize this document?

 2   A.   No, I have not seen this document.

 3   Q.   All right.  Does it refresh your recollection at all as to

 4   the 300-200 split?

 5   A.   No, it doesn't.

 6   Q.   And with respect to that document, you've never seen that

 7   before?

 8   A.   No, I have not.

 9   Q.   How about with respect to the one I just showed you, the

12:24 10   448 that's in evidence, Singer note to self.  Have you seen

11   that before coming here today?

12   A.   Yes, I've seen that.

13        MR. KELLY:  Okay.  Let's go back to the transcript of

14   that first call 587, please.  Let's go to page 5.

15   Q.   Do you see where Aziz says, "Is that what you're saying?"

16   Line 9?

17   A.   Yes, I see that.

18   Q.   So Aziz is trying to find out what Singer is saying,

19   right, "Is that what you're saying?"

12:25 20        MR. FRANK:  Objection to what Aziz is trying to do.

21        THE COURT:  Sustained.

22   Q.   Well, when you see that on your transcript, "Is that what

23   you're saying," to you, Agent, does that signify to you someone

24   doesn't know what the other person is saying?

25        MR. FRANK:  Objection.
```

**A2176**

         1          THE COURT:  Overruled.  If she agrees with it, she can

         2     say so.

         3     A.   Mr. Abdelaziz is saying, "Is that what you're saying?"

         4     Q.   Okay.  Then further on down, after being told about this

         5     IRS audit on line 19 -- I'm sorry, start with 17.  Aziz says

         6     "But Rick, you're a friend.  You've been a friend of my family

         7     for many years."

         8          MR. KELLY:  Can you highlight that, Mr. Carter,

         9     please.

12:25   10     Q.   "Is there anything I can do to help?"  It appears, doesn't

        11     it to you, Agent, he thinks Singer is in trouble with the IRS?

        12          MR. FRANK:  Objection to what he thinks.

        13          THE COURT:  Sustained.

        14     Q.   Well, let me ask you this:  If someone gives $300,000 to

        15     USC, that can be a charitable donation, correct?

        16     A.   Not if it's in exchange for --

        17     Q.   I know, I know, I know.

        18          MR. FRANK:  Your Honor.

        19     Q.   But a donation to USC --

12:26   20          THE COURT:  Wait a minute.  There's an objection.

        21     What's the objection?

        22          MR. KELLY:  I'll rephrase it, Judge.

        23          THE COURT:  Rephrase.

        24          MR. FRANK:  He interrupted her before she was allowed

        25     to answer his own question.  I object.

```
 1                MR. KELLY:  I think the judge told me to keep going.
 2                THE COURT:  We'll let you do that on redirect.
 3                MR. FRANK:  Thank you, your Honor.
 4   Q.   It's generally understood that people can make donations
 5   to 501(c)(3) charities, right?
 6   A.   Yes, they can make legitimate donations to 501(c)(3)
 7   charities.
 8   Q.   All right.  So it could be to a university, it could be to
 9   a cancer association, it could be to all sorts of things which
10   are 501(c)(3) organizations, correct?
11   A.   Correct.
12   Q.   And the person who gives the money, let's say it's
13   $300,000, if that person gives money in a particular year,
14   $300,000 to one charity, it's a $300,000 donation, and he or
15   she gets whatever credit you get in that situation, right?
16   A.   If it's a legitimate donation, yes.
17   Q.   And if a person gives it to two or three charities and it
18   totals 300,000, it's still a $300,000 donation for the giver,
19   right?
20   A.   If it's a legitimate donation, yes.
21   Q.   That's my hypothetical here.  So if there's three
22   legitimate or two legitimate charities, a person can donate
23   money to two legitimate charities?
24                MR. KELLY:  I see Mr. Frank is --
25                MR. FRANK:  He's asking a hypothetical.  She's not an
```

```
 1    expert witness.
 2              THE COURT:  No, she can answer that.
 3    A.   I'm sorry.  Can you repeat that.
 4    Q.   All right.  So you have an accounting degree from Bentley,
 5    right?
 6    A.   Yes.
 7    Q.   And you're an IRS agent, right?
 8    A.   Correct.
 9    Q.   If a person gives $300,000 to charity and claims that, as
12:28 10   a deduction, it doesn't matter how many charities it is, if
11    they're legitimate, it could be five charities, it could be one
12    charity, it's still just 300,000 bucks, right?
13    A.   Correct.
14    Q.   So if a person has in his mind that both a university
15    donation and a donation to The Key is to two charities, it's
16    still just 300,000, right?
17              MR. FRANK:  Objection to what a person has in his
18    mind.
19              THE COURT:  Well, she can answer it if she understands
12:28 20   it.
21    A.   If it was a legitimate donation to the charities, they can
22    be deducted, but it's not -- this isn't a donation.
23    Q.   So if Mr. Abdelaziz thought he had made a legitimate
24    donation to USC and to The Key, it's $300,000 either way,
25    right?
```

A.    The payment was in exchange for something.  That is not a
donation.

Q.    I know that's your position.  But if you're donating
$300,000 to two charities that you think are legitimate, it's
just a $300,000 deduction.  You don't get more or less because
it's to one charity or two, right?

A.    Right.  If you are making a legitimate donation, you can
deduct multiple payments to different charities.

Q.    So if Aziz is thinking, well, he can take the credit for
the foundation or the school, what does it matter to him
financially; it doesn't matter at all, does it?

          MR. FRANK:  Objection.

          THE COURT:  Sustained.

Q.    Well, I mean, The Key Worldwide Foundation was, in fact, a
501(c)(3) registered charity, correct?

A.    It was registered with the IRS, correct.

Q.    Okay.  So if a person like Mr. Abdelaziz Googled it and
checked out where it was incorporated, it was a registered
charity at the time, right?

A.    It was registered with the IRS at that time, yes.

Q.    And it was registered when Aziz was dealing with Singer in
2017, correct?

A.    Correct.

Q.    And, in fact, during the course of your investigation, did
you learn that his son went on some service trip with Singer as

```
 1    part of the Foundation's work?

 2    A.   Yes, I was aware of that.

 3    Q.   Okay.  And are you aware that his son went with a group of

 4    kids to Atlanta to help underserved kids?

 5    A.   I was aware that he participated in the Foundation.  I'm

 6    not aware -- I don't recall specifically Atlanta.

 7    Q.   All right.  But you're aware that Singer went with his son

 8    and some other boys on a trip as part of The Key's functions,

 9    right?

10    A.   Correct.

11    Q.   I'm going to show you a photo of that, which the number

12    escapes me here.

13            MR. KELLY:  Can I have a moment, your Honor.

14            THE COURT:  Yes.

15            MR. KELLY:  I'll communicate by phone.  Got it.

16            Let me show just the witness, please.  I think it's

17    1364, Mr. Carter.  Is that what you said?  All right.  Okay.

18    Q.   Looking at that photo, do you see anyone you recognize

19    there?

20    A.   Yes.

21    Q.   Who do you recognize?

22    A.   I see Mr. Singer.

23    Q.   Okay.  And is he wearing anything in particular?

24    A.   He is wearing a Bruins shirt.

25            MR. KELLY:  I offer this photo, your Honor, 1364.
```

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 1364 admitted into evidence.)

 4              MR. KELLY:  Publish it to the jury, please.

 5    Q.   So Mr. Singer is right in the middle there with the UCLA

 6    Bruins shirt, right?

 7    A.   Yes.

 8    Q.   And to our right there's a boy -- to Singer's left, two to

 9    the left, there's a boy wearing a black T-shirt.  Now there's a

12:32 10  red arrow pointing at him.  Do you recognize him?

11    A.   No, I do not.

12    Q.   Have you ever seen Adam Abdelaziz before?

13    A.   I've never seen a photo of Adam.

14              MR. KELLY:  Okay.  You can take that down.  Thank you.

15              At the end here -- let's go to the top of page 6,

16    please.  I'm still referring to the transcript.  Thank you.

17    Q.   Singer is still talking about the IRS.  "Everything is

18    great but, you know, when you're dealing with the IRS, you

19    never know where they're going to go."  That part is true,

12:33 20  right?

21    A.   Yeah, that's true.

22    Q.   Right.  Okay.  So then we get to the middle where Singer

23    says, "I'll tell you a funny story."  Do you follow me?

24    A.   Yes, I see that.

25    Q.   "Is that Donna Heinel, who is senior women's
```

**A2182**

```
 1   administrator, she actually called me," and then he starts

 2   talking about some fake fire alarm, right?

 3   A.   No.  There was a real fire alarm.

 4   Q.   Oh, okay.  Okay, that's real, too.

 5        Then he continues with the story.  Aziz says, "Yeah,"

 6   and then he tells it.  Supposedly this woman Heinel, who Aziz

 7   doesn't know, praised Singer, right?  "The profile you did for

 8   Sabrina, I loved it.  It was really well done.  And going

 9   forward anyone who isn't a real basketball player as a female,

12:34 10   I want to use that profile going forward."  Aziz says, "I love

11   it."  He says, "Yeah, it was great, absolutely great."

12        So is Singer bragging about a compliment that he

13   received allegedly from Donna Heinel, right?

14        MR. FRANK:  Objection to what --

15        MR. KELLY:  Well, let's go above it, let's go above.

16        THE COURT:  Sustained.

17   Q.   "Donna Heinel," and he announces her title because Aziz

18   doesn't know who she is, "Donna Heinel, who is a senior women's

19   administrator, she called me and says, 'Hey, Rick, that profile

12:34 20   that you did for Sabrina, I loved it.  It was really well

21   done."  Isn't Mr. Singer fishing for a compliment from his

22   client Aziz here?  He's bragging about some compliment he

23   received from Heinel, right?

24        MR. FRANK:  Objection.

25        THE COURT:  Sustained.
```

A2183

```
 1    Q.   All right.  So at the end, let's go to the end, 7.  Aziz
 2    pivots back to his son, right?  He's still concerned about his
 3    son Adam, right?
 4    A.   Yeah, he talks about his son Adam.
 5    Q.   Yeah.  He says, "If you ever have time for a quick call,
 6    I'd appreciate it."  Right?
 7    A.   Yes, I see that.
 8    Q.   He's still thinking about his son because he knows his son
 9    had this great relationship with Singer, right?
12:35 10    A.   It says -- asks Rick to make -- to have a call with Adam,
11    yes.
12    Q.   "I would really appreciate it.  He loves you, looks up to
13    you, and I think this is a moment where you reach out for five
14    minutes to the kid, I think he would appreciate it."  "I'll do
15    that.  I'll do that.  I'll do it this week."  And, of course,
16    he never did, right?
17    A.   Correct.
18         MR. KELLY:  Okay.  Let's take that down, please.
19    Q.   Now, during the course of your investigation, are you
12:36 20    aware that at one point Aziz sent Singer about 30 photos of his
21    daughter playing basketball?
22    A.   I recall a few photos.  I don't recall 30.
23         MR. KELLY:  All right.  Let me show just the witness,
24    please, Exhibit 549.  First to the top so the witness can see
25    the top part, please, who it's between, the date, and then just
```

```
  1    kind of slowly scroll to get a sense of the number here.
  2    Q.   So having seen that, does that refresh your
  3    recollection -- take it down, please -- does that refresh your
  4    recollection at all as to whether or not at some point you
  5    became aware that Aziz sent Singer about 30 photos?
  6    A.   I did not see that e-mail or those photos.  I saw other
  7    photos.
  8    Q.   All right.  But you've never seen this particular e-mail?
  9    A.   Correct.
12:37 10          MR. KELLY:  Offering it now not for the truth of the
 11    matter asserted, your Honor, but as evidence in this case.
 12          MR. FRANK:  No objection.
 13          THE COURT:  There is no objection.  The document will
 14    be admitted, 549.
 15          (Exhibit 549 admitted into evidence.)
 16          MR. KELLY:  All right.  Let's publish that to the
 17    jury, please.
 18    Q.   Let's see who it's from.  All right.  And let's -- what's
 19    the date, and what's the subject?  Okay.  And then see what
12:38 20    Gamal is telling Singer, "More from Hong Kong," "I know you
 21    need a close-up action shot, but it seems we never really took
 22    those."
 23          And then it looks like he's forwarding from his wife
 24    a bunch of pictures, a bunch of photos of a girls' basketball
 25    team, right?
```

```
 1    A.   Yes, I see that.

 2         MR. KELLY:  And then slowly scroll through some of

 3    them, please.  Now, take that down, please.

 4    Q.   That first call, that first recorded call you had Singer

 5    do, that wasn't sufficient, was it?

 6         MR. FRANK:  Objection, your Honor.

 7         THE COURT:  Sustained.

 8    Q.   You had Singer make a second call months later, right?

 9    A.   We had Mr. Singer make another call.  I don't exactly

12:40 10   recall the date, if it was months later, but he made another

11    call.

12    Q.   About two months go by.  On January 3 of 2019 there's a

13    second call, right?

14    A.   Yes.

15    Q.   And in between that time period, there's no contact

16    between Singer and Abdelaziz, is there?

17    A.   No.

18    Q.   Aziz's daughter is still at USC during that time period,

19    right?

12:40 20   A.   Correct.

21    Q.   And you're aware she's about to graduate in the spring,

22    right?

23    A.   This coming spring?

24    Q.   Yes.

25    A.   Yes, I'm aware that.
```

```
 1   Q.   Now, in this call, January 3 of 2019, you decided to try
 2   to scare him about his daughter's status, right?
 3              MR. FRANK:  Objection.
 4              THE COURT:  Sustained.
 5   Q.   Well, you decided to try to have Singer suggest that his
 6   daughter was in trouble with USC, right?
 7              MR. FRANK:  Objection.
 8              THE COURT:  Sustained.
 9   Q.   Well, didn't you try to have Singer suggest to him that
12:41 10   his daughter was going to be in trouble with the USC admissions
11   office?
12              MR. FRANK:  Objection.
13              THE COURT:  Sustained.
14              MR. KELLY:  Well, let's look at transcript 621.
15   Q.   Let's look at page 3, please, and let's start on line 5.
16   Let me see if I read this correctly.  Singer says -- above it
17   on 2, he says, "I want to give you just a quick heads-up."  So
18   Aziz says, "Okay."  "Donna Heinel, who is a senior women's
19   administrator at USC" -- again, he announces her title -- "she
12:42 20   called me."  "Yeah, yeah."  "To give me a heads-up and asked --
21   she was asked by admissions as to why Sabrina did not show up
22   for women's basketball in the fall."
23              Now, isn't that an attempt to scare him about his
24   daughter's status with the admissions office?
25              MR. FRANK:  Objection.
```

```
         1              THE COURT:  Sustained.
         2    Q.   Well, would most parents, most fathers be worried and
         3    distracted if his daughter's status was being asked about by
         4    the admissions office?
         5              MR. FRANK:  Objection.
         6              THE COURT:  Sustained.
         7    Q.   And here Singer says admissions is asking us why Sabrina
         8    did not show up, right?
         9    A.   Correct.
12:42   10    Q.   Aziz doesn't say, "What are you talking about?  We bribed
        11    her way in.  She doesn't have to show up."  Right, he doesn't
        12    say that?
        13    A.   He responds, "Yeah."
        14    Q.   Okay.  So if he thinks -- he thinks she has to show up,
        15    whether it's for a practice player, team manager, or whatever,
        16    she's supposed to show up, right?
        17              MR. FRANK:  Objection --
        18              THE COURT:  Sustained.
        19    Q.   Then the phrase "side door" gets injected on line 20.
12:43   20    "Side door," who is the first one who used that?
        21    A.   Mr. Singer.
        22    Q.   In fact, if you go to the top of page 4, he says it again.
        23    "Side door," right?
        24    A.   Yes.
        25    Q.   And not showing up for practice?
```

```
 1   A.   Yes.

 2   Q.   Suggesting to Aziz at least it was inappropriate for his

 3   daughter not to show up for practice?

 4          MR. FRANK:  Objection to what he's suggesting.

 5          THE COURT:  Sustained.

 6   Q.   Well, this double reference to the side door, it's

 7   Singer's double reference, right?

 8   A.   Mr. Singer said "side door."

 9   Q.   Twice, right?

10   A.   Yes.

11   Q.   And you're aware during the course of this investigation

12   Singer used the term "side door" differently with different

13   people, right?

14   A.   No, I'm not aware of that.

15   Q.   Well, are you aware that he made presentations in public

16   about how the side door was legitimate?

17   A.   I remember Mr. Singer making presentations and saying that

18   he had a side door.

19   Q.   Okay.  He never said, "I have this illegal" -- well, are

20   you aware that a video of a presentation he made at the

21   Starbucks company was seized from his laptop?

22   A.   Yes, I'm aware that there was a video from the Starbucks.

23   Q.   Okay.  And you saw that video, right?

24   A.   Yes.

25   Q.   Okay.  And he says -- he gives a description of the side
```

```
 1    door to all of these Starbucks employees, doesn't he?

 2              MR. FRANK:  Objection, hearsay.

 3              THE COURT:  Sustained.

 4              MR. KELLY:  Well, I'm going to offer that Starbucks

 5    video right now, your Honor.  It's Exhibit -- do you know the

 6    exhibit number?  I believe it's 1374A, your Honor, and it's

 7    independently admissible in this case given the extensive

 8    testimony about the phrase "side door," what it means, how it's

 9    presented by Singer, how it goes to the state of mind in the

10    803(3) exception to the hearsay rule of Mr. Singer, who is

11    alleged to be part of some conspiracy, and it's independently

12    admissible, and we respectfully request permission to play it

13    now.

14              MR. FRANK:  Objection.

15              THE COURT:  Sustained.

16    Q.   Okay.  But you are aware, Agent, that, in fact, Singer

17    discussed the side door with many different people in many

18    different contexts, right?

19    A.   I'm aware he discussed the side door with people.

20    Q.   And he had a -- he could sing a different tune for every

21    person, couldn't he, Mr. Singer?

22              MR. FRANK:  Objection to what he could do.

23              THE COURT:  Sustained.

24    Q.   He could take a different approach to different people,

25    couldn't he?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3    Q.   He could scream at Mr. Isackson and still be invited to

 4    Mr. Isackson's home, right?

 5              MR. FRANK:  Objection.

 6              THE COURT:  Sustained.

 7    Q.   Did he, in fact, scream at Mr. Isackson and still get

 8    invited to Mr. Isackson's home?

 9    A.   Yes.

12:47 10    Q.   Do you think -- well, was it your experience during the

11    course of this investigation that he screamed at all his

12    clients like that?

13    A.   I'm not aware of Mr. Singer -- I don't recall Mr. Singer

14    screaming at other parents or other people in this

15    investigation.

16    Q.   Right.  He took a different approach with different

17    people, right?

18              MR. FRANK:  Objection.

19              THE COURT:  Sustained.

12:47 20    Q.   Sometimes he became animated, sometimes not, right?

21              MR. FRANK:  Objection.

22              THE COURT:  Sustained.

23              MR. KELLY:  Well, let's move then to the Heinel

24    invoice that we have in evidence here.  One moment.  Yes, the

25    Heinel invoice, please.  That's Exhibit 596A, if I'm not
```

```
 1   mistaken.
 2   Q.    This is dated 11/5/2018, correct?
 3   A.    Correct.
 4   Q.    It's the Counting Stars invoice, correct?
 5   A.    Correct.
 6   Q.    And this is approximately, what, eight months, eight
 7   months after Aziz had made his payment, correct?
 8   A.    Correct.
 9   Q.    And on the second page there's a reference to "Hong Kong
12:48 10   International School, Abdelaziz," right?
11   A.    Correct.
12   Q.    Singer had her put that on this invoice, didn't he?
13   A.    No, he did not.
14   Q.    You requested -- whether it was you or someone else on the
15   government team, requested that Singer have her put on more
16   detail, right?
17   A.    Mr. Singer requested that Ms. Heinel put more detail on
18   her invoice.
19   Q.    Okay.  So Singer requested of Heinel to put things like
12:49 20   this on her invoices, right?
21   A.    He asked for more information on the invoices for
22   Ms. Heinel, and that's what she put on there.
23   Q.    And he did so at the government's request, didn't he?
24   A.    We directed Mr. Singer to ask Ms. Heinel to put more
25   detail on her invoices.
```

```
 1   Q.   Even though in this instance, it's eight months later,
 2   right?
 3   A.   The invoice is dated eight months later than the payment
 4   Mr. Abdelaziz made, yes.
 5        MR. KELLY:  Okay.  And, in fact, let's go back to
 6   Exhibit 13A already in evidence.
 7        MR. FRANK:  13A is not in evidence.
 8        MR. KELLY:  I'm sorry.  13, please.  Right, this
 9   October 2 note to self.  Could you scroll down to the bottom of
10   October 2, right before October 3.
11   Q.   Can you look at that last sentence that Singer writes to
12   himself, "Also as requested."  "Also as requested by agents,
13   asked her to put detail on her 20K invoices being sent to the
14   Foundation."  So Singer was asked to get Heinel to create this
15   invoice, right?
16   A.   Mr. Singer was asked to -- asked Donna Heinel to put more
17   detail in the invoices that she sent Mr. Singer.
18   Q.   Even if it made no sense from a chronology perspective?
19        MR. FRANK:  Objection.
20        THE COURT:  Sustained.
21        MR. KELLY:  Well, let's do a brief chronology then of
22   what's happening.  Just a chalk for the agent and the jury.
23   Q.   We've seen in Exhibit 11 in evidence here today an e-mail.
24        MR. FRANK:  Your Honor, could I see the chalk before
25   it's published to the jury?
```

```
 1              THE COURT:  Show it to counsel.
 2              MR. FRANK:  Can you take it down?  It's in front of
 3       the jury.
 4              THE COURT:  Yeah, take it down.
 5              MR. FRANK:  Do you have a copy, Mr. Kelly?
 6              MR. KELLY:  I think we can give you a copy.  It's
 7       right there.
 8              MR. FRANK:  We object to this chalk, your Honor.
 9              MR. KELLY:  Your Honor, it's consistent with what
12:52 10       evidence has gone in so far.
11              MR. FRANK:  It is, in fact, not consistent, your
12       Honor.
13              THE COURT:  We'll talk about it at the break, but
14       don't put it up now.
15              MR. KELLY:  Sure.  Let me -- you want me to keep
16       going, your Honor?
17              THE COURT:  Yes.
18              MR. KELLY:  Okay.  Let me show you then Exhibit 1381,
19       yes, Exhibit 1381.  Just the witness, please.
12:52 20              MR. FRANK:  Is it being offered to refresh the
21       witness's recollection?
22              MR. KELLY:  Well, okay.  Take it down, please.
23       Q.  Didn't Mr. Singer at some point text you with regard to
24       this invoice and say, "As requested" and attach a copy of the
25       invoice?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Let me show you 1381, please.
 3            MR. FRANK:  There's no reason to refresh her
 4   recollection.
 5            MR. KELLY:  I'd like to get it into evidence, your
 6   Honor.  It's evidence in the case.
 7            THE COURT:  You can show her.
 8   Q.   Can you please look at 1381.
 9            MR. KELLY:  And scroll down.  Keep going.  Wait a
10   minute.
11            MR. SHARP:  It's 1381A.
12            MR. KELLY:  It's 1381A.  Sorry about that.  Can't
13   forget the A.  1381A.
14   Q.   Take a look at that, please.
15            MR. KELLY:  And then scroll to the second page.
16   Q.   You know what that is, right?
17   A.   Yes, that's the invoice.
18   Q.   All right.  And that's Singer communicating with you about
19   it, right?
20   A.   Mr. Singer sent the invoice to the case agents, yes.
21            MR. KELLY:  I offer 1381A.
22            MR. FRANK:  Objection.
23            THE COURT:  Grounds?
24            MR. FRANK:  The chain is hearsay, your Honor.  The
25   photograph can come in, but not the chain itself.
```

```
 1              MR. KELLY:  It's not hearsay.  I'm not offering it for

 2    the truth of the matter asserted.  It's evidence in the case.

 3    It's independently admissible.  He keeps saying "hearsay."

 4    It's not being for the truth.

 5              THE COURT:  Again, it's not going to be admitted now.

 6    If you want to talk about it at the break, you can.

 7              MR. KELLY:  Yes, your Honor.

 8    Q.   But you don't dispute, Agent, do you, that at some point

 9    Mr. Singer texts you a copy of that invoice we've been

12:54 10    discussing, right?

11    A.   Correct.

12    Q.   And he said "As requested," right?

13              MR. FRANK:  Objection, hearsay.

14              THE COURT:  Sustained.

15    Q.   Do you recall?  Do you recall what he said when he sent

16    you a copy of that?

17    A.   I don't recall specifically what he said, but I recall the

18    text message with the invoice.

19    Q.   Okay.  Let's show that exhibit again, just the witness

12:55 20    again, and see if it refreshes your recollection as to what he

21    specifically said.

22              Having seen that, is your recollection refreshed as

23    to what he said?

24              MR. FRANK:  Objection to the hearsay.

25              MR. KELLY:  Refreshing recollection.
```

**A2196**

```
 1              THE COURT:  He can ask her whether her memory has been

 2     refreshed by showing the document.

 3     Q.   Has your recollection been refreshed, Agent?

 4     A.   Yes.

 5     Q.   What do you recall him saying when he sent you that

 6     invoice?

 7              MR. FRANK:  Objection, hearsay.

 8              THE COURT:  Overruled.

 9     A.   "As requested."

12:56 10              MR. KELLY:  Just a moment, your Honor.

11              THE COURT:  Yes.

12              MR. KELLY:  I'm going through my little piles here,

13     Judge.  Okay.

14     Q.   You don't dispute, Agent, do you, that Mr. Singer deleted

15     hundreds of iMessages on his phone when he was cooperating with

16     the government, right?

17     A.   I know Mr. Singer deleted text messages.  I don't know how

18     many.

19     Q.   Let me show you Exhibit 1481A in evidence, please.  Let's

12:57 20     go to the date of that on the front page.  That's October 5,

21     2018, correct?

22     A.   Yes.

23              MR. KELLY:  Let's go to, I believe it's the second or

24     third page.  It's the second -- no.  Third page, yeah, there we

25     go.
```

```
 1   Q.   Under "Contents," about six lines down, it says,

 2   "iMessages."  To the right it says, "1342 deleted."  Do you see

 3   that?

 4   A.   I see that.

 5   Q.   Is it fair to say a lot of iMessages were deleted?

 6   A.   IMessages were deleted, but I don't know if they were all

 7   deleted within the time period of Mr. Singer's cooperation.

 8   Q.   Well, at this time he was cooperating, right?

 9   A.   This extraction was made while he was cooperating.

10   Q.   I'm sorry, what?

11   A.   The extraction of the phone was made when he was

12   cooperating.

13   Q.   Okay.  Well, there was another extraction made in March of

14   '19, right?

15        MR. KELLY:  You can take this one down, please.

16   A.   Yes.

17   Q.   And that extraction showed additional deletions, right?

18   A.   I don't recall the number -- the amount that it says there

19   were messages deleted.  I don't recall the number.

20        MR. KELLY:  Let's go to 1482A, please, just for the

21   witness.

22        MR. FRANK:  How many pages is this document?

23        MR. KELLY:  This is a cover page.  This is a two-page

24   document.

25        MR. FRANK:  Do we have a copy?
```

```
 1    Q.   Do you recognize what this document is, Agent?
 2    A.   Yes.
 3             MR. FRANK:  Could we have a moment, your Honor?
 4             THE COURT:  Yes.
 5             MR. FRANK:  Thank you, your Honor.
 6    Q.   Do you recognize this document, Agent?
 7    A.   Yes.
 8    Q.   It's a second extraction report of Singer's phone, right,
 9    in March of 2019?
10    A.   It's the extraction -- a page of the extraction report
11    from March 11, 2019.
12    Q.   Right.  So it's several months after the first one I just
13    showed you, right?
14    A.   Yes.
15             MR. KELLY:  Okay.  Let's scroll down to the second
16    page, please.  Go again to the "Contents" section.  Go again to
17    "iMessages."
18    Q.   Do you see now the number is higher, right?  1648 is
19    higher than the previous number, correct?
20    A.   Yes.
21    Q.   So many more iMessages have been deleted by Mr. Singer
22    during the time he was cooperating with the government,
23    correct?
24    A.   iMessages were deleted when Mr. Singer was cooperating
25    with the government.
```

```
 1    Q.   Right.  And those are the ones, those iMessages are the
 2    ones that you can't capture in a wiretap, right?
 3    A.   Correct.
 4    Q.   And I think you testified yesterday, I'm sorry, two days
 5    ago, that you didn't find out about these deletions until
 6    February of 2020?
 7    A.   Some of the deleted text messages I found out about in
 8    February, approximately February 2020, and then other iMessage
 9    deletions I did not find out about until I was preparing for
10    trial.
11    Q.   All right.  Is there anything in particular which
12    triggered your finding out that these had been deleted in
13    February of 2020?
14    A.   The AUSA asked me to look at the deleted -- the iPhone
15    extraction for deleted text messages.
16    Q.   Okay.  And are you aware if that was triggered by a
17    defense request or this was some sort of government
18    determination?
19    A.   I'm aware of the defense allegation that there were
20    deleted text messages.
21    Q.   And it's because of that then the government determined
22    deletions had been made, right?
23    A.   And at that point -- and then I was asked by an AUSA to
24    look through the phone images for deleted text messages.
25    Q.   Right.  There was a request from the defendant's counsel
```

```
 1   in this case about deletions?
 2          MR. FRANK:  Objection.  He's testifying.
 3   Q.   That's when it was discovered.
 4          THE COURT:  Sustained.
 5   Q.   Now, I believe you testified --
 6          MR. KELLY:  Judge, apologies, but I probably have 15
 7   to 20 minutes.
 8          THE COURT:  All right.  We're going to take the lunch
 9   break.  You may step down for the time being, Ms. Keating.
10          We'll be in recess for one hour.
11          (Jury exits.)
12          THE COURT:  All right.  Be seated, counsel.
13          Mr. Kelly, how much longer?
14          MR. KELLY:  I'm trying to move this, your Honor.  I
15   would certainly hope I can get this done in a half an hour.
16          THE COURT:  And then I take it, Mr. Kendall, you'll be
17   the rest of the afternoon?
18          MR. KENDALL:  Into tomorrow morning sometime, your
19   Honor.
20          THE COURT:  Okay.  Anything else that needs to come to
21   the Court's attention before we recess for lunch?
22          MR. FRANK:  No, your Honor.
23          MR. KELLY:  No, your Honor.
24          MR. KENDALL:  No, thank you, your Honor.
25          THE COURT:  We're in recess then until 2:00.
```

01:02 on line 10, 01:03 on line 20

```
 1              (Recess taken 1:03 p.m. to 2:07 p.m.)

 2              (Jury enters.)

 3              THE CLERK:  You may be seated.  Court is now in

 4    session.

 5              THE COURT:  Good afternoon, jurors.  We're ready to

 6    resume.

 7              Miss Keating, again, you're reminded that you remain

 8    under oath.

 9              Mr. Kelly, you may continue with cross-examination.

02:07 10              MR. KELLY:  Thank you, your Honor.

11    BY MR. KELLY:

12    Q.   I believe one of the things I asked you about recently was

13    1482A, just for the witness.  I don't think I put that into

14    evidence yet.  Agent, that's the second extraction -- so-called

15    extraction report, right?

16    A.   That's the extraction report from 3/11/2019.

17    Q.   All right.  And that's the one we talked about earlier.

18    If you scroll to the second page, under "Contents", the

19    iMessage deletions have increased, right?

02:08 20    A.   Yes.

21              MR. KELLY:  Okay.  I offer this exhibit, your Honor.

22              MR. FRANK:  No objection.

23              THE COURT:  It will be admitted, 1482A.

24              (Exhibit 1482A admitted into evidence.)

25    Q.   Now I believe you --
```

```
 1              MR. KELLY:  Take that down, please.
 2    Q.   I believe you testified a couple days ago that all of
 3    Mr. Singer's calls were recorded.  You testified that way,
 4    right?
 5    A.   The calls on his 8802 from a certain time period were
 6    recorded.
 7    Q.   Let me show you Exhibit 9051, a transcript from two days
 8    ago, exhibit -- page 185 at line 24.  You were asked at the
 9    bottom, "And were -- to what extent were his calls on the phone
10    recorded on the phone that he was using?"
11              Answer, "all the calls that Mr. Singer made on his
12    phone were recorded".
13              Now, you didn't mean to imply he didn't have other
14    phones, right?
15    A.   Mr. Singer had an unauthorized telephone during this
16    period.
17    Q.   Okay.  And that wasn't recorded, was it?
18    A.   No, it was not.
19    Q.   And, in fact, he had a second so-called burner phone that
20    the government gave him, right?
21    A.   He had a phone that the government gave him to call agents
22    and his attorney.
23    Q.   Did the government refer to it as a burner phone?
24    A.   I -- I didn't -- I don't refer to it as a burner phone,
25    but I'm not sure if anyone on the team did.
```

```
 1   Q.   Now there's a lot of calls on that phone that were not

 2   recorded, right?

 3   A.   We did not record the conversations on that phone.

 4   Q.   And the unauthorized phone he had, I assume because it was

 5   unauthorized, that wasn't recorded either, right?

 6   A.   That was not -- correct.  That was not recorded.

 7   Q.   And the phone call that Singer references in his note to

 8   himself about where he claims he was told to bend the truth.

 9   That was on an unrecorded phone, right?

02:10 10   A.   The phone with his notes --

11   Q.   Let me be more clear.  He writes this note to himself that

12   we've gone over repeatedly, right?

13   A.   Correct.

14   Q.   He writes that note referencing a call he had had with

15   you, right?

16   A.   Correct.

17   Q.   And that call he had with you, that wasn't recorded, was

18   it?

19   A.   I don't recall a call on that date with Mr. Singer, but

02:11 20   the calls we had with Mr. Singer on the phone that he called

21   just agents was not recorded.

22   Q.   All right.  Now, a few more items I want to get to.

23        During the course of your investigation you never

24   found any evidence that money was misappropriated from the

25   Galen Center at USC, did you?
```

```
 1              MR. FRANK:  Objection.  Foundation.

 2              THE COURT:  Well, overruled.

 3    A.   My -- I did not focus that.  That was not my focus of the

 4    investigation.

 5    Q.   Did anyone investigate whether money from the Galen Center

 6    was somehow misappropriated?

 7              MR. FRANK:  Objection.  Foundation.

 8              THE COURT:  She can answer it.

 9    Q.   You're an agent on this case, right?

02:12 10   A.   Yes.

11    Q.   And you've talked to your fellow agents hundreds of times,

12    right?

13    A.   Yes.

14    Q.   And you've reviewed e-mails.  You've reviewed wiretaps.

15    You're very familiar with this case, right?

16    A.   Yes.

17    Q.   Okay.  And are you aware of anyone investigating whether

18    money was misappropriated from the Galen Center?

19    A.   No, I'm not.

02:12 20   Q.   Then you're not aware of any evidence that it was

21    misappropriated, right?

22    A.   I'm not aware.

23    Q.   Okay.  And in fact, are you aware that Mr. Abdelaziz's

24    $300,000 never made it to USC?

25    A.   Yes.  I'm aware of that.
```

```
 1    Q.   Not one penny of what he agreed to donate went to USC,

 2    correct?

 3    A.   The payment did not go to USC.

 4    Q.   So he got suckered by Singer, didn't he?

 5         MR. FRANK:  Objection, your Honor.

 6         THE COURT:  Sustained.

 7    Q.   If Singer had told him the money's going to USC and the

 8    money's going to the foundation, none of it went to USC, right?

 9         MR. FRANK:  I object to the argument.

02:13 10         THE COURT:  Sustained.

11    Q.   How about during the course of your investigation?  Did

12    you find out what the Trojan Athletic Fund was?

13    A.   No, I did not.

14    Q.   You're not aware that's the fundraising arm of the

15    Athletic Department at USC?

16    A.   I'm aware of that, but I did not investigate further into

17    that.

18    Q.   Okay.  How about the chief fundraiser for USC Athletics,

19    Ron Orr?  Did you ever interview him?

02:13 20         MR. FRANK:  Objection.  Beyond the scope.

21         THE COURT:  Overruled.

22    A.   Mr. Orr was interviewed.

23    Q.   Mr. Orr was interviewed?

24    A.   Yes.

25    Q.   By whom?
```

**A2206**

A.    I recall Mr. Orr was interviewed.  Maybe I'm mistaken.  I

thought Mr. Orr was interviewed, but I may be mistaken.  We

interviewed a lot of people in this investigation, a lot of

people from USC.

Q.    All right.  But you, yourself, did not interview Mr. Orr,

did you?

A.    I don't recall.  There were a lot of people interviewed

and I don't recall interviewing him.

Q.    All right.  Is it fair to say you're not sure?

A.    Correct.

Q.    Now during the course of your investigation you learned

who Mikaela Sanford was, right?

A.    I'm sorry.  Can you repeat that?

Q.    During the course of your investigation on this case, you

learned who Mikaela Sanford was, right?

A.    Yes.

Q.    All right.  And did you, in fact, learn that she submitted

Sabrina Abdelaziz's application to USC?

A.    Yes.

Q.    In fact, did you learn that she included on that

application fake athletic awards?

A.    I'm aware she included basketball on the application.

Q.    All right.  And are you aware she got information directly

from Rick Singer to include on that application?

A.    I'm aware she got information from Mr. Singer.

```
 1   Q.   Let me show you Exhibit 458 in evidence.  And I want to

 2   highlight where Mikaela says to Gamal, "I have to confirm a few

 3   things with Rick before I can submit".

 4        Do you see that?

 5        MR. FRANK:  Your Honor, we've been over this with

 6   another witness and this is well beyond the scope of this

 7   witness' direct.

 8        THE COURT:  Overruled.

 9   Q.   You see that, right?

10   A.   Yes, I do.

11   Q.   And are you aware then, after this, Ms. Sanford got

12   information directly from Singer without copying Abdelaziz?

13   A.   Yes.

14   Q.   All right.  Let me show you Exhibit 1540.  And do you

15   recognize this document?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It is an e-mail from Mikaela Sanford to Rick Singer.

19   Q.   Is there anybody else on this?

20   A.   No.

21        MR. KELLY:  I offer 1540.

22        MR. FRANK:  Your Honor, this is part of the issue

23   that's before the Court.

24        MR. KELLY:  This is a request.  It's non-hearsay.

25        THE COURT:  Are you objecting to its admission?
```

```
 1          MR. FRANK:  On the basis that it's pending, your
 2   Honor.
 3          THE COURT:  I'm sorry?
 4          MR. FRANK:  Yes, your Honor.  On the basis that it's
 5   pending on the brief that we submitted to the Court.
 6          MR. KELLY:  It's nonhearsay.  He has no valid basis to
 7   object.  We respectfully say it's central to the defense.
 8   She's just getting --
 9          THE COURT:  I'm not going to allow it in now.  If you
10   wish to be heard outside the hearing of the jury later, I will
11   hear you.
12          MR. KELLY:  Yes, your Honor.
13   Q.   Let me show you Exhibit 1541.
14          MR. FRANK:  Your Honor, this is all part of the same
15   issue.
16          THE COURT:  Yeah.  There are three or four of these,
17   right?
18          MR. KELLY:  There's four, your Honor.  I believe the
19   agent just testified she was aware Mikaela Sanford got
20   information directly from Singer without Aziz on the e-mail.
21          THE COURT:  Yes.  Same ruling.  The objection is
22   sustained, but subject to further discussion at a later time.
23          MR. KELLY:  Okay.  Well then, just for the record,
24   it's 1540, 1541, 1254 and 1255 I'd like to inquire of this
25   agent about while she's on the stand, your Honor.
```

```
 1            THE COURT:  All right.  Same ruling.
 2   Q.   How about, as part of your investigation, did you
 3   interview anybody from USC's SUBCO committee?
 4   A.   I know I interviewed people from USC.  I don't recall if
 5   the individuals were on the SUBCO committee.
 6   Q.   Did you ever interview a woman named Kelsey Bradshaw in
 7   the Admissions Department at USC?
 8   A.   I don't recall specifically her.
 9   Q.   In the course of your investigation, did you learn that
02:18 10  she was joking around with another member of the Admissions
11   Department regarding Sabrina Abdelaziz's application?
12            MR. FRANK:  Objection to the hearsay.
13            THE COURT:  Sustained.
14   Q.   As part of your investigation, did you learn anything
15   about how Kelsey Bradshaw viewed Sabrina Abdelaziz's
16   application?
17            MR. FRANK:  Objection.  Hearsay.
18            THE COURT:  Sustained.
19   Q.   Are you aware of anybody on the investigative team, agent
02:18 20  or prosecutor, who interviewed Miss Bradshaw about this?
21   A.   I don't recall.
22            MR. KELLY:  One moment, your Honor.  Nothing further,
23   your Honor.
24            THE COURT:  Cross-examination, Mr. Kendall.
25            MR. KENDALL:  Yes.  Thank you, your Honor.  I need a
```

```
 1    moment to set up, please.
 2              THE COURT:  Yes.
 3                CROSS-EXAMINATION OF ELIZABETH KEATING
 4    BY MR. KENDALL:
 5    Q.   Good afternoon, Agent Keating.
 6    A.   Good afternoon.
 7    Q.   My name's Mike Kendall.  I represent John Wilson.
 8              Fair to say we've never met before, have we?
 9    A.   Correct.
10    Q.   Okay.  I want to start off by asking you some questions
11    about the investigation and the evidence you found and I'd like
12    to just clarify.  I'm not seeking your opinion on the law, just
13    about the events that occurred in the past.  Okay?
14    A.   Okay.
15    Q.   Okay.  As part of your work in this case, did you review
16    the Wilson calls on the wiretap?
17    A.   I listened to the Wilson calls on the wiretap.
18    Q.   The September 15th call?
19    A.   Yes.
20    Q.   And the prior text message?
21    A.   I reviewed text messages and the wiretap calls.
22    Q.   Okay.  With Mr. Wilson?
23    A.   With Mr. Wilson, yes.
24    Q.   Okay.  Did you review calls from other parents on the
25    wiretap?
```

02:20 10
02:21 20

```
 1   A.   Yes.

 2   Q.   And I take it you reviewed a lot of Mr. Singer's e-mails

 3   that were gathered during the investigation?

 4   A.   I reviewed some of Mr. Singer's e-mails gathered during

 5   the investigation.

 6   Q.   Okay.  When you were with us on Tuesday, you said, "My

 7   focus was to investigate the financial aspects of the case."

 8   Did that include money laundering by Mr. Singer?

 9   A.   Yes.

10   Q.   Okay.  And did that mean you reviewed the financial

11   records of The Key Foundation?

12   A.   Yes.

13   Q.   And their tax filings?

14   A.   Yes.

15   Q.   Did you review The Key Foundation's Wells Fargo account

16   that ends in the numbers 391?

17   A.   I reviewed Mr. Singer's -- The Key Worldwide Foundation

18   accounts.

19   Q.   At Wells Fargo?

20   A.   Not entirely -- I don't recall reviewing everything, but I

21   did review some of that information from that account.

22   Q.   Some Wells Fargo account information?

23   A.   Yes.

24   Q.   And would you agree with me the IRS trains agents to

25   follow certain rules and procedures in their investigations?
```

02:21 (line 10)
02:22 (line 20)

```
 1   A.   Yes.

 2   Q.   And one of the most important things you're taught in your

 3   job is to go through the evidence objectively, correct?

 4   A.   Correct.

 5   Q.   You should always try to gather evidence that is truthful,

 6   correct?

 7   A.   Correct.

 8   Q.   And accurate?

 9   A.   Correct.

10   Q.   And you should accept the evidence as you find it and not

11   try to change it, correct?

12   A.   Correct.

13   Q.   Or misrepresent it?

14   A.   Correct.

15   Q.   You know that tax laws can be very complex, correct?

16   A.   Correct.

17   Q.   And a person's intent is often an important issue in a tax

18   case, correct?

19   A.   Willfulness, yes.

20   Q.   So it's important to get reliable evidence of intent,

21   correct?

22   A.   Correct.

23   Q.   Not to make it confusing or ambiguous?

24   A.   Correct.

25   Q.   And you agree with me that you should treat all taxpayers
```

02:22 appears at line 10
02:23 appears at line 20

**A2213**

```
 1    the same?

 2    A.    Correct.

 3              MR. FRANK:  Your Honor, this witness hasn't testified

 4    about taxes on her direct examination.  So if we're going to

 5    now embark on a tax exploration with her, I object to that.

 6              THE COURT:  Well, I'm going to let him explore this as

 7    it goes thus far.

 8              MR. KENDALL:  Thank you, your Honor.

 9    Q.    For example, the IRS expects its agents to take accurate

10    notes of any significant meeting with its confidential

11    informants, correct?

12    A.    IRS informants?

13    Q.    Yes.

14    A.    Accurate -- accurate notes, correct.

15    Q.    And they should take notes of any significant meeting with

16    an informant, correct?

17    A.    Yes.

18    Q.    Okay.  And you should write complete reports, correct?

19    A.    Correct.

20    Q.    Okay.  Now the FBI -- are you aware the FBI called its 302

21    reports something that should be written up or something that

22    should contain the subject of testimony that could be in a

23    case, that that's the purpose of a 203 report, to write up

24    something that could be the subject of testimony in a case?

25    A.    Not -- not -- I'm not -- specifically that terminology,
```

```
 1    but I know the 302 is to memorialize an interview that's

 2    conducted.

 3    Q.   And would you agree with me that IRS and the FBI have

 4    similar standards of trying to memorialize any significant

 5    aspect of a case?

 6    A.   It's important to memorialize significant interviews.

 7    Q.   And to do that completely and thoroughly, correct?

 8    A.   Correct.

 9    Q.   And would you also agree with me that when conducting

02:25 10   electronic surveillance of a person's telephone calls you

11    should record all of their calls in the investigation, not just

12    some of them, correct?

13    A.   We -- for the wire -- wire tapped calls, we record those.

14    Q.   Okay.  And if you're conducting consensual monitorings,

15    you should not selectively record the consensual calls.  You

16    should record all of them with a particular target of the

17    investigation, correct?

18    A.   The consensual calls that we -- we recorded the consensual

19    calls from Mr. Singer's 8802 number.

02:25 20   Q.   Okay.  And if you fail to record a call, you should

21    immediately write a report that describes the contents of the

22    call, correct?

23    A.   I don't know if that's policy or not.

24    Q.   You don't know if that's in the IRS manual?

25    A.   I don't know if that's in the IRS manual.
```

```
 1    Q.    Do you know if that's good practice in general, if you
 2    fail to record a call to write it up at least so that there's
 3    some record of what happened?
 4    A.    I think it depends on the type of call it is.
 5    Q.    Okay.  If there's anything of substantive impact on the
 6    case, should that be recorded?
 7    A.    Yes.  If there's a consensual wiretap and the conversation
 8    is substantial, then yes, it should be recorded.
 9    Q.    And when you debrief a confidential informant, you should
10    also write a complete report, correct?
11    A.    When we interview cooperators, we write -- it's practice
12    to write a report.
13    Q.    I said a complete report.
14    A.    Yes.  It's important the report to be complete.
15    Q.    You can't selectively exclude information that's bad for
16    the government's side of the case, correct?
17    A.    Correct.
18    Q.    And the importance of these practices and rules is, in
19    part, to protect innocent people.  You understand that,
20    correct?
21    A.    Correct.
22    Q.    And so if an informant like Mr. Singer gives you
23    information that's helpful to the defendant, it's important
24    that you include that in the report, correct?
25    A.    Correct.
```

```
 1   Q.   And that's particularly important when dealing with
 2   someone who's a confidential informant like Mr. Singer when
 3   they're generally known to be untrustworthy, correct?
 4            MR. FRANK:  Objection.
 5            THE COURT:  Sustained.
 6   Q.   There are heightened standards for care that law
 7   enforcement applies when handling confidential informants,
 8   correct?
 9   A.   Correct.
10   Q.   That's because law enforcement recognizes there's greater
11   risks when dealing with a confidential informant, correct?
12            MR. FRANK:  Objection.
13            THE COURT:  You can have that.
14   A.   It's important to be accurate and document some sort of
15   conversations with cooperators and witnesses.
16   Q.   Okay.  And if you give a confidential informant specific
17   instructions on how to speak to a target on a wire, shouldn't
18   that be recorded?
19            MR. FRANK:  Objection to what should and shouldn't.
20            THE COURT:  Sustained.
21   Q.   Okay.  Would you agree with me it's good investigative
22   practice to record the instructions you give a confidential
23   informant in how to go after a target on a consensual
24   monitoring?
25            MR. FRANK:  Objection.
```

02:27 appears at line 10
02:28 appears at line 20

**A2217**

```
 1              THE COURT:  Sustained.
 2    Q.   Based upon your experience, is it good investigative
 3    practice to memorialize the instructions you give a
 4    confidential informant about what to say on the wire?
 5              MR. FRANK:  Objection.
 6              THE COURT:  Sustained.
 7    Q.   In this case, you'd agree with me you did not memorialize
 8    the instructions you gave Mr. Singer when speaking in the
 9    consensual monitorings, correct?
02:28 10   A.   We documented periodically.  We documented our
11    communications with Mr. Singer.
12    Q.   You documented the fact that you met with him, correct?
13    A.   Correct.
14    Q.   You didn't document the content of what you said to him,
15    correct?
16    A.   We did not document the specific discussion, but we
17    documented -- summarized our communications with Mr. Singer on
18    a periodic basis.
19    Q.   You summarized the fact that you met with him.  You didn't
02:29 20   summarize what you said to him, correct?
21    A.   The specifics of what we discussed was not documented.
22    Q.   Okay.  So one could read those reports and have no idea
23    what you said to him when giving him instructions on how to
24    speak on the wire, correct?
25    A.   Correct.
```

A2218

```
 1    Q.   Would you agree with the statement "When giving

 2    instruction, direction and active support in a monitoring

 3    situation, the criminal investigative division inherits

 4    additional responsibility and risk through the use of the

 5    confident -- cooperating witness or confidential informant"?

 6              MR. FRANK:  Objection, your Honor.

 7              THE COURT:  Grounds?

 8              MR. FRANK:  For one thing, Mr. Singer was not a

 9    confidential informant of the IRS so this is completely

10    irrelevant.

11              THE COURT:  Sustained.

12    Q.   This was a joint investigation, correct?

13    A.   It was a joint investigation.  Mr. Singer was cooperating

14    on the FBI case, his FBI-led case.

15    Q.   But he was cooperating on a joint investigation of which

16    the IRS was a part of, correct?

17    A.   I was assigned to the case, but it was an FBI-led case.

18    Q.   And you know that quote I just read you is from the IRS

19    manual, isn't it?

20    A.   It sounds like it is.  I don't know exactly.

21    Q.   So the IRS Criminal Investigation Division manual, the

22    rules you're supposed to follow are IRS regulations, correct?

23    A.   On -- with an IRS cooperator on an IRS investigation.

24    Q.   So the fact that Mr. Singer was working primarily --

25    strike that.
```

```
 1          The fact that Mr. Singer was designated a confidential
 2   informant controlled by the FBI meant the IRS standards for
 3   investigations didn't apply?
 4   A.   The policy of the cooperator was -- the IRS policy was of
 5   a cooperating agent -- excuse me -- the cooperator does not
 6   apply to FBI cooperators.
 7   Q.   Okay.  Who wrote all of the investigative reports of the
 8   interviews of Mr. Singer?
 9   A.   Agent -- the agents wrote the reports.
10   Q.   FBI or IRS?
11   A.   FBI agents wrote reports.  I wrote some reports.
12   Q.   Okay.  How did you decide who would write a report of
13   which event?
14          MR. FRANK:  Objection.  Relevance.
15          THE COURT:  Overruled.
16   A.   We split it up.  There was no specific rule.  It was just
17   whoever was available and whoever -- we took turns.
18   Q.   If no report got written at all of an event, who decided
19   that?
20   A.   All substantive conversations with Mr. Singer were
21   documented.
22   Q.   What about the October 1, 2018, conversation that led to
23   his notes in Exhibit 13?  There's no report of that
24   conversation, is there?
25   A.   I don't recall that conversation.
```

02:31 appears at lines 10, 20.

**A2220**

```
 1   Q.   Do you recall being on a phone call that was recorded by
 2   Mr. Singer?
 3   A.   You have to be more specific.  Mr. Singer was on a lot of
 4   recorded phone calls.
 5   Q.   Okay.  We'll get to this in more detail, but you remember
 6   playing a September 29 tape of a conversation between
 7   Mr. Singer and Mr. Wilson earlier with Mr. Frank?  You remember
 8   that?
 9   A.   Yes.
10   Q.   Okay.  Do you remember -- that was September 29.  Do you
11   remember on October 1 Mr. Rosen and the rest of the agents had
12   a call with Mr. Singer to go over his calls with John Wilson
13   and other targets of the investigation?
14   A.   I do remember that, yes.
15   Q.   And do you remember that after a few minutes you realized
16   that Mr. Singer had called you on the phone that records the
17   conversation, correct?
18   A.   I personally didn't realize that, but one of the AUSAs
19   did.
20   Q.   And Mr. Rosen immediately stopped the call because he
21   didn't want to be recorded giving instructions to Mr. Singer,
22   correct?
23        MR. FRANK:  Objection.
24        THE COURT:  Sustained.
25   Q.   Okay.  Mr. Rosen stopped the call, correct?
```

```
 1   A.   Correct.

 2   Q.   And that prevented anybody from recording the instructions

 3   that you gave to Mr. Singer, correct?

 4   A.   Correct.

 5   Q.   And you then reconvened on a conference call that wasn't

 6   being recorded, correct?

 7   A.   Correct.

 8   Q.   And nobody wrote up a report to discuss what happened in

 9   that conference call, correct?

02:33 10   A.   Not specifically with that, that operational conversation.

11   Q.   Is that a yes?

12   A.   No one -- no one wrote a report specifically based on that

13   phone call.

14   Q.   The only person who wrote a report was Rick Singer,

15   correct?

16        MR. FRANK:  Objection.

17        THE COURT:  Sustained.

18   Q.   The only person who wrote a written record of what

19   happened in that October 1 call was Mr. Singer, correct?

02:33 20        MR. FRANK:  Objection.  This wildly misstates.

21        THE COURT:  Sustained.

22   Q.   Mr. Singer wrote up a note that -- on October 1st,

23   correct?

24   A.   Correct.

25   Q.   And he referred to the call that he had with you folks,
```

```
 1   correct?

 2   A.   He referred to a call, correct.

 3   Q.   It was the call of October 1st, wasn't it?

 4        MR. FRANK:  Objection to what Mr. Singer was referring

 5   to.

 6        THE COURT:  Sustained.

 7   Q.   Okay.  Well, the only note -- the only call you're aware

 8   of that agents had with Mr. Singer on October 1st is the one

 9   we've just been discussing for the last few minutes, correct?

10   A.   Can you repeat that?

11        MR. FRANK:  Your Honor, can we approach for a minute?

12        THE COURT:  No.

13   Q.   The only call that you had with Mr. Singer on October 1st

14   is the one that we've just discussed for the last few minutes,

15   correct?

16   A.   There may have been other calls with Mr. Singer that day.

17   I don't recall, but --

18   Q.   You don't recall more than this -- well, there were two

19   calls, the one that was recorded, and then there was a

20   conference call that wasn't recorded, correct?

21   A.   I don't recall if that was the specific date, but there

22   were -- we had calls, one call that was recorded that Mr. Rosen

23   ended the call.

24   Q.   Okay.  If you accept my representation, that was

25   October 1st.
```

```
 1              MR. FRANK:  Objection.
 2              THE COURT:  She can.  She can.  If she doesn't want
 3      to, she doesn't have to.
 4      Q.   Will you accept my representation that that call was
 5      October 1st?
 6      A.   I don't recall if it was October 1st.
 7      Q.   Okay.  You know the government gave us a copy, don't you?
 8      A.   I don't know what the government gave you.  I'm not part
 9      of the discovery process.
02:35 10      Q.   Okay.  Will you accept my representation that this call
11      that Mr. Rosen stopped the recording of occurred on
12      October 1st?
13      A.   If you can refresh my memory if there's something that I
14      can see.
15      Q.   Sure.
16              MR. KENDALL:  What's the number for the -- could we
17      have up Exhibit 8182, please?  8182A would be the transcript.
18              MR. FRANK:  Your Honor, if he's intending to play this
19      call, we'd object.
02:36 20              MR. KENDALL:  I'd first ask if the agent could read
21      this and if that refreshes her recollection.
22      A.   Yes, it does.
23      Q.   Okay.  Does that refresh your recollection that this call
24      that was being recorded by Mr. Singer occurred on October 1st?
25      A.   Yes.
```

A2224

```
 1   Q.   Have you ever listened to a copy of the tape?

 2   A.   No.

 3   Q.   Okay.  But you know it was recorded, correct?

 4   A.   Yes.

 5        MR. KENDALL:  Your Honor, I'd like to offer

 6   Exhibit 8182.

 7        MR. FRANK:  Objection.

 8        MR. KENDALL:  Your Honor, this goes directly to

 9   Exhibit 13 in the notes.

10   MR. FRANK:  It does not actually.

11        THE COURT:  No.  The objection is sustained.

12   Q.   In that call, you remember that Mr. Rosen told Mr. Singer

13   that they were going to review his calls with Donna Heinel,

14   John Wilson, and others?  Do you recall that being the case?

15   A.   I don't recall specifically those names, but I do recall

16   the conversation that we talked with Mr. Singer.

17        MR. KENDALL:  Okay.  Could we show the witness again

18   8182A, please, to refresh her recollection?

19   Q.   Okay.  If you would take a look about two-thirds of the

20   way down on the first page, and if you could read that and tell

21   us does that refresh your recollection that one of the calls

22   being discussed today -- being discussed that day was with John

23   Wilson?

24   A.   Yes.  It does refresh my memory.

25   Q.   Okay.  Thank you.  Now, you'd agree with me that prior --
```

```
     1  okay.  Does that refresh your memory that Mr. Wilson's call was

     2  part of the ones to be discussed that day?

     3          After you reviewed the transcript and saw what you

     4  read, does that not refresh your memory that Mr. Wilson's call

     5  was one of the ones being reviewed on October 1st?

     6  A.   Yes.

     7  Q.   Okay.  Prior to Mr. Singer's cooperation, there was --

     8  there was about a four-month wiretap?

     9  A.   Yes.

02:38 10  Q.   Okay.  And would you agree with me that during the

    11  four months of that wiretap you and the other agents were

    12  developing an investigative plan, correct?

    13  A.   Yes.

    14  Q.   Okay.  And part of that investigative plan was you wanted

    15  to confront Mr. Singer and persuade him to become an informant,

    16  correct?

    17  A.   Part of our plan was to discussing, approaching Mr. Singer

    18  to talk to him.

    19  Q.   And getting him to cooperate?

02:39 20  A.   That was part of our plan.

    21  Q.   Okay.  And in order to -- and you intended to get him to

    22  do just what you did, go out, do consensual monitoring and try

    23  to get evidence against other people that he knew, correct?

    24  A.   We -- yes.  Have Mr. Singer make phone calls to gather

    25  additional evidence.
```

1    Q.    Okay.  And you spent several months planning that approach

2    and planning to implement that goal, correct?

3    A.    I don't know how long we planned that.  I don't know if it

4    was a couple months or couple weeks, but that was our plan.

5    Q.    The wiretap was up for four months, so was it for most of

6    the wiretap you were working towards getting Mr. Singer's

7    cooperation?

8    A.    We were gathering evidence on the individuals on the call

9    and other individuals.

02:39 10    Q.    Okay.  And you were doing various types of evidence

11    gathering so you could know how to use Mr. Singer properly when

12    he's making consensual monitorings, correct?

13    A.    Can you repeat that, please.

14    Q.    Sure.  You wanted to use Mr. Singer effectively, correct?

15    A.    Correct.

16    Q.    And so you wanted to gather information and do an

17    investigation before the approach so you would know how to make

18    the best use of his services, correct?

19             MR. FRANK:  Objection to "use of his services".

02:40 20             THE COURT:  Sustained.

21    Q.    To make the best use of his cooperation with you.

22    A.    We were gathering evidence on a number of individuals,

23    including Mr. Singer, and we decided to approach Mr. Singer and

24    ask him to make phone calls for us.

25    Q.    Right.

1    A.   Yes.

2    Q.   And you had done several months of investigation to get

3    the proper understanding of how to approach him and how to make

4    proper use of his cooperation, correct?

5    A.   Yes.

6    Q.   Okay.  Now, by the time you approached him on September

7    21, you had had only one substantive call on the wiretap

8    between Mr. Singer and Mr. Wilson, correct?

9    A.   Correct.

02:41 10   Q.   It was a couple of small calls of like scheduling and

11   logistics, but the September 15th is the only substantive one,

12   correct?

13            MR. FRANK:  There were two on September 15th.

14            MR. KENDALL:  Excuse me?

15            MR. FRANK:  I object.  There were two.

16            THE COURT:  Sustained.

17   Q.   There was a call that was dropped and then immediately

18   recommenced?

19   A.   Correct.

02:41 20   Q.   Okay.  So the September 15th conversation, that was the

21   only substantive call with Mr. Singer and Mr. Wilson prior to

22   September 21?

23   A.   Correct.

24   Q.   And then you had consensually recorded calls between them

25   from September 22nd to January 2019?

```
 1   A.   Correct.
 2   Q.   Okay.  If -- and you'd agree with me that over that
 3   three-month period there were phone calls, correct?
 4   A.   With who?
 5   Q.   Between Wilson -- Mr. Wilson and Mr. Singer.
 6   A.   During that period, yes.
 7   Q.   There were phone calls, correct?
 8   A.   Yes.
 9   Q.   There were voicemail messages?
10   A.   Yes.
11   Q.   There were text messages?
12   A.   Yes.
13   Q.   Even a few e-mails?
14   A.   Yes.
15   Q.   Would you agree with me that that added up to about 87
16   electronic contacts between Mr. Singer and Mr. Wilson over that
17   three-month period?
18   A.   I'm not sure how many contacts, but we had -- we had
19   Mr. Singer make numerous contacts with Mr. Wilson.
20   Q.   In the dozens, fair to say?
21   A.   At least eight phone calls, a little over a dozen, yes.
22   Q.   There were about eight calls and three voicemails,
23   correct?
24   A.   I don't recall how many voicemails, but I recall eight
25   calls with Mr. Wilson.
```

```
 1   Q.   And there were numerous text messages?

 2   A.   Yes.

 3   Q.   And a few e-mails?

 4   A.   Correct.

 5   Q.   Now, Mr. Frank raised with you a September 28 telephone

 6   call that occurred from -- by Mr. Singer when he was in an FBI

 7   office in California.

 8   A.   He was in a U.S. Attorney's office in California.

 9   Q.   Okay.  Was he in San Jose?

10   A.   That was Sacramento.

11   Q.   Sacramento that day.  And he was being debriefed by, I

12   think there were four agents, a data analyst, and a prosecutor

13   that had flown out from Boston?

14   A.   There were three agents, forensic accountant, and two

15   prosecutors.

16   Q.   Okay.  You were one of the people present?

17   A.   Yes.

18   Q.   And you debriefed Mr. Singer for much of the day?

19   A.   Yes.

20   Q.   Okay.  And at some point you folks took a break, correct?

21   A.   Correct.

22   Q.   And Mr. Singer made a phone call to the Wilson family,

23   correct?

24   A.   To Mr. Wilson's daughters.

25   Q.   You say to Mr. Wilson's daughters.  Did you monitor
```

```
 1  Mr. Singer's phone call?

 2  A.   It was specifically to Mamie, according to his contacts.

 3  Q.   Okay, but I'd ask you to just tell us what you personally

 4  observed.  You're quoting what a telephone record shows the

 5  contact between two phones, correct?

 6  A.   Yes.

 7  Q.   You don't know who was speaking on those phones, do you?

 8  A.   I know that it went to Mamie's phone.

 9  Q.   Okay.  You don't know who was speaking, correct?

10  A.   Mr. Singer was speaking on the government side and it was

11  a call on Mamie Wilson's phone.

12  Q.   Who was in the room with Mr. Singer when he made that

13  call?

14  A.   He was by himself.

15  Q.   So no agent monitored him when he's making a call to the

16  Wilson family?

17  A.   There was no agent in the room.  There was no -- we had no

18  evidence that his daughters were involved in the scheme, so we

19  decided to have him speak with Mr. Wilson's daughters.

20  Q.   Okay.  Well, you know that this call on September 8th was

21  a rescheduling of a meeting that was supposed to take place

22  face-to-face when Mr. Singer was in Boston earlier?

23           MR. FRANK:  I'd need you to say the date again.

24           MR. KENDALL:  This phone call was September 28.

25           MR. FRANK:  You said September 8.
```

```
 1              MR. KENDALL:   Thank you.
 2    Q.   You know this call on September 28 was rescheduled from a
 3    face-to-face meeting that had been scheduled earlier in
 4    September, correct?
 5    A.   There was a meeting between Mr. Singer and Mr. Wilson that
 6    was scheduled earlier.
 7    Q.   Well, Mr. Wilson, his wife and his two daughters, they
 8    were going to meet Mr. Singer on September 21, correct?
 9    A.   Mr. Wilson was going, and his wife, were going to meet
02:45 10    Mr. Singer at a hotel and they were going to Facetime
11    Mr. Wilson's daughters or Skype or electronically.
12    Q.   You weren't part of any of the conversation on the
13    September 21 call, were you?  I'm talking --
14              Mr. Singer told Mr. Wilson he was coming to Boston on
15    September 21 to meet the president of Tufts and Harvard,
16    correct?
17    A.   Yes.
18    Q.   That was in the September 15 phone call, correct?
19    A.   Yes.
02:45 20    Q.   And that was in a prior text message that Mr. Singer had
21    sent around September 6 to 7th, correct?
22    A.   Yes.
23    Q.   Okay.  So Mr. Singer twice tells Mr. Wilson, I'm coming to
24    Boston to meet the president of Harvard and Tufts, and then he
25    says in the September 15 call, I'm negotiating side doors
```

```
 1   directly with the president of Harvard, correct?
 2            MR. FRANK:  Objection.
 3            THE COURT:  Sustained.
 4   Q.   He says that the president of Harvard invited him to
 5   negotiate side door deals.  Do you remember that?
 6            MR. FRANK:  Objection.  Misstates.
 7            THE COURT:  Sustained.
 8   Q.   Do you remember the September 15th call that refers to the
 9   president of Harvard's supposed conversation with Mr. Singer,
10   correct?
11   A.   I remember the call that Mr. Singer referenced Harvard.
12   Q.   Okay.  And then Mr. Wilson was coming in on September 21
13   to see Mr. Singer, correct?
14   A.   Correct.
15   Q.   You don't know who was in the car with Mr. Wilson, do you?
16            Unless you were in that car, you don't know who was
17   in there?
18   A.   If I recall, the transcripts says Leslie Wilson --
19   Q.   I'm not asking you what somebody else said.
20   A.   From what I remember from the call, Mr. Wilson was with
21   his wife.
22   Q.   Okay.  I'm not asking you what you heard on a call.  I'm
23   asking what did you observe or see.
24   A.   Yeah.  I was not in Mr. Wilson's car so I did not know if
25   it was true that Mrs. Wilson was in his car.
```

```
 1    Q.    You don't know who was or wasn't in that car, correct?
 2    Just yes or no.
 3    A.    Correct.
 4    Q.    Okay.  And I ask you -- unless I say otherwise, if we
 5    could limit your answer to just things you personally observed
 6    and not things that you think may have happened.  Is that okay?
 7    A.    I'm answering the question how I'm going to answer it.
 8    Q.    Okay.  And then it got rescheduled for Mr. Wilson to come
 9    back after the 21st, correct?
02:47 10   A.    It did -- I don't -- I don't recall it being rescheduled
11    at the exact date that it was being rescheduled, but they did
12    discuss having a meeting.
13    Q.    Don't you remember Mr. Singer calling Mr. Wilson and
14    saying he was sick and he couldn't meet with him and Mr. Wilson
15    saying, you know, I hope you get better?
16    A.    Yes.  I recall that.
17    Q.    And isn't he driving in with his family to meet with
18    Mr. Singer at that time?
19         MR. FRANK:  Objection.
02:48 20        THE COURT:  Sustained.
21    Q.    Okay.  Are you aware that Mr. Singer had scheduled to meet
22    with Mr. Wilson and his family at that time?
23    A.    I don't -- I don't recall that there was an exact date
24    that they were going to schedule another meeting, but I do
25    remember them saying that it was going to be -- they would try
```

```
 1   to reschedule with his daughters.
 2   Q.   Okay.  So Mr. Singer has some cancelled meetings with the
 3   Wilson's around September 21, 22, and then there's this call
 4   that's booked for September 28th, correct?
 5   A.   There's a call with Mr. Wilson's daughters scheduled for
 6   the 28th.
 7   Q.   And Mr. Singer goes into the room by himself and makes a
 8   call to the Wilson family, and the six agents and prosecutors
 9   and investigators are all in other rooms and leave him there
10   alone to speak with the Wilson's, correct?
11        MR. FRANK:  Objection to the Wilson family.
12        THE COURT:  Sustained.
13   Q.   They leave him there to make the phone call unsupervised,
14   correct?
15   A.   We leave -- agents and the rest of the team and
16   prosecutors broke for lunch, and Mr. Singer stayed in the room
17   and made the phone call.
18   Q.   Okay.  And the call lasted about 34 minutes, 33, 34
19   minutes?
20   A.   Yes.
21   Q.   Okay.  And then you folks came in and you resumed,
22   correct?
23   A.   Yes.
24   Q.   And in the FBI report of that day, it makes no reference
25   to a call with anybody from the Wilson family, correct?
```

02:49 (line 10)

02:49 (line 20)

```
 1    A.    Correct.
 2    Q.    The interview report simply says "a break was taken",
 3    correct?
 4    A.    Correct.
 5    Q.    So we know now from the report taking here there was no
 6    report written to summarize a September 28th call that was
 7    unsupervised, correct?
 8          MR. FRANK:  Objection to what we know.
 9    Q.    Excuse me.  To what you know.  There was no report written
02:50 10   that refers to the September 28th call that you assume was with
11    some members of the Wilson family, correct?
12    A.    I'm sorry.  Can you repeat that, please?
13    Q.    There's no reference in any report anywhere to indicate
14    that Mr. Singer had a call with some members of the Wilson
15    family when he was in the U.S. Attorney's office, correct?
16    A.    There was no report written that Mr. Singer had a Facetime
17    call with Mamie Wilson and Courtney Wilson.
18    Q.    You don't know who the call was with.  You keep repeating
19    names, but you don't know because you didn't supervise that
02:51 20   call, correct?
21    A.    I was not in the room when that call was made.
22    Q.    Okay.  So you would agree with me you have no basis to say
23    who was on that call, correct?  Other than Mr. Singer.
24          MR. FRANK:  Objection.
25          THE COURT:  Sustained.
```

```
 1    Q.   Okay.  You'd agree with me when you said it was Mamie and
 2    Courtney and you're trying to limit it, you have no personal
 3    knowledge of that?
 4            MR. FRANK:  Objection to what she's trying to do.
 5            THE COURT:  Sustained.
 6            MR. KENDALL:  I didn't ask what she's trying to do,
 7    your Honor.  I'm just asking if she agrees that she doesn't
 8    have personal knowledge of what she just testified to.
 9            THE COURT:  You can ask her that.
02:51 10   Q.   You don't have personal knowledge as to who from the
11    Wilson family was on that call, correct?
12    A.   I was not in the room with Mr. Singer so I did not witness
13    who was on the call.
14    Q.   Nobody from federal law enforcement was in the room with
15    Mr. Singer so nobody from federal law enforcement is a witness
16    to who was in the conversation with Mr. Singer, correct?
17    A.   Correct.
18    Q.   And the report that was written that day just said "a
19    break was taken".  It makes no reference to any call with the
02:51 20   Wilson family, correct?
21    A.   Correct.
22    Q.   Okay.  Now, the first report you wrote of any interaction
23    with Mr. Singer, face-to-face conversation with agents, is of
24    the September 21 meeting, correct?
25    A.   Yes.  That was the first face-to-face contact with
```

1    Mr. Singer.

2    Q.    Okay.  And one of the agents there wrote up that

3    debriefing, correct?

4    A.    Correct.

5    Q.    And in Mr. Singer's October 1, October 2 note in

6    Exhibit 13, he refers to what he claims is you are raising your

7    voice with him and giving him certain instructions and telling

8    him certain things.  Which you -- do you recall him saying that

9    in his note?

02:52 10    A.    That was written in his note, yes.

11    Q.    Okay.  Would you agree with me that the sequence of

12    September 21st is as follows:  Mr. Singer's meeting with Rudy

13    Meredith in the hotel room, correct?

14    A.    On the 21st, correct.

15    Q.    And Mr. Meredith asks Mr. Singer questions and Mr. Singer

16    is talking and being recorded, correct?

17    A.    Correct.

18    Q.    The tape is then shut off and the agents all come into the

19    room and confront both Mr. Singer and take away Mr. Meredith,

02:53 20    correct?

21    A.    Correct.

22    Q.    And then four agents go into a different -- do you stay in

23    that room or do you go to a different room?

24    A.    We stayed in that room.

25    Q.    So three or four agents sit with Mr. Singer in that room,

```
 1   correct?
 2   A.   Correct.
 3   Q.   And you're one of the agents?
 4   A.   Yes.
 5   Q.   Who else was there with you?
 6   A.   FBI Special Agent Laura Smith, FBI Special Agent Katelyn
 7   Cedrone and Supervisory Special Agent from the FBI John Keelan.
 8   Q.   And there's some conversation with Mr. Singer about there
 9   being an investigation and does he want to cooperate, correct?
02:53 10  A.   Yes.
11   Q.   And how long does that conversation go where you explain
12   to him the investigation and discussing with him whether he'd
13   cooperate?  Is that five minutes, a half hour, whatever?
14   A.   I don't recall the time.
15   Q.   More than 20 minutes?
16   A.   I don't recall the time.
17   Q.   You don't know if it's one minute or an hour?
18   A.   It was more than one minute.  I don't recall exactly how
19   long it took.
02:54 20  Q.   Okay.  And fair to say of the interview report written up
21   of that day, none of this conversation is recorded, correct?
22   A.   Correct.
23   Q.   You didn't record anything the agent said to Mr. Singer
24   about why he should cooperate, correct?
25   A.   We did not record our meeting with Mr. Singer that day.
```

```
 1   Q.   No.  I'm not talking recording.  I'm talking writing it

 2   down to put it into an interview report.  You debriefed him

 3   that day about some of the parents, correct?

 4   A.   Correct.

 5   Q.   And you had a report to write-up of the debriefing of the

 6   parents?

 7   A.   Correct.

 8   Q.   But you did not write down any of the things you said to

 9   him before he started the debriefing and talking about the

10   parents, correct?

11   A.   Correct.

12   Q.   And so Mr. Singer in Exhibit 13 makes certain statements

13   about you shouting at him in a hotel room and giving him

14   certain instructions on the law, correct?

15           MR. FRANK:  Objection to the shouting.

16           THE COURT:  Sustained.

17           MR. KENDALL:  He says that.  I'm not saying it

18   happened.

19           MR. FRANK:  Objection.

20   Q.   Mr. Singer, in Exhibit 13, makes certain statements about

21   what happened in the hotel room, correct?

22   A.   Correct.

23   Q.   And you disagree with Mr. Singer's description of what

24   happened in the hotel room on September 21, correct?

25   A.   Correct.
```

```
 1    Q.   But this is another time where the agents did not write
 2    down the conversation of that event, correct?
 3    A.   The -- we wrote down the interview of Mr. Singer that
 4    happened on September 21.
 5    Q.   But you didn't write down what you said to him during that
 6    time period that he describes in his Exhibit 13 notes, correct?
 7    A.   What I told Mr. Singer what a donation was was not written
 8    down.
 9    Q.   Okay.  The whole sort of level of conversation you had
10    explaining why he should cooperate, what problems he might have
11    with the law, whatever you said to him, there's no record of
12    that of what you said to persuade him to cooperate and give a
13    debriefing, correct?
14    A.   We did not write down what we said to Mr. Singer.  We
15    wrote down the substance that he gave us.
16         MR. KENDALL:  Okay.  Could we have Exhibit 13, please,
17    up in evidence on the first page to show the jury.  It's
18    already in evidence.
19    Q.   So if we go down to -- if we look at the far left column
20    where it says "2", and we see it's created on October 1, 2018
21    and then it's modified a few days later on October 4th.  You
22    see that, correct?
23    A.   Yes.
24    Q.   Okay.  If we could go down to October 2nd, please, where
25    it starts "loud and abrasive call with agents".  And I just
```

```
 1    would like us to stick with the first paragraph -- no.  The two

 2    paragraphs, please.

 3            It says, "Loud and abrasive call with agents.  They

 4    continue to ask me to tell a fib and not restate what I told my

 5    clients as to where the money -- as to where here money was

 6    going -- to the program not the coach and that it was a

 7    donation and they want it to be a payment".

 8            You agree with me the agents had a call with

 9    Mr. Singer on October 1?  We just went through that a few

10    moments ago, correct?

11    A.   Yes.

12    Q.   There's no interview report of any call with Mr. Singer on

13    October 2nd, correct?

14    A.   Correct.

15    Q.   So would you agree with me this loud and abrasive call

16    with agents is referring to an October 1 call?

17    A.   No.  I don't know what it refers to.

18    Q.   Well, it's on or before October 2nd, correct?

19    A.   That's what Mr. Singer's saying, correct.

20    Q.   Can you -- based upon the number of meetings you had with

21    Mr. Singer and the dates, is there any other date this call

22    could have occurred on other than October 1st?

23    A.   I don't recall this loud and abrasive call, however, we

24    had calls with Mr. Singer on a daily basis.

25    Q.   Well, did you record all of those calls on a daily basis?
```

```
 1   A.   We did not record our operational conversations with

 2   Mr. Singer on -- during this investigation.

 3   Q.   Well, you say "operational."  If you're telling him how

 4   he's supposed to speak on a consensual wire and he's

 5   disagreeing, is that something operational that doesn't have to

 6   be recorded or is that something significant that should be

 7   memorialized?

 8           MR. FRANK:  Objection to "should".

 9           THE COURT:  Sustained.

10   Q.   Is that something that is substantive and could be

11   memorialized?

12   A.   Could be.  Could be, but it wasn't.

13   Q.   Okay.  Would it be fair to say that the agents made a

14   decision every time they told him how to talk on a wire they

15   were not going to write down the instructions in a typed

16   report?  Correct?

17   A.   Our communication with Mr. Singer was documented on a

18   periodic basis and it was submitted and approved by the

19   supervisor.

20   Q.   Did you answer my question?

21   A.   The conversations were not specifically documented every

22   single day.

23   Q.   You never recorded the substance of the conversations

24   where you were giving him instructions, correct?

25   A.   We did not write down the -- what we told Mr. Singer to
```

A2243

```
 1   say.
 2   Q.   Okay.  So the only person who wrote down their version of
 3   what Mr. Singer was told to say is Mr. Singer with Exhibit 13,
 4   correct?
 5   A.   Mr. Singer wrote these notes, correct.
 6   Q.   Do we have -- do you know of any other version of the
 7   agents' instructions to Mr. Singer other than Exhibit 13,
 8   instructions on what to say in a consensual call?
 9   A.   There was nothing written down.  We didn't write
10   specifics, but -- I did not tell Mr. Singer to tell a fib.  I
11   did not say that to Mr. Singer.
12   Q.   I'm not asking you what you told him.  I'm just asking you
13   what -- if you could give me the courtesy of just answering my
14   question and not adding it.  I asked you whether --
15            MR. FRANK:  I object.
16            THE COURT:  Sustained.
17   Q.   Okay.  My question was, are there any other notes of
18   instructions given by the agents on what to say in consensual
19   calls?  That's a yes or no answer.  Could you give us a yes or
20   no answer, please?
21   A.   Written notes, no.  Not that I recall.  I don't.
22   Q.   What other notes are there other than written?
23   A.   The scripts from the AUSA.  I wasn't sure if you were
24   referring to that.
25   Q.   Okay.  There's a -- we've got one copy of a script
```

03:00  next to line 10

03:01  next to line 20

```
 1    Mr. Rosen wrote with respect to Mr. McGlashan.  Is there any
 2    other --
 3               MR. FRANK:  I object to the testifying.
 4               THE COURT:  Sustained.
 5               MR. KENDALL:  Strike that.  I'll rephrase, your Honor.
 6    I'm sorry.
 7    Q.   Other than a script to Mr. McGlashan, are there any other
 8    scripts you're referring to?
 9    A.   I don't recall.
10    Q.   I want to move to another report.  You testified both with
11    Mr. Frank and with Mr. Kelly that Mr. Singer deleted a large
12    number of iPhone or whatever they are messages, iMessages from
13    his iPhone.  Do you remember talking about that?
14    A.   I remember saying that Mr. Singer deleted iMessages.
15    Q.   Okay.  And when you testified on direct with Mr. Frank,
16    you actually said that you had instructed Mr. Singer not to
17    delete anything.  Do you remember testifying about that?
18    A.   Yes.
19    Q.   When did you give him that instruction?  Let me take that
20    back.
21               Did you personally give that instruction or another
22    agent?
23    A.   It was another agent and we -- and she told Mr. Singer
24    toward the beginning not to delete any text messages.
25    Q.   Who was the agent that gave that instruction?
```

**A2245**

```
 1   A.   Agent Smith.

 2   Q.   And what day did she give that instruction?

 3   A.   I don't recall.

 4   Q.   Okay.  Because if I were to -- can you identify a single

 5   interview report written from September 21 to October 5, 2018,

 6   that memorializes an agent giving Mr. Singer that instruction?

 7   A.   Specifically with a text, no, I don't.

 8   Q.   Okay.  So you agree with me you took his phone on

 9   October 5, correct?

10   A.   Yes.

11   Q.   You had left it in his custody for two weeks, correct?

12   A.   We imaged Mr. Singer's phone on October 5.

13   Q.   Okay.  And he deleted some number of text messages prior

14   to October 5, correct?

15   A.   Yes.

16   Q.   The extraction report shows 1,300, correct?

17   A.   That's what it says, yes.

18   Q.   Okay.  And you cannot identify a single interview report

19   that actually corroborates your statement that he was

20   instructed prior to October 5th not to delete things from his

21   phone, correct?

22   A.   I don't recall -- I don't recall there -- I feel like

23   there is an interview report where we instructed Mr. Singer not

24   to delete things, but I don't recall exactly.

25   Q.   Do you recall there's one in March of 2020, a year and a
```

```
 1   half later, correct?

 2   A.   I recall that interview.

 3   Q.   Do you recall any prior to October 5, 2018?

 4   A.   No.  I don't recall before that time.

 5   Q.   Okay.  So are you testifying about something that occurred

 6   and was not memorialized in a report, or are you testifying

 7   this instruction happened after October 5th?

 8   A.   We told Mr. Singer to be honest.

 9   Q.   I'm not asking that.  I'm asking you, are you referring to

10   something that occurred after October 5th or before

11   October 5th?

12   A.   I don't recall the date.

13   Q.   Okay.  So you don't know if you gave him the instruction

14   not to delete text messages prior to October 5th, correct?

15   A.   I don't recall the date.

16   Q.   Okay.  And is it your view that the interview reports

17   written in this case are thorough and contain all the relevant

18   information stated at the events?

19   A.   Yes.

20   Q.   So if it's not in the report, would it be your view it

21   didn't happen?

22        MR. FRANK:  I'll object, your Honor.  He asked about

23   the interview reports.

24        THE COURT:  Sustained.

25   Q.   Okay.  And whether you instructed him or not, looking back
```

03:05 at line 10

03:05 at line 20

|      |                                                                          |
|------|--------------------------------------------------------------------------|
| 1    | on it, do you agree with me it was a colossal mistake to leave           |
| 2    | Mr. Singer with his phone for two weeks and not to copy it?               |
| 3    | A.   There was no reason to believe that Mr. Singer was going            |
| 4    | to delete messages, so there was no reason to believe that he            |
| 5    | was going to delete any messages, so we didn't image his phone           |
| 6    | at that time and we imaged it the next time he came to Boston.           |
| 7    | Q.   Was it a conscious decision not to image his phone or was          |
| 8    | it just overlooked?                                                       |
| 9    | A.   I don't know why we didn't image his phone the first day,          |

03:06 10  the first weekend he was here, but we imaged his phone the next
11  time he came to Boston.
12  Q.   You were with him multiple times on his trip to Boston and
13  your trip to California, correct?
14  A.   Correct.
15  Q.   At no point in that two week period did anybody take
16  custody of his phone, correct?
17  A.   Correct.
18  Q.   And you're testifying there was no reason to think that
19  you needed to secure that phone from Mr. Singer's possession?
03:06 20  A.   We did not secure the phone until October.
21  Q.   That's not my question.  My question is, you just
22  testified you didn't think there was any reason that you needed
23  to secure the phone.
24  A.   We had no reason to believe that Mr. Singer was deleting
25  text messages.

```
 1   Q.   Well, you know he's engaged in fraud, correct?

 2   A.   Correct.

 3   Q.   You know he's engaged in bribery, correct?

 4   A.   Correct.

 5   Q.   You know he's engaged in tax evasion, correct?

 6   A.   Not specifically tax evasion, but tax crimes.

 7   Q.   Tax crimes.  You know he's defrauding many of the parents

 8   that work with his company, correct?

 9   A.   No.

10   Q.   Your position is he didn't defraud anybody?  He didn't

11   defraud any of the parents?

12             MR. FRANK:  Objection to her position.

13             MR. KENDALL:  Okay.  Strike that.

14             THE COURT:  Sustained.

15   Q.   Your knowledge after listening to that wiretap for

16   four months and doing your investigation was Mr. Singer had not

17   defrauded any of the parents?

18   A.   He kept some of the money for himself and didn't tell the

19   parents.

20   Q.   Is that called fraud?

21             MR. FRANK:  Objection to the legal definition.

22             THE COURT:  Sustained.

23   Q.   Okay.  I'm not asking for a legal definition, just a

24   practical definition.  If you take money from people and keep

25   it for yourself and not use it for the purpose you told them,
```

```
 1    would you call that a fraud, a theft, a something?
 2           MR. FRANK:  Objection.
 3           THE COURT:  She can have that question.
 4    A.   I would call it a lie.
 5    Q.   Okay.  It's a lie that got him money, correct?
 6    A.   A lie.  He kept some of the money, yes.
 7    Q.   Well, no.  He lied to people to get their money and kept
 8    it for himself, correct?
 9           MR. FRANK:  Objection.
10           THE COURT:  Overruled.
11    A.   Mr. Singer conspired with parents to describe --
12    Q.   I'm not asking you that.  Answer my question and not just
13    give your own view of the overall case.
14           MR. FRANK:  Your Honor, he asked a question.  She's
15    entitled to answer it.
16           MR. KENDALL:  I'll retract it and rephrase it.
17    Q.   Do you agree with me Mr. Singer took money from parents
18    under false pretenses and kept it for himself?
19    A.   Mr. Singer kept some --
20    Q.   Can you tell me yes or no?
21    A.   Mr. Singer kept some of the money, yes.
22    Q.   Okay.  So you're saying -- how long have you been an
23    agent, a CID agent?
24    A.   Approximately 13 years.
25    Q.   So you're -- back at that time it was 11 years?
```

1   A.    Yes.

2   Q.    So you're telling us, based upon your 11 years of

3   experience, knowing Mr. Singer's activities, you didn't think

4   there was any reason to be concerned that he might delete some

5   text messages if you left him with the phone for two weeks,

6   correct?

7              MR. FRANK:  Objection.

8              THE COURT:  Overruled.

9   A.    At that point there was no reason to believe Mr. Singer

03:09 10   was deleting his text messages, or if he was going to delete

11   text messages.

12   Q.    And you trusted him?

13   A.    At that point Mr. Singer said he would work with the

14   government and we trusted him.

15   Q.    Okay.  And you know at that time Mr. Singer was involved

16   in money laundering with his brother Cliff Singer, correct?

17              MR. FRANK:  Objection.

18              THE COURT:  Sustained.

19   Q.    During -- when you were doing the wiretap and Rudy

03:09 20   Meredith was recording calls with Mr. Singer, he admitted that

21   he was doing money laundering with his brother, correct?

22              MR. FRANK:  Objection.

23              THE COURT:  She can answer that question.

24   A.    I don't recall the specific conversation that Mr. Singer

25   had.

1    Q.    Do you recall generally that he discussed that with Rudy

2    Meredith?

3    A.    I don't recall that.

4    Q.    Okay.  Would you like us to -- if we showed you the

5    transcript of the tape, would that help refresh your

6    recollection?

7    A.    Yes.  It might.

8            MR. KENDALL:  Okay.  If we could do that, please.

9    Q.    Because you would agree, one of your jobs in this case was

03:10 10   to investigate money laundering as part of the case, correct?

11   A.    Yes.

12   Q.    And that's money laundering by Mr. Singer, correct?

13   A.    Correct, and others.

14   Q.    Okay.  And you're telling us, given that that was part of

15   the job that you explained when Mr. Frank had you on direct,

16   you'd have no memory of a tape in which Mr. Singer is

17   describing money laundering activities?

18   A.    I don't recall after all these years.

19   Q.    Would it be fair to say then if you don't recall it, you

03:11 20   certainly never investigated it, correct?

21   A.    No.  This happened in 2018.  I don't recall every single

22   conversation Mr. Singer had and everything that he said in the

23   conversations.

24   Q.    You agree with me, though, that when agents bring in a

25   person to make them a confidential informant, they're supposed

|   | |
|---|---|
| 1 | to debrief them about all of the criminal activity that they |
| 2 | know about, correct? |
| 3 | A.   Debrief about criminal activity that they know about, yes. |
| 4 | Q.   So you want the informant to tell you everything that |
| 5 | they're involved in criminal activity so you know what the |
| 6 | issues are with the informant, correct? |
| 7 | A.   Yes.   That's important. |
| 8 | Q.   So that's important protocol for both the IRS and the FBI, |
| 9 | correct? |
| 03:11 10 | A.   Yes. |
| 11 | Q.   You can't turn a blind eye to some of the informant's |
| 12 | criminal activity, correct? |
| 13 | A.   That's correct. |
| 14 | Q.   Okay.   That would be a violation of both IRS and FBI |
| 15 | regulations on investigations, correct? |
| 16 | MR. FRANK:   Objection. |
| 17 | THE COURT:   Overruled. |
| 18 | MR. FRANK:   I object at least to the FBI regulations. |
| 19 | MR. KENDALL:   I'll rephrase, your Honor. |
| 03:12 20 | Q.   Okay.   That certainly would be a violation of IRS |
| 21 | regulations on how to handle an informant, correct? |
| 22 | A.   Yes.   You want to know the criminal activity of the |
| 23 | informant. |
| 24 | Q.   You want the informant -- you want to debrief the |
| 25 | informant on it, correct? |

```
 1   A.   Yes.

 2   Q.   And you don't want the informant to think that you're

 3   going to turn a blind eye and let him get away with it,

 4   correct?

 5   A.   Correct.

 6   Q.   You've got to keep control of the informant, correct?

 7   A.   We want to find out what the criminal activity of the

 8   informant has been a part of.

 9   Q.   And you don't want them doing things that you haven't

10   authorized?

11   A.   That's correct.

12   Q.   Okay.  Could you take a look at Exhibit 1491 -- excuse

13   me -- 1491A, this transcript and read it and tell us --

14        MR. FRANK:  Can we have a copy, Mr. Kendall?

15        THE COURT:  Copy for counsel.

16   Q.   If we could go to pages five to six, please.  If we go to

17   the bottom of page 5, please, and go over to six then.  Okay.

18        MR. KENDALL:  Page 6 in the middle, if you could

19   highlight that, Mr. Carter, where it says "RM how".  And if you

20   could go down the rest of that page.

21   Q.   If you could read that and tell us if that refreshes your

22   recollection.  Tell us when you're finished with that, and

23   we'll go further down so you can read the rest of it.

24   A.   This refreshes my memory, yes.

25   Q.   Okay.  So you were on notice at the time you debriefed
```

```
 1   Mr. Singer in September that he had been discussing he was
 2   involved in money laundering with his brother, correct?
 3   A.   I recall that conversation that he had with Mr. Meredith.
 4   Q.   Okay.  And do you recall another one he had with somebody
 5   up at the basketball facility in Oakland, Mark Oliveri?
 6   A.   You have to be more specific because he's had a lot of
 7   calls with him.
 8   Q.   How he was going to pay for three to $400,000 worth of
 9   renovations in the locker room?
10   A.   I don't recall that specific.
11   Q.   Okay.  But you'd agree with me you were on notice as of
12   September 21 that Mr. Singer had been discussing money
13   laundering with his brother, correct?
14   A.   He was discussing the credit card fraud that his brother
15   was running.
16   Q.   Credit card fraud is a credit card processing for gambling
17   overseas.
18   A.   That's what he was discussing on the phone.
19   Q.   Yeah.  His brother would run a credit card processing
20   company for --
21            MR. FRANK:  I object to the testimony.
22            THE COURT:  Sustained.
23   Q.   That's your understanding, that his brother was running --
24            MR. FRANK:  I object, your Honor.
25            THE COURT:  Sustained.
```

```
 1              MR. FRANK:  If this line of inquiry is going to go
 2      further, I object on the basis that it's misleading and would
 3      request a sidebar.
 4              THE COURT:  Go forward.
 5      Q.   Okay.  So you testified just a few moments ago that as
 6      part of bringing a person in as an informant, the expected
 7      practice is to brief them -- to debrief them about all their
 8      criminal activities, correct?
 9      A.   Yes.
03:16 10 Q.   You never debriefed Mr. Singer about what he discussed in
11      that phone call with Rudy Meredith, correct?
12      A.   Correct.
13      Q.   So Mr. Singer discussed being involved in money laundering
14      with his brother --
15              MR. FRANK:  Objection.
16      Q.   -- and you never debriefed him on it?
17              MR. FRANK:  Objection.
18              THE COURT:  Sustained.
19      Q.   Do you think that was the correct way to prepare somebody
03:17 20 to become an approved informant for law enforcement?
21              THE COURT:  Sustained.
22      Q.   Okay.  Was it purposeful that you didn't ask him these
23      questions?
24              MR. FRANK:  Objection.
25              THE COURT:  Sustained.
```

**A2256**

```
 1    Q.    Okay.  Could you tell us why didn't you ask him about this
 2    activity?
 3              MR. FRANK:  Objection.
 4              THE COURT:  Sustained.
 5              MR. KENDALL:  Your Honor, if I may be heard?
 6              THE COURT:  Move forward.
 7              MR. KENDALL:  Okay.
 8    Q.    Now, I want to go to the few weeks prior to the
 9    September 21 initial discussion with Mr. Singer.  You had
10    understood that many of Mr. Singer's clients were not involved
11    in criminal activity, correct?
12    A.    Mr. Singer had clients that were not involved in the
13    criminal activity, correct.
14    Q.    As part of your investigation of this case, did you see
15    the customer list from The Key Foundation?
16    A.    Can you be more specific on that?
17    Q.    There's a list of 1,700 names and it's called "Customer
18    List."  Did you see it?
19              MR. FRANK:  Objection to the testifying.
20              THE COURT:  Sustained.
21    Q.    Did you see a document that was called "Customer List"?
22    A.    I don't recall off the top of my head.  I've seen a lot of
23    documents in this investigation.
24    Q.    Well, as part of your investigation, would it be important
25    for you to look for the customer list and to see who the
```

```
 1  customers were?
 2  A.   I didn't see the documentation.  Someone on my team could
 3  have seen that document.
 4       MR. KENDALL:  If I can just have Exhibit 8189 and see
 5  if this refreshes her recollection.
 6  Q.   You see 8189?  All the subsequent pages are not much
 7  different.  Looking at this, does this refresh your
 8  recollection that you've ever seen this document before?
 9  A.   No.  I've not seen this document.
10  Q.   Okay.  So it would be fair to say, in the three years
11  you've been investigating Mr. Singer, you never made it a point
12  to look for his customer list, correct?
13  A.   I specifically did not look for a customer list.
14  Q.   Okay.  And you never asked anybody on your team if they
15  ever looked for a customer list?
16  A.   I never discussed the customer list with anybody on my
17  team.
18  Q.   Okay.  Would you agree with me that he has at any one time
19  more than 100 customers a year?
20  A.   I don't recall the exact amount, but he had legitimate
21  customers as part of his college counseling business.
22  Q.   Okay.  And based upon your investigation, you know that he
23  told parents that the side-door donations were going to a
24  program at the school, correct?
25  A.   That was Mr. Singer's pitch, that there was donations
```

03:19  10

03:19  20

 1  going to a program.

 2  Q.   Okay.  And he told you that for many of the parents he

 3  never said that there was a bribe going to anyone, correct?

 4          MR. FRANK:  Objection.  Hearsay.

 5          THE COURT:  Sustained.

 6          MR. KENDALL:  I just want the state of mind, your

 7  Honor, for the consensual instructions.

 8  Q.   The point being you spoke to Mr. Singer about what types

 9  of things he should say to John Wilson on the consensual wires,

03:20 10  correct?

11  A.   We gave instructions to Mr. Singer to say to a number of

12  parents, including Mr. Wilson.

13  Q.   Okay.  And he told you with respect to Wilson that he had

14  never used the word "bribe" with him, correct?

15  A.   I don't remember him specifically saying specific to

16  Mr. Wilson.  I do know Mr. Singer did not use the word "bribe"

17  when he was discussing the side door.

18  Q.   And he told you that he did not want to use the word

19  "bribe" in the consensuals because he had never talked like

03:21 20  that with Mr. Wilson before, correct?

21  A.   That he had not talked to parents using the word "bribe".

22  Q.   Well, he spoke -- on the consensuals, he used the word

23  "bribe" with some parents, didn't he?

24  A.   One parent in particular at our direction he used the word

25  "bribe".  It was a parent that he never worked with before.  It

```
 1   was the first time.  They were working on the side door
 2   together.
 3   Q.   That was Nazzy Saffron, correct?
 4   A.   Yes.
 5   Q.   And he said explicitly to her, this is a bribe for the
 6   coach, correct?
 7   A.   Correct.
 8   Q.   "The coach needs the money.  It's a bribe for the coach."
 9   A.   Correct.
10   Q.   And she said, "Okay.  What are the wiring instructions",
11   correct?
12   A.   Correct.
13   Q.   You never told him to talk like that to John Wilson,
14   correct?
15   A.   Mr. Singer's relationship with John Wilson in the past
16   with the side door, they did not talk explicitly "bribe," so we
17   instructed Mr. Wilson to use "payment to a coach."
18   Q.   He had never paid a coach either, correct?
19   A.   The payment -- the payment he made for Johnny went to the
20   water polo program.
21   Q.   Except for the amount of money that Mr. Singer kept for
22   himself, correct?
23   A.   Correct.
24   Q.   And so when you're introducing the phrase "pay the coach",
25   did you think that would show a willingness to pay a bribe to a
```

```
 1    coach?
 2            MR. FRANK:  Objection to what she thought.
 3            THE COURT:  Sustained.
 4    Q.   Okay.  What was the purpose of picking the phrase "payment
 5    to the coach"?
 6    A.   Mr. Singer was reluctant to use the word "bribe", so we
 7    said "payment to a coach" so he then would be explicit and the
 8    parents could not use the cover story that it was a donation.
 9    Q.   Well, you can't give the donation check to the coach?
10    A.   You can give a donation check to a coach.
11    Q.   Yeah.  And then the coach can give it to the school and
12    deposit it into the school account?
13    A.   Correct.
14    Q.   And that would be a payment to the coach, correct?
15    A.   The purpose of this call --
16    Q.   If you could just answer my question.  That would be a
17    payment to the coach, correct?
18    A.   You could make a payment to a coach that the coach puts
19    into a program.
20    Q.   You could make that payable to the USC Water Polo Fund to
21    the coach.  The coach can give it to the business office and
22    that could be a payment to the coach, correct?
23    A.   That's not what --
24    Q.   Answer my question, please.
25    A.   -- what the instructions were, but that could be one
```

1 interpretation.

2 Q. Okay. And you knew -- strike that.

3    And the fact that Mr. Singer in this three months of

4 conversations and three months of communications never once

5 said the word "bribe" is because you told him he shouldn't use

6 that word, correct?

7 A. That's not correct.

8 Q. He said he didn't want to use it and you agreed with him?

9 A. That's not correct.

03:24 10 Q. You could have at any time told Mr. Singer lay it out

11 there, tell Wilson it's a bribe to get his kids into school,

12 use the B word. You could have instructed to him any time to

13 use the bribe, correct?

14 A. Mr. Singer was reluctant to use the word "bribe."

15 Q. I'm not asking what he's reluctant. I'm asking what you

16 could have instructed him if he -- using law enforcement

17 enforcement.

18    MR. FRANK: I object to the yelling.

19    THE COURT: Sustained.

03:24 20    MR. KENDALL: Okay. I'll try to be softer, your

21 Honor.

22    THE COURT: Sustained.

23 Q. But if you could answer my question, please. You were

24 telling him what to say to various parents, correct?

25 A. Yes.

```
 1    Q.    In the law enforcement/informant relationship, you could
 2    have told him on a call to John Wilson, I want you to say we're
 3    going to pay a bribe to the coach.  You had the authority to do
 4    that, correct?
 5    A.    We could have told Mr. Singer to say that.
 6    Q.    And you never did?
 7    A.    We told Mr. Singer to say "bribe" --
 8    Q.    If you could answer my question.
 9    A.    No.  That's not correct.
03:25 10    Q.    You never did.
11          You told Mr. Singer to say "bribe" to Mr. Wilson?
12    A.    We told Mr. Singer to use the word "bribe" in some
13    conversations and he was reluctant to do so, so it was "payment
14    to the coach".
15    Q.    Well, who's running this investigation, Mr. Singer or the
16    FBI and IRS?
17    A.    We're running the -- the FBI and the IRS are running the
18    investigation.  Mr. Singer was very reluctant to say the things
19    that we wanted him to say.
03:25 20    Q.    So you let him veto who would hear the word "bribe" and
21    who wouldn't?
22    A.    We directed Mr. Singer to make calls and say "payment to
23    the coach", and he did.
24    Q.    But that's not my question.  That's not the question I was
25    asking.  You have the authority to direct him to say what you
```

```
 1  want to each parent, correct?
 2  A.   Yes.
 3  Q.   You knew from the wiretap that you had a September 15th
 4  call that showed how Mr. Wilson discussed things with
 5  Mr. Singer, correct?
 6  A.   Yes.
 7  Q.   And in that September 15th call, there's no use of the
 8  word "bribe", correct?
 9  A.   Correct.
10  Q.   There's no use of the word "false profile", correct?
11  A.   Correct.
12  Q.   There's no use of the phrase "fake athlete", correct?
13  A.   Not that specific term, but there was a reference to one
14  of his daughters was a sailor, even though she didn't sail.
15  Q.   Mr. Singer made some reference along those lines.
16  Mr. Wilson never used those words, correct?
17  A.   Mr. Singer said that.
18  Q.   Okay.  So when you told Mr. Singer, we want you to use the
19  word "bribe", he wouldn't do it with Mr. Wilson, correct?
20  A.   He was reluctant to do it with any of the parents.
21  Q.   Well, he certainly wouldn't do it with Mr. Wilson,
22  correct?
23  A.   He did not do it with Mr. Wilson.
24  Q.   Okay.  Did you tell him we make the decisions in this
25  investigation, we're instructing you, go in and use the word
```

```
 1    "bribe" with Mr. Wilson?  Did you ever say that to him?

 2    A.    Not directly say that to Mr. Singer, but we also wanted

 3    his calls to sound -- not sound rehearsed and not sound like

 4    Mr. Singer was forced to say something.

 5    Q.    And not sound criminal?

 6              MR. FRANK:  Objection.

 7              THE COURT:  Sustained.

 8    Q.    You know, in all the calls that you had Mr. Singer do with

 9    Mr. Wilson, he never once used the word "bribe", correct?

10    A.    Correct.

11    Q.    He never once said, "I am going to make a fake profile",

12    correct?

13    A.    He never said the term "fake profile".

14    Q.    He never said, "We're going to have to falsify erg times

15    for your daughters", correct?

16    A.    Correct.

17    Q.    He never said, "I'm going to create false credentials and

18    make them look like championship sailors when they're not",

19    correct?

20    A.    He made references that he was getting them admitted as

21    fake athletes and that he was going to sell them as athletes.

22    Q.    Did he use the word "fake athletes"?  Does that appear in

23    any of the tapes?

24    A.    "Sell them as athletes."

25    Q.    He talked about the girls being a manager, correct?
```

```
 1   A.    He mentioned a manager in one of the calls.

 2   Q.    More than one of the calls?

 3   A.    I recall one of the calls.

 4   Q.    Okay.  And Mr. Wilson raised that several times, didn't

 5   he?  You know, the girl who's a sailor would be better at

 6   Stanford so she won't look like a fool and be embarrassed that

 7   she doesn't know anything about sailing when she's there as

 8   part of the team?  He's talking along that way, isn't he?

 9   A.    He mentions that his daughter was a sailor at the yacht

10   club.

11   Q.    No.  He mentioned that she was -- the daughter who knew

12   about sailing would be a better fit to be part of the sailing

13   team as a manager?

14   A.    I'd have to look at the transcript.

15             MR. FRANK:  Objection.  Misstates.

16             THE COURT:  Sustained.  And we're going to take a

17   break at this stage.

18             Miss Keating, you may step down.

19             We're going to recess for the day, jurors.  I'm going

20   to see you tomorrow morning.  We'll have a full day tomorrow.

21   I'm hopeful at the end of the day I'll be able to give you some

22   guidance about the remainder of this trial.  I'm going to talk

23   to the attorneys about that and, at the end of the session

24   tomorrow, I think I'll have some better information to further

25   inform you.
```

```
 1            Just for your information, we will have a full week
 2    next week, but we will not have a session on Thursday.
 3    Thursday will be our day off.  I have other business that I
 4    have, preplanned judicial business that I have to attend to.
 5    So we'll go Monday, Tuesday, Wednesday and Friday next week.
 6            Now we're off until tomorrow morning 9:00 a.m.  Please
 7    don't talk about the case with anybody else, or do any
 8    independent research.  You know the reasons why.  I'll see you
 9    tomorrow morning at 9:00 a.m.  Have a pleasant rest of the day.
10            THE CLERK:  All rise for the jury.
11            (Jury exits.)
12            THE COURT:  Be seated, counsel.
13            Approximately, how much longer on cross, Mr. Kendall?
14            MR. KENDALL:  It's hard for me to say, your Honor, but
15    I expect I will go at least to the break tomorrow.
16            THE COURT:  You mean until 11 o'clock?
17            MR. KENDALL:  At least until 11 o'clock.  I may go
18    past that.  I've got to just look at things and try to trim
19    things.
20            THE COURT:  All right.  And then if we get that far?
21            MR. FRANK:  Your Honor, we have a concern about that
22    because we have a witness who's been here from California away
23    from her 5-year-old daughter all week waiting to testify.  We
24    actually brought in an additional witness from California
25    yesterday because we were advised by counsel that we might be
```

(Line labels at left margin: 03:30 at line 10, 03:31 at line 20)

1    done by the end of the day today.  Our time has not gone longer

2    than we predicted with this witness.  Now we're way into the

3    day tomorrow, and it's not clear that these witnesses are going

4    to get on, much less at all, which is a concern.

5              THE COURT:  You have two witnesses from California?

6              MR. FRANK:  Yes, your Honor.

7              THE COURT:  And their direct exams will be how long?

8              MR. FRANK:  One will be an hour and 15 minutes

9    approximately.  One will be shorter than that.

03:31  10              THE COURT:  Ad who are they?

11              MR. FRANK:  They are Laura Janke and Aaricka Hughes.

12              THE COURT:  I'm sorry?

13              MR. FRANK:  Aaricka, A-a-r-i-c-k-a, Hughes.

14              THE COURT:  Miss Hughes.

15              Well, I am perfectly agreeable to taking witnesses out

16    of order if they're in the government's case.

17              MR. FRANK:  I understand that and I appreciate that,

18    your Honor.  We prefer not to do that.  We prefer to be done

19    because it would be quite disruptive to be out of order.

03:32  20              MR. KENDALL:  Your Honor, Mr. Frank said 45 minutes --

21              THE COURT:  What's that?

22              MR. KENDALL:  Mr. Frank predicted 45 minutes.  Then he

23    took an hour and 45.  I don't dispute that.  He has to put on

24    his case, but I've got to respond to something of that length.

25    He went through every tape.  I've got to go through every tape.

1     I've got to match him for whatever he covers.

2         MR. FRANK:  To be clear, I said this witness would be

3     two and a half to three hours, and she was 2 hours and

4     40 minutes -- Defense said they would be an hour and 15

5     minutes, and it's been precisely an hour and 15 minutes.

6         MR. KELLY:  Your Honor, I'm not going to get into a

7     back and forth about time, but look, the government blocked us

8     from finishing up Miss Sanford.  She's got to come back from

9     Georgia.  The government blocked us from a few questions of one

03:32 10     of the agents.  He's got to come back.  We'll try to move this

11     as expeditiously as possible and we'll try to move it forward

12     quickly tomorrow as well.

13         MR. KENDALL:  Your Honor, my understanding is

14     Miss Hughes is probably a very short witness.  I have to

15     discuss with Mr. Kelly.  Miss Janke is someone who is in a Plea

16     Agreement and is in much more control of the government.

17         THE COURT:  Meaning what?  You'll have a shorter

18     cross?

19         MR. KENDALL:  She'll come exactly as they want because

03:33 20     she has to curry favor with the government under the Plea

21     Agreement.

22         THE COURT:  She's from California though, right?

23         MR. KENDALL:  Yes, she is.

24         THE COURT:  All right.  I want Miss Janke to get on

25     and off tomorrow.  And if we have to go longer in the day,

maybe we'll have to do that.  You're not going to make a jury

very happy if you push them beyond 3:30 on a Friday afternoon,

but if necessary, that's what's going to happen.  So stand

forewarned we may have a long day tomorrow, but I'm going to

get Miss Janke on and off and Miss Hughes on and off tomorrow.

Okay?

     We're in recess.

     MR. FRANK:  One other slight issue, your Honor.  We

can discuss this at a later point if your Honor prefers.  I'm

concerned about an implication that Mr. Singer was allowed to

get away with money laundering.  In fact, Mr. Singer, as

counsel knows, pled guilty to money laundering conspiracy.  We

can't elicit that, our hands are tied, but there was certainly

an implication given to the jury that we let him get away with

it.

     MR. KENDALL:  Your Honor, it's a different issue I'm

raising.  The agent testified they're supposed to have a

complete debriefing of the informant's criminal activities

before they take him on as an informant.

     THE COURT:  Well, if you go too far, I'm going to give

a limiting instruction to the jury that will be drafted by the

government that will explain that.  So that's enough for today.

We're in recess.  We'll be back tomorrow morning at 9 a.m.

     (Whereupon, the proceedings concluded at 3:34 p.m.)

1                     I N D E X

2     Witness                          Page

3     ELIZABETH KEATING

4     Direct Examination by Mr. Frank          5

5     Cross-Examination by Mr. Kelly          42

6     Cross-Examination by Mr. Kendall       129

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2     NO.                      ADMIT

 3     591    ....................      7

 4     594    ....................     10

 5     602    ....................     14

 6     613    ....................     17

 7     623    ....................     18

 8     625    ....................     21

 9     587    ....................     26

10     621    ....................     28

11     572    ....................     32

12     574    ....................     36

13     596    ....................     37

14     596A   ....................     41

15     272    ....................     41

16     1364   ....................     54

17     549    ....................    100

18     1482A  ....................    120

19

20

21

22

23

24

25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10   proceedings taken September 23, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley           September 23, 2021

15       /s/ Kelly Mortellite            September 23, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Kelly Mortellite, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25

1

2                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
3

4
UNITED STATES OF AMERICA,           )
5                    Plaintiff       )
                                     )
6  vs.                               )  No. 1-19-CR-10080
                                     )
7  GAMAL ABDELAZIZ and JOHN          )
   WILSON,                           )
8                    Defendants.     )
                                     )
9                                    )

10

11
                BEFORE THE HONORABLE NATHANIEL M. GORTON
12                 UNITED STATES DISTRICT JUDGE
                        JURY TRIAL - DAY 11
13

14
              John Joseph Moakley United States Courthouse
15                      Courtroom No. 4
                        One Courthouse Way
16                 Boston, Massachusetts 02210

17

18                    September 24, 2021
                         9:06 a.m.
19

20

21
                   Kristin M. Kelley, RPR, CRR
22                   Kathy Silva, RPR, CRR
                     Official Court Reporter
23          John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 3209
24               Boston, Massachusetts 02210
                  E-mail: kmob929@gmail.com
25
              Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

4

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  You may be seated.  Court is now in

 3     session.

 4            THE COURT:  Good morning, jurors.  Welcome back.

 5     We're ready to go back to work.

 6            Miss Keating, you're reminded again that you remain

 7     under oath.

 8            Mr. Kendall, you may continue with cross-examination.

 9            MR. FRANK:  Thank you, your Honor.

10     BY MR. KENDALL:

11     Q.   Miss Keating, good morning.

12     A.   Good morning.

13     Q.   Yesterday you told us that, as part of your work in

14     preparing to have your investigative plan, you reviewed the tax

15     filings of the Key Foundation.  Do you remember that?

16     A.   Yes.

17     Q.   Okay.

18            MR. KENDALL:  Can we have Exhibit 9767 on the screen,

19     please.

20            MR. FRANK:  For the witness only?

21            MR. KENDALL:  Do you -- just for the witness only.

22     Q.   Do you recognize this document?

23     A.   Yes.

24     Q.   Okay.  And what is it?

25     A.   It is IRS "e-file Signature Authorization for an Exempt
```

|     |     |
| --- | --- |
| 1 | Organization". |
| 2 | Q.   Okay.  And you don't have a paper copy.  We'll show you |
| 3 | the back here.  We'll show you the second page as well.  If you |
| 4 | could look at the top left corner. |
| 5 | A.   Yes. |
| 6 | Q.   And what is this document? |
| 7 | A.   It's a Form 990, Return Of Organization Exempt From Income |
| 8 | Tax. |
| 9 | Q.   And for what entity is it? |
| 09:09 10 | A.   The Key Worldwide Foundation. |
| 11 | Q.   And what year? |
| 12 | A.   2014. |
| 13 | MR. KENDALL:  Your Honor, I'd like to offer 9767 into |
| 14 | evidence, please. |
| 15 | THE COURT:  It will be admitted. |
| 16 | (Exhibit 9767 admitted into evidence.) |
| 17 | MR. KENDALL:  If we could show everybody. |
| 18 | Q.   Okay.  I'd like to start on the first page and have you |
| 19 | help us go through this tax form.  The first page is simply for |
| 09:09 20 | e-filing.  You can file electronically instead of via paper, |
| 21 | correct? |
| 22 | A.   Correct. |
| 23 | Q.   Okay.  And if we look in the middle of the first page |
| 24 | where it says "I authorize X", it says "Williams and Olds, |
| 25 | CPA", correct? |

```
 1   A.    Correct.

 2   Q.    That's a CPA firm that did the accounting work for both

 3   the foundation and Mr. Singer's business, correct?

 4   A.    Correct.

 5   Q.    Okay.  Could we then turn to page 2.  And this is the

 6   actual Form 990 tax return, correct?

 7   A.    Correct.

 8   Q.    And whenever you say Form 990, that means it's a nonprofit

 9   organization that is filing the document?

09:10 10  A.    Correct.

11   Q.    Only charities file this that are approved to get tax

12   deductible donations?

13   A.    Correct.

14   Q.    Like a business couldn't file it, correct?

15   A.    Correct.

16   Q.    Thank you.

17         And if we could go to the top right corner there, you

18   see the "2014"?  Is that the tax year?

19   A.    Yes.

09:10 20  Q.    Which is also the calendar year?

21   A.    I believe so, but --

22   Q.    It doesn't say?

23   A.    It doesn't specifically say.

24   Q.    But if we look under "A", it says, "for the 2014 calendar

25   year, or tax year beginning" and blank.  So, by default, you
```

would assume it's the calendar year, correct?

A.   Correct.

Q.   And then if we look right under the 2014 date under -- it says "Open to Public Inspection".  These Form 990s are put on the IRS website, correct?

A.   A portion of the forms.  A portion of the 990 is put on the public, the IRS website, yes.

Q.   And the IRS does that, for one purpose, to make them available to taxpayers and their tax preparers, correct?

A.   Correct.

Q.   It's a resource that the tax preparer and the taxpayer can rely on when they're filling out their tax return?

MR. FRANK:  Objection to rely.

THE COURT:  Sustained.

Q.   Okay.  It's a statement that the entity that's filing the 990 is an approved 501(c)3 organization, or it has an application pending, correct?

A.   Correct.

Q.   And the IRS will indicate whether it's approved or whether it's pending, correct?

A.   Correct.

Q.   Thank you.

Now, if we could go down to "Part I Summary".

MR. KENDALL:  And if you could just, Mr. Carter is highlight the typed in sentence beginning with "The Key

1    Worldwide".

2    Q.    And could you read that to us, please.

3    A.    "The Key Worldwide Foundation endeavors to provide

4    education that would normally be unattainable to

5    underprivileged students, not only attainable but realistic.

6    With programs that are designed to assist young people in every

7    day situations and educational".

8    Q.    They didn't finish the sentence?

9    A.    It appears that way.

09:12 10    Q.    If we can go to the bottom of that page and just show the

11    signature line, whose names are there?  We see it's Rick

12    Singer, Executive Director, and James B. Williams CPA, correct?

13    A.    Correct.

14            MR. KENDALL:  I'd like to go to page 3, please,

15    Mr. Carter, and if we could go to 4C at the bottom of the page

16    3 and if you could highlight the typed stuff.

17            It says "expenses of 1846."  And can you list the

18    entities down there?

19    A.    Better LA Program.

09:13 20    Q.    And then can you read the rest of that, please?

21    A.    "As a result of the efforts by Joel Margulies and Olga

22    Serverina, the foundation hosted 39 students at a one week

23    entrepreneurial program for high school students at UCLA.

24    These students were identified and placed by the 1736 Family

25    Crisis Center in Los Angeles.  There was no cost to the

```
 1    students".

 2    Q.    Okay.  If we could go to page 11, please.  Do you

 3    understand what page 11 is, "Part IX Statement of Functional

 4    Expenses"?

 5    A.    It lists the expenses of the organization.

 6    Q.    Okay.  And if we could go to line 13, Mr. Carter, and if

 7    you can just highlight that, please.  That's "Office Expenses"?

 8    A.    Correct.

 9    Q.    And you agree with me that the organization doesn't list

09:14 10    anything for "office expenses"?

11    A.    Correct.

12    Q.    You know, people can make a contribution to a 501(c)(3),

13    such as this one, by writing a check, is that correct?

14    A.    Correct.

15    Q.    Can even give cash?  They can take greenbacks, correct?

16    A.    Correct.

17    Q.    They can also make a noncash contribution, correct?

18    A.    Correct.

19    Q.    You could say, pay the expenses of the office staff and

09:14 20    contribute the work of the office staff that you paid for,

21    correct?

22          MR. FRANK:  Objection, beyond the scope.

23          THE COURT:  Overruled.

24    A.    Correct.

25          MR. KENDALL:  Okay.  Could you bring up Exhibit 112,
```

```
 1   please, Mr. Carter.

 2   Q.   This is an e-mail that's in evidence.  If you can take a

 3   look in the middle e-mail -- well, let's go to the bottom.

 4        MR. KENDALL:  Work a little further up.  I'm sorry.

 5   Let's go to the second e-mail.  If you can highlight March 31,

 6   2014, at 7:03 p.m., the message from Debbie Rogers.

 7   Q.   She says, "I contacted Rick and he directed me to Steve.

 8   Per Steve 100K will be to his foundation, 100K an invoice from

 9   The Key and 20K to Rick Singer.  Since you said 200K, we're at

09:15 10   220K, is this a moving target?"

11        MR. KENDALL:  Then if we can highlight the response

12   from Mr. Wilson.

13   Q.   What does he write?

14   A.   "Yes, I added $20,000 for his expenses".

15        MR. KENDALL:  Okay.  Could we have Exhibit 118 in,

16   please?  Excuse me.  Can you show, the witness, only 118?

17   Q.   This is an e-mail.  Have you seen this before?

18   A.   No.  I've not seen this e-mail.

19   Q.   Do you recognize this as an e-mail from Mr. Singer?

09:16 20   A.   Yes.

21        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

22   this subject to our authenticity stipulation.

23        MR. FRANK:  The authenticity is not in dispute, but

24   it's a coconspirator statement.  It's not admissible to the

25   defense.
```

```
 1              THE COURT:  Sustained.
 2              MR. KENDALL:  Your Honor, this is on the government's
 3    exhibit list.
 4              MR. FRANK:  That's true, your Honor.  It's not
 5    admissible to the defense.  It's hearsay.
 6              THE COURT:  Sustained.
 7              MR. KENDALL:  Okay.  I'd like to go back to
 8    Exhibit 9767, please, and if we can go to page 23.  And you see
 9    number three, if you could highlight that for us, Mr. Carter.
09:17 10    Q.   It lists a $100,000 donation from John Wilson at 2 Fleur
11    Place.  You see that?
12    A.   Yes.
13    Q.   Okay.  And then if we could go to page 26, please, and go
14    to Item 6.  And what does it list?
15    A.   USC Water Polo.
16    Q.   What's the amount of cash that it lists as a grant?
17    A.   $100,000.
18    Q.   So this filing with the IRS shows that Mr. Wilson gave
19    $100,000 to the foundation and the foundation claims it gave
09:18 20    $100,000 to USC Water Polo, correct?
21    A.   That is what's reported on the tax return.
22    Q.   But, in fact, you know from your investigation the
23    foundation didn't send the $100,000 to USC Water Polo, did it?
24    A.   Yes, it did.
25    Q.   Wasn't the $100,000 given through the for-profit company?
```

```
 1   A.   Yes.  I believe it is, but -- you corrected me.  Yes, it
 2   was.
 3   Q.   So there's $100,000 that Mr. Wilson gave to Mr. Singer,
 4   which Mr. Singer bought a cashier's check to his for-profit
 5   business, and he gave that to USC, correct?
 6   A.   Correct.
 7   Q.   And that's the one that gets back the letter from the
 8   Trojan Fund, thank you for your donation?
 9   A.   Correct.
10   Q.   Okay.  He then gives a separate 100,000 that's supposed to
11   go into the foundation, correct?
12   A.   He gets another $100,000, yes.
13   Q.   To the foundation.  And the foundation doesn't send
14   $100,000 to USC to your knowledge, correct?
15   A.   Correct.
16   Q.   That's left for Mr. Singer to use for whatever purposes he
17   chooses, correct?
18   A.   Correct.
19   Q.   Okay.
20        MR. KENDALL:  And if we could keep going through here,
21   I'd like to take us next to page 30.  And if we can go to the
22   top typed section and highlight that entire paragraph that
23   starts "The Key Worldwide Foundation".  Thank you.  Highlight
24   that.
25   Q.   And if you can read that to us?
```

```
 1   A.   "The Key Worldwide Foundation endeavors to provide
 2   education that would normally be unattainable to
 3   underprivileged students, not only attainable but realistic.
 4   With programs that are designed to assist young people in every
 5   day situations, and educational situations, we hope to open new
 6   avenues of educational access to students that would normally
 7   have no access to these programs.   Our contributions to major
 8   athletic university programs may help to provide placement to
 9   students that may not have access under normal channels".
09:20 10   Q.   Did the investigative team read this tax return before
11   they confronted Mr. Singer on September 21?
12   A.   I saw this tax return.
13        MR. KENDALL:  And then can we turn to the next page,
14   please, and highlight 4d.
15   Q.   Could you read us what 4d states.
16   A.   "Financial Literacy Project: During 2013, the foundation
17   developed a program that can be presented to college students
18   and young adults that will assist them with the financial
19   aspects of responsible adulthood, such as the purchase of a
09:21 20   home, establishment and use of credit, retirement programs, et
21   cetera.  This program is currently on hold".
22        MR. KENDALL:  Can we next go to Exhibit 7011 that's in
23   evidence, Mr. Carter.  And I'd like to go to page 7.  If you
24   could highlight that printing and call it out, please.
25   Q.   Could you read that to us, please?
```

1   A.   "Dear Rick, I'm writing this e-mail today to simply say

2   thank you.  I leave for SMU in 30 days, and I could not be more

3   excited about moving to Dallas.  I'm positive that I would have

4   never found such a perfect school for me if it wasn't for your

5   guidance.  Not only did you help me through the college search

6   and the application processes, you were also able to help me

7   obtain a manager position on the basketball team.  I have

8   already met some of the players and other managers and I am

9   very excited to begin working with all of them.  I'm looking

09:22 10   forward to staying in touch as I go through my years as a

11   Mustang".

12          MR. KENDALL:  Can we go to the next page, please.  Can

13   you highlight the language under that photograph there.

14   Q.   Could you read that to us as well, please?

15   A.   "Hey Rick, I wanted to thank you personally for all your

16   help in getting me into the University of Texas in Austin and

17   for helping me secure a managers position with the UT

18   basketball team.  And, can you believe it, here is a picture of

19   me with basketball star Kevin Durant at the UT summer

09:22 20   basketball camp".

21          MR. KENDALL:  Can we go to the next page, please.

22   Next page, please.

23   Q.   And if you could -- at the bottom where it says "Dear

24   Rick", can you read that to us?

25   A.   "Dear Rick, I can't say thank you enough.  My team spent

```
 1   most of the evening discussing the incredible value you
 2   delivered.  Our CFO, Casey, is interested in speaking with you
 3   further about his daughter.  I know you can help them as well.
 4   Thanks again".
 5   Q.   Who is the person who's sending it?
 6   A.   Rick Nelson, CEO Director of Technology.
 7        MR. KENDALL:  If we can go back in -- to the next
 8   page, please.  And maybe a little further down, next page as
 9   well.
10   Q.   Before -- had the investigative team read Mr. Singer's
11   website before it met with Mr. Singer on September 21?
12   A.   I read Mr. Singer's website.  I'm not sure if I read it
13   before or after.  I don't know if the team read it before or
14   after.
15   Q.   So you were -- fair to say you have no memory of being
16   aware about all these testimonials about helping people getting
17   manager positions at the time that you were directing
18   Mr. Singer on what to say to Mr. Wilson?
19   A.   At that time -- I'm not aware of when I read it.  I may
20   have read it beforehand.  I just don't recall.
21   Q.   I appreciate your candor, but I just want to be a little
22   more specific.  It would be correct to say you have no memory
23   of being aware of these manager testimonials at the time that
24   you were directing Mr. Singer's conversations with Mr. Wilson?
25   A.   I have no memory.
```

**A2289**

```
 1   Q.   You testified yesterday that Mr. Singer was reluctant to

 2   say the things we wanted him to say.  Do you remember saying

 3   that?

 4   A.   Yes.

 5   Q.   Could you tell us the things that he was reluctant to say

 6   that you wanted him to say?

 7   A.   Mr. Singer was reluctant to say, "a payment to a coach."

 8   In some situations, he was reluctant to say the word "bribe".

 9   Q.   What else?

10   A.   That's what I -- that was my -- what I recall the main

11   points were.

12   Q.   Would you agree with me that in all of the tapes with John

13   Wilson, Mr. Singer once never says something along the lines of

14   a fake profile or a false profile?

15   A.   Correct.

16   Q.   Was that his decision not to use that phrase, or was it

17   you simply didn't instruct him to use that phrase?

18   A.   Specifically with Mr. Wilson, I don't recall.  With other

19   parents, we asked Mr. Singer to say it was a payment to a

20   coach, and some of the other things we asked him to say was

21   that they would be recruited and didn't have to play,

22   admissions wouldn't know.

23   Q.   Did you have any written record of the instructions you

24   gave Mr. Singer of what to say to Mr. Wilson?

25   A.   No.
```

09:25 — line 10
09:26 — line 20

|    |    |
|----|----|
| 1  | Q.   Do you have any written record of what Mr. Singer refused |
| 2  | to say to Mr. Wilson? |
| 3  | A.   No. |
| 4  |      MR. KENDALL:  Your Honor, I'd like to put up |
| 5  | demonstrative K.  It's a demonstrative we have that's simply |
| 6  | verbatim quotes of government exhibits. |
| 7  |      MR. FRANK:  Your Honor, may I look at it? |
| 8  |      THE COURT:  Sure.  If you show it to counsel. |
| 9  |      MR. KENDALL:  Yes. |
| 09:27 10 |      MR. FRANK:  Is it a multipage document? |
| 11 |      MS. PAPENHAUSEN:  Yes, it is. |
| 12 |      THE COURT:  I need a technical break for a moment. |
| 13 |      (Pause.) |
| 14 |      THE COURT:  Thank you, counsel.  Go ahead. |
| 15 |      MR. FRANK:  Your Honor, this is full of argument. |
| 16 | These are not simply excerpts.  There are actually headings on |
| 17 | here with defense arguments on them. |
| 18 |      MR. KENDALL:  Your Honor, I have some titles, but |
| 19 | everything there is a verbatim quote. |
| 09:29 20 |      THE COURT:  You want to do something like this, bring |
| 21 | it to the Court's attention before we have a jury.  I'm not |
| 22 | going to allow it in, but at a break, I'll look at it. |
| 23 |      MR. KENDALL:  If I can have that back, Mr. Frank. |
| 24 | Q.   I'd like to next go to the September 15 conversation that |
| 25 | you monitored.  I'd like to just show you a couple of excerpts, |

ver short excerpts from that conversations.  It's basically the
government transcript with a few statements written in red.
I'd just ask you if you can tell us if you agree with the red
corrections or not.

    This is going to be exhibit -- excerpts from 561.

    MR. FRANK:  Your Honor, I'd just point out, in the
interest of time, Exhibit 561 came through a different witness
who was cross-examined extensively about what was in 561.  This
witness did not testify about 561 and is now going to be
recross examined about that exhibit.  I'm just pointing it out
in the interest of time.

    MR. KENDALL:  In the interest of time, I'm going to
meet the expectations, your Honor.  That's not going to be a
problem.  I'd like to just flip through a few corrections with
her in very short excerpts, your Honor, very short, two lines,
three lines.

    THE COURT:  You can show her 561, but this redlined, I
don't know what you're talking about, red inserts.  You can
show her 561 and ask her about it.

    MR. KENDALL:  Okay.  Well, I need to play the excerpt.
I don't have to show the jury.  I can just show her the excerpt
and then play -- I can play the excerpt and show her the
redline and see if she agrees with it.

    MR. FRANK:  This is what we did with the other
witness.

```
 1              MR. KENDALL:  Your Honor, if I may proceed.
 2    Mr. Carter, could we go to 561, page 8, lines 9 through 21.  If
 3    you could just show the transcript only to the witness.  Then
 4    I'd ask that you play the excerpt.
 5              Your Honor, we have a version where we've slowed down
 6    the pace just a little bit.  We haven't altered anything.  We
 7    just played it at a slightly slower speed so people can listen
 8    better.
 9              If you'll just play those three lines, lines 19, 20,
10    21, from page 8 with the slowed down version.
11    Q.   And can you see the three line transcript?
12              THE COURT:  This is in 561?
13              MR. KENDALL:  Yes, your Honor.
14              THE COURT:  Is it in the binder?  It's not in
15    Miss Keating's binder.
16              MR. KENDALL:  It's not in Miss Keating's, no.
17    Q.   Miss Keating, do you see the three lines there with the
18    red on it?
19    A.   Yes.
20              MR. FRANK:  Our monitors are not working.
21              MR. KENDALL:  We can give the government a paper copy,
22    your Honor.
23              And if you can just play the three lines there.
24    Q.   I'd ask you to look at the red and tell us if you agree
25    with it or not.
```

09:31 10

09:32 20

```
 1              (Audio recording played.)
 2              MR. KENDALL:  I think you didn't start from the
 3     beginning, Mr. Carter.
 4              (Audio recording played.)
 5     Q.   Would you agree with me it states, "If they had a really
 6     good time, they could work on that"?
 7     A.   I'd have to hear that again.
 8     Q.   Okay.  Sure.
 9              (Audio recording played.)
09:33 10     A.   Yes.
11     Q.   Okay.  Next I'd like to go to page 16 and lines 3 to 15.
12     I'm going to play you the slowed down version and ask if you'd
13     just agree with the red words that have been typed in on top of
14     the government's transcript.
15              (Audio recording played.)
16     Q.   Do you agree that Mr. Wilson states, "That's more than
17     we'll want to go"?
18     A.   I'd like to hear that again, please.
19     Q.   Sure.
09:34 20              (Audio recording played.)
21     A.   I heard "we're willing".
22     Q.   That's probably more than?
23     A.   "We're willing to go".
24     Q.   "We're willing to go"?
25     A.   Yes.
```

```
 1   Q.   Okay.  And we'll play it one more time.  Whatever you

 2   hear, we're willing or we'll want, whatever.

 3             (Audio recording played.)

 4   A.   I hear, "willing to go".

 5   Q.   Can we just play it one more time and whatever you're

 6   comfortable with is fine.

 7             (Audio recording played.)

 8   A.   I still hear "willing".

 9   Q.   Okay.  So you hear "that's probably more than"?

10   A.   "We're willing to go".

11   Q.   "We're willing to go".  Okay.  And if we could go to the

12   page 19, lines 12 to 16.

13             (Audio recording played.)

14   Q.   Did you hear that "Are those numbers, are there anyway to

15   make those like tax deductible?  Are they donations to the

16   school and stuff?"

17   A.   Can we please play that one more time?

18   Q.   Sure.  As much as you'd like.  Whatever is good for you.

19             (Audio recording played.)

20   A.   One more time.

21   Q.   Sure.

22   A.   Thanks.

23             (Audio recording played.)

24   A.   "Are they", yes.

25   Q.   Yes.  Okay.  And did you hear, just to be grammatical,
```

```
 1    "is" versus "are"?

 2    A.    I'm sorry.  Can you repeat that?

 3    Q.    Did you also hear "is there anyway" as opposed to "are

 4    there anyway"?

 5    A.    I wasn't focusing on that.  If you want to play it again,

 6    I can listen.

 7    Q.    Sure.

 8            MR. KENDALL:  Just play that little section.

 9            (Audio recording played.)

10    A.    "Are there any way to make those".

11    Q.    Okay.  And then the last one, thank you, page 18, lines 1

12    to 8.

13            MR. KENDALL:  Excuse me.  Exhibit 571, page 18, the

14    last clip, Mr. Carter.

15    Q.    Line 8 I'm asking you to focus on.

16    A.    Sorry.  What line?

17    Q.    It will be starting on line 1.  We're going to play line 1

18    to line 8.

19            (Audio recording played.)

20    Q.    Did you hear that, "so you gotta get in there and get them

21    to try it"?

22    A.    Can you play that one more time, please.

23    Q.    Yes.  Be happy to.

24            MR. KENDALL:  You can just play line 7, 8, 9.

25            (Audio recording played.)
```

09:38 at line 10
09:39 at line 20

```
 1   A.   At the end, I hear "give it a try".

 2   Q.   "So you gotta get in there and give it a try"?

 3   A.   It's a little.

 4   Q.   Shall we play it again?

 5   A.   Yes.  Let's hear it one more time.

 6        (Audio recording played.)

 7   A.   I just hear "give it a try".

 8   Q.   "So you gotta get in there and give it a try"?

 9   A.   I just hear the "give it a try" at the end.

09:39 10   Q.   "You gotta give it a try."

11   A.   Yeah.  They speak over each other so it's hard to hear the

12   last part.

13        MR. KENDALL:  Your Honor, I'd like to have a chance to

14   adapt her to the fine points to what we presented and then

15   offer this as an exhibit.

16        THE COURT:  What is it?

17        MR. FRANK:  Your Honor, transcripts are not exhibits.

18        MR. KENDALL:  It's a chalk.

19        THE COURT:  But they're not exhibits.

09:40 20        MR. KENDALL:  But I'd like to make this a chalk so the

21   jury can see it later once it's adjusted.

22        THE COURT:  Well, why don't you do that and we'll see

23   it and talk about it outside the hearing of the jury.

24        MR. KENDALL:  Thank you, your Honor.

25   Q.   So the September 15th call with Mr. Wilson, which we've
```

```
 1   just done some clips on.  Then there's the meeting with
 2   Mr. Singer on September 21, 2018.  And you've testified about
 3   that, correct?
 4   A.   Yes.
 5   Q.   You've seen the videotape of Mr. Meredith talking with
 6   Mr. Singer, correct?
 7   A.   Yes.
 8   Q.   You actually were monitoring it as it was occurring,
 9   correct?
10   A.   Correct.
11   Q.   Okay.
12        MR. KENDALL:  Your Honor, I'd like to play the short
13   excerpt of that videotape from September 21 meeting with
14   Mr. Meredith and Mr. Singer.
15        MR. FRANK:  Objection.  No basis for it to come in,
16   your Honor.
17        MR. KENDALL:  Your Honor, it's not for the truth of
18   the matter asserted.  It's for the state of mind.
19        MR. FRANK:  Whose state of mind?
20        MR. KENDALL:  Mr. Singer's.  And if he's part of the
21   agreement, your Honor, the state of mind should be relevant.
22        MR. FRANK:  Objection, your Honor.
23        THE COURT:  Yeah.  We'll talk about it outside the
24   hearing of the jury, Mr. Kendall.
25   Q.   Okay.  I'd next like to turn to Exhibit 13.  We've gone
```

 1    through some excerpts on page 1.  I'd like to actually go to

 2    the page that's, if you see the number there where it says

 3    "Singer-Phone".  I'd like to go to Singer-Phone 712.  If we

 4    look at Singer phone 717 and look at entry 14 in the top left

 5    column, and it states "created January 30, 2019" and modified

 6    on the same day.  Do you see that?

 7    A.    Yes.

 8    Q.    So this would have been created after all of the

 9    consensual calls had been made with Mr. Wilson, correct?

09:42 10   A.    Yes.

 11   Q.    And if we could look there about midway down where it says

 12   "John Wilson".  It says, "John Wilson 20k nothing to do with

 13   USC plus donation to USC program for real polo player",

 14   correct?

 15   A.    Yes.

 16   Q.    Now, you participated in an interview with Mr. Singer on

 17   September 27, 2018, correct?

 18   A.    Correct.

 19   Q.    Was that the second day of the trip out to California or

09:43 20   the first day?

 21   A.    The second.

 22   Q.    Second day.  And you, in fact, took the handwritten notes

 23   that time, correct?

 24   A.    Yes.

 25   Q.    And would it be fair to say when you met Mr. Singer in the

```
 1   Marriott on September 21 through, let's say, November 1, 2018,
 2   so that's really October -- the month of October.  The only
 3   entry you have in any written interview report about Mr. Wilson
 4   is two lines in the report from this day, correct?
 5   A.   There were a lot of interview reports during that period.
 6   I don't know if that's the only time we mentioned Mr. Wilson
 7   off the top of my head.
 8   Q.   Okay.  You can't remember any other time, correct?
 9   A.   I can't remember.
10   Q.   Okay.  And you wrote in your notes for that interview
11   report what he told you, "Jovan Vavic got Johnny Wilson in, was
12   a real player and played", correct?
13   A.   That's what Mr. Singer stated.
14   Q.   He told you he was a real player and played, correct?
15   A.   That's what Mr. Singer stated, yes.
16   Q.   He also told you "Jovan got 150k, 100k to USC water polo,
17   50k to Rick", correct?
18   A.   Correct.
19   Q.   You would agree with me that for all the consensual calls
20   you did with Mr. Wilson starting in mid September, let's say go
21   up to December 1st, that's the only entry about Mr. Wilson in
22   your interview reports, correct?
23   A.   For -- like I said, I don't remember off the top of my
24   head if that was the only time he talked about Johnny, but I do
25   remember that interview.
```

1    Q.    Okay.  You don't remember anything else being said about

2    Mr. Wilson prior to December 1st, do you?

3    A.    I don't recall off the top of my head.  Again, we wrote a

4    lot of reports.

5    Q.    Okay.  I'd like to put some exhibits before you and ask

6    you if you can identify them.

7         MR. KENDALL:  Can we first put Exhibit 570 in front of

8    the witness.

9    Q.    Do you recognize Exhibit 570?

09:45 10   A.    Yes.

11   Q.    And what is it?

12   A.    It's an iMessage exchange between Mr. Singer and

13   Mr. Wilson.

14   Q.    Okay.  And this is at the time when Mr. Singer was working

15   under the direction of the agents as an informant?

16   A.    Correct.

17   Q.    Is he showing you copies of these messages?

18   A.    I've seen them on the extractions.

19   Q.    You see them on the extractions.  Did you discuss them

09:46 20   with him as he was having this dialogue with Mr. Wilson?

21   A.    I was not.  I'm not sure if anybody on the team was.

22   Q.    So you don't know if this was unsupervised or something

23   that was according to the government's instructions and

24   direction?

25   A.    I didn't discuss this, but based on the content, it was at

         1    the direction of the government.

         2    Q.   You don't have a memory of that?  You're just assuming

         3    that?

         4    A.   Correct.

         5    Q.   And it wasn't at the direction of you?  You're assuming it

         6    was at the direction of someone else?

         7    A.   It was not at the direction of me.

         8    Q.   Okay.  And is there any interview report that would record

         9    who was giving the direction on these text messages?

09:46   10    A.   No.

        11    Q.   Okay.  So if we take a look at the first entry, he

        12    states --

        13         MR. FRANK:  Your Honor, I'm don't object to this

        14    coming into evidence.

        15         MR. KENDALL:  I'd like to offer this into evidence,

        16    your Honor.

        17         THE COURT:  Are you objecting?

        18         MR. FRANK:  We do not object.

        19         THE COURT:  All right.  It will be admitted, 570.

09:47   20         (Exhibit 570 admitted into evidence.)

        21    Q.   If we look at the first one, it's the time of 9:47 p.m.

        22    That's from John Wilson to Mr. Singer, correct?

        23    A.   Correct.

        24    Q.   And he writes in the middle there, "Is there a side door

        25    for nonathletes", correct?

**A2302**

1   A.   Yes.

2   Q.   And he states, "He would also be extremely concerned about

3   her not knowing he pulled springs if that's possible for

4   nonathlete".  He was referring to his friend at Brown, who the

5   friend's daughter is interested in Brown?

6   A.   Yes.

7   Q.   Okay.  At any point did the agents tell Mr. Singer, you

8   have to tell Mr. Wilson there's no program for nonathletes?  It

9   has to be an athlete whose credentials we falsify?  Did you

09:49 10   ever tell him to say that to Wilson?

11   A.   I don't recall.

12   Q.   If we look at the next line, he writes, "Rick, can we chat

13   this weekend?  Want to understand side door for my girls and

14   does it also require sports connection", correct?

15   A.   Correct.

16   Q.   And then we have -- we drop two down.  He writes "Rick I

17   can help you a lot on the 'value based' pricing front.

18   Seriously (I don't want to brag I am considered one of

19   McKinsey's world leaders in pricing strategy.)

09:49 20         Anyway, if you would like, let's set up an hour or

21   two and review your business model and pricing ".

22         You recall from your investigative report that

23   Mr. Wilson was repeatedly raising with Mr. Singer that he

24   wasn't getting paid to do these side-door donations and

25   Mr. Wilson thought he should be, correct?

```
 1   A.    Correct.

 2   Q.    And Mr. Wilson, as you know, has an MBA from Harvard?

 3   A.    Correct.

 4   Q.    And he has business experience in legitimate businesses?

 5   A.    Correct.

 6   Q.    And you would agree with me that, throughout this time of

 7   consensual calls, he keeps on saying the same thing, you're not

 8   getting paid and let me advise you on how to make this a more

 9   organized or better paying business, correct?

10   A.    Correct.

11   Q.    Did the agents ever tell Mr. Singer you have to tell them

12   this is not part of a legitimate business?

13   A.    No.

14   Q.    And you agree with me, Mr. Wilson raised this time and

15   time again from September to January and not once did you say

16   to Mr. Singer, correct his misinformation?

17         MR. FRANK:  Objection to misinformation.

18   Q.    Correct his understanding?

19         MR. FRANK:  Objection.

20         THE COURT:  Overruled.

21   A.    I'm sorry.  Can you repeat that, please.

22   Q.    I'll see if I can.  Would you agree with me that from

23   September 21 to the last call on January 10, 2019, the agents

24   never said to Mr. Singer tell him this is not a legitimate

25   business that can have pricing and operations like the type of
```

1  businesses he was?

2  A.   Correct.

3  Q.   If we can go to the next page, please.  If we look at the

4  second to the bottom there, "I -- we really should discuss".

5        So we can follow it, the green circles are

6  Mr. Wilson's messages, correct?

7  A.   Correct.

8  Q.   And the purple is Mr. Singer's?

9  A.   Yes.

09:52 10  Q.   So we see here Mr. Wilson saying September 30th -- it's

11  just the next day, correct?  "We really should discuss your

12  business and pricing model -- I believe some quick dialogue and

13  data exchanges could make a real difference for you".  Correct?

14  A.   Correct.

15  Q.   And then if we go to the next page.  And then Mr. Wilson

16  offers at the top there, "For example, added service fees for

17  side-door donations?  Top school intro fees?  Pricing

18  differently by geography?  Calibrating four different base

19  fees: School section assistance, test prep, application

09:52 20  support, admissions support, overall rates based on zip code,

21  income, et cetera".

22        Fair to say Mr. Wilson kept on trying to give

23  Mr. Singer help in how he could better run his business?

24  A.   He kept on discussing the pricing strategy with

25  Mr. Singer.

```
 1   Q.   And you know that in the prior things you monitored

 2   Mr. Singer had told Mr. Wilson he was doing 700 side doors a

 3   year at 40, 50, 60 schools, correct?

 4   A.   Yes.

 5   Q.   He made it sound like it was a big national business?

 6   A.   Yes.

 7   Q.   And he told him always that he didn't get paid for it, he

 8   just included it in his $6,000 fee?

 9   A.   Yes.  He said he did not get paid for it.

10   Q.   And this business was at such a sophisticated level that

11   Mr. Singer could actually talk to the presidents of

12   universities to help deliver this service to people?

13   A.   Mr. Singer told parents that he knew presidents of

14   universities.

15   Q.   And that he was also reading files in admissions offices

16   to help make admissions decisions?

17        MR. FRANK:  Objection.  Misstates.

18        THE COURT:  Sustained.

19   Q.   Well, you recall that Mr. Singer told Mr. Wilson he was

20   reading files at Harvard, correct?

21        MR. FRANK:  Objection.  Misstates.

22        THE COURT:  Sustained.

23   Q.   Do you recall Mr. Singer saying anything to Mr. Wilson

24   about reading at Harvard?

25   A.   Mr. Singer stated that he was reading at Harvard.
```

```
 1   Q.   Okay.  And do you know from your monitoring of the wiretap

 2   that Mr. Singer frequently told parents he was reading

 3   admission files at admissions offices?

 4   A.   I recall Mr. Singer telling people that he read

 5   applications at colleges.

 6   Q.   And he would read different ones different years, correct?

 7        MR. FRANK:  Objection.  Hearsay.

 8        THE COURT:  Sustained.

 9   Q.   Okay.  Did you -- did the investigative team ever tell

10   Mr. Singer, tell Wilson that you're not reading files at

11   Harvard?

12   A.   No.

13   Q.   Did you ever say to him, we want to be explicit with

14   Mr. Wilson that he doesn't think you have any official

15   connection to Harvard University?

16   A.   No.

17        MR. KENDALL:  If we could go to -- if we could have

18   Exhibit 597, please.

19   Q.   Could we -- do you recognize this?

20   A.   Yes.

21   Q.   What is it?

22   A.   iMessages between Mr. Singer and Mr. Wilson from 11/6/2018

23   to 1/10/2019.

24        MR. KENDALL:  Okay.  I'd like to offer these into

25   evidence, your Honor.
```

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  Exhibit 597 will be admitted.

 3              (Exhibit 597 admitted into evidence.)

 4              MR. KENDALL:  We can show the jury.  If we can go to

 5    the third one from the top.

 6    Q.   "Rick.  How's it going?  Apps done?  Mamie's first choice

 7    is Stanford; Courtney's is Harvard.  How would it work if Mamie

 8    doesn't sail at all?  Any update on 750k?"

 9              You see that?

10    A.   Yes.

11    Q.   Were the agents monitoring this text message chain?  If

12    you have personal knowledge.  Please don't guess.

13    A.   I don't recall.  I'm not sure if some of the team did.

14    Q.   Was anybody in the team assigned to monitor text messages

15    with Mr. Singer?

16    A.   Agents and AUSAs discussed Mr. Wilson's communications and

17    phone calls with parents.

18    Q.   Was anybody assigned to monitor Mr. Singer's text messages

19    to see what he was saying to Mr. Wilson and to correct or

20    discuss it with him?

21    A.   I don't recall a specific person being assigned.

22    Q.   So as far as you know, Mr. Singer was able to do this

23    without any supervision?

24    A.   I was personally not supervising it, but someone on the

25    team was discussing this with Mr. Singer.
```

```
 1    Q.   Discussing with him after the fact or discussing with it
 2    as he's writing and drafting them?
 3    A.   As he's writing this.
 4    Q.   Okay.  And do you have a memory of who it is?
 5    A.   No, I don't.
 6    Q.   Is there an investigative report who identifies who plays
 7    that role?
 8    A.   No.
 9    Q.   So you're just assuming, I take it?
09:57 10   A.   Based on the response by Mr. Singer --
11    Q.   Yes or no.  You're just assuming it, correct?
12    A.   Based on the investigation and my knowledge, the responses
13    were Mr. Singer's from our communications with Mr. Singer.
14    Q.   Are you doing it as he's writing them, or are you looking
15    at it after the fact?
16    A.   Looking at them after the fact.
17    Q.   And did anybody ever tell him that text message created
18    ambiguity and doubt about what was going on, you have to give a
19    better ruse or a better story?
09:58 20        MR. FRANK:  Objection to his testifying.
21             THE COURT:  Sustained.
22    Q.   Did anybody ever correct his text messages and say they
23    wanted them to be different?
24    A.   We -- as a group, we discussed with Mr. Singer different
25    strategies along the way during phone calls and text messages.
```

```
 1   Q.   Did you discuss different strategies with the text
 2   messages to John Wilson?
 3   A.   I did not personally.
 4   Q.   And can you identify any agent you observed doing this?
 5   A.   I don't specifically remember.
 6   Q.   Or assigned to do this?
 7   A.   I don't specifically remember.
 8        MR. KENDALL:  If we can go to the second page, please.
 9   Q.   We see Monday, January 7, 2019.
10   MR. KENDALL:  Do we have that?  Thank you.  It was
11   another page.
12   Q.   Now, January 7th, that's after he's given a million
13   dollars to Mr. Singer, correct?
14   A.   Correct.
15   Q.   Okay.  And he writes, "Rick Courtney PSAT was 1350.  740
16   verbal and 610 math.  She didn't do well in math -- it wasn't a
17   good day for her.  Is that good enough?  Obviously, she will
18   keep studying with your tutor.  John".
19        So fair to say that even after Mr. Singer has taken
20   the money from Mr. Wilson, Mr. Wilson thinks the girls had to
21   get good SAT scores?
22        MR. FRANK:  Objection to what Mr. Wilson thinks.
23        THE COURT:  Sustained.
24   Q.   Mr. Wilson is texting Mr. Singer for advice on the SAT
25   prep and scores of his daughters, correct?
```

**A2310**

```
 1              MR. FRANK:  Objection to what he's texting for.
 2              THE COURT:  Sustained.
 3    Q.   Not for.  About.  He's texting about his daughter's SAT
 4    scores and tutoring, correct?
 5    A.   Correct.
 6    Q.   Okay.  And then if we take a look at the bottom of that
 7    page, he writes, "When I look at bottom quartile of accepted
 8    students at Harvard versus Stanford -- I see she makes the
 9    Stanford 25th percentile cut with those scores, but Harvard's
10:00 10    much higher".
11              He wrote that as well, correct?
12    A.   Correct.
13              MR. KENDALL:  Next I'd like to go to Exhibit 580, your
14    Honor.
15    Q.   Do you recognize this?
16    A.   Yes.
17    Q.   What is it?
18    A.   iMessages between Mr. Singer and Mr. Wilson from
19    10/17/2018 to 10/22/2018.
10:00 20              MR. KENDALL:  I'd like to offer those into evidence as
21    well.
22              MR. FRANK:  No objection.
23              THE COURT:  580 will be admitted.
24              (Exhibit 580 admitted into evidence.)
25    Q.   At 580, let's go to the second page -- actually, the first
```

```
 1   page, and look at the bottom one from John Wilson.  "R given
 2   all the H admissions trial publicity is that still an option
 3   for both girls?  If they get good test scores what are the odds
 4   we get them in?"
 5           Now, this is October 21st.  He's already sent some of
 6   the money, correct?
 7   A.   Yes.
 8   Q.   "Given all of the H admissions trial", do you understand
 9   that he's referring to a trial about the Harvard admissions
10   policies?
11   A.   Yes.
12   Q.   And then if we turn to the next page, we see Mr. Singer's
13   response.  "I would not worry about the decision on the Harvard
14   case affecting us.  We are going through the side door with
15   athletics and the rules and process is quite different.  Yes if
16   the girls get what they are capable of 31-34 no problem through
17   the side door".
18           Did the agents tell Mr. Singer to tell Mr. Wilson in
19   the middle of paying the money that the side door has rules and
20   process?
21   A.   I did not tell Mr. Singer to do that.  Someone on the team
22   may have.
23   Q.   Well, you said, "may have."  You're just guessing?  You
24   don't know?
25   A.   I don't know if someone told Mr. Singer to say that
```

 1  specifically.

 2  Q.   Because you have no idea who was supposed to be monitoring

 3  his text messages before they went out?

 4  A.   I don't know who was monitoring Mr. Singer's text

 5  messages.

 6  Q.   Would you agree with me, when somebody describes something

 7  as having rules and process, it sounds like it's part of an

 8  organization?

 9           MR. FRANK:  Objection.

10:02 10          THE COURT:  Sustained.

11  Q.   Do you agree with me, universities have rules, correct?

12  A.   Correct.

13  Q.   And they have process?

14  A.   Correct.

15  Q.   Did anybody from the investigative team tell Mr. Singer,

16  after he sent that text message, you've got to tell John Wilson

17  this is not a part of any rules or process at Harvard

18  University?

19  A.   I don't recall that.

10:03 20  Q.   I'd like to turn the page, please.  Can we take a look at

21  the third from the top?  Mr. Wilson says again on October 21 --

22  this is in the middle of when the money is being transferred,

23  correct?

24  A.   Yes.

25  Q.   He writes, "When do you want to talk about your pricing

```
  1    strategies?  I am on the west coast until Tuesday.  Then I fly
  2    to Europe and the Mid East".
  3              He's still asking about giving advice to Mr. Singer
  4    on pricing, correct?
  5    A.    Correct.
  6    Q.    And if we look at Mr. Singer's response with the purple,
  7    he says, "Let's wait to do pricing later", correct?
  8    A.    Correct.
  9    Q.    And then Mr. Singer responds, "Okay no rush -- let me know
10:04 10   when you are ready".
 11              I'm going to ask the same questions I've asked
 12    before.  Can you identify anybody from the investigative team
 13    who was monitoring these e-mails before they went out?
 14    A.    I don't know of the specific person monitoring these text
 15    messages.
 16    Q.    Can you identify anybody who was assigned as part of their
 17    job responsibilities to monitor these text messages before they
 18    went out?
 19    A.    I don't recall somebody specific being assigned or an AUSA
10:04 20   being assigned to monitor text messages.
 21    Q.    And did anybody say -- did anybody from the investigative
 22    team say to Mr. Singer, you have to make it clear to Mr. Wilson
 23    that this is not the type of business that has the MBA advice
 24    that you're looking to give?
 25    A.    No.
```

```
 1              MR. KENDALL:  If we can turn the page, please.
 2    Q.   And then we see Mr. Singer's comment -- page 4, I believe,
 3    the bottom one.  Okay.  We see Mr. Singer's comment.  "John you
 4    have to relax - based on the girls' desires, grades and scores
 5    you will have the choice of where the girls want to go based on
 6    what spots are open.  Give it a little time -- trying to finish
 7    this year's kids".
 8              Did anybody from the investigative team tell
 9    Mr. Singer, tell Mr. Wilson to stop worrying about grades and
10:06 10   test scores because this is being done through some type of
11    improper financial arrangement, they don't count?  Anybody tell
12    Mr. Singer to tell Mr. Wilson that?
13    A.   Not to my knowledge.
14    Q.   This whole three-month period Mr. Wilson is repeatedly
15    raising issues about text scores and tutoring and the girls'
16    performance in academics, correct?
17    A.   He is texting Mr. Singer about that, yes.
18    Q.   He's discussing it on the phone calls, too?
19    A.   Yes.
10:06 20   Q.   And not once in this three month period do you instruct
21    Mr. Singer to say something along the lines, it doesn't matter,
22    John, because we have a bribery or a corrupt payment that means
23    those things don't count?
24    A.   Correct.
25    Q.   Mr. Wilson thinks he still has -- his daughters still have
```

```
 1  to go through the admissions office, correct?

 2         MR. FRANK:  Objection.

 3         THE COURT:  Sustained.

 4  Q.  You agree with me the admissions office looks at people's

 5  grades and score tests, correct?

 6  A.  Correct.

 7         MR. KENDALL:  I'd now like to call up on the screen,

 8  for the witness only, please, Exhibit 597.

 9         MR. FRANK:  I believe it's in evidence.

10:07 10       MR. KENDALL:  Is it?  Okay.  Great.

11         THE COURT:  What's the number?

12         MR. KENDALL:  Oh.  597.  Excuse me.  That's what we

13  just did.  That's in evidence.  Okay.

14         And then I'd like to call up Exhibit 684 and 685.

15  Q.  Do you recognize both of those?

16  A.  Is there a date on those text messages?

17  Q.  They're prior to September 21, I believe.  I think that's

18  from the space you can see it.

19  A.  Yes.  I do recall those.

10:08 20  Q.  And what are they?

21  A.  Text messages from Mr. Singer to Mr. Wilson.

22         MR. KENDALL:  Your Honor, I'd like to offer 684 and

23  685 and show it to the jury.

24         MR. FRANK:  No objection.

25         THE COURT:  It will be admitted, 684 and 685.
```

**A2316**

1                    (Exhibit 684, 685 admitted into evidence.)

2    Q.   These are the ones that were sent around September 7th or

3    so prior to the September 15th call?

4    A.   Correct.

5    Q.   Okay.  So the first substantive discussion that you pick

6    up on the wiretap between Mr. Wilson and Mr. Singer is

7    Mr. Singer saying, "Might be in Boston to meet with Harvard and

8    Tufts presidents Friday, September 21.  Might be able to meet

9    at 11:00 a.m.ish".

10:08 10            Now, of course, that's the meeting with Rudy Meredith

11   at the Marriott that -- is when you met Mr. Singer, correct?

12   A.   Correct.

13   Q.   He's meeting Rudy Meredith at what, 10:00 a.m. or so?

14   A.   I don't recall the exact time, but it was in the morning.

15   Q.   Now, the very first contact that you see with Mr. Wilson

16   and Mr. Singer is Mr. Singer saying he's going to meet with the

17   presidents of Harvard and Tufts?

18   A.   Correct.

19   Q.   The investigative team knew this was not correct?

10:09 20   A.   Correct.

21   Q.   Do you know who the president of Harvard was at the time?

22   A.   No, I don't.

23   Q.   If I suggest Larry Bacow, does that sound familiar?

24   A.   I don't recall.

25   Q.   Do you know who the president of Tufts was at the time?

1 A. No.

2 Q. If I suggest Anthony Monaco?

3 A. That doesn't sound familiar.

4 Q. Would you agree just based upon their positions they're

5 probably two of the most respected in leading university

6 presidents in the country?

7   MR. FRANK:  Objection.  Relevance.

8   THE COURT:  Sustained.

9 Q. Would you agree with me Mr. Wilson is -- strike that.

10:09 10   Would you agree Mr. Singer is telling Mr. Wilson he's

11 meeting with two very prominent and prestigious people in

12 higher education, correct?

13 A. Correct.  He's meeting with the Harvard and Tufts

14 president.

15 Q. And based on your investigation and listening to the

16 wiretaps, you knew that Mr. Singer frequently would tell

17 parents false statements that he was meeting with university

18 presidents or provosts?

19 A. Correct.

10:10 20 Q. And you'll agree with me, from September 21, 2018 to

21 January 10, 2019, not once did a member of the investigative

22 team tell Mr. Singer you have to tell John Wilson you're not

23 meeting with the president of Harvard, correct?

24 A. Correct.

25 Q. Not once did you say, you have to tell John Wilson you

|     |                                                               |
|-----|---------------------------------------------------------------|
| 1   | never met with the president of Tufts, correct?               |
| 2   | A.   Correct.                                                  |
| 3   | Q.   You never once said, you have to let John Wilson know    |
| 4   | somehow that you have no authorization by Harvard or Tufts or |
| 5   | any of these other schools?                                   |
| 6   | A.   Correct.                                                  |
| 7   |      MR. KENDALL:  If we could take a look at 8212, please.   |
| 8   | Q.   Do you recognize 8212?                                   |
| 9   | A.   Is there a second page, or if you go further down?  Yes. |
| 10  | Q.   What is it?                                               |
| 11  | A.   It is an e-mail.                                          |
| 12  | Q.   From who to who?                                          |
| 13  | A.   If you go further up, it's between Mr. Singer and        |
| 14  | Mr. Wilson.                                                    |
| 15  |      MR. KENDALL:  I'd like to offer that, your Honor.        |
| 16  |      MR. FRANK:  Objection.  Hearsay.                         |
| 17  |      THE COURT:  Sustained.                                   |
| 18  |      MR. KENDALL:  Your Honor, for state of mind, not for    |
| 19  | the truth of the matter asserted.                             |
| 20  |      MR. FRANK:  Self-serving hearsay, your Honor.           |
| 21  |      THE COURT:  Sustained.                                   |
| 22  |      MR. KENDALL:  Okay.  I'd like to put up, your Honor, a   |
| 23  | demonstrative M, which is simply a quote from the witness'    |
| 24  | testimony yesterday.                                          |
| 25  |      MR. FRANK:  Can I take a look, please?  No objection.    |

Line 10 timestamp: 10:11
Line 20 timestamp: 10:12

```
 1              THE COURT:  It may be put up.
 2    Q.   This is a quote -- do you remember testifying about this
 3    yesterday?
 4    A.   Yes.
 5    Q.   And this is a quote from the affidavit you filed before
 6    Judge Gorton under oath, correct?
 7    A.   Yes.
 8    Q.   Okay.  And you stated in your affidavit, "We wanted him to
 9    be explicit that the scheme involved bribes.  The purpose was
10    to ensure that, for clients who had not yet committed a crime,
11    or were still in the middle of it, there would be no possible
12    confusion about their intent".  That's what you put in your
13    affidavit, correct?
14    A.   Correct.
15    Q.   And what you in fact told us is you didn't put it in the
16    affidavit.  One of the prosecutors put it in and you just
17    signed it, correct?
18    A.   I reviewed the affidavit for accuracy and then signed it.
19    Q.   Yesterday you were able to identify who drafted the
20    affidavit for you.  Can you tell us who you think was involved
21    in the drafting?
22    A.   Two AUSAs.
23    Q.   And who were they?
24              MR. FRANK:  I object, your Honor.  This is irrelevant.
25              THE COURT:  Sustained.
```

A2320

| | | |
|---|---|---|
| 1 | Q. | And two other people filed affidavits as well? |
| 2 | A. | Yes. |
| 3 | Q. | That was Mr. Rosen and Agent Smith? |
| 4 | A. | Yes. |
| 5 | Q. | Okay. Did the same people draft all the affidavits? |
| 6 | | MR. FRANK: Objection. |
| 7 | | THE COURT: Sustained. |
| 8 | Q. | Did you read their affidavits? |
| 9 | | MR. FRANK: Objection. |
| 10:14 10 | | THE COURT: She can say whether she read them. |
| 11 | A. | I read them, yes. |
| 12 | Q. | They use similar language to this quote, don't they? |
| 13 | | MR. FRANK: Objection. |
| 14 | | THE COURT: Sustained. |
| 15 | Q. | Okay. Do you know what the dictionary definition is of |
| 16 | | "explicit"? |
| 17 | A. | The dictionary definition? |
| 18 | Q. | Yes. |
| 19 | A. | No. |
| 10:14 20 | Q. | Do you know what the dictionary definition is of "ensure"? |
| 21 | A. | No. |
| 22 | Q. | Okay. If I were to show you a dictionary definition, |
| 23 | | would you look at it and tell us if that's your understanding |
| 24 | | of what these words mean? |
| 25 | A. | Yes. |

```
 1              MR. KENDALL:  Your Honor, I'd like to --

 2              MR. FRANK:  Your Honor, I object.  She can tell him

 3     what her understanding of the words is without using a

 4     dictionary.

 5              THE COURT:  Yeah.  Go ahead.

 6              MR. KENDALL:  Okay.  Would you agree with me -- hold

 7     one second, please.

 8     Q.   Would you agree with me that the word "explicit" can be

 9     defined as "leaving no question as to meaning or intent"?

10:16 10    A.   Can you repeat that?

11     Q.   Yes.  "Leaving no question as to meaning or intent".

12     A.   Yes.

13     Q.   It could also mean "fully revealed or expressed without

14     vagueness, implication or ambiguity"?

15     A.   Yes.

16     Q.   And for the word "ensure", would you agree with me that

17     means "to make sure, certain or safe, to guarantee"?

18     A.   I'm sorry.  Can you repeat that?

19     Q.   Yes.  "To make sure, certain or safe, to guarantee".

10:17 20    A.   I agree.

21     Q.   Okay.  So you wanted Mr. Singer to leave no question as to

22     the meaning or intent of what he was doing with Mr. Wilson,

23     correct?

24     A.   Can you repeat that?

25     Q.   You wanted Mr. Singer to use words that left no question
```

```
 1    as to the meaning or intent of what he was proposing to

 2    Mr. Wilson, correct?

 3    A.   Correct.

 4    Q.   Did Mr. Singer agree to do that?

 5    A.   Yes.

 6    Q.   And so it's your statement that the words on these tapes

 7    leave no question as to the meaning or intent of what was going

 8    on?

 9    A.   No.

10    Q.   There was ambiguity?

11    A.   No.  Mr. Singer said that he would say the, would be

12    explicit, but at times he would go back to his whole pitch and

13    go back to the old cover story as part of his just being used

14    to saying "donation" when we asked him to say payment.

15    Q.   I'm not asking what Mr. Singer told you he was going to

16    do.  I'm asking you, do you think in the tapes and consensual

17    monitoring that Mr. Singer accomplished what you wanted him to

18    do, to leave no question as to the meaning or intent of the

19    words?

20              MR. FRANK:  I object, your Honor.  It's irrelevant.

21              THE COURT:  Sustained.

22    Q.   Why don't we take a look at some of the transcript.  I'm

23    not going to play the tapes.  They've been played, but I do

24    want to go through the transcripts of some of the calls that

25    you've testified with with Mr. Frank.
```

```
 1              I'd like to turn first to tab 571, the transcript
 2     please.  That's the September 29, 2018 call.  I'd like us to go
 3     to page 4, and I'll start with lines 14 to 20.
 4              MR. FRANK:  I'm sorry.  This is not a transcript
 5     that's before the jury, your Honor.
 6              THE COURT:  I thought it was.
 7              MR. FRANK:  571.  We have a transcript that's before
 8     the jury.  This is an alternate transcript.
 9              MR. KENDALL:  Oh, no.  Excuse me.  We want to use the
10     government's transcript, certainly.  It is the government's.
11     We called it 571A to distinguish it as a transcript of a tape.
12              I'd like to show you, as a chalk, your Honor, the
13     government transcript for the October -- the September 29th
14     call, page 4, starting at line 14.
15     Q.   Mr. Wilson states, "And what were the schools in that, if
16     you did the side door?  And I'm interested about the side door
17     and that stuff".
18              So Mr. Singer says, "So the side door is gonna be --
19     gonna happen where you want 'em to happen".
20              Mr. Wilson asks, "It can happen anywhere?  Does it
21     have to be a sports side door?  I wasn't clear on that".
22              Did the agents tell Mr. Singer that he should tell
23     Mr. Wilson that the side door is going to happen where you want
24     them to happen?
25     A.   I don't recall specifically saying that.
```

```
 1   Q.   Did you ever have -- did any of the agents ever have a
 2   conversation with Mr. Singer and tell him you should not tell
 3   Mr. Wilson that the side door is so commonly practiced that
 4   there's over 700 at 50 different schools this year?
 5   A.   No.
 6   Q.   If you could turn to page 5, line 12, Mr. Wilson states,
 7   "What if they're not really that good?  I mean, they can do
 8   some crew, but I don't know that they're gonna be good.
 9   Courtney's not even that good competitively at sailing.  She
10   just taught sailing and did sailing in, you know, yacht club".
11        And then Mr. Singer responds, "But at the end of the
12   day, by the side door, I may be able to go to the sailing coach
13   and say, 'hey, this family's willing to make the
14   contributions'".
15        Did the agents instruct Mr. Singer to use the word
16   "contributions"?
17   A.   No.
18   Q.   Did you instruct him to not use words like "donation" and
19   "contribution"?
20   A.   No.
21   Q.   So he's defying your instructions?
22   A.   No.
23   Q.   He's ignoring them?
24   A.   He's going back to his pitch that he was using for years
25   that it was a donation.
```

```
 1   Q.   That wasn't my question.  Did he defy the agents'
 2   instructions and do something different from what they told
 3   him?
 4   A.   Mr. Singer said something different than what we asked him
 5   to say.
 6   Q.   So he defied your instructions, correct?
 7   A.   I wouldn't call it defying.
 8   Q.   A defy?
 9   A.   He misspoke.  We asked him to say "payment" and he said,
10   "contribution".
11   Q.   So you think he just misspoke here, correct?
12   A.   Yes.
13   Q.   Okay.  Do you know how many times in this tape he misspoke
14   and used the words "contribution" or "donation"?
15   A.   He did say that, at times, I don't know exactly how many.
16   He did use the word "contribution" rather than "donation" --
17   I'm sorry -- "payment".
18   Q.   So at any time from September 21, 2018, to January 10,
19   2019, did the agents tell Mr. Singer, you misspoke too many
20   times about contributions and donations, you've got to tell
21   Wilson this payment is neither?
22   A.   We spoke with Mr. Singer and told him not to say
23   "contributions" or "donations".
24   Q.   My question is different.  Did you tell him to correct his
25   language because he didn't carry out your instructions?  Did
```

```
 1   you tell him to affirmatively tell Wilson it's not a
 2   contribution and it's not a donation?
 3   A.   Yes.
 4   Q.   And he didn't do that, did he?
 5   A.   Mr. Singer went back to his pitch that he's been using for
 6   years with lots of parents that it was a donation to a program.
 7   Q.   So what you're telling me is he's not following the
 8   agents' instructions on what to say to Mr. Wilson, correct?
 9   Yes or no.
10   A.   No.
11   Q.   Excuse me?
12   A.   No.
13   Q.   He is following --
14   A.   He's following our instructions and at times he misused
15   the word.
16   Q.   Well, if he misuses the word, is that following your
17   instructions to misuse the word, or is that not following your
18   instructions to misuse the word?
19   A.   That's a mistake that he made using a different word.
20   Q.   And did you ever ask him to correct his mistakes to
21   Mr. Wilson so that you could ensure that there was no ambiguity
22   or confusion?
23   A.   We asked Mr. Singer to say "payment".
24   Q.   Did you ever say to him, tell him explicitly it's not a
25   donation or a contribution?
```

```
 1   A.   I did not say those exact words.  I said use the word
 2   "payment".
 3   Q.   Did any agent ever instruct him over that 3-month period,
 4   tell him it's not a donation?
 5   A.   Not specifically.  We told him to say "a payment".
 6   Q.   And then it states, "She could be on your team.  She is a
 7   sailor.  She may not be up to the level you are, but she can
 8   comp you know.  You're going to get a benefit and the family's
 9   gonna get a benefit".
10:25 10        Okay.  Then if we turn to the next page, page 6 at
11   line 6, Singer says, "Then I have to go to -- then I have to go
12   to the department chairs and, and, and get -- some schools have
13   a VIP list at the department chair level, so we can go that
14   route, and then you can help their program -- their program.
15   It just depends on which school you want to go to".
16        Did the agents tell Mr. Singer to say this or did he
17   do this on his own?
18   A.   He did that on his own.
19   Q.   Did you tell him at some point, you've got to tell Wilson,
10:26 20   this is not like a VIP program?  Did you ever tell Mr. Singer,
21   you have to explicitly tell Mr. Wilson this is not a VIP
22   program?
23   A.   No.
24   Q.   Did he just misspeak this time?
25   A.   Yes.  He went to his pitch about different programs.
```

```
 1  Q.   Did you at any point tell him no more pitch, do what we
 2  tell you, follow our instructions?
 3  A.   Yes.
 4  Q.   And he still did his pitch and ignored you, correct?
 5  A.   And he still went back to his pitch because that was what
 6  he was doing for a number of years.
 7  Q.   And who was in charge of this investigation?
 8  A.   The government.
 9  Q.   And he repeatedly is ignoring your instructions on how to
10  speak to Mr. Wilson, and you just let him keep going out and
11  making more of these misstatements?
12  A.   No.  He -- we asked Mr. Singer to say "payment to a
13  coach".  He would go back to his old pitch because he was doing
14  this for a number of years with many different parents.  We
15  would keep reminding Mr. Singer to use "payment to coach".
16  Q.   Be fair to say you couldn't control him, could you?
17  A.   That's not fair to say.
18  Q.   He would say what he wanted to say and you'd let him go
19  back out and do it again?
20  A.   Not correct.
21  Q.   Okay.  Let's keep going through here.
22            You agree with me that was the pitch he made to
23  Mr. Wilson about Johnny, that you're going to make a payment to
24  the water polo team and it will help your kid get in?
25  A.   I don't know exactly what Mr. Wilson said to -- I'm
```

**A2329**

```
 1    sorry -- Mr. Singer said to Mr. Wilson at that time.

 2    Q.   Okay.  Then we have, if we go to line 12 of page 6, "I

 3    have this friend, you know.  One of the things I wanted to talk

 4    to you about, too, is -- I don't know how -- I remember last

 5    time I did this, you didn't really make any money on this, on

 6    this side stuff.  You just charge and then you make a donation

 7    to the school and that's it".

 8             Nobody told Mr. Singer to correct those statements

 9    and tell Mr. Wilson he did make money on it and it wasn't a

10    donation, correct?

11    A.   Can you repeat that, please.

12    Q.   Nobody told Mr. Singer to go back and correct this

13    statement and say that he does make money on this stuff and

14    it's not a donation?

15    A.   We told Mr. Singer to use the word "payment" specifically

16    for this call.  I don't recall if we had him go back.

17    Q.   He never did correct it, did he?

18    A.   He -- he would say "payment to a coach".

19    Q.   Okay.  We'll get to that in just a minute.

20             Then it says, in line 20, "You know, we did Johnny,

21    was that essentially now the money goes into my foundation, as

22    a donation".  Is that again just misspoken?

23    A.   Yes.

24    Q.   You didn't tell him to correct it?

25    A.   We told Mr. Singer -- we repeatedly told Mr. Singer stop
```

```
 1    using "donation".

 2    Q.    But he kept on doing it?

 3    A.    He kept on going back to his old pitch.

 4    Q.    Okay.  And you guys are in charge of the investigation?

 5    A.    Correct.

 6    Q.    If an informant doesn't follow your direction, aren't you

 7    at some point supposed to stop using him?

 8    A.    We kept working with Mr. Singer and throughout the

 9    investigation we told him what to say.  And as the calls went

10    on, he was more explicit.

11    Q.    Okay.  You didn't answer my question.  If an informant

12    will not follow the directions of an agent, aren't you supposed

13    to stop using him under both IRS and FBI protocols?

14          MR. FRANK:  Your Honor, I believe the defense is

15    opening the door here to something he doesn't want to open the

16    door to.

17          THE COURT:  Overruled.

18    Q.    I'm just saying to stop sending him out there to get

19    conversations with Mr. Wilson.

20    A.    It depends on what an informant does.

21    Q.    Now, I want it keep going through this.  He says, on the

22    bottom of page 6, he says, "Now the money goes into my

23    foundation, as a donation".

24          And Wilson says, "Oh, to your foundation, not to the

25    schools".
```

```
 1              And Singer says, "yeah, then that way the kids don't
 2       know it happens".
 3              You agree with me during this three-month period
 4       Mr. Singer repeatedly said that one of the benefits of doing
 5       the side door is the kids wouldn't find out about it, correct?
 6       A.   Yes.  He said that.
 7       Q.   And he said another benefit of using the side door was
 8       that the other parts of the university, like the development
 9       office, wouldn't find out about it and come asking for
10:31 10  donations as well?
11       A.   He said that, yes.
12       Q.   Did at any time the agents say, you can't tell him
13       legitimate reasons for keeping this secret?  You've got to tell
14       him to keep it secret because it's illegal or it's improper?
15       A.   No.
16       Q.   Then if we can take a look at page 7, it's just what I
17       said starting at line 3.  "So -- and then the other part of
18       that is they don't chase you all the time for money.  Cause
19       once you -- you know, once you're -- they know you gave money,
10:31 20  it's a different story".
21              So part of the ruse Mr. Singer is using is that
22       people should not talk about this side-door donation because
23       other parts of the university will ask them for even more
24       money, correct?
25              MR. FRANK:  Objection, your Honor.
```

```
 1              THE COURT:  Overruled.
 2    A.   Can you repeat that, please?
 3    Q.   Part of the reasons that Mr. Singer is giving Mr. Wilson
 4    not to talk about the side door is so that other parts of the
 5    university will not solicit him for even more donations?
 6              MR. FRANK:  Objection to having her interpret what
 7    he's saying, your Honor.  The words speak for themselves.
 8              THE COURT:  She can answer it if she understands it.
 9    A.   We directed Mr. Singer to tell parents that the schools
10:32 10  didn't know about the side door to gather evidence that the
11    parents knew that the admissions office did not know about the
12    side door and about their children being admitted as recruited
13    athletes.
14    Q.   My question is different.  Did you ever -- I'll rephrase
15    it a bit.
16              You never told Mr. Singer, you can't give him a
17    legitimate reason to keep this a secret, you have to give him
18    an improper reason to keep this a secret.  Did you ever tell
19    him that?
10:33 20  A.   I don't recall telling him that.
21    Q.   Okay.  And then we have here at page 7, line 6, "And then
22    what I can -- what I'll do is I'll split the money potentially
23    to the coach or the other pl -- parties that are at that school
24    that need the money, right?
25              "M-hm
```

1           "So -- or it may go right to the coach, that's

2     helping us.  It just depends on the school.

3           "Right.

4           "Okay, so you don't actually get credit for a

5     donation to the school, or get hounded for that.  You get your

6     donation to you, or your foundation, The Key or whatever --

7           "Right.

8           "And you get your write-off, and then you do your

9     thing.

10:34 10           "Ok".

11           Is that the instructions that the agents gave

12     Mr. Singer to say, that they pay the coach?

13     A.   Make a payment to the coach, yes.

14     Q.   And is it your view that that was both explicit and

15     ensuring that there would be a bribe?

16           MR. FRANK:  Objection.

17           THE COURT:  Overruled.

18     A.   Yes.

19     Q.   Okay.  Then let's go to top of page 8, start at line 2.

10:34 20     Mr. Wilson starts, "If it's all going to your foundation, you

21     can't take a share if it goes to your foundation.  You don't

22     get a fee on that, then".

23           Mr. Singer says, "I just do my fee for what I take

24     when I do your normal applications".

25           Did the agents tell Mr. Singer to say that?

```
 1   A.    I don't recall.

 2   Q.    Did they ever tell him to retract it?

 3   A.    No.

 4   Q.    Okay.  And then the next section is Mr. Wilson again

 5   talking about giving business advice and how to charge better

 6   for his business, correct?

 7   A.    Correct.

 8   Q.    Let's go to page 9.  They're talking about Mr. Wilson's

 9   friend whose daughter is applying to Brown.  Let's start at

10   line 13.  Mr. Singer says, "I'd love to help -- you know, it is

11   late and all of that.  The president takes meetings all the

12   time from influential people.  She's a good gal.  And she --"

13         Mr. Wilson says, "of Brown?  Yeah, I don't know".

14         "Yeah, at Brown.  So what I would suggest is that, he

15   calls up her office -- they have a scheduling person for the

16   president -- and he sets up a meeting for he and his daughter

17   to go meet, and she kinda meets with them.  And then she'll

18   give".

19         Did the agents tell Mr. Singer to talk about his

20   knowledge of the president of Brown and that she's a good gal?

21   A.    I don't recall that specific -- having Mr. Singer say that

22   specifically.

23   Q.    Did you ever instruct him that he should correct

24   Mr. Wilson -- correct himself to Mr. Wilson and tell him he has

25   no relationship with the president of Brown?
```

```
 1   A.   No.
 2   Q.   And then let's go to page 11.  Start at page 10.  "What I
 3   would do is I would still -- because them going to meet the
 4   president isn't -- doesn't mean that she's gonna help him, but
 5   that's a good starting point".
 6              Then if we drop down to page -- to line 19, "So I
 7   just had a family do that and essentially what they told me to
 8   do was just, have, have my family call the scheduling
 9   coordinator".
10   Did the agents tell Mr. Singer to say that about
11   scheduling this other family to meet the president of Brown?
12   A.   I don't recall specifically if we told them that.
13   Q.   Okay.  I'd now like to go to page 16, lines 3 to 12.
14   Mr. Singer says "your legacy means 0, because".
15              And Wilson says, "That's true for most of my life,
16   you know".
17              And Singer says, "John", and Wilson says, "unless
18   you're donating a building".
19              And Singer says, "You've done quite well for
20   yourself, for a guy that has no legacy, you're okay".
21              Are you aware that and Mr. Wilson and Mr. Singer had
22   discussed Mr. Wilson's background?
23              MR. FRANK:   Objection.
24              THE COURT:   Sustained.
25              MR. KENDALL:   I'm just asking for what you know, not
```

```
 1   what was said.
 2   Q.   Do you know if Mr. Singer understood Mr. Wilson's
 3   background?
 4   A.   I don't know.
 5   Q.   Then Mr. Wilson says, "So legacy doesn't help at all,
 6   huh?"
 7            And Singer says, "Unless you're a big legacy, but
 8   you".
 9            Wilson says, "especially a big donor legacy, huh?"
10   Mr. Singer says, "You haven't -- you haven't done
11   that yet".
12            Did you discuss with Mr. Singer at all Mr. Wilson's
13   contributions for education?
14   A.   No.
15   Q.   Or his knowledge of Mr. Wilson's contributions for
16   education?
17   A.   No.
18   Q.   Or his knowledge of Mr. Wilson's will and trust plans?
19   A.   No.
20   Q.   Now, if we go to page 17, at the end of line 22, "No,
21   she -- no".  This is Mr. Singer talking.  "They, they may end
22   up getting in without even a donation".
23            That's the third time he misspoke using "donation" or
24   "contribution", correct?
25   A.   Correct.
```

```
 1   Q.   And then he goes on, "But you -- you'll know at least this
 2   route, we got an".
 3              And Mr. Wilson says, "They've gotta get erg scores".
 4              Now -- if we go to the bottom of page 18, line 22,
 5   Mr. Singer states, "I just wanted to make sure I got back to
 6   you.  I'm gonna be spending some time in Boston".
 7              At any point did you tell Mr. Singer, stop telling
 8   him that you're coming to Boston to read at Harvard?
 9   A.   I don't recall saying that specifically.
10   Q.   It says, "Because I'm gonna be reading at Harvard this
11   year, so I'll be able to get together with you".  That's top of
12   line -- top of page 19.
13              Now I'd like to move next to -- and he never did
14   retract his statement about reading at Harvard, correct?
15   A.   Correct.
16   Q.   Or meeting the presidents of any of the Universities?
17   A.   Correct.
18   Q.   Okay.  And now I'd like to go to -- well, this call was
19   September 29th, correct?
20   A.   Correct.
21   Q.   Mr. Singer's notes that are in Exhibit 13 were originally
22   written on October 1st?
23   A.   Correct.
24   Q.   This is the call that precipitated the conversation that
25   he wrote about in his notes, correct?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3   Q.   Did you have -- did the agents have a conversation with

 4   Mr. Singer about this September 29th call?

 5   A.   Yes.

 6   Q.   Were you critical of the things he said?

 7   A.   I don't recall getting critical.

 8   Q.   Did you tell him that he was not following your

 9   instructions and providing explicit language to ensure there

10   would be no ambiguity?

11   A.   I don't recall specifically what we said about this call

12   with Mr. Wilson.

13   Q.   You weren't particularly upset by it, were you?

14   A.   Generally, for the calls, we talked to Mr. Singer and

15   explained to him, stop using the word "donation" and

16   "contribution".  Use "payment to a coach".

17   Q.   Can you answer my question, please?

18   A.   Can you repeat your question?

19   Q.   You were not critical of this call, were you?

20   A.   I don't recall specifically what we said to Mr. Singer

21   about this call.

22   Q.   Were you animated about this call?

23   A.   I don't recall specifically.

24              MR. KENDALL:  If we could next go to exhibit -- not

25   exhibit.  If we could go to chalk 578, the transcript for the
```

October 15th call.

Q.   If we take a look at page 2, the top line starting at 1,
Mr. Wilson says, "Oh, I know, next year, exactly.  So, hey, uh,
there, were a couple topics.  One was, you know, my daughters,
and uh, making some donations now".

Mr. Wilson is still referring to donations, correct?

A.   Mr. Wilson says "donations".

Q.   Okay.  Was Mr. Singer instructed after this call, tell him
explicitly it's not a donation?

A.   We told Mr. Singer the words "payment to coach".  I don't
recall specifically what was said about this call.

Q.   But in the prior call, Mr. Singer said "donation" twice
and "contribution" once.  Did you tell Mr. Singer you have to
take it back and make it clear and explicit, your taking back
the use of the word "donation" and "contribution"?

A.   We told Mr. Singer to be clearer in the subsequent calls.

Q.   That's not my question.  My question was did you tell him
to take back those words to correct it, I didn't mean to say
that, John.  It's not a contribution.  It's not a donation.

A.   Not those specific words.

Q.   Okay.  If we take a look at page 3.  Actually, let's go to
page 5.  Page 5, line 13, Mr. Wilson testifies, "You have
multiples everywhere, it sounds like".

And Singer answers, "Correct".

"And they don't actually have to do that sport,

```
 1    you're saying.  They could just go in, in, correct, and -- be

 2    like the scorekeeper or -- correct -- water boy, water girl".

 3              And Singer says, "Manager or whatever you want to

 4    call 'em yeah".

 5              Wilson says, "Or manager, those things.  Okay".

 6              Now, did the agents instruct Mr. Singer to use the

 7    word "manager" there?

 8    A.   No.

 9    Q.   Did you after that call tell him, you can't tell them

10    they're going to be a manager?  You have to tell him they have

11    to come in as a fake athlete?

12    A.   I don't recall specifics, but that's the general

13    instruction we would give Mr. Singer.

14    Q.   Specifics -- you say the general.  Was the general you

15    can't tell them they can be a manager, you have to tell them

16    we're going to falsify their credentials to make them look like

17    the athlete they are not?

18    A.   I don't recall having that specific conversation with

19    Mr. Singer.

20    Q.   And you had -- and you have no memory of having read

21    Exhibit 7011, the website, where Mr. Singer brags about getting

22    people jobs as managers with the testimonials, correct?

23    A.   I remember seeing that website.  I don't recall the exact

24    date I saw that.

25    Q.   Okay.  Now, if we go to page 8, line 21, Mr. Singer says,
```

1    "John, I've known you for years.  So I know when we get the
2    girls in, it's a done deal and you're gonna take care of your
3    part of it, you're gonna make the payments to the schools and
4    the -- to the coaches.  And that's what I need".

5         Did you tell him to use the phrase "to make payments
6    to the school and the coaches"?
7    A.   We told Mr. Singer to say payments to the coach.
8    Q.   He, on his own, decided to put in school and coach,
9    correct?
10:46 10   A.   He put in the word "schools".
11   Q.   Because he wanted to create ambiguity, correct?
12   A.   No.
13   Q.   So you thought this was being explicit to say payments to
14   school and coaches?
15   A.   No.  I think it was a mistake.  Again, he went back to his
16   old pitch because he had been doing that for years with
17   numerous parents, and so he, at times, would go back and say
18   "donation" and "contribution".
19   Q.   Okay.  And Mr. Singer says, starting at the bottom of
10:46 20   line 24, page 8, "You're gonna make the payments to the schools
21   and to the coaches.  And that's what I need".

22        And then Mr. Wilson says, at line 3, page 9, "I
23   thought I make the payment to you and you make the payment to
24   the schools".

25        Singer says, "Correct.  That's correct".

```
 1                "Oh, you said I make the payment to the schools".

 2                Do you think that was being explicit, that "payment

 3      to the coach" meant a bribe?

 4      A.    That was not being as explicit as we asked Mr. Singer to

 5      be.

 6      Q.    This is once again -- Mr. Singer is not listening to the

 7      agents' instructions and doing what he wants to do and not what

 8      you want him to do, correct?

 9      A.    No.  I think it was a mistake where he went back to his

10      old pitch.

11      Q.    He makes a lot of mistakes, Mr. Singer, doesn't he?

12      A.    At this time, he went back to his old pitch.

13      Q.    Let's look over to page 16, line 17.  Mr. Wilson states,

14      "So I'll have the girls plan on meeting you sometime November 1

15      and 2.  Let me know the next time you're".

16                Singer says, "will do".

17                Wilson says, "Yeah.  I'd be happy to help you with

18      your business model.  So I think you're leaving a lot of money

19      on the table".

20                This conversation is on November 15th -- excuse me,

21      on October 15th, correct?

22      A.    Correct.

23      Q.    You know on October 20th Mr. Wilson reached out to his tax

24      preparers at Goldman Sachs, correct?

25      A.    I don't know.  I'm not aware of that.
```

```
    1   Q.   Sure you do.  You spoke to Mr. Demaio, didn't you?

    2   A.   I was involved in some of the interviews with Mr. Wilson's

    3   accountants.  I don't recall that one.  If you have it, you can

    4   refresh my memory.

    5   Q.   Were you involved at the most recent interview with

    6   Mr. Wilson's accountants, Mr. Demaio?

    7   A.   When that was?

    8   Q.   August 11, 2021.

    9   A.   No, I was not.

10:49 10   Q.   Okay.  Did you read the report of that conversation?

   11   A.   No, I did not.

   12        MR. KENDALL:  If we could go to transcript 591, the

   13   chalk that goes with the exhibit -- that number.  This is the

   14   October 27, 2018 call.

   15   Q.   This is after Mr. Wilson has made half or all of the

   16   payment, correct?

   17   A.   He made one payment.

   18   Q.   $500,000?

   19   A.   Yes.

10:50 20   Q.   So bottom of line 23 on page 1, Mr. Singer, "So I had a

   21   conversation with the Stanford sailing coach and, so I just

   22   gave the Stanford sailing coach 160,000 for his program".

   23        Did the agents tell Mr. Singer to say "program" or

   24   did he misspeak yet again?

   25   A.   He misspoke on that as well.
```

```
 1   Q.   You worked a lot with Mr. Singer, correct?  You spent a

 2   lot of time in his presence?

 3   A.   Yes.

 4   Q.   He's an intelligent man, correct?

 5   A.   Yes.

 6   Q.   Did he misspeak or did he intentionally say these things

 7   in your view?

 8            MR. FRANK:  Objection.

 9            THE COURT:  Sustained.

10   Q.   Well, you said he misspoke.  You don't know if he misspoke

11   or if it was intentional.  You just know he said a word

12   different than what you asked him to say, correct?

13   A.   We directed Mr. Singer to say "payment to a coach" and he

14   said "donation".

15   Q.   And he said "payment to program"?

16   A.   And program.  Yes.

17            MR. KENDALL:  I'd like to keep going through.  I'd

18   like to go to -- please look at the chalk 594 transcript that

19   goes with the exhibit with that number, the November 5, 2018

20   conversation.

21            One minute, your Honor.

22   Q.   If we could go to page 7, line 8, Mr. Singer states, "No,

23   so what happens is -- it's like -- I'll give an example.  Like

24   women's lacrosse is always looking for help.  Women's fencing,

25   looking for help.  This -- immediately they give us a spot,
```

A2345

```
 1    guaranteed spot, you -- we pay the coach".
 2              So he's talking about we pay the coach in the context
 3    of a program needs help, correct?
 4    A.   He's saying that women's lacrosse and fencing are looking
 5    for help, and then further down, he says they pay the coach.
 6    Q.   Did you tell him -- did the agents instruct him to say
 7    that the team needs help in the same context of saying "pay the
 8    coach"?
 9    A.   No.
10    Q.   That was Mr. Singer's contribution, correct?
11    A.   Mr. Singer said that.
12    Q.   It's all mixed up, isn't it?
13    A.   Mr. Singer -- we directed Mr. Singer to say payment to a
14    program, and he would go back to his old pitch and say "payment
15    to a coach" or "donation to a program".
16    Q.   He repeatedly refused to do what you instructed him to do,
17    correct?
18    A.   I don't think he refused.
19    Q.   He repeatedly did not do what you instructed him to do,
20    correct?
21    A.   He would go back to his old pitch and he wasn't as
22    explicit as we directed him to be.
23    Q.   Is this because he keeps misspeaking?
24              MR. FRANK:  Objection.
25              THE COURT:  Overruled.
```

**A2346**

1   Q.   He just keeps misspeaking and it keeps happening?

2   A.   He keeps using his old pitch, yes.

3   Q.   Now, if we take a look at the next page, at line 15,

4   Mr. Wilson is talking about Stanford.  "So then there's the --

5   the value of money.  Does he care about budget this year versus

6   next year?"

7        You agree with me university programs have budgets?

8   A.   Yes.

9   Q.   And they have budgets each year?

10:55 10   A.   Yes.

11  Q.   Okay.  Did any of the agents tell Mr. Singer, you have to

12  go back and tell Mr. Wilson this money is not going into the

13  budget for the school program?

14  A.   We did not have that specific conversation.

15  Q.   You did not have that general conversation, correct?

16  A.   We did not tell Mr. Singer to go back and correct that

17  statement.  We told Mr. Singer, for future calls, be more

18  explicit and say "payment to a coach".

19  Q.   You agree with me, coaches taking bribes don't have

10:55 20  budgets like school programs, correct?

21        MR. FRANK:  Objection.

22        THE COURT:  Sustained.

23        MR. KENDALL:  Okay.  If we could go to Tab 602, which

24  is from the November 29, 2018, call.

25  Q.   And we start at line 17.  Mr. Singer again is, "Okay,

```
 1  cool.  Well, I'm in Boston working on your pet project,
 2  Harvard", correct?
 3  A.   Yes.  He said that.
 4  Q.   Okay.  And again, nobody has told him he needs to make
 5  clear that his visits to Boston have nothing to do with reading
 6  at Harvard, correct?
 7  A.   Correct.
 8  Q.   If we take a look at page 2, line 12, Mr. Singer states
 9  "So I got the senior women's administrator at Harvard is going
10  to give us a spot.  What we have to do is we'll have to give
11  her $500,000.  That money, obviously, like the others, will go
12  through my foundation and then I will fund the senior women's
13  administrator at Harvard".
14        Do you agree with me, programs at universities have
15  funding?
16  A.   Programs have funding, yes.
17  Q.   Okay.  Did the agents instruct Mr. Singer to use the word
18  "fund"?
19  A.   No.
20  Q.   He did that on his own, correct?
21  A.   He used -- yes.  He used the word "fund".
22  Q.   Then if we look at line 3 -- excuse me -- page 3, line 15
23  to 17, Mr. Wilson says, "Yeah, but she is a -- a sailor
24  actually, so sailing is actually a logical thing.  She could be
25  even the mascot, whatever, but she knows sailing".
```

```
 1              Again, nobody told Mr. Singer to say, Mr. Wilson,
 2    she's not going to be a manager, she's not going to be on the
 3    team, correct?
 4    A.   Mr. Singer told Mr. Wilson that they don't have to play
 5    the sport.
 6    Q.   Excuse me.  I'm just asking -- if you can answer my
 7    question.  Did anybody tell him they don't have to be a
 8    manager, they don't have to be part of the team?  Yes or no?
 9    A.   Specifically that?
10    Q.   Yes.
11    A.   No.
12    Q.   I'm trying to make all my questions specific so we have
13    specific answers and not general.  I'd appreciate that.
14              MR. FRANK:  Objection.
15              THE COURT:  Sustained.
16    Q.   Okay.  If we could go to transcript 620, this is the -- it
17    says it's January 2nd.  Is it January 2nd or January 3rd where
18    the call took place?
19    A.   This -- the transcript says January 2nd.  I don't
20    recall --
21    Q.   Okay.  Excuse me.  This is the Singer/Vavic call.  Now,
22    you had the ability to instruct Mr. Singer to say whatever you
23    wanted on this call with Coach Vavic, correct?
24    A.   Yes.
25    Q.   If you wanted to, you could have written out a script and
```

10:58    10

10:59    20

1    just said, read it just like we wrote it, correct?

2    A.    Yes.

3    Q.    Would you agree with me, he has this call with Coach Vavic

4    and there's absolutely no reference to Johnny Wilson's

5    application?

6    A.    Correct.

7    Q.    Did the agents instruct Mr. Singer to raise Johnny

8    Wilson's application with Coach Vavic?

9    A.    I don't recall.

10:59 10    Q.    And Mr. Singer certainly didn't on his own raise it,

11    correct?

12    A.    Correct.

13    Q.    And that's because -- would it be fair to say the agents

14    didn't instruct him because he'd already told you he was a real

15    polo player who played?

16    A.    No.

17    Q.    You knew -- he had told you that though, correct?

18    A.    Mr. Singer told us that Johnny Wilson was a water polo

19    player, yes.

11:00 20    Q.    Okay.  And then, if we go to -- at no point did you say to

21    Mr. Singer, ask Vavic if those tuition payments to Loyola

22    School have anything to do with John Wilson?  You didn't

23    instruct him to ask that, correct?

24    A.    Correct.

25    Q.    And, in fact, you know those tuition payments to Loyola

```
 1   have nothing do with John Wilson, correct?
 2           MR. FRANK:  I object.
 3           THE COURT:  Sustained.
 4   Q.   They were made 18 months after his son was admitted,
 5   correct?
 6   A.   They were made after Johnny was admitted, yes.
 7   Q.   It's like July or August of 2015, correct?
 8   A.   Correct.
 9   Q.   The boy was admitted around March 1st of '14?
10   A.   Correct.
11   Q.   17, 18 months after.  And you don't trace any of Wilson's
12   money paying those tuition payments, do you?
13   A.   I don't see Mr. Wilson, specifically Mr. Wilson's funds
14   going to the tuition payments.
15   Q.   And you don't see a shred of evidence that Mr. Wilson had
16   any understanding that Mr. Vavic -- his son's tuition would be
17   paid 18 months after his son's admission?
18           MR. FRANK:  Objection to Mr. Wilson's understanding.
19           THE COURT:  Sustained.
20   Q.   You don't see any evidence informing Mr. Wilson that
21   18 months after his son is admitted Mr. Singer is going to pay
22   some tuition for Mr. Vavic, correct?
23   A.   Correct.
24   Q.   And you could have asked Vavic any question you wanted
25   about Mr. Wilson's involvement with USC and you chose to ask
```

1    zero, correct?

2    A.    I don't recall exactly what we asked Mr. Singer to say,

3    but he said nothing about Johnny Wilson.

4    Q.    And after this call, you didn't say, Mr. Singer, you

5    forgot to ask about Johnny, we need another call with Vavic.

6    You didn't do that?

7    A.    We did not have another call about Johnny Wilson.

8    Q.    You didn't ask him to do another call about Johnny Wilson,

9    correct?

11:02 10    A.    Correct.

11    Q.    Okay.  And if we take a look at page 3, line 13, Vavic

12    says to Singer -- actually, let's start at line 12.  No.

13    Line 13.  "Now the walk-on is required to have decent grades".

14         Based upon your investigation, you know a 3.87 is a

15    decent grade for a walk-on at USC, don't you?

16         MR. FRANK:  Objection.  Foundation.

17         THE COURT:  Overruled.  If she knows.

18    A.    I don't know exactly what the criteria is for USC, but I

19    know that that's a pretty good GPA.

11:02 20    Q.    "And he has to have some kind of a resume.  He can't just

21    be a total nobody.  So he has to be a water polo player.  He

22    has to have a -- a somewhat decent resume and maybe, you know,

23    3rd team all-CIF, or you know, 4th or 5th team all American".

24         You know from your investigation that Johnny Wilson

25    was First Team All Peninsula Athletic League, don't you?

```
 1    A.    I don't recall specifically that.

 2    Q.    You know he participated in the U.S. Olympic Development

 3    Program, didn't he?

 4              MR. FRANK:  Objection to the testifying, your Honor.

 5              THE COURT:  Overruled.

 6    A.    I don't specifically know.  I know Johnny Wilson was a

 7    water polo player.

 8    Q.    Do you know if his teams were in the Junior Olympics, the

 9    regional, the sectional Junior Olympics?

11:03 10   A.    I don't know.

11              MR. KENDALL:  I want to go to Exhibit 623.

12    Q.    This is the chalk transcript of the January 3, 2019, call

13    between Mr. Wilson and Mr. Singer, correct?

14    A.    January 3rd transcript, yes.

15    Q.    Let's go to page 6, line 10.  Can we go to -- actually,

16    line 14.  Mr. Singer starts, "the money's all been paid" --

17    this is the second to last phone call, correct?

18    A.    Correct.

19    Q.    Mr. Singer states, at line 14, "Both at Stanford and

11:04 20   Harvard.  I mean, one of the things I just wanted to really

21    make sure, cause, this has kinda come back to me, not because

22    of you guys but for other families that we've gone through the

23    side door -- is that I just gotta make sure that you guys don't

24    get engaged at Harvard or Stanford with anybody in admissions

25    or development or anything, that you guys keep your name out of
```

1    the room.  Is that okay?"

2              And he states, "Yeah, so what does that mean, don't

3    get engaged?  Like".

4              "Yeah.  So".

5              So let's drop down to line 7.  "No, no, no, that's

6    fine.  That's all good".  This is what Mr. Singer says.  "The

7    issue is like I've had families before that essentially have

8    gone through the side door and then because people found out

9    who they were, the development office calls them.  Admissions

11:05 10  will call them, all trying to get, you know, donations, and,

11    um, so as soon as your name is known amongst those other

12    groups, then people start saying, on the athletics side, since

13    we're going through the side door, and you've already made, you

14    know, two $500,000 contributions, they're going to say, so, you

15    know, so why are you going through athletics, um, you know,

16    when development has already been talking to you?"

17              Did the agents tell Mr. Singer to say that?  Just yes

18    or no.  Did the agents tell him what to say?

19    A.   It's hard to answer yes or no to this.  We directed

11:05 20  Mr. Singer to make this call, to gather Mr. Wilson's

21    understanding that the admissions office did not know about the

22    side door.  He wasn't as clear as we asked him to be.

23    Q.   Well, he wasn't as clear.  Did you tell him to say the

24    reason you have to keep this to yourself is because the

25    development office will come and want more money?

```
 1    A.    We did not ask him to say that.

 2    Q.    He's stating that it's going to be a tug of war between

 3    two different fundraising arms of the university.

 4          MR. FRANK:  Objection to what he's stating.  It's on

 5    the page.

 6          THE COURT:  Sustained.

 7    Q.    Did you tell him -- after this call, did you tell him?

 8    Did you say, you've got to call Wilson and tell him, this is

 9    not about the two different offices looking for the money, it's

10    we've got to keep it secret because it's improper?  You didn't

11    tell him that, did you?

12    A.    No.

13    Q.    Okay.  So your first conversation you're aware of that

14    Wilson has with Singer is a text message in September of 2018

15    that says, "I'm coming to meet the presidents of Harvard and

16    Tufts," correct?

17    A.    Yes.

18    Q.    And the last conversation -- well, this is the second to

19    last.  I'm sorry.  The second to last conversation is, keep

20    your side-door donation quiet or otherwise the development

21    office people will want even more of a contribution.  That's

22    the word he uses, isn't it?

23    A.    That's what -- that's the word he uses.

24    Q.    So he's been misspeaking for now three months?

25    A.    He wasn't as clear in this call as we asked him to be.
```

11:06 (line 10)
11:07 (line 20)

```
 1   Q.   You told us earlier, when he uses "contribution", that's
 2   misspeaking, correct?
 3   A.   Correct.
 4   Q.   Okay.  So he's been misspeaking for three months and you
 5   guys can't get him to speak correctly in the whole
 6   three months, correct?
 7   A.   Mr. Singer was doing the side door scheme for years and he
 8   kept going back to his old pitch.  Sometimes it's hard for
 9   cooperators to say or use other language that the investigators
11:07 10  ask.
11   Q.   Mr. Singer had known Mr. Wilson from 2010 to 2018 before
12   you met Mr. Singer, correct?
13   A.   Correct.
14   Q.   So Mr. Singer and Mr. Wilson had a way of talking and
15   dealing with each other that you're not aware of, correct?  You
16   weren't monitoring before September 15th?
17   A.   Correct.
18              THE COURT:  We're going to take the morning recess.
19              You may step down, Miss Keating.
11:08 20            We're going to be in recess for 15 minutes.
21              THE CLERK:  All rise for the jury.
22              (Jury exits.)
23              THE COURT:  Please be seated, counsel.
24              How much longer, Mr. Kendall?
25              MR. KENDALL:  May I look at my notes, your Honor?
```

```
 1    I'll give you a more reliable estimate.

 2            THE COURT:  Yes.

 3            MR. KENDALL:  Your Honor, I'd like to say roughly

 4    30 minutes, but I will have a minimal role in the rest of the

 5    witnesses for the day.  So we're very mindful of your desire to

 6    be done by 3:30.

 7            THE COURT:  Mr. Frank, plans for the day?

 8            MR. FRANK:  Well, I would guesstimate about a half

 9    hour on redirect, plus or minus.  I can't be sure.  We also

10    have Miss Janke here.  Her direct is about an hour and

11    15 minutes.  We have Miss Hughes here.  Her direct is about

12    20 minutes.  So we have, you know, another hour and a half of

13    direct examination, plus my redirect examination of this

14    witness.

15            THE COURT:  All right.  Anything that needs to come to

16    the Court's attention before we recess?

17            MR. KENDALL:  No, your Honor.

18            THE COURT:  We're in recess for 15 minutes.

19            THE CLERK:  All rise.

20            (Recess taken 11:10 a.m. to 11:31 a.m.)

21            THE CLERK:  All rise for the jury.

22            (Jury enters.)

23            THE COURT:  Good morning again, jurors.  We're ready

24    to resume.

25            Ms. Keating, again, you remain under oath.
```

```
 1              Mr. Kendall, you may continue with cross-examination.
 2              MR. KENDALL:  Thank you, your Honor.
 3              Thank you, Ms. Keating.  I'm pretty much at the end.
 4    I hope to be done in 15 minutes or so, maybe even a little
 5    less.  I appreciate your patience.
 6    BY MR. KENDALL:
 7    Q.   I want to finish up with the transcript we were looking at
 8    623, and if we go to line 7 -- excuse me, page 7, lines 17, 18,
 9    19, 20.  This is the second-to-last college, January of 2019.
10    It's really at the end of the three-month period of consensuals
11    with Mr. Wilson.  And Mr. Singer says at line 17, "So you
12    know -- so why you going through athletics?"
13              Did the agents tell Mr. Singer to tell Mr. Wilson
14    after he paid the million dollars that he was going through
15    athletics, or was that Mr. Singer's choice of words?
16    A.   I don't recall if that was at our direction or his choice
17    of words.
18    Q.   "Athletics" is the athletics department, correct?
19    A.   Mr. Singer says "going through athletics" --
20    Q.   It's the athletics department, correct?
21    A.   He says going through athletics.  You could interpret it
22    that way.
23    Q.   Okay.  Did you tell him to say at the end, "Tell Wilson he
24    paid a coach, not the athletics department"?
25    A.   I don't recall the specifics on this -- what we directed
```

A2358

1    him to say on this conversation.

2    Q.    Okay.  So at the end of it all, Mr. Singer is still

3    telling Wilson that he's paying for a program, not for a coach,

4    correct?

5    A.    He doesn't say "coach," correct.

6    Q.    And no agent told Mr. Singer, "Call up Wilson and correct

7    that and let him know he's paying a coach, not a program"?

8    A.    Correct.

9    Q.    So if we could go then to the last transcript, which is

11:34 10    625, the chalk for the call of January 10, 2019.  This is the

11    final call, correct?

12    A.    Yes.

13    Q.    And if we go to page 4, starting at line 1, Mr. Wilson

14    says, "We'd like to have something if we had any influence on

15    that, that actually fits with their, at least, interests, so

16    you don't have this kind of" --

17          "God, I'm a failure I know -- I'm an idiot on

18    sailing.  I know nothing about sailing.  I'll look really

19    stupid even trying to be the bag carrier of sailing?"

11:35 20          The final call after three months, did you tell

21    Mr. Singer go back and tell Mr. Wilson there are not going to

22    be manager or support staff on the team?

23    A.    No.

24    Q.    Then if we go look at page 5, we see two things.

25    Mr. Wilson is still offering to give advice and pricing, at

```
     1  line 17; isn't that correct?
     2  A.   Yes.
     3  Q.   "I'm just trying to help you, but, you know, I can only
     4  offer so many times."
     5          And then he asks at line 22 -- actually, lines 20 and
     6  22, "When are you gonna be in Boston next?"  And that's because
     7  you never retracted the statement that he's reading files at
     8  Harvard, correct?
     9  A.   We never retracted that statement.
11:36 10  Q.   And he asks, "When are you going to be in Boston next?"
    11  Because if you look at line 24 of page 5, "Let me know.  I'd
    12  love to see you.  And I know the girls would love to see you,"
    13  correct?
    14  A.   Correct.
    15  Q.   And in addition to the consensual calls you made with
    16  people like Mr. Wilson, you made what you called a series of
    17  audit calls, correct?
    18  A.   Correct.
    19  Q.   Those were for people whose children's applications had
11:36 20  already been completed and done and they were in the past,
    21  correct?
    22  A.   Correct.
    23  Q.   Johnny Wilson fell in that category, correct?
    24  A.   Johnny Wilson was in the past, correct.
    25  Q.   Is it fair to say in the three months of text messages,
```

**A2360**

```
 1    phone calls, e-mails, voicemail messages, not once did you try

 2    to ask Mr. Wilson about the details of Johnny's application to

 3    USC, correct?

 4    A.    On the phone calls?

 5    Q.    Yes.

 6    A.    Correct.

 7    Q.    All the other people who got audit calls, you did not try

 8    that same thing with Mr. Wilson, correct?

 9    A.    Correct.

11:37 10   Q.    And that three months, whatever it was, 60, 70 electronic

11    communications, not once did you ever raise that there was

12    something Mr. Wilson knew about that was fraudulent about his

13    son's application?

14              MR. FRANK:  Objection, your Honor.

15              THE COURT:  Sustained.

16              MR. KENDALL:  Okay.

17              The last thing, your Honor, just a couple of minutes.

18              Could we have Exhibit 9736 just for the witness.

19              MR. FRANK:  Do you have a copy, Mr. Kendall?

11:37 20        MR. KENDALL:  These were produced to us by the

21    government, your Honor.

22              MR. FRANK:  Well, I'll need a copy.  Thank you.

23    Q.    Do you recognize this document?

24    A.    I have not seen this document.

25    Q.    Have you reviewed Jim Nahmens' work papers?
```

```
 1   A.   I did not.  There was another special agent assigned that

 2   looked at the John Wilson tax papers.

 3        MR. KENDALL:  Could we put up 9737, please.  Just for

 4   the witness, please.

 5   Q.   Do you recognize this document, this e-mail?

 6   A.   Can you scroll further down, please?

 7        No, I don't recognize that e-mail.

 8        MR. KENDALL:  Could I show you Exhibit 9738 just for

 9   the witness, please.

11:39 10  Q.   Have you seen 9738 before?

11   A.   No, I have not seen this.

12        MR. KENDALL:  Could we show her 9746, please.

13   Q.   Have you seen this before?

14   A.   No, I have not.

15   Q.   Could we see Exhibit 7974, and I ask you if you've seen

16   that?

17   A.   No.  I don't recall seeing this e-mail.

18   Q.   During all the times you had conversations with Mr. Singer

19   about his interaction with Mr. Wilson, did you ever suggest to

11:40 20  him to say something along the lines, "You need to make the

21   payment because the coach has got to make his mortgage" or "the

22   coach is building a house?"  Did you ever suggest adding that

23   extra detail to show personal use of the payment to the coach?

24   A.   No.

25   Q.   And you never said anything like, "The Stanford coach" --
```

**A2362**

```
 1   did he ever tell him to say something along the lines, "The
 2   Stanford coach doesn't have a budget.  He's just short on cash
 3   and he's got to pay bills"?
 4   A.   No, not that I recall.
 5           MR. KENDALL:  Okay.  Thank you very much.  No further
 6   questions.
 7           THE COURT:  Redirect, Mr. Frank.
 8           MR. FRANK:  Thank you, your Honor.
 9            REDIRECT EXAMINATION OF ELIZABETH KEATING
10   BY MR. FRANK:
11   Q.   Good afternoon, Agent Keating.  Or good morning.
12   A.   It's still morning.
13   Q.   Still a few more minutes.
14   A.   Good morning.
15   Q.   Agent Keating, you were asked a whole series of questions
16   about the word choice -- Mr. Singer's word choice in the
17   consensually recorded calls.  Do you recall all those
18   questions?
19   A.   Yes.
20   Q.   You were asked questions about his use of the word
21   "donation" or "contribution" as opposed to "payment."  Do you
22   recall those questions?
23   A.   Yes.
24   Q.   And you were asked questions about whether the money was
25   going to the program or whether the money was going to the
```

```
 1   coach and what choice of words Mr. Singer made on those
 2   consensually recorded calls, correct?
 3   A.   Correct.
 4   Q.   And he didn't always use the words that you instructed him
 5   to use.  He sometimes fell back on his pitch.  I believe that
 6   was your testimony?
 7   A.   Yes.
 8   Q.   The pitch that he'd been using for decades with the side
 9   door scheme, correct?
10   A.   Yes.
11   Q.   And if you take a look at the transcript for 571, you were
12   asked questions on 571 at page 5.
13   A.   I don't see anything.
14   Q.   Oh, do you not have a transcript binder?
15   A.   Sorry.  I thought it was going to be on the screen.
16   Q.   I'm going to be referring to the transcript binders.  If
17   you look in the transcript binder under the transcript for
18   Exhibit 571, this is the consensually recorded call from
19   September 29, 2018?
20   A.   Correct.
21   Q.   And Mr. Kendall asked you questions about -- at page 5, at
22   the end of that page, page 5, line 19, where Mr. Singer says,
23   "But at the end of the day by the side door, I may be able to
24   go to the sailing coach and say, 'Hey, the family's willing to
25   make contributions.'"  Do you see that?
```

```
 1   A.   Yes.

 2   Q.   And he asks you about Mr. Singer's use of the word

 3   "contributions."  Do you recall those questions?

 4   A.   Yes.

 5   Q.   And what Mr. Singer actually said there was, "I may be

 6   able to go to the sailing coach and say, 'Hey, the family is

 7   willing to make the contributions.  She could be on your team.

 8   She is a sailor.  She may not be up to the level you are, but

 9   she can -- you know, you're going to get a benefit and the

10   family's going to get a benefit.'  So are you interested in

11   doing that?"

12             MR. KELLY:  Your Honor, excuse me.  My monitor is not

13   working.

14             MR. FRANK:  It's not on the monitor.  It's in the

15   transcript binder.

16             THE COURT:  Only on the transcript, apparently.

17             MR KELLY:  Okay.

18   Q.   "You're going to get a benefit and the family's going to

19   get a benefit," is that what Mr. Singer said to Mr. Wilson on

20   September 29, 2018?

21   A.   Yes.

22   Q.   And Mr. Wilson responded, "Yeah, okay."  Do you see that

23   at line 3 on page 6?

24   A.   Yes.

25   Q.   You're going to get a benefit and the family's going to
```

```
 1   get a benefit.

 2          Have you heard the term "quid pro quo"?

 3   A.   Yes.

 4   Q.   What is a quid pro quo?

 5          MR. KENDALL:  Objection, your Honor, to the extent

 6   it's a legal term.

 7          MR. FRANK:  I'm not asking for a legal term, your

 8   Honor.

 9          THE COURT:  Overruled.

10   A.   This for that.

11   Q.   This for that.  You're going to get a benefit and the

12   family's going to get a benefit?

13          MR. KELLY:  Objection to the leading of his own

14   witness, your Honor.

15          MR. FRANK:  It's redirect, your Honor.

16          THE COURT:  Well, you can't direct, but -- I'll allow

17   you to have that question, but don't lead.

18   Q.   You're going to get a benefit and the family's going to

19   get a benefit.  How does that compare with "this for that"?

20          MR. KENDALL:  Objection, your Honor.

21          THE COURT:  Overruled.

22   A.   It's the same.

23   Q.   And right before this, Mr. Wilson has just said, in his

24   own words at page 5, line 14, "Courtney's not even that good

25   competitively at sailing.  She just taught sailing and did
```

```
 1   sailing in yacht club."  Do you see that?

 2   A.   Yes.

 3   Q.   What is the sailing coach, according to Mr. Singer, going

 4   to be doing in exchange for the, quote-unquote, contribution?

 5   A.   Put her -- I'm sorry.  Can you repeat that?

 6   Q.   What's the sailing coach going to be doing for Courtney

 7   Wilson in exchange for that contribution?

 8   A.   He's going to get a payment.

 9   Q.   And what's he going to be doing for Courtney Wilson?

11:46 10   A.   Say that she's a sailor.

11   Q.   Put her on the sailing team?

12             MR. KELLY:  Objection, your Honor.

13             THE COURT:  Overruled.

14   A.   Yes.

15   Q.   And Mr. Kendall asked all these questions about

16   Mr. Singer's use of the word "contribution," right?

17   A.   Yes.

18   Q.   In the consensual calls?

19   A.   Correct.

11:47 20   Q.   Could we take a look at Exhibit 83, please.  And if you

21   could look at page -- I believe it's page 3.  If you look in

22   the middle of the page --

23             MR. FRANK:  Ms. Lewis, if you could highlight right

24   there.  Thank you.

25   Q.   -- that's Mr. Wilson talking about his son Johnny on
```

A2367

1    October 13, 2013.  Do you see that?

2    A.    Yes.

3    Q.    That is about five years before Mr. Singer began making

4    consensual recordings of Mr. Wilson?

5    A.    Correct.

6    Q.    And what does Mr. Wilson say in the second line, beginning

7    with "Also"?

8    A.    "Also, when is Jovan going to be able to give us a

9    decision on USC.  And do I pay you?  Was it 50 percent in

11:48 10   November or 50 percent in Feb when we get the final official

11    notice?"

12    Q.    Is there any reference to a donation or a contribution in

13    Mr. Wilson's e-mail of October 13, 2013?

14    A.    No.

15    Q.    Let's look at Mr. Singer's response.

16            Do you see where it says, "Jovan will provide

17    Johnny's info to admission when he does his other guys over the

18    next month"?

19    A.    Yes.

11:48 20   Q.    What does it say after that?

21    A.    "No payment of money till he gets a verbal and written

22    from admissions and then 50 percent to a savings account I set

23    up.  Then the remainder upon an acceptance letter in March with

24    everybody else."

25    Q.    Was Mr. Singer using the word "contribution" or "payment"

1    in October of 2013?

2    A.    "Payment."

3    Q.    Could we look at Exhibit 710, please.  This is March

4    of 2014, after Johnny was admitted as a recruited water polo

5    player to the University of Southern California.  If I could

6    direct your attention to the subject line of Mr. Wilson's

7    e-mail.  What does he call it?

8    A.    USC fees.

9    Q.    No mention of a donation or contribution?

11:49 10    A.    No.

11    Q.    And then let's look at what he says at the bottom.  "Rick,

12    thanks again for making this happen."

13              And then what does he say?

14    A.    "Please give me the invoice.  What are the options for the

15    payment?  Can we make it for consulting or whatever from The

16    Key so that I can pay it from my corporate account?"

17    Q.    Any reference to "donation" or "contribution"?

18    A.    No.

19    Q.    What does Mr. Singer respond?

11:49 20    A.    "Yes.  We can send you an invoice for business consulting

21    fees and you may write off as an expense."

22    Q.    Any reference to "donation" or "contribution"?

23    A.    No.

24    Q.    How many years was this before Mr. Singer started making

25    consensual recordings at the direction of the government?

1    A.    Approximately four years.

2    Q.    Could we look at -- I'm sorry -- the transcript for

3    Exhibit 578, please, the 578 transcript.  That's in everyone's

4    binders.

5            If we look at transcript 578 at page 5 -- 578 at

6    page 5, line 15, Mr. Wilson says, "And they don't actually have

7    to do that sport you're saying.  They could just go in and be

8    like the scorekeeper or water boy, water girl."

9            And Mr. Singer responded, "Manager or whatever you

11:50 10    want to call them, yup."  Do you see that?

11    A.    Yes.

12    Q.    Now, Mr. Wilson isn't saying "manager," that's Mr. Singer?

13    A.    Correct.

14    Q.    What words is Mr. Wilson using?

15    A.    "Scorekeeper," "water boy," "water girl."

16    Q.    And do you know if universities recruit water boys and

17    water girls?

18    A.    No, they do not.

19            MR. KENDALL:  Objection, your Honor.  I don't think

11:51 20    she's got a foundation to know what universities do.

21            THE COURT:  Overruled.

22    Q.    And Mr. Kendall asked you about the use of the term

23    "manager."  Do you recall that?

24    A.    Yes.

25    Q.    Could we turn to page 7, please.  Page 7, line 11,

```
 1    Mr. Singer says, "With your girls because they're athletic and
 2    they're big and all of that, I can sell to anybody that they're
 3    athletic enough to be able to take them and there will be no
 4    question."  Do you see that?
 5    A.   Yes.
 6    Q.   Do you recall Mr. Kendall asking you any questions about
 7    that?
 8    A.   No.
 9    Q.   He didn't ask a single one about that, right?
11:52 10   A.   Correct.
11    Q.   He could have asked you anything he wanted in the many,
12    many hours he was up here asking you questions.  Not one
13    question about selling to anybody that the girls are athletic
14    enough to be able to take them and there will be no question.
15         And how did Mr. Wilson respond?
16    A.   "Yeah, their size and everything else."
17    Q.   Now, you were asked whether Mr. Singer ever told
18    Mr. Wilson that there would be a fake athletic profile, whether
19    he used the words "fake athletic profile."  Right?  He didn't
11:52 20   use those words in these calls, did he?
21    A.   No.
22    Q.   But he did say, "I could sell to anybody that they're
23    athletic enough to be able to take them and there will be no
24    question."  He did say that, right?
25    A.   Correct.
```

```
 1    Q.    Would you say that's explicit?

 2    A.    Yes.

 3    Q.    And if we could look at 597 in evidence, please.  These

 4    are the text messages that Mr. Kendall put into evidence.

 5    A.    Yes.

 6    Q.    Do you recall that?

 7          If we could look at page 3, the second text message.

 8          "Rick, for Mamie, what is the sport or angle I need

 9    to prep her for to help get in without her knowing?  Also, is

11:53 10   it a 100 percent done deal after final payment in spring?"

11          Now, Mr. Kendall put this exhibit in.  But do you

12    recall him asking you any questions about this text?

13    A.    No.

14    Q.    And these are Mr. Wilson's words?

15    A.    Yes.

16    Q.    And is it possible to manage a sport without knowing it?

17    A.    No.

18    Q.    You can't manage without knowing what you're doing, right?

19    A.    Correct.

11:53 20   Q.    And what word does Mr. Wilson use to describe the money?

21    A.    "Payment."

22    Q.    Now, let's take a look at the next call, 591.  And

23    Mr. Kendall asked you about page 2 at the top where Mr. Singer

24    said that he could give the sailing coach, John Vandemoer,

25    $160,000 for his program.  Do you recall those questions?
```

```
 1   A.   Yes.
 2   Q.   At page 3, the very next page -- I'm sorry -- at page --
 3   yes, at page 3, the very next page, Mr. Singer says at line 12,
 4   "It doesn't matter if it's one of the girls who's not a sailor.
 5   I can still put her as a sailor."  Do you see that?
 6   A.   Yes.
 7   Q.   Now, again, you were asked about fake athletic profiles.
 8   Can you put somebody as a sailor who's not a sailor without a
 9   fake profile?
11:55 10        MR. KENDALL:  Objection, your Honor.
11              THE COURT:  Overruled.
12   A.   No.
13   Q.   And how does Mr. Wilson respond at line 18?
14   A.   "Right.  Right."
15   Q.   Do you recall Mr. Kendall asking you any questions about
16   this?
17   A.   No.
18   Q.   And if you look at page 2, the very same page where
19   Mr. Kendall did ask you some questions, at line 20 Mr. Singer
11:55 20   says, "I asked him for a second spot in sailing, and he said he
21   can't do that because he actually has to actually recruit some
22   real sailors so that Stanford doesn't catch on."
23              Did Mr. Kendall ask you any questions about that?
24   A.   No.
25   Q.   And then Mr. Singer actually said it again, right, right
```

A2373

```
 1   below that?
 2          Mr. Wilson responds at line four, "He's got to
 3   actually have some sailors.  Yeah."
 4          And then Mr. Singer says, "So that Stanford doesn't
 5   catch on to what he's doing."
 6          And how does Mr. Wilson respond?
 7   A.   "Right."
 8   Q.   And what would the Stanford sailing coach be doing in
 9   exchange for the money?
10   A.   Putting the girls on the sailing team.
11   Q.   And that would be regardless of whether the money went to
12   the program or his pocket, right?
13   A.   Correct.
14   Q.   Mr. Wilson -- Mr. Singer has just talked about money going
15   to the program and he's also talked about Stanford not catching
16   on, correct?
17   A.   Correct.
18   Q.   And this was after Mr. Singer told Mr. Wilson that he'd be
19   meeting with the Harvard president, right?
20   A.   Correct.
21   Q.   And it was after he had told Mr. Wilson that he'd be
22   meeting with the Tufts president, right?
23   A.   Correct.
24   Q.   But he's talking about Stanford not catching on to what
25   the sailing coach is doing in exchange for money to his
```

```
 1   program?

 2   A.   Correct.

 3   Q.   Anything ambiguous or mysterious about that?

 4        MR. KENDALL:  Objection, your Honor.

 5        THE COURT:  Overruled.

 6   A.   No.

 7   Q.   It's explicit, right?

 8   A.   Yes.

 9   Q.   Dictionary definition or Agent Keating's definition, it's

10   explicit, right?

11   A.   Yes.

12   Q.   Could we look at Exhibit 594, please.  Mr. Kendall asked

13   you some questions about page 7, where Mr. Singer talked about

14   women's lacrosse is always looking for help, women's fencing is

15   looking for help.  Do you recall those questions?

16   A.   Yes.

17   Q.   He didn't ask you any questions about page 3, did he?

18   A.   No.

19   Q.   On page 3, Mr. Singer says, "Let me give you an update,"

20   at the top.  "We got the Stanford spot," line four.  "They want

21   to know if you want it because I have to pay the coach right

22   away."  Do you see that?

23   A.   Yes.

24   Q.   And then at line 12, he says, "So the sailing spot that we

25   have that we'll pay the coach, he doesn't care if it's a sailor
```

```
 1    or not."  Line 16, "he doesn't care one bit."  Do you see that?

 2    A.   Yes.

 3    Q.   No questions about that from Mr. Kendall, were there?

 4    A.   No.

 5    Q.   Is that explicit?

 6    A.   Yes.

 7    Q.   And then at page 5.  I have the wrong page number.  I'm

 8    going to withdraw that question and we'll come back to that.

 9             Let's go to 602.  Mr. Kendall asked you some

10    questions about line -- page 2, line 16, about when Mr. Singer

11    said that he would be funding the senior women's administrator

12    at Harvard.  Do you recall that?

13    A.   Yes.

14    Q.   And if we look at the very next page, Mr. Wilson says --

15    Mr. Singer says at line 9, "Maybe she won't have to sail, but

16    we're going to put her through sailing and John Vandemoer.

17    This is actually a better play at Harvard because she'll go in

18    through athletics in one of the sports, but it won't matter.

19    It won't matter."

20             And then Mr. Wilson responds, "Yeah, but she's a

21    sailor, actually, so sailing is actually a logical thing.  She

22    could even be the mascot."

23             Now, during the course of your investigation into

24    recruiting for athletics at the University of Southern

25    California and elsewhere, did you ever come across a recruited
```

11:59 appears at line 10
12:00 appears at line 20

```
 1   mascot?

 2   A.   No.

 3           MR. KENDALL:  Objection, your Honor.

 4           THE COURT:  Overruled.

 5   Q.   It's absurd, right?

 6   A.   Correct.

 7   Q.   Whose words were those?  Who was talking about a recruited

 8   mascot?

 9   A.   Mr. Wilson.

12:00 10   Q.   And what had Mr. Wilson previously told Mr. Singer about

11   whether Courtney was any good at sailing?

12   A.   Mr. Wilson said Courtney does sailing at the local yacht

13   club and that she wasn't very good.

14   Q.   Can we look at transcript for 623, please.

15           Mr. Kendall asked you some questions about page 7 and

16   what Mr. Singer was saying about not talking to admissions.  Do

17   you recall those questions?

18   A.   Yes.

19   Q.   I'd like to direct your attention to the next page, at

12:01 20   line 7.  Mr. Singer says, "We'll go through kind of like what

21   we did with Johnny."

22           Who's Johnny?

23   A.   Mr. Wilson's son.

24   Q.   So he's talking about Mr. Wilson's son in these calls

25   after all, isn't he?
```

```
 1    A.    Yes.

 2    Q.    "We went -- Johnny went, you know, right to water polo.

 3    And for the girls, I'll probably just go to two sports, sailing

 4    and crew, just walk them right through as recruited walk-ons."

 5    Do you see that?

 6    A.    Yes.

 7    Q.    And how does Mr. Wilson respond?

 8    A.    "Okay."

 9    Q.    And then further on, he says, "My only thing to you," at

10    line 15, "was I just want to make sure because, you know,

11    you're a known entity, a known family.  And they're going --

12    people know you're interested and they're going to say, "Hey, I

13    can help you.  Or people may call you.  And I just want to say

14    you just say, 'Hey listen, we got' -- we're taking care of

15    things ourselves.  We have it all.  The girls are great

16    students.  We're just going to apply on their own."

17          And Mr. Wilson responds, "Okay just kind of -- just

18    say we're applying on our own.  Nothing."

19          And Mr. Singer responds, "Correct.  Nothing.

20    Nothing.  No side doors.  We're not doing anything."

21          And Mr. Wilson says, "Yeah, don't mention about that.

22    Right."

23          And Mr. Singer responds, "Yeah, where you're making a

24    payment to help the kids get into school."

25          And how does Mr. Wilson respond?
```

```
 1   A.    "Right, okay.  That sounds good."

 2   Q.    So in that instance, when Mr. Singer tells Mr. Wilson not

 3   to say anything about the side door to anyone who comes to him

 4   from admissions or elsewhere and Mr. Wilson agrees and

 5   Mr. Singer says where you're making a payment to help the kids

 6   get into school, was there anything lacking in explicitness

 7   about that?

 8   A.    No.

 9   Q.    You were asked a series of questions, Special Agent, about

12:03 10  the fact that Mr. Singer did not use the word "bribe" in these

11   consensual calls with Mr. Wilson.  Do you recall those

12   questions?

13   A.    Yes.

14   Q.    Prior to approaching Mr. Singer on September 21, 2018, did

15   you ever intercept a recording in which he -- a call in which

16   he used the word "bribe"?

17   A.    No.

18   Q.    Did you see it in his e-mails?

19   A.    No.

12:04 20  Q.    In your experience as a 20-year IRS employee and as a

21   criminal agent, do white-collar defendants typically use that

22   type of explicit language when they're talking to one another?

23         MR. KENDALL:  Objection, your Honor.

24         THE COURT:  Overruled.

25   A.    No, they do not.
```

```
 1   Q.   Do they say to one another, "Now I would like to discuss
 2   our fraud"?
 3   A.   No, they do not.
 4   Q.   Were you worried that using the word "bribe" would tip
 5   Mr. Wilson off that Mr. Singer was cooperating?
 6   A.   Yes.
 7   Q.   Is that why you didn't instruct him to use the word
 8   "bribe"?
 9        MR. KENDALL:  Objection, your Honor.
10        THE COURT:  Sustained.
11   Q.   Why did you not instruct him not to use the word "bribe"?
12   A.   Because we thought it would tip Mr. Wilson off that there
13   was something going on such as an investigation.
14   Q.   You were asked questions about your affidavit in which you
15   wrote -- the affidavit that you signed under penalties of
16   perjury in which you noted that you asked Singer to be more
17   explicit on the calls so there would be no confusion about the
18   parents' intent?
19   A.   Correct.
20   Q.   Now, yesterday you started to answer a question by saying
21   something about outsiders looking in.  Do you recall that?
22   A.   Yes.
23   Q.   But you weren't allowed to answer the question.
24   Mr. Kendall interrupted you.  Do you recall that?
25   A.   Correct.
```

```
 1   Q.   Who were you concerned would be potentially confused about

 2   the parents' intent if Singer used words like "donation"?

 3              MR. KENDALL:  Objection, your Honor.

 4              THE COURT:  Overruled.

 5   A.   If it went to trial, jurors and other people that were

 6   looking such as -- I should say jurors were probably the top

 7   concern.

 8   Q.   Not the parents themselves, right?  They knew what they

 9   were doing?

10   A.   Correct.

11              MR. KENDALL:  Objection your Honor.

12              THE COURT:  Sustained on the leading.

13   Q.   In these calls with Mr. Singer and Mr. Wilson, these

14   consensual calls, was it explicit what Mr. Wilson's money was

15   buying?

16              MR. KENDALL:  Objection, your Honor.

17              THE COURT:  Overruled.

18   A.   Yes.

19   Q.   Was it explicit whether the girls would be admitted as

20   sailors or crew recruits without the money?

21   A.   They would not be admitted without the money.

22   Q.   Was it explicit that it didn't matter if they could sail

23   or row crew?

24   A.   Yes.

25   Q.   Was it explicit that they were not recruitable athletes at
```

12:06 appears at lines 10 and 20.

A2381

```
 1   that level?

 2   A.   Yes.

 3   Q.   When Singer told Wilson that Stanford -- that the coach

 4   needed to recruit some real sailors so that Stanford doesn't

 5   catch on, was that explicit?

 6   A.   Yes.

 7   Q.   In any of those calls, did Mr. Wilson ever ask, "Why do we

 8   have to sell the girls as athletes if they're just going to be

 9   managers"?  Did he ever ask that?

10   A.   No.

11   Q.   Did he ever ask why Stanford shouldn't catch on for this

12   to work?

13   A.   No.

14   Q.   He did ask whether he'd be able to get his money back if

15   his kids changed their minds about schools.  Do you recall

16   that?

17   A.   Yes.

18   Q.   He referred to that as a high-class problem?

19   A.   Yes.

20   Q.   In your experience as an IRS agent, do people typically

21   get their money back when they make a donation to charity?

22   A.   No.

23   Q.   Do people typically ask for their money back to the

24   American Cancer Society if they don't get something in

25   exchange?
```

```
 1   A.   No.
 2   Q.   All of those other donations that Mr. Wilson purportedly
 3   made that Mr. Kendall asked you about, education and other
 4   causes, did you see any evidence that he asked for those
 5   donations back?
 6   A.   No.
 7   Q.   You were asked some questions about Mamie and Courtney
 8   Wilson's test scores.  Do you recall those questions?
 9   A.   Yes.
10   Q.   Could we look at Exhibit 580, please.  If you could go to
11   the next page, please.  Do you see at the top right, the last
12   sentence, Mr. Singer says, "If the girls get what they are
13   capable of, 31 through 34, no problem."  And what are the last
14   four words?
15   A.   "Through the side door."
16   Q.   And if we look at the transcript for Exhibit 602 on
17   page 4.  Page 4, line 18, Mr. Wilson says, "Well, hopefully
18   that's settled, right?  I'm always I'm on pins and needles here
19   because it's like, okay, they got to still get good test
20   grades, of course, and all that stuff."
21        How does Mr. Singer respond?
22   A.   "No, they've got to be -- they've got to be good.  They
23   don't have to be over the top."
24   Q.   How does Mr. Wilson responds when he says that the girls'
25   grades and test scores do not have to be over the top?
```

(line 10 timestamp: 12:08)
(line 20 timestamp: 12:09)

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | A.   "Okay."                                                 |
| 2     | Q.   I'd like to direct your attention to the transcript at  |
| 3     | 594, please.  At 594, page 12, Mr. Singer says --            |
| 4     |      Are you with me, Special Agent?                         |
| 5     | A.   Yes.                                                    |
| 6     | Q.   Mr. Singer says at line 7, "I mean, you weren't going to |
| 7     | get into either one, let's just say, just based on the numbers |
| 8     | it takes to get in."                                         |

1   A.   "Okay."

2   Q.   I'd like to direct your attention to the transcript at

3   594, please.  At 594, page 12, Mr. Singer says --

4          Are you with me, Special Agent?

5   A.   Yes.

6   Q.   Mr. Singer says at line 7, "I mean, you weren't going to

7   get into either one, let's just say, just based on the numbers

8   it takes to get in."

9          Mr. Wilson says, "Yeah."

12:10 10          Mr. Singer says, "Admissions rate and they don't even

11   play the sports, right?"

12          And how does Mr. Wilson respond?

13   A.   "Yeah.  They had a 2 percent shot or whatever taking the

14   test, or whatever it comes out at."

15   Q.   You were asked some questions in Exhibit 5 -- transcript

16   571 about the president of Brown University.  Do you recall

17   those questions?

18   A.   Yes.

19   Q.   And at pages 9 to 10, Mr. Singer says at the bottom, 571,

12:11 20   page 9 at line 18, "So what I would suggest is that he calls up

21   her office.  They have a scheduling person for the president.

22   And he sets up a meeting for he and his daughter to go meet.

23   And she kind of meets with them and then she'll give an

24   indication and he'll get an idea of what it's going to need --

25   "what's going to need to be done to have her go to Brown."

```
 1              And then what does Mr. Wilson say, at line 2?
 2   A.   "The front door."
 3   Q.   Not "the side door," right?
 4   A.   No.
 5   Q.   What scheme is Mr. Wilson engaged in?
 6   A.   The side door.
 7   Q.   And then at line 15, Mr. Wilson says, "He wanted to do
 8   it -- so the other thing he had a concern was he wanted to do
 9   it in a way his daughter wouldn't know."
10              And what does Mr. Singer say at line 20?
11   A.   "Well, then that's a different path and then -- then I may
12   have to get involved in that."
13   Q.   You were asked a series of questions, Special Agent, about
14   Mr. Wilson's offer to help Mr. Singer develop a pricing
15   strategy.  Do you recall those questions?
16   A.   Yes.
17   Q.   Can criminals, in your experience, have a pricing
18   strategy?
19   A.   They do pricing.  They have -- some types of frauds
20   involve different types of pricing.
21   Q.   And you were asked questions about The Key Worldwide
22   Foundation tax form, the 990?
23   A.   Yes.
24   Q.   Can legitimate charities be used, in your experience, to
25   funnel bribe money?
```

```
 1    A.   Yes.

 2    Q.   And in fact, you were investigating Mr. Singer for just

 3    that, right?

 4    A.   Correct.

 5    Q.   By the way, that 990, did you see any evidence that either

 6    Mr. Abdelaziz or Mr. Wilson saw that document ever?

 7    A.   No.

 8    Q.   You were asked a series of questions by both counsel about

 9    Exhibit 13, Mr. Singer's notes.  Do you recall those questions?

10    A.   Yes.

11    Q.   And they were characterized to you as Mr. Singer's notes

12    to himself, correct?

13    A.   Correct.

14    Q.   They were analogized to his diaries.

15    A.   Yes.

16    Q.   Do you recall that question?

17    A.   Yes.

18    Q.   You were asked whether people lie to their diaries?

19    A.   Yes.

20    Q.   Do you know if these notes were written for Mr. Singer

21    himself or for someone else?

22         MR. KENDALL:  Objection, your Honor.  It's hearsay.

23         THE COURT:  Overruled.  She can answer as to

24    whether -- what she knows.

25    A.   They were written for his attorney.
```

```
 1              MR. FRANK:  Could we show the witness only
 2    Exhibit 714, please.
 3    Q.   Do you recognize Exhibit 714?
 4    A.   Yes.
 5    Q.   What is it?
 6    A.   It's a summary of the notes that were sent from Mr. Singer
 7    to his attorney.
 8    Q.   What is the date?
 9    A.   October 4, 2018.
12:14 10             MR. FRANK:  The government offers 714.
 11             MR. KENDALL:  Objection, your Honor, hearsay.
 12             MR. FRANK:  It's not hearsay, your Honor.  It's the
 13   identical notes that are in evidence, and we're admitting it
 14   for the fact it was sent to his attorney on the same day.
 15             THE COURT:  I'm not going to admit it now.  I'll hear
 16   argument about it later.
 17   Q.   The bottom line --
 18             THE COURT:  The objection is sustained.
 19             MR. FRANK:  Thank you, your Honor.
12:14 20   Q.   The bottom line, Special Agent, is that on the same day
 21   Mr. Singer drafted these notes, he sent them to his lawyer,
 22   correct?
 23   A.   He modified the notes on the 4th and then he sent them
 24   to --
 25             MR. KENDALL:  Objection, your Honor.  They're not in
```

```
 1  evidence.
 2          THE COURT:  Sustained.
 3  Q.   Does this refresh your recollection that he sent the notes
 4  to his lawyer on October 4, 2018?
 5          MR. KENDALL:  Objection, your Honor.  It's hearsay.
 6          THE COURT:  Sustained.
 7  Q.   In your experience, do white-collar defendants always
 8  admit their guilt right away when they're confronted?
 9          MR. KENDALL:  Objection.
10          THE COURT:  Overruled.
11  A.   No.
12          MR. KELLY:  Objection to the suggestion that she knows
13  what they tell their lawyer.
14          THE COURT:  Well, she can testify from her experience
15  what they do.
16  Q.   Are you familiar with the term "minimize" in this context?
17  A.   Yes.
18  Q.   What's is minimizing?
19  A.   Not accepting responsibility.
20  Q.   In the early days after you approached Mr. Singer, was he
21  fully cooperative with you?
22          MR. KENDALL:  Objection, your Honor.
23          THE COURT:  Overruled.
24  A.   No.
25  Q.   Did he refuse to make phone calls that you asked him to
```

12:15 (lines 10)
12:15 (line 20)

**A2388**

```
 1   make?

 2   A.    Yes.

 3   Q.    Did he deny he'd done anything wrong?

 4   A.    Yes.

 5   Q.    Mr. Kelly asked you some questions yesterday about whether

 6   donating money to the USC women's athletic fund or to the Galen

 7   Center was illegal.  Do you recall those questions?

 8   A.    Yes.

 9   Q.    What about making payment to those funds in exchange for

12:16 10   having a child recruited as a basketball player based upon

11   falsified credentials?

12          MR. KENDALL:  Object, your Honor.

13          THE COURT:  Sustained.

14   Q.    What did Mr. Abdelaziz get in exchange for his payment to

15   the women's athletic fund?

16          MR. KENDALL:  Objection, your Honor.

17          THE COURT:  Overruled.

18   A.    His daughter's admission to USC.

19   Q.    Are those donations?

12:16 20   A.    No.

21          MR. KENDALL:  Objection, your Honor.

22          THE COURT:  Overruled.

23   Q.    You were asked some questions about the transcript -- let

24   me just find the number.  587, the first call between

25   Mr. Abdelaziz and Mr. Wilson on the consensual.  Do you recall
```

1   those questions?

2   A.   Yes.

3   Q.   And you were asked about page 4 of the transcript, 587,

4   where Mr. Singer says at line 14, "I'm not going to tell the

5   IRS anything about the fact that your $300,000 was paid to

6   Donna Heinel at USC to get Sabrina into school even though she

7   wasn't a legitimate basketball player at that level."

8        Do you recall that question?

9   A.   Yes.

12:17 10   Q.   And you were asked about the fact that Mr. Singer had not

11   used the specific name Donna Heinel before with Mr. Abdelaziz?

12   A.   Yes.

13   Q.   Did Mr. Abdelaziz ask who Donna Heinel was?

14   A.   No.

15   Q.   Did he seem confused?

16        MR. KENDALL:   Objection.

17        THE COURT:   Sustained.

18   Q.   Did he ask questions indicating confusion?

19   A.   No.

12:18 20   Q.   Did he say to Mr. Singer, "Whatever you do, don't lie to

21   the IRS"?

22   A.   No.

23   Q.   You were asked questions about the exchange on page 6 of

24   that transcript, the ruse regarding using Sabrina's profile for

25   anybody who isn't a real basketball player?

```
 1              MR. KELLY:  Objection again.  Mischaracterization.
 2              THE COURT:  Overruled.
 3     Q.   Mr. Singer says, at line 12, "Hey, Rick" -- "She called me
 4     and says, 'Hey, Rick.  That profile that you did for Sabrina.
 5     I loved it.  It was really well done.  And going forward,
 6     anybody who isn't a real basketball player that's a female, I
 7     want you to use that profile going forward.'"  Did I read that
 8     correctly?
 9     A.   Yes.
12:18 10   Q.   And how did Mr. Abdelaziz respond?
11     A.   "I love it."
12     Q.   Did he ask what profile Mr. Singer was talking about?
13     A.   No.
14     Q.   Did he say, "Hey, wait a minute I don't recall ever seeing
15     a profile"?
16     A.   No.
17     Q.   Does it sound like he's yessing him to death there?
18     A.   No.
19     Q.   You were asked whether Mr. Abdelaziz sounded like his
12:19 20   heart dropped in this first phone call when he was advised
21     there was an IRS audit.  Do you recall those questions?
22     A.   Yes.
23     Q.   Could we look at the transcript for 621, please, the next
24     call.
25              Now, that call we just looked at, that was
```

1  October 25, 2018, correct?

2  A.    Correct.

3  Q.    And this next call is January 3, 2019, correct?

4  A.    Correct.

5  Q.    So it's almost three months later, two and a half months

6  later?

7  A.    Yes.

8  Q.    I want to direct your attention to page 5.  Two and a half

9  months after Rick Singer called Gamal Abdelaziz and told him he

12:20 10  was being audited, Mr. Abdelaziz says, at page 5, line 8, "You

11  know, this whole tax issue, you called me a few months ago."

12          And then what are his next three words?

13  A.    "I got worried."

14  Q.    "I got worried.  When I do my taxes, should I mark this

15  as, you know, as a charity or not or use the 501(c) or not?"

16          And then what does he say next?

17  A.    "Because you got me concerned when you called me last

18  time."

19  Q.    Does that sound a little bit closer to his heart stopping?

12:20 20  A.    No.

21  Q.    Does it sound like he's concerned and worried?

22  A.    Yes.

23  Q.    You were asked -- Mr. Kelly represented to you

24  yesterday -- I believe his words were, "Typically things that

25  aren't true are lies."  Do you recall Mr. Kelly saying that?

```
 1    A.    Yes.

 2    Q.    Did Sabrina Abdelaziz have an injury that prevented her

 3    from playing basketball in January of 2019?

 4    A.    No.

 5    Q.    Did she have plantar fasciitis?

 6    A.    No.

 7    Q.    How do you know that for sure?

 8    A.    It was a ruse that Mr. Singer stated at our direction.

 9    Q.    At page 4 at the bottom, Mr. Singer says, "I just wanted

12:21 10   to give you a heads-up, they asked about it, and Donna

11    replied" -- and at line 3 of page 5 -- "and I wanted you to

12    know what her reply was."

13          And how does Mr. Abdelaziz respond?

14    A.    "That's fine.  I will answer the same, should they call

15    me."

16    Q.    "Answer the same," meaning he would tell admissions what?

17    A.    That Sabrina had plantar fasciitis.

18    Q.    Now, that wasn't true, right?

19    A.    Correct.

12:21 20   Q.    So by Mr. Kelly's definition, that would be what?

21    A.    A lie.

22    Q.    Did Mr. Abdelaziz ask in this phone call why he needed to

23    lie about his daughter having plantar fasciitis?

24          MR. KELLY:  Objection.  He continues to lead his own

25    witness.  Objection.
```

```
 1              THE COURT:  With respect to the leading, the objection
 2    is sustained.
 3    Q.    Did Mr. Abdelaziz ask in this phone call why it would be
 4    necessary to lie if his daughter was going in as a manager?
 5    A.    No.
 6    Q.    You were asked some questions about whether Mr. Abdelaziz
 7    was captured on the wiretap.
 8    A.    Correct.
 9    Q.    Now, the wiretap was when?
12:22 10    A.    January -- I'm sorry.  June 2018 through September.
11    Q.    By June of 2018, had Sabrina already been admitted to USC?
12    A.    Yes.
13    Q.    You were asked some questions about whether you knew that
14    Mr. Abdelaziz was in Macao, China, while his wife and daughter
15    were in Hong Kong.  Do you recall that question?
16    A.    Yes.
17    Q.    Do you know how long the commuter ferry is from Hong Kong
18    to Macao?
19    A.    Approximately 50 minutes.
12:23 20    Q.    50 minutes?
21    A.    Yes.
22    Q.    Less than the time it takes from here to get to the Cape?
23    A.    When it's not rush hour, yes.
24    Q.    Could we take a look at Exhibit 415 in evidence, please.
25              This is from Mr. Aziz to Mikaela Sanford, forwarding
```

```
 1    and e-mail that was sent to his cox.net account.  Do you see
 2    that?
 3    A.   Yes.
 4    Q.   He says --
 5              MR. FRANK:  Ms. Lewis, could you please highlight at
 6    the bottom -- at the end of the second line of the e-mail, "We
 7    currently live" to the end of that paragraph.
 8    Q.   Could you read that for the record, Special Agent?
 9    A.   "We currently live in Hong Kong, so there's a time
10    difference of 16 hours.  Please let me know your availability
11    and your preferred method of communication.  Sabrina and I can
12    be available for a call on your Monday, 5:00 p.m., if that
13    works for you."
14    Q.   It says, "We currently live in Hong Kong," right?
15    A.   Yes.
16    Q.   It says, "Sabrina and I can be available for a call,"
17    correct?
18    A.   Yes.
19    Q.   Nothing about Macao in this e-mail?
20    A.   No.
21    Q.   You were asked about a memo you wrote seeking
22    authorization to assist the FBI with its wiretap.  Do you
23    recall those questions?
24    A.   Yes.
25              MR. FRANK:  For the witness only because I don't
```

```
 1  believe it's in evidence, Exhibit 9014, please.  I think we
 2  might need the defense's assistance with this.  We don't have
 3  this exhibit.
 4          MR. KENDALL:  What exhibit?
 5          MR. FRANK:  9014.
 6          MR. KELLY:  They didn't ask us for it in advance.  I
 7  don't know where --
 8          MR. FRANK:  Mr. Carter, are you able to call up 9014?
 9          Thank you so much.  I appreciate it.
10          If we could go to --
11          MR. KENDALL:  I don't think this is in evidence.
12          MR. FRANK:  It's not.  It's for the witness only.
13  Q.   This is the same exhibit that Mr. Kelly showed you
14  yesterday.  Do you recall that?
15  A.   Yes.
16  Q.   If I could direct --
17          MR. FRANK:  Mr. Carter, if you could go to page 8 of
18  that exhibit.  Thank you.
19  Q.   You were asked about that second paragraph.
20          MR. FRANK:  And Mr. Carter, if you wouldn't mind just
21  highlighting the second paragraph and the first sentence, "On
22  May 4," through the first sentence of the next paragraph.
23          MR. KENDALL:  Your Honor, I don't think she's
24  testified she's had a failure of memory.
25          MR. FRANK:  Your Honor, I'm doing exactly what
```

```
 1    Mr. Kelly did yesterday.
 2          THE COURT:  You may proceed.
 3    Q.   You were asked, based on this paragraph, whether you
 4    recalled that Mr. Singer told the Yale soccer coach in May that
 5    Donna Heinel had not yet taken money personally.  Do you recall
 6    those questions?
 7    A.   Yes.
 8    Q.   I'd like to have you read to yourself, please, beginning
 9    with -- let's see if I can do this on my screen.  Do you see
 10   that, Special Agent?
 11   A.   Yes.
 12   Q.   Could you read to yourself, beginning with "Singer then
 13   explained," to the end of the first sentence ending in "Vavic,"
 14   in the next paragraph?
 15         MR. KENDALL:  Your Honor, he's going beyond the scope.
 16   Nothing about Vavic was raised in this.
 17         MR. FRANK:  I'm asking about the paragraph she was
 18   asked about.
 19         THE COURT:  Overruled.
 20   Q.   Could you let me know when you're done.
 21   A.   Yes.
 22   Q.   Thank you.
 23         MR. FRANK:  Mr. Carter, you can take that down.  I
 24   appreciate it.
 25   Q.   Special Agent, does this refresh your recollection that
```

```
 1    not only did Mr. Singer tell you that he believed Donna Heinel
 2    might yet take money personally, in May of 2018, but that he
 3    also explained that he could distribute money to the recipient
 4    of his bribes in three different ways.  If they want it
 5    directly to them for personal use --
 6              MR. KENDALL:  Objection, your Honor.  It's leading.
 7              THE COURT:  You can't read from the document.
 8    Q.   Does it refresh your recollection that he told you --
 9              MR. KELLY:  Objection.  He's still leading.
10              MR. FRANK:  I'm not going to lead.
11              THE COURT:  Well, ask the question, but you cannot
12    quota a document that's not in evidence.
13              MR. FRANK:  I will not.  Thank you, your Honor.
14    Q.   Does it refresh your recollection that he told you he
15    could distribute the money to coaches in three different ways?
16              MR. KENDALL:  Your Honor --
17              THE COURT:  Overruled.
18              MR. KENDALL:  -- it's hearsay.
19    A.   Yes.
20    Q.   Directly to them personally?
21    A.   Yes.
22    Q.   Is that one of the ways?
23    A.   Yes.
24    Q.   Was another way to their program?
25              MR. KENDALL:  Objection, your Honor.  It's hearsay.
```

```
 1              THE COURT:  Overruled.
 2    A.   Yes.
 3    Q.   Was the third way split between their program and
 4    themselves, if that's what they wanted?
 5    A.   Yes.
 6    Q.   And, Special Agent, wherever the money went, however it
 7    was allocated, what would the coach or athletic department
 8    insider be doing in exchange for the money?
 9    A.   Recruiting the student as an athlete.
12:28 10   Q.   Could we look at the transcript of 571, please, at page 7.
11    At 571, page 7, this is the call between Mr. Singer and
12    Mr. Wilson on September 29, 2018.
13              At line 6, Mr. Singer says, "And then what I can,
14    what I'll do is I'll split the money potentially to the coach
15    or other parties that are at the school that need the money.
16    Right?"
17              And Mr. Wilson says, "Mm-Hmm."
18              And then Mr. Singer says, "Or it may go right to the
19    coach that's helping us.  It just depends on the school."
12:29 20             Do you see that?
21    A.   Yes.
22    Q.   Was that consistent or inconsistent with your
23    understanding of how the scheme worked?
24              MR. KENDALL:  Objection, your Honor.
25              THE COURT:  Overruled.
```

A2399

```
 1              MR. KENDALL:  Her state of mind is not relevant.

 2    A.   Consistent.

 3    Q.   Special Agent, you were asked some questions about 439,

 4    the voicemail that Donna Heinel left for Rick Singer directing

 5    him to send money to the Galen Center.  Do you recall that?

 6    A.   Yes.

 7    Q.   Do you recall that?

 8    A.   Yes, I do.

 9              MR. FRANK:  And if we could quickly look at the

12:29 10   transcript of 439.  I hope it's still in the jurors' binders.

11    Is 439 still there?  No?

12              Can we have a clean copy?

13              If I could just use the Elmo for one moment.  If you

14    don't have it, that's all right.  We can use my marked-up copy.

15    That's all right, Ms. Kearney.  I'm all set.  This is that

16    transcript.

17    Q.   Do you see that, Special Agent?

18    A.   Yes.

19    Q.   Ms. Heinel said on that voicemail, "For the rest of the

12:31 20   people that owe money, could you please, uh, I need it to go to

21    the Galen Center gift account.  It just makes it better."

22              Do you see that?

23    A.   Yes.

24    Q.   And then she talks about Mr. Abdelaziz?

25    A.   Yes.
```

```
 1   Q.   Why did Mr. Abdelaziz owe money?

 2             MR. KELLY:  Objection.

 3             THE COURT:  Sustained.

 4   Q.   What was Mr. Abdelaziz getting for his money?

 5             MR. KELLY:  Objection.

 6             THE COURT:  Yes.  Sustained.

 7   Q.   Special Agent, in your experience, do people who make

 8   donations, is that typically referred to as owing money?

 9             MR. KENDALL:  Objection, your Honor.

10             THE COURT:  She can state her understanding.

11   A.   No.

12             MR. FRANK:  Can we look at Exhibit 549, please.

13             And I'm done with the Elmo.  Thank you.

14   Q.   Exhibit 549, were these photographs that Mr. Abdelaziz

15   sent to Mr. Singer on August 18, 2017.  Do you see that?

16   A.   Yes.

17   Q.   That was about a year and a half after Sabrina stopped

18   playing basketball?

19   A.   Yes.

20   Q.   And Mr. Singer said -- Mr. Abdelaziz says, "More from Hong

21   Kong," not Macao, right?

22   A.   Correct.

23   Q.   "I know you need a close-up action shot but it seems we

24   never really took those."

25             How did Mr. Singer use close-up action shots?
```

**A2401**

```
 1   A.   For fake profiles.

 2   Q.   And Mr. Abdelaziz says "it seems we never really took

 3   those."  Do you notice that's in the past tense?

 4   A.   Yes.

 5   Q.   Is that how you talk about somebody who still plays?

 6   A.   No.

 7   Q.   Did Mr. Abdelaziz offer to get a shot at Sabrina's next

 8   game?

 9           MR. KELLY:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.   You were asked some questions, Special Agent --

12           MR. FRANK:  We can take that down, thank you.

13   Q.   -- about Exhibit 1482, deleted text messages.

14   A.   Yes, I recall that.

15   Q.   Was it possible to tell -- it's actually 1482A.

16           MR. FRANK:  I'm sorry.  We don't need it up.  That's

17   all right.

18   Q.   Is it possible to tell from that extraction how many text

19   messages Singer deleted before you approached him on September

20   21 versus how many he deleted in the two weeks thereafter?

21   A.   No.

22   Q.   Did you and the other agents tell him not to delete text

23   messages?

24   A.   Yes.

25   Q.   Mr. Kendall asked you yesterday about whether leaving the
```

```
 1   phone in Mr. Singer's custody for two weeks after September 21

 2   was a colossal mistake.  Do you recall that?

 3   A.   Yes.

 4   Q.   Was Mr. Singer arrested on September 21?

 5   A.   No, he was not.

 6   Q.   Was he in custody?

 7   A.   No, he was not.

 8   Q.   Was he fully cooperative with you at that time?

 9   A.   He said -- Mr. Singer agreed to cooperate with the

10   investigation.

11   Q.   Was he fully cooperative in those first days?

12   A.   He was reluctant and did not follow our instructions fully

13   at that time.

14   Q.   Did he, in fact, refuse to make phone calls?

15   A.   Yes.

16   Q.   And did he return to California to meet with his lawyer?

17   A.   Yes.

18   Q.   And, in fact, did you meet with Mr. Singer and his lawyer

19   in the next few days?

20   A.   Yes.

21   Q.   Did you then image his phone the next time he returned to

22   Boston?

23   A.   Yes.

24   Q.   You were asked whether you took notes of what you said or

25   what the agents said to Mr. Singer.  Do you recall that?
```

```
 1   A.   Yes.
 2   Q.   Do you typically take notes of what law enforcement says
 3   to the witness?
 4   A.   No.
 5   Q.   Do you typically take notes when the witness tells you
 6   something substantive?
 7   A.   Yes.
 8   Q.   How many hundreds of pages of interview reports are there
 9   of Rick Singer in this case?
12:34 10   A.   I don't know the exact amount, but there are hundreds.
11   Q.   Binders full, right?
12   A.   Yes.
13   Q.   Those are notes that you and your fellow agents took of
14   what he said?
15   A.   Yes.
16   Q.   You were asked about what you told him to say on those
17   consensual calls?
18   A.   Correct.
19   Q.   How do we know to a certainty what he said on those
12:35 20   consensual calls?
21   A.   The calls themselves.
22   Q.   They're recorded, right?
23   A.   Correct.
24   Q.   You were asked -- I believe it took up seven transcript
25   pages yesterday -- about how you knew who was on the
```

```
 1   September 28 FaceTime call.  Do you recall that?
 2   A.   Yes.
 3   Q.   And I believe Mr. Kendall called it a phone call but it
 4   was actually a FaceTime?
 5   A.   It was FaceTime, yes.
 6           MR. FRANK:  Could we look at Exhibit 713 for the
 7   witness only, please.
 8   Q.   Do you recognize that, Special Agent?
 9   A.   Yes, I do.
10   Q.   It's a page from an extraction report?
11   A.   Yes.
12   Q.   Could we look at the next page, please.  Do you recognize
13   that?
14   A.   Yes.
15           MR. FRANK:  The government offers 713.
16           THE COURT:  It will be admitted.
17           MR. KELLY:  No objection.
18           (Exhibit 713 admitted into evidence.)
19   Q.   Could we looked at the line marked 172.
20           Do you see there's an outgoing call marked?
21   A.   Yes.
22   Q.   Who is it to?
23   A.   Mamie Wilson.
24   Q.   On the far right, what does it say?
25   A.   FaceTime.
```

12:35 (line 10)
12:36 (line 20)

1    Q.    And how long is the call?

2    A.    33 minutes, 8 seconds.

3    Q.    And what is the date?

4    A.    September 28, 2018.

5    Q.    From this, do you know to a certainty that there was a

6    FaceTime call to Mr. Wilson's daughter at that time?

7    A.    Yes.

8    Q.    You were asked about how you knew who was on that call,

9    because you weren't present for it?

12:36 10   A.    Yes.

11           MR. FRANK:  Can we look at Exhibit 570, please.  This

12    is the exhibit that Mr. Kendall showed you.

13    A.    Yes.

14    Q.    Could we look at the top text.  This is a text from

15    Mr. Wilson to Mr. Singer on September 28?

16    A.    Yes.

17    Q.    That same day?

18    A.    Yes.

19    Q.    What does Mr. Wilson say at the top?

12:37 20   A.    "Heard girls had a good first session.  Can we debrief at

21    some point?"

22    Q.    Does that sound like somebody who was on the call?

23           MR. KENDALL:  Objection, your Honor.

24           THE COURT:  Overruled.

25    A.    No.

```
 1    Q.   Could we look at the transcript for 571, please, back in

 2    the transcript binder.  Do you have that in front of you?

 3    A.   Yes.

 4    Q.   At the very top of the transcript, page 1, line 11,

 5    Mr. Wilson says, "Hey, Rick.  How you doing?"

 6              Mr. Singer responds, "Hey, John.  How are you?"

 7              Then what does Mr. Wilson say?

 8    A.   "Good.  You're feeling better?"

 9    Q.   Now, this is the day after the FaceTime call?

12:38 10   A.   Yes.

11    Q.   Do you recall when Mr. Singer told Mr. Wilson at the

12    government's instruction that he couldn't meet because he

13    wasn't feeling well?

14    A.   Yes.

15    Q.   When was that?

16    A.   September 23.

17    Q.   September 23.  And on this call on September 29,

18    Mr. Wilson asks, "You feeling better?"  Do you see that?

19    A.   Yes.

12:38 20   Q.   Does it sounds like they've talked between those dates?

21              MR. KENDALL:  Objection, your Honor.

22              THE COURT:  Sustained.

23    Q.   Then on the rest of -- the next few lines, Mr. Singer

24    talks about what?

25    A.   The call with his girls, the FaceTime call.
```

```
 1    Q.   And Mr. Wilson's asking questions about it, right?

 2    A.   Yes.

 3    Q.   Does that sound like somebody who was on the call?

 4    A.   No.

 5    Q.   You were asked some questions about Exhibit 13,

 6    Mr. Singer's notes.  And Mr. Kendall asked you --

 7              MR. FRANK:  And if we could just call that up,

 8    Ms. Lewis.  And if you could just enlarge from note No. 2 down

 9    a ways.  No, no, from note No. 2 from the beginning, just up at

12:39 10    the top there.  Thank you.  Exactly.

11    Q.   Now, you see that this note was created on October 1 and

12    then modified, right?

13    A.   Yes.

14    Q.   And the first entry is actually September 29?

15    A.   Yes.

16    Q.   And Mr. Kendall suggested that the note from October 2

17    actually refers to a call on October 1.  Do you see that?

18    A.   Yes.

19    Q.   But there are separate entries for October 1, October 2,

12:39 20    there's an entry for October 3, and then there's an entry for

21    October 4.  Do you see that?

22    A.   Yes.

23    Q.   And under October 1, he describes other calls, correct?

24    A.   Correct.

25    Q.   And the first call he describes was, "Called Laura.
```

1    Update on weekend text and call with John Wilson on side door."

2         Do you see that?

3    A.    Yes.

4    Q.    And that's on October 1, right?

5    A.    Yes.

6    Q.    And then there's an entry for October 2, and that's where

7    he refers to a loud and abrasive call with agents.  Do you see

8    that?

9    A.    Yes.

12:40 10    Q.    Now, Mr. Kendall asked you whether the October 2 entry

11    referred to a call with agents on October 1.  Do you recall

12    that?

13    A.    Yes.

14    Q.    You do recall a call on October 1, correct?

15    A.    Yes.

16    Q.    And on that call, there was also an assistant United

17    States Attorney on the call, correct?

18    A.    Yes.

19    Q.    AUSA Rosen?

12:40 20    A.    Yes.

21    Q.    Was Mr. Wilson's attorney -- I'm sorry.

22         Was Mr. Singer's attorney also on that call?

23    A.    I don't recall if he was on that call.

24    Q.    Okay.  But if he was on that call, there'd be no reason to

25    send him notes -- withdrawn.

```
     1              October 2, there's no reference to an AUSA being on
     2       the call, is there?
     3       A.   No.
     4       Q.   There's no reference to Mr. Singer's attorney being on the
     5       call, correct?
     6       A.   Correct.
     7       Q.   And there would be no reason to send your attorney notes
     8       of a call your attorney was on?
     9       A.   Correct.
12:41 10     Q.   You were asked, and I've asked you a bit today, about
    11       whether there were any references on the consensual calls to
    12       false profiles or falsifying erg times.  Do you recall that?
    13       A.   Yes.
    14              MR. FRANK:  Could we look at Exhibit 561.  We'll wrap
    15       up momentarily.  561 was the transcript of the September 15
    16       call.  I'm not sure that's still in the jurors' binders.  No?
    17       Okay.  We'll use mine.  If I could just have the Elmo back.
    18              If I could just have one moment.
    19       Q.   Now, Special Agent, September 15, 2018, was six days
12:43 20     before you approached Rick Singer, correct?
    21       A.   Correct.
    22       Q.   And on this call, which was intercepted on the Title III,
    23       Mr. Singer couldn't have known you were listening, correct?
    24       A.   Correct.
    25       Q.   And Mr. Wilson couldn't have known you were listening,
```

```
  1    correct?
  2    A.    Correct.
  3    Q.    And you weren't telling Mr. Singer what to say on this
  4    call, were you?
  5    A.    No.
  6    Q.    And you weren't telling Mr. Wilson what to say?
  7    A.    Correct.
  8    Q.    And Mr. Wilson says at line 6, "What sports would be best
  9    for them?  Is crew the best, even, you're talking about the
12:43 10   ivies and stuff like that, or is it not gonna even matter?"
 11             Do you see that?
 12    A.    Yes.
 13    Q.    It's Mr. Wilson who asks whether the sport is not going to
 14    even matter, right?
 15    A.    Correct.
 16    Q.    Just to be clear, they're talking about the side door,
 17    right?
 18    A.    Yes.
 19    Q.    And Mr. Singer responds, "They -- oh, for me?  It doesn't
12:44 20   matter.  I'll make them a sailor or something because of where
 21    you live."  Right?
 22    A.    Yes.
 23    Q.    And then there's some dispute about whether Mr. Wilson
 24    says "That's probably more than I want to go for or whether we
 25    are going to go for."  Right?
```

```
 1    A.   Yes.
 2    Q.   There's no dispute that he said, "Is there a two-for-one
 3    special if you got twins?"  Right?
 4    A.   Correct.
 5    Q.   Does making the girls a sailor or something because of
 6    where you live sound like telling the truth?
 7    A.   No.
 8    Q.   Does making them a sailor or something because of where
 9    you live sound like doing something like lying?
10    MR. KENDALL:  Objection, your Honor.
11    MR. KELLY:  He continues to lead, your Honor.
12    THE COURT:  Sustained.
13    Q.   What does Mr. Wilson say?
14    A.   On --
15    Q.   -- line 13.
16    A.   13?
17    "That's probably more than I want to go for.  Is
18    there a two-for-one special if you've got twins?"
19    Q.   After this call, did Mr. Wilson make two $500,000 payments
20    to the Key Worldwide Foundation?
21    A.   Yes, he did.
22    Q.   Is it fair to say he went for it?
23    A.   Yes.
24    MR. FRANK:  No further questions.
25    THE COURT:  Recross, Mr. Kelly.
```

```
 1              MR. KELLY:  Yes.
 2                 RECROSS-EXAMINATION OF ELIZABETH KEATING
 3    BY MR. KELLY:
 4    Q.    Good afternoon, Agent.
 5    A.    Good afternoon.
 6    Q.    Let's be clear about a couple things first, can we?
 7    You're not Sabrina Abdelaziz's medical doctor, are you?
 8    A.    No.
 9    Q.    You have no idea what her medical history is, do you?
12:46 10   A.    No.
11    Q.    How about this exhibit he just showed you, 549.
12              MR. KELLY:  Can you bring that up, please.
13    Q.    It's a series of photographs that Aziz -- Gamal forwarded
14    to Singer, right?
15    A.    Yes.
16    Q.    And Mr. Frank tried to suggest --
17              MR. KELLY:  Go to the top, please.
18    Q.    -- about the past tense of the words.  Do you remember
19    those questions?
12:47 20   A.    Yes.
21    Q.    Can you look at the date when these photos were sent,
22    August?
23    A.    August 18, 2017.
24    Q.    Right.  That's not basketball season, is it?
25    A.    Generally basketball season is in the winter, correct.
```

```
 1   Q.   Now, he keeps bringing up Donna Heinel.  So let me ask you
 2   a few questions again about her.  Okay?
 3   A.   Yes.
 4   Q.   It's undisputed that she did not start taking money
 5   personally until the summer of 2018, correct?
 6   A.   Correct.
 7   Q.   And it's undisputed that Mr. Abdelaziz's money was sent in
 8   March of 2018, right?
 9   A.   Correct.
10   Q.   So that's -- I don't know even how many months apart, but
11   his money was sent before she started taking money, right?
12   A.   Correct.
13   Q.   July is not March, right?
14   A.   Correct.
15   Q.   And in fact, the invoice that she wrote was on
16   November 1st, right, of 2018?
17   A.   Yes.
18   Q.   All right.  So -- and the day before, Halloween, Singer
19   had told agents, Abdelaziz doesn't know who Heinel is, right?
20   A.   Yes.
21   Q.   Okay.  So this little invoice situation is between Singer
22   and Heinel.  Abdelaziz doesn't even know about it, right?
23   A.   He doesn't know who Donna Heinel is.
24   Q.   Right.  They have a side deal, right?
25             MR. FRANK:  Objection.
```

```
 1              THE COURT:  Sustained.
 2    Q.   Well, they keep talking about a side door.  Doesn't this
 3    appear to be a side door between Singer and Heinel?  Because
 4    this man doesn't even know her, right?
 5              MR. FRANK:  Objection.
 6              THE COURT:  She can answer it if she understands it.
 7    A.   Mr. Abdelaziz did not know Donna Heinel's name.
 8    Mr. Singer and Ms. Heinel allocated his payment to Ms. Heinel
 9    for $20,000 a month.
12:49 10  Q.   And Mr. Frank showed you one e-mail involving Mikaela
11    Sanford.  Do you remember that one he just put up?
12    A.   Yes.
13    Q.   Apparently there were a series of other e-mails involving
14    Mikaela Sanford and Rick Singer he has not shown you, has he?
15    A.   Correct.
16    Q.   Those e-mails did not include my client, Mr. Abdelaziz, on
17    them, did they?
18    A.   No.
19    Q.   And they were right about the time Sanford was submitting
12:50 20  his daughter's application to USC, right?
21    A.   Correct.
22    Q.   So he asked you about whether you knew the term
23    "minimize."  Have you heard the term "hide evidence"?
24              MR. FRANK:  Objection, move to strike.
25              THE COURT:  No, she can answer that.  Overruled.
```

```
 1   A.    Yes.

 2   Q.    So you've testified that with respect to the need to be

 3   more explicit to show the intent, you weren't concerned about

 4   the parents being confused and stumbling into a situation like

 5   this.  You were concerned about the jurors being confused,

 6   right?

 7   A.    The calls and the evidence we had were pretty clear that

 8   the parents were not confused on what their payments were going

 9   in exchange for a recruitment spot.

12:51 10  Q.    Well, Mr. Abdelaziz's conversation in February of 2017,

11   that wasn't recorded, was it?

12   A.    No, it was not.

13   Q.    So you don't know what was said in February 2017 between

14   Singer and Abdelaziz, do you?

15   A.    Correct.

16   Q.    The prosecution team doesn't know either, does it?

17   A.    No.

18   Q.    Mr. Singer knows, doesn't he?

19   A.    Mr. Singer knows.

12:51 20  Q.    And your concern about this confusion, you don't want it

21   to go to the jury, but are you concerned that these four

22   e-mails are not being presented to the jury?

23          MR. FRANK:  Your Honor, I object.

24          THE COURT:  Sustained.

25   Q.    Well, you were asked a series of questions about, you
```

```
  1   know, whether Singer ever talked about a manager -- I'm not

  2   going to get into that, in the interest of time.  I'll cut to

  3   the chase.

  4            You're also aware he sometimes referenced the parents

  5   that their kids would be practice players, right?

  6   A.   I remember him mentioning that one -- two or three times.

  7   Q.   And do you recall him mentioning that to a witness in this

  8   case, Bruce Isackson?

  9   A.   No.

12:52 10           MR. KELLY:  Let's play 607, please, evidence in the

 11   case.

 12            MR. FRANK:  Your Honor, this is well beyond the scope

 13   of redirect.  There was not a single question about it.

 14            THE COURT:  How is this --

 15            MR. KELLY:  It's quick and it's on point because it

 16   was raised in redirect about managers and what Singer said to

 17   parents.

 18            MR. FRANK:  I didn't ask about it.

 19            MR. KELLY:  It's evidence in the case already.  I'm

12:53 20   not asking to admit it.

 21            THE COURT:  You can have it.

 22            MR. KELLY:  Exhibit 607.  Play it, please.  Page 68,

 23   line 22.

 24            THE COURT:  What is it, Mr. Kelly, just for the

 25   record?
```

A2417

1          MR. KELLY:  It's a tape and corresponding transcript

2     of Mr. Isackson's discussions with Singer, page 68, line 22,

3     through page 70 through line 18.  We'll play it real quick.

4          (Audio recording played.)

5     Q.   All right.  So that is consistent with your general

6     understanding that he sometimes told people their kids could be

7     practice players, right?

8     A.   Yes.

9     Q.   And there are other messages he left with parents.

12:55 10          Are you familiar with one where he told a parent

11    whose kid wanted to go to Stanford, "We'd love to have him be a

12    practice player for us"?

13    A.   I don't recall that specifically.

14    Q.   Let me show you, witness only, Exhibit 1452, please.

15          MR. FRANK:  Objection to other parents, your Honor.

16          MR. KELLY:  The transcript only.

17          We've had lots of evidence what happened with other

18    parents in this case, your Honor.  I think I'm trying to rebut

19    some of the things that were suggested.

12:55 20          MR. FRANK:  Your Honor, this is not appropriate.

21          THE COURT:  This is not in evidence, right?

22          MR. KELLY:  No.  I'm just showing the witness to

23    refresh her recollection and then I'll move on.

24          MR. FRANK:  We object, your Honor.

25          THE COURT:  Overruled.

```
 1   Q.   Please read that to yourself, Agent, where Singer starts

 2   talking.

 3   A.   I see what it says.  I don't recall this.

 4   Q.   It doesn't jog your memory at all as to whether Singer

 5   would ever tell a Stanford-bound parent that his kid would be a

 6   practice player?

 7           MR. FRANK:  Object, your Honor.  This is very

 8   misleading.

 9           THE COURT:  Well, if it refreshes her memory, she can

10   say it does.  If it doesn't, it doesn't.

11   A.   I don't recall this.

12           MR. KELLY:  Okay.  Put it down, please.

13   Q.   Mr. Frank asked you a bunch about Singer's iPhone notes,

14   right, Exhibit 13?

15   A.   Yes.

16   Q.   I'm not going to get all into that again.  But you're

17   aware there were other notes, right, by Singer?

18   A.   Can you be more specific?

19   Q.   On that iPhone.

20   A.   I'm aware the notes --

21   Q.   Are you aware of the notes where he says, "I am a liar,

22   face it.  Let's not lie today.  Let's go back and stop lying

23   for a day"?

24   A.   I don't recall that.

25           MR. KELLY:  Let me show you Exhibit 1474B, please,
```

```
 1   witness only.
 2   Q.    Please read that to yourself.
 3         MR. KELLY:  And, Mr. Carter, if you could highlight
 4   the fourth line down.  And then the seventh line down -- eighth
 5   maybe.  Keep going.  There you go.
 6   A.    I don't recall seeing this.
 7   Q.    Does it appear also to be coming from his iPhone?
 8   A.    Yes.
 9         MR. KELLY:  All right.  Stipulate that it's authentic,
12:57 10  your Honor.  We're offering it into evidence now.
11         MR. FRANK:  Your Honor, it is well outside the scope
12   of even the cross in this case.
13         THE COURT:  The objection is sustained.
14   Q.    No dispute saying he was a big liar?
15   A.    He's lied to us, yes.
16   Q.    He's lied to a lot of people, hasn't he?
17   A.    Yes.
18   Q.    Now, you were very specific in your response as to it
19   being a 50-minute ride from Macao to Hong Kong.  You were on
12:58 20  cross-examination yesterday and you remained on
21   cross-examination this morning.
22         In between yesterday and this morning, did you confer
23   with government counsel at all?
24   A.    No.
25   Q.    Okay.  So you just happen to know it's a 50-minute ride
```

|  | between Macao and Hong Kong? |
|---|---|
| 1 | between Macao and Hong Kong? |
| 2 | A.   Yes. |
| 3 | Q.   Have you ever lived in Asia? |
| 4 | A.   No. |
| 5 | Q.   Okay.  Do you know anything about the fact that sometimes |
| 6 | Division One women's basketball programs do use practice |
| 7 | players? |
| 8 | A.   I'm aware that some -- |
| 9 | Q.   Some do, right? |

```
 1   between Macao and Hong Kong?
 2   A.   Yes.
 3   Q.   Have you ever lived in Asia?
 4   A.   No.
 5   Q.   Okay.  Do you know anything about the fact that sometimes
 6   Division One women's basketball programs do use practice
 7   players?
 8   A.   I'm aware that some --
 9   Q.   Some do, right?
12:58 10   A.   Some do, yes.
11   Q.   Some even use men, right?
12   A.   Yes.
13   Q.   But to somebody who doesn't know anything about
14   basketball, that may not be obvious, right?
15        MR. FRANK:  Objection to what would be obvious to
16   someone who doesn't know.
17        MR. KELLY:  Strike that.
18   Q.   You've investigated this case, right?
19   A.   Yes.
12:59 20   Q.   So you know that some of the programs use practice
21   players.  Right?  Or was that just from general sports
22   knowledge?
23   A.   General knowledge, yes.
24   Q.   Okay.  But not everyone has the same general sports
25   knowledge as you do.  Is that a fair statement?
```

```
 1    A.   Yes.

 2    Q.   And let me see, Mr. Frank asked you about something

 3    Abdelaziz said in his transcript.  He highlighted where he

 4    said, "I love it."  Do you remember where he asked you that, "I

 5    love it"?

 6    A.   Yes.

 7    Q.   Have you ever talked to Mr. Abdelaziz?  You never have,

 8    right?

 9    A.   No.

10    Q.   Are you aware he says "I love it" about ten times a day?

11         MR. FRANK:  Objection.

12         THE COURT:  Overruled.

13    A.   I'm not aware of that.

14    Q.   People do have favorite expressions, and that appears to

15    be one of his.  Are you aware of that?

16         MR. FRANK:  Objection.  Counsel is testifying.

17         THE COURT:  Sustained.

18         MR. KELLY:  One moment, your Honor.

19         I'm going to show the witness only, lastly, just four

20    exhibits.

21    Q.   I want you to look at them again, please, and advise

22    whether it refreshes your recollection as to whether or not

23    you've seen them or not.

24         MR. FRANK:  Your Honor, we've been over this ad

25    nauseam.
```

```
 1            MR. KELLY:  It involves Mikaela Sanford.  He raised it

 2    on redirect.  I'm just seeing if it refreshes her recollection.

 3            MR. FRANK:  I did not raise it on redirect.

 4            MR. KELLY:  He raised the subject of Mikaela Sanford

 5    with 549, which is -- it's to her, it's in evidence --

 6            THE COURT:  He can show the witness the four exhibits

 7    again and ask if they refresh her memory.

 8            MR. KELLY:  So please start with 1540.  And then show

 9    her 1541, please.  And show her 1254, please.  And show her

01:01 10    1255.

11    Q.   Now, having seen those four exhibits, does that refresh

12    your recollection as to whether or not you've ever seen them

13    before today? -- or yesterday, I should say.

14    A.   Yes, I've seen these.

15    Q.   You have?

16    A.   Yes.

17            MR. KELLY:  We move to admit, your Honor.

18            MR. FRANK:  Objection for the same --

19            THE COURT:  Objection sustained.

01:02 20    Q.   Do you know what they are?

21            MR. FRANK:  Objection.

22    A.   They're --

23            THE COURT:  Well, the answer is yes or no.

24    A.   They're e-mails, yes.

25            THE COURT:  No, no.  The answer is yes or no.  Do you
```

```
 1   know what they are?

 2           THE WITNESS:  Yes.

 3   Q.   What are they?

 4           MR. FRANK:  Objection.

 5           THE COURT:  Sustained.

 6           MR. KELLY:  No further questions, your Honor.

 7           THE COURT:  All right.  Before we have Mr. Kendall's

 8   recross, we're going to break for lunch.

 9           You may step down, Ms. Keating.

10           We'll be recessed for one hour.  I'll see you back

11   here at 2:00.

12           THE CLERK:  All rise for the jury.

13           (Jury exits.)

14           THE COURT:  Be seated, counsel.  Mr. Kendall.

15           MR. KENDALL:  Your Honor, I'm going to need some time

16   for recross-examination.  Mr. Frank took an hour and fifteen

17   minutes.  I'll take less than that, but I can't --

18           THE COURT:  I actually had an hour and five minutes.

19           MR. KENDALL:  I'll take less than an hour and five,

20   your Honor, I promise you that.  But how much less, I've got to

21   put it together and see what I've got to do.

22           MR. KELLY:  I suspect for the witness who is the

23   basketball coach, it's going to be a quick witness, your Honor.

24   I don't anticipate extensive cross.

25           MR. KENDALL:  I don't object to putting them out of
```

(Line markers: 01:02 at line 10; 01:03 at line 20)

1  order, if that's a courtesy to them.  But I feel like I'm sort

2  of being squeezed here by the government.

3         THE COURT:  Mr. Frank, do you want to put the shorter

4  of the two -- I can't remember what her name was -- on and off?

5         MR. FRANK:  We do not, your Honor, and I am not

6  squeezing anyone.  Mr. Kendall has had ample time for his

7  examinations.

8         THE COURT:  Okay.  So you think you're going to take

9  the afternoon, which is about an hour and a half?

01:04 10      MR. KENDALL:  I don't think I'm going to take the full

11  afternoon, but I'm going to take --

12         THE COURT:  All right.  You'll be prepared to put on a

13  witness if we conclude?

14         MR. FRANK:  We are.  And the issue is Ms. Janke's

15  testimony is longer.

16         THE COURT:  What about the short one, the shorter of

17  the two witnesses?

18         MR. FRANK:  Her testimony is short.

19         THE COURT:  Fifteen minutes, I thought you said.

01:04 20      MR. FRANK:  15, 20.

21         THE COURT:  And the cross?

22         MR. KELLY:  Five.

23         MR. KENDALL:  Nothing for me, your Honor.

24         THE COURT:  All right.  Why don't we put her on after

25  we get through with Ms. Keating and at least she can go back to

```
 1   California.
 2           MR. FRANK:  Yes, your Honor.
 3           THE COURT:  All right.  Anything else from your side
 4   before we recess?  Because I have one thing I want to ask you.
 5           MR. KENDALL:  Nothing, your Honor.
 6           THE COURT:  I want to tell the jury where we are.  And
 7   I am inclined to tell them that I believe the government will
 8   rest next week and the defendants will rest the week after
 9   that.  Is there any reason why I can't say that?
10           MR. KENDALL:  I'd put it a little differently, your
11   Honor.  Could you tell them that you think the case will go the
12   week after next?  We're planning to put on a case, but until he
13   rests, we're not going to make the final decision on how long.
14           THE COURT:  Okay.  All I want to tell them,
15   Mr. Kendall, is that the government is going to rest next week
16   and that the defendants will rest no later than the following
17   week; that is, by October -- whatever the Friday is -- 8th.
18           MR. KENDALL:  That's the point, your Honor.  I'd ask
19   the Court just tell them it expects the case will go to about
20   October 8th and not say whether we're putting on a case or not.
21   We're not going to make that final decision until they rest.
22           THE COURT:  All right.  I'll say I expect the
23   government to rest next week and the case to be completed by
24   the following Friday.
25           MR. KENDALL:  That's, again, telling them that there's
```

```
 1    likely to be a defense case.  Why do we have to say when the
 2    government's going to rest?  Can't we just say that the case
 3    should be completed by around October 8th and nothing else?
 4              THE COURT:  Yes, we can say that.
 5              MR. KENDALL:  I'd request that, if it's okay with the
 6    Court.
 7              THE COURT:  Any problem with that from the
 8    government's side?
 9              MR. FRANK:  No, your Honor.
01:06 10              THE COURT:  All right.  That's what I intend to tell
11    them at the end of this session, that this case is going to be
12    completed two weeks from today.
13              MR. KENDALL:  Thank you, your Honor.
14              THE COURT:  All right.  We're in recess until 2:00.
15              (Recess taken 1:07 p.m. to 2:06 p.m.)
16              THE CLERK:  Court is now in session.
17              THE COURT:  Good morning -- rather, good afternoon,
18    jurors.  We're ready to resume.
19              Miss Keating, again, you're reminded that you remain
02:06 20    under oath.
21              Mr. Kendall, you may conduct recross examination.
22              MR. KENDALL:  Thank you, your Honor.
23                 RECROSS-EXAMINATION OF ELIZABETH KEATING
24    BY MR. KENDALL:
25    Q.   Could we have Exhibit 710, which is already in evidence.
```

|         |    |                                                                     |
|---------|----|---------------------------------------------------------------------|
|         | 1  | I'm going to show you a document that Mr. Frank showed you when      |
|         | 2  | he was asking you questions just before the break.  Do you see       |
|         | 3  | this e-mail from John Wilson to Rick Singer and a CC to Debbie       |
|         | 4  | Rogers?                                                              |
|         | 5  | A.   Yes.  I see that.                                               |
|         | 6  | Q.   You know Debbie Rogers is Mr. Wilson's bookkeeper and           |
|         | 7  | office manager for Hyannis Port Capital?                             |
|         | 8  | A.   Yes.                                                            |
|         | 9  | Q.   HPC?                                                            |
| 02:07   | 10 |      I'd like to go down to the bottom e-mail.  It's                 |
|         | 11 | March 1, 2014.  And he says, "Rick, thanks again for making          |
|         | 12 | this happen!"  That's his son's admission to USC, correct?           |
|         | 13 | A.   Yes.                                                            |
|         | 14 | Q.   "Please give me the invoice".  Would you agree with me          |
|         | 15 | when companies write checks and issue money, they typically          |
|         | 16 | have an invoice for it, correct?                                     |
|         | 17 | A.   Companies give invoices, yes.                                   |
|         | 18 | Q.   Okay.  "What are the options for payment?  Can we make it       |
|         | 19 | for consulting or whatever".  He says whatever -- he says            |
| 02:08   | 20 | consulting or whatever.  He doesn't care what it's called,           |
|         | 21 | correct?                                                             |
|         | 22 |      MR. FRANK:  Objection to what he cares about.                   |
|         | 23 |      THE COURT:  Sustained.                                          |
|         | 24 | Q.   He lets Mr. Singer have complete discretion what to call        |
|         | 25 | it, consulting or whatever, correct?                                 |

1              MR. FRANK:  Objection.

2              THE COURT:  Sustained.

3    Q.   He writes "consulting or whatever", correct?

4    A.   Correct.

5    Q.   "From The Key so that I can pay it from the corporate

6    account".

7              Now, in the course of your work in this case, you

8    know the Key is a -- excuse me.  Not the Key.  You know that

9    HPC is a sub S corporation, correct?

02:08 10    A.   Yes.

11    Q.   And the $100,000 that was paid to the for-profit business

12    that Mr. Singer had is 100,000 that went directly to USC,

13    correct?

14    A.   Yes.

15    Q.   And a few months later the thank you note for the

16    charitable deduction came, correct?

17    A.   Yes.

18    Q.   And you would agree with me a sub S corporation is

19    sometimes called a disregarded entity, correct?

02:09 20    A.   Yes.

21    Q.   Also called a flow-through entity, correct?

22    A.   Yes.

23    Q.   Because with a sub S corporation, there's no federal

24    corporate income tax on the sub S, correct?

25    A.   Correct.

```
 1   Q.   That's different than a sub C corporation, which does pay
 2   corporate income taxes, correct?
 3   A.   Correct.
 4   Q.   And so by paying this out of the sub S corporation, it
 5   means any charitable deductions should be reported on
 6   Mr. Wilson's personal return on the Schedule A, correct?
 7            MR. FRANK:  Objection.
 8            THE COURT:  Grounds?
 9            MR. FRANK:  What should happen.
10            THE COURT:  Okay.  Yeah.  That part is objectionable.
11   The rest of it is not.
12   Q.   You would agree with me, the Schedule A on the personal
13   return has a place to put charitable contributions, correct?
14   A.   Yes.
15   Q.   So if a sub S corporation writes a donation for $100,000
16   to USC, it's going to show up on his personal return, not any
17   corporate return at the end of the day, correct?
18   A.   Yes.  It flows through to his personal return.
19   Q.   And let me correct that.  It will show up on the sub S
20   return, but the tax consequences are taken out on his personal
21   return, correct?
22   A.   Correct.
23   Q.   So if for some reason you reduce the income on the sub S
24   corporate return as a business expense or as a charitable
25   contribution, either way the same amount is going to come out
```

02:09 (line 10)
02:10 (line 20)

```
 1   on the personal return and reducing the income by the same

 2   amount, correct?

 3           MR. FRANK:  Objection to the hypothetical, and it's

 4   beyond the scope of the redirect.

 5           THE COURT:  Well, if she understands, she can answer

 6   it.

 7   A.   Can you rephrase the question?

 8   Q.   If you treat something as a business expense in a sub S

 9   corporation, it's going to reduce the owner's taxable income

10   by, let's say, $100,000, correct?

11   A.   Yes.

12   Q.   If the person treated that as a charitable contribution on

13   the Schedule A, it also would reduce their personal taxable

14   income by $100,000, correct?

15           MR. FRANK:  Objection.  Misstates.

16           THE COURT:  She can answer it.  It's a hypothetical

17   question, but she can answer it.

18   A.   It depends on some factors in it, how much income he has.

19   Some Schedule A deductions are limited based on your AGI.

20   Q.   Okay.  There might be some slight difference on the

21   computation, but both have the same impact of reducing income

22   by $100,000 somewhere in the computation, correct?

23           MR. FRANK:  Objection to the testifying of what the

24   impact would be.

25           THE COURT:  Overruled.
```

02:10 (line 10)
02:11 (line 20)

**A2431**

```
 1   A.    There's many factors.  It doesn't just come straight out

 2   of a -- it wouldn't just be straight out of $100,000.  There

 3   are other factors.  There's a -- you can deduct charitable

 4   contributions that you take on an S corp.

 5   Q.    Okay.  And, in fact, in your investigation of the

 6   financial transactions, you're aware that in 2014 most of his

 7   cash was in the sub S corporation, wasn't it?

 8   A.    I didn't investigate Mr. Wilson's tax return.  That was

 9   another Special Agent, so I am not familiar with what was on

10   his tax returns.

11   Q.    You're not aware that two million out of the three million

12   cash he had was in the sub S corporation in 2014?

13             MR. FRANK:  Objection.  Asked and answered.

14             THE COURT:  Overruled.

15   A.    No.

16   Q.    Okay.  Next I'd like to go to the term "side door" and

17   "back door".  Do you remember there was discussion Mr. Singer

18   had with Mr. Wilson about Mr. Wilson's friend whose daughter

19   wanted to go to Brown?

20   A.    Yes.

21   Q.    And Mr. Singer gave his whole talk about his knowledge of

22   how to deal with the president of Brown and go in and make a

23   back-door donation, correct?

24   A.    I don't know if he used the word "back door", but he was

25   speaking -- telling Mr. Wilson that his friend should talk to
```

```
 1    someone.
 2    Q.    To go speak to the president?
 3    A.    Speak to the president, yes.
 4    Q.    "She's a good gal" is what Mr. Singer said, correct?
 5    A.    Correct.
 6    Q.    As if he knew her, correct?
 7    A.    That's what he said.
 8    Q.    And he talks about he could go in, discuss with the
 9    president, maybe even offer to make some business lectures or
10    some business programs at the school to really be part of the
11    school, correct?
12    A.    That's what Mr. Singer said, correct.
13    Q.    And it's being done with the president so it's not being
14    hidden from the school, correct?
15              MR. FRANK:  Objection.
16              THE COURT:  Sustained.
17    Q.   He talks about disclosing it to the president of the
18    university, correct?
19    A.   He talks about having the friend meet with the president
20    of the university.
21    Q.   And the president of the university is the single highest
22    person in university administration, correct?
23    A.    Correct.
24    Q.    Okay.  And so at the end of that conversation, Mr. Wilson
25    says, well, he doesn't want his daughter to get embarrassed.
```

```
 1    Do you remember that in the tape?

 2    A.   I don't recall embarrassed, but he didn't want his

 3    daughter to know.

 4    Q.   She said, daddy, don't get involved, and he didn't want

 5    the daughter to know that he was trying to do something to help

 6    his daughter.

 7         MR. FRANK:  Objection.

 8    Q.   And that's when Mr. Singer says, well, that's when you may

 9    have to come to me and go through me, correct?

10    A.   Correct.

11    Q.   So he's treating the side door and the back door as

12    basically the same except the side door lets you hide it from

13    your child, correct?

14         MR. FRANK:  Objection to what he's doing.

15         THE COURT:  Sustained.

16    Q.   He immediately tells someone to move from making a

17    contribution through the president to working with Mr. Singer

18    only when it's raised that he wants to hide it from his

19    daughter, correct?

20    A.   In that phone call?

21    Q.   Yes.

22    A.   Yes.

23    Q.   Okay.  You're not aware of any communication where

24    Mr. Singer ever said, you know, the side door is not like the

25    back door, it's not legitimate, it's not accepted?  You never
```

```
 1    heard anything where he distinguished and said, the side door

 2    was a scheme and the back door was something acceptable,

 3    correct?

 4    A.    Not in that explicit language.

 5    Q.    And, in fact, you've used the word side-door scheme,

 6    side-door scheme.  You've never heard Mr. Singer ever use the

 7    word "scheme" when he was talking to Mr. Wilson, do you?

 8    A.    No.

 9    Q.    Okay.  And you know every time he talked about the back

02:15 10    door he said the people would get help with admissions if they

11    did a back door donation, correct?

12          MR. FRANK:  Objection to what he did every time.

13          THE COURT:  Sustained.

14    Q.    You heard him refer to the back door donation as something

15    that would get you help with admissions, correct?

16          MR. FRANK:  Objection.  In what context?

17          MR. KENDALL:  Any context.

18          THE COURT:  It's unclear.

19    Q.    Okay.  You heard Mr. Singer describing the conversation

02:16 20    with the president of Brown and making a donation as part of it

21    is to get help with admissions, correct?  That's the whole

22    point of him going to see the president of Brown, is to make a

23    donation and help his daughter get in, correct?

24          MR. FRANK:  Objection to what the point is.

25          THE COURT:  Sustained.
```

```
 1   Q.   Okay.  That's part of the conversation of why he's

 2   suggesting that the friend go to the president of Brown

 3   University and make a donation, to help his daughter get

 4   admitted to Brown, correct?

 5   A.   That was one point.  He also mentioned about helping with

 6   the school.

 7   Q.   Yes, but one point was to get help to get his daughter

 8   admitted, correct?

 9   A.   Yes.

10   Q.   That's the same quid pro quo for a back door as there is

11   with a side door, correct?

12        MR. FRANK:  Objection.  Misstates.

13        THE COURT:  Sustained.

14   Q.   He's getting help for admissions in return for giving a

15   donation.  That's what he says about the Brown situation,

16   correct?

17   A.   Not that explicit, saying that he could talk to the

18   president and they could -- he could talk with the president

19   about doing things with the school.

20   Q.   And making a donation?

21   A.   And making a donation.

22   Q.   And that would help get his daughter in?

23        MR. FRANK:  Objection.  That's not what he said.

24        THE COURT:  Sustained.

25   Q.   Okay.  Did you ever hear Mr. Singer ever discuss a back
```

```
 1  door?
 2  A.   He's mentioned --
 3  Q.   Just yes or no, did you ever --
 4         MR. FRANK:  Objection, your Honor.  If it wasn't with
 5  this defendant, I don't see the relevance.
 6         THE COURT:  Well, she can answer the question.
 7  A.   Sorry.  Can you repeat the question, please?
 8  Q.   Did you ever hear Mr. Singer discuss the back door
 9  donations?
10  A.   Yes.
11  Q.   Okay.  And in it, he would describe people as getting
12  admissions benefits for large donations to schools, correct?
13         MR. FRANK:  Objection.
14         THE COURT:  If you're -- no.  Overruled.
15  A.   Yes.
16  Q.   Okay.  And in return for this large donation, you would
17  get that level of help with admissions, correct?
18         MR. FRANK:  Objection.  This is so vague as to be.
19         THE COURT:  Yeah.  That's a vague question.
20  Sustained.
21  Q.   The whole point being one of the benefits of a back door
22  donation was to get help with admissions for more than
23  one person in the family, correct?
24         MR. FRANK:  Objection.
25         THE COURT:  Overruled.
```

02:17 (line 10)
02:18 (line 20)

```
 1   A.   I don't recall more than one person in the family.

 2   Q.   At least one person?

 3   A.   Mr. Singer in some calls suggested that it would cost 40

 4   to $50 million to go and do the back door to get someone in at

 5   some of the schools.

 6   Q.   Okay.  And so they're getting a this-for-that with a back

 7   door donation?  They're getting admissions help in return for

 8   the back door donation, correct?

 9            MR. FRANK:  Objection.

10            THE COURT:  Overruled.

11   A.   Mr. Singer is saying that, but there's a difference

12   between --

13   Q.   I'm not asking the difference.  That's what he said.  I'm

14   just asking what he said, not your explanation of what it

15   means.

16            MR. FRANK:  Actually, he did say what it means, and

17   she's trying to answer the question.

18            THE COURT:  All right.  Let her finish the answer and

19   then go on.

20   A.   There's a difference between making the donation the back

21   door, which was just donating to the school in hopes of getting

22   the children in, as compared with the side door, which is

23   making a payment to a program in exchange for a child being a

24   recruited athlete.

25   Q.   Well, he didn't always restrict the side door to being a
```

A2438

```
 1   recruited athlete, did he?

 2   A.   Can you be specific, please?

 3   Q.   Well, he said -- didn't he just describe the side door as

 4   how they fund their special programs?

 5   A.   I don't recall specifically.

 6          MR. KENDALL:  Can we have Exhibit 1043, please, just

 7   for the witness.

 8   Q.   Do you recognize this as an e-mail?

 9          MR. FRANK:  Your Honor, it's redacted.  We have no

10   idea what this is.

11          MR. KENDALL:  I'll give you the name if you want.

12   It's not a person whose in this case.

13          MR. FRANK:  Well, then it's irrelevant.  Objection.

14          THE COURT:  Are you showing it to her to refresh her

15   memory?

16          MR. KENDALL:  I'm going to start with that, your

17   Honor.

18          THE COURT:  I'm sorry?

19   Q.   Does that refresh your memory that Mr. Singer would tell

20   people he would define the term "side door" as a way that is

21   not improper and how schools fund their special programs?

22          MR. FRANK:  I object, your Honor.  What he told

23   people.

24          THE COURT:  She can be shown the document to refresh

25   her memory.  Then take the document down and see if it does.
```

```
 1            MR. KENDALL:  Okay.  If we can take it down.
 2   Q.   Does that refresh your memory that Mr. Singer would tell
 3   people that the side door was an appropriate way to fund
 4   special programs at schools?
 5   A.   No, it doesn't.
 6            MR. KENDALL:  Okay.  Your Honor, I'd like to offer
 7   Exhibit 1043 into evidence.  It's subject to an authenticity
 8   stipulation.
 9            MR. FRANK:  Objection, your Honor.
10            THE COURT:  Sustained.
11   Q.   Okay.  Nowhere in any of these tapes does Mr. Singer
12   actually define what a side door is, correct?  He never said a
13   side door does this and it does that and it does this.  He
14   talks about a side door, but he doesn't give a specific
15   definition, a side door has the following components or
16   elements, correct?
17   A.   He explains that he has a side door and he has people in
18   schools that will --
19   Q.   That got in through side doors?
20   A.   He explains the difference between side doors and -- I
21   guess -- can you repeat that?  I don't understand.
22   Q.   You don't know how Mr. Singer defined a side door to John
23   Wilson, do you?
24   A.   I do not.
25   Q.   At no time during the three months when you were having
```

```
 1    these consensual calls did you ever tell Mr. Singer, I want you
 2    to go in and tell Wilson that the side door requires deception,
 3    it requires fraud, and it's not approved by the university
 4    administration?  At no time did you say that in maybe more
 5    subtle terms -- no.  Strike that.
 6              At no time did you say that in explicit terms,
 7    correct?
 8    A.   Not explicitly, correct.
 9    Q.   Okay.  And you recall at those January tapes Mr. Singer
02:22 10    told Wilson that if the development office knew about his
11    side-door donation to athletics, they would solicit him for
12    more money?  Do you remember that?
13    A.   That is what Mr. Singer said.
14    Q.   You never instructed Singer to say, don't tell them
15    because if they find you did a side-door donation, they'll run
16    from you and think you're a terrible person?  You never told
17    him to say something like that, correct?
18    A.   No.  We never told him to say that.
19    Q.   You let him pick his own words and his own words were,
02:23 20    if -- one, if they heard you made a side-door donation to
21    athletics, they're going to want to do business with you and
22    get even more donations, correct?
23              MR. FRANK:  Objection.
24              THE COURT:  Sustained.
25              MR. FRANK:  This wildly misstates.
```

```
 1   Q.   Okay.  He stated in there that if the development office

 2   finds out you made a side-door donation to athletics --

 3           MR. FRANK:  Objection.  That's not what he said.

 4           THE COURT:  He hasn't finished the question.

 5   Q.   You've never told him to -- you never told Mr. Singer to

 6   tell Mr. Wilson that if people hear you did a side-door

 7   donation, they'll think you did something improper or illegal?

 8   You never instructed Mr. Singer to tell Mr. Wilson that,

 9   correct?

10   A.   Not as explicit language.

11   Q.   I want to now turn to the September 28th Facetime call.

12   That's the call that Mr. Singer made to Mamie Wilson's phone of

13   33, 34 minutes.  All the agents are out to lunch when

14   Mr. Singer makes that call without anybody supervising or

15   monitoring, correct?

16   A.   Correct.

17   Q.   Okay.  You don't know who was on that call, correct?

18   A.   I was not present for the call.

19   Q.   So does that mean you do not know who was on the call?

20   A.   He made a call to Mamie Wilson.

21   Q.   He made a call to Mamie Wilson's phone.  You don't know

22   who was in the room when the call was taken, do you?

23   A.   Based on the --

24   Q.   Do you know -- are you a witness?  Do you have personal

25   knowledge of who was in the room when that call was received in
```

| | |
|---|---|
| 1 | the Wilson household? |
| 2 | A.   I was not in the room when that call was received. |
| 3 | Q.   And you were not on the other end of the call to hear who |
| 4 | was speaking? |
| 5 | A.   Correct. |
| 6 | Q.   And you don't know if Mr. Wilson was on that call for |
| 7 | one minute or five minutes or longer, do you? |
| 8 | MR. FRANK:  Or at all.  Objection, your Honor. |
| 9 | THE COURT:  She can answer the question. |
| 02:24 10 | Q.   You don't know if he was on that call for one minute or |
| 11 | five minutes or some other time, correct? |
| 12 | A.   He was not on that call. |
| 13 | Q.   Were you on the call? |
| 14 | A.   No, but based on his -- |
| 15 | Q.   I'm not asking what your -- |
| 16 | A.   Based on the recorded conversation, he was not on that |
| 17 | call on the conversation on the 29th. |
| 18 | MR. KENDALL:  Your Honor, I move to strike.  I'm |
| 19 | asking for her personal knowledge. |
| 02:25 20 | THE COURT:  Well, she is entitled to answer a |
| 21 | question. |
| 22 | Q.   Okay.  Did you hear any of the voices that were on that |
| 23 | call? |
| 24 | A.   No. |
| 25 | Q.   So you're making your interpretation of a transcript of a |

 1    different day's call, correct?

 2    A.    And -- and the text messages.

 3    Q.    Okay.  So you're interpreting documents about something

 4    you did not observe because you had gone to lunch and you

 5    didn't supervise Singer, correct?

 6    A.    I'm basing it on other evidence, yes.

 7    Q.    Okay.  Six people there from the Boston investigation team

 8    and they all go to lunch and let Singer make a call unescorted,

 9    correct?

02:25 10    A.    He made a call with Mr. Wilson's daughters because, as

11    evidence showed, they were not involved in the side-door

12    scheme.

13    Q.    Okay.  You made a -- you allowed Mr. Singer to make a call

14    unsupervised while the six of you went to lunch?  Yes or no?

15    A.    He made a call while we went to lunch, yes.

16    Q.    Okay.  Now, you made some discussion about quid pro quo

17    and this-for-that.  Do you understand that there is a

18    difference between giving a coach money to put in their pocket

19    and giving a donation to a school program?

02:26 20    A.    Yes.

21    Q.    And you know, for example, Rudy Meredith got paid money by

22    Mr. Singer to put in his pocket that he used to build a home

23    down in Florida, correct?

24    A.    Correct.

25    Q.    Okay.  And you also know that the Yale Development Office

```
  1    told Mr. Meredith to put donors' kids on the roster --
  2              MR. FRANK:  Objection.
  3              THE COURT:  Sustained.
  4    Q.   -- and he didn't get any money?
  5              MR. KENDALL:  Your Honor, they specifically asked
  6    about her knowledge about college fundraising in the redirect.
  7    They opened the door.
  8              MR. FRANK:  That is not true.
  9              THE COURT:  The objection is sustained.
02:27 10    Q.   You made some comments about the use of the words
 11    "payment", "donation", and "contribution".  Do you remember
 12    that with Mr. Frank asking you questions?
 13    A.   Yes.
 14    Q.   People can make a payment for a variety of reasons,
 15    correct?
 16    A.   Correct.
 17    Q.   You can make a payment to pay your taxes, correct?
 18    A.   Correct.
 19    Q.   You can make a payment to fulfill a pledge you've made to
02:27 20    a charity, correct?
 21    A.   A payment for a charity as a donation, yes.
 22    Q.   Yes.  I mean, a payment just means one person is
 23    transferring funds to another recipient, correct?
 24    A.   Yes, a payment is --
 25    Q.   So when a person says they are making a payment, they can
```

1    be doing it for perfectly appropriate and legal reasons,

2    correct?

3    A.    Correct.  When a payment is made it could be for

4    legitimate reasons.

5    Q.    Okay.  And do you know that the e-mails the government has

6    and Mr. Wilson's tax papers and others show that he and his

7    bookkeeper routinely used the word "payment" for charitable

8    contributions?

9            MR. FRANK:  Objection.  Facts not in evidence.

02:28 10           THE COURT:  Overruled.

11   A.    I'm not aware.

12   Q.    So you're testifying on the use of the word "payment"

13   versus "contribution", and you haven't even looked at the tax

14   preparer's records that were the basis of the return at issue

15   in this case, correct?

16   A.    I was not the agent responsible for investigating

17   Mr. Wilson's tax crimes.

18   Q.    You were the IRS agent on the case, correct?

19   A.    Yes, but there was another IRS agent that assisted

02:28 20  investigating numerous parents' tax returns.

21   Q.    And so -- but for Mr. Wilson, you did not review any of

22   the tax preparers' papers, correct?

23   A.    I did not.

24   Q.    But yet you're giving testimony on the difference between

25   "payment" and "contribution" and "donation", correct?

```
 1              MR. FRANK:  She's not actually.  She read words on the
 2      on a paper.
 3              THE COURT:  Overruled.
 4      A.   I answered the question that Mr. Frank asked about payment
 5      and donation.
 6      Q.   Do you think it would have been better preparation for you
 7      if -- strike that.
 8              Mr. Frank did not show you the Wilson tax papers using
 9      the words "donation" and "payment" in the same transaction, did
02:29 10    he?
11      A.   I did not see those.
12      Q.   Okay.  And he didn't pick them out and give them to you,
13      correct?
14      A.   No.
15      Q.   Now, you also testified in redirect about the hundreds of
16      pages of interview notes that the agents took of the things
17      that Mr. Singer said to them, correct?
18      A.   Yes.
19      Q.   But just to clarify, none of those notes have anything of
02:29 20    what the agents said to Mr. Singer, correct?
21      A.   No.  We did not document our operational communication
22      with Mr. Singer, correct.
23      Q.   You say "operational".  You didn't document what you told
24      Mr. Singer about what to say to Mr. Wilson, correct?
25      A.   We did not document that.  We documented substantial
```

```
 1    comments that Mr. Singer made to us as part of the interview

 2    process.

 3    Q.   But you -- and so it's basically a one-way mirror.  It

 4    shows what he said to you, but not what you said to him,

 5    correct?

 6    A.   We were collecting evidence and we documented the

 7    substance that Mr. Singer told us about different people and

 8    about his schemes.

 9    Q.   Could you answer my question, please?

10         MR. FRANK:  Objection, your Honor.  She just did.

11         THE COURT:  Yeah.  Sustained.

12    Q.   It shows what he said to you, nothing of what you said to

13    him, correct?

14    A.   I did not write down what I said to Mr. Singer.

15    Q.   Okay.  The only person who purports to have done that is

16    Mr. Singer in Exhibit 13, correct?

17         MR. FRANK:  Objection to what Mr. Singer purports.

18         THE COURT:  Sustained.

19    Q.   But even when you say that you wrote down what Mr. Singer

20    told you, you didn't write down everything, correct?

21    A.   Can you be specific?

22    Q.   Yes.  He told you on multiple occasions he didn't use the

23    word "bribe" with Mr. Wilson and other parents, and you didn't

24    put that in the reports, correct?

25    A.   I don't recall if that's in the reports or not.
```

02:30 (line 10)
02:31 (line 20)

1    Q.   Can you identify a single time you put in a report,

2    Mr. Singer told us he did not use the world "bribe" with

3    Mr. Wilson?

4    A.   The reports summarize what Mr. Singer said.  I don't

5    recall if he used -- if the exact word "bribe" is in the

6    reports.

7    Q.   Well, you told us you had this ongoing dialogue with him

8    of giving him instructions and him misspeaking and not

9    following them.  Do you remember that testimony?

02:31 10   A.   Yes.

11   Q.   You didn't record any of that in your notes that you had

12   repeatedly told him to use certain words and he repeatedly

13   misspoke and didn't use those words or used the wrong words,

14   correct?

15   A.   I did not document that, correct.

16   Q.   Okay.  It's an ongoing conversation with him for the

17   entire three months that he's recording consensuals with

18   Mr. Wilson and not once did you put it in an interview report,

19   correct?

02:32 20   A.   An interview report is what Mr. Singer tells us, not what

21   we tell Mr. Singer.

22   Q.   Well, he's telling you that he's never used a bribe with

23   Mr. Wilson, the word "bribe" with Mr. Wilson, and you don't put

24   that in a report?

25   A.   I don't recall the specific word that is in the report.

**A2449**

```
 1   Q.   You don't put anything in there of what he told you about
 2   how he spoke to Mr. Wilson, correct?
 3   A.   I don't recall that.  I recall putting down what
 4   Mr. Singer told us that he did the side door with Mr. Wilson
 5   and the specifics.
 6   Q.   You never even put down there that Mr. Singer told you
 7   that his pitch to Mr. Wilson for the prior eight years had been
 8   that the side door took donations?
 9   A.   That was not -- I don't recall that being documented
10   specifically like that.
11   Q.   He told you that on more than one occasion, correct?
12        MR. FRANK:  Objection.  I'm not sure how counsel could
13   be testifying to that.
14        THE COURT:  Sustained.
15   Q.   Did he tell you that on more than one occasion?
16   A.   Specifically with Mr. Wilson, I'm not -- I don't recall,
17   but his general pitch was that it was a payment to a -- excuse
18   me -- a donation to a program.
19   Q.   Okay.  And nowhere in your interview reports did you write
20   down that Mr. Singer told us his general pitch to many of his
21   parents was to tell them it is a donation to a program and not
22   of any personal benefit to the coach, correct?
23        MR. FRANK:  Objection to the last part.
24        THE COURT:  Overruled.
25   A.   I don't recall if he used that specific term, but we did
```

1  document what Mr. Singer did with parents and discussed the --

2  wrote down the side door and the SAT scheme in the reports.

3  Q.   Could you answer my question, please?

4       MR. FRANK:  Objection, your Honor.

5  Q.   Not once did any agent write in a report that Mr. Singer

6  said he didn't tell the parents it was a bribe.  He always told

7  them it was a donation.

8  A.   I don't recall that specific statement written down.  We

9  documented what the side door was, the SAT scheme, and the

02:34 10  communication -- what Mr. Singer told us that he did with the

11  parents.

12  Q.   Not once in hundreds of pages of interview reports,

13  correct?

14  A.   Correct.

15       MR. FRANK:  I'm not sure what that question was.  Not

16  once what?

17  Q.   And it says nowhere in those interview reports what you

18  said to him to get him to cooperate, correct?

19  A.   I did not document those -- that specific comment or those

02:35 20  specific part of the meeting with Mr. Singer.

21  Q.   And you didn't document any of your criticisms of how he

22  made the consensual tapes, correct?

23  A.   Operational discussion --

24       MR. FRANK:  Objection to the term "criticisms".

25       THE COURT:  Sustained.

```
 1    Q.    Okay.  You testified with Mr. Frank that your concern

 2    about getting things to be explicit was not worrying about

 3    Mr. Wilson's state of mind, correct?

 4    A.    Correct.

 5    Q.    You were worried about how it would look to the jury,

 6    correct?

 7    A.    Correct.

 8    Q.    Because it wouldn't look like it was enough evidence to

 9    convict anyone, correct?

10              MR. FRANK:  Objection, your Honor.

11              THE COURT:  Sustained.

12              MR. KENDALL:  Your Honor, she's opened this door.

13              MR. FRANK:  That is not true, your Honor.

14              THE COURT:  No.

15    Q.    You were concerned that if Mr. Singer used the same

16    approach that he used with Mr. Wilson, that wouldn't be good

17    enough for the jury, correct?

18              MR. FRANK:  Objection.  That's not what she said.

19              THE COURT:  Sustained.

20    Q.    You were concerned that Mr. Singer was using the standard

21    approach that he had used with Mr. Wilson for the prior

22    eight years, correct?

23    A.    That he was using the general pitch, yes.

24    Q.    Okay.  And you thought the general pitch wouldn't be clear

25    enough for the jury, correct?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3   Q.   When Mr. Singer was cooperating during those three months,

 4   did you believe he was trying to fulfill your instructions?

 5              MR. FRANK:  Objection to what she believed.

 6              THE COURT:  Sustained.

 7              MR. KENDALL:  Your Honor, I want to know her state of

 8   mind, if I may inquire.

 9              MR. FRANK:  Objection to her state of mind.

10              THE COURT:  Sustained.

11   Q.   Okay.  When Mr. Singer was cooperating, he was supposed to

12   be trying to follow your instructions, correct?

13   A.   Yes.

14   Q.   And you view it -- and you described in your prior

15   testimony that he repeatedly made mistakes in carrying out

16   these instructions?

17   A.   He wasn't as clear and explicit with the wording that we

18   asked him to be.

19   Q.   And he went back to his old pitch saying "donation",

20   correct?

21   A.   Correct.

22   Q.   And he used "program", not "coach"?

23   A.   Correct.

24   Q.   And he talked about university presidents and reading

25   admission files, correct?
```

```
 1    A.    That's what he said on some of his calls, yes.

 2    Q.    When you trained as a revenue agent, one of the things the

 3    IRS taught you was to look for patterns, correct?

 4    A.    Can you be specific?

 5    Q.    Yeah.  When you look at someone's tax return, if something

 6    happens three times, you view that as a pattern?  Isn't that

 7    part of the IRS training?

 8    A.    We look at other years while we're auditing for the same

 9    activity, to see if they occur in other years.

02:38 10    Q.    And if it keeps on happening over and over, the IRS trains

11    you that that is a pattern and may not be a mistake, correct?

12    A.    I don't recall my training, my training as a revenue agent

13    because it was so long ago.

14    Q.    But you'd agree with me here we have a pattern of

15    Mr. Singer repeatedly not following your instructions, correct?

16    A.    No.  Mr. Singer misspoke.  He would -- we asked him to say

17    "payment to a coach".  He kept going back to his old pitch.  It

18    was a mistake.  He wasn't as explicit as we asked.  And we

19    asked him, after each call, if he could be more explicit and to

02:38 20    say "payment to a coach".

21    Q.    Okay.  And you testified earlier that you didn't want to

22    use the word "bribe" because supposedly Mr. Wilson would become

23    suspicious there was an investigation, correct?

24    A.    Yes.

25    Q.    Mr. Wilson, you'd agree, trusted Mr. Singer quite a bit?
```

A2454

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3    Q.   Mr. Wilson had been working with Mr. Singer for

 4    eight years on and off, correct?

 5    A.   Correct.

 6    Q.   He wanted him to be an adviser to all of his children,

 7    correct?

 8    A.   He hired him to be -- for college counseling services.

 9    Q.   Yes.  And when he's away in Europe, Mr. Singer is visiting

02:39 10   his son Johnny as part of the college counseling service,

11    correct?

12    A.   Correct.

13    Q.   He wants his daughters to meet him face-to-face, correct?

14    A.   Correct.

15    Q.   And he wants his daughters to have Facetime calls with him

16    too, correct?

17    A.   Correct.

18    Q.   And he wants to give him advice so he can make more money

19    from his business of 750 side door deals at 50 schools,

02:39 20   correct?

21              MR. FRANK:  Objection to what Mr. Wilson wants.

22              THE COURT:  Sustained.

23    Q.   He's giving him business advice on how he can make money

24    from a service that Mr. Singer describes as being for free,

25    correct?
```

A.    He tells Mr. Singer that he can offer him pricing

strategies.

Q.    For a business that Mr. Singer describes as having over

700 side doors at about 40 to 50 schools, correct?

A.    Yes.

Q.    Okay.  And if you couldn't have used the word "bribe", did

you ever tell Mr. Singer just to say something more subtle,

like the coach needs the money for his house in Florida?  Did

you ever say that to Mr. Singer?

A.    No.  It was a payment to the coach.

Q.    The coach wants money for a vacation.  You never told him

to say that?

A.    No.  "Payment to the coach" was what we had him say.

Q.    And then he said "payment to the coach or the school",

correct?

A.    And then, at times, he would go back to his old wording.

Q.    Okay.  And you never told him to tell Mr. Wilson simply

it's not for the school, it's for the coach's pocket?  You

never told Mr. Singer to tell Mr. Wilson that, did you?

A.    We briefed -- debriefed Mr. Singer after each call and

said, can you be more explicit, say "coach to the program".

Q.    But he repeatedly misspoke, correct?

A.    And as I said before, Mr. Singer's been doing this a long

time and he would go back to his old pitch.  And each time we

would try and talk to him and ask him to be more explicit.

```
 1   Q.   And so Mr. Singer would decide what would be said to
 2   Mr. Wilson, not the agents, correct?
 3           MR. FRANK:  Objection.
 4           MR. KENDALL:  Excuse me.  Did the Court rule?
 5           THE COURT:  I didn't hear an objection.
 6           MR. FRANK:  I did object, your Honor.
 7           THE COURT:  Grounds?
 8           MR. FRANK:  What Mr. Singer would want.
 9           THE COURT:  Sustained.
02:41 10  Q.   Okay.  In the final analysis, Mr. Singer ended up
11   determining much of what was said in those tapes, correct?
12   A.   No.  We asked Mr. Singer -- we asked Mr. Singer to say
13   certain things on the call, and Mr. Singer had spoke to the
14   parents.
15   Q.   But every time he misspoke, you didn't make him -- you
16   didn't require him to go correct it and take it back, did you?
17           MR. FRANK:  Your Honor, we've been over this so many
18   times.
19           THE COURT:  Sustained.
02:42 20          MR. KENDALL:  Okay.  I'm all done.  Thank you, your
21   Honor.
22           THE COURT:  Mr. Kelly?
23           MR. KELLY:  I'd like to go again, but I don't think
24   I'm entitled to.
25           THE COURT:  Thank you.
```

```
 1              Miss Keating, you may step down.

 2              Next witness.

 3              MR. STEARNS:  The government calls Aaricka Hughes.

 4              (Aaricka Hughes, sworn.)

 5              THE CLERK:  And would you please state your name for

 6    the record, spelling your last.

 7              THE WITNESS:  Can I take my mask off?

 8              THE COURT:  Yes, you may take your mask off.

 9              THE WITNESS:  Okay.  Thanks.  Aaricka Hughes,

02:43 10    H-u-g-h-e-s.

11              THE COURT:  And Miss Hughes, if you'll pull closer to

12    the microphone and then pull it in so that we can all hear you.

13    Thank you.

14              MR. STEARNS:  May I inquire, your Honor?

15              THE COURT:  Yes, you may, Mr. Stearns.

16                  DIRECT EXAMINATION OF ARRICKA HUGHES

17    BY MR. STEARNS:

18    Q.   Good afternoon, Miss Hughes.

19    A.   Hello.

02:44 20    Q.   Where do you live?

21    A.   Marina del Ray, California.

22    Q.   Okay.  Are you presently employed?

23    A.   Yes.

24    Q.   Where do you work?

25    A.   Loyola Marymount University.
```

```
         1   Q.   And does Loyola Marymount go by another name sometimes?

         2   A.   Yes, LMU.

         3   Q.   LMU.  How long have you worked at LMU?

         4   A.   From the spring of 2021.

         5   Q.   And what's your title?

         6   A.   Head women's basketball coach.

         7   Q.   Okay.  Where did you work immediately prior to becoming

         8   the head women's coach at LMU?

         9   A.   USC.

02:44   10   Q.   Okay.  And if you could just briefly describe how long you

        11   worked at USC and what titles you held.

        12   A.   I worked there from 2017 until 2021.  I was a recruiting

        13   coordinator, assistant coach, and associate head coach over the

        14   four years.

        15   Q.   What years were you the recruiting coordinator?

        16   A.   Around 2017 to '18.

        17   Q.   During your time as the recruiting coordinator and on the

        18   coaching staff for the USC women's basketball program, how

        19   would you describe your level of involvement in recruiting?

02:45   20   A.   As the recruiting coordinator, my sole priority was to be

        21   active and present in recruiting.

        22   Q.   Okay.  Let's back up.  Where did you -- did you graduate

        23   from college?

        24   A.   Yes.

        25   Q.   Where did you go to school?
```

```
 1   A.    USC.

 2   Q.    What year did you graduate?

 3   A.    2010.

 4   Q.    And did you play basketball in college?

 5   A.    Yes, I did.  I was also a -- I clearly played for

 6   four years.  I was also a captain the last two years that I was

 7   there.

 8   Q.    Okay.  What did it take for you to achieve the level of

 9   basketball ability to be recruited by USC?

02:45 10   A.    Countless hours in the gym working on skills, going to

11   camps, practicing, lot of sacrifice socially while in high

12   school.

13   Q.    Now, going to when you became the recruiting coordinator

14   and coach at USC, how would you describe the overall strength

15   of the women's basketball program?

16   A.    It's a Division 1 level, very highly sought after,

17   probably anywhere from top 25 to top 50 in the nation.

18   Q.    And, similarly, how would you describe the level of

19   athletes that you recruited to the team?

02:46 20   A.    The same, the top in the country.

21   Q.    Okay.  Directing your attention to the fall of 2017, that

22   was a few months after you joined USC, correct?

23   A.    Yes.

24   Q.    Could you just walk us through, at a high level, what was

25   involved in the recruiting process as a coach and the
```

recruiting coordinator.

A.    Recruiting prospect student athletes involve us going out
on the road, identifying student athletes in the gym, camps,
assessing them in practice, high school games, also having
conversations with them and the prospects, their high school
coaches, their parents, while also watching film.

Q.    Did you consider financial contributions in deciding whom
to recruit to the women's basketball?

A.    No.

Q.    What was the most important thing that you considered in
deciding whom to recruit?

A.    Making sure that they were at a level that could help us
win games at the highest level of basketball.

Q.    Are you familiar with the SUBCO process at USC,
Miss Hughes?

A.    Yes.

Q.    What was your role in that process when you were the
recruiting coordinator and an assistant coach at USC?

A.    To recruit prospect student athletes and create bios, or
profiles, that we would then turn in to SUBCO.

Q.    Okay.  And to whom did you give those bios for recruiting?

A.    To my sports supervisor, and at the time that was Donna
Heinel.

Q.    And what did Miss Heinel do with those profiles and SUBCO
packets?

```
 1   A.    To my knowledge, she then took those and presented them on

 2   behalf of our program.

 3   Q.    To whom?

 4   A.    To SUBCO, which I believe is admissions.

 5   Q.    Okay.  Did you have an understanding as to whether, when

 6   you were putting together those SUBCO bios and packets, whether

 7   it was important to be truthful?

 8              MR. KENDALL:  Objection, your Honor.

 9              THE COURT:  Overruled.

10   A.    Yes.  I believe that at that point that was what they were

11   relying on to be able to get kids into school, so yes, being

12   truthful when turning in those packets was important.

13   Q.    Did anyone other than you and members of your coaching

14   staff have the authority to recruit women's basketball players

15   for the team?

16   A.    No.

17   Q.    Okay.  Did Donna Heinel have the authority to recruit

18   members for the basketball team?

19   A.    No.

20   Q.    Are you familiar with the term "practice players" in the

21   context of the women's basketball team at USC?

22   A.    Yes.

23   Q.    Who were practice players?

24   A.    They were male current students that were already enrolled

25   in the university.
```

|  |  |
|---|---|
| 1 | Q.   So did they go through the SUBCO process for recruiting? |
| 2 | A.   No. |
| 3 | Q.   Are you familiar with managers of the women's basketball |
| 4 | team? |
| 5 | A.   Yes. |
| 6 | Q.   What did managers do generally? |
| 7 | A.   They helped assist, water, sweeping the floor, helping set |
| 8 | up for practice. |
| 9 | Q.   Did you recruit managers through the SUBCO process? |
| 02:49 10 | A.   No. |
| 11 | Q.   During your time as head -- as recruiting coordinator and |
| 12 | assistant coach for the USC team, did you ever recruit an |
| 13 | individual named Sabrina Abdelaziz? |
| 14 | A.   No. |
| 15 | Q.   Did you ever watch any film on Miss Abdelaziz? |
| 16 | A.   No. |
| 17 | Q.   Did you ever speak with her high school coach? |
| 18 | A.   No. |
| 19 | Q.   Did Sabrina Abdelaziz ever become a member of the USC |
| 02:49 20 | women's basketball team? |
| 21 | A.   No. |
| 22 | Q.   Did she ever become a practice player on the USC women's |
| 23 | basketball team? |
| 24 | A.   No. |
| 25 | Q.   Did she ever become a manager of the team? |

```
 1    A.    No.

 2    Q.    Did she ever attend any practices?

 3    A.    No.

 4    Q.    Now, you were interviewed by FBI agents in the summer of

 5    2019, Miss Hughes?

 6    A.    Yes.

 7    Q.    Before that interview had you ever heard of Sabrina

 8    Abdelaziz?

 9    A.    No.

10          MR. STEARNS:  Miss Lewis, if we can pull up

11    Exhibit 383, which is already in evidence.

12    Q.    Miss Hughes, do you see the date at the top here of this

13    student profile October 2017?

14    A.    Yes.

15    Q.    Are you generally familiar with what this type of document

16    is?

17    A.    Yes.

18    Q.    What is it?

19    A.    It would be a profile or bio that would be created for

20    SUBCO.

21    Q.    Okay.  Can we go to page 2.  Now, in the fall of 2017,

22    Miss Hughes, did anyone -- who wrote the profiles for SUBCO for

23    the women's basketball team?

24    A.    I did.

25    Q.    Did anyone else?
```

```
 1    A.    Not to my recollection, no.

 2    Q.    Okay.  During 2017 or 2018 did you ever see this SUBCO

 3    profile packet for Sabrina Abdelaziz?

 4    A.    No.

 5    Q.    Did you write any of the material in this bio?

 6    A.    No.

 7    Q.    During your time at USC did you ever recruit an athlete

 8    for the women's basketball team who had played exclusively

 9    junior varsity basketball?

02:51 10    A.    No.

11    Q.    Did you ever recruit an athlete for your team who did not

12    play basketball the last two years of high school?

13    A.    No.

14    Q.    Why didn't you recruit those types of individuals?

15    A.    They would not have been at the level that we were looking

16    for to add to our roster.

17    Q.    Would that type of basketball player be able to practice

18    with a Division 1 basketball team like USC?

19    A.    No.

02:51 20    Q.    Did you ever accept any money either personally or to a

21    women's basketball fund in exchange for recruiting an athlete?

22    A.    No.

23    Q.    Did you ever lie to admissions?

24    A.    No.

25    Q.    Why not?
```

```
 1    A.    Because it's the wrong thing to do.
 2              MR. KELLY:  Objection.
 3              MR. KENDALL:  Objection, your Honor.
 4              THE COURT:  Well, she can answer that question
 5    briefly.  Go ahead.
 6    A.    Because it's the wrong thing to do.
 7    Q.    Are you aware -- have you ever seen any formal written
 8    policy forbidding you from accepting money for recruiting a
 9    student athlete?
10    A.    No.
11    Q.    Have you ever seen any formal written policy at USC
12    forbidding you from lying to your colleagues?
13    A.    No.
14    Q.    So how did you know not to do those things?
15    A.    Common sense.
16              MR. STEARNS:  That's all I have.
17              THE COURT:  Cross-examination, Mr. Kelly.
18              MR. KELLY:  Sure.
19                   CROSS-EXAMINATION OF AARICKA HUGHES
20    BY MR. KELLY:
21    Q.    Good afternoon, coach.
22    A.    Hello.
23    Q.    How's your team?
24    A.    Doing okay.
25    Q.    Good.  There are, in fact, NCAA regulations about
```

```
 1    accepting monies and meals and things of value that coaches
 2    can't do, right?
 3    A.   Yes.
 4    Q.   Okay.  Now, when you were an assistant coach at USC, the
 5    team had approximately 13 to 15 players, right?
 6    A.   Yes.
 7    Q.   And so the number varied year to year, right?
 8    A.   Correct.
 9    Q.   And if someone were to say that USC's women's basketball
10    team used practice players and had a team manager, that would
11    be true, right?
12    A.   Yes.
13    Q.   And when Sabrina Abdelaziz arrived on USC's campus in
14    2018, she had not been recruited by you, correct?
15    A.   Correct.
16    Q.   And the USC women's basketball that year wasn't short a
17    player because of Sabrina's presence on campus, was it?
18    A.   No.
19    Q.   And you've worked as a women's basketball coach at three
20    different universities, right?
21    A.   This would be my fourth.
22    Q.   Fourth.  Okay.  So you are very familiar with the
23    recruiting process, right?
24    A.   Yes.
25    Q.   And have you ever recruited a player from the Hong Kong
```

```
 1   International School?

 2   A.   I have not personally, no.

 3   Q.   Are you aware of any Division 1 women's basketball player

 4   coming out of the Hong Kong International School?

 5   A.   I am not aware, no.

 6   Q.   Are you familiar with the fact that USC accepted lots of

 7   students from the Hong Kong International School every year?

 8            MR. STEARNS:  Objection.  Foundation.

 9            THE COURT:  Well, she can say if she's familiar.

10   Overruled.

11   A.   I'm not involved with the admissions process, nor did I

12   really pay attention to that portion of what was going on at

13   the school.

14   Q.   Your focus was the basketball?

15   A.   Yes, sir.

16   Q.   And as the basketball coach, you had no experience with

17   the Hong Kong International School, right?

18   A.   Correct.

19   Q.   And there was a reference to a woman named Donna Heinel in

20   the direct questioning.  Did you ever talk to her about Sabrina

21   Abdelaziz?

22   A.   No.

23   Q.   Do you know a man named Rick Singer?

24   A.   No.

25   Q.   I assume then you have no idea what Donna Heinel and Rick
```

```
 1    Singer may have discussed between the two of them?
 2              MR. STEARNS:  Objection.
 3              THE COURT:  Overruled.
 4    A.   No.
 5    Q.   All right.  And you don't have any idea what this man Rick
 6    Singer might have said to my client, Gamal Abdelaziz, about
 7    USC, do you?
 8    A.   No.
 9    Q.   And when you were at USC, was the athletic director a man
10    named Pat Haden?
11    A.   No.
12    Q.   Who was the athletic director then?
13    A.   In those years?  What years are you asking?
14    Q.   Let's go with 2017-2018.
15    A.   Lynn Swann.
16    Q.   Lynn Swann.  Former Pittsburgh Steeler player, right?
17    A.   Yes, sir.
18    Q.   All right.  Did he have a VIP list for students he could
19    get in?
20              MR. STEARNS:  Objection.
21    Q.   If you know.
22              THE COURT:  Well, if she knows.
23    A.   I don't know about a VIP process.
24    Q.   Have you ever heard about a VIP list that various upper
25    management would have?
```

02:56 appears at lines 10, 20

**A2469**

```
 1   A.    No.
 2   Q.    Okay.  How about when you were at USC?  Was the head of
 3   the Trojan Athletic Fund a man named Robert Orr?
 4   A.    Yes.
 5   Q.    And the Trojan Athletic Fund raised money for USC
 6   athletics, right?
 7   A.    I believe so.
 8   Q.    You, yourself, didn't play any role in the fundraising
 9   process, right?
10   A.    Correct.
11   Q.    Now, let me direct your attention to the time period
12   before the summer of 2018, before the summer of 2018.  Do you
13   know whether Donna Heinel used the athletic admissions process
14   to raise money for USC?
15               MR. STEARNS:  Objection.
16               THE COURT:  If she knows, she can answer.
17   A.    I do not know.
18   Q.    All right.  Do you know whether those above you in the
19   hierarchy at USC were instructed to raise money for USC
20   athletics by recruiting walk-on athletes?
21   A.    No.
22   Q.    You don't know?
23   A.    I don't know.
24   Q.    All right.  So any discussions like that did not involve
25   you?
```

```
 1    A.    Correct.

 2    Q.    Now, if a recruited scholarship athlete quits playing the

 3    team, she loses her scholarship, right?

 4    A.    If she quits?

 5    Q.    Quits the team.  Maybe you recruit her, she gets a

 6    scholarship.  She decides, I want to study chemistry instead of

 7    play hoops.  She loses her scholarship, right?

 8    A.    No.

 9    Q.    She doesn't?

10    A.    No.

11    Q.    She gets to keep it?

12    A.    It just depends.

13    Q.    Depends on what?

14    A.    It could be -- like for us, we're not -- we could pull the

15    scholarship as a coaching staff after talking with

16    administration, but I've never experienced that as the coach

17    personally.

18    Q.    Have you ever had a scholarship athlete quit and keep the

19    scholarship?

20    A.    Not me personally, no.  I don't recall.

21    Q.    All right.  But the coaching staff had the authority to

22    revoke the scholarship if some young woman comes, quits midway

23    through the season, doesn't want to play basketball anymore,

24    right?

25    A.    Yes.  I believe so.
```

A2471

```
 1   Q.   Whereas a walk-on recruited player, there's no consequence

 2   because the person has no scholarship, right?

 3           MR. STEARNS:  Objection on "no consequence".

 4           THE COURT:  Well, if she can understand the question.

 5   Q.   Okay.  I'll rephrase it.  A recruited walk on doesn't get

 6   a scholarship, right?

 7   A.   Correct.

 8   Q.   So if the recruited walk on stops playing mid season for

 9   whatever reason, that young woman does not lose the scholarship

10   because she doesn't have one, right?

11   A.   Correct.

12   Q.   So the consequences to the recruited walk on are less

13   significant than the scholarship athlete, right?

14   A.   Yes.

15   Q.   Okay.  Now, do you know if this recruited walk-on process

16   was ever used by people at USC to raise money for the Athletic

17   Department?

18   A.   I don't know.

19   Q.   And you don't know what authority Donna Heinel had prior

20   to the summer of 2018 with respect to how she did her job, do

21   you?

22           MR. STEARNS:  Objection.  Misstates.

23           THE COURT:  Well, if she -- overruled.  If she

24   understands the question.

25   A.   Can you repeat the question, please.
```

A2472

```
 1   Q.    Sure.  Sure.  Prior to the summer of 2018 you have no idea

 2   what Donna Heinel's authority was to do as instructed by her

 3   superiors to raise money for USC, do you?

 4   A.    No, I do not.

 5              MR. KELLY:  One moment, your Honor.

 6              THE COURT:  Yes.

 7   Q.    You've never, of course, spoken or interacted with my

 8   client, Gamal Abdelaziz, at all, have you?

 9   A.    No.

10   Q.    And you've never spoken or interacted at all with his

11   daughter Sabrina, have you?

12   A.    No.

13              MR. KELLY:  Okay.  Good luck with your season.

14              THE WITNESS:  Thank you.

15              THE COURT:  Mr. Kendall, any cross?

16              MR. KENDALL:  No, thank you, your Honor.

17              THE COURT:  Any redirect?

18              MR. STEARNS:  Just a couple questions.

19              THE COURT:  Mr. Stearns?

20              MR. STEARNS:  Just a few questions.

21               Miss Lewis, can we have Exhibit 383, please.

22                  REDIRECT EXAMINATION OF ARRICKA HUGHES

23   BY MR. STEARNS:

24   Q.    Miss Hughes, you weren't asked any questions about this,

25   but if we can turn to page 2.
```

```
  1              MR. KELLY:  That's beyond the scope of cross, Judge.

  2    Q.   Miss Hughes, does it say anywhere on Exhibit --

  3              THE COURT:  How -- is this something that came up on

  4    cross?

  5              MR. STEARNS:  Yes.  It has to do with practice

  6    players, your Honor.

  7              THE COURT:  All right.

  8    Q.   Were you asked questions on cross-examination about

  9    practice players?

03:02 10    A.   Yes.

 11    Q.   On this profile here, Exhibit 383, page 2, does it say

 12    anywhere that Sabrina Abdelaziz is going to be a practice

 13    player?

 14    A.   No.

 15    Q.   What's the first sentence of the first paragraph?

 16    A.   "Sabrina Abdelaziz is a starting point guard and team

 17    capital at the Hong Kong International School basketball team".

 18    Q.   And what's the last sentence of the last paragraph,

 19    beginning with "Sabrina will be"?  What's that say?

03:02 20    A.   "Sabrina will be a great addition to our USC program".

 21    Q.   You were asked questions about whether you knew anything

 22    about a VIP process at USC.  Do you recall those questions?

 23    A.   I do recall those questions.

 24    Q.   To be clear, what is this?  What type of packet is this?

 25    A.   This is a profile for a SUBCO packet.
```

```
 1   Q.   Okay.  Can you be a practice player without going to

 2   practice, Miss Hughes?

 3   A.   No.

 4           MR. STEARNS:  Okay.  Nothing further.

 5           THE COURT:  Any recross?

 6           MR. KELLY:  Yes, your Honor.

 7           THE COURT:  Mr. Kelly.

 8               RECROSS EXAMINATION OF AARICKA HUGHES

 9   BY MR. KELLY:

10   Q.   With respect to that athletic profile that the prosecutor

11   just put up, you had nothing to do with that, did you?

12   A.   Nothing to do with what?

13   Q.   You didn't create that, did you?

14   A.   I did not create that profile, no.

15   Q.   Okay.  So -- and you don't know what a man named Rick

16   Singer may have said to my client, Gamal Abdelaziz, about

17   practice players at USC, do you?

18   A.   I do not.

19   Q.   You don't know what a man named Rick Singer may have said

20   to Gamal Abdelaziz about managers at USC either, right?

21   A.   Correct.  I do not know.

22   Q.   All right.  So bearing in mind you're in front of a Boston

23   jury, my last question.  In your experience, who is the better

24   player, Larry Bird or Magic Johnson?  You're under oath.

25   A.   I know I may have to sprint out of here, but I'm going to
```

03:03 on line 10, 03:04 on line 20

A2475

1    have to go with Magic on that one.  I'm sorry.  I have to tell
2    the truth.
3            MR. KELLY:  Okay.  I may bring you up on impeachment.
4    Thank you.
5            THE COURT:  Thank you, Miss Hughes.  You may step
6    down.
7            THE WITNESS:  Thank you.
8            THE COURT:  Next witness.
9            MR. FRANK:  Your Honor, we sent her back to the hotel.
03:04 10         THE COURT:  All right.  So you don't have another one.
11           MR. FRANK:  Not right now.
12           THE COURT:  All right.  Sometimes this happens,
13    jurors.  You get a half an hour off today.
14           Did you want to say anything else, Mr. Frank?
15           MR. FRANK:  No, your Honor.  I was just reading a
16    note.
17           THE COURT:  All right.  So we are done for the week,
18    and I'm going to ask you to come back on Monday morning.  I do
19    want to give you a heads up on where I think we are.  I have
03:05 20   talked to counsel.  Of course, there are no guarantees in jury
21    trials.  I'm sure you know that, but I am confident that this
22    case will be completed not next week but the following week.
23    It will be completed before that long weekend so that you're
24    going to be able to have a little respite for the long October
25    weekend.  That's my best judgment.  It's not infallible, but I

1    am confident that this case will be completed not next week,

2    but the following week.

3         So we're now essentially halfway through the trial

4    because we've been at this just about two weeks, and we have

5    maybe that long, maybe a little less than two weeks, to go.  It

6    is extremely important that you remember my instructions about

7    not talking about this case with anybody.  Members of your

8    family I'm sure will be curious.  If you haven't had it

9    already, I'm sure somebody's going to say, let me tell you

03:06 10    about a case that I've heard about that's similar to the one

11    that you're hearing and so on and so forth.  It would be

12    entirely improper for you to listen to that conversation.  You

13    have to say, tell me about it after the end of the case.  I'll

14    talk to you all you want after the end of the case, but I

15    cannot, because of this ornery judge in Boston, I cannot talk

16    to you about this case.  It would be inappropriate.  It may end

17    up resulting in a mistrial if you don't follow my instructions.

18    So please hang in there.  I'm sure you've had temptations up to

19    this point and I hope you've resisted them and continue to do

03:06 20    that.

21         And you're going to base your decision on all of the

22    testimony.  You haven't heard all the testimony yet.  You're

23    going to base your decision in this case on all of the

24    testimony that comes into this case and only on the evidence

25    that comes in in this courtroom, not on the basis of anything

```
 1    you may see or hear in the media, or somebody else might talk
 2    to you about.
 3            So I'll see you on Monday morning.  Remember, next
 4    week we will have sessions on Monday, Tuesday, Wednesday, and
 5    Friday.  Not Thursday.  The following week I'm not sure about,
 6    but I'm hopeful the case is going to end in that week.
 7            So have a pleasant weekend.  I'll see you on Monday
 8    morning at 9:00 a.m.
 9            THE CLERK:  All rise for the jury.
10                (Jury exits.)
11            THE COURT:  All right.  Be seated, counsel.  Monday's
12    schedule, Mr. Frank?
13            MR. FRANK:  One moment, your Honor.
14            Your Honor, it will be Laurie Janke, Steven Masera.
15            THE COURT:  Wait a minute.  Janke's direct is about an
16    hour and 15?
17            MR. FRANK:  Hour and 15.
18            THE COURT:  Hour and 15.  Yes?
19            MR. FRANK:  Steven Masera, M-a-s-e-r-a.  He's about a
20    half an hour.
21            THE COURT:  All right.
22            MR. FRANK:  Jim Nahmens.
23            THE COURT:  How do you spell that?
24            MR. FRANK:  N-a-h-m-e-n-s.
25            THE COURT:  And his direct?
```

03:07 10
03:08 20

|  |  |
|---|---|
| 1 | MR. FRANK:  45 minutes. |
| 2 | THE COURT:  And if we get that far, the next one? |
| 3 | MR. FRANK:  Jeff Demaio. |
| 4 | THE COURT:  How do you spell that? |
| 5 | MS. KEARNEY:  D-e-m-a-i-o. |
| 6 | THE COURT:  Okay.  Mr. Demaio's direct? |
| 7 | MS. KEARNEY:  About 45 minutes, your Honor. |
| 8 | THE COURT:  Okay.  And if we get into Tuesday? |
| 9 | MR. FRANK:  Casey Moon. |
| 03:09 10 | THE COURT:  Last name? |
| 11 | MR. FRANK:  M-o-o-n. |
| 12 | THE COURT:  And her direct? |
| 13 | MR. FRANK:  His direct -- |
| 14 | THE COURT:  His. |
| 15 | MR. FRANK:  -- is 30 minutes. |
| 16 | THE COURT:  Okay.  And one more? |
| 17 | MS. KEARNEY:  Colleen Ranahan. |
| 18 | THE COURT:  Ranahan? |
| 19 | MS. KEARNEY:  Yes. |
| 03:09 20 | THE COURT:  And her direct? |
| 21 | MS. KEARNEY:  About, I would say, 45 minutes. |
| 22 | THE COURT:  Okay. |
| 23 | MR. KENDALL:  Your Honor, if I may just inquire? |
| 24 | THE COURT:  Yes. |
| 25 | MR. KENDALL:  My guess is that's close to the end of |

```
 1    the government's case.  Could we just ask the government to

 2    tell us what else there is because we just need to know when to

 3    have people on deck ready to come in as soon as they're done?

 4             MR. FRANK:  After that it's just a summary witness,

 5    your Honor.

 6             THE COURT:  A summary witness after Miss Ranahan?

 7             MR. FRANK:  Yes.

 8             THE COURT:  Okay.

 9             MR. KENDALL:  So could the government tell us when

10    they think they'll rest given --

11             THE COURT:  Before they do that, you tell me roughly

12    how long you'll have Janke on cross.

13             MR. KENDALL:  Wilson will have her very little.

14             THE COURT:  Sorry?

15             MR. KENDALL:  Wilson will have her on cross very

16    little.

17             THE COURT:  By little, 15?

18             MR. KENDALL:  Maybe.

19             THE COURT:  Okay.  And why don't you go through the

20    rest.

21             MR. KENDALL:  Masera will be a substantial cross.

22             THE COURT:  By substantial, you mean one hour,

23    four hours, two and a half days?

24             MR. KENDALL:  Maybe more in the range of the first, an

25    hour, plus or minus, but in that range.
```

```
 1              THE COURT:  Okay.

 2              MR. KENDALL:  Nahmens and Demaio, an hour, hour plus.

 3    Moon, maybe a half hour, 45 minutes.  And Ranahan -- those, if

 4    it's not obvious, your Honor, most of those are all Wilson

 5    witnesses.

 6              THE COURT:  Okay.  Ranahan you didn't tell me.  How

 7    much?

 8              MR. KENDALL:  I'm going to guess an hour, but I

 9    haven't finished putting it together.  I doubt that there will

10    be very little, if any, from Mr. Kelly.

11              THE COURT:  Why don't we hear from Mr. Kelly in that

12    regard on all those witnesses.

13              MR. KENDALL:  But Nahmens to Ranahan are all the tax

14    people, your Honor.  Not Moon, but Nahmans, Demaio, and Ranahan

15    are all tax people.

16              THE COURT:  Okay.

17              MR. KELLY:  Yes, your Honor.  There will be

18    cross-examination from me on Janke and Masera.

19              THE COURT:  About how much?

20              MR. KELLY:  I can't see myself going more than an hour

21    and change.

22              THE COURT:  Okay.  Masera?

23              MR. KELLY:  Same thing.

24              THE COURT:  Yeah.

25              MR. KELLY:  Nahmens, Demaio, Moon and Ranahan, unless
```

```
 1    I've been wildly inattentive in my reading, I don't think they
 2    pertain to me.
 3              THE COURT:  Okay.
 4              MR. KELLY:  I'll double check and if they don't
 5    pertain to Abdelaziz, I'll probably keep quiet.
 6              THE COURT:  All right.  With that in mind, Mr. Frank,
 7    when is your best estimate as to when the government might
 8    rest?
 9              MR. FRANK:  Wednesday.
10              THE COURT:  Wednesday.  All right.
11              Counsel, I do, if you intend to submit, I do not think
12    I have opposed verdict forms, and I would like them.  In fact,
13    I'd like them earlier.  But in any event, I want them by the
14    end of Monday, no later than the end of Monday if -- of your
15    intent.  If you don't care what the verdict form says, then
16    I'll draft my own, but if you expect me to consider yours, it
17    will be in by Monday at five.  Okay?
18              MR. KENDALL:  Sure.
19              THE COURT:  Anything else that needs to come to my
20    attention?
21              MR. FRANK:  Just one brief matter, your Honor.  We had
22    scheduled with defense counsel and with counsel for the witness
23    Mr. Haden's deposition for Sunday.  We'd all reserved that all
24    week long.  We were just informed late last night that
25    Mr. Wilson's team is cancelling that deposition without a new
```

date.  We don't know what the new date, whether they intend to
take the deposition, what the new date would be, but we're all
ready to go on Sunday.  And we don't see a reason why if that
deposition is going to happen, given that everyone's available,
it shouldn't happen on Sunday.

MR. KENDALL:  Your Honor, we do not want to do it on
Sunday.  I spoke with Mr. Haden's counsel about Thursday, our
day off.  He's available.  That was discussed in the e-mail
chain as a possibility.  Assuming we're off on Thursday, I'd
prefer to do it then.

MR. FRANK:  Your Honor, we will have just found out on
Wednesday who the defense is calling on Friday.  We have no
idea who they're calling.  We have no idea if they're calling
anyone.  So to jam in Mr. Haden, who they were prepared to
depose last week on the day before a cross that we will have
found out about the night before, seems to us to be an attempt
to jam us up.

THE COURT:  Yeah.  Haden should be taken before next
Thursday.  You can take another day, but it shouldn't be that
long.

MR. KENDALL:  Your Honor, if I may ask on that?  The
whole sort of list we have here, Masera, Nahmens, Demaio, Moon,
Ranahan, those are all my witnesses.  Most of -- except for
Moon, they're all heavily tax related witnesses.  Nobody else
can pick them up.  I'm also supposed to do Mr. Haden.  Thursday

is plenty of time.  We agreed to give the government two days

advance notice of who our witnesses will be.  So if we're

starting our case on Friday, they'll have advanced notice of

who we'll have, if we are going to put anybody on.  So we're

not going to catch them.  We're going to show them the same

courtesy you've had them show us, your Honor.  So they'll have

plenty of time to prepare --

MR. FRANK:  It's a little different, your Honor.  We

don't have any *Jencks* material.  We have nothing about these

03:14 witnesses.  Mr. Kendall was prepared to go last Sunday for

Mr. Haden.  All of a sudden last night he can't.  We will

have -- Wednesday night is when we're going to find out who

they're calling on Friday, and now they want to have most of

the day Thursday taking Mr. Haden's deposition.  That, I would

submit, is unfair.

THE COURT:  Well, his deposition is limited to

three hours, right?

MR. KENDALL:  Yes.

MR. FRANK:  Three hours on direct, which we assume

03:15 includes redirect, but that doesn't include cross.

MR. KELLY:  I think the whole thing is three hours,

your Honor.  I think --

MR. KENDALL:  It's three hours for us, for the

defense.  But your Honor, I can't get it done properly on

Sunday.  I wish I could.  I just can't.  Thursday we have a day

```
 1    off.  We're all available to do it.  We can do it then.  I've

 2    raised it.  Mr. Haden's counsel is available on Thursday.  He's

 3    already told me he's available that day.  I don't think it's --

 4    I've never told Mr. Frank when I was prepared to do it.  I

 5    talked about scheduling to do it.  I am not prepared to do it

 6    and I have to do all of the tax case early next week.

 7                MR. FRANK:  Well, then perhaps Mr. Kendall would be

 8    prepared to tell us now who he's calling on Friday.

 9                MR. KENDALL:  I'll tell him that Wednesday, your

10    Honor.

11                THE COURT:  Well, Counsel, you know, this is why I

12    don't like to get involved in discovery disputes, but it does

13    seem to me, you know, there's some quid pro quo.  I think I

14    heard that term --

15                MR. KENDALL:  Fine, your Honor.

16                THE COURT:  -- today.  Some quid pro quo ought to be

17    shown.  I think at this stage if you want the prosecutor to

18    give you a break, you ought to give him a break and tell him

19    who you're going to call on Friday.  You know, what's the

20    secret?

21                MR. KENDALL:  There isn't, your Honor.  I'm happy to

22    do it.

23                THE COURT:  All right.  Do that and we'll delay the

24    taking of the deposition, but the defendants will tell the

25    government exactly who they intend to call on all of Friday
```

```
 1   next week.

 2           MR. KENDALL:  Certainly.

 3           THE COURT:  And in return, Mr. Haden's deposition will

 4   be taken on Thursday.

 5           MR. KENDALL:  Thank you.

 6           THE COURT:  We're adjourned.

 7           (Whereupon, the proceedings concluded at 3:17 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2     Witness                          Page

 3     ELIZABETH KEATING

 4     Cross-Examination by Mr. Kendall      5

 5     Redirect Examination by Mr. Frank    90

 6     Recross-Examination by Mr. Kelly    140

 7     Recross-Examination by Mr. Kendall  154

 8

 9     AARICKA HUGHES

10     Direct Examination by Mr. Stearns   185

11     Cross-Examination by Mr. Kelly      193

12     Redirect Examination by Mr. Stearns 200

13     Recross-Examination by Mr. Kelly    202

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          E X H I B I T S

 2      NO.                         ADMIT

 3      9767    ....................      6

 4      570     ....................     29

 5      597     ....................     35

 6      580     ....................     38

 7      684     ....................     44

 8      685     ....................     44

 9      713     ....................    132

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8          We, Kristin M. Kelley and Kathy Silva, certify that

9    the foregoing is a correct transcript from the record of

10   proceedings taken September 24, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley              September 24, 2021

15       /s/ Kathy Silva                    September 24, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Kathy Silva, RPR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

**A2489**

1            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2


3

UNITED STATES OF AMERICA,            )
4                      Plaintiff     )
                                     )
5    vs.                             )  No. 1-19-CR-10080
                                     )
6    GAMAL ABDELAZIZ and JOHN        )
     WILSON,                         )
7                      Defendants.   )
                                     )
8                                    )

9


10


             BEFORE THE HONORABLE NATHANIEL M. GORTON
11               UNITED STATES DISTRICT JUDGE
                   JURY TRIAL - DAY 12
12


13

        John Joseph Moakley United States Courthouse
14                    Courtroom No. 4
                    One Courthouse Way
15              Boston, Massachusetts 02210

16


17                   September 27, 2021
                        9:09 a.m.
18


19


20

             Kristin M. Kelley, RPR, CRR
21              Kathy Silva, RPR, CRR
               Official Court Reporter
22      John Joseph Moakley United States Courthouse
                One Courthouse Way, Room 3209
23             Boston, Massachusetts 02210
                E-mail: kmob929@gmail.com
24

        Mechanical Steno - Computer-Aided Transcript
25

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3          Robert L. Sheketoff

 4          One McKinley Square

 5          Boston, MA 02109

 6          617-367-3449

 7          sheketoffr@aol.com

 8          for Gamal Abdelaziz.

 9

10

11          Michael Kendall

12          Lauren M. Papenhausen

13          White & Case, LLP

14          75 State Street

15          Boston, MA 02109

16          617-939-9310

17          michael.kendall@whitecase.com

18          for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                                        |
| 2  | THE CLERK:  You may be seated.  Court is now in                              |
| 3  | session.                                                                     |
| 4  | THE COURT:  Good morning, jurors.  Welcome back.  I                          |
| 5  | hope you had a pleasant weekend.  We're ready to resume.  The                |
| 6  | government will call its next witness.                                       |
| 7  | MS. WRIGHT:  The government calls Laura Janke.                               |
| 8  | (Laura Janke, sworn.)                                                        |
| 9  | THE CLERK:  And would you please state your name for                        |
| 09:10 10 | the record, spelling your last.                                          |
| 11 | THE WITNESS:  Laura J-a-n-k-e.                                               |
| 12 | DIRECT EXAMINATION OF LAURA JANKE                                           |
| 13 | BY MS. WRIGHT:                                                               |
| 14 | Q.   Good morning, Miss Janke.                                              |
| 15 | A.   Good morning.                                                          |
| 16 | Q.   Let's go into your background just a little bit.  Can you              |
| 17 | tell us where you live?                                                     |
| 18 | A.   I currently live in North Hollywood, California, which is             |
| 19 | part of Los Angeles County.                                                |
| 09:10 20 | Q.   Do you work?                                                        |
| 21 | A.   Yes, I do.                                                            |
| 22 | Q.   What do you do?                                                       |
| 23 | A.   I do tax assembly and preparation, along with some                    |
| 24 | bookkeeping.  I also help a company doing scheduling and                   |
| 25 | appointments, and I also help coach a small soccer team for my             |

**A2494**

1    5-year-old daughter.

2    Q.   Where did you work prior to your current employment?

3    A.   I worked at Geffen Academy at UCLA.  It's a middle school

4    and high school.

5    Q.   Why did you leave that job?

6    A.   I left that job because I was fired due to -- I was fired.

7    Q.   Why were you fired?

8    A.   Due to my involvement in pleading guilty.

9    Q.   And when you say you pled guilty, what crime did you plead

09:11 10   guilty to?

11   A.   I pled guilty to RICO conspiracy.

12   Q.   When was that approximately?

13   A.   I pled guilty in May of 2019.

14   Q.   Can you tell the jury what you did that led you to plead

15   guilty.

16   A.   Yes.  During my time of working at USC, myself and my boss

17   were taking students from Rick and we were putting them in as

18   athletes into our program, even though they were not and they

19   were not going to play on our team.

09:12 20         After I finished working at USC, I still continued to

21   work for him and I helped other students get in as athletes and

22   I also created false profiles for him for his students and I

23   was paid in return for that.

24   Q.   When you say "Rick," that's Rick Singer?

25   A.   Correct.

```
        1   Q.    Okay.  We'll come back to that in a few minutes.  I want
        2   to just talk a little bit more about your background.  Can you
        3   tell us where you were born?
        4   A.    Yes.  I was born in Thousand Oaks, California.
        5   Q.    How far did you go in school?
        6   A.    I received my master's in kinesiology.
        7   Q.    And where did you go to school?
        8   A.    I went to California State University, Fullerton.
        9   Q.    How did you end up there?
09:12  10   A.    I ended up there -- I knew that I wanted to play soccer in
       11   college and during my junior year I was going through the
       12   recruiting process and the assistant coach at Fullerton, who
       13   had been recruiting me, came out to actually watch one of my
       14   high school games.  And he actually came to watch the other
       15   keeper, goalkeeper.  I was -- my position was goalkeeper.  And
       16   I ended up playing in that game, and he liked my talent level
       17   and decided to recruit me, and I went through the recruiting
       18   process and then decided to go and play athletics and be a
       19   student at Cal State, Fullerton.
09:13  20   Q.    Who was the coach that recruited you to play at Cal State,
       21   Fullerton?
       22   A.    His name is Ali Khosroshahin.
       23   Q.    Did you end up playing soccer all four years of college?
       24   A.    I did, yes.
       25   Q.    And after you graduated from Cal State, Fullerton, what
```

```
 1   did you do?
 2   A.   So after I initially graduated my undergraduate, I stayed
 3   at Cal State, Fullerton as a graduate assistant coach for the
 4   soccer program and received my master's.  After that I went
 5   into a sales job just for a couple months.  I decided that
 6   sales wasn't for me.  My passion was working with children and
 7   I decided I was going to go to nursing school and started
 8   applying to nursing schools.  I wanted to be a pediatric nurse.
 9             And then I received a phone call from Ali, who I had
10   played for and worked for as a graduate assistant, and he told
11   me that he got the job at USC and asked me to come and be a
12   part of the staff there instead of going to nursing school.
13   Q.   And when you say Ali got the job at USC, what job was
14   that?
15   A.   He received the head women's soccer coaching position.
16   Q.   And he asked you to come join the staff?
17   A.   Yes, he did.
18   Q.   In what position?
19   A.   He asked me to come join the staff as an assistant head
20   coach -- sorry -- as an assistant coach, and I would work
21   primarily with the goalkeepers.
22   Q.   And when did you go to USC to join Ali?
23   A.   Ali asked me to join him in January of 2007, however, I
24   didn't join him until February of 2007 because I was coaching a
25   junior varsity high school team and I wanted to finish my
```

A2497

```
  1  commitment to them.
  2  Q.   So after you went to USC in February of 2007, can you just
  3  tell us a little bit about what your role was on the coaching
  4  staff?
  5  A.   Yeah.  So my primary role was mostly just working with the
  6  goalkeepers.  That was the position that I played.  And so
  7  working with the goalkeepers, recruiting of some goalkeepers,
  8  and then my biggest role was probably off the field doing all
  9  the operations, from travel to working with the student
 10  athletes off the field, checking out, making sure that they
 11  were just being responsible student athletes.
 12  Q.   And you mentioned having a little bit of involvement in
 13  recruiting, primarily with goalkeepers, you said?
 14  A.   That's correct.
 15  Q.   At some point did you come to have more involvement in
 16  recruiting on the team?
 17  A.   Yes, I did.
 18  Q.   Can you tell us a little bit more about that?
 19  A.   Yeah.  So -- so, recruitment wise, I would, in the soccer
 20  world, you can find tournaments every weekend to recruit at.
 21  And so I was involved with the process from getting e-mails
 22  from potential students that wanted to play at the University,
 23  looking over their resumes, talking to club and high school
 24  coaches about them, and then we would actually go to the field
 25  and would go to tournaments on the weekends.  We would watch
```

09:15 10

09:16 20

the students play.  And we would decide if we -- we'd watch

them multiple times and decide if they might be a fit for our

program.  And we would continue that conversation with their

club coaches and would communicate with them, if we were

allowed to, by the NCAA guidelines, and communicate with them

and try to get them to want to commit to our university.

Q.    And did you recruit both scholarship soccer players and

walk-ons?

A.    Yes, we did.  We recruited anybody that was playing on our

team.  We went and recruited and watched them.

Q.    Can you tell us the difference between a recruited

scholarship athlete and a recruited walk-on?

A.    Yeah.  In my experiences for our team, the biggest

difference was that a scholarship athlete received money from

the university to play on the team and a recruited walk-on did

not receive any money to play for various reasons, but both of

them were still valued and could make an impact on our team.

Q.    Have you heard the term "practice player" before?

A.    Yes, I have.

Q.    What does that mean to you?

A.    So, for us, again, with my experience, we wouldn't -- we

would -- we would use the term "practice player" amongst

ourselves as coaches and -- but we never used it specifically

when talking to an athlete, but for us, whether you were --

even if we, as coaches, talked about you as a practice player,

```
 1   it still meant for us that you were a recruited walk-on.  You
 2   were still expected to be at every practice, at every game, at
 3   every team event.  You were on the team and you were recruited
 4   in our mind.
 5   Q.   And when you coached at USC, did you ever recruit team
 6   managers?
 7   A.   No, I did not.
 8   Q.   So once you had gone through this process and identified
 9   your recruits for the year, what did you do next?
10   A.   So once we had identified our recruits and once they had
11   also made a commitment to us that they wanted to play for us,
12   we would put together information on them, such as we would get
13   all information together, test scores, transcripts, player
14   profiles, and we'd put that together so that we could then
15   present them to Admissions Subcommittee.
16   Q.   And who did you provide that information to?
17   A.   We would provide that information to Donna Heinel.
18   Q.   And you were talking a little bit about practice players
19   and walk-ons.  Did you ever present a player to SUBCO as a
20   practice player?
21   A.   No.  So our players would go as they were still recruited
22   walk-ons.  So, for us, it was the same thing.  We expected
23   everybody there to make an impact on our team.
24   Q.   At some point after you started coaching and you got more
25   involved in recruiting, did you become familiar with an
```

```
 1    individual named Rick Singer?

 2    A.    Yes, I did.

 3    Q.    Can you tell us a little bit about that?

 4    A.    Yeah.  So the head coach I worked for, Ali, had met Rick

 5    Singer and spoke with him, and Rick spoke with Ali about using

 6    soccer to help his students gain admittance into the

 7    university.

 8    Q.    Did Ali say that this was going on at USC?

 9    A.    Ali told me that there were other coaches that had been

10    doing it and so that it was -- it had been done, yes.

11    Q.    Did Ali mention any specific coaches?

12    A.    Yes.

13          MS. PAPENHAUSEN:   Objection.

14          THE COURT:  She can answer whether she mentioned any

15    specific coaches.  That question is all right.  She can answer

16    it.

17    A.    Yes, he did.

18    Q.    Who did he mention?

19    A.    He mentioned Jovan Vavic.

20    Q.    Who was that?

21    A.    That was the men's and women's water polo coach at USC.

22    Q.    What happened after Ali told you about this arrangement

23    with Rick Singer?

24    A.    So after that we would get possibly one or -- Rick would

25    reach out to us and give us one to two students of his and we
```

1 would start the process to admit them as an athlete into our

2 program despite the fact that we actually hadn't recruited them

3 or spoke with them.

4 Q. And how -- if you had never seen them or spoken with them,

5 how did you go about presenting them as recruits?

6 A. We basically would take a player profile that was given to

7 us and we had to put it into the format that we used and gave

8 to Donna Heinel for our other student athletes.  We would

9 basically take bits of information from their profile, and then

09:22 10 we also had to write a paragraph on them.  So that paragraph

11 was made up by myself, and it was made up, and so we tried to

12 make it sound like they would be a benefit to the team and make

13 an impact on the team by certain verbiage we would use or

14 things within the paragraph.

15 Q. And you mentioned that Rick would send you the initial

16 draft of the profile?

17 A. Yes.

18 Q. Did you have an understanding of where that came from?

19 A. I did not, but once again --

09:22 20   MS. PAPENHAUSEN:  Objection.  Your Honor, she just

21 responded I did not.

22   THE COURT:  Yeah.  She answered the question.

23 Q. Do you know whether the information in the profile that

24 Rick sent to you was true or false?

25   MS. PAPENHAUSEN:  Objection.

```
 1    A.    I did not.
 2           THE COURT:    She can answer whether she knew it was
 3    true or false.
 4    A.    No, I did not.
 5    Q.    And your mentioned that you hadn't spoken with these
 6    students or seen them play.    Did you know anything else about
 7    them?
 8    A.    No.
 9    Q.    Did you ever talk to their coaches?
10    A.    No.
11    Q.    Did you know if they even played soccer?
12    A.    No.
13    Q.    And did any of them end up playing on the USC women's
14    soccer team?
15    A.    No.
16    Q.    What did you and Ali Khosroshahin get in exchange for
17    doing this?
18    A.    We were paid money.
19    Q.    How much approximately?
20    A.    Approximately $50,000 every student.
21    Q.    And would you and Ali have recruited any of those students
22    but for the payments?
23    A.    I wouldn't have even known who the students were, so no.
24    Q.    Could you tell us a little bit about where that money,
25    that $50,000 per student, went and what you used it for?
```

A.    Yeah.  So, initially, that money went into -- for the
women's soccer program, and we would use that money for -- we
could use it for equipment, anything that was above our school
budget.  So we could use it for that purpose, but, primarily,
we did take our team on a European trip one summer and so we
used that money to help fund that trip.

Q.    Was it part of your job as a coach at USC to fundraise for
the soccer team?

A.    Ali always said to me there was two ways to keep your job
at USC.  It was to win or it was to bring in money, but I
never -- other than Ali, never specifically had conversations
with anybody about fundraising.

Q.    And in your experience in recruiting soccer players, did
fundraising play a role in recruitment?

A.    No.  We always looked at a student to see what kind of
impact they could make on the team and if they could help us be
successful on the team.

Q.    You mentioned that at first these payments from Rick went
to the USC women's soccer program.  Did that change at some
point?

A.    Yes, it did.

Q.    Can you tell us about that?

A.    Yeah.  So at one point the money stopped going to the
women's soccer program and it transitioned over to what was
called The Football Academy.  And the money would go into there

```
 1   instead.
 2   Q.   What was The Football Academy?
 3   A.   The Football Academy was a separate business account that
 4   was set up to -- for us to run camps during the summer and
 5   throughout the year at USC and so it was a separate business
 6   entity.
 7   Q.   And can you explain a little bit about what the purpose of
 8   the camps are?
 9   A.   So, as a coach at USC, we would run summer camps and we
10   would run identification camps throughout the year.  There's
11   two purposes for the camps.  One is it can help you see
12   students.  It can help you get to know them and they get to see
13   your campus as well if you're recruiting them, and they get to
14   know you as coaches on a different level because they're
15   actually training with you at a camp.
16        The second purpose is the camps help coaches make
17   extra money and help pay volunteer assistants.  So it's also a
18   money maker.
19   Q.   So the money that Rick Singer paid to you and Ali that
20   went to the camp, what was that money used for?
21   A.   That was used to -- well, ultimately, it was used for Ali
22   and myself to make more money.
23   Q.   Did you have an understanding of whether others at USC
24   were aware of what you and Ali were doing?
25        MS. PAPENHAUSEN:  Objection.
```

**A2505**

```
 1              THE COURT:  Give me the question again.

 2   Q.   Did you have an understanding of whether others at USC

 3   were aware of what --

 4              THE COURT:  She can answer whether she has an

 5   understanding.

 6   A.   To my knowledge, nobody else did.

 7   Q.   Anyone in Admissions?

 8   A.   No.

 9   Q.   What did you understand your responsibility to be as a

09:27 10  coach with respect to recruiting?

11   A.   So my responsibility as a coach was to, first and

12   foremost, find student athletes that were going to make an

13   impact on our team; student athletes that could contribute to

14   our team, both on and off the field, and student athletes that

15   were going to come in and work hard for the team, represent the

16   university with pride, and just be responsible people.

17   Q.   Did there come a time when you left USC?

18   A.   Yes, I did.

19   Q.   Can you tell us how that happened?

09:27 20  A.   Yeah.  So Ali was eventually let go from the university

21   for various reasons and I was kept on for a few months.

22   Eventually, I was let go by the coach that they brought in to,

23   the new head coach of the team.  And, typically, in the college

24   coaching world, when a new head coach comes in, they bring

25   their coaches with them and so I was let go at that time.
```

```
 1   Q.   And when was that approximately?

 2   A.   January of 2014.

 3   Q.   Did you continue to work with Rick Singer after you left

 4   USC?

 5   A.   Yes, I did.

 6   Q.   How did that come about?

 7   A.   So during the time, the last year that I was at USC, we

 8   had two of Rick's students that we were trying to get into the

 9   program still.  One of them had been admitted already and the

10   other had not been admitted yet.  So I continued to help get

11   that student in and then some future students also.

12   Q.   So let's start with the first student you mentioned that

13   kind of started the process.  What was her name?  Do you

14   recall?

15   A.   Are you referring to the first student that got in before

16   we left, or like after we left?

17   Q.   The one that you just mentioned who you had started the

18   process, but she had not yet made it through at the time you

19   left.

20   A.   Okay.  Her name was Amanda Feiwell.

21   Q.   And you said so you continued to work to try to get her

22   in.  Why did you do that?

23   A.   Ali had reached out to me and said that we really needed

24   to get her in still.  And so I felt like I owed it to him to

25   continue to help him and also, in return, we were still going
```

```
 1    to get paid for doing this.
 2    Q.   So if you were no longer at USC, how did you go about
 3    trying to usher her through the process?
 4    A.   So I had a relationship with Donna Heinel.  I reached out
 5    to her and gave her the scenario that we had been trying to get
 6    her in, we couldn't get her in, and if she got in, that her
 7    family was going to be giving money to the women's soccer
 8    program and asked if she could still help get her in.  Then the
 9    funds could go to Donna Heinel instead.
09:30 10   Q.   And you say to Donna Heinel -- what do you mean?  The
11    funds go to Donna Heinel.  What do you mean by that?
12    A.   So they would go to Donna Heinel at USC to whatever
13    program or funds she wanted them directed to.
14    Q.   What was the outcome with Amanda Feiwell?
15    A.   She was admitted into USC and her parents did pay money.
16    Q.   Do you recall acting in this kind of liaison role with
17    Donna Heinel at any point after Amanda Feiwell?
18    A.   Yes.  I did with another student after that.
19    Q.   Can you tell us a little bit about that.
09:30 20   A.   Yes.  So I believe it was the following year that I got a
21    call from both Rick and Ali asking me to help with another
22    student named Jaeger Hodge.  His sister, Macall, had
23    previously --
24         MR. KELLY:  We're going to object again, your Honor.
25         THE COURT:  Sustained.
```

```
 1   Q.   Can you tell us how you became aware of Jaeger Hodge?
 2            MR. KELLY:  Objection.
 3            THE COURT:  No.  She can say that.
 4   A.   His sister Macall had previously come in under soccer as
 5   one of Rick's students.
 6   Q.   And who reached out to you about the younger brother,
 7   Jaeger?
 8   A.   Rick Singer.
 9   Q.   And what did you do for Jaeger Hodge?
10            MR. KELLY:  Objection.  Relevance.
11            THE COURT:  Overruled.
12            You may answer.
13   A.   I reached out to Donna Heinel and asked her if she would
14   be willing to put him through athletics to gain admissions, and
15   she said yes and started that process.
16   Q.   And how did he go through athletics?
17   A.   I sent her two player profiles of him, one for tennis and
18   one for football, and she ended up presenting him as a football
19   athlete, and he was admitted to the University as a football
20   athlete.
21   Q.   Were the profiles that you created for Jaeger Hodge
22   accurate?
23   A.   No.  I had falsified them.
24   Q.   And was there a financial discussion or agreement about
25   this, about Jaeger Hodge?
```

```
 1   A.    Yes.  So once he was in, his family gave money to the
 2   Women's Athletic Fund, which was run by Donna Heinel.
 3   Q.    And what did you get out of it?
 4   A.    I received money, as well.
 5   Q.    Do you remember how much?
 6   A.    There was approximately $50,000 that went to the Football
 7   Academy that Ali and I split.
 8         MS. WRIGHT:  Okay.  Miss Lewis, if we could pull up
 9   Exhibit 693, for the witness only, please.  Thank you.
10   Q.    Miss Janke, do you recognize this document?
11   A.    Yes.
12   Q.    What is it?
13   A.    It's a --
14         MR. KELLY:  Further objection under Petruziello, your
15   Honor.
16         THE COURT:  All right.  The objection is noted.
17   A.    It's an e-mail from myself to Rick Singer.
18   Q.    What's the date of the e-mail?
19   A.    March 17, 2015.
20   Q.    And the subject?
21   A.    "Jaeger."
22         MS. WRIGHT:  Government offers it.
23         THE COURT:  It will be admitted.
24         (Exhibit 693 admitted into evidence.)
25   Q.    So here you say, "Hey Rick, I just got this message from
```

09:33 appears at lines 10 and 20.

```
 1    Donna".  So you're passing on a message you received from Donna
 2    Heinel?
 3    A.    Correct.
 4    Q.    "Jaeger's admission packet will be mailed on March 24th.
 5    After the packet is received, please let the father know to
 6    send the check directly to me at USC, make out to what we had
 7    discussed before.  Thank you!"
 8            When she says, "make out to what we had discussed
 9    before," what had you discussed before?
10    A.    So, previously, she had discussed with me about having the
11    payment go to the Women's Athletic Fund, which was a fund that
12    she oversaw.
13    Q.    Do you recall any discussion with Donna as to whether
14    Jaeger Hodge would be joining the USC football team?
15    A.    No.
16    Q.    And to your knowledge, was the USC football coach involved
17    in this at all?
18    A.    No.
19    Q.    Did you continue to work with Rick Singer after getting
20    both Amanda Feiwell and Jaeger Hodge admitted to USC through
21    Donna Heinel?
22    A.    Yes, I did.
23    Q.    How did that come about?
24    A.    So there was one other student that he had asked me to
25    look into that I looked into for.  And then, after that, I
```

09:34 (line 10)
09:35 (line 20)

```
 1   continued to create false profiles for students of his.
 2   Q.   How did you make that arrangement with Rick to continue
 3   making false profiles?
 4   A.   So I spoke with Ali Khosroshahin and he had told me that
 5   he had spoke with Rick and told Rick that I could make profiles
 6   for him and received an e-mail from Ali also -- basically
 7   saying that he had spoke with Rick and he wanted to continue to
 8   use me to make profiles.  While I was working, Rick actually
 9   came to my job and he spoke with me about helping him for a
10   different business that he wanted to try to set up.  And at the
11   end of that conversation, he asked me about continuing to
12   create profiles for him, and I said yes, just send me whatever
13   information I need.
14   Q.   And that other business idea that Rick Singer mentioned to
15   you, did that ever go anywhere?
16   A.   No, it did not.
17   Q.   And what did you get in exchange for agreeing to continue
18   making profiles?
19   A.   I received money.
20   Q.   Approximately how much, total?
21   A.   A couple thousand dollars.
22   Q.   Were all of the profiles that you created for USC?
23   A.   No, they were not.
24   Q.   What other schools did you create profiles for?
25   A.   I also created profiles for UCLA, Stanford, and Yale.
```

Q.    And for Yale, do you recall what sport those profiles were

for?

A.    Yes.  They were for soccer.

Q.    And what about UCLA?

A.    UCLA was for soccer as well.

Q.    Okay.  Can you just tell us a little bit about how it

worked when Rick had a profile for you to create.

A.    Yeah.  So Rick would send me an e-mail giving me basically

the student's name and the sport and possibly the position that

he wanted me to create this profile for.  In the beginning, he

would sometimes give me a little bit more information, such as

maybe team or one or two awards, but even if he did that, I

still had to fill in and come up with other accolades for the

student.

        And then, eventually, like I said, he would just give

me the name and the sport that he would want and I would

basically take the student's -- that sport information.  I

would always, on a profile, put the generic information, name,

address, GPA, test scores.  Then I would take -- from there I

would take the student's high school that they played at and I

would Google everything else.  And I would look at the high

school that they played for and I would try to match up --

basically, if the school was part of XY and Z conference, I

would try to find awards that correlated with that XY and Z

conference.  And I would take those that didn't pertain to that

1    student and I would still fill them in there.

2         And then I would do the same for the club sport.  I

3    would find a club team that was in the area where the student

4    lived and I would use that team.  And I would also try to find

5    tournaments or other awards that could be associated with that

6    club team, and I would once again take those, which didn't

7    pertain to that student, and I would put them all in the

8    profile.

9    Q.   You mentioned the high school that they played for.  Did

09:39 10   you have an understanding one way or the other whether these

11   kids played the sport in high school?

12   A.   I did not.  Sometimes I could Google -- I would Google the

13   student's name and no information would come up on that.  So

14   what I knew, regardless of whether they actually were playing

15   that sport or not, they weren't at the level to be able to play

16   at that division of athletics and I was going to have to fill

17   in and falsify information no matter what.

18   Q.   In addition to the athletic information you put on the

19   profiles, you put photos as well?

09:39 20   A.   That's correct.

21   Q.   And how did you get the photos?

22   A.   So sometimes a photo was forwarded to me from Rick and

23   other times I just Googled and found a photo of anybody doing

24   that sport online and I would put that photo in.

25   Q.   Of course, you had made these soccer profiles before in

1    your role as a coach.  How did you make the profiles for sports

2    you weren't as familiar with?

3    A.   So, initially, the sports I wasn't as familiar with is I

4    could find, like, sample profiles online and look at those to

5    kind of determine what needed to be used.  And as the process

6    went on and once I already had a profile for a sport, if I had

7    to use that sport again, I could go back and use a very similar

8    format to what I had already been using for that sport.

9    Q.   What did you do with the profiles once you completed them?

09:40 10    A.   I would take them and I would send them to Rick Singer and

11    see if there were any changes that needed to be made.

12    Q.   Did you have an understanding of what Rick Singer did with

13    the profiles once you sent them to him?

14    A.   No.

15    Q.   Then how did you know that they were being created for a

16    specific university?

17    A.   Because sometimes he would tell me the university that

18    they were for or sometimes in the e-mail to me, maybe in the

19    headline it would say "USC water polo" or he might say, "I need

09:41 20    this profile for Yale."  So a lot of times he would tell me.

21    Q.   Let's go through an example.

22        MS. WRIGHT:  Miss Lewis, if you could please pull up

23    Exhibit 694, for the witness only.

24    Q.   Miss Janke, do you recognize this document?

25    A.   Yes.

```
 1    Q.   What is it?

 2    A.   It's an e-mail from myself to Rick Singer.

 3    Q.   What's the date?

 4    A.   September 23, 2015.

 5    Q.   And the subject line?

 6    A.   "Waterpolo 3".

 7              MS. WRIGHT:  Government offers 694.

 8              THE COURT:  It will be admitted.

 9              (Exhibit 694 admitted into evidence.)

09:42 10         MS. WRIGHT:  Okay.  Miss Lewis, if we can go down to

11    the bottom e-mail in the chain, please, and pull that part up.

12    Q.   So, actually, the bottom e-mail appears to be an e-mail

13    that Rick Singer had forwarded to you from someone named

14    Lawrence Feiwell; is that right?

15    A.   Correct.

16    Q.   And attached there is a photo of what appears to be a girl

17    playing water polo?

18    A.   Correct.

19    Q.   And Rick says to you, "Laura, can you do a profile for

09:42 20    Vanessa Feiwell for water polo.  I will send info today.

21    Charge me whatever you want.  Jovan and I have already spoken".

22              Can you remind us who Jovan is?

23    A.   Jovan, at the time, was the water polo coach for men and

24    women at USC.

25              MS. WRIGHT:  Miss Lewis, if we can go to the top
```

1  e-mail, please.

2  Q.   You respond, "No problem.  I will make a regular profile

3  and also the type I used to make at USC so Jovan can have his

4  pick".

5        What did you mean by a regular profile and the type

6  you used to make at USC?

7  A.   So the regular profile was referring to is where you put

8  the student's generic information and then I would put just

9  their accolades from -- the accolades I found from high school

09:43 10  and club, and I was referring to the type I used to make when I

11  was at USC.  We would take the profile and put a little bit of

12  information, but then we would write a paragraph pertaining to

13  that person.

14  Q.   Here, you say, "Here is the info I will need", and you

15  list a number of items, including date of birth, phone,

16  address.  Down here, do you see where it says "Position:

17  Assuming GK (correct?)"

18        What did you mean by that?

19  A.   So based off of that picture that was forwarded, it looks

09:44 20  like a goalkeeper playing water polo, but I had no way to be

21  certain since I had never met this person or actually knew

22  anything about them.

23  Q.   Then you see where you say "club team if any"?

24  A.   Yes.

25  Q.   What did you mean by that?

A.    So I just meant that if they were playing on a club team,
could he provide me with that information because if they
weren't, then I was going to have to Google and find a club
team in that area.

Q.    And then, at the bottom there, you say, "I can add in any
awards, et cetera, if she does not have any"?

A.    Yeah.  So, again, same thing if -- I didn't actually know
if she played the sport or not, so if she played it at some
sort of level, if there were any awards that she had, I could
add that into the profile along with anything else I was going
to add.  Or if she didn't, then that meant that I was going to
make up all of the awards and everything in it.

        MS. WRIGHT:  Miss Lewis, if we can now pull up
Exhibit 695, again for the witness only.  Thank you.

Q.    Miss Janke, do you recognize this document?

A.    Yes.

Q.    What is it?

A.    That's an e-mail from myself to Rick Singer.

Q.    The date of the e-mail?

A.    September 30, 2015.

Q.    And the subject line?

A.    "Vanessa".

        MS. WRIGHT:  The government offers Exhibit 695.

        THE COURT:  It will be admitted.

        (Exhibit 695 admitted into evidence.)

1   Q.   So here you say "Here are 2 profiles" -- you say to Rick,

2   "Here are 2 profiles for Vanessa.  They are similar, but

3   figured Jovan can choose which one he prefers.  If he needs

4   something different as well let me know".

5        So you had created two different versions of the

6   profile for Vanessa Feiwell?

7   A.   That's correct.

8        MS. WRIGHT:  Okay.  Let's take a look at the

9   attachments, please, Miss Lewis.  I have a paper copy with the

09:46 10   attachments not on it.  I have a paper copy.  I can use that

11   one.

12   Q.   So this is that same e-mail we were just looking at?

13   A.   Yes.

14   Q.   Okay.  And is this one of the profiles that you attached,

15   that you created for Vanessa Feiwell?

16   A.   Yes, it is.

17   Q.   And did you follow that same basic process you discussed

18   to create this?

19   A.   I did, yeah.

09:47 20   Q.   And these photos, they appear to be different than the one

21   that was in that original e-mail?

22   A.   Can I see that?  Can I see that again real fast?

23   Q.   Can we go back to it?  Yes.

24   A.   Yes.

25   Q.   Okay.  So here, Huntington Beach High School, that was the

```
 1   high school information that you came up with?
 2   A.   Yes.
 3   Q.   And then Huntington Beach Water Polo Club, that's a club
 4   team that you found?
 5   A.   Yes.  I actually believe in the previous e-mail that was a
 6   club team that was listed on there, but I still had to look for
 7   that club team and come up with all of the stuff associated
 8   with it.
 9   Q.   Okay.  And this is the second attachment to that same
10   e-mail.  So this is just a slightly different version of that
11   same profile?
12   A.   That's correct.
13   Q.   And why did you create the two different versions?
14   A.   So I created one with two photos in case that was what
15   they wanted to use, and it was really just the two different
16   photos was the big thing.
17   Q.   And so based on your communications with Rick you believe
18   that you were creating these profiles for Jovan Vavic?
19   A.   That's correct.
20   Q.   At some point did you start creating profiles for Donna
21   Heinel instead of for coaches at USC?
22   A.   Yes, I did.
23   Q.   Can you tell us how that came about?
24   A.   Yes.  So I received an e-mail from Rick that said that he
25   had spoke with Donna Heinel directly and he was given the
```

```
 1   go-ahead to give her athletes and ask me to -- or give her

 2   students to present as athletes, and he asked me to create the

 3   profiles for them.

 4          MS. WRIGHT:  Okay.  Miss Lewis, if we can switch back

 5   to the monitor and pull up Exhibit 329, for the witness only.

 6   Q.   Miss Janke, do you recognize this document?

 7   A.   Yes, I do.

 8   Q.   What is it?

 9   A.   It's an e-mail from myself to Rick Singer.

10   Q.   What's the date?

11   A.   July 16, 2017.

12   Q.   So approximately two years after those e-mails about

13   Vanessa Feiwell we just looked at?

14   A.   Correct.

15   Q.   And had you continued making profiles for Rick Singer

16   during that two-year interim period?

17   A.   Yes, I had.

18   Q.   And what's the subject line of that e-mail?

19   A.   "A couple opportunities to help if you like".

20          MS. WRIGHT:  The government offers Exhibit 329.

21          THE COURT:  It will be admitted.

22          (Exhibit 329 admitted into evidence.)

23          MS. WRIGHT:  Okay.  Miss Lewis, if we can go to the

24   bottom e-mail in the chain and blow that up.  Thank you.

25   Q.   So this is from Rick to you.  "Laura I met with Donna this
```

```
 1   week in her office and she gave the action items to create
 2   profiles for all the kids I presented to her.  Would you be
 3   willing to put the profiles together for pay?"
 4            What did you understand him to mean by the kids he
 5   presented to her?
 6   A.   What I understood it to mean was he spoke with her about
 7   these kids going in as, being presented as athletes, and that
 8   he would give her all the information for these students.
 9   Q.   Was it typical for Mr. Singer to ask you to create this
10   many profiles at one time?
11   A.   Previously before this, no.  It had just been for a few
12   students here and there, so no.
13   Q.   And did you end up -- we'll go through some of them, but
14   did you end up creating profiles for each of the students
15   listed here?
16   A.   To my knowledge, I believe that I did for everyone, yes.
17   Q.   And did you follow that same basic process you discussed
18   in order to create them?
19   A.   I did.
20   Q.   So were they all falsified?
21   A.   They were, correct.
22            MS. WRIGHT:  We can go to the next part of the e-mail
23   chain.
24   Q.   You say, "Yes I would be willing to do that.  When does
25   she need them by?  Did she say if the format I normally use is
```

```
 1    fine, or did she want other items in it?"
 2          What did you mean by the formatting you normally use?
 3    A.   I just meant the format -- so on the profile we saw before
 4    of Vanessa Feiwell, was that format okay or did she specify if
 5    there was a different type of profile that she needed.
 6          MS. WRIGHT:  Okay.  So if we can go to the top half of
 7    the chain.  Thank you.
 8    Q.   So Rick responds, "She would prefer by very early
 9    August -- same format as the rest".
10          And then your response up here at the top, "Okay
11    sounds good.  Please send me the pertinent information and I
12    will get started".
13          And you list some items here similar to how you had
14    for Vanessa Feiwell?
15    A.   That's correct.
16    Q.   And then down here, you say, "If they play the sport --
17    position, club, accolades if they have them, picture".  What
18    did you mean by that?
19    A.   So, again, if they did play the sport at some sort of
20    level, I just wanted to get some of that information, or
21    information that they had so I could include that in there, and
22    then I could add -- falsify and add to that list of
23    information.
24    Q.   And here you say, "If they don't have the items pertaining
25    to the sport, let me know and I will create"?
```

```
  1   A.    Yes.  So that meant if they hadn't played a sport or
  2   didn't have enough accolades, then I was going to have to
  3   Google and find information that could be used so that they
  4   appear to be an athlete.
  5   Q.    Did you have any direct contact with Donna Heinel in
  6   relation to these profiles for these students?
  7   A.    I did not.
  8   Q.    Did you have any discussions with Donna about whether or
  9   not these were legitimate recruits?
 10   A.    I did not.
 11   Q.    Did you have an understanding of whether they were
 12   legitimate recruits?
 13   A.    Well, based on the fact that I was the one creating these
 14   profiles, I knew a couple things:
 15            One, if they were truly an athlete at the caliber of
 16   playing there, they would have their own profile already.  And
 17   also, if they were an athlete that could play at the college
 18   level, they would have been going through the coach of that
 19   sport at the university to be recruited.  They would not have
 20   been going in through Donna Heinel, because in all of my
 21   experiences recruiting when we had an athlete that we wanted,
 22   we, as the coach, presented it to her, not somebody else coming
 23   and giving the information to her.
 24   Q.    Let's discuss some of the students that are listed in the
 25   bottom e-mail in just a little bit more detail.
```

```
 1              MS. WRIGHT:  Miss Lewis, if you could pull up
 2    Exhibit 335, for the witness only.
 3    Q.   Miss Janke, do you recognize this document?
 4    A.   Yes.
 5    Q.   What is it?
 6    A.   It's an e-mail from Rick Singer to myself.
 7    Q.   What's the date?
 8    A.   July 27, 2017.
 9              MS. WRIGHT:  Government offers Exhibit 335.
10              THE COURT:  It will be admitted.
11              (Exhibit 335 admitted into evidence.)
12    Q.   Here Rick has forwarded you an e-mail from Gamal Aziz and
13    writes, "For Sabrina Aziz - basketball player from China".
14              Do you recall whether Sabrina Abdelaziz was on that
15    list of students that we just looked at?  We can pull it back
16    up if you like.
17    A.   Yeah.  If you can pull it back up.  I believe she was, but
18    I just want to make certain.
19              MS. WRIGHT:  Sure.  If you can pull up Exhibit 329
20    again, Miss Lewis.  The bottom.  Perfect.  Thank you.
21    Q.   You see here where it says "Sabrina Abdelaziz -
22    basketball"?
23    A.   Yes.
24              MS. WRIGHT:  Okay.  If we can go back to 335.  Thank
25    you.  There's an attachment to this e-mail.  If we can go to
```

the attachment.

Q.    This appears to be Sabrina Abdelaziz's high school

transcripts?

A.    Yes.

Q.    What did you -- by Rick sending you this transcript and

saying basketball player from China, what did you understand

that to mean?

A.    That he needed me to come up with a profile for her and he

was basically telling me that she lives in China so I would

have to find accolades that seem realistic for somebody that's

playing in China.

        MS. WRIGHT:  Miss Lewis, if you can now pull up

Exhibit 346, again for the witness only.

Q.    Miss Janke, do you recognize this document?

A.    Yes, I do.

Q.    What is it?

A.    It's an e-mail from Rick Singer to myself.

Q.    What's the date of the e-mail?

A.    July 27, 2017.

Q.    So the same date as that e-mail we just looked at?

A.    Correct.

        MS. WRIGHT:  The government offers this exhibit,

Exhibit 346.

        THE COURT:  It's admitted.

        (Exhibit 346 admitted into evidence.)

```
 1   Q.   Again, Rick Singer is forwarding you an e-mail from Gamal
 2   Aziz?
 3   A.   Correct.
 4   Q.   And there's an attachment, but the subject line is "First
 5   SAT score taking it again soon"?
 6   A.   Yes.
 7        MS. WRIGHT:  And if we just scroll down to the
 8   attachment, please, Miss Lewis.
 9   Q.   This appears to be a copy of Sabrina Abdelaziz's SAT
10   score?
11   A.   Yes.
12   Q.   Again, what was your understanding of why Rick Singer was
13   sending this information to you?
14   A.   Because, again, he wanted to -- me to come up with this
15   profile for her.  And when I was making these profiles, I
16   needed the pertinent information, such as SAT score and
17   transcript, to put on there, but also -- I also used this
18   information because as -- student athletes being presented, at
19   least at USC, they have a lot more leeway than in terms of
20   grades than the normal population of students has.  And so when
21   I was creating these, I have to look at the grades they have,
22   knowing that they possibly wouldn't get in if they were an
23   athlete based on their grades, but then I would also have to
24   come up with the accolades I was creating for basketball and I
25   had to make it believable enough so that you could look at them
```

A2527

```
  1  and say that they would make an impact on the team, but without

  2  raising any red flags as well to -- for them to say this person

  3  is so good, why are they, you know, a walk-on or anything else.

  4         MS. WRIGHT:  Miss Lewis, if you could pull up

  5  Exhibit 344, for the witness only.

  6  Q.  Miss Janke, do you recognize this document?

  7  A.  Yes, I do.

  8  Q.  What is it?

  9  A.  It's an e-mail from Rick Singer to myself.
```

09:59 10    Q.  What's the date of the e-mail?

```
 11  A.  July 27, 2017.

 12  Q.  So the same date as those prior two e-mails we just looked

 13  at?

 14  A.  Correct.

 15  Q.  And what's the subject line?

 16  A.  "Sabrina".

 17         MS. WRIGHT:  Government offers Exhibit 344.

 18         THE COURT:  It's admitted.

 19         (Exhibit 344 admitted into evidence.)
```

10:00 20    Q.  So, again, this is a forwarded e-mail that Rick sends you,

```
 21  the original e-mail being from Gamal Aziz with this photo here.

 22  What do you understand this photo to be?

 23  A.  I understood that to be the photo that I needed to use in

 24  the profile that I was creating.

 25  Q.  Did you believe that to be a photo of Sabrina Abdelaziz
```

```
 1    playing basketball?

 2    A.    I did.

 3    Q.    Why did you believe that?

 4    A.    Because it was forwarded from somebody and, also, any time

 5    that Rick didn't have a photo, he wasn't -- I was Googling it

 6    and trying to just find a photo of anybody online.

 7          MS. WRIGHT:  Miss Lewis, if we could now pull up

 8    Exhibit 658, please, for the witness only.

 9    Q.    Do you recognize this document, Miss Janke?

10    A.    Yes, I do.

11    Q.    What is it?

12    A.    It's an e-mail from myself to Rick Singer.

13    Q.    What's the date of the e-mail?

14    A.    August 7, 2017.

15    Q.    And again, what's the subject line?

16    A.    "Sabrina."

17          MS. WRIGHT:  The government offers Exhibit 658.

18          THE COURT:  It will be admitted.

19          (Exhibit 658 admitted into evidence.)

20    Q.    So here you write "Profile for Sabrina.... her e-mail,

21    phone and parents names needed to be added in as I did not have

22    that.  Let me know if you want me to add any other awards to

23    her profile, or if you think that is enough".

24          MS. WRIGHT:  And then if we can go to the attachment,

25    please.  Thank you.
```

```
 1    Q.    Is this the profile that you created for Sabrina

 2    Abdelaziz?

 3    A.    Yes, it is.

 4    Q.    Okay.  Let's go through a few of the items on here.  This

 5    picture, I know it's a little bit hard to see this copy, but is

 6    this the same picture that Rick had forwarded to you?

 7    A.    Yes, it is.  I just cropped it down to zoom in more on

 8    certain players and the ball.

 9    Q.    Okay.  And you see where it says "Point Guard" under

10    Sabrina Abdelaziz's name?

11    A.    Yes.

12    Q.    Did you know whether Sabrina Abdelaziz played point guard?

13    A.    I did not.

14    Q.    So how did you come up with that?

15    A.    Based on the picture, the individuals in the picture

16    didn't look very tall, height-wise, and I knew that to be the

17    other positions you had to be, you know, 6 feet or taller.  So

18    I knew that, as a point guard, you could be a little bit

19    smaller, and so I felt that that would be the most believable.

20    Q.    And then the height, 5'8".  Did you know whether Sabrina

21    Abdelaziz's height was 5'8"?

22    A.    I did not.

23          MS. WRIGHT:  If we could scroll down to the bottom

24    point of the profile.  Thank you.

25    Q.    Here under "Hong Kong International School Basketball",
```

```
 1    where did this information come from?
 2    A.   So that was the name of her school based off of the
 3    transcript and then I basically Googled that school.  This one
 4    was a little bit harder because I didn't know anything about
 5    the way China ran their athletic programs and so I basically
 6    had to Google about the school and then other schools in the
 7    area so that I could try to find activities or conferences that
 8    would align with where she was going to school.
 9    Q.   And then under "Hong Kong Basketball Academy", did you
10    know what Hong Kong Basketball Academy was?
11    A.   No.  Again, that was just me Googling to try to find
12    something that would be believable enough to admissions and to
13    also make it look like she was a strong enough player to make
14    an impact on the team so she could be admitted.  In regards to
15    that as well, I know there's a couple things on there that I
16    would typically use for soccer profiles that I put in there
17    because I just -- I wasn't sure about athletics there.
18    Q.   You see up above where it says "Season Average" and then
19    it has those stats there, statistics?
20    A.   Yes.
21    Q.   Where did you get those?
22    A.   I just came up with those.  I looked to see on different
23    profiles what might be like an average points per game or
24    assists per game for a player that could look like they could
25    play at the college level.
```

```
  1   Q.   Did you have any direct communication with Gamal Aziz in

  2   relation to this profile?

  3   A.   I did not.

  4   Q.   Did you ever have any direct contact with the parents for

  5   whom you were creating these profiles?

  6   A.   No.

  7   Q.   Okay.  Just a few more documents to go through.

  8        MS. WRIGHT:  Miss Lewis, if we could pull up Exhibit

  9   361, which I believe is in evidence.  Sorry.  If we can start

10:05 10  at the top so we can see the subject line.

 11   Q.   This is an e-mail from you to Rick Singer, dated

 12   August 16, 2017, so close in time to when you had just sent

 13   that profile for Sabrina Abdelaziz?

 14   A.   Yes.

 15   Q.   And the subject line is "For me to complete USC athletic

 16   profile"?

 17   A.   Yes.

 18   Q.   Okay.

 19        MS. WRIGHT:  Now, let's scroll down to the bottom,

10:05 20  please, Miss Lewis.  Thank you.

 21   Q.   So you're not on these original e-mails, but it appears to

 22   be a chain between Rick Singer and Devin Sloane that he then

 23   forwards to you?

 24   A.   Yes.

 25   Q.   And you see here Rick says "did you do Matteo Sloane --
```

```
 1    Italian water polo player that attends Buckley"?
 2    A.   Yes.
 3    Q.   Do you recall -- and again, we can pull it up side by side
 4    if you like -- was Matteo Sloane one of the kids on that
 5    original list that Rick had sent to you?
 6    A.   I believe it was, but I would have to see the e-mail to be
 7    sure.
 8    Q.   Okay.
 9         MS. WRIGHT:  Miss Lewis, if you could pull up 329.
10    Q.   You see here where it says "Matteo Sloane - Water Polo"?
11    A.   Yes.
12         MS. WRIGHT:  We can go back to 361, please.
13    Q.   You respond, "No.  I didn't have anything on him.  I will
14    get it done".
15         And then Rick responds back to you, "Donna sent back
16    she needs a different picture for Olivia and Sabrina and I need
17    to get an action photo for Gino from mom".
18         Who is Olivia?
19    A.   Olivia is Olivia Giannulli, who I had created a profile
20    for for rowing at USC.
21    Q.   And then do you recall who Gino is?
22    A.   Yes.  Gino Palatella.  And in the e-mail Rick had asked me
23    to create a profile for him for football.
24         MS. WRIGHT:  If we can scroll up, Miss Lewis.
25    Q.   And then you reply, "What kind of pictures does she want
```

from them?"

And then Rick replies, "For Sabrina clearer and
Olivia different look than the one we used".

What did you understand Rick to mean with respect to
Olivia by saying "different looks than the one we used"?

A.   So what I understood that to mean is when I was creating
Olivia's profile, I had Googled and found multiple pictures of
females that were rowing and I had sent him multiple pictures,
and we were trying to decide which one to use because we --
when looking for that picture, we didn't want it to be a
picture that was just dead on of their face because I didn't
necessarily know what she looked like, and also, we didn't want
to tip anybody off if -- to know that that wasn't actually her.
So yeah, I sent him multiple pictures.  And so I believe that
from this e-mail what he was saying was the one that we ended
up using wasn't going to work and now could we pick from a
different photo from all the ones that I had sent him.

Q.   And had you previously created a profile for Olivia
Giannulli's older sister?

A.   Yes, I had.

Q.   Do you happen to recall which school or sport?

A.   It was also for USC rowing.

Q.   And at the top of the e-mail chain, you say, "Yikes... you
gave me the picture for Sabrina.  Do you have a different one?"

What did you mean by that?

```
 1   A.   I just meant that he had initially forwarded me the e-mail

 2   with the picture that was being used for Sabrina.  So I was

 3   asking him if he had a different one to put on the profile.

 4           MS. WRIGHT:  Miss Lewis, if we can now pull up

 5   Exhibit 367, for the witness only.

 6   Q.   Do you recognize this document, Miss Janke?

 7   A.   Yes.

 8   Q.   What is it?

 9   A.   It's an e-mail from Rick Singer to myself.

10   Q.   What's the date of the e-mail?

11   A.   August 16, 2017.

12   Q.   The same day as that previous e-mail chain we just looked

13   at?

14   A.   Uh-hum.

15   Q.   And what's the subject line?

16   A.   "Tommy".

17           MS. WRIGHT:  The government offers Exhibit 367.

18           THE COURT:  It will be admitted.

19           (Exhibit 367 admitted into evidence.)

20   Q.   So down here, the first e-mail from you to Rick is "Here

21   is a profile for Tommy.  Let me know what you think of the

22   picture, et cetera.

23           "Also, any thoughts on the pictures for Olivia and

24   Sabrina?"

25           Who is Tommy?  Do you recall?
```

A.    Tommy is Tommy Kimmel, who I had also done a profile for
for him.

Q.    You say, "Let me know what you think of the picture, et
cetera".  Do you happen to recall what picture you were
referring to?

A.    Yeah.  So for him I also had to Google and just find a
picture online of a track athlete.

        MS. WRIGHT:  Miss Lewis, if we can pull up Exhibit 384
quickly, which is already in evidence.  If you'll go to the
second page, please.  Thank you.

Q.    Is that the photo that you had put on the profile you
created for Tommy Kimmel?

A.    Yes, it is.

        MS. WRIGHT:  Thank you.  If we can go back to 367,
please.

Q.    Rick responds, "Can we take one of the others for Olivia
that you provided?  Sabrina -- I will get another".

        MR. KELLY:  I'll object, 401, 403 and all these
questions about other kids.

        THE COURT:  Objection's overruled.

Q.    Do you recall ever receiving another photo or replacement
photo for Sabrina Abdelaziz?

A.    I do not.

        MS. WRIGHT:  Miss Lewis, if you can pull up
Exhibit 383, which is in evidence, and go to the second page,

A2536

 1    please.

 2    Q.   If we can pull up the one that we already looked at that

 3    you created for Sabrina Abdelaziz, but how does this compare to

 4    what you had done?

 5    A.   I know that the height is different than what I had put,

 6    because I put 5'8", and in addition, that is not the picture

 7    that I had put on the profile.

 8         MS. WRIGHT:  Miss Lewis, if we can now pull up, for

 9    the witness only, Exhibit 659.

10:12 10   Q.   Do you recognize this document, Miss Janke?

11    A.   Yes.

12    Q.   What is it?

13    A.   It's an e-mail from myself to Rick Singer.

14    Q.   And the date?

15    A.   August 21, 2017.

16    Q.   And the subject line?

17    A.   "Profiles".

18         MS. WRIGHT:  The government offers Exhibit 659.

19         THE COURT:  It will be admitted.

10:12 20        (Exhibit 659 admitted into evidence.)

21    Q.   This is an e-mail from you to Rick.  "Sorry, I just found

22    these in my outbox from over the weekend.  Olivia and Matteo".

23         And those are the students we had discussed from that

24    prior e-mail chain?

25    A.   That's correct.

1          MS. WRIGHT:  If we could go then to the attachments,

2     please, Miss Lewis.

3     Q.   Is this the profile that you had created for Matteo

4     Sloane?

5     A.   Yes.

6     Q.   And we won't go through it all, but did you follow that

7     same basic process we've discussed in creating this?

8     A.   I did, yes.

9     Q.   And here on the right-hand side where it says "Italian

10:13 10   Youth National Team", why and how did you come up with that?

11    A.   So in the previous e-mail, Rick had said Matteo Sloane,

12    Italian Youth National Team.  So I used that.  I don't know if

13    he actually did play for them or did not.  I didn't have the

14    information.  And so, once again, I looked up the Italian Youth

15    National Team and tried to come up with accolades that

16    pertained to the actual Italian national team and tried to use

17    those to make it look like he's a believable athlete.

18          MS. WRIGHT:  And if we could go to the next page,

19    please, next one.

10:13 20   Q.   And is this the profile you created for Olivia Giannulli?

21    A.   Yes.

22    Q.   And where did that photo come from?

23    A.   That's again a photo that I found online of a rowing

24    person.

25          MS. WRIGHT:  If we could now pull up Exhibit 414,

```
 1    which is in evidence.  Go to the second page, please.

 2    Q.   Here at the top, do you see it says "Matteo Sloane"?

 3    A.   Yes.

 4    Q.   Is that the photo that you had put on the profile you

 5    created for Matteo Sloane?

 6    A.   No.

 7    Q.   But there's Italian Youth National Team.  Is that the

 8    information that you had put for Matteo Sloane purportedly

 9    playing in Italy?

10    A.   Yes.

11    Q.   Did you continue creating false athletic profiles for

12    Mr. Singer after this point?

13    A.   Yes, I did.

14    Q.   Do you recall creating a profile for a girl named Audrey

15    Isackson?

16    A.   Yes.  I believe it was for rowing.

17    Q.   What about Agustina Huneeus?

18    A.   Yes.  I believe she was for USC water polo.

19    Q.   And others as well?

20    A.   Yes.

21    Q.   When you were doing all this, did you believe that you

22    were committing a crime?

23    A.   I know that lying is wrong and I was raised by my family

24    to be better.  I was raised to have morals and values and

25    raised to know that lying is wrong and is not appropriate and
```

```
 1   I completely put all that aside and continued to lie throughout
 2   this process, and that is wrong.
 3   Q.   And who did you feel that you were lying to?
 4   A.   I was lying to the universities.  I was lying to
 5   admissions.  And even furthermore, I know what it takes to be a
 6   Division 1 athlete.  It takes a lot of commitment, a lot of
 7   dedication, and it's something that you don't take lightly,
 8   because it's very hard to do and in doing this --
 9           MR. KELLY:  Objection.  No question is pending, your
10   Honor.
11           THE COURT:  Overruled.
12   Q.   You may continue.
13   A.   In doing this and creating these profiles and lying about
14   that, I basically devalued and underscored the commitment that
15   it takes for an athlete to play and to be given the
16   opportunity.
17   Q.   When were you arrested for your participation in this?
18   A.   I was arrested in March of 2019.
19   Q.   You testified earlier that you pled guilty to racketeering
20   and conspiracy in about May of 2019?
21   A.   Yes.
22   Q.   In connection with your guilty plea, did you enter into
23   any agreements with the government?
24   A.   Yes.
25           MS. WRIGHT:  Miss Lewis, if you could first pull up
```

Exhibit 676, for the witness only.

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's my plea deal between myself and the government.

     MS. WRIGHT:  And the government offers Exhibit 676.

     THE COURT:  It will be admitted.

     (Exhibit 676 admitted into evidence.)

     MS. WRIGHT:  If you can go to page 7, please,

Miss Lewis.

Q.   Do you see where it says under "Acknowledgment of Plea

Agreement"?  Is that your signature, Miss Janke?

A.   That's my signature, yes.

Q.   What's your general understanding of what sentence the

government has agreed to recommend under the terms of this Plea

Agreement?

A.   They recommend 27 months.

     MS. WRIGHT:  Miss Lewis, if you can please now pull up

Exhibit 677, for the witness only.

Q.   Do you recognize this document, Miss Janke?

A.   Yes.

Q.   What is it?

A.   It's a Cooperation Agreement between myself and the

government.

     MS. WRIGHT:  The government offers Exhibit 677.

```
 1              THE COURT:  It will be admitted.

 2              (Exhibit 677 admitted into evidence.)

 3              MS. WRIGHT:  If we can go to page 5, please,

 4     Miss Lewis.

 5     Q.   And again, under "Acknowledgment of Cooperation

 6     Agreement", is that your signature there?

 7     A.   Yes.

 8     Q.   Can you tell the jury what your understanding is of what

 9     you've agreed to do under the terms of the Cooperation

10:18 10  Agreement?

11     A.   That I have agreed to tell the truth.  I have agreed to

12     tell exactly what I did and be truthful and, in exchange, they

13     could recommend a different sentencing.

14     Q.   Are you hoping for a lower sentence as a result of your

15     cooperation?

16     A.   I mean, yeah.  I don't want to go to jail and not be home

17     with my kids.

18     Q.   Who ultimately decides your sentence?

19     A.   The judge.

10:19 20       MS. WRIGHT:  No further questions.

21              THE COURT:  Cross-examination, Mr. Kelly.

22              MR. KELLY:  Yes, your Honor.

23                   CROSS-EXAMINATION OF LAURA JANKE

24     BY MR. KELLY:

25     Q.   Good morning, Miss Janke.  I represent Gamal Abdelaziz.
```

```
 1    A.    Good morning.

 2    Q.    Now, everything the prosecutor just asked you about, none

 3    of it you discussed with Gamal Abdelaziz, right?

 4    A.    Correct.

 5    Q.    And all of the fake stuff that you put into Sabrina

 6    Abdelaziz's athletic profile, none of it you discussed with

 7    Gamal Abdelaziz, right?

 8    A.    Correct.

 9    Q.    And you got that information from Rick Singer, right?

10:20 10   A.    Correct.

11    Q.    That's the man you and the prosecutor keep calling Rick,

12    right?

13    A.    Correct.

14    Q.    And Rick is the reason you're here today, right?

15    A.    The reason I'm here is because I allowed myself to

16    continue to lie and to do this, and I need to take

17    responsibility for that.

18    Q.    Okay.  Well, you didn't voluntarily drive down to the

19    federal U.S. Attorney's office and say, I'd like to confess to

10:20 20   lying and taking bribes, what can I do to help, did you?

21    A.    No, but I also didn't stand up for myself and stop it when

22    I knew it was wrong.

23    Q.    Right.  But you also got a call from Rick Singer when he

24    pretended there was some audit of his foundation, right?

25    A.    Yes.
```

```
 1   Q.   And that's what triggered this chain of events that lands

 2   you here today, right?

 3   A.   That's what ultimately did, but again, it was me not being

 4   truthful.

 5   Q.   Well, you said you knew that lying was wrong.  You also

 6   know that taking bribes is wrong, too, right?

 7   A.   Yes.

 8   Q.   Okay.  And Singer called you on December 3rd of 2018.  Do

 9   you recall that?

10   A.   I recall him calling me, yes.

11   Q.   And do you recall that he twice just referred to a person

12   as Donna?

13   A.   I don't remember those specific details.

14        MR. KELLY:  All right.  Let me just show the witness

15   then, please, 609A.

16   Q.   And direct your attention to page 2, lines 19 through 23.

17   And then I'm going to direct your attention to something else

18   in this document.  Okay.  And then go to page 3, lines 23 to

19   24.  Do you see a reference to a person named Donna?

20   A.   Yes.

21   Q.   And having seen that --

22        MR. KELLY:  Please take it down.

23   Q.   Having seen that, does that refresh your recollection that

24   when Singer called you he twice referred to a person as Donna?

25   A.   Yes.
```

```
 1    Q.    And you knew exactly who he was referring to, right?

 2    A.    Correct.

 3    Q.    He didn't have to tell you multiple times that she's the

 4    Senior Women's Administrator of USC?  He didn't have to explain

 5    who she was to you, right?

 6    A.    Right.

 7    Q.    You knew exactly who it was, right?

 8    A.    Uh-hum.

 9    Q.    And who was it?

10:23 10    A.    That was Donna Heinel, the Senior Women's Administrator at

11    USC.

12    Q.    Right.  And you knew that because you had worked at USC as

13    an assistant soccer coach and you were very familiar with both

14    Donna Heinel and the internal workings of the USC SUBCO

15    process, right?

16    A.    I knew the SUBCO process from my experience with them, but

17    I've never been in a SUBCO meeting to know the internal part of

18    it.

19    Q.    Okay.  Fair enough.  But you at least knew there was a

10:23 20    SUBCO process, you weren't part of it, but it existed at USC

21    and that's how the athletes got into USC, right?

22    A.    Yes.

23    Q.    Okay.  And you, at least, were a coach at USC.  You

24    weren't some outsider like a parent, right?

25    A.    Yes.
```

```
 1   Q.   And you never discussed the internal USC SUBCO process
 2   with Gamal Abdelaziz, did you?
 3   A.   No.
 4   Q.   And again, you never spoke with Gamal Abdelaziz at all
 5   about any of this, right?
 6   A.   No.
 7   Q.   And you got all your information about the Abdelaziz
 8   family from Rick Singer, correct?
 9   A.   Correct.
10   Q.   And, of course, when Singer was calling you in December of
11   '18, he was hiding the fact that he was working for the
12   government, right?
13   A.   Yeah.  He didn't tell me that anything had happened.  I
14   don't know that -- the term working for the government.
15   Q.   Well, he at least hid the fact that he was taping your
16   call, right?
17   A.   Yes.
18   Q.   Okay.  And based upon your experience, he was an
19   especially good liar, wasn't he?
20   A.   I mean, from the instances of our interactions of him
21   having me create these profiles, then, knowing that they were
22   not truthful.
23   Q.   So he hid things, a lot of things from you, correct?  A
24   lot of his business, what he was actually doing?
25   A.   Yes.  He hid some.
```

```
     1   Q.   And all these forwarded messages, the prosecutor showed

     2   you from Singer that had earlier e-mails from Gamal Abdelaziz,

     3   Singer never connected you directly with Gamal, did he?

     4   A.   No.

     5   Q.   And you were the one making up the fake athletic profiles,

     6   right?

     7   A.   I created the fake athletic profiles.  Yes.

     8   Q.   With zero communication to Gamal Adelaziz, right?

     9   A.   Correct.

10:25 10   Q.   And let me show you, please, I think it's in evidence,

    11   344.  Yes.  That's it.  Now, Singer forwarded you that, right?

    12   A.   Yes.

    13   Q.   Okay.  Now, when he forwarded you that, did he ever tell

    14   you that there were four other photos that day from

    15   Mr. Abdelaziz?

    16   A.   No.

    17   Q.   He hid that from you?

    18   A.   Yeah.  He didn't -- I wasn't aware.

    19   Q.   Okay.  Did the government ever show you the four other

10:26 20   photos from that day?

    21   A.   No.

    22   Q.   So that was hidden from you --

    23        MS. WRIGHT:  Objection.

    24        THE COURT:  Sustained.

    25   Q.   Let's look at Exhibit 338 in evidence.  Let's go to the
```

1    second page.  You ever seen that picture before in that e-mail?

2    A.    No.

3    Q.    Let's go to 339, please, Exhibit 339 in evidence.

4         MS. WRIGHT:  Objection.  She's not on any of these

5    e-mails.

6         MR. KELLY:  It's in evidence.

7         THE COURT:  Well, she can look at the pictures and see

8    if it refreshes her memory.

9    Q.    Have you seen this one before?

10:27  10   A.    No.

11   Q.    Let me show you 341, in evidence.  Have you ever seen this

12   one before?

13   A.    No.

14   Q.    How about Exhibit 342?  Let's go back to the top of this,

15   please.  Have you ever seen this one before?

16   A.    No.

17   Q.    And it's also dated July 27, 2017, right?

18   A.    Uh-hum.

19   Q.    I should have pointed out the dates of the others as well,

10:28  20   but would you -- did you happen to see that the others I just

21   showed you were also dated July 27th?

22   A.    No.  I didn't look at the dates of those pictures.

23   Q.    Yeah.  Sorry.  Let me do that real quickly.  341.  See the

24   date?

25   A.    Uh-hum.

```
 1   Q.    July 27th.
 2              Okay.  Let's see 339.  The date.
 3              Let's see 338.  The date.
 4              Let's go back to the one you were shown, 344.  Let's
 5   look at the date.  The date from Aziz.
 6              So you were unaware that there were four other
 7   pictures, correct?
 8   A.    Correct.
 9   Q.    Singer hid that from you, right?
10   A.    Yeah.  I did not -- I never saw them.
11   Q.    And in preparation for your testimony today, you never saw
12   them either, right?
13   A.    No.
14   Q.    How many hours of preparation do you think you did
15   approximately with the government before you testified here?
16   A.    Several.
17   Q.    More than five, less than ten or?
18   A.    Probably more than ten.
19   Q.    More than ten.  Okay.  In those more than ten hours, you
20   never saw those photos, right?
21   A.    No.
22   Q.    Now, are you aware that Singer hid things about you from
23   Abdelaziz?
24   A.    No.
25   Q.    Let me show you Exhibit 329, which is now in evidence.
```

```
 1    Okay.  You were shown this earlier today.  Let's just look at
 2    that line.  Well, first of all, let's look at the date,
 3    July 16th.  Then let's look at the line where it says, "If they
 4    don't have the items pertaining to the sport, let me know and I
 5    will create".  You see that?
 6    A.   Yes.
 7    Q.   And above it there's a bunch of stuff you're trying to get
 8    information, right?
 9    A.   Uh-hum.
10    Q.   Now, let's put that side by side with what's in evidence
11    at Exhibit 330.  Let's look at the date on 330.  Let's go down,
12    further down, please, to where Singer, on July 16th, same day,
13    same day, look at all the stuff he's asking for.  It's the same
14    stuff you want, right?
15    A.   Uh-hum.
16    Q.   And below, the message from Singer to Aziz, there's
17    nothing from you, is there, in Exhibit 330?
18    A.   No.
19    Q.   It's being cut out where you say "If they don't have the
20    items +pertaining to the sport, let me know and I will create".
21    That's been deleted, correct?
22    A.   Correct.
23    Q.   So Singer is not telling Abdelaziz there's a young woman
24    named Laura Janke who's creating information about the profile,
25    is he?
```

```
 1   A.   No.  He hasn't here.
 2   Q.   All right.  Let's go to -- before we go to that, your
 3   expertise is really soccer, right?
 4   A.   Yes.
 5   Q.   You played in college.  You coached.  So you know a lot
 6   about soccer, right?
 7   A.   Uh-hum.
 8   Q.   How about basketball?
 9   A.   I played basketball when I was younger and I never played
10   at a high level.  I've been around it from coaching and
11   speaking with coaches of basketball.
12   Q.   Right.  So you've actually coached some basketball over
13   the years?
14   A.   No.  I was saying I've spoke with coaches that have.
15   Q.   Right.  Are you familiar with all the numbers that certain
16   players do -- like in the old days, you got two guys, two
17   forwards, and a center.  Right?
18   A.   Uh-hum.
19   Q.   Now they use numbers.  Are you familiar with the number
20   system?
21   A.   I know they use numbers, but I'm not familiar with them.
22   Q.   Right.  Not everyone's familiar with the numbering system
23   of a player, right, including yourself who has some experience
24   in this area?
25   A.   Uh-huh.
```

```
 1    Q.    Is that a yes?

 2    A.    Yes.

 3    Q.    Let's go to 658, please, that's in evidence.  Let's go to

 4    the picture on the back of that, please, second page.

 5          MR. KELLY:  Thank you, Mr. Carter.

 6    Q.    And do you see the picture of a girl with glasses

 7    dribbling the ball, right?

 8    A.    Yes.

 9    Q.    Let's put that next to --

10    MR. KELLY:  I'm sorry, Mr. Carter, I want to put that

11    next to Exhibit 381 in evidence.  Let's see it -- well, let's

12    first look at the front page of 381.

13    Q.    This is from Donna Heinel on 10/3/17, right before SUBCO

14    meets about Sabrina.

15    A.    Okay.

16    Q.    Okay?  And now let's look at the second page of that one.

17    Different girl, right?

18    A.    Uh-hum.

19    Q.    So all these questions about the girl with the basketball

20    and the glasses is not even the one that was presented to SUBCO

21    on behalf of Sabrina Abdelaziz's application, correct?

22    A.    Correct.

23    Q.    Did you have anything to do with finding this young woman

24    just jogging there, number five?

25    A.    No, I did not.
```

```
 1   Q.   All right.  Now let's go to --
 2        MR. KELLY:  Let's keep these two up, please, and let's
 3   go to I think it's 658, the one on the right.  The front page,
 4   please.
 5   Q.   Okay.  Here, you are asking Singer about the profile.
 6   First sentence you're saying you need her --
 7        MR. KELLY:  I'm sorry.  Just yellow that whole line.
 8   A.   "Her e-mail, phone" ... "as I did not have that".  You're
 9   telling Singer you don't have Sabrina's e-mail, phone, right?
10   Her e-mail, phone, and parents' names, correct?
11   A.   Yes.  I would always ask Singer to give that to me.  I
12   hadn't had it yet to put into the profile.
13   Q.   Okay.  So you wanted to put Sabrina's e-mail and Sabrina's
14   phone into the package, right?
15   A.   Uh-hum.
16   Q.   I'm sorry.  You have to say yes or no just for the record.
17   A.   Yes.  Sorry.
18   Q.   And are you aware that Singer never got her e-mail and
19   phone from Gamal Abdelaziz?
20   A.   No.
21   Q.   Well let's look at the Exhibit 381 that's in evidence to
22   the left.  Let's look at the phone and the e-mail line in the
23   top left.  It's her dad's phone and dad's e-mail that Singer
24   had at the time, right?
25   A.   Yes.
```

```
  1            MR. KELLY:  We can take that down, please.
  2    Q.    You've -- in addition to being prepared for today, you
  3    estimate that's over ten hours.  Is that separate from any
  4    discussions or meetings with the FBI?
  5    A.    What do you mean discussions with the FBI?
  6    Q.    I'm sorry.  In terms of just general amount of time you
  7    spent with the government, whether it's the FBI or prosecution
  8    team, is that what you were referring to when you said more
  9    than 10 hours, or were there additional meetings with the FBI
 10    that you weren't counting?
 11    A.    No.  I was referring to all of it.
 12    Q.    The whole thing?
 13    A.    Uh-hum.
 14    Q.    Okay.  Now, didn't you tell the FBI that the USC soccer
 15    team did not have a particular number of spots, it could vary
 16    slightly year to year, right?
 17    A.    Yes.  It can vary within reason of a soccer team.
 18    Q.    Sure.  You can't have a hundred kids on a soccer team, but
 19    you can have 13 or 20, 21 or 22, right?  It varies year to
 20    year?
 21    A.    Correct.
 22    Q.    And didn't you also tell the FBI that, at USC, donations
 23    were looked upon favorably, but did not create a guarantee?
 24    Did you say that?
 25    A.    I said donations were looked upon fairly, but in a --
```

10:37 (line 10)
10:38 (line 20)

```
 1    Q.    Favorably?

 2    A.    But in an honest way.

 3    Q.    Favorably?

 4    A.    I don't recall using that word specifically, but what I

 5    would have meant by it is in an honest way they would have

 6    wanted donations.

 7          MR. KELLY:  Let me -- just for the witness only,

 8    please.

 9    Q.    Show you Exhibit 9032 and go to the second page, please,

10:39 10    and go to on the --

11          MR. KELLY:  Keep going, please where it says "USC

12    Development".

13    Q.    Can you look at the first sentence of that, please, and

14    just read it to yourself.

15          MR. KELLY:  Okay.  Please take it down.

16    Q.    And does that refresh your memory as to whether or not you

17    told the FBI that, at USC, it was looked upon favorably if a

18    student could donate to USC, but this was not a guarantee?

19    A.    I recall that, but that's not the full context that I

10:39 20    meant it to be.

21    Q.    All right.  So, like everything, there's always more

22    context, right?

23    A.    Uh-hum.

24    Q.    I'm sorry, but you have to say yes or no.

25    A.    Yes.  Sorry, sorry.
```

```
 1    Q.    But that is something you told the FBI, right?

 2    A.    Yes.

 3    Q.    Of course, you knew that USC is a private university,

 4    right?

 5    A.    Yes, they are.

 6    Q.    They, in fact, at one point had a $6 billion campaign to

 7    raise money?

 8    A.    Yes, they did.

 9    Q.    And a lot of wealthy kids do, in fact, go to USC?

10    A.    Yes.  There's -- there's kids of every economic background

11    there.

12    Q.    Including a lot of wealthy kids at USC, right?

13    A.    Yes.

14    Q.    And were you aware while you were there that the USC

15    Athletic Department had a whole group devoted to fundraising

16    called the Trojan Athletic Fund?

17    A.    Yes.  I've heard of it, but again, it's through proper

18    channels of donations.

19    Q.    Well, did you work for the Trojan Athletic Fund while you

20    were there?

21    A.    No.

22    Q.    Okay.  Did you know that a man named Ron Orr led the

23    Trojan Athletic Fund?

24    A.    I know who he is, yes.

25    Q.    Okay.  And how much interaction did you have with him?
```

```
 1   A.   Not a lot, just hi or hello.

 2   Q.   Do you know whether or not he used this SUBCO process as a

 3   means to raise money for USC?

 4   A.   I'm not aware of that.  From what I was always told, SUBCO

 5   was -- you use it to admit athletes that are going to play for

 6   your team.

 7   Q.   Well, I mean, this whole SUBCO process is what Rick

 8   Singer, with your assistance, exploited, right?

 9            MS. WRIGHT:  Objection to the argument.

10:41 10            THE COURT:  Sustained.

11   Q.   Well, didn't you help Rick Singer exploit the process at

12   USC so kids could get in that otherwise might not get in,

13   right?

14   A.   I did, and I'm not proud of it and --

15   Q.   But -- but Rick Singer did that with you, right?

16   A.   Yes.

17   Q.   He was the one asking you and providing you all the

18   information, right?

19   A.   Yes.  He was the one e-mailing me and forwarding me

10:42 20   e-mails.

21   Q.   Okay.  And based upon your discussions with him, he knew

22   there was a SUBCO process at USC, right?

23   A.   Yes.

24            MS. WRIGHT:  Objection to what he knew.

25            THE COURT:  Yeah.  Sustained.
```

A2557

```
 1    Q.   Well, at some point during your many years in discussions

 2    with him, did it appear to you that he knew there was a SUBCO

 3    process at USC?

 4    A.   He knew how the process worked for athletes to get in, in

 5    my discussions with him or speaking to him about it.

 6    Q.   Okay.  And in fact, didn't you tell the FBI that all of

 7    Singer's kids went in through the walk-on process, right?

 8    A.   Could I look at the document?

 9    Q.   Sure.

10:43 10        MR. KELLY:  Let's go to Exhibit 9031, please, page 4,

11    just for the witness.  The middle paragraph where it begins

12    with "for kids being recruited".

13    Q.   And then look at the last sentence of that paragraph and

14    just read it to yourself, please.

15        MR. KELLY:  Okay.  Now please take it down.

16    Q.   Having read that, does it refresh your memory that, in

17    fact, you told the FBI that all of Singer's student athletes

18    were put forth as walk-ons?

19    A.   All the ones that we used with soccer were put through as

10:43 20   walk-ons.

21    Q.   So Singer exploited that walk-on process, right?

22    A.   He used that.

23    Q.   Right, because I think you told the FBI also that

24    recruited walk-ons, if they quit, they don't lose a

25    scholarship.  They don't have a scholarship, right?
```

A.    No.  Recruited walk-ons don't have a scholarship.  But on
my team, we still expected them to come and participate and be
an active member of the team participating.

Q.    But it was not unusual for recruited walk-ons to leave the
roster after a year, right?

A.    When recruited walk-ons, if they did leave, it was a very
hard decision for them because it was a sport that they loved.
They loved being a part of the team and they loved being around
it.  So while sometimes you would have one quit in a year, you
may not, and it was not a process that they took lightly to
just up and quit or leave the team.

Q.    Okay.  Didn't you tell the FBI it was not unusual for
recruited walk-ons to leave the roster after one year?

A.    Once again --

Q.    I'll show you Exhibit 9032.

        MR. KELLY:  Just the witness, please.

Q.    Top of page 2, the sentence that starts with "some".

        MR. KELLY:  Yellow that, please.  All right.  Please
take it down.

Q.    Having read that, does it refresh your recollection that
you told the FBI that some recruited walk-ons decided this may
not have been them and quit, so it's not unusual for recruited
walk-ons to leave the roster after a year?

A.    It does refresh my recollection.  And again, I was
referring to the athletes that we recruited in regards to

```
 1    playing for us or making the decision not to play anymore.
 2    Q.   Okay, but Singer did this because, as you told the FBI,
 3    this made it easier to put Rick Singer's students as recruited
 4    walk-ons because no one would ask questions at USC as to why
 5    they were leaving the roster after one year, right?
 6    A.   Uh-hum.
 7    Q.   I'm sorry.  Again, you have say yes or no.
 8    A.   Yes, yes.
 9    Q.   It doesn't raise any red flags to do it this way with
10:46 10   these recruited walk-ons.  If you're going to make up phony
11    accolades and get kids who aren't the USC level, that's the way
12    to do it, right, to use the recruitment process?
13    A.   That's the way we did it, but from admissions or anybody
14    else's standpoint, it would not have been okay.
15    Q.   Well, did you ever work at the Admissions Office?
16    A.   No, but we were told to be truthful and employees of
17    character.
18    Q.   And did you know what Donna Heinel may have told about --
19    may have been told about her fundraising responsibilities for
10:46 20   USC?
21    A.   I do not know what she was told.
22    Q.   You don't know what Pat Haden -- do you know who Pat Haden
23    is, right?
24    A.   I know who Pat Haden is.
25    Q.   He was the athletic director of USC, right?
```

1    A.    Yes.

2    Q.    Do you know what Pat Haden may have told Donna Heinel she

3    should be doing to raise money at USC?

4    A.    I do not, but again, I can just speak for my experiences

5    there.  They always talked to us about making sure we're

6    employees of character and being good role models for our

7    student athletes.

8    Q.    Well, you do know what Coach Ali told you, right?

9    A.    Yes.

10:47 10    Q.    He said there's two ways to keep your job at USC?  I think

11    you said win -- win or bring in money, right?  Isn't that what

12    you just testified to with the prosecutor?

13    A.    Bring in money in an okay fashion, not by lying to the

14    university or anybody else.

15    Q.    Well, that's certainly what Ali was doing, right?

16    A.    Yes.

17    Q.    And there was pressure on him to bring in money.  Either

18    win or bring in money, right?

19    A.    But our first and foremost job was to recruit and win and

10:47 20    be coaches.

21    Q.    Now you said you didn't recruit team managers, but you

22    did, in fact, have team managers, correct?

23    A.    We did have one team manager to my recollection and we

24    later had a student athlete who was no longer able to play

25    because of injury, and she stayed on to help the team and be in

```
 1    that role.
 2    Q.    Okay.  And you were asked by the prosecutor about practice
 3    players.  And the question was, what does it mean to you.  Do
 4    you remember that question?
 5    A.    Uh-hum.  Sorry.
 6    Q.    Yes, you remember that question?
 7    A.    Yes.
 8    Q.    Okay.  So you were asked, what does it mean to you,
 9    correct?
10:48 10   A.    Correct.
11    Q.    Now, you, obviously, have been an assistant soccer coach
12    at USC and have a lot more knowledge about the system than most
13    people, don't you?
14    A.    Correct.
15    Q.    You have no idea what a practice player meant to Gamal
16    Adbelaziz, do you?
17    A.    Sorry.  Can you --
18    Q.    You have no idea what the term "practice player" means to
19    Gamal Abdelaziz, do you?
10:49 20   A.    No.
21    Q.    And you have no idea what Rick Singer told Gamal Abdelaziz
22    about practice players at USC, do you?
23    A.    I don't.
24    Q.    And you have no idea what Rick Singer told Gamal Abdelaziz
25    about team managers at USC, do you?
```

```
 1   A.   I don't.

 2   Q.   I'm not sure if I asked you this.  If I already asked you,

 3   I apologize.  Pat Haden, you knew who he was, right?

 4   A.   Yes.

 5   Q.   Did you know that Pat Haden met with Rick Singer at one

 6   point?

 7   A.   Rick had told me that he was meeting with Pat Haden, but I

 8   don't know what was discussed or anything like that.

 9   Q.   Are you aware that it was the athletic director Pat Haden

10   who introduced Donna Heinel to Rick Singer?

11   A.   Yes.

12   Q.   And you have no idea, again, what Haden told Heinel about

13   her responsibilities to raise money for USC, correct?

14   A.   I do not, but, again, in my seven years working there,

15   there was never -- there was never so much pressure that we

16   needed to lie and do things dishonestly in order to bring in

17   money.

18   Q.   But you did anyway, right?

19   A.   I did, yes.

20   Q.   And are you aware that other coaches took walk-ons in

21   exchange for contributions?

22   A.   No.  The only thing that I was ever told was that when Ali

23   told me that water polo was doing the same thing.

24   Q.   Are you aware that USC itself kept data on practice

25   players who were children of significant donors?
```

```
 1   A.   No.

 2   Q.   I'd like to show you Exhibit 1219, please.

 3        MR. KELLY:  I'd like to go to the second page.  I'd

 4   like to go to the box on the far right under "Notes".  I'd like

 5   to go to the second and third entry.  First one says

 6   "significant" -- yes.  That one there, yeah.  And the one above

 7   it.  Right there.

 8        MS. WRIGHT:  Can we take the document down now?  She

 9   already said she's unaware.

10   MR. KELLY:  Objection.  I haven't asked the question.

11        THE COURT:  He hasn't asked the question.

12   Q.   Now, have you had time to read that?

13   A.   I've read the parts in yellow.

14        MR. KELLY:  Okay.  And please take it it down.

15   Q.   Does that refresh your recollection as to whether or not

16   USC kept data about children of donors and how they could be

17   practice players?

18   A.   I've never seen that document before, but what I can tell

19   you is I didn't know that they -- I've never seen that, so I

20   didn't know they kept data.

21        And second, in my experiences, anybody that was on

22   our team, walk-on or practice player, because we didn't call

23   them practice players, but that was somebody who could be on

24   the team and make an impact and actually contribute.

25        MR. KELLY:  Now, your Honor, this has been agreed upon
```

**A2564**

```
 1    as preauthenticated through stipulation.  I offer this
 2    document, 1219.
 3              MS. WRIGHT:  Objection.  Can we see it?  Just because
 4    it's authentic, doesn't mean it's admissible.
 5              MR. KELLY:  It's their document.  It's 1219.
 6              MS. WRIGHT:  Okay.  She just said she's never seen it
 7    before and wasn't aware.
 8              THE COURT:  Are you objecting?
 9              MS. WRIGHT:  Objection.
10    THE COURT:  The objection's sustained.
11              MR. KELLY:  One moment, your Honor.
12    Q.   Now with respect to the profile on Sabrina Abdelaziz, you
13    simply made up her statistics, like scoring 12 points a game,
14    right?
15    A.   Yes.
16    Q.   Okay.  And these athletic profiles, again, were created by
17    you based upon information provided by Rick Singer, right?
18    A.   He provided some of the information and the rest of it was
19    me Googling and finding information.
20    Q.   Okay.  And you had zero discussions with Mr. Abdelaziz
21    about this, correct?
22    A.   Correct.
23    Q.   You never met the man?
24    A.   Correct.
25    Q.   You never talked to the man?
```

```
 1    A.    Correct.

 2    Q.    You never met his daughter Sabrina?

 3    A.    No.

 4    Q.    Never talked to Sabrina?

 5    A.    No.

 6    Q.    Here, as the government brought out on direct, you've pled

 7    guilty to a racketeering conspiracy?

 8    A.    Correct.

 9    Q.    Are you aware that's not charged in this case?  There's no

10:54 10   racketeering RICO charges in this case?

11    A.    No.

12    Q.    And it's the government who is suggesting they could

13    recommend 27 months in prison for you, the mother of, at the

14    time, a 3-year old?  That was your understanding?

15          MS. WRIGHT:  Objection.

16          THE COURT:  Sustained.

17    Q.    Well, you testified on direct that your child is 5 years

18    old, correct?

19    A.    Yes.

10:55 20   Q.    And two years ago when you pled guilty, obviously that

21    means your child was three, correct?

22    A.    Yes.

23          THE COURT:  Objection.

24          THE COURT:  Sustained.

25    Q.    Well, when you pled guilty, the government said it would
```

```
 1   recommend 27 months in prison unless you cooperated, right?
 2           MS. WRIGHT:  Objection to the characterization.
 3           THE COURT:  Sustained.
 4   Q.   Well, okay.  Let's look at Exhibit 676, page 2.  Line --
 5   under "Sentence Recommendation", let's see how it's
 6   characterized under A.  "Incarceration at the low end of the
 7   Guidelines".  That's how the government characterized it,
 8   right?
 9   A.   Uh-hum.
10   Q.   I'm sorry.  You have to say yes or no.
11   A.   Yes.
12   Q.   And then let's go to Exhibit 9035, not in evidence, just
13   for the witness.  You've seen the face page.  Now let's go to
14   page 9, bottom sentence.
15           MR. KELLY:  Let's yellow that whole sentence.  There
16   you go.  And does -- take it down, please.
17   Q.   And does that refresh your recollection that the
18   government said the guidelines were 27 to 33 months?
19   A.   Correct.
20   Q.   And, under the Plea Agreement, they had said they'd
21   recommend the low end of the Guidelines, correct?
22   A.   Correct.
23   Q.   And that's how they characterized it, right?
24   A.   Correct.
25   Q.   And the low end is -- obviously 27 to 33, the low end is
```

1   27 months, right?

2   A.   Correct.

3   Q.   So unless they -- you cooperate with them, that's what

4   they were going to recommend for somebody like you, right?

5          MS. WRIGHT:   Objection.   Someone like you.

6          THE COURT:   Sustained.

7   Q.   Well, is that what they were going to recommend for you?

8   A.   On my document, that's what it says would be recommended.

9   Q.   Right.   And then there's a Cooperation Agreement where

10:57 10   it's up to the U.S. Attorney's office to decide whether to file

11   this substantial assistance motion, right?

12   A.   Are you referring to the --

13   Q.   Let me ask you what's your understanding.   It depends

14   upon -- the ultimate sentence, of course, depends on whatever

15   the judge who was assigned to your case wants to do, right?

16   A.   Yes.

17   Q.   Different case, different judge, right?

18   A.   Yes.

19   Q.   All right.   And, by testifying obviously you're hoping to

10:58 20   get some credit for assisting the government in this case,

21   right?

22   A.   I'm here testifying, because, first, I want to take

23   responsibility for what I did.   It was wrong.   Second, I know,

24   like I said, what I did was wrong and I'm here to tell the

25   truth and tell what I know happened.

```
 1    Q.    Okay, but obviously, you don't want to go to jail, right?

 2    A.    No.  Nobody wants to go to jail.

 3    Q.    Right.  And the determination of who files a substantial

 4    assistance motion to your judge is entirely up to the

 5    prosecutors, right?

 6    A.    From how I know is it's ultimately up to the judge what

 7    happens to me.

 8    Q.    Okay.  Let me show you Exhibit 677 in evidence, please.

 9          MR. KELLY:  Go to page 2, Substantial Assistance

10    Motion, second paragraph, the first two lines.

11    Q.    You see where it says, "The determination whether

12    Defendant", that would be you, "has provided substantial

13    assistance rests solely in the discretion of the U.S. Attorney

14    and is not subject to appeal or review"?  You see that?

15    A.    Yes.

16    Q.    And then it says, "The U.S. Attorney will make this

17    determination based on the truthfulness and value of

18    Defendants' assistance, regardless of the outcome or result of

19    any proceeding or trial".  You see that?

20    A.    Yes.

21    Q.    So it's up to the U.S. Attorney to determine the value of

22    your assistance to them, right?

23    A.    Yes.  They recommend.

24    Q.    It says, "The U.S. Attorney will make this determination",

25    and then they talk about truthfulness and value of your
```

1  assistance, right?

2  A.   Yes.

3  Q.   They make the call.  They don't all collectively vote.

4  They make the call before they file a Substantial Assistance

5  Motion, right?

6  A.   Well, again, they make the call, but it's up to the judge.

7  I mean, I --

8  Q.   Well, if you can just read the first sentence, it says

9  "The determination whether Defendant has provided substantial

11:00 10  assistance rests solely in the discretion of the U.S. Attorney

11  and is not subject to appeal or review".  If they don't want to

12  file a motion, they don't have to, right?

13  A.   Right.

14  Q.   Okay, but ultimately, of course, it's up to the judge to

15  determine what's appropriate in your case, right?

16  A.   Yes.

17        MR. KELLY:  Okay.  Nothing further, your Honor.

18        THE COURT:  Before we go to the cross from

19  Miss Papenhausen, we will take a morning recess of 15 minutes.

11:01 20  We will be in recess for 15 minutes.

21        THE CLERK:  All rise for the jury.

22        (Jury exits.)

23        THE COURT:  Be seated, counsel.

24        You may step down, Miss Janke.

25        Miss Papenhausen, approximately how long on cross?

```
 1              MS. PAPENHAUSEN:  No more than five to ten minutes,
 2    your Honor.
 3              THE COURT:  Five to ten minutes.  All right.  And then
 4    will the next witness be the order that we had on Friday,
 5    Mr. Frank?
 6              MR. FRANK:  The next witness is Mr. Nahmens, your
 7    Honor.
 8              THE COURT:  Mr. Nahmens.  So we're skipping Masera for
 9    the time being?
11:02 10          MR. FRANK:  Correct, your Honor.
11              THE COURT:  And then the order is as originally.
12              MR. FRANK:  And Mr. DeMaio after that.
13              THE COURT:  Anything that needs to come to the Court's
14    attention before we recess?
15              MR. FRANK:  No, your Honor.
16              MR. KELLY:  No, your Honor.
17              THE COURT:  We're in recess for 15 minutes.
18              (Recess taken 11:02 a.m. to 11:22 a.m.)
19
11:22 20          THE CLERK:  All rise for the jury.
21              (Jury enters.)
22              THE CLERK:  Thank you.  You may be seated.
23              THE COURT:  Good morning again, jurors.  We're ready
24    to resume.
25              Ms. Janke, you're reminded you remain under oath.
```

```
 1              And, Ms. Papenhausen, you may conduct
 2    cross-examination.
 3              MS. PAPENHAUSEN:  Thank you.
 4                   CROSS-EXAMINATION OF LAURA JANKE
 5    BY MS. PAPENHAUSEN:
 6    Q.   Good morning, Ms. Janke.  My name is Lauren Papenhausen.
 7    I represent John Wilson.
 8    A.   Good morning.
 9    Q.   You testified on direct that Mr. Khosroshahin told you
10    that Jovan Vavic had been working with Rick Singer, correct?
11    A.   Correct.
12    Q.   Now, Mr. Khosroshahin told you that Jovan Vavic was in
13    fact one of at least five USC coaches who were working with
14    Rick Singer, correct?
15    A.   Sorry, can you repeat that again?
16    Q.   Mr. Khosroshahin told that you Jovan Vavic was one of at
17    least five USC coaches who were working with Rick Singer,
18    correct?
19    A.   I don't -- I don't recall that it was five other coaches.
20    Q.   You recall the tennis coach?
21    A.   Yes, he did tell me the tennis coach, yes.
22    Q.   The golf coach.
23    A.   Yes, I know he had spoke with the golf coach, but I don't
24    know for sure if he was working with Rick Singer.
25    Q.   Maybe some other coaches?
```

A2572

```
 1    A.    I honestly don't recall who else he told me.  It was
 2    mainly Jovan that Ali would always speak about.
 3    Q.    When you heard that all of these coaches were working with
 4    Rick Singer, the money was going to the program, correct?
 5    A.    In terms of soccer, that's how it initially started, but
 6    in terms of the other programs, I don't know.
 7    Q.    So in terms of soccer, when the money was going to the
 8    program, you mentioned that some of the money from a parent
 9    went to fund a summer trip that the soccer team took, correct?
11:25 10   A.    That's correct.
11    Q.    Where was that summer trip to?
12    A.    The soccer team took a trip to Europe to compete.
13    Q.    What was the purpose of going to Europe to compete?
14    A.    So, at least for soccer, once every four years, at least
15    when I was coaching, you were allowed to take your team on a --
16    on a -- to play in other countries just to give the team more
17    experience, to allow them to come together as a team and just
18    compete internationally.
19    Q.    How expensive was that trip?
11:25 20   A.    It was very expensive.  I don't know off the top of my
21    head, but it was a large expense.
22    Q.    When you were at USC and working with Rick Singer to help
23    get his students admitted onto the soccer team, were any of
24    those students all-league players?
25    A.    I don't know for sure if any of them were.  I would
```

1    falsify documents or the profiles and say that students were

2    all league or this or that, but I don't -- I don't know if any

3    were, in fact, or not.

4    Q.    Were any of those students playing in a top school

5    program?

6    A.    Again, there could have been some that were playing, but I

7    don't know to the extent, and as far as I knew it was not

8    enough to be able to play at that level or else they would have

9    been being recruited by the coach of the university.

11:27 10    Q.    Were any of those students playing in a top club program?

11    A.    Again, there could have been some that were playing in the

12    club programs.  But, again, the information that I added to

13    their profile was to fill in any gaps or to falsify, to make

14    them seem that they were a strong enough athlete to, again,

15    play at that level.

16    Q.    Were any of those players supported by a top high school

17    coach?

18    A.    I don't know.

19    Q.    You didn't even talk to the high school coaches for any of

11:27 20    these players, correct?

21    A.    Correct.

22    Q.    As opposed to, as you were talking about what a normal

23    recruiting process would involve of course talking to the high

24    school coach, correct?

25    A.    Yes.  So the normal process I would have talked to the

```
 1    high school coach or a club coach; and in a typical process if

 2    an athlete is good enough to play at that school, they're being

 3    admitted and recruited by a specific coach.

 4    Q.   You also mentioned on direct that if somebody was an

 5    athlete at the college level, that it would be going through

 6    the coach, correct?

 7    A.   Correct.

 8    Q.   So if Johnny Wilson was going through the coach, that

 9    would suggest that he could be an athlete at the college level,

 10   correct?

 11            MS. WRIGHT:  Objection, hypothetical.

 12            THE COURT:  Well, she can -- I'll allow her to answer

 13   that hypothetical.

 14   A.   Can you repeat the question?

 15   Q.   Sure.

 16            If Johnny Wilson were, in fact, going through the

 17   coach, that would suggest that he could be an athlete at the

 18   college level, correct?

 19   A.   Well, it depends if they were recruited or not.  We had

 20   people going through Ali and I but they weren't recruited to be

 21   on our team, they were just coming in through Rick.  So it

 22   would just depend on, I guess, what you're referring to.

 23   Q.   Sure.  But if they were going through the process where

 24   the coach was talking to the high school coach, that would be a

 25   normal recruitment process, correct?
```

```
 1   A.   Yes.
 2   Q.   And that would suggest that they're an athlete who can
 3   compete at the college level, correct?
 4   A.   Correct.
 5   Q.   In your early dealings with Rick Singer, you initially
 6   believed that he was truthful, correct?
 7   A.   Yes, I believed, yes, that he was truthful.
 8   Q.   You trusted him.
 9   A.   I trusted him because I trusted Ali with my life and Ali
10   trusted Rick and so I trusted him as well.
11   Q.   Ms. Janke, you never made a profile for Johnny Wilson,
12   correct?
13   A.   No.
14            MS. PAPENHAUSEN:  Thank you, I have nothing further.
15            THE COURT:  Any redirect?
16            MS. WRIGHT:  Very briefly.
17            THE COURT:  Yes, Ms. Wright.
18                          REDIRECT EXAMINATION
19   BY MS. WRIGHT:
20   Q.   Just a couple of questions for you, Ms. Janke.
21   A.   Okay.
22   Q.   Mr. Kelly asked you some questions about whether Rick
23   Singer hid things from you.  Do you remember those questions?
24   A.   Yes.
25   Q.   Did Rick Singer ever hide from you the way that he was
```

11:29 10

11:30 20

```
 1    getting these kids into school?
 2    A.   No, not at all.  I was part of that process for him to get
 3    these students into school.
 4    Q.   And he didn't hide the fake profiles aspect of that from
 5    you, correct?
 6    A.   No, because I was, especially at the end, the one creating
 7    those profiles and supplying, giving them to him.
 8    Q.   And Rick Singer didn't hide from you the fact that the
 9    parents of these students were paying money to get their kids
10    in as recruited athletes, did he?
11              MR. KELLY:  Objection to leading the witness.
12              THE COURT:  Sustained.
13    BY MS. WRIGHT:
14    Q.   Was it clear to you that the parents of these students
15    were paying money to get these kids into school as recruited
16    athletes?
17              MR. KELLY:  Objection.
18              THE COURT:  She can have that question.
19    A.   Yes, because he always made it clear that if these
20    students did get in through athletics, myself and Ali would be
21    compensated; and also I knew that once it was -- when I had
22    helped facilitate it through Donna, I knew that she was being
23    compensated as well from the money.
24    Q.   Mr. Kelly also showed you a bunch of photos that Gamal
25    Abdelaziz had sent to Rick Singer of girls playing basketball.
```

```
 1    Do you remember those e-mails?

 2    A.   The -- yes, I remember.

 3              MS. WRIGHT:  Ms. Lewis, if we could please pull up

 4    Exhibit 344, which is in evidence.

 5    Q.   And this is the photo that Rick Singer did forward to you

 6    from Gamal Abdelaziz, right?

 7    A.   That's correct.

 8    Q.   And this is the only photo that was attached to that

 9    e-mail?

11:32 10    A.   That's correct.

11    Q.   And what's the subject line of this e-mail?

12    A.   "Sabrina."

13    Q.   Mr. Kelly also asked you some questions suggesting that

14    it's not unusual for a walk-on to leave the team and be taken

15    off the roster after one year.  Do you remember that set of

16    questions?

17    A.   I do.

18    Q.   Would it be unusual in your experience coaching soccer at

19    USC for a walk-on to not show up ever?

11:32 20    A.   The only scenario that we had that was with Rick's

21    students where they didn't show up; I never met them, I had

22    never spoke with them.  Any other player that -- even if they

23    had quit after a year was a player that we had recruited, we

24    had gone through the process with, we saw them play, we knew

25    them, and I believe, as I said before, it was -- if they did
```

```
 1    choose to quit, it was not a decision that was taken lightly.
 2    There was a lot of conversations with them, a lot of them going
 3    back and forth in trying to decide if that's what they wanted
 4    to do because they had given their life to the sport.
 5    Q.   You were also asked some questions about fund-raising at
 6    USC, particularly in the athletics department.  Do you remember
 7    that?
 8    A.   Yes.
 9    Q.   Did anyone -- while you were coaching at USC, did anyone
11:33 10  come out and explicitly tell you that you couldn't lie to get
11    recruited athletes in in exchange for money?
12    A.   We were never told that we could do this, and outside of
13    Ali, I didn't speak about it with anyone else anywhere within
14    the department, because I knew at the end of the day that it
15    wasn't -- it wasn't something that would be appropriate or okay
16    to do.
17    Q.   Was there any written policy saying you couldn't do it?
18    A.   Well, we were always told as coaches and in our job
19    descriptions that we needed to be good role models, set good
11:33 20  examples, and our job was to recruit student athletes that
21    could make an impact on the team and help us win, help
22    contribute to the team, and student athletes that could also do
23    well in the classroom.
24    Q.   And you've testified a little bit about how initially at
25    USC when you were doing this for Rick Singer, the money went to
```

A2579

1    the soccer program initially and then it went to the camp that

2    you and Ali Khosroshahin ran, correct?

3    A.    That's correct.

4    Q.    And whether -- in either instance, whether the money was

5    going to the soccer program or to your camp, did you believe

6    that it was wrong?

7    A.    Yes, I believe that it was wrong.  At the end of the day,

8    like I said, it was not a truthful way to be getting people

9    into school.  And I can tell you that if somebody that we maybe

11:34 10  knew slightly or didn't know at all had come up to us and said,

11    Hey, I have a student that I want to get into school, they will

12    never play on your team, they won't do anything and can you

13    just do it out of the goodness of your heart, we wouldn't have

14    presented them.

15    Q.    Say that a student was playing for a top club or top coach

16    and as a coach you had spoken to the high school coach or the

17    club coach, even in that instance would it be okay for you to

18    accept money in exchange for the recruitment?

19              MS. PAPENHAUSEN:  Objection.

11:35 20             THE COURT:  Grounds?

21              MS. PAPENHAUSEN:  It's a hypothetical, calls for

22    speculation.

23              THE COURT:  Well, she answered a hypothetical for you,

24    I'll let her answer a hypothetical for the government.

25    A.    Sorry, can you repeat that?

```
 1    Q.    Sure.  In your experience coaching at USC, say that you

 2    were recruiting a top player and you had spoken to a well-known

 3    coach for that player and gotten a great recommendation, in

 4    that case would it be okay to accept money in exchange for the

 5    recruitment?

 6    A.    No, not at all.  We were recruiting athletes because they

 7    were athletes.  We had people on our team from all backgrounds

 8    and we gave scholarships or offered spots based on what they

 9    could contribute to the team on the field.
```
11:36 
```
10    Q.    Mr. Kelly asked you some questions about it being the

11    government that decides whether to recommend a lower sentence.

12    Do you remember those questions?

13    A.    Yes.

14    Q.    In your meetings with the government, what did agents and

15    prosecutors tell you was the number one thing to focus on and

16    the number one thing that was the most important?

17            MR. KELLY:  Objection, vouching.

18            THE COURT:  Sustained.

19    BY MS. WRIGHT:
```
11:36 
```
20    Q.    Do you have any vested interest in the outcome of this

21    trial?

22    A.    No, I'm -- I'm here solely to tell the truth, to take

23    responsibility.

24            Every day I feel ashamed and embarrassed for what I've

25    done, for the disappointment that I've caused family and
```

A2581

```
 1    friends, and I have two daughters that they need their mom to
 2    be a role model and I need to show them you take responsibility
 3    even when you really messed up, which is what I've done.
 4            So, for me, however it turns out, it turns out.  I'm
 5    here because I need to tell the truth.  That's all I have left
 6    right now.
 7            MS. WRIGHT:  No further questions.
 8            THE COURT:  Mr. Kelly, recross.
 9            MR. KELLY:  Briefly, your Honor.
10                  RECROSS-EXAMINATION OF LAURA JANKE
11    BY MR. KELLY:
12    Q.   Just a few questions, Ms. Janke.
13            The prosecutor asked you about whether something was
14    clear to you about the parents.
15            It is clear to you that you never spoke to
16    Mr. Abdelaziz, right?
17    A.   Yes.
18    Q.   And you can tell the jury what your intent was, right?
19    A.   Yes.
20    Q.   You have no idea what his intent was, right?
21    A.   I don't.
22    Q.   And you have no idea what Rick Singer may have told this
23    man, Gamal Abdelaziz, do you?
24    A.   No.
25    Q.   All right.  In fact, are you aware with respect to all
```

```
 1    these questions about Donna Heinel, there's no evidence she was

 2    personally pocketing any money until the summer of 2018?  Are

 3    you aware of that?

 4    A.    No.

 5    Q.    And are you aware of what she may or may not have

 6    discussed with Pat Haden, the athletic director at USC?

 7    A.    I don't know what would have happened in both of their

 8    discussions.

 9    Q.    You are aware, of course, that USC had an athletic
```
11:39 10    compliance department, right?
```
11    A.    Yes.

12    Q.    You're familiar with a man named Scott Simon?

13    A.    I know the name, yes.

14    Q.    And he was in the athletic compliance department, right?

15          MS. WRIGHT:  Objection, this is beyond the scope.

16          THE COURT:  How is this within the scope?

17          MR. KELLY:  Well, your Honor, I will get to it very

18    quickly.  I'm going to reoffer Exhibit 2019 (sic.).  I'd like

19    to hear the government's objection so I can respond to it.
```
11:39 20    It's preauthenticated -- I checked my notes, we have
```
21    preauthenticated Exhibit 1219 and they have not articulated,

22    all they said is she's not on it.  It's authenticated, so I'm

23    asking --

24          MS. WRIGHT:  It's hearsay as to this witness.

25          MR. KELLY:  Your Honor, it's a business record of USC.
```

```
 1    This witness can be asked about non-hearsay business record;
 2    that's what I'm trying to do here.
 3              MS. WRIGHT:  As to her, she wasn't on it --
 4              THE COURT:  The objection on 1219 is sustained.
 5              MR. KELLY:  Fine, your Honor.
 6    Q.   I guess the last question, with respect to that photo that
 7    you did see, 344 with the girl dribbling the basketball, you
 8    were totally unaware that there were other photos that had been
 9    sent to Mr. Singer, right?
11:40 10   A.   Correct.
11    Q.   And you were totally unaware that 30 more had been sent to
12    Singer by Aziz in the middle of August, right?
13    A.   Correct.
14              MR. KELLY:  Nothing further, your Honor.
15              THE COURT:  Ms. Papenhausen, any recross?
16              MS. PAPENHAUSEN:  No, your Honor.
17              THE COURT:  Thank you, Ms. Janke, you may step down.
18              Ms. Kearney.
19              MS. KEARNEY:  The government calls James Nahmes.
11:41 20             THE CLERK:  Would you please take the stand, sir, and
21    raise your right hand.
22              (James Nahmes, sworn.)
23              THE CLERK:  Thank you.  You may be seated.
24              And would you please state your name for the record,
25    spelling your last.
```

```
 1              THE WITNESS:  James Nahmes, N-a-h-m-e-s.

 2              THE COURT:  Mr. Nahmes, you may remove your mask if

 3    you choose to.

 4              THE WITNESS:  Thank you, your Honor.

 5           MS. KEARNEY:  May I proceed?

 6              THE COURT:  Ms. Kearney, you may direct exam.

 7                 DIRECT EXAMINATION OF JAMES NAHMES

 8    BY MS. KEARNEY:

 9    Q.   Good morning, Mr. Nahmes.

10    A.   Good morning.

11    Q.   Where do you live?

12    A.   In Santa Rosa, California.

13    Q.   Are you currently employed?

14    A.   Yes.

15    Q.   Where?

16    A.   I am self-employed.

17    Q.   What do you do?

18    A.   I'm a Certified Public Accountant.

19    Q.   Is that also known as a CPA?

20    A.   Yes.

21    Q.   How long have you been a CPA?

22    A.   Forty years this year.

23    Q.   Can you tell us your educational background?

24    A.   I have a Bachelor of Science in commerce degree from Santa

25    Clara University.
```

```
 1   Q.   And how long have you been in business for yourself as a
 2   CPA?
 3   A.   Since about 1990.
 4   Q.   Briefly, what did do you before that?
 5   A.   I worked in public accounting for various firms for four
 6   years, and then I worked in private industry for a
 7   manufacturing firm leading an accounting department before I
 8   went on my own.
 9   Q.   What kind of accounting work do you do now?
10   A.   Primarily tax return preparation and bookkeeping.
11   Q.   Approximately how many tax returns have you prepared in
12   the course of your nearly 40-year career?
13   A.   I don't have an accurate number, but I would guess about
14   2,000.
15   Q.   And what kinds of tax returns have you prepared?
16   A.   Individual returns and a variety of business returns,
17   including corporations, partnerships, limited liability
18   companies.
19   Q.   I want to ask you some questions now about Hyannisport
20   Capital, but first let me ask you, are you familiar with John
21   Wilson?
22   A.   Yes.
23   Q.   Who is he?
24   A.   He was the president of Hyannisport Capital.
25   Q.   And how did you come to know John Wilson?
```

The time notations in the left margin: 11:43 at line 10, 11:44 at line 20.

A.   I was introduced to the firm by a colleague of mine.

Q.   When you say "the firm," are you referring to Hyannisport Capital?

A.   Yes.

Q.   And did you begin working for Hyannisport Capital?

A.   I did.

Q.   Approximately when did you work for Hyannisport Capital?

A.   That was March of 2011.

Q.   What work did do you?

A.   Bookkeeping and preparation of the tax return for the corporation.

Q.   For how many years did you prepare Hyannisport Capital's tax return?

A.   I worked for Hyannisport Capital until March 2019.

Q.   What kind of return did Hyannisport Capital file?

A.   It's an S corporation income tax return.

Q.   What is an S corporation?

A.   An S corporation is a -- what's known as a pass-through entity.  The S corporation pays no federal tax itself, unlike a regular corporation that would pay tax on its own income.  Instead, the income and deductions are passed through to the shareholders and they pay tax on the income on their individual return.

Q.   How many shareholders did Hyannisport Capital have during the time you were preparing its tax returns?

```
 1   A.   One.

 2   Q.   Who was that shareholder?

 3   A.   Mr. Wilson.

 4   Q.   On whose return was Hyannisport Capital income reported?

 5   A.   Mr. Wilson's.

 6   Q.   Did you ever prepare Mr. Wilson's personal taxes?

 7   A.   I did not.

 8   Q.   Why not?

 9   A.   I wasn't hired to do that.

10   Q.   When it came time to prepare Hyannisport Capital's

11   returns, did you have a typical process that you followed?

12   A.   Yes, I did.

13   Q.   What was that process?

14   A.   I would either phone or e-mail the administrative

15   assistant for Hyannisport Capital and either discuss with her

16   or put in an e-mail a list of standard documentation that I

17   needed.

18        I would also ask for a copy of the QuickBooks file,

19   the electronic accounting system, and I would prepare an

20   engagement letter to send to the client.

21   Q.   Who was the administrative assistant that you contacted?

22   A.   Debbie Rogers.

23   Q.   What was the standard documentation you requested?

24   A.   It was typically -- the most common documentation I

25   requested was backup for asset and liability accounts.
```

```
 1   Q.   And you mentioned QuickBooks.  What is that?
 2   A.   QuickBooks is an electronic accounting system widely used
 3   in the United States.  In my situation, most of the clients
 4   enter bank transactions and credit card transactions and then I
 5   kind of take it from there.
 6            MS. KEARNEY:  Ms. Lewis, can we pull up for the
 7   witness only Exhibit 646, please.
 8   Q.   Mr. Nahmes, do you recognize this document?
 9   A.   I do.
10   Q.   What is it?
11   A.   Is it an engagement letter.
12   Q.   To whom was it sent?
13   A.   To Hyannisport Capital.
14   Q.   And what's the date?
15   A.   The date is August 31, 2015.
16            MS. KEARNEY:  The government offers Exhibit 646.
17            MR. KENDALL:  No objection.
18            THE COURT:  It will be admitted.
19            (Exhibit 646 received into evidence.)
20   BY MS. KEARNEY:
21   Q.   And, Mr. Nahmes, if we can turn to the second page of this
22   engagement letter, section 2, the second service listed that
23   you provide concerns preparation for federal and California
24   corporation income tax returns for Hyannisport Capital.  For
25   what tax period was this engagement letter applicable to?
```

A.    For tax year 2014.

Q.    And in that first paragraph under section 2, you wrote, "I will not audit or verify the data you submit for preparation of your returns and I will perform my tax services under the assumption that all the information you submit to me is true, complete and accurate according to the documents and other information retained in your files."

        What did you mean by that?

A.    I meant that I was not going to verify any documentation I received from the client.

Q.    The last sentence of this paragraph reads:  "My work in connection with the preparation of your income tax returns does not include any procedures designed to discover fraud, defalcations, or other irregularities, should any exist."

        What did you mean by that?

A.    I meant that the work that I was going to do was not designed to discover fraud and other things listed in the letter.

        MS. KEARNEY:  And let's go to the bottom of the letter, please, Ms. Lewis.

Q.    And there's a signature there under the words "accepted by."

        Whose signature is that?

A.    John Wilson.

Q.    I'd like to turn next to what's been marked as Exhibit 134

1    for the witness only, please.

2           And, Mr. Nahmes, this is a lengthy document, there's

3    also a hard copy in the binder in front of you.

4    A.   Okay.

5    Q.   Do you recognize this document?

6    A.   I do.

7    Q.   What is it?

8    A.   It's a copy of the work papers I used to prepare the 2014

9    tax return.

11:50 10   Q.   For which company?

11   A.   For Hyannisport Capital.

12   Q.   Who prepared these work papers?

13   A.   I did.

14          MS. KEARNEY:  The government offers Exhibit 134.

15          THE COURT:  They will be admitted -- it will be

16   admitted.

17          (Exhibit 134 received into evidence.)

18          MS. KEARNEY:  If we can turn to page 3, Ms. Lewis.

19   BY MS. KEARNEY:

11:50 20   Q.   And this is rather small print, but, Mr. Nahmes, generally

21   what information is contained on this page?

22   A.   This is a schedule that I use to reconcile the amounts

23   that are shown on the company's books to what is reported on

24   the tax return.

25   Q.   And if we can look at the line item titled "Consulting."

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | Underneath is an entry for "general business."  What does that            |
| 2     | refer to?                                                                 |
| 3     | A.   That refers to expenditures for general business                     |
| 4     | consulting.                                                               |
| 5     | Q.   What amount was attributed to general business consulting            |
| 6     | for 2014?                                                                 |
| 7     | A.   $120,000.                                                            |
| 8     | Q.   Did you receive backup documentation for this expense?              |
| 9     | A.   I did.                                                               |
| 11:51 10 | Q.   And if I can direct your attention to page 95 of this            |
| 11    | document.                                                                 |
| 12    |       What is reflected on this page?                                     |
| 13    | A.   Give me just a moment.                                              |
| 14    |       Page -- what's the --                                               |
| 15    | Q.   It's up on your screen and it's a page --                           |
| 16    | A.   Oh.  This was an invoice for general business consulting.          |
| 17    | Q.   And who is the invoice from?                                        |
| 18    | A.   Rick Singer.                                                         |
| 19    | Q.   Who is it to?                                                       |
| 11:52 20 | A.   Hyannisport Capital.                                             |
| 21    | Q.   What's the amount?                                                   |
| 22    | A.   $20,000.                                                             |
| 23    | Q.   Were you familiar with Rick Singer at the time you were            |
| 24    | preparing this tax return?                                                |
| 25    | A.   No.                                                                  |

```
  1   Q.    The description in the invoice states "Special consulting

  2   income concept, design, and implementation of professional

  3   development program for Hyannisport Capital associates."

  4         What did you understand this invoice was for?

  5   A.    General business consulting.

  6   Q.    And how many employees did Hyannisport Capital have at

  7   this time to your knowledge?

  8   A.    One.

  9   Q.    And who was that?

11:53 10  A.    Debbie Rogers.

 11   Q.    And if we go to the next page, what is reflected on this

 12   page?

 13   A.    This is also an invoice for general business consulting.

 14   Q.    And who is it from?

 15   A.    The Key.

 16   Q.    Who is it to?

 17   A.    Hyannisport Capital.

 18   Q.    What's the amount?

 19   A.    $100,000.

11:53 20  Q.    Were you familiar with The Key at the time you prepared

 21   this tax return?

 22   A.    I was not.

 23   Q.    And the description here states:  "Business consulting -

 24   August-June 2014."

 25         Are you familiar with what consulting was provided?
```

```
 1   A.    I am not.

 2   Q.    How were these payments to Mr. Singer and The Key

 3   classified for tax purposes?

 4   A.    As, again, business consulting services.

 5   Q.    And I believe you testified that because Hyannisport

 6   Capital is an S corporation, its income and expenses are passed

 7   through to the shareholder here, Mr. Wilson.  How does having

 8   an additional $120,000 in business consulting expenses affect

 9   the amount of taxes that Mr. Wilson ultimately owes?

10   A.    It would reduce the amount of taxable income that was

11   reported on that return.

12   Q.    And how does that affect Mr. Wilson's taxes?

13   A.    That should reduce the amount of tax paid.

14         MS. KEARNEY:  If we go back to page 3, please,

15   Ms. Lewis.

16   Q.    There's a line item here for "Donations."  What does that

17   refer to?

18   A.    Those would have been the charitable contributions for the

19   company.

20   Q.    What amount was listed for donations for 2014?

21   A.    $195,000.

22   Q.    Are charitable donations tax deductible?

23   A.    Yes, they are.

24   Q.    What qualifies as a deductible charitable donation?

25   A.    Generally the donations need to be made to what's called a
```

|  |  |
|---|---|
| 1 | 501(c)(3) organization to be deductible, and there are quite a |
| 2 | few other requirements in order to have the deduction be |
| 3 | qualified. |
| 4 | Q.    What is a 501(c)(3)? |
| 5 | A.    It is a nonprofit organization. |
| 6 | Q.    Is there any documentation requirements for -- that the |
| 7 | IRS requires for donations to be deductible? |
| 8 | A.    Yes. |
| 9 | Q.    What are those? |
| 11:55  10 | A.    The substantiation requirements are that for donations |
| 11 | over $250 you need to have an acknowledgment from the |
| 12 | organization and that needs to show the date of the |
| 13 | contribution, the charitable organization's name, amount of the |
| 14 | contribution, and the acknowledgment needs to state whether any |
| 15 | goods or services were received in exchange for the |
| 16 | contribution. |
| 17 | Q.    Did you receive any backup documentation for these |
| 18 | donations totaling $195,000? |
| 19 | A.    I did. |
| 11:56  20 | MS. KEARNEY:  Can we turn to page 97, please, |
| 21 | Ms. Lewis. |
| 22 | Q.    Mr. Nahmes, what is reflected on this page? |
| 23 | A.    This is a printout from the QuickBooks accounting system |
| 24 | that shows the detail of the donations made during the tax |
| 25 | year. |

```
 1   Q.   One of the entries is dated April 7, 2014 for a wire to

 2   The Key Worldwide in the amount of $100,000.  Were you familiar

 3   with The Key Worldwide Foundation at the time you prepared this

 4   return?

 5   A.   I was not.

 6   Q.   What were Hyannisport Capital's total donations for 2014

 7   according to this page?

 8   A.   $195,000.

 9   Q.   I want to turn your attention to page 107 of this

10   document.

11        What is reflected on this page?

12   A.   This is an acknowledgment from The Key Worldwide

13   Foundation for $100,000 contribution.

14   Q.   To whom was it sent?

15   A.   Hyannisport Capital.

16   Q.   What's the date?

17   A.   April 7, 2014.

18   Q.   The first paragraph of this letter reads, "Thank you for

19   your contribution of $100,000 to The Key Worldwide Foundation.

20   Your generosity will allow us to move forward with our plans to

21   provide educational and self-enrichment programs to

22   disadvantaged youth."

23        And the next paragraph indicates that no goods or

24   services were exchanged.

25        What did you understand that to mean?
```

```
 1   A.   The last part or all of that?

 2   Q.   What did you understand the sentence about no goods or

 3   services were exchanged to mean?

 4   A.   Exactly what it says, that no goods or services were

 5   exchanged in -- for the contribution.

 6   Q.   And again, where Hyannisport Capital's income and expenses

 7   are passed through to the shareholder, Mr. Wilson, how does

 8   having a charitable contribution of $100,000 affect the amount

 9   of taxes Mr. Wilson ultimately owes?

10   A.   Generally it would reduce the amount of taxes.

11        MS. KEARNEY:  We can take that down, Ms. Lewis.

12   Q.   Mr. Nahmes, are you familiar with what's called a 1099

13   miscellaneous form?

14   A.   Yes.

15   Q.   What is that?

16   A.   It's an annual information return that's required to --

17   that's used by businesses to report payments to independent

18   contractors.

19   Q.   Who is required to file a 1099 miscellaneous form?

20   A.   Anyone who makes certain payments over $600 in the course

21   of their business.

22   Q.   And when in the calendar year are these forms typically

23   filed?

24   A.   They are due to the recipients, the people who receive the

25   money, at the end of January.  They're due to the government
```

1    later in the year.

2    Q.   Do you recall a time when you were preparing Hyannisport

3    Capital's 2014 return that you realized that the company had

4    not filed 1099 miscellaneous forms for certain payees?

5    A.   Yes.

6    Q.   Which payees?

7    A.   That was Rick Singer and The Key.

8    Q.   What did you do when you realized this?

9    A.   I drafted an e-mail and sent an e-mail to Debbie Rogers

12:00 10   explaining the situation, that I felt that 1099 miscellaneous

11   needed to be completed for those payments to be in compliance

12   with tax law and suggested that I prepare them and file them.

13   Q.   And would you have completed 1099 miscellaneous forms for

14   Mr. Singer and The Key if you thought the payments to them were

15   charitable contributions?

16   A.   No.

17   Q.   Once Hyannisport Capital's tax return was prepared, what

18   did you do with it?

19   A.   I sent it to Debbie Rogers requesting that the return be

12:00 20   reviewed and the e-file authorization signed and returned to

21   me.

22        MS. KEARNEY:   And if we can look at, for the witness

23   only, Ms. Lewis, Exhibit 645.

24   Q.   Mr. Nahmes, do you recognize this document?

25   A.   I do.

```
 1   Q.   What is it?
 2   A.   It's IRS form 8879-S.  It's the IRS e-file signature
 3   authorization for form 1120S.
 4   Q.   And there's a date at the bottom.  What is it dated?
 5   A.   September 4, 2015.
 6           MS. KEARNEY:  The government offers Exhibit 645.
 7           THE COURT:  It will be admitted.
 8           (Exhibit 645 received into evidence.)
 9   BY MS. KEARNEY:
10   Q.   Mr. Nahmes, what is the purpose of a form 8879?
11   A.   This form authorizes me to e-file a company's tax return
12   on behalf of the client with the IRS.
13   Q.   And under Part II, declaration and signature authorization
14   of officer, it reads, "Under penalties of perjury, I declare
15   that I am an officer of the above corporation and that I have
16   examined a copy of the corporation's 2014 electronic income tax
17   return and accompanying schedules and statements and to the
18   best of my knowledge and belief, it is true, correct and
19   complete."
20           And below that is a line for officer's signature.
21   Whose signature appears there?
22   A.   John Wilson.
23           MS. KEARNEY:  And, Ms. Lewis, if we can pull up
24   Exhibit 157A, which is already in evidence.
25   Q.   Mr. Nahmes, I'm showing you a certified copy of the 2014
```

Lines 10: 12:01
Line 20: 12:02

```
 1   Form 1120-S income tax return for an S corporation for

 2   Hyannisport Capital which has already been admitted into

 3   evidence, and I'll note for the record that the identifying

 4   number of the company has been redacted throughout this

 5   document.

 6           Who prepared this return?

 7           MS. KEARNEY:  Ms. Lewis, if you can go to the second

 8   page to show the witness, please.

 9   A.   I prepared the return.

10   Q.   If we go to page 3, Mr. Nahmes, is that your information

11   under "paid preparer use only"?

12   A.   Yes, it is.

13   Q.   Who filed this return on behalf of Hyannisport Capital?

14   A.   I did.

15   Q.   How did you file it?

16   A.   Electronically.

17           MS. KEARNEY:  If we can go back to page 2, Ms. Lewis.

18   Q.   At the top of the form 1120S is that identifying

19   information for Hyannisport Capital?

20   A.   Yes, it is.

21           MS. KEARNEY:  If we can go just below this section,

22   please, Ms. Lewis.

23   Q.   Do you see there that below the identifying information

24   there is a line that says in bold, "caution, include only trade

25   or business income and expenses on lines 1a through 21."
```

(12:03 appears at line 10)
(12:03 appears at line 20)

1          What did you understand that to mean?

2  A.   That you were only supposed to put trade or business

3  expenses on those lines.

4  Q.   And what is your understanding of the types of expenses

5  that can be included on an S corporation's tax return?

6  A.   Business expenses.

7  Q.   Where are personal expenses reported on this kind of

8  return?

9  A.   They are not.

12:04 10  Q.   What effect does the fact that Mr. Wilson was the sole

11  shareholder of Hyannisport Capital have on whether Mr. Wilson

12  could report personal expenses on Hyannisport Capital's

13  corporate return?

14  A.   It has no impact because personal expenses are not

15  deductible.

16  Q.   If we look below, there's a section titled "Income" and

17  has lines 1 through 6.  How much income did Hyannisport Capital

18  report for tax year 2014?

19  A.   No trade or business income.  I believe there was other

12:05 20  types of income reported.

21  Q.   If we go down to lines 7 through 21, in a section titled

22  "Deductions" -- first, just generally what are deductions?

23  A.   Those are expenses of the company that qualify as tax

24  deductions.

25  Q.   And if we look at line 19 under "other deductions," and it

```
 1   says "attach statement," and it lists an amount of $271,886.
 2          MS. KEARNEY:  And I'd like, Ms. Lewis, to put this
 3   page up on the left, and if we can pull up page 34 of this same
 4   exhibit on the right.
 5   Q.   Mr. Nahmes, you see on the right Ms. Lewis has pulled up
 6   an "other deductions" schedule.  How do the items listed in the
 7   "other deductions" schedule relate to the information listed
 8   under "other deductions" on line 19 of the return?
 9   A.   The schedule on the right should agree with the total of
10   the other deductions reported on line 19 on the screen on the
11   left.
12   Q.   And on the right there is an entry for consulting.  Does
13   that number include the $20,000 payment to Mr. Singer and the
14   $100,000 payment to The Key that we saw earlier?
15   A.   It does.
16   Q.   Why?
17   A.   Because it was classified on the books as such.
18   Q.   Whose expenses did you understand those invoices to relate
19   to?
20   A.   Hyannisport Capital.
21   Q.   And looking back on the left, there is line 21, ordinary
22   business income or loss of negative $383,987.
23          Does that include the $271,886 amount in other
24   deductions?
25   A.   Yes, it does.
```

**A2602**

1    Q.    And does that also then include the $120,000 in payments

2    to Mr. Singer and The Key?

3    A.    Yes.

4    Q.    How does having a business loss of $383,987 affect the

5    taxes that the shareholder of Hyannisport Capital, Mr. Wilson,

6    will ultimately owe?

7    A.    Generally it would reduce the amount of taxes owed.

8            MS. KEARNEY:  Ms. Lewis, if we can take those down and

9    turn to page 37 of this same document.

12:08 10   Q.    Mr. Nahmes, I'm showing you the Schedule K-1.  What is a

11   Schedule K-1?

12   A.    The Schedule K-1 is a schedule that's included within the

13   tax return.  It's also -- a copy is given to the shareholder

14   showing their portion of the income and deductions that flow

15   through to their individual return.

16   Q.    Who is this K-1 for?

17   A.    John B. Wilson.

18   Q.    And the K-1 indicates that Mr. Wilson was the 100 percent

19   shareholder.  What does that mean in terms of what is reported

12:08 20   on Mr. Wilson's personal tax returns?

21   A.    That all of the income and deductions from Hyannisport

22   Capital would be reported on Mr. Wilson's individual income tax

23   return.

24            MS. KEARNEY:  And, Ms. Lewis, if we can keep the K-1

25   up on the right and going back to page 2, line 21, on the left,

```
 1   please.
 2           And if you can call out box 1 on the K-1, please.
 3   Q.   Mr. Nahmes, how does box 1 on the K-9, which lists an
 4   amount of $383,987, relate to the ordinary business loss listed
 5   in line 21?
 6   A.   It's the same amount.
 7           MS. KEARNEY:  And, Ms. Lewis, if we can now call out
 8   box 12A of the K-1.
 9   Q.   And if we can -- well, first let me ask this.
10           Mr. Nahmes, what is reflected in box 12A?
11   A.   That's the total charitable contributions that are
12   allocated to that shareholder.
13           MS. KEARNEY:  And leaving, Ms. Lewis, the K-1 up on
14   the right, can we pull up page 28 of this exhibit on the left.
15   Q.   And, Mr. Nahmes, what is reported in this schedule on the
16   left of your screen?
17   A.   It shows the detail of the charitable contributions,
18   indicating that they were cash contributions subject to a 50
19   percent limitation.
20   Q.   And does -- do these cash contributions of $195,000
21   include the $100,000 payment to The Key Worldwide Foundation
22   that we saw earlier?
23   A.   Yes.
24   Q.   Why?
25   A.   Because they were charitable contributions on the books of
```

```
 1    Hyannisport Capital.
 2    Q.    How would the K-1 for Mr. Wilson change if Hyannisport
 3    Capital's business expenses had been reduced by $120,000?
 4    A.    The loss, the $383,000 number, would have been lower.
 5    Q.    And how would that effect the taxes that Mr. Wilson as a
 6    sole shareholder would ultimately owe?
 7    A.    That would generally increase the tax owed.
 8    Q.    How would the K-1 for Mr. Wilson change if Hyannisport
 9    Capital's charitable contributions had been reduced by
10    $100,000?
11    A.    That would increase taxable income.
12    Q.    And how would that affect Mr. Wilson's taxes?
13    A.    That would increase the amount of tax paid on the
14    individual return.
15    Q.    And when preparing a tax return, who do you rely on to
16    provide you with the information necessary to determine if a
17    payment should be deducted, either as a business expense or a
18    charitable contribution or in some other fashion?
19    A.    The client.
20              MS. KEARNEY:  I have nothing further.
21              THE COURT:  Cross-examination, Mr. Kendall.
22              MR. KENDALL:  Yes, your Honor.
23              Can I have just a minute to get organized?
24              THE COURT:  Yes, you may.
25                    CROSS-EXAMINATION OF JAMES NAHMES
```

BY MR. KENDALL:

Q.   Good afternoon, Mr. Nahmes.  How are you?

A.   Good afternoon.  I am well.

Q.   Good.

     You flew out from California join us?

A.   I did.

Q.   Thank you.  I hope to get you done so you can get back
this afternoon.

A.   I would appreciate that.

Q.   You're a CPA, you told us that.

     Do you want to explain what it means to be a CPA?

A.   A CPA is a Certified Public Accountant.  We are required
to have certain educational background, a college degree.  You
have to have two years of experience in public accounting, and
then you have to pass a five-part exam.

Q.   And what types of clients do you work with in your private
practice?

A.   I've worked with a variety of clients over the 40 years
from manufacturing companies, consulting businesses, real
estate developers, a variety of businesses.

Q.   Privately owned companies, not public, I take it?

A.   Correct, all privately owned.

Q.   In the past have you worked with sub S corporations?

A.   I have.

Q.   Exactly who referred you to Hyannisport Capital?

```
 1    A.    It was a colleague of mine.

 2    Q.    And who was your first contact?

 3    A.    Debbie Rogers.

 4    Q.    And who is Debbie Rogers?

 5    A.    Debbie Rogers was the administrative assistant for

 6    Hyannisport Capital.

 7    Q.    And how did the process go of retaining you for HPC?  Who

 8    did you meet first?  Who did you talk to?  What happened?

 9    A.    We scheduled an appointment and I went to the home office

12:14 10    of Mr. Wilson where Debbie worked, and I believe I sat down

11    with Debbie first and had a discussion with her.  She explained

12    what types of services were needed and asked me some questions

13    that I don't remember what they were back then, and then I sat

14    down with Mr. Wilson.

15    Q.    Okay.  And this was back in March 2011?

16    A.    That's correct.

17    Q.    And you continued to work with HPC for the next eight

18    years?

19    A.    Yes.

12:15 20    Q.    After that first March 2011 meeting, how many times did

21    you meet Mr. Wilson face to face?

22    A.    I don't believe I met him face to face after that initial

23    meeting.

24    Q.    Did you meet Debbie Rogers face to face after that?

25    A.    Yes, I did.
```

```
 1   Q.   How frequently did you meet Debbie?

 2   A.   Not very frequently.  I would say maybe a half a dozen

 3   times.

 4   Q.   And of your contact over the next eight years, rough

 5   percentages, how much was your contact with Debbie and how much

 6   of it was with John Wilson?

 7   A.   Rough percentages, 80/20.

 8   Q.   Okay.  And did that ebb and flow over time?

 9   A.   Yes.

10   Q.   When Mr. Wilson went to Europe and became the president to

11   Staples, did you notice his schedule was a little more hurried

12   or busy?

13   A.   Yes.

14   Q.   And he was nine hours away, correct?

15   A.   Correct.

16   Q.   So Debbie was even more active then?

17   A.   She was as active as she had been, but there was a little

18   less direct contact with Mr. Wilson.

19   Q.   Okay.

20   A.   Because of the time difference.

21   Q.   And when you first came to be introduced, was that at the

22   home in Hillsborough?

23   A.   That's correct.

24   Q.   John was working from home at that time?

25   A.   Yes.
```

```
         1   Q.   Then he went to Europe in 2012.  Did you ever go to the
         2   HPC address in Atherton, California?
         3   A.   I did.
         4   Q.   Two Fleur Place?
         5   A.   Yes.
         6   Q.   Could you describe to us what the office looked like for
         7   HPC at 2 Fleur Place?
         8   A.   It was in the back of the house.  I could characterize it
         9   as a pool house, and --
12:16   10   Q.   It was a separate building, a separate structure?
        11   A.   It was a separate structure from the main house.
        12   Q.   And how big was it?
        13   A.   Maybe 30 by 30.  I don't -- I don't recall an exact size.
        14   Q.   One large room, was there also a smaller room and bathroom
        15   off of it?
        16   A.   Again, I don't recall exactly.  I know there was one large
        17   room where Debbie had her office set up.
        18   Q.   Okay.  And they vacated that by 2016; is that correct?
        19   A.   That sounds right.  I don't know exactly when.
12:17   20   Q.   And Debbie moved to Nevada, and that's what became HPC's
        21   headquarters after they left the Atherton location?
        22   A.   That was their mailing address.  I believe their
        23   headquarters was the Massachusetts address.
        24   Q.   John's house in Massachusetts.
        25   A.   Yes.
```

```
 1    Q.   And during the time that Debbie was working out of the
 2    Atherton, was that the normal corporate office for mail, for
 3    her to sit and do work and take phone calls and things of that
 4    nature?
 5    A.   Yes, it was.
 6    Q.   You told us you provided two services, you did bookkeeping
 7    and you prepared the tax return, correct?
 8    A.   That's correct.
 9    Q.   What did the bookkeeping involve?
10    A.   The bookkeeping typically involved during the year from
11    time to time Debbie would have questions about how to record
12    certain transactions, but most of the work was done at the year
13    end.
14    Q.   And what would you do at year end?
15    A.   It's a typical process for accountants to what we call
16    clean up a client's books.  They will provide us with the
17    QuickBooks files and the underlying documentation that I would
18    request, and just as an example, I would compare an asset
19    account, say, some investment, to a balance shown on an
20    underlying document.  And if there was a discrepancy between
21    the two, I would record an adjustment so that the books matched
22    the underlying documentation.
23    Q.   Is that what you mean when you say you clean up the books?
24    A.   Yes.
25    Q.   And I take it "clean up" is not a negative concept, it's
```

1    just putting in organizational order, it's not like there's

2    something bad there?

3    A.    Correct, correct.

4    Q.    When you refer to QuickBooks, is that where the general

5    ledger is located?

6    A.    Yes.

7    Q.    Do you want to explain what a general ledger is?

8    A.    A general ledger is a document that lists all of a

9    company's transactions for the year.

12:19 10    Q.    And when you do this cleaning up the books, would Debbie

11    get involved at all to assist you with it?

12    A.    Yes, she would.

13    Q.    What would she do?

14    A.    She would generally answer questions that I had with

15    regard to certain transactions and then provide me with

16    additional documentation or clarification.

17    Q.    And how common is it that you provide that service to a

18    client of cleaning up the books at year end or, you know,

19    adjusting the books?

12:20 20    A.    It's very common.  I -- almost every business client I

21    perform that service for.

22    Q.    In the eight years that you worked with HPC, did you ever

23    observe Debbie Rogers try to withhold information from you?

24    A.    Not that I remember.

25    Q.    Or John Wilson?

| | |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Did they follow your advice? |
| 3 | A.   Not always. |
| 4 | Q.   When they didn't follow your advice, did it involve an |
| 5 | ethical issue or was it just a business decision? |
| 6 | A.   I don't recall a specific example of when they didn't |
| 7 | follow my advice, but it's common to have give and take between |
| 8 | client and CPA. |
| 9 | Q.   Okay.  You never had to refuse to sign a return for them, |
| 12:21 10 | correct? |
| 11 | A.   Correct. |
| 12 | Q.   And that's a sign when a CPA finds there's an ethical |
| 13 | problem, correct? |
| 14 | A.   If they wouldn't sign the return? |
| 15 | Q.   Yes. |
| 16 | A.   Yeah, I'm not sure I would characterize it as an ethical |
| 17 | problem -- |
| 18 | Q.   But a difference of opinion that was important to the CPA. |
| 19 | You never had that is my point. |
| 12:21 20 | A.   Correct. |
| 21 | Q.   Okay.  Now, if we could put up Exhibit 646, which the |
| 22 | government just showed you.  That's the -- that's your sort of |
| 23 | standard retention letter, fair to say? |
| 24 | A.   Yes, engagement letter. |
| 25 | Q.   It's the type you use with many clients? |

```
 1    A.    Yes.

 2    Q.    The language there isn't special to Mr. Wilson.

 3              If we could go to the very end of the last page.

 4              It says, "accepted by John Wilson," but it says

 5    "DocuSigned by John Wilson."  Fair to say you don't know if

 6    Debbie did the DocuSign or John did.

 7    A.    I assume John did.

 8    Q.    Okay.  But you don't know.

 9    A.    I do not know.

10    Q.    You don't -- be fair to say that Debbie was the person who

11    ran the paperwork in the office and kept things moving?

12    A.    Yes.

13    Q.    Okay.  Now, I want to talk a little bit about a Sub S

14    corporation that Ms. Kearney asked you about during her

15    questioning.

16              Please explain what is a sub S corporation.

17    A.    Sub S corporation is what's known as a pass-through

18    entity.

19    Q.    Go ahead, please.

20    A.    I was going to say, I stated it earlier, that rather than

21    paying tax itself as an entity, the income and deductions flow

22    through to the shareholders and they pay tax on the income.

23    Q.    Okay.  One thing about a sub S corporation is it gives the

24    owner, from perhaps what lawyers or others have told you, legal

25    protection, if you sue the company -- if I own a restaurant
```

| | |
|---|---|
| 1 | with a sub S corporation and somebody slips and falls, they can |
| 2 | sue the corporation but they can't sue the owner, correct? |
| 3 | MS. KEARNEY:  Objection, calls for a legal conclusion. |
| 4 | THE COURT:  He can have that one. |
| 5 | A.   I understand that that is the case, but I defer to legal |
| 6 | people for that. |
| 7 | Q.   Sure.  But it also means there's no double taxation, |
| 8 | correct? |
| 9 | A.   That is correct. |
| 12:23 10 | Q.   Could you explain to the jury what is the issue of double |
| 11 | taxation with a C corporation and how an S corporation |
| 12 | eliminates that. |
| 13 | A.   I will do my best. |
| 14 | Q.   Okay. |
| 15 | A.   A C corporation, or also known as a regular corporation as |
| 16 | opposed to an S corporation, pays tax on its own income.  Say a |
| 17 | corporation makes $100,000 profit for the year, and then later |
| 18 | they decide they're going to pay a dividend to their |
| 19 | shareholders.  Well, the company has already paid tax on that |
| 12:24 20 | $100,000, then they distribute the earnings to their |
| 21 | shareholders and the shareholders have to pay tax on that |
| 22 | income as well, and that's where the term "double taxation" |
| 23 | comes from. |
| 24 | MR. KENDALL:  If we could take a look at Exhibit 9777 |
| 25 | to the witness only, please.  Exhibit 9777. |

A2614

```
 1              Do we need to do the ELMO?

 2              If we could have the ELMO please for the witness only.

 3    Q.    Do you recognize this document, Mr. Nahmes?

 4    A.    Give me just a moment.

 5              Yes -- well, it's an e-mail that I wrote.

 6    Q.    And who did you send it to?

 7    A.    To Debbie Rogers.

 8    Q.    And does it deal with sub S issues?

 9    A.    Give me an opportunity to read it here.

10              Okay.

11    Q.    Do you recognize it?

12    A.    I do.

13              MR. KENDALL:  I'd like to offer that into evidence,

14    your Honor.

15              MS. KEARNEY:  Objection, your Honor, it's hearsay.

16              MR. KENDALL:  It's his own document.

17              MS. KEARNEY:  It doesn't make it not hearsay.

18              THE COURT:  Sustained.

19              MR. KENDALL:  Your Honor, he can be cross-examined on

20    it; it's not hearsay, your Honor.

21              MS. KEARNEY:  Your Honor, this is about a different

22    entity, first of all.

23              THE COURT:  It's hearsay.  The objection is sustained.

24              MR. KENDALL:  Okay.

25    BY MR. KENDALL:
```

**A2615**

1    Q.   Are you familiar with an entity called Discovery Gateway

2    Spectrum II, DGS II?

3    A.   Yes.

4         MS. KEARNEY:   Objection, your Honor.  This is beyond

5    the scope of the direct.

6         MR. KENDALL:   It is not at all, your Honor.

7         THE COURT:   I'll let him have that question.

8    BY MR. KENDALL:

9    Q.   What entity owned DGS II?

12:26 10  A.   Hyannisport Capital.

11   Q.   So Hyannisport Capital, a sub S, owned an entity called

12   DGS II, correct?

13   A.   I believe, if I recall correctly, that DGS II was owned by

14   the other LLC, DGS, Discovery Gateway Spectrum.

15   Q.   Thank you.

16        And that's owned by HPC, correct?

17   A.   That was owned by HPC.

18   Q.   And DGS II, like HPC, is also a Sub S corporation,

19   correct?

12:27 20  A.   I believe it was a limited liability company is my

21   recollection.

22   Q.   Thank you.

23        But it's also considered a disregarded entity,

24   correct?

25   A.   That is correct.

```
 1   Q.   Now, was there a practice at HPC to use -- to make
 2   charitable donations at the direction of John Wilson?
 3             MS. KEARNEY:  Objection.
 4             THE COURT:  Grounds?
 5             MS. KEARNEY:  How does this witness know what the
 6   practice is?
 7             THE COURT:  Well, if he knows, he can answer it.
 8   A.   I know that the company made charitable donations.
 9   Q.   Okay.  You saw that there was a donation in 2014 for
10   $100,000 to The Key Foundation from HPC, correct?
11   A.   Correct.
12   Q.   During that year there were several other charitable
13   contributions made from HPC, correct?
14   A.   Yes.
15   Q.   Autism Speaks, $50,000?
16   A.   I don't recall the amount.  I'd have to look at it.
17   Q.   Sure.  And in prior years HPC made charitable
18   contributions, correct?
19   A.   Yes.
20   Q.   So the $100,000 from The Key Foundation was not the first
21   charitable contribution that came out of HPC, correct?
22   A.   Yes.
23   Q.   Okay.  And I'd like to show you Exhibit 9775, please.
24             MR. KENDALL:  To the witness only.
25   Q.   Can you see it?
```

A2617

```
 1   A.   No.
 2           MR. KENDALL:  Can we have the ELMO just for the
 3   witness, please.
 4           MS. KEARNEY:  Do you have a copy for me, please?
 5           MR. KENDALL:  Yes, right here.
 6           If we could show the witness.
 7   BY MR. KENDALL:
 8   Q.   Do you recognize this?
 9   A.   Yes, I do.
10   Q.   And what is it?
11   A.   It's an e-mail I wrote.
12   Q.   And who did you send it to?
13   A.   Joyce Wang.
14   Q.   At the IRS?
15   A.   Correct.
16   Q.   But also to John Wilson and Debbie Rogers?
17   A.   Yes, I copied them on the e-mail.
18           MR. KENDALL:  Your Honor, I'd like to offer the
19   exhibit for state of mind, not for the truth of the matter
20   asserted.
21           MS. KEARNEY:  Your Honor, this e-mail appears to
22   concern a matter that defense counsel asked the government to
23   keep out of its exhibits, so I'm concerned as to what
24   Mr. Kendall is doing with that.
25           On top of it, it is being offered --
```

```
 1              MR. KENDALL:  I'll withdraw it, your Honor.  I'll just
 2      go to the question.
 3      BY MR. KENDALL:
 4      Q.   When HPC makes charitable contributions, did you ever have
 5      an issue of whether the paperwork was in John's name or the
 6      paperwork was in HPC's name, whether the money came from an HPC
 7      account or it came from John's account, so -- could you explain
 8      if that issue came up and what was its significance?
 9      A.   I recall at least one instance where the name on the
12:31 10     receipt was not in the name of the S corporation.
11      Q.   Okay.  And what does that mean?  What's the significance
12      of that?
13      A.   The charitable donation, I would like to see it in the
14      name of the corporation if the corporation paid the charitable
15      donation.
16      Q.   Okay.  In the end it's going to flow through to the
17      individual's return but in terms of paperwork, you want to have
18      it aligned in the books, correct?
19      A.   Yes.
12:31 20     Q.   Okay.  But in the end, if it's a donation, it's going to
21      show up on the Schedule A for Mr. Wilson's personal 1040,
22      correct?
23      A.   Yes.
24      Q.   I'd like to show you Exhibit 9778, please.
25              MR. KENDALL:  Just to the witness.
```

```
 1   Q.   And do you recognize this e-mail?

 2   A.   Yes, I do.

 3   Q.   Okay.  Are you --

 4        MR. KENDALL:  Mr. Carter, are you okay to do things

 5   now?

 6        MR. CARTER:  Yes.

 7        MR. KENDALL:  I'll turn this off.

 8   BY MR. KENDALL:

 9   Q.   What is this?

10   A.   It's an e-mail to Debbie Rogers.

11   Q.   Concerning what?

12        MS. KEARNEY:  Objection.  It's not in evidence.

13        MR. KENDALL:  Your Honor, I'd like to put it into

14   evidence.

15        MS. KEARNEY:  Your Honor, I object again.  This is

16   hearsay.  It also appears that Mr. Kendall is trying to put in

17   a number of exhibits not to impeach and these exhibits were not

18   provided to the government in advance.

19        MR. KENDALL:  Your Honor, cross-examination materials

20   don't have to be --

21        THE COURT:  Yes.

22        MR. KENDALL:  But this is to explain the testimony

23   that she brought out that has a broader base than what she's

24   given.

25        THE COURT:  The objection is sustained.  You can put
```

```
 1    it in front of the witness to refresh his memory if that's what

 2    you're trying to do, but the document itself will not be

 3    admitted.

 4              MR. KENDALL:   Okay.

 5    BY MR. KENDALL:

 6    Q.   Does this document refresh you that in 2013 you were

 7    working with Debbie on this issue of getting the charitable

 8    donations aligned so that the receipt and the account where it

 9    came from were aligned, whether it would be John or the sub S

10    corporation?

11    A.   Yes.

12    Q.   If you have your own way to describe that process, it

13    might be clearer than what I'm using, if you want to phrase it

14    in your own words.

15    A.   As I stated before, I would like to see the underlying

16    documentation match the expend -- match the expenditure on the

17    books.  So if Hyannisport Capital made a contribution from its

18    bank account, I would like to see their name on the charitable

19    contribution receipt.

20    Q.   The -- what you described earlier was the process of

21    cleaning up the books or getting the accounting cleaned up, did

22    that sometimes involve the charitable contributions?

23    A.   I'm sorry, excuse me?

24    Q.   You discussed earlier the service you provided of getting

25    the accounting entries in order and correcting and updating
```

**A2621**

```
 1   them from what Debbie had done.
 2   A.   Right.
 3   Q.   And you did that on an annual basis for HPC as well as
 4   other clients.
 5   A.   Yes.
 6   Q.   Okay.  Did that also involve doing those tasks for the
 7   charitable contributions?
 8   A.   Those were things I noted and brought up to Debbie's
 9   attention.
12:35 10  Q.   And would she have to go get the paperwork from the
11   charitable contributions to give to you to finish the
12   correcting of the accounting detail?
13   A.   Yes, that did happen.
14        MR. KENDALL:  I'd like to show you a copy of Exhibit
15   9779 for the witness only.
16   Q.   Is this an e-mail that you recognize?
17   A.   Yes.
18   Q.   Okay.  And does this deal with running down the charitable
19   receipts?
12:36 20  A.   I believe so.
21        MR. KENDALL:  Your Honor, I'd like to offer this into
22   evidence.
23        MS. KEARNEY:  Same objection, your Honor.
24        THE COURT:  The objection is sustained.  Again, it can
25   be used to refresh memory.
```

```
 1    BY MR. KENDALL:
 2    Q.   Does that refresh your memory that in September of 2013,
 3    Debbie for that year's tax returns was running down charitable
 4    receipts so you could clean up the books as you've described?
 5    A.   Yes.  It was not necessarily cleaning up the books as it
 6    was having proper documentation in the work papers.
 7    Q.   Now, in fact, when you were first retained, you had to do
 8    this process of cleaning up all of the books and transactions
 9    for years prior to when were you engaged.  Do you remember
10    doing a multiyear cleanup for HPC?
11    A.   Yes, for certain accounts on the books.  But that was not
12    something that I was hired to do at the inception of my
13    relationship.  It came upon later.
14    Q.   Do you remember finishing it in early 2015?
15    A.   I don't know the exact date, but that could very well be.
16    Q.   Okay.  Now, in preparing the 2014 tax returns, do you
17    remember there was problems with the receipts for some of the
18    charitable contributions?
19    A.   I believe there was.
20    Q.   Okay.  I'd like to show you -- the witness only -- Exhibit
21    9783.
22         If you could take a look at that, please.
23    A.   I don't see anything on the screen.
24         MR. KENDALL:  Why don't we give a copy to the witness
25    as well so he can look through the entire thing.
```

```
  1              THE WITNESS:  It's up now.
  2              MR. KENDALL:  But it's three pages.  It will be easier
  3      for you to look through.
  4              MS. PAPENHAUSEN:  May I?
  5              THE COURT:  Yes.
  6              THE WITNESS:  Thank you.
  7      BY MR. KENDALL:
  8      Q.   If you could take a look at that and tell us after you're
  9      done reading it to yourself if that refreshes your recollection
12:38 10 about a $50,000 receipt for Autism Speaks for the 2014 tax
  11     year.
  12     A.   Okay, I've read the document.
  13     Q.   Does this refresh your recollection of what happened with
  14     the Autism Speaks receipt for 2014?
  15     A.   Yes.
  16              MS. KEARNEY:  If the witness can be instructed to put
  17     the document down, your Honor.
  18              THE COURT:  Yes, yes.
  19     BY MR. KENDALL:
12:39 20 Q.   If you could put the document down and tell us what you
  21     remember about that receipt.
  22     A.   I don't recall specifically what -- it appears that from
  23     the document that that receipt was missing --
  24              MS. KEARNEY:  Objection, your Honor.
  25              THE COURT:  If it doesn't refresh your memory, then
```

A2624

```
 1   you can't testify to it.
 2   BY MR. KENDALL:
 3   Q.   Would reading it a little more closely help you refresh
 4   your memory to it?
 5            This is an e-mail you sent, correct?
 6   A.   It was an e-mail --
 7            THE COURT:  No, no, put the document down, please.
 8            And then ask your question, Mr. Kendall.
 9   BY MR. KENDALL:
10   Q.   Do you recall that there was a $50,000 donation to Autism
11   Speaks in 2014?
12   A.   I would have to look at the work papers.
13   Q.   For the amount.  You recall there was a contribution,
14   though, for Autism Speaks?
15   A.   Yes.
16   Q.   And John made contributions to Autism Speaks for many
17   years, correct?
18   A.   Yes.
19   Q.   It was one of the common charities he supported.
20   A.   I recall that.
21   Q.   And you recall in 2014 there was some problems with the
22   receipts, that Debbie had to run down additional paperwork for
23   the Autism Speaks donation.
24   A.   Yes.
25   Q.   Okay.
```

```
 1              For the $100,000 donation listed to The Key
 2   Foundation, when you saw that, did you do anything in
 3   particular?
 4   A.   I read the document, and I was not familiar with that
 5   organization, so I looked it up on the -- there is an IRS
 6   website that lists 501(c)(3) organizations.  And I looked -- I
 7   looked it up and recall finding it there.
 8   Q.   You found The Key Foundation on the IRS website.  And what
 9   was the purpose of you looking it up?
12:42 10  A.   To ensure that it had been -- or it was in the process of
11   being approved by the IRS.
12   Q.   And so, therefore, it was authorized to take charitable
13   contributions?
14   A.   Yes.
15   Q.   Okay.
16              MR. KENDALL:  Could we show the witness what's already
17   in evidence Exhibit 126, please?
18              If we could show him page 2.
19   Q.   Would it be fair to say that the standard practice was for
12:42 20  Debbie to send you copies of the receipts for charitable
21   contributions?
22   A.   Yes.
23   Q.   Okay.  Did you ever get this one?
24              MS. KEARNEY:  Objection, your Honor, to the
25   characterization of this as a receipt.
```

```
 1              THE COURT:  Yes, sustained.
 2              MR. KENDALL:  I'll rephrase, your Honor.
 3    BY MR. KENDALL:
 4    Q.   Did you ever get a copy of the letter that's Exhibit 126?
 5    A.   I did not.
 6    Q.   Okay.  It says, "Thank you for your generous gift to USC
 7    athletic men's water polo in the amount of $100,000.
 8    Maintaining state-of-the-art facilities is an essential part of
 9    USC's commitment to excellence.  Through your contribution, you
12:43 10   are helping the University achieve this important goal.
11              "On behalf of the young student athletes that will
12    benefit from your anonymous gift, thank you.
13              "Fight on!
14              "Ron Orr."
15              Was it your practice if you received gift notices or
16    documents referring to gifts or contributions in the range of
17    $100,000 you would look at them in the accounting books and
18    check them?
19    A.   Yes.
12:43 20   Q.   And if you had found this and found that had it been
21    booked as a business consulting instead of a charitable
22    contribution, would you have raised it with Debbie?
23    A.   Yes.
24    Q.   And because you never got this letter, you never had the
25    reminder to raise it with Debbie, fair to say?
```

```
 1    A.    Yes.

 2    Q.    Okay.

 3              I'd like to show you next Exhibit 9776.

 4              Do you recognize that document?

 5              MR. KENDALL:  For the witness only.

 6    A.    I do.

 7    Q.    And what is it?

 8    A.    These are my notes that I make while preparing the books

 9    and tax return for Hyannisport Capital.

12:44 10              MR. KENDALL:  I'd like to offer this into evidence,

11    your Honor.

12              MS. KEARNEY:  No objection.

13              THE COURT:  It will be admitted without objection.

14              (Exhibit 9776 received into evidence.)

15              MR. KENDALL:  If we could show the jury Exhibit 9976.

16    BY MR. KENDALL:

17    Q.    I take it it's your handwriting?

18    A.    Yes, it is.

19    Q.    Did they teach you in CPA school to have such fine, small

12:45 20    handwriting?

21    A.    No, it came to me somehow.

22    Q.    And is this a list of tasks that you made for yourself to

23    follow up on after looking at the books and records that had

24    been sent over to you by Debbie?

25    A.    That's correct.
```

```
 1   Q.   And I can see there's checks -- we can see there's checks

 2   on some of the numbers or lines drawn through them.  Is that

 3   you marking taking care of that task?

 4   A.   My system has changed over the years.  That may have meant

 5   that I asked Debbie for those documents.

 6   Q.   Okay.  I want to you take a look now at Exhibit 122,

 7   please, which is already in evidence.

 8           Now, this is an e-mail from Mr. Wilson to Debbie

 9   Rogers on July 2014.  It's just a couple of months after the

10   date of those invoices you were shown for consulting.

11           MR. KENDALL:  I want to go to the bottom of this

12   document, if we can, Mr. Carter.

13   Q.   And you see "big incomes" there.

14           MR. KENDALL:  Can we do the next three lines?

15   Q.   DGS net sales $2 million, Franklin $440K, Staples $800K

16   with bonus.

17           "DGS net sales," is that the LLC or whatever it is

18   that HPC owns?

19   A.   I believe that's what it's referring to.

20   Q.   And what is Franklin $450,000?  Was that a response -- was

21   that a board membership Mr. Wilson had?

22           MS. KEARNEY:  Your Honor, I'm going to object to this

23   line of questioning.  This witness is not on this e-mail and he

24   has testified he did not prepare Mr. Wilson's personal tax

25   returns to have a foundation for this.
```

A2629

```
 1              MR. KENDALL:  Your Honor, I need two questions.

 2              Just simply --

 3              THE COURT:  If he knows, he can answer.

 4    BY MR. KENDALL:

 5    Q.   Do you know if Mr. Wilson had some involvement with the

 6    Franklin Templeton Funds as a board member?

 7    A.   Yes, I was aware of that.

 8    Q.   And you know he worked at Staples, correct?

 9    A.   Yes.

10    Q.   So if we do the math there, basically a little bit less

11    than two-thirds of his big income is in DGS net sales, correct?

12    A.   Correct.

13    Q.   Which is captured within HPC, correct?

14    A.   Yes.

15    Q.   So when he is writing -- or he's transferring money for

16    $100,000 checks to various things, that's the largest source of

17    cash he appears to have available, correct, something in HPC?

18              MS. KEARNEY:  Objection, your Honor.

19              THE COURT:  Sustained.

20    BY MR. KENDALL:

21    Q.   Okay.  I'd now like to go to your work papers, Exhibit

22    134, please.

23              And there is the exhibit you just went through with

24    Ms. Kearney.  Do you remember that?

25    A.   Yes.
```

```
 1              MR. KENDALL:  Mr. Carter, I'd like to go to page 3
 2      where that fine print is again.
 3              And if we could go to the middle of the page where it
 4      says "gross profit expenses," and blow that up a bit so that we
 5      can read it.
 6              And if you could raise that.
 7      Q.   It says "gross profit" at the top, and then if we drop
 8      one, two, three, four, five lines down, it says "consulting
 9      general business $120,000," correct?
12:48 10    A.   Yes.
11      Q.   Okay.  So that's the $120,000 expense that was booked as a
12      general business expense.
13              If, in fact, that was a charitable contribution, that
14      should be lowered down on this list but under -- still under
15      "expense," correct?
16      A.   On the company's books, yes.
17      Q.   Okay.
18              MR. KENDALL:  If we could go further back down this
19      list, and if you just go a little bit lower and just do that
12:49 20    next section.
21              And if we see here -- it's hard to -- you see "total
22      DGS expenses" and under that "donations," correct?
23      A.   Correct.
24      Q.   So if that was a charitable contribution and not a
25      business expense, that 169 would go down by 120,000 and
```

```
 1   donations would go up by 120,000, correct?

 2   A.   I'm not sure the consulting is included in that 169.

 3   Q.   You know what, you're absolutely right.  I'm sorry about

 4   that.

 5        Let's go up a little higher.  I appreciate you

 6   pointing that out.

 7        If we take a look here, the total consulting of 133,

 8   that would go down 120,000 and then the donations would go up

 9   120,000, correct?

12:50 10  A.   Could you repeat the question as you started it?

11   Q.   If we see where it says "consulting general business

12   120,000" --

13   A.   Yes.

14   Q.   -- if that was improperly or incorrectly booked and it

15   really is a charitable contribution, that total consulting

16   number should go down by 120,000, correct?

17   A.   Correct.

18   Q.   And the donations should go up by 120,000.

19   A.   Correct.

12:51 20  Q.   Okay.  Now, these numbers carry over to the personal tax

21   return, correct?

22   A.   Right.

23   Q.   So what it would mean on the tax return is that the income

24   number would go up by $120,000 because you reduce the loss by

25   $120,000, correct?  Taxable income would go up 120,000?
```

 1    A.    Yes.

 2    Q.    But then, on the Schedule A for charitable contributions,

 3    the deductible charitable contribution would go up $120,000,

 4    correct?

 5    A.    Yes.

 6    Q.    So what you're doing is you're increasing -- when do you a

 7    tax return, it's a series of computations, correct?

 8    A.    Yes.

 9    Q.    You add things, you subtract things, you multiply things,

12:51 10    and you do these computations so you get the final number,

 11    correct?

 12    A.    Yes.

 13    Q.    So what we're talking about here is the income number

 14    should have been a little higher in the beginning, but if it's

 15    a charitable contribution, the deduction is bigger towards the

 16    end, correct?

 17    A.    Yes.

 18    Q.    And they're both by the same gross number of $120,000,

 19    correct?

12:52 20    A.    Yes.

 21    Q.    But you can't tell what impact it will have on the

 22    computation until you know all the numbers, correct?

 23    A.    Yes.

 24    Q.    So if I were -- no person in March of 2014 could predict

 25    if those numbers move, would you save money or not save money

|   | |
|---|---|
| 1 | on your taxes because you need all the numbers at year end to |
| 2 | do the calculation, correct? |
| 3 | MS. KEARNEY:  Objection as to what someone could |
| 4 | predict. |
| 5 | THE COURT:  Yes, that part is sustained. |
| 6 | BY MR. KENDALL: |
| 7 | Q.    In order to calculate if you could have had any positive |
| 8 | impact by putting a charitable contribution as a business |
| 9 | deduction, what numbers would you need to do the calculation? |
| 12:53 10 | A.    What impact it would have on the individual return? |
| 11 | Q.    Yes, on the person's 1040. |
| 12 | A.    You would need all items of income and deductions for that |
| 13 | year. |
| 14 | Q.    And are those numbers available in March of 2014? |
| 15 | A.    No. |
| 16 | Q.    Okay.  I'd like to go to in the same exhibit to Bates -- |
| 17 | the Bates number ending 3407. |
| 18 | It's a long exhibit. |
| 19 | 3407, please. |
| 12:54 20 | Perfect. |
| 21 | Okay. |
| 22 | Could you tell us what is this "W-1"? |
| 23 | I take it that's your handwriting. |
| 24 | A.    Yes, that's just a reference number, a sequence number for |
| 25 | the work papers. |

```
 1   Q.   Okay.  And this is a list of the donations that were put
 2   down for Hyannisport Capital.  One is the Menlo School for
 3   $35,000.
 4   A.   Right.
 5   Q.   Do you know that to be where Johnny went to high school?
 6   A.   I did know that.
 7   Q.   Okay.  Then it says Society For the Preservation of Theta
 8   XI at RPI.  Do you understand "RPI" is Rensselaer Polytechnic
 9   Institution?
12:54 10  A.   I'm not aware of that.
11   Q.   You're not aware it's Mr. Wilson's college?
12        Okay.  But there's a $10,000 donation there.
13        And then there's the $100,000 to The Key Worldwide,
14   and then there's $50,000 for Autism Speaks.
15        And if, in fact, that $120,000 business consulting was
16   a mistake and a true charitable donation, we would have
17   included it here, correct?
18   A.   Yes.
19   Q.   Okay.
12:55 20        Now, that letter I showed you earlier, the letter that
21   said, Thank you for the $100,000 to USC, that did not have that
22   language, no goods or services were delivered or no goods or
23   services were exchanged.
24        Are you familiar that sometimes charities give that
25   language in a separate document, not in the thank you note
```

```
 1    itself?
 2    A.    Yes.
 3    Q.    They can do it any way they want, correct -- strike that.
 4            They can put them all in one document or they can
 5    separate them in two documents.
 6    A.    I've seen them in two documents, yes.
 7    Q.    So if a person were to get a thank you note without that
 8    language, it wouldn't necessarily be alarming because the
 9    charity may just be sending a separate document.
12:56 10   A.    That's possible.
11    Q.    But you'd have to run it down when you're doing the tax
12    returns.
13    A.    Correct.
14    Q.    Okay.  Now, if we could go to the next page, please.
15            We see that's a March 6 letter to the Wilsons from the
16    Menlo School.  And it says, "Thank you so much for your recent
17    gift of $35,000 through Discovery Gateway Spectrum II LLC to
18    Menlo School."
19            This is on the HPC return, but the $35,000 came out of
12:56 20   DGS II which we saw had the $2 million, correct?
21    A.    That's what it indicates in the letter.
22    Q.    Okay.  And if we look at the bottom of this letter, it has
23    that language: "For tax purposes we acknowledge no goods or
24    services."
25            So they put it all in one document, correct?
```

```
 1    A.    Yes.

 2          MR. KENDALL:  Now, if we could go over two pages,

 3    Mr. Carter, to the Bates ending 3410 -- Denise McAdoo there.

 4    Q.    Now, I want to go to the middle of that page.

 5          You see there it says, "Wilson documentation."  And

 6    this relates to the $35,000 amount from the -- that was given

 7    to the Menlo School.

 8          Actually, let's go to the top so we can see the top of

 9    the e-mail, it's the Menlo School.

12:57 10       You see that, it's Denise McAdoo of the Menlo School

11    talking about Wilson documentation for the gift, correct?

12    A.    Yes.

13    Q.    Now, could we go to the bottom of that page, and look at

14    that line right there.

15          It says, "Debbie, the last installment was made on

16    2/12/13.  No payments have been received in 2014."

17          Based upon your 40-plus years or around 40 years as a

18    CPA, is there anything inappropriate about referring to a

19    charitable contribution as a payment?

12:58 20  A.    Not in an e-mail like this.

21    Q.    Okay.  It's just the monies got to go from one person to

22    another place for the charitable contribution, correct?

23    A.    Say that again?

24    Q.    "Payment" just means you're giving them the money,

25    correct?  It means it's common understanding, correct?
```

```
 1   A.    If you're using the term that way.

 2   Q.    Okay.

 3   A.    I could understand it.

 4   Q.    If we could go to the top of the next page, please.

 5         And if we look there it says, February 28, 2014 where

 6   Debbie writes to the person at the Menlo School, "Hi Denise,

 7   before I send the $35,000 I want to make sure there have been

 8   no payments received this year."

 9         Did I read that correctly?

10   A.    Yes.

11   Q.    Okay.

12         And if we drop down to the next e-mail message, going

13   back and forth where she writes, "Going back and forth with

14   John this morning, he seems to think he made a payment this

15   year, can you double check.  I just want to be sure we have all

16   payments towards this commitment accounted for."

17         Did you see that?

18   A.    Yes.

19   Q.    Okay.

20         MR. KENDALL:  If you could turn the next e-mail,

21   please, and go down to the next page, actually, Mr. Carter.

22   Right there.

23   Q.    It says, "Good morning, Denise" -- and again, they're

24   using the word "payment" and "payable" for a charitable

25   donation, correct?
```

```
 1   A.   Yes, they are.

 2           THE COURT:  All right.  We're going to break for lunch

 3   at this stage.

 4           You may step down for the time being, Mr. Nahmes.

 5           We'll be in recess for one hour, jurors.  I'll ask you

 6   to return then.

 7           THE CLERK:  All rise for the jury.

 8           (Jury left the courtroom.)

 9           THE COURT:  Be seated, counsel.

10           You may step down, Mr. Nahmes, for the time being.

11           THE WITNESS:  Thank you.

12           THE COURT:  How much longer on cross, Mr. Kendall?

13           MR. KENDALL:  I'd guess, your Honor, 25 to 40 minutes,

14   somewhere in that range.  I've got to flip through my notes,

15   but I'm more than halfway through.

16           THE COURT:  All right.  And then we are going to go to

17   Mr. Masera; is that right?

18           MS. KEARNEY:  Mr. DeMaio.

19           THE COURT:  All right, Mr. DeMaio.  Then we will not

20   get through his testimony this afternoon.

21           MS. KEARNEY:  I don't think so.

22           THE COURT:  Is there anything else that needs to come

23   to my attention before we recess?  If not, we are in recess

24   until 2:00.

25           THE CLERK:  All rise.
```

```
 1              (Recess taken 1:02 p.m. to 2:05 p.m.)
 2              THE CLERK:  Thank you.  You may be seated.  Court is
 3    now in session.
 4              THE COURT:  Good afternoon, jurors.  We're ready to
 5    pick up again.
 6              Mr. Nahmens, you're reminded that you remain under
 7    oath.
 8              Mr. Kendall, you may continue with cross-examination.
 9              MR. KENDALL:  Thank you, your Honor.
02:06 10   BY MR. KENDALL:
11    Q.   Mr. Nahmens, I want to continue going through Exhibit 134,
12    your work papers.  Just to clarify a couple of points, if you
13    had gotten that thank you letter from USC at the time you were
14    putting together these work papers, you would have raised it
15    with Debbie, correct?
16    A.   Would have raised?
17    Q.   If you got that letter that said thank you for the
18    $100,000, you would have said something to Debbie, correct, and
19    to ask her to explain to you what it was for and figure out
02:06 20   what it was for?
21    A.   Yes.
22    Q.   Okay.  And would it be fair to say Debbie is the one who
23    did all of the Quickbooks classifications?  John wasn't there
24    putting in the entries to Quickbooks.
25    A.   That's my understanding.
```

1    Q.    Yeah.  And when you would send back corrections for the

2    Quickbooks, you'd send them to Debbie for her to adopt,

3    correct?

4    A.    Yes.

5    Q.    As a general practice for forwarding your paperwork and

6    e-mails and receipts, that was Debbie, correct?

7    A.    Mr. Wilson forwarded me e-mails as well, from time to

8    time.

9    Q.    Excuse me.  Let me take back e-mails.  Receipts,

02:07 10    documents, backup accounting detail.

11    A.    Yes.

12    Q.    That would be Debbie, correct?

13    A.    Yes.

14    Q.    John wasn't in Amsterdam at Staples headquarters e-mailing

15    you a receipt for a $500,000 charitable contribution?

16    A.    That's correct.

17    Q.    I'd like to show you exhibit --

18          MR. KENDALL:  If we can put up Exhibit 118 for a

19    minute.  It's already in evidence.

02:07 20    Q.    I want to show you -- this is an e-mail you've never

21    received, but it's in evidence.  This is from Rick Singer, the

22    man who got that $20,000 that you discussed doing the tax form

23    for.

24          MR. KENDALL:  If we can go up to the middle of it.

25    Q.    It says -- in the middle, we see Rick Singer, April 10th,

at 2:14 p.m.  He says, "I think the money that came was from

Wilson's?  Did we charge both extra 20 for expenses?" I think

it's supposed to say, "If so great, if not fine, too".

       If you had been informed that that $20,000 payment

that was eventually sent to Rick Singer was supposed to cover

expenses of the Key Foundation, would that be an appropriate

thing to put down as a donation?  If you're going to pay the

expenses of a 501(c)(3) organization.

A.   You're saying would it make a valid charitable

contribution?

Q.   Yes.

A.   If it met the IRS standards for such.

Q.   Sure.  You know, you see when you make a contribution to

somebody by credit card, they sometimes say could you pay an

extra $5 to cover the credit card expense.  Are you familiar

with that?

A.   Yes.

Q.   There's nothing wrong with, in addition to your donation,

to pay part of the expenses of the charity as well to help

cover their overhead?

A.   Nothing wrong with that.

Q.   Thank you.

       I'd like to go back then into Exhibit 134.  And let's

go further to past where we were to the bates ending in 3416.

You see here there's a -- do you recognize this from your work

```
 1   papers?  You see the W-10 up at the top?
 2   A.   Yes.
 3   Q.   Okay.  Now, if we go to the top, it says "for good and
 4   valuable consideration."  It says the Theta Xi Association of
 5   Troy, New York.  Are you aware that Rensselaer Polytechnic
 6   Institute is in Troy, New York?
 7   A.   No.
 8   Q.   Okay.  Well, whatever it is.  This is a bill from a
 9   charitable organization using the word "payable", correct?
10   A.   Yes.
11        MR. KENDALL:  And if we go to the bottom of this page,
12   Mr. Carter, to the left side.
13   Q.   It says "make checks payable" and for a tax-deductible
14   purpose, correct?
15   A.   Yes.
16   Q.   Now, if we could go flip one, two pages, actually,
17   three pages, please, to receipt of the letter from The Geier
18   Group.  You see The Geier Group.  It's dated December 12, 2014.
19   "Dear John, I want to personally thank you for your generous
20   gift of $50,000 to Autism Speaks".
21        Now, if we look at this letter in its entirety,
22   there's no language that says no gifts or services.  Do you see
23   that?  No gifts or services were provided in exchange?
24   A.   Correct.
25   Q.   So that's an example of a thank you letter for a
```

02:10 10
02:11 20

1   charitable contribution that doesn't have the language,

2   correct?

3   A.   It's -- it's a -- yes, a thank you letter.

4   Q.   Okay.  And it's the response -- and under the Internal

5   Revenue Code, it's the responsibility of the charity to send

6   the letter saying whether there are no goods or services

7   exchanged, or what's the value of the goods and services

8   exchanged?

9   A.   Yes.

02:12 10   Q.   So, for example, if -- let's say the Cancer Society is

11   having a fundraiser dinner and it's $1,000 a ticket and it's at

12   a very fancy restaurant where the meal costs $100, they're

13   going to send a receipt saying, you gave us $1,000, but the

14   cost of your meal was $100, so your donation was $900, correct?

15   A.   Right.

16   Q.   And the Internal Revenue Code puts the obligation to send

17   that notice on the charity receiving the donation, correct?

18   A.   Yes.

19   Q.   Now --

02:13 20   A.   Let me restate.  I'm not sure it's the Internal Revenue

21   Code, but it could be the regulations.

22   Q.   Thank you very much.  The regulations is sort of another

23   part of the IRS.

24   A.   Yes.

25   Q.   I appreciate the clarity.

1          Now, anywhere -- and they have to put a value on the

2    meal, correct?

3    A.    Correct.

4    Q.    They have to do a market value, like you know, that's what

5    it is on their menu so they know it's $100?

6    A.    Yes.

7    Q.    Or they have to look at a comparable transaction if there

8    isn't a market price?

9    A.    Correct.

02:13 10   Q.    Is there anywhere in these work papers a deduction for the

11   rental expense of HPC's headquarters?

12   A.    I would have to go back through it, but my recollection is

13   that for this year it was not.

14   Q.    Okay.  Didn't John raise that issue with you, whether or

15   not he could take a deduction for the rent?

16   A.    He raised it to Debbie, who forwarded me that request.

17   Q.    Okay.  And you -- can you tell us what happened on that

18   issue of the rent for the 2014 year?

19   A.    The best I recall, I responded that -- initially, that it

02:14 20   would be possible to have a reimbursement arrangement whereby

21   the corporation would reimburse a portion of the rent that

22   applied to the office.

23   Q.    John never followed up in pursuing rent for HPC, correct?

24   A.    Not that I was aware of.

25   Q.    For '14, '15 and '16 when they were renting the Atherton

| | |
|---|---|
| 1 | house, correct? |
| 2 | A.   Not that I recall. |
| 3 | Q.   Okay.  I want to now turn to the last page, I think we're |
| 4 | going to cover in Exhibit 134.  Could we go to the bates ending |
| 5 | in 3434.  It says "Hyannis Port Capital, Inc. Journal". |
| 6 | MR. KENDALL:  If we could turn that around.  Thank |
| 7 | you, Mr. Carter. |
| 8 | Q.   What does this document show? |
| 9 | A.   These are the journal entries that I made to, as we |
| 02:15 10 | discussed before, to clean up the books. |
| 11 | Q.   These are corrections you're making in Debbie's entries or |
| 12 | bookings of various transactions? |
| 13 | A.   It's beyond that.  Some of them are corrections.  Some of |
| 14 | them are entries to record transactions that are more technical |
| 15 | than would be recorded, you know, just recording transactions |
| 16 | from a bank account or a credit card. |
| 17 | Q.   Okay.  If we could go to the next page, 2, these are more |
| 18 | of those corrections we just discussed? |
| 19 | A.   Yes, corrections and original entries. |
| 02:16 20 | Q.   Okay.  If I were to suggest to you they count up to about |
| 21 | 61 lines in those two pages, would that seem reasonable to you? |
| 22 | A.   Well, that seems somewhat close. |
| 23 | Q.   And are these the type of corrections or additional |
| 24 | entries you would recommend each year? |
| 25 | A.   Yes.  They -- they tend to be similar from year to year. |

```
 1   Q.   And if you had discovered that they had booked a -- they

 2        had booked a charitable deduction mistakenly as a business

 3        deduction, would that have been sort of reclassified in these

 4        pages?

 5   A.   Most likely.

 6   Q.   If we can take a look at Exhibit 164.  I'm not sure if

 7        that's -- maybe we don't need an exhibit.

 8             Who would you send the tax returns to, to Debbie,

 9        didn't you?

02:17 10  A.   For signature?

11   Q.   Yes.

12   A.   Yes.

13   Q.   Okay.  And then she'd arrange it with John to get it done?

14   A.   To sign and e-file.

15   Q.   Sign and take care of them.

16             Now, the last thing I want to cover with you, it's

17        only going to take us a couple of minutes is, in 2018, John

18        contacted you about the million dollars he was donating to the

19        Key Foundation, correct?

02:17 20  A.   It was either John or Debbie contacted me.

21   Q.   Yeah.  But they e-mailed you wanting your tax advice and

22        then that issue was really referred over to Mr. DeMaio,

23        correct?

24   A.   They didn't want my tax advice about the contribution

25        itself.  It was, I believe -- if I remember correctly, it was a
```

```
 1    technicality related to the receipt, the acknowledgment.

 2             MR. KENDALL:  Okay.  If I may have just one moment,

 3    your Honor.

 4             THE COURT:  Yes.

 5             MR. KENDALL:  Thank you, your Honor.  No further

 6    questions.

 7             THE COURT:  Mr. Kelly.

 8             MR. KELLY:  No questions.

 9             THE COURT:  Miss Kearney, any redirect?

10             MS. KEARNEY:  Yes, your Honor.

11                  REDIRECT EXAMINATION OF JAMES NAHMENS

12     BY MS. KEARNEY:

13    Q.   Good afternoon, Mr. Nahmens.

14    A.   Good afternoon.

15    Q.   During his questioning, Mr. Kendall asked you whether

16    Hyannis Port Capital had a practice to make donations.  Do you

17    remember that question?

18    A.   I'm not sure those were the exact words, but there was a

19    question similar to that.

20    Q.   Do you recall that Hyannis Port Capital had made no

21    charitable contributions in 2013?

22    A.   I don't recall specifically.

23    Q.   Would it refresh your recollection to look at the 2013

24    return?

25    A.   Yes.
```

```
 1              MS. KEARNEY:  May I approach, your Honor?

 2              THE COURT:  Yes.

 3    Q.   Mr. Nahmens, I handed you the 2013 Hyannis Port Capital

 4    return.  Do you want to take a minute to look at that?

 5    A.   With regard to the charitable contributions?

 6    Q.   Yes, please.

 7    A.   Okay.

 8    Q.   Having looked at that return, is your memory refreshed as

 9    to whether Hyannis Port Capital had any charitable

02:21 10    contributions in tax year 2013?

11    A.   It appears there were none.

12    Q.   And then do you recall whether Hyannis Port Capital had

13    any charitable donations in 2015?

14    A.   I do not recall.

15    Q.   Okay.  In front of you is the 2015 tax return.  Do you

16    want to take a look at that and see if that refreshes your

17    recollection as to whether Hyannis Port Capital had any

18    charitable donations in 2015?

19    A.   It appears not.

02:22 20    Q.   Do you recall whether Hyannis Port Capital had only

21    $10,000 worth of donations in 2016?

22    A.   No.

23    Q.   Would it refresh your recollection to look at the 2016

24    return that's also in front of you?

25    A.   Yes.
```

```
 1   Q.   Could you take a look at that and see if looking at the
 2   2016 return refreshes your recollection as to whether Hyannis
 3   Port Capital had only $10,000 in donations in 2016?
 4   A.   Yes.  That's correct.
 5   Q.   And do you recall whether Hyannis Port Capital had any
 6   charitable donations in 2017?
 7   A.   I do not.
 8   Q.   Would it refresh your recollection to look at the 2017
 9   return?
10   A.   Yes.
11   Q.   And that is also in front of you.
12   A.   It appears there is none.
13   Q.   Mr. Nahmens, Mr. Kendall asked you a number of questions
14   about a letter from USC regarding a $100,000 donation?
15   A.   Yes.
16   Q.   And he suggested that you sometimes had to work with
17   Miss Rogers to get tax receipts cleared up?
18   A.   Yes.
19        MS. KEARNEY:  Miss Lewis, if we can pull up
20   Exhibit 134 in evidence, and go to page 96.
21   Q.   Mr. Nahmens, was there anything to clear up about that
22   $100,000 payment, given that you had a copy of an invoice that
23   corresponded to that payment?
24   A.   No.  Based on the document that I've seen, I've got it
25   documented as showing an expenditure on the books.
```

```
 1          MS. KEARNY:  And if we can look at page 95,
 2   Miss Lewis.
 3   Q.   Mr. Nahmens, was there anything to clear up given that you
 4   had a copy of an invoice that corresponded to a $20,000 payment
 5   to Rick Singer?
 6   A.   No.  Same as the other one.  I forgot to mention the 1099
 7   miscellaneous issue, that that was something that I believe
 8   once I saw these it reminded me of that as well.
 9   Q.   Once you saw the invoices, it reminded you --
10   A.   I can't remember if it was when I saw these invoices or I
11   saw the expenditure on the general ledger.  It was one or the
12   other most likely.
13   Q.   And would you have completed 1099s for charitable
14   donations?
15   A.   No.
16   Q.   Let's look at Exhibit 134 on page 3.  If we can blow up
17   under the "Expense" category, Miss Lewis.
18          Mr. Nahmens, Mr. Kendall asked you a number of
19   questions about whether or not the consulting fees had been
20   reduced and the donations had been increased, it would all wind
21   up under expenses, correct?
22   A.   The way I remember the question is -- yes, that's correct.
23   It would be an expense of the corporation on the books.
24   Q.   But what is the -- let me rephrase that.
25          If an amount was moved from consulting to donations,
```

1    those donations could not be taken as business expenses on the

2    tax return, correct?

3    A.    Correct.  I was just stating that they would be

4    reclassified on the books.

5    Q.    And is it -- is there any difference between reporting a

6    deduction as a business expense versus a charitable donation?

7    A.    Yes.

8    Q.    What's that difference?

9    A.    The business expenses go into the calculation of ordinary

02:26 10    business income, whereas the charitable contributions are

11    considered what's called a separately stated item and are

12    reported separately from the net business income.

13    Q.    They're reported on a Schedule A of itemized deductions?

14    A.    Once they get to the individual return, yes.

15    Q.    And business expenses are, fair to say, 100 percent

16    deductible from income?

17    A.    Generally.

18    Q.    Are there limits on itemized deductions?

19    A.    Yes.

02:27 20    Q.    Such that once the taxpayer surpasses a certain limit,

21    deductions for expenses above that amount are phased out?

22    A.    In certain years that was true.

23    Q.    And in March of -- or April of 2014, a taxpayer would

24    understand that a business expense would be a hundred percent

25    deductible, but wouldn't yet know whether a charitable

```
 1    deduction would be 100 percent deductible?

 2              MR. KENDALL:  Objection.

 3              THE COURT:  Overruled -- well, what's the objection?

 4              MR. KENDALL:  Speculation.  A taxpayer would know?

 5    Who knows what taxpayers know, your Honor?

 6              THE COURT:  Well, to the extent he has expertise, I'll

 7    let him answer that.

 8    A.    I believe some taxpayers would know.  Others would not.

 9    Q.    Mr. Kendall asked you some questions about making a

10    payment to Mr. Singer and being able to deduct that as a

11    charitable donation.  Do you recall those questions?

12    A.    Somewhat.

13    Q.    Is there a difference between sending funds to a private

14    entity or a private person compared to sending funds to a

15    501(c)(3) charity?

16    A.    Yes.

17    Q.    Are you -- in your experience, your 40 years of

18    experience, have you ever had a client who tried to take a

19    charitable deduction for a payment to an individual?

20    A.    Not that I recall.

21              MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 134

22    again.  And if we can go to I think it's around 97.  We can

23    actually go a few more pages down, please.  Keep going.  Keep

24    going.  Right here.

25              And Miss Lewis, can you blow up the bottom where it
```

02:27 10
02:28 20

1    says "Make checks payable to".

2    Q.   Mr. Nahmens, do you see here that checks made to the

3    Society for the Preservation of Greek Housing were considered

4    tax-deductible, whereas payments to the Theta Xi Association of

5    Troy, New York are non tax-deductible?

6    A.   I see that.

7    Q.   Is it your understanding that the difference there is one

8    of those payments would be made to a 501(c)(3), whereas the

9    other would be made to a private entity?

02:29 10   A.   I would assume the one that says tax deductible is to a

11   501(c)(3).  I don't know about the other one.

12        MS. KEARNEY:  Miss Lewis, if we can go two pages above

13   that.  Excuse me, three pages above that.

14   Q.   You see here, Mr. Nahmens, there was a thank you letter

15   received from the Society for the Preservation of Greek

16   Housing?

17   A.   Yes.

18   Q.   And this letter includes that language you were talking

19   about earlier that no goods or services were provided in return

02:30 20   for the gift?

21   A.   Correct.

22        MS. KEARNEY:  And Miss Lewis, if you'd go to the next

23   page.

24   Q.   There is a separate thank you letter for that same

25   donation and here there's actually an indication the foundation

```
 1   will provide an acknowledgment for tax receipt purposes?
 2   A.   I see that.
 3   Q.   And is it your experience that entities that receive
 4   donations often send a thank you letter and sometimes a
 5   separate gift receipt for tax purposes?
 6   A.   That does happen.
 7        MS. KEARNY:  And if we can go, Miss Lewis, a few pages
 8   down to the letter from The Geier Group that Mr. Kendall showed
 9   you.
10   Q.   Do you recall looking at this, Mr. Nahmens?
11   A.   I'm sorry.  What?
12   Q.   Do you recall looking at this letter with Mr. Kendall?
13   A.   Yes.
14   Q.   And this appears to be a thank you letter.  It does not
15   include that language about whether goods or services were
16   exchanged.  Do you see that?
17   A.   Yes.
18   Q.   So it does not include that language, correct?
19   A.   Correct.
20        MS. KEARNEY:  And Miss Lewis, if we go up one page.
21   If we can make sure we get the bottom of the letter, please,
22   Miss Lewis.
23   Q.   Do you see that this letter also concerns that same
24   donation, but includes the tax receipt language that no goods
25   or services were exchanged, correct?
```

```
 1    A.    Yes.

 2    Q.    Mr. Kendall asked you some questions about a potential

 3    reimbursement arrangement for Hyannis Port Capital's office

 4    space?

 5    A.    Yes.

 6    Q.    And you don't prepare Mr. Kendall's -- excuse me --

 7    Mr. Wilson's personal tax returns, correct?

 8    A.    That's correct.

 9    Q.    And you don't know what his personal tax advisers advised

02:32 10   him with respect to any deduction for the office space,

11    correct?

12    A.    There was a discussion at one time about it, but it had

13    been for prior years.

14         MS. KEARNEY:  Miss Lewis, can you pull up Exhibit 710,

15    which is in evidence.

16    Q.    Mr. Nahmens, I understand you're not on this e-mail.  Do

17    you see in the bottom e-mail from John Wilson, he writes,

18    "Rick, thanks again for making this happen!  Please give me the

19    invoice.  What are the options for the payment?  Can we make it

02:33 20   for consulting or whatever from the Key, so that I can pay it

21    from the corporate account?"

22         Do you see that?

23    A.    Yes.  I see that.

24    Q.    And if you look at the e-mail above, there's a response

25    from Rick Singer.  He says, "Yes.  We can send you an invoice
```

```
  1    for business consulting fees and you may write-off as an
  2    expense.  What is the name, address, et cetera that you want
  3    the invoice to be made out to?"
  4           Do you see that?
  5    A.   Yes.
  6    Q.   And Mr. Wilson responds, "R awesome!"  And then he
  7    provides the name and address for Hyannis Port Capital.  Do you
  8    see that, Mr. Nahmens?
  9    A.   Yes.
 10    Q.   Does this e-mail look like a charitable contribution being
 11    discussed?
 12           MR. KENDALL:  Objection, your Honor.
 13           THE COURT:  Sustained.
 14    Q.   Mr. Nahmens, had you seen this e-mail in preparing the
 15    2014 tax returns, would you have asked questions about those
 16    payments?
 17    A.   Give me a moment to read it again.
 18           Honestly, it's tough to say what I would have done
 19    under those circumstances.  I would have to give that some
 20    further thought.
 21    Q.   Mr. Nahmens, I just want to point one other thing out on
 22    this document.  Do you see the subject line there?
 23    A.   I do.
 24    Q.   It says "USC fees".  Do you see that?
 25    A.   Yes.
```

02:34 10
02:35 20

```
 1   Q.   And Mr. Kendall asked you a number of questions about

 2   using the word "payment", but in your experience do you refer

 3   to donations as "fees"?

 4           MR. KENDALL:  Objection, your Honor.

 5           THE COURT:  Overruled.

 6   A.   I do not.

 7   Q.   And Mr. Nahmens, can a taxpayer deduct a payment to his

 8   son's college counselor as a business expense?

 9   A.   No.

10           MS. KEARNEY:  Thank you.

11           THE COURT:  Recross, Mr. Kendall.

12           MR. KENDALL:  Yes, your Honor.

13               RECROSS-EXAMINATION OF JAMES NAHMENS

14   BY MR. KENDALL:

15   Q.   I just want to go through a few things.  If Debbie is

16   transferring amounts of, let's say, $100,000 or more out of the

17   HPC, proper accounting or proper bookkeeping would be to have

18   some type of invoice for the amount, correct?  You just don't

19   send a $100,000 bank transfer without an invoice, correct?

20   A.   Correct.  Assuming it's for an expenditure, yes.

21   Q.   Okay.  And if Mr. Singer is saying, I'm going to be the

22   delivery boy for the $100,000 donation to USC, send me the

23   $100,000, I'll buy the bank check and I'll drop it off to them,

24   the charitable thank you is going to come sometime after that

25   $100,000 is transferred out of HPC, correct?
```

```
 1   A.    An acknowledgment would follow a payment.

 2   Q.    And you -- the document that Miss Kearney just showed you

 3   is Mr. Wilson saying, consulting or whatever, correct?

 4   A.    That's what that document said.

 5   Q.    He's indifferent, consulting or whatever.  He needs a

 6   receipt for Debbie to make the transfer, correct?

 7         MS. KEARNEY:  Objection, your Honor, as to what

 8   Mr. Wilson.

 9         THE COURT:  Sustained.

10   Q.    The language he uses is "consulting or whatever", correct?

11   A.    That's what was on that e-mail.

12   Q.    And it gives an invoice just so Debbie knows where to send

13   the $100,000, correct?

14   A.    Was it $100,000 or?

15   Q.    It was $100,000 even.

16   A.    Okay.

17   Q.    And then, a few months later, USC sends a thank you note

18   for the donation, correct?  That was the letter I showed you.

19   It came in July.

20   A.    You did show that to me.

21   Q.    And then, if you, yourself, checked the IRS website to

22   make sure that The Key Foundation was a recognized certified

23   charity, correct?

24   A.    I did.

25   Q.    And if the head of an IRS approved and certified charity
```

```
 1    says, can you make another $20,000 contribution to cover the
 2    expenses of the foundation, that, too, can be a charitable
 3    donation, correct?
 4         MS. KEARNEY:  Objection, your Honor.  It's assuming
 5    facts not in evidence.
 6         THE COURT:  Sustained.
 7    Q.   A $20,000 donation to cover the expenses of an IRS
 8    approved charity is also a donation, correct?
 9    A.   Assuming it makes -- it meets IRS standards.
10    Q.   And if you do it as a cash contribution, or as a noncash
11    contribution, they're both tax deductible, correct?
12    A.   Yes.
13    Q.   And a cash contribution would be to, say, to the charity,
14    here's $20,000, I'm donating it to the charity.  That's a cash
15    contribution, correct?
16    A.   Right.
17    Q.   And if you also go to the head of the foundation and say,
18    here's $20,000 to cover the expenses, I assume you'll take care
19    of it to pay the bookkeeper, to pay whatever, that could be a
20    non-cash contribution, correct?
21         MS. KEARNEY:  Objection.  Misstates the evidence.
22         THE COURT:  Sustained.
23    Q.   A $20,000 payment to the head of a foundation to buy
24    resources, you know, personnel, supplies, whatever, for the
25    expenses of the foundation can be a non-cash contribution,
```

```
 1    correct?
 2    A.    A payment to the head of the organization, or a payment to
 3    the organization?
 4    Q.    If you give the head of the organization $20,000 to go out
 5    and buy the -- to go out and buy the resources for the place.
 6    We don't have a car.  We don't have paper.  We don't have
 7    computers.  I'll pay for the computers for the foundation.
 8    Here's the cash.  Go get them.
 9            MS. KEARNEY:  Objection.
10    Q.    That's a non-cash contribution?
11            THE COURT:  If he understands it as an expert in that
12    area, I'll allow him to answer.
13    Q.    That's a non-cash contribution, correct?
14    A.    You're saying a payment to the head of an organization?
15    Q.    No.  Let me correct it.  If the person says, I will pay
16    for the computers of the organization, I'll pay for the
17    secretarial help, here is the money, you can go buy them with
18    my money and it's my contribution to the organization, I'm
19    paying for the expenses of the organization, can that be a
20    contribution?
21    A.    By making a charitable contribution to the organization.
22    Q.    Yes.  Fair enough.
23            And all the documents you had about the $20,000 to
24    Mr. Singer and requiring tax stuff, that was all e-mails for
25    Debbie Rogers.  It wasn't with John Wilson, correct?
```

```
 1    A.    That's correct.

 2    Q.    The last issue.  There's -- I want to clarify the home

 3    office issue that Miss Kearney just raised with you.  There was

 4    an issue -- there is an issue common that people want to deduct

 5    a part of their expenses for their personal home as a home

 6    office deduction.  You're familiar with that concept?

 7    A.    Yes.

 8    Q.    Okay.  There was a separate and distinct issue that Debbie

 9    Rogers had her office in a house that was only being used for

10    the HPC office, because the Wilson family had gone to Europe,

11    correct?

12    A.    I'm not aware of how the house was being used.  I only saw

13    the office.

14    Q.    You saw the office and you know John and his wife and his

15    daughters were in Europe?

16    A.    Yes.

17    Q.    So if they're paying rent on this house and the only

18    person using it is Debbie using it for an office, that's not a

19    home office deduction.  That's just a rental expense.

20             MS. KEARNEY:  Objection.

21             THE COURT:  Sustained.

22    Q.    Do you understand the difference of what I'm trying to

23    point out?  Let me rephrase that.

24             Didn't John raise with you whether or not he could

25    take part of the rent expense for the house and just have it as
```

|   |   |
|---|---|
| 1 | an office expense, not a home office expense, just an office |
| 2 | expense, and then he never followed up on it? |
| 3 | A.   Debbie raised it with me by forwarding an e-mail from |
| 4 | John. |
| 5 | Q.   And then John just never followed up on it, correct? |
| 6 | A.   I was not aware of any follow-up on that. |
| 7 | MR. KENDALL:  Thank you very much.  No further |
| 8 | questions. |
| 9 | MR. KELLY:  Still nothing, your Honor. |
| 02:43 10 | THE COURT:  All right.  Thank you, Mr. Nahmens.  You |
| 11 | may step down. |
| 12 | THE WITNESS:  Thank you, your Honor. |
| 13 | THE COURT:  Miss Kearney? |
| 14 | MS. KEARNEY:  The government calls Jeff DeMaio. |
| 15 | THE CLERK:  Thank you.  You may be seated.  Would you |
| 16 | please state your name for the record, spelling your last.  You |
| 17 | can take that off. |
| 18 | THE WITNESS:  Jeffrey DeMaio, D-e-m-a-i-o. |
| 19 | MS. KEARNEY:  May I proceed? |
| 02:44 20 | THE COURT:  Miss Kearney, you may. |
| 21 | DIRECT EXAMINATION OF JEFFREY DEMAIO |
| 22 | BY MS. KEARNEY: |
| 23 | Q.   Good afternoon, Mr. DeMaio. |
| 24 | A.   Good afternoon. |
| 25 | Q.   Where do you live? |

```
 1   A.    Irvine, California.
 2   Q.    Are you currently employed?
 3   A.    Yes, ma'am.
 4   Q.    Where?
 5   A.    The AYCO Company, AYCO Financial Planning Division,
 6   Goldman Sachs.
 7   Q.    What is AYCO?  What does it do?
 8   A.    Personal financial management.
 9   Q.    What do you do at AYCO?
10   A.    I'm a financial planner.
11   Q.    What does that involve?
12   A.    Working with mostly individuals in the areas of tax and
13   investment planning, retirement planning, benefits and
14   compensation planning, mortgage planning, debt management,
15   things of that nature.
16   Q.    How long have you been a financial planner?
17   A.    28 years.
18   Q.    What's your educational background?
19   A.    I have a Bachelor of Science in finance and an MBA in
20   finance.
21   Q.    In the course of your career, have you been involved in
22   the preparation of tax returns?
23   A.    I have.
24   Q.    What role have you played in the preparation of tax
25   returns?
```

02:44 (line 10)
02:45 (line 20)

```
 1   A.   Various roles over the course of my career, whether it's
 2   gathering data and helping prepare the tax return, reviewing
 3   tax returns, of course signing tax returns.
 4   Q.   Approximately, how many returns have you been involved in
 5   preparing over the course of your career?
 6   A.   In one form or another, probably 4 or 5,000.
 7   Q.   What kind of returns have you prepared?
 8   A.   Mostly personal returns.  Sometimes I'll get involved in a
 9   trust income tax return, or a partnership return, sometimes a
10   gift tax return, estate tax return.
11   Q.   I'm going to ask you some questions about John Wilson.  Do
12   you know him?
13   A.   Yes.
14   Q.   How do you know him?
15   A.   He's a former client.
16   Q.   When did Mr. Wilson become a client?
17   A.   Approximately January of 1999, I believe.
18   Q.   What work did you do for him?
19   A.   Tax work and financial planning work over the course of
20   our relationship.
21   Q.   Did that involve preparing his personal tax returns?
22   A.   Yes, ma'am.
23   Q.   For how many years did you prepare Mr. Wilson's tax
24   returns?
25   A.   Our entire relationship.
```

02:45 (line 10)
02:46 (line 20)

```
 1   Q.   So nearly 20 years approximately?

 2   A.   Yes.

 3   Q.   I want to ask you some questions now about Rick Singer.

 4   Do you know Rick Singer?

 5   A.   I do.

 6   Q.   How do you know him?

 7   A.   I was introduced to Rick Singer by an HR professional

 8   in -- around 2006 or '07 at a lunch meeting, I believe.

 9   Q.   Did there come a time when you recommended Mr. Singer to

10   some of your clients?

11   A.   Yes.

12   Q.   How many of your clients did you refer to Mr. Singer?

13   A.   I'd say four or five over the course of about 10 years.

14   Q.   Why did you refer clients to Mr. Singer?

15   A.   If it came up in a meeting that a client was inquiring

16   about if I knew of anybody that did ACT prep and tutoring and

17   things of that nature, a person that might be pursuing college,

18   did I know anybody.  That was really the only name I knew of at

19   the time.

20   Q.   Are you aware whether any of the clients to whom you

21   referred Mr. Singer ever used his services?

22   A.   The only one I'm aware of is John.

23   Q.   And when did you recommend Mr. Singer to Mr. Wilson?

24   A.   Right around 2010, around three years after I had been

25   introduced to him.
```

**A2666**

1    Q.    What did you discuss with Mr. Wilson about Mr. Singer?

2    A.    It was a fairly limited conversation.  I just vaguely

3    recall that one of his children were going to be preparing for

4    college soon and that they were looking at ACT prep and

5    tutoring services and things of that nature, so Rick came to my

6    mind from the earlier introduction.

7    Q.    What did you know about Mr. Singer at the time you gave

8    his name to Mr. Wilson?

9    A.    I knew that he worked with clients up and down the western

02:48 10    United States.  He definitely had significant tutoring staff.

11    The person who introduced us mentioned that we had a number of

12    mutual clients because of his role.  He knew of the clients

13    that Rick worked with and he knew the clients that I worked

14    with.  He didn't get into specifics, but he mentioned that we

15    had some mutual clients and that he had heard that Rick had

16    done good work.

17    Q.    Did you discuss with Mr. Wilson that you had referred

18    Mr. Singer to any of your other clients?

19    A.    I believe in the e-mail I sent back to John when he had

02:48 20    requested his contact information, I mentioned that we had some

21    mutual clients.

22    Q.    Did there come a time when you hired Mr. Singer yourself?

23    A.    I did.  Approximately --

24    Q.    When was that?

25    A.    I did, yes.

|    |    |
|----|----|
| 1 | Q.   When was that? |
| 2 | A.   Around 2015, about 5 years after I introduced him to John. |
| 3 | Q.   And what did you hire Mr. Singer for? |
| 4 | A.   Tutoring services, ACT prep type services for around six |
| 5 | or seven months trying out the services.  We were looking for |
| 6 | some tutors and I recall that he had a pretty good tutoring |
| 7 | staff, or at least had a number of them, and we tried his |
| 8 | services for about six or seven months, and then discontinued |
| 9 | it after that. |

02:49 10   Q.   How old were your children at the time you used
11   Mr. Singer's services?
12   A.   They were starting their freshman year.
13   Q.   What did you pay for Mr. Singer's services?
14   A.   It worked out to about 6 or $700 a month per student.
15   Q.   And I want to back up a second.  When you said "freshman
16   year," freshman year of high school?
17   A.   Yes.
18   Q.   Did you use Mr. Singer for any other services?
19   A.   No.
02:49 20   Q.   Why not?
21   A.   We just -- at the time, there wasn't real good chemistry
22   between him and my kids and my wife.  We were still exploring
23   different resources and perhaps maybe started a little early
24   with them and decided to go in a different direction.
25   Q.   I want to turn now to the preparation of Mr. Wilson's tax

returns.  Did you and your team have a regular set of steps

that you followed in preparing Mr. Wilson's returns?

A.    Yes.

Q.    Typically, what was that process?

A.    Our process involved sending out a tax data collection

package, which involves a number of checklists and reminder

notices and instructions to pull together your tax data.  And

it also included an organizer reflecting a number of data

points from the prior year to help remind the client of things

to pull together, different envelopes, things of that nature.

Q.    What did you do after you collected all of the materials

you needed?

A.    If there was sufficient data to begin work on the return,

we'd complete a draft of the returns, and then we would compile

a list of open items or questions.  There would usually be a

number of people involved in the preparation of the return, for

example, a tax preparer, a reviewer from our CPA staff, myself,

perhaps another member of the team to work on it as a team.

Between all of us, we had a list of items that were missing and

we approached the client in order, or the client's

representatives, for the missing information.

Q.    And who did you contact if you had a question about

missing information?

A.    Often -- for John, we had contacted his assistant Debbie

Rogers.

```
 1   Q.   What about if a substantive question came up?  Who did you

 2   contact?

 3   A.   Often, we would suggest a conference call with John

 4   through Debbie.  That might be one course.

 5   Q.   And what happened once Mr. Wilson's return was prepared

 6   and you had all your questions answered?  What happened next?

 7   A.   We had all of the missing items or items we thought were

 8   missing.  We then would finalize the tax return.  We would

 9   collate it, contact the client or Debbie perhaps in this

10   situation for John, and we would confirm where to send the data

11   -- or excuse me -- the tax return for review and filing

12   purposes.

13   Q.   And did there come a time when Mr. Wilson asked you

14   questions about a return after you sent it to him?

15   A.   Over the course of our relationship?

16   Q.   Yes.

17   A.   Of course.

18   Q.   How often did that happen?

19   A.   Periodically.  I'd say at least once on average per tax

20   year.

21   Q.   What kinds -- excuse me.  Did you have more to say?

22   A.   We would also discuss questions during the course of the

23   year, perhaps if we were doing quarterly tax preparing, as

24   well.  But I think you're focussing on just on the tax

25   preparation process.
```

1   Q.   Well, let me ask you this.  What kind of questions did you

2   discuss with Mr. Wilson?

3   A.   Well, after the return was completed?

4   Q.   Let's start with that, after the return was completed.

5   What kind of questions did you ask?

6   A.   Usually, we would be answering questions that -- at that

7   point in time, that the client might have, or John would have.

8   So, for example, how did a return turn out compared to your tax

9   projection, or if I have a refund, why aren't you applying it

02:53 10   and how much, what's the rationale behind that, what's the

11   strategy, things like that.

12   Q.   What about during the course of the year?  What kinds of

13   questions did you discuss with Mr. Wilson?

14   A.   If there's any income or deduction changes that we should

15   be aware of just to take into account while we're working on

16   estimated payment planning, the tax projection that we try to

17   update on a quarterly basis.

18        MS. KEARNEY:  Miss Lewis, can we pull up Exhibits 170

19   and 172 for the witness only?

02:53 20   Q.   Mr. DeMaio, these are also in the binder in front of you,

21   if it's easier to look at them in hard copy.

22        Mr. DeMaio, do you recognize the documents up on the

23   screen, Exhibits 170 and 172?

24   A.   I do.

25   Q.   What are they?  Let's start with 170.  What is that?

```
  1   A.    That is a draft cover letter of a tax package that we
  2   would send out to a client when the return was finalized.
  3   Q.    And what do you recognize the document on the right to be?
  4   A.    That is the final cover letter of a tax return that's
  5   going to be sent out to the client.
  6   Q.    And what year are these both dated?
  7   A.    2015.
  8         MS. KEARNEY:   The government offers Exhibits 170 and
  9   172.
 10         THE COURT:   It will be admitted.
 11         (Exhibit 170, 172 admitted into evidence.)
 12   Q.    So Mr. DeMaio, starting with Exhibit 170, dated
 13   November 25, 2015, to whom was this document addressed?
 14   A.    John and Leslie Wilson.
 15   Q.    And at what address?
 16   A.    2 Fleur Place, Atherton, California, 94027.
 17         MS. KEARNEY:   And Miss Lewis, if we can zoom out.
 18   Q.    It doesn't appear that this letter was printed on any kind
 19   of letterhead, correct?
 20   A.    Correct.
 21         MS. KEARNEY:   Can we go to page 3 of this document,
 22   Miss Lewis.
 23   Q.    These appear to be instructions for filing a Form 1040.
 24   What is a Form 1040?
 25   A.    Personal income tax return.
```

02:54 at line 10
02:55 at line 20

A2672

```
 1          MS. KEARNEY:  And Miss Lewis, can we pull up the last
 2    paragraph of the instructions.
 3    Q.   This paragraph states, "These returns were prepared from
 4    information provided by you or your representative.  The
 5    preparation of tax returns does not include the independent
 6    verification of information used.  Therefore, we recommend you
 7    review the returns before filing to ensure there are no
 8    omissions or misstatements.  If you note anything which may
 9    require a change to the returns, please contact us before
02:56 10    filing them".
11          What did you mean by that?
12    A.   These are our filing instructions, and this is where we
13    are advising a client that we're depending on the data that
14    they provided to us, but we're not auditing their data and
15    we're relying on it to prepare an accurate return.
16    Q.   And did you send these instructions to Mr. Wilson?
17    A.   Yes.
18          MS. KEARNEY:  Miss Lewis, can we go to page 22.
19    Q.   Is the remainder of this document the 1040 and
02:56 20    accompanying schedules and statements?
21    A.   I only see the first page, but --
22    Q.   It's also in the binder in front of you, if that's easier,
23    at tab 170.
24    A.   Thank you.  Would you scroll down, please.  Yes.
25    Q.   And you'll see there's some redactions on this exhibit.
```

```
 1    The government has redacted any social security numbers or bank

 2    account numbers.

 3             MS. KEARNEY:  Can we go to Exhibit 172, please,

 4    Miss Lewis.

 5    Q.   This is a cover letter dated December 4, 2015.  To whom is

 6    it addressed?

 7    A.   John Wilson.

 8    Q.   At what address?

 9    A.   1101BE Amsterdam, The Netherlands.

10             MS. KEARNEY:  And Miss Lewis, if we can zoom out for a

11    moment.

12    Q.   This appears to be on AYCO letterhead and there's a

13    signature on the page.  Do you see that?

14    A.   Yes.

15    Q.   Whose signature is that?

16    A.   That's mine.

17    Q.   Why -- was this mailed to Mr. Wilson?

18    A.   Yes.

19    Q.   Why was it mailed to him in The Netherlands?

20    A.   Because after we finalized the tax return on the 25th, we

21    contacted John's assistant.  I think it might have been a

22    weekend or some vacation time in between there and we confirmed

23    where the return should be sent.  So instead of Atherton, John

24    was working in the Netherlands, and we were directed to send it

25    to the Netherlands.
```

```
 1    Q.   And Mr. DeMaio, I'll ask you to just slow down a little
 2    bit so we don't give the court reporter a headache.
 3    A.   Okay.  Sorry.
 4         MS. KEARNERY:  If we can look at page 4 of this
 5    document, Miss Lewis.
 6    Q.   This appears to be an excerpt of the tax return for
 7    Mr. Wilson, is that correct?
 8    A.   Yes.
 9    Q.   And in the bottom, there's a signature?
10    A.   Yes.
11    Q.   Whose signature is that?
12    A.   That is mine.
13    Q.   And the Wilson's signatures were not yet on this tax
14    return?
15    A.   Correct.
16         MS. KEARNEY:  Can we look at what's already in
17    evidence as Exhibit 174A, please, Miss Lewis.
18    Q.   Mr. DeMaio, this is a certified copy of the Form 1040
19    individual -- U.S. individual tax return for John and Leslie
20    Wilson for tax year 2014, which has already been admitted into
21    evidence.  And again, the government has redacted social
22    security numbers and bank account information from this return.
23         MS. KEARNEY:  Can we look at page 2, Miss Lewis, and
24    highlight the top, please.
25    Q.   Who are the taxpayers identified at the top of the page?
```

02:59 (line 10)
02:59 (line 20)

```
 1   A.   John and Leslie Wilson.

 2        MS. KEARNEY:  If we can look at page three, please,

 3   Miss Lewis, and highlight the bottom.

 4   Q.   Is this the same signature we saw previously in the copy

 5   from AYCO's files that has your signature in the "preparer's

 6   use only" section?

 7   A.   Yes.  That's my signature.

 8   Q.   And it now bears the signatures of John and Leslie Wilson

 9   as well?

10   A.   Are you asking me?

11   Q.   Yes.

12   A.   Yes.

13   Q.   And right above John Wilson's signature, it reads, "Under

14   penalties of perjury, I declare that I have examined this

15   return and accompanying schedules and statements, and to the

16   best of my knowledge and belief, they are true, correct, and

17   complete".  And then, again, whose signatures appear underneath

18   that?

19   A.   John and Leslie Wilson's and mine.

20        MS. KEARNEY:  Miss Lewis, can we jump to page 93,

21   please.

22   Q.   Mr. DeMaio, is this a copy of the instructions that we

23   just looked at in the previous exhibit, which was from AYCO's

24   files?

25   A.   Can you scroll down, please?  Yes.
```

03:00 (line 10)

03:00 (line 20)

**A2676**

```
 1    Q.   It appears the Wilson's actually filed the instructions

 2    with their return as well, correct?

 3    A.   It appears that way, yes.

 4    Q.   So going back to page 2, in the middle of the page there's

 5    a section titled "Income".  Just at a high level, can you

 6    explain what information is reported in the Income section in

 7    an individual tax return?

 8    A.   Yes.  This section makes up the clients' earned income,

 9    interest, dividends, business income, capital gains and losses,

10    miscellaneous income, and pass through income from other

11    entities, such as an investment they might be in, or a business

12    that they operate.

13    Q.   And I want to direct your attention to line 17, which

14    reads "rental real estate, royalties, partnerships, S

15    corporations, trusts, et cetera.  Attach Schedule E".  And

16    there's an amount of negative $495,129.  Are you familiar with

17    whether Mr. Wilson was a shareholder in any S corporations?

18    A.   Yes.

19    Q.   And line 17 says "attached Schedule E".

20         MS. KEARNEY:  I'd like to turn to page 18, please,

21    Miss Lewis.

22    Q.   Mr. DeMaio, what is at page 18?

23    A.   This is the first page of Schedule E.

24    Q.   And if we can go to the next page of the Schedule E at

25    Part II.  This section is entitled "income or loss from
```

```
 1   partnerships and S corporations" and there are entries for

 2   Hyannis Port Capital and 2G Digital Post.  And then if you go

 3   down to line 32, it reports total S corporation losses of

 4   negative $495,129.  What is the source for this number?

 5   A.   That number right there is the total of the two losses

 6   reported above from those two businesses.

 7   Q.   And where does that information come from?

 8   A.   That information comes from a form called a K-1 form,

 9   which summarizes the gains and losses of that other -- of those

10   two other entities, those entities' tax returns.

11   Q.   So you would have looked at the K-1s from Hyannis Port

12   Capital and 2G Digital Post in order to pull that information

13   out of the K-1 and put it into Mr. Wilson's personal tax

14   return?

15   A.   Yes.

16        MS. KEARNEY:  Can we go to page 64, please,

17   Miss Lewis?

18   Q.   And this is a supplement to Schedule E.  And do you see

19   that there is a K-1 named Hyannis Port Capital and then a

20   second one for 2G Digital Post?

21   A.   Yes.

22   Q.   And what is the amount recorded under "ordinary loss" from

23   Hyannis Port -- "ordinary income or loss" from Hyannis Port

24   Capital?

25   A.   Negative 383,987.
```

1    MS. KEARNEY:  Miss Lewis, if we can keep this up on

2  the right and go back to page 2 on line 17 on the left.

3  Q.   Mr. DeMaio, is the $383,987 of business loss from Hyannis

4  Port Capital included in the negative $495,129 number in

5  line 17?

6  A.   Yes.

7  Q.   And how does having a loss of negative $495,129 affect the

8  total income calculation for the Wilsons for 2014?

9  A.   It reduces the total adjusted gross.

03:05 10  Q.   And how does reducing the total adjusted gross income

11  affect the amount of taxes that they would owe?

12  A.   It reduces the taxable income and, therefore, reduces the

13  taxes.

14    MS. KEARNEY:  Miss Lewis, we can take the pages on the

15  right down and go to page 3 of the Exhibit 174A.  Excuse me,

16  page 4.  Sorry.  You were right the first time.  And can we

17  look at line 40, please.

18  Q.   Mr. DeMaio, line 40 reads "itemized deductions (from

19  Schedule A)" and lists an amount of $489,952.  First, just

03:06 20  generally, what are itemized deductions?

21  A.   Itemized deductions are the various sources of deductible

22  items that reduce your income, which are complied on Schedule

23  A.  They're comprised of things like mortgage interest,

24  investment interest expense, charitable contributions, real

25  estate taxes paid, miscellaneous deductions.

Q.   And let's look at page 4 of the Schedule A, and
specifically the "Gifts to Charity" section.  Lines 16 through
19 report gifts to charity of $220,215.  How does making
$220,215 in gifts to charity affect the Wilson's itemized
deduction calculation?

A.   It increases the itemized deductions.

Q.   And how does that affect the amount of taxes that they
would owe?

A.   It would reduce the taxable income and, therefore, reduce
the amount of state and federal income taxes.

          MS. KEARNEY:  If we can keep this page up on the left,
Miss Lewis, and look at page 56 of this exhibit on the right.
If you can blow up "Cash Contributions".  Thank you.

Q.   So on the right is the supplemented Schedule A, which
lists cash contributions, and below that it says "partnership/S
corporation/estate and trust", and the first entity listed is
Hyannis Port Capital, $195,000.  What does that indicate?

A.   That indicates a charitable contribution that passed
through on the K-1 form I was referring to earlier from that
particular business entity.

Q.   And below that are other cash contributions.  What are
those?

A.   Those are cash contributions that John and Leslie would
have paid -- or made personally and reported on Schedule A.

Q.   And combined, the donations from the two S corporations

| | |
|---|---|
| 1 | and the personal donations total $220,215? |
| 2 | A.   Correct. |
| 3 | Q.   And how does that correspond to the gifts to charity in |
| 4 | Schedule A on the left? |
| 5 | A.   That number carried over to line 19 on Schedule A. |
| 6 | MS. KEARNEY:  Thank you, Miss Lewis.  We can take that |
| 7 | down. |
| 8 | Q.   Mr. DeMaio, did Mr. Wilson amend his personal tax return |
| 9 | for 2014? |
| 03:08 10 | A.   Yes. |
| 11 | MS. KEARNEY:  Can we look at Exhibit 235, please, just |
| 12 | for the witness. |
| 13 | Q.   Do you recognize this document, Mr. DeMaio? |
| 14 | A.   Yes. |
| 15 | Q.   What is it? |
| 16 | A.   This is the cover page for a set of amended tax returns. |
| 17 | MS. KEARNEY:  The government offers Exhibit 235. |
| 18 | THE COURT:  It will be admitted. |
| 19 | (Exhibit 235 admitted into evidence.) |
| 03:09 20 | Q.   And to whom was this cover letter addressed? |
| 21 | A.   John and Leslie Wilson. |
| 22 | Q.   At what address? |
| 23 | A.   155 Irving Avenue, Hyannis Port, Massachusetts 02647. |
| 24 | MS. KEARNEY:  If we go to page 8, please, Miss Lewis. |
| 25 | Q.   These are the instructions for filing Form 1040-X.  What |

```
 1    is a 1040-X?
 2    A.    That's an amended personal federal income tax return.
 3    Q.    And the last paragraph of these instructions, is that
 4    consistent with the instructions we already looked at?
 5    A.    Yes.
 6          MS. KEARNEY:  If we can go to page 9, please,
 7    Miss Lewis, and highlight the middle of the page.
 8    Q.    Mr. DeMaio, what changes were made between the original
 9    2014 return and this amended return?
10    A.    No financial changes.
11          MS. KEARNEY:  If we can go to the next page,
12    Miss Lewis, and highlight part 3.
13    Q.    Mr. DeMaio, why was this amended return filed if there
14    were no financial changes to it?
15    A.    The returns were filed to file what's called a protective
16    claim, which basically just allows the taxpayer to make a
17    future amendment to the tax return if there was like a tax law
18    change or some other occurrence that would merit such.
19          MS. KEARNEY:  Thank you.
20          Miss Lewis --
21    Q.    Let me back up.  Mr. DeMaio, did Mr. Wilson amend his 2014
22    returns a second time?
23    A.    Yes.
24          MS. KEARNEY:  And can we pull up, for the witness
25    only, Exhibit 482.
```

```
 1   Q.   Do you recognize this document?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   This is the filing instructions for the amended tax return

 5   for 2014.

 6             MS. KEARNEY:   The government offers Exhibit 482.

 7             THE COURT:   It will be admitted.

 8             (Exhibit 482 admitted into evidence.)

 9   Q.   And at the bottom of this first page, Mr. DeMaio, has been

03:11 10   digitally signed by John O'Neil.  Who is John O'Neil?

11   A.   He's one of the CPAs in our tax department.

12   Q.   And when did he sign this?

13   A.   March 21, 2018.

14   Q.   If we look at the last paragraph on this page, are these

15   instructions consistent with the instructions we've looked at

16   already today?

17   A.   Yes.

18             MS. KEARNEY:   If we could go to page 2, please,

19   Miss Lewis, and highlight the middle of the page.

03:12 20   Q.   Were there changes between the prior returns that we've

21   looked at and this second amended return?

22   A.   Yes.

23             MS. KEARNEY:   Can we go to page 3, please, Miss Lewis,

24   and highlight Part III.

25   Q.   Why were changes made in this second amended return?
```

A.    John's employer issued a corrected form W-2 regarding his

wages or earned income.

        MS. KEARNEY:  And Miss Lewis, can we pull up

Exhibit 174A, the original tax return, on the left and then

this amended return, Exhibit 482, on the right.  And can we go

to the "Income" section on the filed original return.  And if

we go to page 5, I believe, of the second amended return.

Q.    Mr. DeMaio, were there any changes made in the business

losses reported on line 17 between the original return and the

03:13 10   second amended return?

A.    No.

Q.    If we can look at page 4 of the original return on the

left and look at the "Gifts to Charity", and then page 7 of the

second amended return "Gifts to Charity".  Mr. DeMaio, were

there any changes made in the gifts to charity reported between

the original tax return and the second amended return?

A.    No.

        MS. KEARNEY:  Thank you, Miss Lewis.  We can take

those down.

03:14 20   Q.    Mr. DeMaio, during the decade of so you that provided --

or excuse me -- two decades that you provided tax planning

services to Mr. Wilson, how often did you communicate with him?

A.    It would vary year to year, quarter to quarter, but four

to five times a year I would estimate.

Q.    How did you typically communicate with him?

| | |
|---|---|
| 1 | A.   Telephone conference and e-mail. |
| 2 | Q.   Did Mr. Wilson have a familiarity with taxes when you |
| 3 | spoke with him? |
| 4 | MR. KENDALL:  Objection, your Honor. |
| 5 | THE COURT:  He can answer that question, familiarity. |
| 6 | A.   Similar to many clients. |
| 7 | THE REPORTER:  Could you say that again? |
| 8 | THE WITNESS:  Similar to most clients. |
| 9 | Q.   How would you describe Mr. Wilson's level of business |
| 03:15 10 | sophistication? |
| 11 | A.   I thought John was very sophisticated, very sharp. |
| 12 | MS. KEARNEY:  If we look at Exhibit 667, just for the |
| 13 | witness, please. |
| 14 | Q.   Mr. DeMaio, do you recognize this exhibit? |
| 15 | A.   Yes. |
| 16 | Q.   What is it? |
| 17 | A.   This is a text message. |
| 18 | Q.   Between who? |
| 19 | A.   John and myself. |
| 03:15 20 | Q.   What's the date? |
| 21 | A.   October 20th. |
| 22 | MS. KEARNEY:  The government offers Exhibit 667. |
| 23 | THE COURT:  October 20th of? |
| 24 | Q.   Do you recall the year? |
| 25 | A.   2018. |

```
 1              THE COURT:  It will be admitted.

 2              MR. KEARNY:  Can we show it to the jury?

 3              (Exhibit 667 admitted into evidence.)

 4   Q.   Mr. DeMaio, there's lighter color bubbles on the left and

 5   dark colored bubbles on the right.  Whose texts are the lighter

 6   colored bubbles on the left?

 7   A.   John's.

 8   Q.   And whose are the darker colored bubbles on the right?

 9   A.   Mine.

03:16 10   Q.   And if we look at the last text on that chain on

11   October 20th, I think you said of 2018, there's a text from

12   Mr. Wilson that says "Jeff.  Is there a limit on tax deductions

13   for charity contributions?"

14              What did you understand Mr. Wilson to be asking you?

15   A.   It was a generic question, basically.  If you gave or

16   donated money to charity, could the deduction be limited by

17   things such as your level of income, or other factors.

18              MS. KEARNEY:  Could we look at Exhibit 669, for the

19   witness only, please.

03:17 20   Q.   Do you recognize Exhibit 669?

21   A.   Yes.  It's an e-mail exchange.

22   Q.   From whom?

23   A.   Debbie Rogers.

24   Q.   To whom?

25   A.   Myself and John Wilson.
```

```
 1   Q.    What's the date?

 2   A.    October 22, 2018.

 3   Q.    So two days after the text message we just looked at?

 4   A.    Yes.  Or four days, right?  Four days.

 5   Q.    Do you need to see the date of the text message again?

 6   A.    Yeah.  I apologize.  I thought it was the 18th.  Maybe it

 7   was 2018.  My apologies.  It was October 20th.  My apologies.

 8   You're right.  I stand corrected.

 9         MS. KEARNEY:  If we can go back to Exhibit 669, the

03:17 10   government offers Exhibit 669.

11         THE COURT:  It will be admitted.

12         (Exhibit 669 admitted into evidence.)

13   Q.    And if we go to the bottom of page 2, there's an e-mail

14   from you on October 22, 2018, where you wrote "Also, in

15   response to your question about charitable gift limitations,

16   the limits range from 20 percent to 50 percent of your AGI",

17   and Mr. Wilson responded.

18         MS. KEARNEY:  If we can look at that, please,

19   Miss Lewis.

03:18 20   Q.    "Giving half million cash to a 401(c)(3) educational

21   foundation this year.  Possibly more this year and a similar

22   amount next year".

23         What did you understand Mr. Wilson to mean?

24   A.    That he was planning some charitable contributions over

25   the course of one to two or more years.
```

```
 1   Q.   And he references a 401(c)(3).  Do you understand that to
 2   be a typo?
 3   A.   I thought he might be referring to a 501(c)(3).
 4   Q.   And if we look up at your response, you ask for the name
 5   and tax ID number of the charity.  And let's look at -- what
 6   did Mr. Wilson reply?  What was his reply?
 7   A.   He says, "Yes.  Debbie please follow-up".
 8            MS. KEARNEY:  Let's look at Exhibit 670 for the
 9   witness only, please.
10   Q.   Do you recognize this document?
11   A.   Yes.  That's an e-mail.
12   Q.   From who?
13   A.   Debbie Rogers.
14   Q.   To whom?
15   A.   To myself.
16   Q.   And who's copied?
17   A.   Debbie Rogers and John Wilson.
18   Q.   What's the date?
19   A.   October 22, 2018.
20            MS. KEARNEY:  The government offers Exhibit 670.
21            THE COURT:  It will be admitted.
22            (Exhibit 670 admitted into evidence.)
23   Q.   So on the same day as the e-mail we just looked at,
24   Miss Rogers wrote "Hi Jeff... below is the company and FEIN
25   number in which HPC donated 500 thousand last week and you are
```

|   | going to check to see what category they fall under". |
|---|---|
| 1 | going to check to see what category they fall under". |
| 2 | What did you understand her to be referring to when |
| 3 | she said "HPC"? |
| 4 | A.   Hyannis Port Capital. |
| 5 | Q.   And below that is a reference to the Key Worldwide |
| 6 | Foundation.  Were you familiar with that entity at this time? |
| 7 | A.   I do not recall that foundation at the time. |
| 8 | MS. KEARNEY:  Can we look at Exhibit 614, for the |
| 9 | witness only, please. |
| 03:20 10 | Q.   Do you recognize this document, Mr. DeMaio? |
| 11 | A.   Yes. |
| 12 | Q.   What is it? |
| 13 | A.   It's a follow-up e-mail. |
| 14 | Q.   And who is it from? |
| 15 | A.   Debbie Rogers. |
| 16 | Q.   Who is copied on this e-mail? |
| 17 | A.   Myself, Justin Kessler, one of my team members, Christine |
| 18 | Kapp, one of my team members, Debbie Rogers, and John Wilson. |
| 19 | Q.   What's the date? |
| 03:21 20 | A.   December 11, 2018. |
| 21 | MS. KEARNEY:  The government offers Exhibit 614. |
| 22 | THE COURT:  It will be admitted. |
| 23 | (Exhibit 614 admitted into evidence.) |
| 24 | Q.   At the top of this chain, on December 11, 2018, |
| 25 | Miss Rogers references The Key Worldwide Foundation, and she |

```
    1    writes "A total of one million in cash donations in 2018.  See
    2    Jeff's reply from October regarding this donation as well".
    3              What reply did you understand her to be referring to?
    4    A.   So the context of this is my team members were inquiring
    5    as to where John's charitable contributions stood for 2018 for
    6    fourth quarter tax projection planning purposes.
    7    Q.   And do you see that -- below that e-mail she has copied an
    8    e-mail from you on November 7, 2018?
    9    A.   Yes.
03:22 10    Q.   And in that e-mail, you wrote that you and John had
   11    discussed the deductibility of charitable contributions.  Who
   12    did you mean by "John"?
   13    A.   John Wilson.
   14    Q.   What did Mr. Wilson say during that discussion?
   15    A.   That he was planning some charitable contributions and
   16    wanted to know if there would be limitations based on how much
   17    he'd donated, and I said that that can vary depending on the
   18    type of charitable organization and whether you're donating it
   19    in cash or you're donating securities, things like that.
03:22 20    Q.   And you continue that your company had looked up the name
   21    of the foundation.  And it appeared they were a qualified
   22    charity in good standing, but that you don't do due diligence
   23    on charities.  What did you mean by that?
   24    A.   Well, just to provide some context, I was following up on
   25    the earlier e-mail thread that you provided where I had
```

1    initially responded to John's text explaining that, in that

2    e-mail, I didn't reply via text.  I don't think I ever replied

3    to that.  There are limitations and it depends on your level of

4    income, and we needed to know more information about the

5    charity to understand if it's a 501(c)(3), public charity, so

6    that we could determine if -- whether the percentage

7    limitations would apply.

8    Q.   Why were you adding in a caveat that you don't necessarily

9    do due diligence on charities if your charity group had already

03:23 10   looked up the foundation and saw that it was a qualified

11   charity in good standing?

12   A.   Well, because after I had provided that original reply, I

13   explained that we needed to understand at least if the charity

14   was a public charity, and I needed the name and information for

15   the charity to have our charitable services group look it up

16   and see if it was registered with the IRS.  And that's when I

17   obtained the information and confirmed that they were a

18   qualified charity with the -- public charity with the Internal

19   Revenue Service.  So then when I was providing that answer

03:24 20   back, I just wanted to be clear that that was the response or

21   the inquiry that we were responding to.

22          In the earlier e-mail, Debbie had requested that we

23   look up the category that would fall under, so I was explaining

24   that that was what this reply was pertaining to, that it was --

25   I didn't want it to be construed as us that we had done due

diligence on the charity, for example, looking into, you know, their books or their causes, what did they support, things of that nature.

Q.    You add at the end "If John and Leslie are concerned with that particular organization qualifying as a charity and/or the funds getting donated exactly to and how they wish to the designated charity or school, then another advisable option would be to directly donate".

When you say "John and Leslie," who are you referring to?

A.    John and Leslie Wilson.

MS. KEARNEY:  Miss Lewis, can we look at Exhibit 174A again and go to page 2, line 17?

Q.    Mr. DeMaio, how would the Wilson's tax return have changed if the business expenses reported in line 17 had been reduced by $120,000?

A.    Their taxable income would have gone up by $120,000.

Q.    And how would that affect the taxes that they owe?

A.    They would owe additional income tax.

MS. KEARNEY:  And then if we can go to page 4, Miss Lewis, and the "Gifts to Charity".

Q.    How would the Wilson's tax return have changed if the charitable contributions had been reduced by $120,000?

A.    Their charitable contributions would have gone down by $120,000.

|     |     |
| --- | --- |
| 1 | Q.   And how would that have affected their taxes? |
| 2 | A.   It would reduce their taxable income and their further |
| 3 | income taxes for federal and state purposes. |
| 4 | Q.   Did Mr. Wilson ever discuss these deductions with you, the |
| 5 | $120,000 deductions for business expenses, or a $100,000 |
| 6 | charitable deduction? |
| 7 | A.   On the 2014 return? |
| 8 | Q.   Yes. |
| 9 | A.   No, not that I recall anyway. |
| 03:26 10 | Q.   If you had known that, in exchange for the payments that |
| 11 | were reported in those deductions, that the USC water polo |
| 12 | coach had agreed to recruit Mr. Wilson's son to the team so he |
| 13 | would be admitted to the university as an athletic recruit, |
| 14 | would you have done anything differently with Mr. Wilson's tax |
| 15 | return? |
| 16 |           MR. KENDALL:  Objection, your Honor. |
| 17 |           THE COURT:  Overruled. |
| 18 | Q.   Can you repeat the question? |
| 19 | A.   Sure.  If you had known that, in exchange for the payments |
| 03:26 20 | that were deducted as business expenses and as as charitable |
| 21 | contribution, that the USC water polo coach had agreed to |
| 22 | recruit Mr. Wilson's son to the team so that he would be |
| 23 | admitted to the university as an athletic recruit, would you |
| 24 | have done anything differently with Mr. Wilson's tax return? |
| 25 |           MR. KENDALL:  Objection. |

```
 1            THE COURT:  Overruled.
 2   A.   Well, I certainly would have probably done some more
 3   inquiries as to what the background of the situation was and
 4   had an understanding better before, you know, we could both be
 5   comfortable filing the return.
 6   Q.   Would you have taken a deduction for a business expense in
 7   that situation?
 8   A.   No.
 9   Q.   Would you have taken a deduction for a charitable
10   contribution in that situation?
11   A.   No.
12   Q.   Why not?
13   A.   Well, I thought in your example that the coach received
14   the payment.  I didn't understand exactly what you meant.
15   Could you repeat it, please.
16            MR. KENDALL:  If you could finish, please, your Honor.
17            THE COURT:  Go ahead.  Finish your answer.
18   A.   I was saying that I would probably need to inquire more
19   about the nature of the contribution and draw more attention to
20   understanding it and determining if that was a contribution or
21   not.
22   Q.   When preparing a tax return, do you -- who do you rely on
23   to provide you with the information necessary to determine if a
24   payment should be deducted as a business expense or charitable
25   contribution or some other deduction?
```

```
 1   A.    The taxpayer.

 2              MS. KEARNEY:  Nothing further.

 3              THE COURT:  I take it you have more than a few

 4   minutes?

 5              MR. KENDALL:  More than two minutes, your Honor, yes.

 6              THE COURT:  Okay.  We will break for the day.

 7              Mr. DeMaio, you may step down for the time being.

 8              We'll be in recess until tomorrow morning at 9:00 a.m.

 9   Jurors, we'll have a regular day tomorrow, Tuesday.  Have a
```
03:28
```
10   pleasant evening.  I'll see you tomorrow morning at 9:00 a.m.

11              THE CLERK:  All rise for the jury.

12              (Jury exits.)

13              THE COURT:  Be seated, counsel.  You may step down,

14   Mr. DeMaio.

15              Mr. Kendall, approximately how much on cross?

16              MR. KENDALL:  Not sure, your Honor.  Ballpark an hour

17   plus or minus.

18              THE COURT:  All right.  And then after Mr. DeMaio, do

19   we have the same order as we were planning before, Mr. Frank?
```
03:29
```
20              MR. FRANK:  Roughly, your Honor.  We have Mr. Moon,

21   Mr. Deckett.  I don't believe I mentioned Mr. Deckett on

22   Friday.  I neglected to mention him.

23              THE COURT:  And how long approximately is Mr. Deckett?

24              MR. FRANK:  He's a very short witness of about

25   15 minutes.
```

```
 1              THE COURT:  All right.

 2              MR. FRANK:  Miss Ranahan and Miss George.

 3              THE COURT:  Miss George.  I have not heard her name

 4    before.

 5              MR. FRANK:  Lauren George, the government's summary

 6    witness.

 7              THE COURT:  Oh.  She's the summary witness.

 8              MR. FRANK:  Yes, your Honor.

 9              THE COURT:  But we're not going to go back and pick up

03:30 10   Mr. Masera?

11              MR. FRANK:  I think that's unlikely, your Honor.

12              THE COURT:  All right.  And the cross-examinations,

13    approximately what were estimated last week?  Is that fair to

14    say?  Mr. Kendall?  Mr. Kelly?

15              MR. KENDALL:  I don't remember exactly what I said,

16    your Honor.  Mr. Moon, I expect, will be about 45 minutes, plus

17    or minus a bit, maybe a little more than 45.  Miss Ranahan, I

18    don't know how long she's going to go so I don't know how long

19    I'll go.  She's the IRS summary witness.

03:31 20             THE COURT:  All right.  And Mr. Deckett and

21    Miss George.

22              MR. KENDALL:  Deckett is being handled by

23    Miss Papenhausen.

24              MS. PAPENHAUSEN:  I believe incredibly short, your

25    Honor.
```

```
 1              THE COURT:  And George?

 2              MR. KENDALL:  I'm not sure exactly, your Honor.

 3    Mr. Kelly and I have to discuss how we're dividing that up.

 4              THE COURT:  All right.  Mr. Kelly?

 5              MR. KELLY:  I think my crosses of those four witnesses

 6    will be relatively short, but I want to just understand on the

 7    record.  I think the government has advised that they are not

 8    calling Masera at all, or is this just for tomorrow and

 9    Tuesday?

10              MR. FRANK:  I think our inclination is not to call

11    him.  We're going to make a final decision shortly, but as I

12    advised you yesterday or the day before, I think our

13    inclination is probably not.

14              THE COURT:  Okay.  And George is your last witness?

15              MR. FRANK:  Yes, your Honor.

16              THE COURT:  So we may -- the government may be

17    completed by tomorrow, but it will depend on the

18    cross-examinations?

19              MR. FRANK:  It will depend on the crosses.  Possible

20    if they're quick.  More likely they'll bleed into Wednesday.

21              THE COURT:  Okay.

22              MR. KENDALL:  Your Honor, we're ready to go Friday as

23    we've discussed.  We've given the names as we understand them

24    today to Mr. Frank who we're going to call on Friday.

25              We wanted to make one request, your Honor.  We filed a
```

few motions that came in this morning.  We also have some

issues we need to resolve with you.  We also need to deal with

the confrontation clause ruling that the Court has not yet

issued.  We were hoping we could book a little time with you

maybe tomorrow afternoon to go through the motions we filed

today and give us some guidance on how to proceed in our own

case in terms of what's going to be allowed in and how to

proceed.  So we were hoping we might get some time tomorrow

afternoon.

03:32    THE COURT:  You mean to replace the afternoon hearing?

MR. KENDALL:  I don't know if we -- I'll be greedy.  I

would love that, your Honor.  I don't know how much time the

Court can book with us.  But if we could get a half hour,

40 minutes.

THE COURT:  The Court is in the process of making

rulings on all of the motions.  Of course, we just got the last

six or seven early this morning, so we haven't turned around on

those, but yes.  We can spend some time tomorrow dealing with

some out of hearing of jury matters.

03:33    MR. KENDALL:  Okay.  When would the Court like to do

that?

THE COURT:  It would be best probably in the

afternoon, so we may give the jury the afternoon off tomorrow.

MR. KENDALL:  So we would start at one -- we would

start at 2:00 then.

```
 1              THE COURT:  2:00, yes.
 2              MR. KENDALL:  The other thing is, your Honor, we do
 3    think the Rule 29 motion is going to raise some interesting
 4    issues for the Court.  And given that we're planning on putting
 5    on a defense case, we were hoping it might be possible to even
 6    discuss the Rule 29 with you, and if there's anything you're
 7    interested in granting before we put on our witnesses.  Most
 8    times there's not a defense case so it doesn't really matter.
 9    Here there is.
03:33 10              THE COURT:  All right.  Do I understand that if the
11    government rests either tomorrow, which would be unusual, or
12    midday Wednesday, that the defense does not want to start its
13    case in any event even after a Rule 29 motion until Friday?
14              MR. KENDALL:  We have -- we've got people coming in
15    from out of town, so we had booked them on that assumption,
16    your Honor.
17              THE COURT:  Mr. Kelly?
18              MR. KELLY:  I think there are certainly some
19    stipulations we could read into the record, perhaps some
03:34 20    document that we could offer in as well, but in terms of live
21    witnesses, probably Friday would be best.
22              THE COURT:  All right.  Any problem with that from the
23    government's point of view?
24              MR. FRANK:  No.  We've been advised of the names of
25    three witnesses, one of whom has just sent us correspondence
```

1    indicating that he intends to exercise his Fifth Amendment

2    rights, and we have not been advised of any names of witnesses

3    by Mr. Kelly, so I don't know what he has in mind.

4            MR. KENDALL:  Well, it's joint representation, Steve.

5    I was writing about both of us.

6            MR. FRANK:  Okay.  We've been advised of three names,

7    one of which.

8            MR. KELLY:  There's one more thing.  I think it may be

9    on the Court's radar screen and there has been a blizzard of

03:35 10    motions, so I apologize if this one is not on the radar screen,

11    but we asked or we suggested that there at least be a Zoom

12    inquiry of several of these witnesses who are refusing to come

13    based upon their Fifth Amendment privilege.  We've offered to

14    do it by Zoom rather than -- as a courtesy rather than making

15    them come all the way here, but that's just something that's

16    percolating.

17            THE COURT:  Is that among the motions that have been

18    filed?

19            MR. KELLY:  Yes.

03:35 20            THE COURT:  All right.  I will look at them.

21            MR. KENDALL:  And what's not in the motions, your

22    Honor, I hate to burden you too much, but you had ordered

23    Mr. Garfield.  You denied his motion to quash and told him he

24    should come testify.  He's just informed us early this morning

25    I think it was, that he's going to claim the Fifth to try to

1    get out of testifying, and that's something we'll need to

2    discuss as well, how to deal with that.  We don't think it's a

3    valid assertion, so we'll look forward to it tomorrow.

4            THE COURT:  All right.  I have another hearing, so if

5    counsel could vacate the courtroom as soon as possible.  Thank

6    you.

7            MR. KENDALL:  Thank you, your Honor.

8            THE CLERK:  All rise.

9            (Whereupon, the proceedings concluded at 3:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    Witness                          Page

3    LAURA JANKE

4    Direct Examination by Ms. Wright        5

5    Cross-Examination by Mr. Kelly          53

6    Cross-Examination by Ms. Papenhausen    83

7    Recross-Examination by Mr. Kelly        93

8

9    JAMES NAHMENS

10   Direct Examination by Ms. Kearney       96

11   Cross-Examination by Mr. Kendall        116

12   Redirect Examination by Ms. Kearney     159

13

14   JEFFREY DEMAIO

15   Direct Examination by Ms. Kearney       174

16

17

18

19

20

21

22

23

24

25

```
 1                          E X H I B I T S

 2    NO.                             ADMIT

 3    693    ....................     21

 4    694    ....................     27

 5    695    ....................     29

 6    329    ....................     32

 7    335    ....................     36

 8    346    ....................     37

 9    344    ....................     39

10    658    ....................     40

11    367    ....................     46

12    659    ....................     48

13    676    ....................     52

14    677    ....................     53

15    646    ....................    100

16    134    ....................    102

17    645    ....................    110

18    9776   ....................    139

19    170    ....................    183

20    172    ....................    183

21    235    ....................    192

22    482    ....................    194

23    667    ....................    197

24    669    ....................    198

25
```

```
 1                        E X H I B I T S

 2      NO.                        ADMIT

 3      670    ....................    199

 4      614    ....................    200

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   C E R T I F I C A T E

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9   the foregoing is a correct transcript from the record of

10   proceedings taken September 27, 2021 in the above-entitled

11   matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley           September 27, 2021

15       /s/ Debra Joyce                 September 27, 2021

16       Kristin M. Kelley, RPR, CRR              Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2

3

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) No. 1-19-CR-10080 |
| | ) |
| GAMAL ABDELAZIZ and JOHN | ) |
| WILSON, | ) |
| Defendants. | ) |
| | ) |
| | ) |

4

5

6

7

8

9

10

BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
JURY TRIAL - DAY 13

11

12

13

John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts 02210

14

15

16

17

September 28, 2021
9:09 a.m.

18

19

20

Kristin M. Kelley, RPR, CRR
Kathy Silva, RPR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, Massachusetts 02210
E-mail: kmob929@gmail.com

21

22

23

24

Mechanical Steno - Computer-Aided Transcript

25

```
 1    APPEARANCES:

 2

 3            Stephen E. Frank

 4            Ian J. Stearns

 5            Leslie Wright

 6            Kristen Kearney

 7            United States Attorney's Office

 8            1 Courthouse Way

 9            Suite 9200

10            Boston, MA 02210

11            617-748-3208

12            stephen.frank@usdoj.gov

13            for the Plaintiff.

14

15

16            Brian T. Kelly

17            Joshua C. Sharp

18            Lauren Maynard

19            Nixon Peabody LLP

20            100 Summer Street

21            Boston, MA 02110

22            617-345-1000

23            bkelly@nixonpeabody.com

24            for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Thank you.  You may be seated.  We're now
 3    in session.
 4              THE COURT:  Good morning, jurors.  Welcome back.
 5              Mr. DeMaio, you're reminded that you remain under
 6    oath.
 7              Mr. Kendall, you may conduct cross-examination.
 8              MR. KENDALL:  Thank you, your Honor.
 9              Miss Kearney, can we give back that binder to
10    Mr. DeMaio?
11                   CROSS-EXAMINATION OF JEFFREY DEMAIO
12    BY MR. KENDALL:
13    Q.   Good morning, Mr. DeMaio.
14    A.   Good morning.
15    Q.   My name is Mike Kendall.  I represent John Wilson.  Fair
16    to say we've never met before?
17    A.   Correct.
18    Q.   Never spoken before?
19    A.   Correct.
20    Q.   Okay.  I'd like to start off this morning by asking you to
21    go back to Exhibit 482 in that binder, which is the amended tax
22    return that you discussed yesterday?
23    A.   Yes.
24    Q.   If you could go to the second page of Exhibit 482, if we
25    could show this to the jury, please, you'll notice I put an
```

```
 1    empty pad of paper and pen to your right there.  I'd like you
 2    to walk through here and ask you to write down some numbers.
 3             Okay.  First --
 4             THE COURT:  I'm afraid I'm going to have to stop you
 5    for a technical problem.  My screen is not working today, so
 6    hold on a second, please.
 7             Thank you.  You may proceed.
 8    Q.   If we could go down here and look where it says "Tax
 9    Liability" to line 11, and we look in the far right column
10    where it says 230,231, $230,231, what does that indicate?
11    A.   The 230,231 number?
12    Q.   Yes.
13    A.   Total tax.
14    Q.   That's the total federal tax that's owed for this tax
15    return?
16    A.   Yes.
17    Q.   Okay.  Could you write that down on the sheet of paper
18    that I left to your -- the pad of paper there?  Just write
19    "federal tax 230,231".
20    A.   Would you scroll out so I can see the whole page?  I want
21    to make sure I don't misunderstand.
22    Q.   Sure.
23             THE COURT:  Mr. DeMaio, will you pull that microphone
24    closer to you so that we can all hear, please?
25             THE WITNESS:  Yes, your Honor.
```

```
 1              MR. KENDALL:  You have your own copy of the tax

 2     return, so feel free, if you need to --

 3              THE WITNESS:  Yes.

 4              MR. KENDALL:  -- read more than what is shown on the

 5     screen.

 6              THE WITNESS:  Okay.  Thank you.

 7     Q.   So 230,231, if you could write that down, please.

 8              MR. KENDALL:  Mr. Carter, if we could go to the bates

 9     ending 3852 -- wait, excuse me, no.  3853, please.

09:12 10     Q.   If you see that, that's the Schedule A to the return,

11     correct?

12     A.   Yes.

13     Q.   And if we go to line 5A, we see state and local income

14     taxes paid 222,369, correct?

15     A.   Yes.

16     Q.   Could you write that, just state taxes underneath the

17     number you just wrote for federal taxes, so it's like a column?

18              (Witness complies.)

19              MR. KENDALL:  And then, Mr. Carter, if we could go

09:12 20     back one prior page that ends in 852.  Go to line 48.

21     Q.   Mr. DeMaio, do you see line 48?  It says "foreign tax

22     credit" $466,278?

23     A.   Yes.

24     Q.   That's the taxes Mr. Wilson had to pay because he worked

25     in Europe, correct?
```

```
  1   A.    Well, that's the amount of foreign tax credit he received,
  2   and on this particular tax return in this particular year for
  3   taxes he paid in Europe.  I don't know what the total taxes
  4   were.
  5   Q.    Thank you.  Okay.  Thank you.  That's the credit he gets
  6   against his U.S. taxes for what he's doing in Europe?
  7   A.    On this return, yes.
  8   Q.    Could you put that as the third number in the column,
  9   466,278.  Then if you could add up the three numbers for me.  I
09:13 10   get 921,894.
 11   A.    I'm just working on it now.
 12   Q.    Okay.  Sorry.  I've done it in advance.  Don't mean to
 13   cheat.
 14   A.    What was the total you came up with?
 15   Q.    Let me take a look.  Maybe mine aren't as good as I
 16   thought.  Excuse me.  I'm sorry.  I had to make a revision
 17   there.  Tell me what your number is.  I'm off by a digit I
 18   think.  What do you get?
 19   A.    I think I did, too.  One second.  My apologies.  I came up
09:15 20   with 914,878.
 21   Q.    914 -- I don't think your columns.
 22   A.    Yeah.
 23         THE COURT:  We're going to take judicial notice that
 24   it's been $918,000.
 25   Q.    I was going to go to the dollar, but 918 is close enough
```

A2713

```
 1    for what we need.  So it's about $918,000, right?
 2    A.   That's correct.
 3    Q.   So let's look at line 5 on the first page, the second page
 4    of this exhibit, where it says "Taxable income".
 5    A.   Yes.
 6    Q.   What's the taxable income?
 7    A.   The original amount or the corrected amount?
 8    Q.   The corrected amount.
 9    A.   2,127,769.
09:16 10    Q.   If one divides 918,000, using a slightly round number, by
11    2,127,769, what do you get?
12    A.   Almost 50 percent.
13    Q.   You're generous.  43 percent.
14    A.   43 percent.
15    Q.   Almost -- round numbers you could say almost 50.  So what
16    we see here is, on this tax return, Mr. Wilson paid 43 percent
17    of his taxable income in taxes.  That's within the range of the
18    tax bracket that, the federal income tax bracket for income for
19    that year?
09:16 20    A.   Yes.
21    Q.   You know the issue is a question of whether $220,000 in
22    deductions should have been treated as deductions or just put
23    in as income.  Would you agree with me, if we increased the
24    taxable income by $220,000, so instead of $2,127,000, it was
25    $2,347,000, and we divide it by 918, we'll hit about 38,
```

| | |
|---|---|
| 1 | 39 percent, correct? |
| 2 | A.    Correct. |
| 3 | Q.    Rough numbers? |
| 4 | A.    Correct. |
| 5 | Q.    I now want to go to some other topics that the government |
| 6 | asked you about yesterday.  I think you testified that John |
| 7 | became a client of AYCO back around 1999? |
| 8 | A.    Correct. |
| 9 | Q.    At the time he was a senior executive at The Gap? |
| 09:18 10 | A.    Correct. |
| 11 | Q.    The Gap is a clothing company?  They have stores and they |
| 12 | sell jeans and stuff like that, correct? |
| 13 | A.    Correct. |
| 14 | Q.    And The Gap paid for him to get tax preparation services |
| 15 | at AYCO? |
| 16 | A.    Correct. |
| 17 | Q.    Is it AYCO or AYCO? |
| 18 | A.    AYCO. |
| 19 | Q.    Would you agree with me senior executives like John often |
| 09:18 20 | have very demanding schedules? |
| 21 | A.    Yes. |
| 22 | Q.    They work long hours? |
| 23 |     MS. KEARNEY:  Objection. |
| 24 |     THE COURT:  Sustained. |
| 25 | Q.    With respect to John, did you observe he worked very long |

**A2715**

1    hours?

2    A.    Yes.

3    Q.    He had a lot of issues he had to manage?

4    A.    Yes.

5    Q.    At times, when you're an executive at that level, it can

6    be very stressful?

7              MS. KEARNEY:  Objection.

8              THE COURT:  Sustained.

9    Q.    The idea is you bring a level of expertise and

09:19 10    sophistication so people can do their job while you help them

11    manage the areas that you have expertise and sophistication in,

12    is that correct?

13    A.    Yes.

14              MR. KENDALL:  Could we show the witness only

15    Exhibit 9805, please.

16    Q.    Do you recognize this?

17    A.    Looks familiar.

18    Q.    It's your website, isn't it?

19    A.    Yes.

09:19 20              MR. KENDALL:  Your Honor, I'd like to offer 9805 into

21    evidence.

22              MS. KEARNEY:  Objection, your Honor.

23              THE COURT:  Grounds?

24              MS. KEARNEY:  Hearsay.  It's not for impeachment.  He

25    hasn't said anything contradictory.

```
 1              MR. KENDALL:  Your Honor, it's just a website
 2    describing their services.  He can be cross-examined on it.
 3              THE COURT:  I'll let it in.
 4              (Exhibit 9805 admitted into evidence.)
 5    Q.   If we can have Exhibit 9805 to the jury, please.  So this
 6    front page, it says "About Us".  It's about AYCO, correct?
 7    "Piece of mind is more than an expression.  It's our mission.
 8              We're the nation's preeminent leader and innovator in
 9    company-sponsored and individual financial counseling
10    services".
11              That's the type of services you do provide for
12    someone like John Wilson, correct?
13    A.   Yes.
14    Q.   And among those services that you have is tax advice,
15    correct?
16    A.   Yes.
17    Q.   And this sort of financial gifting that goes along with
18    tax planning and tax issues, such as implications?
19    A.   What do you mean by that?
20    Q.   If you want to give money to a nonprofit, there are tax
21    implications?
22    A.   Yes.
23    Q.   You provide that advice to John as well, correct?
24    A.   About the tax implications?
25    Q.   Yes.
```

```
 1    A.    Yes.
 2    Q.    So John became your client in 1999 and you were the
 3    relationship manager, correct?
 4    A.    Yes.
 5    Q.    And as relationship manager, you're coordinating all the
 6    services that AYCO would provide to John?
 7    A.    Yes.
 8    Q.    You're not a CPA yourself, correct?
 9    A.    Correct.
10    Q.    You know a bit about taxes but you're not a person who
11    does tax preparation line by line, is that correct?
12    A.    Well, I'm a registered tax preparer, but I don't prepare
13    all the returns.
14    Q.    You have a team of people that help you do the tax
15    returns, correct?
16    A.    Correct.
17    Q.    As a business person, AYCO primarily does individual tax
18    returns, correct?
19    A.    Primarily.
20    Q.    Primarily.  So you would not do returns for a company like
21    HPC?
22    A.    There may be occasions where we prepare an LLC or an S
23    corporation return.
24    Q.    But you didn't with John.  He had to go to Nahmens to do
25    that?
```

```
 1   A.   He chose to.  Yeah.

 2   Q.   It's your typical business practice though that you focus

 3   on the individual return, correct?

 4   A.   Primarily.

 5   Q.   Okay.  Would you agree with me AYCO did an excellent job

 6   preparing John's tax returns for 20 years?

 7              MS. KEARNEY:  Objection.

 8              THE COURT:  Sustained.

 9   Q.   Okay.  Did you have -- was John very pleased with the --

10   did John tell you he was pleased with the work AYCO had done in

11   preparing his returns?

12              MS. KEARNEY:  Objection.  Hearsay.

13              THE COURT:  Sustained.

14   Q.   You prepared John's tax returns for 20 years, correct?

15   A.   Correct.

16   Q.   And he didn't go to anybody else to do his tax returns

17   over those 20 years, did he?

18              MS. KEARNEY:  Objection.

19              THE COURT:  If he knows.  Overruled.

20   A.   May I answer?

21   Q.   Sure.

22   A.   Not his personal returns.

23   Q.   Right.  When he was working in Europe, they needed a

24   second preparer to do the European returns, correct?

25   A.   Correct.
```

```
 1   Q.   That was PWC?

 2   A.   Correct.

 3   Q.   And you coordinated with PWC because there's interactions

 4   between the two different returns, correct?

 5   A.   I coordinated to understand what his foreign taxes paid

 6   were, to pick up those credits on his personal income tax

 7   return.

 8   Q.   Okay.  Over the 20 years that you worked with John, he at

 9   times asked you to refer professionals for him to hire to

10   assist him in various measures, correct?

11   A.   On occasion he asked me for referrals, yes.

12   Q.   Do you remember one time he needed an executive coach and

13   he asked you if you could refer an executive coach for one of

14   his employees?

15   A.   I don't recall.

16   Q.   Okay.  Do you remember one time he wanted a contact in the

17   real estate industry and he asked you for a referral?

18   A.   I recall that, yes.

19   Q.   You recall that?

20   A.   Yes.

21   Q.   And it was somebody -- it was just kind of the

22   introductions or facilitation that you do as part of your job?

23   A.   I would put some of those into what I would call

24   non-central or courtesy referrals.

25   Q.   Yeah.  But it's part of having a good client relationship?
```

```
 1    A.    Just trying to help our clients, yes.
 2          THE COURT:  Mr. DeMaio, will you move the notebook out
 3    of the way and that microphone closer?
 4          THE WITNESS:  Yes, sir.
 5          MR. KENDALL:  Okay.  If we can show the witness only
 6    Exhibit 9821.
 7    Q.   If you could read this, just really the first paragraph or
 8    two, and tell us if that refreshes your recollection that John
 9    also asked you to refer to him an executive coach?
10          MS. KEARNEY:  Do you have a copy for us?  The screens
11    aren't working.
12    Q.   Does that refresh your recollection?
13    A.    I apologize.  It's not on my screen.
14          THE COURT:  We don't have it on the screen.
15    Q.   Okay.  We can bring you a paper copy, if that would be
16    helpful.
17    A.    Thank you.
18          MR. KENDALL:  Whatever's on the screen should not be
19    on the screen.  We have a different 9821.  We'll go with the
20    one we have a paper copy of.
21    A.    Okay.
22    Q.   Does that refresh your recollection you also referred him
23    to an executive coach to help with one of his employees?
24    A.    Yes.
25          MS. KEARNEY:  Can the witness be instructed to put the
```

09:24  10
09:26  20

```
 1   document aside.
 2          THE COURT:  Take the document away so that we --
 3   Q.   If you can turn the document over so you can't read it.
 4   Does that refresh your recollection that you -- he asked you
 5   for an executive coach to refer to one of his employees to?
 6   A.   Yes.
 7   Q.   Okay.  Now, starting at about 1999 or so, John asked you
 8   to refer to him -- to refer him to some lawyers that could do
 9   trust and wills, correct?
10   A.   Yes.
11   Q.   Okay.  The first task was he wanted to set up educational
12   trusts for his niece and nephews, correct?
13   A.   I don't recall what the initial project was.
14   Q.   Okay.  But you recall that was one of the projects?
15   A.   I don't recall that specific project.
16   Q.   Do you recall he set up five separate trusts with $20,000
17   each for his nieces and nephews' education?
18   A.   20 years ago I don't remember that particular project.  I
19   apologize.
20   Q.   Do you have any memory of explaining to him that a gift to
21   an individual is not tax deductible, gifts to institutions are?
22   A.   No.  I don't remember about gifts to institutions being
23   tax deductible.  We have talked frequently over the years about
24   the annual exclusion gift that you can make to individuals to
25   make a gift to them and not have it be an estate or gift
```

taxable event.

Q.   Do you also recall giving him advice on drafting his will?

A.   I worked with him and a third party attorney to work on his will, yes.

Q.   You, in fact, referred him to Arnold Kahn, the third party attorney, correct?

A.   Yes.

Q.   Okay.  And you did several versions of that will from 1999 to 2010, correct?

A.   I don't recall how many revisions or versions, but perhaps.

Q.   Okay.  And you recall as part of that will he left bequests to set up scholarship funds at two universities, correct?

A.   I don't remember his bequests in his estate planning documents.

Q.   Okay.

        MR. KENDALL:  If we could show the witness Exhibit 9809.  Actually, why don't we show the --

        MS. KEARNEY:  Apologies, your Honor.  Did the witness say that he did or did not remember?

        THE WITNESS:  I don't remember his specific bequests in his estate planning documents.

        MS. KEARNEY:  Thank you.

Q.   Okay.  If you could take a look at Exhibit 9809.  Do you

```
 1    recognize that as one of the trust components of the will that
 2    you worked on?
 3    A.   I recognize the title of this trust, yes.
 4         MR. KENDALL:  Okay.  And I sort of blocked out some of
 5    it.  I'd like to offer this document into evidence, your Honor.
 6         MS. KEARNEY:  Objection, your Honor.  Relevance,
 7    hearsay.
 8         THE COURT:  Sustained.
 9    Q.   If you could take a look --
10    MR. KENDALL:  If we could show the witness only
11    page -- starting on the one, two, three, fourth page of the
12    document.
13    Q.   I want you to read that paragraph just to yourself.  I'm
14    going to see if it refreshes your recollection.  Then I'm going
15    to ask you to go to the next page.
16    A.   Okay.
17         MR. KENDALL:  Actually, not the next page.  If we
18    could then go to the next page, please, Mr. Carter, and just
19    show the title and then go to the next page again after that.
20    Q.   If you can read paragraph 2.7.  Then we're going to drop
21    down to 2.7.d.
22    A.   Okay.
23    Q.   Read 2.7.d.  I'm going to ask you to read that and take a
24    moment to think, and then we'll turn the screen off, and I'll
25    see what refreshes your recollection.
```

```
 1    A.   Would you mind just scrolling back so I can read that
 2    first paragraph?  Thank you.
 3    Q.   Would you prefer a paper copy to refresh your
 4    recollection?
 5    A.   No, thank you.
 6    Q.   Okay.  Whatever is best for you.
 7    A.   Yes.
 8    Q.   Okay.  And if we can go to the top of page 19, please.  If
 9    you could just read that double -- paragraph double ii.
 10   Actually, read the whole of that page and then I'll ask you to
 11   put the screen off and we'll go through it.
 12   A.   Okay.
 13   Q.   If we could turn -- does that refresh your recollection
 14   that in the will and trust plan that you set up for Mr. Wilson
 15   he left bequests to two different universities to set up
 16   scholarship funds?
 17   A.   This is the trust that I worked with an attorney to
 18   prepare, yes.
 19   Q.   Arnold Kahn was the attorney, correct?
 20   A.   Yes.
 21   Q.   And you referred Mr. Kahn to Mr. Wilson, didn't you?
 22   A.   Yes.
 23   Q.   Okay.  And in this trust structure you set up, the plan
 24   was to leave two and a half million dollars to Rensselaer
 25   Polytech and two and a half to Harvard University, correct?
```

```
 1              MS. KEARNEY:  Objection as to who set up the trust.
 2              THE COURT:  Sustained.
 3    Q.   Okay.  Under the trust that was established with
 4    Mr. Kahn's assistance and your assistance, Mr. Wilson was
 5    planning to leave two and a half million dollars to Rensselaer
 6    Polytech, correct?
 7    A.   Yes.
 8    Q.   And two and a half to Harvard, correct?
 9    A.   Yes.
10    Q.   And that was to set up a scholarship fund for students
11    whose parents had not gone to college, correct?
12    A.   I don't recall what the specific scholarship was.
13              MR. KENDADLL:  If we could show the exhibit again to
14    see if we could further refresh his memory.  And if we can go
15    to page 18 of Exhibit 9809.  And I'd -- no.  The other
16    direction, please.  Right there.
17    Q.   Can you read that paragraph again and tell us if that
18    refreshes your recollection.  Then I'll ask him to turn off the
19    screen.  So read it for as long as you need to refresh.
20    A.   Yes.  Now I see.  Thank you.
21    Q.   Okay.  Do you recall that it was to set up scholarships
22    for people whose parents did not receive a college education?
23    A.   Yes.
24    Q.   They call them "first timers"?
25    A.   Yes.
```

09:32 appears at line 10, line 20.

```
 1   Q.   First generation.  And it was for people who would study

 2   science, engineering, or business?

 3   A.   Yes.

 4   Q.   And they had to have at least a B average, correct?

 5   A.   Yes.

 6   Q.   Okay.  And when Mr. Wilson was telling you he wanted to

 7   create a structure like this, do you remember having a

 8   conversation where he discussed with you his personal

 9   background and why he wanted to do this?

10   A.   I don't -- it was a long time ago.  I don't recall if he

11   worked with Arnold directly on that or we had a three-way call.

12   I don't recall.

13   Q.   Don't you remember raising with him that that was a sort

14   of new type of provision or unusual type of provision you saw

15   for a first generation bequest like that, or restricting it to

16   first generation students, and he explained to you what

17   education had done in his life?

18           MS. KEARNEY:  Objection, your Honor.

19           THE COURT:  Sustained.

20   A.   I just don't remember.

21   Q.   Okay.  You have no memory of ever discussing any aspect of

22   Mr. Wilson's background when you were doing the estate planning

23   or tax planning for him?

24   A.   It was 20 years ago.  I don't recall.  I apologize.

25   Q.   Well, these wills were refreshed all the way through 2010,
```

09:33 10

09:34 20

```
 1   correct?

 2   A.   I don't know what aspects of them were refreshed

 3   through 2010.

 4   Q.   Okay.  So you're telling us you have no memory of

 5   Mr. Wilson ever discussing his personal background with you?

 6   A.   Vaguely over the years.  I mean.

 7   Q.   Okay.  What do you remember?

 8          MS. KEARNEY:  Objection.  Hearsay.

 9          MR. KENDALL:  Your Honor, state of mind only.

10          MS. KEARNEY:  Relevance.

11          THE COURT:  Sustained.

12   Q.   Okay.  Mr. Wilson -- did Mr. Wilson explain to you why

13   education was so important to him?

14          MS. KEARNEY:  Objection.

15          THE COURT:  Sustained.

16   Q.   Did you ever have any conversations with Mr. Wilson about

17   his views on education?  Just yes or no.

18   A.   Yes.

19   Q.   Okay.  When did these conversations occur?

20   A.   I don't remember specific conversations.

21   Q.   Intermittently over the relationship?

22   A.   Not in recent years, but perhaps in years ago.

23   Q.   During the times that the will was being set up and

24   revised?

25   A.   I don't remember those specific conversations.
```

(09:34 on line 10, 09:35 on line 20)

```
 1   Q.   Okay.  Can you tell us, did he say anything to you about
 2   why he viewed giving to education to be so important?
 3           MS. KEARNEY:  Objection.
 4   Q.   Yes or no?
 5           MS. KEARNEY:  Objection, your Honor.
 6           THE COURT:  He can answer yes or no.
 7   A.   Can you repeat the question, please.
 8   Q.   Did he say -- do you remember him saying anything to you
 9   about why he viewed education as so important?
10   A.   I feel I would be drawing -- you know, speculating or --
11   you know, I don't have a specific conversation I can refer to.
12   Q.   But, in general, do you remember this being discussed
13   without remembering the specific conversation?  Just yes or no.
14           MS. KEARNEY:  Objection.
15           THE COURT:  Sustained.
16   Q.   Okay.  Mr. Wilson was your client for 20 years, correct?
17   A.   Yes.
18   Q.   Okay.  When this indictment came down involving
19   Mr. Singer, he stopped being your client, correct?
20   A.   Yes.
21   Q.   This is a major embarrassment for you, isn't it, that you
22   referred a client to Rick Singer?
23           MS. KEARNEY:  Objection.
24           THE COURT:  Sustained.
25   Q.   Would you agree with me -- strike that.
```

```
 1              Do you view this as a negative to your career
 2    reputation that you referred a client to Rick Singer?
 3              MS. KEARNEY:  Objection.
 4              THE COURT:  Sustained.
 5    Q.   How many clients did you refer to Rick Singer?
 6    A.   Approximately four or five.
 7    Q.   If I were to suggest it's more like seven or eight, would
 8    you agree?
 9              MS. KEARNEY:  Objection.
10              THE COURT:  He can answer.
11    A.   I'd have to look at the exact number, but I believe that
12    some of those were one of my colleagues or more coming to me
13    and asking me a question about college, you know, prep advisers
14    and maybe I referred them to my colleague.  I don't remember
15    all the numbers.
16    Q.   Who first introduced you to Rick Singer?
17    A.   An HR professional, human resource professional.
18    Q.   And where did this human resources professional work?
19    A.   In Southern California.
20    Q.   What company?
21              THE WITNESS:  Your Honor, should I present the names
22    of the company or --
23              THE COURT:  You answer his questions and we'll go from
24    there.
25              THE WITNESS:  Okay.
```

09:36 at line 10

09:37 at line 20

```
 1   A.   PIMCO.

 2   Q.   PIMCO.  So PIMCO is a major investment management company,

 3   correct?

 4   A.   Yes, sir.

 5   Q.   Okay.  And so you say an HR professional, somebody who

 6   worked in the HR side of PIMCO?

 7   A.   Yes, in that department.

 8   Q.   And how did you meet this person?

 9   A.   Just through our mutual work together.

10   Q.   And you say your mutual work together.  Did you provide

11   investment management work for this PIMCO person?

12   A.   No.

13   Q.   You provided investment management to other PIMCO

14   executives, correct?

15   A.   Yes.

16   Q.   Okay.  And so this HR professional knew about Rick Singer

17   because he was working with PIMCO executives, correct?

18            MS. KEARNEY:  Objection.

19            THE COURT:  Sustained.

20   Q.   Well, this HR professional worked with PIMCO executives,

21   correct?

22   A.   Yes.

23   Q.   He provided HR services to PIMCO executives, correct?

24   A.   Yes.

25   Q.   And some of those PIMCO executives were also your clients,
```

1    correct?

2    A.    Yes.

3    Q.    Okay.  So based upon that, this HR executive introduced

4    you to Rick Singer, correct?

5    A.    Not based on the certain fact that we had the same

6    clients, but just based on his familiarity with Rick.

7    Q.    Okay.  And did you go to some sort of event, a lunch and

8    learn, or something like that, to meet Mr. Singer?

9    A.    I went to a lunch with the HR executive.

09:38 10    Q.    And with Mr. Singer?

11    A.    I believe he was at the lunch.  I was trying to recall

12    that for a couple years now.

13    Q.    That was at The Ritz in Newport Beach?

14    A.    Correct.

15         MR. KENDALL:  Okay.  Could we show the Exhibit 9798 to

16    the witness?

17    Q.    And tell us if that refreshes your recollection that

18    Mr. Singer was also at that lunch at The Ritz.

19    A.    Yes.

09:39 20    Q.    Okay.  And so Mr. Singer, yourself, and this HR executive

21    from PIMCO all met at The Ritz and had lunch?

22    A.    Yes.

23    Q.    Okay.  Now, during that time did Mr. Singer describe his

24    business to you?

25    A.    Yes.

```
 1              MR. KENDALL:  Okay.  Your Honor, I'd like to offer the
 2       conversation, not for the truth of the matter stated, just to
 3       show Mr. DeMaios's state of mind.
 4              MS. KEARNEY:  Objection to how this witness' state of
 5       mind is relevant.
 6              THE COURT:  Sustained.
 7       Q.   Okay.  After this lunch with Mr. Singer and the HR
 8       executive, you reached an agreement with Mr. Singer to refer
 9       clients to each other, correct?
09:40 10     A.   There was no agreement, per se.
11              MR. KENDALL:  If we could take a look at Exhibit 9799,
12       for the witness only, please.
13       Q.   Is this, in fact, a series of e-mails that you and
14       Mr. Singer exchanged after that lunch meeting at The Ritz?
15              MS. KEARNEY:  Objection --
16       Q.   Excuse me.  I'll withdraw that.  Could you identify this
17       document for us, 9799?
18       A.   It's an e-mail.
19       Q.   An e-mail that you had -- chain with who?
09:40 20     A.   Rick Singer.
21       Q.   And it's following up from the lunch you had?
22              MS. KEARNEY:  Objection.
23              THE COURT:  Sustained.
24       Q.   It was a few days after the lunch, correct, about two,
25       three weeks after the lunch?
```

A.    I don't remember the date of the lunch, so I can't.

        MR. KENDALL:  Okay.  Why don't we show the witness

9798 and see if that refreshes his recollection as to the date

of the lunch.

A.    Thank you.

Q.    Okay.  This is an entry in your calendar, correct, 9798?

A.    I don't recognize how we -- what these printouts look

like, but it looks like it is.

Q.    Okay.  And this is a record that you use in your business

at AYCO, correct?

A.    Correct.

Q.    To keep your schedule, to make appointments, and to refer

you back to manage your responsibilities, correct?

A.    Yes.

Q.    And it's in the normal practice of AYCO to maintain these

type of documents, correct?

A.    Yes.

        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

Exhibit 9798 as a business record.

        MS. KEARNEY:  Objection.  I mean, it's hearsay.  It's

a calendar reminder.  It's not a business record.

        THE COURT:  We'll reserve on this one until -- you can

bring it back up at a conversation outside the hearing of the

jury, but it's not admitted now.

        MR. KENDALL:  Is that -- if we can show it to the

1    client -- to the witness one more time.

2    Q.   Does that refresh your recollection that the meeting with

3    Mr. Singer was on November 6, 2007?

4    A.   Yes.

5    Q.   Okay.  Now, if we can go to Exhibit 9799.  Okay.

6    Exhibit 9799, if you could look at it -- and I think you

7    previously testified it's an e-mail exchange with Mr. Singer?

8    A.   Okay.  Yes.

9    Q.   And this e-mail exchange occurred about three weeks or so

09:43 10   or two and a half weeks after your lunch meeting with

11   Mr. Singer, correct?

12   A.   Yes.

13        MR. KENDALL:  Okay.  Your Honor, I'd like to offer

14   9799 into evidence.

15        MS. KEARNEY:  Objection, your Honor.  It's hearsay.

16   It can be used to refresh the witness' recollection.

17        THE COURT:  Sustained.

18   Q.   Okay.  Fair to say -- do you remember telling Mr. Singer

19   after your lunch meeting that you'd be speaking with some of

09:43 20   your associates about Singer's company and looking for

21   opportunities for Mr. Singer?

22   A.   I was responding to his courtesy e-mail after our lunch

23   with another courtesy e-mail.

24   Q.   But did you say that in your courtesy e-mail?

25   A.   I said that I would share my introduction to him with

```
 1    others just to inform them of his existence.
 2    Q.   And you said you'd be looking for some opportunities for
 3    him, correct?
 4    A.   I mentioned that if I saw a bid that might be worth
 5    exploring, I would bring it up.
 6    Q.   You said to him you'd be looking for some opportunities
 7    for you, correct?
 8    A.   Opportunities as in potential bids where our clients can
 9    help each other, or we can help each other as clients.
10    Q.   And you told him that you should keep in touch regarding
11    opportunities to work together with our mutual clients as
12    situations arise, correct?
13    A.   Correct.
14    Q.   You also told him you'd let him know when you'd have a
15    forum where he could do a presentation to some of the other
16    AYCO account managers, correct?
17              MS. KEARNEY:  Objection, your Honor.
18              THE COURT:  Sustained.
19    Q.   Did you, in fact, set up any presentations at AYCO for
20    Mr. Singer to do for any of the professionals there?
21    A.   No.
22    Q.   Okay.  But then, within a month, you referred him to
23    another client, correct?
24    A.   I had a client I inquired for ACT prep type services for
25    one of his clients.  Rick was just top of mind because of the
```

```
  1   lunch and I brought it up, but it never pursued -- got pursued.
  2   We never had a meeting.
  3   Q.   Well, you e-mailed the client and gave him Mr. Singer's
  4   name, correct?
  5   A.   I don't recall in that case if I gave him his name or
  6   contact info.
  7            MR. KENDALL:  Okay.  Could we show the witness
  8   Exhibit 9800.
  9   Q.   Do you recognize this document?
 10   A.   Yes.
 11   Q.   Is this a letter that you sent to a client?
 12   A.   Yes.
 13   Q.   And if we can take a look at paragraph 3 there.
 14            MR. KENDALL:  Your Honor, I'd like to --
 15   Q.   And so this is a letter you sent to a client, correct?
 16   A.   Yes.
 17            MR. KENDALL:  Your Honor, I'd like to offer 9800, not
 18   for the truth of the matter asserted but just to show that the
 19   letter was sent.
 20            MS. KEARNEY:  Objection to relevance.
 21            THE COURT:  Sustained.
 22   Q.   Okay.  After looking at Exhibit 9800, does that refresh
 23   your recollection that you referred him to a second client
 24   within a month of the first referral?
 25   A.   Like I said, it was top of my mind.  A client, ironically,
```

```
 1    had asked me about these type of services and I shared his

 2    contact info.

 3    Q.   Is that a yes?

 4    A.   Yes.

 5    Q.   Okay.  Before you testified in this case yesterday and

 6    today, did you prepare with anybody for your testimony?

 7    A.   Yes.

 8    Q.   How many times did you meet with the government?

 9    A.   Two meetings.

10    Q.   Okay.  And were there phone calls as well?

11    A.   One Zoom conference call.

12    Q.   Okay.  Did you also meet with Goldman Sach's attorney or

13    AYCO's attorney?

14    A.   Yes.

15    Q.   How many times did you meet with AYCO's attorney to

16    prepare your testimony?

17    A.   I don't recall the specific number.

18    Q.   Did you review these documents that I've shown you in any

19    of your preparation?

20    A.   Some of them.

21    Q.   And then do you recall that you referred Mr. Singer again

22    to one of your colleagues at AYCO in 2010?

23    A.   Do you have an exhibit you could show me?

24    Q.   Sure.  9801, if it will refresh the recollection.

25         Does this -- well, do you know who Erick Mccreight
```

```
 1   is?

 2   A.   One of my colleagues.

 3   Q.   Is he, like you, a relationship manager for AYCO?

 4   A.   Yes.

 5   Q.   Okay.  And you gave him Mr. Singer's credentials for him

 6   to refer to his clients, correct?

 7   A.   Erick reached out to our region to see if anybody had a

 8   referral for a college prep type of provider and we tried to

 9   work together to share resources, and I was one of the people

09:48 10   that responded to him.

11   Q.   And you responded with giving Rick Singer's name, correct?

12   A.   Yes.

13   Q.   Okay.  Now, when you gave that response, was it a reply

14   all or was it just to Mr. Mccreight?

15   A.   Just to Mr. Mccreight.

16   Q.   Okay.  And then he went off and referred Mr. Singer to one

17   of his clients, correct?

18        MS. KEARNEY:  Objection.

19        THE COURT:  Sustained.

09:49 20   Q.   Okay.  He copied you on an e-mail to his client referring

21   Mr. Singer, correct?

22        MS. KEARNEY:  Objection.

23   A.   I don't recall.

24   Q.   If you could take a look at 9801 and tell us if that will

25   refresh your recollection.
```

```
 1    A.   I'm not copied on this e-mail.

 2    Q.   So you don't have a memory of receiving it or not?

 3    A.   No.

 4    Q.   Okay.  Then, in 2010, you referred John Wilson to Rick

 5    Singer, correct?

 6    A.   Yes.

 7    Q.   So this is probably the fourth referral you've made from

 8    Mr. Singer that's documented in AYCO records?

 9    A.   This is the third.

 10   Q.   There's the two you made, the one you gave to

 11   Mr. Mccreight --

 12   A.   The first one was a husband and wife.  That was the same

 13   referral.

 14   Q.   Okay.  Thank you.  And you recall that you referred him

 15   around September of 2010?

 16   A.   Yes.

 17   Q.   Okay.  And you describe Mr. Singer as very accomplished,

 18   is that correct?

 19   A.   That was my understanding.

 20   Q.   And that was your sincere belief?

 21   A.   My sincere belief.

 22   Q.   And I'd like to show you Exhibit 9802.  Do you recognize

 23   that?

 24   A.   Yes.

 25   Q.   What is it?
```

A.    A response to a request by John for college prep ACT prep

services, and I think I was responding in this e-mail to his

request.

Q.    And that's where you gave him Rick Singer's contact

information, correct?

A.    If you could scroll down, please.

        MR. KENDALL:  Oh.  Excuse me.  Let me withdraw that

question.

        I'd like to offer 9802 into evidence, your Honor.

09:51  Again, not for truth of the matter asserted, just to show the

introduction was made.

        MS. KEARNEY:  Your Honor, I object.  The defense did

not provide the government with these exhibits on their exhibit

list.  They're springing them on us now.

        MR. KENDALL:  It's cross-examination materials, your

Honor.

        MS. KEARNEY:  This is not being used for impeachment.

It's being used for the defendant's case-in-chief.

        THE COURT:  Yeah.  The objection is sustained.

09:51        MR. KENDALL:  Your Honor, these are records that the

government has.  There's no surprise here, your Honor.

        THE COURT:  The objection is sustained.

Q.    And then after that, you were referring Mr. Singer to

clients as late as 2016, correct?

A.    Can you show me what you're referring to?

```
 1   Q.   If you could take a look at Exhibit 9803.

 2            Excuse me.  I got the date wrong there.  I misread

 3   it.  It's 2012.  In 2012, you were referring Mr. Singer to

 4   other clients, correct?

 5   A.   This is a relative of a client who had asked if I knew

 6   anybody that would have any comment on a ACT and college prep

 7   firm that he was already working with, and Mr. Singer was the

 8   only reference that came to mind.

 9   Q.   Okay.  So you put him in touch with Mr. Singer, correct?

10   A.   Let me read the e-mail, please.

11            I put him in touch to indicate that he might be able

12   to provide some input regarding the firm he was already working

13   with.

14   Q.   Versus Rick's own firm, in case he wanted to go with Rick?

15   A.   Not necessarily, just answering my client's request.

16   Q.   But you did offer him to give insight versus -- for the

17   firm he was working with versus Rick's firm, correct?

18   A.   I would imagine that's what he would compare it to,

19   correct.

20            MR. KENDALL:  Okay.  Your Honor, I'd like to offer

21   9803 into evidence.

22            MS. KEARNEY:  Same objection.

23            THE COURT:  Sustained.

24            MR. KENDALL:  Again, your Honor, it's not for the

25   truth of the matter asserted, and we don't believe it's
```

```
 1    hearsay.
 2    Q.    You were -- I'd like to show you -- and then you made more
 3    referrals to Mr. Singer after that with clients, correct?
 4    A.    If would you like to show me another one, I'd be happy to
 5    discuss it.
 6    Q.    Okay.  If we can refresh his recollection with Exhibit
 7    9804.  Do you recognize this document?
 8    A.    Let me just read it, please, to refresh my memory.  Sorry.
 9    There's a lot of redactions, so I'm trying to follow it.
10         Okay.  I think I recall this e-mail of this memo.
11    Q.    Do you recall making a reference of Mr. Singer to another
12    client in August of 2012?
13    A.    No.  I can explain this memo.
14    Q.    Okay.  What do you recall?
15    A.    This is a memo where I was following up on meetings I had
16    had, just refreshing -- or reminding myself of follow-up work
17    perhaps next time I saw the client or clients.  There was
18    multiple clients referenced in this memo.  And one of those
19    lines I think was referring to one of my clients mentioning
20    that he was starting to explore preparing for college and
21    college prep and ACT prep services.  So I just made a note to
22    myself to maybe add that to my future agenda, but it was never
23    followed up on, and that client never received a referral.
24    Q.    So Exhibit 9804 is a document you created in the course of
25    your work to write down certain information and to refer back
```

```
 1    to it, correct?
 2    A.    Yes.
 3    Q.    And you wrote it?  It's your knowledge?  Your information?
 4    A.    I believe my --
 5    Q.    You dictated --
 6    A.    -- my colleague, yes.
 7    Q.    -- to Shannon, and she recorded it for you?
 8    A.    Yes.
 9    Q.    And that's the custom and practice you sometimes followed
10    there?
11    A.    In the past, yes.
12          MR. KENDALL:  Okay.  Your Honor, I'd like to offer
13    9804 as a business record.
14          MS. KEARNEY:  Your Honor, same objection.  The defense
15    did not include these documents on its exhibit list.
16          MR. KENDALL:  Your Honor, this is direct impeachment
17    of the number of people who are getting referrals, your Honor.
18          MS. KEARNEY:  No, your Honor, it's not impeachment.
19    The witness acknowledged that he referred a handful of clients.
20          THE COURT:  Yeah.  The objection is sustained.
21    Q.    I now -- and then you testified you, yourself, used
22    Mr. Singer's tutoring services for a period of six months or
23    so?
24    A.    A little bit more than six months.
25    Q.    And then, in 2016, you referred Mr. Singer over to a
```

1    company called Beacon Pointe, correct?

2    A.    It was a referral to a friend of mine that I've known for

3    about 29 years that works at Beacon Pointe.

4    Q.    Okay.  Is that person a financial adviser like yourself?

5    A.    Yes.

6    Q.    Okay.  What was the purpose of the referral to your friend

7    at Beacon Pointe?

8    A.    We had breakfast together on occasion and he had mentioned

9    to me that a friend of his son was preparing for college and he

09:57 10    wanted to know if I had anybody who did good ACT prep and

11    things of that nature.

12    Q.    Okay.  I'd like to show you Exhibit 8135, please.

13    Actually, we've got a couple of cover letters here that should

14    be excluded.  Let's just go down a little bit.  For the record,

15    8135 will start with the next page.

16          Do you recognize this as your e-mail with Beacon

17    Pointe?

18    A.    Yes.

19    Q.    Okay.  And this is something you sent over to them as part

09:57 20    of referring Mr. Singer, correct?

21    A.    This was my follow-up to his inquiry.

22          MR. KENDALL:  Your Honor, I'd offer Exhibit 8135,

23    please, not for the truth of the matter asserted, but just show

24    the referral.

25          MS. KEARNEY:  Objection, your Honor.  This is not in

```
 1  the defendants' exhibit list.  Also, it's improper impeachment
 2  evidence because it's --
 3           THE COURT:  Objection is sustained.
 4           MR. KENDALL:  Your Honor, it is on the exhibit list,
 5  and I can give you the citation for where it appears on the
 6  witness list.
 7           MS. KEARNEY:  I apologize.  It is on the exhibit list,
 8  but it is still improper impeachment, because it goes to
 9  collateral matter and the witness acknowledged he did make the
10  referral.
11           MR. KENDALL:  Your Honor, it's to show the referral
12  being made and the relationship with Mr. Singer.  It's not for
13  the truth of the matter asserted.  It's on the exhibit list,
14  your Honor.
15           MS. KEARNEY:  Your Honor, he's acknowledged that --
16           THE COURT:  Yeah.  Objection is sustained.
17           MR. KENDALL:  May I understand the grounds, your
18  Honor, so I can try to do a better job?
19           THE COURT:  No.  We'll talk about it at a later time.
20  Q.   When you did this referral to Mr. Singer, you also saw
21  Mr. Singer's marketing credentials, correct?
22  A.   I believe I was copied on them when he sent them to my
23  acquaintance, yes.
24  Q.   And in his marketing credentials, he made various
25  statements about his expertise?
```

```
 1   A.   I don't remember or recall looking at it at the time.

 2   Q.   Would you like to refresh your recollection?

 3   A.   I'd be happy to look at it if you bring it up.

 4        MR. KENDALL:  If we could show the witness

 5   Exhibit 9057, please.

 6   A.   Yes.  I remember this vaguely.

 7   Q.   Okay.  And fair to say when you read Mr. Singer's

 8   descriptions of his credentials, you took it as being truthful,

 9   correct?

09:59 10   A.   Well, when he provided this copy back to my acquaintance,

11   I didn't look at it necessarily very, very closely because I

12   figured -- I know he's a thorough guy.  He would look at it

13   himself.

14   Q.   But you got a copy of it, correct?

15   A.   It appears I was copied on the e-mail when he was replying

16   to my friend.

17   Q.   Okay.  And you read it to some degree, correct?

18   A.   I read it more recently.

19   Q.   Okay.  Did you read it as well back in 2016?

10:00 20   A.   I don't recall.

21   Q.   Okay.  You knew -- what was your -- what was your

22   understanding of Mr. Singer's level of expertise as a college

23   counselor back at the time that you were making these

24   referrals?

25   A.   My understanding was that he was, you know, very
```

```
 1    experienced in this area and had a longstanding business, many
 2    client referrals.
 3    Q.    Representing some of the wealthiest and most successful
 4    people in California?
 5    A.    Yes.
 6    Q.    Who were some of the clients that he told you he
 7    represented that impressed you?
 8    A.    I don't remember specific ones.  I just remember he had a
 9    hard copy packet at the time, which had a fair amount of
10    materials about that.
11    Q.    Had Steve Jobs of Apple listed?
12    A.    I recall that name.
13    Q.    Joe Montana, the quarterback?
14    A.    Yes.
15    Q.    A group of people who were Chip Rosenbloom, the owner of
16    the St. Louis Rams?
17    A.    I don't recall that one, but.
18    Q.    Christopher Schaepe, the CEO of Lightspeed?
19    A.    I don't recall that specific one, but perhaps.
20    Q.    A series of other senior executives at major companies?
21    A.    Yes.
22    Q.    John Door at Kleiner Perkins?
23    A.    Yes.
24    Q.    Okay.  What is Kleiner Perkins?
25    A.    Private equity and venture capital firm.
```

```
 1   Q.   An immensely successful and respect one, correct?
 2            MS. KEARNEY:  Objection.
 3            THE COURT:  Sustained.
 4   Q.   How would you describe Kleiner Perkins?
 5   A.   A well known and recognized venture capital private equity
 6   firm.
 7   Q.   Also, Hollywood executives he listed?
 8   A.   I don't recall the Hollywood executives.
 9   Q.   Peter Guber?
10   A.   I don't recall that one.
11   Q.   Okay.  And he also listed various corporate clients,
12   correct?
13   A.   Companies?
14   Q.   Yes.
15   A.   You might have to refresh my memory.
16            MR. KENDALL:  If we could show the witness Exhibit
17   9057 and look at page 2.
18   Q.   If you could look at the first paragraph after the list of
19   names.
20   A.   Yes.
21   Q.   And who did that -- did that refresh you as to who he
22   listed among his various corporate clients?
23   A.   Yes.
24   Q.   And who were they?
25            MS. KEARNEY:  Can we take the document down?
```

```
 1            THE COURT:  Yes.  Take the document down.
 2    Q.    Okay.  If you could tell us what you remember.
 3    A.    Disney, Morgan Stanley, Wells Fargo.
 4    Q.    Oppenheimer?
 5    A.    Yes.
 6    Q.    Under Armour?
 7    A.    Yes.
 8    Q.    Sacramento Police Foundation?
 9    A.    I don't recall that one.
10:02 10  Q.    PIMCO?
11    A.    Yes.
12    Q.    Fair to say all highly respected corporate names in
13    California?
14    A.    Yes.
15    Q.    And Mr. Singer also talked about this sort of public
16    service and initiatives for low income and disadvantaged people
17    that The Key did, correct?
18    A.    I wasn't real familiar with that.
19    Q.    Okay, but it was in the credentials he was circulating,
10:03 20  correct?
21    A.    I don't recall.
22            MR. KENDALL:  Why don't we show him again Exhibit 9057
23    and go to page 3, please.  If we could scroll down a little bit
24    more, that's good.
25    Q.    I don't need specific examples, but in general, he was
```

**A2750**

```
 1    touting all this sort of public service and things he was doing

 2    for disadvantaged people, correct?

 3    A.   Yes.

 4    Q.   And I take it whatever you heard about Mr. Singer prior to

 5    2018 you believed?

 6    A.   Yes.

 7    Q.   You thought -- put it this way.  In the business you're

 8    in, your clients are your biggest asset, correct?

 9    A.   Yes.

10    Q.   And the quality of your client service is the most

11    important thing in your job, correct?

12    A.   Yes.

13    Q.   You want to protect your clients, correct?

14    A.   Yes.

15    Q.   You want to give them the best services?

16    A.   Yes.

17    Q.   That's why AYCO and Goldman Sachs are so preeminent,

18    correct?

19    A.   Yes.

20    Q.   And in the 10, 11 years that you were -- from when you met

21    Mr. Singer until his con artist stuff was exposed, you never

22    had the slightest doubt about his integrity, correct?

23    A.   I don't recall having any doubt about his integrity.

24    Q.   You wouldn't have referred him to any of your clients or

25    your professional contacts if you had the slightest doubt about
```

```
 1   his integrity, correct?

 2   A.   Correct.

 3          MR. KENDALL:  If I may have a moment, your Honor.

 4          THE COURT:  Yes.

 5   Q.   Now, the government showed you some of John's tax returns

 6   yesterday and some of them were redacted copies.  Do you

 7   remember that?

 8   A.   Yes.

 9   Q.   In fact, if you look at all the tax returns John got in

10   2014, would you agree he probably got close to 200 pages of

11   various returns?

12   A.   Yes.

13   Q.   He had a federal tax return, correct?

14   A.   Yes.

15   Q.   He had a California state tax return?

16   A.   Yes.

17   Q.   He had a Massachusetts state tax return?

18   A.   Yes.

19   Q.   He had a Dutch tax return?

20   A.   Not in our package of tax returns.

21   Q.   No.  I'm just talking about the whole circle of returns

22   he's dealing with.

23   A.   Yes.

24   Q.   He's got a Dutch tax return.  And you're not aware of John

25   speaking Dutch or reading Dutch?
```

1    A.    No.

2    Q.    Okay.  And in addition, he's got the corporate returns

3    that Jim Nahmens is taking care of, correct?

4    A.    Yes.

5    Q.    The HPC return and perhaps some other businesses

6    affiliated with HPC, like DGS2, or something like that?

7    A.    Yes.

8    Q.    Okay.  And so fair to say John gets, in the course of

9    calendar 2014, probably a couple of hundred of pages of tax

10:07  10    returns?

11    A.    Yes.

12    Q.    And someone even who has some knowledge about business and

13    taxes is not going to go through 200 pages line by line and

14    understanding everything, correct?

15         MS. KEARNEY:  Objection as to what someone might not.

16         THE COURT:  Sustained.

17    Q.    Okay.  You didn't go through these returns with John line

18    by line, did you?

19    A.    No.

10:07  20    Q.    Okay.  The person who was the main contact for providing

21    paperwork for these returns was Debbie Rogers, correct?

22    A.    For providing data, yes.

23    Q.    And for keeping the paperwork flowing back and forth?

24    A.    Yes.

25    Q.    And 2014 is a time where John is living in Amsterdam,

```
 1  correct?
 2  A.   Yes.
 3  Q.   Now, I want to ask you a question that directly relates to
 4  the 2014 return that was discussed yesterday.  In 2013, John
 5  sent an e-mail to you asking about what should be his state of
 6  residency for his state income taxes, correct?
 7  A.   In 2013?
 8  Q.   Yes.
 9  A.   I don't recall it.
10  10:08      MR. KENDALL:  If we could show the witness
11  Exhibit 9831, please.  And if we could go to the last page, the
12  earliest e-mail in time?
13  Q.   Do you recognize 9813 as an e-mail chain that John sent to
14  you?
15      MR. KENDALL:  Excuse me.  9831, please.  I transposed
16  it --
17  Q.   Do you recall this as an e-mail chain that John sent to
18  you?
19  A.   I don't recall this particular e-mail.
20  10:09  Q.   Do you identify it though?  Do you recognize that it is a
21  valid e-mail chain between you and John?
22  A.   Yes.
23      MR. KENDALL:  Okay.  Your Honor, I offer 9831.
24      MS. KEARNEY:  Objection.  Hearsay.
25      THE COURT:  Sustained.
```

1    MR. KENDALL:  Your Honor, it's not for the truth of

2    the matter.  It's to show that a conversation occurred.

3    MS. KEARNEY:  That's hearsay, your Honor.

4    THE COURT:  The objection is sustained.

5    Q.    Does that refresh your recollection that in July of 2013

6    John asked you if he could stop paying California income taxes

7    because he was no longer a California resident?

8    A.    Like I said, I don't remember that specific inquiry.

9    Q.    You don't remember the specific inquiry, but would you

10:10 10    agree with me the topic came up in 2013?

11    A.    Based on the e-mail you just -- and showed me.

12    MS. KEARNEY:  Objection.

13    THE COURT:  Sustained.

14    MR. KENDALL:  Your Honor, if it's a failure of the

15    witness' recollection, I think I get to read it -- at least

16    read the document into the record.

17    THE COURT:  No.  The objection is sustained.  You

18    don't get to read it into the record.

19    Q.    Okay.  If you could take a look at the -- isn't what

10:10 20    happened is John raised a question to you about changing the

21    residency and you asked him some questions and John never

22    followed up?

23    A.    I don't recall that.

24    Q.    Okay.  Take a look at the first page of Exhibit 9831,

25    please, and tell us if that refreshes your recollection.

1    A.    I recall an e-mail of this nature.

2         MR. KENDALL:    Okay.    So if we could turn off the

3    screen, please.

4    Q.    You recall in 2013 you told John it might be a possibility

5    to change the residency, but he needed to respond to you with

6    some information, or get back to you in some details, correct?

7    A.    What refreshed my memory in that e-mail is that my

8    colleague provided him with a checklist of the steps that are

9    necessary or things that you would check to see if you would

10:11 10    qualify to make that change.

11    Q.    Okay.    And John never responded to that e-mail, correct?

12    A.    I don't recall.

13    Q.    Okay.    He raised it again three years later, correct,

14    2016?

15    A.    I believe so.

16    Q.    Okay.    And, in 2016, AYCO, in fact, went back and filed

17    for a bunch of refunds for John for the prior years' California

18    income taxes, correct?

19    A.    I remember doing some amended returns regarding that.    I

10:12 20    don't recall if it was that year or time frame.    I can respond

21    accurately if you show me something that shows me the year or

22    what have you.

23    Q.    Okay.

24         MR. KENDALL:    Your Honor, I'd like to refresh his

25    recollection.    I don't have this marked as an exhibit.    If I

1    can walk over and show it to him, we can call it exhibit

2    whatever is our next number.

3              THE COURT:  Provide counsel a copy.

4              MR. KENDALL:  I'll show them the copy I have, your

5    Honor.  I wasn't expecting to need to do this.

6    Q.   If you could just take a look at the document I'm going to

7    put in front of you.

8    A.   Yes.

9    Q.   Read through all three pages.  Look at the dates

10:13 10   highlighted.  And then put it down, please, and turn it over.

11   A.   One moment.

12             (Witness complies.)

13   Q.   Does that refresh your recollection that AYCO helped

14   provide requests for refunds from California for the years John

15   was in Amsterdam to get back the state income taxes?

16   A.   First of all, all three of those refund checks were dated

17   in 2020, so I did not see them, but it does not surprise me

18   that he received those three refund checks because we prepared

19   amended tax returns to reflect his updated domicile.

10:14 20   Q.   Yeah.  So bottom line, for 2014, he paid a California

21   state income tax and then later got a refund of the money

22   several years later, correct?

23   A.   Yes.

24   Q.   And AYCO handled the request for the refunds form

25   California, correct?

```
 1    A.    We prepared the amended tax returns.

 2    Q.    The amended tax returns, which is a way of asking for them

 3    to refund the money, correct?

 4    A.    Yes.

 5    Q.    And that mistake over the California residency of John not

 6    following up in 2013 involved several hundred thousands of

 7    dollars of income taxes paid to California, correct?

 8    A.    That was not a mistake.

 9    Q.    I'm not saying there was a mistake to do it.  I'm just

10:15 10    saying of John not following up to the e-mail of your colleague

11    in 2013.

12    A.    No.

13    Q.    What does no mean?

14    A.    No, that was not the facts and circumstances.

15    Q.    Well, he got a refund -- you filed for a refund for 2014,

16    correct?

17    A.    Would you like me to explain how the rewind -- when the

18    refund was prepared, or excuse me, the amended tax return was

19    prepared?

10:15 20    Q.    The amended tax return was prepared in 2016, wasn't it?

21    A.    Correct.

22    Q.    Okay.  But it was for the year -- it included the year

23    2014, correct?

24    A.    Because in 2016, plus or minus, his employer prepared a

25    corrected or amended W-2, which reflected his change in
```

```
 1    domicile based on an extensive set of data and a list of
 2    information and -- updated and new information that John
 3    provided to his employer who then issued the corrected W-2.
 4    And based on that new information, we all, as a group, agreed
 5    that he would amend his tax returns to reflect the domicile.
 6    Q.   Correct.  The point being John didn't get it done until
 7    2016, correct?
 8    A.   Because that's when the information was provided.
 9    Q.   Provided to his employer at Staples?
10:16 10    A.   Us and his employer at Staples.
11    Q.   I'm not criticizing AYCO for anything.
12    A.   I'm just clarifying for you.
13    Q.   If John had done that three years earlier and provided
14    that same information, he wouldn't have overpaid the taxes to
15    California, correct?
16    A.   Okay.  I'd have to look at all the circumstances again,
17    but perhaps.
18    Q.   Well, the same circumstances that were truthful in 2016
19    for calendar 2014 would have been truthful in 2014?
10:16 20    A.   Correct.
21    Q.   So if he had provided that information in 2014 to '15, he
22    could have done it without having to overpay the taxes and
23    refile, correct?
24    A.   Correct.
25    Q.   Okay.  And would you agree with me the amount of money at
```

A2759

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | issue for all of the years you filed amended returns on the            |
| 2    | California taxes was in the hundreds of thousands of dollars?           |
| 3    | A.   Yes.  He also had to pay more taxes to the state of               |
| 4    | Massachusetts as well.                                                 |
| 5    | Q.   Right.  He'd have to pay more taxes to Massachusetts.             |
| 6    | He'd have a lower federal deduction because the California             |
| 7    | taxes are higher than Massachusetts.                                   |
| 8    | A.   Correct.                                                          |
| 9    | Q.   But he got a refund of several hundred thousand dollars           |
| 10   | from California, correct?                                               |
| 11   | A.   Correct.                                                          |
| 12   | MR. KENDALL:  Okay.  If I may have a moment, your          |
| 13   | Honor.                                                                  |
| 14   | THE COURT:  Yes.                                            |
| 15   | Q.   When John was preparing his trust and estate plan to leave        |
| 16   | these bequests for the scholarship funds, do you remember              |
| 17   | telling John that because the money was going to a university          |
| 18   | he would get a -- the estate would get a tax deduction, but            |
| 19   | it's something that he would not realize until the money               |
| 20   | actually was paid over at the time of his death?                       |
| 21   | A.   That would be something I might explain to a client in the        |
| 22   | general course of business.  I don't remember that exact               |
| 23   | conversation.                                                          |
| 24   | Q.   You don't remember that specific conversation with John,          |
| 25   | but is setting up that type of trust and estate plan, that            |

```
 1    would be in the ordinary course the type of things you would
 2    explain?
 3    A.   Yes.
 4    Q.   You're giving a donation to a school.  It's tax
 5    deductible, but you've got to pay it before you get the
 6    deduction.
 7    A.   Yes.
 8    Q.   So he understood that he's making a bequest, but he's not
 9    going to see any tax benefit or other benefit until the time of
10    it after his passing, correct?
11    A.   Correct.
12    Q.   And he still went with the provision in the will, correct?
13    A.   Yes.
14    Q.   Do you remember having any conversation with John why it
15    was important to him that the money be given to people whose
16    parents did not go to college?  Just yes or no?
17              MS. KEARNEY:  Objection.
18    A.   I don't recall.
19    Q.   I want to now move to 2018.  The government covered with
20    you yesterday John contacted you in 2018 about donations he was
21    going to make to Rick Singer's foundation, correct?
22    A.   John contacted me initially just to inquire about what
23    percentage of his income he could make a donation and deduct
24    it.
25    Q.   Okay.  But he also at some point sent you an e-mail that
```

 1    said the money was going to go to Rick Singer's foundation,

 2    correct?

 3    A.   I believe there was a threat at one point, or a later

 4    point that I saw that.  I don't recall exactly.

 5    Q.   Is that a yes, he sent you an e-mail telling you the money

 6    was going to Rick Singer's foundation?

 7    A.   I don't recall if John sent me an e-mail saying that.

 8             MR. KENDALL:  If we could take -- Mr. Carter, if you

 9    could show Exhibit 9830, please.

10:21 10    Q.   Do you recognize 9830 as an e-mail chain with Mr. Wilson

11    and Debbie Rogers and others?

12    A.   Yeah.  Can you just scroll all the way down, if I may ask?

13    Q.   If we could go to -- I'm going to jump a little bit ahead.

14             If we could go to page 14 and look in the middle

15    there -- excuse me, 8 of page 14.  I'm sorry.  My mistake.

16             I apologize.  Look at page 8.

17             MS. KEARNEY:  Do you have a copy for us?  Oh, it's

18    back.

19    Q.   Okay.  You see where it says "Hi Debbie".  This e-mail was

10:22 20    not addressed to you, but it was attached to the chain that was

21    sent to you, correct?  It's forwarded to you right above that?

22    A.   Yes.

23    Q.   And they tell you that John wanted to donate to a college

24    through Rick Singer's foundation, correct?

25    A.   Yes.  This was a follow-up to the general inquiry he made

```
 1    I think around October 18th.

 2    Q.    On October 18th, does John -- does he originally text you?

 3    A.    In that general inquiry, yes.

 4    Q.    And then at some point is there a phone call?

 5    A.    I don't remember if there was a phone call, or if there

 6    was an e-mail back.

 7    Q.    At some point, he tells you that you should refer your

 8    clients to Mr. Singer and his foundation, doesn't he?

 9    A.    No.  I don't recall that.

10:23 10    Q.    Do you recall him saying something about referring Goldman

11    clients to Mr. Singer's foundation?

12    A.    To his foundation, no.

13    Q.    Or to Mr. Singer's business?

14    A.    I vaguely remember him saying he worked with a college

15    consultant that he thought was doing a good job or something.

16    Q.    And he suggested that you refer Goldman clients to him,

17    correct?

18    A.    I don't recall.

19    Q.    Well, let me see if we've got something that will refresh

10:23 20    your recollection.

21          You've been interviewed by the government several

22    times, is that correct?

23    A.    I was interviewed one additional time, as I recall.

24          MR. KENDALL:  Okay.  Again, I'd like to show you --

25    your Honor, I don't have this as an exhibit.  It's an FBI
```

```
 1   report.  I'd like to show it to the witness and see if that
 2   refreshes his recollection.
 3              THE COURT:  You may do so.
 4              MR. KENDALL:  It's August 11, 2021, the last page,
 5   paragraph 17.
 6   Q.   Do you remember in August of this year having a
 7   conversation with the FBI agents and your lawyer present?
 8   A.   I don't remember FBI agents per se, but.
 9   Q.   Do you remember having a meeting with Miss Kearney, your
10   attorney Tony Lewis, another lawyer from Mr. Lewis's office at
11   the U.S. Attorney's office in Santa Ana?
12   A.   Yes.
13   Q.   Okay.  You sat down with them and you had an interview?
14   A.   Yes.
15   Q.   Okay.  And at the end of that interview, do you remember
16   telling them that you got a text message from Mr. Wilson on
17   October 20, 2018, correct?
18   A.   They presented that to me and I remember, yes.
19   Q.   And you told them that Wilson said that Singer was running
20   a successful educational foundation and he wanted to donate to
21   it?
22   A.   I don't remember him saying Singer was running a
23   successful foundation.  I thought it was an educational
24   foundation he was telling me about.
25   Q.   And you told them that you were not familiar with
```

```
 1   Mr. Singer's foundation and Wilson suggested that you refer
 2   some clients to Singer.  Take a look and see if that refreshes
 3   your recollection, please.  Just that last paragraph in
 4   yellow.
 5   A.   I remember him referencing that there was a successful
 6   education foundation that he was going to donate to, and I
 7   don't remember it exactly being worded this way, but I remember
 8   him referencing something along these lines.
 9   Q.   What does "something along these lines" mean?
10   THE COURT:  Well, take the document down, please.
11   A.   I can't read it anymore?
12   Q.   No.  Tell us what you remember.
13   A.   I was trying to remember that situation.  I can't remember
14   it very clearly.  That's why I was trying to refresh my memory,
15   but even at that time I can't remember it clearly.
16   Q.   Do you remember that there was a Special Agent there
17   present named Julie Fitzpatrick?
18   A.   Yes.
19   Q.   And Miss Kearney was there as well?
20   A.   Yes.
21   Q.   And are you saying that -- do you dispute that you told
22   Miss Kearney and the agents and your own lawyer there at the
23   Santa Ana U.S. Attorney's office that he told you it was Singer
24   who was running a successful foundation, education foundation?
25   A.   I was saying that I remembered, I vaguely remembered a
```

1    conversation like that, but I didn't remember exactly how it

2    was worded, and that's what I explained at that time as well.

3    Q.    Okay.  Well, you -- I want to know exactly what you do

4    remember being told.  You remember that Mr. Wilson made

5    reference to Singer having a successful education foundation,

6    correct?

7    A.    No.  I remember in our initial conversations he just

8    referenced a successful education foundation.

9    Q.    And so you dispute that you told Miss Kearney and the

10:27 10    agents that it was Singer's foundation?  What I was explaining

11    was that, at a later point when I realized that it was Singer

12    involved in that foundation, I was trying to recall if John had

13    initially mentioned Singer was involved in that foundation or

14    not when he initially brought it up.  In both cases, I

15    explained that I was not familiar with the foundation.

16    Q.    So at one point either in this October call or a few weeks

17    later, you realized it's Singer's foundation that's the

18    successful education foundation, correct?

19    A.    Yes.

10:27 20    Q.    Okay.  And Mr. Wilson told you that you ought to refer

21    some of your clients to Mr. Singer, correct?

22    A.    I vaguely remember something about that.  It was like the

23    end of a conversation and it was more just chit chat.

24    Q.    Yeah.  He was kind of enthusiastic and positive about you

25    should refer your clients to Singer?

```
 1   A.    Yes.

 2   Q.    And the sort of enthusiasm that Mr. Wilson had was similar

 3   to the type of enthusiasm you've seen everybody else express

 4   with Mr. Singer up to that date?

 5   A.    About his college prep.  I wasn't -- I never heard any

 6   enthusiasm about his foundation.

 7   Q.    Until Mr. Wilson mentioned it to you?

 8   A.    Right.  That I recall anyways.

 9         MR. KENDALL:  Your Honor, I'd like to offer 9830,

10   which is this e-mail chain we had previously discussed, for

11   completeness.  The government has offered some of the e-mails

12   in this chain, but not all of them.

13         MS. KEARNEY:  Do you have a copy of 9830?

14         MR. KENDALL:  Oh, I'm sorry.  Yes, of course.

15         MS. KEARNEY:  Your Honor, this appears to be multiple

16   e-mails.  I think the cover e-mail is a continuation of a chain

17   that's already in evidence, and pages 11 to 14 is already in

18   evidence, but I would object to the other pages.

19         MR. KENDALL:  To which pages?

20         MS. KEARNEY:  So no objection to pages 1 and 2 and no

21   objection to 11 to 14, which is already in evidence, but

22   objections to pages 3 to 10 which are different chains.

23         MR. KENDALL:  Your Honor, that's what --

24         THE COURT:  We'll talk about this at a later time, but

25   it won't be admitted in its present form.
```

```
 1   Q.   Okay.  I just want to make it clear.  You got an e-mail

 2   saying John is considering donating to Rick Singer's foundation

 3   and that they're going to -- they asked about the tax deduction

 4   if John donates to a college through the foundation, correct?

 5   A.   Correct.

 6   Q.   Now, it'd be fair to say that some charitable foundations

 7   can have, as part of their role, making grants to other

 8   charities, correct?

 9   A.   Yes, particularly a donor advised fund.

10   Q.   Okay.  So you can give a donation to one foundation and

11   then it can then distribute that money to, let's say, a private

12   university that's also a 501(c)(3)?

13   A.   Yes.

14   Q.   And that's certainly a tax-deductible donation if it

15   complies with the other regulations?

16   A.   Yes.

17   Q.   The mere fact that you're using somebody as a pass-through

18   to make the donation is okay?

19   A.   My experience is that you would use a 501(c)(3) as the

20   pass-through, yes.

21   Q.   Yeah.  A 501(c)(3) can be a pass-through to another

22   501(c)(3)?

23   A.   Yes.

24   Q.   Okay.  And some of those examples are like the United Way,

25   correct?
```

1 A. Yes.

2 Q. Okay.  There are various religious charities, like

3 Catholic charities or combined Jewish philanthropies, that

4 collect money and then distribute to other charities that do

5 things like that.  This is a common structure for a charity to

6 be a pass-through to other charities, correct?

7 A. Correct.

8 Q. You discussed with John him making donations in the range

9 of $500,000 or more to the pass-through charity that would go

10:32 10 to a college, correct?

11    MS. KEARNEY:  Objection.

12    THE COURT:  I didn't understand the question.

13 Q. During this time period of October to December you're

14 having a series of calls and e-mails with John, correct?

15    THE COURT:  In 2018.

16    MR. KENDALL:  Yes, your Honor.  Thank you.

17 Q. In 2018.

18 A. Yes.

19 Q. Okay.  And, as part of that, John tells you he's going to

10:33 20 make donations to this foundation.  At one point he tells you

21 $500,000, correct?

22 A. Well, initially, there wasn't a specific amount.

23 Q. But at some point he tells you 500 and then it goes to a

24 million, correct?

25 A. At a later point, I learned that he had already made a

```
 1    $500,000 contribution, and then I learned that he had made an
 2    additional $500,000 contribution.
 3    Q.   And he told you that it was to go to the foundation that
 4    would then give it to the schools, correct?
 5    A.   We didn't discuss what the intent was or what the ultimate
 6    destination.  I knew that he was making some donations to some
 7    schools over, I believe, one or two years.  I think that was
 8    referenced yesterday.
 9    Q.   Okay.  But it was to go to -- it was to go to the
10    foundation to one or two schools, correct?
11    A.   I don't recall the number of schools, but I think it was
12    one to two years that it was possibly going to be given to a
13    number of schools.
14    Q.   Okay.  And when he asked you that, he actually gave you
15    the name of the foundation, correct, or he gave one of your
16    people the name of the foundation?
17    A.   My recollection is that he did not know the exact name of
18    the foundation and I didn't know the name of the foundation,
19    and he had asked his assistant to provide us the Federal
20    Identification Number for the foundation so we could look it
21    up.
22    Q.   And someone in your office looked it up, correct?
23    A.   Somebody at our firm looked it up to see if they were
24    registered with the IRS.
25    Q.   And they were, correct?
```

```
 1    A.    Yes.

 2    Q.    And if the IRS registers a charity on its website, that's

 3    an indication it's approved to receive charitable

 4    contributions, correct?

 5    A.    Yes.

 6    Q.    That IRS website is a resource for people like you to look

 7    at and rely on, correct?

 8    A.    Yes.

 9          MR. KENDALL:  One moment, your Honor.

10    THE COURT:  Yes.

11          MR. KENDALL:  Could we have Exhibit 8112, please.  If

12    we could show that.

13    Q.    Do you -- take a look at 8112.  Do you recognize that --

14    A.    No.

15    Q.    -- as a part of the IRS website?

16    A.    No.

17    Q.    Do you do the search yourself?

18    A.    No.

19    Q.    So somebody else would have done the search?

20    A.    Yes.

21    Q.    So you wouldn't see the documents --

22    A.    Correct.

23    Q.    -- related to the search?

24          Okay.

25          MR. KENDALL:  I'd like to put in front of the witness
```

what was marked as a chalk, the transcript for the

September 15, 2018 telephone call between Mr. Singer and

Mr. Wilson.  The tape is already in evidence.  Is that 561A, I

believe?  If we could go to the second to last page, please.

If we can go further down, please.  Further down.

Q.   If we look at this last paragraph, and Mr. Singer -- this

is a transcript of a tape that's in evidence of a September 15,

2018 conversation.  So this is a little more than a month

before Mr. Wilson contacted you, correct?

A.   Yes.

MR. KENDALL:  Can we show this to the jury as well,

please, as a chalk only, your Honor.

MS. KEARNEY:  No objection.

Q.   And Mr. Singer states, "And they, and they can do it

because they think -- you know, so the guys from Goldman called

me yesterday, he got four families, they're seniors right now.

Its Lakeville because that's like compared to what they're

being quoted by the development office they're like --" and

then it ends.

MR. KENDALL:  And then can we go to 562A in the

beginning where the conversation continues.

Q.   And then if we start at line 13 where Mr. Wilson says,

"Okay, great.  Sorry you said something about the guys from

Goldman and then boom you dropped out".

Mr. Singer says, "Yeah they sent me four families on

1    Thursday saying they've been checking with development, they'll

2    pay the 1.2, 1.5, 2 million.  They don't care cause they're

3    being quoted over $30 million".

4           And Wilson says, "Oh because they have to donate a

5    whole building or something like that you're saying".

6           Would it be fair to say you never referred any four

7    people or four families over to Mr. Singer as described in that

8    transcript; correct?

9    A.   I have no idea what that transcript's talking about.

10:38 10   Q.   Okay.  You've never heard of such an event occurring,

11   correct?

12   A.   No.

13   Q.   As far as you know, it's probably a completely false

14   story, because you've heard nothing of four families from

15   Goldman being sent over like that, correct?

16           MS. KEARNEY:  Objection.

17           THE COURT:  Sustained.

18   A.   I don't know.

19   Q.   Do you have any reason to believe there's any truth to

10:38 20   that story?  Have you heard anything or seen any evidence to

21   indicate there could be any truth to that story?

22   A.   I don't even really follow this, so I can't even really

23   comment on it.

24   Q.   Okay.  Well, fair to say you've never heard of anybody

25   sending -- anybody at Goldman Sachs sending over four families

|    |    |
|----|----|
| 1  | of their clients to Mr. Singer to make donations at schools, |
| 2  | correct? |
| 3  | A.   I'm not familiar with this. |
| 4  |       MR. KENDALL:  Okay.  One moment, your Honor. |
| 5  | Q.   You agree with me it was a terrible mistake to refer Rick |
| 6  | Singer to any of your clients, correct? |
| 7  |       MS. KEARNEY:  Objection. |
| 8  |       THE COURT:  He can answer that.  Overruled. |
| 9  |       THE WITNESS:  I can answer that, your Honor? |
| 10:40 10 |       THE COURT:  Yes. |
| 11 | A.   I would not do it again if I could choose. |
| 12 | Q.   You did it with the best of intentions? |
| 13 | A.   Yes, sir. |
| 14 | Q.   He appeared to be a highly experienced college counselor |
| 15 | in your mind? |
| 16 | A.   Yes. |
| 17 | Q.   He deceived you, the way he deceived many others? |
| 18 | A.   Yes. |
| 19 | Q.   You're a highly experienced financial adviser, correct? |
| 10:40 20 | A.   Yes. |
| 21 | Q.   28 years in the industry? |
| 22 | A.   Yes. |
| 23 | Q.   You work at one of the most skilled and respected |
| 24 | financial advisory firms in the world, correct? |
| 25 | A.   Yes. |

```
 1    Q.   Your clients are among the most successful people in

 2    business, correct?

 3    A.   Yes.

 4    Q.   AYCO is run by one of the most prominent investment banks

 5    in the world, correct?

 6    A.   Yes.

 7    Q.   And you, in good faith, thought you were doing all of your

 8    clients a favor by introducing them to Mr. Singer, correct?

 9    A.   Not all my clients, the clients I --

10    Q.   Introduced?

11    A.   -- responded to their requests for that, yes.

12    Q.   Mr. Singer deceived you for 12 years, correct?

13    A.   Yes.

14    Q.   He mixed lies and truth?

15    A.   In retrospect, yes.

16    Q.   It made him very effective as a con man?

17    A.   Yes.

18    Q.   And you didn't know he was a fraud until 2019, correct?

19    A.   Yes.

20         MR. KENDALL:  Thank you.  I have no further questions,

21    your Honor.

22         THE COURT:  Any cross, Mr. Kelly?

23         MR. KELLY:  Briefly.

24              CROSS-EXAMINATION OF JEFFREY DEMAIO

25    BY MR. KELLY:
```

```
 1   Q.   Good morning, sir.  I represent Mr. Abdelaziz.
 2             I'm not going to go through the questions that
 3   Mr. Kendall has just asked you about.  You just indicated to
 4   him that, in your business, your clients are the most important
 5   asset, right?
 6   A.   Yes.
 7   Q.   And you unwittingly introduced your own clients to
 8   Mr. Singer, right?
 9   A.   What do you mean by unwittingly?
10   Q.   You didn't know Mr. Singer was a con man committing crimes
11   outside your presence, did you?
12   A.   Correct.
13   Q.   And it's not just your clients, right?  They're your most
14   important asset, but your most precious asset are your
15   children, right?
16   A.   Yes.
17   Q.   And you trusted this man so much that you introduced him
18   to your own children, right?
19   A.   For tutoring, yes.
20   Q.   And you certainly had no intention of introducing a con
21   man to your own kids, right?
22   A.   Correct.
23   Q.   You had absolutely no idea that Singer was a con man who
24   was committing fraud outside your presence, correct?
25   A.   No.
```

```
 1              MR. KELLY:  Nothing further.

 2              THE COURT:  Any redirect?

 3              MS. KEARNEY:  Yes, your Honor.

 4              THE COURT:  Miss Kearney.

 5                 REDIRECT EXAMINATION OF JEFFREY DEMAIO

 6    BY MS. KEARNEY:

 7    Q.   Good morning, Mr. DeMaio.

 8    A.   Good morning.

 9    Q.   Mr. Kendall was just asking you about your own experience

10    as a business executive, correct?

11    A.   Yes.

12    Q.   Mr. Wilson, you would also describe, as an experienced

13    business executive?

14    A.   Yes.

15    Q.   And both Mr. Kendall and Mr. Kelly asked you about your

16    referral of Mr. Singer to a handful of clients, as well as your

17    use of him yourself?

18    A.   Yes.

19    Q.   Did any of your other clients besides Mr. Wilson actually

20    use Rick Singer's services?

21              MR. KENDALL:  Objection, your Honor.

22              THE COURT:  Overruled.

23    A.   Not that I'm aware of.

24    Q.   Okay.  And you, yourself, you ceased using Mr. Singer's

25    services, correct?
```

```
 1    A.    Yes.

 2    Q.    When was that?  Or excuse me.  How old were your children

 3    when you stopped using his services?

 4    A.    Freshmen.

 5    Q.    In high school?

 6    A.    Yes.

 7          MS. KEARNEY:  If Mr. Carter would be so kind as to

 8    pull up Exhibit 9809, for the witness only, please.  And if we

 9    can go down I think it was a couple pages in.  Right there,

10    please.

11    Q.    Mr. DeMaio, do you recall Mr. Kendall asking you questions

12    about this trust document?

13    A.    Yes.

14    Q.    For John and Leslie Wilson?

15    A.    Yes.

16    Q.    And is it fair to say that any of the money that was to be

17    distributed to Rensselaer Polytech or Harvard was only going to

18    be distributed after Mr. Wilson had died?

19    A.    In this document, yes.

20    Q.    And if you look at section 2.7.d, you were asked questions

21    about this section.

22    A.    Yes.

23    Q.    And do you recall whether the money that might go to

24    Rensselaer Polytech or Harvard would only be distributed after

25    any of the money distributed in the prior section that's
```

```
 1    blacked out was left over?
 2    A.   I don't recall how the language was written for this.
 3           MS. KEARNEY:  Mr. Carter, if you can zoom out for a
 4    one moment.
 5    Q.   You see there are sections ahead of the distributions to
 6    Rensselaer Polytech and Harvard that are blacked out, correct?
 7    A.   Yes.
 8    Q.   And you don't recall what was being distributed in those
 9    sections, correct?
10:46 10    A.   No.
11    Q.   You were asked a number of questions this morning about
12    the effective tax rate for Mr. Wilson in 2014.  Do you recall
13    those questions?
14    A.   Yes.
15    Q.   Do you recall that Mr. Wilson had a tax equalization
16    agreement with Staples?
17    A.   Yes.
18    Q.   And just generally, what is a tax equalization agreement?
19    A.   If you agree to work overseas on an assignment, the
10:46 20    company, depending on how it's structured, will generally say
21    that if you have to pay extra taxes in the foreign country,
22    we'll equalize you so that you pay similar -- your net bottom
23    line is similar to where -- what your taxes would be in the US.
24    Q.   In other words, if your taxes are more because you're
25    working and living in Europe than what you would have to pay if
```

```
 1    you were living and working in the United States, the company,
 2    such as Staples, will make up the difference for you?
 3    A.   Yes.
 4    Q.   Does paying a large percentage in taxes give you license
 5    to claim false deductions on your return?
 6            MR. KENDALL:  Objection, your Honor.
 7            THE COURT:  Overruled.
 8    A.   No.
 9            MR. KENDALL:  Miss Lewis, can we look at Exhibit 667
10    in evidence, please.
11    Q.   Mr. Kendall asked you a number of questions about your
12    discussions with Mr. Wilson about the $1 million donation that
13    he was making to the Key Worldwide Foundation and his questions
14    about limitations on charitable deductions?
15    A.   Can you just repeat that one more time.
16    Q.   Sure.  Do you recall Mr. Kendall asking you questions
17    about discussions you had with Mr. Wilson about his donations
18    to the Key Worldwide Foundation in 2018?
19    A.   Yes.
20    Q.   And in Exhibit 667, this was the first communication about
21    that, correct?
22    A.   It's the first one I recall.
23    Q.   And Mr. Wilson is reaching out to you, correct?
24    A.   Yes.
25    Q.   And he's asking about a limit on tax deductions for
```

```
 1  charity contributions?

 2  A.   Yes.

 3  Q.   So it's fair to say he was familiar enough with taxes to

 4  even know that this was a question he should be asking,

 5  correct?

 6  A.   Perhaps, yes.

 7  Q.   You recall Mr. Kendall asked you some questions about how

 8  you were first introduced to Mr. Singer?

 9  A.   Yes.

10  Q.   And you acknowledged that that was through a contact at

11  PIMCO?

12  A.   Yes.

13  Q.   Are you familiar with an individual named Doug Hodge who

14  used to work at PIMCO?

15  A.   Yes.

16  Q.   And are you aware that there's been evidence in this

17  case --

18       MR. KENDALL:  Objection -- withdrawn, your Honor.

19  Q.   -- regarding two of his children, Jaeger and Macall Hodge?

20  A.   Generally.

21  Q.   And you're aware that they were admitted to USC as fake

22  athletic recruits?

23       MR. KENDALL:  Objection, your Honor.

24       THE COURT:  Overruled.

25       MR. KENDALL:  This is all hearsay to this person.
```

```
 1              MS. KEARNEY:  It's evidence in this case, your Honor.
 2              THE COURT:  Overruled.
 3    A.   I don't remember the details of the case.
 4    Q.   Mr. Kendall asked you some questions about the volume of
 5    paperwork Mr. Wilson would have received with respect to his
 6    2014 taxes?
 7    A.   Yes.
 8    Q.   When his tax return for 2014 was amended the first time,
 9    did he get the same volume of paper, or would it have just been
10    the amended return?
11    A.   I believe with an amended return you receive, or you also
12    get the pages that were as originally filed as well.
13    Q.   You wouldn't receive the corporate returns again, would
14    you?
15    A.   No.
16    Q.   You wouldn't receive the state return again?
17    A.   Well, the state return would be prepared separately, and
18    that would be in a different package.
19    Q.   And same thing would apply with the second amended return
20    that Mr. Wilson received?
21    A.   Yes.
22    Q.   You were asked questions about Mr. Wilson's change in
23    residency?
24    A.   Yes.
25    Q.   And I just wanted to follow-up on something you had said.
```

```
 1    I believe you indicated that despite the refund from

 2    California, Mr. Wilson would have owed additional taxes in

 3    Massachusetts?

 4    A.    Yes.

 5    Q.    And that would also affect his deductions on his federal

 6    taxes, is that correct?

 7    A.    Yes.

 8    Q.    One of the --

 9          MS. KEARNEY:  And, actually, Miss Lewis, if we can

10    pull up Exhibit 501A.  And go to page 4, I believe.  Excuse me.

11    I think it might be 8.  Keep going.  There we go.  And if you

12    can highlight the taxes you paid section, lines 5 through 9.

13    And can we keep this up on the right, please, Miss Lewis, and

14    pull up Exhibit 174A on the left, and go to page 4, I believe,

15    on this exhibit.  And I -- and then highlight the "Taxes you

16    paid" section.

17    Q.    Mr. DeMaio, on the left of your screen is Mr. Wilson's

18    original 2014 tax return and on the right is his second amended

19    return.  And his second amended return was filed after his W-2

20    was changed?

21    A.    Yes.

22    Q.    And the W-2 was changed, in part, because he changed his

23    residency?

24    A.    I believe that was part of it.

25    Q.    And one of the items that he took on his itemized
```

1    deductions was related to state and local taxes he paid,

2    correct?

3    A.    Yes.

4    Q.    And so the state and local taxes in the original return on

5    the left side of your screen were related to California,

6    correct?

7    A.    I don't know the make up of all of them but perhaps that

8    was the majority of it.

9    Q.    Because his residence was California at the time?

10:53 10    A.    Right.

11    Q.    And on the right side of your screen in the second amended

12    return, the state and local taxes would be largely made up of

13    taxes related to his residency in Massachusetts, correct?

14    A.    I'd have to, you know, dig into these details because

15    depending on when you paid the state taxes, you have to take

16    those deductions on a different year.

17    Q.    But it's fair to say that the deduction in the amended

18    return after he changed his residency was lower than the

19    deduction he took for state and local taxes in his original

10:54 20    return, correct?

21    A.    In this example, yes, but I was just saying that there

22    might be -- if the taxpayer pays state taxes at a different

23    point in time because they're paying them at a later point,

24    they might also be deducting those at a -- on a return in that

25    year.

```
 1   Q.   Regardless though, it's still correct that the state and
 2   local taxes used for his itemized deductions in his second
 3   amended return after he had changed his residency were lower
 4   than the state and local taxes used for his itemized deductions
 5   in his original return?
 6   A.   Yes.
 7   Q.   You were asked a number of questions about your referral
 8   of Mr. Singer to other clients.  Besides Mr. Singer, did you
 9   know of any other college counselors in the area?
10   A.   At the time, not really, that I recall anyways.
11   Q.   Did you ever tell Mr. Wilson that you had referred
12   Mr. Singer to other clients?
13   A.   I don't recall.
14        MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 667
15   again.  Thank you.
16   Q.   Again, looking at this text message chain, Mr. Wilson is
17   asking if there's a limit on tax deductions for charity
18   contributions.  Is that -- well, let me rephrase that.
19        Are charitable contributions always 100 percent
20   deductible on taxes?
21   A.   No.
22   Q.   And finally, Mr. DeMaio, if you knew that Mr. Singer was
23   posing students as fake athletes to get them recruited to
24   sports they did not play, would you have recommended him to any
25   of your clients?
```

```
 1              MR. KENDALL:  Objection.

 2              THE COURT:  Overruled.

 3    A.   No.

 4              MS. KEARNEY:  Thank you.

 5              THE COURT:  Recross, Mr. Kendall?

 6              RECROSS-EXAMINATION OF JEFFREY DEMAIO

 7    BY MR. KENDALL:

 8    Q.   Mr. DeMaio, let's start with the tax equalization issue

 9    that Miss Kearney just raised.

10    A.   Yes.

11    Q.   Why don't you explain it again, what is tax equalization

12    and what it was with respect to Mr. Wilson working in Europe.

13    A.   Yes.  If you have an agreement with the company that you

14    agree to take an assignment with overseas and, generally

15    speaking, these agreements, the company that is employing you

16    overseas will tell you that they'll equalize you with your net

17    taxes due based on where you -- or what your taxes are going to

18    be in the United States.

19    Q.   So if working in Holland means you're going to pay an

20    extra $100,000 in taxes because Holland has higher taxes than

21    the United States, your employer will make it up to you so

22    you're not losing money by taking the foreign assignment?

23    A.   Yes.

24    Q.   Okay.  But you also have to pay taxes on this equalization

25    amount, don't you?
```

```
 1   A.    No.  I mean, you do, but they -- most -- if I may?
 2   Q.    Yes.
 3   A.    Most tax equalization agreements, they will gross you up
 4   for the tax impacted.
 5   Q.    That's exactly my point.  So your income has to go high
 6   enough so you can actually pay taxes on the equalization
 7   amount, too?
 8   A.    Correct.
 9   Q.    And that's the phrase that you use, "grossing it up"?
10   A.    Yes.
11   Q.    Okay.  Second, Miss Kearney brought up the fact that you
12   stopped using Mr. Singer's services.
13   A.    Yes.
14   Q.    Fair to say, prior to the publicity in 2019, you never
15   heard anything to cause you to doubt Mr. Singer's integrity?
16   A.    No.
17   Q.    You decided not to use the tutor with your children after
18   six months or so, correct?
19   A.    Actually, we kept using the tutor.  We just decided just
20   to work with the tutor for a while.
21   Q.    Directly and not with Mr. Singer's group?
22   A.    Yes.
23   Q.    Okay.  But whatever you did with the tutor and your kids,
24   you heard nothing to cause to you be concerned about referring
25   Mr. Singer to any of your clients?
```

```
 1    A.    I don't recall anything at the time.

 2    Q.    And if you'd heard something ethically, you would have

 3    acted to warn your clients to do something, correct?

 4    A.    If I had substantial reasons, yeah.

 5    Q.    I mean, you wouldn't refer someone to a client, hear that

 6    person is an unethical person, and then not warn your client,

 7    correct?

 8    A.    Right.

 9    Q.    Okay.  Now, Miss Kearney also asked you about the

10:59 10    distributions in the will, and she actually showed you a copy,

11    though it's not in evidence.  Would it be fair to say there

12    weren't just distributions to the scholarship funds?  It was

13    also distributions to autism, the Cancer Society, and other

14    charities as well?

15    A.    I recall John being a supporter of those charities, yes.

16    Q.    Supporters of those for like most of the time you worked

17    with him, correct?

18    A.    Yes.

19    Q.    Okay.  Now, let's go back to that HR person at PIMCO.  You

10:59 20    met with this HR person.  They were a professional that you

21    respected?

22    A.    Yes.

23    Q.    Okay.  And in their description to you of the value of

24    working with Mr. Singer, did they say anything to indicate he

25    was unethical?
```

```
 1   A.   No.

 2   Q.   Or improper?

 3   A.   No.

 4   Q.   They gave a glowing reference, didn't they?

 5   A.   Well, he -- I just mentioned that other clients similar to

 6   like those we worked with seemed pleased with his work.

 7   Q.   Okay.  So they told that several very high level business

 8   people that you worked with and that they work with were very

 9   pleased with Mr. Singer's work?

10   A.   And/or that we were both familiar with, yes.

11   Q.   Yeah.  And would it be fair to say that in the business

12   you have, getting people to -- you provide referrals as part of

13   your professional services, correct?  A good lawyer, a good

14   business coach, a good college counselor?

15   A.   Yes.

16   Q.   And sometimes you rely on other people's recommendations

17   before you make your reference, correct?

18   A.   Yes.

19   Q.   If there's people whose judgment you trust and they say

20   someone is good, that carries a good bit of weight with you,

21   correct?

22   A.   Yes.

23   Q.   And then you -- you feel more comfortable giving a

24   referral if somebody says I've worked with him, he's quite

25   good, and you respect that person's opinion?
```

```
 1    A.    Yes.

 2    Q.    And when you met Mr. Singer, you found him very

 3    impressive?

 4    A.    Yes.

 5    Q.    He talked a good game, didn't he?

 6    A.    Yes.

 7    Q.    He had authority?

 8    A.    Yes.

 9    Q.    Confidence?

10    A.    Yes.

11    Q.    Great knowledge about college advising?

12    A.    Yes.

13    Q.    Could rattle off details about schools and sports and

14    tests and all of the other details of the college advisory

15    world, correct?

16    A.    Yes.

17    Q.    And he loved to drop names, correct?

18    A.    Yes.

19    Q.    The endless list of famous and successful people that were

20    his clients, correct?

21    A.    Yes.

22    Q.    And you thought to yourself, well, if he's at that level,

23    then he'd be an appropriate person for my clients?

24    A.    Yes.

25    Q.    Looking back on it, he was a very effective con man,
```

**A2790**

 1    wasn't he?

 2    A.   Yes.

 3    Q.   He knew how to manipulate successful, sophisticated,

 4    wealthy people?

 5              MS. KEARNEY:  Objection to what he knew.

 6              THE COURT:  Sorry.  What's the objection?

 7              MS. KEARNEY:  To what Mr. Singer knew.

 8              THE COURT:  Sustained.

 9    Q.   His -- his speech and his pitch was effective at

11:02 10    manipulating wealthy and successful people, correct?

11              MS. KEARNEY:  Objection.

12              THE COURT:  Sustained.

13    Q.   The PIMCO HR executive, he didn't jump up at the lunch and

14    say, you're a liar, Rick Singer, did he?

15    A.   No.

16    Q.   He was proud to introduce him to you?

17              MS. KEARNEY:  Objection.

18              THE COURT:  Sustained.

19    Q.   He introduced him to you, correct?

11:02 20    A.   Yes.

21    Q.   And you walked away from that lunch being very impressed

22    by him, correct?

23    A.   I looked like -- I looked at him as an additional possible

24    resource.

25    Q.   Okay.  And the last thing is, with the stated taxes, back

```
 1    in the 2014/15 period, California state income tax was running

 2    around 13 percent for people in higher incomes like Mr. Wilson?

 3    A.   12 or 13, yes.

 4    Q.   12 or 13.  Massachusetts was five?

 5    A.   Yes, in that range.

 6    Q.   Okay.  Everybody in the courtroom will maybe feel more

 7    authoritative than you?

 8    A.   Yes.

 9    Q.   But so the difference of getting this refund was about

11:03 10    seven to eight percent of Mr. Wilson's income each year?

11    A.   Yes.

12    Q.   And so if it's three, four years, if it's, you know,

13    several millions of dollars, it adds up to hundreds of

14    thousands of dollars that was overpaid, correct?

15    A.   You would pay more in the State of California, yes.

16              MR. KENDALL:  Okay.  Thank you, your Honor.  No

17    further questions.

18              THE COURT:  Mr. Kelly?

19              MR. KELLY:  Nothing for me.

11:04 20              THE COURT:  Thank you, Mr. DeMaio.  You may step down.

21              We're going to take the morning recess at this point,

22    15 minutes, jurors.  I'll see you back here in 15 minutes.

23              THE CLERK:  All rise for the jury.

24              (Jury exits.)

25              THE COURT:  Be seated, counsel.
```

```
 1              Is the schedule the same as it was yesterday?  In
 2    other words, we next have -- is it Mr. Moon?
 3              MR. FRANK:  Yes, your Honor.
 4              THE COURT:  And that was a roughly 45 minutes of
 5    direct?
 6              MR. FRANK:  Approximately.
 7              THE COURT:  And then if we get beyond that, it would
 8    be Mr. Deckett, Miss Ranahan and your final witness is
 9    Miss George, right?
11:05 10         MR. FRANK:  Yes, your Honor.
11              THE COURT:  Okay.  Same schedule?
12              MR. FRANK:  Yes, your Honor.
13              THE COURT:  All right.  Is it the request of counsel
14    that we give the jury the afternoon off and discuss some of the
15    legal matters this afternoon?
16              MR. KENDALL:  Very much so, your Honor.
17              THE COURT:  Mr. Kelly?
18              MR. KELLY:  Yes, your Honor.  Yes.
19              MR. KENDALL:  It will help Friday and the rest go much
11:05 20    more efficiently.
21              THE COURT:  Mr. Frank?
22              MR. FRANK:  We don't object to that, your Honor.
23              THE COURT:  I'm sorry?
24              MR. FRANK:  We do not object to that.  We filed some
25    oppositions this morning.
```

```
 1              THE COURT:  All right.  So I'm going to tell the jury
 2    when they come back that we're not going to have an afternoon
 3    session today, but it is still likely that the government will
 4    be able to rest tomorrow.
 5              MR. FRANK:  Barring extended cross examinations, that
 6    should be possible, your Honor.
 7              THE COURT:  All right.  Anything else that needs to
 8    come to my attention before we recess?
 9              MR. FRANK:  No, your Honor.
11:06 10          MR. KENDALL:  No, your Honor.
11              MR. KELLY:  No, your Honor.
12              THE COURT:  We're in recess.
13              (Recess taken 11:06 a.m. to 11:27 a.m.)
14              (Jury enters.)
15              THE COURT:  Good morning again, jurors.  Ready to
16    resume?
17              Mr. Moon, would you please stand.
18              MR. FRANK:  The government calls Casey Moon, your
19    Honor.
11:26 20          THE COURT:  All right.
21              (Casey Moon, Sworn.)
22              THE CLERK:  Would you please state your name for the
23    record, spelling your last.
24              THE WITNESS:  My name is Casey Moon.  Last name is
25    M-o-o-n.
```

A2794

```
 1                    THE COURT:  You may remove your mask, Mr. Moon.  Thank
 2       you.
 3               Mr. Frank.
 4               MR. FRANK:  Thank you, your Honor.
 5                    DIRECT EXAMINATION OF CASEY MOON
 6       BY MR. FRANK:
 7       Q.    Good morning, Mr. Moon.  How are you?
 8       A.    Great.  Thank you.
 9       Q.    Where do you live?
11:27 10 A.    In Los Angeles, California.
11       Q.    And where do you work?
12       A.    At USC.
13       Q.    What do you do at USC?
14       A.    I'm a women's water polo coach.
15       Q.    How long have you worked at USC?
16       A.    For 13 and a half years.
17       Q.    And how long -- are you the head coach of women's water
18       polo?
19       A.    No.
11:27 20 Q.    What are you?
21       A.    I'm the associate head coach on the women's water polo
22       team.
23       Q.    How long have you held that position?
24       A.    For the past four years.
25       Q.    Before you became the associate head coach of women's
```

```
 1    water polo, what did you do?
 2    A.   I was an assistant coach for both programs, men's and
 3    women's.
 4    Q.   And so directing your attention to the period of 2007 to
 5    2014, was that the position that you were in?
 6    A.   Correct.
 7    Q.   And then at some point did you also serve in another
 8    function?
 9    A.   Yes.  After 2014 I was on the men's side, the director of
11:28 10    player personnel.
11              THE COURT:  Mr. Moon, would you pull that microphone a
12    little closer to you so we can all hear.
13              THE WITNESS:  Sure.  Yes, sir.
14    Q.   How far did you go in school?
15    A.   Bachelor's degree.
16    Q.   Where from?
17    A.   UC Santa Cruz.
18    Q.   And did you play sports in college?
19    A.   Yes.  I played water polo.
11:28 20    Q.   And what kind of division school is UC Santa Cruz?
21    A.   It's Division III.
22    Q.   What position did you play?
23    A.   I was a field player, attacker.
24    Q.   During the time that you were the assistant coach of men's
25    water polo, who was the head coach?
```

```
 1   A.    It was Jovan Vavic.

 2   Q.    Is he still the coach?

 3   A.    No.

 4   Q.    When did he stop being the coach?

 5   A.    2019.

 6   Q.    During the time that you've been working for the last 13

 7   years as a water polo coach and as director of operations for

 8   men's water polo at USC, have you been involved in recruiting

 9   student athletes?

11:29  10   A.    Yes, very much.

11   Q.    How familiar are you with the student athletes that the

12   men's water polo team recruited?

13   A.    Very familiar.

14   Q.    And just to give us some perspective, where does the USC

15   men's water polo program rank nationally?

16   A.    We're number one or two every year.

17   Q.    How many national championships has the USC men's water

18   polo team won since you became a coach on the team in 2007?

19   A.    We won seven.

11:30  20   Q.    And do you have a general familiarity with the other water

21   polo teams, men's water polo teams against which you compete?

22   A.    Yes.

23   Q.    How does the USC men's water polo program compare, for

24   example, to the program at Loyola Marymount?

25   A.    It is apples and oranges.
```

```
      1   Q.   What do you mean by that?

      2   A.   So the caliber for USC is every year number one or two in

      3   the country.  For example, for LMU, they fight to be in the top

      4   ten.

      5   Q.   In the top --

      6   A.   Ten in the country.

      7   Q.   What about USC versus UC Santa Barbara?

      8   A.   The same.  UC Santa Barbara fights every year to be in the

      9   top ten in the country.

11:30 10  Q.   What about USC versus the Air Force Academy?

     11   A.   It is similar.  The Air Force Academy probably is top 15

     12   in the country every year.

     13   Q.   So USC is a far superior program?

     14   A.   Absolutely.

     15   Q.   And that's not just you bragging?

     16   A.   No.

     17   Q.   Directing your attention to 2014, how many players were on

     18   the men's water polo team, if you remember, approximately?

     19   A.   We had about 30 plus.

11:31 20  Q.   And is that typical for the men's water polo team?

     21   A.   Yes.

     22   Q.   Has the team fluctuated in size over the years?

     23   A.   It has, yes, due to personnel.

     24   Q.   How many players, for those of us who are not as familiar

     25   with water polo, how many players are in the pool at any one
```

```
 1    time?
 2    A.   It's seven on seven.  So six field players, plus a goalie
 3    on each side.
 4    Q.   So if there are only seven players in the pool at any one
 5    time representing USC, why do you have 30-plus players on the
 6    team?
 7    A.   Because the nature of our program is all about
 8    competition, and the players that we have fight every day to
 9    have an opportunity to play and push our top players per se.
11:32 10   Q.   Do you have practice players?
11    A.   No, we don't like to use that term.
12    Q.   Why don't you like to use that term?
13    A.   Because every player that we have, their primary objective
14    is to participate and contribute in games.  We never use the
15    term "practice player."
16    Q.   What about the players who aren't playing in games at a
17    particular period of time, what are they doing?
18    A.   So they compete against the other players who actually
19    have the opportunity to play in games.
11:32 20   Q.   And what is the long-term goal?
21    A.   The long-term goal is to contribute, you know, a minute,
22    two, a quarter of their opportunity to play in a game.
23    Q.   Generally speaking, on average how many players, freshmen,
24    do you recruit each year?
25    A.   About five to ten.
```

A2799

1    Q.    Directing your attention to 2013, do you recall that in

2    that year you recruited more players than usual?

3    A.    Yes.

4    Q.    Why did that happen?

5              Well, first of all, before I ask you that question,

6    do you recall how many approximately you recruited that year?

7    A.    It was about 20 plus.

8    Q.    Why did you recruit so many players in one year?

9    A.    So the previous year, due to graduation, as well as how

11:33 10    our system has consisted, we would like to have depth in each

11    position for personnel.

12    Q.    And did something else happen leading into that year that

13    caused you to lose a lot of players from the team?

14    A.    Yes.  We had a death, tragic death of one of our former

15    players right around New Year's Eve time.

16    Q.    And why did that cause so much attrition from the team?

17    A.    Well, a lot of his close friends -- hardship and they just

18    couldn't get over the tragic situation and make it through.

19    Q.    Tell us a little bit about what's involved in the

11:33 20    recruiting process for USC men's water polo.

21    A.    So the number one thing for USC water polo is talent

22    level.  You know, the involvement we have in recruiting is,

23    one, we go offsite to watch in person.  Second, we have

24    conversation with coaches, their specific coach, their

25    competing coaches, coaches in their federation.  And lastly, we

1    have an opportunity to review game film.

2    Q.    What about for students, student athletes who live far

3    away, do you go to their games?

4    A.    Depending on demographics.  We're in Southern California.

5    So depending on demographics, we have coaches that we chat with

6    via phone.  We talk, again, with their opponents' coaches,

7    their federations, their club coaches to get their perspective

8    thoughts on the player.

9    Q.    What about for students who live overseas?

11:34 10    A.    So overseas we have the ability to speak with our

11    federation coaches and we review game film.

12    Q.    You mentioned that your number one criteria is talent.

13    Tell us a little bit more about what you're looking for in

14    deciding who to recruit.

15    A.    Every year the players that we recruit, one, we look at

16    our roster, depending on specific personnel, position players.

17    You need to be talented to be able to compete and play for our

18    program at USC.

19    Q.    Are there intangible factors that you look for besides

11:35 20    what you can see in the pool?

21    A.    Absolutely.  The reason why we go in person to recruit

22    players is, one, to see what their interaction is amongst their

23    teammates; two, what their interaction is amongst their coach.

24    Can they take direction?  Do they take criticism?  And lastly

25    we try to see what their interaction is outside of the pool.

          1  Q.    What are you looking for?

          2  A.    So we want selfless, hardworking kids, both men's and

          3  women's, that strive for one goal, you know, an opportunity to

          4  play when they potentially get to USC but ultimately to win a

          5  championship.

          6  Q.    Do you have redshirts?

          7  A.    Yes, we do.

          8  Q.    What are redshirts?

          9  A.    So redshirts are incoming freshmen that don't have the

11:35    10  opportunity to play or contribute because of -- they just don't

         11  cut it to be our top 16, our top 20.

         12  Q.    So what is their role and function on the team?

         13  A.    So their function is to be at practice daily, to be able

         14  to push the players that contribute every day at practice.

         15  Q.    And then what?

         16  A.    And outside of -- outside of practice, when we travel,

         17  redshirts help to do other team functions, as in help set up

         18  the pool, as in help film games.  You know, they're pretty much

         19  a part of our team as much as our number one player is to

11:36    20  number 30 on the team.  Everybody has a role.

         21  Q.    After a redshirt year, what are your expectations for

         22  redshirts?

         23  A.    After that year, our expectation is, one, they get fit to

         24  learn the system and ultimately contribute in the pool.

         25  Q.    When you say "contribute in the pool," are you talking

1   about games?

2   A.   Yes.

3   Q.   The USC men's water polo team, how is it funded?

4   A.   We have an operating budget that is given to us by our

5   athletic department.

6   Q.   And beyond the operating budget given to you by the

7   athletic department, is there a fund that helps support the

8   team that people can donate to?

9   A.   Yes.

11:37 10   Q.   And what is that fund used for?

11   A.   It is used to supplement what our operating budget is.  So

12   that fund is used, again, to supplement travel, supplement

13   food, apparel for the team.  Our ultimate goal as a coaching

14   staff, as a program, we want our players to enjoy the

15   experience when they travel.

16   Q.   During the time that Jovan Vavic was the head coach of USC

17   men's water polo, who controlled the fund?

18   A.   Our head coach.

19   Q.   And who was that?

11:37 20   A.   Jovan Vavic.

21   Q.   At any time did Jovan Vavic tell you that he was accepting

22   money to the fund in exchange for recruiting certain

23   individuals?

24   A.   No.

25   Q.   Did you know that?

1  A.   I did not.

2  Q.   Are you familiar with something called the SUBCO process

3  at USC?

4  A.   Yes.

5  Q.   Directing your attention to 2013, 2014, what was your role

6  in that process for men's water polo recruits?

7  A.   My primary role was to document upkeep, meaning make sure

8  I have all the updated revised documents that the student

9  athlete would send us that I would need to send to our athletic

11:38 10  department.

11  Q.   Were athletic resumes part of that process?

12  A.   Yes.

13  Q.   Did you have help prepare athletic resumes?

14  A.   Yes, because the subcommittee had their format that the

15  students resumes needed to be in.

16  Q.   So what was your function with respect to those?

17  A.   So I had two sources of information.  One was the actual

18  physical resume that the student athletic would send us.  It

19  would be forwarded to me by our head coach.  And my second

11:39 20  source would be the conversations I had with our head coach.

21  Q.   And what would you do with the information that you

22  received in the student's resume that they submitted and the

23  information that you received about the student athlete from

24  Coach Vavic?

25  A.   So I would transcribe what the actual physical resume

```
 1   would be into the format the subcommittee requests, as well as
 2   add anything that our head coach has told me about that player.
 3   Q.   Did you at that time take any steps on your own to verify
 4   the information in the profiles that you received from the
 5   students?
 6   A.   No.
 7   Q.   Did you take any steps to verify the information that you
 8   received from Coach Vavic?
 9   A.   No.
10   Q.   Generally speaking, prior to preparing those SUBCO
11   packets, did you have some level of familiarity with the
12   individuals whose packets you were preparing?
13   A.   Yes.
14   Q.   How so?
15   A.   We would have discussion amongst our coaching staff about
16   so and so recruits that we are potentially recruiting,
17   depending on their personnel and their potential help for the
18   team.
19   Q.   And if a recruit was a particularly valued recruit, was
20   it -- would you discuss those with the coaching staff from time
21   to time?
22   A.   Yes.
23   Q.   Directing your attention to the 2013-2014 time period, did
24   there come a time when you became aware of a potential recruit
25   to the men's water polo team named Johnny Wilson?
```

11:39 (line 10)
11:40 (line 20)

```
 1    A.    Yes.

 2    Q.    How so?

 3    A.    I had his information, resume forwarded to me by our head

 4    coach.

 5    Q.    Before that time do you recall having heard of Johnny

 6    Wilson?

 7    A.    No.

 8    Q.    Do you recall having discussed him before that time with

 9    Coach Vavic or any of the other coaches?

11:40 10    A.    No.

11    Q.    Do you know what, if any, research Coach Vavic did before

12    sending you Johnny Wilson's resume?

13    A.    I do not.

14          MR. FRANK:  For the witness only, if we could have

15    Exhibit 106, please.

16    Q.    Mr. Moon, do you recognize that document?

17    A.    It is an e-mail.

18    Q.    Who is it from?

19    A.    It's from Jovan Vavic to myself.

11:41 20    Q.    And what is the subject?

21    A.    It says, "Forward John Wilson resume."

22    Q.    And is there an attachment?

23    A.    Yes.  It says "Wilson.pdf."

24    Q.    What is the date of this e-mail?

25    A.    February 22 -- excuse me, February 26, 2014.
```

```
 1              MR. KELLY:  Excuse me one moment.  Somehow it didn't
 2     come up on our screen.
 3              THE COURT:  Do you still have a malfunction?
 4              MR. KELLY:  Just ours, Your Honor.  But we can proceed
 5     with the paper copy.
 6              THE COURT:  All right.
 7              MR. FRANK:  May we proceed?
 8              THE COURT:  Yes, you may.
 9              MR. FRANK:  Government offers 106.
11:42 10              THE COURT:  It will be admitted.
11              (Exhibit 106 admitted into evidence.)
12     Q.   Mr. Moon, if you take a look at this e-mail, you see that
13     the e-mail that you were sent by Jovan Vavic on February 26,
14     2014 was actually a forward of an e-mail that he sent to
15     someone named Alex Garfio.  Do you see that?
16     A.   Yes.
17     Q.   And he wrote "Alex, here is his resume"?
18     A.   Yes.
19     Q.   Who is Alex Garfio?
11:43 20     A.   Alex Garfio was a liaison between athletics and admissions
21     for the subcommittee process.
22     Q.   Are you familiar with somebody by the name of Donna
23     Heinel?
24     A.   Yes.
25     Q.   What was the relationship between Alex Garfio and Donna
```

**A2807**

```
 1   Heinel?

 2   A.   So Alex and Donna worked together.  If there was a

 3   hierarchy, Alex would be right underneath Donna.

 4   Q.   He worked for her?

 5   A.   Correct.

 6   Q.   Did you have an understanding when you received this

 7   document as to why Coach Vavic was sending you a resume for

 8   John Wilson?

 9   A.   Yes, to prepare for the subcommittee process.

11:44 10        MR. FRANK:  If we can take a look at the next page.

11   Q.   Is that the resume you recall receiving?

12   A.   Yes.

13   Q.   Okay.  Taking a look at it generally, you see that there

14   are grades on the left-hand side and test scores.  Do you see

15   that?

16   A.   Yes.

17   Q.   And then there are awards and honors beneath that?

18   A.   Yes.

19   Q.   And there's a whole list of teams.  Do you see that?

11:44 20   A.   Yes.

21   Q.   And various other accolades?

22   A.   Yes.

23   Q.   And then on the right there is some additional

24   information, swim times, it says the school that he plays at

25   and it has a club listed, the Stanford Water Polo Club.  Do you
```

1    see that?

2    A.    Yes.

3    Q.    Generally speaking, how do the qualifications on this

4    resume compare to those of athletes that you would typically

5    recruit on the men's water polo team?

6    A.    Just looking at his academics, his test scores, you know,

7    accolades that are written on the left side is pretty similar

8    to all the kids, the men and women that we recruit.  By looking

9    on the left side, you know, it shows his swim times as well as

11:45 10    his high school and his water polo club, and his swim times

11    truly jumped out to us on the page.

12    Q.    I think you said the left side, but were you referring to

13    the right side?

14    A.    Oh, yes.  I apologize.

15    Q.    The other left?

16    A.    Yes.

17    Q.    Taking a look at the awards and honors, you see that he's

18    listed as a four-year varsity letterman?

19    A.    Yes.

11:45 20    Q.    And a three-year co-captain of the team?

21    A.    Yes.

22    Q.    Are those factors that you look at in evaluating water

23    polo talent?

24    A.    Yes, absolutely.

25    Q.    Why?

A.    One, to be a captain of your team is very important.  It
shows leadership skills, your accountability and understands,
you know, your ability to be the coach's extension for the
team.  Secondly, if you see a varsity letterman, it shows
obviously on your team that you represent, that you play for,
you're the best players on that team.

Q.    Do you know if it was true that Johnny Wilson was
co-captain of his team for three years?

A.    I do not.

Q.    Looking on the right side of the page, there are swim
times listed.

A.    Yes.

Q.    And it says 50 freestyle 20.12 short course, 100 freestyle
43.98 short course?

A.    Yes.

Q.    What is your understanding of -- the 50 freestyle and the
100 freestyle, is that yards, meters, what is that?

A.    When it says "short course" it's considered yards.

Q.    Okay.  And how does the time of 20.12 on the short course
for 50 yards and 43.98 for 100 yards compare with times of
players on the USC men's water polo team?

A.    20.12 in the 50 free is exceptional.  It's blazing fast.
If we see that time on a piece of paper, he's playing the wrong
sport.

Q.    When you say if you see that time, he's playing the wrong

```
 1   sport, what do you mean by that?

 2   A.   So 20.12 in short course, 50 free, he should be swimming

 3   for our swim team at USC.

 4   Q.   Why is that?

 5   A.   Because 20.12 is probably top ten on our men's team for

 6   swimming.  It's incredibly fast.

 7   Q.   And what if those times were a little slower?  What if it

 8   was 22 seconds for the 50 yards and 49 1/2 seconds for the 100

 9   yards?  How would that compare with the water polo team?

11:47 10   A.   That's pretty average for us.

11   Q.   Okay.  So a few seconds can make a big difference?

12   A.   Oh, absolutely.

13        MR. FRANK:  For the witness only, can we take a look

14   at Exhibit 105, please.

15   Q.   By the way, Mr. Moon, those swim times we just looked at,

16   do you know if those are true?

17   A.   I do not.

18   Q.   Do you recognize Exhibit 105?

19   A.   Yes, it is an e-mail.

11:48 20   Q.   Who is it from?

21   A.   From Jovan Vavic.

22   Q.   Who is it to?

23   A.   To myself.

24   Q.   And what is the date?

25   A.   February 26, 2014.
```

```
 1   Q.   So same date as the last one we just looked at?

 2   A.   Correct.

 3   Q.   And what's the subject?

 4   A.   It says, "Forward Johnny Wilson's last semester grades."

 5            MR. FRANK:  The government offers 105.

 6            THE COURT:  It will be admitted.

 7            (Exhibit 105 admitted into evidence.)

 8   Q.   You see, Mr. Moon, that Coach Vavic is again forwarding

 9   you an e-mail that he previously sent to Alex Garfio?

10   A.   Yes.

11   Q.   And it says, "Johnny Wilson's last semester grades," and

12   he writes, "Alex, this kid would be the fastest player on our

13   team.  He swims 50 yards in 20 seconds.  My fastest players are

14   around 22 seconds.  This kid can fly.  He was the captain of

15   his high school team as a sophomore, great work ethic, was all

16   CCS, he is a" -- I believe that should say "legit walk-on who

17   could end up playing for us very soon."

18            Did you have an understanding of why Coach Vavic was

19   sending you these grades and copying you on that write-up that

20   he sent to Alex Garfio?

21   A.   No.

22   Q.   You did not have an understanding?

23   A.   This understanding of this e-mail would have been to add

24   to --

25   Q.   I'm just asking if you had an understanding of why you
```

```
 1   were being sent this, for what purpose?
 2   A.   No, I do not.
 3   Q.   Were you at this time preparing a SUBCO packet for Johnny
 4   Wilson?
 5   A.   Yes.
 6   Q.   And how would you use grades in preparing a SUBCO packet?
 7   A.   So this would be my two sources of information to complete
 8   the SUBCO packet for his resume.  One would be his actual
 9   physical bio, resume, and second would be the information that
10   I had from our head coach in conversation.
11   Q.   Okay.  And in this write-up Coach Vavic wrote, "He is a
12   legit walk-on who could end up playing for us very soon."  Do
13   you see that?
14   A.   Yes.
15   Q.   What do you understand that to mean?
16          MR. KENDALL:  Objection, your Honor.  He didn't write
17   it.
18          THE COURT:  Well, he can state what his understanding
19   of it is.
20   A.   So to my understanding it would be, he would come to us,
21   join us, and contribute immediately right away.
22   Q.   Contribute immediately in what sense?
23   A.   To help us in playing games.
24   Q.   And is that typical for a walk-on?
25   A.   It's very rare.
```

```
 1    Q.   What did you do with the information that Coach Vavic
 2    provided you in terms of Johnny Wilson's grades, his test
 3    scores and the other information he provided?
 4    A.   So I compiled it in his SUBCO packet and sent it to Donna
 5    Heinel and Alex Garfio.
 6              MR. FRANK:  If we could bring up Exhibit 107 in
 7    evidence, please.
 8    Q.   Do you recognize this to be a SUBCO packet for Johnny
 9    Wilson?
10    A.   Yes.
11    Q.   And if we look at the next page, do you see there's a
12    different resume?
13    A.   Yes.
14    Q.   Do you know who prepared this athletic profile?
15    A.   I did.
16    Q.   And, again, what did you rely on to create it?
17    A.   The actual physical copy of the student athlete's resume,
18    as well as a conversation I had with our head coach.
19              MR. FRANK:  If we could put this page from Exhibit 107
20    on the right, Ms. Lewis, and put the second page of Exhibit 106
21    on the left.
22    Q.   Now, Mr. Moon, it appears that there are more accolades
23    listed on the right than there are listed on the left.  Do you
24    see that?
25    A.   Yes.
```

11:51 (line 10)
11:51 (line 20)

```
 1    Q.   Part of that appears to be that the ones on the left have
 2    been broken out by year on the right.  So, for example, on one
 3    line on the left, it has multiple years listed, California
 4    Scholar Athlete Award 2011, '12, and '13.  Do you see that?
 5    A.   Yes.
 6    Q.   And those are broken out into separate lines on the right?
 7    A.   Yes.
 8    Q.   Why is that?
 9    A.   This is just following the format that the subcommittee
10    requests.
11    Q.   Okay.  But there are also, it appears, additional
12    accolades listed on the right that are not listed in the
13    profile on the left.  Do you see that?
14    A.   Yes.
15    Q.   For example, on the right it says "four-year varsity
16    starter."  Do you see that?
17    A.   Yes.
18    Q.   And on the left, it lists four years but it just says
19    "varsity letterman."  It doesn't say anything about starter?
20    A.   Yes.
21    Q.   Where would you have gotten that additional information?
22    A.   In conversation with our head coach.
23    Q.   Now, I want to focus you on the bottom portion of the
24    resume.  It says "Assets" on the right, it says "Assets to our
25    men's team."  Do you see that?
```

```
 1    A.    Yes.
 2    Q.    It says "Top 10 attacker in grad class."  What does that
 3    mean?
 4    A.    So in his graduating class, he is one of the top ten in
 5    the country.
 6    Q.    Not just at his high school but in the country?
 7    A.    In the country.
 8    Q.    Where did you get that assessment of Johnny Wilson's
 9    skills?
10    A.    Again, from conversation with our head coach.
11    Q.    And below that it says, "Exceptional leader.  Immediate
12    impact player due to his speed."  What does "immediate impact
13    player" mean?
14    A.    That when he joins us as a freshman, he'll play in games
15    and contribute right away.
16    Q.    Who gave you that assessment?  Where did you get that
17    assessment of Johnny as an immediate impact player?
18    A.    I got that information from the e-mail that he forwarded
19    to Alex Garfio that I was on.
20    Q.    How many players are immediate impact players that you
21    recruit?
22    A.    Very rare.  Potentially two or three.
23          MR. FRANK:  You can take this down, Ms. Lewis.
24    Q.    Was Johnny Wilson an immediate impact player on the men's
25    water polo team at USC?
```

```
 1    A.    No.

 2    Q.    Do you recall that he was on the roster his freshman year?

 3    A.    Yes.

 4    Q.    I'd like to show you what's been marked as Exhibit 751.

 5          MR. FRANK:  For the witness only, please.

 6          MR. KENDALL:  Your Honor, I don't know if we've seen

 7    this before.

 8          MR. FRANK:  I think we just marked this.  I believe

 9    it's a version of a document that the defense used at one

11:55 10    point.  We have a paper copy for them.  It's the -- well --

11    Q.    Mr. Moon, do you recognize this document?

12    A.    Yes.

13    Q.    What is it?

14    A.    It is our media guide.

15    Q.    And it's for the year 2014?

16    A.    Correct.

17    Q.    For men's water polo?

18    A.    Yes.

19    Q.    And what is a media guide?

11:55 20    A.    It states -- it has our team photo.  It states all the

21    members of the team, as well as little snippet bios of their

22    previous history with us.

23    Q.    And this is a USC publication?

24    A.    Yes.

25          MR. FRANK:  The government offers 751.
```

```
 1              MR. KENDALL:  I'd object, your Honor.  I have not seen
 2    this before.  I need a little bit of time to look at it.
 3              THE COURT:  Well, you can look at it.
 4              MR. KENDALL:  It was not on their exhibit list, your
 5    Honor, that I'm aware of, or produced to us.  This is the first
 6    time we've touched it.
 7              MR. FRANK:  I believe Mr. Kendall introduced a
 8    photograph from this guide.
 9              MR. KENDALL:  I don't believe so.  If so, I didn't
11:56 10    have it from this document.  It may be the same photo.
11              MR. FRANK:  Well, why don't we just start with the
12    photo for right now.  If you could go to the back cover,
13    Ms. Lewis.
14              MR. KENDALL:  Your Honor, it's not in evidence.
15              MR. FRANK:  I'm not showing it to anyone other than
16    the witness.  And if you could zoom in on that photograph.
17    Q.   Mr. Moon, do you recognize that photograph?
18    A.   Yes.
19    Q.   What is it?
11:56 20    A.   It's a photo of our team.
21    Q.   And this is from 2014?
22    A.   Correct.
23              MR. FRANK:  Okay.  We'd offer it, your Honor.
24              MR. KENDALL:  Your Honor, no objection to the photo
25    itself, but the rest of the document we've never seen, and
```

```
 1    that's not the version of the photo we had.

 2            THE COURT:  We'll mark it as Exhibit 751A.  It will be

 3    admitted, the photograph of the team.

 4            MR. FRANK:  Okay.

 5            (Exhibit 751A admitted into evidence.)

 6    Q.   And Mr. Moon, looking at that photograph, I want to direct

 7    your attention to this individual in the top left corner.  Do

 8    you see that individual standing in the top left?

 9    A.   Yes.

10    Q.   Do you recognize that individual?

11    A.   Yes.

12    Q.   Who is it?

13    A.   It's Johnny Wilson.

14    Q.   Okay.  Do you recognize the other individuals in this

15    photograph as well?

16    A.   Absolutely.

17            MR. FRANK:  And just for the witness only, if we could

18    look at page 16 of this document -- I'm sorry, page 17.

19            Ms. Lewis, if you could just scroll down, I'll direct

20    you.  It actually says page 15 at the bottom of the page.  Oh,

21    you don't have it?

22            Mr. Stearns, can you just show the witness a paper

23    copy of the page marked 15 at the bottom -- there it is.  Thank

24    you.

25    Q.   Mr. Moon, do you see that page?
```

```
 1    A.   Yes.
 2    Q.   And generally speaking, these media guides that USC
 3    publishes, they have short player profiles?
 4    A.   Correct.
 5    Q.   And they have photographs of each individual player?
 6    A.   Yes.
 7    Q.   And does this refresh your recollection that there was a
 8    photograph of Johnny Wilson in the 2014 media guide and there
 9    was a short player profile of him along with all the other
10    players on the roster that year?
11    A.   Yes.
12         MR. FRANK:  Okay.  And if we can now go back to the --
13    I believe, your Honor, we marked it 751A, the photograph.
14         THE COURT:  Yes.
15         MR. FRANK:  If we could go back to 751A in evidence.
16    Q.   This photograph of the team, when is it taken regularly in
17    the school year?
18    A.   So it's usually taken about three weeks into the season.
19    Q.   Okay.  And the photographs that appear inside the media
20    guide, the head shots that appear in the media guide, when are
21    those taken?
22    A.   Approximately the same time.
23    Q.   Beyond being on the roster and appearing in the media
24    guide and in these photographs, what do you remember, Mr. Moon,
25    about Johnny Wilson?
```

```
 1    A.    I don't remember him at all being at practice daily.

 2    Q.    Do you remember him ever being at practice?

 3    A.    Only on the first day, and after the first day I've never

 4    seen him again.

 5    Q.    What about all of the other individuals in this

 6    photograph?

 7    A.    Oh, I see them every day.

 8    Q.    They all came to practice?

 9    A.    Yes, and participated every day.

12:00 10          MR. FRANK:  If we could show the witness only Exhibit

11    129, please.

12    Q.    Mr. Moon, do you recognize this document?

13    A.    Yes, it is an e-mail.

14    Q.    And the top e-mail on the chain, who is that from?

15    A.    It's from myself.

16    Q.    Who is it to?

17    A.    Alex Garfio.

18    Q.    And who is copied?

19    A.    Our head coach.

12:01 20    Q.    And there are some other individuals as well?

21    A.    Yes.

22    Q.    And do you recognize them to work in compliance?

23    A.    Correct.

24    Q.    And what's the date?

25    A.    It is September 10, 2014.
```

| | |
|---|---|
| 1 | MR. FRANK:  The government offers 129. |
| 2 | MR. KENDALL:  No objection, your Honor. |
| 3 | THE COURT:  It will be admitted. |
| 4 | (Exhibit 129 admitted into evidence.) |
| 5 | MR. FRANK:  Now if we could start with the bottom |
| 6 | e-mail in the chain. |
| 7 | Q.   Do you see there's an e-mail dated August 28, 2014 from |
| 8 | Alex Garfio? |
| 9 | A.   Yes. |
| 12:01 10 | Q.   And you're one of the individuals he sent it to? |
| 11 | A.   Yes. |
| 12 | Q.   What's the subject? |
| 13 | A.   "John Wilson eligibility center status." |
| 14 | Q.   What is the eligibility center? |
| 15 | A.   So that is connected with the NCAA, and the eligibility |
| 16 | center makes sure and verifies that all high school prospective |
| 17 | student athletes have valid test scores, transcripts and proof |
| 18 | of graduation.  You need to be registered with the NCAA in |
| 19 | order to participate in college athletics. |
| 12:02 20 | Q.   So on August 28, Mr. Garfio writes.  "Hi all.  Men's water |
| 21 | polo freshman John Wilson is still not certified academically |
| 22 | with the eligibility center.  The EC has not received his test |
| 23 | score and they will not evaluate him until they do.  I spoke |
| 24 | with his mother last week regarding the scores and advised her |
| 25 | to have them expedited.  Can we confirm that they were sent? |

|   |   |
|---|---|
| 1 | Please let me know if you have any questions." |
| 2 | Do you see that? |
| 3 | A.   Yes. |
| 4 | Q.   And the date is August 28? |
| 5 | A.   Correct. |
| 6 | Q.   If we could look at the next e-mail up in the chain, the |
| 7 | date of this e-mail is not quite two weeks later, September 10? |
| 8 | A.   Yes. |
| 9 | Q.   And how long is September 10 into the water polo season? |
| 12:02 10 | A.   It's approximately -- it's about three weeks. |
| 11 | Q.   And Mr. Garfio writes, "Hi Casey.  John Wilson has still |
| 12 | not submitted his test scores to the NCAA.  This needs to be |
| 13 | taken care of ASAP if he plans on being on the team.  Can we |
| 14 | get his username and login so we can confirm that he has sent |
| 15 | them?"  Do you see that? |
| 16 | A.   Yes. |
| 17 | Q.   And how do you respond, if we could look at the next |
| 18 | e-mail up in the chain? |
| 19 | A.   Is that a question for me to answer? |
| 12:03 20 | Q.   Yes.  I'm sorry.  How did you respond? |
| 21 | A.   It says, "Morning.  I will text him right now and get that |
| 22 | info for you.  Thanks, Casey." |
| 23 | MR. FRANK:  Okay.  Could we show the witness only |
| 24 | Exhibit 128, please. |
| 25 | Q.   Mr. Moon, do you recognize this document? |

```
 1    A.    Yes, it is an e-mail.

 2    Q.    Who is it from?

 3    A.    Myself.

 4    Q.    Who is it to?

 5    A.    To Johnny Wilson.

 6    Q.    And what's the date?

 7    A.    September 10, 2014.

 8    Q.    So the same date as the e-mail we just looked at?

 9    A.    Correct.

10              MR. FRANK:  Government offers 128.

11              THE COURT:  It will be admitted.

12              (Exhibit 128 admitted into evidence.)

13    Q.    And you write, "Johnny, morning.  This is very important

14    to be completed ASAP.  I just heard from our athletic

15    department saying you still have not submitted your SAT score

16    to the NCAA.  Can you please send me your username login

17    password for your NCAA account so we can try to check on our

18    end.  Do you know if and when your scores were sent to the

19    NCAA?  Please get back to me ASAP.  This is extremely important

20    for you being on the team.  Thanks."

21              What did you mean when you wrote, "This is extremely

22    important for you being on the team"?

23    A.    Because all of our athletes need to be registered and

24    validated through the NCAA.  If we have athletes that practice

25    with us that are not registered validated with the NCAA, it is
```

a violation on our end.  So every one of our players prior to

his or her admittance to USC physically being there needs to be

registered through the NCAA eligibility center.

Q.    In this e-mail --

        I believe you testified a moment ago you don't

remember Johnny coming to practice.

A.    Correct.

Q.    And did you go to practice every day?

A.    Yes, I was there every day.

Q.    Did you know all the players?

A.    Absolutely.

Q.    In this e-mail, did you ask Johnny Wilson why he hadn't

been to practice?

A.    No.

Q.    Why not?

A.    I was just relaying the message from Alex Garfio regarding

his NCAA status.

Q.    Why didn't you ask where he was?

A.    I don't recall.  You know, when I received that e-mail

from Alex, you know, it was our job, my job at that point to

make sure this is all set and squared.  So I just relayed the

message.

Q.    Do you recall Johnny attending practices after this?

A.    No, I do not.

Q.    Do you recall him attending strength and conditioning

```
 1    training sessions?
 2    A.    No.
 3    Q.    Do you recall him attending team meetings?
 4    A.    No.
 5    Q.    Do you recall ever following up with him?
 6    A.    I do not.
 7    Q.    Why not?
 8    A.    Just, if he wasn't at practice every day, daily, you know,
 9    we figured, I figured, you know, his heart wasn't in it to be
12:06 10   with the team.  So if he wasn't there, then I had no bother
11    checking.
12    Q.    Did there come a time when you learned that Johnny Wilson
13    had formally quit the team?
14    A.    Yes, I've heard just kind of hearsay amongst the players.
15    Q.    And when was that?
16    A.    I believe it was about midseason.
17    Q.    Do you recall learning why he had quit the team, what
18    reason he had given?
19    A.    No.
12:06 20   Q.    Do you recall at any point hearing that he had had a
21    concussion?
22    A.    No.
23    Q.    Were you surprised when you found out that Johnny Wilson
24    had quit the team?
25    A.    No, because I had never seen him practice.  He was never
```

```
 1    there.

 2              MR. FRANK:  No further questions.

 3              THE COURT:  Cross-examination, Mr. Kendall.

 4              MR. KENDALL:  Yes, Your Honor.

 5                  CROSS-EXAMINATION OF CASEY MOON

 6    BY MR. KENDALL:

 7    Q.   Good afternoon, Mr. Moon.

 8    A.   Good afternoon.

 9    Q.   My name is Mike Kendall.  I represent John Wilson.  Thank

10    you for coming out from California.  We hope to get you done so

11    you can get back home this evening.

12    A.   Thank you.

13    Q.   I want to start first with your reference about the size

14    of the team.  You said that there was a death of one of the

15    athletes and that year they had to recruit a large number, an

16    unusually large class.  Do you remember talking about that?

17    A.   Yes.

18    Q.   The unfortunate young man was Jon Walters, wasn't it?

19    A.   Correct.

20    Q.   He died in January 2014, didn't he?

21    A.   Yes.

22    Q.   And about eight of the athletes quit the team just because

23    of, you know, a beloved star player died and a bunch of people

24    left the team separate from graduation, correct?

25    A.   Yes, just due to their hardship of the tragic incident.
```

```
 1   Q.   You lost about eight good athletes that year in 2014,
 2   correct?
 3   A.   To my -- if I recall, yes.
 4   Q.   So the big recruiting class to deal with this loss was the
 5   class that was entering in September of 2014, correct?
 6   A.   No.  How we recruit is based on player personnel, and we
 7   want to have depth on our team.  So every year we recruit
 8   anywhere from five to ten depending on the player personnel we
 9   need.
10   Q.   But you testified earlier that there was, you said in 2013
11   I think you said there was about 20 people recruited and you
12   referred to the death of the athlete?
13   A.   Correct.
14   Q.   He died in 2014, not in 2013, correct?
15        MR. FRANK:  Misstates, your Honor.  I believe I said
16   2013-2014.
17        THE COURT:  All right.
18   Q.   Yes, but it wasn't the 2013 to '14 academic year.  It was
19   in 2014 that he died, correct?
20   A.   Correct.  That's when he passed away, but the 2013-'14 is
21   the same academic year.
22   Q.   Right.  But in 2014, a whole bunch of kids quit the team
23   in January or so, correct?
24   A.   Correct.  That was, again, due to potential hardship of
25   the tragic incident that everybody witnessed and was a part of.
```

```
 1    Q.    And do you recall how many were recruited to join the team
 2    as freshmen in September of 2014?
 3    A.    Again, I believe we had a pretty big class.  It was about
 4    20 plus.
 5    Q.    Okay.  Entering in September of '14?
 6    A.    Correct.
 7    Q.    And about 13 of them were redshirts?
 8    A.    Yes.
 9    Q.    Now, that document that Mr. Frank was just showing you
10    about Johnny registering with the NCAA, do you remember how the
11    situation got resolved?
12    A.    I do not.  After I sent him that e-mail, I don't recall
13    what happened after that.
14    Q.    Do you recall if you ever heard back from him?
15    A.    I don't recall.
16    Q.    You're not saying that he didn't get back to you.  You're
17    just saying it was eight years ago, seven years ago, whatever,
18    and I just don't remember, correct?
19    A.    I just don't recall.
20            MR. KENDALL:  Okay.  Could we show the witness Exhibit
21    9513, please.  I don't think that's 9513.  If it is, it's not
22    the one I have marked.
23            Your Honor, I'd like to use the Elmo.  I'll get the
24    exhibit number resolved as soon as someone can assist me, but
25    I'd like to show this document to the witness only at this
```

12:10  (line 10)

12:11  (line 20)

```
 1   point.
 2   Q.   Do you recognize this as an e-mail chain between you and
 3   Mr. Garfio concerning Johnny Wilson's eligibility?
 4          MR. FRANK:  May I see it, counsel?
 5          MR. KENDALL:  I apologize.  When we locate the
 6   number --
 7          MR. FRANK:  Can you shrink it?
 8          MR. KENDALL:  -- I'll tell you, but this is one of the
 9   documents you gave us.
10          MR. FRANK:  We gave you 2.7 million documents.
11          MR. KENDALL:  I understand.
12          MR. FRANK:  So that doesn't help.
13          MR. KENDALL:  We're looking for our copy now.
14   Q.   Do you recognize this as an e-mail that came after the
15   e-mails that Mr. Frank just showed you, Exhibit 128, and the
16   others.  This is a little later in the day, correct?
17   A.   Correct, it is the same date, but if you say it's a little
18   later in the day -- it says 6:56 p.m.  So I presume the other
19   e-mails were prior to that.
20   Q.   Okay.  And then you see there's an e-mail here at
21   10:45 a.m. from you as well, correct, on the same topic?
22   A.   Yes, that is an e-mail.
23   Q.   It's the same communications the same day on the same
24   topic, correct?
25   A.   Correct.
```

1        MR. KENDALL:  For purposes of completeness, your

2   Honor, I'd like to offer the subsequent e-mails that were not

3   put in by the government.

4        MR. FRANK:  No objection, your Honor.

5        THE COURT:  It will be admitted.  We need a number.

6        MR. FRANK:  I can't see the whole document, so I

7   actually don't know --

8        THE COURT:  How about showing him the whole document?

9        MR. KENDALL:  I would love that, your Honor, if I

12:13 10   could do this.  Do we have the number?  9844.  Thank you very

11   much, Ms. Bovier.  If we could put 9844 on the screen.

12        MR. FRANK:  If I could see it first, your Honor, that

13   would be helpful.

14        THE COURT:  Let counsel see it, please.

15        MR. KENDALL:  If we could show it to the witness only

16   on the screen and at least let Mr. Frank look at it on the

17   screen until we get him a paper copy.  You don't have 9844?

18        MR. FRANK:  No.

19        MR. KENDALL:  Okay.

12:13 20   Q.   Okay.  What I want to suggest to you is -- when we get the

21   document we'll show it -- didn't Johnny Wilson get back to you

22   and the problem was he was using the name Johnny instead of

23   John and there was a mix-up with the records?

24   A.   I don't recall.

25   Q.   Okay.  We'll get you the document in just a minute and

```
 1  we'll get back to that.
 2        You say you have no memory of Johnny being at
 3  practice after the first day, correct?
 4  A.   Correct.
 5  Q.   Did you take attendance?
 6  A.   I did not, no.
 7  Q.   So are you testifying he wasn't there or you just don't
 8  remember it?
 9  A.   I don't remember.
10  Q.   Okay.  And there's a lot of other team events that go on
11  in the year as well besides just showing up at practice,
12  correct?
13  A.   Well, if you come to USC to play water polo, coming to
14  practice every day is first and foremost.
15  Q.   Yes.  And there's also social events.  The team gets
16  together, correct?
17  A.   Yes, they do social events, but we don't take a role or we
18  don't know what those social events are.
19  Q.   Sure.  And even the redshirts who don't play, they go to
20  the games and they help assist putting up things, doing tasks
21  as you described earlier?
22  A.   Yes.
23  Q.   Sometimes scouting other teams, correct?
24  A.   Redshirts are not allowed to scout other teams.  They are
25  there daily to help us set up the pool, set up the game course,
```

12:14 at line 10

12:15 at line 20

```
 1    help us film, but they're not allowed to scout other teams.
 2              MR. KENDALL:  Okay.  If we could show the witness
 3    Exhibit 8008, please, for impeachment.
 4    Q.   Do you recognize this as an e-mail from one of the
 5    assistant water polo coaches to Johnny Wilson in 2014?
 6    A.   Yes, it is an e-mail.
 7              MR. KENDALL:  I'd like to offer 8008, please, your
 8    Honor, for impeachment.
 9              MR. FRANK:  It's not inconsistent, your Honor, and
10    he's never seen it.  He's not on it.
11              THE COURT:  The objection is sustained.
12    Q.   Do you recognize the email --
13              MR. KENDALL:  If we could have 8008 up for the
14    witness, please.
15    Q.   Do you recognize -- what was Stefan Luedecke's role in
16    2014?
17    A.   I believe he was an assistant coach.
18    Q.   Okay.  And do you recognize that as his e-mail address?
19    A.   Yes, that is his e-mail address.
20    Q.   Do you recognize that as a student's e-mail address or a
21    team member's e-mail address and the form of it?
22    A.   Yes.
23    Q.   usc.edu, do you recognize that as Johnny Wilson's e-mail
24    address?
25    A.   I'm not sure if that's his actual e-mail address, but
```

12:15 (line 10)
12:16 (line 20)

1    every student athlete, every student at USC has an @usc.edu

2    email.

3    Q.    That's his name in 2014, correct?

4    A.    I don't recall; I'm not sure.

5    Q.    If you could read the document.

6    A.    Yes, it's an e-mail.

7    Q.    And it's about water polo uniforms, correct?

8    A.    Yes.  That's what the e-mail states and asks.

9    Q.    Okay.  And that's something that the team sets out in the

12:17 10   ordinary course, to get all the athletes' sizes and to order

11   their uniforms, correct?

12           MR. FRANK:  Your Honor, if the effort is to show that

13   an e-mail sent to a student is a business record, we object.  I

14   would also point out this document was sent on August 9, which

15   is before the water polo season.

16           THE COURT:  Objection sustained.

17   Q.    Does the team send out to the incoming members of the team

18   an e-mail asking them about their sizes for their uniforms?

19   A.    We do send e-mails or we discuss in person.

12:17 20   Q.    Okay.  And is Exhibit 8008 one of those?

21   A.    My screen is blank, but --

22           MR. KENDALL:  If we could show the witness again.

23   A.    This is an e-mail, yes.

24   Q.    And it's an e-mail to order a uniform, correct?

25   A.    It's just asking for sizes.

```
 1    Q.   And if you could look further down, look at the top of the

 2    second page.  "I hope all is well."

 3    A.   Yes, I see that.

 4         MR. KENDALL:  Your Honor, I offer this not for the

 5    truth of the matter but just to show that there was an email

 6    sent and responded to to order a uniform.

 7         MR. FRANK:  Your Honor, we object and it's completely

 8    irrelevant.  It was sent before the --

 9         THE COURT:  The objection is sustained.
```

12:18 10
```
      Q.   Do you dispute that Johnny Wilson ordered a uniform and

11    got a uniform to be on the team that season?

12    A.   I don't recall.  I didn't send that e-mail.

13    Q.   Okay.  When you saw him on the first day, he had a uniform

14    on, didn't he?

15    A.   No, we don't have our players wear team gear on the first

16    day.  They show up in normal clothes.

17    Q.   I'd like to show you now Exhibit 9844.  I think we have

18    copies that we can give out to people.

19         MR. KENDALL:  I think this has been admitted.  If we
```

12:19 20
```
      can show it on the screen.

21         MR. FRANK:  Your Honor, this is the document I believe

22    I was going to review before it was admitted.

23         THE COURT:  Okay.  Take a look at it.

24         MR. FRANK:  No objection.

25         THE COURT:  It was previously admitted and it is now
```

```
 1   admitted, 9844.
 2           MR. KENDALL:  Thank you, Your Honor.  Can we put it on
 3   the -- oh, we're going to use the Elmo.  Okay.  Could we show
 4   the Elmo to everybody.  I want to move it up to the middle.
 5   Q.    Okay.  So at 10:45 a.m. on the same day, September 10,
 6   that Mr. Frank showed you that e-mail, you sent to Alex Garfio
 7   "Just heard back from Johnny."  That's referring to Johnny
 8   Wilson, correct?
 9   A.    Correct.
10   Q.    "When I spoke to him, he said we sent his scores three
11   weeks ago but he sent them as Johnny Wilson, not John Wilson.
12   He also said he'll resend them right away.  Below is his
13   username login password as requested.  Thanks."
14           Did you just forget about this e-mail address -- I
15   mean, this e-mail response?
16   A.    Yes, I don't recall.
17   Q.    You don't recall it.
18           How long did you spend preparing with the U.S.
19   Attorney's Office preparing your testimony?
20   A.    We had two meetings and two meetings via Zoom.
21   Q.    So a total of four meetings?
22   A.    Yes.
23   Q.    How long was each meeting?
24   A.    Anywhere from two hours to four hours.
25   Q.    And so we've had maybe eight, ten, 12 hours in there of
```

```
 1  preparation?

 2  A.   Yes.

 3  Q.   And in addition, you have USC lawyers that have helped you

 4  prepare for your testimony, correct?

 5  A.   Yes, I had conversations with them.

 6  Q.   And none of those lawyers showed you this e-mail, correct?

 7  A.   I don't recall.

 8  Q.   Okay.  It wasn't your job to collect the e-mails, was it?

 9       MR. FRANK:  Objection, your Honor.

10       THE COURT:  Overruled.  He can answer it.

11  A.   I don't understand the question.  It's not my job to?

12  Q.   You weren't assigned the responsibility of collecting

13  e-mails relevant to Johnny Wilson's role on the water polo

14  team, were you?

15  A.   No.

16  Q.   The lawyers gave them to you and they gave you things to

17  refresh your memory, correct?

18  A.   If they showed me things I had never seen before, I don't

19  recall, then I would tell them.

20  Q.   And if they don't show you things, it doesn't refresh your

21  memory, correct?

22  A.   I don't recall them.

23  Q.   And this is an example in Exhibit 9844.  You didn't recall

24  the conversation with Johnny Wilson?

25       MR. FRANK:  Objection to "example of," your Honor.
```

The times 12:21 appear at lines 10 and 20.

```
 1              THE COURT:  Sustained.

 2    Q.   You didn't recall the conversation with Johnny Wilson

 3    until you saw 9844 just now, correct?

 4    A.   I don't recall.

 5    Q.   What do you mean you don't recall?

 6    A.   I don't recall the conversation that you asked.

 7    Q.   Okay.  You don't recall it, but you don't dispute it

 8    occurred, correct?

 9    A.   I don't recall.

12:22 10    Q.   Well, you wrote in an e-mail that you spoke to him.  Would

11    you have written a false e-mail?

12    A.   No.  That e-mail is sent 2014.  I don't recall everything

13    that I sent that year.

14    Q.   But was it your practice to write truthfully about topics

15    like this in your role on the team?

16    A.   Yes, part of my job, yes, everything that I've done is

17    truthful.

18    Q.   Yeah.  So as far as you know, this is a truthful statement

19    that you wrote in this e-mail that you spoke to Johnny?

12:22 20    A.   It is, yes.

21    Q.   Okay.  And then Alex Garfio responds to you, "Thanks,

22    Casey.  The NCAA found him under that name," I believe it's

23    supposed to be.  "He should be cleared by the end of the day.

24    He still needs to request his final amateurism."

25              That's the response Alex Garfio sent to you, correct?
```

```
 1   A.   Yes, in the e-mail, yes.

 2   Q.   And it would be fair to say practice starts sometime in

 3   August, correct?

 4   A.   In the end of August.

 5   Q.   Yeah.  Okay.

 6            Now, next I'd like to show you a copy of Exhibit 7316

 7   only for the witness, please.

 8            MR. KENDALL:  We have numbering problems here.  That

 9   is not the 7316 I have.

12:24 10        Again, your Honor, if I can show this on the Elmo just

11   to the witness.  We'll get the numbers straightened out.  I

12   apologize for this confusion.

13   Q.   Do you recognize this --

14            MR. FRANK:  Can I have a copy, please?

15            MR. KENDALL:  Yes.

16            THE COURT:  Show counsel a copy.

17            MR. KENDALL:  I certainly will, your Honor, as soon as

18   I get one.  There's obviously a numbering problem here, and

19   it's left me a little bit less than perfectly prepared.

12:24 20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   Okay.  And what is it?

23            MR. FRANK:  Your Honor, I object to it coming in

24   before I can examine it.

25            THE COURT:  Yeah.  How about showing him a copy first.
```

```
 1            MR. KENDALL:  Okay.  I'm happy to give him my only
 2    copy, but then we can't put it on the screen.
 3    Q.   Can you tell us what it is.
 4    A.   It's just an IRL report, which states, one, if you were
 5    recruited, two, if you were not, and members of the team.
 6    Q.   It's a roster report, isn't it?
 7    A.   It states that on the top of the page, yes.
 8            MR. KENDALL:  9515, I guess page 7 of Exhibit 9515.
 9            THE COURT:  Are you offering this?
12:26 10        MR. KENDALL:  Yes, Your Honor.
11            THE COURT:  And there's no objection?
12            MR. FRANK:  Well, if it's an impeachment exhibit, your
13    Honor, he needs to show an inconsistency.  I haven't heard one
14    yet.
15            MR. KENDALL:  Your Honor, it's to show the members on
16    the roster of the team as of October 2014.
17            MR. FRANK:  Again, I'm not hearing an inconsistency.
18            THE COURT:  You didn't object when he offered it at
19    first.
12:26 20        MR. FRANK:  Well, I hadn't seen it.  I just looked at
21    it, and I'm now objecting.
22            THE COURT:  So are you objecting?
23            MR. FRANK:  I'm objecting unless there's a ground
24    that's offered for its admission.  I haven't heard one yet.
25            MR. KENDALL:  Your Honor, if we have to do this on
```

1    Friday with him, I will, Your Honor.  I'm hoping to avoid that.

2         THE COURT:  Well, go ahead and see if we can't resolve

3    the problem.

4         MR. KENDALL:  Okay.

5    Q.   This roster report, is that something that the athletic

6    department keeps to record who is on the team on a certain date

7    relevant to their membership?

8    A.   Yes, this is through our compliance department.

9    Q.   Yeah, it's a business record, correct?

12:27 10  A.   No.  It's a roster --

11         MR. FRANK:  Objection.

12    A.   It's a roster report.

13    Q.   It's a roster report that compliance requires you to keep?

14    A.   That they keep on their end.  We don't keep roster --

15    Q.   It's a compliance record for the compliance department to

16    do its job, correct?

17    A.   It's a roster report.

18    Q.   Yeah.  It's a roster report that the compliance department

19    assembles, correct?

12:27 20  A.   No, the compliance department doesn't assemble this

21    record.  The compliance department just compiles information

22    that shows who is present on our team.

23    Q.   Who creates this document?

24    A.   This is -- I believe this document is made within our

25    department.

**A2841**

```
 1   Q.   By the athletics department?

 2   A.   Correct.

 3   Q.   Then it's given over to the compliance department?

 4   A.   For review.

 5   Q.   And it records the team members and certain information

 6   about the team members?

 7   A.   It records the members, yes.

 8           MR. KENDALL:  Okay.  Your Honor, I offer it.

 9           MR. FRANK:  No objection.

12:28 10         THE COURT:  It will be admitted, 9515.

11           (Exhibit 9515 admitted into evidence.)

12           MR. KENDALL:  If we could show the jury, please.

13           MR. FRANK:  Just to clarify, this is just a one-page

14   document, right?

15           MR. KENDALL:  It's two pages.  There's a back page.

16           MR. FRANK:  Okay, yeah.

17   Q.   The roster report is dated October 3, 2014, correct?

18   A.   Correct.

19   Q.   And it lists various people's statuses on the team,

12:28 20   correct?

21   A.   Yes.

22           MR. KENDALL:  If we could keep it down to the top,

23   please, Mr. Carter.

24   Q.   Added to the team, quit, withdrew, cut, medical exception,

25   whatever, on the top, correct?
```

```
 1   A.   Yes.

 2   Q.   If we turn on the second page, we see that John Wilson is

 3   listed, correct?

 4   A.   Yes.

 5   Q.   And it says -- if we look at the -- you see there's an "N"

 6   next to his name, correct?

 7   A.   Yes.

 8   Q.   If you look at the first page, it says "recruited status,"

 9   and he and some of the other people are not listed as recruited

10   status.  They're N's not Y's, nos, not yes, correct?

11   A.   Yes.

12   Q.   And that indicates whether or not they were recruited

13   pursuant to certain NCAA regulations relating to contacts with

14   people?

15   A.   No.  That means recruited as if our coaching staff

16   recruited them to be members of the team.

17   Q.   Excuse me?

18   A.   They're recruited in regards for them being members of our

19   team.

20   Q.   Well --

21   A.   To be members of the team.

22   Q.   Doesn't it mean that the coach contacted them to recruit

23   them as opposed to them coming to the coach?  Isn't that an

24   NCAA regulation about coaches contacting athletes, when they

25   can do it, how they can do it?
```

```
 1    A.    Yes, there are NCAA rules about that, yes.
 2    Q.    Okay.  Now, I want to show you Exhibit 9515.  And tell us
 3    if you recognize that.
 4              MR. FRANK:  Was that not 9515?
 5              THE COURT:  That was 9515.
 6              MR. KENDALL:  Is it?  Okay.  Excuse me.  That actually
 7    is a blowup from 9515.  I'm sorry.  No, they're different
 8    documents.  Let's call this 9515A.  Make life easy.
 9              If we could show the witness 9515, if we call it A.
10    Do you have it, Mr. Carter?  I believe so.
11    Q.    Do you recognize this document?
12              MR. FRANK:  Your Honor, I don't mean to be difficult,
13    but none of the 9,000 series of documents were marked as
14    exhibits.  We don't have them as exhibits.  So I don't know
15    what we're looking at.
16              THE COURT:  He needs a copy before we admit it or
17    before it's offered to be admitted.
18              MR. KENDALL:  Yes, Your Honor, but they're all for
19    impeachment and this is from the government's production as
20    well.
21              MR. FRANK:  Your Honor, they're not being offered for
22    impeachment.  They're being offered as evidence.
23    Q.    Do you recognize 9515?
24              MR. FRANK:  May I have a moment, Mr. Kendall?
25              THE COURT:  Yeah, let him take a look at it.  And this
```

1    is 9515A, right?

2              MR. KENDALL:  Yes, please.

3              MR. FRANK:  I have no objection to 9515 being shown to

4    the witness.

5              THE COURT:  No objection.  It will be admitted.

6    9515A.

7              (Exhibit 9515A admitted into evidence.)

8              MR. KENDALL:  Okay.  If we could go to page 6 of the

9    exhibit, please.  If you could turn it around.

12:33 10   Q.   This is the freshman eligibility report.  Do you see that?

11   A.   Yes.

12   Q.   And would you agree with me there's 19 names on that list?

13   A.   Yes, 19.

14   Q.   Okay.  And Johnny Wilson is listed as being on the

15   eligibility report October 3, 2014?

16   A.   Yes.

17              MR. KENDALL:  Okay.  Go to the next document.

18   Q.   Was there a tradition at the team back in those days that

19   the freshmen had to go out and walk around the campus in their

12:34 20   little Speedo bathing suits?  Do you remember that, before one

21   of the tournaments they would have to go out to where the

22   sororities were and parade around in their Speedos?

23   A.   Yes, it's potentially a right of passage, you know, to be

24   a part of the team.

25   Q.   And they'd go out as a group to do it, correct?

```
 1   A.   That I'm not sure.  We have family parents, team moms that

 2   organize that.  So we don't know if they go singles, pairs.

 3   Q.   Okay.  Can I show you a photograph that should be, I hope,

 4   Exhibit No. 9517?  Do you see that?

 5   A.   Yes.

 6   Q.   And do you recognize that to be members of the freshmen

 7   team in 2014?

 8   A.   Yes.

 9        MR. KENDALL:  I'd like to offer that into evidence,

10   your Honor.

11        MR. FRANK:  Your Honor, we don't have a date on this

12   document.

13        MR. KENDALL:  There's a date right on the top of it.

14        MR. FRANK:  But I don't know who took the picture or

15   whether that's the date.

16        THE COURT:  It will not be fdmitted until further

17   examination.

18   Q.   9517, can you identify the people who are in that

19   photograph?

20   A.   Yes.  Everybody in this photograph are players of our --

21   members of our team that were there every day practicing.  If I

22   start -- excuse me.

23   Q.   And they're freshmen, they're all freshmen?

24   A.   Yes.

25   Q.   And this looks like one of the buildings on USC's campus,
```

12:35  (line 10)
12:35  (line 20)

```
 1   correct?
 2   A.   From the picture, I can't tell which building that is.
 3   Q.   And in October of the season, October 2014, is that when
 4   this right of passage usually takes place?
 5   A.   That I'm not sure.  That happens usually -- it's up to the
 6   team.
 7   Q.   Okay.  And do you recognize Johnny Wilson in this photo?
 8   A.   Yes.  He is in the lower right.  He is the furthest right
 9   member.
12:36 10        MR. KENDALL:  Your Honor, I'd like to offer it into
11   evidence.
12             MR. FRANK:  Your Honor, I don't object to the photo as
13   long as the writing and other photos on the left are redacted.
14             MR. KENDALL:  Certainly the photos on the left should
15   be redacted.
16             THE COURT:  It will be admitted as redacted.
17             MR. KENDALL:  We'd like to keep the date on it, Your
18   Honor.
19             MR. FRANK:  The witness was unable to authenticate
12:36 20   that date, your Honor.
21             THE COURT:  I'll let the date stay.
22             MR. KENDALL:  Thank you.
23   Q.   You know, part of the right of passages in the beginning,
24   they all have their head shaved, correct?
25   A.   Yes.
```

A2847

```
 1   Q.   And so now that we've shown it to the witness -- to the
 2   jury, you can see here their hair was grown in, correct?
 3   A.   Yes, it looks so, yes.
 4   Q.   So it was taken sometime after the team photo was taken
 5   that Mr. Frank showed, correct?
 6   A.   That I'm not sure, depending on when the team photo was
 7   taken and when this photo was taken.
 8   Q.   Okay.  So, okay.  Well, if it's an October date, 2014,
 9   that indicates it's after the team photo, correct?
10   A.   Usually the team photo is taken potentially the first
11   three weeks of the season.
12   Q.   Yeah, so this is about a month later or so?
13   A.   So it is after.
14   Q.   Okay.  Now, if we could show the witness 9623.  This is a
15   glossier version of the photo that Mr. Frank showed you,
16   correct?
17   A.   Correct, that is the photo of the team.
18   Q.   Okay.  And you can see the shaved heads to show it was
19   taken a bit earlier in the season, correct?
20   A.   Correct.
21   Q.   And it's the freshmen with the shaved heads?  The upper
22   classmen --
23        MR. FRANK:  Your Honor, I object to the "earlier in
24   the season" because the witness testified he wasn't clear on
25   that.
```

```
 1              THE COURT:  Sustained.
 2  Q.   This is earlier in the entire season.  I'm not saying
 3  anybody's season.
 4  A.   Usually it's in the first three weeks of when school
 5  starts.
 6  Q.   Now, what was your specific title in the fall of 2014?
 7  A.   It was assistant coach.
 8  Q.   When were you director of player personnel?
 9  A.   I believe the year following.
10  Q.   In 2015?
11  A.   Yes.
12  Q.   Are you sure what year you became director of player
13  personnel?
14  A.   I'm pretty certain that it is 2015.
15  Q.   Did you check any records for that?
16  A.   No.
17  Q.   Okay.  Why is that significant, whether or not you're
18  director of player personnel?
19  A.   So the reason being for the title change is at that point
20  there was an NCAA ruling that there would not be allowed
21  combined programs.  Combined programs ultimately comes down to
22  the number of coaches that are allowed to coach one team.
23  Q.   Okay.  And so when you were director of player personnel,
24  you were not allowed to coach the men's team, correct?
25  A.   Correct.  But I was there every day at practice.
```

```
 1    Q.   Okay.  And one of your interviews with the government you
 2    said was by Zoom, correct?
 3    A.   Correct.
 4    Q.   And Mr. Frank was participating in that, as well as
 5    Mr. Stearns, correct?
 6    A.   Correct.
 7    Q.   And that was when you were in the Gibson Dunn law office
 8    in Los Angeles, correct?
 9    A.   I believe so, yes.
12:39 10    Q.   And you told the agent and prosecutors that from 2012 to
11    2019, you were director of player personnel?
12    A.   I don't recall.
13         MR. KENDALL:  Let me show you a document, and let's
14    see if that will refresh your recollection.  Your Honor, it's
15    an interview report of August 26, 2021.  If I may just approach
16    the witness to show him to refresh his recollection.
17    Q.   If you could look at the yellow highlighted part and read
18    it and then we'll ask if your memory has been refreshed or not.
19    A.   I don't recall.
12:40 20    Q.   Okay.  You don't recall if you said that or not?
21    A.   I don't recall that I said that or not.
22    Q.   Okay.  So you have no -- you're testifying you have no
23    memory of telling Mr. Frank, Mr. Stearns and the agents that
24    were with them that from 2012 to 2019, you worked with the
25    men's water polo team as the director of player personnel?
```

```
 1   A.   I don't recall.
 2   Q.   You don't dispute you said that, you just don't have a
 3   memory if you said it or not?
 4   A.   No, I don't recall what I said.
 5   Q.   You don't recall what you said.  So again, you don't
 6   dispute that you said it.  You just don't have a memory of what
 7   you said?
 8           MR. FRANK:  Objection, Your Honor.
 9           THE COURT:  Sustained.
10   Q.   And you'd agree with me that for every year that you were
11   director of player personnel, you were not allowed to
12   participate in the men's practices, correct?
13   A.   So the role of director of player personnel, you can't do
14   any physical coaching.
15   Q.   Okay.  So you can't --
16   A.   But in participating with practice, I could help set up
17   practice and do other things to help the coaching staff, but I
18   cannot verbally coach one on one with an athlete.
19   Q.   Okay.  So that was an NCAA rule, correct?
20   A.   Correct.
21   Q.   And that rule, would you agree that that rule was passed
22   because a lot of the other teams didn't like how Vavic had so
23   many players and so many coaches on his team?
24           MR. FRANK:  Objection.
25           THE COURT:  Sustained.
```

```
 1   Q.   Did you have the perception that that rule was direct in
 2   the part against the USC team?
 3   A.   No.
 4   Q.   Okay.  It was adopted --  okay.  But you'd agree with me
 5   for whatever time period you were director of player personnel,
 6   you were not allowed to coach the team, correct?
 7   A.   Correct, yes, me physically I cannot coach the team.
 8        MR. KENDALL:  Okay.  I'd next like to show the witness
 9   Exhibit 8005.
12:42 10   Q.   Do you recognize this document?
11   A.   It is an e-mail.
12   Q.   Okay.  And it's an e-mail being sent to the team?
13   A.   To members of the team, yes.
14   Q.   Including you?
15   A.   Yes.  I was cc'd on the e-mail.
16   Q.   And if you look at it, is it the entire team or is it just
17   a subset of the team?
18   A.   It's just a group of the team.
19   Q.   Okay.  And is it the freshmen on the team?
12:43 20   A.   Yes, so that group is the redshirts.
21        MR. KENDALL:  Okay.  I'd like to offer it into
22   evidence, Your Honor.  It goes directly to impeachment.
23        MR. FRANK:  There's been no impeachment, Your Honor,
24   and it's extrinsic evidence, if that.
25        THE COURT:  Objection sustained.
```

```
 1              MR. KENDALL:  Your Honor, I think the statement was
 2      that freshmen redshirts were not used for scouting
 3      responsibilities, and this is impeachment of that, Your Honor.
 4      That was the testimony.
 5              MR. FRANK:  Well, he can use it to refresh his
 6      recollection, Your Honor.
 7              THE COURT:  Yeah, it may refresh his recollection, but
 8      it's not going to be admitted.
 9      Q.   Do you remember testifying earlier that freshmen redshirts
12:43 10   were not used for scouting?
11      A.   Yes.
12      Q.   If you could take a look at Exhibit 8005, please, and read
13      the first part, who it's addressed to, and then if you could
14      read the paragraph that starts under "Hi all."
15      A.   So it is addressed to a group of freshmen.
16      Q.   And does that refresh -- I'm not asking you to read the
17      document out loud.  I want you to read it to yourself, and then
18      I want to ask you a question.  Okay?
19      A.   Okay.
12:44 20   Q.   Have you read that yellow highlighted paragraph?
21      A.   Yes.
22      Q.   Okay.  Does that refresh your recollection that freshmen
23      redshirts were given scouting responsibilities in 2014?
24      A.   That is a mistake.  Scouting responsibilities, the list of
25      names that are on that e-mail was filming responsibilities.
```

```
 1              MR. KENDALL:  If we could show the witness again
 2    Exhibit 8005.  Then I want to show you the attachment to it,
 3    which is Exhibit 9516.
 4    Q.   Do you see freshmen listed on the attachment?
 5    A.   Yes.
 6    Q.   And that's assignments for scouting?
 7    A.   No.  On the top it says, "Morning setup, 8:30 to 11:30."
 8    This is not assignments for scouting.  It says "flag," you
 9    know, "tee flag setup, check in."  That is not considered
10    scouting.
11    Q.   So this isn't scouting, but this is other assignments --
12    the cover e-mail says "scouting" but these are other
13    assignments?
14    A.   Yes, not to do with scouting a game.
15    Q.   Okay.  Would you agree with me that Johnny Wilson was one
16    of the people given an assignment on this schedule?
17    A.   So first of, for the redshirts, you can't mandate an
18    assignment.  It's all by voluntary base, and if they want to be
19    part of the team, they sign up themselves.
20    Q.   So would this indicate Johnny Wilson signed up for a task
21    with the team?
22    A.   Yes, his name is highlighted.
23              MR. KENDALL:  Your Honor, I'd like to offer Exhibit
24    8005 and the attachment 9516.
25              MR. FRANK:  No objection.
```

```
 1              THE COURT:  It will be admitted.

 2              (Exhibit 9516 admitted into evidence.)

 3    Q.   If we could just show the jury the attachment, please.

 4    Actually, let's show him the first page.  Okay.

 5              So this is Marko Pintaric.  Who is he at that point?

 6    A.   He was our associate head coach.

 7    Q.   Okay.  What is he now?

 8    A.   He's the head coach of our program.

 9    Q.   Okay.  And then a lot these names underneath are the

10    freshmen redshirts, correct?

11    A.   Correct.

12    Q.   And then the cc is you and Stefan, the two assistant

13    coaches?

14    A.   Correct.

15    Q.   Then the date is October 9, 2014, correct?

16    A.   Yes.

17    Q.   And it says "SoCal Schedule."  What does "SoCal Schedule"

18    mean?

19    A.   So "SoCal Schedule," SoCal is the name of a water polo

20    tournament, and the attachment that is connected to this is

21    incorrect.

22    Q.   Okay.  So it's a Southern California water polo

23    tournament?

24    A.   Yes, it's hosted by UC Irvine.

25    Q.   It says, "Attached is a SoCal schedule with scouting
```

```
 1   responsibilities.  Please meet as a group and organize best

 2   possible.  We need to do a great job with minimal mistakes.

 3   Plan to come 30 minutes before practice tomorrow for a quick

 4   training and discussion about the weekend.  Thank you."

 5             Now, if we then go to the attachment of 9516, these

 6   are the various assignments that are given, and your point is a

 7   lot of these are not scouting assignments.  They're other

 8   responsibilities, correct?

 9   A.   Correct.

10   Q.   But if we look at that green in the top corner, 8:30 to

11   11:30, we see John Wilson has got a task.  And what would his

12   task be?

13   A.   So I believe to the left it says "morning setup."

14   Q.   Okay.  And underneath it it says "check-in, four players."

15   Would he be one of the four players doing check-in, or would he

16   just be somehow in morning setup?

17   A.   That I'm not sure.

18   Q.   Okay.  And I think you just said a moment ago that if

19   freshmen are doing these type of actions, they volunteer for

20   it?

21   A.   Correct, because we can't mandate redshirts to do things.

22   Q.   Okay.  I want to show you --

23             MR. KENDALL:  Your Honor, I think there's actually an

24   issue with that document.  I will correct it after we take our

25   break.
```

12:48 (line 10)

12:49 (line 20)

```
 1   Q.   9623 you identified earlier.  I don't think we showed it
 2   to the jury.  I'd like to show them a copy of it.  That's the
 3   glossy photo of the team taken you believe in October, correct?
 4   I mean, not in October, September.
 5            THE COURT:  I don't have that document as being
 6   admitted.
 7            MR. KENDALL:  9623, I thought it was, your Honor.  If
 8   not, I'd like to offer it at this point.
 9            MR. FRANK:  No objection.
10            THE COURT:  It will be admitted.
11            (Exhibit 9623 admitted into evidence.)
12   Q.   I'd like to show you a document we'll identify as Exhibit
13   8004.
14            MR. KENDALL:  If we could just show the witness,
15   please.
16   Q.   Okay.  Do you see the series of e-mails at the top for
17   8004?  Do you recognize them as all or at least three of them
18   as USC e-mails?
19   A.   I've never seen this e-mail.
20   Q.   I know you've never seen the e-mail.  I'm just asking if
21   you recognize the e-mail addresses.
22   A.   Yes.  If it is @usc.edu, it is -- you know, you're
23   connected with USC.
24   Q.   And do you recognize John Wilson's e-mail address as the
25   same one we've seen on the prior team e-mails that have been
```

12:50 at line 10
12:51 at line 20

```
 1   circulated?

 2   A.   Yes.

 3          MR. KENDALL:  Your Honor, I'd like to offer this

 4   e-mail.

 5          MR. FRANK:  Complete hearsay, Your Honor, objection.

 6          MR. KENDALL:  It's not for the truth of the matter

 7   asserted, Your Honor.  It's just to show that it was sent.

 8          MR. FRANK:  We object.

 9          THE COURT:  The objection is sustained.

10   Q.   I'd like to show you an exhibit that's 7956.

11          MR. KENDALL:  Actually, these numbers are not right,

12   your Honor.  I apologize.

13          Okay.  Could we show the witness Exhibit 9822.

14   Q.   Do you recognize that?

15   A.   I've never seen that photo.

16   Q.   But do you recognize what event it is?

17   A.   Well, on the back side of the picture it says -- it states

18   "NCAA men's water polo championship."

19   Q.   Did you go to that championship?

20   A.   Yes.

21   Q.   You were there in San Diego where it happened?

22   A.   Yes.

23   Q.   So is this a picture of the tournament that you attended?

24   A.   I was a part of the coaching staff, and yes, that's a

25   tournament that I went to.
```

```
 1              MR. KENDALL:  Your Honor, I'd like to offer this into

 2       evidence, 9822, please.

 3              MR. FRANK:  Could we have a relevance proffer, your

 4       Honor?

 5              THE COURT:  How is it relevant?

 6              MR. KENDALL:  The photos that are going to follow,

 7       your Honor, will show Johnny Wilson there.

 8              MR. FRANK:  No objection.

 9              THE COURT:  It will be admitted without objection.

12:53 10              (Exhibit 9822 admitted into evidence.)

11       Q.   So this you recognize, 9822, as the championship

12       tournament at the end of the 2014 season?

13       A.   Correct.

14       Q.   Is that probably early December?

15       A.   Yes.

16              MR. KENDALL:  Now, if we could show the witness 9824,

17       please.

18       Q.   Do you recognize those two people?

19       A.   I've never seen this picture.

12:54 20       Q.   I didn't ask you if you saw the picture.  Do you recognize

21       the two people?

22       A.   Yes.

23       Q.   Who are they?

24       A.   To my left is Tristan Reinhardt and to the right is Johnny

25       Wilson.
```

```
 1   Q.   Okay.  Is this at the San Diego tournament?

 2   A.   I believe so.  I can't tell the background, but it looks

 3   like those are the bleachers that are behind the pool.

 4   Q.   And it would be accustomed for the freshmen redshirts to

 5   show up in T shirts like that?

 6   A.   Yes, to support the team.  It's an NCAA tournament.

 7             MR. KENDALL:  Your Honor, I'd like to offer 9824 into

 8   evidence.

 9             MR. FRANK:  No objection.

10             THE COURT:  It will be admitted.

11             (Exhibit 9824 admitted into evidence.)

12   Q.   I'd like to next show the witness 9823.  That's also

13   another picture of Johnny Wilson at the NCAA tournament, isn't

14   it?

15   A.   Again, I've never seen this photo, but I believe it is,

16   yes.

17             MR. KENDALL:  Your Honor, I'd like to offer 9823 into

18   evidence.

19             MR. FRANK:  No objection.

20             THE COURT:  It will be admitted.

21             (Exhibit 9823 admitted into evidence.)

22             MR. KENDALL:  If we could show the jury, please.

23   Q.   You see there that's Johnny in the T-shirt on the left?

24   A.   To myself --

25   Q.   My left, the photo's right.  Do you see Johnny is there
```

12:54 (line 10)
12:55 (line 20)

```
 1   with the T-shirt "Trojans SC," correct?
 2   A.   Correct.
 3   Q.   And do you see that's John Wilson, his father, sitting
 4   right over there, next to him at the tournament, correct?
 5   A.   I've never met his father.
 6   Q.   But it's the gentleman sitting right over there.  He has a
 7   mask on.  Would you like him to take his mask off?
 8            MR. FRANK:  We'll stipulate, your Honor.
 9            THE COURT:  It's so stipulated.
10            MR. KENDALL:  Okay.
11   Q.   Now, you testified that you thought Johnny had quit in the
12   middle of the season, correct?
13   A.   Yes, via hearsay from the players.
14   Q.   Well, you see him, he's at the NCAA tournament with the
15   team, correct?
16   A.   But he is on -- he came on his own.
17   Q.   Just answer my question.  You see him at the NCAA
18   tournament with the team, correct?
19   A.   He is there with the other freshmen separate from the team
20   because we're only allowed to travel 16 members to the NCAA
21   tournament and everybody else needs to travel on their own.
22   Q.   Yeah.  So he and a bunch of other redshirts traveled on
23   their own to come down to the tournament, correct?
24   A.   To support the team, yes.
25   Q.   And that's what they're supposed to do, correct?
```

A.    They're not supposed to.  We can't mandate redshirts to
travel or be --

Q.    You can't mandate them, but it's a nice thing to do for
the team, correct?

A.    Well, if you want to be part of the team and show where
your heart is, sure.  Regardless, if you contribute or are a
redshirt, you want to be with the team.

        MR. KENDALL:  Could we show the witness Exhibit 9835.

Q.    Do you recognize this document?

A.    I have never seen this.

Q.    Have you ever seen this kind of form before, though?

A.    No, I've never seen this.

Q.    You're not aware of the freshmen redshirts having some
form to sign up?

A.    No, I'm not aware.

Q.    Okay.  Well, when the freshmen want to go to a tournament
or an event and they can't travel as part of the team, do they
have to -- how do they get their tickets and how do they sign
up to do that?

A.    So it depends on the tournament.  We cannot pay for any,
you know, travel.  We cannot pay for their tickets.  Certain
tournaments we could get -- allow via a pass list, ticket list,
but other tournaments they need to pay for themselves.

Q.    What is the MPSF tournament?

A.    MPSF is the acronym for our conference.

```
 1   Q.   What does it stand for?

 2   A.   Mountain Pacific Sport Federation.

 3   Q.   Okay.  And there was a tournament there in November of

 4   2014, correct?

 5   A.   Yes, so it states.

 6   Q.   And where would that tournament have been held?

 7   A.   I don't recall.

 8   Q.   Okay.  And any of the freshmen going would have to sign up

 9   for tickets to attend the tournament if they wanted to go

12:58 10   support the team, correct?

11   A.   Again, it just depends, it depends on the actual

12   tournament.  Some tournaments we're allowed to use a ticket

13   list.  Even if the prior year they used a ticket list,

14   sometimes that is taken away the year after.

15   Q.   You recognize the e-mail address here as Johnny Wilson's,

16   correct?

17   A.   Yes, I see it, his e-mail there.

18   Q.   And do you know what NMNathletics.com is?

19   A.   I do not.

12:59 20       MR. KENDALL:  Your Honor, I'd offer 9835.

21       MR. FRANK:  Objection.

22       THE COURT:  Sustained.

23       Let me see counsel at sidebar.

24         * * * BEGINNING OF SIDEBAR * * *

25       THE COURT:  Counsel, it's 1:00.  I would like to get
```

```
 1    this witness off the stand.  How much longer do you have on

 2    cross?

 3            MR. KENDALL:  My apologies, your Honor.  The exhibit

 4    numbering is all messed up, and I am embarrassed and humiliated

 5    that happened, and I want to get this done quickly.  May I make

 6    a suggestion?  Can we take a lunch break, do him for a half

 7    hour and then he's gone, he's done, and then we're --

 8            MR. SHEKETOFF:  I have cross.

 9            MR. KENDALL:  Oh, you do?

10            MR. SHEKETOFF:  Yeah.

11            MR. KENDALL:  Okay.  I mean, if I can straighten out

12    the --

13            THE COURT:  You have cross-examination of this

14    witness?

15            MR. SHEKETOFF:  Yes.

16            MR. KENDALL:  If we want to go a little this afternoon

17    or we can do him tomorrow morning, whatever the Court would

18    prefer.

19            MR. FRANK:  The witness is from California, your

20    Honor.

21            THE COURT:  We're going to get him off, but it's not

22    going to end now because Mr. Sheketoff has cross-examination.

23    So we're going to take a lunch break.  I thought we were going

24    to let the jury go, but we're not, and we're not going to have

25    that conference.
```

**A2864**

```
 1              MR. KELLY:  Can we do that tomorrow morning, your

 2    Honor?

 3              THE COURT:  We'll see.  I don't know.

 4              MR. KENDALL:  I'll get this straightened out.  I'm

 5    sorry, Your Honor.

 6                  * * * END OF SIDEBAR * * *

 7              THE COURT:  All right it's 1:00.  Mr. Moon, you may

 8    step down for the time being.  We're going to be in the recess

 9    for lunch for one hour.  I'll ask you to be back here at 2:00.

10              (Jury exits.)

11              THE COURT:  Be seated, counsel.

12              You may step down, Mr. Moon, for the time being.

13              How much longer on this cross, Mr. Kendall?

14              MR. KENDALL:  Your Honor, if I can straighten out this

15    confusion, I hope to get it done in 30 minutes, maybe a few

16    minutes less.

17              THE COURT:  All right.  And how long for you,

18    Mr. Sheketoff?

19              MR. SHEKETOFF:  I believe 20 minutes or less.

20              THE COURT:  All right.  And then there will be some

21    redirect.

22              MR. FRANK:  Briefly.

23              THE COURT:  So it will be an hour before we get this

24    witness off the stand, right?

25              MR. FRANK:  It appears that way.
```

```
 1              THE COURT:  All right.  Do you have Mr. Deckett here?

 2              MR. FRANK:  We do.  He's a very brief witness, your

 3    Honor.

 4              THE COURT:  All right.  We may get through him, but

 5    it's unlikely we're going to have a conference because we're

 6    not going to be able to review this.  We'll see, and I have

 7    also afternoon business as well.

 8              MR. FRANK:  Your Honor, just one brief issue.

 9              THE COURT:  Yes.

01:02 10              MR. FRANK:  The e-mail, the so-called scouting e-mail

11    with the attachment, we're still investigating it, but it

12    appears that that e-mail did not correspond with the attachment

13    that was submitted.  So we would ask that the e-mail be

14    withdrawn as an exhibit and that matter be clarified for the

15    jury.

16              MR. KENDALL:  Your Honor, I think he may be correct.

17    You may remember I said in the middle of my examination I have

18    to straighten out the exhibits.

19              THE COURT:  Why don't you resolve that amongst

01:03 20    yourselves and if we need to correct it before the jury, we

21    will do so.

22              We're in recess until 2:00.

23              (Recess taken 1:02 p.m. to 2:06 p.m.)

24              (Jury enters.)

25              THE CLERK:  Thank you.  You may be seated.  Court is
```

```
 1   now in session.
 2           THE COURT:  Good afternoon, jurors.  We're ready to
 3   resume.
 4           Mr. Moon, you're reminded that you remain under oath.
 5           Mr. Kendall, you may continue with your
 6   cross-examination.
 7   BY MR. KENDALL:
 8   Q.   Good afternoon, Mr. Moon.  I owe you and everybody else in
 9   the courtroom an apology.  I got some of the exhibit numbers
10   mixed up, and I want to go correct that, if that's okay.  To
11   the extent there's some confusion, I want you to take the time
12   to undo whatever confusion I've done.  Okay?
13           MR. KENDALL:  Mr. Carter, if we can show the witness
14   Exhibit 8005.
15   Q.   I'm going to start with the e-mail, and it's the
16   attachment I want to straighten out.  This is the e-mail we
17   discussed earlier.  It was sent on October 9, 2014, from the
18   Assistant Coach Marko Pintaric to a group of, looks like mostly
19   freshmen, correct?
20   A.   Correct.
21   Q.   And it says "SoCal schedule". Then it says "attached is
22   SoCal schedule with scouting responsibilities". And your
23   testimony was that freshmen shouldn't be -- freshmen redshits
24   shouldn't be doing scouting, is that correct?
25   A.   Correct.
```

```
 1    Q.   But this is addressed to a group of redshirt freshmen,
 2    including Johnny Wilson, correct?
 3    A.   Correct.  The term "executing responsibility" is game
 4    film.
 5    Q.   Excuse me?
 6    A.   They go to film games.
 7    Q.   So they would go and just take video of the USC game or
 8    other people's games?
 9    A.   Our games, USC, as well as other games.
10    Q.   So they tape USC playing another team, but they'd also be
11    taking it of two competitors playing as well?
12    A.   Correct.  And once they have that game footage, they give
13    it to the coaching staff.
14    Q.   And fair to say -- is that something they volunteer to do
15    or they can be required to do?
16    A.   So for redshits, it's not mandatory that we tell them it's
17    not mandated.  It's all by a volunteer basis.
18    Q.   We take a look -- I want to show you Exhibit 8007.  I hope
19    this is going to come out right.  This looks like a scouting
20    schedule, filming schedule, for the Southern California
21    tournament, correct?
22    A.   Correct.
23    Q.   It has the various games listed?
24    A.   Correct.
25    Q.   And there's no people signed up for it yet, but it is a
```

1    schedule for people who want to do filming responsibilities,

2    correct?

3    A.    Correct.

4    Q.    And so this was sent to Johnny Wilson on October 9, 2014,

5    correct?

6    A.    As well as the other names that are on that e-mail.

7    Q.    I want to then go back to Exhibit 9524.  And just

8    straighten out the attachments.  Again, this is --

9           MR. KENDALL:  I believe this is in evidence, your

02:09 10    Honor.  I just need to straighten out.

11           MR. FRANK:  I don't believe so.

12           MR. KENDALL:  Then let's not show the jury quite yet.

13    Q.    This is an e-mail from Marko Pintaric, correct?

14    A.    This is my first time seeing this e-mail.

15    Q.    Who's on the cc's?

16    A.    My name is on there but this is the first I'm seeing this.

17    Q.    First time you've ever seen it in your life or preparing

18    for today's testimony?

19    A.    Just for today.

02:10 20    Q.    Fair to say if it was addressed to you back in 2014, you

21    expect you would have received it and read it as part of your

22    coaching responsibilities?

23    A.    I don't recall.

24    Q.    I'm not asking if you remember it.  Would the ordinary

25    practice of you being a coach be that you would have read the

```
 1    e-mail sent to you as part of your coaching job?
 2    A.   Yes.  It's part of my responsibilities, but I receive 50,
 3    75 e-mails a day so.
 4    Q.   Do you try to read all of them, even if you can't remember
 5    them?
 6    A.   I try to, yes.
 7    Q.   You agree with me this e-mail was sent to you and a large
 8    number of people on the team, correct?
 9    A.   Correct.
10    Q.   And it is with respect to assignments for a golf schedule?
11    A.   Correct.
12    Q.   And it would be fair to say that part of the fundraising
13    that the water polo team did was to have a golf tournament?
14    A.   Correct.
15         MR. KENDALL:  Your Honor, I'd like to offer 9524 into
16    evidence.
17         MR. FRANK:  I'm not sure -- it's not impeachment and
18    it's hearsay.
19         THE COURT:  Are you objecting?
20         MR. FRANK:  Yes.  Sorry, your Honor.
21         THE COURT:  Objection's sustained.
22    Q.   If we can take a look at 9516, which is one of the
23    attachments to this exhibit, you see this is the attachment I
24    got confused with earlier?  You see that green box?
25    A.   Yes.
```

```
 1    Q.   If a freshman redshirt is going to help with the
 2    fundraising golf tournament on October 6, 2014, is that
 3    something required or is that something they volunteer for?
 4    A.   They volunteer for.
 5          MR. FRANK:  May I inquire, Mr. Kendall?  Is this in
 6    evidence?
 7          MR. KENDALL:  I'm about to reoffer it.
 8          THE COURT:  It's not in evidence.
 9          MR. KENDALL:  9516 was mistakenly offered with the
10    wrong cover e-mail.
11          MR. FRANK:  You're offering it in conjunction with
12    9524?
13          MR. KENDALL:  I believe that's the appropriate
14    attachment.
15          MR. FRANK:  Then I have no attachment.
16          THE COURT:  As well as to 9524.
17          MR. FRANK:  Yes, your Honor.
18          THE COURT:  All right, 9524 and 9516 are both
19    admitted.
20          (Exhibit 9524 admitted into evidence.)
21    Q.   If we could show the jury first 9524, we see at the top
22    from Marko Pintaric, sent on October 6, 2014.  If we look at
23    the bottom of the "To" list, johnbwil@usc.edu, that's Johnny
24    Wilson's e-mail address at USC?
25    A.   Yes.
```

A2871

```
 1    Q.   That's the e-mail address the team would send all

 2    communications to him with?

 3    A.   Correct.

 4    Q.   If we look at the cc's, it includes Stefan and yourself,

 5    correct?

 6    A.   Yes.

 7    Q.   It says "RE: Golf Schedule".  The attachment is "2014

 8    water polo roster".  Do you see that?

 9    A.   Yes.

10    Q.   It has another reference to a roster.  Then it says

11    "palyers golf schedule", I assume players, is another

12    attachment as well?

13    A.   Yes.

14    Q.   If we look at the e-mail message, it says "Hi all,

15    attached please find the work schedule for tomorrow.  People

16    highlighted in red responded to our e-mail and plan to work.

17    Thank you for your effort and help!  If you see any of the guys

18    not highlighted and they plan to come please let them know to

19    kindly contact us so we can include them to the schedule".

20            You see that?

21    A.   Yes.

22    Q.   Let's go to 9516.  We see in the block in the top right

23    corner in the green, Johnny Wilson is highlighted in red,

24    correct?

25    A.   Yes.  I see his name, yes.
```

```
 1    Q.    So that indicates, as of October 6, 2014, he's
 2    volunteering to participate in one of the fundraising events
 3    for the team, correct?
 4    A.    Correct.
 5           MR. KENDALL:  I'd now like to show the witness
 6    Exhibit 9845.
 7    Q.    Do you recognize this as one of the e-mail addresses one
 8    of the coaches sent to the team?
 9    A.    Yes.  It's an e-mail.
02:14 10   Q.    And it's sent to the team?
11    A.    To the team, yes.
12    Q.    And if you look at the date?
13           MR. FRANK:  Copy of this exhibit, Mr. Kendall?
14           MR. KENDALL:  Your Honor, I'd like to offer 9845.
15           MR. FRANK:  May I have a moment.
16           THE COURT:  Let counsel see it.
17           MR. FRANK:  At this point, I object on hearsay
18    grounds.
19           MR. KENDALL:  It's not for truth of the matter, just
02:15 20   that it was sent, your Honor.
21           THE COURT:  The objection is sustained.
22    Q.    Was it a practice during the season for the coach to send
23    diagrams of plays to the team?
24    A.    To the entire team, yes.
25    Q.    Would you agree with me plays were sent to Johnny Wilson
```

```
 1   as well during the season?

 2   A.   Yes.  We had -- we had an e-mail program that sends blast

 3   e-mails to the entire team.

 4   Q.   I'd like to show you next Exhibit 1116.

 5   Q.   You testified this is an e-mail.  It's not addressed to

 6   you?

 7   A.   Correct.  This is the first time I'm seeing this.

 8   Q.   Alex Garfio is who?

 9   A.   He is our liaison that works under Donna Heinel with the

10   Athletic Deparment and Admissions for the SUBCO process.

11   Q.   Did he handle a lot of the paperwork for the SUBCO?

12   A.   Yes.

13   Q.   Would you also keep track of the decisions and results on

14   the SUBCO process so you'd know who got in and who didn't?

15            MR. FRANK:  Objection.  Foundation.

16            THE COURT:  Sustained.

17   Q.   Did you work with Mr. Garfio at certain points on SUBCO

18   issues?

19   A.   If you're asking working, then the documents that I select

20   I forward it to him.

21   Q.   Okay.  Would he, at times, let you know the results of the

22   SUBCO decisions?

23   A.   The first result would always be to our head coach, and

24   then the head coach would let the rest of the coaching staff

25   know so and so has been admitted, so and so has not been
```

1    admitted.

2    Q.    And Donna Heinel was his boss in charge of the SUBCO

3    process?

4    A.    Donna was Alex's boss, yes.

5    Q.    I'd like to show you what is I believe page 14 of

6    Exhibit 1116.  Just for people's privacy, I've blacked out the

7    names of everybody other than one.  Do you recognize this as a

8    list of these --

9         MR. FRANK:  I object to the description, your Honor.

02:17 10    If it's being used to impeach, he can look at it.

11         THE COURT:  Yes.  Sustained.

12    Q.    Do you recognize this document?

13    A.    This is the first time I'm seeing this.

14    Q.    I'm going to show you a redacted version of it.

15         MR. KENDALL:  Do you have the unredacted version of

16    it, Mr. Carter, or should I use a paper copy?

17         Do you have one, Mr. Carter?  You do not?

18         If I may approach the witness, your Honor.

19         THE COURT:  Yes.

02:18 20         MR. KENDALL:  We're trying to do this under the

21    protective order as required.

22    Q.    I want to show you this document and ask you if you

23    recognize this.

24    A.    Yes.  This is a list of the players that go through the

25    subcommittee process.

```
 1   Q.   For the 2014 season, correct?  If you look at the name on

 2   the bottom, maybe that will help you.

 3   A.   There are 20 other names on here.

 4   Q.   Right.

 5   A.   Yes.

 6        MR. KENDALL:  Your Honor, I'd like to offer this into

 7   evidence.

 8        THE COURT:  You haven't said what this is or put a

 9   number on it or anything.

10       MR. KENDALL:  It's a one -- it's a two page excerpt

11   from Exhibit 1116.

12       MR. FRANK:  Your Honor, we don't object to the list.

13   We object to the cover e-mail, which is hearsay.

14       MR. KENDALL:  That's fine.  If we get the list, I'm

15   not worried about the e-mail.

16       THE COURT:  All right.  So this is a list that is part

17   of 1116?

18       MR. KENDALL:  Yes, your Honor.

19       THE COURT:  It will be admitted as 1116A.

20       MR. KENDALL:  Thank you, your Honor.

21       (Exhibit 1116A admitted into evidence.)

22   Q.   If we can show the jury the redacted version of 1161A, the

23   green sheet -- would it be more helpful for you if I left you

24   the one with the names on it or?

25   A.   This is fine.  Thank you.
```

```
 1          MR. FRANK:  Your Honor, I didn't see that there was an
 2    "A-8".  I believe that needs to be redacted.
 3          THE COURT:  What?
 4          MR. FRANK:  There's a redaction that has a letter and
 5    a number on it.
 6          MR. KENDALL:  We can redact that later, your Honor.
 7          THE COURT:  It should be redacted.
 8          MR. KENDALL:  We've redacted all of the names.  We'll
 9    take that up as well.
02:20 10   Q.   If we take a look at the group of SUBCO approvals for
11    2014, we see Johnny Wilson at the bottom, correct?
12    A.   Correct.
13    Q.   Now let's go -- and you see it says "sport" "MH20".  That
14    means men's water polo?
15    A.   Correct.
16    Q.   And what does "Eth" stand for?
17    A.   I don't see that.
18    Q.   The column next to sport, it says "Eth".
19    A.   Oh, yes.  I see that.  I'm not sure.
02:21 20   Q.   Then it says scholarship, "SCHL", correct?
21    A.   Yes, that's the next column.
22    Q.   Johnny Wilson is one of the ones that's "WO", walk on?
23    A.   Yes.
24    Q.   And the number's 50 or 1.  That's the number of
25    scholarship that he may be getting?
```

```
 1   A.   I don't see that.

 2   Q.   You see "SCHL"?

 3   A.   Yes.

 4   Q.   What are those numbers, 50 or 1 or FA?

 5   A.   So those are the scholarship amounts.

 6   Q.   One percent means you get a book scholarship.  It's an

 7   honorary scholarship?

 8   A.   It's a book scholarship.

 9   Q.   It's like $500?

10   A.   I'm not sure the amount.  You get your books paid for.

11   Q.   It's in the range of that amount, several hundred dollars?

12   A.   I'm not certain.  You get your books for your semester.

13   Q.   "WO" means a walk on, correct?

14   A.   I'm uncertain of that, but -- I'm uncertain of the

15   abbreviation "WO".

16        MR. KENDALL:  If we can go to the next column,

17   Mr. Carter, to where it says GPA.  Let's call out GPA.

18   Q.   That's grade point average, correct?

19   A.   Correct.

20   Q.   If we look at John Wilson's, his is 3.87 as adjusted by

21   the SUBCO, correct?

22        MR. FRANK:  Objection.  No foundation.

23        THE COURT:  If he knows, he can answer.

24   Q.   You see his GPA's 3.87, correct?

25   A.   I see that there, but this is not the information that I
```

1    inputted into this Excel sheet.

2    Q.   I didn't ask if it was.  I'm just going through this list

3    here.  You see in terms of GPA, there's only two higher than

4    him, correct, 4.16 and 4.11?

5    A.   Yes.

6    Q.   So in terms of GPA of the 17 SUBCO candidates, he's number

7    three, correct?

8    A.   On that number scale, yes.

9    Q.   Go to the next column, please.  Actually, jump over to

02:23 10   "Test Scores".  If we look at the test scores there, his test

11   scores for his SAT is 1880, correct?

12   A.   Correct.

13   Q.   There's no 29 for an ACT listed there, is there?

14   A.   It's not listed, but for the subcommittee you have either

15   the SAT score or the ACT score that you can submit to use for

16   admission.

17   Q.   But if you take a look at it in terms of SAT scores, he's

18   number four in that list, correct?  There's a 1940, a 1980 and

19   a 2040, correct?

02:24 20   A.   Correct.

21   Q.   If you look at that 1940, that person has a 29 on the ACT,

22   correct?

23   A.   If that's what that number represents, yes, it is 29.

24   Q.   Okay.  So if Johnny had a 29 on the ACT, he'd actually be

25   tied for number three, correct?

```
 1              MR. FRANK:  Objection to this, your Honor.

 2              THE COURT:  Sustained.

 3    Q.   Would you agree with me one of the issues that's important

 4    to the SUBCO is to have candidates who have strong enough

 5    academics for USC?

 6              MR. FRANK:  Objection.  Foundation

 7              THE COURT:  Sustained.

 8    Q.   Based upon your years of experience of working in

 9    recruiting and working with the SUBCO, have you learned that

02:24 10   academics is an important factor that's used to evaluate

11    candidates?

12              MR. FRANK:  Objection.  Foundation.

13              THE COURT:  If he understands it, he can answer it.

14    A.   Yes.  Absolutely, and with talent ability of every water

15    polo player.

16    Q.   But there is some of the best -- there's two things SUBCO

17    is looking for.  They're looking for people who can meet their

18    academic standards and they're looking for people who can meet

19    athletic standards, right?

02:25 20              MR. FRANK:  Objection to the testifying, your Honor.

21              THE COURT:  Sustained.

22    Q.   If somebody has strong academics, does that make them a

23    more attractive candidate to the SUBCO?

24              MR. FRANK:  Objection.  Foundation.

25              THE COURT:  Sustained.
```

**A2880**

```
 1   Q.   Based upon your years of experience working with SUBCO, if
 2   a candidate has strong academics, does that help their
 3   admissions?
 4   A.   If hand-in-hand if they're a strong water polo talent.
 5   Q.   Would you agree with me sometimes the strongest water polo
 6   talents have very low academics, correct?
 7   A.   No.  We have a handle of players on our team that have
 8   exceptional academic grades and are exceptional water polo
 9   players.
10   Q.   There's somebody here that has a 2.4 GPA, correct, and
11   they got a 70 percent scholarship?  Correct?
12   A.   Yes.  That's stated there, yes.
13   Q.   So that would indicate that the 70 percent scholarship is
14   that's a very strong recruit, correct?
15   A.   Yes.  By the number, yes.
16   Q.   So would you agree that there's a range of talent you get
17   in on the walk on class, correct?
18   A.   No.  I don't understand the range of talent.  Every talent
19   that we presented at subcommittee is talent based and we expect
20   them to contribute every year when they come as a freshman.
21   Q.   But some of those people are getting high scholarship
22   numbers, correct?
23   A.   Depending upon their talent ability, yes.
24   Q.   Yes.  The more talent you have, the higher scholarship you
25   typically get, correct?
```

**A2881**

```
 1    A.   Well, that depends because we only have four and a half
 2    scholarships to work with.  That was across the board.  For
 3    example, if we're going to field a 30 plus roster, we can't
 4    give one full scholarship on on athlete.  We're not going to
 5    have enough players to play a game.
 6    Q.   Right, but you also have to compete for the best players
 7    to give them an attractive scholarship or another school will,
 8    correct?
 9    A.   Yes.
10    Q.   My point being all 17 members of this walk on -- excuse
11    me -- all 17 members of this SUBCO group, they're not all
12    exactly equal in water polo skills, correct?
13    A.   Correct.
14    Q.   Some are better than others, correct?
15    A.   Yes.
16    Q.   Okay.  And if some are not as strong on water polo but are
17    very strong academically, they can be a candidate that the
18    SUBCO will accept, correct?
19              MR. FRANK:  Objection.
20              THE COURT:  Sustained.
21    Q.   You only have four and a half scholarships to give out to
22    what was here, 17 kids, correct?
23    A.   Yes, four and a half scholarships across the board.
24    Q.   And USC, at the time in 2014, was about 50, $60,000 a year
25    to go to?
```

A.    I'm uncertain, but yes.  It's about that.

Q.    So a walk-on candidate that didn't need a scholarship that had high academics and had good water polo credentials was an attractive walk-on candidate, would you agree?

MR. FRANK:  Objection, your Honor.  Speculation.

THE COURT:  Sustained.

Q.    You testified earlier about times in swimming or candidates, and you said 20 seconds would be an exceptionally fast swimmer and belongs on the USC swim team, correct?

A.    Correct.

Q.    22 seconds though is somebody who is a fast member of the water polo team, correct?

A.    Yes.

Q.    Okay.  That was Vavic's e-mail, my fastest guys are in the 22s, or something like that, correct?

A.    Correct, but to explain the difference between a 20 second swimmer and a 22 second swimmer is we -- our conversion is one second is 3 yards.  So if you're 2 seconds slower, that's potentially 6 yards, which is about half the pool length, so 20 seconds is exceptionally fast.

Q.    But 22 seconds is still quite fast on the USC team?

A.    Yes.  It's fast, but not a 20.125.

Q.    I understand your point.  If somebody's swimming in 22 when they're a sophomore in high school, that's a pretty fast high school kid, wouldn't you agree?

```
 1   A.    Yes, and he should be swimming in college.

 2   Q.    Well, I'm not asking what he should be doing.  If

 3   somebody's swimming 22s his sophomore and junior year of high

 4   school, you would view him as a fast water polo player,

 5   correct?

 6   A.    Yes.

 7   Q.    Because in high school he can keep up with the USC team at

 8   just swimming speed, not in the other skills, correct?

 9   A.    There's a handful of players that we recruit and they send

10   us resumes.  Their swim teams are as good.

11   Q.    If you can just answer my question, please.  I just asked

12   you a question about --

13         MR. FRANK:  I object, your Honor.  He was answering

14   the question.

15         THE COURT:  Let him answer his question.

16   Q.    Okay.  Do you know Jack Bowen?

17   A.    I do, yes.

18   Q.    Have you spoken to him?

19   A.    Recently, no.

20   Q.    Have you ever spoken to him about recruiting?

21   A.    We've only chatted as in passing.

22   Q.    And he's the coach of the Menlo School?

23   A.    Yes.

24   Q.    He's also the coach at the Sopen Club?

25   A.    The Sopen Club I've never heard of.
```

```
 1    Q.    The Southern Peninsula Club?  You've never heard of Jack
 2    Bowen's club?
 3    A.    Never heard of Sopen Club.
 4    Q.    You agree with me Jack Bowen is a respected water polo
 5    coach?
 6    A.    Yes.  In the high school community, absolutely.
 7    Q.    Do you know his accomplishments as a college player?
 8    A.    Yes.  He's an Olympian.  He was a goalie at Stanford.
 9    He's a great water polo player.
10    Q.    MVP 2 years in a row at the NCAA tournament?
11    A.    That I'm not certain.
12    Q.    His Stanford team won 2 years in a row at the NCAA
13    championship, correct?
14    A.    I believe so.  That was before my time at USC.
15    Q.    But he's somebody you would view as a highly regarded,
16    highly successful high school water polo coach, correct?
17    A.    Correct.
18    Q.    And would a recommendation from a coach like Jack Bowen
19    that a candidate was good enough to play at USC, would that
20    carry weight?
21    A.    Yes.  Behind his name, yes.
22    Q.    The Stanford Water Polo Club, do you know that?
23    A.    Yes.
24    Q.    Jack Barnaigh or John Barnaigh is the guy who runs it?
25    A.    Correct.
```

| | |
|---|---|
| 1 | Q.   Jack Bowen has nothing to do with Stanford to your |
| 2 | knowledge, correct? |
| 3 | A.   To my knowledge regarding the club? |
| 4 | Q.   Yes. |
| 5 | A.   To my knowledge, no. |
| 6 | Q.   If somebody was a well regarded player at the Stanford |
| 7 | Water Polo Club, would that carry weight with you in terms of |
| 8 | recruiting? |
| 9 | A.   Yes. |
| 02:31 10 | Q.   And that's a club that has serious athletes, correct? |
| 11 | A.   Correct. |
| 12 | Q.   They do well in tournaments? |
| 13 | A.   Yes. |
| 14 | Q.   They have good coaching? |
| 15 | A.   Yes. |
| 16 | Q.   The Menlo School, you know, for a long time was dominating |
| 17 | its league in water polo, correct? |
| 18 | A.   That I'm not a hundred percent sure, but I know the school |
| 19 | has a great program. |
| 02:32 20 | Q.   If somebody was one of the stars at the Menlo School, that |
| 21 | also would be a good credential to evaluate as a walk on, |
| 22 | correct? |
| 23 | A.   If I would have known the name, yes. |
| 24 | Q.   If somebody was All Peninsula Athletic League First Team, |
| 25 | that would be a good credential, correct? |

```
 1    A.    I think that's objective because that's voted within
 2    coaches within the conference.  If that's an accolade a player
 3    has, if you're all conference, all area, sure.  That has some
 4    clout.
 5    Q.    That carries some clout with you if you were recruiting,
 6    correct?
 7    A.    Sure.
 8    Q.    If somebody's playing in U.S. Olympic Development team
 9    events, would that carry some weight with you?
02:32 10    A.    The U.S. Olympic Development Team is, you need to pay
11    money to be a part of.  Yes.  They help you beef up your name
12    per se to put you out there.  You have more opportunities to
13    play, but for us, if we look at water polo players, you can
14    play high school, you can be a great high school player, a
15    great club player, and not involve yourself with the U.S.
16    Olympic Development Program and have the same ability to play
17    at USC.
18    Q.    Sure, but playing there is also a good experience, isn't
19    it?
02:33 20    A.    Sure.
21    Q.    And the National Junior Olympics Tournament Team, being
22    part of that several years in a row, that's also very good
23    experience, isn't it?
24    A.    Yes.  Junior Olympics is the biggest club tournament of
25    the year.
```

```
    1    Q.   And so playing in there many years with a solid team like
    2    Stanford, that would be a good credential, wouldn't it?
    3    A.   It would be great of ultimately what your outcome is.  If
    4    you're winning that tournament, if you're always playing for a
    5    medal, then great.  That Junior Olympic tournament is the one
    6    tournament that's for all club sports teams for the entire
    7    country, so everybody comes together.  You play potentially
    8    nine games in 4 days.
    9    Q.   Did the water polo team ever do trips to Europe?
02:34 10    A.   Yes.  Through NCAA rule, we're allowed one, four and two
   11    every 4 years.
   12    Q.   Typically, Coach Vavic would take the team to Europe and
   13    you'd do a tour of some European countries to train and play?
   14    A.   Every 4 years the entire team goes, yes.
   15    Q.   Now, you testified, I think, about some of the finances
   16    involved in the water polo team.  The team has a budget it has
   17    to live within, correct?
   18    A.   Operating budget, yes.
   19    Q.   If they go outside that budget, they have to raise the
02:34 20    money to pay the difference, correct?
   21    A.   To supplement, yes.
   22    Q.   The funds -- the school actually has several different
   23    bank accounts to control the funds for the team, correct?
   24    A.   That I have no clue about.
   25    Q.   Are you familiar with a water polo gift account?
```

```
 1   A.   I know the name, yes.

 2   Q.   And that's while the coach may have some influence on how

 3   the money's spent, there's actually a business office that

 4   controls the bank account and writes the checks, correct?

 5   A.   That I have no knowledge of.

 6   Q.   You don't know the procedures for approvals for

 7   expenditures?

 8   A.   No.

 9   Q.   I want to go through a few other things.

10        Under the NCAA, can you tell us what's the definition

11   of a redshirt?

12   A.   I'm not a hundred percent certain, but the definition of a

13   redshirt is you show up every day at practice but you cannot

14   compete in games.  The coaching staff did not pay for any

15   travel expenses.  That is all on your own.

16   Q.   And be fair to say a redshirt does not play one second in

17   any game during their redshirt year?

18   A.   Correct.

19   Q.   And the whole idea is they have 4 years of eligibility

20   under NCAA rules, correct?

21   A.   You're allowed 4 years in a 5-year window.

22   Q.   So your first year you don't play in any games, you don't

23   use up any eligibility, correct?

24   A.   Correct.

25   Q.   And so an athlete can develop both physically and skill
```

02:35 (line 10)
02:36 (line 20)

```
 1    wise in that redshirt year and they start their first of

 2    4 years when they're a sophomore at USC, not a freshman,

 3    correct?

 4    A.   Correct.

 5    Q.   They're bigger?

 6    A.   Yes.

 7    Q.   They've had a lot of the advantages of the level of

 8    college coaching that can develop them better?

 9    A.   That's not an advantage.  They're there every day

10    competing with their teammates so.

11    Q.   You agree with me that the USC program's good at

12    developing the athletes?

13    A.   We're the best.

14    Q.   Being the best, you can take a high school kid and develop

15    them quite well over their redshirt year, correct?

16    A.   That depends on the player, does that player buy into our

17    system, does that player understand what we're about, how's his

18    IQ, how's his physical talent.  There's a lot of things that go

19    into it, but ultimately our goal is every redshirt that's there

20    freshman year that doesn't play, it's our job as coaches to

21    develop them to play to ultimately give them the opportunity to

22    play.

23    Q.   In that time frame, Jovan was known for running some of

24    the most physically demanding water polo practices in the NCAA,

25    correct?
```

```
 1   A.   Correct.

 2   Q.   That's his coaching style?

 3   A.   Carries an iron fist for sure.

 4   Q.   He's one of the toughest coaches around?

 5   A.   He's the toughest.

 6   Q.   He's the toughest.  Some of the athletes would quit

 7   because they didn't want to have that level of physical demand

 8   on them, correct?

 9   A.   Some of them do, but that's on them.

10   Q.   Jovan also at that liked to have big rosters, correct?

11   A.   Yes.

12   Q.   36 to as many as 50 athletes on the team?

13   A.   Yes.  The reason why we have big teams and rosters is the

14   nature of our program is all about competition, so you want to

15   make sure you push the person in front of you, and if they

16   don't perform, obviously there's people behind you that are

17   itching to play.

18   Q.   And you can run lots of drills and lots of scrimmages and

19   lots of activity with a big roster having this constant level

20   pushing?

21   A.   Yes.

22   Q.   You testified, I think, earlier with Mr. Frank that the

23   coach controlled the gift account or the coach controlled the

24   bank account.  Do you remember saying that?

25   A.   Yes.  That was to my knowledge, yes.
```

**A2891**

```
 1   Q.   To your knowledge, they control what it's supposed to be

 2   spent for, but you're not saying there were no checks and

 3   controls on it?

 4   A.   I have no idea what goes along with that.

 5   Q.   You're not testifying that the coach can just spend the

 6   money any way they want, correct?

 7   A.   I don't know.

 8   Q.   In addition to being members of the team developing as

 9   athletes, the freshmen walk-ons, they do provide a lot of

02:39 10   support for the team, don't they?

11   A.   Support as in?

12   Q.   They help set up the games?

13   A.   Yes.

14   Q.   They do the filming?

15   A.   Yes.

16   Q.   They're there as a cheering section?

17   A.   Yes.

18   Q.   Do they do other tasks?  We saw they help run the golf

19   tournament?

02:39 20   A.   Yes, but that's the entire team.

21   Q.   What else do the freshmen help out with?

22   A.   At practice, they're there every day to participate in the

23   pool, two, to help little tasks are are on the pool deck, to

24   set up the pool, pump up balls, set up balls, set the game

25   course, help practice, film.  They're there to help.  If it's
```

```
 1   not there in the pool helping drills, they're on the outside
 2   helping.
 3   Q.   Do you recall that Johnny Wilson got a concussion early in
 4   his season at USC?
 5   A.   I was never aware.
 6   Q.   So you know nothing about the concussion?
 7   A.   No.
 8   Q.   You have no idea of what impact that had on his ability to
 9   be in the pool during practices in September or early October?
10   A.   I have no idea.
11   Q.   And you don't know if he was in the weight room or
12   elsewhere doing things when he couldn't be in the pool?
13   A.   No.
14        MR. KENDALL:  I'd like to show the witness Exhibit 79.
15   Excuse me.
16   Q.   Who was the team's trainer?
17   A.   Sandy Olsen.
18   Q.   Would he be -- is it a he or she, Sandy?
19   A.   She.
20   Q.   Would Sandy be the person if somebody had a concussion
21   that would help them deal with it and help bring them back to
22   be practicing as a team?
23   A.   She would be the first point of contact, yes.
24   Q.   I'd like to show you Exhibit 7967.
25        MR. KENDALL:  I'd like to show you Exhibit 7967, the
```

```
 1  witness only, please.
 2  Q.    If we look at the very top, do you know who Minette Carden
 3  is?
 4  A.    Yes.  She's our team mom.
 5  Q.    That would be one of the parents who would help with
 6  organizational tasks to assist the coaches?
 7  A.    Yes, outside the pool.
 8  Q.    And do you recognize this as an e-mail that she would send
 9  out in that capacity?
10  A.    Yes.  It is an e-mail.
11  Q.    And what is the MPSF Tournament?
12  A.    MPSF is the name of our conference.  So that's Mountain
13  Pacific Sports Federation.  The tournament, Minette is
14  referring to the conference tournament.
15  Q.    Long Beach happens to be the location of this particular
16  tournament?
17  A.    Correct.
18        MR. KENDALL:  Your Honor, I'd like to offer this into
19  evidence.
20        MR. FRANK:  Objection.  Hearsay.
21        THE COURT:  Sustained.
22        MR. KENDALL:  Your Honor, it's not for the truth of
23  the matter.  It's to show who it was sent to.
24        MR. FRANK:  Still object, your Honor.
25        MR. KENDALL:  It's also impeachment, I think, your
```

```
 1  Honor.

 2         THE COURT:  Still sustained.

 3  Q.   I'd like to show -- did Coach Vavic have a tradition of

 4  inviting the team to his house for Thanksgiving?

 5  A.   Yes.

 6  Q.   That's, in part, because they're going to be there

 7  practicing that week?

 8  A.   Yes.  We practice before the Thanksgiving team meal, yes.

 9  Q.   And everybody was invited, redshits, everybody?

02:42 10  A.   Correct.

11  Q.   If you could take a look at Exhibit 7972, please.  Can you

12  identify that?

13  A.   It is an e-mail.

14  Q.   Is it an e-mail -- what is the e-mail for?

15  A.   The subject reads "Fwd: You are invited to a Trojan" --

16         MR. FRANK:  Objection, your Honor.

17  Q.   Is it an e-mail to the team?

18  A.   The team is cc'd.

19         MR. KENDALL:  Your Honor, I'd offer 7972 and the

02:43 20  attachment, 7973, into evidence.

21         MR. FRANK:  Same objection, your Honor.

22         THE COURT:  Objection is sustained.

23  Q.   Do you have a memory whether or not Johnny Wilson was

24  invited to Coach Vavic's house for Thanksgiving?

25  A.   I don't recall.
```

```
 1   Q.   If we could take a look at Exhibit 7972 and tell us if
 2   that refreshes your recollection, if you look in the middle of
 3   it.
 4   A.   Yes.  I see his e-mail in there, but that e-mail is to the
 5   entire team.
 6   Q.   So does it refresh your recollection that he, as well as
 7   the entire team, were invited to Coach Vavic's Thanksgiving
 8   event?
 9   A.   The entire team could receive this e-mail, but I don't
10   recall who actually was there.
11   Q.   I didn't ask you who was there.  I asked you who got their
12   invitation.
13           MR. FRANK:  Objection to the argumentation.
14           THE COURT:  Overruled.
15   Q.   You agree with me he was invited to Coach Vavic's house?
16   A.   He was included in the e-mail, yes.
17   Q.   I'd like to show you Exhibit 8027, please.  This is a --
18   do you recognize the e-mail?
19   A.   This is the first I'm seeing this.
20   Q.   If you could take a look on the cc's, do you see your name
21   there?
22   A.   Yes.
23   Q.   Is this an e-mail that was sent to you in January 2015?
24           MR. FRANK:  Can I have a copy, Mr. Kendall?
25   Q.   Was this an e-mail sent to you in July of 2015?
```

```
 1   A.    Yes.  I was cc'd on the e-mail.

 2            MR. KENDALL:  Can we show Mr. Moon the second page,

 3   please.

 4   Q.    Do you recognize the attachment?

 5   A.    Yes.  This is considered a competition record.

 6   Q.    And is this one of the records that the team keeps?

 7   A.    At the end of the year, Compliance asks the coaches to

 8   review so they know who played in games.

 9   Q.    Is this part of keeping track of the redshits?

02:45 10   A.    The entire team is listed under the student athletes, yes.

11            MR. KENDALL:  Your Honor, I'd like to offer 8027 and

12   8028 into evidence.

13            MR. FRANK:  Which is 8028?

14            MR. KENDALL:  8028 is the attachment.

15            MR. FRANK:  No objection, your Honor.

16            THE COURT:  8027 and 8028, which is the attachment to

17   8027, is that right?

18            MR. KENDALL:  8028 is the attachment.

19            THE COURT:  They'll both be admitted.

02:46 20            (Exhibit 8027, 8028 admitted into evidence.)

21            MR. KENDALL:  Thank you, your Honor.

22   Q.    If we can show the jury the first page, please.  It says

23   it's from Marko Pintaric, dated July 21, 2015, -- excuse me --

24   January, not July.  January 2015.  If we look at the

25   attachment, it says "MWP".  I take it that's men's water polo?
```

1   A.   Yes.

2   Q.   "Competition record" for 2014 and 2015.  Then it says

3   Brad.  Who is Brad?

4   A.   He's an assistant compliance director.

5   Q.   "Enclosed are signed and excel copies of 2014 Men's Water

6   Polo Competition record".

7           MR. KENDALL:  Can we look at the second page, the

8   attachment, please.  If we can blow it up a little bit.  We

9   don't need that top section with the name of the games, just

02:47 10   where it says "Student-Athlete", across there.

11   Q.   This is a list of all of the members of the team, correct?

12   A.   Correct.

13   Q.   The greens indicate that they're red shifts, correct?

14   A.   That they haven't played any games in the season.

15   Q.   Does that mean they're redshits?

16   A.   Correct.

17   Q.   And there's 13 of them, correct?

18   A.   Correct.

19   Q.   Johnny Wilson's the one listed last alphabetically,

02:47 20   correct?

21   A.   Yes.

22   Q.   Now, I'd like to show you Exhibit 137, please.  Have you

23   seen this document before?

24   A.   No.

25   Q.   Mr. Frank and the government didn't show it to you?

```
 1    A.    Never seen this document.

 2    Q.    The lawyers that represent USC have never shown it to you?

 3    A.    I've never seen this document.

 4    Q.    So when you testified that somebody on the team's told you

 5    Johnny had quit mid season, you had not seen this document when

 6    you gave that testimony, correct?

 7    A.    I have not seen it, yes.

 8    Q.    I jut want to go through it with you.  It says "Hello

 9    Jovan, I hope that you had a great break and wonderful holiday

02:48 10   season.  I wanted to thank you and illustrate how profoundly

11    appreciate I have I am for the incredible opportunity you have

12    given me here at USC as an individual member on the team as

13    well as a student at this school."

14          Then he says, "unfortunately this was a much bigger

15    commitment than I had planned on making and despite my best

16    efforts, my grades reflected my inability to balance my

17    academic and athletic life.  Along with my academic struggles,

18    I am also still very conscience about my situation regarding my

19    head.  While water polo has gotten me very far in my life and

02:49 20   always played a major role, I must start considering being more

21    careful with my head.  I already have 3 diagnosed concussions".

22          So you had no memory that he got a concussion during

23    the season?

24    A.    No.

25    Q.    And then he says, "with a very likely fourth concussion
```

```
 1    looming in the near future I must start considering my future".

 2              Concussions are a part of water polo, correct?

 3    A.   Yes.

 4    Q.   Players get them?

 5    A.   Players, yes.

 6    Q.   Sometimes they get them more than once?

 7    A.   Yes.

 8    Q.   And at a certain point, they have to decide they've

 9    reached their limit of how many concussions they can risk?

10    A.   Yes.  Depending on the severity, yes.

11    Q.   Then he wrote, "because my body is already starting to

12    burn out from water polo, I need to make sure the same doesn't

13    happen with my head".  Then at the bottom, he says, "for these

14    reasons, I will not be playing water polo this semester and

15    will be focusing on my academic life and my future career in

16    the business world".

17              You were not aware of any of these comments that he

18    had expressed to Coach Vavic prior to getting on the stand

19    today, correct?

20    A.   Fair, unaware.

21    Q.   I'd like to next turn to the topic -- you said that USC

22    does not have any practice players?

23    A.   Yes.  We don't use the term "practice player".  We never

24    used it.

25    Q.   Didn't Coach Vavic use the term "practice players"?
```

**A2900**

```
 1    A.    No.  We don't recruit players for practice players.

 2          MR. KENDALL:  If we can show the witness only

 3    Exhibit 7080.

 4    Q.    I'd like you to read its first half of this page just to

 5    yourself and see if it refreshes your memory.

 6    A.    No.  This is the first time I'm seeing this.

 7    Q.    I understand.  I want you to read the document.  I'm going

 8    to ask if it refreshes your memory and a question I'm going to

 9    ask you.

02:51 10   A.    Okay.

11    Q.    Does that refresh you that Coach Vavic would use the

12    phrase "practice goalies"?

13    A.    No.

14    Q.    So it's your testimony that you've never heard him use

15    that term?

16    A.    We never used the term "practice", "practice goalie".

17    Q.    If he put it in an e-mail, is that something you're saying

18    never could have happened?

19    A.    "Practice goalie", "practice player", never used that

02:51 20   term, because we have -- everybody who we recruit comes to our

21    team that wants to play and compete.

22          MR. KENDALL:  Your Honor, I'd like to offer the first

23    page of Exhibit 7080 as direct evidence for impeachment.

24          MR. FRANK:  Objection, your Honor.

25          THE COURT:  Objection's sustained.
```

**A2901**

```
 1   Q.   I'd like you to take a look at Exhibit 9833.  Would you
 2   agree with me that's a roster for a different sport for the
 3   swim team?
 4        MR. FRANK:  Objection to the description, your Honor.
 5   Q.   Strike that.
 6        Do you recognize this document?
 7   A.   It's the team roster.
 8   Q.   Is it -- for what team?
 9   A.   It's 2013 -- excuse me -- "2012-13 Men's Swimming and
10   Diving Roster".
11        MR. KENDALL:  Your Honor, I offer it into evidence.
12        MR. FRANK:  Objection, your Honor.
13        THE COURT:  Sustained.
14        MR. KENDALL:  If I may have one moment, your Honor.
15        THE COURT:  Yes.
16   Q.   Marko Pintaricis now the head coach at USC for the men's
17   team, correct?
18   A.   He's the head coach for both men's and women's.
19   Q.   How long was he an assistant coach before he was head
20   coach?
21   A.   The years I couldn't tell you.  He's been there since '97
22   as a player and he's moved up the ranks of coaching.
23   Q.   The two of you have coached together for many years,
24   correct?
25   A.   Correct.
```

02:53 (line 10)
02:54 (line 20)

```
 1    Q.    He's now your boss?

 2    A.    He's our head coach, yes.

 3    Q.    Are you aware that the FBI interviewed Coach Pintaric

 4    about this case?  Just yes or no.

 5    A.    No.

 6    Q.    Are you aware that Coach Pintaric has a better memory

 7    about Johnny Wilson's participation than you?

 8              MR. FRANK:  Objection, your Honor.

 9              THE COURT:  Sustained.

10              MR. KENDALL:  No further questions, your Honor.  Thank

11    you.

12              THE COURT:  Cross-examination, Mr. Sheketoff?

13              MR. SHEKETOFF:  Yes, your Honor.  Thank you.

14                 CROSS-EXAMINATION OF CASEY MOON

15    BY MR. SHEKETOFF:

16    Q.    Good afternoon, Coach Moon.

17    A.    Good afternoon.

18    Q.    As I understand your testimony, you've been with USC water

19    polo for over a decade?

20    A.    Correct.

21    Q.    That's been your sole job at USC?

22    A.    As a coach, yes.

23    Q.    How big is the USC Athletic Department?

24    A.    Are you referring to staff members or athletes?

25    Q.    Staff I'm talking about.
```

A2903

```
 1   A.   I couldn't tell you a number, but we have a pretty
 2   extensive staff.
 3   Q.   So how big is just the water polo staff?
 4   A.   We have potentially four coaches: A volunteer coach,
 5   strength staff, our trainer.  So it could be, say, four to 7
 6   people.
 7   Q.   And how many other sports does USC field teams in besides
 8   water polo?
 9   A.   Excuse me?
10   Q.   How many other teams does USC field teams in besides water
11   polo?
12   A.   You just mean other sports, correct?
13   Q.   Correct.
14   A.   So there's -- I believe that we have 19 varsity sports.
15   Q.   Right.  So -- and besides coaches for those 19 sports, and
16   those are men and women, correct?
17   A.   Yes.
18   Q.   So there are 38 different varsity teams?
19   A.   No. It's 19 all in all.
20   Q.   Including men and women?
21   A.   Yes, the same.
22   Q.   So in that 19, you're counting as men's basketball and
23   women's basketball?  Those are two of the 19?
24   A.   Correct.
25   Q.   And your best estimate of the number of coaches in all 19
```

02:56 (line 10)

02:56 (line 20)

1    sports?

2    A.    I'd say 50 plus.

3    Q.    Is it common knowledge in the USC coaching group that

4    there are two ways to keep your job?  You either win or you

5    bring in money?

6    A.    I've never heard that.

7    Q.    Do you have anything at all to do with fundraising?

8    A.    No.

9    Q.    Do you know who does do fundraising for the water polo

02:57 10    team?

11    A.    I know our head coach helps with that, but besides that,

12    no.

13    Q.    Do you know if the Athletic Department has a group called

14    the Trojan Fund whose sole responsibility is to raise money for

15    the Athletic Department?

16    A.    I've heard of the name, but I'm not really aware of what

17    their responsibilities are.

18    Q.    So you've never interacted, to the best of your knowledge,

19    with anyone from the Trojan Fund?

02:57 20    A.    Correct.

21    Q.    Do you know Pat Haden?

22    A.    He was our athletic director.

23    Q.    Have you ever heard of Pat's VIP list?

24    A.    I have not.

25    Q.    So putting aside the coaches and the fundraising arm of

1    USC athletics, how many administrators does USC have in the

2    Athletic Department?

3    A.   I couldn't give you a solid number but we definitely have

4    quite a few.  30 plus would be my guess.  I'm not certain.

5    Q.   And the head of that entire organization would be Pat

6    Haden?

7    A.   Pat Haden runs our Athletic Department.  He's our athletic

8    director, yes.

9    Q.   So USC have an Athletic Compliance office?

02:59 10    A.   Yes.

11    Q.   What -- do you know what the Athletic Compliance office

12    does?

13    A.   Fairly well, yes.  The Athletic Compliance is separated

14    from our Athletic Department.

15    Q.   It's a separate entity?

16    A.   Yes.

17    Q.   And they're in charge of making sure the Athletic

18    Department lives up to NCAA rules and regulations?

19    A.   Per sport, yes.

02:59 20    Q.   At each sport there's different rules and regulations,

21    correct?

22    A.   Each sport does, yes.

23    Q.   So water polo, for instance, you told us the men get four

24    and a half scholarships, correct?

25    A.   Yes.  That's not just USC.  That's all Division 1 water

```
 1   polo.
 2   Q.   And the Compliance Office is there, in part, to make sure
 3   that you only give out four and a half scholarships, correct?
 4   A.   Yes.
 5   Q.   Do you know how many scholarships women's basketball gets?
 6   A.   I do not.
 7   Q.   Does the NCAA regulate the number of team members you can
 8   have on water polo?  You told us that only -- I think you said
 9   16 can go to a tournament, correct?
10   A.   So that 16 was referring to conference only.
11   Q.   So when you go to a conference game, you can only bring 16
12   players, correct?
13   A.   Correct.
14   Q.   Does the NCAA regulate the number of players you can
15   actually have participate on the team as long as they don't go
16   participate in the actual meets?
17   A.   So you're referring to the number of players we have on
18   the team, correct.
19   A.   I'm not hundred percent certain the NCAA does that.
20   Q.   Do you know whose in charge of deciding, let's say, how
21   many players are going to be on the water polo in any given
22   year?  Is it the head coach or the Athletic Department?
23   A.   I'm pretty sure it's the Athletic Department.
24   Q.   And what is the largest number in your experience that the
25   Athletic Department has allowed on the men's water polo team?
```

```
 1   A.   Incoming recruits you're speaking?

 2   Q.   No.  The entire team.

 3   A.   Oh, we've had 30 plus, at some point 40 plus players on

 4   the team.

 5   Q.   So it varies.

 6           Out of curiosity, if I gave you an action picture of

 7   me playing water polo, would that have any meaning to, an

 8   action picture?

 9           MR. FRANK:  Objection, your Honor.

10           THE COURT:  Overruled.  If he understands the

11   question, he can answer.

12   Q.   Let me back up.  If you were going to recruit somebody

13   like me, you would actually want to see film of me competing,

14   right?

15   A.   Yes.

16   Q.   Or a game of me competing, correct?

17   A.   Yes.

18   Q.   An action picture wouldn't tell you much of anything,

19   correct?

20   A.   An action picture, no.

21   Q.   Do you have an understanding of why SUBCO required an

22   action picture to be on the application for a scholarship or

23   walk on athlete?

24   A.   No.

25   Q.   Did that strike you as silly?
```

|    |    |
|----|----|
| 1  | MR. FRANK:  Objection. |
| 2  | THE COURT:  He can answer it. |
| 3  | A.  No. |
| 4  | Q.  Why would you want an action picture on an application if |
| 5  | you were on SUBCO? |
| 6  | A.  Just to validate that so and so plays that respective |
| 7  | sport. |
| 8  | Q.  But it wouldn't tell you anything about how good or bad |
| 9  | they were, would it? |
| 03:02 10 | A.  No. |
| 11 | Q.  I mean -- okay. |
| 12 | MR. SHEKETOFF:  Can I have Exhibit 1219 just for the |
| 13 | witness. |
| 14 | Q.  Do you know who Scott Simon is? |
| 15 | A.  Yes. |
| 16 | Q.  And who is Scott Simon? |
| 17 | A.  He's the director of the Compliance Department. |
| 18 | Q.  So his concern would -- his field of concern would include |
| 19 | scholarship athletes? |
| 03:03 20 | A.  As he oversees all compliance of a sport.  Yes, that's |
| 21 | something he would check. |
| 22 | MR. SHEKETOFF:  I would offer this, your Honor. |
| 23 | MR. FRANK:  Objection.  Hearsay. |
| 24 | MR. SHEKETOFF:  I'm not offering it for the truth of |
| 25 | the matter.  I'm offering it for the fact that this was Scott |

```
 1   Simon's state of mind and also for the fact that since it's to

 2   Donna Heinel, what she understood from Scott Simon, not the

 3   truth.  This is what he told her.

 4          MR. FRANK:  Your Honor, Scott Simon's state of mind is

 5   not at issue.  This is an irrelevant document and this witness

 6   has never seen it.

 7          THE COURT:  The objection's sustained.

 8          MR. SHEKETOFF:  Just for the witness, can I have 1219

 9   back.

10   Q.   You've never seen this e-mail?

11   A.   I've never seen this.

12          MR. SHEKETOFF:  Can I go to the next page portion of

13   the document.

14   Q.   Have you ever seen any spreadsheet like this where there's

15   a discussion of the recruited athletes?

16   A.   No.  I've never seen anything like this.

17          MR. SHEKETOFF:  Please take it down.

18          Can I have Exhibit 105, government's Exhibit 105.

19   Q.   This is something Mr. Frank showed you during your direct

20   examination.  Do you recall that?

21   A.   Yes.

22   Q.   Mr. Frank suggested to you that the word "legid" is

23   actually legit.  Do you recall that?

24   A.   He didn't suggest.  He stated that it was legit.

25   Q.   Do you know a word -- do you know the meaning of the word
```

```
 1   "legid"?  Do you agree with Mr. Frank that that's actually

 2   legit?

 3   A.   I don't know the word "legid".  I would agree with

 4   Mr. Frank that he was getting to legit, yes.

 5   Q.   Mr. Vavic, Coach Vavic, said -- he wrote "legid".  But you

 6   agree with Mr. Frank that you think he meant legit, correct?

 7   A.   Yes.

 8   Q.   And this is to Alex Garfio.  You already explained Alex

 9   Garfio worked for the Athletic Department under Donna Heinel as

10   a coordinator with SUBCO, which is the Admissions Department?

11   A.   Correct.

12   Q.   Do you have an understanding why your former Coach Jovan

13   Vavic would tell Alex Garfio that someone was a legit walk on?

14   A.   I do not.

15   Q.   Are there illegitimate walk-ons that Mr. Vavic would talk

16   to Mr. Garfio about, to your knowledge?

17   A.   No.  Every recruited athlete, walk on or not, scholarship

18   or not, was a water polo player.

19   Q.   So you don't have an understanding of why of all the words

20   that he could have picked he described this walk on as legit?

21   A.   I have no clue.

22        MR. SHEKETOFF:  Thank you, sir.

23        THE COURT:  Any redirect, Mr. Frank?

24        MR. FRANK:  Briefly, your Honor.

25             REDIRECT EXAMINATION OF CASEY MOON
```

```
  1    BY MR. FRANK:

  2    Q.   Mr. Moon, have you ever heard the expression "that guy is

  3    legit"?

  4    A.   Yes, if you were talking about exceptional players, yes.

  5    Q.   So legit can be exceptional?

  6    A.   Legit could be the real deal.  Obviously, it's a

  7    subjective term, but if you were speaking of athletes or

  8    players that are legit, you would hear they're the real deal

  9    for sure.

03:07 10   Q.   You were asked some questions by Mr. Kendall about Jack

 11    Bowen and the Stanford Water Polo Club.  Do you recall those

 12    questions?

 13    A.   Yes.

 14         MR. FRANK:  Can we take a look at Exhibit 107 at

 15    page 2, please.

 16    Q.   Now, this write-up was based on Johnny Wilson's athletic

 17    profile that had been sent to you and on what Coach Vavic told

 18    you, correct?

 19    A.   Correct.

03:08 20   Q.   Did Coach Vavic tell to you put anything in there about a

 21    reference from Jack Bowen?

 22    A.   No.

 23    Q.   Did he tell you anything about Jack Bowen recommending

 24    Johnny Wilson?

 25    A.   No.
```

```
 1   Q.   If we can take a look at 1116A.
 2           MR. FRANK:  Mr. Kendall, that was in evidence?
 3           MR. KENDALL:  1116A I believe is.
 4           MR. FRANK:  Thank you.
 5   Q.   1116A, you were asked some questions about the grade point
 6   averages and test scores of these water polo recruits relative
 7   to Johnny Wilson?
 8   A.   Yes.
 9   Q.   The other water polo recruits were all recruit, right?
10   A.   On this list, there are some legitimate real deal water
11   polo players, absolutely.
12   Q.   And the other water polo players who were recruited in the
13   fall of 2014, they all showed up for practice, correct?
14   A.   Yes, every day.
15   Q.   Only Johnny Wilson didn't?
16   A.   I only recall meeting him on the first day.
17   Q.   So grade point averages, would you agree with me, of water
18   polo players or athletic recruits generally tend to be lower
19   than the general population at USC?
20   A.   In the general population, you mean the other --
21   Q.   Nonathletes.
22   A.   Nonathletes, yes.
23   Q.   So having a high grade point average or test score
24   comparable to other athletes doesn't mean a whole lot if you're
25   not an athlete, right?
```

```
 1   A.   Yes.
 2   Q.   And it's easier to get in as an athlete than as a
 3   nonathlete, right?
 4   A.   No.
 5   Q.   If you're an exceptional athlete?
 6   A.   And you've got to be great in the classroom.
 7   Q.   You were asked some questions about whether you were aware
 8   of Johnny Wilson having a concussion.  Do you recall those
 9   questions?
10   A.   Yes.
11   Q.   You were asked whether you knew whether he was in the
12   weight room when you were at practice.  Do you recall that?
13   A.   Yes.
14   Q.   Do you ever recall seeing him in the weight room?
15   A.   Never.
16   Q.   You go to the weight room?
17   A.   Yes.
18   Q.   Does the team go to the weight room?
19   A.   Yes.  As a whole, yes.
20   Q.   Are you around the team when they're in the weight room?
21   A.   Yes.
22   Q.   Ever see Johnny there?
23   A.   No.
24   Q.   Have other players on the water polo team suffered
25   concussions during your time there?
```

**A2914**

```
 1   A.   Yes.  We currently have one of our players who has a

 2   concussion now, but he doesn't help us in the pool due to his

 3   concussion, but he's there helping around the pool deck every

 4   day.

 5   Q.   So players with concussions still show up to practice?

 6   A.   Yes.

 7   Q.   You were asked some questions about whether you had been

 8   shown an e-mail that you weren't on from Johnny Wilson to Coach

 9   Vavic quitting the water polo team in January 2015.  Do you

10   recall those questions?

11   A.   Yes.

12   Q.   And he quit the water polo team, according to that e-mail,

13   after the first semester of his freshman year?

14   A.   To my knowledge, yes.

15   Q.   I didn't show you that e-mail, right?

16   A.   No.

17   Q.   You weren't on that e-mail, right?

18   A.   No.

19   Q.   Were you aware that Johnny Wilson's father was told by

20   Rick Singer that he only needed to stay on the team for

21   one semester after he was recruited as a walk-on athlete and

22   then he could just walk away?

23   A.   I was never told that.

24   Q.   I didn't show you that e-mail either?

25   A.   No.
```

```
 1              MR. FRANK:  If we could, Mr. Carter, if you wouldn't
 2    mind, call up 8028, please.
 3    Q.   Do you see 8028, Mr. Moon?
 4    A.   Yes.
 5    Q.   Mr. Kendall asked you some questions about the players
 6    highlighted in green who didn't play in any games.  Do you
 7    recall those questions?
 8    A.   Yes.
 9    Q.   It means very little that a redshirt doesn't play in any
10    games, right, in their freshman year?
11    A.   Yes.  They show up to practice every day.  This list just
12    showed that they participated in games or not.
13    Q.   As a redshirt, they're not allowed to play in games,
14    right?
15    A.   They're not allowed, yes.
16    Q.   They're still required to go to practice?
17    A.   Absolutely.
18    Q.   Besides Johnny Wilson, did the other redshits in green
19    show up to practice?
20    A.   Absolutely.
21    Q.   By the way, would you refer to a redshirt as an immediate
22    impact player?
23    A.   No.
24    Q.   Why not?
25    A.   Because if you're an immediate impact player, you join our
```

```
 1   team, you have the ability to contribute and play games right
 2   away.
 3   Q.   You were asked some questions about what your status was
 4   on the water polo staff in 2014.  Do you recall those
 5   questions?
 6   A.   Yes.
 7        MR. FRANK:  Could we, for the witness only, take a
 8   look at 751, please.
 9   Q.   Mr. Kendall was suggesting that you were, in fact, not an
10   assistant coach, but the director of player operations in 2014.
11   Do you recall that?
12   A.   Yes.
13   Q.   Do you see the media guide for 2014?
14   A.   Yes.  This is the cover.
15        MR. FRANK:  Miss Lewis, could you go to page, I think
16   it's 9.
17        MR. KENDALL:  I don't think this is in evidence, your
18   Honor.
19        MR. FRANK:  It's for the witness only.  I'm sorry.
20   Can you go to the prior page and the page before that.  I'm way
21   off.  Can you go to the page before that and before that and
22   before that and before that.  There we go.
23   Q.   You see this page from the 2014 Men's Water Polo Media
24   Guide?
25   A.   Yes.
```

```
 1    Q.   And it lists the staff of the water polo team?

 2    A.   Yes.

 3    Q.   In 2014?

 4    A.   Correct.

 5    Q.   Does this refresh your recollection that you were, in

 6    fact, the assistant coach on the team in 2014?

 7    A.   Yes.

 8    Q.   And not the director of player operations?

 9    A.   Correct.

10         MR. FRANK:  Your Honor, the government now offers 751.

11         MR. KENDALL:  No objection, your Honor.

12         THE COURT:  It will be admitted.

13         (Exhibit 751 admitted into evidence.)

14         MR. FRANK:  If we can show that page to the jury.

15    Q.   It shows you as assistant coach, right?

16    A.   Correct.

17    Q.   And, as the assistant coach, you're on the pool deck every

18    day and working with the players each and every practice,

19    correct?

20    A.   Correct.

21    Q.   6 days a week?

22    A.   6 days a week every day, yes.

23         MR. FRANK:  Can we look at 9516, please.  Sorry I keep

24    going back and forth.  That's for you, Mr. Carter.  We can show

25    this to the jury as well.  I believe this is in evidence.
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Q.   Do you recall, Mr. Moon, Mr. Kendall asking you questions |
|       | 2  | about this sign up to work at a golf tournament?             |
|       | 3  | A.   Yes.  The sign up is all volunteer.                      |
|       | 4  | Q.   You don't actually know who showed up for the golf       |
|       | 5  | tournament, right?                                            |
|       | 6  | A.   No.                                                      |
|       | 7  | Q.   Fair to say that a golf tournament is not a water polo   |
|       | 8  | practice?                                                     |
|       | 9  | A.   Correct.                                                 |
| 03:16 | 10 | MR. FRANK:  Mr. Carter, if we can look at 9517,               |
|       | 11 | please.                                                       |
|       | 12 | Q.   Mr. Kendall showed you this photograph which suggested, I |
|       | 13 | believe, members of the water polo team when they run around |
|       | 14 | campus in their bathing suits?                               |
|       | 15 | A.   Yes.                                                     |
|       | 16 | Q.   And this conclusively shows that Johnny Wilson purchased a |
|       | 17 | men's water polo bathing suit, correct?                       |
|       | 18 | A.   He has the suit on, yes.                                 |
|       | 19 | Q.   He's got it on, right?                                   |
| 03:17 | 20 | A.   Correct.                                                 |
|       | 21 | Q.   He's sort of standing a little bit apart from the other |
|       | 22 | members of the team in this photo?                           |
|       | 23 | A.   Yes.                                                     |
|       | 24 | Q.   This isn't a practice either, right?                     |
|       | 25 | A.   No.                                                      |

```
 1    Q.   Just a social event?

 2    A.   Yes.

 3              MR. FRANK:  Could we look at 9822.  Thank you.

 4    Q.   This was a photograph of the NCAA Men's Water Polo

 5    Championship?

 6    A.   Correct.

 7              MR. FRANK:  I think it was 9823 was the next.

 8              What was the other photo with the other student?

 9    Q.   In any event, this photo conclusively shows that Johnny

03:18 10   Wilson went to the NCAA Championship at the end of the program,

11    right?

12    A.   Yes.

13    Q.   A festive event would you say?

14    A.   Yes.  Every member that is not traveling on that 16-man

15    roster, if you're a part of the team, you want to go support

16    your team win a national championship, absolutely.

17    Q.   He's wearing a water polo shirt?

18    A.   Yes.

19    Q.   But he's not playing, right?

03:18 20   A.   No.

21    Q.   And it's not a practice, right?

22    A.   No.

23    Q.   And he's there with his dad, right?

24    A.   Appears to be, yes.

25              MR. FRANK:  Could we look at 9623, please.
```

```
 1    Q.   By the way, Mr. Kendall asked you a bunch of questions

 2    about a series of e-mails that were sent out to the men's water

 3    polo team.  Do you recall those questions?

 4    A.   Yes.

 5    Q.   Those were blast e-mails, right?

 6    A.   Correct.  We have an e-mail program, yes.

 7    Q.   So if your name's on the roster, you get the e-mail,

 8    right?

 9    A.   Correct.

10    Q.   If your name's on the roster, you get invited to

11    Thanksgiving, right?

12    A.   Correct.

13    Q.   It doesn't mean you go to practice, right?

14    A.   No.

15    Q.   And if we look at this photograph, again, this is not a

16    practice?

17    A.   No.

18    Q.   Do you know each of the players in this photograph?

19    A.   Absolutely.

20    Q.   Do you know their names?

21    A.   Yes.

22    Q.   Do you know where they're from, where they went to school?

23    A.   Yes.

24    Q.   You know what position they play?

25    A.   Fairly well, yes.
```

```
 1   Q.   And you know whether or not you saw them when you were at
 2   practice?
 3   A.   Yes, absolutely.  If they were there every day in the
 4   pool, I would recognize them a hundred percent.
 5   Q.   Let's go through the back row, starting from the back row
 6   right.  This individual, who is that?
 7   A.   That's Tyler Heffernan from Santa Barbara.  He went to
 8   Santa Barbara High School.
 9   Q.   And that whole back row, those are redshirt freshmen?
10   A.   Yes.
11   Q.   And did Tyler Heffernan show up for practice?
12   A.   Yes, every day.
13   Q.   And who is this gentleman?
14   A.   That's Andrew Mericle from Coto de Caza.
15   Q.   Did he go to practice?
16   A.   Every day.
17   Q.   Who's this gentleman?
18   A.   Next to him is Tristan Reinhardt from Murrieta,
19   California.
20   Q.   Did he go to practice?
21   A.   Every day.
22   Q.   Who's this gentleman?
23   A.   Colby Watson from Newport Beach.
24   Q.   Did he go to practice?
25   A.   Every day.
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Q.   What about this guy?                                          |
|       | 2  | A.   That's Jake Sanders from Santa Ana.  He went to Mater Dei     |
|       | 3  | High School.                                                       |
|       | 4  | Q.   What about this guy?                                          |
|       | 5  | A.   Zach Traversi from Rancho Palos Verdes.  He went to Loyala    |
|       | 6  | High School.                                                       |
|       | 7  | Q.   Did both of those guys go to practice?                       |
|       | 8  | A.   Every day.                                                    |
|       | 9  | Q.   What about this guy?                                          |
| 03:20 | 10 | A.   Tim Leong from Honolulu, Hawaii.  I believe he went to        |
|       | 11 | 'Iolani High School.                                               |
|       | 12 | Q.   Did he go to practice?                                        |
|       | 13 | A.   Every day.                                                    |
|       | 14 | Q.   By the way, could you answer that question for all the        |
|       | 15 | other players on the team?                                         |
|       | 16 | A.   All the other players sitting there, yes.                     |
|       | 17 | Q.   What about this guy in the back left, Johnny Wilson?  Did     |
|       | 18 | he go to practice?                                                 |
|       | 19 | A.   I just remember seeing him on the very first day.             |
| 03:21 | 20 | Q.   Did he have an immediate impact on the USC men's water        |
|       | 21 | polo team?                                                         |
|       | 22 | A.   No.                                                           |
|       | 23 | MR. FRANK:  No further questions.                                  |
|       | 24 | THE COURT:  Recross?  Mr. Kendall?                                 |
|       | 25 | RECROSS-EXAMINATION OF CASEY MOON                                  |

```
 1   BY MR. KENDALL:

 2   Q.   You say you have no memory of Johnny Wilson after the

 3   first day, correct?

 4   A.   Correct.

 5   Q.   And you have absolutely no knowledge of him being out with

 6   a concussion and not cleared to play until sometime in October,

 7   correct?

 8   A.   No knowledge.

 9   Q.   You have no knowledge of Sandy Olsen taking care of him

10   and dealing with him until he could get cleared to return to

11   play to water polo?

12   A.   No knowledge.

13        MR. KENDALL:   I'd like to show the witness an exhibit

14   marked as 9700.   I don't think that's the correct exhibit.

15   Give me one second, please.

16        I'd like to show for the witness only -- I think I

17   should do it from the Elmo?

18   Q.   What is the Keck Medical Center?

19   A.   This is the first time seeing this.

20   Q.   I'm not asking you anything about this document.   I'll

21   turn it off for a moment.   What is the Keck Medical Center?

22   A.   That is our umbrella medical school, medical hospital.

23   Q.   Okay.   And do injured water polo players with concussions

24   go to Keck Medical Center?

25   A.   After all of our athletes get evaluated in house through
```

```
  1   our athletic trainer, as well as our athletic medicine
  2   department, and depending on the severity of any injury, they
  3   get referred to the Keck Medical Center, yes.
  4   Q.   And do you know if Dr. McCleary was one of the doctors who
  5   took care of people with concussions?
  6   A.   I do not.
  7   Q.   Do you know if Leslie Weiner -- strike that.
  8        Do you know Leslie Weiner Neurologic Care and Research
  9   Center is where a lot of the people with concussions went from
03:24 10   the team?
 11   A.   I do not.
 12   Q.   I'd like to show you this document marked as Exhibit 9970.
 13        MR. KENDALL:  For the witness only, please.
 14   Q.   I want you to read the section that I'm going to point out
 15   to you.  Just read it to yourself, not out loud.
 16        Sandy Olsen is the athletic trainer to the team?
 17   A.   Yes.  This is the first I'm seeing this.
 18   Q.   If you can just read down here in the bottom.  Does that
 19   refresh your memory that Johnny Wilson had a concussion and
03:25 20   wasn't cleared to return to play until well into the season?
 21   A.   No.  I have no recollection.
 22   Q.   You're not disputing that that occurred, did you?  You're
 23   just saying you don't remember?
 24        MR. FRANK:  I object to the "not disputing".  He said
 25   he had no recollection.
```

```
 1              THE COURT:  Sustained.
 2    Q.   You just have no recollection of whether he had a
 3    concussion, correct?
 4    A.   Correct.
 5    Q.   And you have no recollection that Sandy Olsen was
 6    overseeing his concussion care until he could return to play?
 7    A.   I have no recollection.
 8    Q.   And you have no recollection of the coaches informing the
 9    medical staff at Keck Medical Center that they wanted to know
03:25 10   when Johnny would be cleared because they wanted him to come
11    back to practice once he was cleared from his concussion?
12    A.   I have no recollection.
13    Q.   And fair to say that to the extent that Johnny had any
14    concussion or other issues in that fall season, you just had no
15    involvement with it, correct?
16    A.   If there was injuries to our players that showed up every
17    day, our coaching staff would know.  I would see it.
18    Q.   If you could answer my question, please.
19              MR. FRANK:  He was answering the question.
03:26 20            THE COURT:  Let him finish.
21    Q.   My question is --
22              MR. FRANK:  He was answering the question.
23              THE COURT:  Let him finish.  Are you finished with
24    your answer?
25    A.   So if there's player that's show up every day at practice
```

```
 1    and they, God forbid, have an injury, if they show up every day
 2    at practice, us coaches can see that something's happened, but
 3    I have no recollection of Johnny Wilson and his concussion.
 4    Q.    You have no recollection of his concussion or Sandy
 5    Olsen's involvement with his treatment or requesting the
 6    medical staff when would he be cleared to return to play.  You
 7    just don't know anything about that topic, correct?
 8    A.    I have no recollection of his concussion.  He was never at
 9    practice.  If he was at practice and something happened, then I
 10   would have seen it, but I've never seen him at practice so I
 11   have no recollection of his concussion.
 12   Q.    I'm not saying he got the concussion at practice.  I'm
 13   saying the -- I'm asking you whether or not there was a
 14   concussion that kept him from practice.
 15   A.    I have no recollection he even had a concussion.
 16          MR. KENDALL:  May I have one moment, your Honor.
 17          THE COURT:  Yes.
 18          MR. KENDALL:  I have no further questions.
 19          THE COURT:  Mr. Sheketoff.
 20          MR. SHEKETOFF:  Thank you, Judge.
 21              RECROSS-EXAMINATION OF CASEY MOON
 22   BY MR. SHEKETOFF:
 23   Q.    Could I have Exhibit 105 up again.
 24          So is it your testimony that the former head coach,
 25   Mr. Vavic, said legit walk on because he was puffing him up?
```

```
        1   A.    No.   I'm just reading what his e-mail said.

        2   Q.    Well, Mr. Frank suggested to you that legit means really

        3   really something, right?

        4   A.    He was just saying it in his own words.

        5   Q.    The opposite of legitimate is illegitimate, correct?

        6   A.    Correct.

        7   Q.    Why would Jovan Vavic tell Alex Garfio that a walk on --

        8           MR. FRANK:   Objection, your Honor.

        9           THE COURT:   Finish the question.

03:28  10   Q.    -- that a walk on was actually legit?

       11           MR. FRANK:   Objection.

       12   Q.    Why would he do that?

       13           THE COURT:   Sustained.

       14   Q.    Do you have an understanding of why he would do that?

       15   A.    No.

       16   Q.    I thought you told this jury that all your walk-on

       17   recruits were exceptional athletes?

       18   A.    They are, that participate in practice every day to vie

       19   for a spot to play in a game.

03:29  20   Q.    That's what your walk-ons are, because you only have four

       21   and a half scholarships to give out, correct?  I mean, water

       22   polo relies on walk-ons, correct?

       23   A.    Due to the number of scholarships, yes, because we only

       24   have four and a half to work with.

       25   Q.    And you're allowing to take 16 to a conference game,
```

1   correct?

2   A.   Per rule, yes.

3   Q.   So you need walk-ons.  Four and a half is not 16, correct?

4   A.   Correct, yes.

5   Q.   So why in the world would Vavic pick the word "legit" to

6   tell the liaison with SUBCO about any walk on?

7           MR. FRANK:  Objection.

8           THE COURT:  Sustained.

9   Q.   Do you know if the Athletic Department top administrators

03:30 10   permitted coaches to raise money by getting donations for

11   walk-on recruits?

12   A.   I have no idea.

13          MR. SHEKETOFF:  Thank you.

14          THE COURT:  Thank you, Mr. Moon.  You may step down.

15          We are going to break for the day, jurors.  I'm going

16   to ask you to be back here at 9:00 a.m. tomorrow morning,

17   however, the good news is that it may not be a full day for

18   you.  We may be able to give you a part of tomorrow off.  It

19   will depend on the way the case goes in, but we have some legal

03:30 20   business that we are going to need to work on tomorrow outside

21   of your hearing.  I'm hopeful that we will not have a full day

22   tomorrow.  I can't be held to any promises, but I am very

23   confident that we will not be going for a full day tomorrow.

24          As we get closer to the end of the evidence, it is

25   more and more important each day that you honor my instructions

```
 1    about not talking about this case with anybody else, not trying

 2    to do any independent research because you haven't heard all

 3    the evidence yet.  You almost have, but not all of it.  You

 4    haven't heard closing arguments.  You haven't heard my

 5    instructions to you on the law, all of which are important

 6    before you retire to deliberate on this case.

 7            So please honor my questions as we get closer to end

 8    of this case.  It's more and more important each day.

 9            I'll see you back here tomorrow morning at 9:00 a.m.

10    Have a pleasant rest of the day.

11            THE CLERK:  All rise for the jury.

12            (Jury exits.)

13            THE COURT:  Be seated, counsel.  Tomorrow's outlook

14    will be what?  Mr. Deckett, Miss Ranahan and Miss George, is

15    that correct?

16            MR. FRANK:  Yes, your Honor.  In theory, we could

17    avoid Mr. Deckett's testimony if there were a stipulation that

18    the three relevant universities received more than $10,000 in

19    federal funding in any one year, but if not, that will be about

20    15 minutes of testimony.

21            THE COURT:  All right.  Remind me again of

22    Miss Ranahan's direct was going to be how long?

23            MS. KEARNEY:  About 45 minutes plus or minus.

24            THE COURT:  And Miss George's?

25            MS. WRIGHT:  About an hour, plus or minus.
```

03:31 10

03:32 20

```
 1              MR. KELLY:  Your Honor, we have conveyed to the
 2    government certain objections about those charts.
 3              THE COURT:  About those what?
 4              MR. KELLY:  The charts that Miss George apparently
 5    intends to testify about.  We'll try to go back and forth with
 6    the government before tomorrow on it.
 7              THE COURT:  All right.  We are still confident that
 8    we're going to finish the government's case tomorrow?
 9              MR. FRANK:  Well, based on the length of the direct,
03:33 10   yes.
11              THE COURT:  Okay.  Anything else needs to come to my
12    attention before we adjourn for the day?
13              MR. KELLY:  No, your Honor.
14              MR. KENDALL:  Your Honor?  It was unfortunate things
15    got bumped today and we lost the chance to have the conference
16    with you on the various evidentiary and other issues, which we
17    need guidance in order for us to start Friday.
18              THE COURT:  We're going to have that tomorrow, if the
19    government rests.
03:33 20          MR. KENDALL:  Thank you, your Honor.
21              THE COURT:  Okay?  We're in recess until tomorrow
22    morning.
23              (Whereupon, the proceedings ended at 3:34 p.m.)
24
25
```

```
 1                          I N D E X

 2    Witness                            Page

 3

 4    JEFFREY DEMAIO

 5    Cross-Examination by Mr. Kendall        5

 6    Cross-Examination by Mr. Kelly         70

 7    Redirect Examination by Ms. Kearney    72

 8    Recross-Examination by Mr. Kendall     81

 9

10    CASEY MOON

11    Direct Examination by Mr. Frank        90

12    Cross-Examination by Mr. Kendall      122

13    Cross-Examination by Mr. Sheketoff    198

14    Redirect Examination by Mr. Frank     206

15    Recross-Examination by Mr. Kendall    218

16    Recross-Examination by Mr. Sheketoff  222

17

18

19

20

21

22

23

24

25
```

```
 1                          E X H I B I T S
 2    NO.                      ADMIT
 3    9805    ....................    12
 4    106     ....................   102
 5    105     ....................   107
 6    751A    ....................   114
 7    129     ....................   117
 8    128     ....................   119
 9    9515    ....................   137
10    9515A   ....................   140
11    9516    ....................   150
12    9524    ....................   166
13    1116A   ....................   171
14    8027    ....................   192
15    8028    ....................   192
16    751     ....................   213
17
18
19
20
21
22
23
24
25
```

**A2933**

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          We, Kristin M. Kelley and Kelly Mortellite, certify

9    that the foregoing is a correct transcript from the record of

10    proceedings taken September 28, 2021 in the above-entitled

11    matter to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley          September 28, 2021

15        /s/ Kelly Mortellite           September 28, 2021

16        Kristin M. Kelley, RPR, CRR            Date
          Debra Joyce, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25

<div style="text-align:center">

1          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS

2

3

</div>

```
UNITED STATES OF AMERICA,        )
4                 Plaintiff      )
                                 )
5  vs.                           )  No. 1-19-CR-10080
                                 )
6  GAMAL ABDELAZIZ and JOHN      )
   WILSON,                       )
7                 Defendants.    )
                                 )
8                                )
```

<div style="text-align:center">

9

10

11          BEFORE THE HONORABLE NATHANIEL M. GORTON
               UNITED STATES DISTRICT JUDGE
                 JURY TRIAL - DAY 14

12

13

14       John Joseph Moakley United States Courthouse
                    Courtroom No. 4
                   One Courthouse Way
15              Boston, Massachusetts 02210

16

17                 September 29, 2021
                      9:10 a.m.

18

19

20

21            Kristin M. Kelley, RPR, CRR
                Debra Joyce, RMR, CRR
                 Official Court Reporter
22       John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 3209
23              Boston, Massachusetts 02210
                E-mail: kmob929@gmail.com

24

25       Mechanical Steno - Computer-Aided Transcript

</div>

```
 1    APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  You may be seated.  Court is now in
 3   session.
 4            THE COURT:  Good morning, counsel.  I understand
 5   counsel wanted to talk to me about some evidentiary matters.
 6            MS. WRIGHT:  Yes, your Honor.  We plan to introduce
 7   six summary charts through summary witness Lauren George.
 8   We've been in communication with the defense.  My understanding
 9   is they have remaining objections to two of those.  I just
 10   wanted to raise that with your Honor outside the presence of
 11   the jury.
 12            THE COURT:  What is the objection, Mr. Kelly?
 13            MR. KELLY:  Yes.  We've gone back and forth.  Some of
 14   them we don't object to anymore.  It's just two of the exhibits
 15   we have 403 objections.  We believe, in our view, they're
 16   misleading and confusing.  That's with respect to two of them.
 17   We'll log the objection when they -- or I can articulate it now
 18   if you wish.
 19            THE COURT:  Well -- why don't I take a look at the
 20   charts.
 21            MS. WRIGHT:  Yes.  I have paper copies and Ms. Lewis,
 22   if you could pull them up, too.
 23            THE COURT:  Can you put them on the screen so we can
 24   all see them at the same time?
 25            MS. WRIGHT:  Yes.
```

09:10 (at line 10)
09:11 (at line 20)

```
 1          MR. KENDALL:  And your Honor, we have separate
 2   objections as well.
 3          MS. WRIGHT:  It's what's been marked as Exhibit 718
 4   and 720.
 5          THE COURT:  Okay.  So I've been given Exhibit 718 and
 6   720.
 7          MS. WRIGHT:  Yes, your Honor.
 8          THE COURT:  What is your objection, Mr. Kelly, to 718?
 9          MR. KELLY:  Yes.  Under 403, we think it's unfairly
10   misleading and confusing.  There's been no evidence suggesting
11   that my client, Mr. Abdelaziz, has any knowledge of Gordon
12   Ernst, Rudy Merideth, John Vandemoer, Jorge Salcedo --
13          THE COURT:  Wait a minute.  I see Ernst.  Where are
14   the other names?
15          MR. KELLY:  They've got somebody -- at Georgetown,
16   they've got Ernst.  On Yale, they've got Meredith.  Stanford
17   they've got Vandemoer.  UCLA they've got Salcedo.  And there's
18   simply no connection with my client.  And you know, at the
19   heading at the top, you know, "payments to individuals/entities
20   associated with Georgetown, USC, Yale, Stanford, and UCLA". My
21   guy's not associated with any of these schools except USC.  So
22   we're objecting to that on the --
23          THE COURT:  Miss Wright?
24          MS. WRIGHT:  Your Honor, there's no suggestion about
25   intent or knowledge in this chart.  It's simply showing inflows
```

```
 1   and outflows of money.  Each of these individuals and schools

 2   is part of the charged conspiracy.  The chart makes it very

 3   clear where the money is going, whether it's to the individual

 4   or a fund at the school and the names listed there are simply

 5   the payee line of the check.  There's nothing misleading about

 6   that or inaccurate.

 7             MR. KELLY:  The only other thing, your Honor, on this

 8   particular one, 718, is under USC.  They've got Heinel's

 9   private business, the Clearinghouse.  That's not USC's

10   business.  That's her private business.

11             MS. WRIGHT:  Yes.  That's affiliated with Donna

12   Heinel.

13             THE COURT:  Where are you referring?  I'm sorry.  USC

14   whereabouts?

15             MR. KELLY:  About -- after they go through the sports.

16             THE COURT:  Clear the Clearinghouse?

17             MR. KELLY:  Yes.

18             THE COURT:  What's that about, Miss Wright?

19             MS. WRIGHT:  That is a company affiliated with Donna

20   Heinel to which The Key Worldwide Foundation made payments.  It

21   is included there because it's clearly connected with Donna

22   Heinel.  We're simply showing the association.  The summary

23   witness will explain how she tied the Clearinghouse to Donna

24   Heinel, and that's simply based on bank records.

25             MR. FRANK:  Your Honor, there's actually -- if I just
```

```
 1    could add, there's been evidence concerning Clear the
 2    Clearinghouse already.  There was an invoice that is in
 3    evidence that Donna Heinel submitted to Mr. Singer when he was
 4    working for the government.  And it says Clear the
 5    Clearinghouse right on it for the $20,000 monthly payment,
 6    which we've already talked about at length in front of jury.
 7              MR. KELLY:  Well, the reason it's still misleading is
 8    because Heinel, as they've agreed, wasn't taking money until
 9    the summer of 2018.  So that cleared the clearinghouse because
10    of the personal bribe, and so they're trying to mix that in
11    with the USC aspect.
12              MR. FRANK:  That's the scheme, your Honor.
13              MS. WRIGHT:  And I will just note we have a separate
14    chart that clearly lays out each of the payments to the Clear
15    the Clearinghouse along with the time periods of each of those
16    checks.
17              THE COURT:  All right.  Any objection from Mr. Kendall
18    on this one?
19              MR. KENDALL:  Yes, your Honor.  Or actually --
20              THE COURT:  Go ahead.  I'm talking about 718.
21              MR. KENDALL:  Excuse me?
22              THE COURT:  718.
23              MS. PAPENHAUSEN:  Is that LG3?
24              MR. KELLY:  Yes.  That would be LG3.
25              MR. KENDALL:  Yes I do, your Honor, for 718.  A few
```

things, your Honor.  First, if we go down to the USC category,

there's USC water polo $150,000.  I assume that's $100,000 from

John Wilson and $50,000 from someone else?

            MS. WRIGHT:  Yes.

            MR. KENDALL:  Who is the other person?

            MS. WRIGHT:  It's a check from KWF Foundation.

            MR. KENDALL:  But it's not related to Wilson.

            THE COURT:  Let's not have a conversation here about

it.

09:15   MR. KENDALL:  Your Honor, so other than the $100,000

to John Wilson, none of these things have anything to do with

my client.  In particular, Gordon Ernst and Georgetown's got

nothing to do with my client.  Clear the Clearinghouse, Donna

Heinel.  Donna Heinel didn't meet Rick Singer until the year

after my client's son was admitted.  So everything with Donna

Heinel --

            THE COURT:  Miss Wright?

            MS. WRIGHT:  It's part of the charged conspiracy, your

Honor.

09:15   THE COURT:  I'm going to reserve on this.  If the

proper foundation is laid for this document, I'm going to allow

it to be used, but of course I will reserve until the testimony

of this witness lays a foundation.

            MR. KENDALL:  May I refer to one specific entity, your

Honor?

```
 1              THE COURT:  Yes.

 2              MR. KENDALL:  Under Stanford, it says "Stanford

 3    Sailing, John Vandemoer."  My understanding is that was a check

 4    payable to Stanford Sailing.  It was given to John Vandemoer to

 5    deposit into the Stanford bank account, but I think it's

 6    misleading to put John Vandemoer's name there.

 7              MS. WRIGHT:  That's incorrect.  John is a payee line

 8    of a specific check.  It's Stanford Sailing, John Vandemoer,

 9    and if you move over to the next column, deposit account

10    beneficiary, it clearly states the beneficiary account is

11    Stanford University.

12              THE COURT:  All right.  I'm going to do what I said

13    I'm going to do.  Of course I will allow you to cross-examine

14    neutrally, as I have throughout this trial.

15              MR. KELLY:  Yes, your Honor.

16              The only other one would be -- excuse me.  The only

17    other objection we would have to the charts would be, I think

18    it's Exhibit 720?  Is that?

19              THE COURT:  Yes.

20              MR. KELLY:  Okay.  Yes.  Again, we think that one is

21    unfairly misleading about Mr. Abdelaziz.  They have put these

22    two blocks here and not --

23              THE COURT:  Which two blocks?

24              MR. KELLY:  The $5,000 and the $300,000.

25              THE COURT:  Yes.
```

            1          MR. KELLY:  To suggest that this wide disparity on how

            2    his son was treated versus his daughter, and they bury in the

            3    2018 the $7,000 that was for his daughter Sabrina, who's the

            4    subject of the trial.  That should be in the side -- in that

            5    block with the $5,000, if you really want to see what's going

            6    on, they say because it's a credit card they've dropped it down

            7    here at the bottom, the $7,000, and that's why they can't put

            8    it up top.  So we think it's unfairly misleading and under 403

            9    should be excluded.

    09:17  10          THE COURT:  Miss Wright?

           11          MS. WRIGHT:  Your Honor, I don't understand how

           12    something is misleading when it's laid out there very clearly

           13    in a chart.  If the placement of the boxes is the problem, I

           14    really don't understand the objection.  The reason that the

           15    credit card payments are laid out separately is not solely

           16    because they're credit card payments.  It's because the records

           17    that the summary witness relied upon are different.  For the

           18    check and wire payments, she relied on bank records.  For the

           19    credit card payments, she relied on Quickbooks, which is a

    09:18  20    secondary source as opposed to a primary source, and that is

           21    the only reason they are laid out differently like that.

           22          MR. KELLY:  Well, your Honor, I think, again, we renew

           23    our 403 objection.  And then we would ask to at least, to

           24    counter this, be permitted to introduce Exhibit 1568 which

           25    confirms that, in fact, he paid $7,000 in January for his

1  daughter Sabrina, so that -- this is not some mystery number

2  down at the bottom, $7,000.

3      THE COURT:  Well, when and if it comes in, if that

4  becomes relevant, as it has not been up to this point, I will

5  reconsider that ruling.

6      MR. KENDALL:  Your Honor, and then with respect to

7  721.

8      THE COURT:  I don't have 721.

9      MS. WRIGHT:  Miss Lewis, if we can pull it up.

09:18 10   MR. KENDALL:  They both go together, 721 and 722.  We

11  have the same issue on both.

12      MS. WRIGHT:  I will just note that we sent these

13  charts on Sunday evening and this is the first I've heard of

14  any objections from Mr. Kendall.

15      MR. KENDALL:  Your Honor, both of these are purely

16  Donna Heinel documents.  Seven -- the one with the green thing

17  on the bottom there, 721, these are payments in 2018 to Donna

18  Heinel.  That is four years after my client's son is admitted

19  to USC, and my client has no association of any kind with Donna

09:19 20   Heinel.

21      You may remember Agent Keating's testimony that the

22  government then disputes that Singer told them John Wilson was

23  always told he was making a donation, he was never told he was

24  making a bribe.  So to say that anything with Donna Heinel

25  that's a personal benefit to her is reasonably foreseeable to

```
 1   my client I suggest is misleading.  It's not within the scope
 2   of anything foreseeable to him because Singer told him that at
 3   the time they were dealing with USC, that he thought everything
 4   was a donation.
 5         And that would, I think, go over to 722 as well.
 6   These are things with Donna Heinel.  My client doesn't know who
 7   she is.  She's not associated with his son's admission.  It
 8   truly is only to mislead, your Honor.
 9         THE COURT:  Miss Wright?
10   MS. WRIGHT:  Your Honor, neither of these charts
11   indicate any association with Mr. Wilson at all.  The payments,
12   to whom they're made, is very clear.  The time period is very
13   clear.  Miss George will be testifying as to the time period of
14   these payments, and Mr. Kendall is free to cross-examine her.
15         THE COURT:  Same ruling.  I'm going to allow them in
16   if a proper foundation is laid and I will certainly allow
17   counsel to cross-examine liberally.  Anything else?
18         MR. KENDALL:  Your Honor, may we get a limiting
19   instruction on some of them with respect to what the government
20   has conceded that Donna Heinel has nothing do with my client,
21   that my client had no knowledge of the Vavic tuition payments?
22   We've discussed this before in motion practice, your Honor.
23         THE COURT:  Mr. Frank?
24         MR. FRANK:  Donna Heinel had everything to do with his
25   client, your Honor.  His client joined a conspiracy of which
```

1    Donna Heinel was a member and this continued argument is beyond

2    my comprehension.

3            THE COURT:  Yeah.  I'm not going to make a special

4    instruction.  I will, of course, instruct on conspiracy very

5    carefully at the time that I give the charge.  All right.  Call

6    the jury.

7            (Jury enters).

8            THE CLERK:  Thank you.  You may be seated.  Court is

9    now in session.

09:23 10         THE COURT:  Good morning, jurors.  We are ready to

11   resume.  We had some legal matters we had to dispose of outside

12   of your hearing, but we're ready now to continue with the

13   evidence.

14           The government will call its next witness.

15           MR. STEARNS:  Thank you, your Honor.  The government

16   calls Mark Deckett.

17           (Mark Deckett, sworn.)

18           THE CLERK:  Thank you.  You may be seated.  Will you

19   please state your name for the record, spelling your last.

09:24 20         THE WITNESS:  Mark, M-a-r-k, Deckett, D as in David,

21   e-c-k-e-t-t.

22           THE COURT:  Good morning, Mr. Deckett.  Would you

23   please pull your chair in and the microphone closer to you so

24   that we can all hear you.  Thank you.

25           MR. STEARNS:  May I proceed, your Honor?

```
  1              THE COURT:  Mr. Stearns.
  2                  DIRECT EXAMINATION OF MARK DECKETT
  3    BY MR. STEARNS:
  4    Q.   Good morning, Mr. Deckett.
  5    A.   Good morning.
  6    Q.   Where do you work?
  7    A.   I work for the United States Department of Education,
  8    Office of Inspector General.
  9    Q.   What's your title?
09:24 10   A.   I'm employed as a Special Agent.
 11    Q.   Okay.  How long have you been a Special Agent with the
 12    Office of the Inspector General?
 13    A.   Since 1999.
 14    Q.   Okay.  What's your role as a Special Agent with the
 15    Department of Education?
 16    A.   To investigate allegations of fraud involving the U.S.
 17    Department of Education programs.
 18    Q.   Are you familiar with this investigation?
 19    A.   Yes.
09:24 20   Q.   Okay.  Have you had substantive involvement in this
 21    investigation?
 22    A.   Limited involvement.
 23    Q.   And what has been your limited involvement in the
 24    investigation?
 25    A.   To review Department of Education records related to grant
```

         1   programs and payments to certain institutions.

         2          THE COURT:  Again, Mr. Deckett, please pull the

         3   microphone closer because we're having a hard time.

         4          THE WITNESS:  Sorry.

         5   Q.   What's been your role?

         6   A.   To review certain Department of Education records related

         7   to grant payments to certain post-secondary institutions.

         8   Q.   Okay.  Are you familiar with Pell grants?

         9   A.   Yes.

09:25   10   Q.   Could you just explain a little bit what Pell grants are,

        11   Special Agent Deckett.

        12   A.   It's a form of student financial assistance offered to

        13   many students as a benefit to pay for tuitions and costs for

        14   colleges.

        15   Q.   And who are Pell grants offered by?

        16   A.   The U.S. Department of Education.

        17   Q.   And who receives the Pell grants?  How are they

        18   administered?

        19   A.   They're administered by the U.S. Department of Education.

09:25   20   They're first disturbed to post-secondary institutions.  They

        21   then credit student accounts for tuition and other educational

        22   expenses.

        23   Q.   Okay.  And how long have Pell grants been in existence?

        24   A.   Since the 1970s.

        25   Q.   Okay.  How do universities and colleges in the U.S. become

**A2950**

1   eligible to participate in the federal Pell grant program?

2   A.   So they first need to enter into a Program Participation

3   Agreement with the U.S. Department of Education.  It's

4   essentially an agreement that the schools will comply and apply

5   the laws and regulations to that specific program.

6   Q.   And then how do students become eligible to receive or

7   benefit from Pell grants?

8   A.   They first need to apply, submit the free application for

9   federal student aid.  It's more commonly known as the FAFSA

09:26 10   form.

11   Q.   And what's the maximum Pell grant award that a school can

12   receive from the Department of Education per student per year?

13   A.   Approximately $6,100.

14   Q.   And so, approximately, how many students receiving Pell

15   grants at a given university would a college need to have in

16   order to receive more than $10,000 in Pell grants?

17   A.   Two or three.

18   Q.   Now, you mentioned earlier in your role in this

19   investigation you conducted an analysis to determine -- to

09:27 20   evaluate Pell received by certain universities?

21   A.   Yes.

22   Q.   Okay.  And you reviewed records?

23   A.   Yes.

24   Q.   Can you just briefly explain what those records are?

25   A.   So, through my training and experience, I gathered

information from the program participation agreements, as well

as eligibility documents, as well as grant payments, both of

the certain post-secondary institutions, as well as payments to

the schools overall.

Q.   Okay.  And where were those payment records?  Where are

those maintained by the Department of Education?

A.   Yes.

Q.   Where are they maintained?  Are they maintained in the

database?

A.   They're maintained in various databases, yes.

Q.   Okay.  The records you reviewed, are they made at or near

the time by a Department of Education employee with knowledge

of their contents?

A.   Yes.

Q.   Okay.  And who are they maintained by generally?

A.   The federal student aid office.

Q.   Okay.  And those records are maintained in the regular

course of activity with the Department of Education?

A.   Yes.

Q.   Fair to say, Special Agent Deckett, the records you

reviewed in preparation for today were voluminous?

A.   Yes.

Q.   Okay.  I'm not going to go through all of them.  For what

schools did you conduct your review?

A.   The University of Southern California, Harvard University

```
 1   and -- oh, my gosh -- Stanford University.
 2            MR. STEARNS:  Miss Lewis, if you can please pull up
 3   Exhibit 691, for the witness only at this point.
 4   Q.   Do you recognize Exhibit 691, Special Agent Deckett?
 5   A.   Yes.
 6   Q.   Just generally what is it?
 7   A.   It's a summary of Pell grant disbursements made to
 8   Stanford University and University of Southern California, as
 9   well as Harvard University.
10   Q.   For what years?
11   A.   2007 through 2020.
12   Q.   And what is this chart based on?
13   A.   It's based upon the information I obtained from the G5
14   grant payment system of the U.S. Department of Education.
15            MR. STEARNS:  Government offers 691 pursuant to
16   Rule 1006, your Honor.
17            THE COURT:  Say that again.
18            MR. STEARNS:  The government offers 691 as a summary
19   chart, your Honor.
20            THE COURT:  It will be admitted.
21            (Exhibit 691 admitted into evidence.)
22   Q.   Just a couple questions before we talk about the numbers
23   in this chart, Special Agent Deckett.  Do you see in the title
24   it says "Confirmed Deposits"?
25   A.   Yes.
```

|    |    |
|----|----|
| 1  | Q.   What does that mean? |
| 2  | A.   That represents U.S. Department of Education payments to |
| 3  | those particular universities. |
| 4  | Q.   Okay.  So payments that the schools actually received? |
| 5  | A.   Correct. |
| 6  | Q.   And then you see the column entitled "Award Year"? |
| 7  | A.   Yes. |
| 8  | Q.   And there are two years in each row? |
| 9  | A.   Yes. |
| 09:29 10 | Q.   Can you just explain what that means? |
| 11 | A.   So the U.S. Department of Education award year for |
| 12 | colleges and Pell program runs from July 1st from one year into |
| 13 | June 30th of the next year. |
| 14 | Q.   Okay.  And just to take a step back, we've been discussing |
| 15 | Pell grants, but fair to say that the Department of Education |
| 16 | provides other forms of federal money to -- in the forms of |
| 17 | grants and contracts and loans to universities? |
| 18 | A.   Yes. |
| 19 | Q.   Okay.  Let's look at Exhibit 691, let's focus on the |
| 09:30 20 | University of Southern California first, all the way on the |
| 21 | right.  Did USC receive more than $10,000 in Pell grants each |
| 22 | year from 2007 to 2020? |
| 23 | A.   Yes. |
| 24 | Q.   Approximately, how much did USC receive over the course of |
| 25 | those years in Pell grants? |

```
 1   A.   At least $7 million each year.

 2   Q.   Okay.  Turning to Harvard, did Harvard University receive

 3   Pell grants from the Department of Education exceeding $10,000

 4   each year?

 5   A.   Yes.

 6   Q.   From 2007 to 2020?

 7   A.   I'm sorry.  Yes.

 8   Q.   Okay.  And directing your attention specifically to

 9   2018-2019 row, do you see that?

09:31 10   A.   Yes.

11   Q.   Again, what dates does that cover?

12   A.   That covers July 1, 2018 through June 30, 2019.

13   Q.   And how much in federal Pell grants did Harvard receive

14   that year from the Department of Education?

15   A.   At least $6 million.

16   Q.   And finally, Stanford, do you see in the middle, Special

17   Agent Deckett?

18   A.   Yes.

19   Q.   Did Stanford receive more than $10,000 in Pell grants each

09:31 20   year from 2007 to 2020?

21   A.   Yes.

22   Q.   And, again, 2018 to 2019, how much did Stanford receive in

23   Pell grants from the Department of Education?

24   A.   At least $5 million.

25            MR. STEARNS:  That's it, your Honor.  Thanks.
```

```
 1              THE COURT:  Cross-examination.  Is it
 2   Miss Papenhausenen?
 3              MS. PAPENHAUSEN:  Yes, your Honor.
 4                 CROSS-EXAMINATION OF MARK DECKETT
 5   BY MS. PAPENHAUSEN:
 6   Q.   Good morning, Agent Deckett.  My name is Lauren
 7   Papenhausen.  I represent John Wilson in this case.
 8   A.   Good morning.
 9   Q.   Is it fair to say, Agent Deckett, that in addition to
10   Harvard, Stanford and USC, which you've just gone through,
11   there are many other universities nationwide that participate
12   in the Pell grant program?
13   A.   Yes.
14   Q.   You understand that the Department of Education spends
15   billions of dollars on the Pell grant program each year,
16   correct?
17   A.   Yes.
18   Q.   There are -- fair to say there are extensive regulations
19   put forth by the Department of Education that apply to any
20   school that wants to participate in the Pell grant program,
21   correct?
22   A.   There are regulations to participate.
23   Q.   Well, there are extensive regulations, correct?
24   A.   There are many.
25   Q.   Fair to say that the program and the participation of
```

```
 1   these schools in the program is heavily regulated, correct?

 2   A.   It is well regulated.

 3   Q.   In fact, you previously testified to the grand jury that

 4   these regulations were extensive and that it was heavily

 5   regulated, correct?

 6   A.   I don't remember specifically, but it is well regulated.

 7   Q.   Sure.  The regulations are pretty significant, correct?

 8   A.   Correct.

 9   Q.   Do you agree that nowhere in these significant regulations

10   does the Department of Education limit the ability of a

11   university to give a boost in admissions to the child of a

12   donor?

13          MR. STEARNS:  Objection, your Honor.  The Department

14   of Education doesn't regulate admission.

15          THE COURT:  Well, if he understands the question, he

16   can answer.

17   A.   I'm not familiar with that.

18   Q.   You're not familiar with any regulations anywhere in the

19   Department of Education's extensive regulations that has

20   anything to do with admissions consideration given to the child

21   of a donor?

22   A.   I'm not familiar -- I'm not that familiar with that

23   aspect, if it is there.  I don't -- I don't have extensive

24   experience in that area.

25   Q.   You can't point us to any regulation that has anything to
```

```
 1    do with giving an admissions boost to the child of a donor,

 2    correct?

 3              MR. STEARNS:  Objection.

 4              THE COURT:  Overruled.

 5    A.   I cannot.

 6    Q.   And fair to say that these extensive regulations, they

 7    cover everything from copyright law to campus security to a

 8    host of other requirements that the Department of Education

 9    imposes on universities that participate in the Pell grant

10    program, correct?

11    A.   Again, I'm not familiar with every regulation for the

12    Department of Education.

13    Q.   You know they cover a wide range of topics, correct?

14    A.   Yes.

15    Q.   And the purpose of these extensive regulations, right, the

16    purpose of these extensive regulations for participating

17    schools is to ensure the integrity of these participating

18    schools, correct?

19    A.   In general and it may include other reasons as well.

20    Q.   And the Department of Education has the authority to

21    impose regulations to do that, correct?

22    A.   Yes.

23              MS. PAPENHAUSEN:  Thank you.  I have nothing further.

24              MR. KELLY:  Briefly, your Honor.

25              THE COURT:  Mr. Kelly.
```

```
 1              CROSS-EXAMINATION OF MARK DECKETT
 2    BY MR. KELLY:
 3    Q.   Good morning, Agent Deckett.  My name is Brian Kelly.  I
 4    represent Gamal Abdelaziz.
 5    A.   Good morning, sir.
 6    Q.   Now, you testified in the grand jury in this case, right?
 7    A.   Yes, sir.
 8    Q.   Back in July of 2019, July 23, 2019, correct?
 9    A.   Yes, sir.
10    Q.   And the prosecutor at the time who asked you questions was
11    an individual named Eric Rosen, right?
12    A.   Yes, sir.
13    Q.   And was your role in this case pretty much limited to your
14    appearance in the grand jury to talk about some of the things
15    you just talked about today?
16    A.   Yes, sir.
17    Q.   So subsequent to that grand jury appearance, you really
18    didn't do anything else on this case?
19    A.   No, sir.
20    Q.   All right.  Now, the government just had you testify about
21    Pell grants, right?
22    A.   Yes, sir.
23    Q.   There's no -- they're basically undergraduate student
24    loans, correct?
25    A.   They're undergraduate grants.  They do not have to be
```

```
 1   repaid.
 2   Q.   Okay.  So students in need, if they're eligible for these
 3   grants, they can get a Pell grant and they don't have to pay
 4   them back because it's a grant and not a loan, correct?
 5   A.   If they're eligible, yes.
 6   Q.   Sure.  But there's no Pell grant fraud alleged in this
 7   case, right?
 8   A.   I'm not familiar with any, if there is or is not.
 9   Q.   Okay.  But you're not aware of any Pell grant fraud
10   allegations against Gamal Abdelaziz's daughter Sabrina, right?
11   A.   I'm aware of general allegations, but I'm not aware of
12   whether or not that includes that.
13   Q.   So the Pell grant issue is just really to establish
14   jurisdiction?  Is that your understanding of why you testified
15   to the grand jury?
16   A.   I was asked to provide the information related to the
17   funding to the schools.
18   Q.   Okay.  And you've been a federal agent for what, 20 years?
19   A.   Yes, sir.
20   Q.   And you know that USC is a private university, right?
21   A.   Yes.
22   Q.   And USC obviously doesn't need the federal government's
23   permission to accept kids at their private school, right?
24   A.   Could you repeat that, please?
25   Q.   Sure.  The federal government is very powerful, but it
```

```
 1    can't decide what student a private university lets in, right?
 2    A.   There are certain admission criteria for most schools.
 3    I'm not familiar exactly with what it is, so I can't speak to
 4    that.
 5    Q.   Well, you know USC's a private university, right?
 6    A.   Yes, sir.
 7    Q.   And they can give preferences to children of wealthy
 8    donors, can't they?
 9    A.   I guess they can.  I don't know.
10    Q.   You're not aware of any law that prohibits USC from
11    accepting donations and giving preferences to donors' children,
12    are you?
13              MR. STEARNS:  Objection.
14              THE COURT:  Overruled.
15    A.   I'm not familiar if they can or can't.
16    Q.   And you're not aware -- there's no law or regulations that
17    says parents can't give money to USC with the hope that it
18    helps their kids get into that school, right?  There's no
19    prohibition against that?
20    A.   I'm not familiar either way.
21    Q.   And people donate to private universities all the time,
22    right?
23    A.   Yes.
24    Q.   And in --
25              MR. KELLY:  Well -- nothing further.
```

09:37 at line 10
09:38 at line 20

**A2961**

```
 1              THE COURT:  Any redirect, Mr. Stearns?
 2              MR. STEARNS:  Very brief, your Honor.
 3                 REDIRECT EXAMINATION OF MARK DECKETT
 4    BY MR. STEARNS:
 5    Q.   Special Agent Deckett, you were asked a series of
 6    questions by both Miss Papenhausen and Mr. Kelly about
 7    donations to schools.  Do you recall those questions?
 8    A.   Yes, sir.
 9    Q.   And donations to schools in the hope that someone's
10    student could get in?
11    A.   Yes, sir.
12    Q.   And to give someone a boost with the Admissions
13    Department?
14    A.   Yes, sir.
15    Q.   Do you work in the Admissions Department of any of those
16    schools?
17    A.   I do not.
18    Q.   Okay.  You're familiar that there's a criminal
19    investigation in this case, correct?
20    A.   Yes, sir.
21    Q.   Okay.  And who was responsible for that investigation?
22    What agency?
23    A.   The FBI, IRS, and the Department of Justice.
24    Q.   Okay.  And you were asked a series of questions about
25    whether it was an illegal -- you knew whether it was illegal to
```

```
 1    give a donation to a school, right?
 2    A.   Yes.
 3    Q.   Are you familiar whether Title 18 prohibits bribes,
 4    Special Agent Deckett?
 5    A.   Yes.
 6    Q.   Okay.  And what about fraud?
 7    A.   Yes.
 8              MR. STEARNS:  Nothing further.
 9              THE COURT:  Miss Papenhausen?
10              MS. PAPENHAUSEN:  Nothing further, your Honor.
11              THE COURT:  Mr. Kelly?
12                  RECROSS EXAMINATION OF MR. DECKETT
13    BY MR. KELLY:
14    Q.   He just asked you whether you were familiar with whether
15    bribes or et cetera -- your role in this case was limited to
16    your grand jury appearance back in July of 2019, right?
17    A.   Yes.
18    Q.   You didn't work on this case the way these other agents
19    did, right?
20    A.   I did not.
21              MR. KELLY:  Thank you.  Nothing further.
22              THE COURT:  All right.  Thank you, Mr. Deckett.  You
23    may step down.
24              THE WITNESS:  Thank you, sir.
25              MS. WRIGHT:  The government calls Lauren George.
```

**A2963**

```
 1                    (Lauren George, sworn.)
 2              THE CLERK:  Would you please state your name for the
 3       record, spelling your last.
 4              THE WITNESS:  My name is Lauren George, G-e-o-r-g-e.
 5              MS. WRIGHT:  May I inquire?
 6              THE COURT:  Yes, you may, Miss Wright.
 7                  DIRECT EXAMINATION OF LAUREN GEORGE
 8       BY MS. WRIGHT:
 9       Q.   Good morning, Miss George.
09:41 10     A.   Good morning.
11       Q.   Miss George, can you tell the jury how you're employed?
12       A.   I work for the U.S. Attorney's office here in Boston as an
13       auditor.
14       Q.   And how long have you been doing that?
15       A.   I've been doing it for the past two and a half years with
16       that title, approximately nine years total.  Prior to that I
17       was a contractor performing the same job function.
18       Q.   And can you briefly describe what you do as an auditor?
19       A.   Sure.  So I do the financial investigations associated
09:41 20     with certain ongoing criminal investigations.  So to the extent
21       that agents bring a target of investigation to me, I'll then do
22       a financial workup trying to identify assets and where funds
23       are coming in and out of and essentially analyze the financial
24       aspects of those targets and in some cases try to recommend
25       whether I think financial charges should be brought.
```

**A2964**

```
 1   Q.    Where did you work before you became an auditor for the
 2   U.S. Attorney's Office here in Boston?
 3   A.    For one year I was a contractor under the U.S. Marshals'
 4   Service where I worked on the Complex Asset Team.  And then
 5   prior to that I was an auditor for the Northern District of
 6   Georgia.  Prior to that I was a DEA Special Agent down in
 7   Miami, Florida.  And prior to entering government service I was
 8   in private industry, first as an auditor and then as a forensic
 9   accountant in an investigative consulting practice.
10   Q.    Can you briefly describe your educational background.
11   A.    Sure.  I have an undergraduate degree in economics and
12   accounting from Holy Cross.  I have a law degree from Suffolk
13   University.  And I have two certifications:  One, a certified
14   public accountant, and the other a certified fraud examiner,
15   both of which require continuing professional education
16   requirements on an annual basis.
17   Q.    Okay.  Miss George, can you tell the jury just a little
18   bit about your involvement with and role in this case?
19   A.    Sure.  I was asked to review financial records for --
20   primarily for The Key Worldwide Foundation, The Key and Rick
21   Singer, and prepare summary charts based on what I reviewed.
22   Q.    And what is a summary chart?
23   A.    So, with financial records, they're usually very
24   voluminous, and so a summary chart is a way to concisely convey
25   what's going on in those financial accounts, kind of the ins
```

09:42 (line 10)
09:43 (line 20)

```
 1    and outs and key categories of what's going on in those
 2    financial records.
 3           MS. WRIGHT:  Miss Lewis, if we could please pull up,
 4    for the witness only at this point, Exhibit 716?
 5    Q.   Miss George, showing you what has been marked as 716.  Can
 6    you briefly describe what this is.
 7    A.   Sure.  It's a summary chart that I prepared that
 8    highlights the total dollar values going in and out of The Key
 9    Worldwide Foundation and The Key business bank accounts.
10    Q.   What records did you review in preparing this?
11    A.   Primarily the underlying bank records from US Bank, Wells
12    Fargo, Bank of America, and Merrill Lynch.  That fed into it.
13    Q.   Does the chart accurately reflect your review of those
14    records?
15    A.   Yes, it does.
16           MS. WRIGHT:  The government would offer Exhibit 716 as
17    a summary chart.
18           MR. KENDALL:  Objection, your Honor.
19           THE COURT:  Grounds?
20           MR. KENDALL:  The things we discussed it earlier.
21    Relevance.  Prejudice.
22           THE COURT:  All right.  The objection's overruled.
23    716 is admitted over the objection of defendant Wilson.
24           MR. KELLY:  I join, your Honor, just for the record.
25           THE COURT:  And both defendants.
```

```
          1              (Exhibit 716 admitted into evidence.)
          2    Q.   Okay.  Now that we have this up in front of the jury,
          3    Miss George, there's two different sections here on the chart?
          4    A.   That's correct.
          5    Q.   With a few different columns, correct?
          6    A.   Yes.
          7    Q.   Can you just explain to the jury what it is they're
          8    looking at?
          9    A.   Sure.  The top part of that is, in the gray shading, you
09:45    10    can see is The Key Worldwide Foundation.  And underneath that
         11    there are four account numbers listed.  So I've listed the name
         12    of the bank and the last four digits of the account numbers.
         13    And then to the right of that I've listed the time period for
         14    which the records that are reviewed and the figures on the
         15    right represent during that time period.  And then I have a
         16    deposit column and a withdrawal column.  And that's to show the
         17    money coming into those accounts and the money going out of
         18    those accounts.
         19    Q.   Okay.  And same thing down here under The Key?
09:45    20    A.   That's correct.
         21    Q.   Okay.  And then in full sections, do you see where it says
         22    "same entity movement of funds"?
         23    A.   Yes, I do.
         24    Q.   What does that mean?
         25    A.   So, for example, to take The Key Worldwide one up top,
```

there's four bank accounts listed up there. To the extent that
money went from one account held by KWF and went into another
account of KWF, I'm just showing that as backing out so that we
can get a better sense of net money coming in and out of the
account.

Q.   Okay. And then below that where it says up top, it says,
"The Key, RWS Management Inc., and Rick Singer". First, what
is RWS Management, Inc.?

A.   It's a management company controlled by Rick Singer.

Q.   And what do those rows show?

A.   Again, I was showing to back out related parties so
that -- if you look again as -- KWF as an example, the total 36
million in deposits, if we take out money that moved between
those same accounts and then we take out money that was from
Rick Singer or his related businesses, then we get to a net
number at the bottom that reflects money coming in and out from
third parties.

Q.   Okay. And based on your review, what were the net
deposits into The Key Worldwide Foundation accounts between
January of 2013 and February of 2019?

A.   Approximately 27.6 million.

Q.   Can you tell the jury where -- in broad categories the
majority of that $27 million came from?

A.   The vast majority came from parents, approximately 26
million, a little bit above. And by parents I mean they were

1    individuals that were clients of The Key, which is the business

2    below.  So they're a parent fund that go into KWF.

3    Q.   And what were the net withdrawals from the KWF accounts

4    during this time period?

5    A.   Approximately 20.6 million.

6    Q.   Where did the majority of that money go?

7    A.   So, in broad category, approximately six and a half

8    million went to various colleges and universities, or

9    individuals associated with those entities, and then another

09:48 10    approximately 6.4 million went into business investments that

11    The Key Worldwide Foundation had engaged in.  And then there

12    was additional funds that went to other business interests.

13    And I say that to distinguish from the business ventures for

14    which there were -- appeared to be formal contracts and

15    agreements versus there was another category of over a million

16    dollars where there seemed to be some sort of kind of offshoot

17    business venture.

18    Q.   And could you tell from your review approximately how much

19    of that 20 million went to charitable causes?

09:48 20    A.   I can't put an exact figure on it.  I would say very

21    little based on my ability to trace what money did go out to

22    other ventures.

23    Q.   Okay.  Moving on to the second section below, "The Key".

24    Based on your review, what were the net deposits of The Key

25    account in the time period depicted here, which is January 2012

```
 1   to February of 2019?

 2   A.   Approximately 15.5 million.

 3   Q.   And same question here, where did the majority of that

 4   money come from?

 5   A.   Again, it was mostly from parent funds.  So approximately

 6   8.9 million came directly from parents in the form of checks or

 7   other wires.  And then there was another five million that came

 8   into the account through a credit card processor, which based

 9   on my review of other materials in the case, appears to

10   represent parent funds as well.

11   Q.   Okay.  And then what were the net withdrawals from The Key

12   accounts during this time period?

13   A.   Approximately 13.4 million.

14   Q.   Okay.  And then same question, where did the majority of

15   that $13 million go?

16   A.   The vast majority was in payroll related expenses,

17   approximately 5 million.  Some of that was in the form of the

18   traditional payroll processing that would go through a payroll

19   processor called Intuit.  And others of that was paid directly

20   to individuals, and in the reference line it would indicate a

21   certain pay period.  So it was those two kind of categories

22   combined as payroll.  And then there was additional money that

23   came out of that account for credit card payments.

24            So The Key had maintained credit card accounts with

25   Amex and other credit card companies.  And so a little over two
```

1    million went to those credit card payments.  And then, to a

2    smaller extent, there were some funds here out of The Key that

3    went to colleges and universities and individuals associated

4    with them.  That was roughly $800,000 or so.

5    Q.    And then down at the bottom, under "Combined Net Totals",

6    what does that show?

7    A.    That shows, between the two entities, approximately 43.1

8    million in deposits and 34.1 million in withdrawals.

9    Q.    And depicted in each section, which we talked about a

09:51 10   little bit, the backing out the transfers, is it fair to say

11   that there were significant transfers among all of these

12   accounts from KWF to The Key, from The Key to KWF, and to and

13   from Rick Singer's personal accounts?

14   A.    Yes.  That is correct.

15   Q.    Based on your review and backing out those transfers, can

16   you tell the jury approximately how much money went to Rick

17   Singer's personal accounts?

18   A.    Sure.  It was approximately 3.5 million.

19         MS. WRIGHT:  Okay.  For the witness only, can you

09:51 20   please pull up Exhibit 718, Miss Lewis.

21   Q.    Miss George, showing you what's been marked as

22   Exhibit 718, can you please describe generally what this is.

23   A.    It's a summary chart that I prepared that highlights flow

24   of funds out from The Key and the KWF accounts to certain

25   colleges, universities, and associated entities.

```
 1   Q.   What records did you review in preparing this chart?
 2   A.   The -- my primary source was the financial records that we
 3   just discussed in the first exhibit, the underlying bank
 4   account records.
 5   Q.   And does this chart accurately reflect that review?
 6   A.   Yes, it does.
 7        MS. WRIGHT:  The government offers Exhibit 718, the
 8   summary chart.
 9        MR. KELLY:  Note our 403 objection, your Honor.
10        MR. KENDALL:  Same objection, your Honor.
11        THE COURT:  718 is admitted over the objections of the
12   defendants.
13        (Exhibit 718 admitted into evidence.)
14   Q.   Okay.  Now that we have it up for the jury, Miss George,
15   can you just explain what we're looking at in a bit more
16   detail.
17   A.   Sure.  On the left-hand side, I've listed five different
18   colleges and universities.  So that's how I've broken down the
19   payments.  And then, in the second column, you'll see a payee
20   and that would be who the -- the actual payment was directed to
21   in terms of the face of the payment, whether it be a check or a
22   wire.  And then the third column is marked as "Deposit Account
23   Beneficiary".  That's ultimately reflective of where the money
24   went to.  And then the last column is a total sub-totalling
25   each one of these categories.  And then --
```

```
 1   Q.   What was -- oh, sorry.
 2   A.   Oh, sorry.  I was going to say and then there's a small
 3   box in the bottom that's in bold that just indicates, of the
 4   figures that are detailed up above, how much came from KWF and
 5   how much came from The Key.  So in total, this sheet is talking
 6   about $5.7 million in payments.  And that box at the bottom
 7   just breaks out which accounts they're coming from.
 8   Q.   Okay.  So the 5.7 million, over 5 million came from KWF
 9   accounts?
09:54 10   A.   That's correct.
11   Q.   How did you determine the association between -- and we'll
12   go through each, but how did you determine the association
13   between some of these individuals listed here and the
14   associated university?
15   A.   In the majority of cases, the association was written on
16   the face of the payment.  So it might reference the individual
17   name, or it references the University, or it references a name
18   in care of that university.  In other cases, I'd look through
19   discovery materials to identify e-mails or other bits of
09:54 20   information that would provide context to know that
21   association.  And, in some cases, looked at the underlying bank
22   records for those individuals.
23   Q.   Okay.  Let's walk through each section in a little bit
24   more detail.  Under "Georgetown", can you tell the jury what
25   we're looking at under "Georgetown"?
```

```
 1   A.    Sure.  The first payee is Gordon Ernst.

 2   Q.    Who is that?

 3   A.    He was the former Georgetown tennis coach.

 4   Q.    Okay.  And how much money went to him?

 5   A.    Approximately 2.7 million.

 6   Q.    And that's -- where it says "Deposit account beneficiary",

 7   it says "Gordon Ernst."  What does that signify?

 8   A.    That it was paid directly to him and it was endorsed by

 9   him, and based on the review of the materials, it appears to

10   have been deposited into accounts controlled by him

11   individually.

12   Q.    Okay.  And then there's a separate $5,000 payment to

13   Georgetown Tennis?

14   A.    That's correct.

15   Q.    And those funds went to Georgetown?

16   A.    As far as I know, that was a single payment that was a

17   cashier's check.  And I wasn't able to look at the -- I wasn't

18   able to see the cleared copy of the check to see where it went,

19   but I -- I'm basing that on the fact that it was made payable

20   to the University itself.

21   Q.    Okay.  And moving on to USC, can you walk us through this

22   part of the chart?

23   A.    Sure.  I've broken them out into different subsections.

24   So this top part, there are four separate categories of

25   payments that went directly to USC.  So on the face of the
```

1    checks, they would say women's athletic board or water polo or

2    baseball or women's volleyball.  So that was reflected on the

3    checks and they all were deposited into USC controlled bank

4    accounts.

5    Q.   Okay.  And then what about Clear the Clearinghouse?

6    A.   Those were a series of check payments that were made

7    payable to Clear the Clearinghouse and ultimately deposited

8    into a personal bank account maintained by Donna Heinel.

9    Q.   And why is Clear the Clearinghouse listed along with these

10   USC -- the payments that went directly to USC?

11   A.   Because Donna Heinel was an employee of USC and so I was

12   associating individuals connected to that university in this

13   summary.

14   Q.   Okay.  Moving on to the next client.  What is that?

15   A.   That says "Loyola High School."  Similar, that is an

16   outside entity that was receiving payments on behalf of -- on

17   the face of the payments, there was a reference to Vavic and

18   the individuals that were attending that high school.

19          MS. WRIGHT:  Okay.  Miss Lewis, if we can pull up a

20   few exhibits and just show them one at a time to Miss George.

21   156.

22   Q.   I've give you a moment to look at that.

23   A.   I see that.

24          MS. WRIGHT:  And then 213, Miss Lewis.

25   A.   I see that.

```
 1            MS. WRIGHT:  350, please, Miss Lewis.
 2   A.   Yes.
 3            MS. WRIGHT:  And then 534.
 4   Q.   What were those four exhibits?
 5   A.   Those four exhibits were checks made payable to Loyola
 6   High School, and there were notations on the checks that
 7   referenced tuition and specific individuals' names and amounts.
 8            MS. WRIGHT:  The government offers Exhibits 156, 213,
 9   350 and 534.
10            MR. KENDALL:  Objection, your Honor.
11            THE COURT:  Grounds?
12            MR. KENDALL:  Relevance, 403 prejudice.
13            THE COURT:  Overruled.  They will be admitted.
14            (Exhibit 156, 213, 350, 534 admitted into evidence.)
15            MS. WRIGHT:  And then, Miss Lewis, if we could just go
16   back to 156, please.
17   Q.   And the jury will have these so we don't need to go
18   through each one.  Let's just take a look at an example.  So
19   this is a check from The Key Worldwide Foundation?
20   A.   Yes, it is.
21   Q.   Made payable to Loyola High School?
22   A.   Yes.
23   Q.   In the approximate amount of $37,000?
24   A.   That's correct.
25   Q.   And then here on the notation, it says "Stefan Vavic and
```

```
 1    Marko Vavic"?
 2    A.   Correct.
 3    Q.   And over here on the right "2015-2016 tuition"?
 4    A.   Yes.
 5    Q.   And then the next three exhibits were checks similar to
 6    this for each of the following years?
 7    A.   That's correct.
 8         MS. WRIGHT:  Okay.  Miss Lewis, if we can go back to
 9    the summary chart, which is Exhibit 718, please.
10    Q.   Okay.  So moving on from Loyola High School, what is this
11    next section under USC?
12    A.   They were payments that were made payable to these
13    entities, so they varied.  So SoCal, SC, Fullerton Football,
14    and Newport Football, all of those payments were made to one
15    variation of that payee, but all deposited into a single bank
16    account held by that entity, that soccer club.
17         And then the second category is -- were payments made
18    directly to Ali Khosroshahin and the last one was payments
19    directly to Laura Janke.
20    Q.   It's hard to say.  I know.
21    A.   It is.
22    Q.   And who are Ali Khosroshahin and Laura Janke?
23    A.   They were -- they are former soccer coaches at USC.
24    Q.   And is this total amount paid to them, does that include
25    payments that were made after Mr. Khosroshahin and Miss Janke
```

 1    were no longer at USC?

 2    A.    Yes.  That's correct.

 3    Q.    Can you tell us what the total amount paid from either KWF

 4    or The Key to individuals and/or these funds associated with

 5    USC was?

 6    A.    Approximately 1.2 million.

 7    Q.    Okay.  Moving onto Yale, what does this section show?

 8    A.    There was a number of payments made payable to "Summertime

 9    Sports".

10:00 10    Q.    What is Summertime Sports?

11    A.    It's a separate entity that's controlled by Rudy Meredith.

12    Q.    Who was Rudy Meredith?

13    A.    He was the former soccer coach at Yale.

14    Q.    And what was the total amount paid to Summertime Sports?

15    A.    $860,000.

16    Q.    Okay.  Next, under Stanford, what does this section show?

17    A.    There were three separate payments made payable to

18    Stanford Athletics, Stanford University, Stanford Sailing John

19    Vandemoer, and all three of those were deposited into Stanford

10:01 20    University bank accounts.

21    Q.    Okay.  So although John Vandemoer's name is on the payee

22    line of this one check, the recipient of the actual funds was

23    Stanford University?

24    A.    That's correct, yes.

25    Q.    All right.  What does the section "UCLA" show?

A.   There was two payments.  One was a wire transfer directed
to an account, Princeville Enterprises, Jorge Salcedo, and the
second one is a check payment directly to Jorge Salcedo.

Q.   And who is Jorge Salcedo?

A.   The former soccer coach at UCLA.

Q.   And then just again looking at the total in this box in
the bottom, what does this show?

A.   In total, there's all the amounts reflected above, the
total of approximately $5.7 million.

10:02     MS. WRIGHT:  For the witness only, please, Miss Lewis,
can you pull up Exhibit 719.

Q.   Miss George, showing you what has been marked as
Exhibit 718.  Can you describe generally what this is?

A.   It's a summary chart depicting the payments that went from
John B. Wilson to --

     MR. KENDALL:  Objection, your Honor, again for the
same prior reasons.

     THE COURT:  Overruled.

A.   They're a chart depicting payments made from John B.

10:03 Wilson or his associated business to The Key, KWF, or to Singer
individually.

Q.   And again, what records did you review in preparing this
chart?

A.   My primary source was the underlying bank account records
of the businesses, and then I also reviewed the Quickbooks

business records from The Key.

Q.   And does the chart accurately reflect your review of those records?

A.   It does.

        MS. WRIGHT:  The government offers Exhibit 719 as a summary chart.

        MR. KENDALL:  Objection.

        THE COURT:  It will be admitted over the objection of the defendant Wilson.

10:03   (Exhibit 719 admitted into evidence.)

Q.   Okay.  Now that we have this up in front of the jury, let's walk through the summary chart.  It's divided up into three sections, right?

A.   Yes, it is.

Q.   And what do those three different sections show?

A.   Their payment activity during three separate time periods. So if we start with the one on the left during that time period of 2012 and 2013, there are payments totalling $10,835 that went directly into The Key bank account, and it was via 11

10:04 separate check payments.  And I reflect the date ranges of those check payments between October of 2012 and November of 2013.

Q.   Okay.  And then if we can go down to the box in the bottom, what does that reflect?

A.   So there were additional payments referenced in the

```
 1    Quickbooks of The Key that indicated that there were additional
 2    payments made from Mr. Wilson.  And they indicated that they
 3    were credit card records for these 2012, 2013 and 2014.  And so
 4    those additional funds are approximately $22,000 worth are
 5    believed to have gone into The Key, but I did not have the
 6    detail from the credit card records themselves to be able to
 7    substantiate that.
 8    Q.   Okay.  So for those of us who don't have the experience
 9    that you do, what is Quickbooks?
10    A.   Quickbooks is a processing -- an accounting software
11    processing system.
12    Q.   So the top payments are based on bank records, whereas
13    this reflects what you saw in The Key's Quickbooks files?
14    A.   That's correct.
15         MS. WRIGHT:  Okay.  You can zoom out of that,
16    Miss Lewis.
17    Q.   And then moving on to the 2014 section, what does this
18    show?
19    A.   On April 7, 2014, there was three separate wire transfers
20    that were made from the Hyannis Port Capital bank account.  In
21    total, they equal $220,000, but they were to three separate
22    entities.  So the first one on the left, The Key, there was a
23    transfer of $100,000.  And then in the middle I'm showing
24    another $100,000 that went to KWF.  And on the right, I'm
25    showing there was a wire of $20,000 to Mr. Singer's personal
```

```
 1   account.
 2          MS. WRIGHT:  Miss Lewis, if we could please pull up,
 3   for the witness only, Exhibit 117.
 4   Q.   Miss George, do you recognize this?
 5   A.   Yes, I do.
 6   Q.   What is it?
 7   A.   It's a wire advice.
 8   Q.   For those three wires that are depicted in the chart we
 9   just looked at?
10   A.   Yes.  That's correct.
11          MS. WRIGHT:  The government offers Exhibit 117.
12          THE COURT:  It will be admitted.
13          (Exhibit 117 admitted into evidence.)
14          MS. WRIGHT:  Okay.  Miss Lewis, if you can please go
15   back to the chart which is 719.
16   Q.   Okay.  Down below still in 2014 under The Key payment,
17   there's two other boxes under there.  Can you tell the jury
18   what those reflect?
19   A.   Yes.  From that Key bank account, which I've noted as US
20   Bank ending in 6275, there was a $100,000 cashier's check that
21   flowed out of that account, and it was made payable to "USC
22   Men's Water Polo", and in the remitter section of the cashier's
23   check it referenced "Wilson family".
24          MS. WRIGHT:  Miss Lewis, if we could please pull up,
25   for the witness only, Exhibit 121.
```

```
 1    Q.    Miss George, do you recognize this?

 2    A.    Yes, I do.

 3    Q.    What is it?

 4    A.    It's a withdrawal slip from the US Bank account ending in

 5    6275.

 6          MS. WRIGHT:  And if you could just flip through the

 7    next few pages, please, Miss Lewis.

 8    Q.    Do you recognize these two pages?

 9    A.    Yes.

10    Q.    What are those?

11    A.    Those were the cashier's checks that were processed via

12    that -- through the withdrawal transaction.

13          MS. WRIGHT:  The government offers Exhibit 121.

14          THE COURT:  It will be admitted.

15          (Exhibit 121 admitted into evidence.)

16    Q.    If we can go back to the first page, please, Miss Lewis.

17    You said this is the withdrawal used to purchase those two

18    cashier's checks?

19    A.    That's correct.

20          MS. WRIGHT:  Okay.  If we can go to the next page,

21    please, and blow that up a bit.  Thank you.

22    Q.    What is this?

23    A.    That's a $100,000 cashier's check made payable to "USC

24    Baseball".

25    Q.    And what's the purpose or remitter?
```

```
 1   A.   It says "Driscoll family".

 2   Q.   If we can go to the next page, please.  What is this?

 3   A.   A $100,000 cashier's check made payable to "USC Men's

 4   Water Polo".

 5   Q.   And what's listed under "purpose/remitter"?

 6   A.   "Wilson Family".

 7   Q.   So this was that check that was reflected in your chart?

 8   A.   That's correct.

 9        MS. WRIGHT:  Sorry to keep switching things up on you,

10   Miss Lewis.  If we can go back to the chart, that's 719.

11   Q.   So that cashier's check we just looked at made payable to

12   "USC Men's Water Polo", when was that issued in relation to

13   Mr. Wilson's $100,000 wire transfer to The Key?

14   A.   Just over a week after that.

15   Q.   Okay.  Finally, we can move on to the last section of the

16   chart, the 2018 section.  What does this show?

17   A.   On the left, we -- it depicts that there was a check

18   written from John B. Wilson for $16,000.  The check was dated

19   10/16/18 and it was deposited into The Key bank account at

20   Wells Fargo, 7833.

21   Q.   Do you happen to recall the memo line of that check?

22   A.   Yes.  I believe I do.  It referenced "college prep

23   session, or services for C and M".

24   Q.   And then on the right-hand side, what does that reflect?

25   A.   That there were two wire transfers totalling $1 million
```

10:08 10

10:09 20

```
  1    that occurred in 2018 from Hyannis Port Capital to the KWF
  2    account Bank of America ending in 0486.  One occurred on
  3    10/17/18 and another occurred on 12/11/18.
  4         MS. WRIGHT:  Okay.  Miss Lewis, if we can pull up,
  5    please, side by side, Exhibits 707 and 708, which are already
  6    in evidence.
  7    Q.   And Miss George, do you recognize Exhibit 707 and 708?
  8    A.   Yes, I do.
  9    Q.   And what are those?
 10    A.   Those are the wire transmittals that reflect those two
 11    $500,000 wire transfers.
 12         MS. WRIGHT:  Miss Lewis, for one final time, can we go
 13    back to Exhibit 719, please.
 14    Q.   Miss George, if you look at these two different boxes
 15    reflecting payments to The Key Worldwide Foundation or KWF,
 16    there are different bank accounts listed there, is that right?
 17    A.   That is correct.
 18    Q.   What can you tell us about the Bank of America account
 19    listed here?
 20    A.   That account was opened in September 2018 at a branch
 21    located in Massachusetts.
 22         MS. WRIGHT:  For the witness only, Miss Lewis, can you
 23    please pull up Exhibit 720.
 24    Q.   Miss George, can you briefly describe what this exhibit
 25    is?
```

```
 1   A.    It's a summary chart that I prepared reflecting payments

 2   from Gamal Abdelaziz to The Key and KWF.

 3   Q.    What records did you review in preparing this chart?

 4   A.    Again, the underlying bank records of The Key and KWF and

 5   the Quickbooks of The Key.

 6   Q.    Does the chart accurately reflect your review of those

 7   records?

 8   A.    It does.

 9          MS. WRIGHT:  The government would offer Exhibit 720,

10   the summary chart.

11          MR. KENDALL:  Objection.

12          MR. KELLY:  Same 403 objection, your Honor.

13          THE COURT:  It will be admitted over the objections of

14   the defendants.

15          (Exhibit 720 admitted into evidence.)

16   Q.    Miss George, can you please just walk the jury through

17   this chart.

18   A.    So the information above reflects the payments that came

19   from the bank accounts that went into the bank accounts of The

20   Key and the KWF.  On the left, we see there was a $5,000

21   payment dated July 25, 2012.  It was a check.  And on the memo

22   line, it referenced "Adam college counseling".  That was

23   deposited into The Key account.

24          And then subsequently, on March 26, 2018, on the

25   right, we see a wire transfer for $300,000 that went into the
```

Line markers: `10:11` at line 10, `10:12` at line 20.

 1    KWF account.

 2    Q.   And that references an invoice?

 3    A.   It does.  Invoice 1174 "Gamal Abdelaziz" was written on

 4    the wire.

 5    Q.   Okay.  And we'll get to that box in a minute.

 6    A.   Okay.

 7         MS. WRIGHT:  But first, Miss Lewis, can we please pull

 8    up Exhibit 500 just for the witness.

 9    Q.   Miss George, do you recognize this, the bottom section

10:13 10    specifically?

11    A.   Yes, I do.

12    Q.   What is it?

13    A.   It's the wire transmittal.

14    Q.   For that $300,000?

15    A.   For the $300,000 transfer.

16         MS. WRIGHT:  The government offers Exhibit 500.

17         MR. KELLY:  No objection.

18         THE COURT:  It will be admitted.

19         (Exhibit 500 admitted into evidence.)

10:13 20         MS. WRIGHT:  And then if we can just go back to the

21    chart, please, Miss Lewis, which is 720.

22    Q.   Okay.  So let's now talk a little bit about this box.

23    What did the Quickbooks show?

24    A.   That there were additional credit card payments made from

25    Mr. Abdelaziz that went into The Key's bank accounts in the

```
       1   years of 2012, 2013 and 2018.
       2   Q.   And did the Quickbooks have any references for what those
       3   payments may have been for?
       4   A.   They were categorized under the various names of Adam and
       5   Sarah and Sabrina.
       6   Q.   And 2012 and 2013, that was for Adam and Sarah?
       7   A.   That's correct.
       8   Q.   And 2018 was for Sabrina Abdelaziz?
       9   A.   That's correct.
10:14 10        MS. WRIGHT:  Miss Lewis, if we can please pull up
      11   Exhibit 721 for the witness only.
      12   Q.   Miss George, if you can just describe what Exhibit 721 is
      13   briefly.
      14   A.   It's a summary chart that I prepared depicting payments
      15   that went from KWF to Donna Heinel via Clear the Clearinghouse.
      16   Q.   What records did you review to put together this chart?
      17   A.   The underlying bank records of KWF.
      18   Q.   And does the chart accurately reflect that review?
      19   A.   Yes.
10:14 20        MS. WRIGHT:  The government offers Exhibit 721 as a
      21   summary chart.
      22        THE COURT: It will be admitted.
      23        (Exhibit 721 admitted into evidence.)
      24   Q.   Okay.  We have it up for the jury.  Can you tell the jury
      25   what this is in a bit more detail?
```

```
      1    A.    Sure.  There was a series of payments that were made from
      2    the KWF bank accounts and the box in the gray on the right
      3    shows those listing of the check payments, and each of the
      4    eight payments were for $20,000 and they were deposited into a
      5    bank account held by Donna Heinel at Bank of America.
      6          And I failed to mention when we were entering it, I
      7    did review the Donna Heinel bank accounts to see the money
      8    coming in strictly for that purpose, to just see that it was
      9    going into those accounts.
10:15 10    Q.    Okay.  So the arrow here, the checks were made out to
     11    Clear the Clearinghouse, but the arrow indicates that the funds
     12    actually wound up in Donna Heinel's personal accounts?
     13    A.    That's correct, yes.
     14          MS. WRIGHT:  Okay.  And Miss Lewis, I'd now like to
     15    show the witness only just a series of exhibits beginning with
     16    533 and 548, 564, 573, 600, 611, 624.  And if you could go to
     17    the next page of that one, please.  And then 628, please.
     18    Q.    Miss George, do you recognize those documents?
     19    A.    Yes, I do.
10:16 20    Q.    What are they?
     21    A.    Those are the copies of the actual check payments that
     22    were on my summary chart.
     23          MS. WRIGHT:  The government would offer 543, 548, 564,
     24    573, 600, 611, 624, and 628.
     25          MR. KELLY:  Object to all of those.  They're not part
```

```
 1   of this.
 2              MR. KENDALL:  Objection, your Honor.
 3              THE COURT:  They will be admitted over the objections
 4   of the defendants.
 5              (Exhibit 543, 548, 564, 573, 600, 611, 724, 628
 6   admitted into evidence.)
 7              MS. WRIGHT:  And if we could show, Miss Lewis, the
 8   jury just the first one, 533.
 9   Q.   So Miss George, this is that first check that was
10   referenced in your chart, the first $20,000 payment on July 3,
11   2018, from The Key Worldwide Foundation to Clear the
12   Clearinghouse?
13   A.   That's correct.
14   Q.   And then the rest of those exhibits are also the $20,000
15   check payments?
16   A.   Yes.  That's correct.
17              MS. WRIGHT:  If we can show the jury 628, please,
18   Miss Lewis, and blow up kind of the middle.  No.  Sorry.  Right
19   above that.
20   Q.   This is also a $20,000 check payable to Clear the
21   Clearinghouse?
22   A.   Yes, it is.
23   Q.   This one looks a bit different, though, than that first
24   one we looked at?
25   A.   Yes.
```

```
 1   Q.   Why is that?

 2   A.   This one came -- is a cashier's check and it came from

 3   Bank of America.

 4        MS. WRIGHT:  Okay.  Miss Lewis, if we can please go

 5   back to the summary chart, which is Exhibit 721.

 6   Q.   So under the "KWF" box, do you see how there are two

 7   different accounts listed there?

 8   A.   That is correct.

 9   Q.   Why is that?

10   A.   Because part of the payments came from the Wells Fargo

11   account ending in 2391, and the last three payments came from

12   the bank of America account ending in 0486.

13   Q.   Okay.  And can you tell the jury when this first payment

14   from KWF to Clear the Clearinghouse was in relation to

15   Mr. Aziz's $300,000 payment that we looked at in the prior

16   chart?

17   A.   It was approximately three months after.

18        MS. WRIGHT:  Okay.  For the witness only, please,

19   Miss Lewis, can you pull up Exhibit 722.

20   Q.   Miss George, can you briefly describe this.

21   A.   It's a summary chart that I prepared based on a -- records

22   produced by USC regarding the Women's Athletic Board Fund gift

23   account.

24        MR. KELLY:  Sorry.  Which exhibit number is this?

25        THE COURT:  722.
```

10:18 (line 10)
10:19 (line 20)

```
 1   Q.   And does this chart accurately reflect your review of

 2   those records?

 3   A.   It does.

 4        MS. WRIGHT:  The government offers Exhibit 722 as a

 5   summary chart.

 6        THE COURT:  It will be admitted.

 7        (Exhibit 722 admitted into evidence.)

 8   Q.   Okay.  We have it up for the jury.  So Miss George, can

 9   you explain what it is we're looking at?

10   A.   This is a bar chart that I recreated to reflect the

11   donations -- excuse me -- the total dollar amounts of money

12   that went into the USC Women's Athletic Board Fund during those

13   fiscal years.

14   Q.   You see the orange and the blue?

15   A.   Yes.

16   Q.   What does that signify?

17   A.   So, collectively, the orange and the blue total, the

18   amount of money that was deposited into the gift account per

19   fiscal year, but the blue is representative of the portion of

20   which -- the portion of the total that represents money that

21   came from Singer related individuals, or from The Key, or KWF

22   directly.

23   Q.   And how did you determine which payments were Singer

24   related?

25   A.   Well, in the case where it was drawn directly from The Key
```

(line 10)
(line 20)

or KWF accounts, I included those.  And then there were other
payments from parents that I was able to associate with Singer
because they had made payments or had correspondence with
Singer to indicate that they were clients of The Key or other
business relationships with Mr. Singer.

Q.   Fair to say that during this time period the funds given
by Rick Singer's clients comprised more and more of the total
amount given to the USC Women's Athletic Board Fund?

A.   Yes.  You can see the blue portion growing over the time
period.

Q.   Okay.  And how come it drops off like this in fiscal year
2019?

A.   Because we -- I only had records from the gift account
through January of 2019 and the fiscal year ends June 30th, so
we only had a partial year.

        MS. WRIGHT:  Miss Lewis, if you can pull up, for the
witness only, Exhibit 2.

Q.   And there's some redactions here per agreement of the
parties, but if we could go -- it's a voluminous record, which
the jury will have.  If we can go to page 8, do you recognize
what this is, Miss George?

A.   Yes, I do.

Q.   What is it?

A.   It's the personnel file for Donna Heinel at USC.

        MS. WRIGHT:  The government offers this exhibit

```
 1    pursuant to the parties' business records stipulation.

 2           MR. KENDALL:  Your Honor, there were some redactions

 3    that needed to be done.  If they're being done, then I don't

 4    think we have an issue, but reserving that right.  I object in

 5    general on relevance.

 6           THE COURT:  It will be admitted as redacted.

 7           (Exhibit 2 admitted into evidence.)

 8           MS. WRIGHT:  Okay.  If we could publish that.

 9    Q.   Miss George, did you review these records in preparation

10    for your testimony here today?

11    A.   Yes, I did.

12    Q.   And was primarily to determine salary information for

13    Donna Heinel?

14    A.   Yes, it was.

15    Q.   Can you tell the jury in general terms how Miss Heinel's

16    salary changed over the time period that's depicted in that

17    summary chart?

18    A.   Yes.  It increased.  It started at approximately $150,000

19    and went just under $250,000.

20           MS. WRIGHT:  Miss Lewis, if you could please go to

21    page 27 of this exhibit.

22    Q.   I'm just going to have you read a few lines for the jury,

23    Miss George.  So the top, what does that say?

24    A.   It says "2013/2014 Year End Review for Donna Heinel".

25    Q.   Great.
```

A2994

```
 1              MS. WRIGHT:  And then Miss Lewis, under "Overall", can
 2    you please highlight number five.
 3    Q.    What does that read?
 4    A.    "Terrific job on admissions and relationship with
 5    Admissions Office".
 6              MS. WRIGHT:  And then under -- Miss Lewis, if you can
 7    highlight number three.
 8    Q.    What does that say?
 9    A.    "Keep working on development".
10    MS. WRIGHT:  And then finally, Miss Lewis, if you can
11    go to page 23 of the same exhibit and highlight the top title
12    line.
13    Q.    What is this titled, Miss George?
14    A.    "2014/2015 Year-End Review for Donna Heinel".
15    Q.    So this is the following year?
16    A.    Correct.
17              MS. WRIGHT:  And then if you could highlight numbers
18    four and six under "Overall", please, Miss Lewis.
19    Q.    And Miss George, if you could just read those?
20    A.    "Strong relationship with admissions -- very important for
21    the department.
22              "Really improved her development efforts --
23    important".
24              MS. WRIGHT:  And then under "To Do", if you could
25    highlight just that first part of number one, please.
```

A2995

```
 1   Q.   If you could read that, please, Miss George.

 2   A.   "Continue development success".

 3            MS. WRIGHT:  No further questions.

 4            THE COURT:  Cross-examination, Mr. Kelly.

 5            MR. KELLY:  Yes, your Honor.

 6                 CROSS-EXAMINATION OF LAUREN GEORGE

 7   BY MR. KELLY:

 8   Q.   Good morning, Miss George.

 9   A.   Good morning.

10   Q.   I represent Mr. Abdelaziz.

11            Those questions you were just asked about on those

12   charts about where Heinel's getting praised for her development

13   efforts, that means she was out raising money, correct?

14   A.   She was being acknowledged for her development efforts.

15   Q.   Right.  She was being praised for bringing in money to

16   USC, correct?

17   A.   They said it was important and they acknowledged that in

18   her yearly review that -- yes.

19   Q.   And her boss there, Pat Haden, the athletic director,

20   actually singled out her efforts in one of those, "keep working

21   on development", right?

22   A.   Right.  He's encouraging her to keep working on it, yes.

23   Q.   So she was doing what her USC superiors wanted her to do,

24   wasn't she?

25            MS. WRIGHT:  Objection.  Foundation.
```

```
 1              THE COURT:  Sustained.
 2   Q.   Well, this was her personnel file we just heard about,
 3   right?
 4   A.   It was, yes.
 5   Q.   And she was getting praised by her superiors because she
 6   was out raising money for USC, right?
 7   A.   She appeared to be commended for her development efforts.
 8   Q.   Right.  And you know that there's no suggestion at all in
 9   this case that Ms. Heinel started personally pocketing money
10:26 10  until the summer of 2018, correct?
11   A.   Well, I know from reviewing the bank records that that's
12   when she started depositing funds.
13   Q.   Right.  You're not disputing that there's no evidence that
14   she started personally pocketing money before the summer of
15   2018, correct?
16   A.   I'm not aware of any evidence.
17   Q.   And before that, before the summer of 2018, the money was
18   going to USC, correct?
19   A.   It was going to athletic funds that appeared to be under
10:26 20  her direction.
21   Q.   Well, and she's being praised for bringing in money,
22   correct?
23   A.   Yes.
24   Q.   And, in fact -- let's go to a few of these charts, please.
25              MR. KELLY:  Let's go to Exhibit 718, Mr. Carter.  It
```

         1    was LG3 before.  I believe this is in evidence.  Yes.

         2    Q.   Now, you're not aware -- there's several schools here

         3    listed -- you're aware that my client, Mr. Abdelaziz, has no

         4    connection to Georgetown, right?

         5         MS. WRIGHT:  Objection.

         6    Q.   Well, you prepared this chart, right?

         7    A.   I did.

         8    Q.   Okay.  And in preparing this chart, you didn't see any

         9    connection between my client, Mr. Abdelaziz, and Georgetown,

10:28   10    correct?

        11         MS. WRIGHT:  Objection.  Foundation.

        12         THE COURT:  Well, she can answer it if she understands

        13    it.

        14    A.   The purpose of this chart was to depict money that was

        15    going from The Key or KWF to these universities.

        16    Q.   Right.  And nothing of what you saw connected Abdelaziz to

        17    Georgetown, right?

        18         MS. WRIGHT:  Objection to the characterization of a

        19    connection.

10:28   20         THE COURT:  Yeah.  Sustained.

        21    Q.   You're not aware of any evidence that he has anything to

        22    do with Georgetown or Gordon Ernst, are you?

        23         MS. WRIGHT:  Same objection.

        24         THE COURT:  Well, if she has such, she can answer that

        25    question.

```
 1   A.   I'm not aware of any connection.

 2   Q.   Okay.  And you're not aware of any connection between

 3   Abdelaziz and Yale and Rudy Meredith either, are you?

 4   A.   No personal connection with Mr. Abdelaziz.

 5   Q.   All right.  And you're not aware of any personal

 6   connection between Abdelaziz and Stanford and John Vandemoer

 7   either, right?

 8   A.   I'm not aware of any.

 9   Q.   And you're not aware of any personal connection between

10   Abdelaziz and UCLA and Jorge Salcedo, correct?

11   A.   Correct.

12   Q.   And much of your analysis that are in all these charts

13   came from bank records, right?

14   A.   That's correct.

15   Q.   And I assume you got those bank records by using a grand

16   jury subpoena for records, correct?

17   A.   That's correct.

18   Q.   Okay.  And a grand jury is a group of individuals who meet

19   in secret and analyze evidence that the government presents,

20   right?

21        MS. WRIGHT:  Objection.  Relevance.

22        THE COURT:  Sustained.

23   Q.   Well, all right.  You have access to a grand jury but a

24   private individual doesn't, right?

25        MS. WRIGHT:  Objection.
```

```
 1              THE COURT:  Sustained.
 2   Q.   Well, do you have any evidence that Mr. Abdelaziz saw the
 3   bank records of KWF?
 4   A.   I would have no reason to know that one way or another.
 5   Q.   All right.  But putting aside bank records, tax records
 6   are public of charities, aren't they?
 7   A.   Yes.
 8   Q.   So, for instance, if someone had bothered to look at the
 9   tax return of KWF or Key Worldwide Foundation, they would have
10   seen -- it always says "open to public inspection", right?
11              MS. WRIGHT:  Objection.  Foundation.
12   Q.   Well, let me show you Exhibit 3721.
13              MR. KELLY:  Just the witness, please.
14   Q.   I'll direct your attention to the top right corner.
15              MR. KELLY:  Then take it down, please.
16   Q.   Are you aware that tax returns of charities are open to
17   public inspection?
18   A.   Yes.
19   Q.   Okay.  So, unlike the grand jury, the public can see
20   what's happening with a charity's tax return, correct?
21              MS. WRIGHT:  Objection to the continued references to
22   the grand jury.
23              THE COURT:  Overruled.
24   A.   Could you repeat the question, please?
25   Q.   Sure.  Unlike a grand jury, which is a secret proceeding
```

**A3000**

1    closed to the public, the tax returns of KWF are open to the

2    public, correct?

3    A.    That's correct.

4    Q.    And if someone were to look at their KWF tax returns to

5    see if it was legit, they would see, in fact, donations to USC

6    baseball, USC water polo, USC women's soccer, NYU athletics,

7    things like that?

8    A.    I don't think they would have the ability to know by

9    reading the face of it what they were for, but they could

10:31 10    certainly see that they -- that's what they were reporting.

11    Q.    Sure.  If an outsider looking at the tax return filed by

12    the charity would see what appeared to be legitimate donations,

13    correct?

14    A.    Again, there would be no basis for knowing whether it's

15    legitimate or illegitimate.  It's -- that's the foundation

16    listing the entities that received payments.

17    Q.    Right.  And the foundation was a 501(c)(3) charity and so

18    is a university a 501(c)(3) charity, right?

19    A.    Correct.

10:32 20    Q.    And one -- one 501(c)(3) charity is entitled to and it's

21    permissible to send money to another 501(c)(3) charity, right?

22    A.    Yes.

23    Q.    And if a person gives $300,000 to one charity and then

24    that charity sends it to another charity, it's still just a

25    $300,000 donation.  It doesn't get diminished, it doesn't get

increased.  It's still just a $300,000 tax deduction for the

person who gave it, correct?

A.   It would only be that the first step in that scenario

that's relevant to that taxpayer, where they give it to.

Q.   Right, but it would still just be $300,000, right?

A.   Correct.

Q.   Now, let's look at -- well, let's go back to -- let's stay

with Exhibit 18.

          MR. KELLY:  Mr. Carter, again, which used to be LG3.

Q.   And let's look at the middle there where it says "Clear

the Clearinghouse" "Donna Heinel".  You lumped it under USC,

correct?

A.   That's correct, yes.

Q.   And this, in fact, was Heinel's private business, right?

A.   It -- yes.  It was a business controlled by Heinel.

Q.   Right.  It wasn't part of USC, right?

A.   Well, as the title of the schedule says, it's payments to

individuals, entities, and funds associated with those

universities.

Q.   Okay.  So Heinel was working at USC, but this was her

private business, correct?

A.   That's correct.

Q.   Now, let's look at another one of these exhibits.  Let's

look at 721, please.  Now, here it's very clear upon your

review of the records, the first time Heinel's taking money in

```
 1    her private business is on July 3, 2018?
 2    A.   That's correct.  That's the first date of the deposit.
 3    Q.   Right.
 4    A.   Of the check.  Sorry.
 5    Q.   And are you aware, in fact, that my client,
 6    Mr. Abdelaziz's donation to KWF was in March, not July?  Are
 7    you aware of that?
 8    A.   Yes, I am.
 9    Q.   And let's move to Exhibit 722, which, Mr. Carter, was LG7.
10:35 10    Here we see why Miss Heinel was being commended.  More and more
11    money was going to USC, correct?
12    A.   Yes.  This is limited to one specific fund within USC, but
13    yes, this -- USC Women's Athletic Board Fund, this one fund was
14    growing.
15    Q.   Right.  And you are aware, aren't you, that there is no
16    reason to believe that any money that went to the athletic --
17    Women's Athletic Board account was ever misappropriated or used
18    by any USC employee personally for any purpose unrelated to
19    their employment at USC?  You're aware of that, right?
10:35 20    A.   No, I'm not.
21    Q.   All right.  So if there were stipulation to that in this
22    case, you would be unaware?
23    A.   Yes.  That's correct.
24    Q.   How about in your review of the documents in this case?
25    Did you learn that of the $300,000 donated by Abdelaziz to KWF,
```

```
 1   $200,000 was supposed to go to USC?

 2         MS. WRIGHT:  Objection to "supposed to."

 3         THE COURT:  Sustained.

 4   Q.   Well, did you uncover any evidence that suggested $200,000

 5   to USC, the remaining to KWF?

 6   A.   I only saw the $300,000 payment that went to the bank

 7   account.

 8         MR. KELLY:  All right.  Let me show you, just the

 9   witness only, Exhibit 1564.

10   Q.   I'll direct your attention about --

11         MR. KELLY:  Keep going, please.  Highlight the Aziz

12   name, please.

13   Q.   Just read that to yourself.  Take a look.

14         MR. KELLY:  Take it down, please.

15   Q.   Having seen that document, does it refresh your

16   recollection as to whether or not you learned at any time

17   during your investigative work that $200,000 was going to USC,

18   $100,000 to KWF for Sabrina Aziz?

19   A.   No, it does not.

20   Q.   How about Exhibit 720, please?  Here these two boxes are

21   really apples and oranges, aren't they?

22         MS. WRIGHT:  Objection.

23   Q.   Apples should be the 5,000 and oranges should be the

24   300,000, right?

25         MS. WRIGHT:  Objection.
```

```
 1              THE COURT:  Overruled.
 2    A.   I don't know what you're characterizing apples and
 3    oranges.  One is a much a smaller amount and one is a much
 4    larger amount.
 5    Q.   Right.  And the suggestion is somehow this is nefarious,
 6    but, in fact, the $5,000 pertains to his son's -- Mr. Aziz's
 7    son Adam, right?
 8    A.   Yes, the middle reference "Adam College Counseling".
 9    Q.   Okay.  If you were just talking about Sabrina, that $7,000
10    at the bottom, 2018, should be in that box, not Adam.
11    Sabrina's in dispute in this case, right?
12    A.   Well, the box above just simply reflects activity that I
13    was able to observe through the bank account review.  The box
14    below is what I reviewed from the Quickbooks, so it's just a
15    matter of where I obtained the information.
16    Q.   Well, okay, and so the bottom one, $7,000, that was for
17    Sabrina's college counseling and was paid on January 5, 2018,
18    correct?
19    A.   Correct.
20    Q.   All right.  So if we were to move that up into a box,
21    whether it's cash or check or credit card, that would be next
22    to the $300,000, right, not $500,000 to Adam, $300,000 over
23    there?
24    A.   It wouldn't be next to the $300,000.  It would be on the
25    box in the left that went to The Key.
```

```
 1    Q.   Right.  And this is -- the college counseling amount
 2    changed from 5,000 in 2012 for Adam and then 7,000 for Sabrina,
 3    correct?
 4    A.   Correct.
 5    Q.   And in fact, let me show you Exhibit 1568.
 6         MR. KELLY:  Just the witness, please.  Go to the
 7    second page, please.  Highlight up to where it says "Good
 8    morning".
 9    Q.   Okay.  And have you ever seen this document before?
10    A.   Yes, I have.
11         MR. KELLY:  Okay.  And I offer it, your Honor.
12         MS. WRIGHT:  No objection.
13         THE COURT:  It will be admitted.
14         (Exhibit 1568 admitted into evidence.)
15    Q.   All right. So there's no dispute that Mr. Abdelaziz paid
16    $7,000 for college consulting services for his daughter
17    Sabrina, right?
18    A.   No.  I reflected that on the chart.  I don't dispute.  I
19    just don't know that -- I did not have the actual credit card
20    records to be able to fully substantiate that activity.
21    Q.   Sure.  And with respect to the Galen Center at USC, are
22    you aware that there's no reason to believe there was any money
23    misappropriated from there?
24    A.   I'm not aware one way or another.  I have no knowledge of
25    that.
```

**A3006**

```
 1              MR. KELLY:  Okay.  One moment, your Honor.

 2              THE COURT:  Yes.

 3              MR. KELLY:  All set, your Honor.

 4              THE COURT:  Mr. Kendall?

 5              MR. KENDALL:  Yes.  Just a minute, your Honor.

 6              MR. KELLLY:  Actually, sorry.  Quick question.

 7              THE COURT:  All right.  One more question by

 8    Mr. Kelly.

 9    Q.   You testified regarding Miss Heinel's salary.  Do you

10    recall that question?

11    A.   Yes, I do.

12    Q.   Isn't it, in fact, the rate of increase of her salary

13    actually decreased over time?  That is, didn't she get an

14    8 percent raise in fiscal year '14, 5 percent in fiscal year

15    '15 and '16, and then 4 percent in fiscal year '17, and then

16    3 percent in fiscal year '18?  The big bump was not part of her

17    salary, but her salary increases were 8 percent, 5 percent,

18    5 percent, 4 percent, 3 percent.  That's decreasing, correct?

19    A.   And then I'd have to look at the math again, but I think

20    in the very last year for fiscal '19 it may have gone up again.

21    Q.   You're correct.  It went up to 5.5 percent, right?

22    A.   Yes.

23    Q.   So -- but over time, the fiscal year '14 was an 8 percent

24    bump.  Then it went down to 5 percent in fiscal year '15 and

25    '16, and then 4 percent in fiscal year '17, 3 percent in '18,
```

```
 1    and then back up to 5.5 in '19, right?
 2    A.   Yes.  That's my recollection.  Yes.
 3              MR. KELLY:  Thank you.  That's it.  That really is it.
 4              THE COURT:  Cross, Mr. Kendall.
 5              MR. KENDALL:  Yes, your Honor.  Thank you.
 6                  CROSS-EXAMINATION OF LAUREN GEORGE
 7    BY MR. KENDALL:
 8    Q.   Good morning, Miss George.
 9    A.   Good morning.
10:43 10 Q.   My name's Mike Kendall.  I represent John Wilson.  Thank
11    you for joining us this morning.  I have a few questions I'd
12    like to start with.
13              To do your work in this case on these summary charts,
14    did you listen to any of the evidence at trial?
15    A.   Yes, I did.
16    Q.   Okay.  Which witnesses did you listen to?
17    A.   Well, I listened to the trial.  I prepared these summary
18    charts prior to the start of trial and had -- obviously
19    produced them now, I mean, produced them prior to my testimony
10:44 20 here today, but I listened to the trial, yes.
21    Q.   Okay.  So for example, did you listen to the testimony of
22    Special Agent Keating?
23    A.   Yes.
24    Q.   Okay.  And So you're familiar with her testimony that
25    Mr. Singer told the agents that John Wilson always thought
```

```
 1    everything was a donation.
 2             MS. WRIGHT:  Objection.  This is beyond the scope.
 3             THE COURT:  Sustained.
 4    Q.   Are you familiar with the testimony that Agent Keating
 5    gave?
 6    A.   I mean, I listened to the trial over the course of the
 7    trial.  I obviously -- as much as I can remember what was going
 8    on.
 9    Q.   Okay.  Do you remember that Agent Keating testified that
10:44 10    prior to her work with the government she told John Wilson and
11    others -- he told John Wilson and others that these were
12    donations to the school and not bribes?
13             MS. WRIGHT:  Objection.
14             THE COURT:  Sustained.
15    Q.   Do you recall anything about Agent Keating's testimony of
16    what Singer told the agents he had told Wilson and the parents
17    prior to his cooperation?
18    A.   No.  I don't specifically recall specific testimony.
19    Q.   Okay.  You're not -- do you remember anything of her
10:45 20    testifying along the line that certain parents were told by
21    Mr. Singer prior to his becoming an informant that the money
22    was a donation to the program?
23             MS. WRIGHT:  Objection.
24             THE COURT:  Sustained.
25    Q.   Fair to say -- did you hear Miss Keating's testimony that
```

```
 1   the agents didn't write any such comments down in their report?
 2              MS. WRIGHT:  Objection.
 3              THE COURT:  Sustained.
 4   Q.   Okay.  Do you have any memory of what Miss Keating said
 5   about what Mr. Wilson and other parents were told about the
 6   monies prior to September 18th?
 7   A.   No, I do not.
 8   Q.   Okay.  And in order to organize these charts, did the
 9   prosecutors tell you how they wanted the groupings done and
10   what they wanted to emphasize?
11   A.   Not necessarily the groupings.  And you know, for example,
12   for the specific schools, I was advised which schools to
13   reflect.
14   Q.   Okay.  And the decision that payments to individuals
15   personally and payments to schools would be grouped together,
16   was that your decision or the prosecutor's decision?
17   A.   That's how I prepared the chart and showed it to them.
18   That was my decision, I guess.
19   Q.   So you decided that without any direction or conversation
20   by them?
21              MS. WRIGHT:  Objection to our conversations.
22              THE COURT:  Yeah.  Sustained.
23   Q.   Did you decide that without any direction from the
24   prosecutors?
25   A.   Yes, I did.
```

A3010

Q.   And you understood how to group each individual with each
school based upon your own information and not any discussion
with the prosecutors?

A.   That's correct.

Q.   And how did you get that?

A.   As part of my review of the financial records, I was
trying to understand payment categories, whether it came from a
parent or a business venture or whatever.  So to the extent
that I was unclear as to who was -- belonged to what or their
affiliation, I would move through the discovery records and
look for -- in some cases, we had the underlying bank records
for some of these parties.  And then in other cases, it would
be e-mail communication between Mr. Singer where I would gain
an understanding of what this third party business was, or
entity.

Q.   So you've reviewed a lot of records that are not in
evidence at trial to put together your charts, correct?

A.   No.  I would wouldn't say a lot of evidence.  I would have
very directed searches where, if I came across a payment in a
particular name that I -- if it wasn't obvious on the face of
the payment as to what that was, then I would do a directed
search within the discovery to try to see if I could gain any
clarification.

Q.   But you don't know if that directed search was looking at
stuff that's been admitted to evidence or not admitted to

```
 1   evidence, correct?

 2   A.   I do not know that.

 3   Q.   Okay.  And you prepared these charts before the trial was

 4   even started, correct?

 5   A.   Correct.

 6   Q.   Okay.  So, as far as you know, a lot of these charts are

 7   based upon things that are not in the evidentiary record,

 8   correct?

 9   A.   No.  That's not correct.

10   Q.   Well, you just said you were going through all sorts of

11   documents that you don't know if they were --

12   A.   You asked me if I knew if they were based on stuff not in

13   evidence.  When I -- at the time that I prepared this, I had no

14   idea what was going to be in evidence at the time that I was

15   asked to testify.

16   Q.   Right.  And you don't know if all of that material ever

17   got into evidence, correct?

18   A.   I don't know.

19   Q.   Okay.  I'd like to take a look at -- if we can have

20   Exhibit 716 up on the chart.  Okay.  Now, I believe when you

21   were testifying with the government, if we go to that

22   $27 million, 27.6 million in the middle, you said that was

23   about 26 million from parents, correct?

24   A.   Correct.

25   Q.   Okay.  And they had 20.6 million in the red.  That's money
```

```
 1    that's withdrawn and came out of the account, right?
 2    A.    That's correct, yes.
 3    Q.    And you told us there was about six and a half million
 4    that went to colleges or associated individuals?
 5    A.    That's correct.
 6    Q.    And about six and a half million that went to business
 7    investments?
 8    A.    Yes.  I think I referenced 6.4, but yes.
 9    Q.    Okay.  And was that like the soccer club that Mr. Singer
10:49 10 invested in?
11    A.    Correct.
12    Q.    And the food business?
13    A.    Yes.
14    Q.    Monies all going overseas for his investments?
15    A.    I don't know about that.  There was a basketball venture,
16    a basketball gym.
17    Q.    The gym was in California --
18    A.    Correct.
19    Q.    -- but wasn't the soccer team in Europe?
10:49 20 A.    Oh, yes.  Specific to the soccer team, yes.
21    Q.    Yeah.  And some of the money went up to Canada?
22    A.    I don't recall which entity he was at.
23    Q.    Was it Sharkeys or one of the food investments was up in
24    Canada?
25    A.    That wasn't reflected on the payment.  I saw a payment.  I
```

A3013

1    don't know --

2    Q.   So you saw from this about six and a half million went to

3    what you called colleges and associated individuals, but a

4    roughly equal amount of money went apparently to Mr. Singer's

5    own personal benefit and investments, correct?

6              MS. WRIGHT:  Objection.

7              THE COURT:  Sustained.

8    Q.   Well, the 6.4 million that you saw went to investments

9    that you connected to Mr. Singer, correct?

10:50 10   A.   They were investments that were engaged with The Key

11   Worldwide Foundation.

12   Q.   And did it appear to be that Mr. Singer was directing

13   them?

14   A.   In terms of like the term agreements, they were in the

15   foundation's name.

16   Q.   Correct, but from -- seeing who was directing it and

17   getting the benefit of it, it was Mr. Singer, correct?

18              MS. WRIGHT:  Objection.

19              THE COURT:  Sustained.

10:50 20   Q.   To the extent you know, who was the beneficiary of the

21   6.4 million in business investments?

22   A.   I -- I don't know.  I mean, I know -- I would say The Key

23   Worldwide Foundation is their investment, so I would have to

24   say that the foundation.

25   Q.   And so 6.5 and 6.4 gets us 12.9.  Where'd the other

**A3014**

```
 1   7.7 million go?  I think you said other business investments?

 2   A.   Yes.  There were several other business ventures.

 3   Q.   What were the other business ventures?

 4   A.   There were payments to individuals that appeared to be

 5   doing -- there was one that was an outreach for an addiction

 6   program.  There were other outreach programs that The Key

 7   Worldwide Foundation appeared to be joining efforts with.

 8   Q.   Well, would you give us some of the other things that were

 9   joining efforts with something, for addiction issues and what

10   else?

11   A.   Right.  There was a -- I'm trying to recall -- I forget

12   the name of the entity, but there was a game on or -- I can't

13   recall the specific entity name, but there was --

14   Q.   Wasn't there over a million dollars going to China?

15   A.   I don't recall specifically.  Do you know what entity

16   you're referring to?

17   Q.   I did at one point and, I apologize, I forget the name.

18   But you're not aware of him financing some sort of business

19   school venture in China to bring Chinese students over?

20   A.   If you knew the name, I would be better to answer that.  I

21   can't recall at this moment.

22   Q.   All right.  Okay.  And then if we go down to the deposits,

23   it's 14.6 million in deposits.  And you said about five million

24   of that was credit card payments?

25   A.   Are we going to The Key now?
```

**A3015**

Q.   No.  We're still in 716.  Excuse me.  Yes.  Under The Key,
College and Career Network, deposits 14.6 million.

A.   Oh, that's only one single account, so really we're
talking --

Q.   The five million in credit card payments, what did that
refer to?

A.   In total, all of the -- I don't know how much the credit
cards went to which one of these accounts.  In total, there
were credit card deposits that were processed through Global
Payments and American Express that totaled approximately 5
million that went into the collection of these accounts held by
The Key.

Q.   And that -- those credit card payments, were they mostly
in smaller amounts in the hundreds or few thousands of dollars,
not in the hundreds of thousands of dollars?

A.   Correct.  I -- based on the -- my review of the Global
payments, there was one single credit card transaction for
$40,000, but otherwise there were generally in the few thousand
dollar range or lower.

Q.   And based upon your financial review, you know that
Mr. Singer charged people getting legitimate college counseling
work in that range of four, five, $6,000?

       MS. WRIGHT:  Objection to legitimate and what he
charged.

       THE COURT:  Sustained.

```
 1    Q.   You know that Mr. Singer charged people who were getting
 2    college counseling services an annual fee in the five to $7,000
 3    range, correct?
 4    A.   I am aware of that.
 5    Q.   Or smaller amounts for tutoring and other special services
 6    that might be charged as a few hundred or a couple thousand
 7    dollars as well?
 8    A.   I don't exactly know his model, his billing model, but
 9    I -- in reviewing the payments, I would often see references to
10:54 10  tutoring or college prep, or testing.  That sort of thing, yes.
11    Q.   And that -- and there were five million credit card
12    payments in these smaller amounts, correct?
13    A.   Of deposits into The Key, correct.  Yes.
14    Q.   Now, if we could go to Exhibit 718, please.  You have
15    Gordon Ernst to Georgetown Tennis.  What did you rely on to do
16    that?
17    A.   Primarily references within e-mails that I looked at and
18    reviewed in trying to make that association.
19    Q.   Do you know if those e-mails are in evidence or not?
10:55 20  A.   I do not.
21    Q.   Okay.  Next -- and you see you attribute $2.7 million to
22    Mr. Ernst?  That went into his pocket, correct?
23    A.   They're made payable directly to him, yes.
24    Q.   No university or no school name on that.  2.7 million
25    payable to Mr. Ernst to enjoy as he likes, correct?
```

**A3017**

```
 1              MS. WRIGHT:  Objection to enjoy as he likes.
 2              THE COURT:  Sustained.
 3   Q.   2.7 million paid personally to Mr. Ernst?
 4   A.   That is correct, yes.
 5   Q.   And you see no connection of any funds from John Wilson
 6   going to Gordon Ernwst, correct?
 7   A.   I didn't review the bank account of Gordon Ernst or the
 8   bank account of Mr. Wilson.
 9   Q.   Okay.  And then -- and so that would be fair to say you
10   did not observe any connection between the two, correct?
11              MS. WRIGHT:  Objection to repeated references to
12   connection.
13              THE COURT:  I'm sorry.  I didn't hear you.
14              MS. WRIGHT:  Objection to the repeated references to
15   "connection".
16              MR. KENDALL:  I think that was the language Mr. Kelly
17   was allowed to use, your Honor.
18              THE COURT:  Go ahead.
19   Q.   Okay.  You didn't find any financial connection between
20   Mr. Ernst and Mr. Wilson, correct?
21   A.   I -- I would have no basis of saying one way or another.
22   I did not review financial records for either.
23   Q.   Okay.  We then go down to USC.  We see that there's four
24   entities that are listed with USC:  USC Women's Athletic Board,
25   USC Water Polo, USC Baseball, and USC Women's Volleyball.  I
```

1    total that up to about 525,000.  My math is not good, as people

2    found out yesterday, or the day before.

3    A.    Yes.

4    Q.    Is that right, 5.25?

5    A.    525,000.  Yes.

6    Q.    And the total down there you have is about 1.25 million

7    for all USC related entities, correct?

8    A.    Correct.

9    Q.    So there's 525 that goes to the school's bank accounts and

10:57 10    about 725,000 that goes somewhere else, correct?

11    A.    Correct.

12    Q.    Okay.  Now, for USC water polo you have $150,000, correct?

13    A.    Yes.

14    Q.    $100,000 of that is from John Wilson; am I correct?

15    A.    Yes.  That is correct.  Yes.

16    Q.    And that was for a bank check that said payable to USC

17    water polo -- or USC Men's Water Polo and had the Wilson's

18    family name on it, correct?

19    A.    That's correct.

10:57 20    Q.    Okay.  And it was just, from all appearances, a

21    conventional bank check that identified who was paying it and

22    who was receiving it, correct?

23    A.    Yes.  It was a traditional cashier's check.

24         MR. KENDALL:  Okay.  I'd like to show the witness

25    Exhibit 125.  Is 125 in evidence?  I'm not sure.  If not, I

only want to show the witness page 9 of Exhibit 125.  If we

could just turn that around.

Q.   Is that the bank check, a copy of the bank check that

you're referring to for the USC number you have there of

$150,000?

A.   Yes.

       MR. KENDALL:  I'd like to offer this copy of the check

into evidence, your Honor.

       MS. WRIGHT:  No objection.

10:58    THE COURT:  It will be admitted, 125.

       (Exhibit 125 admitted into evidence.)

       MR. KENDALL:  Thank you, your Honor.

       If we could show the jury, please.

       MS. WRIGHT:  Just this check, though, correct?

       MR. KENDALL:  Just this check.

Q.   You see it says US Bank cashier's check pay $100,000 and

it's payable to the order of Usc Men's Water Polo, correct?

A.   Correct.

Q.   No individual's name there associated with USC, correct?

10:59 Not Donna Heinel, not a coach?

A.   Correct.

Q.   Just to the water polo team.  And then it says

"purpose/remitter".  That means -- the remitter is the person

who bought the check, or is supplying the funds?

A.   It doesn't always mean who bought it.  I mean --

```
 1   Q.   The purpose who was giving it?
 2   A.   It's the -- you can advise the bank to put a particular
 3   thing.
 4   Q.   Okay.  It says "Wilson Family", correct?
 5   A.   Yes, it does.
 6   Q.   Okay.  If you look and see those handwritten numbers at
 7   the top, 93-9101-6984, you know that to be the men's USC water
 8   polo gift account bank account number?
 9   A.   It's not the bank account number.
10   Q.   Is it the account number?
11   A.   It's -- my understanding is that is the general ledger
12   account number of the internal USC.
13   Q.   Thank you.  So it's how USC tracks the money that goes
14   into its gift account?
15   A.   That's right.
16   Q.   It may not actually be the bank's account number?
17   A.   Correct.
18   Q.   But it's the USC accounting entry to show it went into the
19   USC gift fund account, correct?
20   A.   That's correct.
21   Q.   Now, if we go back to 718, please.  We see the water polo,
22   which the 100,000 is connected to John Wilson.  Then you see
23   Clear the Clearinghouse with Donna Heinel of $160,000.  Do you
24   know those payments occur 4 years after Johnny Wilson is
25   admitted to USC, correct?
```

```
 1   A.   Yes, I am aware.

 2   Q.   You did not see any connection between the Clear the

 3   Clearinghouse money and the admittance of John Wilson, correct?

 4   A.   I only saw the payments from The Key or KWF to Clear the

 5   Clearinghouse.

 6   Q.   So the answer is yes, you did not see anything that would

 7   connect funds from John Wilson to Clear the Clearinghouse?

 8   A.   I guess it depends on how you want to answer that.  I saw

 9   Wilson funds go into The Key or KWF and I saw funds from The
```
11:01 10   Key or KWF going out to Donna Heinel and Clear the
```
11   Clearinghouse, not close in time.  I'm saying in general.

12   Q.   4 years apart, correct?

13   A.   Yes, correct.

14   Q.   So you saw nothing that connected money from John Wilson

15   traceable to Clear the Clearinghouse, correct?

16   A.   There was -- there was no indication of Mr. Wilson on any

17   payments that went from The Key or KWF to Clear the

18   Clearinghouse.  There's no specific reference.

19   Q.   And what's the total amount you had in The Key Worldwide
```
11:01 20   Foundation for deposits?  $36 million?  Is that correct?
```
21   Excuse me.  After you netted out, it was $27 million, correct?

22   A.   Yes.  I believe that's correct.

23   Q.   So his 100,000 is part of $27 million?

24   A.   It is.

25   Q.   But you don't trace any money going directly from him to
```

|     |     |
| --- | --- |
| 1 | Clear the Clearinghouse, correct? |
| 2 | A.   It came from the same accounts from which his money was |
| 3 | placed in.   That's the only connection. |
| 4 | Q.   Right.   Separated by 4 years and multimillions of dollars |
| 5 | of deposits? |
| 6 | A.   Absolutely, yes. |
| 7 | Q.   And then you see an entry for Loyola High School Jovan |
| 8 | Vavic, correct? |
| 9 | A.   Yes. |
| 11:02 10 | Q.   Based upon listening to the testimony at trial, you know |
| 11 | there's nothing about the Loyola High School payments that was |
| 12 | associated as funds coming from John Wilson, correct? |
| 13 |         MS. WRIGHT:   Objection to associated with. |
| 14 |         THE COURT:   Sustained. |
| 15 | Q.   Traced as funds coming from John Wilson. |
| 16 | A.   It would be the same answer with Clear the Clearinghouse. |
| 17 | Money goes into The Key or KWF accounts and at one time it goes |
| 18 | out and the Loyola High School payments are one of the payees, |
| 19 | the money coming out. |
| 11:03 20 | Q.   The money coming in from Mr. Wilson to that bank account |
| 21 | was about -- strike that. |
| 22 |         The acceptance of Mr. Wilson's son was about 18 months |
| 23 | prior to the first check going out for a tuition payment, |
| 24 | correct?   His son's accepted around March 1st of '14.   The |
| 25 | first check is cut in August of '15. |

```
 1   A.   That's -- yes.  That's my.  -- yes.

 2   Q.   16, 17 months separation?

 3   A.   Yes.

 4   Q.   And you see no document in your accounting work and your

 5   thorough review of all of the records, you see no document that

 6   attributed any Wilson funs as going for the Vavic tuition

 7   payments, correct?

 8   A.   There was no -- there was no direct reference on any of

 9   the Vavic payments.  It would be on behalf of Mr. Wilson.

11:04 10  Q.   And you saw no reference where Mr. Wilson was ever

11   informed about the Vavic payments, correct?

12   A.   I would have no idea one way or another if he was

13   informed.

14   Q.   You've seen no evidence of it?

15   A.   In my review of the bank accounts, there was nothing to

16   indicate that.

17   Q.   But you watched the whole trial?

18   A.   I did.

19   Q.   You saw the government play the tape of Mr. Singer and

11:04 20  Jovan Vavic being recorded when Mr. Singer was an informant,

21   correct?

22   A.   Yes.

23   Q.   And you saw the government did not direct Mr. Singer to

24   ask any questions of Mr. Vavic relating to Johnny Wilson or the

25   Wilson family monies, correct?
```

```
 1              MS. WRIGHT:  Objection.

 2              THE COURT:  Sustained.

 3    Q.   You reviewed the tape, correct?

 4    A.   I heard it at trial, as you did.

 5    Q.   You saw nothing in that tape that caused you to associate

 6    Mr. Wilson's money as a source of funds for the Vavic payments,

 7    correct?

 8    A.   There was -- there was no discussion of that in the tape

 9    itself.

11:05 10    Q.   Thank you.

11              THE COURT:  We're going to take the morning recess at

12    this stage.  You may step down for the time being, Miss George.

13              THE WITNESS:  Thank you, your Honor.

14              THE COURT:  We'll be in recess for 15 minutes.

15              THE CLERK:  All rise for the jury.

16              (Jury exits.)

17              THE COURT:  Be seated, counsel.

18              How much longer, Mr. Kendall, on cross?

19              MR. KENDALL:  Let me take a quick look, your Honor.  I

11:06 20    could see 30, 40 minutes, maybe 45.

21              THE COURT:  Then we'll have redirect?

22              MS. WRIGHT:  Yes, your Honor.  I expect to be very

23    brief.

24              THE COURT:  Are we going to hear from the other

25    witness?
```

```
 1              MR. FRANK:  Agent Ranahan.  That is very much my hope,

 2    your Honor.

 3              THE COURT:  Her direct was how long?

 4              MS. KEARNEY:  I trimmed it down to probably about

 5    30 minutes.

 6              THE COURT:  She'll be the last witness.

 7              MR. FRANK:  Yes, your Honor.

 8              THE COURT:  Anything else that needs to come to my

 9    attention before we recess?

11:06 10         MR. KELLY:  No, your Honor.

11              MR. KENDALL:  No, your Honor.

12              THE COURT:  If not, we're in recess for 15 minutes.

13              (Recess taken 11:06 a.m to 11:26 a.m.)

14              THE CLERK:  All rise for the jury.

15              (Jury entered.)

16              THE CLERK:  Thank you.  You may be seated.

17              THE COURT:  Good morning again, jurors.  We're ready

18    to resume.

19              Ms. George, you are reminded that you remain under

11:26 20    oath.

21              THE WITNESS:  Yes, your Honor.

22              THE COURT:  You may continue with cross-examination,

23    Mr. Kendall.

24              MR. KENDALL:  Thank you, your Honor.

25    BY MR. KENDALL:
```

**A3026**

Q.   Ms. George, before we took the break, I was asking you

about that 6.5 million that went out of the foundation's

accounts and went into all of those business investments.  Do

you remember that?

A.   Yes.

Q.   Then there was another 6 million as well that went out for

various ventures, a total of about 12.4 million.

A.   The 6 million -- the two different buckets of 6 millions

were one to colleges and universities and one is to the

11:27 business investments.

Q.   6.5 went to colleges and universities, correct?

A.   Yes.

Q.   6.4 went to soccer teams and food businesses and whatever?

A.   Yes.

Q.   And another, whatever the remainder is, 7, 8 million, went

to other things you called ventures or investments, correct?

A.   No, sir.  I didn't mean to imply that all the rest of that

money went to that sole thing.  Another large grouping of funds

went to some of those other ventures.  That was probably more

11:27 in the line of a million to million and a half.

Q.   Wait, a million to million and a half on top of the 6.4

went to Mr. Singer's business ventures?

A.   Correct.

Q.   So that would be about 8 million?

A.   Correct.

```
 1    Q.    And then --
 2    A.    But they were business ventures from The Key Worldwide
 3    Foundation.
 4    Q.    But you would agree with me The Key Worldwide Foundation
 5    is a tax deductible charitable foundation.
 6    A.    Yes.
 7    Q.    Okay.  Charitable foundations are not allowed to make
 8    investments in for-profit businesses.
 9           MS. WRIGHT:  Objection, foundation.
10           THE COURT:  Sustained.
11    BY MR. KENDALL:
12    Q.   You agree with me what was going on was a 501(c)(3)
13    foundation is investing in various for-profit ventures all
14    around the world.
15           MS. WRIGHT:  Objection to the characterization.
16           THE COURT:  Sustained.
17    BY MR. KENDALL:
18    Q.    Is investing in for-profit foundations both inside the
19    United States and outside the United States?
20    A.    What was the question of that?  I'm sorry, could you
21    please repeat?
22    Q.    You referred to the monies that went out of The Key
23    Foundation to these various business investments as investments
24    by The Key Foundation, and I just wanted to review with you The
25    Key Foundation is a 501(c)(3) charity, correct?
```

11:28 (line 10)
11:28 (line 20)

```
 1   A.    That is correct, yes.

 2   Q.    It's not-for-profit corporation?

 3   A.    Correct.

 4   Q.    But you've traced, I think we're now up to about 8 million

 5   that went from that foundation into various business type

 6   investments?

 7   A.    Business ventures of some kind, yes.

 8   Q.    And then there was another 6 or so million, you said, of

 9   other types of business ventures that money went into as well,

11:29 10   correct?

11   A.    I'm not sure which category we're talking about right now.

12   Q.    I'm sorry.  Maybe we need to go back to the exhibit and

13   I'll try to be more helpful.

14         If we could go back to 716, please.

15         We see here under The Key Worldwide Foundation

16   withdrawals, 20.6 million in withdrawals, correct?

17   A.    Correct.

18   Q.    6.5 million is to colleges or associated individuals in

19   your view, correct?

11:29 20   A.    Correct.

21   Q.    6.4 is into business investments that we just discussed?

22   A.    Correct.

23   Q.    And I was raising with you, this is a 501(c)(3) charity

24   that you say has put 6.4 million into for-profit business

25   investments.
```

**A3029**

```
 1   A.    That's correct.
 2   Q.    Okay.  Then if we add 6.4 and 6.5, we get 12.9.  So we got
 3   another 7.8, 7.9 million.  Where did that 7.8, 7.9 million go?
 4   A.    Well, some of the -- probably a million and a half went to
 5   these other types of business ventures, because we had talked
 6   before about if we're combining those two categories, that's
 7   about 8 million.
 8   Q.    Okay.
 9   A.    And then other types of expenses were payables for taxes,
11:30 10  payments --
11   Q.    Wasn't Mr. Singer also siphoning some of the funds out for
12   his personal expenses?
13           MS. WRIGHT:  Objection to "siphoning."
14           THE COURT:  She can answer it.
15   A.    I mean -- so I didn't go through a characterization of
16   whose -- in looking at the expenditures, I tried to gain an
17   understanding of the majority of the funds.
18   Q.    Okay.
19   A.    So I don't know the specific details associated with each
11:31 20  and every payment that went out.  As I stand here today, I
21   don't know the details associated with each one of them.
22   Q.    I think you've addressed about 14.5 million.  I'm trying
23   to run down that last 6.1 million.
24           Do you recall there being expenditures for Mr. Singer
25   renting a yacht called ILLUSIONS to go to the Bahamas?
```

A.   I don't have a specific memory of that.  I don't know for
sure if it went through the accounts or not.

Q.   You're not aware of him for one of The Key Foundation
accounts and another one for one of the eds. that he twice
rented a yacht called ILLUSIONS for around $16,000 or $17,000
to go on vacation in the Bahamas?

A.   I'm not aware.  That doesn't stick out in my memory of the
payments that I was --

Q.   Okay.  And you've not traced out the amount of monies that
Mr. Singer might have used for his own personal benefit I take
it?

A.   I did not.

Q.   Now, let's go back to Exhibit 718, please.

        We were going through Loyola High School.  Now we're
down to this grouping of Ms. Janke and Mr. Khosroshahin, and
they get about 430,000, 440,000; is that correct?

A.   Yes.

Q.   Okay.  And that goes to various entities that you believe
were all affiliated with those two people, one or both of those
two people?

A.   Correct, based on the records I reviewed, yes.

Q.   You'd agree with me you do not trace any funds from
Mr. Wilson going to the Janke/Khosroshahin group at all.

A.   My answer would be similar to what we previously discussed
with Clear, the Clearinghouse, and Loyola High School.  I saw

money that went into the foundation and The Key from

Mr. Wilson, and at various points throughout the period that I

reviewed I saw money coming out of those same accounts going to

these entities.

Q.   Yes, so other than it being possibly commingled amongst

millions and millions and millions of dollars, you see no

tracing or association of Mr. Wilson's funds going to those

people, correct?

A.   I saw no reference to Mr. Wilson on any of the payments to

those specific entities that --

Q.   And the same with Summertime Sports, correct?

A.   Correct.

Q.   And the same with UCLA Principal Enterprises and Jorge

Salcedo?

A.   Correct.

Q.   Now, with respect to the 100,000 of the USC water polo

money that's there --

        MR. KENDALL:   Could we have Exhibit 126, please, page

2.

Q.   Did you review this thank you note from USC to Mr. Wilson?

A.   I did see that while I was reviewing materials, yes.

Q.   So we know the only amount of money on 718 that you can

attribute to Mr. Wilson, it's a $100,000 bank check with his

name payable to USC that generates a thank you note from USC,

correct?

```
 1    A.    That's correct, yes.

 2    Q.    Okay.

 3          Now, I'd like to go to the Stanford entries you have

 4    on Exhibit 718.

 5          You have three checks there, correct?

 6    A.    Yes.

 7    Q.    And you list one of those checks as Stanford sailing John

 8    Vandemoer, correct?

 9    A.    That's correct.

11:35 10   Q.    If we see the deposit, all three are for Stanford

11    University?

12    A.    That's correct, yes.

13    Q.    So for Stanford, $770,000, by your accounting, every

14    single penny went into the school's bank account; is that

15    correct?

16    A.    Correct.

17    Q.    Not a penny into Mr. Vandemoer's pocket, correct?

18    A.    They were deposited into the institution's bank account.

19    Q.    Now, I have the three checks but I have a different

11:35 20   numbering.  I have a different numbering than what you used for

21    the checks.  Do you have the three numbers for the exhibit

22    numbers for the checks that you called up earlier or should I

23    use my own exhibit numbers?

24          MS. WRIGHT:  We didn't show these checks as exhibits.

25          MR. KENDALL:  Oh, you didn't.
```

```
 1   BY MR. KENDALL:

 2   Q.   I'd like to show you first Exhibit 9870.

 3            Is that one of the checks that's in your sheet here?

 4   A.   Yes, it is.

 5            MR. KENDALL:  Could we offer that, your Honor?

 6            MS. WRIGHT:  No objection.

 7            THE COURT:  It will be admitted, 9870.

 8            (Exhibit 9870 received into evidence.)

 9            THE COURT:  And it is a check to Stanford.

11:36 10          MR. KENDALL:  Stanford Athletics Department, $500,000.

11   BY MR. KENDALL:

12   Q.   And then I'd like to show you Exhibit 9872 and ask you if

13   that is another one of the Stanford checks.

14   A.   Yes, it is.

15   Q.   And that's payable for $110,000?

16   A.   Yes, it is.

17            MR. KENDALL:  Your Honor, I'd like to offer 9872 into

18   evidence.

19            MS. WRIGHT:  No objection.

11:36 20          THE COURT:  It will be admitted.

21            (Exhibit 9872 received into evidence.)

22   BY MR. KENDALL:

23   Q.   And then I'd like to show you 9871, and if you could tell

24   us if that's the third check?

25   A.   Yes, it is.
```

**A3034**

```
 1              MR. KENDALL:  I'd like to offer that into evidence,

 2    too.

 3              MS. WRIGHT:  No objection.

 4              THE COURT:  I need the date.

 5              MR. KENDALL:  The date is October 25, 2018.

 6              THE COURT:  It will be admitted.

 7              (Exhibit 9871 received into evidence.)

 8              MR. KENDALL:  Now, can we put all three -- how best

 9    can we do it?  Can we put the first checks up, Mr. Carter, 9870

11:37 10   and 9872.

11    BY MR KENDALL:

12    Q.   Now, if we look at the first check, the $500,000 check, we

13    see it's paid to the order of Stanford Athletics Department,

14    correct?

15    A.   Yes.

16    Q.   It has underneath it a reference to Mr. Vandemoer of the

17    Stanford Athletics Department, but it's not payable to him,

18    correct?

19    A.   That is correct.

11:37 20   Q.   And it's for $500,000.

21    A.   Yes.

22    Q.   And it's dated August 24, 2017.

23    A.   Correct.

24    Q.   And you know from your work in this case, that's before

25    Mr. Singer became an informant, correct?
```

```
  1    A.    I am aware.
  2            MR. KENDALL:  Can we look at the next check, please,
  3    9872, please.
  4    Q.    And we see that's for $110,000, correct?
  5    A.    Yes.
  6    Q.    Payable to the order of Stanford University, correct?
  7    A.    Yes.
  8    Q.    The only person who could cash either of these checks
  9    would be Stanford University legally.
 10    A.    Correct.
 11    Q.    Okay.  There's no confusion at all that this is paying a
 12    coach.  This is money to the school, correct?
 13    A.    Correct.
 14    Q.    Okay.  But we see underneath on this second check as well
 15    that it's a reference to Mr. Vandemoer but the payee for both
 16    is Stanford University or its athletics department?
 17    A.    That is correct.
 18    Q.    And if we look at the date of this check, it's May 9,
 19    2018.  That's before Mr. Singer agreed to cooperate with the
 20    government, correct?
 21    A.    Yes, it is.
 22    Q.    Okay.
 23            Could we now call up check 9871.
 24            And if we look at this check, we see the person -- the
 25    name it's being payable to is a little bit different.  Payable
```

**A3036**

```
 1   to the order of Stanford Sailing John Vandemoer.

 2   A.   Yes, I see that.

 3   Q.   Okay.  So we see that the coach's name is now being

 4   included as the payee on the check, correct?

 5   A.   Yes, as well as the university, yes.

 6   Q.   Okay.  And the date of this check is October 25, 2018,

 7   correct?

 8   A.   Yes.

 9   Q.   And that is after Mr. Singer has become an informant,

11:39 10  correct?

11   A.   Yes, that's correct.

12   Q.   And he's working at the direction of the government.

13   A.   Yes.  Well, he's working with the government.  I wasn't

14   part of that --

15   Q.   Okay.

16   A.   -- part of that investigation.

17   Q.   He's working with the government at the time the $160,000

18   check is made payable to the order of Stanford Sailing John

19   Vandemoer.  Okay.

11:40 20       So, in sum, every penny payable to Stanford, whether

21   it's before -- strike that.

22            In sum, all the amounts that relate to Stanford,

23   whether before or after Mr. Vandemoer starts to cooperate, go

24   into a Stanford bank account, correct?

25   A.   That is correct, yes.
```

```
 1   Q.   And the only money you can attribute to Mr. Wilson goes
 2   into a USC bank account, correct?
 3   A.   I'm sorry, the money -- I see other money from Mr. Wilson
 4   going into The Key and --
 5   Q.   I'm talking about in this chart.  The only money on
 6   Exhibit 718 --
 7   A.   Understood, yes.
 8   Q.   -- is what goes into the USC account on a bank check
 9   payable to the water polo team that gets a thank you note.
11:41 10   A.   Right.  That's the only account for which Mr. Wilson's
11   name was specifically referenced.
12   Q.   Did you see any thank you notes for the Gordon Ernst
13   payments?
14   A.   I did not.
15   Q.   Did you see any thank you notes for the Janke/Khosroshahin
16   payments?
17   A.   In the bank records, in anything, no, I did not.
18   Q.   Did you see any thank you notes for the Rudy Meredith
19   payments?
11:41 20   A.   I did not.
21   Q.   Or the Jorge Salcedo payments?
22   A.   I did not.
23   Q.   Next --
24        MR. KENDALL:  One moment, your Honor, please.
25   Q.   Okay.  If we can now go to Exhibit 719, please.  This is
```

```
 1    the chart where you look at various funds originating with

 2    Mr. Wilson or Hyannisport Capital, correct?

 3    A.   That is correct.

 4    Q.   In 2012, 2014 you see about $10,800 paid in 11 different

 5    checks; correct?

 6    A.   That's correct.

 7    Q.   It's about 900 to a thousand bucks on average per check --

 8    I'm not saying that's perfect averaging, but it's small checks

 9    in multiple times, correct?

11:42 10  A.   Correct.

11    Q.   And then if we look at the additional payments indicated

12    per QuickBooks, you've got some other amounts, 13,000 in 2011,

13    7,800, 404, 620.

14    A.   That's correct.

15    Q.   And so this would be -- is the 10,835 in addition to the

16    22,000?

17    A.   Correct, they should be added together, yes.

18    Q.   Okay.  So over a four-year time period, Mr. Wilson is

19    paying Mr. Singer about $33,000, correct?

11:43 20  A.   Correct.

21    Q.   It's about $8,000 a year.

22    A.   Yes.

23    Q.   And from your work on this case, you know that Mr. Singer

24    was providing college counseling services to Mr. Wilson's son.

25    A.   I am familiar.
```

|  | |
|---|---|
| 1 | Q.   And he was providing tutoring services, correct? |
| 2 | A.   That I don't know.  I didn't get into the detail of that. |
| 3 | Q.   Okay.  But we see there's about $32,000 to $33,000 over a |
| 4 | four-year period for various types of counseling, correct? |
| 5 | A.   Yes, that's my understanding of what they were for. |
| 6 | Q.   Then if we look at the middle one for 2014, we see there's |
| 7 | $100,000 that we've already reviewed, that's the bank check |
| 8 | payable to the water polo team, and it goes to the water polo |
| 9 | team, correct? |

11:44 10   A.   It goes to the water polo, yes.

11   Q.   And then we see in the middle, $100,000 goes to The Key

12   Foundation, correct?

13   A.   Yes.

14   Q.   And we also see $20,000 is payable to Mr. Singer.

15   A.   Yes.

16   Q.   Okay.

17         MR. KENDALL:  Now, could we have Exhibit 118, please.

18   Q.   And have you seen Exhibit 118 before?

19   A.   No, I don't believe I have.

11:45 20   Q.   Okay.  If we could look at the middle of it where it says,

21   "I think the money."

22         It says -- Mr. Singer writes to Mr. Masera -- do you

23   know who Mr. Masera is?

24   A.   Yes, I do.

25   Q.   He's a person who does bookkeeping, accounting work for

```
 1    Mr. Singer?

 2    A.    Yes, I'm aware.

 3    Q.    For some period of years?

 4    A.    Yes.

 5    Q.    Mr. Singer tells Mr. Masera April 10, 2014 -- right around

 6    the time that the funds were sent over from Hyannisport

 7    Capital, correct?

 8    A.    Correct.

 9    Q.    Mr. Singer writes, "I think the money that came was from

11:45 10   Wilson's.  Did we charge both extra 20 for expenses?"

11                I think he means, "If so, great.  If not, fine too."

12                MS. WRIGHT:  Objection, sorry --

13                MR. KENDALL:  Excuse me.

14                MS. WRIGHT:  I don't believe this is in evidence, is

15    it?

16                MR. KENDALL:  I believe it is, 118.

17                MS. WRIGHT:  That's not what we have in our records.

18                THE COURT:  I don't know.

19                MR. KENDALL:  Your Honor, then I'd like to offer it.

11:46 20           MS. WRIGHT:  We object.

21                THE COURT:  Is there an objection?

22                MS. WRIGHT:  Objection, hearsay.

23                THE COURT:  On what grounds?

24                MS. WRIGHT:  Hearsay.

25                THE COURT:  Yes, the objection is sustained.
```

**A3041**

```
  1            MR. KENDALL:  Your Honor, it's not for the truth of
  2      the matter asserted.  I represent to you we don't believe it is
  3      a truthful statement.  We're offering it for a different
  4      purpose.
  5            THE COURT:  The objection is sustained.
  6            MR. KENDALL:  Okay.
  7            One moment, please.
  8            (Discussion off the record.)
  9      BY MR. KENDALL:
11:46 10  Q.   So the $100,000 that goes to The Key Foundation, you don't
 11      see that specifically directed to any other place, do you?
 12      A.   Obviously there's lots of payments that come out of the
 13      foundation.  I didn't see any payments that specifically had
 14      Mr. Wilson's name referenced on it.
 15      Q.   Okay.  Do you know though that the -- do you know what a
 16      990 tax return is for a charitable foundation?
 17      A.   Yes, I'm aware.
 18      Q.   Are you aware that the 2014 990 shows The Key Foundation
 19      sending $100,000 to USC water polo?
11:47 20  A.   I did not review that.
 21      Q.   Okay.  So I'm not saying -- I'm not trying to suggest in
 22      my question that the money actually went.  I'm just saying the
 23      990 claims that 100,000 went from The Key Foundation to USC
 24      water polo.  You did not look up that record in your work,
 25      correct?
```

```
 1    A.    I did not review the tax records, no.

 2    Q.    Okay.

 3          Next I'd like to show you Exhibit 112, which I do

 4    believe is in evidence.

 5          If we could take -- have you read this document

 6    before?

 7    A.    Yes, I have.

 8    Q.    Okay.  And if you could look in the middle where it says,

 9    "From John Wilson, March 31, 2014," and what Debbie writes to

10    him in the bottom of the e-mail is, "I contacted Rick and he

11    directed me to Steve.  Per Steve 100k will be to his

12    foundation, 100k invoice from The Key, and 20k to Rick Singer.

13    Since you said 200k, we're at 220k.  Is this a moving target?"

14          And Mr. Wilson responds, "Yes, I added 20k for his

15    expenses."

16          Do you see that?

17    A.    I do see that.

18    Q.    Did you make any attempt to try to find out what expenses

19    this was referring to?

20    A.    No, I did not.

21    Q.    Okay.  You just -- we showed you just a moment ago at

22    Exhibit 118 that's not in evidence, but you saw Exhibit 118,

23    correct?

24    A.    Is that what you just showed me prior?

25    Q.    Yes, that was the number.
```

```
  1              And Exhibit 118 is something you looked at in your

  2    investigation, correct?

  3    A.   I can't recall specifically.  I did directed searches, and

  4    I can't recall if that one came up in one of --

  5    Q.   I think you said you saw it at the time I showed it to

  6    you.  You had already seen it at the time I showed it to you,

  7    didn't you?

  8              MS. WRIGHT:  That misstates.  That's incorrect.  She

  9    said she had not seen the document.

11:49 10              THE COURT:  Sustained.

 11    BY MR. KENDALL:

 12    Q.   Did I ask you earlier if you had seen 118 before?

 13    A.   The document that was shown, I wasn't aware of that

 14    document.  I hadn't --

 15    Q.   You were not aware of that document, okay.

 16              So the prosecutors didn't give you a copy to look at,

 17    correct?

 18    A.   The prosecutors gave me access to the discovery and they

 19    did not identify anything specific for me to look at.

11:49 20    Q.   So going back to Exhibit 719, you have no idea what the

 21    $20,000 expenses refers to, correct?

 22    A.   There's no correlation with anything that I reviewed that

 23    would show a specific reference to these particular

 24    expenditures that were made after the time that that money came

 25    in was anything specific that Wilson directed for the payments
```

**A3044**

```
 1    to be.  I mean, I just saw payments going out from the account

 2    after the date in which that was deposited.

 3    Q.   And you made no effort to find out what the $20,000

 4    expenses were that were referenced in Exhibit 112.

 5    A.   No, sir.

 6    Q.   Okay.

 7         Now I'd like to go to the next column, 2018, in

 8    Exhibit 719.

 9         We see John B. Wilson, $16,000 on October 16 to The

10    Key, correct?

11    A.   Yes.

12    Q.   And I think you testified there was some memo or reference

13    there indicating it was payment for the counseling services for

14    his daughters?

15    A.   Yes, that's correct.

16    Q.   Okay.  $8,000 for each child?

17    A.   Yes, that was my understanding, yes.

18    Q.   Okay.  And then the Hyannisport Capital transfers you see

19    there, correct?

20    A.   Yes.

21    Q.   And there's a Bank of America account.  That was opened in

22    September of 2018?

23    A.   Yes, that's correct.

24    Q.   It was opened up specifically as part of Mr. Singer's work

25    as a cooperator with the government or an informant.
```

```
 1   A.   I don't know -- I don't know the circumstances by which
 2   that account was opened.  I just know it was opened in
 3   Massachusetts.
 4   Q.   Well, you'd agree with me the FBI and IRS wouldn't let
 5   Mr. Singer put a million dollars in his own account.
 6             MS. WRIGHT:  Objection.
 7             THE COURT:  Sustained.
 8             MR. KENDALL:  Okay.
 9   BY MR. KENDALL:
11:51 10   Q.   Next, if we could go to 721, please.
11             This is your analysis of checks that were payable to
12   an entity associated with Donna Heinel called Clear the
13   Clearinghouse?
14   A.   Yes, that's correct.
15   Q.   And the earliest check you had was July 3, 2018?
16   A.   Yes, that's correct.
17   Q.   You'd agree with me that's more than four years after
18   Johnny Wilson's admission to USC.
19   A.   Yes.
11:52 20   Q.   And I think you may have testified, but indulge me if I'm
21   redundant, you cannot trace any money from Mr. Wilson to any of
22   these checks, correct?
23   A.   His name was not referenced on any of these payments.
24   Q.   But you saw no accounting detail of any kind to associate
25   Mr. Wilson as being the source of funds for these payments or
```

1   being aware of these payments.

2   A.   I reviewed the account as a whole, so Mr. Wilson's money

3   had gone into the whole organization, and I didn't see anything

4   that came out that specifically referenced his name other than

5   that USC water polo check.

6   Q.   And finally, I'd like to you take a look at Exhibit 722.

7        And you have the blue and the orange.  And blue is you

8   have Singer related contributions to the women's athletic board

9   fund, and orange you have all other donors, correct?

11:53 10   A.   That's correct.

11   Q.   It would be fair to say that you don't trace any funds

12   from Mr. Wilson to the blue or orange on any of the entries on

13   Exhibit 722, correct?

14   A.   Well, this chart reflects only deposits into the women's

15   athletic board fund.  So the funds that went from the

16   foundation went to men's water polo.

17   Q.   So is that, yes, you don't have any association with

18   Mr. Wilson's funds with this chart?

19   A.   It would be similar -- my similar answer where money came

11:53 20   out of The Key or KWF and went into the women's athletic board

21   fund that was commingled with the money from Mr. Wilson that

22   had gone into the same bank account source.

23   Q.   You can say that about every dollar of the $27 million

24   that were spent out of those bank accounts?

25   A.   Yes, I can.

```
 1   Q.   So it's no more association than that?

 2   A.   Correct.

 3   Q.   Next I'd like to go to the behind employment records that

 4   were previously shown to you by the government.

 5          MR. KENDALL:  Is that Exhibit 2 or Exhibit 3, because

 6   I think there's two versions or two copies.  Is it Exhibit 3

 7   we're dealing with?

 8          MS. WRIGHT:  Sorry?

 9          MR. KENDALL:  The Donna Heinel's folders.  We have two

11:55 10   versions, One Exhibit 2, one Exhibit 3.

11          MS. WRIGHT:  There are two different exhibits.  One is

12   in evidence.

13          MR. KENDALL:  Which one is that?

14          MS. WRIGHT:  2.

15          MR. KENDALL:  Okay.

16   BY MR. KENDALL:

17   Q.   Let's go to Exhibit 2, please.  And this is the employment

18   folder for Donna Heinel, correct?

19          MS. WRIGHT:  Apologies, but we actually introduced a

11:55 20   redacted version.

21          MR. KENDALL:  I don't think that's a problem for what

22   I'm going to be using it for right now.

23          If we could go to Bates 28763, VB records ending in

24   the Bates 28763, Mr. Carter.

25          Why don't we go to 28761.
```

```
      1              Okay.
      2    BY MR. KENDALL:
      3    Q.    Do you see this document --
      4    A.    Yes, I do.
      5    Q.    -- Ms. George.
      6              You see it says, "Employee Data Form, University
      7    Payroll Services."
      8    A.    Yes.
      9    Q.    And we see in the top right there it says, "Athletics,"
11:56 10    and there's something "as something bonus," always a nice thing
     11    to see in a person's payroll form.
     12    A.    Correct.
     13    Q.    If we could go to the bottom, please, bottom left, we see
     14    it's dean director, does it look like Pat Haden to you, signing
     15    it in July 2012?
     16    A.    That's --
     17    Q.    It's hard to read.
     18    A.    -- a little tricky but I could see that.
     19    Q.    You can see a "P," an "Ha," a "D."
11:56 20    A.    Yes.
     21    Q.    Now, if we flip the page, we see at the top it says
     22    "2011/2012 year end review for Donna Heinel."
     23              Do you see that?
     24    A.    Yes, I do.
     25    Q.    And if we go to the next page again, it says, "Areas for
```

```
 1    improvement."

 2            Do you see that?

 3    A.   Yes, I do.

 4    Q.   And it says, "Donna has shown flashes of good development

 5    work.  AD," athletic director or athletic department "like to

 6    see some results in this area."

 7            And then it's signed Patrick C. Haden, February

 8    something 2012, and then signed Donna Heinel, correct?

 9    A.   Yes.

11:57 10   Q.   Okay.

11            MR. KENDALL:  Now, Mr. Carter, if we could go to Bates

12    ending in 28749, please.

13    Q.   And it says -- well, let's look at the top.  "2013/2014

14    Year-End Review for Donna Heinel."

15            And then we go "To Do."  These are the things for her

16    to do.

17            Number 3 says, "Keep working on development."

18            Do you see that?

19    A.   Yes, I do.

11:58 20   Q.   And that's also signed by Pat Haden and Donna Heinel in

21    July of 2014, correct?

22    A.   Yes, I see that.

23    Q.   If we next could go to the Bates ending 28745, please.

24            We see this the next year-end review for Donna Heinel,

25    correct?
```

**A3050**

```
 1   A.   Yes.
 2   Q.   And we see number 1, "I believe Donna to be the best
 3   senior women's administrator in PAC 12.
 4            "2.  Fantastic work ethic.
 5            "3.  Gets things done!  No procrastination.
 6            "4.  Strong relationship with admissions - very
 7   important for the department.
 8            "5.  Gives athletic director great advice, or AD."
 9            And then "6.  Really improved her development efforts
10   - important."
11            That's the only task here of the seven in this group
12   or the four below that actually has "important" put at the end
13   to stress its importance, correct?
14   A.   Well, the word "important" is reflected above, but it's
15   the only one where it says it at the end.
16   Q.   Actually, excuse me.  It says it twice.  It says, "Strong
17   relationship with admissions very important for the
18   department," and the other important thing is development.
19   A.   Yes, I see that.
20   Q.   Okay.  And we see this is signed by Mr. Haden on June 2015
21   and Ms. Heinel signs as well?
22   A.   Yes.
23            MR. KENDALL:  If I may have one moment, your Honor.
24            THE COURT:  Yes.
25            (Discussion off the record.)
```

```
 1              MR. KENDALL:  No further questions, your Honor.

 2              THE COURT:  Redirect, Ms. Wright.

 3              MS. WRIGHT:  Your Honor, there's just one issue that

 4    I'd like to cover on redirect that I believe Mr. Kendall opened

 5    the door to.  I'd ask for a very brief sidebar.

 6              THE COURT:  All right.

 7              (At sidebar on the record.)

 8              MS. WRIGHT:  Mr. Kendall asked a series of questions

 9    about how many millions were left over in The Key Worldwide

10    Foundation's accounts, and several million of that was paid in

11    forfeiture to the U.S. Marshals.  So I suggest it's misleading

12    to suggest that that money ended up and stayed with Rick Singer

13    when a very significant portion of it was paid to the

14    government.

15              I don't intend to ask anything about forfeiture

16    specifically.  I just want to ask one question about whether

17    she saw checks from the accounts to the U.S. Marshal service.

18              MR. KENDALL:  Your Honor, they opened the door by

19    having her testimony on this topic and putting out the category

20    of the last 6.5 million or whatever it is.

21              I think they're walking on very thin ice.  We've been

22    up before the First Circuit before and it did not turn out well

23    for the government when they start bringing in something

24    relating to a conviction for a person who's not testifying.

25    Singer has not testified.  Forfeiture is criminal forfeiture,
```

**A3052**

```
 1   that tells the jury it's a conviction.  There's the Akami
 2   (phon.) opinion.  I suggest we all read it before the
 3   government opens up this door.
 4        MR. FRANK:  Well, the door was opened when Mr. Kendall
 5   suggested that Mr. Singer pocketed the money and asked specific
 6   questions about whether that money went into Singer's pocket.
 7   So at a minimum we would ask for an instruction to the jury to
 8   disregard where the remaining money went that Mr. Kendall asked
 9   about when he suggested --
10        THE COURT:  You prepare a limiting instruction.  I'm
11   not going to give it right now, but I'll give it at some point
12   soon.
13        MR. KENDALL:  Your Honor, the witness testified there
14   were three buckets of money.  I did not -- it was investments
15   he was making.  It may have been forfeited years later, but he
16   was making eight years' worth of investments with this money
17   for his own personal businesses.  That's all I raised.
18        MS. WRIGHT:  He testified to that, but you also raised
19   what was left over after that.
20        MR. FRANK:  He specifically --
21        THE COURT:  Only one counsel will talk at sidebar for
22   each party.
23        Ms. Wright.
24        MS. WRIGHT:  She covered those investments, that's
25   correct; and you asked a series of questions about what money
```

A3053

```
 1   remained left over after those investments.

 2            MR. KENDALL:  No.  I asked what was left over in

 3   calculation of the 20 million --

 4            THE COURT:  We're not going to argue it here.  The

 5   government will prepare a limiting instruction.  I will give it

 6   to the jury at an appropriate time in the near future.

 7            MS. WRIGHT:  Understood.

 8            MR. KENDALL:  Thank you, your Honor.

 9            (End of discussion at sidebar.)

12:03 10            MS. WRIGHT:  I don't have any redirect, your Honor.

11            THE COURT:  All right.

12            Thank you.  You may step down, Ms. George.

13            THE WITNESS:  Thank you, your Honor.

14            THE COURT:  Yes.

15            MS. KEARNEY:  The government calls Agent Colleen

16   Ranahan.

17            THE CLERK:  Please raise your right hand.

18            COLLEEN RANAHAN, having been duly sworn by the Clerk,

19   was examined and testified as follows:

12:04 20            THE CLERK:  Thank you.  You may be seated.

21            And would you please state your name for the record,

22   spelling your last.

23            THE WITNESS:  Colleen Ranahan, R-a-n-a-h-a-n.

24            THE COURT:  Ms. Kearney, you may direct.

25                 DIRECT EXAMINATION OF COLLEEN RANAHAN
```

```
    1  BY MS. KEARNEY:

    2  Q.   Good afternoon, Agent Ranahan.  Where do you work?

    3  A.   I work at the Internal Revenue Service.

    4  Q.   What do you do there?

    5  A.   I am an Internal Revenue agent in the special enforcement

    6  program.

    7  Q.   What is a Revenue agent?

    8  A.   A Revenue agent examines and audits tax returns in order

    9  to determine if a taxpayer is compliant.

12:04 10  Q.   How long have you been a Revenue agent with the IRS?

   11  A.   For 15 years.

   12  Q.   You mentioned this Special Enforcement Program.  What's

   13  that?

   14  A.   So a Special Enforcement Revenue agent works directly with

   15  IRS Criminal Investigation, the U.S. Attorney's Office,

   16  Department of Justice Tax Division in working tax aspects of

   17  criminal cases.

   18  Q.   How long have you been a member of this Special

   19  Enforcement Program?

12:05 20  A.   Seven years.

   21  Q.   What did you do at the IRS before joining the Special

   22  Enforcement Program?

   23  A.   I was in a division called projects in special planning,

   24  and worked as a coordinator for our national research program

   25  and our report generation software.
```

A3055

1    Q.    Have you ever been involved in the audits of taxpayers?

2    A.    I have.

3    Q.    Approximately how many?

4    A.    A couple hundred.

5    Q.    And in your experience of being an internal revenue agent

6    for 15 years, are you familiar with the Internal Revenue Code?

7    A.    I am.

8    Q.    What did do you to prepare for your testimony today?

9    A.    I reviewed the 2014 tax returns for John and Leslie

12:05 10    Wilson, Hyannisport Capital, including any amended returns that

11    were filed.  I reviewed some of the preparer records, and I

12    also have been listening to testimony.

13          MS. KEARNEY:  Ms. Lewis, can we pull up what's in

14    evidence as Exhibit 174A.

15          And can we look at pages 2 and 3.

16    Q.    Agent Ranahan, I'm showing you what's already been

17    admitted, which is the original Form 1040 U.S. Individual Tax

18    Return for John and Leslie Wilson.  Have you reviewed this

19    return?

12:06 20    A.    I have.

21          MS. KEARNEY:  And if we can look at line 17, please,

22    Ms. Lewis.

23    Q.    Agent Ranahan, do you see on line 17 it reports an amount

24    of negative $495,129.

25          Do you have an understanding of whether this entry

1    includes a $20,000 payment to Mr. Singer for consulting fees?

2    A.    I do.

3    Q.    What is that understanding?

4    A.    The understanding is that Hyannisport Capital wrote a --

5    wired $20,000 to Mr. Singer personally and deducted it as a

6    business consulting expense on Hyannisport Capital's return,

7    which would be included in this loss on the Form 1040.

8    Q.    Do you have an understanding as to whether this entry also

9    includes a $100,000 payment to The Key for consulting fees?

12:07 10    A.    I do.

11    Q.    What is that understanding?

12    A.    There was $100,000 wire from Hyannisport Capital to The

13    Key, Rick Singer's business, for-profit business, and it was

14    also deducted as a business consulting expense on Hyannisport

15    Capital return which, in fact, flows through to line 17.

16    Q.    And what makes a business expense deductible?

17    A.    So a business expense is ordinary and necessary to the

18    carrying on of a trade or business.

19    Q.    And what does that mean in lay terms?

12:08 20    A.    Lay terms is it has to be directly to -- related to the

21    trade or business that is, you know, why the business is in --

22    basically in effect.

23    Q.    Did you make any determination about whether the $120,000

24    in consulting fees that were reported in line 17 were, in fact,

25    deductible business expenses?

|  |  |
|---|---|
| 1 | A.   I did. |
| 2 | Q.   What did you determine? |
| 3 | A.   I determined that they were not deductible business |
| 4 | expenses. |
| 5 | Q.   Why? |
| 6 | A.   Because they were personal. |
| 7 | Q.   How does having an additional $120,000 in business |
| 8 | expenses affect the amount of taxes that the Wilsons owed for |
| 9 | 2014? |
| 12:08 10 | A.   It would reduce the tax due. |
| 11 | Q.   Why is that? |
| 12 | A.   Because any deductions on a business return that flows |
| 13 | through to the 1040 would reduce adjusted gross income, which |
| 14 | then reduces the taxable income, which reduces the tax. |
| 15 | MS. KEARNEY:  Ms. Lewis, if we can expand this out a |
| 16 | little to show line 22. |
| 17 | Q.   Agent Ranahan, what was the total income reported for the |
| 18 | Wilsons in 2014? |
| 19 | A.   $2,605,539. |
| 12:09 20 | Q.   Were the Wilsons taxed on this amount? |
| 21 | A.   They were not. |
| 22 | Q.   What happens before a tax is assessed? |
| 23 | A.   Before the tax is assessed, there's adjusted gross income |
| 24 | adjustments, which could be the deductible part of |
| 25 | self-employment tax or any self-employment health insurance, |

1  different types of deductions.  And then also there can be

2  either a standard or an itemized deduction and some exemptions.

3  Q.   What are itemized deductions?

4  A.   Itemized deductions are personal expenses that a taxpayer

5  is allowed to take on a tax return.  They include things such

6  as state and local income taxes, real estate taxes, mortgage

7  interest, charitable contributions, unreimbursed business

8  expenses.  It's very limited.

9        MS. KEARNEY:  Ms. Lewis, can we look at page 4.

12:10 10  Q.   Agent Ranahan, this is the Schedule A of itemized

11  deductions.

12        MS. KEARNEY:  And can we look at the gifts to charity

13  section please, Ms. Lewis.

14  Q.   Agent, do you have an understanding as to whether the

15  $220,215 reported in charitable donations includes a $100,000

16  payment to The Key Worldwide Foundation?

17  A.   I do.

18  Q.   And what is that understanding?

19  A.   The understanding is that there was a wire, a $100,000

12:10 20  wire, from Hyannisport Capital to The Key Worldwide Foundation,

21  and it was put on the Schedule K-1 as part of charitable

22  contributions which, in fact, was able to flow through to the

23  Form 1040.

24  Q.   What makes a charitable contribution deductible?

25  A.   It has to be given to a 501(c)(3) and no goods or services

```
 1   can be received.
 2   Q.   Did you make any determination about whether the $100,000
 3   payment to The Key Worldwide Foundation was, in fact, a
 4   deductible charitable contribution?
 5         MR. KENDALL:  Objection, your Honor.  That's an issue
 6   for the Court and the jury.  This is what we filed our motion
 7   in limine on, and the Court granted it because the government
 8   said it wasn't going to be an issue.
 9         THE COURT:  Ms. Kearney.
10         MS. KEARNEY:  Your Honor, this falls within what is
11   acceptable summary witness testimony for an IRS agent.  She's
12   allowed to explain her analysis.
13         MR. KENDALL:  This is exactly what I raised in the --
14         THE COURT:  Well, for the time being the objection is
15   sustained.  We'll go forward.
16   BY MS. KEARNEY:
17   Q.   Agent Ranahan, was this $100,000 payment to The Key
18   Worldwide Foundation factored into the Wilsons' itemized
19   deductions for 2014?
20   A.   Yes.
21   Q.   And if we can go back to the bottom of page 4.
22         What were the total itemized deductions that the
23   Wilsons took for 2014?
24   A.   $489,952.
25   Q.
```

12:11  (line 10)
12:11  (line 20)

|  |  |
|---|---|
| 1 | MS. KEARNEY:  And, Ms. Lewis, if we can go up to page |
| 2 | 3, please.  And look at the top line 40. |
| 3 | Q.   Agent, how does including an additional $100,000 in |
| 4 | charitable donations in the Wilsons' itemized deduction |
| 5 | calculation affect the amount of taxes that the Wilsons owed |
| 6 | for 2014? |
| 7 | A.   It lowers the taxable income which, in effect, lowers the |
| 8 | tax. |
| 9 | Q.   As a result of these additional deductions, what was the |
| 12:12 10 | Wilsons' taxable income reported on line 43? |
| 11 | A.   $2,058,349. |
| 12 | MS. KEARNEY:  And, Ms. Lewis, can you go down and call |
| 13 | out the sections from other taxes through refund. |
| 14 | Q.   Agent, how much did the Wilsons owe in federal taxes for |
| 15 | 2014 based on the information provided in this original return |
| 16 | that was filed? |
| 17 | A.   Their total tax was $202,622. |
| 18 | Q.   And what information is recorded in the refund section, |
| 19 | lines 75 through 77? |
| 12:13 20 | A.   That shows that the amount of refund that the Wilsons were |
| 21 | due was $246,634, which of that amount $146,634 was deposited |
| 22 | into their bank account and an additional $100,000 was applied |
| 23 | towards their 2015 estimated tax. |
| 24 | MS. KEARNEY:  Ms. Lewis, can we go to the last page of |
| 25 | this document, page 95. |

**A3061**

```
 1    Q.   Agent Ranahan, what appears on the last page of the filed
 2    Form 1040?
 3    A.   This is a photocopy of the envelope that the return was
 4    mailed into the IRS.
 5    Q.   And do you see what date it was shipped on?
 6    A.   It was shipped on December 18, 2015.
 7    Q.   And do you see in the left, just above that to the left
 8    there's a return address?
 9    A.   Yes.
10    Q.   What is the return address?
11    A.   It's a little cut off, but I think it's Amsterdam,
12    Netherlands.
13             MS. KEARNEY:  Ms. Lewis, can we look at Exhibit 501A
14    in evidence.
15             And can we go to the next page, please.
16    Q.   Agent Ranahan, I'm showing what's been admitted into
17    evidence as Exhibit 501A.  This is the second amended return
18    filed by the Wilsons for tax year 2014.  Are you aware that the
19    Wilsons filed a first amended return that made no changes in
20    terms of the financial information reported?
21    A.   I am.
22    Q.   Were there changes made between the original return and
23    this second amended return?
24    A.   There were.
25             MS. KEARNEY:  If we can blow up the middle of this
```

**A3062**

1    page, Ms. Lewis.

2    Q.   Agent, how does this second amended return differ from the

3    original return?

4    A.   The taxable income was increased by $69,420.

5    Q.   And why was that?

6    A.   There was a corrected W-2 from Staples that was given to

7    Mr. Wilson, and the itemized -- there was a state and local

8    income tax change, a very, very minor one.  So there was a

9    little bit of a change to the Schedule A as well.

12:15 10    Q.   Was there any change to the taxes that the Wilsons owed

11    for 2004 as a result of these changes?

12    A.   They did.  They owed an additional $27,609.

13         MS. KEARNEY:  Ms. Lewis, can we pull up the original

14    return, Exhibit 174A on the left, and keep this amended return,

15    second amended return up on the right of the screen, please.

16         If we can go to page 2 of the original and page 5 of

17    the second amended.

18         And can we look at line 17 on both returns, please.

19    Q.   Agent, has the business loss reported in line 17 of the

12:16 20    second amended return changed from the original return?

21    A.   It has not.

22    Q.   And does that amount reported in line 17 still include the

23    $120,000 in consulting fees paid to Mr. Singer and The Key?

24    A.   It does.

25         MS. KEARNEY:  And if we can look at page 4 of the

A3063

```
 1    original return on the left and page 7 of the second amended
 2    return, please.
 3           And look at the charitable contributions or gifts to
 4    charity section.
 5    Q.   Agent Ranahan, has the amount reported as gifts to charity
 6    changed between the original return and the second amended
 7    return?
 8    A.   It has not.
 9    Q.   Does that amount still include the $100,000 payment to The
10    Key Worldwide Foundation?
11    A.   It does.
12           MS. KEARNEY:  And, Ms. Lewis, if we can go to page 3
13    in the second amended return and we can take down the first
14    return.
15           And can you blow up where it says "sign here," please.
16    Q.   Agent Ranahan, at the bottom of this page of the second
17    amended return there is a paragraph that states, "Under
18    penalties of perjury, I declare that I have filed an original
19    return and that I have examined this amended return, including
20    accompanying schedules and statements, and to the best of my
21    knowledge and belief, this amended return is true, correct, and
22    complete."
23           Whose name is signed under that statement?
24    A.   It appears to be John Wilson and Leslie Wilson.
25           MS. KEARNEY:  Can we look at the last page of this
```

 1    return, please, Ms. Lewis.

 2    Q.    What appears on the last page of this second amended

 3    return?

 4    A.    This is a copy of the envelope that the second amended

 5    return was mailed to the Internal Revenue Service in.

 6    Q.    And do you see in the upper right corner there's a stamp

 7    from the U.S. Post Office?

 8    A.    I do.

 9    Q.    What does that say?

12:18 10   A.    It says, "U.S. postage paid, Lynnfield, Massachusetts

11    01940."

12    Q.    What date was it mailed?

13    A.    March 26, 2018.

14    Q.    Do you know what the Wilsons listed as their current

15    address in their 2017 tax return which was filed in 2018?

16    A.    If was a Lynnfield, Mass. address.

17         MS. KEARNEY:  We can take that down.  Thank you,

18    Ms. Lewis.

19    Q.    Agent Ranahan, have you calculated the tax that the

12:19 20   Wilsons would have owed had the $120,000 in payments to The Key

21    and Mr. Singer for consulting fees and the $100,000 payment to

22    The Key Worldwide Foundation not been taken as deductions in

23    2014?

24    A.    I have.

25         MS. KEARNEY:  Can we show for the witness only,

| | |
|---|---|
| 1 | please, Exhibits 697 and 698. |
| 2 | Q.   Agent, starting with Exhibit 697, which is on the left of |
| 3 | your screen, do you recognize that document? |
| 4 | A.   I do. |
| 5 | Q.   What is it? |
| 6 | A.   It's a schedule of additional tax due and owing for tax |
| 7 | year 2014 for John Wilson. |
| 8 | Q.   Who prepared this chart? |
| 9 | A.   I did. |
| 12:19 10 | Q.   And looking at Exhibit 698, do you recognize that |
| 11 | document? |
| 12 | A.   I do. |
| 13 | Q.   What is it? |
| 14 | A.   It is a schedule of itemized deduction adjustments for tax |
| 15 | year 2014 for John Wilson. |
| 16 | Q.   Who prepared that chart? |
| 17 | A.   I did. |
| 18 | MS. KEARNEY:  The government offers 697 and 698. |
| 19 | THE COURT:  It will be admitted, 697 and 698. |
| 12:20 20 | (Exhibits 697 and 698 received into evidence.) |
| 21 | BY MS. KEARNEY: |
| 22 | Q.   We'll start with Exhibit 697. |
| 23 | Can you tell us what -- the first line reads, "Taxable |
| 24 | income per second amended return." |
| 25 | What is that? |

1   A.   That is the income that was -- the taxable income that was

2   already included on the second amended return.

3   Q.   So you pulled that directly from Exhibit 501A, the second

4   amended return we've been looking at?

5   A.   Correct.

6   Q.   What appears on lines 2 and 3?

7   A.   That's the $220,000 that was wired to The Key, The Key

8   Worldwide Foundation, and Rick Singer that were disallowed for

9   tax purposes.

12:21 10   Q.   And then you get to itemized deduction adjustment in line

11   4.  What is that?

12   A.   So in certain tax years, itemized deductions are limited

13   based on a taxpayer's income.  In 2014, if the itemized

14   deductions were more than $305,050 and the adjusted gross

15   income of the taxpayer was over a certain limit, they were not

16   able to take the entire amount of itemized deductions.  So in

17   this case, it made an additional $3,600 adjustment to limit the

18   amount of itemized deductions.

19        MS. KEARNEY:  Ms. Lewis, can we look at Exhibit 698.

12:21 20   Q.   Agent Ranahan, does Exhibit 698 show your calculation of

21   how the itemized deduction limit was adjusted between the

22   second amended return and then your calculation with the

23   disallowed deductions?

24   A.   Yes.

25   Q.   And what appears at the top of this chart?

```
 1    A.   So at the top of the chart is what is actually in the

 2    Schedule A of the second amended return.

 3              So if you look at the "per return" line, it lists the

 4    amounts that were listed on the second amended return for every

 5    deduction that was taken.  The "corrected" column, the only

 6    adjustment that was made was the disallowance of the $100,000

 7    cash charitable contribution.

 8    Q.   And then below that are a series of calculations.  Is that

 9    the calculations necessary to figure out what part of the total

12:22 10    itemized deductions would actually be allowed since they both

11    exceed the $305,050 limit you mentioned?

12    A.   Correct.  So both the original and the corrected itemized

13    deductions exceed the $305,050.  We also adjusted -- gross

14    income also increased in the tax computation.  So even though

15    the amount of the charitable contribution -- or the total

16    itemized deductions was reduced because the income went up for

17    adjusted gross income, it created an additional limitation.

18    Q.   And what was the result of your calculations?

19    A.   There was an additional limitation of $3,600.

12:23 20              MS. KEARNEY:  Can we go back to Exhibit 697, please,

21    Ms. Lewis.

22    Q.   So, Agent Ranahan, after you started with the taxable

23    income from the second return, disallowed the $220,000 in

24    payments to Mr. Singer, The Key, and The Key Worldwide

25    Foundation and factored in your itemized deduction adjustment,
```

1    what was the corrected taxable income for 2014 for the Wilsons?

2    A.    $2,351,369.

3    Q.    What did you do next?

4    A.    I then calculated the income tax due on that $2,351,369.

5    Q.    And then there's a line that reads "credits and additional

6    taxes from second amended return."

7          What is that?

8    A.    Those are the original tax credits.  There was a foreign

9    tax credit, there was a general business tax credit, and there

12:24 10   was also some additional taxes, as in self-employment tax and

11    tax on additional Medicare.  So I took those directly from the

12    filed amended return.

13    Q.    And that resulted in a corrected tax liability.  What is

14    that?

15    A.    $318,777.

16    Q.    So, in other words, that's the tax that the Wilsons would

17    have owed had the payments to Mr. Singer, The Key, and The Key

18    Worldwide Foundation not been deducted?

19    A.    Correct.

12:25 20   Q.    And what did do you after that?

21    A.    I took that corrected tax liability and I reduced it by

22    the tax that was already reported on the second amended return

23    to determine the additional tax due and owing as $88,546.

24    Q.    That's about a third more in taxes than the Wilsons paid

25    for 2014?

A3069

```
 1   A.    Correct.

 2            MS. KEARNEY:  Nothing further.

 3            THE COURT:  Cross-examination, Mr. Kendall.

 4            MR. KENDALL:  Yes, your Honor.

 5            I'm going to need a couple of minutes to set up, your

 6   Honor, if I may.

 7            THE COURT:  Yes.

 8            MR. FRANK:  Your Honor, while we're waiting, we do

 9   have a proposal for the Court.  It's being printed.  I could

12:27 10   also e-mail to the Court's deputy if that's easier.

11            THE COURT:  Either one is fine.

12            MR. FRANK:  Thank you.

13              CROSS-EXAMINATION OF COLLEEN RANAHAN

14   BY MR. KENDALL:

15   Q.    Good afternoon.

16   A.    Good afternoon.

17   Q.    My name is Mike Kendall.  I represent John Wilson.  Thank

18   you for joining us today.

19            I think the point you were making when you started out

12:28 20   is that you're qualified to testify about the tax return based

21   upon your work as a revenue agent doing civil audits.

22   A.    Correct.

23   Q.    And you were in the IRS, what was it, 15 years?  Was that

24   the number?  I'm not sure if I wrote it down correctly.

25   A.    Yes, 15.
```

|  | Q. | Of those 15 years, how many years did you actually spend |

1    Q.   Of those 15 years, how many years did you actually spend

2    doing audits as a revenue agent?

3    A.   As a revenue agent?

4    Q.   Yes.

5    A.   Personally I did three years.  The other programs, I

6    helped other agents in the field with high -- with technical

7    tax stuff.

8    Q.   So you've only done audit work for three years, and that

9    was back -- the last time was about 12 years ago?

12:29 10    A.   Yes.

11    Q.   Okay.  What particular group of the IRS were you doing

12    audits for?  Was it a particular industry or business or some

13    organizational assignment?

14    A.   Yes.  I was a small business, self-employed revenue agent.

15    Q.   Okay.  Have you ever heard of a part of the IRS called

16    exempt organizations?

17    A.   I think it's referred to as TEGE, which is tax exempt

18    government entities.

19    Q.   Yes, okay.  Tax exempt government entities.  That's the

12:29 20    group that regulates nonprofits like universities, correct?

21    A.   Correct.

22    Q.   Did you ever work with TEGE?

23    A.   I did not.

24    Q.   Okay.  And they're the ones that look over donations by

25    501(c)(3) organizations, correct?

```
 1   A.   I would assume.  I honestly don't know.

 2   Q.   In your three years as a revenue agent, did you ever do an

 3   audit of an exempt organization?

 4   A.   I did not.

 5   Q.   I take it you had no association with TEGE at all in your

 6   years with the IRS?

 7   A.   I actually taught a special enforcement class to one of

 8   the TEGE groups.

 9   Q.   But you weren't teaching them about TEGE tax issues, you

10   were teaching them more about general enforcement stuff?

11   A.   Correct.

12   Q.   Have you ever read the audit manual for exempt

13   organizations?

14   A.   I have not.

15   Q.   Do you even know if they have one?

16   A.   Like an -- like an internal manual revenue?

17   Q.   Yeah, an internal manual that everybody working at TEGE

18   gets to tell them how to do their work?

19   A.   I have not read it in full, no.

20   Q.   Have you read it at all?

21   A.   I've read bits and pieces of it over the past seven years.

22   Q.   Recently?

23   A.   A couple of years ago probably the last time.

24   Q.   Okay.  And would you agree with me that one goal that the

25   IRS wants to accomplish during its audits is to have an
```

1  equitable process for all taxpayers, correct?

2  A.   Correct.

3  Q.   And as part of the equitable process, the IRS wants to

4  apply the same tax rules in the same way to all taxpayers.

5  A.   Correct.

6  Q.   And that's an important part of what they teach the

7  revenue agents, correct?

8  A.   It's very important.

9  Q.   Okay.  And of the thousands of people who have donated

12:31 10  billions of dollars to USC in the past ten years, do you know

11  anybody whose donation was set aside because of an admission

12  benefit or boost?

13        MS. KEARNEY:  Objection, foundation.

14        THE COURT:  Sustained.

15  BY MR. KENDALL:

16  Q.   As part of an equitable audit process, a revenue agent

17  will give the taxpayer credit for items which the taxpayer

18  overpaid, correct?

19  A.   Yes.

12:32 20  Q.   Did you do a thorough look at the tax return to look for

21  overpayments?

22  A.   I don't understand.

23  Q.   Did you do a full review of the tax -- a full audit of

24  Mr. Wilson's tax returns to look if there were any items that

25  were -- which he overpaid?

```
 1   A.   I did not do a full audit of 2014.

 2   Q.   And you heard Mr. Nahmens testify that Hyannisport Capital

 3   didn't take any deductions for the rent it paid for 2014 and

 4   other years, correct?

 5   A.   I heard that, yes, there was no deduction paid for rent.

 6   Q.   Okay.

 7        So if you haven't done a full audit of his tax

 8   returns, you really can't say if he owes money or not, you can

 9   just say there's one item that you challenge, correct?

10        MS. KEARNEY:  Objection, your Honor.

11        THE COURT:  Sustained.

12   BY MR. KENDALL:

13   Q.   I mean, you haven't done a complete audit of his tax

14   return, correct?

15   A.   I have not completely audited the 2014 return or

16   Hyannisport Capital.

17   Q.   And you don't know if there are offsets that might erase

18   that tax obligation to any degree, correct?

19        MS. KEARNEY:  Objection.

20        THE COURT:  I didn't hear the whole question.

21        MR. KENDALL:  She has not looked to see if there are

22   any offsets to the amount of tax due and owing that she claims.

23        MS. KEARNEY:  Objection, relevance.

24        THE COURT:  Sustained.

25   BY MR. KENDALL:
```

12:32 (line 10)
12:33 (line 20)

```
 1    Q.   When did you first get involved in this case?

 2    A.   August of this year.

 3    Q.   Okay.  That's about two months ago, maybe less, six weeks?

 4    A.   Approximately.

 5    Q.   Okay.  And you weren't part of the investigation, correct?

 6    A.   I was not.

 7    Q.   Okay.  When the decision was made to bring tax charges,

 8    you weren't part of the analysis that gave rise to that

 9    decision, correct?

12:33 10    A.   I was not.

11    Q.   You were just brought in to give this testimony, correct?

12    A.   I redid a tax computation, yes, and was brought in to

13    testify.

14    Q.   In fact, you were the fourth revenue agent brought in to

15    do the analysis to testify, correct?

16              MS. KEARNEY:  Objection.

17              THE COURT:  Sustained.

18    BY MR. KENDALL:

19    Q.   And you're just -- you're following the same analysis that

12:34 20    the prior agents did, correct?

21    A.   I did my own analysis based on the testimony.

22    Q.   And you came to the exact same conclusion these three

23    prior agents did, correct?

24    A.   I did.

25    Q.   Okay.  Did you participate -- have you listened to this
```

```
 1   whole trial record?

 2   A.   Yes.

 3   Q.   Okay.  You heard the testimony of James Nahmens?

 4   A.   Yes.

 5   Q.   And you testified that for charitable deduction, there can

 6   be no goods or services received.  That's verbatim from your

 7   testimony, correct?

 8   A.   I believe that's what I said.

 9   Q.   Okay.  Do you remember Mr. Nahmens talking about

10   charitable deductions where one has to offset the value of

11   goods and services?

12   A.   The organization has to offset.

13   Q.   Yes.

14   A.   Yes, I recall.

15   Q.   So let's take for an example a person buys a

16   thousand-dollar ticket to a charity dinner run by the cancer

17   society and they have it in a fancy hotel and the cost of the

18   meal by the menu in the hotel is $100.  That would mean the

19   goods and services received were $100 and $900 would be tax

20   deductible, correct?

21   A.   Correct.

22   Q.   So a charitable deduction can be a payment that has both

23   some goods and services received and something that's above

24   that, correct?

25   A.   Correct.
```

```
 1   Q.   Okay.  And what you just mentioned is the donation -- the
 2   charity is required under the Internal Revenue regulations or
 3   code to tell the donor what's the value of any goods or
 4   services received, correct?
 5   A.   Correct.
 6   Q.   And with respect to my example of the dinner, if they had
 7   this fund-raising dinner for a thousand dollars a ticket at
 8   McDonald's and all they served was a hamburger and French
 9   fries, the value of the goods and services received would be
10   $5, let's say, correct?
11   A.   I don't know McDonald's prices, but it sounds -- it's
12   definitely not a high-end hotel.
13   Q.   My kids have grown up and I don't know them either.  But
14   you get my point.
15   A.   I do.
16   Q.   You have to use the fair market value of any goods or
17   service received if you want to reduce the value of the
18   donation, correct?
19   A.   Correct.
20   Q.   Okay.  And for some things it's easy to see the fair
21   market value, we look at the menu of McDonald's or we look at
22   the menu of the fancy hotel, correct?
23   A.   Correct.
24   Q.   If it's something that doesn't have an easily available
25   fair market value, you have to look for comparables, correct?
```

12:37 (line 10)
12:37 (line 20)

```
 1    A.    Correct.

 2    Q.    Okay.  And in this case, there is no evidence of any

 3    comparable for the value of an admission boost at USC, correct?

 4              MS. KEARNEY:  Objection.

 5              THE COURT:  Do you want -- give me the question again.

 6              MR. KENDALL:  Excuse me?

 7              THE COURT:  Give me the question again.

 8              MR. KENDALL:  I'll see if I can.

 9    BY MR. KENDALL:

12:38 10   Q.    In this case, you do not have any information on a

11    comparable transaction to assign a value to the goods and

12    services that you claim were received for the donation,

13    correct?

14              MS. KEARNEY:  Objection.

15              THE COURT:  Sustained.

16              MR. KENDALL:  Your Honor, this goes right to the tax

17    case, your Honor.  I'd ask if I could have a sidebar.

18              THE COURT:  No.  Not now.

19              MR. KENDALL:  Okay.

12:38 20   BY MR. KENDALL:

21    Q.    So you're disallowing the 100,000 donation, correct?

22    A.    Correct.

23    Q.    You're also disallowing $120,000 that was written as

24    consulting fees.

25    A.    Correct.
```

A3078

```
      1   Q.   And it would be your position that they could not be
      2   reclassified as part of the donation.
      3   A.   Correct.
      4   Q.   Did you make any effort to determine what's the value of
      5   the goods and services received so you would know the proper
      6   amount to offset the $220,000 you want to set aside?
      7           MS. KEARNEY:  Objection.
      8           THE COURT:  Sustained.
      9   BY MR. KENDALL:
12:39 10  Q.   You know that the IRS instructs its revenue agents that
     11   they're supposed to look for a fair market value or a
     12   comparable transaction to determine the value of the goods and
     13   services, correct?
     14   A.   Correct.
     15   Q.   Okay.  You didn't do that, correct?
     16   A.   I relied on the one -- an e-mail that was put in evidence
     17   that the $220,000 was not payable until Johnny Wilson was
     18   guaranteed admission into USC.
     19   Q.   But you don't know what the value of that admission boost
12:39 20  was, do you?
     21           MS. KEARNEY:  Objection.
     22           THE COURT:  Sustained.
     23   BY MR. KENDALL:
     24   Q.   If someone tells me the thousand-dollar ticket is not
     25   payable until I eat my dinner at McDonald's, I still get a $995
```

```
 1    write-off and a $5 goods and value received, correct?
 2              MS. KEARNEY:  Objection.
 3              THE COURT:  She can answer that if she understands it.
 4    A.    Could you repeat it?
 5    Q.    Yes.  If I pay a thousand dollars for a ticket for the
 6    cancer society fund-raiser and I don't have to pay it until I
 7    eat my meal at McDonald's, we have a $5 goods and services
 8    received to offset the thousand-dollar ticket price, correct?
 9    A.    One would assume.
10    Q.    So I still get a $995 tax deductible deduction even though
11    I don't have to pay the ticket until after I've shown up for
12    the meal, correct?
13    A.    Correct.
14    Q.    Okay.  And fair to say you've got no evidence to say how
15    likely Johnny Wilson would have been admitted into USC anyways?
16    A.    Can you just repeat that?
17    Q.    You're not relying on any evidence to determine how much
18    of a boost he got to get into school?
19              MS. KEARNEY:  Objection.
20              THE COURT:  Sustained.
21              MR. KENDALL:  Your Honor, may we have a sidebar?  This
22    is, I suggest, important enough to merit it.
23              THE COURT:  All right.
24              (At sidebar on the record.)
25              THE COURT:  Mr. Kendall.
```

12:40 (line 10)
12:41 (line 20)

1        MR. KENDALL:  Thank you for the sidebar.

2        We have briefed this extensively.  We've cited the

3   Supreme Court case of Boulware, B-o-u-l-w-a-r-e.  We have a

4   right to put in an alternative tax calculation.  Both

5   Mr. Nahmens, as well as this witness, have testified that under

6   the IRS procedure she is supposed to value what the goods or

7   services received are and use that to offset the amount of the

8   donation.

9        We suggest that there is no evidence in this record to

12:42 10   value what's that admission boost worth, and in particular, we

11   have with a subpoena to you to rule on with USC, USC has never

12   given a value to an admission boost to anybody in any tax

13   donation in history, and they told us that and they told you

14   that in the briefing that they filed.  If they don't have a

15   value for the goods and services received, they can't challenge

16   the deduction.

17        If we're not allowed to put in an alternative tax

18   calculation on the case, I suggest that's reversible error on

19   the tax charge.  We've briefed this.  It's not a surprise to

12:42 20   the government.  We briefed it extensively to them.

21        MS. KEARNEY:  Your Honor, Mr. Kendall is talking about

22   a boost, and Johnny Wilson did not receive a boost.  The

23   evidence is that it was in exchange for his admission.

24        Also, the payment that went to The Key Worldwide

25   Foundation that Mr. Kendall would suggest we offset was never

**A3081**

1    passed on to USC.  That was kept within The Key Worldwide

2    Foundation.  So he's mischaracterizing the evidence as well.

3          MR. KENDALL:  Your Honor, good faith is a defense to a

4    tax charge.  If Mr. Wilson thinks he's making a $220,000 tax

5    deductible donation, even if it can be set aside in a civil

6    audit, he has good faith.  We have the right to put in that

7    good-faith defense and to show that they failed to prove the

8    most essential element to set aside a deduction.

9          Mr. Nahmens gave them the testimony.  This is not a

12:43 10    surprise to them at all.

11          THE COURT:  All right, Ms. Kearney.

12          MS. KEARNEY:  Your Honor, that's a different issue.

13          This has do -- Boulware has to do with an alternative

14    tax calculation based on the -- based on the evidence.

15    Mr. Kendall is trying to put in information that's not in

16    evidence and it's not supported by the evidence.

17          MR. KENDALL:  Your Honor --

18          THE COURT:  Okay.  All right.  I'm not going to

19    continue this argument now.  I'm not going to let you -- I'm

12:44 20    going to sustain the objection now.  We'll talk about it at the

21    break when we have time when the jury is not waiting around.

22          MR. KENDALL:  Sure.  I'll do other stuff.

23          THE COURT:  Yeah.

24          MR. KENDALL:  I'll take us to 1:00.  If I can't, I'll

25    let the Court know.

```
 1              THE COURT:  Okay.

 2              (End of discussion at sidebar.)

 3     BY MR. KENDALL:

 4     Q.   In doing your analysis, you, I take it, accept that

 5     $100,000 that Mr. Wilson gave actually did go to the USC water

 6     polo bank account, correct?

 7     A.   From Mr. Singer's for-profit business.

 8     Q.   Mr. Wilson sent $100,000 to Mr. Singer's for-profit

 9     business.  They turned around and bought a $100,000 bank check

12:45 10    and delivered it.

11     A.   Correct.

12     Q.   They didn't charge any administrative fee or anything

13     else, it was $100,000 that just went through a bank check to

14     the water polo fund.

15     A.   There's the additional $20,000 charged.

16     Q.   That's separate.  I'm talking about the $100,000 that was

17     sent, they bought a $100,000 bank check, correct?

18     A.   If it was the same money.  Obviously I don't know.  I

19     didn't see the bank records.

12:45 20    Q.   And you agree with me there's no allegation that money in

21     the USC water polo fund gift account went to the personal

22     benefit of any coach, correct?

23     A.   I do not know if that occurred.

24     Q.   And then there's $100,000 that went to The Key Foundation,

25     correct?
```

A3083

```
 1   A.   Correct.
 2   Q.   And there's $20,000 that was described as expenses that
 3   actually went as personal payments to Mr. Singer.
 4   A.   Correct.
 5   Q.   Have you listened to the entire trial?
 6   A.   I have.
 7   Q.   Okay.  So you heard the playing of the tapes, the
 8   consensual tape recordings with Agent Keating, correct?
 9   A.   Yes, I heard it, yes.
10   Q.   And you heard Mr. Wilson say on several occasions in those
11   tapes that Mr. Singer did not make any money when he did the
12   donation or the whatever you want to call it with USC for
13   Johnny, correct?
14   A.   I don't recall that particularly.
15   Q.   You don't recall Mr. Wilson repeatedly saying, "You don't
16   make any money on this.  Let me give you advice for pricing.
17   You should do this in a more sophisticated business way"?  You
18   don't remember all those conversations that Agent Keating
19   testified --
20   A.   Yes, I remember those conversations, but I don't remember
21   the exact wording of you don't make any money.  It could have
22   been you don't make enough money.
23   Q.   Well, is that your testimony, that you heard the
24   transcript say, "You don't make enough money"?
25   A.   I just said I don't remember exactly.  It could have been
```

```
 1    "any."  It could have been "enough."  I do not remember

 2    exactly.

 3    Q.   Okay.  So I want you to assume for purposes --

 4              (Court reporter interrupted - technical

 5    difficulties.)

 6              THE COURT:  You may continue.

 7    BY MR. KENDALL:

 8    Q.   It would be fair to say you don't disagree with anything

 9    Mr. Nahmes testified to about the idea of offsetting the value

12:49 10    of the goods and services by fair market value or comparable

11    transactions, correct?

12    A.   That I don't disagree with him?

13    Q.   Yes.

14    A.   No, I don't disagree with offsetting for goods and

15    services.

16    Q.   But you didn't do it in this case?

17    A.   I did not.

18    Q.   And you don't have the information to do it if you wanted

19    to.

12:50 20              MS. KEARNEY:  Objection.

21              THE COURT:  Sustained.

22    BY MR. KENDALL:

23    Q.   I'd like to -- now, if we could have Exhibit 9864, please.

24              Other than my -- excuse me.

25              Actually, why don't we take that exhibit off, because
```

**A3085**

1    I've got to adjust it somewhat.

2         MR. KENDALL:  I'd like you to go back to the --

3    Mr. Carter, could we have the transcript for September 29,

4    2018.

5         (Discussion off the record.)

6         MR. KENDALL:  If we could go to the transcript of

7    Exhibit 571A.

8         (Discussion off the record.)

9         MR. KENDALL:  Can you do a word search or scroll down

12:51 10   to the word "foundation"?

11        Okay.  Could you keep going further, more to the

12   next -- if you could do a search for the next "foundation."

13        Okay, perfectly, where it says, "And then the kids get

14   into school, line 23.

15   Q.   You see Mr. Singer says, "And then the kids get in the

16   school.

17        MR. KENDALL:  Can we highlight the next seven or eight

18   lines, please?

19   Q.   Mr. Wilson says, "I assume" -- he says, "So, my

12:53 20   colleagues -- so, so you c -- you I assume take a share of that

21   or something.  If it's all going to your foundation, you can't

22   take a share if it goes your foundation.  You don't get a fee

23   on that, then."

24        Mr. Singer says, "Um-Hmm, I just do my fee for what I

25   take when I do your normal applications."

1    Does that refresh your memory there was discussion on
2    more than one occasion that Mr. Singer told Mr. Wilson he was
3    not charging for the side door donations?
4    A.   Can you scroll up just so I can start again at the top
5    where it says --
6    Q.   Please.
7    A.   Thank you.
8        Yes, he cannot take a share out of the foundation, but
9    the $20,000 check was written directly to Mr. Singer.
12:54 10    Q.   But if you take -- if you -- but you know Mr. Wilson
11   wasn't on the e-mails that discussed that the money would go to
12   Mr. Singer personally?
13       MS. KEARNEY:   Objection.
14       THE COURT:   Sustained.
15   BY MR. KENDALL:
16   Q.   Have you seen any e-mails that indicate that Mr. Wilson
17   was told that the $20,000 would go as income to Mr. Singer?
18   A.   He said to Rick for expenses, I think.
19   Q.   Thank you.  For expenses.
12:54 20       You agree with me expenses is different than income.
21   A.   Yes, I agree with you that it's different.
22   Q.   Okay.  And so you agree with me Mr. Singer says here at
23   lines 5 and 6, "I just do my fee for what I take when I do your
24   normal applications."
25       Correct.

A.   Correct.  But this conversation is also in 2018.  I don't
know what the context would be in 2014.

Q.   I'm asking are you aware of any evidence where Mr. Singer
said that he was getting paid to do any part of the side door
donation?

A.   I am not aware of him saying that.

Q.   Okay.  And so -- okay.

If we could, I'd like to do this on the ELMO, it's a
little bit cleaner that way.

I want to show you Exhibit 9864, please.

MR. KENDALL:  If we could show the witness first.

Q.   Do you recognize 9864?

A.   It looks like a copy of the website where you can search
for tax exempt organizations.

Q.   Thank you.

MR. KENDALL:  I'd like to offer that into evidence,
your Honor.

MS. KEARNEY:  No objection.

THE COURT:  It will be admitted, 9864.

(Exhibit 9864 received into evidence.)

BY MR. KENDALL:

Q.   If we take a look -- this is an official IRS publication,
right?

A.   On the website, yes.  It's official IRS website, yes.

Q.   And this is what the IRS puts out there so tax preparers

 1    and taxpayers can check whether tax-exempt organization has

 2    been certified by the IRS, correct?

 3    A.    Correct.

 4    Q.    And if we take a look here, it says, "tax-exempt

 5    organization search helps users find information about a

 6    tax-exempt organization's federal tax status and filings."

 7          It states, "You can find:

 8          "Organizations eligible to receive tax-deductible

 9    charitable contributions."

12:56 10         And they state, "Users may rely on this list in

 11    determining deductibility of their contributions."

 12          Is that correct?

 13    A.    That's what it says.

 14    Q.    So what the IRS is telling people, if you make a

 15    contribution, you can look it up on our website and if we tell

 16    you we've certified that charity as an approved registered

 17    charity, you can rely on us when taking a deduction.

 18    A.    Correct.

 19    Q.    Now, I'm going to -- this form -- we actually have the

12:57 20    search attached to it, and you see tax-exempt organizations

 21    search bulk data downloads.  That's the database that's on the

 22    website where you can look up all the different charities,

 23    correct?

 24    A.    Correct.

 25    Q.    And you see this one states that its last update was

```
 1    December 9, 2019.

 2    A.    Correct.

 3    Q.    Almost two years ago.

 4    A.    Yes.

 5    Q.    Okay.  And if we flip the page, we see that The Key

 6    Worldwide Foundation, here highlighted in blue, is still listed

 7    as an approved charity.

 8    A.    I cannot read that.  I'm sorry.

 9    Q.    Let's see if we --

10    A.    Okay, I got it now, thank you.

11    Q.    So in December 2019, which is about eight, nine months

12    after this case became public, the IRS was still listing The

13    Key Worldwide Foundation as a valid charity.

14    A.    It appears so.

15    Q.    And you'd agree with me with respect to Mr. Wilson's

16    $100,000 to USC, there's no evidence in this case that USC has

17    ever refunded it to him, correct?

18    A.    Not that I'm aware of.

19    Q.    And no evidence that USC ever sent him a gift notice

20    saying that there was goods or services received, correct?

21    A.    There was no gift receipt ever sent from USC from what I

22    know.

23    Q.    Right.  It's USC's obligation to send it to Mr. Wilson,

24    and they never did.

25    A.    The Wilsons didn't pay USC directly, The Key did.  So The
```

12:58 (line 10)
12:59 (line 20)

**A3090**

1    Key most likely got the gift letter.

2        I don't know that, but from -- it came out of The Key,

3    so -- and I understand that "The Wilson Family" was written on

4    the top, but it still came from The Key.

5    Q.   So you're assuming that USC sent a thank you letter or

6    thank you note to The Key Foundation?

7    A.   A gift receipt.  I cannot say whether they did or not, but

8    what was received by the Wilsons was a thank you letter.  So

9    the goods or services didn't have to be included in that

01:00 10    letter, it was to be included in a gift receipt.

11    Q.   Right.  But sometimes we know charities will send a thank

12    you note separate from a gift receipt.

13    A.   Oh, absolutely.

14    Q.   Do you know what the USC practice was?

15    A.   I have no idea.

16    Q.   And do you have -- are you just guessing that USC sent

17    something to The Key?

18    A.   Yes.

19    Q.   Okay.  So you're just making it up.  There's no evidence

01:00 20    in the case for that.

21        MS. KEARNEY:  Objection.

22        THE COURT:  Sustained.

23    BY MR. KENDALL:

24    Q.   You're guessing, correct?

25    A.   I didn't say that it was definitely sent.  I said if it

```
 1    was, it probably would have went to The Key because that's

 2    where the check came from.

 3    Q.    Well, the check doesn't say "The Key Foundation," it says

 4    "The Wilson Family," correct?

 5    A.    Yes.

 6    Q.    And they tracked down the Wilson family and sent them a

 7    letter to their address, correct?

 8    A.    I think the athletic fund did.

 9    Q.    Yes.  And did you see anything to indicate that USC ever

 10   sent anything to The Key for that $100,000 donation?

 11   A.    No.

 12   Q.    So you had no evidence to base that statement on that you

 13   just made.

 14          MS. KEARNEY:  Objection.

 15          THE COURT:  Sustained.

 16          MR. KENDALL:  Your Honor, would you like to --

 17          THE COURT:  Yes, we're going to take the break.

 18          Ms. Ranahan, you can step down for the time being

 19   here.

 20          We're going to recess for one hour; we'll see you at

 21   2:00.

 22          THE CLERK:  All rise for the jury.

 23          (Jury left the courtroom.)

 24          THE COURT:  Be seated, counsel.

 25          Approximately how much lodger on cross, Mr. Kendall?
```

```
 1              MR. KENDALL:  Your Honor, I expect 30 to 45 minutes,
 2      maybe 50 minutes.
 3              MR. KELLY:  I expect nothing from me, your Honor.
 4              THE COURT:  All right.
 5              And redirect?
 6              MS. KEARNEY:  Depends on what comes out in the rest of
 7      the cross.
 8              THE COURT:  Okay.
 9              First of all, I have received a proposed curative
01:02 10    instruction from the government.  The government will give a
11      copy of that to defendants, we'll talk about it at 2:00 before
12      we bring the jury back in.
13              I certainly am inclined to give such an instruction,
14      but I'll hear the defendants if they have any objections to
15      this particular instruction.
16              Is there anything more that needs to be said with
17      respect to the sidebar that we had a few minutes ago?
18              MR. KENDALL:  Yes, your Honor.
19              This is central to our tax defense.  There's 100
01:03 20    percent aligned with both the testimony of Mr. Nahmes, as well
21      as the witness' own testimony of what the IRS standard is.
22              If they want to disallow a charitable deduction for
23      goods and services, they have to give a value to the goods and
24      services and offset.  That's my example, if you go to
25      McDonald's or the Four Seasons --
```

```
 1          THE COURT:  Are you intending to offer an expert

 2     that's going to say this for the defendant?

 3          MR. KENDALL:  Your Honor, we're discussing now whether

 4     we put on a tax expert, but I don't have to, your Honor, it's

 5     the law.

 6          THE COURT:  I understand that, I'm just asking whether

 7     you intend to do it.

 8          MR. KENDALL:  Given the testimony of Mr. Nahmes and

 9     her, I don't think I have to, your Honor.

10          But it's in our proposed jury instructions, it's in

11     the briefs we filed, your Honor.  This is black letter law.

12     They need -- the charity -- USC has to determine what's the

13     fair market value of the offset or deduction or reduction of

14     the deduction, and there's no evidence that they have it here.

15     And she didn't consider it, your Honor, so she's not complied

16     with the Internal Revenue Code.

17          THE COURT:  Ms. Kearney.

18          MS. KEARNEY:  Your Honor this is a tax fraud case, not

19     a tax evasion case.  So the actual amount of the tax loss is

20     not relevant, it's not an element of this charge.

21          On top of that, Mr. Kendall is arguing about a

22     donation to The Key Worldwide Foundation that was never passed

23     on to USC.  The fraud here was related -- related to the

24     payment to USC was deducted as a business expense, not a

25     charitable contribution.
```

01:03 (line 10)
01:04 (line 20)

**A3094**

1          So the value that he wants to attribute to that is not

2     relevant to the fraud related to deducting it as a business

3     expense.

4          MR. KENDALL:  Your Honor, if I may be heard.

5          First, her testimony should being set aside if it

6     violates the Internal Revenue Code and is against law.

7          She's trying to calculate a damage.  Good faith is an

8     absolute defense to a tax charge.  They have to show violation

9     of a known legal duty.

01:05 10         If Mr. Wilson in good faith believed he was making a

11     $220,000 charitable contribution, which I suggest Agent

12     Keating's testimony establishes in the record basis for us to

13     argue that in good faith, then she cannot argue that there's

14     any tax loss which is -- it is an essential fact for them to

15     make the case attractive to the jury.

16          It's not just a line mistake on a tax return that had

17     no consequence.  They're trying to prove that Mr. Wilson

18     intentionally evaded $88,000.

19          Her testimony should be struck if she's violating the

01:05 20     Internal Revenue Code in her calculation.

21          THE COURT:  All right, Ms. Kearney.

22          MS. KEARNEY:  She's not violating the Internal Revenue

23     Code in her calculation.

24          The evidence that she saw during the trial is that

25     Mr. Wilson tried to first put all of the money as business

consulting expenses, so she, based on that, determined that the

business expenses, as well as the charitable donation where it

did end up in The Key Worldwide Foundation, are not allowed

deductions, and she based her analysis based on that.

THE COURT:  All right.  I'm going to give you an

opportunity, Mr. Kendall, to put this in writing and submit a

motion to this effect by 5:00 tonight and I'll hear the matter

between now and the time you commence your case.

MR. KENDALL:  Okay, your Honor.

01:06  THE COURT:  The government will be allowed to respond

to it, but I'm not going to either exclude her testimony or

allow to -- or sustain the effort to do what you're expecting

to do before the end of the government's case.

MR. KENDALL:  Your Honor, my only request is if we

could have a little bit more than 5:00.  I expect we're going

to be this afternoon finishing up this witness and then perhaps

having a conference with you.  Can we have a little bit more

time --

THE COURT:  How many lawyers do you have working on

01:06  your case?

MR. KENDALL:  Not too many on the tax issue.

THE COURT:  Four in the courtroom.  5:00 tonight.

MR. KENDALL:  Thank you, your Honor.

THE CLERK:  All rise.

(Recess taken 1:07 p.m. to 2:07 p.m.)

1          THE CLERK:  You may be seated.  Court is now in

2     session.

3          THE COURT:  Counsel, before the break the government

4     submitted a proposed curative instruction, which I instructed

5     counsel to look at.

6          Has there been any agreement on this, Mr. Kelly?

7          MR. KELLY:  No, your Honor.  I would respectfully

8     suggest the Court, as it's done with these other requests for

9     curative instructions, take it under advisement and give it an

02:08 10     appropriate time and not now.  I'd like to determine further

11     whether the numbers, in fact, add up.  The exhibit that I think

12     was a subject of discussion was 716.  It was about $9 million

13     and I'm looking at the Plea Agreement of 3.4 million, and -- as

14     well as all funds on deposit as of the Plea Agreement's date of

15     2/6/19.

16          THE COURT:  No.  I'm talking about the curative

17     instruction with respect to the examination of Miss George.

18          MR. KELLY:  Yes, so am I, your Honor.  Maybe I'm not

19     being clear enough.

02:08 20          THE COURT:  Okay.

21          MR. KELLY:  I don't know if this is entirely accurate.

22     Their question was about several million dollars that were in

23     account, and it's being stated unequivocally here by the Court,

24     which the jury will believe, that he wasn't allowed to keep any

25     of it.  And I'm trying to look through Singer's Plea Agreement

1    and his Cooperation Agreement.  There's a reference to he has

2    to cooperate with respect to something under Swiss law.  I

3    don't know if there's a Swiss account.  We've raised it with

4    the government earlier in the discovery phase about -- it was

5    in September he had a $1.4 million account.  And when he signed

6    his affidavit, it was -- his financial affidavits, it was down

7    to 1.1.  I just want to confirm all the money he no longer

8    really does -- didn't get any, wasn't allowed to keep any.  So

9    my point is that I would like to pursue it a little further

02:09 10    after I analyze the documents, discuss it further with the

11    government and it's a timing thing from my perspective.

12                THE COURT:  All right.

13                MR. KENDALL:  Friday morning, your Honor, if that's

14    convenient.

15                THE COURT:  Government's position, Mr. Frank?

16                MR. FRANK:  Well, first of all, the account that

17    Mr. Kelly is talking about is a different account, not the KWF

18    account.  But we believe the instruction should be given now

19    when it's fresh in the jury's head.  What I would suggest, your

02:10 20    Honor, is if we strike the last sentence of the proposed

21    instruction and simply instruct the jury to disregard any

22    suggestion that he was permitted to keep that money.  Then the

23    Court is not affirmatively stating other than that they should

24    disregard the suggestion.

25                MR. KENDALL:  Your Honor, I have a different issue

than Mr. Kelly.  I don't think they've quoted me accurately and

I would like to get the transcript today to provide you with

the exact question and answer that I put so you can make a

decision whether this is warranted or not.  I think if we get

it to you tonight or tomorrow morning, you can give any

instruction you think appropriate Friday morning, but I

strongly suggest, your Honor, I don't think they've quoted me

accurately.  And I think the Court should have the benefit of

the transcript before it makes a decision.

THE COURT:  All right.  I am going to reserve on it.

I'm not going to give any instruction at this time and we're

going to go forward with the testimony at this point, hoping to

end the government's case today.

MR. FRANK:  One very brief issue, your Honor.  Earlier

today, Mr. Kendall put up Exhibit 118 and suggested it was

evidence.  We quickly noted it was not in evidence and it was

taken down.  That caused us to go back and check the record.

On Friday, the 24th, he offered that exhibit through Agent

Keating.  The Court sustained our objection to it coming in.

On Monday, he put it in again with Mr. Nahmens and asserted

twice on the record that it was in evidence.  That was not true

and there was about a page of cross-examination about the

exhibit that was in front of the jury.  We would ask that that

page of cross-examination be stricken from the record.

MR. KENDALL:  Your Honor, I'll take a look at the

```
 1   transcript.  There are two documents that are very similar.
 2   Mr. Frank is correct that I mistook one for the other.  They
 3   both discussed the 20,000 as being expenses.  I'll look at the
 4   transcript and I'll respond to it, your Honor.
 5            THE COURT:  All right.  I'm not going to do anything
 6   immediately on that or the other issue that was discussed at
 7   the end of this morning's testimony, but I've given defendants
 8   an opportunity to brief that, if they want to, by 5 o'clock and
 9   I'm going to reserve all those issues until later in the trial.
10            So call the jury and hopefully we can complete the
11   testimony of the last witness with cross-examination.
12            MR. KENDALL:  Your Honor, we will brief it by five as
13   the Court instructs.  We are not giving up any rights we have,
14   though, to cross-examine this witness in the government's case
15   on that topic.
16            THE COURT:  Fair enough.
17            MR. KENDALL:  Thank you.
18            THE CLERK:  All rise for the jury.
19            Thank you.  You may be seated.  Court is now in
20   session.
21            THE COURT:  Good afternoon.  Once again, jurors, we're
22   ready to proceed.
23            Miss Ranahan, you're reminded that you remain under
24   oath.
25            And Mr. Kendall, you may continue with
```

```
 1   cross-examination.
 2            MR. KENDALL:  Thank you, your Honor.
 3   BY MR. KENDALL:
 4   Q.  Miss Ranahan, I only did half of the section.  So I want
 5   to go back to Exhibit 571A, the transcript that we went through
 6   before lunch.  Do you remember that's where there's the
 7   discussion about Singer and the fee.  We started on page 7,
 8   line 24.  Do you remember that?
 9   A.   I do.  I think we started at line 23, when it says, "then
10   the kids get in the school".
11   Q.   23 and then the kids get in the school.  Yes.  So my
12   colleagues -- and then if you can turn to page 8, please.
13            MR. KENDALL:  If you can highlight, Mr. Carter, all
14   the way down to line 18.  And why don't we start at the top of
15   the page and we'll work our way down.
16   Q.   So lines 1 through 6, you remember we went through that
17   where Mr. Singer says "You can't take a share if it goes to
18   your foundation.  You don't get a fee on that, then."
19            Mr. Singer said, "Um, I just do my fee for what I
20   take when I do your normal applications".  Correct?
21   A.   Correct.
22   Q.   And you saw that the fees for normal applications were in
23   the area of five to $8,000 a year?
24   A.   I thought that was for tutoring or prep.  I didn't realize
25   that they were like, you know, his fees.  I just thought they
```

```
 1   were related to something different.
 2   Q.   Okay.  Well, you saw there was two $8,000 fees for
 3   Mr. Wilson's two daughters for a total of $16,000?
 4   A.   In 2018?
 5   Q.   Yes.
 6   A.   Yeah.  Okay.  Yup.
 7   Q.   Okay.  You saw the prior witness go through that on the
 8   charts, didn't you?
 9   A.   I did.
10   Q.   Okay.  And so do you understand that to be the normal
11   application fee?
12   A.   I do not.
13   Q.   Okay.  Then let's look further starting at line 7.
14            "Yeah, that's, like terrible.  I, I think, from a
15   business model point of view, again, I advised you last time".
16            Do you recall that "last time" is when his son
17   applied to USC?
18            MS. KEARNEY:  Objection.
19            THE COURT:  Sustained.
20   Q.   "I still advise you, this is worth a lot to people, and
21   so, you know, to the extent you want to make more money, I
22   would think you would have some kind of fee for that.  It's
23   about.... it's 350 to the foundation, plus another 20 percent
24   for me for using my leverage and my relationships .
25            "Yeah.
```

```
 1              "Or something, no?"
 2              And Mr. Singer responds, "well, I'm gonna use your
 3     business model going forward."
 4              You see that?
 5     A.   I do.
 6     Q.   So you see there at lines 11 and 12, Mr. Wilson says, "I
 7     would think you would have some kind of fee for that".  You see
 8     he's referring to making side-door donations, correct?
 9     A.   Yes.
10     Q.   Okay.  Now we can put that down.  Thank you.
11              Are you familiar with the -- strike that.
12              With respect to the IRS website, they have the
13     Form 99s from all the charitable entities, correct
14     A.   Yes.
15     Q.   Like The Key foundation's tax returns put up on the
16     website every year?
17     A.   I believe so.
18     Q.   And you can look at the data and see where the money is
19     reported as going, correct?
20     A.   Correct.
21     Q.   And one of the things that allows people to do is to see
22     how efficient the charity is, correct?
23     A.   I would assume so.
24     Q.   Yeah.  And when you can look and see does this charity
25     give 10 percent overhead and 90 percent to people who are
```

 1   underprivileged, or does this charity give 60 percent to

 2   overhead and only 40 percent to people who are underprivileged

 3   or in need of assistance.  Do you understand my point?

 4   A.   I do.  As an accountant myself, that's what I would do.  I

 5   can't speak for people who are not a numbers person.

 6   Q.   Okay.  And for donors, they can look up a charity and say,

 7   this charity is going to give most of my money to the

 8   beneficiaries versus this is my charity's that's going to pay a

 9   lot of salaries and overhead and have fancy offices.  You

02:18 10   understand that concept?

11   A.   Yes, I do.

12   Q.   Are you familiar with the website Charity Navigator?

13   A.   I am not.

14   Q.   Okay.  But you understand that people who donate money

15   sometimes look up on the IRS website or other websites to see

16   how efficient the charity is in distributing the funds for the

17   intended purpose?

18   A.   I would hope so.  I can't say what the public does.

19   Q.   But you know that that's what those websites are there

02:19 20   available for, correct?

21         MS. KEARNEY:  Objection.

22         THE COURT:  Sustained.

23   Q.   Okay.  And so when Mr. Wilson is told that the $20,000 is

24   going for expenses, did you consider that Mr. Singer told him

25   that's expenses for the foundation?

**A3104**

```
 1              MS. KEARNEY:  Objection.  Mischaracterizes the
 2       evidence.
 3              THE COURT:  Sustained.
 4       Q.   You'd agree with me, a $20,000 contribution to cover the
 5       expenses of a 501(c)(3) charity can be a deductible payment,
 6       correct?
 7       A.   It was deducted as business consulting, so it was not a
 8       contribution.
 9       Q.   I'm not asking you what was deducted.  I'm asking you for
10       the principle.  If a person is expecting to pay $20,000 with
11       the expenses of a 501(c)(3) organization, that can be a $20,000
12       deduction?
13       A.   If they donate it to the charity.
14       Q.   Yes, or if they pay for the services and the services are
15       provided to the charity?
16       A.   If they pay directly for the services.
17       Q.   Okay.  So you understand a person can give $20,000 to buy
18       noncash contributions for the charity?
19       A.   Directly to the charity.
20       Q.   Or they could say the charity says we need secretaries and
21       bookkeeping help to administer a travel brand for a sports
22       team, here's the money to pay for the secretary that will work
23       for the charity.  I'll pay the secretary.  That's a
24       contribution, correct?  The secretary's salary, the
25       bookkeeper's salary?
```

```
 1    A.    If it was paid to the charity.

 2    Q.    If it's paid to the bookkeeper and the bookkeeper shows up

 3    to work at the charity, that's a noncash contribution.  Don't

 4    you remember Mr. Nahmens talking about that?

 5    A.    I don't recall his exact wording.

 6    Q.    Well, you'd agree with me, if I provide a noncash benefit

 7    to a charity, that, too, is deductible?

 8    A.    Under a different line in cash contributions it would be

 9    deductible, yes, if it's for a good.

10    Q.    Yeah.  So you know a charity has no bookkeeping help, they

11    have to administer a hundred thousand dollar grant, I'll give

12    $20,000 to hire a bookkeeper to administer the grant.  That's a

13    noncash contribution.  I'm giving $20,000 of bookkeeping

14    services to the charity.

15    A.    It would go directly to the charity and the charity would

16    pay the bookkeeper.

17    Q.    No.  You can also pay the bookkeeper and the bookkeeper's

18    services are the contribution, correct?

19          MS. KEARNEY:  Objection.

20          THE COURT:  Sustained.

21    Q.    You'd agree with me you can do a noncash contribution of

22    someone's professional services or work, not your own, but

23    somebody you pay to do the work?

24    A.    Can you repeat that?

25    Q.    You agree with me that a person can make a noncash
```

**A3106**

 1    contribution to a charity by paying a third party to provide

 2    services to the charity?

 3            MS. KEARNEY:  Objection.

 4            THE COURT:  Grounds?

 5            MS. KEARNEY:  Assuming facts not in evidence.

 6            THE COURT:  Well, it's a hypothetical.  If she knows

 7    the answer, she can answer it.

 8    A.   I do not know a hundred percent so I don't feel

 9    comfortable answering.

02:22 10    Q.   I'd next like to go to the tax return, the second amended

11    return.  Now, I want to show you Exhibit 482.  It's in

12    evidence.  Are you familiar?  This is the -- what AYCO gave to

13    Mr. Wilson that became the, that was electronically filed.

14    It's the same return.

15            MS. KEARNEY:  Objection.  It was not electronically

16    filed.

17            THE COURT:  Sustained.

18    Q.   Excuse me.  That was filed -- you understand that 482 is

19    the same copy of the return as the blue ribbon you have, except

02:23 20    the blue ribbon is from the IRS and this is from the preparer?

21    A.   Yes.

22    Q.   Okay.  I'd like to go through 482 with you and ask you a

23    few questions.  Can you go to line 63?  I put a piece of paper

24    and a pen right next to you there.  I'm going to ask you to

25    write down some numbers.  I'd like you to go to line 63 of the

1    1040.  If you could go to the bates ending in 852, line 63.

2    And do you see line 63?

3    A.    Yes.

4    Q.    What is that?

5    A.    It is the total tax on the second amended return.

6    Q.    Okay.  That's the total federal income tax, correct?

7    A.    Correct.

8    Q.    And what is -- if we go up to line 48, you see line 48,

9    $466,278?

02:24 10    A.    I do.

11    Q.    And that's a foreign tax credit.

12    A.    Correct.  Am I supposed to be writing these numbers down?

13    Q.    You can.  I would appreciate that.

14    A.    Okay.

15    Q.    Last time Judge Gorton had to correct the math, but this

16    time I'll try to get it right.

17    A.    I will, too.

18    Q.    And we've had testimony about a foreign tax credit.

19    That's a foreign credit Mr. Wilson gets for taxes he's paid

02:25 20    overseas that the internal revenue code will give him an offset

21    for, correct?

22    A.    Correct.

23    Q.    He's paying taxes in Holland.  The government isn't going

24    to tax him twice in two different countries and tax him on the

25    same income, so the US will give him a credit for what he pays

1    in Holland?

2    A.    Correct.  This was not for all of 2014, though.  There was

3    some carry forward from 2012 and 2013.

4    Q.    Okay.  But the foreign tax credit he's getting is

5    $466,278, correct?

6    A.    Not all for 2014.  That's the total including the carry

7    forward.

8    Q.    But that's what's being applied to this return?

9    A.    Yes.

02:25 10    Q.    Okay.  So he's got a credit of 466,278.

11              And then if we go to Schedule A, line 5, which is the

12    next page, bates ending in 853, we see the state line 5A, state

13    local income taxes are 222,369, correct?

14    A.    Correct.

15    Q.    And if you were here with us when I did this before, I

16    left out one number, which is why I'm troubling you.  If we

17    could go to the W-2, which is in the bates ending 850?

18              MR. Kendall:  If we can look at Box 6, "Medicare tax

19    withheld", 47 thousand -- the other one, "Corrected

02:26 20    Information", not previously reported, but to the right.  Thank

21    you.

22    Q.    Medicare tax withheld, $47,942.  47,942.60.  We'll round

23    it up to 943.  Would you agree with me those are the taxes

24    being paid for 2014?

25    A.    Correct.

1          MR. KENDALL:  I want to show an exhibit just for the

2     witness, 9849, page 1 of 1.

3     Q.    Do you recognize that as the numbers we just went through

4     and the total taxes paid?

5     A.    The foreign tax is different.

6     Q.    The foreign tax credit was 468,278, I believe.

7     A.    I have 476 -- can I see the return again?

8     Q.    Sure.   466 -- you're right.  You're correct.  My math.

9     I'm not going to call it a typo.  I'm just going to call it my

02:27 10    error.  It's off by $2,000.  So it's -- the total would be

11    966,821.

12    A.    Yes.

13    Q.    Okay.  And you agree with me the taxable income is

14    $2,131,369?

15    A.    I'd have to see it.

16    Q.    Okay.  Why don't we go back to Exhibit 482.  Let's look at

17    line 43, please, of the 1040, which would be at bates 852,

18    line 43.

19          Well, actually, hold on a second.  I may be off by a

02:28 20    fraction.

21          MR. KENDALL:  One minute, your Honor?

22          THE COURT:  Yes.

23    Q.    So taxable income would be what?

24    A.    Is $2,127,769.

25    Q.    So $2,127,769.  If we divide $2,127,769 -- excuse me -- if

1  we decide 966,821, the amount of tax paid, by the taxable

2  income, it will get us about 45 percent.  Is that correct?

3            MS. KEARNEY:  Objection.

4            THE COURT:  Grounds?

5            MS. KEARNEY:  The witness testified that not all the

6  foreign tax credit was paid in 2014.

7            THE COURT:  Sustained.

8  Q.   The foreign tax credit was applied to the return, correct?

9  A.   There was a carry forward from 2012 and 2014.  It wasn't

02:30 10  paid in 2014 though.

11  Q.   So using the carry forward, we would see that the carry

12  forward in taxes paid are about 45 percent of the taxable

13  income, correct?

14  A.   All of the foreign tax credit wasn't paid in 2014, so I

15  can't.

16  Q.   I'm not saying it's paid.  I'm agreeing with you it wasn't

17  all paid.

18  A.   Okay.

19  Q.   I'm saying the foreign tax credit applied and the other

02:30 20  taxes paid equal 45.5 percent of the taxable income?

21            MS. KEARNEY:  Objection, your Honor.

22            THE COURT:  Well, if she understands, she can answer.

23  A.   I understand.  I just don't agree with that percentage,

24  because it's not 45 percent of the taxable income, because the

25  taxable income for this year relates only to 2014, whereas the

```
 1   credit that he's getting for foreign tax credit was not all

 2   from 2014.  So to get a percentage, I don't feel comfortable

 3   doing that.

 4   Q.   I'm just asking you to do the math and the government can

 5   ask you questions to explain your view of it later.

 6            MS. KEARNEY:  Objection.

 7            THE COURT:  Overruled.

 8   Q.   My question is simple.  If we take the line, the numbered

 9   line 43 and divide it by 966,821, we get about 45 percent,

10   correct?

11            MS. KEARNEY:  Objection.  Relevance.

12            THE COURT:  She can answer the question.  Overruled.

13   A.   I'm trying to do some long division here.  It might take

14   me a minute.

15   Q.   Would you like a calculator?

16   A.   That would be awesome.  It would go a lot quicker.

17   Q.   Promise me you won't read my e-mails.

18   A.   I promise.

19   Q.   Would you like a simple calculator?

20   A.   That would be perfect.  It should be a simple calculation.

21   Thank you.  Yeah.  45.4 percent.

22   Q.   Okay.  So that 966 of foreign tax credits and taxes paid

23   is 45 point -- what did you say, 6 percent?

24   A.   Four.

25   Q.   45.4 percent of the taxable income.
```

**A3112**

```
 1    A.    Correct.
 2    Q.    Next, I'd like to show you your chart, Exhibit 697.  This
 3    is a calculation you made assuming that the $220,000 should be
 4    disallowed as deductions?
 5    A.    Correct.
 6    Q.    Disallow the $120,000 as a consulting fee and disallow
 7    $100,000 as a charitable contribution?
 8    A.    Correct.
 9    Q.    Did you do a calculation of what it would be if someone
10    expected that the entire $220,000 would be a charitable
11    contribution?
12    A.    I did not.
13    Q.    Okay.
14          MR. KENDALL: I'd like to show you, only as a chalk,
15    trial Exhibit 9836, your Honor, if I may.  And I'd just like to
16    walk the witness through the calculation.  If we can show this
17    to the jury.  It's only a chalk for the moment, your Honor.
18          MS. KEARNEY:  Can I -- do you have a hard copy I can
19    take a look at, please?
20          MR. KENDALL:  Sure.
21          MR. FRANK:  Your Honor, this should not be in front of
22    the jury.  It is already.
23          THE COURT:  I can't hear you.
24          MR. FRANK:  I don't know if this is in front of the
25    jury, but it should not --
```

02:33 (line 10)
02:33 (line 20)

A3113

 1          MR. KENDALL:  It shouldn't be in front of the jury

 2    until you rule.

 3    Q.   I'd like to show you this as a chalk.

 4          MR. FRANK:  Can we have a moment, please?

 5          THE COURT:  Yes.

 6          MR. KENDALL:  May I just explain the sources, your

 7    Honor?  It may put everybody at comfort.  The right column is

 8    from her exhibit that she put into evidence, 6907 or whatever

 9    it was.  The far right column is from Exhibit 482, which is in

02:34 10    evidence.  And the middle column is just the calculation I've

11    just asked her if she could do and walk through with me.  So

12    two-thirds of this is already in evidence.  It's only the

13    middle column I want to question her about that's not in

14    evidence.

15          MS. KEARNEY:  I"m sorry.  What's the source of the

16    middle column?

17          MR. KENDALL:  The middle column is just making the

18    assumption that the 220 would be deductible as a charitable

19    expense, as opposed to 120 as a business expense and 100 as a

02:35 20    charitable expense.  That's the only difference between that

21    and the others is the assumption that it could be treated as a

22    220 charitable donation.

23          THE COURT:  Go ahead.

24    Q.   If we can take a look at this, Miss Ranahan, do you see

25    under "government", those are your numbers, lines 1 through 11,

```
 1    correct?
 2    A.    Correct.
 3    Q.    Do you want to check them?  Or -- never trust my math, I
 4    assure you.
 5    A.    Can we put up my copy just to make sure that they're
 6    exactly the same.
 7    Q.    That's an excellent suggestion.
 8           MR. KENDALL:  Can we have 687 alongside that, please.
 9    697, please.
02:36 10    A.    Yes.  It matches.
11    Q.    Faithful to your numbers that I even did the numbering
12    correctly.  The only addition was 3A, additional charitable
13    contributions, which is zero in your list, correct?
14    A.    Correct.
15           MR. KENDALL:  Mr. Carter, if we can put them back side
16    by side in full.
17    Q.    Okay.  And then the 1040X is just off the Exhibit 482.
18    Does that look right to you, same taxable income number,
19    nothing disallowed, nothing added, because it's the baseline?
02:37 20    A.    Yes.
21    Q.    Okay.  So now let's look at the middle column for
22    Mr. Wilson.  We start out with the same taxable income number
23    that you had, correct?
24    A.    Yes.
25    Q.    Okay.  And that's line 43 of the 1040, correct?
```

A.    Yes.

Q.    We agree with you that the consulting fee for $120,000

should be disallowed.  Do you see that?

A.    Yes.

Q.    But we disagree that there should be a charitable

contribution disallowed.  So there's a $100,000 difference in

line 3, correct?

A.    Correct.

Q.    And then, in line 3A, which you didn't have, I added

line 3A, we add back the $120,000 as an additional charitable

contribution, correct?

A.    Correct.

Q.    And we -- both calculations have the itemized deduction

adjustment of $3,600.  And would it be fair to say if we're

doing something to raise the adjusted gross income, we've got

to give back a little bit of the deduction adjustment?  You

lose a little in your deductions, right?

A.    If you raise adjusted gross income, you lose a little bit

of your deduction, yes.

Q.    And you lose 3,600 bucks, correct?

A.    Correct.

Q.    Okay.  So the income tax and the corrected taxable income

with our calculation would be about $678,492.  It's just a

little bit more than what's on the Form 1040X, correct?

        MS. KEARNEY:  Objection to a little bit more.

```
 1              THE COURT:  Sustained.
 2    Q.   Okay.  Would you agree with me, we've got to pay an
 3    additional tax on that $3,600?
 4    A.   Taxable income went up, so yes.  You would have to.
 5    Q.   The taxable income went up by $3,600, so there's a tax due
 6    and owing on $3,600, correct?
 7    A.   Yes.
 8    Q.   Okay.  And it would be about 39 point something for that
 9    year at his income level?
10    A.   I don't know the rates off the top of my head, but it's a
11    higher rate.
12    Q.   Okay.  My point being, if you treat it that the taxpayer
13    had the expectation that it was all tax deductible and it was
14    just misclassified, the only adjustment that would have any
15    impact on the tax calculation would be $3,600 for the itemized
16    deduction adjustment, correct?
17    A.   If it was allowed as a charitable contribution.
18    Q.   Yes.  And that would result in a total tax increase of
19    $1,425, correct?
20    A.   Correct.
21              MR. KENDALL:  Okay.  Thank you.  Your Honor, I would
22    like to offer this into evidence given that the witness has
23    validated the calculation.
24              MS. KEARNEY:  Objection, your Honor.
25              THE COURT:  Sustained.
```

|   | |
|---|---|
| 1 | Q.   Now, you heard testimony earlier about sub S corporations? |
| 2 | A.   Correct. |
| 3 | Q.   You heard Mr. Nahmens talk about it? |
| 4 | A.   Yes. |
| 5 | Q.   Perhaps Miss Keating talk about it? |
| 6 | A.   I think so. |
| 7 | Q.   And you agree with the testimony that a sub S corporation |
| 8 | in 2014 did not have an federal corporate income tax, correct? |
| 9 | A.   In any year it doesn't, correct. |

02:40 10    Q.   Okay.  It's a pass-through entity?

11    A.   Correct.

12    Q.   And if a sub S corporation had $220,000 in charitable

13    deductions in 2014, that would show up as properly recorded on

14    the Schedule A for the owner of the business, correct?

15    A.   Correct.

16         MR. KENDALL:  If I may have one moment, your Honor.

17    I'm pretty much at the end.

18         No further questions, your Honor.  Thank you.

19         THE COURT:  Any cross, Mr. Kelly?

02:41 20    MR. KELLY:  No, your Honor.  No cross.

21         THE COURT:  All right.  Any redirect?

22         MS. KEARNEY:  Briefly, your Honor.

23         THE COURT:  Miss Kearney.

24              REDIRECT EXAMINATION OF COLLEEN RANAHAN

25    BY MS. KEARNEY:

```
 1   Q.   Good afternoon again, Agent Ranahan.

 2   A.   Good afternoon.

 3   Q.   Before the lunch break, Mr. Kendall asked you several

 4   questions about other deductions, hypothetical deductions

 5   Mr. Wilson could have taken?

 6   A.   Yes.

 7   Q.   Does that affect your analysis as to whether the

 8   deductions in this case were allowable?

 9   A.   No.

10   Q.   And what is your analysis?

11   A.   That the $220,000 is not deductible on the tax return.

12   Q.   And why is that?

13          MR. KENDALL:  Objection, your Honor.

14          THE COURT:  Overruled.

15          MR. KENDALL:  I think it should be phrased as a

16   hypothetical, not her opinion on the law.

17          THE COURT:  No.  She can answer that question.

18   A.   $120,000 of it was deducted as business consulting

19   expenses, and $100,000 of it was deducted as charitable

20   contributions when goods or services were received.

21   Q.   Mr. Kendall also asked you several questions about whether

22   taxpayers can rely on information on the IRS website?

23   A.   Yes.

24   Q.   And he pointed out that The Key Worldwide Foundation was

25   still listed on the IRS website as of December 2019?
```

**A3119**

```
 1   A.   Yes.
 2   Q.   Are you aware that the Key Worldwide Foundation was shut
 3   down in March of 2019?
 4   A.   I am not.
 5   Q.   Can you donate to a shuttered entity?
 6   A.   You cannot.
 7   Q.   Just because an entity is listed as a tax exempt
 8   organization on the IRS website, does that mean all payments to
 9   that entity are charitable?
10   A.   No.
11   Q.   Does that mean that all payments to that charity are
12   deductible?
13   A.   No.
14   Q.   Can charitable organizations be used to commit fraud?
15   A.   Yes.
16   Q.   Even if they're listed on the IRS website?
17   A.   Yes.
18   Q.   Mr. Kendall asked you to do some calculations about
19   Mr. Wilson's effective tax rate.  First you started to say
20   something about carry forward.  Can you just explain what you
21   meant by that?
22   A.   So there are certain line items in a 1040 return, or
23   actually, a lot of different types of returns, that if the
24   entire amount, in this case it's a credit, so if the entire
25   amount is not allowed in the year that it was paid, it can be
```

| | |
|---|---|
| 1 | carried forward to be used against income in future years. |
| 2 | Q.   So not all those taxes were paid in 2014, correct? |
| 3 | A.   Correct. |
| 4 | Q.   And are you aware that Mr. Wilson received a refund in |
| 5 | 2012 for some of his Dutch taxes? |
| 6 | A.   I am not aware of that. |
| 7 | Q.   Does paying a high effective tax rate give you license to |
| 8 | take fraudulent deductions? |
| 9 | A.   No, it does not. |
| 02:45 10 | Q.   And Mr. Kendall showed you just before he sat down a chart |
| 11 | he had prepared showing your calculation and then his version |
| 12 | of the calculations of what taxes Mr. Wilson might owe? |
| 13 | A.   Yes, he did. |
| 14 | Q.   Is it still false to claim a charitable deduction as a |
| 15 | business expense? |
| 16 | MR. KENDALL:  Objection, your Honor. |
| 17 | THE COURT:  Overruled. |
| 18 | A.   Yes. |
| 19 | Q.   And that calculation that Mr. Kendall showed you, that |
| 02:45 20 | assumes that the $220,000 were legitimate charitable donations, |
| 21 | correct? |
| 22 | A.   Correct. |
| 23 | Q.   And even with that, Mr. Wilson would still owe more in |
| 24 | taxes? |
| 25 | A.   Yes. |

```
 1            MS. KEARNEY:  Miss Lewis, can we pull up Exhibit 710
 2      in evidence, please.
 3      Q.    Agent Ranahan, you've seen this e-mail before?
 4      A.    Yes.
 5      Q.    And if we look at the subject line, it's "USC fees".
 6      There's no discussion of donations in this e-mail, is there?
 7      A.    There is not.
 8      Q.    And the bottom e-mail from Mr. Wilson says "Rick, thanks
 9      again for making this happen!  Please give me the invoice.
02:46 10 What are the options for the payment?  Can we make it for
11      consulting or whatever from The Key so that I can pay it from
12      the corporate account?"
13            And Mr. Singer responds, "yes.  We can send you an
14      invoice for business consulting fees and you may write-off as
15      an expense.  What is the name and address et cetera you want
16      the invoice to be made out to?"
17            Mr. Wilson replies "R, awesome!" And gives the
18      contact information for Hyannis Port Capital?
19      A.    Yes.
02:46 20 Q.    And again, they're still not discussing any charitable
21      contributions, correct?
22      A.    Correct.
23      Q.    And when Mr. Singer writes you can -- he can send an
24      invoice for business consulting fees "and you may write-off as
25      an expense".  There's not a discussion of charitable
```

```
 1  deductions, is there?

 2  A.    There is not.

 3  Q.    And Hyannis Port Capital is who paid the fees for "making

 4  it happen", correct?

 5  A.    Yes.

 6        MS. KEARNEY:  Miss Lewis, can we look at Exhibit 109,

 7  please, that's in evidence.

 8  Q.    Agent Ranahan, you've seen this e-mail before as well?

 9  A.    Yes.

10  Q.    And Mr. Wilson, in the first e-mail, says to his assistant

11  Debbie Rogers, "Monday we will get an invoice and wiring

12  instructions for $250,000 to be paid by HPC Inc.".

13        And Miss Rogers asks in response, "What is the

14  account I'm charging this to?"

15        And Mr. Wilson replies "business consulting -- the

16  invoice will be for consulting -- please work with him to get

17  invoice correct".

18  A.    Yes.

19  Q.    So was the full $250,000 expected to be for business

20  consulting?

21        MR. KENDALL:  Objection, your Honor.  I don't think

22  she can testify to what Mr. Wilson expected.

23        THE COURT:  Sustained.

24  Q.    I'll rephrase that.  Ms. -- excuse me.  Agent Ranahan,

25  does this e-mail reference $250,000 for business consulting?
```

```
 1    A.    Yes.
 2    Q.    And that's what Mr. Wilson was willing to pay to get his
 3    son recruited to the USC water polo team, to facilitate his
 4    admission?
 5              MR. KENDALL:  Objection.  She can't testify.
 6              THE COURT:  Sustained.
 7    Q.    That's what Mr. Wilson agreed to pay?
 8              MR. KENDALL:  Objection, your Honor.
 9              THE COURT:  The question is confusing.  Sustained.
02:48 10   Q.    Agent Ranahan, did you rely on this e-mail in coming to
11    your conclusions that the deductions that Mr. Wilson took for
12    the $220,000 in payments were not allowable deductions?
13    A.    This is one of them that I relied on.
14              MS. KEARNEY:  Thank you.
15              THE COURT:  Recross?
16              MR. KENDALL:  Thank you, your Honor.
17              THE COURT:  Mr. Kendall.
18                   RECROSS EXAMINATION OF COLLEEN RANAHAN
19    BY MR. KENDALL:
02:49 20   Q.    Miss Ranahan, if my memory is correct, 12 years ago is the
21    last time you did an audit as a revenue agent?
22    A.    So --
23    Q.    Yes or no?  You did the audit?
24              MS. KEARNEY:  Objection, your Honor.
25              THE COURT:  Let her answer the question.
```

A.    So being in the Special Enforcement Program, we -- the

whole reason that I am a revenue agent in the Special

Enforcement Program is to do the tax side to help CI.  So I

have done specific item audits on tax returns almost my entire

career.

Q.    Okay.  The last time you did an audit as a revenue agent

during a standard civil audit for the IRS was 12 years ago,

correct?

A.    Correct.

Q.    Okay.  So that -- my math is terrible.  That was 2009?

A.    It was actually the beginning of 2010 I think is when I

went to projects and special planning.

Q.    And in the thre years that you did civil audits, did you

ever have a taxpayer whose credits and taxes were $966,000 and

you referred them over to a fraud case for $1,450?

        MS. KEARNEY:  Objection.

        THE COURT:  Sustained.

Q.    Did you -- when you would typically do your civil audit

work, if somebody had called a deduction -- one form of

deduction and it was better classified as another type of

deduction, you just reclassified in the audit, correct?

        MS. KEARNEY:  Objection.

        THE COURT:  Sustained.

Q.    You had never worked as a person doing audits or tax

examinations for the Exempt Organization Group, correct?

```
 1   A.   Correct.

 2   Q.   You don't know what their standards are for looking at

 3   donations where somebody gets an admission boost, correct?

 4              MS. KEARNEY:  Objection.

 5              THE COURT:  Sustained.

 6   Q.   You agree with me it is a standard well-known rule in the

 7   IRS that when people make donations for buildings to

 8   universities, it is treated as no goods or services received to

 9   have your name on the building, correct?

10              MS. KEARNEY:  Objection.

11              THE COURT:  Sustained.

12   Q.   Are you familiar -- without asking what they are, are you

13   familiar with the standards that the IRS has for people who

14   donate buildings to universities?  Just yes or no.  Do you know

15   the standard?

16   A.   I do not.

17   Q.   Okay.  You don't know any of the practices that exempt

18   organizations have when they review universities, correct?

19   A.   No.

20   Q.   No, it's not correct, or no, I don't know?

21   A.   No.  I don't know.  I'm sorry.

22              MR. KENDALL:  Okay.  Thank you very much.  Oh.  Wait a

23   minute.

24              Your Honor, may I have one more moment?

25   Q.   Is it a crime to misclassify a deduction?
```

02:51 (line 10)
02:52 (line 20)

```
 1              MS. KEARNEY:  Objection.

 2              THE COURT:  Sustained.

 3              MR. KENDALL:  Thank you, your Honor.

 4              THE COURT:  Thank you, Miss Ranahan.  You may step

 5      down.

 6              THE COURT:  Mr. Frank?

 7              MR. FRANK:  The government rests, your Honor.

 8              THE COURT:  All right.  Let me see counsel at sidebar.

 9                   *** BEGINNING OF SIDE BAR ***.

10              THE COURT:  All right, counsel.  I'm going to excuse

11      the jury for the rest of this day and for tomorrow, of course,

12      as I've told them I would.  I will tell them I want them to

13      come back on Friday morning, at which point the defendants will

14      be presenting a defense.

15              MR. KENDALL:  Yes, your Honor.

16              MR. KELLY:  Yes.  We will deal with the 29 motion this

17      afternoon shortly.

18              THE COURT:  Okay.  We can do lots of things outside

19      their hearing.  But I just -- before I excused them, I want to

20      tell them when they're coming back and if the defendant is

21      going to put on a defense and then I'm still hopeful that this

22      case is going to be completed next week.

23              MR. KENDALL:  You know me, your Honor.  I'm always

24      very careful.  We are putting on a case.  We are putting on

25      witnesses.  I prefer you say just that they'll come back on
```

```
 1   Friday and the case will be over by sometime middle of next
 2   week.  If something happens between now and then, I'd rather
 3   not tell them something.
 4           THE COURT:  And how is that different than what I just
 5   said?
 6           MR. KENDALL:  Just not saying we're putting on a
 7   defense.  Just say the case will continue on Friday and
 8   respectfully will be concluded in the middle of the week.  We
 9   are putting it on.  I'm not playing games.
10           THE COURT:  Okay.  Thank you.
11                   *** END OF SIDEBAR ***
12           THE COURT:  All right, jurors.  What that means is
13   that the government is through with presenting their part of
14   the case and I'm going to excuse you about a half an hour early
15   today.  And as you already know, we're not having a session
16   tomorrow, but we will have a session on Friday.  The case will
17   continue.  And I am now very confident that we are going to be
18   able to complete the case next week.  I don't know exactly
19   when.  I don't know how many days, but I think next week the
20   case is going to be completed.  You're going to hear closing
21   arguments, my charge to you on the law, and the case is going
22   to be delivered to you for deliberation before the end of next
23   week.
24           So take my instructions about not talking about the
25   case or doing any independent research and multiply by about
```

02:54 (line 10)
02:55 (line 20)

**A3128**

five.  That's how important it is now not to do anything that
would jeopardize this case.  That means don't do any
independent research.  Don't talk to anybody else about the
case.  You have heard almost all the evidence, not all of the
evidence.  You've heard most of it.  You haven't heard closing
arguments.  You haven't heard my instructions on the law, all
of which is important, therefore, please honor my instructions.

Have a pleasant day off from the case.  I'll see you
back here on Friday, the date of which is October 1st, I
believe.  October 1st I'll see you back here and we'll continue
then.  Take care.

THE CLERK:  All rise for the jury.

(Jury exits.)

THE COURT:  Be seated, counsel.  So we have several
issues that are outstanding, but I don't think the Court is in
a position to address them at this stage unless there's
something else that we have not discussed earlier today that
you wish to bring to my attention.

Mr. Kelly.

MR. KELLY:  No.  I just think, as a housekeeping
matter, there's been a lot of motions going back and forth.  It
does appear we have some agreement on Exhibits 1254, 1255, and
1540.  The government has withdrawn its objection to the
admission those.

THE COURT:  Why don't you give me those numbers again,

1    Mr. Kelly?

2         MR. KELLY:  1254, 1255, and 1540.  They have also

3    suggested that, in a similar vein, they are entitled to submit

4    Exhibit 1714 over a previous objection by the defense.  I agree

5    with them.  They're right on that.  And so we won't oppose the

6    admission of that one either, 1714.

7         And it's really -- I don't know if the Court wants to

8    hear any argument on the Rule 29 issues, but we will file

9    something with the Court in writing, but there's one particular

02:58 10   issue I'd ask that the Court give attention to with respect to

11   Count 2.

12        Even if the Court concludes there's a single

13   conspiracy, which we're going to object to, but even if the

14   Court finds a single conspiracy, with Count 2 there's a serious

15   venue problem and we think it should be dismissed.

16        Count 2 is the USC federal programs bribery

17   conspiracy.  It relates only to USC.  The government in this

18   case has presented evidence that Mr. Wilson was in

19   Massachusetts when discussing Harvard and Stanford for his

02:58 20   daughters in 2018, but with respect to his conduct on the USC

21   bribery conspiracy, 2013 to 2014, the evidence presented showed

22   Wilson lived in California and the Netherlands during that

23   time.  There was zero evidence that Wilson did anything in

24   furtherance of the conspiracy, the USC conspiracy in Count 2,

25   and that's pretty clear.  There's zero evidence that Aziz did

1    anything in Massachusetts, so it's in furtherance of the USC

2    conspiracy in Count 2.

3            We've made this motion before in a motion to

4    dismiss docketed at 1020 and 1234.  We -- the Court ruled at

5    the time that venue was proper because the Court found that

6    Singer -- the Court alluded to that Singer had mailed the check

7    for Donna Heinel from Massachusetts.  That was docket 1402 at

8    page 7, Judge Gorton's order.  That's what you referred to as

9    giving venue.

03:00 10           Now, here, in this trial, the government hasn't

11   offered any evidence that showed Singer mailed this check from

12   Boston to Heinel.  That was the venue hook the Court based its

13   ruling upon earlier.  We suggest it's not been established

14   here.  So while there are a series of legal issues that we will

15   raise under Rule 29, we would respectfully ask the Court to

16   look carefully at that one with respect to Count 2 as to both

17   defendants.  There's no venue, in our view, that's been

18   established.

19           So we'll flesh it out more in our motion, but I

03:00 20  thought I'd bring that to the Court's attention.

21           THE COURT:  All right.  Fair enough.  ^ Check audio

22   did he mean Kelly? thank you, Mr. Singer.

23           Mr. Kendall?

24           MR. KENDALL:  Your Honor, a couple things.  We're

25   filing a tax memo at 5 o'clock, as the Court has instructed.

**A3131**

        1    Just as Mr. Kelly wanted to highlight or peak your interest for

        2    the Rule 29 analysis, I do think the shortcoming on the fair

        3    market value basis to offset the deduction really is death to

        4    their tax account, and I'd like to focus the Court on that.

        5            But more importantly, we have a case to put on on

        6    Friday.  There are so many things up in the air.  We do need a

        7    little guidance from the Court on what we can expect to do and

        8    what's going to happen because we want to fill the day and not

        9    sort of leave it empty.  So if we could have a few of your

03:01  10    moments now, could I just go through a couple of things?

       11            THE COURT:  Yeah, a few.  I have other business.  I

       12    have a Rule 11 at 3:30, which I need to attend to, but I'll

       13    give you a few minutes now.

       14            MR. KENDALL:  Here's the two main issues, your Honor,

       15    for this week.

       16            First, we've got on for witnesses -- and we've told

       17    the government this back on Monday or whenever, Mr. Maricle,

       18    Mr. Masera, and Mr. Garfio.

       19            THE COURT:  What was the first name?

03:01  20            MR. KENDALL:  Mr. Andrew Maricle, M-a-r-i-c-l-e.

       21    Mr. Masera, who is in a government Plea Agreement that the

       22    government dropped from their witness list, but we're wanting

       23    to present in our case.  And then Mr. Garfio, a former employee

       24    of the USC Athletic Department.  We also have the issue of

       25    Mr. Haden's deposition tomorrow that's related to what I'm

```
 1    going to raise.

 2           Maricle is fine, no wrinkles.  We're going to put him

 3    on.  He's going to testify.  He'll be great.

 4           With respect to Mr. Masera, he's raised a Fifth

 5    Amendment claim.  He's pled guilty and has a cooperation

 6    agreement with the government for precisely the issues in this

 7    case and was prepared to testify for the government.  When the

 8    government dropped him, we subpoenaed him and said we want you

 9    to come as our witness.  His lawyer is now raising an issue of

10    a Fifth Amendment claim.  We don't see a valid Fifth Amendment

11    claim if he has a Plea Agreement and an immunity provision for

12    his cooperation with the government on this particular case.

13    If the Court was inclined to recognize his Fifth Amendment

14    claim, that leaves a hole for us on Friday and we'd have to

15    deal with it.  I don't know if the Court is prepared to deal

16    with Mr. Masera's Fifth Amendment assertion given that he has a

17    Plea Agreement and a Cooperation Agreement with the government.

18    I don't see what Fifth Amendment exposure he has.

19           THE COURT:  Let me hear from the government in

20    response to that.

21           Mr. Frank.

22           MR. FRANK:  Your Honor, that's Mr. Masera's decision

23    raised in conjunction with his counsel.  His counsel has filed

24    a brief on that.  We have nothing to do with that decision.  We

25    spoke to his counsel.  We made --
```

```
 1            THE COURT:  Was this the subject matter of the request
 2    that I grant immunity to --
 3            MR. FRANK:  It was not, your Honor.
 4            THE COURT:  This is different?
 5            MR. FRANK:  It was not.  Neither Mr. Garfio nor -- I
 6    don't think Mr. Garfio was part of that.  No.
 7            MR. KELLY:  That dealt with Mr. Orr and Mr. Lopes and
 8    another person we're not concerned with.
 9            MR. FRANK:  Right.  So neither Mr. Masera's invocation
10    of the Fifth Amendment, nor Mr. Garfio's, were the subject of
11    that motion.  Both individuals have addressed this issue
12    through counsel.  They've filed briefs on the issue.  They've
13    raised that issue with the Court and it's pending for the Court
14    right now.  I don't think I have anything to add to that.
15            THE COURT:  Yeah.  Do you want me by zoom to make them
16    in, quote, open court claim the Fifth Amendment not before the
17    jury?  Is there some issue that they perhaps, when confronted
18    with the questions, will not claim the fifth?
19            MR. KENDALL:  Your Honor, I expect he'll take the
20    Fifth if he can to try to get out of testifying, but the point
21    we have is, your Honor, I think this --
22            THE COURT:  I'm supposed to order him to testify
23    notwithstanding his claim of a Fifth Amendment immunity or
24    Fifth Amendment?
25            MR. KENDALL:  This the unique situation, because he
```

**A3134**

has a cooperation and immunity agreement with the government

for exactly the same activities that would give rise to the

Fifth.  Given that he's pled guilty and he has immunity from

the government, he no longer has Fifth Amendment exposure.

This is the unique situation we agreed about in the law school

exam, your Honor.

So yes, I think for  this -- and the others I see are

different.

And maybe the government can tell us, will the

government agree that his corporation and immunity agreement

will apply to his testimony in this trial, but I don't think

the government wants to -- they certainly would take that

position if they were calling him.  So can the government

simply agree that he's going to testify in our case the same

way he testified in their case subject to the cooperation and

immunity agreement?  That would eliminate the whole Fifth

Amendment issue.

MR. FRANK:  It would actually not.

MR. KENDALL:  Your Honor, I think you can make a

finding that there's no good faith basis to assert it, but as a

second back up issue, I think the government could give us that

acknowledgment.

THE COURT:  Mr. Frank?

MR. FRANK:  We cannot, your Honor.  As counsel knows,

the Fifth Amendment right lasts at least until sentencing and

perhaps beyond.  This defendant has not been sentenced.  What

Mr. Kendall characterizes as a cooperation and immunity

agreement is no such thing.  It's a cooperation agreement, it's

a standard cooperation agreement that allows us to call him to

testify as a witness.  It provides no immunity from prosecution

if he were to lie under oath.  It provides no immunity from

prosecution for crimes we haven't charged him with, and it

certainly provides no immunity from prosecution, as his counsel

points out in his own filing, from state prosecution or from

prosecution by other federal authorities.  It's not an immunity

agreement.

THE COURT:  Yeah.  Can you cite me a case,

Mr. Kendall, in which a court in my position has ordered

somebody to testify against his right to claim the Fifth

Amendment?

MR. KENDALL:  I don't have one at my fingertips, your

Honor.

MR. KELLY:  I do think, your Honor, they have to

put -- we're fine with zoom.  With respect to Mr. Orr and

Mr. Lopes, you know, if they're going to claim the Fifth

Amendment for doing their jobs as fundraisers, I think it

should be on the record that's why they're saying they can't

testify in this case.  We've given them subpoenas, and if it's

by Zoom, if the Court has time on Friday to memorialize it on

the record, we're fine with Orr and Lopes invoking to the

```
 1    Court, outside the presence of the jury, which is the way it's

 2    usually done.  If they claim they have a valid Fifth, well, I

 3    think the Court should inquire to determine what they're saying

 4    is accurate.

 5           THE COURT:  All right.  I'll take that under

 6    advisement.

 7           MR. KENDALL:  The other issue we have, your Honor, is

 8    during the past couple of weeks when we've been trying to

 9    cross-examine in the government's case, the Court has excluded

10    numerous documents that we've wanted to bring up that we

11    thought directly impeached the witness and the Court sustained

12    the government's objections to us trying to introduce these

13    documents.  It was with Miss Chassin, with Mr. Moon, and

14    others.  The issue I have is we're scheduled to depose

15    Mr. Haden tomorrow.  Based upon his 302 and my conversations

16    with his lawyer, I expect Mr. Haden to give testimony that

17    directly contradicts the documents we have to cross-examine him

18    with.  And so, for me, it's fabulous impeachment.  The

19    documents are great.  If he testifies contrary to the

20    documents, I want to use the documents to impeach him.

21           If the Court is going to maintain its rulings on

22    documents for Mr. Haden that it has been in the past, I don't

23    want to take his deposition, have the documents excluded, and

24    then I have testimony that directly conflicts with the

25    documents.  That's the brief we filed with you for both
```

**A3137**

```
 1   Mr. Haden and Garfio, as well as Miss Chassin and others.

 2         These people are coming -- the Court made a ruling

 3   that it didn't want us to go through individual admissions

 4   issues to question USC.  The government has taken advantage

 5   that have by having several witnesses testify directly contrary

 6   to the documents in our possession.  And we need to know before

 7   we depose Mr. Haden, will the documents come into evidence if

 8   it's only Mr. Haden's testimony, then we can't depose him if we

 9   can't impeach him with the documents.

03:09 10         THE COURT:  Mr. Frank?

11         MR. FRANK:  Your Honor, the Court's ruling was

12   explicit and repeated that USC is not on trial, that this case

13   is not about other practices in the Athletic Department, and

14   the defendants took that ruling and recharacterized the same

15   evidence as impeachment material.  It has absolutely no

16   relevance to this case.  Mr. Haden has no relevance to this

17   case.  This was a fraud on the Admissions Department.  No

18   evidence that Mr. Haden can provide is relevant to that issue

19   and -- or to these defendants who he doesn't know.  It is

03:09 20   absolutely categorically addressed by your Honor's prior

21   rulings and they're now trying to come at it through the back

22   door.

23         MR. KENDALL:  If I may explain our position, your

24   Honor?  Our position is simple.  My client did not normally

25   participate in any fraud on USC.  He disclaims all knowledge of
```

A3138

the profile and the government doesn't have a strong case to
show he read that profile and understood its contents.  In
fact, when Mr. Singer started his cooperation, he never
referenced a profile or Mr. Wilson having a fraudulent
submission for his son.  So for us the case comes down to no
fraud on his credentials that can be attributed to him, simply
the thought that if you make a contribution to the school, it
helps your kid get in.  Mr. Haden can testify, he won't like
it, but the documents will show that he repeatedly got people
admitted in return for donations.

        And so they want to say, if the government is -- the
government wants to say that a donation to get somebody in
without fraud is a bribe or a violation or something like that.
Mr. Haden's documents show that was the common practice at USC
and it's not an honest services fraud.  That's why the issue is
so relevant to us, your Honor.  And we just need the Court's
guidance of what we can do/

        THE COURT:  I have that motion under advisement.  The
order is in draft.  So you will have an answer probably before
5 o'clock on that motion.

        MR. KENDALL:  Thank you, your Honor.

        MR. KELLY:  Final point, your Honor, is -- at least a
final point for me, as I see Mr. Frank stand up.

        You know, they charged a conspiracy.  They've insisted
that Heinel is a coconspirator.  Her state of mind is relevant.

<pre>
  1    We have documents showing that what she did was what was asked

  2    of her by USC up until the summer of 2018 and, you know, we

  3    dispute that there can be fraud on the one part of USC but not

  4    the other part.  USC's an entity.  So either there's fraud on

  5    USC or there isn't.  So that's why it's relevant to Heinel's

  6    honest services.  And that's why we're trying to use a handful

  7    of these documents, not a million of them, just a handful.

  8              MR. FRANK:  Your Honor, I'll just point the Court to

  9    the fact that we briefed the issue Mr. Kendall was raising in

03:11 10    docket number 2296 and that's before the Court.

 11              THE COURT:  Say that again?

 12              MR. FRANK:  We briefed the issue with respect to the

 13    impeachment material that's Mr. Kendall is raising at 2296 on

 14    the docket.  We filed that yesterday.  I just wanted to draw

 15    that.

 16              THE COURT:  2296?

 17              MR. FRANK:  Yes.  For the Court's attention.  Finally,

 18    your Honor, Mr. Masera has invoked, Mr. Garfio has invoked.

 19    That leaves only Mr. Maricle as a witness on Friday.  Assuming

03:12 20    that Mr. Masera and Mr. Garfio don't testify on Friday, which

 21    unless the Court rules differently is our current assumption,

 22    that leaves only Mr. Maricle.  We've been given the names of no

 23    other witnesses who would testify on Friday.

 24              THE COURT:  Let me confirm that.

 25              Mr. Kelly, you were asking for a Zoom conference with
</pre>

```
 1   respect to the Fifth Amendment on Orr and Lopes, not Masera and

 2   Garfio, is that right?

 3           MR. KELLY:  Yes.  I was speaking about Orr and Lopes.

 4   They've invoked the Fifth.

 5           THE COURT:  What about Masera and Garfio?

 6           MR. KELLY:  And I'm sorry.  With respect to Masera I

 7   did as well.  I did request that -- you know, he's invoking the

 8   Fifth.  He has -- he pled guilty to a racketeering conspiracy.

 9           THE COURT:  I understand your argument.  But you're
```
03:13 10  asking the Court to examine, outside the hearing of the jury,
```
11   three witnesses now?

12           MR. KELLY:  Yes, sir.

13           THE COURT:  Garfio, Lopes, Orr.

14           MR. KELLY:  And I guess Masera would be the fourth.

15           THE COURT:  So there are four now.

16           MR. KELLY:  Yes, so that would consume time on Friday.

17   If in fact they have valid a Fifth, I think the Court needs to

18   determine, or if they're just using it as an excuse not comply

19   with a federal subpoena for a federal trial.
```
03:13 20           MR. KENDALL:  Your Honor, Mr. Frank is correct in that
```
21   Mr. Masera is not required to attend and the others are not

22   required to testify, we have Maricle for Friday.  We were

23   planning to play a bunch of tapes from the wiretap and to put

24   in a bunch of documents from USC and from the Singer

25   organization.  I don't know if that fills all of Friday if we
```

| | |
|---|---|
| 1 | lose all our witnesses with all these claims of the Fifth |
| 2 | Amendment.  We can go Friday and fill the day as much as we can |
| 3 | with those things, or we can put it all on Monday and we'd have |
| 4 | another witness who will be in on Monday and we'll fill up |
| 5 | Monday that way. |
| 6 | THE COURT:  Mr. Frank? |
| 7 | MR. KENDALL:  We've got five, six different subpoenas |
| 8 | out there and everybody's claiming the fifth.  It's not like |
| 9 | we're not trying to bring people in. |
| 03:14 10 | THE COURT:  Mr. Frank. |
| 11 | MR. FRANK:  I don't know how they're going to play |
| 12 | wiretap evidence, your Honor.  It's complete hearsay as to |
| 13 | them. |
| 14 | MR. KENDALL:  Your Honor, it goes to -- it's part of |
| 15 | what's in front of the Court now in the motions.  It goes to |
| 16 | Singer's state of mind.  How can we conspire someone on the |
| 17 | side door if he's saying the side door is legal and that's his |
| 18 | state of mind. |
| 19 | THE COURT:  All right.  I've heard enough.  I will |
| 03:14 20 | make an effort to make findings on some of the pending motions. |
| 21 | There's another matter that's going to be briefed by the |
| 22 | defendants by 5 o'clock this afternoon.  I will give the |
| 23 | government an opportunity to respond to that. |
| 24 | I have other business, as you're probably aware.  The |
| 25 | MDL panel meets tomorrow morning virtually.  That's going to |

**A3142**

1    take half of my day, but I'm hopeful that I will be free in the

2    afternoon, so reserve a time to meet tomorrow afternoon.  I

3    don't know whether I'll take advantage of it, but I want you to

4    plan on being here at let's say 3:30 tomorrow afternoon for a

5    hearing on any matters that need to be discussed.

6          Mr. Frank?

7          MR. FRANK:  The only issue is, your Honor, the Haden

8    deposition was scheduled by video to occur beginning at noon.

9    The defense has three hours for direct and redirect and does

03:15 10   not include our cross.  I don't imagine we're going to have a

11   long cross, but I imagine it might go past 3:30.

12         THE COURT:  How many attorneys from the government

13   will be involved in that deposition?

14         MR. FRANK:  That's a good point, your Honor.  We

15   hadn't really thought about that.

16         THE COURT:  Every one of you have multiple attorneys

17   working on this case.  Some of them will be taking a deposition

18   tomorrow.  Others will be in this courtroom at 3:30.  You can

19   pick who it is.  Okay?

03:16 20         MR. FRANK:  Yes, your Honor.

21         THE COURT:  3:30 tomorrow.

22         THE CLERK:  All rise.

23         (Whereupon, the proceedings concluded at 3:16 p.m.)

24

25

```
 1                        I N D E X

 2    Witness                            Page

 3

 4    MARK DECKETT

 5    Direct Examination by Mr. Stearns        15

 6    Cross-Examination by Ms. Papenhausen     22

 7    Cross-Examination by Mr. Kelly           25

 8    Redirect Examination by Mr. Stearns      28

 9

10    LAUREN GEORGE

11    Direct Examination by Ms. Wright         30

12    Cross-Examination by Mr. Kelly           62

13    Cross-Examination by Mr. Kendall         74

14

15    COLLEEN RANAHAN

16    Direct Examination by Ms. Kearney       120

17    Cross-Examination by Mr. Kendall        136

18    Redirect Examination by Ms. Kearney     184

19    Recross-Examination by Mr. Kendall      190

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2     NO.                    ADMIT

 3     691    ...................    19

 4     716    ...................    33

 5     718    ...................    38

 6     156    ...................    42

 7     213    ...................    42

 8     350    ...................    42

 9     534    ...................    42

10     719    ...................    46

11     121    ...................    49

12     720    ...................    52

13     500    ...................    53

14     721    ...................    54

15     543    ...................    56

16     548    ...................    56

17     564    ...................    56

18     573    ...................    56

19     600    ...................    56

20     611    ...................    56

21     724    ...................    56

22     628    ...................    56

23     722    ...................    58

24     2      ...................    60

25
```

```
 1                    E X H I B I T S

 2    NO.                      ADMIT

 3    1568   ....................   72

 4    125    ....................   86

 5    9870   ....................   100

 6    9872   ....................   100

 7    9871   ....................   101

 8    697    ....................   132

 9    698    ....................   132

10    9864   ....................   154

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS     )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9    the foregoing is a correct transcript from the record of

10    proceedings taken September 29, 2021 in the above-entitled

11    matter to the best of our skill and ability.

12

13

14       /s/ Kristin M. Kelley            September 29, 2021

15       /s/ Debra Joyce                  September 29, 2021

16       Kristin M. Kelley, RPR, CRR            Date
         Debra Joyce, RMR, CRR
17       Official Court Reporter

18

19

20

21

22

23

24

25
```

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3
    UNITED STATES OF AMERICA,          )
4                    Plaintiff         )
                                       )
5   vs.                                )  No. 1-19-CR-10080
                                       )
6   GAMAL ABDELAZIZ and JOHN           )
    WILSON,                            )
7                    Defendants.       )
                                       )
8                                      )

9

10

11           BEFORE THE HONORABLE NATHANIEL M. GORTON
                 UNITED STATES DISTRICT JUDGE
                    JURY TRIAL - DAY 15
12

13
             John Joseph Moakley United States Courthouse
14                      Courtroom No. 4
                       One Courthouse Way
15               Boston, Massachusetts 02210

16

17                    September 30, 2021
                         3:42 p.m.
18

19

20
                  Kristin M. Kelley, RPR, CRR
21                   Official Court Reporter
             John Joseph Moakley United States Courthouse
22                 One Courthouse Way, Room 3209
                   Boston, Massachusetts 02210
23                 E-mail: kmob929@gmail.com

24           Mechanical Steno - Computer-Aided Transcript

25

**A3148**

```
 1      APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```



```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

4

```
 1   APPEARANCES:

 2

 3            Andrew E. Tomback

 4            McLaughlin & Stern, LLP

 5            260 Madison Avenue

 6            New York, NY 10016

 7            917-301-1285

 8            atomback@mclaughlinstern.com

 9            for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<div align="center">P R O C E E D I N G S</div>

THE CLERK:  Court is back in session. You may be seated.

THE COURT:  Good afternoon, counsel.

Let me just say what the order of events will be this afternoon.  I have received overnight the defendants' motion for judgement acquittal under Federal Rule of Criminal Procedure Rule 29, which includes a memorandum of 39 pages. The government, I presume, has not had a chance to presume in writing, but what I am going to do this afternoon is hear a brief, I emphasize the word "brief", summary of the Rule 29 motion, say ten minutes.

I will then allow the government to respond equally briefly, understanding that I am going, of course, to allow an opportunity to respond in writing.

I am going to deny the motion without prejudice and instruct the defendants to put on a case.

I will consider this matter in more detail once I have a written response from the government.  Of course, the defendants will be free to file this motion at a later time, either after the end of all of the evidence or after a verdict.

So that's what we're going to start with, the ruling or hearing a summary at least of the defendants' Rule 29 motion.

After that, we're going to talk about the defendants

```
 1    expectations with respect to witnesses for tomorrow.  I will

 2    hear a report on the status of the Haden deposition, if it

 3    occurred, and we will talk about the Fifth Amendment claims of

 4    Messrs. Garfio, Masera, Orr and Lopes, which will be done by

 5    Zoom technology sometime tomorrow at an hour that will be less

 6    inconvenient to those on the West Coast than it would be if we

 7    did it at 9:00 a.m. Eastern Daylight Time.

 8           Mr. Kelly, you rise to be heard.

 9           MR. KELLY:  Yes.  Sorry, your Honor.  Just procedural

10    point.  Mr. Masera is here with counsel and is available for

11    inquiry in person today regarding the Fifth Amendment

12    invocation.  If that affects the Court's schedule, we're not

13    adverse to addressing that first, but whatever the Court needs

14    to do.  There's no need for Zoom tomorrow if he's here today.

15           THE COURT:  That's fair enough.  We can probably do

16    that -- that can be part of the agenda for this afternoon.

17           With that in mind -- I also -- you have, I think now,

18    it might be upwards of 20 pending motions.  I am doing my best

19    to quickly respond, and I will have responses to you with

20    respect to at least 12 of those motions and an explanation with

21    respect to some of them, but not all of them, by 5 o'clock this

22    afternoon.  So that will at least inform counsel with respect

23    to some of the pending motions.

24           Having said that, I will first hear now from the

25    defendants with respect to their motion under Criminal Rule 29.
```

1    Who wishes to be heard first?

2         MR. KENDALL:  Your Honor, the brief is fairly detailed

3    and substantive.  I will not do it justice in this hearing.  I

4    will just highlight what I think are some of the major points.

5    The first issue, it's an issue the Court has ruled on

6    previously, but I think it's involved --

7         THE COURT:  We're having feedback from some place.

8         MR. KENDALL:  The first issue is -- I think we're

9    still getting it.

03:47 10         THE COURT:  I don't know if it's on your mic or

11    somewhere else.  We'll proceed.

12         MR. KENDALL:  The first issue is for the property

13    fraud, your Honor, have they alleged property that's recognized

14    by the statute.  The Court has ruled on this.  As we know,

15    there's a split in this district on how that's to be handled

16    between yourself and Judge Talwani.

17         THE COURT:  We've called IT, but maybe if you turn

18    your microphone off, I can hear you just fine.  Maybe the Zoom

19    folks are --

03:48 20         MR. KENDALL:  How does one turn these off?  Just by

21    pressing?

22         THE COURT:  Let's try it now.  He thinks he corrected

23    the problem.

24         MR. KENDALL:  The first issue is, your Honor, we don't

25    think that what the government has presently defined as the

**A3154**

property is recognized by the statute and it's also changed

from what was originally alleged in the indictment.  It's not

that they're now saying that admission slots was the goal of

the property crimes or the fraud crimes.  They're saying

athletic recruitment slots.  The athletic -- what they call an

athletic recruitment slot is nothing more than a coach's

reference or suggestion that a person be admitted through SUBCO

at USC.  That is not a proper.  It's not an admission to a

university.  It's nothing more than a coach saying I'd like

03:49  this person in the pool of people that I'd like to be

considered by the SUBCO.  It's not defined enough to be a piece

of property.

          With respect to the Harvard and Stanford counts, there

it's even less defined.  At least with USC, the SUBCO adherence

to what the process is, there's no adherence to what is

Stanford's process, what is Harvard's process, what is the

property that you're going to get if the senior women's

director at Harvard or Stanford coach wants to designate you.

It's much too undefined, your Honor.

03:50          Second, your Honor, there's a definition of how to

define what property is.  The athletic slots simply don't fit

that.  They're not something that's essentially saleable.  They

don't come with any type of intellectual type -- the issues

that have been previously discussed in the briefing that we

filed on this before, your Honor.

```
 1              Very significant we think is the issue of bribe.
 2     There's also an issue, your Honor, the government's theory has
 3     evolved quite differently.  We have remained throughout that
 4     the honest services expected of employees of the Athletics
 5     Department at USC has not been defined.  I'm not looking to
 6     reopen an issue, your Honor, but we've litigated heavily
 7     because we believe we've not been allowed to put in a defense
 8     as to what was the true definition of honest services expected
 9     at the people at the Athletics Department with respect to
03:51 10     students whose parents would make contributions.
11              My understanding of some of the Court's recent rulings
12     is the Court has taken the position that the issue is one of
13     whether or not a false profile was submitted.  If the issue is
14     of fraud, a false profile, then bribery should be taken out of
15     this completely because it's undisputed that our clients --
16     I'll speak for my client.  I'll let Mr. Kelly speak for his.
17              My client, it's undisputed, was told these are
18     donations to the University.  Agent Keating was not happy to
19     give this testimony but she was quite clear that she was told
03:51 20     by Mr. Singer that Mr. Wilson's understanding was these are
21     donations.  It was never suggested to Mr. Wilson that anything
22     he gave would ever be of a personal benefit or for a personal
23     expenditure of a coach.
24              I do think the bribery claim falls apart, your Honor.
25     To say that giving a donation to go to the school's water polo
```

**A3156**

```
  1   fund account is a bribe, it's just too far.  If the interests
  2   of the coach and the interest of their employer are aligned,
  3   then making a donation to the school is not corrupting the
  4   process.  It's making the school more enriched for what it
  5   wants to do, which is raise money.
  6          Another issue we've raised in the brief, and I think
  7   is a very important one, and the government has completely
  8   avoided it, they're claiming the theft of honest services
  9   becomes because of the corruption of a fiduciary.  Under both
 10   Massachusetts and California law, which will define the
 11   fiduciary relationship for the three universities at issue,
 12   there's no basis to find that any of these coaches was a
 13   fiduciary.  Fiduciary, under the state laws as we've presented
 14   to the Court, is a trustee, a guide, somebody who has that type
 15   of elevated level of care or trust.  With respect to Donna
 16   Heinel and Vavic, they're employees of the University but
 17   there's nothing there to indicate that it rises to the level of
 18   a fiduciary.  More significantly, with the Harvard and Stanford
 19   ones, we don't even know what these people's jobs are.
 20          According to the testimony in this case, Vandemoer is
 21   a coach at Stanford.  What does that mean?  Is he a full-time
 22   employee?  Is he a volunteer?  Is he a consultant?  What is his
 23   role?  Is he the head coach?  Is he the coach that is
 24   independent authority of rules?  He's just described as a
 25   coach.
```

03:52 (line 10)
03:53 (line 20)

1          The senior women's administrator at Harvard is a title

2     thrown out without any definition.  I don't see how the

3     government can argue to the jury that there's evidence to show

4     that these people are fiduciaries.  We don't even know if

5     they're full-time employees, if they're consultants or

6     volunteers or whatever else.  It's a complete lack of evidence

7     on that topic.

8          The bribery issue I've covered, your Honor.  I do

9     think that is equally compelling.  This case started out with

03:54 10     30 or 40 parents in the indictment.  There were serious

11     terrible bribery going on by some of these people.  We see from

12     some of the summaries Mr. Ernst gets $2 million, other people,

13     Janke and others, get money in their pocket.  None of that is

14     soaked with our clients in any way.  More importantly, none of

15     it is our clients ever saying they would even agree to such

16     behavior, that they would agree to pay anybody for personal

17     enrichment.

18          It's what is the scope of the agreement to join a

19     conspiracy.  If somebody's involved in a very far reaching

03:54 20     conspiracy and all sorts of elicit behavior, the person only

21     agrees to do one sliver of that with them -- you know, we see

22     typically in a drug case, let's say somebody's smelling

23     marijuana, cocaine, methamphetamine and is the largest dealer

24     in the city, if an individual comes by and says I'm having a

25     party with friends and would like to buy some marijuana with

1    you, they don't join the entire conspiracy.  They're involved

2    for a simple small little marijuana transaction.

3           Whatever our clients agreed to do, it was agreeing to

4    do something that never involved, never contemplated, never was

5    within the scope of their understanding that there would be a

6    payment to an individual to personally enrich them.  It was

7    always, as Mr. Singer told Agent Keating and others, they were

8    told that they were giving donations.  That was a consistent,

9    unchallenged view of the evidence I suggest, your Honor.

03:55  10           I covered the fiduciary relationship issue, your

11    Honor.

12           With respect to my client in particular, there

13    certainly is no evidence of falsity.  What the government

14    relies on is a profile was sent to Mr. Wilson on October 19th,

15    and there's no evidence that he ever opened it, responded to

16    it, commented on it, acknowledged its existence.  It's an

17    e-mail from Mr. Singer, attaching an e-mail from Mr. Margulies,

18    and Mr. Margulies's e-mail has it as an attachment.  It's sent

19    over to Mr. Wilson and that's where the trail ends.  It's dead.

03:56  20           So, first, there's no evidence that Mr. Wilson is

21    aware of this, but more important, there's no evidence of

22    falsity in the profile.  There are times Mr. Frank wants the

23    jury to think are not accurate, but there's no evidence to

24    which time is accurate, which time is inaccurate, if any time

25    is false.  The times were lowered.  Mr. Singer says, you know,

from 22 go to 20 seconds, but nobody has proven that either one
of those times is correct or incorrect.  There's nothing in the
record.  So they have to show that there's a material element
in that profile that Mr. Wilson observed that is false and
would have led to a significant impact with the material to
SUBCO.

Mr. Moon testified both of the times were good times
for recruiting.  20 was so fast you belong on the USC swim
team.  22 is as fast as the USC water polo team.  And for a kid
to do that in high school is a very impressive fast time to be
doing 22.  That was Mr. Moon's testimony.

So there's no evidence in the record, I suggest, to
show that Mr. Wilson knew that there was a false profile or
that there is falsity in that profile at a level that's
material to the jury or to SUBCO, for the jury to find was
material to SUBCO.  Just because Mr. Singer changes entries on
a profile doesn't mean one is true and one is false.

If I may have a moment, your Honor.

That issue of the profile goes to the whole issue of
conspiracy to make false statements, knowledge of false
statements, and the like.

An important issue to us is the Harvard and Stanford
counts.  There's a claim that Mr. Wilson aided and abetted
Mr. Singer to commit those violations.  Mr. Singer was working
as a government informant.  He is not someone who is committing

a crime.  You can't aid and abet a person whose not committing

a crime.  So I think that's an important issue for the aiding

and abetting counts, your Honor.

We had the *Kotteakos* issue on the rule of conspiracy.

The Court has ruled on that. We think it's very important,

particularly the way the evidence came in.  There's no way to

associate Mr. Wilson with any other member of this conspiracy

in terms of sharing a goal of its accomplishment sharing

efforts to have the means accomplished.  There is perhaps some

reference of a Palatella comment or phone call with Marci

Palatella, but she doesn't say Mr. Wilson told her anything or

she ever did anything with Mr. Wilson.  She's just asking

Leslie something and Leslie saying you'll have to ask John, and

there's no indication Mr. Wilson spoke to this woman.

There's no connection between him and any other parent

in trying to accomplish any of the goals of the overarching

conspiracy, your Honor.  That, I think, really creates a

significant *Kotteakos* issue.

For *Petriezzello*, it's really the same issue I

realize.  There's nothing to show Mr. Wilson is conspiring with

any of these other parents with anybody involved in test

cheating or other things.  We think that's also an issue.

Finally, your Honor, I think there's a lot in here

that will be covered better in the documents.  The one thing I

do want to raise on the tax issue with respect to Mr. Wilson,

they have to show that he made a false statement on a tax
return that was material.  The whole way they try to establish
the materiality of the false statement is to say that but for
that false statement he would have had to have paid $88,000
more in taxes.  The agent acknowledged that the IRS regulations
require, it's not optional, require that she put a value on the
benefit or goods and benefits received that can be offsetting
the charitable contribution.  She has no information to do
that.  There's no information in the record that any jury could
draw an inference from and, therefore, she's no basis to say
that the number is 88,000.

The government says it's a bribe so none of it should
be deductible.  Your Honor, it's clear.  It's not a bribe.
Mr. Singer told him, Mr. Wilson's state of mind was that it was
a donation.  What everyone wants to call it in reality,
Mr. Wilson's state of mind is he was making a donation.  He got
two thank you notes from the two different 501(c)(3)
organizations.  For her to say that it is an entire 220,000
that has to be set aside, there's simply nothing in the
evidence to support that.

If I may have one moment, your Honor.

Your Honor, Mr. Tomback points out to me.

THE COURT:  You're over your 10 minutes now,
Mr. Kendall, so please.

MR. KENDALL:  If I can summarize one last point.

```
 1            THE COURT:  Yes.
 2            MR. KENDALL:  In 2265 in the document you ordered in
 3     our docket entries, you wrote at page 5, "as the Court has
 4     ruled on previous occasions, testimony concerning the general
 5     fundraising practices of USC is not relevant to whether
 6     admitting students through SUBCO with falsified athletic
 7     credentials deprive USC of the honest services of its
 8     employees".
 9            If the issue is the falsification of athletic
04:02 10   profiles, then I suggest, your Honor, the bribery issue falls
11     out.  If the whole issue is just up and down whether or not we
12     knew they were falsified credentials, I think the evidence is
13     clear that standard has not been met.
14            Thank you very much, your Honor.
15            THE COURT:  Thank you.
16            MR. SHARP:  Your Honor, I have 4 minutes.
17            THE COURT:  Yes.  You may have 4 minutes.
18            MR. SHARP:  Thank you.  Just two brief points.
19            First, on the meaning of bribe, they've had their case
04:02 20   to show now that there's been a bribe.  We filed a document,
21     docket 2077, on the meaning of bribe.  We would submit there's
22     never been a case anywhere in the federal courts where a
23     payment to a victim has been considered a bribe for purpose of
24     honest services fraud.  And there's a case where justice --
25     excuse me -- Judge Easterbrook wrote that "the United States
```

1    has not cited, and we have not found, any appellate decision

2    holding that an increase in official salary, or a psychic

3    benefit such as basking in a superior's approbation (and

4    thinking one's job more secure), is the sort of "private gain"

5    that makes an act criminal under under Sections 1341 and 1346".

6          So we submit that, under the *Skilling* case, which says

7    that honest services has to be a classic or core kickback or

8    bribe, that there is such no classic or core kickback or bribe

9    here, especially because the government has admitted that our

04:03 10   clients thought that the money was going to a program at the

11   school, and that's their theory.  Their theory is that payment

12   is a bribe, to the school, to a program at the school.

13         Secondly, very briefly on the venue issue, this was

14   briefed extensively last year.  There were motions to dismiss

15   practice over this issue.

16         On Count 2, even if there is a single conspiracy,

17   there is no venue.  That is because your Honor held that the

18   case could be tried if you didn't dismiss because there was an

19   allegation in the indictment that Rick Singer dropped the check

04:04 20   in a mailbox in Boston to Donna Heinel in California, however,

21   the government did not elicit any testimony about that and

22   there's been no proof of that.  So all that they really have

23   now is the fact that Mr. Singer was in Boston when he was

24   making these recorded calls.

25         And we briefed extensively at docket No. 1234, which

is easy to remember, that the consensual calls cannot create

venue.  And that is because they are narratives of past events,

as the government has admitted.

In one of their briefs, she said it was like calling

up a customer about a drug deal from years ago and saying,

remember when we did that drug deal.  By the time these calls

were made with defendants Wilson and Abdelaziz, their children

were already at USC or had -- I think Wilson's had graduated

from USC and they were simply not in furtherance of a

conspiracy.

So we submit Count 2 there is no venue.  Thank you,

your Honor.

THE COURT:  All right.  Mr. Frank?

MR. FRANK:  Thank you, your Honor.  To be completely

candid, I haven't fully read the brief yet.  The comments I'm

going to make now are very preliminary, but I'll just sort of

give your Honor the headlines of our response.

First of all, with respect to the argument that

admission slots are not property, the law of the case is that

admission slots are property.  The Court has already decided

this issue.  We have not changed our theory.  This is not --

the defense is playing something of a linguistic game here.

The defendants sought to gain admission to the University as

athletic recruits.  They did gain admission to USC as athletic

recruits.  They obtained admission approval letters, which

```
 1    Becky Chassin testified, which effectively 100 percent
 2    guaranteed admission.  They did that by going through the SUBCO
 3    process as fake athletic recruits to obtain those admission
 4    slots.
 5              So that the Court already decided.
 6              With respect to the second issue Mr. Kendall raised,
 7    the notion that, and that counsel just raised again, the notion
 8    that payments that went to the University cannot constitute
 9    bribes, again, this Court has already decided that issue.  It's
10    the law of the case, and the Court has decided that even if the
11    victim, in this case the University, ends up profiting as a
12    result of a kickback scheme, there's still this actionable harm
13    in the denial of that party's right to the offender's honest
14    services.  It's the honest services that is the object of that
15    fraud and the money.  It matters not where the money goes.  It
16    matters what the purpose of the payment is.
17              There's also, by the way, evidence, your Honor, that
18    neither of these defendants saw those payments as donations to
19    the University.  Mr. Wilson, of course, instructed his
20    assistant to arrange for them and arrange with Mr. Singer to
21    arrange for them to be billed as consulting fees.  It was only
22    later that it was decided to split them between consulting fees
23    and a purported charitable donation.
24              Mr. Aziz was recorded on consensual calls expressing
25    concern when he was told of an audit that they would look back
```

1    and realize that this was not a donation and expressed concern

2    about whether he should take it as a deduction for that very

3    reason.

4         With respect to the fiduciary duty issue, the law is

5    clear, the Supreme Court law that this Court has already cited

6    that the existence of a fiduciary relationship between an

7    employer and employee is beyond dispute.

8         With respect to the claim to the argument about

9    falsehoods and the profiles, there is an abundance of evidence

04:08 10    on this topic, your Honor.  Mr. Singer, Mr. Vavic told

11    Mr. Singer to make it a good profile with respect to

12    Mr. Wilson's son.  Mr. Singer told Mr. Wilson that he was going

13    to be embellishing the profile pursuant to Mr. Vavic's

14    instructions.

15         There was evidence that the swim teams were completely

16    fabricated.  They went from 22 seconds to 20 seconds within the

17    space of 45 minutes.  There was evidence of other invented --

18    another invented award on that profile, the Asics award, which

19    was listed on that profile, and there was evidence that that

04:09 20    award was completely fabricated by Mr. Singer and used on

21    numerous students' profiles.

22         There was evidence that the difference in times is

23    extremely significant.  Mr. Moon testified those two times are

24    hugely significant.  There was evidence that if the

25    subcommittee knew there were fabrications on the profile, it

would not have admitted Mr. Wilson and, likewise, Johnny

Wilson, and, likewise, with respect to Sabrina Aziz.

There was evidence that additional lies, for example,

Mr. Vavic instructed Mr. Moon to put on the profile that was

submitted to the subcommittee in terms of Johnny Wilson being

an immediate impact player and top ten attacker in his

graduating class and, of course, the profile that Mr. Singer

and Mr. Margulies created was e-mailed to the defendant Wilson,

and there was evidence that he was actually in his e-mail that

very evening about 90 minutes after receiving that profile.

There was also, by the way, evidence that this whole

scheme was false.  The whole premise was false.  Mr. Wilson

himself, there's evidence called his son a clear misfit for the

USC water polo team and noted that obviously his talent was

below the level of the other players on the team.  And counsel

for Mr. Aziz has conceded repeatedly that that profile, which

was found in his client's e-mail box, was completely fabricated

and false.

With respect to the claims about a hub and spoke

conspiracy, your Honor, it's not a hub and spoke conspiracy.

This was a web of a conspiracy.  There were contacts between

the defendants and other parents, between Mr. Wilson and other

parents.  There were contacts between the defendants and other

participants in the conspiracy.

Mr. Wilson had, for example, direct contact about

Mr. Vavic.  There was contact about Mr. Masera.  There was

contact with Miss Sanford.  There was also extensive evidence

that the very nature of the scheme required it to be a

sprawling conspiracy.

Mr. Isackson testified about that, about his relief

when he learned how many parents were involved in the scheme.

That was the reason he was drawn to the scheme, that it had

been successfully done with many parents before.  The

commingling of funds in the Key Worldwide Foundation was

significant to him, particularly with respect to the

concealment of the scheme.

With respect to the tax issue, I'll just briefly note

that we briefed this issue.  We submitted a brief on this issue

to the Court today.  I will note that 7206 doesn't require any

tax loss calculation, much less a tax loss calculation that

relates to the materiality aspect of that crime.  In fact, the

jury instruction that we've proposed reads that a material

matter is one that is likely to affect the calculation of tax

due and oweable or to affect or influence the IRS in carrying

out the functions committed to it by law, such as monitoring

and verifying tax liability.  So we easily met that element.

With respect to the venue argument, this is frankly

frivolous.  Venue needs to merely be proven by a preponderance.

There's an abundance of evidence of venue with respect to

Count 2.  There's evidence in Exhibit 64 and Exhibit 68 that

those checks were obtained in Massachusetts.  One of them

indicates Massachusetts -- actually, both of them indicate

Massachusetts.  One of them indicates it was purchased in

Seaport Square.  Another indicates it was an out-of-state

withdrawal in Massachusetts.  There's also consensual call with

Donna Heinel, Exhibit 574, in which Mr. Singer tells

Miss Heinel they're in Boston.  Miss Heinel updates him on the

approval of Isobelle Janavs and Claire Altman.  She also makes

him make sure that the family doesn't tell anyone about the

04:13 10    admission because she doesn't want it to get out.  She also

asks him to make sure that the payments are not made right away

to the Women's Athletic Board because she doesn't like it to be

so close.  That's a call in furtherance of the scheme.

        Miss Keating also testified that Mr. Singer was in

Boston at that time.  There were calls on the wire between

Mr. Wilson and Mr. Singer that we introduced, Exhibits 561 and

562, in which Mr. Wilson is again reaching out again to

reengage in the scheme.  At that point they're discussing a

number of schools.  One of the schools they're discussing is,

04:14 20    in fact, USC.  Mr. Wilson and Mr. Singer arrange, on the wire,

to meet in Boston.  Then Mr. Wilson, in fact, drives to Boston

to Logan Airport to meet with Mr. Singer, and there's a call

from Mr. Singer to Mr. Wilson on the consensual cancelling that

meeting when Mr. Wilson is already in Boston.  So there is

abundant evidence of venue to satisfy that requirement, your

```
 1    Honor.
 2              THE COURT:  All right.  Thank you.
 3              As I say, the motion under Rule 29 of the criminal
 4    rules is denied without prejudice.  I will consider the matter
 5    further when I have both sides' written briefs in support and
 6    opposition to that motion.
 7              We need to discuss the government's motion to exclude
 8    hearsay wiretap calls and e-mails, docket 2324, and the
 9    defendants' opposition, which is 2329, because I am not clear
10    what it is that's intended to be introduced, so I can't make a
11    ruling in a vacuum.
12              Counsel wish to anticipate tomorrow's activities in
13    that regard?
14              MR. FRANK:  Your Honor, there are roughly a hundred
15    calls that defense has put on its exhibit list from the
16    wiretap.  Not a single one of those calls involves these
17    defendants.  Roughly 70 percent of them involve parents who are
18    not even charged or unindicted coconspirators in the scheme.
19              What the defense has asserted is that they intend to
20    introduce the statements, these calls, as evidence of Singer's
21    state of mind for that nonhearsay purpose.
22              Your Honor, we respectfully submit you've already
23    decided this issue with respect to the Starbucks video.  This
24    is simply more of the same.  These are calls to random other
25    parents that have nothing to do with these defendants.  It's an
```

1   effort to completely get around the hearsay rules as these

2   defendants have been trying from the beginning of this case

3   with an ever shifting series of arguments about why Singer's

4   statements or other people's statements to other people about

5   other parents and other children should be introduced in this

6   case.  It is a complete attempt to end run around.

7          801(d)2(E), the coconspirator statement rule, which

8   that provides that coconspirator statements are not admissible

9   by defendants themselves.  And so instead of calling them

04:17 10   coconspirator statements, they're calling them state of mind

11   evidence.

12          It would be an exception that swallows the rule.  We

13   found no case where defendants, not a single one, that we

14   found, nor one that they've cited, where defendants are allowed

15   to admit coconspirator statements like this on the basis that

16   basically anything the coconspirator says is admissible for

17   state of mind.  In fact, we've looked at some selection of

18   these calls.  We've cited them in our brief.  There's not even

19   remotely state of mind.  To the extent, if anything, it's a

04:17 20   statement of belief.  If he says the side door is not improper,

21   that's not state of mind evidence.  That's clearly a statement

22   of belief.  And there's explicit case law, black letter law, on

23   this topic.

24          It's not -- to the extent that they're arguing that

25   his statements are false, they're using them as a general

attack on the credibility of a nontestifying witness, which is
prohibited by Rule 608B.  So there's just no theory under which
these statements come in.  It's just an attempt to put in all
sorts of pure hearsay statements to other parents and other
individuals that have nothing to do with this case.

MR. KELLY:  Your Honor, I'll speak briefly and then
defer to my co-counsel about the tapes.  He raised this issue
about the Starbucks video.  The reason we're offering that, and
now it's down to 3 minutes, just the part about the side door,
they spent all this time about side door elicit, elicit,
elicit.  Under Rules of Evidence 806, we are allowed to impeach
a non-declarant like Mr. Singer.  They spent all this time
suggesting, especially in these recorded calls, that the side
door is nefarious.  We're allowed to impeach Singer on 806.
We've got the video down to 3 minutes where he talks about the
side door in a public way which suggests is totally
appropriate.  Not even if is it admissible under 4086 --

THE COURT:  Are we talking about the Starbucks?

MR. KELLY:  Yes, your Honor.  It's admissible as
Singer's state of mind.  There's two good cases I'd recommend
the Court consider.  It's a First Circuit case, DeSimone, 488 F
3rd 561 and 568 to 569.  It's a First Circuit case.  "Out of
court statements may be admissible as circumstantial evidence
of the speaker's state of mind at the time".

It's important here because they're suggesting Singer

is conspiring with our client.  If his state of mind in

presenting to Starbucks about the side door is that it's legit,

that's admissible under that state of mind.  State of mind is

not just the Rule of Evidence 8033.  That's a separate type.

This well-recognized exception is the effect on the listener as

well as the and declarant.  It's admissible as Singer's state

of mind, plus 806.  It's right on the money.

I just wanted to address the video because we think

it's important and we think it's significant to help us defend

our case here, which, of course, we have a right to do when

they keep presenting the side door as something elicit when, in

fact, there's evidence that it's not.  So that's all you'll

hear from me on this point, the tapes themselves.

It's two separate bases for getting in the Starbucks

video, 806 and the state of mind.  If that wasn't clear, I

wanted to make sure that is clear to the Court.  That's why

we're trying to get in the Starbucks video.

THE COURT:  You want to respond to that, Mr. Frank?

MR. FRANK:  Your Honor, as we briefed this issue, it's

not an inconsistent statement.  In fact, what he says on that

tape is exactly what he said in the tape that we put in with

respect to Mr. Caplan.  So it's not a prior inconsistent

statement.

Number two, the fact that he mentioned the side door

without describing that it involved false athletic profiles,

that it involves bribes, he just mentioned the term "side door"
and said it was cheaper than other ways to get into college.
It has nothing to do with his state of mind.  It doesn't
suggest that it's one thing or another thing.  He just
mentioned it in this forum to other people who have nothing to
do with this case.  And it has nothing to do with his state of
mind.  We've provided your Honor in today's briefing a citation
to a case where it explicitly considers whether a statement
that something is not improper or not illegal is state of mind
evidence, and the Court clearly held that that was a statement
of belief.  It's not state of mind like I'm scared, I'm
worried, I'll -- a spontaneous statement that somebody doesn't
have a chance to consider.  It's a statement of belief and is
not statement of mind evidence.

MR. KELLY:  Respectfully, your Honor, they have put on
these recorded calls about the side door as if it's
illegitimate.  And they're going to argue that to the jury,
guaranteed.  It's per se improper.  This tape, in a public
setting by Singer, shows under 806 it's inconsistent, and we're
allowed on 806 to impeach an out of court declarant.  So that's
why it's critical to the defense, and they keep using it to
suggest it's improper.  They're going to argue that to the
jury.

We have evidence that, A, he said something
inconsistent in public and his state of mind, a supposed

A3175

1    coconspirator, was in front of Starbucks people.  He wasn't up

2    there bragging about something illegal he wanted all these

3    people to do.  We're entitled to show that and the jury gives

4    it weight.

5        THE COURT:  You may have an appellate issue,

6    Mr. Kelly, but the Starbucks presentation is not going to be

7    submitted to this jury.  If I get reversed on it and you are

8    lucky enough to try the case again, maybe you can convince a

9    different judge to admit that, but the Starbucks presentation

04:23 10    is not going in.  I don't know whether you want tomorrow to

11    offer it and have the objection by the government and have me

12    sustain an objection or whether we want to decide now what the

13    defendants are going to present.  You are free to do whatever

14    you want in terms of your defense.  That's the issue.

15        MR. KELLY:  Understood, your Honor.

16        THE COURT:  It's not going to be allowed into

17    evidence.

18        MR. KELLY:  Okay.  I'll lose the argument twice, here

19    now and I'll present it tomorrow too.  It will be objected to,

04:23 20    and I understand the Court's ruling.

21        THE COURT:  Okay.  So what do we do tomorrow?  If

22    you're planning to offer calls that are properly described by

23    government's counsel, I am going to sustain objections to their

24    admission.  We might go through tomorrow and you can offer one

25    hundred different calls, but if they're all as described by the

```
 1    government, the government's objection is going to be

 2    sustained.

 3              MR. KELLY:  Yes.  That's right, your Honor.  I'll

 4    defer to my co-counsel.  He does have witnesses.  I have

 5    stipulations.  I have one exhibit I'm especially keen on.  It's

 6    a two page exhibit, Exhibit 1219.  We briefed it.  There's been

 7    a lot of briefs.  That's one we intend to offer.  It's from the

 8    head of compliance to Ms. Heinel, and it clearly goes to her

 9    state of mind.

10              We've got this honest services issue in play.  If

11    she's being told by her boss that this is -- here's the data

12    and it's a two pager and the data shows practice players are

13    being admitted to USC who are children of wealthy donors, is

14    goes to her state of mind.  We've briefed it.  We think it's

15    clear the First Circuit has said that the statements proffered

16    to show something in the accuracy of the content is an

17    analogous state of mind of the declarant for one conversation

18    are not considered hearsay.  They're quoting Wigmore on

19    evidence.

20              It's Figueroa at 18 F2nd 1020.  That's an exhibit we

21    intend to offer, including a few others, including the

22    government's pleading.  An admission is an admission.  If the

23    issue is they don't want the signature of the AUSAs on there,

24    fine. We don't care about that. It's the statement that they

25    put in their own brief in this case, which is an admission.
```

1          THE COURT:  Okay.  Outline to me, starting with

2     Mr. Kelly, and then Mr. Kendall, what is tomorrow's evidence

3     going to be?  Who is going to be called and what do you expect

4     to put into evidence?

5          MR. KELLY:  Mr. Kendall's going to call a couple

6     witnesses, which we can share momentarily.  My plan is to offer

7     in a few stipulations and a few of these exhibits.  I will try,

8     try again with the video.  In terms of live witnesses from me

9     tomorrow, none.  The live witnesses are from Mr. Kendall.

04:26 10          THE COURT:  All right.  Mr. Kendall.

11          MR. KENDALL:  Yes.  If I can go through what I think

12     would be the evidence we'd offer tomorrow in full.

13          We will have a live witness disclosed to the

14     government already.  His name is Andrew Mericle.  He was a

15     teammate of Johnny Wilson on the USC water polo team.  His

16     testimony's probably, his direct, is 30, 40 minutes, maybe plus

17     or minus.  He's not a very long complicated witness, like some

18     of those we've had.

19          In addition, we had planned to call Mr. Masera, who is

04:26 20     here in Boston, but given the Court's preliminarily views from

21     our discussion, my expectation is I probably will not prevail

22     in persuading the Court to order him to testify over his Fifth

23     Amendment.

24          His counsel is here.  I think the Court needs to rule.

25     If you rule in our favor, Mr. Masera will testify.  If you rule

```
 1   against us, he will not testify.

 2         With respect to the Haden deposition, we have

 3   cancelled it, your Honor.  We're not going to pursue Mr. Haden

 4   or Mr. Garfio.  We understand the Court's ruling has been made.

 5   We're not looking to reargue it.  We feel that makes it

 6   impossible for us to present either of those witnesses if we

 7   can't use documents and we also think it's a burden on our

 8   Fifth Amendment rights as well.  Bottom line is we're not

 9   putting on Haden's deposition and we're not calling Garfio.

10         THE COURT:  So let me understand.  Are we still on

11   schedule to, by Zoom, take statements out of the hearing of the

12   jury of Mr. Orr and Mr. Lopes and Mr. Garfio, that they are

13   going to --

14         MR. KENDALL:  I think Mr. Kelly may have been more on

15   top of that issue.  If you want me to finish.

16         THE COURT:  Yes. Go ahead.

17         MR. KENDALL:  On Monday, we will have three other

18   witnesses.  We've given the names to Mr. Frank already.  That

19   is Jack Bowen, the high school water polo coach of Johnny

20   Wilson, and two other of his teammates will also be coming.

21         THE COURT:  So Jack Bowen and then Johnny Wilson?

22         MR. KENDALL:  No.  Jack Bowen and then the other are

23   Quinn Barron and James Walters.

24         THE COURT:  What are they testifying about?

25         MR. KENDALL:  They're just teammates from the team.
```

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | We had had a coach of the team and another teammate listed.  |
| 2   | They've dropped off.  Instead, there will be these two other |
| 3   | teammates.  They're giving the same testimony as the two     |
| 4   | people we dropped off.                                        |
| 5   | MR. FRANK:  We object to those two witnesses.  They          |
| 6   | were not disclosed to us before today.  They were not on the |
| 7   | defendants' witness list that was due pretrial.  They were   |
| 8   | sprung on us today.                                           |
| 9   | MR. KENDALL:  Your Honor, we spoke with them yesterday       |
| 04:29 10 | and they agreed to testify yesterday.  We had two other people |
| 11  | from the team on the list.  We've taken those two off.  One of |
| 12  | them is objecting through counsel.  The other one we're not  |
| 13  | going to present.  We've got these two yesterday.  We told him |
| 14  | this morning as soon as we had it confirmed.  It's not as if we |
| 15  | delayed or playing games.  It's the same type of witnesses   |
| 16  | they've already given notice of the two withdrawn.  We're    |
| 17  | substituting two and they're fungible.  There's no change or |
| 18  | surprise.                                                    |
| 19  | MR. FRANK:  I don't know if it's fungible or not.  I         |
| 04:29 20 | know there was a witness list due well pretrial in a case   |
| 21  | that's been pending for several years and days before the   |
| 22  | witnesses are being called we're being given names of        |
| 23  | individuals who have never been identified to us as witnesses. |
| 24  | There's things that we do to research people that we do.     |
| 25  | That's one of the reasons that witness lists are due pretrial. |

```
 1    We now don't have time to do things.  This is complete

 2    sandbagging, your Honor.

 3              MR. KENDALL:  It's not sandbagging.  Mr. Moon gave

 4    testimony that went far beyond his field too.  I'll tell you

 5    exactly what happened.

 6              THE COURT:  I don't want an argument here.  Are those

 7    witnesses available for a deposition by Zoom on Saturday?

 8              MR. KENDALL:  I think they're flying out that day.  If

 9    the issue is --

10              THE COURT:  You're planning to call them on Monday?

11              MR. KENDALL:  Put them on Monday morning, yes.  We're

12    planning to put on Bowen and the two other water polo players

13    Monday morning.

14              THE COURT:  Bowen has been known, correct?

15              MR. KENDALL:  Yes.

16              THE COURT:  I'm not concerned about Bowen.  How long

17    are you expecting the direct of those two players to be?

18              MR. KENDALL:  20, 30 minutes at most.

19              THE COURT:  You will make them available by Zoom or

20    otherwise to the government at the government's convenience,

21    which of course won't be convenient between now and Monday

22    morning, but at their less inconvenient for a deposition of

23    each of them to extend no more than 1 hour.  The defendants

24    will be responsible for paying for daily copies so they have

25    copies of those depositions at the time they are put on the
```

```
 1    stand.

 2              MR. KENDALL:  That's fine, your Honor.  In terms of

 3    scheduling of it, these are people that we don't have control

 4    over witnesses the way the government does.  We will get them

 5    to be available.

 6              THE COURT:  If you want them to testify, you'll make

 7    them available to the government before they go on the stand.

 8              MR. KENDALL:  Understood, your Honor.  I'm just saying

 9    when may be a function of airplane flights and work

04:32 10    commitments, but we understand.

11              MR. KELLY:  Your Honor, one more point.  I want to

12    make clear what I was referring to about the admission.  I was

13    talking about Exhibit 1563A, the briefing.  We believe there is

14    binding First Circuit precedent.

15              THE COURT:  On what part of your argument does this

16    relate?  I'm sorry.

17              MR. KELLY:  Yes.  There's multiple motions pending.

18    One of them pertains to a government pleading where they state

19    something to the effect that they're not alleging that Donna

04:32 20    Heinel was personally pocketing money.  I don't have the exact

21    quote in front of me.  The exhibit that's discussed is 1563A,

22    and it's our position, your Honor, there's binding First

23    Circuit precedent on this vote that an admission is an

24    admission, and the cite is 840 F 2nd 118.  It's the Kattar,

25    K-a-t-t-a-r, case.
```

```
 1            THE COURT:  What is 1563A?

 2            MR. KELLY:  That is -- I'll get it in a moment.

 3            MR. FRANK:  It's a pleading in this case.

 4            MR. KELLY:  It's a pleading in this case where the

 5       government said X.  It's an admission.  They've tried to

 6       distinguish Kattar by saying Kattar was somehow something in

 7       dispute.  Kattar is clear.  It says, "we first must determine

 8       what the government, the party opponent for purpose of this

 9       rule".  Then they agree with a prior case.  "We can find no

10       authority to the contrary.  Whether or not the entire federal

11       government calls capacity shall be deemed a party opponent in

12       criminal cases, the Justice Department certainly should be

13       considered such".

14            First Circuit law.  It's admissible.  They made it.

15       We respectfully suggest we should be able to present it to the

16       jury.

17            THE COURT:  Have you submitted a brief on this?

18            MR. KELLY:  Yes, your Honor.

19            THE COURT:  Docket No. What?

20            MR. KELLY:  That one is --

21            MR. FRANK:  You've ruled on this, your Honor.

22            MR. KELLY:  2276.

23            MR. FRANK:  You ruled on this from the bench, your

24       Honor.  I would point out that we briefed this as well.  In the

25       Kattar case, the pleading was admitted because it was
```

A3183

1    inconsistent with the government's arguments at trial.  There's

2    been in inconsistent argument at this trial.  We've argued from

3    the open that the defendants were told the money was going to

4    the University.  That's not consistent with what's in the

5    pleading.

6          MR. KELLY:  We respectfully disagree with his analysis

7    of that First Circuit case and simply ask the Court to

8    reconsider the motion pending.

9          THE COURT:  I'll look at it.

04:34 10          MR. KENDALL:  Your Honor, you want me to finish

11    previewing the evidence for tomorrow?

12          THE COURT:  Yes.

13          MR. KENDALL:  There are some tapes we do want to play.

14    One is the Marriott hotel video where Mr. Singer is describing

15    how he defrauds parents by befriending them going to their

16    house while advising their children.  That's directly relevant

17    to our defense that Mr. Singer defrauded Mr. Wilson as there is

18    plenty of evidence in this case that Mr. Singer repeatedly

19    visited his son and visited the Wilson's family at their house

04:35 20    and that he stole at least $120,000 from them.

21          So, your Honor, that's one video --

22          THE COURT:  That's a video of what?

23          MR. FRANK:  If you recall the testimony of Agent

24    Keating, on September 21, 2018, the undercover informant

25    invited Mr. Singer to Boston, had a conversation with him in a

1    hotel room at the Marriott Long Wharf here in Boston, and then

2    the agents came in and persuade him to become an informant.

3        This is his discussion just before the agents come in

4    where he explains how he defrauds families that are working

5    with his college advisory service.  It's directly relevant to

6    what we say happened with Mr. Wilson.  It's admissible.  It's

7    admissible.  It's a statement of interest.  It's a statement of

8    intent.  There's many reasons why it's admissible.  It's a

9    short tape.  We're going to play an excerpt of it, just a few

04:36 10    minutes.

11        Second, there is the call that Agent Keating testified

12    about with the woman Nazie Saffari that shows how they could

13    get Mr. Singer to make explicit statements about bribery to

14    some parents, but they didn't do that to Mr. Wilson.  That

15    shows the sort of contradiction of the way he was treated and

16    he was treated differently than others.

17        The third thing is we have some calls of Mr. Singer

18    trying to defraud other parents similar in the way that he

19    defrauded Mr. Wilson.  This is admissible to 404B.  This is his

04:36 20    pattern of defrauding innocent parents telling them that their

21    donation is going to go pay for the water polo trip to Serbia

22    or things of that nature.  These are short, small clips.  We're

23    not going to play the whole tapes, just snippets of them.

24        We have three calls that have, not a hundred, your

25    Honor, three calls, a few minutes of each.  As I say, I believe

it's all admissible for 404B and state of mind.  This is the

exact same fraud we're alleging was perpetrated on Mr. Wilson.

In addition to that, we have some e-mails we'd like to

put in.  There are e-mails between Mr. Wilson and Mr. Singer

that go to Mr. Wilson's state of mind that detail the

representations that Mr. Singer said to him.  It's not more the

truth of the matter.  We probably can stipulate that a lot is

untruthful, but it's part of the fraud that was said to him.

These e-mails have been stipulated to by the government.

There's no foundation issues with them.

There are some e-mails that we'd like to offer, not

for the truth.  These are with respect to USC.  I don't expect

you'll want to admit them given your recent ruling but we do

need to offer them to preserve our rights.  There's an e-mail

between Mr. Singer and Mr. Masera not for the truth of the

matter, just for that topic was discussed.  In fact, the topic

they're discussing is a line of fraud and Mr. Wilson, but the

fact that they acknowledge to each other that these words were

said is all we want to put in.  We don't say it's truthful at

all.

Finally, we have a USC medical report of Johnny

Wilson's concussion.  It is admissible to the hearsay exception

for medical records stated by a medical provider.  We think

it's admissible under 8033, 8034, 8036.

Finally -- not finally.  Next, we have Mr. Singer in

various e-mails describing to define the side door as a
legitimate business and a legitimate way to make donations.  To
us, it's a bit like a drug case when agents get on the stand
and try to explain what a term means.  If you've got an XYZ
agent, what does that mean?  This is a disputed issue for the
jury.  They have their view.  We have our view.  The jury has
to decide a disputed issue of fact, is a side door a code name
for some sort of fraudulent transaction or is the side door
Mr. Singer's way to defraud parents and to get them to do
legitimate donations.  We're entitled to put in evidence, give
our view of it.

　　　　Agent Keating testified on the stand that this was a
side-door scheme, a side-door scheme.  We have a right to give
Mr. Singer's repeated statements to people that the side door
was not a scheme.  It's not what he says.  It's the fact that
he says it publicly, that he wants to put it in a book, that he
wants to put it in a speech.  How can they say this is some
secret criminal event when he uses it as one of his main
marketing tools?  It's not that he's saying it privately.  He's
saying it publicly and openly.  It's really the audience that's
relevant, not the words that he's speaking.

　　　　We also have some e-mails showing Mr. Wilson
introducing Mr. Singer to a client, again showing Mr. Wilson's
state of mind, that he would not be introducing a person who is
committing fraud to one of his clients.  He'd only be

introducing honest persons.  We also have personal records for

his daughters' SAT result.  That seems pretty straightforward

business records.

I think that's the list of stuff we have, your Honor.

THE COURT:  Mr. Frank?

MR. FRANK:  Almost nothing of what Mr. Kendall has

just described is admissible on any grounds, your Honor.

Mr. Singer's statements on a Marriott televideo are

pure hearsay, your Honor.  They do not go to his state of mind.

They are, at most, his statements of belief.  They are

completely irrelevant to this case.  They have nothing to do

with these defendants.  These defendants never heard the calls

of Mr. Singer and other parents.  We've just discussed that.  I

don't know whether it's 404B or whatever it is, but it's not --

it's hearsay.  It's pure hearsay.

The Nazie Saffari call is a call that Mr. Singer made

at agents' direction to a different person.  The defendants

didn't know about it.  It has nothing to do with this case.

Singer describing the side door in other e-mails is pure

hearsay.  It has nothing to do with these parents.  It was

statements to other parents.  They're trying to admit it for

improper purpose, your Honor.

Certified business records, there are rules around

certified business records.  We don't have -- there's no

stipulation that these records come in.  There's no keeper of

1    records who's been called.  I don't know what records they're

2    even talking about.  This is the first I'm hearing they intend

3    to introduce purported business records pursuant to a

4    certification that is not allowed.

5         This is just an effort to dump stuff.  USC e-mails,

6    again, the Court has ruled on that time and again that these

7    are hearsay and that the defendants didn't know anything about

8    them.  So they're just trying to dump stuff in in circumvention

9    of the laws of evidence, the rules of evidence, and this

04:42 10    Court's prior rulings.

11         MR. KENDALL:  If I may respond to one thing, your

12    Honor.  A lot of things we're talking about is on the exhibit

13    list they've had for a period of time.  The ACT scores are

14    certified records.  They have that.  That's 8242, 8243, 8244

15    from the exhibit list. This is not a question of surprise

16    sandbagging.

17         THE COURT:  Are you saying when you put it on an

18    exhibit list that it's automatically admissible?

19         MR. KENDALL:  No.  I'm saying they've had notice.

04:42 20    We're not sandbagging them.  They have copies.

21         THE COURT:  Counsel, defendants can put on a defense

22    as they have a right to do, but from what I have heard, I am

23    going to sustain all of the objections of the government unless

24    I'm missing something.  Whether it's for planning purposes or

25    not, you can understand that if the evidence is as described by

```
 1   the government, I have already ruled that it is not going to be
 2   admissible if it's hearsay, so we may not have much to do
 3   tomorrow other than the defendants offering documents, the
 4   government objecting, and the Court sustaining the objection.
 5   So stand forewarned that that's what is likely to be done.  You
 6   have to do what you have to do to preserve the record.  I
 7   understand that.  For planning purposes, that's a heads up.
 8            MR. KELLY:  Your Honor, I think I noted this yesterday
 9   that we have reached agreement on four e-mails anyway, 1540,
10   1254, 1255 and 714.
11            THE COURT:  You noted that and it was recorded by the
12   Court and those documents are admitted.
13            (Exhibits 1540, 1254, 1255, 714 admitted into
14   evidence.)
15            MR. KELLY:  Thank you, your Honor.  I'm sorry.  I
16   forgot I specified.
17            THE COURT:  Refresh my memory.  Do you want to present
18   Mr. Masera now, his argument that he will claim the Fifth
19   Amendment?
20            MR. KENDALL:  Happy to.  Counsel is here.
21            MR. KELLY:  I would respectfully suggest on the Fifth
22   Amendment invocation, typically it's done question by question.
23   Here with Mr. Masera, I have one substantive question and then
24   two or three procedural questions which follow on one
25   particular document.  That's it.  I don't have any other
```

1  questions that I'd like the Court to ask to see if he has a

2  valid Fifth Amendment privilege on that one question.

3      I would respectfully suggest he doesn't because he

4  pled guilty to a RICO conspiracy.

5      THE COURT:  How are you expecting this hearing to

6  proceed?  What role do you expect the judicial officer to play?

7      MR. KELLY:  I would like to submit to the Court the

8  document I'm talking about and ask him one question.  If he

9  invokes the Fifth, the Court can determine for itself whether

04:45 10  he has a valid Fifth Amendment privilege on that one question

11  because I don't think he does.  If he doesn't have a valid

12  privilege on that and says what the document is, and it's a

13  business record, it comes into evidence.  If the Court wishes

14  to do it ex parte, fine by us.  It doesn't have to to it in

15  open court.

16      THE COURT:  What I'm going to do today is going to be

17  here.

18      MR. KELLY:  Then I'd like to submit, if I can

19  approach, the actual document I'd like the Court to ask.

04:45 20      THE COURT:  I'm not going to ask the witness anything.

21      MR. KELLY:  Okay.  If the Court wishes, I can ask.

22      THE COURT:  Yes.

23      MR. KELLY:  Can I still give the Court a copy?  I

24  can't pull it up on the screen.  The IT guy's not here.  I'd

25  like to ask a question about the document I'd like to show the

|    | government and the Court. |
|---|---|
| 1  | government and the Court. |
| 2  | THE COURT:  Mr. Frank? |
| 3  | MR. FRANK:  If the witness is going to get up on the |
| 4  | stand, counsel's going to ask him a question.  His counsel, the |
| 5  | witness' counsel has advised that he will invoke.  I don't |
| 6  | quite understand what's supposed to happen next.  If there's |
| 7  | going to be a judicial inquiry into the bases of his invocation |
| 8  | and whether they are valid, that I don't think is supposed to |
| 9  | happen in open court. |

 1   government and the Court.

 2          THE COURT:  Mr. Frank?

 3          MR. FRANK:  If the witness is going to get up on the

 4   stand, counsel's going to ask him a question.  His counsel, the

 5   witness' counsel has advised that he will invoke.  I don't

 6   quite understand what's supposed to happen next.  If there's

 7   going to be a judicial inquiry into the bases of his invocation

 8   and whether they are valid, that I don't think is supposed to

 9   happen in open court.

04:46 10          MR. KELLY:  The jury's not here.  If the document

11   is --

12          THE COURT:  The government is here.  If he's going to

13   be inquired of as to his bases for taking the Fifth Amendment,

14   I don't think that can happen.

15          MR. KELLY:  I think it's typically done at sidebar.  I

16   can show him the document.

17          THE COURT:  Folks, you can get together and decide

18   overnight how you want to do this and if you can agree I'll do

19   it, I'm not going to do it today.  There's obviously too much

04:47 20   disagreement.  I want to know, are we going to do anything with

21   the absent, those who are in California, Mr. Orr and Mr. Lopes?

22   Are they going to be inquired of with respect to Fifth

23   Amendment rights?

24          MR. SHARP:  We would like them to be.  If I can

25   arrange with their attorneys and the deputy clerk, when would

A3192

```
 1   your Honor like to do that with them?
 2        THE COURT:  For planning purposes, I think everybody
 3   ought to be on the same page, tomorrow morning at 9:00 a.m. is
 4   6:00 a.m. California time.  I don't think that would be a good
 5   time to do it, but maybe noon, 9:00 a.m. Pacific Time would be
 6   appropriate.
 7        Counsel, get together and decide when and if you want
 8   to do that.
 9        With respect to Mr. Masera who is going to be here,
10   give me proposed procedural direction as to how you want it to
11   proceed but I will consider.  I'm not going do it tonight
12   because there's obviously no agreement on that.
13        Is there anything else that needs to come to my
14   attention before we adjourn for the day?
15        MR. FRANK:  Just briefly, your Honor.  It would be
16   hopeful to know if the defense case is going beyond Monday just
17   for planning purposes.
18        THE COURT:  Yes.  Is it going beyond Monday?
19        MR. KENDALL:  Your Honor, in terms of witnesses, not
20   our clients, I expect it will be done Monday.  I gave you the
21   three water polo witnesses we're putting on.  There may be a
22   tax witness, Mr. Spire, who's already been disclosed.  I think
23   not.  I just need to confirm that with the government.
24        With respect to our clients, that's something that's
25   going to be discussed over the weekend and we probably won't
```

know until fairly late.

        MR. FRANK:  Well, your Honor, so that means that other than the defendants, the only issue is Mr. Spire, right?  So there's going to be no family members testifying?

        MR. KENDALL:  That -- it may be sort of all rolled up together.

        THE COURT:  You have an obligation to inform the government.  Is it 2 days in advance?

        MR. FRANK:  Yes, sir.

        THE COURT:  I think that was the rule at the beginning of the case.  So you're going to have to notify them by the conclusion of tomorrow who you're going to call Monday and/or Tuesday.

        MR. KENDALL:  Okay.

        MR. KELLY:  Your Honor, for planning purposes, your Honor, I would respectfully submit that Tuesday we should be closing unless the defendants decide to testify.

        THE COURT:  I am not going to close immediately after.  If the defendants rest on Monday, I'm going to give the jury Tuesday off and we're going to have closings and charge on Wednesday.

        MR. KENDALL:  Would the Court do its charge conference?

        THE COURT:  Either Monday or early Tuesday.

        For planning purposes before I decide the matter, what

```
 1    does the government believe it needs for closing time?

 2             MR. FRANK:  Ball park, 90 minutes, your Honor.

 3             THE COURT:  Total?

 4             MR. FRANK:  No.  That would be closing and then a

 5    rebuttal on top of that.  We had 45 minutes for the opening, so

 6    I'm doubling that.

 7             THE COURT:  Defendants, what do you think you need?

 8             MR. KELLY:  I think I need an hour, your Honor.  Lot

 9    of things to go over.  I think I can maybe beat the hour, but I

10    would like the hour.

11             THE COURT:  Mr. Kendall?

12             MR. KENDALL:  Your Honor, I have a lot more counts and

13    a lot more issues.  I was hoping 70 minutes.  I won't go above

14    that.

15             THE COURT:  What?

16             MR. KENDALL:  70 minutes.

17             One thing I may ask, your Honor.  Mr. Frank and I have

18    had the pleasure of two prior trials.  I find his rebuttal

19    often goes longer than his closing.  I'd ask the Court to set a

20    time for his rebuttal.

21             THE COURT:  There will be time limits on all.  You

22    said 90 as an argument and then a rebuttal?

23             MR. FRANK:  Yes, your Honor.  I would guesstimate 20

24    to 30 minimums on rebuttal.

25             THE COURT:  It's likely to be 90 government, 60 each
```

1    defendant, 30 rebuttal.   That's 2 hours each.   That will be a

2    maximum.

3            We're in recess until tomorrow morning at nine a.m.

4            (Whereupon, the proceedings concluded at 4:52 p.m.)

```
 1                         E X H I B I T S

 2   NO.                      ADMIT

 3   1540   .....................   43

 4   1254   .....................   43

 5   1255   .....................   43

 6   714    .....................   43

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8         I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    September 30, 2021 in the above-entitled matter to the best of

11    my skill and ability.

12

13

14    /s/ Kristin M. Kelley          September 30, 2021

15    Kristin M. Kelley, RPR, CRR           Date
      Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3
     UNITED STATES OF AMERICA,         )
 4                      Plaintiff      )
                                       )
 5   vs.                               )  No. 1-19-CR-10080
                                       )
 6   GAMAL ABDELAZIZ and JOHN          )
     WILSON,                           )
 7                      Defendants.    )
                                       )
 8                                     )

 9

10

11             BEFORE THE HONORABLE NATHANIEL M. GORTON
                   UNITED STATES DISTRICT JUDGE
                       JURY TRIAL - DAY 16
12

13

14        John Joseph Moakley United States Courthouse
                        Courtroom No. 4
                       One Courthouse Way
15                 Boston, Massachusetts 02210

16

17                      October 1, 2021
                           9:25 a.m.
18

19

20

21              Kristin M. Kelley, RPR, CRR
                   Official Court Reporter
22        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
23                 Boston, Massachusetts 02210
                    E-mail: kmob929@gmail.com
24

25        Mechanical Steno - Computer-Aided Transcript
```

**A3199**

```
 1     APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```



```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         THE CLERK:  You may be seated.  Court is now in
 3    session.
 4         THE COURT:  Good morning, counsel.  The government has
 5    asked to see me with respect to a motion they filed overnight,
 6    which is a motion for a ruling on objections outside the
 7    presence of the jury.  It's docket No. 2332.  I have read the
 8    motion.  Do you wish to address it further, Mr. Frank?
 9         MR. FRANK:  Just briefly, your Honor, to supplement
09:25 10   it.  We are very concerned about not just wasting the jury's
11    time with the introduction of dozens of exhibits that the Court
12    has already indicated a likelihood will be excluded on the
13    basis of the government's various objections, but also that
14    this is highly prejudicial to the government.  The entire
15    narrative that the defense has been weaving throughout this
16    case is that the government has been withholding evidence from
17    the jury.  Now they propose to introduce dozens of exhibits,
18    many of which the Court has ruled on time and again already to
19    exclude and have the government stand up and object to each and
09:26 20   every one and then have the objection potentially sustained and
21    have the exhibits then not introduced into evidence, thereby
22    portraying the government as withholding the evidence from the
23    jury.
24         This is compounded by the fact that, at 2 o'clock this
25    morning, the defense identified another 40 new exhibits, many
```

```
 1    of which appeared to have previously been in the 9000 -- part

 2    of the 9000 series of their exhibits which were previously

 3    their impeachment exhibits that they did not -- deliberately

 4    did not disclose to the government.  Around a quarter of them

 5    were also produced last night as reciprocal discovery, even

 6    though the deadline for exhibit lists and reciprocal discovery

 7    was more than three months ago, and that the government has,

 8    therefore, never seen before.

 9              We've quickly gone through those new exhibits and they

09:27 10    are exactly the same as the exhibits we talked about yesterday,

11    all objectionable under hearsay grounds.  So this is going to

12    be an exercise, we fear, in wasting the jury's time but also

13    prejudicing the government with what is nothing more than

14    gamesmanship here.

15              THE COURT:  Mr. Kelly.

16              MR. KELLY:  Yeah, I didn't -- I'm not producing any

17    additional documents at all, so I'm not sure what he's talking

18    about.  I have not produced anything new.

19              MR. FRANK:  Mr. Kelly is right.  This was all from

09:27 20    Mr. Wilson.

21              MR. KELLY:  My approach today will be -- I'm not

22    dumping in dozens of documents that the Court's going to, if

23    they object, the Court's going to deny.  I've got five, a

24    video, four e-mails.  Actually, a video and four documents.

25    I'm hopeful I will have success on the four documents.  If I
```

```
 1    don't, I don't, but I don't think that prejudices the

 2    government if the defense tries to put in exhibits in our case.

 3         If the Court sustains the objection, so be it.  I'm

 4    not putting in dozens of documents for the sake of wasting

 5    anyone's time.  I'm cutting to the chase.  I've got five

 6    things, a couple stipulations that we've agreed to, and that's

 7    about it, Judge.

 8         THE COURT:  Mr. Kendall.

 9         MR. KENDALL:  Okay.  Your Honor, first, my
09:28 10  understanding is we produced ten new documents to the

11    government yesterday.  We didn't dump a huge number on, some

12    things that were maybe for cross or for other reasons that

13    didn't get used, but it's ten documents.  It's a small number.

14         We have some things that your Honor has not yet ruled

15    on that we think they do come in and it's not to try to create

16    prejudice to the jury.

17         For example, Casey Moon disputed that Johnny Wilson

18    had a concussion.  We have the medical records that were marked

19    as a government exhibit, 133, that the government didn't choose
09:29 20  to offer.  We'd like to offer the medical records.  There's an

21    exception for medical records under the hearsay rules.  It's a

22    government exhibit we're offering.  I don't think that's

23    creating prejudice of the type he's talking about.

24         We do have some e-mails and things that the Court has

25    indicated that he does not want to admit.  We have to protect
```

1    the record and put those in, but there's other things that have

2    been yet -- been put before you that need to be dealt with and

3    that we think are not just challenging -- they're certainly not

4    challenging what you've already ruled.  Some of it we need to

5    sort of have an effective record, but other of it is new stuff

6    that is not things that anybody has dealt with, your Honor.

7         So for example, the medical record, it's a hearsay

8    exception to -- for medical errors for statements made.  All we

9    want to do is put in that the guy actually did have a

09:29  10    concussion and Moon sort of disputed that.  It's their exhibit

11    that shows it happened.  I don't think that's something

12    inappropriate to offer to the jury.

13         THE COURT:  Mr. Frank.

14         MR. FRANK:  Your Honor, he's focusing on one document,

15    which by the way is appended to an e-mail that is hearsay,

16    there is a cover note that is pure hearsay, and the medical

17    record has not been authenticated and is not pursuant to a

18    business record certification or anything like that.

19         But leaving aside the medical record, there are dozens

09:30  20    e-mails, Singer/Haden e-mails, Heinel e-mails, all sorts of

21    exhibits that the Court has already indicated its impression

22    of, some of which -- many of which the Court has explicitly

23    ruled on.  He can protect the record but he doesn't have to do

24    it in front of the jury.  It's a waste of the jury's time.

25    It's prejudicial.

**A3206**

9

```
 1              And by the way, the same is true of the Starbucks

 2    video.  That has been ruled on two or three times already.  To

 3    do that in front of the jury serves only one purpose, and that

 4    is to prejudice the government by having him identify the

 5    exhibit and then having us stand up and object to it.  There's

 6    no reason to do that in front of the jury.  The record can be

 7    protected and the jury's time saved by doing it outside the

 8    presence of the jury.

 9              MR. KENDALL:  Your Honor, Mr. Frank raises an issue

09:31 10    that he hadn't raised before, which is claiming that, for

11    certain records, there should be a record keeper from USC to

12    validate them.  We subpoenaed the record keeper to establish

13    the business records basis.  USC is refusing to send somebody.

14    There's motions to quash pending before you.  If this is an

15    issue about having a record keeper, your Honor, then I request

16    that the Court order USC to send someone here.  We have a

17    stipulation on authenticity, so there's no doubt these are USC

18    documents.  But to the extent that they're saying that we

19    haven't laid the basis for business records for the medical

09:31 20    records, which at least parts of them come within the hearsay

21    exception for medical records, then we subpoenaed that record

22    keeper.  USC won't send them.  That can be dealt with Monday if

23    the Court just orders USC to send the record keeper to show up

24    pursuant to a validly served subpoena that USC has received.

25              THE COURT:  Mr. Frank?
```

**A3207**

```
 1          MR. FRANK:  Mr. Kendall's a very experienced lawyer

 2     and he knew how to do this properly and he's not doing it

 3     properly.  There's no stipulation as to the authenticity of

 4     that record.  But more importantly, we're not talking about one

 5     document.  We're talking about dozens and dozens of documents.

 6     The Court can rule on those documents outside the presence of

 7     the jury, and if there is a few that do come in, then those can

 8     come in on Monday, but we don't need to sit here for hours

 9     wasting the jury's time and prejudiced to the government by

09:32 10     doing that in the presence of the jury.

11          MR. KELLY:  We will not be sitting here for hours.  In

12     my presentation, Judge, I have five.  And if they have a valid

13     objection, they should make it.  If the Court thinks it's

14     valid, I assume the Court will sustain it.  If they don't --

15     the Court doesn't think it's valid, you'll overrule it and I

16     can present the document.  That's it.

17          THE COURT:  Yeah.  I'm going to let the defendant

18     Abdelaziz move forward with five documents.

19          With respect to the defendant Wilson, it depends on

09:33 20     the amount of time that you expect that we are going to be at

21     this.  If it gets to the point where it's multiple documents

22     with multiple objections and multiple rulings, I'm going to

23     suspend the proceedings and do it outside the hearing of the

24     jury.

25          MR. KENDALL:  Okay.  Your Honor, I do have multiple
```

1    documents to deal with, but they're in different categories.

2            THE COURT:  I'm sorry?

3            MR. KENDALL:  I do have multiple documents to deal

4    with and they -- but they fall into different categories.  I

5    think some of them this Court has not ruled on, they're clearly

6    not hearsay, their authenticity has been stipulated to and, you

7    know, they have --

8            THE COURT:  They better be documents that I've not

9    already ruled on because I'm not going to change my rulings

09:33 10   just because you offer them three or four times, your Honor.

11           MR. KENDALL:  I understand, your Honor.  And for those

12   I'd ask that we be able to do those out of the jury, but have a

13   thorough record established of that.

14           THE COURT:  Yes.  You're entitled to make a record.

15   For sure.

16           MR. KENDALL:  Okay.  With respect to the issue of the

17   USC record keeper, if the Court thinks we need to have a USC

18   record keeper, which is a --

19           THE COURT:  Is this for the medical records?

09:34 20   MR. KENDALL:  That's probably the most significant

21   one, but there were some other e-mails as well from USC.  The

22   things that I'm thinking of in particular are there is a

23   medical record, government Exhibit 133, and then there is the

24   e-mails between Pat Haden and Rick Singer, which are not for

25   the truth of the matter, just to show that Haden knew Singer

```
 1    was involved with the Athletics Department and knew he was --

 2              THE COURT:  Haven't we dealt with that problem before?

 3              MR. KENDALL:  I'm not sure if the Haden ones have been

 4    offered or not, your Honor, yet.  A lot of the others have.

 5    I'd have to look at the records to see if the particular Haden

 6    ones -- but these are clearly not hearsay.

 7              It just shows -- and your Honor, these are not -- your

 8    concern of other admissions issues with nonSinger people,

 9    that's not what these e-mails are.  These are e-mails central
09:34 10   to the whole issue, Pat Haden dealing with Rick Singer and

11    authorizing him to be part of the Athletics Department

12    fundraising.  That's very different than the issue of other

13    parents, other kids unrelated to Singer, and what was their

14    admission decisions.

15              MR. FRANK:  He could have deposed Mr. Haden.  He chose

16    not to depose Mr. Haden.  Now he's just trying to put in the

17    same documents that your Honor has already ruled on that we

18    previously called impeachment evidence.  And now he's calling

19    it evidence in his case-in-chief.  This is so tiresome.  This
09:35 20   keeps coming up and again and again with ever shifting grounds

21    for introducing the same documents that the Court has already

22    ruled on, and it's highly prejudicial.

23              MR. KENDALL:  Your Honor, I cannot think of a --

24              THE COURT:  All right.  Enough.  Enough.  I'm going to

25    allow the defendant to put on a case.  And if I believe that it
```

| | |
|---|---|
| 1 | is being done for reasons other than to preserve the record, I |
| 2 | will call a halt to it and we'll do it outside the hearing of |
| 3 | the jury, but I will allow the defendant to commence to put on |
| 4 | their case. |
| 5 | Call the jury. |
| 6 | MR. FRANK:  Your Honor, one minor other issue.  We |
| 7 | have a curative instruction pending.  Defense asked us a bunch |
| 8 | of questions.  This is on the issue of the leftover funds in |
| 9 | the Key Worldwide Foundation and we haven't heard back from the |
| 09:36 10 | defense, but that instruction was -- the instruction that we |
| 11 | submitted is pending. |
| 12 | THE COURT:  I'm losing you on that one. |
| 13 | MR. FRANK:  Sorry, your Honor.  On Wednesday, there |
| 14 | was the issue of the proposed curative instruction that your |
| 15 | Honor said you were inclined to give on the money that is left |
| 16 | over, that was left over in the Key Worldwide Foundation |
| 17 | account.  Mr. Kendall was questioning the witness about these |
| 18 | leftover funds.  We believe that was misleading.  We proposed a |
| 19 | curative instruction.  Your Honor said you were inclined to |
| 09:36 20 | give it.  The defense asked to hold off until today, and now |
| 21 | we're here. |
| 22 | MR. KENDALL:  Your Honor, if you take a look at the |
| 23 | transcript, I think you'll find it's not as the government has |
| 24 | represented it.  She said there was approximately 20 million |
| 25 | dollars that left the account, and she said there was six and a |

1   half million in one bucket, 6.4 in the other --

2           THE COURT:  All right.  I remember the issue.  Let me

3   consult with my law clerk.

4           MR. KELLY:  And your Honor, just for the record, I

5   thought there was some back and forth between the government

6   and Mr. Wilson's team, and perhaps we can deal with it at the

7   break, because I thought there was something they agreed to.  I

8   need to see it and what it was finalized as.

9           (Pause.)

09:38 10           THE COURT:  Counsel, I have a memorandum and order

11  that deals with 11 pending motions that I'm going to sign right

12  now.

13          And I'm going to retain the curative instruction until

14  the break and then I'll look at it again.

15          MR. KENDALL:  Your Honor, we're against any

16  instruction, but if the Court is to give one, we have got a

17  revision on the government's suggestion, if we can hand that up

18  to the Court.

19          THE COURT:  You can hand it up to the Court.

09:39 20           MR. KENDALL:  But that's clearly an alternative.  Our

21  position is that the testimony was completely accurate and

22  within the scope of what was raised on the direct.  We're just

23  simply trying to find out where did the $20 million go that she

24  said had been withdrawn.

25          THE COURT:  All right.  Thank you.

```
 1              Call the jury.

 2              (Jury enters.)

 3         THE CLERK:  Thank you.  You may be seated.

 4         THE COURT:  Good morning, jurors, and welcome back.

 5    You'll notice we're starting a little late, but it's not that

 6    we've been idle.  We've been working on legal matters outside

 7    of your presence to, hopefully, shorten up the trial.

 8              So, at this stage, you'll recall that when we last met

 9    on Wednesday, the government rested.  The defendants will now

 10   put on their case.

 11             Mr. Kelly.

 12             MR. KELLY:  Yes, your Honor.  Thank you.  Your Honor,

 13   for the record, I'm going to read a stipulation and then

 14   publish it to the jury afterwards; a stipulation regarding USC

 15   accounts.  It's Exhibit 9067.

 16             "The parties hereby stipulate and agree as follows:

 17             If called to testify, Brandon Loftus, USC Assistant

 18   Athletic Director for Budget and Financial Performance, would

 19   state that for the period January 1, 2014, to March 5, 2019,

 20   based on his personal review of the relevant documents, he has

 21   no reason to believe there were any expenditures, debits, or

 22   transfers from:

 23             The USC Women's Athletic Board Account; or the USC

 24   Galen Center Gift Account to any USC employee personally for

 25   any purpose unrelated to their employment at USC".
```

(09:41 appears at line 10, 09:42 appears at line 20)

1          And I'd ask to publish that now to the jury.

2          MR. FRANK:  Your Honor, obviously we've stipulated to

3    this and we agreed to it, but we don't believe it comes in as

4    an exhibit.

5          THE COURT:  It does not come in as an exhibit, but

6    it's a stipulation.

7          MR. KELLY:  And next I'm going to publish to the jury

8    three exhibits in evidence which have not yet been published.

9          First, Exhibit 1540.  And I'd ask Mr. Carter to just

09:43 10    highlight who it's from, when it was sent, what time it was

11    sent, who it was to and what it's about, the subject.

12          Next, after that, Exhibit 1540, I'd like Mr. Carter to

13    publish --

14          THE COURT:  I thought that was 1540.

15          MR. FRANK:  That was 1540, correct.

16          THE COURT:  That will be admitted.

17          (Exhibit 1540 admitted into evidence.)

18          MR. KELLY:  I misspoke.  The next one is 1254.  I'll

19    publish that to the jury, as well.  Again, please highlight who

09:44 20    it is from, when it was sent, to whom, and what's it about, and

21    what was the attachment.

22          Publish that to the jury.

23          Move to admit that as well.

24          THE COURT:  That will be admitted, 1254.

25          (Exhibit 1254 admitted into evidence.)

```
 1              MR. KELLY:  Now to 1255.  I'd like to highlight who it

 2    was from, when was it sent, who it was to, what's the subject,

 3    what's the message.

 4              I'll move to admit that as well.

 5              THE COURT:  It will be admitted.

 6              (Exhibit 1255 admitted into evidence.)

 7              MR. KELLY:  Next, your Honor, I have a stipulation

 8    that I've previously marked as 9068 between the parties.  I'll

 9    read it into the record:

10              "The parties hereby stipulate and agree as follows:

11              "Gamal Abdelaziz donated a total of $200,000 to

12    Columbia University between October 4, 2013, and June 14, 2015.

13    These donations occurred after his son was admitted to Columbia

14    University".

15              I would move this into evidence, although I recognize

16    the Court's ruling.

17              THE COURT:  It is a stipulation, but it's not marked

18    as an exhibit.

19              MR. KELLY:  Next, another stipulation I would read

20    into the record, your Honor, that I've previously marked as

21    9065.

22              "The parties hereby stipulate and agree as follows:

23              "The records of the College Board reflect that Sabrina

24    Abdelaziz received scores for SAT exams taken on three

25    occasions: May 6, 2017, October 7, 2017, and December 2, 2017.
```

1    The records reflect that all tests were taken at the Hong Kong

2    International School".

3         Again, this is Exhibit 9065.  We'd move to admit,

4    recognizing the Court's ruling.

5         THE COURT:  Again, it is a stipulation acknowledged by

6    the Court, but it's not admitted as an exhibit.

7         MR. KELLY:  The next stipulation, your Honor, I'd like

8    to introduce or read to the jury is 9069.  It's a stipulation

9    regarding Chapman University.

09:47 10        "The parties hereby stipulate and agree as follows:

11        The records of Chapman University reflect that Sabrina

12   Abdelaziz attended a campus tour and participated in a campus

13   interview in Orange County, California on October 25, 2017.

14   Sabrina Abdelaziz was offered admission to Chapman University

15   for the fall 2018 semester".

16        Now, your Honor, that's the last of the stipulations.

17   I have five documents I'm going to reference in an attempt to

18   introduce.

19        Document 1374B, which we've previously discussed, it

09:48 20   is a video excerpt where Mr. Singer references the side door in

21   a public setting.  I'd offer it under Rule 806 of the Federal

22   Rules and existing law regarding state of mind evidence and the

23   other basis we discussed.

24        MR. FRANK:  Objections for the reasons previously

25   stated.

```
 1              THE COURT:  And the objection is sustained as
 2     previously.
 3              MR. KELLY:  Yes.  And then, your Honor, we'd offer
 4     Exhibit 1219, an e-mail dated 6/8/17, which is an e-mail to
 5     Donna Heinel from the USC Athletic Compliance person Scott
 6     Simon.
 7              MR. FRANK:  Objection.  Hearsay.
 8              THE COURT:  The objection is sustained.
 9              MR. KELLY:  We would next offer an excerpt of a U.S.
09:49 10     Attorney filing in this case at docket 1104 dated 4/24/20 under
11     the Kattar case, Exhibit 1563, as an admission of a party.
12              MR. FRANK:  Objection for the reasons previously
13     stated.
14              THE COURT:  And the objection is sustained.
15              MR. KELLY:  Next, your Honor, we would offer a text
16     chat between two USC Admission Officers regarding Sabrina
17     Abdelaziz dated 3/27/18, Exhibit 1288.
18              MR. FRANK:  Objection.  Hearsay.
19              THE COURT:  The objection is sustained.
09:49 20              MR. KELLY:  Finally, your Honor, we would offer a
21     document dated 1/26/15 regarding Pat Haden.  It's Exhibit 1085.
22              MR. FRANK:  Objection.  Hearsay.
23              THE COURT:  The objection's sustained.
24              MR. KELLY:  And with respect to those last five
25     documents, your Honor, we will mark them for identification at
```

1    the appropriate time at a break.

2              THE COURT:  Yes.  Thank you.

3              MR. KELLY:  Nothing further, your Honor.

4              MR. FRANK:  Just to clarify the record, your Honor, I

5    thought Mr. Kelly would be offering Exhibit 714 that the

6    parties had agreed would come into evidence, but --

7              MR. KELLY:  Be glad to.  Be glad to.  In fact, I'll do

8    that right now.  Let's offer 714.  We offer 714 and direct

9    Mr. Carter's attention to October 2nd.  Let's have that

09:50 10    highlighted, please.  October 2nd, "loud and abrasive". Keep

11    going, please.  The whole first paragraph, please.  Highlight

12    that and then the next paragraph.  I'm going to read it.

13              "Loud and abrasive call with agents.  They continue to

14    ask me to tell a fib and not restate what I told my clients as

15    to where their money was going -- to the program not the coach

16    and that it was a donation and they want it to be a payment.

17              "I asked for a script if they want me to ask questions

18    and retrieve responses that are not accurate to the way I

19    should be asking the questions.  Essentially, they are asking

09:51 20    me to bend the truth, which is what they asked me not to do

21    when working with the agents and Eric Rosen".

22              And then, please, Mr. Carter, can you scroll down and

23    at the very end here.  Let's show the first part.  "Spoke to

24    Donna Heinel".  I just want that yellowed, that part there,

25    "spoke to Donna Heinel".  And then go at the very end, "as

```
 1   requested".
 2           "As requested by agents asked her to put detail on her
 3   20K invoices being sent to the foundation".
 4           Then, if you'll -- way back up again to the top, who
 5   is it?  Way up to the top.  Who is he sending -- who is it from
 6   and who is it to?
 7           Nothing further, your Honor.
 8           THE COURT:  714 will be admitted.
 9           (Exhibit 714 admitted into evidence.)
10           THE COURT:  Mr. Kendall?
11           MR. KENDALL:  Yes, your Honor.  We call Andrew Mericle
12   to testify.  Thank you.
13           (Andrew Mericle, sworn.)
14           THE CLERK:  Thank you.  You may be seated.  Would you
15   please state your name for the record, spelling your last.
16           THE WITNESS:  Andrew Mericle, M-e-r-i-c-l-e.
17           DIRECT EXAMINATION OF ANDREW MERICLE
18   BY MR. KENDALL:
19   Q.   Good morning, Mr. Mericle.  I'm Mike Kendall.  We've met
20   before, correct?
21   A.   Yes.
22   Q.   Okay.  How old are you?
23   A.   25.
24   Q.   Where do you currently live?
25   A.   Dallas, Texas.
```

09:52 (line 10)
09:53 (line 20)

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Q.   Where do you work?                                    |
|       | 2  | A.   Mr. Cooper.                                           |
|       | 3  | THE COURT:  Mr. Mericle, could you pull that              |
|       | 4  | microphone closer to you, so that we can hear?  Thank you. |
|       | 5  | THE WITNESS:  Definitely.  Sorry about that.              |
|       | 6  | Q.   And what do you do at this place you refer to as     |
|       | 7  | "Mr. Cooper"?                                              |
|       | 8  | A.   I work in operations between sales and marketing, so tech |
|       | 9  | systems.                                                   |
| 09:53 | 10 | Q.   Where did you go to college?                         |
|       | 11 | A.   University of Southern California.                    |
|       | 12 | Q.   When did you graduate?                               |
|       | 13 | A.   2018.                                                 |
|       | 14 | Q.   Did you play water polo?                             |
|       | 15 | A.   I did.                                                |
|       | 16 | Q.   Okay.  Who was your roommate at USC?                |
|       | 17 | A.   Johnny Wilson.                                        |
|       | 18 | Q.   Okay.  How did you end up on the USC water polo team? |
|       | 19 | A.   I went through a recruitment process, as I did with a |
| 09:54 | 20 | couple other schools.  I played water polo since I was a young |
|       | 21 | kid.                                                       |
|       | 22 | Q.   Okay. Did you get a scholarship?                     |
|       | 23 | A.   One percent.                                          |
|       | 24 | Q.   One percent.  What is a one percent scholarship?    |
|       | 25 | A.   It's like they pay for your books.  So it's like 600 |

```
 1    bucks.
 2    Q.    Were you the first member of your family to go to USC?
 3    A.    No.  My father went there in the early 90s and my cousin
 4    went there and actually played on the water polo team, too.
 5    Q.    Okay.  When did your cousin play on the water polo team?
 6    A.    The late 90s.  He won a national championship with them in
 7    1998.
 8    Q.    Did he play with Coach Vavic?
 9    A.    Yes.
10    Q.    Okay.  Did your cousin stay the whole four years?
11    A.    No, he did not.
12    Q.    Why did he not play the whole four years?
13    A.    There's a lot of reasons, but eventually, you get burn out
14    of playing USC water polo.  Many people leave the team because
15    they don't either want to deal with the coach or the pressure
16    and they want to focus on --
17              MR. FRANK:  Objection.
18              THE COURT:  Sustained.
19    Q.    When did you first meet Johnny Wilson?
20    A.    First day of class, so middle of August.
21    Q.    Were you roommates freshman year?
22    A.    Yes.
23    Q.    Was it -- tell us what was the rooming situation where you
24    and Johnny were roommates.
25    A.    We lived in a suite in an athlete dorm.  So there was a
```

```
 1    main room and then four other rooms where two guys would live
 2    in each, so Johnny and I were in the same room.
 3    Q.   And the -- so there's four rooms with two people in each
 4    room?
 5    A.   That's right.
 6    Q.   So there's beds for eight?
 7    A.   That's right.
 8    Q.   And then there's a common room?
 9    A.   Yes.
10    Q.   Okay.  In each of those rooms of two, how many people were
11    assigned to the eight beds in those four rooms?
12    A.   Eight total.  The room was full.
13    Q.   Okay.  And were they all water polo players?
14    A.   Yes.
15    Q.   Okay.  So this was a place for all members of -- this was
16    a place for members of the water polo team, this suite?
17    A.   That's right.
18    Q.   How did that come about?
19    A.   We just were assigned by the coaching staff, but it was at
20    random.  You didn't get a choice on who you were rooming with.
21    Q.   Okay.  So it was just by chance you were assigned to be
22    Johnny's roommate in the water polo suite?
23    A.   That's right.
24    Q.   Okay.  Of the eight people in that suite, were they
25    redshirts, were they scholarship -- you know, more than
```

09:55 at line 10; 09:56 at line 20

```
 1   one percent scholarships?  How would you describe the group?
 2   A.   So there was two water polo suites.  The suite that I was
 3   in was like a redshirt suite.  No one played in matches and the
 4   one below was others.
 5   Q.   Okay.  Do you remember what was the date that you moved
 6   in?
 7   A.   It was like the 19th or the 20th of August.
 8   Q.   Okay.  And did you start with practice right away?
 9   A.   Yeah, we did.  There was no way Vavic was not going to
10   have us in the pool.
11   Q.   Okay.  What was the name of the dorm you lived in?
12   A.   Fluor Tower.
13   Q.   And how do you spell that?
14   A.   F-l-u-o-r.
15   Q.   What was the typical practice starting off in August, mid
16   August, August 19th, whatever, with the water polo team,
17   particularly for the freshmen redshirt?
18   A.   Sure.  So a typical practice was morning practice, so
19   sometime before 7:00 for a couple hours of swimming,
20   conditioning, just stuff to keep you in shape.  And then we
21   would go to class, and then around 3 o'clock we would go to the
22   weight room, be there for an hour.  And then from 4:00 to 7:00
23   4:00 to 8 o'clock, we were in the pool doing water polo
24   activity, so less swimming, more skills stuff.
25   Q.   Okay.  When you first started to go to practice that
```

09:56 appears before line 10
09:57 appears before line 20

1 August 19th/20th time frame, what did Johnny Wilson do?

2 A. He went to practice with the rest of us.

3 Q. And what did he do at practice?

4 A. Same thing that we all did.

5 Q. Did you -- and when did the water polo season run?

6 A. It runs the same as football season, so August to

7 December.

8 Q. And you practiced what days of the week?

9 A. We would practice every day with the exception of Sunday

09:58 10 and days that we had matches, unless there was some other

11 reason not to be practicing.

12 Q. How many hours a week would it take?

13 A. Well over 20, if you include matches as well.

14 Q. Okay.  How would you characterize the schedule?  How

15 demanding was it?  How tough was it?

16 A. Rigorous.  When you play at a place like USC, you know,

17 six time defending national champion, it was like a full-time

18 job and then you're going to class, too, at the same time.  So

19 everything was very structured and demanding.

09:58 20 Q. Did Coach Vavic allow teammates or team members to have

21 any activities outside of water polo?

22 A. No.  And if he found out that you had them, that was a big

23 problem.

24 Q. What happened if you joined a fraternity?

25 A. The punishment was you would swim one hundred 100s every

```
 1    day until you quit either the team or you quit the fraternity.
 2    Q.    And how was it decided who would be a redshirt?
 3              MR. FRANK:  Objection.  Foundation.
 4              THE COURT:  Sustained.
 5    Q.    Were you a redshirt?
 6    A.    Yes.
 7    Q.    Okay.  How was it decided for you to be a redshirt?
 8    A.    It's not like there's a total decision unless you're a
 9    fringe person.  They just select who is going to be the match
10    player.  And then if you're not competing, then you maintain
11    eligibility, so you're a redshirt.
12    Q.    Okay.  And does the coach decide, or does the student
13    decide?
14    A.    The coach decides.
15    Q.    Okay.  And was that true, to your knowledge, for all 12 or
16    13 redshirt your year?
17    A.    Yes.
18    Q.    What's the benefit of being a redshirt?
19    A.    You get to train with the full squad, follow the guys on
20    the starting team without losing that year of eligibility, so
21    you can continue to play for the full four years even though
22    you're already on the team.
23    Q.    You play for full four years after your redshirt year; is
24    that correct?
25    A.    That's right.
```

|     |                                                                    |
|-----|--------------------------------------------------------------------|
| 1   | Q.   And what benefits do you get from being a redshirt?            |
| 2   | A.   The same.  You get to train.  You're a part of the system.    |
| 3   | You learn the offense, the defense, all that sort of stuff,        |
| 4   | without having the pressure you're competing and, like I said,     |
| 5   | without losing that eligibility.                                   |
| 6   | Q.   And you have a year to develop physically?                     |
| 7   | A.   Exactly.                                                       |
| 8   | Q.   Okay.  Do redshirts get in the pool when they're on the       |
| 9   | team?                                                               |
| 10  | A.   Yes.                                                           |
| 11  | Q.   How do they get in the pool?  What do you do?  What do you     |
| 12  | do in the pool as a redshirt?                                      |
| 13  | A.   The same as everybody else.  We swim.  We practice.  We       |
| 14  | develop skills.  It's a normal practice.  You're just divided      |
| 15  | up by, you know, what level you are basically.                     |
| 16  | Q.   And I take it you don't go to any of the games?               |
| 17  | A.   We're at home competitions.                                   |
| 18  | Q.   Excuse me.  You don't go in the pool at the games?            |
| 19  | A.   Oh, no.  No.                                                   |
| 20  | Q.   Okay.  Is it fair to say that a redshirt can have one         |
| 21  | second in a game?                                                  |
| 22  | A.   No.  You cannot be a redshirt and compete in a match.         |
| 23  | Q.   Okay.  How many redshirts were there on the team your         |
| 24  | year?                                                              |
| 25  | A.   About a dozen.                                                |

(Line 10 marked 10:00; line 20 marked 10:01)

```
 1    Q.    Is that typical for the team?

 2              MR. FRANK:  Objection.  Foundation.

 3              THE COURT:  Sustained.

 4    Q.    Are you aware of what the rosters looked like either

 5    before or after that year?

 6    A.    I haven't looked at them, but I do recall when we were on

 7    the team, the redshirts would talk about how many of us there

 8    were.  I mean, there was 30 --

 9              MR. FRANK:  Objection.  Hearsay.

10              THE COURT:  Sustained.

11    Q.    Now, in August, you and Johnny, you were living in the

12    same room?  Is that what you told us?

13    A.    Yes.

14    Q.    There's two beds in a small room off this living room?

15    A.    Yes.

16    Q.    Okay.  And would you go to practice together?

17    A.    Yes, we would.

18    Q.    Okay.  Did you see Johnny in the water in August?

19    A.    I did.

20    Q.    Okay.  What did you observe about him at practice?

21    A.    Nothing out of the ordinary.  He was like the rest of us.

22    Q.    Okay.  Did you observe -- was there anything he was

23    particularly good at, or particularly weaker at?  What were his

24    strengths, what were his weaknesses that you observed in

25    practice?
```

```
 1   A.   His strengths were his swimming and his shot.  I'd say his

 2   weaknesses were his defenses, shot blocking, things like that.

 3   Q.   Okay.  When you say his strengths were his swimming and

 4   his shot, what do you mean by that?

 5   A.   He was a fast swimmer, faster than me, and he had a hard

 6   shot.

 7   Q.   How could you tell who was a fast swimmer in the

 8   redshirts?

 9   A.   We basically were set up in lanes.  So if you were

10   swimming slow and somebody would be touching your feet, or if

11   someone was swimming faster than you, then they'd be

12   overlapping you.  So you would get a sense of who was fast, who

13   wasn't, who was about in the middle.

14   Q.   Okay.  And what was your observation about Johnny's speed

15   as a swimmer among the redshirts?

16   A.   Honestly, he was above average at swimming.

17   Q.   In terms of speed?

18   A.   Yes.

19   Q.   Okay.  How would he compare to the non-redshirts on the

20   team?

21        MR. FRANK:  I'm going to object to this.

22   Q.   Did you observe how his speed compared to the

23   non-redshirts on the team?

24   A.   Yes.

25   Q.   What did you observe?
```

|       |                                                                          |
|-------|--------------------------------------------------------------------------|
| 1     | A.    He was fast.  He kept up with some of the guys who had             |
| 2     | been on the team longer than freshmen.                                   |
| 3     | Q.    Okay.  In terms of his shot, what did you observe about            |
| 4     | his shot?                                                                |
| 5     | A.    He had a hard shot.                                                |
| 6     | Q.    And how do you know that?                                          |
| 7     | A.    I would occasionally be in the goal because we didn't have         |
| 8     | enough goalies on the team.                                              |
| 9     | Q.    Okay.  Fair to say you were college roommates for several          |

10:03 10    years?

11    A.    Yes.

12    Q.    You're friends?

13    A.    Yes.

14    Q.    You're friendly with the Wilson family?

15    A.    I am.

16    Q.    Would that cause you to exaggerate anything you're saying

17    to this jury today?

18    A.    No.

19    Q.    Okay.  So -- and what's it like to be in practice that

10:04 20    first week or two in August?  Can you tell us what you were

21    thinking, what you were observing, what caused you to observe

22    how different people were performing?

23    A.    Sure.  So as a freshman on that team, I mean, it's a scary

24    thing.  And you realize I'm competing with guys who have been

25    here for years.  I'm competing with the best of the best.  This

```
 1    isn't high school water polo anymore.  So there's an element of
 2    I'm trying to survive and compete and do my best and manage
 3    being away from all that sort of stuff.
 4    Q.   Okay.  Were you, at times, insecure about your skills?
 5    A.   Absolutely.
 6    Q.   Okay.  Did other team members express the same concerns?
 7         MR. FRANK:  Objection.  Hearsay.
 8         THE COURT:  Sustained.
 9    Q.   What kind of condition -- what did you observe about
10:05 10   Johnny's conditioning when he showed up for water polo in mid
11    August?
12         MR. FRANK:  Objection.  He's not testifying as as an
13    expert, your Honor.
14         THE COURT:  He can answer the question.  Yes.
15    Overruled.
16    A.   He was in normal water polo shape.
17    Q.   Okay.  Do you know from your -- in high school, were you
18    also on the swim team?
19    A.   I was.
10:05 20   Q.   Okay.  Do you know from your high school years what would
21    count as fast times for high school swimmers in standard
22    events?
23    A.   A 24 or 25 would be varsity.  If you were fast, you were
24    swimming a 22.
25    Q.   Talking about 50-yard freestyle?
```

A.    Yes.

Q.    Okay.  So go over that again with me.  What would be a

fast time in high school for a 50-yard freestyle?

A.    If you were swimming 50-yard freestyle and you swim 24 or

25, then you would be above average, but if you were swimming

22 or 23, then that's fast.

Q.    Okay.  And how would that be fast in terms of water polo?

A.    That would be -- water polo players aren't the same as

swimmers.

MR. FRANK:  I object on foundation grounds.

THE COURT:  Sustained.

Q.    You were both on a water polo team and a high school swimm

team?

A.    Yes.

Q.    Okay.  So from your experience and observation, would

water polo players be as fast as swimmers in general in terms

of a 50-yard freestyle?

A.    No.

Q.    Okay.  What would something like about a mid-22 be for a

high school sophomore?

MR. FRANK:  Objection, your Honor.

THE COURT:  Sustained.

Q.    In your observations, what would a 22 second be considered

for a high school water polo player?  Would that be fast,

exceptional?

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  The objection's sustained.

 3   Q.   Okay.  When you were a sophomore in high school, could you

 4   swim the 50 in 22 seconds?

 5   A.   No.

 6   Q.   Okay.  Did you know many people who could swim, water polo

 7   players, who could swim 50 yards in 22 seconds as high school

 8   sophomores?

 9   A.   No.

10   Q.   Okay.  Is speed, in your experience, important to

11   recruiting in water polo?

12              MR. FRANK:  Objection.  Foundation.

13              THE COURT:  Sustained.

14   Q.   How many different schools did you talk with with respect

15   to water polo recruiting?

16   A.   Three or four.

17   Q.   Okay.  In your experience, was speed an important factor?

18   A.   Yes.

19   Q.   Okay.  And why is that?

20   A.   As with any college level, professional level, the speed

21   of the game goes up.  So being fast and being in good shape and

22   having good conditioning are important.

23   Q.   Okay.  Is there a physical limit to how fast people can

24   get?

25              MR. FRANK:  Objection.  Foundation.
```

10:07 is marked at lines 10 and 20.

```
 1              THE COURT:  Sustained.
 2   Q.   Okay.  From what you observed by watching him swim during
 3   August, did you think Johnny had speed that made him an asset
 4   to the team?
 5   A.   Yes.
 6   Q.   I take it you got certain honors and awards when you were
 7   in high school water polo?
 8   A.   I did.
 9   Q.   Okay.  In your understanding, what does it mean to be
10   something like All Peninsula Athletic League?
11              MR. FRANK:  Objection.
12              THE COURT:  Sustained.
13   Q.   Okay.  Were you invited to participate in the United
14   States Olympic Development Program?
15   A.   No, I was not.
16   Q.   Do you understand what criteria it takes to be invited to
17   participate?
18   A.   You are under development to compete for the Olympic team
19   potentially.
20   Q.   Do you understand what it means to be a starter on a team
21   in the National Junior Olympics?
22   A.   Yes.
23   Q.   Were you a starter on the team in the National Junior
24   Olympics?
25   A.   I was.
```

**A3233**

```
 1    Q.   Okay.  What does it mean to you?  What is your
 2    understanding of what it means?
 3    A.   It means that you're competing at a high level if you're
 4    part of a Southern California or Northern California club.  If
 5    you're at the Junior Olympics, that's the biggest event of the
 6    year.
 7    Q.   Okay.  And people with those credentials -- strike that.
 8    The redshirts on the team that you were teammates with, did
 9    they have those type of credentials?
10    A.   Yes.
11    Q.   Now, from what you were able to observe from the time that
12    Johnny was going to practices in August, was he able to keep up
13    with the other players during the conditioning work?
14    A.   Yes.
15    Q.   Did -- was there anything noticeable about him falling
16    behind other teammates in any way?
17    A.   No.
18    Q.   Roughly, how many players were on the water polo team that
19    year?
20    A.   Around 35.
21    Q.   How many traveled to games officially as part of the team
22    going to games?
23    A.   14, and then you could have two goalies, so 16.
24    Q.   Okay.  What did the rest of the 20 or so members of the
25    team do?
```

```
 1   A.   The expectation was that we were at competitions --

 2              MR. FRANK:  Objection to the expectation.

 3              THE COURT:  Sustained.

 4   Q.   What was the actual occurrence?  What -- did the rest of

 5   the team members go to the games or not?

 6   A.   We were all there, regardless of if we were competing.

 7   Q.   Did the school provide you transportation and housing?

 8   A.   No, they did not.

 9   Q.   And so you guys had to go on your own?

10   A.   Yes.

11   Q.   But everybody went?

12   A.   Yes.

13   Q.   Okay.  How many players are in the water at any one time

14   in a game?

15   A.   You can have six field players and one goalie.

16   Q.   Did Johnny go to the games that would go on during the

17   year when the redshirts would have to drive themselves?

18   A.   Yes, he did.

19   Q.   Okay.  Did he go to more than one?

20   A.   Yes, he did.

21   Q.   How many do you remember him going to?

22   A.   I don't have a number, but he was at the competitions like

23   the rest of us.

24   Q.   Okay.  Why was the team so big, 36, 38 people, if they

25   only had 14 or so playing?
```

```
 1              MR. FRANK:  Objection.

 2              THE COURT:  Sustained.

 3    Q.   What is the benefit of a team being -- having so many

 4    members?

 5              MR. FRANK:  Objection.

 6              THE COURT:  Sustained.

 7    Q.   What would the other members of the team do who did not go

 8    to play in games?

 9    A.   If we weren't playing in the games, then we were at the

10    facility.  We were filming the varsity team playing.  Those who

11    were in the water, we were taking stats on who was passing to

12    who, who was scoring, plays that were being run, things like

13    that.

14    Q.   Okay.  At a certain time, did you come back to your dorm

15    room and notice something about Johnny?

16    A.   Yeah.  At the end of August, I came back from class or

17    practice and noticed that he was laying in a dark room.

18    Q.   And was this during day or in evening?

19    A.   It was both.

20    Q.   Okay.  And the dark room being your bedroom?

21    A.   That's right.

22    Q.   Okay.  And so for how long -- was it more than one day he

23    was just sitting in a dark room?

24    A.   Yes.

25    Q.   And this was at daytime and nighttime?
```

|    |    |
|----|----|
| 1 | A. Yes. |
| 2 | Q. Was he going to school? |
| 3 | A. No. |
| 4 | Q. Was he going to class? |
| 5 | A. No. |
| 6 | Q. Was he going to practice? |
| 7 | A. No. |
| 8 | Q. Okay. At some point did you learn what happened to him? |
| 9 | A. Yes. |
| 10:12 10 | Q. What happened to him? |
| 11 | A. I learned that he had had a concussion. |
| 12 | Q. Okay. And so do you remember how many days he was sitting |
| 13 | in the dark room day and night? |
| 14 | A. I don't remember the exact number of days, but it was a |
| 15 | couple of weeks it seemed. |
| 16 | Q. Couple of weeks he didn't go to class? |
| 17 | A. Right. |
| 18 | Q. When did he leave the room? |
| 19 | A. The only time I ever saw him leave was to go get food, |
| 10:13 20 | otherwise he was always there. |
| 21 | Q. Was he doing the computer or watching TV or goofing off? |
| 22 | A. No. |
| 23 | Q. Okay. He was just lying in a dark room? |
| 24 | A. Yes. |
| 25 | Q. Okay. What did the water polo team do for athletes who |

```
  1    were injured?  What was their role if they were injured and
  2    couldn't be in the pool actually training?
  3    A.   We were on the pool deck.  We were setting up clocks,
  4    passing out balls, weight belts, basically facilitating
  5    practice.
  6    Q.   At some point were you injured during that season?
  7    A.   Yeah.  I got sick and I was out for a period of time.
  8    Q.   And what was your problem?
  9    A.   I had strep throat.
10:13 10  Q.   And how long were you out there?
 11    A.   A few weeks.
 12    Q.   Okay.  Did there come a point in time where Johnny stopped
 13    staying in the dark room by himself and actually was going back
 14    to classes?
 15    A.   Yes.
 16    Q.   Okay.  What did he do with respect to water polo?
 17    A.   He would do the normal things that somebody who was
 18    injured would do, so all that stuff I described.
 19    Q.   How frequently was he coming to practice after he was out
10:14 20  of the dark room?
 21    A.   Every day.
 22    Q.   He was there every day?
 23    A.   Yes.
 24    Q.   Okay.  And were there other injured people doing these
 25    types of activities?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Is it basically to say they were up on the pool
 3   deck?
 4   A.   Yes.
 5   Q.   They're not in the water?  They're sort of in the area
 6   around the water?
 7   A.   That's correct.
 8   Q.   Okay.  And did you participate in some of these activities
 9   when you had strep?
10:14 10   A.   I did.
11   Q.   Did you do them with Johnny?
12   A.   Yes.
13   Q.   Were there other teammates there, as well?
14   A.   Yes.
15   Q.   Okay.  Tell us some of the tasks you did on the pool deck
16   that you saw Johnny doing, as well.
17   A.   So we would pull tarps at the end of practice.  We would
18   set up the clocks or run the scoreboard when they were
19   scrimmaging, pass out weight belts, pass out balls, things like
10:14 20   that.
21   Q.   Okay.  How many injured players would there be typically
22   during the season, the range, two, three, five, six?  What
23   would be the range of people who would be injured at any one
24   time?
25   A.   There was never normally a time where everyone was in the
```

```
 1    pool.  I'd say usually there was two to four people who were
 2    out of the pool doing those tasks.
 3    Q.   Okay.  And is it your -- and I take it you and Johnny
 4    lived together.  Did you walk to and from practice together?
 5    A.   Yes.  We all walked from our doom to practice together.
 6    Q.   Okay.  So you observed him on pretty much a daily basis
 7    going to practice after he was out of the dark room?
 8    A.   I did.
 9    Q.   Okay.  Did Casey Moon have any interaction with you and
10:15 10   Johnny when Johnny was in this injured status on the deck?
11    A.   Yes.  He would be the one that generally would assign out
12    what we needed to be doing.
13    Q.   Are there particular events involving Casey that you
14    remember with him having interaction with Johnny at this
15    injured time?
16    A.   Yes.
17    Q.   What do you remember?
18    A.   He would tell Johnny and I, or whoever was injured to, you
19    know, go out, set up the clocks, run the scoreboard.  Hey, you
10:16 20   guys do this, basically.  So Johnny and I were sitting there
21    and kind of just watching practice.  Then he would have us do
22    something.
23    Q.   Do you remember a particular incident involving a Mexican
24    restaurant?
25    A.   I do.  There was a place that water polo players always
```

```
 1   went.  It was like the go-to Mexican in LA and we had been
 2   planning on going there after practice, and I was sick at the
 3   time.  He was injured, so that's when we really started
 4   talking.  And basically, the rest of the team was already
 5   showering up, other redshirts were already leaving the pool
 6   deck.  And we were still there being told by Casey, hey, you
 7   guys do this.  So we were kind of singled out.
 8             And we went to the restaurant afterwards and were
 9   kind of like, you know, this isn't right.  We're doing all this
10   work and everyone else is leaving the pool.  The other
11   redshirts at least should be here with us helping, so it felt
12   like Casey kind of singled us out.
13   Q.   Okay.  For those who were -- did any freshman play in
14   games your season?
15   A.   Yes.
16   Q.   How many?
17   A.   I don't know the exact number, but I know some of the
18   names.
19   Q.   None of the redshirts, I take it, played, correct?
20   A.   No.
21   Q.   So a few non-redshirts played?
22   A.   Right.
23   Q.   Typically, for those playing in games, what grades were
24   they in?  What years were they?
25   A.   Usually a junior or a senior.  There was some sophmores, a
```

```
 1    few freshman.

 2    Q.   Okay.  And juniors and seniors, those would include people

 3    who had been redshirted, so they were actually a year extra?

 4    A.   Yes.

 5    Q.   Okay.  Who was Marko Pintaric?

 6    A.   He was the assistant head coach.

 7    Q.   Okay.  And he was helping to run the team as well?

 8    A.   That's right.

 9    Q.   Okay.  I want to just show you a couple of exhibits while

10:18 10    we're going through this.

11              MR. KENDALL:  If we could show the witness only

12    Exhibit 9911.

13    Q.   Do you recognize it?

14    A.   Yes.

15    Q.   Is this a form document?

16    A.   Yes.

17    Q.   Okay.  Did you receive a copy of it?

18    A.   Yes.

19    Q.   On the same day that's indicated on 9911?

10:18 20    A.   Yes.

21              MR. KENDALL:  Your Honor, I offer Exhibit 9911,

22    please.

23              MR. FRANK:  Objection.  Hearsay.  This is not

24    addressed to this witness.

25              MR. KENDALL:  Your Honor, it's not offered for the
```

```
 1   truth of the matter asserted, just to show that it was sent.

 2             MR. FRANK:  Objection.  Hearsay, your Honor.

 3             THE COURT:  Sustained.

 4             MR. KENDALL:  Okay.  Do you --

 5             Your Honor, if we can just show the witness again,

 6   only the witness, the 9911, please.

 7   Q.   Do you know what Johnny Wilson's e-mail address was?

 8   A.   Yes.

 9   Q.   Do you recognize it on this document?

10   A.   I do.

11   Q.   Is that his school e-mail address?

12   A.   It is.

13             MR. KENDALL:  Your Honor, I'd reoffer it.

14             MR. FRANK:  Same objection.

15             THE COURT:  Sustained.

16             MR. KENDALL:  Okay.  For the record, your Honor, we're

17   not offering it for the truth of the matter asserted, just that

18   it was sent to him.

19   Q.   Next, I'd like to show the witness Exhibit 8005.  I

20   believe this is already in evidence, so we can show the jury,

21   please.

22             Do you recognize this e-mail from Marko Pintaric?

23   A.   I do.

24   Q.   And who are the group of people that got this e-mail?

25   A.   Those are all the redshirts, people not competing.
```

```
 1    Q.   Do you recognize the names?

 2    A.   I do.

 3    Q.   And these were your teammates?

 4    A.   Yes.

 5    Q.   Okay.  It also says to Casey Moon and Stefan Luedecke.

 6    Who is Stefan Luedecke?

 7    A.   Stefan is another assistant coach.

 8    Q.   Okay.  And then it says "SoCal schedule".  "Hi all,

 9    attached is SoCal schedule with scouting responsibilities".

10    What was SoCal and what is scouting responsibilities?

11    A.   SoCal was a tournament that happened every year that our

12    team would compete in.  And the scouting responsibilities were

13    the filming of the game, the responsibilities that we had to be

14    at the pool watching our games and taking those stats and

15    filming it.

16    Q.   Okay.  And if I notice in the two lists there, it says to

17    John B. Wilson, do you see that?

18    A.   Yes.

19    Q.   Okay.  Is your name in there, as well?

20    A.   It is.

21    Q.   A. Mericle about three lines above Wilson?

22    A.   Yes.

23    Q.   And you recognize the others as your teammates, correct?

24    A.   I do.

25    Q.   Who organized the filming for the scouting at this event?
```

```
 1  A.    I did.

 2  Q.    How did you get that responsibility?

 3  A.    Marko selected me, and so I would manage it for him

 4  basically.

 5  Q.    And you'd do this at more than one game, or more than one

 6  tournament?

 7  A.    Yes.

 8  Q.    Okay.  It became sort of your seasonal responsibility?

 9  A.    Exactly.

10:21 10        MR. KENDALL:  Okay.  If we can turn next to

11  Exhibit 8007, please.

12  Q.    Is this the schedule?

13  A.    Yes.  This is the schedule for the tournament.

14  Q.    Okay.  And what would you do with the schedule?

15  A.    We were supposed to have it filled out.  So we would write

16  the names and who was scheduled to be where and what they would

17  be doing.

18  Q.    Would you make the assignments?

19  A.    I would.

10:21 20  Q.    I mean, Marko Pintaric gave it to you to organize and then

21  you'd hand out who would do which game?

22  A.    Yes.

23  Q.    Okay.  Did Johnny participate in doing these tasks?

24  A.    He did.

25  Q.    Okay.  And what did you assign him to do?
```

```
 1   A.   He would either film, or he would be working that
 2   iPod/computer and he would do whatever was open and what he
 3   basically signed up for.
 4   Q.   And who else would be doing this?
 5   A.   All the other redshirts.
 6   Q.   This was a redshirt responsibility, fair to say?
 7   A.   That's right.  If you weren't competing, you were expected
 8   to be contributing in this way.
 9   Q.   And did the two of you do this for more than just the
10:22 10   SoCal tournament?
11   A.   Yes.
12   Q.   And you were organizing the other tournaments, as well,
13   for this filming?
14   A.   That's right.
15   Q.   And Johnny was participating at your direction?
16   A.   Yes.
17   Q.   Did Johnny ever refuse to do any of the redshirt tasks
18   that were assigned outside the pool?
19   A.   No.
10:22 20   Q.   Did he participate any less than the other redshirts in
21   the tasks assigned outside of the pool?
22   A.   No.
23   Q.   Okay.  Was Johnny a full fledged member of the team?
24   A.   Yes.
25          MR. KENDALL:  Okay.  I'd like to go to Exhibit 8028,
```

```
 1   please.
 2   Q.   If you could look at the names in green, we can see that
 3   they don't have any Xs.  Do you see that?
 4   A.   Yes.
 5   Q.   Do you recognize them?
 6   A.   I do.
 7   Q.   Do you -- and who are the people in green?
 8   A.   The people in green are those who weren't competing.  They
 9   were redshirts.
10   Q.   And if we can just look at the top to show what the X or
11   absence of an X means.  That list there, are those the games or
12   tournaments that the team was playing in?
13   A.   Yes, they were.
14   Q.   So if you're green with no X, that means you didn't play
15   in it?
16   A.   Right.
17   Q.   So all of the people in that group were not playing in any
18   of these games, all the people in green?
19   A.   Correct.
20        MR. KENDALL:  Okay.  Your Honor, I have a note here.
21   I'm not sure if that's correct or not, but it may be that 8007
22   wasn't actually -- I though it was offered in, but it may not
23   have been offered.  I'd like to offer in 8007, which was
24   just the schedule that was attached to 8005, which is in.  I'd
25   like to make sure both have been offered.  8005 and 8007.
```

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  They'll be admitted, 8007.

 3              MR. KENDALL:  Thank you, your Honor.

 4              (Exhibit 8007 admitted into evidence.)

 5    Q.   What club team did you play for in high school?

 6    A.   I played for SET water polo.

 7    Q.   How is that spelled?

 8    A.   S-E-T.  It stands for Saddleback El Toro.

 9    Q.   Okay.  Was it a good club?

10    A.   Yes.

11    Q.   Did it have a good reputation?

12              MR. FRANK:  Objection.

13              THE COURT:  Sustained.

14    Q.   Did you know about the Stanford Club in Northern

15    California?

16    A.   I did.  We competed against them.

17    Q.   What was your opinion of the Stanford Club?

18              MR. FRANK:  Objection.

19              THE COURT:  Sustained.

20    Q.   Was the Stanford club a well-known tournament, or well

21    known club in high school tournaments?

22              MR. FRANK:  Objection.

23              THE COURT:  Sustained.

24    Q.   What did you know about the Stanford Club?

25    A.   They were a good club.  They were --
```

```
 1            MR. FRANK:  Objection.

 2            THE COURT:  Relevance?

 3            MR. KENDALL:  Your Honor, it goes to the qualification

 4    issue and the qualifications of Johnny that he played for a top

 5    club team.

 6            THE COURT:  Go ahead, but so far the objections are

 7    sustained.

 8    Q.   Okay.  For the redshirts who were on the team, did they

 9    play for club teams?

10:26 10  A.   Yes.

11    Q.   And what -- how were they -- what were the type of clubs

12    that they played for?

13            MR. FRANK:  Objection.  This is all based on hearsay.

14            THE COURT:  Sustained.

15    Q.   You played against the Stanford Club Team, correct?

16    A.   Yes.

17    Q.   Okay.  What did you observe about the Standford Club Team

18    when you played against them?

19    A.   They were a good water polo team.  They were one of our

10:26 20  main rivals, along with a handful of others.  So we always

21    expected a difficult game when we would compete against them.

22            MR. KENDALL:  Okay.  I'd now like to show the witness

23    Exhibit 9845.

24    Q.   Do you recognize this document?

25    A.   Yes.
```

```
 1   Q.   Okay.  And if we could go down a little bit --
 2        MR. KENDALL:  No.  To the top.  I'm sorry, Mr. Carter.
 3   To the top.
 4   Q.   It's from Stefan Luedecke, the assistant coach.  And who
 5   is it addressed to?
 6   A.   This looks like the full team to me.
 7        MR. KENDALL:  Your Honor, I'd like to offer 9845 into
 8   evidence.
 9        MR. FRANK:  Objection.  Hearsay.
10:27 10      THE COURT:  Sustained.
11        MR. KENDALL:  Your Honor, it's not for the truth of
12   the matter asserted.  It's just to show that it was sent.
13        THE COURT:  Sustained.
14        MR. KENDALL:  Okay.  One moment, your Honor.
15   Q.   Did you get this document?
16   A.   Yes.
17   Q.   Okay.  And you read it at the time you got it?
18   A.   Yes.
19        MR. KENDALL:  I'd like to offer again 9845.  He has
10:27 20  personal knowledge.
21        MR. FRANK:  It's still hearsay, your Honor.
22        THE COURT:  Sustained.
23   Q.   Okay.  Was it the practice of the coaching staff to send
24   plays and sort of strategic documents to team members?
25        MR. FRANK:  Objection to what the practice of the
```

**A3250**

```
 1   coaches was.

 2           THE COURT:  Sustained.

 3   Q.   During the season when you played there, did you get any

 4   strategic type materials from the coaching staff?

 5   A.   Yes.

 6   Q.   What type of materials would you get?

 7   A.   We had a playbook that we received.

 8   Q.   Okay.  Did Johnny get the playbook?

 9           MR. FRANK:  Objection.

10           THE COURT:  Sustained.

11   Q.   Did you observe Johnny get the playbook?

12   A.   Yes.

13   Q.   Okay.  Did you observe Johnny with the plays?

14   A.   Do you mean like practicing the plays?

15   Q.   No, have the physical description of the plays in his

16   hand.

17   A.   We all had one.

18   Q.   Okay.  And would you discuss it amongst yourselves?

19   A.   Yes.

20   Q.   Okay.  Was he part of those discussions?

21   A.   Yes.

22   Q.   Okay.  Was there any sort of chalkboard or classroom time

23   where they would go over plays and strategies?

24   A.   We would do that at the beginning of some practices.

25   Q.   Did Johnny attend those sessions?
```

```
 1    A.    Yes.
 2    Q.    Okay.  Based upon what you observed that year, did Johnny
 3    have the skills to develop into a varsity player?
 4            MR. FRANK:  Objection.
 5            THE COURT:  Sustained.
 6    Q.    Okay.  At a certain point did Johnny get back into the
 7    water?
 8    A.    Yes, he did.
 9    Q.    When did you observe him back in the water at a practice
10    with the team?
11    A.    Towards the end of the season.
12    Q.    Sometime in November?
13    A.    Yes.
14    Q.    Okay.  What did you observe him doing in the water?
15    A.    He was doing swimming conditioning, some skill drills, but
16    I don't recall him being in a full scrimmage or anything that
17    was full contact.
18    Q.    Okay.  Is that because of the concussion?
19    A.    Yes.  I would think so.
20            MR. FRANK:  Objection to the last part.  Move to
21    strike.
22            THE COURT:  Sustained.
23    Q.    Okay.  When people have concussions, do they make gradual
24    returns to practice?
25            MR. FRANK:  Objection.
```

```
 1            THE COURT:  Sustained.
 2    Q.   In your experience in water polo, if somebody's had a
 3    concussion, how do they reenter training?
 4            MR. FRANK:  Objection.
 5            THE COURT:  Sustained.
 6    Q.   Describe Johnny's attitude that season.
 7            MR. FRANK:  Objection.
 8            THE COURT:  Sustained.
 9    Q.   Did you observe Johnny's attitude that season?
10:30 10          MR. FRANK:  Objection to "attitude".
11            THE COURT:  Yeah.  Sustained.
12    Q.   Did Johnny ever refuse to do any of the tasks he was
13    assigned as part of the team?
14    A.   No.
15    Q.   Was he a slacker in terms of any responsibilities?
16            MR. FRANK:  Objection.
17            THE COURT:  Sustained.
18    Q.   Did he fulfill all of his responsibilities that you saw
19    assigned to him?
10:30 20          MR. FRANK:  Objection.
21            THE COURT:  He can answer that one.
22    A.   Yes.
23    Q.   Okay.  How would you describe his demeanor when he was at
24    the practices?
25    A.   The same as the rest of us, so waiting for direction from
```

the coach, setting things up.  He was a full member of the

team.

Q.    How demanding was Coach Vavic?

A.    Extremely.

Q.    In what ways?

A.    I would describe him as like the Bill Belichick of water

polo, so you were expected to be, you know, full water polo all

the time.  Water polo was priority number one.  If you were --

he said to me one time, if you were getting As and Bs, then you

were not focused enough on water polo.  You should de getting

Cs and doing better in the pool.

Q.    Did you ever meet Johnny's parents freshman year?

A.    I did.

Q.    Did you ever see them at a game?

A.    I did.

Q.    Who did you see at the game?

A.    I saw Johnny's father at the game.

Q.    Do you see him here in court today?

A.    I do.

Q.    Okay.  Do you want to point him out to us?

A.    He's right here with the light blue tie.

Q.    Was it more than one game you saw him attend?

A.    Yes.

Q.    How many games?  Can you give us an estimate of the number

of games you saw him at?

```
 1    A.    A handful.

 2    Q.    Okay.  And what does a handful mean?

 3    A.    Somewhere in the five range.

 4    Q.    Okay.  Was there any particular thing the team used to

 5    tease Johnny about?

 6    A.    Yes.  I don't remember how we found out about it, but one

 7    time Johnny told us that he had done a swim from Alcatraz to

 8    the shore in San Francisco and he was on Oprah.

 9    Q.    Okay.  And that became a joke?

10:33 10    A.    Oh, yeah.  He was ragged quite a bit for that, not so much

11    the swimming from Alcatraz, because that's impressive, but for

12    being on Oprah as a little kid.

13          MR. KENDALL:  If you could -- I'd like to show the

14    witness Exhibit 9527 for the witness only.

15    Q.    Do you recognize this photo?

16    A.    I don't recognize the photo, but I recognize people in it.

17    Q.    Do you recognize what event it's from?

18    A.    Yes.

19          MR. KENDALL:  Okay.  Your Honor, I'd like --

10:34 20    Q.    Can you tell us what event it's from?

21    A.    It's the national championships.

22    Q.    That year that -- your freshman year?

23    A.    That's right.

24          MR. KENDALL:  Okay.  Your Honor, I'd offer 9825 into

25    evidence.
```

```
 1              MR. FRANK:  No objection.

 2              THE COURT:  It will be admitted.

 3              (Exhibit 9825 admitted into evidence.)

 4              MR. KENDALL:  Okay.  And if could show the jury.

 5    Q.   Could you tell us who do you recognize?

 6    A.   I recognize some of my teammates.  I recognize Johnny

 7    there.

 8    Q.   Okay.  You say you recognize Johnny.  Is he the person in

 9    the gray T-shirt closest to the fence?

10    A.   Yes.  That's right.

11    Q.   Okay.  Is that him circled?

12    A.   Yes.

13    Q.   Who's the person to his right?

14    A.   That's Charlie McBean, another member of the team.

15    Q.   Okay.  And who else do you recognize from the team there?

16    A.   I recognize Chase Cockwell.

17    Q.   Where is he?

18    A.   He's in the row below Johnny, in the gray, to the left

19    side.  Yes.

20    Q.   With the beard?

21    A.   Yes.

22    Q.   That's Chase Cockwell?

23    A.   Chase Cockwell.

24    Q.   Chase Cockwell.

25    A.   And then above him, that's Colby Watson.
```

**A3256**

```
 1   Q.   And were you at this tournament?

 2   A.   I was.

 3   Q.   Okay.  But you're not in this picture?

 4   A.   No.

 5        MR. KENDALL:  Could we have Exhibit 8028, please, for

 6   the witness only.  Excuse me.  We've already gone through that.

 7   Can we go back to 8028, please?

 8   Q.   For the people in the green, if we could just focus on

 9   starting from the top green to the bottom green line.  When did

10   Johnny leave the water polo team?

11   A.   Sometime in January.

12   Q.   When did you leave?

13   A.   Sometime in March.

14   Q.   And why did you leave?

15   A.   To focus on school and to be out of that environment.

16   Q.   Okay.  Did you keep your As and Bs?

17   A.   I did for the most part.  I can't say they were all As and

18   Bs.

19   Q.   For the other freshmen redshirts on that team, how many of

20   them left the team your freshman or sophomore year, that you

21   can recall?

22   A.   You're saying out of the people in green here?

23   Q.   Yes.

24   A.   If I could just go down the list.  Jake Taburchlick left

25   in his first year.  Tyler left in the first semester.  Chase
```

```
 1    Cockwell stayed for at least couple years.  Tim Leong was there
 2    for I believe all four, but more than two years.  I left.
 3    Steve Michaud also left after his first year.  And then
 4    Tristan, Kyle, they remained on the team.  Colby left and
 5    Johnny left.
 6    Q.   Okay.  When did Colby leave, to your memory?
 7    A.   First year.
 8    Q.   After you and Johnny left the team freshman year, did you
 9    remain friends with people who were still on the team?
10:38 10    A.   Yes, we did.
11    Q.   Okay.  Are you still friends today?
12    A.   Johnny and I?
13    Q.   And the other teammates.
14    A.   Yes.
15    Q.   Okay.  Do you currently work for USC?
16    A.   No.
17    Q.   You graduated and you've gone off and left the school,
18    correct?
19    A.   That's correct.
10:38 20    Q.   Did any USC lawyers prepare you to testify today?
21    A.   No.
22    Q.   Does USC have any financial control or influence over your
23    income?
24    A.   No.  They just ask me for donations all the time.
25             MR. KENDALL:  One moment, your Honor.  Okay.  No
```

```
 1    further questions, your Honor.
 2              THE COURT:  Cross-examination, Mr. Frank.
 3              MR. FRANK:  Thank you, your Honor.
 4                  CROSS-EXAMINATION OF ANDREW MERICLE
 5    BY MR. FRANK:
 6    Q.    Good morning, Mr. Mericle.
 7    A.    Good morning.
 8    Q.    You're up from Dallas?
 9    A.    I am.  Got to say that I like the crisp weather here
10    versus the scorching back home.
11    Q.    Mr. Mericle, you were an accomplished water polo player in
12    high school?
13    A.    Yes.
14    Q.    And you played all four years?
15    A.    Yes.  In high school?
16    Q.    Yes.
17    A.    Yes.
18    Q.    And I suspect you worked very, very hard at it?
19    A.    I did.
20    Q.    And getting recruited to USC was a big deal for you,
21    wasn't it?
22    A.    Yes.
23    Q.    And it was a long and arduous process for you, right?
24    A.    Yes.
25    Q.    And I believe you testified on direct examination that you
```

```
 1   went through a recruitment process not just at USC, but at
 2   other schools as well?
 3   A.   Yes.
 4   Q.   Tell us about that process.
 5   A.   So the process for getting recruited in water polo is --
 6   can be one of two things:  The coach might reach out or you
 7   might reach out to the coach, submit a profile of some sort,
 8   and try to get in contact.  So once you have contact with them,
 9   you would either give them some film, or meet with them in
10:40 10 person.  For example, I met with the coach of Loyola Marymount,
11   then talk about your water polo past, basically, and see if
12   you'd be a good fit or contribute to the team in the future.
13   Q.   And so you submitted resumes as part of that process?
14   A.   Yes.
15   Q.   And you e-mailed the coaches?
16   A.   Yes.
17   Q.   And you submitted film as part of that process?
18   A.   Yes.
19   Q.   Okay.  And it was a long process you went through, right?
10:41 20 A.   Yes.
21   Q.   And you did that all personally?
22   A.   Me and my dad would work on stuff.
23   Q.   Okay.  And it took a lot of time, right?
24   A.   Yes.
25   Q.   Okay.  And then Coach Vavic called you to offer you a
```

**A3260**

```
 1    spot?
 2    A.   Yes.  So I met with Coach Vavic at a -- well, he was
 3    watching one of my games in Newport by coincidence.  I heard
 4    that he was interested.  I ran out to the parking lot to talk
 5    to him and met him again in San Diego and talked with him a few
 6    more times and at one point he called and asked me to be on the
 7    team.
 8    Q.   You met him again in San Diego?
 9    A.   Yes.
10    Q.   Where did you meet him in San Diego?
11    A.   I had gone down to a tournament there that I knew USC was
12    competing at in my senior year of high school.
13    Q.   And you searched him out there?
14    A.   Yes.
15    Q.   And he came and he saw you at a match, as well, at a game?
16    A.   He did. It was a Junior Olympic qualifying match.
17    Q.   So he saw you play?
18    A.   Correct.
19    Q.   And after seeing you play and reviewing your resume and
20    going through that process, he called to offer you a spot?
21    A.   That's right.
22    Q.   And he offered you a one percent book scholarship, as
23    well?
24    A.   Right.
25    Q.   And that, you understood, to be recognition of your skill
```

1    and your hard work, correct?

2    A.    Yes.

3    Q.    And you ultimately singed a National Letter of Intent,

4    right?

5    A.    I did.

6    Q.    And that was a big deal as well, correct?

7    A.    Yes.

8    Q.    There was a signing ceremony?

9    A.    There was.

10:42 10    Q.    And other student athletes were there from your school?

11    A.    That's correct.

12    Q.    Signing National Letters of Intent?

13    A.    Yes.

14    Q.    And the local newspaper was there?

15    A.    I believe so.  I don't remember.

16         MR. FRANK:  Can we show the witness only Exhibit 726,

17    please.

18    Q.    Does that refresh your recollection that the local

19    newspaper was there?

10:43 20    A.    Yes, it does.

21    Q.    And, in fact, that's your photo, correct?

22    A.    That is me with some long hair.

23    Q.    And the photo was published in the local newspaper?

24    A.    Yes.

25         MR. FRANK:  And can we show the witness 728, please.

**A3262**

```
 1   Q.   That's you with your high school classmates, all of whom

 2   were recruited?

 3   A.   Right.

 4   Q.   And you were all photographed for the local newspaper?

 5   A.   Yes.

 6   Q.   And it was published in the local newspaper?

 7   A.   Yes.

 8   Q.   So that slipped your mind earlier?

 9   A.   It's been a long time.

10        MR. FRANK:  Yeah.  Government offers 726 and 728.

11        THE COURT:  It will be admitted.

12        (Exhibit 726, 728 admitted into evidence.)

13   Q.   And you didn't offer Coach Vavic any money to recruit you,

14   did you?

15   A.   No.

16   Q.   You didn't make a payment to Coach Vavic --

17        MR. KENDALL:  Objection, your Honor.

18        THE COURT:  Overruled.

19        MR. KENDALL:  Not in the evidence.

20   Q.   You didn't make a payment to Coach Vavic?

21   A.   No.

22   Q.   You didn't make a payment to the water polo team to get

23   recruited, did you?

24   A.   No.

25   Q.   Your parents did not make a payment to Coach Vavic to get
```

**A3263**

```
 1    you recruited?

 2    A.    No.

 3    Q.    Your payments did not make a payment to the water polo

 4    team at USC to get you recruited?

 5    A.    No.

 6    Q.    You didn't offer payments to any other coaches to recruit

 7    you, did you?

 8    A.    No.

 9    Q.    You didn't offer payments to any other teams to recruit

10    you, did you?

11    A.    I did not.

12    Q.    You didn't seek to funnel payments through a charity to

13    any of those teams to recruit you, did you?

14    A.    No.

15    Q.    You didn't seek to offer funnel payments through a charity

16    to any coaches to recruit you, did you?

17    A.    No.

18    Q.    You didn't have a college counselor who made payments on

19    your behalf to get you recruited, did you?

20    A.    No.

21    Q.    You didn't make donations in exchange for getting

22    recruited, did you?

23    A.    I didn't.

24    Q.    And your parents didn't do that either?

25    A.    No.
```

|  |  |
|---|---|
| 1 | Q.   You made a number of submissions to USC and other schools |
| 2 | as part of the recruiting process? |
| 3 | A.   I did. |
| 4 | Q.   You submitted a profile, an athletic profile? |
| 5 | A.   Yes.  First time, yes. |
| 6 | Q.   You didn't lie in those submissions to get recruited, did |
| 7 | you? |
| 8 | A.   No. |
| 9 | Q.   Because you know that lying is wrong? |
| 10 | A.   Yes. |
| 11 | Q.   You've known that since you were a kid, right? |
| 12 | A.   Yes. |
| 13 | Q.   Everybody knows that? |
| 14 | A.   I would assume. |
| 15 | Q.   And in fact, you knew that if you gave false information |
| 16 | to USC as part of your recruitment process, that would be |
| 17 | wrong, correct? |
| 18 | A.   Yes. |
| 19 | Q.   And you could face consequences for that, correct? |
| 20 | A.   Yes. |
| 21 | Q.   And you knew that you couldn't misrepresent yourself or |
| 22 | your abilities to USC, or any other school as part of the |
| 23 | recruitment process, correct? |
| 24 | A.   Yes. |
| 25 | Q.   You were cocaptain of your high school water polo team? |

```
 1    A.    I was.

 2    Q.    And you were also on your high school swim team?

 3    A.    Yes.

 4    Q.    And Mr. Kendall asked you some questions about the 50-yard

 5    freestyle.  What was your time?

 6    A.    I don't recall what my time was for high school water polo

 7    or swim.  I didn't do the final semester, but it was probably

 8    somewhere in the 24, 22, 23, somewhere in that 25 range maybe,

 9    but not as fast as the top guys on my team.

10    Q.    What about in the 100-yard freestyle?

11    A.    I don't know if I ever had a match time because I never

12    swam varsity because I didn't particularly like swimming.

13    Q.    I thought you testified you were on your high school swim

14    team.  You were not the varsity swim team?

15    A.    No.  I was on the high school swim team, but I didn't swim

16    for our varsity squad.

17    Q.    But you know what good times are on the 100-yard

18    freestyle, correct?

19    A.    Sure.  Water polo players and swim aren't the same always,

20    so just because I didn't like swim didn't mean that I wasn't a

21    good swimmer.

22    Q.    And a swim time of 43, 44 seconds in a 100-yard freestyle?

23    A.    I don't know if that's possible.

24    Q.    It's exceptional, right?

25    A.    Yeah.
```

```
 1    Q.   What about 53 seconds?

 2    A.   It's good, really good.

 3    Q.   That's a decent time, right?

 4    A.   For sure.

 5    Q.   But 53 seconds versus 43 seconds or 44 seconds, that's a

 6    massive difference, correct?

 7    A.   Yes.

 8    Q.   For a hundred yards, right?

 9    A.   Uh-hum.

10:48 10   Q.   And you don't even know if 43 or 44 yards is possible,

11    correct?

12    A.   It's not possible for me.

13    Q.   And nothing about Johnny's swimming ability led you to

14    believe he could do 44 seconds, correct?

15    A.   I'm not sure, no.

16    Q.   You didn't see it, right?

17    A.   No.

18         MR. FRANK:  Could we show the witness and the jury

19    Exhibit 88 in evidence.

10:48 20   Q.   If we go to the next page, please, have you seen John

21    Wilson's water polo profile?

22    A.   I have not.

23    Q.   You prepared for your testimony today with Mr. Kendall?

24    A.   Yes.  We've spoken.

25    Q.   How many times have you spoken to Mr. Kendall?
```

|    |    |
|----|----|
| 1  | A.    Mr. Kendall, less than five times. |
| 2  | Q.    Less than five times? |
| 3  | A.    Yeah.  Probably two or three. |
| 4  | Q.    Okay.  Was it two or was it three? |
| 5  | A.    I'm not sure the exact number, but it probably was three. |
| 6  | Q.    Okay.  By phone or in person? |
| 7  | A.    A couple times by phone and then I spoke to him one time |
| 8  | in person. |
| 9  | Q.    How long were each of those sessions? |
| 10:49 10 | A.    The phone sessions were less than an hour.  And the |
| 11 | in-person was a bit over an hour, but less than two.  Probably |
| 12 | about an hour and 20, hour and 30. |
| 13 | Q.    So all told, three or four hours? |
| 14 | A.    Yes. |
| 15 | Q.    And in those three or four hours, he never showed you, |
| 16 | Exhibit 88, Johnny's swim profile? |
| 17 | A.    No, he did not. |
| 18 | Q.    But you see that on the profile, in the bottom right, it |
| 19 | says that his time on the 50-yard freestyle is 20.12, right? |
| 10:49 20 | A.    I do. |
| 21 | Q.    That is exceptional, right? |
| 22 | A.    Yes.  That's fast. |
| 23 | Q.    And the 100-yard freestyle, it lists his time as 43.98, |
| 24 | right? |
| 25 | A.    Yes. |

```
 1    Q.   And you testified you don't even know if that's possible?
 2    A.   It's darn fast.
 3    Q.   Okay.  In your conversations with Johnny and in your
 4    observations with Johnny, did he ever tell you what his actual
 5    times were for the 100-yard freestyle?
 6    A.   No.  Would never discuss that type of stuff.  Guys on the
 7    team wouldn't really ask that stuff.
 8    Q.   Do you recall what his time was in the 100-yard
 9    freestyle?
10    A.   I don't.
11         MR. FRANK:  For the witness only, could we have 8193,
12    please.
13    Q.   And could we go -- you see that this is times from a game
14    involving the Menlo School?
15         MR. KENDALL:  Objection.  It's not in evidence, your
16    Honor.
17         MR. FRANK:  It's for the witness only, your Honor.
18    I'm going to refresh his recollection.
19         MR. KENDALL:  The witness has never seen it.  I don't
20    know how he can refresh his recollection.
21         THE COURT:  He can be refreshed with a banana peel if
22    that refreshes his memory.
23    Q.   And if we can look at page 3, please, of defense
24    Exhibit 8193.  You see that in defense Exhibit 8193 there are
25    times listed for the boys --
```

```
 1              MR. KENDALL:  Objection, your Honor.  He can ask him
 2    to read it.  He shouldn't be reading it to the jury.
 3              THE COURT:  Yeah.  Correct.
 4              MR. FRANK:  Yes, your Honor.  That's correct.
 5    Q.   Can you take a look at the times for the boys 100-meter
 6    freestyle?
 7    A.   Yes.
 8    Q.   You see that time listed there next to Johnny Wilson?
 9              MR. KENDALL:  Objection.  Again, your Honor, he should
10:51 10   not be reading to the jury what's on the document.
11              THE COURT:  He can point out what he wants him to read
12    but not read it himself.
13    Q.   Do you see that time?
14    A.   Yes, I do.
15    Q.   Okay.  And if we can just take a look at the date.
16              MR. KENDALL:  Your Honor, the document is in meters,
17    not yards.  It's apples and oranges and it's misleading.
18              MR. FRANK:  I will address that.
19              THE COURT:  Go ahead.
10:52 20   Q.   You see the date?
21    A.   I do.
22    Q.   Does that refresh your recollection --
23              MR. FRANK:  Can we take that down, please.
24    Q.   Does that refresh your recollection that as of March of
25    2013 Johnny --
```

1    MR. KENDALL:  Objection, your Honor.  He has no

2 recollection of what Johnny did in March of 2013.

3    THE COURT:  He can ask him whether it refreshes his

4 memory and then ask the question.

5 Q.   Does it refresh your recollection that in March of 2013

6 Johnny's time --

7    MR. KENDALL:  Objection.  He never said he had a

8 failure of recollection.  He never said he had something that

9 he forgot.  He has to first get the witness to say he can't

10:52 10 remember before you can start suggesting things like that, your

11 Honor.

12    MR. FRANK:  These rules were not applied when

13 Mr. Kendall was asking cross-examination questions.

14    THE COURT:  Go ahead.

15 Q.   Does that refresh your recollection --

16    MR. KENDALL:  Objection, your Honor.

17    THE COURT:  Overruled.

18 Q.   -- that in March of 2013 Johnny's time in the 100-meter

19 freestyle was north of 59 seconds?

10:53 20 A.   I have not seen that and did not know Johnny at the time,

21 so this is the first time I'm seeing this document.

22 Q.   And Johnny never told you that his time in the 100-meter

23 freestyle at the time that he was applying to USC in 2013 was

24 north of 59 seconds?

25    MR. KENDALL:  Objection, your Honor.

```
 1              THE COURT:  Cross-examination.  Overruled.
 2    A.    I don't remember him telling me that.
 3    Q.    And a time of 59 plus seconds in the 100-meter freestyle
 4    would translate to north of 53 seconds in the 100-yard
 5    freestyle, correct?
 6    A.    I don't know the conversion.
 7    Q.    You don't know the conversion after all your years of
 8    swimming?
 9    A.    No.  Like I said, I don't -- I didn't like swimming, so
10    knowing meters to yards, one was just further than the other.
11    Q.    Yeah.  But a time of -- would you accept my representation
12    that a time of 59 plus seconds in the 100 yard -- meter
13    freestyle translates to north of 53 seconds in the 100 yard
14    freestyle?
15    A.    Yes.
16    Q.    And a time of north of 53 seconds in the 100 yard
17    freestyle is nowhere near the time that we saw on Exhibit 88,
18    Johnny's profile, correct?
19    A.    Yes.  They're different.
20    Q.    Well, they're not just different, right?
21              MR. KENDALL:  Objection.  It's not in evidence.
22              THE COURT:  Overruled.
23    Q.    They're not just different, right, Mr. Mericle?
24    A.    Well, they are different, and one is faster than the
25    other.
```

```
 1   Q.   One is vastly faster than the other, correct?

 2   A.   Yes.

 3   Q.   Apples and oranges you'd say?

 4   A.   I didn't say that.

 5   Q.   Would you?

 6   A.   Yes.  There's a big difference between 44 and 53.

 7   Q.   And you do seem fairly knowledgeable about Johnny and his

 8   swimming abilities.  Did he ever tell you that he was not

 9   cocaptain of his high school water polo team?

10   MR. KENDALL:  Objection, your Honor.

11   THE COURT:  Overruled.

12   MR. KENDALL:  It's hearsay.

13   A.   Not that I remember.

14   Q.   Did you know that he was not cocaptain of his high school

15   water polo?

16   A.   I did not.

17   MR. FRANK:  Could we show the witness only

18   Exhibit 733, please.

19   Q.   You see Exhibit 733, Mr. Mericle?

20   A.   I do.

21   Q.   Okay.  And if we go further down the page --

22   MR. FRANK:  Miss Lewis, if you could move it a little

23   further down.  Could you highlight the last paragraph, please.

24   Q.   Did Johnny ever tell you there was another John Wilson on

25   his high school water polo team?
```

```
 1   A.    No.

 2   Q.    John D. Wilson, who was recruited --

 3              MR. KENDALL:  Objection, your Honor.

 4              THE COURT:  Sustained.

 5   Q.    Could you read Exhibit 733 and then we'll take it down,

 6   the highlighted portion.

 7   A.    "Menlo's boys".

 8              MR. KENDALL:  I object, your Honor,

 9   Q.    Just to yourself --

10:56 10        THE COURT:  Read it to yourself.

11   A.    Oh, yes.

12              MR. FRANK:  We can take that down.

13   Q.    Does that refresh your recollection that --

14              MR. KENDALL:  Objection, your Honor.  He didn't say he

15   had a failure of recollection.  He's trying to put in things

16   the witness doesn't know by claiming it's a -- refreshing a

17   recollection when he doesn't have a recollection that's been

18   exhausted.

19              THE COURT:  Sustained.

10:56 20  Q.    Does that refresh your recollection that Johnny was not a

21   cocaptain of his high school water polo team?

22              MR. KENDALL:  Objection, your Honor.

23              THE COURT:  Overruled.

24   A.    I don't recall Johnny telling me whether or not he was a

25   captain.
```

```
 1    Q.    But you knew Johnny well and were close friends with him,
 2    correct?
 3    A.    Yes.
 4    Q.    And you roomed with him throughout college?
 5    A.    Yes.
 6    Q.    And you were water polo teammates, correct?
 7    A.    Correct.
 8    Q.    And the subject of Johnny's being captain or not being
 9    captain of his high school water polo team never once came up?
10    A.    No.
11    Q.    You just have no idea?
12    A.    When you are -- if you were on the team --
13    Q.    Just yes or no, Mr. Mericle.  Yes or no.  Do you have any
14    idea whether Johnny was cocaptain of his high school water polo
15    team?
16    A.    No.
17    Q.    Because it never came up?
18    A.    Not that I remember.
19    Q.    And he never told you there was another John Wilson, John
20    D. Wilson, who was recruited to play at Hopkins who was
21    cocaptain of Johnny's high school water polo team?
22    A.    Not that I remember.
23    Q.    And did you know that Johnny was not a four-year starter
24    on his high school water polo team?
25    A.    I did not.
```

```
 1   Q.   Mr. Mericle, when you were recruited to USC, you viewed it
 2   as a great opportunity to play on a six-time national
 3   championship team, correct?
 4   A.   Yes.
 5   Q.   And you intended to play on that team, correct?
 6   A.   I did.
 7   Q.   You didn't set out to get recruited and then drop out
 8   after the first semester, correct?
 9   A.   No.
10   Q.   That wasn't your plan?
11   A.   No.
12   Q.   You had worked hard for years toward the goal of getting
13   recruited, correct?
14   A.   That's right.
15   Q.   You looked forward to playing in college, correct?
16   A.   Yes.
17   Q.   You attended practices, correct?
18   A.   Yes.
19   Q.   And they were rigorous, correct?
20   A.   Yes.
21   Q.   And you attended strength training sessions?
22   A.   I did.
23   Q.   And you attended team meetings?
24   A.   Yes.
25   Q.   I believe you testified that it was north of 20 hours per
```

```
 1   week, correct?

 2   A.   Yes.

 3   Q.   In fact, you're aware that the NCAA restricts the time for

 4   games and practices and team meetings to no more than 20 hours

 5   per week?

 6   A.   I am aware.

 7   Q.   You're not contending that Coach Vavic broke the rules,

 8   are you?

 9   A.   We were --

10   Q.   Are you contending that Coach Vavic broke the rules?

11   A.   Yes.  We practiced -- we would be in team meetings on our

12   own going over the playbook.  I'm not saying that he broke the

13   rules.  What I'm saying is that --

14   Q.   So you're not saying he broke the --

15   A.   -- we were on the pool deck --

16   Q.   Mr. Mericle, if you could answer my question.

17        MR. KENDALL:  Let him finish.

18        THE COURT:  Let him finish the question, the answer.

19   A.   We were on the pool deck for more than 20 hours a week.

20   Q.   But not at Coach Vavic's instruction, correct?

21   A.   He didn't directly tell us to be on the pool deck, but I

22   mean, there was an unwritten thing, an unspoken thing.

23   Q.   And despite your one percent book scholarship and the

24   recruitment process you went through, fair to say you were not

25   an immediate impact player on that championship team, right?
```

```
 1    A.    That is fair to say.

 2    Q.    Fair to say Johnny wasn't either?

 3    A.    Yes.

 4    Q.    Fair to say he was not?

 5    A.    Right.

 6    Q.    You lived with Johnny all four years of college?

 7    A.    I lived with him for my first and then my third and

 8    fourth.  And we were still close during our second.

 9    Q.    And you're friends to this day?

10    A.    Yes.

11    Q.    You're here today with an attorney?

12    A.    I am.

13    Q.    Mr. Hoops who is sitting right there?

14    A.    Yes.

15    Q.    And that was arranged for you by Mr. Wilson's counsel?

16    A.    Yes.

17    Q.    And you're not paying for Mr. Hoops, are you?

18    A.    No.

19    Q.    Mr. Wilson is paying for Mr. Hoops?

20    A.    To my knowledge.

21    Q.    Did he pay for you to be here today?

22    A.    Yes.  He took care of the logistics of getting me here.

23    Q.    And he is covering the cost of your legal representation?

24    A.    To my knowledge.

25    Q.    And the Wilsons have been good to you throughout the
```

The timestamps "11:00" appear in the left margin at lines 10 and 20.

```
 1   years?
 2   A.   Yes.  Being friends with Johnny, we would go to dinner
 3   with them on occasion if they were in town or things like that,
 4   so they've always been kind.
 5   Q.   Dinner on occasion when they were in town?
 6   A.   Yes.
 7   Q.   And also family vacations, right?
 8   A.   We did go to visit them when they were living in Europe
 9   for our freshman and second semester of freshman year, and then
11:01 10  the following year we visited them over spring break.
11   Q.   So you went to Europe with the Wilson family on a couple
12   of occasions, correct?
13   A.   Two times, yes.
14   Q.   And they paid your way?
15   A.   Yes.  I paid for my flight.
16   Q.   Okay.  But they paid the rest?
17   A.   Yes.
18   Q.   And, in fact, you mentioned a spring break trip.  That was
19   in 2015?
11:01 20  A.   Yes.
21   Q.   And that wasn't just any spring break trip.  That was a
22   trip to Chamonix?
23   A.   That's correct.
24   Q.   That's C-h-a-m-o-n-i-x?
25   A.   That's right.
```

```
 1   Q.   And that's a ski resort in France?

 2   A.   That's correct.

 3   Q.   And in fact, the Winter Olympics were held there in 1924,

 4   correct?

 5   A.   I think so, yes.

 6   Q.   At Mount Blanc?

 7   A.   Yes.

 8   Q.   And you went skiing in the Alps?

 9   A.   Yes.

11:02 10   Q.   With the Wilson family?

11   A.   Yes.

12   Q.   And that was amazing skiing, correct?

13           MR. KELLY:  Relevance here.

14           THE COURT:  Sustained.

15   Q.   And you considered that one of the top vacations you've

16   ever been on?

17   A.   Yes.

18   Q.   Fabulous meals?

19   A.   Yes.

11:02 20   Q.   All paid for by the Wilsons?

21           MR. KENDALL:  Objection, your Honor.

22           THE COURT:  Sustained.

23           MR. FRANK:  Goes to bias, your Honor.

24           MR. KENDALL:  Your Honor, I'm not objecting to too

25   much of this, but at some point.
```

```
 1              THE COURT:  Yeah.  The objection is sustained.
 2   Q.   And Johnny's sisters reminded you of your own sisters on
 3   that trip, correct?
 4   A.   Yes.
 5   Q.   And you also went to Amsterdam on that same trip?
 6   A.   We did.
 7   Q.   And you went to the Rijksmuseum?
 8   A.   We did.
 9   Q.   Could we show the witness only Exhibit 723, next page.
10              MR. FRANK:  First of all -- actually, I'm sorry,
11   Miss Lewis.  If you can go to the first page.
12   Q.   Do you see that e-mail?
13   A.   Oh.  Yes.
14   Q.   You see who it's from?
15   A.   Yes.
16   Q.   Okay.  If we can go to the next page, you see the
17   photograph?
18   A.   I do.
19              MR. FRANK:  Government offers 723, your Honor.
20              MR. KENDALL:  Objection, your Honor.
21              THE COURT:  Grounds?
22              MR. KENDALL:  Redundancy, irrelevance.
23              THE COURT:  Sustained.
24              MR. FRANK:  Can we show the witness only 724,
25   and the next page?
```

```
 1              MR. KENDALL:  Same objection, your Honor.

 2              MR. FRANK:  It's not in, your Honor.  Just showing it

 3     to the witness.

 4              And 725.

 5              MR. FRANK:  If we can take those down.

 6     Q.   Mr. Wilson, the defendant took photographs of you with

 7     Johnny on that trip?

 8     A.   Yes.

 9     Q.   And then he e-mailed you those photographs of you at the

11:04 10    Rijksmuseum and inside the Rijksmuseum in Amsterdam?

11     A.   Yes.

12     Q.   And the Wilson's paid for everything, correct?

13     A.   Yes.

14     Q.   And then you also traveled with Johnny to Las Vegas for

15     his 21st birthday in January of 2017, correct?

16              MR. KENDALL:  Objection.  Again, redundancy.

17              THE COURT:  Overruled.

18     Q.   And there were eight other friends on the trip?

19     A.   Yes.

11:04 20    Q.   Wyatt Driscoll was one of them?

21     A.   Yes.

22     Q.   You know that Wyatt was recruited to USC to play baseball?

23              MR. KENDALL:  Objection, your Honor.

24              THE COURT:  Sustained.  We're going to take the

25     morning recess at this point.
```

```
 1              Mr. Mericle, you may step down for the time being.
 2    We'll be in recess for the time being.
 3              THE CLERK:  All rise for the jury.
 4              (Jury exits.)
 5              THE COURT:  Be seated, counsel.
 6              You may step down, Mr. Mericle.
 7              How much longer on cross?
 8              MR. FRANK:  Five or ten minutes, your Honor.
 9              THE COURT:  And then what will we have after redirect?
10              MR. KENDALL:  We have a stipulation, your Honor.
11    There are some documents we'd like to offer that I don't think
12    the Court has yet ruled on or looked at, but I think are a
13    different category of the things that -- maybe we can do it at
14    sidebar later.
15              THE COURT:  Why at sidebar?
16              MR. KENDALL:  Well, I thought you wanted to -- you
17    thought there was too many documents of things you've already
18    ruled on.  Those should not be done in front of the jury -- I
19    said side bar.  I meant out of the presence of the jury, your
20    Honor, but I think there were some that were not of the
21    category that has been discussed and ruled on.
22              THE COURT:  All right.  Anything else that needs to
23    come to my attention before we recess?
24              MR. KELLY:  No, your Honor.
25              MR. FRANK:  No, your Honor.
```

(11:05 at line 10, 11:06 at line 20)

```
 1              THE COURT:  We're in recess for 15 minutes.
 2              (Recess taken 11:06 a.m. to 11:32 a.m.)
 3              THE CLERK:  All rise for the jury.
 4              (Jury enters.)
 5              THE CLERK:  Thank you.  You may be seated.
 6              THE COURT:  Good morning again, jurors.
 7              Mr. Mericle will retake the witness stand, please.
 8              Mr. Mericle, you're reminded that you remain under
 9         oath.
11:32 10            Please be seated.
11              Mr. Frank, you may continue with cross-examination.
12              MR. FRANK:  Thank you, your Honor.
13         BY MR. FRANK:
14         Q.   Mr. Mericle, you know that when you're on
15         cross-examination you're not supposed to communicate directly
16         or indirectly with the party that called you to testify,
17         correct?
18         A.   I did not know that.
19         Q.   You weren't told that?
11:33 20   A.   No.
21         Q.   Mr. Kendall didn't tell you that during your preparation
22         sessions?
23         A.   No.
24         Q.   But during the break just now -- without telling me what
25         you discussed -- you spoke with your attorney, Mr. Hoops,
```

```
 1   correct?
 2   A.   Yes, we were just chatting about --
 3   Q.   I'm not asking what you were chatting about.  I just want
 4   know just now on the break you spoke with your attorney?
 5   A.   Yes.
 6   Q.   And immediately before your attorney speaking to you, you
 7   observed him speaking to Mr. Kendall, correct?
 8   A.   I don't think I saw him talking to Mr. Kendall.  I wasn't
 9   paying -- when?
10   Q.   Just now, out in the hallway, did you observe your
11   attorney speaking to Mr. Kendall immediately before you spoke
12   to your attorney?
13   A.   No, I didn't notice -- I didn't see that.
14   Q.   You're not sure --
15   A.   I'm not sure.
16   Q.   So it might have happened?
17        MR. KENDALL:  Objection, your Honor, calls for
18   speculation.
19        THE COURT:  Sustained.
20   BY MR. FRANK:
21   Q.   And no one told you that was not permitted, correct?
22        MR. KENDALL:  Objection, your Honor.  I passed him by
23   the men's room.  This is ridiculous.
24        THE COURT:  Sustained.
25   BY MR. FRANK:
```

```
 1   Q.   In addition to the preparation sessions you had with

 2   Mr. Kendall totaling several hours, you were also prepared by

 3   Mr. Hoops?

 4   A.   Mr. Hoops and I just handled, like, logistics, so getting

 5   here --

 6   Q.   Your attorney didn't prepare you at all for today?

 7   A.   Other than, like, general advice, like tell the truth.

 8   Q.   I don't want to hear what he told you.  But he didn't

 9   prepare you for your testimony, only Mr. Kendall did?

11:34 10  A.   That's right.

11   Q.   Are you friends with Wyatt Driscoll?

12   A.   Yes.

13   Q.   And you know that Wyatt Driscoll was recruited to --

14        MR. KENDALL:  Objection, your Honor, relevance and

15   beyond the scope of the direct.

16        MR. FRANK:  It's directly relevant, your Honor.

17        THE COURT:  Overruled.

18   BY MR. FRANK:

19   Q.   You know that Wyatt Driscoll was recruited to USC to play

11:35 20  baseball?

21   A.   I did know that.

22   Q.   Do you know that Wyatt Driscoll was a close childhood

23   friend of Johnny Wilson?

24   A.   Yes.

25   Q.   Do you know that Wyatt Driscoll was a client of Rick
```

A3286

```
        1    Singer?

        2    A.   No.

        3    Q.   No one told you that?

        4    A.   No.

        5    Q.   Wyatt didn't tell you that?

        6    A.   No.

        7    Q.   Johnny didn't tell you that?

        8    A.   No.

        9    Q.   Mr. Kendall didn't tell that you?

11:35  10    A.   No.

       11    Q.   Didn't come up in your preparation?

       12    A.   No, it did not.

       13    Q.   Before the break, I asked you about a trip for Johnny's

       14    21st birthday to Las Vegas in January of 2017.

       15    A.   Yes.

       16    Q.   Do you recall those questions?

       17    A.   I do.

       18    Q.   And you were picked up in a chauffeured car and driven

       19    from L.A. to Las Vegas?

11:35  20         MR. KENDALL:  Objection, your Honor.  I think we've

       21    had enough of the Facebook.

       22         THE COURT:  Overruled.

       23    A.   Yes.

       24    Q.   And you had a thousand dollars per night for room

       25    incidentals?
```

A3287

```
 1   A.   I wasn't aware of that.

 2          MR. FRANK:  Could we show the witness only Exhibit

 3   732.  Page 2.

 4          Could you enlarge that?  Thank you.

 5          And Ms. Lewis, could you highlight beginning with the

 6   second bullet point.

 7   Q.   Could you read that, Mr. Mericle?

 8   A.   Yes.

 9   Q.   Have you read it?

11:36 10        THE COURT:  To yourself.

11   A.   Yes.

12   Q.   Have you read it?

13   A.   Yes.

14          MR. FRANK:  Ms. Lewis, can you take it down.

15   Q.   Does that refresh your recollection that there was a

16   $1,000 per night for room incidentals?

17   A.   I didn't know that there was.  That's the first time I'm

18   seeing this.

19   Q.   But you didn't pay for the room incidentals, did you?

11:36 20   A.   I did not.

21   Q.   There was a party at a place called Battlefield Vegas?

22          MR. KENDALL:  Objection, your Honor.  I think --

23          THE COURT:  Overruled.

24   A.   Yes, if that's the place we went to see the tank, yes.

25   Q.   Well, you did more than see the tank, right, you crushed a
```

```
   1   car with a tank with an M1 Abrams tank?
   2   A.   Yes.
   3   Q.   You rode around in the tank and you crushed an actual car?
   4   A.   I wasn't the one riding, but I did watch it, yes.
   5   Q.   Johnny was riding?
   6   A.   Yes.
   7   Q.   And you had dinner at Nobu, that's a very fancy sushi
   8   restaurant?
   9   A.   We did.
11:37 10   Q.   And then you went to a nightclub called Surrender?
  11   A.   Yes.
  12   Q.   VIP seating?
  13   A.   Yes.
  14   Q.   And you knew that there was a $3,000 per table minimum?
  15        MR. KENDALL:  Objection, your Honor.
  16        THE COURT:  Sustained.
  17   BY MR. FRANK:
  18   Q.   And all of that trip was paid for by Mr. Wilson, correct?
  19   A.   Yes.
11:37 20   Q.   You were asked on direct examination about whether USC was
  21   currently paying you.  Do you recall that question?
  22   A.   Yes.
  23   Q.   And you were asked whether USC has any financial control
  24   over you.  Do you recall that question?
  25   A.   I do.
```

```
 1   Q.   Fair to say that the defendant, Mr. Wilson, has been
 2   extremely generous to you over the years?
 3   A.   Yes.
 4   Q.   European vacations?
 5   A.   Yes.
 6   Q.   Trips to Vegas?
 7   A.   That's correct.
 8   Q.   High-end hotels, restaurants, and nightclubs?
 9   A.   Yes.
10   Q.   All paid for by Mr. Wilson?
11   A.   Yes.
12   Q.   And you are very close to Johnny Wilson, correct?
13   A.   Yes.
14   Q.   Your college roommate.
15   A.   Yes, good friend of mine.
16   Q.   Good friend of yours, correct?
17   A.   Yes.
18   Q.   And is it fair to say, Mr. Mericle, you don't want to see
19   your good friend's dad convicted of a crime in this court?
20   A.   Yes.
21   Q.   And is it fair to say you are grateful to the defendant
22   for everything he's done for you over the years?
23   A.   Yes.
24              MR. FRANK:  No further questions.
25              THE COURT:  Any redirect?
```

**A3290**

```
 1            MR. KENDALL:  No, your Honor.

 2            THE COURT:  Thank you, Mr. Mericle, you may step down.

 3            THE WITNESS:  Thank you.

 4            MR. KELLY:  Your Honor, briefly --

 5            THE COURT:  Mr. Kelly.

 6            MR. KELLY:  Your Honor, pursuant to the Court's ruling

 7    today, Docket 2336 at page 9, I'm just offering two other

 8    documents.

 9            THE COURT:  And that's the most recent order the Court

10    entered?

11            MR. KELLY:  Yes, your Honor, from this morning, Docket

12    2366, page 9 I'm referencing.

13            THE COURT:  I don't have it in front of me.

14            MR. KELLY:  I can submit it, your Honor.

15            THE COURT:  I've got it.

16            MR. FRANK:  Your Honor, we have no objection to that.

17    There was a redaction that counsel had stipulated to

18    previously, and we would ask that that redaction be made before

19    this document coming in.

20            MR. KELLY:  I think I offered that and he rejected the

21    offer.

22            THE COURT:  The Court -- this is the document that the

23    Court has reconsidered and allowed to be admitted?

24            MR. KELLY:  Yes, your Honor; there's two of them.

25            THE COURT:  All right.  There was a redaction to it
```

```
 1    apparently, that should still be maintained?

 2              MR. KELLY:  Sure.

 3              The first one --

 4              THE COURT:  What is the exhibit that you're now

 5    offering?

 6              MR. KELLY:  There's two of them, 9025 --

 7              THE COURT:  Yes.

 8              MR. KELLY:  -- and 1563A, and I will redact --

 9              MR. FRANK:  We actually believe, your Honor --

11:40 10         MR. KELLY:  -- the last two pages.

11              MR. FRANK:  -- that everything should be redacted

12    except for the sentence that he wants to put in.

13              The entire pleading does not need to come in, your

14    Honor.

15              MR. KELLY:  Well, the face page identifies what it is.

16              THE COURT:  You need the face page plus the language

17    but nothing else.

18              MR. KELLY:  Fine, your Honor.

19              MR. FRANK:  With respect to the other affidavit, your

11:40 20    Honor, I'm not sure what the entire exhibit contains, whether

21    it's --

22              MR. KELLY:  It's a four-page document that we've

23    already provided --

24              THE COURT:  Well, we can discuss that outside the

25    hearing of the jury, but Exhibit 9025 and 1563A as redacted
```

1   will be admitted.

2         (Exhibits 9025 and 1563A admitted into evidence.)

3         MR. KELLY:  Yes.  And with respect to Exhibit 9025,

4   Mr. Carter, I'd like you to bring that up, please.

5         Oh, he already did.  Thank you.

6         I'd like you to highlight what it is, the affidavit.

7         And then highlight whose affidavit it is on 1 there.

8         I'll just read that for the record.

9         "I, Laura Smith, Special Agent, Federal Bureau of

11:41 10   Investigation."

11         And then I'd like you to scroll down to -- keep going,

12   please, keep going, please -- keep going, please.

13         Okay, this paragraph here.

14         Paragraph c I'm referencing, and I want you to start

15   highlighting where it starts with, "Up until the summer."  And

16   I'm going to read that.

17         "Up until the summer of 2018, I believe that all the

18   money Singer provided to Heinel for her assistance went to USC

19   athletic programs.  However, in July 2018, Heinel created a

11:42 20   company called 'Clear the Clearinghouse,' and bank records

21   (including records from bill.com) have shown that Singer has

22   directed $40,000 to the company in the last two months,

23   indicating that Heinel may now be receiving bribe payments

24   herself."

25         And if you could go to the very end of this document,

1    please.

2         Let's highlight the last paragraph, "I, Laura Smith,

3    having signed this affidavit under oath as to all assertions

4    and allegations contained herein, state that its contents are

5    true and correct to the best of my knowledge, information and

6    belief."  Signature block, "Laura Smith, Special Agent FBI."

7         Second and final document, your Honor, is the one we

8    just discussed, 1563A.

9         Mr. Carter, we're only showing the first two pages,

11:43 10   please.

11        And second page, please.

12        And I'm going to read that sentence, if you can yellow

13   it, please.

14        The government was not attempting to build a case that

15   all the parents understood Heinel to be personally pocketing

16   money, and the government has never alleged that.

17        Let's go back to that first page, please.  I want to

18   make sure whose filing this is.

19        Could you please highlight the caption.  Just the

11:43 20  first two words.  "Government's sur-reply."

21        Nothing further on that document, your Honor.

22        And nothing further for those two documents.

23        MR. KENDALL:  Your Honor, we have a stipulation we'd

24   like to put in, please.

25        THE COURT:  Yes.

```
 1          MS. PAPENHAUSEN:  Your Honor, the stipulation has been

 2    marked as Exhibit 9070, if we could have that up on the screen,

 3    please, while I read it.

 4          "The parties hereby stipulate and agree as follows:

 5          "If called to testify, Brandon Loftus, USC Assistant

 6    Athletic Director for Budget and Financial Performance, would

 7    state that for the period January 1, 2014 to March 5, 2019,

 8    based on his personal review of the relevant documents, he has

 9    no reason to believe there were any expenditures, debits, or

11:44 10    transfers from the USC men's water polo accounts to any USC

11    employee personally for any purpose unrelated to their

12    employment at USC."

13          THE COURT:  All right.  That is admitted as a

14    stipulation.  It will not be admitted as an exhibit.

15          MR. KENDALL:  Your Honor, I have a few documents I'd

16    like to offer that the Court has not looked at or ruled on.

17    And I will go through them somewhat briefly.

18          Would you like us to put them up on the screen for the

19    Court only to see?

11:45 20          THE COURT:  Yes, that would be fine.

21          MR. FRANK:  We would just request that they not be

22    described at length.

23          THE COURT:  Yes.

24          MR. KENDALL:  Okay.

25          Mr. Carter, could you put up 9901, please, and maybe
```

```
 1    if you could put next to it 9899.

 2           There's actually three in this group, but we can only

 3    get two on the screen, your Honor.

 4           The government put in Exhibit 712, which is dated

 5    October 19, 2013.  That was just one part of a chain of e-mail

 6    exchanges.  So we would like for completeness to put the rest

 7    of the e-mails that were part of that chain of communications.

 8           MR. FRANK:  Your Honor --

 9           THE COURT:  This is 9901 we're talking about?

11:46 10       MR. KENDALL:  9901 and 9899 that are in front of you

11    are two of the four e-mails that were in that chain of

12    exchanges.

13           And, your Honor, we don't need it for the truth of the

14    matter.  We just want to have the context there was a chain of

15    communications, and we're happy to have an instruction that

16    nobody is to consider it to be truthful of the matter asserted.

17           MR. FRANK:  We object.  It's not a chain, your Honor,

18    and we object on hearsay grounds.

19           THE COURT:  Hearsay grounds, the objection is

11:46 20  sustained.

21           MR. KENDALL:  Just for the record, your Honor, Exhibit

22    9902 would go in that chain as well, subject to --

23           THE COURT:  9902.

24           MR. KENDALL:  Yes, would also be part of that.

25           Second, your Honor, there is a document we have
```

```
  1   referenced but the Court has not ruled on yet, Exhibit 133,

  2   which is we offer as a -- not for -- we offer it under three

  3   different rules of evidence, 803(3), statement of physical

  4   condition for certainly parts of the record, 803(4), statement

  5   for medical diagnosis or treatment, and 803(6), records of

  6   regularly conducted activity.

  7          If the Court thinks we need a record keeper, we're

  8   happy to arrange for the USC person to testify, but we think

  9   this could go without that given the stipulation of

 10   authenticity and the various rules that apply.

 11          This is a medical record from Keck Medical Center at

 12   USC.

 13          MR. FRANK:  Your Honor, we object at a minimum to the

 14   -- I haven't seen the entire document here, but this page we

 15   certainly object to.

 16          MR. KENDALL:  It's the government's exhibit, your

 17   Honor.  They're the one who put it on their list.

 18          MR. FRANK:  Your Honor, I object to the --

 19          THE COURT:  Yes, it's not the government's exhibit.

 20          MR. KENDALL:  The government has seen it, your Honor.

 21   They've assembled it.

 22          MR. FRANK:  We object to the first page, your Honor.

 23          We object to the second page.

 24          THE COURT:  The objections to the first and second

 25   pages is sustained.
```

```
 1              MR. FRANK:  Is there more?

 2              MR. KENDALL:  Yes, if we could show the third page.

 3              MR. FRANK:  So to the extent that this is the

 4    remainder -- if you could just flip through it.

 5              MR. KENDALL:  There's one paragraph here that relates

 6    to unrelated medical issues that we would propose to redact,

 7    but we can work that out together.

 8              MR. FRANK:  We object to that, your Honor.  It's

 9    either coming in, which we would not object to this portion of

11:48 10   it coming in, but for completeness, then the entire thing comes

11    in.

12              THE COURT:  I can't hear you.

13              MR. FRANK:  I'm sorry, your Honor.  We object to the

14    first two pages.

15              THE COURT:  Yes, and the objection has been sustained

16    to the first two pages.  We're talking about everything else.

17              MR. FRANK:  Everything else we do not object to

18    provided it all comes in and not -- provided that the rest of

19    the document comes in in its entirety for completeness.

11:49 20         THE COURT:  All right.  So other than pages 1 and 2,

21    the document is admitted in its entirety.

22              MR. KENDALL:  Your Honor, may I represent pages 1 and

23    2 with a keeper of the records from USC to establish the

24    business records foundation?

25              THE COURT:  I don't believe the objection was
```

1    sustained on business record grounds.

2            MR. KENDALL:  I don't know what the objection was to

3    the first two pages.  If it's hearsay, then the business

4    records would answer --

5            THE COURT:  We can talk about this outside the hearing

6    of the jury --

7            MR. KENDALL:  Very well, your Honor.

8            THE COURT:  -- Mr. Kendall.  But as of now, 133 is

9    admitted with the exception of pages 1 and 2.

11:49 10            (Exhibit 133 admitted into evidence.)

11            MR. KENDALL:  May I read sections of the parts that

12    are in?

13            THE COURT:  Yes.

14            MR. KENDALL:  Thank you, your Honor.

15            And if we could put up page 3 of the exhibit and start

16    from there and show the jury, your Honor.

17            "Keck Medical Center of USC, Re: Johnny Wilson,

18    confidential, report of neuropsychological assessment.  Chief

19    complaint, referral question.

11:50 20            "Mr. Wilson is an 18-year-old right-handed USC water

21    polo player with a history of concussion.  Assessment is

22    requested to evaluate neuropsychological status."

23            If we drop down to "relevant history."

24            "A neurological report by Dr. Liu (9/31/14) indicated

25    that Mr. Wilson suffered from a head trauma when a friend

1    accidentally elbowed him in the right temple.  No loss of

2    consciousness was reported.  Subsequent to the head trauma

3    Mr. Wilson reported difficulty participating in class,

4    dizziness and headaches, localized to the right side of the

5    head."

6             If we may have -- if I may have one minute, your

7    Honor.

8             THE COURT:  Yes.

9             MR. KENDALL:  And then if we could go to page 7,

11:51 10   please.

11             "Summary, Mr. Wilson is an 18-year-old right-handed

12   USC freshman water polo player.  Baseline verbal abilities were

13   estimated to be in the high average range."

14             Okay.  If we could drop down to recommendations and

15   number 7.

16             "Just prior to the discussion of the

17   neuropsychological assessment results, today's impact test

18   results were received from Mr. Wilson's athletic trainer Sandra

19   Olsen."

11:52 20            Okay.  Thank you, your Honor.  That's all I have to

21   read from this exhibit.

22             THE COURT:  All right.

23             MR. KENDALL:  Next, your Honor, I'd like to offer in

24   two e-mails, we can put them side by side for your Honor, 8116

25   Exhibit, and 7993.  We offer them, again, not for the truth of

        the matter asserted, but just show the action that the e-mail

        was sent and certain steps were taken.  We do not care for

        anything to assert the truth of what is actually stated in

        there, only the act of sending the e-mails.

                MR. FRANK:  We object on 401, 403 and hearsay grounds.

                THE COURT:  The objections are sustained.

                MR. KENDALL:  And we maintain it's relevant to his

        state of mind, your Honor, but thank you.  Our client's state

        of mind.

                Next is an e-mail, 9848.  Again, it's not for the

        truth of the matter asserted.  It's just to show that

        Mr. Wilson sent this e-mail and to show his state of mind,

        particularly in the 2018 time period.

                MR. FRANK:  Objection, hearsay.

                THE COURT:  The objection is sustained.

                MR. KENDALL:  Again, your Honor, we are happy to have

        an instruction that it's not for the truth of the matter

        asserted, just that it was sent.

                THE COURT:  The objection is sustained.

                MR. KENDALL:  Okay.

                Next, your Honor, Exhibit 8184.  This may have been

        presented earlier, your Honor, with a witness, I'm not sure.

        We again present this not for the truth of the matter asserted,

        just to show that it was sent to Mr. Wilson and it influenced

        his state of mind.

```
 1              MR. FRANK:  This was previously offered and the
 2       objection was sustained.
 3              THE COURT:  The objection is sustained again.
 4              MR. KENDALL:  Okay.
 5              Your Honor, Exhibits -- there are six e-mails, I'll go
 6       through them quickly.  Exhibit 8119, Exhibit 8123, we can put
 7       those up together.  These are two -- and there's a group of six
 8       e-mails all between Mr. Wilson and Mr. Singer.
 9              MR. FRANK:  Your Honor, we object to the
11:55 10  characterization of the documents, it's unnecessary.
11              THE COURT:  Yes.
12              MR. KENDALL:  I don't offer anything more than that.
13              And they're for state of mind of my client only, your
14       Honor, not for the truth of the matter asserted.
15              THE COURT:  These are both in May of 2013, right?
16              MR. KENDALL:  Yes, your Honor.  One's May and one is
17       September.
18              THE COURT:  Are they objected to?
19              MR. FRANK:  On hearsay grounds, your Honor.
11:55 20       THE COURT:  The objection is sustained.
21              MR. KENDALL:  Your Honor, of a similar vein, I'll just
22       give you the numbers, Exhibit 86, Exhibit 8220 --
23              THE COURT:  Wait a minute, 86, just 86.
24              MR. KENDALL:  86 and 8220, they're separate exhibits.
25       They're more of the same type, your Honor, for state of mind
```

```
 1    only, not for the truth of the matter asserted.

 2              MR. FRANK:  Same objection.

 3              THE COURT:  Again, both -- the objections are

 4    sustained as to both documents.

 5              MR. KENDALL:  And then, your Honor, again, Exhibit 103

 6    and Exhibit 9627.

 7              MR. FRANK:  Same objection.

 8              MR. KENDALL:  And again, same representation, it's not

 9    for the truth of the matter asserted, just to show state of

11:56 10    mind of my client.

11              THE COURT:  Again, the objections are sustained.

12              MR. KENDALL:  Your Honor, next, to finish out this

13    group, Exhibits 9652 and Exhibit 9619 to show my client's state

14    of mind, your Honor, and not for the truth of the matter

15    asserted.

16              MR. FRANK:  Same objection.

17              THE COURT:  And the objection is sustained.

18              MR. KENDALL:  And then the last one, your Honor, is --

19    we have certified records from the entity or the organization

11:56 20    that created them, and I have the certification in my hand.  If

21    we could show the Court Exhibits 8243 and 8244.  These are both

22    business records that have been certified, and as I say, your

23    Honor, I have the written certification available.

24              MR. FRANK:  We object to the certification.  We object

25    on relevance grounds, your Honor.
```

```
 1              THE COURT:  The objections are sustained.
 2              MR. KENDALL:  Your Honor, if there's something
 3    deficient about the certification, I'd ask that the government
 4    tell us that, otherwise if it's just objecting in general, just
 5    so we understand exactly where we stand.
 6              MR. FRANK:  We object.
 7              THE COURT:  The objection is sustained.
 8              MR. KENDALL:  That's all I have to do at this moment,
 9    your Honor.  The others will be dealt with separately.
11:57 10          THE COURT:  I'm sorry?
11              MR. KENDALL:  That's all I have to do at this moment,
12    your Honor.  The others will be dealt with separately.
13              THE COURT:  All right.  Let me see counsel at sidebar.
14              *** Beginner of sidebar on the record. ***
15              THE COURT:  All right.  Counsel, I do understand
16    that's all the evidence that the defendants have to put on
17    today?
18              MR. KENDALL:  This morning, yes, your Honor.
19              THE COURT:  And what do we have beyond that for
11:58 20      Monday?
21              MR. KENDALL:  For Monday we have Coach Bowen, we
22    have -- I mentioned two water polo players yesterday from the
23    team, Mericle's teammates, one of them is Waters, he's coming.
24    The other one I'm not sure of.  We may only have one of the
25    two; I'll get that confirmed today.
```

```
 1              In addition, we may want to play some excerpts of
 2     tapes that have already been admitted into evidence in the
 3     government's case.  We may want to replay some of them.  And
 4     then we have to make the decision about our clients.
 5              THE COURT:  Okay.
 6              Mr. Kelly.
 7              MR. KELLY:  For Mr. Abdelaziz, at this point, subject
 8     to his determination he is going --
 9              (Court reporter interrupted.)
11:59 10         MR. KELLY:  For Mr. Abdelaziz, subject to his
11     determination over the weekend as to whether he is going to
12     testify, I don't think there's any actual live witnesses I'm
13     going to bring.  There may be one or two exhibits I may reenter
14     into the record, but other than that --
15              THE COURT:  Okay.
16              MR. KENDALL:  Your Honor, I want to clarify one thing.
17     I think you told us yesterday you wanted us to indicate by
18     tonight if our clients were going to testify.
19              Can we have until tomorrow morning, like 11:00
11:59 20    tomorrow?  This is a big decision to make, and it takes some
21     time to sit and talk.
22              THE COURT:  Yeah, but you got to give the government
23     some heads-up.  They need a couple of days to prepare his
24     cross.
25              MR. KENDALL:  I think it's all prepared, your Honor,
```

1   but I understand.

2          So if we may tell them tomorrow morning, if Mr. Wilson

3   testifies, his daughter Mary Wilson will also testify.  If he

4   doesn't testify, then she doesn't testify.

5          MR. FRANK:  Your Honor, we would object to that

6   testimony happening on Monday if he's not going to let us know

7   until tomorrow.  The rule was today, and that's a big deal for

8   us.

9          We also have depositions this weekend that --

12:00 10          MR. KELLY:  Respectfully, I think there is a Supreme

11   Court case, Brooks v. Tennessee, where the defendant can wait

12   until the close of the evidence to make a decision, so there's

13   that.

14          MR. FRANK:  That's fine and all well and good but then

15   the Court has the discretion to give us time to prepare for it.

16          THE COURT:  Are you expecting that if your client

17   testifies, he'll do so on Monday?

18          MR. KENDALL:  He'll do so whenever you tell him to

19   start.

12:00 20          We could start on Monday, yes, your Honor.

21          THE COURT:  Well, you let the government know no later

22   than tomorrow morning --

23          MR. KENDALL:  Sure.

24          THE COURT:  -- as to what you're going to do on that.

25          I'm going to tell the jury that they're excused for

```
 1    the day, that they're coming back on Monday, they will hear

 2    testimony on Monday, and I guess I better be obscure in terms

 3    of when this case is going to end, but that it is still going

 4    to end next week.

 5              MR. KENDALL:  Yes, your Honor, excellent.

 6              MR. KELLY:  Yes.

 7              MR. FRANK:  Your Honor, there's a couple of issues but

 8    I think they can wait until the jury is excused.

 9              THE COURT:  All right.  One of the issues is the Zoom
```
12:01 10    conference with respect to the Fifth Amendment, right?
```
11              MR. KENDALL:  Yes, your Honor.

12              MR. FRANK:  We also have the issue of a curative

13    instruction.

14              THE COURT:  Yes.  Are you asking me to give that now?

15              MR. FRANK:  I would prefer it as close in time to the

16    actual --

17              THE COURT:  I'm ready to give a compromised

18    instruction to the jury right now.  So I'll do that before I

19    excuse the jury for the weekend.
```
12:01 20              MR. KENDALL:  Please note our objection, your Honor.
```
21    I was doing cross-examination of what the woman said and just

22    wanted to follow through on her numbers.  I did not raise

23    anything about money being given to Mr. Singer after

24    cooperation status.

25              THE COURT:  I understand.
```

**A3307**

```
 1              MR. KELLY:  I would object, too.  I just don't know
 2    where it stands right now.  So what is the proposal to the
 3    Court?
 4              COURT:  All right.  This is what I intend to instruct
 5    the jury:
 6              "During the cross-examination of Lauren George on
 7    Wednesday, September 29th, there were a series of questions
 8    concerning several million dollars remaining in the accounts of
 9    The Key Worldwide Foundation after payments had been made to
10    colleges and universities, individuals associated with them,
11    and various business ventures and expenses.
12              "I instruct you to disregard any questions or
13    testimony regarding the ultimate disposition of those funds.
14              "You should not consider those questions or that
15    testimony in any way."
16              MR. KENDALL:  May I make one request, your Honor?
17              I think it was both the direct and cross-exam that
18    raised that issue.  Could we just say during the testimony of
19    Lauren George as opposed to attributing it all to the
20    cross-exam?
21              MR. FRANK:  There was no implication on the direct
22    examination concerning the disposition of the remaining $6.1
23    million, your Honor, that was only on cross-exam.
24              THE COURT:  Yes, that's my memory.
25              I'm going to give it the way I drafted it.
```

```
 1              MR. KENDALL:  We'll note our objection.

 2              THE COURT:  Note your objection.

 3              MR. KENDALL:  Thank you.

 4              THE COURT:  But after that, I'm going to excuse the

 5    jury for the weekend and give them the instructions I've just

 6    mentioned to you.

 7              MR. KENDALL:  And can we go through the rest of the

 8    evidentiary issues that we need to make a record on out of the

 9    jury's presence?

12:04 10         THE COURT:  Yes.

11              MR. KENDALL:  Okay, thank you.

12              *** End of sidebar. ***

13              THE COURT:  All right, jurors.

14              We need very often to discuss matters outside of your

15    hearing.  It's not that we're trying to keep secrets from you.

16    We're talking about legal matters about which you need not be

17    concerned.

18              One thing I need to tell you before I dismiss you for

19    the weekend is that during the cross-examination of Lauren

12:05 20  George on Wednesday, September 29th, that's two days ago, there

21    were a series of questions concerning several million dollars

22    remaining in the accounts of The Key Worldwide Foundation after

23    payments had been made to colleges and universities,

24    individuals associated with them, and various business ventures

25    and expenses.
```

A3309

```
 1            I instruct you to disregard any questions or testimony
 2      regarding the ultimate disposition of those funds.  You should
 3      not consider those questions or that testimony in any way.
 4            So having given you that instruction, I'm now going to
 5      dismiss you for the weekend.  And I will just forewarn you that
 6      we are on schedule to complete this case next week.  We don't
 7      know exactly when, but at some point next week all of the
 8      evidence and testimony will be completed.  We will probably
 9      then have a break between the end of the testimony and the
12:06 10      closing arguments and my charge to you.  I don't know whether
11      the break will be half a day or a day or whatever.  After that,
12      you will hear the closing arguments of the government and the
13      defendants, and then you'll hear my instructions to you on the
14      law, after which the case will be submitted to you for your
15      deliberations.
16            So hang in there.  We've got one more week, give or
17      take, and I can't tell you exactly when any of this is going to
18      happen until after we get going on Monday.  We're going to have
19      some testimony, some witnesses on Monday, and from there the
12:06 20      rest of the week is a little bit up in the air, but it's
21      going -- this case is going to be submitted to you next week.
22            Again, you're on now a longer break.  It's a weekend
23      break.  The temptations are there.  Your friends, I'm sure, are
24      still very curious.  They're going to ask you about the case
25      and they're going to offer their opinions of the case, and
```

 1    they're going to offer suggestions about what you should and

 2    shouldn't do.  You are to resist that.  You cannot take anybody

 3    else's suggestion because they haven't heard all the evidence.

 4    Only you have heard the evidence, almost all of it, not all of

 5    it, but almost all of it, and only you, after you've heard all

 6    the evidence, after you've heard closing arguments, after

 7    you've heard my instructions on the law, then you and you alone

 8    will decide this case during your deliberations.

 9            It would be entirely inappropriate for you to do any

12:07 10   independent research or to talk to anybody or read anything

11    about this case.

12            So please don't do it because it could have very dire

13    consequences.

14            Have a pleasant weekend.  Don't worry about this at

15    all over the weekend.  Be ready to come back and work hard next

16    week because it is going to be a big week.

17            Have a pleasant weekend, and I'll see you Monday

18    morning at 9:00 a.m.

19            THE CLERK:  All rise for the jury.

12:08 20        (Jury exits.)

21            THE COURT:  All right.  Be seated, counsel.

22            As I understand it, we have a schedule, roughly now,

23    to deal with the Fifth Amendment invocation of several

24    witnesses, including Mr. Lopes, Mr. Orr, and perhaps

25    Mr. Masera.  Is there a fourth one?

```
 1              MR. KENDALL:  Your Honor, I don't know if he's filed a
 2    motion or he just sent a letter, but I thought Mr. Garfio was
 3    raising this as well.
 4              THE COURT:  Mr. Garfio.
 5         Do counsel know what the schedule is now with respect
 6    to the attorneys for these particular potential witnesses and
 7    how we are to proceed?
 8              MR. SHARP:  I believe that Mr. Orr and Lopes'
 9    attorneys are on Zoom right now and we can pull up -- pull them
12:09 10   up if that's the right --
11              THE COURT:  And it is the expectation of counsel that
12    we're going to do at least the initial reference here in the
13    courtroom?
14              MR. SHARP:  Yes, we talked about it last night and
15    agreed, if it's okay with the Court, that we would ask a couple
16    of questions.  The witness could invoke their Fifth Amendment.
17    We would ask if they intend to continue to invoke their Fifth
18    Amendment as to all questions.  They might say yes.  And then
19    we would request that the Court compel them to answer because
12:10 20   we don't believe they have a valid Fifth Amendment right or in
21    the alternative that the Court inquire of them in camera to
22    determine why they have a Fifth Amendment right.
23              THE COURT:  And you want me to do that outside the
24    hearing of counsel?
25              MR. SHARP:  Yes.  To be clear, Mr. Frank didn't agree
```

1    to that latter part, I'm sure he was going to say.

2         MR. FRANK:  What I was going to say, your Honor, is

3    that we defer to the Court as to whether the Court feels it's

4    necessary to have an *ex parte* hearing on whether the invocation

5    was proper.

6         MR. SHARP:  But we would suggest that would be in your

7    chambers.  You could call them or however Ms. Lima --

8         THE COURT:  It wouldn't be in my chambers.  It would

9    be in my lobby, which is right behind the courtroom.

12:11 10        All right.  Why don't we proceed to that since it is

11   the hour at which these gentlemen and their counsel have

12   scheduled and presumably are available right now.

13        MR. SHARP:  Yes.

14        MR. KENDALL:  Is Mr. Masera's counsel here as well?

15        MR. KELLY:  He's physically here.

16        MR. KENDALL:  There's also Mr. Masera's counsel.

17        THE COURT:  So we have Mr. Masera's counsel in the

18   courtroom?

19        MR. KELLY:  I saw him the morning.  I assume he can

12:11 20   wait until we do the Zoom matter and then bring him back in.

21        THE COURT:  You're expecting me to do these one at a

22   time; is that right?

23        MR. KELLY:  Yes, your Honor.

24        THE COURT:  All right.

25        And we don't know about Mr. Garfio?  Has he not been

**A3313**

```
 1   in the loop?
 2        MR. FRANK:  I may have missed something, but I
 3   understood counsel yesterday to suggest that they were no
 4   longer pursuing Mr. Garfio in light of the Court's order on the
 5   impeachment materials.  Maybe I misunderstood.
 6        MR. KENDALL:  It's an issue that we're trying to sort
 7   through, your Honor, but I would like to get a ruling --
 8   Mr. Garfio is different because he was directly involved with
 9   Mr. Wilson's son's application, and so he's different than the
10   others.  He's more directly relevant.
11        Mr. Masera's counsel is right here, your Honor, if you
12   wanted to address him.
13        THE COURT:  Mr. Masera, have you heard what we're --
14        Mr. Masera's counsel, identify yourself for the
15   record, please.
16        MR. THOMAS:  From the lectern?
17        THE COURT:  Yes, please.
18        MR. THOMAS:  Your Honor, may it please the Court, Dave
19   Thomas on behalf of Steve Masera.
20        THE COURT:  Mr. Thomas, have you heard what we're
21   planning to do?
22        MR. THOMAS:  Yes.  So I was in the overflow courtroom,
23   so I missed about 20 seconds of it.
24        THE COURT:  Why don't you repeat what you had said
25   previously.  Mr. Sharp, right?
```

1       MR. SHARP:  Yes, your Honor.  We'll call the witness,

2   we'll ask him a few questions, he may assert his Fifth

3   Amendment right.  We'll ask if he intends to continue doing so

4   on all questions on that topic.  At that time we'll suggest

5   that the Court either compel the witness to testify or to hold

6   an in-camera hearing and the Court may choose whatever it

7   wishes to do at that time.

8       Thank you, your Honor.

9       THE COURT:  All right.  Thank you.

12:13 10    So why don't we proceed first with Mr. Lopes and his

11   counsel, if that's --

12       MR. SHARP:  Yes.  And his counsel's name is Daniel

13   Nixon.  It might be coming up as that on Zoom.  Do you see him?

14       THE COURT:  Daniel --

15       MR. SHARP:  Nixon, N-i-x-o-n.

16       MR. NIXON:  Good morning, your Honor.  My name is

17   Daniel Nixon.  I'm the counsel for Mr. Lopes and Mr. Orr but

18   I'm based in Los Angeles.  Local counsel, Mark Smith and Payal

19   Salsburg, are also on the line, and they are admitted members

12:13 20    of the District Court in Massachusetts.  I am admitted in the

21   District of California -- Central District of California and

22   other places but not Massachusetts.  So they would be the -- I

23   guess the speaking voice.

24       I can -- I have Mr. Lopes available to testify, and if

25   the Court would like, I can go bring him before the Court right

```
 1   now.
 2          THE COURT:  Mr. Nixon, please give me the names of
 3   local counsel.  I didn't get them.
 4          MR. NIXON:  Yes, thank you, your Honor.  Mark Smith
 5   and Payal Salsburg, and I'll spell it.  First name is
 6   P-a-y-a-l, second name is S-a-l-s-b-u-r-g.
 7          THE COURT:  All right.
 8          Mr. Smith and Mr. Salsburg.
 9          MR. NIXON:  It's Ms. Salsburg, your Honor.
10          THE COURT:  I'm sorry, Ms. Salsburg.
11          Okay.  Why don't you bring your client to the screen,
12   if you will, and we'll proceed from there.
13          MR. NIXON:  Very well.  I'm going to turn the video
14   off for just one moment briefly, your Honor, to get him, and be
15   right back.  It should be a minute.
16          THE COURT:  Fair enough.
17          MR. NIXON:  Your Honor, I'm going to place before you
18   right now Steven Lopes, who is the witness that's been called.
19          THE COURT:  All right, thank you.
20          Normally we ask the witness to stand to be sworn, but
21   under these circumstances, I would say just remain seated,
22   Mr. Lopes.  But would you please respond to my deputy who is
23   going to swear you in.
24          THE CLERK:  Mr. Lopes, would you please raise your
25   right hand.
```

```
 1              STEVE LOPES, having been duly sworn by the Clerk, was
 2      examined and testified as follows:
 3              THE CLERK:  Thank you.
 4              And would you please state your name for the record,
 5      spelling your last
 6              THE WITNESS:  Steve Lopes, L-O-P-E-S.
 7              THE COURT:  Mr. Sharp, do you wish to examine?
 8              MR. SHARP:  Yes, your Honor.
 9                  DIRECT EXAMINATION OF STEVE LOPES
12:16 10     BY MR. SHARP:
11      Q.   Good afternoon, Mr. Lopes.
12                  Were you the chief financial officer and chief
13      operating officer for the athletic department at the University
14      of Southern California?
15      A.   On the advice of my counsel, I assert my Fifth Amendment
16      right to remain silent.
17      Q.   Were walk-on students sometimes admitted through the
18      subcommittee on athletic admission for reasons other than
19      athletic talent?
12:16 20     A.   On the advice of my counsel, I assert my Fifth Amendment
21      right to remain silent.
22      Q.   Was one of those reasons that their parents would donate
23      money to the University of Southern California?
24      A.   On the advice of my counsel, I assert my Fifth Amendment
25      right to remain silent.
```

```
 1   Q.   Did the USC athletic department exchange preferential

 2   admissions treatment for donations to the University of

 3   Southern California?

 4   A.   On the advice of my counsel, I assert my Fifth Amendment

 5   right to remain silent.

 6   Q.   Mr. Lopes, do you intend to assert the Fifth Amendment in

 7   response to all of my questions on this topic?

 8   A.   Yes, I do.

 9        MR. SHARP:  Your Honor, for the reasons discussed in

10   our briefing, we do not believe that the witness has a valid

11   Fifth Amendment right.  He was simply a member of the USC

12   athletic department doing his job, which included fund-raising.

13   I respectfully request the Court to compel the witness to

14   testify or otherwise hold an in-camera hearing to determine

15   this witness has a valid Fifth Amendment right.

16        THE COURT:  All right.  I will hold an in-camera

17   hearing, not at this very moment because we're going to go

18   through the other witnesses --

19        MR. SHARP:  Yes.

20        THE COURT:  -- but within a few minutes I will hold

21   such a hearing, and, of course, I'll have Mr. Lopes and his

22   counsel present, but not counsel for the defendants or the

23   government.

24        So let's proceed now to Mr. Orr.

25        (Pause.)
```

```
 1              THE COURT:  While we're waiting for Mr. Orr, I want it
 2    on the record that counsel agree with this procedure that the
 3    Court has outlined.  Let me hear first from the government.
 4              MR. FRANK:  We do, your Honor.
 5              THE COURT:  From the defendant Abdelaziz.
 6              MR. KELLY:  We agree, yes.
 7              THE COURT:  And from the defendant Wilson.
 8              MR. KENDALL:  Excuse me, your Honor?
 9              THE COURT:  I want to hear from counsel for the
10    defendant Wilson as to whether or not he agrees to this
11    procedure --
12              MR. KENDALL:  Yes, your Honor --
13              THE COURT:  -- that the Court has --
14              MR. KENDALL:  -- of course.
15              THE COURT:  Mr. Orr.
16              THE WITNESS:  Yes.
17              THE COURT:  Do we have counsel for Mr. Orr present?
18              MR. SMITH:  Yes, your Honor.
19              THE COURT:  Would you please identify yourself for the
20    record.
21              MR. SMITH:  Mark Smith, Loredo & Smith for Daniel Orr.
22    Joining me is Payal Salsburg from my office.
23              THE COURT:  Okay.  So the same attorneys that
24    represented Mr. Lopes also represent Mr. Orr under these
25    proceedings; is that correct?
```

 1          MR. SMITH:  That's correct, your Honor.

 2          THE COURT:  And Mr. Nixon is California counsel?

 3          MR. NIXON:  Yes, that's right, your Honor.  I'm poking

 4   my head on the screen to say "yes."

 5          THE COURT:  Thank you, Mr. Nixon.

 6          All right.

 7          Mr. Orr, do we have -- Mr. Orr is on the screen now.

 8          THE CLERK:  Yes.

 9          THE COURT:  Mr. Orr, would you please raise your hand

12:20 10   and be sworn by my deputy clerk.

11          RONALD ORR, having been duly sworn by the Clerk, was

12   examined and testified as follows:

13          THE CLERK:  And would you please state your name for

14   the record spelling your last.

15          THE WITNESS:  Ronald Orr, O-r-r.

16          THE COURT:  All right, Mr. Sharp for the defendant

17   Abdelaziz.

18                  DIRECT EXAMINATION OF RONALD ORR

19   BY MR. SHARP:

12:20 20   Q.   Good afternoon, Mr. Orr.

21          Were you the head fund-raiser for the athletic

22   department at USC for over a decade?

23   A.   On the advice of my counsel, I assert the Fifth Amendment

24   right to remain silent.

25   Q.   Were walk-on students sometimes admitted through the

1  subcommittee on athletic admission for reasons other than

2  athletic talent?

3  A.   On the advice of my counsel, I assert the Fifth Amendment

4  right to remain silent.

5  Q.   Was one of those reasons that their parents would donate

6  money to the University of Southern California?

7  A.   On the advice of my counsel, I assert my Fifth Amendment

8  right to remain silent.

9  Q.   Did the University of Southern California athletic

12:21 10  department exchange preferential admissions treatment for

11  donations to USC?

12  A.   On the advice of my counsel, I assert my Fifth Amendment

13  right to remain silent.

14  Q.   Do you intend to assert the Fifth Amendment in response to

15  all questions on this topic?

16  A.   Yes.

17       MR. SHARP:  Your Honor, for the reasons I previously

18  discussed, the same apply to Mr. Orr.  We request the Court

19  compel the witness to testify or hold an in-camera hearing to

12:21 20  determine the validity of his Fifth Amendment rights.

21       THE COURT:  All right.  The Court will, in fact, hold

22  an in-camera hearing within a few minutes, but not exactly

23  right now, at which point, of course, the witness and counsel

24  will be in attendance but counsel for the government and the

25  defendants will not be.

```
 1              All right.  We now need to do the same with respect to

 2      Mr. Masera, and I take it we'll do that in the courtroom; is

 3      that right?

 4              I'm sorry, I've lost the name of Mr. Masera's counsel

 5      again.

 6              MR. THOMAS:  It's David Thomas, your Honor.

 7              THE COURT:  Mr. Thomas.  Is that what we are going to

 8      do at this point?

 9              MR. THOMAS:  I defer to the Court, but that was my

12:22 10     understanding.

11              Would you like me to bring him in?

12              THE COURT:  Yes, please.

13              MR. KELLY:  May I approach the lectern, your Honor?

14              THE COURT:  Yes.

15              Good afternoon, Mr. Masera would you please remain

16      standing.

17              STEVE MASERA, having been duly sworn by the Clerk, was

18      examined and testified as follows:

19              THE CLERK:  Thank you.  You may be seated.

12:23 20     And would you please state your name for the record,

21      spelling your last.

22              THE WITNESS:  Steve Masera, M-a-s-e-r-a.

23              MR. KELLY:  Do you want him to -- it's up to him.

24              THE COURT:  You may remove your mask, Mr. Masera.

25              THE WITNESS:  Thank you.
```

```
 1              THE COURT:  Thank you.
 2                  DIRECT EXAMINATION OF STEVE MASERA
 3   BY MR. KELLY:
 4   Q.   Good afternoon, Mr. Masera.  My name is Brian Kelley.  I
 5   represent Mr. Gamal Abdelaziz.
 6            I'd like to direct your attention to what has been
 7   marked as Exhibit 1564, it will appear before you.
 8            And I'm asking Mr. Carter to highlight one section
 9   only.
10            Do you see where that's been yellowed?
11   A.   Yes.
12   Q.   The question then is:  Is that your handwriting?
13   A.   Based on advice from my counsel, I will assert my Fifth
14   Amendment and not answer that question.
15   Q.   And, sir, were you employed by The Key Worldwide from
16   approximately 2008 to 2017 as an accountant?
17   A.   Based on advice from my attorney, I will assert the Fifth
18   Amendment and not answer that question.
19   Q.   And that document I just showed you, was that part of a
20   record kept by The Key in the regular course of business?
21   A.   Based on advice from my attorney, I will not answer that
22   question based on my privilege of the Fifth Amendment.
23   Q.   And with respect to that document I just showed you, was
24   it the regular practice of The Key to collect and record such
25   information?
```

     1   A.   Based on the advice from my attorney, I will assert my
     2   Fifth Amendment privilege and not answer that question.
     3   Q.   And does this -- was this record made at or near the time
     4   of the recorded events by you based upon your personal
     5   knowledge of the information contained therein?
     6   A.   Based on the advice of my attorney, I will assert my Fifth
     7   Amendment privilege and not answer that question.
     8   Q.   And does that notation, 300,000 with 200,000 to USC, in
     9   fact represent a $300,000 donation from Gamal Abdelaziz with
12:25 10   $200,000 going to the USC and $100,000 going to The Key?
    11   A.   Based on advice from my attorney, I will assert my Fifth
    12   Amendment privilege and not answer that question.
    13   Q.   Sir, is it your intention to keep asserting the Fifth
    14   Amendment with each question I pose to you?
    15   A.   Yes, sir.
    16         MR. KELLY:  Your Honor, with respect to this witness,
    17   we respectfully submit he does not have a valid Fifth Amendment
    18   privilege and the Court should order him to testify.
    19   Alternatively, the Court should make an inquiry to determine if
12:26 20   he does have a valid Fifth Amendment privilege with respect to
    21   those few questions I just asked him.
    22         MR. KENDALL:  Your Honor, I have some separate
    23   questions from my client's perspective, if I may ask.
    24         THE COURT:  Yes, you may ask those questions,
    25   Mr. Kendall.

```
 1              MR. KELLY:  Does the Court wish me to present the
 2      clerk with a copy of that document?
 3              THE COURT:  The document that you offered?  I suppose
 4      for the record --
 5              MR. KELLY:  Yes.
 6              THE COURT:  Did you identify it?
 7              MR. KELLY:  I marked it as 1564, 1-5-6-4.  And I
 8      yellowed the portion in the middle.
 9              THE COURT:  For identification it will be docketed but
12:27 10      it's not admitted as an exhibit.
11              MR. KELLY:  Yes, your Honor.
12              (Exhibit 1564 marked for identification.)
13              THE COURT:  Mr. Kendall.
14              MR. KENDALL:  Thank you, your Honor.
15                  DIRECT EXAMINATION OF STEVE MASERA
16      BY MR. KENDALL:
17      Q.   Good afternoon, Mr. Masera.
18      A.   Good afternoon.
19      Q.   My name is Mike Kendall.  I represent John Wilson.
12:27 20              Fair to say you've never met my client, correct?
21      A.   Correct.
22      Q.   And you've never spoken to him, correct?
23      A.   Based on advice from my attorney, I will assert my Fifth
24      Amendment privilege and not answer that question.
25      Q.   Okay.  I'd like to show the witness Exhibit 118, please.
```

```
 1              Do you recognize this document as an e-mail chain

 2    between you and Rick Singer?

 3    A.   Based on advice from my attorney, I will assert my Fifth

 4    Amendment privilege and not answer that question.

 5    Q.   There's a reference in this e-mail in Exhibit 118 about

 6    $20,000 for expenses.  Do you see that?

 7    A.   Based on advice from my attorney, I will assert my Fifth

 8    Amendment privilege and not answer that question.

 9    Q.   You're aware that Mr. Wilson was told by Mr. Singer that

12:28 10   the $20,000 was for the expenses of The Key Foundation,

11    correct?

12    A.   Based on advice from my attorney, I will assert my Fifth

13    Amendment privilege and not answer that question.

14    Q.   Is it fair to say that you were at one point on the

15    government's witness list as testifying on the government's

16    behalf?

17    A.   Based on advice from my attorney, I assert my Fifth

18    Amendment privilege and will not answer that question.

19    Q.   And if the government had called you to testify, you would

12:28 20   have testified pursuant to your plea agreement with the

21    government?

22    A.   Based on advice from my attorney, I assert my Fifth

23    Amendment privilege and will not answer that question.

24              MR. KENDALL:  I think that's it for me, your Honor.

25              Would you like me to leave you a copy of Exhibit 118,
```

```
 1    please?
 2              THE COURT:  If you want it to be preserved for the
 3    record, yes.
 4              MR. KENDALL:  And if the Court needs it for the
 5    in-camera inquiry, your Honor.
 6              THE COURT:  All right.
 7              (Exhibit 118 marked for identification.)
 8              THE COURT:  Thank you.
 9              You may step down for the time being, Mr. Masera.
12:29 10   Actually, for good.
11              All right.  What I'm going to do now -- I take it
12    Mr. Garfio is not present or counsel on the other end?
13              MR. KENDALL:  No, he's not, your Honor.
14              MR. KELLY:  No, your Honor.
15              THE COURT:  All right.  So what I intend to do now is
16    to adjourn to my lobby where I will have a phone contact, it
17    will not be a Zoom contact, it will be just by phone, on which
18    each of the witnesses who just testified, Mr. Lopes, Mr. Orr,
19    and then after that Mr. Masera, with counsel will be with me.
12:30 20   I will have a court reporter taking down the information, and
21    after I have listened to the witness and counsel, I will return
22    with a finding to make -- that I will publish to counsel.
23              Anything that I have missed?
24              MR. KELLY:  That's fine, your Honor.
25              And I just respectfully submit I think the Court's
```

```
 1   inquiry with the witness is question by question that was posed
 2   to the witness as to whether or not there's a valid Fifth
 3   Amendment privilege for each question.
 4           MR. FRANK:  We believe the Court has discretion to do
 5   that inquiry as the Court sees fit, your Honor, under the
 6   caselaw.
 7           THE COURT:  All right.  Thank you.  We're in recess
 8   for roughly 15 or 20 minutes.
 9           THE CLERK:  All rise for the court.
10           (Discussion off the record.)
11           THE COURT:  And I will instruct Mr. Thomas to be
12   available.  I'm going to do the other two first, but then
13   Mr. Masera after that.
14           MR. THOMAS:  Judge, should I wait here in the
15   courtroom?
16           THE COURT:  Sure.
17           (Recess taken.)
18           (Discussion in the lobby is sealed and has been
19   removed from this transcript.)
20                      * * * * * * * * * *
21           THE CLERK:  All rise.
22           (Court entered.)
23           THE CLERK:  Thank you.  You may be seated.
24           THE COURT:  Good afternoon, counsel.
25           The Court has conducted telephone interviews with the
```

12:30 (line 10)

12:58 (line 20)

**A3328**

1    three witnesses from whom we heard testimony, Mr. Lopes,

2    Mr. Orr, and Mr. Masera in the attendance of their counsel.

3         With respect to Mr. Lopes and Mr. Orr, their counsel,

4    Attorneys Nixon, Smith and Salsburg, participated in the phone

5    conversation, and then in person Mr. Masera was joined by his

6    counsel, Mr. Thomas.

7         I have inquired of Mr. Lopes, Mr. Orr, and Mr. Masera

8    and their attorneys, and as to the basis for those individuals'

9    invocation of their Fifth Amendment rights not to testify in

12:59 10    this case, each witness has satisfied the Court that there is

11    at least a reasonable probability that they would face some

12    authentic danger of incrimination were they to testify.

13         Further, I have determined that none of these three

14    witnesses will offer any relevant, non-privileged testimony.

15    Therefore, they will not be required to take the stand in this

16    case.

17         Is there anything else that needs to come to the

18    Court's attention in that regard, Mr. Frank?

19         MR. FRANK:  No, your Honor.

01:00 20         THE COURT:  Mr. Kelly?

21         MR. KELLY:  No, your Honor.  At the appropriate time

22    we may seek an instruction with respect to Mr. Masera given his

23    status as a government witness, but we'll leave that until

24    later.

25         THE COURT:  All right.

A3329

```
 1            Mr. Kendall?

 2            MR. KENDALL:  Your Honor, one thing I'm not fully

 3    understanding is, is it your position that you don't think

 4    Mr. Masera would offer any relevant evidence to this case or

 5    simply that his privilege is such that there's no way that we

 6    can compel him to offer any evidence?

 7            THE COURT:  The latter.

 8            MR. KENDALL:  Thank you.

 9            THE COURT:  All right, counsel.  Then we are going to

01:00 10    adjourn for the week, but just for planning, why don't we hear

11    one more time who actually we're going to have as witnesses on

12    Monday, at least as of now.

13            MR. KENDALL:  Your Honor, we have two.  One is the

14    water polo player we've identified to the government.

15            THE COURT:  And his direct will be approximately half

16    an hour?

17            MR. KENDALL:  I think less than Mericle.

18            THE COURT:  Okay.

19            MR. KENDALL:  And then Coach Bowen.

01:01 20            THE COURT:  And his direct?

21            MR. KENDALL:  Probably around what Mericle was, could

22    be a fraction longer.

23            THE COURT:  And then from the government?

24            MR. FRANK:  Probably comparable to today.

25            Your Honor --
```

```
 1              THE COURT:  Wait, Mr. Kelly rose behind you.

 2              Are you going to examine?

 3              MR. KELLY:  We have previously subpoenaed two FBI

 4    agents, Brown and Smith, and we're releasing them from their

 5    subpoenas.  We had previously indicated on the record on behalf

 6    of Abdelaziz we were going to call back Mikaela Stanford, we're

 7    not going to.

 8              THE COURT:  Thank you for that notification.

 9              If we get through all of the witnesses that the

01:02 10    defendant Wilson intends to call, does the defendant Abdelaziz

11    intend to call any more witnesses?

12              MR. KELLY:  I think we had also subpoenaed an agent

13    named Cedrone, we're not going to pursue that either.

14              THE COURT:  All right.  So the answer is --

15              MR. KELLY:  So subject to our own consideration about

16    whether or not the defendant himself will testify, we do not

17    anticipate calling any live witnesses next Monday.

18              THE COURT:  All right.

19              So --

01:02 20              MR. KENDALL:  Your Honor, we do have the issue of the

21    exhibits you wanted to handle out of the presence of the jury

22    for us to offer and to make the record you discussed earlier

23    today.

24              We can do that today or Monday.  Whatever is the

25    Court's preference.
```

1      THE COURT:  What exhibits are those?

2      MR. KENDALL:  There's a series of exhibits we want to

3  offer that we don't think -- some have not been ruled on, some

4  may have been, but we just wanted to have a record of what was

5  the basis for denying their admission and we wanted to state --

6  they're all -- I think virtually all of them are non-hearsay,

7  we're offering for non-hearsay purposes.

8      You said earlier you didn't want it all done in front

9  of the jury, that some should be done outside the presence, so

01:03 10  we divided it up that way.

11      THE COURT:  So how long do you expect this to take?

12      MR. KENDALL:  Ten minutes.

13      THE COURT:  Why don't we do it now.

14      MR. FRANK:  There's also a couple of housekeeping

15  matters that we have, your Honor, that should be very brief.

16      THE COURT:  Okay, let's go.

17      MR. KENDALL:  Mr. Carter, if we could put up Exhibit

18  118.

19      Your Honor, this is an exhibit between Mr. Singer and

01:03 20  Mr. Masera we did as part of the inquiry earlier on the Fifth

21  Amendment issue.  It is not for the truth of the matter

22  asserted.  It's just to show that they were discussing how they

23  were defrauding my client of $20,000.  It's, in fact, not for

24  the truth of what they say.  We want to admit it for not for

25  what is said in there, but just to show that it was exchanged.

```
 1              MR. FRANK:  Your Honor, we've been over this exhibit
 2    multiple times, and we continue to object on the same grounds.
 3              The other issue we have with this particular exhibit
 4    is Mr. Kendall asserted incorrectly on Monday during the
 5    cross-examination of Mr. Nahmens that it was in evidence and
 6    used it as basis for cross-examination for about a page and a
 7    half of cross-examination, and we would move to strike that
 8    portion of the cross-examination.
 9              MR. KENDALL:  Your Honor, I did confuse 118 with 112,
01:04 10    they both deal with the same topic, the $20,000 in expense.
11              I think there were six lines that refer to this
12    exhibit.  I don't mind the six lines being struck, but then
13    there was general discussion of a topic that wasn't tethered to
14    the exhibit which should not be struck.  But for the six lines
15    where I refer to 118, I have no problem with that being struck.
16              THE COURT:  The six lines that refer to 118 are
17    stricken.
18              MR. KENDALL:  Thank you, your Honor.
19              THE COURT:  The objection is sustained.
01:05 20              MR. KENDALL:  Okay.
21              Your Honor, I think you've already ruled on the
22    Marriott -- the Marriott tape, Exhibit 8141A of the September
23    21 conversation.  We do want to offer it in our case.  If it
24    was found to be beyond the scope of the government's case, we
25    do believe it's directly relevant to the fraud that was
```

1    perpetrated on our client.  It's not hearsay, it's Mr. Singer

2    saying things that are against his interests, which would also

3    be a hearsay exception.

4        MR. FRANK:  We object, your Honor.  First of all, the

5    witness has to be unavailable for that exception to even apply,

6    and we've had no offering on that front, it's not true; and

7    also we object on hearsay grounds and relevance grounds.

8        THE COURT:  The objection is sustained.

9        MR. KENDALL:  It's also various state of mind, your

01:05 10    Honor, as well.

11        We have a group of e-mails, your Honor, in which

12    Mr. Singer has given descriptions of the side door, some of

13    these have been offered to you, but not all of them have.  So I

14    expect you'll be consistent in how you approach them, but I

15    just need of need to put them all into the record.

16        1043 may have already been offered, if we could show

17    that, but there's also 8197, 9721, 9672.  We offer these --

18        THE COURT:  I'm sorry, 9721.  What was the last one?

19        MR. KENDALL:  Sorry, your Honor, 9672.

01:06 20        THE COURT:  Okay.

21        MR. KENDALL:  These are four mails in which Mr. Singer

22    discusses the meaning of the side-door term with parents.

23        Given Agent Keating's testimony that he had a set

24    pitch he used with parents and her attempt to describe it is a

25    side-door scheme, we think this both impeaches her testimony

1    and shows a 404(b) purpose Mr. Singer's practices, intent,

2    understanding of what he was doing with the parents when he

3    described the side door.

4        And so it's not for the truth of the matter asserted,

5    but for these other reasons, your Honor.

6        MR. FRANK:  Your Honor, first of all, she's not here

7    to be impeached.  She testified and was cross-examined, that

8    was the appropriate time to attempt to impeach her.  She can't

9    be impeached on somebody else's statements.  And we also object

01:07 10    on 401, 403, and hearsay grounds.

11        MR. KENDALL:  I think we can impeach her at any time,

12    your Honor.

13        THE COURT:  The objections are sustained to those four

14    exhibits.

15        MR. KENDALL:  Okay.

16        Your Honor, again, this may have been offered before

17    in the government's case, but I offer it in our case, a case

18    that's an important issue, Exhibit 9564, and Exhibit 9682 where

19    Mr. Singer is in two different contexts discussing making

01:07 20    public discussions of the side door and disclosing it widely

21    and publicly.  9564 is a book proposal and 9682 is a speech to

22    the Young Presidents Organization.  Again, we think it goes to

23    what was the meaning of the side door and Mr. Singer's state of

24    mind, that it was not something that was criminal but something

25    that could be discussed in numerous public settings.

1          MR. FRANK:  We object on 403 and hearsay grounds, your

2     Honor.

3          THE COURT:  The objection is sustained.

4          MR. KENDALL:  Your Honor, Exhibit 8135A is Mr. Singer

5     presenting his credentials to Mr. DeMaio in January of 2016.  I

6     suggest, your Honor, very little of this is truthful.  We're

7     not offering it for the truth of the matter asserted, rather,

8     we're showing how Mr. Singer was able to defraud and con

9     Mr. DeMaio, who is Mr. Wilson's adviser in taxes, the person

01:08 10   who referred Mr. Wilson to Mr. Singer and was giving tax advice

11     to him about Mr. Singer in 2018.

12          It clearly goes to the issue of how Mr. DeMaio was

13     beguiled by Mr. Singer and how that Mr. Singer was able to

14     perpetrate the fraud.

15          None of this is being offered for the truth of the

16     matter asserted, your Honor.

17          MR. FRANK:  To the extent it's general character

18     impeachment, your Honor, it's not admissible on those grounds.

19     We also object on 401, 403, and hearsay grounds.

01:09 20        THE COURT:  The objection is sustained.

21          MR. KENDALL:  There are a few calls from the wiretap,

22     your Honor, that we would like to offer.  They are to show how

23     the fraud was perpetrated on parents, and we suggest it's the

24     same fraud that Mr. Wilson was a victim of.

25          There's Exhibit 1422A, a tape and transcript of a

conversation where Mr. Singer is telling the parents that their

money would go to his foundation to pay for a team to go to

Serbia for their summer training.  We all know Coach Vavic is

from Serbia and did a lot of his recruiting there.

There's a second one, Exhibit 1497A, where Mr. Singer

is talking to another parent describing his connections to

university presidents and university provosts.

And then there is another tape, 9591A, where

Mr. Singer -- I believe this is one he's describing his

relationships with the senior management at Brown University

and how he's, again, defrauding another parent.

We think these are not for the truth of the matter

asserted but for 404(b) and other purposes to show how

Mr. Singer perpetrated the fraud on parents, the types of

stories he would tell to beguile them, to lull them into

trusting him, and we offer them for those purposes.

MR. FRANK:  Your Honor, it's not an inconsistent

statement so it doesn't come in under 806.  It doesn't -- it's

also hearsay and objectionable on 403 grounds, so we object on

all of those grounds.

THE COURT:  Objection sustained.

MR. KENDALL:  We would maintain that they are

consistent with the government's interpretation of the

consensual tape, your Honor.

Exhibit -- I believe you may have ruled on these

already, but I don't know if all of them were before you when

you ruled, your Honor, so I need to put all the numbers in.

          The series of e-mails between Haden and Rick Singer

showing how Mr. Singer got introduced to Mr. Haden and how

Mr. Haden allowed him to do fund-raising or at least not

prohibit him from doing fund-raising at USC.  That would be

Exhibit the 8032, 9707, 7360.  And as I suggest, your Honor,

it's not to show the truth of the matter asserted, but it's to

show the relationship, the introduction, the failure to stop

and to prohibit contacts with him, those types of acts.

          I may be missing a number here, your Honor, I don't

know if I've read them all correctly.  Just to be sure, 8032,

7816 --

          THE COURT:  I didn't get that one first time, 7816.

          MR. KENDALL:  Yeah, I missed it, that's what caught

me.  9707 and 7360, I'm sorry about those.

          THE COURT:  I got those, all four of them.

          MR. KENDALL:  We're towards the ends of this.

          THE COURT:  I haven't made a ruling on those.

          Is there an objection?

          MR. FRANK:  There is, your Honor.  As an initial

matter, Mr. Kendall forfeited his opportunity to depose

Mr. Haden, he declined do so.

          These exhibits are not relevant to Mr. Wilson in any

way; they were years after Johnny Wilson was admitted to USC.

1    So we object on 401, 403, and hearsay grounds.

2    　　　　THE COURT:  Objection sustained.

3    　　　　MR. KENDALL:  If I may address, just so our position

4    noted, your Honor.  The introduction did come a year or so

5    after Mr. Wilson's son's admission; however, we're alleged to

6    be part of this universal overarching conspiracy.  These

7    directly go to Mr. Haden and Mr. Singer's relationship, the

8    expectation of honest services and other issues of fraud and

9    deceit with respect to Mr. Singer arose with the athletic

01:12 10    department.  I think it's directly relevant to Counts One and

11    Two.

12    　　　　We did not forfeit anything, your Honor.  Given the

13    Court's ruling on the documents, we had to make an appropriate

14    strategic decision of whether or not Mr. Haden would testify

15    truthfully.

16    　　　　With respect to the next group, your Honor, we have

17    four e-mails that describe the Pat Haden VIP or special

18    interest list.  The Court has ruled on these before.  We

19    suggest these relate to honest services issues, as well as

01:13 20    bribery issues and would, thus, be also relevant to the tax

21    case:  Exhibits 1085, 7572, Exhibits 79 -- let me get all these

22    numbers correctly.  1058, 7572, 7923, 7331, which is the

23    attachment to 7923, 7332, and then -- yes, I'm just trying to

24    check the numbering here.  If I can have the Court's patience

25    for a minute.

1           And then 1129 is both the cover and the attachment,
2      and then 7333 is also one of the attachments, your Honor.
3           All of those exhibits we would offer to show those
4      issues.
5           And as I said, the Court has ruled on these before,
6      and I'm not looking to reargue them.
7           MR. FRANK:  We renew our objection on the same
8      grounds.
9           THE COURT:  The objection is sustained once again.
01:15 10        MR. KENDALL:  Your Honor, to show the -- to impeach
11     Ms. Chassin and to show that the Subco was aware of finances
12     being considered as part of Subco decisions separate from
13     Singer to show the honest service expectations, we'd offer
14     Exhibit 1187 which is an e-mail between Heinel and Haden and
15     references to Tim Brunold.
16          MR. FRANK:  We object on the grounds that this is
17     hearsay.  We also object on the grounds that she cannot be
18     impeached with extrinsic evidence when she's not here to
19     respond and have an opportunity to respond, and we also object
01:15 20    on the grounds that she cannot be impeached on somebody else's
21     e-mail.
22          THE COURT:  Objection sustained.
23          MR. KELLY:  Just for the record, I want to make it
24     clear, we're joining in the offering of all of these exhibits.
25          THE COURT:  All right, Mr. Kelly.

             1          MR. KENDALL:  And, your Honor, it's again to show the

             2   contact, the discussion, the knowledge.  It isn't to show the

             3   truth of the matters actually stated.

             4          Next would be Exhibit 1208.  It's the organizational

             5   chart of the athletic department, and it shows all the people

             6   they have for fund-raising.

             7          MR. FRANK:  We object, 401, 403, and hearsay, your

             8   Honor.

             9          THE COURT:  Objection sustained.

01:16       10          MR. KENDALL:  Exhibit 7939 is an e-mail to Donna

            11   Heinel.  It relates to the issue of managers being admitted as

            12   walk-on players.

            13          MR. FRANK:  Same objection.

            14          THE COURT:  Objection sustained.

            15          MR. KENDALL:  Again, your Honor, on issues that the

            16   Court has already dealt with but we just want to have the

            17   record complete, we would offer a series of documents that

            18   relate to admissions of Subco candidates or VIP candidates

            19   through athletics where money was a determining factor, and

01:16       20   I'll just read the exhibit numbers to the Court.

            21          1024, 7862, 7341, 9735, 9503A, 9503, 7648, 9734,

            22   7219 --

            23          THE COURT:  Wait a minute, you're a little too fast.

            24   The last two.

            25          MR. KENDALL:  9734.

```
 1              THE COURT:  Yes.
 2              MR. KENDALL:  7219, 7235, 7490, 7504, 7502, 8045,
 3      8082, 7525, 7524, 7565, 7409, 8066, 7358.  That's that
 4      category.
 5              We have then a series of other ones that also
 6      relates -- excuse me, I need to wait for the Court's ruling and
 7      then we'll go through the others.
 8              MR. FRANK:  We object, 401, 403, and hearsay.
 9              THE COURT:  Objection sustained.
01:18 10        MR. KENDALL:  Okay.  The others would be on the same
11      topic, your Honor, of showing for the same issues based upon
12      admissions of non-Singer people for fund-raising purposes
13      through Subco and VIP.  7862, 7341, 9735, 9503A, and 9503.
14              THE COURT:  They just went in in the other group.
15              MR. KENDALL:  That so have I double-counted something,
16      your Honor?
17              THE COURT:  9503A and 9503 were in the last group.
18              MR. KENDALL:  So we have duplication?
19              MS. PAPENHAUSEN:  Yes.
01:19 20        MR. KENDALL:  Sorry, your Honor.  I was repeating them
21      twice --
22              THE COURT:  All the ones you read were in the other
23      group.
24              MR. KENDALL:  Then the last one, your Honor, which I'm
25      sure you're all happy to hear is simply the tape, 9566A.  It is
```

A3342

a consensual recording of Rick Singer and Nazie Saffari.  It

was referenced by Agent Keating in her testimony.  It is not

for the truth of the matter, but just to show that at times the

agents did direct Singer to make tapes with explicit statements

such as bribery and payments of money going to the coach

personally to show that Wilson was treated differently.  Not

for the truth of the matter at all, just to show the different

instructions and results they got with Singer with different

people.

01:20      MR. FRANK:  401, 403, and hearsay, we object, your

Honor.

     THE COURT:  Objection sustained.

     MR. KENDALL:  That may be it, your Honor, if I may

just confer for one moment.

     THE COURT:  Yes.

     MR. KENDALL:  And I thank you for your patience.

     (Discussion off the record.)

     MR. KENDALL:  That's it, your Honor.  If we have

anything on Monday, we'll let you know, but I think this is the

01:20 bulk of it.

     THE COURT:  Is there anything that needs to come to

the Court's attention before we adjourn for the week?

     MR. FRANK:  Briefly, your Honor.  With respect to the

testimony of the additional water polo player, Mr. Walters, two

issues:  One, as the Court may recall, Mr. Walters is a water

```
 1   polo player who's older brother was tragically -- died

 2   tragically during the season.  We would object to any testimony

 3   about the older brother on 403 grounds.  We don't think that

 4   it's relevant, and we also think that it's more prejudicial,

 5   substantially more prejudicial than probative.

 6           We also have an issue with the scheduling of the

 7   deposition which may or may not have been resolved.  We asked

 8   for it to happen tomorrow, if he arrives, tomorrow in person at

 9   our offices or --

10           THE COURT:  This is the new witness?

11           MR. FRANK:  Yes.  Or Sunday morning.  And the only

12   response that we've gotten so far is he won't be available

13   until Sunday afternoon, which is too late for it to have

14   practical value for us.

15           MR. KENDALL:  Your Honor, if I may respond.

16           Two things:  I'm not going to raise the death of the

17   poor brother at all, I'm shocked that Mr. Frank thinks he needs

18   to raise that in court.  That has nothing to do with what the

19   young man is coming to testify to.  He's just coming to refute

20   Casey Moon's testimony that Johnny Wilson wasn't on the team.

21   With respect to his deposition, your Honor, you know, he's

22   coming in sometime on Saturday.  We wanted to meet with him.

23   We're happy to make him available for a deposition.  I'd

24   suggest we do it Sunday morning, give the government plenty of

25   time.  They have a one-hour deposition for this guy, that's
```

```
 1    what they're asking for.  I mean, he's not a very complicated

 2    witness; he's basically going to be a shorter version of

 3    Mericle.

 4                 MR. FRANK:  Sunday morning at 10:00 would be fine with

 5    the government, your Honor.

 6                 THE COURT:  10:00 a.m. Sunday morning.

 7                 MR. FRANK:  At the government's offices.

 8                 THE COURT:  At the government's offices.

 9                 MR. KENDALL:  Your Honor, you had originally said it

10    would be a Zoom deposition.  They just need to ask the kid the

11    questions.  Can we have the convenience of the Zoom --

12                 THE COURT:  No, in person, 10:00 in the government's

13    office.

14                 MR. KENDALL:  Okay.

15                 MR. FRANK:  Thank you, your Honor.

16                 Anything else?

17                 MR. FRANK:  Not for the government.

18                 THE COURT:  We're adjourned until Monday at 9:00 a.m.

19                 THE CLERK:  All rise.

20                 (Whereupon, the proceedings adjourned at 1:22 p.m.)

21

22

23

24

25
```

```
 1                    I N D E X
 2   Witness                          Page
 3
 4   ANDREW MERICLE
 5   Direct Examination by Mr. Kendall      21
 6   Cross-Examination by Mr. Frank         61
 7
 8   STEVE LOPES
 9   Direct Examination by Mr. Sharp       119
10
11   RONALD ORR
12   Direct Examination by Mr. Sharp       122
13
14   STEVE MASERA
15   Direct Examination by Mr. Kelly       125
16   Direct Examination by Mr. Kendall     127
17
18
19
20
21
22
23
24
25
```

```
 1                     E X H I B I T S

 2    NO.                       ADMIT

 3    1540   ....................    16

 4    1254   ....................    16

 5    1255   ....................    17

 6    714    ....................    21

 7    8007   ....................    50

 8    9825   ....................    58

 9    726    ....................    65

10    728    ....................    65

11    9025   ....................    95

12    1563A  ....................    95

13    133    ....................   101

14

15

16    NO.                       FOR IDENTIFICATION

17    1564   ....................   127

18    118    ....................   129

19

20

21

22

23

24

25
```

```
 1    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           We, Kristin M. Kelley and Debra Joyce, certify that

 9    the foregoing is a correct transcript from the record of

10    proceedings taken October 1, 2021 in the above-entitled matter

11    to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley          October, 2021

15        /s/ Debra Joyce                October 1, 2021

16        Kristin M. Kelley, RPR, CRR        Date
          Debra Joyce, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25
```

**A3348**

<pre>
 1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3
      UNITED STATES OF AMERICA,          )
 4                        Plaintiff      )
                                         )
 5    vs.                                )  No. 1-19-CR-10080
                                         )
 6    GAMAL ABDELAZIZ and JOHN           )
      WILSON,                            )
 7                        Defendants.    )
                                         )
 8                                       )

 9

10

                   BEFORE THE HONORABLE NATHANIEL M. GORTON
11                     UNITED STATES DISTRICT JUDGE
                          JURY TRIAL - DAY 17
12

13
               John Joseph Moakley United States Courthouse
14                          Courtroom No. 4
                           One Courthouse Way
15                      Boston, Massachusetts 02210

16

17                          October 4, 2021
                              9:26 a.m.
18

19

20
                      Kristin M. Kelley, RPR, CRR
21                     Kelly Mortellite, RMR, CRR
                        Official Court Reporters
22            John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 3209
23                    Boston, Massachusetts 02210
                      E-mail: kmob929@gmail.com
24
               Mechanical Steno - Computer-Aided Transcript
25
</pre>

**A3349**

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```

```
 1    APPEARANCES:

 2

 3            Robert L. Sheketoff

 4            One McKinley Square

 5            Boston, MA 02109

 6            617-367-3449

 7            sheketoffr@aol.com

 8            for Gamal Abdelaziz.

 9

10

11            Michael Kendall

12            Lauren M. Papenhausen

13            White & Case, LLP

14            75 State Street

15            Boston, MA 02109

16            617-939-9310

17            michael.kendall@whitecase.com

18            for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  Thank you.  You may be seated.  Court is
 3      now in session.
 4           THE COURT:  Good morning, counsel.  I need to see you
 5      about the pending motions that have been filed over the weekend
 6      before we recall the jury.
 7           There were four by my count.  First is a motion by the
 8      defendants to reconsider the submission of contextual e-mail,
 9      or, in the alternative, to limit misleading argument.
09:28 10           I haven't received a response from the government.
11      Does the government have an opposition to that.
12           MR. FRANK:  We do, your Honor, for the same reasons
13      previously stated:  They don't come in under Rule 106.  They
14      are hearsay, they are being admitted for the truth of the
15      matter that they were about a different subject.
16           THE COURT:  What about the argument for completeness?
17           MR. FRANK:  It's a completely different series of
18      e-mails.  They're each independent of one another.
19           THE COURT:  You're saying they were contemporaneous.
09:29 20           MR. FRANK:  They were in the same time period.  We're
21      not arguing that he cut and paste the e-mail from the resume to
22      the e-mail to his wife.  We're not arguing, as the defendant
23      suggests in his motion, that there was an attempt to snip the
24      photograph out of the one document and put it in the other.
25      We're just arguing that he received the photograph and then he
```

subsequently sent the original version of the identical

photograph to his wife.  The jury can draw whatever inferences

it wants from that, but we're not arguing it's an actual cut

and paste.

THE COURT:  Mr. Kendall?

MR. FRANK:  Thank you, your Honor.  Rule 106 is not

limited to a single document.  If there is a sequence of

correspondence, which is what I think your question was looking

at, then it is relevant and it needs to be admitted.  They want

to argue and they want the jury to think that because he saw

the profile at 7:30, he picked up the same photograph and

circulated at 8:30.  The context is clear.  There's been two or

3 days of communications about getting pictures for the

yearbook photo page and the wife and Debbie Rogers and John are

all circulating pictures.  They're going to buy a page in the

yearbook to have things about Johnny, what photos would be good

at that.  This is just one of several photos being discussed.

This is what Rule 106 is written for, your Honor, so

that the context of the complete communication will not be lost

on the jury.  Thank you.

THE COURT:  All right.  I am going to allow the

admission of those -- what are there, three documents --

MR. FRANK:  Yes, your Honor.  Thank you very much.

THE COURT:  -- for the completeness of the subject

matter.

         The second motion goes with the third actually, the

motion by the defendant to exclude irrelevant or prejudicial

testimony, which I assume was filed in anticipation of the

motion of the government to preclude testimony of Mr. Walters

for violation of the sequestration order.

         Why don't I hear first from the government in that

regard.

         MR. FRANK:  Your Honor, this is a situation of the

defendants' own making.  They didn't bother contacting the

witness until after Casey Moon had testified.  They then

disclosed to us only that he had read an article about Casey

Moon's testimony, but in our deposition sought to preclude us

from asking any questions about the fact that he actually went

on after being contacted by defense counsel to discuss not just

Casey Moon's testimony, to which he is responding here, but

also his own expected testimony and the expected testimony of

another witness who was on the defense witness list.

         That is completely inappropriate and in violation of

the Court's sequestration order.  If, in fact, it appears the

defense didn't even bother notifying him of the sequestration

order last week, which is why he went on to see the discussion

of Casey Moon's testimony and the other witness's testimony and

speak with the other witness, then he's going to come in today

and testify about those very issues that he discussed with

another defense witness.  He's completely tainted, your Honor.

1    This is a sequestration order that the defense sought here,

2    repeatedly sought to enforce, and experienced counsel was well

3    aware of.

4              THE COURT:  Mr. Kendall.

5              MR. KENDALL:  Your Honor, we didn't have a chance to

6    prepare a written response but we're prepared to respond orally

7    today.  The first thing I'd like to do is mark as an exhibit

8    for the Court the complete deposition transcript so the Court

9    can look with its own eyes to see exactly what happened, what

09:32 10    questions were asked and make its own judgment.

11              THE COURT:  You can do that, but I'm not going to do

12    that now.

13              MR. KENDALL:  I'll summarize it for the Court then and

14    hand it up to the clerk.

15              This is the chronology of what happened.  Casey Moon

16    testified last week on Tuesday.  He testified even beyond what

17    we expected based upon his 302 and the extreme statements he

18    made during his testimony.  That was Tuesday.

19              There was some press coverage of it on Tuesday.  We,

09:33 20    Wednesday evening, the following day, called Mr. Walters for

21    the first time, never spoken to him, had no contact with him.

22    He didn't know who we were.  We introduced ourselves.  We said,

23    would you come to Boston this weekend and testify on Monday.

24    He said, fine.

25              We called a second member of the team, named McQuin

**A3356**

     1    Baron, and asked him the same thing.  By coincidence, they said

     2    we're good friends, we're having dinner tonight.  We said,

     3    okay, you guys can fly out together, have the weekend together.

     4         He never asked in the deposition, so he's making a

     5    representation he has no foundation for, we told him you can't

     6    talk about the case, don't read any press about the case, when

     7    you come, we'll prepare you and we'll deal with things on

     8    Saturday.

     9         When -- because of scheduling things, the other guy

09:34 10    didn't come.  Just Walters came.  McQuin Baron didn't come.  He

    11    had a scheduling order.  He had to drop out.  When we sit and

    12    talk with Mr. Walters, he tells us.  We said, have you read

    13    anything about the case.  It's in the deposition transcript.

    14    He said, I saw an article about Casey Moon that said Johnny

    15    wasn't on the team.  Then he goes on to say, but I didn't

    16    subscribe to the publication so I couldn't read the whole

    17    article and I wasn't going to pay them the money, so all I saw

    18    was something on the internet.  I didn't read the whole

    19    article.  It was just a sort of tease that they give you to try

09:34 20    get you to subscribe.

    21         He has never discussed it with McQuin, Moon's

    22    testimony, other than that.  When he and McQuin got together on

    23    Wednesday night, the few minutes after we had called them, they

    24    said to each either, they called me, they called you, we're

    25    going out, can you imagine them saying Johnny wasn't on the

```
 1    team, and that was it.  There was no manipulating testimony.

 2    McQuin is not a trial witness.

 3            So what could be a violation of sequestration?  The

 4    exposure to the newspaper article occurred before he was asked

 5    to be a witness.  That's not a sequestration violation.  That

 6    may be a timing situation we don't like.  It was a

 7    nonsubstantive exposure, I suggest to you.  It didn't change

 8    his testimony in any way.  We spoke to him.  We gave him

 9    instructions.  He flew out here.  We disclosed it in the

10    deposition.  They had an hour to go through.  They went through

11    everything thoroughly.  They want to bring it up in trial

12    before the jury to impeach him that he spoke to McQuin.

13            THE COURT:  Why shouldn't they be allowed to if I

14    allow him to testify?

15            MR. KENDALL:  If they want to ask him about talking

16    about McQuin, I don't object.

17            I'm not finished, Mr. Frank.

18            They say there's a contact with Vavic.  That's

19    nothing.  Vavic sent the kid a text sometime last week saying

20    would you talk to my lawyer.  That was it.  Vavic has nothing

21    to do with us.  There was no discussion of substance.  You can

22    understand that Coach Vavic may ask a person if they'll talk to

23    his lawyer.  Whatever went on, that has nothing to affect the

24    integrity of his testimony in this courtroom.  That's why it's

25    described so vaguely.
```

A3358

         1              THE COURT:  Let me hear from you, Mr. Frank.

         2              MR. FRANK:  I'm amused that Mr. Vavic has nothing to

         3    do with Mr. Wilson.  Mr. Vavic is the individual that

         4    Mr. Wilson bribed.  The notion that McQuin Baron opted out,

         5    McQuin Baron has been on the witness list for months --

         6              I misspoke, your Honor.  McQuin Baron was identified

         7    last week as a witness.  He then opted out and, instead, they

         8    chose to call this other witness.  If they told the witnesses

         9    not to speak with each other, then it's a violation of a

09:37 10    sequestration order by the witnesses.  If they didn't tell the

        11    witnesses not to speak with each other, then it's a violation

        12    of the sequestration order by counsel.

        13              Either way, the notion that this testimony has nothing

        14    to do with -- that the violation has --

        15              THE COURT:  Why isn't the resolution to allow him to

        16    testify and allow the government to cross-examine him,

        17    including all the conversations he's had before he testified,

        18    which will come in?  They wouldn't normally because they're

        19    hearsay, but because of bias and because of state of mind, they

09:37 20    will come in.

        21              MR. FRANK:  That is a possible solution, your Honor.

        22    If that is a solution the Court chooses, I think we should also

        23    inquire about the fact that McQuin Baron was identified as a

        24    witness and is not testifying here.

        25              I think we should also be able to explore the Vavic

```
 1   issue, which is central to this witness' bias.

 2          THE COURT:  I will allow to you do that on

 3   cross-examination.

 4          MR. FRANK:  Thank you.

 5          THE COURT:  I'm going to let Mr. Walters testify but

 6   I'm going to let the government cross-examine about everything

 7   that happened in the last week, including conversation and

 8   exchange of e-mails with Vavic.

 9          MR. KENDALL:  Your Honor, I understand the Court's

10   ruling.  We're fine with the Court's ruling.  I thank you for

11   it.  I want to clarify one thing.  If he wants to ask if you've

12   had any contact Vavic, that's one thing.  There should be no

13   reference to Vavic being arrested, Vavic going on trial, Vavic

14   having his own legal issues, your Honor.  He's not in this

15   courtroom.  His legal issues should not be before the jury.

16          MR. FRANK:  The whole issue of the bias is the fact

17   that Vavic is facing criminal charges.  That is not

18   prejudicial.  That's a fact that's essentially before the jury

19   already.  They know that he's the coconspirator, alleged

20   coconspirator of this defendant.

21          Your Honor gave a limiting instruction in the *Prange*

22   case that was upheld by the First Circuit on a very similar

23   matter.  We would not oppose a limiting instruction to this

24   one.  In this case, they're not allowed to consider Vavic's

25   guilt or inference with respect to Mr. Wilson, but they are
```

1    allowed to consider this issue of bias in the witness'

2    testimony.

3              THE COURT:  Mr. Kelly?

4              MR. KELLY:  We would object to that part, the criminal

5    charges.  That's what we think, under the First Circuit *Ackerly*

6    case, it's a violation, and we would object to that because it

7    prejudices us too.  Other than that, we don't have.

8              THE COURT:  One more.

9              MR. FRANK:  He's not been adjudged guilty, your Honor.

09:39 10   We're not referencing a guilty plea.  We're not referencing a

11   conviction.  We're referencing the fact that, like these

12   defendants, he's facing criminal charges arising out of the

13   exact same investigation.

14             THE COURT:  With respect to the conviction or the

15   charges against Vavic, I'm going to reserve.  I want to see a

16   copy of the limiting instruction I gave in what you say is a

17   similar situation.  And I will cogitate on that until that

18   portion of Mr. Walters' cross-examination, at which point we'll

19   have a sidebar to further discuss it.

09:40 20             MR. KENDALL:  Thank you, your Honor.

21             MR. FRANK:  I appreciate that, your Honor.  We can

22   hand it up.  The one thing I would say is to leave out the fact

23   that he's facing criminal charges completely undermines our

24   ability to effectively cross-examine the witness on his bias.

25   It's the fact of the criminal charge that is pending, the fact

1    that he is being called to testify as a witness for Vavic that

2    goes directly to his bias.  It's the whole point --

3              MR. KENDALL:  Your Honor --

4              THE COURT:  Mr. Kendall?

5              MR. KENDALL:  -- I think your suggestion is a wise

6    one.  Hear the young man testify.  He's an earnest, sincere

7    person.  Let him see if he's got a bias.  The kid testified in

8    deposition.  He hasn't spoken to Vavic since he graduated USC.

9    He hasn't had any contact with him.  He has no opinion on the

09:40 10    charges that have been brought.  I think the Court's suggestion

11    that he wanted to see the witness and have something tactile in

12    front of you before you made a decision is a good one.

13              THE COURT:  All right.  I'm going to take that one

14    under advisement.

15              The last motion that was filed was by the government

16    to exclude Exhibit 8131, a video excerpt from the Oprah Winfrey

17    Show discussing Johnny Wilson at age 9.  This seems absolutely

18    irrelevant and I'm not going to allow that to be introduced.

19              MR. KENDALL:  We were not planning to play any video

09:41 20    from Oprah, your Honor.

21              THE COURT:  Okay.  Well, in any event, that motion is

22    allowed.

23              I'm going to take a short recess.  Then we're going to

24    call the jury in and proceed.

25              Who will be the first witness?  Mr. Walters?

1          MR. KENDALL:  It will be Mr. Walters, your Honor.

2          THE COURT:  All right.

3          MR. KENDALL:  May we get a copy of what the government

4     handed to the Court?

5          THE COURT:  Yes.  They will give you a copy.

6     Absolutely.

7          MR. KENDALL:  Thank you, your Honor.

8          THE COURT:  We'll be in recess for five minutes.

9          THE CLERK:  All rise.

09:54 10          (Recess taken (9:41 a.m. to 9:54 p.m.)

11          THE CLERK:  Thank you.  You may be seated.  Court is

12     now in session.

13          THE COURT:  Good morning, jurors, and welcome back.  I

14     hope you had a pleasant weekend.  We had business to conduct

15     outside of your hearing just now, so that's why we're starting

16     a little late, but these, as I have said before, these save

17     time.  We're not wasting time.

18          So the defendants will call their next witness.

19          Mr. Kendall.

09:54 20          MR. KENDALL:  Thank you, your Honor.  James Walters

21     will be our next witness.

22          (James Walters, sworn.)

23          THE CLERK:  Would you please state your name for the

24     record, spelling your last.

25          THE WITNESS:  James Walters, W-a-l-t-e-r-s.

```
 1              THE COURT:  Good morning, Mr. Walters.  Will you
 2    please pull that microphone in close and -- so that we can all
 3    hear you.  Thank you.
 4                    DIRECT EXAMINATION OF JAMES WALTERS
 5    BY MR. KENDALL:
 6    Q.   Good morning, Mr. Walters.
 7    A.   Good morning.
 8    Q.   Where do you live?
 9    A.   I live in Mission Viejo, California.
10    Q.   And what do you do for a living?
11    A.   I work in real estate development.
12    Q.   When did you first realize that you were going to be a
13    witness in this case?
14    A.   On Thursday or Wednesday of last week.
15    Q.   Okay.  Wednesday night Mr. Tomback called you?
16    A.   Yes.
17    Q.   And asked you to come testify?
18    A.   That's correct.
19    Q.   Came out this weekend?
20    A.   Yes.
21    Q.   Going back home today?
22    A.   Tomorrow morning.
23    Q.   Okay.  Good.  Where did you go to high school?
24    A.   I went to Mater Dei Catholic High School.
25    Q.   Where is that?
```

```
 1   A.   That's in Santa Ana, California.

 2   Q.   Okay.  Did you play water polo there?

 3   A.   Yes, I did.

 4   Q.   For those who do not know the high school water polo

 5   world, what is Mater Dei in water polo in high school?

 6   A.   We were -- when I was there, we were easily the best team

 7   in -- probably in the nation, although we never got to compete

 8   on the national stage, but we were one of the best out there.

 9   We had a 105 game win streak.

10   Q.   Okay.  And so they never lost when you were there, fair to

11   say?

12   A.   We won three CIF championships, but we did lose the fourth

13   year.

14   Q.   Okay.  And what club did you play for?

15   A.   Regency, which was the club team of Mater Dei.

16   Q.   Did you play water polo at USC?

17   A.   Yes, I did.

18   Q.   What was your freshman year when you went there?

19   A.   Could you repeat that?

20   Q.   When did you enter as a freshman to USC?

21   A.   2014 was my freshmen year.

22   Q.   September 2014?

23   A.   Yes.

24   Q.   And you graduated June of '18 or May of '18?

25   A.   That's correct, May of '18.
```

```
 1    Q.   I don't mean to embarrass you, but tell us some of the
 2    awards you got in high school as a water polo player, just the
 3    top ones.
 4    A.   I was most valuable player once in high school.  I had --
 5    this was a Mater Dei recognition.  I had most valuable
 6    defender, recognized by the CIF, which was our -- you know, our
 7    league, so to speak.  I was recognized as first team, second
 8    team, third team throughout my years in high school.
 9    Q.   Okay.  Would it be fair to say that you were ranked as one
10    of the best water polo players in high school in the country?
11           MR. FRANK:  I Object to the leading, your Honor.
12           THE COURT:  Sustained.
13           MR. KENDALL:  I'll rephrase, your Honor.  Sorry.
14    Q.   How were you ranked your senior year?
15    A.   I was certainly one of the better players in the nation,
16    yes.
17    Q.   Okay.  Did there -- was there all American or any type of
18    distinctions or anything like that when you were in high
19    school?
20    A.   Yes, there were.
21    Q.   And what did you get in that area?
22    A.   I believe in my senior year I was Second Team
23    All-American.
24    Q.   Okay.  How did you end up at USC?
25    A.   Ended up at USC, I always wanted to go to USC.  Their
```

```
 1    water polo team is just one of the best in the nation, it
 2    always has been, and that was where I dreamed of going.
 3    Q.   Okay.  Did you get a scholarship?
 4    A.   Yes.
 5    Q.   Freshman year, were you a redshirt or varsity?
 6    A.   I was varsity.
 7    Q.   Were you playing in games your freshman year?
 8    A.   Yes.
 9    Q.   When you were with Mater Dei, that's in Southern
10    California, correct?
11    A.   That's correct.
12    Q.   Okay.  And you know Johnny Wilson's high school, you know,
13    was in Northern California toward San Francisco?
14    A.   Yes.
15    Q.   Did you ever play his teams in any tournaments?
16    A.   Yes.
17    Q.   What teams of his did you play?
18    A.   We played Menlo, the high school team.  We had a
19    tournament where it's called North South Tournament where we
20    would go -- basically, the best teams in the south would travel
21    to north or vice versa and we would compete, and that's where I
22    would play him.
23    Q.   Fair to say we don't have to ask who won.
24    A.   That's correct.
25    Q.   Okay.  And you ever play the Stanford Club teams?
```

```
 1   A.   Yes.

 2   Q.   Okay.  What was your impression of the Menlo School and

 3   the Stanford Club teams as programs?

 4        MR. FRANK:  Objection.

 5        THE COURT:  Sustained.

 6   Q.   You played both teams, correct?

 7   A.   Yes.

 8   Q.   What did you observe about them?

 9        MR. FRANK:  I Object, your Honor.  It's the same

09:59 10   question.

11        THE COURT:  Sustained.

12   A.   They were good teams.

13        THE COURT:  There's no question before you.

14   Q.   I want to go to August 19, 2014, the first day of school

15   at USC.  What dorm were you assigned to?

16   A.   Fluor Tower.

17   Q.   What room number?

18   A.   208.

19   Q.   Who were your roommates?

09:59 20   A.   My roommates were McQuin Baron, Murphy Slater, Bryce

21   Hoerman, Grant Stein, Brock Hudnut, Matteo Morelli, and I may

22   be missing one.

23   Q.   Were these varsity players or redshirts?

24   A.   Mostly varsity.  One or two of them did not play that

25   year.
```

```
 1    Q.    And then was there another suite in Fluor Tower of water
 2    polo players?
 3    A.    Yes.
 4    Q.    What suite was that?
 5    A.    307, I believe.
 6    Q.    And who was in that suite?
 7    A.    That suite was Johnny Wilson, Andrew Mericle, Tristan
 8    Reinhardt, Steve Michaud, Zach Traversi, and I believe I'm
 9    missing two or -- I believe I'm missing two in there.
10:00 10    Q.    Okay.  Were they mostly redshirts in the second suite?
11    A.    Mostly redshirts.  They were all redshirts.
12    Q.    Did you meet Johnny on August 19th, the first day?
13    A.    Yes, I did.
14    Q.    Okay.  Where did you meet him?
15    A.    At practice.
16    Q.    Okay.  Had you met him before?
17    A.    Not formally before, no.
18    Q.    Had you played against him in games?
19    A.    Yes.
10:00 20    Q.    Okay.  But I take it you don't really have introductions
21    in the water?
22    A.    No.
23    Q.    Okay.  Had you heard about anything about Johnny before
24    you met him?
25              MR. FRANK:  Objection.
```

```
 1              THE COURT:  Sustained.
 2    Q.   Without telling us what was said, could you just tell us,
 3    yes or no, had you heard anything about Johnny before you met
 4    him?  Just a yes or no.  Don't say what was said.
 5    A.   Yes.
 6    Q.   And who was the person that said something about him?
 7    Again, just the name.  I don't want to hear what was said.
 8    A.    It was talked about with our coach, Jovan.
 9    Q.   Jovan Vavic?
10:01 10    A.   Yes.
11    Q.   Okay.  During August 19th to 26, that first week of
12    practice, did you see Johnny Wilson in the water?
13    A.   Yes.
14    Q.   Okay.  How was practice organized?  Where were the varsity
15    guys and where were the redshirts?  Just tell us the layout.
16    A.   The first week of practice is very hectic.  And you know,
17    I was practicing with the varsity team and we were all together
18    in the same pool, but the way that it's organized is that the
19    guys who are redshirts or not on the traveling roster, so
10:01 20    basically they're not going to be suiting up for games, they're
21    on one end of the pool.  And the traveling team, so to speak,
22    not the redshirts, were on the other side, but you know, still
23    in the same pool.  So the way it's organized is that we have
24    the head coach on us and he's coaching us predominantly.
25    Q.    Okay.  Was there anything particularly noteworthy that you
```

|  |  |
|---|---|
| 1 | saw about Johnny when he was in the water? |
| 2 | A.   Nothing really noteworthy. |
| 3 | Q.   Just another redshirt? |
| 4 | A.   Just another redshirt. |
| 5 | Q.   In late August, was there a problem at a particular |
| 6 | practice? |
| 7 | A.   Yes. |
| 8 | Q.   Could you tell us what did you personally observe?  What |
| 9 | did you do and what did you observe? |
| 10:02 10 | A.   As I mentioned before, I was on sort of the varsity side |
| 11 | of the pool.  Play stopped.  We were working on some drills. |
| 12 | Play stopped.  I don't know what happened, but Johnny was |
| 13 | basically swimming to the side slowly.  A couple teammates, I |
| 14 | don't remember which ones, were escorting him over.  There was |
| 15 | clearly some sort of problem, although I didn't know what it |
| 16 | was.  He was getting out of the pool and then we continued to |
| 17 | play.  You know, we were working on some things.  And so next I |
| 18 | see, he is leaving the pool.  He's got, like, sunglasses on and |
| 19 | a hoodie on and he had left and went to the hospital. |
| 10:03 20 | Q.   Who left -- who was physically accompanying him as he went |
| 21 | out of the pool area? |
| 22 | A.   My roommate, McQuin Baron. |
| 23 | Q.   McQuin Baron is a -- how long have you known McQuin Baron |
| 24 | at this time? |
| 25 | A.   At that time I had known him for about five years. |

**A3371**

```
 1    Q.   Okay.  He had played at Mater Dei as well?

 2    A.   Yes.

 3    Q.   Was he also on the varsity?

 4    A.   Yes.  He was our goalie.

 5    Q.   Okay.  One of the -- how would you describe his

 6    accomplishments as a goalie?

 7    A.   He was an Olympian in 2016 Rio de Janeiro.  And he was a

 8    very accomplished athlete.  He was player of the year in

 9    college with the Peter J. Cutino award.

10:04 10  Q.   Okay.  So McQuin and somebody else is taking Johnny out of

11    the pool.  Now, did McQuin have a car, to your knowledge?

12    A.   Yes.  McQuin was -- he had offered to take him to the

13    hospital because he had the parking structure --

14         MR. FRANK:  Objection, your Honor.

15         THE COURT:  Sustained.

16    Q.   Just answer my question.  Did McQuin have a car at school?

17    A.   Yes.

18    Q.   Did you see that car?

19    A.   Yes.

10:04 20  Q.   Do you know where he parked it?

21    A.   Yes.

22    Q.   What was noteworthy about the parking space of his car?

23    A.   He got the structure that was closest to the pool and the

24    dorms, so a convenient spot.

25    Q.   So McQuin left with Johnny from the pool area on this
```

1    particular day, correct?

2    A.    That's correct.

3    Q.    That evening, did you see McQuin's car?

4    A.    Yes.

5    Q.    How did you end up seeing McQuin's car?

6    A.    It was a mess.

7    Q.    Well, tell me what did you do.

8    A.    Well, apparently --

9    Q.    Don't tell me apparently.  Just tell me I did this.  I did

10:05 10    that.  Just tell me what you personally did.

11    A.    I brought towels down and helped clean vomit off of it and

12    inside of it on the door and on the outside of it.

13    Q.    Okay.  So you cleaned vomit out of McQuin's car the

14    evening of the day Johnny was taken out of the pool?

15    A.    That's correct.

16    Q.    Have you ever had a concussion?

17    A.    Yes, I have.

18    Q.    One or more than one?

19    A.    Just one.

10:05 20    Q.    One.  And are you familiar with concussion symptoms and

21    concussion protocols for water polo players?

22    A.    Yes, I am.

23    Q.    Is vomiting part of a concussion symptom?

24    A.    Yes, it is.

25    Q.    Okay.  After this time when you cleaned the vomit out of

1   McQuin's car, is Johnny at practice the next day?

2   A.   No.

3   Q.   Okay.  Is there some period of time Johnny's not at

4   practice?

5   A.   Yes.

6   Q.   Okay.  Fair to say you're testifying from your memory?

7   A.   That's correct.

8   Q.   You weren't writing down the dates and times of these

9   events, correct?

10:06  10        MR. FRANK:  Objection to the leading, your Honor.

11        THE COURT:  Sustained.

12   Q.   Did you make any written record of these events?

13   A.   No.

14   Q.   Did you have any reason to?

15   A.   No.

16   Q.   Okay.  You're testifying based upon your memory of

17   seven years ago, correct?

18   A.   That's correct.

19   Q.   After this event with cleaning the car, do you know how

10:06  20  long Johnny's out of practice?

21   A.   He wasn't there for three weeks or so.

22   Q.   Okay.  Is this an estimate, or is this a precise?

23   A.   This is an estimate.  This is seven years ago.

24   Q.   So he's not there for a while.  And then when he comes

25   back, what do you observe?

```
 1    A.    He was still not cleared for contact.

 2    Q.    So what did you see him doing at the pool?

 3    A.    Well, at first he was just observing practice.

 4    Q.    And then did his role change and did his tasks evolve?

 5    A.    Yes, yes.

 6    Q.    What did you observe?

 7    A.    Then he was cleared to do light swimming in the diving

 8    well and later on then he was allowed to come back with us and

 9    contact.

10    Q.    Do you know the amount of time that passed before he was

11    doing light swimming?  Don't guess.  Just tell us what you

12    know.

13    A.    Four -- probably four weeks before he could do any of

14    that.

15    Q.    Do you know that, or is that an estimate?

16    A.    It's an estimate.

17    Q.    Okay.  So fair to say some period of time after he

18    returns, you eventually see him in -- you call it the diving

19    well?

20    A.    Yes.

21    Q.    What is the diving well and what is the point of him being

22    there?

23    A.    The point of the diving well is after you've had a

24    concussion, you're very prone to a much worse injury if you

25    were to get hit by a ball.  And so what we do is we would go
```

1    and swim in the diving well so that if you're swimming and a

2    ball comes over, you're far enough away to where if you get hit

3    in the head, it's not going to be too big of a deal.

4    Q.    Okay.  Before he went into the diving well, did you see

5    him doing any type of tasks on the pool deck?

6    A.    Yes.

7    Q.    What type of tasks did you observe?

8    A.    He would help clean up, you know, clean lines, put the

9    covers on, put the balls away.

10:08 10    Q.    Did other injured athletes do those type of tasks?

11    A.    Always.

12    Q.    Okay.  Did you ever see him at any games or tournaments?

13    A.    Yes.

14    Q.    Okay.  And what did you observe there?

15    A.    He was filming a lot of our games.  And there's a lot of

16    tasks that go on like if you're not playing.  There's a lot of

17    things that you have to do to help the team.

18    Q.    Is that what redshirts typically do?

19    A.    Yes.

10:08 20    Q.    Okay.  From the period that he starts returning after the

21    incident at the pool where he's throwing up, once he starts

22    coming back, is he at practice on a regular basis?

23    A.    Yes.

24    Q.    Okay.  And he's doing filming?  He's doing chores?  What

25    else do you observe?

```
     1   A.    That's about it, I mean, just helping with organizational

     2   things.

     3   Q.    Okay.  By the -- as we're getting more closer towards

     4   Thanksgiving and the early December national tournament, or the

     5   NCAA finals, was he still around doing things as a member of

     6   the team?

     7   A.    Yes.

     8   Q.    Okay.  Are you close friends with the Wilson family?

     9   A.    No.

10:09 10  Q.    After Johnny left the team freshman year, did you have

    11   much contact with him?

    12   A.    I haven't talked to him.

    13   Q.    Are you friendly with him?

    14   A.    I know him, but I mean...

    15   Q.    I mean, you're not enemies?  You just --

    16   A.    Yeah.  If I saw him, I would say hi, we'd catch up for a

    17   few minutes, but I don't suspect we'd have much to talk about.

    18   Q.    Okay.  And I take it you've never been a guest of the

    19   Wilson family for any vacations or trips --

10:09 20         MR. FRANK:  Objection to the leading, your Honor.

    21         THE COURT:  Sustained.

    22   Q.    Have you ever been a guest of the Wilson family at any

    23   vacations?

    24   A.    Never.

    25   Q.    Okay.  In high school, how fast could you swim 50 yards?
```

A3377

```
 1   A.   Probably about 21 seconds, the high end of 21 seconds.

 2   Q.   What's the high end mean?

 3   A.   21.8, 21.9, something like that.

 4   Q.   And you were one of the best in the country, correct?

 5   A.   That's correct.

 6   Q.   If somebody's swimming in the mid 22s, 22.5, 22.4, 22.7,

 7   how would that -- what would that mean about their speed as a

 8   high school water polo player?

 9   A.   It means they're fast.

10        MR. FRANK:  Objection.

11        THE COURT:  Grounds?

12        MR. FRANK:  He's not an expert, your Honor.

13        MR. KENDALL:  Your Honor.

14        THE COURT:  I'll let him have the question.

15   Q.   Okay.  After your freshman year, did you assume a certain

16   role at USC?

17   A.   Yes.

18   Q.   What was that role?

19   A.   I was elected captain at the end of -- just after season

20   of my freshman year.

21   Q.   So how many years were you captain of the USC water polo

22   team?

23   A.   Three years.

24   Q.   And in addition, did -- in the most recent Olympics, did

25   you have an opportunity to join the Olympic team?
```

```
 1   A.    I was asked to train with them, yes.

 2   Q.    And what did you decide to do?

 3   A.    I decided not to.

 4   Q.    Okay.  So going back to that question of somebody is a

 5   junior in high school is swimming in the 22s for a 50-yard

 6   sprint freestyle, what level does that put them at in high

 7   school in terms of speed for a water polo player?

 8   A.    That means they're fast.  They can -- they're a good

 9   swimmer.

10   Q.    Would that even be a fast time on the USC team?

11   A.    Yes, depending on your position, it would be.

12   Q.    Have you had any contact with Johnny Wilson in the last

13   year or two?

14   A.    No.

15   Q.    Do you know who his father -- have you ever met his

16   father?

17   A.    No.

18   Q.    Okay.  Of the coaches at USC, who was the one that you

19   were closest to?

20   A.    Probably Casey Moon or Marko Pintaric.

21   Q.    Okay.  And in fact, in your sports profile, what did you

22   say about Casey Moon?

23   A.    I don't recall.

24   Q.    Do you recall saying that he was your sports hero?

25   A.    Yes.  Now -- maybe I did say that.
```

```
 1   Q.   Okay.  Have you had any phone calls or substantive

 2   conversation with Coach Vavic since you've graduated?

 3   A.   None.

 4        MR. KENDALL:  Okay.  If I may have one moment, your

 5   Honor?

 6        THE COURT:  Yes.

 7   Q.   That year 2014 that you played, were there any European

 8   recruits on the team?

 9   A.   Yes.

10   Q.   What are the Europeans like in terms of age and size

11   compared to the American redshirts?

12   A.   They are very good at water polo.  When they came in, they

13   had been -- it's just clear that they have more experience.

14   Q.   Are they -- do the Europeans come in at age 18, or do they

15   come at a different age?

16   A.   Typically older.

17   Q.   How many years older?

18   A.   For example, one of my teammates that came in from Serbia

19   was, when he came in, I believe he was either 20 or 21, as

20   opposed to 18 like myself.

21   Q.   And what's their heights of the Europeans for that year

22   2014?

23   A.   I think they were a couple inches taller, 6'2", 6'3",

24   something like that.

25        MR. KENDALL:  Okay.  No further questions.  Thank you,
```

**A3380**

```
  1    your Honor.
  2              THE COURT:  Cross-examination, Mr. Frank.
  3              MR. FRANK:  Thank you, your Honor.
  4                  CROSS-EXAMINATION OF JAMES WALTERS
  5    BY MR. FRANK:
  6    Q.    Good morning, Mr. Walters.
  7    A.    Good morning.
  8    Q.    So you played water polo all four years in high school at
  9    Mater Dei?
 10    A.    Yes, I did.
 11    Q.    And you were a starter all four years?
 12    A.    Yes.
 13    Q.    And just as in college, you were elected a captain of the
 14    Mater Dei High School team during your sophomore year, correct?
 15    A.    The end of my sophomore year, yes.
 16    Q.    And then you also served as captain of the Mater Dei High
 17    School team during your junior and senior years, correct?
 18    A.    That's correct.
 19    Q.    And you actually committed to going to USC and playing for
 20    USC during your sophomore year in high school, correct?
 21    A.    That's correct.
 22    Q.    Coach Vavic was already familiar with your skills at that
 23    point?
 24    A.    Yes.
 25    Q.    And he had come to your games?
```

```
 1    A.   Yes.

 2    Q.   And he had seen you play?

 3    A.   Most likely.  I don't know that he came specifically for

 4    me because my team had a lot of great players, so it was a

 5    recruiting opportunity for sure.

 6    Q.   But Coach Vavic saw you play?

 7    A.   Certainly, yes.

 8    Q.   And he saw you play more than once?

 9    A.   Yes.

10:15 10   Q.   And you didn't even apply to any other schools, correct?

11    A.   I did not.

12    Q.   And during your senior year in high school, you signed a

13    National Letter of Intent, correct?

14    A.   Yes.

15         MR. FRANK:  Can we show the witness only Exhibit 771.

16    Q.   Mr. Walters, do you recognize that document?

17    A.   I believe so, yes.

18         MR. FRANK:  Okay.  Can we look at the next page.

19    Q.   Is that your signature at the bottom?

10:16 20   A.   No.  I don't recall signing that.  That doesn't look like

21    my signature.  I don't recall signing it.

22         MR. FRANK:  Can we look at the prior page, please.

23    Q.   That's your name at the top, correct?

24    A.   Yes.  And my signature is below there.

25    Q.   Right.  And that's your signature down there?
```

```
 1   A.   Yes, with my number in it.  I put my cap number in there.

 2   Q.   Okay.  And that's your mother's signature there?

 3   A.   Yes, it is.

 4   Q.   Okay.  And that's a National Letter of Intent?

 5   A.   Yes.

 6        MR. FRANK:  Can we look at the next page, please.

 7   Q.   And that's your name at the top there, right?

 8   A.   Yes, it is.

 9   Q.   And do you recall getting a 50 percent scholarship?

10   A.   Yes.

11   Q.   Okay.  So this is, in fact, your National Letter of

12   Intent, correct?

13   A.   Yes.

14        MR. FRANK:  Okay.  Government offers 771.

15        THE COURT:  It will be admitted.

16        (Exhibit 771 admitted into evidence.)

17   Q.   So the 50 percent scholarship that you got to go to USC

18   and play at USC was in recognition of the fact that you had

19   tremendous skill, correct?

20   A.   I would say so.

21   Q.   You know that they only get four and a half scholarships

22   to award?

23   A.   Yes.

24   Q.   And getting a 50 percent scholarship when there are only

25   four and a half scholarships to award suggests that you're
```

|       |                                                                      |
|-------|----------------------------------------------------------------------|
| 1     | going to have an immediate impact on the team, correct?              |
| 2     | A.    Yes.                                                            |
| 3     | Q.    You didn't pay Coach Vavic to recruit you, did you?            |
| 4     | A.    No.                                                             |
| 5     | Q.    You didn't agree to donate money to the team in exchange       |
| 6     | for your recruitment, did you?                                       |
| 7     | A.    No.                                                            |
| 8     | Q.    You didn't lie on your application to get recruited, did       |
| 9     | you?                                                                 |
| 10:17 10 | A.    No.                                                         |
| 11    | Q.    You submitted an athletic profile at some point in            |
| 12    | connection with your recruitment?                                    |
| 13    | A.    I assume so, but I don't recall.                               |
| 14    | Q.    But you didn't lie on any documents, did you?                  |
| 15    | A.    Never.                                                         |
| 16    | Q.    And you wouldn't do that?                                      |
| 17    | A.    Correct.                                                       |
| 18    | Q.    And I believe you testified on direct you started playing     |
| 19    | immediately your freshman year.  You were not a redshirt?           |
| 10:18 20 | A.    That's correct.                                             |
| 21    | Q.    And you played, in fact, at USC for all four years?           |
| 22    | A.    Yes.                                                           |
| 23    | Q.    And you played in every single game your freshman year?       |
| 24    | A.    Most every single game.  I mean, I had some injuries and      |
| 25    | things like that, so maybe I missed a couple.                       |

1    MR. FRANK:  Can we show the witness only Exhibit 8028,

2    please.

3    Q.    See all the games from freshman year, Mr. Walters?

4    MR. FRANK:  Actually, I believe this document is in

5    evidence so we can show the jury as well.

6    Q.    See all the games from your freshman year, Mr. Walters?

7    A.    Is this marking that I played in each game?

8    Q.    Does this refresh your recollection that you played in

9    each game freshman year?

10:18 10    A.    Yes.  Yes.  Okay.

11    Q.    And, in fact, you were a starter in most of those games,

12    correct?

13    A.    That is correct.

14    Q.    And you scored 34 goals during your freshman year?

15    A.    Sounds correct.

16    Q.    So it's fair to say you did, in fact, have an immediate

17    impact on the championship USC water polo team?

18    A.    Yes.

19    Q.    And, in fact, you played in just about every regular

10:19 20    season game during all four years that you were at USC?

21    A.    Yes.

22    Q.    And just like in high school, you were elected a captain

23    of the team during your sophomore year?

24    A.    Well, in college I was elected at the end of my freshman

25    year, as opposed to the end of my sophomore year.

```
  1   Q.   Even better.  And you served as a captain during your

  2   sophomore, junior, and senior years at USC?

  3   A.   That's correct.

  4   Q.   And you attended practices regularly?

  5   A.   Yes.

  6   Q.   And you attended strength training sessions?

  7   A.   Yes.

  8   Q.   And you attended team meetings?

  9   A.   Yes.

 10   Q.   And by the way, those practices and other sessions were

 11   limited to 20 hours a week under NCAA rules?

 12   A.   Yes.

 13   Q.   And Coach Vavic didn't exceed that number, did he?

 14   A.   Not to my recollection.

 15   Q.   If someone testified that he exceeded that number, that

 16   would be inconsistent with your recollection, correct?

 17   A.   I would need to hear more facts of which they're talking

 18   about and when.

 19   Q.   Well, you just testified that he didn't exceed that number

 20   to your recollection, correct?

 21   A.   To my recollection, but --

 22   Q.   Okay.  So if somebody testified differently, that would be

 23   different than your recollection; is that fair to say?

 24   A.   Well, with all due respect --

 25   Q.   Can you answer my question yes or no?  Would it be
```

1    different than your recollection?

2    A.    I don't know.

3    Q.    You don't know?

4    A.    Because if they're talking about in 15 minutes or like a

5    de minimis amount, maybe.  But to my recollection, I think it

6    was pretty much 20-hour weeks.

7    Q.    Now, you testified that you recall Johnny practicing with

8    the team before his concussion?

9    A.    Yes.

10:20 10    Q.    And that was for about a week or two at the beginning of

11    the season, to the best of your memory?

12    A.    Yes.

13    Q.    And then you testified that you remember him practicing

14    with the team after his discussion (sic) just before the end of

15    the season?

16    A.    After his concussion you said?

17    Q.    After he recovered from his concussion just before the end

18    of the season.

19    A.    Oh.  Yes, yes.

10:21 20    Q.    Of the first season, correct?

21    A.    Uh-hum.

22    Q.    Now, you and I spoke yesterday, correct?

23    A.    That's correct.

24    Q.    And yesterday do you recall that I asked you if you

25    remembered him being there that first week and you told me that

```
 1    he might have missed a day or two for class or something like
 2    that?
 3    A.    That's correct.  I said that.
 4    Q.    Okay.  And you were testifying under oath yesterday as
 5    well, correct?
 6    A.    Yes.
 7    Q.    And so that statement was true, correct?
 8    A.    That's correct.
 9    Q.    But you know that there's no class during the week of
10    August 19th at USC?
11    A.    I don't remember if there was or if there wasn't, but
12    there are orientations and things like that.
13    Q.    But there is no class during that first week, is there,
14    Mr. Walters?
15    A.    Maybe there's not.  Maybe not.
16    Q.    And you don't remember Johnny standing out in any way
17    during those classes -- during those sessions, correct?
18    A.    That's correct.
19    Q.    When I asked you about it yesterday, you said you didn't
20    think he was one of your passing partners at practice.  Do you
21    recall that?
22    A.    I recall, yeah.
23    Q.    Okay.  And then a few moments later you said he might have
24    been one of your passing partners, correct?
25    A.    Yes.  He may very well could have been.
```

```
 1   Q.   But that was seven years ago?

 2   A.   Yes.

 3   Q.   So you couldn't distinctly remember passing the ball with

 4   Johnny during those first two weeks, correct?

 5   A.   Correct.

 6   Q.   And Johnny was a redshirt, right?

 7   A.   Yes.  I don't know if at the time -- I don't know when you

 8   opt to redshirt, but it's prior to the first game.  So at that

 9   time maybe he wasn't quite yet but he was going to be.  I don't

10   know.

11   Q.   You don't know one way or the other?

12   A.   I don't know.

13   Q.   Okay.  But in any event, in the pool you're divided up

14   based on your skill level?

15   A.   After warm up, yes.

16   Q.   And so the redshirts are on one end of the pool and the

17   traveling team is on the other end of the pool?

18   A.   Typically, unless they're needed for defense or offense in

19   certain situations to play against us, so we can practice plays

20   and things like that.

21   Q.   And you're aware, sir, that your practices are videotaped?

22   A.   Yes.

23   Q.   And you study those videotapes of practices?

24   A.   Yes.

25   Q.   And you can access them from the website when you want?
```

```
 1    A.    Yes.

 2    Q.    Have you seen any recordings recently of Johnny at

 3    practice?

 4    A.    Recently?

 5    Q.    Yes.

 6    A.    Like as in now?

 7    Q.    In preparation for your testimony today, have you seen any

 8    recordings of Johnny at practice?

 9    A.    No.  I haven't seen anything, any video.

10    Q.    So the defense hasn't showed you any recordings of Johnny

11    at practice?

12    A.    No.  I haven't seen anything, no.

13    Q.    But they are videotaped?

14    A.    Well --

15    Q.    Yes or no.  Are the practices videotaped?

16    A.    It's not a yes or no question.  Sometimes they are.  It's

17    when we have things that we need to study to work on plays.  So

18    we're not going to videotape our warmup or our swim sets.

19    Q.    Okay.  But practices are videotaped from time to time,

20    correct?

21    A.    From time to time, yes.

22    Q.    Okay.  And you're not aware of any videotape of Johnny at

23    practice?

24    A.    I didn't say that.

25    Q.    Are you aware of videotape of Johnny at practice?
```

```
 1   A.    There could be some.  I don't know.

 2   Q.    Are you aware of one?

 3   A.    I mean, he was at practice so he could have very well been

 4   videotaped.

 5   Q.    He could be made of green cheese, Mr. Walters, but are you

 6   aware of a videotape of Mr. --

 7              MR. KENDALL:  Objection, your Honor.

 8              THE COURT:  Sustained.

 9   Q.    -- of Mr. Wilson at practice?

10   A.    If there's --

11   Q.    Yes or no, are you aware of a videotape of Johnny Wilson

12   at practice?

13   A.    I haven't seen one.

14   Q.    Thank you.  Now, you testified that Johnny Wilson was

15   taken from practice to the emergency room after what you

16   witnessed in the pool, correct?

17   A.    Yes.

18   Q.    And you have a specific memory of him being accompanied to

19   the hospital by McQuin Baron?

20   A.    That's correct.

21   Q.    But you're the one testifying here today?

22   A.    That's correct.

23   Q.    And you remember that Johnny apparently vomited in the car

24   and you cleaned it up?

25   A.    Helped clean it up, yes.
```

**A3391**

```
 1    Q.   And you have a specific memory from seven years ago that
 2    Johnny left the pool wearing dark glasses and a hoodie,
 3    correct?
 4    A.   That's correct.
 5    Q.   You haven't spoken to Johnny in substance since January of
 6    2015, but you remember that on that day he was wearing a
 7    hoodie; is that your testimony?
 8    A.   That is.
 9    Q.   And you don't have any memory of any coaches with him when
10:26 10    he was taken from practice to the emergency room, correct?
11    A.   They didn't take him.  That's correct.
12    Q.   You don't remember Coach Vavic being with him?
13    A.   They may have seen him when he was out of the pool, but
14    they didn't go.
15    Q.   I'm asking what you observed.  Did you observe them with
16    him when he was taken from the pool?
17    A.   Yeah.  They saw him before he left and talked to him
18    probably.  I have a vague recollection of who talked to him.
19    Q.   You have a recollection of them being with him?
10:26 20    A.   On the pool deck, to walk out, they would have to pass by
21    the coaches.
22    Q.   I'm asking what you recall, not what you would have to
23    have happen.  Do you recall the coaches being with him when he
24    was taken from the pool deck?
25    A.   I recall the athletic trainer being with him.
```

| | |
|---|---|
| 1 | Q.   So you don't recall the coaches being with him? |
| 2 | A.   That is correct.  I don't have a direct recollection of |
| 3 | that.  Yeah. |
| 4 | Q.   You don't recall Coach Vavic being with him when he was |
| 5 | taken from the pool? |
| 6 | A.   I recall -- I recall Coach Vavic talking to him briefly, |
| 7 | just to see him before he left.  That -- I mean, it's a very, |
| 8 | very vague recollection. |
| 9 | Q.   Is that a new memory that you've recovered since yesterday |
| 10:27 10 | when we spoke? |
| 11 | MR. KENDALL:  Objection, your Honor. |
| 12 | THE COURT:  Overruled. |
| 13 | A.   It's -- now that I'm thinking about it, I mean, I can't |
| 14 | imagine -- |
| 15 | Q.   I'm not asking for your imagination.  I'm asking for your |
| 16 | memory. |
| 17 | A.   Right. |
| 18 | Q.   Is it a new memory that you've recovered since yesterday |
| 19 | when we spoke and you were under oath? |
| 10:27 20 | A.   Yes. |
| 21 | Q.   Because you recall yesterday I asked you what were the |
| 22 | coaches doing.  Do you remember that question? |
| 23 | A.   Yes I do. |
| 24 | Q.   And do you remember answering me under oath "I don't |
| 25 | recall?"  Was that your testimony yesterday? |

|  |  |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And I asked again, "Do you remember which coaches were |
| 3 | there?" |
| 4 | A.   I don't recall. |
| 5 | Q.   And you said, "I don't recall," correct? |
| 6 | A.   Correct. |
| 7 | Q.   And then I asked you again, "So you don't remember the |
| 8 | coaches attending to him at all?"  Do you recall that question? |
| 9 | A.   I believe I said I don't recall. |
| 10:28 10 | Q.   You said, "I don't have a specific recollection of it," |
| 11 | correct? |
| 12 | A.   Yes. |
| 13 | Q.   So overnight you've recovered a memory of Coach Vavic |
| 14 | being there, correct? |
| 15 | A.   Well, you asked me a lot of questions.  I was thinking |
| 16 | about it a whole lot more after you'd asked. |
| 17 | Q.   And after we spoke, did you meet with defense counsel? |
| 18 | A.   No. |
| 19 | Q.   Really?  You haven't met with defense counsel since |
| 10:28 20 | yesterday? |
| 21 | A.   I said good morning to Andy this morning and that was all. |
| 22 | Q.   But after seven years your memory suddenly got better |
| 23 | overnight, correct, Mr. Walters? |
| 24 | A.   You could say that. |
| 25 | Q.   And do you remember Coach Moon being there? |

```
 1   A.    No.  I don't recall.

 2   Q.    And you don't remember Coach Pintaric being there?

 3   A.    I don't recall.

 4   Q.    And you're aware that injuries at practice are documented,

 5   correct?

 6   A.    Yes.

 7   Q.    And you haven't seen any documentation --

 8   A.    I have not.

 9   Q.    -- about Johnny's injury at practice, have you?

10:29 10  A.    I have not seen any documentation.

11   Q.    And you're aware that vomiting after a concussion is a

12   pretty serious side effect, right?

13   A.    Yes, yes.

14   Q.    It indicates a pretty serious concussion, right?

15   A.    Yes.

16   Q.    And you haven't seen any medical records that mention

17   Johnny's vomiting, have you?

18   A.    I haven't seen any medical records.

19   Q.    And you haven't seen any records of Johnny being taken

10:29 20  from practice to the hospital, correct?

21   A.    Nothing documented.

22   Q.    But you're aware it would be documented?

23   A.    Yes.

24   Q.    Now, you're aware Andrew Mericle testified in this case

25   last week?
```

```
 1   A.   No.  I wasn't aware of when he testified.  I thought he --

 2   Q.   Are you aware he testified in this case?

 3   A.   I thought he was going to testify after me.  I didn't know

 4   he already testified.

 5   Q.   Who told you he was going to testify after you?

 6   A.   I believe -- I don't remember.  I don't know.

 7   Q.   Well, when did you find out he was going to testify?

 8   A.   There was talk when I spoke to --

 9   Q.   My question, sir, was when did you find out he was going

10   to testify?

11   A.   I'm trying to remember.  I don't remember when -- it must

12   have been after Wednesday of -- or around Wednesday of last

13   week, because it -- I don't know.

14   Q.   Mr. Walters, you remember what Johnny was wearing

15   seven years ago, but you can't remember a conversation you had

16   last week about finding out that Mr. Mericle was going to

17   testify?

18   A.   You wear sunglasses after a concussion because the lights

19   are really bright and --

20   Q.   I was asking about the hoodie.

21   A.   Oh.  Okay, well --

22   Q.   You remember the hoodie, right?

23   A.   Yes.

24   Q.   From seven years ago?

25   A.   Yeah.
```

```
 1   Q.   But you don't remember when you found out that Andrew
 2   Mericle was going to testify in this case?
 3   A.   What I told you is it was sometime between Wednesday and
 4   now.
 5   Q.   And you don't remember who told you that?
 6   A.   No.  I don't remember.
 7   Q.   Was it Mr. Kendall?
 8   A.   No.  It may be -- no.  It was not.
 9   Q.   It was Mr. Tomback?
10   A.   No.
11   Q.   Was it Miss Papenhausen?
12   A.   I believe it was -- it may have been McQuin Baron.
13   Q.   May have been, but you're not sure?
14   A.   That's correct.
15   Q.   Well, who else have you been talking about your testimony
16   with?
17   A.   No one.
18   Q.   You're aware that Andrew Mericle was Johnny's roommate?
19   A.   Suitemate I knew, yes.
20   Q.   And you're aware that Andrew was also a redshirt on the
21   water polo team?
22   A.   Yes.
23   Q.   Do you know that he testified that he learned of Johnny's
24   concussion when he found him in his room with the lights off?
25   A.   I didn't know that, but okay.
```

```
 1   Q.   Do you know that he never mentioned anything in his
 2   testimony about Johnny being taken to the emergency room from
 3   practice?
 4   A.   Didn't know.
 5   Q.   Did you know that in his testimony he didn't mention
 6   anything about Johnny vomiting?
 7   A.   Didn't know.  I don't know his testimony.
 8   Q.   Fair to say that Andrew Mericle is closer to Johnny than
 9   you are?
10   A.   For sure.
11   Q.   And you testified that you haven't spoken with Johnny in
12   substance for seven years, correct?
13   A.   Since -- yeah.  Seven years, give or take, six years,
14   something like that.
15   Q.   And he never played in any games?
16   A.   That's correct.
17   Q.   And he practiced with the team for a few weeks at the
18   beginning of the season and a few weeks at the end of the
19   season?  That's your testimony?
20   A.   That's correct.
21   Q.   But you have specific memories of him being at practice
22   all those years ago?
23   A.   Yes, yes.
24   Q.   Now, yesterday, you recall I asked you who the other
25   freshmen on the team were?
```

```
 1    A.    Yes.

 2    Q.    And you gave me 14 names?  Do you recall that?

 3    A.    Yes.

 4    Q.    But, in fact, including you there were 22 freshmen on the

 5    team the first year, correct?

 6    A.    There were a lot of us, yes.

 7    Q.    So you didn't remember seven names?

 8    A.    Yes.

 9    Q.    And among the names that you forgot yesterday was Lachlan

10:33 10    Edwards, who played with you for four years.  Do you remember

11    that?

12    A.    Yes.

13    Q.    Lachlan scored 31 goals as a freshman and was All-American

14    as a senior?

15    A.    Yes.

16    Q.    But his name slipped your mind?

17    A.    He didn't live in the dorms.  He lived off campus and was

18    older and, you know, like 250 pounds, a huge guy.  I just never

19    really looked at him as a freshman.

10:34 20    Q.    But you played with him for four years?

21    A.    Yes.  I was close with Lachlan.

22          MR. FRANK:  Your Honor, I object to the laugh track

23    from the defense table.

24          THE COURT:  Yeah.  Let's have no emotional reactions

25    to questions.
```

```
 1  Q.   And you also forgot Ben Goncharenko?  Am I pronouncing
 2  that name correctly?
 3  A.   Something like that.  You did better than I would.
 4  Q.   Did better than you would, but you played with him for
 5  three years, correct?
 6  A.   He was a --
 7  Q.   Yes or no, you played with him for three years?
 8  A.   He left the team at some point.  I think it may have been
 9  two or three years.
10  Q.   Okay.  And he played 12 games as a freshman?
11  A.   Sounds right.
12  Q.   And you also forgot Chase Koplow, Steven Michaud, and Jake
13  Sanders, who all played on the team for two years, correct?
14  A.   That's correct.
15  Q.   But you remember practicing with Johnny Wilson even though
16  he missed most of the first season and quit the team after the
17  first semester and you haven't spoken with him since?
18  A.   Yes.
19  Q.   And you testified you're not close to Johnny or the
20  Wilson's, correct?
21  A.   That's correct.
22  Q.   But you're here today with a lawyer provided by
23  Mr. Wilson?
24  A.   That's correct.
25  Q.   That's Mr. Hoops over there?
```

**A3400**

```
 1    A.    That's correct.
 2    Q.    And you recall that yesterday when I asked you if you had
 3    any feelings about this case, Mr. Wilson's lawyers objected to
 4    the question --
 5              MR. KENDALL:  Objection, your Honor.
 6    Q.    -- and Mr. Hoops --
 7              THE COURT:  Overruled.
 8    Q.    -- instructed you not to answer that question about
 9    whether you had any feelings about this case.  Do you recall
10    that?
11    A.    I recall.
12              MR. KENDALL:  Objection, your Honor.  May we go to
13    sidebar?  This is the issue that --
14              THE COURT:  No.
15    Q.    Now you've known Coach Vavic for a very long time,
16    correct?
17    A.    Yes.
18    Q.    Since tenth grade in high school?
19    A.    Yes.
20    Q.    He coached your brother?
21    A.    Yes.  He's a celebrity in the sport.
22    Q.    Well, but you've known him since tenth grade personally,
23    correct?
24    A.    I met him the first time in tenth grade.
25    Q.    And he coached your brother?
```

**A3401**

```
 1   A.   Yes.
 2   Q.   And he coached you for four years throughout college?
 3   A.   Yes.
 4   Q.   And for those four years during the season you saw him
 5   six days a week, several hours a day?
 6   A.   That's correct.
 7   Q.   And Coach Vavic has been supportive of you and your
 8   family, correct?
 9   A.   Yes.
10   Q.   And your parents were very involved with the water polo
11   team?
12   A.   They helped out, yes.
13   Q.   Fair to say they were very involved?
14   A.   Yes.
15   Q.   And you're good friends with Coach Vavic's son Marko?
16   A.   Yes.  He was my teammate.
17   Q.   And you're good friends with him?
18   A.   Yes.
19   Q.   And you're aware that Coach Vavic was fired from USC and
20   arrested in connection with this investigation?
21            MR. KENDALL:  Objection, your Honor.
22            THE COURT:  Let me see counsel at sidebar.
23                 *** Beginning of sidebar ***
24            MR. KENDALL:  Your Honor, I remember the Court saying
25   that your Honor would like to see things before he just blurted
```

**A3402**

1    out in front of the jury.  I apologize.  This is *Ackerly* all

2    over again.  The same thing with *Ackerly*, he blurts it all out

3    when he knows he's not supposed to, your Honor.  He was on

4    notice that this court wanted to hear the witness, see the

5    testimony before you would make a ruling, and instead he just

6    takes it upon himself to blurt it out in front of the jury.

7         MR. KELLY:  We object, too, your Honor.  It was

8    deliberate.  And I think the case that they cited to you is not

9    the same.  The case that they cited to you, *Prange*, involved a

10:38 10   submission of an indictment to the jury of the same defendant

11    in the same case.  This is a different fact pattern.  So A, it

12    was deliberate.  And B, the case they cite is not on all fours,

13    so to the extent this is the instruction, it has to be

14    different from what they're proposing.  We do object to what he

15    just did on the *Ackerly* grounds.

16         MR. FRANK:  The issue in *Prange* was a coconspirator

17    who was charged in the same series of events.  It's exactly the

18    same situation here.  He's been identified throughout this case

19    as a coconspirator.  The notion that he's been arrested and has

10:38 20   pled not guilty is absolutely not prejudicial.

21         THE COURT:  I'm going to allow the government to

22    question him about this.  I am going to give a limiting

23    instruction to the jury.  If you have some specific objection,

24    Mr. Kelly, as to the wording of that objection off of that

25    instruction, I'll hear you.

```
 1              MR. KELLY:  Yes.  I would object to where it says
 2    "based, in part, on allegations related to the charges in this
 3    case".  That case involves a co-defendant where the issue in
 4    dispute is whether the Court can give the indictment to the
 5    jury.  It's not this issue now.  It's misleading to suggest
 6    that that case is this case.  It's not.
 7              MR. KENDALL:  It's two separate indictments.
 8              MR. KELLY:  Yeah.  It's two separate indictments in
 9    this case.  And so they can't be throwing that line in there
10:39 10   because it's not accurate.
11              THE COURT:  The line?
12              MR. KELLY:  Where it says "based, in part, on
13    allegations related to the charges in this case", that needs to
14    come out.  It's --
15              THE COURT:  Wait.
16              MR. KELLY:  -- different matter.
17              THE COURT:  Wait.
18              MR. KELLY:  It's a totally different scenario at issue
19    in this case.  That needs to come out because in that case it
10:39 20   was the same indictment, same co-defendants.  This is a
21    different indictment, different case.  So he's trying to
22    suggest to the Court that this is on all fours.  It's not.
23              THE COURT:  Mr. Frank?
24              MR. FRANK:  This case has a much closer set of facts
25    than in the *Prange* case where some of the defendants had very
```

little relationship with each other.  In this case, Mr. Wilson
is charged with bribing Mr. Vavic and Mr. Vavic is charged with
receiving a bribe from Mr. Wilson.  The fact that they're
charged in two separate indictments is of absolutely no matter.
The fact is it rises out of the same operative facts, it is the
same charge that they are charged with.  It's identical.
Identical facts.

MR. KENDALL:  Your Honor, if I may be heard.  I think
Mr. Frank is playing with fire and pushing the Court to a
new -- to a position you don't need to take.  We're almost at
the end of this case.  They've gotten in their case.  This is
wholly prejudicial what he's doing.  Why are we creating an
issue like this, your Honor?  It doesn't go to the correlations
of this case.

It's just saying Vavic got indicted, therefore the
jury should think something less.  This guy has testified he
has had no contact with Vavic at all since he graduated.  Vavic
sent a text saying would you talk to my lawyer and nobody ever
followed up.  He never spoke to the lawyer.  He never spoke to
Vavic.  He's testified he's much closer to Casey Moon than he
is to Vavic.  Your Honor, there is no -- to put in Vavic's
indictment and arrest, your Honor, when there's no basis to
think that's influencing this kid, I suggest, your Honor, is
highly prejudicial.

THE COURT:  The wording that Mr. Kelly says is that he

```
 1   wants to put in "previously indicted" rather than "based, in

 2   part, on allegations related to the charges in this case",

 3   correct, Mr. Kelly?

 4           MR. KELLY:  Yes.  That's a more fair representation.

 5           THE COURT:  What is your objection to that, Mr. Frank?

 6           MR. FRANK:  I have no objection to that, your Honor.

 7           THE COURT:  That's what I'm going to do.  Thank you,

 8   counsel.

 9                   *** End of sidebar ***

10           THE COURT:  All right.  Before we continue, jurors, I

11   have an instruction for you.  During this testimony of

12   Mr. Walters, you have heard and perhaps will hear that

13   Mr. Vavic was previously indicted.  Mr. Vavic has pleaded not

14   guilty.  I remind you that indictments are not evidence and

15   that Mr. Vavic, like all charged defendants, is presumed

16   innocent until -- unless and until proven guilty.

17           I instruct you that you are not to concern yourself

18   with the guilt or innocence of Mr. Vavic and that the fact that

19   Mr. Vavic has been charged is relevant only for context in

20   assessing the credibility of Mr. Walters.

21           You may continue with your cross-examination,

22   Mr. Frank.

23           MR. FRANK:  Thank you, your Honor.

24   BY MR. FRANK:

25   Q.  I believe the question pending to you, Mr. Walters, was
```

```
 1    whether you were aware that Coach Vavic was fired from USC and

 2    arrested in connection with this investigation.

 3    A.   Yes.  I was aware.

 4    Q.   And you are aware that the defendant, Mr. Wilson, is

 5    charged in this case with bribing Coach Vavic to recruit Johnny

 6    Wilson based on a fake athletic profile?

 7    A.   I was vaguely aware.

 8    Q.   Vaguely?

 9    A.   Yes.  I didn't know any details, did not know any of the

10    charges.

11    Q.   Okay.  But they sound familiar?

12    A.   Somewhat.

13    Q.   And Coach Vavic reached out to you just last week,

14    correct?

15    A.   Yes.

16    Q.   Right around the time that Mr. Wilson's lawyers called you

17    last week?

18    A.   That's correct.

19    Q.   And Coach Vavic reached out to you to ask you to speak

20    with his attorneys, correct?

21    A.   That's correct.

22    Q.   And you agreed to do so?

23    A.   Yes.

24    Q.   And fair to say you don't want to see Coach Vavic

25    convicted?
```

**A3407**

```
 1   A.    If he's found guilty, then that's what's right.  I don't
 2   have an opinion on whether he should be or shouldn't be.  I
 3   don't know any of the facts.
 4   Q.    So you've known Coach Vavic since you were in tenth grade
 5   and you don't have an opinion one way or the other?
 6   A.    I don't know the facts.
 7   Q.    And you don't have an opinion one way or the other?
 8   A.    Not until I know the facts.
 9   Q.    And speaking of the facts, you are aware that Coach Moon
10   testified last week in this case, correct?
11   A.    Yes.
12   Q.    And, in fact, prior to coming here today, you read an
13   article about his testimony?
14   A.    I read about half of an article about his testimony, yes.
15   Q.    You're aware of what he testified to.  Is that fair to
16   say?
17   A.    I -- just the quotes in the press article, yes.
18   Q.    Okay.  And that's the only article about this case you've
19   read?
20   A.    That's correct.
21   Q.    So it just happens that all the articles about this case,
22   that's the one you read about Coach Moon's testimony?
23   A.    Not a lot of articles about it, yes.
24   Q.    And then you spoke about that article, about his
25   testimony, with McQuin Baron, correct?
```

**A3408**

```
 1   A.   Yes.

 2   Q.   And that was after Mr. Tomback called you last week?

 3   A.   Yes.  It was that night.

 4   Q.   And Mr. Tomback didn't tell you that you're not supposed

 5   to speak to other witnesses?

 6   A.   He did tell me that.

 7   Q.   Oh, he did?  And you went ahead and did it anyway?

 8   A.   The conversation was brief, but yes.

 9   Q.   I didn't ask you what the conversation was, but you

10   disregarded his instruction and spoke with McQuin Baron,

11   correct?  Is that your testimony?

12            MR. KENDALL:  Objection, your Honor.

13            THE COURT:  Overruled.  He can explain himself.

14   A.   If I'm explaining myself, it was just --

15   Q.   I remind you, sir, that you're under oath and I've asked

16   you a yes or no question.

17            MR. KENDALL:  Objection.

18   Q.   Did you disregard the attorney's instruction and speak

19   with McQuin Baron about your testimony?  Yes or no?

20            MR. KENDALL:  Objection.  If he may answer.

21            THE COURT:  Let him answer.

22   A.   Okay.  I did disregard in a sense, but it was a very brief

23   conversation that I asked him -- I said.

24            MR. KENDALL:  Objection.

25            THE COURT:  He's not going to testify as to what
```

1    Mr. McQuin said.

2    A.    The conversation --

3    Q.    I don't think there's a question pending.

4         MR. KENDALL:  Your Honor, let him finish his answer.

5         THE COURT:  I'll let you go over that on redirect,

6    Mr. Kendall.

7    Q.    Did Mr. Tomback tell you that brief conversations with

8    other witnesses were okay?

9    A.    No.

10:46 10    Q.    You just decided that yourself?

11    A.    It's a rare occurrence you're asked to go to federal court

12    to testify.

13    Q.    You decided it was okay to disregard his instruction and

14    speak with another witness about your testimony, correct?  Yes?

15    A.    The plan was we were going to fly out together.

16    Q.    So he was going to testify also, correct?

17    A.    I don't know.  Supposedly he was going to.

18    Q.    You don't know?

19    A.    Well, he told me he was going to testify as well.

10:47 20    Q.    Okay.  And you discussed his testimony as well, correct?

21    A.    Just that he was asked to testify.

22    Q.    You discussed the substance of his testimony, as well,

23    correct?

24    A.    Very briefly.

25    Q.    And he's not here today, correct?

     1    A.    He's not here today.

     2    Q.    And you're aware the defense is not calling him?

     3    A.    I don't know.  The defense is not calling him?  What do

     4    you mean?

     5    Q.    But Coach Moon, who did testify and whose testimony you

     6    read about, he's a hero of yours, correct?

     7    A.    I think that athletic profile that you had read was, it

     8    was meant as -- I don't know when that was written or who wrote

     9    it.  I don't recall writing that he was my hero in that

10:47 10    profile.  I don't know where that came from.

    11    Q.    Let's take a look.  It's Exhibit 751 in evidence.

    12          MR. FRANK:  Miss Lewis, can you take us to page 17.

    13    Q.    There's you at the top of the page and Johnny Wilson at

    14    the bottom of the page, correct?  Do you see that?

    15    A.    It's moving a lot.  Hang on.  Where's the part of?

    16          MR. FRANK:  Miss Lewis, can you highlight the

    17    sentence?

    18          Exactly.  Thank you.

    19    A.    I didn't even say why he's my biggest sports hero.  I

10:48 20    don't know --

    21    Q.    Mr. Walters, if you could just wait until I ask a question

    22    and then the defense can ask you questions on redirect.  Fair?

    23    A.    Sure.  Yes.

    24    Q.    Did you list Casey Moon as your biggest sports hero?

    25    A.    It appears so.  I don't remember doing so, but yes.

```
 1   Q.    Okay.  And in fact, you think Casey Moon is a great guy,

 2   correct?

 3   A.    Yes, I do.

 4   Q.    And you have nothing but respect for Casey Moon?

 5   A.    That's correct.

 6              MR. FRANK:  No further questions.

 7              THE COURT:  Any redirect, Mr. Kendall?

 8              MR. KENDALL:  Yes, your Honor.

 9              Do you have a hard copy of the exhibit you just showed

10   the witness?

11              MR. FRANK:  Are you talking about the transcript or

12   the --

13              MR. KENDALL:  No, the USC document.

14              MR. FRANK:  I do not.

15              REDIRECT EXAMINATION OF JAMES WALTERS

16   BY MR. KENDALL:

17   Q.    Mr. Walters, have you told the truth today?

18   A.    Yes.

19   Q.    Do you have any reason not to tell the truth?

20   A.    No.

21   Q.    This conversation with McQuin Baron, how long have you

22   been friends?

23   A.    Since we were little kids, like 12 or 13 years old.

24   Q.    You played water polo for over 10 years together?

25   A.    That's correct.
```

**A3412**

| | |
|---|---|
| 1 | Q. How would you describe the closeness of the friendship? |
| 2 | A. Well, we're best friends. We lived together four years. |
| 3 | I've been closest friends with him since freshman year of high |
| 4 | school. |
| 5 | Q. When we called you Wednesday night, did you already have |
| 6 | existing plans with Mr. Baron? |
| 7 | A. McQuin was driving to my house as I got the call, for |
| 8 | dinner. |
| 9 | Q. He was coming over to see you for dinner? |
| 10:50 10 | A. That's right. |
| 11 | Q. Did we indicate any knowledge that we thought the two of |
| 12 | you were meeting that night? |
| 13 | A. No. |
| 14 | Q. Okay. What exactly did you say to Mr. Baron and did he |
| 15 | say to you that Mr. Frank was asking questions about? |
| 16 | MR. FRANK: Objection. Hearsay, your Honor. |
| 17 | THE COURT: Sustained. |
| 18 | MR. KENDALL: Your Honor, he opened the door, your |
| 19 | Honor. |
| 10:50 20 | THE COURT: No. |
| 21 | Q. Did you do anything with Mr. Baron to try to coordinate |
| 22 | testimony? |
| 23 | A. No. |
| 24 | Q. Did you do anything with Mr. Baron to try to falsify |
| 25 | testimony? |

|       |     |                                                          |
|-------|-----|----------------------------------------------------------|
| 1     | A.  | No.                                                      |
| 2     | Q.  | Now, he raised issues of Coach Vavic.  Since you've     |
| 3     |     | graduated from USC, have you ever spoken to Vavic on the |
| 4     |     | telephone?                                               |
| 5     | A.  | No.                                                      |
| 6     | Q.  | Have you physically seen him?                            |
| 7     | A.  | I have seen him.                                         |
| 8     | Q.  | Where did you see him?                                   |
| 9     | A.  | I saw him at one of my teammate's funerals.             |
| 10:51 10 | Q.  | It was sad.  One of the young men passed away?        |
| 11    | A.  | Yes.                                                     |
| 12    | Q.  | So there was a large group of people there?             |
| 13    | A.  | Yeah, very big.                                          |
| 14    | Q.  | Vavic was there and you were there?                     |
| 15    | A.  | Yes, the whole team was.                                 |
| 16    | Q.  | And a hundred or more other people?                     |
| 17    | A.  | Yeah.  It was on the baseball field.  It was a big     |
| 18    |     | ceremony.                                                |
| 19    | Q.  | Okay.  Other than that funeral, have you seen Vavic in  |
| 10:51 20 |     | person at all since graduation?                      |
| 21    | A.  | No.                                                      |
| 22    | Q.  | Okay.  He sent you a text last week after Casey Moon's  |
| 23    |     | testimony, correct?                                      |
| 24    | A.  | That's correct.                                          |
| 25    | Q.  | And he asked if you'd talk to his lawyer?               |

**A3414**

```
 1   A.   He asked if I would, yes.

 2   Q.   Did you speak to his lawyer?

 3   A.   No, I did not.

 4   Q.   Did you speak to Vavic?

 5   A.   No.

 6   Q.   So since graduation, which has been how many years?

 7   A.   I've been graduated for three years now.

 8   Q.   Okay.  So in three years you had one text message after

 9   Casey Moon's testimony and one unplanned -- being in the same

10   funeral with Vavic, correct?

11   A.   That's correct.

12   Q.   Okay.  Would you lie in a court to help Coach Vavic?

13   A.   No.

14   Q.   Okay.  One other thing I want to ask is you testified

15   yesterday that you saw Johnny being taken out of the -- you

16   testified today that you saw Johnny being taken out of the pool

17   and obviously looking like he's not in his best condition?

18   A.   That's correct.

19   Q.   You're not testifying the concussion happened there, did

20   you?

21   A.   No, I'm not.  I don't know when that happened.

22   Q.   You just know that he went in the pool and he wasn't doing

23   well and he had to be taken to the hospital?

24   A.   That's correct.

25   Q.   Okay.  If Coach Moon testified that Johnny only attended
```

**A3415**

```
 1    one practice on the first day on August 19, would that be

 2    accurate testimony?

 3    A.    I don't think so, no.

 4          MR. KENDALL:  No further questions.  Thank you.

 5          THE COURT:  Any recross?

 6          MR. FRANK:  Very briefly, your Honor.

 7              RECROSS EXAMINATION OF JAMES WALTERS

 8    MR. FRANK:

 9    Q.    You're aware, Mr. Walters, that a federal criminal trial

10:53 10   is serious business, correct?

11    A.    Yes.

12    Q.    You were asked whether you coordinated your testimony with

13    McQuin Baron, correct?

14    A.    Yes.  I was asked that.

15    Q.    And you testified that you didn't?

16    A.    That's correct.

17    Q.    But he told you what he was going to say and you told him

18    what you were going to say, correct?

19          MR. KENDALL:  Objection.

10:54 20         THE COURT:  Overruled.

21    A.    That's -- no.  That's not how it happened.

22    Q.    You discussed your testimony and he discussed his

23    testimony?  Is that what you're testifying?

24    A.    We discussed --

25    Q.    I didn't ask you anything other than that.  Yes or no, did
```

```
 1    you discuss your testimony?
 2    A.   Not my testimony.  We discussed the contents of why we
 3    were asked to be here.
 4    Q.   Is that different from what you testified to a few moments
 5    ago, sir?
 6    A.   Well, it seems like there's a big difference because we
 7    weren't talking about what we would be speaking about.  We were
 8    talking about we were asked if we remembered Johnny Wilson
 9    being on the team.
10    Q.   Do you recall telling me yesterday that you discussed his
11    testimony and you discussed your testimony?
12    A.   That's not what I said.
13    Q.   But you knew you weren't supposed to talk to him, correct,
14    about the case?
15    A.   That's correct.
16    Q.   And you did it anyway, correct?
17    A.   Yes, correct.
18    Q.   And you testified that you haven't spoken recently other
19    than that text last week with Coach Vavic, correct?
20    A.   That's correct.
21    Q.   But you did agree to speak with his lawyers?
22    A.   That's correct.
23    Q.   And after all these years he chose you to reach out to,
24    correct?
25              MR. KENDALL:  Objection.
```

```
 1              THE COURT:  Overruled.
 2    A.   Yes, seems so.
 3              MR. FRANK:  No further questions.
 4              THE COURT:  Thank you, Mr. Walters.  You may step
 5    down.
 6              THE WITNESS:  Thank you, your Honor.
 7              MR. KENDALL:  Your Honor, we call as our next witness
 8    Jack Bowen.
 9              (Jack Bowen, sworn.)
10:56 10        THE CLERK:  Thank you.  You may be seated.
11              And would you please state your name for the record,
12    spelling your last, and you may remove the mask if you like.
13              THE WITNESS:  My legal name is John Bowen.  I go by
14    Jack.  Last name is B-o-w-e-n.
15                   DIRECT EXAMINATION OF JOHN BOWEN
16    MR. KENDALL:
17    Q.   Good morning, Mr. Bowen.
18    A.   Good morning.
19    Q.   Do you like to go by Mr. Bowen or Coach Bowen?
10:57 20   A.   Mr. Bowen is fine, thanks.
21    Q.   Where do you live?
22    A.   Redwood City, California.
23    Q.   You flew out to join us just this weekend?
24    A.   Yes.
25    Q.   You're going back tomorrow?
```

**A3418**

```
 1    A.    Yes.

 2    Q.    What do you do for a living?

 3    A.    I'm a philosopher.  I teach philosophy and ethics.  I

 4    coach water polo.  I'm a writer.  I write books.

 5    Q.    Okay.  And for the teaching and the coaching, where do you

 6    do that?

 7    A.    Menlo School in Atherton.

 8    Q.    And how long have you been speaking at the Menlo and

 9    coaching at the Menlo School?

10:57 10    A.    I've -- I'm in my 22nd year of coaching and I've taught

11    there for 16 years.

12    Q.    Where did you grow up?

13    A.    Coronado, California.

14    Q.    Is that near San Diego?

15    A.    Yes.

16    Q.    And fair to say that California seems to be the center of

17    water polo, at least at the high school, if not the college

18    level?

19    A.    Yes.

10:58 20    Q.    What is your connection to water polo?

21    A.    I played in high school extensively.  I went on to play at

22    Stanford.  I trained with the national team.  I was an

23    alternate on the '96 Olympic team and then I've been coaching

24    high school since then.  I coached for a few years with the

25    national team as an assistant and I run goalie clinics.
```

```
 1   Q.   At Stanford, how did your Stanford team do?  When you were
 2   at Stanford, how did the team do?
 3   A.   Pretty well.
 4   Q.   Why don't you tell us, your junior and senior year, how
 5   well it did.
 6   A.   We won the national championships my junior and senior
 7   year.
 8   Q.   Okay.  Was Vavic coaching USC at the time?
 9   A.   Yes.
10   Q.   So you beat Vavic's team two years in a row?
11   A.   Yes.
12   Q.   Who was the MVP of the NCAA tournament for those
13   two years?
14   A.   My senior year it was myself and Wolf -- sorry -- Frank
15   Schneider and Jeremy Lester.  I actually don't remember the MVP
16   my junior year.
17   Q.   Okay.  And as a coach, when you've been at the Menlo
18   School, what awards have you received for coaching?
19   A.   I was chosen as the Positive Coaching Alliance Coach of
20   the Year, National Coach of the Year.  United States Water Polo
21   honored me as the National Coach of the Year.  CIF chose me as
22   one of the top 13 coaches in the state.
23   Q.   What does "positive coaching" mean?
24   A.   The Positive Coaching Alliance is about winning but
25   winning in the right way and actually focusing on the character
```

10:58 (line 10)
10:59 (line 20)

**A3420**

```
 1   of the athletes, so it's a character-focused method of

 2   coaching.

 3   Q.   Is that an important part of your coaching approach?

 4   A.   Yes.

 5   Q.   And can you give us a few examples of it.

 6   A.   Since day one, our team's motto has been "be your best".

 7   I actually would say I borrowed this from Aristotle, or it's my

 8   way of condensing a thousand pages of Aristotle into

 9   three words, and focuses on truly being your best, not

10   necessarily the best, although that -- there tends to be some

11   cross over, but the focus is really on being good people, and

12   that translates then into water polo.

13          So it's everything from honoring your teammates and

14   honoring your school and honoring your community, and we do a

15   lot of community service.  And it's really, I think, the

16   athletes come to realize water polo's a little bit of a

17   catalyst for what I consider much bigger more important things

18   than water polo.

19   Q.   Okay.  What grades does the Menlo School have?

20   A.   There's a middle school.  The middle school is grade 6

21   through 8.  And then the Menlo School, the upper school, is 9

22   through 12.

23   Q.   Back when Johnny Wilson graduated in 2014, was it a co-ed

24   school, or just a boys school?

25   A.   Co-ed.
```

```
 1   Q.   And how big is the school?  How many kids in each grade?

 2   A.   There's about 150 per grade.

 3   Q.   In addition to teaching and coaching, did you do anything

 4   else at the Menlo School in a -- as a particular

 5   responsibility?

 6   A.   For about the first ten years I was the aquatics director.

 7   And then for about ten years I was the college athletics

 8   recruiting counselor for the athletic -- sorry -- the college

 9   recruiting department.

11:01 10   Q.   Outside of the Menlo School, do you do any coaching?

11   A.   I run national level goalie clinics.

12   Q.   And do you have your own club that you do in conjunction

13   with Menlo?

14   A.   Yes.  It's not exactly in conjunction with Menlo.  It's

15   run out of Menlo School and it's comprised of about 80 percent

16   Menlo students.

17   Q.   What is that club called?

18   A.   South Peninsula Water Polo.

19   Q.   SoPen?

11:01 20   A.   SoPen is the short name for it.  Yes.

21   Q.   S-o-P-e-n?

22   A.   Yes.

23   Q.   And when they call it Southern Peninsula, is it the

24   peninsula that is part of the geography of the San Francisco

25   area, or -- just so we understand the reference?
```

```
 1   A.    Oh.  Yes.  It's -- yes.  That's correct.

 2   Q.    Okay.  And how long have you been coaching the SoPen Club?

 3   A.    Since year one, 22 years.

 4   Q.    What's the time that people are part of SoPen?

 5   A.    The high school season, which is the Menlo school season,

 6   is during the fall, so August, September, October, November,

 7   and then the SoPen season is in the winter, so the end of

 8   November through the end of January.  And then there's another

 9   slightly more intense season in the summer that starts mid May

10   and runs through late July.

11   Q.    And what is SoPen's focus?  Is it competition or training

12   or what?

13   A.    We don't actually compete.  It's sort of a unique approach

14   to -- in winter, the best analogy I can give is it's sort of

15   like playing pick-up basketball.  Like athletes go to the gym,

16   so to speak, or come to the pool.  We work on a specific skill

17   and then we run the Court, to borrow a basketball terms.  So

18   it's a way to train in a pressure free environment.  You're not

19   trying to make the team.  You're not trying to make the travel

20   team.  You're allowed to make mistakes and it's not held

21   against you.  So it's primarily -- it's actually not primarily.

22   It's the only skills focused and chance to improve without the

23   pressure of competition.

24   Q.    Did Johnny Wilson participate in SoPen?

25   A.    Yes.
```

1   Q.   Throughout high school?

2   A.   Yes.  Pretty much every Menlo player does.

3   Q.   Okay.  And in addition to being on SoPen, was Johnny on

4   another club?

5   A.   He participated with Stanford's -- the Stanford Water Polo

6   Club at Stanford.

7   Q.   Did you ever coach at Stanford?

8   A.   For one year I think in the early 2000s I did.

9   Q.   Okay.  What is the -- what is the sort of -- back in the

11:03 10   2010 to 2014 time period, what was the quality or the level of

11   play at the Stanford Club?

12   A.   Stanford's a high level club.  I mean, they've been

13   consistently -- we'll say top eight in the United States to be

14   safe.  Occasionally they win -- I mean, occasionally they're

15   number one.  It's hard for me to know exactly where they were

16   in 2010 to 2014.  Very high in level nationally ranked club.

17   Q.   Back in that time, 2010 to 2014, who were the coaches or

18   people running the Stanford Club that you're familiar with?

19   A.   Jon Barnea, who's the assistant coach of the Stanford

11:04 20   University team, has overseen the Stanford Club team and he has

21   coached it quite a bit, but they also hire out local high

22   school coaches.  So, again, it would be hard for me to know

23   exactly who the coaches were at the time, because they tend to

24   change year by year, but he would have overseen and likely

25   coached quite a bit at that time.

1    Q.    Do you know Clarke Weatherspoon?

2    A.    Yes.

3    Q.    Who is Clarke Weatherspoon?

4    A.    Clarke Weatherspoon, he teaches at a small private school

5    in San Francisco, but he has coached, up until very recently,

6    at Stanford's Club.  I would say a very respectable coach,

7    coaches similar style to the way that I do and he focuses a lot

8    on character, but he's also an exceptional water polo coach.

9    Q.    Do you look anything like that Jon Barnea?

11:05 10    A.    That's difficult.  Not really.

11    Q.    He has a full head of hair, doesn't he?

12    A.    He sure does.  Thank you.

13    Q.    Do you look anything like Clarke Weatherspoon?

14    A.    I do not.

15    Q.    Okay.  Clarke Weatherspoon is African-American, isn't he?

16    A.    He is.

17    Q.    There's no way anybody would mistake you for either one of

18    them, correct?

19    A.    Correct.

11:05 20    Q.    Now, how do you know Johnny Wilson and his family?

21    A.    Well, I know Johnny having been his coach for seven years.

22    Q.    What grade did you start coaching Johnny?

23    A.    Sixth grade.

24    Q.    And how did he come over to the water polo program?

25    A.    That would be hard to remember back to how or why he

|  |  |
|---|---|
| 1 | started playing in sixth grade.  We have a middle school that's |
| 2 | a very robust athletic department in our middle school and it |
| 3 | offers swimming in the fall.  And then it's a four-quarter |
| 4 | system and then water polo for the remaining three quarters. |
| 5 | Q.   Do you recall if he was on the swim team first? |
| 6 | A.   I don't. |
| 7 | Q.   Okay.  But you started coaching him in sixth grade, his |
| 8 | first year at the Menlo School, correct? |
| 9 | A.   Yes. |

11:06 10    Q.   And you coached him through his senior year?

11    A.   Yes.

12    Q.   Have you met Johnny's parents?

13    A.   Yes.

14    Q.   Do you see his father?

15    A.   He's right there, yes.

16        MR. KENDALL:  Let the record reflect he's correctly

17    identified John Wilson, your Honor.

18        THE COURT:  It may so reflect.

19    Q.   When Johnny was at the Menlo School, did you see his

11:06 20    parents often at water polo events?

21    A.   Yes.

22    Q.   Did they go to practices?

23    A.   No.

24    Q.   Did they go to games?

25    A.   Yes.

|      | Q.   Okay.  And were they often at games? |
| 1    | |

1    Q.   Okay.  And were they often at games?

2    A.   They came to a lot of games from what I recall.

3    Q.   Okay.  And do you remember at some point the father moved

4    to Europe --

5    A.   Yes.

6    Q.   -- and he was away a bit?  And Johnny was actually living

7    with a family friend?

8    A.   Yes.

9         MR. KENDALL:  Okay.  I'd like to show the witness

11:07 10    Exhibit 7968A, please.

11    Q.   Do you recognize this exhibit?

12    A.   Looks like an e-mail from me.

13    Q.   Okay.  If you take a look at the date and the subject

14    line, can you tell us if you recognize this as something you

15    sent?

16    A.   Yes.

17    Q.   Okay.  And you sent it to -- who did you send it to?

18    A.   Looks like a team of parents that might have been like the

19    senior -- the parents of seniors or juniors.

11:08 20    Q.   Okay.  And is that Leslie Wilson's e-mail among the

21    people?

22    A.   Yes.

23         MR. KENDALL:  Okay.  Your Honor, I'd look to offer

24    Exhibit 7968A, please.

25         MR. FRANK:  Objection.  Hearsay.

```
 1              MR. KENDALL:  Not for truth of the matter, just to
 2       show it was sent, your Honor.
 3              MR. FRANK:  Same objection.
 4              THE COURT:  The objection is sustained.
 5       Q.   Okay.  Did you ever have any contact with the Wilson's
 6       apart from actual games and practices?
 7       A.   Very little.  I mean, our water polo team I call our water
 8       polo family, and so I do occasionally interact with parents and
 9       we have -- they hosted a team dinner one night and the whole
10       team was at their home, so occasionally.
11       Q.   Do you remember they once -- Mrs. Wilson once helped
12       organize a baby shower for your wife?
13       A.   Yes.
14       Q.   Okay.  Once in a while, he gave you some tickets to a
15       baseball game?
16       A.   Giants games, yes.
17       Q.   Other than that, did you ever have any hospitality from
18       the Wilsons?
19       A.   Aside from the team dinner, no, and those things, no.
20       Q.   Okay.  How good was the Menlo School water polo team in
21       the 2010 to 2014 period?
22       A.   We won league, which is a relatively small league.  We won
23       league.  We were top five in CCS, which is a much larger
24       section.  I would put us roughly 25th to 15th in the country
25       depending on the year.
```

11:08 (line 10)
11:09 (line 20)

| | |
|---|---|
| 1 | Q.   One of the top 15 to 25 teams in the country? |
| 2 | A.   Yes. |
| 3 | Q.   Okay.  And you said the CCS.  What is CCS? |
| 4 | A.   It stands for Central Coast Section.  It's the section of |
| 5 | teams from like Monterey up to San Francisco, all down the |
| 6 | peninsula.  It's about 150 schools.  I don't know the exact |
| 7 | number of schools, but it's the big section title that everyone |
| 8 | is essentially fighting for. |
| 9 | Q.   And there's 150 water polo teams in that CCS section |
| 11:10  10 | roughly? |
| 11 | A.   I don't know.  The reason I don't know is we only play the |
| 12 | top 20 of those teams, so I really don't know how many teams |
| 13 | are outside of the top 20. |
| 14 | Q.   And typically, how was the Menlo team doing in CCS from |
| 15 | 2010 to 2014? |
| 16 | A.   Top five.  We finished top five whether it was quarter |
| 17 | finals, semifinals, finals at some point in all four of those |
| 18 | years. |
| 19 | Q.   Okay.  So you started coaching Johnny Wilson in sixth |
| 11:10  20 | grade on a middle school team, correct? |
| 21 | A.   Yes. |
| 22 | Q.   What did you observe about his skills and abilities during |
| 23 | his middle school years as a water polo player? |
| 24 | A.   He was exceptionally fast, which is a huge, especially |
| 25 | early on, when a lot of athletes are not so fast.  So he was |

able to just separate himself completely from everyone.  I

think water polo was very easy for him initially because of

that.

Q.   How was his stamina, his ability to last in a game?

A.   Outstanding.

Q.   Is that important, speed and stamina for a water polo

player?

A.   Extremely.

Q.   Okay.  Was he both on the swim team and the water polo

team during middle school?

A.   I would be surprised if he wasn't on the swim team.  I

just can't remember because I wasn't so involved and I don't

have a recollection of that.  He was on the water polo team.

Q.   Okay.  And then you coached him through four years of high

school?

A.   Yes.

Q.   How would you characterize him as a high school player?

A.   Boy, so Johnny, who I have very fond memories of, was --

again, the speed factor, people start to catch up.  Athletes

start to catch up on speed, and despite that, he would still

continue to separate himself, even at this high level.  And in

part, because he was sort of a -- he was like a quiet grinder

is the best.  I would give guys -- and sometimes part of being

your best is being pushed to failure and seeing what you do.

Do you complain?  Do you yell at your teammates?  And Johnny

```
 1    was the kind of guy who I couldn't get to crack.  I would say
 2    do this impossible swim set and he would put his head down and
 3    do it.
 4            And so that sort of focus led to the way that he
 5    played the game.  He was a -- sort of a nonstop constantly
 6    moving -- he was a driver.  So that meant after you swim the
 7    length of the pool, you then are expected to do this really
 8    explosive drive, which I -- whether or not this is relevant, I
 9    was the goalie and I feel like what Johnny and those athletes
11:13 10   do is just miserable.  It doesn't look like any fun to me at
 11   all and Johnny was willing to do the really miserable part of
 12   water polo and he kind of did it quietly.  So you know, quiet
 13   grinder is the best way I could summarize him in a nutshell.
 14   Q.   What does grinder mean?  What do you mean when you use the
 15   word "grinder"?
 16   A.   What do I mean?  I mean that he's got the fortitude to
 17   just put your head down and swim these very challenging
 18   difficult sets without stopping, without complaining, to just
 19   get it done.  Whereas a lot of young players stop, they come up
11:13 20   with excuses, my goggles are loose, I need to get some water, I
 21   forgot to call my mom, he just went in and did these sets
 22   consistently.
 23           MR. KENDALL:  Your Honor, this might be a good time
 24   for the break.
 25           THE COURT:  Yes.  We will take the morning recess for
```

```
 1   15 minutes.
 2            Jurors, we will be in recess for 15 minutes.
 3            THE CLERK:  All rise for the jury.
 4            (Jury exits.)
 5            THE COURT:  Be seated, counsel, please.
 6            You may step down for the time being, Mr. Bowen.
 7            How much longer on direct?
 8            MR. KENDALL:  It will be past noon, your Honor.
 9   Whether it's 40 minutes or an hour I can't predict, but we're
10   going to take him past 12 o'clock certainly.  For the direct, I
11   expect I will be done by 1:00, but it will be sometime between
12   12:00 and 1:00
13            THE COURT:  And cross?
14            MR. FRANK:  And based on what's happened so far, not
15   that much, but I don't know what's going to happen.
16            THE COURT:  And after Mr. Bowen, Mr. Kendall?
17            MR. KENDALL:  We have some documents to present, but
18   no other witnesses.
19            THE COURT:  And from the defendant Abdelaziz?
20            MR. KELLY:  Nothing further from Abdelaziz.
21            THE COURT:  So the defendants will be resting today?
22            MR. KENDALL:  Hopefully.
23            THE COURT:  Yes, Mr. Frank?
24            MR. FRANK:  If the documents that Mr. Kendall is
25   referring to are the ones that he marked as exhibits over the
```

```
 1    weekend, we have the same objection to all of them that we've

 2    had to all of the ones he's previously presented, your Honor.

 3              THE COURT:  How many of them are there?

 4              MR. KENDALL:  Well, there's a few that the Court

 5    allowed in, so we need to present those, your Honor, from your

 6    ruling earlier today.  And then most do not have to be done in

 7    front of the jury, so I don't have a good number for you.  Most

 8    of them we can just do without the jury's presence.

 9              THE COURT:  All right.  We're in recess for

10    15 minutes.

11              THE CLERK:  All rise.

12              (Recess taken 11:16 a.m. to 11:41 a.m.)

13              (Jury enters.)

14              THE COURT:  Good morning again, jurors.  Are you ready

15    to resume?

16              Mr. Bowen, you are reminded you remain under oath.

17              THE WITNESS:  Yes.

18              THE COURT:  You may remove your mask if you choose to,

19    and Mr. Kendall you may continue with direct examination.

20              MR. KENDALL:  Thank you.

21    BY MR. KENDALL:

22    Q.  Mr. Bowen, before we took the break, you used the phrase

23    "a driver."  Can you tell us, what is a driver?

24    A.  In water polo you have a center, a center forward, center

25    defender, goalkeeper.  Essentially everyone else is a driver.
```

```
 1    Sometimes left-handed players are just called left-handed
 2    players.  The drivers do everything else.
 3            In basketball it's somewhat akin to a point guard.
 4    They're driving through the offense, trying to clear out space,
 5    trying to earn what's called ejections where a defender attacks
 6    you illegally, and if they can, get the ball close to the goal
 7    for a goal-scoring opportunity.
 8    Q.   What is a swim-off in water polo?
 9    A.   We call it a sprint, and it's actually how every quarter
10    starts.  So the game starts and all four quarters start, the
11    referee has the ball at the edge of the pool, and six players
12    from each team are lined up at the goal line.  And on the
13    whistle, the players sprint -- the two players closest to the
14    edge of the wall where the referee is are the sprinters.  The
15    referee drops the ball, and the first person to get it, that's
16    how the game starts and they're on offense.
17    Q.   And did Johnny ever play that role of being the sprinter?
18    A.   Yes.
19    Q.   Did he do it his sophomore or junior year or senior year?
20    A.   He would have been our primary sprinter all three of those
21    years.  Again, I can't say exactly how many times he sprinted,
22    but he absolutely would have played that role.
23    Q.   Does that mean he was the fastest person on the team those
24    years?
25    A.   Not necessarily.  I happen to know he was the fastest
```

11:41

11:42

because I had his times.  Sometimes the sprinter is the one who
reacts better to the whistle.  But he happened to also be the
fastest.  It helps to be the fastest.

Q.   Did you keep records of how fast people were on the team
in their performances and various physical activities?

A.   Yes.

Q.   And what type of records did you keep and how did you make
them?

A.   So during our preseason we run a number of sets, and we
then rank all the players, and they get a power ranking at the
end.  So on day one we do a 200 freestyle, which is eight laps,
so 200 meters freestyle for time.  Then we do some -- we
actually do the same test sets that the Olympic team did when I
was on the Olympic team, again the field players not the
goalies, but I borrowed them from the Olympic team.  And we do
ten 25s, which is a one-length sprint on 30 seconds.  So you're
getting about ten seconds rest.  We would do sixteen 75s on
120.

          I'm happy to explain the intervals if you need me to,
but there's just different lengths of swimming where we would
take all the times and average them and then you would have
your power ranking at the end of the preseason.

          So it was -- it's a little bit of an internal
competition.  Players give them an external reward to push
themselves even more.  Bust it's also helpful for me to

```
 1   understand where the various players' respective fitness levels

 2   are.  Are they more endurance based?  Are they more speed

 3   based?  Can I keep them in for an entire quarter?  So it played

 4   a role of both internal competition, which actually helped them

 5   condition optimally, as well as some information for me as

 6   their coach.

 7          MR. KENDALL:  Could we show the witness only Exhibits

 8   9928, please, and since we can get two on the screen, we'll do

 9   9929.

10   Q.   Do you recognize those?

11   A.   Yes.

12   Q.   And what are they?

13   A.   These are my excel spreadsheets that I used to track times

14   and rankings.

15   Q.   And are they from when Johnny was on the team?

16   A.   Yes and yes.

17          MR. KENDALL:  Your Honor, I'd like to offer

18   Exhibits --

19   Q.   And did you create these yourself?

20   A.   Yes.

21   Q.   Did you have personal knowledge of the times and rankings

22   that were entered there?

23   A.   I'm the only one who has access to these, so yes.

24   Q.   These are things you keep in the ordinary course of being

25   a coach at the Menlo School?
```

```
 1   A.   Yes.
 2        MR. KENDALL:  Your Honor, I'd like to offer 9928 and
 3   9929 into evidence.
 4        MR. FRANK:  No objection.
 5        THE COURT:  They will be admitted.
 6        (Exhibit 9928, 9929 admitted into evidence.)
 7        MR. KENDALL:  If we could show the jury those two
 8   copies, please, these two exhibits together.
 9   Q.   If we take a look at 9929, at the top we see "Johnny."  Is
11:45 10  that John Wilson, Johnny Wilson?
11   A.   On the fourth line, yes, yes.
12        MR. KENDALL:  That's the 2013 preseason.  Can we go to
13   the other one first, please, Mr. Carter.
14   Q.   Do you see Menlo's water polo times?
15   A.   Yes.
16   Q.   You see "Johnny" at the top?
17   A.   Yes.
18   Q.   Is that Johnny Wilson?
19   A.   Yes.
11:45 20  Q.   You had another player on the team named John Wilson,
21   correct?
22   A.   Correct.
23   Q.   Was Johnny this John Wilson's son, and John was the other
24   person; is that how you kept them apart?
25   A.   That's correct.
```

|  | |
|---|---|
| 1 | Q.   You have them down as one under the 200.  What does that |
| 2 | mean? |
| 3 | A.   That's the 200 freestyle.  So when we come back, the very |
| 4 | first thing we do is a 200 freestyle.  That's the eight lengths |
| 5 | as fast as you can go. |
| 6 | Q.   Okay.  And what does the number one thing mean? |
| 7 | A.   He was the fastest on the team. |
| 8 | Q.   Okay.  And if we go all the way over to the right side |
| 9 | where it says "Ranked 4," what does that mean? |

11:46 10   A.   So if you look and you see Johnny's averages, average to

11   5.5.  So I guess on average that means he finished about fifth

12   or sixth in every test set that we did.  And only three players

13   had a better average than him.

14   Q.   Okay.  And this is his sophomore year?

15   A.   Let's see.

16   Q.   If you take a look the other exhibit, 2013.  Is '13 his

17   senior year?

18   A.   Boy, you're taxing my memory here.

19   Q.   If I suggest to you he graduated in May 2014.

11:47 20        MR. FRANK:  Your Honor, I object to coaching the

21   witness.

22        THE COURT:  Overruled.

23        MR. KENDALL:  Your Honor, that's in evidence already.

24   Q.   If we assume he graduated in May 2014 --

25   A.   Yes, if he graduated in May 2014 -- I don't have my

```
 1    players' graduation dates memorized -- then 2013 would be his

 2    senior year.

 3    Q.   Okay.

 4    A.   I don't see a date on this.

 5    Q.   Okay.  I want to show you next Exhibit 9929 -- 9928.  9929

 6    is 2013.  And 9930, if you could take a look at 9930.

 7            Do you see that's 2012?

 8            MR. KENDALL:  If we could take that down.

 9    Q.   2012, we see "Wilson" down in one, two -- third, fourth,

11:48 10   correct?

11    A.   Correct.

12    Q.   So that's his junior year?

13    A.   Correct.

14    Q.   2013 is his senior year?

15    A.   Correct.

16    Q.   And that other document we had would be what?  He's on the

17    varsity three years?

18    A.   Correct.

19    Q.   So that would be the sophomore year?

11:48 20   A.   Sophomore or junior year.  I'd need my -- it's sophomore

21    or junior year for sure.

22    Q.   So 2012 is what year for him, if 2013 is his senior year?

23    A.   He graduated in 2014.

24    Q.   Right.

25    A.   So that means when we say the year he played would be
```

```
 1    2013.
 2    Q.    For the senior year?
 3    A.    He would play in the fall.  That would be his senior year.
 4          The fall of 2012 would be his junior year.  And the
 5    fall of 2011 would be his sophomore year.
 6    Q.    Okay.  So we have right in front of us right now 2012
 7    stats for Exhibit 9930.  That's his sophomore year?
 8    A.    By my math -- again, this is hard for me to do without
 9    everything in front of me -- that would be his junior year.
10    Q.    Excuse me, his junior year.  I'm sorry, I confused it.
11    Yes.  Junior year.
12          So what do you see for this record on his junior year
13    2012 stats?
14    A.    So the way that I organized this --
15          MR. KENDALL:  Before I ask any more questions, I
16    should move to admit them.  I move to admit Exhibits 9928 --
17          THE COURT:  9928 and 29 have already been admitted.
18          MR. KENDALL:  9930, please, your Honor.
19          THE COURT:  9930 is admitted.
20          (Exhibit 9930 admitted into evidence.)
21    Q.    So what can you tell us about the statistics here in 9930
22    where it says "Wilson"?
23    A.    The way that I organize the statistics, tier one teams are
24    on the left.  You can see there were 19 tier one teams.  Then
25    tier two teams are on the right.  We, unfortunately, just by
```

1   way of tournament seatings and leagues, sometimes we have to

2   play teams where there's a great disparity.  We could

3   essentially, if we went full throttle, beat them 50 to nothing

4   and we don't.  And so I put those teams on the right as tier

5   two teams.

6        The remainder of tier one teams are teams that

7   essentially we have to go at 100 percent all out.  These are

8   the top teams in the country.  So these are the statistics that

9   I'm most interested in.  And so what I see here against those

11:50 10  top teams -- so first of all, you see I keep track of every

11  minute that every athlete plays.  So Johnny played the second

12  most number of minutes.  That's the 467.  The team captain that

13  year was a senior.  His name is Alexander Carlisle.  He's the

14  only one who played more.  And then Chris Z there played for

15  439 minutes.  He ended up playing and having a very nice career

16  at Princeton.  So he played the second most number of minutes

17  and --

18  Q.   He's got 34 steals.  He's number two in steals.  What does

19  that indicate?

11:51 20  A.   Yeah, so steals is, it's a defensive statistic, which it's

21  actually one of my favorite statistics because it's typically

22  not highlighted by the press, and it shows a commitment to our

23  team defense.  All it means -- again, similar to basketball, if

24  that's more familiar for most people.

25        It means that you were marking your player.  You're

```
 1   doing what's expected of you, but you're also aware of where
 2   the ball is, where the other players are, where the other team
 3   wants the ball to go.  So it requires that you're not just in
 4   the correct position, but typically in water polo that you have
 5   your hips in the correct position and that you're able to read
 6   what the other player is doing to take the ball away from them.
 7   Q.   So his junior year he's the player with the second highest
 8   number of minutes in the game, correct?
 9   A.   Correct.
10   Q.   And what does that indicate?
11   A.   Endurance for one, but, as I've said to my own team before
12   and when we're at preseason, being fast alone or having good
13   endurance alone doesn't mean you're good at water polo.  We've
14   had some phenomenal swimmers who didn't -- they just weren't
15   good at water polo.  They were just very fast.  So it's a
16   combination.  Absolutely it speaks to more of his endurance
17   than his speed but also his water polo IQ.  I mean, he wouldn't
18   play those minutes against that level of teams if he weren't
19   that level of player.
20   Q.   I take it it's your decision how many minutes each player
21   gets?
22   A.   Yes.
23   Q.   If we can go back to Exhibit 9928, please.  You see here
24   Johnny is their number one in the 200.  What do these other
25   metrics indicate?
```

A.    So these are test sets that I mentioned.  So I'm happy to
go through all of them or just use five 300s as an example.  So
the one adjacent to the 200 for time is five 300s.  So we swim
at 300, which is 12 laps, on a five-minute interval.  So you're
going all out.  As you can see here, Johnny got a time of 408.
So he would swim all out for about four minutes and then rest
for about a minute and do that five times and average it.

Q.    Okay.  And then 12 by 100, he's number two.  What does
that indicate?

A.    The interval on that is two minutes.  So you swim 100
yards, which is one, two, three, four laps, on a two-minute
interval.  So, as you can see, Johnny averaged a 110.  And that
means he swam about as hard as he could for a minute, ten
seconds, at basically a sprint pace and then would get about 50
seconds rest.

Q.    And he's the second best on the team on that?

A.    Yes.

Q.    And then the 10 by 25 where he's number one, what does
that indicate?

A.    That's more of a speed focus.  That is, it tests more the
anaerobic conditioning system.  We are swimming one lap, just
one sprint, and it's on 30 seconds.  So again here he's
swimming at about 13 seconds.  So he's getting about 16, 17
seconds rest and then going again, and it's ten of those.

Q.    Okay.  And based upon the other teammates that are on this

```
 1  list, can you tell what year this is for Johnny?
 2  A.   Boy, I would guess sophomore year.
 3  Q.   And how many other sophomores his sophomore year were
 4  playing in the varsity games?
 5  A.   If I had -- I would say he's the only one on this list.
 6  Q.   Okay.  And his senior year he got a concussion in the
 7  middle of the year, didn't he?
 8  A.   Yes.
 9  Q.   And he was out for part of the season?
10  A.   Yes.
11  Q.   Even though he got a concussion, did he get any particular
12  awards his senior year?
13  A.   Well, our team, first of all, we don't -- I don't give
14  awards.
15  Q.   I'm talking about -- what's the Peninsula Athletic League?
16  A.   Oh, PAL, yes.  Thank you.  The Peninsula Athletic League
17  does give awards.  That's the league that oversees the play,
18  and then at the end of the year the coaches meet and they
19  discuss who the top players are, and that's how they determine
20  it.
21       The terminology is first team all league, second team
22  all league.  And what that means is it's not an actual team.
23  It's just a designation for, the first team are essentially the
24  top seven players and goalie.  It varies year to year.
25  Sometimes it's six players, sometimes it's eight, but the top.
```

**A3444**

```
 1    And then the next best seven players are called second team,

 2    and then sometimes there's a third team and there's an

 3    honorable mention.

 4              MR. KENDALL:  If we could show the witness only 8003,

 5    please.

 6    Q.    If you could look at this e-mail and go through it,

 7    particularly the second page of it, and tell us if you

 8    recognize it.

 9    A.    It looks like an e-mail I had written, yes.

11:56 10   Q.    And who did you send this e-mail to?

11    A.    To Leslie and John, his parents.

12    Q.    Okay.  And this was back when Johnny was playing his

13    senior year?

14    A.    November of 2013 would be his senior year season, end of

15    his senior year season, yes.

16              MR. KENDALL:  Your Honor, I offer this into

17    evidence.

18              MR. FRANK:  Objection, hearsay.

19              THE COURT:  Sustained.

11:56 20   Q.    Okay.  What team did he make for all league at the

21    Peninsula Athletic League his senior year?

22    A.    First team.

23    Q.    First team.  So that means he was one of the top six or

24    seven players in the league?

25    A.    Yes.
```

Q.   And he made it even though he missed a significant amount

of playing time from his concussion?

A.   He missed playing time for his concussion and also earned

first team all league.

Q.   So he played fewer games than a lot of the other people,

but he was still one of the top players in the league?

A.   He played fewer games and was still selected to all

league, yes.

Q.   Who picks the all league at PAL?

A.   It's the coaches of the teams in the leagues.

Q.   So it's not just you; it's the coaches you're playing

against?

A.   Correct.

Q.   How important -- during Johnny's junior and senior year,

how important was his speed for him to be a water polo player?

A.   Speed in general is exceptionally important.  I mean,

it's -- again, I use basketball because people tend to be more

familiar with basketball, especially on the east coast.  If you

can get down the court faster than the defender next to you,

then you're closer to the basket.  So speed is exceptionally

important.

Q.   And how would you describe his speed up until the time he

got the concussion senior year?

A.   Well, thankfully we have the data to show that he was

arguably the fastest player on the team and also one of, I

```
         1   would say one of the fastest in the league.  I don't have

         2   evidence to prove that, but --

         3   Q.   That's what you observed --

         4   A.   Yes.

         5   Q.   -- from being at the games?

         6           And do college coaches give much weight to a player

         7   having that type of speed relative to others?

         8           MR. FRANK:  Objection, hearsay.

         9           THE COURT:  Sustained.

11:58   10   Q.   Have you been involved in much college recruiting in your

        11   water polo career?

        12   A.   Yes.

        13   Q.   Okay.  How many recruiting calls do you do in a typical

        14   year as a coach at Menlo?

        15   A.   I feel like in the last month I've had, I don't know, 50.

        16   Q.   Would that be typical for a season over the last ten

        17   years?

        18   A.   Yes.

        19   Q.   You have well in excess of 50 recruiting calls with

11:59   20   college coaches every year?

        21   A.   Oh, more than that.  I'm saying in the last month.

        22   Q.   Okay.  Typical season or typical year, how many recruiting

        23   calls do you have with coaches?

        24   A.   Including e-mails or just phone calls?

        25   Q.   Contacts where you're discussing candidates with coaches.
```

```
 1   A.   500.

 2   Q.   500 during a year?

 3   A.   Yeah.

 4   Q.   And is that with just about your athletes or about other

 5   athletes as well?

 6   A.   Both.

 7   Q.   Coaches want your opinion of people you played against?

 8   A.   Correct.

 9   Q.   Okay.  Based upon all this experience, how important was

10   speed like Johnny's for recruiting?

11   A.   Exceptionally important.  The problem with -- it's not

12   fair to say "the problem."  The trick with going from high

13   school to college is the college game is just a much faster,

14   much more intense and, actually, at the time they were playing

15   30 meters at the college level, not 25 yards.  So high school

16   players, if you're not conditioned and you don't have the speed

17   required at the college level, you can actually have quite a

18   bit of success as a high school athlete.

19        If you're big and you're athletic and maybe you don't

20   have the greatest stamina or endurance or speed, you can get

21   away with it because it's a shorter pool and the players are

22   not national caliber.  That does not translate well to the

23   college level.  That is a huge part of making the jump from

24   going to high school to going to a national level in a college

25   program.
```

```
 1   Q.   Did Johnny have the speed to make that jump?

 2   A.   Yes.

 3   Q.   Is there a phrase that water polo coaches use called

 4   "inside game"?

 5   A.   The term is "inside water."  I guess some may call it

 6   "inside game."  "Inside water" would be more appropriate.

 7   Q.   What does that mean?

 8   A.   Inside water, if this Kleenex box is the goal, and here is

 9   the defender, and here is the offensive player, if the

10   offensive player can find a way to get closer to the goal than

11   the defensive player, then they're said to have inside water.

12   That's not only important for the obvious reasons, because you

13   want to be closer to the goal without a defender in your way,

14   but if a defender fouls you in this situation, even if it would

15   have typically been a normal foul, this defender is either

16   excluded from the game or a penalty shot is awarded.  So in a

17   way, the high level athletes are more trying to get inside

18   water than to just throw the ball into the goal.

19   Q.   How was Johnny at inside water?

20   A.   Very strong.  I would say his ability to earn inside water

21   and his defensive ability to read the game and earn steals were

22   his forte.

23   Q.   Okay.  And were they at a level where he could play at a

24   good Division 1 team, or at least be a redshirt walk-on to a

25   good Division 1 team?
```

**A3449**

```
 1   A.    Oh, yes.

 2   Q.    Okay.  Are those qualities that Division 1 coaches look

 3   for in high school athletes?

 4   A.    Yes.

 5   Q.    Okay.  Would it be fair to say Johnny was playing varsity

 6   his sophomore year, correct?

 7   A.    Yes.

 8   Q.    Did his teammates give him any particular recognition

 9   sophomore year?

10   A.    Yeah.  So sophomore year was unique in that we run a

11   tournament in honor of a player that was unfortunately killed

12   in a car accident when he went off to play at Princeton.  It's

13   called the Scott Roach Invitational.  It honors his spirit.  It

14   turns out the kid was an amazing person in many ways, but

15   that's not necessarily relevant here.

16         So we host this tournament called the Scott Roach

17   Invitational.  And that year we won the tournament.  It's a

18   pretty high level tournament, and we won the tournament.  And

19   so typically there's a sponsor of the tournament, you get like

20   a suit or a bag or a shirt or something.  And the sponsor gave

21   me an extra, I think it was an extra sweatshirt, some extra

22   item.  And the team decided to vote on who was the most

23   inspirational player of the tournament, and they chose Johnny.

24   Q.    As a sophomore?

25   A.    Yeah.
```

12:02 (line 10)
12:03 (line 20)

```
 1    Q.   Could you take a look at Exhibit 7258, please.

 2         Do you recognize it?

 3    A.   It looks like an e-mail from me to Leslie and John, yes.

 4    Q.   And it's in 2011?

 5    A.   Correct.

 6    Q.   Is that the year of this tournament?

 7    A.   That would be the weekend after probably, yes, yes.

 8         MR. KENDALL:  Your Honor, I'd offer Exhibit 7258,

 9    please.

12:04 10        MR. FRANK:  Objection, your Honor.  Hearsay, and the

11    exhibit also appears to be redacted.

12         THE COURT:  The objection is sustained.

13         MR. KENDALL:  I don't think it's redacted, your Honor,

14    just to make the objection correct.

15    Q.   Did you tell Johnny's parents about that award?

16    A.   Yes.

17    Q.   If you could look at, just for the witness again, Exhibit

18    7258.  If you could read the last paragraph there.

19         THE COURT:  To yourself.

12:05 20   A.   "Pretty cool" --

21    Q.   Don't read it -- Read it to yourself.

22    A.   Sorry.

23         MR. KENDALL:  Now, if we could turn that off, please.

24    Q.   Does that refresh your recollection as to how many

25    sophomores were playing varsity that year on the Menlo team?
```

**A3451**

```
 1   A.    Oh, I didn't read it.

 2         MR. KENDALL:  Can we show the witness.

 3   Q.    Just read it to yourself and see if that refreshes your

 4   recollection.

 5   A.    Yes, yes, it does.

 6   Q.    Okay.  How many sophomores were playing varsity on the

 7   Menlo team that year?

 8   A.    One.

 9   Q.    That was Johnny?

10   A.    Yes.

11   Q.    What's an assist in water polo?

12   A.    It is the pass immediately preceding a goal which leads to

13   the goal being scored.

14   Q.    Was Johnny good with assists?

15   A.    It would be hard for me to remember exactly.

16   Q.    Okay.  Why don't we see if we can help you with the

17   exhibit, please.

18         MR. KENDALL:  If we could show the witness Exhibit

19   9929.  Excuse me, not that one.  Yeah, 9930.  Thank you.

20         Everybody has seen this.  It's admitted.  If we could

21   show the jury as well, 9030.

22   Q.    He's got 11 assists on the tier one team.  What does that

23   indicate?

24   A.    That indicates that 11 times in those 19 games he threw

25   the pass that led immediately to a goal.
```

12:05 (line 10)

12:06 (line 20)

**A3452**

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | Q.   Okay.  Great.  And where does he rank in goals that year?       |
| 2   | A.   Looks like he was third.                                        |
| 3   | Q.   Okay.  How good was the Menlo team Johnny's junior year?        |
| 4   | A.   Boy, 2012, '13 -- 2012, this year.  Very good.                  |
| 5   | Q.   Do you recall typically how was the team performing at the      |
| 6   | sectionals tournament each year?                                     |
| 7   | A.   Well, if I could see that again.  I have 22 years of            |
| 8   | coaching.  It's really hard for me to rattle off what a team         |
| 9   | did per year.  I'm having trouble trying to remember what our        |
| 12:07 10 | team did last year.  But seeing that, I can tell you exactly    |
| 11  | what's the national data.                                            |
| 12  | Q.   I'll get to that in just a minute.                              |
| 13  |      MR. KENDALL:  I'd like to show the witness Exhibit              |
| 14  | 7124.                                                                 |
| 15  | Q.   Do you recognize that picture?                                  |
| 16  | A.   I don't know if I've seen this picture before.  I               |
| 17  | recognize what's going on.                                           |
| 18  | Q.   Okay.  Do you recognize what it's a picture of?                 |
| 19  | A.   Yes.                                                             |
| 12:08 20 | Q.   Do you recognize the person with the cap that looks like   |
| 21  | number -- with the blue cap with the ball in their hand?             |
| 22  | A.   Number 3?                                                        |
| 23  | Q.   Yeah.                                                            |
| 24  | A.   Yes.                                                             |
| 25  | Q.   Who is it?                                                       |

A3453

```
 1   A.    That's Johnny Wilson.

 2   Q.    And when he's playing for you?

 3   A.    Yes.

 4         MR. KENDALL:  Okay.  Your Honor, I'd like to offer

 5   Exhibit 7124 into evidence.

 6         MR. FRANK:  No objection.

 7         THE COURT:  It will be admitted.

 8         (Exhibit 7124 admitted into evidence.)

 9         MR. KENDALL:  If we can show the jury, please.

10   Q.    So the person holding the ball is Johnny, correct?

11   A.    Yes.

12   Q.    And that banner behind him where it says "Boys Water Polo

13   Champions League Menlo," could you tell us what all those years

14   there indicate?

15   A.    Yes, those are the years we won the league championship

16   and then the CCS, Central Coast Section championship.

17   Q.    Okay.  Now, at some point during his senior year, did you

18   learn that Johnny was hoping to get into USC as a water polo

19   player?

20   A.    I knew he had a list of schools that he was interested in.

21   Q.    Okay.  And was USC one of them?

22   A.    Yes.

23   Q.    And did you discuss that with his parents?

24   A.    Well --

25   Q.    Or e-mail them about it?  When I say "discuss," e-mail or
```

The timestamps in the left margin: 12:08 at line 10, 12:09 at line 20.

1    orally, either way.

2    A.   Again, as I mentioned, you're going back 6,000

3    conversations over eight years.

4    Q.   If we could show the witness Exhibit 7976, please.  I'd

5    ask you to read that document.

6              THE COURT:  To yourself.

7    Q.   To yourself, please.

8    A.   Yes, yes.

9    Q.   Okay.

12:10 10   A.   Yes.

11   Q.   And do you recognize Exhibit 7976?

12   A.   This e-mail?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Okay.  And what is it?

16   A.   It references our work with the USC coach.

17   Q.   Okay.  And who is it from and who is it to?

18   A.   It's from me to Leslie Wilson and John Wilson, his father.

19             MR. KENDALL:  Your Honor, I'd offer 79 and 76 into

12:10 20   evidence.

21             MR. FRANK:  Objection.

22             MR. KENDALL:  Not for the truth of the matter.  Just

23   to show the communication with the family.

24             MR. FRANK:  Objection, hearsay.

25             THE COURT:  Objection sustained.

```
 1   Q.   Okay.  After reading Exhibit 7976, does it refresh your

 2   recollection that you e-mailed the Wilsons about Johnny's

 3   applying to USC for water polo?

 4   A.   Yes.

 5   Q.   And what did you tell the Wilsons?

 6            MR. FRANK:  Objection, your Honor.

 7            MR. KENDALL:  It's for state of mind of my client,

 8   your Honor.

 9            MR. FRANK:  Your Honor, he can testify what he told

10   them generally but not in particular.

11            THE COURT:  He can testify as to what he told them

12   generally.

13   Q.   Generally, what did you tell the Wilsons?  Were you

14   supportive?  What was your position on his going to USC?

15   A.   So again, as I'm trying to be as exact as possible, it is

16   impossible for me to remember what I said to any parent seven

17   years ago.

18            So what I can say is with every athlete of mine,

19   regardless -- I have two seniors right now who aren't

20   interested in playing water polo and I sit with them and I talk

21   about -- what they want from their college experience.  So --

22   Q.   Why don't you -- if we could show the witness again 7976.

23   If you could tell us if that refreshes your recollection of

24   what you told the Wilsons generally.  I don't want you to read

25   this document out loud.  I want to see if it refreshes your
```

```
 1   memory.

 2   A.   Right.

 3   Q.   If you could look at the one, two, third paragraph of the

 4   e-mail.

 5   A.   Yes.  So what I --

 6            THE COURT:  Take the document down after he's had a

 7   chance to read it.

 8            THE WITNESS:  I saw it, thank you.

 9   A.   What I would have told Johnny in this situation is how to
12:12 10  start the outreach with each of the coaches, which begins by

11   introducing himself, sending a cover letter, sending a resume,

12   which I look over, and that he reaches out to all the coaches.

13   In this case the USC coach was included in that.  And to

14   establish a relationship with those coaches because the

15   recruiting process isn't just one outreach, "I'd like to go to

16   your school," and the coach says, "We'd like you" or "We don't

17   want you."  They need a sense to understand what this athlete

18   is like, how serious are they taking this, how professional are

19   they, what's their coach saying about them, how are they
12:13 20  stacking up against all the other athletes.

21            So what I would have told Johnny to do here in this

22   case is to do that with the USC coach, and that's the work that

23   we were doing with all the coaches, including the USC coach.

24   Q.   Do you remember telling him that you supported him in the

25   process?
```

```
 1    A.    Yes.

 2    Q.    Okay.  And you were enthusiastic about him trying to do

 3    this?

 4    A.    I'm enthusiastic about doing this process with all of my

 5    student athletes, and I would have been with Johnny,

 6    absolutely.

 7    Q.    And you offered to do anything you could to help with his

 8    application, correct?

 9    A.    "Anything I could" is strong.  But I --

10    Q.    If you could take a look at 7679 again, please, and tell

11    us -- 7976, please.  And if we could leave it up for a minute

12    and if you could read the third paragraph.

13    A.    Yes.

14    Q.    And after you've read that, could you tell us, does that

15    refresh your memory --

16    A.    It does.

17    Q.    -- you told the Wilsons that you --

18    A.    I wanted the Wilsons to know if there was anything that I

19    could do to help in the process, I am more than happy to do

20    that.

21    Q.    Okay.  When Johnny had his concussion, did he remain part

22    of the team for the rest of the season?

23    A.    Yes, he was with the team.  He couldn't -- he wasn't

24    allowed to train during that specific time.

25    Q.    Okay.  Other than USC, did Johnny express interest in any
```

```
 1    other teams for recruiting?

 2    A.   So, yes.  The two that jump out -- typically I ask players

 3    to at least get to a list of six, if not more, because of how

 4    challenging the process is.  I know he got interest from the

 5    Air Force Academy, although I don't remember him being super

 6    interested in that.  He did get some interest from the Boston

 7    College swim program, although they didn't have water polo.  He

 8    would have, although I don't remember, have had other schools

 9    on his list.

12:15 10   Q.   Okay.  I'd like to show you Exhibit 7960, and if you could

11    read that document and tell us if you recognize it.

12    A.   Yes.

13    Q.   And what is it?

14    A.   It's an e-mail from me to Leslie and John Wilson, Johnny's

15    father.

16    Q.   Is it during his senior year in high school?

17    A.   Yes.  It's right at the beginning of his senior year, yes.

18    Q.   And did you send this to them as part of your work as the

19    coach at the Menlo School?

12:16 20   A.   Yes.

21    Q.   As part of your college advising work?

22    A.   Not -- I mean, as part of my work with my athletes.

23    Q.   Yes?

24    A.   So, yes.

25         MR. KENDALL:  Your Honor, I offer 7960 into evidence
```

**A3459**

```
 1    again to show state of mind of my client.
 2              MR. FRANK:  Objection, hearsay.
 3              THE COURT:  The objection is sustained.
 4              MR. KENDALL:  Okay.
 5    Q.   At some point did you agree to write a recommendation for
 6    Johnny to USC?
 7    A.   Yes.
 8    Q.   Okay.  What type of recommendation did you offer to write,
 9    an academic one, a nonacademic one?
12:16 10   A.   It would by definition be a nonacademic recommendation.
11    Schools typically require two academic and then allow for a
12    nonacademic.  So it would have been from his water polo coach
13    per se.
14    Q.   Okay.  Did you volunteer to a lot of parents to write
15    nonacademic recommendations?
16    A.   I don't typically do that.
17    Q.   And why did you offer it for Johnny?
18    A.   I think it was a way, especially with what he was going
19    through with concussion and then being out of town, and just
12:17 20   wanting to make sure that everything was being done for him to
21    help him get to the next step that he wanted to get to.
22    Q.   In fact, you didn't write a recommendation to USC,
23    correct?
24    A.   That's correct.
25    Q.   But did you have a phone call with the USC coach?
```

```
 1   A.   Yes.

 2   Q.   Okay.  Now, do you know Coach Vavic?

 3   A.   Yes.

 4   Q.   Okay.  Do you know Coach Moon, Casey Moon?

 5   A.   Yes.

 6   Q.   Did you know Coach Marko Pintaric at the time?

 7   A.   Yes.

 8   Q.   Do you remember specifically who called you about Johnny?

 9   A.   No.

12:17 10            MR. FRANK:  Objection, assumes facts not in evidence.

11            THE COURT:  I didn't hear you.

12            MR. FRANK:  The question was who called you.

13            THE COURT:  Sustained.

14   Q.   You had a telephone call with the USC coach, correct?

15   A.   Correct.

16   Q.   Do you remember which of those three coaches it was?

17   A.   I would guess Pintaric.  He's the one that handles -- that

18   I do almost all of the recruiting with.  Although Casey, when I

19   send e-mails, gets carbon-copied.

12:18 20   Q.   Is it fair to say if it was Vavic, you would have

21   remembered that?

22   A.   Yes.

23   Q.   So either Pintaric or Moon called you, correct?

24   A.   I don't know who called who.

25   Q.   Okay.  Strike that.  I appreciate that, and I'm not
```

**A3461**

1    looking to suggest anything.

2           There was a phone call between you and one of those

3    two coaches, correct?

4    A.    Correct, yes.

5    Q.    And you spoke to them about Johnny?

6    A.    Correct.

7    Q.    Do you remember exactly what you said?

8    A.    There's just -- no, I can't get to a call I made a year

9    ago about a player, so I can't get to seven years ago.

12:18 10   Q.    Do you remember being supportive of Johnny going to USC?

11   A.    I would have been.

12   Q.    When you get recruiting calls from college coaches, are

13   you always truthful with them?

14   A.    Painfully.

15   Q.    Do you ever exaggerate or misrepresent an athlete?

16   A.    I try my best not to.

17   Q.    So you spoke on the phone with one of those two coaches,

18   and after that did you hear that Johnny got into USC?

19   A.    At some point in time, yes, that's the chronology.

12:19 20   Q.    Okay.  What was your reaction when you heard that he was

21   admitted?

22   A.    I was a little surprised.  I wouldn't say shocked, but a

23   little surprised.

24   Q.    And what did you think had influenced them to accept him?

25   A.    I joked at the time to friends that what I had said on the

**A3462**

1    phone must have influenced the coach.  Like, I said, "That call

2    must have done it."

3    Q.    Okay.  And that's because you thought Johnny had speed for

4    the high level of college play?

5    A.    It's a combination of his speed, which you can't teach.

6    So the speed and the water polo IQ just by virtue of starting

7    for a team, a national caliber team for three years, that is

8    enough to confidently say by your junior year, maybe senior

9    year, you could contribute to a high-level program like USC.

12:20 10    Not as a freshman or a sophomore but later in the career.

11    Q.    Okay.  At the time this happened, you knew how good the

12    USC team was, correct?

13    A.    Yes.

14    Q.    You knew how tough Coach Vavic was, correct?

15    A.    Yes.

16    Q.    And you thought Johnny could find a place in that program?

17    A.    Yes.

18    Q.    Did your conversation with the USC coach take place before

19    or after Johnny had his concussion, if you can remember?

12:21 20    A.    I cannot remember that chronology.

21    Q.    Okay.  Are you aware of the honor given to some high

22    school athletes of being all-CCS?

23    A.    Yes.

24    Q.    What does that mean?

25    A.    It's very similar to the all-league.  It's a bigger award

because it's a much bigger section.  There are about 11 leagues
in the section.  So like the Peninsula Athletic League is one
of those leagues that we talked about previously.  And then
there are about 11 -- ten other leagues.  So about 11 leagues
total in the CCS, which is the section.

Q.    Okay.  And what does it mean to be tier one versus tier
two in the CCS section?

A.    Division 1.  Division I versus Division 2?

Q.    Thank you.  Division 1 versus Division 2.

A.    It's a little misleading.  The way they separate the
divisions is at the end of the season the committee puts
together what they believe to be the -- let's see, there's a
quarter final -- the top sixteen teams in all of CCS.

      So they say after the entire regular season is over
and the league playoffs are over, they say here are the top 16
teams in all of CCS.  But then what they do is they break them
up by school size.  So they say, okay, the eight biggest
enrollment sizes from these 16 are Division 1, and then the
eight smallest by enrollment are Division 2, and then those two
groups of eight have a playoff, a quarter final, a semifinal
and then a final.  And then the winner of those are the
respective Division 1 and Division 2 champions.

Q.    Though the Division 2 schools are smaller, which ones back
in that 2010 to '14 time period actually had the better water
polo team?

```
 1    A.    Like I said, it's a little misleading.  I would say most

 2    of the time the Division 2 teams were quite a bit stronger than

 3    Division 1.

 4    Q.    And Menlo is in Division 2?

 5    A.    Always, we're very small.  We'll never be in the big

 6    school division.

 7    Q.    Okay.  I'd like to ask you to take a look at Exhibit 7255,

 8    please.  Do you recognize that?

 9    A.    It's an e-mail from me to Leslie Wilson.

12:24 10   Q.    Okay.  And it's during Johnny's senior year?

11    A.    This is December --

12    Q.    Excuse me, during his junior year?

13    A.    Correct.

14         MR. KENDALL:  Thank you.  Your Honor, I'd like to

15    offer 7255 into evidence.

16         MR. FRANK:  Objection.

17         MR. KENDALL:  Again, it's for notice to my clients,

18    not for the truth of the matter asserted.  It's for state of

19    mind.

12:24 20        THE COURT:  Sustained.

21         MR. KENDALL:  Okay.

22    Q.    Did SoPen have an alumni game every year?

23    A.    Yes.

24    Q.    And what was the alumni game?

25    A.    So the alumni game is essentially all of the alumni come
```

```
 1    back.  We do it the Saturday prior to Christmas, and the alumni

 2    forms a team and they play the sort of current Menlo team.  And

 3    at the end of that game we give the alumni the seniors from the

 4    Menlo team.  It's an unofficial -- it's a game.  We play but

 5    it's unofficial.

 6    Q.   Do you have a memory that the Wilsons attended some of the

 7    alumni games?

 8    A.   There are so many parents and people that come to this

 9    game, it's impossible to remember.

12:25 10   Q.   If you could take a look at Exhibit 7255, please, and look

11    at the third page and just tell us if that refreshes your

12    recollection where we could start --

13         MR. KENDALL:  Further down, Mr. Carter.

14    Q.   If you could just read that e-mail that's in front of you.

15         MR. KENDALL:  It should not be in front of the jury.

16    Q.   Does it refresh your recollection that the Wilsons came to

17    some of the alumni games?

18    A.   It does.  It looks like they attended.

19    Q.   Okay.  It's fair to say that John Wilson knew his son was

12:26 20   in the SoPen Club, correct?

21    A.   Yes.

22    Q.   I'd like to show you what's been marked as Exhibit 8192.

23    Do you recognize this document?

24    A.   Yes.  Yes.

25    Q.   What is it?
```

```
 1    A.    So these are the trials, the preliminary races for the

 2    championship swim meet, excuse me, hosted by the league in

 3    which Menlo School participated.

 4    Q.    Is this part of the CCS?

 5    A.    Yes.  Yes.  WBAL is again another league under the

 6    auspices of CCS.  So this is a league within CCS, yes.

 7    Q.    Do you have a role with CCS, or do you play some sort of

 8    position with CCS?

 9    A.    No.  I was for a while one of the chairpersons to help

12:27  10    with the seeding but not formally.

11    Q.    Okay.  But you participate in CCS events in water polo,

12    correct?

13    A.    Menlo can only -- well, CCS is also under the auspices of

14    CIF, the California Interscholastic Federation.  We're a

15    section amongst other sections under the CIF.  So all of our

16    games are under the banner of CIF.  Occasionally we play teams

17    outside of our section.

18    Q.    Okay.  Do you recognize 8192 as records of the CCS

19    tournament swim times?

12:28  20    A.    So this is the league championships, it says at the top.

21    I'm only reading what I see.

22              MR. FRANK:  I object to this, Your Honor.  This

23    witness is not familiar with this document.  It's from a

24    different school, and he's testified he doesn't know anything

25    about --
```

```
 1              MR. KENDALL:  It's not from a different school.

 2              THE WITNESS:  It's not from a different school.

 3              MR. FRANK:  It says it at the top, your Honor.

 4              THE COURT:  Are you offering this document?

 5              MR. KENDALL:  I wanted to lay a foundation with the

 6     witness, and then I would, your Honor.

 7              MR. FRANK:  The witness testified he is not involved

 8     with swimming, your Honor.

 9     Q.   Do you recognize this document?

12:28 10     A.   Yes.

11     Q.   Without telling us the times in it, can you tell us what

12     this document is?

13     A.   This is the document that tracks the swim times of every

14     athlete who participated in the WBAL championship swim trials

15     hosted by Sacred Heart Prep School.

16              MR. KENDALL:  Your Honor, I'd like to offer this into

17     evidence.

18              MR. FRANK:  Objection.

19              THE COURT:  The objection is sustained.

12:29 20     Q.   Are these kept in the ordinary course of business -- the

21     ordinary course of the league's work?

22     A.   Yes.

23     Q.   And it's recorded by people who are actually at the meets

24     and they put down the times?

25     A.   Yes.
```

1          MR. KENDALL:  Your Honor, I'd like to reoffer it.

2          MR. FRANK:  Objection, foundation, your Honor.

3          THE COURT:  The objection is sustained.

4   Q.   What was Johnny's --

5          MR. KENDALL:  Your Honor, I have Exhibit 8191 I would

6   offer as well.  I'd ask the Court if I could reoffer it, if I

7   could show the Court Exhibit 8194 for the Court, as well as for

8   the government.  We have a certification of regularly conducted

9   activity from the league itself.  So in addition to him

12:30 10   being -- in addition to a Coach Bowen being a record-keeper, we

11   have the league certification.  I'd like to offer it pursuant

12   to Exhibit 8194, the certification.

13          MR. FRANK:  Objection, your Honor.

14          THE COURT:  The objection is sustained.

15          MR. KENDALL:  Your Honor, is it based on the

16   certification or is there some other --

17          THE COURT:  We've been over this a number of times.

18   Mr. Kendall.  The objection is sustained.

19          MR. KENDALL:  We have not offered this document

12:30 20   before, your Honor.

21   Q.   Did Johnny compete in other events as well?  Strike that.

22          Do you know what strokes Johnny did in high school?

23   A.   Definitely freestyle.  I recall him doing butterfly.

24   Q.   I'd like to show you Exhibit 8024.  Do you recognize this

25   picture?

```
 1   A.    Yes.

 2   Q.    What is it?

 3   A.    It is Johnny Wilson swimming butterfly.

 4         MR. KENDALL:  Your Honor, I'd like to offer this into

 5   evidence.

 6         MR. FRANK:  No objection.

 7         THE COURT:  It will be admitted.

 8         (Exhibit 8024 admitted into evidence.)

 9         MR. KENDALL:  If we could show it to the jury, please.

12:31 10  Q.   Is that -- the swim cap he has on, for what school or what

11   club is that?

12   A.    Menlo School.

13   Q.    It's the Menlo Knights.  Is that why we see the "K"?

14   A.    Correct.

15   Q.    Okay.  What's particularly noteworthy about swimming the

16   butterfly, particularly for a water polo player?

17   A.    It requires a lot of upper body strength for one, a lot of

18   power.  And there's a sense of flexibility too in the way that

19   you're controlling your body to do -- to time the dolphin kick

12:31 20  correctly with the arm strokes so that it's fluid instead of

21   causing you to slow down when you combine the kick to the

22   stroke.

23   Q.    How much in your experience, physically how much do

24   athletes develop in those years from, let's say, their junior,

25   senior year of high school until their first couple of years of
```

1   college, that 17 to 18 to 20, 22?

2   A.   On the one hand, this is a question for a developmental

3   biologist, so it varies.  But there really is, there's a

4   massive leap.  And this is why you see many athletes, certainly

5   water polo players, redshirting, especially because the

6   experience required to play water polo where essentially your

7   eyes are about this high off of the playing field, so you don't

8   really have the view that you would typically have in the rest

9   of your life.  It really takes some time.  And then the speed

12:33 10   of the college game and the strength and the quickness that

11   happens at the college game is just on another level compared

12   to what happens in the high school game.

13       So typically -- not always -- there are a handful of

14   freshmen who have success, but very often it's the case that

15   freshmen need at least a year to acclimate to the quantum leap

16   that happens from high school to college.

17       MR. KENDALL:  I'd like to show the witness -- I'd

18   actually like to show everybody, because it's in evidence,

19   Exhibit 88, please.  If we could go to page 2.

12:33 20   Q.   Have you seen this document prior to today?

21   A.   Yes.

22   Q.   You saw it in preparation with us, correct?

23   A.   Correct.

24   Q.   You did not see this at the time it was submitted to USC,

25   correct?

```
  1   A.   Correct.

  2   Q.   Do you have any knowledge of who prepared it?

  3   A.   Pardon me?

  4   Q.   You don't know who prepared this, correct?

  5   A.   I don't.  I wasn't -- no, I wasn't involved.

  6   Q.   You weren't involved, and you don't know if Mr. Wilson or

  7   anybody else prepared it.  You have no opinion on that topic;

  8   fair to say?

  9   A.   Yes.

12:34 10        MR. FRANK:  Objection to "opinion," your Honor.

 11             THE COURT:  Sustained.

 12   Q.   I'd like to just go through some of the entries here.  It

 13   says, "John B. Wilson 2014, Menlo School, Atherton,

 14   California."  He did go to the Menlo School and he was in

 15   Atherton, California, correct?

 16   A.   Correct.

 17   Q.   Then we have some grades, if we could go further down.  We

 18   see there are a couple of SATs there.  In your experience, is

 19   it best for people applying to college to put down their best

12:34 20   scores?

 21             MR. FRANK:  Objection.

 22             THE COURT:  Sustained.

 23   Q.   Do people -- do you usually recommend to your students to

 24   put their best scores down and not leave them off?

 25             MR. FRANK:  Objection, your Honor.
```

A3472

```
 1              THE COURT:  Sustained.
 2   Q.   Okay.  Are you aware of the practice, do people typically
 3   put their best scores down when they're applying to college?
 4              MR. FRANK:  Objection.
 5              THE COURT:  Sustained.
 6   Q.   Based upon your experience advising people in college
 7   admissions, do you know of any reason why they would not put
 8   their best score down for an application?
 9              MR. FRANK:  Objection.
10              THE COURT:  Sustained.
11              MR. KENDALL:  Okay.
12   Q.   If we could go down to awards and honors there.  It says
13   varsity letterman for four years.  How many years was he a
14   varsity letterman?
15   A.   From my records, he earned a varsity letter for three
16   years.
17   Q.   Okay.  It says "Co-captain."  Was he co-captain?
18   A.   No.
19   Q.   Okay.  And then it says "Central Coast Section --
20   A.   No.
21   Q.   -- 2011, 2012, 2013, All Section."  Is that accurate?
22   A.   Again, I'd have to -- I'd be very surprised.  He wasn't in
23   2011.  I'd be surprised if he was in 2012, but I'd have to
24   see --
25   Q.   Okay.
```

A.    -- the records.

Q.    If we actually go above the Awards and Honors, do you see anywhere on this document an ACT score of 29?

A.    No.

Q.    Okay.  Let's go back to the Awards and Honors.  Then it says, "Team, CCS 2012, offensive most valuable player."  Did Johnny get such an award?

A.    That's not an award.

Q.    And the California Scholar Athlete Award, did he get that?

A.    I don't know what that is.  There might -- I've never heard of it.

Q.    If you don't know, that's all you have to say.

        U.S. National Water Polo qualifier, do you know if he got that?

A.    I don't, I don't know.

Q.    Would that be through Stanford?

A.    It would be through Stanford.  Well, high school doesn't have a national water polo qualifier.

Q.    And specific zone water polo qualifier, would that be through Stanford as well?

A.    That -- yes, yes.

Q.    Where it says down at the bottom there "Asics National Sports Youth Leadership Council," I take it you've never heard of that, correct?

A.    Correct.

```
 1    Q.   Do you see it lists him as a varsity letterman on the swim
 2    team?
 3    A.   That would make sense.
 4    Q.   Okay.
 5    A.   But I don't know.
 6    Q.   Do you know if he swam his senior year?
 7    A.   I don't.
 8    Q.   Do you know if he was captain of the swim team?
 9    A.   For -- I don't.
12:37 10   Q.   Do you know if he was captain one year?
11    A.   I really don't.
12    Q.   Okay.  And you would agree with me, to your knowledge, he
13    was not an all-American swimmer?
14    A.   I don't know that either.
15    Q.   Or Central Coast Section high point scorer?
16    A.   That we can find out.
17    Q.   Okay.  But you're not aware of that, correct?
18    A.   Correct.
19    Q.   Okay.  And U.S. Junior Olympic Swimming Championships, you
12:37 20   have no reason to believe he went there either, correct?
21    A.   I don't know.
22    Q.   Okay.  Now let's look at the other side.  Six-one, 180
23    pounds.  Does that sound right?
24    A.   I would have guessed six feet.
25    Q.   Okay.  Driver?
```

```
 1   A.   Yes.
 2   Q.   Now, 50 freestyle 20.12 short course.  Do you know if
 3   that's an accurate time?
 4   A.   I don't.
 5   Q.   You know he's fast, correct?
 6   A.   I do.
 7   Q.   But you're not claiming he's that fast?
 8   A.   I just never timed him.  We don't have a short course pool
 9   at Menlo.  We have a long course -- a meters pool.
10   Q.   And the 100 freestyle 43.98 short course, do you know if
11   he ever swam that speed?
12   A.   I don't.
13   Q.   Okay.  You have no basis to suggest that he would,
14   correct?
15   A.   I don't.
16   Q.   Okay.  Menlo School Water Polo, that is you, correct?
17   A.   Yes.
18   Q.   Is that your phone number?
19   A.   At school, yes.
20   Q.   Okay.  Then Stanford Water Polo Club, is that a mistake?
21   A.   I wouldn't -- I did not coach Stanford.
22   Q.   Okay.  Now, we see a lot of awards there that you're not
23   familiar with or aware of.  Are there awards he got that are
24   not there that you are familiar with?
25   A.   Well, we talked about first team all league, which I
```

```
 1    don't --
 2    Q.   So he was --
 3    A.   -- see here.
 4    Q.   -- first team Peninsula Athletic League 2013, correct?
 5    A.   Yes.
 6    Q.   And did he get like lower things than first team in the
 7    prior years?
 8    A.   I would have to look at my notes.
 9    Q.   Okay.  We'll get to that in a minute.  Was he all CCS
12:39 10   Division 2 at some point?
11    A.   His senior year -- oh, boy.  I strongly recollect that he
12    was.
13    Q.   Okay.  And All Daily News Prep Water Polo?
14    A.   That would make sense because the Daily News just takes
15    what the coaches do and prints it.
16    Q.   And they print their own?
17    A.   Yes.
18    Q.   What's the KAP7 International Tournament Team?
19    A.   KAP7 International Tournament is a club tournament.  So
12:39 20   it's not a Menlo tournament.  It's run by USA Water Polo, and
21    it's one of the top club tournaments.  That would be what I
22    mentioned earlier, the top players would make the
23    all-tournament team, meaning the coaches had selected them as
24    being one of the top players in that particular tournament.
25    Q.   Okay.  And he certainly was a member of the SoPen Water
```

```
 1    Polo Club, correct?
 2    A.    Correct.
 3            MR. KENDALL:  Okay.  Your Honor, I'd like to show the
 4    Court Exhibit 31 -- excuse me -- Exhibit 8130, 8130.
 5            We have a certified record from the Peninsula Athletic
 6    League I'd like to offer into evidence.
 7            MR. FRANK:  Objection, your Honor.
 8            THE COURT:  The objection is sustained.
 9            MR. KENDALL:  May I understand the basis of the
12:40 10    objection?
11            THE COURT:  We've been over this a number of times.
12            MR. KENDALL:  We have not offered these before, your
13    Honor.
14            THE COURT:  I'm not talking about this particular
15    document but the reasons why these are not admissible.
16            MR. KENDALL:  If we could show the witness only page 3
17    of Exhibit 8130.  If we could look down to number 7 there.
18    Q.    If you could read that.
19    A.    Yeah.
12:41 20    Q.    Read that and then if we could turn it off, please.
21            Does that refresh your recollection if Johnny was
22    first team PAL, 2013?
23    A.    Yes, he was.
24    Q.    And then do you recall exactly where he was ranked in
25    2012?
```

```
 1    A.    I don't.
 2          MR. KENDALL:  If we could, just to refresh his
 3    recollection, show 8130, page 4.
 4    Q.   And tell us where in the bottom he was.  If you could look
 5    at the bottom.
 6          Does that refresh your recollection of where he was
 7    ranked in 2012?
 8    A.   Yes, it does.
 9    Q.   And what does it refresh you?
12:42 10   A.   Honorable mention.
11    Q.   Okay.  If we could then turn, do you recall where he was
12    ranked his sophomore year, when he was the only sophomore on
13    varsity?
14    A.   I do not.
15    Q.   Okay.  If we could show the witness page 5 of Exhibit
16    8130, and if you could look at that and tell us if that
17    refreshes your recollection.
18    A.   Yeah.  Yes, it does.
19    Q.   What was he ranked his sophomore year?
12:42 20   A.   Honorable mention.
21    Q.   Were there any other sophomores ranked at all that year by
22    PAL?
23    A.   Could I see that refresher?
24    Q.   Yeah, if we could refresh his recollection again with page
25    5, the exhibit.
```

```
 1   A.   No.  Sorry.  Yes, there's one other honorable mention.
 2   There are two sophomores.
 3   Q.   Okay.  Out of first team, second team and honorable
 4   mention, there's only two sophomores, correct?
 5   A.   Correct.
 6   Q.   And that's close to 20 players?
 7   A.   21.
 8   Q.   What does it mean to be honorable mention?  How much of a
 9   ranking is that?
10   A.   It's essentially, the designators that I gave earlier, it
11   would be better termed third team.  So the first team all
12   league are the top seven.  Second team all league are eight
13   through 14.  And honorable mention is 15 through 21.  So the
14   coaches, if you earn honorable mention early, the coaches
15   believe that you are somewhere in the 15th best to the 21st
16   best player in the league.
17   Q.   As a sophomore?
18   A.   Correct.
19   Q.   And if you're in first team as a senior, that means you're
20   in the top six or seven in the whole league?
21   A.   Top seven, yes.
22   Q.   Okay.  And how good are the teams in that league?
23   A.   This league is exceptionally strong.  Menlo Atherton tends
24   to be very strong and Burlingame and Woodside are up and down
25   but not exceptionally strong.  There are a handful of teams
```

        1    considerably weaker.  So it's a mid-range league.

        2    Q.   Are there some strong teams in that league besides Menlo

        3    School?

        4    A.   Yes.

        5    Q.   What are those teams?

        6    A.   Menlo Atherton and then Woodside and Burlingame tend to be

        7    up and down.  It's hard to know.

        8    Q.   Okay.  It's not as high a recognition, but do you remember

        9    that Johnny was also recognized as the All Daily News -- in the

12:44  10    All Daily News Prep teams?

       11    A.   Yes.

       12    Q.   Do you recall exactly what he got for those teams?

       13    A.   I do not.

       14         MR. KENDALL:  If we could show the witness Exhibit

       15    7071, please.

       16    Q.   And if you could look down towards the bottom there.  For

       17    2011, does that refresh your recollection of where he was

       18    ranked?  About midway, about six, seven up there,

       19    alphabetically.  Right above there, just a line below.  Does

12:44  20    that refresh your recollection where he was his sophomore year?

       21    A.   Yes.

       22    Q.   What was that?

       23    A.   He was honorable mention.  This isn't all league, though.

       24    This is a bigger --

       25    Q.   All Daily News?

```
 1    A.   Yes.
 2         MR. FRANK:  Your Honor, the witness is simply reading
 3    from documents at this point.
 4         THE COURT:  Yeah.
 5    Q.   You knew this at the time, correct?
 6    A.   Yes.
 7    Q.   Okay.  And if we could -- do you know how he ended up with
 8    All Daily News Prep in his junior year; do you remember?
 9    A.   I don't know.
12:45 10  Q.   But you knew at the time, correct?
11    A.   Yes.
12         MR. KENDALL:  If we could show the witness 8265,
13    please, page 3 at the top.  Actually, maybe you could start at
14    page 2 to see where the title is.  If you go down to page 2 at
15    the bottom and then go to the top of page 3.
16    A.   Yes, he earned honorable mention as a junior.
17    Q.   Do you recall if he got some recognition from the All
18    Central Coast section in water polo?
19    A.   I do recall that he did.  I don't know exactly what it
12:46 20  was.
21    Q.   Okay.  What does All Central Coast section mean?
22    A.   So that's the one that -- CCS comprises all 11 leagues
23    throughout the entire peninsula.  So it's essentially all the
24    teams in that section.  It's the best players selected by the
25    coaches.
```

```
 1    Q.   And if I were to show you Exhibit 7069, just for the
 2    witness, please.
 3              For 2012, which would have been his junior year, if
 4    you could look at page 3, does that refresh your recollection
 5    as to what you remember him being?
 6    A.   Yes, he was -- sorry, not that one -- honorable mention.
 7    Q.   His junior year?
 8    A.   Yes.
 9    Q.   And then for his senior year, if we could show the witness
12:47 10    7070 and see if that refreshes his recollection, looking at
 11   page 3.
 12   A.   He was the number 3 player selected for second team.
 13              MR. KENDALL:   Okay.  Your Honor, we have --
 14   Q.   And do you remember his senior year who was selected for
 15   the all-star game for Division 2 teams at the CCS all-star
 16   game?
 17   A.   I don't.
 18   Q.   Okay.  I'd like to ask you to take a look at Exhibit 7959,
 19   please.  Tell us if you can identify that.  Just yes or no, do
12:48 20   you recognize it?
 21   A.   Oh, yes.  Yes.  Sorry.
 22   Q.   And what is the document?
 23   A.   Excuse me.  It's an e-mail from me to the parents of Ryan
 24   Hammarskjold.
 25   Q.   Don't read all the names.
```

```
 1   A.   Oh, I'm sorry.

 2   Q.   Including the Wilsons?

 3   A.   Including the Wilsons.

 4        MR. KENDALL:  Your Honor, I'd offer 7959, please.

 5        MR. FRANK:  Same objection, your Honor.

 6        THE COURT:  The objection is sustained.

 7   Q.   Do you recall if Johnny was selected for the CCS all-star

 8   game?

 9   A.   He was.

10   Q.   And what does that mean?

11   A.   So the same meeting, what the coaches do is they select

12   the top 18 seniors from the CCS section, and then we have an

13   unofficial all-star game with the North Coast Section, which is

14   across the bay in the Bay area.  And so it's the top 18 seniors

15   from CCS selected by the coaches and they play a game against

16   the top 18 seniors of the NCS, which is another very

17   competitive section across the bay, and we have, like I said,

18   an informal all-star game.

19   Q.   So if he's one of the 18 best from the CCS group, roughly

20   how many water polo teams are in that group?

21   A.   I really -- someone could find that out.

22   Q.   How many schools are in that group?

23   A.   It could be 100, it could be 200.

24   Q.   Somewhere between 100 and 200 schools?

25   A.   I'm not comfortable -- it's me guessing.  I'd love for
```

1     someone to look that up and we could tell you in 30 seconds.

2     Q.    There's a CCS tournament each year, correct?

3     A.    Correct.

4     Q.    Do you recall how your team did in 2011 --

5     A.    Semifinals?

6     Q.    -- sophomore year.

7     A.    I'd have to see -- 22 years.

8     Q.    I'd like to show you Exhibit 7002.  Do you recognize it?

9     A.    It is the official CCS document of the tournament.

12:50 10    Q.    And did you get it back at the time from the tournament

11    that you participated in?

12    A.    Did we what, sorry?

13    Q.    Are these the results they gave you?

14    A.    These would be the correct results, yes.  They're posted

15    by CCS when they're happening.

16    Q.    And that's something they do in the regular course of

17    their running the tournament is post these results?

18    A.    Correct.

19    Q.    And give them to the coaches who participate?

12:50 20    A.    They're posted on their website.

21            MR. KENDALL:  Your Honor, I'd like to offer 7002 into

22    evidence.

23            MR. FRANK:  I object, your Honor.  I also object to

24    having the witness read from documents that he obviously

25    doesn't remember.

```
 1              THE COURT:  Yeah, the objection is sustained, and I
 2      think you ought to cease this line.
 3              MR. KENDALL:  Your Honor, we have a certified copy,
 4      certification for this document under Exhibit 8185.  May I
 5      offer it pursuant to the certification?
 6              MR. FRANK:  I object, your Honor.
 7              THE COURT:  The objection is sustained.
 8              MR. KENDALL:  Okay.
 9      Q.   Does this document refresh your recollection as how your
12:51 10     team did in the CCS tournament in 2011?
11              MR. FRANK:  I object, your Honor.
12              THE COURT:  Sustained.
13      Q.   Did you know at the time how your team did?
14              MR. FRANK:  I object.
15      A.   Yes.
16              THE COURT:  You can answer that question.
17              THE WITNESS:  Sorry.
18      Q.   Is there a document that could help refresh your
19      recollection as how the team did from what you once knew?
12:51 20     A.   I keep very accurate documents of exactly how many wins
21      and losses we've had each year, how far we made it in CCS, how
22      far we made it in the league, how many goals and minutes and
23      who scored which goal in which situation, and I can't do this
24      by memory.
25      Q.   Exactly.  Could a document help refresh your memory of
```

```
 1    what you knew back --
 2    A.    Absolutely, yes.
 3              MR. KENDALL:  I'd like to show the witness Exhibit
 4    7002.
 5    Q.    Does that refresh you as to how well your team did at the
 6    tournament?
 7              THE COURT:  Show him the document, take the document
 8    down, and ask him if it refreshes his memory.
 9    Q.    Have you had a chance to look at the document?
10    A.    Yeah, yes.
11    Q.    Do you need to look at it longer?
12    A.    I would take three more seconds so I get it right.
13              MR. KENDALL:  If you could show it to him.
14    Q.    Tell us when you've had enough time to look at the
15    document.
16    A.    Yes.
17              MR. KENDALL:  Okay.  And if we could take it down.
18    Q.    Does that refresh your memory as to how you did at the
19    tournament?
20    A.    Yes.
21              MR. FRANK:  Your Honor, I object to this.  This is
22    obviously just reading from documents.
23              THE COURT:  Well, I'm going to let him answer that
24    question.
25    A.    We made it to the semifinals, and it looks like we lost to
```

```
 1    Los Altos 11 to 8.
 2              MR. FRANK:  Objection, move to strike.
 3              THE COURT:  Sustained.  It's stricken.
 4    Q.  If you could just tell us how far you went in the
 5    tournament.  Would this refresh your memory of how far you made
 6    it in the tournament?
 7              MR. FRANK:  Objection, your Honor.
 8              THE COURT:  Yeah.  That question is objectionable, and
 9    the objection is sustained.
12:53 10              MR. KENDALL:  Okay.  Your Honor, I would like to do
11    this for the next two years.  Is the Court's ruling going to be
12    the same?
13              THE COURT:  Yes.
14    Q.  Would it be fair to say that your teams were finishing
15    towards the top of those tournaments each year?
16    A.  Absolutely.  I can say from memory, without telling you
17    exact years, that we have made it to the semifinals at least
18    every year but one, which is the top four in that CCS
19    tournament.
12:54 20              MR. KENDALL:  Your Honor, I have some certified
21    records from the Stanford Water Polo Club.  Am I to assume that
22    it will be the same ruling?
23              THE COURT:  Yes.
24              MR. KENDALL:  And we should deal with those
25    separately?
```

```
 1              THE COURT:  Yes.

 2              MR. KENDALL:  Okay.  And we also have the same from

 3    the West Bay Athletic League.  I assume it should be treated

 4    the same way, your Honor?

 5              THE COURT:  Yes.

 6              MR. KENDALL:  Your Honor, USA Water Polo records would

 7    fall into the same category, I believe.

 8    Q.   Did your team ever do any special practices with any

 9    military or other groups?

10    A.   Yes.

11    Q.   What was the special practice you had?

12    A.   So every year we took a training trip to Coronado, and we

13    would stay with Coronado families.  I grew up in Coronado and

14    played water polo there, and my parents live there.

15              So we would stay with water polo families, and we

16    were training two to three times a day and doing a lot of other

17    activities.  And the four- to five-day training would culminate

18    with us training with a Navy Seal or a team of Navy Seals, and

19    they would put us -- they would do the workout with them, put

20    us through essentially Navy seal training drills.

21    Q.   Did Johnny participate in that group?

22    A.   Yes.

23    Q.   Did the whole team go?

24    A.   It's the top 14 because it's a 15-passenger van, and I

25    drive it, so it's the top 14.
```

```
 1   Q.   Is that something that would be of relevance to a college
 2   coach?
 3              MR. FRANK:  Objection.
 4              THE COURT:  Sustained.
 5   Q.   Are you familiar with Johnny having done the Alcatraz
 6   swim?
 7   A.   Yes.
 8   Q.   He did that when he was --
 9              MR. FRANK:  I object to this, your Honor.
10              THE COURT:  It's an unclear question.  Sustained.
11   Q.   What is the Alcatraz swim?
12              MR. FRANK:  Your Honor, this was addressed by the
13   Court's ruling this morning.
14              THE COURT:  Sustained.
15              MR. KENDALL:  I don't think it was addressed by your
16   ruling this morning, your Honor.
17              I'm moving quickly, your Honor.  I just need another
18   moment to check my notes, please.
19   Q.   What is the KAP7 Tournament?
20   A.   It's a club tournament, one of the top club tournaments in
21   the country.
22   Q.   When you say "one of the top club tournaments," what do
23   you mean by that?
24   A.   They select clubs based on club strength.  So it's not a
25   tournament that any club can sign up for.
```

```
 1   Q.   And how does that tournament stand in terms of national

 2   status or competition?

 3   A.   It's considered very top tier, in a group of four, five,

 4   six.  There's probably six or seven tournaments that would be

 5   considered top tier national club tournaments.  That would be

 6   one of them.

 7            MR. KENDALL:  If I may have just a moment, your Honor.

 8            THE COURT:  Yes.

 9   Q.   Johnny's junior and senior year, were there other members

12:58 10  of the Menlo team that went to Division 1 college programs?

11   A.   Yes.

12   Q.   What were some of the programs the kids went to?

13   A.   Am I allowed to look at -- I don't know how -- I've had so

14   many players.  I don't know how -- am I expected to do this by

15   memory?

16   Q.   Do you remember any players going to Princeton?

17   A.   It would be very easy to find out.

18   Q.   Do you remember any of your players going to Princeton

19   that year?

12:59 20  A.   Two, Chris Z -- can I say names?

21   Q.   Yes.

22   A.   Chris Z and Ryan Hammarskjold.  There may be more.

23   Q.   If we could take you back, we'll go to the list of stats

24   you have for the team that are in evidence.

25   A.   Nick Bisconti was on that team.  He went to UC Berkeley,
```

```
 1   national champion.

 2   Q.   How did Berkeley end up doing?

 3   A.   National champion, Nick Bisconti.

 4   Q.   Then if we take a look at Exhibit 9929, please.

 5   A.   That's helpful.

 6   Q.   From this team, who else went on to significant Division

 7   One teams?  Nick Z, is that the person that went to --

 8   A.   That's Nick Bisconti.  He went to play at UC Berkeley.  He

 9   was the national champion.  Ryan played at Princeton and

 10  actually earned some award I don't know the name of his senior

 11  year at Princeton.  Chris Z played at Princeton.  Nikhil,

 12  Nikhil Andreas started for three years at Johns Hopkins.  Tegan

 13  went to Johns Hopkins.  John Wilson, the goalie, went to

 14  Johnson Hopkins, actually, I think set the record for the most

 15  saves in a career.  Spencer went to Johns Hopkins.  That's it

 16  from that list.  That's a good team.

 17        MR. KENDALL:  May I have a moment, your Honor?

 18        THE COURT:  Yes.

 19        MR. KENDALL:  No further questions, and thank you.

 20        THE COURT:  All right.  Before we have cross, we'll

 21  break for lunch.  Mr. Bowen, you may step down for the time

 22  being.

 23        We'll be in recess for one hour.

 24        (Jury exits.)

 25        THE COURT:  Be seated, counsel.  You may step down,
```

```
 1    Mr. Bowen.
 2            MR. FRANK:  Your Honor, may I request that the witness
 3    be instructed to comply with the sequestration order?
 4            MR. KENDALL:  I don't know what that means, but if
 5    he's accusing me of planning to talk to the witness, you don't
 6    need to instruct me, your Honor.  I know the rules.
 7            THE COURT:  How long on cross-examination, Mr. Frank?
 8            MR. FRANK:  I'm guessing about 30 minutes, your Honor.
 9            THE COURT:  All right.  And then what is the remainder
10    of the defendant's case?
11            MR. KENDALL:  Your Honor, we have those documents you
12    ruled earlier today that can be admitted.  We'd like to read
13    those for the jury.  We have a document or two that's already
14    in evidence we wanted to read to the jury.  We have some
15    documents we'd like to offer.  Some I think can be outside of
16    the presence of the jury, given the Court's prior rulings.
17    Some I don't believe the Court had made prior rulings on.  So I
18    would consider those a foregone conclusion.
19            THE COURT:  How long do you think it will take you?
20    Because I want the defendants to rest in front of the jury.
21            MR. KENDALL:  Okay.  I think -- I'm hoping we can do
22    that in 15, 20 minutes.
23            THE COURT:  You mean outside of the hearing of the
24    jury will take 15 to 20 minutes?
25            MR. KENDALL:  No.  I was thinking in front of the
```

1    jury, to read the things we wanted to read, things you've

2    allowed, and then to offer some things and see what the Court's

3    rulings are.

4         THE COURT:  And how long -- you say you have some

5    materials to offer outside of the hearing of the jury.  How

6    long will that take?

7         MR. KENDALL:  15 minutes, ten, 15 minutes.

8         THE COURT:  So you want me to hold the jury 15

9    minutes, bring them back in and then rest?

01:03 10         MR. KENDALL:  If that's what the Court would like.  We

11   need to present some stuff to them they're going to see.  So

12   that will be either after the cross-examination or whatever.

13   We can put stuff in front of them.  We can take them out, we

14   can do a few things with you, your Honor, and then bring them

15   back.

16        MR. FRANK:  Your Honor, I would propose that anything

17   that the Court has not yet approved should be done outside of

18   the presence of the jury given the nature of the documents that

19   defense has tried to put in in front of the jury and the number

01:04 20   of objections that we've had to make that have been sustained.

21        I think it's prejudicial to the government to have to

22   keep doing that in front of the jury.  If we're going to meet

23   outside of the presence of the jury anyway before they rest, we

24   might as well do it all then, and then if there's anything that

25   comes in, it can come in in front of the jury without an

```
 1   objection from the government.
 2            MR. KENDALL:  Your Honor, there are some things that
 3   are unquestionably either already admitted or the Court has
 4   ruled are admitted and we can offer.  So we don't have to do
 5   those in front of the jury.
 6            MR. FRANK:  That I have no objection to, your Honor.
 7            THE COURT:  All right.  What I may do is out of order,
 8   take these matters up before the cross-examination of Mr. Bowen
 9   at 2:00 and then call the jury back and have them in the
10   courtroom while the defendant completes whatever they're going
11   to do in the courtroom in front of the jury and then rest.
12            MR. FRANK:  Yes, your Honor.
13            MR. KENDALL:  Do you want the cross first before the
14   documents, your Honor, or do you want the documents?
15            THE COURT:  No.  I'm going to talk to you all at 2:00.
16   You're going to put in everything and talk about everything
17   outside the hearing of the jury.  I'm going make rulings, and
18   then we're going to call the jury back, complete the
19   cross-examination of Mr. Bowen and any further evidence the
20   defendants have to offer.
21            And then I understand the defendants will rest in
22   front of the jury.  Is that right?
23            MR. KELLY:  Correct.
24            MR. KENDALL:  Yes, your Honor.
25            THE COURT:  Okay.  We're in recess until 2:00.
```

```
 1              (Recess taken 1:05 p.m. to 2:03 p.m.)
 2         THE CLERK:  Thank you.  You may be seated.
 3         THE COURT:  Good afternoon, counsel.
 4         MR. KENDALL:  Good afternoon, your Honor.
 5         THE COURT:  I would like defendants now, Mr. Kendall,
 6    to proffer what he believes should be proffered outside the
 7    hearing of the jury.
 8         MR. KENDALL:  Okay.  Your Honor, I have them.  I'll go
 9    through them.  Just so I understand it, we've done a few
10    already and we're going to add a few more.  We want those to be
11    part of the record if there is an appeal in this case.  How do
12    you want things that have not been admitted treated?  Do you
13    want a separate list of them, or do you want something
14    indicating them?  Or how would you want them accepted into --
15         THE COURT:  We usually mark things for identification
16    with letters.  I think we have six or eight already marked with
17    letters for identification.
18         MR. KENDALL:  Okay.  Do you want us just to add a
19    letter to each number, so it can be A7120, A7220?  This is a
20    large number and they've been -- they're referred to in the
21    transcript by numbers.  It might be helpful to keep that.
22         THE COURT:  Well, you mean a letter before the number?
23    As you know, we have a number of exhibits that are four numbers
24    and a letter A usually.
25         MR. KENDALL:  We can do a Z.  We can just call them Z
```

```
 1    with a number to follow.
 2            THE COURT:  Does the government have any position in
 3    this regard?
 4            MR. FRANK:  No, your Honor.  Whatever the Court
 5    thinks.
 6            THE COURT:  Okay.  All right.  We can do that. You can
 7    put a letter in front of the numbers to indicate that it has
 8    not been admitted into evidence, but it is marked for
 9    identification.  We do already have, I believe, maybe my deputy
02:04 10   knows how many we have lettered.
11            THE CLERK:  I don't know.
12            THE COURT:  Okay.  We odn't know, but I think it's
13    been six or eight.
14            MR. KELLY:  I think the Court is right.  We had four
15    that we needed to mark for identification from before and I can
16    talk to the clerk at the break for that purpose.
17            MR. KENDALL:  Your Honor, we have a large number.  I
18    would suggest just putting a Z in front of all the ones I'm
19    putting, Z1, Z2, Z3, Z4.
02:05 20           THE COURT:  That's fine.
21            MR. KENDALL:  Okay.  Thank you, your Honor.
22            For the ones that we'd like to offer, your Honor, the
23    first is Exhibit 125.  We offered a check, one page of that
24    exhibit, which was not objected to by the government.  We'd
25    like to offer the rest of the exhibit.  It shows the fact of
```

 1    communications among USC people, including Vavic, Garfio, and

 2    others, around Wilson's $100,000 donation.  It shows USC's

 3    knowledge of the donation connected to a student who had just

 4    been admitted as part of the water polo team.  It's to show

 5    knowledge, not the truth of the matter asserted, and it

 6    directly refutes the honest services violation and it shows the

 7    openness of the donation, your Honor.  That is Exhibit 125.

 8            THE COURT:  So that will be marked for identification

 9    Z125.

02:06 10            MR. FRANK:  For the record, we object to it on hearsay

11    grounds and dispute the characterization of it for those

12    reasons.

13            MR. KENDALL:  Next, your Honor, 8195 is an e-mail

14    exchange between Mr. Singer and Mr. Wilson.  It shows Wilson's

15    state of mind with respect to the USC application of his son.

16    It's not for truth of the matter asserted.

17            MR. FRANK:  Same objection, your Honor.

18            THE COURT:  It will be marked for identification,

19    Z8195.  And all of these matters, the objections of the

02:06 20    government has been sustained, so I don't believe the

21    government needs to object each time.

22            MR. KENDALL:  Okay.  Your Honor, 8014 that will now be

23    Z8014.  Okay.  It's just an e-mail from Mr. Wilson and Debbie

24    Rogers in reacting to the ACT scores of his son and again to

25    show state of mind.  This has not previously been offered.

```
 1            THE COURT:  Marked for identification, Z8014.

 2            MR. FRANK:  Your Honor, I'm not seeing these on my

 3    screen, so I actually don't know if these are ones that the

 4    Court has previously ruled on or if Mr. Kendall is introducing

 5    these for the first time.

 6            MR. KENDALL:  Mr. Carter, can we put these up as we go

 7    through them, please?

 8            MR. FRANK:  If they've not been previously ruled on,

 9    then I think I do need to object.

02:07 10            THE COURT:  Yes.

11            MR. KENDALL:  None of these have been previously

12    marked, your Honor, so the government should state its position

13    with each one of them.  If we can start with -- if you want us

14    to show the government Z125.

15            Exhibit 125, Mr. Carter.

16            MR. FRANK:  We object on hearsay grounds, your Honor.

17            THE COURT:  Objection sustained.

18            MR. KENDALL:  Okay.  Your Honor, then 8195 again

19    offered for a non-hearsay basis to show state mind of our

02:08 20    client and the communication.

21            MR. FRANK:  Same objection.

22            THE COURT:  Objection sustained.

23            MR. KENDALL:  Then, your Honor, 8014, now Z8014, again

24    not to show the truth of the matter, to show my client's

25    knowledge and state of mind.
```

1          MR. KELLY:  Your Honor, just for the record, all these

2    Z exhibits, we'll join as well.

3          THE COURT:  Join for what?

4          MR. KELLY:  We'll join for the record in offering as

5    well.

6          MR. FRANK:  Same objection, your Honor.

7          THE COURT:  8014 objection sustained.

8          MR. KENDALL:  Okay.  Then 9924, now Z9924, a

9    November 1, 2012 e-mail from Leslie Wilson to Rick Singer.  It

02:09 10   shows John's state of mind with respect to the son's visit to

11   the USC campus.

12         MR. FRANK:  Same objection and also on the 403

13   grounds, your Honor.

14         THE COURT:  Okay.  Objection sustained.

15         MR. KENDALL:  Your Honor, Exhibit 9937, which is a

16   text message of November 29, 2018, during the time of the

17   interception of the consensual monitoring after the wiretap

18   ended and they were doing consensual monitoring, this is one of

19   the consensually monitored text messages.  It shows Mr. Wilson

02:09 20   and his wife discussing the side-door application of their

21   daughters in wholly innocent, noncriminal ways, to show their

22   state of their mind that they did not think they were being --

23   whatever.

24         Excuse me.  This was not picked up by the monitoring,

25   but it was during the time of the monitoring and so it shows

```
 1   their state of mind.
 2           MR. FRANK:  Your Honor, just to be clear, this was not
 3   on the government's wiretap.  We object to it on authenticity
 4   grounds.  We also object to it on 403 grounds and on hearsay
 5   grounds.
 6           THE COURT:  Objection sustained.
 7           MR. KENDALL:  Okay, your Honor -- may I have
 8   one moment, your Honor?
 9           THE COURT:  Yes.
02:10 10         MR. KENDALL:  So then next would be Exhibit 8230,
11   three text messages from -- certified records of a regularly
12   conducted activity.  The tutor from the Singer tutoring company
13   or the Singer college consulting company, Lily Ann, has
14   completed her certification that she normally communicates with
15   her customers at the time by text, and these were sent in the
16   regular course of her business.  It's certified under 803(6).
17   It's not for the truth of the matter, to show the Wilsons'
18   insistence of hard work for his daughters for test preparation
19   and his state of mind.  There's a total of three exhibits.
02:11 20  They bear the numbers Z8230, Z8231, Z8232, and then the
21   certification, Z8241.
22           MR. FRANK:  We object to the certification as invalid.
23   We object to these on authenticity grounds.  There is no
24   evidence that these were sent to the defendant.  We object to
25   them on 401, 403 grounds, and hearsay grounds.
```

1          THE COURT:  The objection is sustained to those three.

2          MR. KENDALL:  Your Honor, Exhibit Z9738, an e-mail

3    from John Wilson to Debbie Rogers and others.  It is with

4    respect to Hyannis Port Capital making a charitable donation.

5    It shows John Wilson's state of mind, a donation e-mail with

6    fees in the subject line.  The government is claiming that the

7    use of fees or payment is indicative that an item is not a

8    charitable contribution.  This is to refute that government

9    allegation and the contribution is made from HPC Capital.

02:12 10          MR. FRANK:  So the record is clear, this exhibit

11   appears to shows that the defendant had paid fees, rental fees,

12   which he then did not use and then donated the money

13   subsequently.  We object to it on 401, 403, and 802 grounds.

14          THE COURT:  Objection is sustained.

15          MR. KENDALL:  Your Honor, next would be Exhibit 9836.

16   This is a summary chart that Revenue Agent Ranahan went through

17   with me.  She validated the entries for the government in --

18   for Exhibit 482, the left and the right columns.  And we went

19   through with the middle column, under John Wilson, to show

02:12 20   that's just the defense's difference of opinion with her on the

21   calculation.  It's -- and she went through the calculation and

22   validated it if the assumptions we suggested were held that

23   this would be the correct calculation, the tax due, and owing.

24          MR. FRANK:  Your Honor, I believe the witness

25   testified there were errors in this chart and we object to it

```
 1   on those grounds and also on 401 grounds.

 2            THE COURT:  Objection sustained.

 3            MR. KENDALL:  Next, your Honor, we have Exhibit 9031A.

 4   This was discussed the other day.  The Court said we shouldn't

 5   offer it in the present form, but we could discuss it later.

 6   It's an e-mail between Jeff DeMaio, Debbie Rogers, and other

 7   people working with DeMaio, informing them about Wilson's

 8   intent to take a deduction on the donation in 2018 for Stanford

 9   and Harvard.  And then it's going to help to get to -- it's

10   going to go through a college through Rick Singer's foundation.

11   It goes to state of mind.  It goes to intent.  It goes to an

12   action, but it's not for the truth of the matter asserted.

13            MR. FRANK:  We object on hearsay and 403 grounds and

14   would also note this is -- as presented, this was a compilation

15   of multiple e-mails, so we object to it on those grounds, as

16   well.

17            MR. KENDALL:  It's 98 --

18            THE COURT:  Objection.  Sustained.  Go ahead.

19            MR. KENDALL:  This document, just for the record, your

20   Honor, on 9830A, is how the document was produced to us.

21   That's how we're presenting as an exhibit.

22            Exhibit 614, it's an e-mail showing the due diligence

23   John and his tax preparation team were doing with respect to

24   the 2018 donations, not for the truth of the matter asserted.

25   It's an e-mail chain.  At the top, it's with Debbie Rogers and
```

1    various people, Jeff DeMaio, John Wilson, and others.

2         MR. FRANK:  We object to the characterization of the

3    document.  We object on 403 and 802 grounds.

4         THE COURT:  The objection is sustained.

5         MR. KENDALL:  Your Honor, the next is Exhibit 111.  It

6    was originally on the government's exhibit list.  It shows a

7    chain of events for how invoices were introduced and came to be

8    created with respect to the tax charge.  It shows John was not

9    involved in this invoicing process, that Mr. Singer, Mr. Masera

02:15 10   were the people who were doing this.  It's for the fact that it

11   was sent, not for the truth of the matter asserted, that we

12   offer it, your Honor.

13        MR. FRANK:  I would note that the defendant is not on

14   this e-mail chain, and we also object to it on 802 grounds.

15        THE COURT:  Objection sustained.

16        MR. KENDALL:  Okay.  Your Honor, we had offered this

17   document before in the government's case.  I didn't know if the

18   issue was whether we had to reoffer it in our case because it

19   wasn't really for impeachment.  It's Exhibit 8189, which is the

02:15 20   customer list taken off of the sources of information from

21   Mr. Singer's company and produced to us by the government, I

22   believe.

23        MR. FRANK:  Object on 401, 403 and 802 grounds.

24        THE COURT:  Objection is sustained.

25        MR. KENDALL:  Your Honor, next would be Exhibit 1409

and 9668.  They're both explanations of Mr. Singer explaining

that the side door is an appropriate and legally correct thing.

It's a 404(b), as well as to show Mr. Singer's state of mind.

It's not for the truth of the matter asserted, but it directly

refutes the testimony of Agent Keating and others that side

door means a scheme and something illegal, as opposed to the

way Mr. Singer uses it, that side door is an appropriate way to

make a donation.

MR. FRANK:  So we object to 9668 on 401, 403, and 802

grounds and also there are redactions that we object to, but I

believe 614, which is not on my screen, may be in evidence

though.  I need to look at that.

THE COURT:  I thought it was 104 that we were

referring to.

MR. KENDALL:  The one I was just referring to about

side door was Exhibit 1049, Exhibit 9668.

THE COURT:  Okay.  You said 140.  It's 1049.

MR. KENDALL:  My apologies, your Honor.  1049.  And

it's redacted only to keep the person's name out.  I'm happy to

put the person's name back in if that's the issue for the

government.

MR. FRANK:  That's not the issue.  There were many

issues.  We object to both of these on the same grounds, your

Honor.

614, I don't know --

```
 1          THE COURT:  I haven't heard about 614 yet.  Wait a
 2     minute.  Yeah.  That was in the last group.
 3          MR. FRANK:  I withdraw my objection.  614 is in
 4     evidence, your Honor.
 5          THE COURT:  Well, he offered that just a few minutes
 6     ago.
 7          MR. FRANK:  It was previously in evidence, I believe.
 8          THE COURT:  All right.  So that's not going to be part
 9     of this offering, right, Mr. Kendall?  614 is already in.
02:17 10          MR. KENDALL:  If 614 is in, that's fine, your Honor.
11     Then we do not need to include it in the batch we've just done.
12          MS. PAPENHAUSEN:  No.  This is the few pages that were
13     not in, I believe, your Honor.
14          MR. KENDALL:  I think these are two pages that were
15     not part of 614 that were --
16          MS. PAPENHAUSEN:  If I may, there was a 14 page
17     document and the government objected to it in its present form
18     as the compilation, which was how it was produced to us.  They
19     didn't object to I think two pages at the beginning and
02:18 20     two pages at the end coming in.  This is the additional
21     three pages in the middle that we're now offering.
22          MR. FRANK:  Then I renew my objection.
23          THE COURT:  All right.  614, the middle, objection to
24     it is sustained.
25          MR. KENDALL:  Your Honor, just for the record, I'll
```

1    give the Bates numbers so there will be no confusion.  It has

2    the bates USA-OBB01718787, 788, 789.

3         THE COURT:  1049 the objection is sustained and 9688

4    the objection is sustained.

5         MR. KENDALL:  9668, your Honor.

6         THE COURT:  I beg your pardon.  9668.

7         MR. KENDALL:  Your Honor, Exhibit 9833 is a copy of a

8    swimming roster off of the USC website.  It's undisputed in

9    terms of its authenticity.  It's for the purpose of only one

02:19 10   point.  Mr. Singer used an e-mail we offered that showed a man

11   named Nick Johnson writing to him and Singer wrote back and

12   said you should talk about embellishing your description of

13   your swimming.  This shows embellishing was being used in a

14   perfectly honest and non-misleading way, because the man is a

15   star of the USC swimming team.  So if he's going to embellish

16   on his swimming, it shows the word "embellish" does not mean

17   fraud.

18        MR. FRANK:  We dispute that's what this document shows

19   and we object on 401, 403 and 802 grounds.

02:19 20        THE COURT:  Objection is sustained.

21        MR. KENDALL:  Okay.  Your Honor, with respect to the

22   issue of the definition of honest services and USC's practice

23   of using SUBCO to raise funds from candidates, as well as VIP,

24   we have a series of exhibits.  You've already ruled on this

25   concept.  We just want to put the exhibits on the list.  It

 1  would be 7389, 7223, 7387, 7492, 1088, and 7242, all of which

 2  would get the Z prefix, your Honor.

 3          MR. FRANK:  We object on 403 and 802 grounds, your

 4  Honor, and to some of these we object on 401 grounds.  There

 5  was a --

 6          THE COURT:  All six of them the objections are

 7  sustained.

 8          MR. KENDALL:  Okay.  We have two more things to go

 9  through and it will be -- we're about past the halfway, your

02:20 10  Honor.  We would like to mark a copy of the complete transcript

11  of Mr. Walters' deposition yesterday given our objection to

12  Mr. Frank stating Vavic's arrest and the information related to

13  that.  We think there would be no basis given the deposition

14  and what the man testified to yesterday how Vavic had no impact

15  on him.  If we can just mark the transcript as whatever letter

16  you would like.

17          THE COURT:  What's the next one?

18          MR. FRANK:  Your Honor, the transcript is actually

19  appended to a pleading that we filed this morning in its

02:21 20  entirety, so we don't believe it needs to be marked.

21          MR. KENDALL:  Is it in its entirety?

22          MR. FRANK:  Yes.

23          MR. KENDALL:  Okay.  We don't have a copy of the

24  entire document.

25          THE COURT:  If it's already a part of a pleading in

```
 1    its entirety, it doesn't need to be marked.
 2              MR. KENDALL:  We agree, your Honor, if it's in its
 3    entirety.  We'll take a look at the pleading if there's an
 4    issue.
 5              And then Miss Papenhausen has the list of exhibits
 6    that the Court did not want us to go through with respect to
 7    Coach Bowen, so we can just quickly list the exhibits that the
 8    Court ruled we should not go through.
 9              THE COURT:  All right.
10    MS. PAPENHAUSEN:  And your Honor, that is Exhibit 7003
11    and 7004, which are certified by Exhibit 8185.  And all of
12    these I should say, your Honor, we understand essentially that
13    your Honor has already ruled that the objections are sustained,
14    so this is for purposes of putting into the record.
15              THE COURT:  All right.  So I don't need it to make
16    rulings on these.  They've already been ruled on, correct?
17              MS. PAPENHAUSEN:  We didn't quite get to the point of
18    introducing all of these, your Honor.
19              THE COURT:  If they haven't been so ruled, I will rule
20    en masse that the objections are sustained.  Why don't you read
21    the numbers.
22              MS. PAPENHAUSEN:  Thank you, your Honor.
23              7069 and 7070, which are certified by Exhibit 8255.
24              Then we have Exhibit 7071 and 7072, which are
25    certified by Exhibit 8264.
```

1          Then we have Exhibit 7076, 7077, and 7078, which have

2     been certified as business records by Exhibit 8194.

3          Then we have Exhibit 8030 and 8031, which have been

4     certified by Exhibit 9750.

5          Then, finally, we have Exhibits 8144, 8157 and 8163,

6     which have been certified by Exhibit 8142.

7          MR. FRANK:  And just for the record, we object on

8     authenticity, 802 and 403 grounds to all of those exhibits.

9          THE COURT:  The objections are sustained with respect

02:23 10     to all of those exhibits.

11          MR. KELLY:  Your Honor, separate and apart from those

12     Z exhibits are the four you referenced earlier.  The Court

13     already ruled and has sustained objections, and for ease of

14     reference later, I'll coordinate with the deputy clerk with the

15     next letters in line, but it's Exhibits 1219, Exhibit 1288,

16     Exhibit 1085, and Exhibit 1374B.  They've already been

17     objected to and --

18          THE COURT:  What was the last number?

19          MR. KELLY:  1374B.

02:24 20          THE COURT:  And they -- all right.  Do we happen to

21     know how many letters we've used?

22          MR. KELLY:  I was struggling to figure that out, but I

23     don't know what's the next letter.

24          THE COURT:  All right.  We will use -- my best memory

25     is we got up to about H.  So let's start with J.  19 will be J.

```
 1   1288 will be K.  1085 will be L.  1374 will be M.
 2              MR. KELLY:  Yes.  Your Honor, 1374B.
 3              THE COURT:  I'm  sorry.  1374B will be M.
 4              MR. KELLY:  Thank you.
 5              (Exhibit J, K, L, M marked for Identification.)
 6              MR. KENDALL:  Your Honor, for purposes of, I hope,
 7   consistency and convenience, we've offered some documents prior
 8   to today that the Court similarly ruled would not be
 9   admissible.  I think it would be easier if we made all of those
10   Z prefixes and then quickly to identify those as one category.
11              THE COURT:  You mean instead of letters?
12              MR. KENDALL:  No, the Z plus the letter, like we've
13   done today.  We'll do that for the stuff that we offered last
14   week.
15              THE COURT:  Any problem with that?
16              MR. FRANK:  No, your Honor.
17              THE COURT:  All right.  We'll do that.
18              MR. KENDALL:  Your Honor, that now leaves we have
19   three documents you've ruled are admissible, that you ruled
20   this morning, so given your ruling, we'd like to read those to
21   the jury later today.
22              THE COURT:  Those will be read to the jury.
23              MR. KENDALL:  And then there's one document that's
24   already in evidence.  That's exhibit -- I think it's 49.  Let
25   me take a look.  Exhibit 49's already been admitted.  We wanted
```

(with timestamps 02:25 at lines 10 and 20)

|  | |
|---|---|
| 1 | to read that to the jury, and those are the only things that we |
| 2 | would read to the jury before we close. |
| 3 | THE COURT:  That will be done after we call the jury. |
| 4 | MR. KENDALL:  Thank you, your Honor. |
| 5 | MR. FRANK:  Just briefly, your Honor, I want to |
| 6 | inquire about the Court's intention with regard to inquiring of |
| 7 | the defendants about their decision not to testify and also |
| 8 | with respect to the *Petriezzello* rule. |
| 9 | THE COURT:  Well, *Petriezzello* will come after the |
| 02:26 10 | close of the evidence and that can be this afternoon if we have |
| 11 | time.  Why do I need to inquire of the defendants that they |
| 12 | choose not to testify? |
| 13 | MR. FRANK:  We just think it would be a good idea to |
| 14 | put it on the record, your Honor, but we defer to the Court. |
| 15 | MR. KELLY:  It's -- objection, your Honor.  We don't |
| 16 | call the witnesses. |
| 17 | MR. KENDALL:  Our clients are present and we're not |
| 18 | calling them.  I think that it's obvious. |
| 19 | THE COURT:  All right.  Fair enough. |
| 02:26 20 | MR. FRANK:  Thank you, your Honor. |
| 21 | THE COURT:  Call the jury. |
| 22 | (Jury enters.) |
| 23 | THE CLERK:  Thank you.  You may be seated. |
| 24 | THE COURT:  Good afternoon, jurors.  Once again, we |
| 25 | needed to use time outside of your hearing to talk about legal |

|    |    |
|----|----|
| 1 | matters.  We're ready to proceed now with the defendants' case. |
| 2 | Mr. Kendall, do you have other evidence to -- |
| 3 | MR. KENDALL:  I believe it's cross of Mr. Bowen, your |
| 4 | Honor. |
| 5 | THE COURT:  I'm sorry.  I beg your pardon.  We're |
| 6 | going to do that first and then do the rest of it. |
| 7 | MR. KENDALL:  Yes, your Honor. |
| 8 | THE COURT:  So we're going back to the |
| 9 | cross-examination of the witness. |
| 02:28 10 | You are reminded that you remain under oath, |
| 11 | Mr. Bowen. |
| 12 | THE WITNESS:  Yes. |
| 13 | THE COURT:  Cross examination by Mr. Frank. |
| 14 | MR. FRANK:  Thank you, your Honor. |
| 15 | CROSS-EXAMINATION OF JOHN BOWEN |
| 16 | BY MR. FRANK: |
| 17 | Q.   Good afternoon, Mr. Bowen. |
| 18 | A.   Good afternoon. |
| 19 | Q.   You've been a water polo coach for quite some time.  I |
| 02:29 20 | think you said 22 years? |
| 21 | A.   That's correct. |
| 22 | Q.   And you've also been a teacher for a very long time.  I |
| 23 | think you said 16 or 17 years? |
| 24 | A.   22, but for five years in college, then 16 at Menlo. |
| 25 | Q.   And you've taught philosophy and ethics? |

1    A.    Yes.

2    Q.    And you've actually written and spoken about ethics in

3    sports, correct?

4    A.    Yes.

5    Q.    And you've written a book entitled *Sports Ethics and*

6    *Leadership*?

7    A.    Yes, co-authored.

8    Q.    And in those writings, you've analyzed moral issues in

9    athletics?

02:29 10    A.    Yes.

11    Q.    You've written and spoken about a topic called "flopping"?

12    A.    Yes.

13    Q.    What is flopping?

14    A.    The technical term is simulation, but flopping is most

15    common in soccer.  It happens in all sports where a player

16    simulates a foul that did not actually occur with the hopes and

17    intent to earn a foul that he otherwise did not deserve.

18    Q.    And you called that immoral and unethical?

19    A.    That is my position.

02:30 20    Q.    And you said it's deceiving the referee?

21    A.    Amongst other criteria, yes.

22    Q.    And taking something you don't deserve?

23    A.    Amongst other things, yes.

24    Q.    And I believe you said that, in normal secular life, we

25    call that stealing?

```
 1    A.   Well, there's a third criteria that involves -- I mean,
 2    I'm happy to break down all the criteria.
 3    Q.   I believe you spoke at the Fifth Annual Institute of
 4    Sports Law and Ethics Symposium at Santa Clara University in
 5    2014?
 6    A.   Yes.
 7    Q.   And you said there that flopping is immoral.  "You're
 8    deceiving the referee and you're taking something you don't
 9    deserve.  In normal secular life, we call that stealing."
10    A.   Yes.  That was the end of a long argument.
11    Q.   That's what you said, right?
12    A.   It's really hard to remember exactly what I said.  I've
13    given a lot of talks.  It sounds like something I would have
14    said, I guess, to be accurate.
15    Q.   And you've also written that when a player intentionally
16    breaks a rule intending to avoid detection in order to gain an
17    advantage, the player has cheated?
18    A.   With deception.  Are you including that criteria?  I'm
19    just trying to understand.
20    Q.   I'm just reading what you've written and asking you if you
21    remember writing that "when a player intentionally breaks a
22    rule intending to avoid detection in order to gain an
23    advantage, the player has cheated".
24    A.   Yes.  That sounds like something I've written.
25    Q.   And when college coaches -- when you speak with them about
```

```
 1   potential recruits, you give them an honest assessment, is that
 2   correct?
 3   A.   Yes.
 4   Q.   And you understand that recruiting is very important for
 5   colleges?
 6   A.   For their sports programs?
 7   Q.   Yes.
 8   A.   Yes.
 9   Q.   And you've written that "successful recruiting provides
10   the lifeblood for college athletics"?
11   A.   Where did I write that?  I'm sorry.  I've written a lot.
12   Q.   I understand.
13        MR. FRANK:  Can we show the witness only Exhibit 767,
14   please.
15   Q.   This is Chapter 4 of your book.  Does that refresh your
16   recollection that you wrote "successful recruiting provides the
17   lifeblood for college athletics"?
18   A.   Yes.
19   Q.   And that "to produce winning sport programs, coaches and
20   administrators must find student-athletes with outstanding
21   abilities."
22   A.   Yes.
23   Q.   You recall writing that?
24   A.   Yes.
25   Q.   And that's your view, correct?
```

02:32 on lines 10, 20.

```
 1    A.   Yes.
 2         MR. FRANK:  Okay.  We can take that down.
 3    Q.   Now, in 2013, there were two John Wilsons on the Menlo
 4    water polo team, correct?
 5    A.   Correct.
 6    Q.   The other John Wilson, John D. Wilson, was an exceptional
 7    goalie?
 8    A.   Yes.
 9    Q.   And goalies are more recruitable than other positions?
10    A.   It's situational.  The benefit of being a specific
11    position -- so a team knows they either do not need a goalie or
12    absolutely.  It's much more cut and dry and black and white.
13    Q.   Typically, they're more recruitable in your view, correct?
14    A.   No.  Well, last -- this current year, actually if you
15    wanted to go to the school where John Wilson attended and you
16    were a goalie, you would not get in because they have two very
17    strong freshmen due to not having freshmen goalies the previous
18    year.  So, actually, this would be a terrible year for someone
19    who is a goalie wanting to attend Johns Hopkins.
20    Q.   Do you recall speaking to FBI agents and government
21    attorneys on October 29, 2018?
22    A.   I know we spoke.  I don't know the date.
23    Q.   And you know they were taking notes during that
24    conversation?
25    A.   I -- I have no idea what they were doing.
```

```
 1  Q.   And you were attempting to be truthful in that
 2  conversation, correct?
 3  A.   Yes.
 4       MR. FRANK:  Can we show the witness only the 10/29/19
 5  302 at page 2.
 6       MR. KELLY:  Objection.  There's no evidence he wrote
 7  it.
 8       THE COURT:  I take it you're showing it to him to
 9  refresh his memory?
10  MR. FRANK:  To refresh his recollection.
11       THE COURT:  You can do that.
12       MR. FRANK:  And Miss Lewis, if you could --
13       MR. KENDALL:  Your Honor, I don't think he said he's
14  forgotten anything.  I don't think Coach Bowen, Mr. Bowen, said
15  he had a failure of memory.
16       THE COURT:  All right.
17       Go ahead, Mr. Frank.
18       MR. FRANK:  If you could highlight, Miss Lewis, just
19  above the middle of the page, the short paragraph there, the
20  very short paragraph, the second sentence.
21  Q.   Do you recall saying that goalies are more recruitable
22  than other positions?
23  A.   I don't.  I stand by what I just said about two minutes
24  ago.  It's the exact answer.  This, I'm not sure.  What I just
25  said is, really, if anyone is looking to be recruited as a
```

**A3518**

```
 1    goalie, what I just said is the best advice and the most true

 2    statement I can say about being recruited as a goalie.

 3            So last year the goalie --

 4    Q.   There's not a question pending.

 5    A.   Pardon?

 6    Q.   There's not a question pending for you right now.

 7            But John D. Wilson was an exceptional goalie,

 8    correct?

 9    A.   Yes.

10    Q.   And he was recruited to Hopkins?

11    A.   Johns Hopkins, yes.

12    Q.   And that's a Division 3 school, correct?

13    A.   Yes.

14    Q.   Now, you don't recall any USC coaches coming to watch

15    Johnny Wilson, Johnny B. Wilson, play water polo, do you?

16    A.   I don't recall it.

17    Q.   And you testified earlier that you offered to help Johnny

18    with his admission process and write a letter for him.  Do you

19    recall that testimony?

20    A.   Yes.

21    Q.   And I believe counsel asked you if you would do anything

22    you could to help and you testified that was too strong a

23    statement.  Do you recall that?

24    A.   Yes.

25    Q.   Because you wouldn't lie, correct?
```

```
 1    A.    Correct.

 2    Q.    And you wouldn't pass a bribe?

 3    A.    Correct.

 4    Q.    And you testified earlier that you spoke with a coach at

 5    USC and you thought it must have been Coach Pintaric?

 6    A.    That was my best guess.

 7    Q.    Right.  It was a guess?

 8    A.    It was not Vavic and Pintaric is the one I speak to mostly

 9    on the phone.  Casey Moon is often carbon copied on e-mails.

10    Q.    So fair to say, sir, that you don't remember who you spoke

11    to?

12    A.    I couldn't be exact.  That's fair to say.

13    Q.    And you don't remember what you said?

14    A.    Correct.

15    Q.    Okay.  But you were always, I believe you said, painfully

16    truthful?

17    A.    Yes.

18    Q.    Okay.  And the truth is that Johnny B. Wilson was a B plus

19    player in high school, correct?

20    A.    It's really hard to put a grade on him.  He had A plus

21    speed.  He was a B shooter.  He had A minus ability to steal.

22    He had B plus ability to split the gap.  I'm not happy with the

23    grading system.  I've never really used it before, but I have

24    used to try and frame it in the past, so I don't know what the

25    average grade would be.
```

```
 1    Q.   Well, do you recall telling the government when we first
 2    interviewed you that you thought Johnny was a B plus player?
 3    A.   I've been saying B plus/A minus as a way to frame how USC
 4    recruits player.  They recruit A's.  Johnny was a B plus, A
 5    minus if you put together all the pieces.
 6    Q.   Well, when you spoke to the government in October of 2019,
 7    do you recall saying he was a B plus player?
 8    A.   I read that I did, yes.
 9    Q.   Okay.  And then after that you spoke with Mr. Wilson's
10    counsel, correct?
11    A.   Correct.
12    Q.   And, in fact, you spoke with Mr. Wilson's counsel about
13    once a month for at least six months between that interview and
14    the time we spoke to you again?
15    A.   Sounds about right.
16    Q.   Okay.  And then in a second interview you told us that
17    Johnny was an A minus water polo player, correct?
18    A.   Sounds correct.
19    Q.   But then you thought about it some more and then said
20    Johnny was, in fact, a B plus water polo player?
21    A.   Like I said, this is not a system I'm used to using.
22    Q.   But those were your grades, right?
23    A.   Yes.
24    Q.   Okay.  And your testimony -- I believe you told us that
25    USC recruits A, A plus players, correct?
```

02:37 on line 10
02:38 on line 20

**A3521**

```
 1   A.   If we're sticking with this unfortunate grading system,
 2   yes.
 3   Q.   Well, the unfortunate grading system is one you came up
 4   with, correct?
 5   A.   It's not one that I use.  It was my way of -- the FBI
 6   called me for the first time in my life and started asking me
 7   questions, and I tried to immediately explain in laymen's terms
 8   what had gone on in a way I've never -- language I've never
 9   used before.  I'd prefer to use the common language, but yes.
10   That's correct.  B plus, A minus, B plus.
11   Q.   The upshot was you didn't think Johnny would get into USC
12   as a water polo player, correct?
13   A.   No, I don't -- did I think at the time he would get in?
14   Q.   You did not think?
15   A.   I'm trying to remember seven years ago what I thought.
16   Q.   I'm actually asking you for your memory of what you told
17   us two years ago.
18   A.   I don't.
19        MR. FRANK:  Could we show the witness the 10/29 302 at
20   page 4, please.  If you could highlight the first two sentences
21   of the second -- of that full paragraph.  No, no.  I'm sorry.
22   Miss Lewis, that -- exactly.  Thank you.
23   A.   Oh, yeah.  Surprised, not shocked, yes.
24   Q.   Do you see the top sentences that are highlighted?
25   A.   Yes.
```

```
 1   Q.   Does that refresh your recollection that you told the
 2   government that you did not think that John B. would get into
 3   USC as a water polo player?
 4   A.   Yes.
 5   Q.   That was truthful when you said it?
 6   A.   Yes, given the circumstances at the time.
 7   Q.   It was truthful, correct?
 8   A.   It was as truthful as I could be, absolutely.
 9   Q.   And I believe you testified this morning that when he did
10   get in, you thought your phone call must have done it.  Do you
11   recall that testimony?
12   A.   Oh, yeah.
13   Q.   Okay.  Did you know that Johnny was working with an
14   outside college counselor named Rick Singer?
15   A.   I did not.
16   Q.   And you testified that Johnny was living with another
17   family his senior year?
18   A.   Yes.
19   Q.   That was the Driscoll family?
20   A.   Yes.
21   Q.   Wyatt Driscoll was Johnny's friend?
22   A.   Yes.
23   Q.   Rudy Driscoll was his father?
24   A.   Yes.
25   Q.   And did you know that Wyatt Driscoll was working with the
```

```
 1    same college counselor, Rick Singer?

 2    A.    No.

 3           MR. FRANK:  And if we could show -- if we could call

 4    up Exhibit 83 in evidence at page 3.  And if you could,

 5    Miss Lewis, in the October 13th e-mail below that -- no --

 6    that -- from Rick Singer, if you could highlight just that

 7    e-mail from Rick Singer.

 8    Q.    Directing your attention, Mr. Bowen, to the second

 9    sentence of that e-mail, do you see where it says, from Rick

02:41 10    Singer, "Jovan has Johnny's stuff and asked me to embellish his

11    profile more, which I am doing"?

12    A.    Yes.

13    Q.    Have you seen that e-mail before?

14    A.    Boy, I don't remember.

15    Q.    Have you seen an e-mail from Rick Singer to John Wilson,

16    the defendant?

17    A.    I don't remember.

18    Q.    But you see what it says, "Jovan has Johnny's stuff and

19    asked me to embellish his profile more, which I am doing"?

02:41 20    A.    Yes.

21           MR. FRANK:  And then, Miss Lewis, if you can move two

22    e-mails up.  If you could enlarge -- if you could highlight the

23    second paragraph.

24    Q.    Do you see, Mr. Bowen, where it says "Jovan will provide

25    Johnny's info to admission when he does his other guys over the
```

```
 1   next month.  No payment of money till he gets a verbal and
 2   written from admissions and then 50 percent to a savings
 3   account I set up.  Then the remainder upon an acceptance letter
 4   in March with everyone else"?  Have you seen that e-mail
 5   before?
 6   A.   I don't think so.
 7        MR. FRANK:  And if you -- Miss Lewis, if you back out
 8   of that.
 9   Q.   You see that that e-mail was exchanged with John Wilson at
10   John@HyannisPortCapital.com?
11   A.   Yes.
12   Q.   And that's the same e-mail address that you used to
13   communicate with Mr. Wilson, correct?
14   A.   I recall him having two e-mail addresses.
15   Q.   Do you recall using that e-mail address to communicate
16   with him?
17   A.   I'm sure I had at some point, yes.
18        MR. FRANK:  If we can show, the witness only,
19   Exhibit 752, please.
20   Q.   Does that refresh your recollection, Mr. Bowen, that you
21   e-mailed Mr. Wilson at John@HyannisPortCapital.com?
22   A.   Yes.
23        MR. FRANK:  If we can show the witness only
24   Exhibit 88 -- I'm sorry.  If we can pull up Exhibit 88 in
25   evidence.
```

02:42  10

02:42  20

**A3525**

```
 1   Q.   And this is the profile that you went through with

 2   Mr. Kendall earlier?

 3   A.   Yes.

 4   Q.   You recall going through this and discussing that these

 5   honors are mostly false?

 6   A.   Yes.

 7   Q.   And Johnny wasn't on the varsity team for four years?

 8   A.   He didn't earn a varsity letter for four years.

 9   Q.   And he was not cocaptain ever?

10   A.   Correct.

11   Q.   He was never cocaptain, correct?

12   A.   Correct.

13   Q.   Okay.  And then you went through a bunch of honors with

14   Mr. Kendall that Johnny did win.  Do you recall that?

15   A.   Yes.

16   Q.   Including some various honorable mention awards?

17   A.   Yes.

18   Q.   Would you agree that this profile makes him look like a

19   better player than the player you described?

20   A.   Yes.

21        MR. FRANK:  And if we could go back to the cover page.

22   Q.   Mr. Kendall didn't show you this part, but do you see that

23   this profile was made to John Wilson at -- mailed to John

24   Wilson at John@HyannisPortCapital.com?

25   A.   Yes.
```

1    Q.   And that's the same e-mail address that you used when

2    communicating with Mr. Singer?  I'm sorry.  With Mr. Wilson?

3    A.   Yes.

4    Q.   And this e-mail was six days after the last e-mail that we

5    looked at?  Do you recall that?

6    A.   I can go back and look at the date.

7    Q.   Can we show -- you see this is October 19, 2013?

8         MR. FRANK:  Miss Lewis, can you show Mr. Bowen

9    Exhibit 83.

02:45 10    A.   Six days, yes.

11         MR. FRANK:  Could we show -- could we call up

12    Exhibit 107 in evidence, please.

13    Q.   Have you seen this document before, Mr. Bowen?

14    A.   It doesn't look familiar.

15    Q.   And if we look at the second page, have you seen this

16    profile before?

17    A.   I see so many of these resumes.  That doesn't -- I don't

18    know.

19    Q.   This is the Subcommittee packet for Johnny Wilson.  This

02:45 20    is what was presented to the USC Subcommittee on Athletic

21    Admissions.  Do you believe you've ever seen this?

22    A.   It's really hard for me to say accurately.  I've seen

23    thousands of sports resumes.

24    Q.   But you don't typically see the internal working documents

25    of the USC Subcommittee on Athletic Admissions, do you?

```
 1    A.    No.

 2    Q.    Okay.  And a lot of those same falsehoods that you looked

 3    at on Exhibit 88 are on this resume, correct?

 4    A.    There are -- yes.

 5    Q.    For example, it says four-year varsity starter.  That's

 6    not true, correct?

 7    A.    He did not start as a freshman.

 8    Q.    And it says three-year varsity team captain?

 9    A.    That's not correct.

02:46 10   Q.    That's not correct either.

11           And then if we look at the bottom, there are some

12    additional things on this resume, you see that, that we didn't

13    see on the other resume?

14    A.    Yes.

15    Q.    Under "Assets to our Men's Team"?

16    A.    Yes.

17    Q.    "Top 10 Attacker in Grad Class".  Johnny was not amongst

18    the top ten attackers in the entire country that year, was he?

19    A.    No.

02:47 20   Q.    Okay.  And then it says below that, second from last,

21    "Exceptional Leader".  Do you see that?

22    A.    Yes.

23    Q.    You never told, whichever coach you spoke with at USC,

24    that Johnny was an exceptional leader, did you?

25    A.    I don't remember saying that.
```

```
 1    Q.   It wasn't true, was it?

 2    A.   I don't know if I'm capable of saying that's true or

 3    false.

 4    Q.   Well, do you recall telling the FBI when you spoke with

 5    the FBI that John was not a strong enough leader to be elected

 6    captain?

 7    A.   Yes.

 8    Q.   And that was true, correct?

 9    A.   Yes.

10    Q.   And then it says "Immediate impact player".  Do you see

11    that?

12    A.   Yes.

13    Q.   And you testified earlier that you thought Johnny could

14    contribute later in his career.  He was a quiet grinder,

15    correct?

16    A.   Correct.

17    Q.   But you did not expect him to be an immediate impact

18    player on the championship USC water polo team, did you?

19    A.   Correct.

20    Q.   And would you agree that this profile is deceptive?

21    A.   It has falsehoods in it.

22    Q.   Would you agree that makes it deceptive?

23    A.   If they were intentional.

24    Q.   And would you agree that someone lying -- as someone

25    relying on this profile, would be misled about Johnny's
```

The line labels "02:47" appear before lines 10 and 20.

```
 1  abilities?
 2          MR. KENDALL:  Objection, your Honor.  Can't speak to
 3  what other people were thinking would happen with other people.
 4          THE COURT:  Sustained.
 5  Q.  Would you agree, sir, that lying on a profile is not being
 6  your best?
 7  A.  Yes.
 8          MR. FRANK:  No further questions.
 9          THE COURT:  Redirect, Mr. Kendall?
02:48 10         MR. KENDALL:  One moment, your Honor.
11              REDIRECT EXAMINATION OF JOHN BOWEN
12  BY MR. KENDALL:
13  Q.  Mr. Bowen, I think when you were under examination you
14  said he had A plus speed?
15  A.  Yes.
16  Q.  Did you also say he had an A or A plus work ethic as a
17  grinder?
18  A.  Yes.
19  Q.  Okay.  Did -- was it your view that he could make a -- if
02:49 20  he had joined the USC program and stuck with it, he would make
21  a meaningful contribution to it?
22  A.  The way I've consistently framed it as I did believe,
23  given his speed and his water polo IQ, that at some point by
24  his junior or senior year he could make a contribution to a
25  program like USC.
```

```
 1              MR. KENDALL:  Okay.  Thank you very much.

 2              THE COURT:  Any recross?

 3                    RECROSS EXAMINATION OF JOHN BOWEN

 4   BY MR. FRANK:

 5   Q.   He was not an immediate impact player, correct?

 6   A.   Correct.

 7              MR. FRANK:  No further questions.

 8              THE COURT:  Thank you, Mr. Bowen.  You may step down.

 9              MS. PAPENHAUSEN:  Your Honor, at this point we have

02:49 10   some documents we'd like to put up.

11              THE COURT:  Yes.  Miss Papenhausen.

12              MS. PAPENHAUSEN:  Thank you, your Honor.

13              First, I would like to formally move into admission

14   the three exhibits that we previously discussed today, your

15   Honor.  They are 9901, 9899, and 9902.

16              THE COURT:  For the record, will you describe them,

17   please?

18              MS. PAPENHAUSEN:  Sure.  Exhibit 9901 is an e-mail

19   chain.  The top e-mail is from Debbie Rogers to John Wilson,

02:50 20   dated October 17, 2013.

21              THE COURT:  That will be admitted, 9901.

22              (Exhibit 9901 admitted into evidence.)

23              MS. PAPENHAUSEN:  Exhibit 9899 is an e-mail with an

24   attachment from Leslie Wilson to John Wilson, dated October 19,

25   2013.
```

```
 1              THE COURT:  That will be admitted.

 2              (Exhibit 9899 admitted into evidence.)

 3              MS. PAPENHAUSEN:  Then Exhibit 9902 is an e-mail from

 4    John Wilson to Leslie Wilson, dated October 19, 2013.

 5              THE COURT:  And that will be admitted.

 6              (Exhibit 9902 admitted into evidence.)

 7              MS. PAPENHAUSEN:  And your Honor, at this point I

 8    would like to read in some parts of both of these documents and

 9    some other documents that are already in evidence.

10              THE COURT:  You may do so.

11              MS. PAPENHAUSEN:  Thank you, your Honor.

12              If we could first, please, put up Exhibit 712.

13              And if you could enlarge the top, please, Mr. Carter,

14    and if you could highlight, please, who this e-mail is from and

15    who it is to, and the date of 10/19/2013 and the time of

16    8:53:47 p.m.  And the subject line, please, "water polo shot".

17    And then could you please turn to page 2, which is the

18    attachment.  Thank you, Mr. Carter.

19              And if we could next please put up Exhibit 9901, which

20    has just been admitted.  Excuse me.  9901.  Thank you.

21              And if we could start please at the last e-mail of the

22    chain on the second page.  If we could highlight, please, who

23    this e-mail is from, just John Wilson, who it's to, Debbie

24    Rogers, the date, please, of October 17, 2013, and -- oh, I'm

25    sorry.  We're not at the very bottom one.
```

| | |
|---|---|
| 1 | If we could look, please, at the very bottom one and |
| 2 | highlight the -- who it is from, which is Debbie Rogers, and |
| 3 | the date, which is October 17, 2013.  And then this e-mail |
| 4 | reads "For Johnny's senior page, there is no limit on words for |
| 5 | tribute.  More words equals smaller print". |
| 6 | And if we could look at the e-mail just above this. |
| 7 | And at this point, Mr. Carter, if you could please highlight |
| 8 | who it's from and who it's to and the date, which is |
| 9 | October 17, 2013.  Then the text is "I know nothing of this. |
| 02:53 10 | What is it?" |
| 11 | And then if we could flip, please, or move up, scroll |
| 12 | up, to the next e-mail sequentially, and if you could note |
| 13 | below that -- if you could highlight from Debbie Rogers.  Thank |
| 14 | you.  On October 17, 2013 is the date.  And then the text is |
| 15 | "yearbook page for Johnny.  I have samples you can look at when |
| 16 | you get here". |
| 17 | And then if we can look, please, to the e-mail |
| 18 | immediately above that, which is from John Wilson to Debbie |
| 19 | Rogers, dated October 17, 2013, and the text is "Is it an ad |
| 02:53 20 | that we buy?" |
| 21 | And if you could go, please, to page 1 of this |
| 22 | document -- sorry.  The bottom of page 1.  Flip further down, |
| 23 | please.  Sorry.  Top of page 2.  From Debbie Rogers, |
| 24 | October 17, 2013.  And she writes, "You pay 250 for the page, |
| 25 | provide up to five pictures, and write a tribute to Johnny if |

1    you want to".

2         And then if we could flip, please, to page 1, and

3    let's go all the way to the second e-mail from the top, which

4    is -- yes, October 17, 2013, 2:41 p.m. from John Wilson to

5    Debbie Rogers.  The text is "D don't see examples".

6         If we could look, please, at the e-mail at the top

7    from Debbie Rogers to John Wilson, October 17, 2013, and then

8    the text is "I have the examples printed out to show you when

9    you get here".

02:54 10         Now, Mr. Carter, if we could please go to

11   Exhibit 9899.  And if you could -- thank you.  And can we

12   actually put that next to Exhibit 88.  If we could look at

13   Exhibit 88, perhaps blow it up a little bit, the date there we

14   see is Saturday, October 19, 2013.  Then if we could look,

15   please, over at 9899, the date there is October 19, 2013, 11:46

16   a.m. from Leslie Wilson to John Wilson.  The subject is senior

17   page.

18        And then if we could look at Exhibit 9899.  I think we

19   can get rid of Exhibit 88.  If we can look at Exhibit 9899 in

02:56 20   the text of the e-mail, please.  It says, "This is one photo I

21   really like from a game this year showing Menlo's championship

22   banner in the background".

23        And then could we turn to page 2, please, of

24   Exhibit 9899, page 3?

25        Next could we pull up Exhibit 9902, please.  And if we

1    could highlight it's from John Wilson to Leslie Wilson, date

2    October 19, 2013, 3:32:24 p.m., subject "Johnny year book".

3    Then the text is "Johnny yearbook, every year you make us

4    prouder!  From a wonderful baby to a delightful child to an

5    accomplished young man!  Best wishes as you pursue your

6    dreams".

7         Next, please, Mr. Carter, if we could put up

8    Exhibit 49.  And let's start here, please, at the bottom of

9    page 2.  The very bottom e-mail there, if we can highlight

02:57 10   is -- who it's from and who it's to and the date.  And if we

11   can un-zoom so we can see at the bottom there?  It says

12   "itinerary for John Wilson".

13        And then if we can turn to page 3, continuing the

14   e-mail, we see "Tuesday, April 2nd, USC, 9 o'clock a.m. campus

15   tour".

16        If we go down to the next bullet point, it says "LMU,

17   1 o'clock p.m. to 2:30 p.m. campus tour".

18        Then we see "Wednesday, April 3rd".  We see "UCSB"

19   under that.

02:58 20        Further down, we see "Thursday, April 4th" and "USC"

21   under that.

22        Then if we can go back to page 2, please.  It's an

23   e-mail about two-thirds of the way down the page, which is

24   March 26, 2013, at 1:27 p.m.  And if you could highlight who

25   that e-mail is from.  And then the text is "Rick, these are

1    generic tours?  I thought we might be meeting with assistant

2    water polo coaches et cetera, John."

3           And then if we can go next, please, to the bottom of

4    page 1, the e-mail there, if we can highlight who it's from,

5    perfect, and who it's to and the date, please.  And then the

6    third paragraph of that e-mail says "Jovan just texted me.  He

7    will meet you all at 3:30 p.m. on Tuesday on the pool deck.

8    You will have to leave LMU early".

9           And then if we could back out of that, and above the

02:59 10   e-mail we just read, we can see it says "begin forwarded

11   message".  If you can highlight, we see that forwarded message

12   is from Leslie Wilson.

13          Then if you could go up, please, to the e-mail above

14   that, which we see is from John Wilson.  That e-mail reads, in

15   part, starting at the middle of the first line "What are the

16   schools that he has a realistic shot at (without help)".

17          And if we can go up, please, to the e-mail above that.

18   We can highlight, please, who it's from, Rick Singer.  Then if

19   you could highlight, please, on the second line of the e-mail

03:00 20   where it says "USC".

21          Thank you, your Honor.  That's all.

22          THE COURT:  All right.  Defendant Abdelaziz's counsel?

23          MR. KELLY:  Your Honor, we rest.

24          MR. KENDALL:  We rest as well, your Honor.

25          THE COURT:  Defendant Wilson's counsel?

```
 1              MR. FRANK:  We rest.

 2              THE COURT:  All right.  What that means, jurors, is

 3      the evidentiary part of this case is concluded.  The defendants

 4      have rested.

 5              As I told you last week, I thought we would get to

 6      this point.  We need tomorrow to prepare all of the legal

 7      issues that we have to go over, so we're not going to have a

 8      session tomorrow, Tuesday.  And I'm going to ask you to come

 9      back on Wednesday morning at 9:00 a.m., at which point you will

03:01 10      hear closing arguments.  You will hear first from the

11      government.  Then you will hear from both of the defendants.

12      Finally, the government has an opportunity to say a rebuttal.

13              So again, you've heard all of the evidence, but you

14      have not heard closing arguments.  You've not heard my

15      summation and my instructions to you on the law.  I'm going to

16      do that not on Wednesday, because Wednesday may be a full day

17      just hearing the closing arguments.  And rather than give you a

18      charge mid to late afternoon and ask you to start deliberating

19      late afternoon, I'm not going to do that.  We --

03:02 20              After the closing arguments by counsel on Wednesday,

21      we will recess.  I don't know exactly what time that will be.

22      It will be somewhere around the middle of the day, 1:00 to

23      1:30, somewhere around that.  But I'm going to let them let you

24      off for the rest of Wednesday to come back on Thursday morning,

25      at which point you will hear my charge on the law, which won't
```

```
 1    be quite as long as both sets of arguments, but it will be long

 2    and detailed.  And then after that, sometime mid morning on

 3    Thursday, the case will be submitted to you.

 4         All of this is for your planning and for your

 5    understanding, but I need to urge you even more urgently than I

 6    have before not to try to do any independent research in this

 7    time that you have off, not to talk to anybody about this case,

 8    not to refer to anything in the media about this case.  All of

 9    that would be inappropriate and might put something in your

10    head that's not the evidence, the evidence you have heard.

11         You haven't heard closing arguments.  You haven't

12    heard my instructions on the law, but you have heard the

13    evidence.  You're the only ones that have, not anybody else out

14    there who's going to talk to you informally about this case or

15    a newspaper article or anything else has seen and heard all of

16    the evidence you have.  So that means that you are to keep to

17    yourself until after all this is done.

18         And then after my charge to you, you'll go into the

19    jury room and then you will deliberate, and that is the

20    appropriate time to express your opinions and hear what all the

21    other jurors have to say.  So please honor those instructions.

22    I will see you day after tomorrow.  That's -- my deputy will

23    give me the date just so I don't mess up.

24              THE CLERK:  That is Wednesday the 6th.

25              THE COURT:  Wednesday, October 6th.  So that's
```

```
 1    two days from now, and then my charge will be to you on

 2    Thursday, October 7th.  Have a pleasant day off.  I'll see you

 3    back here on Wednesday morning at 9:00 a.m.

 4              THE CLERK:  All rise for the jury.

 5              (Jury exits.)

 6              THE COURT:  Be seated, counsel.

 7              Petriezzello.

 8              MR. FRANK:  Your Honor, we would move to have all the

 9    coconspirator statements admitted pursuant to Petriezzello.

10              THE COURT:  Do you have any argument to make in that

11    regard?

12              MR. FRANK:  I certainly can if the Court would like,

13    your Honor.  We believe there's been extensive evidence in this

14    case about the nature of the scheme, about the fact that it

15    involved fraudulent athletic profiles that were falsified that

16    were accompanied by payments of money to USC athletic programs,

17    other athletic programs, and then ultimately to individuals at

18    those universities in exchange for the admission of those

19    students as recruited athletes.

20              We also believe there was extensive evidence of the

21    defendants' participation in that scheme.  We submitted e-mail

22    evidence showing them receiving each of those fraudulent

23    athletic profiles, which contained all sorts of falsified

24    information.  There's really no dispute about the fact that the

25    profiles were falsified, that they were sent to the defendants'
```

           1   e-mail accounts.  They were sent to and received in e-mail

           2   accounts that the defendants actually used and that defendants

           3   thereafter made substantial payments to The Key Worldwide

           4   Foundation with the understanding that that money would be

           5   passed on to the athletic programs at the Universities where

           6   their students were being recruited, their children were being

           7   recruited, based upon those falsified athletic profiles.

           8          The payments were styled as donations.  Although the

           9   defendant Wilson deducted them, in part, as a donation and, in

03:06     10   part, as a business expense, there was extensive evidence that

          11   they were neither, but that they were quid pro quo payments in

          12   exchange for the admission of those students based -- as

          13   recruited athletes, based on those falsified profiles.

          14          There was also evidence from the Subcommittee on

          15   Athletic admissions that they relied on those profiles.  They

          16   believed that that came from the coaches.  They were unaware of

          17   the fact that there were payments being made in connection with

          18   those and that those students would not otherwise have been

          19   admitted.

03:06     20          And there was evidence that, for example, Sabrina

          21   Abdelaziz, never showed up.  There was also evidence that

          22   Johnny Wilson didn't show up, and even if he did show up, he

          23   dropped off after one semester, which is exactly what Rick

          24   Singer told his father he could do at the outset of his scheme.

          25          There was evidence on the consensual calls that the

1    defendants knowingly and intentionally participated in this

2    scheme, in addition to all of the other evidence we presented.

3    The consensual calls with respect to Abdelaziz showed that he

4    was aware of the deception.  He was aware that his daughter was

5    not a legitimate basketball recruit at that level.  He was

6    aware that the payment was made in exchange for that

7    recruitment.  He was aware that his daughter hadn't shown up to

8    practice.  He was aware that the Admissions Committee had been

9    lied to.  In fact, he agreed to further lie to the Admissions

03:07 10    Committee in that call and to further deceive them about the

11    reason that his daughter hadn't shown up for practice by

12    telling them that she had plantar fasciitis.  So we submit that

13    all of that shows additional evidence of his knowledge and

14    intent to join in the scheme.

15            In addition, there was extensive evidence with respect

16    to defendant Wilson on the consensual calls and on the wiretap

17    about his knowledge of how the side door worked, that it was --

18    that there were payments being made in exchange for admission

19    in those calls.  There was evidence that the defendant Wilson

03:08 20    was aware that his daughters were not sailors at all.  They

21    didn't row crew at a collegiate level and yet they would be

22    presented, they would be sold as a crew recruit or as sailors

23    and that's how they would gain admission to the universities in

24    exchange for payments.  And there was evidence that he, in

25    fact, went ahead and made payments, two $500,000 payments, to

1    ensure their admission to Stanford and Harvard in connection

2    with that.

3         There was extensive evidence of the fact that this was

4    a unified conspiracy, a unified conspiracies in Count 1 and

5    Count 2.  And, in particular, there was evidence with respect

6    to Wilson that Wilson knew other participants in the conspiracy

7    and even introduced other participants in the conspiracy.

8         There was evidence with respect to the Driscoll family

9    and their participation in the scheme.  There were calls and

03:09  10   e-mails introduced with respect to Marci Palatella, who

11   participated in the scheme.  There was evidence of her son

12   Gino's fraudulent recruitment to USC based on a falsified

13   athletic profile through Donna Heinel as a football player, and

14   we introduced phone calls and e-mails to show that defendant

15   Wilson was aware of the fact that Marci Palatella -- and that

16   Marci Palatella and the Wilson's were aware that they were

17   working with Rick Singer in connection with that.

18        There was also evidence presented through Laura Janke

19   and others about the way that this scheme worked, that these

03:09  20   falsified profiles were fabricated by Janke and by others

21   working for Rick Singer, sort of with consistent -- by a

22   consistent methodology and that the profiles were submitted to

23   Donna Heinel where they were voted on by the subcommittee in

24   bulk.

25        There was evidence that multiple profiles submitted by

A3542

```
 1    Rick Singer that were falsified submitted to Donna Heinel were
 2    submitted to the Subcommittee and voted on at those
 3    Subcommittee meetings.
 4          There was evidence that Rick Singer's payments, the
 5    payments of the parents through Rick Singer to the women's
 6    athletic board, and by payments directly to the women's
 7    athletic board, comprised an increasing percentage of the
 8    revenues derived by the women's athletic board, and that Donna
 9    Heinel benefitted from that in her professional capacity.
10    There was also evidence that she controlled the women's
11    athletic board.
12          There was also evidence that Jovan Vavic controlled
13    the water polo team and that the funds associated with the
14    water polo team and that's where money was sent in exchange for
15    these recruitments, and that he also received money personally
16    in exchange for recruitment.
17          There was also evidence that it was -- that the very
18    nature of this scheme was only possible because it was such a
19    large conspiracy that involved multiple parents, multiple
20    coaches at different universities, and all sorts of different
21    players.
22          We presented evidence, for example, from Bruce
23    Isackson testifying that it was the very nature of the scheme
24    that it was tried and true that made it appealing to him.
25          There was other additional evidence on that point in
```

| | |
|---|---|
| 1 | the form of recorded phone calls.  And we presented evidence |
| 2 | that the scheme benefitted all of the participants by virtue of |
| 3 | the fact that all of the money flowed through The Key Worldwide |
| 4 | Foundation and was distributed from The Key Worldwide |
| 5 | Foundation, which would make it easier to conceal and harder to |
| 6 | trace. |
| 7 | So we believe all of that shows both the nature of the |
| 8 | scheme and the conspiracy and the defendants' participation in |
| 9 | the scheme and the conspiracy and that all of the statements |
| 03:12 10 | that we introduced by coconspirators, including Rick Singer, |
| 11 | including the other parents who participated in the scheme, |
| 12 | were statements in furtherance of that scheme and of that |
| 13 | conspiracy, the very conspiracy that Janke and Isackson and |
| 14 | Mikaela Sanford testified to and that the e-mails and the phone |
| 15 | calls of the defendants showed that they, too, were part of |
| 16 | that conspiracy and were benefitting from that broader |
| 17 | conspiracy, understood its nature, and knowingly and |
| 18 | intentionally joined in it to obtain the admission of their |
| 19 | children to universities based on fraudulent athletic profiles |
| 03:12 20 | in exchange for quid pro quo payments. |
| 21 | THE COURT:  All right.  Thank you, Mr. Frank. |
| 22 | Mr. Kelly. |
| 23 | MR. KELLY:  Yes, your Honor.  I think it's black |
| 24 | letter law that evidence of an agreement to join in a |
| 25 | conspiracy must be based on defendant Abdelaziz's own words and |

```
 1    own actions.

 2            There is zero evidence that this man joined one

 3    nationwide conspiracy.  They presented tapes of people from New

 4    York who were involved in cheating on tests.  What's that got

 5    to do with him?  Those should not have been admitted, nor

 6    should statements of the Huneeus fellow, also a test cheater,

 7    nothing to do with Aziz.

 8            At worst, the two tapes they played, those consensual

 9    recordings, were a discussion between him and Singer.  There

03:13 10   was zero evidence that he was involved with other people or

11    knew of other people or was part of some nationwide conspiracy.

12            So with respect to Abdelaziz, we think the

13    Petriezzello finding has not been established by the government

14    and those statements that were admitted should not have been

15    admitted and they prejudice our clients, and we think they

16    should be thrown out.

17            THE COURT:  Thank you, Mr. Kelly.

18            Mr. Kendall.

19            MR. KENDALL:  Your Honor, along the way Mr. Kelly

03:13 20   approached it, I think we need to focus on what was the scope

21    of my client's agreement and what is the best that the

22    government could argue that he knowingly agreed to participate

23    in.

24            We know he had nothing to do with test cheating.  He

25    had nothing to do with people taking classes.  And very
```

importantly, it was Agent Keating's testimony about the Singer

notes, Exhibit 13, what Singer told them and what was not

disputed, and Singer said that he thought he was making a

donation.  I always said donation.  I never said payment.  It

was a donation to a program, not a payment to a coach.  If we

-- that's uncontested.  It was the scope of any understanding

or expectation of Mr. Wilson.  Anything involving bribery,

anything involving the test cheating or taking classes, is far

beyond the scope of that agreement.

03:14    Furthermore, Mr. Wilson made his donation through

Mr. Singer in 2014 to Coach Vavic.  Donna Heinel had not been

introduced to Rick Singer at that point.  The sort of Donna

Heinel activity that was the focus of much of the evidence was

really 2017, 2016, years after my client's son's admission.

There's no way that Bruce Isackson, Gordon Caplan, Huneeus can

be associated with my client anyway, particularly all of those

whose admissions was going through Donna Heinel.

    Thank you, your Honor.

    THE COURT:  Do you wish to respond, Mr. Frank?

03:15    MR. FRANK:  Your Honor, it was clear from the evidence

that Heinel and Vavic knew and were aware of each other.  Janke

testified about that fact.  Janke testified that Singer started

putting people increasingly through Heinel rather than through

Vavic, but then there was a Vavic phone call that we also

played that was in evidence in which Vavic was aware of the

1    fact that that was happening and was willing to do additional

2    bogus recruitments in exchange for the money he was receiving

3    personally.

4         There was extensive evidence of these defendants'

5    knowledge and intent to join that conspiracy, not just from the

6    nature of the e-mails that we submitted, which we introduced

7    into evidence in which they're talking about how they were

8    going to get into the University of Southern California with

9    Rick Singer in exchange for these payments and falsified

03:16 10  profiles, but also extensive evidence on the wiretap in the

11   form of Wilson's calls and in the consensual calls with

12   Abdelaziz.

13        With respect to Huneeus, there was evidence on both

14   the Huneeus and Caplan calls of how Singer presented his scheme

15   to coconspirators.  Both of those conspirators clearly

16   willingly joined in the scheme on those calls and then there

17   was additional evidence with respect to Agustina Huneeus, with

18   respect to her admission to USC, in fact, through the side door

19   based on a falsified profile through Donna Heinel.

03:16 20       And so all of that is evidence, not just of the nature

21   of the scheme and the conspiracy and the fact that those

22   statements were in furtherance of it, but evidence that these

23   defendants knowingly and intentionally joined that scheme and

24   their statements were, likewise, directed toward that scheme

25   and in furthering it.

```
 1              THE COURT:  All right.  Thank you, counsel.  What I'm

 2    going to do is I'll take that matter under advisement and

 3    advise you tomorrow at the charge conference.

 4              I need some time to get ready for the charge

 5    conference, so we're not going to have that starting in the

 6    a.m.  We'll have the charge conference at 1:00 p.m.  And I will

 7    make -- the way that we do that is I will go through both of

 8    your requests for instructions and give you my rulings as to

 9    how I am going to go, that is whether I will give the

03:17 10    substance, and I emphasize the word "substance" of a proposed

11    request or not.  And if I'm not going to give it, I'll tell you

12    why.

13              I will then hear, first from the government, on my

14    potential rulings on its requests, followed by the defendants'

15    response to the government's arguments.  Then we'll do the same

16    for the defendants' instructions, giving first the defendants a

17    chance to respond and then the government.

18              It's not going to take all afternoon, so be prepared.

19    If I were to specifically answer all of the requests that I

03:18 20    have so far, I believe the defendants are over 100 pages, the

21    government's not quite that long, but if I were to answer each

22    and every one in detail, we would be here all tomorrow

23    afternoon and into Wednesday.  So it's not going to take that

24    long, but I will give you ample opportunity to respond to my

25    rulings on the requests.
```

```
 1              Then what we're going to do is, as I've told the jury,
 2   we are going to hear closing arguments on Wednesday, but not my
 3   charge.  I'm not going to charge after roughly four hours of
 4   closing arguments, which would be somewhere in the middle of
 5   the day to the afternoon.  My charge is not going to be short.
 6   It would mean I would be submitting this case to the jury mid
 7   to late afternoon on Wednesday.  And I much prefer to give the
 8   jury the afternoon off, have them come back in on Thursday
 9   morning, hear my charge, and get this case submitted to them
10   sometime mid to late morning on Thursday.  So those are my
11   plans.
12              And responses or comments from counsel?  Mr. Kelly?
13              MR. KELLY:  None.  No responses.
14              THE COURT:  Mr. Kendall?
15              MR. KENDALL:  Will we get a written copy of your draft
16   charge?
17              THE COURT:  No, not before I give it.
18              MR. KENDALL:  Okay.  When you give it, will we get a
19   written copy?
20              THE COURT:  If you ask for it, you will be given it.
21              MR. KENDALL:  I'm asking for it now, if I may, your
22   Honor, so we can follow you as you give it.
23              THE COURT:  Well, I'm not going to give it to you
24   before I give the charge.  After I give the charge, I will give
25   you a copy if you request it.
```

```
 1              MR. KENDALL:  Okay.  Thank you, your Honor.

 2              MR. FRANK:  Nothing from the government, your Honor.

 3              THE COURT:  All right.  Thank you.  I will see you

 4     tomorrow at 1:00 p.m. in this courtroom for a charge

 5     conference.

 6              THE CLERK:  All rise.

 7              (Whereupon, the proceedings adjourned at 3:21 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2   Witness                          Page

3

4   JAMES WALTERS

5   Direct Examination by Mr. Kendall      16

6   Cross-Examination by Mr. Frank         33

7   Redirect Examination by Mr. Kendall    64

8   Recross-Examination by Mr. Frank       68

9

10  JOHN BOWEN

11  Direct Examination by Mr. Kendall      70

12  Cross-Examination by Mr. Frank         165

13  Redirect Examination by Mr. Kendall    182

14  Recross-Examination by Mr. Frank       183

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2    NO.                        ADMIT

 3    771    ....................    35

 4    9928   ....................    89

 5    9929   ....................    89

 6    9930   ....................    92

 7    7124   ....................    106

 8    8024   ....................    122

 9    9901   ....................    183

10    9899   ....................    184

11    9902   ....................    184

12

13

14                        E X H I B I T S

15    NO.                        FOR IDENTIFICATION

16    J      ....................    163

17    K      ....................    163

18    L      ....................    163

19    M      ....................    163

20

21

22

23

24

25
```

```
 1    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8           We, Kristin M. Kelley and Kelly Mortellite, certify

 9    that the foregoing is a correct transcript from the record of

10    proceedings taken October 4, 2021 in the above-entitled matter

11    to the best of our skill and ability.

12

13

14        /s/ Kristin M. Kelley           October 4, 2021

15        /s/ Kelly Mortellite            October 4, 2021

16        Kristin M. Kelley, RPR, CRR              Date
          Kelly Mortellite, RMR, CRR
17        Official Court Reporter

18

19

20

21

22

23

24

25
```

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3
     UNITED STATES OF AMERICA,          )
 4                      Plaintiff       )
                                        )
 5   vs.                                )  No. 1-19-CR-10080
                                        )
 6   GAMAL ABDELAZIZ and JOHN           )
     WILSON,                            )
 7                      Defendants.     )
                                        )
 8                                      )

 9

10

11            BEFORE THE HONORABLE NATHANIEL M. GORTON
                   UNITED STATES DISTRICT JUDGE
                       JURY TRIAL - DAY 18
12

13
              John Joseph Moakley United States Courthouse
14                        Courtroom No. 4
                          One Courthouse Way
15                    Boston, Massachusetts 02210

16

17                        October 5, 2021
                             1:10 p.m.
18

19

20
                    Kristin M. Kelley, RPR, CRR
21                     Official Court Reporters
              John Joseph Moakley United States Courthouse
22                   One Courthouse Way, Room 3209
                     Boston, Massachusetts 02210
23                    E-mail: kmob929@gmail.com

24            Mechanical Steno - Computer-Aided Transcript

25
```

```
 1    APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2          THE CLERK:  You may be seated.  Court is now in

 3   session.

 4          THE COURT:  Good afternoon, counsel.

 5          We are here on a charge conference in this case.  What

 6   I'm going to do is a little out of order, but I'm going to

 7   start with the defendants' requests today because they seem to

 8   be more voluminous and I need to take more time to make my

 9   rulings on them.  What I'm going to do is go through starting

10   with the defendants' proposed instructions, which were filed

11   back in August in docket No. 2015.  I'm going to address each

12   one of them.

13          Because there are so many, when I get halfway through,

14   I will stop and hear objections of the defendants to my

15   rulings, if there are any, and then objections from the

16   government, if there are any with respect to the defendants'

17   requests.  Then we'll go back and complete the defendants'

18   requests, which number somewhere in the 90s, I think.  Then

19   we'll turn to the government's requests and do the same thing.

20          When I say I'm going to give the substance of a

21   request, it means just that.  It doesn't mean verbatim.  It

22   doesn't even mean that I'm going to cover all of the items that

23   are covered in the request, but I'm giving what I deem to be

24   the substance.  Sometimes I say I'm going to give the rough

25   substance of a request and other times I say I'm not going to
```

give it.  When I say I'm not going to give it, I'll explain
myself.  Please keep in mind that substance doesn't mean
verbatim.  It means what it says, substance.

So we will start with the defendants' original set of
requests.  Of course, there have been multiple supplements
since then.  We'll get to those.  They're numbered, and I'll
identify the number as we go.

Starting with number one, which is a request for
preliminary instruction, which is moot, I've already given
them.  They are what I would call boilerplate.  To the extent I
didn't give them as a preliminary instruction, I will give the
boilerplate of one.

Two, pretrial publicity, I will give the rough
substance of that.

Three is a preliminary instruction, so it's moot.  I'm
not going to give that again, the conduct of the jury, of
course.  I've already told them how they should behave.

Number four, yes, I will give the substance, the
nature of the indictment.  In fact, I do quote the indictment
at some length, so I give the substance of that.

Number five, again, the first part of that is
preliminary instruction, which is now moot.  I don't say the
presumption of innocence alone may be sufficient to raise a
reasonable doubt to require the acquittal.  That's not in my
general instruction, however, the bottom of that first page is

```
  1    verbatim what I give, the paragraphs that starts "a reasonable
  2    doubt may arise and the next one is not sufficient".  That
  3    comes out of one of my previous charges.  You quoted well.
  4         The last paragraph on the second page I think is
  5    almost verbatim.  I believe there are a few words that I don't
  6    use, but it's practically verbatim for what I give on the
  7    presumption of innocence and proof beyond a reasonable doubt.
  8         Number six I give the rough substance, not as detailed
  9    of that one.
01:13 10      Number seven, that is verbatim.  It's right out of my
 11    DeNunzio charge.
 12         Number eight is verbatim, again, apparently out of the
 13    DeNunzio.  I will give that.
 14         Number nine is verbatim, the first and last
 15    paragraphs.  Middle paragraph I'll give the substance of.
 16    Apparently, it's not verbatim what I normally give.
 17         Number ten, no.  I will not charge on spoliation.
 18         There is no such evidence, nor failure to collect
 19    evidence in number 11.  I will not give that.
01:14 20      Number 12, use of tapes and transcripts.  I was going
 21    to talk about this with respect to the government, but I
 22    suppose now is as good a time as any.
 23         What is the position if the transcripts, which are not
 24    exhibits, go into the jury room?  Has there been an agreement
 25    of counsel on that or not?
```

```
 1              MR. KENDALL:  There has been no agreement, your Honor.
 2              THE COURT:  If they were to go in, I would allow the
 3       defendants' alternate so-called corrected versions to go as
 4       well, but I want to hear from counsel.  What do you feel?
 5              MR. FRANK:  Your Honor, it's not customary in my
 6       experience for those to go back.
 7              THE COURT:  No, it isn't, but I have on occasion when
 8       parties agreed to allow transcripts, although they are not
 9       exhibits, to go to the jury.
10              MR. KELLY:  We object.
11              MR. KENDALL:  We object as well, your Honor.
12              THE COURT:  All right.  Then they will not go.  So I
13       will give the substance of that.
14              Stipulations, number 13, I give the substance of that.
15              Credibility of witnesses, that's verbatim, right out
16       of one of my prior charges, presumably DeNunzio.
17              I will not give missing witness because there's no
18       reason to give that instruction in my opinion, so I don't give
19       15.
20              16 is testimony of law enforcement agents and
21       employees.  Yes, I give the substance of that, substance.  I
22       don't give it verbatim.
23              On testimony of witnesses with immunity, I'm not going
24       to give that.  We haven't had any.
25              18, testimony of cooperating witnesses, I give the
```

1    substance of that one.

2         Inconsistencies in witnesses' testimony, this is

3    verbatim with exception of the first sentence.  "You should

4    remember that the law is not imposed on the defendant in a

5    criminal case.  The burden or duty of calling witnesses are

6    producing", I don't say that.  The rest of it is verbatim that

7    I give.

8         Number 20, I give the substance of that.

9         Number 21, no, I do not give that.  As far as I know,

01:16  10    there was no character evidence given about reputation, so I'm

11    not going to give that.

12         22, yes, I give the rough substance of that but not in

13    this form.  We charge with respect to good faith and we talk

14    about willful elsewhere in the charge, and we're not going to

15    repeat it several times during the course of the charge.  I see

16    it once but not multiple times.

17         23, collective knowledge.  This instruction

18    effectively eliminates private sector honest services fraud in

19    contravention of the Supreme Court decision in *Skilling* because

01:17  20    it imputes fraud of the employee to the employer and,

21    therefore, I won't give it.  The answer is no on 23.

22         24, I give the substance of other individuals who are

23    not defendants in this trial, yes.

24         25, basic elements of a conspiracy.  Well, I give the

25    substance of the first two paragraphs, but as to the conspiracy

in Count 1, I do not believe it is the law that an overt action must be proved, so I will not give that portion of this request in the third paragraph.

Number 26, I give the substance of that paragraph, but we will give it in a broader context and I'm not going to say that when Singer became the government's agent and cooperator and, therefore, could -- you asked me to say "could not be a coconspirator". If I say it at all, I won't say it this directly. I will say "no longer be a coconspirator" so there's 01:19 no confusion. Can be a coconspirator up until September 21, 2018, but not thereafter. So I give the rough substance of that one.

On 27, I give the rough substance of that one but not as detailed. That goes on for a long time and I'm not going to give in much detail.

Number 28, first element, multiple conspiracies. We are not going to give the substance of this proposed instruction because it is lengthy, misleading, and not in conformance with the law, but I do, of course, charge on single 01:19 and multiple conspiracies and cooperators and informants.

Number 29, I give the rough substance of this, but we instruct on motive elsewhere but talk about good faith here with respect to willfulness. So I give the rough substance of that one.

30, again, I do give the rough substance about good

1    faith, but we talk about it once, not about 12 times as I've
2    been requested to do by the defendants.  I give the rough
3    substance of that one.

4         On intent, yes, number 31.  I give the rough substance
5    of the first, second and fourth paragraphs, but not at this
6    point in the charge but rather where a charge on willfulness.
7    That third paragraph, "a conspiracy requires more than a
8    buyer/seller relationship", I don't give examples like that so
9    I'm not going to give that part of it at all.

01:21 10        Number 32, third element.  I dealt with that earlier,
11    number 25, I'm not going to charge on overt act.  I don't
12    believe it's required under the first conspiracy.

13        Number 33, I will give the sufficient substance, but I
14    do not comment directly on the evidence.  I charge generically
15    for the most part and, furthermore, this is too specifically
16    aimed at Mr. Singer, so I give rough substance but not in this
17    format.

18        Number 34, mail and wire fraud elements, yes.  I give
19    the substance of that one.

01:21 20        The substance of 35.

21        The rough substance of 36, we define materiality for
22    clarification rather than talking about materially false and
23    fraudulent pretenses.  We talk about materiality.

24        Number 37 is the same decision as 36.  It's
25    duplicative.  We give the rough substance of it, of the first

1   paragraph, but not the last paragraph.  "Alleged victim

2   regularly makes similar decisions", I don't give that.  I give

3   the rough substance.

4         Number 38, yes, rough substance, knowingly and

5   willingly.

6         39, rough substance of intent due to fraud, yes.

7         Number 40, I don't give this because I have

8   determined, to the contrary, an admission slot is intangible

9   property.  So I won't give the first part requested by

01:22 10   defendant Wilson, nor the second requested now by just

11   defendant Abdelaziz.  That's a question of law.  I'm not going

12   to instruct the jury on that.  That, I believe, is a question

13   of law for the Court.

14         Number 41, of course, is no longer relevant because

15   defendant Palatella is no longer a defendant.  I don't give

16   that one.

17         42, yes, I give the rough substance of conspiracy to

18   commit honest services mail and wire fraud, the introduction.

19         Number 43, I do not give the rough substance of this

01:23 20   because we have already decided and believe the Supreme Court

21   has decided as well that, under federal law, employees owe a

22   fiduciary duty to their employers, so I think this misstates

23   the law.  I will not give it.

24         Number 44, no longer relevant.  It refers to defendant

25   Palatella.

         1              Number 45, I will give the rough substance of the

         2      intent -- the first paragraph is certainly relevant, and I will

         3      give the rough substance of that, but we don't give the rest of

         4      this request because it is repetitive and we give a general

         5      instruction on intent at the outset of our discussion of the

         6      substantive charges or the law in this case.  So I give the

         7      rough substance but not most of the rest of this.  The

         8      paragraph on 56, second to last paragraph, does not make any

         9      sense to me at all.

01:24   10              46, honest services, this is bribes and kickbacks.  I

        11      will give the substance of this.  The second paragraph, except

        12      for the word "personally", I give the substance of that, but

        13      not the four caveats because I don't believe it's a fair

        14      statement of the law and, in fact, this one I might as well

        15      talk about bribes and kickbacks at this stage.

        16              This refers to the defendants' request 46, 53, and a

        17      supplemental request of instruction that was filed on

        18      August 13th.  I'll get to it a little later.  With respect to

        19      the defendants' proposed instructions, numbers 46 and 53 and

01:25   20      supplemental instruction on the meaning of bribe, the Court has

        21      previously held, see docket No. 1334, that a payment to a

        22      university account may be a bribe if the account is controlled

        23      by a corrupt insider.  Payments to those accounts may still

        24      constitute a benefit to the insider, not withstanding the fact

        25      that they are University of Southern Cal accounts, therefore

1       the Court will not instruct on bribery in the manner requested

2       by the defendants.

3              The fourth caveat at the very end of that request, we

4       sort of give that at a different point, the rough substance of

5       that fourth caveat.

6              Number 47, official act, we'll give the rough

7       substance of that request.

8              Number 48, fourth element is representation.  We give

9       the rough substance of that but we only address materiality one

01:27 10   time and not here, but we do instruct on materiality.

11             49, honest services mail fraud.  This the fifth

12      element of foreseeable harm.  We do not give this request

13      because this is not a correct statement of the law and because

14      foreseeable harm is not an element of the crime charged.

15      Furthermore, the *Skilling* decision allows for the victim to

16      benefit from the bribe.  So we don't give this.

17             Number 50, honest services mail and wire fraud, the

18      sixth element, yes.  We give the substance of that.

19             Perhaps it's appropriate, we're about halfway through,

01:28 20   any comments from the defendants on my rulings on the first 50

21      requests?

22             MR. SHEKETOFF:  Your Honor, with respect to

23      Mr. Abdelaziz, we ask your permission to file written

24      objections at the end of the hearing since you're not going to

25      give your charge until 2 days from now.  That way we can gather

```
 1   our thoughts and not waste as much time with the Court right

 2   now.

 3           I do have one comment on 46, however.

 4           THE COURT:  On 46?  Let me go back to that.

 5           MR. SHEKETOFF:  This has been an ongoing dispute

 6   between the parties.  I know your Honor has ruled over our

 7   objection that if an account is controlled by an insider,

 8   that's sufficient.  We filed the supplemental pleading this

 9   morning, I believe, where we pointed out that there's no

10   evidence in this case that Donna Heinel controlled any account

11   at USC and, therefore, while theoretically that might do the

12   trick, at least that's the Court's position and the

13   government's position, it's our position that it doesn't do the

14   trick here because there was just no evidence that she

15   controlled any account at USC.  So the charge on a theory

16   that's not supported by the evidence would be an issue.

17           THE COURT:  Government wish to respond to that?

18           MR. FRANK:  There was evidence that she oversaw that

19   account.  It was testified to by Laura Janke.  There was also

20   circumstantial evidence she was directing -- she's on tape

21   directing money to that account.

22           MR. SHEKETOFF:  Directing money to that account is not

23   circumstantial evidence that she controlled that account.

24   We've laid out in our pleading this morning, your Honor,

25   because we do have daily transcript, exactly what the evidence
```

1   was on this topic.  We say there's no way a reasonable juror
2   could find beyond a reasonable doubt that she controlled this
3   account based on the evidence that was produced at trial.
4           THE COURT:  Do you wish to respond?
5           MR. FRANK:  It's the same response, your Honor.  We
6   introduced witness testimony that she oversaw that account.
7   She directed money into that account.  We also saw evidence of
8   the fact that under a -- during a term of the conspiracy the
9   inflows to that account comprised a majority of funds from Rick
01:30 10   Singer's clients and that her salary increased over that same
11   period and that her performance reviews reflected that
12   fundraising of an important part of her performance review.
13           THE COURT:  Are you going to file a written response
14   to the pleading that was filed this morning that I haven't
15   seen?
16           MR. FRANK:  I haven't seen it, your Honor, but if it's
17   helpful to the Court, we can do that.
18           THE COURT:  Yes.
19           MR. SHEKETOFF:  Whether her salary increased or not is
01:31 20   not the same thing as whether she controlled that account.
21   That the university rewarded her in some sense for bringing in
22   money, which is one of the things that helped her keep her job
23   at USC, is not the same as controlling an account.  We pointed
24   out records that we saw from the daily transcript, and perhaps
25   the government in their written response will point to the

1    record where this evidence is from their point of view.

2            THE COURT:  Anything further, Mr. Frank?

3            MR. FRANK:  If you can just give me one moment, your

4    Honor.

5            THE COURT:  Yes.

6            MR. FRANK:  I believe your Honor's prior ruling is it

7    doesn't even need to be control over the account, it can be

8    control or benefit from the account.  There was extensive

9    evidence about the parties benefitting from that account,

01:32 10    notwithstanding the fact that the money went to USC.  It

11    clearly benefitted them.  There was evidence of that.

12            THE COURT:  All right.  I will wait until I see the

13    memorandum.  If the government wishes to respond, they should

14    do so promptly, otherwise the ruling is as previously

15    announced.  Apparently, the defendants want to file a written

16    response to all of these rulings, which they're entitled to do.

17    We can do that a little more orderly than having to go through

18    all of these at a charge conference.

19            Mr. Kendall?

01:32 20            MR. KENDALL:  With respect to Mr. Wilson, your Honor,

21    two issues.  On request No. 40, the Court correctly --

22            THE COURT:  Let me just get these in front of me

23    before you talk about them, please, Mr. Kendall.

24            Okay.  I have 40.  Yes.

25            MR. KENDALL:  That's the one with respect to the issue

```
  1    of the property.  We had not originally joined in on the

  2    request of Aziz, and I think maybe Palatella, that the issue be

  3    put to the jury, which you denied.  We would like to join in

  4    that request as well and just protect our rights under that

  5    equally to Mr. Aziz.  I don't think that requires any further

  6    argument or persuasiveness to the Court.

  7              THE COURT:  Fine.

  8              MR. KENDALL:  I just wanted to join in on that.

  9              THE COURT:  Yes.  You've saved your rights.

 10              MR. KENDALL:  Thank you.

 11              With respect to No. 46 and the issue of a payment can

 12    go to -- the issue of a corrupt insider, is the Court going to

 13    define what makes an insider corrupt if they don't get any

 14    money for their personal benefit?  I mean, we have an issue

 15    where the behavior that in many respects is considered

 16    appropriate and legal is now being deemed as not so, you know,

 17    raising money for an institution and not for a personal

 18    benefit.  I think it's a very fuzzy line that the jury needs to

 19    have some very sort of concrete guidance when somebody does

 20    fundraising for their institution and gets no personal benefit

 21    from the payment that they're somehow deemed to still be

 22    corrupt.

 23              THE COURT:  Well, I don't know.  I have the charge,

 24    the draft of the charge here with respect to this, which you

 25    will hear soon enough.  I'll give you an opportunity to respond
```

01:33 (line 10)

01:34 (line 20)

```
 1    to it at the appropriate time.

 2            MR. KENDALL:  Thank you, your Honor.

 3            THE COURT:  Going on, starting, I believe, with 51.

 4    We left off at 50.

 5            MR. FRANK:  Your Honor, could I just briefly respond?

 6            THE COURT:  Yes.  I'm sorry.  The government may

 7    respond to my rulings.

 8            MR. FRANK:  We just had two questions, your Honor.

 9    With respect to -- since we're on 46, I'll just ask about that

10    one first.  Your Honor indicated that you intended to sort of

11    give the rough substance of the fourth caveat, which concerns

12    whether the victim condoned or provided tacit approval for the

13    payment.  That have the defendants' request.

14            THE COURT:  Yes.

15            MR. FRANK:  Could you give us some clarity on what you

16    mean by "condoned or provided tacit approval"?

17            THE COURT:  I'm not sure whether I give that -- I'll

18    give you a preview of what I'm going to charge on this subject.

19    This is, of course, taken out of context, but it's in the

20    process of my charging on the subsequent counts.  I say, "the

21    breach of the fiduciary duty must be by participation and

22    bribery or kickback scheme, which involves the actual intended

23    or solicited exchange of a thing of value for something else,

24    in other words, a quid pro quo, which is a Latin phrase meaning

25    this-for-that or these-for-those.  The employee or fiduciary
```

01:35 (line 10)
01:36 (line 20)

1    and the individuals providing the thing or things of value need

2    not, however, state the quid pro quo in express terms, rather

3    the intent to exchange may be established by circumstantial

4    evidence based upon the defendants' words, conduct, acts and

5    all the surrounding circumstances disclosed by the evidence and

6    the rational or logical inferences that may be drawn from them.

7         Bribery and kickbacks require the intent to affect an

8    exchange of something of value for, as applicable here, an

9    official act, but each payment need not be correlated with a

10   specific action.  The requirement that there be payment of a

11   thing of value in return for action is satisfied so long as the

12   evidence shows a course of conduct of things of value flowing

13   to an employee or fiduciary in exchange for the repeated action

14   of the employee fiduciary.  All that must be shown is that

15   things of value were provided to the employee or fiduciary or

16   for his or her benefit with the intent of securing the action

17   of the employee fiduciary in return.

18        A bribe is simply a payment or other benefit given in

19   exchange for an employee's provision of influence or favorable

20   treatment from his employer.  Payments to third parties,

21   including even employer universities, may qualify as bribes or

22   kickbacks.

23        An official act is a decision or action or an

24   agreement to make a decision or take an action on any matter

25   within the scope of the employee's duties.  The act must be

1    specific and focused and involve a formal exercise of the

2    organization's power.  A decision or action constituting an

3    official act may include using one's official position to exert

4    pressure on another official to perform an official act or

5    advise another official, knowing that such advice will form the

6    basis for an official act.

7         The government need not prove that the scheme

8    succeeded or that anything of value was exchanged, rather, the

9    government must only prove that the defendant, then under

01:39 10   consideration, knowingly advised or participated in the scheme

11   to defraud the universities of their right to the honest

12   services of their employee or fiduciary through bribes or

13   kickbacks.

14        That's what I'm going to say on that subject in that

15   part of my charge.

16        MR. KENDALL:  Your Honor, if I may be heard.

17        THE COURT:  Yes.

18        MR. KENDALL:  Our concern is that that describes

19   perfectly legal behavior as well and it doesn't give the jury

01:39 20   direction of what is corrupt and what is not.  An organization

21   and its employees can do many quid pro quo exchanges that are

22   perfectly appropriate.  If you donate a building, we'll let

23   your children into the school.  That's perfectly fine.  There's

24   all sorts of things that the institution and its employees can

25   routinely exchange as a quid pro quo.  I'll sell you tickets to

a football game if you give me $100.  That's the face price of

the ticket.  Those are all quid pro quo.  A quid pro quo by

itself is perfectly appropriate.  It's every commercial

transaction in the world is a quid pro quo.  If I want to file

a complaint in this courthouse, I have to pay $100 or so for a

filing fee.  That's a quid pro quo.  Without some right lane

definition that it is truly corrupt and for the employee's

personal benefit so they're taking away things that belong to

the organization for their own personal use, we have no way to

really define an acceptable quid pro quo and an unacceptable

quid pro quo.

        That was, in part, our concern about Agent Keating

testifying that this is a quid pro quo and the side door's not

correct.  I suggest, your Honor, it's not a clear legally

defined distinction of legal quid pro quo versus illegal quid

pro quo.

        THE COURT:  Does the government wish to respond?

        MR. FRANK:  Your Honor only read part of the

instruction, but what I took from the instruction is that it

has to be a deprivation of the honest services of the employee

in exchange for the quid pro quo, and that's what the

instruction is.  So we disagree with the defense's

characterization of that.  When you buy a ticket, you're not

depriving anyone of honest services.  If the employee is being

dishonest for the quid pro quo, that's where the problem

1     arises, so we don't share a concern.

2          I did have another question about another instruction.

3          THE COURT:  Mr. Sheketoff had a question.

4          MR. SHEKETOFF:  Yes, your Honor.  We asked for a

5     condemnation instruction.  That's not in the instruction that

6     you just gave.  In other words, you said you're going to give

7     the substance of the fourth caveat, but I don't hear it there.

8     There is a Fourth Circuit case right on point, *Joslin*, that we

9     cite that says condemnation is a defense.  We think there's

01:42 10    sufficient evidence of condemnation in this case to raise it.

11    So we want an instruction on that.

12          Also, I join Mr. Kendall.  I mean, students pay

13    tuition.  That's a quid pro quo.  It has to -- there has to be

14    somewhat -- as the government said in its opening, giving money

15    to a university, a donation, in the hope that your child will

16    get a step up in the admissions policy is not a crime.  They

17    said that in their opening.  I think the jury has to understand

18    that, that it's not a crime to give money to a university in

19    the hope that your child will benefit from that.

01:43 20          So whatever the final instruction is from the Court,

21    it seems to me the jury has to be clear reading that

22    instruction of what the government conceded in its opening is

23    not a crime.  So when I hear that instruction, I think, well,

24    it's now a crime, what they conceded was not a crime.

25          MR. KENDALL:  Your Honor, I just want to make it

clear.  Obviously, we join in each other's instructions and

concerns, but to be clear, what the government said in the

opening I don't think is the legal floor.  I don't think

that -- what the government said in the opening is a

concession.  I think what the law requires is an even higher

level of corruption than what the government put in its

opening.  It has to be truly -- I mean, that's why -- I know

the Court has ruled on this.  I'm not trying to -- while I'd

like to, I'm not trying to persuade you to change, but when it

goes to their personal benefit, it's a clean cut line.

Everybody can see that's money that belonged in USC's bank

account and instead it's in your summer house down in Florida.

It's a clear delineation of stealing, taking way from the

university its property or its benefits.

A lot of times employees cut some corners and break

some rules to try to do the overall goal of the organization.

Sometimes it's a small thing.  Sometimes it's a serious thing.

That's a much difficult thing for the jury to understand that

they're raising money for the university, they're fulfilling

the president's $7 billion program but there are some rules

that can be flexible and some rules that are inflexible, and

how are they to know when the money's going to the university

that that person is really acting with corrupt intent.

The issue with Vavic and Heinel are particularly

difficult because there's a period of time where it's

1   undisputed they get no financial benefit.  That's when they're

2   dealing with our kids.  After they stop dealing with our kids,

3   they do get some type of financial benefit:  The tuition

4   payments and Heinel's 20,000 counting whatever payments.  The

5   jury has no clear delineation to say, you know, these are all

6   great quid pro quos that the university is delighted to get and

7   here is one that our clients are on notice and clearly

8   understand and have no good faith to believe should happen when

9   it's just money going into the same gift account that all the

01:45 10   other honest quid pro quo money goes into.

11           I think the government has dug a hole in this case

12   that I don't think we have a good solution with the proposed

13   instructions.

14           Your Honor, there are a few other issues.  We're

15   making a list.  I want to put my notes together succinctly.  If

16   I could come back in about five or 10 minutes of things you've

17   gone through with one to 50.  I want to note some concerns, but

18   I'd like to do it in an organized fashion.

19           THE COURT:  Does the government wish to respond?

01:46 20           MR. FRANK:  Briefly.  There's been no evidence of

21   condemnation in this case.  In fact, the evidence was

22   explicitly to the contrary that the Admissions Department had

23   no idea there was money being exchanged for the recruitment of

24   these purported athletes.

25           The defense is conflating fraud, which is the

1    deprivation of money or property of the university, with honest

2    services fraud, which is the deprivation of the honest services

3    of the employee.  That's what's at issue here.  The employees

4    were lying about the fact that they were recruiting these

5    students in exchange for the money and were purporting

6    outwardly to the Admissions Department to be recruiting them

7    for their athletic abilities.  That is the deprivation of

8    honest services at the heart of the charge that the Court is

9    going to give.

01:47 10           The only other question the government had, your

11    Honor, was with respect to the Instruction 26.  Your Honor had

12    indicated that you intended to give the substance of the charge

13    that a government cooperator is no longer part of the

14    conspiracy, and our only question about that is we wanted to

15    make sure that the jury was not confused about the fact that

16    the allegation here is that the conspiracy encompass more than

17    just the defendants and the government cooperator.

18           THE COURT:  Yeah.  I believe that's clear in my

19    instruction.

01:47 20           MR. SHEKETOFF:  Your Honor, just going back to the hot

21    topic, whether or not the Athletic Department lied to the

22    Admissions Department is not the issue for the jury.  That may

23    be one sub issue.  If the Athletic Department was doing -- if

24    the employees of the Athletic Department were doing what the

25    Athletic Department condoned, they weren't depriving USC

```
 1    whether they were lying to Admissions or not, the honest
 2    services of the athletic employees.
 3              USC is one entity.  If the Athletic Department
 4    participants, people like Heinel, were lying to Admissions, so
 5    what if they were following Athletic Department policy?  They
 6    weren't depriving USC of their honest services.
 7              THE COURT:  Do you wish to respond?
 8              MR. FRANK:  They were fired, Judge.
 9              MR. KENDALL:  Your Honor, if I could deal with some of
10    the other issues.
11              THE COURT:  We're talking about the first 50 requests?
12              MR. KENDALL:  Yes.  The first 50.
13              With respect to bribery -- first of all, the
14    termination after the event, your Honor, can relate to a
15    variety of issues.  We don't have in evidence why they were
16    terminated or what was the purpose of the terminated.  It could
17    be people covering their own mistakes or problems and blaming
18    people.
19              Also with the bribery issue, we have a federal bribery
20    charge, your Honor, federal program bribery.  That is not an
21    honest services issue.  That has to be -- for federal program
22    bribery, the bribery, I believe, has to be defined as a corrupt
23    payment to the individual.  So what we have really is two
24    different bribery theories with two different bribery
25    definitions in the same case.  I don't know if the government
```

01:48 (line 10)
01:49 (line 20)

```
 1    is going to urge this Court to say that a federal program

 2    bribery the case law says a payment to the university where the

 3    money goes to the university's bank account satisfies federal

 4    program bribery.  It is not an honest services concept.  It's a

 5    flat out old, conventional bribery charge.  So I think there's

 6    an inconsistency there.

 7            Do you want to address these each by topic to respond

 8    or?

 9            THE COURT:  No.  I want to address by the number of

10    the requests that I have dealt with.

11            MR. KENDALL:  Okay.  I believe the bribery issue is at

12    number 40.  It's either 40 or 46.

13            MS. PAPENHAUSEN:  46.

14            MR. KENDALL:  It's 46, your Honor.  It is 46, but it

15    will bleed over to the federal program bribery count as well.

16    I'll get to that charge in just a minute.  That would be 52.

17            So I think 46 and 52 --

18            THE COURT:  We haven't got to 52 yet.

19            MR. KENDALL:  Fair enough.  46, they relate.  I can

20    wait on that if you would like.

21            With respect to the other issues, in number 43, we

22    believe there's no holding in *Skilling* that says "all employees

23    are fiduciaries".  I don't think it says that statement that

24    fiduciary duty law does not apply.

25            With respect to 40, we'd like to know what is the
```

1    exact property that's at issue.  Is it an admission slot?  Is

2    it the coach's recommendation?  What exactly is the specific

3    item of property that was taken?

4        THE COURT:  Mr. Kendall, I'm making rulings on your

5    requests for me to instruct the jury.  I've made the ruling and

6    you can put on the record why you object to my ruling, but this

7    is not an open forum for discussing legal matters.

8        MR. KENDALL:  I understand, your Honor.  We need to

9    know what to argue with the jury.  Are we going to argue that

01:52 10   it wasn't the coach's recommendation?  Are we going to argue it

11   wasn't the admission by SUBCO?

12       THE COURT:  Your argument is up to you, Mr. Kendall.

13       MR. KENDALL:  We also would suggest that for number

14   40, given that it's the heart of the case and such a

15   complicated issue, it would be appropriate to have another good

16   faith instruction with that to remind the jury.

17       With number 40, your Honor, we believe the

18   government's theory has changed.  The government indicted this

19   case saying it was an admissions slot that was the property.

01:52 20   We think at some point they've been arguing or saying to the

21   jury that it's the coach's recommendation.  We think it would

22   be a material variance of the indictment if they go from one to

23   the other, so we are concerned about that.

24       For request number 32 in our group, your Honor, we

25   believe the First Circuit has required an overt act for a fraud

```
 1    conspiracy.  We'd ask the Court to consider that.

 2              THE COURT:  What case do you have that suggests that?

 3              MR. KENDALL:  I believe it's in the footnotes to our

 4    request.  I can get a specific one if you'd like, your Honor.

 5    I should say Miss Papenhausen will specifically.

 6              THE COURT:  First Circuit case?

 7              MR. KENDALL:  Excuse me.  I believe the First Circuit

 8    may not have ruled on that.

 9              THE COURT:  It has not.

01:54 10              MS. PAPENHAUSEN:  It is, I think, based on the pattern

11    of instructions, your Honor.

12              MR. KENDALL:  So I stand corrected.  It's not a First

13    Circuit decision, but we believe it's in the pattern

14    instruction that's being offered.

15              With respect to numbers 10 and 11, we believe there's

16    substantial evidence of spoliation.  Mr. Singer deleted all his

17    messages on the phone, which the government left with him for

18    two weeks.  We think, for 10 and 11, spoliation and failure to

19    collect evidence is directly relevant to this case.  And the

01:54 20    failure to record, excuse me, your Honor -- the government's

21    submission is that it did not record the September 28 call with

22    the Wilson family, which you know we filed affidavits in the

23    motion pleading saying Mr. Wilson was on that call.

24              THE COURT:  How is not recording something spoliation?

25              MR. KENDALL:  Because the agent testified if you start
```

```
 1    to record somebody as part of an investigation, you should

 2    record all of their calls, and they did not record Mr. Wilson

 3    on that call.  That was the practice of the IRS agent that said

 4    that was the practice.  Once you start to record something, you

 5    have to record all the calls.  You can't pick and choose which

 6    ones you record.

 7              THE COURT:  Mr. Frank?

 8              MR. FRANK:  That's not the IRS agent's testimony.

 9    It's directly contrary to the case law which provides exactly

10    the opposite.  If Mr. Kendall now wants to point to his

11    client's affidavit that he was on that Facetime call when it

12    was physically impossible for him to have been on that Facetime

13    call and there's evidence directly to the contrary, his client

14    should have taken the stand to contradict that fact.

15              MR. KENDALL:  There's no evidence to the contrary.  My

16    client was on that call.  We gave you an affidavit outside of

17    this court.  It's trial, but in the pretrial stuff that firmly

18    states he was on it.  There were multiple witnesses he was on

19    that call.  I think we are entitled to both a failure to

20    collect evidence and a spoliation based on the destruction of

21    the phone information, as well as the failure to record that

22    call.

23              Finally, your Honor, with respect to the collective

24    knowledge issue, it's the issue that --

25              THE COURT:  Number what?
```

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | MR. KENDALL:  23.  Mr. Sheketoff has raised.  The |
| 2    | issue is not that a corrupt individual hid information from |
| 3    | their employer, which I could understand would not warrant a |
| 4    | collective knowledge instruction, but if it's an entire |
| 5    | department that has a different approach to a practice than |
| 6    | what another department claims is the case after the fact that |
| 7    | does raise the collective knowledge issue in a way that's not |
| 8    | just one bad person hiding their bad acts.  Given what was |
| 9    | going on in the Athletic Department, I think Miss Janke |
| 01:57 10 | testified that there were several coaches taking donations in |
| 11   | return for promoting people within the SUBCO process in the |
| 12   | beginning and it wasn't for personal benefit.  I think there |
| 13   | was other evidence on that area as well in the discussion of |
| 14   | the VIP program. |
| 15   | Thank you, your Honor. |
| 16   | THE COURT:  Does the government have any response to |
| 17   | the defendants' objections to my rulings? |
| 18   | MR. FRANK:  Nothing beyond what we've already stated, |
| 19   | your Honor. |
| 01:57 20 | THE COURT:  All right.  Then we will continue, picking |
| 21   | up, I believe, with No. 51. |
| 22   | I will give the rough substance of 51. |
| 23   | 52 is the federal programs bribery definition.  I will |
| 24   | give the rough substance of 52, with the exception of this |
| 25   | middle paragraph on page 66.  I don't give examples. |

"Defendant was unaware of his or her payments going to corrupt
university officials", I don't give that middle paragraph, at
least in rough substance.

Number 53 is the definition of a bribe, which, of
course, we've dealt with before.  I think I read to you my
earlier definition.  That same one applies that I've read with
respect to request No. 56 and it will apply again with the
defendants' supplemental instruction on the meaning of bribe,
so I don't give that one.

54, federal programs bribery does not require proof of
an official act so I will not give this instruction.

55, of course, is money laundering.  That's out of the
case, as is 56 and 57, 58 and 59.  They all have to do with
money laundering and is no longer in the case.

Turning to No. 60, I will give the rough substance of
honest services wire fraud general instruction.

I will give the rough substance of 61, but it's
shorter than that request and I don't give the last paragraph
on page 77 about factual impossibility.  I don't think I've
gotten to that one previously, but I will.  I'm not going to
instruct on factual impossibility.

62, I give the rough substance, but it's shorter and I
believe clearer than this.  We describe willful one time our
initial instructions.  We don't repeat it multiple times as
requested.

        Number 63, I give the substance of that one, aiding

and abetting.

        Number 64, I give the rough substance of that.

        Number 65, we charge on aiding and abetting but not

twice.  We refer back to our earlier instructions about aiding

and abetting.  We don't go through the process twice.

        Number 66, we give the rough substance of the top

portion of that, but we don't say what is described in the last

paragraph about the evidence may not establish deductions, et

cetera.  That's inconsistent with a prior ruling.

        Number 67, I give the substance of that one.

        68, the rough substance but in a shorter version, I'm

not going to say the last paragraph on that first page or

basically anything after the paragraph that starts with "in

determining whether Mr. Wilson intended to misstate anything on

his tax return".  I don't say that.  Deficiency is not

relevant.  Some of it's duplicative and we're not going to give

the rest of that instruction.

        Number 69, this is commenting on the evidence.  It is

superfluous and I do not believe it's a correct statement of

law, so I'm not going to give 69.

        Number 70, I'm not going to say this for lack of

supporting authority offered by the defendant.

        Number 71, I don't give that for the same reason.

        Number 72, I do not charge on factual impossibility.

```
 1    This Court has previously ruled that impossibility is not a
 2    defense to the substantive fraud or bribery counts against the
 3    defendant Wilson.  I said that in docket No. 1438 at pages 10
 4    to 13.
 5            Further, in the Dickson First Circuit case, the First
 6    Circuit held that the elements of the offense do not require
 7    that the unlawful goal be achieved and factual impossibility is
 8    irrelevant.  So I'm not going to charge on factual
 9    impossibility as requested on 72.
10            73, I'm not going to give that because it comments on
11    the evidence, which is vigorously disputed.
12            Turning then to the supplemental instructions, and
13    it's hard to follow these because they're not sequentially
14    numbered, but I'm dealing first with docket No. 2077 filed on
15    August 13th.
16            It is a supplemental objection to the government's
17    jury instructions regarding the meaning of bribe.  This one, as
18    I've said before, with respect to bribery with respect to the
19    defendants' proposed instructions, the Court has previously
20    held in docket No. 1334 that a payment to a university account
21    may be a bribe if the account is controlled by a corrupt
22    insider.  Payments to those accounts may still constitute a
23    benefit to the insider, notwithstanding the fact that they are
24    Southern Cal accounts, therefore, the Court will not instruct
25    on bribery in the manner requested in this request.
```

1     With respect to the request in docket 2343, which was

2     filed on October 3rd, the Court will not instruct that

3     defendant Wilson's payment was not a bribe as a matter of law

4     because such an instruction is an incorrect statement of the

5     law and inconsistent with the Court's prior decision, see

6     docket 1334, nor will the Court instruct that the jury cannot

7     convict the defendant Wilson on the basis that he did not

8     offset any goods or services from his alleged donation to

9     Southern Cal.  The Court will thoroughly instruct the jury on

02:05 10     the tax charge and the defendants' additional instruction is

11     unnecessary and would serve only to confuse the jury.  That's

12     with respect to docket 2343.

13     Next, dealing with docket 2078, which was filed on

14     August 13th, it is with respect to an instruction about

15     legitimate giving.  The Court will not give the defendants'

16     proposed instruction on legitimate giving, docket 2078.  It

17     will instruct the jury that they must follow the law as it has

18     been given to them and that they cannot let any sympathy or

19     prejudice affect their decision.

02:06 20     Finally, the defendants' instruction, as drafted,

21     comments on the evidence beyond the Court's role and knowledge.

22     So I will not give that limiting -- legitimate giving request.

23     Turning then to docket No. 2149, which was filed on

24     September 3rd, there are I think six requested instructions

25     here.

1          The Court will not give a separate instruction on this

2    issue, this first request, because the Court's instructions on

3    the elements of honest services fraud addresses it.  So I'm not

4    going to give it a second time.

5          With respect to the second and third requests and

6    instructions in this group, I had previously instructed that

7    the Court will not rule on impossibility or it will not rule

8    that impossibility is not a defense to this substantive fraud

9    and bribery count against the defendant Wilson.  I previously

02:07 10   made that ruling.  That applies to the second and third

11   requests on this supplemental filing.

12         On the fourth request with respect to tax exempt

13   organizations and charitable deductions, and this applies to

14   the fourth and fifth of these requests, the Court will not

15   instruct on charitable deductions, noncash contributions, or

16   earmarking.  The Court will instruct on willfulness.  The

17   defendants' proposed instructions linking willfulness to these

18   three subjects may be appropriate for closing argument, but the

19   Court will not comment on the evidence in this matter.  So that

02:08 20   deals with four and five.

21         Then the sixth request, earmarking contributions

22   directly contributing to specific programs and routing

23   donations for charity, I'm not going to give that one for

24   reasons previously described.

25         Then I believe, finally, with respect to docket -- not

1    quite.  Docket No. 2348, conspiracy counts, falsified athletic

2    profiles.  This request and numbers two and three that follow

3    it relate to intent upon which the Court instructs in detail

4    elsewhere, so they are repetitive and won't be repeated here.

5    That deals with the first three in this group.

6            The fourth one, with respect to honest services wire

7    fraud and conspiracy to commit honest services wire fraud,

8    relevant customs, practices and policies, I have previously

9    rendered a ruling with respect to docket No. 2149.  We won't

02:10 10   give a separate instruction on that issue because the Court's

11   instructions on the elements of honest services fraud addresses

12   it.

13           The fifth and final request in this group we've

14   already instructed on materiality or we will have instructed on

15   materiality and don't need to do it again, thus I won't give

16   that one.

17           Then the final request has to do with a filing, docket

18   No. 2341, defendants' supplemental proposed jury instruction on

19   the subject of venue.  On this one, I invite the government's

02:10 20   response to this request and will take the matter under

21   advisement.

22           Mr. Frank, have you had a chance to look at that venue

23   request filed on October 3rd?

24           MR. FRANK:  Not sufficiently to argue on it, your

25   Honor.  We'll file something tonight.

```
 1              THE COURT:  All right.  I would appreciate that.
 2         That concludes my rulings on 51 through all of the
 3    supplemental requests.  Any comments in that regard starting
 4    with the defendants?
 5              MR. SHARP:  Your Honor, just briefly, we filed a
 6    supplemental instruction, one sentence, yesterday at 2350.
 7    It's a sentence that wasn't in our proposed instructions but it
 8    actually was in the government's proposed instructions that
 9    proof that either of the defendants willfully joined the
10    conspiracy must be based upon evidence of their own actions
11    and/or words.  I believe it's typically given.
12              THE COURT:  I'm going to give that.
13              MR. SHARP:  Thank you.
14              THE COURT:  Any comments with respect to the second
15    set of requests?
16              Mr. Sheketoff.
17              MR. SHEKETOFF:  On the legitimate giving request, your
18    Honor.
19              THE COURT:  Which was?  One of the supplemental ones?
20              MR. SHEKETOFF:  Yes.  It's docket 2078.
21              THE COURT:  Yes.  I have it.
22              MR. SHEKETOFF:  So my concern, which I've expressed
23    earlier, is that the jury know from your instructions, whether
24    it's with this instruction or any other portion of the
25    instructions, that the concession that the government made in
```

1    its opening is a real concession and that the jury should not

2    consider donations for the purpose of hoping that it will

3    influence the institution to give your child a leg up.  What

4    I'm concerned about is the jury could think that that is a

5    crime charged in these indictments.

6        I think what the government said was "this case is not

7    about wealthy people donating money to universities in the hope

8    that their children get preferential treatment in the

9    admissions process.  The defendants are not charged with crimes

02:13 10  for having donated money to USC.  If that was all they had

11   done, we would not be here today".  That was the opening

12   statement.  And I think that's correct.

13       When you read the charge as a whole, I don't want a

14   juror to be able to come to the conclusion that just doing what

15   the government said is not a crime in its opening is, in fact,

16   a crime.

17       THE COURT:  Mr. Frank, do you wish to respond?

18       MR. FRANK:  Your Honor, I think the evidence is clear

19   on that point and the instruction is clear on that point that

02:13 20  there has to be a deprivation of honest services.  That's what

21   this case is about.  That's what the instruction makes clear.

22       THE COURT:  Any further comments on the rulings 51

23   through the supplements?  Mr. Kendall?

24       MR. KENDALL:  Yes, your Honor.  I'm checking the cite

25   to make sure I give you the right one.  I believe it's -- I'm

```
 1   not finding it correctly.  I'll get it to you in a minute.  The

 2   issue of -- we raised in a supplemental pleading, I don't know

 3   if it was 2149 or 2049.  I'm just trying to confirm it.  2149,

 4   your Honor.  The issue of legal impossibility, you stated that

 5   you had already ruled on it in a prior request we had given you

 6   that was dealt in the earlier section.  In the previous one, we

 7   had raised factual impossibility as the issue.  In 2149, I

 8   believe it's request number two, two and three in 2149, legal

 9   impossibility is a different issue than the factual
```

02:14

```
10   impossibility we had raised earlier.  So we'd ask the Court to

11   consider 2149 requests two and three, the issue of legal

12   impossibility as different from factual impossibility.

13           THE COURT:  All right.  I will look at that again.

14           MR. KENDALL:  Your Honor, this was in the first 50 and

15   I forgot to raise it.

16           If I may?

17           THE COURT:  Yes.

18           MR. KENDALL:  Request No. 28, it's the conspiracy

19   instruction.  We do think it would be appropriate to have at
```

02:15

```
20   least a multiple conspiracy instruction given how vast and

21   overarching is the allegation of the conspiracy that we joined

22   and the different behaviors.

23           THE COURT:  I do charge on multiple conspiracies.

24           MR. KENDALL:  Thank you, your Honor.

25           MR. SHEKETOFF:  Your Honor, just for clarification, as
```

1    you've asked the government to respond, we filed a supplemental

2    memorandum regarding venue as a judgment of acquittal motion.

3    That was 2342.  Then we also filed, the same day, a request for

4    an instruction on venue.  So there are two separate --

5              THE COURT:  What's the docket number, Mr. Sheketoff?

6              MR. SHEKETOFF:  The venue request instruction was 2341

7    and the supplemental memorandum for judgment of acquittal was

8    2342.

9              THE COURT:  2342?

02:16 10              MR. SHEKETOFF:  Yes, your Honor.

11              THE COURT:  All right.  I'll look at that.

12              MR. SHEKETOFF:  Thank you.

13              THE COURT:  The government will get its response in

14    promptly.

15              MR. FRANK:  We were going to respond on the

16    instruction.  Does your Honor also want us to separately

17    respond on the motion for judgment of acquittal?

18              THE COURT:  No.  On the venue question.

19              MR. FRANK:  Yes.  On the instruction.

02:16 20              THE COURT:  Yes.

21              MR. FRANK:  Yes.  We will file something promptly.

22              THE COURT:  The government's comments on the final,

23    after 51?

24              MR. FRANK:  The only comments we have, your Honor, is

25    we would ask the Court not to instruct on aiding and abetting.

1    We're not proceeding on that theory for the substantive counts.

2            THE COURT:  Not to?

3            MR. FRANK:  Instruct on the aiding and abetting theory

4    as to the substantive counts against Mr. Wilson.

5            THE COURT:  All right.  Let me write that down.

6            MR. KENDALL:  Your Honor, if I may inquire.  So it's

7    the government's position that Mr. Wilson is guilty as a

8    principal and no aiding and abetting theory and all associated

9    with those counts?

02:17 10            MR. FRANK:  The government's position is we are not

11    proceeding on an aiding and abetting theory on the substantive

12    counts against Mr. Wilson:  6, 8, 9, 11 and 12.

13            THE COURT:  Those are the counts that are involved,

14    right?

15            MR. FRANK:  Yes, your Honor.

16            Your Honor, with respect to -- I just wanted to point

17    the Court.  I had alluded to this earlier on the issue of the

18    definition of the bribe or kickback with respect to both honest

19    services fraud and federal programs bribery.  I just wanted to

02:18 20    point the Court to its own decision in this case 468 F.3rd 428

21    at 444 to 445.  In that decision, the Court wrote "the FSI

22    alleges that the payments were made to designated accounts that

23    were either controlled by the corrupt insiders or that

24    otherwise inured to their benefit professionally.  Those

25    payments, therefore, represent a thing of value to the insider

**A3596**

            1   even if the payments were not deposited directly into their

            2   personal accounts.  As the government notes in an honest

            3   services fraud prosecution, a thing of value is defined broadly

            4   to include the value to which the defendant subjectively

            5   attaches to the items received".  The Court cited the *Renzi*

            6   case out of the Ninth Circuit.

            7        Then the Court went on to say "payments made to

            8   accounts controlled by university insiders, even if such

            9   payments were ultimately received by the universities, may

02:18  10   still constitute a benefit to those insiders who exercise

           11   control over the accounts".

           12        So we believe that, in that decision, the Court

           13   recognized that a thing of value for purposes of both federal

           14   programs bribery and the honest services fraud statute could be

           15   a payment to an account that was either controlled by the

           16   corrupt insider or that otherwise inured to their benefit

           17   professionally.

           18             THE COURT:  All right.  Thank you.

           19        Let me reorder.  We need to turn to the government's

02:19  20   proposed jury instructions.  I don't think this is going to

           21   take as long because most of them are boilerplate or come right

           22   out of instructions that I've given before.  I think it might

           23   be easier.  Unfortunately, the government hasn't numbered each

           24   of theirs but at least we have pages to deal with.

           25             I'm going to give basically the substance of all of

        the requests of the government with the following exceptions:
        On page 7 where you talk about motive in the middle paragraph,
        "personal or familiar advance and financial gain, for example,
        our two recognized motives", I do not say that.  I talk about
        motive, but I don't include that middle paragraph.

                With respect to the proposed instruction on page 9, I
        give the rough substance of that but I don't recall using the
        terms "stealth" and "deception" in the middle of that page or
        that "the government may utilize a broad range of schemes and
        ploys to ferret out criminal activity".  I don't say that.

                We had previously decided with respect to transcripts
        of the tapes are not going to the jury.  That was page 11 where
        the government was talking about that.

                Of course, one of the requests of the government in
        the overview of the indictment talks about money laundering.
        That charge has since been dropped.  Of course, I'm not going
        to talk about other defendants who are no longer in the case.

                I don't give examples of conspiracy, like on page 17,
        talking about bank robbery.  That also was brought up on
        page 20.  That I don't give.

                Of course, I'm not going to talk about SAT or test
        scores where it is included in this request that was drafted
        back in August when that might have been relevant to one of the
        defendants at the time.  It's no longer relevant.  Of course,
        I'm not going to mention that.

        Again, the government has asked me to charge on
willfully several times.  I charge once on willfully in the
beginnings of the dealing with the counts, but I don't go back
to it every time willfulness comes up in a particular count.

        Page 38, in a request involving Count 2, the top
couple of lines, it says the "government does not have to prove
that the defendants have the authority to administer these
federal benefits".  I don't understand that.  Maybe it's the
parents.  That doesn't make sense to me, so I'm not going to
give that.

        Of course, we have no money laundering anymore so
page 41 and 42 are out.

        You did ask for aiding and abetting on page 43, but
now I understand you're asking that that go out, is that
correct?

        MR. FRANK:  Yes, your Honor.

        THE COURT:  Okay.  Other than that I give the
substance or rough substance of all of the requests, all of the
other requests of the government.

        Any comments with respect to my rulings on the
government's request?  Mr. Frank?

        MR. FRANK:  No, your Honor.  Thank you.

        THE COURT:  Mr. Kendall?

        MR. KENDALL:  Your Honor, a few things.  First, we
obviously have these differences between their requests and our

1   requests and you've already addressed a lot of the issues

2   you're not accepting from our request.  So I assume you don't

3   want me to.

4          THE COURT:  I don't think you need to.  I think we've

5   covered that ground.

6          MR. KENDALL:  Right.  I don't think I'll make friends

7   if I do that.  I just wanted to confirm that, your Honor.

8          Second, number 13 of the government's request deals

9   with expert witnesses.

02:25 10        THE COURT:  Page 13?

11         MR. KENDALL:  I guess it was page 13, yes.  There were

12  no experts in this case.  There were summary witnesses.

13  Ranahan, the revenue agent, testified as a summary witness.

14  They gave no expert disclosure for her.

15         MR. FRANK:  That's correct, your Honor.

16         MR. KENDALL:  And George --

17         THE COURT:  All right.  The expert comments, I just

18  had a short one, but that one will go out, right?

19         MR. FRANK:  Yes, your Honor.  That was in anticipation

02:25 20  of defense experts.

21         THE COURT:  Okay.  No expert testimony.

22         MR. KENDALL:  If I may have one moment to confer, your

23  Honor.

24         THE COURT:  Yes.

25         MR. KENDALL:  Miss Papenhausen has something she can

A3600

```
 1    articulate better than me.

 2              THE COURT:  She may do so.

 3         MS. PAPENHAUSEN:  Yes, your Honor.  In our objections,

 4    our response and objections to the government's proposed jury

 5    instructions, there was several places where we said if the

 6    Court intends to give an instruction, you know, on X topic as

 7    the government has proposed, then here's what we would propose

 8    be part of that instruction or be given as that instruction.  I

 9    just wanted to make sure that the Court had seen and considered

02:26 10   those proposed instructions as well.

11              THE COURT:  I have, but I have to confess.  I

12    personally haven't read them, but somebody in my chambers has

13    and we will take it into account.

14         MS. PAPENHAUSEN:  Thank you, your Honor.

15         MR. SHEKETOFF:  This is government request for

16    instruction --

17              THE COURT:  They don't number them but they have

18    pages.

19         MR. SHEKETOFF:  I should have guessed that they

02:27 20   wouldn't number them.  Count 1, and this would be at page 26 of

21    their pleading on page 29 --

22              THE COURT:  Wait.  26?

23         MR. SHEKETOFF:  Of their pleading, your Honor, at 29.

24              THE COURT:  Their proposed requests?

25         MR. SHEKETOFF:  Yes.
```

```
 1              THE COURT:  Yes.
 2              MR. SHEKETOFF:  They talk about willful blindness, so
 3      we object to an instruction on willful blindness because there
 4      has to be some sort of red flag warnings.  I'm not sure what
 5      they're pointing to in the evidence would have been red flag
 6      warnings for a willful blindness instruction.
 7              If you were to give a willful blindness instruction,
 8      the First Circuit is very clear that willful blindness is
 9      contained, so to speak, to proving the knowledge of an
02:28 10     existence of a conspiracy, not to the intent portion of the
11     conspiracy.
12              THE COURT:  Say that again.
13              MR. SHEKETOFF:  So I don't think there's any grounds
14     for a willful blindness instruction, but if your Honor
15     disagrees with me and intends to give an instruction on willful
16     blindness, the First Circuit has said that it only goes to
17     whether or not the defendant had knowledge of the conspiracy
18     but not to the willfulness, the specific intent, to join or to
19     commit the underlying offense.  Intent cannot be proved by
02:28 20     willful blindness.  And so if you're going to give that
21     instruction, I think you have to confine it to the one topic
22     that it's admissible.
23              THE COURT:  All right.
24              MS. PAPENHAUSEN:  Your Honor, that is one of the
25     things that we actually proposed an instruction for in our
```

1    response to the government's instructions.

2            THE COURT:  You mean in opposition to a willful

3    blindness instruction?

4            MS. PAPENHAUSEN:  Yes, your Honor.  As Mr. Sheketoff

5    explained, we don't believe a willful blindness instruction

6    should be given, but to the extent the Court intends to give a

7    willful blindness instruction, we have proposed some language

8    that would cabin it to the issues that are relevant and not the

9    issues, i.e. intent, for which it is not relevant.

02:29 10            MR. SHEKETOFF:  And the cite for this proposition is

11    445 F.3rd 73 and 86.

12            THE COURT:  445 F.3rd.

13            MR. SHEKETOFF:  F.3rd 73 and 86, a case that I tried

14    and loss.  It was really my first loss.

15            THE COURT:  All right.  Mr. Frank?

16            MR. FRANK:  Your Honor, we think the instruction we

17    proposed is clear, that it goes to whether the defendants acted

18    knowingly.  It's a whole separate paragraph and it separately

19    defines willfulness.  We think that's clear.

02:30 20            THE COURT:  What about the comments that it be cabined

21    and not include intent?

22            MR. FRANK:  That's what I was suggesting, your Honor.

23    We believe that the instruction specifically defines that in

24    deciding whether the defendants acted knowingly, you may infer

25    that they had knowledge of particular facts if they

1    deliberately closed their eyes to the facts that would have

2    otherwise been obvious to them.  That is called willful

3    blindness, and it defines it further.  It's in a paragraph that

4    specifically begins by saying determining whether the

5    defendants acted knowingly.

6            The next paragraph talks about as to acting willfully.

7    An act is willful if done voluntarily and intentionally.  So we

8    think there is distinction between those two things.

9            THE COURT:  And, therefore, the instruction you've

02:31 10   requested is what I should give?

11           MR. FRANK:  Yes, your Honor.  I'm not sure what

12   else -- there could be a different heading perhaps, but I'm not

13   sure how that would help.  We believe that the instruction is

14   cabined to knowledge.  That is our intent, to cabin it to

15   knowledge.

16           MR. SHEKETOFF:  I think either the Court or someone in

17   chambers reads this, I think it has to be clear to the jury

18   what they can use it for.  It's just knowledge of the

19   conspiracy, not intent to join.  And they mix knowledge and

02:31 20   willfulness together in their instruction.  So I don't

21   understand the government's --

22           THE COURT:  Wait a minute, please.

23           MR. SHEKETOFF:  So I don't understand the government's

24   reluctance to make it clear to the jury that it only goes to

25   one possibility and not another.  I mean, willfulness is the

```
 1    real issue in this case.  I don't think the jury should be

 2    confused that willful blindness goes to willfulness.

 3              THE COURT:  Do you want to respond to that, Mr. Frank?

 4    We're talking about page 26 your request, right?

 5              MR. FRANK:  Yes, your Honor.  We're not -- we believe

 6    it does go to knowledge and we believe that's clear.  We cited

 7    the Court's decision in *Prange*, which, in contrast to

 8    Mr. Sheketoff, is a case that I won, and we believe -- we're

 9    trying to look it up right now.  We believe the instruction is

02:33 10    verbatim from the *Prange* instruction that this Court gave.

11              MR. SHEKETOFF:  Unfortunately, I did not go to Harvard

12    Law School so I would lose to Mr. Frank at every opportunity.

13    I went to a smaller school in a smaller town.

14              There is a First Circuit case that makes it clear that

15    the jury can't use it for the wrong purpose.

16              THE COURT:  All right.  I'll look at that case that

17    you cited, Mr. Sheketoff.

18              MR. SHEKETOFF:  Thank you.

19              THE COURT:  We will take this matter under advisement.

02:34 20    We are going to charge on willful blindness, but I will look at

21    it again.

22              MR. SHEKETOFF:  Understood.

23              THE COURT:  Anything else, Mr. Kendall, with respect

24    to the government's requests?

25              MR. KENDALL:  Yes.  Page 48, your Honor, impossibility
```

not a defense.  The government puts in language about a

defendant may be guilty of intent to engage in criminal

activity.  I do not believe federal program bribery has the

intent language in it like other statutes do.  I don't think

there's a basis to charge my client or convict my client on

intent.  I don't think intent language should be included.

        The other one is on page 22 --

        THE COURT:  Where is the intent language?  I see.  In

the last sentence?

        MR. KENDALL:  The last sentence, yes, and really sort

of the preceding sentence too.  I think any type of intent is

not appropriate, your Honor.

        I also believe -- I'll wait for you to finish your

notes, your Honor.

        THE COURT:  Okay.

        MR. KENDALL:  22 to 24 of the government's instruction

on Count 1.

        THE COURT:  Wait a minute.  22 to 24, underlying

offenses?

        MR. KENDALL:  Yes.  I believe there's language in

there that talks about the government can prove a defendants'

guilty by omission.  I think we're being charged with

affirmative misrepresentations.  I don't think there's been any

evidence or proof of omission as being a theory to convict

anybody, so any reference to omission in those pages I think

```
 1    should be taken out.
 2            THE COURT:  Where does it say "omission"?  Oh, I see
 3    it.  On page 23.
 4            MS. PAPENHAUSEN:  I believe it also appears on pages
 5    22 and 24, your Honor.
 6            THE COURT:  I found one on 23.  Where are the others?
 7            23 in the second element.
 8            MS. PAPENHAUSEN:  And then page 24, the paragraph that
 9    begins with the term "false or fraudulent pretenses", the
10    second sentence talks about "half truths, knowing concealment
11    of facts and omission of material facts".
12            THE COURT:  All right.  I'll look at that.
13            MR. FRANK:  Your Honor, that's straight out of the
14    pattern instruction.  We have not abandoned that theory.
15            THE COURT:  It's in the pattern instruction?
16            MR. FRANK:  Yes, your Honor.
17            MS. PAPENHAUSEN:  I would say it's not charged here,
18    your Honor.  It's not what's at issue here in this case.
19            MR. KENDALL:  Another issue with page 22, your Honor,
20    the same instruction, it says in the third line on page 22, "so
21    you can determine whether a conspiracy between at least two
22    people to commit one of these crimes existed".  The
23    government's theory is that there was far more than two people,
24    so I think we should take out the "two".
25            THE COURT:  The law is that the conspiracy can be
```

      1    between two or more, right?

      2         MR. KENDALL:  That's generally the law but, as charged

      3    in this case, the government's made it specific that it's an

      4    overarching conspiracy that brings in all this evidence and all

      5    this behavior.  It may underscore the need for a multiple

      6    conspiracy charge that we discussed earlier.  It's clearly

      7    contrary to the government's theory that there were two people

      8    in this conspiracy.

      9         THE COURT:  It doesn't say two.  It says "at least

02:38 10    two".

     11         MR. KENDALL:  Yes.  If the jury were to find there

     12    were two people in the conspiracy, it would be a different one

     13    by the way it's charged, just by the way the government has

     14    charged it.

     15         THE COURT:  Mr. Frank?

     16         MR. FRANK:  I think we should stick with the law.  We

     17    didn't raise the burden on ourselves in the way that we charged

     18    this case.  We think the law is the law and that's what the

     19    Court has charged.

02:39 20         With respect to the material omission point, it is

     21    straight out of the pattern instruction.  There were material

     22    omissions in this case.  Among other things, there was a

     23    material omission of the fact that the recipients of the bribes

     24    failed to disclose those bribes to their employers, failed to

     25    disclose that they were acting in exchange for those bribes.

There was also material omission of the fact that, for example,
Sabrina Abdelaziz hadn't played basketball for 2 years.  So
there were both affirmative statements and material omissions.

THE COURT:  All right.  I will think about that one
again.

Anything else?

MS. PAPENHAUSEN:  Just one point in response to
Mr. Frank's comment.  In terms of the omission, I believe it's
required that there needs to be a duty to speak.

THE COURT:  A duty?

MS. PAPENHAUSEN:  A duty to speak in order to be held
liable to be charged with an omission.  I don't believe that's
been either charged or proven here.

THE COURT:  Anything else?

MR. KENDALL:  Yes, your Honor.  On page 25 of the
government's set, the language says, at the bottom of page 25
under element to materiality, "the second element of mail fraud
and wire fraud is that the false representation or fraudulent
failure to disclose related to a material fact".  I believe the
fact or representation itself has to be material.  Being
related to a material fact is not sufficient.  What they claim
is the factor representation that is false, that itself has to
be what is material.  Related to material fact is kind of an
ambiguous connection that could mean something false was said
and it may be related to a material fact but the falsity itself

**A3609**

1   wasn't material.

2           I believe, your Honor, that relates to an issue that

3   arises from one of your rulings recently that in defining what

4   evidence we could bring into the case and what we could not,

5   the Court focused on that.  It viewed this case as being did

6   the defendants knowingly submit falsified profiles to get their

7   kids into college.  I think, based upon the Court's ruling of

8   what evidence is relevant and admissible and what is not, that

9   should be the focus of what is the material misrepresentation

02:41 10  is the false profile.  To have a material fact related to, that

11  has something related to a material fact is quite attenuated

12  and disconnected.  The Court's ruling was that the charge of

13  this case that we had to -- that defined what evidence we could

14  present was submitting a falsified profile.  I think the

15  government substantially deviates from that.  It's mentioned in

16  25, your Honor.

17          THE COURT:  Do you wish to respond?

18          MR. FRANK:  Not really, your Honor.  We didn't limit

19  the case to the false profiles.  We don't believe that the jury

02:42 20  instructions should be used as a way of arguing the defense

21  case.  We believe the instructions are what the law sets forth

22  and that's what the instructions should be.

23          THE COURT:  Anything else?  Mr. Kendall?

24          MR. KENDALL:  Yes, your Honor.  I don't know the

25  relevant page from the government's charge.  We can look for

it.  It relates to the tax charge.  I believe based upon Agent

Ranahan's testimony the government's theory is that the tax

charge is based upon what was called a deduction or a business

expense was a bribe, and the only way they can prove their tax

charge is if they prove that the money deducted was a bribe and

my client knew it.  I believe that relates to docket entry

2343, request No. 1.

THE COURT:  Wait a minute.  That's your request?

We're talking about the government's requests.

MR. KENDALL:  I don't have the cite at my hand.  We're

looking for it now.  I think to the extent the two overlap,

it's going to be the same.

THE COURT:  What's again the reference to your

request?

MR. KENDALL:  It's Document 2343 and it's request

No. 1.  I believe the government's theory, through Agent

Ranahan, if you remember, we argued a good bit about did she

meet the definition of an offset for a charitable contribution

in her calculation.

THE COURT:  2341 --

MR. KENDALL:  2343.  I'm sorry, your Honor.  I

misspoke.  2343.  It was filed just a couple days ago, I

believe.

THE COURT:  Okay.

MR. KENDALL:  2343, request No. 1.

```
 1          THE COURT:  There was only one request in that

 2   document anyway, right?

 3          MR. KENDALL:  I believe so, your Honor.  The issue is

 4   the government's evidence was that the tax return was false.

 5          THE COURT:  So you want me to rule as a matter of law

 6   that the payment wasn't a bribe, right?

 7          MR. KENDALL:  I would like that, but that's not what

 8   I'm asking, your Honor.

 9          THE COURT:  That's what it seems to ask.

10          MR. KENDALL:  I think we requested that and you

11   indicated you weren't going to go that way, but the issue is

12   the way it's presented to the jury, they have to decide whether

13   it's a bribe or something else.  If it's a bribe, it could

14   support the tax charge.  If they find it wasn't a bribe,

15   there's no basis to find that there was a tax violation.  With

16   the way the government's charged this is, they've got to prove

17   if this was a bribe and that was what was improper to put on

18   the tax return.

19          THE COURT:  Any response to that?  Mr. Frank?

20          MR. FRANK:  Your Honor, that's not what we charged.

21   In fact, our charge is very complicit.  In Count 13, "among

22   other things, the tax return was not correct because the lines

23   for adjusted gross income and itemized deductions and the

24   attached Form 1040 includes losses and gifts to charity based

25   on payments from HPC to KWF Singer and The Key as reported
```

```
 1    charitable contributions or business expenses".  The charge
 2    says nothing about bribe and does not limit itself.  It says
 3    "among other items".
 4            THE COURT:  Do you know where it occurs in your
 5    requests?
 6            MR. FRANK:  It's page 49 and 50, your Honor, of our
 7    requests.
 8            MR. KENDALL:  Your Honor, I think the relevant
 9    discussion would be in the government's filing.  That's docket
10    entry 2328, which was their memorandum opposing our position on
11    the tax issue.  In their opposition concerning whether or not
12    the Court should strike Agent Ranahan's testimony, they made it
13    very clear their theory is it's a bribe, that's why it can't be
14    deducted and Ranahan does not have to take into account any
15    other tax issues with respect to offsets of quid pro quo things
16    in a charitable contribution.
17            So the evidence in the case and the way the government
18    has presented it to you is it's a bribe, you can't deduct it.
19    You need no further analysis or calculation of the tax.  So I
20    think they should be held to that for the jury instruction.
21            MR. FRANK:  Your Honor, we're asking for a
22    straightforward tax instruction like the Court has previously
23    given.
24            THE COURT:  All right.  Thank you.  Anything further?
25            MR. SHARP:  Yes.  One thing.  Are we past the jury
```

A3613

```
 1    instructions, your Honor?  We filed a motion this morning.
 2         THE COURT:  We're done with the jury instructions.
 3    Let me just clear my desk.
 4         MR. SHARP:  Yes.
 5         MR. FRANK:  Your Honor, can I ask one additional
 6    question on the instructions?
 7         THE COURT:  Yes.
 8         MR. FRANK:  You had previously suggested you would
 9    give an instruction regarding materials discussed in opening
10    that did not come into evidence.  I don't know if that's part
11    of the Court's preliminary instructions about opening
12    statements.
13         THE COURT:  Say that again.
14         MR. FRANK:  You had previously indicated you would
15    instruct the jury that evidence discussed in opening statements
16    that did not come into evidence during the case is not, in
17    fact, evidence.  I just wanted to know -- I imagine that's part
18    of the Court's preliminary instructions.
19         THE COURT:  This is with respect to the playing of the
20    tape?
21         MR. FRANK:  That's the principal example of it but
22    there were other examples of it.  There was the text chain
23    between two low level admissions officials.  There was a whole
24    series of statements about defendant Wilson's growing up, the
25    circumstances of his childhood and growing up, the playing of
```

the tape regarding Nazzi Saffori, an unindicted coconspirator

who was on the wiretap and on the consensual recordings that

was also played during opening.  There was a whole series of

potential exhibits that were played in opening that did not

come into evidence.

THE COURT:  If you want me to so instruct, give me a

proposed instruction with respect to statements made in

openings.

MR. KELLY:  Your Honor, there's also a request from us

for a curative instruction for the prosecutor's false statement

in front of the jury that I had falsely represented someone to

be an Admission Officer, which he conceded at sidebar but not

the jury.  We had asked for that earlier.  If the Court's going

to be taking that into account.

THE COURT:  Give me a proposed instruction in that

regard.

MR. KELLY:  Thank you, your Honor.

THE COURT:  By 5 o'clock.  You have more lawyers than

I do.

MR. SHARP:  He won't be writing it, your Honor.

Docket No. 2353, which was a --

THE COURT:  3663?

MR. SHARP:  2353, which was a motion to exclude

argument regarding some things that Mr. Frank mentioned

yesterday.  It was also mentioned in the opening that Donna

```
 1    Heinel controlled the funds and that she benefitted
 2    professionally from them.  It's mentioned in the indictment.
 3    It's mentioned in the opening.  It is the theory on which your
 4    Honor decided not to dismiss that charge that the funds she
 5    controlled or benefitted professionally from them.
 6            So it goes to the jury instructions, to Rule 29, and
 7    to their closing.  We don't think they should be able to
 8    reference this or argue this in closing because there hasn't
 9    been any evidence of it.  Maybe it's somewhere in the record
10    but we couldn't find it anywhere other than in the opening
11    statement that Donna Heinel controlled the Women's Athletic
12    Board or that she benefitted professionally from it.  No
13    witness has testified to that.
14            MR. KENDALL:  Your Honor, I think that applies to some
15    extent with Mr. Vavic as well.  There may have been some
16    testimony that he would oversee an account and then there was
17    testimony he built a business office and others to manage it,
18    but there was no testimony it benefitted him anyway.
19            MR. SHARP:  With respect to Heinel, they proved the
20    salary went up year after year, but no connection to that
21    account.  There was no testimony.  Nobody was brought in who
22    could testify to that.
23            MR. KENDALL:  Your Honor, with us --
24            THE COURT:  Is this a tag team effort?
25            MR. SHARP:  I hope not.
```

```
 1          MR. KENDALL:  I'll be quiet until you're ready, your

 2   Honor.

 3          THE COURT:  Go ahead.

 4          MR. KENDALL:  With us, it's two issues, your Honor,

 5   three if you want to call it that way.  There's the issue they

 6   raised with USC and respect to Vavic.  There's no testimony

 7   that he got salary increases, benefits, or whatever else that

 8   somebody was depositing into a bank account.

 9          With respect to the count relating to the Stanford and

10   Harvard ruse that the government perpetrated, there was no

11   description of what's going to benefit who are these people,

12   the Stanford coach and the senior women's administrator at

13   Harvard.  There's no description of who they were, what their

14   job status was, how this would affect their job, what was the

15   custom, practice or expectations of honest services at their

16   place of employment.  So there, your Honor, there's no evidence

17   to say what was going on or how these people would benefit.  I

18   think it's a much more magnified problem for the two imaginary

19   counts.

20          MR. SHARP:  I want to focus more on 2353, which

21   relates specifically to precluding the government from

22   mentioning this during their closing.  I know it's kind of a

23   late hour but we did this motion based on the *Petriezzello*

24   transcript from yesterday where Mr. Frank said that Donna

25   Heinel benefitted in a professional capacity from the funds and
```

02:52 (lines 10, 20)

1    that she controlled the Women's Athletic Board.  So to the

2    extent the Court could rule on that, I guess before the

3    closing, it would be necessary unless the government can point

4    us to some evidence that shows this in the record.

5                THE COURT:  Let's hear from Mr. Frank.

6                MR. FRANK:  Your Honor, there was direct evidence that

7    Mr. Vavic controlled the water polo fund.  That is testified to

8    by Casey Moon.  The fact that there are checks and balances on

9    his accounts, which the defense tried to argue, doesn't mean

02:53 10    that he didn't control the money in that account.

11                There was also direct evidence that Donna Heinel

12    directed -- certainly evidence from which a jury could conclude

13    that Donna Heinel benefitted from the flow of funds into the

14    Women's Athletic Board.  She specifically directed funds into

15    the Women's Athletic Board.  They heard her doing that on tape.

16    We showed that there was an increase over that period in the

17    flow of funds into that account, specifically from Rick

18    Singer's clients.  We demonstrated that her salary increased

19    substantially over that same period, and we demonstrated that

02:54 20    her performance was reviewed based on that.  Laura Janke also

21    testified she oversaw that fund.

22                For all those reasons, we think there's substantial

23    evidence from which a jury can conclude both that there was

24    control and also there was personal benefit to both of these

25    individuals.

```
 1          MR. SHARP:  Respectfully, those are just conclusions.

 2   The fact her salary went up during this time period and more

 3   money went into this fund during this time period, the fact

 4   that she directed money to go into this fund, that does not

 5   prove their theory, which is it's a bribe because it went to a

 6   program and she controlled the account or benefitted

 7   professionally from it.  They need to bring somebody in to say

 8   that and nobody said that.

 9          THE COURT:  All right.

02:55 10          MR. FRANK:  Just to be specific, your Honor, Janke

11   specifically testified that the Women's Athletic Fund was run

12   by Donna Heinel.

13          THE COURT:  That was testimony of Janke?

14          MR. FRANK:  Yes.

15          MR. KENDALL:  Your Honor, I have a very distinct one

16   separate from those raised.

17          THE COURT:  The government?

18          MR. KENDALL:  The government's requests, yes.  Page 35

19   of the government's request that deal with a federal program

02:55 20   bribery, I believe under the First Circuit decision in *Martinez*

21   994 F.3rd page 1 in 2021 that an official act is required.  I

22   don't think the government's instruction acknowledges that.

23   They have to prove that the bribery was to influence an

24   official act.

25          THE COURT:  Didn't I just, in going through this, on
```

1    the federal count say no official act is required?  I thought I

2    said that some place.

3         MR. KENDALL:  Your Honor, I ask that the Court

4    consider the *Martinez* decision.  I haven't read it myself, but

5    part of my team has read it.

6         THE COURT:  It's a First Circuit decision?

7         MR. KENDALL:  *Martinez* First Circuit 994 F.3rd 1.  As

8    I said, I have not read it, but I'm representing others have

9    that told me it would be relevant.

02:56 10         THE COURT:  With respect to the official act?

11         MR. KENDALL:  Yes.

12         THE COURT:  Applying to the second conspiracy?

13         MR. KENDALL:  Yes, your Honor.  And the substantive

14    counts that are also based on federal bribery.

15         THE COURT:  I'll look at it.

16         MR. KENDALL:  The other issue, your Honor, is on pages

17    17 and 22 of the government's requests.  They need to

18    establish -- let me check those pages.

19         The falsified athletic profile issue on pages 17 and

02:57 20    22, they don't narrow the issue to honest services fraud that

21    Vavic knew that the profile was fraudulent.  If my client knows

22    it's fraudulent but Vavic doesn't, there's no honest services

23    fraud.  It has to be that Vavic knows he's committing a fraud

24    on his employer, not my client.  I think that would relate to

25    pages 17 and 22.

1          THE COURT:  Mr. Frank?

2          MR. FRANK:  It was direct evidence that Vavic

3   personally directed lies to the subcommittee based on

4   falsehoods that he directed concerning Johnny Wilson.

5          THE COURT:  Say that again.

6          MR. FRANK:  Sorry.  That was unclear.  Vavic

7   personally directed Casey Moon to lie to the subcommittee by

8   giving Casey Moon false information that Casey Moon

9   incorporated in the athletic profile about Johnny Wilson that

02:58 10  secured his recruitment.

11         For example, there was direct evidence that Vavic

12  directed Casey Moon to write that Johnny Wilson was an

13  immediate impact player, that he was one of the top ten

14  attackers in the graduating class.  So there was direct

15  evidence of Vavic's knowing complicity in lying to the

16  subcommittee.

17         MR. KENDALL:  Your Honor, I'm not debating the

18  evidence.  It's just not in his instruction.  It has to say

19  that Vavic knew it was false and Vavic intended to mislead.  He

02:59 20  just needs an instruction to follow what he's saying is the

21  evidence.

22         MR. FRANK:  There doesn't need to be an instruction as

23  to Mr. Vavic.  There needs to be a conspiracy instruction, and

24  there is.

25         THE COURT:  All right.

**A3621**

```
 1              MR. SHARP:  One more point, your Honor.  If they're
 2    going to hang their hat on this sentence by Janke that the
 3    Women's Athletic Fund was run by Donna Heinel, this theory they
 4    have of a donation going to a school being a bribe, it's the
 5    first time in the history of the federal courts that we've been
 6    researching this case for 2 years where they have to have a
 7    bribe going to the purported victim.  We understand your ruling
 8    that there has to be a personal benefit that has to be
 9    controlled by or personally benefit from the fund in order for
02:59 10   it to be a bribe.
11              The fact that somebody runs a fund, this offhand can
12    comment made by Janke, we do not think is sufficient to say
13    that she controlled it.  We do not know anything about the
14    outflows from that fund other than there was no
15    misappropriation.  Nobody said she was spending it on things
16    that were good for her personally.  There's simply no
17    testimony.
18              Thank you, your Honor.
19              THE COURT:  All right.  With respect to tomorrow, let
03:00 20   me understand.  It is the intention of the government to argue
21    for 90 minutes or less on the case-in-chief, if you will, and
22    then 30 minutes or less for rebuttal?
23              MR. FRANK:  Yes.
24              THE COURT:  Each defendant gets one hour, right?
25              MR. KELLY:  Yes, your Honor.  Is there a break after
```

**A3622**

```
 1    the 90 minutes?

 2         THE COURT:  Probably there will be.  We're not going

 3    to go 4 hours without a break.  We're also not going to try to

 4    do the charge after 4 hours of -- we're going to break for the

 5    day at the end of the closing arguments.

 6         MR. FRANK:  Does your Honor anticipate a break before

 7    the rebuttal?

 8         THE COURT:  It depends on whether the defendants use

 9    all their time.  We'll see.  I'm not going to force people to

10    hang in longer than they did during trial.

11         MR. FRANK:  Yes, your Honor.

12         MR. KENDALL:  Your Honor, we understand we have an

13    hour each.  I've been talking with Mr. Kelly.  If he uses less

14    than his hour, can I take some of that time?

15         THE COURT:  Yes, you may.

16         MR. KELLY:  If I use more, can I take some of his?

17         MR. KENDALL:  No.

18         Thank you.

19         THE COURT:  You understand, I don't want you closer

20    than 10 feet from the jury box.  You can use this portable

21    lectern if you want.  You can stand in the well without a

22    lectern, but not closer than 10 feet and no wandering during

23    closings.  If you need to retrieve a document, that's fine,

24    otherwise no wandering.

25         I need to enter a formal decision with respect to
```

1    *Petriezzello.*  Evidence has been conditionally admitted in this

2    case pursuant to the *Petriezzello* case because the Court is

3    satisfied that the government has met its evidentiary burden to

4    show a single conspiracy and that the statements at issue were

5    in furtherance of that conspiracy.  The evidence conditionally

6    admitted under *Petriezzello* is fully admitted.

7         Anything else that needs to come to the Court's

8    attention before we adjourn for the day?

9         MR. FRANK:  Thank you, your Honor.  We were going to

03:02 10   submit a proposed redacted indictment for the Court --

11        THE COURT:  It must be redacted with all of the counts

12   with respect to defendants who are not before the jury.

13        MR. FRANK:  Right.  So that led to a second question,

14   which was how do we number the counts as to these defendants.

15        THE COURT:  I'm going to make a statement that they're

16   to disregard the numbers in the indictment.

17        MR. FRANK:  So when we're arguing to the jury, should

18   we use the numbers of the counts as they are in the indictment?

19        THE COURT:  Yes.

03:03 20   MR. FRANK:  Thank you, your Honor.

21        THE COURT:  There will be holes in the numbers.  I

22   think you go one to -- two to six or something.

23        MR. FRANK:  That's right, your Honor.

24        THE COURT:  That's fine.

25        Anything else that needs to come to my attention

1    before we adjourn for the day?

2              MR. FRANK:  No, your Honor.

3              MR. KELLY:  No, your Honor.

4              THE COURT:  We are adjourned.  Thank you.

5              (Whereupon, the proceedings adjourned at 3:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    October 5, 2021 in the above-entitled matter to the best of my

11    skill and ability.

12

13

14       /s/ Kristin M. Kelley              October 5, 2021

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

1

2                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
3

4
    UNITED STATES OF AMERICA,          )
5                    Plaintiff         )
                                       )
6   vs.                                )  No. 1-19-CR-10080
                                       )
7   GAMAL ABDELAZIZ and JOHN           )
    WILSON,                            )
8                    Defendants.       )
                                       )
9                                      )

10

11
              BEFORE THE HONORABLE NATHANIEL M. GORTON
12                 UNITED STATES DISTRICT JUDGE
                        JURY TRIAL - DAY 19
13

14
              John Joseph Moakley United States Courthouse
15                       Courtroom No. 4
                         One Courthouse Way
16                 Boston, Massachusetts 02210

17

18                       October 6, 2021
                            9:21 a.m.
19

20

21
                    Kristin M. Kelley, RPR, CRR
22                    Debra Joyce, RMR, CRR
                       Official Court Reporters
23       John Joseph Moakley United States Courthouse
             One Courthouse Way, Room 3209
24              Boston, Massachusetts 02210
                E-mail: kmob929@gmail.com
25
              Mechanical Steno - Computer-Aided Transcript

```
 1     APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Brian T. Kelly

17          Joshua C. Sharp

18          Lauren Maynard

19          Nixon Peabody LLP

20          100 Summer Street

21          Boston, MA 02110

22          617-345-1000

23          bkelly@nixonpeabody.com

24          for Gamal Abdelaziz.

25
```

**A3628**

```
 1    APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  You may be seated.  Court is now in
 3    session.
 4            THE COURT:  Good morning, counsel.
 5            Before we call the jury and commence closing
 6    arguments, I need to make some rulings.  I will first address
 7    the two pending matters, the objection to the proposed verdict
 8    form and the defendants' motion to exclude argument regarding
 9    control of funds, docket 2353.
10            I will then briefly go back over some of the matters
11    that were discussed yesterday at the charge conference.  Then
12    we will commence oral argument.
13            I'm afraid I'm going to have to have that screen moved
14    so I can see everybody in the courtroom, including all counsel.
15    It's going to have to be moved about 5 feet back.  Keep going.
16    Right there.  Thank you.
17            MR. FRANK:  Do you want it there during closings as
18    well?
19            THE COURT:  If not, it's going to have to be brought
20    into such a position that I can see everybody in the courtroom.
21            First of all, with respect to the defendants'
22    objection to the proposed verdict form, docket 2363, that
23    objection is overruled because the Court finds that its
24    proposed verdict form is not an offending verdict form that
25    would be restricted by any case law.  It's not a special
```

1    verdict form.

2          Second, the defendants' motion to exclude argument

3    regarding control of funds, the Court sees this as an argument

4    about sufficiency of evidence and concludes that the government

5    has offered evidence sufficient to argue about it in its

6    closing, but it cautions counsel not to go beyond what the

7    evidence shows.

8          Third, with respect to matters that were discussed

9    yesterday at the charge conference, defendants requested that

09:23 10    the Court instruct on venue.  The Court will give an

11    instruction on venue, which will embody the substance of both

12    requests of the government and the defendants.

13          Attorney Sheketoff requested the Court further clarify

14    that willful blindness can only be used to prove knowledge and

15    not intent.  Because his concerns were specific to the context

16    of the government's proposed instruction, which differs from

17    our final charge, we will address the substance of defendants'

18    request in our version.

19          With respect to comments made by counsel during

09:24 20    openings and at other times during trial, I will instruct the

21    jury as follows:  What counsel say in their opening statements,

22    closing arguments, objections, and at other times during the

23    trial is intended to help you interpret the evidence, but it is

24    not evidence and sometimes counsel are mistaken.

25          Third, Attorney Kendall requested an instruction that

```
 1    an official act is required for federal programs bribery citing

 2    U.S. vs. Martinez, a First Circuit case this year.  The

 3    government has filed a response arguing that the language in

 4    Martinez is dicta and that federal programs bribery does not

 5    require an official act.  This matter is retained under

 6    advisement and the Court will charge accordingly after it makes

 7    its conclusion.

 8              Next, Attorney Kendall requested an instruction with

 9    respect to materiality, in particular that a misrepresentation

09:25 10    or concealment in the context of honest services fraud had to

11    be of a material fact, not merely relate to a material fact.

12    Our charge adopts Attorney Kendall's request.

13              Attorney Kendall objected to use of the term

14    "omission".  Consistent with the pattern instructions,

15    "omission" has now been replaced with the word "concealment".

16              The instruction concerning expert witnesses has been

17    deleted.

18              The Court will neither instruct on nor use the term

19    "corrupt insider" in its charge.  The Court will instruct the

09:25 20    jury on the crimes charged and does not believe it is necessary

21    to further explain to the jury the concept of corrupt insider.

22              The Court will not provide a condonation instruction

23    because, under the standard expressed in U.S. vs. Joslin, the

24    Court finds there has not been sufficient evidence to warrant

25    it.  The Court will give the rough substance of the defendants'
```

```
 1    proposed legitimate giving instruction.
 2            Finally, the Court will not instruct on pure legal
 3    impossibility because such an instruction is not warranted in
 4    light of the charges and the evidence in this case.
 5            Anything that needs to come to my attention before we
 6    call the jury for oral argument?
 7            Mr. Kelly.
 8            MR. KELLY:  Your Honor, we can discuss it at the break
 9    or later, but I do want to drill down a bit on the instruction
09:26 10  about mistaken.  It was clearly the government who was mistaken
11    when they objected in my opening about the USC admissions
12    people.  I don't want it being suggested that I was mistaken.
13    They were mistaken.  They conceded their mistake at sidebar.
14    That's why we asked for the clarification, that it was the
15    government's mistake.
16            THE COURT:  Did you submit a specific instruction?
17            MR. KELLY:  Yes, we did, your Honor.  I'll get the
18    docket number momentarily.
19            THE COURT:  I'll look at it.  All right.  Anything
09:27 20  else?
21            MR. KELLY:  No, your Honor.
22            THE COURT:  Call the jury.
23            (Jury enters.)
24            THE CLERK:  Thank you.  You may be seated.  Court so
25    now in session.
```

```
 1              THE COURT:  Good morning, jurors.  Welcome back.  I
 2       hope you're ready to go to work today.  As I told you before,
 3       what we're going to do is give closing arguments today.  They
 4       are going to be extensive.
 5              The order is that the government makes its closing
 6       first.  Then you'll hear from counsel for both of the
 7       defendants, after which the government has a short time for
 8       rebuttal.
 9              With that, I will invite Mr. Frank to make the closing
09:29 10       for the government.
11              MR. FRANK:  Thank you, your Honor.
12              May I proceed, your Honor?
13              THE COURT:  You may proceed.
14              MR. FRANK:  Good morning.
15              "I'll make them a sailor or something.  Because of
16       where you live".
17              "I'll make them a sailor or something.  Because of
18       where you live".
19              That is what Rick Singer told John Wilson when they
09:30 20       were discussing the side-door scheme for Wilson's daughters.
21       And how did the defendant respond?  He laughed.  And then he
22       asked if he could get a two for one special.
23              That exchange between John Wilson and Rick Singer was
24       intercepted on a court authorized wiretap on September 15,
25       2018, one week before the FBI approached Singer, at a time when
```

1    neither the defendant nor Singer knew that the FBI was

2    listening, caught red-handed, scheming to get Wilson's two

3    daughters into some of the finest universities in the country

4    as recruited athletes in exchange for money.

5         But you know that they were not athletes.  There was

6    no chance they were going to be legitimately recruited as

7    college athletes, and the defendant knew that as well.  In the

8    same call he asked, what sport would be best for them or is it

9    not going to even matter.

09:31  10         Here's what else you know:  This was not John Wilson's

11    first time doing a dirty deal to get his kids into college

12    through lies and bribery, the same deal that Gamal Abdelaziz

13    did to get his daughter into USC as a recruited basketball

14    player even though she didn't even make her high school's

15    varsity team and she hadn't played basketball for the last

16    two years of high school.

17         You heard him on tape as well.  How did Mr. Aziz

18    respond when Rick Singer told him that Donna Heinel wanted to

19    use that same fake athletic profile for anybody who isn't a

09:32  20    real basketball player?  "I love it".  Just like Mr. Wilson, he

21    thought it was funny.

22         At the beginning of this case, the government told you

23    the evidence would prove beyond a reasonable doubt that these

24    defendants conspired to get their children into college through

25    fraud and bribery to gain admission as recruited athletes based

on falsified credentials, to induce corrupt Athletic Department

insiders to fool their own colleagues in the Admissions

Department in exchange for money and to cover it up and to

cheat the IRS with a paper trail of bogus donation letters and

phony consulting invoices.

You now know that the evidence has shown exactly that,

and that evidence has given you remarkable insight into the

minds of these two defendants. That's no accident. The FBI

investigation that you've heard about over these last three and

a half weeks was designed to do exactly that, to make sure that

the evidence of the defendants' knowledge and intent was

captured on tape so that you, the jury, would be able to hear

these defendants in their own words scheming to trade money for

recruitment spots based on falsified credentials and lying to

cover it up and to make sure that they couldn't later hide

behind those phony documents that they used as a cover story

for their crime to make their payments look like legitimate

charitable contributions or even business expenses.

For their actions, the defendants are charged in two

counts, with conspiracy to commit mail fraud and wire fraud and

honest services mail fraud and wire fraud, and with conspiracy

to commit federal programs bribery.

Mr. Wilson is charged with three additional counts for

wire fraud and honest services wire fraud and two additional

counts of federal programs bribery in connection with payments

1    that he made and phone calls that he had to get his daughters

2    into Stanford and Harvard as recruited athletes, and he's

3    charged with one count of filing a false tax return for lying

4    on his taxes about the payments he made to get his son Johnny

5    admitted to USC as a water polo recruit.

6         Now, Judge Gorton is going to instruct you tomorrow on

7    the elements of those charges.  I'm now going to take you

8    through the evidence that establishes each of those elements.

9         First, I'm going to discuss the evidence of how the

09:35 10  scheme worked.  Next, I'm going to discuss these specific

11    defendants, the evidence of their knowledge and their intent to

12    join in that larger conspiracy.  Finally, I'm going to address

13    a few big picture points and legal issues.

14         First, you know from the evidence that there was a

15    scheme to defraud to get the defendants' children admitted to

16    college as recruited athletes based on falsified credentials in

17    exchange for money.  The scheme involved fabricating or

18    embellishing the student's athletic qualifications and making

19    payments that benefitted corrupt athletic department insiders

09:36 20  who misled their own colleagues in the admissions department

21    and secretly traded those recruitment spots for money.

22         The scheme was organized by Rick Singer.  He called it

23    his "side door", but it was a sweeping conspiracy that involved

24    dozens of others:  Corrupt coaches and athletic department

25    insiders, like Jovan Vavic and Donna Heinel at USC, Rudy

**A3638**

Meredith at Yale, John Vandemoer at Stanford, Jorge Salcedo at

UCLA, and Gordie Ernst at Georgetown; Singer's employees and

associates like Mikaela Sanford and Laura Janke; and parents,

including these defendants, Gamal Abdelaziz and John Wilson,

and dozens of others who would stop at nothing to get their

children admitted to the college of their choice.

You know that the scheme involved creating athletic

profiles that were either completely invented, like Sabrina

Aziz's, or falsified in other ways with fake honors and

fabricated times, like Johnny Wilson's.

Bruce Isackson, you'll remember him, he was the

government's first witness, he told you that he and his wife

e-mailed Singer an action photo of their daughter or, if they

didn't have one of those, a headshot, with the understanding

that Singer or one of his associates would use that photo to

create a falsified athletic profile.  For Lauren Isackson, it

was a soccer profile because she actually played a little bit

of soccer in high school.  For Audrey Isackson, it was a crew

profile, even though she had never rode in her life.

You know that corrupt athletic department insiders

then used those fake profiles to get those students admitted as

recruited walk-on athletes.

At USC, Donna Heinel was the Athletic Department

liaison who presented the profiles to the Subcommittee on

Athletic Admissions.  That is a unit of the Admissions

Department comprised of Admissions Officers.  It's also called

SUBCO.  And the Admissions Department, the SUBCO, relied on

those profiles and believed that those students had been

selected by USC's coaches based on their athletic

qualifications to be recruited on to USC's Division 1 teams.

Those are some of the finest, most competitive and elite

athletes, collegiate athletic teams in the country.  They have

actual Olympians among their ranks.

          Here's how Singer described this part of the scheme to

Agustin Huneeus.  He's one of the parents who participated in

the conspiracy.  This call was captured on the court authorized

wiretap before agents approached Singer when neither of them

knew that anybody was listening.

          (Audio recording played.)

          MR. FRANK:  Now, you know that none of those students

were recruitable athletes at the USC level.  For example,

remember when Huneeus told Singer his daughter couldn't play

water polo.

          (Audio recording played.)

          MR. FRANK:  But that's not what Donna Heinel sold the

SUBCO.  Under "Assets to Our Women's Team", she wrote "Agustina

is a high caliber walk on in a much needed goalie position".

That is the fraud, lies about student's athletic qualifications

to have them admitted as recruited athletes.

          And you know that after the Admissions Committee

1  signed off, students typically received letters letting them

2  know that they had been approved for admission as recruited

3  athletes, sometimes before they even applied.

4       And that is when the money came due.  Sometimes

5  parents made payments directly to athletic department funds

6  that were controlled or overseen by the corrupt insider, like

7  the Women's Athletic Board that Heinel oversaw or the Water

8  Polo Fund that Vavic oversaw as the coach of the water polo

9  team.

09:41 10      Here's how Singer explained that part of the scheme to

11  Agustin Huneeus.

12       (Audio recording played.)

13       MR. FRANK:  "It essentially goes right to her".

14  That's how Rick Singer described the scheme before he knew that

15  the FBI was listening.  Other times parents sent their money to

16  Singer's purported charity, The Key Worldwide Foundation, or

17  KWF, for him, in turn, to distribute to the insiders.  That's

18  what the Isackson's did.  Sometimes parents paid all at once

19  after their kids were admitted.  Other times they paid part of

09:42 20  the money when they received the admission approval letter and

21  the rest when the parent received final confirmation of

22  admission.

23       Here's how Singer described that to Huneeus.

24       (Audio recording played.)

25       MR. FRANK:  And that is the bribery.  They don't use

the word "bribe".  They don't use the word "fake profile"
because that's not how criminals talk.  What they do talk about
is sending money as a donation to a USC fund in exchange for
having an insider push an unqualified applicant past the
Admissions Department as a recruited athlete.

That is also called honest services fraud, because in
exchange for that so-called donation, the insider is lying to
their own colleagues in the Admissions Department.  They are
not providing their employer with their honest services.

Now, you know Singer did not always tell parents the
whole truth.  For example, with Sabrina Aziz, Singer didn't
actually send the money to USC.  Instead, a few months after
Aziz paid him, he began paying Heinel $20,000 a month
personally.  With Johnny Wilson, Singer sent part of the money
to the water polo team and he kept the rest for himself.

There's no honor among thieves, but I expect that
Judge Gorton will instruct you that, in a conspiracy, that does
not matter.  Conspirators don't need to know all of the
details.  They just need to know the essential features of the
conspiracy.  And in this conspiracy, there were two essential
features.

The first was fabricated athletic qualifications.  The
second was payments, wherever those payments went, to induce
corrupt athletic department insiders, like Vavic and like
Heinel, to lie to their own colleagues in admissions by

1    pretending to recruit students based on those fabricated

2    athletic credentials.

3          Each of those things independently is a crime.  The

4    defendants are guilty if you find that they participated in

5    even one aspect of the scheme:  Either the fraud or the

6    bribery.  You know they participated in both.

7          The government was able to intercept Singer's call

8    with Agustin Huneeus because it happened to occur while the FBI

9    was monitoring Singer's phone with a court authorized wiretap

09:46 10   in the summer of 2018.  Agents did not intercept Mr. Aziz on

11   the wiretap because his daughter Sabrina had already been

12   admitted to USC before the FBI even uncovered the scheme.

13   Similarly, Johnny Wilson was admitted to USC back in 2014, but

14   agents did intercept Wilson on the wire when he came back for

15   more and called Singer about his two daughters in September of

16   2018, about a week before the agents approached Singer.

17         We played the Huneeus call for you and the Caplan

18   calls, Gordon Caplan, because those calls are evidence of how

19   the scheme worked and how Singer pitched it to the parents who

09:47 20   were participants in the scheme before the FBI approached him.

21   And Bruce Isackson described that to you in the same way.

22         In fact, you know that Singer's pitch was so

23   consistent that, as Agent Keating told you, the FBI had trouble

24   shaking him from it even when they told him to use different

25   language.  Singer told the insiders -- I'm sorry -- Singer told

1    the parents that the money would go to the athletic program at

2    the schools, but Bruce Isackson told you that, despite what

3    Singer said, he thought the insiders must be pocketing some of

4    that money.

5         But wherever the money went, whether to the insider's

6    pocket or to their program, you know and the defendants knew

7    what it was for:  Admission as a recruited athlete based on

8    falsified athletic credentials, getting insiders to recruit the

9    defendants' children by lying to their own colleagues in

09:48 10   admission.  Wherever the money went, that's what it was for.

11   In plain English, we call that a bribe.  In legal terms, it has

12   a fancier Latin name, quid pro quo.  All that means is "this in

13   exchange for that".

14        And that's what Singer offered, a money back

15   guarantee.  You saw the e-mail in which he confirmed that the

16   Isackson's donation would be returned if Lauren's admission to

17   UCLA were reversed.  That's Exhibit 204.

18        Members of the jury, that is not a donation, no matter

19   what you call it, even if the money goes to a charity or even

09:49 20   if it goes to a university.  No matter where the money goes,

21   that is a payment to get an insider to give up a recruitment

22   spot based on falsified athletic credentials.  This in exchange

23   for that.  That's fraud.  And it's also honest services fraud.

24   And that was the scheme.

25        And it's the conspiracy to commit those two crimes

1    that's charged in Count 1 of the indictment against these

2    defendants.

3            Count 2 charges the defendants with conspiracy to

4    commit federal programs bribery, which is a form of bribery

5    involving a federally funded program, but it's based

6    essentially on the same conduct.

7            You know from the evidence that these defendants

8    joined in that scheme and that conspiracy knowingly and

9    intentionally.  That's the second thing that you need to find,

09:50 10   that the defendants knew what they were doing and that they

11   intended to do it, and that they knew that what they were doing

12   is wrong.

13           One way you know that is because Bruce Isackson told

14   you that he knew it, from that witness stand.  Just like these

15   defendants, his daughter Lauren actually played some soccer but

16   not at a recruitable level.  He knew that Singer's scheme

17   required lying about her qualifications and paying money to get

18   an insider to recruit her based upon that lie.  Remember how

19   many times Bruce Isackson told you from the witness stand that

09:51 20   it was all common sense?  He knew, just as Huneeus knew, just

21   as these defendants knew that, without the money, their kids

22   were not getting recruited.  Without the money, the insiders

23   would never have lied to their colleagues in admissions.

24   Common sense.

25           And you have other evidence to back up what he told

 1    you, including his own words captured on tape in realtime.

 2          (Audio recording played.)

 3          MR. FRANK:  How worried did Bruce Isackson sound on

 4    that tape, worried that Singer's phone was tapped, worried that

 5    if the IRS probed too deep, they'd find out what the money was

 6    for, that it was not a donation, that it was a payment for

 7    admission?  Bruce Isackson was worried because he knew that

 8    what he was doing was wrong.  And the evidence shows that these

 9    defendants knew that as well.

09:52 10          Let's start with Mr. Aziz.  This is Exhibit 330.  It's

11    the e-mail in which Singer asked him for information for

12    Sabrina's USC athletic profile.  Take a look at the subject

13    line of the e-mail.  It actually says "For Me to complete USC

14    athletic profile".  Then look what it says down below, "If they

15    play the sport", and basketball is filled in.

16          Now, of course you know that at the time Singer sent

17    this e-mail to Mr. Aziz, Sabrina didn't play basketball.  She

18    hadn't played basketball for nearly two years.  She never even

19    made her high school's varsity team, because that's what Rachel

09:53 20    Sih told you.

21          In this e-mail, Singer told Aziz that he was creating

22    a USC athletic profile.  That's a profile to be recruited to a

23    Division 1 school for Sabrina in a sport she no longer played

24    and she had never played particularly well.

25          Ladies and gentlemen, this e-mail alone, this e-mail

**A3646**

alone is powerful evidence that Aziz knew what he was doing,
which was lying to get his daughter admitted to USC as a fake
basketball recruit.

Here's the e-mail where Singer requests a photo or two
of Sabrina playing basketball, just like he requested photos of
Bruce Isackson of his daughters.  And here are some of the
photos that Mr. Aziz sent him.  The defense points out that he
later sent even more photos, but you saw the e-mail in which
Singer told him that this is the photo they were going to use,
a photo that you know, because Rachel Sih told you, doesn't
depict Sabrina Aziz.  It's not even her.  That's Exhibit 345.
Singer keeps his coconspirator in the loop by telling him, we
will use this one.

Here's that same photo on Sabrina's fake athletic
profile.  There is no dispute in this case that this profile is
fake.  And Laura Janke testified to you that she made it up.
And how do you know that the defendant knew that?  Well, for
one thing, because he sent Rick Singer that photo and Rick
Singer told him that's the photo he was going to use.  But also
because Singer sent him the fake profile.  That e-mail is
Exhibit 352.

Now, the defense wants you to believe that Mr. Aziz
never saw this e-mail because it was sent to his cox.net e-mail
address, but you know from Special Agent Keith Brown's
testimony that it was found in the Gmail account that the

```
 1    defendant regularly used to correspond with Rick Singer and
 2    many others.
 3            Here's what else you know:  Bruce Isackson told you
 4    that he knew his kids' profiles were fake even though Singer
 5    never even sent him the profiles.  How did he know?  Because
 6    they would have to be fake since his kids were not athletes at
 7    the collegiate level.  And the whole point of the scheme, the
 8    whole point, was to have them recruited as Division 1 athletes.
 9    And the same is true of Gamal Aziz.
10    Members of the jury, you did not check your common
11    sense at the door with your cell phones when you came into the
12    courthouse, and you know, you know, just like Gamal Aziz knew
13    that Sabrina was not qualified to be recruited at the
14    Division 1 level as a practice player or as anything else.
15    Rachel Sih told you she didn't even make the varsity team at a
16    school that had never had anyone recruited to play basketball
17    at USC.  And you saw her high school yearbooks.  She didn't
18    even play basketball for the last 2 years of high school.
19    There was simply no possibility that she could ever be
20    recruited to play basketball anywhere, much less at USC.
21    That's common sense.
22            What happened next?  Singer e-mailed this fake profile
23    to Donna Heinel, and Heinel presented Sabrina to the SUBCO as a
24    basketball recruit.  Here is the packet of materials that the
25    SUBCO saw.  And here's Heinel's write-up.  Look what she says,
```

1    "Sabrina will be a great addition to our USC program".  That's

2    exactly what she wrote for Agustina Huneeus, but you know

3    that's true.

4         In fact, Donna Heinel wasn't even responsible for

5    recruiting athletes to the basketball team or any team.  That

6    wasn't her job.  She was just the liaison between the coaches

7    and the Subcommittee.  Rebecca Chassin told you she was the

8    member of the Subcommittee that testified.  She told you that

9    the subcommittee thought this profile came from the basketball

09:57 10   coach because that's who recruits basketball players.  But

11   Aaricka Hughes, who's the women's basketball coach, told you

12   she never heard of Sabrina Aziz and she certainly never

13   recruited her.

14        Look what else Donna Heinel did.  She took the fake

15   profile Singer sent her and she embellished it even more.  She

16   added more lies.  For one thing, she changed the photo.  She

17   took the photo that Singer sent and substituted a different

18   photo.  And Rachel Sih told you that photo isn't Sabrina Aziz

19   either.  That's a photo of a different player on the team that

09:58 20   was published in an online newspaper.  And look what else she

21   did.  She added 2 inches to Sabrina's height.  Laura Janke

22   testified she made up the height on the left, the 5'8".  Look

23   at the height Donna Heinel admitted to the SUBCO.  She added

24   2 inches.  It says Sabrina's 5'10".

25        Here's what else you know:  Sabrina Abdelaziz would

1    not have been admitted to USC without being an athletic

2    recruit.  Rebecca Chassin told you that the average unweighted

3    GPA of students who get accepted in the general population to

4    USC is 3.8, and none of the students in the SUBCO packets that

5    she looked at on that witness stand were qualified to get

6    admitted based on their academic qualifications alone.  But

7    Sabrina's weighted GPA was only 3.2.

8         Now, I want to be very clear.  We are not here making

9    fun of these kids.  These kids are not on trial today, but

09:59 10    their parents are on trial because they wanted their kids to

11    get into those schools no matter what their academic

12    qualifications were, no matter what their athletic

13    qualifications were.  These parents were not willing to take no

14    for an answer.  To get to yes, they crossed a line.  And in

15    crossing that line, they broke the law.

16         And you know what happened next.  SUBCO did, in fact,

17    approve Sabrina's admission because, as Rebecca Chassin told

18    you, they believed Donna Heinel.  They trusted her.  She was

19    their colleague.  They thought Sabrina Aziz was a legitimate

10:00 20    basketball recruit.

21         Here's the admission approval letter that Heinel sent

22    to Singer and here's the e-mail where Singer forwarded that

23    letter to the defendant.  It's Exhibit 390.  Take a look at

24    what it says.  "Your records indicate that you have the

25    potential to make a significant contribution to the

intercollegiate athletic program as well as to the academic
life of the University".  Just below that it requires Sabrina
to register with the NCAA.  There is no dispute in this case
that the defendant received this letter, and he could not
possibly have thought that it was true, that Sabrina could
contribute to the intercollegiate athletic program at USC.

Look at the date of the letter, October 2017.  Look at
what the defendant told the college counselor, another college
counselor who was advising Sabrina back in Hong Kong the
following month.  That counselor recommended that Sabrina
submit an application to USC in December.  What did Mr. Aziz
tell him?  "We're going to pass".

Think about that.  Sabrina had already been approved
for admission to USC by this point.  She was in as long as she
fulfilled basic requirements, like registering with the NCAA
and submitting a formal application.  But Aziz didn't tell the
counselor that.  Why do you think?  Because he knew that what
he was doing was wrong.  And he knew that if he told that
counselor that Sabrina had already been approved for admission
to USC, that would have given away that she had been recruited
as an athlete, and anyone who knew Sabrina knew that that was
preposterous.  Telling the counselor would have exposed the
lie, so Aziz couldn't tell him, so instead he just said, "We're
going to pass".

And you know what happened next.  Sabrina did submit

her formal application to USC, as required by the admission

approval letter.  You saw the e-mails in which the defendant

made sure that they followed the requirements of the admission

approval letter and Singer's instructions to answer one

question using playing basketball as a passion.  Those are

Exhibits 415 and 459.

He even overruled Sabrina, who had written an essay

about something else.  Common sense tells you why, because you

cannot be admitted as a division -- to a Division 1 school as a

basketball recruit without mentioning basketball in your

application.  That would raise red flags in the admissions

office.  In the same e-mail chain, Singer told the defendant

that basketball would go in Sabrina's activities on her

application.

Here's the essay that Sabrina e-mailed to Mikaela

Sanford, with a copy to her father.  Look at the first

sentence, "the basketball court is like my art studio", this

from a girl who didn't even play basketball at the time that

this essay was submitted and hadn't played for nearly 2 years.

Now, the defense wants you to focus on e-mails between

Mikaela Sanford and Rick Singer, e-mails that his client wasn't

on, that were sent months after she'd already been approved for

admission to USC as a recruited athlete based on that fake

profile.

I'm asking you to look at the e-mails he was on:  The

e-mail that he received and forwarded to his wife saying, "for

me to complete USC athletic profile" and "if they play the

sport"; the picture he sent to Rick Singer of other girls

playing basketball; the fake profile with the picture that Rick

Singer selected from that and told the defendant he was

selecting; the fake profile that was found in the defendants'

e-mail box; a lie to the other college counselor about passing

on applying to USC; the essay about basketball as a passion;

the e-mail telling him that basketball would go in the

10:04  activities section of Sabrina's USC application; the admission

approval letter telling him that Sabrina was admitted based on

her athletic potential and requiring her to register with the

NCAA.  That's just the CliffsNotes, folks, an avalanche of

lies.  And that's the fraud.

    Next came the bill, $300,000 for a so-called private

contribution to KWF, and the bogus donation letter that the

defendant received back.  Look what it says.  "This letter

shall serve as formal acknowledgment of your contribution for

which no goods or services were exchanged".  Another lie.  This

10:05  bill only came due after Sabrina was admitted to USC.  It was

explicitly in exchange for her admission to USC.  That's the

only reason he received the bill.

    Singer told the defendant the money would go to USC.

There's no dispute about that.  The defense has focused you

time and again on the fact that the payments to Donna Heinel

personally only started a few months after Mr. Aziz paid Rick

Singer.  They've even put into evidence an FBI affidavit and a

government brief making those same points.

We agree.  There's no dispute about that fact.  We

told it to you in our opening statement.  Singer's pitch was

that the money would go to the program in exchange for the

bogus recruitment.  It's still a quid pro quo wherever the

money goes.

And some of the money did, in fact, go to USC.  Look

at how much of the money flowing into the Women's Athletic

Board came over the period of the conspiracy from Rick Singer's

clients.  You heard testimony that Donna Heinel's salary went

up by about $100,000 over this same period.  And you saw that

fundraising was an important part of her annual performance

reviews, but the evidence also showed that Singer kept a lot of

the money for himself or invested it in businesses and ventures

held in the name of his foundation, and eventually, you saw the

evidence that Singer began paying Vavic and Heinel personally.

(Audio recording played.)

MR. FRANK:  Listen to what she said there.  She wants

to structure the payment for Sabrina because it's a larger

amount of money.  Now, initially, Heinel told Singer to have

the money sent to the Galen Center.  That's where the

basketball team plays.  That's Exhibit 439.

(Audio recording played.)

```
 1              MR. FRANK:  Ultimately, Aziz's money didn't go there

 2     either.  Instead, beginning in July of 2018, he started paying

 3     Heinel $20,000 a month --

 4              MR. KELLY:  Objection.  He didn't start paying.

 5              MR. FRANK:  The checks were made out to her consulting

 6     company.

 7              THE COURT:  Overruled.

 8              MR. FRANK:  But you know that that was just another

 9     cover up.

10:09 10         In October of 2018, Singer, acting at the government's

11     direction, asked Heinel to put more detail on those invoices.

12              (Audio recording played.)

13              MR. FRANK:  And you saw the detail that Donna Heinel

14     put into that next invoice.  "Consulting Services", "interview,

15     evaluation and assessments for prospective students", and then

16     she lists three schools and three students.

17              The first name on the list, Abdelaziz, Singer didn't

18     tell her to put that name there.  You just heard the call in

19     which all he did was ask her to put some detail on the

10:10 20    invoices.  She chose to put that name there.

21              And the evidence showed that those checks were

22     deposited into Donna Heinel's personal bank account.  The money

23     was in exchange for getting Sabrina Aziz admitted to USC as a

24     basketball recruit based on a fake athletic profile, for

25     getting Heinel to violate her duty to her employer by
```

misleading her own colleagues in the Admissions Department.

That's honest services fraud.  And it's also federal programs

bribery.  This in exchange for that, or in legal terms, quid

pro quo.

     And I expect that Judge Gorton will instruct you that,

under the law, whether the money went to Donna Heinel's pocket

or whether it went to her program doesn't matter.  What matters

is what the money was for.  In this case, the evidence of

"that" is similarly overwhelming.

     Listen to what Heinel told Singer about the payments

for two other students Isabel Janavs and Claire Altman.  This

call happened, as Agent Keating told you, when Rick Singer was

in Boston.

     (Audio recording played.)

     MR. FRANK:  Singer says, "Are you going to send me the

letter", that's the admission approval letter, and "then I'll

get them to forward the 50K".  This in exchange for that.  It

could hardly be any clearer, clear as day.  And Heinel

responds, "Let's hold on that right now.  I don't like to do

it" so close.  So close to what?  To the admission.  That

$50,000 is money going to the program, not her pocket, to the

program, but she doesn't want to do it so close to the

admission and the admission approval letter.  Why?  Because

that would raise red flags because she might get caught.

     Members of the jury, this is devastating evidence that

the money to the program was a quid pro quo that Heinel hid

from her colleagues, in plain English, a bribe, even though the

money did not go to her pocket.  There is no legitimate

explanation, none, for why Donna Heinel didn't want the money

to the program so close.  The only reason is because she wanted

to hide the connection between the money and the recruitment.

Under the law, it does not matter that Singer did not

specifically tell Aziz that the money went to her pocket

because what matters is not where the money went, but what he

understood it was for.

Of course, Donna Heinel did have good reason to have

concern about getting caught.  As you know, she almost did get

caught almost 6 months before this phone call putting fake

recruits through SUBCO.  You heard that, in April of 2018, the

USC Admissions Department heard from several private schools

about applicants who had been recruited to USC as athletes but

didn't participate in those sports in their high schools.

Take a look at Exhibit 511.  The Dean of Admission

writes "have we heard back from Donna on the cases where we

expressed concern?"  Another Admissions Officer responds, "I

heard back on one I gave her, Sloane, the Italian player

Buckley said was a small guy.  She says he really plays

internationally, met Jovan at a tournament in Serbia, and that

he's a solid talent".

Now you know that's not true because Laura Janke told

1  you that she invented the water polo profile for Matteo Sloane.

2  She simply made it up.  And it goes on from there.

3       Heinel responds with more lies about two students,

4  Olivia, that's Olivia Giannulli, and Tyler.  That's Tyler

5  Kornguth.  Laura Janke testified she made up their profiles as

6  well.

7       Look at what the Dean of Admissions wrote.  "Donna

8  also told the water polo coach the high school pushed back when

9  got back to the dad, who hollered at the counselors".

10:15 10      First of all, look at Exhibit 3772 on the right.  You

11  can see Olivia Giannulli and Tyler Kornguth were side door

12  candidates that Singer provided to Donna Heinel.

13       Then the dean writes the parents hollered at

14  counselors.  The date of that e-mail is April 13, 2018.  And

15  you heard the voicemail that Donna Heinel left for Rick Singer

16  one day earlier, April 12, 2018.

17       (Audio recording played.)

18       MR. FRANK:  Think about those words, "I don't want

19  anybody going into Buckley or Marymount", those are two private

10:15 20  schools in California, "yelling at counselors.  That'll shut

21  everything down".  What will it shut down?  The fraud scheme,

22  the steady stream of bribes from Rick Singer and his clients.

23  That's what it will shut down.

24       And look at what else Heinel told Singer to do.  You

25  can't see it here but you'll see it on the transcript or you'll

hear it on the audio, which is in evidence.  "Make sure that if

questioned at the school, they respond in an appropriate way

that they are walk-on candidates for their respective sports".

That's what else she tells him in that voicemail.

Members of the jury, this is more devastating evidence

of the fraud, to lie to the high schools, to lie to USC, to lie

to the Admissions Department, and to get students admitted to

USC as fake athletic recruits in exchange for money.

And here's how else you know that Gamal Aziz was in on

that scheme, because he told you so in his own words.  This is

what he told Rick Singer in a recorded call on October 25,

2018, while Singer was here in Boston.

(Audio recording played.)

MR. FRANK:  "Of course."

"Of course."

That's Gamal Aziz's words, "of course."  Of course

he's okay with not telling the IRS that the $300,000 was paid

to Donna Heinel to get Sabrina into school even though she

wasn't a legitimate basketball player at that level, because

why would you tell the IRS that the money was a quid pro quo?

Why would you tell the IRS that you were involved in a fraud

scheme?

The defense has focused on Singer's word choice here,

that he said the money was paid to Donna Heinel, rather than to

a program administered by Donna Heinel, and that Singer used

1    Heinel's name, which he hadn't used with Aziz before.

2         Again, there is no dispute about those things.

3    There's no dispute.  And they don't matter.  The defendant was

4    not confused.  He knew his daughter was recruited to play

5    basketball at USC even though she was not a legitimate

6    basketball player at that level.  He admitted it on the call.

7    That is fraud.

8         He also knew that somebody at USC pretended to recruit

9    her based on those fake credentials in exchange for the money,

10:19 10  whatever it was.  That's honest services fraud.

11         "Of course."  That's what the defendant responded when

12   Rick Singer said he would lie to the IRS by not telling them

13   those things.  Think about what Gamal Aziz did not say on that

14   phone call.  Rick, what are you talking about?  Rick, my

15   daughter is a legitimate basketball player at that level.

16   Rick, I thought you said she could be a practice player or a

17   manager.  He didn't say any of those things because he knew

18   exactly what Singer was talking about.

19         And here's what else he said.

10:20 20       (Audio recording played.)

21       MR. FRANK:  There's the cover story.  "My intention

22   was to donate the money to the foundation...  and then from

23   there obviously ... do they have the intention of reaching out

24   to the people that sent those payments".  You can actually hear

25   him stutter in that call.  The wheels are turning.  And if that

```
 1   wasn't clear enough, here's what happened next.
 2              (Audio recording played.)
 3              MR. FRANK:  "Anybody who isn't a real basketball
 4   player that's a female, I want you to use that profile going
 5   forward".  How did the defendant respond?  "I love it".  "I
 6   love it".
 7              The defense tried to suggest that Mr. Aziz uses that
 8   expression a lot.  Maybe he does, although there's certainly no
 9   evidence of that in this case, but so what?  I love it is what
10   we say when we agree with something, when we're happy about it,
11   when we think it's funny.  Those are the defendant's words.
12   That's what he said when he was told that his daughter's fake
13   athletic profile was so good, that it worked so well, that it
14   was going to be used in the future to get other fake athletes
15   admitted to USC.
16              Throughout this case the defendants have tried to get
17   you to focus on what Rick Singer said and what Rick Singer did,
18   but this is the defendants' trial.  It's their words.  It's
19   their actions.  It's the choices that they made that are the
20   reason that we're here today.  And when you go back to the jury
21   room to think about those things, I'd ask you to think about
22   Mr. Aziz's next interaction with Rick Singer on January 3,
23   2019.
24              (Audio recording played.)
25              MR. FRANK:  Members of the jury, there is no innocent
```

**A3661**

```
 1    explanation for that phone call.  Singer just told the
 2    defendant that an insider at USC in the Athletic Department,
 3    Donna Heinel, had lied to Admissions about why Sabrina wasn't
 4    playing basketball.  He said that she had invented an injury,
 5    plantar fasciitis, and had told Admissions that's why Sabrina
 6    hadn't shown up.  And how did the defendant respond?  He wasn't
 7    concerned or surprised about the fact that Sabrina hadn't shown
 8    up for practice.  Of course not, because he knew she wasn't
 9    going to show up.  That was the whole plan.  He knew that
10    already.  He was concerned that Admissions would call Sabrina
11    and ask her about it and then, without missing a beat, he
12    agreed to lie.  "That's fine.  I will answer the same should
13    they call me".
14         Lying is not what someone does when they're acting in
15    good faith.  People lie when they know they've done something
16    wrong, to cover their tracks, and that's why Gamal Aziz agreed
17    to lie when Singer told him that the USC Admissions Department
18    might call.  And listen to what he said next.
19         (Audio recording played.)
20         MR. FRANK:  "Should I mark this as a charity or not
21    because you got me concerned when you called me the last time?"
22    The defendant is referring to the call nearly 3 months earlier
23    when Singer told him that KWF was being audited, the call that
24    we just heard a moment ago when he said "my intention was to
25    donate the money to the foundation".  Think about that.  If
```

Mr. Aziz thought he had made a legitimate donation, why was he
worried and concerned about an audit of KWF, Singer's charity?
Those are his words.

He brought up the audit on this call out of the clear
blue. He was worried for the same reason Bruce Isackson was
worried when Singer made the same call to him, because he knew,
just like Bruce Isackson knew, that it was not a legitimate
donation, that it was a payment in exchange for admission for
getting his daughter recruited to USC to basketball even though
she didn't play basketball. This in exchange for that. And
that is not charity. That's a quid pro quo, wherever the money
goes, and you can't deduct it from your taxes.

And how does he respond when Singer reassures him that
the money went to a 501(c)(3)? "I just wanted to make sure
we're on the same page". Think about that. When you donate
money to the American Cancer Society or to the Jimmy Fund, you
don't call them up to make sure we're on the same page. That
is the language of conspiracy. Those are the words of
conspirators getting their stories straight because they have
something to hide because getting a fake tax deduction for a
fake charitable donation for a fake athletic recruitment for a
fake athlete was the icing on the cake of this conspiracy.

And that brings us to John Wilson. He joined the
conspiracy before Gamal Aziz and it worked so well that he came
back for more for his daughters. Milestones of his involvement

1   are largely the same.  From the beginning, it was clear what

2   Wilson was buying a recruitment spot for an athlete that

3   wouldn't make it on his own as a way to get admitted to USC.

4           This is Exhibit 48, an e-mail dated February 12, 2013.

5   Singer says to Wilson, "Jovan is giving me 1 boys slot and as

6   of yet no one has stepped up to commit".

7           The defendant's wife Leslie responds with a question,

8   "is another candidate looking at USC also so we should be

9   pushing Johnny to decide if that's his number 1 choice - as I

10:29 10   mentioned hate to lose this due to us taking too long to decide

11   (Johnny is unaware of this arrangement)".

12           You know, just as the defendant knew, that Johnny was

13   not good enough to earn that spot based on merit.

14           This is Exhibit 49, March 26, 2013.  Singer tells him,

15   "at LMU they are not very interested in Johnny - same for

16   others".

17           And the defendant replies, "so, none of the teams

18   really, even LMU, want to meet with him on their campus"?

19           And later, "if swimming and water polo are not

10:30 20   realistic for Johnny, then what are the schools that he has a

21   realistic shot at (without help)".  Those are the defendant's

22   words, "swimming and water polo are not realistic for Johnny".

23   As good as Johnny was, he was not good enough to get recruited

24   by USC, which consistently has the best water polo team in the

25   entire country.

1          And the defendant's own witness Jack Bowen told you

2     the same thing.  As fond of Jack Bowen was of Johnny, he

3     testified Johnny was a B plus player and USC recruit A, A plus

4     players.  He told you that he did not think Johnny would get

5     admitted to USC as a water polo player.  That was their

6     witness.

7          Look at what else the defendant says in this e-mail.

8     "What would a bench warmer position mean?  Would the other kids

9     know he was a bench warmer side door person?"

10:31 10          Then in the very next e-mail, "obviously his skill

11    level may be below the other freshmen.  In your view will he be

12    so weak" that he will "be a clear misfit at practice"?  He was

13    worried that Johnny would stick out like a sore thumb, that it

14    would be obvious to his teammates that he had no business being

15    on the team, that his very presence, his very presence would be

16    a giveaway that he got in some illegitimate way because the

17    defendant knew that what he was doing was wrong and he was

18    worried that somebody else might figure it out.

19          And Singer told Wilson that Johnny would not have to

10:31 20    play, that the team was big enough that he could hide.  He

21    said, "the commitment is to be on the roster not attend all

22    practices", "frankly after the first semester he can move on".

23          You saw another e-mail in which Singer told Wilson

24    Johnny wouldn't even have to get in the pool.

25          And Casey Moon told you that is what happened.  Johnny

didn't practice with the team and he dropped off the roster

after just one semester.

Now, Johnny's friends testified that he did come to

some practices at the beginning of the semester and at the end

of the semester.  I leave it to you to judge their credibility,

but here's the point.  Whether he showed up for a few practices

or no practices, however many practices he showed up for, there

is no dispute that he was not an immediate impact player.  Once

again, the defendant's own witnesses told you that and he did,

in fact, move on after the first semester, just like Rick

Singer said that he could.

And you know what happened next.  First came the

falsified athletic profile.  Singer told the defendant that he

was sending Vavic "a transcript, test scores and player profile

so he could add Johnny to his recruit list and present him to

admissions in October".  A player profile to present to

admissions for the kid the defendant was just told wouldn't

have to get in the pool, the kid he was worried would be a

clear misfit on the team.

Look how the defendant responds.  "Great - let me know

when you have verified you have it all completed and into

Jovan.  Also when and where to wire money".  That's Exhibit 75.

And you know all about that player profile.  Here's

what Singer told Wilson about it in a subsequent e-mail.  This

is Exhibit 83.  "Jovan has Johnny's stuff and asked me to

1   embellish his profile more, which I am doing".  Singer is

2   literally telling the defendant that he is going to falsify the

3   profile at the direction of the water polo coach.

4        And he even tells him why.  "Jovan will provide

5   Johnny's info to admission when he does his other guys" next

6   month.  That is the fraud.

7        And then this, "no payment of money until he gets a

8   verbal and written from admissions and then 50 percent to a

9   saving account I set up.  Then the remainder upon an acceptance

10:34 10   letter in March with everyone else".

11        That is the bribery.  No talk of donations.  Payment

12   for admission to a savings account I set up based on an

13   embellished profile that Jovan will provide to admission for a

14   kid who would be a clear misfit and wouldn't have to play.

15        These e-mails alone are enough to convict Wilson of

16   the conspiracies charged in Counts 1 and 2, just these e-mails.

17        The defense spent a lot of time on the word

18   "embellish".  They want you to believe it has an innocent

19   meaning.  You know embellish is just another fancy word for

10:35 20   lie.  Days after this e-mail Singer sent Wilson the embellished

21   profile and the defendant's own witnesses told you it was full

22   of lies.

23        Coach Bowen told you Johnny was not a four time

24   varsity letterman and he was never, not once, cocaptain of the

25   team, and he hadn't even heard of many of these awards.

1           Andrew Maricle, Johnny's close friend and college

2      roommate, told you that he didn't even know if a swim time of

3      43 seconds on the short course was even possible.  And you saw

4      the e-mails where Singer simply invented those times.

5           Coach Bowen told you this profile made Johnny look

6      like a better player than he actually was.

7           And you know that the defendant sent this falsified

8      profile to Wilson.  There's the e-mail right there.  It's

9      Exhibit 88.

10:36 10           Now, the defense wants you to believe that he never

11      read it, because if he had, he would have corrected the address

12      in the top right corner where it says "Street" instead of

13      "Place".  You know that he was in this same e-mail account

14      barely 90 minutes later e-mailing another copy of the same

15      photo to his wife for Johnny's yearbook page.  And he also made

16      plans to meet with Rick Singer the next day.

17           Here's what else you know:  The fake profile worked.

18      Johnny was admitted as a water polo recruit because the members

19      of the SUBCO believed Coach Vavic.  They trusted him.  They had

10:37 20      no reason not to.  He was their colleague.

21           And here's what Coach Vavic told them:  That Johnny

22      was a top ten attacker in grad class.  Casey Moon told you what

23      that meant.  That meant he was one of the top 10 attackers in

24      the country that year and that he would be an immediate impact

25      player.  And Johnny Wilson's own friend, Andrew Maricle, told

1    you that was not true, he was not an immediate impact player.

2    And his high school coach, Coach Bowen, told you the same

3    thing, he had no chance of being an immediate impact player.

4    Those were the defendant's own witnesses.

5        Why did Coach Vavic lie to the Admissions Department?

6    Because of what happened next.  Wilson asks Singer to send him

7    the bill.  Look at the subject line of this e-mail.  It's

8    Exhibit 710.  "USC fees".  And he writes "thank for making this

9    happen!  Please give me the invoice.  What are the options for

10:38  10  the payment?  Can we make it for consulting or whatever from

11   The Key so that I can pay it from the corporate account?"

12       Singer's response, "yes we can send you an invoice for

13   business consulting fees" and you can write it off as a

14   business expense.

15       Where to begin?  First, look at the words the

16   defendant used, "invoice", "fees", "payment".  That's not the

17   language of charity.  That's how you talk when you buy

18   something.  That's how you talk when you pay someone a fee for

19   services that they've rendered.  And you know that is exactly

10:38  20  what happened here.  The defendant literally says "thanks for

21   making this happen".  "This" was Johnny's admission to USC as a

22   recruited water polo player.  The defendant was paying The Key

23   for making that happen.  He was asking for the bill for getting

24   Vavic to lie to the Admissions Department to recruit Johnny as

25   an immediate impact player when the defendant himself thought

he would be a clear misfit.  "This" in exchange for "that".  It
couldn't be any clearer from this e-mail.

          Second, if you think you're making a legitimate
donation, you don't write it off from your business as a
consulting expense.  And this wasn't his assistant Debbie
Rogers' fault.  Here's the defendant telling her a month later
"charge it to business consulting".  Look at the dates on those
e-mails.  First is March 1st.  The second is March 2nd.  That
wasn't an accident.  This was the defendant telling her what to
do.  It wasn't a lie Rick Singer came up.  This was a lie the
defendant came up with all by himself.  This was his lie.  And
lying is not what somebody does when they're acting in good
faith.

          And you know where the defendant's money ended up.
$100,000 went to the USC Men's Water Polo Fund.  That was the
quid pro quo payment Coach Vavic got for getting Johnny
admitted as a water polo recruit based on falsified
credentials.  The rest of the money stayed with Rick Singer
because, once again, there's no honor among thieves.

          Here's what else you know:  Singer also paid year
after year for Vavic's kids to go to private school.  This
wasn't for Johnny specifically.  It started after a year after
he was admitted to USC, even a year after he quit the water
polo team, but it was part of the same conspiracy.

          You heard Vavic admit it on tape at Exhibit 620.  For

1  that money, he was going to admit another kid that Singer sent

2  his way, but he warned Rick Singer that things had gotten

3  harder.

4          (Audio recording played.)

5          MR. FRANK:  "He can't just be a total nobody".  Why?

6  Because Admissions would catch on.  Singer didn't tell the

7  defendants that he was paying the insiders personally, and he

8  didn't tell them that he was keeping a chunk of the money for

9  himself, but the personal payments to Heinel and to Vavic were

10:41 10  part of the conspiracy, just as much as the payments to their

11  funds.  And wherever the defendants thought the money was

12  going, they knew what they were getting in exchange and they

13  were satisfied with what they got, so satisfied that John

14  Wilson came back for more.

15          Here he is, in his own words, on September 15, 2018,

16  when neither he nor Rick Singer knew that the government was

17  listening.

18          (Audio recording played.)

19          MR. FRANK:  John Wilson is the one who says on that

10:42 20  recording that the sport is not going to even matter.  And then

21  they literally make up the sport right there in the phone call

22  on the phone in the very same breath that they're talking about

23  how much it's going to cost to get his daughters into Harvard

24  and Stanford as fake athletes in that sport.  "I will make them

25  a sailor or something.  Because of where you live".

1          When you go back to the jury room, ladies and

2     gentlemen, listen to this exchange, and listen carefully to how

3     the defendant responds.  He laughs.  He thinks it's funny.

4     This is before the FBI approached Rick Singer.  This is

5     devastating evidence of the crime as it is happening.

6          And listen to what he has next:  "Is there a two for

7     one special?  If you got twins?"  This senior executive, this

8     Harvard School graduate, he isn't troubled over the fraud.

9     He's haggling over the price.

10:43  10          Kids work hard to be recruited athletes.  They devote

11     their lives to it.  Aaricka Hughes, Laura Janke, the

12     defendants' own witnesses tell you about the hours they spend

13     each day making enormous sacrifices to become elite athletes.

14     And as hard as they work, there are only so many who can make

15     it because there are only so many spots available.

16          The evidence showed that, at USC, 56,000 kids applied

17     in 2018 for admission and only about 15 percent got in.  Only

18     about 200 to 250 were presented to the SUBCO as recruited

19     athletes, but almost all of those kids got in through the

10:44  20     SUBCO.  And that's true even though their average grades and

21     test scores were below that of the general population.

22          For John Wilson, buying an admission spot for his

23     daughters who didn't play sports was funny.  It was as simple

24     as writing a check.  Here he is again in his own words.

25          (Audio recording played.)

```
 1              MR. FRANK:  The mascot.  At another point he talks
 2   about her being the scorekeeper or water girl because he thinks
 3   it's funny, a joke, because he knows that Harvard doesn't
 4   really recruit mascots.  That is fraud, ladies and gentlemen.
 5   It is as raw as it gets.  And John Wilson knew it.
 6              As Agent Keating told you, these calls were designed
 7   to strip away the cover stories.  Now, did Rick Singer follow
 8   the agents' instructions perfectly?  No.  He fell back on his
 9   old pitch.  He sometimes used the word "donation" and "program"
10   instead of "payment" and "coach".  But what's happening in the
11   calls is completely unambiguous.  Wilson is agreeing to pose
12   his daughters as athletes in a sport they don't play.  That is
13   fraud.  And he's agreeing to induce the coaches of those sports
14   to recruit them in exchange for money.  That is honest services
15   fraud regardless of whether the money is going to the coach
16   personally or their program.  And listen to what else Singer
17   told Wilson.
18              (Audio recording played.)
19              MR. FRANK:  That's Exhibit 578 again.  "I can sell to
20   anybody that they're athletic enough to take 'em and there'll
21   be no question".
22              You know what "sell" means.  It means I can pose them
23   as elite athletes even though they aren't, and there will be no
24   question.  No question from who?  From Admissions.
25              And Wilson knew what this meant.  How did he respond?
```

1    "Even though they wouldn't play.  Ok".  Because he knew they

2    needed to be sold as athletes even though they wouldn't play,

3    just like with Johnny, only here it's even more blatant because

4    they don't even play the sport.

5            On those recorded calls, Singer told him again and

6    again and again that Admissions didn't know.  He said, stay

7    away from Admissions.  They're not involved in this.  This

8    isn't going through them.  Stay away from Development.  You

9    don't want them asking questions.  Those are Exhibits 623 and

10:47 10    625.

11            (Audio recording played.)

12            MR. FRANK:  "I just want to make sure that we keep

13    this clean".  Wilson didn't ask why they should stay away from

14    Admissions because he knew why.  He just wanted to know if they

15    should still go back on campus and interview or would that give

16    it away.

17            When you go back to the jury room, listen to

18    Exhibit 591.

19            (Audio recording played.)

10:48 20            MR. FRANK:  Listen to how slowly and clearly Singer

21    says it, not once, but twice.  He has to recruit some real

22    sailors so that Stanford doesn't catch on.  How does the

23    defendant respond?  He laughs.  He even repeats what Rick says,

24    "Yeah.  He's got to actually have some sailors.  Right".

25            Wilson thinks it is funny to buy a sailing spot at

Stanford for a kid who can't sail, who will, in his own words, look really stupid even trying to be the bag carrier of sailing. That's at Exhibit 625 again. He's not bothered by the fraud. His worry is making sure he buys an admission spot to a school his daughters actually want to attend.

(Audio recording played.)

MR. FRANK: A high-class problem, Posing your kid as a fake athlete to get her admitted to Stanford in a slot reserved for an actual athlete in exchange for money. And then finding out, oh, geez, she wanted to go to Harvard instead.

But here's what John Wilson did not know. He did not know that the government was listening to those phone calls. He did not know that the conspiracy had been uncovered and that Rick Singer had started taking directions from government agents. He did not know that this e-mail asking Singer to bill his bribe payment as a consulting fee or whatever so that he could pay it from the corporate account or this e-mail instructing his assistant to work with Singer to get the invoice correct, he didn't know that those e-mails and these calls would one day be placed before a jury of his peers in a Boston courtroom.

Here are the fake consulting invoices that Debbie Rogers had prepared at the defendant's direction.

And here's the e-mail in which she confirmed with the defendant that they would report those payments as both

 1  consulting fees and a charitable donation.

 2          And here's the tax return which you can see was mailed

 3  from Lynnfield, Massachusetts in which he deducted the payment

 4  for Johnny Wilson's admission to USC, splitting it between

 5  $120,000 in fake consulting fees, which he wrote off as a

 6  business expense, and $100,000 as a fake charitable donation.

 7  His tax preparers relied on the information he provided them.

 8  What they didn't know was that there wasn't any consulting and

 9  there was no charitable donation.  They didn't know that was in

10:50 10  exchange for getting Johnny admitted to USC as a water polo

11  recruit based on a fake profile.

12          John Wilson signed this tax return on penalty of

13  perjury.  He verified that it was true.  He knew that it was

14  not.

15          Agent Ranahan told you the IRS would not have allowed

16  these deductions if they had known what the money was for and

17  if he hadn't taken them, he would have owed close to $90,000 in

18  additional taxes.  The defense argued, well, he paid a lot of

19  taxes already, but you can't lie on your tax returns just

10:51 20  because you pay a lot of taxes.  There's no exemption from the

21  truth for rich people.  And lying on your tax returns is not

22  acting in good faith.  If you think you're making a legitimate

23  charitable donation, you don't write it off as a business

24  expense.  That's fraud.

25          Few final points.  First, you know that this fraud

mattered.  You heard evidence that without it it was highly
unlikely that the defendants' children would have been admitted
to USC, but by posing as athletic recruits and getting
recruited, their admission was virtually guaranteed.

Second, the defendants have made much of the fact that
they don't know each other, that they weren't involved in any
larger conspiracy they say, but you know that that's not true.
This was not some one-off scheme that Rick Singer developed for
John Wilson or Gamal Aziz.  His whole pitch, his whole pitch
was that he had done it before, that it was tried and true.
You heard him explain that to Gordon Caplan and to Agustin
Huneeus.

Bruce Isackson testified that Rick Singer told him the
exact same thing.  And he told you why that was so important to
him, because he didn't want to be a guinea pig.  He wanted to
make sure that this scheme worked, that other parents had done
it before.  And the whole nature, the whole nature of the
scheme was that it would only work if there was a network of
corrupt coaches willing to admit kids as fake athletic recruits
in exchange for money and a whole network of parents who were
willing to participate.

That is the reason that Rick Singer was able to offer
his clients a network of different schools, all those different
options, UCLA, USC, Georgetown with Gordie Ernst, Yale with
Rudy Meredith.  Gamal Aziz and John Wilson didn't need to know

each other to know that they were joining in something that was

bigger, a conspiracy that extended far beyond Rick Singer and

involved other parents and other coaches and all of the other

people, like Laura Janke and Mikaela Sanford, who made it

happen.

And you saw evidence that the Wilson's were connected

to the Palatella's and to their son Gino, who's one of the

students that Heinel admitted to USC as a fake football

recruit.  Those were Exhibits 409 and 563.

And the Wilson's, in turn, introduced Singer to their

friends the Driscoll's, parents of Johnny's friend Wyatt

Driscoll, who was recruited to USC to play basketball.  That's

Exhibit 64.

Here are the checks from KWF to USC baseball and USC

water polo.  The baseball check says "Driscoll family" right on

top of the check.  The water polo check says "Wilson family"

right on the top of the check.  Look at the date, April 16th,

the very same date.

Once in, every parent was vested in the scheme's

success, not just in getting their own kid's admission into

college but continuing to make sure it worked so, like Bruce

Isackson and like John Wilson, they could come back for more

for their younger kids, and also so that the whole thing didn't

unravel, because if it unraveled as to one parent, there was

the threat that it would unravel as to all.

1          That's why Bruce Isackson told you he was so relieved

2     that there was all that money.  You heard him on tape talking

3     about all that money in KWF from all those different parents

4     and all the money going out of the KWF to all those different

5     places.  He was relieved about that fact because that fact

6     would make it harder for anyone to ever figure out what was

7     going on.  And that is just one way that these parents all

8     shared the same goal and were dependent on each other to

9     achieve that goal.

10:55 10          Finally, a quick word on Rick Singer.  The defense has

11     made much of the fact that the government didn't call him as a

12     witness in this trial, but as we told you at the outset, you

13     heard a lot about him and you heard a lot from him, in his

14     e-mails and in those recorded phone calls, and in the testimony

15     that you heard from all those witnesses.

16          You know a lot about Rick Singer, that he wasn't

17     truthful, that he didn't follow agents' instructions, that he

18     deleted text messages, and even that he tipped off some of the

19     parents that the government was investigating.

10:55 20          He took these notes accusing the agents of telling him

21     to lie and he e-mailed them, as you can see at the top, to his

22     lawyer.  That's Exhibit 714.  These weren't a diary.  These

23     were notes for his lawyer.  He accused Agent Keating of raising

24     her voice and trying to get his coconspirators to agree to a

25     lie about where their money was going, but you know exactly

**A3679**

what he said on those consensual recordings because we played those recordings for you.  And you heard how the defendants responded.

Here's what else you know:  The defendants made the choice to join forces with Rick Singer and the other participants in his scheme to get their kids into college through fraud and bribery.  They chose Rick Singer.  We didn't choose him.  They did.  He's their guy.  At the end of the day, this trial is not about Rick Singer.  This trial is about them. It's about the choices they made.  It's about their actions. It's about their intentions.

Now I told you earlier that the defendants are charged in Counts 1 and 2.  Count 1 charges conspiracy to commit mail and wire fraud and honest service mail and wire fraud.  As the judge will instruct you, a conspiracy is nothing more than an agreement between two or more people to do something that the law forbids.  It doesn't have to be explicit.  It doesn't have to be written down.  It can be a common understanding.

Here, as you know, there was an understanding between the defendants and Singer and many others to get their children into college in two interconnected ways, by lying about their athletic credentials, that's fraud, and by inducing corrupt insiders in athletic departments to mislead their colleagues to get those children admitted as fake recruits in exchange for money.  That's honest services fraud.  And you know there was a

1    lot of mailings and a lot of wires and e-mails and phone calls

2    and admission letters sent through the mail as part of that

3    scheme.

4         Count 2 charges them with conspiracy to commit federal

5    programs bribery.  That's a form of bribery that involves

6    bribing an agent of a program that receives more than $10,000

7    in any one year from the federal government.  And you heard

8    evidence that USC and Harvard and Stanford all received

9    millions of dollars.

10:58 10       Mr. Wilson is charged with three additional counts of

11   wire fraud and honest services wire fraud and two additional

12   counts of federal programs bribery.  Those are for the wires he

13   sent to a Boston bank account, it's set forth there in Exhibit

14   707 and 708, in exchange for getting his daughters admitted to

15   Harvard and Stanford as fake athletes, as well as the

16   10/27/2018 phone call he had with Rick Singer in furtherance of

17   that scheme while Singer was in Boston.

18        I expect Judge Gorton will instruct you that it

19   doesn't matter that there wasn't actually an Harvard

10:58 20  administrator and we weren't actually going to let the Stanford

21   sailing coach get bribed.  Mr. Wilson didn't know that when he

22   agreed to make those things happened, when he tried to make

23   those things happened.

24        He's also charged with one count of filing a false tax

25   return for lying about the payment for Johnny's recruitment on

1   his taxes.  And you know that those lies mattered because they

2   inhibited the IRS from figuring out what he actually owed and

3   because it helped save him close to $90,000.

4          During the course of this trial, ladies and gentlemen,

5   you've heard a lot about the college recruitment process and

6   the admissions process.  You've seen hundreds of documents and

7   e-mails.  You've listened to numerous recorded phone calls.

8   You've heard from over a dozen witnesses, but at the end of the

9   day, the only thing you really need to decide this case is what

10:59 10 you walked into this courtroom with three and a half weeks ago,

11   and that's your common sense.

12          Common sense tells you that it is wrong to fake your

13   children's athletic qualifications to get them admitted to

14   highly competitive colleges as recruited athletes when they

15   aren't good enough to play and they don't intend to.  That is

16   fraud.

17          Common sense tells you that it is wrong to get

18   insiders at those schools to mislead their colleagues to

19   recruit those children using those falsified credentials in

11:00 20 exchange for money.  That is honest services fraud, bribery.

21          And common sense tells you it is wrong to lie on your

22   taxes by deducting the cost of those bribes as fake business

23   expenses and phony charitable contributions.  That is tax

24   fraud.

25          You don't need to be a senior corporate executive or a

```
 1    graduate of the Harvard Business School like these two

 2    defendants to know about those things.

 3            All of the evidence in this case, the tapes, the

 4    e-mails, the documents, the testimony, all of it leads to a

 5    single inescapable conclusion:  These two defendants, John

 6    Wilson and Gamal Aziz, are guilty beyond a reasonable doubt as

 7    charged.

 8            Thank you.

 9            THE COURT:  All right, jurors.  Before we hear from

10    the defendants, we'll have a short recess.  It won't be a

11    complete recess.  About 10 minutes.  We'll be back.

12            THE CLERK:  All rise for the jury.

13            THE COURT:  We're in recess for 10 minutes.

14            (Recess taken 11:02 to 11:18 a.m.)

15                    (Pause in proceedings, court reporter had

16    technical difficulties.)

17            THE COURT:  Mr. Kelly.

18            MR. KELLY:  Thank you.  This is like icing the kicker

19    in a football game.

20            But good morning.

21            So let's get back to reality here, okay, not some

22    prosecutorial fantasy land where they're talking about corrupt

23    insiders, corrupt insiders, and they don't name them.

24            Look, he who must not be named, no, they must be

25    named; we're in federal Court.
```

1          The only corrupt insider you heard evidence about was

2    Donna Heinel, and she didn't go bad, apparently, until the

3    summer of 2018, well after Gamal Abdelaziz made his donation.

4    And it's beyond dispute he doesn't even know her.

5          The prosecutor wants to get up here and keep repeating

6    that phrase, "quid pro quo," "quid pro quo."  It means this for

7    that.

8          Okay.  A quid pro quo is not illegal unless there's

9    corrupt intent.  So, for instance, if you are lucky enough to

11:19 10    go to the Red Sox game last night, you paid the Red Sox money

11    for a ticket.  It's a quid pro quo.  You go to the grocery

12    store, you buy groceries, you pay money for groceries, that's a

13    quid pro quo.  There's nothing wrong with it.  It has to be a

14    corrupt intent.  And here, the two charges, and only two

15    charges against my client, are conspiracy charges.

16          The government has the burden of proving specific

17    intent, what was in his mind, not what was in the mind of all

18    these people in some supposed nationwide conspiracy.

19          They have to prove the conspiracy they charged in this

11:19 20    indictment, not some other conspiracy in some other indictment.

21    If they have mischarged this, it's not guilty.

22          There's no proof that Gamal Abdelaziz had specific

23    intent to join some nationwide conspiracy.  There simply isn't.

24          Now, the government keeps trying to suggest -- and

25    when you hear instructions from the Court tomorrow, you'll

1    learn that proof that a defendant willfully joined an agreement

2    must be based upon evidence of his own words and actions.  Not

3    Bruce Isackson, the guy he doesn't even know, the guy who tells

4    you he won't lie to you to avoid prison, although he lied to

5    get his daughter into school.  He has nothing to do with Gamal

6    Abdelaziz.

7         You'll hear from the Court that good faith, if he

8    thinks what he's doing is legitimate, he thinks he's dealing

9    with a trusted college counselor, that's a defense in this

11:20 10   case.  What's in his mind, not somebody else's mind, not some

11    lawyer in New York he doesn't even know.

12         And the reasonable doubt standard which applies to

13    them, it can arise not just from evidence that's produced in

14    this court but also from a lack of evidence.

15         You know, the government keeps trying to suggest that

16    Sabrina Abdelaziz stole a seat somehow from somebody at USC.

17    It's not true; it's not true at all.

18         You heard from Ms. Chassin from USC, they let in 8,500

19    kids her year with the expectation that only 3,200 or 3,300

11:21 20   were going to go there.  There's no -- USC did not lose a seat;

21    the basketball program was not affected.  So to the extent

22    they're waiving this around like some big harm, it's not true.

23         Coach Hughes, she said it best when I asked her:

24         "Now, when you were an assistant coach at USC, the

25    team had approximately 13 to 15 players, right?

 1              "Yes.

 2              "So the number varied year to rear, right?

 3              "Correct.

 4              "And if someone were to say that USC's women's

 5     basketball team used practice players and a team manager, that

 6     would be true, right?

 7              "Yes.

 8              "And when Sabrina Abdelaziz arrived on USC's campus in

 9     2018, she had not been recruited by you, correct?

11:21 10              "Correct.

11              "And the USC women's basketball that year wasn't short

12     a player because of Sabrina's presence on campus, was it?

13              "No."

14              So let's put aside that, put aside that there's

15     somehow some harm to USC by Sabrina going there.

16              Also, this was a crime without a motive.  They didn't

17     prove any motive.  This is not a murder case where the intent

18     is an evil intent.  This is a white collar case.  Usually you

19     have a motive of greed.  What's the motive here?  He gave away

11:22 20     his money.  He was lucky enough to have made a lot of money and

21     he gave it away.  He gave it away to Columbia, gave it away to

22     USC.

23              What are they going to say to him now?  Oh, it's

24     prestige.  Oh, he did it for prestige.  This guy had plenty of

25     prestige.  Successful executive; his son was at Columbia, an

1    Ivy League school.  USC, fine school, but it's USC, it's not

2    M.I.T.  He has no motive to commit fraud.

3         He has this conversation with his trusted counselor

4    who he had known for the guy's help with his son.  That's how

5    he gets involved in this.

6         So let me begin where I started this case, all right.

7    He is, in fact, presumed innocent, not just a figure of speech,

8    it's the law.  He's presumed innocent.  And he actually is

9    innocent in this case.  He never agrees with Rick Singer to

11:23 10    bribe anyone at USC, and he never agrees with Rick Singer to

11    defraud USC with some phoney athletic profile that he never

12    saw.

13         And that's what a conspiracy is, an agreement with two

14    or more people to do something illegally.  He didn't agree with

15    Singer on that.  Of course, we never heard from Singer.

16         The government has failed to meet its burden of proof

17    in this case.  They have the burden of proof, not the defense.

18    I don't have to present witnesses; they do.

19         The beyond a reasonable doubt standard is the highest

11:23 20    burden of proof in the law.  This is not some civil case where

21    people are fighting about money and it can be more likely than

22    not and people can recover money.  This is a criminal case.

23    It's the highest standard in the law.  It's not may be guilty,

24    it's not probably guilty.  No, no, no.  It has to be beyond a

25    reasonable doubt.  And they simply haven't proven that in this

```
 1    case.

 2            All they've got are these two setup tapes where

 3    they're trying to frame the guy well after the fact that his

 4    daughter is in school.  They don't have him on wiretaps.  They

 5    have nothing.  That's why they're talking about these -- I'll

 6    get to the exhibits in a moment and I'll get to the transcripts

 7    in a moment.  But they're trying to cherry-pick things here and

 8    there and make it look like he did something wrong, and he

 9    didn't.

11:24 10           They're the ones -- they say Rick Singer is our

11    witness.  He's not our witness.

12            They have the burden of proof.  You heard from Agents

13    Brown and Keating, Singer was recently here.  This case is

14    about choices, and the government chose not to present him.

15            In fact, why don't we just count up the number of

16    government trial witnesses who actually spoke to my client.

17    Okay, let's count them up.

18            How about zero?  I mean, what kind of case is this?

19    What kind of prosecution is this, where the government brings

11:25 20    two felony charges against somebody and they don't have one

21    trial witness who met with or spoke with the supposed

22    perpetrator.  It's crazy.

23            They have these two little tapes from a guy they don't

24    call to trial.

25            I mean, they spent about -- there are four skilled
```

1    prosecutors here trying to put Gamal Abdelaziz -- convict him

2    of two crimes and they took the time and resources to locate a

3    high school yearbook.  They chose to present a high school

4    yearbook to you on an issue we don't even dispute.  We're not

5    saying she was the next coming of Lebron.  That's not what he

6    thought.

7         He was asked:  "Does she play a sport?"

8         USC has this thing, you can be a practice player, team

9    manager; make a donation, it helps her get in.

11:25 10    There's no guarantee.  In fact, that's why I showed

11    you those stipulations from Chapman University and the SAT.

12         Quickly look at those again.  Might not have been

13    readily apparent why I was reading those to you the other day.

14         You know, she goes and takes the SAT three different

15    times.

16         In December, he's saying, Oh, they're lying to a

17    counselor about she doesn't want to apply in December.  She's

18    still taking the SATs.  She took a third SAT.  The records of

19    the College Board reflect that she took it three different

11:26 20    times, okay.

21         She also comes back to L.A.  They're out in Hong Kong,

22    16 hours away.  She flies back to do a tour of Chapman

23    University, also in Southern California; she gets in.  Who does

24    that if you think you have a guarantee?  There's no guarantee.

25    She gets this likely letter and they still come back, because

|   |   |
|---|---|
| 1 | in his mind there's no guarantee.  He's not going to be some |
| 2 | crazy man, have his daughter take the SATs again, fly 16 hours. |
| 3 | So bear that in mind.  But also bear in mind this: |
| 4 | It is their burden of proof, and, you know, why don't |
| 5 | they call Singer? |
| 6 | Throughout this trial those empty chairs have been |
| 7 | over there.  Those empty chairs signify Singer.  There it is. |
| 8 | Empty chair. |
| 9 | What happens if Singer gets called as a trial witness |
| 11:27 10 | by the government?  You know what happens.  You know what |
| 11 | happens. |
| 12 | I get to cross-examine him. |
| 13 | I get to say to him, Good morning, Mr. Singer, nice of |
| 14 | you to join us.  Nice of you to take time off from surfing and |
| 15 | paddle boarding in Southern California, whatever you do this |
| 16 | time of year. |
| 17 | We're at a federal trial here.  A man's liberty is at |
| 18 | stake, so I'm going to ask you a few questions, Mr. Singer. |
| 19 | Mr. Singer, you never told Gamal Abdelaziz he had to |
| 11:27 20 | bribe someone, did you? |
| 21 | You never told Gamal Abdelaziz that he had to submit a |
| 22 | phony profile to USC, did you? |
| 23 | No. |
| 24 | You knew he trusted you, right? |
| 25 | You knew that he trusted you because you had helped |

1    his son, Adam.

2         And you knew he was an easy mark.  He had donated

3    $200,000 to Columbia.  You knew that, Mr. Singer, didn't you?

4         Yeah, yeah.

5         And you told him if he made a donation, it would help

6    his daughter get in.  She could be a practice player, she could

7    be a team manager, that's the type of thing you say, right,

8    Mr. Singer?

9         That's your old pitch, donate to the program.

11:28 10         You're not telling this guy, who's flying back and

11    forth to the United States, working 15 hours a day, you're not

12    telling him this is a bribery scheme, this is a nationwide

13    crime I'd like you to join.

14         No, no.  You took advantage of him, didn't you,

15    Mr. Singer?

16         You made a lot of money on this deal, didn't you?

17         Yes, I did.

18         Now, of course, they didn't call him.  Avoid questions

19    like that.  The case would fall apart.  It was bad enough as it

11:28 20    was.  They bring him in here, he'd get torn apart and he'd be

21    exposed.  He'd be exposed to what really happened between him

22    and Gamal.

23         Of course they don't have any interceptions of what

24    really happened in February 2017, that's when they had this

25    discussion, not 18 months later.

1             In fact, let's look at some of these exhibits.

2             I want to show you some exhibits to show his state of

3    mind, Gamal's state of mind.  What's going on when he's talking

4    to Singer, because, again, they have to prove that he joined,

5    knowingly joined a conspiracy, the one they charged in this

6    case, not some other situation.

7             If the government can't -- the government has to prove

8    what he did, what he was thinking, his state of mind, nobody

9    else's.

11:29 10          This trial has gone on so long, my eyes have gotten

11   worse; I'm going to use these.

12            So let's go with Exhibit 272.

13            Here it is.  Back in February of 2017.  They had this

14   discussion.  I've attached Sabrina's basketball photos as

15   discussed.  He apologized that they're not professional

16   pictures, but you'll recognize Sabrina from an MVP picture.

17   You can use ones you find suitable.  Okay.

18            Now, this is not from a man who thinks he's in some

19   scheme.  The government doesn't know when he found out that his

11:30 20   daughter wasn't playing hoops anymore.  The government doesn't

21   know his daughter's medical history.  They don't know a lot of

22   things.  They don't know what he did after that second phone

23   call, whether he checked why didn't she show up, she's supposed

24   to be a practice player, she's supposed to be a manager, you

25   got to show up.

```
 1              But here, you can see back in February of 2017, she's
 2      getting pictures.  Singer asked him, Get me some pictures.
 3              Now, what else is going on in Gamal's mind?
 4              Well, he thinks it's a legitimate charity.  His son
 5      had gone on a trip with Singer.
 6              Look at picture 1364, Exhibit 1364.
 7              This is why somebody like Gamal might actually think
 8      it's a legitimate charity.
 9              And for Gamal, busy guy, he's proud of his daughter.
11:31 10  When he's asked has she played a sport, yes, yes, she has
11      played a sport, it's called basketball.
12              Look at Exhibit 1168.  Okay.
13              As the government helpfully pointed out, I think
14      that's a most valuable player award she won, 10th grade.
15              So when he's having these discussions back in February
16      of 2017, it's not unreasonable for him to say, Yes, she's
17      played a sport in high school, basketball.  Get me some
18      pictures.  Okay, he gets some pictures.
19              And, as we've stipulated, agreed, look at 9068, or
11:31 20  call it up.  It's not in evidence, it's a stipulation.  This is
21      by agreement.  We all know he donated 200 grand to Columbia.
22      Now, that's a ton of money.  Most people give $100, $50 if
23      their college asks for money, but he was fortunate to have made
24      it.  That can't be held against him.
25              Okay.  That's also his mindset.  It doesn't seem crazy
```

when Singer says, You got to donate to USC, too.  Donated for

his son, okay, donate for my daughter.

There's no guarantee here.  There's no bribery scheme

that's explained to him.  He doesn't know what's going on in

USC's Subco process, some internal process.  How is he supposed

to know that?  He's a guy working all the time, talking to a

guy who he thinks is a friend, who he had experience with as a

good college counselor.

And that's why -- you know, that's his mindset back in

February of 2017.  They haven't proven otherwise.  Again, they

got no wiretaps.  They don't even have Singer to tell you what

was agreed to.  And they have to show what he agreed to with

Singer, not somebody else.  There's no agreements between him

and anybody else.

And let's be clear, there's no guilt by association

allowed here.  You can't just say, Oh, these other parents did

something, so he must have done it.  No, no.  It's what was in

his mind, not Bruce Isackson or some New York lawyer that was

paying someone to take a test.

There's no test cheating involved with him.  There's

no class taking involved with him.  It's totally separate from

what they're talking about, this nationwide conspiracy with

mysterious corrupt insiders that he doesn't know anything

about.

And let's not forget, what did Agent Keating say

multiple times, multiple times was the old pitch:  It would be
a donation to a program.  That doesn't sound so bad for a guy
like him.  Okay, it's a donation to a program.

What was he saying?  The kids could be practice
players or team managers.  That's what he said.

Look, look at 607.  Even on the Isackson tape he's
caught -- this is a thing he does, he says practice players,
practice players.  It's Exhibit 607.

And managers.  Look at Exhibit 711 (sic.), excerpt.

11:34  Exhibit 7011.  These are testimonials on his website,
kids thanking him for being managers.

So that's why -- that's why the agents were desperate
to say you have to be more explicit, because what you're
telling these people is legitimate.  When you're telling a guy
like him, it sounds legitimate, so it goes to his intent.

He has to have a corrupt intent for a quid pro quo to
be illegal.

Now, we know that Singer, at some point, he increases
his request from 200 grand to 300 grand.  Take a look at
11:35  Exhibit 448.

A little note he writes to himself.  "200 is going to
USC, the extra hundred is going to The Key, something Gamal, at
least from his perspective, thinks is legit.

And this is where Singer decides I can get another 100
grand out of the guy.  Of course he took all 300, unbeknownst

1    to Gamal.  Gamal never agreed to donate 300 grand to Singer's

2    pocket.

3            And when Singer tells him it's going to the Galen

4    Center, that's a real place.  It's not a made up place.  Donna

5    Heinel doesn't control the Galen Center.  Some corrupt insider

6    doesn't control the sports arena.  It's where they play hoops

7    at USC.  It seems legit.

8            So for a guy who is presumed innocent, that's not

9    proof beyond a reasonable doubt that he was involved in some

11:36 10   scheme.

11           And there was another stipulation that I read to you

12   where the parties agreed that nothing was misappropriated from

13   the Galen Center account or the women's athletic board account.

14   I read it to you.

15           This guy from USC, if he had been called to testify,

16   would have said there's no reason to believe there are any

17   expenditures, debits or transfers from the USC women's athletic

18   board account or the USC Galen Center gift account to any USC

19   employee personally for any purpose unrelated to their

11:36 20   employment at USC.

21           Nothing inappropriate, apparently, was done in these

22   accounts.

23           So what is the government talking about?  Heinel

24   didn't start taking money until the summer of '18, well after,

25   months after Gamal made his donation.

 1           In fact, this whole thing with Heinel is a bit crazy.

 2   They've conceded that he doesn't know Heinel, right, and

 3   they've conceded that Heinel never took any money personally.

 4           Look at Exhibit 1563A.  This is a pleading in this

 5   case.

 6           The government was not attempting to build a case that

 7   parents understood Heinel to be personally pocketing money, and

 8   the government has never alleged that.

 9           Well, good, glad they cleared that up.  Sure sounded

11:37 10   like that was their theory at the beginning of this case.

11           How about Exhibit 9025.  This is under oath by an FBI

12   agent.  She was the case agent.  She was someone else they

13   couldn't bother to bring to court.  Actually, they brought her

14   to court, she was in the spectator section earlier in the

15   trial, she was in the spectator section for the government's

16   closing, but they don't put her on the stand; no, they put on

17   an agent who had very little to do with the case to read some

18   e-mails.  We'll get to that in a moment.

19           Anyway, we got this exhibit into evidence, and it

11:38 20   shows you that Agent Smith, when she's filling out a wiretap

21   application, she told the court, Up until the summer of 2018, I

22   believe that all the money Singer provided to Heinel for her

23   assistance went to USC athletic programs.  Okay.  Where's the

24   crime?

25           However, in July of 2018, Heinel creates this company

**A3697**

1    called Clear the Clearinghouse and bank records have shown that

2    Singer, not Aziz, has directed $40,000 to this company in the

3    last two months indicating that Heinel may now, may now be

4    receiving bribe payments.

5         Okay.  That is a critical admission.  It is something

6    that they are trying to gloss over because it shows Gamal

7    couldn't have been bribing Donna Heinel, who he didn't know, if

8    he wanted to; she wasn't taking bribes until the summer of

9    2018.  He has his discussion in February of 2017, doesn't know

11:39 10   her.  She doesn't go bad, apparently, until the summer of 2018.

11        Now, you know, the government, you know, makes much

12   ado about what's going on at USC.  What's he know about the

13   internal workings of USC?  We know there was pressure at USC to

14   raise money.  They had a $6 billion fund-raising campaign;

15   that's serious money no matter how you cut it.  And we know

16   that the USC athletic director, the guy in charge, was

17   commending Heinel for raising money in 2014 and 2015, her

18   performance reviews.  We know that.

19        And we know that Laura Janke told you at USC there

11:39 20   were two ways to keep your job: win or bring in money.  Okay.

21        So what USC was telling one another, it's irrelevant

22   to Abdelaziz.  Who knows what the real requirement was at USC

23   athletic department.  If the USC athletic department is not

24   telling the USC admissions department what is going on, how is

25   he supposed to know?  He doesn't know anything about the Subco

process or the VIPs at the admissions office, so whatever is

happening at USC suggested at least that Heinel was doing --

            (Court reporter interrupted, technical difficulties.)

            THE COURT:  Okay, Mr. Kelly, you may continue.

            MR. KELLY:  No problem.

            By the way, the government pointed to one exhibit in

their opening -- I'm sorry, in their closing -- Exhibit 330, as

if that was in and of itself proof of a crime.

            Well, if you're going to look at that when you

deliberate, look at 329 as well, because that's where Janke

wrote that note, If you don't have this, I'll create one.  And

he gets cut off when he sends 330 to Gamal.

            So it's just proof Singer cuts it off because he's

keeping it from Gamal.  He's hiding it from Gamal because Gamal

is not on in this little side deal.

            They talk about side door, side door.  No, Singer has

a side deal going that he doesn't tell Gamal about.  So bear

that in mind.

            If you're going to look at 330, look at it in context

with at 329, what is cut off.  He could have forwarded 329 but

he doesn't, he doesn't because he knows that Gamal is not a

part of this.

            Now, let's keep talking a little bit about Heinel,

okay.  This whole Heinel business is really outrageous.

They're trying to smear Abdelaziz and frame him for something

 1    he didn't do.  I don't say that lightly.  Look at what goes on

 2    here.

 3          Singer, at the request of the agents, all right,

 4    that's according to him, request of somebody -- look at 721.

 5    Okay.  We know Heinel goes bad in the summer of '18, according

 6    to the government's theory, right?  Again, months and months

 7    after Gamal made his donation.

 8          But that one I've got circled there, November 15th,

 9    that's the one where Abdelaziz's name magically appears.  This

11:44 10    is backdating an invoice, backdating an invoice to set up

11    Gamal.  Gamal has got nothing to do with this invoice.

12          Let's look at the next exhibit, 596A.  Okay.  That's

13    where the name appears.  Singer, Heinel -- who knows who's

14    behind it, but that's not anything Gamal had anything to do

15    with it.  It's made to look -- it's designed to make him look

16    guilty of something he didn't do.  That right there, they're

17    backdating an invoice, sticking on Gamal Abdelaziz's name to

18    make it look like he did something, okay.

19          Because we know, we know at this trial -- look at the

11:44 20    date here, it's November 1st of 2018.  We know from this trial

21    that the day before, Halloween, Singer had told the agents that

22    Gamal didn't even know Donna Heinel.  We know that from the

23    testimony in the case.  There's multiple times where Agent

24    Keating said that in the transcript.

25          Let's go to that, please.

```
 1              So here's some testimony.

 2              All right.

 3              "How about Donna Heinel?  You have no evidence that he

 4      ever knew of Heinel before those two calls either, do you?

 5              "A.  Mr. Singer told us at some point that

 6      Mr. Abdelaziz did not know the name Donna Heinel.

 7              Question to Keating:  "Yeah isn't there a report of

 8      one of your first meetings with Singer where Singer said Gamal

 9      and his wife thought their money with respect to Sabrina was

11:45 10      going to the school?

11              "A.  I don't remember if it was one of the first

12      reports, but I remember Mr. Singer saying that the payment was

13      going to USC.

14              "Q.  The school, correct?

15              "A.  Yes.

16              "Q.  But then when -- you also remember Singer told

17      you Gamal didn't know who Donna Heinel was, correct?

18              "A.  Correct."

19              "Well, he didn't know who Donna Heinel was, that's

11:46 20      correct, right?"

21              "We didn't find out until after the call."

22              Remember, the call is on October 25th, 25th.

23              "When you made that call, you knew for sure he had

24      never heard of Donna Heinel, right?

25              "No, Mr. Singer didn't tell us until after the call.
```

1          So he's injecting this name, all this gibberish onto

2     that first call, Abdelaziz doesn't even know who she is.

3          "Okay, okay.  After the call, like six days later" --

4     six days later, Halloween, 2018 -- "he doesn't know who Donna

5     Heinel was, correct?

6          "Correct."

7          And yet, on November 1st, they're throwing the

8     Abdelaziz name onto that invoice.  How is that fair?  How is

9     that proof of anything beyond a reasonable doubt except that

11:46 10     they're desperate to set up this guy, Gamal.  That's what

11    they're doing here.

12          In fact, look at Exhibits 13 and 714 side by side.

13    Okay.  They're basically the same thing.  This is the Singer

14    note, whether it's to himself like it's a diary or it's to his

15    lawyer, I guess the theory he's lying to himself or he's lying

16    to his lawyer, who cares?  What it shows is that it shows

17    Singer's state of mind.  It shows he's saying, Spoke to Donna

18    Heinel.

19          Look at this -- I'm pointing to the bottom -- as

11:47 20     requested by agents, asked her to put detail on her 20K

21    invoices being sent to the Foundation.

22          They concoct this little side deal to set up Gamal,

23    and they stick Gamal Abdelaziz's name on an invoice.  He's got

24    nothing to do with it.  They're backdating the invoice to frame

25    him, okay?

```
 1              And then you have up above on the same note -- this is

 2     a very important note, whether you look at 13 or 714 in the

 3     jury room when you deliberate, this is like the little decoding

 4     device, the top one.  This is how you look at what he's doing

 5     when he made those two calls to Gamal, because, in Singer's

 6     mind, look what he says.

 7              He says -- he claims he had a loud and abrasive call

 8     with agents.  They continue to ask me to tell a fib and not

 9     restate what I told my clients as to where their money was

11:48 10    going, to the program, not the coach, and that it was a

11     donation, and they wanted it to be a payment because it makes

12     it look like something illegal.

13              I asked for a script if they want me to ask questions

14     and retrieve questions that are not accurate to the way I

15     should be asking the questions.

16              Essentially, they're asking me to bend the truth,

17     which is what they asked me not to do when working with the

18     agents and Eric Rosen.

19              Liz raised her voice to me like she did in the hotel

11:48 20    room this time about asking each person to agree to a lie I was

21     telling them.

22              This is his mindset.  What he's telling Gamal is all

23     nonsense, and he's trying to frame him and set him up.

24              So the government goes back to those two tapes, but of

25     course they only show you a little bit, they cherry-pick.  You
```

```
 1    guys can listen to the whole thing.

 2           That first tape is October 25th of 2018.  He's in --

 3    Gamal hasn't heard from Singer in months.  His daughter is

 4    already at USC where, apparently, she's doing quite well,

 5    getting As and she's due to graduate in the spring.

 6           So he gets called out of the blue and there's a lot of

 7    talk initially about general chitchat two friends or a trusted

 8    adviser would have.  This is all about Adam.  He's concerned

 9    about his son, Adam, and some of the difficulties he's had.
```
11:49 10    And he references Columbia.  Again, Singer knows this guy gave
```
11    a lot of money to Columbia.

12           Gamal goes back and forth, how he's too busy in China,

13    he just landed in China, didn't even have time to discuss

14    things with his own son about some business proposition.

15           But that's the context of this quick call out of the

16    blue to Gamal.  Right?

17           And then, what does he do?  Singer tells him this

18    audit thing.  Oh, my foundation is being audited.

19           Now, Gamal doesn't panic.  His heart isn't dropping
```
11:50 20    like Mr. Isackson.  He yeses him to death, yes, yes, yes, yes.
```
21    There's a series of questions.  Listen to it in there.

22           My foundation, we're getting audited right now.  Yes.

23           It's typical, they're looking at all my payments.

24    Yes.

25           They've come into my foundation, they asked me about
```

```
 1   the $300,000 payment.  Yes, that was made, yes.
 2        Okay.  He's not driving off the road because Singer's
 3   foundation is getting audited.  He's worried about his friend.
 4   Is his friend in trouble with the IRS?
 5        Then Singer drops this nonsense statement into the
 6   record.  You can listen that, too.  There's a pause.  He's
 7   like, what is he talking about?
 8        Then he says, You're okay with me not telling that to
 9   the IRS.  Of course.
10        Of course because it makes no sense.  He's never heard
11   of this woman; he doesn't know what he's talking about.  Why
12   would he say that to the IRS?  If Singer is being audited, it
13   does make no sense.
14        And then they go back to the Foundation.  His intent
15   was to donate to the Foundation obviously.
16        And from there, from there obviously USC.
17        But, apparently, Singer's in trouble for -- he wants
18   to claim the whole 300.  Singer is getting audited.
19        So, okay.  So if Singer is in trouble, you know -- for
20   Gamal it's a 300,000 donation either way.  They're both
21   501(c)(3)s.  If they're split up, it's a donation.  So that's
22   the context of this conversation.
23        He says -- Gamal says to him, Is there anything I can
24   do to help?  He doesn't think he's in trouble for anything.
25        So -- and he's not charged with any tax crimes.
```

1          So this tax business is just a nonsense rouse, as they

2     say, or trick, to try to get him to say something that doesn't

3     make sense.

4          Then Singer goes back to Donna Heinel, gives her a

5     title because he's never heard of her.

6          And then he says they ran a fire alarm.  It's a very

7     confusing message.

8          In the middle.

9          Well, she called him, Singer, to compliment him on the

11:51 10    profile he did for Sabrina.  So he's fishing for a compliment

11     from his client, Gamal.

12          He says, I love it.  He does say I love it a thousand

13     times a day, ten times a day, whatever it may be.

14          So this is not proof beyond a reasonable doubt of

15     anything.  He goes back to his son again.

16          You know why it's not proof beyond a reasonable doubt,

17     they have to go back two-and-a-half months later.

18          Gamal doesn't call Singer, but the government was

19     desperate to get some evidence; they don't have it.  So they

11:52 20    get back with this new -- this second call in January of 2019.

21     Again, Sabrina is already in school, it's well after the fact.

22     As a matter of law, you cannot conspire with a government

23     agent.  At this time he's a government agent.  So the

24     government is saying, Well, this is not the conspiracy, it's

25     evidence of a past conspiracy.

1          Well, here, they do panic him a little bit.  They tell

2     him his daughter's in trouble, that the admission's person

3     called.  But, again, they first start talking about Adam, it's

4     always about Adam.  That's the focus.  Listen to the whole

5     thing.

6          Again, a second call out of the blue.

7          And what happens?  He's worried and distracted about

8     his daughter.  He starts -- and Singer starts dropping side

9     door, side door into it, because, apparently, they think that's

11:53 10   per se illegal, some magic phrase.  It's not.  He never heard

11     it before; there's no evidence he had.

12          So he gets worried when they talk about why are they

13     asking her to show up?  He doesn't say -- you know, Mr. Frank

14     suggested all these things he could have said.  He didn't say,

15     Wait a minute, he thinks she has to show up.  He thinks she has

16     to be a practice player or team manager and to do that you got

17     to show up.  So why is he worried?  She didn't show up.

18          If he thought he bribed USC, why would she have to

19     show up?  Why doesn't he say, What are you talking about?  This

11:53 20   was a big scam, Rick.  Because in his mind it's not, he thinks

21     it's legit; he thinks his daughter is in trouble.

22          And the government doesn't show what Gamal did after

23     this call, what investigation he made because he thought she

24     had to show up.  They haven't presented evidence like that.

25          And so that's why these two tapes don't do it for

```
 1    them.

 2              So they start talking about these e-mails that mean

 3    nothing.

 4              Let's go through some of these e-mails.

 5              First e-mail is Exhibit 334.  Okay.  This is Singer in

 6    July telling Gamal, I need an action photo or two of Sabrina

 7    playing basketball.  He says, Got it.  All right, that's on

 8    July 27th.

 9              Then there are five e-mails in a row.  Okay.  One 338,

10    339, 340, 341, 342.

11              Take a look at those.  There are five pictures in two

12    minutes.

13              So he's just flipping pictures to the guy.  Right?

14              And then they think -- the government thinks they have

15    their big moment, Exhibit 345.

16              Let's see the actual 345, please.

17              It's a blank page.  Look at the top.  The whole thing

18    is blank.

19              Singer:  We'll use this one.

20              Gamal doesn't reply.

21              There's no picture attached to this one.

22              He doesn't say, Wow, that's a beautiful picture of my

23    daughter, what a smile.

24              There's nothing there.  It's just this JPEG that the

25    agent talked about.
```

1    No one memorizes JPEG numbers.  It's crazy.

2    You flip through five pictures.  Singer says, We'll

3    use this one because the girls happens to be dribbling the

4    ball.

5    She's got glasses on; it's not even his kid.  But he's

6    not looking at JPEG numbers and have them memorized.

7    So they're trying to suggest this is somehow sinister;

8    it's not.

9    In fact, what happens a little while later, Exhibit

11:55 10    549.  Gamal sends him a whole bunch of pictures from Hong Kong,

11    about a month later.  Amateur photos a parent would take of a

12    kid playing hoops.  There's no intent to give phony pictures of

13    someone else playing basketball.

14    Singer chose a girl with glasses.  He didn't say, Use

15    somebody different.

16    And look what happens -- so look what happened at

17    Subco.  Exhibit 381.

18    They use a different girl altogether.  So it's not

19    even material, it doesn't even matter the girl with glasses.

11:56 20    It's all smoke and mirrors.  They're trying to

21    buttress a weak case.  They know these two setup calls don't do

22    it, so they're trying to suggest this e-mail stuff matters.

23    Look on this thing that went to Subco, the e-mail and

24    the phone, those are her dad's.  They're not hers.  When Janke

25    asked for the daughter's e-mail and phone, Singer never got it

```
 1    because he never talked to Gamal about it.

 2            That's what leads us to the big e-mail with the

 3    athletic profile.  It's the key to the government's fraud part.

 4            Let's go to 352.

 5            This is the whole ball game for the government, and

 6    they've botched it badly, and here's why.

 7            Look at Exhibit 352.  It's on August 8th.  This is

 8    from Janke to Singer.

 9            See, look below.  They're looking for Sabrina's

11:57 10   e-mail, phone; as you just saw, they never got it.

11            It goes to Singer, sends it to Gamal at the cox.net

12    address.  Okay?  Remember that.  It goes to the cox.net

13    address.

14            But then, there were two more e-mails, two more that

15    the government chose not to show the FBI agent.

16            The FBI agent takes the stand.  They hide it from him.

17    Because if they hide it from him, you're not going to see it

18    either.

19            Here's the other two -- so all they show the FBI agent

11:57 20   is this one, okay?  There are two more you have to look at in

21    context.

22            And the poor FBI agent.  He's caught unaware.  He's on

23    the witness stand.  He hasn't been shown this by the

24    government.  The defense lawyer has got to show it to him.

25    It's nuts.
```

**A3710**

1          So look at this.  9024 is the away message or the

2     bounce back I was calling it.

3          But it says, Please be advised I've changed my e-mail

4     address to gamalaziz797.  So that's up top there.  That's the

5     auto reply from cox.net, that's what Singer gets.

6          So what does Singer try to do?  He tries to send it to

7     the new e-mail address, gamalaziz797.  But he doesn't.  He

8     makes a typo.

9          Look below at Exhibit 351 there.  "Amalaziz."

11:58 10          It's to nowhere.  It's to cyberspace.  No one gets it.

11          Gamal doesn't get it.  They don't show that to the

12     FBI.

13          If they show that to the FBI, he might have to

14     testify.

15          I brought it out on cross-examination:  Why are they

16     hiding this from you?  Let me just tell you what really

17     happened.  No, because they've got a weak case, and they're

18     trying to dress it up with this e-mail from August 8th.

19          In fact, here's what they say to you:

11:58 20          They say, Oh, but we did a search warrant.

21          So what?  They did a search warrant in July 2019,

22     almost two years after that thing was sent.  And the only thing

23     the government can say with any certainty about that cox.net

24     e-mail is that they found it in the Gmail two years later, July

25     2019.

```
 1            They don't have any proof that Gamal ever replied to
 2    it.  They don't have any proof that he ever opened it, and they
 3    don't have any proof that he replied.
 4            In fact, I'll show you what Agent Brown said.
 5            All he testified to is:
 6            "The only thing you know is that on July 1st of 2019,
 7    the FBI served a search warrant and Google reported as of July
 8    2019 there was this e-mail in Gmail.
 9            "But you don't know how it got there, right?
10            "That's a fair statement, right.
11            "Right."
12            Even the FBI could draw no conclusions, and they want
13    you, a jury, to draw conclusions.
14            The agent, Agent Brown, he said he consulted with the
15    FBI forensics team.  That's probably the best in the world.
16    They can't figure it out.
17            How does the government expect you to convict a man
18    beyond a reasonable doubt based upon this supposed fraud?
19            It never got to him.
20            They want to you speculate and convict this man for a
21    fraud, even though the FBI can't draw any conclusions.  It's
22    crazy.
23            I mean, they have guesses.
24            You know what, here's a guess, too.  How about when a
25    man gets indicted in March of 2019, months -- several months
```

```
 1    before the search warrant, he checks all his devices.  I bet he

 2    checks all his e-mail addresses and then things migrate into

 3    your Gmail account.

 4         How about that for a guess?  That's probably a pretty

 5    good guess.

 6         But you shouldn't be out here guessing.  The

 7    government wants you to guess -- first they don't show it to

 8    you, then they want you to guess.

 9         Look at excerpt to what Agent Brown said.

10    I asked him:

11         "You have no idea how that ended up in his Gmail, do

12    you?

13         "We have thoughts on how it could have, but I do not

14    know with certainty how it did, no.

15         "Right.  A lot of different thoughts or ideas but no

16    certainty, correct?

17         "Discussed two possibilities with our forensics team,

18    but they're just possibilities, I don't know for sure.

19         "Right.  No conclusions have been drawn, right?

20         "Correct.

21         "There's no evidence he ever replied to this, right?

22         "No.

23         "And there's no evidence that he's ever forwarded

24    this, right?

25         "Not that I've seen, no.
```

(Line 10 marked "12:00"; line 20 marked "12:01")

```
 1          "Okay.  There's no evidence that he ever posed the
 2     attachment to this, is there?
 3          "No."
 4          By the way, do you remember that little question the
 5     government asked of him:  Do you know what auto forwarding is?
 6          And I objected.
 7          He said, Oh, I withdraw that question.
 8          Why was he asking that question if there's no evidence
 9     he ever forwarded?  Why is he trying to mislead the jury in
12:01 10     this case?  Because their case is weak, and he didn't do the
11     crimes he's charged with.
12          There's no fraud here.
13          So let's not forget who's got the burden of proof
14     here.  Not me; they do.
15          They chose not to call Singer as a trial witness.
16     They chose not to call the FBI agent, the case agent who was
17     here as a spectator.
18          They chose not to call any of them from the athletic
19     department except two coaches who don't know anything about
12:01 20     fund-raising.
21          They didn't call anyone from the Trojan Athletic Fund
22     either, which raises money for USC.
23          And they hid evidence from Agent Brown in an effort to
24     hide it from you.
25          But that's not all.  That's not all.
```

1           They also hid evidence from that Mikaela Sanford in an

2    effort to keep that from you.  That's also part of the side

3    deal they wanted to keep from you.

4           Let's walk through that.  Remember that little fiasco

5    with Ms. Sanford?  She spent 15 hours prepping with the

6    government.  We didn't get 15 seconds; they had 15 hours.

7    Okay.

8           And at first on direct exam she appeared to have an

9    answer for every question about every e-mail, spitting out

12:02 10    those answers.  Very well prepared.  Fifteen hours will do

11    that.  Okay.

12           Then there was this one little line on one e-mail.

13    Quick question, quick answer:  "That I don't remember."  Mmm.

14    That's when the red flags go off, when the government witness

15    who's been with them for 15 hours says, "That I don't

16    remember."

17           That's Exhibit 458.

18           That little line in the e-mail:  "I have to confirm a

19    few things with Rick before I can submit."

12:03 20           Prosecutor asked:  Let's look at the response to the

21    next e-mail.

22           You wrote, "I have to confirm a few things with Rick

23    before I can submit."

24           I'm sorry, he asked:

25           "What were you confirming?

```
 1              "A.  That I don't remember."

 2         Okay.  Well, people have failures of memory, but their

 3    memories can be refreshed, as you've seen in this trial.

 4         You can show them the relevant e-mails, how about

 5    that?  How about being refreshed in memory in 15 hours.

 6         No, no, they didn't do it.

 7         She told you, I've been consistent with my position in

 8    court and with the government, I don't remember.

 9         So they choose not to refresh her memory.

12:03 10         But guess what?  What was going on on the side that

11    Gamal did not know about?

12         Well, let's take a look.  Okay.

13         Let's look at 1540.  This is a side e-mail that

14    Sanford doesn't remember; it wasn't shown her.

15         From her to Singer.  "Please send profile for Sabrina

16    Aziz."

17         Okay.  She forgot about that.

18         Let's go to 1254.

19         Singer flips to her, Mikaela, without Gamal being

12:04 20    present, the August 7th profile.  He still hasn't got a new

21    one, it's the same one, it's off in cyberspace, that he sent to

22    Gamal months ago.

23         So here we are in January.  Singer to Mikaela, no

24    Gamal.

25         He's sending it to Mikaela.
```

1          What does she do?  Does she send it to Gamal to make

2     him check for accuracy before it gets submitted to USC?

3     Negative.

4          What happens is 1255.  Boom.

5          Sanford says, "Thanks, will update her app and

6     submit."

7          She's going to update the app with the phony

8     information.

9          Not Gamal.  Gamal is not on this chain.

12:05 10          Why did they cut him out.  If he's involved in some

11    nationwide conspiracy, why not just include him?

12          You know why.  This is a side deal Singer has with his

13    people; this is the way they make money.  Gamal has been

14    suckered.  He doesn't know this is going on.

15          Look at the next exhibit.  The receipt goes right back

16    to Mikaela.  She's the one who did that, not Gamal.

17          And so this is another example of how Singer is

18    exploiting both Gamal in this whole process at USC, this crazy

19    Subco process that Gamal has nothing to do with.

12:05 20          Now, in this case -- let me reference a couple more

21    points here.

22          You know, remember, the proof that Mr. Abdelaziz

23    joined a nationwide conspiracy must be based on evidence of his

24    words and actions, not somebody else, not all these other

25    characters they're talking about; it's got to be him.  It's an

1    individual specific.  He doesn't know anyone else in this case.

2    You've got to judge him alone.  All they got are these two

3    flimsy setup tapes, which they effectively concede are not

4    enough because they're trying to pepper you with this e-mail

5    nonsense, this photo nonsense, stuff that goes into cyberspace

6    that he doesn't see, side deals that is being cut with Sabrina.

7    And they keep talking about quid pro *quos*.

8         Again, a quid pro quo is not illegal in and of itself.

9    There has to be corrupt intent in Gamal's skull.  And you have

12:06 10    to determine if the facts establish that, if there's anything

11   in these e-mails that suggest he's guilty of anything except

12   being a sucker for a guy who is an excellent con man.  Okay.

13   And a guy he trusted and who he thought had a legit charity who

14   helped his own son, a guy who is over there in the empty chair

15   who never bothers to show up as a government trial witness,

16   never gives us a chance at cross-examining him.

17        So I urge you on those two transcripts, don't just

18   cherry-pick the one section they want you to listen, listen to

19   the whole thing.  This guy is caught off guard out of the blue

12:07 20    by a con man who is injecting all sorts of gibberish on this

21   phone call.  There's not multiple wiretaps.  They have those

22   two narrow setup calls.

23        These two charges have been hanging over

24   Mr. Abdelaziz's head like the sword of Damocles for too long

25   here.

**A3718**

1          They don't have the evidence to prove him guilty of

2     these two charges.

3          He did not agree to do anything illegal with Rick

4     Singer.

5          He did not agree to bribe anyone at USC.

6          He did not agree to defraud anyone at USC with some

7     phony baloney athletic profile that he never saw and that he

8     never put together.

9          You're the jury.  You're the only thing that stands in

12:08 10   between the government, who is trying to convict a citizen

11    based upon flimsy evidence like this.  Don't let them do it.

12    Don't let Rick Singer in the empty chair fool you, too.

13          The evidence is not there.  They have not met their

14    burden of proof.  It's their burden, highest burden in the law.

15    Again, not some civil case, not a may be guilty.  This has to

16    be definite, and there's no evidence to suggest he's part of

17    these two nationwide conspiracies.

18          I'm running out of time here, but a couple more points

19    that the Court, not me, will instruct you on the law.  Because

12:08 20   I think I said from the outset, the reasonable doubt can arise

21    from a lack of evidence, not just the evidence you've seen, but

22    the evidence -- a lack of evidence as well.

23          A defendant is never to be convicted on suspicion or

24    conjecture alone, and that's what we have here.  Proof that a

25    defendant like Abdelaziz willfully joined in a criminal

1    agreement must be based upon evidence of his own words and

2    actions, not someone else.

3            And there's two words you need to listen to when the

4    judge gives you these instructions.  Those two words are "good

5    faith."  Because those two words, "good faith," lead to even

6    two better words, "not guilty."  Because if somebody has good

7    faith, if they act in good faith, that's a defense to the

8    charge, because that's in their mind, they think it's legit.

9    That's -- a good faith defense is a defense to the two

12:09 10   conspiracy charges.  Because my client, Mr. Abdelaziz, had no

11   specific intent to do anything wrong.  He just didn't.  He was

12   presumed innocent, and he is innocent.

13           I ask you to be fair when you consider the evidence,

14   consider the exhibits that you have seen, there's a lot of

15   them, take a look at the ones I've pointed to.  I appreciate

16   it, and thank you for your time serving on this jury and your

17   attention.

18           Appreciate it very much.

19           THE COURT:  All right.  For the defendant Wilson,

12:10 20   Mr. Kendall may make his closing arguments.

21           MR. KENDALL:  Your Honor, just to confirm, I believe

22   Mr. Kelly has given me a small gift.

23           THE COURT:  Yes.

24           MR. KENDALL:  About six minutes.

25           THE COURT:  About that, yes.

```
 1            MR. KENDALL:  Thank you.

 2            (Pause.)

 3            MR. KENDALL:  Good afternoon.  On behalf of John

 4   Wilson, his family and his legal team, I want to thank you for

 5   your jury service and your patience.

 6            The first thing I want to do is, as I did with my

 7   opening, not go with my remarks, I want to call up -- if we

 8   could have the Chassin exhibit, please.

 9            Mr. Frank gave this whole speech, quid pro quo, as if

10   it were some terrible, horrible thing, a quid pro quo.  It's

11   this for that.

12            Every government employee in this room is here on a

13   quid pro quo.  They give their time, and they get paid for it.

14   You got a cup of coffee this morning, it was a quid pro quo.

15   You paid for parking, it is a quid pro quo.  A this for that by

16   itself is not a legal problem for my client.

17            That's why I ask you to look at Ms. Chassin's

18   testimony.

19            If you recall, she doesn't work for the athletic

20   department, but they brought her in to talk about what was the

21   obligation that the coaches would owe, though she never spoke

22   to the coaches, she never spoke to Pat Haden, she didn't know

23   what Pat Haden discussed with Tim Brunold about the VIP list

24   and how all the donors' kids were handled.  She knows zero on

25   that topic.
```

**A3721**

1          But what did she testify:

2          "Q.  Are you aware of any rules that restrict when a

3    coach can consider when submitting a walk-on candidate to SUBCO

4    back in 2014?

5          "A.  There are no rules.

6          "Q.  There is nothing that prohibits Coach Vavic from

7    taking into consideration will the parents donate.  If they

8    want to factor that in, like every school does when they're

9    raising money, there's nothing against that."

12:12 10          And what is her response on the VIP questions?

11          "A.  Many of the students are on there because of the

12    hope that they will, you know, contribute to the university

13    financially.  Some are not there for that reason."

14          You know most of the VIPs are there for money and it's

15    taken into consideration.

16          So the mere fact that Mr. Frank likes to use those

17    sort of sinister terms, a quid pro quo, and imply there's

18    something wrong with it, that's not the law.  That's not the

19    facts.

12:13 20          And as he referred to, that's not your common sense in

21    life.

22          So after hearing this case, I think you can see why

23    trial by jury is so fundamental to our legal system and to our

24    freedom in this country.

25          The agents and prosecutors can pick and choose who to

1    indict.  They can use informants to manipulate taped

2    conversations.  They can sanitize their reports to hide

3    exculpatory evidence.  But it's the jury, it's you, who decide

4    if they've truly proven their case beyond a reasonable doubt,

5    whether the evidence is so strong that it excludes all

6    reasonable doubt, a doubt based upon reason, a doubt based upon

7    evidence, a doubt based upon common sense.

8          This burden is particularly important here because, as

9    we'll see, the government picked so many of its witnesses based

12:14 10   upon what the witness did not know.  Chassin had no idea what

11   Brunold and Haden discussed about fund-raising.  She has no

12   idea about the athletic department rules on coaches'

13   recruitment and fund-raising.  We'll get to Casey Moon, him not

14   knowing virtually anything, or at least claiming he didn't

15   know.

16          The prosecutors and agents took one of the most

17   deceptive con men in the country and they let him spend three

18   months on recorded calls and unsupervised texts telling John

19   the side door was a way to make donations that the school

12:14 20   presidents approved and he better be careful because if the

21   development office has heard he made a side door donation,

22   they'd be after him for even more money.  As if we're supposed

23   to believe you're getting a bribe, you're involved in bribes

24   and then the development office will want more money from you.

25   That wasn't John's attitude, and that wasn't his understanding.

1    There is no proof that John ever said false things to
2    any school, only Rick Singer did.
3    The government's case is riddled with contradictions.
4    Even though the evidence shows that Singer repeatedly conned
5    John, made him believe he was running a national side door
6    business and stole his money, the government nevertheless
7    contends that John twice agreed to bribe college officials.
8    John is not part of Singer's con.  There is no evidence, not
9    even a hint, that John figured out Singer's scam.  The truth is
12:15 10    quite simple.  John is Singer's victim not once but twice.
11    What the government claims is that Mr. Singer fooled
12    bankers, businessmen, universities, accountants, the IRS, the
13    FBI, lawyers, even prosecutors, but somehow John figured it out
14    before any of these other people did.
15    You heard from Agent Keating about how the government
16    trusted Singer.  They let him keep his phone so he could delete
17    1,300 text messages.  And you heard from Jeff DeMaio, a
18    sophisticated and honorable financial adviser, about how he
19    trusted Singer, too.
12:16 20    As you review the evidence, I suggest you do two
21    things:  First, as you discuss it in the jury room, start with
22    the facts that are not in dispute.  Take an inventory of things
23    that everybody agrees upon and use that undisputed set of facts
24    as your foundation to make decisions on more disputed issues.
25    And then, second, look at the evidence from John

1     Wilson's perspective.  Before you judge him, you have to look

2     at things as he saw them.  All of the charges require that the

3     government prove beyond any reasonable doubt that John intended

4     to commit fraud and bribery, that he acted knowing he was

5     committing a crime so you must look at things the way he did.

6     Pay particular attention to what John said, not what Singer

7     said, but what did John say.

8             Good faith is a complete defense to every one of these

9     charges.  Rick Singer manipulated and deceived John Wilson for

12:17 10    eight years.  You may think John was naive, even foolish to

11    believe Rick Singer's claims that the presidents of Harvard and

12    Tufts and Brown all endorsed his national side door business

13    and that they were even working with him on it and that the

14    side door had grown to 50 schools across the country with over

15    700 donations and 700 families a year.

16            But if John Wilson believed the stories Mr. Singer

17    told him, and he clearly did, that proves he acted in good

18    faith and you must find him not guilty on every charge.

19            One undisputed fact is that Mr. Singer was a highly

12:18 20    successful college adviser.  Lots of honest people hired him.

21            A second undisputed fact is that when Johnny applied

22    to USC, Mr. Singer always told John that John would be making a

23    legal donation to a university program.

24            Remember Exhibit 13, Mr. Singer's notes that Mr. Kelly

25    just showed you?  Remember what Agent Keating told us on

cross-examination?  This was told to the agents repeatedly by
Mr. Singer, that the parents, including John Wilson, did not
intend to make bribes, were not told they were making bribes,
they thought they were making donations.  But the agents
refused to write it down in their reports.  They made no
written record of it.  You may remember the cross-examination.

"Q.  In fact, to quote your direct -- your
declaration, he said that he usually told clients that the
money was a donation to an athletic program?

"A.  Correct.

"Q.  Not once did any agent write in a report that
Mr. Singer said he didn't tell the parents it was a bribe, he
always told them it was a donation?

"A.  I don't recall that specific statement written
down.

"Q.  Not once in hundreds of pages of interview
reports, correct?

"A.  Correct."

John Wilson never bribed anyone.  As much as they kept
it out of their reports, as much as they didn't write it down,
there is no evidence Mr. Wilson paid money personally to a
coach or knew money was being paid into any coach's pocket.

If he made a donation to USC where there was no rule
prohibiting a parent of an applicant to make a donation, that's
not an illegal quid pro quo.  It may be a legal quid pro quo,

 1    but not an illegal one.

 2         And remember what they put in the Keating affidavit

 3    talking about what they wanted Singer to do:  "We wanted him to

 4    be explicit," and that's the word, "explicit," without any

 5    doubt, without any ambiguity, without anything hidden, without

 6    anything disguised.  "We wanted him to be explicit that the

 7    scheme involved bribes.  The purpose was to ensure" -- remember

 8    the dictionary definition -- "ensure" means to guarantee -- "we

 9    wanted him to be explicit and guarantee for clients who had not

12:20 10   yet committed a crime or were still in the middle of it there

11    would be no possible confusion about their intent."

12         That is not the way they made the tapes with John

13    Wilson.  What Mr. Singer said to John is wholly different from

14    what he said to other parents.  They played the Janavs tapes

15    for you, they played the Isackson stuff.  Mr. Singer never

16    talked to Mr. Wilson that way.  He talked to them in a

17    qualitatively different way.

18         And why is that?  Because, as he told the government,

19    Mr. Wilson always thought he was making a donation to a program

12:20 20   that is undisputed, that's what Keating testified, and his son

21    was a real water polo player who played.

22         So the prosecutors and agents let Mr. Singer

23    repeatedly tell John the side door was legitimate.  They never

24    gave John a fair chance.  All they had to do was one time, just

25    one time all they had to say is, "John, send the money ASAP.

The coach needs to pay his mortgage."  All they had to say to John was, "We need head shots of your daughters so we can make a false sports profile for your daughters.  Is that okay?"

Three-and-a-half months, dozens and dozens of electronic communications, close to 60 minutes of phone calls, they wouldn't ask that question once.  That's the way they spoke to Gordon Kaplan, Nazie Saffari, Bruce Isackson, and so many others.  But they wouldn't dare talk to John that way.

They had one of the world's greatest con men working under their control.  They could have scripted Mr. Singer's comments any way they wanted.  The prosecutors and agents never had Mr. Singer ask John Wilson those explicit questions because they were afraid of the answer.  They were afraid that John would say, No.  And so was Mr. Singer.  He knew John had never put a cent in a coach's pocket, and he knew John would never agree to do that.

That's why I want to call your attention to -- look how much they played tapes of and they talk about people that John never met, that John never agreed to do anything with, that did cheating on tests and other things that John never did.  Why are they bringing in Janavs, and Isackson.

Isackson, isn't he a creep?  A rich, arrogant guy who gets caught and then does anything the government wants him to do to try to keep himself and his wife out of jail.

With that as a context for my remarks, I'd now like to

A3728

1    review the evidence in this case in three sections.

2         First, Johnny's application to USC and John's

3    eight-year relationship with Mr. Singer as a trusted family

4    advisor.

5         Second, John's 2014 tax return.

6         And third, the 2018 tape recordings and other

7    communications.

8         You heard from Jeff DeMaio how John had a great

9    relationship with Ayco, the Goldman Sachs company.  It's a

12:23 10    world renowned tax adviser.  It's a place known for integrity,

11    for quality, for conservatism, the type of place you can rely

12    on and have security in what they do.

13         They provide teams to help high-level executives

14    manage their overscheduled lives.

15         Mr. DeMaio worked on the will and trust where John set

16    up $5 million to go to scholarships for kids at Rensselaer and

17    Harvard whose parents did not go to college, who wanted to

18    study science and math and who had a B average, people that

19    John identified with.

12:23 20         And in addition to setting up this $5 million worth of

21    trust, you heard how he discussed a college counselor with him

22    and Jeff DeMaio recommended Rick Singer because he was one of

23    the best in California.

24         This is the guy that advised Steve Jobs, the founder

25    of Apple; Joe Montana, the Hall of Fame quarterback; various

1    executives at Disney; Under Armour; PIMCO, and many of the most

2    respected businesses in the country.

3            No one was looking for a shortcut when they introduced

4    John to Rick Singer.

5            And Rick Singer did a great job for the family for

6    three years.  The tutors worked with Johnny and he got a 29 on

7    the ACT, which puts him right in the middle 50 percent for

8    non-athletes being admitted to USC.  His board scores were good

9    enough without any athletic consideration for admission to USC.

12:24  10            His grades were from a school that was very tough and

11    he took a lot of AP courses, so his grades were treated as like

12    a 3.87 because of the rigor of the classes he took.

13            You'll recall John e-mailed Mr. Singer twice about the

14    ACT scores, and you see from the tapes, John is very fixated on

15    the kids' scores, their tutoring, what numbers they're getting,

16    what the schools expect.

17            And then John goes to Amsterdam in 2012 to work in

18    Europe, and he leaves Johnny behind.  And Johnny is there after

19    the wife and daughters leave living with friends.

12:25  20            What does he do?  He asks Rick Singer to check in on

21    him, to go visit him, to see how he's doing, to keep him on

22    track with school, to keep him on track with practice.

23            Do you ask a con man, a fraudster, somebody you know

24    is a cheat, to check in on your child, the most precious thing

25    in your life, or do you ask somebody you trust, you respect to

1   do that work, not somebody who is running a major national

2   criminal enterprise.

3        In 2014, USC was taking a large class of red shirt

4   walk-ons for its water polo team.  A lot of athletes had

5   graduated and several had quit after the death of a teammate.

6   They recruited over 20 candidates and 13 were red shirts.  Most

7   were like Andrew Mericle and Johnny, red shirts who had talent

8   but needed time to develop.

9        Remember what Rebecca Chassin said:  The Subco

12:26 10   deferred to the coaches to pick who they wanted to bring in.

11   The Subco mainly was concerned about academic issues.  Johnny

12   was number three in the Subco class for water polo, academics

13   were not an issue.

14        And so what did the government do?  They called Casey

15   Moon.  But let's look at what Casey Moon had to say compared to

16   Johnny's high school coach.

17        Casey Moon gave the list of issues that they looked

18   for, and what did Bowen say?  Bowen was probably the most

19   scrupulously honest witness you had in this whole trial.  You

12:26 20   saw how careful he was, how thoughtful he was.  He didn't want

21   to overstate anything.  He's a grinder with an A-plus speed.

22   If there's one characteristic that's going to catch a water

23   polo coach's eye, if a candidate has A-plus speed and a great

24   work ethic, that's someone worth having as a red shirt on the

25   team to see if you can develop.

1    Johnny wasn't as fast as James Walters, but he was

2  close, and a kid with that speed, with that unassuming grinding

3  work ethic of doing what the coach told him and never

4  complaining is a reasonable person to apply to USC.  Bowen, one

5  of the best high school coaches in the country, supported the

6  application and thought he'd fit in with the team.

7    What did Moon say?  He doesn't remember him.  He

8  thought he had quit the team.  After the first day, he knew

9  nothing about that.  Sounds like Moon was well prepared by the

12:27 10  USC lawyers.

11    But what did you hear from Mr. Mericle and what did

12  you hear from Mr. Walters?  He came, he practiced, he was fast,

13  he kept up with the team.  He got a concussion outside of

14  practice, and he still came to practice and tried to swim, and

15  he got so sick they had to take him to the hospital.  And

16  Walters remembers it because he cleaned up the vomit in the car

17  later that night.

18    Now, maybe Casey Moon doesn't remember that and

19  doesn't remember what Mericle and Walters testified to, that

12:28 20  Johnny was there after he recovered from the worst parts of the

21  concussion, that he was there with the injured players doing

22  all the things during the season, he was with the team

23  continually, and at the end of the season, he was cleared to

24  get back in the pool and starting out with non-contact work but

25  swimming.

```
 1              He was part of the team the whole season.  Why do they
 2     put on a coach who's going to say something that's so contrary
 3     to what the teammates will say?
 4              If we could have the next slide, please.
 5              And you have Coach Bowen.  Read his -- remember his
 6     testimony.  Look at the slide, what it says here.  He tells you
 7     he was good enough to be on that team, there was nothing
 8     inappropriate about recruiting Johnny for that team.  He had
 9     A-plus speed, he had a great work ethic and a great attitude.
12:29 10              The government's whole case really turns on Exhibit
11     88, the profile Mr. Singer submitted to USC.
12              They have to prove John knew the profile was false,
13     knew Singer submitted it, and they have to prove that Vavic
14     relied on it knowing it was false, that Vavic was part of the
15     fraud.
16              They can't show that at all, and they certainly can't
17     prove that beyond a reasonable doubt.
18              First, it's undisputed, John didn't supply any
19     information in that profile, 88, other than the photograph,
12:29 20     which is a genuine photograph.
21              Second, Mr. Singer gave his own false information to
22     Joel Margulies and asked him to write up the profile.
23              So what does the government do?  They cite Exhibit 83.
24     Please write that down and look at it when you're in the jury
25     room.  You know, that's the embellished e-mail.  Jovan has
```

1    Johnny's stuff and asked me to embellish his profile.

2         Look at John Wilson's response.  He isn't talking

3    about the content of the embellished profile.  He's saying,

4    When is the application going to be done?  When is the profile

5    going to be done?  When is the date you're going things

6    completed?  No discussion of the content.

7         And when he refers to the profile, Singer responds to

8    him in Exhibit 83 on page 3:  "The profile, I am assuming you

9    are speaking about Naviance.  I've attached the comment to

12:30 10   Naviance, filled in schools, et cetera."

11        John responds to his comment on a profile being

12   embellished and Singer, for some reason, changes it to a

13   Naviance profile, not a sports profile.

14        There's nothing to put him on notice that

15   "embellished" means something sinister.

16        "Embellished" has two definitions in the dictionary.

17   You can make something look better.  There's embellished blue

18   jeans, you put little embroidery and sparkle on them, that's

19   not a fraud.  Or it can be used to exaggerate things

12:31 20   incorrectly.  But do you think that your trusted family adviser

21   that you trust with your kids is going to use "embellish" in a

22   fraudulent way without any forewarning or without any notice?

23   It's not a good inference.

24        You know, in the law we have a phrase to use when the

25   government tries to rely on a word that has two meanings and

1    can't show which one applies.  We call that reasonable doubt.

2         If there's two different ways to define "embellish"

3    properly and they have no reason to show that the bad one is

4    known to John and understood by John, that is reasonable doubt.

5         The next issue is they cite Exhibit 49.  And that's

6    where John's, you know, asked what exactly would Johnny have to

7    do on the team, what is to be expected.  This is March 27th,

8    before the plan visit to see Vavic and meet the USC team the

9    first week of April.

12:31 10         And so John does have some concerns.  You've heard

11   they had some hulking European guys that are 21-year-old

12   freshmen.  But they also have a bunch of red shirts like Andrew

13   Mericle where Johnny would fit in perfectly.

14         So what does Singer tell him?

15         "They have 42 guys, 20 do not travel but practice, he

16   will be fine.  Bench warming on the fourth time in a row

17   national champion is not bad as a freshman."

18         And what does John say?

19         "I would love him to actually be committed and give it

12:32 20   his best.  I don't want to taint his meeting with USC coach."

21         It's a father's normal concerns and questions, and

22   Rick Singer, for once, tells the truth and gives him an honest

23   explanation.

24         Now, Mr. Frank said something that is flatly wrong,

25   and I suggest he knows the evidence that contradicts what he

1    said.

2         It's Exhibits -- I ask you to write them down -- 711

3    and the 9698.  Those are the e-mails, you may remember, they

4    put 711 before Agent Brown and tried to create the impression

5    that the meeting between John and Mr. Singer when John is

6    flying home from Amsterdam was going to be scheduled for 3:30

7    on Sunday.

8         We had to put in Exhibit 9698, which is the mirror

9    image e-mail, one is from Singer's e-mail set, the other is

12:33 10   from Wilson's e-mail set.  What 9698 shows, which you may

11   remember and Agent Brown testified, is that the dates don't

12   line up.  We have a European date and an American date.

13        So Mr. Frank is trying to make it look like the

14   meeting was on Sunday, but if you look at 9698, you'll remember

15   that the meeting was on Saturday before the profile was sent to

16   John Wilson, before the profile I think was even sent to

17   Mr. Singer.

18        So what is the point of that?  There was no meeting

19   between the two of them when the profile had been sent to John

12:33 20   Wilson.  There's no reason to think that they sat down and

21   discussed it.

22        He does send the e-mail on October 19 with an FYI.

23   John never responds.  And you know when it comes to his

24   children, John sends text messages, he sends e-mails, he is on

25   top of anything Singer sends him.  He's back and forth, back

and forth.  You'll see in the September call Singer even teases

him that he gets so many text messages from John.

There is zero response to the profile, not an e-mail,

not a text message, not a reference to a phone call.  And why

is that so important?

If we could have the profile, please.

There were too many errors in there for John to have

missed if he had read it.  It's got his wrong -- first of all,

it's got the wrong SAT scores.  It doesn't have the 29 ACT.

12:34  That's what John was e-mailing Singer about, calling out

percentile, celebrating the 29 is the 93rd percentile.  That's

a magic number for USC admissions.  It puts him in the middle

50 percent.

It lists Jack Bowen as a Stanford coach when he's not.

It doesn't list Jack Bowen's SoPen club, and it has the wrong

street address.  It doesn't have the Alcatraz swim that's a

very big thing in the Wilson family.

The point being, if John Wilson had seen this, he

would have recognized at least one of these errors.  He

12:35  probably would have recognized all of these errors, and he

wasn't going to let it go out without correcting errors.

And it doesn't have a lot of the true credentials that

Johnny has.  Johnny is somebody who got CCS recognitions.  He

got all-league recognitions both before and after the date of

this e-mail.  You know, Johnny's credentials are not as good as

1    on that profile, but they're good enough to get into USC with

2    Jack Bowen's support.

3         You heard Casey Moon say if Jack Bowen supported

4    somebody, that would be a substantial impact on USC recruiting.

5    And you heard Jack Bowen testify he spoke to probably Coach

6    Pinterik, maybe Coach Moon, and he was very supportive of

7    Johnny going to USC, A-plus speed, great work ethic, a real

8    grinder.  He supported Johnny getting in.

9         So bottom line, that creates, I suggest, substantial

12:36 10   reasonable doubt that John ever saw it, that he would let

11    something go out with so many obvious errors that -- and

12    particularly the ACT scores.  It hurts him to put the lower SAT

13    on the document without the higher SAT.  There would be no

14    reason to do that.  There would be no reason to put Jack Bowen

15    down for a club that he doesn't coach.

16         Finally -- so when you look at the evidence, keep in

17    mind the Wilson family has no secrets.  They took every e-mail

18    the family had over a five-year period, they grabbed all their

19    tax returns.  They wire-tapped, they had recordings.  They put

12:37 20   a vacuum cleaner on this family's communications and data, and

21    they haven't come up with anything better.  They haven't come

22    up with a single response or comment on that profile.  If they

23    had a document, you know that they would have brought it to you

24    and shown you something to corroborate that.

25         The last comment I want to say of that profile is the

government showed Exhibit 712 during Agent Brown's testimony.
It shows that on October 19, about two -- about an hour after
the profile was sent to John, he sent out an e-mail that had
the same picture of the profile.  The government didn't put in
the exhibits, a week later we did, 9901, 9899, and 9902.  The
government didn't want you to see those.  They wanted you to
think there was something special about that e-mail on October
19 with the photo in it from John.  It was part of a whole
series of correspondence about the yearbook page they were
purchasing for Johnny and looking for pictures, wholly
unrelated to the issue of the profile.

And so perhaps the most damning thing and the greatest
source of reasonable doubt on the profile is what happened in
2018.  Think of it from the prosecutor's perspective.  Singer
agrees to be their informant.  They can have him talk to
whoever they want.  They can have him talk as many times as
they want.  They can have them say whatever they want.  For
lots of parents, they had Singer discuss bad acts in the past,
fraudulent things, Isackson, Kaplan, others.

Can we have slide 11, please.

But with respect to John Wilson, they never asked him
anything about Johnny's profile.  They never asked him anything
about false credentials to USC.  All those tapes, all those
text messages, everything that occurred during 2018, not a
reference once to Johnny's profile, to false credentials, to a

```
 1    bribe to Vavic.  They avoided that topic like the plague, and

 2    they did it because Singer was so adamant, Wilson never thought

 3    he was giving a bribe, he always thought it was a donation.

 4    The kid was a real polo player who played.

 5          You know, they could have just settled this whole case

 6    with one question about that profile in all their tapes.  They

 7    didn't leave it out by mistake.  They didn't leave it out

 8    because they didn't have budget.  They left it out because they

 9    knew they would get an answer that they didn't want, an answer

10    that would be showing innocence, not guilt.

11          And even in Exhibit 620, they take Coach Vavic, they

12    have Singer call Vavic.  Again, they don't mention anything

13    about Johnny Wilson to Vavic.  If they thought they were going

14    to catch a fish, don't you think they'd try?

15          Coach Vavic, remember that thing we did for Johnny

16    Wilson?  Not much of a kid and he never showed up and it was a

17    good thing you got the money for your quid pro quo.

18          They said nothing about John Wilson to Vavic.  We have

19    a expression in the legal community when the government avoids

20    asking a question that could lead to an innocent statement:

21    reasonable doubt.

22          If they thought they could get anything of John Wilson

23    on that profile, don't you think they would have asked Vavic or

24    Wilson sometime during those tapes?  It's the most basic issue

25    in this case, it's the most important issue for them, and they
```

**A3740**

didn't even try.

In sum, if the government cannot prove beyond a reasonable doubt that John knew Mr. Singer had exaggerated or lied about Johnny's credentials, then Mr. Wilson had no reason to believe Coach Vavic had done anything wrong. There's no theft of honest services, there's no deception of the Subco that he'd be aware of, and there's no reason to think that Mr. Singer is committing bribery.

Now I want to turn to the issue of the tax returns.

What happens, Singer tells John he wants to pay the money through Singer's organizations. You know he always does that. Oh, there won't be publicity, your kid won't find out.

John has a Sub S corporation, he can take the money out of that, you've heard enough testimony. A Sub S means it's, in effect, his money for tax purposes. There's no skimming out of a corporate account.

We gave you Exhibit I think it's 122 that shows John had $2 million in a Sub S corporation. Anybody who ever manages cash knows you go to the account where the cash is if you need it.

So he says -- what does he say to Singer? Send me a receipt for consulting or whatever. He doesn't care what it's called, whatever. He needs a receipt when he's in Europe to give Debbie Rogers to direct where the money should be transferred, $220,000 out of the Sub S corporation. It's a

1   receipt for accounting purposes, not tax purposes.

2        The only way the government can prove a tax offense is

3   they have to make a particularly high standard that Judge

4   Gorton will instruct you on.  Taxes are complicated.  People

5   make mistakes all the time on a tax return.  In order to make a

6   mistake something criminal, they have to prove more than it's a

7   mistake.  They have to show it's a violation of a known legal

8   duty.  That's a higher level standard of intent than any other

9   charge in this case, a violation of a known legal duty.  They

12:42 10   have to show that John actually knew he had paid a bribe for

11   $220,000, that he was not entitled to deduct that, and he

12   purposefully put it on his tax return deducting it knowing that

13   he was not entitled to do so.

14        If there is negligence or there's mistake, the IRS can

15   go chase him for money in a civil audit, but to make a criminal

16   tax case, they have to show there was a violation of a known

17   legal duty.

18        What do we know?  John filed five different tax

19   returns in 2014:  Holland, California, the U.S., HPC,

12:43 20   everything.  He had to file amended returns for several of

21   those years.  He probably filed nine tax returns for 2014,

22   several hundred pages long.  He had the finest tax preparers

23   you could find doing the work.

24        So what happened?

25        If we could show slide 12, please.

1          John's going to give $100,000 to The Key Foundation,

2     and he does.  He's going to give -- excuse me, going to give

3     $120,000 to The Key Foundation that's going to be used for the

4     benefit of the USC team.  They admit, that's the money Singer

5     stole, John had no idea about it.  And he gives $100,000 to The

6     Key.

7          If we could have the next slide, please.

8          He gets a thank you -- what happens is, he steals the

9     money, he gets a thank you note from USC, the Trojan Athletic

12:44 10     Fund.  He gets a thank you note from The Key Worldwide

11     Foundation.

12          And look at the check that's being used that was

13     invoiced through the expression of consulting.  It's paid to

14     the order of USC men's water polo from the Wilson family.  And

15     he gets a thank you letter.

16          There would be no purpose to intentionally and falsely

17     report this on a tax return as a business expense if you could

18     take it as a charitable deduction.

19          The issue of motive is critical on this tax issue.

12:44 20          There was no tax saving or benefit to John to have it

21     recorded as a business deduction when it was simply a

22     charitable contribution paid to USC with a thank you note from

23     USC.

24          You remember the agent testified that because of some

25     calculation issues it actually might result in a saving of

```
 1    $1,425 on a tax bill that was $966,000.

 2          Now, during that year, John missed his deduction for

 3    the HPC office rent, he overpaid the California income tax and

 4    had to get refunds for $500,000 years later.  What that shows

 5    is John's not real attentive to his taxes.  He makes mistakes.

 6    He was in Europe running around as a CEO of a major company,

 7    and he made some errors.  It doesn't allow him to make false

 8    statements, but it explains that something is not a violation

 9    of a known legal duty.

10          It was a mistake a busy executive who was not

11    following -- could we have the next slide, please -- what was

12    going on.

13          $20,000 of it, that was for expenses.  And you know it

14    was for expenses because in the 2018 tapes, Singer and Wilson

15    specifically discuss Singer was never personally paid for any

16    work for Johnny's donation.  Singer may have taken that $20,000

17    for himself, but John thought it was for expenses.  He never

18    knew it was a payment to Singer.  That's why he keeps saying:

19    You don't get paid for this.  You just do it for your $7,000 a

20    year fee.  Take my Harvard Business School advice, I can tell

21    you how you can make a better cost and production out of this

22    national business that you're running.

23          If we could have the next slide, please.

24          And the next one after that, please.

25          Okay.  And you can see, Debbie Rogers is the one who's
```

12:45 (line 10)
12:46 (line 20)

doing the paperwork on the invoices.  None of the invoices the

government focuses on were ever sent to John.  It was all done

by Debbie in California when John is working in Europe.  He's

delegated it to his bookkeeper.

And what do we see?

If we could have the full slide, please.

He asked her to deal with Singer's bookkeeper to do

it, and then the green is all the sort of tax preparation work

done by tax preparers that John's not involved in.

12:47 10      If we could have the next slide, please.

The whole problem was, and you heard James Nahmes

testify, every year Nahmes cleans up the books at HPC.  He

would go through the audit work and he would reclassify all the

entries.  You may remember we went through his work papers,

Exhibit 134, and these papers you see are the 61 corrections he

made in 2014 to the accounting entries in HPC's books.  And he

testified if somebody had had a copy of that Trojan fund thank

you letter in the records, it would have raised questions, he

would have run it down, and he would have classified it

12:47 20  properly.

Debbie sent a copy of it to John, she did not send a

copy of it to Nahmes.  It was an oversight.

The same year Mr. Nahmes testified he had to reconcile

a $50,000 charitable contribution to Autism Speaks because of

paperwork issues.  It's something he did every year.  This one

1    got overlooked.

2         And you may be skeptical, why this one gets
3    overlooked, this one is the one the government says is the most
4    suspicious.  My response is, what is the motive?  There's no
5    tax benefit to calling this a business deduction when it can so
6    easily be called a charitable deduction.

7         And we know that the only way the government can show
8    that there is a crime, that there's a known violation of a
9    legal duty is if they can show that John actually thought it
12:48 10   was a bribe, knew he couldn't deduct it, and falsely described
11   it on his tax return.  That's the violation of the known legal
12   duty that Agent Ranahan was trying to testify to.

13        But the problem is that conflicts directly with what
14   Agent Keating told us, that Singer kept on telling the
15   government John always thought it was a donation.

16        It's unambiguous, it's undisputed, they
17   repeatedly told -- Singer repeatedly told the government John
18   always thought it was a donation.

19        And what does that mean?  There's no intentional
12:49 20   violation of a known legal duty.  There may be a mistake.  The
21   IRS can bring a civil audit and collect money.  But to have
22   that high level of intent necessary for a criminal tax charge,
23   if John believes it's a donation and doesn't think that it's a
24   bribe, then they cannot show a violation of a known legal duty.

25        And so now we want to turn to the issue of the tapes

that were made in 2018 and that give rise to the claim of

violations involving Stanford and Harvard.

        The prosecutors charge John with eight felony counts,

a lot more than Bruce Isackson ever faced, Mikaela Sanford,

Laura Janke.  Five of these counts are solely about discussions

in the consensual phone calls and text messages in 2018.  And

the question for you is:  Did Rick Singer con, manipulate, and

deceive John only one time when he stole the $120,000 or did he

do it twice?

        The best evidence that Mr. Singer had conned John

about USC comes from Singer's and John's own words.  Mr. Singer

was emphatic in his notes, that's Exhibit 13, which you've seen

many times.  John was a real player who played.  He always told

John that he gave a donation to a program, not a coach.

        You can see how sincerely John believed Mr. Singer

from the wiretap communications before September 21.

        Mr. Frank focused on that September 15 call.  Let's

start out with the text messages before that, September 6 or 7,

where Mr. Singer is saying, I'm coming to meeting the president

of Harvard and Tufts.

        If they're part of a nationwide fraud, if John is a

cynical crook like Bruce Isackson or a cynical guy like Gordon

Kaplan, you need to lie to him and get the credibility that

you're meeting the presidents of Harvard and Tufts to try to

get him to do business with you?

1          Look at the September 15 call.

2          Mr. Singer -- whatever Mr. Singer says, what does John

3     say?  When they talk about his daughter doing crew, John is

4     talking about, Well, they're going to have to get good times.

5     He's talking about what could they realistically expect they'll

6     get for erg scores to show a coach.  He's not talking about

7     falsifying anything.

8          At some point they're talking about being a manager of

9     the team, and John says in many of the tapes, Well, you know,

12:51 10   the one who's a sailor should go to Stanford because she'll

11     know how to be the sailing manager.

12          The little clip that Mr. Frank showed you of him

13     saying a mascot or water boy, he cut off the bottom where they

14     said a manager.  Maybe they bantered about what it would be,

15     but it's repeatedly discussed as being a manager and that the

16     girl who is best equipped to do sailing would be appropriate

17     for Stanford because she would know how to be a manager of a

18     team.

19          How do we know that that's realistic?  Look at

12:52 20   Singer's website.  Do you see -- remember the two testimonials

21     from the two students at UT Austin and SMU thanking Singer for

22     arranging them to be a manager of teams at their colleges?

23          It's not a made-up story.  That was a standard part of

24     what Singer did.

25          Listen to the entire September 15 tape.  Listen to

what John says and you'll see John is not proposing to falsify

credentials, to falsify records.  Singer makes a flip comment

or two, but it's not John's statements.

Also look at the October 15 and the November 29 calls

where John talks about they don't have to be athletes.

Can we have the next slide, please.

Perhaps one of the most compelling things is 10 times

during this three months' period John is offering Singer

business in how he can make more money.  It's a little bit

comical I will admit, but that is what John's perspective, he

can give Singer better advice on how to run his business.

He talks about a pricing model, added service fees,

manage your overall pricing.  He's talking to him like he runs

a legitimate business.  Seven hundred side doors at 50 schools

around the country.  This man has an amazing network of

connections, he ought to run it like a proper business and make

some money on it and not do it for free like John thinks he's

done it for John Wilson.

John is not having conversations like Gordon Kaplan or

Janavs or the others about controlling a room or falsifying or

lying to the IRS or challenging an audit.

And when we pressed Agent Keating about that, why

didn't you treat John like the other parents?  Why did you have

conversations that were not explicit, that do not ensure clear

evidence?  She said, Well, you know, we were concerned that if

we did it that way, John would realize Singer was under
investigation and it would spook him and scare him off.  That's
made up, wholly made up.

Do you think John would ever think that the guy he
trusted with his teenage children was going to be under
investigation?  He simply would have said, No.

And to be honest, it doesn't matter what excuse the
government comes up with.  It doesn't matter what sort of
rationalization they have.  They purposefully treated John
differently.  They never asked him an explicit question, they
allowed Singer for three months to keep him talking, the
president of Harvard, reading admission files at the admissions
offices at Harvard and other schools, you know, pricing for
this, donation, donation, donation.

And what's the issue?  Once in a while he can slip in
a little word, he can say donation, donation ten times in a row
and then slip in something like, Oh, a real sailor, and if John
doesn't catch him every time, that's not an agreement to join a
conspiracy.  That means they know how to play with him.  A
great con man and a bunch of agents can play with a guy and
never give him a straight-up, direct question.  Do you want to
join the conspiracy?  Do you want us to control the room and
cheat, like they said to Gordon Kaplan?  Do you want us to
create fake profiles, like they said to Bruce Isackson?  Or do
they keep on saying, you know, it's legit, it's legal, we'll

discuss pricing later.  The president this, the president of
Brown, the president of Harvard, reading at the files, and then
slip in a little word.

That doesn't show an agreement.  That doesn't show
somebody willfully on his own words on his own behavior joining
a criminal conspiracy.

I suggest to you if Rick Singer and the FBI and the
IRS targeted anybody to play games with, and there was an
eight-year relationship of trust and respect and reliance and
affection and friendship, they could slip in a few words on
anybody.

They never made it a drop dead, easy, clearcut
question:  Do you want to join a criminal conspiracy?  Yes,
they could use different words.  We've got to pay the coach
some cash.  The coach needs money for a mortgage.  The coach
wants to go on vacation.  We're going to have to falsify the
credentials, is that okay with you?

They never once put it in those terms.

If I could have the next slide, please.

The payment to the coach, is there a better example
than that?  What did they say?  First of all, they say you
can't use the word "bribe."  Tell him you want to pay a coach.
So what does Singer do?  We got to pay the coach in the school.

And Wilson responds, "I thought you paid the school.
What do you want me to pay the school for?"

1          And then later when the issue comes up, he says,
2    "Well, the side door has rules and procedures.  If they wanted
3    to make John pick which side he was on, did he want to join a
4    criminal conspiracy or was he going to keep on doing what he
5    thought, just making a donation that was legal and lawful, they
6    should have given him a straightforward choice.  They shouldn't
7    be sort of sneaking around, reassuring him constantly and then
8    every once in a while slip in a little word.

9          We've all had friendships, relationships that go eight
12:57 10    years where we trust people, maybe it's a doctor, maybe it's a
11    car mechanic, maybe it's anybody you deal with at work.  But if
12    you have someone you trust who's been good to your family and
13    you respect for eight years, if they say an oddball comment, if
14    they say something inappropriate, what do you do?  You go back
15    to the eight years of relationship you've had.

16          Remember what Agent Keating said:  We kept on trying
17    to get him to say things more explicit but he'd always go back
18    to the way he had done things in the past, talking about
19    donation, treating it as legal.

12:58 20          Well, don't you think John Wilson did the same?  Don't
21    you think John Wilson was in an eight-year relationship and an
22    eight-year type of communication and set of expectations and
23    didn't have his antenna up?

24          And so why would you expect him to be looking for the
25    one phrase here or there when Singer was constantly reassuring

him?

Here are some of the excerpts we've given you.

Yes, Singer says on October 15th, "I can sell them to somebody.  They're athletic enough to be able to take them."

But then look at all the things on the other side.

"And they don't actually have to do the sport, you're saying?"  Wilson is asking questions, he's not conspiring.

"They can just go and be like the score keeper or water boy or water girl."  Singer says, "Manager, or whatever you want to call them."

Manager, those things, that's what Mr. Frank cut out of the stuff he was showing you, the discussion that they're actually discussing.  They can be manager of the team.

John is never saying, What do I have to make up?  What time are we going to falsify for the erg scores?  What are we going to falsify for this?

And he's saying even though they wouldn't play, he's asking that, he's confirming that.  He's not conspiring with it.

If we could have the next slide, please.

Yes, he has to recruit some real sailors so that Stanford doesn't catch on.  It slipped by John, what can I say? It's not a good phrase, it's not a good expression, but I suggest to you there's not enough notice and intent and discussion and awareness to say that someone joins a criminal

conspiracy because somebody purposefully slips in that phrase

amidst all of the other discussions of Harvard approving it,

the president of Brown, the president of Tufts, reading

admission folders.

And if we could go to the next slide, please.

And here is him telling him why he has to keep it a

secret. "So you don't get hounded for more donations."  And

Singer says, "Don't go to development."

This, I think, is perhaps one of the most important

calls because the one on the bottom occurs on January 3rd,

after the money has been paid.

Look at the highlighted.  "I've had families before

that essentially have gone through the side door and then

because people found out who they were, the development office

calls them, admissions will call them, all trying to get, you

know, donations."

And then you go further down.  "Then people start

saying on the athletic side that since we're going through the

side door and you've already made, you know, two $500,000

contributions, they're going to say so, you know, so why are

you going through athletics, you know, when development has

already been talking to you?"

Could we have the next slide, please.

This is what the government wants us to think John

Wilson was thinking.

**A3754**

```
 1              Look at the left side.  Their story is Mr. Singer is
 2    telling him, "Don't tell them about the bribe you just paid
 3    because they'll come back and development will ask for
 4    legitimate donations."
 5              It's ridiculous.
 6              Look at the blue side.
 7              What are they telling him on January 3rd to further
 8    mislead him that it's a legitimate operation?
 9              "Don't tell them about the donation you've made
10    through the side door, a legitimate donation, they will ask for
11    more donations and they will come after you."
12              Why is Singer spinning that story on January 3rd?
13              And more importantly, as Agent Keating told us, why
14    did they never correct it?
15              Do you remember how many times I asked her -- I was
16    probably a bit redundant but I had to make the point -- why
17    didn't you ever correct any of the lulling stories that
18    Mr. Singer said?  Why didn't you ever go in and tell John,
19    "John, this is not authorized by the presidents of
20    universities.  John, this is not a charitable contribution.
21    John, you didn't make a donation in years past, it was a
22    bribe."
23              Why didn't they ever sort of undo the things that
24    Singer was saying?
25              Keating tried to disown Singer.  You may remember she
```

said, "We wanted him to be more explicit but he wouldn't listen us."

My first question is:  Who runs the investigation?  Is it the FBI or is it Mr. Singer?  Or was it, more importantly, they liked what Singer was doing?  They wanted Singer to give the lulling stories because John could fall asleep and they could slip in a word here or there.  Because if Singer had ever said to John, "John, I got to admit, we've been friends for eight years, I'm sorry, John, but the president of Harvard doesn't approve this, I'm going to have to grease somebody and bribe somebody, the president of Harvard has nothing to do with this," what do you think the answer they would have gotten from John?  And why do you think they didn't ask that question?  And why do you think they kept so much stuff out of their reports that Singer told them?

You know, the notes we have, that's from an October 1st phone call that they had with Singer when they yelled at him over the September 29th phone call with John Wilson.  Why do you think they sort of danced this fine line, slip in a word but never tell John what's really going on?

Is that proof beyond a reasonable doubt?  Is that sort of ensuring explicit statements where there will be no doubt about a person's intent?  Or is that just manipulating the same chump that Singer has been manipulating for the last eight years?

```
 1              I'd like to quickly finish up.

 2              With respect to the witnesses, I talked about Chassin.

 3       You know, she's not the boss, she doesn't talk to anybody.

 4       They picked her because she knew nothing.

 5              What do we say about Casey Moon?  He doesn't know

 6       anything, that's why he was picked.  Either he doesn't know

 7       anything or he'll say he doesn't know anything.  He's the guy

 8       that prepared the witness -- the athletic profile that had the

 9       times they say were so obviously unrealistic anybody should

01:04 10       know.  Casey Moon is the guy that typed that up.  Casey Moon is

11       the guy that typed up he's the number 10 attacker in the

12       country when Casey Moon knows who the top ten attackers are in

13       the country.

14              What's going on with Casey Moon?  I'm not sure.  USC

15       wants to deny any knowledge of anything, wants to pretend they

16       have a pristine clean admissions process.

17              The bottom line is, when Casey Moon says Johnny was

18       not there after the first day, we know that's not true, and

19       that's what they called to bring him in for.  Anything else

01:05 20       they say about Casey Moon is a retreat from their original

21       position.  They brought Casey Moon in to say he wasn't there.

22              Remember they showed him that September 10 document

23       when Johnny wasn't responding to the e-mails?  That's when he's

24       in the dark room and he can't get out and he finally responds.

25       I put in the document that has the response.  They just leave
```

1    it like Casey Moon never got an answer from Johnny on getting

2    his stuff for NCAA clearance.

3        You heard the testimony.  He's sitting in a

4    blacked-out room and he can't use the computer.  They had both

5    of those documents.  Why did they give you the one that didn't

6    have Johnny's answer?

7        I'd like to now go into the issue of the indictment.

8    There is two conspiracy counts against us: conspiracy to commit

9    mail, wire, property and fraud and honest services; and

01:06 10    conspiracy to commit federal program bribery related to USC.

11        Count One is this big, national conspiracy.  That

12    means to convict John of Count One, you've got to find he

13    agreed, shown by his own words and his own actions, to conspire

14    with Janavs, Kaplan, Bruce Isackson, test cheating, taking

15    classes for people, things he didn't know about, things he

16    never heard about, things that were never within the scope of

17    his agreement or knowledge or intent.

18        In order to show him guilty of any of these charges,

19    the government has to show that he acted willfully.

01:06 20        The judge will instruct you "willfully" means to act

21    voluntarily and intelligently and with the specific intent that

22    the underlying crime be committed.

23        Do you think John acted with the specific intent for

24    this nationwide conspiracy to be committed?

25        That's to say he acted with a bad purpose, either to

disobey or disregard the law.  If the government fails to prove

beyond a reasonable doubt that John was acting in bad faith

with the intent to disobey the law, then you must find him not

guilty as to each of the charges.

That makes sense.  Before someone can face serious

consequences of being found guilty of a felony, you have to

decide beyond a reasonable doubt that he truly intended to

commit the crime.

It's not enough if you think John should have been

shrewder.  Look, let's face it, John was the math nerd in high

school.  He wasn't the guy who was the cool kid or the street

smart kid.  He's an engineer, a guy whose life is math and

taking standardized tests and making his kids take standardized

tests.  So you've got to stand in his shoes.  It's not enough

if you think he was gullible or too trusting.  He certainly

was.  But you have to show that he intended and knowingly and

wanted to join a criminal conspiracy.

He didn't act out of ignorance, accident or mistake.

You have to find that he acted willfully, knowingly or

corruptly.

Count One is the conspiracy charge we've just

discussed.

Count One has two separate parts.  One is a property

fraud and the other is honest services fraud.  The government

hasn't proven either beyond a reasonable doubt.

1          Honest services fraud would mean he had to corrupt
2     Vavic and intentionally done so.
3          Property fraud would mean he had to have known that
4     that profile was fraudulent, that he was going to get some
5     property out of the school.
6          To prove mail fraud or wire fraud with regard to
7     property, they have to prove each of these elements.  John
8     entered a scheme to cheat a university out of its property.
9     It's clear Singer said he was there to make donations.  That
01:09 10    alone ends the issue.
11          In terms of whether any misrepresentation was
12    material, the government has to prove beyond a reasonable doubt
13    that if the Subco had been presented with an accurate profile
14    for Johnny Wilson, they would have not let him in.  The Subco
15    deferred to the coaches' decisions, they would have let him in.
16    He had the academic standards, he had the athletic abilities.
17    Maybe he wasn't A-plus in every category, but you heard Bowen,
18    he was A-plus in speed, and that's going to catch the eye of a
19    good college coach, including a USC coach.
01:09 20          He fit in with the team, he was able to keep up at
21    practices.  He clearly belonged to get in.
22          With respect to John's daughters, the government
23    hasn't proven any misstatement.  John never said, "We're going
24    to file a false profile.  We're going to fake some times.
25    We're going to pull things off the internet and give some

 1  regattas and titles and championships."

 2          All you had was Singer slipping things in here and

 3  there without John ever agreeing that he was going to defraud

 4  Harvard or Stanford.

 5          The heart of the claim is whether John knowingly and

 6  willfully participated in a scheme to defraud a university,

 7  that he knew false information would be presented for Johnny,

 8  and he intended to break the law by doing so.

 9          Where does the government have evidence here?  The

01:10 10  embellished e-mail, that's reasonable doubt.  An e-mail that

 11  was sent to him that had all the errors he didn't correct,

 12  that's zero evidence.

 13          For honest services, they have to show he participated

 14  in a scheme to defraud the university of the honest services of

 15  its employees.  There's nothing about that with respect to

 16  Harvard or Stanford.  He's not agreeing to defraud the school

 17  of their honest services.

 18          And you heard Rebecca Chassin's testimony.  There was

 19  no limits on what Vavic could consider for admissions through

01:10 20  Subco.  If Vavic wanted to consider a donation, he's perfectly

 21  allowed to do that.

 22          With respect to the bribery element of honest

 23  services, we have Singer's testimony and Agent Keating.  John

 24  always thought it was a donation, always thought it was a

 25  donation.  That's why Singer's not testifying in this

courtroom, and that's why his notes in Exhibit 13 are so important.

Finally, the government has to prove a misrepresentation of a material fact or matter. They haven't proved Johnny wouldn't be admitted. Bowen, Walters, and Mericle showed that he belonged on the team as a red shirt. He may not have been the best athlete on the team, but with his speed, his sense of the game, he was qualified enough to be a red shirt.

I don't need to go through the rest of these 6, 8, 9, 11 and 12, they are the same issues, just substantive counts.

But Count Two, the federal program bribery, they have to show John intended to bribe somebody. And Singer's testimony -- Singer's statements repeatedly that John never intended to pay a bribe, he always thought he was giving a donation to a program, deals with each one of those briberies.

With respect to the tax charge, I've already spoken to you about that. They have to show violation of a known legal duty. John thought he made a donation. He thought he could get a deduction for it. He had all the statements from the IRS-approved charities telling him it was an approved donation. If there's a small difference in the tax calculation, the government can get it. But there is not proof beyond a reasonable doubt of a known violation of a known legal duty.

In sum, I'm going to finish up and thank you for your

```
 1    time and thank the Court for its indulgence.

 2          Agent Keating admitted that Singer never took back all

 3    the lulling statements he had been making to John for eight

 4    years.  He didn't take back the Harvard president wanting to

 5    partner up with Singer, the four Goldman Sachs clamoring to do

 6    side doors.  And you heard Jeff DeMaio testify John was so

 7    enthusiastic about his work with Singer that he told Mr. DeMaio

 8    in October 2018, You should send the Goldman clients to

 9    Mr. Singer, he's got this great foundation, you should be

10    working with him.  He wanted to share the opportunities, not

11    hide it like it was a crime.

12          In sum, we appreciate your attention to this case.  We

13    ask that you find John Wilson not guilty on all of the charges.

14          Thank you very much.

15          THE COURT:  All right, jurors.  Normally we'd be

16    breaking for lunch, but we just have the rebuttal of the

17    government left, so I'm going to ask you to take a short break,

18    we'll have the rebuttal, and then I'm going excuse you for the

19    day.  Right now we'll have a ten-minute break and then come

20    back.

21          THE CLERK:  All rise for the jury.

22          (Jury exits.)

23          THE COURT:  All right, we're in recess for 10 minutes.

24          (Recess taken 1:14 p.m. to 1:27 p.m.)

25          THE CLERK:  All rise for the jury.
```

**A3763**

```
 1              (Jury enters.)

 2              THE CLERK:  Thank you.  You may be seated.

 3              THE COURT:  Good afternoon, jurors.  We're ready to

 4      hear the government's rebuttal.

 5              Mr. Frank.

 6              MR. FRANK:  Thank you, your Honor.

 7              Good afternoon, ladies and gentlemen.

 8              I am acutely aware as I begin that I am the only thing

 9      that stands between you and your freedom from this courtroom

01:28 10      for the day and your lunch, and that is the last place any

11      lawyer wants to be.  You've been so incredibly attentive for

12      the last three-and-a-half weeks.  I'm asking you for 30 more

13      minutes of your attention before we let you go.

14              I just want to start off with a couple of quick things

15      that Mr. Kendall said right at the end of his closing argument.

16              First, he said there was no evidence of a scheme to

17      defraud Stanford or Harvard.

18              He was explicitly told he has to recruit some real

19      sailors so that Stanford doesn't catch on.  He was told that

01:29 20      twice in very slow, very plain, very clear English.  He

21      repeated it.  He has to actually recruit some real sailors.

22      Listen to that section of the tape.  It's not insignificant;

23      it's very significant.  It's clear evidence that he was told

24      Stanford was not in the loop, that the coach was doing this so

25      that Stanford wouldn't catch on.  That is honest services
```

1    fraud, ladies and gentlemen.

2        He told you that we haven't proved that Johnny

3    wouldn't have been admitted on his merit.  Ladies and

4    gentlemen, his own witness, Jack Bowen, sat up there on the

5    witness stand and said Johnny, for all his fondness for Johnny,

6    was a B-plus player who was recruited onto an A, A-plus team.

7    And from that witness stand Jack Bowen told you he did not

8    think Johnny would be recruited to USC for water polo.  That

9    was his own coach.

01:30 10        And Rebecca Chassin, the subcommittee member, the

11    member of the admissions department, she testified that neither

12    of these students would have made it into USC based on their

13    academic credentials if they had not been recruited athletes if

14    the subcommittee did not think that the coaches wanted them for

15    their athletic qualifications to play on those teams.  That's

16    what the Subco thought, and without that edge, without that

17    thought that these were recruited athletes, recruited onto

18    these teams for their athletic ability, that they were in that

19    highly coveted group of 200 to 250 people, almost all of whom

01:30 20    get into USC, they would not have made it.  They would have

21    been among the 85 percent of applicants to USC who don't make

22    it.

23        And then the last point I wanted to just quickly

24    address was on the tax point, that you have to somehow conclude

25    that this was a bribe in order to hold him accountable of the

tax charge, that there was no known violation of a legal duty.

Actually, that's not true.  For one thing, it was the defendant who told his assistant to bill this as business consulting.  He told her that.  He asked Singer, "Can we bill it as consulting or whatever so I can deduct it from the corporate account?"  Look at Singer's response.  He says, "Yes, I can invoice you for business consulting so that you can deduct it from your taxes."  And the defendant says, "Awesome." And then a month later he tells his assistant, "Make sure to get the invoice right so that we can deduct this as business consulting."  Whether or not you conclude it's a bribe, and for many reasons that we'll discuss you should, but whether or not you do, he is guilty of tax fraud based on those e-mails alone, taking it as a business expense when he knew it was not. Whatever he thought it was, whether he thought it was a donation, which he didn't, or whether he thought it was college counseling for his kid, you cannot deduct it from your taxes as a business expense.

And whether you pay $900,000 in taxes, which, p.s., is not what he paid that year in taxes, you can look at his tax return, or whether you pay $200,000 a year in taxes, you cannot lie on your taxes about what it is, because that obstructs and impedes the IRS in its calculation of the taxes due and owing. And whether he saved $90,000, which is what he did save by lying, or whether he saved $1,400, it doesn't matter.  He was

obstructing and impeding the IRS in order to save money on his

taxes.

Mr. Kendall suggested that you begin your

deliberations by focusing on what is not in dispute.  Now, I

think that is an excellent suggestion.  I encourage you to do

that.

What is not in dispute in this case is that there was

fraud in the admission of Sabrina Abdelaziz and Johnny Wilson.

There is no dispute that those athletic profiles were full of

lies.  There is no dispute that Sabrina's profile was totally

made up.  There is no dispute, in fact, the defendant's own

witness told you, that Johnny's profile made him look better

than he was.

There is no dispute in this case that Vavic and Heinel

both lied to the subcommittee on athletic admissions about

these two individuals.  There's no dispute about that.  You

actually saw what they submitted to the subcommittee and it was

completely false.  It was false about Sabrina Abdelaziz.  It

was false about Johnny Wilson.  There was no way he was one of

the top ten attackers in the graduating class in the in the

entire country, and he was not an immediate impact player.

Again, the defendant's own witnesses told you that.  The

profiles that Vavic and Heinel submitted to the subcommittee

were false.

There's no dispute that those lies worked and that

these two kids were admitted to USC because of those lies, that
Subco approved those admissions because they thought that these
were legitimate recruits for the basketball team and the water
polo team.  They believed the credentials and the
qualifications that they thought came from the coaches, and
that the students would not have been admitted otherwise.
That's what Rebecca Chassin told you.

          And there is no serious dispute, ladies and gentlemen,
that Vavic and Heinel did that in exchange for the money.
Vavic got that $100,000 to the water polo team, that's why he
did it.  And later on, Singer started paying for his kids' high
school tuition, and he agreed to do it again in the future.
That is why he did it.  There's no serious dispute about that,
nor is there any serious dispute why Heinel did it.  In fact,
you heard her on tape, there can't be serious dispute about
that.  She did it in exchange for the money.  First money she
took into the women's athletic board that she oversaw, and you
saw the increase in those funds during the time of the
conspiracy and the increase in her salary over that same period
of time because she benefitted from that, from that
fund-raising that everyone thought she was doing, and next
because eventually she started taking the money personally.

          So the upshot, as you begin your deliberations, what
is not seriously in dispute in this case is that there was a
fraud, that because of that fraud these kids got into USC, and

1    that the insiders did it because of the money.  That is not

2    seriously in dispute.

3         So now the only question becomes whether the

4    defendants knew and intended for that fraud to happen.

5         Well, here's what else is not in dispute:  Singer

6    e-mailed those fake profiles to both of these defendants.  The

7    fake profiles were found in the e-mail boxes of both of these

8    defendants.  It's not in dispute.  So the argument that the

9    defendants are making is that they didn't read those e-mails,

01:36 10   that it slipped by, they slipped by him.  Why?  Because, of

11   course, they can't admit that they read those e-mails.  If they

12   admit that they read the e-mails, it is game over.  It is game

13   over.  So they admit that the e-mails were sent to them because

14   they can't deny that, can they?  They admit that the e-mails

15   are in their inboxes, but they missed them.  They admit what

16   they can't deny, and they deny the one thing, the one thing

17   that they cannot admit, because if they admit that, it's game

18   over.

19        It's amazing when you think about it.  Two men, two

01:36 20   sophisticated business executives, two men who are so

21   intimately involved in getting their kids into college, they're

22   in every detail.  Mr. Kendall told you that about his client.

23   These two men on opposite sides of the world, and they both

24   missed the exact same e-mail.  They both missed it.  Think

25   about the chances of that.  They must be the two unluckiest men

1    in the entire world.  They must be the two unluckiest men in

2    the entire world to have had their kids admitted to USC as fake

3    athletes or based on fake athletic profiles, they both paid

4    hundreds of thousands of dollars to Rick Singer to get their

5    kids admitted to USC as athletic recruits, the fraudulent

6    profiles are e-mailed to them, and both of these men on

7    opposite sides of the world somehow missed it.  They missed

8    that one e-mail.  That is some incredible unbelievable bad

9    luck.

01:38 10         Of course they saw the e-mails, ladies and gentlemen.

11   They both used those e-mail accounts regularly.  They were

12   intimately involved in this process every step of the way.

13   Wilson was in his e-mail account within 90 minutes of receiving

14   the e-mail.  Yes, he was sending his wife that same photo so

15   they could use it in the yearbook profile, just happens to be

16   the same photo that was on the fake athletic profile.  But he

17   was in his account within 90 minutes.  And he had just been

18   told six days earlier that Singer was embellishing that profile

19   at Vavic's direction.

01:38 20         But the bigger point, ladies and gentlemen, is this:

21   Don't miss the forest for the trees.  Whether or not they saw

22   the e-mail doesn't actually matter.  It actually doesn't

23   matter.  The defendants want you to believe, they have asked

24   you in their closing arguments to believe that Rick Singer

25   perpetrated this fraud scheme totally behind their backs, that

1    they were duped, that they were not in on it, that they didn't

2    know what he was doing with those fake profiles, that he didn't

3    tell Gamal, that's what Mr. Kelly asked you to believe.

4        Here is how you know to a certainty, to a certainty

5    you know that that is not true:  Because this master con man

6    that they've been telling you about for the past

7    three-and-a-half weeks, what a master con man he is, he

8    e-mailed the fake profile to the very people he was supposedly

9    trying to con.  Who does that?  He actually wrote "FYI" on the

01:39 10   e-mail to Mr. Wilson and sent him the fake profile.  If he's

11   trying to con him, he wouldn't send him the fake profile, and

12   the same is true of Gamal Abdelaziz, whether they looked at it

13   or not.

14       By the way, Bruce Isackson he never got an e-mail.  He

15   never was sent an e-mail by Rick Singer, and he knew that his

16   daughter wasn't qualified to be recruited at the Division I

17   level, both of his daughters.

18       So he knew that there was a profile being prepared, as

19   both of them knew, for me to create a USC athletic profile,

01:40 20   that's an e-mail that Mr. Aziz definitely received, he

21   definitely saw, he forwarded it to his wife.  Right?  They knew

22   that the profiles were being -- he wants an embellished

23   profile, he's asked me to embellish it more, which I am doing.

24   That was Mr. Wilson's e-mail.  So they know that profiles are

25   being prepared.  Right?

**A3771**

```
 1              And Bruce Isackson told you he knew the same thing,
 2     and even though he never saw the profile, he knew it could not
 3     be real, it had to be fake, because his kid wasn't getting
 4     recruited at the Division I level based on her actual truthful
 5     athletic qualifications.  And the same is true of both of them.
 6              But whether or not they saw the e-mail, what you know
 7     to a certainty is that he sent them that fake profile.  He sent
 8     them each the fake profile.  And if they weren't in on it, he
 9     would not have sent them the fake profile.  He wouldn't have
01:41 10     sent it to them unless they knew and were involved in the
11     fraud.
12              So I submit to you, ladies and gentlemen, do not
13     believe that they didn't look at the e-mail.  Of course they
14     looked at the e-mail.  They both looked at the e-mail.  But
15     whether or not they looked at the e-mail, they were in on it,
16     and the fact that he sent them the e-mail is enough for you to
17     reach that conclusion to a certainty.
18              And once you reach that conclusion, it is, in fact,
19     game over.  They are guilty of the fraud conspiracy in Count
01:41 20     One.  They are in on the fraud.  And that's regardless of what
21     you find about the bribery.
22              If you conclude that he sent them the e-mail and that
23     they were in on it, whether or not they saw it, they are
24     guilty.
25              Now, let's talk about the bribery.
```

1          They want you to believe that they thought this was

2    legitimate, these were legitimate donations.  Again, let's

3    begin with what is not in dispute.

4          What is not in dispute is that they paid the money,

5    $220,000 for Johnny, $300,000 for Sabrina, a million dollars

6    for the Wilson daughters.

7          What is not in dispute is that they paid that money to

8    have their kids admitted to those schools.  That was the only

9    reason they paid that money.  There's never been any serious

01:42 10    dispute about that.

11          What is not in dispute is that they only paid the

12    money once they were guaranteed admission.  Right?  Once Singer

13    told him, "If you put up the $500,000" -- listen to the

14    tapes -- "If you put up the 500 and the 500 for your daughters,

15    it's a done deal."  That's when he paid the money.

16          With Johnny Wilson, with Sabrina Abdelaziz, they

17    didn't pay until the admission was done, 50 percent upon verbal

18    and written from the subcommittee, and then 50 percent when you

19    get the final letter.  That's what Mr. Wilson was told, and

01:43 20    that is, in fact, when he paid.

21          And so the argument then goes, well, they thought it

22    was a legitimate donation and quid pro quo, that's the same

23    thing like when you go to the Red Sox game and you buy tickets,

24    that's a quid pro quo.  Well, ladies and gentlemen, the judge

25    will instruct you what an illegal quid pro quo is.  Right?

A3773

```
 1    It's not going to the Red Sox game to buy tickets.

 2         But paying money to get somebody to admit your kid as

 3    a fake athletic recruit, paying money to get someone who's

 4    employed by a university to lie to their colleagues, that is an

 5    illegal quid pro quo.  That is honest services fraud.  That is

 6    federal program bribery, and it's not like going to the Red Sox

 7    game to buy tickets.  Or presumably buying the tickets before

 8    you go to the Red Sox game.

 9         The judge is also going to instruct you on a concept
01:44 10   called willful blindness.  Pay attention to that instruction.

11    That means you can infer that the defendants have knowledge of

12    something if they deliberately closed their eyes to a fact that

13    should have been obvious to them if they stuck their heads in

14    the sand.

15         Here it was abundantly clear that that money was in

16    exchange for admission as recruited athletes, that the kids

17    were not getting in without the money.  That was abundantly

18    clear from all of the evidence you've seen.

19         But here's how you know to a certainty, once again,
01:45 20   that they didn't think this was a legitimate quid pro quo, that

21    they didn't think this was a legitimate donation, because they

22    both lied about it.  Repeatedly.

23         You saw the e-mails, we've discussed them at length,

24    in which Mr. Wilson asked Mr. Singer if he could deduct the --

25    if he could invoice the USC fees -- he calls them that in the
```

1    e-mail -- as consulting expenses so that he can pay them from

2    the corporate account.

3         And then he instructs his assistant to do just that.

4         And Singer responds, You can do that -- "I can do that

5    so you can deduct it as an expense," and Wilson replies,

6    "Awesome."

7         There is no legitimate explanation -- despite the many

8    heroic efforts of defense counsel, there is no legitimate

9    explanation for deducting the USC fees as a business consulting

01:46 10   expense.  That was the defendant's idea.  If he thought it was

11   a donation, he would never have sent that e-mail.  That tells

12   you everything you need to know.

13        You also heard the call in which Gamal Aziz agreed for

14   Singer to lie to the IRS in which he said he was worried and

15   concerned about the audit of The Key Worldwide Foundation, he

16   wanted to make sure he and Singer were on the same page, and in

17   which he agreed to lie about a fake injury to explain why his

18   daughter hadn't shown up for practice.

19        If it was a legitimate donation in his mind, why agree

01:46 20   to lie to the IRS when Singer told him there was an audit?  Why

21   did he agree that Singer should lie to the IRS?  Why be worried

22   and concerned that KWF was being audited?  You're not worried

23   and concerned if you find out the Jimmy Fund is being audited

24   and you gave them money.  It doesn't make sense.  People lie

25   when they have something to hide, when they are not acting in

1    good faith.  Lying is not good faith.

2         They argue that they didn't know about the personal

3    payments to Heinel or to Coach Vavic.  Those weren't connected

4    to their kids.  Under the law, as the Judge will instruct you,

5    that doesn't matter.  It doesn't matter where the money goes.

6    Listen to those instructions, ladies and gentlemen.

7    Conspirators doesn't need to know all the details.  What

8    matters is what they thought the money was for.  If they

9    thought the money was to get their kids in as recruited

01:47 10    athletes based on those falsified profiles to get an insider to

11    misrepresent to their colleagues what the true situation was,

12    why they were actually recruiting those kids, that's honest

13    services fraud.  That's an illicit quid pro quo.

14         They knew that the money -- without the money their

15    kids were not getting in, that the money was getting somebody

16    on the inside to recruit them as athletes, that it was in

17    exchange for admission.  The evidence of that is simply

18    overwhelming.

19         There was a lot of argument about the extent to which

01:48 20    Johnny showed up for practice.  Was it one day, was it more

21    than one day, was it at the beginning of the season, was it

22    also at the end of the season?  Now, the first point on that is

23    the defendants have no obligation to put on a case, right, they

24    do not carry any burden.  We carry the burden.  It is our

25    burden to prove their guilt beyond a reasonable doubt.  We

```
 1    embrace that burden, that's ours.

 2          But when the defendants choose to put on a case, you

 3    can look at the case that they put on.  You can look at the

 4    credibility of the witnesses they chose to put up on that

 5    witness stand.

 6          Their own witnesses testified there was video of

 7    practices, right, but what did you see?  You saw a photograph

 8    of Johnny Wilson running around Sorority Row in his Speedo to

 9    try to gin up interest for a game, a social event.  You saw a

01:49 10   photograph of Johnny in the bleachers with the rest of the fans

11    watching the NCAA championship game.

12          You didn't see Johnny at practice, even though there's

13    video of the practice.

14          But, again, it's all beside the point.  It doesn't

15    matter whether he showed up for practice or whether he didn't

16    show up for practice.  Frankly, it doesn't matter if he was the

17    Tom Brady of water polo or whatever the equivalent is in water

18    polo.  Or the Lebron James of water polo.  It doesn't matter.

19    Here's why: Because Count One charges the defendants with

01:50 20   conspiracy.  That is an agreement to do something the law

21    forbids, and that crime charged in Count One was complete the

22    moment the defendant agreed to it.  And the evidence in this

23    case is that he agreed to it months before Johnny even showed

24    up at USC, months before the first water polo practice.  It

25    doesn't matter if his kid was the Tom Brady of water polo
```

because if he paid money to get someone on the inside to

mislead their colleagues about why they were recruiting him, if

he lied about his athletic qualifications or agreed to have his

qualifications misrepresented to get him in, he could have been

Tom Brady or Lebron James, or whatever you want to call him,

but the lies and the payment of the money make him guilty, no

matter how qualified his kid is, no matter whether he showed up

to practice or not.  Count One is the agreement, and that was

done months before.

01:51    Count Two, same thing.  It was the agreement.  But for

Count Two you have to find there was an overt act, some step

taken by some member, any member of the conspiracy to make it

happen.  And here there are dozens and dozens, hundreds of

overt acts: wires that were sent, e-mails that were sent, phone

calls that were made, wire transfers that were done, admission

letters that were received.  All of these overt acts are

enough.  You only need one.

And he's guilty of Count Two before his kid ever

showed up for practice, or didn't show up, as the case may be.

01:52    The defendants spent much of their closing arguments

attacking the FBI investigation, that this was a giant FBI plot

to frame their clients.  I'm not going to respond point by

point.  Whether the agents wrote down everything that Singer

said or didn't write down or wrote down everything they told

him -- by the way, there is no evidence in this case that there

1    is any FBI or IRS rule that requires the agents to write down

2    what they said to a person cooperating.  There's no evidence of

3    that.  That's all insinuations in questions of defense counsel,

4    and insinuations in questions of counsel are not evidence.

5         Your job is to consider the evidence.  But the fact is

6    that what Singer actually said, more importantly, what the

7    defendants said back to him, that evidence is on tape and you

8    have it and you've heard it and you can listen to it in the

9    jury room.

01:53 10         And the same is true about Singer's notes, which, by

11   the way, are not diary entries, they weren't notes to himself,

12   they were notes taken by somebody who had not accepted

13   responsibility for what he had done in the early days after he

14   was approached by FBI agents.  They were notes for his lawyer

15   at a time when he was actively obstructing the investigation,

16   including by not just deleting his text messages but by tipping

17   people off that the investigation was happening.

18         They want to present to you that this guy is the

19   world's most amazing con man, but the one thing they want you

01:54 20   to believe is that he was telling the truth in his notes to his

21   lawyer on that one day when he accuses the FBI of trying to

22   encourage him to lie and says that the FBI were the bad guys.

23   That's the one thing that the con man was telling the truth

24   about.

25         It's all a distraction.  Why?  Because they don't want

```
 1    you to look at what they did and what they said.  That's the
 2    evidence in this case, ladies and gentlemen.  And by the way,
 3    you have plenty of evidence to convict them of these crimes
 4    before you even get to the consensual recordings that Singer
 5    made at the FBI's direction.  You can convict them on the
 6    e-mails alone.  You can convict John Wilson based on those
 7    September 15th phone calls alone.
 8              And, of course, blaming the investigation doesn't
 9    explain why Wilson laughed when Singer told them that the coach
10    had to recruit some real sailors so Stanford doesn't catch on.
11    That was on September 15th, before the FBI ever knocked on
12    Singer's door or the hotel room.
13              And it doesn't explain -- I'm sorry, I misspoke about
14    that.  I'm sorry.
15              The September 15th call is when he told them they
16    would make them a sailor because of where you live, and that's
17    where the defendant laughed.
18              And then on the consensual call he said Stanford has
19    to recruit some real sailors so that the -- the coach has to
20    recruit some real sailors so Stanford doesn't catch on.  And
21    you can listen to defendant's response.  Listen to the
22    defendant's response to that and listen to what the defendant
23    said on the September 15th call before the FBI approached him
24    when Singer said that we'll make them a sailor because of where
25    you live.  Right?  There's no innocent explanation for that
```

line.  The defense wants you to believe the second line slipped

by him somehow even though Singer repeated it twice slowly and

the defendant repeated it back to him.  He asked him "actually

recruit some real sailors," but the first line, they don't have

an explanation for that one, when Singer said, "We'll make them

a sailor because of where you lived."  And the defendant

laughed and said, "Can we get a two-for-one special because

they're twins."

It's a blame everyone defense that you've heard,

ladies and gentlemen.  Blame the agents, the investigation was

shoddy.  They didn't say to Singer -- they didn't have Singer

say, "Do you want to join a criminal conspiracy?"  Seriously.

That is not how criminals talk.  They don't say, "Do you want

to join a criminal conspiracy?"  It's the prosecutor's fault,

we hid all the evidence from you, even though you've been

sitting here for three-and-a-half weeks looking at dozens and

dozens of e-mails and documents, listening to phone call after

phone call, listening to more than a dozen witnesses testify.

They want you to imagine what else is out there.  Imaginary

evidence, imaginary cross-examination of witnesses, that's not

evidence, ladies and gentlemen, that is speculation.  That is

designed to distract you from the evidence.  But it's the

evidence you have to consider.

They want you to believe that it was Rick Singer's

fault.  He was the consummate con man.  That it was USC's

**A3781**

```
 1    fault, they were desperate for money.  John Wilson is even

 2    blaming his long-time secretary, Debbie Rogers.  That one takes

 3    the cake.  It's the FBI's fault, it's the prosecutor's fault,

 4    it's Rick Singer's fault, it's USC's fault, it's Debbie Rogers'

 5    fault.  Follow the actual evidence, ladies and gentlemen, not

 6    the imaginary evidence.  Look at what the defendants did and

 7    what the defendants said.  It's in their e-mails, it is on

 8    tape.  This isn't Rick Singer's trial.  It's not the FBI that's

 9    on trial.  It's not USC that's on trial.  Certainly it's not

10    Debbie Rogers that's on trial.  And Debbie Rogers isn't the one

11    who said, "Let's bill it as a business consulting expense,"

12    that was John Wilson.

13             THE COURT:  You need to wrap up, Mr. Frank.

14             MR. FRANK:  I will, your Honor.  Thank you.

15             The only people they have to blame for their actions

16    is themselves.  They have a million different arguments about

17    who was responsible, each more ridiculous than the last.  Was

18    he wearing a hoodie, was he not wearing a hoodie when he was

19    throwing up at practice?  Was he throwing up at practice or was

20    he passed out in his dorm room?  They're all more ridiculous

21    than the last.

22             We end, ladies and gentlemen, where we started, with

23    the defendant's own words.  John Wilson knew his son was a

24    clear misfit for the USC water polo team, he paid the money as

25    a fee only when admission was confirmed, he directed his
```

01:57  (line 10)
01:58  (line 20)

assistant to lie and call it a business consulting expense, and
those are all his own words black on white.

You heard him laugh when Singer told him he'd make the
girls a sailor because of where they live and laugh again when
Singer told him they needed to recruit some actual sailors so
that Stanford doesn't catch on.  Those were his words, his
responses.

Same with Gamal Abdelaziz.  He sent Rick Singer a
photograph of a different girl for a USC athletic profile.  He
directed Sabrina to submit an essay about her love for
basketball, a sport she hadn't played for two years and was
never veery good at.  You heard him say, "I love it" when
Singer told him that Donna Heinel would use that same fake
profile for another fake basketball player and agreed to lie to
admissions to say that she had plantar fasciitis and that's why
she hadn't shown up.  And by the way, that doesn't stop you
from being a manager.  If you think you're going to be a
practice player, you got to show up to practice.

The defendants' own words, members of the jury,
convict them in this case.

And this case is important.  College admissions is
important.  These defendants used lies and money --

MR. KELLY:  Objection, your Honor --

MR. FRANK:  My final two sentences, your Honor -- to
steal admission spots their kids couldn't earn on their own.

        1    They crossed a line, and they broke the law.

        2            And just because it's an important case does not mean

        3    it's a close case.  The evidence in this case is overwhelming.

        4    That evidence and your common sense, the common sense that you

        5    walked into this courtroom with three-and-a-half weeks ago

        6    tells you that these defendants are guilty beyond a reasonable

        7    doubt as charged.

        8            We ask you to hold them accountable.

        9            Thank you.

02:00  10            THE COURT:  All right, jurors.

       11            Rather than give you my charge on the law and then ask

       12    you to deliberate after a long day, it would be inappropriate,

       13    so that's why we're going to break for the day and ask you to

       14    come back tomorrow morning at 9:00 when you will hear my

       15    instructions to you on the law, after which the case will be

       16    submitted to you for your deliberations.

       17            It is extremely important now that you honor my

       18    instructions.  You've heard everything except my closing

       19    instructions on the law, but you haven't heard them, and they

02:01  20    are necessary before you go to deliberate.

       21            So please do not discuss this case with anybody, that

       22    is members of your family, friends or anyone who wants to talk

       23    to you about it, and say that you'd be glad to talk to them

       24    about it after you have deliberated and after you have come to

       25    a verdict but you can't do it before.  That would be

```
 1   inappropriate, and I'm asking you not to do it.
 2          So I'll see you tomorrow morning at 10:00 a.m.  Have a
 3   pleasant rest of the day.  And we'll get the case to you
 4   tomorrow.
 5          (Discussion off the record.)
 6          THE COURT:  Did I say 10:00?  Nine.  9:00 a.m.
 7          (Jury exits.)
 8          THE COURT:  We are in recess until 9:00 a.m.
 9          MR. KENDALL:  Your Honor, may we raise one issue,
10   please?
11          THE COURT:  Quickly.
12          MR. KENDALL:  We are concerned about an improper
13   burden shifting in the government's rebuttal.
14          The government referred to videos of practices from
15   the 2014 season.  We don't believe such videos exist.  Does the
16   government have a good-faith basis to say such videos exist and
17   are available or did they just make that up and mislead the
18   jury?
19          MR. FRANK:  The defense witness testified the videos
20   were made, your Honor.
21          THE COURT:  That's my recollection, is there were
22   videos made of the practices.
23          MR. TOMBACK:  But, your Honor, the issue isn't whether
24   they were made.  It's seven years ago --
25          THE COURT:  If you want to file a motion in this
```

```
 1   regard, file a motion and I'll deal with it tomorrow.
 2            MR. KELLY:  Your Honor, I have a procedural matter.
 3   The Court asked about the curative instruction.  We filed it
 4   yesterday, we gave it to the clerk, it's in.
 5            If I have an issue on the verdict form or jury
 6   instruction, can we just file something?
 7            THE COURT:  Do you have an issue on the verdict form?
 8            MR. KELLY:  Yes.
 9            THE COURT:  You've had it since last night.
10            MR. KELLY:  Yes.  Our position was we wanted a general
11   verdict that's as was suggested, but as proposed, when it
12   refers to Count One, there's four questions, almost like
13   there's four counts when there really should be one for Count
14   One with four subdivisions is my only request.  So that it
15   goes --
16            THE COURT:  Do you want to submit something?
17            MR. KELLY:  Yes, I do.  I do.
18            THE COURT:  Do so by 5:00 p.m.
19            MR. KELLY:  Yes, we will.
20            THE COURT:  We'll deal with it.
21            MR. KELLY:  The only other request on jury instruction
22   was on the willful blindness piece, we respectfully ask the
23   Court make sure it shows that willful blindness does apply to
24   intent to join a conspiracy.
25            I think the Court said that yesterday, but given the
```

1    argument we respectfully ask -- it's black letter law, <u>Lizardo</u>

2    445 F.3d at 73, willful blindness does not apply with someone's

3    intent to join a conspiracy.

4              THE COURT:  Thank you.  It's on the record.

5              (Whereupon, the proceedings adjourned at 2:04 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS     )

 6

 7

 8          We, Kristin M. Kelley and Debra Joyce, certify that

 9    the foregoing is a correct transcript from the record of

10    proceedings taken October 6, 2021 in the above-entitled matter

11    to the best of my skill and ability.

12

13

14        /s/ Kristin M. Kelley            October 6, 2021

15        /s/ Debra Joyce                  October 6, 2021

16        Kristin M. Kelley, RPR, CRR          Date
          Debra Joyce, RMR, CRR
17        Official Court Reporters

18

19

20

21

22

23

24

25
```

**A3788**

```
 1

 2                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
 3


 4
      UNITED STATES OF AMERICA,          )
 5                         Plaintiff     )
                                         )
 6    vs.                                )  No. 1-19-CR-10080
                                         )
 7    GAMAL ABDELAZIZ and JOHN           )
      WILSON,                            )
 8                         Defendants.   )
                                         )
 9                                       )


10


11
                     BEFORE THE HONORABLE NATHANIEL M. GORTON
12                        UNITED STATES DISTRICT JUDGE
                             JURY TRIAL - DAY 20
13


14
                    John Joseph Moakley United States Courthouse
15                            Courtroom No. 4
                             One Courthouse Way
16                       Boston, Massachusetts 02210


17


18                            October 7, 2021
                                 9:17 a.m.
19


20


21
                        Kristin M. Kelley, RPR, CRR
22                          Official Court Reporter
                  John Joseph Moakley United States Courthouse
23                       One Courthouse Way, Room 3209
                          Boston, Massachusetts 02210
24                        E-mail: kmob929@gmail.com

25          Mechanical Steno - Computer-Aided Transcript
```

```
 1      APPEARANCES:

 2

 3           Stephen E. Frank

 4           Ian J. Stearns

 5           Leslie Wright

 6           Kristen Kearney

 7           United States Attorney's Office

 8           1 Courthouse Way

 9           Suite 9200

10           Boston, MA 02210

11           617-748-3208

12           stephen.frank@usdoj.gov

13           for the Plaintiff.

14

15

16           Brian T. Kelly

17           Joshua C. Sharp

18           Lauren Maynard

19           Nixon Peabody LLP

20           100 Summer Street

21           Boston, MA 02110

22           617-345-1000

23           bkelly@nixonpeabody.com

24           for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3           Robert L. Sheketoff

 4           One McKinley Square

 5           Boston, MA 02109

 6           617-367-3449

 7           sheketoffr@aol.com

 8           for Gamal Abdelaziz.

 9

10

11           Michael Kendall

12           Lauren M. Papenhausen

13           White & Case, LLP

14           75 State Street

15           Boston, MA 02109

16           617-939-9310

17           michael.kendall@whitecase.com

18           for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3          Andrew E. Tomback

 4          McLaughlin & Stern, LLP

 5          260 Madison Avenue

 6          New York, NY 10016

 7          917-301-1285

 8          atomback@mclaughlinstern.com

 9          for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2          THE CLERK:  Thank you.  You may be seated.  Court so
 3    now in session.
 4          THE COURT:  Good morning, counsel.
 5          Before I charge the jury, I will rule on several
 6    pending matters.  First, with respect to the defendants'
 7    request that the Court instruct the jury that a, quote,
 8    official act, unquote, is required for a conviction of Title 18
 9    of United States Code Section 666, the Court has reviewed the
10    Martinez decision rendered earlier this year and does not
11    believe that an official act is required under the federal
12    programs bribery statute.  Therefore, the Court denies the
13    defendants' request for an instruction on official abilities in
14    the context of Count 1.
15          Second, with respect to the jury verdict form, the
16    Court will provide the jury with the verdict form as originally
17    drafted without the defendants' proposed changes.  The
18    formatting of defendants' proposed form as it relates to
19    Count 1 is unnecessarily confusing and, furthermore, it is not
20    substantively different from the Court's proposal.
21          Finally, with respect to the defendants' motion for
22    supplemental jury instructions, docket 2369, the Court will
23    instruct on willful blindness, venue and intent to join the
24    alleged conspiracies, but it will not alter or modify its
25    previously planned instructions on those topics based upon the
```

```
 1    government's closing argument.
 2            Anything needs to come to the attention of the Court
 3    before I deliver my charge to the jury?
 4            MR. KELLY:  Two quick things, your Honor.
 5            THE COURT:  Mr. Kelly.
 6            MR. KELLY:  First, I think we had also requested, I
 7    don't know where the Court landed or decided on the curative
 8    instruction we had proposed.
 9            THE COURT:  I will include an instruction that deals
09:19 10    with both of those issues.
11            MR. KELLY:  Thank you, your Honor.
12            And then I think Mr. Kendall might be raising this,
13    but after the Court instructs, I think we have to preserve any
14    and all objections with the Court under First Circuit
15    procedures.  I defer to the Court on how you prefer to do it.
16            THE COURT:  We'll do it at sidebar.  The jury is going
17    to see us.  If you have to take half an hour at sidebar, you're
18    going to take it in front of the jury.
19            MR. KELLY:  That's fine by me.
09:19 20            MR. KENDALL:  Your Honor, a few things.  I believe the
21    Court misspoke when you gave your rulings with respect to
22    *Martinez*.  I think you said it was with respect to Count 2.
23            THE COURT:  I meant Count 2.
24            MR. KENDALL:  Just wanted to clarify that.
25            THE COURT:  Thank you.
```

```
 1              MR. KENDALL:  We obviously object to any of the giving

 2      of willful blindness instruction.

 3              I wanted to raise a couple of concerns, your Honor,

 4      that I think arise from the government's closing yesterday.

 5      The Court told us they were not going to give an instruction on

 6      a corrupt insider, but Mr. Frank did do that.  He used the term

 7      "corrupt insider" repeatedly.  I believe the gist of his

 8      closing was that an exchange of an -- an economic exchange that

 9      he called a quid pro quo would be the way to look for it to

10      define the corrupt insider's transaction.  As we all know, a

11      simple financial exchange of a "this-for-that" is not a crime

12      in any sense and there has to be something more than that.  I

13      think, particularly given that the closing yesterday, there has

14      to be some guidance given to the jury of when is it corrupt for

15      a donation to be made to a university and when is it not

16      corrupt.  I think the confusion the government has created has

17      really compounded the need to have that done.

18              THE COURT:  Mr. Frank?  I'll hear Mr. Frank in

19      response.

20              MR. FRANK:  Your Honor, I think I made it very clear

21      that it's an elicit quid pro quo when it induces an insider to

22      lie to their colleagues in the admissions department to admit a

23      purported athlete based upon falsified athletic credentials.

24              MR. KENDALL:  That leads to the second issue, your

25      Honor.  I think the government has defined the theft of honest
```

services, I think consistent with your ruling at ECF 2265 at

page 5, that it has to be a false statement, the falsified

athletic profile has to be an integral part of the honest

services violation.  The question I have is whose honest

services are owed -- I think the Court has to define how are

the honest services defined and who are they owed to and who is

the victim.

With respect to USC, I think the government's theory

is that they misled the SUBCO and that the SUBCO is the victim

and that the honest services, I'm not sure if it's the Athletic

Department defines the honest services or something else, but

there has to be some sort of coherence to what the jury's going

to analyze.

With respect to the Harvard University charges, the

evidence is that the president approved a side-door

relationship and there's no information on what the senior

women's administrator does, what their role is, what is their

obligation of honest services, and what's the admission process

that they would be a part of or would be influencing.

With respect to the Stanford counts, there's no

information on what is the coach's nature of their employment

or their role, same as with senior women's administrator, and

no information on the admissions process or how it is being -

in either of those two schools, Harvard and Stanford, how is

the honest services disrupting or defrauding or creating any

problem.  There's no there there.  I don't think the jury can

define honest services just because of its common sense, you

know, you're supposed to tell the truth, which is at what point

what Mr. Frank tried to bring up with a witness.  It has to be

imposed by the organization, by the employer.  There has to be

some clear guidance on the employers of what's to be expected

of them.  I think the jury needs to be told of because it's so

lacking with those issues.

And who is it owed to?  Is it to the Athletic

Department, the SUBCO, the University as a whole?  That's an

issue with USC.  With Harvard and Stanford, we don't even have

enough coherence to know who is the honest services defined by

and who is it owed to.  That's the next issue.

MR. KELLY:  We join Mr. Kendall's remarks here, your

Honor.

MR. KENDALL:  I have a few others.

THE COURT:  Mr. Frank, do you wish to respond?

MR. FRANK:  Your Honor, Mr. Kendall made these

arguments to the Court previously.  The Court ruled on them.

He made these comments to the jury.  The jury's heard them.

They don't become more effective through repetition.

THE COURT:  Anything further, Mr. Kendall?

MR. KENDALL:  Yes, your Honor.  Again, what is the

property that's the object of the theft?  We think that was

left confusing by the government's closing.  Is it the SUBCO's

1   decision to admit someone or is it the coach's recommendation?

2   I think the jury needs to have guidance on whether it's the

3   coach's recommendation or the SUBCO's decision.  Particularly,

4   there's a lot of case law that says a mere recommendation or a

5   mere suggestion is not something that can give rise to a theft

6   of honest services.  I think we need to define that, have the

7   property defined.

8          The indictment said it was a SUBCO decision.  I think

9   the coach's recommendation is a deviation or a variance from

09:24 10   the indictment.  I think there needs to be clarity of what it

11  is.

12         And then whose property is it?  Is it the

13  University's?  Is it a subdivision of the University's?

14         THE COURT:  Anything else?

15         MR. KENDALL:  The other issue is, your Honor, there is

16  no intent for a federal bribery statute.  We want to make sure

17  there's no instruction that an intent would satisfy the

18  evidence required for the federal program bribery.  The word

19  "intent" is not part of the statute.

09:25 20         THE COURT:  Does the government wish to respond?

21         MR. FRANK:  We'll rest on our previous responses, your

22  Honor.

23         THE COURT:  All right.  Call the jury.

24         (Jury enters.)

25         THE CLERK:  Thank you.  You may be seated.  Court is

1    now in session.

2         THE COURT:  Good morning, jurors.  You have now heard

3    the evidence and the closing arguments in this case.  It is now

4    my duty to instruct you on the law that you must follow and

5    apply.

6         In any jury trial, there are, in effect, two judges.

7    I am one of the judges and you, collectively, are the other.

8    It is my duty to preside over the trial and to determine what

9    testimony and evidence is relevant under the law for your

09:27 10    consideration.  It is also my duty at the end of the trial to

11    instruct you on the law applicable to the case.

12         You, as jurors, are judges of the facts.  But in

13    determining what actually happened in this case, that is, in

14    reaching your decision on the facts, it is your sworn duty to

15    follow the law as I am about to define it for you.  When I have

16    finished, you will begin your discussions with one another,

17    which we call jury deliberations.

18         Now, to help you understand and remember these

19    instructions on the law, I will divide them into three parts:

09:28 20    First, general instructions intended to guide you throughout

21    your deliberations; second, instructions about the Indictment

22    and about the law that determines what the government has to

23    prove in this case; and third, some additional general

24    instructions about procedures that you are to follow during

25    your deliberations.

1           Now, these instructions are somewhat complicated, and
2      I ask you to pay very careful attention.  I need to read them
3      because I cannot commit to memory all of the law about which I
4      have to instruct you, but I will submit to you a copy of this
5      charge when you go to the jury room.  I want to caution you
6      right away, however, not to dwell on any one particular portion
7      of it, if you decide to refer to it at all, because you must
8      consider these instructions as a whole and not just one
9      individual particular instruction.  So I ask you to do your do
09:29 10     the best you can to stay with me.
11           Part one.
12           All of my instructions are about the law you must
13     apply.  I do not mean any of these instructions to be
14     understood by you as comment by me on the facts or on the
15     evidence in this case.  The defendant in a criminal trial is
16     presumed to be innocent by law, and this presumption stays with
17     both of the defendants throughout the trial and your
18     deliberations.
19           The government has the burden of proving beyond a
09:29 20     reasonable doubt that the defendants then under consideration
21     is guilty as charged.  It is for you to decide whether, based
22     upon the evidence before you, the government has met its with
23     respect to the charges against that defendant.
24           You are the judges of the facts.  Although the law
25     allows a trial judge in this Court to comment on the evidence,

1    I deliberately do not do so and instead leave the fact-finding

2    entirely in your hands.  You are the sole and exclusive judges

3    of the facts.

4         You must not read into these instructions, or anything

5    anything I may have said or done, any suggestions by me as to

6    what verdict you should return.  That is a matter entirely for

7    you to decide.

8         Fortunately, do you not need to resolve every dispute

9    of fact raised by the evidence.  In order to know which fact

09:30 10   disputes are important, you need to follow what rules of law to

11   apply.  I have explained some of those rules to you during the

12   course of the trial, and I will explain others to you now.

13        The lawyers were allowed to comment during their

14   closing arguments on some of these rules of law, but if what

15   they said about the law differs in any way from my

16   instructions, you must be guided only by the instructions on

17   the law as I state testimony.

18        You must follow all of the rules as I explain them to

19   you.  A single sentence or statement might not refer to an

09:31 20   exception or a qualification that I have stated elsewhere in

21   these instructions, so you must follow all of these

22   instructions together, as a unit.

23        Even if you disagree with one or more of the rules of

24   law, or don't understand the reasons for them, you are bound to

25   follow them.  This is a fundamental part of our system of

government by law rather than by the individual views of the judge or jurors who have the responsibility for deciding a case.

If I make any mistake in instructing you about the law, fair and even-handed application of the law to this and other cases is nevertheless assured, because any mistake I make on the law is subject to appeal.

In contrast, your decision on disputed facts is final. That is, your findings on material disputed facts are not subject to appeal. You are the final and exclusive judges of the facts.

Under your oath as jurors, you cannot allow consideration of the punishment which may be imposed upon the defendant then under consideration, if convicted, to influence your verdict or enter into your deliberations in any way. In addition, you cannot allow considerations of sympathy for that defendant or for the government to influence your verdict or enter into your deliberations in any way. It would be improper for you to allow any feelings you might have about the nature of the alleged crime to interfere with your decision-making process.

You're not to be swayed by bias, prejudice, sympathy or antagonism. Rather, your function is to find the facts fairly and impartially, on the basis of the evidence. The evidence in this case consists of all exhibits received into

1    evidence, all facts that may have been admitted or stipulated

2    to and all of the sworn testimony of the witnesses.

3         If an exhibit purports to summarize underlying

4    material on which it is based, you need to satisfied that the

5    summary evidence is fair and accurate before relying upon it.

6         As I told you at the beginning of the trial,

7    statements, arguments, objections and questions by lawyers are

8    not evidence.  This includes opening statements, in which

9    counsel tell you what the parties expect the evidence will

09:33 10    show.  To the extent items were shown to you or recordings were

11    played for you during opening statements that were not

12    subsequently admitted into evidence during trial, you are not

13    to consider those items or recordings as evidence in this case.

14         Also, during the opening statement on behalf of

15    defendant Abdelaziz, the prosecutor mistakenly objected to the

16    defendants' characterization of a document.  You are to

17    disregard the government's objection, as well as the reference

18    to that document.

19         Any evidence ordered stricken by the Court must also

09:34 20    be disregarded.  Anything you may have seen or heard outside

21    the courtroom, including news stories you may have seen before

22    the trial discussing these or other defendants, is not evidence

23    and you must disregard them entirely.  Your verdict must be

24    based solely on the evidence presented in this courtroom and in

25    accordance with my instructions.

 1          Also, from the facts proved, you may draw reasonable

 2    inferences about additional facts.  An inference is a deduction

 3    or conclusion.  An inference is an additional finding that your

 4    experience, reason and common sense lead you to draw from the

 5    facts that you find are proved by the evidence.

 6          Some exhibits have been redacted in accordance with

 7    the Court's rules or orders.  You are not to speculate about

 8    what has been redacted, nor are you to draw any inferences

 9    about those redactions.

09:35 10          It is lawful for the government to obtain evidence

 11    through court-obtained or consensual wiretaps.  During the

 12    course of the trial you have heard certain recorded

 13    conversations of the defendants and others made without their

 14    knowledge.  If you find that the other party to the

 15    conversation consented to the recording, the use of this

 16    procedure is lawful.  The government's use of a

 17    court-authorized wiretap to obtain evidence is also lawful.

 18          The government is also permitted to use undercover

 19    agents, informants, and co-conspirators in its investigations.

09:36 20    Whether or not you approve of certain investigative techniques

 21    is not to enter into your deliberations in any way.

 22          Now, two more phrases often used in discussions about

 23    evidence received in trial are "direct evidence" and

 24    "circumstantial evidence".

 25          Testimony of a witness showing firsthand observation

**A3804**

of a fact by that witness is direct evidence.  For example, the testimony of an eyewitness just about what he or she saw is direct evidence.  If the witness is permitted to go beyond what he or she saw and permitted to state a conclusion, or an inference, or an opinion, that part of the answer is not direct evidence.  Instead, it's a kind of circumstantial evidence.

Circumstantial evidence is proof of some facts, including events and circumstances, on the basis of which the jury may infer the existence or nonexistence of additional facts.

For example, let's suppose you've been in this courtroom for a few hours and unable to look outside.  A man comes into the back of the courtroom wearing a wet raincoat and carrying a dripping umbrella.  You may draw the inference from those circumstances that it is raining outside.  That is what we call circumstantial evidence as opposed to direct evidence, which would be the testimony of the man in the wet raincoat taking the witness stand and telling you that it is raining outside.

Direct and circumstantial evidence have equal standing in the law.  That is, with respect to what weight shall be given to the evidence before you, the law makes no distinction between direct and circumstantial evidence.  No greater degree of certainty is required of circumstantial evidence than of direct evidence.  You are to consider all of the evidence in

1  the case and give each item of evidence the weight you believe

2  it deserves.

3  The evidence in this case may include facts to which

4  the lawyers have agreed or stipulated.  A stipulation means

5  simply that the government and the defendants accept the truth

6  of a particular proposition or fact and you, likewise, should

7  accept it as true.  Because there is no disagreement, there is

8  no need for evidence of that fact apart from the stipulation.

9  As with all evidence, however, you should give the stipulation

09:38 10  whatever weight you believe it deserves.

11  Any inference that you draw from the facts proved must

12  be a reasonable one and not merely conjecture or guesswork.

13  You might decide that you do not have a sufficient basis to

14  decide what inference to draw.  It is for you, as judges of the

15  facts, to decide whether the evidence before you is or is not

16  sufficient for you to draw an inference.  Ultimately, in

17  drawing inferences, you should use your common sense.

18  If any reference by the Court or by the lawyers to

19  matters of evidence is different from the way you remember the

09:39 20  evidence, let your collective memory control.

21  Now, during this trial you've heard evidence of

22  conversations that were recorded.  That is proper evidence for

23  you to consider.  In order to help you, I have allowed you to

24  have transcripts to read along as the tapes were played.  The

25  tapes are the evidence, not the transcripts.  The transcripts

1  are merely to help you understand what is said on the tapes.

2  If you believe at any point that the transcripts say something

3  different from the tapes, remember that it is the tapes that

4  are the evidence, not the transcripts.  Any time there is a

5  variation between the tapes and the transcripts, you must be

6  guided solely by what you hear on the tapes and not by what you

7  saw in the transcripts.

8          Now, at times during the trial you heard lawyers

9  object to questions asked of the other lawyer, and to answers

10 of the witnesses.  It is a proper function for lawyers to

11 object.  In objecting, a lawyer is requesting that I make a

12 decision on a question of law.  Do not draw from the

13 objections, or from my rulings on them, any inferences about

14 facts.  The objections and my rulings relate only to legal

15 questions that I had to determine.  They should not influence

16 your thinking about the facts.

17         When I sustained an objection to a question, the

18 witness was not allowed to answer.  Do not attempt to guess

19 what the answer might have been.  And if you heard an answer to

20 the question before my ruling, you are to disregard it.

21         In your deliberations, do not consider or talk about

22 any question to which I sustained an objection or any other or

23 other statement that I excluded, or struck, or told you not to

24 consider.

25         Also, during the course of the trial I may have made

1    comments to the lawyers or spoken to a witness concerning the

2    manner of his or her testifying.  Do not assume from anything I

3    may have said that I have any opinion concerning any of the

4    issues in this case.  Except for my instructions to you on the

5    law, you should disregard anything I may have said during the

6    trial in arriving at your own findings of the facts.

7         At the beginning of the trial, I instructed you about

8    taking notes.  I remind you that notes taken by any juror are

9    not evidence in the case and must not take precedence over your

09:41 10    independent recollection of the evidence received in the case.

11    Notes are only an aid to recollection and are not entitled to

12    any greater weight than actual recollection or the impression

13    of each juror as to what the evidence actually is.

14         Charts and summaries have been admitted into evidence

15    and were shown to you during the trial for the purpose of

16    explaining facts that are contained in other documents.  You

17    may consider the charts and summaries as you would any other

18    evidence admitted during the trial and give them such weight,

19    if any, as you feel they deserve.

09:42 20         A defendant in a criminal case has a constitutional

21    right not to testify and a right not to produce any evidence at

22    all.  No inference of guilt, or of anything else, may be drawn

23    from the fact that a defendant did not testify.

24         In this case, both of the defendants have chosen to

25    exercise their right not to testify.  It would be improper and

unfair for you to speculate as to the reason or reasons why the

defendants have so chosen.  You must not infer anything

whatsoever from their decisions not to testify, and I

specifically instruct you that during your deliberations you

may not discuss that fact in any manner whatsoever.

An important part of your job as jurors will be

deciding whether or to what extent you believe what each

witness had to say, and how important that testimony was.  You

are the sole judges of the credibility of the witnesses.  In

deciding whether to believe a witness or how much weight to

give a witness' testimony, you may consider anything that

reasonably helps you assess that testimony.

The following are the kinds of questions you may want

to consider in evaluating a witness' credibility:  Did the

person seem honest?  Did she or she have some reason not to

tell the truth?  Did the witness have an interest in the

outcome of the case?  Did he or she gain any personal advantage

by testifying in this case?  Did the witness seem to have a

good memory?  Did the witness' testimony differ from his or her

earlier testimony or from the testimony of other witnesses?

Was the witness' testimony different on cross-examination than

on direct examination?  What was the witness' manner while

testifying?  These are some, but, of course, not all, of the

kinds of things that may help you decide how much weight to

give to what each witness had to say.

1    You may also consider any demonstrated bias, prejudice

2    or hostility of a witness in deciding what weight to give to

3    the testimony of that witness.

4    The mere number of witnesses or exhibits or the length

5    of the testimony has no bearing on what weight you are to give

6    to the evidence, or on whether you find that the burden has

7    been met.  Weight does not mean amount of evidence.  Weight

8    means your judgment about the credibility and importance of the

9    evidence.

09:44 10    There are some persons whose names you have heard

11    during the course of the trial but who did not appear here to

12    testify and as to whom there was no stipulation about what they

13    would testify to if they appeared.  Each party had an equal

14    opportunity or lack of opportunity to call any of those

15    persons.  Therefore, you should not draw any inferences or

16    reach any conclusions as to what they would have testified had

17    they been called.  Their absence should not affect your

18    judgment in any way.  You should, however, remember that the

19    law does not impose on a defendant in a criminal case the

09:45 20    burden or duty of calling any witness or producing any

21    evidence.

22    You may consider inconsistencies or differences as you

23    weigh evidence, but you do not have to discredit testimony

24    merely because an inconsistency or difference exists.  Two or

25    more witnesses may see or hear things differently.  Innocent

1    misrecollection, like failure of recollection, is a common

2    experience.  In weighing the effect of any inconsistency or

3    difference, consider whether it concerns a matter of importance

4    or an unimportant detail, and whether it results from innocent

5    error or intentional falsehood.

6         On the other hand, you are not required to accept

7    testimony merely because it is uncontradicted.  You may decide,

8    because of a witness' bearing or demeanor or because of

9    inherent improbability, or for whatever reason, that testimony

09:46 10  is not worthy of belief.  You may accept all of a witness'

11   testimony or reject all of it, or you may accept part and

12   reject another part.

13        A lawyer who calls a witness to testify in a criminal

14   trial may properly conduct interviews of such a witness before

15   he or she takes the witness stand at trial so as to present the

16   evidence in the case to the jury in an orderly and proper

17   manner.

18        By the same token, a witness may make his own free and

19   voluntary choice to either discuss the case or to refuse to

09:46 20  discuss the case with counsel, whether it be counsel for the

21   government or counsel for a defendant.

22        Accordingly, there is nothing nothing improper in a

23   lawyer interviewing a witness before he or she testifies.

24   There is also nothing improper if a witness elects not to

25   discuss the case with counsel before trial.

1          You have heard testimony of law enforcement officers.

2    The fact that a witness may be employed as a law enforcement

3    officer does not mean that their testimony is necessarily

4    deserving of more or less consideration or greater or lesser

5    weight than that of an ordinary witness.

6          It is also appropriate to consider whether, in their

7    investigation, the particular law enforcement witnesses acted

8    in accordance with the standards of their department or agency.

9    If you find any omissions in the investigation were significant

09:47 10    and not adequately explained, you may consider whether the

11    omissions tend to affect the quality, reliability, or

12    credibility of the evidence presented by the government.  It is

13    your decision, after reviewing all of the evidence, whether to

14    accept the testimony of the law enforcement witness and to give

15    that to that testimony whatever weight, if any, you you believe

16    it deserves.

17          You've heard testimony from witnesses who provided

18    testimony under an agreement with the government.  A witness

19    who admits to committing a crime and testifies against others

09:48 20    pursuant to a Plea Agreement with the government almost always

21    does so in the expectation or of a more lenient treatment in

22    reward for their cooperation.  You should credit testimony of

23    cooperating witnesses with particular caution.  A witness

24    testifying in such circumstances may be completely truthful.

25    They also may have had reason to make up stories or exaggerate

 1    what others did in order to help themselves.  You must

 2    determine whether the testimony of such witnesses has been

 3    affected by any interest in the outcome of the case, any

 4    prejudice for or against the defendants, or by any of the

 5    benefits they hope to receive from the government.

 6         You may consider the guilty pleas of cooperating

 7    witnesses in assessing their credibility, but you are not to

 8    consider their guilty pleas as evidence against these

 9    defendants in any way.

09:49 10        Now, the defendants in this case are being tried

11    together.  Each defendant, however, is entitled to have his

12    guilt or innocence determined on an individual basis.  Thus,

13    with respect to each charge, you must assess the evidence

14    against each defendant individually.

15         Sometimes a particular item of evidence will be

16    admitted against one defendant and not the other.  You may not

17    consider those items of evident whether determining the guilt

18    or innocence of the defendant against whom they have not been

19    admitted.

09:49 20        You are here to decide whether the government has

21    proven beyond a reasonable doubt that the defendants, Mr. John

22    Wilson and Mr. Gamal Abdelaziz, are guilty of the crimes

23    charged in the Indictment.  You are not to be concerned with

24    the guilt or innocence of any other person or persons not on

25    trial as a defendant in this case.  It's not unusual for

```
 1    criminal cases to proceed separately against different

 2    individuals even if they are allegedly involved in the same

 3    offenses or charged in the same indictment with other alleged

 4    crimes.  You may not speculate as to the reasons why other

 5    people are not on trial.  Those matters are wholly outside your

 6    concern and have no bearing on your function as jurors.

 7            A defendant in a criminal case is presumed to be

 8    innocent.  This presumption is a fundamental part of our legal

 9    system and remains with the defendant throughout all stages of

10    the trial and during your deliberations.  It is not overcome

11    unless, all of the -- from all of the evidence in the case, you

12    are unanimously convinced, beyond a reasonable doubt, that the

13    defendant then under consideration is guilty of a specific

14    charge against him.  The fact that that has been charged with a

15    crime is not in any sense evidence against him.

16            There is never any burden on a defendant in a criminal

17    case.  The law does not require the defendant to prove his

18    innocence or to produce any evidence at all.  The burden of

19    proof is on the government throughout the case.  It never

20    shifts to the defendant.  If the government fails to meet its

21    burden of proof beyond a reasonable doubt with respect to a

22    specific crime charged against the defendant then under

23    consideration, you must acquit that defendant.

24            If, however, the government meets its burden of proof

25    beyond a reasonable doubt, you have a similar responsibility to
```

09:50 at line 10
09:51 at line 20

1    find that defendant guilty.

2          As I have said, the burden is upon the defendant to

3    prove beyond a reasonable doubt that the defendant is guilty of

4    the charge against him.  This is a strict and heavy burden, but

5    it does not mean that a defendant's guilt must be proved beyond

6    all possible doubt.  It does require that the evidence exclude

7    any reasonable doubt concerning a defendant's guilt.

8          A reasonable doubt may arise not only from the

9    evidence produced but also from the lack of evidence.

10   Reasonable doubt exists when, after weighing and considering

11   all of the evidence, using reason and common sense, jurors

12   cannot say that they have a settled conviction of the truth of

13   a charge.

14         Of course, a defendant is never convicted on suspicion

15   or conjecture.  If, for example, you view the evidence in the

16   case as reasonably permitting either of two conclusions - one,

17   that the defendant is guilty as charged, the other that the

18   defendant is not guilty - you will find the defendant not

19   guilty.

20         It is not sufficient for the government to establish a

21   probability, even if a strong one, that a fact charged is more

22   likely true than not true.  That is not enough to meet the

23   burden of proof beyond a reasonable doubt.  On the other hand,

24   there are very few things in this world that we know with

25   absolute certainty, and in criminal cases, the law does not

1    require proof that overcomes every conceivable doubt.

2         I instruct you that what the government must do to

3    meet its heavy burden is to establish the truth of each part of

4    the offense charged by proof that convinces you and leaves you

5    with no reasonable doubt and thus satisfies you that you can,

6    consistent with your oath as jurors, base your verdict upon it.

7         If you so find as to the charge against the defendant

8    then under consideration, you will return a verdict of guilty.

9         If, on the other hand, you think there is a reasonable

09:54 10    doubt about whether that defendant is guilty of the offense,

11    you must give him the benefit of that doubt and find him not

12    guilty.

13         It is not against the law to donate money, even large

14    sums, to universities, nor is it against the law to hope that

15    such a contribution will make the admission of one's child to

16    that university more likely.

17         As I have explained, your duty is to apply the law as

18    I define it for you, and determine whether the government has

19    proven beyond a reasonable doubt that the defendant then under

09:54 20    consideration has committed the crimes with which he is

21    charged.

22         The question of whether someone committed an act

23    knowingly or intentionally should never be confused with the

24    motivation for the act.  Motive is what prompts a person to act

25    or fail to act.  The concept of motive is different than the

concept of knowledge or intent.  Knowledge or intent refer only to the individual's state of mind in acting or failing to act.

The government is not required to prove motive, and good motive, if any, is not a defense when the action or failure to act is a crime.  Thus, for the purpose of your deliberations, the motive of a defendant is immaterial except in so far as evidence of motive may aid in the determination of that defendant's state of mind or intent.

Now, the Indictment, to which I'll turn next, charges that the offenses alleged were committed "on or about" certain dates.  Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed on dates reasonably near the dates alleged in the Indictment, it is not necessary for the government to prove that the offenses were committed precisely on the dates charged.

So that's part one.

I turn to the Indictment in this case and the statutes on which it has been based.  The Indictment is simply a description of the charges against the defendants.  It is not evidence of anything, and you cannot consider it as evidence.

An Indictment can allege more than one charge against a defendant.  When it does, the different charges are stated separately in what we call "counts".  The Indictment in this case has nine counts against the defendants.  Some counts are against both defendants, and some are against only Mr. Wilson.

1    You should disregard the gaps in the numbers of counts before

2    you and keep in mind that the number of counts against

3    defendants is not evidence any way and should not be considered

4    as evidence by you.

5            The defendants pled not guilty to the charges and deny

6    committing the crimes.  As I have explained, they are presumed

7    innocent and are not guilty with respect to any count unless

8    you unanimously find that the government has proven that

9    defendant's guilt as to that count beyond a reasonable doubt.

09:57 10            Count 1 charges both the defendants with conspiracy.

11    Specifically, it charges the defendants with conspiracy to

12    commit four crimes, or what are called "underlying" or

13    "substantive" crimes.  The four underlying or substantive

14    crimes are also known as the "objects" of the conspiracy.

15            Here, they are:  One, mail fraud; two, honest services

16    mail fraud; three, wire fraud; and, four, honest services wire

17    fraud.

18            The defendants are accused of conspiring to commit

19    these crimes by engaging in a fraudulent scheme to obtain

09:58 20    property, specifically, admission to the University of Southern

21    California for their children, and to deprive those

22    universities of their intangible right to the honest services

23    of their athletic coaches and university administrators.

24            Count 2 also charges both defendants with conspiracy.

25    It charges them with conspiracy to commit a different crime,

federal programs bribery.  The defendants are accused of

conspiring to commit that crime by corruptly giving, offering

and agreeing to give something of value to a person, with

intent to influence and reward an agent of an organization that

receives more than $10,000 per year in federal funding, in

connection with any business, transaction, or series of

transactions of the University of Southern California involving

a value of $5,000 or more.

Counts 6, 8 and 9 charge defendant John Wilson with

substantive wire fraud and honest services wire fraud.

Mr. Wilson is accused of committing those crimes by engaging in

a fraudulent scheme to obtain property, in particular,

admission of his daughters to Harvard and Stanford

Universities, and to deprive those universities of their

intangible right to the honest services of their athletic

coaches and university administrators.

Counts 11 and 12 charge defendant Wilson with

substantive federal programs bribery.  Mr. Wilson is accused of

committing that crime by corrupt lively giving, offering and

agreeing to give something of value to a person, with intent to

influence and reward an agent of an organization that receives

more than $10,000 per year in federal funding, in connection

with any business, transaction, or series of transactions

involving anything of value of $5,000 or more.

Count 13 charges defendant John Wilson with filing a

1  false tax return.

2       For each count, the government must prove several

3  things, which we call elements, beyond a reasonable doubt.  I

4  will now give you instructions with respect to each count and

5  its elements.

6       Count 1 charges both defendants with conspiracy.  In

7  particular, it alleges that the defendants, along with others,

8  conspired to commit, quote, mail fraud and honest services mail

9  fraud (and wire fraud and honest services wire fraud), that is,

10  having devised and intending to devise a scheme and artifice to

11  defraud and obtain money and property, to wit admission to the

12  (University of Southern California), by means of materially

13  false and fraudulent pretenses, representations, and promises,

14  and to defraud and deprive (USC) of (its) right to the honest

15  and faithful services of (its) athletic coaches and university

16  administrators, through bribes and kickbacks, unquote.

17       The objects of the conspiracy charged in Count 1 are

18  mail fraud, honest services mail fraud, wire fraud, and honest

19  services wire fraud.

20       I now turn to some general instructions regarding

21  conspiracy that apply to both Counts 1 and 2.

22       A conspiracy is an agreement to commit a crime.  The

23  crime of conspiracy is an independent crime, and it is a

24  separate offense from the underlying or substantive crimes that

25  the defendants have allegedly agreed to commit.

1    If there are multiple charged counts of conspiracy,

2  the government does not have to prove that the defendants

3  agreed to commit all of, or even more than one of, the objects

4  in order for you to find them guilty of the conspiracy charge.

5    For example, in the context of Count 1, the government

6  does not have to prove that the defendant then under

7  consideration agreed to commit all four objects of the alleged

8  conspiracy, that is mail fraud, wire fraud, honest services

9  mail fraud, honest services wire fraud, in order for you to

10:02 10  find him guilty of the conspiracy charge.  The government must,

11  however, prove that the defendant agreed with one or more

12  persons to commit at least one of the four object crimes, and

13  you must unanimously agree on which object crime that defendant

14  agreed to commit.  In making this determination, you must, of

15  course, consider each defendant individually.

16    It is not a defense to a conspiracy charge that the

17  object of the conspiracy could not be achieved because of

18  circumstances that the conspirators did not know about.  Thus,

19  you may find the defendants guilty of conspiracy even though it

10:03 20  was impossible for them to carry out their plan successfully.

21    Remember, however, that in order to find a defendant

22  guilty of the charged conspiracy, you must find that the

23  defendant then under consideration intended to commit one of

24  the object offenses, not some other criminal or non-criminal

25  goal.

1          The government must prove that the conspiracy

2     specified in the Indictment, and not some other agreement or

3     agreements, even one involving some of the same alleged

4     conspirators, existed at or about the times specified in the

5     Indictment.

6          A conspiracy requires at least two conspirators.  When

7     a coconspirator becomes a government informant, from that point

8     forward he can no longer count as a conspirator.  Therefore, an

9     agreement between only an informant and one other individual

10:04 10    does not constitute a conspiracy.  If the informant and that

11    other individual had entered a conspiracy before the informant

12    began cooperating with the government, the informant's later

13    cooperation does not change that fact, and any actions

14    predating the informant's cooperation may, if you find by the

15    facts proved, be attributed to that conspiracy.

16          Recall, however, that the Indictment charges both

17    defendants with participation in two overarching conspiracies

18    prized of numerous participants: The fraud conspiracy charged

19    in Count 1, and the bribery conspiracy charged in Count 2.

10:05 20          To find the defendant then under consideration guilty

21    of those counts, you my find that the defendant participated in

22    the conspiracies charged in the Indictment, not some other,

23    possibly smaller conspiracy.

24          Now, some of the events you have heard about in this

25    case happened outside the Commonwealth of Massachusetts.  There

is no requirement that the entire conspiracy charged in either

Count 1 or Count 2 took place here in Massachusetts, or that

either agreement was entered into here.  For you to return a

guilty verdict on the conspiracy charged in Count 1, however,

you must find that the government has proved by a preponderance

of the evidence that at least part of the conspiracy charged in

Count 1 took place in Massachusetts.

Unlike every other element in this case, venue

requires proof only by a preponderance of the evidence.  That

means you need be convinced only that it is more likely than

not that part of the conspiracy took place in Massachusetts.

That standard of proof does not alter in any way the

requirement that the government must prove every other element

of each count beyond a reasonable doubt.

For you to find a defendant guilty of the conspiracy

charged in Count 1, you must be convinced that, as to that

defendant, the government has proven each of the following

elements beyond a reasonable doubt.

First, that the agreement specified in the Indictment,

and not some other agreement or agreements, existed between at

least two people to commit at least one of the following: Mail

fraud, wire fraud, honest services mail fraud or honest

services wire fraud.  And second, that the defendant willfully

joined the agreement.

With respect to the first element, a conspiracy is an

agreement, spoken or unspoken.  The conspiracy does not have to

be a formal agreement or plan in which everyone sat down

together and worked out all the details.  But the government

must prove beyond a reasonable doubt that those who were

involved shared a general understanding about the crime.  Mere

similarity of conduct among various people, or the fact that

they may have associated with each other or discussed common

interests does not necessarily establish proof of the existence

of a conspiracy, but you may consider such factors.

The government does not have to prove that the

conspiracy succeeded or that the objects were achieved.  A

conspiracy is complete, and the crime of conspiracy has

occurred, once the agreement to commit the underlying crime has

been reached.

To act willfully for the purposes of Count 1 means to

act voluntarily and intelligently and with the specific intent

that the underlying crime or crimes be committed; that is to

say, with bad purpose, either to disobey or disregard the law,

not to act by ignorance, accident, or mistake.

The government must prove two kinds of intent beyond a

reasonable doubt before the defendants can be said to have

willfully joined the conspiracy: An intent to agree and an

intent, whether reasonable or not, that the underlying crime or

crimes be committed.  Proof that the defendant willfully joined

the agreement must be based upon evidence of his own words and

1    actions.

2         You need not find that the defendant then under

3    consideration agreed specifically to or knew about all the

4    details in the crime, or knew every other coconspirator or

5    played a major role, but the government must prove beyond a

6    reasonable doubt that he knew the essential features and

7    general aims of the venture.

8         Even if that defendant was not part of the agreement

9    at the very start, he can be found guilty of the conspiracy if

10:09 10   the government proves that he willfully joined the agreement

11   later.

12         On the other hand, a person who has no knowledge of

13   the conspiracy but simply happens to act in a way that furthers

14   some object or purpose of the conspiracy does not thereby

15   become a coconspirator.

16         As I have previously noted, Count 1 of the Indictment

17   charges the defendants with conspiracy to commit mail and wire

18   fraud, as well as honest services mail and wire fraud.  These

19   crimes are the underlying crimes alleged to have been the

10:09 20   objects of the conspiracy charged in Count 1.

21         As I will explain to you in a moment, mail and wire

22   fraud on the one hand, and honest services mail and wire fraud

23   on the other hand, are different crimes.  Title 18 Section 1349

24   of the United States Code makes it a crime to conspire to

25   commit both mail and wire fraud, and honest services mail and

1   wire fraud.

2          I will now explain the elements of the object crimes.

3          The crimes of mail fraud, described in Section 1341 of

4   Title 18 of the United States Code, and wire fraud, described

5   in Section 1343 of Title 18 of the United States Code, have

6   three elements.  Elements are as follows:

7          First, that there was a scheme, substantially as

8   charged in the Indictment, to defraud or obtain money or

9   property by means of false and fraudulent pretenses;

10:10  10          Second, that the scheme to defraud involved the

11   misrepresentation or concealment of a material factor matter,

12   or the plan to obtain money or property by means of false or

13   fraudulent pretenses involving a false statement, assertion,

14   half-truth, or knowing concealment as to a material factor

15   matter;

16          Third, that the defendant knowingly and willfully

17   participated in this scheme with the intent to defraud;

18          Fourth, that, for the purpose of executing the scheme

19   or in furtherance of the scheme, the defendant caused the

10:11  20   United States mail to be used, or it was reasonably foreseeable

21   for the purpose of executing the scheme or in furtherance of

22   the scheme, the United States mail or delivery by a private or

23   commercial interstate carrier (for the mail fraud) or an

24   interstate wire communication (for the wire fraud) would be

25   used.

1          I will now describe the four elements of mail and wire

2     fraud in more detail.

3          The first element that the government must prove

4     beyond a reasonable doubt is that there was a scheme to defraud

5     or to obtain money or property by false and fraudulent

6     pretenses.

7          A "scheme" includes any plan, pattern, or course of

8     action.

9          The term "defraud" means to deceive another in order

10:12  10    to obtain money or property by misrepresenting or concealing a

11    material fact.

12         The term "false or fraudulent pretenses" means any

13    false statements or assertions that were either known to be

14    untrue when made or were made with reckless indifference to

15    their truth and that were made with the intent to defraud.  The

16    term includes all actual, direct false statements as well as

17    half-truths, the knowing concealment of facts, and the knowing

18    omission of material facts.

19         The term "property" in this case relates to the

10:12  20    admission of students to the Universities.  For purposes of the

21    mail and wire fraud statutes, admission slots are the property

22    of the Universities.

23         It is not necessary for the government to prove that

24    the defendant then under consideration realized any gain from

25    the scheme or that the intended victim, in this case, the

1  University of Southern California, suffered any loss, so long

2  as the goal of the scheme was to deprive the victim of money or

3  property.  You are not required to agree on the means or a

4  particular false statement that a defendant used to carry out a

5  fraudulent scheme.

6        Furthermore, there is no requirement that the person

7  or entity deceived be the same person or entity who is deprived

8  of money or property, nor that the particular defendant knew

9  the identity of the fraud victim.

10:13  10        The government is also not required to prove that a

11  particular defendant or defendants originated the scheme to

12  defraud.  A scheme to defraud need not be shown by direct

13  evidence but may be established by all of the circumstances and

14  facts in the case.

15        The second element of mail fraud and wire fraud is

16  that the false representation or fraudulent failure to disclose

17  relate to a material fact.  A fact or matter is "material" if

18  it has a natural tendency to influence or be capable of

19  influencing the decision of the decision-maker to whom it was

10:14  20  addressed.  Put differently, if you find that a fact was

21  intentionally withheld or omitted, you must determine whether

22  the fact was one that a reasonable person might have considered

23  important in making his or her decision, although the

24  government need not prove that anyone actually relied on the

25  statement or omission.

A3828

1          The third element of mail fraud and wire fraud is that

2     the defendant knowingly and willfully participated in this

3     scheme with the intent to defraud.  Defendants acted

4     "knowingly" if they were conscious and aware of their actions,

5     realized what they were doing and what was happening around

6     them, and did not act because of ignorance, mistake, or

7     accident.

8          In deciding whether the defendant then under

9     consideration acted knowingly, you may infer that the defendant

10:15 10     had knowledge of a fact if you find that he deliberately closed

11    his eyes to a fact that otherwise would have been obvious to

12    him.

13         In order to infer knowledge, you must find that two

14    things have been established: First, that the defendant was

15    aware of a high probability of the fact in question and,

16    second, that the defendant consciously and deliberately avoided

17    learning of that fact.  That is to say, the defendant willfully

18    made himself blind to that fact.

19         It is entirely up to you to determine whether a

10:16 20     defendant deliberately closed his eyes to a fact and, if so,

21    what inference, if any, should be drawn.  However, it is

22    important to bear in mind that mere negligence or mistake in

23    failing to learn a fact is not sufficient.  You cannot convict

24    the defendant upon a finding that he should have known, or that

25    a reasonable person would have known, an illegal act was taking

1  place.  There must be a deliberate effort to remain ignorant of

2  the fact.

3       The third element of mail and wire fraud requires not

4  only the defendant then under consideration knowingly

5  participated in the scheme, or was willfully blind to it, but

6  also that the defendant acted willfully.  You should not

7  confuse willful blindness, which concerns a defendant's

8  knowledge, with acting willfully, which concerns a defendant's

9  intent, and to which I will turn now.

10:17 10      To act "willfully" means to act voluntarily and

11  intelligently and with the specific intent to do something that

12  forbids, that is to say, with bad purpose either to disobey or

13  disregard the law and not by ignorance or mistake.  Intent may

14  be inferred from the surrounding circumstances.

15       Here, the government must prove that the defendant

16  acted with a specific intent to defraud.  Conversely, if that

17  defendant acted in good faith, he cannot be guilty of the

18  crime.  The burden to prove intent, as with all other elements

19  of the crime, rests with the government.

10:17 20      Intent or knowledge may not ordinarily be proven

21  directly because there is no way of directly scrutinizing the

22  workings of the human mind.  In determining what a particular

23  defendant knew or intended at a particular time, you may

24  consider any statements made or acts done or omitted by that

25  defendant, and all other facts and circumstances received in

**A3830**

1    evidence that may aid in your determination of his knowledge or

2    intent.  You may infer, but you certainly are not required to

3    infer, that a person intends the natural and probable

4    consequences of acts knowingly done or knowingly omitted.  It

5    is entirely up to you, however, to decide what facts are proven

6    by the evidence received during this trial.

7         As to the fourth element of mail fraud and wire fraud,

8    the government must prove that for the purpose of executing the

9    scream or in furtherance of the scheme, the defendant caused to

10:18 10   be used, or it was reasonably foreseeable that for the purpose

11   of executing the scheme or in furtherance of the scheme the

12   mail or an interstate wire communication would be used.

13        A mailing can be via the United States mail or

14   delivery by a private or commercial interstate, such as UPS or

15   FedEx.  An interstate wire communication includes a telephone

16   communication from one state to another, an e-mail transmission

17   or other internet communication, or a financial or wire

18   transaction from one state to another.

19        The mailing or interstate wire communication does not

10:19 20   itself have to be essential to the scheme, but it must have

21   been made for the purpose of carrying it out.  There is no

22   requirement that the particular defendant himself was

23   responsible for the mail or wire communication, that the mail

24   or wire communication itself was fraudulent, or that the use of

25   the mail or wire communication in interstate commerce was

1    intended as the specific or exclusive means of accomplishing

2    the alleged fraud.  But the government must prove beyond a

3    reasonable doubt that the defendant then under consideration

4    knew, or could reasonably have foreseen, that use of the mail

5    or wire communication would follow during the scheme, in

6    furtherance of the scheme, or for the purpose of executing the

7    scheme.

8            As I noted earlier, count one of the Indictment also

9    charges the defendants with conspiracy to commit honest

10:20 10    services mail fraud and honest services wire fraud.

11    Specifically, the defendants are charged with agreeing to

12    deprive the relevant universities of the intangible right to

13    the honest services of their athletic coaches and university

14    administrators.

15           Honest services mail fraud is defined by two statutes,

16    the first of which is the mail fraud statute that I previously

17    noted.  Similarly, honest services wire fraud is also defined

18    by two statutes, the first of which is the wire fraud statute

19    that I previously noted.

10:21 20           The second relevant statute for both crimes is

21    Section 346 of Title 18 of the United States Code, which

22    provides that the term "scheme to defraud", as set forth in the

23    mail and wire fraud statutes - in the context of honest

24    services fraud - includes a "scheme to deprive another of the

25    intangible right of honest services".

**A3832**

1          Taken together, the mail fraud statute and the honest

2    services fraud statute constitute the offense of honest

3    services mail fraud.  Similarly, taken together, the wire fraud

4    statute and the honest services fraud statute constitute the

5    offense of honest services wire fraud.  The four elements of

6    these offenses are as follows:

7          First, that the defendant knowingly devised or

8    participated in a scheme to defraud the relevant universities

9    of their intangible right to the honest services of their

10   athletic coaches and/or university administrators, through

11   bribery or kickbacks;

12         Second, that the defendant knowingly and willfully

13   participated in that scheme with the intent to defraud;

14         Third, that the scheme to defraud involved the

15   misrepresentation or concealment of a material factor matter,

16   or the omission of a material factor matter, or the scheme

17   involved a false statement, assertion, half truth, or knowing

18   concealment concerning a material factor matter; and

19         Fourth, that, for the purpose of executing the scheme

20   or in furtherance of the scheme, the defendant caused to be

21   used, or it was reasonably foreseeable that for the purpose of

22   executing the scheme or in furtherance of the scheme, the

23   United States mail or delivery by a private or commercial

24   interstate carrier (for honest services mail fraud) or an

25   interstate wire communication (for the honest services wire

fraud) would be used.

I have already instructed you on elements two, three
and four of honest services mail fraud and honest services wire
fraud, which are the same as mail fraud and wire fraud,
respectively, and I will not repeat those instructions here.

The first element of honest services counts is,
however, different.  The first element that the government must
prove is that the defendant then under consideration knowingly
devised or participated in a scheme to defraud the relevant
universities of their right to the honest services of their
athletic coaches and/or university administrators through
bribery or kickbacks.

As I previously described, a "scheme" is any plan or
course of action formed with the intent to accomplish some
purpose.  Thus, to find a defendant guilty of this offense, you
must find that he devised or participated in a plan or course
of action involving bribes or kickbacks given or offered to
athletic coaches and/or administrators of the Universities.
Without a bribe or a kickback, there cannot be an honest
services fraud.

An employee owes a fiduciary duty to his or her
employer.  This fiduciary duty is a duty to act only for the
benefit of the employer, and not for the employee's own
enrichment or benefit.  When an employee devises or
participates in a bribery or kickback scheme, that employee

violates his employer's right to his honest services.  This is
because the employee outwardly purports to be working solely
for the employer, but instead has received benefits from a
third party.  The employer is defrauded because the employer is
not receiving what it expects and is entitled to, namely, the
employee's honest services.

The breach of the fiduciary duty must be by
participation in a bribery or kickback team - which involves
the actual, intended, or solicited exchange of a thing of value
for something else, in other words, a quid pro quo (which is a
Latin phrase meaning "this for that" or "these for those").
The employee or fiduciary and the individuals providing the
things of value need not, however, state the quid pro quo in
express terms.  Rather, the intent to exchange may be
established by circumstantial evidence, based upon the
defendant's words, conduct, acts, and all the surrounding
circumstances disclosed by the evidence and the rationale or
logical inferences that may be drawn therefrom.

Bribery and kickbacks require the intent to affect an
exchange of something of value for, as applicable here, an
official act, but each payment need not be correlated with a
specific action.  The requirement that there be payment of a
thing of value in return for action is satisfied so long as the
evidence shows "a course of conduct" of things of value flowing
to an employee or fiduciary in exchange for the repeated action

1    of the employee/fiduciary.  All that must be shown is that

2    things of value were provided to the employee or fiduciary, or

3    for his or her benefit, with the intent of securing the action

4    of the employee/fiduciary in return.

5         A bribe is simply a payment or other benefit given in

6    exchange for an employee's provision of influence or favorable

7    treatment from his employer.  Payments to third parties,

8    including even employer universities, may qualify as bribes or

9    kickbacks.

10:27 10         An official act is a decision or action, or action, or

11    an agreement to make a decision or take an action, on any

12    matter within the scope of the employee's duties.  The matter

13    must be specific and focused and involve a formal exercise of

14    the organization's power.  A decision or action constituting an

15    official act may include using one's official position to exert

16    pressure on another official to perform an official act, or

17    advise another official knowing that such advice will form the

18    basis for an official act.

19         The government need not prove that the scheme succeed

10:28 20    he had, or that anything of value was exchanged.  Rather, the

21    government must only prove that the defendant then under

22    consideration knowingly devised or participated in a scheme to

23    defraud the Universities of their right to the honest services

24    of their employee or fiduciary through bribes or kickbacks.

25         I'm going to stop at this point and ask my deputy to

1    distribute the verdict form, which you will have when you

2    retire to the jury room.

3         All right.  You'll see that this is a court document

4    entitled "Verdict Form".  It says at the top "We, the jury,

5    unanimously find".  Then there are eight questions.  We'll go

6    through them one by one.

7         The first question says "The defendant under

8    consideration on the charge of conspiracy to commit mail fraud

9    (Count 1)", and then there's a place for Mr. Abdelaziz, not

10   guilty or guilty, and Mr. Wilson, not guilty or guilty.

11        Each successive question refers to a different crime.

12        The second question to wire fraud, as you'll see, as

13   opposed to mail fraud.

14        The third question is honest services mail fraud.

15   Over to page 2, the question has to do with honest services

16   wire fraud.

17        In each place, there's a space to answer as to each

18   defendant guilty or not guilty.

19        Question No. 5, which we haven't gotten to but will in

20   just a moment, refers to Count 2, and that is the federal

21   programs bribery.  Again, it has a place to check off not

22   guilty or guilty for both of the defendants.

23        Then questions six, seven and eight refer only to the

24   defendant John Wilson.  They do not involve the defendant

25   Abdelaziz.

```
 1            Question six, which is broken into three parts, says
 2   "The defendant, John Wilson, on the charges of wire fraud and
 3   honest services wire fraud with respect to", and they're broken
 4   out into three separate matters.  The first one involves the
 5   $500,000 wire transfer to a bank account.  It refers to that
 6   one.  Then there's a place to check off not guilty or guilty.
 7   The second one refers to a telephone call on October 27 of
 8   2018.  And the third to a wire transfer on December 11.  Each
 9   have a place to check with respect to Wilson not guilty or
10   guilty.
11            Turning over to the last page, paragraph 7 refers to
12   federal programs bribery, again, broken into two separate
13   subsections, one referring to a $500,000 wire transfer on
14   October 17 of 2018 and the second one on December 11, 2018,
15   again places to check off not guilty or guilty.
16            Finally, paragraph 8 refers or asks the defendant John
17   Wilson on the charge of willfully filing a false tax return and
18   a place for you to check those off.
19            After that, you'll see an instruction that says "Your
20   deliberations are complete.  The foreperson will sign the
21   verdict form and notify the marshal", et cetera.
22            So what I'd like to you do -- you understand this is
23   the verdict form you'll have in the jury room.  If you'll put
24   it down, we're going to talk about Count 2, which refers to the
25   question No. 5 and the succeeding questions after that.
```

**A3838**

1          Count 2 charges both the defendants with a second

2   conspiracy.  In particular, the Indictment alleges that the

3   defendants, along with others, conspired to commit federal

4   programs bribery, that is, quote, to corruptly give, offer and

5   agree to give anything of value to any person, with intent to

6   influence and reward an agent of an organization, to wit,

7   agents of USC, in connection with any business, transaction and

8   series of transactions of USC involving anything of value of

9   $5,000 or more, that is, in exchange for facilitating the

10:33 10   admission to USC for the defendants' children, where USC

11   received benefits in excess of $10,000 under federal programs

12   involving grants, contracts, subsidies, loan guarantees,

13   insurance or other forms of federal assistance in any one-year

14   period, unquote.

15          All of the instructions that I previously given you

16   generally relating to conspiracy in the context of Count 1

17   apply to Count 2.

18          Specifically, the government must prove beyond a

19   reasonable doubt that, first, the agreement specified in the

10:34 20   Indictment, and not some other agreement or agreements existed

21   between at least two people to commit the crime of federal

22   programs bribery and, second, the defendant then under

23   consideration willfully joined the agreement.

24          In addition to those two elements, the conspiracy

25   charged in Count 2 requires proof of a third element, namely,

1  that at least one of the members of the conspiracy committed an

2  overt act in furtherance of it.

3       The venue requirement for Count 2 is slightly

4  different than for that for Count 1.  For you to return a

5  guilty verdict on conspiracy charged in Count 2, you must find

6  that the government has proved, by a preponderance of the

7  evidence, that an overt act in furtherance of the conspiracy

8  charged in Count 2 occurred in Massachusetts.

9       I will now provide you with instructions regarding the

10:35 10  elements of the underlying crime of the conspiracy charged in

11  Count 2, federal programs bribery.

12       As previously noted, Count 2 of the Indictment charges

13  both defendants with conspiracy to commit the underlying

14  offense of bribery relating to an organization that receives

15  federal funds in violation of Section 666(A)(2) of the United

16  States Code.  The elements of the underlying offense of federal

17  programs prescribe that the government must prove beyond a

18  reasonable doubt are as follows:

19       First, that at the time alleged in the Indictment,

10:35 20  Donna Heinel and Jovan Vavic were agents of USC;

21       Second, that in a 1 year period, USC received federal

22  benefits in excess of $10,000;

23       Third, that the defendant then under consideration

24  gave, agreed to give, or offered something of value to

25  Ms. Heinel or Mr. Vavic;.

Fourth, that that defendant acted corruptly with the intent to influence or reward Heinel -- rather, Miss Heinel or Mr. Vavic with respect to a transaction or series of transactions at USC;

And, fifth, that the value of the transaction or series of transactions to which the payment related was at least $5,000.

As to the first element, an "agent" is a person authorized to act on behalf of another person or organization. Employees, partners, directors, officers, managers and representatives are all agents of the organization with which they are associated.

As to the second element, the government must establish that USC received, during a 1 year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of federal assistance. This does not include valid bona fide salary, wages, fees or other compensation paid or expenses paid or reimbursed in the ordinary course of business.

As to the third element, the government must prove that the particular defendant gave, agreed to give, or offered something of value to an agent of USC as alleged in the Indictment. The statute makes no difference between offering or giving a bribe and the mere offer of a bribe is just as much a violation of the statute as the actual giving of one. The

1    thing of value may be tangible property, intangible property or

2    services, of any dollar value, so long as it has value.

3         It is not necessary that the payment be made directly

4    to the agent.  If the payment was made to a third party or a

5    conduit for the purpose of influencing the agent, that is

6    sufficient to satisfy this element.

7         With respect to the fourth element, the government

8    must prove that the defendant then under consideration gave,

9    agreed to give, or offered something of value to the recipient

10:38 10    knowingly and corruptly and with the intent to influence or

11    reward the recipient's actions in connection with some business

12    or transaction of USC.

13         To act corruptly means simply to act voluntarily and

14    intentionally with an improper purpose or purpose to influence

15    or reward the recipient's actions.  This involves conscious

16    wrongdoing or, as it has sometimes been expressed, a bad or

17    evil state of mind.

18         In considering this element, remember that it is the

19    defendant's intent, at least in part, to influence the

10:38 20    recipient's actions that is important, not the subsequent

21    actions of the recipient or the organization.  Thus, the

22    government does not have to prove that the recipient accepted

23    the bribe offer or that the bribe actually influenced the final

24    decision of the agent or USC.  It is not even necessary that

25    the recipient had the authority to perform the act that the

1    defendant sought.

2         As to the fifth element, the government must prove

3    beyond a reasonable doubt that the value of the transaction to

4    which the payment related was at least $5,000.  To establish

5    this element, the government must prove that the particular

6    defendant intended to influence or reward the recipient in

7    connection with any business or transaction or series of

8    transactions of USC involving anything of value of $5,000 or

9    more.  If you find that the business or transaction in question

10   had a value of at least $5,000, this element is satisfied.

11        The government is not required to prove that the

12   defendant paid or offered at least $5,000.  It is the value of

13   the business or transaction that the bribe was intended to

14   influence or reward that is important for the purpose of this

15   element.

16        Now, as to Counts 6, 8 and 9, those counts of the

17   Indictment charge the defendant Mr. Wilson with substantive

18   counts of wire fraud and honest services wire fraud.

19        Count 6 charges defendant Wilson with wire fraud and

20   honest services wire fraud in connection with a $500,000 wire

21   transfer on or about October 17, 2018, to a bank account in the

22   name of the Key Worldwide Foundation.

23        Count 8 charges the defendant, Mr. Wilson, with wire

24   fraud and honest services wire fraud in connection with an

25   October 27, 2018 telephone call with William "Rick" Singer.

Count 9 charges the defendant, Mr. Wilson, with wire fraud and honest services wire fraud in connection with a $500,000 wire transfer on or about December 11, 2018, to a bank account in the name of the Key Worldwide Foundation.

In explaining the conspiracy charged in Count 1 and the objects of that conspiracy, I have previously instructed you on the elements of wire fraud and honest services wire fraud. I will not repeat those instructions here.

As to Counts 11 and 12 of the Indictment, they charge the defendant, Mr. Wilson, with substantive counts of federal programs bribery.

Count 11 charges the defendant, Mr. Wilson, with federal programs bribery in connection with a $500,000 wire transfer on or about December 11, 2018, to a bank account in the name of the Key Worldwide Foundation for the benefit of the sailing coach at Stanford University.

Count 12 charges the defendant, Wilson, with federal programs bribery in connection with a $500,000 wire transfer on or about December 11, 2018, to a bank account in the name of the Key Worldwide Foundation for the benefit of a fictitious senior women's administrator at Harvard University.

I have previously instructed you on the elements of federal programs bribery. I will not repeat all of those instructions here. However, I will remind you of the five elements that the government must prove in the context of

Counts 11 and 12 of the Indictment, which are:

First, as to Count 11, that at the time alleged in the indictment, the sailing coach of Stanford university was an agent of Stanford, and as to Count 12, the defendant believed that the fictitious "senior women's administrator" was an agent of Harvard;

Second, that in a one-year period, Stanford, as to Count 11, and Harvard, as to Count 12, each received federal benefits in excess of $10,000;

Third, that the defendant gave, agreed to give, or offered something of value to an individual who he believed to be an agent of Harvard, as to Count 11 -- I'm sorry -- an agent of Stanford as to Count 11 and Harvard as to Count 12;

Fourth, that the defendant Wilson acted corruptly with the intent to influence or reward an agent of Stanford, as to Count 11, and an agent of Harvard, as to Count 12, with respect to a transaction or series of transactions of the respective universities;

And, five, that the value of the transaction or series of transactions to which the payment related was at least $5,000.

Finally, Count 13 of the Indictment charges defendant Wilson with willfully filing a false federal income tax return.

For you to find Mr. Wilson guilty of that charge, the government must prove each of the following elements beyond a

1   reasonable doubt:

2       First, that the defendant Wilson made or caused to be

3   made a federal income tax return for the year in question,

4   namely 2014, that he verified to be true;

5       Second, that the tax return was false as to a material

6   matter;

7       Third, that Wilson signed the return willfully and

8   knowingly -- knowing that it was false;

9       And, fourth, that the return contained a written

10:45 10   declaration that it was made under the penalty of perjury.

11       A "material" matter is one that is likely to affect

12   the calculation of tax due and payable, or to affect or

13   influence the Internal Revenue Service in carrying out the

14   functions committed to it by law, such as monitoring and

15   verifying tax liability.  A return that omits material items

16   necessary to the computation of taxable income is not true and

17   correct.

18       I have previously instructed you as to the meaning of

19   the term "willfully" but, just to remind you, it means to act

10:45 20   voluntarily and intelligently and with the specific intent to

21   do something that the law forbids, that is to stay, with bad

22   purpose either to disobey or disregard the law and not by

23   ignorance or mistake.

24       Recall that intent may be inferred from the

25   surrounding circumstances, and that if the defendant then under

```
 1    consideration acted in good faith, he cannot be guilty of the

 2    crime.  Again, the burden to prove intent, as with all other

 3    elements of the crime, rests with the government.

 4         You'll be glad we are now at part three.

 5         When you go to the jury room to begin considering the

 6    evidence in this case, the foreman, Mr. Ayles, will assure that

 7    every juror is present during all of your deliberations and

 8    that all jurors, the foreman included, will have equal and full

 9    opportunity to participate in your deliberations.

10:46 10    All of the exhibits that have been admitted into

11    evidence will be able to you physically and you will be able to

12    listen to the audio recording dollars, if you choose.  There is

13    also a large, touch-screen computer in the jury room upon which

14    you will be able to access the exhibits and the Indictment

15    electronically.

16         I am told that operating the machine is very simple.

17    If you have any difficulty understanding the technology, you

18    can access a short tutorial film by pressing a button in the

19    lower left-hand corner of the screen.

10:47 20    Once you are in the jury room, if you need to

21    communicate with me, the foreman will send a written signed

22    message to me.  If you do send a written message to me, I will

23    discuss it with counsel for both sides before responding to

24    you, so please continue your deliberations to the extent you

25    are able during the time it takes me to respond to your
```

question.  Do not stop your deliberations while you wait for a

responsibility, and do not tell me how you stand, either

numerically or otherwise, on any issue before you, until after

you have reached a verdict.

On matters touching simply on the arrangements for

your meals, schedule and convenience, you are free to

communicate with the marshal orally rather than in writing.

You are not to communicate with anyone other than me about the

case, however, and then only in writing.

I have read to you what is called a verdict form.  The

verdict form is simply the written notice of the decision that

you reach.  You will have the original and copies of this form

in the jury room with you and, when you have reached your

verdict, you will have your foreman fill in, date, and sign the

original to state the verdict upon which you agree.

You will then report in writing to the marshal that

you have reached a verdict, after which you will be invited to

return with your verdict to the courtroom.

Your verdict of not guilty or guilty must represent

the individual verdict of each juror as to whether or not each

element of the charge against the defendant then under

consideration is proved beyond a reasonable doubt.  Your

verdict must be unanimous.

It is my practice, absent special circumstances, to

allow a jury to recess before dinner and begin deliberations

```
 1    again in the morning of the next regular court day.  In this
 2    case, that would be tomorrow, Friday.
 3            It is not quite time for you to start deliberating.  I
 4    will have a sidebar conference with counsel and you may be at
 5    ease for a few minutes.  I will then return with a final
 6    instruction to give to you before you retire to deliberate.
 7            I will see counsel at sidebar.
 8                    *** BEGINNING OF SIDEBAR ***
 9            THE COURT:  This is on behalf of defendant Abdelaziz.
10    Mr. Smart?
11            MR. SHARP:  Sharp.
12            THE COURT:  Excuse me, Mr. Sharp.
13            MR. KENDALL:  We will join in each other's objections,
14    your Honor.
15            THE COURT:  Okay.  Mr. Sharp.
16            MR. SHARP:  We object to the statement as to the
17    essential wiretaps being unlawful for the reasons stated in the
18    briefing.
19            We object to the Court not instructing on pretrial
20    publicity.
21            We think the Court misstated during the instruction on
22    reasonable doubt, that the defendant has a burden to prove
23    something.  I believe that was a misstatement.  We all heard
24    that.
25            THE COURT:  What was it that you heard?
```

```
 1          MR. SHARP:  That your Honor said the defendant,
 2   misspoke.
 3          LAW CLERK:  It was the settled conviction language, I
 4   believe, your Honor.  Essentially, instead of saying "do not
 5   have a settled conviction", I believe it was "you have a
 6   settled conviction".
 7          THE COURT:  Do you have a page?
 8          MR. KENDALL:  It was right after the presumption of
 9   innocence, your Honor, when you said there was no burden on the
10   defendant.
11          MR. SHARP:  Should I continue?
12          We object to the description of the conspiracy.  It's
13   not the conspiracy alleged in the indictment.  The conspiracy
14   alleged in the indictment related to the SAT, test cheating,
15   other matters, other universities, Georgetown.  The government
16   has the burden of proving the conspiracy alleged in the
17   indictment and not some other conspiracy.
18          THE COURT:  I thought I said that about six times.
19          MR. SHARP:  Well, your Honor, we object to the not
20   discussing the SAT test cheating and the other universities at
21   issue in Count 1.  Count 1 is broader than USC.
22          We object that the Court --
23          THE COURT:  Is that going to be redacted from the
24   version of the indictment that goes to the jury?
25          MR. KENDALL:  It hasn't been.
```

```
 1            THE COURT:  I thought you had an agreement as to what
 2    was and what was not redacted?
 3            MR. SHARP:  We don't believe it should be redacted.
 4            MR. KENDALL:  It shouldn't be.  They've alleged this
 5    overarching conspiracy.  They can't prove a smaller count of
 6    USC.  They have to prove this overarching conspiracy.
 7            MR. SHARP:  We object to the honest services
 8    instruction that the defendant has to intend that a fiduciary
 9    duty to be breached.
10:52 10         We object to the instruction that all employees owe
11    fiduciary duties to their employer.
12            We object to the failure to give a spoliation charge,
13    a failure to give a collect evidence charge, failure to
14    adequately instruct on good faith, including the instruction
15    that the government bears the burden of proving the absence of
16    good faith beyond a reasonable doubt and the defendant does not
17    bear any burden on good faith, failure to instruct collective
18    knowledge as set forth at docket 2015, failure to remind the
19    jury that Singer's testimonial statements cannot be used as
10:53 20    evidence, including as evidence of venue when he says "I am in
21    Boston", failure to refer to AUSA's Frank statements that
22    e-mails sent by Singer could prove defendants' knowledge when
23    only the defendants' actions and words can prove their intent
24    to join the conspiracy.
25            We object to permitting the jury to consider whether
```

there is venue in this case on Count 2 when there is no factual

predicate for venue on Count 2, especially in light of AUSA

Frank's closing argument referring to a tax filing from Lynn

Massachusetts which relates to a separate tax charge;

permitting the jury to consider a theory of conviction based

upon one part of an entity, the Athletics Department of USC,

defrauding another part of the same entity, the Admissions

Department of USC.  We believe this theory of conviction is

contrary to law.

10:54    We object to permitting the jury to consider a theory

of conviction for 666 bribery and honest services fraud where

there is no factual support because the government failed to

establish what, if any, honest services Donna Heinel or Jovan

Vavic owed to the University of Southern California; permitting

the jury to consider theories on conviction on Counts 1 and two

that the defendants entered into an overarching coast to coast

conspiracy when there has not been sufficient factual

foundation established at trial.

We object to the instruction on multiple conspiracies

10:55    to the extent inconsistent with that set forth at docket 2015.

For both counts, failure to provide a condonation

instruction when such instruction was warranted.  We object to

the Court's failure to object to both theories of condonation

as set forth in United States versus *Joslin* 206 F.3rd 144:

First, that condonation goes to intent and, second, that there

could be no scheme to defraud where the purported victim knew
of the fraud and, in fact, benefitted from it.  The jury should
have been able to consider this theory for Count 1 and Count 2,
property fraud, honest service fraud.

For Count 1 in particular, failure to instruct on the
overt act requirement; failure to instruct that an admissions
slot is not property or, in the alternative, not submitting the
question to the jury of whether an admissions slot is property;
failure to permit the jury to consider whether the
co-conspirators owed a fiduciary duty to USC, but instead
finding that because the co-conspirators were employees, they
necessarily fiduciaries; for the honest services count,
permitting the jury to consider a theory of honest services
that is contrary to law that a payment to a USC athletic
program is a bribe or kickback when the entity that was
purportedly deprived of its honest services was the University
itself; permitting the jury to consider a theory of conviction
that there could be honest services fraud where a payment is
made to a fund controlled by a coconspirator or where a
coconspirator benefits professionally from such payments, even
where it is made to an victim entity when there is no factual
predicate in the record.

We object to the failure to instruct the jury that
intent to deceive alone is not enough for honest services
fraud; that a payment to the entity deprived of its honest

1    services cannot be a bribe or kickback under the *Skilling* case;

2    that a bribe requires a private payment or private gain

3    personal benefit of the employee or some third party that is

4    not the victim entity; that salary, wages, psychic benefit,

5    such as basking in superior's praise or collateral professional

6    benefit cannot be the bribe or kickback itself; that a gratuity

7    is not by bribe or kickback; that foreseeable harm is an

8    element of honest services fraud; failure to adequately

9    distinguish for the jury between a legal and illegal quid pro

10:57 10    quo, therefore, permitting the jury to convict the defendant on

11    proof of a legal quid pro quo.

12         Objection to the instruction that a bribe can be a

13    payment to a victim as contrary to establish law.

14         Count 2, failure to clearly instruct on the corrupt

15    element of the statute, meaning that under the Court's

16    instructions, the jury could convict the defendants for what

17    was a legal quid pro quo.

18         Failure to properly describe a bribe as a payment to a

19    particular individual -- actually, strike the last part.

10:58 20         Failure to properly define a bribe as something other

21    than a payment to the victim, an entity that would benefit the

22    victim; failure to state the bribe requires private payment or

23    private gain or personal benefit to an employee; that a

24    gratuity is not a bribe; that a psychic benefit basking in

25    superior's praise, collateral professional benefit, et cetera,

A3854

1    cannot be a bribe or kickback; failure to instruct that

2    foreseeable harm is an element of the statute; failure to

3    instruct an official act is an element; failure for both

4    Counts 1 and two, failure to provide the specific intent

5    instructions set forth at docket 2015.

6          The Court did not instruct that "corrupt intent" means

7    the defendant knew that he was making a bribe, which permitted

8    the conclusion that purely legal contact and legal quid pro

9    quos, that the jury could convict the defendants for making

10   purely legal conduct, including purely legal quid pro quos, and

11   the Court did not specifically instruct on good faith with

12   respect to Count 2.

13         That's all I have, your Honor.

14         MR. KENDALL:  Your Honor.

15         THE COURT:  Wait a minute.  So what are you saying?

16   At the end of this with respect to reasonable doubt, I was to

17   say reasonable doubt exists when after weighing and considering

18   all the evidence using reason and common sense jurors cannot

19   say that they have a settled conviction on the truth of the

20   charge?

21         MR. SHARP:  I believe you left out the word "cannot",

22   your Honor, in your oral remarks.

23         THE COURT:  So I said "jurors can"?

24         MR. SHARP:  I think it was the opposite of whatever it

25   was.  It was either "can" or the word is missing.

**A3855**

```
 1              THE COURT:  Let me hear the rest.  I take it
 2   Mr. Kendall wants to add.
 3              MR. KENDALL:  Yes, your Honor.
 4              MR. SHARP:  For the record, we join in defendant
 5   Wilson's forthcoming objections.
 6              MR. KENDALL:  And we join in Aziz's.  I may have some
 7   redundancy because I haven't organized my notes as well as I'd
 8   like.
 9          I think he raised issue of misspeaking about the
10   burden is on the defendant to provide evidence.
11          I believe the language you used "settled conviction of
12   the truth of the charge when giving reasonable doubt".  This is
13   Mr. Levy, who is assisting me on the jury charge, your Honor.
14              MR. LEVY:  Yes.  Similar instance.
15              THE COURT:  What are are we talking?
16              MR. KENDALL:  The Court in referring to settled
17   conviction of the truth of the charge.
18              MR. LEVY:  This is the issue we were just discussing.
19   "Cannot" is I believe what was left out.  That's what we heard.
20              THE COURT:  All right.
21              MR. KENDALL:  With respect to -- you gave the
22   instruction it's not against the law to donate money to a
23   university in the hope that admission would be more likely.  I
24   don't think that's strong enough, your Honor.  We need an
25   instruction that says there's nothing against the law to donate
```

11:00 (line 10)
11:01 (line 20)

1   money to a university in order to influence an admission

2   decision.  That's clearly what my client was told about the

3   president of Harvard.  We think that was clearly Miss Chassin's

4   testimony.  It has to be much stronger than a hope.  It can be

5   to influence an admission decision, if that's what a school

6   willing to do.

7          Your Honor, with respect to all of the honest services

8   charges in both the conspiracy and the substantive counts, to

9   obtain admission to USC or to obtain admission to a university,

11:02 10   as we discussed with you before, was not property.  We view it

11   as recognized under the mail or wire fraud statutes.  That will

12   be every time that issue comes up with each of the counts with

13   our client.

14          MR. LEVY:  For the record, your Honor, Mr. Kendall is

15   referring both to the wire fraud statute as well as honest

16   services statute.  Both charges.

17          MR. KENDALL:  For the mail as well.  For all of the

18   fraud statutes.

19          With respect to Harvard and Stanford, we think there

11:02 20   has to be some definition of what's the intangible right to the

21   honest services of the coach and administrator.  There's no

22   guidance to them and there's no evidence really to say what

23   their relationship was, what they owed to the University, what

24   did the University expect from them.  We had a little bit of

25   that at USC where Chassin said coaches -- there's no rule to

1    prohibit a coach from taking into effect a donation, but we

2    don't have any guidance of any kind for Harvard and Stanford.

3         With respect to every time the issue of bribery came

4    up, both with respect to the mail and wire fraud statutes as

5    well as the federal program bribery statute, I think the Court

6    has to give direction that they have to show that in order to

7    be a bribe, that the money benefitted the individual personally

8    in a corrupt way and to the detriment of their employer.

9         You know, it is the issue that we have fought over,

11:03 10    your Honor.  He obviously have to incorporate our briefing on

11    this, but a donation to the university's bank account or to the

12    university's program can in no way be a bribe for either

13    federal program bribery or any of the fraud statutes for the

14    conspiracy or substantive.  When you said you corruptly give

15    something of value to a person with respect to the program

16    bribery statute, I think we have to clarify that it goes to the

17    person and not the university.

18         Again, whenever the phrase "bribes" or "kickbacks"

19    come up, we think that's the same issue.  Whenever any fraud

11:04 20    statute, the issue of property comes up, it has to be indicated

21    that admission to USC or admission to any university is not

22    sufficient.

23         We do believe impossibility is a defense.  The Court

24    did not give that instruction.  You indicated you were not

25    going to.  We believe in impossibility and legal impossibility,

```
 1    issues that we raised with you earlier.  Both should have been

 2    included.

 3              MR. LEVY:  Your Honor, with respect --

 4              THE COURT:  Is there a double team?

 5              MR. KENDALL:  If I have the time, I'll take my notes.

 6              THE COURT:  In this case, I'll let it go.

 7              MR. LEVY:  Understood, your Honor.  I'll be very

 8    brief.  With respect to your Honor's initial description of

 9    federal program bribery in the overview of the counts, you

10    referenced that $10,000 in federal funding was required as

11    opposed to benefits.  We object to that.  The cite for that is

12    Fernandez case 915 F.3rd 2 through 4.

13              With respect to your Honor's statement in discussing

14    the fraud counts that concealment or omission could form a

15    basis for liability, we incorporate our prior papers, ECF 2076

16    at 17, that there was no --

17              THE COURT:  Keep your voice down.  High enough so heck

18    she can hear you but low enough so the jury isn't party to this

19    conference.

20              MR. LEVY:  Your Honor, with respect to materiality, we

21    object to the Court's description that a reasonable person's

22    standard applied.  We believe that, under the Apalon case, it

23    is actually -- the standard is the decision-maker itself and

24    the information that they would want as opposed to a reasonable

25    person.
```

```
 1            We object to a willful blindness instruction that was
 2   given.  Our papers are ECF 2078 at 18.
 3            On the fiduciary duty issue, we believe that, as a
 4   matter of law, the jury should have been instructed that state
 5   law controls whether or not an individual is a fiduciary as
 6   opposed to federal law.  And we believe that issue is left open
 7   in Skilling and incorporate our prior briefing on that.
 8            Alternatively, excuse me, at one point your Honor had
 9   said an employee or fiduciary in discussing quid pro quo with
11:07 10   reference to the honest services charge.  We object.  It would
11   have to be a fiduciary.
12            We object to the official act requirement not being
13   included with respect to the federal program bribery charge and
14   the Martinez case that we cited our papers on that you
15   discussed this morning.  They're incorporated there.
16            With respect to the official act requirement, your
17   Honor did not include the language from McDonough where the nap
18   out case 332 F. sub 533 clarifying that an official act needed
19   to be something like a contract filing a lawsuit or something
11:07 20   like that.
21            With respect to federal program bribery and your
22   Honor's instructions regarding gives offers, agrees to give, we
23   believe the jury should have been instructed that an offer is
24   not an offer unless the counterparty actually receives the
25   message, so to speak.
```

```
 1              Same thing with the agreeing to give.  We believe your

 2     Honor should have instructed there is no agreement to give

 3     unless the counterparty has solicited the actual counterparty

 4     and the actual defendant at issue, in turn, agreed to give a

 5     bribe.

 6              With respect to your Honor's description of

 7     willfulness, in particular for Count 13, we object to it not

 8     being put into language in pattern instructions.  The pattern

 9     is 4.267206.  It's the violation of a known legal -- voluntary

11:08 10  violation of a known legal duty.

11              MR. KENDALL:  It's the elevated level of intent for

12     tax charge, your Honor.

13              MR. LEVY:  Your Honor, with respect to the tax count,

14     we believe the jury should have been instructed on the specific

15     theory that the government has restricted itself to in this

16     case, namely, the issue that Jovan Vavic was bribed and,

17     therefore, the deductions were improper or, alternatively, that

18     the deductions at issue were not true business expenses.

19              One moment, your Honor.  With respect to aiding and

11:09 20  abetting, we understand the government has taken the position

21     that the jury should not be instructed on that, however, our

22     position is that the jury should be affirmatively instructed

23     that aiding and abetting cannot form the basis for a conviction

24     in this case.

25              With respect to official act, your Honor, we believe
```

1   the jury should have been expressly instructed that, as a

2   matter of law, merely expressing support or writing a letter of

3   recommendation cannot be an official act and that the Court

4   should give guidance on what requires pressure for the federal

5   programs bribery statute.  Our citations are the *Jefferson* case

6   289 F.3rd 717, as well as the Third Circuit's decision in

7   *Falter* 914 F.3rd 112.

8          With respect to the honest services charges against

9   Mr. Wilson in particular, we believe your Honor should have

11:10 10  instructed that the jury had to find beyond a reasonable doubt

11  that there was, in fact, a SUBCO like process that existed as

12  those institutions and that the defendant, at a minimum, knew

13  facts under which he believed the employees at issue were

14  fiduciaries under Massachusetts and California law,

15  respectively.

16          We also object to not having a venue instruction that

17  mentioned a preponderance of the evidence with respect to

18  Count 1 which lines up with our position that an overt act is

19  required and the First Circuit has not resolved the issue

11:11 20  definitely whether an overt act is required for wire fraud.

21          MR. KENDALL:  Your Honor, I have a few others.

22          When you gave --

23          THE COURT:  Who is this on behalf of?  Whose was his

24  on behalf of?

25          MR. KENDALL:  We're doing it jointly, your Honor.  I

```
 1    did not have time to go through my notes.

 2             THE COURT:  Okay.

 3             MR. KENDALL:  You gave an instruction about the false

 4    statement that you said that the government has to prove that

 5    there's a false statement that relates to a material fact.  I

 6    thought you had indicated yesterday you were not going to use

 7    the "relate to" language, it would have to be a false statement

 8    about a material fact.

 9             Second, your Honor, with the willful blindness

11:11 10    instruction, I'm not sure if this was said or not.  I don't

11    believe I heard that you said they cannot use willful blindness

12    to consider whether someone joined a conspiracy.  It can only

13    be used for other issues about, but not whether or not they

14    joined the conspiracy.

15             With respect to -- let me go through my notes.

16             With respect to the definition of the fiduciary duty,

17    you instructed that the employee has a fiduciary duty only to

18    act for the benefit of the employer, your Honor.  I think the

19    fiduciary duty has to be defined by the actual expectations or

11:12 20    requirements of the individual in the applicable state law, but

21    also their contract and the customs and practices of the

22    institution.

23             With respect to participation of the kickback and

24    bribery scheme, we made a reference that they have to prove

25    that they received benefits from a third party.  I think it has
```

1    to be that it's actually a corrupt bribe, as we previously

2    described it in the traditional terms.

3          When you defined "breach of fiduciary duty", you used

4    the quid pro quo language, which we've already discussed, we

5    think is not adequate to show there's sufficient corrupt intent

6    and deprivation of the interests of the principal in the

7    fiduciary relationship.

8          Again, when you said "they need not state the quid pro

9    quo in express terms", given the problems with the quid pro quo

11:13 10    and definition of bribery, we think that was improper as well.

11          Then you instructed that the bribes and kickbacks are

12    required or in exchange for an official act.  Again, your

13    Honor, it's the definition of bribes and kickbacks for an

14    official act.  They are donations and would not be a violation

15    of any of the fraud statutes or the bribery statutes.

16          You used the language "in the course of conduct of

17    things of that value that flow to the employee or fiduciary".

18    Again, the issue of whether or not the donation to the

19    University could be included in that or not we object to.

11:14 20          Again, a bribe is simply a payment to or payments to

21    third parties, even to the employing university, we object to.

22    Any official act that's any matter within the scope, including

23    the formal exercise of the organization's power, but then you

24    said "to advise another official to take an official act would

25    be within that scope", and we think that language "to advise

         1    another" -- you said to "exert pressure or advise another

         2    official to take some action".  We think that's beyond what the

         3    law allows.

         4         We've objected to the verdict form already.  You're

         5    aware of our objections.

         6         Then, your Honor, in discussing the federal bribery

         7    statute, the Court gave instructions the defendants gave

         8    something of value to Heinel and Jovan Vavic and they acted

         9    corruptly to reward or to influence, Heiel and Vavic.  They

11:15  10    offered to give a bribe and, your Honor, that's again bribery

        11    language we've discussed before.

        12         I think when the Court gave the instruction if the

        13    money was paid to a third party or a conduit, it creates some

        14    ambiguity, because if the third party is the university, that's

        15    not something prohibited by the statute.

        16         I'm towards the end, your Honor.  I thank you for your

        17    patience.

        18         You spoke about a bad or evil state of mind about what

        19    the jury is to consider.  Again, I think that raises the issue

11:16  20    of whether the money is going to the University and that's not

        21    within the scope of a bad or evil state of mind.

        22         Same thing with the influence or received, to

        23    influence or receiver the recipient.  We have to put in that

        24    it's the corrupt personal benefit.

        25         Your Honor, I think you misspoke on one of the

1    instructions.  When you were talking about Counts 11 and 12,

2    the money I think you said for both of them was transferred

3    both times in December 2018.  I think one it was October 2018

4    and the other time it was December.  I think it was just a

5    misspeaking.

6         Then when you gave the elements of the federal program

7    bribery for Counts 11 and 12, you said "give benefits to an

8    agent and reward an agent".  Again, we think it raises the

9    issue it has to be corrupt bribery for the benefit of the

11:17 10   person, as we extensively discussed.

11        Mr. Levy raised with the tax charge.  We think you

12   have to instruct them that they have to prove that Mr. Wilson

13   intentionally violated a known legal duty for a tax charge.

14        This is my last few issues, your Honor.

15        Your Honor, we do object to the narrowing of Count 1

16   to just USC given the *Kodiakas* issues and the *Petriezzello*

17   issues.  I think the government has to meet the burden that

18   it's assumed.

19        You said that the agent did not have to have the

11:18 20   actual authority to do the acts that were asked of them.  We

21   believe that it should be the opposite of that.

22        Then if I can just go through my last few notes, your

23   Honor.

24        The definition that a conspiracy should be two or more

25   people, we raised that with you before, your Honor.  Given the

 1   nature of the conspiracies, they involve far more than two

 2   people and it should not be limited to just two or more people.

 3          The Court used concealment language.  I don't know if

 4   the Court used omissions.  The Court used concealment and

 5   omissions and half-truths of material facts.  I don't think

 6   those are at issue in this case and I don't think that would be

 7   the appropriate language to instruct the jury on.  Same with

 8   respect to a false statement, assertion of a half-truth,

 9   knowing concealment, without saying that they must be material

11:19 10  if those things did occur.  In addition, we object to them

11   being said.  If they did occur, they have to be about something

12   that's a material fact.

13          I believe upon your instruction, your Honor, the case

14   has been narrowed to they have to prove that there was a

15   falsified athletic profile as part of any scheme or artifice to

16   defraud or as part of any bribery scheme.  That's how they've

17   narrowed it, and I believe that's how your court order had

18   recognized it.  I think the jury has to be instructed for that

19   for each one they have to prove that there's a falsified

11:20 20  athletic profile for every count in the case, even with the tax

21   one, because the tax one turns on whether or not there was a

22   bribe or improper payment made, violation of federal bribery

23   law.

24          MR. LEVY:  Your Honor, lastly, with respect to the

25   honest services counts at issue in this case, both the

**A3867**

conspiracy and the substantive counts, we believe the jury

should have been instructed that the relevant honest services

are controlled by the customs, practices and policies of the

Athletic Department, which is where the employees the issue

either worked or supposedly worked.

MR. KENDALL:  For USC.  And then for wherever the

senior women's administrator and the Stanford coach worked.

Done?

MR. LEVY:  Yes.

MR. KENDALL:  Thank you for your patience, your Honor.

THE COURT:  Government?

MR. FRANK:  Does your Honor want me to respond to

anything specifically?

THE COURT:  This is for the benefit of the parties.

You're free to say anything you want.

MR. FRANK:  May I have one moment, your Honor?

THE COURT:  Yes.

MR. KENDALL:  Your Honor, when Mr. Frank returns, we

have one other thing to mention.

THE COURT:  Mr. Frank.

MR. FRANK:  Your Honor, we don't believe there's been

an improper narrowing of the charges the Court laid out the

scope of the conspiracy.  We believe the conspiracy was

accurately set forth by the Court and there was evidence of the

manner in which the conspiracy set forth, so we don't believe

 1    there's anything to correct there.

 2            With respect to the allegations, the suggestion that

 3    the Court misspoke at a couple of points in the giving of the

 4    charge, we believe that -- we didn't hear that and if the Court

 5    is inclined to correct something, we would suggest that we

 6    first check with the court reporter rather than unnecessarily

 7    draw attention to one component of the charge over other

 8    components of the charge, which we believe would be the

 9    consequence of revisiting those things.

11:22 10          With respect to everything else, we'll rest on our

 11   papers and the Court's prior orders.

 12           MR. SHARP:  We don't object to checking with the court

 13   reporter of course, if it can be done.

 14           With respect to the Indictment, the copy of the

 15   Indictment that the jury will receive that we agreed upon,

 16   those have allegations with respect to Georgetown, other

 17   universities, the SAT, the ACT.  When the Court instructed the

 18   jury on what the indictment charge, the Court did not include

 19   those allegations and we do feel strongly that what is in the

11:23 20   indictment must be proved and that to the extent the jury might

 21   be confused that those allegations appear in the indictment but

 22   the Court did not refer to them.

 23           THE COURT:  Do you wish to respond to that, Mr. Frank?

 24           MR. FRANK:  The indictment charged the defendants

 25   inspired to improperly gain admission to universities through

```
 1    various manners and means as set forth in the indictment.  We

 2    believe the evidence showed that in the scope of the

 3    conspiracy.

 4              THE COURT:  All right.  Thank you.

 5              MR. KENDALL:  Your Honor, we have a couple other

 6    things.

 7              We object to the instruction that an official act is

 8    anything within the scope of the agent's duties or actions.  We

 9    think there's a much higher standard we covered in the briefing

11:24 10   that we filed with the Court.

11              May Miss Papenhausen articulate anything?

12              THE COURT:  No.

13              MR. KENDALL:  You gave an instruction that the

14    official act could be something done in exchange for

15    facilitating for the admission when defining the $5,000

16    requirement.  You said the official act could be in exchange

17    for facilitating the admission of the defendants' children.  We

18    don't believe facilitating is an official act.

19              Thank you for your patience, your Honor.

11:24 20   THE COURT:  All right.  I'm going to check with the

21    court reporter on one matter.  Thank you, counsel.

22                    *** END OF SIDEBAR ***

23              THE COURT:  All right, members of the jury.  You

24    probably noticed there are 15 of you and only 12 in a jury.

25    The last three jurors seated in the jury box way back when we
```

began this 3 weeks ago are alternates.  That doesn't mean that
their job has been wasted or even that their job is over
because I'm going to ask you all to remain.  They will not be
deliberating with the jury.  They will remain in case I need
their help at a later time.  They're not to deliberate
themselves.  They can talk about anything else, but not about
this case.

The alternates, the last three jurors seated were
Mr. Marshal in seat 5, Miss Reyes in seat 15 -- 14 -- and
Mr. Callahan in seat 15.

So my deputy will show you a different room to be in.
The rest of you will be the deliberating jury.

Now, members of the jury, it is now time for the case
to be submitted to you.  You may commence your deliberations.
All of you who are the jury must be together at all times when
you are deliberating.  Whenever you need a recess for any
purpose, your foreman, Mr. Ayles, may declare a recess.  Do not
discuss the case during a recess in your deliberations.  All of
your discussion of the case should occur only when you are all
together and your foreman has indicated that deliberations may
proceed.  This should be your procedure so that everyone on the
jury will have an equal opportunity to participate and to hear
all of what other the members of the jury have to say.

You may go to the jury room and commence jury
deliberations.

```
 1              THE CLERK:  All rise for the jury.

 2                   (Jury exits.)

 3              THE COURT:  Be seated, counsel.  We need to assemble

 4    all of the exhibits to be submitted in paper as well as

 5    electronically.  You'll need to stay here for when the clerk

 6    returns.

 7              Also, you need to be available within 10 minutes if we

 8    have any question from the jury.  So please leave your cell

 9    phone numbers and ability for the deputy to reach you.  If we

11:29 10   get a question, I want to be able to at least have you able

11    within ten minutes.  We may not be able to talk to you that

12    quickly, but we need to have your ability.

13              Is there anything else that needs to come to the

14    attention of the Court outside the hearing of the jury?

15              MR. KELLY:  No, your Honor.

16              MR. KENDALL:  No, your Honor.

17              MR. FRANK:  No, your Honor.  Thank you.  Would you

18    like us back at the end of the day or in the morning?

19              THE COURT:  Yes.  If we go to the end of the day, I do

11:29 20   not inquire of juries as to whether they want to go home.  They

21    ask me.  I haven't ever had them go beyond 5:15 before they

22    ask.  If and when they ask to be excused, I will excuse them

23    and call them into the jury room and caution them with my usual

24    cautions.  So it behooves you to be here toward the end of the

25    day.  I can't tell you exactly what time, but during the end of
```

```
 1    the day.
 2           MR. KELLY:  Is it the Court's practice to have us here
 3    as 9:00 a.m. as well?
 4           THE COURT:  Yes.  I greet them at 9 o'clock in the
 5    morning and tell them welcome back and go to work.  If you want
 6    to be here, you can be.  I don't require you to be.  I expect
 7    you will be.  We're in recess.
 8           (Recess taken.)
 9            Clerk all rise.  Thank you you may be seated.
10    THE COURT:  Good afternoon, counsel.  The jury has
11    asked to go home for the day.  I am going to allow that
12    request.
13           Before I call them, I wanted to run by you what I
14    intend to do with the alternates.  I'm going to bring the
15    alternates back in.  They, of course, have not been with the
16    other 12.  They've been in a separate room.  I'm going to call
17    them in.  They will not be in the jury box.  They'll be in
18    these three seats here.  I'm going to thank them for their
19    service and tell them they don't have to come in tomorrow, but
20    that I would like them to stay available in the unlikely event
21    that we would need their attendance so that they would be
22    available at telephone to come in if we needed them.  That's
23    what I normally do after the first day of deliberation.  I
24    would tell them also that my deputy will call them sometime
25    toward the end of day tomorrow to tell them what their
```

responsibilities are thereafter.  It would be my intention,

unless something else happens, to not require them to remain

available after the end of the day tomorrow.  Any problem with

that?

MR. KELLY:  Your Honor, I would respectfully suggest

that after tomorrow if there's no verdict to keep them

available next week for at least a day or two given all the

health situation out there.  If one of these 12 remaining

jurors get sick, and we need an alternate.

05:00  THE COURT:  I'm certainly going do that for tomorrow.

We can talk about toward the end of the day tomorrow.

MR. KELLY:  We request that the alternates be

instructed they can't look at the media either.  I do think

given -- we've been lucky so far, but who knows what happens

with the weekend.

THE COURT:  We'll cross that bridge when we get to it

late tomorrow.  I'll take that under advisement.

THE COURT:  Mr. Kendall?

MR. KENDALL:  I join with Mr. Kelly's position.

05:01  THE COURT:  The government?

MR. FRANK:  We agree, your Honor.

THE COURT:  We'll call the jury.  The 12 deliberating

jurors will be seated in the box.  My deputy is going to tell

the two at the end to fill in the blank seat in the front row.

Of course, the back row is the same because the alternates were

          1    the last three anyway.  The three alternates will be seated

          2    outside the box here.

          3              Call the jury.

          4              (Jury enters.)

          5              THE CLERK:  Thank you.  You may be seated.

          6              THE COURT:  Good afternoon, jurors, and /TKPWA,

          7    alternates.  You've asked to go home.  You've worked hard

          8    today.  You deserve to have an affirmative response to that.

          9    It's a little bit after 5 o'clock.  I am going to allow you to

05:05  10    recess for the evening and return tomorrow morning at 9:00 a.m.

         11    to continue your deliberations.

         12              Now, it is especially important now that you are a

         13    deliberating jury that you not consult with anybody else or

         14    read anything in the media or let anybody talk to you about

         15    what's in the media, and that might happen.  Somebody's going

         16    to say, I saw in the newspaper.  You say, no, I cannot talk

         17    about that, I cannot think about that, because what I am doing

         18    is I'm part of a jury that is deliberating toward a verdict.

         19    You are to honor my instructions.  It's more important than

05:05  20    ever before.

         21              With respect to the alternates, I'm going to permit

         22    you not to come in tomorrow, but I want you to remain available

         23    by the phone in the unlikely event we need your attendance.

         24    That doesn't mean you can't do anything.  I want you to be

         25    available and give my deputy your cell phone numbers, if you

have them, and just remain available.  You too are not allowed

to /SRAO*U any media or talk to anybody about this case.  You

are still part of this jury and the instructions that I give to

the deliberating jury apply equally to the alternates.  So,

please, all of you, honor my instructions.  You deserve to have

a night off to think about anything else.  Maybe you can watch

the Red Sox.  I don't want you to think about this case or talk

about it.

I'll see you tomorrow morning at 9 a.m.  And I will

greet you at 9 a.m. before you start your deliberations.  Those

alternates don't have to come.  You have to remain available.

My deputy will call you sometime during the day to advise you

about any future responsibilities, but you will hear from her

tomorrow.  Okay?  Have a pleasant evening.  I'll see the

deliberating jury tomorrow morning at 9 a.m.

THE CLERK:  All rise for the jury.

THE COURT:  We will reconvene at 9:00 a.m. tomorrow

morning.  Anything that needs to come to the Court's attention

before we recess for the night?

MR. KENDALL:  No, your Honor.

MR. KELLY:  No, your Honor.

THE COURT:  Then we are in recess until 9 o'clock

tomorrow morning.

(Whereupon, the proceedings adjourned at 5:07 p.m.)

```
 1                     C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    October 7, 2021 in the above-entitled matter to the best of my

11    skill and ability.

12

13

14        /s/ Kristin M. Kelley               October 7, 2021

15        Kristin M. Kelley, RPR, CRR              Date
          Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 3


 4
     UNITED STATES OF AMERICA,        )
 5                       Plaintiff    )
                                      )
 6   vs.                              )  No. 1-19-CR-10080
                                      )
 7   GAMAL ABDELAZIZ and JOHN         )
     WILSON,                          )
 8                       Defendants.  )
                                      )
 9                                    )


10

11
                 BEFORE THE HONORABLE NATHANIEL M. GORTON
12                  UNITED STATES DISTRICT JUDGE
                         JURY TRIAL - DAY 21
13


14
              John Joseph Moakley United States Courthouse
15                         Courtroom No. 4
                          One Courthouse Way
16                   Boston, Massachusetts 02210


17


18                         October 8, 2021
                             9:08 a.m.
19


20


21
                   Kristin M. Kelley, RPR, CRR
22                    Official Court Reporter
              John Joseph Moakley United States Courthouse
23                 One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
24                   E-mail: kmob929@gmail.com

25         Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Lauren Maynard

19         Nixon Peabody LLP

20         100 Summer Street

21         Boston, MA 02110

22         617-345-1000

23         bkelly@nixonpeabody.com

24         for Gamal Abdelaziz.

25
```

```
 1   APPEARANCES:

 2

 3         Robert L. Sheketoff

 4         One McKinley Square

 5         Boston, MA 02109

 6         617-367-3449

 7         sheketoffr@aol.com

 8         for Gamal Abdelaziz.

 9

10

11         Michael Kendall

12         Lauren M. Papenhausen

13         White & Case, LLP

14         75 State Street

15         Boston, MA 02109

16         617-939-9310

17         michael.kendall@whitecase.com

18         for John Wilson.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2         THE CLERK:  Thank you.  You may be seated.  Court so

 3    now in session.

 4         THE COURT:  Good morning, jurors.  Welcome back.  I

 5    want to commend you for your dedication and for your ability to

 6    get here on time and your willing to accept this very important

 7    responsibility that you have.  I also want to remind you that

 8    the Court is here if you need us for any reason.  I would ask

 9    you now to return to the jury room and continue with your

10    deliberations.

11         Thank you.

12         Counsel, I am informed that the jury has a couple of

13    questions.  I'm going to ask counsel to stay.  I will look at

14    them and be back in about 15 minutes.

15         (Recess.)

16         THE CLERK:  All rise.

17         Thank you.  You may be seated.

18         THE COURT:  Good morning, counsel.  We've had a

19    question from the jury.  I will read the question, then my

20    proposed response, and then hear counsel as to their proposals.

21         The question is, "Judge Gorton, do we need to return a

22    verdict on all four objects of Count 1 or just the count

23    itself?  Thank you", signed the foreman.

24         My proposed response is you should consider all of the

25    questions on the verdict form independently and return a
```

1    verdict on all of those as to which you are unanimous.

2        Mr. Kelly?

3        MR. KELLY:  I think if they find not guilty on that

4    Count 1, they don't have to find further.  That's why we had

5    requested what we had before, that if you find somebody not

6    guilty, they don't have to go through the four.  If they found

7    somebody guilty on Count 1, they've got to tell us which one it

8    is.

9        THE COURT:  Why didn't you suggest that before now?

09:24 10       MR. KELLY:  Well, I did, your Honor.

11       THE COURT:  Well, you didn't say -- and if you said it

12   the way you're going to say it, you've got to have an

13   instruction after Question 1.

14       MR. KELLY:  I think our proposal that we cited, our

15   last proposal, made that clear.  We had originally objected to

16   not having a general verdict, but then when the Court rejected

17   that, we filed a request on Count 1 and then ABCD.  You don't

18   get to ABCD if they find not guilty for a defendant.

19       It's a First Circuit case, *USA v. Spock*, S-p-o-c-k.

09:25 20       MR. SHEKETOFF:  It was Dr. Spock.

21       THE COURT:  Actually, it was Dr. Spock.

22       MR. KELLY:  Who knew?  I think they have to be told

23   that.  They don't have to answer the four predicates if they

24   found one of these people not guilty.  The other case is *United

25   States versus Black*.  It's a Supreme Court case.

**A3883**

```
 1              MR. FRANK:  We don't think the Dr. Spock case is

 2      applicable for the reasons that we set forth in our briefing,

 3      your Honor.  We do believe that they need to find on all four

 4      objects of the conspiracy.  There are four different objects.

 5      They need to find as to each one, otherwise there's going to be

 6      a lack of clarity as to the verdict.

 7              MR. KELLY:  They're only doing this four to avoid

 8      appellate ambiguity.  If they found somebody not guilty, they

 9      don't have to check off all four.  I think it suggests

09:26 10     something that should not be suggested to them if they found

11      not guilty.  They don't have to say not guilty five times for

12      one count.  They just have to say not guilty.  To avoid

13      appellate ambiguity, if they say guilty, they have to answer

14      the questions the Court has posed.

15              THE COURT:  Mr. Kendall?

16              MR. KENDALL:  We join in Mr. Gamal Aziz's position.

17              THE COURT:  So you're suggesting that if they answer

18      not guilty on question No. 1 with respect to mail fraud, that

19      they should not go on and consider the question of wire fraud

09:26 20     or?

21              MR. KELLY:  No.  I'm suggesting they should be told we

22      need to return a verdict on all four counts on Count 1.

23      They're looking at this because there's four questions about

24      one count.  I think they need to be told, if you've found one

25      of the defendants not guilty in Count 1, you don't need to
```

answer all four counts.  If they've concluded somebody's not

guilty of Count 1, they don't need to check off not guilty, not

guilty, not guilty, not guilty.  If they found somebody guilty,

they've got to check those off.  I think the short answer is,

under *Black*, the Supreme Court case, you say if you find

someone not guilty of Count 1, you don't need to go any further

on Count 1.

THE COURT:  Mr. Frank?

MR. FRANK:  Your Honor, we stand by our previous

position.  The verdict form that they have asks them whether

the defendants are not guilty or guilty of conspiracy to commit

mail fraud, conspiracy to commit honest services mail fraud,

conspiracy to commit wire fraud, and conspiracy to commit

honest services wire fraud.  They need to answer those

questions to be clarity about what the verdict is.  We don't

see any prejudice to anyone from having them answer those

questions as set forth by the Court.

MR. KELLY:  Respectfully, they do see a prejudice.

They obviously want further clarity on the form.  They have the

form and now they've asked a question.  If the Court were to

simply tell them no, you don't have to answer all four sections

of the question about Count 1 if you found someone not guilty.

THE COURT:  Give me a hypothetical, Mr. Frank, that if

they answered no on question No. 1, there was no mail fraud, as

to how they could then come back with a guilty verdict on any

**A3885**

```
 1   of the remaining three counts, any of the remaining three
 2   objects.
 3           MR. FRANK:  They could come back on wire fraud, for
 4   example.  They could come back on the honest services wire --
 5           THE COURT:  Because there was no mailing and there was
 6   an e-mail?
 7           MR. FRANK:  Correct.  Or they could come back on
 8   honest services fraud and not on property fraud, or they could
 9   come back on property fraud and not on honest services fraud.
10   There's a number of different scenarios where they can come
11   back.
12           THE COURT:  Property fraud is not asked.
13           MR. FRANK:  The conspiracy to commit mail fraud as
14   opposed to the honest services mail fraud to get the admissions
15   slot as opposed to the private university of honest services.
16   There's a number of different scenarios where they could find.
17   That's why there's four different objects charged.  They could
18   come back with one and not another in any number of ways.
19           MR. KELLY:  Your Honor, respectfully, it's a single
20   count with multiple theories.  So if they've concluded they're
21   not guilty, they don't have to walk down the checklist.  It's
22   just being done to prejudice the defendant.
23           Under *Spock*, I think footnote -- it's the Supreme
24   Court case, the *Black* case, the footnote talks about how these
25   multiple instructions should be avoided in almost all cases.
```

1    So they clearly -- there's some confusion.  I think there's no

2    prejudice to the government.  They have their verdict form.  If

3    they found one of these defendants not guilty on Count 1, they

4    don't have to specify all the theories.  If they found them

5    guilty, they need to specify one of the four theories to avoid

6    appellate ambiguity.  That's the only reason they have to

7    specify.  It's one count, four theories.  If they're not

8    guilty, doesn't matter on these four theories.

9         MR. FRANK:  *Spock* isn't applicable because *Spock*

09:30 10   channeled them to a verdict because it channeled them to the

11   different elements of a charge.  Here they can't get to a

12   decision of not guilty or guilty without going through those

13   four objects.

14        THE COURT:  He's citing *Black* now, not *Spock*.

15        MR. FRANK:  *Black* is the same issue, your Honor.  They

16   can't get to a decision of not guilty unless they've eliminated

17   each of the different theories.  So there's no prejudice by

18   having them spell out what theories they've considered.

19        MR. KELLY:  We believe *Black* is the exact same issue.

09:30 20   There's no prejudice to the government.  If they found someone

21   guilty, they'll tell us which theory of the four theories.  If

22   they found the person not guilty, they don't have to specify

23   which of the four theories because they found them not guilty.

24        THE COURT:  I think the government's position is

25   correct and that my proposal is correct, but I'm going to take

        1    a few more minutes to think about it.

        2            Also, I have to add, yesterday the jury asked for

        3    extra copies of the charge, which I gave them.  They now have

        4    four copies of the charge.

        5            This morning they've asked for extra copies of the

        6    indictment.  They have one copy of the indictment, which is

        7    redacted pursuant to an agreement of counsel.

        8            What do you wand me to do with the request for

        9    additional copies of the indictment?

09:31  10            MR. KELLY:  For Abdelaziz, we have no objection to

       11    giving them extra copies.

       12            MR. FRANK:  Agreed, your Honor.

       13            THE COURT:  All right.  I'll be in recess or we'll be

       14    in recess for about 5 minutes.

       15            MR. KENDALL:  Your Honor, may we get a written copy of

       16    the charge?

       17            THE COURT:  Yes.  We will get you a written copy of

       18    the charge.

       19            THE CLERK:  All rise.

09:38  20            (Recess taken.)

       21            THE CLERK:  All rise.

       22            Thank you.  You may be seated.

       23            THE COURT:  Good morning again, counsel.  What I did

       24    in the intervening moments is I went back and looked at the

       25    defendants' proposed alternate verdict form, the most recent,

1    that was docket 2370.  It says, after the introductory

2    statement "We the jury unanimously find", "the defendant under

3    consideration on the charge of conspiracy to commit mail fraud

4    and wire fraud and honest services mail and wire fraud", and

5    then it asks the jury to check off guilty or not guilty with

6    respect to that question.

7            That is an inappropriate question.  That requires them

8    to find all four objects at once or they will say not guilty.

9    That is inappropriate.  They need to address each object

09:39 10    separately the way that I have proposed instructing them and,

11    therefore, I am not going to give the requested answer that

12    Mr. Kelly proposes.

13            MR. KELLY:  Well, your Honor, I would suggest if the

14    Court would prefer to put it in the word "or" instead of "and".

15            THE COURT:  Then it will be the equivalent of what

16    I've already done.

17            MR. KELLY:  I respectfully suggest that that would be

18    more accurate to say -- it's a conspiracy charge.  It's one

19    count with four possible theories.  I think that's what they

09:40 20    may be getting at.  The way it's in front of them now with the

21    verdict form it looks like there's four different crimes when

22    there's really one.  So perhaps that should have been worded

23    better on our alternate proposal.  It's a conspiracy to commit

24    mail fraud or wire fraud or honest services fraud.

25            THE COURT:  That's not the way you propose it.

**A3889**

1      MR. KELLY:  I agree.  I'm suggesting the word "or"

2    should be substituted for "and" and then they can be found

3    either guilty or not guilty.  If it's guilty, they've got to

4    tell us which of the four to respond.

5          MR. FRANK:  We don't think there should be a brand new

6    verdict form in the middle of deliberations.  Your Honor's set

7    forth the four different ways.  They have to find on each of

8    those theories.

9          MR. KELLY:  You don't have to have a verdict form.

09:41 10   You can simply tell them.  They asked a question.  They're in

11   the middle of deliberations.  They asked a question.  The Court

12   could make it clear to them that it's really if they found a

13   person not guilty, they don't have to specify.  If they found

14   somebody guilty, they have to specify.

15         THE COURT:  Thank you, counsel.

16         Call the jury.

17         MR. KENDALL:  We join with Gamal Aziz, your Honor.

18   Thank you.

19         THE CLERK:  All rise for the jury.

09:43 20         (Jury enters.)

21         THE CLERK:  Thank you.  You may be seated.

22         THE COURT:  Good morning, jurors.  You have posed a

23   question to the Court.  I'll read it for the record an then

24   read my answer.

25         You've said "Judge Gorton, do we need to return a

1    verdict on all four objects of Count 1 or just the count

2    itself", and it's been signed by the foreman.

3              Jurors, you should consider all of the questions on

4    the verdict form independently and return a verdict on all of

5    those as to which you are unanimous.

6              Please return to the jury room and continue your

7    deliberations.

8              THE CLERK:  All rise for the jury.

9              THE COURT:  Once again, counsel, you need to be within

09:44 10    10 minutes of the courthouse in case we get another question.

11              We're in recess.

12              (Recess taken.)

13              THE CLERK:  Thank you.  You may be seated.

14              Mr. Foreman, have the jury agreed upon a unanimous

15    verdict?

16              JURY FOREPERSON:  Yes.

17              THE CLERK:  Mr. Foreman, will you return your verdict

18    to the Court.

19              JURY FOREPERSON: Yes.

02:38 20              THE COURT:  The verdict form is in order and may be

21    recorded.

22              THE CLERK:  Mr. Foreman, members of the jury, harking

23    to your verdict as the Court has received it.

24              "We, the jury, unanimously find:  The defendant under

25    consideration on the charge of conspiracy to commit mail fraud

```
 1    (Count One):
 2            Gamal Abdelaziz, guilty; John Wilson, guilty.
 3            2.  The defendant under consideration on the charge of
 4    conspiracy to commit wire fraud (Count One):
 5            Gamal Abdelaziz, guilty; John Wilson, guilty.
 6            3.  The defendant under consideration on the charge of
 7    conspiracy to commit honest services mail fraud (Count One):
 8            Gamalal Abdelaziz, guilty; John Wilson, guilty.
 9            4.  The defendant under consideration on the charge of
10    conspiracy to commit honest services wire fraud (Count One):
11            Gamal Abdelaziz, guilty; John Wilson, guilty.
12            5.  The defendant under consideration on the charge of
13    conspiracy to commit federal programs bribery (Count Two):
14            Gamal Abdelaziz, guilty; John Wilson, guilty.
15            6.  The defendant, John Wilson, on the charges of wire
16    fraud and honest services wire fraud with respect to:
17            a.  A $500,000 wire transfer to a bank account in the
18    name of the Key Worldwide Foundation on or about October 17,
19    2018 (Count Six):
20            Guilty.
21            b.  A telephone call with William "Rick" Singer on or
22    about October 27, 2018 (Count Eight):
23            Guilty.
24            c.  A $500,000 wire transfer to a bank account in the
25    name of the Key Worldwide Foundation on or about December 11,
```

02:39 (line 10)
02:40 (line 20)

```
 1   2018 (Count Nine):

 2          Guilty.

 3          7.  The defendant, John Wilson, on the charge of

 4   federal programs bribery with respect to:

 5          a.  a $500,000 wire transfer to a bank account in the

 6   name of the Key Worldwide Foundation on or about October 17,

 7   2018 (Count Eleven):

 8          Guilty.

 9          b.  a $500,000 wire transfer to a bank account in the

10   name of the Key Worldwide Foundation on or about December 11,

11   2018 (Count 12):

12          Guilty.

13          8.  The defendant, John Wilson, on the charge of

14   willfully filing a false tax return (Count Thirteen):

15          Guilty.

16          So say you, Mr. Foreman, and so say you, all members

17   of the jury.

18          JURORS:  We do.

19          THE COURT:  Do counsel have anything for the Court

20   before I discharge the jury?

21          MR. KELLY:  No, your Honor.

22          MR. KENDALL:  No, your Honor.

23          MR. FRANK:  No, your Honor.  Thank you.

24          THE COURT:  All right.

25          Then, jurors, I want to thank you for your attention,
```

```
 1    concern and care in performing your civic duty over these past

 2    4 weeks, and because you have performed it, justice has been

 3    done regardless of the direction of your verdict.  I hope that

 4    you do feel a sense of pride in your service because you have

 5    performed one of the most fundamental duties of your

 6    citizenship and one that distinguishes your duties from those

 7    of citizens of most other countries because, uniquely in the

 8    United States, our citizens have the right to a trial by jury

 9    of their fellow citizens.

10    So you are excused from further jury duty and

11    dismissed with the thanks of this Court.  I hope you will all

12    return to your various walks of life with a better

13    understanding and appreciation of what doing justice in this

14    country is all about.  You are adjourned and -- we are

15    adjourned and you are discharged.

16                 THE CLERK:  All rise for the jury.

17                 (Jury exits.)

18                 THE COURT:  Be seated, counsel.  We need to schedule

19    the sentencings.

20                 We have the dates for Mr. Abdelaziz, Wednesday,

21    February 16, 2022, at 3:00 p.m.

22                 Any known conflicts Mr. Kelly?

23                 MR. KELLY:  No, your Honor.

24                 MR. FRANK:  No, your Honor.

25                 THE COURT:  So that will be Wednesday, February 16,
```

02:42 (line 10)
02:43 (line 20)

1    3:00 p.m. in this courtroom.

2          For Mr. Wilson, it will be Thursday, February 17,

3    2022, at 3:00 p.m.

4          Mr. Kendall?

5          MR. KENDALL:  Let me check my calendar for one minute.

6    I doubt there's a conflict, your Honor.

7          THE COURT:  Yes.

8          MR. KENDALL:  None that I can see, your Honor.  Thank

9    you.

02:44 10          THE COURT:  The government?

11          MR. FRANK:  No, your Honor.  That's fine.

12          THE COURT:  Then that will be it for Mr. Wilson,

13    Thursday, February 17, 2022, at 3:00 p.m.

14          Is there anything else that needs to come to the

15    Court's attention before we adjourn this trial?

16          MR. KELLY:  No, your Honor.

17          MR. FRANK:  Not from the government, your Honor.

18    Thank you.

19          MR. KENDALL:  No, your Honor.

02:45 20          THE COURT:  Thank you.  Thank you, counsel, for a well

21    tried case.  We're adjourned.

22          (Whereupon, the proceedings adjourned at 2:45 p.m.)

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    October 8, 2021 in the above-entitled matter to the best of my

11    skill and ability.

12

13

14    /s/ Kristin M. Kelley                October 8, 2021

15    Kristin M. Kelley, RPR, CRR              Date
      Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN THE MATTER OF THE** ) | |
| **APPLICATION OF THE UNITED** ) | |
| **STATES OF AMERICA FOR AN** ) | |
| **ORDER AUTHORIZING THE** ) | **M.B.D. No.    18-MC-91232-ADB** |
| **CONTINUED INTERCEPTION OF** ) | |
| **WIRE AND ELECTRONIC** ) | |
| **COMMUNICATIONS OCCURRING** ) | **FILED UNDER SEAL** |
| **ON AT&T WIRELESS** ) | |
| **TELEPHONE** ███████**-8802** ) | |

<u>APPLICATION TO SEAL RECORDINGS</u>
<u>AND TO POSTPONE INVENTORIES</u>

The United States of America, by and through Assistant U.S. Attorney Eric S. Rosen, herein applies for an Order:

Sealing DVD disks which contain recordings of wire and electronic communications intercepted pursuant to an Order dated August 30, 2018 over cellular telephone with call number ████████**8802 (TARGET TELEPHONE 1).**   The Court Order concerned the following federal offenses (TARGET OFFENSES):

  a. Title 18, United States Code Section 1343 – wire fraud and honest services
    wire fraud;

  b. Title 18, United States Code, Section 1952 – Travel Act (bribery);

  c. Racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§
    1962(c) and (d), and punishable under 18 U.S.C. § 1963, by conducting the
    affairs of an "enterprise," that is, a group of individuals associated in fact,
    although not a legal entity, to wit: the Subjects and others, the activities of

1

USAO-LP-001564

which affect interstate and foreign commerce, through a pattern of

racketeering activity consisting of the violations of federal law set forth in (a)

through (c) above, and,

    d.  Title 26, United States Code, Section 7201 – Attempt to Evade or Defeat Tax.

(b)    Directing that the aforementioned DVD disks be held in the custody of the Federal

Bureau of Investigation ("FBI") for a period of ten years from the date of this Order in a manner

so as to prevent editing, alteration, and/or destruction;

(c)    Directing that the contents of the said DVD disks be disclosed only upon the Order

of this Court or any other court of competent jurisdiction, except that disclosure may be made

pursuant to Title 18, United States Code, Section 2517 and consistent with the Court's prior

Orders;

(d)    Postponing the notification requirements of Title 18, United States Code, Section

2518(8)(d) as to all persons intercepted during the subject electronic surveillance until further

Order of the Court; and

(e)    Directing that this Order and Application be sealed until further Order of the Court.

In support of this Application, the United States of America represents as follows:

1.    On August 30, 2018, pursuant to an application by Assistant U.S. Attorney Eric

Rosen, an Order was issued by the Honorable Allison D. Burroughs, District of Massachusetts,

authorizing the interception of wire and electronic communications of the Target Subjects,

described therein, over TARGET TELEPHONE 1 for a period of 30 days.  The monitoring of

TARGET TELEPHONE 1 began on August 30, 2018 and ceased at midnight of September 27,

2018.

2

USAO-LP-001565

2.    The government's investigation of this matter continues in that SINGER is now cooperating with investigators and he is placing consensual calls to various target subjects. Notification to the persons whose conversations were intercepted would alert the subjects to the existence and extent of the investigation, and should therefore be postponed until ordered by the Court.

WHEREFORE, I respectfully request that the Court issue an Order granting this Application.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:    _Eric Rosen / JDO_____
ERIC S. ROSEN
Assistant U.S. Attorney

Dated: October 2, 2018

3

USAO-LP-001566

# EXHIBIT C

## CONSENT AND ACKNOWLEDGEMENT

I, _RICK SINGER_ , hereby state that:

1.    I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents.  My consent extends to all communications over any such phone, whether or not that communication relates to a criminal investigation, to any and all messages left on any voicemail feature of any such phone, photographs taken using the phone, and text messaging.  I further consent to the disclosure of any information or records regarding such communications to law enforcement agents.

2.    I acknowledge that I have been instructed that any cellular telephones provided to me in the course of my activities are to be used only by me, and that I am not authorized to allow any other person to make, receive or participate in telephone calls involving those telephones as defined above in which I am not a participant.

Date: _9/27/18_

_____
Signature

_____
Printed Name

_____
Witness/Interpreter Signature

_____
Witness/Interpreter Printed Name

**A3902**                                    **SINGER-VOL002-000378**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| GAMAL ABDELAZIZ *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' OFFER OF PROOF FOR
EVIDENCE EXCLUDED IN THE EXAMINATION OF REBECCA CHASSIN AND
OPPOSITION TO MOTION TO ADMIT EXTRINSIC EVIDENCE FOR
IMPEACHMENT OF PAT HADEN, ALEX GARFIO, AND TIMOTHY BRUNOLD
[Dkts. 2283, 2293]**

At the final pre-trial conference more than a month ago, the Court made clear that this case

would not devolve into a series of mini-trials about students and admissions policies that have

nothing to do with the charged conspiracy or the two defendants on trial:

> As a preliminary matter, counsel should understand that this trial is not going to be
> about the general admissions policy of [USC] or the method it uses to admit
> students. USC is not on trial here, and I will not have this case devolve into multiple
> side trials.

Dkt. 2108 at 6. The Court further made clear what the defendants would need to establish in order

for such evidence to be admitted:

> Unless there's evidence that a defendant was misinformed with respect to the
> admission policy of the subject university and/or ***knew*** that USC admitted a specific
> unqualified student whose parent made a large donation to the school ***before*** that
> defendant entered into the alleged conspiracy, evidence of what other unrelated
> students and parents did has ***no bearing*** on the defendants' state of mind[.]

*Id.* (emphasis added). The Court reiterated, specifically as to other applicants admitted through

Subco, or VIP or other special interest routes, that such evidence was not admissible unless "it was

known to the proffering defendant and somehow impacted his or her state of mind." *Id.* at 20. As

the evidence has come in, the Court has repeatedly affirmed its prior rulings that the relevant

evidence in this case should be limited to these defendants, their intent, and evidence regarding

**A3903**

the charged conspiracy. For example, the Court has held that "testimony concerning the general fundraising practices of USC is not relevant to whether admitting students through Subco with falsified athletic profiles deprived USC of the honest services of its employees," and that VIP or special interest admissions practices are irrelevant because defendants' children "were admitted through Subco as putative athletic recruits." Dkt. 2265 at 5.

The defendants' latest "offer of proof" and motion to admit "extrinsic evidence" for impeachment mark their refusal to accept the Court's repeated rulings, and confirmation that they seek to turn this proceeding into a series of mini-trials about irrelevant USC applicants and a general attack on USC's admissions practices. *See* Dkt. 2283, 2293. Nearly three years into this case and approaching the end of trial, the defendants still cannot point to *any* evidence that they knew about VIP lists or other specific unqualified students admitted through the Subco before they entered into the charged conspiracy. *See* Dkt. 2108 at 6. Unable to proffer evidence that they knew about VIP lists or specific students admitted through the Subco other than their own children, the defendants instead seek to back-door the identical evidence as purported extrinsic impeachment evidence of a witness who has already testified, and witnesses who have yet to testify, in direct contravention of Fed. R. Evid. 613(b) and the "collateral matter" rule that the First Circuit has consistently applied. Their attempt to introduce this irrelevant evidence as purported impeachment should be rejected.

## I.    The Defendants' Proffered Evidence is Irrelevant and Inadmissible

The defendants' proffered evidence – consisting of e-mails that they did not receive, about students they did not know, and admissions practices such as VIP lists that have nothing to do with their children – is irrelevant and inadmissible. *See* Fed. R. Evid. 401, 403. "While a defendant has a 'wide-ranging' right to present a defense, that right is not absolute and does not include the

<center>2</center>

<center>**A3904**</center>

right to present irrelevant evidence." *United States v. Gottesfeld*, 319 F. Supp. 3d 548, 553 (D. Mass. 2018) (Gorton, J.) (quoting *United States v. Maxwell*, 254 F.3d 21, 26 (1st Cir. 2001)). Evidence is relevant only "if it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence." Fed. R. Evid. 401. Thus, any relevant evidence at trial must relate to the elements of the crimes charged or applicable defenses. *See United States v. Smith*, 940 F.2d 710, 713 (1st Cir. 1998). The defendants are charged with conspiring to commit mail fraud, wire fraud, and honest services mail and wire fraud, and conspiring to commit federal programs bribery. 18 U.S.C. §§ 1346, 1349, 371.[1] Thus, there are essentially only two relevant elements: (i) whether the conspiracies alleged in the indictment existed between at least two people, with the underlying offenses as the objects of those conspiracies; and (ii) whether the defendants knowingly and intentionally joined those agreements. *See, e.g.*, *United States v. Wyatt*, 561 F.3d 49, 54 (1st Cir. 2009) (listing elements for Section 1349 conspiracy).

The evidence the defendants seek to introduce about other applicants and athletic recruits, and USC's decisions and internal communications about those other applicants, is not probative of any of the charges or of the defendants' knowledge and intent. The defendants seek to introduce evidence concerning "VIP" lists and "special interest" flags, but *none* of their children was admitted to USC as a VIP or special interest candidate. And there is no evidence that the defendants had knowledge of the internal communications, spreadsheets, or background information about other USC applicants that they propose to introduce, such that those exhibits could have any bearing on their state of mind. *See, e.g.*, *United States v. Brandon*, 17 F.3d 409,

---

[1] Defendant Wilson is also charged with several substantive counts of wire fraud and honest services wire fraud, federal programs bribery, and a tax offense.

445 (1st Cir. 1994) (rejecting defendants' attempt to introduce evidence of victim's internal practices irrelevant to the fraud charged); *United States v. June*, No. 10-CR-30021-MAP, 2012 WL 245243, at *2 (D. Mass. Jan. 25, 2012) (rejecting attempt to show victim's "general lending policies were so slipshod or so venal that [d]efendant's alleged lies about his income and assets were of no moment").

The defendants' proffered evidence should also be excluded under Rule 403. *See* Fed. R. Evid. 403. In a case that is going to last more than three weeks of full trial days and has involved extensive cross-examination, the defendants now want to embark on a parade of mini-trials about admissions practices and students that they never knew about, flouting the Court's prior orders. *See, e.g.*, *United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014) ("[T]he judge could have ended up with a mini-trial about a side issue – [a third party's] innocence of charges not made – that might have confused the jury."); *see also United States v. Taylor*, 848 F.3d 476, 485 (1st Cir. 2017) (excluding defense's attempt to introduce government's letter identifying an unindicted co-conspirator, which "could lead to a mini-trial about a side issue – to wit, why [the co-conspirator] was unindicted – so the risk of confusing the issues substantially outweighed the Letter's probative value").

## II.     The Defendants' "Offer of Proof" to Impeach Chassin Fails

The defendants' "offer of proof" and request to introduce 26 exhibits and a summary chart summarizing those exhibits to impeach USC admissions officer Rebecca Chassin is meritless for several reasons. *See* Dkt. 2283.

First, 25 of the 27 documents with which the defendants seek to impeach Chassin do not involve her – she is not copied on them, and she testified as to many that she never saw them. *See* Ex. 1085, 1116, 1219, 1249, 1288, 1565, 3628, 7107, 7207, 7223, 7235, 7238, 7242, 7332, 7341,

4

7387, 7409, 7527, 7529, 7807, 7845, 8045, 9734, 9748; *see also, e.g.*, 9/21/2021 Trial Tr. at 144 ("I don't know about this document [Ex. 1085].  I don't know what it is.  I've never seen it.  I don't know who made it.").  She cannot be impeached with someone else's statement or a document that she has never seen.  *See* Fed. R. Evid. 613 ("Extrinsic evidence of a ***witness's*** prior inconsistent statement . . .") (emphasis added).

As to the two remaining exhibits, Exhibits 1297 and 7358 are (i) irrelevant, because they involve transfer students on a VIP list from 2018, well after both Johnny Wilson and Sabrina Abdelaziz were admitted through Subco, (ii) inadmissible hearsay, and (iii) improper impeachment on a collateral matter.  *See infra* Part II.

Second, none of the proffered exhibits is inconsistent with the core of Chassin's testimony: that the Subco evaluates the athletic profiles it receives from the athletic department and does not "offer admission in exchange for money."  9/20/2021 Trial Tr. at 100–01.  The fact that other applicants appearing on VIP lists get a "second look" from admissions officers for a variety of reasons, including potential philanthropy, has nothing to do with the Subco process.  It is also not inconsistent with Chassin's testimony that USC's admissions department does not engage in *quid pro quo* deals of admission for money.  9/21/2021 Trial Tr. at 123.  *See United States v. Rivera-Donate*, 682 F.3d 120, 127 (1st Cir. 2012) ("[T]he court must be persuaded that the statements are indeed inconsistent."); *United States v. Martin*, 694 F.2d 885, 888 (1st Cir. 1982) (same).

Third, Chassin has already testified, and she was subjected to extensive cross-examination and impeachment for nearly four hours.  The defendants cannot now seek to introduce extrinsic evidence to impeach her retroactively.  *See* Fed. R. Evid. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement[.]").

5

**A3907**

III.    **The Defendants May Not Flout the Court's Orders through Impeachment**

The defendants' motion to admit extrinsic evidence for impeachment of Pat Haden, Alex Garfio, and Timothy Brunold should be denied under  Fed. R. Evid. 401, 403, 613(b), and 802. *See* Dkt. 2293.  In their motion, the defendants preemptively seek admission of more than 150 pages of "impeachment" material regarding special interest or VIP lists, and ten different Subco and/or VIP applicants who have nothing to do with the charged conspiracy, the defendants, their intent, or the defendants' children.

This "impeachment" evidence is simply the defendants' latest back-door attempt to evade the Court's pre-trial ruling that this trial will not devolve into a series of mini-trials that have no bearing on the critical issue in this case: the defendants' state of mind.  Absent from the defendants' filings and hundreds of pages of exhibits is any evidence that either defendant knew about any of these students prior to the date they allegedly joined the Singer-led conspiracy.  This evidence is irrelevant, unduly prejudicial, a waste of the jury's time, and rife with hearsay, and is therefore inadmissible under Fed. R. Evid. 401, 403, 802.

For example, the defendants seek to introduce nearly 100 pages of exhibits about a golf recruit and two tennis recruits – all of whom were admitted *after* Johnny Wilson, and none of whom the defendants suggest they knew about before they began working with Singer.  *See* Exs. I, J, K.  These "exhibits" include dozens of e-mail chains filled with hearsay statements by non-testifying witnesses, transcripts and test scores of students who have nothing to do with this case, and even copies of internet profiles from Forbes about those students' parents and their wealth. These are not exhibits for a federal criminal trial; they are invitations to a circus.

Further, to the extent the defendants are trying to evade the Court's previous orders by offering this evidence about other students via extrinsic evidence to impeach, they are wrong as a

6

**A3908**

matter of black-letter law.  *See* Fed. R. Evid. 613(b).  It is more than telling that the defendants do not cite Rule 613(b) or the collateral matter rule even once in their brief.  *See* Dkt. 2293 at 1–8.

"It is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on *a collateral matter*."  *United States v. Cruz-Rodriguez*, 541 F.3d 19, 30 (1st Cir. 2008) (emphasis added); *accord United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir. 1993).  In affirming this Court's exclusion of extrinsic impeachment evidence on a collateral matter, the First Circuit noted that "[w]hether something is collateral is within the discretion of the trial judge."  *United States v. Marino*, 277 F.3d 11, 24 (1st Cir. 2002).  A matter is considered collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, *i.e.*, not relevant for a purpose other than mere contradiction of the in-court testimony of the witness."  *Beauchamp*, 986 F.2d at 4; *see also United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) (explaining that the collateral matter rule is "a manifestation of the district court's general discretion to exclude" evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or by considerations of undue delay or waste of time").  In other words, "a matter is collateral if it could not have been introduced into evidence for any purpose other than contradiction . . . the evidence must have an independent purpose and an independent ground for admission."  *United States v. Mulinelli-Navas*, 111 F.3d 983, 988 (1st Cir. 1997).

For example, in *DeCologero*, the First Circuit explained that extrinsic evidence for impeachment is properly considered a collateral matter and thus excludable if it would "distract from the main issues of the case" and introduce a "mini-trial."  530 F.3d at 60.  Further, in *Marino*, the First Circuit affirmed this Court's exclusion of extrinsic evidence on a collateral matter via impeachment because it was "not relevant to [the] defendant's guilt or innocence."  277 F.3d at 24; *accord United States v. Lipscomb*, 539 F.3d 32, 39 (1st Cir. 2008) (affirming exclusion of

7

extrinsic evidence for impeachment on collateral matter unrelated to defendant's intent).  And as the First Circuit held just a few months ago in *Maldonado-Pena*, "a party may not present extrinsic evidence for the sole purpose of impeaching a witness on a collateral matter," and extrinsic evidence about others' conduct that has no "bearing on the issue of [the defendant's] own culpability" is properly excluded.  4 F.4th 1, 36 (1st Cir. 2021); *accord United States v. Andujar*, 49 F.3d 16, 26 (1st Cir. 1995) (same, where extrinsic evidence "was irrelevant to the substance of the case").

Application of Rule 613(b) and the collateral matter rule is straight-forward here: the Court has already concluded – multiple times – that evidence about other students admitted through Subco unknown to the defendants and unrelated to the charged conspiracy, and evidence regarding VIP lists, is irrelevant and not admissible under Rules 401 and 403.  *See* Dkt. 2108 at 6 (excluding such evidence unless defendant "knew that USC admitted a specific unqualified student whose parent made a large donation to the school before that defendant entered into the alleged conspiracy [because] evidence of what other unrelated students and parents did has no bearing on the defendants' state of mind").  Accordingly, there is no "independent purpose and [] independent ground for admission." *Mulinelli-Navas*, 111 F.3d at 988.  There can be no serious dispute that evidence about VIP lists or students who were admitted through Subco, absent the defendants' knowledge of those students, has no bearing on the defendants' intent, as this Court has already held.  *See* Dkt. 2265 at 5.  In short, if extrinsic evidence about what *other* applicants did or did not do, sports accolades that *other* applicants did or did not have, donations that *other* applicants' parents did or did not make – all unbeknownst to the defendants – is not collateral, it is difficult to discern what is.  The defendants' motion provides the Court with no justification for departing

from its prior repeated holdings, and granting their motion will ensure that the trial devolves into a series of extended irrelevant mini-trials. *See DeCologero*, 530 F.3d at 60.

## **CONCLUSION**

For the foregoing reasons, the defendants' offer of proof for impeachment of Chassin and motion to admit extrinsic evidence for impeachment of Haden, Garfio, and Brunold should be denied.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Ian J. Stearns*
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: September 28, 2021              */s/ Ian J. Stearns*
IAN J. STEARNS

9

**A3911**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| GAMAL ABDELAZIZ *et al.*, | ) | **Motion for Leave to File Excess Pages and** |
| | ) | **Partially Under Seal Granted [Dkt. 2422]** |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS
FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL PURSUANT TO
<u>FEDERAL RULES OF CRIMINAL PROCEDURE 29,  33 [DKTS. 2330, 2342, 2351, 2412]</u>**

NATHANIEL R. MENDELL
Acting United States Attorney

KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………….…....…..1

LEGAL STANDARD………………………………………………………….…..…..3

ARGUMENT………………………………………………………………………...…4

I.    Defendants' Motion for Judgment of Acquittal Pursuant to Rule 29 Should Be Denied………………………………………………………………….…....4

    A.    The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Mail Fraud and Wire Fraud, and Wilson of Wire Fraud……………..4

        1.    Admission Slots Are Property under the Mail and Wire Fraud Statutes…………………………………..…………………4

        2.    The Indictment Was Not Constructively Amended…...………………..8

        3.    Mail and Wire Fraud Conspiracy Does Not Require Tangible Economic Harm………………………………………………....10

        4.    The Evidence Was Sufficient to Convict Wilson on Count One………..12

    B.    The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Honest Services Mail and Wire Fraud and Federal Programs Bribery, and Wilson of Substantive Counts of Those Crimes …………………..14

        1.    The Evidence of *Quid Pro Quo* Payments Was Sufficient…..………...14

        2.    The Evidence of Official Acts Was Sufficient or Unnecessary…..……...17

        3.    The Defendants' Legal and Factual Sufficiency Challenges to Their Honest Services Fraud Convictions Are Without Merit………….21

        4.    Bribe Payments Need Not Be Made to a "Person" under 18 U.S.C. § 666………………………………………………....23

    C.    The Defendants' Remaining Assorted Arguments Are Insufficient to Reverse the Jury's Verdict under Rule 29……………………………..…25

II.    Defendants' Motion for a New Trial Pursuant to Rule 33 Should Be Denied..………...33

    A.    The Court's Evidentiary Rulings Were Proper and Do Not Provide a Basis for a New Trial…………………………..………….…..33

    B.    The Defendants' Undeveloped Arguments Concerning All of the Court's Decisions on Motions *in Limine* Are Meritless…………………42

    C.    The Court Did Not Err in Conducting Jury Selection or in Providing the Jury With a Special Verdict Form…………………………..…43

D.     There Was No Constructive Amendment or Prejudicial Variance……………....46

E.     The Jury Instructions Were Proper……………………………….…………...48

F.     Wilson's Tax Conviction Does Not Provide a Basis for a New Trial…………..48

G.     The Court Did Not Err in Denying the Defendants'
Motions for Severance…………………………………………………………...50

III.    The Government Did Not Hide Exculpatory Evidence and the Wiretap
Was Legally Authorized at All Times………………………………………………...53

A.     Applicable Law……………………..……………………………………………54

B.     The Fax Cover Sheet Was Neither Exculpatory
Nor Improperly Withheld………………………………………………………54

CONCLUSION………………………………………………………………………...57

# TABLE OF AUTHORITIES[*]

### Cases

*Andrews v. United States,*
817 F.2d 1277 (7th Cir. 1987)………….…...………………………………….…...…..30

*Black v. United States,*
561 U.S. 465 (2010)…………………………….……………………………….…..…..46

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) …......................………………………………………….…..…..24

*Fountain v. United States,*
357 F.3d 250 (2d Cir. 2004)………………………...…………...………….……….…...7

*Griffin v. United States,*
502 U.S. 46 (1991)……………………...………...…………………………….…...…..49

*Griggs-Ryan v. Smith,*
904 F.2d 112 (1st Cir. 1990)……………...…………….………………….……...…..57

*Irvin v. Dowd,*
366 U.S. 717 (1961) …......................………………………………….…..…...…..44

*Kassel v. Gannett Co., Inc.,*
875 F.2d 935 (1st Cir. 1989)….………………………………………….…...…...…..39

*Kotteakos v. United States,*
328 U.S. 750 (1946) …………......………………………………………….…...…..26

*McDonnell v. United States,*
136 S. Ct. 2355 (2016) ……………………………………………...…...17, 18, 20

*Sabri v. United States,*
541 U.S. 600 (2004) …………………...…………………………………….…...…..50

*Salinas v. United States,*
522 U.S. 52 (1997) …...……………….……...………………………….…..…..50

*Skilling v. United States,*
561 U.S. 358 (2010) …......................………………………….……15, 21, 43, 46

*United States v. Alfonzo-Reyes,*
592 F.3d 280 (1st Cir. 2010) …...…………...………………...………...…………...46

*United States v. Antunes,*
419 F. Supp. 3d 139 (D. Mass. 2019) …...…………………...…….……...……………...9

---

[*] Citations to the final pre-trial conference transcript, charge conference transcript, and trial transcripts appear as "Pre-trial Conf. Tr." (Dkt. 2108), "Charge Conf. Tr." (Dkt. 2405), and "[Date] Tr." (Dkts. 2338, 2387, 2388, 2387–2392, 2398–2407, 2413). The jury's verdict is located at Dkt. 2376. Unless otherwise noted herein, all internal quotation marks, alterations, and citations are omitted.

*United States v. Barrington*,
    648 F.3d 1178 (11th Cir. 2011)…………...…………….…………….…....…..6

*United States v. Beauchamp*,
    986 F.2d 1 (1st Cir. 1993)…....................……………….……………….……38

*United States v. Bedini*,
    861 F.3d 10 (1st Cir. 2017) ….................…...………….……………….…..26

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ………….....………………...…………….…...11

*United States v. Blastos*,
    258 F.3d 25 (1st Cir. 2001) ………….....…………………………….....…..14

*United States v. Boylan*,
    898 F.2d 230 (1st Cir.1990) ………….....………….....…………….…....…..51

*United States v. Brandao*,
    539 F.3d 44 (1st Cir. 2008) …....................……………………….…....…..10

*United States v. Brandon*,
    17 F.3d 409 (1st Cir. 1994) …....................……………………….…....…..41

*United States v. Cadden*,
    965 F.3d 1 (1st Cir. 2020) ………....................…………………….…....…..42

*United States v. Chan*,
    981 F.3d 39 (1st Cir. 2020) …....................………………...………………...8, 47

*United States v. Chin*,
    15 F.4th 536 (1st Cir. 2021) …....................…………………...….…………...…..35

*United States v. Ciampaglia*,
    628 F.2d 632 (1st Cir. 1980) ….....................……………………….…....…..28

*United States v. Colburn*,
    475 F. Supp. 3d 18 (D. Mass. 2020) ….....................……………………....…..25

*United States v. Conley*,
    249 F.3d 38 (1st Cir. 2001) ………....…....................……………………….…....…..54

*United States v. Cordero*,
    668 F.2d 32 (1st Cir. 1981) ….....................…….…....………………….…....…..30

*United States v. Cruz-Ramos*,
    987 F.3d 27 (1st Cir. 2021)…....................……………………….…....…..26

*United States v. de Castro*,
    843 F.2d 631 (1st Cir. 1988)……....…....................……………………….…....…..43

*United States v. DeCicco*,
    439 F.3d 36 (1st Cir. 2006)……....................……………………….…....…..10

*United States v. DeCologero*,
    530 F.3d 36 (1st Cir. 2008)……....................……....……………………...……..39, 51, 52

*United States v. DeLuca,*
   137 F.3d 24 (1st Cir. 1998)……................…………………………………..…..50

*United States v. DeNunzio,*
   2015 WL 5305226 (D. Mass. Sept. 9, 2015) …….....………………………..…..11

*United States v. Dowdell,*
   595 F.3d 50 (1st Cir. 2010) ………………..…………………………………..…..10

*United States v. Dray*,
   901 F.2d 1132 (1st Cir. 1990)…………………………………..…….…...…..6

*United States v. Ernst,*
   No. 19-10081-IT (D. Mass. July 28, 2021)……………………..…..…….………15

*United States v. Fanfan,*
   468 F.3d 7 (1st Cir. 2006)…..................…………………………………..…..45, 46

*United States v. Fattah,*
   914 F.3d 112 (3d Cir. 2019)…..................…………………………………..…..20

*United States v. Fisher*,
   981 F.3d 39 (1st Cir. 2020) …..................…………………………………...…..9, 47

*United States v. Foley*,
   73 F.3d 484 (2d Cir. 1996) …..................…………………………………...…..49

*United States v. Frost*,
   125 F.3d 346 (6th Cir. 1997)……………………………………………..…....…..6

*United States v. George*,
   761 F.3d 42 (1st Cir. 2014)…………………..……………………………..…....3

*United States v. Giry*,
   818 F.2d 120 (1st Cir. 1987)…………..……………………………………....11, 23

*United States v. Gobbi*,
   471 F.3d 302 (1st Cir. 2006)…………………..……………………………..…....49

*United States v. Godfrey*,
   787 F.3d 72 (1st Cir. 2015) …..................……………………………………..…..10

*United States v. Gonzalez*,
   683 F.3d 1221 (9th Cir. 2012) ….................…………………………………..…..30

*United States v. Gorski*,
   880 F.3d 27 (1st Cir. 2018) …..................…………………………………...…..31

*United States v. Hatch*,
   434 F.3d 1 (1st Cir. 2006) ………………..……………………………………......3

*United States v. Heidecke*,
   900 F.2d 1155 (7th Cir. 1990)…………………………………...…………………....36

*United States v. Henderson*,
   2 F.4th 593 (6th Cir. 2021) …..................…………………………………..…..20

*United States v. Iacaboni,*
    363 F.3d 1 (1st Cir. 2004).………………………………………………….……..8

*United States v. Iacaboni,*
    667 F. Supp. 2d 215 (D. Mass. 2009)…..……………………………..…...2

*United States v. Jain,*
    1995 WL 9301 (W.D. Mo. Jan. 9, 1995).……………………..……………...24

*United States v. Jarigese,*
    999 F.3d 464 (7th Cir. 2021) .…...……..…………………………………..…..24

*United States v. Jimenez,*
    507 F.3d 13 (1st Cir. 2007) …...…………..………………………...…...24

*United States v. Khoury,*
    2021 WL 2784835 (D. Mass. July 2, 2021) …………..…………….………..6, 11

*United States v. Lasanta-Sanchez,*
    681 F. App'x 32 (1st Cir. 2017)…..………….…………………………..…...7

*United States v. Leary,*
    2019 WL 1584508 (D. Mass. Apr. 12, 2019).…..........................…....…………....…31

*United States v. Lopez-Cotto,*
    884 F.3d 1, 9 (1st Cir. 2018) …..………………………………………..……..10

*United States v. Lopez-Diaz,*
    794 F.3d 106 (1st Cir. 2015) …………………………………………………..3

*United States v. Matthews,*
    643 F.3d 9 (1st Cir. 2011) …..……………………………………………......5

*United States v. Maggio*
    862 F.3d 642 (8th Cir. 2017) …..……………………………………..…..18

*United States v. Martinez,*
    994 F.3d 1 (1st Cir. 2021) …..…………………..………...……………...…..18

*United States v. Merlino,*
    592 F.3d 22 (1st Cir. 2010)……..……..………………………………..…...4

*United States v. Moran,*
    312 F.3d 480 (1st Cir. 2002)………………..…………………………..……...3, 23

*United States v. Moran,*
    393 F.3d 1 (1st Cir. 2004)…..…………..…………………………………......5

*United States v. Mubayyid,*
    658 F.3d 35 (1st Cir. 2011)…..…………………………………………......10

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019) …….…..…………………………………......18

*United States v. O'Brien,*
    14 F.3d 703 (1st Cir. 1994)…..…………..……………………………......3

*United States v. O'Bryant,*
998 F.2d 21 (1st Cir. 1993)………..…………………………………………………50, 51

*United States v. Owens,*
917 F.3d 26 (1st Cir. 2019)..…………………………………………………....…..…..3

*United States v. Pelisamen,*
641 F.3d 399 (9th Cir. 2011) …....…………………..…..……………………..…...46

*United States v. Percoco,*
13 F.4th 180 (2d Cir. 2021) …....…………………………………….…17, 18, 20

*United States v. Perez-Melendez,*
599 F.3d 31 (1st Cir. 2010)……..…………………………………….………….…...3

*United States v. Petrozziello,*
548 F.2d 20 (1st Cir. 1977) ….................…..……………………………..……26, 27, 28

*United States v. Polanco,*
634 F.3d 39 (1st Cir. 2011)..…………………………………………..……...…..…3

*United States v. Ponzo,*
853 F.3d 558 (1st Cir. 2017)...………………………………………………....…..…3

*United States v. Ponzo,*
2014 WL 1364796 (D. Mass. Apr. 3, 2014)..……………………………….….….……3

*United States v. Porter,*
886 F.3d 562 (6th Cir. 2018)...………………………………………..….…..18

*United States v. Potter,*
463 F.3d 9 (1st Cir. 2006) …..………………..…………………..…………….…...23

*United States v. Prange,*
771 F.3d 17 (1st Cir. 2014) ….................……………………….………….…...25

*United States v. Renteria,*
903 F.3d 326 (3d Cir. 2018) …..............………………………………..……...30

*United States v. Repak,*
852 F.3d 230 (3d Cir. 2017) …..............………………………………..……...20

*United States v. Rivera-Ortiz,*
14 F.4th 91 (1st Cir. 2021)…….…..…………………………………….….…...…35

*United States v. Rivera Rangel,*
396 F.3d 476 (1st Cir. 2005)…..………………………………………...….……...4, 54

*United States v. Roberson,*
998 F.3d 1237 (11th Cir. 2021) …..............………………………………...18, 24

*United States v. Rodriguez-Berrios,*
573 F.3d 55, 69 (1st Cir. 2009)...………..…………………………………………...…35

*United States v. Rodriguez-Milian,*
820 F.3d 26 (1st Cir. 2016)……………..…………………………………..……..…8

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2007) …...………………………………...…30

*United States v. Rosen*,
    130 F.3d 5 (1st Cir. 1997) …...……………………………………...…11

*United States v. Sandoval*,
    6 F.4th 63 (1st Cir. 2021)…...……………………………...….……...…3

*United States v. Sawyer*,
    85 F.3d 713 (1st Cir. 1996)…...…………………………………...…21

*United States v. Santopietro*,
    166 F.3d 88 (2d Cir. 1999)…...................…………………………...…50

*United States v. Scott*,
    270 F.3d 30 (1st Cir. 2001) …...............…….…………………...…28

*United States v. Sidoo*,
    468 F. Supp. 3d 428 (D. Mass. 2020) …...……………………….…..*passim*

*United States v. Simon*,
    12 F.4th 1 (1st Cir. 2021)…………………………………….……....33, 51

*United States v. Slade*,
    980 F.2d 27 (1st Cir. 1992)……………………………………...…43

*United States v. Soto-Beniquez*,
    356 F.3d 1 (1st Cir. 2003)……...…..………………………………...…50

*United States v. Spock*,
    416 F.2d 165 (1st Cir. 1969)……………………………...…...…45

*United States v. Stepanets*,
    989 F.3d 88 (1st Cir. 2021)……………………………….…….…31

*United States v. Taylor*,
    54 F.3d 967 (1st Cir. 1995) ……………………………….……53

*United States v. Thrower*,
    746 F. Supp. 2d 303 (D. Mass. 2010) …………………………………3, 4

*United States v. Torres-Rosario*,
    658 F.3d 110 (1st Cir. 2011)…………….....……………………….......…7

*United States v. Weyhrauch*,
    548 F.3d 1237 (9th Cir. 2008) …................………………..…………...…22

*United States v. Valdes-Ayala*,
    900 F.3d 20 (1st Cir. 2018) ……...……………………………….…...…47

*United States v. Valenzuela*,
    849 F.3d 477 (1st Cir. 2017) …...............……..………………….…...28, 30

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990)…...……..……..……………………….…42, 43

*United States v. Zenon-Rodriguez*,
  289 F.3d 28 (1st Cir. 2002)……….....………….....………………………......….......7

*Woodward v. United States*,
  905 F.3d 40 (1st Cir. 2018) …………....…..………………………….…...…..20

*Zafiro v. United States*,
  522 U.S. 52 (1997) …....…..……………..……....……………………….…....…..50

## **Statutes and Other Authorities**

1 U.S.C. § 1…………………………………………………………………..….24, 25

18 U.S.C. § 201…………………………………………………………………17, 18

18 U.S.C. § 666…………………………………………………………....…*passim*

18 U.S.C. § 1341…………………………………………………………..…...6

18 U.S.C. § 1343…………………………………………………………………..6

18 U.S.C. § 1346…………………………………………………………...21, 22

18 U.S.C. § 1349…………………………………………………………...…..6

26 U.S.C. § 7206(1)………………………………………………….……48, 50

## PRELIMINARY STATEMENT

"I love it."  Those were defendant Gamal Abdelaziz's words in responding to William "Rick" Singer when Singer told him that his daughter's fraudulent athletic profile was so convincing that corrupt USC athletics insider Donna Heinel wanted Singer to use it as a model to get other fake athletes admitted to USC in exchange for money.  During the same phone call, Abdelaziz agreed that Singer should lie to the IRS about the purpose of his $300,000 payment for his daughter's admission slot, and on a later call, Abdelaziz agreed to lie to USC's admissions department about a phony injury to explain why his daughter had not attended basketball practice.

"Is there a two-for-one special if you've got twins?"  After paying $220,000 to get his son admitted to USC through the side door scheme years earlier, those were defendant John Wilson's words when Singer told him that he would make his daughters "a sailor or something because of where you live."  After Wilson paid Singer $500,000 to have the Stanford sailing coach purport to "recruit" one of his non-athlete daughters, Singer told Wilson that the coach had "to actually recruit some real sailors" so that "Stanford doesn't catch on to what he's doing."  Wilson laughed and agreed: "He's got to actually have some sailors."  Wilson later paid Singer an additional $500,000 to have his other daughter admitted to Harvard as a purported athletic recruit, and told Singer that his daughter "could be even the mascot."

The defendants' devastating admissions, captured on tape, constituted only a sliver of the overwhelming evidence of their guilt admitted during the four-week trial, including nearly 250 exhibits and testimony from 17 witnesses.  After considering that evidence, it took the jury barely a day of deliberations to return a verdict finding the defendants guilty on all counts.  During two-and-a-half years of pre-trial litigation, the defendants tried to delay that verdict by filing one unmeritorious motion after another.  Now convicted, they pick-up where they left off: In 65-plus

pages of briefing supporting their motions for judgment of acquittal and a new trial under Fed. R. Crim. P. 29 and 33, they assert that this a "misguided prosecution" that has "nothing to do" with fraud or bribery.  A jury of their peers unanimously disagreed.  Once again, the defendants' motions are without merit.

The defendants' Rule 29 motion should be denied because this Court has previously rejected nearly all of their legal arguments, and the remainder are contrary to precedent, and because their factual challenges fail to recount the evidence in the light most favorable to the verdict, as Rule 29 requires.

Their Rule 33 motion fares no better.  Without meaningfully developing any of their arguments, they challenge essentially every one of this Court's pre-trial and mid-trial rulings and "incorporate by reference" dozens of motions and briefs.  The defendants' motion is not a serious attempt to obtain a new trial under Rule 33 by showing a "miscarriage of justice."  Instead, it is a transparent and legally specious attempt to preserve appellate rights in bulk.  And for good measure, as they have throughout this case, the defendants throw in another frivolous attack on the government for a purported *Brady* violation.  This time, the "crucial exculpatory" evidence they accuse the government of withholding is a fax cover sheet that confirms the government sent Singer's telephone carrier his signed consent to record his phone calls on September 28, 2018, before the Court-authorized wiretap of his phone expired.

In short, "nothing substantive from [the defendants'] profuse filings warrants overruling the jury that this Court empaneled and charged with great care or reconsidering the Court's legal rulings."  *United States v. Iacoboni*, 667 F. Supp. 2d 215, 218 (D. Mass. 2009) (Gorton, J.).  For these reasons, and the reasons set forth below, the defendants' motions should be denied.

## **LEGAL STANDARD**

The standard governing motions for judgment of acquittal under Fed. R. Crim. P. 29 imposes "daunting hurdles" for defendants, *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006), and it is therefore "rare" for a court to reverse a conviction under Rule 29. *United States v. Lopez-Diaz*, 794 F.3d 106, 108 (1st Cir. 2015). Indeed, challenges to convictions under Rule 29 are "a tough sell," *United States v. Polanco*, 634 F.3d 39, 45 (1st Cir. 2011), and defendants seeking acquittal "face an uphill battle." *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). In considering such motions, courts must determine "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994).

Accordingly, granting a motion for judgment of acquittal requires a court to find that "no levelheaded jury could have found the defendants guilty," *United States v. Sandoval*, 6 F.4th 63, 75 (1st Cir. 2021), and in applying Rule 29, a court must review the evidence in a "prosecution-friendly light" and make all "credibility choices in the government's favor." *United States v. George*, 761 F.3d 42, 48 (1st Cir. 2014). Further, it is "important[]" that courts "place no premium . . . upon direct as opposed to circumstantial evidence since both types of proof can adequately ground a conviction." *United States v. Owens*, 917 F.3d 26, 39 (1st Cir. 2019). "[A]s long as the guilty verdict finds support in a plausible rendition of the record, it must stand." *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002); *see also United States v. Ponzo*, 2014 WL 1364796, at *2 (D. Mass. Apr. 3, 2014) (Gorton, J.) (denying Rule 29 motion), *aff'd*, 853 F.3d 558 (1st Cir. 2017); *United States v. Thrower*, 746 F. Supp. 2d 303, 305 (D. Mass. 2010) (Gorton, J.).

Similarly, the First Circuit applies a demanding standard to Rule 33 motions for a new trial, which should be denied absent "exceptional circumstances." *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (reversing district court's order granting new trial). A court may vacate a jury verdict and grant a new trial under Rule 33 only "if the interests of justice so require." *Thrower*, 746 F. Supp. 2d at 307 (quoting Fed. R. Crim. P. 33). The "interests of justice so require" a new trial "only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *Id.* (quoting *Merlino*, 592 F.3d at 32); *see also United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005) (reversing grant of new trial).

## ARGUMENT

### I.    Defendants' Motion for Judgment of Acquittal Pursuant to Rule 29 Should Be Denied

#### A.    The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Mail Fraud and Wire Fraud, and Wilson of Wire Fraud

The defendants advance four principal arguments in asserting that the jury's verdict convicting them of conspiracy to commit mail fraud and wire fraud in Count One and Wilson of wire fraud in Counts Six, Eight, and Nine should be reversed under Rule 29. Dkt. 2330 at 7–12, 26–29. They contend that: (i) admission slots are not property as a matter of law, and that there was no evidence that admission slots are property; (ii) the government constructively amended the indictment by referring to "athletic recruitment slots" in its opening statement; (iii) there was no evidence that the charged conspiracy caused tangible economic harm to the universities; and (iv) as to Wilson, there was insufficient evidence that he "conspired to make false statements" that were material. *Id.* These arguments are without merit.

##### 1.    Admission Slots Are Property under the Mail and Wire Fraud Statutes

The defendants' contention that "admission slots cannot, as a matter of law, constitute property," Dkt. 2330 at 7–9, is unavailing for at least two reasons.

    <u>First</u>, this Court has previously decided, multiple times, that admission slots are property. Those rulings "should remain the law of th[e] case throughout the litigation, unless and until the decision is modified or overruled by a higher court." *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004); *see also United States v. Matthews*, 643 F.3d 9, 12 (1st Cir. 2011) ("[T]he law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). The law of the case doctrine precludes previously rejected legal arguments in Rule 29 and 33 motions unless there exist "rare and narrowly circumscribed" "exceptional circumstances," such as where "controlling legal authority has changed dramatically," or if "the earlier decision is blatantly erroneous." *Matthews*, 643 F.3d at 14. More than a year ago, after extensive briefing, this Court concluded that "the definition of 'property' [under the mail and wire fraud statutes] extends readily to encompass admission slots." *United States v. Sidoo*, 468 F. Supp. 3d 428, 441 (D. Mass. 2020). The Court has since reaffirmed that holding in ruling on other dispositive motions, pre-trial evidentiary motions, and jury instructions.[1] The defendants do not, and cannot, suggest that "controlling legal authority has changed dramatically" since the Court reached that conclusion, and they therefore may not use Rule 29 to relitigate previously rejected arguments.

    <u>Second</u>, even were the Court to consider the merits of the defendants' renewed argument, it should reach the same conclusion. As the government has previously argued,[2] the concept of

---

[1] *See, e.g.*, *United States v. Sidoo*, 471 F. Supp. 3d 369, 377 (D. Mass. 2020) ("For reasons previously explained, this Court has determined that so-called 'application slots' are property of a university [] under the mail and wire fraud statutes."); Pre-trial Conf. Tr. at 20 ("This Court has already concluded that admission slots . . . are both limited and highly coveted, are valuable because they are limited and, in fact, may constitute the object of the alleged conspiracy."); Charge Conf. Tr. at 12 ("I have determined, to the contrary, an admission slot is [] property.").

[2] The government incorporates by reference its prior briefing on this issue and all other previously raised issues that the defendants relitigate in their post-trial motions. *See, e.g.*, Dkt. 1170 at 25–35.

"property" under the mail and wire fraud statutes 18 U.S.C. §§ 1341, 1343, 1349 "is to be interpreted broadly." *United States v. Dray*, 901 F.2d 1132, 1142 (1st Cir. 1990). And courts have held—relying on logic that this Court found applied "neatly" to the allegations and evidence in this case, *see Sidoo*, 468 F. Supp. 3d at 441—that universities have property rights in their degrees and grading systems. *See United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997) (holding that university had property right in unissued degrees); *see also United States v. Barrington*, 648 F.3d 1178, 1191 & n.11 (11th Cir. 2011) (A "[u]niversity certainly has an intangible property interest in the integrity of its grading system"); *United States v. Khoury*, 2021 WL 2784835, at *2 (D. Mass. July 2, 2021) (Casper, J.) (agreeing with this Court's conclusion in holding that university admission spots are property because they have "tangible value, not just from what [admission] offers to prospective students, but also from the limited nature of [admission]"). Consistent with this precedent, this Court's prior holding remains correct: "Admission slots at competitive universities, such as USC, are both limited and highly coveted," and "[t]he ability to grant admission is an asset of the university subject to its control." *Sidoo*, 468 F. Supp. 3d at 441.

Unable to evade the law of the case or offer new precedent, the defendants retreat to a fallback argument: that whether admission slots are property is a "mixed question of law and fact," and that there was no evidence at trial that such slots are property of universities like USC. Dkt. 2330 at 9–10. This assertion, offered without legal support, is meritless for at least four reasons.

First, the defendants have conceded—including in dispositive motions, proposed jury instructions, and even their Rule 29 motion itself—that this is a question of law for the Court to decide. *See, e.g.*, Dkt. 1042 at 7–23 (arguing that Count One should be dismissed because admission slots are not property as a matter of law); Dkt. 2015-1 at 45 (proposed jury instruction that admission slots are not property as a matter of law); Dkt. 2330 at 7–8 (contending that whether

admission slots are property is "a matter of law"). This "concession constitutes waiver," and the defendants cannot change their mind because the Court decided the question of law contrary to their position. *United States v. Lasanta-Sanchez*, 681 F. App'x 32, 35 (1st Cir. 2017) (quoting *United States v. Torres-Rosario*, 658 F.3d 110, 116 (1st Cir. 2011)).

<u>Second</u>, the Court has previously concluded that the question whether admission slots are property is "a question of law for the Court," and the law of the case doctrine therefore forecloses this argument as well. *See* Charge Conf. Tr. at 12 ("I have determined to the contrary, an admission slot is intangible property. . . . That's a question of law."); 10/7/21 Tr. at 39.

<u>Third</u>, whether admission slots are property of universities falling within the scope of the mail and wire fraud statutes is, indeed, a question of law. *See, e.g.*, *United States v. Zenon-Rodriguez*, 289 F.3d 28, 31 (1st Cir. 2002) (explaining that construing the reach of criminal statutes is a matter for courts and explaining that "[w]hether prosecutions under [a Title 18 statute] may include" certain acts is "a question of law").[3]

<u>Fourth</u>, even were the Court to reconsider and find that the issue is a mixed question of law and fact—which it should not—there was ample evidence supporting the jury's verdict, including testimony from USC admissions officer Rebecca Chassin that, among other things, admission slots at USC are limited, the university has an interest in admitting the most qualified students, and USC can revoke admission if a student lies during the application process. *See, e.g.*, 9/20/21 Tr. at 146, 148, 152, 158, 186, 202–04; 9/21/21 Tr. at 124, 128–29, 134; *see also Sidoo*, 468 F. Supp. 3d at

---

[3] Without citation or elaboration, the defendants assert that "the three factors [they] discuss[] [] are the only factors that bear on whether admissions 'slots' . . . are property." Dkt. 2330 at 10 n.9. That argument is waived for lack of developed argumentation and in any event lacks support in the law. *See, e.g.*, *Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004) (observing that *Cleveland*'s "particular selection of factors" did not establish "rigid criteria for defining property but instead . . . provid[ed] permissible considerations.").

440–42 (describing factors considered in holding admission slots are property, including that admission slots are "both limited and highly coveted").[4]

### 2.    The Indictment Was Not Constructively Amended

Because the government used the phrase "athletic recruitment slots" a few times in its opening statement, the defendants next assert that the government "abandoned" its original theory regarding "admission slots," resulting in an impermissible "constructive amendment" of the indictment. Dkt. 2330 at 8. The defendants' conclusory, one-paragraph argument is undeveloped and without legal support.[5] Accordingly, the Court should consider it waived. *See United States v. Chan*, 981 F.3d 39, 50 & n.4 (1st Cir. 2020) (undeveloped arguments without support are waived, collecting cases); *United States v. Rodriguez-Milian*, 820 F.3d 26, 32 n.2 (1st Cir. 2016) (constructive amendment argument waived where underdeveloped in briefing).

In any event, parsing two words in an opening statement does not establish a constructive amendment or justify vacating the jury's verdict. A constructive amendment (contrary to a variance), occurs only "when the charging terms of the indictment are altered, either literally or in

---

[4] As to the substantive wire fraud charges against Wilson relating to Stanford and Harvard in Counts Six, Eight, and Nine, his own recorded words are more than sufficient to sustain the jury's verdict finding that Wilson participated in a scheme to defraud those universities by obtaining admission slots by means of materially false pretenses. *See, e.g.*, Ex. 591 (Singer: "I can send [the Stanford sailing coach] your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so Stanford doesn't . . . catch on." Wilson: "[Laughter] Right. . . . Yeah, no. He's got to . . . actually have some sailors. Yeah." Singer: "Yeah. So that Stanford doesn't catch on to what he's doing." Wilson: "Right."); Ex. 602 (Singer: "So I got the senior women's administrator at Harvard is going to give us a spot. What we have to do is we'll have to give, um, her, um, $500,000. . . ." Wilson: "Ok, great. . . . [S]ailing is actually a logical thing. She could be even the mascot, whatever . . . [laughter]."). Further, having established that admission slots are property of USC, the evidence leads to the same conclusion about two even more competitive schools.

[5] Indeed, the defendants cite no precedent about constructive amendments at all, save for one inapposite case in which the First Circuit found constructive amendment in a forfeiture order for a defendant who pleaded guilty. *See United States v. Iacaboni*, 363 F.3d 1, 7 (1st Cir. 2004).

effect, by prosecution or court after the grand jury has last passed upon them." *United States v. Fisher*, 3 F.3d 456, 462–63 (1st Cir. 1993). As this Court has held, "[t]he existence of a constructive amendment is generally determined upon consideration of the *statutory elements of a crime* and an analysis of whether the crime charged has been altered between indictment by the Grand Jury and trial." *United States v. Antunes*, 419 F. Supp. 3d 139, 141 (D. Mass. 2019) (Gorton, J.) (emphasis added).

The government made clear in its opening statement, its closing argument, and the evidence adduced at trial[6] that "athletic recruitment slots" were *the means by which* the defendants used fraud and bribery to obtain "admission slots." Belying even a non-prejudicial variance, much less a constructive amendment, the defendants did not conspire to obtain athletic recruitment slots *as opposed to* admission slots; rather, as charged in the indictment, they conspired to use fraud and bribery to (1) "secur[e] the *admission* of the defendants' children to selective colleges", (2) by "*using* . . . bogus academic and athletic credentials, falsified applications, and bribes," and "fabricating athletic 'profiles' containing falsified athletic credentials" and "bribing athletic coaches and university administrators to designate students as purported athletic recruits." FSI ¶¶ 65, 66(f), (g) (emphasis added). And as the jury found beyond a reasonable doubt, that is exactly what the evidence proved. At most, the government used "athletic recruitment slots" interchangeably with "admission slots," insofar as the evidence adduced at trial was that the overwhelming majority of recruited athletes were admitted, and that recruitment slots and

---

[6] *See, e.g.*, 9/13/21 Tr. at 26 (Opening statement: describing the conspiracy as involving "coaches and athletic department administrators who agreed to facilitate *the admission* of these students *as phony athletic recruits* in exchange for money") (emphasis added); 10/6/21 Tr. at 10–11 (Closing argument: summarizing the evidence that "the defendants conspired to get their children into college through fraud and bribery *to gain admission* as *recruited athletes* based on falsified credentials, to induce corrupt Athletic department insiders to fool their own colleagues in the Admissions Department in exchange for money . . .") (emphasis added).

admission slots were therefore effectively the same thing.  The First Circuit has rejected constructive amendment arguments with far more weight than the defendants' retreat to semantics, and the government's reference to athletic recruitment slots in its opening statement is not remotely akin to those rare situations in which the First Circuit has found constructive amendments. *Compare, e.g.*, *United States v. Brandao*, 539 F.3d 44, 56–57 (1st Cir. 2008) (finding constructive amendment where the jury was instructed on elements of "the substantive crime of murder" even though indictment "had only charged conspiracy to murder," but affirming on plain error review), *with United States v. Dowdell*, 595 F.3d 50, 68 (1st Cir. 2010) ("no constructive amendment present where the difference between the evidence presented and the text of the indictment does not affect any element of the offense," and finding no constructive amendment where indictment charged distribution of *different drug* than what evidence at trial proved).[7]

### 3.    Mail and Wire Fraud Conspiracy Does Not Require Tangible Economic Harm

Next, the defendants contend that their convictions for mail and wire fraud conspiracy must be reversed because "the government had to prove that the alleged scheme (1) deprived USC of potentially valuable economic information; and (2) caused tangible economic harm to USC."  Dkt. 2330 at 10–11.  That argument is not correct for at least two reasons.

---

[7] *See also United States v. Lopez-Cotto*, 884 F.3d 1, 9–10 (1st Cir. 2018) (no constructive amendment where "imperfect" jury instructions focused on "single benefit" theory in bribery scheme even though indictment charged "stream of benefits" theory); *United States v. Godfrey*, 787 F.3d 72, 78–79 (1st Cir. 2015) (no constructive amendment where, despite variance in evidence of material falsehoods, "the jury convicted [defendants] for precisely the mail and wire fraud for which they were charged"); *United States v. Mubayyid*, 658 F.3d 35, 52–53 (1st Cir. 2011) (same, despite change in object of conspiracy, because the First Circuit has "declined to parse the conspiratorial object so finely"); *United States v. DeCicco*, 439 F.3d 36, 46–47 (1st Cir. 2006) (no constructive amendment where indictment charged defendant with submitting false claims for "building loss insurance proceeds," but evidence centered on "demolition expenses").

<u>First</u>, the defendants were convicted on Count One for *conspiracy* to commit mail and wire fraud.  Accordingly, the government needed to prove only that: (1) the conspiracy charged in Count One existed between at least two people to commit mail or wire fraud; and (2) the defendants willfully joined in that agreement.  *See* Dkt. 2014 at 18; 10/7/21 Tr. at 35.  No tangible economic harm is required because the crime of conspiracy is complete upon the agreement's inception.  *See United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987).

<u>Second</u>, and in any event, the First Circuit has made clear that the scope of the mail and wire fraud statutes is "broad," and such schemes "must, at a minimum, contemplate *either* some articulable harm befalling the fraud victim *or some gainful use of the object of the fraudulent scheme by the perpetrator*, regardless of whether this use is profitable in the economic sense." *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997) (emphasis added).  Thus, as this Court has noted, it is "mistaken" to argue that economic harm or "intent to harm or financially injure is required for wire fraud" because "[t]he First Circuit has, on multiple occasions, held that in fraud cases the government must prove merely that the defendant had an intent to defraud," and "[o]ther circuits concur."  *United States v. DeNunzio*, 2015 WL 5305226, at *4 (D. Mass. Sept. 9, 2015) (Gorton, J.) (rejecting argument that harm or intent to harm was necessary for wire fraud conviction and assertion that victim "got what it bargained for," collecting cases); *see also Khoury*, 2021 WL 2784835, at *3 (explaining why university admission slots are also cognizable property under the "right to control theory" and how scheme of making payment in exchange for recruiting underqualified athlete, as alleged, caused "indirect" "tangible economic harm," such as by "providing the victim with lower-quality goods than it otherwise could have received").  The defendants' argument fails even based on the out-of-circuit precedent on which they rely but selectively quote.  Dkt. 2330 at 11–12; *United States v. Binday*, 804 F.3d 558, 570–71 & n.11 (2d

Cir. 2015) ("[N]o 'pecuniary harm' need be inflicted or intended, so long as the deceit goes to an essential element of the bargain.").

### 4.   The Evidence Was Sufficient to Convict Wilson on Count One

Finally, Wilson contends that there was no evidence that he "conspired to make false statements to USC" because the government "failed to prove that [his son's water polo] profile included any false or misleading statements, let alone any that are materially false or misleading." Dkt. 2330 at 26–29.  That is not true—nor, of course, was the government specifically required to prove material falsities on the "player profile" Singer sent Wilson.  Indeed, the defendant's own words about his son's water polo abilities were sufficient to sustain the verdict.  And the evidence was overwhelming regarding Wilson's agreement to obtain admission for his son as a water polo recruit through fraud, including but not limited to, the following:

- In March 2013, after Wilson confirmed with Singer that "none of the [Division I water polo teams he was interested in] . . . even want to meet with him on their campus" and college "water polo [was] n[o]t realistic for Johnny," he asked about the side door at USC and whether "the other kids [would] know he was a . . . side door person?"  Ex. 49.  Singer told Wilson his son would not even have to attend water polo practices and that "frankly after the 1st semester he can move on."  Wilson stated that "obviously" his son's abilities were "below the other freshmen" and worried that he would be a "clear misfit."  *Id.*

- After Wilson sent Singer pictures of his son playing water polo for a player profile, he asked "what does Jovan need by [September]?  . . . Do I make the first payment to you then?"  Singer responded, "I believe I have everything.  Transcript test scores and a player profile so he can add Johnny to his recruit list and present him to admissions in October."  Ex. 75.  Wilson was informed by his son's high school that, based on Johnny's academic credentials, it was highly unlikely he would be admitted to USC.  Ex. 87.

- Vavic told Singer, "I need [Johnny Wilson's] resume, needs to be a good resume."  Ex. 81.  About one week later, Singer told Wilson, "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing."  Ex. 83.  Wilson responded, "Thx . . . When is Jovan going to be able to give us decision on USC?  And when do I pay u?  Was it 50% in nov?  50% in feb when we get final official notice?"  Singer told Wilson, "Jovan will provide Johnny's info to admission . . . No payment of money till

he gets a verbal and written from admissions and then 50 percent to a savings account I set up. Then the remainder upon an acceptance letter." *Id.*

- Less than a week later, Singer sent Wilson the profile that Vavic had asked him to "embellish." Ex. 88. It was replete with falsities, even according to the testimony of Wilson's *own witnesses*. Singer invented the swim times (*see* Exs. 84, 85)—times that former USC water polo player Andrew Mericle, a close friend of the Wilson family, testified he did not know were even "possible." 10/1/21 Tr. at 68–69. And Jack Bowen, Johnny Wilson's high school coach, testified that (i) he was "surprised" that Johnny was admitted to USC as a water polo player and "did not think that [he] would get into USC as a water polo player," and that (ii) the credentials on the profile sent to Wilson and the profile submitted to USC's Subco were "mostly false," and that the "falsehoods" made him look like a "better player." 10/4/21 Tr. at 82, 125–28, 174–75, 178–82.

- After Singer sent Wilson the fake profile, Wilson responded from the same e-mail account asking about the "expectations" for this "WP [water polo] approach." Singer told Wilson that his son would not even need to "get in the pool." Ex. 89.

- When Vavic received the falsified profile, he added even more falsehoods that were submitted to USC's subcommittee on athletic admissions ("Subco"), including that Wilson was "top 10" in the country at his position, and would be an "immediate impact player" and the "fastest player on the team." Exs. 105, 107. Numerous witnesses, including Mericle, Bowen, and USC assistant water polo coach Casey Moon testified those representations were false. *See* 9/28/21 Tr. at 110–12; 10/1/21 Tr. at 79–80; 10/4/21 Tr. at 180.

- After the Subco approved Wilson's son for admission based on those false credentials, in an e-mail titled "USC fees," Wilson told Singer, "Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" Ex. 710. Wilson later wired $220,000 to The Key and Singer's sham charity KWF, and falsely deducted the payments from his taxes as a purported charitable donation and fake business expenses. 9/29/21 Tr. at 185; *see* Exs. 109, 110, 112.

From this evidence, the jury was easily justified in concluding that there were, in fact, falsehoods in the athletic profile Singer had prepared for Johnny Wilson; that Wilson knew of (and approved of) those falsehoods because, among other things, Singer e-mailed the fraudulent profile to him and Wilson knew that his son was not qualified to be recruited by USC; that Vavic caused those falsehoods, and additional lies, to be presented to USC's Subco to secure Johnny's admission (a fact Wilson does not seriously dispute); and that Wilson paid Singer to make that happen.

Confronted with that overwhelming evidence, Wilson now challenges the *materiality* of those false misrepresentations, asserting that Johnny would "have been admitted to USC based on his true credentials," that he was "qualified to be a recruit" for the USC water polo team, and that therefore any "misstatements . . . were immaterial." Dkt. 2412 at 4–5. This argument is frivolous. First, it is not true, as Wilson contends, that materiality could be proven only if Johnny "would not have been admitted to USC based on his true credentials," and Wilson fails to cite any case in which a court disturbed a verdict under Rule 29 on the fact-intensive issue of materiality. *See, e.g.*, *United States v. Blastos*, 258 F.3d 25, 29 (1st Cir. 2001) ("After review of the entire record, we hold that no jury could reasonably find that the false and fraudulent pretenses . . . made by the defendant were not material as they had the *natural tendency to influence the decisionmaker*.") (emphasis added). Second, USC admissions officer Chassin did, in fact, testify that (i) the admissions committee believed the falsehoods in Johnny Wilson's Subco packet, and (ii) Wilson's son was admitted as an athletic recruit, in reliance on those falsehoods, and would not have been admitted to USC on his academic credentials alone. *See* 9/20/21 Tr. at 161–69.

### B. The Evidence Was Sufficient to Convict the Defendants of Conspiracy to Commit Honest Services Mail and Wire Fraud and Federal Programs Bribery, and Wilson of Substantive Counts of Those Crimes

The defendants argue that their convictions for conspiracy to commit honest services mail and wire fraud in Count One and federal programs bribery in Count Two, and Wilson's convictions for substantive honest services wire fraud in Counts Six, Eight, and Nine and for substantive federal programs bribery in Counts Eleven and Twelve must be reversed for four reasons. This Court has previously rejected several of these arguments, and the remainder are equally meritless.

### 1. The Evidence of *Quid Pro Quo* Payments Was Sufficient

First, the defendants contend that their convictions must be reversed because "a payment to an alleged victim cannot constitute a bribe or kickback, even where a coach or administrator

may receive some . . . benefit from the payment." Dkt. 2330 at 12–13. But this Court has, on several occasions, held otherwise: "Payments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities, may still constitute a benefit to those insiders," and therefore a bribe, if "the payments were made to designated accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit professionally" such that the payments "represent a 'thing of value' to those insiders, even if the payments were not deposited directly into personal accounts." *Sidoo*, 468 F. Supp. 3d at 444–45; *see also* Charge Conf. Tr. at 14 ("[T]he *Skilling* decision allows for the victim to benefit from the bribe."). Accordingly, consistent with precedent from other courts,[8] "[e]ven if the victim, in this case the university, ends up profiting as a result of a [bribery] scheme, there still exists actionable harm 'in the denial of that party's right to the offender's honest services," and "[t]hat the payments made by defendants eventually went to USC does not thereby preclude such payments from constituting bribes." *Sidoo*, 468 F. Supp. 3d at 445 (quoting *Skilling v. United States*, 561 U.S. 358, 400 (2010)). In addition to the honest services fraud charges, "[t]his logic applies to the federal programs bribery charges as well." *Id.* at 445. Accordingly, the law of the case doctrine compels the denial of the defendants' motion on this basis. And even were the Court to reach the merits of their renewed argument, the "law is clear that payments to third parties, including even charities, may qualify as bribes or kickbacks . . . [s]o long as the money was paid with corrupt intent—as a *quid pro quo* for recruiting students as athletes based on fals[ified] credentials." Dkt.

---

[8] *See, e.g.*, *United States v. Ernst*, No. 19-10081-IT (D. Mass. July 28, 2021), Dkt. 733 at 3 ("The requirement that the government prove a 'private payment' or 'private gain' does not foreclose . . . a scenario where the Defendant agreed to have bribes paid to university accounts so long as the government proves that the defendant entered into a *corrupt or illegitimate* agreement to receive something 'of value' where a thing of value is defined broadly to include the value which the defendant subjectively attaches to the items received.").

1170 at 43 (collecting cases).  The Court correctly instructed the jury on this issue.  *See* 10/7/21

Tr. at 48, 54–55.

Next, the defendants challenge the sufficiency of the evidence of a corrupt *quid pro quo*,

but notably, do not dispute that the money they paid was in exchange for the admission of their

children as recruited athletes.  *See* Dkt. 2330 at 12–18, 39.  Instead, they simply assert, without

more, that there was "zero evidence" that their payments were made to "designated university

accounts over which the bribe recipients exercised discretion or that otherwise benefitd [*sic*] them

professionally."  *Id.* at 39; *see Sidoo*, 468 F. Supp. 3d at 444–45 ("[P]ayments [] made to designated

accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit

professionally" may serve as a "thing of value to those insiders even if the payments were not

deposited directly into personal accounts").  The Court correctly rejected this argument before

closing arguments.  *See* 10/6/21 Tr. at 6.  At trial, there was detailed testimony and other evidence

establishing that the payments from the defendants and other co-conspirators were "made to

designated accounts that were either controlled by the corrupt insiders or that otherwise inured to

their benefit professionally," including, *inter alia*, evidence that: (i) Vavic controlled and oversaw

the USC men's water polo fund, and money in the men's water polo fund benefited Vavic;[9]

(ii) Heinel controlled and oversaw the USC Women's Athletic Board fund;[10] (iii) Heinel directed

---

[9] *See, e.g.*, 9/28/2021 Tr. at 98 (Casey Moon testifying that Vavic controlled the account); *see also, e.g., id.* at 183–84; 9/27/2021 Tr. at 15, 72.

[10] *See, e.g.*, 9/27/2021 Tr. at 20–21 (Laura Janke testifying that fund "was run by" Heinel); *see also id.* at 19 (Janke testifying that side door bribe payments "would go to Donna Heinel at USC to whatever program or funds she wanted them directed to"); *id.* at 22 (Janke testifying that the Women's Athletic Board fund "was a fund that [Heinel] oversaw"); Ex. 555 (Singer telling co-conspirator on wiretap: "[I]t will go to Donna Heinel Senior Women's Athletic Director.  It will be made out to USC Women's Athletics. . . . [E]ssentially just it goes right in-right to her.  She took care of that part.").

Singer's clients to send bribe payments to that fund;[11] (iv) Heinel's salary increased as payments to that fund increased, those increased payments were principally from Singer's clients, and Heinel's performance was evaluated based, in part, on her fundraising.[12] That evidence was more than sufficient to sustain the jury's verdict.[13]

### 2.    <u>The Evidence Regarding Official Acts Was Sufficient or Unnecessary</u>

Second, the defendants contend that their convictions must be reversed because there was no evidence that coaches and administrators like Vavic and Heinel agreed to perform an "official act" by securing the admission of the defendants' children as recruited athletes using false pretenses in exchange for money. Dkt. 2330 at 13–18. "At most," the defendants maintain, the coaches' presentation of athletic recruits to Subco was "akin to writing a letter of recommendation . . . which is not an official act." *Id.* at 17–18. The defendants' argument is without merit for several reasons.

As an initial matter, and as this Court has correctly held, federal programs bribery under 18 U.S.C. § 666 and conspiracy to commit the same do not require proof of an official act. *See* 10/7/21 Tr. at 5; Charge Conf. Tr. at 33. Consistent with the text of 18 U.S.C. § 666, every court of appeals to address the issue, in the wake of the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), has held that federal programs bribery under that statute, unlike 18 U.S.C. § 201, does not require an official act. *See, e.g.*, *United States v. Percoco*, 13

---

[11] *See* Ex. 396 (voicemail from Heinel to Singer directing funds to Women's Athletic Board fund); 9/29/2021 Tr. at 41 (auditor testimony about source of money in that fund).

[12] *See* Exs. 2, 722; *see also* 9/29/2021 Tr. at 57–62 (Lauren George testifying, based on a review of financial and Heinel personnel records, about funds in Women's Athletic Board fund increasing over time, and Heinel's job performance being evaluated based on fundraising).

[13] Likewise, with respect to Counts Six, Eight, and Nine, the evidence demonstrated that Wilson knew the money was being paid for the benefit of the Stanford sailing coach and the Harvard athletics administrator. *See, e.g.*, Exs. 591, 594, 623, 625.

F.4th 180, 190 n.2 (2d Cir. 2021) ("[A]s we have repeatedly explained, *McDonnell*'s 'official act' standard for the quo component of bribery as proscribed by § 201 does not apply to the more expansive language of § 666.").[14]

As to Wilson's convictions for honest services wire fraud and the defendants' convictions for conspiracy to commit honest services mail and wire fraud, the evidence was easily sufficient for the jury to conclude—after receiving the Court's legally correct instructions on what constitutes an "official act" (*see* 10/7/21 Tr. at 48)—that the defendants agreed to pay money in exchange for the corrupt insiders like Vavic and Heinel to perform an official act: secure their children's admission to USC as athletic recruits by presenting them to the Subco. An official act "is a decision or action on a question, matter, cause, suit, proceeding or controversy," and "may include" an employee using their "position to exert pressure on *another* official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell*, 136 S. Ct. at 2371–72 (emphasis in original).

Here, the evidence, including the testimony of Subco member Rebecca Chassin and multiple USC coaches, established, *inter alia*, that: (i) athletic recruiting was the responsibility of USC coaches; (ii) coaches were expected to create athletic biographies for their recruits, and to be honest in creating those profiles; (iii) coaches sent those profiles to Heinel, whose job was to

---

[14] *Accord United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) ("Consistent with the views of our sister Circuits, we hold that *McDonnell* does not disturb this court's holding . . . and we do not read into section 666 limitations unsupported by the language of the statute."); *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019) (same as *Percoco*); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018) (holding that "[i]n *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than [§ 666]"); *cf. United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (explaining that *McDonnell* "had nothing to do with § 666"). As this Court previously explained, dicta in the First Circuit's decision in *United States v. Martinez*, 994 F.3d 1, 6–7 (1st Cir. 2021) does not directly address whether federal programs bribery requires proof of an official act.

present them to the Subco; (iv) admissions officers voted on the admission of recruits who were presented; and (v) approximately nine out of every ten recruits was approved for admission. *See* 9/20/21 Tr. at 144–59; 9/24/21 Tr. at 185–90; 9/28/21 Tr. at 89–122. Notably, the defendants do not appear to dispute that Heinel's presentation of athletic recruits to the Subco constituted an official act; indeed, Heinel is not mentioned once in their argument on this issue. *See* Dkt. 2330 at 13–18. Their failure to develop an argument as to Heinel amounts to waiver, and accordingly Abdelaziz's honest services fraud conspiracy conviction on Count One must stand.

Instead, the defendants focus on Wilson and Vavic, and analogize Vavic's fraudulent recruitment of Wilson's son in exchange for money to "writing a letter of recommendation." Dkt. 2330 at 18. That is not an accurate characterization of the evidence under any standard, much less Rule 29. As Singer told Wilson, Vavic agreed to "add [Wilson's son] to his recruit list and present him to admissions," *not* simply to write him a letter of recommendation, Ex. 75, and Vavic told Singer that Wilson's son would "go to subco after [his] top recruits." Ex. 101. Moreover, after receiving the false profile for Wilson's son from Singer, Vavic added even more lies, instructing his assistant coach Casey Moon to (i) create a Subco packet falsely representing to admissions that Wilson's son was a "top 10" player in the country and an "immediate impact player," and (ii) send it to be presented to Subco. Exs. 105, 106, 107; 9/28/21 Tr. at 100–12. Relying on Vavic's action to recruit Wilson's son and believing the falsified credentials he submitted, the Subco approved his admission. Ex. 107.

Viewed in the light most favorable to the verdict, Vavic's agreement to (i) accept the false athletic profile and purport to "recruit" Johnny Wilson in exchange for money, (ii) instruct his assistant coach to create a falsified Subco profile for Wilson's son, and (iii) cause that Subco packet to be presented to USC's admissions department to secure Johnny's admission, easily

amounts to taking "action on a question, matter, cause, suit, proceeding or controversy": Johnny Wilson's application to USC. *See McDonnell*, 136 S. Ct. at 2371–72; *Woodward v. United States*, 905 F.3d 40, 48 (1st Cir. 2018) ("carrying" or guiding a bill through the legislative process "qualifies as an official act"); *see also United States v. Henderson*, 2 F.4th 593, 599–600 (6th Cir. 2021) (prison guard who accepted bribes in exchange for smuggling contraband agreed to commit official act by lying to disciplinary board); *United States v. Fattah*, 914 F.3d 112, 157 (3d Cir. 2019) ("Official acts need not be momentous decisions—or even notable ones," and concluding that hiring "part-time, short term" employee was an official act).

Further, even if Vavic did not *himself* commit an official act, which he did, the evidence establishes that he agreed to use his "position to exert pressure on *another* official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official" by sending the false Subco packet for Johnny Wilson to USC's admissions officers and telling them that Johnny would be an "immediate impact player," knowing that they would then take an official act by voting on his admission. *See McDonnell*, 136 S. Ct. at 2372. As the Supreme Court held in *McDonnell*, "advising [another official], contrary to the truth, that the facts of the case warranted [a certain outcome]" was a "decision or action [that] fits neatly within our understanding of [official action]" because it "reflected a decision or action to advise another official *on* the pending question." *Id.* at 2371; *see also Percoco*, 13 F.4th at 200 (official act for executive branch aide to "push" another public official to take action, and rejecting defendant's argument that he merely "set up meetings"); *United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017) (official act for executive director of organization to "make[] recommendations" to organization's board of directors regarding which contractors should receive grants, in exchange for bribes from contractor).

### 3.    The Defendants' Legal and Factual Sufficiency Challenges to Their Honest Services Fraud Convictions Are Without Merit

Third, the defendants contend (i) that the corrupt athletics insiders who facilitated their children's college admission as fraudulent athletic recruits in exchange for money did not owe their employer universities fiduciary duties under state law, and (ii) that there was not "any evidence showing that these employees owed fiduciary duties" or breached those duties by agreeing to lie to university admissions officers. Dkt. 2330 at 18–26. These arguments misstate the law and ignore the evidence supporting the verdict.

As an initial matter, the defendants have waived their argument on several occasions, having conceded in prior briefs that it "is beyond dispute" that employees owe employers fiduciary duties. *See* Dkt. 1022 at 13; *see also* Dkt. 1232 at 11. And, as the Supreme Court made clear in the context of an honest services fraud case, it is "beyond dispute" that "under any definition of" fiduciary duties, such duties are present in "employee-employer" relationships. *Skilling*, 561 U.S. at 407 n.41; *see also Sidoo*, 468 F. Supp. 3d at 443 ("As the Supreme Court noted, the existence of a fiduciary relationship between employer and employee is 'beyond dispute.'").

Retreating from this precedent and their own concessions, the defendants contend that *state* law must form the basis of a fiduciary duty under 18 U.S.C. § 1346. In other words, the defendants maintain, if two employees in different states are charged with honest services fraud for the same conduct, the defendant in State A may be guilty, while the employee in State B may be innocent as a matter of law, so long as State B's state legislature has circumscribed fiduciary duties more narrowly. That is not the law. *See, e.g.*, *Skilling*, 561 U.S. at 411 ("[O]ur construction of § 1346 establishes a uniform national standard."); *United States v. Sawyer*, 85 F.3d 713, 726 (1st Cir. 1996) ("[P]roof of a state law violation is not required for conviction of honest services fraud."); *United States v. Sawyer*, 239 F.3d 31, 41–42 (1st Cir. 2001) (reaffirming that "establishing honest

services mail fraud . . . does not require proof of a violation of any state law" and collecting cases); *United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) (collecting cases and noting that "[t]he majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard inherent in §1346"), *vacated and remanded on other grounds*, 561 U.S. 476 (2010). And because the Court rejected this argument during the parties' charge conference, the law of the case doctrine forecloses the defendants' bid to reverse their convictions under Rule 29. *See* Charge Conf. Tr. at 12 ("[I] have already decided and believe the Supreme Court has decided as well that, under federal law, employees owe a fiduciary duty to their employers.").

Pivoting from a legal argument to a sufficiency challenge, the defendants contend that there is "no evidence" that, in agreeing to lie to their admissions colleagues about the athletic credentials of the defendants' children in exchange for money, the coaches and administrators violated their duty of honest services to their employers. Dkt. 2330 at 23–26. Even the mere sampling of the evidence below, including Heinel and Vavic's own words, is sufficient to support the verdict:

- Heinel told Singer that she did not like to collect bribe payments to her program "so close" to presenting the children of Singer's clients to Subco, because it would raise red flags. Ex. 574. Amid an inquiry by the USC admissions department regarding the athletic credentials of several side door students she presented to Subco, Heinel instructed Singer to have his clients lie about their athletic abilities "if questioned," and worried that the actions of several parents would expose the scheme and "shut everything down." Ex. 508. Heinel lied repeatedly to her colleagues in USC's admissions department when they began to suspect that she and coaches like Vavic were misrepresenting the athletic credentials of recruits. 9/20/21 Tr. at 188–206; Exs. 511, 513. Vavic later told Singer that his side door candidates could not "be just a total nobody" any longer with "the way [U]SC's now doing everything." Ex. 620.

- USC terminated Heinel and Vavic because of their conduct, withdrew admission for students involved in the scheme who had not yet matriculated, and subjected students who had matriculated to discipline depending on their level of involvement. 9/21/21 Tr. at 127–28, 188–206; 10/4/21 Tr. at 59; 9/21/21 Tr. at 124–33.

- Admissions officers on Subco expected that the information provided by coaches and Heinel about athletic recruits was truthful. 9/20/21 Tr. at 155. Chassin testified that it was "unacceptable" to lie to admissions or for coaches or Heinel to solicit or accept

money for their programs or personally in exchange for recruiting an athlete, and that they "betrayed" the university. *Id.* at 187–88, 203–04.

- USC coaches testified that it was "important" to be truthful with admissions in presenting athletic recruits to Subco. 9/24/21 Tr. at 189; 9/28/21 Tr. at 133. Former USC women's soccer coach Laura Janke testified that in accepting bribe payments to her team's program from Singer in exchange for presenting unqualified athletes to the Subco, "I was lying to admissions." 9/27/21 Tr. at 12–17, 50–51.

- Singer told Wilson several times that Stanford's sailing coach could recruit only one of his daughters as a fake sailor in exchange for money because he had to recruit "some real sailors," so that the university "doesn't catch on." Ex. 591. Singer and Wilson discussed the need to hide from admissions their side door scheme with a Stanford coach and Harvard administrator, to "stay away" from admissions, and the need to "make sure that we keep this clean." Exs. 623, 625.

These few examples are merely a sample of the evidence that administrators and coaches, like Heinel and Vavic, agreed to violate their duties to provide honest services to their employers by lying to admissions in exchange for money, and the evidence at trial is more than sufficient under Rule 29 to sustain the jury's verdict. *See Moran*, 312 F.3d at 487 ("As long as the guilty verdict finds support in a plausible rendition of the record, it must stand.").[15]

### 4. Bribe Payments Need Not Be Made to a "Person" under 18 U.S.C. § 666

Fourth, the defendants contend that their convictions for federal programs bribery and conspiracy to commit the same should be reversed because "bribery occurs only when a thing of value is given to '*a person*.'" Dkt. 2330 at 35 (emphasis added). But this contention is merely a recycled version of the same argument this Court and others have rejected. *See Sidoo*, 468 F.

---

[15] In any event, the government had no obligation to prove that Heinel or Vavic actually breached fiduciary duties to USC to convict the defendants of *conspiracy* to commit honest services mail and wire fraud. *See Giry*, 818 F.2d at 126 ("[T]he crime of conspiracy . . . is complete upon the agreement[.]"). And as to the substantive counts against Wilson, what matters is his *intent* to participate in a scheme to defraud Harvard and Stanford of their right to the honest services of their employees, and therefore, his belief that he was inducing a violation of their fiduciary duties is sufficient. *See United States v. Potter*, 463 F.3d 9, 22 (1st Cir. 2006) (affirming convictions for wire fraud relating to scheme to bribe legislator, where "all that mattered for the crimes charged was whether the defendants *believed* that [legislator] possessed such power").

Supp. 3d at 445 ("Payments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities, may still constitute a benefit to those insiders who exercise control over the accounts. This logic applies to the federal programs bribery charges as well."); *see also, e.g.*, *Roberson*, 998 F.3d at 1243–44 (affirming convictions for federal programs bribery where payments were made to charitable organization); *United States v. Jarigese*, 999 F.3d 464, 468 (7th Cir. 2021) (affirming federal programs bribery conviction where payments were made to companies).[16] The defendants' argument would legalize large swaths of bribery as long as the recipients of those bribes were careful to solicit *quid pro quo* payments, not to their pockets, but to companies, campaign funds, non-profits, or any other entities that benefitted them indirectly. That is not the law.

Finally, the defendants contend that because 18 U.S.C. § 666 does not define "person," the rule of lenity requires a narrow construction of that term. Dkt. 2330 at 35. This argument is contrary to the very first statute in the United States Code, and to Supreme Court precedent, which establish that when Congress uses "person" without further specification, the meaning of the term includes corporations, non-profit entities, etc. *See* 1 U.S.C. § 1; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707–08 (2014) ("RFRA applies to 'a person's' exercise of religion, and RFRA itself does not define the term 'person.' We therefore look to the Dictionary Act," which provides a "quick, clear, and affirmative answer" that "person" encompasses "corporations" and "nonprofit" entities); *see also United States v. Jimenez*, 507 F.3d 13, 19–21 (1st Cir. 2007) (explaining

---

[16] The defendants' lone authority for their argument is a case from the Western District of Missouri that was reversed by the Eighth Circuit and has never been cited by a court for the proposition that Section 666 prohibits bribes only if they are paid to a "person." *United States v. Jain*, 1995 WL 9301 (W.D. Mo. Jan. 9, 1995), *rev'd*, 93 F.3d 436 (8th Cir. 1996).

definition of "person" under The Dictionary Act and rejecting "rule of lenity" argument because it applies only "if there is a *grievous* ambiguity in the statute") (emphasis in original).

### C.    The Defendants' Remaining Assorted Arguments Are Insufficient to Reverse the Jury's Verdicts under Rule 29

Finally, the defendants adopt a shotgun approach, taking aim at reversing the verdicts with a panoply of arguments whose only merit is that they are brief.

First, Wilson contends that no rational jury could find him guilty of the aiding and abetting charges in Counts Six, Eight, Nine, Eleven, and Twelve.  Dkt. 2330 at 29.  But the government requested that the Court not instruct the jury on an aiding and abetting theory for those counts, the Court did not instruct the jury on aiding and abetting, and there were no references to aiding and abetting in the verdict form or the redacted indictment submitted to the jury.  *See* Charge Conf. Tr. at 43; 10/7/21 Tr. at 11–61.  Accordingly, there is no possibility that Wilson was convicted on an aiding and abetting theory.

Second, Wilson contends that the government "failed to overcome" his "factual impossibility" defense to the wire fraud, honest services wire fraud, and federal programs bribery counts based on Singer's status as a government cooperator.  Dkt. 2330 at 29–30.  This argument is meritless for two reasons.  To start, the law of the case doctrine forecloses it because the Court, in deciding Wilson's motion to dismiss, concluded more than a year ago (and several times since) that factual impossibility is not a defense to those crimes, which "require proof of intent to defraud or bribe but [not] that the fraud or bribe accomplish the intended goal."  *United States v. Colburn*, 475 F. Supp. 3d 18, 26 (D. Mass. 2020); Charge Conf. Tr. at 34–35 ("This Court has previously ruled that impossibility is not a defense to the substantive fraud or bribery counts against the defendant Wilson.").  And even were the Court to reconsider Wilson's argument under Rule 29, it remains incorrect.  *See, e.g.*, *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014) (affirming

convictions for substantive wire fraud in a sting operation); *see also* Dkt. 2073 at 47–48 (collecting cases holding that factual impossibility is not a defense to those charges).

 Third, the defendants contend that the evidence failed to prove the existence of a single "hub and spoke" conspiracy under *Kotteakos v. United States*, 328 U.S. 750 (1946), and that the co-conspirator statements admitted by the Court pursuant to Fed. R. Evid. 801(d)(2)(E) did not satisfy *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  Dkt. 2330 at 30–32.  But the defendants' first assertion is meritless for several reasons.  To start, it merely regurgitates an argument the Court has rejected numerous times.  *See* Dkt. 1334 at 7–10 ("The question of whether [defendants] participated in a single conspiracy or multiple conspiracies is properly left to the jury."); Dkt. 1414 at 3–4 (noting that this argument "has previously [been] considered and rejected"); Dkt. 1438 at 5–6 (rejecting Wilson's *Kotteakos* argument that "has been previously addressed by this Court and found to lack force").  Further, the Court gave the jury a multiple conspiracy instruction at the defendants' request.  *See* 10/7/21 Tr. at 34 (multiple conspiracy instruction); *see also, e.g.*, *United States v. Cruz-Ramos*, 987 F.3d 27, 39 (1st Cir. 2021) (affirming a similar instruction and explaining that "[q]uite a number of our cases have found instructions of this sort sufficient").  And finally, the defendants' argument amounts to a mere sufficiency challenge that wilts under the weight of the evidence considered by the jury.  *See United States v. Bedini*, 861 F.3d 10, 14 (1st Cir. 2017) ("The question whether [the] evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency.").  After following the Court's correct legal instructions, based on four weeks of testimony and nearly 250 exhibits, the jury found a single overarching conspiracy, encompassing Singer, his employees and associates like Mikaela Sanford and Laura Janke, a network of corrupt athletics coaches and

administrators like Heinel, Vavic, Yale soccer coach Rudy Meredith, Georgetown tennis coach Gordon Ernst, Stanford sailing coach John Vandemoer, and USC soccer coach Ali Khosroshahin, and a web of largely interconnected parents like Bruce Isackson,[17] who testified that the scheme's past success, network of coaches, involvement of other wealthy parents, and large amount of money "coming in the pot" to Singer's sham charity KWF and The Key was "very important" not only because he and his co-defendant wife did "not want to be guinea pigs and have this thing blow up," but also it would make the scheme "a tough thing to figure out" by law enforcement. *See, e.g.*, 9/13/21 Tr. at 96–97, 138–64.[18]  And, of course, as the government argued in closing, the very nature of the scheme was such that it "it would only work if there was a network of corrupt coaches willing to admit kids as fake athletic recruits in exchange for money and a whole network of parents who were willing to participate." 10/6/21 Tr. at 51.

As to the Court's admission of co-conspirator statements pursuant to *Petrozziello* and Rule 801(d)(2)(E), the argument is waived for underdevelopment.  Indeed, the defendants' motion does

---

[17] *See, e.g.*, Ex. 64 (Wilson's spouse referring other parents to Singer, including parents of Wyatt Driscoll); Ex. 120 (Singer and Masera discussing making payments to USC for Wilson and Driscoll from same account); Ex. 121 (Wilson and Driscoll checks to USC water polo and baseball); 9/13/21 Tr. at 161 (Isackson testifying that he knew Singer worked with the Palatella family); Ex. 323 (Singer note to himself about "USC with Donna" listing families and monetary amounts, including Gino Palatella and Sabrina Abdelaziz); Ex. 409 (e-mail from Wilson's spouse to Marci Palatella: "I had  a few thoughts about Rick and USC.  Easier to talk on the phone."); Ex. 563 (recorded call between Singer and Palatella in which Palatella says "Everyone lies.  One of my very best friends the Wilsons," and then tells Singer "I knew you were gonna work with [Wilson's daughters] cause [Wilson's spouse] told me."); Exs. 107, 229, 383, 384, 413, 414, 420, 592, 661, 662, 663 (USC Subco packets for Singer's side door clients, including Abdelaziz, Wilson, and Palatella); 9/20/21 Tr. at 143–206 (Chassin testifying that all of Singer's side door clients were considered during USC Subco meetings); 9/27/21 at 6–53 (Janke testifying how she created fake athletic profiles for side door clients, including Abdelaziz and Palatella); 9/29/21 Tr. at 29–62 & Exs. 716, 718 (Lauren George testimony and summary charts showing finances of KWF and The Key and payments from parents for side door).

[18] The defendants' assertion that the government was obligated to prove a specific "hub and spoke" conspiracy is a strawman; the government had the burden to prove the conspiracy charged *in the indictment*, which the jury found.

not cite a single specific co-conspirator statement admitted at trial that failed to satisfy *Petrozziello*'s requirements.  Dkt. 2330 at 32; *see also, e.g.*, *United States v. Ciampaglia*, 628 F.2d 632, 637 (1st Cir. 1980) (explaining that *Petrozziello* merely requires that it be "more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in furtherance of the conspiracy").  Their argument is also without merit.  After considering four weeks of testimony and reviewing hundreds of exhibits, the Court found that the government had satisfied its burden under *Petrozziello* "fully" to prove by a preponderance of the evidence the single conspiracy charged.  Charge Conf. Tr. at 71.  Finally, the defendants' hyperbolic assertion— that absent admission of unspecified co-conspirator statements, "the government's entire case against Defendants collapses"—ignores the weight of the evidence.  The most damning evidence against Wilson and Abdelaziz was the avalanche of their *own words* in e-mails and phone calls.

Fourth, the defendants challenge venue of the conspiracies charged in Count One and Count Two.  Dkt. 2330 at 36–38.  Venue is not an element of the offense, a defendant's venue challenge in the context of Rule 29 is a sufficiency challenge, and the government must prove merely by a preponderance of the evidence that an act in furtherance of the conspiracy took place in Massachusetts.  *See, e.g.*, *United States v. Valenzuela*, 849 F.3d 477, 487 (1st Cir. 2017) (explaining that government agents may influence where a crime occurs, and thus where venue lies, and that venue may be established in a conspiracy even if a particular co-conspirator was not himself physically present in that district); *accord United States v. Scott*, 270 F.3d 30, 35 (1st Cir. 2001) ("We review the evidence on venue in the light most favorable to the government.").  Here, the Court instructed the jury on venue at the defendants' request (*see* 10/7/21 Tr. at 32, 52), but the defendants neglected to even mention venue to the jury during their closing arguments.  *See* 10/6/21 Tr. at 57–137.

Now, however, they assert that there was "zero evidence" of venue. Dkt. 2330 at 37. That is not correct. The jury's venue finding was supported by, *inter alia,* the following facts: (i) Singer and Wilson arranged to meet in Boston in September 2018, before Singer began cooperating, to discuss the side door scheme, and during the same call, they discussed the side door scheme at USC; (ii) Singer called Wilson, while both were in Boston, to postpone that meeting; (iii) Singer flew to Boston to meet with Yale soccer coach Rudy Meredith at a Boston hotel in September 2018, in furtherance of the conspiracy charged in Count One; (iv) Singer obtained a check for his $20,000 monthly bribe payments to USC insider Heinel from a bank in Boston's "Seaport Square,"[19] and that check was drawn on a bank account opened in Massachusetts and deposited by Heinel into her bank account in California (from which the jury could also have concluded that it was mailed from Boston); (v) Singer withdrew funds from that same Massachusetts bank account for other bribe payments to Heinel; (vi) Singer was in Boston during an October 5, 2018 recorded phone call in which Heinel instructed him to not have parents make side door payments "so close" to the admissions approval letters; and (vii) Singer told Abdelaziz that he was in Boston during a recorded phone call when Abdelaziz agreed that Singer should lie to the IRS about the true nature of his side door payment for a USC admission slot. *See* Exs. 561, 562, 665, 574, 624, 628, 587;

---

[19] As an example demonstrating the lengths to which the defendants will go to evade the Rule 29 standard, they attempt to explain away a cashier's check that Singer obtained from a Bank of America branch in the Seaport district of Boston, Massachusetts, which literally reads "Seaport Square" at the top of the check. Ex. 624. Straining credulity, the defendants argue in a supplemental Rule 29 motion on venue: "Maybe all Bank of America cashier's checks from a certain group of states simply say 'Seaport Square' on the top of the left corner." Dkt. 2342 at 3. Maybe. But the defendants (correctly) chose not to make this argument to the jury (constituting waiver), and the jury was certainly entitled to conclude, by a preponderance of the evidence and consistent with the testimony of Special Agent Elizabeth Keating, that Singer obtained that check from a "Seaport Square" branch that is one block away from where the jury deliberated in a courthouse located in Boston's Seaport district.

9/21/21 Tr. at 150–53, 178–79 (testimony of Agent Keating that Singer was in Boston on October 5, 2018).

Under well-established precedent in the First Circuit and elsewhere, that evidence—particularly Exhibit 574, the October 5, 2018 call between Singer and Heinel when Singer was in Boston—is easily sufficient to sustain the jury's verdict. *See Valenzuela*, 849 F.3d at 487 (rejecting arguments of "manufactured venue" or "venue entrapment"); *United States v. Cordero*, 668 F.2d 32, 43–44 (1st Cir. 1981) (Breyer, J.) ("[Co-conspirators] spoke to [undercover agent] while he was in Puerto Rico and provided him with key information . . . [t]he fact that [undercover agent] placed the calls to [co-conspirators] who were outside the Commonwealth, does not change the fact that [they] transmitted this information [to undercover agent] who was inside Puerto Rico."). As Judge Raggi correctly explained, in citing then-Judge Breyer's decision in *Cordero*:

> We agree with the First and Seventh Circuits that a telephone call placed by a government actor within a district to a conspirator outside the district can establish venue within the district provided the conspirator uses the call to further the conspiracy. Indeed, we conclude that the critical factor in conspiracy venue analysis is not whether it is a conspirator or a government actor who initiates the call; nor does it matter whether the conspirator is communicating with someone who is a knowing confederate, an undercover agent, or an unwitting third-party. What is determinative of venue . . . is whether the conspirator used the telephone call to further the objectives of the conspiracy. . . . When a conspirator uses a telephone call—by whomever initiated—to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into that of the person with whom he is speaking. . . . [T]he conspirator's commission of an overt act does not depend on whether the listener rather than the conspirator initiates the conversation. Nor does it matter whether the listener is a confederate, an innocent third party, or an undercover agent.

*United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) (Raggi, J.); *accord United States v. Renteria*, 903 F.3d 326, 331–32 & n.35 (3d Cir. 2018); *United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012); *Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir. 1987).

<u>Fifth</u>, the defendants contend that "the evidence of [their] good faith is so strong that a rational jury could not find that the government has met [its] burden." Dkt. 2330 at 32–35.

Relatedly, Abdelaziz advances a more specific argument that he acted in good faith because there was "no forensic evidence" that he "saw or opened" his daughter's self-admitted "phony" basketball profile. *Id.* at 38–39. But a Rule 29 motion is not a means to recycle good-faith arguments that were rejected by a properly instructed jury. *See, e.g.*, *United States v. Leary*, 2019 WL 1584508, at *2 (D. Mass. Apr. 12, 2019) (summarily rejecting good-faith argument in denying Rule 29 motion because "this same argument was made to a jury properly instructed that good faith was a complete defense to the mail fraud charges"), *aff'd sub nom. United States v. Stepanets*, 989 F.3d 88 (1st Cir. 2021); *see also United States v. Gorski*, 880 F.3d 27, 37 (1st Cir. 2018) (rejecting sufficiency challenge to jury's verdict based on good-faith defense). Here, the Court instructed the jury, several times, that good faith was a complete defense to all of the charges. *See* 10/7/21 Tr. at 42, 58–59. And the defendants heavily relied on a good-faith defense, emphasizing "good faith" nearly ten times during their closing arguments. *See, e.g.*, 10/6/21 Tr. at 59, 94 ("Those two words, 'good faith,' lead to even two better words, 'not guilty.'"), 99 ("Good faith is a complete defense to every one of these charges."), 133. The jury rejected that defense in finding them guilty on all charges.

Even were the Court to consider whether the defendants' good faith was "so strong" that it mandates acquittal, the evidence does not come close to supporting that conclusion. As summarized above, the evidence undermining Wilson's purported good faith and establishing his willfulness, including nearly an hour of recorded calls with Singer, is overwhelming. *See supra* at Part I.A.4; Exs. 561, 562, 571, 578, 665, 591, 594, 602, 623, 625. As to Abdelaziz, the evidence of his intent summarized below is more than sufficient to sustain the jury's verdicts—whether or not he ever "saw or opened" his daughter's athletic profile (which the evidence establishes he did):

- Abdelaziz's daughter played two years of junior varsity basketball in high school, but she did not play basketball during her junior and senior years, and she never played for

her high school's varsity team.  9/17/21 Tr. at 165–84; Exs. 702–05.

- In July 2017—more than a year after his daughter stopped playing basketball in high school—Abdelaziz forwarded his wife an e-mail from Singer, with the subject "For me to complete USC athletic profile," which requested information for the falsified athletic profile, including "if they play the sport."  Ex. 330.  During the same month, Singer told Abdelaziz that he "need[ed] an action photo or two of Sabrina playing basketball," and Abdelaziz replied "got it," sending Singer several photographs to use on the athletic profile, including an e-mail with the subject "Sabrina" attaching a photograph of a girl who was *not Abdelaziz's daughter*.  Exs. 334, 340.  Singer replied to Abdelaziz to tell him that he would use that photograph.  Ex. 345.

- Singer e-mailed Abdelaziz the fake basketball profile, which co-conspirator Laura Janke invented from information she found on the internet, stating "let me know if you want me to add any other awards to her profile or if you think that is enough."  Ex. 352.  The falsified basketball profile contained the photograph of a different girl, which Abdelaziz had previously sent Singer, falsely stated that Abdelaziz's daughter was a "starting point guard" and "team captain," and included numerous other fabricated awards, honors, and credentials.  9/17/21 Tr. at 165–84; 9/27/21 Tr. at 36–42.  Abdelaziz received the e-mail in an account he regularly accessed and from which he later forwarded e-mails.  Exs. 352, 415.

- After Heinel presented Abdelaziz's daughter to USC's Subco as a basketball recruit, Heinel e-mailed the conditional acceptance letter to Singer, and Singer sent it to Abdelaziz.  Exs. 387, 390.  The letter informed Abdelaziz that his daughter had been provisionally admitted as a recruited athlete with "the potential to make a significant contribution to the intercollegiate athletic program" at USC.  Abdelaziz forwarded that letter to co-conspirator Mikaela Sanford, instructing her to complete the USC application in accordance with "the exact requirements" in the letter, including his daughter's registration with the NCAA.  Ex. 415.

- When the Hong Kong college advisor for his daughter asked if she wanted to apply to USC in December 2017, Abdelaziz did not disclose to the counselor that his daughter had already been admitted to USC as a phony basketball recruit two months earlier, and instead told him that "we're going to pass on applying in December."  Ex. 427.

- Abdelaziz exchanged several e-mails with Singer, Sanford, and others in which they discussed that basketball would be included in the "activities" section of his daughter's application to USC, and that one of her college essays for USC would focus on basketball.  Exs. 441, 442, 458, 459.  The first sentence of that essay, which Abdelaziz reviewed and edited in January 2018—two years after his daughter stopped playing basketball—stated, "the basketball court is like my art studio."  Exs. 461, 463.

- In March 2018, Abdelaziz's daughter was formally admitted to USC.  The same month, an employee of KWF e-mailed Abdelaziz an invoice for $300,000, thanking him for his "generous donation."  Ex. 478.  One week later, Abdelaziz wired $300,000 to KWF.  Ex. 505.  Shortly thereafter, Abdelaziz received a purported donation receipt letter from

KWF falsely stating that his donation would "provide educational and self-enrichment programs to disadvantaged youth" and that "no goods or services were exchanged" for his payment.  *Id.*

- During an October 2018 consensually recorded phone call with Singer, Abdelaziz stated that "of course" he agreed that Singer should not "tell the IRS anything about the fact that [Abdelaziz's] $300,000 was paid to Donna—Donna Heinel at USC to get Sabrina into school even though she wasn't a legitimate basketball player at that level." During the same call, Abdelaziz said "I love it" in response to Singer telling him that Heinel thought his daughter's fake athletic profile was so "well done" that "going forward, anybody who isn't a real basketball player that's a female, [Heinel] want[ed] [Singer] to use that profile going forward."  Ex. 587.

- During a January 2019 call, Abdelaziz told Singer that he was "worried" about the IRS audit of KWF.  And when Singer told him that Heinel had lied to USC's admissions department by inventing a fake injury to explain why Abdelaziz's daughter had not shown up for basketball practice, Abdelaziz agreed to lie to USC's admissions department too: "I will answer the same, uh, should they call me."  Ex. 621.

## II.    Defendants' Motion for a New Trial Pursuant to Rule 33 Should Be Denied

### A.    The Court's Evidentiary Rulings Were Proper and Do Not Provide a Basis for a New Trial

The defendants' contention that they should be granted a new trial because the Court erred in denying the admission of certain defense exhibits, Dkt. 2412 at 6, is without merit.  "It hardly bears repeating that a trial court enjoys considerable discretion with respect to its evidentiary rulings."  *United States v. Simon*, 12 F.4th 1, 40 (1st Cir. 2021).  Here, the Court acted within its broad discretion in rejecting the defendants' pretextual explanations for the admission of irrelevant and inadmissible evidence, and precluding its admission on, *inter alia*, relevance, hearsay and Rule 403 grounds.  Moreover, as with the rest of their brief, the defendants speak only in generalities, and fail to cite examples of the "key exculpatory evidence" they contend was improperly excluded, *id*. at 7, or how that exclusion prejudiced them.  Accordingly, they fail to meet their burden of demonstrating that the Court abused its discretion in excluding any evidence, much less that the exclusion of such evidence resulted in a miscarriage of justice, particularly in light of the overwhelming evidence of their guilt.

At trial, the defendants offered a series of shifting reasons for their effort to introduce reams of irrelevant hearsay, including that the exhibits were being offered simply for the fact that they were sent, or as business records, or to impeach witnesses (including with documents they had never seen, that were not inconsistent with their testimony, or that concerned collateral matters), or as evidence of the state of mind of the declarant or recipient. The Court properly rejected these transparent attempts to confuse and mislead the jury and circumvent the rules of evidence.

As one example, during opening statements, counsel for defendant Abdelaziz played a lengthy excerpt from a video recording of Singer presenting to an audience of Starbucks employees (the "Starbucks video"). Counsel advised the jury that Singer was "a very smooth talker," adding: "It wasn't just Gamal who got sucked in by it. Major corporations would listen to him." 9/13/21 Tr. at 56. Abdelaziz thus sought to suggest that the video was evidence of how Singer presented his scheme to Abdelaziz, and of Abdelaziz's state of mind—even though Abdelaziz was not present for Singer's presentation, and there was no evidence he knew or heard about it until after it was produced in discovery following his arrest. Wilson's counsel referred to the same video during his opening as evidence "of *Mr. Singer's* state of mind." *Id*. at 77 (emphasis added).[20] Counsel thus suggested, without any foundation, that these out-of-court statements to third parties—that their clients neither heard nor knew about—were evidence of what Singer told them, what they believed, and what he believed.

Abdelaziz first sought to introduce the Starbucks video into evidence during the cross-examination of a cooperating witness who had not testified about it, and had not seen it until it was produced in discovery after her arrest. 9/20/21 Tr. at 70–71. Counsel argued that the video was

---

[20] Wilson's counsel similarly referenced a book proposal Singer drafted, and an e-mail between Singer and an uncharged parent, and suggested, without foundation, that they were "exactly the same information he told John." *Id*. at 78.

admissible to "attack the character of Rick Singer" pursuant to Rule 806, and because "it goes to Singer's state of mind." *Id*. at 108.

The Court saw these efforts for what they were—attempts to confuse and mislead the jury with irrelevant hearsay. As an initial matter, the Starbucks video was irrelevant because neither of the defendants attended Singer's presentation, or knew what he said, and because, although Singer used the term "side door" in passing, he neither defined the term nor elaborated on it in the course of his roughly 90-minute presentation. *See* Dkt. 2336 at 5. The video was substantially more prejudicial than probative for the same reasons: to the extent Abdelaziz sought to use it as evidence of what Singer told him, or what he understood about the scheme, the video had no probative value and its introduction for that purpose would have confused, misled, and distracted the jury. *See United States v. Chin*, 15 F.4th 536 (1st Cir. 2021) (district court has "wide latitude" in making determinations pursuant to Fed. R. Evid. 403, and will be overturned "only in exceptional circumstances"); *United States v. Rivera-Ortiz*, 14 F.4th 91, 101 (1st Cir. 2021) ("The Federal Rules of Evidence allow a district court to exclude even relevant evidence if its 'probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury.'" (citing Fed. R. Evid. 403)). To the extent the defendants sought to use the video as impeachment evidence, pursuant to Rule 806, they failed to cite a single instance in which Singer's statements on the video were inconsistent with any statements the government introduced at trial. That is because, as the Court recognized, there was no inconsistency. *See* Dkt. 2336 at 5. *See also, e.g.*, *United States v. Rodriguez-Berrios*, 573 F.3d 55, 69 (1st Cir. 2009) (no error in denying admission of audio recordings as impeachment evidence pursuant to Rule 806 where "their contents did not contradict the statements appellant sought to impeach"). And to the extent the defendants sought to use the video as evidence of Singer's state of mind, Singer's rehearsed and prepared statements

in a public forum were not probative of his state of mind in private communications, at different times, with the defendants. Indeed, the defendants themselves argued at length that Singer was a "con man" who could not be trusted.[21] Yet by their argument, his every out-of-court utterance would be admissible as "state of mind" evidence, and therefore admissible merely by recasting it "as probative evidence of [his] thoughts." *United States v. Heidecke*, 900 F.2d 1155, 1163 (7th Cir. 1990); *see also* Dkt. 2309. The Court was well within its discretion in precluding the defendants from circumventing the rules of evidence by labeling otherwise inadmissible statements as evidence of the "state of mind" of whoever made them or whoever heard them— and, in the case of the Starbucks video, even those who did not hear them.

That the defendants' "state of mind" arguments were pretextual and devoid of any limiting principle was evident from their effort to invoke the state-of-mind exception to justify the introduction of dozens of internal USC e-mails and documents, and wiretap recordings of calls between Singer and third parties, including parents who were not charged. For example, they repeatedly sought to admit a June 8, 2017 e-mail from a USC athletics compliance employee, Scott Simon, to Donna Heinel, marked as Exhibit 1219 (as well as a similar document, marked as Exhibit 1249). *See* 9/21/21 Tr. at 107; 9/27/21 Tr. at 76, 95; 9/28/21 Tr. at 204–05. The Simon e-mail attached an undated scholarship analysis spreadsheet that included a note referencing a "unique scenario for this year": that three students, whose parents were donors to USC, were included on the rosters of two athletic teams for "practice only." The defendants argued that these exhibits were admissible either for the fact that they were sent, or as evidence of Simon's or Heinel's state

---

[21] *See*, *e.g.*, 9/13/21 Tr. at 49 (Abdelaziz opening statement: "[Abdelaziz] had no inkling that Singer was a skilled con man. And make no mistake, that's what Singer is, an extremely skilled con man."); *id*. at 76 (Wilson opening statement: "Listen to him brag, what a great con man he is.").

of mind.  The Court properly excluded them for, among other reasons, the same reason that the video of Singer speaking to an audience of strangers was inadmissible:  the fact that they were sent did not make them relevant to the *defendants*, who knew nothing about them; nor were they probative of Simon's or Heinel's state-of-mind any more than *any* e-mail, or *any* utterance, is probative of the state-of-mind of the declarant or recipient; nor was Simon's state of mind even relevant.  Moreover, to the extent they had any probative value, the Court correctly concluded that it was substantially outweighed by the likelihood that the exhibits would confuse, mislead, and distract the jury, and result in mini-trials about individuals not on trial.[22]  *See* Dkt. 2320.

As a final example, the defendants sought to introduce Exhibit 1288, a March 27, 2018 instant message exchange between two low-level admissions office employees, Kelsey Bradshaw and Alexander Alvendia, referencing defendant Abdelaziz's daughter.  In the exchange, Bradshaw stated that Sabrina Abdelaziz had been admitted to USC, and Alvendia stated that Sabrina's high school counselor had inquired about the admission, noting, "This school sends us like 60 and [she is] near the bottom."  *Id.*  Bradshaw also noted that Sabrina was a basketball player and "it appears she actually plays the sport!"  *Id*.

After reading the exchange to the jury in his opening statement, 9/13/21 Tr. at 62–63, Abdelaziz's counsel sought to introduce it during the cross-examination of *another* USC admissions official, Rebecca Chassin, who testified that she had never seen it before.  9/21/21 Tr. at 21–22.  In so doing, counsel argued that the instant message exchange was admissible "for the fact that it took place and that it was never shown to her," and because he sought to ask Chassin

---

[22] For example, Simon's e-mail was sent several years after Wilson's son was admitted to USC, and several months after Abdelaziz began the side-door process for his daughter.  The spreadsheet it attached was undated and there was no evidence of who authored it.  It made no reference to admissions, or whether the students it referred to had been admitted as recruited athletes, or even who the students were.

"to explain why her underlings never talked about it with her." *Id*. at 22.  But Chassin had no foundation to testify about why two third parties chose not to include her in a conversation, and why she had not been shown instant messages between them—presumably by government counsel[23]—and the Court properly sustained the government's hearsay objection.  Abdelaziz then sought to introduce the exhibit as evidence of the "state of mind of USC's Department of Admissions," Dkt. 2251 at 1, while arguing that he sought to impeach Chassin with the document by demonstrating that her "underling[s] understood that [Sabrina] did *not* have athletic credentials," and that "if they knew, how could she not know?"  9/21/21 Tr. at 91–92 (emphasis added).  But of course, nothing on the face of the document suggested that Sabrina did *not* have athletic credentials; instead, Bradshaw specifically advised Alvendia that she *did*.  Counsel thus sought to argue that—contrary to the assertions within the instant messages—the declarants were being sarcastic.  *See, e.g*., Dkt. 2275 at 2 (noting that "[t]he two admissions officers appear to be joking around about Ms. Abdelaziz's basketball skills").  He thereby sought to impeach Chassin with a document she had not seen, reflecting out-of-court statements by third parties she had not heard, that on their face were *consistent* with her testimony.  Once again, the Court acted within its discretion in precluding the defense from introducing, as extrinsic impeachment evidence, an otherwise inadmissible document the witness had not seen and about which she had no knowledge.  *See United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir. 1993) (noting "well established" rule "that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter," and that "extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence"); *see also*

---

[23] Defense counsel's next question was:  "Do you know why the government would hide this document from you?"  *Id*. at 23.

*United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) ("Evidence is collateral if it is relevant only because it contradicts the in-court testimony of another witness.").[24]  Abdelaziz's counsel next shifted to arguing that the exhibit was admissible as a business record (presumably now for its truth), but failed to adduce any evidence that it satisfied the threshold requirements for the admission of such records pursuant to Fed. R. Evid. 803(6).  9/21/21 Tr. at 92–93.  He then returned to the argument that the exchange was admissible as evidence of the "state of mind of the people that admitted Sabrina Abdelaziz."  *Id*. at 93.  The Court properly excluded the exhibit on that basis, finding that Abdelaziz "failed to present evidence that an informal text exchange between Admissions Officers is evidence of the institutional belief of the Admissions Department as a whole."  Dkt. 2336 at 7.  Indeed, by Abdelaziz's argument, *any* conversation between employees of whatever seniority would be admissible as evidence of their employer's state of mind, and a litigant would be able to circumvent the rule against hearsay simply by labeling it as relevant to "state of mind."[25]  Moreover, even assuming, *arguendo*, that a group of "people," or an admissions department, can have a collective "state of mind," the Court was within its discretion in finding that a single instant message chain between two low-level employees was not probative

---

[24]  The Court advised Abdelaziz to "[c]all the underlings and you might have some impeachment."  *Id*. at 92.  Tellingly, Abdelaziz did not do so, despite the fact that Bradshaw was on his witness list.  *See* Dkt. 2202.  Instead, counsel asked an FBI agent, on cross-examination, whether she had asked Bradshaw how she "viewed Sabrina Abdelaziz's application," 9/23/21 Tr. at 128, a question that on its face sought to elicit a third party's out-of-court statement for its truth.  The Court again properly sustained the government's hearsay objection.

[25]  Abdelaziz's reference to *Kassel v. Gannett Co., Inc.*, 875 F.2d 935, 945 (1st Cir. 1989), is inapposite.  In that case, the Court concluded that the "conclusions and recommendations" of a formal investigative report issued by a Veterans' Administration board of inquiry were properly admissible as state of mind evidence of the Veterans' Administration.  *Id*.  Here, by contrast, Abdelaziz attempted to argue that the purported beliefs of two low-level employees as set forth in a single instant message exchange could be attributed to the department generally, even as he also suggested that the employees did *not* believe what they were saying.  *See* Dkt. 2297 at 4.

of it and would have confused and misled the jury—particularly where, as here, Abdelaziz sought to argue that the employees did *not* actually believe what they were saying.[26]

The upshot of these examples is that there were multiple evidentiary grounds—relevance, hearsay, improper impeachment, and Rule 403—to exclude this evidence, and the defendants' retreat from one poor justification for admission to the next revealed that they did not have a single one with merit by which to stand. Finally, even assuming that the Court erred in excluding any of the defendants' exhibits—which it did *not*—the defendants do not even attempt to meet their burden of demonstrating how any such error prejudiced the outcome of the case or resulted in a miscarriage of justice under Rule 33. Instead, they simply argue in conclusory fashion that the evidence was admissible to bolster "their theory that Mr. Singer told them that donations to athletic programs were welcomed by USC in exchange for preferential admissions treatment," and that the Court's evidentiary rulings prevented them from "introducing exculpatory evidence aligning with their theory of defense unless they testified at trial." Dkt. 2412 at 8. But that is not true.

First, the defendants were not charged with making donations to athletic programs "in exchange for preferential admissions treatment," as the government noted at the outset of the trial. *See* 9/13/21 Tr. at 47. Instead, the defendants were charged with lying to secure the admission of their children to elite universities as athletic recruits based upon falsified credentials, and bribing corrupt university insiders to mislead their own colleagues to admit those students based on those falsified credentials. *See id.* Accordingly, evidence that Singer told the defendants that USC accepted money for "preferential admissions treatment," or that USC *in fact* did so, was not exculpatory, because—as the government stipulated in its opening—that is neither fraud, nor

---

[26] Abdelaziz later offered the exhibit in his case-in-chief, without a witness or further explanation. 10/1/21 Tr. at 19. Once again, the Court acted within its discretion in sustaining the government's hearsay objection. *Id.*

bribery, and it is not what the defendants did. *See United States v. Brandon*, 17 F.3d 409, 443–44 (1st Cir. 1994) (excluding defense evidence that victim bank provided no-down-payment financing to other lenders where defendants were charged with lying about fake down payments).

Second, the Court's requirement that the defendants introduce evidence that they knew "what other unrelated students and parents did" before admitting such evidence did *not* require that the defendants testify in their own defense, as they contend. Dkt. 2412 at 7 (quoting Pre-trial Conf. Tr. at 6). For example, the defendants could have called Singer—whom they subpoenaed and listed on their witness list—to testify about what he told them. Dkt. 1955. Indeed, the defendants thanked the government "for helping out" in facilitating service of that subpoena for Singer through Singer's attorney. *See* Exs. B, C, D (attached hereto). Alternatively, they could have called other members of their families, including their spouses and children, who were included on communications with Singer. Wilson, for example, specifically identified his wife and two daughters as witnesses to at least one discussion with Singer where he purportedly described the side door as legitimate, and identified all three of these family members, and his son, as potential witnesses in his case-in-chief, yet chose not to call any of them. *See* Dkt. 972-43 (Aff. of John B. Wilson in Support of Def. Motion to Dismiss Indictment with Prejudice) at 2 (describing Singer's purported statements during a FaceTime call with Singer and defendant Wilson's "family"); Ex. A (identifying Leslie Wilson, John Wilson, Jr., Courtney Wilson, and Mary Wilson as potential defense witnesses) (attached hereto); 10/1/21 Tr. at 108 (Wilson counsel noting that Wilson's daughter Mary Wilson may testify). The defendants chose to do none of these things.

Third, the Court did not, in fact, preclude the defendants from introducing evidence concerning USC's preferential treatment of students whose parents donated money to the university—and they did so. As just one example, the Court permitted the defense, over the

government's objection, to elicit testimony from Chassin, the USC admissions official, that the university tracks so-called "VIP" applicants "due to fundraising efforts that the University Advancement Office is doing." 9/21/21 Tr. at 10.[27]  The Court also permitted the defense to ask Chassin whether wealthy individuals "can give donations to schools and that changes the school's mind about whether or not they're decent candidates," to which Chassin responded:  "I think that happens very rarely with most wealthy students who are applying to college." *Id.* at 142.

Fourth, the defendants fail to develop any meaningful argument as to how the exclusion of any evidence prejudiced them, much less resulted in a miscarriage of justice.  Absent any such explanation, their claim necessarily fails.  *See United States v. Cadden*, 965 F.3d 1, 31 (1st Cir. 2020) (affirming denial of Rule 33 motion where defendant failed to develop "any of the arguments or their prejudicial effects in sufficient detail, either in front of the District Court or in front of us"); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *United States vs. Green*, No. 09-10183-GAO, 2011 WL 2847537 at *1 (D. Mass. July 14, 2011) (noting that where defendants "fail[ed] to elaborate on any particular arguments in support of a new trial, it cannot be said that the jury's verdict constitutes a miscarriage of justice").

**B.    The Defendants' Undeveloped Arguments Concerning All of the Court's Decisions on Motions *in Limine* Are Meritless**

In their second and third arguments in support of their motion for a new trial, the defendants simply list nearly 50 defense motions by docket number that they contend, without explanation, the Court should have granted, and another nearly dozen government motions they contend—

---

[27] Chassin further testified:  "[T]he President might have an interest in applicants, the Provost, deans at the University, the University Advancement Office, trustees of the University, as well as the Athletic Advancement Office."  *Id.* at 16; *see also id.* at 35 ("I'm aware that the Athletic Advancement Office is tracking applicants and are interested in their outcome of the admission decision.").

again, without explanation—the Court should have denied.  Dkt. 2412 at 8–9.  "Passing allusions are not adequate to preserve an argument in either a trial or an appellate venue." *United States v. Slade*, 980 F.2d 27, 30 (1st Cir. 1992) (citing *Zannino*, 895 F.2d at 17 (rejecting defendant's "ploy" to incorporate arguments by reference given "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (citing cases))).  The defendants' listing of docket numbers, without more, leaves the Court (and the government) "to do counsel's work, [that is, to] create the ossature for the argument, and put flesh on its bones." *Id.*  But they have "an obligation 'to spell out [their] arguments squarely and distinctly,' or else forever hold [their] peace." *Id.* (quoting *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).  Without notice of the bases for the defendants' arguments, the government cannot meaningfully oppose them beyond incorporating by reference its responses and the Court's prior rulings on these motions.[28]

### C.   The Court Did Not Err in Conducting Jury Selection or in Providing the Jury With a Special Verdict Form

Similarly, the defendants' incorporation of every objection they made during three days of jury selection does not develop any objection sufficiently for the government to respond or for the Court to consider the argument.  The defendants make only one specific argument—that one of the jurors seated had seen the Netflix program concerning the "Varsity Blues" case.  Dkt. 2412 at 9.  As an initial matter, "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire.*" *Skilling*, 561 U.S. at 386–91 (finding defendant failed to show *voir dire* fell short of constitutional requirements where court screened prospective jurors with comprehensive questionnaire drafted largely by defendant, examined each prospective juror individually and

---

[28] *See* Dkts. 2001, 2003, 2004, 2006, 2007, 2008, 2036, 2038, 2039, 2040, 2045, 2046, 2048, 2049, 2050, 2056, 2090, 2099, 2101, 2150, 2151, 2162, 2191, 2211, 2215, 2219, 2239, 2241, 2265, 2296, 2297, 2320, 2323, 2324, 2328, 2335, 2336, 2347, 2352, 2357, 2359.

allowed attorneys to ask follow up questions, and selected only those jurors who responded that they could be impartial, despite that "many expressed sympathy for victims of Enron's bankruptcy and speculated that greed contributed to the corporation's collapse"). The Court has broad discretion in assessing jurors' impartiality. *Id.* at 386 (explaining that trial judge's appraisal of prospective jurors "is ordinarily influenced by a host of factors impossible to capture fully on the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty"). Jurors "need not enter the box with empty heads in order to determine the facts impartially. 'It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.'" *Id.* at 398–99 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). The Court's *voir dire* process here was thorough, including (i) screening several hundred jurors with a detailed questionnaire (largely agreed to by the parties) containing dozens of questions, and (ii) leading individual questioning over two days.

Notably, the defendants did not object to *any* of the jurors that deliberated in this case, for cause or otherwise, including the deliberating juror ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████  Given the

Court's thorough inquiry and the juror's responses, the defendants' ability to ask follow-up

questions if they had concerns about the juror's answers, and their failure to even lodge an

objection, there is no basis to order a new trial on this ground.

The defendants' recycled argument that the Court erred in providing the jury with a verdict

form, which contained multiple questions concerning Count One, is equally undeveloped and thus

waived.  *See* Dkt. 2412 at 9 (citing Dkt. 2362 and trial transcript excerpts, without more).  To

address the defendants' unspecified arguments, the government incorporates by reference its prior

response.  *See* Dkt. 2364; *see also supra* at Part I.A.1 (law of the case).  The defendants' argument

is waived for the additional reason that they proposed an alternate verdict form that separately

listed each object of the conspiracy, Dkt. 2370, which the Court found was not substantively

different from the verdict form used.  10/7/21 Tr. at 5:15–20.

The defendants' argument fails for the further reason that neither their current motion nor

earlier briefing and arguments to the Court identify any prejudice from the use of the verdict form

here.  Contrary to the verdict form used in *United States v. Spock*, a case on which the defendants

earlier relied, the verdict form here did not exert "judicial pressure" on the jury to reach a certain

result.  416 F.2d 165, 180–83 (1st Cir. 1969) (noting that, because charges stemming from Vietnam

War protest raised free speech issues, special verdict form that suggested a particular outcome was

"peculiarly" disfavored).  Since its decision in *Spock*, the First Circuit has recognized that special

verdict forms do not necessarily pose a risk of suggesting "through progressive steps a particular

outcome," and can have a "permissible purpose."  *United States v. Fanfan*, 468 F.3d 7, 13 (1st Cir.

2006) (finding no error in use of special verdict form to determine whether conspiracy encompassed 500 grams or more of cocaine); *see also United States v. Alfonzo-Reyes*, 592 F.3d 280, 293 (1st Cir. 2010) (approving use of special verdict form that asked jury to consider sentencing enhancement, which necessarily "assumed guilt," where court instructed jury to consider question only after finding defendants guilty and "there was strong evidence of guilt"). As detailed above, *supra* at Parts I.A.4, I.B.1–3, and I.C, there was overwhelming evidence of Wilson and Abdelaziz's guilt on Count One. Further, the verdict form did not assume their guilt in asking the jury to consider each object of the conspiracy separately. And, the verdict form served a permissible purpose: to avoid appellate ambiguity. *See, e.g.*, *United States v. Pelisamen*, 641 F.3d 399, 407 (9th Cir. 2011) ("In the wake of *Skilling*, several district courts have also considered cases involving special verdict forms providing for conviction on either a pecuniary fraud theory or an honest-services theory, similar to that used here. Those courts have concluded, as we do here, that convictions for mail or wire fraud remain valid, as long as the special verdict form shows that the jury found the defendant guilty on the pecuniary fraud theory.").[29] Accordingly, there was no error in the Court's use of a special verdict form here.

### D.    There Was No Constructive Amendment or Prejudicial Variance

The defendants next contend that they are entitled to a new trial because "there was a constructive amendment of the indictment or a prejudicial variance from the indictment when the government presented the theories that: (1) the property at issue in this case is not admissions 'slots,' but athletic recruitment 'slots,' and (2) the victim at issue in this case is not USC as a whole, but the USC admissions department." Dkt. 2412 at 9. Neither is true and the defendants once

---

[29] The defendants' reliance on *Black v. United States*, 561 U.S. 465 (2010), is misplaced. There, the Court ruled that the defendant need not acquiesce to the use of a special verdict form in order to preserve an argument and objection to the government's alternate theory of guilt; it did not hold that special verdict forms are impermissible or even disfavored. *Id.* at 468.

again fail to develop their argument in any meaningful way. "Merely stating th[e] issue without any developed argument is insufficient" to warrant any relief. *Chan*, 981 F.3d at 55.

In any event, the defendants' claims are meritless. As set forth above, a constructive amendment occurs only "when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." *Fisher*, 3 F.3d at 462–63. "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." *United States v. Valdes-Ayala*, 900 F.3d 20, 37 (1st Cir. 2018). "A variance is grounds for reversal if it affected the defendant's substantial rights—*i.e.*, the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense." *Id.*

The defendants do not spell out how the facts proved at trial differed from those alleged in the indictment, much less how they were materially prejudiced thereby. For all the reasons set forth above with respect to the defendants' Rule 29 motion, the government's occasional use of the phrase "recruitment slots" did not constitute either a constructive amendment or a prejudicial variance. So, too, with respect to the evidence that the defendants induced corrupt insiders at USC to lie to their colleagues in the USC admissions department. The indictment charged the defendants with, *inter alia*, agreeing to bribe corrupt insiders in the USC athletics department to mislead their colleagues in the admissions department by purporting to recruit the defendants' children as athletes, based on falsified credentials, in violation of their duty of honest services to USC. That is what the evidence at trial proved. That the members of the admissions department were the immediate "victims" of the insiders' lies, and that the "recruitment slots" were the mechanism by which the insiders secured the admission of the defendants' children, neither

"alter[ed] the charges against [the defendants] in the indictment," nor did it "show a materially different sequence of events than that depicted in the indictment."  *Id.*

### E.     **The Jury Instructions Were Proper**

With respect to the defendants' contentions concerning jury instructions, the government and the Court are again left in a position to guess at the defendants' argument, where they simply incorporate by reference more than a dozen prior docket entries and more than 75 pages of trial transcripts.  Indeed, after hundreds of pages of proposed jury instructions and responses and a lengthy charge conference, their argument is that the instructions contained "many errors."  Dkt. 2412 at 10.   The government cannot meaningfully respond and incorporates by reference its responses.  *See* Dkts. 2014, 2079, 2358, 2372; *see generally* 10/5/21 & 10/7/21 Tr.; 10/6/21 Tr. at 6:8–8:4, 159:19–22.  The government further notes that the jury instructions the Court gave closely tracked the First Circuit pattern instructions.

### F.     **Wilson's Tax Conviction Does Not Provide a Basis for a New Trial**

Wilson argues that his conviction on Count Thirteen, for willfully filing a false tax return in violation of 26 U.S.C. § 7206(1), is invalid because it is unclear whether the jury convicted on the basis that (1) he could not properly deduct an illegal bribe as a business expense, or (2) he took deductions for business expenses that were not true business expenses.   Dkt. 2412 at 10.[30] Wilson's argument is premised on his contention that "the payments at issue cannot constitute a bribe."  *Id.*  As described, *supra* at Part I.B.1 & 4, the evidence overwhelmingly supports the jury's finding that the payments to The Key, Singer, and KWF constituted bribes.  Because the jury could convict on either theory—that Wilson deducted an illegal bribe as business and charitable deductions, or because he deducted payments to The Key, Singer, and KWF that were not in fact

---

[30] Wilson inexplicably omits that the evidence at trial also demonstrated that he took deductions for charitable contributions that were not true charitable contributions.

charitable contributions or business expenses—his conviction on Count Thirteen should stand. The fact that Wilson willfully lied on his tax return in multiple ways does not justify a new trial.

Even if there were insufficient evidence on the first theory, as Wilson contends, "[t]he law is crystalline that, when the government has advanced several alternate theories of guilt and the trial court has submitted the case to the jury on that basis, an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories." *United States v. Gobbi*, 471 F.3d 302, 309 (1st Cir. 2006) (citing, *inter alia*, *Griffin v. United States*, 502 U.S. 46, 49–51, 55–60 (1991) (explaining that general verdicts in which there was insufficient proof of one of the theories of liability will be upheld, while those based on an illegal or unconstitutional theory may be set aside)).  While Wilson calls the government's theory deficient "as a matter of law," he cites Dkt. 2342, which in turn relies on Dkt. 2330, in which he argues that the "evidence shows that Mr. Wilson did not intend to pay money into the pockets of any coaches or administrators."  Dkt. 2330 at 33; *id*. at 12–13 (arguing that there is no evidence of a bribe).[31]

Wilson's reliance on *United States v. Foley*, 73 F.3d 484, 494 (2d Cir. 1996), which he quotes at length, ignores that that decision is no longer good law.  In *Foley*, the Second Circuit overturned a defendant's conviction under 18 U.S.C. § 666(a)(1)(B) after holding that the government was required (but failed) to prove that the "business, transaction, or series of transactions"—namely, state legislation—involved anything of value of $5,000 or more *to the entity receiving federal funds*—there, the State of Connecticut.  *Id*. at 493.  Where it was not clear the jury had found the defendant guilty of deducting an illegal bribe (which basis the court had overturned) or a legal bribe that was not an ordinary and necessary business expense, the court

---

[31] To the extent Wilson also makes legal arguments about whether a payment to a victim can constitute a bribe, that argument is without merit.  *See supra* at Part I.B.1.

vacated the Section 7206 charges. *Id.* at 493–94. Wilson neglects to note that *Foley* was overruled in part by *Salinas v. United States*, 522 U.S. 52 (1997), and further abrogated in relevant part by *United States v. Santopietro*, 166 F.3d 88, 92–93 (2d Cir. 1999) ("to the extent that *Foley* required the Government to plead and prove that the transaction involved something of value *to the governmental entity that received the requisite amount of federal funds*, that narrowing construction of the statute must be discarded") (emphasis in original); *see also Sabri v. United States*, 541 U.S. 600, 605–06 (2004) (affirming *Santopietro* and holding that proof of link between federal funds and alleged bribe not required for conviction under § 666(a)(2)). Thus, under the subsequent case law that Wilson ignores, the Section 666 conviction in *Foley* was not legally erroneous. So too here. There is no basis to order a new trial on Wilson's Section 7206 conviction.

### G.    The Court Did Not Err in Denying the Defendants' Motions for Severance

The defendants next seek to assign error to the Court's denial of their motions to sever their trial from one another, or to sever Wilson's tax charge from the remaining charges. Dkt. 2412 at 11. These contentions, too, are without merit.

As an initial matter, the law is clear that where, as here, defendants are indicted together, they should as a general rule be tried together, because joint trials "prevent inconsistent verdicts and . . . conserve judicial and prosecutorial resources." *United States v. Soto-Beniquez*, 356 F.3d 1, 29 (1st Cir. 2003) (citing *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir. 1993)). Moreover, "[b]ecause conspiracy cases often involve evidence that is admissible against all members of the conspiracy, 'in the context of conspiracy, severance will rarely, if ever, be required.'" *Id.* (quoting *United States v. DeLuca*, 137 F.3d 24, 36 (1st Cir. 1998)). Accordingly, severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Indeed, now that the defendants have been tried, their

burden is still higher:  to make "a strong showing *that prejudice resulted* from the denial of severance, and prejudice in this context 'means more than just a better chance of acquittal at a separate trial.'" *DeCologero*, 530 F.3d at 52 (quoting *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir.1990) (emphasis added)).  "This is a difficult battle for a defendant to win." *Boylan*, 898 F.2d at 246.

In their motion, the defendants do not even attempt to meet their burden of identifying any prejudice that *actually* resulted from their joint trial, or how the jury was confused.  Instead, they complain generically of prejudicial spillover based on the introduction of evidence concerning "personal payments" that flowed as part of the charged conspiracy to Jovan Vavic and Donna Heinel, the two individuals they were charged with bribing.  That is not enough.  They do not explain *how* they were unfairly prejudiced, or *how* the jury's judgment was undermined.  This is unsurprising, because there was no prejudice that resulted from the denial of severance.

As this Court properly concluded, where defendants are charged as coconspirators, "almost all of the evidence properly admitted against other coconspirators [is] relevant to and independently admissible against" each of them. *See Simon*, 12 F.4th at 44 (citing *O'Bryant*, 998 F.2d at 26).  And where such evidence is independently admissible against each defendant—as it was here, to prove, *inter alia*, the nature, scope, operation and evolution of the conspiracy, and the relationships among the conspirators—they "hardly can be heard to complain about an untoward spillover effect." *Id*.

At trial, the government made clear that Singer did not apprise the defendants of the personal payments, and that this evidence was relevant to show how the conspiracy worked. *See* 9/13/21 Tr. at 29 (noting that Singer did not tell parents "about these payments to the insiders' pockets"); *id*. at 33–34 (same).  Indeed, the evidence at trial proved that the conspiracy involved

multiple complicit university insiders, and neither defendant was markedly more or less culpable than the other simply because one bribed Vavic and the other bribed Heinel. And, in any event, "disparity between the relative culpability of co-defendants does not entitle a defendant to severance. . . . Prejudice must be shown." *DeCologero*, 530 F.3d at 55. The defendants do not, because they cannot, even attempt such a showing. Nor is it clear how Abdelaziz could have been prejudiced by evidence of personal payments to Vavic, or how Wilson could have been prejudiced by evidence of personal payments to Heinel, insofar as the government never argued that Abdelaziz bribed Vavic or that Wilson bribed Heinel, and the Court instructed the jury, *inter alia*, that it was required to "assess the evidence against each defendant individually" with respect to each charge, 10/7/21 Tr. at 25, and that "[p]roof that the defendant willfully joined the agreement must be based upon evidence of his own words and actions," *id*. at 36–37. Likewise, the defendants fail to argue how the evidence unfairly prejudiced them when the government made clear that it did not matter whether the money went to the USC insiders' pocket or to their program, provided that the payments were in exchange for lying to their colleagues to secure the children's admission to USC as recruited athletes based on falsified credentials. 9/13/21 Tr. at 35 ("[W]hether the money went to the insider's pocket or to their program, the important point is what the money was for, what it was intended to do."); 10/6/21 Tr. at 30 (same).[32]

Nor was there anything improper about the government's reference in rebuttal to the fact that both defendants argued in closing that they did not open an e-mail from Singer attaching the fraudulent profile of their child. As an initial matter, the defendants did not object to the

---

[32] At the same time, the defendants' contention that "there was no connection whatsoever between Mr. Abdelaziz and Jovan Vavic," and "no connection whatsoever between Mr. Wilson and Donna Heinel," Dkt. 2412 at 11–12, is untrue. They willfully joined the same conspiracy.

government's argument at the time, thereby waiving this argument.[33]  *United States v. Taylor*, 54
F.3d 967, 977 (1st Cir. 1995) ("When a defendant defaults on this obligation by failing to make a
contemporaneous objection to [] comments in the prosecution's closing argument, the raise-or-
waive rule applies").  The defendants have also never previously argued that the Court should have
severed them because their defenses were *the same*, which makes no sense.  The government was
entitled to argue, in rebuttal, that the defendants' explanations were implausible.

Likewise, Wilson's contention that the Court should have "at least severed the tax charge"
against him, Dkt. 2412 at 13 n.4, and that this failure was "particularly prejudicial in light of the
government's closing," is undeveloped.  His argument, which is confined to a single footnote, fails
as a matter of law because he does not explain how the failure to sever the tax charge actually
prejudiced him at trial, much less how it resulted in a miscarriage of justice.  His contention that
the government "advanced novel legal theories on the bribery and fraud counts . . . confused the
jury's consideration of the tax count," *id.*, is wholly conclusory.  It also makes no sense insofar as
his conviction on the tax charge was not contingent on the jury's finding that the improper
deductions he took were bribes, as set forth above (although the jury properly found they were).

## III.   The Government Did Not Hide Exculpatory Evidence and the Wiretap Was Legally Authorized at All Times

The defendants next contend that they are entitled to a new trial because the government
"withheld crucial exculpatory evidence"—namely, a fax cover sheet indicating that Singer's
consent to the interception of his phone calls was faxed to AT&T on September 28, 2018.  Dkt.

---

[33] The government's references in closing to the fact that other applicants to college "work hard to be recruited athletes," and to Wilson's use of the phrase "high-class problem" were hardly inflammatory, as the defendants' contend, and the defendants did not object to the government's closing on this ground at trial.  Dkt. 2412 at 14 n.4.  The government simply cited the witness testimony, and Wilson's own statements.  It did not argue that Wilson's actions deprived specific students of admission.

2412 at 15–20. The defendants' argument is frivolous. The fax cover sheet is not exculpatory and simply confirms what the discovery produced to the defendants more than two years ago makes apparent—that the government intercepted Singer's phone calls pursuant to the Court's authorization, and with Singer's consent, and that the wiretap of Singer's phone was legally authorized at all times.

### A. <u>Applicable Law</u>

A defendant seeking a new trial based on a claim of newly discovered evidence that purportedly should have been produced under *Brady* "must establish that (1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001) (reversing grant of new trial based on *Brady*); *accord Rivera Rangel*, 396 F.3d at 486 (same).

### B. <u>The Fax Cover Sheet Was Neither Exculpatory Nor Improperly Withheld</u>

The fax cover sheet referenced in the defendants' new trial motion was produced to the defendants in a related case, *United States v. Heinel*, No. 19-cr-10081-IT, on October 14, 2021, in response to the court's order in that case to provide evidence as to *when* AT&T received Singer's consent form. *See United States v. Heinel*, No. 19-cr-10081-IT, Dkt. 885-1. The cover sheet, which is devoid of any substantive content, shows that the government faxed the consent—which Singer signed on September 27, 2018—to AT&T on September 28, 2018. The defendants contend that this is exculpatory for four reasons: <u>first</u>, because "the government had previously represented to Judge Burroughs that court-authorized monitoring had ceased at midnight on September 27, 2018, and it appears that the government had only sealed wiretaps through September 27, 2018,"

Dkt. 2412 at 15; second, because, as a result, "there was at least some time on September 28, 2018 when the United States was monitoring Mr. Singer's phone without any lawful authority," id. at 17; third, because "the documents show the government only requested technical assistance from AT&T up until December 26, 2018, and AT&T only agreed to provide technical assistance through that date," id. at 18; and fourth, because the failure to disclose the cover sheet was a *Brady* violation that should have resulted in the suppression of the consensual calls. The defendants' arguments are factually incorrect and legally frivolous.

First, the fax cover sheet is not exculpatory for a number of reasons—not least, that the Court-authorized wiretap did not expire until September 29, 2018, *after* Singer consented to the consensual recording of his calls on September 27, 2018, and after that consent was faxed to AT&T on September 28, as the defendants themselves have acknowledged to this Court. Dkt. 972 at 24–25 (noting that the government recorded Singer's calls "pursuant to a Title III wiretap between June 5, 2018, and September 29, 2018, and with his consent between September 27, 2018 and March 11, 2019"). The defendants have had Singer's signed consent, bearing the September 27 date, for more than two years, since it was produced in automatic discovery in April 2019, and have even appended it to a motion they filed in this case. See Dkt. 972-39 at 34. The fax cover sheet simply shows that the FBI faxed that consent to AT&T on September 28, 2018.

The defendants contend that the Court-authorized wire expired between the time Singer signed the consent and AT&T received it, because in a motion to seal the wiretap on October 2, 2018, the government mistakenly stated that the monitoring "began on August 30, 2018 and ceased at midnight of September 27, 2018." But the reference to September 27 was simply an error, which the defendants have known for more than two years, because the government disclosed it in a filing *in this case* on April 30, 2020. In that filing, the government explained: "Although Singer

consented to a wiretap on September 27, the 30-day period for the non-consensual wiretap did not

expire until midnight on September 28. . . . Accordingly, the date listed in the government's sealing

motion—September 27—was incorrect." *See* Dkt. 1138 at 29 n.22.  Likewise, it is not true, as the

defendants contend, that the government only sealed the intercepted calls through September 27.

Instead, the calls were sealed through September 29.  *See United States v. Heinel*, No. 19-cr-10081-

IT, Dkt. 969 at 2, 6–7; *id*., Dkt. 969-1 at 11–12.

      <u>Second</u>, there was no period of time on September 28 when the government intercepted

calls without lawful authority.  To the contrary, throughout September 28, the government was

operating pursuant to the Court's valid authorization to intercept Singer's phones.  It *also* had

Singer's consent, which it faxed to AT&T that morning.  *Id*., Dkt. 969 at 1–2; *id*., Dkt. 969-1 at 8–

9.  Accordingly, on September 28, 2018, the government was authorized to intercept Singer's calls

pursuant to both the Court's order and Singer's consent—as the government's automatic discovery

makes clear, and as the government advised the defendants again in a letter dated March 13, 2020,

that the defendants themselves cited in motion practice to this Court in which they acknowledged

that, as the government noted in the letter:  "[Singer's] telephone was intercepted pursuant to a

Court-ordered wiretap between June 5, 2018 and September 29, 2018.  Between September 27,

2018 and March 11, 2019, calls made to and from this telephone were consensually recorded."

*See* Dkt. 972 at 30–31; Dkt. 972-33 at 4.  And, in any event, the first pertinent call on the wire on

September 28, 2018 occurred *after* the FBI faxed Singer's consent form to AT&T.  *See United*

*States v. Heinel*, No. 19-cr-10081-IT, Dkt. 969 at 2, 6–7; *id*., Dkt. 969-1 at 9.

      <u>Third</u>, the defendant's contention that the government was only authorized to intercept

calls until December 26, 2018—based on a fax receipt confirmation indicating that AT&T

regarded Singer's consent as valid until that date—is similarly frivolous.  In April 2019, as part of

automatic discovery, the government produced to the defendants a consent form signed by Singer on December 20, 2018, authorizing the continued interception of his phone, and the defendants' included *this very consent form* as an exhibit to their own March 25, 2020 motion to dismiss. *See* Dkt. 972-39. The FBI faxed that form to AT&T on December 21, 2018, five days *before* Singer's prior consent expired. *See id.*, Dkt. 969 at 2, 6–7; *id.*, Dkt. 969-1 at 16–17. Thus, the government continued to intercept calls after that date with Singer's consent.

<u>Fourth</u>, the government has not hidden any evidence, and there was nothing to hide. To the contrary, the government's automatic discovery, and its letter to the defendants in March 2020, both made clear that the Court-authorized and consensual wiretaps overlapped, and the defendants have acknowledged those facts in their own filings before this Court. AT&T received Singer's signed consent before the Court order expired, and that order was, by its express terms, valid until September 29, 2018. The defendants' attempt to manufacture a *Brady* violation out of these events—and from that, to secure a new trial—is frivolous and contradicted by their own filings.[34]

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants' motions for judgment of acquittal and a new trial should be denied, and the jury's verdict finding them guilty of all charges should be upheld.

---

[34] The fax cover sheet is, in any event, irrelevant. Even if the Court-authorized wiretap had expired before AT&T received the fax of Singer's consent, the government had that consent, and there has never been any dispute in this case that it is valid. And, of course, even without a signed consent form, Singer's actions in making the consensual calls at the government's direction, over a phone he knew was being intercepted, is evidence that he consented to that interception. *See, e.g., Griggs-Ryan v. Smith*, 904 F.2d 112, 116–17 (1st Cir. 1990) ("In the Title III milieu . . . consent inheres where a person's behavior manifests acquiescence or a comparable voluntary diminution of his or her otherwise protected rights," and that implied consent may be "inferred from surrounding circumstances indicating that the party knowingly agreed to the surveillance").

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Ian J. Stearns*
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants. I further certify that unredacted copies will be served on counsel for the defendants.

*/s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3
      UNITED STATES OF AMERICA,          )
 4                      Plaintiff        )
                                         )
 5    vs.                                )  No. 1-19-CR-10080
                                         )
 6    GAMAL ABDELAZIZ,                   )
                        Defendant.       )
 7                                       )
                                         )
 8                                       )

 9


10

                  BEFORE THE HONORABLE NATHANIEL M. GORTON
11                    UNITED STATES DISTRICT JUDGE
                               SENTENCING
12


13
                  John Joseph Moakley United States Courthouse
14                          Courtroom No. 4
                           One Courthouse Way
15                       Boston, Massachusetts 02210

16


17                          February 9, 2022
                               3:00 p.m.
18

19


20
                        Kristin M. Kelley, RPR, CRR
21                        Official Court Reporter
              John Joseph Moakley United States Courthouse
22                     One Courthouse Way, Room 3209
                        Boston, Massachusetts 02210
23                       E-mail: kmob929@gmail.com

24            Mechanical Steno - Computer-Aided Transcript

25
```

**A3980**

```
 1    APPEARANCES:

 2

 3         Stephen E. Frank

 4         Ian J. Stearns

 5         Leslie Wright

 6         Kristen Kearney

 7         United States Attorney's Office

 8         1 Courthouse Way

 9         Suite 9200

10         Boston, MA 02210

11         617-748-3208

12         stephen.frank@usdoj.gov

13         for the Plaintiff.

14

15

16         Brian T. Kelly

17         Joshua C. Sharp

18         Nixon Peabody LLP

19         100 Summer Street

20         Boston, MA 02110

21         617-345-1000

22         bkelly@nixonpeabody.com

23         for Gamal Abdelaziz.

24

25
```

```
1    APPEARANCES:

2

3            Robert L. Sheketoff

4            One McKinley Square

5            Boston, MA 02109

6            617-367-3449

7            sheketoffr@aol.com

8            for Gamal Abdelaziz.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2            THE CLERK:  This is Criminal Action No. 19-10080, the

 3  United States of America versus Gamal Abdelaziz.

 4            Would counsel please introduce themselves for the

 5  record.

 6            MR. STEARNS:  Good afternoon, your Honor.  Ian

 7  Stearns, Leslie Wright, Kristen Kearney and Stephen Frank for

 8  the government.

 9            THE COURT:  Good afternoon, Mr. Stearns, Ms. Wright,

03:02 10  Ms. Kearney, and Mr. Frank.

11            MR. KELLY:  Good afternoon, your Honor.  Brian Kelly,

12  Robert Sheketoff, and Joshua Sharp on behalf of Mr. Abdelaziz.

13            THE COURT:  Yes.  Mr. Kelly, Mr. Sheketoff, Mr. Sharp

14  and Mr. Abdelaziz.  We also have Ms. Victoria from Probation

15  with us as well.

16            We are here on the sentencing of Mr. Gamal Abdelaziz.

17  I have received and read the Presentence Report, the

18  defendant's Sentencing Memorandum, to which there are

19  attachments, including 19 letters submitted on behalf of the

03:02 20  defendant, eight from family members, nine from professional

21  colleagues and two from friends.  I've also received and read

22  the government's Sentencing Memorandum.  Those are all of the

23  papers that I have received.

24            Is there anything I haven't mentioned that I should

25  have received?  Mr. Stearns?
```

1          MR. STEARNS:  Not from the government, your Honor.

2          THE COURT:  Or Mr. Kelly?

3          MR. KELLY:  No, your Honor.

4          THE COURT:  All right.  Then there are multiple

5     objections that were registered to the Presentence Report,

6     which I will now go over.

7          There were three objections filed by the government.

8          The first objection is to the Probation Officer's

9     determination of the victim impact and the offense level

03:03 10    computation with respect to Count 1, which of course has been

11    addressed much times before.  The Court has overruled that

12    objection with respect to numerous co-defendants in this case

13    and does so again.

14         The fraud and deceit guideline, Section 2B1.1, is

15    deemed by this Court to be applicable in this case rather than

16    the commercial bribery guideline, which is 2B4.1.  There is no

17    specific gain or loss to be applied under the guidelines.  It

18    is clear to this judicial officer that Mr. Abdelaziz's actions

19    caused harm, not only to the University of Southern Cal, but

03:04 20    also to the system of higher education in this country.  That

21    harm, because of its conjectural nature, cannot be calculated

22    in terms of actual financial gain or loss sufficient to

23    determine an enhancement under the loss tables in the

24    guidelines Section 2B1.1.  Therefore, consistent with prior

25    rulings of this Court, the government's objection No. 1 is

```
 1    overruled.

 2          The second objection by the government is to the

 3    initial determination of the Probation Officer that the value

 4    of the bribe paid by the defendant was $20,000 and, therefore,

 5    pursuant to Section 2B1.1(b)(1)(C), the base offense level

 6    should be increased by four levels from 12 to 16.

 7          The government contends that the bribe was $300,000

 8    and that the offense level should be accordingly increased by

 9    12 levels pursuant to the same guideline Section (b)(1)(G).

10          In response to that objection, Probation has revised

11    its position and now concludes that the value of the bribe was

12    $200,000 and that therefore the base offense level should be

13    increased by 10 levels pursuant to the Section 2B1.1(b)(1)(F).

14          The Court agrees with the Probation Officer and finds

15    by a preponderance of the evidence that the defendant intended

16    to pay a $200,000 bribe with an additional $100,000 so-called

17    middle man fee to Singer.  Therefore, the government's

18    objection is overruled in so far as it would increase the base

19    offense level by 12 levels rather than 10 levels.

20          Third and last of the government's objection,

21    objection No. 3, is to the Probation Officer's recommendation

22    that the Court consider a downward departure on the basis that

23    the guidelines section for federal programs bribery, 2C1.1, may

24    not properly address the defendant's culpability because the

25    status of the Southern Cal -- University of Southern Cal, as a
```

**A3985**

```
 1    recipient of federal funds, did not bear on his motivation for

 2    engaging in the conduct for which he has been convicted under

 3    Count 2 of the indictment.

 4         The Court will consider -- in fact, will enter a

 5    downward departure from the guideline range as is recommended

 6    by both parties and the Probation Officer on the basis of the

 7    defendant's culpability, which the Court considers to include

 8    whether his conduct was of the sort anticipated by the

 9    Sentencing Commission in promulgating Section 2C1.1 and,

10    therefore, the government's objection is overruled.

11         Are there any responses from counsel with respect to

12    the Court's ruling on the government's objections to the

13    Presentence Report?  Mr. Stearns?

14         MR. STEARNS:  No, your Honor.  Thank you.

15         THE COURT:  All right.  From the defendant with

16    respect to my rulings?

17         MR. KELLY:  No, your Honor, except for the issue of

18    the $200,000 where Probation says on page 48 -- I think I

19    mistakenly said paragraph 48.  The $200,000, there's no

20    evidence that he agreed Donna Heinel was going to get it.  To

21    the extent it reads about Heinel, the government was clear in

22    its closing where Mr. Frank said "Singer can't tell the

23    defendants that he was paying insiders personally".  The

24    government was clear in its closing when it referenced

25    Abdelaziz specifically.  Singer told the defendant the money
```

1    would go to USC.  As the Court well knows, presiding over this

2    case, he didn't know Heinel.  So to the extent -- I understand

3    the Court's ruling, but to the extent it's being suggested he

4    knew Heinel in advance, we would continue to object on that and

5    otherwise rest on our submissions, your Honor.

6            THE COURT:  Well, I think you anticipate that I'm

7    going to now deal with the objections interposed by the

8    defendant as opposed to the government.  I will go through and

9    you can just say, I said it before, with respect to that.

03:08 10            The defendant has entered ten objections to the

11    Presentence Report.

12            As I understand them, objection No. 1 is to the

13    offense conduct section in which the defendant disputes that

14    the payment to the University is a bribe within the meaning of

15    the *Skilling* decision.  The Court has previously ruled

16    otherwise and, therefore, overrules objection No. 1 imposed by

17    the defendant.

18            As I understand the rest, Mr. Kelly -- actually, it's

19    objections 2 through 9, with the exception of 10.  They are

03:09 20    what I would describe as informational objections.  They don't

21    have an impact on the guideline range as such, but they do

22    include the matter that you just discussed.  Am I correct?

23            MR. KELLY:  You are correct, your Honor.  We're

24    preserving it for appellate purposes.

25            THE COURT:  But to the extent they are informational,

```
 1   the objections are overruled.  That is two through nine are

 2   overruled.

 3        That leaves us with objection No. 10, which I take as

 4   an objection with respect to the specific offense

 5   characteristics.  The enhancement for the amount of the bribe,

 6   the defendant objects to the plus four, which was later revised

 7   by Probation to be a plus ten.  I presume the defendant objects

 8   even more strenuously to the plus ten.  But for the reasons

 9   stated in connection with the government's objection No. 2,

03:10 10   which I just outlined, that objection is overruled.

11        You're free to make any comments in that regard,

12   Mr. Kelly.

13        MR. KELLY:  Well, as I said before, Judge, and perhaps

14   I'll say it better now, we do object to that.  We don't think

15   there's any evidence.  We think the government agrees he did

16   not know Miss Heinel prior to this matter, your Honor.  We

17   think the $20,000 invoice, they can't include all of those

18   invoices because one of them was labeled Bizak.  In front of

19   Judge Woodlock, they said that invoice for $20,000 was part of

03:11 20   the Bizak bribe.  So they can't have both a Bizak bribe and an

21   Abdelaziz bribe on the same document.  So that's why we

22   thought, if anything, the $20,000 figure made more sense for

23   the guidelines, to the extent it can be calculated at all,

24   given the fact he did not know Heinel.  So we will rest on our

25   papers for the rest.
```

1         THE COURT:  Your objection is noted.  Does the

2   government wish to respond?  Mr. Stearns?

3         MR. STEARNS:  No, your Honor.  I think counsel

4   conceded in his argument to the jury that at all times the

5   defendant thought $200,000 was going to USC.  Whether it was

6   going to Donna Heinel's pocket or going to a Women's Athletic

7   Board account or a Galen Center account, it's irrelevant to the

8   amount of the bribe under the Court's rulings, as I understand.

9         THE COURT:  All right.  The Court's ruling remains the

03:12 10  same.  Objection No. 10 by the defendant to the Presentence

11  Report is overruled.

12         That means we next need to turn to the recommendations

13  made in the Presentence Report with respect to the

14  establishment of appropriate guidelines.

15         That information is included starting at page 26 of

16  the Presentence Report, wherein I am advised that the 2021

17  Guideline Manual applies in this case.  That is the most recent

18  guideline manual.  And within that particular guideline, we are

19  centered on guideline 2C1.1.  The section provides for a base

03:12 20  offense level of 12 because the defendant was not a public

21  official pursuant to subsection (a)(2) of that guideline.

22         Do counsel disagree or agree with that recommendation?

23  Mr. Stearns?

24         MR. STEARNS:  Government agrees.

25         THE COURT:  Mr. Kelly?

```
 1              MR. KELLY:  Agree.

 2              THE COURT:  The Court so finds.

 3              Then with respect to the specific offense

 4      characteristics, which you've actually dealt with before, under

 5      the table of 2B1.1, the Court has found that the evidence

 6      reflects that $200,000 of the payment was intended as the bribe

 7      and, therefore, because that falls between $150,000 and

 8      $250,000, subsection (b)(1)(F) of guideline 2B1.1 applies and a

 9      ten level increase is warranted.

03:13 10              Do counsel agree with the calculations that are made

11      in that section?  Mr. Stearns?

12              MR. STEARNS:  Just subject to our prior objection,

13      your Honor.

14              THE COURT:  Mr. Kelly?

15              MR. KELLY:  Same for the defense.  Subject to our

16      prior objection, we do believe if the Court's going with

17      $200,000, ten is the right number.

18              THE COURT:  Thank you.  The Court finds that by a

19      preponderance of the evidence and, therefore, the specific

03:14 20      offense characteristics yield a ten level increase to the base

21      offense level.

22              There are no other adjustments to be made, therefore

23      the adjusted offense level ends up at 22 and the total offense

24      level is 22.

25              Do counsel agree with those calculations? Mr. Stearns?
```

```
 1              MR. STEARNS:  Yes, your Honor.

 2              THE COURT:  Mr. Kelly?

 3              MR. KELLY:  Yes, your Honor.

 4              THE COURT:  Turning to the defendants' criminal

 5     history, there are no prior convictions.  He therefore has zero

 6     criminal history points and falls in Criminal History Category

 7     I.  That means that at total offense level 22 and Criminal

 8     History Category I, the guideline range in this case is 41 to

 9     51 months.

03:15 10            Do counsel agree with the Court's calculations?

11     Mr. Stearns?

12              MR. STEARNS:  Yes, your Honor.

13              THE COURT:  Mr. Kelly?

14              MR. KELLY:  Subject to our prior objections, yes.  We

15     think the Court has correctly calculated.

16              THE COURT:  All right.  Then I am aware, having

17     carefully read the sentencing memoranda of the government and

18     the defendant, as to your recommendations, but I will now hear

19     sentencing recommendations, starting with the government.

03:15 20            Mr. Stearns.

21              MR. STEARNS:  Thank you, your Honor.  The conclusion

22     of the defendant's Sentencing Memorandum comes the closest to

23     acknowledging any responsibility for his actions.  There he

24     calls the conduct at issue a terrible, quote, mistake, but I

25     mistake is forgetting a friend's birthday or accidentally
```

1  backing into another car in the parking lot.  The defendant, a

2  sophisticated, experienced businessman, would not be sitting

3  here today a convicted criminal if he had only committed a

4  mistake or even a one time error in judgment.  The defendant

5  did not make a mistake.  Instead, he lied and he agreed to lie

6  over and over again for 18 months from the summer of 2017, when

7  he first began discussing a false athletic profile with Rick

8  Singer for his daughter, to the January 2019 phone call that

9  this Court heard during trial when he agreed to lie to USC

03:16 10  about a fake basketball injury to cover up his crimes.

11       The defendant did not just lie.  He also paid a six

12  figure bribe to get his co-conspirators to tell the same lie

13  which secured his daughter's admission to USC as a fake

14  basketball recruit.

15       Calling his lies and bribery a mistake, your Honor,

16  minimizes the conduct for which a jury of his peers found him

17  guilty of multiple crimes.  It's an excuse, and it's part of a

18  continued effort by this defendant to blame Rick Singer and to

19  blame others for the choices that he made all by himself.

03:16 20       Throughout this case and at trial, this defendant has

21  tried to pin his lies on other people.  He has argued that he

22  was duped by Rick Singer, portraying himself as a victim of the

23  very person that he agreed to commit fraud and bribery with.

24  He has pointed the finger at lower level conspirators, like

25  Laura Janke and Mikaela Sanford, for the fraud on his

daughter's USC application.  And he has even blamed the victim, USC itself.

But his minimization and excuses did not end with the jury's verdict.  They've continued at sentencing.  In his objections to the Presentence Report, for example, he asserts that he had no knowledge that a falsified athletic profile was being created for his daughter.  Probation found that excuse, quote, not credible, just like the jury did.  He also claims that it was an accident that he sent Singer a picture of another girl playing basketball for that fake profile.  And he just happened to miss the one email that Singer sent him attaching the fake profile for the defendant's review. Probation found those excuses too not believable.

Even in his Sentencing Memorandum filed just last week the defendant suggests that he believes there was nothing wrong with his daughter, quote, receiving favorable admissions treatment as a walk-on basketball player in exchange for a, quote, donation.  But the defendant did not make a donation, nor did his daughter receive favorable admissions treatment, and she wasn't a basketball player either.

The defendant has gone so far in this case, your Honor, as to suggest that he was set up by the FBI agents who investigated his crimes, that he was framed.  To this day as he appears before the Court for sentencing arguing for leniency, he has failed to disavow those lies too.  It is not surprising

1    then that a defendant who has continued to blame others and

2    peddle false excuses talks so much about other people in his

3    Sentencing Memorandum, other defendants who have already been

4    sentenced.

5          As an initial matter, the government has taken

6    sentences of other defendants into consideration, which is why

7    we're making a sentence that is 66 percent below the applicable

8    guidelines range for this defendant.  But the defendant is

9    different from his co-defendants and he deserves a longer

03:19 10   sentence.

11          For example, his contention that, quote, almost all of

12   his co-defendants engaged in conduct more culpable than him is

13   flatly untrue.  For starters, as Judge Talwani has concluded,

14   his involvement in the side-door scheme alone automatically

15   makes him more culpable than the defendants who only engaged in

16   the test cheating portion of the scheme.

17          Further, he's more culpable than many of the side door

18   defendants that he compares himself to in the Sentencing

19   Memorandum, people like Diane Blake and Humayunzadeh, people

03:19 20   that this Court knows because it sentenced those defendants,

21   were less involved in the day-to-day mechanics of the scheme,

22   including both the fraud and the bribery.  Diane Blake, for

23   example, didn't provide any information for her daughter's

24   false athletic profile.  She never even received the false

25   profile and she did not make any of the bribe payments either.

1         In any event, your Honor, I'm not going to devolve

2    into an extended discussion of other defendants because it's

3    sort of irrelevant.  This doesn't involve those people.

4    They've had their day.  This proceeding is about this

5    defendant.  The defendant's myopic focus on other people is

6    further misplaced because only one Section 3553(a) factor

7    concerns unwarranted sentencing disparities for similarly

8    situated defendants.  And as we've explained at length in our

9    Sentencing Memorandum, under First Circuit law the defendant is

03:20 10   not similarly situated to any of the defendants that this Court

11   has sentenced previously.  He was convicted under different

12   statutes of more serious crimes and, therefore, has a higher

13   applicable guidelines range.

14        But most importantly, unlike every other defendant to

15   date in this case, the defendant has not accepted an ounce of

16   responsibility for his conduct or demonstrated a shred of

17   remorse other than for getting caught and now convicted.  To

18   this day he minimizes his culpability, portrays himself as a

19   victim, offers excuses, and blames others.  For those reasons

03:21 20   alone, he is not similarly situated to his co-defendants.

21        I'll wrap up with this, your Honor.  In sentencing

22   defendants in this case, the Court has observed that this was a

23   crime born not out of greed but rather out of arrogance, out of

24   entitlement and out of hutzpah, a belief that the law did not

25   apply to people like him.  It's in that context that we ask the

1    Court to consider the arrogance, the entitlement, the hutzpah

2    it takes for this defendant to claim on this record that he was

3    framed by the FBI, that the government created false evidence

4    against him.  We ask the Court to consider his continued

5    assertion to this day that he was unaware that a false athletic

6    profile was being prepared for his daughter, even though she

7    hadn't played basketball in years.

8            Based on the letters submitted in support of his

9    Sentencing Memorandum, your Honor, the defendant may well be a

03:22 10    successful executive, a good brother, someone who has risen to

11    enormous wealth from humble beginnings, but he is also a

12    criminal, who unlike every other defendant in this case has not

13    accepted any responsibility for his conduct and continues to

14    falsely minimize his actions and point the finger at others for

15    the choices that he made.

16            We respectfully submit that those facts, your Honor,

17    are critical and perhaps the most critical factors that the

18    Court should consider in fashioning a sentence here today.  And

19    for those reasons, the government respectfully recommends that

03:22 20    the Court sentence the defendant to 14 months in prison,

21    two years of supervised release, including 400 hours of

22    community service, and a statutory maximum $250,000 fine.

23            Thank you.

24            THE COURT:  Thank you, Mr. Stearns.

25            Mr. Kelly.

1        MR. KELLY:  Yes, your Honor.  I'll just briefly

2   respond to Mr. Stearns and then address my client's situation,

3   your Honor.

4        For the life of me, I don't know why they continue to

5   harp on the weakest part of their case.  The Court presided

6   over this trial.  Those five photos that were sent within

7   two minutes, they were of his daughter's game.  Four of them

8   was his daughter.  The fifth one was another girl dribbling the

9   ball with glasses.  It wasn't some spectacular Michael Jordan

03:23 10   photo that he thought would help his daughter he sent by

11   mistake.  He sent five photos.  Singer comes back and says I'll

12   use this one.  The photo's not there.  It's just the JPEG.  As

13   the agent testified, no one memorizes JPEG.  In fact, it's not

14   only the photo that was used eventually with USC.  Laura Janke

15   prepared a separate photo from the internet.  Why they keep

16   harping on this photo is unclear.

17        The same thing with the email snafu.  The Court will

18   recall that Singer sent the phony profile to him at the Cox.net

19   email address, the wrong email address.  What the government

03:23 20   didn't show the FBI agent so the jury couldn't hear was that

21   there was a bounce back, an away message, saying I'm now using

22   Gmail.  What the government didn't show the FBI agent was that

23   Singer sent it to the wrong Gmail address.  So why they

24   continue to harp on that is probably because they have nothing

25   else to suggest he's more culpable than everyone else, and he's

         1    not, your Honor.

         2         I think today is not the day for me to try to

         3    relitigate the case.  The Court presided over the trial.  The

         4    jury has spoken.  I think today is who is Mr. Abdelaziz and

         5    what's the amount of punishment that's appropriate based upon

         6    the conviction.  That's what I want my focus to be, your Honor.

         7         I think here, as you can see from the letters that

         8    were submitted, Mr. Abdelaziz is, in fact, a humble man.  He's

         9    a kind man.  He's a very considerate man.  He has been a hard

03:24   10    worker his whole life.  He is devoted to his family, perhaps

        11    too devoted.  That's one of the reasons we find ourselves here

        12    today.

        13         He grew up poor in Egypt, unlike a lot of these other

        14    defendants who grew up with a silver spoon in their mouth.  Not

        15    him.  He grew up poor.  He came to this country legally, became

        16    a U.S. citizen, worked hard his whole life to provide for his

        17    family.  He became a U.S. citizen and a very productive U.S.

        18    citizen.  That's something that the Court should please keep in

        19    mind here because with respect to specific deterrence, which is

03:25   20    cited in the government's memo, there's no real concern there.

        21    He's a 65-year-old man, first time offender.  He's not going to

        22    interact with the criminal justice system again.  He's not

        23    going to reoffend.  I do think that should be off the table.

        24         I do think there are some unique characteristics about

        25    Mr. Abdelaziz that the Court should consider in imposing a

```
 1    sentence here.  One of the things that I want to bring to the
 2    Court's attention, as we have in the sentencing memo, is the
 3    fact that unlike many of the other defendants in this case,
 4    this conviction in this case is like capital punishment to his
 5    career.  He's done.  His chosen profession that he's worked in
 6    for decades is over.  He can't work in the hospitality and
 7    gaming industry anymore.  It's a heavily regulated industry.
 8    It requires all sorts of liquor licenses and casino licenses
 9    and most of them are public companies and they're not going to
10    hire a convicted felon.  It is what it is at this point.
11    That's reality.  And that's a collateral consequence of his
12    conviction.  It's a serious punishment.  It's his livelihood.
13         He's going to have to figure out something else to do,
14    but it's something that a lot of these other parents didn't
15    have to face.  He's not some movie star.  He's not some guy who
16    owns his own business where a felony conviction doesn't matter.
17    It matters here.  I respectfully ask the Court to consider that
18    when imposing sentence.
19         One other point I'd like to make, and I'm not going to
20    belabor this point but it's real, Judge, it's in the
21    Presentence Report in paragraph 109, the Probation department
22    does, in fact, cite to a medical doctor.  He has, in fact, had
23    moderate to severe asthma for many, many years.  He's fine now.
24    And I'm not suggesting he's not fine now, but it is a risk
25    factor when he goes off to prison.  If he does get COVID in a
```

1    prison setting, that's a major problem.  Again, I'm not going

2    to belabor that point but I think it's something that the Court

3    should consider in determining how much incarceration is really

4    necessary for this man for his conviction.

5         I think the most important thing that I'd like the

6    Court to consider in sentencing him is what is going on in this

7    very case.  This Court knows this case as well as anybody.

8    You've presided over many, many sentences.  Thirty parents have

9    already been sentenced.  Nineteen of them have been less than

03:28 10   three months.  Mr. Abdelaziz, on a scale of culpability, is on

11   the lower end.  There's just no other way to analyze that.

12        I think one example I can give the Court is look at

13   the defendant Doug Hodge.  Let's compare him to Mr. Abdelaziz.

14   Hodge, for more than a decade, participated in five different

15   side-door schemes, five.  Five kids.  Five schemes.  More than

16   a decade.  Far more than any other.  Hodge is some Ivy League

17   graduate who chose to take false tax deductions for his taxes,

18   not Mr. Abdelaziz.  Hodge made personal payments twice to a

19   Georgetown tennis coach.  Abdelaziz did not do that.  So I

03:29 20   think any objective measure, he is less culpable in the grand

21   scheme of things and deserving less punishment than Mr. Hodge,

22   who as this Court knows got 9 months.  So 14 months is very

23   excessive, and 9 months we also admit is also excessive given

24   his conduct for what he is convicted of.

25        Now, in terms of general deterrence, there has been,

A4000

1    as I said, 30 parents sentenced, national publicity.  There's a

2    lot of general deterrence that has already been imposed and set

3    forth.  There haven't been any recent cases like this.  Perhaps

4    the general deterrence has worked, but we don't need more

5    general deterrence here.

6         Your Honor, it shouldn't be that the distinguishing

7    factor is he goes to trial and somehow he's more culpable than

8    Hodge because he went to trial.  He didn't disrupt the

9    proceedings.  He sits there respectfully.  He didn't take the

03:30 10   witness stand and lie, which you know that's a reason to punish

11   him more, but he sat there.  He exercised his constitutional

12   right to a trial.  This is a federal courthouse.  Occasionally,

13   there are trials.  People should not be punished if they don't

14   lie on the witness stand.  They shouldn't be punished because I

15   cross-examined a witness vigorously or I made some argument

16   vigorously.  That's not him.  He's sitting there.  I'm doing

17   the best I can to defend him.  They seem to be suggesting he

18   should be punished for that.  He shouldn't be, your Honor.

19        Trial by jury is very important and, occasionally, the

03:30 20   public has to see a trial.  The public saw a trial here.

21   Despite all the hysteria over the coronavirus, we had a proper

22   trial.  Nobody got sick.  It went fine.  I would just ask the

23   Court not to punish him for going to trial.

24        I would ask the Court to impose a sentence of

25   four months.  It's more than 19 other parents who got

```
 1    three months or less.  It incorporates the fact he's not

 2    getting a deduction for acceptance of responsibility, but it

 3    doesn't go overboard here.  I don't think that would be

 4    appropriate if the Court did.  Fourteen months is way

 5    overboard.  We ask the Court to impose a sentence with someone

 6    like Hodge in mind:  Nine month cap, five kids over a decade.

 7    We'd just ask the Court to impose a sentence as low as it can

 8    that it deems reasonable so he can go back to his family and

 9    rebuild his life after this case is over.

10            Thank you.

11            THE COURT:  Thank you, Mr. Kelly.

12            Does the defendant wish to address the Court before

13    sentence is imposed?

14            THE DEFENDANT:  Sure, your Honor.

15            Your Honor, I'd like to apologize to my family, my

16    friends and to this Court.  For the sake of my family, I would

17    like the Court to be merciful in its sentencing today.  Thank

18    you.

19            THE COURT:  All right.  Thank you.

20            Do counsel know of any reason why sentence ought not

21    to be imposed at this time?

22            MR. STEARNS:  No, your Honor.

23            MR. KELLY:  No, your Honor.

24            THE COURT:  All right, Mr. Abdelaziz.  Please stand.

25            Before I impose sentence upon you, I will explain
```

03:31 appears at line 10
03:32 appears at line 20

1    briefly my reasons for doing so.

2         You stand before me the 14th parent whom I have had to

3    sentence in this college admission scandal, once again leaving

4    me bewildered.  As expressed by your counsel and by the 19

5    letters that I have read that you submitted on your behalf from

6    family, friends and colleagues, you are by all accounts an

7    intelligent, hardworking businessman who has devoted

8    significant time, money and resources toward helping others and

9    yet here you are, convicted of a crime that displays an

03:33 10   incredible lack of integrity, morality and commonsense.

11         You of all people should understand the value of

12   education and how important it is that college admissions be

13   fair and accessible.  It baffles me that someone who was not

14   born to privilege but who worked so hard for his own education

15   and whose father ensured that every one of his children would

16   pursue higher education, despite difficult economic

17   circumstances, would enter into a conspiracy to cheat your

18   daughter's way into a prestigious university by paying $300,000

19   to someone to fabricate an athletic profile and secure her

03:34 20   admission as a recruit for a sport she no longer played.  It

21   boggles the mind, but nevertheless, you did just that.  In

22   doing so, you, in essence, stole an admissions spot at a good

23   college from another deserving student who does not have all of

24   your advantages.

25         You know, part of my responsibility as a judge when

1  imposing sentence in a criminal case relates to deterrence,

2  first, specific deterrence to make sure you never do anything

3  like this again despite the fact that you have not accepted

4  responsibility for the crime of which you have been convicted

5  by a jury, nor shown any remorse for that crime and, second,

6  general deterrence, which in this case is meant to stop any

7  parent of a college applicant who is rich enough and

8  unscrupulous enough to try to bribe their kid's way into

9  college from doing so.  That is why I am sending you to prison

03:35 10  and I hope you get the message and that you spend the rest of

11  your life and your considerable talent and good fortune making

12  up for your inexplicable conduct.

13         Pursuant to the Sentencing Reform Act of 1984 and

14  having considered the sentencing factors enumerated in Title 18

15  of United States Code Section 3553(a), it is the Judgment of

16  this Court that you, Gamal Abdelaziz, are hereby committed to

17  the custody of the Bureau of Prisons to be imprisoned for a

18  term of 12 months and 1 day.  This term consists of terms of

19  12 months and 1 day on Counts 1 and 2 of the Fourth Superseding

03:36 20  Indictment, such terms to be served concurrently.

21         Upon release from imprisonment, you shall be placed on

22  a term of supervised release for 2 years.  This term consists

23  of terms of 2 years on Counts 1 and 2 of the Fourth Superseding

24  Indictment, such terms to run concurrently.

25         Within 72 hours of release from the custody of the

1    Bureau of Prisons, you are to report in person to the district

2    to which you are released.

3           It is further ordered that you shall pay to the United

4    States a fine of $250,000.  This consists of $125,000 on each

5    count.

6           It is further ordered that you shall make a lump sum

7    payment of $250,000, which is due and payable 60 days from this

8    day of sentencing.

9           Any fine imposed is to be continued to be paid until

03:37 10    the full amount, including any interest required by law, is

11    paid.  All fine payments are to be made to the Clerk of the

12    United States District Court.  You are to notify the United

13    States Attorney for this district within 30 days of any change

14    of mailing or residence address that occurs while any portion

15    of that fine remains unpaid.

16           While under the Probation Office's supervision, you

17    shall comply with the following terms and conditions: First,

18    you shall not commit another federal, state or local crime.

19    You shall not unlawfully possess a controlled substance.  Drug

03:38 20    testing conditions are suspended based upon the Court's

21    determination that you pose no risk of future substance abuse.

22    You are to cooperate in the collection of a DNA sample as

23    directed by the Probation Office and you are to comply with the

24    standard conditions that have been adopted by this Court and

25    are described in the Sentencing Guidelines at Section 5D1.3(c),

1    which will be set forth in detail in the Judgment and

2    Committal.

3         The following further special conditions apply during

4    your supervised release: You are to complete 400 hours of

5    community service at an agency approved by the Probation

6    Office.  You shall pay the balance of any fine imposed

7    according to the Court ordered repayment schedule.  You are

8    prohibited from incurring new credit charges or opening

9    additional lines of credit without the approval of the

03:39 10   Probation Office while any financial obligation remains

11   outstanding.  You are to provide the Probation Office access to

12   any requested financial information which may be shared with

13   the Financial Litigation Unit of the United States Attorney's

14   office.

15        It is further ordered that you shall pay to the United

16   States a Special Assessment of $200, which shall be due and

17   payable immediately.

18        Mr. Abdelaziz, you have a right to appeal this

19   sentence.  If you choose to appeal, you must do so within

03:39 20   14 days.  If you cannot afford an attorney, an attorney will be

21   appointed on your behalf.

22        Do you understand that?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  It is further ordered that pursuant to a

25   motion filed on behalf of you and your co-defendant Mr. Wilson,

1    which was allowed this morning, your self-surrender date is

2    indefinitely postponed, but you nevertheless remain subject to

3    the previous conditions imposed and under the same bond imposed

4    pretrial, specifically relative to reporting to your Probation

5    Officer and receiving permission to travel.

6              Do you understand that?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Is there any further business then to come

9    before the Court in these proceedings?  Mr. Stearns?

03:40 10              MR. STEARNS:  Not from the government.  Thank you,

11    your Honor.

12              THE COURT:  Mr. Kelly?

13              MR. KELLY:  No.

14              THE COURT:  We're adjourned.

15              THE CLERK:  All rise.

16              (Whereupon, the proceedings concluded at 3:41 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    February 9, 2022 in the above-entitled matter to the best of my

11    skill and ability.

12

13

14       /s/ Kristin M. Kelley            February 11, 2022

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2


3

   UNITED STATES OF AMERICA,          )
4                     Plaintiff       )
                                      )
5  vs.                                )  No. 1-19-CR-10080-NMG-17
                                      )
6  JOHN WILSON,                       )
                      Defendant.      )
7                                     )
                                      )
8                                     )

9


10

              BEFORE THE HONORABLE NATHANIEL M. GORTON
11                  UNITED STATES DISTRICT JUDGE
                         SENTENCING
12


13

           John Joseph Moakley United States Courthouse
14                      Courtroom No. 4
                        One Courthouse Way
15                  Boston, Massachusetts 02210

16


17                      February 16, 2021
                           3:34 p.m.
18

19


20

                   Kristin M. Kelley, RPR, CRR
21                    Official Court Reporter
            John Joseph Moakley United States Courthouse
22                  One Courthouse Way, Room 3209
                    Boston, Massachusetts 02210
23                  E-mail: kmob929@gmail.com

24         Mechanical Steno - Computer-Aided Transcript

25


**A4009**

```
 1     APPEARANCES:

 2

 3          Stephen E. Frank

 4          Ian J. Stearns

 5          Leslie Wright

 6          Kristen Kearney

 7          United States Attorney's Office

 8          1 Courthouse Way

 9          Suite 9200

10          Boston, MA 02210

11          617-748-3208

12          stephen.frank@usdoj.gov

13          for the Plaintiff.

14

15

16          Michael Kendall

17          Lauren M. Papenhausen

18          White & Case, LLP

19          75 State Street

20          Boston, MA 02109

21          617-939-9310

22          michael.kendall@whitecase.com

23          for John Wilson.

24

25
```

```
 1   APPEARANCES:

 2

 3           Andrew E. Tomback

 4           McLaughlin & Stern, LLP

 5           260 Madison Avenue

 6           New York, NY 10016

 7           917-301-1285

 8           atomback@mclaughlinstern.com

 9           for John Wilson.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              (The Honorable Court entered, 3:34 p.m.)
 4              THE CLERK:  This is Case No. 19-10080, the United
 5      States of America versus John Wilson.
 6              Would counsel please introduce themselves for the
 7      record.
 8              MR. STEARNS:  Good afternoon, your Honor.  Ian
 9      Stearns, Leslie Wright, Kristen Kearney, Steven Frank for the
10      government.
11              THE COURT:  Good afternoon, Mr. Stearns, Ms. Wright,
12      Ms. Kearney, and Mr. Frank.
13              MR. KENDALL:  Good afternoon, your Honor.  For
14      defendant John Wilson, Michael Kendall, Andy Tomback and Lauren
15      Papenhausen.
16              THE COURT:  Good afternoon, Mr. Kendall, Mr. Tomback,
17      and Ms. Papenhausen.
18              And we have Miss Victoria from Probation here as well.
19              We are here on the sentencing of Mr. John Wilson.  I
20      have received and read the presentence report, the government's
21      memorandum, the defendant's Sentencing Memorandum and an
22      extensive list of letters submitted in support of the
23      defendant, including 20 letters from members of his family,
24      four from what I would call philanthropic acquaintances, 20
25      from professional acquaintances and 33 from friends, a total of
```

         1    77 letters.  Those are all of the writings I have received.

         2          Is there anything I haven't mentioned that I should

         3    have received?  Mr. Stearns?

         4          MR. KELLY:  Not from the government's perspective.

         5          THE COURT:  Mr. Kendall?

         6          MR. KENDALL:  You may have included it when you

         7    referred to sentencing memos.  There were some supplementary

         8    materials on the request for obstruction from the government.

         9          THE COURT:  Yes.  I have read all of that and received

03:35 10    it.

        11          MR. KENDALL:  Thank you.

        12          THE COURT:  Before we start, however, counsel, I note

        13    that counsel will be well advised to use their time today to

        14    argue why a particular sentence that they propose is

        15    appropriate, rather than to argue about what I view as esoteric

        16    and academic issues pertaining to the calculation of the

        17    guideline range from which both parties urge the Court to

        18    depart and which the Court plans to do.

        19          In addition, the Court does not consider it necessary

03:36 20    to hold, nor will it hold, an evidentiary hearing concerning

        21    whether Mr. Wilson obstructed justice with respect to an

        22    affidavit he submitted to Court and, therefore, defendant's

        23    request for evidentiary hearing, docket 2523, is denied.  The

        24    Court will consider all of the pleadings which have been

        25    submitted to the Court by the defendant and by the government

1   when imposing a sentence in this case, but I will not apply an

2   obstruction of justice enhancement when calculating the

3   guidelines applicable to this case.

4          So I understand there are multiple objections filed

5   with respect to the Presentence Report.  I'm going to deal with

6   them first.  I will announce my rulings on the government's

7   objections and then a response if the government wishes to make

8   it and hear from the defendant as well in that regard.  Then I

9   will turn to the defendant's objections and do the same thing.

03:37 10          Starting with the government's objections, the first

11   three of the eight objections registered by the government do

12   not need attention.  Objection No. 1 corrects a Scribner's

13   error.  Objection No. 2 corrects the date of Mr. Wilson's

14   arrest.  Objection 3 is informational.

15          The fourth objection by the government is to the

16   Probation Officer's determination that a two-level enhancement

17   for obstruction of justice relating to an affidavit submitted

18   by Mr. Wilson should not be applied.  Probation states that it

19   believes that the issue is a close call but defers to the

03:38 20   Court.  This dispute is largely academic because again, as I've

21   said before, both parties are recommending a substantial

22   downward departure from the guideline range and the Court

23   agrees that one should be adopted.  The Court, therefore,

24   considers the issue moot and will not apply a two-level

25   enhancement for obstruction of justice but will consider the

1  arguments of both parties when imposing a sentence.  The

2  government's objection is, therefore, overruled as moot.

3        Objection No. 5, the fifth objection by the

4  government, is to the Probation Officer's determination that

5  there is no calculable loss or gain for purposes of an

6  enhancement under the fraud guideline with respect to the

7  offense level computation under Counts 1, 6, 8 and 9.  This

8  objection has been addressed many times before.  The Court has

9  overruled that objection as to numerous co-defendants, and in

03:39 10  this case it does so again.

11        The fraud and deceit guideline, Section 2B1.1, is

12  deemed by this Court to be applicable in this case rather than

13  the commercial bribery guideline, which is 2B4.1.  There is no

14  specific gain or loss to be applied under the guidelines.  It

15  is clear to this judicial officer that Mr. Wilson's actions

16  caused harm, not only to the University of Southern California,

17  but also to the system of higher education in this country.

18  That harm, because of its conjectural nature, however, cannot

19  be calculated in terms of financial gain or loss sufficient to

03:40 20  determine an enhancement under the loss tables in guidelines

21  Section 2B1.1.  Therefore, consistent with the prior rulings of

22  this Court, government's objection No. 5 is overruled.

23        The government's sixth objection is to the Probation

24  Office's determination that the total amount of the bribes paid

25  by the defendant for the purpose of the Sentencing Guidelines,

1    Sections 2C1.1 and 2B1.1, was $100,000, and a resulting

2    increase of the offense level ought to be eight.  The

3    government submits that the amount was $1.22 million dollars

4    and that the offense level should accordingly be increased by

5    14 levels pursuant to subsection B1(h) of the same guideline.

6          This dispute is also academic because the sentences

7    recommended by the parties are substantial below the low end of

8    the guideline range regardless of whether the base offense

9    level is increased by 8 or by 14.  The Court finds that the

03:41 10    defendant intended that some portion of the $1 million dollars

11    that he paid to Singer concerning his daughters be directed to

12    persons he believed were corrupt insiders at Stanford and

13    Harvard and agrees with the Probation department, that on the

14    evidence before it, the bribe amount cannot be reduced to a

15    specific figure as is required to calculate a guideline

16    enhancement.  It appears with the Probation Officer's

17    determination that $100,000 of the $220,000 payment the

18    defendant made to Singer in connection with the admission of

19    his son to University of Southern California was a bribe for

03:42 20    the purpose of calculating the applicable offense level.

21          The government's objection, therefore, is overruled.

22    Nevertheless, it is clear to this judicial officer that

23    Mr. Wilson intended to bribe individuals whom he believed to be

24    corrupt insiders at Stanford and Harvard with a huge sum of

25    money to secure his daughters' admissions to those schools.

1          Objection No. 7 of the government is derivative of its

2    earlier objections 4 and 6 and concern the Probation Officer's

3    calculation of the total offense level.  For the same reasons

4    that the earlier objections were overruled, government's

5    objection No. 7 is overruled.

6          Finally, the eighth and final objection of the

7    government is to the Probation Officer's recommendation that

8    the Court consider a downward departure on the basis of the

9    guidelines section for federal programs bribery, that is 2C1.1,

03:43 10   may not properly address the defendant's culpability because

11   the status of the University of Southern California as a

12   recipient of federal funds did not bear on his motivations for

13   engaging in the conduct for which he has been convicted under

14   Count 2 of the Superseding Indictment.

15         The Court has previously overruled a similar objection

16   by the government with respect to the defendant Abdelaziz.  The

17   Court will consider a downward departure or variance from the

18   guideline range as is recommended by both parties on the basis

19   of the defendant's culpability, which the Court considers to

03:44 20   include whether his conduct was of the sort anticipated by the

21   Sentencing Commission in promulgating Section 2C1.1 and,

22   therefore, the government's objection is overruled.

23         I'll hear from the government with respect to my

24   rulings on the government's objections if they wish to be

25   heard.  Mr. Stearns.

```
 1              MR. STEARNS:  No, your Honor.  Thank you.

 2              THE COURT:  Do the defendants wish to be heard in that

 3       regard?

 4              MR. KENDALL:  No, your Honor.

 5              THE COURT:  Then we'll turn to the defendant's

 6       objections.  I note that, pursuant to footnote No. 1 on page 3

 7       of the defendant's Sentencing Memorandum, the defendant

 8       concedes that most, that is 48 of his 68 objections to the

 9       Presentence Report, are informational and, in my opinion,

03:45 10 and/or support his arguments and, therefore, they are overruled

11       as not pertinent to the guideline calculations.

12              I will address the other objections which the

13       defendant contends are noninformational as follows:

14              First, objection No. 27, which pertains to the

15       defendant's tax liability, it also raises previous rejected

16       factual and legal arguments and it is overruled.

17              Objections 36 and 37 concern the construction of the

18       obstruction of justice issue which the Court will not address

19       for reasons discussed when addressing the government's

03:45 20 objection just now.

21              Objection No. 39, which pertains to the alleged impact

22       on the University of Southern California, is mostly

23       informational and, to the extent it is not, it is overruled.

24              Objection No. 40 adopts the argument made in objection

25       No. 27 and it is overruled for the same reasons.
```

**A4018**

1          Objection No. 42 disputes the Probation Officer's

2     calculation of an adjusted offense level of 22 based upon the

3     application of the bribery guideline, that is 2C1.1, to

4     determine the base offense level as well as the Probation

5     Officer's application of an 8 level enhancement.  The Court

6     agrees with the Probation Officer's and the defendant's

7     objection No. 42 is overruled.

8          Objection No. 43, disputes the Probation Officer's

9     finding that Count 13 of the Superseding Indictment cannot be

03:46 10     grouped with the other counts for the purpose of calculating

11     the guideline range.  The Court agrees that the count cannot be

12     grouped and, therefore, objection No. 43 is overruled.

13          Objection No. 44 concerns the application of

14     Sentencing Guidelines Section 2C1.1 to determine the base

15     offense level, which defendant contends is incorrect.  The

16     Court agrees again with the Probation Officer's determination

17     that 2C1.1 applies and defendant's objection 44 is overruled.

18          Objection No. 45 disputes the Probation Officer's

19     application of an eight-level enhancement under 2C1.1(b)(2)

03:47 20     because the value of the payment exceeded $95,000.  Defendant

21     asserts that because no public official was involved and

22     because the Presentence Report misstates the, quote, value of

23     the payment, unquote, he made, no enhancement applies.  For the

24     reasons stated with respect to the government's objection

25     No. 6, the Court agrees with the Probation Officer's

1    calculation of the enhancement and the defendant's objection

2    No. 45 is overruled.

3          Objection No. 46 concerns the recommendation that the

4    tax loss in this case was $88,546.  Defendant contends that

5    some portions of the $220,000 could have been claimed as a

6    charitable deduction.  The Court agrees with the Probation

7    Officer's conclusion that because the entire payment was

8    fraudulent, it could not have been taken as a deduction and,

9    therefore, defendant's objection 46 is overruled.

03:48 10          Objection No. 47 concerns the Probation Officer's

11    calculation of the multiple count adjustment per Section 3D1.4.

12    It is derivative of objection No. 43, which the Court overruled

13    and, therefore, objection No. 47 is overruled.

14          Objection No. 48 is also derivative of the earlier

15    objections and, therefore, is overruled.

16          Objection No. 63 has to do with the defendant's net

17    worth and the value of his assets, which the Probation Officer

18    has amended to state that his net worth is at 3.5 million plus.

19    The Court, therefore, acknowledges that at least part of that

03:49 20    objection was sustained and part of it is overruled.

21          Finally, with respect to objections 66, 67, and 68,

22    they are derivative of the defendant's objections to the

23    calculation of the offense level which has been overruled and,

24    therefore, they are also overruled.

25          I will hear from the defendant if they have any

1    comments with respect to the Court's ruling on his objections

2    to the Presentence Report.

3        MR. KENDALL:  None, your Honor.  We just wanted to

4    preserve our rights to everything.

5        THE COURT:  Your rights are preserved, Mr. Kendall.

6        Does the government have any response in that regard?

7        MR. STEARNS:  No, your Honor.

8        THE COURT:  We turn to the Presentence Report and the

9    recommendations made in that report by the Probation Officer

03:50 10   with respect to the calculation of the guidelines, albeit that

11   they are in large part not controlled in this case.  I am

12   advised that the 2021 Guideline Manual applies.  That's the

13   most recent manual.  Within that manual, because we need to

14   consult with three separate guidelines by virtue of the

15   superseding indictment for fraud, bribery and false tax

16   returns, we go to the conspiracy guideline, 2X1.1.  That refers

17   us to the base offense level of the substantive offense.  We

18   are going to have to group these counts so that under the fraud

19   and bribery counts, that's 2B1.1, applies to the fraud counts

03:51 20   and 2C1.1 to the bribery counts.  It is recommended that I

21   group those two but not the two with the false tax return

22   counts, which is controlled by guidelines 2T1.1.

23        Considering all three of those guidelines, and because

24   the offense level for the most serious of the counts comprising

25   the groups of the fraud counts and the bribery counts is the

bribery count itself, we go to that to determine the first base

offense level for those groups.  Again, 2X1.1, the conspiracy

guideline, refers us to the substantive count, which in this

case is 2C1.1.

The offense involved convictions for more than one

bribe and, therefore, under Count 11 of the superseding

indictment, that was a $500,000 wire transfer in October of

2018.

Count 12 of the superseding indictment was for a wire

transfer to the KWF Foundation account in December of 2018.

The defendant paid Singer $220,000 in March of 2014.

That comprised of $100,000 to KWF and $100,000 to the Key and

$20,000 to Singer personally.  Accordingly, a two level

enhancement is applied to the base offense level of 12 and,

furthermore, because the monetary value of the benefit to be

received by the defendant cannot be determined, the value of

the payment that went to the Southern Cal men's water polo

account controlled by Coach Vavic as a bribe of $100,000 is the

determinative figure.

Therefore, under Section 2C1.1(b)(2), since the value

of the payment made by the defendant exceeded $95,000 but did

not exceed $150,000, the offense level is increased by 8 levels

under guidelines Section 2B1.1(b)(1)(F).  That all means that

the adjusted offense level of the first group is 22.

Do counsel have any comments with respect to those

1  findings?  Mr. Stearns?

2         MR. STEARNS:  No, your Honor, just subject to our

3  prior objections.

4         THE COURT:  Mr. Kendall?

5         MR. KENDALL:  Same, your Honor.

6         THE COURT:  All right then.

7         As to the second group, which was for the filing of

8  the false tax return, we turn to Section 2T1.1.  The base

9  offense level is corresponding to the tax loss from the tax

03:54 10  table under Section 2T4.1.  Because the tax loss is 88,000 plus

11  dollars, that falls between $40,000 and $100,000.  The base

12  offense level is 14 pursuant to guideline Section 2T4.1(E).

13         Do counsel agree with that calculation?

14         MR. STEARNS:  Yes, your Honor.

15         MR. KENDALL:  Same, your Honor.

16         THE COURT:  The Court so finds.  Therefore the

17  adjusted offense level on the tax count is 14.

18         Then turning to the multiple count adjustment under

19  guideline Section 3D1.4, count group one calls for one unit and

03:55 20  the count group two calls for a .5 unit.  That's a total of 1.5

21  units.  Pursuant to 2D1.4, that means I should add one offense

22  level to the number assigned to the amount of the highest

23  offense level.  That was 22.  That means that the combined

24  adjusted offense level is 23 and the total offense level is 23.

25         Do counsel agree with those calculations? Mr. Stearns?

```
 1              MR. STEARNS:  Yes.

 2              MR. KENDALL:  Yes, your Honor, subject to our

 3      objections.

 4              THE COURT:  Yes.

 5              Turning to the defendant's criminal history, he has no

 6      prior convictions and falls in Criminal History Category I.

 7      That means that with a total offense level 23 and a Criminal

 8      History Category I, the guideline range applicable in this case

 9      is 46 to 57 months.

03:56 10              Do counsel agree with those calculations?

11      Mr. Stearns?

12              MR. STEARNS:  Yes, your Honor.

13              THE COURT:  Mr. Kendall?

14              MR. KENDALL:  Yes, your Honor.

15              THE COURT:  The Court so finds.  And, of course, I

16      have carefully considered the recommendations made in both of

17      the Sentencing Memorandums, but I will hear recommendations for

18      sentencing, starting with the government, Mr. Stearns.

19              MR. STEARNS:  Thank you, your Honor.  A week before

03:56 20      the FBI approached Rick Singer in this case, he and the

21      defendant John Wilson were captured on a court authorized

22      wiretap.  When they thought no one else was listening, they ban

23      to discuss the side-door scheme for the defendant's daughters.

24              The defendant asked Singer, "What sports would be best

25      for them or is that not even going to matter?"
```

1          Singer responded, "It doesn't matter.  I'll make them

2     a sailor or something because of where you live."

3          In response to that, the defendant laughed and asked

4     if he could have a two-for-one special because he had twins.

5          And the response to that, Singer laughed along with

6     him.

7          Later, the defendant was captured on a consensually

8     recorded phone call and by then the sailing plan had developed

9     to focus on a specific school, Stanford.  Singer told the

03:57 10   defendant that he could get one of his daughters admitted to

11    Stanford as a fake sailor in exchange for half a million dollar

12    bribe, but the defendant would need to bribe someone else at

13    another top school to get his second daughter admitted because,

14    as Singer told John Wilson, the Stanford coach actually had to

15    recruit some real sailors so that Stanford doesn't catch on to

16    what he's doing.  And the defendant again laughed, and he

17    confirmed his understanding. "He's got to actually have some

18    real sailors, right."

19         John Wilson did not just commit fraud and bribery like

03:57 20   the other parents in this case.  He did it brazenly, and he

21    laughed while doing it.  He didn't just lie on his taxes

22    either.  With respect to the side-door payments for his son at

23    USC years earlier, in an email to Singer, he described the tax

24    fraud as awesome, awesome that he could deduct some of the

25    bribe payments as fake consulting services and awesome that he

could deduct the rest as fake charitable donation.  Those are
just some of the things that John Wilson did and said and
thought in private, things that he didn't expect a jury, the
government, or this Court to hear at sentencing.

And now, having been convicted of eight crimes from a
jury of his peers, he resorts to minimization, finger pointing,
and excuses throughout his informational objections in the PSR
and his Sentencing Memorandum.

For example, in his objections to the PSR, he claims
that the language I just quoted to the Court, the coach
actually has to have some real sailors so that Stanford doesn't
catch on, he says that that language was soft and ambiguous.
In other words, this Harvard educated executive who described
himself on tape to Rick Singer as one of McKinsey's foremost
thought leaders on pricing strategy, he just didn't get it,
just like he claims he didn't get or he didn't read the fake
water polo profile for his son that Singer sent him and was
sitting in his inbox during a night when he was actively
sending emails.  And just like he tried to suggest at trial,
and continues to suggest, that it was his secretary's innocent
oversight that he deducted part of the bribe payments as a
business expense, even though on the face of the emails that
made it crystal clear it was his own idea.

To this day, this defendant continues to declare that
he is not only innocent but that he and his family were

1    exploited by Rick Singer, that they are victims of the very

2    co-conspirator that he was caught on tape laughing with about

3    lies that he told and agreed to tell schools.

4         At sentencing, he submitted a letter from his wife

5    asserting that there were misleading statements during the

6    trial in this courtroom during the trial.  He submitted a

7    letter from his son who refers to the facts underlying the

8    jury's verdict as allegations, and then calls those allegations

9    preposterous.  Preposterous.  But they're not allegations any

04:00 10    more and they're certainly not preposterous.

11         Here's what is preposterous though: Asserting that the

12    defendant is one of the least culpable parents in this case.

13    That's a quote from his Sentencing Memo.  We don't have time to

14    compare the defendant's actions to all the other parents who

15    have been convicted today, your Honor, but I would like to

16    discuss Gamal Abdelaziz, the defendant who was just sentenced

17    last week.

18         The defendant suggests that he is far less culpable

19    than Gamal Abdelaziz.  Mr. Abdelaziz did the side door for one

04:00 20    of his three children.  The defendant did it for all three of

21    his children.  Mr. Abdelaziz paid a $300,000 dollar bribe.

22    This defendant paid four times that amount, 1.2 million dollars

23    in three separate bribes.  Mr. Abdelaziz was convicted on two

24    counts of conspiracy.  John Wilson was convicted on both of

25    those counts, plus five more substantive counts of fraud and

```
 1   bribery.

 2        Then the defendant tried to distinguish himself from

 3   Mr. Abdelaziz.  He says on page three, quote, Abdelaziz agreed

 4   that Singer should lie to the IRS about the payments, and then

 5   it says that Wilson purportedly didn't do that.

 6        The defendant didn't need Rick Singer to agree to lie

 7   to the IRS.  The defendant did that all by himself.  He was

 8   convicted of tax fraud, of lying on the same tax return in not

 9   one, but two ways.  And one of those ways, the fee consulting

04:01 10  services that were purportedly performed by Singer for his

11   company, Hyannis Port Capital, that was the defendant's own

12   idea.

13        At page 12 of his Sentencing Memo, he suggests that

14   himself, Diane Blake, and one other parent are the only three

15   parents in this scheme who are not actively involved, but as

16   the evidence at trial established, your Honor, there were

17   dozens, dozens of emails and nearly a dozen recorded phone

18   calls in which this defendant was captured in realtime

19   discussing both of the bribes and the lies in painstaking

04:02 20  detail.  The defendant was intimately involved in the scheme,

21   and the evidence shows that he insisted on knowing the details.

22        Stripped of the minimizations, the excuses, and the

23   finger-pointing, the defendant's conduct makes him one of the

24   most culpable defendants in this case.  And when the Court

25   considers his strident refusal to accept responsibility for
```

1    anything, he deserves the longest sentence of all the parents

2    in this case.

3    I'd like to briefly address two other themes in the

4    defendant's sentencing submission, your Honor.  First, his

5    charitable work.  To be sure, like many of the defendants in

6    this case, the defendant has given generously to charity, but

7    the government respectfully submits that his charitable giving

8    was not so unusual in comparison to other defendants,

9    particularly given his enormous wealth to warrant a further

04:03 10    reduction in his sentence.

11    Second, the defendant cites his difficult upbringing.

12    The defendant's rise to academic and business success, your

13    Honor, is noteworthy, but it doesn't explain or justify or

14    excuse his conduct.  John Wilson was a man in his mid 50s,

15    decades removed from his childhood, when he decided to

16    participate in the scheme involving lies and payoffs to get his

17    three children into college, and those three children, unlike

18    him, they didn't have the opportunity to go to private school.

19    I mean they did have the opportunity to go to private school.

04:03 20    They had private tutoring.  They had every other opportunity

21    that money could buy.

22    The defendant did not commit his crime out of want or

23    need and he was not driven to a life of crime in his teenage

24    years or his early 20s because of his childhood.  Far from

25    that.  By the time the defendant decided to participate in this

1  conspiracy, he had already achieved the American dream and he

2  threw it all away, and his childhood had nothing to do with

3  that.

4         The bottom line is this:  The defendant may have had a

5  humble beginning, but he is not humble and he has not yet been

6  humbled.  He stands before this Court regretful that he was

7  caught, regretful that he was convicted, but he's not actually

8  regretful for his conduct, and he accepts not an ounce of

9  responsibility for his actions.  The 21 month sentence that the

04:04 10  government is recommending in this case, your Honor, reflects

11  all these things.  We acknowledge it's not an insufficient

12  sentence but it's a fair one.  It's significantly below his

13  applicable guidelines range, however the Court calculates it,

14  and it's firmly within just the guideline range for his tax

15  fraud count alone, setting aside the multiple fraud and bribery

16  convictions.

17         By contrast, the defendant's request for a six month

18  term, that's half of what the Court sentenced to Gamal

19  Abdelaziz to last week, a less culpable defendant.

04:05 20         And that brings me back to the word "preposterous",

21  because then the defendant suggests that he cannot afford and

22  does not deserve to pay a fine of more than $25,000.  The Court

23  will recall this is the same defendant who was caught on tape

24  bragging about and inviting Rick Singer to a birthday party he

25  was going to throw himself at Versailles.  Now he seeks credit

1    for the fact that the one million dollars in bribe payments for

2    his daughters to get into college was seized by the government

3    as proceeds of a crime.  It is, to say the least, tone deaf.

4        The defendant would have the Court believe that he

5    does not have the ability to pay a meaningful financial

6    penalty, unlike every other defendant in this case, because he

7    has to cover mortgages on not one mansion but two, and this is

8    in a case where privilege and entitlement were the driving

9    forces of the conspiracy.

04:06 10        For all those reasons, your Honor, the government

11    respectfully recommends that the Court sentence John Wilson to

12    21 months in prison, to run concurrently on all counts of

13    conviction, two years of supervised release, 500 hours of

14    community service, a $250,000 fine, and restitution as set

15    forth in the PSR.

16        Thank you.

17        THE COURT:  Thank you, Mr. Stearns.

18        Mr. Kendall.

19        MR. KENDALL:  Yes.  Thank you, your Honor.

04:06 20        When determining John Wilson's sentence, I suggest to

21    you the single most important thing for you to consider is his

22    character.  The government wants you to think of his character

23    through one series of events, the events that led to his

24    conviction in this courtroom and his involvement in the side

25    door.  They say that's it, that's all you need to look at.  I

1    suggest to you the way you judge a person's character is to

2    look at what they did their whole life and see what values they

3    have practiced and lived by, values that they have helped

4    others with.

5         You've used a very apt and effective phrase from

6    Yiddish, chutzpa, to describe the behavior here that you've

7    seen here and been offended by.  I'd like to take another

8    concept from Jewish learning.  It's called The Golden Ladder of

9    Charity.  It was something written 900 years ago by the

04:07 10   foremost scholar in the history of the Jewish people, Rabbi

11   Maimonides.  He gave a list of criteria to use to evaluate the

12   charitable works of a person.  He said, these are the ways you

13   can sort of rank and evaluate them.

14        Among the things he talked about was did the person

15   give to people that they didn't know.  Did the person give to

16   the people who had no idea who they were?  Did they give when

17   they will not get any recognition or benefit?  And did they

18   give even though no one asked them to give?  I'd like to review

19   a little bit of the charitable accomplishments and

04:08 20   contributions Mr. Wilson made.

21        And one thing I agree with Mr. Stearns.  For a rich

22   person to write a check and to give some money, that's very

23   nice, but that's not a measure of character.  That's a measure

24   of fitting in with social conventions and sort of expectations.

25   I suggest to you if we look at the contributions Mr. Wilson has

made, it's far more than somebody just opening up a checkbook.
It's somebody giving their time, their skill, and their effort,
and I suggest to you giving time is a very precious thing.
Rich or poor, we never have enough time in our lives.

        The first thing, of course, is Mr. Wilson's
contribution for the autism charities.  What you see from the
letters that were sent by those people is he got involved
because he saw such a pressing need for people afflicted with
autism and for their families.  There's over five million
autistic adults in the United States, plus numerous children.
Nobody in his family was afflicted by it but he thought it was
a charity and an area where he could help.

        And what do we see in the letters?  He came in as a
CEO and the first thing he said was you need to do a merger.
You've got two small little charities that compete with each
other and don't have a lot of impact.  Let's put them together.
And Dr. Robinson, Ricky Robinson from USC, describes how John
came up with the merger idea and spent a year negotiating that
merger to put it together.  He spent a year convincing doctors
and scientists and emotionally effected parents that they had
to merge these organizations.  And like a good CEO, he also
told them, you have to change your strategy.  You're talking
about public education, awareness.  We need to lobby the
federal government and other sources to get research money to
find a scientific cure.

```
 1          And what do we have in here?  We look at
 2   Dr. Robinson's letter.  His leadership in this effort was the
 3   key that actually brought this collaboration to the finish
 4   line.  I am convinced his efforts made a huge difference, not
 5   just in the life of our organizations but for the lives of so
 6   many living with development disabilities.
 7          Then you have Jon Shestack, one of the leaders of the
 8   autism groups whose family was personally effected.  He
 9   describes it.  "John took on his volunteer position as if it
10   were his job.  He met families and scientists and completely
11   mastered the field.  He helped us grow from over 5 million a
12   year in revenue to over 20 million a year.  There are thousands
13   of excellent scientists working in the field when there were
14   once less than a dozen.  And the federal government now spends
15   over 200 billion a year on autism research when they once spent
16   under 5 million.  None of this would have been possible without
17   John Wilson's help and guidance.  It's really hard to
18   communicate what a super human force for good John was in our
19   lives.  He had the energy and talent of five men and gave it
20   freely".
21          That's not writing a check to attend some fancy dinner
22   and be with your rich friends.  That was a 15 year commitment,
23   providing leadership and vision that turned them around from a
24   small group that raised funds to educate people to be more
25   sensitive to be a major force in developing scientific research
```

1    to cure a terrible affliction.

2          The second major philanthropic thing he's done

3    addresses an issue that this Court has highlighted,

4    appropriately so, throughout his discussion of the side-door

5    activities.  The Court has raised specifically the problem of

6    economic inequality, the impact that the side door would have

7    on people who did not have financial resources to compete that

8    had to compete upon their grades and hard work only.

9          Ten years before John Wilson ever met Singer you heard

04:12  10    from the testimony of his tax preparer.  He created a trust and

11    bequest in his will to give five million dollars to his college

12    and to Harvard, his other alma mater for college scholarships

13    to endow for students whose parents didn't go to college, for

14    students in engineering math with good grades.  This is exactly

15    the same type of people the Court has been concerned about

16    being left behind by the side door.

17          So while it doesn't excuse his conviction, and his

18    conviction should not be erased, the values you're concerned

19    about he put his money where his mouth is and he made

04:13  20    commitments for a large amount of money to take care of that

21    issue of social inequity.  John didn't know the people who

22    would get these scholarships.  They'll never know him.  He

23    didn't get any benefit from himself or his children from the

24    schools that he attended to make a bequest for.  He made it the

25    largest charitable contribution of his life because he shared

1    the values you're concerned about, the issue of economic

2    inequality in children getting into college.

3         There's an old saying that good character is what you

4    do when nobody else is watching, so I want to turn to some of

5    the letters from his friends that told you that, in addition to

6    the large acts, being on boards taking major roles, what does

7    he do in his every day life.

8         You have a letter from a Richard O'Keefe, a retired

9    physician, who described how John, in fact, is not the arrogant

04:14 10    person they describe but an incredibly humble person.  As

11    Dr. O'Keefe wrote to you, "He has worked very hard throughout

12    his life and has become quite successful.  In my experience,

13    many people who share the same type of story tend to possess a

14    great deal of braggadocio, but John is very humble and a very

15    genuine person".

16         You also have him describing how when he was diagnosed

17    with cancer, he had to go out of state for treatment, and

18    because of some craziness in our insurance laws, it wasn't

19    covered.  John gave him the money to get his out-of-state

04:14 20    cancer treatment.  And what he says is he never raised it with

21    John.  He never asked.  John somehow heard of the need and John

22    gave him the money to get his treatment.  And what does he say?

23    "I am convinced that he is one of the reasons that I am still

24    here today".

25         Finally, on a personal level, there's a letter from

1    Jacqueline Bastien.  You may remember when you read this letter
2    she had a mother who was living on Cape Cod who had had
3    dementia that was eventually overtaking her.  When the woman
4    tried to live independently, John was the person to come down
5    and fix the house, fix the fence, deal with the landscaping.
6    If it was too hot, he'd buy a couple of air conditioners and
7    install them for her during a heat wave.  Never asked to do
8    this.  Never solicited.  He did it just because he wanted to
9    help someone who needed him.  And, in fact, when the family
04:15 10    wanted to move her into a dementia care unit, they didn't have
11    the money and he lent them $30,000 so they could get proper
12    care for her.

13          Finally, your Honor, you have the letter from his
14    childhood friend, Fred Lukens, who describes the difficulties
15    John grew up with, the sheer poverty, growing up in a housing
16    project with violence, with alcohol and mental health issues.
17    And from the earliest of age John was the one who shielded his
18    siblings.  John was the one that became valedictorian at his
19    high school, overcoming some disabilities by always having good
04:16 20    ethics and good values.

21          Finally, what was he like as a corporate leader?  We
22    live in an age when CEOs love to be greedy and everybody
23    celebrates the more money they can grab for themselves, the
24    bigger the yachts they can buy.  What did the employees of
25    Staples tell you in their letters?  When John came into

1   Staples, the first thing he did was take a ten percent cut.

2   The company was doing poorly and he was going to share the

3   pain.  After that, he spent thousands of dollars every year

4   giving rewards and bonuses in support out of his pocket, it was

5   after tax money, this was not tax deductible stuff, to

6   encourage his team and the middle management folks to stick

7   with the company and work as a team.

8          And what did they tell you?  He treated everybody the

9   same, the union people, the midlevel workers, the low level

04:17 10   workers.  He has a tremendous sense of humility and he's not

11   someone who's caught up in hierarchy.  This is somebody who

12   started off working his first job in life working in tobacco

13   fields alongside migrant farm workers.  He is not a person of

14   arrogance and contemptuousness.  Maybe he spends his money, but

15   he spends it generously, sharing with many.

16          So, your Honor, I now want to turn to the sentencing

17   issue.  In terms of the issue of general deterrence, the

18   sentences in this case are known nationwide.  They're known

19   internationally.  The college admissions prosecutions in this

04:17 20   courthouse have shown the world that people of wealth, of

21   celebrity, of influence, are all subject to the same rules and

22   the same punishment as the rest of the world.  Giving him the

23   sentence in line with the other defendants reinforces general

24   deterrence.  It doesn't undercut it.

25          As for specific deterrence, John has been a

```
 1    businessman for over 40 years.  He has an unblemished record,
 2    not a single regulatory ethical problem in his entire career
 3    outside of the side door.  The government brought a tax charge.
 4    He's been convicted on it, but you also know they went through
 5    probably a dozen or more of his tax returns.  They combed his
 6    tax returns over several years, and this is the only issue they
 7    found.  You remember from the trial, here is a guy who spends
 8    38 to 42 percent of his income either in paying taxes or making
 9    charitable donations unrelated to Rick Singer.  This is not
10    somebody who is nickel and diming the government or cheating
11    the government as a general practice, putting aside Count 13.
12    This is somebody that has paid his fair share in taxes and,
13    when they reviewed his taxes, they found nothing else to raise.
14         So, your Honor, their recommendation says he should
15    get almost two times higher than the next sentence, four times
16    more -- more than four times the average sentence that you have
17    given in this case.  You've sentenced, I believe, 15 people in
18    this case.  Other judges in this courthouse have sentenced
19    others as well.  We suggest to you, treating John somewhere in
20    the middle of the group of the defendants is appropriate, above
21    the average of four, four and a half months for the sentences
22    you give, and we recommend six.  Our point is simply, Judge, he
23    is not the outlier that the government wants to make him out to
24    be.  You and other judges in this courthouse have noted several
25    characteristics that warrant a longer sentence in this case.
```

1    I'd like to review some of those now and how they apply to

2    John.

3            Agent Keating of the IRS testified at trial.  I'm sure

4    you remember that, your Honor.  She testified that Singer spoke

5    to John Wilson differently than to the other parents.  He had

6    never used the word "bribe" to him.  He had always told him all

7    the money was going to a school program.  We're not disputing

8    the Court's ruling and the Court's instruction that that can be

9    a corrupt bribe, but I suggest to the Court there is a

04:20 10    difference in the corrupt bribe that goes to the school program

11    and gives some benefit to the corrupt insider than putting cash

12    directly in the pocket of the insider, which many of the

13    parents did and got a far lesser recommendation than what the

14    government does.  I'm not challenging whether that can be a

15    violation, but it's a difference in the degree of the violation

16    is what I'm suggesting to you, your Honor.

17            He never took fake pictures of his children.  He did

18    not lie to his children's high school teachers and counselors,

19    as many of the parents did.  In fact, Coach Bowen was told he

04:21 20    was applying and Coach Bowen supported Johnny's application to

21    USC.  Singer called other parents and described this fictitious

22    IRS audit and got them to agree to participate in deceiving the

23    IRS in the audit.  Singer never even tried that with John

24    because he knew John would never agree to it.

25            Singer never called John to get him to lie to USC

**A4040**

         1    about his child having an ankle injury or lie to the schools

         2    for any other purpose.  In fact, John, unlike many of the

         3    parents, including Mr. Abdelaziz, never had one of his children

         4    write a phony college essay that claimed they were playing a

         5    sport that they didn't play.

         6          There's a lot of behaviors in this case that the Court

         7    is rightfully indignant over and rightfully critic of.  I

         8    suggest one of the behaviors that's the most egregious, if not

         9    the most egregious, is when people made their children active

04:22  10    participants in the behavior, getting them to knowingly pose

        11    for phony pictures they knew were going to be used improperly,

        12    getting for them or ghost writing for them essays that were

        13    false and misleading and having the children read it and help

        14    put it together.

        15          To dirty your own children's hands with actual

        16    fraudulent conduct I suggest, your Honor, is the worst behavior

        17    that you'll find in this case.  Many of the defendants who got

        18    lower sentences than the government recommendation did that.

        19    John Wilson's children knew nothing about the side door.  He

04:22  20    never had them involved and participating in it, and that is

        21    uncontested in this case, your Honor.  That alone, I suggest,

        22    makes him not an outlier and the worst defender but somewhere

        23    in the mix of the defendants.

        24          And if you look at what he taught his children, they

        25    scored incredibly high on the ACTs, all three of them.  He

1    hired tutors from Rick Singer who would grill these kids and

2    make them work for months on end to prepare for those tests and

3    get honest scores.  His son was an honest athlete, who actually

4    was on the USC team for a season even if he was out for a lot

5    for concussion.  His daughters had wonderful activities,

6    champions in debate and math team.

7         These are the practices and the way he taught his

8    children to be.  He never involved them in any of the behavior

9    of the side door, which so many of the other defendants who

04:23 10    have been sentenced actively did.

11         The sad irony of John's conviction is his kids didn't

12    need a side door.  They were qualified, capable kids that could

13    have got into highly competitive schools without the side door.

14    That is his problem, that he made judgment, but I'm just

15    pointing out, your Honor, he taught his children values that

16    you would admire and respect, unlike many of these defendants

17    who taught their children to cut corners.

18         The government's sentence is excessive, your Honor.

19    We ask that he be sentenced more in line with the other

04:24 20    defendants.  The sentence recommendation they make will cause

21    not just John but his wife and children to suffer far more than

22    is necessary.

23         I want to address briefly the issue of the

24    obstruction.  I'm grateful you found the government did not

25    carry its burden of proof and it wasn't relevant to the

guideline calculation.  I do not want any aspect of that to
influence the Court.  We have put together four affidavits.
They control Rick Singer and they won't say what Rick Singer's
view on it was.  They would not disclose anything what the
other witness to that phone call would say.  I suggest you can
draw an adverse inference against the government if they're
hiding Rick Singer's statements on that when four people have
put in affidavits and two of them are willing to testify in
court.

04:24    You can say many things about John Wilson, your Honor,
but I don't think anybody could say that he would ever put up
his wife or children to commit perjury in this court for his
own benefit.  His problem is he does too much for his children,
not that he exploits them for his own legal issues.

So I ask that the obstruction allegation have no
impact on your assessment of what type of downward departure is
appropriate.

Finally, with respect to the fine, your Honor, there's
a few things.  We say he doesn't have a lump sum because his
04:25    assets aren't liquid.  If you are to impose a substantial fine,
we'd ask that you give him six months.  He has all sorts of
debts and assets that are just not cash that can be readily
used.  Many things are tied up in his business.  So a six month
period to pay a substantial fine, I'd suggest, is not arrogant
or lacking of humbleness.  It's just an economic reality.

```
 1              Your Honor, in terms of what is the appropriate fine,
 2    the government is getting a million dollar forfeiture from him.
 3    I believe that's four times the amount anybody else has paid in
 4    a fine.  I'd ask that you factor that into your analysis as
 5    well.
 6              I thank you for your patience as always, your Honor.
 7    We await your judgment.
 8              THE COURT:  Thank you, Mr. Kendall.
 9              Does the defendant wish to address the Court before
10    sentence is imposed?
11              THE DEFENDANT:  Yes, your Honor.  Can I take this off?
12              THE COURT:  Yes, you may.
13              THE DEFENDANT:  Thank you, your Honor, for the
14    opportunity to speak today.  The last several years have been
15    extremely difficult for me and my family, and yet I know that
16    in many ways I'm a very fortunate person.
17              The U.S. educational system is one of the best in the
18    world, and it's changed my life profoundly for the better.
19    That is why I especially regret and apologize for any negative
20    impact that my actions have had on the level of trust and
21    confidence that people have in the college admissions process
22    and higher education in general.
23              I have a wonderful wife, three honest and hardworking
24    kids, and my children have earned tremendous success in school
25    with their own hard work and in many other areas as well.  And
```

1    I am incredibly proud of them.  And I'm terribly sorry that

2    because of the some of the choices I have made that my children

3    have been publically and unfairly harmed.

4         Your Honor, I know that you've been very diligent in

5    trying to root out any unfairness in the college admissions

6    process and I respect that and apologize to you as well.

7         I have always believed that the greatest

8    responsibility of someone who's achieved success in their life

9    is to share it with others, and I have a lifelong history of

04:27 10   doing what I can to help others, at many levels.  As you decide

11   what is an appropriate sentence for me, I ask that you look at

12   my entire life and my entire life history and what I've done

13   for others in the past, and I would like still to do for others

14   in the future.

15        Thank you again for your time.

16        THE COURT:  Thank you, Mr. Wilson.

17        Do counsel know of any reason why sentence ought not

18   to be imposed at this time?  Mr. Stearns?

19        MR. STEARNS:  No, your Honor.

04:28 20        MR. KENDALL:  No, your Honor.

21        THE COURT:  Please stand, Mr. Wilson.

22        Before I impose sentence, I will explain my reasons

23   for doing so.

24        You stand before me the 15th parent whom I have had to

25   sentence in this college admissions scandal, once again leaving

        me dumbfounded and appalled.  You are an intelligent and

        successful businessman whose achievements are all the more

        remarkable considering your difficult childhood.  You have used

        your wealth and privilege to help others, as reflected in the

        numerous letters submitted on your behalf, but you stand before

        me today a convicted felon because you also used your wealth

        and privilege to bribe your son's way into Southern California

        and attempted to pay for your daughters to get special

        treatment and allow them to get into Harvard and Stanford.

04:29           Mr. Wilson, as I have said to many of your

        co-defendants before, you, of all people, should understand the

        value of education and how important it is that the college

        admissions be fair and accessible.  Where would you be, for

        instance, if your admission to RPI had depended on how much

        money your family could pay to secure it?  It astounds me that

        someone who worked so hard for his education would enter into a

        conspiracy to cheat his son's way into a prestigious university

        by paying $200,000 to someone to fabricate an athletic profile

        and secure his admission as a water polo recruit based upon

04:30   false qualifications.  Nevertheless, you did just that.

        Undeterred, you attempted to do the same thing for your

        daughters.  Only this time you agreed to pay $500,000 each to

        get them into prestigious universities.  In doing so, in

        essence, you stole admission spots at good colleges from other

        deserving students who did not have all of your advantages.

1           Part of my responsibility as a judge when imposing

2    sentence in criminal cases is to deter, first to deter you from

3    ever doing anything like this again despite the fact that you

4    have not accepted responsibility for the crime of which you

5    have been convicted by a jury, nor shown the least remorse in

6    that crime and, second, to deter generally any parent of a

7    college applicant who is rich enough and unprincipled enough to

8    try to bribe their kids' ways into college from doing so.  That

9    is why I'm going to send you to prison, and I hope you and

04:31  10    others get the message and that you spend the rest of your life

11    and your considerable good fortune making up for your egregious

12    conduct.

13           Pursuant to the Sentencing Reform Act of 1984 and

14    having considered the sentencing factors enumerated in Title 18

15    of United States Code, Section 3553(a), it is the Judgment of

16    this Court that you, John Wilson, are hereby committed to the

17    custody of the Bureau of Prisons to be imprisoned for a term of

18    15 months.  This term consists of terms of 15 months on all

19    superseding counts, to be served concurrently.

04:32  20           Upon release from imprisonment, you shall be placed on

21    supervised release for a term of two years.  This term consists

22    of terms of two years on all counts of the Fourth Superseding

23    Indictment except Count 13, and a term of one year on Count 13

24    of the Superseding Indictment, such terms to run concurrently.

25           Within 72 hours of release from custody of the Bureau

1   of Prisons you shall report in person to the district to which

2   you are released.

3         It is further ordered that you shall pay to the United

4   States a fine of $200,000.  This consists of $100,000 on Count

5   1 of the superseding indictment and $100,000 on Count 2 of the

6   superseding indictment.

7         It is further ordered that you shall pay a lump sum of

8   $200,000, which is due and payable within 90 days of

9   sentencing.

04:33 10        Any fine imposed is to be continued to be paid until

11  the full amount, including any interest required by law, is

12  paid.  All fine payments shall be made to the Clerk of the

13  United States District Court.  You are to notify the United

14  States Attorney for this district within 30 days of any change

15  of mailing residence address that occurs while any portion of

16  the fine remains unpaid.

17        While under the Probation Office's supervision, you

18  shall comply with the following terms and conditions: First,

19  you shall not commit another federal, state, or local crime.

04:34 20  You shall not unlawfully possess a controlled substance.  Drug

21  testing conditions are suspended based upon the Court's

22  determination that you pose no risk of substance abuse.  You

23  must cooperate in the collection of a DNA sample as directed by

24  the Probation Officer and you are to comply with the standard

25  conditions that have been adopted by this Court and are

described in the Sentencing Guidelines at Section 5D1.3(c),

which will be set forth in detail in the Judgment and

Committal.

         The following special conditions apply during your

supervised release: First, you must pay restitution to the

Internal Revenue Service in the amount of $88,546 according to

a court-ordered repayment schedule.  You are to meet with the

Internal Revenue Service within the first six months of your

period of supervised release in order to determine your prior

tax liability and you are to file tax returns and pay any past

or future taxes due.

         You must complete 400 hours of community service at an

agency approved by the Probation Office.

         You must pay the balance of any fine or restitution

imposed according to a court-ordered repayment schedule.

         You are prohibited from incurring new credit charges

or opening additional lines of credit without the approval of

the Probation Office while any financial obligation remains

outstanding.  And you are to provide the Probation Office

access to any requested financial information which may be

shared with the Financial Litigation Unit of the United States

Attorney's office.

         It is further ordered that you shall pay to the United

States a Special Assessment of $800, which shall be due and

payable immediately.

```
 1              Mr. Wilson, you have a right to appeal this sentence.
 2    If you choose to appeal, you must do so within 14 days.  If you
 3    cannot afford an attorney, an attorney will be appointed on
 4    your behalf.
 5              Do you understand that?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  Pursuant to the joint motion which was
 8    filed by your counsel and counsel for your co-defendant
 9    Abdelaziz, which was allowed by this Court last week, your
10    surrender date is indefinitely postponed pending a decision of
11    this Court, but you nevertheless remain subject to the previous
12    conditions and under the same bond imposed pretrial,
13    specifically relative to reporting to your Probation Officer
14    and receiving permission to travel, et cetera.  Do you
15    understand that?
16              THE DEFENDANT:  Yes, your Honor.
17              THE COURT:  Is there any further business then to come
18    before the Court in these proceedings?  Mr. Stearns?
19              MR. STEARNS:  No, your Honor.
20              THE COURT:  Mr. Kendall?
21              MR. KENDALL:  One small matter.  We asked if the Court
22    would consider a judicial recommendation to the Bureau of
23    Prisons that he be assigned to FMC Devens.
24              THE COURT:  Yes.  If the Bureau of Prisons deems that
25    the appropriate security level for this defendant, the Court
```

**A4050**

1    recommends that he be incarcerated at the Devens facility.

2              MR. KENDALL:  Thank you, very much.

3              THE COURT:  We're adjourned.

4              THE CLERK:  All rise.

5              (The Honorable Court exited, 4:37 p.m.)

```
 1                  C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing is a

 9    correct transcript from the record of proceedings taken

10    February 16, 2022 in the above-entitled matter to the best of

11    my skill and ability.

12

13

14       /s/ Kristin M. Kelley              February 18, 2022

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,       )
                                )            Criminal Action
          Plaintiff,            )            No. 19-10222-DPW
                                )
v.                              )
                                )
JEFFREY BIZZACK,                )
                                )
          Defendant.            )
                                )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

October 30, 2019

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Eric S. Rosen
 3    Kristen A. Kearney
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3412
 6    eric.rosen@usdoj.gov

 7    On Behalf of the Defendant:
      Jeremy N. Goldman
 8    Law Offices of Jeremy N. Goldman
      19200 Von Karman Avenue
 9    Suite 300
      Irvine, CA 92612
10    949-387-6670
      jeremy@goldmandefense.com
11
      Katherine Corrigan
12    Corrigan Welbourn & Stokke, APLC
      4100 NewportPlace
13    Suite 550
      Newport Beach, CA 92660
14    949-251-0330
      kate@cwsdefense.com
15
      Seth P. Berman
16    Nutter, McClennen & Fish, LLP
      155 Seaport Boulevard
17    Boston, MA 02210
      617-439-2338
18    sberman@nutter.com

19

20

21

22

23

24

25
```

```
 1    question of Mr. Singer's -- Mr. Bizzack's, if I pronounce it

 2    correctly, involvement in the conspiracy with Mr. Singer.  Am I

 3    correct?  I mean, that's the core of what his involvement is,

 4    right?

 5              MS. KEARNEY:  Yes, Your Honor.

 6              THE COURT:  All right.  So now I want to get to this

 7    question of, you know, what's the harm?

 8              The government now has kind of settled, I guess --

 9    maybe it's not fair to say "now."  The government has this

10    theory that this is bribery, that is the proper way to

11    characterize what's going on.  It's a mail fraud for bribery.

12    Now, I understand it's charged as a conspiracy, but the core

13    charging event is mail fraud.

14              MS. KEARNEY:  Is honest services fraud, mail fraud.

15              THE COURT:  Honest services, the statute is simply a

16    definitional statute.  It's not the charging statute.  You can

17    not charge it alone.

18              MS. KEARNEY:  Correct.

19              THE COURT:  Okay.  So we're talking about mail fraud

20    as being the underlying crime, right?

21              MS. KEARNEY:  Yes.

22              THE COURT:  Okay.  So this is supposed to be bribery.

23              MS. KEARNEY:  Yes.

24              THE COURT:  Who is being bribed?

25              MS. KEARNEY:  Here it was Donna Heinel.
```

Case: 22-1138 Case: 19-1003 Document: 003113273495 Document: 545-3 Filed: 05/19/2022 Filed: 03/19/2024 Page: 25 Page: 25 of 124 Entry ID: 6491447

14

```
 1              THE COURT:  So how much did Ms. Heinel make from this
 2    bribery?  What was the bribe that was paid to her?
 3              MS. KEARNEY:  Personally she received approximately
 4    $160,000.
 5              THE COURT:  From this defendant in connection with
 6    this matter?
 7              MS. KEARNEY:  A portion of that was in connection with
 8    this defendant.
 9              THE COURT:  What portion?
10              MS. KEARNEY:  That is not specified.
11              THE COURT:  It certainly isn't.  Now, what portion is
12    it?  Does the government have a position on what portion it is?
13    Because I have to find what that is.  You want to talk about it
14    as bribery, and I understand that.  And that's a theory that is
15    at large I suppose in some fashion.  But what is the bribe
16    amount?
17              MS. KEARNEY:  Well, the bribe amount here was the
18    $250,000.
19              THE COURT:  No.  What is the bribe amount with respect
20    to this defendant?  It has to be reasonably foreseeable by this
21    defendant.  So first we're going to talk about what the amount
22    is that Ms. Heinel -- do I pronounce that correctly -- Ms.
23    Heinel received for purposes of this transaction?
24              MS. KEARNEY:  So the defendant, our understanding is
25    that he understood, and he's acknowledged this in his plea,
```

```
 1   that the $250,000 amount that he agreed with Singer was going
 2   to be used to bribe officials at USC to get his son admitted.
 3            THE COURT:  So the amount is what he perceives would
 4   be used even if it isn't used, even if that isn't the scheme
 5   that Mr. Singer had?
 6            MS. KEARNEY:  The government acknowledges that there
 7   is some disagreement among the case law about whether --
 8            THE COURT:  It's not just the case law.  I'm just
 9   talking about the facts now.
10            MS. KEARNEY:  Yes, Your Honor.
11            THE COURT:  If this were tried as a mail fraud bribery
12   case, okay, honest services as a commercial bribe.  Put to one
13   side whether it fits easily into commercial bribery.  But let's
14   just say it's a commercial bribery, and the government was
15   taking this to me for an evaluation on sentencing, what's the
16   dollar amount that we're talking about here?
17            MS. KEARNEY:  So --
18            THE COURT:  You said it was $160,000, as I understand
19   it.
20            MS. KEARNEY:  Personally.  In addition there were
21   payments directly to USC but to accounts that she controlled
22   and benefited from.
23            THE COURT:  That's not a bribe, is it?  It's received
24   by USC.  Then we've got a faithless employee.  That's a
25   different issue from bribery, right?
```

1        MS. KEARNEY:  No, Your Honor, because in light of

2  Skilling, there has to be a bribe or kickback.

3        THE COURT:  Yes, there does, I agree.  And this is a

4  case in search of a bribe or kickback, and now I'd like to find

5  it and find it with specificity because you've got to be able

6  -- if you want to make a request for an enhanced guideline

7  range, you've got to identify it.

8        So now we're back to this question of what was the

9  bribe that she received?  Because it has to be to her, not some

10  account that she controlled, unless you say it was reasonably

11  foreseeable to him that she was going to toy with that account.

12        MS. KEARNEY:  It was reasonably foreseeable to this

13  defendant because he sent a check directly to her --

14        THE COURT:  To whom --

15        MS. KEARNEY:  -- to be deposited into a USC account.

16        THE COURT:  To whom was the check made out?

17        MS. KEARNEY:  It was made out to the Galen Center.

18        THE COURT:  Was it deposited to the Galen Center?

19        MS. KEARNEY:  It was, and that's an account that Ms.

20  Heinel oversaw.

21        THE COURT:  Right.  And now, the Galen Center, was

22  that a 501(c)(3)?

23        MS. KEARNEY:  This is a facility at USC.

24        THE COURT:  Right.  But would a payment to the Galen

25  Center, apart from machinations that she could undertake, would

```
 1    that be a charitable contribution?

 2           MS. KEARNEY:  My understanding is yes.

 3           THE COURT:  Okay.  So we've got $50,000 going to the

 4    Galen Center that I gather you say is, at least that's

 5    identifiable bribery?

 6           MS. KEARNEY:  Yes, Your Honor.

 7           THE COURT:  Okay.  Anything else?

 8           MS. KEARNEY:  There are also payments that Mr. Singer

 9    made directly to Ms. Heinel beginning in the summer of 2018.

10    He agreed with her, given the number of students she was

11    helping him admit, including the defendant's son, to pay

12    $20,000 a month.  She would provide invoices to Mr. Singer.

13    One such invoice --

14           THE COURT:  But how do we particularize that to

15    Mr. Singer?

16           MS. KEARNEY:  To Mr. Bizzack.

17           THE COURT:  I mean Mr. Bizzack, sorry.

18           MS. KEARNEY:  She provided invoices to Mr. Singer.

19           THE COURT:  Right, but how do we --

20           MS. KEARNEY:  And one of those invoices identified the

21    defendant's son.

22           THE COURT:  How much money?

23           MS. KEARNEY:  That would have been a $20,000 invoice.

24           THE COURT:  Every time there's an invoice, it's

25    $20,000?
```

```
 1            MS. KEARNEY:  Correct.
 2            THE COURT:  So now we're at 70, giving the government
 3       the benefit of the doubt on this.  Anything else?
 4            MS. KEARNEY:  No, Your Honor.
 5            THE COURT:  Okay.  So we've got a $70,000 bribe that
 6       the government contends here.  Not $250,000.  $70,000.  That's
 7       reasonably foreseeable by anybody in this, unless you take the
 8       position that some speculation on the part of Mr. Bizzack --
 9       sorry if I keep using the wrong pronunciation -- Bizzack, is
10       that the proper --
11            THE DEFENDANT:  Bizzack.
12            THE COURT:  Bizzack.  Okay.  We've got $70,000, right?
13            MS. KEARNEY:  So there was $70,000 actually received
14       by the bribe recipients.
15            THE COURT:  But that was the whole scope, isn't it,
16       from Mr. Singer's point of view?
17            MS. KEARNEY:  Well, the way Mr. Singer worked, the
18       scheme he never disclosed to parents that he was taking a --
19            THE COURT:  He was the hub on this.  And analyzing
20       this as a bribery scheme, it has to be whatever Mr. Singer was
21       prepared to pay to a faithless employee of USC.
22            MS. KEARNEY:  Well, it also involves what the
23       defendant believed his bribe was going to.
24            THE COURT:  So if the defendant believes that somebody
25       says I could get your child into USC for a million dollars,
```

```
 1   doesn't tell him how; it doesn't tell him that it provides

 2   Photoshop services, for example, it's a million-dollar bribe?

 3           MS. KEARNEY:  If the defendant then paid the

 4   million-dollar bribe with the expectation --

 5           THE COURT:  Is there any case law that says something

 6   like that?

 7           MS. KEARNEY:  I believe there is, Your Honor.  I don't

 8   have it at hand.  I can submit something to the court.

 9           THE COURT:  That is reasonably foreseeable by the

10   defendant in a case like this?

11           MS. KEARNEY:  Yes, Your Honor.

12           THE COURT:  For purposes of sentencing, is that it?

13           MS. KEARNEY:  I would --

14           THE COURT:  You don't want to mix up a substantive

15   liability conspiracy with the liability that's identified for

16   purposes of the sentencing guidelines.

17           MS. KEARNEY:  Your Honor, I would have to go back and

18   look at the cases to confirm.

19           THE COURT:  So you're not familiar with any case law

20   that does it.  Another way of saying it is you're not familiar

21   with the case law in this area; is that right?

22           MS. KEARNEY:  Your Honor, I am aware that there are

23   cases.  I have not looked at them recently.  I apologize.

24           THE COURT:  Did you think that that might be important

25   for purposes of sentencing?  That is, the government bears the
```

```
 1 │ burden of proving this, doesn't it?
 2 │         MS. KEARNEY:  Yes, Your Honor.
 3 │         THE COURT:  Okay.  But you're not familiar with the
 4 │ cases or at least you can't call them up right now?
 5 │         MS. KEARNEY:  Not off the top of my head, Your Honor.
 6 │         THE COURT:  So we have $50,000 and $70,000, and that's
 7 │ reasonably foreseeable -- that certainly is reasonably
 8 │ foreseeable from your point of view as to the defendant here?
 9 │         MS. KEARNEY:  Correct.
10 │         THE COURT:  Okay.  What's the basis for saying that
11 │ it's reasonably foreseeable that this defendant would have
12 │ known that that was the amount of money that would go to a
13 │ faithless employee?
14 │         MS. KEARNEY:  Well, the government's position is that
15 │ it was reasonably foreseeable that $250,000 would be going to
16 │ the faithless employee.
17 │         THE COURT:  This is not meant to be exegesis by
18 │ assertion.  Give me the evidence.
19 │         MS. KEARNEY:  That the defendant understood that
20 │ $70,000 was --
21 │         THE, COURT:  Yes, at least $70,000 would go.
22 │         MS. KEARNEY:  So again, Your Honor, our understanding
23 │ of the evidence is that the defendant believed $250,000 --
24 │         THE COURT:  What's the basis for believing that?
25 │ Mr. Singer apparently extracted from the defendant $250,000.
```

 1   Did he tell him all $250,000 is going to go to Ms. Galen?  Did

 2   he tell him $50,000 was going to Ms. Galen?  Did he tell him

 3   $70,000 was going to Ms. Galen?  What did he tell him that

 4   would give him some reasonable foreseeability with respect to

 5   this amount?

 6          MS. KEARNEY:  So what Mr. Singer told the defendant

 7   and how it worked with the scheme at USC generally was that --

 8          THE COURT:  I want to know about this defendant.  The

 9   scheme generally is something to be taken up case by case and

10   has been taken up case by case.  I want to understand it with

11   respect to this defendant.

12          MS. KEARNEY:  So with respect to this defendant, this

13   defendant agreed that upon receipt of the conditional

14   acceptance to USC, he would send a $50,000 check directly to an

15   account designated by Donna Heinel; and then upon receipt of

16   his son's formal acceptance to USC, he would have to make a

17   $200,000 payment to Rick Singer's charity, the Key Worldwide

18   Foundation, and from that Mr. Singer would transmit the bribe

19   to USC or to the coaches that he was bribing at USC.

20   Mr. Singer did not share with the defendant that he was taking

21   a middleman fee.

22          THE COURT:  That's not in the Presentence Report as

23   such, is it?

24          MS. KEARNEY:  So in paragraph 33, it identifies that

25   the defendant participated in a scheme and conspired to pay

1    $250,000.

2         THE COURT:  Right.  As I said, that's a kind of

3    summary of it.  I want to get the specifics of the facts here.

4         MS. KEARNEY:  So then -- sorry, Your Honor.  In

5    paragraph 43 it indicates that the defendant at Mr. Singer's

6    direction issued a $50,000 check to USC's Galen Center.

7         THE COURT:  So the Galen Center, yeah.  Does it say to

8    Ms. Heinel?

9         MS. KEARNEY:  Yes, it does, because the voicemail that

10   the defendant left for Mr. Singer before sending the check

11   indicated, "Sending this check off to Donna, and I just put a

12   note in the letter just saying, you know, it's a donation."

13        THE COURT:  So I'm supposed to draw from that that he

14   knew that this was going to Ms. Heinel for her own personal

15   use?

16        MS. KEARNEY:  Yes, because he understood that Ms.

17   Heinel was the one directing him to send the money to this

18   particular account as opposed to USC's general fund or another

19   account within USC.

20        THE COURT:  Okay.  So let's go to the next part of it,

21   which is the $20,000.  Where do I see that?

22        MS. KEARNEY:  Again, the $20,000 is specified in

23   paragraphs 49 and 50.

24        THE COURT:  No.  That says that he's making the

25   payments to Heinel.  The question is where do I see that

 1   Mr. Bizzack was aware of that.

 2        MS. KEARNEY:  Well, Mr. Bizzack was aware, if we look

 3   at paragraph 47 that and 48, that he was paying another

 4   $200,000 upon his son's formal acceptance.

 5        THE COURT:  Right, right.  But where does it say that

 6   it's to be used for a bribe?

 7        MS. KEARNEY:  Well, in paragraph 48, one of the

 8   payments, the $100,000 check that he sent, he included a note

 9   tying the payment to his son's admission.

10        THE COURT:  Right.  But the question is payment as a

11   bribe to someone, and the someone being Ms. Heinel.  So for

12   example, one of the problems, of course, is that people,

13   particularly people whose children are awaiting admission,

14   sometimes make large payments to institutions.

15        MS. KEARNEY:  That's correct.

16        THE COURT:  They're not bribes if they're not matters

17   of concealment, are they?

18        MS. KEARNEY:  Correct, Your Honor.

19        THE COURT:  As a matter of fact, you say that in the

20   previously sealed document that the deprivations here are

21   property in the form of admissions spots.  That is, it's

22   property of USC that's been misappropriated in the form of

23   admissions spots.  So if USC decides to take money, say

24   $100,000 or $200,000, and says, "By the way, we're going to let

25   this kid in," that's not any criminal violation; is that right?

1       MS. KEARNEY:  It might be a violation of their

2  tax-exempt status.  But no, I don't believe that to be a

3  criminal violation.

4       THE COURT:  Okay.  So we're drawing the line between

5  how USC, for whatever reason, decides to deploy its property in

6  the form of admissions spots, right?

7       MS. KEARNEY:  Correct.

8       THE COURT:  Okay.  And so what do we know about Ms.

9  Heinel being the person who intercepts that ability in a way

10  that's knowledgeable to this defendant?

11       MS. KEARNEY:  Well, Your Honor, the defendant

12  understood that his son was being admitted as a fake athlete

13  and that there had to be someone at USC, which he also knew was

14  Donna Heinel, who was arranging that in exchange for his

15  payment.

16       THE COURT:  Well, we settled on Ms. Heinel for $50,000

17  for present purposes.  Now I'm talking about the other

18  $200,000.  Because you're wanting to use the guidelines to pile

19  on the amount of time that could be spent according to the

20  amount of money involved.  So looking at $200,000 more, where

21  do we have that he thought that this was or believed that this

22  was money going to Ms. Heinel as a faithless employee as

23  opposed to the institution itself or whatever it was that

24  Mr. Singer offered by way of services apart from facilitating

25  bribes?

|  |  |
|---|---|
| 1 | MS. KEARNEY:  So we have the defendant's agreement |
| 2 | with Mr. Singer that the defendant's son was being admitted as |
| 3 | a fake athlete and that the defendant understood that all |
| 4 | $250,000 was going to be used as a bribe payment.  He did not |
| 5 | understand that Mr. Singer was taking any kind of middleman |
| 6 | fee. |
| 7 | THE COURT:  Okay.  So Mr. Singer, as I understand it, |
| 8 | is cooperating; is that right? |
| 9 | MS. KEARNEY:  That's correct. |
| 10 | THE COURT:  What does Mr. Singer say? |
| 11 | MS. KEARNEY:  Mr. Singer has told the government that |
| 12 | he did not disclose his middleman fee. |
| 13 | THE COURT:  He did not disclose his middleman fee. |
| 14 | What did he disclose? |
| 15 | MS. KEARNEY:  That -- |
| 16 | THE COURT:  Did he tell Mr. Bizzack that all $200,000 |
| 17 | was going to go to Ms. Heinel? |
| 18 | MS. KEARNEY:  I'm not exactly sure, Your Honor.  I |
| 19 | believe that he generally would tell parents to pay the bribe |
| 20 | amount, the full bribe amount and that it was -- |
| 21 | THE COURT:  Well, you've characterized a bribe amount. |
| 22 | That's petitio pincipii.  We're begging the question by saying |
| 23 | it's the full bribe amount.  I'm trying to figure out how it's |
| 24 | a bribe.  So you say he told them to pay me $200,000, and |
| 25 | that's a bribe.  Did he tell him that's a bribe that's going to |

1    go to Donna Heinel?

2        MS. KEARNEY:  Mr. Singer was not as explicit, but it

3    was understood, given the fabrications to the student's

4    application such as --

5        THE COURT:  Just assuming it was understood, which is

6    the passive voice way of expressing that there was nobody

7    saying anything, is there something that Mr. Singer said?  For

8    instance, did he say, "I'm doing this for free for you.  I'm

9    not taking a finder's fee out of this.  I'm not taking any fee

10   for doing things like Photoshopping a kid"?

11       MS. KEARNEY:  As Your Honor might be aware, with

12   criminal conspiracies like this, the co-conspirators --

13       THE COURT:  I am aware --

14       MS. KEARNEY:  -- don't generally lay out every single

15   detail.

16       THE COURT:  Trust me, I am aware of that.  Now, you

17   still have a responsibility of meeting your burden of proving

18   something like this, and I'm trying to understand what it is

19   that you're relying on for this theory.

20       MS. KEARNEY:  So we're relying on the fact that the

21   defendant had an agreement with Mr. Singer to pay $250,000 to

22   get his son admitted as a fake athlete; that the nature of the

23   payment connected to his son's admission as well as the fact

24   that his son had to be admitted as a fake athlete all in total

25   allowed the defendant to understand that the total amount was

1   being conveyed as a bribe payment.

2           THE COURT:  Okay.  So Ms. Corrigan, is it?

3           MS. CORRIGAN:  Yes, Your Honor.

4           THE COURT:  What's the defendant's position?  I

5   understand you've stipulated to all of this, or you've

6   stipulated to an amount.  Maybe the first question is why did

7   you do that?

8           MS. CORRIGAN:  Well, Your Honor, as the court is

9   aware, Mr. Bizzack and counsel had conversations with the

10  government prior to entering into a plea agreement.

11          THE COURT:  So it's an artifact of the plea agreement.

12          MS. CORRIGAN:  I'm sorry?

13          THE COURT:  It's an artifact of the plea agreement.

14          MS. CORRIGAN:  Well, it essentially -- well, what I'd

15  like to say is that what we have here --

16          THE COURT:  I tried to make clear to your sister, I'll

17  make clear to you, first answer the question I put to you.  If

18  you've got something more that you want to say, of course I'll

19  listen to it.  But it's a fairly simple question.  Is it

20  because you wanted to facilitate a plea agreement?

21          MS. CORRIGAN:  Yes.

22          THE COURT:  Okay.  What is the evidence as you

23  understand it that your client knew that $250,000 was going to

24  be paid for a bribe?

25          MS. CORRIGAN:  We don't have that information.  And in

```
 1    listening to the government today, we don't have the
 2    information that I've heard about Mr. Singer.  But what I will
 3    tell the court is there's no question that $250,000 was paid.
 4    The evidence of the checks and the wiring from Eco-Pivot, one
 5    of the companies, is --
 6              THE COURT:  But you see what I'm -- the parties can
 7    agree to whatever they want.  And the parties apparently have
 8    -- not the parties, but the government in particular has been a
 9    little upset that the Probation Office actually looked at this
10    carefully.  As if this case begins and ends over the question
11    of what agreements was the government able to extract from
12    those who are vulnerable.  But the court makes the decision
13    about sentencing --
14              MS. CORRIGAN:  Understood.
15              THE COURT:  -- issues, and this is something that I'd
16    like to get to the bottom of rather than just process through.
17    Did your client know that $50,000 was going to be paid as a
18    bribe to Donna Heinel?
19              MS. CORRIGAN:  No.  He knew -- if I might, if we look
20    at the checks, the check was to the Galen Center, and he knew
21    that the check was going to -- that there was someone named
22    Donna that was associated with it.  But beyond that, there was
23    no indication and no conversation that I'm aware of between
24    Mr. Singer and my client that indicates at any time that my
25    client knew that the $50,000 or any amount was going to a
```

```
 1    person named Donna, whether it's Donna Heinel or not, but let's
 2    assume it is --
 3            THE COURT:  Why did your client pay $50,000?
 4            MS. CORRIGAN:  Your Honor, this case is about getting
 5    admission for his son to USC.  There's no question about that.
 6            THE COURT:  Right.  So there's an amount that's
 7    figured out.
 8            MS. CORRIGAN:  Correct.
 9            THE COURT:  Is it simply, Mr. Singer says, "I can do
10    it through the side door, and it's, for you, $250,000"?  Is
11    that what it comes to?
12            MS. CORRIGAN:  Yes, it's very simple.  And if I might
13    just address -- I think the court -- I understand the court's
14    -- if I might move a little bit outside of the court's
15    question.
16            THE COURT:  We'll see, we'll see.
17            MS. CORRIGAN:  Okay.  The court has, I understand the
18    tension between what's in the PSR and what's in the plea
19    agreement.  And as the court has noted in our position, we're
20    in a little bit of a difficult position because I don't want to
21    put my client in a position of breach.  However, what I would
22    note to the court is I've read through Judge Talwani's rulings.
23    I've seen what Judge Zobel has done.  And I've read obviously
24    in very great detail what Ms. Victoria and her office has
25    produced in this case.  I think it's very well thought out.
```

```
 1          THE COURT:  Wait.  You are going beyond, because I do
 2   want to move through this in an orderly fashion.  It's not that
 3   I'm not interested in all of that.
 4          MS. CORRIGAN:  Sure.
 5          THE COURT:  So what I'm faced with is the suggestion
 6   that the defendant does not agree that he knew that there was
 7   money to be paid to Ms. Heinel --
 8          MS. CORRIGAN:  He knew that --
 9          THE COURT:  -- as a bribe.
10          MS. CORRIGAN:  Correct.  The payments --
11          THE COURT:  Go ahead.  I'm sorry.
12          MS. CORRIGAN:  Sorry.  The payments --
13          THE COURT:  I'm stretching.  Not expressing nonverbal
14   communication about what I think.
15          MS. CORRIGAN:  Thank you.  The payments -- the bulk of
16   the payments go to the Key Foundation, KWF, which the court is
17   well aware of.  And that's a foundation that Mr. Singer put out
18   there, and it's been described in various pleadings and in the
19   PSR as a sham charity.  That's where the bulk of the money
20   went.  There was no idea, no direction that I'm aware of by
21   Mr. Singer or any information given to anyone of where exactly
22   that money was going to go.  He had some ideas about different
23   centers and that sort of thing, and that's all the information
24   that's before the court.
25          The $50,000 check that goes to the Galen Center, I am
```

```
 1    not aware of any communications or writings between Mr. Singer

 2    and my client that indicate, Oh, this particular amount is

 3    going to Donna Heinel, or this particular amount is going to

 4    Ms. Janke or anybody else.

 5            THE COURT:  Well, Ms. Janke could not be a recipient

 6    of a commercial bribe because she was not an employee.  The

 7    only person who could be the recipient of a commercial bribe

 8    would be Ms. Heinel, unless the government disagrees with me

 9    about that.

10            MS. KEARNEY:  Right.  No, Your Honor.

11            MS. CORRIGAN:  And the only reason I bring that up is

12    because she is mentioned throughout the papers.

13            THE COURT:  So let me just go back to this question.

14    What did he think when he wrote "Donation," question mark?  Why

15    was it that, that he was concerned that his accountant would

16    get full information about the payments that he was making?

17            MS. CORRIGAN:  No, Your Honor.  In fact, he did not

18    submit this as some of the other parents did, he did not submit

19    this as a tax deduction.

20            THE COURT:  Why did he say "Donation," question mark?

21            MS. CORRIGAN:  I'm sorry?

22            THE COURT:  Why did he say, "Donation" question mark?

23            MS. CORRIGAN:  I believe that was directed by

24    Mr. Singer to write into the check.

25            THE COURT:  Okay.  So is that the state of the record,
```

```
 1   that we have a dispute over whether or not there was a full

 2   knowledge on the part of Mr. Bizzack?

 3          MS. KEARNEY:  Your Honor, I would just note back at

 4   the change of plea hearing that the defendant did agree with

 5   the government's representation that his participation in the

 6   scheme, he agreed --

 7          THE COURT:  Could you tell me the page number.

 8          MS. KEARNEY:  At page 16, lines 5 through 12 of the

 9   change of plea hearing indicate that he agreed and did pay a

10   total of $250,000 to facilitate the admission of his son to USC

11   as a purported athletic recruit.

12          THE COURT:  To use a scheme to use bribery and other

13   forms of fraud to facilitate it?

14          MS. KEARNEY:  Correct.

15          THE COURT:  But of course that's not really factual.

16   He agreed to plead to that, plead guilty to the information.

17   Now we're talking about facts.  What are the underlying facts?

18          MS. KEARNEY:  Right.  And it goes on, Your Honor, on

19   that same page that he agreed to pay Singer an amount

20   ultimately totaling $250,000 to facilitate the admission of his

21   son.

22          THE COURT:  Where does it say "bribery to facilitate"?

23          MS. KEARNEY:  I'm sorry?

24          THE COURT:  Where does it say "bribery to facilitate"?

25   It's different from the language of the charge.  This is the
```

```
1   specific language of facts that you have here, and it doesn't
2   seem to say bribery.
3           MS. KEARNEY:  Well, Your Honor, while it doesn't say
4   the word "bribery," it does.
5           THE COURT:  Well, words are important, you know.
6           MS. KEARNEY:  It talks, though, about an exchange of
7   one thing for another, so it talks about that --
8           THE COURT:  But this exchange could be with
9   Mr. Singer.  If he did nothing but paid Mr. Singer $250,000 and
10  there wasn't bribery involved, then we wouldn't have a bribery
11  guideline, right?
12          MS. KEARNEY:  I'm sorry, Your Honor.  Can you say that
13  again?
14          THE COURT:  If he simply paid Mr. Singer to work his
15  magic and there was no evidence of bribery involved, then we
16  wouldn't be dealing with the bribery count, right?
17          MS. KEARNEY:  If there's no evidence of bribery, then
18  we wouldn't be dealing with bribery.
19          THE COURT:  Okay.  So now I'm looking for the places
20  where there's evidence of bribery.  You told me about the
21  clearing of the throat that the government did at the outset of
22  its recitation of the factual basis, simply to tell me first
23  what the charge was here.  Then you said then the next thing
24  that they did is the defendant agreed to pay Singer, it
25  ultimately totaled $250,000 to facilitate the admission of his
```

| 1 | son. |
|---|---|

1   son.

2          MS. KEARNEY:  Correct.

3          THE COURT:  Doesn't say bribery.

4          MS. KEARNEY:  It does not, but it goes on to talk

5   about payments to Donna Heinel from the Key Worldwide

6   Foundation in the amount of $20,000 each month.

7          THE COURT:  But where does it say that the defendant

8   is aware that $20,000 each month is going to be paid to Donna

9   Heinel?

10          MS. KEARNEY:  It does not say that explicitly.

11          THE COURT:  Okay.  And if I understand the

12   government's theory, whether conveyed to the defendant or not,

13   it is that there was an invoice each month for a different

14   person, a different student.  Is this a kind of retention

15   agreement for Ms. Heinel?

16          MS. KEARNEY:  She would send invoices indicating she

17   evaluated certain students and that the total amount of her

18   time for those invoices was $20,000 a month.

19          THE COURT:  So a month in which she evaluated five

20   people, she'd get $20,000, and a month in which she evaluated

21   two, she would get $20,000?

22          MS. KEARNEY:  Correct.

23          THE COURT:  So they were not allocated to the

24   students?

25          MS. KEARNEY:  She did not divvy it up, no.

```
 1              THE COURT:  There's no evidence as to how it's to be
 2    divvied up?
 3              MS. KEARNEY:  Correct.
 4              THE COURT:  Okay.  So now we come back to the question
 5    of whether you've got enough evidence here to show bribery by
 6    this defendant.  I understand the parties agreed to bribery and
 7    appears to be an artifact of plea negotiations; who's got
 8    power, who doesn't have power, and who can extract what by way
 9    of agreements.  But now I'm looking for the underlying
10    evidence.  And this is it?
11              MS. KEARNEY:  Well, Your Honor, the defendant did
12    plead guilty to conspiring to commit honest services mail
13    fraud, which requires bribery or kickbacks.
14              THE COURT:  No, it doesn't.
15              MS. KEARNEY:  Under Skilling it does.
16              THE COURT:  That's a theory that you have.  You can
17    also have a form of payment that's illegal.  And no, just to
18    the contrary.  A kind of cheating that's involved -- the
19    government doesn't like this because it doesn't run up the
20    sentencing guidelines, but you can have a kind of cheating
21    misrepresentation with respect to the foundation for which this
22    student is brought in.  As a matter of fact, the government
23    takes that position, included it in its list of theories of
24    harm here.
25              MS. KEARNEY:  But without the bribe payments, Your
```

 1    Honor, it would not be honest services fraud.

 2         THE COURT:  I understand that.  But to say that it's

 3    honest services fraud is simply the government's theory of why

 4    there's a violation of 1346.

 5         MS. KEARNEY:  Correct, but --

 6         THE COURT:  That's all -- I mean, you have a lesser

 7    included offense of violation of mail fraud, don't you?

 8         MS. KEARNEY:  Yes, Your Honor, but the defendant pled

 9    guilty to conspiracy to commit mail fraud and honest services

10    mail fraud.

11         THE COURT:  Specifically stated, he pled guilty to a

12    violation of 1346.

13         MS. KEARNEY:  I believe it's 1349, Your Honor.

14         THE COURT:  1349.  Excuse me.  Right?

15         MS. KEARNEY:  Right, but it was --

16         THE COURT:  Does that require bribery?

17         MS. KEARNEY:  I'm sorry?

18         THE COURT:  Does that require bribery?

19         MS. KEARNEY:  Where he was charged as mail fraud and

20    honest services mail fraud, yes.

21         THE COURT:  The government cannot prove it any other

22    way?

23         MS. KEARNEY:  The government has -- the way it was

24    charged included the honest services mail fraud.

25         THE COURT:  I understand.  The government can't prove

1  it any other way?  So that if there is not proof of bribery

2  here, then the defendant pled to a -- would have been pleading

3  to an offense that he didn't commit?

4       MS. KEARNEY:  Well, Your Honor, I think the issue is

5  that he did plead to an offense he committed.

6       THE COURT:  At some point you will answer my question,

7  I assume, but go ahead and answer the question that you'd like

8  to answer before you answer mine.

9       MS. KEARNEY:  Well, Your Honor, I'll just go back to

10  the fact that there was an agreement here to pay $250,000 to

11  get his son admitted.  He understood that that money was

12  somehow being conveyed to USC.  I acknowledge, Your Honor, we

13  don't have anything explicit saying how much of that amount was

14  going to USC.  We know at least 50,000 he understood was going

15  to USC, or to an individual at USC, excuse me.

16       THE COURT:  The individual at USC was to receive a

17  check for USC.

18       MS. KEARNEY:  For an account that she controlled and

19  designated.

20       THE COURT:  All right.  But it's going to USC.

21       MS. KEARNEY:  Yes, but they had to get the son in as a

22  fake athlete, so he understood that it was not a legitimate

23  donation, that it was tied to his son's acceptance and that

24  they had to hide his son's true nature, who, his son was not a

25  division level 1 volleyball player, was not being recruited by

1    USC to play volleyball, but they had to put him in that way in

2    order to get his admission.

3           THE COURT:  Right.  I understand the government's

4    theory.  The question is the proof of the theory.  So let's

5    perhaps back away from the bribery issue for a moment and

6    analyze the memorandum that you submitted for the methodology

7    of calculating gain and loss to Judge Talwani.

8           You identified three forms of pecuniary loss.  One is

9    the value of the salaries the universities paid to the

10   employees the defendants and their co-conspirators conspired to

11   bribe.  Is that the theory?  In listening to you, you were

12   saying it was actually money paid to Donna Heinel.  It's not to

13   be calculated in terms of some evaluation of what they were

14   being paid in a kind of payroll analysis.

15          MS. KEARNEY:  So separate from the payments that Donna

16   Heinel received personally, in addition, USC was paying her for

17   her honest services.

18          THE COURT:  See, in that memo to Judge Talwani, you

19   identified three separate forms of harm, right?

20          MS. KEARNEY:  Correct.

21          THE COURT:  Those are the ones, at least as of

22   September 5, the government was offering as their theories.

23          MS. KEARNEY:  Yes.

24          THE COURT:  The first one is that the government --

25   that the universities, including USC, lost the value of their

```
 1   corrupt employees' honest services, right?

 2        MS. KEARNEY:  Correct.

 3        THE COURT:  That's in theory the bribery, but it's

 4   particularized.  It's said that the way you calculate this is

 5   by looking to the salaries the universities paid to the

 6   employees, monies the universities would not have paid had they

 7   known their employees were corrupt.

 8        MS. KEARNEY:  Correct.

 9        THE COURT:  What you just told me was it depends upon

10   the amount of money that Mr. Bizzack knew, not the amount that

11   the universities knew.

12        MS. KEARNEY:  No, Your Honor.

13        THE COURT:  That's what it says here.  Now, maybe

14   you're reformulating it, and certainly you're entitled to do

15   whatever you want to refine and reframe the question, although

16   I will be asking some questions about the evolving explanation

17   of why it was that bribery is being charged in this case and

18   then charged much more explicitly in a statute that provides

19   specifically for bribery in the context of government

20   contracts.  But I want to take this snapshot at September 5,

21   and at September 5 you weren't arguing it this way, the way you

22   have today, right?

23        MS. KEARNEY:  I apologize, Your Honor.  I'm not sure

24   how you've interpreted the way I'm arguing it today.

25             THE COURT:  So let me give a dramatic reading and you
```

1   can tell me how I've misinterpreted it.  "While it is difficult

2   to calculate the value precisely, the loss can be approximated

3   by looking to the salaries the universities paid to the

4   employees the defendants and their co-conspirators conspired to

5   bribe - monies the university would not have paid had they

6   known their employees were corrupt and that they stopped paying

7   as soon as they found out."

8            MS. KEARNEY:  That's correct, Your Honor.

9            THE COURT:  So it's the salaries that they received,

10  not the amount of money that the defendant anticipated.  Is

11  that it?

12           MS. KEARNEY:  Your Honor, I think that there's two

13  separate issues here.  The first is that under the parties'

14  stipulation as well as the government's --

15           THE COURT:  You keep relying -- I can't be clearer

16  about this.  There is throughout the government's filings this

17  idea that because you can extract an agreement from a defendant

18  that I'm bound by it.  This is not a C plea.  And even in a C

19  plea, I can reject it.

20           One of the insidious aspects of all of this is the

21  suggestion that suffuses this set of discussions that the

22  government decides what the sentence is going to be.  That's

23  not the case.  It certainly wasn't the case before Judge

24  Talwani, and I assure you it's not the case before me.  So the

25  fact of an agreement is, as I've indicated before, an artifact

1    of plea negotiations, the kind of sausage-making that goes on

2    in the criminal justice system, but it does not determine this

3    matter.

4    And so now I'm asking you to justify the positions

5    that you've taken, without respect to there's an agreement.

6    And furthermore, without -- well, you can talk about it if you

7    want, if you think that the guidelines bind me in some fashion

8    on this.  I don't think you'll take that position.  But I need

9    to have evidence of this.  I'm trying to find out the evidence.

10   What I'm hearing is something that is approximated at best, and

11   the approximation that you were talking about was not the

12   approximation that you made here.

13   MS. KEARNEY:  So here, the government looked at 2B4.1,

14   which, the base offense level is 8, and then it can be enhanced

15   based on the bribe amount.

16   THE COURT:  Right.

17   MS. KEARNEY:  Before Judge Talwani, the government was

18   looking at 2B1.1, which, the base offense level is 7 and can be

19   enhanced based on --

20   THE COURT:  But didn't you have a plea agreement at

21   that time with respect to 2B1 -- the bribery one?  Didn't you

22   have a plea agreement that extended to that before Judge

23   Talwani?  Weren't those plea agreements?  So they didn't

24   include this particular plea agreement?

25   MS. KEARNEY:  That's correct, Your Honor.

 1          THE COURT:  Okay.  I'm sorry.  That helps me

 2     understand this a little bit better.

 3          Okay.  So maybe we do go into the history of this,

 4     which is, how is it that the government was taking the position

 5     with respect to essentially the same case different guidelines

 6     at different times were applicable.  As I understand it, let's

 7     take the Abbott case, the government did not take the position

 8     that there was an agreement in the Abbott case.  It didn't make

 9     an argument with respect to bribery, but the bribery argument

10     was not the same as it was here.

11          Then here, I'll just use this as another point in the

12     case, here, the government took the position in the plea

13     agreement which was, whenever it was -- June was it -- I can't

14     remember when the plea agreement was.  I'll pull it out -- took

15     the position in the plea agreement and the defendant agreed to

16     it that the bribery guideline would be the proper guideline to

17     apply, right?

18          MS. KEARNEY:  Correct, Your Honor.

19          THE COURT:  Okay.  So that's that position.  I

20     understand it.  And then at some point, I see it in another

21     case I have, Sui, the government supersedes and says, by the

22     way, it's government fraud, 666 violation, bribery.  Okay.  How

23     did that evolving understanding take place?  What led to that?

24     You know, it just doesn't get pulled out of the air.  It's

25     something that the government chooses to do in its charging

1    decisions.

2          MS. KEARNEY:  Your Honor, with respect to the Abbott

3    case and the plea agreements there, the government made the

4    same mistake that you see in the PSR here that this was not a

5    bribery case and that 2B1.1 applies.

6          THE COURT:  This is not holding you to some admission

7    or something, but it was a mistake or misunderstanding and not

8    completely developed.  Do I fairly say it?

9          MS. KEARNEY:  Correct.

10         THE COURT:  So then the mistake is clarified in this

11   case or in cases like this where you start to cite to the

12   bribery violation?

13         MS. KEARNEY:  That's correct.

14         THE COURT:  Okay.  And then when you charge 666, what

15   was the new understanding there?

16         MS. KEARNEY:  I wouldn't say it's a new understanding.

17   It's just that the charges we believed and the grand jury

18   believed were appropriate.

19         THE COURT:  But why didn't you believe it before?  I

20   mean, you know, 666 is not a new statute.

21         MS. KEARNEY:  It is not, Your Honor, but this, even

22   after it was initially charged in March, was an ongoing

23   investigation.

24         THE COURT:  Right.  But was there some new information

25   that said, by the way, we didn't know it before but USC

 1   contracts with the government in a way that makes a case like

 2   this eligible to be charged explicitly as bribery?

 3            MS. KEARNEY:  Your Honor, the U.S. Attorney has

 4   prosecutorial discretion to decide on charging decisions.

 5            THE COURT:  That's right.  Absolutely.  I'm asking why

 6   it was exercised, and maybe you just say, "None of your

 7   business, Your Honor.  It's not before you."  But I don't know.

 8   Is that your position?

 9            MS. KEARNEY:  I would defer to the prosecutorial

10   discretion of the U.S. Attorney.

11            THE COURT:  Pardon me?

12            MS. KEARNEY:  I would defer to the prosecutorial

13   discretion of the U.S. Attorney.

14            THE COURT:  You are the U.S. Attorney here in court.

15            MS. KEARNEY:  Yes, Your Honor.

16            THE COURT:  So on behalf of the U.S. Attorney, you

17   decline to answer the question?

18            MS. KEARNEY:  Your Honor, as I mentioned, this was an

19   evolving investigation.  Decisions were made not to charge 666

20   initially.  Perhaps we didn't have all the information we

21   needed.  It has been charged against some of the defendants

22   now, not this defendant.

23            THE COURT:  What information did you not have that

24   made you make the change?

25            MS. KEARNEY:  I don't believe I can disclose --

```
 1                THE COURT:  What do you mean you can't disclose it?
 2                MS. KEARNEY:  Under grand jury secrecy rules.
 3                THE COURT:  You changed the charge.  You have made
 4       charges of other people on the basis of 666, and that's public
 5       of course.
 6                MS. KEARNEY:  Yes, Your Honor, the charges are public.
 7                THE COURT:  Right.  And the disclosure will have to
 8       be, right?  Won't there be discovery disclosure?
 9                MS. KEARNEY:  Yes, Your Honor.
10                THE COURT:  So I understand your position is you don't
11       have to answer these questions any further.  Maybe you won't
12       answer this question either.  But perhaps you're familiar with
13       Rule 83.3.1.  It's our rule with respect to release of
14       information by attorneys.
15                MS. KEARNEY:  Yes, Your Honor.
16                THE COURT:  In it, it explicitly says that those
17       persons associated with the prosecution in this case shall not
18       release any information by extrajudicial statement which a
19       reasonable person would expect to be disseminated by means of
20       public communication relating to, and it lists a series of
21       things, but number 5 is the possibility of a plea of guilty to
22       the offense charged.
23                MS. KEARNEY:  I am aware of that rule, Your Honor.
24                THE COURT:  Right.  Now, if someone associated with
25       the prosecution engaged in that public dissemination, that is,
```

1    a discussion of the possibilities of pleas of guilty to the

2    offense charged or the possibility, for example, of enhanced

3    sentences or enhanced charges, would that be a violation of

4    Rule 83.21?

5          MS. KEARNEY:  Your Honor, I don't believe I can answer

6    that question.  I do know in the statements with respect to

7    Mr. Bizzack that have been released by our office, I believe

8    those are in compliance with the rule.

9          THE COURT:  We're talking about the evolving

10   understanding of the United States Attorney's Office, including

11   those kinds of charges that have been subsequently made of

12   other individuals here.  And perhaps you don't want to respond

13   to that.

14         MS. KEARNEY:  Your Honor, I'm happy to convey the

15   message to the office, but as you might imagine --

16         THE COURT:  Then let's go back.  What we have is the

17   government has this evolving understanding of what can be

18   charged and what will be charged, how it will be charged and

19   how this question will be teed up.  In the Abbott case the

20   government made a mistake.  It didn't want to make the mistake

21   again.  It made it explicit and got the defendant to agree to

22   bribery here.

23         MS. KEARNEY:  Correct.

24         THE COURT:  That's where we are.  And the bribery, as

25   I understand it, is variously expressed, including the way you

```
 1   expressed it here today, and I'm asked to draw some conclusions

 2   of inferences about what the defendant knew about who was going

 3   to be paid because he certainly had to know that someone who

 4   was a faithless employee was going to be paid a bribe, right?

 5        MS. KEARNEY:  Yes, Your Honor.

 6        THE COURT:  And so the inference I'm supposed to draw

 7   from the direction of a check made payable to someone, to an

 8   entity that could not be bribed, it was the entity that would

 9   have been the victim of the bribe or the government contends

10   it's a victim of a bribe.  Although that statement, by the way,

11   of USC doesn't say "Bribery," does it?

12        MS. KEARNEY:  Your Honor, I don't believe the letter

13   addresses that question.

14        THE COURT:  But the letter addresses how it was

15   harmed, right?

16        MS. KEARNEY:  It discusses how it was harmed, yes.

17        THE COURT:  Right.  And it doesn't say it was harmed

18   by bribery, right?

19        MS. KEARNEY:  It doesn't say how it was harmed.  It

20   identifies the harms.

21        THE COURT:  To the contrary.  It says two ways.  One

22   way is that it affected its reputational interest, and the

23   other way is they had to spend money in investigation.  Doesn't

24   say anything else, does it?

25        MS. KEARNEY:  Well, it says that the harm was by the
```

 1    conduct alleged by the government.

 2          THE COURT:  But they're talking about -- you know, a

 3    victim witness statement generally, particularly by a

 4    sophisticated institution, tells us what the loss is that

 5    they're claiming or identifies what the harm is.  They don't

 6    identify bribery as a harm, do they?

 7          MS. KEARNEY:  They identify the conduct alleged by the

 8    government.

 9          THE COURT:  Right, again, this kind of general charge,

10    right?  Are they asking for restitution?

11          MS. KEARNEY:  No, Your Honor.

12          THE COURT:  Restitution is payment for the harm,

13    right?  Reimbursement for the harm, right?

14          MS. KEARNEY:  Yes, but it's within their discretion

15    whether they want to request it.

16          THE COURT:  No doubt it is, but it doesn't appear that

17    they view this or at least they're not asserting it, I should

18    say, as a bribery case, right?

19          MS. KEARNEY:  They have asserted this based on the

20    conduct alleged by the government.  They are not seeking

21    restitution.  There are many reasons why they might not be

22    seeking restitution, including their potential publicity around

23    it, and so I don't think that we can read anything into that.

24          THE COURT:  So we just have to deal with their actual

25    language, right?

1          MS. KEARNEY:  Yes.

2          THE COURT:  Okay.  So let's read their actual

3    language, since it's now public.  And I've found them -- I'm

4    not even sure they're victims, frankly, but that's a different

5    issue.  I'll assume they're victims.  I'm going hear from them.

6    They submitted it presumably for purposes of influencing me.

7    And, you know, I look at the information, and they say,

8    "Applications containing false information that misrepresent

9    the applicant undermine public confidence in the college

10   admission process," which USC relies upon, and they hired

11   outside counsel.  Those are the harms that they refer to.  They

12   don't refer to anything else, right?

13         MS. KEARNEY:  There's a general statement, Your Honor,

14   about other resources.  But yes, that's right.

15         THE COURT:  Well, those other resources are basically

16   having to spend money in connection with cooperation with the

17   government's investigation.

18         MS. KEARNEY:  Well, it doesn't indicate that's in

19   cooperation with the government's investigation.  They say,

20   "USC has also dedicated valuable employee time and other

21   resources to this matter."

22         THE COURT:  Right.  But where does it say "bribery"?

23         MS. KEARNEY:  Again, Your Honor, it does not say

24   bribery, but it does indicate that the harm was caused by the

25   conduct alleged by the government.

```
 1                THE COURT:  Okay.  It says or indicates.  Now, let's
 2       look at that language.  Where does it say that, that we could
 3       say that they are incorporating by reference whatever the
 4       government ultimately ends up alleging?  Where does it say
 5       that?
 6                MS. KEARNEY:  In the first sentence of the last
 7       paragraph on the first page, it references the conduct alleged
 8       by the government, and I'll note at the time of this letter in
 9       August that was after the information here was filed.
10                THE COURT:  But let me just see precisely the letter,
11       the language that you're alleging they've incorporated by
12       reference what the government said.
13                MS. KEARNEY:  In that first sentence of the last
14       paragraph on the first page of their letter.
15                THE COURT:  The government -- "USC's reputation has
16       been harmed by the conduct alleged."
17                MS. KEARNEY:  Correct.
18                THE COURT:  Not, "We've suffered commercial bribery,"
19       right?
20                MS. KEARNEY:  No, they don't say that.
21                THE COURT:  Okay.  So what they've said is that it
22       undermined the integrity of their process, the selection
23       process.  What you characterize as their property right in
24       admission slots.  And they've suffered some harm to their
25       reputation.  That's reputation, I suppose.  And then they hired
```

```
 1   outside people, and hiring outside people in connection with

 2   the investigation is not recoverable, is it?

 3           MS. KEARNEY:  Not as loss, Your Honor.

 4           THE COURT:  Right.  Well, that's what we're ultimately

 5   talking about here.  So now we're back to what do I make of the

 6   bribery here, other than its factual support is somewhat thin

 7   and attributing it to the defendant is somewhat difficult under

 8   these circumstances.  The short of it being I wonder how

 9   reliable that is for purposes of establishing a guideline, even

10   under an evolving theory of what the case is in this case.

11           But let me be sure that I haven't missed something

12   that you've alleged here.  So apart from -- I'm going to

13   Abbott, the submission to Judge Talwani in Abbott.  The second

14   grounds is that they undertook costly internal investigations

15   separate and apart from the government's investigation, and

16   those costs were direct and foreseeable consequences of the

17   defendants.  I think we're agreed that's not a loss.

18           MS. KEARNEY:  Your Honor, I before was speaking to

19   their -- in any investigation related to helping the government

20   with its investigation.  But we would argue that these losses

21   are in fact losses.

22           THE COURT:  Is there case law that says that

23   investigations that are conducted by someone into this sort of

24   thing is a compensable loss that's taken into consideration for

25   purposes of the sentencing guidelines?
```

1          MS. KEARNEY:  Yes, Your Honor.  There is the Piggie

2     case, where the investigative costs into the coach's scheme to

3     deprive the university of its honest services was properly

4     included in calculating loss.

5          THE COURT:  And?

6          MS. KEARNEY:  Then the DeRosier case, where, if the

7     investigation was prompted there, it was a bank, but for the

8     university's own benefit.

9          THE COURT:  Bank investigation here.  And again, no

10    dollar figure provided by the university here?

11         MS. KEARNEY:  No, we have not received that yet.

12         THE COURT:  So here is the thrust of it, I guess, and

13    that is the guidelines attempt to monetize.  It's an illusory

14    quest and particularly here without more evidence than the

15    government has adduced in this case to monetize in that

16    fashion.  There's nothing here I can rely on to figure out what

17    the amounts are.  You know, the arguments that the government

18    has made here, we've been through I think most of them, are not

19    fully supportable.  I'm sorry.  Go ahead.

20         MS. KEARNEY:  I'm sorry, Your Honor.  That's exactly

21    what our argument was to Judge Talwani, that the loss here is

22    difficult to calculate.  And so that's why we looked to the

23    bribe amount as an alternate measure.

24         THE COURT:  Right.  But I look at the bribe amount and

25    say how much?  So I get to the bribe amount, and it does make a

```
 1   difference, if it's bribery.  I guess we start with the base
 2   offense level of 6, and then based on the discussion of
 3   specificity at least from the government about the bribe
 4   amount, the government would be contending it's more than
 5   40,000 but less than 95,000?
 6            MS. KEARNEY:  I believe the base offense level would
 7   be 7.
 8            THE COURT:  7, okay.  I'll take that.
 9            MS. KEARNEY:  Then if we are basing it on a $50,000 or
10   $70,000 bribe, then yes, we would want to add 6.  Of course the
11   government's position has been that the bribe amount was
12   $250,000.
13            THE COURT:  I understand that, but I'm not asking you
14   to say uncle, but there hasn't been sufficient evidence about
15   anything over that.  And in fact, the $20,000 in addition to
16   the 50 is questionable but it's within the range here, so we're
17   talking about a guideline range of 13, right?
18            MS. KEARNEY:  Correct.
19            THE COURT:  Base offense level.  Okay.  And the
20   guideline range for the loss that you contended before Judge
21   Talwani, under the Judge Talwani analysis, that is basic fraud?
22            MS. KEARNEY:  Judge Talwani calculated the guideline.
23            THE COURT:  I know what she did.  But the government's
24   position with respect to that was how much?  What was the
25   guideline?
```

1        MS. KEARNEY:  It varied depending on the amount.

2        THE COURT:  Okay.  If the amounts were the amounts

3   here, somewhere between 40 and 95, although I understand that

4   the numbers change a little bit.

5        MS. KEARNEY:  So if it were the same amounts here,

6   then that would be the same calculation, Your Honor.

7        THE COURT:  13.

8        MS. KEARNEY:  Yes.

9        THE COURT:  Okay.  So I think maybe a way of saying

10  this is I find myself more or less in the position of Judge

11  Talwani.  We've gone through this in some ways, but it seems to

12  me that, you know, she's outlined a protocol for analyzing this

13  in the context of not just uncertainty but inability to

14  identify with the kind of specificity that loss or bribe or

15  whatever should be calculated.

16       Assume that I am coming to that opinion, that is, that

17  the characterization of this seems to be a result in search of

18  a justification, that is, a result of higher guidelines or

19  higher amounts in search of a justification that can't be found

20  in the guidelines themselves.  Is there anything about Judge

21  Talwani's analysis, that is the general analysis that she gave

22  in her preliminary memorandum -- I think it was September

23  5th -- 13th.

24       MS. CORRIGAN:  13th, Your Honor.

25       THE COURT:  13th, that the government disagrees with,

1    just the way in which she's dealt with that?  That is, if you

2    can't specify the amounts here, then you're left to look at the

3    guideline that's provided with specificity, that's 1349 or

4    1341, the underlying one if you go to 2X.  And that's to say

5    it's 0 to 6 as a guideline.  Now, I'm no slave to guidelines,

6    but I just have to make the determination accurately.  But

7    that's where I'd be, right?  With the assumption that I've just

8    built in.  I understand you don't accept the assumption, but

9    with the assumption I've built in.

10          MS. KEARNEY:  With that assumption built in, I would

11   also point out, though, that Judge Talwani did find that the

12   colleges were victims, and she did appear to acknowledge that

13   there was a loss.  It just was not calculable.  And so she left

14   it as no loss rather than looking to the gain.

15          THE COURT:  But what's the gain here?

16          MS. KEARNEY:  The gain here is --

17          THE COURT:  Monies received by Singer?

18          MS. KEARNEY:  Is both monies received by Singer as

19   well --

20          THE COURT:  But that has to be a bribe of some sort,

21   doesn't it?  Let's assume that somebody pays somebody who tells

22   him they're going to give him a terrific benefit, but you can't

23   identify that as a bribe or identify it specifically as a

24   bribe.  That's the same situation.  It's calculable against

25   Singer but not against a defendant like the defendant here or

 1    the defendants in Abbott.

 2            MS. KEARNEY:  Well, not where it's a conspiracy,

 3    though.

 4            THE COURT:  Whether it's a conspiracy or not, the

 5    question of what the intent was of the conspiracy, that is, to

 6    extract money from unwitting or witting victims to receive

 7    money for some service that has not been established to involve

 8    a bribe of a specific amount amounts to the same thing under

 9    this analysis.

10            MS. KEARNEY:  No, Your Honor.  The amounts paid by the

11    defendant to both USC's account at the Galen Center as well as

12    to Mr. Singer would be gains to the conspiracy as a whole.  In

13    addition, the --

14            THE COURT:  No, but the conspiracy has to be one

15    that's violative of federal law, and what you've said is or the

16    assumption that I've dealt with -- I'm not sure you said

17    this -- but essentially, it's not a bribery that can be

18    recognized under the sentencing guidelines because it's too

19    speculative, at best too speculative.  So then we're left with

20    what do we say?  There's money sloshing around, and we should

21    use the sloshing around money as the basis for calculating a

22    guideline.

23            MS. KEARNEY:  That's one basis.  In addition, the

24    other gain here is the admission spot itself --

25            THE COURT:  What's the value of that?

```
 1          MS. KEARNEY:  -- which is not easily valuable --
 2          THE COURT:  Right.  So I can't calculate that.  See,
 3     the point I'm getting to is these are -- they're not
 4     comprehended by the guidelines.  These are outside of the
 5     guidelines.  The guidelines, we're talking about fraud
 6     guidelines which have their own problems generally, simply
 7     because of the versatility of fraud.  There's so many ways that
 8     people can commit fraud, and every time there's a new one, it
 9     doesn't really fit into the guidelines themselves.  What you
10     essentially have is a kind of Procrustean bed.  Procrustes was
11     a Greek mythological figure who took slaves and cut them to the
12     size of the bed that he had, not because that fit them, but
13     because it fit the structure that he was trying to deal with.
14     That's what the guidelines are on this, and on many things,
15     frankly.
16          So I do have to decide what the guidelines are.  I'm
17     doing my best to do that.  There's been a challenge to the
18     Probation Office.  I'll put to one side whether or not that was
19     a hyperventilating challenge but a challenge.  The U.S.
20     Attorney's Office says that the Probation Office disregarded
21     their views.  There is no basis for saying that that happened.
22     They considered their views.
23          Now, the Probation Office has their point of view.
24     The reason I have them sitting over there is they are mere
25     witnesses in this court, which brings me to another point.
```

1    Maybe you can't answer it because you're not the person who can

2    answer these questions, but I noted in that submission with

3    respect to the difference of opinion with the Probation Office

4    that the U.S. Attorney's Office took the position that

5    recommendations made by the Probation Office should be public.

6    Is that the general position now, the new position of the

7    United States Attorney's Office?

8         MS. KEARNEY:  Your Honor, the position of the U.S.

9    Attorney's Office is that private recommendations that neither

10   the government nor defense counsel or the defendant can respond

11   to do not further --

12        THE COURT:  "Can respond to," I'm not sure I

13   understand that qualification.  Is it the position of the

14   United States Attorney's Office now that the Probation Office

15   should not submit private recommendations to the judge?

16        MS. KEARNEY:  Yes.

17        THE COURT:  And that's consistent not just in cases in

18   which they have reason to believe that the Probation Office

19   doesn't agree with them but in every case?

20        MS. KEARNEY:  Correct.

21        THE COURT:  And will be taking that in every case --

22   perhaps you know for the last 20 years I've been taking that

23   position.  Some of my colleagues have not.  Most of them

24   haven't.  But that is now the policy of the United States

25   Attorney's Office?  I just want to be clear about that.  And

1    that's something you can answer?

2         MS. KEARNEY:  Yes, Your Honor, I can answer that, and

3    that is correct.

4         THE COURT:  All right.  So now we're back to this

5    issue of evaluating what Probation says, what the government

6    says and challenge to it.  Put to one side the tone and also

7    the kind of defensiveness that was evidenced by the Probation

8    Office, which should understand that they're subject to

9    challenge like everybody else, and I make the decision or my

10   colleagues make the decision ultimately.  That's what the

11   adversarial process is all about.  But we're back down to this

12   question.  We just can't figure a guideline without stretching

13   -- an amount with respect to the guideline without stretching

14   it in some fashion that is wholly speculative.

15        MS. KEARNEY:  Well, going back to, we discussed

16   valuing the admission spot, and it's not wholly speculative in

17   the sense that we know what it was worth to the defendant, what

18   he was willing to pay for it.

19        THE COURT:  But let's pause with that, too, because I

20   want to be sure that I understand for purposes of making an

21   evaluation that is applicable, generally applicable.  Does the

22   culpability of a defendant depend upon the amount of money he

23   paid for the admission slot?

24        MS. KEARNEY:  Yes.

25        THE COURT:  How?  So somebody drives a hard bargain

```
 1    and they get say $15,000 for the same service that Mr. Bizzack

 2    spent $250,000; that's a difference in culpability?

 3              MS. KEARNEY:  Yes, Your Honor.

 4              THE COURT:  How?

 5              MS. KEARNEY:  Because in every bribery case someone

 6    sets the bribe amount.  It's either the person demanding the

 7    bribe or the person receiving the bribe.

 8              THE COURT:  But the same thing is being sold.  That's

 9    what we're talking about here.  We're talking about a slot.

10    And so some people drive a hard bargain; some people don't.

11    But the same thing is being sold.  The same value is being

12    provided.  Once we start valuing in terms of slots, whether we

13    can figure out what the slot is worth in some reasonable way,

14    I'm not sure we can, but it amounts to the same thing.

15              Some victims spend more money.  Some victims spend

16    less, although we can't really say in this case that we have

17    gullible victims.  We have victims who know exactly what they

18    want and they pay for it, and they pay as much as they want or

19    as little as they want, but they pay it.  But I don't

20    understand how culpability is shaped under these sets of

21    circumstances in the way it would be in the stealing from

22    widows and orphans, another form of fraud.

23              MS. KEARNEY:  Well, here the amount represents what

24    the defendant valued that at.  And so he was willing to spend

25    $250,000 to get this guaranteed admissions spot.
```

```
 1                THE COURT:  But that doesn't establish the value.  It
 2      establishes how rich the defendant is or how good a bargainer
 3      he is.  It doesn't value the slot.
 4                MS. KEARNEY:  But that's the situation in every
 5      bribery case.
 6                THE COURT:  Not necessarily.
 7                MS. KEARNEY:  In addition, here, Your Honor, the going
 8      rate at USC was $250,000.  This is not the only defendant
 9      who --
10                THE COURT:  Were all the defendants in the USC
11      circumstances paying $250,000?
12                MS. KEARNEY:  The majority were.
13                THE COURT:  So the minority were not, is another way
14      of saying that, which is to say it was not a consistent market?
15                MS. KEARNEY:  There were one or two outliers.
16                THE COURT:  Well, you can call them outliers, but the
17      point is there's no real market for this sort of thing.
18                MS. KEARNEY:  That's correct, Your Honor, which is why
19      we have to look at the evidence that we do have.
20                THE COURT:  We look at culpability.  That's the point.
21      This is a rich person's crime.  That's what it is.  And so then
22      do we make the distinctions between how rich and how foolish
23      they are?  Is that the way we do it?
24                MS. KEARNEY:  No, Your Honor.
25                THE COURT:  Okay.  So we're back down to, you know,
```

```
 1    how do we characterize this?  I mean, that's what I've been
 2    trying to wrestle with you about, and I appreciate your candor
 3    to the degree that you're in a position to respond to the
 4    questions I've raised, and I understand there are various
 5    reasons why you can't answer some of the questions I raise.
 6    But I have to tell you I just don't see this as a case that
 7    lends itself to any meaningful analysis of gain or of loss, of
 8    bribery amount calculated by means of how much money is spent,
 9    even if I could, which I don't think I can in this case.
10            This is, as far as I can see, I mean, I've tried to
11    think of a way of characterizing this, but this is a kind of
12    crime of sneaky conspicuous consumption, the kind of thing that
13    rich people can do that poor people can't because they've got
14    the money to do it, to obtain a good -- let's call it a good --
15    that impresses their friends and satisfies the sense of
16    personal self-worth, but it doesn't monetize in that way or at
17    least there has not been -- maybe there will be in other cases.
18    It wasn't presented to Judge Talwani as near as I could find
19    out, and it isn't presented here.
20            So we're left with a guideline like the one that has
21    been offered here, which I adopt as the guideline in this case.
22    I, in short, reject the government's objection to the
23    guidelines.  But I'll say further that on the basis of this,
24    even if we could calculate it in some fashion, it's meaningless
25    because of all the various unknowns and estimates and
```

1    speculations that are involved.

2         So I think I've dealt with that issue, that is to say

3    the issue of what the guideline is.  I think that resolves any

4    outstanding questions here about objections, unless there's

5    some other specific objections that aren't tied directly into

6    the guideline calculation.

7         MS. KEARNEY:  Not for the government.

8         THE COURT:  Okay.  All right.

9         MS. CORRIGAN:  Not for the defense, Your Honor.

10        THE COURT:  Okay.  So after this long, perhaps painful

11   discussion of what the guidelines are and my view that

12   Probation has done as well as can be done in this area, and I

13   will add that, while I have an obligation to determine these

14   guidelines accurately, I don't believe that my decision on

15   sentencing is going to be, would be affected by the idea that

16   it's a bribe as opposed to a gain as opposed to a loss.  It is

17   to try to capture what is the culpability of somebody who

18   engages in a cheat of the type that only rich people can do.

19   That's what I'm focusing on for myself to the degree that that

20   shapes the views of the parties in making their allocutions

21   apart from the memorandum that they've had.

22        Now let me turn to another dimension of this, because

23   as Judge Talwani said at the end of her memorandum, of course

24   it all depends on 3553.  Even if the guidelines point in some

25   particular direction, it depends on 3553.  And this is an area

# EXHIBIT B



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )    Criminal Action No.
                                     )    1:19-cr-10081-IT-2
DONNA HEINEL,                        )
                                     )
        Defendant.                   )
                                     )
_____


    BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


        RULE 11 HEARING BY VIDEOCONFERENCE


            Friday, November 5, 2021
                 11:38 a.m.


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

```
 1                    A P P E A R A N C E S

 2

 3       On behalf of the Government:

 4            UNITED STATES ATTORNEY'S OFFICE
             BY:  KRISS BASIL
 5                LESLIE WRIGHT
             One Courthouse Way
 6           Suite 9200
             Boston, MA  02210
 7           (617) 748-3387
             kriss.basil@usdoj.gov
 8           leslie.wright@usdoj.gov

 9

10       On behalf of the Defendant:

11            KAPLAN MARINO, PC
             BY:  NINA MARINO
12                JENNIFER LIESER
             9454 Wilshire Boulevard
13           Suite 902
             Beverly Hills, CA  90212
14           (310) 557-0007
             marino@kaplanmarino.com
15           lieser@kaplanmarino.com

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURT:  From the Government?

 2            MR. BASIL:  No, Your Honor.

 3            THE COURT:  Okay.  So, Mr. Basil, I'll have you

 4   proceed with the evidence that you're prepared to present if

 5   the case went to trial.

 6            Dr. Heinel, I will then inquire as to the parts

 7   that we need to make sure are clear and that you agree have

 8   been proven beyond a reasonable doubt so that I ensure that

 9   there are facts sufficient for the plea.

10            So, with that, Mr. Basil.

11            MR. BASIL:  Yes, Your Honor.

12            If this case were to proceed to trial, the

13   Government would prove the following facts beyond a

14   reasonable doubt:

15            From at least January of 2015 to March 12, 2019,

16   Dr. Donna Heinel was the senior women's administrator in the

17   Department of Athletics at the University of Southern

18   California, or USC.  As the senior women's administrator in

19   the USC's athletics department, Dr. Heinel owed a fiduciary

20   duty to USC to provide honest and faithful services.

21            At all relevant times, USC's admissions department

22   considered the admission of athletes who had been recruited

23   by USC's athletic coaches using a subcommittee composed of

24   admissions officers, and that was called the subcommittee on

25   athletic admissions.
```

1    One of Dr. Heinel's responsibilities as the senior
2    women's administrator at USC was the presentation to the
3    subcommittee on athletic admissions of recruited student
4    athletes on behalf of the coaches of USC's athletic teams.
5    From at least 2015 to 2019, Dr. Heinel presented student
6    applicants to the subcommittee using athletic profiles for
7    students that she had received from William Rick Singer, who
8    ran a college counseling business.
9    The profiles that Dr. Heinel presented misled the
10   admissions subcommittee into believing that Heinel was
11   presenting the applicants on behalf of USC's athletic
12   coaches.  And they contained falsified information, including
13   in some stances information that Dr. Heinel added herself.
14   Dr. Heinel presented those applicants to the
15   subcommittee as athletic recruits in exchange for payments
16   from Singer or from his clients.  Dr. Heinel did not disclose
17   to the admissions subcommittee that she was presenting the
18   purported athletic recruits in exchange for the payments from
19   Singer and from Singer's clients.
20   Among the applicants Heinel presented to the
21   subcommittee as purported athletic recruits in exchange for
22   such payments were a purported women's volleyball recruit and
23   a purported women's soccer recruit, and that's in the fall of
24   2018.
25   On or about October 5, 2018, Dr. Heinel, who was in

```
 1    California, spoke by telephone with Mr. Singer, who was in
 2    Massachusetts, and confirmed in that telephone call that she
 3    had presented the purported volleyball recruit and the
 4    purported soccer recruit to the subcommittee, that both had
 5    been approved for admission by the subcommittee.  Singer, in
 6    turn, confirmed that the students' families would each pay
 7    $50,000 to USC athletic funds as directed by Dr. Heinel.
 8            Through that interstate wire communication on
 9    October 5, 2018, Heinel executed a scheme to defraud USC of
10    its tangible right to her honest services.
11            That's it, Your Honor.
12            THE COURT:  Is the Government -- would the
13    Government be proving beyond a reasonable doubt that
14    Dr. Heinel also accepted payment that wasn't directed to USC?
15            MR. BASIL:  At trial, Your Honor, the Government
16    would present evidence that Dr. Heinel invoiced Mr. Singer in
17    relation to three recruits, purported recruits, including a
18    women's basketball recruit and a men's volleyball recruit.
19    And I'm forgetting what the last student was for.  In -- and
20    women's volleyball, pardon me.  And that, as a result of
21    that, Dr. Heinel received -- or actually Dr. Heinel's company
22    received at least one payment from Mr. Singer.
23            THE COURT:  With regard to the volleyball and
24    soccer recruit, does the Government have proof that those
25    recruits, that those applications contained falsified
```

     1    figure out if what is left still amounts to a felony here.  I

     2    looked at this.  I think we're there.  But I need to make

     3    sure that the facts, in fact, get us there and not that we

     4    have some ambiguity around it.

     5            So let me just go through it.  There's no dispute

     6    about the time that Dr. Heinel was in this position.

     7            THE DEFENDANT:  It was the -- March 12th is when I

     8    was -- not the 19th.

     9            MS. MARINO:  Nobody said the 19th.

    10            THE COURT:  March 12, 2019.

    11            THE DEFENDANT:  Okay.  Sorry.

    12            THE COURT:  That's okay.

    13            And that there's no dispute that, as the senior

    14    administrator, she did owe a fiduciary duty to USC to provide

    15    honest and faithful services, correct?

    16            MS. MARINO:  Correct.

    17            THE COURT:  And I'm going to go through,

    18    Ms. Marino, first and just check with you, and then I'm going

    19    to come back to Dr. Heinel on it.

    20            And that one of Dr. Heinel's responsibilities was

    21    to present to the subcommittee recruited student athletes.

    22    You agree with that?

    23            MS. MARINO:  I do.

    24            THE COURT:  Now, there's further allegation that

    25    suggests that she was only to do so on behalf of the coaches.

1    Is that in agreement?

2              MS. MARINO:  She -- I wouldn't say on behalf of

3    the -- I would say with the consent of the coaches.

4              THE COURT:  Okay.  And that she -- between it --

5    during the time period, she did present applicants to the

6    subcommittee using athletic profiles for students that she

7    received from Singer?

8              MS. MARINO:  That is correct.

9              THE COURT:  And that the profiles that she

10   presented -- so here's where -- that the -- the profiles that

11   she presented contained false information.

12             MS. MARINO:  The profiles that she presented

13   contained information that appeared to have been received

14   from coaches, and it was not.

15             THE COURT:  Appeared to have been received from the

16   coaches, and it was not.  Okay.

17             MS. MARINO:  That is correct.

18             THE COURT:  So if I look at the way Mr. Basil

19   presented this, he said it misled the committee into

20   believing she was presenting the applicants on behalf of --

21   the more accurate way would be -- or I'm not sure it's more

22   or less accurate.

23             The way that Dr. Heinel would view it is that the

24   profiles misled the subcommittee into believing that she had

25   received -- that this -- that the material had been provided

1    to Dr. Heinel by the coaches.

2              MS. MARINO:  That is correct.

3              THE COURT:  And with regard to false information

4    that was provided by Dr. Heinel, is that specifically that --

5    where this source of the information was, or is it also

6    additional information such as transcripts or achievements?

7              MS. MARINO:  There was -- Dr. Heinel had no

8    knowledge of any falsified transcripts or test scores or

9    anything like that.  I don't think the Government would

10   disagree with that.

11             THE COURT:  Well, I think there's an allegation

12   about an altered incomplete on one transcript.

13             MS. MARINO:  Yes.  And that -- that -- there was no

14   alteration to that transcript.  So there was a phone call --

15   just so the Court has a full picture, there was a phone call

16   where Dr. Heinel says, "I'll just white out that incomplete,

17   that 'I' on the transcript" 'but ultimately, when that

18   transcript is submitted to subco, nothing is whited out.  So

19   for me, it's just nothing.

20             THE COURT:  So Dr. Heinel is prepared to admit to

21   having presented the information to the -- to USC, misleading

22   them into understanding the information was received from

23   coaches when it was, in fact, received from Rick Singer?

24   That's what Dr. Heinel is prepared to plead to?

25             MS. MARINO:  That's correct.

```
1          THE COURT:  And that in exchange for this,
2   Dr. Heinel received payments -- and here, again, on her own
3   behalf or on behalf of the school?
4          MS. MARINO:  So in connection with this plea right
5   now before the Court, it is our position that Dr. -- that the
6   university received the money.
7          THE COURT:  Okay.  And --
8          MS. MARINO:  And really, Your Honor, if I can
9   clarify, I think that the key here is that the understanding
10  that the money would be sent to USC predated the admission of
11  the student in connection with Count 11.
12         THE COURT:  Yes.  But if you are -- if you are
13  basing the -- if the basis for the plea is the money that USC
14  received, and it received the money because Dr. Heinel
15  provided false information to USC, and in return USC received
16  the money, it seems to me that Dr. Heinel violates her duty
17  of honest services.
18         But the bribe kickback piece seems less clear to
19  me.  The bribe kickback piece seems to be proven by the money
20  that goes in her pocket, if it goes there.  But it seems to
21  me you're saying that she doesn't get the money in her
22  pocket.
23         MS. MARINO:  That is -- that is what I'm saying in
24  connection with Count 11.  That's right.  And the
25  Government's theory would be that she derived some personal
```

1  and professional benefit from money going to USC; and our

2  position would be, well, she's an employee of USC. She's an

3  employee specifically of the athletic department. And when

4  the athletic department receives money, that is obviously

5  something that is good for Dr. Heinel.

6  THE COURT: Well, it's not -- so I guess my problem

7  here is, I certainly see why what Dr. Heinel -- if what

8  Dr. Heinel did was to give false information to USC, I

9  understand why that's a terminable offense for her

10  employment. And I understand why USC has been deprived of

11  her honest services.

12  I understood it to be an element of the crime that

13  there's also a bribe or a kickback. And the way I think

14  about that for a private employer is the private employer has

15  somebody doing something, and then whatever the person is

16  doing is supposed to be on behalf of the employer. And a

17  bribe and kickback -- the person is, in fact, pocketing money

18  for doing those services.

19  And I'm -- I don't -- I don't understand the basis

20  for finding that to be a bribe or kickback under the law.

21  I'm not saying it's proper or right. I'm saying you have an

22  honest services problem. I'm just not sure how I get the

23  bribe and kickback I need for the felony.

24  Help me out here, Mr. Basil.

25  MR. BASIL: Sure. Dr. Heinel directed these funds

```
 1    to go into an account at USC that directly benefited her
 2    professionally.  It was called the Women's Athletic Board.
 3    It's not a general donation to USC.  This allows her to
 4    advance her own projects, and so she derives -- it's a thing
 5    of value being given.  It's subjectively of value to her
 6    because it allows her to do her job.
 7            So leaving aside that we would prove at trial that
 8    she was, in fact, paid through her consulting company for the
 9    admission of students, the funds are also directed by her to
10    specific funds at USC that allowed -- that benefit her
11    professionally at USC.  This is not something that is ever
12    disclosed to the university, and the university does not
13    intend for her to raise funds in this way.
14            THE COURT:  So tell me more about the Women's
15    Athletic Board.
16            MR. BASIL:  Sure.  The Women's Athletic Board is a
17    fund that -- it's the fund that got the most number.  There's
18    some other things, like the Galen Center, for example, that
19    received funds.  The Women's Athletic Board is a fund that
20    Dr. Heinel had oversight and control, although not exclusive
21    control.  Other people could spend money out of that.
22            That was a fund on which she was -- and the
23    testimony at trial from the finance officer at USC would be
24    she was the principal on that account.  She could spend money
25    out of that account on projects as she -- through their
```

```
 1    budgeting process.  It was a way of self-funding herself and
 2    her own programs.
 3                THE COURT:  When you say "self-funding" --
 4                MR. BASIL:  Yes.
 5                THE COURT:  -- so was she using it to -- are there
 6    any expenses out of that that are for personal expenses?
 7                MR. BASIL:  There's no misappropriation out of that
 8    fund, that -- she uses it to advance herself professionally.
 9                MS. MARINO:  Your Honor, I would kind of liken it
10    to John Vandemoer, who raised money for the Stanford sailing
11    program.
12                THE COURT:  I understand that.
13                MS. MARINO:  Yeah.  So that's what I would liken
14    this to.
15                THE COURT:  But I'm not right now dealing with
16    that -- I'm not dealing with that prosecution here.  And --
17    and I don't want to raise problems where there are no
18    problems.
19                I just -- I don't -- I don't -- I need more to
20    understand -- I mean, my -- this is so much simpler to
21    understand in terms of people taking money in their pocket.
22    But as soon as you're not having money in people's pocket and
23    then you're saying that the money is being paid to programs
24    at a university, if the -- I mean, if your contention is that
25    those programs at the university, you know, there's a
```

1    misappropriation of funds, then, again, it's easy.

2          But as soon as you're saying, you know -- if, for

3    example, the program is one -- that she's using -- is one

4    that USC is proud of and uses in their recruitment material

5    or has various things, again, you have a problem that you

6    have an employee who was dishonest to their employer, and you

7    have a problem that the person deprived their employer of

8    their honest services.

9          But the bribery or kickback is a meaningless

10   element if you don't have it being something -- and to simply

11   say in a university -- I mean, where -- the point of a

12   bribery or kickback is that the person is gaining something

13   of -- that they have an obligation to do things for their

14   employer.  They're doing something that doesn't benefit their

15   employer.  That's the bribery and kickback.

16          MR. BASIL:  Your Honor, you -- am I -- I'm not

17   muted.

18          Your Honor, I believe you ruled on this, that a key

19   issue was whether the money -- a bribe to a third party could

20   be a bribe.  The key was the intent.  And this was a thing of

21   value given to her for her to use in -- out of this account

22   for her professional benefit.  And the key was whether she

23   subjectively valued this; and that, we would prove at trial.

24          THE COURT:  I need to go through all of my writings

25   before.  I -- the issue that I recall addressing is the

1   question of what the -- whether she violated her honest

2   services with regard to what their expectations were for

3   these positions. And I certainly ruled on that. And I said

4   that the -- that that would be a violation of honest services

5   to -- to, essentially, use those spots for her personal gain.

6          But what the univers- -- what the Government

7   charges, a personal gain simply being, well, this enhances

8   her reputation or things, seems different than what the

9   Supreme Court requires for a bribe or a kickback.

10         I mean, do you disagree that if everything was

11  exactly as happened, but let's say the money, instead of

12  going to -- let's assume these were the facts, which is that

13  rather than having the money go into the Women's Athletic

14  Board, it simply went to USC's general funds. Would that

15  still, in your view, amount to honest services wire fraud?

16         Because it would be an honest services problem.

17  She wasn't supposed to cheat to let people in. But if the

18  money went into the university generally, would that still

19  meet the element of a bribe or a kickback?

20         MR. BASIL: Your Honor, the example you give

21  illustrates the point precisely. It's that she was using

22  these admissions slots in order to fund specifically the

23  Women's Athletic Board and her accounts. That's the fraud.

24         THE COURT: So back up, though. Would you agree

25  with me my hypothetical for a minute, which is if the money

```
 1    went generally to USC, is it honest services wire fraud?
 2              MR. BASIL:  So, yes, it is, Your Honor, because
 3    it's not -- it's still honest services wire fraud,
 4    Your Honor, because there are -- pardon me -- the kickback,
 5    Your Honor, is that there is -- she is illicitly getting
 6    money into the -- she's, essentially, selling the admissions
 7    slot in order to fund the school.  That is not something the
 8    school ever agreed to --
 9              THE COURT:  I agree that this is honest services
10    fraud.
11              MR. BASIL:  Yes.
12              THE COURT:  But there's an element -- there's a
13    separate element, which is a bribe and a kickback, or a
14    kickback.
15              MR. BASIL:  Yes, Your Honor.  And the -- a
16    professional gain can be a thing of value that is conveyed.
17    And so if what happens here is the professional gain is what
18    derives from the donation or the payment, whatever we're
19    going to call it in this instance, then, yes, there is a
20    kickback.
21              THE COURT:  And I know that your colleagues have
22    been arguing professional gain for a while.  Have I been
23    given any authority ever for that --
24              MR. BASIL:  I --
25              THE COURT:  -- any case law that suggests that
```

1   professional gain gets you a bribe or kickback?

2           MR. BASIL:  There are -- in pattern jury

3   instructions, Your Honor, from various districts, there are

4   rulings that have that.  I don't know -- as the Court says,

5   you've issued a lot of rulings.  I don't remember all of the

6   filings.  It is the law, however, that professional gain

7   counts.  So, for example, yes, professional gain counts, and

8   that can certainly be briefed.

9           THE COURT:  Okay.  And tell me again how funding

10  into the -- tell me again what the Women's Athletic Board is.

11  This is not -- it's not a concept that comes up

12  automatically.

13          MR. BASIL:  Sure.  Okay.  So there are -- at USC,

14  there are gift accounts, and there are general operating

15  accounts.  The Women's Athletic Board is a gift account.

16  It's an account that can take donations.

17          In her role as senior women's administrator, that

18  is an account that Dr. Heinel had access to and could use to

19  fund her projects.  She repeatedly gave Singer instructions

20  that that's where the money should go --

21          THE COURT:  Okay.  But tell me, what does it do?

22  It's a gift account.  It comes in.  And what happens with it?

23          MR. BASIL:  I -- Dr. Heinel could use money out of

24  that account to fund various programs that she wanted to fund

25  to advance her career at USC.

```
 1            THE COURT:  And what did she do with it that was

 2    for her -- what -- I understand the money is there, but so

 3    what did she use it for?

 4            MR. BASIL:  A large number -- I don't have a list

 5    of those things right now.  There was programming for

 6    students.  I understand that there may have been Pride week

 7    events, things of that nature, that she put on.  So this is a

 8    source of funds that she can use for her own office and to

 9    develop her career and advance herself within USC.

10            I want to make clear, though, and this is

11    something I -- Ms. Marino reminded me of last night.  She

12    does not have exclusive control over that account.  It's just

13    an account that she does, in fact, have access to.

14            THE COURT:  Okay.

15            MR. BASIL:  Also, Your Honor, Dr. Heinel got raises

16    in relation to her ability to raise funds in this manner;

17    that is, for raising funds not in this manner.

18            THE COURT:  Ms. Marino?

19            MS. MARINO:  We disagree with that.

20            MR. BASIL:  Okay.

21            THE COURT:  Well, I am -- let me -- let me go

22    through the first parts of this, and I'm not quite sure what

23    to do with the bribe element of this.  But let me go through

24    the parts of the element, which seem to me the Government has

25    certainly satisfied me, and I want to make sure that you have
```

1    no disagreement with this, Dr. Heinel.

2            MR. BASIL:  Your Honor, could I just --

3            THE COURT:  Yes.

4            MR. BASIL:  The Court had asked before about the

5    specific ruling.  It's actually Docket 33 -- 733 at 3, and

6    this is what the Court previously wrote:  "The requirement

7    that the Government prove a private payment or private gain

8    does not foreclose a scenario where the defendant agreed to

9    have bribes paid to university accounts so long as the

10   Government proves that the defendant entered into a corrupt

11   or illegitimate agreement to receive something of value where

12   a thing of value is defined broadly to include the value

13   which the defendant subjectively attaches to the items

14   received."

15           That's what we were relying on.

16           THE COURT:  And I think, in my view, the words

17   there that modified it some are the corrupt -- that the

18   agreement is a corrupt agreement and then the remaining

19   part -- if you can -- I don't have that, again, in front of

20   me, but I think the last part of that.

21           MR. BASIL:  I can read it to you again, Your Honor,

22   if that's helpful.  I -- it's -- you said:  "So long as the

23   Government proves that the defendant entered into a corrupt

24   or illegitimate agreement to receive something of value where

25   a thing of value is defined broadly to include the value

```
 1    which the defendant subjectively attaches to the items

 2    received."

 3              THE COURT:  That order -- that was -- you're right.

 4    That language is a little bit broader, but I don't think that

 5    language was regarding the money to universities.  That was

 6    regarding the money to -- that's been alleged as to Vavic's

 7    tuition for his children, right?  Wasn't -- isn't that the

 8    context of that order?

 9              MR. BASIL:  Your Honor, so the -- it actually

10    says -- you've described a scenario where the defendant --

11    I'm quoting now -- "a scenario where the defendant agreed to

12    have bribes paid to university accounts."  So that's not --

13    that's not Mr. Vavic.

14              THE COURT:  Okay.  I'm -- let's come back to the

15    bribe or kickback problem, and let me start at the beginning

16    here.  There is -- Dr. Heinel, you have no disagreement, I

17    take it, with the facts that -- described by the Government

18    that you owed USC a fiduciary duty to provide honest and

19    faithful services?  Any dispute with that?

20              THE DEFENDANT:  No, Your Honor.

21              THE COURT:  And do you have any dispute with their

22    assertion that you provided student applicants to the

23    subcommittee using athletic profiles for students where you

24    received the athletic profiles from Williams -- from Rick

25    Singer?
```

```
 1              THE DEFENDANT:  No, Your Honor.
 2              THE COURT:  And do you have any dispute that the
 3    profiles from Rick Singer that you presented to the
 4    subcommittee were -- that your presentation was false and
 5    misleading in that you led the subcommittee to believe that
 6    those applications had been received by -- from coaches
 7    rather than from Rick Singer?  Any disagreement with that?
 8              THE DEFENDANT:  No, Your Honor.
 9              THE COURT:  And that you presented those applicants
10    to the subcommittee as athletic recruits in exchange -- in
11    exchange for payments from Singer or his clients to USC?
12              THE DEFENDANT:  No, Your Honor.
13              THE COURT:  No disagreement?
14              THE DEFENDANT:  No disagreement, yeah.
15              THE COURT:  And that you did not disclose to the
16    subcommittee that there was a -- that you had an exchange, an
17    agreement for payments from Singer in return for presenting
18    those or for -- in return for the admission of those clients?
19              THE DEFENDANT:  No disagreement.
20              THE COURT:  Okay.  And that among those were a
21    purported women's volleyball recruit and a purported women's
22    soccer recruit?
23              THE DEFENDANT:  In agreement.
24              THE COURT:  Okay.  And that on October 5, 2018, you
25    spoke by phone with Singer, and you confirmed to him that you
```

1   presented the volleyball recruit and soccer -- or you -- you

2   confirmed to him that you presented these two applicants --

3   one as if the person was a volleyball recruit and the other

4   as if the person was a soccer recruit -- to the subcommittee,

5   that both had been approved by the subcommittee, and Singer

6   then confirmed that the students' families would each pay

7   $50,000 to USC.  No dispute about that?

8                THE DEFENDANT:  No dispute about that, no.

9                THE COURT:  And that some, if not all, of that

10  money was directed to accounts that -- that some or all of

11  that money was directed to accounts of -- at USC where you

12  were -- where you had sole or some role, at least, in

13  directing the use of those funds.  No dispute about that?

14                THE DEFENDANT:  Some control.  I agree to that,

15  yes.

16                THE COURT:  And it seems further that there's no

17  dispute that USC didn't know -- this is part of the

18  misleading -- that USC didn't know about this arrangement,

19  that these amounts were going to these accounts in return for

20  your presenting these students as athletic recruits.

21                THE DEFENDANT:  I don't believe that admissions

22  knew about that, no.

23                MS. MARINO:  I think, Your Honor, certainly, when

24  the presentation was made to subco, they didn't know.  At

25  some later time, could those admissions people find out that

```
 1  donations were made or -- you know, that these payments were
 2  made to the USC accounts, I presume so.  We don't know.  We
 3  don't know the answer to that.
 4          THE COURT:  But the critical question is that USC
 5  didn't know in extending an admissions office that -- in
 6  extending an offer of admission to these students, USC didn't
 7  know that there was an arrangement for these funds to be paid
 8  in return for the individual to have been presented --
 9  I'm drawing a --
10          MS. MARINO:  To the subcommittee.  Yes, that's
11  correct, Your Honor.
12          THE COURT:  So my only -- my only hesitation here
13  is, finally, on the question of whether -- there's clearly
14  a -- you have admitted to an illicit agreement and to
15  misleading the university and to -- to arranging an agreement
16  that the university -- that was contrary to what the
17  university expected from you as part of your fiduciary duty
18  and that there's honest services fraud here.  So I get that
19  far.
20          And I guess my issue is simply, finally, on whether
21  the professional gain satisfies the statutory requirement of
22  a bribe or kickback.  And I guess what I am sort of weighing
23  here is where both sides seem to be in agreement that there
24  is a violation, perhaps the simplest answer is that the --
25  that the defendant waives -- if the defendant is proceeding
```

1    here, that the defendant waives any argument that a

2    professional gain isn't sufficient for the bribe and kickback

3    element of this crime.

4            MS. MARINO:  Could we have a moment?

5            THE COURT:  Yep.

6            (Pause in proceedings.)

7            MS. MARINO:  Your Honor, I apologize for that

8    delay.

9            In response to the Court's inquiry, part of

10   Dr. Heinel's job responsibilities was development, which

11   means raising money.

12           THE COURT:  So I've gone back and looked at the

13   order that you were referring to, Mr. Basil, and I think what

14   I -- reading slowly, the whole finding there -- which, as you

15   read it, I didn't -- I didn't focus on -- what I said -- it

16   was not just that it benefitted the defendants

17   professionally, but then I included also -- which you

18   probably read, but it went too quickly for me reading it --

19   where the university's admissions office would not have

20   approved such an arrangement.

21           And so I think the question here is -- I think that

22   was that -- that is accurate, that is what I found before,

23   and I certainly have no reason to rethink that.  But I think

24   the question then is, what are the facts -- so, certainly, if

25   the university knew that what -- Rick Singer's profiles were

1    themselves false or fraudulent, I think, again, the

2    university would not be approving admissions on false facts.

3            But I haven't heard Dr. Heinel admit that she knew

4    that Rick Singer's descriptions were fraudulent.  All she's

5    admitted to so far is that she misled the university into

6    believing that these rec- -- that these recommendations came

7    from coaches.

8            And so I guess my next question to you is the

9    allegation -- this is -- this is wording from the

10   superseding -- second superseding indictment:  "The

11   university's admissions office would not have approved such

12   an arrangement."

13           So I see -- it seems implicit, and I don't think I

14   need much further convincing that the university admissions

15   office would not have approved an arrangement where the

16   applications were false, and I think that's what was sort of

17   in my mind as we're going there.

18           But if what Dr. Heinel has admitted to here is only

19   that she was making the recommendations using Rick

20   Singer's -- relying on Rick Singer rather than the coaches'

21   recommendation, and she misled the university, how would the

22   Government be showing this fact the university admission

23   would not have approved such an arrangement, if that's all

24   she's admitted to as to the wrongdoing?

25           MR. BASIL:  Your Honor, she's not only -- she's not

1    simply passing along information from Singer.  She's adding

2    to it, and the information that she's adding to it is not

3    true.  So --

4         THE COURT:  She's adding the information that the

5    coaches were --

6         MR. BASIL:  She's adding information as if it came

7    from the coaches.  I -- so I don't want to name a student,

8    but there's various -- for example, a student on the -- on

9    the information that comes from Singer, the student is listed

10   as having -- it's a basketball player, a height of

11   five-foot-eight.  Dr. Heinel changes that to be

12   five-foot-ten.  She changes the photograph to be a different

13   person.  So there are --

14        THE COURT:  So if that's what we're going -- I

15   mean, if there's -- so my concern here is that we make sure

16   that what -- what facts she's pleading guilty to get you

17   there, not just what facts you believe the Government has,

18   which the Government may very well have, but those are not in

19   front of me, and she's not pleading to whatever is in your

20   files.

21        So -- and we can take this in pieces.  Or we can

22   take this one of two ways.  I mean, either we can go through

23   and say here are -- here are these additional facts, as you

24   wanted to do, and you can give me as few or -- as you want or

25   as many as you want.  We can try to figure out whether that

```
 1    gets you there -- that the university admissions would not

 2    have approved.

 3           If the statement was the more general one, which is

 4    where we were up until five minutes ago, which is simply by

 5    these being Rick Singer's applications rather than the

 6    coaches' recommendations, that the -- on that alone, the

 7    university would not have wanted this transaction, my

 8    question is, what's the evidence the Government would have to

 9    prove that?  Alternatively -- so that's one route.

10           Alternatively is where you started going now, which

11    is, no, she did something more than just say this is Rick

12    Singer's versus the coaches'; and if she admits to that, then

13    we can go that way.  But I need one or the other of those

14    things in order to find that each of the elements is

15    established here.

16           MS. MARINO:  I -- maybe I could answer that,

17    because I think the establishment of the element is by the

18    fact that Dr. Heinel takes these profiles and adds in

19    information that makes these student athletes look like

20    better athletes, makes them -- makes it appear that the

21    coaches are saying, "These are athletes that we want on the

22    team."  And I think that that really --

23           THE COURT:  Okay.

24           MS. MARINO:  -- gets the point.

25           THE COURT:  Dr. Heinel -- and I'm sorry; I believe
```

```
 1    I've been mispronouncing your name the whole time.
 2    Dr. Heinel --
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  -- is that accurate?  Do you have any
 5    dispute with what your counsel just stated here, which was
 6    that you added information to the applications that made
 7    these individual students look like better athletes than they
 8    were?
 9              THE DEFENDANT:  I added information to these
10    profiles to put them into a format that was a standardized
11    kind of template format of which we presented student
12    athletes to the subco with.
13              THE COURT:  But in doing so --
14              THE DEFENDANT:  I -- there was -- when that -- when
15    I received information and put that into the -- I had found
16    out that that is -- that was fake -- that is fake
17    information.  So I --
18              MS. MARINO:  Can we pause for a second?  Can we
19    pause?  We need to pause.
20              THE COURT:  Yep.
21              (Pause in proceedings.)
22              MS. MARINO:  Your Honor, I think Dr. Heinel
23    misunderstood the question.  So if you could just repeat the
24    question, that would probably be best.
25              THE COURT:  Did you add information to the
```

```
 1    applications that made the applications look better --
 2              THE DEFENDANT:  Yes, I did.
 3              THE COURT:  And I'm sorry; I was looking away.
 4    That was from you, Dr. Heinel?
 5              THE DEFENDANT:  Yes.  Yes, I did.
 6              THE COURT:  Okay.  And would -- is there any
 7    dispute that the university -- do you have any dispute that
 8    the university would not have approved the arrangement here
 9    where the athletes you were presenting were better -- that
10    you made them look better than they were -- that you would
11    not have approved -- they would not have approved that
12    arrangement where you did that in return for the money being
13    placed in university accounts?
14              MS. MARINO:  Your Honor, I just want to caveat the
15    Court's statement to -- instead of the university, we're
16    talking about subco.  Okay?  And the presentation was made to
17    subco, not to the greater university.  And the subcommittee
18    is -- and the allegations in the indictment specifically
19    refer to misrepresentations to the subcommittee.
20              THE COURT:  So subco would not have admitted the
21    students regardless of where the money was going in the
22    university based on those misrepresentations?
23              MS. MARINO:  I don't think it's where the money is
24    going is the critical -- I'm sorry, Your Honor.  I don't mean
25    to nitpick, but I do want to make this correct.  I think the
```

1    issue is that the misrepresentations were made to subco; and

2    subco, had they had -- had known that there were

3    misrepresentations, would not have admitted this student.

4            THE COURT:  Okay.  And, Dr. Heinel, you -- no

5    disagreement with that fact?

6            THE DEFENDANT:  No disagreement, yes, that the

7    subco wouldn't have approved it, yes.

8            THE COURT:  Okay.  And, now, the last piece of that

9    is that, regardless of whether raising funds were -- was or

10   was not part of your normal job duties anyway, you did have

11   professional gain in the money going there.  Even if that was

12   part of your normal job responsibilities, you had a

13   professional gain in the money going into those accounts.

14           Do you have any dispute with that?

15           MS. MARINO:  I think, Your Honor, if I could just

16   sort of fine-tune that a little bit, that because there is a

17   job duty to bring money into the university, the fulfillment

18   of that duty would be considered a professional gain.  I

19   mean, if my job duty is to be a lawyer, and if in the course

20   of that duty, I can't spell, then I'm not doing a very good

21   job.  So not fulfilling my job duty, right?

22           THE COURT:  I think with those -- I think with

23   those two parts to this, one is that -- and I think,

24   Ms. Marino, you may be absolutely right that it isn't the

25   exceptional advantage to her of this being an account that

```
 1    she had her signature on or that she used it for pet
 2    projects; without any of those, the point being, if you meet
 3    job requirements by an arrangement that your employer
 4    wouldn't approve of, then that meeting of your job
 5    requirements could be considered a sufficient gain for
 6    purposes of the bribe and kickback.  I think that's where we
 7    have gotten here.
 8                Any disagreement with that, Mr. Basil?
 9                MR. BASIL:  I would agree with the Court right now.
10                THE COURT:  The point -- the point being here, it
11    isn't -- I think what I have found troubling about these
12    allegations is the notion that these account are ones
13    controlled by the university employees, is so -- it's sort of
14    pregnant with this notion of misappropriation of funds, and
15    that isn't part of the allegation here.  And then the
16    question of whether this was something to overpromote a
17    person, I have overachieved by doing this, also seemed
18    incorrect to me without proving it.
19                But I think Ms. Marino's point is that it was
20    simply fulfilling her job duties in an illicit way when that
21    was a job expectation.  And perhaps that then brings you back
22    to the sailing coach, that it's sort of analogous that there
23    was an expectation that you raise money, but the university
24    isn't expecting you to raise money in this manner where there
25    is a fraudulent representation as part of the package.
```

```
 1            MS. MARINO:  Yeah.  And I just want to clarify one

 2    point, Your Honor.  We -- the approval or disapproval of the

 3    manner in which the transaction takes place is pursuant to

 4    the indictment related to subco, or related to admissions,

 5    and that is a distinction that's important to us.

 6            So she had a duty to subco, obviously, because she

 7    has a duty as an employee of the athletic department.  She

 8    has many duties and duties to different departments.  She has

 9    a duty to compliance.  She has a duty to subco, to the

10    admissions.  She has a duty to the development officer.  She

11    has different duties to different departments at USC.

12            But what she's charged with violating and what she

13    is admitting to violating is violating the duty that she has

14    to subco.

15            THE COURT:  And that's sufficient because subco is

16    a subpart of the university?

17            MS. MARINO:  That's correct.

18            MR. BASIL:  Your Honor, subco is a subpart of the

19    admissions department, and admissions is the only part of the

20    university that can let a student in.

21            THE COURT:  Understood.  But right now we're

22    talking about honest services.

23            MS. MARINO:  Right.

24            THE COURT:  And I think, if I understand where

25    Ms. Marino may be going with this, is that perhaps Dr. Heinel
```

```
 1    feels like she was serving a larger purpose for the
 2    university or some other argument.
 3           But she is conceding that she had a duty to the
 4    admissions people to not give fraudulent information to the
 5    admissions committee, and that regardless of whether she was
 6    trying to fulfill other parts of her job requirements to the
 7    university by giving fraudulent information to the admissions
 8    committee, she thereby violated her duty of honest services.
 9    I think that's where we're coming out here.
10           MS. MARINO:  The Court is, as usual, very astute,
11    and that is accurate.
12           THE COURT:  I don't know whether we're going to go
13    there, but we are, I think, getting to the end of our hour.
14    So we should probably keep moving here.
15           But for the Government, I think it is a slightly
16    more narrow statement that she's making; and I think you
17    don't seem to be in any disagreement that the problem was her
18    obligations to the side of the university that's dealing with
19    admissions, and that's what she breached.
20           MR. BASIL:  I agree, yes.  I agree with that.
21           THE COURT:  Okay.  So, with that, I believe we have
22    all the facts needed for me to go ahead and take the plea.
23           Counsel, is there any reason at this point for me
24    not to -- oh, I'm not sure I added that, when we went through
25    the statements, the phone call that you made was an
```

```
 1    interstate call.  Any disagreement, the one that's the issue
 2    at this -- of this -- of this count on October --
 3                THE DEFENDANT:  Yes.
 4                THE COURT:  Okay.  Given all of that, it seems to
 5    me we have sufficient facts.  Is there any reason for me not
 6    to take the change of plea at this point?
 7                MR. BASIL:  From the Government's point of view,
 8    no, Your Honor.
 9                MS. MARINO:  Not from us, Your Honor.  Thank you.
10                THE COURT:  All right.  And we are taking a change
11    of plea as to a part of Count 11; and with that,
12    Ms. Marchione, if you could proceed.
13                THE DEPUTY CLERK:  Yes, Your Honor.
14                Dr. Heinel, you are charged in a second superseding
15    indictment with Count 11, honest services wire fraud, all in
16    violation of Title 18 United States Code Sections 1343 and
17    1346.  You have previously pleaded not guilty to this charge.
18    Do you now wish to change your plea?
19                THE DEFENDANT:  Yes.
20                THE COURT:  How do you now plead to Count 11,
21    guilty or not guilty?
22                THE DEFENDANT:  Guilty.
23                THE DEPUTY CLERK:  Thank you.
24                THE COURT:  The Court finds that the defendant is
25    fully competent and capable of entering an informed plea,
```

# EXHIBIT C

Case: 22-1138   Case: 1:19-cr-10080-NMG   Document 2575-3   Filed 11/04/22   Page 2 of 37   Entry ID: 6491447
1

-SEALED PORTION REMOVED-

1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2
                                        )
3    UNITED STATES OF AMERICA,          )
                                        )
4          Plaintiff,                   )
                                        )    Criminal Action
5    v.                                 )    Nos. 1:19-cr-10080-NMG-19
                                        )
6    ROBERT ZANGRILLO,                  )
                                        )
7          Defendant.                   )
                                        )
8

9
                   BEFORE THE HONORABLE M. PAGE KELLEY
10                   UNITED STATES MAGISTRATE JUDGE

11
                          MOTION HEARING
12                     SEALED PORTION REMOVED

13

14                       November 26, 2019

15

16          John J. Moakley United States Courthouse
                       Courtroom No. 24
17                     One Courthouse Way
                   Boston, Massachusetts 02210
18

19
                     Linda Walsh, RPR, CRR
20                   Official Court Reporter
            John J. Moakley United States Courthouse
21              One Courthouse Way, Room 5205
                  Boston, Massachusetts 02210
22                   lwalshsteno@gmail.com

23

24

25

**A4142**

—————————————————SEALED PORTION REMOVED—————————————————

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3         UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Justin D. O'Connell
 4         One Courthouse Way
           Boston, Massachusetts 02210
 5         617-748-3412
           eric.rosen@usdoj.gov
 6
      On Behalf of the Movant University of Southern California:
 7
           HOGAN LOVELLS US LLP
 8         By: Anthony E. Fuller, Esq.
           125 High Street, Suite 2010
 9         Boston, Massachusetts 02110
           617-371-1000
10         anthony.fuller@hoganlovells.com

11         GIBSON DUNN
           By: Douglas Fuchs, Esq.
12             Debra Wong Yang, Esq.
           333 South Grand Avenue
13         Los Angeles, California 90071

14    On Behalf of the Defendant Robert Zangrillo:

15         MARTIN G. WEINBERG, PC
           By: Martin G. Weinberg, Esq.
16         20 Park Plaza, Suite 1000
           Boston, Massachusetts 02116
17         617-227-3700
           owlmcb@att.net
18
      On Behalf of the Defendant Mossimo Giannulli:
19
           DONNELLY, CONROY & GELHAAR, LLP
20         By: George W. Vien, Esq.
           260 Franklin Street
21         Boston, Massachusetts 02110
           617-720-2880
22         gwv@dcglaw.com

23

24    (Appearances continued on next page.)

25
```

**A4143**

————SEALED PORTION REMOVED————

1    APPEARANCES (Continued):

2    On Behalf of the Defendant John Wilson:

3        WHITE & CASE, LLP
         By: Michael Kendall, Esq.
4        75 State Street
         Boston, Massachusetts 02109
5        617-939-9310
         michael.kendall@whitecase.com
6

7              Proceedings recorded by sound recording and
8                produced by computer-aided stenography

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────────SEALED PORTION REMOVED─────────

1              P R O C E E D I N G S

2          THE CLERK:  November 26th, 2019, and we are on the

3    record in Criminal Case Number 19-10080, the *United States*

4    *versus Robert Zangrillo*, the Honorable M. Page Kelley

5    presiding.

6          Would counsel please identify themselves for the

7    record.

8          MR. FULLER:  Good morning, Your Honor -- or afternoon.

9    Tony Fuller on behalf of U.S.C., and with me is Doug Fuchs and

10   Deborah Wong Yang.

11         THE COURT:  Okay.  Good afternoon.

12         MR. FUCHS:  Good afternoon, Your Honor.

13         MS. YANG:  Good afternoon, Your Honor.

14         MR. WEINBERG:  Good afternoon.  Martin Weinberg on

15   behalf of Robert Zangrillo.

16         THE COURT:  All right.

17         MR. VIEN:  Good afternoon, Your Honor.  I don't mean

18   to be presumptuous because we are not a moving partner but --

19   party, but George Vien on behalf of Mossimo Giannulli, and with

20   me is Michael Kendall who represents Mr. Wilson and -- I don't

21   want to take over the hearing or get out of order, but really

22   we're here for two reasons.  One, we would just like the

23   hearing to be open; and two, and perhaps more importantly,

24   whatever is directed to Mr. Weinberg, we have a simple request

25   that all of the co-defendants get the same information and the

─────────SEALED PORTION REMOVED─────────

1    same material.  And we'll sign whatever protective order that

2    the Court issues or requires.  I just don't want to be in a

3    position of if Mr. Weinberg does obtain documents, that he

4    can't give them to the co-defendant.  And as I understand,

5    U.S.C. would give them to the Government, but then we would

6    have to deal with the Government to get them.  And we've

7    already filed a *Brady* letter, and I expect litigation on that.

8    So we are trying to cut to the chase and be efficient, and

9    that's why Mr. Kendall and I are here on behalf of the

10    defendants -- our defendants, at least, to make that request.

11           THE COURT:  Mr. Fuller?

12           MR. FULLER:  I always welcome Mr. Vien's input, as he

13    knows, and I think -- well, two things.  One is -- we'll have

14    to talk to the client, but I think it's a reasonable request

15    that they get the same information pursuant to the same

16    confidentiality order that we negotiated with Mr. Zangrillo's

17    counsel.

18           However, that protective order itself I think is the

19    reason why U.S.C. would like to have the hearing, at least a

20    portion, where we discuss the stuff that's been turned over and

21    the e-mails at issue, that we have that in camera because the

22    parties have agreed at least that they're -- the documents and

23    what the information contain are of a sensitive nature, and

24    they are subject to the protective order.  So if they were to

25    be used, they would be filed under seal in a pretrial

SEALED PORTION REMOVED

1  proceeding.  So the parameters of that order itself I think

2  contemplate -- if we're going to be talking about these things

3  in a scenario where a disagreement with one of the parties

4  about what should be turned over, it should be done in camera.

5  So that's our position on that.

6        But in terms of, I think, getting the other defendants

7  the same information, I think that's a reasonable request.

8  We'd have to talk to the client, but on the same terms as were

9  negotiated, I don't think that would be a problem, but I defer

10  to co-counsel if they think it might be.

11  MS. YANG:  Yes, Your Honor.  Debra Yang.  I think

12  that, first of all, I think we want to discuss it with the

13  client and also do at least some sort of visual analysis of it.

14  I think everything, you know, as is requested, has to be

15  tethered under 17(c).  I haven't looked at all the different

16  charges for every specific defendant.  They are all

17  very -- even though they are the same kind of thing, they are

18  very unique as far as the process at which folks went to and

19  how they ultimately got admitted.  So I think we would want to

20  just take a look at that and do some analysis.  In good faith I

21  need to do that for the client and have that conversation.

22        But I hear what counsel is saying as far as efficiency

23  and being willing to execute on the protective order; I take

24  that to heart.  So if we could report back to the Court or, you

25  know, work that out with counsel, we'll do that.

─────────── SEALED PORTION REMOVED ───────────

1    THE COURT:  Sure, okay.  So I'm not going to make any

2  ruling now on the general discoverability of the information

3  for other defendants.  I assume there will be some overlap

4  about that, but I just think, for purposes of this hearing

5  today, I'll just hear from Mr. Weinberg, and I'll let you,

6  Mr. Vien and Mr. Kendall, work things out as best you can with

7  U.S.C. and perhaps the Government, if the Government is in

8  possession of certain things, and then if you have a problem,

9  to file something.  And I think it should be more abbreviated

10  than these proceedings have been because I'll have set some

11  parameters on what U.S.C.'s obligations are.

12    So I do wonder if we do seal part of this hearing if

13  it ought to be -- if the co-counsel ought to be excluded as

14  well.  I was thinking the Government would not be excluded.

15  But what's your view on that, Mr. Fuller?

16    MR. FULLER:  Your Honor, the Government, I agree,

17  should not be excluded, although I don't believe they're here.

18  Oh, sorry.

19    MR. O'CONNELL:  Your Honor, Justin O'Connell on behalf

20  of the Government.

21    THE COURT:  The Government is always here.

22    MR. FULLER:  The Government is here.  They are

23  everywhere.  But, yeah, we agree that the Government should be

24  here.  Obviously certain materials -- I'm sorry.  I should

25  stand.

─────────────SEALED PORTION REMOVED─────────────

1           THE COURT:  It's all right.

2           MR. FULLER:  -- that were submitted ex parte, the

3    Government hasn't, I believe, had seen those.  But to the

4    extent that we're going to be talking about what's been

5    produced and what's at issue in our papers, they are welcome

6    to -- we agree they should be there.

7           THE COURT:  Okay.  And what about other counsel in the

8    case?

9           Mr. Fuchs?

10          MR. FUCHS:  Just a moment, Your Honor.  I can speak or

11   I can -- I would say that they're not yet parties to the

12   protective order that we signed, and therefore, we would not be

13   comfortable at this point having them present for any

14   discussion --

15          THE COURT:  Sure, okay.

16          MR. FUCHS:  -- of confidential information.

17          THE COURT:  Yes, Mr. Vien?

18          MR. VIEN:  Your Honor, Mr. Kendall and I will sign the

19   protective order right now, and we think we should be privy to

20   these discussions in part because our entire analysis is --

21   there's one conspiracy charge, so if it's relevant to a member

22   of the conspiracy, it's relevant to all the members of the

23   conspiracy.

24          THE COURT:  Sure.  I mean, I'm not quite sure that

25   we're going to need to do the ex parte or the sealed hearing.

────SEALED PORTION REMOVED────

1    I don't know, Mr. Fuller, what you've prepared as far as your

2    argument goes.  Why don't we just go ahead and get started with

3    argument, and I'll try not to speak specifically about the

4    materials and give away -- at this point, I've read so much,

5    I'm not -- I don't trust myself not to say things that were in

6    an ex parte filing, but I'll try to ask general questions.  And

7    let's see how far we can get, and then if we need to exclude

8    the public, we'll do that.  And -- yes?

9          MR. WEINBERG:  Thank you, Your Honor.

10          MR. FUCHS:  Your Honor, sorry.  I just want to say

11    that I was going to be taking the lead on the argument

12    responding to defendant Zangrillo's remaining outstanding

13    issues and everything about those issues involves what has

14    already been produced to defendant Zangrillo and which is

15    subject to the protective order.  So it's almost impossible to

16    make any argument to discuss his outstanding requests without

17    referring back to the information that --

18          THE COURT:  That you provided.

19          MR. FUCHS:  -- the comprehensive information that we

20    produced subject to the protective order.

21          MR. WEINBERG:  I simply don't agree.  We had a public

22    hearing on the original motion to quash by U.S.C. that related

23    to filings we made that are highly relevant to the

24    decision-making today.  There are general disagreements between

25    U.S.C. and myself regarding, you know, the 17(c), the Nixon

─────────SEALED PORTION REMOVED─────────

1    test, whether we should superimpose some civil test and allow,

2    you know, U.S.C. to argue things accumulative, or prejudice

3    outweighs relevance, or concepts that are far into the Nixon

4    tests.  We can certainly address the generic issues.

5         I also wanted to just say one more thing since the

6    Government is here, which is that pursuant to the

7    confidentiality agreement, which I signed with U.S.C. in order

8    to expedite the production and minimize the litigation, I have

9    given to the Government as part of reciprocal discovery every

10   page, 242 pages to be precise, at least about 242, that I

11   received from U.S.C.  So the Government has it.  You know, they

12   need to evaluate whether or not that triggers their *Brady* or

13   Rule 16 obligations.  I certainly have a strong opinion whether

14   it does or not, but it's a second waif to try to cut through

15   the understandable issues that have been raised by Mr. Vien,

16   Mr. Kendall, and others who have offered to sign the protective

17   order with U.S.C., as well as the ordinary protective order.

18        I've communicated their willingness to sign the U.S.C.

19   confidentiality agreement in which case I could have provided

20   the documents directly to them but didn't because of the

21   conditions that I received them.  So I think U.S.C. can decide

22   whether to reconsider its communication to me telling me no,

23   you know, you can't give those documents even when people sign

24   the protective order; or two, the Government being here should

25   seriously think about whether or not in the next Rule 16

Case: 22-1138 Case: 19-1768 Document: 2573-3 Document: 2565-3 Filed: 03/03/22 Filed: 04/28/22 Page: 12 of 87 Page 12 of 87 Entry ID: 6491447

11

————SEALED PORTION REMOVED————

 1  discovery to produce those documents to co-counsel.

 2       THE COURT:  Well, okay.  So how about if you argue,

 3  Mr. Weinberg, and Mr. Fuchs, if you find the argument is

 4  encroaching on what you consider to be protected information,

 5  I'll just count on you to object.  Yes?

 6       MR. FUCHS:  That's fine, Your Honor.  I think that

 7  when we have the opportunity to present our side in rebuttal,

 8  if you are going to allow Mr. Weinberg to speak first, that we

 9  would request that that be in camera because I know we're going

10  to want to refer to the protected material --

11       THE COURT:  Okay.

12       MR. FUCHS:  -- that we produced.  If Your Honor

13  then -- I just think it would be -- enable a more seamless

14  presentation of the issues, a discussion of all of the issues,

15  and then if Your Honor wants to come back out and issue

16  findings on the record that don't touch on the protected

17  material, that's of course your prerogative.

18       THE COURT:  Okay.  All right.  So I think I will let

19  Mr. Weinberg go ahead with the caution that we're taking a

20  narrow view of what's protected here, so.

21       MR. WEINBERG:  Thank you, Your Honor.

22       First, the context.  I think, you know, we have worked

23  with U.S.C. to try to avoid restarting the subpoena process

24  following the last hearing and issuing an amended subpoena if

25  it would, you know, build on our new and evolving knowledge of

─────SEALED PORTION REMOVED─────

 1   how the U.S.C. program and practices work.  We've worked

 2   together to narrow the disputes.  We've -- I've narrowed a

 3   four-year subpoena to one year.  There's no need to search 22

 4   different, you know, e-mail boxes for the deans of each of the

 5   schools at U.S.C.  We've narrowed it down to Mr. Brunold and

 6   Mr. Brennan, and we've signed the confidentiality agreement.

 7        What's left is the three areas of dispute.  One being

 8   the advocacy e-mails; two being U.S.C.'s desire to either

 9   continue to broadly redact the documents that they've produced

10   to me or to superimpose the designations of the people whose

11   names they want to redact.  In other words, instead of having

12   an authentic document that says X donated money.  Please let

13   his student in, they want to eliminate X and say alumni or

14   parent or dean is advocating for parent, et cetera.  I'll

15   address that second.

16        The second part of the context is what U.S.C. produced

17   to the Government.  You know, they are represented by some of

18   the biggest and best law firms in the United States.  It's

19   simply implausible to me that with the argument they made they

20   didn't realize the Government would be producing to defense

21   counsel of indicted defendants what U.S.C. produced to the

22   Government, but they produced to the Government 250,000 pages.

23   It did not redact donors' names.  It did not redact sponsors'

24   names.  It did not redact anything.  It didn't redact students'

25   names.  And it provided the bases for the opposition that I

─────SEALED PORTION REMOVED─────

1    provided the Court that led to our original hearing.

2         They are taking a dramatically different position

3    regarding the 17(c) subpoena, and they're taking it, with all

4    due respect, you know, with what I think is an insensitivity to

5    the needs of a criminal defendant.  They don't get to decide,

6    you know, when I have enough evidence if the evidence matches

7    the Nixon test.  They don't get to argue, well, this might

8    embarrass, you know, a sponsor or donor.  They do get to raise

9    privileges, but they don't get to withhold documents because

10   they can argue I've got a list so I don't need an advocacy

11   e-mail, or they get to redact business records because they

12   don't want to have a name of a sponsor or a promoter or an

13   alumni or whoever is pushing for a particular student to be

14   part of the production when in the context I have precisely

15   that kind of evidence from the Government through Rule 16 but

16   narrowed to the athletic department.

17        And so I've made the argument that I need, for a whole

18   host of reasons, to detoxify the likely Government argument

19   that athletics and Donna Heinel and the athletic subco and all

20   of the athletic programs are different than the rest of the

21   university.  And the university shouldn't be defined by its

22   athletic department.

23        What I've tried to do in the original opposition

24   is -- and what I've received in exhibits, which we can discuss

25   in camera, is evidence that I think helps that detoxification.

————————————SEALED PORTION REMOVED————————————

1   It broadens the practices of the university, and that's

2   essential to my defenses.  So when you drill down to why these

3   documents that are in dispute are needed, first, they match the

4   Nixon test.  They're all admissible.  The unredacted list is

5   more admissible than a redacted list because it's an authentic

6   business record rather than a record that U.S.C. unilaterally

7   changed.

8          Second, it's specific.  We've negotiated specificity.

9   We've narrowed it to Brunold and Brennan.  We've narrowed it to

10  the year surrounding Amber Zangrillo's admission.

11         So the only third issue is relevance and materiality.

12  The principal overriding reason why the documents are necessary

13  is that Amber Zangrillo was advocated for by athletics as a

14  VIP, not as an athlete.  In other words, it may be

15  counterintuitive, but athletics, as we now know, advocates for

16  many students through the VIP process knowing that these are

17  not athletes.  Amber Zangrillo is particularly, you know,

18  emblematic of that because she suffered medical issues, that

19  she provided essays, character references.  Her entire

20  application was saturated with information that would

21  demonstrate to any admissions department this is not a world

22  class athlete.

23         So I want to show with the advocacy e-mails that are

24  being withheld, with the unredacted lists, that the other 22

25  departments advocate for their special interest students, not

—SEALED PORTION REMOVED—

 1   necessarily say the history department because this is the

 2   smartest high school historian or the film department because

 3   this is the most talented future film director, but because

 4   these are lucky students that have family or friends or

 5   neighbors or sponsors or advocates that either have donated or

 6   are perceived as likely to donate to U.S.C.  This is not unique

 7   to U.S.C.  This is a --

 8          THE COURT:  So don't the spreadsheets that you've been

 9   given, even if they were further unredacted -- I know they're

10   heavily redacted -- demonstrate that?

11          MR. WEINBERG:  Yes, they demonstrate that.  And if

12   they're unredacted, they would demonstrate that better and

13   they'd be admissible, and I wouldn't have to trust U.S.C. what

14   to redact and what not to redact and what to give and what not

15   to give.  I don't think there's a privilege to anything that

16   they're redacting.  Putting that aside, yes, the list --

17          THE COURT:  I agree with what you say so far, as far

18   as the law concerning the restrictions on the information that

19   you should be receiving, but, you know, Nixon is very clear

20   that I have discretion to limit requests that are unreasonable

21   or oppressive, and I haven't found too much explication of that

22   in the case law.  But one way that your request might be deemed

23   unreasonable or oppressive is if you already have enough

24   information to make your point, and I hear you that you never

25   have enough evidence in your client's support, but if you can

————SEALED PORTION REMOVED————

1    make the point ably at trial that it could be unreasonable or

2    oppressive to kind of expose the inner workings of the

3    university when they find that to be either proprietary

4    information -- we know college admissions is a very hot topic

5    these days, and I don't know that U.S.C. should be made to lay

6    bare all of its admissions secrets when your client already can

7    cover his bases.

8         MR. WEINBERG:  I have strained to accommodate those

9    legitimate interests on U.S.C.'s behalf.  If Your Honor looks

10   at the lists, 30 columns are completely redacted.  We're

11   fighting about Column 31 and the "Notes and Comments" section.

12   So all of the --

13        THE COURT:  Well, I do want them to unredact some of

14   those columns for you even if they replace it with like a

15   generic description.  But with regard --

16        MR. FUCHS:  Your Honor, I'm sorry to interrupt --

17        THE COURT:  Yes?

18        MR. FUCHS:  -- but I did want to just pick up on

19   something Mr. Weinberg said.  We redacted information in the

20   spreadsheet that we're talking about either because it was

21   necessary to protect student privacy under FERPA, which

22   Mr. Weinberg agreed with, or alternatively, it reflected

23   proprietary information.  He's not arguing about that here

24   today.  The only thing that's at issue are the redactions of

25   individual names in the "Comment" section of that chart.  So

Case: 22-1138 Case: 19-1619 Document: 003114943088 Document: 2576-3 Filed: 04/22/2022 Page: 218 of 287 Entry ID: 6491447

17

SEALED PORTION REMOVED

1   the chart itself as redacted is fine per agreement of the

2   parties.  The only thing at issue are the names in that last

3   column.

4          THE COURT:  Okay.  So in his brief he pointed out his

5   Exhibit 11, which -- do they have your Exhibit 11?

6          MR. WEINBERG:  Yes.  These are -- they certainly do

7   have everything, Your Honor.

8          THE COURT:  Okay.  So in Exhibit 11, for example, the

9   column titles are redacted, and I understand that you may be

10  referring to proprietary information because those are

11  admission criteria.

12         MR. FUCHS:  Yes, Your Honor, different than I think

13  what's in 11, although I need a moment to look at 11.

14         THE COURT:  Sure, but I just wonder -- so in Exhibit

15  11, the titles of columns are -- a lot of them are redacted and

16  the referral source is redacted, which I think could be, at the

17  very least, generically described.  But -- so I want you to

18  continue with your presentation, Mr. Weinberg, but I'm

19  interested in the question that U.S.C. raises which is why are

20  documents showing influential people lobbied Mr. Brunold, the

21  director of admission, for admission of particular people

22  relevant when no one did that for Ms. Zangrillo?

23         MR. WEINBERG:  And the answer is three or four reasons

24  why it is relevant.

25         THE COURT:  So one could be your client's state of

————SEALED PORTION REMOVED————

1  mind, right?

2      MR. WEINBERG:  Correct.

3      THE COURT:  And his understanding of how the process

4  worked?

5      MR. WEINBERG:  Yes.  He's in part a Los Angeles

6  businessman, although he spends time in Miami, and it is -- I

7  will be able to prove that it is widespread knowledge that

8  having a powerful person who's part of the, quote, Trojan

9  family advocate for you radically increases your chances for

10  admission.

11      THE COURT:  Well, sure.  And that actually seems -- I

12  think everyone probably assumes that to be true.  So I just

13  wonder, directing my question to U.S.C., is there some way to

14  admit this and then you don't have to turn over all these

15  documents, but you're -- Mr. Weinberg just knows at trial

16  you're going to answer that question yes?

17      MR. FUCHS:  To make the general point, Your Honor,

18  acknowledge the general point -- let me talk about the

19  compromise we have offered, which I think actually gets to the

20  issue that Mr. Weinberg is trying to prove much more cleanly

21  and crisply, and that is, rather than have names of people who

22  are meaningless to a Boston jury, an unknown to Mr. Weinberg,

23  we have offered to put in labels which define these people's

24  role or title in society which immediately demonstrate that

25  they are or are not people of influence.

─────SEALED PORTION REMOVED─────

1          THE COURT:  And people of -- and that would be

2     attested to -- I mean, one of the problems he raises is how

3     will I know that that's accurate, but you could have someone

4     attest that they have so designated these people and that

5     that's an accurate designation.

6          MR. FUCHS:  Yeah, in fact -- exactly, Your Honor, that

7     we have -- unfortunately we were unable to complete the

8     exercise prior to this hearing because it is -- it takes a

9     tremendous amount of work to check all the names in the

10    spreadsheet and in good faith to try to demonstrate who all

11    these people are.  But we would have someone who could do that,

12    if necessary, that they were -- they gathered information from

13    a variety of sources similar to the declarations that we

14    voluntarily put together and provided to Mr. Weinberg relating

15    to other information that we provided that I think Your Honor

16    is aware of that I'd prefer not to get into right now.

17         THE COURT:  Sure.  So let me just let Mr. Weinberg

18    continue.  Okay.

19         MR. WEINBERG:  In terms of why I would want more of

20    dividing up the advocacy e-mail, which I'll address secondly,

21    20 or so e-mails that have been provided ex parte from the

22    redaction issue:  One, it remains an inauthentic document.

23    It's a business record of U.S.C. that U.S.C. is unilaterally

24    changing.  I have no assurance from the Government that they

25    would not object and say what is this, it's not a business

————————SEALED PORTION REMOVED————————

1  record.

2       THE COURT:  Well, obviously if the Government refused

3  to admit such a document because it was redacted, it would have

4  to be unredacted, so.

5       MR. WEINBERG:  I have a second issue which is a jury

6  looking at what would obviously be something other than a

7  business record.  We have a "Notes and Comments" section or,

8  you know, "Referral" section or "Source," dean or trustee,

9  rather than a human being.  It would require an explanation to

10  the jury that U.S.C. made this objection and, you know, was

11  allowed to substitute, you know, labels for people.

12       THE COURT:  Sure.  I think these are the kind of

13  arguments that perhaps would be made to the trial judge about

14  the efficacy of using certain things and whether -- I mean, I

15  think that's something you could raise just for purposes of

16  discovering it and letting you prepare your defense.

17       MR. WEINBERG:  Third, if I could --

18       THE COURT:  Yes?

19       MR. WEINBERG:  -- you know, intervene before Your

20  Honor makes a preliminary decision?

21       THE COURT:  Sure, sure.

22       MR. WEINBERG:  I think I have a right to interview

23  some of the people.  Obviously I'm not going to interview 100

24  people.  Obviously I'm not going to try to call 100 people as

25  witnesses, but if I could find witnesses whose experience

─────────SEALED PORTION REMOVED─────────

1    matches Mr. Zangrillo's experience, I at least could, you know,

2    attempt to produce that witness and have them testify.  Jurors

3    need --

4            THE COURT:  So why is that admissible?

5            MR. WEINBERG:  It would be admissible, A, to show the

6    general knowledge of how the admissions process works from the

7    perspective of sponsors and donors as well as parents.  And,

8    you know, I would -- I'm going to try to legitimize -- despite

9    this kind of public passion that's played out in the media,

10   I've got a burden to legitimize donations, to demonstrate to

11   the jury they're not criminal.

12           THE COURT:  Sure.  I don't think you have much of an

13   uphill battle convincing a jury that if you give donations to a

14   school, you would improve your chances of getting in.  I mean,

15   I don't for a second believe Mr. Brunold's affidavit that he

16   submitted here, and I think it's belied by many of the

17   documents that we've received.  I mean, part of the problem

18   we're facing here is that I think you have a very basic fact

19   that you need to get across to a jury to support your defense

20   that I think jurors would have no problem accepting as true,

21   and U.S.C. has gone on the record saying that's not true.  So

22   you're digging assiduously for documents showing that donations

23   affected a person's chance of getting in, and U.S.C. is denying

24   that's true.  And I think it's caused U.S.C. a lot of trouble

25   here unnecessarily.  Even if the parting line there, which I

─────────────────── SEALED PORTION REMOVED ───────────────────

1   know may be we don't admit people because they make donations,

2   I just think that's not credible.

3          MR. WEINBERG:  But it's not credible given reality,

4   but to jurors who will come to the jury and believe that their

5   kids' chances to get in have, you know, have been minimized,

6   inequitably minimized or trivialized by a system, I've got an

7   uphill battle.

8          Mr. Zangrillo is presumed innocent, but from what I've

9   seen in the public media and in responses of the public media,

10  there is a passion against the wealthy or the influential

11  having any advantage, you know, in the system.  People may

12  recognize it but, you know, the line between what Mr. Rosen and

13  Mr. O'Connell, their team, will be arguing are appealing to

14  this sense that it is illegal not to have a meritocracy.  I've

15  got to prove that it is not only not illegal but that U.S.C. is

16  not a victim, and they made a victim impact statement and the

17  Government claims they're a victim.  They are not a victim.

18  They welcome people like Mr. Zangrillo.  They reward people who

19  are like Mr. Zangrillo who gave donations in the past, and they

20  welcome the students of the people that advancement targets for

21  potential donations in the future.

22          And this is the antithesis of being a victim of fraud

23  to claim that they've been denied money or property or that

24  their admissions slot is some wire fraud when so many people

25  similarly situated to Mr. Zangrillo, donors, people that know

─────SEALED PORTION REMOVED─────

1   donors, people that know past donors, people who might donate

2   in the future, are admitted.  But I've got to fully embrace a

3   practical burden despite the principles that the burden rests

4   exclusively on the Government.  I'm fighting a tidal wave of

5   negative and toxic publicity that doesn't make distinctions,

6   you know, other than anything that doesn't demonstrate

7   meritocracy is wrong, and jurors tend to have a shorter route

8   from feeling morally wrong to feeling like a crime than they

9   would if they felt the donation process was moral.  And so I'm

10  seeking, therefore, different categories of information.  I've

11  received the statistics through the declarations.

12          MR. FUCHS:  Your Honor, this is exactly what I wanted

13  to avoid having.

14          MR. WEINBERG:  I'm not naming the statistics.

15          THE COURT:  Okay.  All right.  So thank you for

16  objecting.  All right.  So why don't we -- you just address --

17  well, how much more do you have to say?

18          MR. WEINBERG:  Just one other area --

19          THE COURT:  Okay.

20          MR. WEINBERG:  -- which is that the relevance, and I

21  will not get into the specific documents, but why do I need the

22  advocacy e-mails?  Because I want to show that those e-mails

23  that the Government gave me, that they received from U.S.C.

24  that were Donna Heinel's e-mails to Tim Brunold, which are in

25  the -- which were not within our confidentiality agreement, are

SEALED PORTION REMOVED

1  not aberrational, that athletics was not an aberration, that

2  just like athletics urged -- not just by having lists but urged

3  through advocacy.  Whether it's on the phone I can't prove

4  without testimony, but if they did it by e-mail saying pick a

5  student from the list and urge his admission, I want to show

6  that was done by the Marshall School of Business, I want to

7  show that was done by the Annenberg School of Communications, I

8  want to show the development was involved.

9       THE COURT:  So you have the spreadsheets from those?

10      MR. WEINBERG:  I have the spreadsheet that shows --

11      THE COURT:  Advocacy.

12      MR. WEINBERG:  I have a spreadsheet that has the

13 "Notes and Comments" section that's heavily redacted, but I

14 have e-mails from Ms. Heinel to Mr. Brunold that I want to

15 match by showing that in the U.S.C. practice more was done than

16 just simply tagging students through lists.

17      THE COURT:  Okay.

18      MR. WEINBERG:  That individuals on that list got

19 special advocacy on one-to-one e-mails from people of power to

20 admissions and that Mr. Brunold's, you know, expected testimony

21 that he didn't want that and didn't consider that was

22 contradicted by the frequency that people sent him lists that

23 mentioned donations or sent him advocacy e-mails that explained

24 why a certain student, not because they were the best high

25 school theater person but because they were the daughter of a

───────────SEALED PORTION REMOVED───────────

1    wealthy donor or the daughter of a friend of a wealthy donor.

2    I need those individual e-mails because that's something the

3    jury can relate to.  That's something that matches what Heinel

4    did from the athletic special VIPs, and it's within Nixon.

5    They're relevant to my defenses.  They're relevant to the

6    defense that Donna Heinel was doing what the university

7    approved.

8         She didn't breach her honor services by reaching out

9    to Tim Brunold to support certain students.  She was doing

10   exactly what Pat Haden asked her to do and what the university

11   welcomed that she did.

12        THE COURT:  And right now the e-mails you're talking

13   about are the 20 e-mails that you were not given?

14        MR. WEINBERG:  Yes.

15        THE COURT:  Okay.

16        MR. WEINBERG:  I haven't seen them.  I can only

17   predict that they are para -- that if U.S.C. is fighting so

18   hard to withhold them that they in some respects further prove

19   by overriding case that U.S.C. is not a victim and Donna Heinel

20   did not violate 1346, at least in the way that she advocated

21   for Amber Zangrillo.  Mr. Zangrillo's state of mind was

22   accurate and circumstantially supported by the business records

23   of U.S.C., and in essence, athletics could advocate for

24   nonathletes, just like the history department, to name one of

25   22, who predictively have advocated for people not just because

─────SEALED PORTION REMOVED─────

1   of his skills as a future historian.  Thank you.

2           THE COURT:  Okay.  Okay.  So I think I will seal the

3   hearing, and I think the Government may stay but I'm not going

4   to have other defendants stay at this time.  And this is all

5   being recorded, Mr. Vein.  I know this displeases you, but

6   you'll be able -- you are not participating anyway.  There will

7   be a record of the hearing.  So -- and I think -- I'm happy to

8   entertain motions for transcripts of it in the future after the

9   parties have sorted out the protective order issue.

10          MR. VEIN:  Your Honor, I understand your ruling.  I'm

11  not going to belabor it and take your time.  I object to it,

12  but I want to move on.

13          Regarding the issue that brought us here, whether

14  U.S.C. will agree to give us, the rest of the defendants or at

15  least Mr. Wilson's attorney and me, whatever they give to

16  Mr. Weinberg, I was wondering if you could -- it seems like

17  it's a yes or no answer.  Could they tell us by Monday?

18          THE COURT:  Yeah, I'm no going to rule on that now.

19  U.S.C. hasn't had a chance to -- I don't know.  Did you talk to

20  them about this before today?  I'm not going to be hearing

21  argument on this, Mr. Vien.  That's not the purpose of this

22  hearing.

23          MR. VIEN:  I know.  I just wanted an answer so I don't

24  waste anybody's time.

25          THE COURT:  I know you do, but you're not going to get

─────────────── SEALED PORTION REMOVED ───────────────

1    one from me right now.  So -- okay.  So we'll just ask everyone

2    to step out, and I'll hear you argue, Mr. Fuchs.

3         MR. KENDALL:  Just so I can make my record, Your

4    Honor, I just want to note my objection that the Government is

5    going to hear things that I'm not going to hear, and that's

6    really my point.  We're all one conspiracy.  It's all one

7    prosecution team.

8         THE COURT:  So because we're talking -- the reason I'm

9    doing this, Mr. Kendall, is because you've had months to join

10   in this effort.  You show up at the hearing today unannounced,

11   take a seat at counsel table, stand up and address the Court as

12   if you're part of the hearing, which you are not.  And I think

13   I'm being very polite to you actually, and you can file

14   something.  This is being recorded.  You're not being shut out

15   permanently.  You can certainly get a transcript of it once

16   you're entitled by joining a protective order or whatever it is

17   you wish to do to hear the information that is presently

18   protected.  So I don't doubt that you are going to have a right

19   to this, but I'm just not going to rule on it right now.

20        MR. KENDALL:  Okay.  Thank you, Your Honor.

21        THE COURT:  Okay.

22        (All parties exit the courtroom.)

23                         *  *  *  *  *

24   (Recording and transcript is sealed from 12:44:49 to 1:46:13)

25                   SEALED PORTION REMOVED

─────────SEALED PORTION REMOVED─────────

1                              * * * * *

2              (On the public record.  Recording begins at 1:54:26)

3              THE CLERK:  Today is Tuesday, November 26th, 2019, and

4    we are back on the record in Criminal Case Number 19-10080, the

5    *United States versus Robert Zangrillo*, the Honorable M. Page

6    Kelley presiding.

7              THE COURT:  Okay.  And can we just have counsel

8    identify themselves again.

9              MR. FULLER:  Good afternoon, Your Honor.  Tony Fuller

10   along with Doug Fuchs and Deborah Wang for U.S.C.

11             MR. WEINBERG:  Martin Weinberg for Zangrillo.

12             THE COURT:  Okay.  So we have had a very lengthy ex

13   parte -- well, not ex parte, but under seal argument concerning

14   the issues that are still remaining with regard to the 17(c)

15   subpoena.  The Government, I will note for the record, was

16   present.

17             We are now back on the public record, and in the

18   interest of moving things along, I'm not going to enter a

19   written order.  I'm going to rule from the bench here.  So I'm

20   guided by *United States versus Nixon*, which I find to be the

21   leading case concerning 17(c) subpoenas.  And most relevant

22   here to my analysis is that in *Nixon* the Supreme Court said

23   that a 17(c) subpoena can be modified by the Court if

24   compliance would be unreasonable or oppressive, and I am -- I

25   agree with Mr. Weinberg in his filings concerning the

SEALED PORTION REMOVED

1    good-faith basis that he has for seeking certain information

2    from U.S.C., but I am balancing that against the trouble that

3    U.S.C. has to go to to produce the information.  And also, I do

4    credit U.S.C.'s representations concerning that it's

5    proprietary information about its admissions process and also

6    concerning the -- just the importance of keeping information

7    concerning donors and other friends of the university's actions

8    private.

9         So I also find that no one has suggested that any

10   information about individual students should be produced by

11   U.S.C.  These are prospective students, many of them are high

12   school students, some of them are minor, they have rights under

13   FERPA, and also, I find that they have a privacy interest.  The

14   information about them is extremely sensitive.  It involves

15   their test scores, their academic achievement, other people's

16   assessment of their abilities, et cetera, and so that is just,

17   I think, off the table, and I don't think anyone is seeking

18   that information but I would not allow it.

19        So with regard to the specific disputes here, I will

20   allow U.S.C. to produce the tables that were discussed with the

21   names of people redacted and the replacement of those names

22   with the person's role or a description of the person's

23   occupation as in the sample table that was handed up to me

24   during the hearing.  But I do want to caution U.S.C. that I'm

25   allowing its request for redactions, but I don't want to

SEALED PORTION REMOVED

1  disadvantage defendant in preparing for trial or especially, if

2  there is a trial, at the trial. And so, for example -- an

3  example might be if the defendant wanted to establish that

4  deans involved in the communications at issue were from

5  different schools or departments across the university and a

6  witness said, oh, I can't tell because it's been redacted, then

7  that would be a problem and that should not happen. Or if a

8  defendant cannot link -- if defendant cannot link different

9  e-mails to the same person because of the redactions, that's

10  going to be a problem. So in other words, I want U.S.C. to

11  work with defendant to clarify matters and assist him in

12  working around the redactions if he has questions or if the

13  redactions make things unclear.

14       And if, as Mr. Weinberg has suggested, the Government

15  takes the position that redacted documents are not admissible

16  as business records or otherwise not usable at trial and they

17  otherwise would be admissible, then the documents may have to

18  be unredacted. And my intention is not to render documents

19  inadmissible, and I think that would be patently unfair.

20       Mr. Weinberg also complains that he has no means of

21  checking the accuracy of the redaction of names and replacement

22  of those names with the description of the person's role, and

23  so, to ameliorate this, the redactions need to be accompanied

24  by an attestation, some kind of sworn statement from the person

25  who did the redactions.

SEALED PORTION REMOVED

1          So with regard to the 20 items that U.S.C. attached to

2    its filing and requested it not have to give to the defendant,

3    I do find that those are relevant but only the e-mails to

4    Mr. Brunold or where he's copied on them, and I will permit

5    U.S.C. to redact the names of the persons involved and replace

6    them with descriptions as you do in the table that was handed

7    up.  And I'm going to -- I want to make sure that these

8    materials are protected and they're not used without seeking

9    permission from the Judge.

10          So with regard to the additional donor information,

11    I'm going to find that it's in a balancing consideration, it's

12    troublesome for the school and not that relevant, and I'm also

13    not going to force U.S.C. to run additional search terms

14    through its system at this time.  Okay.

15          Any questions?

16          MR. FUCHS:  One question, Your Honor, with regard to

17    the 20 e-mails, there's also proprietary information reflected

18    in those.  Are we able to redact that information?

19          THE COURT:  So the proprietary information I think

20    you're referring to has to do with the admissions process

21    itself?

22          MR. FUCHS:  Yes.

23          THE COURT:  And I couldn't really understand what it

24    was while I was looking at it, and I wonder if you could file

25    something ex parte explaining what that is.

────────────SEALED PORTION REMOVED────────────

1        MR. FUCHS:  Yes.

2        THE COURT:  I noticed there were terms being used, but

3    I don't know what their significance is.  And I think I'll take

4    a look at that and rule further on that.

5        MR. FUCHS:  Thank you, Your Honor.

6        MR. WEINBERG:  Just the last thing, I'm sure U.S.C.

7    tends to preserve the original documents just in case we need

8    them at trial, and I would ask the Court to -- I would ask

9    U.S.C. to agree that any document that they provided redacted

10   form pursuant to Your Honor's orders, they would preserve the

11   unredacted documents so if needed it's available.

12       THE COURT:  Okay.  Any problem with that?

13       MR. FUCHS:  No, Your Honor.  I would just, though,

14   pick up on one thing you mentioned about seeking leave of Court

15   before these documents were to be used, these 20 e-mails, I

16   think you mentioned seeking leave of the District Court, we've

17   entered into a protective order with Mr. Weinberg, and I'm

18   wondering, Your Honor, if you would order that the protections

19   in that protective order govern the documents that were

20   produced to Mr. Weinberg so as to not limit them somehow --

21   limit the protection to the agreement between us and

22   Mr. Weinberg but actually protect the documents themselves.

23       MR. WEINBERG:  I don't know what Mr. Fuchs is relating

24   to.  We have two different means of protected documents in the

25   case, one is the protective order which is between all the

SEALED PORTION REMOVED

1   defendants and the U.S. Attorney's Office that prevents

2   dissemination and set for litigation purposes.  We have a

3   second confidentiality agreement between U.S.C. and myself that

4   prohibits me from using or in any way filing any of the

5   documents that I received from U.S.C. litigation, and I

6   consider that to include both anything I received as a result

7   of today's decisions as well as what I received several weeks

8   ago.  That protects U.S.C. against pretrial use except under

9   seal, absent the Court not wanting it under seal and I have to

10  give U.S.C. notice.  At trial there's an exhibit list, and to

11  the extent I would want to use any of the 20 exhibits, I would

12  be identifying them by date of e-mail but not by content on the

13  exhibit list.  The Government could object, and I'm glad to be

14  required to give U.S.C. notice as to the 20 e-mails about --

15          THE COURT:  Sure, I think the use of trial is one

16  thing, but I guess what is new here is that the documents are

17  being given to you, you're giving them to the Government, and

18  then they're governed by this much less strict rule.

19          MR. FUCHS:  Exactly, Your Honor.  And in order to

20  facilitate the distribution of the documents, which apparently

21  at least two of the defense counsel want, having a protection

22  over the documents that is no different than what Mr. Weinberg

23  has agreed to is what we're requesting.

24          THE COURT:  So, in other words, you -- I mean, I'm --

25          MR. FUCHS:  There can't be an end run around the

─SEALED PORTION REMOVED─

1    protective order.  In other words, they go to the Government

2    and then the Government is under some other obligation to do

3    something with those documents, and now they're no longer

4    protected.  We want the protections to run with the documents,

5    the same protections he's already agreed to.

6            THE COURT:  So I think it's hard if the documents run

7    to the Government and the Government isn't part of the

8    protective order for them to just magically be governed by a

9    protective order that they haven't acknowledged.

10           So I don't know -- here's what I would like you to do:

11   With -- let me just ask the Government since they're here.

12   Have you already distributed any of the materials that you got?

13           MR. O'CONNELL:  No, I don't think at this point.  I

14   think we only got the materials from Mr. Weinberg --

15           THE COURT:  Last week.

16           MR. O'CONNELL:  -- in the last week or so, and they

17   haven't gone out.

18           THE COURT:  Let me do this:  Let's have U.S.C. talk to

19   the Government about what you're going to do with documents

20   that you're given -- that defendants share with you because

21   they also have reciprocal discovery obligations that may

22   obligate them to give over certain of the documents they get

23   from you.  So let's have the Government either enter into

24   protective orders with defendants or U.S.C. or someone.  Let's

25   make sure those documents are still protected if U.S.C. wants

————————SEALED PORTION REMOVED————————

1    them to be, okay?

2         MR. O'CONNELL:  Your Honor, I think from the

3    Government's perspective, we concur with U.S.C.'s position and

4    Mr. Weinberg's position.  I think, if we've learned anything

5    from the last time in trying to negotiate a protective order,

6    the defense counsel sometimes does not, so I think it kind of

7    puts us in a little bit of a bind.  We do have those discovery

8    obligations.  We do have to produce that, but we can raise

9    those when they come up.  I heard Mr. Vien and Mr. Kendall say

10   today that they would enter an order.  I saw Mr. Kelly in the

11   back of the room.  I don't know what his position is.  But

12   we're open to those conversations.

13        THE COURT:  Well, I think this all gets complicated by

14   the fact that these documents may have absolutely no relevance

15   to some defendants who weren't involved at U.S.C., and also,

16   we've got -- this is such a big case that we've got a lot of

17   people potentially, even with that limitation, who might want

18   these documents.  So I'm going to just leave it up to the

19   parties to work together and figure out a way to protect these,

20   and I'm happy to sign off on anything you agree to.  And if you

21   can't agree, then we'll have a hearing on it.

22        MR. O'CONNELL:  Just for context purposes, Your Honor,

23   not to belabor the point, but most of the remaining defendants

24   do have a U.S.C. connection.  Some are purely testing, but most

25   of them are U.S.C.  So to the extent that these documents have

Case: 22-1138 Case: 1:19-cr-00069-WCG Document 2573-3 Filed 12/04/22 Page 33 of 37 Document: 2573-3 Filed: 12/04/22 Page 33 of 37 Entry ID: 6491447

36

─────────SEALED PORTION REMOVED─────────

1    any relevance, which I know Marty and I have a respectful

2    disagreement on, for anybody, I think that they would be

3    pertinent if you assume the relevance of those documents.

4         MR. FUCHS:  And we will try to work with Mr. Weinberg.

5    He's offered to before to help in this regard, and we'll work

6    with the Government as well to try to get everyone who has a

7    U.S.C. connection or who otherwise might get these documents to

8    sign off on the same protective order that Mr. Weinberg signed

9    off on.

10        THE COURT:  Okay.  And if you're encountering problems

11   with that, let's not let time go by because I think time -- the

12   time is getting narrower here in this case, and we'll -- I'm

13   happy to hear you by phone.  You don't have to come all the way

14   from California or local counsel or whatever, and we'll try to

15   work through those issues, okay.

16        MR. FUCHS:  Thank you, Your Honor.

17        MR. WEINBERG:  Thank you, Your Honor.

18        MS. WANG:  Your Honor, thank you for hearing us during

19   the week of Thanksgiving, too.

20        THE COURT:  No problem.

21        (Recording ends at 2:09:11)

22

23

24

25

EXHIBIT A
Consent Forms
From Automatic Discovery
April 2019

September 20, 2018

Re:    Consensual Monitoring of Wireless Phone by Law Enforcement

Dear:

Kindly accept this correspondence as confirmation of representations made by the Department of Justice (DOJ) and the **Federal Bureau of Investigation (FBI)** regarding the consensual monitoring of mobile phones for law enforcement purposes pursuant to 18 U.S.C.§ 2511 (2)(c). The specific phone referenced in this letter for AT&T's assistance in conducting consensual monitoring is an AT&T cellular telephone assigned telephone number 916 384 8802

Pursuant to 18 U.S.C. § 2501 *et seq.,* the law enforcement agencies of the Department of Justice sometimes consensually monitor the wire and electronic communications of confidential informants and other parties in order to gather information for their criminal investigations. As you know, consent of one of the parties to a communication is sufficient under the law to permit monitoring without court order. Even though consensual monitoring does not require a judge's authorization, given the portability of cellular phones and possibility of civil liability arising from someone other than the consenting party using the phone, AT&T has been requiring prosecutors to obtain a court order before permitting consensual monitoring.

Since we are aware of your concerns regarding the portability, and correspondingly the common transfer of mobile phones to non-consenting third parties, the **DOJ/FBI** propose that with consensual monitoring under 18 U.S.C. § 2511, consenting parties will be required to sign a consent and acknowledgment form pledging that the target phone will not be used by anyone else, including the uses of cell phone photography and text messaging. A sample copy of this form is attached.

After a thorough review of current applicable law, it is the position of the **DOJ/FBI** that an order is not required when a party to a communication consents to the monitoring, even when that phone used is inherently mobile; however, since the **DOJ/FBI** also recognizes the rights of third parties should be protected, the consenting party will be required to read and sign a statement pledging that the phone shall not be used by any other party.

We hope that this information assuages AT&T's concerns. Should you have any additional questions, please do not hesitate to contact us. Thank you for your anticipated cooperation in this matter.

Sincerely yours,

AUSA Signature

*ERIC S. ROSEN*

AUSA Printed Name

SINGER-VOL002-000377

## CONSENT AND ACKNOWLEDGEMENT

I,  RICK SINGER  , hereby state that:

1.      I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents. My consent extends to all communications over any such phone, whether or not that communication relates to a criminal investigation, to any and all messages left on any voicemail feature of any such phone, photographs taken using the phone, and text messaging. I further consent to the disclosure of any information or records regarding such communications to law enforcement agents.

2.      I acknowledge that I have been instructed that any cellular telephones provided to me in the course of my activities are to be used only by me, and that I am not authorized to allow any other person to make, receive or participate in telephone calls involving those telephones as defined above in which I am not a participant.

Date:  9/27/18

Signature

Ricc Singer
Printed Name

Witness/Interpreter Signature

Donald H. Heller
Witness/Interpreter Printed Name

**A4180**

SINGER-VOL002-000378

December 17, 2018

Re:    Consensual Monitoring of Wireless Phone by Law Enforcement

Dear AT&T:

Kindly accept this correspondence as confirmation of representations made by the Department of Justice (DOJ) and the **Federal Bureau of Investigation (FBI)** regarding the consensual monitoring of mobile phones for law enforcement purposes pursuant to 18 U.S.C.§ 2511 (2)(c). The specific phone referenced in this letter for AT&T's assistance in conducting consensual monitoring is an AT&T cellular telephone assigned telephone number 916 384 8802

Pursuant to 18 U.S.C. § 2501 *et seq.*, the law enforcement agencies of the Department of Justice sometimes consensually monitor the wire and electronic communications of confidential informants and other parties in order to gather information for their criminal investigations. As you know, consent of one of the parties to a communication is sufficient under the law to permit monitoring without court order. Even though consensual monitoring does not require a judge's authorization, given the portability of cellular phones and possibility of civil liability arising from someone other than the consenting party using the phone, AT&T has been requiring prosecutors to obtain a court order before permitting consensual monitoring.

Since we are aware of your concerns regarding the portability, and correspondingly the common transfer of mobile phones to non-consenting third parties, the **DOJ/FBI** propose that with consensual monitoring under 18 U.S. C. § 2511, consenting parties will be required to sign a consent and acknowledgment form pledging that the target phone will not be used by anyone else, including the uses of cell phone photography and text messaging. A sample copy of this form is attached.

After a thorough review of current applicable law, it is the position of the **DOJ/FBI** that an order is not required when a party to a communication consents to the monitoring, even when that phone used is inherently mobile; however, since the **DOJ/FBI** also recognizes the rights of third parties should be protected, the consenting party will be required to read and sign a statement pledging that the phone shall not be used by any other party.

We hope that this information assuages AT&T's concerns. Should you have any additional questions, please do not hesitate to contact us. Thank you for your anticipated cooperation in this matter.

Sincerely Yours

*Eric S. Rosen*

AUSA Signature          Eric S. Rosen

**AUSA Printed Name**

**A4181**                                          SINGER-VOL002-000379

**CONSENT AND ACKNOWLEDGEMENT**

I, _Rick Singer_ hereby state that:

1.    I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents. My consent extends to all communications over any such phone, whether or not that communication relates to a criminal investigation, to any and all messages left on any voicemail feature of any such phone, photographs taken using the phone, and text messaging. I further consent to the disclosure of any information or records regarding such communications to law enforcement agents.

2.    I acknowledge that I have been instructed that any cellular telephones provided to me in the course of my activities are to be used only by me, and that I am not authorized to allow any other person to make, receive or participate in telephone calls involving those telephones as defined above in which I am not a participant.

Date: _12/29/2018_

_Rick Amy_
Signature

_Rick Singer_
Printed Name

_____
Witness

_____
Witness/Interpreter

**A4182**

EXHIBIT B
Declaration of
Jamaal C. King

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
    v.

DONNA HEINEL, et al.,

    Defendants

No. 10-cr-10081-IT

CERTIFICATION IN SUPPORT OF
AUTHENTICITY OF BUSINESS RECORDS
AND OTHER EVIDENCE

Jamaal C. King, being duly sworn, based on information and belief, deposes and states:

1.      I am a Supervisory Special Agent (SSA) with the Federal Bureau of Investigation (FBI), currently serving within the Telecommunications Intercept & Collection Technology Unit (TICTU), Collections and Infrastructure Section (CIS), Operational Technology Division (OTD) in Quantico, Virginia. The CIS provides technical expertise, services, and support to the FBI in collecting evidence and intelligence through the use of lawfully authorized electronic surveillance. The CIS core functions include the interception of: wireline, wireless, and data network communication technologies; software development/exploitation; special project technology; technical operations, implementation of CALEA, and supporting physical infrastructure. The TICTU is responsible for the development, deployment, and support of lawfully authorized wireline and wireless electronic surveillance capabilities. I hold a Master of Science in Information Systems and a Bachelor of Science in Computer Science, both from the University of Maryland Baltimore County.

2.      I am filing this certification to satisfy Federal Rules of Evidence 902(11) and 803(6).

3.      In my training and experience, I have the requisite knowledge in both how the CIS maintains an electronic legal demand transmittal system (ELDTS) used to send legal process to telecommunications service providers and in the use and maintenance of the FBI collection

system used to collect authorized wireless, wireline, and SMS electronic communications. Transmission of legal demands occurs via fax or electronic mail depending upon the agreed upon implementation with the provider. The ELDTS also transmits service provider request forms which outline the specific electronic surveillance techniques requested from the provider as authorized in the legal demand.

4.    Upon completion of the fax transmission, the ELDTS, as part of its regular course of business, maintains records within the system documenting both the date(s) and time(s) of initiation and completion of the transmission; the status of the transmission; what was transmitted; and the number of pages.  It was through the ELDTS that I was able to access the records related to this matter and was able to confirm the following information.

5.    Specifically, as it relates to the electronic surveillance of telephone number 916-384-8802, I was able to determine from the records maintained within the ELDTS that the FBI's Boston field office successfully transmitted via fax the legal process to AT&T requesting the provider convert the existing intercept from a Title III wiretap to a consensual intercept.

a.    The ELDTS documented the initiation of the send date and time of the fax transmission as September 28, 2018, at 2:46:17 p.m. Coordinated Universal Time (UTC) (10:46:17 a.m. Eastern Daylight Time (EDT).

b.    The ELDTS's successful fax included the signed consenting party's approval form, AUSA authorization letter, service provider request form (two pages), and authorized service provider technical points of contact list for a total of five (5) pages on September 28, 2018, at 3:02:48 p.m. (UTC) (11:02:48 a.m. EDT).  The ELDTS's recording of the fax being "successfully" transmitted is evidence a transmission receipt was received from AT&T acknowledging it had successfully

received the fax from the FBI and indicates the transmission was properly completed.

6.      The FBI's collection system used to receive the authorized electronic surveillance intercept data from the provider was changed on September 28, 2018, at 10:25 a.m. EDT, from a Title III collection to a consensual monitoring collection.  Under the consensual monitoring setting, phone calls and text messages are passively collected in full without the need of live monitoring and contemporaneous minimization.

7.      The collection system received a total of five (5) phone calls and six (6) SMS messages on September 28, 2018, between 12:00 a.m. EDT and 11:23 a.m. EDT. One (1) call was classified as non-pertinent, four (4) calls were classified as privileged, five (5) SMS messages were classified as non-pertinent, and one (1) SMS message was classified as no audio/no content.  The next call was received at approximately 11:38 a.m. EDT and was classified as pertinent by the investigative team.

8.      The collection system logs show the field team operating the wire room live-monitored the interceptions from the initiation of the Title III order through to the last session collected on September 28, 2018.   The collection system logs reflect continuous live-monitoring ceased at 12:00 a.m. EDT, on September 29, 2018.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED: October 29, 2021.


                                        Jamaal C. King
                                        Jamaal C. King
                                        Supervisory Special Agent, FBI

EXHIBIT C
Declaration of
Crisasha Harry

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

DONNA HEINEL,

Defendant

No. 19-cr-10081-IT

## DECLARATION OF CRISASHA HARRY

I, Crisasha Harry, state as follows:

1.      Since November 2017, I have been employed as an Electronic Surveillance ("ELSUR") Operations Technician for the Federal Bureau of Investigation ("FBI"), assigned to the Boston Field Office.

2.      As an ELSUR Operations Technician, I am responsible for managing physical electronic surveillance evidence, including Title III wiretap evidence.  As part of my responsibilities, I routinely and regularly burn data from our Title III interception systems to disk for preservation as evidence in criminal cases.  In my time at FBI, I have burned over 250 Title III evidence disks.

3.      On October 2, 2018, at 11:15 a.m., at the request of the case agent, I burned a disk containing data, including calls, text messages, and other files, from the Title III wiretap of phone number 916-384-8802.

4.      FBI systems show that the data burned to disk on October 2, 2018 includes all data from the wiretap in the date range September 1, 2018 to September 29, 2018.

5.      The Title III interception system labelled the disk I set to burn with the date range September 1, 2018 to September 29, 2018 to indicate the full date range of the data included on

the disk.  The labelling of the date range on the disk is determined by the Title III interception system from the command given to the system when sessions from a particular date range are set to be burned to disk by an ELSUR Operations Technician.

6.      Based on my training and experience with the Title III interception system, when I enter the command for the system to burn data from a date range, the Title III interception system reliably copies all data within the data range to disk.

7.      It is my practice prior to providing a disk of data to a case agent to verify that the transfer of data was successful and complete.

8.      I have reviewed the chain of custody for the disk I burned on October 2, 2018, and I have examined the evidence envelope containing the disk, which is sealed by Judge Allison D. Burroughs on October 2, 2018 at 2:15 pm.

9.      Based on my review of information in FBI systems and the chain of custody, the disk I burned on October 2, 2018 from the Title III wiretap of phone number 916-384-8802 is the physical disk in evidence, under seal, at the FBI Field Office, including all data from the wiretap from all dates from September 1, 2018 to September 29, 2018.

Signed under penalty of perjury,

Crisasha Harry
FBI ELSUR Operations Technician

Dated:  10/26/2021

2

EXHIBIT D
Sealed Wiretap
Disk in Evidence
Envelope



**E4937281**

Chain of Custody - ELSUR Evidence Medium Storage Envelope
FD-504d (4-17-2015)

**Evidence Type:**  ☒ Title III   ☐ FISA   ☐ Consensual Monitoring   ☐ Computer Trespasser

☐ Other Electronic Surveillance

**Recorded Interview:**  ☐ Non-Custodial - Overt Interview    ☐ Custodial - Interview

☐ Non-Custodial - Surreptitious Interview

**Enclosure:**  ☒ Original  ☐ Enhanced Original  ☐ Other _____

**Media Type:**  ☐ Magnetic Media  ☒ CD/DVD/Blu-Ray  ☐ SD Card  ☐ Other _____

Case File # 318A-BS-2885343  ID # 16  T-Number _____  CM/Doc # _____

Case Agent/Task Force Officer: SA Laura Smith _____

Intercept Date (s): 9/1/18 - 9/29/18        Location: Chelsea, MA

Download Date: 10/2/18        Time: 11:15am

Title III/CM Interceptees - ☐ Attached or ☐ Listed Below:
916-324-8802 _____    _____
_____    _____
_____    _____
_____    _____

| **Accepted Custody** | **Released Custody** |
|---|---|
| Print Name: Cesasus Happy | Print Name: Cesasus Happy |
| Signature: Cesar Happy | Signature: Cesar Happy |
| Date: 10/2/18  Time: 11:15am | Date: 10/2/18  Time: 1:20pm |
| Reason: Download | Reason: Released to RA for Sealing |
| Tracking #: | Tracking #: |

| | |
|---|---|
| Print Name: Laura Smith | Print Name: Laura Smith |
| Signature: Laura Smith | Signature: Laura Smith |
| Date: 10/2/18  Time: 1:20 pm | Date: 10/2/2018  Time: 2:42 pm |
| Reason: Seal before Judge | Reason: Return to Elsur |
| Tracking #: | Tracking #: |

| | |
|---|---|
| Print Name: | Print Name: |
| Signature: | Signature: |
| Date:   Time: | Date:   Time: |
| Reason: | Reason: |
| Tracking #: | Tracking #: |

FEDERAL BUREAU OF INVESTIGATION    EVIDENCE

A4-91

EXHIBIT E
December 21, 2018
Fax Cover Sheet
and Receipt
Confirmation



# AT&T WIRELESS CARRIER REQUEST FORM
11760 U.S. HWY ONE, 6TH FLOOR, NORTH PALM BEACH, FL 33408
PHONE 800-635-6840, OPTION 2 • FAX 888-938-4715

## CONTACT INFORMATION

| | |
|---|---|
| Requesting Agency: FBI-Boston | |
| LEA Tracking Number: ATT-BS-20180928-0001 | Date: 12/21/2018 |
| Primary POC: ▮▮▮▮▮ | Office: ▮▮▮ 4046    Mobile: |
| Email Addr: ▮▮▮▮▮ | Fax: ▮▮▮ 2102 |
| Additional Authorized Contacts:<br><br><See Attachment> | Billing Address:<br>Federal Bureau of Investigation<br>Mailstop/Attn to: FBI ETMU<br>ERF, Building 27958A<br>Quantico, VA 22135 |

**Please include last four digits of Target's telephone number and the LEA Tracking Number on invoice**

## LEGAL AUTHORITY

| | |
|---|---|
| Legal Authority: Consensual Monitoring | Court Order / Docket Number: Consent ELA 13 |
| Action: Extend/Renew | Date / Time Signed: 12/17/2018 12:00 AM    EST |
| Cell Site Location Authorized: No | Judges Name: AUSA Eric Rosen |

## PROVISIONING INFORMATION

Target Indentifier: (916) 384-8802    ☐ International Number  ☐ IMSI/MSID

**CALEA Services**
**Pen Register / Trap and Trace**
Start:                    End:
☐ Telephony          ☐ Packet Data/WiFi
☐ Text Messaging    ☐ With Cell Site Location
☐ Push-To-Talk       ☐ With PCTDD
    PTT ID:
**Full Content**
Start: 12/17/2018    End: 03/17/2019
☑ Telephony          ☑ Packet Data/WiFi
☑ Text Messaging    ☐ With Cell Site Location
☑ With PR/TT         ☐ With PCTDD
☐ Push-To-Talk
    PTT ID:

**Historical Records Services**
Start:                    End:
☐ Call Detail Records ☐ With Cell Site Location
☐ With PCTDD
☐ Stored Voicemail ☐ Stored Photos
☐ Cell Tower Search
**Location Services**
Start:                    End:
☐ GPS Ping          ☐ CALEA Event-Based Location
    Frequency: ☐ 15 Min ☐ 30 Min ☐ 60 Min
Delivery Email:
Delivery Email:
Carrier Case #:

| | | | |
|---|---|---|---|
| **Audio Delivery:** Dial Down 1: (857) 957-3739 | Dial Down 2: | Method: | |
| **Call Data Channel Delivery:** IP: | Port: | CFID: 25 | |
| **Packet Data/WiFi Delivery:** IP: | Port: | CFID: 66 | |

**Markets/Switches:** Northeast, Southeast, West,

## REMARKS/SPECIAL INSTRUCTIONS

This is a renewal.  See attached for authorized contacts.

## SERVICE PROVIDER USE ONLY:

Date received:  ___/___/_____   Time received: _____   A4193  ☐ AM ☐ PM   Received by: _____

1.0.2



## RESPONSE COVER SHEET
11760 US HIGHWAY 1
SUITE 600
NORTH PALM BEACH, FL 33408-3029
Phone (800) 635-6840   Facsimile (888) 938-4715

| To: | | File Code: |
|---|---|---|
| | **FBI BILLING** | **2457009.007** |
| | **1 CENTER PLZ. - STE 600** | |
| | **BOSTON, MA 02108** | |

| | | From: DP |
|---|---|---|
| Phone Number: | Request Dated: 12/17/2018 | Number of Pages: 1 |
| **Fax Number:  1(857) 386-2102** | Received On: 12/21/2018 | Date: 12/21/2018 |

### Confirmation of Court Order Installed

**In order to expedite any further requests for records pursuant to this order, please include the above File Code.**

**In order to ensure capture of all potential SMS events,  you will need to monitor both voice and packet data as it is possible SMS can traverse both the voice and IP networks. If you did not request packet data and would like it to be added, please provide this direction on your CALEA worksheet.**

#### VOICE
AT&T has calculated the end date of your request as:  3/17/2019 11:45:00 PM
**Court Issued Number(s):** CONSENSUAL
**Target Number(s):** XXXXXX8802
**Case ID(s):**A240 (For each target provisioned, your Case ID is the ten digit target number plus A240)

#### PACKET DATA
**IMSI:** 310410926734733
**Case ID(s): A234**          (For each target provisioned, your Case ID is the ten digit target number plus the Case ID)

**CONFIDENTIALITY NOTICE**
**This cover sheet, and any document which may accompany it, contains information from the National Compliance Center which is intended for use only by the individual to whom it is addressed, and which may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient or the person responsible for delivering this message to the intended recipient, any review, disclosure, dissemination, distribution, copying or other use of this message or its substance is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone to arrange for the return of this communication to us at our expense.  Thank you.**
2457009.007

A4194

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

     v.

GAMAL ABDELAZIZ, et al.

     Defendants.

Cr. No. 19-10080-NMG

## NOTICE OF APPEAL

Defendant Gamal Abdelaziz hereby appeals the final judgment entered by this Court on

February 16, 2022 (and amended on February 23, 2022) (ECF 2532 and 2539) to the United

States Court of Appeals for the First Circuit.

Dated: February 23, 2022          Respectfully submitted,

GAMAL ABDELAZIZ

By his attorneys,

/s/ *Brian T. Kelly*
Brian T. Kelly (BBO # 549566)
Joshua C. Sharp (BBO # 681439)
Lauren A. Maynard (BBO # 698742)
NIXON PEABODY LLP
53 State Street
Boston, MA  02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

Robert Sheketoff (BBO # 457340)
One McKinley Square
Boston, MA  02109
(617) 367-3449
Robert Sheketoff (BBO # 457340)
One McKinley Square

**A4195**

Boston, MA 02109
617-367-3449


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was filed electronically on February 23, 2022, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Brian T. Kelly</u>
Brian T. Kelly


2

**A4196**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 19-10080 |
| v. | Hon. Nathaniel M. Gorton |
| JOHN WILSON, | |
| Defendant. | |

## <u>DEFENDANT JOHN WILSON'S NOTICE OF APPEAL</u>

Defendant John Wilson appeals to the United States Court of Appeals for the First Circuit from the final judgment entered in this action on February 18, 2022.

February 25, 2022

Michael Kendall (BBO# 544866)
Lauren M. Papenhausen (BBO# 655527)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback (*pro hac vice*)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

/s/ Noel J. Francisco

Noel J. Francisco (*pro hac vice*)
Yaakov M. Roth (*pro hac vice*)
Marco P. Basile (*pro hac vice*)
Harry S. Graver (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Defendant John Wilson*

## <u>CERTIFICATE OF SERVICE</u>

I, Noel J. Francisco, hereby certify that a true copy of the foregoing document filed through

the ECF system will be electronically sent to the attorneys of record of each party.

*/s/ Noel J. Francisco*

Noel J. Francisco

## **CERTIFICATE OF SERVICE**

I certify that on April 25, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system.  Counsel for the United States are registered CM/ECF users and will be served by the CM/ECF system.

Dated:  April 25, 2022

*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Defendant-Appellant*