**No. 22-1138**

―――――――――

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

―――――――――

UNITED STATES OF AMERICA,

v.

JOHN WILSON,

*Defendant-Appellant.*

―――――――――

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 19-cr-10080
Hon. Nathaniel M. Gorton, U.S. District Judge

―――――――――

**DEFENDANT-APPELLANT JOHN WILSON'S
PETITION FOR PANEL REHEARING
OR, ALTERNATIVELY, REHEARING EN BANC**

―――――――――

| | |
|---|---|
| Michael Kendall<br>Lauren M. Papenhausen<br>WHITE & CASE LLP<br>75 State Street<br>Boston, MA 02109-1814<br>(617) 979-9310<br><br>Andrew E. Tomback<br>MCLAUGHLIN & STERN, LLP<br>260 Madison Avenue<br>New York, NY 10016<br>(212) 448-1100 | Noel J. Francisco<br>   *Counsel of Record*<br>Yaakov M. Roth<br>Harry S. Graver<br>JONES DAY<br>51 Louisiana Avenue, NW<br>Washington, D.C. 20001<br>(202) 879-3939<br>njfrancisco@jonesday.com<br><br>Henry W. Asbill<br>ORRICK HERRINGTON &<br>SUTCLIFFE LLP<br>2001 M Street NW, Suite 500<br>Washington, D.C. 20036<br>(202) 349-8000 |

*Counsel for Defendant-Appellant
John Wilson*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND RULE 35(b)(1) STATEMENT ............................................. 1

ARGUMENT ........................................................................................................................ 2

I.   THE PANEL MISAPPREHENDED THE *CHEEK* WILLFULNESS STANDARD ................. 3

   A.   The Panel Overstated the Strength of the Government's Case ...................... 3

   B.   The Panel Understated the Prejudicial Effects of the Trial Errors ................ 8

II.  THE PANEL DID NOT ANALYZE THE ERRORS' CUMULATIVE EFFECT .................. 13

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cheek v. United States*,
　498 U.S. 192 (1991) ................................................................................*passim*

*Gomez v. Rivera Rodriguez*,
　344 F.3d 103 (1st Cir. 2003) ..........................................................2, 13, 14, 15

*U.S. ex rel. Schutte v. SuperValu Inc.*,
　Nos. 21-1326, 22-111, 2023 WL 3742577 (U.S. June 1, 2023) ....................2

*United States v. Anthony*,
　545 F.3d 60 (1st Cir. 2008) ............................................................................7

*United States v. DeCologero*,
　530 F.3d 36 (1st Cir. 2008) ..........................................................................14

*United States v. Fulmer*,
　108 F.3d 1486 (1st Cir. 1997) ......................................................................12

*United States v. Kilmartin*,
　944 F.3d 315 (1st Cir. 2019) ........................................................................13

*United States v. Martínez*,
　994 F.3d 1 (1st Cir. 2021) ............................................................................14

*United States v. Sineneng-Smith*,
　140 S. Ct. 1575 (2020) .................................................................................10

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

In a thorough and thoughtful opinion ("Op."), the panel correctly held that John Wilson's trial was infected by multiple serious legal errors: an invalid theory of honest-services fraud; an impermissibly broad conception of "property" that did not match the record evidence; a prejudicial variance stemming from an archetypal rimless-wheel conspiracy; and a multitude of dubious exclusions of core defense evidence.

Based on these infirmities, the panel vacated all of the principal charges against Wilson—seven counts of conspiracy, fraud, and bribery. The panel understood that the case largely revolved around whether Wilson "acted in good faith," and believed "Singer's side door to be a path to admission of which the universities at least tacitly approved." Op.110. As the panel correctly explained, the errors below irretrievably prejudiced Wilson on that central issue.

Respectfully, however, the panel misapprehended both the record and the law in holding that these errors did not reach Wilson's related tax conviction—a tacked-on count that would never have been charged in isolation. At trial, Wilson offered ample evidence of a good-faith defense cutting across all counts: He sincerely believed the side-door was a legitimate, university-approved admission boost through charitable contributions. Once that defense was unfairly corrupted for *most* of the charges, it was corrupted for *all* of them. Indeed, even the Government conceded that if this Court were to find a prejudicial variance as to the alleged conspiracy, Defendants "[c]orrectly" identified the proper remedy as "a new trial on all counts." Govt.Br.118.

