No. 22-1138

————————————

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

————————————

UNITED STATES OF AMERICA,

v.

JOHN WILSON,

*Defendant-Appellant.*

————————————

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 19-cr-10080
Hon. Nathaniel M. Gorton, U.S. District Judge

————————————

**BRIEF OF DEFENDANT-APPELLANT
JOHN WILSON**

————————————

Michael Kendall
Lauren M. Papenhausen
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
(617) 979-9310

Andrew E. Tomback
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-0066

Noel J. Francisco
   *Counsel of Record*
Yaakov M. Roth
Marco P. Basile
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for Defendant-Appellant
John Wilson*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................iii

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

STATEMENT OF THE ISSUES .......................................................................4

STATEMENT OF THE CASE ...........................................................................5

    A.   The Wilson Family................................................................................5

    B.   Rick Singer and the "Side-Door" .......................................................6

    C.   Wilson's Son and USC .........................................................................7

    D.   Wilson's Daughters and Stanford and Harvard ...............................10

    E.   The "Single Conspiracy" Indictment................................................12

    F.   The Motions to Dismiss .....................................................................13

    G.   The Trial and Sentencing...................................................................14

SUMMARY OF ARGUMENT ........................................................................16

STANDARD OF REVIEW ..............................................................................19

ARGUMENT ...................................................................................................20

I.   WILSON'S CONDUCT COULD NOT HAVE BEEN "BRIBERY"..................20

    A.   The Victim of a Bribery Scheme Cannot Also Be Its Beneficiary...............21

    B.   At Minimum, the Jury Instructions on Bribery Were Overbroad
       and Failed To Provide Adequate Guidance ......................................32

II.  THE ALTERNATIVE "PROPERTY" FRAUD THEORY ALSO FAILS.............33

    A.   An Admission Offer Is Not "Property" ............................................34

    B.   The "Right to Control" Theory Cannot Save These Convictions...............41

# TABLE OF CONTENTS
(continued)

**Page**

III. THE GOVERNMENT DID NOT PROVE THE SINGLE, OVERARCHING CONSPIRACY IT CHARGED IN THE INDICTMENT .......................................................44

    A.   The Government Proved Only an Archetypal "Rimless Wheel" ................45

    B.   The Variance from the Indictment Prejudiced Wilson.................................52

IV. THE COURT WRONGLY EXCLUDED CORE DEFENSE EVIDENCE .........................60

    A.   The District Court Wrongly Excluded USC Admissions Evidence Showing That the Side-Door Was Not Bribery ...........................60

    B.   The Pervasive Exclusion of Other Evidence Undermined Wilson's Good-Faith Defense ..........................................................................72

V. THE DERIVATIVE TAX COUNT FAILS FOR THE SAME REASONS ...........................80

CONCLUSION ...................................................................................................................83

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bielunas v. F/V Misty Dawn, Inc.*,
621 F.3d 72 (1st Cir. 2010) ................................................ 65, 75

*Cameron v. Otto Bock Orthopedic Indus., Inc.*,
43 F.3d 14 (1st Cir. 1994) ................................................... 19

*Carpenter v. United States*,
484 U.S. 19 (1987) ......................................................... 34, 38

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ........................................................... 26

*Cheek v. United States*,
498 U.S. 192 (1991) ....................................................... 81, 82

*Cleveland v. United States*,
531 U.S. 12 (2000) ........................................................ *passim*

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ............................................... 45

*Dunning v. Kerzner*,
910 F.2d 1009 (1st Cir. 1990) .............................................. 70

*Kelly v. United States*,
140 S. Ct. 1565 (2020) .................................................. 29, 34

*Kotteakos v. United States*,
328 U.S. 750 (1946) ...................................................... *passim*

*McCormick v. United States*,
500 U.S. 257 (1991) .......................................................... 30

*McDonnell v. United States*,
579 U.S. 550 (2016) ................................................. 28, 29, 30

*McNally v. United States*,
483 U.S. 350 (1987) ................................................. 25, 34, 39

*Neder v. United States*,
527 U.S. 1 (1999) ............................................................. 67

*Oscanyan v. Arms Co.*,
103 U.S. 261 (1881) .......................................................... 22

iii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Skilling v. United States,*
    561 U.S. 358 (2010) ..................................................................................*passim*

*Squeri v. Mt. Ida Coll.,*
    954 F.3d 56 (1st Cir. 2020) ...................................................................35

*United States v. Bain,*
    874 F.3d 1 (1st Cir. 2017) ......................................................................75

*United States v. Beauchamp,*
    986 F.2d 1 (1st Cir. 1993) ......................................................................69

*United States v. Berroa,*
    856 F.3d 141 (1st Cir. 2017) ..................................................................29

*United States v. Binday,*
    804 F.3d 558 (2d Cir. 2015) .................................................36, 42, 43

*United States v. Boots,*
    80 F.3d 580 (1st Cir. 1996) ....................................................................43

*United States v. Bruchhausen,*
    977 F.2d 464 (9th Cir. 1992) ...............................................36, 38, 42

*United States v. Burhoe,*
    871 F.3d 1 (1st Cir. 2017) ......................................................................41

*United States v. Carnagie,*
    533 F.3d 1231 (10th Cir. 2008)............................................................51

*United States v. Chandler,*
    388 F.3d 796 (11th Cir. 2004) .........................................................46, 48

*United States v. Cruz-Ramos,*
    987 F.3d 27 (1st Cir. 2021) ....................................................................65

*United States v. Cruz-Rodriguez,*
    541 F.3d 19 (1st Cir. 2008) ....................................................................69

*United States v. Delgado-Marrero,*
    744 F.3d 167 (1st Cir. 2014) ..................................................................71

*United States v. Dellosantos,*
    649 F.3d 109 (1st Cir. 2011) ..............................................................*passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Dennis,*
  917 F.2d 1031 (7th Cir. 1990) ........................................................48

*United States v. Didonna,*
  866 F.3d 40 (1st Cir. 2017) ............................................................41

*United States v. Ernst,*
  502 F. Supp. 3d 637 (D. Mass. 2020) .....................................*passim*

*United States v. Evans,*
  970 F.2d 663 (10th Cir. 1992) ..........................................48, 53, 59

*United States v. Fernandez,*
  722 F.3d 1 (1st Cir. 2013) ................................................19, 27, 72

*United States v. Finazzo,*
  850 F.3d 94 (2d Cir. 2017) ..................................................... 42, 43

*United States v. Frost,*
  125 F.3d 346 (1997) ........................................................39, 40, 41

*United States v. Glenn,*
  828 F.2d 855 (1st Cir. 1987) ....................................... 45, 47, 48, 52

*United States v. Gorski,*
  880 F.3d 27 (1st Cir. 2018) ............................................................72

*United States v. Gray,*
  780 F.3d 458 (1st Cir. 2015) ..........................................................29

*United States v. Hausmann,*
  345 F.3d 952 (7th Cir. 2003) .........................................................23

*United States v. Kemp,*
  500 F.3d 257 (3d Cir. 2007) ..........................................................48

*United States v. Khoury,*
  No. 20-cr-10177, 2021 WL 2784835 (D. Mass. July 2, 2021) ....................41

*United States v. Lekacos,*
  151 F.2d 170 (2d Cir. 1945) ..........................................................47

*United States v. Macchia,*
  35 F.3d 662 (2d Cir. 1994) ............................................................49

## TABLE OF AUTHORITIES
(continued)

<strong>Page(s)</strong>

*United States v. Mangual-Santiago,*
  562 F.3d 411 (1st Cir. 2009)...............................................................46

*United States v. Martinez,*
  994 F.3d 1 (1st Cir. 2021) ................................................56, 58, 59

*United States v. Mathis,*
  216 F.3d 18 (D.C. Cir. 2000) .........................................................48

*United States v. Medina-Martinez,*
  396 F.3d 1 (1st Cir. 2005) ...............................................................33

*United States v. Murphy,*
  193 F.3d 1 (1st Cir. 1999)......................................................... 70, 77

*United States v. Nieves-Burgos,*
  62 F.3d 431 (1st Cir. 1995)....................................................... 80, 81

*United States v. Ochs,*
  842 F.2d 515 (1st Cir. 1988)............................................................26

*United States v. Ouimette,*
  753 F.2d 188 (1st Cir. 1985)..................................................... 71, 77

*United States v. Pena,*
  24 F.4th 46 (1st Cir. 2022)...............................................................69

*United States v. Piper,*
  35 F.3d 611 (1st Cir. 1994)..............................................................72

*United States v. Pomponio,*
  429 U.S. 10 (1976) (per curiam) .....................................................72

*United States v. Portela,*
  167 F.3d 687 (1st Cir. 1999)............................................................49

*United States v. Rivera-Ruiz,*
  244 F.3d 263 (1st Cir. 2001)............................................................19

*United States v. Rosnow,*
  977 F.2d 399 (8th Cir. 1992) (per curiam) ....................................50

*United States v. Sadler,*
  750 F.3d 585 (2014)............................................... 36, 38, 41, 42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Sawyer,*
   85 F.3d 713 (1st Cir. 1996) ....................................................... 33, 72

*United States v. Sepulveda,*
   15 F.3d 1161 (1st Cir. 1993) ............................................................ 79

*United States v. Shellef,*
   507 F.3d 82 (2007) ............................................................... 36, 38

*United States v. Stewart,*
   907 F.3d 677 (2d Cir. 2018) ............................................................ 76

*United States v. Takhalov,*
   827 F.3d 1307 (11th Cir. 2016) ........................................................ 36

*United States v. Terry,*
   707 F.3d 607 (6th Cir. 2013) .......................................................... 23

*United States v. Thompson,*
   484 F.3d 877 (7th Cir. 2007) ...................................................... 24, 28

*United States v. Townsend,*
   924 F.2d 1385 (7th Cir. 1991) ..................................................... 50, 58

*United States v. Trenkler,*
   61 F.3d 45 (1st Cir. 1995) ............................................................. 70

*United States v. Woodward,*
   149 F.3d 46 (1st Cir. 1998) ........................................................... 33

*United States v. Wu,*
   711 F.3d 1 (1st Cir. 2013) ............................................................. 83

*United States v. Yates,*
   16 F.4th 256 (9th Cir. 2021) ...................................................... 38, 42

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar,*
   579 U.S. 176 (2016) .................................................................... 67

*Van Buren v. United States,*
   141 S. Ct. 1648 (2021) ............................................................ 27, 37

*Yates v. United States,*
   354 U.S. 298 (1957) ............................................................... 80, 83

vii

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

## STATUTES

18 U.S.C. § 371 ............................................................................................13

18 U.S.C. § 666 ........................................................................................*passim*

18 U.S.C. § 1341 ...................................................................................... 12, 24

18 U.S.C. § 1343 ............................................................................................12

18 U.S.C. § 1346 ........................................................................................*passim*

18 U.S.C. § 1349 ............................................................................................13

18 U.S.C. § 1962 ............................................................................................26

26 U.S.C. § 7206 ..............................................................................13, 80, 81

28 U.S.C. § 1291 ..............................................................................................4

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................ 22, 24

Fed. R. App. P. 28 ..........................................................................................83

Fed. R. Evid. 401 ...........................................................................................65

Fed. R. Evid. 613 ..................................................................................... 68, 69

Fed. R. Evid. 806 ..............................................................................68, 69, 76

Harvey S. James, Jr., *When Is a Bribe a Bribe? Teaching a Workable Definition of Bribery*, 6 TEACHING BUS. ETHICS 199 (2002) ...........................23

Susan Rose-Ackerman, CORRUPTION (1978) ...............................................23

Jon Wertheim, *The Real Scandal of Varsity Blues*, SPORTS ILLUSTRATED (Jan. 20, 2022) ...............................................................................................60

# INTRODUCTION

Because of the sensationalist media coverage it generated, the "Varsity Blues" investigation brings to mind scandalous episodes of cheating, bribery, and corruption. Parents who paid test proctors to fix their children's answers. College coaches who financed vacation homes with cash bribes they accepted for "recruiting" unqualified applicants. Families who staged or photoshopped images to make it appear their children excelled at sports they never played. And participants willing to cover up their wrongdoing by lying to high schools, government agencies, and more.

All of that happened. But John Wilson did none of it. Nor did he even know about it. The Government did not even *allege* otherwise. That is why Wilson is one of the only parents, out of dozens charged, who did not plead guilty. More important, the prosecution's legal theories in this case are meritless, and the trial at which they were presented was fundamentally unfair. This Court should thus reverse all of Wilson's convictions, or at minimum order a new trial.

The Government's claim was that Wilson—at the suggestion of Rick Singer, a highly acclaimed college counselor but also an undisputed "con man"—donated to an athletic program at the University of Southern California ("USC") so that the coach would support the admission of his son, a highly accomplished water-polo player, using an "embellished" athletic profile. Wilson later agreed to make similar donations to help his two daughters, who earned perfect and near-perfect ACT scores. According to the Government, this constituted *bribery* and *property fraud*. But legally it was neither.

Donating to a university is not bribing its employees; the school cannot be both the *victim* of the scheme and its *beneficiary*. No bribery case in history merges those two incompatible roles, for good reason. Characterizing that as a bribe would threaten to criminalize routine transactions, leaving the offense with no clear boundaries. It would also fly in the face of the Supreme Court's warnings against overbroad application of federal bribery laws, not to mention its narrowing of the honest-services statute to what the Court called "core" or "paradigmatic" cases. This case is anything but.

The property-fraud theory fares no better. As another district judge overseeing a Varsity Blues case correctly held, getting a school to extend an admission offer does not deprive the school of *money or property* if the student pays full tuition. The university may have been *deceived* but it was not *defrauded* within the meaning of the mail- and wire-fraud statutes. And again, construing these statutes more broadly would turn every false or exaggerated statement, whether on a resume or a golf-club application, into a federal felony. At minimum, the district court erred by categorically instructing that admission slots are "property" as a matter of law, rather than allowing the jury to make that call.

Why was Wilson convicted for this banal conduct? The answer is not just the flawed legal theories baked into the jury instructions, but also the highly prejudicial way the Government presented its case. The trial was dominated, from start to end, by the unlawful, outrageous, and salacious behavior of *other parents*—who knowingly cheated, lied, and bribed—despite the absence of any allegation that Wilson joined, agreed to, or even knew about such conduct. The Government justified this abusive tactic on the

theory that Wilson and the dozens of parents who had independently hired Singer to help their children all joined a *single, overarching conspiracy*.  But the Supreme Court rejected that notion 75 years ago.  This is an archetypal "rimless wheel" conspiracy, where the "spokes" (parents) are linked only to a common "hub" (Singer) but are not in any way dependent on each other or committed to a common enterprise.  When prosecutors charge such an overbroad conspiracy and use it to overwhelm the jury with prejudicial evidence, the remedy is a new trial.  Even Judge Gorton admitted that a new trial would "likely" be required if the "single conspiracy" theory does not hold up.  It does not.

Worse still, the district court's egregious evidentiary rulings made it impossible for Wilson to prove his core good-faith defense—that Singer repeatedly described his donation strategy as legitimate, and Wilson reasonably believed him.  While the court admitted Singer's calls with other parents proposing outright cheating or bribery, it excluded Singer's calls, speeches, and other statements representing his approach as a *legitimate* one widely promoted by top universities.  The court also kept out Wilson's *own* statements, ostensibly as hearsay even though they were offered to show his good-faith intent, not for their truth.  To top it off, the court excluded evidence showing that USC regularly dressed up donors' children as athletic recruits, including for practice-only or non-athletic team-support roles.  The magistrate judge and another district judge both recognized this evidence as critical for the defense, and a former lead prosecutor told the press it would negate all of the offenses.  Yet Judge Gorton excluded *all of it*—even blocking impeachment of a school official who testified to the contrary.

3

Each of these errors—on the legal theories, the jury instructions, the overbroad conspiracy, and the exclusions of core defense evidence—independently compels either acquittal or, at minimum, a new trial on all counts. That applies equally to the derivative tax count, which was based on the fact that Wilson deducted his USC donations. The jury may have relied on the unsound bribery or fraud theories to conclude that those donations were not deductible, and the unfairness of the trial tarnishes the jury's verdict on this count too. For all of these reasons, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court entered final judgment on February 18, 2022. Add.86. Wilson noticed an appeal on February 25, 2022. A4197. 28 U.S.C. § 1291 confers jurisdiction.

## STATEMENT OF THE ISSUES

1.     Does making a donation to a university in exchange for admission support by one of its employees constitute "bribing" the employee under the honest-services fraud statute, 18 U.S.C. § 1346, or the federal-programs bribery statute, *id.* § 666? And, even if so, is a new trial required because the district court failed to adequately instruct the jury on the circumstances under which such a payment becomes an illegal bribe?

2.     Can making an exaggerated or false statement to help gain an offer of admission to a university constitute "property" fraud even if the student pays full tuition? And, even if so, is a new trial required because the district court instructed that an admission slot is property as a matter of law, rather than allowing the jury to make the finding?

4

**3.**     Did the Government vary from the indictment by failing to prove a single conspiracy comprising all of the parents who independently hired Singer?  And if so, was the variance prejudicial by allowing admission of vast evidence about other parents' wrongful conduct and undermining Wilson's good-faith defense?

**4.**     Is a new trial further required because the district court wrongly excluded evidence showing (i) that USC regularly and knowingly presented donors' children as athletic recruits, including for practice player or team-support roles, without regard to their athletic talent and by puffing their athletic abilities; (ii) that Singer often pitched himself and the so-called "side-door" as legitimate, assuring parents that schools welcomed side-door donations; and (iii) that Wilson believed that pitch in good faith and did not think his son had been guaranteed admission as a "fake" athlete?

**5.**     Do all of these errors also require a new trial on the count asserting that Wilson willfully filed a false tax return by deducting his donations to USC?

## STATEMENT OF THE CASE

This case arises from the "Varsity Blues" investigation into college admissions practices promoted by undisputed "con man" Rick Singer, A2775, who was caught by federal agents and then helped them target parents who had hired him.

### A.     The Wilson Family.

Wilson is an unlikely target of an investigation into privileged access to higher education.  He was born into poverty to a single mother, lived in public housing with multiple half-siblings, and grew up picking tobacco alongside migrant farmworkers.

ECF 2525 at 4. He does not know who his biological father is, and never met his Puerto Rican grandfather who disowned his mother on account of her unwed teenage pregnancy. *Id.* To escape poverty, Wilson turned to education—earning a scholarship and working to attend an engineering college—which opened the door to a successful business career. *Id.* In turn, Wilson has strived to ensure educational opportunity for others, such as by arranging—years before the events at issue—to bequeath millions of dollars to establish college scholarships for underprivileged students. A2723-27.

Wilson and his wife raised a son and twin daughters. ECF 2525 at 9. Wilson took the long view on helping them get ready for college, seeking out tutoring for his oldest, Johnny, when he was still a high-school freshman. A2666-67. His trusted financial advisor at Goldman Sachs recommended one name: Rick Singer. A2664-66.

### B.     Rick Singer and the "Side-Door."

Singer was one of the most established college counselors in California, working through his company, The Key, and nonprofit, the Key Worldwide Foundation. A1670-71, A1703, A2626. He boasted an "endless list of famous" clients, A2790: from Steve Jobs and Joe Montana, to Disney and Wells Fargo. A2748-51. The Government admits that Singer offered legitimate tutoring and other services. A991.

Singer called one of his strategies the "side-door." In his parlance, the "front-door" meant admission solely on merit. The "back-door" meant admission through the fundraising office, for the family (even across generations) of donors who made the type of large gift for which the school names a building. And the "side-door" meant

6

donating smaller sums to a specific university department or program to receive admission support for a single child as an athletic recruit or in a team-support role. A4860, A4866-67.  That support increases one's chances because, for example, USC admits only 15% of the general pool but 85-90% of athletic recruits.  A1809.  Singer arranged for clients to be supported as "walk-on" recruits (*i.e.*, without scholarships), A1814-15, or to serve in non-player roles like team manager, A2288, A2341.

████████████████████████████████

████████████████████████████████

████████████  At a presentation at Starbucks headquarters, Singer claimed to have used the side-door nearly a thousand times, A4860, and in pitches to parents he routinely name-dropped presidents of Ivy League schools, *e.g.*, A4949.

But Singer was also a "con man."  A2775.  The Government admits Singer told parents their side-door payments were donations to the schools, A3643-44, while stealing much of that money, A2286.  The Government never called Singer as a witness, relying instead on recordings of his calls (from both before and after he began to cooperate) and cherry-picked emails.

## C.     Wilson's Son and USC.

Johnny Wilson was a highly accomplished water-polo player since middle school who played on multiple club teams, started on his "national caliber" high-school team (top 25 in the country), and was selected by the conference's coaches as an "all-star." A3424-26, A3428, A3463, A3484.

In spring 2013, Singer presented Wilson with the side-door option for Johnny as a water-polo recruit, which he said would give Johnny a 95% chance at USC, 90% at Georgetown, or just 50% at Boston College.  A1331-32.  Singer called USC a "realistic" school for Johnny *without* the side-door.  A1428.  Johnny's nationally recognized high-school coach, A2885, spoke with USC coaching staff in support of Johnny, A3461-62, whom he testified was "exceptionally fast" with "the water polo IQ" to "contribute to a high-level program like USC" by junior or senior year.  A3429-30, A3463.  According to the Government's USC witness, Johnny's grades and ACT score were "strong" for student-athletes.  A1950.  Wilson initially had questions about whether Johnny—then still a high-school junior, A1429—would fit in on USC's team with its many older European recruits.  A1336-37, A3380.  But Wilson was reassured that half of Johnny's teammates would also practice but not travel for games, A1336-37, and, after a visit to USC to watch the team, A4213-14, Wilson expressed no further concerns.  Singer's own notes later recounted that Johnny was a "real polo player."  A2067.

At USC, the admissions office reviews athletic recruits through a subcommittee called "Subco."  A1807.  After coaches prepare written profiles of their recruits, A1812, the Athletics Department presents the profiles to Subco for a vote.  A1809.

Singer arranged for the USC water-polo coach, Jovan Vavic, to support Johnny in the Subco process in return for a contribution to the USC water-polo fund.  A1342-43, A1372.  One of Vavic's assistants prepared Johnny's Subco packet.  A2805-08, A2814.  Using an ambiguous term, Singer once told Wilson he was going to "embellish"

8

Johnny's profile at Vavic's request, and later forwarded to Wilson an "FYI" email attaching the profile. A1345, A1350-52. That profile included a boosted swim time and some made-up awards. A3471-78. Wilson did not reply to or forward the email, and the agent who introduced it admitted he never saw any evidence that Wilson opened or read the attachment. A1404. Indeed, the profile contained glaring errors—including the wrong home address and use of Johnny's low-80s percentile SAT score instead of his "strong" 93rd percentile ACT score—that Wilson surely would have corrected had he reviewed the profile. A1609-11, A4284, A4918, A4220.

In April 2014, Wilson made a $220,000 contribution, A2981-82, at Singer's direction, A1367. He gave $100,000 to Singer's business, The Key, which sent a bank check payable to "USC Men's Water Polo" for that amount on behalf of the "Wilson family." A2981-82. USC sent a thank-you letter to the Wilsons. A4303-04. The parties stipulated that no funds in that team account benefited "any USC employee personally." A3295. Wilson gave another $100,000 to Singer's foundation, A2981, which sent him a tax receipt noting it was registering as a 501(c)(3) entity, A4411, which it did, A2626. Singer told parents the donations would support "the athletic program," A3643-44, like by paying for team trips, A4867. But Singer actually pocketed Wilson's latter payment. A2286. It is undisputed, however, that Wilson intended all these funds to benefit USC athletics, not any individual. *Infra* n.1. Finally, Wilson gave $20,000 to Singer for what he understood to be reimbursement of related expenses. A1367. Singer told Wilson he did not receive any payment for facilitating the USC donation. A2303-04.

9

Wilson made the payments from his company, Hyannis Port Capital ("HPC"), a pass-through "S corporation" that passes all income and expenses to Wilson personally and pays no taxes itself. A2587. Singer told Wilson he could "write off" the donations. A1362. Wilson's tax returns listed the $100,000 payment to Singer's foundation as a charitable contribution and the other $120,000 (including the $100,000 for which he received a receipt from USC) as business consulting expenses. A2592, A2596-97. HPC's tax preparer testified he had seen only one of the two $100,000 receipts and that—had he seen the USC receipt—may have redesignated that sum as a *charitable* deduction during his routine end-of-year reconciliation. A2627-28, A2640-41; *see also* A2610-11. Classifying the $120,000 as a business deduction instead turned out to decrease Wilson's taxes by just $1,425 (out of $966,821 total—a 45% tax rate), A3117, A3110-12, although even that modest impact was unforeseeable at the outset, A2634.

Johnny's teammates testified that he was on the USC team the entire water-polo season of his freshman year, A3227, A3235, A3238, A3370-77, until he left after a serious third concussion, A1373-74. He was among a dozen or so "redshirt" freshmen, A3225-26, who trained and practiced with the team but could not play in external games, A2715-20. Teammates called Johnny just "like the rest of us." A3227.

### D.    Wilson's Daughters and Stanford and Harvard.

In September 2018, Wilson spoke to Singer about college for his daughters, both strong students who were then starting as high-school juniors and later earned perfect and near-perfect ACT scores. A4593-94, A3303-04 (excluding Exs. 8243-44).

By that time, the Government was monitoring Singer's calls. Singer told Wilson he was meeting with the President of Harvard to do a deal. A4600-01. Later that month, the Government approached Singer, persuaded him to cooperate, and directed him to present various ruses to parents on recorded calls. A2129, A2028-29, A2170. Under the ruse concocted for Wilson, Singer told him that donating now would help his daughters when they applied to college in 2020. He said a Stanford sailing coach and a Harvard "senior women's administrator" would each support admission of one daughter in a nonplayer role—a "scorekeeper," "water girl," "[m]anager or whatever"— on the sailing and crew teams. A2096, A2340-41. Wilson's response: "Or manager, those things. Okay." A2341. Although Wilson's daughters did not play those sports competitively, Wilson wanted to match his daughters with sports that "fit[] with their … interests." A2104. One daughter was a "sailor," Wilson pointed out, "so sailing is actually a logical thing." A2097. "She could be even the mascot, whatever," Wilson bantered, "but she knows sailing." *Id.* Singer directed Wilson to contribute $500,000 each to Stanford and Harvard through Singer's foundation, and he did. A2068-73.

As with Wilson's USC payments, it is undisputed that Wilson intended these contributions to go to the schools, not any individual. The investigating agent testified that, on his calls with Wilson, Singer reverted to his "old pitch" that it was a "donation." A2323-31, A3643. Singer's notes at the time recounted how the agents "continue[d] to ask me to tell a fib and not restate what I told my clients as to where the [money] was going—to the program not the coach and that it was a donation and they want it to be

11

a payment." A2053-54. Prosecutors waited 16 months (during which other parents pleaded guilty) before disclosing these exculpatory notes, a "failure" the district court called "irresponsible and misguided" but did nothing about. ECF 1169 at 3, 8.

### E. The "Single Conspiracy" Indictment.

In March 2019, a grand jury returned an indictment against a parent from Canada, David Sidoo, and the Government separately filed criminal complaints against 32 other parents, including Wilson. Indictment, *United States v. Sidoo*, No. 19-cr-10080 (D. Mass. Mar. 5, 2019); ECF 3.

The Government then superseded any parent who declined immediately to plead guilty into Sidoo's indictment before Judge Gorton, rather than present original indictments for random assignment to other judges. ECF 314. The premise for that maneuver was charging the parents as spokes of a single "wheel" conspiracy with Singer as its hub, even though there was not a single allegation that these parents ever worked with Sidoo or each other regarding college admissions. *Id.*

The operative indictment principally charged Wilson with bribery, under the honest-services fraud definition (18 U.S.C. § 1346) and federal-programs bribery statute (*id.* § 666). Its theory was that side-door payments to "designated university accounts" constituted bribes to college employees who "benefit[t]ed … professionally" as a result of donations to school programs. A226. The fraud charges also rested on an alternative theory: that the side-door sought to deprive the universities of *property* under the mail- and wire-fraud statutes, 18 U.S.C. §§ 1341, 1343, in the form of "admission." *Id.* The

indictment charged conspiracy to commit both types of fraud (Count One), and conspiracy to commit federal-programs bribery relating to USC (Count Two). A276-78; *see* 18 U.S.C. §§ 371, 1349. There were also five substantive counts of the same offenses (Counts Six, Eight, Nine, Eleven, and Twelve), all stemming from the 2018 ruse about Wilson's daughters. A281-83. Finally, the indictment charged that Wilson willfully filed a false 2014 tax return by deducting his side-door donations as "charitable contributions or business expenses" (Count Thirteen). A284; *see* 26 U.S.C. § 7206(1).

