Nos. 22-1129, 22-1138

# In the United States Court of Appeals for the First Circuit

Appeal No. 22-1129

## United States of America, Appellee

### v.

## Gamal Abdelaziz, Defendant-Appellant

Appeal No. 22-1138

## United States of America, Appellee

### v.

## John Wilson, Defendant-Appellant

On Appeal from a Judgment in a Criminal Case,
Entered in the United States District Court
For the District of Massachusetts

## Redacted Brief for the United States

Rachael S. Rollins
United States Attorney

Alexia R. De Vincentis
Donald C. Lockhart

Ian J. Stearns
Stephen E. Frank
Leslie A. Wright
Kristen A. Kearney
Assistant U.S. Attorneys
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... vi

STATEMENT OF ISSUES ........................................................................1

STATEMENT OF THE CASE.....................................................................1

I.    GAMAL ABDELAZIZ .....................................................................3

      A.    "We Will Use this One": The Falsified Basketball Profile...................3

      B.    "The Court is Like My Art Studio": Admission as a
            Recruit .........................................................................7

      C.    "Wire Sent Today": The Bribe and Fake Charitable
            Receipt Letter ...............................................................11

      D.    "I Love It": The Tapes, False Cover Story, and Fake Injury..............14

II.   JOHN WILSON..........................................................................18

      A.    Bribes to Secure Wilson's Daughters' Admission as Fake
            Athletes.......................................................................19

            1.    "I'll Make Them A Sailor or Something": The
                  Wiretap Call .......................................................19

            2.    "[W]hat If They're Not Really That Good?"...........................22

            3.    "Scorekeeper" or "Water Girl": The First $500,000
                  Bribe..............................................................23

            4.    "He's Got to Actually Have Some Sailors"............................25

            5.    "The Mascot": The Second $500,000 Bribe............................26

      B.    Wilson's Bribery and Tax Fraud for His Son's Phony
            Recruitment ...................................................................28

i

1.  "Not Get in the Pool": The Deal to Recruit Wilson's Son.......................................................................29

2.  "Embellish His Profile More": The Falsified Athletic Profile.........................................................30

3.  "Immediate Impact Player": Admission as a Recruit ...............32

4.  "Consulting or Whatever": The Bribe and False Tax Return ........................................................................33

SUMMARY OF ARGUMENT ..............................................................36

ARGUMENT ..........................................................................................42

I.   DEFENDANTS' CORRUPT *QUID PRO QUO* PAYMENTS WERE BRIBES, AND THE JURY INSTRUCTIONS DO NOT ENTITLE THEM TO A NEW TRIAL ..................................................................42

     A.   Defendants' Corrupt *Quid Pro Quo* Payments Were Bribes.......................................................................43

          1.  The Definition of Bribery ........................................44

     B.   Defendants' Counterarguments Fail ...................................48

          1.  "Corruptly" Giving ...................................................48

          2.  "Anything of Value" .................................................55

          3.  "Any Person" ...........................................................59

               (a)   *Skilling*'s interpretation of §1346 ...................60

               (b)   18 U.S.C. §666.................................................62

               (c)   Consequences and Canons...............................64

     C.   Defendants' Fallback Instructional-Error Claim Fails........................66

II.    DEFENDANTS COMMITTED PROPERTY FRAUD................................70

    A.    Admissions Slots Are Property .................................................70

    B.    Defendants' Counterarguments Fail .................................................78

        1.    Admissions "Offers" .................................................79

        2.    Benefit of the Bargain .................................................80

        3.    Consequences and Canons .................................................83

III.    THE VARIANCE CLAIM LACKS MERIT .................................................84

    A.    The Instructional Claim Is Waived And Meritless ...........................85

    B.    There Was No Variance .................................................87

        1.    Standard of Review.................................................87

        2.    The Jury's Verdict was Rational.................................................88

            (a)    Common goal.................................................89

            (b)    Overlap .................................................93

            (c)    Interdependence .................................................94

        3.    The Defense Counterarguments Are Unavailing...................101

    C.    Defendants Have Failed To Carry Their Burden Of Demonstrating They Were Prejudiced By The Alleged Variance.................................................105

        1.    The Spillover Prejudice Claim Fails.........................105

        2.    The Venue Claim Fails .................................................116

    D.    Defendants Correctly Concede The Remedy Issue..........................118

IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS EVIDENTIARY RULINGS ................................................................121

    A.   Standard Of Review ........................................................................121

    B.   The USC Athletics Department Exhibits .........................................121

        1.   Rule 403 Alone Sufficed to Warrant Exclusion ...................122

            (a)   The district court's ruling ............................................123

            (b)   Low-to-no probative value ..........................................125

                (i)   Knowledge, intent, and "good faith"..................126

                (ii)   Scope of fiduciary duty .....................................128

                (iii)   Materiality .......................................................133

            (c)   Substantial risk of the Rule 403 dangers .....................134

        2.   The Exhibits Were Full of Hearsay .......................................135

        3.   The Two Impeachment Claims Fail........................................138

    C.   The Bradshaw-Alvendia Texts........................................................141

    D.   The Starbucks Video and Other Singer Statements .........................144

        1.   The Video................................................................................145

        2.   The Other Statements............................................................148

    E.   Wilson's Own Statements ...............................................................150

    F.   Any Conceivable Error was Harmless .............................................152

V.   ABDELAZIZ'S UNPRESERVED NEW TRIAL CLAIM FAILS ............155

VI.   WILSON IS NOT ENTITLED TO A NEW TRIAL ON THE TAX
      COUNT...................................................................................156

VII.  THE SUPPRESSION CLAIM IS DOUBLY WAIVED AND
      BASELESS...............................................................................159

      A.    Background ...................................................................160

      B.    The Claim is Waived Twice Over......................................163

            1.    Defendants Have Waived Their Claim By Failing to
                  Address the District Court's Merits Ruling...........................163

            2.    The District Court Did Not Abuse Its Discretion in
                  Finding the Claim was Waived Because There Was
                  No "Good Cause" for the Late Filing ....................................164

      C.    There Is No Basis For Suppression....................................166

            1.    Defendants Misread Title III..................................................166

            2.    Suppression is Not Warranted in Any Event.........................169

CONCLUSION................................................................................173

CERTIFICATE OF COMPLIANCE........................................................174

CERTIFICATE OF SERVICE ...............................................................175

### GUIDE TO RECORD CITATIONS

The government uses the following abbreviations: it will cite Wilson's opening brief as "W-Br._" and his addendum as "W-Add._"; Abdelaziz's opening brief as "A-Br._" and his addendum as "A-Add._"; the joint appendix as "A_"; the sealed joint supplemental appendix as "SA_"; the government's supplemental appendix as "GSA_"; docket entries as "D._"; exhibits not included in an appendix as "Ex._"; the brief of *amici curiae* law professors as "LP-Br._"; the brief of *amici curiae* National Association of Criminal Lawyers and the American Board of Criminal Lawyers as "NACDL-ABCL-Br._"; and the brief of *amici curiae* former United States Attorneys as "FUSA_."

v

# TABLE OF AUTHORITIES

## CASES

*Bridge v. Phoenix Bond & Indem. Co.*,
 553 U.S. 639 (2008)................................................................79

*Buckley v. Valeo*,
 424 U.S. 1 (1976)...............................................................51

*Carpenter v. United States*,
 484 U.S. 19 (1987)..................................................... *passim*

*Cedric Kushner Promotions, Ltd. v. King*,
 533 U.S. 158 (2001)............................................... 62, 63

*Ciminelli v. United States*,
 No. 21-1170, 2022 WL 2347619 (U.S. June 30, 2022).....................84

*Cleveland v. United States*,
 531 U.S. 12 (2000).................................................... *passim*

*Dixie Mach. Welding & Metal Works, Inc. v. United States*,
 315 F.2d 439 (5th Cir. 1963) ................................................54

*Ellis v. United States*,
 313 F.3d 636 (1st Cir. 2002)...........................................165

*Evans v. United States*,
 504 U.S. 255 (1992)...........................................................52

*Gilday v. Dubois*,
 124 F.3d 277 (1st Cir. 1997)............................................172

*Griffin v. Oceanic Contractors, Inc.*,
 458 U.S. 564 (1982).................................................. 43, 44

*Heien v. North Carolina*,
 574 U.S. 54 (2014)...........................................................172

*Herring v. United States*,
 555 U.S. 135 (2009).......................................................172

*Hudson v. Michigan*,
    547 U.S. 586 (2006).........................................................................172

*Jones v. United States*,
    527 U.S. 373 (1999)...........................................................................68

*Klein v. O'Brien*,
    884 F.3d 754 (7th Cir. 2018) ...........................................................163

*Kotteakos v. United States*,
    328 U.S. 750 (1946)................................................ 84, 112, 118, 119

*Lund v. Henderson*,
    807 F.3d 6 (1st Cir. 2015)................................................................123

*Martinez v. Cui*,
    608 F.3d 54 (1st Cir. 2010)..............................................................140

*McNally v. United States*,
    482 U.S. 350 (1987)................................................ 60, 61, 71, 77, 84

*Neder v. United States*,
    527 U.S. 1 (1999).............................................................................133

*O'Neal v. McAninch*,
    513 U.S. 432 (1995).........................................................................119

*Oscanyan v. Arms Co.*,
    103 U.S. 261 (1880)...........................................................................43

*Pasquantino v. United States*,
    544 U.S. 349 (2005)................................................ 70, 71, 73, 77

*Roma Constr. Co. v. aRusso*,
    96 F.3d 566 (1st Cir. 1996)........................................................ 45, 52

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)...........................................................................77

*Salinas v. United States*,
    522 U.S. 52 (1997)...................................................................... 64, 65

*Salman v. United States*,
    580 U.S. 39 (2016)..........................................................................64

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)........................................................................66

*Skilling v. United States*,
    561 U.S. 358 (2010)................................................................ *passim*

*Thomas & Betts Corp. v. New Albertson's, Inc.*,
    915 F.3d 36 (1st Cir. 2019)..........................................................119

*United States v. Agurs*,
    427 U.S. 112 (1976)......................................................................119

*United States v. Arbelaez*,
    719 F.2d 1453 (9th Cir. 1983) ......................................................102

*United States v. Arias*,
    848 F.3d 504 (1st Cir. 2017)........................................................165

*United States v. Bedini*,
    861 F.3d 10 (1st Cir. 2017)................................................ 94, 100

*United States v. Belanger*,
    890 F.3d 13 (1st Cir. 2018)................................................ 88, 89

*United States v. Benitez-Avila*,
    570 F.3d 364 (1st Cir. 2009)........................................................137

*United States v. Berroa*,
    856 F.3d 141 (1st Cir. 2017).........................................................73

*United States v. Bertolotti*,
    529 F.2d 149 (2d Cir. 1975) ........................................................112

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) .........................................................82

*United States v. Black*,
    530 F.3d 596 (7th Cir. 2008),
    *vacated and remanded on other grounds*, 561 U.S. 465 (2010) .......................50

*United States v. Blagojevich*,
    794 F.3d 729 (7th Cir. 2015) ................................................................59

*United States v. Brandon*,
    17 F.3d 409 (1st Cir. 1994) ..................................................... 107, 134

*United States v. Breton*,
    740 F.3d 1 (1st Cir. 2014) ........................................................ 123, 147

*United States v. Brown*,
    7 F.3d 648 (7th Cir. 1993) .............................................................124

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992) .............................................................82

*United States v. Bryant*,
    655 F.3d 232 (3d Cir. 2011) .............................................................60

*United States v. Bucuvalas*,
    970 F.2d 937 (1st Cir. 1992), *abrogated on other grounds by,*
    *Cleveland v. United States*, 531 U.S. 12 (2000) ................................84

*United States v. Calderone*,
    982 F.2d 42 (2d Cir. 1992) .............................................................120

*United States v. Camacho-Santiago*,
    851 F.3d 81 (1st Cir. 2017)...............................................................89

*United States v. Cambindo Valencia*,
    609 F.2d 603 (2d Cir. 1979) ...........................................................120

*United States v. Camiel*,
    689 F.2d 31 (3d Cir. 1982) .............................................................120

*United States v. Candelaria-Silva*,
    166 F.3d 19 (1st Cir. 1999).............................................................106

*United States v. Canty*,
    37 F.4th 775 (1st Cir. 2022)..................................................... 89, 101

*United States v. Caplan*,
    No. 19-cr-10117-IT-4 (D. Mass.) ...................................................113

*United States v. Carnagie*,
    533 F.3d 1231 (10th Cir. 2008) ......................................................103

*United States v. Carter*,
    19 F.4th 520 (1st Cir. 2021) ..........................................................143

*United States v. Castleman*,
    572 U.S. 157 (2014) ........................................................................65

*United States v. Castro-Vazquez*,
    802 F.3d 28 (1st Cir. 2015) ............................................................85

*United States v. Chan*,
    981 F.3d 39 (1st Cir. 2020) ...................................................... 87, 88

*United States v. Chandler*,
    388 F.3d 796 (11th Cir. 2004) ......................................................104

*United States v. Chiu*,
    36 F.4th 294 (1st Cir. 2022) ........................................................121

*United States v. Cianci*,
    378 F.3d 71 (1st Cir. 2004) ..........................................................151

*United States v. Ciresi*,
    697 F.3d 19 (1st Cir. 2012) ................................................ 88, 94, 117

*United States v. Congo*,
    21 F.4th 29 (1st Cir. 2021) ..........................................................172

*United States v. Conley*,
    531 F.3d 56 (1st Cir. 2008) ...................................................... 166, 171

*United States v. Cordero*,
    668 F.2d 32 (1st Cir. 1981) ..........................................................116

*United States v. Crozier*,
    987 F.2d 893 (2d Cir. 1993) ..........................................................47

*United States v. Cruz-Ramos*,
    987 F.3d 27 (1st Cir. 2021) ............................................................86

*United States v. Cruz-Rodriguez,*
    541 F.3d 19 (1st Cir. 2008)....................................................... 100, 140

*United States v. Cudlitz,*
    72 F.3d 992 (1st Cir. 1996).............................................................140

*United States v. Czubinski,*
    106 F.3d 1069 (1st Cir. 1997)........................................................128

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) ...........................................................50

*United States v. De La Cruz,*
    998 F.3d 508 (1st Cir. 2021)..........................................................166

*United States v. de Leon-De La Rosa,*
    17 F.4th 175 (1st Cir. 2021)...........................................................102

*United States v. DeCologero,*
    530 F.3d 36 (1st Cir. 2008)............................................................123

*United States v. Delgado,*
    653 F.3d 729 (8th Cir. 2011) .........................................................102

*United States v. Dellosantos,*
    649 F.3d 109 (1st Cir. 2011)................................................. *passim*

*United States v. DeMizio,*
    2012 WL 1020045 (E.D.N.Y. Mar. 26, 2012)............................ 60, 61

*United States v. Dennis,*
    917 F.2d 1031 (7th Cir. 1990) .......................................................105

*United States v. Diallo,*
    40 F.3d 32 (2d Cir. 1994) .............................................................127

*United States v. Diaz,*
    597 F.3d 56 (1st Cir. 2010)...........................................................143

*United States v. Diaz-Diaz,*
    433 F.3d 128 (1st Cir. 2005)..........................................................117

*United States v. Dixon,*
   536 F.2d 1388 (2d Cir. 1976) ................................................................62

*United States v. Doherty,*
   867 F.2d 47 (1st Cir. 1989).................................................................84

*United States v. Donovan,*
   984 F.2d 507 (1st Cir. 1993)...............................................................92

*United States v. Díaz-Arias,*
   717 F.3d 1 (1st Cir. 2013)...................................................................88

*United States v. Encarnacion,*
   26 F.4th 490 (1st Cir. 2022)................................................... 124, 150

*United States v. Ernst,*
   502 F. Supp. 3d 637 (D. Mass. 2020) ........................................ 73, 79

*United States v. Escobar-de Jesús*,
   187 F.3d 148 (1st Cir. 1999)............................................................169

*United States v. Evans,*
   970 F.2d 663 (10th Cir. 1992) ........................................................104

*United States v. Fenton,*
   367 F.3d 14 (1st Cir. 2004)......................................... 85, 86, 87, 98

*United States v. Fernandez,*
   722 F.3d 1 (1st Cir. 2013)...................................................................56

*United States v. Fernandez,*
   892 F.2d 976 (11th Cir. 1989) ........................................................120

*United States v. Fields,*
   871 F.2d 188 (1st Cir. 1989)............................................................117

*United States v. Florentino-Rosario,*
   19 F.4th 530 (1st Cir. 2021)............................................................146

*United States v. Flores-Rivera,*
   787 F.3d 1 (1st Cir. 2015)................................................................106

*United States v. Frost,*
125 F.3d 346 (6th Cir. 1997) ............................................................ 71, 72, 73, 74

*United States v. George,*
761 F.3d 42 (1st Cir. 2014) ............................................................................ 134

*United States v. Glenn,*
828 F.2d 855 (1st Cir. 1987) .................................................................... 92, 116

*United States v. Goldin Indus., Inc.,*
219 F.3d 1268 (11th Cir. 2000) .......................................................................63

*United States v. Gonzales,*
520 U.S. 1 (1997)..............................................................................................55

*United States v. Gonzalez,*
570 F.3d 16 (1st Cir. 2009) ...................................................................... 67, 68

*United States v. Goris,*
876 F.3d 40 (1st Cir. 2017) .............................................................................86

*United States v. Gorman,*
807 F.2d 1299 (6th Cir. 1986) ........................................................................47

*United States v. Gottesfeld,*
18 F.4th 1 (1st Cir. 2021).......................................................................... 85, 118

*United States v. Graham,*
83 F.3d 1466 (D.C. Cir. 1996)......................................................................102

*United States v. Guerrero-Narváez,*
29 F.4th 1 (1st Cir. 2022)..............................................................................102

*United States v. Guzman-Ortiz,*
975 F.3d 43 (1st Cir. 2020)............................................................................102

*United States v. Hausmann,*
345 F.3d 952 (7th Cir. 2003) ..........................................................................51

*United States v. Hedaithy,*
392 F.3d 580 (3d Cir. 2004) ................................................................ 73, 79, 83

*United States v. Heinel*,
   No. 19-cr-10081-IT,
   2021 WL 4948216 (D. Mass. Oct. 25, 2021) ......................... 162, 165, 167, 169

*United States v. Henry*,
   848 F.3d 1 (1st Cir. 2017)...................................................................163

*United States v. Holland*,
   116 F.3d 1353 (10th Cir. 1997) .......................................................157

*United States v. Hunt*,
   521 F.3d 636 (6th Cir. 2008) ...........................................................147

*United States v. Jeffers*,
   570 F.3d 557 (4th Cir. 2009) ...........................................................102

*United States v. Jefferson*,
   674 F.3d 332 (4th Cir. 2012) .............................................................47

*United States v. Johansen*,
   56 F.3d 347 (2d Cir. 1995) ..............................................................120

*United States v. Jones*,
   674 F.3d 88 (1st Cir. 2012)................................................................87

*United States v. Kemp*,
   500 F.3d 257 (3d Cir. 2007) ................................................... 103, 111

*United States v. Khoury*,
   No. 20-cr-10177-DJC, 2021 WL 2784835 (D. Mass. July 2, 2021) ........... 74, 79

*United States v. Lachman*,
   521 F.3d 12 (1st Cir. 2008)..............................................................126

*United States v. Lane*,
   474 U.S. 438 (1986)........................................................................106

*United States v. Lankford*,
   955 F.2d 1545 (11th Cir. 1992) .......................................................127

*United States v. Latorre*,
   922 F.2d 1 (1st Cir. 1990)................................................................127

*United States v. Legarda*,
   17 F.3d 496 (1st Cir. 1994)..................................................................152

*United States v. Levine*,
   569 F.2d 1175 (1st Cir. 1978).................................... 111, 112, 113, 115

*United States v. Levy-Cordero*,
   67 F.3d 1002 (1st Cir. 1995).................................................... 125, 146

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ...........................................................127

*United States v. Long*,
   905 F.2d 1572 (D.C. Cir. 1990)........................................................143

*United States v. Lopez*,
   300 F.3d 46 (1st Cir. 2002)..................................................... 170, 171

*United States v. Lorenzana-Cordon*,
   949 F.3d 1 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 2688 (2021)......... 101, 102

*United States v. Lugo Guerrero*,
   524 F.3d 5 (1st Cir. 2008)................................................................165

*United States v. Maldonado-Peña*,
   4 F.4th 1 (1st Cir. 2022)........................................................ 121, 164

*United States v. Mathis*,
   216 F.3d 18 (D.C. Cir. 2000)...........................................................104

*United States v. Mayendía-Blanco*,
   905 F.3d 26 (1st Cir. 2018)..............................................................152

*United States v. McGregor*,
   2011 WL 1576950 (M.D. Ala. Apr. 4, 2011)............................... 56, 60

*United States v. McLellan*,
   959 F.3d 442 (1st Cir. 2020)....................................................... 68, 69

*United States v. Mize*,
   814 F.3d 401 (6th Cir. 2016) ...........................................................120

*United States v. Monserrate-Valentín*,
   729 F.3d 31 (1st Cir. 2013) ....................................................... 105 106

*United States v. Morgan*,
   117 F.3d 849 (5th Cir. 1997) .............................................................102

*United States v. Morris*,
   46 F.3d 410 (5th Cir. 1995) ..............................................................102

*United States v. Morrow*,
   39 F.3d 1228 (1st Cir. 1994) ...........................................................106

*United States v. Mullet*,
   822 F.3d 842 (6th Cir. 2016) ..............................................................78

*United States v. Munyenyezi*,
   781 F.3d 532 (1st Cir. 2015) .......................................... 135, 136, 148

*United States v. Murphy*,
   836 F.2d 248 (6th Cir. 1988) ..............................................................74

*United States v. Negrón-Sostre*,
   790 F.3d 295 (1st Cir. 2015) ..............................................................89

*United States v. Ocean*,
   904 F.3d 25 (1st Cir. 2018) ..............................................................155

*United States v. O'Hagan*,
   521 U.S. 642 (1997) .................................................................... 65, 66

*United States v. O'Neal*,
   17 F.4th 236 (1st Cir. 2021) ............................................................165

*United States v. Onumonu*,
   967 F.2d 782 (2d Cir. 1992) ............................................................127

*United States v. Ortiz-Islas*,
   829 F.3d 19 (1st Cir. 2016) .......................................................... 89, 94

*United States v. Pabon*,
   819 F.3d 26 (1st Cir. 2016) ..............................................................155

*United States v. Pacheco*,
    434 F.3d 106 (1st Cir. 2006) ............................................................120

*United States v. Palow*,
    777 F.2d 52 (1st Cir. 1985) ............................................................152

*United States v. Paz-Alvarez*,
    799 F.3d 12 (1st Cir. 2015) ................................................ 88, 136

*United States v. Pena*,
    24 F.4th 46 (1st Cir. 2022) ...................................... 87, 124, 141, 147

*United States v. Perez-Trevino*,
    891 F.3d 359 (8th Cir. 2018) ..........................................................102

*United States v. Pierre*,
    484 F.3d 75 (1st Cir. 2007) ...............................................................88

*United States v. Portela*,
    167 F.3d 687 (1st Cir. 1999) ............................................... *passim*

*United States v. Potter*,
    463 F.3d 9 (1st Cir. 2006) ................................................................69

*United States v. Pulliam*,
    973 F.3d 775 (7th Cir. 2020) ..........................................................143

*United States v. Quinn*,
    359 F.3d 666 (4th Cir. 2004) ................................................. 50, 51

*United States v. Renzi*,
    769 F.3d 731 (9th Cir. 2014) .................................................. 46, 47

*United States v. Rivera Calderon*,
    578 F.3d 78 (1st Cir. 2009) .............................................................101

*United States v. Roberson*,
    459 F.3d 39 (1st Cir. 2006) ...............................................................53

*United States v. Robinson*,
    663 F.3d 265 (7th Cir. 2011) .............................................................50

xvii

*United States v. Rodríguez-Berríos*,
   573 F.3d 55 (1st Cir. 2009) ............................................................147

*United States v. Rosen*,
   130 F.3d 5 (1st Cir. 1997) ..............................................................128

*United States v. Rosnow*,
   977 F.2d 399 (8th Cir. 1992) ..........................................................104

*United States v. Sabean*,
   885 F.3d 27 (1st Cir. 2018) ...................................................... 136, 151

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ............................................................82

*United States v. Sanchez-Badillo*,
   540 F.3d 24 (1st Cir. 2008) ........................................................ 89, 94

*United States v. Sans*,
   731 F.2d 1521 (11th Cir. 1984) ......................................................154

*United States v. Santana-Dones*,
   920 F.3d 70 (1st Cir. 2019) ...................................................... 164, 165

*United States v. Santos Batista*,
   239 F.3d 16 (1st Cir. 2001) ............................................................165

*United States v. Sasso*,
   695 F.3d 25 (1st Cir. 2012) ..............................................................46

*United States v. Sawyer*,
   239 F.3d 31 (1st Cir. 2001) ............................................................127

*United States v. Scanlon*,
   753 F. Supp. 2d 23 (D.D.C. 2010),
   *aff'd on other grounds*, 666 F.3d 796 (D.C. Cir. 2012) ....................61

*United States v. Seher*,
   562 F.3d 1344 (11th Cir. 2009) ........................................................93

*United States v. Semprevivo*,
   No. 19-cr-10117-IT-10 (D. Mass.) ..................................................113

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ..................................................82

*United States v. Siegelman*,
   640 F.3d 1159 (11th Cir. 2011) ...........................................47

*United States v. Simon*,
   12 F.4th 1 (1st Cir. 2021)...................................................127

*United States v. Smith*,
   292 F.3d 90 (1st Cir. 2002)................................................147

*United States v. Sorich*,
   523 F.3d 702 (7th Cir. 2008) ....................................... 50, 59

*United States v. Sorich*,
   709 F.3d 670 (7th Cir. 2013) .............................................157

*United States v. Soto-Beníquez*,
   356 F.3d 1 (1st Cir. 2003)..................................................101

*United States v. Stewart*,
   907 F.3d 677 (2d Cir. 2018) ..............................................147

*United States v. Summers*,
   414 F.3d 1287 (10th Cir. 2005) .........................................143

*United States v. Sun-Diamond Growers of Cal.*,
   526 U.S. 398 (1999)............................................................44

*United States v. Sutherland*,
   929 F.2d 765 (1st Cir. 1991)...................................... 106, 115

*United States v. Szpyt*,
   785 F.3d 31 (1st Cir. 2015)........................................ 120, 121

*United States v. Takholov*,
   827 F.3d 1307 (11th Cir. 2016) .................................... 82, 83

*United States v. Tanner*,
   2018 WL 1737235 (S.D.N.Y Feb. 23, 2018),
   *aff'd*, 942 F.3d 60 (2d Cir. 2019)......................................50

*United States v. Taylor*,
848 F.3d 476 (1st Cir. 2017)..............................................................152

*United States v. Terry*,
707 F.3d 607 (6th Cir. 2013) ..............................................................52

*United States v. Terry*,
2011 WL 5008415 (N.D. Ohio Oct. 19, 2011)....................................56

*United States v. Thompson*,
484 F.3d 877 (7th Cir. 2007) ....................................................... 58, 59

*United States v. Torres*,
794 F.3d 1053 (9th Cir. 2015) ...........................................................143

*United States v. Townsend*,
630 F.3d 1003 (11th Cir. 2011) ...........................................................56

*United States v. Townsend*,
924 F.2d 1385 (7th Cir. 1991) ...........................................................104

*United States v. Tracey*,
675 F.2d 433 (1st Cir. 1982)..............................................................140

*United States v. Trainor*,
477 F.3d 24 (1st Cir. 2007)................................................................106

*United States v. Tramunti*,
513 F.2d 1087 (2d Cir. 1975) ............................................................102

*United States v. Upton*,
559 F.3d 3 (1st Cir. 2009)..................................................................117

*United States v. Vavic*,
19-cr-10081-IT (D. Mass.)..................................................... 29, 66, 67

*United States v. Valenzuela*,
849 F.3d 477 (1st Cir. 2017)..............................................................116

*United States v. Varelli*,
407 F.2d 735 (7th Cir. 1969) .............................................................120

*United States v. Vila,*
2009 WL 79189 (D.P.R. Jan. 9, 2009) ........................................................ 56, 57

*United States v. Walker,*
490 F.3d 1282 (11th Cir. 2007) ........................................................................128

*United States v. Walker-Couvertier,*
860 F.3d 1 (1st Cir. 2017)................................................................................88

*United States v. West,*
877 F.3d 434 (1st Cir. 2017)............................................................................151

*United States v. Whitfield,*
590 F.3d 325 (5th Cir. 2009) ............................................................................51

*United States v. Wihbey,*
75 F.3d 761 (1st Cir. 1996).................................................................... 106, 115

*United States v. Williams,*
717 F.3d 35 (1st Cir. 2013)..............................................................................146

*United States v. Zacher,*
586 F.2d 912 (2d Cir. 1978) ..............................................................................43

*United States v. Zannino,*
895 F.2d 1 (1st Cir. 1990)............................................................ 53, 63, 68, 78

*Van Buren v. United States,*
141 S. Ct. 1648 (2021)......................................................................................64

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
412 U.S. 609 (1973)..........................................................................................52

*Yates v. United States,*
354 U.S. 298 (1957).................................................................................. 78, 157

## <u>STATUTES</u>

1 U.S.C. §1 ................................................................................................................63

18 U.S.C. §18 ...........................................................................................................63

18 U.S.C. §201 .........................................................................................................44

18 U.S.C. §371 ................................................................................2

18 U.S.C. §666 .......................................................................... *passim*

18 U.S.C. §666(a)(1)(B) ..................................................................55

18 U.S.C. §1341 ..............................................................................2

18 U.S.C. §1343 ..............................................................................2

18 U.S.C. §1346 ........................................................................ *passim*

18 U.S.C. §1349 ..............................................................................2

18 U.S.C. §1962(c) ................................................................... 62, 63

18 U.S.C. §2510(6) ............................................................... 162, 166

18 U.S.C. §2511(2)(a) ...................................................................167

18 U.S.C. §2511(2)(a)(ii) ............................... 161, 162, 168, 169, 170, 171

18 U.S.C. §2511(2)(a)(ii)(A) ..........................................................171

18 U.S.C. §2511(2)(c) ................................... 162, 166, 167, 168, 169, 171

18 U.S.C. §2511(2)(d) ................................... 162, 166, 167, 168, 169, 171

18 U.S.C. §2511(3) ........................................................................167

18 U.S.C. §2511(3)(b)(i) .................................................................167

18 U.S.C. §2511(3)(b)(ii) ...............................................................167

18 U.S.C. §2515 ..................................................................... 169, 170

18 U.S.C. §2520(d)(3) ....................................................................167

18 U.S.C. §7206 ..............................................................................2

### FEDERAL RULES

Fed. R. App. P. 30(a)(1)(C) ............................................................163

Fed. R. Crim. P. 12(c)(3) ....................................................... 161, 164, 165

Fed. R. Evid. 401 ...................................................................146

Fed. R. Evid. 403 ............................................................ *passim*

Fed. R. Evid. 801(c) ...............................................................143

Fed. R. Evid. 801(d)(2) ..........................................................151

Fed. R. Evid. 802 ...................................................................135

Fed. R. Evid. 803(3) ................................................ 142, 145, 151

Fed. R. Evid. 806 .................................................... 140, 145, 147

1st Cir. Local Rule 28.0(a)(1) ................................................163

1st Cir. Local Rule 30(a)(1)(c) ..............................................163

### LEGISLATIVE HISTORY

H.R. REP. NO. 87-748 (1961) ....................................................55

### OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (11th ed. 2019) .............................43

30B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 6772 (2022 ed.) ..........................................152

Harvey S. James, Jr., *When Is A Bribe a Bribe? Teaching a Workable Definition of Bribery*, 6 TEACHING BUS. ETHICS 199 (2002) ........................................ 53, 54

Jeffrey R. Boles, *The Two Faces of Bribery: International Corruption Pathways Meet Conflicting Legislative Regimes*, 35 MICH. J. INT'L L. 673 (2014) ................................................ 46, 54

Licensing Program, Harvard Trademark Program, https://trademark.harvard.edu/pages/licensing-program ...................................76

6 Michael H. Graham, *Handbook of Federal Evidence* § 801:1 (9th ed. 2021) ...143

USC Trademark and Licensing Services, https://trademarks.usc.edu/....................76

1 William Hawkins, *A Treatise of the Pleas of the Crown* (1762) ................. 55, 56

xxiii

## STATEMENT OF ISSUES

1.    Defendants' conduct amounted to bribery, and the jury instructions do not warrant a new trial.

2.    Admissions slots are property.

3.    The jury supportably found defendants joined the charged conspiracy, and any purported variance was harmless.

4.    Waiver issues aside, there was no abuse of discretion or prejudice in the exclusion of the proposed defense exhibits.