1

In overriding that concession, the panel made two interrelated errors that merit rehearing. *First*, the panel misunderstood the "willfulness" *mens rea* standard that applies to the tax count under controlling Supreme Court precedent, *Cheek v. United States*, 498 U.S. 192, 201 (1991), and so failed to properly evaluate the trial errors against that high standard. Under it, what matters is what a defendant subjectively thought, "whether or not the claimed belief or misunderstanding is objectively reasonable." *Id.* at 202. The Supreme Court reiterated this principle just last week, making clear in a related context that a "scienter element refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *U.S. ex rel. Schutte v. SuperValu Inc.*, Nos. 21-1326, 22-111, 2023 WL 3742577, at *6 (U.S. June 1, 2023). *Second*, the panel analyzed each error in isolation, and never considered their cumulative prejudicial effect, as this circuit's precedent requires. *See, e.g.*, *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 118 (1st Cir. 2003). Separately and together, these mistakes let the tax conviction stand, where it should have fallen with all the other tainted charges.

## ARGUMENT

Count 13 arose from the fact that Wilson's 2014 tax return deducted the funds he sent Rick Singer to donate to USC. At trial, the tax count—like the others—turned on Wilson's intent. The Government said he tried to write off an illicit bribe. Wilson responded that he sincerely believed the funds were true charitable donations, and that categorizing part of the payment as a business expense was an inadvertent, inconsequential foot fault.

2

The panel held that the trial errors did not prejudice this issue as it did the other counts. Op.133-40, 140-46, 146-55. Respectfully, that warrants reconsideration.

## I. THE PANEL MISAPPREHENDED THE *CHEEK* WILLFULNESS STANDARD.

The *mens rea* for tax crimes is the highest known to the law. In such cases, "the standard for the statutory willfulness requirement is the '*voluntary, intentional violation* of a *known* legal duty.'" *Cheek*, 498 U.S. at 201 (emphasis added). It does not matter whether a defendant's conduct or beliefs were "objectively reasonable." *Id.* at 202. All that matters is his subjective intent, and desire to break the law. *Id.*

The panel neither cited *Cheek* nor analyzed the tax count under it. Rather, in evaluating the trial errors, the panel examined their effect on Wilson's ability to show a "plausible" or "reasonable" good-faith explanation of his tax-related conduct. Op.145, 154. But that was not the right inquiry. Because a good-faith tax defense turns entirely on the defendant's subjective state of mind, Wilson did not need to have a plausible or reasonable account—just a *sincere* one. *Cheek*, 498 U.S. at 202.

This error infected the panel's entire analysis of the tax count. In balancing the strength of the Government's evidence against the potential effect of each error, the panel proceeded with a warped scale.

### A. The Panel Overstated the Strength of the Government's Case.

In finding the trial errors harmless as to the tax count, the panel was driven by its belief that the evidence against Wilson was "powerful." Op.142; *see also* Op.149, 153, 155. On the panel's view, Wilson (i) lacked a "plausible good faith explanation" for

3

labeling any payment to Singer as a business expense (Op.145); and (ii) understood his payment to USC "to be part of an explicit quid pro quo," such that it supposedly could not be fully deducted as a genuine charitable donation either (Op.144).

But neither the law nor the record supports those propositions, especially when viewed in light of the *Cheek* standard. As with Wilson's fraud and bribery convictions, the historical facts as to Wilson's tax conduct were mostly undisputed. Everyone agrees Wilson thought the entire $220,000 was for a donation for USC; emailed Singer to ask whether he could pay from his pass-through S-corporation; was told by Singer that his payments could be deducted; received two separate charitable receipts (one from USC, another from Singer's nonprofit); never saw the consulting invoice that Singer sent only to Wilson's assistant; and in a return filed nearly two years later, deducted the donations, in part as business expenses and in part as charitable contributions. Op.129-31.

That may be evidence that Wilson filed an *erroneous* return, particularly as to the business expense designation. But it is not "powerful" evidence that Wilson—who has no criminal history, paid 45% of his income in taxes, and in fact significantly *overpaid* his taxes that year (*e.g.*, A4024, A3112, A3744)—*willfully* committed tax fraud. The facts above are all consistent with Wilson following Singer's side-door guidance in good faith.