The indictment alleged far more egregious conduct by other parents who had no nexus to Wilson—other than the fact Singer was at the center. For instance, the indictment alleged that several parents arranged through Singer to pay someone to take their children's SAT and ACT exams or to correct their answers; that a parent paid for someone to pose as his child in online classes; that parents were submitting false athletic photos of their children; and that Singer was at times giving money to corrupt insiders at a number of schools *personally*. A227, A228, A232, A237, A244, A249, A255, A259. While the indictment charged all of this as part of a single conspiracy, there was no allegation that Wilson had anything to do with test cheating, academic fraud, falsified photos, or personal payments to insiders (or even *knew* of any of this).

## F.    The Motions to Dismiss.

Defendants challenged the bribery theory on the ground that payments to alleged victims (*i.e.*, the universities) are not bribes. ECF 1038 at 7-16. They challenged the property theory because admission is just an *offer* to provide education in exchange for

tuition; there is no *property* deprivation if the school receives full tuition. ECF 1042 at 15-19. And they argued that the indictment charged a "rimless wheel conspiracy," foreclosed by *Kotteakos v. United States*, 328 U.S. 750 (1946). ECF 1032 at 8-17.

Judge Gorton denied dismissal. Add.1-33. The court reasoned that "[p]ayments made to accounts controlled by university insiders," even if "ultimately received by the universities," can still be bribes. Add.27. The court further concluded that admission slots are property because they are "limited and highly coveted" and the university has an interest in the "integrity" of admissions. Add.18-19. Finally, the court found that the indictment adequately charged a single conspiracy "[o]n its face" by alleging "that the participation of others was necessary to the scheme's success." Add.7-10.

### G. The Trial and Sentencing.

Wilson and Gamal Abdelaziz were the only parents who pleaded not guilty and went to trial—jointly, over both of their objections. ECF 995, 1032, 1034, 1909.

Right before trial, Judge Gorton issued a consequential ruling that excluded core defense evidence showing that USC had a widespread practice of dressing up applicants as athletic recruits, including as practice players or for team-support roles, in return for donations. A568; *see* SA160. Although the magistrate judge had recognized the critical nature of that evidence and compelled USC to produce it, *infra*, Part IV.A, Judge Gorton wholesale excluded all evidence about USC's admission practices as "irrelevant" because Wilson did not personally know about the specific instances that the materials reflected. A568; Add.64-65.

14

Ironically, much of the trial that followed was about events and people Wilson also knew nothing about. Over two-plus weeks, the prosecution blurred evidence about side-door donations to universities with salacious details about: parents who paid Singer's associates to cheat on tests, *e.g.*, A991, A1056, A1258-60; parents who arranged for a Singer employee to take online courses in their children's stead, *e.g.*, A992 A1672-73; university insiders whom Singer *personally* enriched, *e.g.*, A995, A2116-17, A2964-96, and parents who knew about those personal payments, A1109; and parents who then lied to high schools and others to cover up their conduct, *e.g.*, A2108-14, A2260. Wilson had nothing to do with any of this—except for having hired the same college prep counselor who indisputably also offered "totally legitimate" services. A991.

Wilson put on a defense—or at least tried. After a preview, the court announced its plan "to sustain all of the objections of the government," A3184-90, later going so far as to sustain a large set of prosecution objections "en masse," A3509. Those rulings prevented the jury from learning how Singer publicly and repeatedly pitched the side-door as a legitimate admissions strategy to parents, as well as Wilson's own statements indicating he believed Singer and the side-door were legitimate. Add.50-51, 64-65.

The court instructed the jury consistent with its pretrial rulings. On bribery, the court instructed over objection, A3574-75, A3853, A3849, that "[p]ayments to third parties, including even employer universities, may qualify as bribes." A3836. As to property, it instructed (again over objection) that "admission slots are the property of the Universities." A3827; A3853, A3849 (objecting and proposing alternative).

The jury returned a guilty verdict on all counts. A3891-93. The court denied post-trial relief, Add.69, and sentenced Wilson to 15 months in prison, Add.88.

## SUMMARY OF ARGUMENT

**I.** The Government's main theory is that Wilson committed "bribery" by donating to the universities in exchange for admission support for his children. That is not bribery. Bribery means providing a private benefit to an agent. Here, however, all concede that Wilson's donations were intended for the universities, not any individual. The universities cannot be both the *victim* and the *beneficiary* of the "bribes." Not a single bribery case in all of American history merges these roles, and expert scholars separate them, defining a bribe as a payment that does *not* go to the agent's principal. This is obviously not the type of "paradigmatic" case covered by the honest-services statute; nor can it be squared with the text of the federal-programs bribery statute. All of this is then driven home by the canons of construction, which require *clarity*—plainly absent here—before federal criminal laws are given sweeping new readings.

At minimum, the district court erred by failing to give the jury a limiting principle to distinguish illicit bribes from routine transactions. Judge Talwani, presiding over a related trial, crafted an instruction that—while still deficient—meaningfully narrowed the theory. Meanwhile, the jury in Wilson's case was left at sea.

**II.** Alternatively, the Government claims Wilson defrauded the schools out of "money or property" by using deception to induce admission offers for his children. But as Judge Talwani held in her related Varsity Blues matter, an admission offer is not

16

property within the meaning of the federal fraud statutes.  Rather, an admission slot is just an offer to *engage in a transaction*—education in exchange for tuition—and the school does not lose property so long as the student pays full tuition, as contemplated here. Of course, schools have an interest in the composition of their student bodies and the integrity of their admission systems, but those interests do not sound in property.  And the Government's contrary theory again threatens to vastly expand the scope of federal criminal liability, in the face of repeated Supreme Court reprimands.

Nor can the Government shift its theory now, to claim the schools were deprived of an intangible "right to control."  Not only did the Government waive that theory below, but this Court has never treated the "right to control" as property.  In any event, even Circuits that recognize that right require a nexus to economic harm and require the jury to determine whether the right was impaired.  Here the Government proved no economic harm, and the district court wrongly took the issue from the jury.

**III.**   The indictment charged that dozens of parents who hired Singer were all participants in a single, overarching conspiracy.  But, at trial, the Government proved only an archetypal "rimless wheel"—a series of spokes (parents) who interacted with a central hub (Singer) but were not interdependent with one another or committed to any common goal.  Each parent was interested only in his *own* child's admission prospects; if anything the parents were *competitors* for scarce slots.  More than 75 years ago in *Kotteakos*, the Supreme Court explained that a rimless wheel is not a valid conspiracy. The Government here has reinvented that legal error.

In this case (as in *Kotteakos*), the consequence of charging but not proving a mega-conspiracy is a prejudicial variance. Prosecutors used the single-conspiracy excuse to introduce prejudicial evidence and "co-conspirator" hearsay about over a dozen other families who engaged in all manner of misconduct (from academic fraud to *true* bribery) that Wilson never knew about and certainly never joined, and who manifested their consciousness of guilt to boot. Indeed, the Government's opening and closing focused on these parents, and *more than half* its witnesses devoted meaningful time to others' misconduct. This was classic guilt by association. Wilson is entitled, at minimum, to a trial at which the jury ascertains *his* guilt or innocence, not someone else's.

**IV.** One of Wilson's defenses to all charges was that USC regularly used its athletic programs to admit donors' children, including as practice players or in support roles like team manager, and that high-ranking USC officials knew and approved of that fundraising strategy. The magistrate judge compelled USC to produce this material and called it a "basic fact" for the defense. But Judge Gorton excluded it entirely. That was reversible error. Whether USC approved of this conduct bears on core elements of the offenses, including whether the college insiders violated fiduciary duties to the school and whether any alleged misstatements in Johnny Wilson's athletic profile were material. That is why *the Government* elicited testimony from a USC official *denying* that fundraising played any role in athletic admissions. Yet Judge Gorton refused to allow Wilson even to impeach that witness with contradictory documents.

Moreover, despite allowing the prosecutors to insinuate Wilson's guilt through evidence that *other parents* knowingly participated in *other misconduct*, the court refused to admit Singer's many statements, speeches, and publications portraying the side-door as legitimate, lawful, and welcomed by university presidents—all of which would have supported Wilson's good-faith defense. The court went so far as to exclude Wilson's *own* statements that manifested his good faith. Once again, these evidentiary errors cut to the heart of Wilson's defense and demand a new—and fair—trial.

**V.**     All of these same errors taint the jury's verdict on Count 13, the tax charge based on Wilson's deduction of his donation to USC. As the Government conceded below, the jury might have convicted on Count 13 by reasoning that an *illegal* payment cannot be deducted as a charitable donation. All the legal flaws in the substantive theories thus require a new trial on the derivative tax count as well.

## STANDARD OF REVIEW

This Court reviews *de novo*: (i) whether the evidence is sufficient to satisfy the offense "elements," *United States v. Fernandez*, 722 F.3d 1, 8 (1st Cir. 2013); (ii) whether sufficient evidence supports the charged conspiracy, *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011); (iii) whether such variance was prejudicial, *United States v. Rivera-Ruiz*, 244 F.3d 263, 271 (1st Cir. 2001); (iv) "preserved claims of legal error in jury instructions," *Fernandez*, 722 F.3d at 16; and (v) evidentiary decisions that are based on "rulings of law," *Cameron v. Otto Bock Orthopedic Indus., Inc.*, 43 F.3d 14, 16 (1st Cir. 1994). Evidentiary rulings are otherwise reviewed for abuse of discretion. *Id.*

19

# ARGUMENT

## I. WILSON'S CONDUCT COULD NOT HAVE BEEN "BRIBERY."

The Government charged Wilson with honest-services fraud (Counts One, Six, Eight, Nine) and federal-programs bribery (Counts Two, Eleven, Twelve), both statutes that proscribe *bribery. Skilling v. United States*, 561 U.S. 358, 411 (2010); 18 U.S.C. § 666.

All of these charges fail as a matter of law. Bribery is giving a benefit to *an agent* to influence the actions he takes on behalf of *his principal*. It corrupts the relationship by giving the agent an extrinsic incentive misaligned with his principal's interests. The principal is the victim of a bribe. But here Wilson agreed to donate *to the colleges* in exchange for admission support *from the colleges*. Employees facilitated that exchange, but Wilson's money was intended for the school—the supposed *victim*—not insiders. Donating to a school is not a bribe to its employees. That is why a judge presiding over a separate Varsity Blues matter called this "a case in search of a bribe." A4059.

The Government's argument fundamentally misunderstands what bribery is. Indeed, counsel has not identified *a single bribery case in the history of American jurisprudence* in which the victim of the bribe was also the recipient of the allegedly illicit payment. Nor can this novel theory be reconciled with *Skilling*'s narrowing of honest-services fraud, or with § 666's text—much less with the applicable canons of construction.

Because there was no evidence Wilson ever agreed to benefit a corrupt insider personally, this Court should reverse and order acquittal. At minimum, Wilson deserves a new trial with jury instructions that meaningfully define "bribery."

## A.    The Victim of a Bribery Scheme Cannot Also Be Its Beneficiary.

This case asks whether the *victim* of a "bribery" scheme can also be the *beneficiary* of the "bribe."  The Government claims Wilson bribed college insiders to recommend his children for admission by donating to college athletic programs.  To be clear, his donations (through Singer) were intended for the universities; USC even gave a receipt.  While Singer arranged for *other* parents to make payments to college insiders *personally*, that was not the case with Wilson.  The Government repeatedly so admitted.[1]

Judge Gorton nevertheless accepted the Government's theory that a payment to the victim of the scheme can be a "bribe" under federal criminal law.  Add.24-27.  And the court instructed the jurors accordingly, telling them that a payment to the university itself could qualify as a "bribe" to the university's employees.  A3836.  Meanwhile, other judges in Varsity Blues cases have been skeptical.  For example, Judge Woodlock was incredulous when the Government cited "payments directly to USC" as grounds for a bribery sentencing enhancement: "That's not a bribe, is it?  It's received by USC.  … That's a different issue from bribery, right?"  A4058; *see also* A4076-81 (similar).

---

[1] A1376 (Government at sidebar: "[W]e opened on the fact that these personal payments were something that Mr. Singer did not tell the parents about.  That's in our opening statement.  We said it repeatedly."); A3643-44, A3671 (Government closing: "Singer told the parents that the money would go to the athletic program" and "didn't tell the defendants that he was paying the insiders personally"); A4883 (Government brief admitting it "was not attempting" to prove parents knew of insider payments).

By contrast, in its case against the USC coach (Vavic), the Government presented evidence that Singer later used *other parents'* money to pay "private school tuition" for "Vavic's children."  *United States v. Ernst*, 502 F. Supp. 3d 637, 644 (D. Mass. 2020).

The latter intuitions were correct. Giving money to a school is not "bribery" of that school's employees. The text of the two bribery statutes at issue confirms that common-sense understanding of the line between lawful payments and criminal ones. And canons of construction foreclose any other construction.

1.    **The Meaning of "Bribery."**  Bribery is when someone offers an agent a personal benefit, *i.e.*, a corrupt payment, to influence his exercise of duties on behalf of his principal. *See Bribery*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The corrupt payment, receipt, or solicitation of a *private favor* for official action." (emphasis added)). Often the agent is a public official—an agent of the public. He has a fiduciary duty to act in the public's best interests. If he is offered a private benefit in exchange for an exercise of his powers, he has been bribed to follow his own interest rather than the public's. The same dynamic can exist in the private sector—*e.g.*, if a corporate officer is offered a personal benefit in exchange for using his corporate authority. The payment induces him to act based on his own interests rather than the company's. The common denominator—what makes bribery bribery—is a private incentive that does not benefit the agent's principal, thereby creating a clear conflict between the agent's *personal interests* and his *duties to his principal*. *See Oscanyan v. Arms Co.*, 103 U.S. 261, 277 (1881) (describing object of a "contract to bribe" as "the control of … agents by *considerations conflicting with their duty and fidelity to their principals*" (emphasis added)). To counsel's knowledge after thorough research, every federal bribery case in U.S. history fits this mold.

22

In this case, however, the payments were to the universities themselves—*i.e.*, the principals of the "bribed" agents. That simply lacks the essential trait of a "bribe." Unlike money destined for the employee's own pocket, there is nothing inherently corrupting about a payment to the principal. The latter does not create an objective misalignment between the interests of the principal and its agent. To the contrary, the agent's job often includes raising money or revenue for the principal, whether by selling a product, closing a deal, or soliciting a donation. Those transactions are obviously not bribes. For these reasons, scholars who have studied bribery closely conclude that the *sine qua non* of bribery is a "payment which is *not passed on to the principal*." Susan Rose-Ackerman, CORRUPTION 6-7 (1978) (emphasis added). Or, as another scholar starkly put it: "Any payment made to a principal, for any purpose, is not by definition a bribe." Harvey S. James, Jr., *When Is a Bribe a Bribe? Teaching a Workable Definition of Bribery*, 6 TEACHING BUS. ETHICS 199, 209-16 (2002).

The district court observed that a bribe need not go into the agent's own pocket. Add.26-27. True enough, but that misses the point. An agent cannot allow his actions to be influenced by personal benefits—whether they go directly to the agent, his friends or family, his political campaign, or even his favorite charity. *See United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013); *United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003). But that is because *none of these payments inures to the benefit of his principal*, so they necessarily *corrupt* the relationship. As the scholars above have recognized, the dynamic is fundamentally different when the benefit inures directly to the principal.

Relatedly, the district court reasoned that a payment to the school could support a bribery charge if the employees stood to derive indirect professional benefit (such as by satisfying their fundraising goals or advancing the sports program they oversaw). Add.26-27. But that logic is obviously overbroad and thus does not solve the problem. Agents *always* stand to benefit when their principals benefit, whether by earning a sales commission or achieving some professional advancement. That *derivative* benefit cannot be fairly described as a "private" one, *Bribery*, BLACK'S LAW DICTIONARY, *supra*, or an inherently corrupting one. Indeed, in rejecting a similar theory, the Seventh Circuit could not find "any appellate decision holding that an increase in official salary, or a psychic benefit such as basking in a superior's approbation (and thinking one's job more secure), is the sort of 'private gain' that makes an act criminal under § 1341 and § 1346." *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007).

In this case, the Government stipulated that no funds in the athletic programs' accounts benefited "any USC employee personally." A3213; *see supra* n.1. So the most that could be said is that the employees may have been influenced by the indirect benefits they could reap from advantaging the schools. But that still is not "bribery" as anyone has ever understood the term. What remains absent is the objective conflict between the agent's personal interests and the interests of his principal.

**2. Statutory Frameworks.** The Government's theory is unprecedented because it is wrong. Indeed, it is irreconcilable with the Supreme Court's interpretation of § 1346 in *Skilling* and with the text and structure of § 666.

24

    **a.**  Congress enacted § 1346 after *McNally v. United States* held that the federal fraud statutes protected only property rights, not the intangible right to honest employment.  483 U.S. 350, 358 (1987).  Although § 1346 revived the honest-services theory, *Skilling* then limited the statute to "paramount applications" of the theory "pre-*McNally*"—*i.e.*, cases of "bribes or kickbacks."  561 U.S. at 404.  To avoid vagueness concerns, the Court narrowed the statute to those "core" or "paradigmatic" cases, *id.* at 409, 411, and refused to extend it beyond "that core category," *id.* at 405.

    *Skilling* dooms the Government's theory.  This case can hardly be described as "paradigmatic" or within the "core of the pre-*McNally* case law."  *Id.* at 411, 409.  After a comprehensive review, neither counsel nor the Government has been able to identify *any* federal bribery case—including pre-*McNally*—where the bribe went to the alleged victim.  Under *Skilling*, that lack of precedent is dispositive.

    Actually, the alleged misconduct here has far more in common with the conduct *Skilling* expressly held was *beyond* § 1346's scope.  The Court there squarely rejected the argument that the statute forbade "the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty."  561 U.S. at 409.  That describes nearly to a tee the accusation against the college insiders here.  If anything, the concealed *financial* interests that *Skilling* held outside of § 1346 were far closer to the "pre-*McNally* core" than the indirect *professional* benefits that allegedly motivated the insiders here.

Simply put, *Skilling* makes clear that § 1346 criminalizes only true bribery and kickbacks, not deception or conflicts of interest or "unfaithful" service more generally. And as this Court has warned, courts cannot "let in through the back door the very prosecution theory that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988). That is precisely what the Government is trying to do by recharacterizing the conduct here as "bribery."

**b.** The text and structure of the federal-programs bribery statute likewise confirm that a payment to a purported victim is not a bribe. Section 666 prohibits "corruptly" giving or offering "anything of value to *any person*, with intent to influence or reward an agent of an *organization* ... in connection with any business, transaction, or series of transactions of *such organization*." 18 U.S.C. § 666(a)(2) (emphases added). Can "any person" (the recipient of the bribe) be the same as the "organization" (the victim)?

The Supreme Court answered "no" to a similar query in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). There, the Court analyzed RICO, which makes it unlawful for "*any person* employed by or associated with *any enterprise* ... to conduct or participate ... in the conduct of *such enterprise's* affairs" through racketeering acts. 18 U.S.C. § 1962(c) (emphases added). Looking to the "statute's language, read as ordinary English," the Court agreed with the "basic principle" that this text requires "two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." 533 U.S. at 161-62.

Section 666 follows a similar structure and, so too here, the statutory reference to "any person" (the recipient of the bribe) must be understood to connote someone distinct from the "organization" (the victim of the bribe). Construing § 666 to require distinctness between the "person" and the "organization" is the only way to give each term independent meaning. That also makes sense of the statute's "corruptly" *mens rea*, *Fernandez*, 722 F.3d at 19, since (as discussed above) the principal-agent relationship is not inherently corrupted by a payment that is made to the principal itself.

**3.      Consequences.**  The practical "fallout" from the Government's novel theory "underscores the implausibility of the Government's interpretation." *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).  Agents routinely take actions that carry indirect personal or professional benefits for themselves; treating all of that as bribery would threaten to criminalize a large swath of ordinary transactions.

Imagine a crowded restaurant with a long queue waiting for seats.  A table opens up.  A celebrity approaches the waiter and offers to pay double the menu prices if his party can cut the line.  The waiter gives him the table, without seeking approval from management.  Again, that might be misconduct of some sort.  But on the Government's view it is *bribery*—the waiter used his power as an agent of the restaurant to facilitate an exchange between the celebrity and the restaurant.  And the waiter derives indirect personal benefit from that exchange, because paying double the menu prices may lead to increasing the waiter's tip.  But nobody would call this—as opposed to slipping the waiter $50 to cut the line—a "bribe."

Or, as another example, consider the development director of a performing arts center who promotes access to scarce box seats to an opera's opening night in exchange for $5,000 donations to the center. While the program is limited to two tickets per donor, she saves effort by giving the eight remaining seats to a single donor willing to donate $100,000. The Government would call that bribery, but—unlike trading seats for *personal* gifts—it is nothing more than a breach of internal protocols.

The same mismatch and overbreadth are present if this theory is applied to the public sector. Imagine a mid-level official who gives a public-works contract to a unionized company. To circumvent regulations that prioritize other factors, the official reports that the unionized company was higher-quality or the low-bidder. Again, there is no doubt this official has engaged in impropriety. But he has not committed *bribery*, even if he would benefit politically or professionally from helping a union shop. That indirect benefit is simply not what the bribery statutes target. *Cf. Thompson*, 484 F.3d at 883-84 (reversing pre-*Skilling* conviction on similar facts).

Fundamentally, the Government's theory makes a "bribe" of every transaction where an employee derives indirect personal gain. But every time an agent performs a task for a principal—every time a salesman closes a sale—the agent stands to receive at least some indirect benefit, be it approbation or professional advancement or a higher commission. That limitless understanding of bribery's *quid* element is just as untenable as the limitless conception of the *quo* element the Supreme Court unanimously rejected in *McDonnell v. United States*, 579 U.S. 550, 574-75 (2016).

28

4.    **Canons.**  At minimum, it surely cannot be said that the Government's novel position *unambiguously* represents the correct construction of the two statutes at issue.  Yet, in construing those federal corruption laws, the Supreme Court has invoked canons of construction that mandate such clarity.

*First*, the rule of lenity requires that an ambiguous statute be given its less punitive reading.  *Cleveland v. United States*, 531 U.S. 12, 25 (2000); *Skilling*, 561 U.S. at 410; *United States v. Gray*, 780 F.3d 458, 468 (1st Cir. 2015).  *Second*, the Court has repeatedly warned that, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes."  *Cleveland*, 531 U.S. at 25; *see also, e.g.*, *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020); *United States v. Berroa*, 856 F.3d 141, 150-51 (1st Cir. 2017).  *Finally*, the Court has reiterated the importance of drawing clear lines in this area, so citizens can understand what conduct is unlawful.  *See, e.g.*, *McDonnell*, 579 U.S. at 576 (worrying about lack of "fair notice" caused by "standardless" and "shapeless" interpretation of bribery statute).

All of these considerations point in the same direction here.  These statutes are, at best for the Government, ambiguous as to whether they proscribe paying a principal to influence its agent.  That triggers the rule of lenity, calling for a narrower reading that would provide fair notice as to what conduct is unlawful.  A limited construction is especially warranted here because the Government's interpretation leaves the bribery statutes without clear boundaries, and thus effectuates a broad and unprecedented expansion of federal criminal jurisdiction.

Most notably, the Government accepts that making a very large donation for a family admissions boost—the so-called back-door—is not illegal. *See* A3574-76. Given the frequency of that practice, it could hardly argue otherwise. *See McDonnell*, 579 U.S. at 581 (rejecting "boundless interpretation" that would criminalize routine conduct); *McCormick v. United States*, 500 U.S. 257, 272 (1991) (refusing to "open to prosecution" conduct "that has long been thought to be well within the law"). But the Government has never been able to explain why a smaller side-door donation is bribery while the back-door is not—again reflecting its lack of a viable limiting principle.

**5.    Counterargument.**  Below, the Government's one attempt to identify a limiting principle was to argue that the college insiders deceived their superiors about the qualifications of the recruits. In other words, payments to the school become bribes to the employees if the employees lied. *See* A3642 ("That is … called honest services fraud, because in exchange for that so-called donation, the insider is lying to their own colleagues …."); A3773-74 ("paying money to get someone who's employed by a university to lie to their colleagues, that is an illegal quid pro quo").

That theory confuses two distinct issues and elements: *misrepresentations* and *bribes*. Lying to one's superiors does not turn a lawful transaction into an illicit bribe. Perhaps these employees subverted the university hierarchy or violated its rules by prioritizing donations in this way, without full approval from or transparency with their superiors. But that is some sort of employment malfeasance—not *bribery*.

Put another way, if the university leadership decided to offer admission to less-qualified athletes in exchange for donations, nobody could call that bribery. *Infra*, Part IV.A (discussing excluded evidence of just that). The Government's allegation is that many subordinates took similar action on the university's behalf, without authorization. But even if it were true that a large group of employees were engaged in unauthorized fundraising—selling admission support without approval of the university president—that does not amount to a bribe. It speaks to internal management and administration; it does not transform an otherwise-lawful action into a serious federal crime.

Thinking back to the hypotheticals above, if the waiter told his manager he had adhered to a first-come-first-served policy, or if the development director reported to her CEO that only two tickets had been provided per donor, or if the official described the winning contractor as the low-bidder—none of that would change the outcome. Those are lies, but the payments that were made to the principals were still not "*bribes*" to these agents as that term has always been understood and applied.

The Government's "lying" theory also finds no support in either statute. As to honest-services fraud, the district court instructed the jury that it requires *both* a "bribe" *and* a "misrepresentation"—separate elements. *See* A3833. At minimum, under *Skilling*, it is very clear that misrepresentation or deception is not enough for an honest-services conviction; there must be a bribe or a kickback. 561 U.S. at 410; *see supra* at 25-26. And, as to § 666, there is absolutely no basis in its language for the notion that lying is what distinguishes corruptly paid bribes from lawful transactions.

The Government's limiting principle of misrepresentation is thus disconnected from the purposes of bribery law, is completely unprecedented, expressly contradicts *Skilling*, and is foreign to § 666. The Court should reverse the bribery convictions.

### B.  At Minimum, the Jury Instructions on Bribery Were Overbroad and Failed To Provide Adequate Guidance.

The discussion above should at the very least suffice to show that characterizing Wilson's donations as "bribes" raises a host of complex issues about the scope of such a theory. What distinguishes a routine transaction from a corrupt bribe? Why is the back-door lawful but the side-door a crime? What is the Government's limiting principle? Insofar as the Court believes there is a viable theory, the district court never instructed the jury on it, and that alone compels vacatur for a new trial.

Judge Gorton instructed the jury: "Payments to third parties, including even employer universities, may qualify as bribes or kickbacks." A3836. He gave no further guidance. On its face, that is patently inadequate to convey the line between lawful and criminal behavior. It tells the jury that payments to a university *can be* a bribe, but does not answer the critical question: *under what circumstances*? Wilson urged the court to provide "concrete guidance" to the jury. A3571. But the court did not. *Id.*

Judge Talwani, meanwhile, recently instructed a Varsity Blues jury that a payment to a university can be a bribe only if either (i) "the employee uses those funds for his or her personal use rather than the entity's use," or (ii) "the payments are made for the employee's own interest and receipt of the payments is contrary to the university's

interest." Tr. of Apr. 7, 2022 at 265, *United States v. Vavic*, No. 19-cr-10081 (D. Mass.). Although subpart (ii) is still wrong for the reasons above, it at least attempts to draw a line for the jury. As a fallback, Wilson proposed a similar instruction—distinguishing payments "for the benefit of the university" from payments "for the personal benefit of the employee," A522-23—but Judge Gorton refused to give it.

"It is a long recognized principle" that "clear, easily understood jury instructions are vitally important in assuring that jurors grasp subtle or highly nuanced legal concepts." *United States v. Medina-Martinez*, 396 F.3d 1, 8 (1st Cir. 2005). Without them, a defendant could be "convicted based on conduct that was not actually illegal," *United States v. Woodward*, 149 F.3d 46, 69 (1st Cir. 1998), and that risk compels vacatur. *E.g.*, *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996) (vacating where instructions allowed jury to convict without finding intent to influence official action).