5.    Abdelaziz's unpreserved new trial claim concerning the delayed admission of three exhibits founders on the record.

6.    Wilson's tax conviction is secure.

7.    Defendants' suppression claim is doubly waived and fails on the merits for two separate reasons.

## STATEMENT OF THE CASE

In 2019, approximately 50 parents, college athletics coaches and administrators, standardized-test proctors, and associates of a college counseling business named The Key were charged in connection with a scheme to secure the admission of the parents' children to selective universities using various forms of fraud and bribery.  [A42].  The cases were drawn to several different district court judges.  The 384-paragraph indictment in this case charged 15 parents with

1

conspiring with the owner of The Key, William "Rick" Singer, and others to, among other things, secure their children's admission to elite universities as Division I athletic recruits based on falsified credentials in exchange for bribes disguised as "donations" that Singer funneled through a sham charity to university accounts controlled by corrupt coaches and athletics administrators, and in some cases, to the coaches and administrators personally. [A225-28].

All but three parents named in this indictment pleaded guilty. [SA4-8]. In September 2021, defendants Gamal Abdelaziz and John Wilson were convicted on all charges after a month-long trial that included testimony from 17 witnesses and nearly 250 exhibits (including dozens of defense exhibits and several defense witnesses). Abdelaziz was convicted of conspiracy to commit mail fraud, wire fraud, and honest-services mail and wire fraud, 18 U.S.C. §§1341, 1343, 1346, 1349 (Count One); and conspiracy to commit federal-programs bribery, 18 U.S.C. §§371 and 666 (Count Two). Wilson was convicted of the same two conspiracy counts; three substantive counts of wire fraud and honest-services wire fraud, 18 U.S.C. §§1343 and 1346 (Counts Six, Eight, and Nine); two substantive counts of federal-programs bribery, 18 U.S.C. §666 (Counts Eleven and Twelve); and one count of filing a false tax return, 18 U.S.C. §7206 (Count Thirteen). [GSA1-3]. After denying defendants' post-trial motions, [A205], the district court sentenced

Abdelaziz to one year and one day of imprisonment and Wilson to fifteen months. [W-Add.85; W-Add.88; A-Add.2; A-Add.10].

## I.    GAMAL ABDELAZIZ

The evidence at trial—including extensive evidence of Abdelaziz's own statements as reflected in his emails and recorded conversations with Singer— proved that Abdelaziz participated in the scheme by agreeing to pay $300,000 to have an Athletics Department insider at the University of Southern California ("USC") facilitate his daughter's admission as a basketball recruit based on falsified credentials, even though she did not play basketball at the time and had never played particularly well.

### A.    "We Will Use This One": The Falsified Basketball Profile

In the spring of 2017, as his daughter Sabrina entered her senior year at a private high school in Hong Kong, Abdelaziz fired her college counselor. [A1264-66; GSA145]. With the college application season approaching, Sabrina had a 2.8 GPA and an SAT score several hundred points below the average USC admitted applicant. [A1805; A4475-78]. Abdelaziz wrote to his wife that it would "be better to hire Rick at this point." [GSA145]. Thereafter, Abdelaziz engaged Singer to secure Sabrina's admission to USC as a Division I basketball recruit in exchange for a payment of several hundred thousand dollars to a charitable entity Singer controlled, the Key Worldwide Foundation ("KWF"), and Singer agreed to funnel

that money to a USC account controlled by a corrupt USC athletics employee. [*Infra* 9-10, 12-13, 15]. Sabrina did not play basketball at the time of her purported recruitment. [A1635]. Although she had played on her high school's junior varsity team years earlier, she quit playing after failing to make varsity. [A1624-35; GSA429-39].

About one month after Abdelaziz agreed to the deal, Singer drafted an email to himself—titled "USC with Donna"—with a running list of students whose admission Donna Heinel had agreed to facilitate as fake athletic recruits.[1] [A1266-68*; GSA147]. Heinel was a senior Athletics Department administrator who acted as the liaison between USC's coaches and the Admissions Department; although she presented recruited athletes to the Admissions Department on behalf of USC's coaches, she did not, herself, engage in recruiting, and she was not authorized to. [A2461-62; A2500]. Sabrina's name was included on Singer's list alongside other children whose parents had also agreed to make payments, through KWF, to have their children admitted to USC as fake athletic recruits. [GSA147]. Beside each name was the amount of the agreed-upon payment.[2] [*Id.*].

---

[1] Heinel pleaded guilty for her involvement in the scheme. [SA9].

[2] The list included children of defendants Marci Palatella, [SA7]; Devin Sloane, [SA13]; Mossimo Giannulli and Lori Loughlin, [SA5-7]; Todd and Dianne Blake, [SA5]; Jeffrey Bizzack, [SA13]; and Robert Zangrillo (who was pardoned and was the only parent not to plead guilty or be convicted at trial), [SA8].

Together, Abdelaziz, Singer, Heinel, and others set about creating a falsified profile for Heinel to use when presenting Sabrina to USC's Admissions Department as a purported basketball recruit. Singer asked Laura Janke, a former USC assistant women's soccer coach, to draft the profile.[3] [A2497, 2521-22; GSA148]. Janke had worked with Singer for about a decade, including when she was employed at USC, when she and the head women's soccer coach, Ali Khosroshahin, agreed to accept payments from parents—first as fake "donations"[4] to the USC soccer program and later to a private soccer club she and Khosroshahin controlled—in exchange presenting the children of Singer's clients as phony recruits.[5] [A2500-06]. After Janke left USC, she continued to work with Singer by creating falsified athletic profiles used to facilitate fraudulent recruitments to USC, Yale, Stanford, and UCLA. [A2507-12; GSA148; GSA419; GSA420].

Singer's email to Janke requested that she make falsified profiles for ten students, noting, "I met with Donna [Heinel] this week in her office and she gave the action item to create profiles …." [GSA148]. The list included the son of

---

[3] Janke also pleaded guilty for her role in the scheme. [SA9].

[4] As Janke testified, it was not permissible for coaches to exchange athletic recruitment slots for purported "donations" to the team or payments to team accounts controlled by the coaches. [A2504-06, 2539-40, 2579-81].

[5] Janke testified that, in addition to Khosroshahin, USC water polo coach Jovan Vavic was one of the "other coaches" doing similar deals with Singer when she joined the scheme. [A2501, 2520].

defendant Marci Palatella as a football "long snapper."[6]  [*Id.*].  For Sabrina, Singer wrote, "Basketball."  [*Id.*].  Janke asked Singer to send her relevant background information, along with the students' athletic positions and accolades "if they play the sport."  She added: "If they don't have the items pertaining to the sport let me know and I will create."  [*Id.*].

Singer asked Abdelaziz to supply the information Janke requested.  [A1268-69; A4444].  The subject of Singer's email to Abdelaziz was "For Me to complete USC athletic profile," and the email included Janke's language: "if they play the sport" and "accolades if they have them."  [A4444].  Abdelaziz forwarded the email to his wife.  [*Id.*].  Because Sabrina did not have any basketball "accolades," Janke invented them.  [*Infra* 7].

Shortly thereafter, Singer asked Abdelaziz to send "an action photo or two of Sabrina playing basketball."  [A4445].  Abdelaziz emailed Singer a photograph of a girl dribbling a basketball; the subject was "Sabrina," but the photo Abdelaziz sent was not his daughter.  [A1287; A1636-37; A4452-53; GSA430].  Singer responded: "[W]e will use this one."  [A1289-90; A4461].

Janke completed the falsified athletic profile and sent it to Singer for review. [A2529-30; GSA356].  Janke wrote: "Let me know if you want me to add any other

---

[6] Palatella was grouped for trial with Abdelaziz and Wilson, but she pleaded guilty two weeks before trial.  [SA7].

awards to her profile or if you think that is enough." [GSA356].  Singer forwarded the phony profile and Janke's inquiry to Abdelaziz.[7]  [A1290-91; A4465-66].  The profile falsely described Sabrina as a "captain" and "starting point guard" for her high school team and contained numerous other fake accolades.  [A1637-41; A2530-31].

## B.    "The Court is Like My Art Studio": Admission as a Recruit

Singer next sent the profile to Heinel, who requested a better photograph.  [A1294-95; A4469-71].  Singer and Janke traded emails about obtaining better photographs for Sabrina and another fake recruit, Olivia Giannulli, [*see supra* n.2], as well as a photo of Palatella's son playing football.[8]  [A2531-35; A4467].  Ultimately, Heinel herself added a photograph of a different girl, and edited Sabrina's height to make her taller.  [A1304-07; A1641-42; GSA158-59].  The false profile was then used as the basis for a separate profile that was presented to USC's subcommittee for athletic admissions ("Subco").  [A1306; A1826; A4474].  Subco,

---

[7] At trial, Abdelaziz disputed he read the email, but it was sent to an account—gamalaziz@cox.net—from which he later forwarded emails.  [A1239, 1318-20; A4485].

[8] Meanwhile, Singer and Heinel discussed the approximately dozen students that Heinel, in exchange for payments to USC accounts she controlled, agreed to present as recruited athletes, including Abdelaziz for basketball, Palatella for football, Giannulli for crew, Sloane for water polo, Blake and Bizzack for volleyball, and the son of defendant Elisabeth Kimmel for track.  [A1300; A4472].

comprised exclusively of admissions officers, reviewed the transcripts, test scores, and athletic profiles of coaches' designated recruits and determined whether to approve their admission.[9]    [A1807-10].    The "Subco profile" Heinel prepared purported to come from USC's basketball coach; it contained the false accolades on the profile that Janke created and Singer sent to Abdelaziz, and it falsely described Sabrina as someone who would "be a great addition to our USC program."  [A4466; A4474].  That was news to USC's associate head women's basketball coach—the recruiting coordinator for the team—who testified she had never heard of Sabrina and never saw the fake Subco profile.  [A2463-64].

On October 5, 2017, Heinel presented Sabrina to Subco along with the son of defendant Kimmel, whom she described as a purported track and field recruit using a profile bearing the likeness of an actual pole vaulter Janke had found on the internet.[10]  [A1826-32; A2536; GSA160-64].  Heinel presented the children of other

---

[9] Multiple witnesses testified that the process of recruiting athletes and presenting them to Subco was separate from the general admissions process. Coaches recruited athletes by, among other things, watching them play, reviewing game film, and speaking with their high school coaches.  Coaches then created Subco "profiles" describing the "assets" their recruits would bring to USC's athletic teams. The coaches sent the profiles to Heinel, who presented them to Subco.  Subco then voted whether to admit the students.  [A1806-16; A2460-63; A2498-2500; A2799-2805].

[10] Like Palatella, Kimmel was grouped for trial with Abdelaziz and Wilson but pleaded guilty weeks before trial.  [SA7].

co-defendants—including the son of Palatella and the daughter of Bruce Isackson—to Subco through the fall of 2017.[11]  [*E.g.*, A1833-36, 1841-42; GSA167-72; GSA178-83].  None was qualified to be recruited.  [*E.g.*, A1087-89].

Like the others, Sabrina had grades and test scores that were not competitive for USC, which rejected approximately 85 percent of the 56,000 applicants in the general admissions process.  [A1803-05, 1826-30].  Conversely, of the approximately 250 athletic recruits who were presented to Subco each year, roughly 90 percent were admitted, despite grades and test scores that were lower than the average applicant.  [A1808-10].  Sabrina, with her lower grades and test scores, was admitted because Heinel misled Subco into believing she was a basketball recruit who had been selected by USC's basketball coach and had the ability to contribute to the elite Division I team.  [A1826-30; A2460-61].

Less than a week after presenting Sabrina to Subco, Heinel forwarded Singer a letter from USC's dean of admissions confirming Sabrina's conditional admission as a recruited athlete.  [A1307-09; A4479-80].  About a week later, Heinel left Singer a voicemail asking him for "the two, um, $50,000 donations" in exchange for facilitating the fraudulent recruitments of Kimmel and another student; she directed him to make the payments to the USC Women's Athletic Board, a fund she

---

[11] Isackson also pleaded guilty.  [A1056].

9

controlled and that benefitted her professionally.[12]   [A1322-23; A4483].   As to Abdelaziz, Heinel said they needed to "talk about … how we can structure that" payment because it was "a larger amount of money."[13]   [A4483].

Singer relayed the admission letter to Abdelaziz.  [A1310; A4481-82].  The letter informed Abdelaziz that Sabrina had been provisionally admitted as a recruited athlete because of her "potential to make a significant contribution to the intercollegiate athletic program" at USC.  [A4482].  The letter required that Sabrina check several logistical boxes to formalize her admission, including submitting a formal application and registering as a student athlete with the NCAA.  [Id.].

Abdelaziz forwarded the letter to Singer's associate, Mikaela Sanford, and instructed her to complete Sabrina's formal USC application in accordance with the

---

[12] Of the approximately $26 million that Singer collected from parents into KWF, very little went toward charitable causes.   [A2966-69; A4839]. Approximately $5.8 million was paid to university athletics administrators and coaches personally, or to department funds they controlled.  [A4840].  Of that amount, hundreds of thousands of dollars went to the USC Women's Athletic Board fund Heinel controlled, before she directed Singer to instead send the payments to her private company, Clear the Clearinghouse, and deposited the money into her personal bank account.  [A2971-75, 2988-91; A4840; A4843].  Heinel also accepted payments to the Women's Athletic Board from parents of Singer's students directly (without having them funneled through KWF).  [A2509-10; A4483; GSA418].  By 2018, more than 75 percent of the money deposited into that account consisted of payments from KWF or parents associated with Singer.  [A2992-96; A4844].

[13] In the same voicemail, Heinel told Singer she would present Palatella's son at a later Subco meeting.  [A4483].

letter's requirements and to register Sabrina with the NCAA. [A1318-19; A4485].

One month later, Abdelaziz falsely informed another college counselor in Hong Kong that Sabrina was going to "pass on applying" to USC, hiding the fact that she had already been approved for admission as an athletic recruit. [A1310-12; A4487]. Abdelaziz also exchanged emails with Singer, Sanford, and others in which they discussed the need to include basketball in the "activities" section of Sabrina's application and to focus on basketball in one of her essays.[14] [A1679-85; A4492; A4494-95; GSA184; GSA185]. Ultimately, Abdelaziz reviewed the application essay, [A4492], which stated:

> The basketball court is like my art studio. It is the one place where I can go and focus my energy into crafting the best plays possible …. I believe that everyone needs a creative outlet, a way to let off steam and escape the struggles of everyday life. Whether I am playing alone or in a pickup game with friends or *in front of a crowd of two hundred people at school*, I feel an enormous release from my everyday life when I am on the court.

[A4497 (emphasis added); A1686-87; GSA202]. At the time Abdelaziz edited this essay, Sabrina had not played basketball in two years. [A1635].

## C.    "Wire Sent Today": The Bribe and Fake Charitable Receipt Letter

With Sabrina's conditional acceptance as a basketball recruit in hand, Heinel and Singer continued to discuss how to "structure" Abdelaziz's payment. In

---

[14] Sanford also pleaded guilty for her role in the scheme. [SA10].

December 2017, Heinel directed Singer to have the payments for the remaining parents—or as Heinel put it, the "rest of the people that owe money"—sent to a gift account for the Galen Center at USC. [A1324; A4489-90]. Heinel said, "[W]e're going to do that with Sabrina, too … [f]or [$]200,000." [A4489].

Meanwhile, after Heinel presented his students to Subco as athletic recruits, Singer and his phony charity's bookkeeper discussed what "bills" to send to parents. [A1313; GSA266-67]. For example, Singer directed the bookkeeper to invoice Palatella $400,000, Isackson $250,000, and Kimmel $200,000. [GSA266]. The entry next to Abdelaziz's name noted Sabrina had been accepted to USC but that the invoice amount had not yet been finalized. [*Id.*].

That happened shortly after Sabrina received her formal confirmation of admission in March 2018. Singer's bookkeeper sent Abdelaziz a false invoice for $300,000, reflecting a purported "private contribution" to KWF and thanking him for his "generous donation." [A1315-16; A4499-4500]. The cover email and invoice were substantially identical—other than the slightly higher price—to those Isackson received a few weeks later for his daughter's admission to USC as a purported crew recruit. [A1096-97; GSA269-70].

Abdelaziz paid the bill in April 2018, writing "wire sent today." [A1316-17; GSA268; A4518-20; A4842]. In return, KWF sent Abdelaziz a false "receipt for [his] contribution to the Foundation." [A4518]. Substantially identical to a phony

12

receipt Isackson received for his older daughter's admission to UCLA as a soccer recruit years earlier, which he testified was "totally untrue," [A1079-81; GSA135-36], the letter to Abdelaziz falsely stated his purported donation to KWF would "provide educational and self-enrichment programs to disadvantaged youth" and that "no goods or services were exchanged" for the payment.  [A4520].

At around the same time, the USC Admissions Department began to receive reports from high school guidance counselors that certain students who had been admitted as athletic recruits were not athletically qualified.  [A1845-46].  USC admissions officer Rebecca Chassin contacted Heinel about the concerns, and Heinel falsely assured her the students were real athletic recruits who were being recruited by USC coaches.  [A1852-55].  In fact, the students Chassin expressed concerns about were (unbeknownst to her at that time) Singer students whom Heinel had presented to Subco along with Sabrina.  [*E.g.*, A4472, 4489-90].  Chassin learned that when counselors began to express concerns, at least one parent of a Singer student confronted the counselor and tried to intimidate him.  [A1856-57].  After falsely assuaging Chassin's concerns to cover up what she and her co-conspirators had done, [A1857-58],[15] Heinel instructed Singer to warn the parents to stop "yelling

---

[15] Chassin testified that when she later learned that Heinel had misled her and the other members of Subco, she "felt truly betrayed by a colleague, somebody that I had trusted."  [A1860-61].

at counselors" because that would risk exposing the scheme: "that'll shut everything down," she said.  [A4521-23].  Heinel further directed Singer that the parents "if questioned [should] respond appropriately that they are involved with the sport." [A4522].  Heinel later told Singer to make sure that the fact his students had been admitted as recruited athletes "doesn't get out," because "I'm always worried about those counselor[s]."  [A4638-40].  When Singer, in turn, asked Heinel when she wanted to receive the parents' outstanding payments to her USC fund, she instructed him to hold off on the payments to conceal their connection to the students' recruitment: "I don't like to do it so close."  [A4640-41].

Ultimately, Singer did not send the payment for Sabrina's admission to the Galen Center account Heinel controlled.  Instead, a few months after Abdelaziz wired the $300,000 to KWF, Singer began sending $20,000 monthly payments from KWF to Heinel's private company, which she then deposited into her personal bank account.  [*Supra* n.12].

Sabrina matriculated at USC in the fall of 2018.  [A2150].  She had no involvement with the women's basketball team, and the coaching staff never heard of her until they were interviewed by the FBI.  [A2463-65].

### D.    "I Love It": The Tapes, False Cover Story, and Fake Injury

FBI agents approached Singer in September 2018, following a multi-month court-authorized wiretap of his phone; he thereafter consented to the monitoring and

14

recording of his phone calls.  [A1255; A2022-23, 2028-29].  Agents directed Singer to make phone calls to, among others, parents who had paid him and the corrupt insiders to secure the admission of their children as fake athletic recruits.  [A2106].  To gather additional evidence of those parents' intent, agents directed Singer to employ a ruse: tell the parents the IRS was auditing KWF.  [A2106-07].

The first of two consensual calls with Abdelaziz occurred on October 25, 2018, with Singer in Boston.  [A2107-08; A4661; GSA510].  Singer told Abdelaziz the IRS was auditing KWF and had asked about Abdelaziz's $300,000 "payment."  [A4664].  Singer said, "I'm not going to tell the IRS anything about the fact that your $300,000 was paid to Donna – Donna Heinel at USC to get Sabrina into school even though she wasn't a legitimate basketball player at that level.  So I'm not gonna – I'm not going to say that to the IRS obviously." [*Id.*].  Abdelaziz responded, "Ok." [*Id.*].  When Singer asked, "you're ok with that, right?" Abdelaziz replied, "of course."  [*Id.*].  Abdelaziz then began to stumble: "No, I – I mean, I – you know, I mean, I – I – my intention was to, uh, donate the money to the foundation and, uh, what – you know, and then from there obviously, uh – I don't think – uh …."  [A4665].

Abdelaziz then pivoted, asking whether the IRS would contact him and other parents "that sent those payments."  [A4665].  Singer responded, "I don't know." [*Id.*].  Singer then said, "I just want to make sure everybody's aware.  I wanted to

make sure our stories are correct," to which Abdelaziz responded by calling Singer "a friend" and offering "to help."  [*Id.*].

At this juncture, Singer told Abdelaziz that Sabrina's basketball profile was so convincing that Heinel wanted to use it for other fake basketball recruits.  Singer said Heinel "actually called me and said … 'Hey, Rick, that profile that you did for Sabrina, I loved it.  It was really well done and going forward, anybody who isn't a real basketball player that's a female, I want you to use that profile going forward.'" [A4666].  Abdelaziz replied, "I love it."  [*Id.*].

Singer went on to confirm that their "stories" about Abdelaziz's payment would be "together": "I'm going to essentially say that your $300,000 payment, um, was made to our foundation to help underserved kids.  …  I just wanted to make sure you're ok with that, too."  [A4666-67].  Abdelaziz responded, "I am," confirming his agreement that Singer should mislead the IRS.  [A4667].

Heinel continued to discuss the scheme with Singer in October 2018, telling him she hoped to "get[] … all [] your people through" admissions by the following month.  [A4634].  Because Heinel had been issuing fake consulting invoices from her company to substantiate KWF's monthly $20,000 payments, agents directed Singer to ask her to "put some detail" into her next invoice. [A2119; A4635].  Heinel agreed.  [A4635].  On the next invoice she sent, Heinel listed $20,000 in purported

16

"consulting services" for the "interview, evaluation and assessments" of three fake athletic recruits, including Sabrina Abdelaziz.  [A2122-24; GSA332-33].

The second consensual call with Abdelaziz was on January 3, 2019.  [A2110; A4806, 4812].  As a ruse, Singer told Abdelaziz that Heinel had given him "a heads up" that the USC Admissions Department had asked why Sabrina had not shown up for basketball practice.  [A4808].  Singer told Abdelaziz that Heinel had lied to the admissions office, pretending that Sabrina had sustained an injury that prevented her from playing.  [*Id.*].  Abdelaziz responded, "yeah … yeah … ok."  [*Id.*].  Singer told Abdelaziz that the same thing happened for "several of our other families that went through the side door," to which Abdelaziz responded, "yes."  [*Id.*].

Singer advised Abdelaziz that "in case" the admissions office contacted him, the fake injury was "plantar fasciitis … which is typical for lots of athletes."  [A4809].  Abdelaziz asked if he had to warn his daughter: "Would they ask her, Rick? … Do I have to prepare her?"  [*Id.*].  Singer told Abdelaziz the admissions office would contact him, not Sabrina, and that "I wanted you to know what [Heinel's] reply was."  [A4809-10].  Abdelaziz agreed to repeat Heinel's lies: "I will answer the same, uh, should they call me."[16]  [A4810].

---

[16] Abdelaziz asserts (without citation) that he believed Sabrina was admitted to USC as "a basketball practice player or team manager."  [A-Br.1].  There was no trial evidence of this purported belief.  "Team managers" were not presented to Subco as recruited athletes, [A1976, 1981; A2463; A2500], and it is unclear why Abdelaziz would have needed a false athletic profile for Sabrina, or why he agreed

Abdelaziz told Singer he "appreciate[d]" the "heads up" and said he was "worried" about the IRS audit. [*Id.*]. Abdelaziz asked, "When I do my taxes, should I mark this as a, a, you know – as a charity, or not, or use the 501(c), or not, or …? Because you got me … concerned when you called last time." [*Id.*]. Singer assured him their story would hold up because KWF was registered as a 501(c)(3) charity. [*Id.*]. Abdelaziz responded: "I just wanted to make sure that we're on the same page." [*Id.*].

## II.    JOHN WILSON

The evidence at trial proved that Wilson agreed to pay Singer $220,000 to facilitate his son's admission to USC as a water polo recruit based on falsified credentials (and fraudulently deducted those payments from his taxes as both charitable donations and business expenses), and further agreed to pay $1.5 million to secure his twin daughters' admission to Stanford and Harvard as purported athletic recruits in sports they did not play competitively. As with Abdelaziz, the evidence focused on Wilson's own words and actions, as reflected in contemporaneous emails and numerous recorded conversations.

---

to mislead the Admissions Department about a fake injury, if he believed she was only going to be a manager, [A2394]. USC's women's basketball team did not recruit "practice players" either, [A2462-63], and in any event, Sabrina never attended any practices, a fact Abdelaziz knew, [A2463-64].

18

## A.     Bribes to Secure Wilson's Daughters' Admission as Fake Athletes

In September 2018, Wilson called Singer to ask whether Singer could arrange his daughters' admission to the colleges of their choice as recruited athletes, in exchange for money, despite the fact that they were not competitive athletes.  The calls were intercepted pursuant to the court-authorized wiretap of Singer's phone. Wilson and Singer referenced the fact that they had previously engaged in a similar fraud to secure the admission of Wilson's son Johnny to USC as a water polo recruit. Singer noted the price to secure admission to USC as a fake recruit had not changed since Johnny's admission, but that the price for more elite schools would be higher. Later, after Singer was approached by law enforcement, Wilson and Singer consummated the deal over the course of multiple recorded calls, and Wilson made two $500,000 payments to KWF to secure his daughters' admission to Harvard and Stanford as athletic recruits.

### 1.     "I'll Make Them a Sailor or Something": The Wiretap Call

In the September 2018 calls, which neither Wilson nor Singer knew were being intercepted, Wilson acknowledged his daughters' standardized test scores, although "not bad," were not high enough to ensure their admission to the Ivy League schools they coveted.  [A1387-88; A4600].  Wilson asked about getting them admitted through a "second door," "like crew."  [A4600].  Referencing their earlier arrangement to get Johnny admitted to USC, [*infra* 28-35], Wilson asked, "Is it like

19

you know, [] water polo and uh donation …?" [A4601]. The men then discussed what it would cost to get coaches to recruit Wilson's daughters—Wilson called it "the sports angle"—and Singer noted the price at "USC hasn't changed." [A4601-02]. Singer said he was working on similar deals with many parents but noted that securing admission in this way was "really hard" at public universities, because "everybody's watchin' 'em." [A4602-03]. Dismissing certain schools as "way too liberal," [A4606], Wilson focused on Stanford—which he called "the cat's meow." [A4607-08]. Wilson and Singer discussed that one way to give his daughters a boost in the admissions process would be to simply make a donation to the university, which Singer explained would need to be in the range of approximately $50 million. [A4601]. But Singer noted that using his "side door," he could guarantee their admission as athletic recruits for far less money: just $1.2 million. [A4608, 4610].

The problem: Wilson's daughters were not athletes. Wilson asked, "What sports would be best for them? Is crew the bes[t] … or is that not gonna even matter?" [A4608]. Singer responded, "[O]h for me? It doesn't matter. I'll make them a sailor or something. Because of where you live." [*Id.*]. Wilson laughed. [*Id.*]. Wilson owned a vacation home in Hyannis Port and a private equity firm called Hyannis Port Capital, and he signed his emails with the firm's logo, a sailboat. [A1389-90].

Wilson noted that $1.2 million was "probably more than I wanna go for," and asked, "Is there a two for one special? If you got twins?" [A4608]. Singer returned the laugh. [*Id.*]. He explained that the money was necessary to induce the coach to use an athletic recruitment slot on a fake athlete: "Guy's giving up his spot ... they're not a good enough athlete, to compete with" and "they only get so many slots." [A4610-11]. But Singer confirmed that if Wilson agreed to pay, his daughters would be guaranteed admission as recruited athletes, just as his son had been: "[I]f you just try the athlete side, and you were using the side door with the athlete it's a done deal. Just like with John." [A4610].

Alluding to tax deductions he took for the payments to secure Johnny's admission to USC, [*infra* 33-35], Wilson asked if he could also make the payments for his daughters' admission "tax deductible as like donations." [A4611]. Singer said he could, because "it's going into a non-profit, 501.3.c [*sic*]." [A4611]. Wilson bemoaned the "big numbers" but acknowledged "there's so many people that want to do that."[17] [A4611-12].

---

[17] Palatella was intercepted on the wiretap the same day telling Singer she knew he was going to "work with" Wilson's daughters because she had discussed it with Wilson's wife Leslie, who had lied to her about how much the arrangement would cost. [A4630-31]. Other emails demonstrated that Leslie Wilson and Palatella discussed their work with Singer when Palatella participated in the scheme to secure her son's admission to USC as a purported football recruit. [GSA165-66].

### 2.    "[W]hat If They're Not Really That Good?"

In a call approximately two weeks later—after Singer agreed to consensually record his conversations at the request of law enforcement—Wilson reaffirmed his interest in "the side door and that stuff" and asked where Singer could make it "happen" and what sports they would use.  [A2041-42; GSA310].  Singer suggested "a sailing option," or "a crew option," prompting Wilson to acknowledge again that his daughters were not competitive in those sports: "[W]hat if they're not really that good?  I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing.  She just taught sailing and did sailing in, you know … Yacht Club."  [GSA311].  Wilson went on to note that his daughters were "not doing crew, rowing crew."[18]  [GSA324].

Singer described the exchange bluntly:  he would "go to the sailing coach and say, 'Hey, this family's willing to make the contributions.  She could be on your team … she may not be up to the level you are, but … you know, you're gonna get a benefit, and the family's gonna get [a] benefit.'"  [GSA311-12].  Wilson responded, "Yeah.  Ok."  [GSA312].  Singer explained that the "money goes into my foundation, as a donation," and then "what I'll do is I'll split the money potentially to the coach or other … parties that are at that school that need the money

---

[18] In a later text message, Wilson asked "How would it work if [his other daughter] doesn't sale [*sic*] at all?"  [GSA334].

… [o]r it may go right to the coach, um, that's helping us." [GSA312-13]. Wilson replied, "Right," confirming that the money would initially go to Singer's foundation—in Wilson's words, "the Key or whatever"—so that neither Wilson's children, nor the universities, would know about the payment. [*Id.*]. Singer noted that this way, "you get … your write-off … [a]nd then the kids get in the school." [GSA313]. Later in the call, Wilson discussed referring a friend to Singer, observing, "he could become a client and do whatever, and I'll let the two of you kinda email back and forth and stuff. He'd love to do something not known to his daughter at Brown." [GSA325]. Laughing, Wilson added: "And he's got money." [*Id.*].

### 3. "Scorekeeper" or "Water Girl": The First $500,000 Bribe

Wilson called Singer back in mid-October to check on the status of their plan. [A2068-69; A4643]. Singer said he could secure athletic recruitment slots via payments to coaches at USC in any sport; at Stanford in sailing, crew, and lacrosse; and at Harvard in sailing, crew, and tennis. [A4644-46]. "And again," Singer reminded Wilson, "they don't have to play. That's just … the path I'm gonna get 'em in on." [A4646]. Wilson confirmed, "Gotcha." [*Id.*]. Because the coaches would give recruitment spots to "whoever's gonna ante up," Singer told Wilson an

upfront payment would be advantageous, and Wilson asked Singer to send wiring instructions for "uh, what's your foundation?"[19] [A4646-48].

They discussed the fraud. Wilson confirmed his daughters would be presented to admissions and admitted as athletic recruits but "don't actually have to do that sport," and laughed that they could even be the "scorekeeper" or "water girl." [A4647]. Singer said he could "sell" Wilson's daughters as athletes so that admissions would not question their recruitment, explaining, "I can sell to anybody that they're athletic enough to be able to take 'em and there'll be no question." [A4649]. Wilson confirmed, "Yeah … [e]ven though they wouldn't play. Ok." [*Id.*].

Repeatedly, Singer stressed that the coaches would require "a payment" in exchange for designating Wilson's daughters as recruits: "[T]hey're gonna say to me, uh, 'We're gonna give up a spot for you …. And is the family guaranteeing me that they're gonna ante up and they're gonna make a payment?' Because they don't want to give up a spot." [A4648]. Wilson responded, "Gotcha," and agreed to make a down payment so he was "locked in for 2" recruitment slots for yet-to-be

---

[19] Wilson sent a text message to his tax preparer, asking, "Is there a limit on tax deductions for charity contributions?" [A2686; GSA377]. Wilson later advised his tax preparer that he would be "giving half million cash to a [5]01(c)(3) educational foundation this year … [p]ossibly more this year and similar amount next year." [A2687-90; GSA379].