Start with the "business expense" theory. Deducting the payment on that basis was mistaken, but makes no sense as a theory of tax fraud under *Cheek*. Wilson plainly believed his payments to USC were charitable, and thus fully deductible as donations. He deducted the portion he sent Singer's nonprofit as such, and promptly received a

4

USC donation receipt for the remaining portion that he contributed through Singer's business. There is no reason he would intentionally lie by characterizing the latter as a business expense when he thought it was deductible anyway as a charitable donation. It turns out that calling it a *business* deduction instead of a *charitable* one saved just $1,425 (on a $966,821 tax bill), and it is undisputed that Wilson could not even have foreseen that at the time. Op.145. The notion that Wilson *voluntarily and intentionally* sought to fraudulently mischaracterize (part of) what he thought was a (deductible) charitable donation as an (also deductible) business expense simply makes no sense.

The panel did not suggest that Wilson had any plausible motive for committing tax fraud in that way; instead, it noted there was no apparent "good faith explanation" for classifying the sum as business consulting. But the explanation is simple: Wilson wanted to pay the funds from his S-corporation where he kept his free cash (a common practice), so Singer sent a placeholder generic business invoice (which the Government does not even contend Wilson ever saw). *See* A2658-62. Singer promptly sent the funds to USC, and USC provided Wilson with a charitable receipt. Nearly two years later, with Wilson halfway around the globe, his accountant mischaracterized the payment because Wilson's assistant did not forward the USC receipt—so the accountant never updated the placeholder entry to reflect a charitable donation. A2626-28. He did reclassify 61 other bookkeeping entries for tax purposes, including charitable donations, but missed this one. *See* A2646-47. And Wilson did not closely review his long, complex tax filings. A2640-41. A mistake, yes—but *Cheek* requires far more.

5

For all these reasons, the panel implicitly recognized that the "business expense[]" theory is not viable if "Wilson believed he could legitimately deduct the entire sum as a charitable contribution." Op.145. The Government claimed Wilson did not actually believe that, but there was ample evidence to allow an untainted jury to conclude he did.

The panel thought Wilson's contributions to USC were "part of an explicit quid pro quo to secure his son's admission," and thus had to be offset for tax purposes by the fair market value of what Wilson received in return, rather than deducted *in toto*. Op.144. But Wilson did not think a side-door donation involved any more of a *quid pro quo* than a back-door donation, which likewise trades money for admission support. All agree that such support—like building naming rights, and other intangible benefits of large donations—is deemed to have a fair market value of zero for tax purposes, since it is too difficult to quantify. Despite bearing the burden of proof, the Government never introduced any contrary evidence. And while Wilson tried to admit evidence showing dozens of examples of USC's routine back- and side-door donations, none of which was "offset" for tax purposes by the value of the admissions boost, the district court excluded it—on grounds even the Government did not fully defend on appeal (Op.128).

Moreover, there was plenty of evidence that Wilson understood his donations as offering a "boost," not a guarantee. *E.g.*, A1331-32 (Singer saying side-door donation would give Johnny 50% odds of admission at Boston College). Indeed, even the emails the panel quoted showcase that good-faith belief: Wilson inquired about making the

6

contribution to USC *before* knowing whether his son would be admitted. Op.144. Likewise, Wilson made the donations to help his daughters *more than a year before they even applied* to college, when it was clear they might ultimately not attend Harvard or Stanford at all. *See* Wilson.Br.11. And this was neither Wilson's first large charitable donation to educational institutions, nor was it anticipated to be his last. A2723-27 (describing multi-million dollar scholarship donations to Harvard in Wilson's preexisting will).

In short, as with the case's core charges, the tax count came down to Wilson's mindset. And as with those charges, Wilson's good-faith defense was certainly viable—indeed, even more so—because under the "willfulness" standard, it does not matter whether Wilson's beliefs about Singer or the peculiar application of tax rules to this unique scenario were "objectively unreasonable." *United States v. Anthony*, 545 F.3d 60, 65 (1st Cir. 2008). The only thing that mattered here is whether Wilson *sincerely believed* he was not breaking the law. *Id.* So long as Wilson trusted Singer, thought this was all part of how the side-door worked, and so believed his donations were fully deductible, he did not commit tax fraud.