The same result is warranted here, at minimum. The jury was left at sea as to the "subtle" and "highly nuanced" contours of what constitutes a bribe. *Medina-Martinez*, 396 F.3d at 8. It is impossible to know how the jury parsed a "bribe" from an otherwise-lawful payment and, in turn, whether the jury convicted Wilson for forbidden conduct. For that reason too, Wilson's convictions "cannot stand." *Sawyer*, 85 F.3d at 731.

## II. THE ALTERNATIVE "PROPERTY" FRAUD THEORY ALSO FAILS.

For the fraud counts (One, Six, Eight, Nine), the Government also offered an alternative theory. It argued that Wilson agreed to use deception to obtain "property" from the colleges in the form of admission offers.

That theory legally fails too, because an offer of admission is not "property" under the federal fraud statutes. A student who lies on an application has *deceived* the college into entering a transaction with him, but he has not *defrauded* the school of *money or property* so long as he pays his full tuition in exchange for the education. The contrary theory would vastly expand the federal fraud statutes—contrary to Supreme Court guidance—by turning every application with an embellishment (for a job, preschool, country club, homeowners association, etc.) into a federal crime, even absent economic harm. The Court should therefore order acquittal on all fraud charges.

Alternatively, a new trial is required because the district court wrongly instructed the jury that admission slots *categorically* qualify as "property," rather than allow the jury to make its own determination, as other Circuits demand in similar contexts.

## A.    An Admission Offer Is Not "Property."

The federal fraud statutes do not prohibit all deception—only schemes that seek to deprive a victim of "money or property." *Kelly*, 140 S. Ct. at 1574; *Cleveland*, 531 U.S. at 18-19. Intangible rights can qualify, but only if they have historically been treated as property or bear its traditional hallmarks. *E.g.*, *Carpenter v. United States*, 484 U.S. 19, 26 (1987) (confidential business information has historically been treated as property).

In construing the scope of property under the federal fraud statutes, the canons discussed above require a narrow reading. *See supra*, Part I.A.4. Indeed, the Supreme Court has invoked those canons specifically in interpreting this term. *Kelly*, 140 S. Ct. at 1574; *Cleveland*, 531 U.S. at 25; *McNally*, 483 U.S. at 360.

Here, the controlling question is whether an offer of college admission counts as "property," such that lying in the college admission process rises to the level of a federal felony. For the reasons below, it does not—certainly not with the requisite clarity.

1.     **Doctrine.** In a related case, Judge Talwani observed that, historically, admissions slots have not been treated as property and lack its traditional hallmarks: Universities neither sell admission slots commercially, nor convey any property rights to admitted students. *United States v. Ernst*, 502 F. Supp. 3d 637, 650-51 (D. Mass. 2020). Judge Talwani also invoked the canons of construction discussed above. *Id.* at 652-53. Ultimately, the court concluded, whatever interest universities have in maintaining the integrity of admissions, it does not sound in property. *Id.* at 651.

Judge Talwani's analysis is compelling. In economic substance, an "admission slot" is an offer to engage in a transaction: The college is offering to provide educational services to a student in exchange for tuition payments. If a student accepts the offer and pays tuition, the university has not been deprived of property. If the student procured that offer through deception, the university was tricked into entering the transaction. But that is not a deprivation of *property*, for ultimately the university was paid in full. After all, in the college context, "the essence of the transaction" is "that the students would receive a semester of education in exchange for a semester of tuition." *Squeri v. Mt. Ida Coll.*, 954 F.3d 56, 71 (1st Cir. 2020). And the law is clear that merely causing "victims to enter into transactions they would otherwise avoid … do[es] not violate the mail or wire fraud statutes" if the victim "received the full economic

benefit of its bargain." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015); *see also Cleveland*, 531 U.S. at 22 (noting that defendant who lied to obtain poker license "paid the State of Louisiana its proper share of revenue" and thus "[i]f Cleveland defrauded the State of 'property,' the nature of that property cannot be economic").

Based on that logic, Courts of Appeals have rejected convictions where the *buyer* allegedly defrauded the *seller* despite paying full price. For example, in *United States v. Sadler*, the Sixth Circuit held that a woman did not commit wire fraud when she lied to pharmaceutical distributors—using a fake name and falsely claiming the pills were for indigent patients—because she paid full price for the drugs. 750 F.3d 585, 590 (2014). As Judge Sutton explained, "paying the going rate for a product does not square with the conventional understanding of 'deprive.'" *Id.* Likewise, in *United States v. Shellef*, the Second Circuit held that a company did not commit wire fraud when it used misrepresentations (a promise to sell certain chemical products only abroad) to induce another company to sell goods, because the buying-company paid full price. 507 F.3d 82, 109 (2007). In so holding, the court explained that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid … do not violate the mail or wire fraud statutes." *Id.* at 108; *see also United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (reversing convictions where "manufacturers received the full sale price" and "suffered no monetary loss" after buyers lied to induce sales); *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) ("[A] wire-fraud case must end in an acquittal if … the alleged victims received exactly what they paid for.").

36

In all these cases, the seller might not have sold the product had it known the truth—but that did not amount to *property fraud*. So too here. Wilson's son did not get a full or even partial athletic scholarship (nor was there any talk of scholarships for his daughters). Wilson donated to the program and was given the ordinary opportunity to pay full tuition, with the *hope* that his son would contribute to USC's water-polo team once on campus. To be sure, USC may have given that opportunity to someone else had it known all the facts—just as it might have declined to admit a candidate had it known that she embellished her viola talents or passion for community service. But that is beside the point: At bottom, seeking to induce a school to admit an applicant paying full tuition does not threaten to deprive the school of *property*.

2. **Consequences.** Again, the practical implications of the Government's contrary theory confirm its flaws. *Van Buren*, 141 S. Ct. at 1661. If an offer of admission is "property," then admission to any desirable organization or program would count. That means parents who exaggerate their toddler's reading skills (or minimize her behavioral challenges) to get her into the best pre-school have committed a federal crime. So too the golfer who reduces his handicap to gain admission to an exclusive club. For that matter, the Government's theory reaches people who misrepresent their height when seeking to join exclusive dating apps. Recall, too, that the federal fraud statutes prohibit not only outright lies but also misrepresentations and misleading omissions—which makes the breadth of conduct criminalized under the Government's theory even more alarming. *See Cleveland*, 531 U.S. at 26.

As these examples illustrate, the Government's sweeping account of "property" would transform prosaic interactions into serious federal felonies. That implicates the Supreme Court's oft-repeated warning against reading ambiguous federal statutes to effect a broad expansion of federal criminal jurisdiction. *Supra*, Part I.A.4. And insofar as the Government tries to distinguish some of these hypotheticals, that only highlights the need for the rule of lenity: Citizens must have notice of what conduct is illegal, and the Government's loose, case-by-case approach does not provide it.

**3.    District Court's Reasoning.** Judge Gorton ruled that admission slots are property because (i) admission is scarce, valuable, and controlled by the universities; (ii) universities have an interest in the "integrity" of admissions; and (iii) an old Sixth Circuit decision described college *degrees* as property. None of this is persuasive.

*First*, the opportunity to engage in a transaction, however rare or coveted, is not itself property. The fact that something is scarce or valuable does not make it property. *See, e.g., Cleveland*, 531 U.S. at 22 (Louisiana did not have property interest in poker licensing despite "substantial economic stake"); *Carpenter*, 484 U.S. at 26 (looking to history and tradition, not value or scarcity, to decide if confidential business information is property). Indeed, if "scarcity or value" were the test, virtually any deception would violate the statute, since people generally lie only to obtain something of "value" to them. *Cf. United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021) (rejecting interpretation of "property" that "would transform all deception into fraud"). As cases like *Sadler*, *Shellef*, and *Bruchhausen* illustrate, that is not the law.

38

Relatedly, even where *engaging* in a transaction has its own value or prestige, that does not create a property interest. Think back to the restaurant from the hypothetical above. *Supra* at 27. Suppose the restaurant is the most popular in town; reservations are scarce, valuable, and controlled by the staff. Suppose, too, that a man lies to the manager, falsely claiming that it is his 75th birthday so that he could get a table. So long as the man pays full price for the meal, nobody would think the restaurant has been defrauded of *property*. That is so even though the restaurant would not have given him the table otherwise. And that is so even though the man may receive some subjective benefit simply from getting a seat at such an exclusive spot. So too here.

*Second*, while it is certainly true that colleges have an interest in the "integrity" of their admission process, that is the epitome of a *non-property* interest. Integrity and honesty are the "rights" that *McNally* held were *not* covered by the fraud statutes. Judge Talwani was quite correct to reason that insofar as "the universities were deprived of integrity and fairness in the admissions process, the honest services fraud statutes—not the property fraud statutes—provide the framework to address the offense." *Ernst*, 502 F. Supp. 3d at 651. (Of course, under *Skilling*, § 1346 criminalizes only bribery and kickbacks, not *every* deprivation of integrity and honesty. *Supra*, Part I.A.)

*Third*, the Sixth Circuit's decision in *United States v. Frost*, 125 F.3d 346 (1997), is distinguishable on multiple grounds. To start, *Frost* at most suggested that a university had a property right in a *degree*. *Id.* at 367. But admission and degrees are very different. Admission is an exchange of tuition for education; as explained, lying to secure

admission therefore does not deprive the school of property if the student pays tuition. Degrees, on the other hand, reflect the university's determination that the student has satisfied academic requirements.  Cheating on those requirements is not just inducing an economic exchange in which both parties get the benefit of their bargain.  It involves obtaining the school's ultimate product (its certification) without satisfying the student's academic end of the bargain.  That present a different problem entirely.

Moreover, as Judge Talwani observed, *Frost* was not even a property-fraud case. *Ernst*, 502 F. Supp. 3d at 648-49.  Rather, *Frost* was a pre-*Skilling* honest-services case, where professors were alleged to have helped part-time graduate students cheat on their academic work in exchange for the students steering government research contracts to the professors.  The court held that an employee commits honest-services fraud by violating her fiduciary duty to "protect" her employer's property.  *Frost*, 125 F.3d at 367. The "property" question thus arose in an inapposite context, based on a premise about § 1346's scope that *Skilling* has since superseded.

Finally, *Frost* was decided before *Cleveland*, and its reasoning cannot be squared with that decision.  *Frost* rested primarily on the ground that degrees are finite, and schools have a reputational interest in safeguarding their receipt.  But that rationale— "that awarding unearned degrees would decrease the value of degrees in general and hurt the reputation of the school"—would "have … been true of Louisiana's interest in only awarding gaming licenses to qualified applicants." *Ernst*, 502 F. Supp. 3d at 650. Yet *Cleveland* found that Louisiana's interest did not sound in property.

Even the Sixth Circuit has since implicitly distanced itself from a broad reading of *Frost*, by holding that a seller who receives the full economic benefit of his bargain has not been deprived of property even if he was deceived into the sale. *See Sadler*, 750 F.3d at 591 (rejecting idea that "right to accurate information" is "property"). Likewise, this Court should hold that an offer of admission is not itself "property."

## B. The "Right to Control" Theory Cannot Save These Convictions.

In some cases where the victim has lost no property, the Government tries to reconceptualize the deprivation as the loss of the victim's "right to control." One judge reasoned that this logic could apply to college admissions: Even if the school receives full tuition, lying during the admission process deprives the college of its right to control its student-body selection. *United States v. Khoury*, No. 20-cr-10177, 2021 WL 2784835, at *2-3 (D. Mass. July 2, 2021). But that theory cannot save Wilson's convictions.

*First*, the Government waived this theory. The indictment identified the property at issue as "admission to the Universities," A276; *see also* A277, A281, and never mentioned any "right to control." Confirming its abandonment, the Government did not request that the jury be instructed on the "right to control" theory. It is too late for the Government to switch horses. *See United States v. Burhoe*, 871 F.3d 1, 21 n.17 (1st Cir. 2017) (holding that "alternative legal theory is not available to the government" if it neither objected to jury instructions nor otherwise preserved theory); *United States v. Didonna*, 866 F.3d 40, 50 (1st Cir. 2017) ("[A] reviewing court cannot affirm a criminal conviction on the basis of a theory that was never advanced in the trial court.").

*Second*, this Court should reject the "right to control" theory, which is the subject of a circuit conflict. *Compare Binday*, 804 F.3d at 570-71 (accepting theory), *with Sadler*, 750 F.3d at 591 (rejecting it). A freestanding "right to control" is "not the kind of 'property' right[] safeguarded by the fraud statutes." *Id.*; *see also Bruchhausen*, 977 F.2d at 467-69. As the Ninth Circuit recently reiterated, "[t]here is no cognizable property interest in 'the ethereal right to accurate information.'" *Yates*, 16 F.4th at 265. Indeed, the "right to control" is no more property than "deciding what to eat" is food. And for all the reasons above—first principles, precedent, and interpretive canons—this Court should not extend the fraud statutes to reach this novel conception of property.

*Third*, even assuming the validity of the "right to control" theory, it does not apply on these facts. Given the statutory nexus to *property*, the courts that have adopted the "right to control" theory hold that the deception must threaten *tangible economic harm* to the victim. Thus, "not every non-disclosure or misrepresentation that could affect someone's decision of how to use his or her assets is sufficient to support a mail or wire fraud conviction." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). Rather, misrepresentations can support a conviction only if those misrepresentations "can or do result in tangible economic harm." *Id.*; *see also Binday*, 804 F.3d at 570-71.

Here, the Government offered no evidence that the universities suffered any direct economic harm from Wilson's conduct. *See* SA29 (finding "no loss" to "USC, Stanford, or Harvard"). To the contrary, USC ended up *better off*—it got to keep Wilson's $100,000 donation plus his son's full tuition. Nor did the Government offer

evidence of *potential* harm.  Again, to the contrary, its USC witness testified *only* that the school would not want to admit *academically* unprepared students (which Johnny was not, as evidenced by his test scores and successful graduation).  A1903.

*Finally*, all else aside, the convictions at minimum would need to be vacated due to instructional error.  In Circuits that recognize it, the "right to control" theory presents a "factual question" for the jury.  *Binday*, 804 F.3d at 571.  The jury must be instructed on what the "right to control" is and when it applies, and make a finding whether the defendant sought to deprive someone of that right.  For example, in *Finazzo*, the Second Circuit upheld instructions that defined "property" as including "the right to control the use of one's own assets," which is "injured when a victim is deprived of potentially valuable economic information it would consider valuable" and is thereby threatened with "some financial or property loss."  850 F.3d at 107-12.

Applying that standard here, a jury would need to consider the value USC would have attached to the supposedly withheld information, and whether Wilson's conduct threatened tangible economic harm.  Even if such an inference were *permissible*, it certainly was not *required*.  Yet, over objection, the court instructed in categorical terms that "admission slots are the property of the Universities."  A3827, A3853 (objection to "not submitting the question to the jury of whether an admissions slot is property"), A501-02 (proposing alternative instruction to put this issue to the jury), A3571.  For that reason, Wilson is entitled, at the least, to a new trial on the fraud counts.  *See, e.g.*, *United States v. Boots*, 80 F.3d 580, 589 (1st Cir. 1996).

### III. THE GOVERNMENT DID NOT PROVE THE SINGLE, OVERARCHING CONSPIRACY IT CHARGED IN THE INDICTMENT.

Beyond the legal defects above, there is an independent, fatal problem with how the Government charged and tried Wilson. The Government built its case on the claim that Wilson participated in a "sprawling conspiracy that extended from coast to coast." A992. On its telling, Singer sat at the heart of this scheme, joined by dozens of parents who had independently hired him. Parents like Wilson were not just mutual clients, but rather co-conspirators with one another in a single criminal endeavor.

But Wilson did not work with any other parent; did not know that other parents arranged for test-cheating, academic fraud, or bribes to school employees; and had zero stake in whether other parents' children got into college. He was no more a confederate with all the other parents than he is with the patients of the same physician. If anything, even less so, given that parents were *competing* for scarce admission. The Government's alleged conspiracy thus amounted to an archetypal "rimless wheel" conspiracy—legally rejected by *Kotteakos v. United States*, 328 U.S. 750 (1946)—in which individual "spokes" each conspire with a central "hub," but otherwise have no connection with one another.

That is not a valid conspiracy, but charging it as such allowed the Government to introduce mountains of inflammatory evidence about the conduct of *other* parents—conduct far worse than anything Wilson was accused of. Moreover, by placing Wilson in a line-up of parents who had expressly conveyed their intent to lie, cheat, and bribe, the Government unfairly destroyed the credibility of Wilson's defense.

Indeed, the Government's case depended *so much* on evidence regarding *other* parents that even Judge Gorton acknowledged he would "likely" need to "declare a mistrial" if the Government failed to prove its alleged single conspiracy.  A562.  On that score, he was right.  The Government's decision to charge a single conspiracy affected every aspect of this case, and its failure to prove one "permeated … the entire trial."  *Kotteakos*, 328 U.S. at 769.  That prejudicial variance alone requires the Court to vacate each of Wilson's convictions and remand for a new trial.

### A. The Government Proved Only an Archetypal "Rimless Wheel."

1. **Legal Framework.**  "The agreement is the *sine qua non* of a conspiracy." *Dellosantos*, 649 F.3d at 115.  And "conspiracy law, like most criminal law, focuses upon the activities of an individual defendant," making it "essential to determine what kind of agreement or understanding existed *as to each defendant*."  *United States v. Glenn*, 828 F.2d 855, 857 (1st Cir. 1987) (Breyer, J.).

That is why a so-called "rimless wheel conspiracy"—one "in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement"—is "not a single, general conspiracy but instead amounts to multiple conspiracies."  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002).  That was the Supreme Court's holding in *Kotteakos*, its seminal precedent on this subject.  *See* 328 U.S. at 755.

45

Whether the Government proved the conspiracy charged in the indictment is a question of "evidentiary sufficiency." *Dellosantos*, 649 F.3d at 116.  This Court considers three factors in deciding whether the proof shows a single conspiracy: "(1) the existence of a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *United States v. Mangual-Santiago*, 562 F.3d 411, 421 (1st Cir. 2009).

**2.     Application.**  Wilson was charged with participating in a sprawling, nationwide conspiracy where Singer was the hub and dozens of parents were the spokes.  But, as Judge Talwani observed in a related Varsity Blues case, the conspiracy charged in the indictment suffered from "a dearth of factual allegations that support a common goal" or "interdependence among the participants." *Ernst*, 502 F. Supp. 3d at 654.  In Wilson's case, the Government did not fill those gaps at trial, failing to put a rim around the indictment's wheel.

The most glaring defect with the Government's alleged single conspiracy is that its participants were not interdependent.  Simply put, Wilson did not work with any other parent; did not rely on any other parent; and did not have any stake in whether those parents' children got into college.  Rather, "[e]ach spoke acted independently and was an end unto itself." *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004).

That makes this case indistinguishable from *Kotteakos* itself.  There, Simon Brown sought fraudulent home loans for individual clients, taking a commission on each loan. The Government charged Brown—along with thirty-one of his clients (including Gus Kotteakos)—with being part of a single conspiracy to commit fraud.

Writing for the Second Circuit, Judge Learned Hand called that theory "plainly wrong." *United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945). "[I]t is not enough that, when one joins with another in a criminal venture, he knows that his confederate is engaged in other criminal undertakings with other persons, even though they be of the same general nature." *Id.* Rather, the participants must share a dependence on each other, not just a common dependence on the hub. *Id.* at 173. And the Supreme Court agreed, reasoning the scheme "was that of separate spokes meeting in a common center, … without the rim of the wheel to enclose the spokes." *Kotteakos*, 328 U.S. at 755.

*Kotteakos* is on all fours with this case; the only difference is that Brown dealt with loan applications while Singer dealt with college applications. Here, as there, the hub figure positioned himself at the center of a scheme. Here, as there, the hub sold that scheme to individual clients who worked exclusively with him, and only on their own behalf. And here, as there, no client was "interdependent, in the sense that the success of the one might have facilitated [success] of the other." *Glenn*, 828 F.2d at 859.

If anything, this is an easier case than *Kotteakos*. For one thing, here the parents engaged in very disparate types of conduct, *infra* Part III.B, undercutting any semblance of a single conspiracy. Even more important, in *Kotteakos*, the ability of one client to obtain a loan was not practically affected by any other's. Here, however, Singer's clients were at times led to believe they were *competitors*. For instance, Singer told Wilson's wife that "Jovan [Vavic] is giving me one boys slot" but that "[t]here are five plus wanting in." A1332-33. That is important. Wilson's "state of mind … is key," yet rather than

"think the aspects of the venture interdependent," *Dellosantos*, 649 F.3d at 117, he was actually led to believe he was directly competing with other parents over a fixed number of side-door admission slots. And the law is clear that "when the evidence shows competition rather than mutual dependence and assistance, the court should find separate conspiracies." *Glenn*, 828 F.2d at 859 (describing Second Circuit decision).

That Singer led his clients to believe they were competitors also underscores the lack of a "common goal." The conspirators' goal must be *shared*, not merely the *same*. *United States v. Evans*, 970 F.2d 663, 670-71 (10th Cir. 1992). The Yankees and the Red Sox do not have a *common* goal, even though they both have the *same* goal: to win the World Series. Brown's clients did not have a common goal, even though they all wanted a loan. And here, the parents did not have a common goal, even though they all wanted to help their own children get into a good college. In trying to help Johnny secure a spot at USC, Wilson could not care less whether a stranger's child got into Yale.

Courts applying *Kotteakos* have time and again turned back attempts to prosecute conspiracies like this one.[2] The same result should obtain here.

---

[2] *E.g.*, *United States v. Kemp*, 500 F.3d 257, 291 (3d Cir. 2007) (no interdependence where operations were not "contingent upon the other"); *Chandler*, 388 F.3d at 808 ("We have never upheld a conspiracy conviction where a single key man moved alone from spoke to spoke, agreeing with no one else common to more than one spoke."); *United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000) ("[C]ompeting spoke suppliers in a hub conspiracy must not only have a connection to the hub sellers but must also have interdependence among each other in order to form a rim …."); *United States v. Dennis*, 917 F.2d 1031, 1032 (7th Cir. 1990) ("A single conspiracy does not exist simply because there are multiple participants dealing with a common central player.").

**3. Counterarguments.** Although the district court gave no reasoning for rejecting this *Kotteakos* argument post-trial, Add.75-76, the Government offered four bases for why the parents were part of a single conspiracy. Each would serve to justify *any* rimless-wheel conspiracy—which is to say that each is no justification at all.

*First*, the Government's chief argument was that the parents were interdependent because they hired Singer due to his track record. A3677, A3948. Here, the Government principally relied on Bruce Isackson (a cooperating parent), who testified "he didn't want to be the guinea pig." A3677. The Government also pointed to the fact that Singer often branded his approach as tried-and-true. *Id.*

Even if *Isackson's* state of mind somehow could bear on *Wilson's* intent to join a conspiracy, this ground makes little sense on its own terms. People select services all the time based on past performance—every time someone goes to Yelp to pick out a hotel, or looks at past returns in choosing an investment manager—but that does not make those people *interdependent* with all customers past, present, and future as part of one endeavor. To establish a single conspiracy, interdependency requires more: It requires people to rely on one another for a common project to actually operate and succeed. *See United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999); *see also United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994) (asking whether "success or failure of one conspiracy is independent of a corresponding success or failure by the other").

Of course, the hub often becomes the hub because he is good at his job. And that may motivate the spokes to hire him. But a common reliance upon a hub, however

successful, does not create interdependency among the spokes. *See, e.g.*, *United States v. Rosnow*, 977 F.2d 399, 403-06 & n.13 (8th Cir. 1992) (per curiam) (rejecting single conspiracy where spokes learned of scheme through video or publications where creators touted its success, because "mere knowledge of another similarly motivated conspiracy or an overlap in personnel [does] not prove one overall agreement"). Indeed, it is black-letter law that merely being aware of the fact that a common figure is involved in similar dealings with similar people is not enough to establish a single conspiracy. *E.g.*, *United States v. Townsend*, 924 F.2d 1385, 1397 (7th Cir. 1991).

*Second*, the Government argued that the parents were interdependent because they did not want Singer (or anyone connected with him) to get caught. A3679, A3948. For proof, the Government relied exclusively on Isackson, who testified he was drawn to Singer's scheme because he thought the large number of parents involved would complicate Singer's finances and, in turn, make his operation "a tough thing to figure out" for law enforcement. A1117.

Put aside Isackson's counterintuitive and idiosyncratic belief that having *more parents* involved would make detection *less likely*. The more fundamental problem is that a "concern over [the] ability to avoid detection, by itself" is not enough to establish interdependency. *Dellosantos*, 649 F.3d at 120. That must be right. If a shared interest in not getting caught could create the rim around the hub and its spokes, there would be no such thing as a rimless conspiracy. No spoke wants its hub to get caught. And no spoke wants another spoke to get caught.

50

*Third*, the Government asserted that the parents were interdependent because "the whole nature of [Singer's] scheme was that it would only work if there was a network of corrupt coaches willing to admit kids as fake athletic recruits in exchange for money and a whole network of parents who were willing to participate."  A3677; *see also* A3948.

This was pure *ipse dixit*, lacking any specific factual support.  In any event, this argument falters even on face value.  It reduces to the idea that in order for Singer to offer parents a wide variety of schools, he needed to have networks of committed coaches and clients.  But that speaks to what *Singer* needed for his business, not how the *parents* related to each other.  A law firm may wish to offer itself as a global firm with offices around the world—and to do so, would need networks of lawyers and clients—but nobody would think that makes the firm's clients *interdependent* with one another.  When Wilson and Singer discussed potential admission to USC for Wilson's son, Wilson had no interest in whether Singer could help other parents' children secure admission as a tennis player at Georgetown or a soccer player at Yale.  Again, other courts have squarely rejected the Government's overbroad theory of interdependence.  *See, e.g.*, *United States v. Carnagie*, 533 F.3d 1231, 1238-39 (10th Cir. 2008) (rejecting argument that interdependence was established by defendants' need for a network of "various loan officers and real estate agents" to accomplish "objective of closing as many fraudulent FHA loans as possible," because spokes did not act "*together* for their *shared mutual benefit*," and merely "similar or parallel objectives" are insufficient).

*Finally*, the Government claimed the parents were interdependent because, once involved, they were "vested in the scheme's success" so it would remain available in case they wanted to hire Singer again. A3678. Here, the Government highlighted that Wilson had referred a friend to Singer, and had also retained Singer a second time for his daughters. *Id.* But this theory—that the parents were interdependent because they wanted Singer to stay in business—suffers from the same basic defect as those above. *Every* rimless-wheel conspiracy depends on the hub sticking around; it does not become a single conspiracy just because some spokes may wish to be repeat customers. Indeed, the same was true in *Kotteakos* itself. *See* Br. for U.S. at 7, *Kotteakos*, 328 U.S. 750 (Nos. 457, 458) (detailing referral); *id.* at 9 (example of man sending "two dozen [loan] applications"). Those hub-spoke interactions, however many, do not transform the spokes' fundamental relationships to each other.

To sum up, the evidence did not support the single, sprawling conspiracy charged in the indictment. Instead, it reflected an archetypal rimless wheel.

### B.    The Variance from the Indictment Prejudiced Wilson.

In rimless-wheel cases, a defendant is charged with joining a single conspiracy but the evidence shows multiple smaller conspiracies. That amounts to a variance between the indictment and the proof. If that variance is prejudicial, the remedy is to vacate any affected convictions. *See Kotteakos*, 328 U.S. at 773-74; *Dellosantos*, 649 F.3d at 124. As then-Judge Breyer put it, the "risks of prejudice in [conspiracy] trials are serious and warrant reversal when they materialize." *Glenn*, 828 F.2d at 858.

This Court has recognized that one form of prejudice is "evidentiary spillover: the transference of guilt to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved." *Dellosantos*, 649 F.3d at 125. That is manifestly what happened here. As Judge Gorton himself acknowledged, given how much the Government's case turned on prejudicial evidence about *other* parents, a "mistrial" (now, a new trial) would "likely" be necessary if the Government failed to prove the charged conspiracy. A562.