24

determined sports. [A4648, 4656]. Two days later, Wilson directed his assistant to wire $500,000 to KWF, calling it a "donation" and "tax write off." [A2073-75; GSA326; GSA330; GSA331; GSA440-43]. Wilson texted Singer to confirm his daughters would be guaranteed admission with a "coaches [*sic*] wink" but actually "apply in [the] fall like everyone else." [GSA328].

### 4.    "He's Got to Actually Have Some Sailors"

About ten days after Wilson made the payment, he called Singer again. [A2088-89; A4669]. Singer said he had arranged with the Stanford sailing coach to "guarantee[]" a recruitment spot for one of Wilson's daughters, and that he would "send … the check to the coach. I can send him your $500,000 that you wired into my account to secure the spot for one of your girls."[20] [A4669-70].

Singer said he had attempted to obtain a second recruitment slot for Wilson's other daughter but that the sailing coach "said he can't do that because he has to actually recruit some real sailors so that Stanford doesn't … catch on." [A4670-71]. Wilson laughed and repeated, "He's got to … actually have some sailors. Yeah." [A4671]. Singer then said it again: "Yeah. So that Stanford doesn't catch on to what he's doing." [*Id.*]. Wilson confirmed, "Right." [*Id.*]. Wilson asked if there was

---

[20] Although by this point Singer's statements were a ruse directed by the FBI, Singer had, in fact, previously bribed the Stanford sailing coach, John Vandemoer, to have other applicants admitted as purported sailing recruits, and Vandemoer pleaded guilty to his involvement in the conspiracy. [SA8].

"any news on the Harvard side" for his other daughter, and Singer agreed to get back to him.  [A4673].

Wilson and Singer spoke again in early November.  Singer reported, "[W]e got the Stanford spot.  They wanna know if you want it because I have to pay the coach, um, right away. … [W]e'll pay the coach, um, he doesn't care if it's a sailor or not."  [A2092; A4683-85].  Wilson asked for more time to confirm that his daughter wanted to go to Stanford.  [A4690-93].  Laughing, he noted that if she said, "'Oh, I really want to go to Harvard,' then oh, shit.  You know, I put all this money into Stanford."  [A4693].  Wilson acknowledged this was a "high class problem" because his daughters "weren't going to get into either" Stanford or Harvard on their own merit and "they don't even play the sports."  [A4694].

### 5.    "The Mascot": The Second $500,000 Bribe

In late November, Singer told Wilson he had arranged with a (fictitious) athletics administrator at Harvard to recruit Wilson's other daughter to an unspecified athletic team in exchange for money.  [A2095-96; A4699].  Singer said, "What we have to do is we'll have to give … $500,000.  That money, obviously, like the others, will go through my foundation and then I will fund the senior women's administrator at Harvard.  And then in the spring, since I've already paid [the Stanford sailing coach] the 500 and now we'll give the senior women's administrator 500, so I got another deal for ya."  [A4700].  When Singer proposed

the two slots would cost $1.5 million in total, Wilson responded, "Ok, great." [A4700-01].  Singer confirmed one of Wilson's daughters would be admitted to Stanford as a purported sailor ("she won't have to sail but we're going to put her through sailing"), and the other would be admitted to Harvard as a purported athlete in a sport to be determined ("she will, um, just get her in through … athletics in one of the sports but it won't matter").  [A4701].  Wilson responded that the daughter being admitted to Harvard "knows sailing" so that was "a logical thing," but said "[s]he could be even the mascot, whatever."  [*Id.*].  Wilson agreed to send Singer a second payment of $500,000 to secure the Harvard admission.  [A4701-02].

Wilson thereafter instructed his assistant to wire another $500,000 to KWF as a "donation." [A2099; GSA339; GSA444].  Three days later, Wilson texted Singer, "[W]hat is the sport or angle I need to prep [my daughter] for?"  [GSA336].  When they spoke a few weeks later, Singer told Wilson they would probably use crew as the second sport and confirmed that, "like what we did with Johnny," he would "walk [Wilson's daughters] right through as … recruite[d] walk-on[s]."  [A2100; GSA352; *see also* A1814-15 (defining "walk-ons" as athletes who were recruited but did not receive scholarships)].  Wilson agreed to conceal their arrangement in case anyone from the school called him, and "just say we're applying on our own." [GSA352-53].  In January 2019, Wilson again expressed concern about what sport he needed to "prep" his daughter on; Singer told him that the athletics insider at

27

Harvard "said 'Don't worry about it. I got you a spot. Not to worry about the sport.' Um, so you know, it's [a] done deal." [A2102-03; A4818]. Singer said Wilson could even "swap" which daughter attended which school; Wilson responded, "put 'em on their heads … Ok. Great." [A4819]. When Wilson noted the daughter who wanted to attend Stanford "has nothing to do with sailing, hates sailing," Singer replied: "[W]e know both [are] not athletes at that level. So it doesn't really matter. They're gonna take care of it, uh, with a spot in each place." [A4820]. But, Singer warned, "the only other thing I just want to remind you of is -- is just stayin' away from the people in, uh, admissions," adding, "I just want to make sure that we keep this clean." [A4821].

### B. Wilson's Bribery and Tax Fraud for His Son's Phony Recruitment

As noted in the recorded calls, prior to engaging in the scheme for his twin daughters, Wilson had arranged with Singer to secure the admission of his son to USC as a recruited water polo player in exchange for a payment to a university account controlled by USC water polo coach Jovan Vavic.[21] In addition to the after-the-fact calls acknowledging the deal, its terms were outlined in a series of contemporaneous emails among Wilson, Singer, and others.

---

[21] Vavic was convicted after trial of honest-services wire fraud, conspiracy to commit honest-services mail and wire fraud, and conspiracy to commit federal-programs bribery. *United States v. Vavic*, 19-cr-10081-IT, D. 1235.

28

1.    "Not Get in the Pool": The Deal to Recruit Wilson's Son

In February 2013, Wilson asked Singer about "the deadline to decide on [the] side door for USC."  [A4210].  Singer responded that the deadline was in the summer, remarking: "Jovan is giving me 1 boys slot," but "as of yet no one ha[d] stepped up to commit."  [A4210].  Copying Wilson, his wife later sought to confirm that the "spot" was still available, noting their son Johnny was "unaware of this arrangement."  [A4209].

As Wilson repeatedly acknowledged, Johnny Wilson was not good enough to play water polo at USC, whose team perennially won the national championship, [A2797-98].  He worried that, if Johnny were admitted as a water polo recruit through the side-door scheme, he would "be so weak as to be a clear misfit" because his water polo talent was "obviously" below that of USC's legitimate recruits. [A4212].  Johnny's high school coach testified that although Johnny was a "B-plus" player, USC recruited "A-plus" players only.  [A2797-98, 3521-22].   At the same time, Wilson knew that, if Johnny were not recruited, USC would be a "double reach" for him.  [A1354; GSA21-23].

Singer arranged for Wilson to meet directly with Vavic and assured him that, under the deal they were discussing, "the commitment is to be on the roster not attend all practices" and "frankly after the 1st semester he can move on" and "walk away." [A4212-13].  Later, when Wilson asked again about the "expectations if Johnny gets

into USC thru this WP approach," Singer confirmed: "Just be ready for practice in the fall as a player on the roster or just a member of the squad but not get in the pool. [H]e has to be on the roster for a year one way or another."[22]  [A4286].

Wilson asked Singer about the financial terms of the deal: "What does Jovan need by [S]ept 20," and, "Do I make the first payment to u then?"  [A4215].  Later, he asked again: "When is Jovan going to be able to give us decision on USC?  And when do I pay u ? Was it 50% in nov?  50% in feb when we get final official notice?" [A4282].  Singer responded that "Jovan will provide Johnny's info to admission when he does his other guys"—a reference to Vavic's legitimate recruits—"No payment of money till he gets a verbal and written from admissions and then 50 percent to a savings account I set up.  Then the remainder upon an acceptance letter in March with everyone else."  [*Id.*].

## 2. "Embellish His Profile More": The Falsified Athletic Profile

With the plan agreed upon, the conspirators went to work creating a falsified athletic profile.  Singer told Wilson he was working on "a player profile so [Vavic] can add Johnny to his recruit list and present him to admissions."  [A4215].  Wilson

---

[22] In 2018, around the same time Wilson and Singer were intercepted on the court-authorized wiretap discussing the side-door for Wilson's daughters, Singer told another parent, Agustin Huneeus, that Vavic and Heinel would help facilitate the admission of Huneeus's daughter as a water polo recruit, even though she did not play water polo, in exchange for money.  Singer said that Vavic "knows she's not coming there to play, he knows all that."  [A4559-60].

responded, "Great – let me know when you have verified u have it all completed and into Jovan.  Also when and where to wire money."  [*Id.*].

Singer told Wilson he needed a "close up in action" photo of Johnny for the profile.  [GSA4].  Photo in hand, Singer directed Sanford and another associate, Joel Margulies, to prepare athletic profiles for Wilson's son and for the daughter of another parent involved in the scheme.[23]  [GSA7-12; GSA255].  Sanford responded with materials for those two profiles and one for a third student.  [A4217].  Singer invented accolades and swim times for the Wilson profile, and less than an hour later, sent Margulies faster falsified swim times to include.  [GSA19; GSA20].

Vavic agreed to add Johnny to his recruiting list without ever seeing him play, [A3519], telling Singer only to make sure he provided "a good resume" for admissions.[24]  [GSA14].  Singer relayed the message to Wilson: "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing."  [A4282].

---

[23] That parent, Toby MacFarlane, pleaded guilty for his role in the scheme. [SA13].

[24] Later, after Heinel deflected an Admissions inquiry about the recruitment of students whose high schools did not believe them to be recruitable athletes, Vavic told Singer in a consensually recorded call: "I used to be able to get 'em in much easier, now … [a recruit] is required to have … some kind of a resume.  He can't just be a to-total nobody."  [A4802; A4805].  During the same call, Vavic confirmed he would recruit additional students in exchange for private school tuition payments Singer made for Vavic's children.  [A4801-02].

Less than a week after Singer told Wilson he was "embellishing" Johnny's water polo credentials even "more" at Vavic's direction, Singer forwarded Wilson the false profile, writing "FYI." [A4284-85]. The profile was filled with false honors and awards, making Johnny appear to be a significantly better player than he was. [A3526]. For example, it described Johnny as a captain of his high school team for three years. [A4285]. He was never a captain. [A3526]. It indicated that Johnny was on the statewide "all section" water polo team for three years in a row. [A4285]. He was not. [A3473]. It included the swim times Singer fabricated, [A4285], which a defense witness testified were so fast he did not even think they were possible. [A3266].

### 3.    "Immediate Impact Player": Admission as a Recruit

After sending Vavic the falsified athletic profile, Singer assured Vavic the Wilson family was "fully on board" and "ready to help," and Vavic replied that he would "present" Johnny to admissions with his "top walkons." [GSA24].

One month later, Vavic sent the fake profile to his assistant coach, Casey Moon, and directed Moon to add Johnny as a recruit and create a profile to submit to Subco. [GSA25-26; A2807-08]. Moon—who did not know Vavic was selling recruitment slots through Singer, [A2803, 2915]—testified he had never heard of Johnny. [A2805-06]. This was unusual, because the USC coaches were familiar with the best players in California and spent significant time trying to recruit the best

32

players in the world, including by traveling to see them play or watching their game films. [A2800-01]. No one from USC's coaching staff ever saw Johnny Wilson play. [A3519]. Nonetheless, Moon testified Vavic directed him to describe Johnny to Subco as one of the "top 10" players in the country at his position, and an "immediate impact player" who would play in games right away—a rare feat for a first-year player on USC's national championship team. [A2813-16; A4289; A4294-95].

A member of Subco testified Johnny would not have been admitted to USC unless Vavic had designated him as a recruited athlete. [A1820, 1844]. The Admissions Department approved his admission based on Vavic's false evaluation that Johnny "had a very strong level of athletic talent" and would contribute to the team "right away." [A1825-26; A4288].

### 4. "Consulting or Whatever": The Bribe and False Tax Return

One day after Wilson learned Johnny had been admitted as a recruit, he wrote Singer: "Pls give me the invoice. What are the options for the payment?" [GSA444]. Wilson also asked whether they could disguise the payment as a business expense of his private equity firm: "Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" [*Id.*]. Singer agreed that "we can send you an invoice for business consulting fees and you may write off as an expense." [*Id.*].

33

Wilson told his assistant to expect a six-figure invoice from Singer and directed her to account for it as "business consulting." [A4296]. After further discussions among Wilson, his assistant, Singer, and Singer's bookkeeper, they settled on a slightly different approach: of the $220,000 Wilson owed for Johnny's admission, he would pay $100,000 to The Key for purported "business consulting," $100,000 to KWF as a purported donation, and $20,000 to Singer personally. [A4297]. Wilson sent the three wires on April 7, 2014. [A4841; GSA27-20].

The following week, Singer's bookkeeper asked when Singer wanted to "pay" the $100,000 to the USC water polo account for Vavic, as well as $100,000 to the USC baseball account for the admission of a friend of Johnny's whose family the Wilsons referred to the scheme. [A1339-40; A3286; GSA6; GSA30]. Singer said he wanted "to deliver a cashier check to both this week." [GSA30; A4300-02; A2983-84].

The bookkeeper sent Wilson a fake charitable receipt letter from KWF, just like the letters Abdelaziz and Isackson received, [*supra* 12], and Wilson used the letter to deduct the $100,000 payment from his taxes as a purported charitable donation. [A2594-96; A4411]. The letter falsely stated that "no goods or services were exchanged" for Wilson's "contribution" to KWF. [A4411]. Wilson also received fake invoices from The Key and Singer for "special consulting" involving the "concept, design, and implementation of professional development program for

34

Hyannis Port Capital associates" and "business consulting," which Wilson used to deduct $120,000 from his taxes as purported business expenses. [A2592-94; A4399-4400]. An IRS revenue agent testified the false deductions saved Wilson $88,546 in taxes. [A3055-70; A4501; GSA35-129; GSA425; GSA426].

As the fall semester of Johnny's freshman year approached, Vavic ignored him—despite having told the Admissions Department that Johnny was one of the top players in the country and would be the fastest player on his team. Singer told Wilson that Johnny had to "create a relationship" with Vavic if he really "wants to be on the team." [GSA31]. Vavic's assistant coach testified Johnny was listed on the roster and attended the first day of practice but did not attend practice after that. [A2820-21, 2825]. Johnny formally quit the team after the first semester, just as Singer told Wilson he could. [A2826-27].

## SUMMARY OF ARGUMENT

Defendants were convicted following a month-long trial for their roles in a scheme to secure the admission of their children to selective universities as fake athletic recruits in exchange for money, thereby committing property fraud, honest-services fraud, and federal-programs bribery.  The facts of this case may be unprecedented, as defendants are keen to suggest.  The legal principles that decide it, however, are not.

* * *

Defendants' frontline challenge to their convictions is to argue that what they did was not a crime.  But it was fraud and bribery, and Abdelaziz's conspiracy convictions and Wilson's conspiracy and substantive fraud and bribery convictions are therefore sound.  Furthermore, the special verdict form shows that the jury separately considered whether defendants conspired to commit property fraud and honest-services fraud and found they did both, meaning their Count One conspiracy convictions can stand on either one.

1.    Defendants do not challenge the sufficiency of the evidence that they intended the payments to university accounts as inducements to university insiders to secure their children's admission as fake athletic recruits.  They also do not dispute that the jury could find the payments served as such.  After all, the jury heard Singer describe the *quid pro quo* to defendants in unvarnished terms and saw them pay

"invoices" issued only after their children were admitted. The jury also heard evidence that the university insiders' professional success—and long-term job prospects—benefited from the payments. Indeed, the jury could well have concluded from the evidence that six-figure payments to university accounts the insiders controlled were more valuable to them than even a $5,000 payment to their pocket would have been—and the latter indisputably would constitute a bribe.

Unable to contend with these facts, defendants posit that if the victim of the scheme is also the recipient of the payment, the payment cannot be a bribe as a matter of law. They are wrong. What matters for purposes of bribery is the corrupt inducement, not the form the inducement takes or whether the benefit to the corrupt insider is material or intangible. That is confirmed not only by the conceptual underpinnings of the bribery prohibition, but also by the text of the bribery statutes defendants largely ignore. Those statutes define bribery broadly to capture the many forms a corrupt inducement may take, and they provide no refuge for bribe payments disguised as donations.

Nor do the jury instructions. Pointing to instructions given by a different judge in a different case, defendants argue in the alternative that the judge in this case erred by failing to instruct that payments to university accounts can constitute bribes only if acceptance of the payments was contrary to the universities' interests. Defendants make this undeveloped (and therefore waived) argument without regard

to the instructions given here, and without regard to what the jury's verdict in light of those instructions necessarily entailed: a finding that receipt of so-called "donations" in exchange for the admissions of fake athletic recruits *was* contrary to the universities' interests. As the government argued and the jury agreed, there would have been no need for fake athletic profiles, no need for false assurances, and no need for cover-ups if it were not.

2.     Admissions slots are property. "Property" is defined by reference to its traditional hallmarks: exclusivity and economic value. There is no dispute that a university has the right to exclude students from admission and the access to the university's labor force and real property that admission entails. And given the facts of this case, there can be no serious dispute that admissions slots have economic value. The defendants, after all, were willing to pay handsomely for them. Indeed, their primary (albeit erroneous) theory of defense was that universities trade admissions slots for money as a matter of course.

Perhaps sensing this incongruence, defendants spend little time defending their assertion that admissions slots are not property. They focus instead on arguing the universities were not *defrauded* of that property because the defendants paid the full cost of tuition once their children enrolled. But what defendants cannot reconcile is this: that as Wilson's "high class problem" admits, they were liable for the cost of the admissions slots whether their children decided to attend the schools

38

or not.  Admissions slots thus have value independent of the stream of tuition payments expected once a student enrolled.  And in the transfer of those slots, defendants can hardly claim the universities got the full benefit of their bargain.

Athletic recruitment slots were reserved for athletic recruits—students with potential to help the universities win games at the highest level of collegiate sports, to the benefit of the schools' visibility, brand, and bottom line.  The universities did not get that in the defendants' children.  They did not get an "immediate impact" water polo player, a basketball player who could "make a significant contribution," or a sailor or rower who even played the sport competitively.  Nor did they get what the admissions slots would be worth had the universities decided to trade them not for athletic talent but for money instead.  The defendants in fact chose to pursue the "side-door" scheme rather than make transparent "back-door" donations for precisely that reason: because it offered them more—a guarantee instead of merely a second look—for less—hundreds of thousands of dollars instead of millions.

*    *    *

Defendants raise additional claims they say warrant a new trial on all counts even if the legal theories underpinning their fraud and bribery convictions are valid. None entitles them to the relief they seek.

3.    Abdelaziz's claim that the conspiracy instructions were flawed is both waived and groundless.  It follows that defendants' conspiracy convictions must be

39

affirmed if a rational jury could have found they joined the overarching conspiracy charged in the indictment.  The jury here supportably reached that very conclusion based on sufficient proof of a common goal, overlap, and interdependence.  In seeking to set aside these verdicts, defendants variously overlook, understate, and balkanize the evidence introduced at the month-long trial.  And any conceivable variance was harmless given the overwhelming evidence of the constituent conspiracies encompassing defendants' own side-door transactions; the integral roles they played in those subset conspiracies, as shown by their own damning statements in multiple recorded phone calls and emails; and a trial record that assures they were convicted based on their own words and deeds.  Abdelaziz's separate claim of venue-related prejudice is baseless.  And although it is thus unnecessary to address the question, defendants correctly concede that a prejudicial variance would at most require a new trial and not judgments of acquittal.

4.    Waiver issues aside, there was no abuse of discretion or prejudice in the exclusion of the proposed defense exhibits.  Merely citing multiple categories of evidence alleged to have been erroneously excluded does not make any individual category any more admissible.

The district court was well within its rights in refusing to admit the USC-related exhibits—consisting mainly of email chains within the Athletics Department—under Rules 403 and 802, since they had minimal, if any, probative

value; were saturated with hearsay; and would have sparked a series of mini-trials concerning the academic and athletic qualifications of applicants with no links to the charged conspiracy, causing confusion and delay.  Nor were these exhibits proper grist for impeachment.  The Bradshaw-Alvendia texts were likewise hearsay, and the statements made by Singer and by Wilson himself were properly excluded on multiple grounds, including Rule 403.  And even assuming the district court abused its discretion in any (or all) of these evidentiary rulings, there is no likelihood the verdicts were affected given the abundant proof of defendants' crimes, much of it in their own words, and the dubious value of the proffered materials.

5.    Abdelaziz's unpreserved new trial claim concerning the delayed admission of three exhibits founders because he employed them effectively on cross-examination; published them to the jury; and argued their significance in his closing.  There was no error, let alone plain error.

6.    Wilson's tax conviction is secure because it did not rest to any degree on the bribery or property theories underlying the remaining counts, and because there is no likelihood the jury's tax verdict was affected by any of the other asserted errors.

7.    Defendants' suppression claim is doubly waived because they fail to address the merits portion of the district court's ruling denying their suppression motion, pretending the court denied the motion solely because it was untimely, and

the court hardly abused its discretion in finding as a threshold matter that there was no "good cause" for the late filing.  At any rate, defendants' suppression theory is hopeless because two judges have correctly concluded the theory rests on a misreading of the Title III wiretap statute, and their competing statutory interpretation would not warrant the remedy of suppression in any event.

## **ARGUMENT**

### I.   **DEFENDANTS' CORRUPT *QUID PRO QUO* PAYMENTS WERE BRIBES, AND THE JURY INSTRUCTIONS DO NOT ENTITLE THEM TO A NEW TRIAL**

On this much, the parties agree: the bribery prohibition is meant to prevent third-party payments intended to corrupt an agent's exercise of his duties on behalf of his principal.  Where views diverge, however, is in defendants' insistence that payments made to a principal cannot constitute bribes.  Thus, they contend, their "donations" to university accounts do not qualify—even if the purpose of the payments was to induce a coach to falsely claim that an applicant should be recruited as an athlete, and even if the coach did so as part of an explicit *quid pro quo*. Congress understood that corrupt inducements can take many forms, however, and it defined bribery broadly to capture whatever form they might take.  Under a straightforward application of that definition, defendants' bribery convictions must stand.  Disguising their bribes in sheep's clothing did not entitle defendants to a free pass.  And the jury instructions do not entitle them to a new trial.

## A.     Defendants' Corrupt *Quid Pro Quo* Payments Were Bribes

"Bribery," as the amici write, "is at heart a corruption offense," and "[w]hat [it] corrupts is the behavior of an agent who owes a duty to a principal." [LP-Br.2; *accord* W-Br.22]. In many cases, the agent is a public official, who owes a fiduciary duty to the public. In other cases, like the one here, the agent is an employee who owes a fiduciary duty to his employer. In all events, what bribery prohibits is this: a payment supplied by a third party which is intended to induce the agent to misuse his position. *See Oscanyan v. Arms Co.*, 103 U.S. 261, 277 (1880) (defining the object of a "contract to bribe" as "the control of … agents by considerations conflicting with their duty and fidelity to their principals"); *United States v. Zacher*, 586 F.2d 912, 915 (2d Cir. 1978) ("The common thread that runs through common law and statutory formulations of the crime of bribery is the element of corruption, breach of trust, or violation of duty."); *see also Bribery*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining bribery as "[t]he corrupt payment, receipt, or solicitation of a private favor for official action," and commercial bribery as "[t]he knowing solicitation or acceptance of a benefit in exchange for violating an oath of fidelity").

Defendants' actions plainly violated that prohibition. That is why they propose an exception, arguing that payments to a principal categorically cannot qualify as bribes. Defendants are unable to support this exemption by reference to the terms of the federal statutes defining bribery, however. *See Griffin v. Oceanic*

43

*Contractors, Inc*., 458 U.S. 564, 571 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes."). They in fact make scant effort to do so, and the statutory arguments they do develop fail to persuade. The statutory definition is clear: it prohibits corruptly giving *anything* of value to *any* person with intent to influence an agent in his duties. Defendants' payments fit that definition, and their resort to canons of construction presupposes ambiguity where there is none.

### 1.    The Definition of Bribery

The federal bribery statutes broadly define a bribe as anything of value corruptly given to any person with the intent to influence an agent in the exercise of his duties on behalf of his principal. *See* 18 U.S.C. §§201 (bribery of a public official), 666 (federal-programs bribery); *Skilling v. United States*, 561 U.S. 358, 410 (2010) (noting that honest-services fraud's prohibition on bribery "draws content" from federal bribery statutes). That definition was readily satisfied here.

The evidence established defendants made payments to university accounts as a *quid pro quo* for university insiders recruiting their children as athletes based on falsified credentials. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999) (intent to influence requires a *quid pro quo*). The *quid pro quo* in the case of Wilson's children was explicit: his daughters' admission in exchange for

$1,000,000 up-front, and his son's admission in exchange for payment of $220,000 in "fees" once he was admitted.  [A4282; A4593-4612; A4614-22; A4699-4703; *see also* A3057].  Abdelaziz's $300,000 payment similarly came due only after his daughter's admission was secured.  [A4481-82; A4499-4500; A4518; *see also* A4810].  The jury rightfully rejected the defense suggestion that the payments were being passed along by Singer as no-strings-attached "donations" to USC.  They were payments made *in exchange for* admission of defendants' children as fake recruited athletes—contingent on defendants receiving the benefit of their bargain, and made only when they actually received it.

That exchange was corrupt.  *See Roma Constr. Co. v. aRusso*, 96 F.3d 566, 573-74 (1st Cir. 1996) ("The *mens rea* implicated by 'corruptly' concerns the intention to obtain ill-gotten gain.").  Subco was reserved for one purpose: to determine the admission of recruited athletes.  [A1807-10, 1926, 1933-34, 1971-72, 1993-96].  The Admissions Department relied on profiles submitted by Athletics Department personnel to accurately reflect the athletic qualifications of students selected by USC's coaches to be recruited to USC's Division I teams.  [A1812, 1996].  By agreeing to falsely present Johnny Wilson as an "immediate impact" water polo player and Sabrina Abdelaziz as someone who would be a "great addition" to the basketball team, defendants and insiders subverted the Subco process.  [A2004-05; A2579-80].  The insiders understood this agreement was at

45

odds with the Admissions Department's expectations; that is why, for example, they doubled down on their lies when high schools began to wonder how students were being recruited for sports they did not play. [A1845-63; A4524-25; A4527-28]. Defendants did, too; that is why they hid the arrangement from their children and their high schools, why Wilson worried whether Johnny would be a "clear misfit" at water polo practice, and why Abdelaziz was not the least bit surprised when told of the invented injury to explain Sabrina's absence from the basketball court. [A212; A1332-33; A1862-63, 1999; A3522-29; A4487-88; A4808-10]. An above-board process would not have required such measures—or fake athletic profiles. [A4282; A4284-85; A4465-66; A4666; A4608; A4669-71; A4699-4701; A4818-20; GSA351-52]. Defendants' "secrecy and dishonesty reinforce the corrupt nature of their actions." Jeffrey R. Boles, *The Two Faces of Bribery: International Corruption Pathways Meet Conflicting Legislative Regimes*, 35 MICH. J. INT'L L. 673, 682 (2014); *see also United States v. Sasso*, 695 F.3d 25, 29 (1st Cir. 2012) ("[A]n attempt to cover up the commission of a crime implies consciousness of guilt.").

The insiders did not agree to lie to their colleagues in Admissions for no reason. They did so, rather, because payments to university accounts they controlled were valuable to them. It is well-settled that the term "anything of value" is "defined broadly to include 'the value which [the agent whose influence is being sought] subjectively attaches to the items received.'" *United States v. Renzi*, 769 F.3d 731,

744 (9th Cir. 2014) (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986)); *accord United States v. Crozier*, 987 F.2d 893, 901 (2d Cir. 1993). It is also well-settled that because the thing of value can be directed to "any person," the agent need not personally receive the payoff. *E.g.*, *United States v. Jefferson*, 674 F.3d 332, 341-42 (4th Cir. 2012); *United States v. Siegelman*, 640 F.3d 1159, 1165-66 (11th Cir. 2011). What matters is only whether the agent perceives personal value in the thing received—and the university insiders here did. For Vavic, more money into the water polo account meant more opportunities to advance the six-time national championship team he had dedicated decades of his career to. [*See* A2888; A3221, 3276]. For Heinel, more money into the women's athletic fund meant a salary increase of nearly $100,000 during the time she was accepting "donations" from parents of Singer's students. [A2992-96]. If the way to keep one's job at USC was "to win" or "to bring in money," [A2504], defendants' payments totaling hundreds of thousands of dollars aided the insiders in doing just that. Those payments thus constituted "things of value" to the insiders—seemingly more valuable, even, than $5,000 payments to their pockets would have been.

Defendants do not challenge the sufficiency of the evidence presented to prove any of these points. To the contrary, their argument asks this Court to *assume* the jury could reasonably have found that the money they paid was in exchange for the admission of their children as fake recruited athletes; that the university insiders

47

considered payments to accounts they controlled to be personally valuable;[25] and that the payments corrupted the relationship between the insiders and the universities to which they owed a duty.  Defendants are silent about this evidence because it was overwhelming.  And what it overwhelmingly established was bribery.

### B.    Defendants' Counterarguments Fail

Resisting a straightforward application of the definition of bribery, defendants insist payments to university accounts cannot constitute bribes.  They offer four reasons why that is so: (1) because payments to a principal are not "inherently corrupting"; (2) because "indirect professional benefits" do not constitute a cognizable gain to the agent; (3) because the statutory prohibition requires distinctness between the recipient of bribe monies and the victim of the bribe; and (4) because consequences and canons compel it.  None is availing.

### 1.    "Corruptly" Giving

Defendants' flagship argument is that a payment to a principal is not a bribe because there is nothing "inherently" or "necessarily" corrupting about a payment

---

[25] Rather than contest the sufficiency of this evidence, defendants run from it, incorrectly asserting the government "stipulated that no funds in the athletic programs' accounts *benefited* 'any USC employee personally.'" [W-Br.24 (quoting A3213; alteration added); *accord* W-Br.9 (quoting A3295)].  The stipulations provided only that there was "no reason to believe there were any expenditures, debits, or transfers from" the relevant USC accounts "to any USC employee personally for any purpose unrelated to their employment at USC." [A3213; A3295].

that "inures to the benefit of [the] principal." [W-Br.23]. Defendants fail to establish that a payment must be "inherently" or "necessarily" corrupting to constitute a bribe, however, and a principal's "interests" are not defined by financial considerations alone.

Defendants' argument starts from the false premise that a payment to a principal cannot be corrupting. [W-Br.23]. That *ipse dixit* is disproved by the facts of this case. Defendants' purported "donations" may have been intended for USC funds, but the jury was entitled to find that they nevertheless created the "misalignment between the interests of the principal and its agent" that defendants repeatedly identify as the hallmark of a bribe, [W-Br.23-24]. If admitting fake athletic recruits in exchange for money were consistent with USC's interests, Heinel would not have had to falsely reassure the Admissions Department of the athletic talent of students about whom high school counselors raised red flags. [A1845-53]. She would not have told Singer to refrain from making "donations" to university programs she controlled "so close" in time to fake athletes' admissions. [A4483; A4489; A4640-41]. And she and Vavic presumably would not have been terminated for their roles in the scheme. [A1859-61].