Measured against *Cheek*, the Government's case—more precisely, the undisputed historical facts—thus did *not* overwhelmingly show Wilson *willfully* violated the tax laws. Nothing above betrays a deliberate effort by Wilson to commit fraud. Nor does any other evidence. Rather, the weight of these facts turns on Wilson's beliefs, and so an untainted jury could have readily credited his defense. Nothing in the Government's submission forecloses that—let alone with overwhelming force.

7

**B.     The Panel Understated the Prejudicial Effects of the Trial Errors.**

Compounding the problem, the panel's misunderstanding of *Cheek* also led it to discount the prejudicial effects of the trial errors. Given willfulness's demands, errors that make it easier for the Government to prove *mens rea*—or harder for the defendant to show good faith—are especially consequential. Wilson's case had both.

**1.     Instructional Errors.** As the panel recognized, the district court erred in allowing the jury to consider the Government's honest-services fraud theory of bribery, and also in categorically instructing that admission slots are property. Op.40-41. The panel acknowledged that this property instruction might have affected the tax count, but judged that risk remote. Op.137. As for bribery, the panel denied any prejudice, finding no reasonable juror "would have viewed the legal status of [Wilson's] payments as bribes as controlling the legitimacy of his deducting those payments." *Id.*

Respectfully, that is not plausible. Given the *Cheek* standard, the easiest way to persuade a jury that Wilson *intentionally* sought to violate the law was to argue that the USC payments were themselves *illegal*. And, contrary to the panel's premise, this was exactly the Government's tack at trial. Its closing barely discussed the tax count, instead focusing on the main fraud and bribery charges—but then expressly connected those to Wilson's taxes on the back end. Prosecutors told the jury: "common sense tells you it is wrong to lie on your taxes by *deducting the cost of those bribes* as fake business expenses and phony charitable contributions. That is tax fraud." A3682.

8

The Government thus drew a direct link between taxes and bribes to help clear *Cheek*'s high bar—and it did so because the Government did not have much else. The argument that Wilson *willfully* committed tax fraud because he tried to write off an *illicit bribe* is undoubtedly one that would overwhelm a lay jury, especially when advanced immediately before deliberations; but this was an argument the Government should not have been allowed to press.

2.     **Kotteakos.**  As the panel recognized, the *Kotteakos* error required vacatur of Wilson's conspiracy, fraud, and bribery convictions, Op.77 & n.26, because it created an "unacceptable risk that the jury in this case may have imputed other parents' culpable mental states to [Wilson]," Op.114. But under a proper view of *Cheek*, that rationale should have extended in equal measure—if not greater—to the tax count.

Once more, the key issue as to the tax count was not what Wilson *did*, but his *intent*. And as with the other counts, the Government used "other parent" evidence to ascribe a "culpable mental state" to Wilson, and color his conduct—conduct that was, on its own, open to an innocuous interpretation. The frequency and ubiquity of the "other parent" evidence left Wilson no chance to distinguish himself. To return to the Government's closing, its argument for why Wilson acted *willfully* was that Wilson *knew* he was "lying." A3681. How did the jury know that? Because other parents said they were lying. Indeed, one of the Government's most oft-raised points (Op.89) was that Bruce Isackson thought the number of parents involved with Singer would make it harder for "[t]he IRS" "to figure things out" (A1110). Another explicit tax linkage.

9

The *Kotteakos* error thus corrupted Count 13 just as it corrupted the other charges: by branding Wilson a criminal and vitiating any claim to sincerity. Once the jury found him a crook, it followed naturally—if not inevitably—he was a tax cheat too. This error thus prevented the jury from approaching Wilson's defense with an open mind.

It is notable that even the Government accepted as much on appeal, affirmatively embracing Defendants' position that a variance would warrant "a new trial on all counts." Govt.Br.118. As to the *Kotteakos* error, the Government never tried to distinguish the tax count from the other charges. *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (reiterating that "the principle of party presentation" means courts should "normally decide only questions presented by the parties").