Indeed, using the guise of a single conspiracy involving upwards of 20 separate families, the Government was able to admit mountains of inflammatory evidence about markedly different conduct by other parents—conduct far worse than what Wilson was even accused of doing. That prejudiced Wilson, because it created an impermissibly high risk that the jury was "so overwhelmed with evidence of wrongdoing by other alleged coconspirators," *Evans*, 970 F.2d at 674, that it could not fairly evaluate Wilson's own knowledge or intent. Using three core categories of evidence, the Government crafted an image that was dramatically different from Wilson's own actions:

***Academic Fraud***. The Government put forth a mass of evidence about parents using Singer to commit academic fraud to bolster their children's prospects. The Government explained at length how Singer "arrang[ed] for test proctors to cheat on the SAT and ACT on behalf of students and bribing test administrators to let that cheating happen." A991. For example, Isackson testified that he "paid to have one of [his] daughter's test scores altered." A1056. Likewise, in an intercepted call played for

the jury, Augustin Huneeus talked about having his daughter's test score doctored, and haggled with Singer over why it was not higher.  A1259-60; *see also* A4567-68.  Not to be outdone, in a different call, Gordon Caplan plotted with Singer about how to fake a learning disability for his daughter so she could get extra time on the ACT, and Caplan could then bribe the proctor.  A1258-59; *see also* A4534-35, A4548-49.

Singer's cheating extended beyond standardized tests.  The Government also introduced evidence about how a Singer employee regularly "pose[d] as students and [took] online classes in their names to improve their GPA."  A992.  Mikaela Sanford, Singer's office manager, testified about how she took online high school and college courses on behalf of students whose parents had hired Singer.  A1672-73.

But Wilson never did *any* of this.  The Government did not even allege that he *knew about* this sort of academic fraud—let alone arrange any of it for his own children.  Singer's academic-fraud operation was wholly foreign to John Wilson.

***True bribes.***  The jury was also told in detail about how, with other parents, "Singer paid the coaches and administrators personally, money to their own pockets or to sports camps or companies they controlled, or he would pay expenses for them."  A995; *see also* A2400, A2117 (payments to Subco liaison, Donna Heinel); A2964-96 (detailing personal payments to coaches at Georgetown, Yale, Stanford, and UCLA).  Those payments were bribes in the classic sense of the word.  The Government also offered evidence that other parents *knew* their money was going directly to corrupt insiders.  *See, e.g.*, A1109 (Isackson testimony).

Here too, however, Wilson did not know about *any* of this—rather, as the Government always conceded, Singer consistently told Wilson that his money was *only* going to the schools. *See supra* n.1 (collecting cites).

**Guilty Knowledge.** The Government offered a curated subset of *other* parents who acknowledged they were doing something wrong, in an effort to imply the (plainly false) proposition that *everyone* involved with Singer was knowingly breaking the law.

For one, the Government put before the jury a number of examples of parents explicitly talking to Singer about fraud or cover-ups. Huneeus asked Singer to assure him he would not get caught for being part of a scheme where the "polo team is selling seats" despite his daughter "not" being a real player. A4579. Isackson testified that he always understood the side-door to be illegitimate. A1109. And many parents were caught in stings agreeing to lie to the IRS or others to cover their tracks. *See, e.g.*, A4825 (Isackson); A4491 (Isackson's wife agreeing to keep daughter's admission "hush hush" from high school); A1327 (Devin Sloane); A1329 (Mossimo Giannulli); *see also* A2260 (IRS Agent testified that another parent agreed on a recorded call to "bribe" a coach).

For another, the Government put on evidence about parents who used fake photos to make it appear that their children were qualified as walk-on athletes for sports they did not even play. An ex-coach who worked for Singer, for instance, testified in detail about how she created, from whole cloth, false profiles for students applying to UCLA, Stanford, and Yale. A2511-39. She walked through sensational examples and explained how she often just pulled random photos from Google. A2514.

55

But unlike parents whose children never played the sports they were "recruited" for, Wilson's son was a nationally competitive high-school water-polo player whose high-school coach spoke directly to USC staff and who participated on USC's team as a red-shirt freshman. And Wilson never made it appear that his daughters sailed or rowed crew competitively. *See supra* at 11. Consistent with that, Wilson *never* suggested to Singer (or anyone else) that he thought he was doing anything wrong. Indeed, even when cooperating with the Government, and despite pressure from its agents, Singer never used the word "bribe" with Wilson, referred to any past "false" profile, or tried to goad him into agreeing to a cover-up (all of which he did with other parents), as Singer knew Wilson believed this was a legitimate process. *See* A2259-65, A4837-38.

In all of these ways, the Government used "voluminous testimony relating to unconnected crimes," *Dellosantos*, 649 F.3d at 125, to define the side-door as inescapably illicit—as the *knowing* purchase of an *illegitimate* service that involved *fabricated* profiles and *direct payments* to corrupt insiders—and then proceeded to brand Wilson as just another side-door client. That tactic is paradigmatically prejudicial. *See United States v. Martinez*, 994 F.3d 1, 15-16 (1st Cir. 2021). Again, Wilson's experience was different in kind: He was never involved in any test-cheating or academic fraud; never had Singer use fake photos to fabricate a profile; never thought his money was going anywhere but the schools; and never conveyed any consciousness of guilt. But the evidence about other parents made it impossible for those distinctions to break through.

The pervasiveness of this "other parents" evidence cannot be overstated.  The Government's very first witness was Isackson, who testified for nearly a *day and a half* about his various crimes with Singer—all unrelated to Wilson.  One of its last witnesses was Lauren George, who—equipped with a range of vivid, colorful demonstratives—provided a detailed overview of how Singer moved millions of dollars in *other* parents' money to *other* coaches to get *other* kids into *other* schools (explaining, for instance, how a Georgetown tennis coach pocketed over $2.7 million).  A3018.  And between those bookends, it was more of the same.  Of the Government's 14 witnesses, at least *nine* meaningfully discussed parents *other than* Wilson.  And of the five witnesses who did focus on Wilson alone, three exclusively discussed his taxes and a fourth was put on briefly to establish that USC, Harvard, and Stanford received federal funds.  Simply put, the frequency and ubiquity exacerbated the prejudice.  *See Kotteakos*, 328 U.S. at 773-74.

To crystallize the point, look at the Government's closing.  In its first segment—meant to recount "how [Singer's] scheme worked," A3638—the prosecutors *barely mentioned* Wilson (or his co-defendant, for that matter).  Rather, they discussed Isackson, Huneeus, and Caplan, using their testimony and wiretapped conversations as "evidence of how the scheme worked and how Singer pitched it to the parents," and implicitly asking the jury to infer that Wilson was in the same boat.  A3643.  And to prove that parents understood the nature of their offenses, the Government used the exact same tactic.  A3645 ("[T]hey knew that what they were doing is wrong.  One way you know that is because Bruce Isackson told you that he knew it.").

Along with creating a high risk of guilt transference, this evidence regarding other parents' purposefully bad behavior (*e.g.*, true bribes, fake photos, cover-ups) undercut Wilson's ability to mount a credible defense. Singer had told Wilson that the side-door was legitimate, and Wilson's core defense was that he thought the side-door was above-board. But the Government pilloried that defense by manufacturing an association between Wilson and dozens of parents tripping over themselves to lie, cheat, and bribe. That allowed the Government to effectively argue: What are the odds Wilson was the only one who did not understand what he was doing? In turn, Wilson was forced to convince the jury not only of his own good faith, but *also* that he was an outlier. That imposed an additional, if not insurmountable, burden. And that burden was further exacerbated by the court's refusal to admit evidence that Singer told *other* parents he was legitimate and the side-door was lawful, leading to a one-sided and misleading presentation. *Infra*, Part IV.B.1. This was markedly prejudicial. *Martinez*, 994 F.3d at 15 (finding prejudice where spillover evidence undermined "primary defense").

Two final points further underscore this prejudice. *First*, the lion's share of the prejudicial evidence was *hearsay*, and admitted only under the co-conspirator exception. *See, e.g.*, A978, A1257, A1817, A3624. Courts have recognized the "potency of the coconspirator exception and the need to ensure that it is invoked only against those who have actually conspired with the declarant." *Townsend*, 924 F.2d at 1388. Yet here, the Government constructed much of its case by way of co-conspirator hearsay that, but for the invalid single-conspiracy theory, would never have been admissible.

58

*Second*, the invalid conspiracy was also the premise for joining Wilson and Abdelaziz for a single trial, over objection. *See* ECF 1334, 1414, 1438, 1916 (denying Wilson's motions to sever). And that joinder resulted in tangible prejudice; all of the evidence that dealt with Abdelaziz's daughter was irrelevant and prejudicial to Wilson, just as all that dealt with Wilson's children was irrelevant to Abdelaziz.

The Government intentionally exploited this prejudice in its rebuttal closing, to which the defense had no opportunity to respond. A key issue at trial was whether Wilson and Abdelaziz ever saw the two athletic profiles that Singer prepared for their children—a claim the Government tried to prove by weak circumstantial inferences (*see supra* at 9) and that each Defendant argued the Government had failed to establish. In rebuttal, the Government made hay of the overlap, remarking that Wilson and Abdelaziz "must be the two unluckiest men in the entire world" to have *both* missed the same type of email from Singer. A3770. This form of prejudice—from wrongful joinder—is itself grounds for vacatur. *Martinez*, 994 F.3d at 13, 15 (finding prejudicial error in "sprawling" corruption case, because of "grave risk of spillover prejudice" from evidence that "could not have been introduced at a trial against [Lopez] alone but to which her jury nonetheless was exposed" due to joinder).

Courts have long warned that "charging many defendants with a single massive conspiracy is fraught with the potential for abuse." *Evans*, 970 F.2d at 674. This case shows why. A new trial is required on all counts. *See, e.g.*, *Martinez*, 994 F.3d at 17.

## IV.    THE COURT WRONGLY EXCLUDED CORE DEFENSE EVIDENCE.

If nothing else, Wilson had the right to mount a vigorous defense.  Yet when he previewed his exhibits, the court told him it planned "to sustain all of the objections of the government," so "stand forewarned." A3184-90.  And the court did just that, deferring to the Government on virtually every evidentiary issue during the defense case and sustaining objections to defense exhibits "en masse."  A3509.  It even excluded classic business records, like Wilson's son's certified swim times and his daughters' ACT scores.  A3468-69 (excluding Exs. 8192, 8194), A3303 (excluding Exs. 8243-44).

The excluded materials included the heart of the defense, and their exclusion rested on fundamental misapplications of relevance and hearsay rules.  This evidence was so important, and its exclusion so erroneous, as to compel a new trial.

### A.    The District Court Wrongly Excluded USC Admissions Evidence Showing That the Side-Door Was Not Bribery.

After the verdict, the former lead prosecutor admitted: "If it were a school policy to accept fake athletes in exchange for money, it probably would not be a crime."  Jon Wertheim, *The Real Scandal of Varsity Blues*, SPORTS ILLUSTRATED (Jan. 20, 2022).  At trial, Wilson wanted to prove essentially that—that USC's Athletics Department had a practice, condoned by the Admissions Department, of dressing up donors' children as athletic recruits, regardless of their athletic abilities, in exchange for donations.  The magistrate judge allowed Wilson and his co-defendants to subpoena that evidence from USC, calling the fact that donations affect admissions "a very basic fact that you need

to get across to a jury to support your defense," and compelling USC to produce evidence on the issue. A4162-63. And in the trial of the coach whom Wilson allegedly bribed, Judge Talwani refused to categorically exclude this evidence pre-trial, Order, ECF 956, *United States v. Ernst*, No. 19-cr-10081 (D. Mass. Oct. 28, 2021); and allowed it to play a significant role in the defense case at trial.

Yet in *this* case, the jury never even got to consider the evidence. Judge Gorton excluded it wholesale as "irrelevant" because Wilson did not show that he had personal knowledge of the specific admissions examples that the evidence reflected at the time that he agreed to make the donations at issue. A568; Add.64-65.

That ruling was egregiously wrong. The evidence is relevant for *objective* reasons, regardless of what Wilson knew. It goes to the scope of the university employees' duties and thus to whether the conspiracy's object was unlawful. It is also relevant to the materiality of the alleged misstatements in Johnny Wilson's athletic profile. At minimum, the evidence was admissible to impeach the Government's lone witness from the USC admissions office who testified otherwise.

1.     **The Excluded Evidence.** Singer exploited a culture that mixed athletic recruitment and fundraising, but he did not create it. Between 2009 and 2019—in the midst of a $6 billion capital campaign, A1883, A1975-76—USC regularly gave preference to donor-related applicants, including through athletic recruitment. █

████████████████████████████████████████

████████████████████████████████████  One

61

Government witness called it an open secret among coaches that there were "two ways to keep your job at USC": "to win" or "to bring in money." A2504; *see also* A4203 (Athletics job description includes "develops fundraising goals").

USC's practices, mixing admissions and fundraising through athletics, embraced the very conduct that the Government seeks to criminalize. Officials openly discussed █████████████████████████████████████, and noted in records when they ████████████████████. Documents show a regular practice, Singer aside, of USC officials supporting donor candidates as "walk-on" recruits regardless of athletic talent, and embellishing their potential athletic value along the way.



Why make things appear above-board if everyone knew what was going on? Because, in the magistrate judge's words, ██████████████████████████████████████████████████████ ██████████████████████████████████.[3]

---

[3] ████████████████████████████████████████████████████ ████████████████████████████████████████████

USC officials even supported donor candidates as "walk-on" recruits for sports they no longer played. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

The excluded evidence also demonstrated that USC officials designated donor candidates as practice players and for non-athletic roles, such as team manager or social-media director. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████[4]

---

[4] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

These were not isolated incidents, and none involved Singer. The USC Athletics Department—including a 14-person Development Office, A4955—advocated regularly for donor applicants. In a typical example, █████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████.

Given the Government's expansive (and incorrect) theory of criminal liability, no wonder several senior USC officials with no connection to Singer pleaded the Fifth Amendment rather than testify in this case. A3311-30; *see also* A4955.

*The jury never got to see any of this evidence.* Following Defendants' initial proffer, *see* SA162-65, SA177-245, the court granted the Government's pretrial motion to categorically exclude it, reasoning that USC was "not on trial," A555, and its "alleged conduct was not known to the subject defendant" and thus "irrelevant." A568. Incredibly, the court stuck to that ruling even after the Government called USC's Assistant Dean of Undergraduate Admissions, Rebecca Chassin, to testify in a way that contradicted this evidence.[5] Following Chassin's testimony, Defendants made an offer

---

[5] *See* A1911-12 (Ex. 1297); A1912-13 (Ex. 7358); A1929-30, A1965-68 (Ex. 1085); A1936 (Ex. 7238); A1961-65 (Ex. 1288); A2011 (Ex. 1565).

of proof of the excluded evidence. *See* SA246, A188, SA262-449; *see also* SA457 (incorporating additional exhibits), SA460-614. The court still stuck to its ruling that the evidence was "irrelevant," adding that it was not proper impeachment evidence either. Add.64-65. The court also refused, on the same ground, to permit live testimony by USC employees about these admissions and fundraising documents: "As the Court has repeatedly ruled, such evidence is irrelevant." Add.37-39, 46-49, 65-66.

**2. Substantive Relevance.** The district court gravely erred in deeming this evidence irrelevant. "Relevancy is a very low threshold, requiring only that the evidence have 'any tendency to make a fact more or less probable.'" *United States v. Cruz-Ramos*, 987 F.3d 27, 42 (1st Cir. 2021) (citing Fed. R. Evid. 401). And the evidence "'need only move the inquiry forward to some degree.'" *Id.* The excluded evidence easily meets this "not-too-difficult-to-meet standard," *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010)—regardless of whether Wilson had known its specific details.

*First*, the Government itself placed USC's practices at the center of this case by charging that a USC employee violates fiduciary duties when she secures a donation for USC by dressing up a donor's child as an athletic recruit. Proving that crime requires establishing what those duties were. *See* A215 (Government admission that whether school's "policies and procedures … condoned [employees'] actions" would be issue at trial). That's why *the Government itself* elicited testimony from Chassin, trying to establish that USC does not permit its employees to exchange admission support for money or look beyond athletic talent in the Subco process. A1844, A1814-15. The whole point

of Chassin's testimony was to establish what duties USC employees owed when it came to recommending athletic recruits, since no documents established those duties. *See* A1925-26, A1973, A2014-15 (Chassin admitting "[t]here is not a written rule"). The excluded evidence goes precisely to this same issue. Specifically, the evidence makes it more likely that USC employees *acted faithfully* to USC—not in breach of their duties— by supporting the admission of athletic recruits in return for donations to USC.

And that matters, regardless of whether Wilson knew about it, because it makes it less likely that the alleged conspiracy's purpose was "unlawful," as required to prove a criminal conspiracy. *Dellosantos*, 649 F.3d at 115. After all, the alleged purpose of the scheme was "to get the defendants' children admitted to college as recruited athletes based on falsified credentials in exchange for money." A3638. But whether that purpose was *unlawful* depends on whether the arrangement constituted *bribery*—which requires a violation of fiduciary duty (honest-services fraud) or "corrupt[]" payments to pervert the employees' services (federal-programs bribery). A3834-35, A3841 (jury instructions).

Indeed, the Government *conceded* the relevance of this issue. The magistrate judge asked it during a discovery hearing: "[T]he government is kind of stuck on this theory that, if the money is going into an account for the school in exchange for Heinel advocating for a student, then the defendants are guilty," but to prove that theory, "you have to show the school wasn't okay with that. Right?" A303-04. The Government *readily agreed*: "Yeah, yes, Your Honor. And we intend to prove that." A304.

66

The excluded evidence would have allowed Wilson to *disprove* it. The jury could have easily inferred from this evidence that Singer's side-door strategy with Wilson was consistent with USC's own practices and faithful service of its employees—not the corrupt scheme of the prosecution's imagination.

*Second*, the excluded evidence also makes it more likely that any misstatement on Johnny Wilson's athletic profile—whether Wilson saw it or not—was immaterial to his admission. The court instructed the jury that both property-fraud and honest-services fraud require misrepresentation or omission of a "material" fact. A3826, A3833. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999). The Government told the jury the alleged misrepresentation "mattered" because "without it it was highly unlikely that the defendants' children would have been admitted to USC." A3676-77.

But, by illustrating the role of donations in the admissions process, the excluded evidence makes it less likely that a donor candidate's embellished athletic qualifications actually mattered to USC. In the False Claims Act context, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016). Likewise, evidence that USC supported admission of donor candidates despite a lack of athletic talent suggests any "embellishment" of Johnny's athletic credentials was not material.

67

**3.    Impeachment.**  At minimum, the excluded evidence was admissible to impeach the testimony of Chassin on behalf of the USC admissions office and its dean, Tim Brunold.  Chassin testified "on behalf of my university."  A1886.  On direct, the prosecutor asked why it would be a "huge problem" if applicants' parents made payments in connection with their admission, and Chassin responded: "Because we don't offer admission in exchange for money."  A1844; *see also* A1881.  The prosecutor also asked about the criteria Subco considers in evaluating walk-on athletic recruits, and Chassin testified that Subco considers only whether they will "contribute athletically to the teams."  A1814-15.  She reiterated on cross that "[t]he work of the SUBCO was to consider students for athletic talent alone."  A1972; *see also* A1934.

The excluded evidence about USC's admissions and fundraising practices would have allowed a jury to discredit this testimony.  Yet the district court precluded its use to impeach Chassin.  A1936 (excluding Ex. 7238), A1965-68 (same for Ex. 1085).  In a written order following Wilson's offer of proof, the court reasoned in full: "[The proffered evidence] is not proper impeachment evidence under Fed. R. Evid. 613 because it does not include statements made by Chassin.  To the extent that Chassin represented the views of the Admissions Department as a whole, or specific employees of that Department, the Court does not believe that these representations are subject to attack under Fed. R. Evid. 806," governing impeachment of an out-of-court declarant.  Add.64-65.  The court erred on both accounts.

*First*, as the defense explained, the evidence was admissible for impeachment *by contradiction*, SA250, A1960, A1965; SA450-51, SA457, which should not be "confuse[d] … with impeachment by prior inconsistent statement." *United States v. Cruz-Rodriguez*, 541 F.3d 19, 29 n.4 (1st Cir. 2008). Impeachment by contradiction is a proper mode of impeachment if the evidence contradicts testimony on a non-collateral issue. *See United States v. Beauchamp*, 986 F.2d 1, 3 (1st Cir. 1993). Whether USC considered donations in the admissions process and looked beyond athletic talent alone is relevant to the scope of USC employees' duties—that's why the Government *elicited* Chassin's claim that there was no such practice. The excluded evidence contradicted that testimony. There was thus no basis to limit impeachment to "statements made by Chassin." Add.64. Impeachment by contradiction does not require such statements, which is why it is "broader" than Rule 613. *Cruz-Rodriguez*, 541 F.3d at 29 n.4.

*Second*, Rule 806 allowed for use of this evidence to impeach Chassin's testimony on behalf of Dean Brunold and his admissions office. SA250; A1966. "Rule 806 . . . allows an attack on a non-testifying declarant's credibility if the declarant's out-of-court statement is *admitted into evidence for its truth*." *United States v. Pena*, 24 F.4th 46, 68 (1st Cir. 2022). The Government relied on Dean Brunold's subordinate, Chassin, to speak on his behalf, and she confirmed that her use of the plural pronoun "we" in her testimony referred to the views of the entire admissions office. A1924-25; *see also* A1927. Once the Government opened that door, Wilson was entitled to impeach the out-of-court declarants with their "inconsistent … conduct." Fed. R. Evid. 806.

By nevertheless excluding this evidence, the court kept the jury from hearing powerful impeachment evidence that went to a key issue in the case. Indeed, when the magistrate judge saw the evidence, she did not mince words about how they undercut the credibility of an affidavit from Dean Brunold stating that his office is uninvolved with donations: "I don't for a second believe [the dean's] affidavit that he submitted here, and I think it's belied by many of the documents that we've received." A4162. The magistrate judge recognized that Defendants ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ SA139; *see also* SA115.

Yet Wilson was never permitted to put that question to the jury.[6]

---

[6] Beyond the relevance rulings on which the district court relied, it also expressed a "general attitude" that "USC is not on trial here, and I will not have this case devolve into multiple side trials." A555. But that "attitude" rested on the court's fundamental misunderstanding of the probative value of this evidence and thus is not an independent basis for exclusion. And this Court cannot undertake the Rule 403 balancing in the first instance. *Dunning v. Kerzner*, 910 F.2d 1009, 1010 n.1 (1st Cir. 1990).

The Government's alternative assertion below that "much" of the evidence was inadmissible hearsay is also wrong. SA158. "So long as out-of-court statements are not offered for their truth, they are not hearsay." *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999). The documents reflected communications among USC employees indicating a practice that negates the Government's bribery and materiality allegations; whether the facts in those communications were true or false is irrelevant. Anyway, Wilson catalogued multiple hearsay exceptions that would apply to statements in the excluded exhibits, SA171; he is entitled to litigate those in the district court in the first instance. *See United States v. Trenkler*, 61 F.3d 45, 57 (1st Cir. 1995). And insofar as the court refused to allow live testimony by USC witnesses, it wrongly prevented Defendants from securing non-hearsay versions of this material.

4.     **Prejudice.**  Because the Government cannot carry its burden to show that the erroneous exclusion of this evidence was harmless, Wilson is entitled to a new trial.  *See United States v. Delgado-Marrero*, 744 F.3d 167, 179 (1st Cir. 2014).

The two conspiracy counts were based on Wilson's son's admission to USC.  The excluded USC evidence thus goes to "the core of the defendant's case" on those two charges, and is obviously prejudicial for that reason.  *United States v. Ouimette*, 753 F.2d 188, 193 (1st Cir. 1985).

The Government also relied on the conspiracy evidence to prove the *substantive* counts against Wilson relating to his daughters.  The Government told the jury to infer from Wilson's conduct regarding his son's side-door admission to USC that Wilson had the *mens rea* to "bribe" Stanford and Harvard.  Indeed, the Government's refrain in its closing argument was: Wilson was so "satisfied" with his son's side-door admission that he "came back for more for his daughters."  A3663, A3671.  But if—as the excluded evidence shows—the USC episode was not unlawful bribery, the fact that he "came back for more" says nothing.  A new trial is thus necessary on all counts.

In sum, that USC had adopted its own side-door practice was "a very basic fact" for Wilson's defense, A4162-63, and something the former lead prosecutor admitted would show that this conduct was not a crime.  Wilson should have been permitted to try to prove that fact.  That evidentiary error alone mandates a new trial.

**B.      The Pervasive Exclusion of Other Evidence Undermined Wilson's Good-Faith Defense.**

A key disputed issue was whether Wilson believed the side-door was lawful or corrupt.  The Government sought to prove the latter using inferences from what Singer and *other parents* said and did.  *Supra*, Part III.  Incredibly, that unfairness was exacerbated by the court's refusal to allow Wilson to balance that picture by showing the lengths to which Singer went to legitimize himself and his side-door.  As a coup de grâce, the court excluded Wilson's *own* prior statements that suggested he believed that pitch.

That Wilson believed the side-door was legitimate is a defense to all the charges, since all require specific intent—"a bad purpose either to disobey or to disregard the law."  *United States v. Gorski*, 880 F.3d 27, 32 n.3 (1st Cir. 2018).[7]  Yet the court pervasively excluded Wilson's evidence establishing his good-faith belief—leaving the jury with a highly distorted, one-sided picture of Singer's operations.

1.      **Singer's Pitch.**  The Government and its witnesses admitted that Singer's pitch was about "donations," *e.g.*, A2258-59, and that "Singer told the parents that the money would go to the athletic program at the schools," A3643-44.    But the Government argued to the jury that—"despite what Singer said," A3644—his pitch was actually a veiled invitation to join a criminal conspiracy because "Bruce Isackson told you that he knew" the side door was a crime and it was "common sense" to parents

---

[7] *United States v. Piper*, 35 F.3d 611, 615 (1st Cir. 1994) (conspiracy); *Sawyer*, 85 F.3d at 723 (fraud); *Fernandez*, 722 F.3d at 19 (federal-programs bribery); *United States v. Pomponio*, 429 U.S. 10, 11 (1976) (per curiam) (false tax return).

like Isackson and Huneeus.  A3645.  "[Y]ou'd have to be a fool" to believe otherwise, Isackson told the jury.  A1234.  And that was the basic way the Government prosecuted this case:  Everyone else who worked with Singer supposedly knew the side-door was illegitimate, so the jury should infer that Wilson did too.  *Supra*, Part III.

To contradict the Government's "wink-and-nod" theory of Singer's pitch, Wilson sought to introduce evidence showing that it was entirely reasonable to believe Singer's words.  But the district court disallowed any defense evidence on this topic.

For example, the court excluded a video of Singer's presentation at Starbucks' headquarters on how to get in to college:

> My goal today is to teach you what goes on behind closed doors.  So I read applications at two schools every year.  This last year, I read at the two most prominent universities in America.  So I'm a part of the admissions process. …
>
> I did 761 side doors into the best schools in America.  What's the side door? … So the front door is you get in on your own.  The back door is through institutional advancement is all the people writing major, big checks.  And the side door is figuring out how I can do that for one tenth of the money to get in the same school … .

A4859, A4860; *see also* A4862 at 0:45-1:27.  Defendants offered excerpts of this video, but the court told them: "You may have an appellate issue … but the Starbucks presentation is not going to be submitted to the jury."  A3176; *see also* A2190, A3216-17; Add.50-51; *see also* Add.40-41 (quashing subpoena for testimony of Starbucks executive); A3335-36 (excluding Ex. 9682, an email in which Singer plans similar presentation about "the 3 doors - front, back and side door," A4956).

Singer also literally wrote the book on college admissions, *Getting In*, which the court refused to admit.  A1705-06 (excluding Exs. 8092 and 9695).  The court also excluded his proposed book outline for *Getting Your Child Into College*, which included a chapter on "Front, back and side door relationships."  A3335-36 (excluding Ex. 9564).

The district court also excluded statements that Singer made to other parents, in emails and on intercepted calls, that were consistent with this highly reputable way he presented his admissions advice.  In one excluded email, for instance, Singer reassured a parent that the "side door is not improper nor is back door both are how all schools fund their special programs or needs."  A4845, A2440; *see also* A3505-07 (excluding Singer email reply to "What is side door? … team mgr?": "Manager or just admit or Dean's admit depending on department and school with financial help," A4848).  In one of the calls, a parent asked Singer whether his side-door check would go to the coach, and Singer responded: "Absolutely not"—the check "will be a donation to my non-profit" and the coach will use it for team purposes: "Some of it will go to fund a trip, we'll take the whole team to Serbia to play.  Part of it will be to enhance the pool."  A4867.  In another, Singer told the parent he was "going to meet … with the President of Harvard and Tufts for lunch."  A4876.  In a third, he claims he has scheduled meetings with the President of Brown University "a million times."  A4949.  The Government objected to defense use of these calls, describing them as "calls to random other parents" and "simply more of the same" as "the Starbucks video."  A3171.  The district court sustained the objection.  A3176, A3336-37.