Defendants' effort to preclude that finding by focusing narrowly on the principal's short-term monetary gain cannot be squared with the nature of the harm the relevant statutes seek to prevent. As the name implies, honest-services fraud

49

prohibits bribes and kickbacks in schemes aimed at corrupting the *intangible* right of honest services.   18 U.S.C. §1346; *Skilling*, 561 U.S. at 404.   And similarly, federal-programs bribery prohibits improper influence on not only the commercial activity but also the "*intangible*, noncommercial business" of a federally funded organization, which "threaten[s] to undermine the integrity of those organizations no less than bribes paid to influence commercial-like transactions." *United States v. Dawkins*, 999 F.3d 767, 786 (2d Cir. 2021) (cleaned up) (quoting *United States v. Robinson*, 663 F.3d 265, 275 (7th Cir. 2011)).   It is contradictory to claim that *tangible* gain precludes conviction for crimes aimed at schemes causing or intending to cause *intangible* harm.   *See United States v. Sorich*, 523 F.3d 702, 710 (7th Cir. 2008) ("In the case of a successful scheme, the [entity to whom honest services are owed] is deprived of its servants' honest services no matter who receives the proceeds." (cleaned up)); *United States v. Tanner*, 2018 WL 1737235, at *6 (S.D.N.Y Feb. 23, 2018) ("[A]fter *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback, but whether such actions benefited or harmed the employer who enjoyed a right to the honest services of its employee, is irrelevant."), *aff'd*, 942 F.3d 60, 65 (2d Cir. 2019).   Indeed, that claim is nothing more than a repackaged "no harm-no foul argument" that courts routinely reject. *United States v. Black*, 530 F.3d 596, 600 (7th Cir. 2008), *vacated and remanded on other grounds*, 561 U.S. 465 (2010); *see also United States v. Quinn*, 359 F.3d 666,

674-75 (4th Cir. 2004) (no defense that agent would have taken same action absent the bribe); *United States v. Hausmann*, 345 F.3d 952, 957 (7th Cir. 2003) (no defense that principal "received the same net benefit as they would have absent the kickback scheme").

Because a payment to a principal clearly *can* be—and in this case *was*—corrupting, defendants conjure a requirement that a payment must be *inherently* so in order to constitute a bribe. That requirement is cut from whole cloth. A payment to an agent's preferred charity is not "inherently" corrupting. And neither is a payment to his political campaign. Indeed, the latter is generally considered First Amendment-protected activity. *See Buckley v. Valeo*, 424 U.S. 1, 19-22 (1976). Yet as defendants concede, [W-Br.23], courts have routinely held that such payments constitute bribes where they are given as a corrupt *quid pro quo*. *E.g.*, *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009); *Hausman*, 345 F.3d at 954. As the Sixth Circuit explained in one such case,

> That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe.

*United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (citation omitted). That is no less true of the supposed "donations" at issue here.

51

Defendants' effort to dismiss the charitable- and campaign-contribution cases merely assumes the point in dispute. [*See* W-Br.23 ("[N]one of these payments inures to the benefit of [the agent's] principal, so they *necessarily* corrupt the relationship." (emphasis altered))]. That circular logic goes nowhere, and defendants make no developed effort to anchor their dismissal of these cases in the statutory definition of bribery in its stead. What defendants elsewhere *appear* to be suggesting—but without actually saying so—is that the statutory requirement that a payment be "corrupt" demands nothing more than that it be intended as a *quid pro quo*. *See* [W-Br.27 (asserting without elaboration that "requir[ing] distinctness between the 'person' and the 'organization'" in 18 U.S.C. §666 "makes sense of the statute's 'corruptly' *mens rea*")]. But defendants do not explain why the way to "make sense" of the corruptly *mens rea* in all cases is to effectively read it out of the statute by defining it using the statute's other terms. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973) (It is a "well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect."). Nor do they attempt to square that result with this Court's case law recognizing that "corruptly" has independent meaning. *See aRusso*, 96 F.3d at 573 (interpreting the term's common law meaning); *see also Evans v. United States*, 504 U.S. 255, 259 (1992) ("[A] statutory term is generally presumed to have its common-law meaning." (cleaned up)). They also fail to reconcile that result with their own

52

repeated insistence before the district court that not every *quid pro quo* is a bribe.[26]
[A521; A3721-22, 3726-27, 3795; D.1237 at 1, 3; D.2015 at 66; D.2077 at 5].  Any
argument that the statutory text demands an inherently corrupt payment is therefore
waived.  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  That waiver, in
turn, is fatal to defendants' claim.  *United States v. Roberson*, 459 F.3d 39, 51 (1st
Cir. 2006) ("As in any case of statutory construction, our analysis begins with the
language of the statute," and "[i]f the statutory language provides a clear answer, the
inquiry ends.").

The arguments defendants *do* develop would fail to persuade even if they were
an appropriate place to begin and end the analysis.  First, defendants point out that
bribe payments in prior prosecutions have been paid to parties other than the
principals, [W-Br.22], but that falls far short of establishing that they *must* be.
Second, defendants identify the views of two scholars who have concluded that any
payment to a principal is not a bribe.  [W-Br.23].  Only one of those scholars' cited
works offers a basis for that conclusion, however, and it is avowedly not a legal one.
Harvey S. James, Jr., *When Is A Bribe A Bribe? Teaching a Workable Definition of*

---

[26] Furthermore, another judge in a related Varsity Blues trial "made sense" of
the "corruptly" element using a tailored instruction on the meaning of "thing of
value."  Despite suggesting elsewhere that the judge in this case should have done
the same, [*see infra* 66-68], defendants do not account for that possibility in making
their perfunctory statutory claim.

*Bribery,* 6 TEACHING BUS. ETHICS 199, 200 n.3 (2002). Moreover, it is built on the assumption that "if the action requested or implied by the payer is not in the interest of the principal, then the principal would not take the money." *Id.* at 214. What, though, when the principal is in the dark as to the action requested? And what if that action is contrary to the agent's obligation to the principal? That scenario—the one at issue here—is not one the scholar considers.

The commercial bribery secrecy requirement cited by the amici law professors does not bridge the gap. [LP-Br.8-10]. The amici observe that jurisdictions that have adopted commercial bribery statutes "largely require that bribery transpire without the knowledge and consent of the agent's principal." [LP-Br.9 (quoting Boles, 35 MICH. J. INT'L L. at 681)]. This makes sense: if an employer knows of and consents to a bribe, the employee cannot be said to have violated his duty of loyalty to the employer.

What does not make sense, however, is the suggestion that an employer's knowledge of a *payment* alone suffices to demonstrate consent. *See Dixie Mach. Welding & Metal Works, Inc. v. United States*, 315 F.2d 439, 444 (5th Cir. 1963) (interpreting phrase "without the knowledge and consent" in state commercial bribery statute to mean payments are illegal "unless they were accompanied by *both* the knowledge *and* the consent of the employer" (emphasis added)). Consider the example of an employee who is lavishly wined and dined by a third party hoping to

secure the employer's business. The employer is aware of the payment—it is the way many business deals get done. But unbeknownst to the employer, the employee has promised to steer the contract to the third party in return. Surely that is still a bribe; the employer cannot consent if it does not know what it is consenting to.

The same goes here. USC was aware of *the payment*—as Wilson points out, it issued him a receipt. [W-Br.21]. But a receipt for a charitable contribution indicates that nothing is being given *in return*. [*See* A2635-36]. Without USC's knowledge of the link between the *quid* and the *quo*, any claim of consent falls apart.

### 2.    "Anything of Value"

Defendants next argue payments to university accounts cannot constitute bribes because the university insiders stood to derive only "indirect professional benefits," such as satisfying fundraising goals or advancing the sports programs the insiders oversaw. [W-Br.24]. Their argument elides the statutory definition of bribery and legislative and common law history indicating that "*anything* of value" means exactly that. [*Supra* 46-47]; *see United States v. Townsend*, 630 F.3d 1003, 1010-11 (11th Cir. 2011) ("[B]ecause 'Congress did not add any language limiting the breadth of that word,' we read the term 'any' in 18 U.S.C. §666(a)(1)(B) to mean 'all' things of value." (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); H.R. REP. NO. 87-748, at 18 (1961) ("[T]he words 'anything of value' comprehend anything that conceivably can be offered or given as a bribe."); 1 William Hawkins,

55

*A Treatise of the Pleas of the Crown* 168 (1762) (referring to the "taking of any valuable thing whatsoever, except meat and drink of small value"); *see also United States v. Fernandez*, 722 F.3d 1, 10 (1st Cir. 2013) (observing that "the Supreme Court has repeatedly rejected constructions of §666 that would impose limits beyond those set out in the plain meaning of the statute").

The argument also ignores the import of the charitable- and campaign-contributions cases applying the term.  Charitable and campaign contributions also confer on the agent benefits that are only psychic (in the form of gratification that a preferred cause will be advanced) or derivative (because advancement of that cause may ultimately inure to the benefit of the agent or a loved one) yet can still constitute a "thing of value."  And in fact, the benefits derived from campaign contributions are not meaningfully different from the benefits at issue here.  In either case, the funds can be used for "all manner of self-promotion" to secure one's professional position. *United States v. McGregor*, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011); *see also United States v. Terry*, 2011 WL 5008415, at *5 (N.D. Ohio Oct. 19, 2011) ("The jury could most certainly have concluded that the defendant personally benefited from this assistance [in the form of campaign contributions and other benefits] as it was arguably instrumental in the defendant's bid to retain his seat as a common pleas judge."); *United States v. Vila*, 2009 WL 79189, at *4 (D.P.R. Jan. 9, 2009) ("It hardly seems plausible to suggest that the viability of a wire fraud

prosecution should turn on a distinction as meaningless as whether a candidate personally receives a gift of two thousand dollars or whether that gift is instead made out to the candidate's political committee. Either way, the candidate reaps 'personal gain.'"). The district court appropriately relied on this reasoning to conclude payments made to accounts "that were either controlled by the corrupt insiders or that otherwise inured to their benefit professionally … may still constitute a benefit to those insiders." [W-Add.26-27]. Indeed, the payments could have constituted a "thing of value" based on the accounts being the insiders' charity of choice alone.

Though defendants insist this logic is "overbroad" because "[a]gents *always* stand to benefit when their principals benefit," [W-Br.24], the overbreadth they posit requires divorcing the "thing of value" from the requirement that it be given corruptly with the intent to influence the agent in his duties.[27] Bribery, however, requires both. As defendants' own proposed definition of bribery admits, a "thing of value," without more, is not a bribe. [W-Br.22 (acknowledging the requirement of a "corrupt payment")]. What makes a bribe a bribe is the exchange of payment for improper influence. It is therefore no answer to the district court's conclusion to argue that an agent benefits by way of commissions or professional advancement

---

[27] Defendants' arguments that indirect professional benefits cannot be fairly described as "inherently corrupting" or "private," [W-Br.24], merit little discussion. The former assertion merely repeats the same failed argument discussed above. The latter is pure tautology.

when he sells a product, closes a deal, or secures a donation. [W-Br.23-24, 28]. Likewise, it is no answer to posit a waiter who benefits by way of tips. [W-Br.27]. Those examples confuse a benefit offered by a third party to improperly induce a transaction with a benefit provided or approved by the principal as a result of the transaction itself. The former is a bribe. The latter is not.

Defendants' reliance on *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), [W-Br.24, 28], suffers from the same flaw. In *Thompson*, the Seventh Circuit reversed the §666 and §1346 convictions of a state procurement officer who steered a state contract to a company her boss favored. 484 F.3d at 878, 884. The defendant was not accused of acting in exchange for payments from the contract recipient. *E.g.*, *id.* at 881 ("Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback."), 883 (noting Thompson did not act because of political contributions). She had engaged in a "politically motivated departure from state administrative rules" and nothing more. *Id.* at 878. In the absence of a *quid pro quo*, the Seventh Circuit concluded that neither "an increase in official salary" nor "a psychic benefit such as basking in a superior's approbation (and thinking one's job more secure)" satisfied the "private gain" requirement the court had adopted to limit honest-services fraud before *Skilling*. *Id.* at 882-84.

The *Thompson* court recognized that "[t]he history of honest-services prosecutions is one in which the 'private gain' comes from third parties who suborn

58

the employee with side payments." *Id.* at 884; *accord Skilling* 561 U.S. at 400, 413. And in *Thompson*, as in the self-dealing cases *Skilling* excluded from honest-services fraud's reach, there was simply no third-party payment to speak of. Where such payments are present, though, the Seventh Circuit has agreed with other courts that "a thing of value" is broadly construed. *See Sorich*, 523 F.3d at 709 ("By 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not"). A "thing of value" can be a private sector job for the agent. *United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015). It can be payments to a fund the agent would control. *Id.* And it can be payments to others. *Sorich*, 523 F.3d at 709. In addressing the later scenario, the court did not mince words: "Robin Hood may be a noble criminal, but he is still a criminal." *Id.* at 710.

Such cases are uncommon. More uncommon still are cases in which a payment to a principal will be sufficiently valuable to an agent to induce him to violate his duties. But these "are the exception to a rule of human nature rather than of law." *Id.* at 709. Where they occur, they are bribery.

### 3. "Any Person"

Seemingly recognizing they must somehow harmonize their position with the text of the relevant statutes, defendants turn to *Skilling*'s interpretation of 18 U.S.C. §1346 and the "text and structure" of 18 U.S.C. §666. [W-Br.24-27]. Neither advances their cause.

### (a)    *Skilling*'s interpretation of 18 U.S.C. §1346

Defendants purport to find support for their position in *Skilling*, claiming that case limited 18 U.S.C. §1346 to "paradigmatic" bribes and kickbacks within the "core of the pre-*McNally* [*v. United States*, 482 U.S. 350 (1987),] case law" and that payments to principals do not fit that mold.  [W-Br.25].  Defendants manage to read *Skilling* both too broadly and too narrowly.

In suggesting *Skilling* forecloses the conclusion that payments to university accounts can constitute bribes, defendants emphasize that neither they nor the government has identified a bribery case in which payments were made to the victim of the fraud.  But that fact is unremarkable.  *Skilling* did not limit honest-services fraud to "paradigmatic" bribes or kickbacks, as defendants claim.  It merely limited the doctrine to bribes and kickbacks.  *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011) ("*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks."); *United States v. DeMizio*, 2012 WL 1020045, at *6 (E.D.N.Y. Mar. 26, 2012) ("[T]he 'core' preserved by *Skilling* is [not] limited to particular fact patterns involving bribes or kickbacks that were recognized by pre-*McNally* case law"); *United States v. McGregor*, 2011 WL 1576950, at *1 (M.D. Ala. Apr. 4, 2011) ("In narrowing §1346 prosecutions to bribery cases, the court did not set forth a specific form in which the

bribery-and-kickback scheme must appear, and nor could they since such schemes

could appear in almost infinite forms and evolve over time. … [I]t is the bribery-

and-kickback scheme that survives, not the precise form in which they took place

pre-*McNally*."); *United States v. Scanlon*, 753 F. Supp. 2d 23, 26 (D.D.C. 2010)

("[*Skilling*] used the term 'core' not … to distinguish 'core bribe-and-kickback'

cases from 'non-core bribe-and-kickback cases,' but rather to distinguish bribery and

kickback cases (which *themselves constitute* the 'core' of pre-*McNally* case law)

from cases involving mere undisclosed self-dealing."), *aff'd on other grounds*, 666

F.3d 796 (D.C. Cir. 2012). Defendants' argument "would effectively freeze honest

services fraud" by placing "[n]ovel bribery and kickback schemes … beyond the

reach of the federal antifraud statutes. Nothing in *Skilling* or its reasoning supports

this result." *DeMizio*, 2012 WL 1020045, at *7.

In fact, the only position *Skilling* supports is the government's. As the *Skilling*

Court observed in describing pre-*McNally* case law, the honest-services doctrine

targeted deprivation of the intangible right to honest services, irrespective of tangible

loss—or gain—to the victim:

> Unlike fraud in which the victim's loss of money or
> property supplied the defendant's gain, with one the mirror
> image of the other, … the honest-services theory targeted
> corruption that lacked similar symmetry. While the
> offender profited, the betrayed party suffered no
> deprivation of money or property; instead, a third party,
> who had not been deceived, provided the enrichment. …
> Even if the scheme occasioned a money or property *gain*

61

> for the betrayed party, courts reasoned, actionable harm
> lay in the denial of that party's right to the offender's
> "honest services." *See, e.g.*, *United States v. Dixon*, 536
> F.2d 1388, 1400 (2d Cir. 1976).

561 U.S. at 400 (emphasis in original).    Defendants' discussion of *Skilling*

conspicuously omits mention of this passage.

### (b)    18 U.S.C. §666

Defendants engage in an equally selective reading of *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158 (2001), to argue that 18 U.S.C. §666

requires distinctness between the person to whom a bribe payment is given and the

victim of the bribe.    [W-Br.26-27].    *Cedric Kushner* interpreted RICO, which

makes it unlawful for "any person employed by or associated with any enterprise

… to conduct or participate … in the conduct of such enterprise's affairs through a

pattern of racketeering activity."    18 U.S.C. §1962(c).    Looking to the "statute's

language, read as ordinary English," the Supreme Court agreed with the "basic

principle" that this text requires "two distinct entities: (1) a 'person'; and (2) an

'enterprise' that is not simply the same 'person' referred to by a different name."

533 U.S. at 161-62.    Defendants contend Section 666 "follows a similar structure"

and so requires a similar conclusion.    [W-Br.27].    To arrive at a "similar structure,"

however, defendants emphasize select phrases of the statutes with no regard

whatsoever for what comes in between.

*Cedric Kushner* itself demonstrates the folly of this approach. Immediately following the statement on which defendants rely, the Court observed that "[t]he Act says that it applies to 'person[s]' who are '*employed by or associated with*' the 'enterprise.'" 533 U.S. at 162 (emphasis added) (quoting §1962(c)). It was the plain reading of *this* language that informed the result in *Cedric Kushner*—and in every court of appeals decision to consider the issue before it: "In ordinary English one speaks of employing, being employed by, or associating with others, not oneself." *Id.* (citing dictionary definitions of "associate" and "employ"); *see also United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000) (en banc) (collecting cases). Despite the obvious import of this language, defendants' attempted analogy reads right past it.

Section 666 lacks any similar limitation.[28] Congress knew how to exclude payments to principals but did not. *Compare* 1 U.S.C. §1 (defining "person" to include entities), *with* 18 U.S.C. §18 (defining "organization" to "mean[] a person other than an individual"). It instead made potentially liable anyone who corruptly gives or offers anything of value "to *any* person," without adding any language

---

[28] Defendants also assert that "distinctness between the 'person' and the 'organization' is the only way to give each term independent meaning." [W-Br.27]. To the extent that single-sentence assertion is intended as a freestanding argument, it is waived. *Zannino*, 895 F.2d at 17. And in any event, it is unavailing. That logic presumably also would demand distinctness between the "person" and the "agent," but money paid to an agent's pocket indisputably can constitute a bribe.

limiting the breadth of those words. In doing so, Congress affirmatively signaled

its intent that courts would construe broadly the range of payments that are within

the reach of Section 666. *See Salinas v. United States*, 522 U.S. 52, 57 (1997) ("The

word 'any' … undercuts the attempt to impose [a] narrowing construction.").

### (c)    Consequences and Canons

In their last effort, defendants resort to "consequences" and canons. [W-

Br.27-29]. Here again they fail to persuade.

The allegedly adverse consequences defendants identify depend on

hypotheticals that ignore one or another component of bribery. In most, defendants

accuse the government of offering a limitless conception of the *quid* by referencing

scenarios that entail no *quid* at all. [*See supra* 57-58]. In another, they pay no heed

to the requirement that the *quid pro quo* be shown to be corrupt. [W-Br.27]. "At

most," they have shown "that in some factual circumstances assessing liability …

will be difficult," but "even clear rules produce close cases." *Salman v. United*

*States*, 580 U.S. 39, 51 (2016) (cleaned up).

Defendants also ignore the fallout that underscores the implausibility of *their*

approach. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021). By defendants'

logic, it would have been criminal if they had paid the coaches personally for

recruiting their unqualified children as athletes, even if the coaches had turned

around and paid the money directly into the USC men's water polo or women's

athletics fund.  But, defendants contend, it was *not* criminal to engage in the same corrupt *quid pro quo* as long as the coaches steered the payments directly into the funds without a momentary pit-stop in their pockets.  Moreover, it would have been criminal if defendants had paid the coaches $5,000 personally to induce them to recruit their unqualified children, but it was *not* criminal to make payments of hundreds of thousands of dollars to the funds to induce the same transaction—even if the coaches thought the latter were far more personally valuable.  Nothing in the relevant statutes supports those absurd results.

Nor do the invoked canons of construction require them.  The bribery statutes are unquestionably broad—and intentionally so, to capture the many forms a bribe can take.  [*Supra* 55-56, 63-64]; *Salinas*, 522 U.S. at 56 (noting "the enactment's expansive, unqualified language").  That does not make them ambiguous.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (statute's application to "situations not expressly anticipated by Congress does not demonstrate ambiguity"; "[i]t demonstrates breadth").  No separation-of-powers or rule-of-lenity issue arises when a court interprets or applies such a statute as written.  *See, e.g.*, *United States v. Castleman*, 572 U.S. 157, 173 (2014) (rule of lenity applies only to resolve "a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended").  Furthermore, any vagueness concerns are blunted by the required mental state.  *See United States v. O'Hagan*, 521 U.S. 642,

65

665-66 (1997). As defendants argued below to both the jury and the court, a defendant who in good faith does not believe his payment to be a bribe cannot be convicted of bribery. [*E.g.*, A521; A3718-20; A3725; A3855]. A defendant whose good faith defense is rejected can thus hardly be heard to complain of vagueness.

### C.    Defendants' Fallback Instructional-Error Claim Fails

Defendants alternatively argue that even if their payments to USC accounts could constitute bribes, the district court's instructions were inadequate to instruct the jury on when that is the case. [W-Br.32-33]. Rather than engage with those instructions, however, defendants merely juxtapose a single line of the 50-page jury charge and an instruction given by a different judge in the recent trial of Jovan Vavic. In that case, Judge Talwani told the jury that payments to university accounts could be bribes if (as relevant here) the payments were made at least in part for the employee's own interests and "receipt of the payments [was] contrary to the university's interest." Tr. of Apr. 7, 2022 at 265-66, *United States v. Vavic*, No. 19-cr-10081 (D. Mass.); *accord id.* at 272. Defendants claim they proposed a "similar" instruction in this case, [W-Br.33 (citing A522-23)], but that is revisionist history. What they proposed was a definition of bribery that altogether excluded the payments to university accounts—not one that explained when such payments could be bribes. [A522 ("[A] payment *to the victim*, to be used for the benefit of that entity,

is not a bribe."); *id.* at nn.143 & 145]. Their objections to the instructions as given were more of the same. [A3854, 3858, 3863-65].

Defendants' objections below may have sufficed to avoid forfeiture, but their failure to elaborate on them before this Court amounts to waiver. Defendants observe that in contrast to Judge Talwani, Judge Gorton instructed that "[p]ayments to third parties, including even employer universities, may qualify as bribes or kickbacks." [W-Br.32 (quoting A3836)]. True. But a district court "has considerable discretion in how it formulates, structures, and words its jury instructions," *United States v. Gonzalez*, 570 F.3d 16, 21 (1st Cir. 2009), and Judge Gorton also said more. At the outset, the court instructed that "[i]t is not against the law to donate money, even large sums, to universities, nor is it against the law to hope that such a contribution will make the admission of one's child to that university more likely." [A3816. In differentiating such payments from legally impermissible ones, the court explained that honest-services fraud entails a breach of the employee's fiduciary duty "to act only for the benefit of the employer, and not for the employee's own enrichment or benefit," and requires not only a *quid pro quo* but also a "misrepresentation or concealment of a material fact [or] matter." [A3833-34]. The court also instructed in connection with federal-programs bribery that the payment must be offered "corruptly," which "involves conscious wrongdoing or, as it has sometimes been expressed, a bad or evil state of mind." [A3842]. It is black-

letter law that "instructions must be evaluated not in isolation but in the context of the entire charge," *Jones v. United States*, 527 U.S. 373, 391 (1999); [*see also* A3880 (instructing jury on same)], and defendants make zero effort to explain how the instructions as a whole failed to convey the relevant legal principles. Any such argument is therefore waived. *Zannino*, 895 F.2d at 17.

Even if this Court were to look past waiver, defendants would not be entitled to a retrial because the formulation they now say they espoused is the only one on which they could have been convicted. *See United States v. McLellan*, 959 F.3d 442, 466 (1st Cir. 2020) ("An erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element."). As an initial matter, Judge Gorton's instructions covered the substance of Judge Talwani's charge. *See Gonzalez*, 570 F.3d at 21 (refusal to give requested instruction requires reversal only if, among other things, the requested instruction was "not substantially covered elsewhere in the charge"). As noted, the court made clear in its prefatory charge that anything less than a *quid pro quo* would not suffice. Then, in its instructions on honest-services fraud and federal-programs bribery, the court explained the need for the *quid pro quo* to be accompanied, respectively, by a material misrepresentation and corrupt intent. A material misrepresentation is a separate element of honest-services fraud, to be sure.

[W-Br.30-31]. But its presence, like the presence of "corruptly" in §666, ensured defendants could be convicted only if they understood that "receipt of the payments [was] contrary to the university's interests." There would have been no need for the lies if it were not. [*Supra* 45-46].

Those lies, moreover, were the crux of the government's case. The government told the jury—repeatedly—that "this case is about lies, lies to obtain athletic admissions slots." [A1012; *see also*, *e.g.*, A990, 994, 1001; A3636-39, 3462-63, 3659-60, 3667, 3669-70, 3673, 3680, 3682; A3767-68]. And from its opening statement to its rebuttal, the government distinguished the back-door from the side-door on this basis. [A1013; A3644; A3773-74; *see also* A3576]. Defendants, for their part, strove to convince the jury they were ignorant of the lies. [*See, e.g.*, A1017-18, 1034-35; A3710-14, 3733-41]. The jury was entitled to believe that spin on the facts. The jury was also entitled to rely on defendants' own recorded words to reject it. Proof that receipt of the payments was contrary to the university's interests was inherent in proof of the overall convictions, however, so the jury could not have failed to find it. Any potential instructional error, therefore, was harmless beyond a reasonable doubt. *See McLellan*, 959 F.3d at 466-67; *United States v. Potter*, 463 F.3d 9, 19 (1st Cir. 2006).

## II.    DEFENDANTS COMMITTED PROPERTY FRAUD

Defendants insist admissions slots are not property, but the very nature of their scheme confirms the conclusion they resist.  Defendants engaged in a transaction: an athletic recruitment slot in exchange for hundreds of thousands of dollars.  The terms of the transaction were clear: they only paid when the slot was delivered, and regardless of whether they chose to use it.  Admissions slots, in other words, have value independent of the stream of tuition payments expected once an admitted student enrolls, and indeed, whether the admitted student enrolls or not.  The slots themselves are transferable by the universities for value, and they therefore constitute property.

### A.    Admissions Slots Are Property

Admissions slots bear the primary traditional hallmarks of property: exclusivity, *see Carpenter v. United States*, 484 U.S. 19, 26-27 (1987), and economic value, *see Pasquantino v. United States*, 544 U.S. 349, 357 (2005); *Cleveland v. United States*, 531 U.S. 12, 22 (2000).  A university has the exclusive right to determine whether and to whom admissions slots are issued, to revoke admissions slots, and to prohibit their transfer to another person, all of which flow from its ownership of an array of tangible and intangible assets.  Admissions slots also have economic value—and not just because an enrolled student pays tuition. They also have economic value for reasons defendants' willingness to pay for them

makes plain: because the slots themselves are transferable by the university in exchange for money—more, even, than defendants paid—should the university choose to sell them. Indeed, defendants themselves argue (contrary to fact) that this is what USC was doing as a regular practice. Admissions slots, therefore, are "something of value" in the university's hands. *Pasquantino*, 544 U.S. at 35 (quoting *McNally*, 483 U.S. at 358, to define "property").

The district court relied for this conclusion primarily on *United States v. Frost,* 125 F.3d 346 (6th Cir. 1997). The defendants in *Frost* were professors and graduate students convicted of mail fraud for their roles in a scheme to award university degrees using plagiarized theses and dissertations. 125 F.3d at 352-53. The Sixth Circuit held that by falsely certifying the students had satisfied degree requirements, the professors infringed a cognizable property right of the university in its unissued degrees. *Id.* at 367. Recognizing that "[u]ltimately, a university is a business," the court reasoned:

> The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students, or to students who have not earned them, will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money.

*Id.* at 267. "The logic of *Frost*," as the district court found, "neatly applies to the case at bar." [W-Add.18].

Defendants strive to distinguish *Frost* on multiple grounds, starting with the fact that *Frost* involved university *degrees* rather than university *admissions slots*. "Degrees," Wilson writes, "reflect the university's determination that the student has satisfied academic requirements," and cheating on those requirements "involves obtaining the school's ultimate product (its certification) without satisfying the student's academic end of the bargain." [W-Br.40]. But admissions decisions reflect the university's determination that the student has satisfied admissions requirements, and cheating on those requirements involves obtaining "a necessary precursor to obtaining [a university's] degree." [W-Add.18 (observing that students gain admission to a university for the purpose of and with the expectation that they will obtain a degree)]. *Frost*'s rationale, moreover, applies equally whether one focuses on the process of gaining admission to a selective university or its awarding of degrees. The number of admissions slots, like the number of degrees, is limited, and the choice to award them is part of a business decision that has repercussions for the school's ability to "attract qualified tuition-paying students," "recruit accomplished professors," and "solicit donations." [W-Add.19]. Awarding *athletic* admissions slots has further repercussions for the performance and profitability of the school's sports teams. The district court thus correctly rejected defendants' distinction as one without a difference.

72

It follows that defendants attack *Frost*'s rationale, claiming it is inconsistent with *Cleveland*'s conclusion that an unissued video poker license was not "property" in the hands of the issuing state.  [W-Br.40 (quoting *United States v. Ernst*, 502 F. Supp. 3d 637, 650 (D. Mass. 2020), for the proposition that *Frost*'s rationale "would have been true" of the state's *non*-property "interest in only awarding gaming licenses to qualified applicants" (cleaned up))].   Their reading of *Cleveland* "misunderstands the fundamental basis of the Supreme Court's reasoning in that case," however.  *United States v. Hedaithy*, 392 F.3d 580, 600 (3d Cir. 2004) (concluding testing company had property interest in test score reports).  Unissued licenses did not qualify as property because the state's concern in issuing them was not economic but regulatory, aimed at promoting "public confidence and trust that gaming activities are conducted honestly and are free from criminal and corruptive elements."  531 U.S. at 20-21 (cleaned up); *accord Pasquantino*, 544 U.S. at 357 ("We held [in *Cleveland*] that a State's interest in an unissued video poker license was not 'property,' because the interest in choosing particular licensees was purely regulatory and could not be economic." (cleaned up)); *United States v. Berroa*, 856 F.3d 141, 149 (1st Cir. 2017).  That reasoning has no application here.  Indeed, the Sixth Circuit concluded just that in rejecting an argument that the outcome in *Frost* was controlled by circuit precedent holding, just as *Cleveland* later did, that unissued regulatory licenses are not property in the hands of the state.  125 F.3d at 367 (citing

*United States v. Murphy*, 836 F.2d 248, 253-54 (6th Cir. 1988)).  The Sixth Circuit found that precedent distinguishable for the same reason *Cleveland* is: because a university is a business.

Failing all else, defendants dismiss *Frost* on the basis that it involved honest-services fraud rather than property fraud.  [W-Br.40 (citing *Ernst*, 502 F. Supp. 3d at 648-49)].  As Judge Casper put it in another college admissions case, this argument "construes *Frost* too narrowly."  *United States v. Khoury*, No. 20-cr-10177-DJC, 2021 WL 2784835, at *2 n.1 (D. Mass. July 2, 2021).  Though the property question in *Frost* arose in a different context, "based on a premise about §1346's scope that *Skilling* has since superseded," [W-Br.40], that premise was that honest-services fraud was defined by reference to *property* rights, *Frost*, 125 F.3d at 369 ("[W]e have construed the intangible right to honest services in the private sector as ultimately dependent upon the property rights of the victim.").  The Sixth Circuit concluded that "[a] professor … owes a fiduciary duty to protect *the property* of his employer university" and thus framed the relevant analysis as whether "the University has a *property right* in a degree which it has not issued yet."  125 F.3d at 367 (emphasis added).  And in answering that question in the affirmative, the court considered "cases that determined whether something was property under the mail fraud statute at issue here."  *Khoury*, 2021 WL 2784835, at *2 n.1 (citing *Frost*, 125 F.3d at 367).

74

What remains is defendants' perfunctory insistence that in assessing the attributes of property, *Ernst* had the better view. [W-Br.35 (stating, without elaboration, that *Ernst*'s analysis is "compelling")]. In *Ernst*, Judge Talwani cited the fact that universities neither sell admissions slots commercially nor convey any property rights to admitted students to conclude that admissions slots are not property. 502 F. Supp 3d at 650-51. Judge Talwani derived these limitations from *Cleveland*'s rejection of proposed analogies of the state's interest in the unissued licenses to a patent holder's interest in an unlicensed patent and a franchisor's right to select its franchisees. *Id.* (citing *Cleveland*, 531 U.S. at 23-24). The *Cleveland* Court distinguished the former on the basis that the state "does not conduct gaming operations itself" or "hold video poker licenses to reserve that prerogative," "does not 'sell' video poker licenses in the ordinary commercial sense," and "may not sell its licensing authority." 531 U.S. at 23. Distinguishing the latter, the Court observed that while "a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market," the state's authority to select licensees "rests on no similar asset." *Id.* at 24.