Despite that concession, the panel distinguished the tax count on the ground that the "government's case on the tax count relied largely on Wilson's own emails," and the "distinctness of this evidence" limited the spillover effects. Op.141. But the panel correctly turned back a variation of this argument as to the other counts, observing that the Government's evidence was not decisive without "an inference regarding Wilson's good or bad faith intent," which is "precisely" what the spillover evidence "prejudiced." Op.120. And the panel emphasized that "the more sweeping the charged conspiracy, the higher the bar for showing … that an error was harmless." Op.119-22.

The same should have obtained on the tax count. Here as there, the Government needed to clear a "high bar," because *Cheek*'s heightened *mens rea* requirement makes each intent-bound error all the more consequential. And here as there, the pervasive

10

use of inadmissible "other parent" evidence suggesting that all of Singer's clients were knowing fraudsters made it virtually impossible for Wilson to convince the jury of his good faith. Particularly since this was a tacked-on, technical charge that got relatively little focus at trial, expecting a jury to compartmentalize the tax count after (unreliably) finding Wilson guilty of conspiracy, bribery, and fraud is just not realistic.

    **3.**     **Evidentiary Errors.** The panel's misapprehension of *Cheek* extended to its analysis of the many evidentiary errors that Wilson identified. Here too, the panel treated the errors as harmless only because it misconceived the applicable *mens rea*.

    For example, the panel dismissed the evidence that USC routinely granted special admissions consideration to the children of donors yet never advised those donors to offset their donations by the fair market value of that boost. Op.154. The panel said that did not show it was "reasonable" for Wilson to think he was "not engaging in a quid pro quo." Op.154-55. But under *Cheek*, the inquiry is not *objective reasonableness*; it is *subjective sincerity*. And this evidence is highly probative as to sincerity: It explains why Wilson did not think his donations had to be offset any more than a donor who names a building to secure a child's admission. The panel thought Wilson's donations differed in kind, but there was no evidence of that—indeed, the district court blocked all of his efforts to demonstrate that USC's admissions practices were rife with *quid pro quos*.

    Especially after the *Kotteakos* error, Wilson's only chance was to make a robust evidentiary presentation—but he was stymied at every step by the wrongful exclusion of his defense case, aided by hundreds of prosecution objections, virtually all sustained.

11

\* \* \*

The decision to treat Wilson's tax conviction differently from all of the others rested on legal error. The panel's repeated refrain was that the evidence against Wilson was overwhelming—or the trial errors were inconsequential—because Wilson did not advance any "plausible" or "reasonable" good-faith explanation of his conduct. Op.145, 154. But under *Cheek*, that is not the correct inquiry.

The right question is whether the errors materially affected Wilson's ability to demonstrate that he *sincerely* thought this was just how side-door donors (like back-door donors) paid their taxes. And, properly evaluated, it is plain the trial errors prejudiced that defense. Because of the instructional errors, the jury had already concluded that Wilson conspired to commit fraud and bribery, facilitating a finding that he also cheated on his taxes by deducting "bribes" (A3682) or receiving "property" for a donation (A3827). Because of the *Kotteakos* error, the jury was overwhelmed by evidence that other parents were knowingly cheating and trying to evade "IRS" scrutiny. And because of the evidentiary errors, the jury was never able to see the facts and statements that built the foundation for Wilson's good-faith belief in how side-door donations worked.

"An error will be treated as harmless only if it is 'highly probable' that the error did not contribute to the verdict." *United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir. 1997). But given the trial errors above, any claim Wilson wanted to be honest on his taxes was dead on arrival. Rehearing is needed to correct the panel's well-intentioned— but highly unrealistic—contrary conclusion.

12

## II.  THE PANEL DID NOT ANALYZE THE ERRORS' CUMULATIVE EFFECT.

Along with improperly evaluating the weight of *each* error, the panel failed to take stock of their *cumulative* effect. Taken together, it is impossible to say "with a fair degree of assurance" these errors "did not substantially sway the jury." *United States v. Kilmartin*, 944 F.3d 315, 338 (1st Cir. 2019). This mistake independently merits rehearing.