74

Excluding this evidence because it was about "random other parents that have nothing to do with these defendants" is richly ironic, given how the Government built its case on evidence about other such parents. *Supra*, Part III. It was also serious error. In its written order excluding the Starbucks video, the court did so solely on relevance grounds "because there is no contention that [Defendants] were present for, or even aware of, that presentation." Add.50-51. But Singer's presentation—and his other statements—are highly relevant to Wilson's good faith. They would rebut the Government's inference that Wilson knew Singer's pitch was a veiled invitation to crime, by painting a different picture of how Singer pitched himself and his advice. The excluded materials showed Singer openly promoting the side-door and his admissions advice in highly reputable contexts, presenting himself as well-connected to admissions offices and university presidents, and emphasizing that side-door contributions are legitimate donations. This evidence would have allowed the jury to find, contrary to Isackson's testimony, that you did *not* have to be a fool to believe Singer.

To meet the "not-too-difficult-to-meet standard" of relevancy, *Bielunas*, 621 F.3d at 76, it does not matter whether Wilson ever saw the Starbucks presentation, read the book, saw the emails, or heard the calls. A jury could have reasonably inferred that Singer pitched the side-door to Wilson in the same way he pitched his advice to other parents. *See United States v. Bain*, 874 F.3d 1, 27 (1st Cir. 2017) (relevancy can be established through inferences). Again, the Government's *own case* rested on a set of carefully curated parallel inferences, just all in the opposite direction.

75

The statements were also admissible to impeach Singer's credibility under Rule 806. The district court reasoned that Singer's statements in the Starbucks video were "not inconsistent with the explanations he provided to defendants." Add.50. But Rule 806 has no requirement of inconsistency with statements *made to the defendant*. Rather, the rule allows "any evidence that would be admissible for [impeachment] purposes if the declarant had testified as a witness." Fed. R. Evid. 806. And Singer's excluded statements were plainly inconsistent with his *admitted* out-of-court statements, including scripted ones after he began cooperating, portraying the side-door strategy as illegitimate. *See, e.g.*, A2106-13 (testimony about call with another parent during which Singer proposed a cover story for side-door payments to evade IRS scrutiny), A2114-20 (testimony about Singer's statements on calls with USC insiders suggesting he was compensating them personally). These statements were thus proper impeachment material. *See United States v. Stewart*, 907 F.3d 677, 691 (2d Cir. 2018) (finding abuse of discretion where court excluded declarant's out-of-court statements to FBI describing the phrase "on a silver platter" innocuously when Government had admitted other out-of-court statements using same phrase in arguably incriminating manner).

Nor is the erroneous exclusion of the Singer statements justified under Rule 403 or the hearsay rules. The district court did not rely on either of these alternative grounds for excluding the Starbucks video. *See* Add.50-51. And although it sustained objections to some of the other statements on these grounds, A3336-37, A3505-07, A1705-06, A3335-36, doing so was further error. The only Rule 403 argument the Government

76

developed pertained to Singer's statements on the calls, which it asserted would "require a series of mini-trials" about "whether [the parents] actually went through with the side door; whether their children were talented athletes; whether parents made a payment; and, if so, where that payment went." ECF 2324 at 6. Not true. What matters is that Singer *held out* the side-door as legitimate to these parents.

For similar reasons, none of these Singer statements is inadmissible hearsay. The defense offered them not for their truth, but rather to show how Singer pitched himself and his admissions advice to parents. *See United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999). Wilson was not trying to prove that Singer was *actually* lunching with the Harvard president on a particular day, A4876, or that Singer *did* "761 side doors," A4860. Rather, the point is that Singer was repeatedly *telling parents* this was all routine and legitimate.

Finally, this exclusion was anything but harmless. The Singer statements go to Wilson's core defense to all the charges: that he participated in Singer's side-door with a good-faith belief that it was legitimate and lawful. *See Ouimette*, 753 F.2d at 193. As the magistrate judge explained, ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████ SA175 (emphasis added). The district court thus excluded the very evidence that had convinced a magistrate judge that a jury could credit the good-faith defense. This error, too, plainly demands a new trial on all counts.

2.    **Wilson's Own Statements.**  Compounding the harm, the district court also excluded statements Wilson undoubtedly *did* know about—his own.  The court did so primarily on hearsay grounds, but these statements were not offered for their truth. They were offered—and were admissible—because they show that Wilson acted in good faith when he engaged in Singer's side-door.

The excluded statements included emails from Wilson in 2015 and 2018—*i.e.*, around the two time periods in which he participated in Singer's side-door—in which he referred Singer to trusted colleagues and acquaintances as, for instance, "an amazing guy" who can help with "preparing, selecting and getting into colleges."  A4925; *see also* A4924, A4953; *see* A3301 (sustaining objections to these exhibits).

Other excluded materials showed Wilson engaging in conduct flatly inconsistent with conspiring to "bribe" a college official for his son's "guaranteed" admission as a "fake" athlete.  By August 2013, Wilson had agreed to make a "payment to USC."  *E.g.*, A1340-41.  Yet the court excluded a September 2013 email from Wilson to Singer expressing concerns about Johnny's SAT and ACT test scores.  A3302 (excluding Ex. 8123).  In other words, one month after Wilson allegedly had agreed to bribe a USC employee to guarantee his son's admission, he was fretting about his son's exam scores. The court also excluded emails from May and July 2014, soon after USC admitted Wilson's son, in which Wilson peppered Singer with questions about the start dates for water-polo—which could easily make a jury doubt that Wilson believed his son was a "fake" player.  A3303 (excluding Exs. 9619 & 9652); *see also* A4951, A4952.

A jury could easily infer that Wilson would refer Singer's services to trusted colleagues and friends only if he believed those services were legitimate. Likewise, a jury could infer from the other emails that Wilson believed in September 2013 that his son still needed to do well on his tests to get into USC, and that in 2014 his son was about to start practicing with the USC water-polo team. Contrary to the district court's rationale, the statements are not hearsay, because they were not offered for their truth. Wilson's referrals were decidedly *not* offered to prove what they stated—for instance, that Singer is "an amazing guy." Nor were the other emails offered to prove that Johnny needed to retake the SAT or that, in 2014, Wilson had not heard from the USC coach about start dates. The point is that a jury could have found—from the fact that Wilson made these statements—that he *believed* that Singer was legitimate, that his son needed to do well on his tests, and that his son was going to play water-polo. And the jury could accordingly have disbelieved the Government's contrary accusations.

In the final analysis, a review of the trial transcript exposes a deep asymmetry. Even as the court opened the floodgates to waves of inflammatory evidence about Wilson's wealth, *e.g.*, A2035-36, A3287-89, it sustained objections to virtually every defense exhibit. Those categorical rulings undercut Wilson's core defense that the side-door was lawful and that he at least so believed in good faith—leaving the jury with a misleading, one-sided picture curated from other parents. These errors, individually and surely cumulatively, "cast a shadow upon the integrity of the verdict," *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993), and require a new trial on all counts.

## V.    THE DERIVATIVE TAX COUNT FAILS FOR THE SAME REASONS.

The final count against Wilson, alleging that he willfully filed a false tax return by deducting his USC-related payments, rises—and, more to the point, falls—with the rest of the case. A jury that condemns Wilson's payments as unlawful or fraudulent would readily conclude that they were not deductible. But a jury that views the payments as lawful, good-faith donations surely would not find that Wilson "[w]illfully" violated the law by deducting them. 26 U.S.C. § 7206(1). Each error identified above therefore extends to Count Thirteen: If the Court finds the Government's legal theories were invalid, or the jury instructions inadequate, or the conspiracy evidence prejudicial, or the evidentiary rulings reversible, then the derivative tax count fails too.

*First*, the Government conceded below that the jury might have convicted on Count Thirteen by finding that "Wilson deducted an illegal bribe." A3969; *see also* A4020 (district court, at sentencing, reasoning that payments "could not have been taken as a deduction" because they were "fraudulent"). But the Government's bribery theory was legally flawed; at minimum, the jury was wrongly instructed on it. *Supra*, Part I. Because the jury might have rested on a legally deficient predicate, a new trial is required. "[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also United States v. Nieves-Burgos*, 62 F.3d 431, 436 (1st Cir. 1995) (new trial required if "one of the possible bases of conviction was legally erroneous"); ECF 2424 at 49 (conceding this rule).

*Second*, the same follows from the legally erroneous property-fraud theory and jury instructions. *Supra*, Part II. Again, the jury might have convicted by reasoning, like Judge Gorton, that "fraudulent" payments "could not have been taken as a deduction." A4020. If the fraud theory was "legally erroneous," the tax conviction must therefore be retried. *Nieves-Burgos*, 62 F.3d at 436. Further, the flawed property instructions also tainted the tax verdict by telling the jury that an admission spot constitutes "property." The Government's IRS witness testified that Wilson's donations were not deductible because they amounted to payment for "goods or services" rather than true "charitable" gifts. A3119. Characterizing an offer of admission as "property" (and thus itself a "good or service") gave credence to that theory. The instructional error thus tarnishes not only the fraud verdicts, but also the tax verdict, both directly and indirectly.

*Third*, the misguided "single-conspiracy" gambit undermined the tax verdict in the same way it prejudiced Wilson on every other count. *Supra*, Part III. It unfairly bolstered the prosecution's case (on bribery and fraud, and so derivatively on tax), while undermining Wilson's good-faith defense by lumping him with parents who engaged in knowing, intentional misconduct. This was especially prejudicial for Count Thirteen, to which good faith is a potent defense. Section 7206 forbids "willful[]" violations, a *mens rea* "negate[d]" by one's "good-faith belief that he was not violating" the law. *Cheek v. United States*, 498 U.S. 192, 201-02 (1991). A jury not misled by the prosecutors' "single-conspiracy" wrongdoing could readily have found that the Government did not carry its willfulness burden—another basis for a new trial.

81

*Fourth*, the evidentiary errors tainted the tax count as well. By excluding the evidence that USC routinely admitted donors' children as athletic recruits, the court hobbled the defense to the bribery and fraud counts—and thereby greased the wheels for this count too (because, again, an illicit payment cannot be deducted). *Supra*, Part IV.A. And by excluding the many statements evincing Wilson's good faith, the court cut off his *Cheek* defense at the knees. *Supra*, Part IV.B.

Adding to all that, the court *also* wrongly foreclosed evidence bearing directly on the tax count. Add.48-49. Charities are obligated to estimate the value of any goods or services provided in connection with a donation and give that figure to the donor, since that portion of the donation is not deductible. A3076-77. Yet USC admitted that it never assigned any tangible value to the admission preference it gave donors; back-door and non-Singer side-door donations were thus fully deductible, despite helping applicants' chances. *See* ECF 2264 at 7 (USC motion admitting it "has no responsive documents reflecting that USC instructed a donor to reduce his or her tax deductibility in connection with an admission decision"). Wilson sought to introduce evidence of that admission, ECF 2279 at 2, which would have supported the good-faith legitimacy of Wilson's deductions. After all, Wilson argued that he understood his donations to be playing that same intangible, immeasurable role, and therefore reasonably believed that no offset was required. Yet even though USC offered to provide a declaration to this effect (ECF 2264 at 7), the district court held that such evidence was irrelevant for the same reasons as the other USC admissions evidence. Add.48-49.

Importantly, these errors would require a new trial even if the evidence were technically sufficient to convict on the tax count. For example, perhaps a jury *could* convict on the theory that Wilson treated a portion of his USC donation as a *business* deduction. Since there is no way to tell if the jury *did* rest on that theory, however, it cannot support the verdict in the face of the legal defects that plagued this trial. *Yates*, 354 U.S. at 312. And that is particularly true given the implausibility of the "business expense" theory. At the time the expense was categorized as a *business* rather than a *charitable* deduction, Wilson was living overseas, A2674, it was impossible to know whether or how that classification would affect his total liability, and the ultimate saving turned out to be just $1,425 on nearly $1 million in taxes. *See supra* at 10. When one has so little to gain from violating the law, it is hard to say he "willfully" did so—and far from clear the jury would have convicted on that basis alone. *See United States v. Wu*, 711 F.3d 1, 30 (1st Cir. 2013) (explaining harmless-error standard).

In short, Count Thirteen is the tail of this case, not the dog. Consequently, relief on the other convictions compels a new trial of this count too.

## CONCLUSION

The Court should reverse Wilson's convictions and grant him an acquittal, or at minimum a new trial, on all counts.[8]

---

[8] Pursuant to Federal Rule of Appellate Procedure 28(i), Wilson also respectfully adopts by reference Parts IV.A and V of Abdelaziz's opening brief.

Dated:  April 22, 2022                    Respectfully submitted,

                                          */s/ Noel J. Francisco*

Michael Kendall                           Noel J. Francisco
Lauren M. Papenhausen                        *Counsel of Record*
WHITE & CASE LLP                          Yaakov M. Roth
75 State Street                           Marco P. Basile
Boston, MA 02109-1814                     Harry S. Graver
(617) 979-9310                            JONES DAY
                                          51 Louisiana Avenue, NW
Andrew E. Tomback                         Washington, D.C. 20001
MCLAUGHLIN & STERN, LLP                   (202) 879-3939
260 Madison Avenue                        njfrancisco@jonesday.com
New York, NY 10016
(212) 448-0066

*Counsel for Defendant-Appellant*
*John Wilson*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the length limitations set by this Court's Order of April 7, 2022.  The brief contains 22,863 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Garamond font.


Dated:  April 22, 2022                          <u>*/s/ Noel J. Francisco*</u>
                                                Noel J. Francisco
                                                *Counsel for Defendant-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 25, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system.  Counsel for the United States are registered CM/ECF users and will be served by the CM/ECF system.


Dated:  April 25, 2022                    <u>/s/ Noel J. Francisco</u>
                                          Noel J. Francisco
                                          *Counsel for Defendant-Appellant*

# ADDENDUM

## TABLE OF CONTENTS

| ECF NO. | DESCRIPTION | DATE FILED | PAGE |
|---|---|---|---|
| 1334 | Memorandum & Order Denying Defendants' Motions to Dismiss | 6/23/2020 | Add.1 |
| 2265 | Memorandum & Order Regarding 6 Trial Motions | 9/23/2021 | Add.34 |
| 2336 | Memorandum & Order Regarding 11 Trial Motions | 10/1/2021 | Add.46 |
| 2489 | Memorandum & Order Denying Posttrial Relief | 12/20/2021 | Add.69 |
| 2536 | Judgment of John Wilson | 2/18/2022 | Add.86 |

## United States District Court
## District of Massachusetts

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Criminal Action No.** |
| ) | **19-10080-NMG** |
| **Sidoo et al,** ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM & ORDER

**GORTON, J.**

The government has charged defendants with conspiring with William "Rick" Singer ("Singer") to have their children fraudulently admitted to elite universities by, <u>inter</u> <u>alia</u>, fabricating applications, falsifying academic and athletic credentials, cheating on standardized tests, making payments to corrupt exam proctors and bribing university employees and athletic coaches. The defendants have moved to dismiss the indictment on a number of grounds, including that the indictment fails properly to allege (1) a single conspiracy; (2) mail and wire fraud and honest services mail and wire fraud and federal programs bribery and (3) a money laundering conspiracy.

This memorandum and order addresses the following motions to dismiss: (1) Defendants' Motion to Dismiss Count One Insofar as it Alleges Conspiracy to Defraud Testing Companies of

-1-

Property and Honest Services (Docket No. 1021); (2) Defendant
William McGlashan's Motion to Dismiss Count Seven of the Fourth
Superseding Indictment (Docket No. 1023); (3) Defendant I-Hsin
"Joey" Chen's Motion to Dismiss Count Five of the Fourth
Superseding Indictment (Docket No. 1026); (4) Defendants' Motion
to Dismiss Pursuant to Federal Rules of Criminal Procedure 8 and
12(b)(3)(B)(i), (iv), and (v) (Docket No. 1031); (5) Elisabeth
Kimmel's Motion to Dismiss Pursuant to Federal Rules of Criminal
Procedure 12(b)(1) and 12(b)(3)(B) (Docket No. 1035); (6)
Defendants' Motion to Dismiss (i) Count One Insofar as it
Alleges Conspiracy to Commit Honest Services Fraud against the
University of Southern California and Georgetown University and
(ii) Count Two Alleging Conspiracy to Commit Federal Programs
Bribery (Docket No. 1037); (7) Defendants' Motion to Dismiss the
Money Laundering Conspiracy (Count III) (Docket No. 1039) (8)
Defendants' Motion to Dismiss Count One Insofar as it Alleges
Conspiracy to Defraud Universities of Property (Docket No. 1041)
and (9) The Joint Motion of Amy and Gregory Colburn to Dismiss
Second Superseding Indictment (Docket No. 341).  For the
following reasons, those motions will be denied.

I.    **Background**

A. **"Side door"**

The Fourth Superseding Indictment ("the FSI") alleges that,
beginning in 2007 and continuing through February, 2019, Singer

orchestrated a scheme, which he referred to as the "side door" whereby he conspired with defendants (other than defendants Gregory and Amy Colburn and I-Hsin Chen) to fraudulently designate students as athletic recruits to bypass the traditional admissions process.  In order to effectuate and conceal the scheme, Singer used two entities, the Edge College & Career Network, LLC ("The Key"), a for-profit college counseling and preparation business, and the Key Worldwide Foundation ("KWF"), a non-profit corporation.

In essence, the government alleges that the side-door operated as follows: Defendants would agree with Singer to begin the scheme and would make large payments to The Key and/or KWF, often $250,000 or more per student.  Singer, in concert with defendants, would fabricate academic and athletic records for defendants' children.  He would then submit the falsified athletic application to the targeted university, at which point a corrupt university insider or coach would present the student as a legitimate athletic recruit to obtain admission for the student.  In return, Singer would make payments, disguised as donations, from one of his entities to the corrupt insider or accounts at the university over which the insiders exercised control.

### B.  Test Cheating

In addition to the side-door scheme, the FSI alleges that

- 3 -

Defendants William McGlashan, I-Hsin Chen, Marci Palatella, and Gregory and Amy Colburn (collectively, the "testing defendants") conspired with Rick Singer to fraudulently inflate their children's scores on the ACT and SAT college admissions exams.

As part of the test cheating scheme, the testing defendants allegedly paid Singer to hire individuals to pose as exam proctors (and secretly correct or provide exam answers) and to bribe exam administrators to allow the cheating to occur. Specifically, to achieve the desired high scores, the indictment alleges that Singer and the testing defendants paid (1) Mark Riddell, an allegedly corrupt test proctor, to provide or correct the student's answers on the tests (or take the tests himself) and (2) Igor Dvorskiy, a corrupt test site administrator who Singer bribed to allow test cheating to occur at a testing facility in West Hollywood, California.

Defendants allegedly participated in the test cheating scheme in several ways, including supplying Singer with copies of their children's photo identification to allow Singer to create false identifications for Riddell to take exams on the students' behalf and obtaining testing accommodations at Singer's direction or by requesting that Singer and Riddell obtain specific scores for their children.  The government maintains that Riddell often communicated directly with defendants to discuss the test answers and scores.  In exchange

- 4 -

**Add.4**

for the services of Singer and Riddell, defendants paid up to $75,000 per student as a "donation" to KWF which Singer then used to pay Riddell and Dvorskiy.

**C. The Indictment**

Count One of the FSI charges the defendants with conspiracy to commit wire fraud and conspiracy to commit mail fraud.  In brief, the government maintains that the defendants conspired to deprive universities and testing companies of (1) property in the form of admissions slots and accurate test scores and (2) the honest services of their coaches and administrators and test administrators, respectively.

Count Two of the FSI charges nine of the defendants with conspiring to commit federal programs bribery by bribing agents of the University of Southern California ("USC") in order to secure the admission of their children to that university.

Count Three of the FSI charges the defendants with conspiracy to commit money laundering in connection with payments made to KWF and The Key in furtherance of the admissions scheme.

Counts Four through Twelve charge defendants with substantive fraud and bribery and Count Thirteen charges just defendant Wilson with tax fraud.

**Add.5**

## II.  **Legal Standard on a Motion to Dismiss**

The Federal Rules of Criminal Procedure provide that an indictment must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  When considering a motion to dismiss in a criminal case, a court accepts the factual allegations in the indictment as true. Boyce Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952).  Such a motion is properly directed only to the question of the validity of the indictment on its face and Courts are to be mindful that

> the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.

United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted).  It is typically sufficient that an indictment articulate the offense in "the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002)(citation omitted).  An indictment is ripe for dismissal if the facts demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense. United States v. Huet, 665 F.3d 588, 596-97 (3d Cir. 2012).

**Add.6**

### III. **Defendants' Motion to Dismiss the Conspiracy**

Each of the three conspiracy counts in the FSI charges
defendants with a single conspiracy. Defendants have moved to
dismiss the FSI on the grounds that: (1) the allegations are
duplicitous and allege individual conduct, not a single
conspiracy *i.e.*, a so-called rimless wheel conspiracy and (2) it
improperly joins the defendants in a single prosecution.

### A. Conspiracy Allegations

In support of their contention that the indictment should
be dismissed for failure to allege a single conspiracy, the
defendants rely on the United States Supreme Court decision
in Kotteakos v. United States, 328 U.S. 750 (1946) which held
that a so-called "rimless wheel" conspiracy cannot sustain
conviction for a single conspiracy. As articulated by the
Fourth Circuit Court of Appeals,

> A rimless wheel conspiracy is one in which various
> defendants enter into separate agreements with a common
> defendant, but where the defendants have no connection with
> one another, other than the common defendant's involvement
> in each transaction.

Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir. 2002).

It is well established, however, that "whether a single
conspiracy or a multiple conspiracy exists is, of course, a
question of fact for the jury." United States v. LiCausi, 167
F.3d 36, 45 (1st Cir. 1999); see also United States v.

- 7 -

**Add.7**

_Villarman-Oviedo_, 325 F.3d 1, 12 (1st Cir. 2003)(noting that the "issue of single conspiracy v. multiple conspiracies is a question of fact for the jury."). To properly charge a conspiracy an indictment must allege the existence of: (1) a common goal, (2) overlap between the participants and (3) inter-dependence. See _United States_ v. _Portela_, 167 F.3d 687, 695 (1st Cir. 1999). On its face the FSI adequately alleges a single conspiracy, the existence of which is a factual question for the jury.

The FSI alleges that for both the fraud and the federal programs bribery conspiracies the defendants shared the common goal of using bribery and fraud in order to secure their childrens' admission to prestigious colleges and universities. With respect to the money laundering conspiracy it alleges that defendants sought to effectuate, and conceal, their fraud by funneling payments through Singer's entities, The Key and KWF. The common goal requirement is to be "broadly drawn" and such allegations are sufficient to allege a common goal and survive a motion to dismiss. _Id._ at 69 n.3; see also _United States_ v. _Ortiz-Islas_, 829 F.3d 19, 25 (1st Cir. 2016).

That defendants allegedly accomplished their common goal through varied chicanery (including but not limited to test cheating and the "side-door" admissions) does not warrant dismissal of the indictment for failure to allege a conspiracy.

- 8 -

A conspiracy may be multifaceted or contain multiple components
but may still be properly charged as a single overarching
scheme. See United States v. Holt, 777 F.3d 1234, 1263 (11th
Cir. 2015); United States v. Prieto 812 F.3d 6 (1st Cir. 2016).

   The FSI also properly alleges overlap and, to the extent
required, inter-dependence.  Overlap is "satisfied by the
pervasive involvement of a single core conspirator."  Portela,
167 F.3d at 695.  The FSI plainly alleges that Singer acted as
the core conspirator.  It further alleges that each defendant
agreed to achieve the common objective of the conspiracy.  As
the government notes, the extent and consequence of the alleged
overlap will be properly determined by the jury.

   With respect to inter-dependence, the government maintains
the scheme as a whole would not have been feasible without the
participation of the codefendants.  See Portela, 167 F.3d at 695
n.2 (noting that when discussing inter-dependence the analysis is
regularly characterized "as an analysis of the nature of the
scheme but there is no conceptual difference between the
tests").  The FSI alleges that the defendants were aware of the
nature and scope of the scheme.  They knew they were not the
only participants.  That others had engaged successfully in the
scheme, tended to promote it and encouraged others to enroll.
The FSI alleges that the participation of others was necessary
to the scheme's success.  Inter-dependence is therefore

**Add.9**

satisfied for the purpose of the indictment. <u>See</u> <u>United States</u>
v. <u>Seher</u>, 562 F.3d 1344, 1368 (11th Cir. 2009).

Finally, as the government points out, district courts
consistently (and properly) rebuff defendants' efforts to
dismiss conspiracy allegations based on claims of duplicity.
<u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gabriel</u>, 920 F. Supp. 498, 503-04
(S.D.N.Y. 1996).

In summary, the indictment sufficiently alleges that the
defendants engaged in a singular, overarching conspiracy.  The
question of whether they participated in a single conspiracy or
multiple conspiracies is properly left to the jury and the
defendants' motion to dismiss on that ground will be denied.

**B. Joinder**

Similar to their argument with respect to conspiracy,
defendants maintain that they have been improperly joined
pursuant to Fed. R. Crim. P. 8(b).  Under that rule:

> The indictment or information may charge 2 or more
> defendants if they are alleged to have participated in the
> same act or transaction, or in the same series of acts or
> transactions, constituting an offense or offenses. The
> defendants may be charged in one or more counts together or
> separately. All defendants need not be charged in each
> count.

The general rule in the First Circuit is that:

> those indicted together are tried together to prevent
> inconsistent verdicts and to conserve judicial and
> prosecutorial resources.

**Add.10**

United States v. Soto-Beniquez, 356 F.3d 1, 29 (1st Cir. 2004).

The First Circuit recognizes two requirements for proper joinder

under Rule 8(b): (1) the offenses in question must constitute a

series of acts or transactions and (2) a showing that joining

the defendants is of benefit to the government. United States v.

Barbosa, 666 F.2d 704, 707-08 (1st Cir. 1981). For the purposes

of Rule 8(b) a "series of acts o[r] transactions means more than

just similar acts." See United States v. Prange, 922 F. Supp. 2d

127, 129 (D. Mass. 2013) (quoting King v. United States, 355

F.2d 700, 703 (1st Cir. 1966)).

For joinder of multiple counts to be suitable, a "rational

basis . . . should be discernible from the face of the

indictment." United States v. Natanel, 938 F.2d 302, 306 (1st

Cir. 1991). The burden falls on the defendant to demonstrate

misjoinder and, if that burden is carried, the appropriate

remedy is severance. Id. Further, for joinder to be proper it

is "settled that a conspiracy count can forge the needed

linkage." Id. at 307. Although some common activity between

defendants is required, joinder may be apt "even when the

objecting defendant is only connected to one part of [a]

scheme." United States v. Azor, 881 F.3d 1, 11 (1st Cir. 2017).

As to the first prong, joinder here is proper because the

allegations set forth in the FSI indicate that the charged

offenses are sufficiently related to constitute a "series of

- 11 -

**Add.11**

transactions." Prange, 922 F. Supp. 2d at 129.  As previously
discussed, the FSI alleges an overarching conspiracy, whereby
defendants conspired, all with Singer, to commit fraud and money
laundering and, as to all but three of defendants, federal
programs bribery.  The scheme involved common participants,
entities and victims.  All substantive fraud and bribery charges
are acts that were alleged to have been conducted in furtherance
of the scheme.

A rational basis for joinder is therefore apparent from
the indictment.  Further, as is the case here, it is permissible
for the government jointly to indict "based on what it
reasonably anticipates being able to prove...at the time of
indictment." Azor, 881 F.3d 1 at 10 (quoting Natanel, 939 F.2 at
306).

The second prong is also clearly satisfied.  Joinder will
provide a substantial benefit.  Separate trials, of which there
may be more than ten, would be extremely costly to the
government and in judicial resources.  Moreover, if separate
trials were to be held, much of the evidence and many witnesses
would be duplicative.  As a final consideration weighing in
favor of joinder, evidence which is relevant to one defendant's
guilt may also be relevant to proving the overall conspiracy.
See Prange, 922 F. Supp. 2d at 129.