Those distinctions are inapt here. Unlike the state in *Cleveland*, the universities have "put [their] labor [and] capital at risk," and "share[] both losses and gains arising from the business venture." *Id.* (observing that "the State did not decide

75

to venture into the video poker business").  They have invested vast sums of money to erect classrooms, laboratories, dormitory rooms, and more, and to employ an extensive, highly trained workforce.  Their right to grant admission derives from their ownership of not only these assets but also a brand and related trademarks that, like a franchisor, they could (and frequently do) "sell on the open market."[29]  And similar to franchisee selection, the selection of students for admission is integral to maintaining the value of that brand.  Moreover, the fact that the universities have not chosen to sell admissions slots "in the ordinary commercial sense" no more detracts from their ownership interest in them than a patent holder's decision not to license her patent would.  The relevant point is that, like a patent holder, they *could*—as defendants' willingness to pay for those admissions slots proves.  In defendants' telling, in fact, the universities *already do*.  [W-Br.62].  Defendants thus contend in one portion of their brief that admissions slots are *not* property because universities do not sell them commercially, [W-Br.35], yet elsewhere say they are not guilty of a crime because USC regularly sold slots to anyone willing to pay, [W-Br.62].  Defendants do not, because they cannot, attempt to reconcile these positions, or to

---

[29] *See, e.g.*, "USC Trademark and Licensing Services," *available at* https://trademarks.usc.edu/; "Licensing Program," Harvard Trademark Program, *available at* https://trademark.harvard.edu/pages/licensing-program.

explain how admissions slots do not qualify as property if what they maintain about USC's practice is true.[30]

In sum, if "[t]he test for identifying property relies on precedent and common sense," [NACDL-ABCL-Br.5], that test is satisfied.[31]  Precedent supports the conclusion that admissions slots bear property's traditional attributes, and common sense confirms that something that can be sold in exchange for money fits the mold.

---

[30] Defendants are not aided by the amici argument that students do not have property rights in admissions slots, [NACDL-ABCL-Br.6-7].  The relevant question is whether "the thing obtained [is] property in the hands of the victim," *Cleveland*, 531 U.S. at 15—here, the universities.

[31] To the extent the amici mean further to suggest that intangible rights cannot qualify as property or that admissions slots can be considered property only if they have historically been treated as such, [NACDL-ABCL-Br.3], defendants are wise not to join those arguments, [W-Br.34 (acknowledging that intangible rights can qualify as property "if they have historically been treated as property *or* bear its traditional hallmarks" (emphasis added))].  *Carpenter* makes clear that property rights are not limited to tangibles, 484 U.S. at 25 (clarifying that *McNally*, 482 U.S. 350, had not "limit[ed] the scope of §1341 to tangible as distinguished from intangible property rights"), and *Cleveland* makes clear that absence of historical pedigree does not end the inquiry, 531 U.S. at 21, 23-24 (observing that the licensing at issue "resemble[d] other licensing schemes long characterized" not as property but "as exercises of state police powers" yet nevertheless considering whether it was sufficiently analogous to forms of property previously recognized); *see also Carpenter*, 484 U.S. at 26 (citing, *inter alia*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984), in which the Court engaged in a similar analysis to determine whether commercial data constituted property); *Pasquantino*, 544 U.S. at 355-56 (embracing a definition and analysis of "property" that contains no historical limitation as to form).

**B.      Defendants' Counterarguments Fail**

Defendants' argument primarily focuses not on whether admissions slots bear the markers of property, but instead on (1) construing the alleged property as merely an offer to engage in a subsequent transaction; (2) arguing the universities were not defrauded because they got the full benefit of that transaction; and (3) again invoking consequences and canons of construction.  These efforts fail.[32]

---

[32] So, too, do further arguments Abdelaziz alone makes regarding the remedy in the event the Court agrees.  In a single sentence, Abdelaziz asserts that even if this Court were to rule in his favor on the bribery issue alone, it should nonetheless vacate his Count One conviction because "the discussion of bribery so infected the proceedings as to prevent [him] from receiving a fair trial on the property fraud issue;" and (2) the district court permitted two former USC officials' invocation of the Fifth Amendment "presumably based on" the bribery theory and "thereby depriv[ed] [him] of the opportunity to examine these witnesses with respect to USC's admissions practices relevant to … property fraud."  [A-Br.28].  These arguments are not only forfeited for failure to make them below but also waived for failure to develop them on appeal.  *Zannino*, 895 F.2d at 17.

Furthermore, implicit in these arguments is what defendants nowhere expressly acknowledge: that the jury separately considered whether defendants conspired to commit honest-services fraud and property fraud and found them guilty of both.  [GSA1-2].  Defendants' Count One conspiracy convictions can therefore stand on the basis of either theory.  *United States v. Mullet*, 822 F.3d 842, 848-49 (6th Cir. 2016) (collecting cases).  *Cf. Yates v. United States*, 354 U.S. 298, 312 (1957) (a verdict may be set aside "where the verdict is supportable on one ground, but not on another, *and it is impossible to tell which ground the jury selected*" (emphasis added)).

### 1. Admissions "Offers"

Defendants cast the alleged property at issue as offers to engage in a transaction: the exchange of tuition for educational services. [W-Br.35-36]. There cannot have been a deprivation of money or property, they say, because in executing that transaction they paid the full tuition price. But tellingly, not a single session of the district court to consider the issue—not Judge Gorton in this case, not Judge Casper in *Khoury*, and not even Judge Talwani in *Ernst*—has approached it that way. [W-Add.16-20]; *Khoury*, 2021 WL 2784835, at \*2-3; *Ernst*, 502 F. Supp. 3d at 647-53. And for good reason. A charity auction attendee who pays the full price of his winning bids is not absolved of liability if he defrauds the charity of the $500 per-head price of admission to the auction (and is on the hook for that fraud whether he places bids or not). *Cf. Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 644, 648 (2008) (holding that false representation to secure an extra bid in county's property tax lien auction, thereby depriving other bidders of the opportunity to obtain the liens, was an "act which is indictable as mail fraud" even though petitioners paid for the liens they obtained). Similarly here, the fact that defendants' children were not awarded scholarships and paid the full cost of tuition demonstrates only that the universities were not defrauded of money once the children were enrolled; it says nothing of whether they were defrauded of property in the first instance. *Cf. Hedaithy*, 392 F.3d at 604 ("[I]f the object of which the victim was alleged to have

79

been defrauded was fully paid for, then the victim could not have been defrauded of any money.  That does not end the inquiry, however, as to whether the victim was defrauded of the object itself.").

As defendants conceded below, a property owner has the right to determine whether and under what conditions to part with its property.  [D.1228 at 8].  *Cf. Carpenter*, 484 U.S. at 26 (concluding newspaper had property right in making exclusive use of schedule and contents of news column prior to publication).  And because admissions slots are property, the universities were deprived of that right.

### 2.    Benefit of the Bargain

In any event, defendants' argument fails even on its own terms.  That is because the transaction bargained for was not merely an admissions slot in exchange for tuition, as defendants suggest.  [W-Br.35].  It was an admissions slot in exchange for tuition *and* athletic talent.  Defendants' children were admitted as members of a rarified group of athletes who were expected to help USC win games at the highest level of collegiate sports, [*e.g.*, A1806-08; A2461], thereby enhancing its visibility and brand and, ultimately, its bottom line.  Chassin testified that the Admissions Department evaluates "every student's academic preparation and … weigh[s] any special talents or contributions that they'll make to the campus and the community." [A1810].  And she and others spoke repeatedly of the value athletic recruits were expected to bring to USC and its teams.  To wit:

> Q. What are expectations for recruited walk-on athletes
> once they are admitted to USC?
> A. That they will contribute to -- contribute athletically to
> the teams for which they've been recruited.

[A1815; *see also*, *e.g.*, A2506 ("So my responsibility as a coach [with respect to recruiting] was to, first and foremost, find athletes that were going to make an impact on our team ….")].  That is why the coaches specifically reported to Subco on their recruits' athletic assets.  [*E.g.*, A1824, 1835; *see also* A2502 (explaining that fake profiles were meant to "make it sound like [the purported recruit] would be a benefit to the team and make an impact on the team")].

The evidence was unequivocal that in the case of defendants' children, the universities did *not* get those bargained-for assets.  In Johnny Wilson, for example, USC did not get a water polo player who attended practice beyond the first day, much less someone who could make an immediate impact as the fastest player on the team.  And in Sabrina Abdelaziz, USC did not get a basketball player who attended practice at all—or ever even intended to.  By misrepresenting their children's abilities, defendants induced USC to part with valuable admissions slots while denying it an essential component of the package of consideration it sought in return: the realistic prospect of a contribution to its sports teams.  That is akin to lying about the quality of goods or services sold, and it is traditional property fraud.

81

The cases cited by defendants are not to the contrary. *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014), and *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), concerned the application of the federal fraud statutes to buyers who deceived sellers about the use to which goods being bought at full price would be put—matters that, in the context of those cases, were not essential elements of the bargain. *Sadler*, 750 F.3d at 590-591 (false assurances that opiate purchases would be used for low-income patients); *Bruchhausen*, 977 F.2d at 466-468 (false assurances that purchased equipment would not be sent to the Soviet Bloc). The Sixth and Ninth Circuits found the deception in those cases did not amount to fraud because a seller has no property interest in "accurate information" about the intended use of its products, *Sadler*, 750 F.3d at 591 (citation omitted), or "in the disposition of goods it no longer owns," *Bruchhausen*, 977 F.2d at 468. Those holdings do not suggest that a scheme like defendants' scheme here, which did involve an essential element of the bargain, is nonfraudulent. And *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), and *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), indicate the opposite. As the Eleventh and Second Circuits recognized in those cases, schemes that depend on misrepresentations about "the very nature of the bargain itself" "*do* violate the mail and wire fraud statutes." *Takhalov*, 827 F.3d at 1313-14 (emphasis added) (quoting, *inter alia*, *Shellef*, 507 F.3d at 108); *see also United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (observing such schemes

include ones premised on misrepresentations that "creat[e] a discrepancy between benefits reasonably anticipated … and the actual benefits [received]" (cleaned up)).

The universities here did not "receive[] exactly what they paid for." *Takhalov*, 827 F.3d at 1314 (cleaned up).  Instead, they were "promise[d] that a gemstone is a diamond when it is in fact a cubic zirconium." *Id.*  And in that process, they were defrauded of property.

### 3.    Consequences and Canons

Defendants' invocation of "consequences" and canons of construction does not alter the analysis.  [W-Br.37-39].  Many of their hypotheticals presuppose deprivation but speak only to deception. *See Takhalov*, 827 F.3d at 1312-14.  Others are merely stalking horses for defining property based on *de minimis* examples in a manner the law does not support.  The meaning of "money" does not change simply because in some cases the sum may be small, and neither is the meaning of "property" determined by reference to examples that might seem slight.  It is determined by reference to the traditional hallmarks of property, and those hallmarks are present here.  And accordingly, neither lenity nor federalism concerns come to bear. *See, e.g.*, *Hedaithy*, 392 F.3d at 601 n.19 ("Because the government's theories of property rights in this case are consistent with traditional concepts of property,

we need not address Defendants' arguments with respect to the rule of lenity." (citing *Cleveland*, 531 U.S at 24)).[33]

## III. THE VARIANCE CLAIM LACKS MERIT

Relying principally on cases stemming from *Kotteakos v. United States*, 328 U.S. 750 (1946), defendants argue they were at most members of smaller conspiracies that were subsets of the charged overarching conspiracy. [W-Br.44-59; A-Br.29-42]. But a rational jury could—and did—find otherwise, so their variance claim fails. And there was no prejudice in any event. Accordingly, although defendants are right that the remedy for a prejudicial variance would be a new trial only and not a judgment of acquittal, the Court need not decide whether to accept that concession.

---

[33] Defendants and amici make additional arguments concerning the "right to control" theory of property, [W-Br.41-43; NACDL-ABCL-Br.8-11], which is the subject of a circuit split the Supreme Court recently granted a petition for a writ of certiorari to resolve, *Ciminelli v. United States*, No. 21-1170, 2022 WL 2347619, at *1 (U.S. June 30, 2022). As defendants explain it, this theory treats the right to control one's assets as not merely an incident of property ownership but as the property itself. [W-Br.17, 41]. This was not the theory on which this case was submitted to the jury, [*see* A3827], and, for the reasons set forth above, the conclusion that the universities were defrauded of property does not depend on it. Thus, although this Court has recognized the "right to control" in a decision that goes uncited in the defense briefing, *United States v. Bucuvalas*, 970 F.2d 937, 945 (1st Cir. 1992) (citing *Carpenter*, 484 U.S. at 26), *abrogated on other grounds by Cleveland*, 531 U.S. 12; *see also United States v. Doherty*, 867 F.2d 47, 60 (1st Cir. 1989) (recognizing a right "of control over how [one's] money was spent" (quoting *McNally*, 483 U.S. at 360), it need not revisit the theory here.

## A.    The Instructional Claim Is Waived And Meritless

Two appellate "ground rules" apply when a defendant contests "the existence of a single overarching conspiracy." *United States v. Fenton*, 367 F.3d 14, 18 (1st Cir. 2004).  The Court first inquires whether there were "proper" or "unchallenged" instructions covering the subject of single-versus-multiple conspiracies. *Id.*  Barring an instructional error, the Court asks "whether the evidence sufficed to support the jury's finding of an overarching conspiracy" under the deferential rational-trier-of-fact standard. *Id.*

Abdelaziz alone invokes the first rule.  In a five-sentence claim relegated to a footnote bereft of legal citations, he asserts the jury instructions "permitted the jury to convict [him] of joining a smaller conspiracy" focused on the USC-related conduct rather than the broader charged conspiracy. [A-Br.35 n.10].  Wilson refrains from adopting this position, [W-Br.83 n.8], and does not separately fault the instructions, [W-Br.44-59], so the point is waived as to him. *United States v. Gottesfeld*, 18 F.4th 1, 16 (1st Cir. 2021).  Meanwhile, Abdelaziz has waived the issue for himself (and for Wilson if he is relieved of the first waiver) through his perfunctory treatment of it. *United States v. Castro-Vazquez*, 802 F.3d 28, 37 n.6 (1st Cir. 2015) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.").

85

There was no error anyway.  Although the district court referred to USC in its conspiracy charge, [*e.g.*, A3818, 3820], "[j]ury instructions must be read as a whole, not in some sort of splendid isolation."  *United States v. Goris*, 876 F.3d 40, 48 (1st Cir. 2017).  In passages Abdelaziz ignores, the court gave him the very instructions he says he was denied, and this record rebuts any notion that the court telescoped the jury's review to the USC-related transactions: (1) "The government must prove … the conspiracy specified in the Indictment, and not some other agreement or agreements," [A3822]; (2) "the Indictment charges both defendants with participation in two overarching conspiracies prized [*sic*, comprised] of numerous participants: The fraud conspiracy charged in Count 1, and the bribery conspiracy charged in Count 2," [A3822]; (3) the jury had to "find that the defendant[s] participated in the conspiracies charged in the Indictment, not some other, possibly smaller conspiracy," [A3822]; (4) the jury had to find "the agreement specified in the Indictment, and not some other agreement or agreements," [A3823]; and (5) "the government must prove beyond a reasonable doubt … the agreement specified in the Indictment, and not some other agreement or agreements," [A3839].  In so charging, the court more than fulfilled its duty.  *United States v. Cruz-Ramos*, 987 F.3d 27, 39 (1st Cir. 2021); *Fenton*, 367 F.3d at 18.  And this explains why, when defendants complained the instructions failed to require proof of the conspiracy alleged in the

indictment, [A3850], the court replied: "I thought I said that about six times." [A3850].[34]

### B.    There Was No Variance

#### 1.    Standard of Review

Without an instructional error to buttress it, defendants' variance argument merely poses an issue of "evidentiary sufficiency." *United States v. Chan*, 981 F.3d 39, 53 (1st Cir. 2020); *Fenton*, 367 F.3d at 18.  Under the familiar sufficiency test, the Court "evaluat[es] the evidence and all plausible inferences therefrom in the light most favorable to the verdict to determine whether a rational factfinder," *United States v. Pena*, 24 F.4th 46, 73 (1st Cir. 2022), could have rejected the notion that defendants participated only in smaller conspiracies.  And it "must uphold the verdict as long as a plausible reading of the record supports the jury's finding of a single conspiracy." *Fenton*, 367 F.3d at 18; *see also United States v. Jones*, 674 F.3d 88, 92 (1st Cir. 2012) (stating that even where, unlike here, the facts were "not the most powerful example one can imagine for the single conspiracy finding, this is a factual issue left to the jury in close cases").

---

[34] If more were needed, at defendants' request, the district court allowed the jury to read the indictment during deliberations.  [A3847, 3850-51, 3869].

### 2.    The Jury's Verdict was Rational

It is settled that "the existence of a single conspiracy does *not* require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy." *United States v. Dellosantos*, 649 F.3d 109, 118 (1st Cir. 2011); *United States v. Pierre*, 484 F.3d 75, 82 (1st Cir. 2007). Moreover, "[a] single conspiracy may exist even if the participants or their respective roles change over time." *United States v. Paz-Alvarez*, 799 F.3d 12, 30 (1st Cir. 2015). In the end, the single conspiracy inquiry is a "pragmatic one." *Fenton*, 367 F.3d at 19; *United States v. Walker-Couvertier*, 860 F.3d 1, 14 (1st Cir. 2017).

For over twenty years, this Court has focused on three non-exhaustive factors in assessing whether a rational jury could have found a single conspiracy: "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) (footnote omitted); *accord Chan*, 981 F.3d at 53-54. The Court has cautioned, however, that "[n]o single one of these factors, standing alone, is necessarily determinative." *United States v. Díaz-Arias*, 717 F.3d 1, 21 (1st Cir. 2013); *accord United States v. Ciresi*, 697 F.3d 19, 26 (1st Cir. 2012). Also, the same body of evidence may have a bearing on more than one factor. *See, e.g.*, *Chan*, 981 F.3d at 54; *United States v. Belanger*, 890 F.3d 13, 30 (1st Cir. 2018). "[A]ll three of those

factors," *Belanger*, 890 F.3d at 30, support the result the jury reached here after evaluating a full month of trial testimony and nearly 250 exhibits.

### (a)    Common goal

The common goal factor is "broadly drawn." *United States v. Ortiz-Islas*, 829 F.3d 19, 25 (1st Cir. 2016); *United States v. Negrón-Sostre*, 790 F.3d 295, 309 (1st Cir. 2015); *Portela*, 167 F.3d at 695 & n.3; *see also United States v. Canty*, 37 F.4th 775, 793 (1st Cir. 2022) (factor is given "wide breadth"); *United States v. Sanchez-Badillo*, 540 F.3d 24, 29 (1st Cir. 2008) (same).  Evidence that defendants had an "interest in furthering" the broader endeavor suffices.  *United States v. Camacho-Santiago*, 851 F.3d 81, 85 (1st Cir. 2017); *Negrón-Sostre*, 790 F.3d at 309; *Portela*, 167 F.3d at 695.

Defendants tacitly admit that those involved in the Wilson side-door (John and Leslie Wilson, Singer, Vavic, Sanford, and Singer's bookkeeper, Steve Masera) and in the Abdelaziz side-door (Abdelaziz, Singer, Heinel, Janke, and Sanford) shared a common goal, and they could hardly claim otherwise.  There is also no serious dispute that the parent-defendants, including Wilson and Abdelaziz, were well aware that Singer's side-door operation involved many other parents, that it had been successful and long-running, and that, by dint of that very success, Singer was able to offer a wider variety of school options and paths to admission; indeed, this was a stock part of Singer's pitch.  [*E.g.*, A4209-11; A4530-42; A4557-91; A4593-

4612; A4614-22; A4643-59; A4666].   Moreover, this was a matter of particular importance for parents like Wilson who had other teenage children and were thus likely to be repeat players, as Wilson ultimately was.  [A2042-43, 2091, 2098, 2367, 2377; GSA144; GSA303-04].  Although individual parents plainly wished to place their own children at prestigious universities, a rational jury could have inferred from the trial evidence—and from the very nature of the scheme—a collective interest in the overall success of the broader venture, and one that Wilson and Abdelaziz shared.

This mutual interest was shown in part by evidence that parents referred and recruited other parents.  The Wilson family experience illustrates the point.  A June 2013 email from Leslie Wilson to Singer reflects the connection between the Wilson family and that of Rudy Driscoll, [GSA6], whose son Wyatt's side-door admission to USC as a baseball player—at a time when Johnny Wilson was living with the Driscoll family, [A3523]—was processed about the same time as Johnny's water polo slot, with the $100,000 checks to USC Baseball and USC Men's Water Polo issuing the same day, [A4288-95; A4300-02; GSA30].  In October 2017, Leslie Wilson emailed Marci Palatella, writing, "I had a few thoughts about Rick & USC – easier to talk on the phone."  [GSA165].  Palatella replied she would "love to talk" and asked Wilson to call her "later today."  [*Id.*].  The fake athletic profile for Gino Palatella was created by Janke as part of a batch of a dozen such profiles that included one for Sabrina Abdelaziz, [A2521-39; A4472; A4483; GSA147; GSA148;

90

GSA190; GSA266], and it was submitted by Heinel to USC's athletic subcommittee in November 2017, [GSA178], two weeks after Heinel pushed the fake recruitment of four other students (including Audrey Isackson) through Subco, [A1832-38]. In September 2018, shortly before agents first approached Singer, he had a conversation with Palatella about the Wilsons in which Palatella said: "I knew you were gonna work with the [Wilson] girls cause she [*i.e.*, Leslie] told me." [A4630]. Palatella assured Singer, "I don't say much to anybody unless I think they'd be a good candidate," [A4626], and "I'll hand you the right people," [A4628], while alluding in this same vein to yet another parent, Douglas Hodge, [A4626-27], whose son Jaeger was admitted to USC through the side-door with a fake athletic profile in a transaction facilitated by Heinel, Janke, and Khosroshahin, [A2508-11; GSA418]. And two weeks later, Wilson himself told Singer he was interested in the possibility of a side-door slot at Brown University for the daughter of a friend who would be "extremely concerned about her not knowing he pulled strings," [GSA303], and that this friend would be "willin' to pay a million, 2 million" on the assumption that Brown would be a "2 million side door," [GSA314-18, 325].

Beyond the Wilson family, an August 2018 call between Singer and Agustin Huneeus captures Huneeus motivating himself to participate in the scheme based on the experience of his friend William McGlashan (convicted and now on appeal, No. 21-1421), [A4569-70, 4582-85, 4588-89], as Singer assures him Vavic and

Heinel are in his pocket ("Jovan … he's my guy," "Donna tells me she's in, we're good") and that the scheme's track record with other parents guarantees success in his case, [A4559-70]. Like Isackson, Huneeus evidently sensed strength in numbers, as his daughter's falsified athletic profile was submitted to USC several months later. [A1842-44; A2118; A2539; A4677-82].

Although Abdelaziz had no known direct dealings with other parents, the evidence reflects he nonetheless welcomed their participation. When Singer told Abdelaziz that Heinel "loved" his daughter's fake profile so much that Heinel wanted Singer to use it for "anybody who isn't a real basketball player that's female"—in other words, that it would serve as a model for getting other fake basketball players admitted through the side-door—Abdelaziz immediately embraced the idea, stating "I love it." [A4666; *see also* A2514-15 (recycling fake profiles as part of the scheme)]. The jury could well have decided that Abdelaziz's enthusiastic response "shed light on [his] intent at earlier stages of the scheme." *United States v. Donovan*, 984 F.2d 507, 513 (1st Cir. 1993).

Given these facts and further evidence, [*infra* 94-101], the jury rationally found that Wilson and Abdelaziz were not "indifferent to the purposes of others in the enterprise." *United States v. Glenn*, 828 F.2d 855, 858 (1st Cir. 1987); *Dellosantos*, 649 F.3d at 117; *Portela*, 167 F.3d at 697. At the very least, when viewed in the light most favorable to the verdict, the record hardly *compels* a finding

of indifference.  *See, e.g.*, *United States v. Seher*, 562 F.3d 1344, 1366-67 (11th Cir. 2009) (sufficient evidence of overarching conspiracy between jeweler and individual drug dealers who laundered proceeds by buying jewelry from him, where there were "set patterns and practices" reflecting "commonality of purpose" and "[m]any of the dealers knew each other, and they often suggested that fellow dealers should come to [his business] to purchase jewelry"); *Portela*, 167 F.3d at 694 (sufficient evidence of single drug conspiracy embracing three appellants and 14 others, though drug deals were conducted "sporadically on a more or less ad hoc basis, using different suppliers and varying … methods for transporting the cocaine," appellants "were involved only in isolated incidents within this irregular pattern," and the appellant-suppliers were competitors and "perhaps unknown individually" to one another, since "the continued health of the trafficking and distribution network necessarily depend[ed] on the continued efforts of multiple suppliers").

### (b)     Overlap

Neither defendant disputes this factor, and for good reason.  Singer was intimately involved in most facets of the scheme he created, coordinating the actions of his inner circle, the university insiders, and the parents.  Working alongside him were key players such as Masera, Janke, Sanford, Heinel, and Vavic.  And, as shown, there was direct overlap among the defendants and other members of the conspiracy, including among Wilson, Palatella, Driscoll, Masera, and Vavic, and among

Abdelaziz, Sanford, and another Singer bookkeeper, Melissa Rail. These circumstances go well beyond what is necessary to establish overlap, which may be shown simply by "the pervasive involvement of a single core conspirator." *Ortiz-Islas*, 829 F.3d at 25 (cleaned up); *accord Ciresi*, 697 F.3d at 26; *Portela*, 167 F.3d at 695. Hence why defendants pass over this factor in silence.

### (c)    Interdependence

Interdependence is shown "when the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *United States v. Bedini*, 861 F.3d 10, 16 (1st Cir. 2017) (cleaned up); *Ciresi*, 697 F.3d at 26-27; *Portela*, 167 F.3d at 695. "Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." *Portela*, 167 F.3d at 695. Such interdependence "makes it reasonable to speak of a tacit understanding between a core conspirator [like Singer] and others upon whose unlawful acts his success depends." *Sanchez-Badillo*, 540 F.3d at 29 (cleaned up).

Defendants do not dispute that interdependence existed as to individual sub-conspiracies involving defendants themselves, Singer, and the confederates who furthered their own transactions; in fact, they effectively concede there was sufficient proof of such subset conspiracies. [*E.g.*, A-Br.30]. The record confirms the wisdom of that concession. Singer directed his associates to create falsified

athletic profiles for the children of his side-door clients, using information and, in some instances, photos the parents provided. Vavic, Heinel, and other corrupt coaches and administrators relied on Singer to provide the profiles so they could use them to fool admissions into believing these students were legitimate recruits. Singer and the parents, in turn, depended on the coaches to submit the profiles to admissions, to answer follow-up questions from Subco (and thereby deflect any concerns), and ultimately to secure the students' admission as purported athletic recruits. Similarly, both the parents and the university-based conspirators relied on Singer and his associates to ensure the students' college applications were consistent with their presentation as student athletes, and with the falsified athletic profiles themselves. Finally, it was the role of Singer's bookkeeper to issue false invoices to the parents, collect payment, and send phony donation receipt letters and/or invoices for consulting services to allow the parents to deduct the payments from their taxes as purported charitable contributions or business expenses. Singer, of course, relied on those payments to keep the scheme going (and to make a handsome profit), while the university-based coconspirators relied on the parents for the money, and on - Singer and his bookkeeper to get them money through the façade of his sham charity.

That pattern of interdependence was borne out here. To secure the admission of Abdelaziz's daughter as a purported basketball recruit, Abdelaziz, Singer, Sanford, Janke, and Heinel relied on one another to perform various tasks.

Abdelaziz supplied information and photos for Sabrina's profile, Janke created it, and Singer sent it to Abdelaziz and Heinel. Heinel edited the profile further and presented it to Subco, fooling Admissions into believing Sabrina would contribute to the team and thereby securing her admission. Heinel sent the conditional admission letter to Singer, who sent it to Abdelaziz, who forwarded it to Sanford, instructing her to complete Sabrina's application in accordance with the letter's terms and to register Sabrina with the NCAA. Abdelaziz also worked with Singer and Sanford to ensure Sabrina's application essay focused on basketball. Once she was formally admitted, Singer's bookkeeper sent Abdelaziz a $300,000 invoice, Abdelaziz paid it, and the bookkeeper sent back a phony donation receipt letter for his taxes. Singer and Heinel then discussed how to structure the portion of the payment owed to Heinel since it was larger than the typical amount. A few months later, Singer began paying Heinel personally, and Heinel provided fake consulting invoices to substantiate those payments.

So, too, with Wilson. Singer obtained the recruitment spot from Vavic and offered it to Wilson, who agreed to pay for it. Vavic requested a "good resume" for Johnny, and Singer, in turn, advised Wilson he would "embellish" the resume at Vavic's request. Singer received action photos for the profile from the Wilsons and directed his associates (including Sanford) to create a profile for Johnny with false water polo accolades and invented swim times. Singer sent the fake profile to

Wilson and to Vavic, and assured Vavic the Wilsons were "on board" and "ready to help." In response, Vavic agreed to present Johnny to Admissions as one of his recruits. Subco approved Johnny's admission based on the profile and Vavic's false assessment of Johnny as a "top 10" player at his position in the country. After Subco approved Johnny's admission, Wilson and his assistant and Singer and his bookkeeper coordinated a payment of $220,000, split three ways, with phony consulting invoices and a fake donation receipt letter so Wilson could deduct the payments from his taxes. Money in hand, Singer directed his bookkeeper to issue a $100,000 payment to Vavic's water polo team.

Faced with this evidence, defendants advance the narrower theory that interdependence was lacking vis-à-vis them and *other* parents. [W-Br.44-52; A-Br.29-35]. There are two distinct defects in this position.

*First*, the argument proceeds from a faulty premise: that interdependence must be established as between *types* of coconspirators—here, parents—within a given network. Under defendants' logic, the interdependence inquiry would require dividing coconspirators into discrete subgroups—*e.g.*, wholesale drug suppliers, street-level dealers, money launderers, mules, and lookouts; mafia bosses, capos, and soldiers; *etc.*—and then measuring the degree of cohesion or interaction as between members of the specific classes. Not surprisingly, defendants cite no case law supporting such a balkanized approach to interdependence review. Their

proposed methodology elevates form over substance and collides with this Court's
admonition that the single conspiracy analysis is a "pragmatic one." *Fenton*, 367
F.3d at 19.

As noted, the very nature of this scheme was such that its various aspects were
interdependent.  One aspect of the scheme was parents agreeing to represent their
children as something they were not to secure athletic recruitment slots for which
they were not qualified, and to pay for those slots.  Another aspect was creating
falsified athletic profiles, which Athletics Department insiders used to fool their
colleagues in Admissions.  A third was funneling money through Singer's sham
charity and providing phony donation receipt letters that the parents could use to
deduct those *quid pro quo* payments from their taxes.  Each of these aspects was
necessary or advantageous to another: the fake profiles helped the Athletics insiders
fool Admissions; the parents' payments provided the necessary inducement to
Singer and the corrupt insiders; Singer's use of the sham charity and fake consulting
invoices helped parents take tax deductions and helped conceal the scheme and
insulate its participants; and when Admissions became suspicious that something
was afoot, Heinel provided cover.

*Second*, there was sufficient proof from which the jury could find parent-
related interdependence in any event.  As discussed, [*supra* 89-82], each of the
parents who participated in the scheme understood Singer did not devise this fraud

98

for them alone, nor would they have joined if he had done so. *See Portela*, 167 F.3d at 697-98.  Broad participation allowed Singer to promote, and parents to rely on, the scheme's success.  It allowed Singer to recruit more coaches and to offer parents (like Wilson) more options at more schools: a water polo slot at USC, a sailing slot at Stanford.  And if a deal fell through at one school—as it did with Lauren Isackson at USC, [A1063-64, 1068-70]—he could offer a fallback elsewhere.