Again, the panel correctly identified a range of trial errors that undoubtedly tainted the tax count in some measure—from the erroneous "property" instruction implying that Wilson had traded his donation for property (Op.137), to the conspiracy's "other parent[]" evidence guilting him by association (Op.141), to at least three separate sets of evidentiary errors that blocked him from erecting a defense (Op.146). But at each turn, the panel's harmlessness analysis focused on each error *alone*. That divide-and-conquer approach necessarily yields an incomplete analysis, and marks a stark departure from this Court's ordinary practice. Even if one or two (or even three) errors were not enough, soon enough their collective effect becomes too much to bear. As this Court has thus stressed, "a reviewing court must scrutinize the record as a whole and aggregate the collective effects of multiple errors." *Rivera Rodriguez*, 344 F.3d at 118.

That broader lens was especially necessary here, given the nature of this case. As the panel knows, Wilson's trial lasted almost three weeks, and was dominated by the fraud, bribery, and conspiracy charges. Of the Government's 14 witnesses, only three testified to the tax count—and only at the end of the prosecution's case, following seven days of testimony focused on the main charges (and largely on the egregious conduct

13

of other parents with whom Wilson never conspired). The Government made every effort to brand Wilson's tax return as an extension of his other illicit conduct. Again, at closing, the Government barely discussed the tax count, and instead principally relied on its other (largely inadmissible) evidence to carry it over. *E.g.*, A3682.

Against this "record as a whole," it is apparent the "collective effects" of these "multiple errors" were devastating. *Rivera Rodriguez*, 344 F.3d at 118. Taken together, the errors not only unfairly inflated the Government's case-in-chief with overbroad instructions and impermissible evidence, but also barred Wilson from raising a full and meaningful defense to *any* of the charges against him (a problem only compounded by Judge Gorton's proclivity to sustain nearly 100% of the Government's objections, while overruling Defendants'). The result was an unstoppable momentum that, by design, carried from the main charges through the tax count. *See United States v. DeCologero*, 530 F.3d 36, 56 (1st Cir. 2008) (non-discriminating verdicts convicting all parties on all counts is "telling[]" sign of prejudice); *see also* Op.126 (recognizing that "jury in this case returned guilty verdicts on all counts, offering no reassurance that jurors were '[]able to compartmentalize the evidence of each offense'").

After all these errors, it is not realistic to expect the jury to "compartmentalize" the tax count. *United States v. Martínez*, 994 F.3d 1, 14-16 (1st Cir. 2021). Indeed, it was impossible for them to do so: To convict on the main charges, the jury *had* to find that Wilson knowingly engaged in an illegitimate scheme; doing so *necessarily* eliminated the basis for Wilson's good-faith tax defense, which was premised on the opposite.

14

The tax count therefore did not stand alone; it was bound part-and-parcel with the others, as the Government underscored by arguing that "common sense" teaches it is unlawful to deduct "bribes" (A3682). Given the interconnectedness of the charges, "there is an unacceptably high risk that these [errors] in cumulation tipped the decisional scales"; thus, the entire "verdict cannot stand." *Rivera Rodriguez*, 344 F.3d at 120.

## CONCLUSION

Rehearing should be granted, and Count 13 vacated.

Dated: June 7, 2023

Michael Kendall
Lauren M. Papenhausen
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco
　*Counsel of Record*
Yaakov M. Roth
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
njfrancisco@jonesday.com

Henry W. Asbill
ORRICK HERRINGTON &
SUTCLIFFE LLP
2001 M Street NW, Suite 500
Washington, D.C. 20036
(202) 349-8000

*Counsel for Defendant-Appellant
John Wilson*

15

# **CERTIFICATE OF COMPLIANCE**

1. This petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A). The petition contains 3,896 words, excluding the items exempted by Fed. R. App. P. 32(f).

2. This petition also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Garamond font.

Dated: June 7, 2023                    */s/ Noel J. Francisco*
                                       Noel J. Francisco
                                       *Counsel for Defendant-Appellant*

# **CERTIFICATE OF SERVICE**

I certify that on June 7, 2023, I electronically filed this petition with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for the United States are registered CM/ECF users and will be served by the CM/ECF system.

Dated: June 7, 2023                              */s/ Noel J. Francisco*
                                                Noel J. Francisco
                                                *Counsel for Defendant-Appellant*