In short, the FSI alleges offenses which properly
constitute a series of acts or transactions and joining
defendants is of benefit to the government and to the court.
Defendants have not met their burden to show misjoinder and
their motion will be denied.

**IV.  Elizabeth Kimmel's Motion to Dismiss**

Defendant Elizabeth Kimmel has moved to dismiss for reasons
similar to the defendants' joint motion to dismiss the
conspiracy and for improper joinder.  The FSI alleges that Ms.
Kimmel participated in the side-door scheme twice, once in 2012
to secure admission for her daughter to Georgetown University as
a purported tennis recruit and once in 2017 to secure admission
for her son to USC as a purported track and field athlete.

In charging her with a single conspiracy offense in each
count, Kimmel claims that the government has impermissibly
grouped together two non-overlapping conspiracies, one involving
Georgetown and one involving USC.  She claims the Georgetown
conspiracy was entirely complete by 2013 and is unrelated to the
USC conspiracy which began in 2017.  She maintains that any
allegations with respect to the Georgetown conspiracy are
therefore barred by the statute of limitations.

Kimmel's motion is premised on essentially the same
argument that the indictment impermissibly alleges a single
conspiracy which the Court has already addressed.  The common

- 13 -

**Add.13**

goal and inter-dependence of the conspiracy is demonstrated as
to Kimmel just as it was with the other defendants for the
reasons expounded and her motion will also be denied.

**V.    Defendants' Motion to Dismiss Count One Insofar as it
Alleges Conspiracy to Defraud Universities and Testing
Companies of Property and Honest Services**

   **A. Legal Standard**

   The mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343,
proscribe use of any

> scheme or artifice to defraud, or for obtaining money or
> property by means of false or fraudulent pretenses,
> representations, or promises.

The Court considers the mail and wire fraud statutes and
standards (and the relevant caselaw interpreting those statutes)
interchangeably. See Pasquantino v. United States, 544 U.S. 349,
355 n.2 (2005) (noting that the Supreme Court has "construed
identical language in the wire and mail fraud statutes in pari
materia.")

   In the wire fraud statute, the word property is to be
"construed in accordance with its ordinary meaning: something of
value in the possession of the property holder." United States
v. Blaszczak, 947 F.3d 19, 31 (2d Cir. 2019) (citing Paquantino,
544 U.S. at 355).  Black's Law Dictionary, as cited by the
Paquantino Court, defines property as "extend[ing] to every
species of valuable right and interest." Property, Black's Law
Dictionary (4th ed. 1951).  Paquantino at 544 U.S. at 355.

- 14 -

In Carpenter v. United States, the United States Supreme
Court held that the contents and publication schedules of
forthcoming Wall Street Journal articles were confidential
business information that constituted property. 484 U.S. 19
(1987).  The Court held that the Journal had "a property right
in keeping confidential and making exclusive use" of its
confidential business information.  Id. at 26.  That the
property was intangible did "not make it any less property
protected by the mail and wire fraud statutes." Id. at 25.

As articulated by the First Circuit Court of Appeals,
the Carpenter Court gave a "broad reading to protected property
interests." United States v. Ochs, 842 F.2d 515, 522 (1st Cir.
1988).  The First Circuit has made clear that the wire fraud
statute should be read broadly and explained that it covers "a
wide variety of tangible and intangible property interests."
United States v. Rosen, 130 F.3d 5, 9 (1st Cir. 1997). See also
United States v. Dray, 901 F.2d 1132, 1142 (1st Cir.
1990)(noting that "the mail fraud statute is limited to the
protection of property rights, but the concept of property is to
be interpreted broadly")(quoting McNally v. United States, 483
U.S. 350, 356 (1987)).

Although broad, the mail and wire fraud statutes do not
have limitless reach.  In Cleveland v. United States, the
Supreme Court held

a State's interest in an unissued video poker license was not property, because the interest in choosing particular licensees was purely regulatory and [could not] be economic.

Pasquantino 544 U.S. at 357 (2005) (quoting Cleveland v. United States, 531 U.S. 12, 22-23 (2000)). As noted by the Second Circuit Court of Appeals, however, "while Cleveland remains good law, courts have consistently rejected attempts . . . to apply its holding expansively." Blaszczak, 947 F.3d 19, 32 (2d Cir. 2019). After Cleveland, the Supreme Court reaffirmed that the "exercise of regulatory power . . . fails to meet the statutes' property requirement." Kelly v. United States, 140 S. Ct. 1565, 1568-69 (2020).

### B. Application to University Admissions Slots

The government contends that an "admissions slot" at a university qualifies as a cognizable property interest under the mail and wire fraud statutes. It maintains that the mail and wire fraud statutes are not, as defendants claim, limited to "traditional" forms of property and that this conclusion follows logically from Supreme and Circuit Court precedent.

Defendants counter that the Supreme Court has specifically limited the fraud statutes to reach only "traditional" forms of property which they contend are only those "long recognized in common law." Because university admissions slots do not constitute such traditional property, defendants proclaim that

- 16 -

they cannot be subject to prosecution for wire fraud. Further, defendants protest that a reading of property which encompasses admissions slots represents a sweeping expansion of criminal liability not contemplated by Congress when it passed the fraud statutes.

This Court holds that application slots to universities are property interests owned by the university cognizable under the mail and wire fraud statutes. Although certainly not boundless, the definition of "property" extends readily to encompass admission slots.

This conclusion is supported by the Sixth Circuit Court of Appeals' decision in United States v. Frost, 125 F.3d 346 (6th Cir. 1997). In Frost, graduate students and professors were convicted of mail fraud for their roles in a scheme whereby students were allowed to submit plagiarized academic work in furtherance of a degree. The Frost Court held that prospective university degrees are property cognizable under the mail fraud statute and explained:

> Ultimately, a university is a business: in return for
> tuition money and scholarly effort, it agrees to provide an
> education and a degree. The number of degrees which a
> university may award is finite, and the decision to award a
> degree is in part a business decision. Awarding degrees to
> inept students, or to students who have not earned them,
> will decrease the value of degrees in general. More
> specifically, it will hurt the reputation of the school and
> thereby impair its ability to attract other students

– 17 –

willing to pay tuition, as well as its ability to raise
money.

Id. at 367.

The logic of Frost neatly applies to the case at bar.  As
the government notes, an admissions slot is not, in this case,
meaningfully distinct from an unissued degree.  A student seeks
admission to a university with the purpose of gaining a degree
and all the advantages, rights and privileges that such a degree
confers.  Though not sufficient, gaining admission to a
university is a necessary precursor to obtaining its degree.
The object of the alleged conspiracy in this case was to obtain
those inherently limited "admission slots" at universities
because they would, presumably, lead to degrees.  It follows
that if a prospective degree is property, so too, is its direct
precursor, an offer of admission.

Admission slots at competitive universities, such as USC,
are both limited and highly coveted.  The ability to grant
admission is an asset of the university subject to its control.
See United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007)
(noting that "[s]ince a defining feature of most property is the
right to control the asset in question . . . the property
interests protected by the statutes include the interest of a
victim in controlling his or her own assets").  A university has
a vested interest in admitting only those students who are

- 18 -

**Add.18**

qualified and equipped to contribute to the academic community and campus life.  Most importantly, a university has an interest in admitting only those students who are capable of completing the coursework necessary to obtain a degree.

Admission slots and prospective degrees are valuable to a certain extent because they are limited.  Students seek admission to universities to be among other qualified and talented individuals and to learn from professors who are attracted to employment at a particular university, in part, for the opportunity to teach qualified students.  Admission also entitles those students to a vast array of material university resources, from dormitories to laboratories.

If a university admits students who are unqualified, it inevitably decreases the value of its degrees, hurts its reputation and its ability to attract qualified tuition-paying students and recruit accomplished professors.  It also impairs its ability to solicit donations.  Universities have an intangible property interest in the integrity of their academic system. See United States v. Barrington, 648 F.3d 1178, 1191 n.11 (11th Cir. 2011) (noting that a "[u]niversity certainly has an intangible property interest in the integrity of its grading system").  The integrity of that system begins with the probity of the admissions process.  Admission slots, therefore,

constitute an intangible property interest cognizable under the mail and wire fraud statutes.

### C. Application to Accurate Test Scores

In a similar vein, the testing defendants submit that accurate standardized test scores or score reports are not a traditional form of property and therefore the indictment cannot properly allege wire fraud with respect to the test cheating scheme.  The government, relying largely on reasoning articulated by the Court in United States v. Hedaithy, 392 F.3d 580 (3d Cir. 2004) maintains that accurate test scores constitute cognizable property for the purpose of the wire fraud statute.

In Hedaithy, foreign nationals hired an imposter to take and pass (on their behalf) the Test of English as a Foreign Language ("TOEFL"), a standardized test administered by the Educational Testing Service ("ETS").  The TOEFL is often used by educational institutions to assess English language proficiency and potential students are regularly required to pass the exam as a prerequisite to admission.  ETS owns copyrights to the TOEFL examination and its component questions and keeps its operations and test material confidential.

Affirming defendants' conviction for mail fraud after a thorough review of relevant caselaw, the Third Circuit Court of Appeals held that ETS had a cognizable property interest in its

- 20 -

confidential business information, (i.e. the TOEFL exam) and that it had been deprived of "the right to decide how to use" that confidential information. Id. at 595. The Court concluded that the TOEFL score reports themselves, and ETS' right to distribute those score reports to only those individuals who met its "prescribed conditions", constituted a cognizable property interest under the mail fraud statue. Id. at 596-97.

The reasoning articulated in Hedaithy is apposite to this case. Similar to ETS, The ACT and SAT are private for-profit businesses that "provide[] a service and report test results in pursuit of a profit-seeking endeavor." Id. At 600. The FSI alleges that ACT and SAT scores, and by logical extension the score reports, just as the TOEFL, are the intellectual and physical property of the testing companies. And, as in Hedaithy, the defendants here have allegedly made misrepresentations (having Riddell correct exam answers) to the ACT and SAT in order to achieve elevated test scores.

It follows, therefore, that like the TOEFL, ACT and SAT examinations and score reports are cognizable property. When the defendants allegedly conspired to have their childrens' test answers altered to achieve higher scores they, as the defendants in Hedaithy,

> (1) gain[ed] access [to the exam on] terms other than those prescribed [by ACT and (2) violated the testing companies]

- 21 -

right to convey [score reports] only to those individuals
who [met] its prescribed conditions. Id. at 595-97.

Moreover, the product provided by a testing company is only
valuable so long as it is not the product of fraud or viewed as
corruptible and unreliable.  A testing company's business
depends almost entirely upon the integrity of its testing
process and the goodwill it has developed.  If that process is
corrupted, or is viewed as corruptible, the product, i.e. its
tests and the resulting scores, become valueless.  Eventually,
if the integrity of the test is subverted (or perceived as
subvertable) with any frequency the company itself becomes
worthless. See e.g., Id. at 600; Barrington, 648 F.3d at 1192
n.11.

Accordingly, a testing company has a cognizable property
right in its test and accurate test scores and the defendants'
motion to dismiss the FSI based on the lack thereof will be
denied.

### D. Honest Services Mail and Wire Fraud

#### 1. Fiduciary Duties

Defendants next move to dismiss Count One of the FSI because
they submit that the government does not allege that ACT and
College Board employee, Igor Dvorskiy ("Dvorskiy") had the
requisite fiduciary duty to either testing company such that his

misconduct could constitute a theft of honest services in violation of the federal mail and wire fraud statutes.

For conduct to fall under the auspices of the honest services fraud statute it must involve an "offender[] who, in violation of a fiduciary duty, participated in bribery or kickback schemes." Skilling v. United States, 561 U.S. 358, 407 (2010). As the Supreme Court noted, the existence of a fiduciary relationship between employer and employee is "beyond dispute." Id. at 407 n.41. Relevant here, a fiduciary duty may also arise under certain circumstances in the context of an independent contractor relationship. See United States v. Rybicki, 354 F.3d 124, 127, 141-42, 142 n.17 (2d Cir. 2003) (noting that § 1346, when applied to private actors includes "an officer or employee of a private entity or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers."); United States v. Milovanovic, 678 F.3d 713, 722 (9th Cir. 2012)(noting that a defendant is not exempted from prosecution for mail fraud "simply because [he is an] independent contractor" and reviewing caselaw holding that such a fiduciary relationship "encompasses informal fiduciaries"). Whether or not a specific employment arrangement qualifies as creating a fiduciary relationship is a factual question reserved for the jury. Id. at 723.

- 23 -

**Add.23**

The indictment sufficiently alleges that Dvorskiy, by the nature of his employment with ACT and the College Board, owed a fiduciary duty to those organizations.  It alleges that Dvorskiy and other test administrators were employed by ACT to administer standardized tests and were agents of the ACT and College board who owed a duty of honest services to those organizations.  The FSI further describes the duties of certification and test administration undertaken by an administrator such as Dvorskiy. Such allegations are sufficient to set forth an indictment for honest services fraud. See United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010).  Whether or not Dvorskiy indeed maintained the requisite fiduciary duty is another issue to be explored at trial and determined by the jury.

### 2. Bribery Allegations and Federal Programs Bribery Charges

Defendants also contend that the honest services fraud and federal programs bribery allegations must be dismissed because the FSI does not properly allege that payments made to university administrators and coaches constitute bribery.  The FSI identifies two sets of payments that the government alleges constitute bribes: 1) payments made by the defendants and Singer to university accounts controlled by corrupt insiders and 2) payments made by Singer (or Singer's entities) directly to corrupt athletic coaches.

**a. Payments to Universities**

For a payment to constitute a bribe, there must be "a quid pro quo — a specific intent to give or receive something of value in exchange for an official act." United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404–05 (1999).

The government contends that so long as defendants made payments with a corrupt intent (exchanging money for admission based on false credentials) those payments constitute bribes. The defendants rejoin that because 1) the payments went to the university and 2) in the case of USC, Donna Heinel did not receive any cognizable personal benefit from accepting the payments, those payments cannot be bribes.

The honest services fraud statute, as explained by the Supreme Court in Skilling, extends only to bribery and kickback schemes but includes those involving private sector employees. See United States v. Bryant, 655 F.3d 232, 245 (3d Cir. 2011) (noting that "Skilling did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks"); United States v. DeMizio, 741 F.3d 373, 381 (2d Cir. 2014).

The federal programs bribery statute, 18 U.S.C. § 666(a)(2) incorporates the same extension and covers, in relevant part, whomever:

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value...

Even if the victim, in this case the university, ends up profiting as a result of a kickback scheme, there still exists actionable harm "in the denial of that party's right to the offender's honest services." See Skilling, 561 U.S. at 400. That the payments made by defendants eventually went to USC does not thereby preclude such payments from constituting bribes. See DeMizio, 741 F.3d at 381.

The issue, as the government reiterates, is whether the defendants paid money with the intent to accomplish a corrupt quid pro quo. Whether the defendants possessed the requisite corrupt intent is an issue of fact for the jury. See, e.g., United States v. DeMizio, No. 08-cr-336, 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012).

Further, the FSI alleges that the payments were made to designated accounts that were either controlled by the corrupt insiders or that otherwise inured to their benefit professionally. Those payments, therefore, represent a "thing

of value" to those insiders, even if the payments were not
deposited directly into personal accounts.  As the government
notes, in an honest services prosecution a

> thing of value is defined broadly to include the value
> which the defendant subjectively attaches to the items
> received.

United States v. Renzi, 769 F.3d 731, 744 (9th Cir.
2014)(citation omitted).

Payments made to accounts controlled by university
insiders, even if such payments were ultimately received by the
universities, may still constitute a benefit to those insiders
who exercise control over the accounts.  This logic applies to
the federal programs bribery charges as well.  Again, to the
extent the defendants maintain that they were unaware that their
payments were going to corrupt insiders or of the extent to
which those insiders deprived the universities of their honest
services is a factual question to be resolved at trial. In sum,
the FSI adequately alleges that the defendants engaged in a
scheme which falls under the ambit contemplated by the fraud and
federal program bribery statutes.

### b. Direct Payments to Coaches

Defendants next argue that payments made to Ms. Heinel by
Singer after she had presented the fraudulent applications to
the admissions committee constitute a legal gratuity rather than
a bribe.  The FSI alleges that Singer agreed to transfer money

- 27 -

**Add.27**

directly to Heinel in late 2017, after Singer and Heinel had
already engaged in the "side-door" scheme on numerous occasions.
That the direct payments were made after Heinel had already
participated in the scheme is not, however, relevant to the
sufficiency of the indictment.

As explained by the First Circuit, the difference between a
licit gratuity and a bribe is

> not [related to] the time the illegal payment is made, but
> the quid pro quo, or the agreement to exchange [a thing of
> value] for official action.

United States v. Fernandez, 722 F.3d 1, 19 (1st Cir.
2013)(citation omitted).  In discerning that difference, the
relevant question is the "timing of the agreement to make or
receive a payment." Id.  The government maintains that the
probative agreement was not the agreement between Singer and
Heinel to compensate her directly but the agreement between
Singer and defendants to effectuate the side-door scheme.  That
the defendants may have been unaware of the exact destination of
their allegedly corrupt payments does not mandate dismissal of
the indictment. United States v. Potter, 463 F.3d 9, 15 (1st
Cir. 2006).

The FSI alleges that in exchange for admitting their children
as specious athletic recruits, the defendants knew that their
payments would be directed to corrupt university insiders.  Such

- 28 -

**Add.28**

quid pro quo allegations are sufficient to survive the motion to dismiss.

## VI.  Defendants' Motions to Dismiss the Money Laundering Conspiracy (Count III)

Count III of the FSI alleges that defendants engaged in a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). In brief, the FSI contends that the defendants made purported charitable donations to The Key or KWF with the intent that those payments would then be used by Singer to effectuate the side-door and test cheating schemes.  Singer did in fact use that money to make payments to corrupt university insiders and to test administrators.  The FSI further declares that the defendants structured the payments as purported donations in order to conceal their fraud.

### A. Legal Standard

The money laundering statute is intended to "punish a separate offense from the underlying specified unlawful activity." United States v. Castellini, 392 F.3d 35, 45 (1st Cir. 2004).  It "criminalizes separate financial transactions involving the funds derived from such illegal activity." Id. Money laundering therefore must involve funds that were "the proceeds of some form of unlawful activity." United States v. Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007).

The laundering of funds cannot be concurrent to the "transaction through which those funds first became tainted by crime." United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000)(citation omitted). There is, however, no requirement that the underlying crime be completed before money laundering can take place. Instead, so long as the underlying offense has progressed to the point of creating proceeds "the money becomes proceeds of illegal activities and it can be laundered." Castellini, 392 F.3d at 48. In other words, so long as a "phase" of the ongoing offense has been completed (and has generated proceeds) a defendant may be liable for money laundering. Id.

**B. Application to the Sufficiency of the Indictment**

Defendants maintain that the FSI does not properly allege that they engaged in a complete phase of an ongoing unlawful activity which generated proceeds prior to engagement in a separate money laundering transaction. In brief, they maintain that the government impermissibly presents the same transactions as both fraud and money laundering. The government rejoins that FSI properly alleges that the money laundering conspiracy came after a complete phase of the underlying fraud offenses. According to the government, as soon as the defendants made payments to KWF and/or The Key in furtherance of the admissions scheme, they had committed mail or wire fraud and thus those

- 30 -

**Add.30**

payments constituted proceeds from that scheme. When Singer
made payments from his corporate shell entities to corrupt
insiders using those proceeds, those transactions constituted
money laundering.

The FSI sufficiently alleges a money laundering conspiracy.
As set out in the indictment, the scheme operated in stages.
Defendants first allegedly made payments to KWF and The Key with
the intent that Singer would use the proceeds to pay Heinel,
Dvorskiy and others. Singer then used that money to pay the
corrupt insiders and effectuate the admissions cheating. The
purported initial payments to KWF and The Key therefore
constitute a discrete phase of an ongoing offense and were
consequently "tainted by crime." Richard, 234 F.3d at 769.
Accordingly, the payments made by Singer to Heinel and others,
if proven, were in fact money laundering transactions.

Further, as the government notes, because the defendants
are charged with money laundering conspiracy, if the allegations
are proved, they are liable for the actions of their co-
conspirators. Each defendant is liable for the payment of every
other defendant to entities controlled by Singer. Once those
funds were deposited in Singer-controlled accounts, the
subsequent payments to other co-conspirators in furtherance of
the scheme constituted money laundering transactions.

Defendants allegedly structured the payments in that manner in an attempt to conceal their scheme. Such action is a hallmark of money laundering. <u>See</u> <u>Castellini</u>, 392 F.3d at 49 (noting that "[t]he money laundering of the proceeds of an underlying illegal activity may make the underlying crime more difficult to detect or to prove. And Congress wanted to curtail the separate market of criminal activity which money laundering represents").

Finally, as the government argues, defendants are charged only with a money laundering conspiracy. Thus the government need only allege that defendants "agreed with another person to violate the substantive provisions of the money-laundering statute." <u>United States</u> v. <u>Hynes</u>, 467 F.3d 951, 964 (6th Cir. 2006). As previously explained, the indictment alleges that defendants (1) made payments to Singer's entities; (2) agreed with Singer that he would use those proceeds to make subsequent payments to university and testing officials in furtherance of the fraud scheme and (3) structured the transaction to conceal the nature, location, source, ownership, and control of those proceeds. 18 U.S.C 1956(h). Accordingly, the indictment properly alleges money laundering conspiracy and survives a motion to dismiss.

VII. **Amy and Gregory Colburn's Joint Motion to Dismiss Second Superseding Indictment**

Because defendants Amy and Gregory Colburn raise identical or substantively similar arguments as those addressed and rejected by this memorandum and order, their motion to dismiss will also be denied.

VIII. **William McGlashan's Motion to Dismiss Count Seven and I-Hsin Chen's Motion to Dismiss Count Five**

Likewise, the motions of defendants McGlashan and Chen will also be denied.

**ORDER**

For the foregoing reasons, the following motions of the defendants to dismiss the indictment (Docket Nos. 341, 1021, 1023, 1026, 1031, 1035, 1037, 1039 and 1041) are **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 23, 2020