The mutually beneficial nature of the scheme was demonstrated in part by evidence that parents referred other parents.  Those referrals kept the scheme going, which was advantageous not just to the parents who referred their friends (and to those they referred) but also to those who intended to be repeat players.  The larger the scheme grew, the more parents had their pick of sports and schools to choose from.  As Singer told Wilson when offering to facilitate the admission of Wilson's daughters to any number of schools: the sport "doesn't matter.  I'll make them a sailor or something. Because of where you live."  [A4608].  Furthermore, the scheme's growth left *all* parents better off, because as more money flowed through Singer's organization to universities and corrupt insiders, the interconnected web of relationships and finances became more difficult to unravel.

Indeed, Bruce Isackson testified it was critical to him that other parents were involved, not just because he and his wife did not want "to be guinea pigs and have this thing blow up and have [their] daughter exposed," [A1062-63], but because the

large volume of "contribution" funds being funneled from other wealthy families through Singer's sham charity to the USC recipients would help mask his own bribe payments and make it "hard to figure things out" should the IRS inquire, especially since these families would likely have "thick" and "complicated" tax returns listing various other donations, [A1109-10, 1116-17, 1121, 1129]. Wilson and Abdelaziz personally participated in this very process as part of the scheme, joining the other parents in channeling millions of dollars through KWF and The Key. [A4839-42]. Both men had discussions and correspondence with Singer and his associates about the mechanics of the money flow. [A4215-16; A4282; A4296; A4297-98; A4303-04; A4499-4500; A4518-20; A4611-12; A4647, 4651, 4656; A4664-66; A4670; A4700; GSA326; GSA339]. And both were sophisticated and successful businessmen, [A2152; A2586, 2608; A2715, 2777; A4501-15], such that the advantages of this feature of the scheme would not have been lost on them, or so a rational jury could have found.

In sum, there was more than sufficient evidence of interdependence to sustain the jury's single conspiracy verdict. The scheme's "success depended on" Singer, his associates, the university insiders, and the parents each "performing various tasks," *United States v. Cruz-Rodriguez*, 541 F.3d 19, 28 (1st Cir. 2008), and the "continuing vitality" of each aspect of the scheme was at least of "some importance" or "advantageous" to another aspect, *Bedini*, 861 F.3d at 16. And even if the proof

of interdependence were limited in the manner defendants suggest, that would not be dispositive, as a recent decision of this Court discloses. *See Canty*, 37 F.4th at 794-96 (holding that, although the evidence "lacks much of what we have previously considered demonstrative of interdependence" because the defendants "had separate suppliers, made trips to New York independently to resupply, and made sales individually from the same locations," the "totality of the evidence" compensated for that shortcoming and allowed a jury to "find a single overarching conspiracy").

### 3.     The Defense Counterarguments Are Unavailing

Defendants' lead argument for why this case is "on all fours" with *Kotteakos* is that, according to them, they and the other parents "worked exclusively with [Singer], and only on their own behalf," [W-Br.47], and they "could not [have] care[d] less" about whether the side-door worked for other parents, [W-Br.48]. But the evidence permitted the jury to draw a contrary inference, as explained above. They also posit that the parents were direct competitors, [W-Br.44, 47], but the lone example they cite, [W-Br.47 (Singer telling Wilson's wife that others wanted a Vavic slot)], is unremarkable, particularly since the law is clear that competition is common among coconspirators and perfectly compatible with a single conspiracy. *See United States v. Rivera Calderon*, 578 F.3d 78, 92 (1st Cir. 2009); *United States v. Soto-Beníquez*, 356 F.3d 1, 21 (1st Cir. 2003); *Portela*, 167 F.3d at 697; *accord United States v. Lorenzana-Cordon*, 949 F.3d 1, 6-7 (D.C. Cir. 2020), *cert. denied*,

101

141 S. Ct. 2688 (2021); *United States v. Perez-Trevino*, 891 F.3d 359, 372 (8th Cir. 2018); *United States v. Delgado*, 653 F.3d 729, 736 (8th Cir. 2011); *United States v. Jeffers*, 570 F.3d 557, 568 (4th Cir. 2009); *United States v. Morgan*, 117 F.3d 849, 859 (5th Cir. 1997); *United States v. Graham*, 83 F.3d 1466, 1471-72 (D.C. Cir. 1996); *United States v. Morris*, 46 F.3d 410, 416 (5th Cir. 1995); *United States v. Arbelaez*, 719 F.2d 1453, 1459 (9th Cir. 1983).[35]

Defendants also argue, [W-Br.49-52], that certain of the circumstances the government has noted do not *individually* suffice to satisfy the *Portela* criteria, citing, for example, [W-Br.50], the fact that a mere desire to "avoid detection" does not "by itself," *Dellosantos*, 649 F.3d at 120 (cleaned up), establish interdependence. This Court has warned against such a "divide and conquer" approach to sufficiency review, and it has insisted instead that the evidence be assessed in its totality. *See, e.g.*, *United States v. Guerrero-Narváez*, 29 F.4th 1, 9 (1st Cir. 2022); *United States v. de Leon-De La Rosa*, 17 F.4th 175, 182 (1st Cir. 2021); *United States v. Guzman-Ortiz*, 975 F.3d 43, 55 (1st Cir. 2020).

---

[35] Defendants do not address these precedents. Instead, they rely on a parenthetical in *Glenn* that paraphrased a Second Circuit case as "indicating" that competition cuts against a single conspiracy finding. [W-Br.48 (citing *Glenn*, 828 F.2d at 859)]. But the *Glenn* Court never pursued the point, and it turns out the case it cited did not engage with the issue either because it found the criminals there "were not independent competitors." *United States v. Tramunti*, 513 F.2d 1087, 1106 (2d Cir. 1975).

Beyond that, defendants incorrectly imply Isackson was only concerned about "past performance," [W-Br.49]; incorrectly assert the evidence reflected only a "common reliance upon a hub," [W-Br.49-50], and awareness of "a common figure … involved in similar dealings," [W-Br.50]; suggest, without legal citation, that the intrinsic "nature" of a scheme has no bearing on the *Portela* analysis, [W-Br.51], even though *Portela* itself says otherwise, *Portela*, 167 F.3d at 698 ("[T]he nature of Villamán-Rodríguez's transaction with Chévere was such that a reasonable jury could have inferred that he understood the scope of the broader conspiracy and the fact that other suppliers would necessarily have been involved."); and minimize the Wilson-related evidence summarized above, shrinking it to "Wilson had referred a friend to Singer," [W-Br.52].  This is just a sustained effort to invert the rational-trier-of-fact standard.

Finally, defendants do not identify a decision of this Court that advances their cause.  They offer extra-circuit cases in lieu of that, [W-Br.48-51], but each is easily distinguished.  *See United States v. Carnagie*, 533 F.3d 1231, 1239-40 (10th Cir. 2008) (variance where two separate hubs, spokes only knew about and interacted with one hub and did not know each other, the two distinct groups "in no way benefitted from or depended upon the success of" each other and indeed were "in direct competition"); *United States v. Kemp*, 500 F.3d 257, 288-91 (3d Cir. 2007) (variance where "no … evidence that Holck and Umbrell should have known that

the conspiracy involved parts beyond White and Kemp," "this [was not] the type of conspiracy that *must* have had other members," and no evidence of interdependence) (emphasis in original); *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) (variance "where a single key man [Jacobson] moved alone from spoke to spoke, agreeing with no one else common to more than one spoke," "there was no connection whatsoever between the various spokes of Jacobson's scheme," "[i]t was part of Jacobson's scheme deliberately to keep each [spoke] separate from and ignorant of the existence of the others," and "[t]he government conceded … that the spokes knew nothing about each other or, indeed, about Jacobson's theft of the game stamps and his overall scheme"); *United States v. Mathis*, 216 F.3d 18, 24-25 (D.C. Cir. 2000) (variance where no interdependence between spoke drug suppliers); *United States v. Rosnow*, 977 F.2d 399, 406 (8th Cir. 1992) (variance where no evidence defendants "implicitly or explicitly joined any agreement or even knew of, much less interacted with, any other defendant in this case"; "no member of [one] group stood to gain a thing by the success of a fellow defendant"; and "[t]hey did not care about the success of the other defendants"); *United States v. Evans*, 970 F.2d 663, 671-74 (10th Cir. 1992) (defendant inadequately linked to drug conspiracy because she merely bought a small amount of drugs from one man and loaned a set of scales to two others); *United States v. Townsend*, 924 F.2d 1385, 1395-1410 (7th Cir. 1991) (variance where distinct buyer-seller drug relationships and no central

hub); *United States v. Dennis*, 917 F.2d 1031, 1032 (7th Cir. 1990) (variance where "[t]he indictment alleged a single overarching conspiracy joining Thompson, Wims and Dennis" but "[t]he evidence at trial … showed only that Dennis may have provided Thompson with cocaine on one day … and that Wims supplied cocaine to Thompson three days later").[36]

## C.    Defendants Have Failed To Carry Their Burden Of Demonstrating They Were Prejudiced By The Alleged Variance

Even if there were a variance, defendants' convictions should be affirmed. Defendants' spillover prejudice claim, [W-Br.52-59; A-Br.36], is undercut by overwhelming evidence that they participated in smaller conspiracies that advanced their own side-door deals and by a trial record that assures the jury convicted them based on their own words and deeds.   The record likewise refutes Abdelaziz's separate venue claim, [A-Br.36-42], that the narrower conspiracy embracing his own side-door transaction had no links to the District of Massachusetts.

### 1.    The Spillover Prejudice Claim Fails

Abandoning two of the three traditional grounds for claiming prejudice from a variance—lack of notice and double jeopardy—defendants rely exclusively on the third: alleged spillover prejudice.  *See United States v. Monserrate-Valentín*, 729

---

[36] The amicus brief submitted by the former U.S. Attorneys simply reprises Wilson's variance argument, quoting and paraphrasing it liberally.  [FUSA-Br.4-16].

F.3d 31, 50 (1st Cir. 2013). To prevail, it is their burden to prove prejudice "so pervasive that a miscarriage of justice looms." *United States v. Wihbey*, 75 F.3d 761, 776 (1st Cir. 1996) (cleaned up); *accord United States v. Trainor*, 477 F.3d 24, 35-36 (1st Cir. 2007); *United States v. Candelaria-Silva*, 166 F.3d 19, 40 (1st Cir. 1999). That is a burden they do not acknowledge and cannot meet.

*First*, it bears noting at the outset that defendants treat the "other parent" evidence *en masse*, making no effort to explain why particular categories of that evidence would not have been admissible as "relevant to proving the[ir] conspiracy's existence." *United States v. Flores-Rivera*, 787 F.3d 1, 27 (1st Cir. 2015). The fact that they "did not directly participate in [a particular] event," *id.*, is not the yardstick by which such relevancy is measured, although their briefs appear to assume as much.

*Second*, "[t]he admissible evidence against each [defendant] amply proved his complicity in the narrow conspiracy relating to the [scheme involving him]." *United States v. Morrow*, 39 F.3d 1228, 1236 (1st Cir. 1994); *see also United States v. Lane*, 474 U.S. 438, 450 (1986) (no "substantial influence" on verdict from misjoinder where evidence of guilt was "overwhelming"); *United States v. Sutherland*, 929 F.2d 765, 773-74 (1st Cir. 1991) (variance harmless where evidence of defendant's involvement in smaller conspiracy was "abundant").

106

While defendants posit they were convicted based on "mountains of inflammatory evidence" about others, [W-Br.44, 53], they ignore the actual "mountain" of evidence concerning their own "actions and statements." *United States v. Brandon*, 17 F.3d 409, 451 (1st Cir. 1994) (noting jury "did not need to rely on evidence relating specifically to other defendants in order to convict"). Indeed, the government repeatedly reminded the jury to focus on *this* evidence—what the *defendants* did and what they said—precisely because it was so incriminating. [*See, e.g.*, A1011 (Opening: "You will also hear the defendants' voices and you will see their words. This trial is about them, John Wilson and Gamal Abdelaziz, what they knew, what they intended and what they agreed to do. That you will hear from the defendants themselves in their own words on tape when they did not know anyone was listening."); A3659 (Closing: "And here's how else you know that Gamal Aziz was in on that scheme, because he told you so in his own words."); A3671-72 (Closing: "Here [Wilson] is, in his own words, on September 15, 2018, when neither he nor Rick Singer knew that the government was listening."); A3680 (Closing: "At the end of the day … [t]his trial is about [the defendants]. It's about the choices they made. It's about their actions. It's about their intentions."); A3779-80 (Rebuttal: "[T]hey don't want you to look at what they did and what they said. That's the evidence in this case[.]"); A3782 (Rebuttal: "Look at what the defendants did and what the defendants said. It's in their emails, it is on tape."); A3782-83 (Rebuttal:

"We end, ladies and gentlemen, where we started, with the defendant's own words…. The defendants' own words, members of the jury, convict them in this case.")].

For Abdelaziz, that evidence included, for example, emails between Singer and Abdelaziz discussing the "USC athletic profile" Singer was creating, with Singer asking Abdelaziz for "an action photo or two of Sabrina playing basketball"—at a time when his daughter had not played basketball in years. Abdelaziz sent Singer a photograph of a girl who was not his daughter and received back a profile full of fake honors and awards. Abdelaziz falsely told Sabrina's other college counselor she was not applying to USC—concealing she had already been conditionally admitted as a basketball recruit—even as he discussed with Singer, Sanford, and others the need to include basketball in the "activities" section of her formal application to avoid raising red flags. He reviewed the USC essay that described the basketball court as Sabrina's "art studio" using present-tense terms. Upon admission, he paid a fake invoice from Singer's sham charity, and received a receipt letter falsely stating that "no goods or services were exchanged" for that $300,000 payment. And, of course, after matriculating at USC, Sabrina had no involvement with the basketball team and appeared surprised to learn that she had been admitted as a basketball recruit. [A1862-63].

108

The jury also heard Abdelaziz admit the scheme in his own words, in recorded calls he simply ignores.  In those calls, Abdelaziz agreed to tell USC's admissions office that Sabrina suffered from a fabricated condition and asked whether he needed to "prepare" her to lie if asked why she had not shown up for practice.  He told Singer he "love[d]" that Heinel wanted to use Sabrina's fake profile as a model to get other unqualified athletes admitted in exchange for money; agreed that Singer should mislead the IRS about the reason for his payment; and worried about whether to deduct the fake donation from his taxes when told Singer's sham charity was being audited.  Against the backdrop of this evidence, Abdelaziz's one-paragraph contention that he was convicted based on "evidence of other co-conspirators' bad faith"—such that his own "good faith" could not "resonate[]" with the jury—rings hollow.  [A-Br.36].

So, too, for Wilson, who did not just admit his crimes on tape—in more than an hour of recorded calls—but laughed about them.  When told Singer would present his twin daughters as "a sailor or something," Wilson wondered whether he could get a "two for one special."  Likewise, when Singer said the Stanford sailing coach could not recruit *both* of Wilson's daughters as fake sailors because "he has to actually recruit some real sailors so that Stanford doesn't catch on," Wilson chuckled and repeated Singer's words: "he's got to actually have some sailors."  Wilson and Singer discussed the exchange of money for recruitment slots in unvarnished terms

("Guy's giving up his spot ... they're not a good enough athlete"), even as Wilson repeatedly acknowledged that his daughters were not real Division I athletes in *any* sport. Singer told Wilson he would "sell" them as real athletes so "there'll be no question," and Wilson joked they could be the "mascot" or "scorekeeper."

Wilson and Singer also referenced their earlier deal for Wilson's son, and the jury saw multiple emails describing the *quid pro quo*, such as when Singer told Wilson that Vavic was giving him "1 boys slot," but that he needed to "commit" financially. Other emails established Wilson knew Johnny was not a legitimate Division I water polo recruit and worried he would be a "clear misfit," but Singer promised that Johnny just had to be "on the roster" for a year, or even just a semester. Singer also told Wilson that Vavic had asked him to "embellish" Johnny's water polo resume and thereafter emailed him a resume that Wilson's own witnesses acknowledged was falsified in numerous ways. The jury also considered that one day after Vavic secured Johnny's admission, Wilson asked Singer for "the invoice" and suggested Singer bill him for fake "business consulting" services so he could deduct the payment from his taxes as a business expense. Wilson's contention that the evidence failed to demonstrate his "consciousness of guilt," [W-Br.56], is thus unfounded.

As this recitation of defendants' own actions and admissions makes clear, there was little risk the jury lost "focus on each specific defendant and on the

evidence properly associated with that defendant." *United States v. Levine*, 569 F.2d 1175, 1177-78 (1st Cir. 1978). Indeed, as noted, the jury was continually reminded to maintain that focus. Asserting he was convicted based on the actions of others, Wilson points to the government's closing, maintaining it "*barely mentioned*" him in the first section. [W-Br.57]. Left unsaid: that the government quoted directly from Wilson's wiretap conversation with Singer, *twice* at the very start of its closing. [A3635]. And in any event, the bulk of the evidence of Wilson's own words and actions was addressed in the second half of the closing precisely because the government segmented the evidence between Abdelaziz and Wilson, presenting the key evidence against each of them seriatim in a way that "minimized the risk of evidence spillover." *Kemp*, 500 F.3d at 292.

Next, Wilson complains the government's rebuttal "made hay" of the fact that he and Abdelaziz offered the same excuse: that they simply overlooked the emails in which Singer sent them the fake profile for their child. [W-Br.59]. But that observation drew no objection below, and Wilson omits what the government said next: that "[w]hether or not they saw the email doesn't actually matter," because the key and undisputed fact was that Singer *sent* each of them the fake profiles— something he only would have done if they were in on the scheme. [A3770]. The reality is that the government conceded Wilson and Abdelaziz never met, and it marshaled its case in a way that demarcated which evidence was attributable to

which defendant. There is no risk the jury had trouble "keeping the evidence straight," as to these two defendants, *Levine*, 569 F.2d at 1177, or that it convicted either because of anything the other did.

Nor is this a case in which the defendants were being "tried en masse for the conglomeration of distinct and separate offenses committed by others." *Levine*, 569 F.2d at 1177 (quoting *Kotteakos*, 328 U.S. at 775). Wilson is wrong in suggesting, [W-Br.54], he was convicted on multiple counts because Sanford briefly acknowledged she took classes for students, [A1672-73], particularly where the government elicited that she did not do so for Wilson's children, [A1673]. Nor was Abdelaziz convicted for his daughter's fake basketball recruitment because Isackson testified *he* paid to have *his* daughter's test score altered, [A1098-1100]. And neither defendant was convicted because Heinel, Vavic, and others accepted bribes to their pockets as well as to their programs, when the jury clearly knew "Singer didn't tell the defendants that he was paying the insiders personally." [*E.g.*, A3671].

There were just two defendants in this trial—not 13, as in *Kotteakos*, or 17, as in a case the Court has distinguished. *See Levine*, 569 F.2d at 1177 (distinguishing *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975)). The government did not introduce "hundreds of telephone conversations" involving 16 co-defendants, as in *Dellosantos*. *See* 649 F.3d at 125. Defendants complain principally of three: two involving Caplan and one involving Huneeus. [W-Br.53-55]. And Wilson is simply

incorrect in stating his "experience was different in kind" from theirs, or from that of Abdelaziz, [W-Br.56]. Like Abdelaziz and Huneeus, Wilson agreed to pay Singer to present his child as a Division I athletic recruit based on falsified credentials, even though he believed he would be a "clear misfit." *See Levine*, 569 F.2d at 1177 (observing that prejudice was "minimized by the fact that those transactions not directly involving appellant were of the same character as the ones that did involve him").[37] And though he "never made it appear that his daughters sailed or rowed crew competitively," [W-Br.56], that was only because he got caught before he got that far. But he agreed to do just that, and he asked Singer what "sport or angle I need to prep [my daughter] for?"

Likewise, although Wilson notes Singer never used the word "bribe" with him, [W-Br.55], that is only because he did not use that word with *any* parent as far as the trial record reveals, except in one instance Wilson elicited, [W-Br.55], in which the FBI directed Singer to use the word with a parent who was new to the

---

[37] The notion that the conduct Caplan discussed with Singer—cheating on a standardized test—was inherently more wrongful than the conduct in which Wilson and Abdelaziz engaged is dubious at best. Judge Talwani thought just the opposite. *United States v. Caplan*, No. 19-cr-10117-IT-4, D.515 at 41 ("The test taking scheme sought to change an aspect of a student's application to make the package more competitive. The recruitment scheme was directed at gaining a specific spot."); *accord United States v. Semprevivo*, No. 19-cr-10117-IT-10, D.499 at 49 (describing fraudulent athletic recruitment as "an order of magnitude different" than test cheating).

scheme, [A2259-60].   Had Singer suddenly introduced the word "bribe" in conversations with a veteran like Wilson, it no doubt would have aroused his suspicions that Singer was working with law enforcement.  As the government observed in its closing, "[T]hat's not how criminals talk.  What they do talk about is sending money as a donation to a USC fund."   [A3641-42].   And Wilson's contention that Singer never "tried to goad him into agreeing to a cover-up," [W-Br.56], also misses the mark.  There was no need: Wilson was already on tape agreeing to pass his daughters off as fake recruits "like what we did with Johnny."

While Wilson speaks of the "pervasiveness" of "'other parents' evidence," [W-Br.57], he mainly targets the testimony of one other parent—Isackson—and the introduction of three wiretap calls: two with Caplan and one with Huneeus, [W-Br.53-55, 57].   And although Wilson observes, [W-Br.57], that the government argued that his knowledge of wrongdoing could be inferred in part because "Bruce Isackson told you that he knew it [was wrong]," [A3645], this unobjected-to portion of its closing was immediately followed by a lengthy summation focusing on defendants' own words and actions, [A3646-83].   In a multi-week trial encompassing hours of testimony about defendants and their children and dozens of defendants' own emails, text messages, and phone calls, this hardly constitutes pervasive prejudice resulting in a miscarriage of justice.

*Third*, any risk of spillover prejudice was addressed by the district court's instruction that the verdict as to each defendant "must be based upon evidence of his own words and actions." [A3824-25]. The court explained: "Each defendant … is entitled to have his guilt or innocence determined on an individual basis. Thus, with respect to each charge, you must assess the evidence against each defendant individually." [A3813]. The court further cautioned that neither defendant could be found guilty of conspiracy unless the jury found that he conspired with at least one other person to commit at least one of the acts alleged, noting again that "[i]n making this determination, you must, of course, consider each defendant individually." [A3821]. Because "these instructions were aimed at preventing evidentiary spillover, and we do not readily assume that a jury disregards clear directions," defendants cannot demonstrate prejudice resulting in a miscarriage of justice. *Wihbey*, 75 F.3d at 775; *accord Sutherland*, 929 F.2d at 773-74 (variance harmless where jury instructed "in unmistakable terms" to "consider the evidence against each defendant separately"); *Levine*, 569 F.2d at 1178 (similar).

In conclusion, it was defendants' own words and actions that proved their guilt in this case, as the government reaffirmed repeatedly in its opening, closing, and rebuttal, and the court minimized any risk of prejudicial spillover in its instructions. Any variance was harmless, and defendants have not carried their burden of showing otherwise.

115

## 2.    The Venue Claim Fails

Abdelaziz alone argues, [A-Br.36-37], he was prejudiced because, without the broader charged conspiracy, "the government could not have established venue in [Massachusetts]." *Glenn*, 828 F.2d at 860.  Not so.

On January 3, 2019, Abdelaziz spoke with Singer and agreed to lie about a fabricated injury when told admissions was asking questions.  [A2110; A4808-10].  Singer was in Boston on the day of the call; that same day, he drew a check for an installment payment to Heinel for her recruitment of Abdelaziz's daughter and others.  [A4813-17].  The check indicated on its face that it was drawn from a bank in Seaport Square, mere steps from the federal courthouse, [*id.*], consistent with agent testimony that Singer opened the account at the FBI's direction while in Boston, [A2022-25].  *See United States v. Cordero*, 668 F.2d 32, 43-44 (1st Cir. 1981) (venue where "[co-conspirators] spoke to [undercover agent] while he was in Puerto Rico and provided him with key information"); *see also United States v. Valenzuela*, 849 F.3d 477, 488 (1st Cir. 2017) (rejecting "manufactured venue" and "venue entrapment" arguments).

Abdelaziz claims these events occurred after "[a]ny conspiracy between Singer and Abdelaziz to fraudulently obtain Sabrina's admission to USC was completed," [A-Br.37], but that assertion is unavailing, for two reasons.  First, Heinel was still being paid for the bogus recruitment in monthly installments that

began in July 2018 and continued through February 1, 2019, [A2116-17; A2988-90;

A4813-17; A4843].  *See United States v. Diaz-Diaz*, 433 F.3d 128, 137 (1st Cir.

2005) ("[T]he conspiracy was still ongoing, as the co-conspirators were seeking to

obtain their payment."); *United States v. Fields*, 871 F.2d 188, 199 (1st Cir. 1989)

(conspiracy was ongoing, in part because "[p]roceeds from the charged crimes were

still to be distributed"); *see also Ciresi*, 697 F.3d at 28 (contrasting *Fields* in case

where bribe monies had been fully paid).  Second, concealment was an integral

aspect of the scheme, as the indictment charged, [A226, 228, 260], and the trial

evidence attests.  Indeed, concealment was essential to the jury's finding that the

defendant committed bribery and fraud and a jury could well have found by a

preponderance that Abdelaziz's agreement to fake Sabrina's injury—so as not to

lose her admissions spot—was a continuation of that preexisting plan, upon which

the success of the scheme depended.  *See United States v. Upton*, 559 F.3d 3, 9-14

(1st Cir. 2009).

If more were needed, Abdelaziz spoke with Singer on October 25, 2018.

[A2107-08].  A jury could likewise find by a preponderance that Singer was in

Massachusetts that day based on agent testimony and a record that Singer purchased

a check from a bank in Everett on October 25.  [A2089; GSA510].

### D.    Defendants Correctly Concede The Remedy Issue

Because the evidence more than sufficed to show that defendants participated in a single conspiracy, and because there was no prejudice in any event, the Court need not explore the remedy question.  In the event it does so, however, it has already embraced the position defendants take here.

Tracking *Kotteakos*, Wilson casts his "rim" theory in "variance" terms, and he requests a specific remedy:  a new trial on all counts.  [W-Br.3 ("When prosecutors charge such an overbroad conspiracy … the remedy is a new trial."), 45 ("That prejudicial variance alone requires the Court to vacate each of Wilson's convictions and remand for a new trial."), 53 ("new trial" is necessary), 59 ("A new trial is required on all counts.").  Wilson pointedly refrains from asking for a judgment of acquittal, even as to the conspiracy counts alleged to be overbroad.  For his part, Abdelaziz, who was convicted *only* on those counts, does not specify what relief he seeks in the event of a prejudicial variance.  [A-Br.29-42].  He twice affirms, however, that he "fully incorporates" the portions of Wilson's brief addressing the variance claim.  [A-Br.29, 36].

Under these circumstances, defendants have waived any argument that they are entitled to judgment of acquittal on the conspiracy counts.  Arguments not made in an opening brief are waived, *see Gottesfeld*, 18 F.4th at 16, and this rule is "especially applicable here" because defendants not only "appear[] to" but in fact

"take a contrary position in their opening brief[s]," *Thomas & Betts Corp. v. New Albertson's, Inc.*, 915 F.3d 36, 68 (1st Cir. 2019), by expressly demanding a new trial only.

Regardless of waiver, defendants are right that even if the Court were to find a prejudicial variance impacting all counts, this would only necessitate a new trial.

In *Kotteakos* itself, the Supreme Court treated the variance as a trial error that is subject to harmless-error review, and the opinion contains "new trial" and "retrial" references reinforcing that message. 328 U.S. at 757, 759-60, 773 n.29. Predictably, later Supreme Court decisions have understood *Kotteakos* as addressing the circumstances in which prejudicial trial error requires a new trial. *See, e.g.*, *O'Neal v. McAninch*, 513 U.S. 432, 434-44 (1995); *United States v. Agurs*, 427 U.S. 112, 111-12 (1976).

The law of this circuit dovetails with this reading of *Kotteakos*. In a case defendants cite repeatedly, [W-Br.45-56; A-Br.25-26], this Court found inadequate proof of the broad charged conspiracy and prejudicial variance, and yet it concluded that: (a) there was "arguably sufficient" evidence of a narrower three-person conspiracy; and (b) "because the statutory violation for joining the [narrower] conspiracy remains the same as that alleged in the indictment …, the jury, *under a proper set of instructions*, could arguably have convicted" both defendants were it not for the prejudicial variance. *Dellosantos*, 649 F.3d at 124.

On remand, the district court entered judgments of acquittal and thereafter the government secured a new indictment charging the defendants with the narrower three-person conspiracy. *United States v. Szpyt*, 785 F.3d 31, 35 (1st Cir. 2015). Over a dissent, this Court rejected the argument that the new case was barred by the Double Jeopardy Clause. *Id.* at 36-41. The Court reasoned that, in *Dellosantos*, it had only found insufficient evidence of the broader conspiracy, and the narrower conspiracy embedded within it was sullied only by a *procedural* error stemming from the prejudicial variance—an error that posed no Double Jeopardy obstacle to the new case. *Id.* at 37-39. Significantly, the Court added that the judgments of acquittal did not alter the analysis because "the entry of 'acquittal' was intended to be no different than had the government on remand moved to dismiss without prejudice or to *amend the indictment*—both of which would not have been barred by the Double Jeopardy clause." *Id.* at 39 (emphasis added). *Cf. United States v. Pacheco*, 434 F.3d 106, 115-16 (1st Cir. 2006) (claim of "material variance or a constructive amendment … if successfully pursued, would at most earn the defendant a retrial").[38]

---

[38] Other courts are in accord. *See United States v. Mize*, 814 F.3d 401, 412 (6th Cir. 2016); *United States v. Johansen*, 56 F.3d 347, 352 (2d Cir. 1995); *United States v. Fernandez*, 892 F.2d 976, 991 (11th Cir. 1989); *United States v. Cambindo Valencia*, 609 F.2d 603, 606, 629 (2d Cir. 1979); *United States v. Varelli*, 407 F.2d 735, 748 (7th Cir. 1969). *But see United States v. Calderone*, 982 F.2d 42, 48 (2d Cir. 1992); *United States v. Camiel*, 689 F.2d 31, 38-40 (3d Cir. 1982).

In light of *Dellosantos* and *Szpyt*, even assuming there was insufficient evidence of defendants' membership in a broader conspiracy and the variance was prejudicial, the proper result—as defendants themselves maintain—is simply a new trial, which may be accomplished through "a proper set of [jury] instructions," *Dellosantos*, 649 F.3d at 124, an amended indictment, *Szpyt*, 785 F.3d at 39, or some combination of the two.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS EVIDENTIARY RULINGS

### A. Standard Of Review

Defendants argue the district court wrongfully excluded four categories of proposed exhibits. [W-Br.60-79; A-Br.42-47, 50-55]. With important exceptions noted below, review is for an abuse of discretion. *United States v. Chiu*, 36 F.4th 294, 299 (1st Cir. 2022). This Court "will find an abuse of discretion only when left with a definite conviction that no reasonable person could agree with the judge's decision." *United States v. Maldonado-Peña*, 4 F.4th 1, 56 (1st Cir. 2022) (cleaned up). There was no such abuse here.

### B. The USC Athletics Department Exhibits

Defendants say the district court should have admitted a raft of exhibits that would have shown "USC's Athletics Department had a practice, condoned by the Admissions Department, of dressing up donors' children as athletic recruits, regardless of their athletic abilities, in exchange for donations." [W-Br.60]. But the

excluded materials provided no support for the defense theory that *the Admissions Department* sanctioned the exchange of athletic admission slots for money based on fake athletic profiles, and defendants were, in any event, concededly unaware of the internal USC chatter reflected in the exhibits, which consisted mainly of emails within the Athletics Department discussing applicants with no connection to defendants or their case.  Moreover, this evidence was rife with hearsay, and to the extent it had any probative value at all—a dubious proposition—it was trivial. Introduction of this evidence—misleading in the absence of context or any witness to explain it—would have spawned a series of side-shows probing the details of how dozens of unrelated students were admitted, offending Rule 403 as well as the hearsay prohibition.  Nor did the evidence even assist a viable line of impeachment. And at any rate, any conceivable error in the exclusion of particular exhibits was plainly harmless given their vanishing probative value and the strength of the government's case.

### 1.    Rule 403 Alone Sufficed to Warrant Exclusion

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Here the proffered USC evidence strongly implicated all of these concerns and raised the real prospect

not just of "a mini-trial," *United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008), but a "series of mini-trials," *Lund v. Henderson*, 807 F.3d 6, 11 (1st Cir. 2015).