United States District Court
District of Massachusetts

```
_____
                                  )
United States of America,         )
                                  )
              v.                  )      Criminal Action No.
                                  )      19-10080-NMG
Gamal Abdelaziz and John Wilson,  )
                                  )
         Defendants.              )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

There are multiple pending motions in this case, six of which the Court now addresses.

I.   **Non-Party University of Southern California's Motion to Quash (Docket No. 2181).**

The motion of non-party University of Southern California ("USC") to quash defendant John Wilson's trial subpoena served on August 12, 2021, (Docket No. 2181) is dealt with as follows:

Defendant Wilson has stated that he will not pursue the first request in the subpoena, i.e for documents prepared for and by the USC Athletics Admissions Review Committee ("Subco") in connection with the applications of six named candidates, and therefore USC's motion to quash with respect to that request is **DENIED as moot.**

**Add.34**

The second request in the subpoena seeks gift receipts issued by USC for donations made by the families of 18 USC students. Wilson contends that the gift receipts are relevant to the charge against him of filing a false tax return. He states that federal law requires that the value of goods and services received in exchange for a donation is to be subtracted from the amount donated in order to determine the amount that may be claimed as a tax deduction. He asserts that the value of goods or services, in this case, the favorable admissions consideration by USC, is determined by reference to similar situations.

Wilson further contends that the 18 gift receipts he seeks to proffer affirm, in each instance, that there were no goods or services exchanged for the donation and demonstrate that, notwithstanding USC's alleged awareness of the connection between the donation and the student's admission, USC does not account for the value of a student's admission.

Wilson's argument is not, however, relevant to the charge against him. The statute, 26 U.S.C. § 7206, makes it illegal for an individual

> [to] make[] and subscribe[] any return, statement, or other
> document, which contains or is verified by a written
> declaration that it is made under the penalties of perjury,
> and which he does not believe to be true and correct as to
> every material matter.

**Add.35**

Because it is uncontested that Wilson knowingly filed his tax return, the only material issue at hand is his state of mind when doing so. A gift receipt which Wilson did not see before he filed his tax return (nor has yet seen) cannot possibly be material or relevant to this case.

The motion to quash (Docket No. 2181) is, with respect to the requested receipts, **ALLOWED**.

## II. USC Employee Intervenors' Motion to Intervene and Quash Trial Subpoenas (Docket No. 2171).

The motion of non-party employee intervenors Alex Garfio, Alexandra Reisman and Scott Wandzilak ("Employee Intervenors") to quash defendant Wilson's trial subpoenas seeking their testimony (Docket No. 2171) will be allowed, in part, and denied, in part.

While Fed R. Crim. P. 17(a), which governs subpoenas for trial testimony, does not provide explicitly for quashing or modification, courts "routinely have entertained motions seeking such relief and decided them by reference" to the principles relevant to Rule 17(c) subpoenas, and "roughly the same standard applies". Stern v. United States Dist. Court, 214 F.3d 4, 17 (1st Cir. 2000). Subpoenas may be quashed if their execution would be unreasonable or oppressive. Fed. R. Crim. P. 17(c)(2).

-3-

**Add.36**

The Supreme Court has held that a subpoena is not "unreasonable or oppressive" if the testimony sought is relevant, admissible, and specific.  United States v. Nixon, 418 U.S. 683 (1974), see Stern, 214 F.3d at 17.

     a.   Reisman and Wandzilak

Employee Intervenors claim that Reisman and Wandzilak are merely fundraisers for the USC Athletic Department and cannot provide testimony relevant to the charges against defendants. Employee Intervenors state that during the meet and confer process, defense counsel conceded that neither Reisman or Wandzilak had any contact with either defendant in this case and had no knowledge of the application for admission of defendants' children to USC.  They assert that the testimony that defendant Wilson seeks from them about the general practices of the USC Athletic Department is exactly the sort which the Court has warned would not be admissible and, in any event, is cumulative of other witnesses' testimony.

Defendants contend that 1) Reisman, as Associate Athletic Director for the USC Trojan Athletic Fund, helped facilitate the admissions process for those families who had the capacity to make substantial donations, and 2) Wandzilak, as a member of the Development Department, recommended applicants to the Athletic Department based solely on their capacity to give.  They argue

-4-

**Add.37**

that defendants cannot be found guilty of honest services fraud
or conspiracy to commit such fraud if USC employees, such as
Reisman and Wandzilak, were acting in accordance with the
customs, practices and policies of USC in connection with the
admission of defendants' children.  They cite an order issued by
Magistrate Judge Kelley concerning another erstwhile defendant
in this case, Robert Zangrillo, wherein Magistrate Judge Kelley
denied a motion to quash a subpoena seeking documents showing
how USC considered applicants marked "special interest" or
"VIP".

   As the Court has ruled on previous occasions, testimony
concerning the general fundraising practices of USC is not
relevant to whether admitting students through Subco with
falsified athletic profiles deprived USC of the honest services
of its employees.  While the testimony of Reisman and Wandzilak
might be relevant to an applicant such as Zangrillo's daughter,
who was marked as "special interest" or "VIP", defendants'
children were not so designated.  Rather, they were admitted
through Subco as putative athletic recruits.  Defendants have
not demonstrated that Reisman and Wandzilak have information
relevant to the honest services question as to these defendants,
i.e. the customs, practices and policies of Subco or the
relevant expectations of the Admissions Department.  Therefore,

**Add.38**

Employee Intervenors motion to quash (Docket No. 2171) is, as to Reisman and Wandzilak, **ALLOWED.**

    b.   Garfio

    With respect to Garfio, Employee Intervenors contend that defendants have not identified any testimony Garfio can provide concerning Abdelaziz's daughter because she applied to USC after Garfio stopped working with Donna Heinel. As to Wilson's son, Employee Intervenors submit that Garfio's involvement was limited to printing out a few emails directed to Heinel and putting them in a file for Subco review. Employee Intervenors conclude that Garfio's testimony would be cumulative and irrelevant.

    Defendants vigorously disagree. They assert that Garfio had a direct involvement with the admission of Johnny Wilson about which they seek to examine him. They also assert that Garfio, who had responsibilities related to Subco admissions, can testify to the honest services that USC expected of its employees and to whether USC was deprived of such services in this case. They argue that Garfio does not suggest that he faces any hardship in testifying and should not be excused from testifying merely because of his disinclination.

**Add.39**

Defendants have made a sufficient showing that the testimony they seek from Garfio is likely to be relevant, admissible and specific.  Employee Intervenors motion to quash (Docket No. 2171) is, as to Garfio, **DENIED**.

### III. Motion of Non-Party Ron Crawford to Intervene and Quash Trial Subpoena (Docket No. 2235).

Non-party Ron Crawford has filed a motion to intervene and quash a trial subpoena served by defendants (Docket No. 2235) the relevant standard for which the Court has previously set forth, see supra p. 3-4.

Defendants argue that Crawford's testimony is "needed to authenticate the video shown in the opening of Mr. Singer's speech to Starbucks employees".  To date, however, defendants have sought to utilize that video to prove that Singer acted in a similar way toward these defendants, an effort impermissible under Fed. R. Evid. 404(a)(1).  Nor is evidence of Singer's specific conduct during his Starbucks presentation admissible as it pertains to Singer's truthfulness because that would be extrinsic evidence prohibited under Fed. R. Evid. 608(b).  More generally, defendants have failed 1) to address persuasively the relevance of the video at issue under Fed. R. Evid. 401, 2) to introduce any evidence to suggest they had any knowledge of the

-7-

**Add.40**

presentation, or 3) to introduce any evidence that they interacted with Singer in a similar context.

The motion of non-party Ron Crawford to intervene and quash the trial subpoena (Docket No. 2235) is **ALLOWED**.

## IV. Defendants' Motion for Curative Instruction (Docket No. 2237).

Defendants have filed a motion for a curative instruction with respect to burden shifting. They argue that the prosecution made comments in front of the jury which improperly suggested that the defendants should produce evidence of their innocence. In particular, defendants contend that the following question posed to Special Agent Keith Brown by counsel for the government improperly shifted the burden:

> Q: When you did that [i.e., when Brown had, previously and unrelated to this case, deleted text messages on his own phone], did it also delete off the phone of the person who received the message?

Brown responded that it was his understanding that when an individual deletes a text message from a device, it is not deleted from the receiving device. Defendants contend that the question and answer suggested to the jury that defendants have the ability and the burden to produce text messages between themselves and other co-conspirators, namely Rick Singer, that he may have deleted.

The government maintains that there has been no impermissible burden shifting, that the colloquy was proper in response to the defendant's implication that relevant evidence was destroyed by a witness under the government's control.

The Court is required to scrutinize comments that may either shift the burden of proof or impermissibly suggest to the jury that the defendant is obligated to present evidence of his innocence.  United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009) (internal citations omitted).  In making that determination, the Court must consider whether the comment was aimed at the failure of the accused to testify, which is forbidden, or simply directed at the lack of evidence or holes in the defendant's case, which is not.  Id., United States v. Salley, 651 F.3d 159, 165 (1st Cir. 2011).

Here, the prosecutor's question was not impermissible. Testimony elicited by defense counsel could, and likely will, be understood to imply a causal relationship between Singer's cooperation and the deletion of the text messages.  The government's re-direct examination concerning deletion of text messages permissibly casts doubt on the theory implied by defense counsel.  It cannot be said to be of such a character that the jury would naturally and necessarily take it to be a

-9-

**Add.42**

comment on the failure of the accused to testify.  Defendants'
motion for a curative instruction (Docket No 2237) is **DENIED.**

### V.    Defendant Gamal Abdelaziz's Motion for a Limiting Instruction (Docket 2252).

Defendant Abdelaziz moves for a limiting instruction with
respect to alleged personal payments to Donna Heinel (Docket No.
2252), including the invoice that Heinel allegedly drafted and
which reflected $20,000 owed as partial payment for services
rendered on behalf of Sabrina Abdelaziz.

Defense counsel contends that Heinel did not begin to
accept personal payments until July, 2018, that Mr. Abdelaziz
made his donation in March, 2018, and thus that the risk of
juror confusion and transferal of guilt is very high, warranting
a limiting instruction.  Defendant proposes an instruction that
the payments should be disregarded when determining his intent
and that they are relevant only to the nature, scope and
operation of the conspiracy.

In its opposition, the government refers to and rests upon
its previous arguments with respect to limiting instructions
regarding co-conspirators and reiterates that it has been clear
about the timing of the payments in question.

**Add.43**

The Court will thoroughly instruct on the law of conspiracy in its charge to the jury but, in the meantime, defendant's motion for a limiting instruction (Docket No. 2252) is **DENIED**.

**VI.  Defendant Gamal Abdelaziz's Motion to Introduce Exhibit (Docket No. 2251).**

Defendant Abdelaziz has filed a motion to admit a series of messages between two USC admissions officers, Kelsey Bradshaw and Alexander Alvendia-Wienkers, concerning Sabrina Abdelaziz which are included in Exhibit 1288.  Defendant asserts that the exhibit is relevant because it concerns Sabrina Abdelaziz's admission to USC and is not hearsay because it is offered for the "state of mind" of the USC Athletic Department.

The Court denied defendant's proffer of Exhibit 1288 during cross-examination of Rebecca Chassin.  The USC Admissions Department is an administrative entity of a university and as such does not have a "state of mind".  To the extent the exhibit suggests a "policy" of that department, its admission would be for the truth of the matter asserted, i.e. that the department's policy was nefarious, and would be hearsay not within an exception.  Moreover, it is not admissible to impeach Ms. Chassin in any event because she is not responsible for what her colleagues said.

**Add.44**

There may be occasion for defendant Abdelaziz to proffer Exhibit 1288 under different circumstances but it cannot be admitted pursuant to the pending motion (Docket No. 2251) which is hereby **DENIED**.

**So ordered.**

                                        /s/ Nathaniel M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge

Dated September 23, 2021

**Add.45**

United States District Court
District of Massachusetts

_____
                                        )
United States of America,               )
                                        )
             v.                         )      Criminal Action No.
                                        )      19-10080-NMG
Gamal Abdelaziz and John Wilson,        )
                                        )
         Defendants.                    )
_____)


MEMORANDUM & ORDER

GORTON, J.

There are multiple pending motions in this case, eleven of
which the Court now addresses.

I.  **Non-Party University of Southern California's Motion to
    Quash Trial Subpoenas (Docket No. 2264).**

Ray Gonzales ("Gonzales"), Tracey Vranich ("Vranich"), Al
Checcio ("Checcio"), and Lauren Whittam ("Whittam")
(collectively, "the Intervenors"), all of whom are employees at
the University of Southern California ("USC"), move to quash
defendants' trial subpoenas seeking their testimony, contending
that the subpoenas are unreasonable and oppressive because they
seek to enter irrelevant testimony and contravene the Court's
prior rulings.  Intervenors state that any testimony they offer
is not relevant because they have no knowledge of the
defendants, the admission of the defendants' children, William
"Rick" Singer ("Singer"), or the alleged misrepresentations of

-1-

**Add.46**

the defendants.  Since the original filing, defendants have
withdrawn the subpoenas for Checcio and Whittam and now oppose
the motion to quash those subpoenas as moot.

More specifically, Intervenors suggest that defendants seek
Gonzales' testimony for the sole reason that he created a
summary chart regarding the admission rate of students who
received a VIP tag in the 2018 academic year, as part of USC's
negotiated response to a pretrial subpoena issued by defendant
Robert Zangrillo ("Zangrillo").  Zangrillo's daughter was never
presented to USC's Athletics Admissions Review Committee
("Subco") but rather received a VIP tag from Donna Heinel
("Heinel").  Even if the chart is relevant, Intervenors argue
that there is no justification for calling Gonzales to testify
about the document, which speaks for itself.

Defendants respond that Gonzales' testimony will rebut the
government's logic that USC was defrauded and deprived of its
employees' honest services because his testimony will
demonstrate that donors' children were given preferential
treatment during the admissions process.  Defendants assert that
such evidence would not contravene the Court order excluding
evidence of USC's general admissions policies because Singer
represented to defendants that USC welcomed donations in
exchange for preferential treatment.  Moreover, defendants
submit that: (1) the inclusion of the name of an alleged co-

-2-

**Add.47**

conspirator's child on a VIP list makes the list relevant to the alleged conspiracy and (2) Gonzales' testimony would serve to rebut that of Rebecca Chassin ("Chassin").

With respect to Tracey Vranich, Intervenors claim the defendants' subpoena is an attempt to evade the Court's prior ruling that testimony on "tax treatment" is irrelevant as it pertains to other students not involved in the case.  Vranich alleges that she is being called to testify about the "tax treatment" of prior donations based on the false premise that a favorable admissions consideration was given in exchange for a donation.

In response, defendants contend that Vranich's testimony is necessary for Wilson to set forth his defense regarding the tax charges he faces because she would testify to the fact that USC indicated the school has "no responsive documents reflecting that USC instructed a donor to reduce his or her tax deductibility in connection with an admissions decision." Defendants assert that such testimony is relevant to whether: (1) Wilson's tax return was false as to a "material matter," and (2) Wilson subjectively knew that his tax return was false.

The Court has previously ruled that such evidence will be admissible at trial only if defendants are able to show that they were aware of an alleged USC policy or practice prior to the events that are the subject matter of the indictment in this

**Add.48**

case.  As a general matter, testimony with respect to the VIP admission process at USC is irrelevant because the defendants' children were not admitted through that process, nor is the "tax treatment" of donations unrelated and unknown to the defendants relevant.  Such evidence does not relate to the crimes charged against the defendants.  For those reasons, Intervenors' motion to quash trial subpoenas (Docket No. 2264) is **ALLOWED**.

## II. Defendants' Motion for Reconsideration of Evidentiary Ruling on Exhibit 1374A and Order on Motion to Quash Subpoena of Ron Crawford (Docket No. 2273).

Defendants argue that Exhibit 1374, a video of Singer presenting at Starbucks Coffee Company ("Starbucks"), is admissible and that the subpoena for Ron Crawford ("Crawford"), who invited Singer to make the presentation, will be mooted if the Court allows the admission of the video.  Defendants contend that the video is admissible as: (1) impeachment evidence of a prior inconsistent statement of a hearsay declarant under Fed. R. Evid. 806, or (2) relevant, non-hearsay evidence under Fed. R. Evid. 401 regarding both Singer's "pitch" and Singer's non-criminal state of mind.

In furtherance of their contention, defendants assert that the video is admissible to impeach Singer's statements regarding the "side door" as an illicit program, and specifically that Singer's recorded explanation of the "side door" is unquestionably inconsistent with the explanation he gave to

-4-

**Add.49**

parents during the consensually recorded calls.  The defendants
also maintain that the video is relevant under Fed. R. Evid. 401
because it is evidence that Singer, at times, characterized the
"side door" as a legitimate process.  They argue that such
evidence makes it more likely that the defendants' belief that
the "side door" process was legitimate was reasonable and held
in good faith and that the video provides evidence of Singer's
"old pitch" that Special Agent Elizabeth Keating repeatedly
referred to during her testimony.

Crawford and the government oppose the motion. Crawford
contends that, if the video is inadmissible, so too is
Crawford's testimony and, if the video is admissible, his
testimony regarding the tape is unnecessary and duplicative.
The government submits that the video is inadmissible under Fed.
R. Evid. 806 because there is no inconsistency among Singer's
descriptions of the "side door."

Singer's assertions during the recorded presentation about
the "side door" are not inconsistent with the explanations he
provided to defendants.  Moreover, the video is irrelevant to
the charges facing the defendants because there is no contention
that they were present for, or even aware of, that presentation.
Consistent with the Court's prior rulings on related matters,
evidence regarding activities in which Singer engaged
unbeknownst to the defendants are irrelevant in the current

-5-

**Add.50**

case.  Finally, to the extent that defendants seek to introduce
the video to reveal Singer's state of mind, such evidence is
irrelevant.  Singer's state of mind is not at issue here.  The
motion for reconsideration (Docket No. 2273) is **DENIED**.

### III.    Defendants' Motions for Hearings on Assertion of Fifth Amendment Rights (Docket Nos. 2274 and 2294).

Insofar as the relevant witnesses will appear by Zoom or
in-person to assert their Fifth Amendment rights, and consistent
with the Court's ruling in open court, these motions (Docket
Nos. 2274 and 2294) are **ALLOWED**.

### IV.    Defendants' Motion for Reconsideration of Ruling on Admissibility of Exhibit 1288 (Docket No. 2275).

Defendants contend that the text message exchange between
USC Admissions Officers Bradshaw and Alvienda should be admitted
as evidence of the state of mind of the Admissions Department
and is not hearsay because it is not being offered for the truth
of the matter asserted.  The state of mind revealed purportedly
tends to show knowledge on the part of Admissions Department
that rebuts Chassin's testimony and indicates that the office
knowingly exchanged donations for preferential admissions
treatment of walk-on athletes.  Defendants also submit that the
exclusion of such evidence would unduly prejudice defendant
Abdelaziz, who relied on this exhibit in his opening and told
the jury that it would be part of his case.  Defendants request

-6-

**Add.51**

that the document be read into the record because it should have
been admitted during Chassin's cross examination.

The government responds that the exhibit does not
demonstrate a "practice" of accepting money in exchange for
preferential admissions treatment of walk-in athletes and
moreover, that reading the text exchange into the record would
be grossly misleading.

The defendants have failed to address the ruling of the
Court that Chassin cannot be impeached based on the words of her
colleagues. Moreover, while defendants point to First Circuit
precedent holding that state of mind evidence is admissible as
to an entity, they have failed to present evidence that an
informal text exchange between Admissions Officers is evidence
of the institutional belief of the Admissions Department as a
whole. Defendants' motion for reconsideration (Docket No. 2275)
is **DENIED**.

### V. Defendants Motion to Introduce Exhibits 1563A, 1478, 9025, 1381A and 8182 (Docket No. 2276).

Defendants seek to introduce: (1) a pleading form from this
case (Exhibit 1563A), (2) a script that an Assistant United
States Attorney ("AUSA") wrote for Singer to use with defendant
William McGlashan (Exhibit 1478), (3) the affidavit of Special
Agent Laura Smith that was submitted in support of a wiretap
application (Exhibit 9025), (4) a text message thread between

**Add.52**

Singer and federal agents regarding an invoice Heinel sent to
Singer (Exhibit 1381A) and (5) a recorded call between an AUSA,
Special Agent Keating, Singer, and Singer's attorney that
occurred shortly before the October 2 note Singer created on his
cellphone (Exhibit 8182).

With respect to Exhibit 1563A, defendants argue that the
government's statement is admissible as a statement of a party
opponent.  They apply similar reasoning to Exhibit 9025,
contending not only that the statements are party admissions,
but also that the affidavit is admissible as a public record
pursuant to Fed. R. Evid. 803(8)(A)(iii).  In response, as to
1563A, the government suggests that the relevant caselaw
requires that there be a prior inconsistency among the opposing
party's statements in order to render evidence admissible as
non-hearsay under Fed. R. Evid. 801(d)(2).  The government
furthermore maintains that exhibit, as well as Exhibit 9025, is
cumulative.

As to Exhibit 1478, defendants argue that the government's
hearsay objection is unavailing because the script is not being
offered for the truth of the matter but rather as evidence of
the extent to which the government coached Singer in preparation
for the consensually recorded telephone calls.  Similarly,
defendants contend that 1381A is admissible to show the close
interaction between the agents and Singer, as well as Singer's

**Add.53**

state of mind.  Specifically, the defendants submit that 1381A is evidence that Singer believed federal agents requested that he procure an invoice bearing the "Abdelaziz" name.  Defendants claim that Exhibit 8182 is admissible to show how Singer was "pressured and coached" by the government when he made the recorded calls which were meticulously contrived.

Upon reconsideration, the Court finds that Exhibits 1563A and 9025 may be offered as opposing party statements under Fed. R. Evid. 801(d)(2).  Relevant case law does not require an inconsistency among a party's prior statements for such evidence to be admissible.  See United States v. Kattar, 840 F.2d 118, 131 (1st Cir. 1988).  Therefore, defendants' motion as to those exhibits (Exhibits 1563A and 9025) is **ALLOWED**.

Defendants' motion to introduce the remaining exhibits (Exhibits 1478, 1381A and 8182) is, however, **DENIED**.  Those exhibits, which defendants seek to introduce to describe Singer's relationship with federal agents, are not probative of facts at issue in this case.  See Fed. R. Evid. 401.  The government does not deny coaching Singer in advance of the consensually recorded calls, nor that it worked closely with him after he became a cooperator.  Multiple witnesses have attested to Singer's relationship with federal agents.  The evidence defendants seek to introduce on that subject is therefore unnecessarily cumulative.  See Fed. R. Evid. 403.

**Add.54**

**VI.  Defendant Wilson's Motion to Strike Testimony of IRS Agent Concerning Tax Calculation (Docket No. 2321).**

Defendant Wilson has moved to strike the testimony of IRS Agent Colleen Ranahan concerning the tax charge against him (Docket No. 2321).  He argues that Agent Ranahan's preparation and analysis in evaluating the materiality element that charge was contrary to the Tax Code and IRS regulations.  For that reason, he requests that the Court strike Agent Ranahan's testimony.

The instant motion is the latest attempt by defendant Wilson to make central the issue of how USC treated the value of admissions slots, in particular admissions slots secured in part by donations, for tax purposes.  Defendant Wilson contends, here and previously, see Docket No. 2226, that USC knew of a connection between large donations and admission to the university, but nevertheless sent donors gift receipt letters stating that their donation was not made in exchange for any goods and services.  For such letters to be truthful, he argues, USC must value the admission slot at $0.  This is relevant, he asserts, because after the value of goods and services received for a donation is offset against the total value of the donation, the Internal Revenue Code allows a taxpayer to take the remainder, that is, the total donation minus the value of the goods and services received, as a charitable deduction.  In

-10-

other words, an individual can take a deduction on their tax
return for the amount donated to a charity so long as they
offset the value, if any, received in return.  Therefore,
notwithstanding the fact that his "donation" aided or secured
his son's admission to USC, Wilson concludes that his tax return
is not false as to a material matter because the value of that
admission slot is $0, meaning that the amount he must offset
from his charitable deduction is also $0 and thus consequently
his deduction in the entire amount of his "donation" was proper.
Wilson's alternate calculation would not give rise to a tax
deficiency, and, absent a tax deficiency, he concludes, he
cannot be found guilty.

It is the question of a deficiency, or rather the lack
thereof, about which defendant Wilson wished to question Agent
Ranahan, and it is because the agent allegedly failed to
consider his no-deficiency theory that he argues her testimony
should be stricken.

For the reasons set out below and in the Court's previous
order, see Docket No. 2265, defendant's argument misapprehends
the charge against him.  Defendant Wilson is charged with one
count of violating 26 U.S.C. § 7206(1).  That statute makes it a
crime for any person to

> [w]illfully make[] and subscribe[] any return, statement,
> or other document, which contains or is verified by a
> written declaration that it is made under the penalties of

-11-

perjury, and which he does not believe to be true and
correct as to every material matter[.]

26 U.S.C. § 7206(1). Section 7206 concerns "Fraud and false
statements" and its first paragraph, under which defendant
Wilson is charged, addresses "Declaration[s] under penalties of
perjury". Stated concisely, it is a perjury statute. As such,
it does not demand proof of a tax deficiency. See Silverstein
v. United States, 377 F.2d 269, 270-71 (1st Cir. 1967)
(explaining that the "real issue in prosecutions under [26
U.S.C. § 7206(1)] is defendant's state of mind in reporting his
income" and that defendant's alternative calculation, not
admitted by the trial court, "casts no light on the question
whether defendant innocently overlooked his gross receipts").

The First Circuit, along with numerous other federal courts
of appeals, has concluded that a tax deficiency is not an
element of § 7206(1). United States v. DeRico, 78 F.732, 736
(1st Cir. 1996) (stating that the government "need not prove an
actual tax deficiency in any false subscription case in order to
demonstrate that a taxpayer's false statement was material"),
see also United States v. Huynh, 721 F. App'x 655, 657 (9th Cir.
2018) (stating that "the challenged instruction is consistent
with the principle that the existence of a tax deficiency is not
an element of this crime under Section 7206(1)") (internal
punctuation omitted) (citing, inter alia, United States v.

-12-

**Add.57**

Marashi, 913 F.2d 724, 736 (9th Cir. 1990)) (explaining that
"Section 7206(1) is a perjury statute; it is irrelevant whether
there was an actual tax deficiency"), United States v.
Giambalvo, 810 F.3d 1086, 1097 (8th Cir. 2016) (stating that
"[n]either §§ 7212(a) nor 7206(1) require proof of a tax
deficiency"), United States v. Tarwater, 308 F.3d 494, 504 (6th
Cir. 2002) (explaining that "Section 7206 is a perjury statute
that criminalizes lying on any document filed with the IRS. It
does not require the prosecution to prove the existence of a tax
deficiency"), United States v. Lassiter, 819 F.2d 84, 87-88 (5th
Cir. 1987) (explaining that § 7206 "requires the government to
prove neither intent to avoid the payment of taxes nor
additional tax due").

The materiality element of § 7206(1) demands, in contrast,
not that a deficiency exists but rather that "the alleged false
statement at issue could have influenced or affected the IRS in
carrying out the functions committed to it by law." DeRico, 78
F.3d at 736. A false statement is material even if it, inter
alia, is only likely to influence the calculation of tax due and
payable, United States v. Griffin, 524 F.3d 71, 76-77 (1st Cir.
2008), or has the potential for hindering the IRS's efforts to
monitor and verify tax liability, DeRico, 78 F.3d at 736 n.1.
For example, in DeRico, the First Circuit considered it a
straightforward matter that a gross receipts entry, which was

-13-

**Add.58**

the allegedly false statement at issue in that case, "has the potential to affect a legitimate function of the IRS", finding fault only in the district court's failure to present the question to the jury. DeRico, 78 F.3d at 736. Further, in Griffin, the First Circuit stated that a jury instruction that a false statement was material if it made a difference as to the amount owed was "more narrow than necessary" and increased the government's burden of proof. Griffin, 524 F.3d at 76. In neither of these cases nor in any other federal appellate decision of which this Court is aware was a finding of a tax deficiency a prerequisite for the satisfaction of § 7206(1)'s materiality element.

Materiality is a mixed question of law and fact and thus a question for the jury. DeRico, 78 F.3d at 736. The Court does not presume to usurp the jury's role as finder of fact and will instruct on materiality at the appropriate time. Until then, however, the Court will not allow the admission of evidence irrelevant to the materiality element as that element has been understood by First Circuit and Supreme Court precedent, nor strike testimony which properly goes to it.

In sum, defendant Wilson would be entitled to present evidence of the absence of a tax deficiency if he were prosecuted under a statute that put the deficiency at issue. Such is the direction the Supreme Court has given in Boulware v.

-14-

<u>United States</u>, 552 U.S. 421 (2008).  Contrary to defendant's

arguments, however, the question of a deficiency is not an

element of § 7206(1), and thus he is not entitled to present an

alternate tax calculation.  See <u>Taylor</u> v. <u>Illinois</u>, 484 U.S.

400, 410 (1988) (holding that the accused does not have an

"unfettered right" to offer testimony otherwise inadmissible

under the rules of evidence).  For the same reason, Agent

Ranahan's testimony was not improper and need not be stricken.

Her statements were proper as to materiality and her failure to

consider defendant's no-deficiency theory was, as has been

explained, of no moment.  Therefore, defendant's motion to

strike the testimony of Agent Ranahan (Docket No. 2321) is

**DENIED**.

**VII.  Defendants' Motion to Admit Exhibits 1219 and 1249 as
State of Mind Evidence (Docket 2309).**

Defendants have moved to admit Exhibit 1219, an email sent

from Scott Simon to Donna Heinel, and Exhibit 1249, another

version of the same (Docket No. 2309).  That email contains an

attachment with information on certain athletic rosters.  With

respect to the men's golf team, the spreadsheet states

"Significant donor's son on roster.  Practices only.  Unique

scenario for this year."  For the men's tennis team, the

spreadsheet states "Two significant donor's sons on roster.

Practice only.  Unique scenario for this year."  Defendants

-15-

**Add.60**

argue that the exhibit is relevant to show that USC had donors'
children on athletic rosters as practice players.  They further
contend that it can be admitted as evidence of state of mind and
knowledge as to Simon and Heinel.

The government argues that the two exhibits are not
admissible because they 1) are not relevant, 2) are inadmissible
hearsay and 3) should be excluded Federal Rule of Evidence 403.

First, the government states that the two exhibits concern
rosters significantly post-dating the admissions of defendants'
children to USC.  Thus, it argues that admission of the exhibits
would contravene the Court's prior orders limiting relevant
evidence to that which would indicate that, at the time
defendants entered into the alleged conspiracy, they knew of the
admission, if any, by USC of unqualified students whose parents
had made large donations to the school.

Second, the government argues that the exhibits are not
encompassed by the hearsay exception contained within Rule
803(3) because that exception excludes statements of a
declarant's memory or belief to prove the fact remembered.  It
further contends that an email from Simon is not admissible to
show the state of mind of Heinel, that no evidence exists
showing that Simon authored the notes and that no evidence
exists that, if he did, he did so with no time to reflect, as
Rule 803(3) requires.

Third, the government argues that, in any case, the email is inadmissible under Rule 403 because its admission would occasion a series of mini-trials about the identities of the three practice players, whether they were admitted through Subco, whether their athletic credentials were misrepresented and other matters.

Defendants rejoin that the evidence is meant for its effect on the listener, here Heinel, and that the government's remaining arguments go to the weight of the evidence, not its admissibility.

Defendants' arguments falter.  The exhibits are not admissible as state of mind evidence as to Simon.  There is no evidence that Simon was the author of the notes in the exhibits, that he wrote those notes without time to reflect or that those notes, if indeed authored by him, were contemporaneous with some relevant mental state of his.  See Colasanto v. Life Ins. Co. of North America, 100 F.3d 203, 212-13 (1st Cir. 2006).  Nor are the exhibits admissible to demonstrate their effect on Heinel. Defendants' cited case law is inapposite.  In United States v. Figueroa, certain statements made by a third-party in the course of a conversation with defendant and an undercover government agent were admitted to show defendant's knowledge of, and sophistication in, the counterfeiting industry.  818 F.2d 1020, 1026-27 (1st Cir. 2010).  Here, the exhibits defendants seek to

-17-

**Add.62**

admit do not show that Heinel entertained a belief that the admission of unqualified students through Subco using falsified athletic profiles was endorsed by Athletic Compliance, or provide a motive for Heinel's actions.  See <u>United States</u> v. <u>Bailey</u>, 270 F.3d 83, 87 (1st Cir. 2001).

In any event, admission of the exhibits would not be permissible under Rules 401 and 403.  The notes, by their own terms, state that the practice players are on the roster as a "[u]nique scenario for this year."  They do not address, and thus are not probative of, USC's policies or expectations with respect to admissions and donations, let alone the Subco process, the athletic talents of the practice players or the circumstances of their admission to USC.

For the foregoing reasons, defendants' motion to admit Exhibit 1219 and Exhibit 1249 (Docket No. 2309) is **DENIED**.

**VIII.  Defendants' Motion to Admit Evidence (Docket No. 2283).**

Defendants contend that the Court erred in refusing to allow the introduction of extrinsic evidence for impeachment and substantive purposes during Chassin's cross-examination.  They submit that Chassin was untruthful when she testified about the Admissions Department and Subco and that they are entitled to introduce impeachment evidence as prior inconsistent statements under Fed. R. Evid. 613 and as extrinsic evidence bearing on a material issue.  Defendants also claim that Chassin opened the

-18-

door to impeachment of a non-testifying declarant under Fed. R. Evid. 806 when she testified as to the views and knowledge of other admissions officers, specifically Timothy Brunold ("Brunold"), and that the proffered evidence is independently admissible as business records, showing state of mind, and/or falling under the residual clause of Fed. R. Evid. 807.

The government responds that the proffered evidence is irrelevant and inadmissible because it: (1) is extrinsic, (2) does not bear on the defendants' culpability and (3) has previously been ruled as such by this Court.  Pointing out that most of the evidence that the defendants seek to admit consists of documents that Chassin has never seen, the government asserts that Fed. R. Evid. 613 is immaterial.  Moreover, the government maintains that the proffered evidence is not inconsistent with Chassin's testimony.

In accordance with the Court's prior ruling, the proffered evidence, which consists largely of communications that the defendants did not receive, about students they did not know and admissions practices that were not relevant to their children, is irrelevant and inadmissible.  Moreover, it is not proper impeachment evidence under Fed. R. Evid. 613 because it does not include statements made by Chassin.  To the extent that Chassin represented the views of the Admissions Department as a whole, or specific employees of that Department, the Court does not

-19-

believe that these representations are subject to attack under
Fed. R. Evid. 806. Defendants' motion to admit evidence (Docket
No. 2283) is **DENIED**.

### IX. Defendants' Motion to Compel Testimony of Scott Simon (Docket No. 2286).

Defendants proffered no evidence to suggest that they had
any knowledge of the students referred to in the document at
issue or their admissions processes. As the Court has
repeatedly ruled, such evidence is irrelevant to the charges at
issue. Moreover, the evidence does not impeach Chassin's
testimony that donations were not considered in the admissions
process for athletes because the document does not refer to
admissions at all but rather to some practice players being
related to significant USC donors. For these reasons, the Court
need not determine whether the relevant evidence is a business
record pursuant to Fed. R. Evid. 803(6), and defendants' motion
(Docket No. 2286) is **DENIED**.

### X. Non-Party Gigi Simon's Motion to Intervene and Quash a Trial Subpoena (Docket No. 2311).

Non-party Gigi Shapiro has moved to intervene and quash a
trial subpoena served upon her by defendant Gamal Abdelaziz
(Docket No. 2311). She argues that the subpoena is unreasonable
and oppressive because 1) it seeks irrelevant testimony with
respect to unknown students and 2) she is not able to certify
the "notes" section of the documents that defendants seek to

admit as business records.  She states that the documents that
defendants are seeking to admit through her are the same as
those that defendants have sought to admit through Scott Simon,
the Associate Vice President for the Office of Athletic
Compliance at the University of Southern California ("USC").

The Court has denied defendants' motion to compel testimony
of Scott Simon (Docket No. 2286).  See IX supra.  The
circumstances as to Shapiro are materially identical.
Therefore, non-party Gigi Shapiro's motion to intervene and
quash defendants' trial subpoena is **ALLOWED**.

### XI.  Non-Party University of Southern California's Motion to Quash Trial Subpoenas (Docket No. 2287).

USC seeks to quash defendants' trial subpoenas, attesting
that the defendants have failed to provide USC with the specific
records they seek.  Defendants finally provided USC with the
list of documents that they seek a record keeper to certify on
the evening of September 28, 2021.

To the extent that the defendants' have supplied USC with a
list of materials at issue, the motion is **DENIED** as moot.  To
the extent that defendants seek materials concerning the
school's general admissions practices and the admission of
students unrelated to this case, the motion to quash (Docket No.
2287) is **ALLOWED**.  As articulated above, such evidence would be
admissible only if defendants show that they were aware of an

-21-

alleged USC policy or practice prior to the events that are the
subject matter of the indictment in this case.  Beyond these
parameters, such evidence does not relate to the crimes charged
against the defendants.

**XII.  Defendants' Motion for Reconsideration of Evidentiary
Rulings on Exhibits 1254, 1255 and 1540 (Docket No.
2289).**

The parties have stipulated that these exhibits, together
with Exhibit 714 proffered by the government, may be admitted
into evidence and therefore defendants' motion is **DENIED** as
moot.

**XIII.  Defendants' Motion to Exclude Evidence (Docket No. 2295).**

Defendants motion to exclude testimony of IRS Agent Colleen
Ranahan who testified as a summary witness is **DENIED** as moot.
With respect to defendants' request for curative instructions
pertaining to Special Agent Keating's testimony, the motion is
**DENIED**.  Special Agent Keating made clear that her testimony did
not provide or supplant legal analysis and was not based on any
specialized knowledge within the scope of Fed. R. Evid. 702.
See Fed. R. Evid. 701.  With respect to the testimony of both
Special Agent Keating and Agent Ranahan, the Court excluded any
testimony that was intended to instruct on the law.

-22-

**Add.67**

**So ordered.**

\_/s/ Nathaniel M. Gorton\_\_\_
Nathaniel M. Gorton
United States District Judge

Dated October 1, 2021

United States District Court
District of Massachusetts