### (a)  The district court's ruling

Defendants suggest the district court focused solely on the scant relevance of the evidence and did not consider Rule 403.  [W-Br.61].  The record says otherwise. Even before trial, when the defense signaled its intent to introduce hundreds of exhibits describing dozens of other USC applicants, [SA144-245], the district court granted that "defendants may under certain circumstances present evidence showing the general admissions practice of the subject university" but warned that it would not permit "a collection of mini trials."  [A572; *accord* A555 (stating it would not allow the case to "devolve into multiple side trials")].   Both before and during trial, the government invoked Rule 403 in written filings as a basis for exclusion.  [SA155-57; A3904-06].   And at trial, the court sustained government objections to this evidence that were based in part on Rule 403, [A3339-44; A3507-08], and relied on Rule 403 itself in two written orders, [W-Add.62-63; D.2323 at 2].   Given that express Rule 403 determinations are not required, *see United States v. Breton*, 740 F.3d 1, 14 (1st Cir. 2014) (collecting cases), this more than suffices to confirm not only that the court *relied* on Rule 403 but that the precepts underlying the rule were integral to its thinking.

A recent Rule 403 case cinches the point. There, the district court alluded to "the potential for confusion arising from mini-trials" simply by reminding defense counsel "that the evidence presented needed to pertain to 'this case, not other cases.'" *United States v. Pena*, 24 F.4th 46, 71 (1st Cir. 2022). This Court readily sustained the apparent Rule 403 ruling, observing: "We broadly defer to these in-the-trenches determinations [absent] compelling reasons for overturning them." *Id.* There is no reason—let alone a compelling one—to reject the district court's on-the-scene assessment here. Indeed, defendants strain to avoid Rule 403 precisely because, as set forth below, it proves fatal to their claim. *See United States v. Encarnacion*, 26 F.4th 490, 508 (1st Cir. 2022) ("We have made it luminously clear that '[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'").[39]

---

[39] Defendants suggest in a footnote, [W-Br.70 n.6], that the district court's Rule 403 judgment call is owed no deference because (according to them), the court placed little or no weight on the "probative value" side of the scale. But such case-specific estimations of the potency of proffered evidence are an inherent part of Rule 403 balancing and they are entitled to just as much respect as a judge's forecast of the potential for confusion and prejudice. *See United States v. Brown*, 7 F.3d 648, 651 (7th Cir. 1993).

**(b)  Low-to-no probative value**

As to the first prong of the Rule 403 inquiry, to the extent the excluded exhibits had any probative value at all, it was "marginal" at best.  *See United States v. Levy-Cordero*, 67 F.3d 1002, 1016 (1st Cir. 1995).  Although defendants disagree for three main reasons, their briefing on this subject, [W-Br.61-65], obscures a basic question: Precisely what evidence is at stake here?

After designating hundreds of exhibits chronicling other USC applicants, late in the trial the defense reduced its proffer to roughly 40 exhibits, with each exhibit often embracing multiple items (*e.g.*, emails, forwarded emails, and attachments). [SA246-614].  On appeal, defendants treat this mass of materials in seven breezy paragraphs.  [W-Br.61-65].

In the first paragraph, defendants assert "[t]he [USC] Athletics Department supported over 50 candidates with donor connections through the Subco process, plus over 100 more through other 'VIP' lists," [W-Br.61], omitting to mention that their source is a defense-prepared chart that was not offered in evidence through any trial witness and the reliability of which was therefore never tested.  [SA434-49].  In fact, the chart is unreliable.  Its basis is not even clear, although it appears to rely at least in part on notes of an attorney or paralegal, such as "spot checked the resumes, not quite the right stuff," and "average athlete."  [SA443, 448].

125

In the ensuing six paragraphs, defendants sprinkle snippets from a select set of excluded exhibits, with little or no context. [W-Br.62-65]. If the Court parses the underlying record cited in these paragraphs, it will see the defense focuses primarily on three specific USC applicants, known for privacy reasons as A-43, A-47, and A-49, and on a handful of additional exhibits that are presumably the best the defense could muster. These examples only serve to underscore the reasonableness of the district court's rulings, as shown below.

### (i)    Knowledge, intent, and "good faith"

Defendants' first theory of relevance is that the excluded documents were relevant to demonstrate good faith. [A-Br.42-47; W-Br.83 n.8]. As the district court well recognized, [A555], a threshold issue looms: How could these internal USC dialogues be relevant to defendants' knowledge, intent, or "good faith," [A-Br.42], if defendants were wholly unaware of them at the time of the charged events?

Wilson declines to answer this question, making no effort to forge a link between this evidence and his own mental state. [W-Br.65-67]. For his part, Abdelaziz offers only an anemic assertion that the evidence "shows the reasonableness of him believing USC exchanged money for athletic admissions." [A-Br.46]. But since Abdelaziz never testified and there is no tangible sign that he— or Wilson, for that matter—held "a contemporaneous belief," *United States v. Lachman*, 521 F.3d 12, 19 (1st Cir. 2008), that USC as an institution sold athletic

126

admission slots for money and welcomed fake athletic profiles,[40] it is hard to see how insider USC conversations of which he was admittedly ignorant could have assisted his cause. *See, e.g.*, *United States v. Simon*, 12 F.4th 1, 55 (1st Cir. 2021).[41] Thus, the district court was on firm ground in concluding the evidence "had no bearing on the defendants' state of mind." [A555].

This conclusion all but dooms defendants' undeveloped, [W-Br.70 n.6], Rule 403 position. Because "[i]ntent is … a crucial aspect of proof in any [honest-services fraud] prosecution," *United States v. Sawyer*, 239 F.3d 31, 40 (1st Cir. 2001), as in conspiracy cases, *United States v. Latorre*, 922 F.2d 1, 8 (1st Cir. 1990), the fact that the excluded evidence had scant probative value on this topic weighed strongly against its admission without more.

---

[40] The district court made clear—repeatedly—that defendants would be permitted to introduce evidence of relevant USC admissions practices if there were any suggestion in the evidence that defendants knew about them. [D.2111; D.2108; D.2323]. Defendants identified none.

[41] The lead case Abdelaziz cites, [A-Br.44], concerns the distinct "statutory willfulness requirement of criminal tax offenses," *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992), and there the defendant "testified that he subjectively believed that the $1500 check he received was a gift and that gifts need not be reported as income," *id.* at 1551. The defendants in the other cited cases, [A-Br.44-45], likewise testified about their relevant subjective beliefs and offered evidence directly on point to show that those beliefs were reasonable. *See United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994); *United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir. 1992). Abdelaziz's parting reference, [A-Br.47], to *United States v. Litvak*, 808 F.3d 160, 188 (2d Cir. 2015), falls flat because that case involved ample direct proof that the defendant held the subjective belief in question and Rule 403 was not in play.

### (ii)    Scope of fiduciary duty

It follows that Wilson offers a second relevance theory: The evidence would have shed light on the scope of the fiduciary duty that Athletics personnel such as Vavic and Heinel owed to USC, and the jury might have "inferred from this evidence that Singer's side-door strategy with Wilson was consistent with USC's own practices and faithful service of its employees." [W-Br.67].  This theory is flawed.

As an initial matter, the theory is irrelevant to the five substantive fraud counts for which Wilson was convicted, for two reasons.  First, and most obviously, those counts pertain to fraud on *other universities*, not USC.  Second, and in any event, whether Wilson *intended* to deprive universities of the honest services of their employees or commit federal-programs bribery is what matters for purposes of these counts, not whether he succeeded—or even *could* have succeeded—in doing so.  *See United States v. Walker*, 490 F.3d 1282, 1297 (11th Cir. 2007) (collecting cases); *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997); *United States v. Czubinski*, 106 F.3d 1069, 1075 (1st Cir. 1997).

Furthermore, with respect to the conspiracy charges against both defendants, the excluded evidence said nothing about the relevant fiduciary duties.  As the district court recognized, "the honest services question as to these defendants" was "whether admitting students through Subco with falsified athletic profiles deprived USC of the honest services of its employees." [W-Add.38].  To answer that

128

question, what mattered were the "customs, practices and policies of Subco or the relevant expectations *of the Admissions Department*." [W-Add.38 (emphasis altered)]. The proffered exhibits would not have shown that the Admissions Department—the arbiter of admissions to USC, and thus the direct target of the deceit—blessed a practice of admitting donors' children as athletes based on fake credentials, making its probative value trifling. A close examination of defendants' three favorite examples and most touted exhibits reveals why this is so, and it also shows why the potential for mini-trials was all too real and why the exhibits were laden with hearsay.

*Proposed exhibits 1085, 7235 and 7238 concerning applicant A-43*. Even if the jurors had been permitted to mine the out-of-court statements in these exhibits for possible "facts" about A-43's application process—contrary to the hearsay rule—this exercise would have left them mystified. It appears that Athletics staff presented A-43 to Subco ███████████████████ but that the Subco vote was postponed, possibly due to ███████████████████ although the records are unclear. [SA387-406]. In inquiring about ████████████ an Athletics employee assured an admissions officer in an email that A-43 was ███████████████ [SA387]. Subco finally voted in favor of A-43 on January 29, 2015. [SA397]. Though not reflected in the Subco packets, it appears ███████████████ ████████████████████████████████ and this was noted in a spreadsheet

129

labeled "PatVIPList" that referred to many other applicants and that Heinel emailed to Dean of Admissions Timothy Brunold as the "VIP list" of Athletics Director Haden. [SA262-63]. A terse entry on the VIP list spreadsheet suggests someone had once "met" with the Dean about A-43, and that A-43 was also being presented to Subco. [SA263]. Other emails may reflect: that Haden had asked Heinel to advocate for A-43 generally, though there is no indication in the emails that he asked her to do so in Subco as opposed to through the separate VIP process, [SA556]; that Haden and Heinel had secured ████████████████████████████████████ ████████████████████████████████████ [SA557-59]; and that, about six months *after* the Subco vote, ████████████ told Heinel that he did not think A-43 "will contribute to us winning or losing," [SA555]. There is no sign in the A-43 exhibits: that Athletics held this neutral view about A-43's talents in January 2015, let alone that it conveyed that view to Admissions; that A-43's Subco packets contained false facts; or that Subco voted to admit A-43 based on ████████████ ████████████████████████████████████ ████ [SA557]. To the contrary, the emails, taken at face value, suggest at most that A-43 was *both* a VIP candidate *and* a Subco candidate, consistent with Chassin's testimony that these were two separate processes, [A1971, 1993-94].

*Proposed impeachment exhibits concerning applicant A-47.* These exhibits indicate that Athletics staff presented A-47 to Subco as ████████████████████ and

that Subco approved A-47's admission on February 27, 2015.  [SA565-73].  Prior to

the vote, Ron Orr in Athletics emailed Heinel to say that A-47 "looks like a good

donor prospect," [SA575], and emails between Heinel and A-47's father suggest

Heinel planned to present A-47 ███████████████████████████ [SA580],

███████████████████████████████ [SA579-80].  It is not

evident from the surface of the exhibits whether A-47's Subco packet, [SA565-73],

contains false or exaggerated athletic achievements, and there is nothing in the

record suggesting anyone in Admissions knew about A-47's ███████████████

In late May 2015, three months after the Subco vote, ███████████████

████████████████████████████████████████

█████ [SA576-78], after which Orr emailed Heinel about the pledge and thanked

her and Heinel replied "Yahoo.  It was all worth it," [SA576].  Contemporaneous

emails including Orr, Heinel, and others in Athletics could be read to suggest that

████████████████████████████████████████

[SA561-64].

        *Proposed exhibits 7242 and 8045 concerning applicant A-49*.  These intra-

Athletics emails indicate that, in 2015-2016, USC's ██████████ and others in

Athletics enlisted Heinel to present A-49 █████████████████████████

████████████████████████████████ and hoping that

her family would reciprocate with a donation in the range of "6 figures." [SA407, 429-31]. Little more is known from the record.

*Other exhibits*. Other hearsay exhibits cited by Wilson likewise capture Athletics staff, including Heinel, exchanging emails that—viewed charitably to the defense and taken for the truth of the statements within them—may suggest that these individuals within the Athletics Department traded athletic admission slots for donations. [*E.g.*, SA194, 202, 209]. But Wilson's effort to implicate *the Admissions Department* in this practice leads nowhere. The cited 2018 email from Dean Brunold, [W-Br.63 n.4], merely states that a transfer applicant—not a Subco candidate—on the "VIP" spreadsheet who was "of interest to athletics" because they had "been working with him for a few years" would serve as a "practice player" if admitted, but that his grades for the next semester would need to be "strong" to justify taking him. [SA413]. In suggesting that Admissions affirmatively "welcomed" what occurred in this case, [W-Br.64], Wilson relies not on a proposed exhibit but rather on an affidavit from a "part-time clerk" employed by one of his criminal defense lawyers, [SA244-45]. In this affidavit, the clerk states that his review of USC records discloses that the university's "interest" in some applicants "derives from their families' actual or prospective donations to USC," and that Admissions staff names appear in the documents; no examples are given. [*Id.*]. Wilson's final source is merely a spreadsheet, labeled "PatVIPList" and emailed to

Dean Brunold, reflecting that certain applicants Haden placed on his VIP list were from families that were donors or potential donors, and that some of these students were also athletic recruits being presented to Subco.  [SA262-71].

In short, none of these exhibits—presumably the best the defense has to offer—even remotely suggests that USC's Admissions Department either participated in or sanctioned the selling of athletic admission slots for money based on fake athletic profiles.  Thus, the probative value of this evidence approaches zero even disregarding the fatal hearsay problems the exhibits posed.

### (iii)     Materiality

Advancing one final relevance theory, Wilson briefly contends the proffered defense exhibits might have been used to suggest that his son's false presentation as an athletic recruit and the lies in his fake profile were immaterial to USC's Admissions Department.  [W-Br.67].  This theory adds nothing to the probative value calculus precisely because, as already explained, the exhibits do not even hint in that direction.  Wilson's reliance on the Supreme Court's observation that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed," *Neder v. United States*, 527 U.S. 1, 16 (1999) (cleaned up); [W-Br.67]—a standard the jury instructions tracked, [A3828]—only underscores his dilemma, because it

was the Admissions Department, not the Athletics Department, that was the relevant "decisionmaking body" here.

### (c)  Substantial risk of the Rule 403 dangers

By now it should be apparent that introduction of the proposed defense evidence would have engendered endless confusion and delay, and that the trial would have "devolve[d] into multiple side trials," [A555], just as the district court feared.  Each admissions transaction would have required the jury to evaluate further documents and witness testimony concerning the athletic and academic merits of individual candidates, the timing and amounts of the donations and the intent behind them, and the full range of the internal discussions within and between the Athletics and Admissions Departments as each application process unfolded.  And the three admissions transactions Wilson cites as his winners would have been replicated many times over.  Likewise, to the extent defendants sought to use the dry documents to conflate the VIP and Subco processes—as their arguments at trial and filings on appeal suggest—their introduction would have confused the issues at best and been misleading at worst.  The district court was thus well within its discretion.  *See, e.g.*, *United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014) (cited by the district court at D.2323 at 2); *Brandon*, 17 F.3d at 443-45.

## 2.    The Exhibits Were Full of Hearsay

If the Court upholds the district court's Rule 403 assessment as within its broad discretion, it need not address a further obstacle to the admission of the proposed defense exhibits: That they were suffused with inadmissible hearsay.

Prior to trial, the government warned that much of the proposed USC-related evidence—consisting chiefly of emails and forwarded emails of non-testifying USC Athletics personnel—would constitute inadmissible hearsay under Fed. R. Evid. 802. [SA158]. The defense briefly disputed this point but provided *no* examples of specific proposed exhibits (or statements within them) that would be immune from the hearsay bar. [SA171]. When the defense offered the documents at trial, the government objected in part on hearsay grounds, the district court sustained those objections, and the defense often said little to illuminate its opposing view. [*E.g.*, A1966-68, 2011; A2583-84; A2870, 2873, 2909-10; A3189; A3217; A3339; A3342; A3507-08].

On appeal, defendants say even less. Their argument on this subject consists of one footnote with a one-sentence assertion that none of the defense exhibits were offered for their truth and a one-sentence bid to adopt the "multiple hearsay exceptions" that Wilson "catalogued" below in a single page, [SA171]. [W-Br.70 n.6]. Defendants also make no effort to link their hearsay position to any particular exhibits or statements therein. This is the very definition of waiver. *See United*

135

*States v. Munyenyezi*, 781 F.3d 532, 542 n.10 (1st Cir. 2015); *Paz-Alvarez*, 799 F.3d at 31.

Waiver aside, even a casual glance at the excluded exhibits, [SA262-433], reveals they were rife with hearsay, as the examples discussed above, [*supra* 129-32], richly attest. The internal emails contain countless assertions of fact about a wide range of matters, such as: the athletic and academic qualifications of numerous USC candidates; the timing and size of possible donations and the intent behind them; other factors that may have played a role in the disposition of the applications; and a broad spectrum of activities that took place within the Athletics Department over the course of half a decade. Defendants cannot evade Rule 802 simply by positing that they hoped to prove from the sheer mass of assertions embedded in the emails "a practice that negates the Government's bribery and materiality allegations." [W-Br.70 n.6]. Indeed, the very phrasing of their position here undercuts any claim that the significance of the out-of-court declarants' statements in the emails lay "*solely* in the fact that [they were] made." *United States v. Sabean*, 885 F.3d 27, 41 (1st Cir. 2018) (cleaned up; emphasis added). Carried to its logical conclusion—with no limiting principle to restrain it—that position would allow the admission of virtually all USC emails touching on the admissions process for the fact that they were sent.

As a result, the proposed exhibits could not substitute for live testimony concerning the matters stated within them barring a viable hearsay exception. Defendants offer no such exception on appeal, and none exists. And defendants made a strategic choice not to call available witnesses, despite having subpoenaed several. [*E.g.*, D.1955]. Those witnesses include, among others, Kirk Brennan—the Director of Undergraduate Admissions, [A1847]—and Brunold—the Dean of Admissions himself, [*id.*]—who did not invoke the Fifth Amendment and could have offered testimony relevant to the fiduciary duty *actually* at issue in this case.

There is yet another barrier. Even assuming defendants could point to isolated non-hearsay statements in the excluded exhibits—and they have identified none so far—Rule 403 once again looms large:

> The admissibility of an out-of-court statement to prove some fact other than what was asserted in the statement, however, assumes that the other fact for which the statement is received is relevant to an issue in the trial and, if so, that the potential for prejudice resulting from the likelihood that the jury might consider the statement for its impermissible hearsay purpose does not unfairly outweigh its proper probative value on the other question.

*United States v. Benitez-Avila*, 570 F.3d 364, 368 (1st Cir. 2009) (citing Rule 403). As explained, the evidence was of low-to-no probative value to begin with. And as the discussion above reflects, there was also a manifest danger—particularly in light of the sheer mass of the exhibits—that the jury would rely on statements in the emails

137

for an impermissible hearsay purpose even if some of them theoretically might have been used for a non-hearsay purpose.

### 3.    The Two Impeachment Claims Fail

Defendants argue in the alternative that they should have been permitted to use the proposed exhibits to impeach USC's Assistant Dean of Admissions, Rebecca Chassin, and yet they cite just two exhibits as examples: Exhibits 1085 and 7238. [W-Br.68-70].  Their impeachment theories lack traction.

Chassin testified the Admissions Department is the only entity "authorized to make undergraduate admission decisions" and that it does not offer admission in exchange for money.  [A1844-45, 1881, 1924-25, 1926-27, 1931].  Chassin also described the Subco process and stated that Subco only considers the athletic talent of applicants except that some may be rejected if they are "too academically risky." [A1807-16, 1903, 1926, 1971-72].  She acknowledged, however, that various "constituents across the campus" such as the President, the Provost, other deans, and fundraising offices, track certain applicants, as reflected in the VIP list; that "[o]ne of the reasons they may be tracking an applicant may be due to fundraising efforts"; and that applicants on the list "are given extra consideration."  [A1881-89, 1994-

96].  She explained that the VIP list has nothing to do with the Subco process.[42]
[A1971, 1993-94].

Exhibit 1085.  During Wilson's cross-examination of her, Chassin testified she had never seen a VIP list specific to Athletic Director Haden and had not discussed such a list with Dean Brunold.  [A1927-28].  Although Chassin was unfamiliar with Exhibit 1085, [SA262-271], defense counsel sought to have it admitted as a "business record" and for "state of mind," without success.  [A1929-30].  In two further efforts, counsel unsuccessfully offered the exhibit to "impeach the truth of [Chassin's] representation," and Chassin repeated she had never seen the document or the information within it.  [A1965-70, 2016-17].

Exhibit 7238.  During the same cross-examination, Chassin testified she could not recall ████████████████████████████████████████████ ██████ while noting she could not "remember ever[y] single student" presented.  [A1931-34].  When Chassin identified her initials on the Subco packet page reflecting the vote for A-43, [SA538], Wilson's counsel unsuccessfully sought to admit that lone page as "direct impeachment," [A1936].

---

[42] Wilson says Chassin purported to speak for the entire university, [W-Br.68], but the cited testimony that "I'm here on behalf of my university" was meant to clarify why her lawyer was "paid for by USC."  [A1886].  Elsewhere Chassin made clear her testimony was specific to the Admissions Department.  [A1924-27].

The two theories on which defendants now rely for admission of these exhibits—"impeachment by contradiction" and Rule 806, [W-Br.68-69]—were late-breaking, developed for the first time only in an offer of proof filed six days after Chassin's testimony was complete. [*Compare* A1927-36, 1965-70, *and* 2016-17, *with* SA246-261]. Neither theory holds water.

*Impeachment by contradiction*. This argument fails for three separate reasons. First, neither of the two exhibits (nor any other proposed exhibit) "prove a fact contrary to what [Chassin] asserted." *United States v. Tracey*, 675 F.2d 433, 440 (1st Cir. 1982). They do not prove the Admissions Department traded athletic admissions slots for cash or that donations were considered in the Subco process; indeed, they do not even imply this. Second, the matter—the admission of an athletic recruit who had nothing to do with Singer or the charged conspiracy—was plainly "collateral." *Martinez v. Cui*, 608 F.3d 54, 62-63 (1st Cir. 2010); *see also Cruz-Rodriguez*, 541 F.3d at 30 (affirming refusal to admit evidence under this exception because "[t]he district court could have concluded that although the officer's testimony was relevant to prove a contradiction, the contradiction involved a collateral matter"). And third, as discussed, the exhibits ran afoul of Rule 403, which, as the district court noted, [D.2323 at 2], applies in this context as well. *See United States v. Cudlitz*, 72 F.3d 992, 996-97 (1st Cir. 1996).

*Fed. R. Evid. 806.*  This argument likewise fails for three distinct reasons.

First, no out-of-court statements of Dean Brunold or his staff were "admitted into

evidence for [their] truth," *Pena*, 24 F.4th at 68 (emphasis omitted).  The mere fact

that Chassin said her testimony was geared to the Admissions Department does not

make every member of that department an out-of-court declarant for purposes of

Rule 806.  Wilson cites no case supporting such a radical construction of the rule,

undermining any claim of an abuse of discretion.  Second, Wilson identifies no

pertinent "inconsistent … conduct," Fed. R. Evid. 806, of Dean Brunold or anyone

else in Admissions, and none is apparent.  Third, Rule 403 once again applies here

for the reasons detailed above.  *See Pena*, 24 F.4th at 69-71.

### C.    The Bradshaw-Alvendia Texts

Abdelaziz argues, [A-Br.50-54], the district court erred in excluding text

messages concerning his daughter Sabrina, [A4854-55], exchanged by two USC

admissions officers, neither of whom testified at trial despite the fact that the district

court invited defense counsel to call them both as witnesses, [A1964-65], and one

had appeared on a defense witness list, [D.2202].  Wilson does not join this

argument.  [W-Br.83 n.8].

When defense counsel first offered the texts during cross-examination of

Chassin, the district court sustained the government's hearsay objection.  [A1894].

At the time, counsel said the text messages were not hearsay because they were

141

offered not for their truth but for (a) "the fact that it took place" or "the fact that it happened," and (b) the fact that "it was never shown to [Chassin]," and "[counsel] would like to ask her to explain why her underlings never talked about it with her." [*Id.*].  During a break, counsel filed a motion clarifying the texts were "offered for the state of mind of USC's Department of Admission."  [D.2251 at 1-2].  Back in court, counsel floated an impeachment idea while adverting to the "state of mind" and "business record" exceptions, but the court was unpersuaded. [A1962-65].  Two days later the court issued a written ruling—not addressed by Abdelaziz on appeal—explaining why. [D.2265 at 11-12].  Counsel then filed a motion for reconsideration citing a decision of this Court indicating the state-of-mind rationale may apply to institutions in certain situations.  [D.2275].  The court denied the motion in an order that distinguished that case, [D.2336 at 6-7], and Abdelaziz likewise ignores this order on appeal.

Abdelaziz has now abandoned his argument that the texts should have been admitted as state-of-mind evidence under Fed. R. Evid. 803(3), and the decision he cited below is absent from his brief.  He claims instead that the texts are simply not hearsay.  [A-Br.52-53].  He is wrong.

The vast bulk of the texted statements, including the multiple "lol" and "ha" remarks as well as "Is she *actually* a bball player??," "she's supposedly the best bball player in the Asian international school league?," "it appears she actually plays the

sport!," "I was like um .... Athlete???," "ooohhh athletes …," and "(headbang),"
constitute hearsay "because they were offered to prove the truth of the matter they
*necessarily implied* (a so-called 'implied assertion')," *United States v. Carter*, 19
F.4th 520, 524 (1st Cir. 2021) (emphasis added), namely, that neither declarant
thought Sabrina was a USC-level basketball player.  And the implication that both
declarants held this belief is precisely what the defense wished to harness—without
calling the declarants themselves to testify—in support of the broader position "that
USC knew that some students did not play the sports for which they were recruited
and that USC did not care."  [A-Br.51].

The "implied assertion" rule that this Court noted in *Carter* and alluded to in
*United States v. Diaz*, 597 F.3d 56, 67 (1st Cir. 2010), rests on a solid footing: "The
term 'matter asserted' as employed in Rule 801(c) and at common law includes both
matters directly expressed and matters the declarant necessarily implicitly intended
to assert."  6 Michael H. Graham, *Handbook of Federal Evidence* § 801:1 (9th ed.
2021); *accord United States v. Pulliam*, 973 F.3d 775, 783 (7th Cir. 2020); *United
States v. Torres*, 794 F.3d 1053, 1059-61 (9th Cir. 2015); *United States v. Summers*,
414 F.3d 1287, 1300 (10th Cir. 2005); *see also United States v. Long*, 905 F.2d 1572,
1579-80 (D.C. Cir. 1990) ("[T]he crucial distinction under rule 801 is between
intentional and unintentional messages, regardless of whether they are express or
implied.").

Here, the declarants' cynical texts, laced with sarcasm and littered with "ha" and "lol" remarks, were plainly *intended* to assert that both were skeptical Sabrina was a USC-caliber basketball star.[43]  The very fact that they "joked about whether Sabrina played basketball," [A-Br.51], proves the point: this *intentional* subtext of the texts is what made the conversation funny to them.  And because the defense offered the texts for the truth of these implied assertions, they were hearsay.

At the very least, the district court's hearsay determination, [A1894-95, 1962-65], was far from an abuse of discretion.  And since Abdelaziz no longer asserts any hearsay exception, that ends the matter.

### D.    The Starbucks Video And Other Singer Statements

The next category of proposed exhibits defendants say the district court wrongfully excluded consists of various statements made by Singer—not to these defendants, but in contexts defendants never demonstrated they had any connection to or knowledge of.  Once again, there was no abuse of discretion.

---

[43] This is hardly surprising since the texts were sent at a time when third parties had begun alerting the Admissions Department that certain purported athletic recruits did not play for their high school teams, prompting Admissions to probe the integrity of assertions that had been made to Subco.  [*Supra* 13-14].  And the context explains Bradshaw's factual assertion (also hearsay) that "that has been a problem this year," [A4854].

### 1. The Video

In 2018, Singer visited the Starbucks Corporation headquarters and gave a videotaped presentation about the college admissions process. [A1763, 1768; A4857; GSA449-509]. During a one-minute slice of his rambling 98-minute speech, Singer briefly referred to a "side door" and said he had "created it" and had used it 761 times. [GSA494-95]. He never explained what he meant by the term or what the side-door entailed, however, and quickly moved on to other topics. [*Id.*].

Defense counsel played this part of the video during their openings. [A1022-23, 1043]. When they initially sought to admit the video, the district court sustained relevance and hearsay objections. [A1706, 1728]. Counsel thereafter cited Rules 803(3) and 806, and the court deferred a definitive ruling. [A1765-68]. Two days later counsel tried again based on Rule 803(3), but without luck. [A2190]. Later that day the court issued an order noting (among other things), that defendants had failed to "address persuasively the relevance of the video" or to offer any evidence suggesting they had "knowledge of the presentation" or had "interacted with Singer in a similar context." [W-Add.40-41]. After a round of briefing, [D.2273; D.2288; D.2297; D.2303], and oral arguments that trained on Rules 803(3) and 806, [A3171-75], the court declined to admit the video, [A3176]. The defense reasserted those two grounds the next day, with the same result. [A3216-17]. The court then issued a written ruling in which it rejected the Rule 806 claim and found the video was

irrelevant because (a) defendants had not been aware of the presentation, and (b) "Singer's state of mind is not at issue here." [W-Add.49-51].

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Trial courts are afforded wide latitude in determining whether evidence crosses this low threshold," and this Court "will not disturb an exercise of that discretion unless an abuse looms." *United States v. Williams*, 717 F.3d 35, 41 (1st Cir. 2013). There was no such abuse here.

The Starbucks video did not have "any tendency to make [it] more … probable," Fed. R. Evid. 401, that defendants acted in "good faith," [W-Br.75]—not just because they were ignorant of the presentation, but also because Singer said virtually nothing about the side-door during the one-minute segment in which he alluded to it. Singer merely hinting that he had found a way to game the system and that parents would need to hire him to learn more hardly would have helped "rebut the Government's inference that Wilson knew Singer's pitch was a veiled invitation to crime." [*Id.*]. Hence, the district court supportably found the video irrelevant. *See, e.g.*, *United States v. Florentino-Rosario*, 19 F.4th 530, 538 (1st Cir. 2021); *United States v. Levy-Cordero*, 67 F.3d 1002, 1016 (1st Cir. 1995).

Defendants also say the video was "admissible to impeach Singer's credibility under Rule 806" because unspecified statements in it were "plainly inconsistent with

his *admitted* out-of-court statements, including scripted ones after he began cooperating, portraying the side-door strategy as illegitimate." [W-Br.76]. But Singer's scripted statements were *not* admitted for their truth, as the district court took pains to tell the jury. [A2033]. Rule 806 and defendants' sole cited authority therefore have no relevance here. *Pena*, 24 F.4th at 68; *United States v. Stewart*, 907 F.3d 677, 686-87 (2d Cir. 2018). And regardless, the video's "contents did not contradict [any] statements [defendants] sought to impeach," *United States v. Rodríguez-Berríos*, 573 F.3d 55, 69 (1st Cir. 2009), and defendants make no effort to identify a single out-of-court statement Singer made that was at odds with anything in the video. *See, e.g.*, *United States v. Hunt*, 521 F.3d 636, 644 (6th Cir. 2008) (evidence inadmissible under Rule 806 because "it is not clear that the statements are inconsistent" and the defendant "fails to point out any particular inconsistencies").

Setting aside these problems, there was a further barrier to admission because, as the government noted below, introduction of the video had the potential "to confuse, mislead and distract the jury." [D.2297 at 3]. This is particularly so given that Singer's disjointed and elliptical references to the side-door were made in a context very different from the one in which these defendants dealt with him. That the district court did not expressly invoke Rule 403 does not alter the analysis. *See Breton*, 740 F.3d at 14; *United States v. Smith*, 292 F.3d 90, 98 (1st Cir. 2002).

147

### 2.  The Other Statements

*Books and book outline*.  Defendants note in two sentences, [W-Br.74], that the district court also excluded a book, [Ex.8092; Ex.9695], and book outline, [A4945-46], authored by Singer, but make no developed argument concerning these items.  They offer no details concerning the contents of the three documents and fail to include two in the appendix.  This is waiver.  *See Munyenyezi*, 781 F.3d at 542 n.10.  Regardless, without a meaningful discussion of which specific statements in the exhibits the defense wished to exploit (the defense made no proffer on this below), there is no basis to conclude the court abused its discretion in sustaining the hearsay and relevance objections to the first two, [A1705-06], or the hearsay and Rule 403 objections to the third, [A3335-36].