```
_____
                                  )
United States of America,         )
                                  )
           v.                     )    Criminal Action No.
                                  )    19-10080-NMG
Gamal Abdelaziz and John Wilson,  )
                                  )
           Defendants.            )
_____)
```

MEMORANDUM & ORDER

GORTON, J.

On October 8, 2021, after a 20-day jury trial, defendant
Gamal Abdelaziz was convicted of one count of conspiracy to
commit mail and wire fraud and honest services mail and wire
fraud, in violation of 18 U.S.C. § 1349, and one count of
conspiracy to commit federal programs bribery, in violation of
18 U.S.C. § 371. Defendant John Wilson was convicted of one
count of conspiracy to commit mail and wire fraud and honest
services mail and wire fraud, in violation of 18 U.S.C. § 1349,
one count of conspiracy to commit federal programs bribery, in
violation of 18 U.S.C. § 371, two substantive counts of federal
programs bribery, in violation of 18 U.S.C. § 666, and one count
of filing a false tax return, in violation of 26 U.S.C. § 7206.

At the close of the government's case, the defendants moved
for judgments of acquittal under Federal Rule of Criminal
Procedure 29 (Docket No. 2330), which they renewed at the close

-1-

**Add.69**

of the evidence (Docket No. 2351).  Following the verdict, the

defendants again renewed their motions and moved for a new trial

under Federal Rule of Criminal Procedure 33 (Docket No. 2412).

The government opposes all pending motions.  For the reasons

that follow, the defendants' motions will be denied.

**I.  Background**

The facts underlying the present case have been recited on

several occasions. See, e.g. Docket Nos. 1169 and 1334.  For

present purposes, it suffices to recount that the defendants,

along with over a dozen other alleged co-conspirators, were

indicted in March, 2019, and charged with the above-listed

crimes in connection with the college admissions of several of

their respective children.  Wilson and Abdelaziz, with the aid

of William "Rick" Singer and others, were alleged to have each

fraudulently designated a child as an athletic recruit to secure

that child's admission to the University of Southern California

("USC").  The indictment further alleged that Wilson, again with

the aid of Singer, attempted to gain admission for his twin

daughters to Stanford and Harvard, respectively, by similar

means.  In September, 2021, this case proceeded to a jury trial

which continued for four weeks and resulted in the conviction of

both defendants on all charges tried.

In their motions for judgment of acquittal and a new trial,

defendants allege error in essentially every ruling made by the

**Add.70**

Court during their trial, and in numerous orders issued by the
Court during the two and a half years that this case has been
pending.  With respect to a majority of those rulings,
defendants incorporate by reference their prior memoranda in
support of motions, previously denied, without substantial
argument or explanation.  As to those for which they do provide
elaboration, their arguments are not materially different from
those previously made, and the Court finds them no more
convincing for their repetition.  Accordingly, the Court
specifically addresses herein only those disputations that raise
issues which the Court has not previously considered and denied.

## II.  Motion for Acquittal

### A. Legal Standard

Under Fed. R. Crim. P. 29(c), the Court "may set aside the
verdict and enter an acquittal".  In ruling upon a motion for
judgment of acquittal under Rule 29, the Court must "consider
the evidence as a whole taken in the light most favorable to the
government" and decide whether a rational jury could have found
guilt beyond a reasonable doubt. United States v. Smith, 680
F.2d 255, 259 (1st Cir. 1982).  If the guilty verdict is
supported by a "plausible rendition" of the record, the Court
must not disturb it. United States v. Moran, 312 F.3d 480, 487
(1st Cir. 2002).

-3-

**Add.71**

## B. Application

The defendants argue that they are entitled to a judgment of acquittal because the government has purportedly failed to prove any of the elements of each of the charged crimes. <u>See</u> Docket No. 2330 at 2. They challenge every aspect of their conviction as resting on a factually deficient basis and contend that for numerous reasons their convictions are unsupportable as a matter of law.

Those arguments are without merit. While the Court does not find it necessary to revisit each of the nearly 250 exhibits and the trial testimony of more than a dozen witnesses, the evidence presented at trial offered the jury, on every count, a substantial basis for its guilty verdict. That was true both at the time the government rested and at the close of all of the evidence. <u>See</u> Fed. R. Crim. P. 29(b).

The defendants devote most of their Rule 29 motions to contesting questions of law upon which the Court has already ruled. For instance, they contend that admissions slots are not property, that there was no tangible economic harm to the victim university and thus no bribe and that co-conspirator statements should not have been admitted. The Court has addressed those issues and declines to reconsider its rulings. <u>See</u> Docket No. 1334 (holding that admissions slots constitute property and that the payments to USC could constitute bribes), Docket No. 2405 at

-4-

70:25-71:6 (holding that the government satisfied its burden to
admit co-conspirator statements under <u>United States</u> v.
<u>Petrozziello</u>, 548 F.2d 20 (1st Cir. 1977)).

Finally, the two contentions that defendants raise that are
not duplicative of previously rejected arguments are confronted
here.

### i.  **Constructive amendment and prejudicial variance**

First, the defendants argue that the government's use of
the term "athletic recruitment slots" at trial constituted a
constructive amendment or a prejudicial variance to the fourth
superseding indictment which charged them, in relevant part,
with participating in a conspiracy the object of which was to
secure admissions slots.

A constructive amendment of an indictment occurs when its
charging terms are altered, literally or in effect, by the
government after the grand jury has last passed on them. <u>United
States</u> v. <u>Brandao</u>, 539 F.3d 44, 57 (1st Cir. 2008).  For its
part, a variance occurs when the indictment is unamended but the
facts proven at trial differ from those alleged in the
indictment. <u>United States</u> v. <u>Fisher</u>, 3 F.3d 456, 462-63 (1st
Cir. 1993).  While a constructive amendment is prejudicial <u>per
se</u>, a variance is only prejudicial if it affected the
defendant's substantial rights, that is, his right to have

**Add.73**

knowledge of the charges against him sufficient to prepare an effective defense. Id.

Neither a constructive amendment nor a variance occurred in this case. The fourth superseding indictment and the government's theory at trial were materially identical. They both identified athletic recruitment as the means employed by the defendants to obtain admissions slots for their children. For instance, as to defendant Abdelaziz, the fourth superseding indictment alleged that he paid Singer $300,000

> to facilitate his daughter's admission to USC as a purported basketball recruit [and that Donna Heinel] obtained the subcommittee's approval to admit her to USC as a basketball recruit.

Docket No. 732 at 18. With respect to defendant Wilson, the fourth superseding indictment alleged that he, too, paid Singer to

> facilitate his son's admission to USC as a purported water polo recruit [and that the] USC subcommittee for athletic admissions approved the admission of Wilson's son as a water polo recruit.

Id. at 35-36 (capitalization removed). It alleged similar facts, i.e. the use of fake athletic credentials to obtain admission of Wilson's daughters to Harvard and Stanford. Id. at 37-38. At trial, the government presented evidence showing that the defendants sought admission for their children in that manner and thus there was no constructive amendment or variance.

**Add.74**

### ii. Venue

Second, the defendants' argument that there was insufficient evidence of venue with respect to Counts I and II is unavailing.  As the Court instructed the jury, venue requires proof only by a preponderance of the evidence. United States v. Valenzuela, 849 F.3d 477, 487 (1st Cir. 2017).  Where, as here, an alleged conspiracy spanned several jurisdictions, the defendants may be tried in any jurisdiction where any act in furtherance of the conspiracy occurred. See United States v. Uribe, 890 F.2d 554, 558 (1st Cir. 1989).  Further, in a conspiracy case, the act giving rise to venue need not be committed by the defendant. United States v. Georgiadis, 819 F.3d 4, 11 (1st Cir. 2016) (explaining that venue is proper in any district where defendant or a co-conspirator committed an overt act in furtherance of the conspiracy), Docket No. 1399 (holding the same).

Defendants contend that because the evidence was insufficient to prove a single conspiracy, venue as to each defendant must be established by that defendant's own acts.  The jury was instructed on the government's burden to prove a single conspiracy as to Counts I and II and found that such conspiracies existed.  The Court considers the defendants' argument to be without merit. See United States v. Bedini, 861 F.3d 10, 14 (1st Cir. 2017) (stating that a jury's finding of a

single conspiracy is disturbed only if there is insufficient
evidence to support it).

In any case, sufficient evidence of venue exists to support
the jury's verdict on the conspiracy counts.  For instance, the
evidence showed that, <u>inter alia</u>, 1) Singer arranged to meet
with John Wilson in Boston and called him while both were in
Boston to postpone the meeting, 2) Singer met Yale soccer coach
Rudy Meredith in Boston, 3) Singer called Heinel while in Boston
and 4) Singer called Abdelaziz while in Boston.  From this and
other evidence, the jury could, and did, reasonably conclude
that venue in Massachusetts was proper.

### III. <u>Motion for New Trial</u>

#### A. Legal Standard

District courts may allow a motion for a new trial "if the
interests of justice so require". Fed. R. Crim. P. 33(a).  While
the Court's authority to order a new trial is greater than its
authority to grant a motion for acquittal, <u>see</u> <u>United States</u> v.
<u>Ruiz</u>, 105 F.3d 1492, 1501 (1st Cir. 1997), the remedy is
nevertheless "sparingly used", <u>United States</u> v. <u>Merlino</u>, 592
F.3d 22, 32 (1st Cir. 2010).  A new trial is appropriate "only
where there would be a miscarriage of justice and where the
evidence preponderates heavily against the verdict". <u>Id</u>.
(quoting <u>United States</u> v. <u>Wilkerson</u>, 251 F.3d 273, 278 (1st Cir.
2001)).

**B. Application**

As with their motion for acquittal, defendants proffer numerous arguments in favor of a new trial. The vast majority of those arguments have been previously considered and rejected by the Court. Two novel claims addressed here for the first time fare no better.

**i. The wiretaps**

Defendants allege that a new trial is required because the government withheld "crucial exculpatory evidence" relating to the consensual wiretaps of Singer's phone in violation of Brady v. Maryland, 373 U.S. 83 (1963). The evidence at issue is a fax cover sheet dated September 28, 2018, and a fax response cover sheet of the same date. The cover sheets pertain to the transmission of Singer's consent to the government's wiretap of his phone to AT&T. Both cover sheets state that the consensual wiretap of Singer's phone would end December 26, 2018.

The Brady decision compels prosecutors to reveal material exculpatory and impeaching evidence. United States v. Laureano-Salgado, 933 F.3d 20, 26 (1st Cir. 2019). A motion for a new trial grounded on newly discovered evidence usually requires the moving defendants to demonstrate, along with the prior unavailability of the evidence and their own diligence, the probability that an acquittal would have resulted from its introduction. See United States v. Wright, 625 F.2d 1017, 1019

-9-

**Add.77**

(1st Cir. 1980).  On the other hand, a new trial claim based on evidence previously unavailable to the defendant due to a <u>Brady</u> violation imposes a less onerous standard with respect to the prejudice element, demanding only that the defendant show a reasonable probability that the proceeding would have been different if the evidence had been available. <u>See</u> <u>United States</u> v. <u>Maldonado-Rivera</u>, 489 F.3d 60, 66 (1st Cir. 2007).

As this Court has previously held, a wiretap may be maintained by court order or by the consent of one of the recorded parties. Docket No. 2211, <u>see</u> <u>United States</u> v. <u>Conley</u>, 531 F.3d 56, 58 (1st Cir. 2008) (explaining that 18 U.S.C. 2511(2)(c) "authorizes telephone calls to be monitored if one party to the call consents to the monitoring") (O'Connor, J.). If adequate consent exists, a court order is superfluous; if not, a court order is required. <u>See</u> 18 U.S.C. § 2511(2)(a), (c)-(d).  Thus, for defendants to prevail on their <u>Brady</u>-based claim for a new trial, the fax cover sheets must, 1) constitute <u>Brady</u> material and, 2) demonstrate that for at least some of the relevant period both forms of authorization were lacking.

To that end, defendants direct the Court to what they contend are gaps in the authorization of the wiretap, i.e. periods where neither consent nor a valid court order existed. First, they maintain that the fax cover sheets show that there was a period of time on September 28, 2018, when the government

-10-

**Add.78**

was unlawfully monitoring Singer's phone which taints the entire consensual monitoring period. Second, they submit that, because the fax cover sheets stated that the end date for consensual monitoring was December 26, 2018, any recordings thereafter must be suppressed, including several in which defendants made incriminating statements.

With respect to the September, 2018, surveillance, defendants contend that the court-ordered wiretap of Singer's phone ended at midnight on September 27, 2018. Because the fax sheet shows that Singer's consent was transmitted to AT&T on September 28, 2018, defendants conclude that there must have been at least some time on September 28 during which the government was unlawfully monitoring Singer's phone. The government rejoins that the reference to September 27, made in its motion to seal the wiretap, was "simply an error" and one which the defendants have known about for more than two years, citing its admission of that error in Docket No. 1138, filed April 30, 2020. Further, it asserts that the intercepted calls were in fact sealed through September 29, 2018, notwithstanding its error in the motion to seal and defendants' argument to the contrary.

This Court (Burroughs, J.) initially authorized a wiretap of Singer's phone on June 5, 2018. On August 30, 2018, the Court allowed the last of several 30-day extensions of that

-11-

**Add.79**

wiretap which, as a result, expired on September 29, 2018.  The
recordings made during the final 30-day extension were sealed on
October 2, 2018.  In the sealing motion, submitted to the Court
after the wiretap expired, the government erroneously referred
to September 27, 2018, i.e. 28 days after the August 30 issuance
of the 30-day extension, as its expiration date.  The sealed
disk, however, contained the wiretap recordings through
September 29, 2018, a fact which other related documents make
clear. See United States v. Heinel, No. 19-10081-IT, Docket No.
969-1 at 14 (D. Mass. Nov. 1, 2021).  While defendants make much
of the mistaken representation, the Court is underwhelmed.  The
government was operating under a court-authorized wiretap
through September 29 and under a consensual wiretap from, at
least, 11:03 a.m. on September 28, when AT&T confirmed receipt
of the transmission of Singer's consent. Id. at 8-9.  At no
point in September, 2018, was there an illegal wiretap of
Singer's phone.

In any event, the Court does not perceive how a failure to
seal tapes properly could retroactively render illegal the
court-authorized wiretap.  Rather, the erroneous reference to
the wiretap's end date would, at most, cast in doubt the
admissibility of the September 28 and 29 recordings. See United
States v. Mora, 821 F.2d 860, 868 (1st Cir. 1987).  On September
28, however, no pertinent calls on the wire occurred until after

the government received the second fax cover sheet from AT&T,
confirming receipt of Singer's consent to have his phone
monitored. <u>See</u> <u>United States</u> v. <u>Heinel</u>, No. 19-10081-IT, Docket
No. 969-1 at 9 (D. Mass. Nov. 1, 2021).  Thus, even if the Court
concluded that the erroneous reference in the motion compromised
the sealing of the September 28 and 29 calls, all recordings
made on those two days also fell within the ambit of the
consensual wiretap.

Turning to the December monitoring, defendants' motion
ignores the fact that Singer consented to the extension of the
consensual wiretap on December 20, 2018.[1]  Singer's consent was
transmitted to AT&T the next day, that is, five days before the
prior consent was to expire, and AT&T confirmed receipt on the
same day. <u>Id</u>. at 16-17.

In conclusion, the evidentiary value of the fax cover
sheets is insufficient to satisfy the <u>Brady</u> standard for a new
trial because the cover sheets would have served only to
corroborate that, at all times, government surveillance of
Singer's phone was conducted pursuant to a valid wiretap,
whether Court-ordered or consensual.  Defendants' argument that
that there were periods of unlawful surveillance is belied by

---

[1] Defendants also fail to note that in March, 2020, they appended
that signed consent form to a memorandum they filed in support
of a motion to dismiss. <u>See</u> Docket No. 972-39 at 35-36.

-13-

**Add.81**

relevant evidence introduced at trial and by the fax cover sheets themselves.  By the same token, defendants have not made out a predicate <u>Brady</u> violation because the allegedly suppressed evidence is neither material nor favorable. <u>See</u> <u>Bucci</u> v. <u>United States</u>, 662 F.3d 18, 38 (1st Cir. 2011).

Finally, defendants propose an alternate route to a new trial through <u>Brady</u>.  Defendants insist that regardless of the legality of the wiretaps, they should be suppressed (and the motion for a new trial granted) because the government failed to disclose the "plainly exculpatory" fax cover sheets for over two years, after having previously failed to disclose certain notes Singer made on his iPhone.  Put differently, they contend that the alleged <u>Brady</u> violation requires suppression of the wiretaps under the Court's general supervisory power and once the wiretaps are suppressed, defendants' motion for a new trial must be allowed. <u>See</u> <u>United States</u> v. <u>Horn</u>, 29 F.3d 754, 760 (1st Cir. 1994) (detailing the contours of that supervisory power). While the Court possesses such power, it is a "potent elixir" not to be "casually dispensed". <u>United States</u> v. <u>Santana</u>, 6 F.3d 1, 10 (1st Cir. 1993).  Because the Court concludes that the fax cover sheets are neither material nor exculpatory, suppression of the wiretaps is unwarranted.

### ii.  The government's closing

Finally, defendants argue that failure to sever their trials was error.  This is not the first time they have made that argument, see, e.g. Docket No. 1414 (denying defendants' motion to sever), but its present iteration contains a novel wrinkle, namely, that the government's rebuttal closing was unfairly prejudicial.

At trial, Wilson and Abdelaziz essentially relied upon the same defense, i.e. notwithstanding the fact that Singer emailed them fake profiles, they never saw those profiles because they never read the emails.  Consequently, they take umbrage with the prosecutor's suggestion that it was "incredible unbelievable bad luck" that they each missed emails from Singer containing their children's fake profiles and contend that the failure to sever allowed the prosecutor to cast unfair aspersions on their defense by implying that, because both relied upon it, it was less likely to be true.  The government responds that it was entitled to argue that defendants' explanations were implausible and that in any event, they waived the argument by failing to raise an objection at the time of the closing.

When considering a motion for a new trial based on a prosecutor's closing argument, the court must determine whether the comments were improper and, if so, whether they "so poisoned the well" as to necessitate a new trial. United States v.

Carpenter, 494 F.3d 13, 23 (1st Cir. 2007). Improper argument

can include the use of inflammatory or pejorative language,

distracting commentary, disregard of court orders or warnings

and misstatements of law or fact. United States v. Brissette,

No. 16-10137, 2020 U.S. Dist. LEXIS 24861 at *100-01 (D. Mass.

Feb. 12, 2020) (citing United States v. Azubike, 504 F.3d 30,

38-39 (1st Cir. 2007)). It does not, however, demand a new

trial unless prejudice results. United States v. Giorgi, 840

F.2d 1022, 1037 (1st Cir. 1988). In determining the prejudicial

effect, if any, of improper argument, a Court considers factors

such as the extent of the improper remarks, the context and the

weight of the evidence against the defendants. Id.

    In addition, a defendant's failure to object to closing

argument contemporaneously generally bars that defendant from

later moving for a new trial on that basis. See Computer Sys.

Eng'g, Inc. v. Qantel Corp., 740 F.2d 59, 69 (1st Cir. 1984).

    The defendants first raised their objection to the

prosecutor's rebuttal closing in their renewed motion for

judgment of acquittal and a new trial and therefore it is

untimely. Even if the Court were to excuse the untimeliness,

the government's rebuttal was neither improper nor unfairly

prejudicial. The prosecutor's comments were not inflammatory,

pejorative or otherwise improper, and defendants were not

prejudiced by the prosecutor addressing the implausibility of

**Add.84**

their defenses when the issue of each defendant's

inattentiveness had been salient throughout the trial.

<strong>ORDER</strong>

For the foregoing reasons,

- defendants' motion for judgment of acquittal under

  Federal Rule of Criminal Procedure 29 (Docket No.

  2330) is **DENIED;**

- defendants' renewed motion for judgment of acquittal

  (Docket No. 2351) is **DENIED**; and

- defendants' renewed motion for judgment of acquittal

  and motion for new trial (Docket No. 2412) is **DENIED.**

**So ordered.**


                                    _/s/ Nathaniel M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge

Dated December 20, 2021

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| JOHN WILSON | Case Number: **1: 19  CR 10080  - 17  - NMG** |
| | USM Number: 75184-479 |
| | Michael Kendall, Esq. |
| | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, 13ss
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 18 U.S.C. §§ 1349, ▾ 1341, 1343, and 1346 ▾ | Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail ▾ and Wire Fraud ▾ | 02/28/19 ▾ | 1ss |
| 18 U.S.C. §§ 371 and ▾ 666(a)(2) ▾ | Conspiracy to Commit Federal Programs Bribery | 02/28/19 ▾ | 2ss |

    The defendant is sentenced as provided in pages 2 through   9   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/16/2022
Date of Imposition of Judgment

*Nathaniel M Gorton*
Signature of Judge

The Honorable Nathaniel M. Gorton ▾
U.S. District Judge ▾
Name and Title of Judge

*02/18/2022*
Date

**Add.86**

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 1A

|  | Judgment—Page | 2 | of | 9 |

DEFENDANT:JOHN WILSON
CASE NUMBER:  **1: 19  CR  10080  - 17  - NMG**

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | | Nature of Offense | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. §§ 1343 | ▼ | Wire Fraud and Honest Services Wire Fraud | ▼ 12/11/18 | 6ss, 8ss, 9ss |
| and 1346 | ▼ | | | |
| 8 U.S.C §666(a)(2) | ▼ | Federal Programs Bribery | ▼ 12/11/18 | 11ss, 12ss |
| 26 U.S.C. § 7206(1) | ▼ | Filing a False Tax Return | ▼ 03/26/18 | 13ss |

**Add.87**

AO 245B (Rev. 11/16)  Judgment in Criminal Case
            Sheet 2 — Imprisonment

DEFENDANT: JOHN WILSON

CASE NUMBER:  **1: 19  CR  10080  - 17  - NMG**

Judgment — Page  **3**  of  **9**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:   **15  month(s)**   ▼

This term consists of terms of 15 months on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, 12ss, and 13ss, to be served concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:

The Court makes a judicial recommendation that the Defendant be designated to FMC Devens, if deemed to be the appropriate security level.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a _____ , with a certified copy of this judgment.

_____
                  UNITED STATES MARSHAL

By _____
                  DEPUTY UNITED STATES MARSHAL

Add.88

AO 245B (Rev. 11/16)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT: JOHN WILSON

Judgment—Page __4__ of __9__

CASE NUMBER: 1: 19 CR 10080 - 17 - NMG

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :    2  year(s)  ☑

This term consists of terms of 2 years on Counts 1ss, 2ss, 6ss, 8ss, 9ss, 11ss, and 12ss, and a term of one (1) year on Count 13ss, such terms to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☑ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add.89

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                Sheet 3A — Supervised Release

| | Judgment—Page | 5 | of | 9 |
|---|---|---|---|---|

DEFENDANT: JOHN WILSON
CASE NUMBER:    1: 19 CR 10080 - 17 - NMG

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**Add.90**

AO 245B(Rev. 11/16)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 9 |

DEFENDANT: JOHN WILSON
CASE NUMBER:   1: 19  CR  10080   - 17   - NMG

## SPECIAL CONDITIONS OF SUPERVISION

1. You must pay restitution to the IRS in the amount of $88,546 according to a court-ordered repayment schedule.

2. You must meet with the Internal Revenue Service within the first six (6) months of the period of supervision in order to determine your prior tax liability and you are to file tax returns and pay any past or future taxes due.

3. You must complete 400 hours of community service at an agency approved by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorney's Office.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

| | |
|---|---|
| DEFENDANT: JOHN WILSON | Judgment — Page ___7___ of ___9___ |
| CASE NUMBER:  **1: 19  CR  10080  - 17  - NMG** | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 800.00 | $ | $ 200,000.00 | $ 88,546.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| IRS | | $88,546.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $         0.00 | $     88,546.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

| | Judgment—Page | 8 | of | 9 |
| --- | --- | --- | --- | --- |

DEFENDANT: JOHN WILSON
CASE NUMBER:   1: 19  CR  10080   - 17   - NMG

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

It is further ordered that the defendant shall pay to the United States a fine of $200,000.00.

This consists of $100.000.00 on Count 1ss and $100,000.00 on Count 2ss.

It is further ordered that the defendant shall make a lump sum payment of $200,000.00 which is due within 90 days of sentencing.

Any fine imposed is to be continued to be paid until the full amount, including any interest required by law, is paid. All fine payments shall be made to the Clerk, U.S. District Court. The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the fine remains unpaid.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

| | Judgment — Page 9 of 9 |
|---|---|

DEFENDANT: JOHN WILSON
CASE NUMBER:    1: 19 CR 10080 - 17 - NMG

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___800.00___    due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
    See Page 8

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

**Add.94**