*Other parents*.  Defendants also call attention to the exclusion of pre-cooperation statements Singer made to other parents in two emails and three intercepted calls.  [W-Br.74].  To the extent they pursue a Rule 806 impeachment claim here, [W-Br.75-76], it cannot succeed because Singer's statements in the *post*-cooperation calls were not admitted for their truth, as noted.  And anyway, defendants fail to point to any concrete contradictions as between the two sets of statements.

Defendants also say they wished to argue from these materials "that Singer pitched the side-door to Wilson in the same way he pitched his advice to other

parents." [W-Br.75]. But this is not a theory of admissibility, and in any event the claim founders on Rule 403. That Singer once told another parent that the "side door is not improper," [W-Br.74], that their money would go to his non-profit and not to a coach, [*id*.], or that he was hobnobbing with the presidents of Harvard and Tufts, [*id.*], has at most only the slightest tendency to show that he said something similar to defendants during their own varied dealings with him. Defendants merely posit the abstract inference that might be drawn from the evidence. [W-Br.75]. They do not explain why the contexts in which Singer made the quoted remarks—contexts that are unclear from the face of the exhibits and would need testimony to be fleshed out—are analogous to their own relationships with Singer. The evidence was thus of miniscule probative value at best.

In addition to objecting on relevance and hearsay grounds, the government relied on Rule 403, noting the threat of mini-trials. [A3171-72, 3336-37, 3505-07; D.2324 at 5-6]. Wilson assures the Court this danger did not exist because "[w]hat matters is that Singer held out the side-door as legitimate to these parents." [W-Br.77 (emphasis omitted)]. But without knowing the precise milieu in which Singer made various comments to other parents—or hearing from those parents directly as to whether they believed Singer when he told them the side-door was "not improper" even as he explained the *quid pro quo* scheme to them—the jury could not evaluate the true import of his remarks or assess the message they were meant to or *did*

149

convey in the circumstances of these other cases. Divorced from the transaction-specific details of the other parents' interactions with Singer, the exhibits would have been misleading and sowed confusion. And the only way those contextual facts could have been supplied is through trial testimony and additional exhibits. Thus, the district court was surely within its rights to exclude the exhibits under Rule 403. *See Encarnacion*, 26 F.4th at 508.

### E.     Wilson's Own Statements

The final evidence-exclusion claim relates to certain of Wilson's statements and is made by him alone. [W-Br.78-79]. When Wilson offered his September 2013 email to Singer asking whether he needed to be concerned about his son's standardized test scores given the pending "school and water polo and applications," [A4927], the district court sustained a hearsay objection, [A3302]. When Wilson offered his May and July 2014 emails to Singer inquiring about the water polo start dates, [A4951-52], the court did likewise, [A3303]. And when Wilson offered his subsequent emails referring Singer to three other families, [A4924 ("This guy can really really help you"), A4925 ("rick is an amazing guy"), A4953 ("Rick has great connections at every university and lots of helpful options")], the district court sustained hearsay, relevance, and Rule 403 objections, [A3300-01]. In each instance, defense counsel argued the exhibits were not offered for the truth of the

matters asserted in them but rather as "state of mind" evidence, apparently invoking Rule 803(3).  [A3301-03].

On appeal, Wilson does not rely on Rule 803(3)'s state-of-mind exception, seemingly recognizing the difficulties it presents.  *See, e.g.*, *United States v. Cianci*, 378 F.3d 71, 105-06 (1st Cir. 2004).  Instead, in an effort to skirt the problem, he argues the exhibits were non-hearsay evidence of his "good faith," [W-Br.78-79], citing reasons he did not articulate below, [A3301-03].  This distinction is invented. And even assuming favorably to him that he has preserved his claim here, there was no abuse of discretion.

Given Wilson's terse treatment of the issue at trial, [*id.*], the district court would be surprised now to learn that the purported significance of his statements in the emails lay "*solely* in the fact that [they were] made."  *Sabean*, 885 F.3d at 41 (emphasis added).  *Cf. United States v. West*, 877 F.3d 434, 440 (1st Cir. 2017) ("[W]hile West contends that he sought to introduce each of these statements solely to show that he had an innocent state of mind at the time that he made them, the inference that West had an innocent state of mind at that time could be drawn by the jury only if the jury found that the statements were true.").  And of course, it is settled that "a party cannot introduce [his] own statements, or those of [his] own employee, conspirator, agent, and so on, under Rule 801(d)(2)," since otherwise "parties could effectuate an end-run around the adversarial process by, in effect, testifying without

swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." 30B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 6772 (2022 ed.) (cleaned up); *accord United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985). Beyond that, Wilson does not address the obvious Rule 403 problems with respect to the last three emails—which contained numerous out-of-court statements by Wilson and unknown third parties on extrinsic matters, torn from the context in which the emails were exchanged and with no background on the "trusted colleagues and friends," [W-Br.79], who appeared in the email chains—so he has waived the point. *United States v. Mayendía-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018). And finally, it is farfetched to think that the exclusion of this evidence—which had at best *de minimis* value as proof of his "good faith"—affected the outcome of his trial.

## F.    Any Conceivable Error Was Harmless

As this Court has stated, "not all improper exclusions of evidence require reversal." *United States v. Legarda*, 17 F.3d 496, 499 (1st Cir. 1994). Reversal plainly is not warranted here because, even if defendants preserved every one of their appellate claims, "it is 'highly probable' that the exclusion of the [proposed defense evidence] did not contribute to the verdict." *United States v. Taylor*, 848 F.3d 476, 485 (1st Cir. 2017).

For starters, the evidence defendants individually claim was erroneously excluded had little hope of bolstering their conspiracy defense. Knowledge is not synonymous with consent, [*supra* 54-55], and Abdelaziz's reliance on the Bradshaw-Alvendia text exchange to suggest the latter would have fallen flat given record evidence showing the Admissions Department's reaction to learning of the fraud, [*supra* n.43]. Meanwhile, what Wilson refers to as an email demonstrating he was "fretting about his son's exam scores," [W-Br.78], was consistent with questioning whether Johnny had to worry more about test scores at all given the side-door arrangement in place, and emails about start dates for water polo practice were likewise consistent with questioning how much effort was needed to keep up the pretense that Johnny was a legitimate recruit. In fact, the latter emails show that Vavic ignored Johnny for at least two months in the immediate lead-up to the start of the season, [A4951; A4952], which hardly squares with the notion that Vavic had recruited Johnny as the soon-to-be fastest player on his team. Finally, Wilson's referrals to other parents were unremarkable even under the most defense-friendly view given uncontested evidence that Singer provided legitimate college-counseling services in addition to illegitimate ones. [*E.g.*, A1670-71, 1733].

Further, though Wilson claims the government "relied on the conspiracy evidence to prove the *substantive* counts against [him]," [W-Br.71], any inference from the evidence flowed in the opposite direction. Wilson's deal regarding his

153

daughters was caught on tape and left no room for ambiguity about whether he believed them to be legitimate recruits and intended his "donations" as bribes. [*Supra* 19-28]. If anything, those conversations informed the jury's view of his dealings with Singer regarding his son, not the other way around, hence why the government began its closing by citing them. [A3635-36].

Exclusion of the remaining evidence was likewise harmless. The best evidence of defendants' knowledge, intent, and "good faith" was found not in statements Singer made to different people in different contexts, or in USC documents defendants were ignorant of. It was found in their own written and recorded words, which overwhelmingly established their guilt and consciousness thereof. Furthermore, as discussed above, review of Singer's statements shows they offered no information about the mechanics of the side-door scheme. And review of the USC exhibits illustrates that remarkably few even involve Admissions Department personnel, and none establish or even imply that Admissions sanctioned being misled about the athletic qualifications of students presented to Subco as athletic recruits. If anything, the USC exhibits suggest the fraud by Heinel and others in Athletics was more pervasive than charged in this case, and that does not advance defendants' cause. *See United States v. Sans*, 731 F.2d 1521, 1530 (11th Cir. 1984) ("Whether the appellants knew that other bankers disobeyed the law was

not relevant to whether they acted knowingly in failing to file the forms or whether they acted with specific intent to ignore the law.").

In sum, defendants were convicted based on their own words—and the falsified profiles sitting in their inboxes. None of the excluded evidence casts doubt on that outcome.

## V.    ABDELAZIZ'S UNPRESERVED NEW TRIAL CLAIM FAILS

Abdelaziz argues, [A-Br.47-50], that a new trial is mandated because he was prejudiced by the delayed *admission* of three email exhibits, [A4850; A4853; A4881], that he wished to use during cross-examination of Mikaela Sanford. The record refutes this unpreserved claim.

When the government withdrew its objection to the three exhibits and they were admitted, Abdelaziz claimed victory but not prejudice. [D.2303 at 1]. He never sought to call Sanford in his own case to ask her about the exhibits. And he made no mention of the delayed admission in his new trial motion. [D.2412]. Because his prejudice argument makes its debut on appeal, review is for plain error. *United States v. Ocean*, 904 F.3d 25, 40 (1st Cir. 2018) ("[R]eview of objections not raised by the appellant at trial is for plain error"). And since he does not try to satisfy the four-part plain-error test, his argument here is waived. *United States v. Pabon*, 819 F.3d 26, 33-34 (1st Cir. 2016).

The argument is groundless anyway.  The record reflects that defense counsel made fruitful use of all three exhibits in cross-examining Sanford, extracting some concessions from her, including that she had not copied Abdelaziz on an email in which she asked Singer for Sabrina's profile.  [A1745-49, 1793-96].  Counsel also published the exhibits after they were admitted, highlighting the key text he wished to emphasize, [A3214-15], and employed them once again in his closing argument, [A3716-17].  And in the end, counsel chose not to call Sanford herself, no doubt because there was nothing to be gained by it.  Against this backdrop, there is no basis to think Abdelaziz was prejudiced, let alone that the verdict was altered by the delay in the exhibits' admission, and thus any claim of plain error necessary fails.

## VI.    WILSON IS NOT ENTITLED TO A NEW TRIAL ON THE TAX COUNT

Finally, Wilson argues the various alleged errors compel a new trial on "the derivative tax count."  [W-Br.80].  Yet the tax count was not derivative in the way he suggests.  The tax count was based on his deduction of payments made to secure his son's admission to USC as a purported water polo recruit, but whether as a legal matter those payments amount to bribes or admissions slots amount to property was beside the point.  To convict Wilson of tax fraud, it was sufficient for the jury to find that Wilson willfully made a false statement as to a material matter on his tax return by falsely claiming the payments were business expenses and/or that he received no

goods or services in exchange for them. The evidence easily supported both findings, and none of the purported errors undermine the jury's verdict.

Wilson's primary argument is that the jury's guilty verdict on the tax count must be set aside because it is impossible to know whether it rested on a legally invalid bribery theory. [W-Br.80, 83 (citing *Yates*, 354 U.S. at 312)]. But first, the bribery theory was sound for all the reasons discussed above. [*Supra* 42-66]. And second, even if the bribery theory were flawed, it is not for lack of a *quid pro quo*. [*Supra* 44-45, 47]. The sufficiency of the evidence to demonstrate a *quid pro quo* is not in dispute, and further, the jury's embrace of the bribery theory in the special verdict form for the conspiracy count shows that it necessarily found Wilson engaged in a *quid pro quo*. [A3835 (instructing that breach of fiduciary duty for honest-services fraud requires a *quid pro quo*); GSA1-2 (verdict form)]. That "this for that" finding, in turn, means the jury found that Wilson received goods or services in exchange for his payments, making his charitable deduction fraudulent. There is no reversible *Yates* problem here, *see United States v. Holland*, 116 F.3d 1353, 1359 & n.4 (10th Cir. 1997) (no vacatur required where verdict included inherent finding of facts required to convict on legally valid theory); *see also United States v. Sorich*, 709 F.3d 670, 673-74 (7th Cir. 2013) (applying harmless error analysis to *Yates* claim), and Wilson's effort to concoct a contrary concession from

157

a single sentence taken out of context from a post-trial argument concerning *evidentiary* sufficiency fails, [*see* W-Br.80; A3969-70].

Wilson's argument that the property theory taints the tax conviction, [W-Br.81], is equally meritless.  Here again, the legal theory was valid, [*supra* 70-83], but would not upend the verdict in any event.  Wilson hypothesizes the jury "might have" reasoned like the district court did at sentencing that the deductions were disallowed because Wilson's payment was "fraudulent," [W-Br.81 (citing A4020)], but nothing in the indictment, presentation of evidence, or jury instructions suggested guilt for tax fraud could be based on such a generalized finding.  [*E.g.*, A284; A3119; A3846].  Moreover, nothing in the jury instructions suggested that the definition of "property" was relevant to anything other than mail and wire fraud.  [A3827 ("*For purposes of the mail and wire fraud statutes*, admissions slots are the property of the Universities." (emphasis added))].

Wilson's remaining arguments, [W-Br.81-83], largely repeat his prior claims of error and fail for the same reasons.  [*Supra* 87-115, 121-41, 144-55].  And indeed, his refrain of harm to his good-faith defense rings especially hollow in the context of his tax fraud.  Wilson had made true charitable contributions in the past.  [*E.g.*, A2617, 2635].  He also knew the size of a donation that would be required to secure a university-sanctioned second look, because Singer told him: it would reach into the millions.  [A4601].  Wilson chose the illegitimate side-door path because it

offered him more—a guarantee of admission—for less—a few hundred thousand dollars. Upon his son's admission as a fake recruit, he requested an "invoice" for "making this happen"; asked whether he could "make [the payment] for consulting or whatever" from Singer's for-profit business (*not* his purported charity); thereafter settled on a split among a "donation," "business expenses," and a payment directly to Singer; and gave his tax preparer a false invoice describing "[s]pecial consulting income concept, design, and implementation of professional development program," which never occurred. [*Supra* 33-35]. No amount of the alleged improperly admitted or excluded evidence—including Wilson's proposed "offset" evidence, [W-Br.82-83]—impacts the conclusion compelled by these facts: that Wilson committed tax fraud, and in more ways than one.

## VII.    THE SUPPRESSION CLAIM IS DOUBLY WAIVED AND BASELESS

Abdelaziz says Rick Singer's consensually-recorded phone calls should have been suppressed because AT&T was not authorized to provide technical assistance with those interceptions. [A-Br.55-64]. Wilson adopts this claim. [W-Br.83 n.8]. The argument is waived for two separate reasons: (1) defendants fail to address the district court's ruling that AT&T's assistance comported with Title III; and (2) the court did not abuse its discretion in finding there was no "good cause" for their untimely suppression motion, which was filed 17 months late. The argument also fails on the merits on two independent grounds: (1) two sessions of the district court

correctly rejected defendants' construction of Title III, and no court has held otherwise; and (2) the defense reading of the statute would not justify suppression even if this Court were to embrace it.

### A.    Background

On September 21, 2018, federal agents approached Singer based on information they had gathered, including evidence from four consecutive 30-day wiretaps of his phone number ending in -8802. [W-Add.79-80; A326; A2022]. The last of those court-authorized wiretaps was set to expire at midnight on September 28/29, 2018. [W-Add.79-80; A326].

On September 27, 2018, after conferring with his attorney, Singer signed a consent form stating, among other things: "I consent to the interception and recording of any and all communications made by me over all telephones, cellular or otherwise, provided to or made available to me by law enforcement agents in connection with actions taken by me in connection with law enforcement agents." [A362]. Singer and his attorney signed the consent form in the presence of federal agents. [A362]. The next morning, September 28, the government faxed the signed consent form to Singer's phone provider, AT&T, along with a letter noting that, in accordance with Title III, "consent of one of the parties to a communication is sufficient under the law to permit monitoring without court order." [W-Add.80;

A361; A4185].[44]   One pertinent interception occurred after AT&T received the consent form on September 28 and before the court-ordered wiretap expired at midnight.  [W-Add.80-81; A4186].

On October 2, 2018, the government informed the district court that Singer had begun cooperating, that he had consented to the recording of his calls, and that the court-authorized interceptions of his phone that had commenced pursuant to the court's most recent renewal of the wiretap on August 30, 2018 had therefore ceased on "September 27 [*sic*, should read "29"], 2018."  [W-Add.80; D.2128-1 at 2-3].

Between September 28, 2018 and March 11, 2019, at the direction of law enforcement, Singer made consensually-recorded calls from his phone to defendants and others, and the government intercepted and monitored those calls with technical assistance from AT&T.  [A326; A547-48; A2028-29].

A mere eight days before trial, defendants moved to suppress thirteen of the calls, principally on the ground that AT&T's technical assistance violated a provision of Title III: 18 U.S.C. §2511(2)(a)(ii).   [D.2128].   In response, the government argued: the motion was untimely under Fed. R. Crim. P. 12(c)(3) because it was filed 17 months past the court-imposed deadline for such motions and

---

[44] The letter was inadvertently dated September 20, 2018.  [A361].   In December 2018, Singer signed an identical consent form that the government provided to AT&T with an identical cover letter.  [W-Add.81; A363-64].

there was no "good cause" for the extraordinary delay; and, in any event, AT&T's assistance was lawful under other Title III provisions, including 18 U.S.C. §2511(2)(c), and nothing in §2511(2)(a)(ii) altered that conclusion or required suppression.  [D.2151].  Defendants thereafter filed a reply.  [D.2155].

In a written ruling issued on the third day of trial, the district court found that the suppression motion was untimely and that "[d]efendants have not shown good cause for their delay here."  [D.2211 at 3].  After this waiver finding, however, the court went on to reject the motion on the merits.  Citing a decision of this Court and §2511(2)(c), the court observed that "Singer gave his consent to the recording of his conversations which defendants seek to suppress, and thus the recordings fall within that exception."  [*Id.* at 3-4].  It then reasoned: "Nor must the wiretaps be suppressed because AT&T aided the government in their execution.  Regardless of whether AT&T is covered by §2511(2)(c), a wire provider such as AT&T is a 'person' as that term is defined in 18 U.S.C. §2510(6).  Therefore, AT&T's assistance would be encompassed within the exception contained in §2511(2)(d)."  [*Id.* at 4].

On October 25, 2021, Judge Talwani denied a nearly identical suppression motion filed by two Varsity Blues defendants, explaining at length why Judge Gorton's rationale and result were both correct.  *United States v. Heinel*, No. 19-cr-10081-IT, 2021 WL 4948216, at *2-5 (D. Mass. Oct. 25, 2021).  Following trial,

Judge Gorton cited his suppression ruling in dismissing discovery violation claims relating to the consensual recordings.  [W-Add.77-82].

**B.    The Claim Is Waived Twice Over**

      **1.    Defendants Have Waived Their Claim By Failing to Address the District Court's Merits Ruling**

Defendants say the district court rested its suppression ruling on a waiver finding alone and "fail[ed] to consider the wiretap issue." [A-Br.62-64].  That is untrue, as shown above.  In line with this ostrich approach, defendants omit the court's written decision from their addenda and appendix, despite rules requiring its inclusion. *See* Fed. R. App. P. 30(a)(1)(C); 1st Cir. Local Rules 28.0(a)(1), 30(a)(1)(c).  And in denying the existence of the merits ruling, they naturally make no effort to engage with its reasoning.

By "inexplicably fail[ing] to address the district court's alternative basis for denying the suppression motion" in their opening briefs, defendants have waived their appellate claim. *United States v. Henry*, 848 F.3d 1, 7 (1st Cir. 2017) ("Henry's failure to preserve for our review any challenge [in his opening brief] to the district court's alternative basis for denying the motion to suppress leaves us no choice but to affirm."); *see also Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018) (appellate claim waived where lawyer "chose to pretend that his client lost on a jurisdictional ground" and did not address merits-based ruling).

163

    **2.**    **The District Court Did Not Abuse Its Discretion in Finding the Claim was Waived Because There Was No "Good Cause" for the Late Filing**

The district court found there was no "good cause" under Fed. R. Crim. P. 12(c)(3) for defendants' untimely suppression motion filed 17 months after the deadline. [D.2211 at 3]. This Court "review[s] a district court's decision to deny relief under Rule 12(c)(3) solely for abuse of discretion," *United States v. Santana-Dones*, 920 F.3d 70, 80 (1st Cir. 2019), and "will find an abuse of discretion only when left with a definite conviction that no reasonable person could agree with the judge's decision," *United States v. Maldonado-Peña*, 4 F.4th 1, 56 (1st Cir. 2021) (cleaned up). There was no such abuse here.

While defendants tried to excuse their tardiness on several grounds below, [D.2128 at 12; D.2155 at 4], they now limit their "good cause" claim to a single assertion: that they did not know AT&T had provided technical assistance with the consensually-recorded phone calls until one month before trial, when the government moved to authenticate the calls, [D.2099], and attached to its motion an affidavit discussing certain aspects of the technical assistance, [D.2099-1; A547-49]. [A-Br.62-63].

This excuse does not wash. As the government pointed out below, more than two years before defendants filed their suppression motion, they received the recordings of all the intercepted calls as well as related sealed filings, including the

164

documents attached to their suppression motion as Exhibit A (a motion to seal),
Exhibit B (the faxed letter to AT&T requesting assistance), and Exhibit C (Singer's
signed consent form transmitted in the same fax). [D.2151 at 1, 6]. The letter to
AT&T made clear that the consensually-recorded phone calls were intercepted with
"assistance" from AT&T; indeed, such assistance is precisely what the letter sought.
[A361]. And in the accompanying consent form provided to AT&T, Singer agreed
to such "interception and recording" of his calls. [A362].

It is true Judge Talwani found "good cause" for the untimely suppression
motion filed in her session. *See Heinel*, 2021 WL 4948216, at *2. Notably, however,
Judge Talwani did not explain why the letter to AT&T failed to supply notice of
AT&T's role. *Id.* And in any event, it is settled that "two judges can decide
discretionary matters differently without either judge abusing his or her discretion."
*Ellis v. United States*, 313 F.3d 636, 653 n.10 (1st Cir. 2002) (collecting cases).
Defendants fail to cite a single decision overturning a district court's Rule 12(c)(3)
waiver finding, and this Court has consistently upheld such findings. *See, e.g.*,
*United States v. O'Neal*, 17 F.4th 236, 244 (1st Cir. 2021); *Santana-Dones*, 920 F.3d
at 81; *United States v. Arias*, 848 F.3d 504, 513-14 (1st Cir. 2017); *United States v.
Lugo Guerrero*, 524 F.3d 5, 11 (1st Cir. 2008); *United States v. Santos Batista*, 239
F.3d 16, 19 (1st Cir. 2001). There is no reason for a different result here.

### C.    There Is No Basis For Suppression

Waivers aside, defendants' suppression theory also fails on the merits for two distinct reasons. Should the Court address their interpretation of Title III, review is *de novo*. *See United States v. De La Cruz*, 998 F.3d 508, 511 (1st Cir. 2021).

### 1.    Defendants Misread Title III

Defendants do not fault the district court's factual determination, [D.2211 at 3-4], that Singer validly consented to the interceptions throughout the five-month period of the monitoring. That consent triggered two provisions that plainly allowed the interceptions, *see United States v. Conley*, 531 F.3d 56, 58 (1st Cir. 2008), as well as AT&T's involvement in them to effectuate the monitoring:

> (c) It shall not be unlawful under this chapter for *a person* acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.
>
> (d) It shall not be unlawful under this chapter for *a person* not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. §2511(2)(c)-(d) (emphasis added). As the district court noted, a wire provider such as AT&T is a "person" for these purposes, *see id.* §2510(6) (defining

166

"person" to include a "corporation" as well as other entities), and thus, "[r]egardless of whether AT&T is covered by §2511(2)(c) … AT&T's assistance would be encompassed within the exception contained in §2511(2)(d)." [D.2211 at 4]. A second judge in this district agrees. *See Heinel*, 2021 WL 4948216, at *3-4. No court has held to the contrary.[45]

This view of the statute dovetails with other Title III provisions. For example, "[a]n … entity providing electronic communication service to the public may *divulge the contents* of any such communication" not just "as otherwise authorized in section 2511(2)(a)," 18 U.S.C. §2511(3)(b)(i) (emphasis added), but also "with the *lawful consent* of the *originator* or any addressee or *intended recipient* of such communication," *id.* §2511(3)(b)(ii) (emphasis added). During the consensual recordings, Singer was variously the "originator" and "intended recipient" of every call. As a result, AT&T enjoyed a qualified defense to a civil or criminal action based on any such divulgement: "A good faith reliance on … a good faith determination that section 2511(3) … of this title permitted the conduct complained of … is a complete defense against any civil or criminal action brought under this chapter or any other law." *Id.* §2520(d)(3).

---

[45] Defendants refer to AT&T's assistance as a "wiretap," [A-Br.55-61], but the operative Title III provisions place no limitation on the manner of the "interception" provided that one party has given "prior consent." 18 U.S.C. §2511(2)(c)-(d).

Against all this, defendants argue that a distinct Title III provision effectively barred AT&T from any involvement in the consensual recordings despite the plain terms of 18 U.S.C. §§2511(2)(c) and (d):

> Notwithstanding any other law, providers of wire or electronic communication service … are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications … if such provider … has been provided with—
> (A) a court order directing such assistance … or
> (B) a certification in writing by a person specified in section 2518(7) of this title or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required,
> …. No provider of wire or electronic communication service … shall disclose the existence of any interception or surveillance … with respect to which the person has been furnished a court order or certification under this chapter … [subject to exceptions]. Any such disclosure, shall render such person liable for the civil damages provided for in section 2520. No cause of action shall lie in any court against any provider of wire or electronic communication service … for providing information, facilities, or assistance in accordance with the terms of a court order, statutory authorization, or certification under this chapter.

*Id.* §2511(2)(a)(ii).

As Judge Talwani has explained, defendants misread §2511(2)(a)(ii):

> [T]he language of section 2511(2)(a)(ii) does not purport to limit consensual interceptions permitted under sections 2511(c) or (d). Instead, the subsection begins "[n]otwithstanding any other law, providers … are authorized to provide information, facilities, or technical

> assistance …" and then sets the alternatives of a court
> order or appropriate certification. *Id.* If the provider has
> not been given such an order or certificate, the providers'
> interceptions that violate such other laws are unlawful, and
> *the provider facilitating the interceptions does so at its*
> *own peril*. In other words, the subsection serves as a safe
> haven for providers but not as an additional requirement
> for a consensual interception permitted under sections
> 2511(c) and (d).

*Heinel*, 2021 WL 4948216, at \*4. Furthermore, the legislative history cited by the

defense, [A-Br.58 n.17], merely bolsters this "safe harbor" interpretation. *Id.* Thus,

§2511(2)(a)(ii) "does not override the consent provisions set forth in sections

2511(c) or (d)." *Id.*[46]

## 2.    Suppression is Not Warranted in Any Event

Defendants posit that if their view of §2511(2)(a)(ii) prevails, suppression

must follow as a matter of course. [A-Br.61-62]. That is not the case.

Title III creates a statutory right to suppression in limited circumstances, *see*

18 U.S.C. §2515, but "it is well-settled that not every failure to comply fully with

any requirement provided in Title III necessitates suppression." *United States v.*

*Escobar-de Jesús*, 187 F.3d 148, 171 (1st Cir. 1999). Even if §2511(2)(a)(ii) limits

the scope of §§2511(2)(c) and (d) in the way defendants suggest, they offer no

---

[46] Although Judge Talwani reserved decision on whether Singer's consent was
effective throughout the operative period, *Heinel*, 2021 WL 4948216, at \*4-5, she
ultimately found that it was, [19-cr-10081-IT, D.1079].

169

plausible reason to think Congress intended that every failure to comply with §2511(2)(a)(ii) must result in suppression under §2515. If an interception is substantively lawful due to valid consent (as it was here), it would be odd indeed if a procedural flaw involving the technical assistance of a carrier could—without more—require suppression. Defendants cite no authority supporting such a counterintuitive outcome.

A decision of this Court is closely on point. In *United States v. Lopez*, the Court held that "the government violated Title III by failing to disclose to the issuing judge that civilian monitors would be utilized during the interception process," that the government thereby withheld "important information about the manner in which the wiretap [would] be conducted," and that this had "frustrate[d] the objectives" of several Title III provisions. 300 F.3d 46, 54-55 (1st Cir. 2002). The Court went on to observe, however, that "violations of even … central requirements [of Title III] do not mandate suppression if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." *Id.* at 56 (cleaned up). The Court then held that suppression was not required because "the wiretap was conducted in [a] manner that preserved the core protective purposes of Title III." *Id.* at 56. In reaching this conclusion, the Court emphasized that "[t]he undisclosed use of civilian monitors did not affect the likelihood that the wiretap would be authorized in the first place, nor did it increase the wiretap's intrusion on

privacy interests," and "there is no indication that the government's violations of Title III were willful or knowing." *Id.* In support of the latter point, the Court found the following significant: "We are the first court of appeals to hold that Title III requires the government to disclose any plans to employ civilian monitors; indeed, we appear to be the first court that has been squarely presented with the issue." *Id.*

This case is aligned with *Lopez*. The core protective function of Title III was preserved here because Singer's valid consent made the ensuing interceptions entirely lawful, and indeed the government was not even required to obtain prior judicial approval to embark on this process given his consent. *See* 18 U.S.C. §2511(2)(c)-(d); *Conley*, 531 F.3d at 58. There is no sign that, if the government had sought an order "directing" the assistance of AT&T under §2511(2)(a)(ii)(A), the district court would have balked or the consensual monitoring would not have occurred. Nor have defendants shown that AT&T's assistance appreciably increased any intrusion on privacy interests. Even without that assistance, the government and Singer could have found other ways to monitor and record incoming and outgoing calls. AT&T's assistance made the process more efficient, but it did not capture calls that could not have been heard and recorded by other means. Finally, there is no evidence that any violation of §2511(2)(a)(ii) was deliberate. Quite the opposite. Two judges have rejected defendants' interpretation of Title III, and that judicial consensus rests on a reasonable understanding of the statute. Conversely, no court

has adopted defendants' contrary view, and whatever else may be said, it is far from obvious that that view is correct.

By all metrics, there is simply no justification for the "extreme sanction of exclusion," *Herring v. United States*, 555 U.S. 135, 140 (2009) (cleaned up), even if this Court disagrees with the statutory analysis of Judges Gorton and Talwani. *Cf. Heien v. North Carolina*, 574 U.S. 54, 61-62 (2014) (denying suppression because mistake of law was reasonable). Given the technical nature of the alleged violation, the lack of any evidence of ill motive, and the absence of authority supporting the defense position, there is no sufficient reason to employ "the massive remedy of suppressing evidence of guilt," *Hudson v. Michigan*, 547 U.S. 586, 599 (2006).[47]

---

[47] Defendants suggest in passing, [A-Br.56], that Singer's written consent applied only to government-issued phones and not to his personal phone, but this position has failed to impress two judges, no doubt because the written consent applied to "*all telephones*, cellular or otherwise, provided to or *made available* to [Singer] by law enforcement agents," [A362 (emphasis added)], and by allowing Singer to use his own phone for the monitored calls the agents made it "available" to him for that purpose. Singer also impliedly consented to this procedure by repeatedly using his phone to make and receive calls that he knew were being intercepted and recorded pursuant to his written consent. *See Gilday v. Dubois*, 124 F.3d 277, 296 (1st Cir. 1997). And regardless, the notion that this issue could require suppression is farfetched, which explains why defendants make no developed argument along these lines, resulting in waiver. *See United States v. Congo*, 21 F.4th 29, 35 (1st Cir. 2021).

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court

affirm the judgments.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   */s/ Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
DONALD C. LOCKHART

IAN J. STEARNS
STEPHEN E. FRANK
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant U.S. Attorneys

173

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**

**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 41,991 words (on July 22, 2022, the Court granted the government's motion to file an oversized responsive brief not to exceed 42,000 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2016.

 /s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

Dated:  August 5, 2022

174

### CERTIFICATE OF SERVICE

I, Alexia R. De Vincentis, Assistant U.S. Attorney, hereby certify that on August 5, 2022, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

*Counsel for Defendant-Appellant Gamal Abdelaziz:*
Brian T. Kelly, Esq.
Joshua C. Sharp, Esq.
Lauren A. Maynard, Esq.
Nixon Peabody LLP
53 State Street
Boston, MA 02109

*Counsel for Defendant-Appellant John Wilson:*
Noel J. Francisco, Esq.
Yaakov M. Roth, Esq.
Harry S. Graver, Esq.
Jones Day
51 Louisiana Avenue, NW
Washington, D.C. 20001

Michael Kendall, Esq.
Lauren M. Papenhausen, Esq.
White & Case LLP
75 State Street
Boston, MA 02109-1814

Andrew E. Tomback, Esq.
McLaughlin & Stern, LLP
260 Madison Avenue,
New York, NY 10016

/s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney